# *EXHIBIT C*

GB/H Bid Submission 12/28/2018
Confidential

## AGENCY AGREEMENT

This Agency Agreement (the "Agreement") is entered into as of this 28th day of December, 2018, by and between Sears Holdings Corporation, a Delaware corporation, and its undersigned subsidiaries (collectively, "Merchant"), and a contractual joint venture comprised of Gordon Brothers Retail Partners, LLC and Hilco Merchant Resources, LLC (jointly, severally and collectively, the "Agent"; and collectively with Merchant, the "Parties").

## RECITALS

WHEREAS, on October 15, 2018, Merchant, together with certain of its affiliates, filed voluntary petitions for relief commencing cases under chapter 11 of Title 11, United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The chapter 11 cases are currently pending before the Bankruptcy Court under case number 18-23538 (the "Bankruptcy Case").

WHEREAS, Merchant operates certain retail stores in the United States and desires that Agent act as Merchant's exclusive agent for the limited purpose of (a) selling all of the Merchandise (as hereinafter defined) located in 425 of Merchant's retail store locations identified on Exhibit A-1 attached hereto (each individually a "Store", and collectively the "Stores") and certain of Merchant's distribution centers identified on Exhibit A-2 attached hereto (the "Distribution Centers"), inclusive of In-Transit Merchandise and Distribution Center Merchandise (each as defined below) that is received in the Stores on or before the Receipt Deadline (defined below), and, if Agent exercises the option under section 8.9, the E-Commerce Platform and (b) to the extent so elected by Merchant, selling all of the Owned FF&E (as hereinafter defined) located in the Stores (but not the Distribution Centers or Merchant's corporate offices (the "COs")) (subject to Section 15 below), in each case by means of such themed sale as more fully set forth herein (as further described below, the "Sale").

WHEREAS, Merchant has entered into one or more consulting agreements with Abacus Advisors LLC (the "Abacus Agreements") to sell all merchandise, furniture, fixtures and equipment located at the retail stores identified on Exhibit A-3 (the "Fee Stores") (which consulting agreements shall be the sole agreements governing liquidation sales at the Fee Stores and the sales at which will not be governed by this Agreement).

WHEREAS, reference is made to (i) that certain Third Amended and Restated Credit Agreement, dated as of July 21, 2015 (as amended, supplemented or otherwise modified from time to time), by and among Sears Roebuck Acceptance Corp. and Kmart Corporation (individually, a "Borrower", and collectively, the "Borrowers"), Merchant and the other guarantors party thereto from time to time, Bank of America, N.A., as Administrative Agent (as defined therein), and Bank of America, N.A. and Wells Fargo Bank, National Association, each as Co-Collateral Agent (as defined therein), and the lenders party thereto (and other parties secured jointly therewith) from time to time, (ii) that certain Letter of Credit and Reimbursement Agreement, dated as of December 28, 2016 (as amended, supplemented or otherwise modified from time to time), by and among Merchant, the Borrowers, the financial institutions party thereto from time to time as L/C Lenders, and Citibank N.A., as Administrative Agent and Issuing Bank, (iii) that certain Second Lien Credit Agreement, dated as of September 1, 2016 (as amended, supplemented, or otherwise modified

- 1 -

HIGHLY CONFIDENTIAL                                                              SEARS_507B_00000772

from time to time), by and among Merchant, the Borrowers, the lenders party thereto, and JPP, LLC as administrative agent and collateral administrator, (iv) Indenture, dated as of October 12, 2010 (as amended, supplemented, or otherwise modified from time to time), by and among Merchant, the guarantors party thereto and Wilmington Trust, National Association as Trustee and Collateral Agent, governing the 6 5/8% Senior Secured Notes which mature on October 15, 2018 and the noteholders thereof, (v) Indenture, dated as of March 20, 2018 (as amended, supplemented, or otherwise modified from time to time), by and among Merchant, the guarantors party thereto and Computershare Trust Company, N.A, governing the 6 5/8% Senior Secured Convertible PIK Toggle Notes which mature on October 15, 2019, (vi) that certain Superpriority Senior Secured Debtor-In-Possession Asset-Based Credit Agreement, dated as of November 29, 2018, by and among, the Borrowers, Merchant and the other guarantors party thereto from time to time, the lenders from time to time party thereto (the "Senior DIP Lenders"), Bank of America, N.A., as administrative agent (the "Senior DIP Agent"), and Bank of America, N.A. and Wells Fargo Bank, National Association, each as co-collateral agent, and (vii) that certain Superpriority Junior Lien Secured Debtor-In-Possession Credit Agreement, dated as of November 29, 2018 (as amended, restated, supplemented or otherwise modified from time to time), by and among the Borrowers, Merchant and the other guarantors party thereto from time to time, the lenders from time to time party thereto (such lenders, together with the Senior DIP Lenders, the "DIP Lenders"), Cantor Fitzgerald Securities, as administrative agent (together with the Senior DIP Agent, the "DIP Agents").

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent and Merchant hereby agree as follows:

Section 1.   Definitions and Exhibits.

1.1   Defined Terms.  The terms set forth below are defined in the Sections referenced of this Agreement:

| Defined Term | Section Reference |
| --- | --- |
| Abacus Agreements | Recitals |
| Actual Test Store Results | Section 5.1(b)(i) |
| Additional Agent Merchandise | Section 8.10(a) |
| Additional Agent Merchandise Fee | Section 3.1(c) |
| Additional Agent Merchandise Proceeds | Section 3.1(c) |
| Additional Taxes and Penalties | Section 8.3(a) |
| Adjustment Amount | Section 3.3(a) |
| Agency Accounts | Section 3.3(b)(ii) |
| Agency Documents | Section 11.1(b) |
| Agent | Preamble |
| Agent's Fee | Section 3.1(b) |
| Agent's FF&E Commission | Section 15(a) |
| Agent Claim | Section 12.5 |
| Agent Collateral | Section 16.11(a) |
| Agent Indemnified Parties | Section 8.3(a) |

- 2 -

US_137191272v1_340878-00024 12/27/2018 2:05 PM

HIGHLY CONFIDENTIAL                                   SEARS_507B_00000773

| | |
|---|---|
| Agreement | Preamble |
| Allocation Schedule | Section 5.2(b) |
| Applicable General Laws | Section 2(c) |
| Approval Order | Section 2(b) |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Benefits Cap | Section 4.1(c) |
| Borrower(s) | Recitals |
| Central Services | Section 4.1 |
| Central Services Expenses | Section 4.1 |
| Committee | Section 8.7(b) |
| Control Agreement | Section 3.3(b)(i) |
| COs | Recitals |
| Cost Factor Threshold | Section 3.1(f) |
| Cost File | Section 5.3(a) |
| Cost Value | Section 5.3(a) |
| Defective Merchandise | Section 5.2(b) |
| Designated Deposit Accounts | Section 3.3(b) |
| DIP ABL Financing Order | Section 3.3(e) |
| Distribution Centers | Recitals |
| Distribution Center Expenses | Section 4.1 |
| Distribution Center Merchandise | Section 5.2 |
| E-Commerce Platform | Section 8.9 |
| E-Commerce Platform Expenses | Section 8.9 |
| Estimated Guaranteed Amount | Section 3.3(a) |
| Events of Default | Section 14 |
| Excluded Benefits | Section 4.1 |
| Excluded Defective Merchandise | Section 5.2(b) |
| Excluded Price Adjustments | Section 5.3(b) |
| Excluded Sears Businesses | Section 5.2(a) |
| Expenses | Section 4.1 |
| Fee Stores | Recitals |
| Final Inventory Report | Section 3.3(a) |
| Final Reconciliation | Section 8.7(b) |
| Final Reconciliation Settlement Date | Section 8.7(b) |
| Force Majeure Event | Section 8.8 |
| FF&E Commission Option | Section 15(a) |
| FF&E Disposition Budget | Section 15(a) |
| FF&E Disposition Expenses | Section 15(a) |
| FF&E Guaranty Amount | Section 15(a) |
| FF&E Guaranty Option | Section 15(a) |
| FF&E Sale Election Deadline | Section 15(a) |
| FF&E Sale Option | Section 15(a) |
| Gross Rings | Section 5.3(b) |
| Gross Rings Period | Section 5.3(b) |

- 3 -

HIGHLY CONFIDENTIAL

SEARS_507B_00000774

| | |
|---|---|
| Gross Rings Shrink Adjustment | Section 5.3(b)(iv) |
| Guaranteed Amount | Section 3.1(a) |
| Guaranty Percentage | Section 3.1(a) |
| Hazardous Materials | Section 15(d) |
| In-Transit Merchandise | Section 5.2(b) |
| Initial Guaranty Payment | Section 3.3(a) |
| Interested Parties | Section 3.3(f) |
| Inventory Date | Section 5.1(a) |
| Inventory Taking | Section 5.1(a) |
| Inventory Taking File | Section 5.1(b) |
| Inventory Taking Instructions | Section 5.1(a) |
| Inventory Taking Service | Section 5.1(a) |
| Inventory Taking Files | Section 5.1(c) |
| K-Mart Merchandise | Section 11.1(s) |
| Letter of Credit | Section 3.3(e) |
| Liquidation Sale Laws | Section 2(c) |
| Membership Program Discount | Section 8.6(b) |
| Merchandise | Section 5.2(a) |
| Merchandise File | Section 5.1(b)(iii) |
| Merchandise Threshold | Section 3.1(e) |
| Merchant | Preamble |
| Merchant Consignment Goods | Section 5.4 |
| Merchant's Designated Account | Section 3.3(a) |
| Merchant Indemnified Parties | Section 8.3(a) |
| Net FF&E Proceeds | Section 15(a) |
| Non-CAM Trash Removal Charges | Section 4.1 |
| Non-Inventoried Stores | Section 5.1(b)(ii) |
| Occupancy Expenses | Section 4.1 |
| Owned FF&E | Section 5.2 |
| Parties | Preamble |
| Payment Date | Section 3.3(a) |
| Prevailing Discount Adjustment | Section 5.3(b) |
| Prevailing Discount Deadline | Section 5.3(b) |
| Proceeds | Section 3.3(a) |
| Receipt Deadline | Section 5.2(a) |
| Remaining Merchandise | Section 3.2 |
| Retail Price | Section 5.3(b)(v) |
| Retained Employee | Section 9.1 |
| Retention Bonuses | Section 9.4 |
| Returned Merchandise | Section 8.5 |
| Sale | Recitals |
| Sale Commencement Date | Section 6.1 |
| Sale Guidelines | Section 8.1 |
| Sale Term | Section 6.1 |
| Sale Termination Date | Section 6.1 |
| Sales Taxes | Section 8.3(a) |

- 4 -

HIGHLY CONFIDENTIAL

SEARS_507B_00000775

| | |
|---|---|
| Sales Tax Account | Section 8.3(a) |
| Senior DIP Agent | Recitals |
| Senior DIP Lenders | Recitals |
| Sharing Amount | Section 3.1(b) |
| Sharing Threshold | Section 3.1(b) |
| Shipping Variance | Section 5.1(c) |
| Shipping Variance Response | Section 5.1(c) |
| Spoiled Goods | Section 5.2(b) |
| Store(s) | Recitals |
| Test Store(s) | Section 5.1(a) |
| Test Store Results | Section 5.1(b) |
| Third party | Section 4.1 |
| UCC | Section 8.10(d) |
| Vacate Date | Section 6.2 |
| Vacate Notice | Section 6.1 |
| Variance | Section 5.1(b) |
| WARN Act | Section 9.1 |

 1.2   Exhibits.  The Exhibits and Schedules annexed to this Agreement, as listed below, are an integral part of this Agreement:

| Exhibit | Section Reference | Description |
|---|---|---|
| Exhibit A-1 | Recitals | Stores |
| Exhibit A-2 | Recitals | Distribution Centers |
| Exhibit A-3 | Recitals | Fee Stores |
| Exhibit 2(c) | Section 2(c) | Firearms and Ammunition Sales |
| Exhibit 3.1(e) | Section 3.1(e) | Merchandise Threshold Adjustment |
| Exhibit 3.1(f) | Section 3.1(f) | Cost Factor Threshold Adjustment |
| Exhibit 3.3(a) | Section 3.3(a) | Merchant's Designated Account |
| Exhibit 3.3(e) | Section 3.3(e) | Form of Letter of Credit |
| Exhibit 4.1(a) | Section 4.1(a) | Store Occupancy Expense Schedule |
| Exhibit 5.1(a)(i) | Section 5.1(a) | Test Stores |
| Exhibit 5.1(a)(ii) | Section 5.1(a) | Inventory Taking Instructions |
| Exhibit 5.2(b)(i) | Section 5.2(b) | Distribution Center Merchandise |
| Exhibit 5.2(b)(ii) | Section 5.2(b) | In-Transit Merchandise |
| Exhibit 8.1 | Section 8.1 | Sale Guidelines |
| Exhibit 8.9 | Section 8.9 | E-Commerce Platform Expenses |
| Exhibit 10.1(c) | Section 10.1(c) | Form of Approval Order |
| Exhibit 11.1(c) | Section 11.1(c) | Pre-Existing Liens |
| Exhibit 11.1(g) | Section 11.1(g) | Pending Matters |
| Exhibit 11.1(s) | Section 11.1(s) | K-Mart Merchandise |
| Exhibit 11.1(v) | Section 11.1(v) | Promotional Activity |

US_137191272v1_340878-00024 12/27/2018 2:05 PM

HIGHLY CONFIDENTIAL                                            SEARS_507B_00000776

Section 2.    <u>Appointment of Agent/Liquidation Sale Laws/Approval Order</u>

(a)    <u>Appointment of Agent</u>.  Effective on the date hereof and subject to the entry of the Approval Order, Merchant hereby irrevocably appoints Agent, and Agent hereby agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale and, in accordance with the terms of Section 15, disposing of Merchant's Owned FF&E at the Stores (but not the Distribution Centers or the COs), in accordance with the terms and conditions of this Agreement.

(b)    <u>Approval Order</u>.  Merchant shall seek entry of an order from the Bankruptcy Court approving this Agreement and authorizing Merchant and Agent to conduct the Sale in accordance with the terms hereof (the "<u>Approval Order</u>").  The Approval Order shall be in substantially the form annexed hereto as <u>Exhibit 10.1(b)</u>, and otherwise be reasonably satisfactory to the Merchant and Agent, and provide, <u>inter alia</u>, that:

(i)    this Agreement (and each of the transactions contemplated hereby, including, without limitation, the Sale) is approved in its entirety;

(ii)    Merchant and Agent shall be authorized to continue to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby (including, without limitation, the Sale and completing the Final Reconciliation);

(iii)    Agent shall be entitled to sell all Merchandise, Additional Agent Merchandise, Merchant Consignment Goods and (to the extent so elected by Merchant, Owned FF&E) hereunder free and clear of all liens, claims, interests or encumbrances thereon (including, without limitation, any liens, claims, interests or encumbrances in favor of any Interested Parties), with any such presently existing liens encumbering all or any portion of the Merchandise, Merchant Consignment Goods, Owned FF&E, the Proceeds or any proceeds of the foregoing attaching, as applicable, only to the Guaranteed Amount and other amounts to be received by Merchant under this Agreement;

(iv)    Agent shall have the right to use the Stores and Distribution Centers, and all related services, furniture, fixtures, equipment and other assets of Merchant as designated hereunder for the purpose of conducting the Sale, free of any interference from any entity or person subject to compliance with the Sale Guidelines and Approval Order;

(v)    subject to the Sale Guidelines and the Approval Order, Agent, as agent for Merchant, is authorized to conduct, advertise, post signs and otherwise promote the Sale as set forth in Sections 2(c) and 8.1 below;

(vi)    (a) Agent shall be granted a limited non-exclusive royalty-free license and right to use until the Sale Termination Date the trademarks, trade names, logos, customer lists, website, URL, social media sites (including Facebook and Twitter), mailing lists and email lists relating to and used in connection with the operation of the Stores, solely for the purpose of promoting and advertising the Sale in accordance with the terms of this Agreement, all of which assets, rights and interests shall remain property of the Merchant; (b) all newspapers and other advertising media in which the Sale is advertised

- 6 -

HIGHLY CONFIDENTIAL                                                                SEARS_507B_00000777

shall be directed to accept the Approval Order as binding and to allow Merchant and Agent to consummate the transactions provided for in this Agreement, including, without limitation, the conducting and advertising of the Sale in the manner contemplated by this Agreement; and (c) all utilities, landlords, creditors and other interested parties and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the Sale, or institute any action in any court (other than in the Bankruptcy Court) with respect to Merchandise or the Owned FF&E or before any administrative body which in any way directly or indirectly interferes with or obstructs or impedes the conduct of the Sale;

(vii)    the Bankruptcy Court shall retain jurisdiction over all parties to this Agreement to enforce this Agreement;

(viii)    Agent shall be authorized to include Additional Agent Merchandise in the Sale subject to the provisions hereof;

(ix)    (a) subject to Agent having satisfied its payment obligations hereunder, any amounts owed by Merchant to Agent under this Agreement shall be granted the status of superpriority claims in Merchant's Bankruptcy Case pursuant to section 364(c) of the Bankruptcy Code senior to all other superpriority claims, including (without limitation) to the superpriority claims of the Interested Parties; and (b) Agent shall be granted a valid, binding, enforceable and perfected security interest and lien as provided for in Section 16.11 hereof without the necessity of filing financing statements or other steps to perfect the security interest or lien (other than entry of the Approval Order);

(x)    Merchant's decisions to (A) enter into this Agreement and (B) perform under and make payments required by this Agreement is a reasonable exercise of the Merchant's sound business judgment consistent with its fiduciary duties and is in the best interests of the Merchant, its estate, its creditors, and other parties in interest;

(xi)    this Agreement was negotiated in good faith and at arms' length between the Merchant and Agent, and Agent is entitled to the protection of Sections 363(m) and 364(e) of the Bankruptcy Code;

(xii)    Agent's performance under this Agreement will be, and payment of the Guaranteed Amount, the Sharing Amount, if any, and other amounts payable under this Agreement will be made, in good faith and for valid business purposes and uses, as a consequence of which Agent is entitled to the protection and benefits of Sections 363(m) and 364(e) of the Bankruptcy Code;

(xiii)    the terms of this Agreement shall be binding on any trustee appointed for the Merchant under any provision of the Bankruptcy Code, whether the Bankruptcy Case of the Merchant is proceeding under chapter 7 or chapter 11 of the Bankruptcy Code (the "Trustee");

(xiv)    the application of any automatic stay of enforcement of the Approval Order is waived;

- 7 -

HIGHLY CONFIDENTIAL

SEARS_507B_00000778

(xv)    the Approval Order constitutes an authorization of the conduct of Merchant and Agent in connection herewith;

(xvi)    Agent shall be entitled to be heard on all issues in the Bankruptcy Case in any way related to or otherwise connected with this Agreement or the transactions contemplated hereby;

(xvii)    nothing contained in this Agreement and none of Agent's actions taken in respect of this Agreement or the transactions contemplated hereby shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees (except for Agent's obligations to pay Expenses), nor shall Agent become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees;[1] and

(xviii)    (a) this Agreement is approved pursuant to Section 363 of the Bankruptcy Code; and (b) in the event any of the provisions of the Approval Order are modified, amended or vacated by a subsequent order of the Bankruptcy Court or any other court, Agent shall be entitled to the protections provided in Bankruptcy Code sections 363(m) and 364(e) and, no such appeal, modification, amendment or vacatur shall affect the validity and enforceability of the sale or the liens or priority authorized or created under this Agreement or the Approval Order.

