AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Ira S. Dizengoff
Philip C. Dublin
Joseph L. Sorkin
Lacy M. Lawrence

*Counsel to the Official Committee of
Unsecured Creditors of Sears Holdings Corporation, et al.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |  |
|---|---|---|
| **In re** | : | Chapter 11 |
|  | : |  |
| **SEARS HOLDINGS CORPORATION,** *et al.,* | : | Case No. 18-23538 (RDD) |
|  | : |  |
| **Debtors.**[1] | : | (Jointly Administered) |
|  | : |  |

---

**THE CREDITORS' COMMITTEE'S (I) QUALIFIED JOINDER TO
THE DEBTORS' OBJECTION TO THE SECOND LIEN PARTIES' REQUESTS
TO DETERMINE CLAIMS UNDER SECTION 506(A) AND SECTION 507(B) AND
REPLY IN SUPPORT OF THE DEBTORS' RULE 3012 MOTION AND (II)
SUPPLEMENTAL OBJECTION TO THE SECOND LIEN PARTIES' REQUEST
TO DETERMINE CLAIMS UNDER SECTION 506(A) AND SECTION 507(B)**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc.(4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................1

ARGUMENT ........................................................................................................................7

I.      THE SECOND LIEN PARTIES HAVE FAILED TO SATISFY THEIR BURDEN
        OF PROVING THEY ARE ENTITLED TO CLAIMS UNDER BANKRUPTCY
        CODE SECTION 507(B) .......................................................................................8

II.     THE DEBTORS HAVE MET THEIR BURDEN OF ESTABLISHING THAT
        THEY ARE ENTITLED TO THE PROPOSED SURCHARGES ................................10

        A.      The Proposed Surcharges Are Appropriate Even if the Second Lien
                Parties Were Not the Intended or Sole Beneficiaries of the Section
                506(c) Expenses ......................................................................................11

        B.      The Second Lien Holders Were Primary Beneficiaries of the
                Section 506(c) Expenses ..........................................................................13

                1.      ESL Was a Direct and Primary Beneficiary of the Sale and
                        Section 506(c) Expenses ...............................................................14

                2.      Cyrus Was a Direct and Primary Beneficiary of the Sale and
                        Section 506(c) Expenses ...............................................................18

                3.      The Remaining Second Lien Holders Were Direct and
                        Primary Beneficiaries of the Sale and Section 506(c)
                        Expenses ........................................................................................20

III.    THE EQUITIES OF THE CHAPTER 11 CASES WEIGH IN FAVOR OF
        ESTOPPING ESL, CYRUS AND WILMINGTON TRUST FROM ASSERTING
        SECTION 507(B) CLAIMS AND DENYING THEIR STATUS AS PRIMARY
        BENEFICIARIES OF THE SECTION 506(C) EXPENSES ..........................................20

        A.      The Equitable Doctrines of Judicial Estoppel and Unclean Hands
                Apply........................................................................................................21

        B.      The Equities of the Chapter 11 Cases Weigh in Favor of Estopping
                ESL from Asserting Section 507(b) Claims and Denying Its Status
                as a Primary Beneficiary of the Section 506(c) Expenses ........................22

        C.      The Equities of the Chapter 11 Cases Weigh in Favor of Estopping
                Cyrus from Asserting Section 507(b) Claims and Denying Its
                Status as a Primary Beneficiary of the Section 506(c) Expenses ..............24

        D.      The Equities of the Chapter 11 Cases Weigh in Favor of Estopping
                Wilmington Trust from Asserting Section 507(b) Claims and
                Denying Its Status as a Primary Beneficiary of the Section 506(c)
                Expenses ..................................................................................................25

CONCLUSION....................................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Andrews*,
   385 B.R. 496 (Bankr. D. Conn. 2008) .....................................................................................21

*In re Blackwood Assocs., L.P.*,
   153 F.3d 61 (2d Cir. 1998).....................................................................................................10

*BPP Illinois, LLC v. Royal Bank of Scotland Group PLC*,
   859 F.3d 188 (2d Cir. 2017)...................................................................................................21

*In re CCT Comms., Inc.*,
   420 B.R. 160 (Bankr. S.D.N.Y. 2009)..........................................................................21, 23, 25

*In re Croton River Club, Inc.*,
   162 B.R. 656 (Bankr. S.D.N.Y. 1993) ...................................................................................10

*In re Delphi Corp.*,
   No. 05-44481 (RDD), 2008 WL 3486615 (Bankr. S.D.N.Y. Aug. 11, 2008).......................21

*In re Domistyle, Inc.*,
   811 F.3d 691 (5th Cir. 2015) ............................................................................................11, 12

*In re Flagstaff Foodservice Corp.*,
   739 F.2d 73 (2d Cir. 1984).................................................................................................10, 11

*In re Flagstaff Foodservice Corp.*,
   762 F.2d 10 (2d Cir. 1985).................................................................................................10, 11

*In re Frontier Ins. Group, Inc.*,
   585 B.R. 685 (Bankr. S.D.N.Y. 2018) (Drain, J.)..................................................................21

*In re Haimil Realty Corp.*,
   No. 14-11779 (MEW), 2015 WL 1396610 (Bankr. S.D.N.Y. Mar. 24, 2015).......................22

*Off. Comm. Unsec. Creds. v. UMB Bank, N.A. (In re Residential Capital, LLC)*,
   501 B.R. 549 (S.D.N.Y. 2013)..................................................................................................8

*PenneCom B.V. v. Merrill Lynch & Co., Inc.*,
   372 F.3d 488 (2d Cir. 2004)....................................................................................................22

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
   324 U.S. 806 (1945).................................................................................................................22

*In re Senior–G&A Op. Co., Inc.*,
957 F.2d 1290 (5th Cir. 1992) ............................................................................................11

*In re SubMicron Systems Corp.*,
432 F.3d 448 (3d Cir. 2010)................................................................................................9

*In re Swift*,
496 B.R. 89 (Bankr. E.D.N.Y. 2013)..................................................................................22

*New Hampshire v. Maine*,
*532 U.S. 742 (2001)*............................................................................................................22

*United States Savings Ass'n v. Timbers of Inwood Forest Assoc., Ltd.*,
484 U.S. 365 (1988)..............................................................................................................8

*Wight v. BankAmerica Corp.*,
219 F.3d 79 (2d Cir. 2000)..................................................................................................21

**Statutes**

11 U.S.C. § 506(a) ....................................................................................................................1

11 U.S.C. § 506(c) ...........................................................................2, 4, 7, 8, 9, 10, 11, 12, 26

11 U.S.C. § 507(b) ...............................................................................................1, 3, 7, 10, 26

The Official Committee of Unsecured Creditors (the "Creditors' Committee") of Sears

Holdings Corporation ("Sears Holdings") and its affiliated debtors and debtors in possession

(collectively with Sears Holdings, the "Debtors"), by and through its undersigned counsel, hereby

files this qualified joinder to the *Debtors' (I) Opposition to Second–Lien Holders' Requests to*

*Determine Amount of Second-Lien Secured Claims Under Section 506(a) and Section 507(b)*

*Administrative Claims and (II) Reply in Support of Debtors' Rule 3012 Motion to Determine the*

*Amount, if any, of 507(b) Claims and To Surcharge Second-Lien Collateral Pursuant to Section*

*506(c)* [ECF No. 4381] (the "Debtors' Objection")[2] and supplemental objection to the Second Lien

Parties' request to determine the extent of their claims under sections 506(a) and 507(b) of the

Bankruptcy Code (the "Joinder and Supplemental Objection"). In support of this Joinder and

Supplemental Objection, the Creditors' Committee respectfully states as follows.

