AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Ira S. Dizengoff
Philip C. Dublin
Sara L. Brauner
Zachary D. Lanier

*Counsel to the Official Committee of*
*Unsecured Creditors of Sears Holdings Corporation, et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| SEARS HOLDINGS CORPORATION, et al.,[1] | ) | Case No. 18-23538 (RDD) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**NOTICE OF FILING OF CREDITORS' COMMITTEE'S LETTER**
**IN SUPPORT OF SECOND AMENDED JOINT CHAPTER 11 PLAN**
**OF SEARS HOLDINGS CORPORATION AND ITS AFFILIATED DEBTORS**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

PLEASE TAKE NOTICE that on June 28, 2019, the above-captioned debtors and debtors in possession (the "Debtors") filed the *Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* [ECF No. 4389] (the "Plan")[2] and the *Disclosure Statement for Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* [ECF No. 4390] (the "Disclosure Statement").

PLEASE TAKE FURTHER NOTICE that also on June 28, 2019, the Court entered the order approving the Disclosure Statement [ECF No. 4392] (the "Disclosure Statement Order"). The Disclosure Statement Order approves, among other things, the contents of the solicitation packages to be distributed to creditors entitled to vote on the Plan (the "Notice Packages"). The Notice Packages will also include a letter from the Creditors' Committee to holders of unsecured claims setting forth, among other things, the Creditors' Committee's recommendation that holders of unsecured claims entitled to vote on the Plan vote to accept the Plan (the "Committee Letter").

PLEASE TAKE FURTHER NOTICE that attached hereto as **Exhibit A** is a copy of the Committee Letter.

PLEASE TAKE FURTHER NOTICE that copies of the Committee Letter are available at the Creditors' Committee's website at https://cases.primeclerk.com/searscommittee.

*[Remainder of page left blank intentionally.]*

---

[2] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

New York, New York                         AKIN GUMP STRAUSS HAUER & FELD LLP
Dated:  June 28, 2019

By: /s/  *Ira S. Dizengoff*
     Ira S. Dizengoff
     Philip C. Dublin
     Sara L. Brauner
     Zachary D. Lanier
     One Bryant Park
     New York, New York 10036
     Telephone: (212) 872-1000
     Facsimile: (212) 872-1002
     Email:  idizengoff@akingump.com
            pdublin@akingump.com
            sbrauner@akingump.com
            zlanier@akingump.com

*Counsel to the Official Committee of Unsecured*
*Creditors of Sears Holdings Corporation, et al.*

## **Exhibit A**

Committee Letter

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS
OF SEARS HOLDINGS CORPORATION, *ET AL.***

**Chapter 11 Case No. 18-23538 (RDD)**

c/o Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036

June 28, 2019

**To:    Holders of Class 4 General Unsecured Claims**

Akin Gump Strauss Hauer & Feld LLP is counsel to the Official Committee of Unsecured Creditors (the "Creditors' Committee") in the above-referenced chapter 11 cases (the "Chapter 11 Cases") of Sears Holdings Corporation and its affiliated debtors and debtors in possession (collectively, "Sears" or the "Debtors"). The Creditors' Committee was appointed by the United States Trustee, a representative of the United States Department of Justice, to represent the interests of all of the Debtors' unsecured creditors. We write to advise you of the Creditors' Committee's position regarding the *Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* [ECF No. 4389] (the "Plan"). The Plan is described in, and attached as an exhibit to, the accompanying *Disclosure Statement for Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* [ECF No. 4390] (the "Disclosure Statement"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Disclosure Statement or the Plan, as applicable.