(c)    Advertisement.    Subject to entry of the Approval Order, Agent shall be authorized to conduct and advertise the Sale as a "going out of business", "total liquidation", "store closing", "sale on everything", "everything must go", "everything on sale", or similar-themed sale and the Approval Order shall provide that Agent shall be required to comply with applicable federal, state and local laws, regulations and ordinances, including, without limitation, all laws and regulations relating to advertising, permitting, privacy, consumer protection, occupational health and safety, the environment, and, as more specifically provided on Exhibit 2(c), firearm and ammunition sales, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed by, governmental authorities (collectively, the "Applicable

---

[1] Note to Draft: With respect to Interested Parties, the Approval Order will contain a clawback provision consistent with the following: *If, and to the extent, Agent over-funds any amounts in respect of the Guaranteed Amount provided for under the Agency Agreement (as determined pursuant to the express terms thereof) and such funding or payment cannot be recovered by Agent from Merchant under Section 3.3(a) or Section 3.3(c) thereof, by means of an offset or otherwise, then Merchant shall be required to (or if Merchant shall be unable to or otherwise for any reason fails to, and any of the Interested Parties have received payment from Merchant of any funds in respect of such overfunding, the applicable Interested Parties (including the applicable agent acting with respect to its own accounts and not jointly and severally with the other applicable agents, and in each case not to exceed the allocable portion of the overfunded amount actually received by such agent for the applicable lenders), shall be required to) reimburse the undisputed amount of such overfunded amount to Agent within two (2) business days of written demand thereof by Agent in the inverse order in which the overfunded amount (or portion thereof) was received by such agent for the applicable lenders. In the event that the Agent funds or pays all or any portion of Merchant's obligations under this Agreement, such funding or payment cannot be recovered by the Agent under section 3.3(a) or 3.3(c) by means of an offset, and, as a result of such funding or payment, Merchant (or an Interested Party) received more value than Merchant (or such Interested Party) would have otherwise received under this Agreement had Agent not funded or paid such obligations, such Interested Party shall pay all such funded or paid amounts to Agent within two (2) business days of Agent's request.* Further, the Approval Order shall incorporate certain other sections hereof applicable to Interested Parties (including without limitation, Sections 3.3(b)(i), 3.3(b)(iv), 8.3, and 8.10(f)).

- 8 -

HIGHLY CONFIDENTIAL                    SEARS_507B_00000779

General Laws"), other than, to the extent provided in the Approval Order, all applicable laws, rules and regulations in respect of "going out of business", "total liquidation", "store closing", "sale on everything", "everything must go", "everything on sale", or similar-themed sales, including laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, posting of signage, and use of sign-walkers solely in connection with the Sale and including ordinances establishing license or permit requirements, waiting periods, time limits or bulk sale restrictions that would otherwise apply to the Sale, but excluding those designed to protect public health and safety (collectively, the "Liquidation Sale Laws"), provided that such Sale is conducted in accordance with the terms of this Agreement, the Sale Guidelines and Approval Order and the provisions of Section 8.1 below, and provided further that the Approval Order shall provide that so long as the Sale is conducted in accordance with the Sale Guidelines and the Approval Order and in a safe and professional manner, Agent shall be deemed to be in compliance with any Applicable General Laws.

(d)    Authority.  Except as otherwise specifically provided in this Agreement, Agent shall have no authority, and shall not represent that it has any authority, to enter into any contract, agreement, or other arrangement or take any other action by or on behalf of Merchant, that would have the effect of creating any obligation or liability, present or contingent, on behalf of or for the account of Merchant without Merchant's prior written consent.

Section 3.    Guaranteed Amount and Other Payments

    3.1    Payments to Merchant and Agent.

(a)    Subject to Merchant's compliance with all representations, warranties, covenants, terms and conditions set forth in this Agreement, as a guaranty of Agent's performance hereunder, in addition to the payment of Expenses (as provided for in Section 4.1 hereof), Agent guarantees that Merchant shall receive an amount equal to 82.0% (the "Guaranty Percentage") of the aggregate Cost Value of the Merchandise (the "Guaranteed Amount").  The Guaranteed Amount will be calculated based upon the product of (x) the Guaranty Percentage *multiplied by* (y) the aggregate Cost Value of the Merchandise (in the case of (y), as determined by (A) the Final Inventory Report at the conclusion of the Inventory Taking by the Inventory Taking Service after verification and reconciliation thereof by Merchant and Agent subject to the terms of Section 5.1 hereof (including without limitation the extrapolation thereof of the Variance to the Non-Inventoried Stores as provided in Section 5.1(b) hereof), (B) the aggregate amount of Merchandise subject to Gross Rings (as adjusted for shrinkage per Section 5.3(b)(iv) of this Agreement), (C) to the extent not included in clauses (A) or (B), the aggregate Cost Value of In-Transit Merchandise and Distribution Center Merchandise included in the Sale (as counted and calculated in accordance with the terms of this Agreement); (D) to the extent not included in clauses (A), (B) or (C), the aggregate Cost Value of Returned Merchandise included in the Sale and not otherwise included in the Inventory Taking; and (E) any other adjustments to Cost Value as expressly contemplated by this Agreement).  Agent shall pay to Merchant (or its designee) the Guaranteed Amount in the manner and at the times specified in Section 3.3 below.

(b)    To the extent that Proceeds exceed the sum of (x) the Guaranteed Amount, plus (y) Expenses of the Sale plus (z) an amount equal to 5.0% of the aggregate Cost Value of the Merchandise included in the Sale (the "Agent's Fee"; and the sum of (x), (y) and (z) being

- 9 -

HIGHLY CONFIDENTIAL                                                              SEARS_507B_00000780

collectively defined as the "Sharing Threshold"), then all remaining Proceeds of the Sale above the Sharing Threshold shall be shared 50.0% to Merchant (Merchant's share of Proceeds beyond the Sharing Threshold is the "Sharing Amount") and 50.0% to Agent. Agent shall pay the Sharing Amount, if any, to Merchant (or its designee), on the first business day after the completion of the Final Reconciliation conducted pursuant to Section 8.7(b) and shall remit such payment to the Merchant's Designated Account.

(c)    In addition to the Guaranteed Amount and all other amounts payable under this Agreement, Agent shall pay to Merchant an amount equal to five percent (5%) of the gross proceeds (net of sales taxes) of the sale of Additional Agent Merchandise (the "Additional Agent Merchandise Fee"). All proceeds of the sale of Additional Agent Merchandise in excess of the Additional Agent Merchandise Fee shall be retained by Agent (the "Additional Agent Merchandise Proceeds"). The amount of the Additional Agent Merchandise Fee shall be reconciled and paid as part of the Final Reconciliation.

(d)    To ensure accurate sales audit functions, and the accurate calculation of the Sharing Amount, Agent shall use Merchant's existing point-of-sale system for recording all sales (including, without limitation, any sales of Additional Agent Merchandise) in the Stores, and Merchant shall ensure that Agent shall have access and use of such point of sale system for the duration of the Sale Term.

(e)    The Guaranty Percentage has been fixed based upon the Merchant's representation that the aggregate Cost Value of the Merchandise included in the Sale is not less than $1,120,000,000 and not more than $1,200,000,000 (the "Merchandise Threshold"). To the extent that the aggregate Cost Value of the Merchandise included in the Sale is less than, or greater than, the Merchandise Threshold, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(e) attached hereto, as and where applicable.

(f)    The Guaranty Percentage has also been fixed based upon the aggregate Cost Value of the Merchandise included in the Sale as a percentage of the aggregate Retail Price of the Merchandise included in the Sale, such percentage being 38.9% (the "Cost Factor Threshold"). To the extent that the ratio of the aggregate Cost Value of the Merchandise included in the Sale to the aggregate Retail Price of the Merchandise included in the Sale is a percentage greater than the Cost Factor Threshold, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(f) annexed hereto.

(g)    The adjustments to the Guaranty Percentage contemplated by Sections 3.1(e) and 3.1(f) shall be independent and cumulative.

3.2    Payments to Agent. Subject to Agent's obligation to pay in full the Guaranteed Amount, the Sharing Amount (if any), and all Expenses, Agent shall be entitled to retain any remaining Proceeds. Provided that no Event of Default has occurred and continues to exist on the part of Agent, all Merchandise remaining at the conclusion of the Sale ("Remaining Merchandise") shall become the property of Agent, free and clear of all liens, claims, interests and encumbrances of any kind or nature. Agent and its affiliates shall be authorized to sell or otherwise dispose of the Remaining Merchandise with all logos, brand names, and other intellectual property on the Merchandise intact, and shall be authorized to advertise the sale of the Remaining Merchandise

- 10 -

HIGHLY CONFIDENTIAL

using Merchant's name and logo.  The proceeds received by Agent from such disposition shall constitute Proceeds hereunder.

3.3    Time of Payments; Proceeds; Control of Proceeds.

(a)    On the first business day after entry of the Approval Order (the "Payment Date"), Agent shall pay to the Merchant's Designated Account (as hereinafter defined) an amount (the "Initial Guaranty Payment") equal to (i) [[TBD] percent (TBD%)] of the product of the Guaranty Percentage *multiplied by* the estimated aggregate Cost Value of the Merchandise in the Stores as reflected on Merchant's books and records maintained in the ordinary course of business at the close of business on the last day immediately preceding the Sale Commencement Date (the "Estimated Guaranteed Amount"); provided that the Estimated Guaranteed Amount payable by Agent on the Payment Date shall be calculated based on Merchandise located in the Stores as of the close of business on the last business day immediately preceding the Sale Commencement Date and shall expressly exclude any In-Transit Merchandise or Distribution Center Merchandise not then located at a Store.  On the Payment Date, the Initial Guaranty Payment shall be made by wire transfer of immediately available funds to the account designated on Exhibit 3.3(a) attached hereto (the "Merchant's Designated Account").  The balance of the Guaranteed Amount, if any (including, without limitation, any portion of the Guaranteed Amount attributable to any In-Transit Merchandise and Distribution Center Merchandise received by the Receipt Deadline and included as Merchandise), shall be paid by Agent by wire transfer of immediately available funds to the Merchant's Designated Account on the later of:  (x) the second business day following the issuance of the final report of the aggregate Cost Value of the Merchandise counted by the Inventory Taking Service following the completion of the Inventory Taking, after review, reconciliation and mutual written verification thereof by Merchant and Agent (the "Final Inventory Report"), and (y) thirty (30) days after the Sale Commencement Date.  In the event of a dispute as to the calculation of the remaining portion of the Guaranteed Amount, any such dispute shall be resolved in the manner and at the times set forth in Section 8.7(b)(ii) hereof.  Merchant and Agent shall exercise reasonable best efforts to reconcile the Inventory Taking within ten (10) days after its completion.  To the extent that the Guaranteed Amount has not been paid in full by the date of the Final Reconciliation, Agent shall pay the unpaid portion of the Guaranteed Amount to Merchant as part of the Final Reconciliation.

For purposes of this Agreement, "Proceeds" shall mean the aggregate of (i) the total amount (in dollars) of all sales of Merchandise (inclusive of any Distribution Center Merchandise and In-Transit Merchandise included in the Sale) and all service revenue made under this Agreement, in each case during the Sale Term and exclusive of Sales Taxes, (ii) the total amount (in dollars) payable to Merchant from leased departments during the Sale Term, (iii) any other amount payable by a third party to Merchant operating or offering goods or services within the Stores (including without limitation, any service or warranty revenue), (iv) all proceeds of Merchant's insurance for loss or damage to Merchandise arising from events occurring during the Sale Term relating to the Merchandise, and (v) any and all proceeds received by Agent from the disposition of Remaining Merchandise. For the avoidance of doubt:  (1) all proceeds from the sales at Merchant's Stores for periods prior to the Sale Commencement Date, including, without limitation, any checks located at the Stores or Distribution Centers on the Sale Commencement Date, and for the avoidance of doubt checks in transit; (2) the proceeds from the sale of Merchant Consignment Goods pursuant to Section 5.4 below (subject to Agent's right to receive the commission under Section 5.4 below);

- 11 -

HIGHLY CONFIDENTIAL                                                                                            SEARS_507B_00000782

(3) all proceeds of Merchant's insurance for loss or damage to Merchandise arising from events occurring prior to the Sale Commencement Date; (4) proceeds from the sale or other disposition of Owned FF&E (subject to Agent's right to receive Agent's FF&E Commission to the extent provided in Section 15 below) or the FF&E Guaranty Amount, as applicable; (5) proceeds of the sale of Additional Agent Merchandise; (6) payments made by Agent on account of the Guaranteed Amount, the Sharing Amount, Expenses, and the Letter of Credit,; and (7) any proceeds of the sales governed by the Abacus Agreements shall, in each case, not constitute "Proceeds" hereunder.

  (b)  All Proceeds shall be controlled by Agent in the manner provided for below:

    (i)  Prior to the date Agent establishes the Agency Accounts (see clause (ii) below), all Proceeds (including credit card proceeds) and proceeds of the sale of Additional Agent Merchandise, Merchant Consignment Goods, and Owned FF&E, and other amounts contemplated by this Agreement (in each case including all cash, credit card payments, checks and similar items of payment and deposits) shall be collected by Merchant and deposited on a daily basis into depository accounts designated by, owned and in the name of, Merchant for the Stores, which accounts shall be designated for the deposit of Proceeds and any other amounts contemplated by this Agreement (including, without limitation, proceeds from the sale of Owned FF&E, Additional Agent Merchandise, and Merchant Consignment Goods), and the disbursement of amounts payable to or by Agent hereunder (the "Designated Deposit Accounts").  Subject to the provisions of Section 16.11 hereof, the Approval Order shall provide (A) that Merchant grants to Agent a first priority security interest in and lien upon each Designated Deposit Accounts to the extent of any Proceeds and any other amounts payable to Agent deposited therein, and (B) for turnover to Agent of any such Proceeds (and any other amounts payable to Agent deposited therein) in accordance with the terms and provisions of this Agreement and the Approval Order, as applicable.  If requested by Agent, each account shall be subject to an agreement between and among the Agent, the Merchant and the subject bank, providing for, among other things, that such bank will comply with instructions originated by Agent directing the disposition of funds in such account without further consent of the Merchant (a "Control Agreement"). If, notwithstanding the provisions of this Section, Merchant (or any Interested Party) receives or otherwise has dominion over or control of any Proceeds, or other amounts due to Agent, Merchant (and such Interested Party) shall hold the same and other amounts in trust for Agent, and shall not deposit or commingle such Proceeds or other amounts due Agent hereunder in any account except a Designated Deposit Account, or with any of Merchant's or such Interested Party's other funds or deposit such Proceeds or other amounts in any account except a Designated Deposit Account or as otherwise instructed by Agent.  Until such time as Agent establishes the Agency Accounts (see clause (ii) below), Merchant and Agent shall cooperate with each other to establish and implement appropriate steps and procedures to accomplish a daily reconciliation, and remittance to Agent, of all Proceeds (including credit card proceeds) and other amounts contemplated by this Agreement as being payable to Agent that are deposited into the Designated Deposit Accounts.

    (ii)  After payment of the Initial Guaranty Payment and delivery of the Letter of Credit, Agent may establish its own accounts (including, without limitation, credit card accounts and systems), dedicated solely for the deposit of the Proceeds and other

US_137191272v1_340878-00024 12/27/2018 2:05 PM

HIGHLY CONFIDENTIAL                     SEARS_507B_00000783

amounts contemplated by this Agreement, and the disbursement of amounts payable to Agent hereunder (the "Agency Accounts"), and Merchant shall promptly, upon Agent's reasonable request, execute and deliver all necessary documents to open and maintain the Agency Accounts; provided, however, Agent may elect to continue to use Merchant's Designated Deposit Accounts as the Agency Accounts. The Agency Accounts shall be dedicated solely to the deposit of Proceeds and other amounts contemplated by this Agreement (including, without limitation, proceeds from the sale of Owned FF&E, Additional Agent Merchandise, and Merchant Consignment Goods), in each case including all cash, credit card payments, checks and similar items of payment and deposits, and the distribution of amounts payable hereunder; provided that, in the event (A) Agent elects to continue to use Merchant's Designated Deposit Accounts as the Agency Accounts, and (B) such accounts have amounts deposited therein by Merchant that do not constitute Proceeds and/or other amounts payable to Agent under this Agreement, then Merchant and Agent shall cooperate with each other to establish and implement appropriate steps and procedures to accomplish a daily reconciliation, and remittance to Agent, of all Proceeds and other such amounts contemplated by this Agreement as being payable to Agent. Upon request, Agent shall deliver to Merchant copies of all bank statements and other information relating to the Agency Accounts; provided that, in the event Agent elects to continue to use Merchant's Designated Deposit Accounts as the Agency Accounts, Merchant shall deliver to Agent copies of all bank statements and other information relating to such accounts to enable Agent to track and trace deposited funds that constitute Proceeds and other amounts contemplated by this Agreement. Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all bank fees and charges, including wire transfer charges, related to the Sale and the Agency Accounts (including if Agent elects to continue to use Merchant's Designated Deposit Accounts as the Agency Accounts), whether received during or after the Sale Term. Upon Agent's notice to Merchant of Agent's designation of the Agency Accounts, all Proceeds of the Sale (including credit card proceeds) and all other amounts contemplated by this Agreement shall be deposited into the Agency Accounts.