## PRELIMINARY STATEMENT

1.     The Creditors' Committee files this Joinder and Supplemental Objection to express

its support for the Debtors' efforts to protect the estates' remaining value for bona-fide holders of

claims, which already are facing precarious recoveries. As made evident by their pleadings, ESL

Investments, Inc. ("ESL"),[3] Cyrus Capital Partners, L.P. ("Cyrus"),[4] and Wilmington Trust, N.A.

---

[2] On May 26, 2019, the Debtors filed the *Debtors' Motion to Estimate Certain 507(b) Claims for Reserve Purposes* [ECF No. 4034], which, pursuant to the *Stipulation and Order Concerning the Resolution of Certain Section 507(b) Claims* [ECF No. 4102], was "deemed to be a motion pursuant to Bankruptcy Rule 3012 to determine the amount, if any, of the Second Lien Parties' Section 507(b) Claims and, pursuant to Section 506(c) of the Bankruptcy Code, for a surcharge upon the collateral securing the Second Lien Parties' claims" (the "Rule 3012 Motion").

[3] *See Supplemental Memorandum of Law on Behalf of ESL Investments, Inc. in Support of Its Requests to Determine the Amount of Its Second Lien Secured Claims Under Section 506(A) and Its Section 507(B) Administrative Claims Pursuant to Bankruptcy Rule 3012; and In Opposition to the Debtors' Motion to Surcharge Its Collateral Pursuant to Section 506(C)* [ECF No. 4273] (the "ESL Supplemental Memo").

[4] *See Memorandum of Law In Support of Request of Cyrus Capital Partners, L.P. to Determine the Amount of Secured Claims Under Section 506(C) and Section 507(B) Administrative Claims Pursuant to Bankruptcy Rule 3012 And In Opposition to Debtors' Request to Surcharge Collateral Pursuant to Section 506(C)* [ECF No. 4313] (the "Cyrus Supplemental Memo").

("Wilmington Trust"[5] and, together with Cyrus and ESL, the "Second Lien Parties")[6] unjustly are seeking to capture the estates' unencumbered assets under the guise of Bankruptcy Code section 507(b) claims despite the absence of facts or law to support their contentions. As the Court is well aware, over the Creditors' Committee's staunch opposition, ESL (with the affirmative support and assistance of Cyrus) prevailed in its case-long effort to acquire substantially all of the Debtors' assets as part of a going-concern sale. The Second Lien Parties now decry the very process they advocated, funded and won. Even worse, the Second Lien Parties expect the expenses incurred to preserve the value of the assets they hand-selected, pursued and ultimately acquired to be borne by the Debtors' estates and their unsecured creditors.

2.     This dispute, at its core, concerns (i) the Debtors' right under Bankruptcy Code section 506(c) to surcharge costs and expenses (the "Section 506(c) Expenses") incurred in connection with these chapter 11 cases and the going-concern sale of certain of the Debtors' assets (the "Sale") to ESL's affiliate Transform Holdco LLC ("Transform") against the collateral (the "Second Lien Collateral") securing the Second Lien Credit Facility,[7] the Second Lien PIK Notes,[8]

---

[5] *See Supplemental Memorandum of Law Supplemental Memorandum of Law of Wilmington Trust, National Association, as Indenture Trustee and Collateral Agent, (I) In Support of Motion Pursuant to Bankruptcy Rule 3012 for Determination of Amount of Secured Claim Pursuant to 11 U.S.C. Section 506(a) and Amount of Claim Entitled to Priority Pursuant to 11 U.S.C. Section 507(b) and (II) In Opposition to the Debtors Motion Pursuant to 11 U.S.C. Section 506(c)* [ECF No. 4280] (the "Supplemental Wilmington Memo").

[6] *See Common Memorandum of Law on Behalf of the Second Lien Parties: (A) In Support of Their Requests to Determine the Amount of Their Second Lien Secured Claims Under Section 506(a) and Their Section 507(b) Administrative Claims Pursuant to Bankruptcy Rule 3012; and (B) In Opposition to Debtors Motion to Surcharge Their Collateral Pursuant to Section 506(c)* [ECF No. 4272] (the "Common Memo").

[7] The "Second Lien Credit Facility" refers to that certain Second Lien Credit Agreement, dated as of September 1, 2016 by and among Sears Roebuck Acceptance Corp. ("SRAC") and Kmart Corporation ("Kmart"), as borrowers, SHC, JPP LLC, as administrative agent and collateral administrator, JPP LLC and JPP II LLC, as lenders, and the guarantors party thereto.

[8] The "Second Lien PIK Notes" refers to the 8% Senior Unsecured Convertible PIK Toggle Notes due 2019 under the certain Indenture, dated as of March 20, 2018 (as amended or modified), among Sears Holdings, certain subsidiaries of Sears Holdings, as guarantors, and Computershare Trust Company, N.A. as trustee.

and the Second Lien Notes[9] (collectively, the "Second Lien Debt," and the holders thereof, the "Second Lien Holders") and (ii) the extent of the Second Lien Parties' claims under Bankruptcy Code section 507(b) for the purported diminution in value of the Second Lien Holders' interests in the Second Lien Collateral during the pendency of these cases (the "Section 507(b) Claims") and their rights to assert such Section 507(b) Claims.  The Debtors contend that the Section 506(c) Expenses may be applied as surcharges (the "Proposed Surcharges") against the value of any allowed Section 507(b) Claims.  The Second Lien Parties assert that the value of the Second Lien Collateral diminished by hundreds of millions of dollars during the pendency of these cases and their resulting claims, which are entitled to priority under Bankruptcy Code section 507(b), dwarf any legitimate Proposed Surcharges.  Simply put, the Debtors are correct on the law, and the facts support the Debtors' requested relief and the denial of any Section 507(b) Claims for the benefit of the Second Lien Holders.  As demonstrated in the Rule 3012 Motion, the Debtors' Objection and herein, it is appropriate and necessary that this Court apply the Proposed Surcharges, which have the effect of eliminating any Section 507(b) Claims to the extent such claims exist at all.

3.    The Second Lien Holders directly and primarily benefited from the Sale (and the decision not to pursue a liquidation of the Debtors' estates as advocated by the Creditors' Committee), which resulted in, among other things, ESL acquiring the Debtors' most valuable assets and operating businesses and the allowance (for credit bidding and other purposes) of ESL's and Cyrus's secured claims against the Debtors.  Having succeeded in obtaining approval of the going-concern Sale, the Second Lien Parties now hope to rewrite history and recast their roles in these cases.  They claim that they instead would have been better off with a liquidation and

---

[9] The "Second Lien Notes" refers to the 6 5/8% Senior Secured Notes due 2018 under that certain Indenture, dated as of October 12, 2010 (as amended or modified), among Sears Holdings, certain subsidiaries of Sears Holdings, as guarantors, and Wilmington Trust as successor trustee and collateral agent.

therefore are entitled to recoveries based on the purported diminution in value of the Second Lien Collateral, which they also argue is not subject to surcharge for the expenses necessarily and reasonably incurred to preserve such collateral.  It is a startling pivot.  This hypocrisy would, if permitted, result in a massive windfall for the Second Lien Parties.