As the official representative of all unsecured creditors in the Debtors' Chapter 11 Cases, the Creditors' Committee believes that, based on modifications made to the Plan to address a number of issues that the Creditors' Committee previously had raised, confirmation of the Plan in its current form is in the best interests of unsecured creditors under the circumstances. Therefore, we recommend that each unsecured creditor (a) **vote to accept** the Plan and (b) **not "opt-out" of the releases** under the Plan, in accordance with the instructions set forth on the applicable Ballots.[1]

\* \* \*

As you likely are aware, the Sears business has been sold to a new entity (referred to as "Transform") controlled by Edward Lampert and his investment vehicle, ESL Investments, Inc. ("ESL")—the same parties that primarily controlled Sears before it filed for chapter 11. What remains of the Sears enterprise against which you hold claims is the corpus of the business that Mr. Lampert and ESL previously controlled and not the new entity that currently owns and operates Sears and Kmart stores. As a result of the sale to Transform, the former Sears enterprise is in the process of liquidating its remaining assets, which comprise primarily litigation claims against Mr. Lampert, ESL and other parties involved in the demise of Sears in its prior form that were preserved in connection with the sale (the "Preserved Causes of Action"). Accordingly, the Plan

---

[1] This letter sets forth the position of the Creditors' Committee and not the views of any member of the Creditors' Committee in its individual capacity.

for which the Debtors seek approval—and on which you are entitled to vote—is considered a "liquidating" chapter 11 plan.

The Plan is structured in order to implement a proposed "Plan Settlement," which effectively results in all of the Debtor entities being treated as a single unit against which all creditor claims will be asserted and from which recoveries will be provided. Specifically, the Plan Settlement, if approved by the Bankruptcy Court, will consolidate the Debtors' assets into a common pool for distribution to creditors to resolve issues associated with the Debtors' ability to allocate claims and assets among the various estates. The Plan Settlement also contemplates certain modifications to this "substantive consolidation" construct to enable creditors of certain Debtor entities, such as Kmart, to be treated better than the creditors of certain other Debtor entities, such as Sears Roebuck, based on the value available for distribution at the respective entities and the claims that have been asserted against such entities, including claims that the various Debtors have against each other.[2]

Under the Plan (in either the Plan Settlement or "toggle" scenario), holders of General Unsecured Claims will receive beneficial interests ("Liquidating Trust Interests") in a liquidating trust (the "Liquidating Trust"). On the Effective Date of the Plan, the Debtors will transfer all of their remaining assets—which largely are the Preserved Causes of Action—to the Liquidating Trust for the primary benefit of unsecured creditors, and the remaining Debtor entities will dissolve. A trustee will be appointed for the Liquidating Trust (the "Liquidating Trustee"), who will be supervised by a five-member advisory board (the "Liquidating Trust Board"). The Liquidating Trust will, among other things, pursue the Preserved Causes of Action and reconcile claims against the Debtors' estates. Any recovery for holders of General Unsecured Claims is dependent on the success of the prosecution of the Preserved Causes of Action.

Over the past several months, the Creditors' Committee has played an active role in the Debtors' Chapter 11 Cases in an effort to obtain the best possible recovery for the Debtors' unsecured creditors, including by ensuring that the Liquidating Trust has adequate funding and that the Creditors' Committee's appointees comprise three of the five members of Liquidating Trust Board, which, in turn, will select the Liquidating Trustee and the professionals to be retained by the Liquidating Trust by majority vote as set forth herein. As set forth in the Creditors' Committee's objection to the Debtors' disclosure statement [ECF No. 4022] (the "Disclosure Statement Objection"), the Creditors' Committee did not support the prior version of the plan (the "Initial Plan") because, among other things, the Initial Plan prevented unsecured creditors from selecting the majority of the members of the Liquidating Trust Board and was likely to leave the Liquidating Trust with inadequate resources to pursue the Preserved Causes of Action for the benefit of unsecured creditors.

Since the filing of the Disclosure Statement Objection, the Creditors' Committee continued to pursue a consensual resolution of its Plan-related concerns and worked cooperatively with the

---

[2] The Plan includes a "toggle" mechanism that will allow the Debtors to seek approval of the Plan without the Plan Settlement. This will result in the Plan being treated as a separate plan of liquidation for each Debtor and holders of General Unsecured Claims against each Debtor receiving different recoveries based on the assets available for distribution at the Debtors against which such creditors have asserted claims. The Creditors' Committee expects the Plan to be confirmed based on the Plan Settlement construct such that the "toggle" portion of the Plan will not be operative.