(iii)    Agent shall have the right to use Merchant's credit card facilities, including Merchant's credit card terminals and processor(s), credit card processor coding, and Merchant identification number(s) and existing bank accounts for credit card Proceeds and for credit card proceeds relating to Additional Agent Merchandise, Merchant Consignment Goods, and Owned FF&E, in each solely for purposes of the Sale. In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures. Without limiting the foregoing, Merchant shall cooperate with Agent to download data from all credit card terminals each day during the Sale Term to effect settlement with Merchant's credit card processor(s), and shall take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s). At Agent's request, Merchant shall cooperate with Agent to establish Merchant's identification numbers under Agent's name to enable Agent to process all such credit card Proceeds (and credit card proceeds from Additional Agent Merchandise, Merchant Consignment Goods, and Owned FF&E) for Agent's own account. Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to the Sale, whether received during or

- 13 -

HIGHLY CONFIDENTIAL    SEARS_507B_00000784

after the Sale Term.   Agent shall not be responsible for, as an Expense or otherwise, any credit card fees, charges, or chargebacks that do not relate to the Sale, whether received prior to, during or after the Sale Term.

(iv)   Commencing on the first business day following the Payment Date, and continuing on each business day thereafter, Merchant shall promptly pay to Agent, by wire transfer of immediately available funds, all funds in the Designated Deposit Accounts (including without limitation, all amounts constituting Proceeds, and proceeds from Merchant Consignment Goods, Additional Agent Merchandise, and Owned FF&E that are deposited into the Designated Deposit Accounts for the prior day) without any offset or netting of Expenses or other amounts that may be due to Merchant.   Agent shall, within a reasonable period of time after the date of each such payment by Merchant, notify Merchant (and the Interested Parties) of any shortfall in such payment, in which case, Merchant (or such Interested Parties, as the case may be) shall promptly pay to Agent funds in the amount of any undisputed shortfall.

(c)   Merchant and Agent further agree that if at any time during the Sale Term, (i) Agent holds any amounts due to Merchant under this Agreement, Agent may, in its discretion, after two (2) business days' notice to Merchant, offset such amounts being held by Agent against any undisputed amounts due and owing by, or required to be paid by, Merchant hereunder, and (ii) Merchant holds any amounts due to Agent under this Agreement, Merchant may, in its discretion, after two (2) business days' notice to Agent, offset such amounts being held by Merchant against any undisputed amounts due and owing by, or required to be paid by, Agent hereunder.

(d)   All amounts required to be paid by Agent or Merchant under any provision of this Agreement shall be made by wire transfer of immediately available funds, which shall be wired by Agent or Merchant, as applicable, no later than 2:00 p.m. (prevailing Eastern Time) on the date that such payment is due; provided that all of the information necessary to complete the wire transfer has been received by Agent or Merchant, as applicable, by 10:00 a.m. (prevailing Eastern Time) on the date that such payment is due.   In the event that the date on which any such payment is due is not a business day, then such payment shall be made by wire transfer on the next business day.

(e)   Guaranty Security.   To secure payment of the balance of any unpaid portion of the Guaranteed Amount, the Sharing Amount, Expenses, the Additional Agent Merchandise Fee, and other amounts due to Merchant hereunder, Agent shall deliver to Merchant, to be held by Merchant for the benefit of parties with security interests in the Merchandise (the "Interested Parties"), in each case, in accordance with the lien priorities set forth in the DIP ABL Financing Order, an irrevocable standby letter of credit, substantially in the form of Exhibit 3.3(e) attached hereto, in an original stated amount equal to the aggregate of (x) [TBD percent (TBD%)] of the product of the Guaranty Percentage *multiplied by* the estimated aggregate Cost Value of the Merchandise in the Stores and Distribution Centers (based upon Merchant's books and records maintained in the ordinary course at the close of business on the last day immediately preceding the Sale Commencement Date, but excluding for purposes hereof the In-Transit Merchandise), and (y) three (3) weeks' estimated Expenses (the "Letter of Credit").   The Letter of Credit shall name Merchant and the Senior DIP Agent (in accordance with the lien priorities set forth in the DIP

- 14 -

HIGHLY CONFIDENTIAL                                                                 SEARS_507B_00000785

ABL Financing Order) as co-beneficiaries. The Letter of Credit shall be delivered to Merchant no later than the Payment Date, and shall be issued by Bank of America, N.A. In the event that Agent fails to timely pay any amount hereunder in respect of the Guaranteed Amount, the Sharing Amount, the Additional Agent Merchandise Fee, Expenses and/or any other amounts due by Agent as required under this Agreement, Merchant, on behalf of itself and the applicable Interested Parties, shall be entitled to draw on the Letter of Credit to fund such amount or obligation after five (5) business days' written notice to Agent. Merchant and Agent agree that, from time to time upon Agent's request, the face amount of the Letter of Credit shall be reduced by the aggregate amount of payments made by Agent on account of the Guaranteed Amount; provided, however, until the Final Reconciliation has been completed, under no circumstances shall the face amount of the Letter of Credit be reduced to an amount less than the parties' mutually agreed upon amount of three (3) weeks' estimated Expenses. The Letter of Credit shall expire no earlier than sixty (60) days after the Sale Termination Date; provided that, if, as of the tenth (10th) business day prior to the scheduled expiration date of the Letter of Credit, there remains any unresolved dispute as to the Guaranteed Amount, the Sharing Amount, the Additional Agent Merchandise Fee, Expenses and/or any other amounts due by Agent under this Agreement, Agent shall cause the expiration date of the Letter of Credit to be extended for successive thirty (30) day intervals (or such other longer duration as Merchant and Agent may agree) until the subject dispute has been resolved and any additional amounts due hereunder on account of the Guaranteed Amount, the Sharing Amount, the Additional Agent Merchandise Fee, Expenses and/or any other amounts due by Agent under this Agreement have been paid to Merchant. If Agent has for any reason not so extended the expiration date of the Letter of Credit by the date that is ten (10) days prior to the expiration date of the Letter of Credit (as may have been extended previously), Merchant shall have the right to make a drawing under the Letter of Credit in an amount equal to the undisputed amount(s) Merchant asserts are then owing to Merchant. After completion of the Final Reconciliation and payment in full of all amounts owing by Agent (including, but not limited to, the Guaranteed Amount, the Sharing Amount, the Additional Agent Merchandise Fee, and Expenses), Merchant shall surrender the original Letter of Credit to the issuer thereof together with written notification that the Letter of Credit may be terminated.

As used herein, the "DIP ABL Financing Order" means the Final Order (I) Authorizing the Debtors to (A) Obtain Post-petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief (Docket No. 955, entered by the Bankruptcy Court on November 30, 2018), as may be amended, supplemented or modified from time to time.

(f)     Agent shall purchase all cash in the Stores and Distribution Centers as of the start of business on the Sale Commencement Date on a dollar for dollar basis, with such payment to be made concurrently with the first weekly reconciliation hereunder.

Section 4.     Expenses of the Sale

4.1     Expenses. Agent shall be responsible for all "Expenses", which expenses shall be paid by Agent in accordance with Section 4.2 below. Agent and/or Merchant may review or audit the Expenses at any time. As used herein, "Expenses" shall mean the Store-level (and where

- 15 -

HIGHLY CONFIDENTIAL                                                      SEARS_507B_00000786

expressly applicable, Distribution Center-level and COs-level) operating expenses of the Sale which arise during the Sale Term and are attributable to the Sale, limited to the following:

(a)    actual (i) Occupancy Expenses for the Stores on a per Store, per category, and per diem basis in an amount not to exceed the respective categories and amounts set forth on Exhibit 4.1(a) hereto, plus (ii) the portion of any percentage rent obligations allocable to the sale of Merchandise during the Sale to the extent set forth on Exhibit 4.1(a), plus (iii) the portion of any percentage rent obligations attributable to the sale of Additional Agent Merchandise during the Sale to the extent set forth on Exhibit 4.1(a) (in each case as determined in the manner described in the definition of "Occupancy Expenses" below in this Section 4.1);

(b)    actual payroll for all Store-level Retained Employees used in conducting the Sale for actual days/hours worked at a Store during the Sale Term; provided that, Agent shall only be obligated to pay 50% of the payroll for actual hours worked by Store-level Retained Employees used during the Inventory Taking, and Merchant shall pay the remaining 50% of the wages for Retained Employees used during the Inventory Taking;

(c)    amounts payable by Merchant for benefits for Retained Employees (including payroll taxes, FICA, unemployment taxes, workers' compensation and health care insurance benefits, but excluding Excluded Benefits) for Store-level Retained Employees used in the Sale, in an amount not to exceed 18.0% of base payroll for all Store-level Retained Employees (the "Benefits Cap");

(d)    Retention Bonuses for Retained Employees, as provided for in Section 9.4 below;

(e)    all costs and expenses of Agent's on-site supervision of the Stores, Distribution Centers, and COs, including, but not limited, to any and all fees, wages, bonuses, deferred compensation, taxes, and third party payroll costs and expenses of Agent's field personnel, travel to, from or between the Stores, Distribution Centers, and the COs, and all out-of-pocket and commercially reasonable expenses relating thereto (including reasonable and documented corporate travel to monitor and manage the Sale);

(f)    all costs and expenses of banners, sign walkers, and interior and exterior signs that are utilized in the Sale;

(g)    the promotional costs, including, without limitation, email blasts, sign walkers, television, ROP, other advertising and direct mail, attributable to the Sale and ordered or requested by Agent;

(h)    the costs and expenses of obtaining additional supplies used at the Stores and Distribution Centers as may be requested by Agent in the conduct of the Sale;

(i)    postage/overnight delivery/courier charges to and from or among the Stores requested by Agent to the extent relating to the Sale;

(j)    credit card and bank card fees, and chargebacks relating to Merchandise sold in the Sale;

- 16 -

HIGHLY CONFIDENTIAL                                                    SEARS_507B_00000787

(k)     any and all costs of moving, transferring, or consolidating Merchandise between the Stores (including delivery and freight costs) as initiated by Agent;

(l)     Intentionally Omitted;

(m)     third-party payroll processing fees associated with the Sale;

(n)     [Intentionally Omitted];

(o)     Agent's (i) reasonable legal fees and expenses incurred in connection with the review of data, documents, preparation, negotiation, and execution of this Agreement and any ancillary documents, and the Sale, (ii) actual cost of capital (including letter of credit fees), and (iii) insurance (as provided in Section 12.4 hereof);

(p)     actual costs of the Designated Deposit Accounts (including Agent Accounts) attributable to the Sale, including bank fees and wire charges, check guarantee fees, and bad check expenses to the extent attributable to the Sale;

(q)     Agent's 50% share (pursuant to Section 5.1 hereof) of the third party fees and expenses of the Inventory Taking;

(r)     [Intentionally Omitted];

(s)     Store cash thefts and other Store cash shortfalls in registers;

(t)     all fees and charges incurred by Merchant (as agreed to by Agent) and Agent to comply with Applicable General Laws in connection with the Sale, if applicable;

(u)     [Intentionally Omitted];

(v)     costs and expenses associated with temporary labor requested or obtained by Agent for purposes of the Sale; and

(w)     if Agent exercises the option under Section 8.9 to utilize the E-Commerce Platform as a sales platform, amounts set forth on Exhibit 8.9; and

(x)     the actual costs and expenses of Agent providing such additional services as Agent deems appropriate for the Sale.

"Expenses" shall not include: (i) Central Service Expenses; (ii) any expenses of any kind relating to or arising from Merchant's COs or Distribution Centers or the Excluded Sears Businesses, including (without limitation) the Distribution Center Expenses or any occupancy or payroll expenses associated with such locations or businesses; (iii) Excluded Benefits; (iv) any rent or Occupancy Expenses or any other occupancy-related expenses of any kind or nature in excess of the respective per Store, per diem occupancy-related categories and amounts expressly provided for as an Expense under Section 4.1(a) hereof to the extent actually incurred; (v) any costs or expenses to the extent relating to the Additional Agent Merchandise, including of moving, transferring, or consolidating Additional Agent Merchandise; or (vi) any costs, expenses or

- 17 -

HIGHLY CONFIDENTIAL                                              SEARS_507B_00000788

liabilities other than the Expenses listed above. All costs or expenses related to the Sale not included as Expenses shall be paid by Merchant promptly when due during the Sale Term. Notwithstanding anything herein to the contrary, to the extent that any Expense category listed in section 4.1 is also included on Exhibit 4.1(a), Exhibit 4.1(a) shall control and such Expenses shall not be double counted. There will be no double counting or payment of Expenses to the extent that Expenses appear or are contained in more than one Expense category. Notwithstanding anything herein to the contrary, Agent shall not have any obligation to pay any Expenses (including, without limitation, Occupancy Expenses and Distribution Center Expenses) with respect to any Store or Distribution Center incurred after the earlier of the Sale Termination Date or the applicable Vacate Date for such Store or Distribution Center. Notwithstanding anything herein to the contrary, Agent shall not have any obligation to pay any Expenses (including, without limitation, Occupancy Expenses and Distribution Center Expenses) with respect to (i) any Fee Store, or (ii) any Store or Distribution Center incurred, and relating to the period, prior to the Sale Commencement Date or after the Sale Termination Date.

As used herein, the following terms have the following meanings:

"Central Service Expenses" means costs and expenses for Merchant's Central Services.

"Central Services" means those Merchant central administrative services necessary for the conduct and support of the Sale, including, but not limited to, use or/and access to Merchant's: (i) inventory control system, (ii) payroll system, (iii) accounting system, (iv) office facilities, (v) MIS and POS services, (vi) cash and inventory reconciliation, (vii) central administrative services and personnel to process and perform sales audit, banking, and other normal course administrative services customarily provided to or for the benefit of operating the Stores and including data processing and reporting, email preparation and distribution, and information technology and E-Commerce Platform updates, functionality, and maintenance, (viii) such other central office services reasonably necessary (in the reasonable judgment of Agent) for the Sale, and (ix) to use reasonably sized offices located at Merchant's central office facility to effect the Sale.

"Distribution Center Expenses" means the actual costs and expenses, including use and Occupancy Expenses and Distribution Center employee payroll and other obligations, of the operations of the Distribution Centers, and the actual costs and expenses (including inbound or outbound freight) related to the processing, transfer, and consolidation of Merchandise, Additional Agent Merchandise, Merchant Consignment Goods, and supplies in the Distribution Centers and from the Distribution Centers to the Stores (and the provision of such services shall be referred to as collectively, the "Distribution Center Services"). Agent shall not use Merchant's Distribution Centers for purposes of receiving or shipping Additional Agent Merchandise unless otherwise agreed to by Merchant and Agent and the associated cost has been paid by Agent to Merchant.

"Excluded Benefits" means (i) the following benefits arising, accruing or attributable to the period prior to, during, or after the Sale Term: (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence and (z) ERISA coverage and similar contributions and/or (ii) any other benefits in excess of the Benefits Cap, including, without limitation, any payments due under the WARN Act.

- 18 -

HIGHLY CONFIDENTIAL                                        SEARS_507B_00000789

"Occupancy Expenses" means rent (including rent for furniture, fixtures and equipment), percentage rent, common-area maintenance, landlord promotional fees, real estate and use taxes, merchant association dues and charges, HVAC, utilities, telecom/telephone charges, point-of-sale systems maintenance, store security systems and security (including, without limitation, security systems, courier and guard service, building alarm service and alarm service maintenance), routine repairs and maintenance, taxes and licenses, costs of all local, long-distance, and international telephone, satellite broadband connections, T-1 lines, broadband internet, and other telecommunications services, trash removal (to the extent excluded as a fixed charge component of lease obligation), snow removal, and ordinary course third-party cleanings, pest control services, and all other categories of expenses at the Stores as set forth on Exhibit 4.1(a) attached hereto and in an amount not to exceed to the specific amounts set forth on Exhibit 4.1(a) attached hereto and calculated in accordance with Section 4.1(a), including any percentage rent obligations indicated thereon and incurred by Merchant under applicable leases or occupancy agreements that are allocable to the sales as part of the Sale during the Sale Term of: (x) Merchandise (including In-Transit Merchandise and Distribution Center Merchandise that arrives in the Stores on or prior to the Receipt Deadline) and (y) Additional Agent Merchandise included in the Sale. Merchant and Agent agree that Exhibit 4.1(a) shall specify the actual applicable percentage and any applicable sales thresholds in respect of percentage rent under any applicable Store lease(s) or other occupancy agreement(s). Merchant and Agent further agree that in the event Exhibit 4.1(a) does not specify the actual applicable percentage and/or the applicable sales thresholds in respect of percentage rent under any applicable Store lease(s) or other occupancy agreement(s), Agent shall have no obligation to pay percentage rent other than as set forth on Exhibit 4.1(a). Notwithstanding anything to the contrary set forth in this Agreement, Merchant and Agent further agree that to the extent that, in connection with the conduct of the Sale and/or Agent's vacating of the Stores (but not in connection with the disposition of any unsold Owned FF&E or other non-Merchandise assets being abandoned or otherwise disposed of by Merchant), Merchant incurs additional trash removal charges at a Store, other than the fixed charge component of Merchant's lease obligation for a particular Store provided for on Exhibit 4.1(a) (the "Non-CAM Trash Removal Charges"), such Non-CAM Trash Removal Charges shall be paid by Agent as an Expense of the Sale, in addition to any trash removal charges as may be set forth in Exhibit 4.1(a) hereof.

"Third-party" means, with reference to any Expenses, a party that is not affiliated with or related to Merchant.