4.      The Bankruptcy Code and the principles of equity incorporated therein do not countenance parties taking unfair advantage of such inconsistent positions.  The plain language of Bankruptcy Code section 506(c) requires that the expenses sought to be surcharged against collateral were for the primary and direct benefit of the creditors whose claims are secured by such collateral—just as was the case here for the Second Lien Holders.  The Second Lien Parties' arguments in opposition to the Proposed Surcharges depend on reading non-existent limitations into the Bankruptcy Code—namely that only a secured creditor who is the ***intended*** and ***sole*** beneficiary of expenses may have its collateral surcharged.  The statute contains no such language and the Second Circuit—consistent with other circuit courts—has not read any such requirement into the statute.

5.      Instead, the facts and actions and many statements of ESL and Cyrus in these cases demonstrate that the Second Lien Holders, individually and collectively, were the direct and primary beneficiaries of the expenses reasonably and necessarily incurred in preserving and enhancing the Second Lien Collateral and causing the Sale, which disposed of the Second Lien Collateral to the direct benefit of the Second Lien Holders.  *First*, as set forth in the Debtors' Objection, the Second Lien Holders received a $433.45 million recovery on account of their interests in the Second Lien Collateral by way of an allowed credit bid in connection with the Sale, which is $60.5 million ***greater*** than the value ascribed to the Second Lien Holders' interests in the Second Lien Collateral on the petition date of October 15, 2018 (the "Petition Date").  *See* Debtors'

4

Objection ¶ 2. The significance of this cannot be minimized. In connection with the Sale and all times leading up to the Sale, ESL valued the inventory and accounts receivable that constituted the Second Lien Collateral at 85% of book value. Indeed, as noted in the Debtors' Objection, even the ESL Asset Purchase Agreement (the "APA") required such valuation. When this adjustment is applied to the book value of all Second Lien Collateral as of the Petition Date ($2.746 billion), and the resulting balance of $2.334 billion (85% of $2.746 billion) is reduced by the First Lien Debt[10] outstanding as of the Petition Date ($1.961 billion), the most the Second Lien Holders would have recovered on account of the Second Lien Collateral was $373 million. Having credit bid $433.5 million for the same collateral, as a matter of fact and law, the Second Lien Holders necessarily cannot have any Section 507(b) Claims.[11]

6.     *Second*, ESL and Cyrus forcefully advocated against a liquidation throughout these cases and took extreme measures to ensure a going-concern sale was achieved. To that end, ESL repeatedly announced to the world its intention to purchase the Sears enterprise as a going concern

---

[10] "First Lien Debt" refers to all indebtedness under (i) that certain Third Amended and Restated Credit Agreement, dated as of July 21, 2015 (as amended or modified) between, among others, Bank of America, N.A., as administrative agent, co-collateral agent and swing line lender, Wells Fargo Bank, National Association, as co-collateral agent, a syndicate of financial institutions and other institutional lenders, SRAC and Kmart, as borrowers, and Sears Holdings; and (ii) the Letter of Credit and Reimbursement Agreement, dated as of December 28, 2016 (as amended or modified) among SRAC and Kmart, as borrowers, Sears Holdings, Citibank, N.A., as administrative agent and issuing bank, and a syndicate of financial institutions.

[11] Even if the First Lien Lenders were required to marshal the collateral securing their debt and collect in the first instance from cash on hand and specified other receivables that did not constitute Second Lien Collateral (*i.e.*, cash and pharmaceutical accounts receivable) which aggregated, according to the Second Lien Parties' experts, approximately $204 million on the Petition Date, the maximum amount of Section 507(b) Claims that could be asserted by the Second Lien Parties in the aggregate would be $143.5 million ($373 million plus $204 million less $433.5 million), which is a fraction of the amount asserted by the Second Lien Parties and does not take into account any 506(c) surcharge. ██████████████████████████████████████ *See* Expert Report of William Henrich in Connection with Assessment of § 507(b) Adequate Protection Claims Asserted by Wilmington Trust, N.A. [ECF No. 4279] at 4 ("Corporate expenses that help to preserve the collateral value are a component of § 506(c) expenses"), 5 ("I understand that § 506(c) expenses include certain professional fees which are incurred in support of the process to monetize or preserve the capital."), ████████████████████████ And the $143.5 million figure is $106.5 million less the approximately $250 million (net of professional fees) in necessary expenses incurred by the Debtors between the effective date of the APA (January 17, 2019) and the closing of the Sale (February 11, 2019) to support the continued operation of the Debtors' business that most obviously qualify as section 506(c) surcharges. *See* Debtors' Objection ¶ 45.

and even went so far as to threaten the board of directors of Sears Holdings with litigation should it fail to force the Debtors to accept ESL's going-concern bid. *See* Letter from J. Bromley (counsel to ESL) to Board of Directors, at 1 (Jan. 7, 2019) (the "Bromley Letter"), a true and correct copy of which is attached hereto as **Exhibit A** ("In the event that the Board does not override the Subcommittee's decision [to reject ESL's going-concern bid], ESL will have no choice but to commence litigation on an expedited basis to hold the relevant members of the Board and the Subcommittee responsible for their breaches of fiduciary duties."). Similarly, Cyrus provided the Junior DIP (as defined below) specifically to enable the going-concern Sale to ESL, and later agreed to roll over up to $350 million in Junior DIP obligations to ESL's purchasing entity, Transform, rather than require ESL to increase the cash component of its bid. The $350 million roll-up was crucial to the closing of the Sale. These were not the actions of mere bystanders. These were the actions of parties who expected these cases to proceed according to their plan—a plan that ultimately prevailed.

7. The equities of the cases also demand the denial of the Second Lien Parties' efforts to profit further at the expense of the Debtors' estates and creditors. In particular, two well-established equitable doctrines operate independently to prevent the sort of cynical flip-flopping engaged in by the Second Lien Parties: (i) judicial estoppel and (ii) the doctrine of "unclean hands." These doctrines prohibit the Second Lien Parties—who spent the duration of these bankruptcy cases deliberately opposing liquidation and pushing for the going-concern Sale—from now claiming that they wanted a different outcome, that they were not primary beneficiaries of the Section 506(c) Expenses or that they are entitled to allowed Section 507(b) Claims. ESL and the other Second Lien Parties argue that liquidation would have been the better path after all—just so they can attempt to enrich themselves with their Section 507(b) Claims at the expense of the

Debtors' unsecured creditors.  The Second Lien Parties owe their successes in these cases to the expenses necessarily incurred to effectuate the Sale and cannot now claim that it worked to their detriment such that they should be compensated further.

8.      The Second Lien Parties hope to have their cake and eat it—or at least not pay for it—too.  To prevent this inequitable result, the Creditors' Committee joins in the relief requested in the Debtors' Objection and Rule 3012 Motion and respectfully requests that the Court deny the Second Lien Parties' Section 507(b) Claims in full and grant the Debtors' request for the Proposed Surcharges under Bankruptcy Code section 506(c).