2

Debtors in order to avoid the significant cost, delay and uncertainty associated with a contested confirmation hearing. These efforts ultimately proved successful, and on June 17, 2019, the Creditors' Committee and the Debtors reached an agreement in principle on the terms of a settlement (the "Committee Settlement"), which terms are reflected in the modified Plan on which you are entitled to vote.

The key changes to the Initial Plan as a result of the Committee Settlement that impact unsecured creditors are as follows:

- unsecured creditors, through the Creditors' Committee, will appoint three of the five members of the Liquidating Trust Board, and the Debtors will appoint the other two members;

- the Liquidating Trust Board will select the Liquidating Trustee, based on the majority vote of the Board members (with the ability of non-consenting Liquidating Trust Board members to object to the majority's selection if more than one member opposes such selection);[3]

- the Liquidating Trust Board will select the advisors for the Liquidating Trust, based on the majority vote of the Board members (with the ability of non-consenting Liquidating Trust Board members to object to the majority's selection of primary litigation counsel if more than one member opposes such selection);[4]

- the Liquidating Trust is anticipated to have initial funding of approximately $25 million in cash;[5]

- the Creditors' Committee will have consent rights, such consent not to be unreasonably withheld, with respect to any settlement or resolution of claims asserted by certain parties in interest, including ESL, Cyrus Capital Partners, L.P. and the Second Lien Notes Trustee, for alleged diminution in the value of the assets that secured such parties' "Second Lien Claims" (such claims for diminution are referred to as "507(b) Claims," as they arise under section 507(b) of the Bankruptcy Code);

- the Creditors' Committee will have consent rights, such consent not to be unreasonably withheld, with respect to the settlement of any Administrative Expense Claims;

- the Creditors' Committee will have consultation rights with respect to the settlement or resolution of issues related to ongoing disputes between the Debtors and Transform

---

[3] If two members of the Liquidating Trust Board do not agree with the majority's selection of the Liquidating Trustee, the opposing members may file an objection with the Bankruptcy Court, and the Bankruptcy Court will determine whether the Liquidating Trust Board's selection of the Liquidating Trustee is in the best interests of the Liquidating Trust and its beneficiaries.

[4] If two members of the Liquidating Trust Board do not agree with the majority's selection of primary litigation counsel to the Liquidating Trust, the opposing members may file an objection with the Bankruptcy Court, and the Bankruptcy Court will determine whether the Liquidating Trust Board's selection of primary litigation counsel is in the best interests of the Liquidating Trust and its beneficiaries.

[5] Such funding, however, is not a condition precedent to confirmation or consummation of the Plan.

regarding the extent of Transform's obligations to the Debtors under the Asset Purchase Agreement (the "APA Disputes"); *provided, however,* that none of the APA Disputes will be settled without the Creditors' Committee's consent to the extent that such settlement results in the settlement or impairment of the Preserved Causes of Action; and

- the Plan, the Liquidating Trust Agreement, and all other Plan-related documents will be reasonably acceptable to the Creditors' Committee.

The Creditors' Committee believes that with the above-referenced modifications, among others, the Plan will ensure that the interests of unsecured creditors are represented appropriately and that their recoveries will be maximized through the vigorous prosecution of the Preserved Causes of Action.  Specifically, as a result of the Creditors' Committee's efforts, the Creditors' Committee believes that the Liquidating Trust should have adequate funding to pursue litigation and reconcile claims against the Debtors' estates.  In addition, the Creditors' Committee's appointees will comprise a majority of the Liquidating Trust Board.  This will ensure that designees of the fiduciary for all unsecured creditors have a crucial voice in all decisions made by the Liquidating Trust.  The members of the Liquidating Trust Board selected by the Creditors' Committee will work constructively with the Debtors' designees to ensure that all viable and valuable Preserved Causes of Action are pursued and, therefore, that unsecured creditor recoveries are maximized.[6]  Moreover, the Creditors' Committee will have consent or consultation rights with respect to critical decisions made by the Debtors prior to the establishment of the Liquidating Trust and all Plan-related documentation.