4.2    Payment of Expenses. From and after the Sale Commencement Date, Agent shall be responsible for the payment of all Expenses, whether or not there are sufficient Proceeds collected to pay such Expenses after the payment of the Guaranteed Amount. All Expenses incurred during each week of the Sale (i.e., Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant immediately following the weekly reconciliation by Merchant and Agent pursuant to Section 8.7(a) below, based upon invoices and other documentation reasonably satisfactory to Merchant and Agent; provided, however, in the event that the actual amount of an Expense is unavailable on the date of the reconciliation (such as payroll), Merchant and Agent shall agree to an estimate of such amounts, which amounts will be reconciled once the actual amount of such Expense becomes available. Agent and/or Merchant may review or audit the Expenses at any time.

- 19 -

HIGHLY CONFIDENTIAL                                                      SEARS_507B_00000790

4.3     _Distribution Center Expenses_.    Agent shall be responsible for allocating and designating the shipment of Merchandise, including Agent's Additional Agent Merchandise, from the Merchant's Distribution Centers to the Stores in accordance with the Allocation Schedule. Notwithstanding the foregoing, all costs and expenses of operating the Distribution Centers, including, but not limited to, use and occupancy expenses, Distribution Center employee payroll and other obligations,  and/or processing, transferring, consolidating, shipping, and/or delivering goods within or from the Distribution Centers, including without limitation, the Distribution Center Expenses, shall remain the sole obligation of the Merchant.

Section 5.     Inventory Valuation; Merchandise.

5.1     Inventory Taking.

(a)     Commencing on the Sale Commencement Date, Merchant and Agent shall cause to be taken a SKU-level Cost Value and Retail Price physical inventory (the "Inventory Taking") of the Merchandise located in the 75 Stores listed on the attached Exhibit 5.1(a)(i) (each a "Test Store" and collectively, the "Test Stores"), which Inventory Taking shall be completed in each such Test Store no later than twenty-one (21) calendar days after the Sale Commencement Date. The date of the Inventory Taking at each such Test Store shall be referred to as the "Inventory Date" for such Test Store. Merchant and Agent shall jointly employ WIS International or another mutually acceptable independent inventory taking service (the "Inventory Taking Service") to conduct the Inventory Taking in the Test Stores. The Inventory Taking shall be conducted in accordance with the procedures and instructions mutually agreed upon by Merchant and Agent and attached hereto as Exhibit 5.1(a)(ii) (the "Inventory Taking Instructions"). As an Expense, Agent shall be responsible for fifty percent (50%) of the fees and expenses of the Inventory Taking Service. The balances of such fees and expenses shall be paid by Merchant. Except as provided in the immediately preceding sentence, Merchant and Agent shall each bear their respective costs and expenses related to the Inventory Taking; provided that, Agent shall be obligated to pay fifty percent (50%) of the payroll and related benefit costs (subject to the Benefits Cap) for actual hours worked for Retained Employees used during the Inventory Taking, and Merchant shall pay the remaining fifty percent (50%) of the payroll and related benefit costs for actual hours worked for Retained Employees used during the Inventory Taking. Merchant and Agent shall each have the right to have representatives present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking Service. Merchant agrees that during the conduct of the Inventory Taking in each of the Test Stores, the applicable Test Store shall be closed to the public and no sales or other transactions shall be conducted until the Inventory Taking at such Test Store has been completed, as agreed by Merchant and Agent. The Inventory Taking shall not take place on Saturdays, Sundays or federal holidays.  Merchant and Agent further agree that from and after the Sale Commencement Date until the Inventory Taking in each particular Test Store is complete, neither Agent nor Merchant shall (i) transfer any Merchandise to or from that Test Store (other than Distribution Center Merchandise and In-Transit Merchandise, which, in each case, is distinctly tagged or otherwise marked as such or recorded in Agent's transfer log), (ii) deliver any Additional Agent Merchandise to such Test Store (unless such merchandise is tracked by unique SKU that can be tracked separately), (iii) move Merchandise within or about the Test Stores so as to make any such items unavailable for counting as part of the Inventory Taking, or (iv) remove or add any Merchant hang tags, price tickets, inventory control tags, or other indicia of pricing affixed to or related to any Merchandise.

- 20 -

HIGHLY CONFIDENTIAL                                                                      SEARS_507B_00000791

Merchant and Agent shall use their reasonable best efforts to reconcile the Inventory Taking within ten (10) days after its completion. In the event there is any dispute with respect to the reconciliation of the aggregate Cost Value, Retail Price, and/or unit count of the Merchandise following completion of the Inventory Taking, then any such dispute shall be resolved in the manner and at the times set forth in Section 8.7(b)(ii) hereof.

(b)     The results of the Inventory Taking at the Test Stores (the "Test Store Results") shall be used to determine appropriate adjustments as may be required to the calculation of the aggregate Cost Value and Retail Price of the Merchandise located in all Stores as of the Sale Commencement Date as follows:

(i)     the aggregate Cost Value and Retail Price of the Merchandise at the Test Stores shall be the Test Store Results for the Test Stores, as adjusted by Gross Rings (including the Gross Rings Shrink Adjustment in accordance with Section 5.3(b)(iv)) for the Gross Rings Period, with such Cost Value and Retail Price referred to as the "Actual Test Store Results"; provided, further, that, within the Test Stores only, the lowest Retail Price for an SKU that is located in more than one Inventoried Store shall be determined on a Test Store by Test Store basis, unless such lowest SKU Retail Price applies to 10% or more of the units in all such SKU in all Inventoried Stores in which case the lowest SKU Retail Price shall apply to all units within such SKU at all such Test Stores; and

(ii)     for purposes of calculating the aggregate Cost Value and Retail Price of the Merchandise at the Stores that are not Test Stores (the "Non-Inventoried Stores"), the Actual Test Store Results at the Test Stores shall be compared to the Cost Value and Retail Price of the Merchandise as reflected in the Merchandise File as of the Sale Commencement Date at the Test Stores for purposes of determining an average variance between the Actual Test Store Results and the Merchandise File (the "Variance"). Once determined, the Variance shall be applied to determine the Cost Value and Retail Price of the Merchandise in the Merchandise File as of the Sale Commencement Date for the Non-Inventoried Stores.

(iii)     For purposes of the Inventory Taking, the "Merchandise File" for purposes of determining the Variance shall mean the merchandise file mutually identified by the Merchant and Agent as representing the Merchandise in the Stores as of the Sale Commencement Date.

(c)     Distribution Center Merchandise and In-Transit Merchandise shall be counted as such Merchandise is shipped to the Stores and shall reconciled within five (5) business days after receipt of such goods in the Stores in accordance with the procedures set forth below. Absent prior notification and agreement of Merchant, failure to report any variance between the received shipment from the respective shipping documents (each a "Shipping Variance"), within such five (5) business day period shall, result in such receipts being confirmed received consistent with the applicable shipping documents. Merchant shall have five (5) business days to verify a timely issued Shipping Variance (each a "Shipping Variance Response"), and absent prior notification and agreement of Agent, failure to respond to an asserted Shipping Variance within such five (5) business day period shall result in such Shipping Variance being deemed valid. If Merchant timely issues a Shipping Variance Response that disputes the asserted Shipping

- 21 -

HIGHLY CONFIDENTIAL                                                      SEARS_507B_00000792

Variance, Merchant and Agent shall cooperate with each other to verify and resolve such dispute; provided that, in the event Merchant and Agent are unable to resolve such dispute within ten (10) business days from Agent's receipt of a Shipping Variance Response from Merchant (or such greater period as Merchant and Agent may mutually agree), such dispute shall be resolved in the manner provided for resolution of disputes under Section 8.7(b)(ii) hereof.

5.2    Merchandise Subject to this Agreement.

(a)    For purposes of this Agreement, including but not limited to the calculation of the Guaranteed Amount, "Merchandise" means all new, first quality (other than as expressly set forth below regarding Defective Merchandise), finished goods inventory that is owned by Merchant, customarily sold to customers in the ordinary course of Merchant's business and located in the Stores (or with respect to Returned Merchandise, In-Transit Merchandise and Distribution Center Merchandise, received at the Stores by the dates specified in this Agreement), which shall include (i) Merchandise subject to Gross Rings; (ii) Merchandise located in the Stores on the Sale Commencement Date; (iii) Defective Merchandise (to the extent Merchant and Agent can mutually agree on the Cost Value applicable thereto); and (iv) In-Transit Merchandise and Distribution Center Merchandise received in the Stores on or before the date that is thirty (30) days after the Sale Commencement Date (the "Receipt Deadline"). Notwithstanding the foregoing, "Merchandise" shall not include (i) goods that belong to sublessees, licensees, or concessionaires of Merchant; (ii) goods held by Merchant on memo, on consignment, or as bailee; (iii) Excluded Defective Merchandise and Merchant Consignment Goods; (iv) Additional Agent Merchandise; (v) furnishings, trade fixtures, furniture, equipment, machinery, office supplies, supplies, conveyor systems, racking, rolling stock, vehicles, trailers, and other personal property (collectively, "Owned FF&E") and improvements to real property that are located in the Stores, Distribution Centers or COs; provided that, if Merchant so elects, Agent shall be permitted to sell Owned FF&E as set forth in this Agreement; (vi) In-Transit Merchandise, Distribution Center Merchandise, or goods in the Distribution Centers, in-transit or on-order that is received at the Stores after the Receipt Deadline; (vii) any merchandise or other assets located at the Fee Stores; (viii) goods utilized in the Sears Auto Centers, goods utilized in the Sears Home Improvement business, prescription pharmacy goods, goods designated for sale to commercial builders and/or distributors, and/or goods designated for sale in restaurants (collectively, "Excluded Sears Businesses") and (ix) any asset, or interest in any asset, owned by Merchant except those assets expressly constituting Merchandise or Proceeds hereunder, including, but not limited to, accounts, cash, cash proceeds, chattel paper, commercial tort claims, deposit accounts, commercial tort claims, general intangibles other than consumer goods inventory, instruments, investment property, letter of credit rights, payment intangible, and records all as defined under UCC 9-102, real estate and interests in real estate, and intellectual property and interests in intellectual property, including copyrights, trademarks, patents, and brands.

(b)    As used in this Agreement, the following terms have the respective meanings set forth below:

"Defective Merchandise" means any item of Merchandise identified and agreed upon by Merchant and Agent as defective in that it is used, damaged, defective, scratched, soiled, ripped, torn, stained, faded, discolored, dented, out of box (if normally sold as new in-the-box), missing pieces, mismatched, mis-mated or near-sized, items typically sold as a set which are incomplete,

- 22 -

HIGHLY CONFIDENTIAL                                                    SEARS_507B_00000793

or gift with purchase items, or otherwise affected by other similar defenses rendering it not first quality. Sample merchandise and merchandise on display in the Stores shall not per se be deemed to be Defective Merchandise.

"Distribution Center Merchandise" means those items of new, finished, first-quality, saleable in the ordinary course of business that are located in Merchant's Distribution Centers, ticketed for retail sale in the Stores prior to shipment to the Stores, reflected on Exhibit 5.2(b)(i) attached hereto, and which inventory shall be delivered by Merchant to the Stores as directed by Agent (in accordance with the Allocation Schedule referenced below) after the Sale Commencement Date; provided, however, it is agreed and understood that between the date of this Agreement and the Sale Commencement Date, Merchant shall have the right (with the prior consent of the Agent) to allocate and distribute Distribution Center Merchandise to the Stores in the ordinary course of business consistent with past practices. Merchant and Agent shall cooperate with each other and shall mutually agree upon a schedule and allocation of the Distribution Center Merchandise to the Stores not later than two (2) days after the Sale Commencement Date (the "Allocation Schedule"); provided, further, that the Parties agree that the Allocation Schedule shall provide that all such Distribution Center Merchandise shall be allocated and received in the Stores no later than the Receipt Deadline.

"Excluded Defective Merchandise" means (a) any item of Defective Merchandise that is not saleable in the ordinary course because it is so damaged or defective that it cannot reasonably be used for its intended purpose and for which the parties cannot mutually agree upon a Cost Value, (b) parts or components not sold separately by Merchant to consumers in the ordinary course of business, and/or (c) Spoiled Goods and/or (d) obsolete or discontinued goods, goods designated as return to vendor, or goods that have been marked out of stock or have received a similar designation. Excluded Defective Merchandise located in the Test Stores shall be identified and counted during the Inventory Taking and thereafter removed from the sales floor. Agent shall use commercially reasonable efforts to identify and segregate Excluded Defective Merchandise located in the Distribution Centers prior to being shipped from the Distribution Centers and segregated. To the extent that goods in transit to the Stores or located at the Distribution Centers constitute Excluded Defective Merchandise and such goods arrive at the Stores, such goods shall be identified during the Inventory Taking (if a Test Store) or, to the extent such goods arrive in a Store after the Inventory Date for such Store (or if such Store is not a Test Store), such goods shall be reasonably identified by Agent within five (5) business days after receipt at such Store and shall be segregated.

"In-Transit Merchandise" means items of inventory that were ordered by Merchant and which (i) were on order or in-transit to the Stores or Distribution Centers as of the Sale Commencement Date and (ii) consist of new, finished, first-quality goods inventory, ticketed for retail sale in the Stores prior to shipment to the Stores, and reflected on Exhibit 5.2(b)(ii); provided, however, it is agreed and understood that between the date of this Agreement and the Sale Commencement Date, Merchant shall have the right (with the prior consent of Agent) to allocate and distribute In-Transit Merchandise to the Stores in the ordinary course of business consistent with past practices. Merchant and Agent shall cooperate with each other and shall mutually agree upon a schedule and allocation of the In-Transit Merchandise to the Stores as part of the Allocation Schedule; provided, further, that the Parties agree that the allocation schedule shall provide that all

- 23 -

HIGHLY CONFIDENTIAL                                                                    SEARS_507B_00000794

In-Transit Merchandise shall be allocated and received in the Stores no later than the Receipt Deadline.

"Spoiled Goods" means spoiled perishable inventory, including, without limitation, opened boxes, bottles or cans containing perishable inventory, expired or out of date goods and goods that would not be bought by a customer in the ordinary course because they are rotted, spoiled, or subject to similar defect.

5.3     Valuation.

(a)     For purposes of this Agreement, "Cost Value" shall mean, with respect to each item of Merchandise (as determined on a SKU by SKU basis), the lower of (i) Merchant's actual cost; (ii) the lowest cost of such item as reflected in Merchant's inventory files entitled "1.1.1.4.6 wk201842_iplan_inventory (2).xlsx", "1.1.1.4.7 shc_inventory_item_ksn_sku_level.xlsx", the Merchandise File (as defined below), and any other additional files delivered by Merchant to Agent on or before the Sale Commencement Date (collectively, the "Cost File"); or (iii) the Retail Price.  The Cost Value, as calculated in accordance with this definition, shall be inclusive of all costs of freight with respect to each item of Merchandise so long as such costs are reflected in the Cost File.

(b)     Anything in Section 5.3(a) and 3.1(e) to the contrary notwithstanding, Merchant and Agent further agree as follows:

(i)     the Cost Value and Retail Price of any item of In-Transit Merchandise or Distribution Center Merchandise that is not received in a Store on or before the 21st day after the Sale Commencement Date (the "Prevailing Discount Deadline"), but on or before the Receipt Deadline, shall be the otherwise applicable Cost Value and Retail Price of such item (determined in accordance with Section 5.3(a) above), *multiplied* by the inverse of the excess of the (i) the prevailing Sale discount in effect on the date such item arrives in the applicable Store *over* (ii) the Merchant's discount  with respect to such item as  of the Sale Commencement Date (provided such excess is a positive number) (the "Prevailing Discount Adjustment").  Agent shall use commercially reasonable efforts to coordinate and schedule shipments of Distribution Center Merchandise and In-Transit Merchandise from the Distribution Centers to the Stores so as to minimize the effect of the Prevailing Discount Adjustment (but giving consideration to the needs and capacity of the Stores);

(ii)     the Cost Value of Defective Merchandise shall be determined by mutual agreement of Merchant and Agent; if Merchant and Agent are unable to so agree, or if an item is determined to be Excluded Defective Merchandise, such goods shall be excluded from the Sale and treated as Excluded Defective Merchandise for all purposes hereunder, including, without limitation, calculation of the Guaranteed Amount, the Sharing Amount (if any) and Proceeds;

(iii)     (A) Excluded Price Adjustments shall not be taken into account in determining the Cost Value of any item of Merchandise and (B) "Excluded Price Adjustments" means the following discounts or price adjustments offered by the Merchant:

- 24 -

HIGHLY CONFIDENTIAL

SEARS_507B_00000795

(i) point of sale discounts or similar adjustments (so long as lasting no longer than thirty (30) days in duration); (ii) employee discounts; (iii) member or customer appreciation points or coupons; (iv) multi-unit purchase discounts; (v) coupons (Merchant's or competitors'), catalog, website, or circular prices, or "buy one get one" type discounts; (vi) customer savings pass discounts or "bounce back" coupons, or discounts for future purchases based on dollar value of past purchases; (vii) obvious ticketing or marking errors; (viii) instant (in-store) or mail in rebates; and (ix) similar customer specific, temporary, or employee non-product specific discounts or pricing accommodations; and[2]

      (iv)     if the Sale commences prior to the completion of the Inventory Taking at any Test Store, then for the period from the Sale Commencement Date until the Inventory Date for such Test Store (together, the "Gross Rings Period"), Agent and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable Sales Taxes but excluding any prevailing discounts ("Gross Rings") and (ii) cash reports of sales within such Store. Agent and Merchant shall keep a strict count of register receipts and reports to determine the aggregate Merchandise actually sold by SKU during the Gross Rings Period. All such records and reports shall be made available to Merchant and Agent during regular business hours upon reasonable notice. To account to shrinkage during the Gross Rings Period at each Test Store, Agent shall pay that portion of the Guaranteed Amount attributable to Merchandise sold during the Gross Rings Period as follows: (i) the aggregate Cost Value of Merchandise sold during the Gross Rings Period at each such Test Store multiplied by (ii) one hundred one percent (101.0%) (the "Gross Rings Shrink Adjustment").

      (v)     "Retail Price" shall mean with respect to each item of Merchandise, as determined on a SKU by SKU basis, the lowest of (x) the lowest ticketed, marked, shelf, hang-tag, stickered, or other hard marked price as at the Sale Commencement Date, (y) the lowest SKU or PLU as at the Sale Commencement Date; and (z) the lowest PLU, SKU, article number or file price contained in the Cost File, or other file price as reflected in Company's books and records for such item, but (a) excluding any Excluded Price Adjustments.