## ARGUMENT

9.      The Second Lien Parties' efforts to dodge the expenses incurred to support their gain in the chapter 11 cases and, instead, realize upon substantial Section 507(b) Claims are meritless.  Specifically, (i) the Second Lien Parties have failed to satisfy their burden of proving that they are entitled to any claims under Bankruptcy Code section 507(b); (ii) the Second Lien Parties have misconstrued the law interpreting Bankruptcy Code section 506(c), which requires only that a secured creditor receive a direct and primary benefit—and not the sole and/or intended benefit—from the expenses incurred to preserve the value of the collateral in question to be subject to a surcharge under Bankruptcy Code section 506(c); (iii) the circumstances of these cases demonstrate that the Second Lien Collateral is subject to surcharge under Bankruptcy Code section 506(c) because the Second Lien Parties—who got precisely what they wanted in these cases— directly benefited from the expenses reasonably and necessarily incurred to preserve and enhance the Second Lien Collateral; and (iv) the Second Lien Parties must be judicially estopped or prevented under the doctrine of unclean hands from asserting Section 507(b) Claims and arguing now that they would have been better off in a liquidation when they have argued throughout these cases in favor of a going-concern sale.

I.    **THE SECOND LIEN PARTIES HAVE FAILED TO SATISFY THEIR BURDEN OF PROVING THEY ARE ENTITLED TO CLAIMS UNDER BANKRUPTCY CODE SECTION 507(B)**

10.    To recover on their Section 507(b) Claims, the Second Lien Holders "must show that the aggregate value of [their] collateral diminished from the Petition Date to the Effective Date." *Off. Comm. Unsec. Creds. v. UMB Bank, N.A. (In re Residential Capital, LLC)*, 501 B.R. 549 (S.D.N.Y. 2013).   Any such diminution in value must be measured relative to the extent of the Second Lien Holders' "value of their interest in collateral as of the Petition Date." *Id.* (citing *United States Savings Ass'n v. Timbers of Inwood Forest Assoc., Ltd*., 484 U.S. 365, 382 (1988)).   The Second Lien Holders bear the burden of proving diminution in the value of the Second Lien Collateral. *In re Residential Capital*, 501 B.R. at 590.   As detailed in the Debtors' Objection, the Second Lien Parties have failed to meet their burden.   Indeed, the Second Lien Parties cannot demonstrate any diminution in the value of their interests in the Second Lien Collateral, even before consideration of the appropriate Proposed Surcharge under Bankruptcy Code section 506(c) (discussed at greater length below).

11.    As detailed in the Debtors' Objection, a proper analysis of whether there has been any diminution in the value of the Second Lien Holders' interests in the Second Lien Collateral since the Petition Date evidences that the Second Lien Holders are not entitled to any Section 507(b) Claims at all.   As of the Petition Date, the book value of the collateral securing the Second Lien Debt was $2.746 billion.   This collateral secured not just the Second Lien Debt, but also the First Lien Debt of $1.961 billion.   At all times during the pendency of these cases, ESL has valued the collateral securing the Second Lien Debt at 85 cents on the dollar.[12]   This results in a net value

---

[12] As explained in the Debtors' Objection, the 85% figure is derived from the APA documenting the ***actual*** sale of the Second Lien Collateral to Transform and represents the *actual* recovery received on the Second Lien Collateral ($1.657 billion book value in inventory and accounts receivable sold for $1.408 billion, i.e., 85%). *See* APA §§ 3.1, 10.9; Debtors' Objection ¶ 25.

of $2.334 billion for the Second Lien Collateral as of the Petition Date. Once the First Lien Debt of $1.961 billion is subtracted from the net collateral value of $2.334 billion, the Second Lien Holders' remaining interest in the Second Lien Collateral as of the Petition Date is reduced to $373 million. Thus, the maximum amount of any Section 507(b) Claims that the Second Lien Holders could assert is $373 million (assuming all of the collateral value dissipated). However, as is well documented, in connection with the Sale, ESL (and Cyrus) credit bid $433.5 million in Second Lien Debt as part of the purchase price under the APA. As a result, the value of the Second Lien Holders' interests in the Second Collateral did not diminish at all, but rather *increased* by $60.5 million. *In re SubMicron Systems Corp.*, 432 F.3d 448, 460–61 (3d Cir. 2010) (holding that credit bidders in a 363 sale could bid up to the full value of their loan, and, thus, that the amount of the credit bid represented the value ascribed to the lender's secured interest in the collateral).

12.    Even if the holders of First Lien Debt were required to marshal their collateral, which they are not, and recover on their claims in the first instance from the cash and pharmaceutical receivables (valued at approximately $204 million)[13] that are not part of the Second Lien Collateral, prior to realizing on the Second Lien Collateral on which they hold a first lien, the Second Lien Holders' Section 507(b) Claims could not exceed $143.5 million.[14] This $143.5 million is dwarfed by the Proposed Surcharges applicable to offset any claimed diminution in value. Moreover, as described in footnote 11, *supra*, such amount is even less than the approximately ███████████████████ Wilmington Trust's expert tacitly acknowledges are due and the approximately $250 million that the Debtors incurred in necessary expenses (net of professional fees) between the execution of the APA (January 17, 2019) and the closing of the

---

[13] The Creditors' Committee has conservatively calculated this number as the average of the figures provided by the Second Lien Parties' experts.

[14] The $143.5 million figure is derived by adding the $373 million discussed above to the $204 million of cash and pharmaceutical receivables and subtracting from the total ($577 million) the $433.5 million credit bid amount.

Sale (February 9, 2019) to support the continued operation of the Debtors' business that most obviously qualify as surcharges under Bankruptcy Code section 506(c).  In sum, the Second Lien Holders are not entitled to any Section 507(b) Claims.

## II.    THE DEBTORS HAVE MET THEIR BURDEN OF ESTABLISHING THAT THEY ARE ENTITLED TO THE PROPOSED SURCHARGES

13.    Bankruptcy Code section 506(c) provides that a debtor may "recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of ***any benefit*** to the holder of such claim."  11 U.S.C. § 506(c) (emphasis added).  In turn, surcharges under Bankruptcy section 506(c) may be used to offset Bankruptcy Code section 507(b) claims asserted by a secured creditor.  *In re Blackwood Assocs., L.P.*, 153 F.3d 61, 68 (2d Cir. 1998).  Here, the Rule 3012 Motion asks this Court to acknowledge that the reasonable and necessary costs and expenses incurred in preserving the Second Lien Collateral for the benefit of the Second Lien Holders—and at their behest—may be surcharged under Bankruptcy Code section 506(c), and that such surcharge dwarfs any possible Section 507(b) Claims asserted by the Second Lien Parties.

14.    A secured creditor's collateral may be surcharged pursuant to Bankruptcy Code section 506(c) where costs and expenses, in addition to being reasonable and necessary, were incurred for the primary and direct benefit of that creditor.  *In re Croton River Club, Inc*., 162 B.R. 656, 658 (Bankr. S.D.N.Y. 1993) (stating that "if a secured creditor gains no direct and primary benefit from the imposition of administrative expenses, then the trustee may not recover such funds from the secured creditor's collateral as a § 506(c) expense").  Specifically, to surcharge expenses against collateral under Bankruptcy Code section 506(c), the expenses must be incurred "primarily for the benefit of a creditor," *In re Flagstaff Foodservice Corp*., 739 F.2d 73, 76 (2d Cir. 1984) ("*Flagstaff I*"), and the creditor must "directly benefit[] from the expenditure."  *In re Flagstaff*

10

*Foodservice Corp.*, 762 F.2d 10, 12 (2d Cir. 1985) ("*Flagstaff II*").  The inquiry into whether a secured creditor is a primary beneficiary of expenses to be surcharged under Bankruptcy Code section 506(c) is case specific.  *In re Domistyle, Inc.*, 811 F.3d 691, 699 (5th Cir. 2015) (citing *In re Senior–G&A Op. Co., Inc.*, 957 F.2d 1290, 1300 (5th Cir. 1992)).