In light of these important modifications, the Creditors' Committee supports the Plan. Nonetheless, the Creditors' Committee remains focused on the numerous unresolved contingencies that may impact creditor recoveries, including the APA Disputes and allowance of 507(b) Claims. For example, if substantial portions of the APA Disputes are resolved in Transform's favor, the Debtors may not have sufficient resources to confirm the Plan.  In such circumstance, the Chapter 11 Cases likely would be converted to cases under chapter 7 of the Bankruptcy Code, and the Preserved Causes of Action would be pursued by a chapter 7 trustee selected by unsecured creditors.  In addition, the Debtors must resolve open issues with respect to the allowance of Administrative Expense Claims, including the 507(b) Claims and claims under Bankruptcy Code section 503(b)(9) for goods delivered to the Debtors in the 20 days prior to the Petition Date.  The consent and consultation rights afforded to the Creditors' Committee in connection with the Committee Settlement will enable the Creditors' Committee to coordinate efforts with the Debtors to ensure the best possible outcome on these contingencies in advance of confirmation of the Plan.

Finally, as set forth in the Disclosure Statement Objection, the Creditors' Committee expressed certain reservations with respect to the Debtors' proposed settlement with Pension Benefit Guaranty Corporation ("PBGC" and such settlement, the "PBGC Settlement").[7]  As of the

---

[6] The Restructuring Subcommittee and the Creditors' Committee are in discussions regarding the addition of certain defendants and causes of action to the Subcommittee Adversary Complaint.

[7] PBGC is the governmental agency that administers the national insurance program under Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA") and guarantees the payment of pension benefits upon the termination of a single-employer pension plan covered by Title IV of ERISA.  When an underfunded plan terminates, including in chapter 11, PBGC invariably becomes trustee of the plan and supplements any assets remaining in the

Petition Date, PBGC asserted that the Debtors' pension plans were significantly underfunded in an amount of at least $1.4 billion, which amount could be asserted as an unsecured claim against every Debtor on a joint and several basis (such claims are referred to as unfunded benefit liabilities or "UBL Claims").  In addition, after the pension plans terminated, PBGC asserted a termination premium claim of at least $300 million, which amount could have been asserted as an unsecured claim against every Debtor on a joint and several basis (such claims are referred to as "Termination Premium Claims").  The UBL Claims and Termination Premium Claims likely would have entitled PBGC to a much greater percentage recovery than holders of General Unsecured Claims that are entitled to assert their claims at only a single Debtor.  During the Chapter 11 Cases, the Debtors and PBGC concurrently sought the termination of the Debtors' pension plans and, shortly thereafter, entered into the PBGC Settlement to resolve all potential litigation and issues between the Debtors and PBGC.  Under the terms of the PBGC Settlement, the Debtors agreed to provide PBGC with (i) a priority interest in the first $97.5 million of proceeds recovered by the Liquidating Trust and (ii) a General Unsecured Claim of $800 million in consideration of PBGC's asserted $1.4 billion UBL Claim and asserted $300 million Termination Premium Claim.[8]  In addition, PBGC agreed to (x) support the Plan Settlement, including the modified substantive consolidation of the Debtors' estates despite the fact that it has claims at every Debtor, (y) forego recoveries at certain Kmart entities at which supplemental distributions will be made to creditors with guarantee claims at such entities and (z) waive any other claims it may have or that could be asserted against the Debtors, including the Termination Premium Claims.  As a result of the PBGC Settlement, the Debtors project that, following prosecution of the Preserved Causes of Action, PBGC (which, as noted above, is the only creditor that had the right to assert its claims at every Debtor) will recover approximately 14.7% on its claims, while other holders of General Unsecured Claims will recover between 2% and 3%.[9]