    5.4    Excluded Goods. Merchant shall retain all rights and responsibilities for any goods not included as "Merchandise" hereunder and shall remove, at Merchant's expense, such goods from the Stores and Distribution Centers prior to the Sale Commencement Date, or as soon thereafter as reasonably practicable. If Merchant so elects during the first two (2) weeks of the Sale Term, Agent shall accept those goods not included as "Merchandise" hereunder and as identified by Merchant for sale (including for these purposes any In-Transit Merchandise or Distribution Center Merchandise that is not received at the Stores on or prior to the Receipt Deadline) (collectively, the "Merchant Consignment Goods"). Merchant Consignment Goods shall be sold at prices mutually agreed upon by Merchant and Agent. Agent shall retain twenty percent (20%) of the sale price (less applicable Sales Taxes) for all sales of Merchant Consignment Goods, and Merchant shall receive eighty percent (80%) of the sale price (less applicable Sales Taxes) in respect of sales of Merchant Consignment Goods provided, however, that with respect to inventory located in the Sears Auto Centers, Agent shall retain five percent (5%) of the receipts

---

[2] Note to Draft: Under review by Sears.

US_137191272v1_340878-00024 12/27/2018 2:05 PM

HIGHLY CONFIDENTIAL    SEARS_507B_00000796

(net of Sales Taxes) in respect of such sales, and Merchant shall receive ninety-five percent (95%) of the receipts (net of Sales Taxes) in respect of such sales.. Merchant shall receive its share of the receipts of sales of Merchant Consignment Goods on a weekly basis, immediately following the weekly reconciliation by Merchant and Agent pursuant to Section 8.7(a) below. Except as expressly provided in this Section 5.4, Agent shall have no cost, expense, or responsibility in connection with any goods not included in Merchandise, including but not limited to, sales commissions and percentage rent.

Section 6.    Sale Term.

6.1    Term. Subject to satisfaction of the conditions precedent set forth in Section 10 hereof, the Sale shall commence at each of the Stores on the date that is one (1) day after the Bankruptcy Court enters the Approval Order, but in no event later than January 19, 2019 (the "Sale Commencement Date"). Agent shall complete the Sale and vacate the premises of each Store in favor of Merchant or its representative or assignee on or before May 31, 2019 (the "Sale Termination Date"). The period beginning on the Sale Commencement Date through and including the Sale Termination Date shall be referred to herein as the "Sale Term." The Sale Termination Date as to any Store may be (a) extended by mutual written agreement of Agent and Merchant or (b) accelerated by Agent, in which case Agent shall provide Merchant with not less than five (5) days' advance written notice of any such planned accelerated Sale Termination Date (each such notice being a "Vacate Notice"). So long as Agent provides timely notice to Merchant in accordance with the preceding sentence, Agent shall only be responsible for its per diem share of the Occupancy Expenses for any month during which the applicable Store was vacated (based on the number of days of the applicable month during which the applicable Store was occupied by Agent), subject in all respects to Section 4.1(a) hereof. If Agent fails to provide Merchant with timely notice of an acceleration of the Sale Termination Date for a Store, Agent shall be liable for and shall pay any Occupancy Expenses solely until the date such notice would be deemed timely in accordance with the terms of this Agreement.

6.2    Vacating the Closing Stores. Subject to the terms of Section 6.1 hereof, Agent shall provide Merchant with not less than five (5) days' advance written notice of its intention to vacate any Store (as to each, as applicable, the "Vacate Date"). On the Vacate Date, Agent shall vacate such Store in favor of Merchant or its representatives or assignee (subject to Agent's right to abandonment) and shall remove all Remaining Merchandise and any unsold Additional Agent Merchandise from the Store, and leave such Store in "broom clean" condition (ordinary wear and tear excepted) subject to the right to abandon, neatly in place, any assets of the Merchant (including, without limitation, any unsold Owned FF&E and any Merchant Consignment Goods). Agent's obligations to pay all Expenses, including Occupancy Expenses, for each Store subject to Vacate Notice shall continue only until the earlier of the (a) applicable Vacate Date for such Store, or (b) the Sale Termination Date. All assets of Merchant used by Agent in the conduct of the Sale (e.g., FF&E, supplies, etc.) shall be returned by Agent to Merchant or left at the Stores or Distribution Centers, to the extent same have not been used in the conduct of the Sale or have not been otherwise disposed of through no fault of Agent. Any reference in this Section 6 to vacating the Stores means vacating the Stores, as applicable, in favor of Merchant, its representatives, or assignee and shall not mean Merchant vacating possession or disclaimer of lease in favor of the landlord or owner of the Store premises. Agent agrees that it shall be obligated to repair any damage caused by Agent (or any representative, agent, or licensee thereof) to any Store during the

- 26 -

HIGHLY CONFIDENTIAL                    SEARS_507B_00000797

Sale Term, ordinary wear and tear excepted. Agent shall have the right to abandon in place any asset of Merchant (including, without limitation, any unsold Owned FF&E).

Section 7.     Intentionally Omitted.

Section 8.     Conduct of the Sale.

8.1     Rights of Agent and Merchant. Subject to the Approval Order and the Sale Guidelines, Agent shall be permitted to conduct a "going out of business", "total liquidation", "store closing", "sale on everything", "everything must go", "everything on sale", or similar-themed sale at the Stores throughout the Sale Term. Agent shall conduct the Sale in the name of and on behalf of Merchant in a commercially reasonable manner and in compliance with the terms of this Agreement and, except as modified by the Approval Order, all governing laws and applicable leases to which Merchant is a party. Agent shall conduct the Sale in accordance with the sale guidelines annexed hereto as Exhibit 8.1 and approved by the Approval Order (the "Sale Guidelines"), whether by in-store promotion, media advertising, or other promotional materials. Merchant shall have the right to monitor the Sale and activities attendant thereto and to be present in the Stores during the hours when the Stores are open for business, so long as Merchant's presence does not unreasonably disrupt the conduct of the Sale. Merchant shall also have a right of access to the Stores at any time in the event of an emergency situation and shall promptly notify Agent of such emergency. In addition to any other rights granted to Agent hereunder, in conducting the Sale, Agent, in the exercise of its sole discretion, shall have the following rights, limited by the Sale Guidelines:

(a)     except as otherwise provided in the Approval Order, to establish Stores' hours, which are consistent with the terms of applicable leases, mortgages, or other occupancy agreements and local laws or regulations, including, without limitation, Sunday closing laws; and will not extend the hours of operation at one or more of the Stores beyond the hours historically operated by Merchant;

(b)     to use without charge during the Sale Term (except where otherwise designated as an Expense pursuant to Section 4.1 hereof), (i) all furniture, fixtures and equipment and leasehold improvements, (ii) bank accounts, (iii) Store-level, Distribution Center-level, and corporate computer hardware and software, (iv) customer lists, mailing lists, email lists, and web and social networking sites utilized by Merchant in connection with its business (but solely in connection with advertising the Sale and pursuant to such reasonable restrictions requested by Merchant in order for Merchant to comply with its privacy policy and applicable laws governing the use and dissemination of confidential consumer personal data; and, for the avoidance of doubt, Agent shall have no rights with respect to the E-Commerce Platforms (as defined in Section 8.9 hereof) unless the election thereunder is made by Agent ,(v) existing supplies located at the Stores or Distribution Centers, (vi) intangible assets (including Merchant's names, logos, and tax identification numbers), (vii) Stores and Distribution Centers' keys, case keys, security codes, and safe and lock combinations required to gain access to and operate the Stores and Distribution Centers, (viii) reasonably sized and placed office space at Merchant's COs and Distribution Centers to coordinate the management of the Sale; and (ix) any other assets of Merchant located at the Stores or Distribution Centers (whether owned, leased, or licensed) consistent with applicable terms of leases or licenses. Agent shall exercise due care and return to Merchant

- 27 -

HIGHLY CONFIDENTIAL                                      SEARS_507B_00000798

immediately at the end of the Sale all materials and supplies except materials or supplies expended. Without limiting the generality of the foregoing, in connection with such use under subsection (iv), (1) Agent shall have the right to solely determine the content and timing of such communications and posts and to include, from time to time, Sale related advertising, coupons, and information; (2) Merchant shall not grant to any third-party buyer the right to use such lists or sites in any manner inconsistent with the foregoing, and any agreement with any such buyer shall include a negative covenant that such buyer and its affiliates will not publicly advertise their business in any manner inconsistent with Agent's advertisement of the Sale; and (3) Merchant will incorporate the terms hereof into any chapter 11 plan of reorganization that provides for the continued operation of any retail stores that are not Stores hereunder, its E-Commerce Platform, and/or any other retail sales channel;

(c)    Merchant agrees and covenants that it shall be responsible for performing and providing to Agent such Central Services and Distribution Center Services necessary or incident to the conduct of the Sale, including, but not limited to, use of Merchant's central office facilities, central administrative services, and personnel to process payroll, perform MIS, and provide other central office services necessary for the Sale; provided, however, that, in the event Agent expressly requests Merchant to provide services other than those normally provided to the Stores and/or Distribution Centers by Merchant in the ordinary course of business or as expressly contemplated by this Agreement, Agent shall be responsible to reimburse Merchant for the actual incremental cost of such services incurred by Merchant as an Expense of the Sale hereunder;

(d)    to establish Sale prices and implement advertising, signage (including A-frame, interior and exterior banners and signs and sign walkers), and promotional programs consistent with the sale theme described herein, and as otherwise provided in the Approval Order and the Sale Guidelines, as and where applicable (including, without limitation, by means of media advertising, A-frame, interior and exterior banners and signs, use of sign walkers and similar signage);

(e)    to transfer Merchandise between and among the Stores provided, however, the Agent shall not transfer Merchandise between and among Stores so as to make the Merchandise unavailable for purposes of the Inventory Taking;

(f)    [Intentionally Omitted];

(g)    to supplement the Merchandise at the Stores with Additional Agent Merchandise in accordance with Section 8.10 hereof; and

(h)    to conduct the Sale in accordance with the Sale Guidelines attached hereto as Exhibit 8.1.

8.2    Terms of Sales to Customers.  Subject to Agent's compliance with applicable law (as determined with reference to the Approval Order), all sales of Merchandise will be "final sales" and "as is" and all advertisements and sales receipts will reflect the same.  Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash or nationally recognized credit and debit cards.  Agent may, in its sole discretion, accept and honor Merchant's

- 28 -

HIGHLY CONFIDENTIAL    SEARS_507B_00000799

employee discount terms on the price of Merchandise as in effect immediately prior to the commencement of the Sale Term so as such employee discount shall not be additive to any other discount that may become available after the commencement of the Sale Term, including as otherwise provided for in this Agreement. Merchant shall have no obligation to reimburse Agent for any amounts related to Merchant's employee discount terms, nor shall any such amounts constitute an Expense. During the Sale Term, Agent shall not accept coupons or groupons. Agent shall clearly mark all receipts for the Merchandise sold at the Stores during the Sale Term, so as to distinguish such Merchandise from the merchandise sold prior to the Sale Commencement Date.

8.3    Sales Taxes.

(a)    During the Sale Term, all sales, excise, gross receipts, transfer and other taxes attributable to sales of Merchandise, Additional Agent Merchandise, Merchant Consignment Goods and/or Owned FF&E as indicated on Merchant's point of sale equipment (other than taxes on income, but specifically including, without limitation, gross receipts taxes) payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise, Additional Agent Merchandise, Merchant Consignment Goods and/or Owned FF&E and collected by Agent in trust for Merchant at time of sale and except for Sales Taxes for Additional Agent Merchandise, shall be paid over to Merchant. All Sales Taxes that are paid over pursuant to the preceding sentence shall be deposited on no less than a bi-weekly basis into a segregated account designated by Merchant and Agent solely for the deposit of such Sales Taxes (the "Sales Taxes Account"). If Agent does not timely remit the applicable Sales Taxes to Merchant, Merchant shall be permitted to draw on the Letter of Credit in the full amount of the applicable Sales Taxes collected by Agent in the preceding week in accordance with Section 3.3(f). Provided that Agent has collected all applicable Sales Taxes during the Sale and remitted the proceeds thereof to Merchant, Merchant shall promptly pay all applicable Sales Taxes and file all applicable reports and documents required by the applicable taxing authorities. Notwithstanding anything to the contrary herein, Agent shall reimburse Merchant for any additional Sales Taxes, interest, fines, penalties, and similar amounts payable to any taxing authority as the result of a Sales Tax audit conducted by or on behalf of such authority which discloses that the Sales Taxes collected by Agent and paid over to Merchant for any period during the Sale Term were less than those mandated by applicable law for the sale of Merchandise, Merchant Consignment Goods and/or Owned FF&E, if any, that is sold by Agent under this Agreement (any such additional Sales Taxes and other amounts are collectively referred to herein as "Additional Taxes and Penalties"). Merchant will be given access to the computation of gross receipts for verification of all such Sales Tax collections. Agent shall add Sales Tax to the sale price of all    (i)Additional Agent Merchandise and (ii) Remaining Merchandise and deposit such amounts into the Sales Taxes Account or existing accounts, trust accounts or other accounts designated by Agent for remittance by Merchant, on behalf of Agent, to the appropriate taxing authority. If Agent fails to perform its responsibilities, and provided that Merchant complies with its obligations in accordance with this Section 8.3, Agent shall indemnify and hold harmless Merchant and its officers, directors, employees, agents and independent contractors (collectively, "Merchant Indemnified Parties") from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines, or penalties (including but not limited to all Additional Taxes and Penalties) that Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and remit them to Merchant and/or, to the extent Agent is required hereunder to prepare reports and other documents, the failure by Agent to promptly deliver any and all reports and other

- 29 -

HIGHLY CONFIDENTIAL    SEARS_507B_00000800

documents required to enable Merchant to file any requisite returns with such taxing authorities. Provided that Agent performs its responsibilities in accordance with this Section 8.3, Agent shall have no further obligation to the Merchant, any Interested Party, any taxing authority, or any other party, and Merchant (and any Interested Party to the extent such party has received funds on account of the Sales Taxes in contest) shall indemnify and hold harmless Agent and its officers, directors, employees, agents and Supervisors (collectively, "Agent Indemnified Parties") from and against all claims, demands, assessments, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required by applicable law to be filed with or delivered to such taxing authorities.

(b)     Without limiting the generality of Section 8.3(a) hereof, the Parties intend that because Agent will conduct the Sale solely as agent for Merchant, the various payments that this Agreement contemplates (including the payment by Agent of the Guaranteed Amount) in respect of the Sale do not represent the sale of tangible personal property and, accordingly, are not subject to Sales Taxes.

8.4     Supplies.     Agent shall have the right to use all existing supplies necessary to conduct the Sale (e.g., boxes, bags, and twine, but not gift certificates, rain checks, merchandise credits, or the like) located at the Stores and/or Distribution Centers at no charge to Agent. In the event that additional supplies are required in any of the Stores or the Distribution Centers and Agent requests such additional supplies, the acquisition of such additional supplies shall be the responsibility of Agent as an Expense; provided, however, that if reasonably requested by Agent, Merchant shall assist Agent in obtaining supplies, at Agent's expense, from Merchant's vendors at Merchant's usual and customary costs for such supplies. Merchant does not warrant that Merchant's existing supplies as of the Sale Commencement Date are adequate for purposes of the Sale.

8.5     Returns of Merchandise.     During the Sale Term, Agent shall (a) accept returns of Merchandise sold by Merchant prior to the Sale Commencement Date in accordance with Merchant's return policies in effect at the time of purchase (to the extent presented in accordance with the foregoing terms, each such item being defined herein as "Returned Merchandise") and (b) maintain a separate log recording each such return. Merchant shall reimburse Agent in cash or credit against the following week's payment for the amount of any store credit, refund, or exchange given to any customer in respect of Returned Merchandise. To the extent Returned Merchandise is salable as first quality merchandise, it shall be included in Merchandise and for purposes of the calculation of the Guaranteed Amount and shall be valued at the Cost Value and Retail Price applicable to such item, multiplied in each case, solely to the extent the applicable return occurs after the Prevailing Discount Deadline, by the inverse of the excess of the (i) the prevailing Sale discount in effect on the date such item is returned over (ii) the Merchant's discount with respect to such item as of the Sale Commencement Date (provided such excess is a positive number). Subject to Merchant's reimbursement to Agent of the amount of any store credit, refund, or exchange granted for any such Returned Merchandise, the aggregate Cost Value of the Merchandise shall be increased by the Cost Value of any Returned Merchandise, and the Guaranteed Amount shall be adjusted accordingly. If the Returned Merchandise is not first quality

- 30 -

HIGHLY CONFIDENTIAL                                                              SEARS_507B_00000801

goods, Merchant and Agent shall negotiate in good faith to determine an appropriate Cost Value applicable to such merchandise for purposes of determining the Cost Value attributable thereto; provided that, in the event Merchant and Agent cannot agree on the Cost Value to be attributed to any particular item(s) of Returned Merchandise, than such item(s) shall be segregated form Merchandise and excluded from the Sale and treated as Excluded Defective Merchandise for all purposes hereunder. Any reimbursements due to Agent as a result of Returned Merchandise shall be accounted for and paid by Merchant immediately following the weekly reconciliation pursuant to Section 8.7(a) hereof. Any increases in payment on account of the Guaranteed Amount as a result of Returned Merchandise shall be paid by Agent as part of the final reconciliation provided for under Section 8.7(b) hereof.

      8.6    <u>Gift Cards; Merchandise Credits; Membership Program.</u>

      (a)    During the Sale Term, Agent shall accept Merchant's gift cards, gift certificates, merchandise credits and other similar Merchant-issued credits, if any; provided, however, Agent shall not advertise the acceptance of gift cards, gift certificates, merchandise credits and other similar Merchant issued credits other than as necessary to comply with the Approval Order, Sale Guidelines, and/or consumer protection laws constituting Applicable General Laws, including without limitation by (i) signage at the point of sale of the Stores and (ii) advertisements regarding the Sale generally. Merchant shall reimburse Agent in cash for gift card, gift certificate, merchandise credit, and other similar Merchant issued credit amounts redeemed during the Sale Term as part of the weekly sale reconciliation provided for in Section 8.7(a) hereof.