15.    As set forth in the Rule 3012 Motion, the Debtors' Objection and herein, the Debtors have demonstrated that the Section 506(c) Expenses primarily and directly benefited the Second Lien Holders and, therefore, may be used to offset any Section 507(b) Claims asserted by the Second Lien Parties, to the extent any such claims are allowed.

### A.    The Proposed Surcharges Are Appropriate Even if the Second Lien Parties Were Not the Intended or Sole Beneficiaries of the Section 506(c) Expenses

16.    The Second Lien Parties impose a non-existent requirement on their Bankruptcy Code section 506(c) analysis that a debtor may surcharge expenses against a secured creditor's collateral only if that creditor is the ***intended*** or ***sole*** beneficiary of those expenses.[15]  With that flawed legal construct in mind, the Second Lien Parties maintain that because the Debtors and other constituencies—and not just the Second Lien Holders—benefited from the Section 506(c) Expenses, the Proposed Surcharges are inappropriate and cannot be deducted from their Section 507(b) Claims (to the extent any such claims exist).

17.    These arguments misconstrue applicable law.  The number of cases interpreting Bankruptcy Code section 506(c) is limited, but none operate to punish a debtor's estate when resources are expended that directly and primarily benefit particular creditors.  The Second Circuit did not hold in *Flagstaff I, Flagstaff II* or in any other case that Bankruptcy Code section 506(c)

---

[15] *See, e.g.*, Common Memo at 22 (". . . these cases have been run to achieve a sale process intended to maximize the value of all of the Debtors' considerable assets, not just the Prepetition Second Lien Collateral, for the benefit of the estates and all creditors, not just the Second Lien Parties . . . ."); ESL Supplemental Memo at 12 ("Moreover, that ESL ultimately submitted the winning bid does not mean that the Debtors intended ESL to be the primary beneficiary of that transaction . . . ."); Supplemental Wilmington Memo at 18 ("None of the Debtors' actions here were for the sole benefit of the Prepetition Second Lien Creditors, did not relate solely to the Collateral . . . .").

surcharges are appropriate only where the secured creditor was the ***intended*** beneficiary of the costs and expenses incurred in preserving or disposing of its collateral. Similarly, the Second Circuit has never required that a secured creditor be the ***only*** party that benefits from expenses incurred to protect or dispose its collateral.

18.    To satisfy Bankruptcy Code section 506(c), the Debtors need only to establish—as they have—that the Second Lien Holders were primary beneficiaries of the expenses incurred to preserve and dispose of the Second Lien Collateral, and that the Second Lien Holders received direct benefits in connection therewith. Even if the Section 506(c) Expenses ultimately did benefit the Debtors' estates and other creditor constituencies, the Second Lien Holders nonetheless were direct and primary beneficiaries of such expenses. The Second Lien Parties completely overlook that a surcharge is appropriate where multiple parties benefited from the same expenses. *See In re Domistyle, Inc.*, 811 F.3d at 698 ("The possibility at the time the expenses were incurred that they could also benefit other creditors does not render surcharge unavailable."). Surcharging the Second Lien Collateral for expenses that ended up benefitting multiple parties therefore is appropriate given that the Second Lien Holders were primary beneficiaries of such expenses. *Id.* (rejecting "the creditor's argument that *primarily* means *solely*" when determining a surcharge (emphasis in original)).

19.    To that end, statements made by the Debtors or the Court that the chapter 11 cases and Sale benefited multiple parties, including the Debtors and other stakeholders, do not counsel against a finding the Second Lien Holders were primary beneficiaries within the scope of Bankruptcy Code section 506(c). Such statements are extraneous to the question of whether the Second Lien Holders received primary and direct benefits in connection therewith.

20.     The Second Lien Parties' misunderstanding of the law also is evident from their theory that "a process conducted for the primary benefit of the Second Lien Parties [would have started] with an immediate acceptance of ESL's initial bid," Common Memo at 25, and ESL's insistence it "was never chosen as a stalking horse bidder or provided with any of the benefits customarily provided to someone with that favored status,"  ESL Supplemental Memo at 2.  The Debtors' refusal to accept ESL's bid reflected their view at the time that such bid did not maximize the value of their estates.  And even though the Debtors declined to extend official purchasing privileges to ESL (as none were justified), there can be no dispute that ESL enjoyed the status of being the only bidder for the Debtors' assets as a going-concern, which fact ESL readily acknowledges.  *See* ESL Supplemental Memo at 3 ("ESL emerged as the only party willing to make a going concern bid.").  By leveraging the weight of its position, ESL singularly motivated the Debtors' going-concern Sale and, along with Cyrus (who financed the Debtors' ability to run the Sale process), enabled the Debtors, over the objection of the Creditors' Committee, to accomplish the Sale—an outcome that ESL did everything in its power to ensure.

21.     The Sale ultimately closed on ESL's terms and resulted in primary and direct benefits for ESL, Cyrus and the Second Lien Holders.  Indeed, as set forth below, the application of the correct legal standard to the facts of these cases yields the inescapable conclusion that the Second Lien Holders were primary beneficiaries of the Section 506(c) Expenses and, as a result, any Section 507(b) Claims assertable against the Debtors must be offset entirely by the Proposed Surcharges.

### B.     The Second Lien Holders Were Primary Beneficiaries of the Section 506(c) Expenses

22.     The history of these cases demonstrates that the Second Lien Holders were primary beneficiaries of the Section 506(c) Expenses, which were incurred to effectuate the Sale to ESL.

13

As discussed herein, the Sale was a culmination of the ESL's and Cyrus's months-long campaign to consummate a going-concern sale of the Debtors' assets to ESL and, thereby, avoid liquidation at all costs. Beginning as far back as their prepetition negotiations with the Debtors over the terms of the Junior DIP, ESL and Cyrus worked in lockstep at every stage of these cases to enable the Sale. These efforts paid off, generating significant benefits and monetary recoveries for the Second Lien Holders that inarguably were direct, quantifiable, and for their primary benefit.

23.   ESL, Cyrus and Wilmington Trust now assert—somehow without even a hint of irony—that they and the other Second Lien Holders would have been better off had the Debtors liquidated instead of pursing and consummating the Sale.[16] While the Creditors' Committee advocated that such a result would have been in the best interests of unsecured creditors, none of ESL, Cyrus or Wilmington Trust ever challenged the Sale or any component thereof on behalf of Second Lien Holders prior to seeking to impose hundreds of millions of dollars of Section 507(b) Claims on the Debtors' estates. Indeed, their misguided efforts should be rejected for the reasons that follow.

### 1.   ESL Was a Direct and Primary Beneficiary of the Sale and Section 506(c) Expenses

24.   Throughout these cases, ESL received precisely what it wanted: It acquired substantially all of the Debtors' most valuable assets. A mere sample of ESL's and its counsel's statements during the chapter 11 cases underscores both ESL's desired outcome (a going-concern sale of assets to ESL) and the significant pressure ESL exerted on the Debtors to ensure that outcome, rather than a liquidation, came to pass:

---

[16] *See, e.g.*, Common Memo at 25 ("[I]t can hardly be said that the Second Lien Parties benefited [from the Sale] when they would have achieved full or nearly full recoveries on their claims in a first-day liquidation."); ESL Supplemental Memo at 14 ("To the extent ESL benefited from the going-concern sale, it did so incidentally and alongside the other second Lien Creditors . . . ESL ultimately would have recovered more for its secured claims in a first-day liquidation.").