Importantly, the Creditors' Committee believes that due to the provision of adequate funding for the Liquidating Trust and the ability for unsecured creditors to appoint a majority of the members of the Liquidating Trust Board (which will control post-confirmation litigation of the Preserved Causes of Action), recoveries on the Preserved Causes of Action may be materially greater than the Debtors project in their Liquidation Analysis.  As a result, the Creditors' Committee believes that unsecured creditors will recover a greater percentage on their claims and the Debtors likely overestimate the apparent disparity between the projected recoveries for PBGC and those for other unsecured creditors.  Specifically, after the payment of the $97.5 million priority interest, PBGC's $800 million unsecured claim will share in recoveries with other unsecured creditors pursuant to the terms of the Plan.  As recoveries on the Preserved Causes of Action increase, the impact that PBGC's $97.5 million preference could have on the recoveries of other unsecured creditor recoveries will be offset by the reduction of PBGC's unsecured claim

---

plan with its insurance funds to pay to the retired employees their pension benefits, subject to statutory limits.  *See* 29 U.S.C. §§ 1321-1322, 1342, 1361.

[8] In a "toggle" scenario, PBGC's priority interest would be reduced to $80.0 million.

[9] The Liquidation Analysis filed in connection with the Plan and Disclosure Statement projects that if the Plan Settlement (which, as noted above, consolidates the Debtors' assets, subject to certain modifications) is approved, PBGC will receive a total recovery of approximately 14.7%, holders of General Unsecured Claims at Kmart will receive a total recovery of approximately 2.7% and holders of General Unsecured Claims at all other Debtors will receive a total recovery of approximately 2.3%.  *See* Plan Settlement Liquidation Analysis, Disclosure Statement, Exhibit E-1.

from an asserted $1.7 billion to $800 million.  Moreover, the PBGC Settlement avoids costly litigation with respect to the claims asserted by PBGC that could have furthered diminished the recoveries for other unsecured creditors.  In light of these considerations, the Creditors' Committee does not oppose the proposed PBGC Settlement.

For the reasons described above, the Creditors' Committee supports the modified Plan and believes that confirmation of the Plan in its revised form is in the best interests of the Debtors' unsecured creditors as a whole under the circumstances, assuming that issues related to allowance of Administrative Expense Claims, including the 507(b) Claims, and the APA Disputes are resolved in the estates' favor.  **Accordingly, the Creditors' Committee recommends that all unsecured creditors vote to accept the Plan and not to opt-out of the releases.**

**PLEASE NOTE THAT THE CREDITORS' COMMITTEE REPRESENTS THE INTERESTS OF UNSECURED CREDITORS AS A WHOLE AND DOES NOT REPRESENT THE INDIVIDUAL INTERESTS OF ANY PARTICULAR UNSECURED CREDITOR.    EACH CREDITOR MUST MAKE ITS OWN INDEPENDENT DETERMINATION AS TO WHETHER THE PLAN IS ACCEPTABLE TO THAT CREDITOR AND SHOULD CONSULT WITH ITS OWN LEGAL AND/OR FINANCIAL ADVISOR IN CONNECTION THEREWITH.**

The foregoing description is not intended as a substitute for the Disclosure Statement. Creditors should read the Disclosure Statement and the Plan in their entirety and then make an independent decision as to whether the Plan is acceptable.

The Debtors have provided you with a Ballot with which to vote to accept or reject the Plan as well as to opt-out of the releases provided under the Plan.  In order to have your vote counted, you must complete and return the Ballot in accordance with the procedures set forth therein and in the accompanying Disclosure Statement Order.  **PLEASE READ THE DIRECTIONS ON THE BALLOT CAREFULLY AND COMPLETE YOUR BALLOT IN ITS ENTIRETY BEFORE RETURNING IT TO THE DEBTORS' SOLICITATION AGENT**.

Should you have any questions about this letter, the Plan, the Disclosure Statement, the solicitation procedures or the Debtors' Chapter 11 Cases, we would be pleased to discuss them with you.  Please direct any such questions to Sara Brauner (212-872-7453; sbrauner@akingump.com) or Zach Lanier (212-872-8094; zlanier@akingump.com).

Very truly yours,

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF SEARS HOLDINGS CORPORATION, *ET AL*.