      (b)    To the extent Merchant maintains any customer membership or customer loyalty discount programs (including, without limitation, ShopYourWay and similar programs), Agent may, in its sole discretion, permit said customers to take advantage of discounts afforded customers in connection with Merchant's customer membership or customer loyalty discount programs ("Membership Program Discounts") in addition to the then-prevailing Sale discounts being offered by Agent (for example, a "take an additional 10% off" Membership Program Discount may be combined with Agent's thirty percent (30%) prevailing sale discount, such that the affected customer would receive an effective discount of thirty-seven percent (37%)), but Agent shall not be reimbursed by Merchant for any incremental increased discount nor shall such increased discount constitute an Expense. During the Sale Term, Merchant and Agent shall not continue to accrue benefits under Merchant's customer membership or customer loyalty discount programs; provided that Merchant alone shall be obligated to prevent such accrual and Agent shall not be liable in any fashion for Merchant's failure to do so.

      (c)    Except as expressly set forth in this Agreement, all sales will be made only for cash, nationally recognized bank credit cards, and, in Agent's discretion, personal checks, provided, however, if Agent determines to accept personal checks, Agent shall bear the risk of loss therefor.

      8.7    <u>Sale Reconciliation.</u>

      (a)    <u>Weekly Reconciliation</u>. On each Wednesday during the Sale Term, commencing on the second Wednesday after the Sale Commencement Date, Merchant (in consultation with the Official Committee of Unsecured Creditors appointed in this Bankruptcy

- 31 -

HIGHLY CONFIDENTIAL      SEARS_507B_00000802

Case (the "Committee")) and Agent shall cooperate to reconcile Expenses, Gross Rings, proceeds of Additional Agent Merchandise, Returned Merchandise, and such other Sale-related items (as either party shall reasonably request, in each case for the prior week or partial week (i.e., Sunday through Saturday), pursuant to procedures agreed upon by Merchant and Agent. On a weekly basis, Agent shall also provide Merchant (who shall provide a copy to the Senior DIP Agent and the Committee) with a report (in electronic format acceptable to Merchant) of all sales of Additional Agent Merchandise, which report shall detail by Store, at a minimum, gross sales and type of items sold. To ensure accurate sales audit functions, Agent shall use Merchant's existing point-of-sale system for recording all sales (including any sales of Additional Agent Merchandise) in the Stores.

  (b) <u>Final Reconciliation</u>.

   (i) Within thirty (30) days after the Sale Termination Date applicable to the last Store in which the Sale is concluded, Merchant and Agent shall jointly prepare a final reconciliation of the Sale including, without limitation, a summary of Proceeds, Sales Taxes, Additional Agent Merchandise Proceeds, sales of Merchant Consignment Goods, proceeds of Owned FF&E, Expenses, and any other accountings required hereunder (the "<u>Final Reconciliation</u>"). Within five (5) days after completion of the Final Reconciliation (the "<u>Final Reconciliation Settlement Date</u>"), Agent shall pay to Merchant or Merchant shall pay to Agent (as the case may be) any and all amounts due the other as set forth in the Final Reconciliation, including, but not limited to, any undisputed and unpaid Expenses. In the absence of an order of the Bankruptcy Court to the contrary, no disputed amounts owing hereunder shall be paid until the dispute has been resolved by agreement of Merchant and Agent or as determined in the manner prescribed in Section 8.7(b)(ii) hereof. During the Sale Term, and until all of Agent's obligations under this Agreement have been satisfied, Merchant and Agent shall have reasonable access to Merchant's and Agent's records with respect to Proceeds, Sales Taxes, Additional Agent Merchandise Proceeds, sales of Merchant Consignment Goods, proceeds of Owned FF&E, Expenses, and other Sale-related items to review and audit such records.

   (ii) In the event that there is any dispute with respect to either (x) the determination of the aggregate Cost Value of the Merchandise, (y) the Final Reconciliation and/or (z) any other dispute relating to this Agreement, such dispute shall be promptly (and in no event later than the fifth (5th) business day following a request by either Merchant or Agent) submitted to the Bankruptcy Court for resolution. In the event of a dispute as to (x), (y) or (z) above, Agent shall extend the Letter of Credit in accordance with the provisions of Section 3.3. If Agent has for any reason not so extended the expiration date of the Letter of Credit by the date that is ten (10) days prior to the applicable expiration date (as may have been extended previously), Merchant shall have the right to make a drawing under the Letter of Credit in an amount or amounts equal to the undisputed amounts Merchant asserts are then owing to Merchant in accordance with the terms of Section 3.3(e).

  8.8 <u>Force Majeure</u>. If any casualty, act of war or terrorism, or act of God prevents the conduct of business in the ordinary course at any Store for a period in excess of five (5) consecutive days (a "<u>Force Majeure Event</u>"), such Store and the Merchandise located at such Store (unless

HIGHLY CONFIDENTIAL  SEARS_507B_00000803

subject to insurance proceeds or transferred to another Store) shall be eliminated from the Sale and considered to be deleted from this Agreement as of the first date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; provided, however, that (i) the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder, and (ii) the Guaranteed Amount shall be reduced to account for any Merchandise eliminated from the Sale that is not the subject of insurance proceeds or consolidated by Agent into another Store(s) and, to the extent Agent has paid the Guaranteed Amount to Merchant, Merchant (or the Interested Parties, as applicable) shall reimburse Agent for the amount by which the Guaranteed Amount is so reduced prior to the end of the Sale Term.  If a Store is eliminated from the Sale due to a Force Majeure Event, Agent will use its commercially reasonable efforts to transfer therefrom all Merchandise that is not the subject of insurance proceeds and include such Merchandise in the Sale at other Stores.

8.9    E-Commerce Platform.  With respect to the e-commerce sales platforms related to or associated with sears.com, kmart.com, and any other related domains (each, the "E-Commerce Platform") Agent and Merchant agree that Agent shall have the option, exercisable no later than the Sale Commencement Date, to use the E-Commerce Platform in connection with the Sale to fulfill customer orders made during the Sale Term and otherwise promote the Sale (in Agent's capacity as Agent hereunder).  If Agent exercises the option to use the E-Commerce Platform as a sales platform to fulfill customer orders, (i) Merchant shall continue to provide for the operation and maintenance of the E-Commerce Platform and provide Agent with all assistance with respect to the functionality of the E-Commerce Platform, fulfillment of orders, and promotion of the Sale and (ii) Agent shall pay Merchant (as an Expense, which shall be in addition to other Expenses contemplated by this Agreement) for the actual costs and expenses (x) incurred and paid by Merchant after the Sale Commencement Date through the date on which the Agent directs the Merchant to cease fulfilling customer orders, (y) that are directly attributed to the continued operation and maintenance of the E-Commerce Platform, and (z) reflected on Exhibit 8.9 ((ii)(x)-(z), the "E-Commerce Platform Expenses"); provided, however, that Agent is only obligated to pay the E-Commerce Platform Expenses to the extent such E-Commerce Platform Expenses are not otherwise included as an Expense of the Sale under Section 4.1 hereof (including, but not limited to, as part of Central Services)).  If Agent exercises the option to use the E-Commerce Platform as a sales platform to fulfill customer orders and thereafter discontinues using it as a sales platform to fulfill customer orders, Agent's obligations to pay the E-Commerce Platform Expenses shall cease upon the date that is seven (7) days after Agent provides Merchant with notice of Agent's intention to discontinue using the E-Commerce Platform as a sales platform to fulfill customer orders; provided, further however, that, if Agent continues the Sale at the Stores after the date on which Agent discontinues using the E-Commerce Platform as a sales platform to fulfill customer orders, Merchant shall, as a Central Service and at no cost or expense to Agent (other than as part of Central Service Expenses), maintain the E-Commerce Platform with limited functionality for the limited purposes of advertising and promoting the Sale at the Stores, periodically updating such advertising and promotions, and maintaining and updating the Store locator function at no cost or expense to Agent.  If Agent exercises the option to use the E-Commerce Platform as a sales platform to fulfill customer orders, in addition to the foregoing, Agent shall provide Merchant with written notice of such election no later than the Sale Commencement Date and Agent and Merchant hereby agree to the following:  (i) all Merchandise sold through the E-Commerce Platform shall be counted based on shipments to customers; (ii) Merchant and Agent shall mutually agree upon

- 33 -

HIGHLY CONFIDENTIAL

an allocation of Merchandise to be sold using the E-Commerce Platform, which Merchandise shall not be subject to the requirement to arrive at the Stores by the Receipt Deadline; (iii) Agent shall be authorized to sell Additional Agent Merchandise through the E-Commerce Platform; and (iv) the Parties may implement such other processes, procedures, and agreements as may be necessary or appropriate for the efficient and continued operation of the E-Commerce Platform. In the event Agent elects not to exercise its rights to use the E-Commerce Platform as a sales platform to fulfill customer orders, Merchant agrees that neither Merchant nor any other person or entity shall complete any sale of goods for Merchant's or any other person's or entity's account utilizing the E-Commerce Platform during the Sale Term, Merchant shall otherwise comply with Merchant's obligations under this Agreement in respect of the E-Commerce Platform, and Merchant shall, as a Central Service and at no cost or expense to Agent (other than as part of Central Service Expenses), maintain the E-Commerce Platform with limited functionality for the limited purposes of advertising and promoting the Sale at the Stores, periodically updating such advertising and promotions, and maintaining and updating the Store locator function.

8.10    Additional Agent Merchandise.

(a)    Agent shall have the right to supplement the Merchandise in the Sale with additional first quality goods procured by Agent which are of like kind and no lesser quality than the Merchandise in the Sale ("Additional Agent Merchandise"); provided that (x) Agent shall be responsible for payment of the costs associated with procuring any Additional Agent Merchandise, (y) Agent shall pay for all costs and expenses related to, or incurred in connection with, obtaining, handling, transporting, delivering, unloading, storing, and sale of the Additional Agent Merchandise, which costs shall not constitute Expenses and (z) Additional Agent Merchandise shall be purchased by Agent at Agent's sole expense (and such purchase price shall not constitute an Expense hereunder).

(b)    Agent and Merchant intend that the transactions relating to the Additional Agent Merchandise are, and shall be construed as, a true consignment from Agent to Merchant in all respects and not a consignment for security purposes. Subject solely to Agent's obligations to pay to Merchant the Additional Agent Merchandise Fee, at all times and for all purposes the Additional Agent Merchandise and the Additional Agent Merchandise Proceeds shall be the exclusive property of Agent, and no other person or entity shall have any claim against any of the Additional Agent Merchandise or the Additional Agent Merchandise Proceeds. The Additional Agent Merchandise shall at all times remain subject to the exclusive control of Agent.

(c)    If requested by Agent, Merchant shall, at Agent's expense, insure the Additional Agent Merchandise and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers. Agent shall be responsible for payment of any deductible under any such insurance in the event of any casualty affecting the Additional Agent Merchandise.

(d)    Merchant acknowledges, and the Approval Order shall provide, that the Additional Agent Merchandise shall be consigned to Merchant as a true consignment under Article 9 of the Uniform Commercial Code in the State of New York (the "UCC"). Subject to Agent's obligation to pay the Additional Agent Merchandise Fee, if any, Agent is hereby granted a first priority security interest in and lien upon (i) the Additional Agent Merchandise and (ii) the

- 34 -

HIGHLY CONFIDENTIAL                                        SEARS_507B_00000805

Additional Agent Merchandise Proceeds, which security interest shall be deemed perfected pursuant to the Approval Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Agent is hereby authorized to deliver all required or desirable notices and file all necessary or desirable financing statements and amendments thereof under the applicable UCC identifying Agent's interest in the Additional Agent Merchandise and the Additional Agent Merchandise Proceeds as consigned goods thereunder and the Merchant as the consignee therefor, and Agent's security interest in and lien upon such Additional Agent Merchandise and Additional Agent Merchandise Proceeds).

(e)    Sales of Additional Agent Merchandise shall be run through Merchant's cash register systems, provided however, Agent shall mark the Additional Agent Merchandise using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Agent Merchandise from the sale of Merchandise.]³  Agent and Merchant shall also cooperate so as to ensure that the Additional Agent Merchandise is marked in such a way that a reasonable consumer could identify the Additional Agent Merchandise as non-Merchant goods.   Additionally, Agent shall provide signage in the Stores notifying customers that the Additional Agent Merchandise have been included in the Sale.

(f)    The Interested Parties shall, by virtue of their consent to entry of the Approval Order, be deemed to have acknowledged receipt of notice of the consignment of the Additional Agent Merchandise and consent to the payments to Agent of Additional Agent Merchandise Proceeds (subject to Agent's obligation with respect to the Additional Agent Merchandise Fee payable hereunder) and the Approval Order shall so provide.

Section 9.    Employee Matters.

9.1    Merchant's Employees.  Subject to the applicable provisions of the Approval Order and any other provisions in this Agreement relating to employees, Agent may use Merchant's Store employees in the conduct of the Sale to the extent Agent deems expedient, and Agent may select and, after consulting with Merchant, schedule the number and type of Merchant's employees required for the Sale.  Agent shall identify any such Store employees to be used in connection with the Sale (each such employee, a "Retained Employee") prior to the Sale Commencement Date. Retained Employees shall at all times remain employees of Merchant, and shall not be considered or deemed to be employees of Agent.  Merchant and Agent agree that except to the extent that wages, payroll taxes, benefits, and other costs relating to the employment of Retained Employees constitute Expenses hereunder and except as otherwise expressly provided in this Agreement, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Excluded Benefits, Worker Adjustment Retraining Notification Act ("WARN Act") claims, and other termination-type claims and obligations, or any other amounts required to be paid by statute or law (except to the extent such items are amounts for which Merchant is entitled to indemnification pursuant hereto), nor shall Agent become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees.  Merchant shall not, without Agent's prior written consent, raise the salary or wages or increase the benefits for, or pay any bonuses or

---

³ Note to Draft: Under review by Sears.

US_137191272v1_340878-00024 12/27/2018 2:05 PM

HIGHLY CONFIDENTIAL                                                                          SEARS_507B_00000806

make any other extraordinary payments to, any of the Retained Employees, except as otherwise provided in this Agreement.

9.2     <u>Termination of Employees by Merchant</u>.  Agent may in its discretion stop using any Retained Employee at any time during the Sale.  In the event Agent determines to discontinue its use of any Retained Employee in connection with the conduct of the Sale, Agent will provide written notice to Merchant at least five (5) days prior thereto, except for termination "for cause" (such as dishonesty, fraud, or breach of employee duties), in which case the five (5) day notice period shall not apply; <u>provided</u>, <u>however</u>, that Agent shall notify Merchant of the basis for such "cause".  During the Sale Term, Merchant shall not transfer or dismiss employees of the Stores except "for cause" without Agent's prior consent (which consent shall not be unreasonably withheld).  Notwithstanding any other provision hereof, Agent will indemnify Merchant with respect to any claims by Retained Employees arising from Agent's actionable treatment of such Retained Employees as provided for in Section 13.2 below.

9.3     <u>Payroll Matters</u>.  Subject to Section 4.1 hereof, during the Sale Term Merchant shall process the payroll for all Retained Employees and any former employees and temporary labor engaged for the Sale.  Each Wednesday prior to the date on which such payroll is payable (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Agent shall transfer to Merchant's payroll accounts an amount equal to the base payroll for Retained Employees plus related payroll taxes, workers' compensation and benefits for such week, in the amount required under Section 4.1(b) and (c).

9.4     <u>Employee Retention Bonuses</u>.  Agent shall pay, as an Expense hereunder, retention bonuses ("<u>Retention Bonuses</u>") (which bonuses shall be inclusive of payroll taxes but as to which no benefits shall be payable) up to a maximum of approximately 10% of base payroll, to certain Retained Employees who do not voluntarily leave employment and are not terminated "for cause", as Agent shall determine in its sole discretion.  The amount of such Retention Bonuses, which will be payable within thirty (30) days after the Sale Termination Date, shall be in an amount to be determined by Agent, in its discretion, and shall be processed through Merchant's payroll system.  Agent shall provide Merchant with a copy of Agent's Retention Bonus plan within three (3) business days after the Sale Commencement Date.  Agent shall not utilize the Retention Bonus as a mechanism to encourage Retained Employees to act contrary to Merchant's best interests.

Section 10.     <u>Conditions Precedent</u>.

10.1     <u>Conditions to Agent's Obligations</u>.  The willingness of Agent to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Agent:

(a)     All representations and warranties of Merchant hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and as of the Sale Commencement Date;

- 36 -

HIGHLY CONFIDENTIAL                                              SEARS_507B_00000807

(b)    No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated by this Agreement (including, without limitation, the Sale);

(c)    The Bankruptcy Court shall have entered the Approval Order, in substantially the form annexed hereto as <u>Exhibit 10.1(c)</u> or as otherwise reasonably acceptable to Agent, on or before January 18, 2019;

(d)    Merchant shall have obtained an order, *inter alia*, approving pursuant to Section 365(d)(4) of the Bankruptcy Code an extension of Merchant's time to assume or reject the leases for the Stores to a date not sooner than the Sale Termination Date; and

(e)    This Agreement shall have been duly executed and delivered by all Parties.

10.2    <u>Conditions to Merchant's Obligations</u>.  The willingness of Merchant to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Merchant:

(a)    All representations and warranties of Agent hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and as of the Sale Commencement Date, in each case solely as a result of Agent's conduct;

(b)    The Bankruptcy Court shall have entered the Approval Order; and

(c)    This Agreement shall have been duly executed and delivered by all Parties.

Section 11.    <u>Representations, Warranties and Covenants.</u>

11.1    <u>Merchant's Representations, Warranties, and Covenants</u>.  Merchant hereby represents, warrants, and covenants in favor of Agent as follows:

(a)    Merchant (i) is a corporation duly organized, validly existing, and in good standing under the laws of the Delaware; (ii) has all requisite power and authority to own, lease, and operate its assets and properties and to carry on its business as presently conducted and to grant the rights intended to be granted herein as provided herein; and (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which any Store is located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)    Subject to the entry of the Approval Order, (i) Merchant has the right, power, and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "<u>Agency Documents</u>") and to perform fully its obligations hereunder, (ii) Merchant has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents,

- 37 -

HIGHLY CONFIDENTIAL                                                    SEARS_507B_00000808

and no further consent or approval on the part of Merchant (or any third party) is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale (other than entry of the Approval Order), (iii) each of the Agency Documents has been duly executed and delivered by Merchant and constitutes the legal, valid, and binding obligation of Merchant, enforceable in accordance with its terms, and (iv) no court order or decree of any federal, state, local, or provincial governmental authority or regulatory body is in effect that would prevent or materially impair, or is required for Merchant's consummation of, the transactions contemplated by this Agreement.