- "We intend to work closely and collaboratively with other stakeholders to restructure the company's balance sheet using the Chapter 11 framework as quickly and efficiently as possible and will continue to press forward with the goal of seeing Sears emerge from this process positioned for success as a smaller, less indebted retailer in an integrated retail environment." ESL Investments, Inc. and Edward S. Lampert Statement on Chapter 11 Reorganization Filing by Sears Holdings Corporation [Press Release] ESL Investments, Inc. and Edward S. Lampert Press Release on Chapter 11 Reorganization Filing by Sears Holdings Corporation (Oct. 15, 2018), attached hereto as **Exhibit B**.

- "ESL Investments' longstanding goal has been to enable Sears Holdings Corporation to return to profitability, for the benefit of Sears and all of its stakeholders . . . ESL put forward proposals in April and August to acquire certain Sears assets, followed by a comprehensive proposal in September for liability management transactions, strategic asset sales (including those assets that ESL had made proposals to purchase) and real estate transactions." *Id.*

- ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

- "ESL is investing substantial resources into developing a going concern bid for hundreds of Sears stores and other Sears assets. ESL is working around the clock with potential lenders seeking to finance a bid, with potential partners to structure a bid, conducting necessary diligence and building the business plan that will support a going concern bid. All of this requires a substantial commitment of time and effort from ESL, which ESL is willing to commit so long as the process is fair, and credit bidding is available." *Limited Response to the Preliminary Objection of the Official Committee of Unsecured Creditors of Sears Holdings Corporation, et al. to Debtors' Motion for Approval of Global Bidding Procedures* ¶ 4 [ECF No. 700].

- "In the event that the Board does not override the Subcommittee's decision [to reject ESL's going concern bid], ESL will have no choice but to commence litigation on an expedited basis to hold the relevant members of the Board and the Subcommittee responsible for their breaches of fiduciary duties." Bromley Letter, at 1.

- "ESL has expended substantial resources in its efforts to submit a going concern bid. ESL structured and offered to provide a junior debtor-in-possession financing facility . . . , which served as the (uncompensated) stalking horse for Great American and for the eventual Junior DIP provided by Cyrus." *Id.* at 2.

15

- "Here, the process from the beginning has focused on the narrow window available for a going concern transaction and the need for a wind-down reserve [unlike in the Toys R Us bankruptcy]." *Id.* at 4.

- "[T]he rejection of [ESL's] going concern proposal violates the duty of care, because it guarantees that the Debtors' largest creditor, ESL, will receive a materially lower recovery on its claims than if the January 7 proposal were accepted." *Id.* at 5.

- "ESL holds approximately $2.4 billion of senior secured debt of Sears. In the Buyer's capital structure, more than $1.3 billion of this debt will be converted into equity. ESL is investing over $300 million in cash to facilitate its credit bid, including buying out other senior debt holders under the IP/Ground Lease, the FILO Facility, the Real Estate Loan 2020 and the Sparrow mortgage debt. Furthermore, ESL will be extending substantial long-term credit to New Sears, including a minimum of $106 million of the New Letter of Credit Facility and $87.5 million as part of the three-year Real Estate Loan. ***ESL therefore has much to lose if the Buyer's go forward business plan is not successful.***" *ESL's Omnibus Response in Support of the Going Concern Sale Transaction* ¶ 30 [ECF No. 2379].

- "And, undercutting the UCC's purported concern about the risk and costs of uncertainty [in connection with the APA conditions] is its relentless pursuit of ***liquidation, a scenario far more uncertain and risky than the Proposed Sale.***" *Id.* ¶ 77.

- "It is true that what happened in this case from the very beginning was that ESL has indicated very clearly that it was interested in a going concern transaction." Transcript of Feb. 7, 2019 Hearing 81:2-5 (J. Bromley on behalf of ESL).

- "In this circumstance, this transaction that is being proposed to be approved is substantially better than the liquidation alternative, and it's substantially better than the one that the Debtors have shown you." *Id.* at 95:16-19.

25.    ESL's desire to credit bid and acquire the Debtors' assets was so ingrained that on January 8, 2019, ESL agreed to fund the negative operating costs of the estates through the auction while ESL worked to improve its bid. Transcript of Jan. 8, 2019 Status Conf. 10:8-18 (the parties agreeing that $17.9 million of ESL's $120 million deposit would be non-refundable and paid to the estates should ESL lose the auction). ESL was the only bidder at the auction (outside of the liquidation alternative favored by the Creditors' Committee) and submitted the only going-concern bid.

26.    Moreover, ESL, Cyrus and the other Second Lien Holders received the quantifiable benefit of an allowed *$433.45 million credit bid* (of which ESL held 78.3%) and the allowance of the remainder of their secured claims for credit bidding and other purposes. *See Declaration of Brian J. Griffith in Support of the Debtors' Motion to Estimate Certain 507(b) Claims for Reserve Purposes* ⁋ 8 [ECF No. 4035].  Had there been a day-one liquidation, the Second Lien Holders likely would have received no recovery on account of the Second Lien Collateral. *Id.* ("Specifically, Second-Lien Holders, as participants in the credit bid, received a 100% recovery on account of their respective, credit bid Second-Lien Debt.").  This $433.45 million was approximately 40% of the total $1.078 billion in Second Lien Debt outstanding, and it represented more than 100% of the value of the Second Lien Collateral as of the Petition Date. *See id.* at Ex. A.  As detailed above, the value of the Second Lien Collateral on the Petition Date was only between $373 million and $577 million, meaning the recovery by the Second Lien Holders on account of the credit bid was between 75% and 116% of the value of the Second Lien Collateral as of the Petition Date.

27.    As made clear through its press releases, letters and actions, ESL had one singular goal in these cases: to acquire its hand-selection of the Debtors' retail operations and real estate assets as a "going concern."  The only reason those assets had value was because the Debtors expended significant estate resources to preserve those assets pending the Sale (at the expense of unsecured creditors, not Second Lien Holders in respect of the Second Lien Collateral).  Indeed, ESL's desired outcome for which it so avidly fought was made possible because the Debtors incurred significant expenses to run the chapter 11 cases, preserve the value of the Second Lien Collateral and effectuate the Sale.  The Proposed Surcharges are appropriate and necessary here as to the Second Lien Collateral securing ESL's claims.

      **2.**    **Cyrus Was a Direct and Primary Beneficiary of the Sale and Section 506(c) Expenses**

28.    Cyrus likewise was a primary beneficiary of the Sale and Section 506(c) Expenses, and its attempt to recast its role in these cases as a mere bystander and unwilling participant in ESL's credit bid is revisionist.  *See* Cyrus Supplemental Memo ¶ 6.  Just as ESL was a principal driver of the campaign to cause the Sale and avoid liquidation at all costs, so too did Cyrus provide fundamental contributions in support of the Sale that ultimately yielded direct and quantifiable benefits to itself.