(c)     Merchant (i) except as set forth on Exhibit 11.1(c), owns and will own at all times during the Sale Term, good and marketable title to all of the Merchandise, Merchant Consignment Goods and, unless otherwise sold by Merchant in accordance with Section 15, Owned FF&E free and clear of all liens, claims, and encumbrances of any nature; provided that, following the sale of the applicable Merchandise, Merchant Consignment Goods, Owned FF&E, the liens identified in Exhibit 11.1(c) shall attach only to the Guaranteed Amount, the Sharing Amount (if any), the Additional Agent Merchandise Fee (if any), amounts paid or reimbursed to Merchant on account of Expenses and such other amounts due Merchant hereunder in the same extent and priority that such liens had in the Merchandise, Merchant Consignment Goods and Owned FF&E; and (ii) Merchant shall not create, incur, assume, or suffer to exist any security interest, lien, or other charge or encumbrance upon or with respect to any of the Merchandise, Merchant Consignment Goods, Owned FF&E (unless otherwise sold by Merchant in accordance with Section 15), Additional Agent Merchandise, the Proceeds, the Additional Agent Merchandise Proceeds and the proceeds of the sale of Merchant Consignment Goods and the sale of Owned FF&E, in each case, except for such liens and security interests as shall have been disclosed by Merchant to Agent and identified in Exhibit 11.1(c) hereof (but in no event shall any such liens attach to the Additional Agent Merchandise or the Additional Agent Merchandise Proceeds), which liens and security interests shall, pursuant to the Approval Order and following the sale of the applicable Merchandise, Merchant Consignment Goods, Owned FF&E, attach only to the Guaranteed Amount, the Sharing Amount (if any), the Additional Agent Merchandise Fee (if any), Expenses, and any other amounts payable to Merchant hereunder.

(d)     Merchant has maintained its pricing files (including (without limitation) the Cost File) in the ordinary course of business, and prices charged to the public for goods are the same in all material respects as set forth in such pricing files for the periods indicated therein, and all pricing files and records are true and accurate in all material respects as to the actual cost to Merchant for purchasing the goods referred to therein and as to the selling price to the public for such goods without consideration of any point of sale discounts, as of the dates and for the periods indicated therein. The Cost File is true and accurate in all material respects as to the actual cost to Merchant for purchasing the goods referred to therein (without consideration of Excluded Pricing Adjustments) as of the dates and for the periods indicated therein. Merchant represents that (i) the ticketed prices of all items of Merchandise do not and shall not include any Sales Taxes; (ii) all registers located at the Stores are programmed to correctly compute all Sales Taxes required to be paid by the customer under applicable law, as such calculations have been identified to Merchant by its retained service provider; and (iii) the Cost File does not include Excluded Price Adjustments.

US_137191272v1_340878-00024 12/27/2018 2:05 PM

HIGHLY CONFIDENTIAL                                    SEARS_507B_00000809

(e)     Subject to the provisions of the Approval Order, Agent shall have the right for the duration of the Sale Term to the unencumbered use and occupancy of, and peaceful and quiet possession of, the Stores. Merchant shall not assign, reject or otherwise terminate any lease relating to any such Store, or vacate any such Store, until the applicable Sale Termination Date or Vacate Date. Merchant shall, throughout the Sale Term, maintain in good working order, condition and repair (at its own expense, except as expressly set forth herein) all cash registers, POS systems, heating systems, air conditioning systems, elevators, escalators, alarm systems and all other mechanical devices necessary or appropriate for the conduct of the Sale at the Stores. Except as otherwise restricted by the Bankruptcy Code or as provided herein and absent a bona fide dispute, throughout the Sale Term Merchant shall remain current on all expenses and payables necessary for the conduct of the Sale.

(f)     Subject to the Approval Order, Merchant has paid and shall continue to pay throughout the Sale Term, all self-insured or Merchant-funded employee benefit programs for Stores' employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(g)     Except for (i) the Bankruptcy Case and (ii) the matters set forth on Exhibit 11.1(g), no action, arbitration, suit, notice, or legal, administrative, or other proceeding before any court or governmental body has been instituted by or against Merchant, or has been settled or resolved, or to Merchant's knowledge, is threatened against or affects Merchant, relative to Merchant's business or properties, or which questions the validity of this Agreement, or that if adversely determined, would materially adversely affect the conduct of the Sale.

(h)     There are currently no strikes, work stoppages, or other labor disturbances affecting any Store, the Distribution Centers, or the COs.

(i)     As of the date of this Agreement, Merchant has not taken, and shall not throughout the Sale Term take, any actions with the intent of increasing the Expenses of the Sale, including, without limitation, increasing salaries or other amounts payable to employees (except to the extent an employee was due a raise in the ordinary course).

(j)     No Store lease or similar occupancy agreement has expired, nor shall expire at any time until the conclusion of the Sale Term in such Store (by its terms or otherwise).

(k)     Through the Sale Commencement Date, Merchant has ticketed or marked, and shall continue to ticket or mark, all items of inventory received at the Stores in a manner consistent with similar Merchandise located at the Stores, in accordance with Merchant's ordinary course past practices and policies relative to pricing and marking inventory, and readable by the point of sale system in the applicable Store. Since December 15, 2018, Merchant has not removed any POS promotions, sale stickers, or other markings indicating items are on sale or on clearance from the Merchandise prior to the Sale Commencement Date, and have not raised, and will not raise, prices of any Merchandise in contemplation of the Sale.

(l)     Since December 15, 2018, Merchant has not, and through the Sale Commencement Date Merchant shall not, purchase for or transfer to or from the Stores any

- 39 -

HIGHLY CONFIDENTIAL          SEARS_507B_00000810

merchandise or goods outside the ordinary course; provided, however, that in no event shall Merchant transfer any goods into the Stores without Agent's consent from and after the date hereof.

(m)      To Merchant's knowledge after reasonable inquiry, all Merchandise is in compliance with all applicable federal, state and local product safety laws, rules and standards. Merchant shall provide Agent with its historic policies and practices, if any, regarding product recalls prior to the Sale Commencement Date.

(n)      Since December 15, 2018, Merchant has not taken, and shall not throughout the Sale Term take, any actions with the intent of increasing the Expenses of the Sale, including without limitation increasing salaries or other amounts payable to employees; except to the extent an employee was due an annual raise in the ordinary course.

(o)      Since December 15, 2018, Merchant has operated, and, except as otherwise restricted by the Bankruptcy Code or as provided herein and absent a bona fide dispute, through the Sale Commencement Date Merchant covenants to continue to operate, the Stores in all material respects in the ordinary course of business including without limitation by: (i) selling inventory during such period at customary prices consistent with the ordinary course of business; (ii) not promoting or advertising any sales or in-store promotions (including POS promotions) to the public outside of the Merchant's ordinary course of business; (iii) except as may occur in the ordinary course of business, not returning inventory to vendors and not transferring inventory or supplies out of or to the Stores; (iv) except as may occur in the ordinary course of business, not making any management personnel moves or changes at the Stores; and (v) replenishing the Stores in the ordinary course of business.

(p)      Prior to the execution of this Agreement, Merchant has provided Agent reasonable access to all pricing and cost files, computer hardware, software and data files, inter-Stores transfer logs, markdown schedules, invoices, style runs and all other documents relative to the price, mix and quantities of inventory located at the Stores and the Distribution Centers or on order or in transit.

(q)      Merchant has provided representatives of Agent with access to (and the opportunity to copy) all collective bargaining agreements, and all amendments, modifications, and supplements thereto.

(r)      To Merchant's knowledge after reasonable inquiry, all documents, information and supplements provided by Merchant to Agent in connection with Agent's due diligence and the negotiation of this Agreement were true and accurate in all material respects at the time provided.

(s)      On and as of the Sale Commencement Date, the aggregate Cost Value of Merchandise in the Stores branded "Kmart" and Merchandise in the Distribution Centers designated for Sale or allocated to such Kmart Stores (the "Kmart Merchandise") shall not exceed forty percent (40%) of the aggregate Cost Value of all Merchandise.  If the aggregate Cost Value of Kmart Merchandise is greater than forty percent (40%), the Guaranteed Amount shall be adjusted in accordance with Exhibit 11.1(s).

- 40 -

HIGHLY CONFIDENTIAL

SEARS_507B_00000811

(t)     Merchant has not and shall not purchase or transfer to or from the Stores any merchandise or goods outside the ordinary course in anticipation of the Sale.

(u)     Merchant has not since December 15, 2018 shipped any Excluded Defective Merchandise from the Distribution Centers to the Stores.  Merchant will not ship any Excluded Defective Merchandise from the date of this Agreement from the Distribution Centers to the Stores.

(v)     Merchant shall not, prior to the Sale Termination Date, offer any promotions or discounts at the Stores, E-Commerce Platform, any other retail store location, or any other retail sales channel, except as detailed on Exhibit 11.1(v) nor shall Merchant offer in any of the foregoing channels or locations (in the event not part of the Sale) any promotions or discounts during the Sale Term that are equal to or greater than the promotions or discounts offered by the Agent in the Stores.

(w)     Merchant hereby acknowledges that, as of and after the date of this Agreement, Agent intends to begin to make arrangements for the purchase of Additional Agent Merchandise from Agent's suppliers of goods as well as Merchant's existing suppliers of goods. To assist Agent in that regard, from and after the date of this Agreement, Merchant shall use Merchant's best efforts to assist and cause Merchant's employees to assist Agent with Agent's efforts to negotiate orders with Merchant's suppliers for goods that Agent is interested in purchasing as Additional Agent Merchandise.

11.2     Agent's Representations, Warranties and Covenants.    Each entity comprising Agent hereby represents, warrants, and covenants in favor of Merchant as follows:

(a)     Each entity comprising Agent (i) is a limited liability company duly and validly existing and in good standing under the laws of the state of its organization; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; and (iii) is and during the Sale Term will continue to be duly authorized and qualified as a foreign company to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification.

(b)     Each entity comprising Agent has the right, power, and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder.  Each entity comprising Agent has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval is required on the part of any entity comprising Agent for such entity to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale. Each of the Agency Documents has been duly executed and delivered by each entity comprising Agent and constitutes the legal, valid, and binding obligation of such entity enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).  No court order or decree of any federal, provincial, state, or local

- 41 -

HIGHLY CONFIDENTIAL                                                      SEARS_507B_00000812

governmental authority or regulatory body is in effect that would prevent or impair or is required for each entity comprising Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor other than as provided herein. No contract or other agreement to which any entity comprising Agent is a party or by which any entity comprising Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)  No action, arbitration, suit, notice, or legal, administrative, or other proceeding before any court or governmental body has been instituted by or against any entity comprising Agent, or has been settled or resolved, or to the knowledge of any entity comprising Agent, has been threatened against or affects any such entity, which questions the validity of this Agreement or any action taken or to be taken by any such entity in connection with this Agreement, or which if adversely determined, would have a material adverse effect upon the ability of any entity comprising Agent to perform its obligations under this Agreement.

(d)  No change shall be made by Agent to the ticketed price, shelf price, hang-tag price, stickered, PLU or other hard-marked price of any Merchandise at any Store on and after the Sale Commencement Date through the Inventory Date for such Store.

(e)  Prior to the Sale Commencement Date, a member of the contractual joint venture comprising the Agent shall be designated in writing to Merchant and shall constitute the lead agent for purposes of communicating and coordinating with Merchant the Sales or other transactions to be consummated in accordance with the terms of this Agreement.

Section 12.    Insurance.

12.1    Merchant's Liability Insurance. Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies including, but not limited to, general liability, products liability, comprehensive public liability, auto liability, and umbrella liability insurance, covering injuries to persons and property in, or in connection with Merchant's operation of the Stores, and shall endeavor to cause Agent to be named an additional insured with respect to all such policies with respect to the Stores. Prior to the date that is two (2) business days after the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent. All such policies shall require at least thirty (30) days prior notice to Agent of cancellation or non-renewal. In the event of a claim under any such policies, (a) Merchant shall be responsible for the payment of all deductibles, retentions, or self-insured amounts to the extent such claim arises from or relates to the alleged acts or omissions of Merchant or its employees (other than Retained Employees acting on Agent's instructions), agents (other than Agent's employees), or independent contractors (other than Agent and supervisors hired by Agent in conjunction with the Sale) and (b) Agent shall be responsible for the payment of all deductibles, retentions, or self-insured amounts (which amounts shall constitute Expenses) to the extent such claim arises from or relates to the alleged acts or omissions of Agent or its employees, agents, or independent contractors, including Retained Employees acting on Agent's instructions.

- 42 -

HIGHLY CONFIDENTIAL                                                    SEARS_507B_00000813

12.2    Merchant's Casualty Insurance.  Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, fire, flood, theft, and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the Cost Value thereof, which coverage shall be reduced from time to time to take into account the sale of Merchandise.  In the event of a loss to the Merchandise on or after the date of this Agreement, the proceeds of such insurance attributable to the Merchandise (net of any deductible) shall constitute Proceeds.  Prior to the date that is two (2) business days after the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof in form and substance reasonable satisfactory to Agent.  All such policies shall require at least thirty (30) days prior notice to Agent of cancellation or non-renewal.  Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date (as may be extended from time to time as set forth herein) without Agent's prior written consent.

12.3    Worker's Compensation Insurance.    Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, worker's compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements.  Prior to the Sale Commencement Date, Merchant shall deliver to Agent a certificate of its insurance broker or carrier evidencing such insurance.

12.4    Agent's Insurance.  As an Expense of the Sale, Agent shall maintain throughout the Sale Term, in such amounts as it currently has in effect, comprehensive public liability, and automobile insurance policies covering injuries to persons and property in or in connection with Agent's agency at the Stores, and shall cause Merchant to be named an additional insured with respect to such policies.  Prior to the date that is two business days after the Sale Commencement Date, Agent shall deliver to Merchant certificates evidencing such insurance policies, setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonably satisfactory to Merchant.  In the event of a claim under such policies, Agent shall be responsible for the payment of all deductibles, retentions, or self-insured amounts thereunder, to the extent such claim arises from or relates to the alleged acts or omissions of Agent or Agent's employees, agents or supervisors.

12.5    Risk of Loss.  Without limiting any other provision of this Agreement, Merchant acknowledges that Agent is conducting the Sale on behalf of Merchant solely in the capacity of an agent, and that in such capacity (i) Agent shall not be deemed to be in possession or control of the Stores, Distribution Centers, or the assets located therein or associated therewith, or of Merchant's employees located at the Stores or Distribution Centers, and (ii) except as expressly provided in this Agreement, Agent does not assume any of Merchant's obligations or liabilities with respect to any of the foregoing.  Agent shall not be deemed to be a successor employer.  Merchant and Agent agree that, subject to the terms of this Agreement, Merchant shall bear all responsibility for liability claims of customers, employees, and other persons arising from events occurring at the Stores during and after the Sale Term, except to the extent any such claim arises directly from the acts or omissions of Agent, or its supervisors, agents, independent contractors, or employees located at the Stores (an "Agent Claim").  In the event of any liability claim other than an Agent Claim, Merchant shall administer such claim and shall present such claim to Merchant's liability insurance carrier in accordance with Merchant's policies and procedures existing immediately prior to the Sale Commencement Date, and shall provide a copy of the initial documentation relating to such claim to Agent at the address listed in this Agreement.  To the extent that Merchant and Agent

- 43 -

HIGHLY CONFIDENTIAL                    SEARS_507B_00000814

agree that a claim constitutes an Agent Claim, Agent shall administer such claim and shall present such claim to its liability insurance carrier, and shall provide copies of the initial documentation relating to such claim to Merchant. In the event that Merchant and Agent cannot agree whether a claim constitutes an Agent Claim, each party shall present the claim to its own liability insurance carrier, and a copy of the initial claim documentation shall be delivered to the other party to the address designated for delivery of notices hereunder.

Section 13.    Indemnification.

13.1    Merchant Indemnification. Merchant shall indemnify and hold Agent and each Agent Indemnified Party harmless from and against all claims, demands, penalties, losses, liability, or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against Agent resulting from or related to:

(a)    Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document;

(b)    any failure of Merchant to pay to its employees any wages, salaries, or benefits due to such employees during the Sale Term or other claims asserted against Agent by Merchant's employees resulting from Merchant's (and not Agent's) treatment of its employees;

(c)    any consumer warranty, products liability, intellectual property infringement, or other claims relating to Merchandise;

(d)    any harassment or any other unlawful, tortious, or otherwise actionable treatment of any customers, employees or agents of Agent by Merchant or any of its employees or representatives; and

(e)    the gross negligence or willful misconduct of Merchant or any of its officers, directors, employees, agents (other than Agent), or representatives.

(f)    subject to Agent's compliance with its obligations under Section 8.3 hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof;

(g)    any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the WARN Act).

The indemnification obligations set forth in this Section 13.1 shall be in addition to (and shall not limit) any other indemnification obligations of Merchant set forth in this Agreement, including without limitation those set forth in Section 8.3(a). Notwithstanding anything to the contrary herein, the indemnification obligations set forth in this Section 13.1 shall not apply to any Agent Claims.

- 44 -

HIGHLY CONFIDENTIAL                                    SEARS_507B_00000815

13.2    <u>Agent Indemnification</u>.    Agent shall jointly and severally indemnify and hold harmless Merchant and the Merchant Indemnified Parties from and against all claims, demands, penalties, losses, liability, or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against Merchant resulting from or related to (including acts or omissions of persons or entities affiliated with or acting on behalf of Agent):

(a)    Agent's material breach of or failure to comply with any Safety Laws (as defined in the Approval Order) or any of its agreements, covenants, representations, or warranties contained in any Agency Document;

(b)    any harassment, discrimination, or violation of any laws or regulations or any other unlawful, tortious, or otherwise actionable treatment of any employees or agents of Merchant by Agent or any of its employees, agents, independent contractors, Supervisors, or other officers, directors, or representatives of Agent;

(c)    any claims by any party engaged by Agent as an employee or independent contractor arising out of such engagement;

(d)    any Agent Claims;

(e)    any Additional Taxes and Penalties arising out of Agent's failure to collect and/or remit to Merchant correct amounts of Sales Taxes;

(f)    the gross negligence, willful misconduct, or fraud of Agent or any of its officers, directors, employees, agents, or representatives (including Retained Employees to the extent acting at Agent's instructions or otherwise under Agent's supervision); and

(g)    any consumer warranty or products liability claims arising out of or related to the sale of Additional Agent Merchandise.