29.    Cyrus's position that the Sale did not inure to its primary benefit is undermined by its own conduct throughout these cases in support of the very same Sale.  Even prior to the Petition Date, Cyrus already had been identified as a co-lender with ESL for the contemplated junior debtor-in-possession facility (the "Junior DIP") described in the DIP Motion.[17]  The Junior DIP was intended to fund the Debtors' efforts to market their assets, hold an auction, and ultimately consummate a going-concern sale.  *See id*. ¶ 7 ("The [Junior DIP] would allow the Debtors to operate a larger number of stores while they try to secure a buyer for a substantial part of their business as a going concern").  ████████████████████

████████████████████████████████████

████████████████████ Later, after ESL withdrew its bid to fund the Junior DIP, Cyrus competed vigorously with a third-party lender to provide postpetition financing, ultimately agreeing to fund the entire $350 million Junior DIP that the Court approved.  *See* Final Junior DIP

---

[17] *See Debtors' Motion for Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections to Prepetition Secured Parties, and (D) Schedule Second Interim Hearing and Final Hearing* [ECF No. 7] (the "DIP Motion") ¶ 15.

Order.[18]  It defies logic that Cyrus would invest so substantially in the Debtors' ability to conduct

a going-concern sale if it did not anticipate and receive benefits commensurate with its efforts.

30.    As the Junior DIP lender, Cyrus's actions proved critical in enabling the Sale.  Not

only did Cyrus's Junior DIP provide the Debtors with the required runway to complete the Sale,

but in agreeing to roll over up to $350 million of the Junior DIP into new financing for Transform

on a cashless basis, Cyrus made the Sale possible.  Absent Cyrus's agreement to roll over its debt,

ESL would have had to advance or procure $350 million in additional cash to cover the Junior DIP

obligations—something ESL would have been unwilling to do and unable to obtain from a third

party.

31.    The monetary benefits Cyrus received in connection with the Sale it enabled were

direct and quantifiable.  Cyrus received a substantial recovery on account of its Second Lien Debt

as a result of its "unwilling" participation in the credit bid.  Cyrus Memo ¶ 6.  ███████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████    █████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

---

[18] *See Final Junior DIP Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing and (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims; (II) Modifying the Automatic Stay; and (III) Granting Related Relief* [ECF No.  1436] (the "Final Junior DIP Order").

██████████████████ Cyrus's receipt of direct and quantifiable benefits is undeniable and the Proposed Surcharges are appropriate.

### 3. The Remaining Second Lien Holders Were Direct and Primary Beneficiaries of the Sale and Section 506(c) Expenses

32.     The remaining Second Lien Holders, represented here through Wilmington Trust, as the collateral agent and indenture trustee for certain tranches of Second Lien Debt, also received direct benefits through the Sale and were primary beneficiaries of the Section 506(c) Expenses. Like ESL and Cyrus, the remaining Second Lien Holders participated in the credit bid and thereby received a substantial recovery on account of the Second Lien Collateral. At no time during these cases did they or Wilmington Trust express a preference for liquidation or oppose to the Sale. Therefore, the Proposed Surcharges are appropriate with respect to all Second Lien Holders.

### III.    THE EQUITIES OF THE CHAPTER 11 CASES WEIGH IN FAVOR OF ESTOPPING ESL, CYRUS AND WILMINGTON TRUST FROM ASSERTING SECTION 507(B) CLAIMS AND DENYING THEIR STATUS AS PRIMARY BENEFICIARIES OF THE SECTION 506(C) EXPENSES

33.     Despite directly and indirectly opposing the Debtors' liquidation and demanding and/or supporting the Sale, ESL and Cyrus now claim that they were not the primary beneficiaries of the expenses that made the Sale possible, arguing instead that they would have fared better in a liquidation scenario. But for the deliberate actions of ESL and Cyrus, liquidation—for which the Creditors' Committee advocated as being in the best interests of unsecured creditors—would have been the Debtors' fate. This Court should recognize this about-face as the opportunistic ploy that it is and apply well-established principles of equity to estop ESL and Cyrus from asserting Section 507(b) Claims and denying their status as primary beneficiaries of the Sale and Section 506(c) Expenses.

### A.   The Equitable Doctrines of Judicial Estoppel and Unclean Hands Apply

34.   Two equitable doctrines apply with equal force to this dispute:  (i) judicial estoppel

and (ii) unclean hands.  "Judicial estoppel is designed to prevent a party who plays fast and loose

with the courts from gaining an unfair advantage through the deliberate adoption of inconsistent

positions in successive suits."  *In re CCT Comms., Inc.*, 420 B.R. 160, 169 (Bankr. S.D.N.Y. 2009)

(quoting *Wight v. BankAmerica Corp.*, 219 F.3d 79, 89 (2d Cir. 2000)).  Although judicial estoppel

"depends heavily on the specific factual context and is 'probably not reducible to any general

formulation of principle," this Court nevertheless has made clear that it "generally will apply

judicial estoppel 'if: [a] a party's later position [in a legal proceeding] is clearly inconsistent with

its earlier position; [b] the party's former position has been adopted in some way by the court in

the earlier proceeding; and [c] the party asserting the two positions would derive an unfair

advantage against the party seeking estoppel.'"  *In re Frontier Ins. Group, Inc.*, 585 B.R. 685, 703

(Bankr. S.D.N.Y. 2018) (Drain, J.) (quoting *BPP Illinois, LLC v. Royal Bank of Scotland Group

PLC*, 859 F.3d 188, 192 (2d Cir. 2017)); *see also In re Delphi Corp.*, No. 05-44481 (RDD), 2008

WL 3486615, at *14 (Bankr. S.D.N.Y. Aug. 11, 2008) (stating that judicial estoppel applies where

a party takes a position that is "clearly inconsistent with a position that it successfully pursued in

the prior proceeding, in a way that the Court adopted," such that the party would receive an unfair

advantage or impose an unfair detriment on opposing parties in the current proceeding).  Judicial

estoppel may apply to different proceedings within the same chapter 11 cases.  *See In re CCT

Comms., Inc.*, 420 B.R. at 169–71 (applying judicial estoppel where a debtor designated itself as a

small-business debtor for purposes of an exclusivity motion and then tried to reverse this

designation for purposes of a motion to dismiss or convert).  It also may apply to inconsistent

positions within the same proceeding.  *See In re Andrews*, 385 B.R. 496, 502–04 (Bankr. D. Conn.

2008) (applying judicial estoppel where inconsistent statements were made in the same

proceeding); *see also New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (stating that judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase").

35.      Under the doctrine of "unclean hands," any party "who comes to equity must come with clean hands." *PenneCom B.V. v. Merrill Lynch & Co., Inc.*, 372 F.3d 488, 493 (2d Cir. 2004).  "The unclean hands defense requires consideration of many facts, including not only the conduct of the opposing party . . . but the motivations for it and the alleged prejudicial impact" it causes. *In re Haimil Realty Corp.*, No. 14-11779 (MEW), 2015 WL 1396610, at *5 (Bankr. S.D.N.Y. Mar. 24, 2015) (citation omitted).  Like judicial estoppel, the doctrine of unclean hands depends upon the specific facts of the case and "gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant.  It is not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion." *In re Swift*, 496 B.R. 89, 101 (Bankr. E.D.N.Y. 2013) (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814–15 (1945)).  A party must "have acted fairly and without fraud or deceit as to the controversy in issue," or else the doctrine "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." *Id.* (quoting *Precision Instrument Mfg.*, 324 U.S. at 814–15).