The indemnification obligations set forth in this Section 13.2 shall be in addition to (and shall not limit) any other indemnification obligations of Agent set forth in this Agreement, including without limitation those set forth in Section 8.3(a).

Section 14.    <u>Defaults.</u>

The following shall constitute "<u>Events of Default</u>" hereunder:

(a)    Merchant's or Agent's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured seven (7) days after receipt of written notice thereof to the defaulting party;

(b)    any representation or warranty made by Merchant or Agent proves untrue in any material respect as of the date made or at any time and throughout the Sale Term;

(c)    the entry of an order (i) converting or dismissing Merchant's bankruptcy case to a case under another chapter of the Bankruptcy Code (other than chapter 11) or (ii) appointing a chapter 11 trustee; or

- 45 -

HIGHLY CONFIDENTIAL                                                SEARS_507B_00000816

(d)      subject to Section 8.8 hereof, the Sale is terminated or materially interrupted or impaired at any Store for a period of at least five (5) consecutive days for any reason other than (i) an Event of Default by Agent or (ii) any other material breach or action by Agent not authorized hereunder.

In the event of an Event of Default, the non-defaulting party (in the case of (a) or (b) above, or Agent in the case of (c) or (d) above) may, in its discretion, elect to terminate this Agreement and pursue any and all rights and remedies and damages resulting from such default hereunder in the event such cure is not effected by the defaulting party.

Section 15.   Fixtures.

(a)      Subject to the provisions of the Approval Order and except as otherwise provided in the Approval Order, with respect to any Owned FF&E (including, but not limited to, machinery, rolling stock, office equipment and personal property, and conveyor systems and racking) owned by Merchant and located at the Stores (but not the Distribution Centers or the COs), Merchant may elect (the "FF&E Sale Option"), and, if Merchant so elects, Agent shall sell, the Owned FF&E either (i) on a commission basis (the "FF&E Commission Option"), or (ii) on a guaranteed recovery basis (the "FF&E Guaranty Option"); provided that, the FF&E Guaranty Option shall be subject to Merchant and Agent agreeing on a mutually acceptable guaranteed amount and FF&E/asset listing.  For the avoidance of doubt, Merchant shall not be required to have Agent sell all or any portion of the Owned FF&E or exercise either the FF&E Commission Option or the FF&E Guaranty Option with respect to the Owned FF&E at the Stores.  If Merchant elects to do so, Merchant shall exercise the aforementioned FF&E Sale Option by written notice to Agent by the date that is not later than the Sale Commencement Date (such date being defined as the "FF&E Sale Election Deadline").  In the event Merchant elects the FF&E Commission Option, Agent shall be entitled to receive a commission equal to fifteen percent (15%) of the gross proceeds (net of applicable Sales Taxes) from the sale of such Owned FF&E ("Agent's FF&E Commission"); provided, however, in such case Merchant shall be responsible for payment of expenses incurred in connection with the disposition of the Owned FF&E ("FF&E Disposition Expenses") in accordance with a budget to be mutually agreed upon between Merchant and Agent ("FF&E Disposition Budget"), and all proceeds realized from the disposition of the Owned FF&E, after deduction of applicable Sales Taxes, Agent's FF&E Commission, and the FF&E Disposition Expenses (collectively, the "Net FF&E Proceeds"), shall be paid to Merchant.  In the event Merchant elects the FF&E Guaranty Option, Agent shall pay Merchant a lump sum payment in an amount to be agreed by Merchant and Agent (hereinafter, the "FF&E Guaranty Amount"), in which case all costs and expenses associated with the disposition of Owned FF&E shall be borne by Agent (and which shall not constitute Expenses hereunder), and all proceeds realized from the sale or other disposition of the Owned FF&E (after payment of the applicable FF&E Guaranty Amount and net of any applicable sales taxes) shall be retained by Agent for its sole account.

(b)      Anything in this Agreement to the contrary notwithstanding and except as otherwise provided in the Approval Order, Agent shall be authorized to abandon any and all unsold Owned FF&E (and all other furniture, fixtures, and equipment at the Stores and the Distribution Centers and COs) in place without any cost or liability to Agent.  Agent shall have no responsibility whatsoever with respect to furniture, fixtures, and equipment located at the Stores, or the Distribution Centers or COs which are not owned by Merchant.

- 46 -

US_137191272v1_340878-00024 12/27/2018 2:05 PM

HIGHLY CONFIDENTIAL                                                      SEARS_507B_00000817

(c)      Merchant hereby represents to Agent that: (i) subject to the Approval Order, all Owned FF&E may be sold by Agent on Merchant's behalf, free and clear of all claims, liens and encumbrances of any kind; and (ii) all such Owned FF&E is devoid of Hazardous Materials.

(d)      Anything in this Agreement to the contrary notwithstanding, Agent will not have any obligation whatsoever to purchase, sell, make, store, handle, treat, dispose, generate, transport or remove any Hazardous Materials that may be located at the Stores, the Distribution Centers or otherwise. Agent shall have no liability to any party for any environmental action brought: (i) that is related to the storage, handling, treatment, disposition, generation, or transportation of Hazardous Materials, or (ii) in connection with any remedial actions associated therewith or the Stores or the Distribution Centers. Merchant (and not Agent) shall be solely responsible to remove from the Stores or the Distribution Centers all Hazardous Materials. For purposes of this Agreement, the term "Hazardous Materials" means, collectively, any chemical, solid, liquid, gas, or other substance having the characteristics identified in, listed under, or designated pursuant to (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C.A. 9601(14), as a "hazardous substance", (ii) the Resource Conservation and Recovery Act, 42 U.S.C.A. 6903(5) and 6921, as a "hazardous waste", or (iii) any other laws, statutes or regulations of a government or political subdivision or agency thereof, as presenting an imminent and substantial danger to the public health or welfare or to the environment or as otherwise requiring special handling, collection, storage, treatment, disposal, or transportation.

Section 16.    <u>Miscellaneous.</u>

16.1    <u>Notices</u>. All notices and communications provided for pursuant to this Agreement shall be in writing, and sent by hand, by e-mail, and/or a recognized overnight delivery service, as follows:

<u>If to Agent</u>:

GORDON BROTHERS RETAIL PARTNERS, LLC
Prudential Tower
800 Boylston Street
Boston, MA 02119
Attn:   Mackenzie Shea
Tel:     617.422.6519
Email: mshea@gordonbrothers.com

HILCO MERCHANT RESOURCES, LLC
5 Revere Drive, Suite 206
Northbrook, IL 60062
Attention: Ian S. Fredericks
Tel: (847) 418-2075
Fax: (847) 897-0859
Email: ifredericks@hilcoglobal.com

US_137191272v1_340878-00024 12/27/2018 2:05 PM

HIGHLY CONFIDENTIAL                                                                                        SEARS_507B_00000818

With a copy to (which shall not constitute notice):

KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022
Attn:   Steven J. Reisman and Cindi M. Giglio
Tel:  (212) 940-8800
Fax:  (212) 940-8776
Email:  sreisman@katten.com; cgiglio@katten.com

If to Merchant:

Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179
Attention: General Counsel
Facsimile: (847) 286-2741
E-mail: counsel@searshc.com

With a copy (which shall not constitute notice hereunder) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention: Ray C. Schrock, P.C., Gavin Westerman, Sunny Singh
Facsimile: (212) 310-8007
E-mail: ray.schrock@weil.com, gavin.westerman@weil.com, sunny.singh@weil.com

16.2    Governing Law; Consent to Jurisdiction.  This Agreement shall be governed and construed in accordance with the laws of the State of Delaware without regard to conflicts of laws principles thereof.  The parties hereto agree that the Bankruptcy Court (and the District Court and Circuit Court of Appeal with appellate jurisdiction over the Bankruptcy Court) shall retain exclusive jurisdiction to hear and finally determine any disputes arising from or under this Agreement, and by execution of this Agreement each party hereby irrevocably accepts and submits to the jurisdiction of such court with respect to any such action or proceeding and to service of process by certified mail, return receipt requested to the address listed above for each party.

16.3    Entire Agreement.   This Agreement, the Exhibits hereto, and the Agency Documents (subject, in each instance, to the Approval Order) contain the entire agreement between the Parties with respect to the transactions contemplated hereby and supersede and cancel all prior agreements, including but not limited to all proposals, letters of intent, or representations, written or oral, with respect thereto.

16.4    Amendments.   This Agreement, the Exhibits hereto, and the Agency Documents may not be modified except in a written instrument executed by each of Merchant and Agent.

- 48 -

HIGHLY CONFIDENTIAL                                                                  SEARS_507B_00000819

16.5    No Waiver.  No party's consent to or waiver of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

16.6    Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon the successors and assigns of Agent and Merchant, including but not limited to any chapter 11 or chapter 7 trustee.  Neither Party shall be permitted to assign any or all of its rights or obligations under this Agreement, in whole or in part, without the prior written consent of the other Party.  For the avoidance of doubt, any entity comprising Agent may assign its right to receive payments under this Agreement collaterally to its lender as security.

16.7    Execution in Counterparts.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one agreement.  This Agreement may be executed by facsimile, and such facsimile signature shall be treated as an original signature hereunder.

16.8    Section Headings.  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

16.9    Survival.  All representations, warranties, covenants and agreements made herein shall be continuing, shall be considered to have been relied upon by the Parties and shall survive the execution, delivery, and performance of this Agreement.

16.10    Termination.  This Agreement may be terminated at any time before the Sale Commencement Date as follows:

(a)    upon written notice by Agent or Merchant, if the Sale Commencement Date has not occurred on or prior to January 19, 2019 and the failure of the Sale Commencement Date to occur is not caused by or the result of a material breach of this Agreement by the party giving such notice;

(b)    by mutual written consent of Merchant and Agent;

(c)    automatically and without any action or notice by either Agent or Merchant, immediately upon the issuance of a final and non-appealable order by any agency, division, subdivision, audit group, procuring office, or governmental or regulatory authority, or any adjudicatory body thereof, of the United States or any state thereof, any foreign government or state or any municipal or other political subdivision thereof to restrain, enjoin, or otherwise prohibit the transfer of the assets contemplated hereby; or

(d)    upon written notice by Agent, upon an order of the Bankruptcy Court approving, or the filing by or on behalf of Merchant of a motion or other request to approve, any financing, refinancing, acquisition, divestiture, public offering, recapitalization, business combination or reorganization of or involving all or a material portion of, collectively, the

- 49 -

HIGHLY CONFIDENTIAL                                                  SEARS_507B_00000820

Merchandise and the Owned FF&E or any standalone plan of reorganization for Merchant involving the Merchandise and the Owned FF&E in a manner inconsistent with this Agreement;

(e)  upon written notice by Agent if Agent is not in material breach of this Agreement and there has been a material violation or breach by Merchant of any representation, warranty, covenant or agreement contained in this Agreement that (A) has rendered the satisfaction of any condition to the obligations of Agent set forth in Section 10.1 impossible, (B) has not been waived by Agent, and (C) is not capable of being cured or, if capable of being cured, is not cured in all material respects within five (5) days following receipt of written notification thereof by Agent;

(f)  upon written notice by Merchant if Merchant is not in material breach of this Agreement and there has been a material violation or breach by Agent of any representation, warranty, covenant or agreement contained in this Agreement that (A) has rendered the satisfaction of any condition to the obligations of Merchant set forth in Section 10.2 impossible, (B) has not been waived by Merchant, and (C) is not capable of being cured or, if capable of being cured, is not cured in all material respects within five (5) calendar days following receipt of notification thereof by Merchant.

In the event that this Agreement is validly terminated as provided herein, then each of the Parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination; provided, however, that the provisions of Section 16 shall survive any such termination and shall be enforceable hereunder; provided further, however, that nothing in this Section 16.10 shall be deemed to release any party from liability for any breach of its obligations under this Agreement arising prior to any such termination.

16.11   Agent's Security Interest.

(a)  In consideration of and effective upon payment by Agent of the Initial Guaranty Payment on the Payment Date and delivery of the Letter of Credit to Merchant, Merchant hereby grants to Agent security first priority, senior security interests in and liens (subject to the subordination provisions set forth herein below) upon: (i) the Merchandise; (ii) the Additional Agent Merchandise; (iii) all Proceeds (including, without limitation, credit card Proceeds); (iv) Agent's commission regarding the sale or other disposition of Merchant Consignment Goods under Section 5.4 hereof; (v) in the event Merchant elects the FF&E Guaranty Option, the Owned FF&E and the proceeds realized from the sale or other disposition of Owned FF&E after payment of the FF&E Guaranty Amount; or, alternatively, the FF&E Commission (to the extent Merchant elects for Agent to sell any Owned FF&E); and (vi) all "proceeds" (within the meaning of Section 9-102(a)(64) of the UCC) of each of the foregoing (all of which are collectively referred to herein as the "Agent Collateral"), to secure the full payment and performance of all obligations of Merchant to Agent hereunder.  Upon entry of the Approval Order, payment of the Initial Guaranty Payment on the Payment Date, and delivery of the Letter of Credit to Merchant (on behalf of itself and the applicable Interested Parties), the security interest granted to Agent  hereunder shall be deemed properly perfected without the necessity of filing UCC-1 financing statements or any other documentation.

- 50 -

HIGHLY CONFIDENTIAL    SEARS_507B_00000821

(b)      Without any further act by or on behalf of Agent or any other party (including, without limitation, any Interested Party), Agent's security interests and liens in the Agent Collateral created hereunder are (i) validly created, (ii) effective upon entry of the Approval Order, perfected, and (iii) senior to all other security interests and liens, provided, however, that (x) until the Merchant receives payment in full of the Guaranteed Amount, the Sharing Amount (if any), the Additional Agent Merchandise Fee, Expenses, the proceeds realized upon a sale of Owned FF&E (less the Agent FF&E Commission) or the FF&E Guaranty Amount, as applicable, (to the extent Merchant elects for Agent to sell any Owned FF&E) and such other amounts due to Merchant hereunder, the security interest granted to Agent hereunder shall be junior and subordinate in all respects to the security interests of the Interested Parties in the Agent Collateral, subject to and in accordance with the terms of the DIP ABL Financing Order, but solely to the extent and amount of the unpaid portion of the any of the Guaranteed Amount, the Sharing Amount (if any), the Additional Agent Merchandise Fee (if any), Expenses, the proceeds realized upon a sale of Owned FF&E (less the Agent FF&E Commission) or the FF&E Guaranty Amount, as applicable, (to the extent Merchant elects for Agent to sell any Owned FF&E) and such other amounts due to Merchant hereunder and (y) upon payment in full of the Guaranteed Amount, the Sharing Amount (if any), the Additional Agent Merchandise Fee (if any), Expenses, the proceeds realized upon a sale of Owned FF&E (less the Agent FF&E Commission) or the FF&E Guaranty Amount, as applicable, (to the extent Merchant elects for Agent to sell any Owned FF&E) and such other amounts due to Merchant hereunder, any security interest or lien of the Interested Parties in the Agent Collateral shall be junior and subordinate in all respects to the security interest and liens of Agent in the Agent Collateral.  Merchant shall cooperate with Agent with respect to all filings (including, without limitation, UCC-1 financing statements) and other actions to the extent reasonably requested by Agent in connection with the security interests and liens granted under this Agreement.

(c)      In the event of an Event of Default by the Merchant hereunder, in any jurisdiction where the enforcement of its rights hereunder is sought, Agent shall have, in addition to all other rights and remedies, the rights and remedies of a secured party under the UCC.

(d)      Merchant shall not grant any lien or security interest in the Agent Collateral other than in favor of the Agent.

16.12    <u>Third Party Beneficiaries</u>.  Except with respect to the Merchant Indemnified Parties and Agent Indemnified Parties, this Agreement shall not be deemed to confer any rights or remedies upon any person or entity (including any landlord of Merchant) that is not a party hereto.

16.13    <u>Right to Joint Venture</u>.  Prior to entry of the Approval Order and upon disclosure to Merchant in advance thereof, Agent shall have the right to include additional entities in the contractual joint venture that shall serve as Agent hereunder, including without limitation, Tiger Capital Group and Great American Group.

16.14    <u>Expense Reimbursement</u>.  In consideration of Agent entering into this Agreement, then in the event that this Agreement shall not be consummated with Agent because Merchant elects to pursue an alternative higher/better transaction (whether with another party serving as liquidating agent under a guaranty structure, as a going concern buyer, as a consultant pursuant to a "fee for service" structure similar to the Abacus Agreements, or otherwise), Merchant shall

- 51 -

HIGHLY CONFIDENTIAL                                                SEARS_507B_00000822

pay Agent (on the first business day following the entry of the approval order for such other transaction or such later date as Agent may agree) an expense reimbursement for all out of pocket costs and expenses incurred by Agent to secure committed financing, produce and pack signage, and negotiate definitive documents, and Merchant shall obtain court approval of such Expense Reimbursement, in form and substance satisfactory to Agent, contemporaneously with its entry into this Agreement.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

US_137191272v1_340878-00024 12/27/2018 2:05 PM

HIGHLY CONFIDENTIAL

SEARS_507B_00000823

IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agency Agreement as of the day and year first written above.

**AGENT:**

GORDON BROTHERS RETAIL PARTNERS, LLC

By: _____
Name: _____
Title: _____

-and-

HILCO MERCHANT RESOURCES, LLC

By: _____
Name: _____
Title: _____

**MERCHANT:**
SEARS HOLDINGS CORPORATION, Debtor and Debtor in Possession, and its subsidiaries[4]

By: _____
Name:
Title:

---

[4] NTD: Company to include additional signature pages for subsidiaries

HIGHLY CONFIDENTIAL                                          SEARS_507B_00000824