### B.      The Equities of the Chapter 11 Cases Weigh in Favor of Estopping ESL from Asserting Section 507(b) Claims and Denying Its Status as a Primary Beneficiary of the Section 506(c) Expenses

36.      ESL's about-face is an overt attempt to use the Bankruptcy Code in a manner that is contrary and offensive to its equitable foundation.  It is indisputable that ESL played *the* central role at every major stage of these chapter 11 cases and was the primary driver of the Debtors' efforts to effectuate the Sale and avoid liquidation.  The record demonstrates not only that ESL desired this outcome, but also that ESL did everything in its power to obtain it.  ESL's claim that

22

it benefited from the Sale only "incidentally and alongside the other Second Lien creditors," ESL Supplemental Memo at 14, is beyond disingenuous and defies reality.  In actuality, ESL received everything it wanted, including the Debtors' assets at a substantial discount.

37.    From the inception of these cases, ESL demonstrated an unyielding commitment to its core belief that the value of the Debtors' assets is maximized through a going-concern sale and not through liquidation.  ESL's first major step toward achieving its objective was proposing funding for the Debtors to conduct an auction process in support of a going-concern sale through the Junior DIP.  *See* DIP Motion ¶ 15.  After the Debtors secured requisite financing to market and sell their assets on a going-concern basis through Cyrus's Junior DIP, ESL remained steadfast in its desire and support for the Sale and opposition to liquidation at all costs.  In addition to making several statements on the record in support of the Sale, as set forth above, ESL accused the Debtors' board of directors of potential breaches of fiduciary duties if it did not accept ESL's going-concern bid.  *See* Letter from J. Bromley, counsel to ESL, to Board of Directors, at 1 (Jan. 7, 2019).  In ESL's own words "[i]t is true that what happened in this case from the very beginning was that ESL has indicated very clearly that it was interested in a going concern transaction." February 7, 2019 Hearing Tr. 81:2-5 (J. Bromley, counsel to ESL).

38.    ESL now comes before this court of equity as if none of that ever happened.  Instead of acknowledging its deliberate and, contrary to the Creditors' Committee's wishes, successful efforts to avoid liquidation and push for the Sale, ESL asks the Court to adopt its new position that it would have been better off under a first-day liquidation and, as a result of the Debtors' decisions, ESL suffered some type of harm.  The equities of these cases estop ESL from adopting this new and contrary position when ESL already benefited from its prior position.  *See In re CCT Comms., Inc.*, 420 B.R. at 171 (applying judicial estoppel where a debtor designated itself as a small

business to gain a benefit in the plan process and then "reverse[d] course to avoid the burdens of the plan process associated with small business debtor status").

39.      Additionally, and for the same reasons, ESL's hands are unclean.  Until now, ESL never so much as suggested that it might gain more in a liquidation scenario than through the Sale, instead demonstrating repeatedly through public statements and actions that it preferred the going-concern Sale, pursuing that Sale, and threatening those who questioned the wisdom of that Sale. The equities of the chapter 11 cases do not permit ESL's opportunistic attempt to reverse its earlier position for its sole pecuniary gain and at the expense of the Debtors' estates and all other creditors.

### C.    The Equities of the Chapter 11 Cases Weigh in Favor of Estopping Cyrus from Asserting Section 507(b) Claims and Denying Its Status as a Primary Beneficiary of the Section 506(c) Expenses

40.      Like ESL, Cyrus is attempting to rewrite the history of these chapter 11 cases so that it can assert substantial Section 507(b) Claims and capture value from the Debtors' remaining unencumbered assets.  To lend credibility to its new position that it would have preferred and benefited from a liquidation scenario, Cyrus attempts to recast itself as a mere bystander and unwilling participant in the going-concern sale process.  This purely fictional account conveniently ignores the reality that Cyrus and ESL have long pursued a common goal of facilitating the Sale.

41.      Cyrus's position is undermined by the entire history of its conduct during the chapter 11 cases.  In addition to agreeing to fund a substantial portion of ESL's proposed postpetition financing, which Cyrus knew at the time was to fund a going-concern sale process, Cyrus ultimately provided the Debtors with the Junior DIP that directly enabled the Sale even after ESL dropped out of the contest to provide such funding.  *See* Final Junior DIP Order.  Even more telling of Cyrus's desire to effectuate the Sale was its decision to roll over up to $350 million of outstanding obligations under the Junior DIP to Transform on a cashless basis.  Absent this concession, which another lender likely would been loath to make, the Sale most likely would not

24

have closed. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

42.    Cyrus's preference for a going-concern sale and the avoidance of liquidation has been clear since prior to the inception of the chapter 11 cases, and the Sale is a direct result of Cyrus's efforts.  If the Court were to accommodate Cyrus's about-face, such decision would unfairly benefit Cyrus at the expense of other interested parties (primarily unsecured creditors) by permitting an inequitable windfall for Cyrus.  For these reasons, as with ESL, the equities of the chapter 11 cases weigh in favor of estopping Cyrus from asserting Section 507(b) Claims and denying its status as a primary beneficiary of the Section 506(c) Expenses.  *See In re CCT Comms., Inc.*, 420 B.R. at 171.

43.    Additionally, and for the same reasons, Cyrus does not come to this Court with clean hands.  As with ESL, Cyrus's unclean hands are evidenced by its new position on liquidation and the Sale, which flatly contradicts the position it took earlier in the chapter 11 cases.  Cyrus facilitated the Sale and enabled the Debtors to avoid liquidation, and it cannot now claim otherwise.  The Court should recognize Cyrus's conduct for what it is and, accordingly, reject Cyrus's argument that it is entitled to Section 507(b) Claims and is not a primary beneficiary of the Section 506(c) Expenses.

### D.    The Equities of the Chapter 11 Cases Weigh in Favor of Estopping Wilmington Trust from Asserting Section 507(b) Claims and Denying Its Status as a Primary Beneficiary of the Section 506(c) Expenses

44.    As with ESL and Cyrus, the equities preclude Wilmington Trust's Section 507(b) Claims.  Wilmington Trust did not advocate for the Sale, but neither did it advocate *against* the Sale on behalf of Second Lien Holders.  In fact, in its *Response of Wilmington Trust, National Association, as Collateral Agent to Notice of Successful Bidder and Sale Hearing* [ECF No. 2089]

25

(the "Wilmington Response"), Wilmington Trust expressly stated its acquiescence in the Sale. Wilmington Response ¶ 4 ("[Wilmington Trust] has no objection to the sale pursuant to the [APA]."). Despite this, Wilmington Trust is now trying to put its thumb on the scale for its own benefit and to the detriment of the Debtors and the Debtors' unsecured creditors by claiming that the Sale negatively affected the Second Lien Holders. The Court should reject this belated and misguided effort on fundamental equitable principles.

## <u>CONCLUSION</u>

For the reasons set forth above, and for the reasons set forth in the Debtors' Rule 3012 Motion and the Debtors' Objection, the Creditors' Committee respectfully requests that the Court (i) deny the Second Lien Parties' claims under Bankruptcy Code section 507(b), (ii) grant the Debtors' request for a surcharge under Bankruptcy Code section 506(c), and (iii) grant such other and further relief as the Court deems just, proper and equitable.

New York, New York
Dated:  June 27, 2019

AKIN GUMP STRAUSS HAUER & FELD LLP

/s/  *Ira S. Dizengoff*

Ira S. Dizengoff
Philip C. Dublin
Joseph L. Sorkin
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
E-mail: idizengoff@akingump.com
          pdublin@akingump.com
          jsorkin@akingump.com

Lacy M. Lawrence (admitted *pro hac vice*)
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
E-mail: llawrence@akingump.com

*Counsel to the Official Committee of Unsecured
Creditors of Sears Holdings Corporation, et al.*

27