WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Paul R. Genender
Jared R. Friedmann
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                           :

**In re**                    :         **Chapter 11**
                           :

**SEARS HOLDINGS CORPORATION,** *et al.*,  :      **Case No. 18-23538 (RDD)**
                           :

            **Debtors.** [1]        :        **(Jointly Administered)**
                           :
------------------------------------------------------------x

**DEBTORS' BRIEF IN OPPOSITION TO TRANSFORM HOLDCO LLC'S**
**ADVERSARY COMPLAINT AND IN FURTHER SUPPORT OF DEBTORS'**
**SUPPLEMENTAL MOTION TO ENFORCE THE ASSET PURCHASE AGREEMENT**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ........................................................................................................................3

ARGUMENT ............................................................................................................................4

I.      Buyer Cannot Escape Its Obligation to Assume Up to $166 Million Worth of
        Accounts Payables (i.e., Other Payables) ...........................................................................4

        A.      Under § 2.3(k) of the APA, Buyer Agreed to Assume Both (i) $166
                Million of Other Payables and (ii) All Payment Obligations With Respect
                to Ordered Inventory.................................................................................................5

                1.      The last-antecedent canon of textual construction does not support
                        Buyer's argument that "with respect to the Ordered Inventory"
                        modifies "Other Payables."..........................................................................7

                2.      Section 2.3, construed as a whole, does not support Buyer's
                        argument that § 2.3(k) delineates three categories of obligations
                        instead of four. ...........................................................................................12

                3.      The Language of § 2.4(q) Does Not Support Buyer's Position that
                        Ordered Inventory Within the Meaning of the APA Was
                        Associated With Payables...........................................................................15

                4.      Extrinsic evidence supports the Debtors' argument that Buyer
                        assumed liability for both Other Payables and all payment
                        obligations with respect to Ordered Inventory...........................................16

        B.      The Debtors Managed the Acquired Assets in the Ordinary Course of
                Business as Required in the APA and in Consultation with Buyer ......................20

                1.      The Debtors Managed the Prepaid Inventory in the Ordinary
                        Course ........................................................................................................20

                2.      The Debtors Managed their Payables in the Ordinary Course .................22

        C.      The Debtors Had No Available Cash at Closing that Could Reduce
                Buyer's Obligation to Assume $166 Million in Other Payables ..........................23

II.     Buyer Is Entitled to a Reduction of Only $56,187,065 Million of the Liabilities It
        Assumed Under § 2.3(k) of the APA................................................................................26

        A.      Buyer Overstates the Prepaid Inventory Shortfall Amount ..................................29

        B.      The Debtors Delivered the Specified Receivables Required Under the
                APA........................................................................................................................32

III.    Buyer Continues to Withhold Estate Property in Violation of the Automatic Stay .........37

        A.      Buyer Was Required Under the APA to Turnover February Rent Proration
                Amounts More Than Four Months Ago ................................................................37

    **B.**    Buyer is Withholding in Excess of $30.4 Million of Estate Property in Violation of the Automatic Stay .................................................................41

**IV.**    Buyer Is Attempting To Misappropriate Assets It Did Not Acquire ................................45

    **A.**    Buyer Has No Right to the 2017 EDA Funds .......................................................45

        **1.**    The EDA Funds Are Excluded Assets Under the Plain Language of the APA.................................................................................................47

        **2.**    Buyer Is Estopped From Asserting Any Rights to the EDA Funds...........52

    **B.**    The Debtors' Hoffman Estates Campus Was Not Sold as a "Buy 3, Get 13 for Free!".................................................................................................54

    **C.**    Buyer Did Not Acquire the Adequate Assurance Deposit...................................57

**V.**    Buyer Is Responsible For Paying, Discharging Or Bonding Over Mechanics' Liens Not Related to Owned Real Property.......................................................................61

CONCLUSION..............................................................................................................................66

RESERVATION OF RIGHTS .......................................................................................................66

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Adelphia Business Sols., Inc.*,
  280 B.R. 63 (Bankr. S.D.N.Y 2002) ....................................................................60

*Gen. Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist.*,
  85 N.Y.2d 232 (N.Y. 1995) .................................................................................53

*GRT, Inc. v. Marathon GTF Tech., Ltd.*,
  No. 5571-CS, 2012 WL 2356489 (Del. Ch. Jun. 21, 2012)..................................49

*Huatuco v. Satellite Healthcare*,
  CV No. 8465-VCG, 2013 WL 6460898 (Del. Ch. Dec. 9, 2013), *aff'd*, 93
  A.3d 654 (Del. 2014) .............................................................................................5

*Interim Healthcare, Inc. v. Spherion Corp.*,
  884 A.2d 513 (Del. Super. Ct. 2005), *aff'd*, 886 A.2d 1278 (Del. 2005) .................5

*Kortright Capital Partners LP v. Investcorp Investment Advisers Ltd.*,
  257 F. Supp. 3d 348 (S.D.N.Y. 2017).................................................................53

*Lockhart v. U.S.*,
  136 S. Ct. 958 (2016)......................................................................................7, 11

*Long Island Lighting Co. v. Great Atl. & Pac. Tea Co. (In re Great Atl. & Pac.
  Tea Co.)*, No. 11-CV-1338 (CS), 2011 WL 5546954 (S.D.N.Y. Nov. 14,
  2011) .................................................................................................................. 59

*Martin Marietta Materials, Inc. v. Vulcan Materials Co.*,
  No. 254, 2012, 2012 WL 2819464 (Del. Supr., May 14, 2012).............................64

*Osborne ex rel. Osborn v. Kemp*,
  991 A.2d 1153 (Del. 2010) .................................................................................25

*Tang Capital Partners, LP v. Norton*,
  No. 7476-VCG, 761-VCG, 2012 WL 3072347 (Del. Ch. July 27, 2012) ..............49

*Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.*,
  807 N.E.2d 876 (N.Y. 2004)...............................................................................5

*Weber v. SEFCU (In re Weber)*,
  719 F.3d 72 (2d Cir. 2013)..................................................................................41

**Statutes**

11 U.S.C. § 542(a), and (ii)..........................................................................................................42

11 U.S.C. § 366...................................................................................................................63, 64

Economic Development Area and Tax Increment Allocation Act, 20 ILCS 620/1
    *et seq.* ................................................................................................................46, 47, 50, 52

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Sears Holdings Corporation and certain of its affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), the sellers under that certain Asset Purchase Agreement, dated January 17, 2019 (as amended on February 11, 2019, and as amended or modified from time to time, the "**APA**"),[1] by and among Transform Holdco LLC (the "**Buyer**"), the Debtors and certain of its subsidiaries (collectively, the "**Sellers**"), respectfully submit this brief in opposition to *Transform Holdco LLC's Brief In Support of the Adversary Complaint And In Opposition To Debtors' Supplemental Motion To Enforce The Asset Purchase Agreement* ("**Buyer Brief**") [ECF No. [●]] and in further support of the *Debtors' Supplemental Motion To Enforce The Asset Purchase Agreement* (collectively, "**Supplemental Motion to Enforce**") [ECF No. 4029].

## PRELIMINARY STATEMENT

1.      Buyer, an affiliate of ESL Investments, Inc., the Debtors' former controlling shareholder, is in breach of its contractual obligations under the Court-approved APA and Sale Order (as defined herein) as well as the automatic stay in numerous respects. The Debtors request that the Court order Buyer immediately turn over funds it owes to the Estate as described below, comply with its assumption of liabilities under the APA, and desist from seeking, through the Adversary Complaint or otherwise, other assets that belong to the Debtors.

2.      Buyer is well aware of the extent to which the Debtors have limited resources to engage in protracted litigation. The funds improperly retained, or sought, by Buyer are critical to maintaining administrative solvency and Buyer's egregious breaches of the APA jeopardize the Debtors' ability to confirm a chapter 11 plan.

---

[1] All capitalized terms used but not defined herein shall have the meaning set forth in the APA. The APA was attached as Exhibit B to the Sale Order (as defined herein).

1

3.      For these reasons and those set forth below, the Debtors respectfully request that the Court enter an order:

(i)      compelling Buyer to perform its obligations under Section 2.3(k) of the APA—that is, to assume up to $166 million of Other Payables **and** all payment obligations with respect to Ordered Inventory;

(ii)     finding that the adjusted Prepaid Inventory Shortfall Amount is $55,943,816;

(iii)    finding that the Aggregate DIP Shortfall Amount is $243,249;

(iv)    finding that the Specified Receivables Shortfall Amount is zero dollars;

(v)     compelling Buyer to immediately turnover $8,000,547 in respect of outstanding February Rent Proration;

(vi)    compelling Buyer to immediately turnover $30,423,697 in Estate property being withheld in violation of the automatic stay;

(vii)   finding that Buyer has no rights to the 2017 EDA funds (defined below)

(viii)  enjoining Buyer from taking any further actions to

(a)     exercise control over the thirteen lots in the Village of Hoffman Estates, Illinois development (the "**Hoffman Estates Development**") that Buyer did not acquire under the APA, or

(b)     interfere with the Debtors' use, enjoyment, or right to dispose of those thirteen lots,

(ix)    finding that Buyer did not acquire the Adequate Assurance Deposit (defined below);

(x)     finding that Buyer is responsible for paying, discharging or bonding over Mechanics' Liens not related to Owned Real Property;

(xi)    dismissing Buyer's Adversary Complaint; and

(xii)   granting the Debtors such other and further relief, at law or in equity, to which they are entitled, including, but not limited to, their attorneys' fees incurred as a result of Buyer's repeated and continuous violations of the automatic stay.

4.      A proposed form of order granting the relief requested in the Motion to Enforce is attached hereto as **<u>Exhibit A</u>** (the "**Proposed Order**").

## BACKGROUND

5.      As set forth in further detail in the Supplemental Motion to Enforce and below, since the Closing Buyer improperly withheld Estate assets that it has refused (without any basis) to turn over to the Debtors, and otherwise violated and continues to violate the APA in multiple respects by taking patently unreasonable positions that frustrate the Debtors' ability to maximize value to the Estate and that further exacerbate the Estate's administrative expenses.

6.      As set forth in the Supplemental Motion to Enforce, the Debtors first requested that Buyer turn over the Estate assets in late February, and after more stalling from Buyer, first moved on several of these issues in their *Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco LLC and (B) Compel Turnover of Estate Property, and (II) Response to Transform Holdco LLCs Motion to Assign Matter to Mediation* to Enforce [ECF No. 2796] ("**First Motion to Enforce**").   On the eve of the March 21, 2019, hearing concerning the issues raised in the First Motion to Enforce, Buyer and the Debtors entered into an interim agreement to attempt to resolve the issues.  However, Buyer continued to refuse to turn over various Estate assets, in violation of both the APA and the automatic stay.

7.      Accordingly, on May 24, 2019, the Debtors filed their Supplemental Motion to Enforce [ECF No. 4029].

8.      The next day, on May 25, 2019, Buyer filed its Adversary Complaint [ECF No. 4033] seeking declaratory relief, specific performance, and damages.  The Adversary Complaint introduced several new efforts by Buyer to commandeer Estate assets, including certain lots at Hoffman Estates, Illinois, the Adequate Assurance Deposit, and EDA Funds, each as discussed in further detail below.

9.      By stipulation of the parties, so-ordered by the Court on June 18, 2019 [ECF No. 4258], the Supplemental Motion to Enforce was "deemed to be an answer to the Adversary Complaint" and "all allegations in the Adversary Complaint not specifically identified in the Motion to Enforce are deemed to be denied."  *Id.* ¶ 1.  The parties further stipulated that the Debtors would file this "single brief (i) in further support of the Motion to Enforce and (ii) in opposition to the relief requested in the Adversary Complaint along with any written direct examinations of their witnesses by declaration by no later than Wednesday, July 3, 2019 at 4:00 p.m."  *Id.* ¶ 4.  The hearing to be held on these issues on July 11, 2019, shall "resolve all requests for relief in the Motion to Enforce and in the Adversary Complaint."  *Id.* ¶ 6.

## **ARGUMENT**

### I.    **Buyer Cannot Escape Its Obligation to Assume Up to $166 Million Worth of Accounts Payables (i.e., Other Payables)**

10.     Contrary to unambiguous contract terms, Buyer argues at great length in its Adversary Complaint and Brief that it is not obligated under the APA to assume both (i) up to $166 million of Other Payables (defined in the APA as "the ***accounts payable*** set forth on Schedule 1.1(g)," APA § 1.1 (emphasis added)) and (ii) all payment obligations with respect to Ordered Inventory.   Buyer's arguments lack merit, notwithstanding its rhetoric and impermissible parole evidence.  No matter how many times or in how many different ways Buyer reproduces § 2.3 in its pleadings—with breaks, without breaks, black-and-white, color-coded, or backwards with an instruction to hold it up in front of a mirror—§ 2.3(k) of the APA unambiguously requires Buyer to assume both of the above-listed obligations.  Buyer's alternative arguments that its obligation, if any, to assume $166 million of Other Payables should be limited by either the Debtors' purported failure to make payments or manage inventory in the ordinary course of business or because of the Debtors' "available cash" at closing likewise fail.

4

Accordingly, the Debtors respectfully request that the Court compel Buyer to satisfy its obligation under the APA to assume both (i) $166 million in respect of Other Payables and (ii) all payment obligations with respect to Ordered Inventory.

> **A.    Under § 2.3(k) of the APA, Buyer Agreed to Assume Both (i) $166 Million of Other Payables and (ii) All Payment Obligations With Respect to Ordered Inventory.**

11.    It is straightforward black-letter law that sophisticated parties entering unambiguous agreements are bound by the terms of those agreements. *See Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 552 (Del. Super. Ct. 2005), *aff'd*, 886 A.2d 1278 (Del. 2005) (holding that parties cannot "escape the express language" of a contract where the contract was "highly negotiated" and the parties are "commercial giants of equal bargaining power") (internal quotations omitted); *see Huatuco v. Satellite Healthcare*, CV No. 8465-VCG, 2013 WL 6460898, at *5 & n.29 (Del. Ch. Dec. 9, 2013), *aff'd*, 93 A.3d 654 (Del. 2014) ("Sophisticated parties entering unambiguous . . . agreements are presumed to understand the consequences of the language they have chosen, and are bound thereby, lest contract rights be subject to endless second-guessing and opportunistic revision."); *see also Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.*, 807 N.E.2d 876, 879 (N.Y. 2004) ("[W]e have repeatedly applied the 'familiar and eminently sensible proposition of law [] that, when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms[;]' 'courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.'") (internal citations omitted).  Buyer is a sophisticated party, and the APA is a highly negotiated and fully integrated contract.  Accordingly, Buyer cannot avoid its obligations under the unambiguous terms of that contract.

12.     The APA unambiguously obligates Buyer to assume up to $166 million of "Other Payables **and** all payment obligations with respect to the Ordered Inventory."   APA § 2.3(k) (emphasis added), 2.3(k)(v).   The two categories of payables—Other Payables and payment obligations with respect to Ordered Inventory—are:

- listed as separate obligations in § 2.3 of the APA, *id.* §§ 2.3(k), 2.4(a);

- defined separately in the APA, *id.* § 1.1; *see also* Declaration of Jared Friedmann ("**Friedmann Decl.**"), Ex. A (Kamlani June 20, 2019 Dep.) ("**Kamlani Tr.**") 22:10-13, 24:2-19 (admitting that Other Payables and Ordered Inventory are defined separately in the APA); and

- set forth in separate schedules appended to the APA, APA at Schedules 1.1(f), (g); *see also* Kamlani Tr. 27:17-23 (admitting that Schedules 1.1(f) and 1.1(g) are two separate schedules appended to the APA).

13.     This Court recognized this plain reading at the Sale Hearing, when it rejected Buyer's argument that it was only obligated to assume up to $166 million in payment obligations with respect to Ordered Inventory, stating:

> I believe it's reasonable to assume that the Debtors' interpretation of § 2.3 would prevail in a proper litigation.   Namely, that the parties defined separately the concept of Other Payables from all payment obligations with respect to ordered inventory, which is the clause that precedes the words, "Other Payables" in § 2.3(k) and further, that the parties clearly set forth in little roman (v) of subsection (k) that the cap of $166 million would apply only to other payables, not to the phrase that follows, those two words in subsection (k), namely, quote, "and all payment obligations with respect to ordered inventory."   ***I'm more than reasonably confident that that would be the result in a contested matter brought before the Court under the Part 7 rules***.

Friedmann, Ex. N (Feb. 7, 2019 Hr'g Tr.) ("**Feb. 7 Tr.**") 242:4-17 (emphasis added).

14.     Notwithstanding the Court's clear statement on the record, Buyer—which claims in its Adversary Complaint that, at the Sale Hearing, the Court merely "preliminarily observed that [the Debtors'] interpretation ***appeared to have some merit***," Compl. ¶ 109

(emphasis added)—advances a number of ill-conceived arguments in an effort to make what is

black and white appear gray.  These arguments fail, because:

- neither the last-antecedent canon nor common sense supports Buyer's argument that the limiting phrase at the end of § 2.3(k)—"with respect to the Ordered Inventory"—modifies "Other Payables;" rather, both support the Debtors' argument that "with respect to the Ordered Inventory" modifies only the phrase that immediately precedes it: "all payment obligations;"

- Section 2.3, construed as a whole, does not support Buyer's argument that § 2.3(k) delineates three categories of obligations instead of four; rather, the whole text of § 2.3 makes clear that § 2.3(k) delineates four categories of obligations, including (i) up to $166 million in respect of Other Payables and (ii) all payment obligations with respect to Ordered Inventory; and

- although the Parties and the Court appear to agree that § 2.3(k) is unambiguous, to the extent extrinsic evidence is admissible to show the Parties' intent with respect to the meaning of § 2.3(k), that evidence supports the Debtors' argument that Buyer assumed liability for both (i) up to $166 million in respect of Other Payables and (ii) all payment obligations with respect to Ordered Inventory.

15.     The terms of the APA—like the words of this Court—are not Play-Doh to

be fashioned into whatever shape most pleases one or another of the Parties.  The terms of § 2.3

of the APA are unambiguous and immutable—and the obligations that flow from them are clear.

> 1.     **The last-antecedent canon of textual construction does not support Buyer's argument that "with respect to the Ordered Inventory" modifies "Other Payables."**

16.     In an effort to bend the unambiguous language of the APA to its purposes,

Buyer reaches for the last-antecedent canon of textual construction.  But the last-antecedent

canon does not help Buyer here.  "The [last-antecedent] rule provides that 'a limiting clause or

phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately

follows.'"  *Lockhart v. U.S.*, 136 S. Ct. 958, 962-63 (2016) (quoting *Barnhart v. Thomas*, 540

U.S. 20, 26 (2003); citing *Black's Law Dictionary* 1532-33 (10th ed. 2014); and A. SCALIA &

B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 144 (2012)).

17.     Justice Sotomayor, writing for the United States Supreme Court in

*Lockhart*, continued:

> The rule reflects the basic intuition that when a modifier appears at the end of a
> list, it is easier to apply that modifier only to the item directly before it.  That is
> particularly true where it takes more than a little mental energy to process the
> individual entries in the list, making it a heavy lift to carry the modifier across
> them all.  For example, imagine you are the general manager of the Yankees and
> you are rounding out your 2016 roster.  You tell your scouts to find a defensive
> catcher, a quick-footed shortstop, or a pitcher from last year's World Champion
> Kansas City Royals.  It would be natural for your scouts to confine their search
> for a pitcher to last year's championship team, but to look more broadly for
> catchers and shortstops.

*Id.* at 963.

18.     That carrying the modifier "with respect to the Ordered Inventory" across

"Other Payables" ***and*** "all payment obligations" is a "heavy lift" or requires "more than a little

mental energy" is manifest in the ***eleven*** pages and ***twenty-seven*** paragraphs Buyer dedicates to

this misguided argument in its Adversary Complaint—not to mention the ***thirty-three*** pages and

***fifty-three*** paragraphs it dedicates to the argument in its Brief in Support.  *See* Compl. ¶¶ 104-31;

Br. ¶¶ 10-63.  That energy is misplaced and those words miss the mark.  Applied to § 2.3(k), the

last-antecedent rule suggests that the phrase "with respect to Ordered Inventory" modifies only

the noun or phrase it immediately follows—that is, "all payment obligations."  *See Lockhart*, 136

S. Ct. at 963 (holding that the last-antecedent rule suggested that the limiting phrase at issue

modified only the phrase that it immediately followed).  Moreover, that interpretation is

consistent with and bolstered by other indicia in the APA of the provision's meaning, as

discussed above.  *See* APA §§ 1.1, 2.3(k), 2.3(k)(v), 2.4(a); Schedules 1.1(f), (g); Feb. 7 Tr.

242:5-15.

19.    In further support of its position, Buyer asserts that "had the Parties intended 'with respect to the Ordered Inventory' to modify only payment obligations, the Parties would have put a comma between 'Other Payables' and 'all payment obligations' to separate the two." Compl. ¶ 114 & n.28.   Buyer cites, as its only authority for that proposition, two provisions in the APA that use a comma after the penultimate item in a list of three or more items (the "**Oxford comma**").   *Id.* (citing APA §§ 1.1, 8.3(d)).   Notably, neither of those provisions contains a limiting clause or phrase like the one at issue here and, thus, Buyer's distinction is one without a difference.   Further, there are more than 100 other instances in the APA in which the Oxford comma is not used and, in some of these, the last-antecedent rule would apply just as it does here:  to suggest that the applicable limiting phrase modifies only the noun or phrase that immediately precedes it.   For example, § 2.3(c) of the APA provides that Buyer shall assume

> all Liabilities arising on or after the Closing Date from or related to any Claim, Action, arbitration, audit, hearing, investigation, suit, litigation or other proceeding (whether civil, criminal, administrative, investigative, or informal and whether pending or threatened or having any other status) arising out of the Assumed Liabilities, the Acquired Assets or the operation of the Business on or after the Closing Date (but not prior to the Closing Date) . . . .

APA § 2.3(c).  The limiting phrase "on or after the Closing Date (but not prior to the Closing Date)" clearly modifies "the operation of the Business" and not "the Acquired Assets" ***and*** "the operation of the Business," as Buyer's argument would dictate.

20.    At bottom, the fact that the Parties did not use an Oxford comma to separate "Other Payables" and "all payment obligations with respect to the Ordered Inventory" in § 2.3(k) is of no moment because what matters most—generally with respect to the interpretation of legal texts and here—is what ***makes sense***.  And applying "with respect to the

Ordered Inventory" to "Other Payables"—as Buyer urges this Court to do (again)—simply ***does
not make sense***.[2]

21.    "[W]ith respect to the Ordered Inventory" cannot and would not modify,
or describe, "Other Payables," because none of the goods that comprised the Ordered Inventory
were associated with payables.  *See* Friedmann Decl., Ex. B (Meghji June 21, 2019 Dep.)
("**Meghji Tr.**") 38:24-39:3 ("Q. So my question, Mr. Meghji, ordered inventory [as defined in
the APA] would have come with payment obligations, correct?  A. No."), 39:6-21;[3] Friedmann
Decl., Ex. C (Riecker June 19, 2019 Dep.) ("**Riecker Tr.**") 32:8-18 ("Ordered inventory is not
booked into the financial systems of the company . . . .  It's not accounted for or recorded in the
company's financial statements that get issued."), 32:19-33:9 (admitting that Ordered Inventory
constitutes "a plan to, at some point in the future, receive title to inventory that the company has
not yet paid for"); *see also* Kamlani Tr. 64:8-11.  Ordered Inventory comprised goods that the
Debtors had ordered but for which it had neither paid for nor taken delivery or title.[4]  Under
rudimentary double-entry bookkeeping principles, one would not enter an unpaid invoice for

---

[2] Buyer also argues, as part of its effort to avoid assuming liability for up to $166 million of accounts payable that it clearly agreed to assume under the unambiguous terms of the APA, that the Parties' use of the word "other" in "Other Payables" shows "that the 'Other Payables' were payables related to inventory but distinct from those payables that were Assumed 503(b)(9) Liabilities."  Compl. ¶ 116; *see also* Br. 20.  But Other Payables is a defined term in the APA: capital "O," capital "P."  The Parties could have referred to the $166 million accounts payable Buyer was to assume as "Pink Unicorns" without altering the nature or scope of the obligation.  A rose by any other name would smell as sweet.

[3] *See also* Meghji Tr. 40:14-21 ("Q. And so there would be value in transferring the liability to make that payment [for Ordered Inventory] to the vendor, correct?  . . .  A. I'm sorry.  There's no liability associated with ordered inventory as it's defined here [in the APA], under the term "ordered inventory."), 48:4-18 ("Q. Are there any payment obligations associated with ordered inventory?  . . .  A. Liabilities only get created or cash goes out for prepaid inventory.  Liabilities do not get created simply from ordered inventory.  Q. And my question is, are there any payment obligations associated with ordered inventory?  . . .  A. Not that I can think of.").

[4] The APA defines "Inventory" as "goods, other than farm products, reflected in the stock ledger of the Sellers as of any date of the determination thereof, which (A) are leased by a person as lessor, (B) are held by a person for sale or lease or to be furnished under a contract of service, (C) are furnished by a person under a contract of service or (D) consist of raw materials, work in process, or materials used or consumed in a business."  APA § 1.1.  Under the APA, "Ordered Inventory" means "Inventory (other than Prepaid Inventory) of the type set forth on Schedule 1.1(f) that has been ordered by Sellers prior to the Closing Date but as to which Sellers have not taken title or delivery prior to the Closing Date."  *Id.*

Ordered Inventory, as it is defined in the APA, in SHC's stock ledger unless and until the company had taken title to or delivery of those goods.  *See* Riecker Tr. 32:8-33:9.  Ordered Inventory is neither a liability nor an asset.  As ESL's President Kunal Kamlani himself put it, "[Ordered Inventory] is nothing."  Kamlani Tr. 64:8-11.  Indeed, had Buyer not agreed to assume payment obligations with respect to Ordered Inventory, the Debtors could have canceled each and every purchase order associated with that Inventory, and the Inventory would ***never*** have been booked into the financial systems of the company.  *See id.* at 79:20-80:6 (admitting that, because the Debtors had neither taken title to nor delivery of the Ordered Inventory, they could have canceled the purchase orders associated with that Inventory at any time).

22.   Accordingly, and contrary to Buyer's assertion in its Brief in Support that this distinction between payables and payment obligations with respect to Ordered Inventory (which Buyer does not dispute) has no "substantive relevance with respect to the obligations [Buyer] would assume," Br. ¶ 10, this distinction dispatches Buyer's argument that § 2.3(k)'s "with respect to the Ordered Inventory" modifies both "Other Payables" and "all payment obligations" and that Buyer thus "assumed a single liability to assume payables and payment obligations with respect to the Ordered Inventory." *See* Compl. ¶¶ 109, 110.  As Supreme Court Justices Kagan and Breyer wrote in their dissenting opinion in *Lockhart*, if "your friend told you ***not*** that she wants to meet 'an actor, director, or producer involved with Star Wars,' but instead . . . a President, Supreme Court Justice, or actor involved with Star Wars[,]' . . . you would know that she wants to meet a President or Justice even if that person has no connection to the famed film franchise."[5]  *Lockhart*, 136 S. Ct. at 970 (quoting *Paroline v. United States*, 572 U.S.434, 435 (2014)). Applying "with respect to the Ordered Inventory" to "Other Payables" makes about

---

[5] Although Justices Kagan and Breyer wrote in dissent, their analysis of the statutory provision at issue in *Lockhart*, applied to Section 2.3(k), would yield the same result as the analysis performed by Justice Sotomayor in her majority opinion.  *See Lockhart*, 136 S. Ct. at  970.

as much sense as applying "involved with Star Wars" to "President" or "Supreme Court Justice"—that is, none.  Accordingly, Buyer's argument fails.

> **2.      Section 2.3, construed as a whole, does not support Buyer's argument that § 2.3(k) delineates three categories of obligations instead of four.**

23.      Buyer further argues, apparently because § 2.3(k) is "in the middle of [a] long list," that § 2.3(k) delineates *three* categories of assumed obligations ("Severance Reimbursement Obligations," "Assumed 503(b)(9) Liabilities," and "Other Payables and all payment obligations with respect to the Ordered Inventory") and not *four*.  *See* Compl. ¶ 113; *see also* Br. ¶¶ 17, 20-22, 32, 35, 45.  By way of explanation, Buyer points out that:

- the Parties specified when Buyer was obligated to make payments with respect to Severance Reimbursement Obligations, 503(b)(9) Liabilities, and Other Payables but did not specify when Buyer was obligated to make payments with respect to Ordered Inventory, Compl. ¶ 119; Br. ¶ 26;

- the Parties limited Buyer's Severance Reimbursement Obligations, Assumed 503(b)(9) Liabilities, and liabilities with respect to Other Payables but did not limit Buyer's obligations with respect to Ordered Inventory, Compl. ¶ 120; Br. ¶ 27; and

- the Parties did not provide for a potential dollar-for-dollar reduction in Buyer's liabilities with respect to Ordered Inventory should the Debtors deliver fewer assets at Closing than targeted by the APA, as the Parties had with some of Buyer's other assumed liabilities,[6] Compl. ¶ 121; Br. ¶ 28.

24.      Buyer then proclaims that, for all of these reasons, § 2.3 demonstrates that Buyer's obligations with respect to Other Payables are subsumed within a purported obligation to assume up to $166 million of Ordered Inventory.  But Buyer's conclusion makes no sense:

- The Parties did not specify when Buyer was obligated to make payments with respect to Ordered Inventory because, again (and unlike Other

---

[6] Buyer even goes so far as to claim that the Parties sometimes referred to "Other Payables and payment obligations with respect to the Ordered Inventory" "by the shorthand 'Other Payables.'"  Compl. ¶¶ 118-19.  This is an unsupported and patently self-serving assertion that is completely inconsistent with (i) the APA's separate definitions of the terms Ordered Inventory and Other Payables and (ii) the APA's separate schedules for Ordered Inventory and Other Payables.

Payables, Severance Reimbursement Obligations, and Assumed 503(b)(9) Liabilities), Ordered Inventory is *not a liability*.  *See* Meghji Tr. 38:24-39:21, 40:14-21, 48:4-18; Riecker Tr. 32:8-33:9; *see also* Kamlani Tr. 64:8-11.

- There can be no dispute that Ordered Inventory is not a liability because, as stated above, the Debtors could have canceled the purchase orders associated with Ordered Inventory at any time and not ever assumed any of the corresponding payment obligations.  *See* Kamlani Tr. 79:20-80:6. Buyer could likewise have decided that it did not want to assume payment obligations with respect to Ordered Inventory and canceled the associated purchase orders.

- The Parties did not limit Buyer's obligations with respect to Ordered Inventory because the APA expressly provides that Buyer is to assume *all payment obligations* with respect to Ordered Inventory.  Moreover, Buyer *craved* Inventory, representing—even in its Adversary Complaint—that it needed assets to sell for a profit and drive EBITDA.  *See* Compl. ¶ 49.

- And the Parties did not provide for a dollar-for-dollar reduction in Buyer's liabilities with respect to Ordered Inventory because, unlike the Other Payables, Severance Reimbursement Obligations, or Assumed 503(b)(9) Liabilities, the Ordered Inventory comprised goods that Buyer would receive, pay for, and then, presumably, sell to the benefit of Buyer's going-forward business.

25.    Stated differently, Other Payables, Severance Reimbursement Obligations, and 503(b)(9) Liabilities are one-sided financial obligations—that is, money Buyer must pay without any subsequent benefit (beyond satisfying its obligations to its vendors, employees, and under the APA).  Thus, it makes sense that the Parties agreed that Buyer should be entitled to a dollar-for-dollar reduction in those liabilities should the Debtors either have more cash than anticipated at Closing or deliver fewer assets than anticipated at Closing.  Ordered Inventory, on the other hand, is a zero-sum game.  Buyer is not paying something for nothing; Buyer is paying something for something.  For every dollar Buyer pays, it will receive a dollar's worth of inventory—something it claims in its Adversary Complaint is of the utmost importance to it.  *See* Compl. ¶ 49.  Accordingly, it makes sense that the Parties agreed that Buyer should *not* be entitled to a dollar-for-dollar reduction in payment obligations with respect to Ordered Inventory

should the Debtors either have more cash than anticipated at Closing or deliver fewer assets than anticipated at Closing.

26.    For much the same reason, Buyer's argument that "[i]t is no coincidence that the [APA] schedules reflecting Other Payables and Ordered Inventory both reflect values of approximately $166 million" because the schedules "were intended to parallel one another" fails. Compl. ¶ 125.[7]  First, if Buyer's interpretation of § 2.3(k) were correct, and its obligations with respect to Other Payables were a subset of its obligations with respect to Ordered Inventory, then the Parties would not have needed to include a schedule reflecting Other Payables at all.  Second, the two schedules reflect two completely different numbers—more than half a million dollars apart (Schedule 1.1(f) reflects $166,557,621 Ordered Inventory; Schedule 1.1(g) reflects $166,000,000 assumed Accounts Payable).  APA at Schedules 1.1(f), 1.1(g); *see also* Kamlani Tr. 27:24-28:4 (admitting that 166.0 and $166,557,621 are different numbers).    Buyer's argument amounts to an assertion that the Debtors were responsible for paying for $557,621 in goods that they had ordered but had neither paid for nor taken delivery of and would never take delivery of—goods that Buyer would take delivery of and sell as part of its going-forward business.  Kamlani Tr. 43:7-18 ("Q. And were Transform to take delivery of all of this ordered inventory and only assume payment obligations with respect to $166 million of it, that would leave the Debtors with a $557,621 bill representing zero assets, correct?   A. It would.").  Nonsense.  How could the Debtors be left with a $557,621 bill for Ordered Inventory under a contract pursuant to which Buyer had agreed to assume *all payment obligations* with respect to Ordered Inventory?  They could not.

---

[7] Buyer appears to abandon this argument in its Brief in Support.

14

### 3.   The Language of § 2.4(q) Does Not Support Buyer's Position that Ordered Inventory Within the Meaning of the APA Was Associated With Payables.

27.     Early in its Brief in Support, Buyer advances the new, but no more logical or persuasive, argument that § 2.4(q) "expressly excludes from the Assumed Liabilities 'accounts payable incurred in the Ordinary Course of Business existing on the Closing Date.'"  Br. ¶ 15. Only later in its Brief in Support does Buyer acknowledge, as it must, that 2.4(q) "identifies two exceptions to those exclusions," including "Section 2.3(g) (Cure Costs) and 2.3(k) (Severance Reimbursement Obligations, Assumed 503(b)(9) Liabilities *and* Other Payables and the payment obligations with respect to the Ordered Inventory)."  *Id.* ¶ 33.   Buyer then suggests that the insertion of an "and" before "Other Payables" in the 2.3(k) parenthetical in § 2.4(q) shows that the Parties intended "Other Payables and the payment obligations with respect to the Ordered Inventory" to represent one obligation instead of two.  Buyer is wrong.  Unlike Sections 2.3 or 2.4 of the APA ("<u>Assumption of Liabilities</u>" and "<u>Excluded Liabilities</u>," respectively), sub-paragraphs 2.3(g) and 2.3(k) of the APA do not have headings or titles.  The Parties included the parentheticals in 2.4(q) merely as markers, for the benefit of the drafters, of the sections to which 2.4(q) was referring.

28.     Buyer also invites the Debtors to explain why the Parties would have included § 2.4(q) at all, given that, according to Buyer, the Debtors contend that they transferred "liability to Transform for all accounts payable existing on the Closing Date up to a cap of $166 million."  Br. ¶ 34.  Buyer ignores the obvious answer to its question.  The Debtors do not contend that they transferred to Buyer *all accounts payables* existing on the Closing Date up to a cap of $166 million.  *Id.*  Rather, the Debtors contend—and the APA unambiguously provides— that the Buyer assumed all liabilities associated with up to $166 million of *Other Payables*, specifically defined in the APA as "the accounts payable set forth on Schedule 1.1(g)."  APA

§ 1.1.  The Parties plainly included § 2.4(q) for the avoidance of doubt and to clarify that Buyer

was not obligated to assume liabilities for accounts payable beyond those specifically delineated

in § 2.3(k) and Schedule 1.1(g).  Accordingly, Buyer's new argument centered on § 2.4(q) of the

APA also fails.

> **4.      Extrinsic evidence supports the Debtors' argument that Buyer
> assumed liability for both Other Payables and all payment obligations
> with respect to Ordered Inventory.**

29.    Finally, Buyer argues that, "if there were ambiguity" in § 2.3(k) (there

isn't) and "to the extent the APA is not clear" (it is), "the APA negotiations reflect the Parties'

unambiguous intentions to tie together the concepts of Other Payables and payment obligations

on the one hand and Ordered Inventory on the other."  Compl. ¶ 126; Br. ¶ 36.  Nothing could be

further from the truth.

30.    Before execution of the APA, Buyer knew that the Debtors estimated their

outstanding accounts payable to be approximately $166,000,000, made up of both merchandise-

related accounts payable and a significant number of non-merchandise, or non-inventory, related

accounts payable (the "**Estimated Outstanding Accounts Payable**").  *See* June 25, 2019

Declaration of Kunal S. Kamlani in Support of Transform's Br. ("**Kamlani Decl.**") ¶ 14 ("On

January 2, 2019, . . . Debtors' advisors from Lazard provided Moelis a spreadsheet of Debtors'

administrative claims, which I reviewed, indicating (among other things) that Debtors faced

outstanding administrative claims of . . . $166 million in accounts payable (comprised of $111

million in merchandise accounts payable and $55 million in non-merchandise accounts

payable).");  *see also* Kamlani Tr. 28:17-29:2, 34:18-35:2.  Buyer also knew that the Debtors

were asking Buyer to assume the Estimated Outstanding Accounts Payable under the APA.  *See*

Kamlani Decl. ¶ 14; *see also* Kamlani Tr. 34:18-35:2.  And in the period between the Effective

Date of the APA and Closing, Buyer received daily cash-flow forecasts that included separate

entries for merchandise-related accounts payable and non-merchandise-related accounts payable, which, if aggregated, represented the Estimated Outstanding Accounts Payable.[8]  *See* Kamlani Tr. 31:8-33:3.  Thus, Buyer could not reasonably have believed (and the Debtors certainly did not suggest) Buyer was assuming "a single liability to assume payables and payment obligations with respect to the Ordered Inventory," because it knew in mid-January (before execution of the APA and several weeks before Closing) that a substantial portion of the payables the Debtors were asking it to assume under the APA consisted of non-merchandise-related accounts payable.

31.    Buyer also knew, before execution of the APA, that administrative solvency was paramount among the Debtors' concerns.  *See* Friedmann Decl., Ex. D (Kamlani Jan. 23, 2019 Dep.) ("**Kamlani Jan. Tr.**") 44:2-46:22 ("The committee, as conveyed by the advisors, is that they were extremely risk averse to being in a position of having liabilities that they could not satisfy.").  Indeed, administrative solvency so concerned the Debtors that, after having considered Buyer's December 28, 2018 bid, the Restructuring Committee, in consultation with the Debtors' advisors, rejected the bid and decided to liquidate.  *See* Feb. 1, 2019 Declaration of Brandon Aebersold [ECF No. 2335] ("**Aebersold Decl.**")) ¶ 22.  It was only after a January 8, 2019 status conference with this Court—during which the Court encouraged the Parties to work together to find a solution that allowed for a going-concern sale—that the Debtors reversed course and indicated they would entertain a higher and better going-concern

---

[8] For its bottom-of-the-barrel argument, Buyer alleges that January 4 and 5, 2019 correspondence between Cullen Murphy of Moelis & Co., Buyer's financial advisor, and Christopher Good of M-III Partners, the Debtors' financial advisor, "clearly shows that $166 million in Other Payables was assumed solely in respect of Ordered Inventory." Compl. ¶ 127.  That Buyer would argue that Saturday afternoon email correspondence between Messrs. Murphy and Good in early January (before the Debtors determined they would reject ESL's bid and liquidate) should govern the obligations of the Parties—and not the unambiguous terms of the extensively negotiated, fully integrated APA—is, perhaps, par for the course.  However, the unambiguous terms of the contract govern here and, even if they did not, the great weight of the extrinsic evidence militates in favor of the Debtors' interpretation of Section 2.3(k).  Finally, Buyer's allegations concerning Mr. Good's statement in the January 5 email both misconstrue the significance of that statement and take it wholly out of context.  Friedmann Decl., Ex. E (Good June 20, 2019 Dep. Tr.) 49:25-50:19 ("I'm a little offended by the way this was taken out of context.  I would like to explain the e-mail and how I interpret it.").  Accordingly, the gambit fails.

bid from ESL.  *See id.* ¶ 23.  Significantly, the Debtors made clear that any new bid must include the assumption of additional liabilities.  *See id.*; *see also* Kamlani Jan. Tr. 44:2-46:22.

32.     On January 9, 2019, ESL submitted a revised bid, which merely ***permitted it to participate in the auction of the Debtors' assets***, set to begin on January 14, 2019 at Weil's New York offices (the "**Auction**").  Aebersold Decl. ¶¶ 24, 26.  But, the language in Buyer's January 9, 2019 bid letter concerning what obligations Buyer proposed to assume is irrelevant to the Court's adjudication of this dispute.  Buyer, then just a bidder, ***still had to win***.  On January 9, it was far from certain it would.  The days between January 9 and January 17, 2019, when the Auction concluded and the Debtors ultimately accepted a revised ESL bid as the highest and best bid, were characterized by day-and-night negotiation, *id.* ¶¶ 25-33, and marked by yet another determination by the Debtors to liquidate, *see* Friedmann Decl., Ex. F (Jan. 15, 2019 Auction Proceeding Transcript) ("**Jan. 15 Tr.**") 50:23-51:5 ("[DEBTORS' COUNSEL:] At this time, unfortunately, after consulting with the consultation parties, the restructuring committee has determined that the ESL bid is not executable and is not otherwise higher or better when compared to the company's alternatives.").[9]  The lodestar of those round-the-clock negotiations was Buyer's assumption of additional liabilities, as reflected in the executed APA.

33.     Buyer's promise to assume payment obligations with respect to Ordered Inventory, on the other hand, would not have addressed the Debtors' administrative solvency concerns.  *See* Meghji Tr. 69:8-16 ("Q. [W]as there some benefit to the debtor from Transform agreeing to take on or assume the obligations for any ordered inventory as that term is defined in the Asset Purchase Agreement?  A. There was no financial benefit.").  First, had Buyer not

---

[9] *See also* Jan. 15 Tr. 52:2-10 ("[DEBTORS' COUNSEL:] [T]here is simply not enough cash to get to the closing. . . . We're roughly, at least 150 million dollar short."); 56:24-57:4 ("[DEBTORS' COUNSEL:] [U]nfortunately, ESL and the debtors we have not been able to agree on what it's going to take and be able to keep the company on the right side of administrative solvency.").

agreed to assume payment obligations with respect to Ordered Inventory, the Debtors could have canceled all purchase orders corresponding to Ordered Inventory and had no associated payment obligations at all. *Id.* at 69:17-24; Kamlani Tr. 79:20-80:6. Second, and as discussed above, if Buyer's argument is correct, Buyer would have assumed only up to $166 million in respect of Ordered Inventory, leaving the Debtors with a half-million dollar bill, which would have been a significant net negative for the Debtors. *Id.* at 43:7-18. Even Buyer agrees that would not address the Debtors' administrative solvency concerns. *Id.* Thus, Buyer's argument that § 2.3(k) obligates it to pay only "a single liability to assume payables and payment obligations with respect to the Ordered Inventory" fails even if the Court looks outside the four corners of the APA (it should not).

34.    If Buyer were under the mistaken impression on January 9—five days before the Auction began and eight days before execution of the APA—that the language in the Proposed APA obligated it to assume only up to $166 million payment obligations with respect to Ordered Inventory (a stunning misimpression, if indeed it was one, for all the reasons discussed herein), then inclusion in the APA of two separate schedules setting forth two separate categories of obligations would have disabused it of that misimpression. Buyer would have its cake and eat it, too—that is, it would acquire substantially all of the Debtors' assets and operations by promising to assume additional liabilities, including up to $166 million of Other Payables as defined in the APA, and then litigate itself out of its promises, ensuring that those additional liabilities fell to the Debtors, with all of the attendant risks to the Debtors' solvency and ability to wind down the affairs of the Estate and confirm a plan of reorganization.

35.    As argued above, the unambiguous terms of § 2.3(k) make unassailably clear that Buyer must assume up to $166 million of Other Payables in addition to all payment

obligations with respect to Ordered Inventory. Thus, the Debtors respectfully request that the Court compel Buyer to satisfy its obligation under the APA to assume *both* (i) $166 million in respect of Other Payables *and* (ii) all payment obligations with respect to Ordered Inventory.

**B.      The Debtors Managed the Acquired Assets in the Ordinary Course of Business as Required in the APA and in Consultation with Buyer**

36.      In the period between the Effective Date and Closing, the Debtor was required to, and did, manage Prepaid Inventory and payables in accordance with the Ordinary Course provisions in the APA. *See* APA § 8.1(a), 8.6. In its Adversary Complaint, Buyer lodges a series of meritless allegations that the Debtors breached the Ordinary Course provisions by failing to deliver the agreed amount of Prepaid Inventory and by delaying certain payables in the days just before Closing. Compl. ¶¶ 45-47, 49, 132-33, 138-40. Buyer appears to have abandoned these allegations—they are not addressed in its Brief—no doubt as a result of the testimony of its own witnesses who confirmed that in the period between the execution of the APA and Closing, the Debtors managed both Prepaid Inventory and payables in accordance with the APA.

**1.      The Debtors Managed the Prepaid Inventory in the Ordinary Course**

37.      Pursuant to § 8.1(a) of the APA, the Debtors were required to act in the "Ordinary Course of Business" with respect to, among other things, Inventory management. APA § 8.1(a). However, § 8.1(a) also contains a proviso expressly permitting the Debtors to "reasonably manage the amount of Inventory" to meet the conditions precedent regarding the delivery of an aggregate $1.657 billion in assets pursuant to § 10.9 and to pay down the Outstanding DIP Indebtedness to $1.2 billion as required by § 10.10, so long as the Debtors did so in consultation with Buyer. Specifically, under the plain language of the APA, the Debtors were required to:

use commercially reasonable efforts to conduct their business in the Ordinary Course of Business (taking into account Sellers' status as debtors-in-possession), including . . . managing Inventory in the Ordinary Course of Business, including with regard to Inventory in transit and Inventory located in distribution centers (and for the avoidance of doubt, Sellers shall not delay taking delivery of Inventory that would be Acquired Inventory on the Closing Date if delivery of such Inventory were managed in the Ordinary Course of Business prior to the Closing Date; ***provided, that Sellers shall be permitted to reasonably manage the amount of Inventory in consultation with Buyer in order to satisfy the condition set forth in § 10.9 and § 10.10 as of the Closing***).

*Id.* § 8.1(a) (emphasis added).

38.    As the plain language of the APA clearly provides, and contrary to Buyer's assertion, it was not a breach of the APA to manage Inventory to satisfy sections 10.9 and 10.10 as long as the Debtors did so in consultation with Buyer.  *Id.*  Once the Debtors determined they would meet the aggregate threshold in § 10.9 by delivering Inventory and Receivables of at least $1.657 billion at Closing, the Debtors managed the Inventory—as they were permitted to do pursuant to § 8.1(a)—to meet the DIP Indebtedness condition precedent in § 10.9.

39.    The Debtors reasonably managed the Inventory in plain sight of and in daily consultation with Buyer consistent with § 8.1(a).  Buyer was aware that "the Debtors were managing [I]nventory and payments in order to meet the [DIP] [C]losing condition."  Kamlani Tr. 58:20-24; *see also* Riecker Tr. 62:21-63:17.  In the weeks leading to Closing, the Debtors maintained daily communications with Buyer concerning the Debtors' efforts toward meeting the various closing conditions in the APA.  *See* Riecker Tr. 63:18-64:13.  Buyer received daily borrowing base forecasts that were updated on a daily basis with the Debtors' inventory management team.  *Id.* at 64:5-13.  Buyer also received daily cash forecasts that included merchandise-related accounts payable that changed on a daily basis.  *Id.* at 41:12-24.

40.    Because Buyer was consulted on a daily basis, Buyer's claim that the Debtors breached the APA by managing the Inventory to meet the conditions precedent in sections 10.9 and 10.10 of the APA—which was expressly permitted under the APA—is meritless.

### 2.    The Debtors Managed their Payables in the Ordinary Course

41.    Buyer's claim that the Debtors failed to manage payables in the Ordinary Course as required by § 8.6 also is meritless.  Buyer's only evidence supporting its allegations is a contention that because throughout the bankruptcy, the "[Debtors] did in fact pay vendors on a timely basis," a five-or-six-day delay just before closing a transaction in excess of $5 billion was outside of the Ordinary Course established by the Debtors.  Compl. ¶ 138-39.  But that is not the standard by which Ordinary Course is measured under the APA.  Specifically, § 8.6 requires the Debtors to:

> make all payments in respect of payables of the Business (including rent payments and sales taxes) arising from the date of this Agreement until the Closing Date in all material respects on a timely basis and shall otherwise manage the accounts payable of the business *in accordance with the Sellers' cash management policies and practices (as in effect prior to the Petition Date)* in the Ordinary Course of Business; provided that Seller's obligations pursuant to this Section 8.6 with respect to taxes are limited to taxes that are not Assumed Liabilities.

APA § 8.6 (emphasis added).

42.    What qualifies as "Ordinary Course" with respect to payables is therefore measured by the Debtors' (in reality, Buyer's principal shareholder's) *prepetition* policies and practices.  The undisputed record evidence demonstrates that the payment of vendors on a six-day delay was well within Sears's "cash management policies and practices . . . in effect prior to the Petition Date."  *See id.*

43. As Buyer's CFO, Mr. Riecker, testified, in the prepetition period "[t]he company had historically delayed payments to vendors." Riecker Tr. 66:20-67:6. He further explained that there was a practice at Sears of delaying vendor payments throughout his entire prepetition tenure as CFO of Sears (i.e., from April 2017 through the Petition Date). *Id.* at 77:22-78:13. The length of those prepetition payment delays was extended to as much as eight days on August 6, 2019—more than two months prior to the petition—and steadily increased to ten business days and then fourteen business days, as the company approached bankruptcy. *Id.* at 66:20-67:6; 67:19-69:4; 69:19-72:8. In sum, delaying payables *was* Sears's prepetition policy and practice.

44. Moreover, Buyer was well aware of these delays through its receipt of daily cash forecasts and daily borrowing base forecasts. *Id.* at 38:16-41:24; 63:18-64:13.

45. Accordingly, because the Debtors acted in accordance with Sears's cash management policies and practices in effect prior to the petition, Buyer's claim that the Debtors acted outside of the Ordinary Course in connection with its management of payables also is without merit.

## C. The Debtors Had No Available Cash at Closing that Could Reduce Buyer's Obligation to Assume $166 Million in Other Payables

46. Buyer argues that if it is obligated to assume the $166 million in Other Payables—which it is—that obligation should be reduced by the "available cash" held by the Debtors at Closing, which Buyer now claims was approximately $8.5 million. *See* Br. ¶ 73. Specifically, Buyer calculates that on the Closing Date, the Debtors had $22.5 million in Cash-in-Transit from which it subtracted $14.0 million of "checks outstanding" to arrive at its conclusion that the Debtors had $8.5 million in "available cash." *See id.* ¶ 69. That claim is belied by the evidence, which shows that at Closing, the amount of "available cash" was $0

because Cash-in-Transit is not "available cash."    Accordingly, Buyer is only entitled to a

reduction in its obligation to assume up to $166 million in Other Payables in the amount of the

$243,249 Aggregate DIP Shortfall Amount, which resulted from the Debtors' overpayment of

the DIP Obligations.  APA § 2.3(k)(vi).

47.    Under the APA, Aggregate DIP Shortfall Amount means "as of the

Closing Date, an amount equal to $1,200,000,000 less aggregate amounts required to be paid (net

of any *available cash*) to fully satisfy the existing indebtedness of Seller under both (i) the DIP

Credit Agreement and (ii) the Junior DIP Term Loan Agreement."  *Id.* § 1.1 (emphasis added).

At Closing, and consistent with the Debtors' daily practice as required by the DIP Agreements,

the Debtors swept *all* of the available cash in its operating bank accounts and reduced the

outstanding DIP indebtedness to $1,199,756,675, causing an Aggregate DIP Shortfall Amount of

$243,249 (i.e., an overpayment). DIP Credit Agreement § 6.01(m)(iv); Junior DIP Term Loan §

6.01(m)(iv); Riecker Tr. 57:12-58:25.  As a result, and, as the undisputed record evidence shows,

on Friday, February 8, 2019—the last bank day before the Monday, February 11, 2019 Closing

Date—the Available Cash Balance was $0.  *See* Friedmann Decl., Ex. G (Daily Cash Flow

Forecast 2.8.2019).

48.    Although the Debtors do not dispute Buyer's assertion that as of 12:01

a.m. on the Closing Date there were approximately $22.5 million in Cash-in-Transit that

belonged to the Estate, consistent with what Sears reported in the Daily Cash Flow Forecast, that

money was not available for the Debtors to use, i.e., it was not "available cash."  "Available

cash" is not defined in the APA.  To determine the plain meaning of terms that are not defined in

a contract, courts applying Delaware law will turn to ordinary dictionary definitions.  *See*

*Lorillard Tobacco Co. v. American Legacy Foundation*, 903 A.2d 728, 738 (Del. 2006).  A thing

is available when it is "present or ready for immediate use." Merriam Webster's Collegiate Dictionary (10th ed. 1995). Here, the Cash-in-Transit was neither present nor ready for immediate use by the Debtors, and thus was not "available."

49. Additionally, as Mr. Riecker testified, in the ordinary course, prior to the Closing, the Debtors tracked "available cash" separate from "unavailable cash." Riecker Tr. 48:22-49:2; 55:19-56:2. And, in the only place the Debtors tracked unavailable cash, unavailable cash was considered to include, *inter alia*, credit card receivables, cash in regional banks, and cash in stores, i.e., cash the Debtors could not use or access at the time. *See id.* at 51:15–52:6; Friedmann Decl., Ex. G (Prelim Daily Cash Forecast 11.1.2018).

50. Buyer disingenuously attempts to conflate "cash" with "available cash" and cites to a practice aid developed by the American Institute of Certified Public Accountants discussing what should be characterized as "cash" in the creation of a balance sheet. But the definition of "cash" is of no moment here, and thus Buyer's reliance on the practice aid is unjustified. Buyer's misguided attempt to read the word "available" out of the APA's definition of "Aggregate DIP Shortfall Amount" as mere surplusage also must be rejected. *See, e.g.*, *Osborne ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010) (refusing to adopt an interpretation that would render a price term "meaningless or mere surplusage"). Had the Parties intended all "cash" to be netted in the definition of Aggregate DIP Shortfall Amount, they would not have included the modifier "available."

51. At 12:01 a.m., New York City time, on February 11, 2019—i.e., the precise moment of Closing as defined by the APA—the Debtors' bank accounts were empty. APA § 4.1; *see* Riecker Tr. 59:18-25. Every available dollar that the Debtors had was used to pay down the outstanding DIP indebtedness. *See id.* Whether or not Cash-in-Transit may have

been in the Debtors' control at that time, it was certainly not *available* to the Debtors to further

pay down the DIP Obligation or for any other purpose.  In short, it was not "available cash."  For

that reason, Buyer's obligation to assume up to $166 million in Other Payables should be

reduced only by the $243,249 Aggregate DIP Shortfall Amount.

## II.    Buyer Is Entitled to a Reduction of Only $56,187,065 Million of the Liabilities It Assumed Under § 2.3(k) of the APA

52.    The Debtors agreed to deliver at Closing, *inter alia*: (i) $147 million of

Prepaid Inventory, (ii) $255.2 million of Specified Receivables, and (iii) $53.6 million of

Warranty Receivables.    APA § 2.3(k)(vii)-(ix).    The Debtors also agreed to pay down the

indebtedness under the Senior DIP Credit Agreement and Junior DIP Credit Agreement to an

aggregate $1.2 billion.  *Id.* § 2.3(k)(vi).  In exchange, Buyer agreed in the APA to assume, *inter*

*alia*: (i) up to $43 million of Severance Reimbursement Obligations,[10] (ii) up to $166 million of

Other Payables, and (iii) up to $139 million of 503(b)(9) Claims.[11]  *Id.*

53.    Pursuant to the terms of the APA, any "Shortfalls" in the amount of assets

delivered by the Debtors would result in a dollar-for-dollar reduction in the liabilities assumed by

Buyer.    Specifically, if there were Prepaid Inventory, Specified Receivables, or Warranty

Receivables Shortfall Amounts, Buyer would receive a dollar-for-dollar reduction in, first,

Severance Reimbursement Obligations and, second, Assumed 503(b)(9) Claims.  *Id.* §§ 1.1,

2.3(k)(vii)-(ix).  To the extent the aggregate DIP balance as of the Closing Date was less than

$1.2 billion (net of any available cash) (the "**Aggregate DIP Shortfall Amount**"), Buyer would

---

[10] With the benefit of hindsight, Buyer's assumption of up to $43 million of Severance Reimbursement Obligations worked out very well for Buyer as it appears that the total Severance Reimbursement Obligations will total only approximately $13 million dollars. Declaration of Christopher A. Good in Support of the Debtors' Brief ("**Good Suppl. Decl.**") ¶ 9.

[11] As discussed in § I.A, *supra*, Buyer also assumed "all payment obligations with respect to the Order Inventory." APA § 2.3(k).

receive a dollar-for-dollar reduction in, first, Severance Reimbursement Obligations; second, the $166 million of Other Payables; and, third, Assumed 503(b)(9) Claims.  *Id.* § 2.3(k)(vi).

54.    During the negotiations of the APA, the Parties set the target amounts for the assets to be delivered by the Debtors at Closing based off of the current amounts of those assets.  Riecker Tr. 87:24-88:9.  Those target amounts were calculated using the same accounting methodology that the Debtors used prepetition to prepare their audited financial statements and to report on inventory and receivables in their filings with the Securities and Exchange Commission ("**SEC**").

55.    At Closing, the Debtors valued the assets they delivered according to those same accounting methodologies and determined that there were two shortfalls:  a $62,573,124 Prepaid Inventory Shortfall Amount and a $243,249 Aggregate DIP Shortfall Amount.  The Debtors delivered Specified Receivables and Warranty Receivables in excess of the required amounts, the latter of which resulted in a credit of $6,629,308 to be applied against the Prepaid Inventory Shortfall Amount.  APA § 1.1.  After adjusting for the Warranty Receivables credit, the adjusted Prepaid Inventory Shortfall Amount of $55,943,816 should be offset, first, against the Severance Reimbursement Obligations, and, second, against the 503(b)(9) Liabilities.  The $243,249 Aggregated DIP Shortfall Amount should be offset, first, against any remaining Severance Reimbursement Obligations and, second, against Buyer's obligation to assume $166 million in Other Payables.  *Id.* § 2.3(k)(vi).

56.    Buyer, however, asserts that as a result of its calculation of the shortfall amounts, it should not be required to assume *any* Severance Reimbursement Obligations, 503(b)(9) Liabilities, or Other Payables, not only because of the dollar-for-dollar offsets provided in the APA, but also because of damages purportedly caused as a result of those

shortfalls (a remedy not found in the APA). *Id.* § 2.3(k)(viii)-(ix). In its Brief, Buyer concedes

that in calculating these purported shortfalls, it abandoned the accounting methodology that the

Parties had used to set the target deliverable amounts. Br. ¶¶ 78-79, 81; *see also id.* ¶¶ 99, 107.

Instead, Buyer spent the last four months manufacturing its own estimates to create an additional

approximately $10 million Prepaid Inventory Shortfall as well as a shortfall in Specified

Receivable (which the Debtors over-delivered on) in an effort to evade its obligations under the

APA.

57.    Notably, when Buyer's advisors—including Ernst & Young—utilized

these newly minted methodologies for calculating the requisite deliverables, Buyer did not

consult with key members of Buyer's own financial team, who not only would have pointed out

the obvious inconsistencies between methodologies of Buyer's advisors and Sears's historical

accounting practices, but also could have helped Buyer's advisors avoid a number of errors

caused by trying to calculate these deliverables removed from the realities of Sears's operations.

Specifically, Mr. Riecker, previously the CFO for the Debtors, and now CFO for Buyer, testified

that he does not know the accounting methodology used by Buyer's financial advisors to

calculate the Prepaid Inventory or Specified Receivables delivered at Closing and that he has

"not seen any of [Ernst & Young's] work product." Riecker Tr. 109:3-14; 112:2-113:9.

Likewise, Mr. Butz, the Senior Director of Accounting Services, who has "all . . . transactional

accounting responsibility," and who helped prepare the schedule of Specified Receivables

included in the APA (i.e., Schedule 1.1(k)), ***was never shown*** the Prepaid Inventory or Specified

Receivables calculations conducted by Buyer's financial advisors. Friedmann Decl., Ex. I (Butz

June 21, 2019 Dep.) ("**Butz Tr.**") 8:21-9:12; 25:20-26:19; Riecker Tr. 97:6-18. This separation

from the actual business and operations of Sears was no doubt necessary for Buyer's advisors to manufacture the exaggerated shortfall amounts.

### A.   Buyer Overstates the Prepaid Inventory Shortfall Amount

58.     At Closing, the Debtors delivered $84,426,880 in Prepaid Inventory, resulting in a $62,573,124 Prepaid Inventory Shortfall Amount.  Declaration of Christopher A. Good in Support of the Debtors' Suppl. Motion to Enforce [ECF No. 4031]] ("**Good Decl.**") ¶ 5. Buyer argues that the Prepaid Inventory Shortfall Amount is larger, but has not been consistent in its valuation of the Prepaid Inventory—asserting, in February, a shortfall in excess of $97 million and more recently an approximately $72 million shortfall in the Adversary Complaint and its Brief.  *Compare* Declaration of Katherine R. Lynch in Support of Transform Holdco LLC's Motion to Assign Matter to Mediation [ECF No. 2767], Ex. A, *with* Compl. ¶ 50 and Br. ¶ 82.

59.     As outlined in the Supplemental Motion to Enforce, and as Buyer now admits, the value Buyer assigned to the amount of Prepaid Inventory delivered by the Debtors was calculated using a valuation methodology different from the one (i) used by the Debtors in filing their Petition, (ii) consistently used by the Debtors in the period leading up to and until Closing to prepare its annual and quarterly reports filed with SEC, (iii) used by both Parties to set the Prepaid Inventory and Specified Receivables targets in the APA, and (iv) used by the Debtors to correctly calculate the value of the delivered Prepaid Inventory.  *See* Suppl. Motion to Enforce ¶¶ 20-22; Br. ¶¶ 78, 81; *see also* Riecker Tr. 107:6-24.

60.     Buyer criticizes the valuation methodology used by the Debtors, i.e., the methodology used by Sears's prepetition, arguing that it is "based on an accounting estimate" rather than "an actual count of Prepaid Inventory on order at a given time" as it claims the APA requires.  Br. ¶¶ 78, 97.  Buyer claims that its new methodology—which is purportedly superior,

but indisputably different—was to "count[] the actual amount of Prepaid Inventory" the Debtors delivered at Closing. *Id.* ¶ 90. Even with the benefit of over four months to analyze what the Debtors delivered at Closing and Buyer's seemingly unlimited resources, that would be an impressive feat, except that it is not true. Buyer's new accounting methodology simply replaces the Debtors' *estimate* with its own *estimate*, that, by design, was guaranteed to result in a finding that less Prepaid Inventory was delivered at Closing resulting in a higher Prepaid Inventory Shortfall Amount.

61.     Buyer's methodology is by no means a "precise count," *see id.* ¶ 83, nor would conducting such an exercise make any sense in a company the size of Sears, where new inventory is being preordered and delivered on a daily basis. Rather, Buyer's advisors took six weeks of financial information from the same systems that the Debtors used and purportedly attempted to reconcile the actual receipt of goods. Br. ¶ 81. But the process employed by Buyer's advisors simply is a *different estimate*, subject to its own lack of precision. For example, Buyer's methodology only looks back six weeks, ignoring the fact that some goods may take longer than that to arrive. June 25, 2019 Declaration of Andrew Hede in Support of Transform Holdco LLC's Br. ¶ 10. As a result, those goods are not captured in Buyer's analysis. Buyer's analysis also necessarily required Buyer to reconcile the accounting entries for Prepaid Inventory with the receipt of the associated goods. But Prepaid Inventory that Buyer could not match during the reconciliation—a frequent occurrence given the scale of Sears's operations— may, nonetheless, have been received by Buyer after Closing. That too would not be captured in Buyer's calculation of Prepaid Inventory delivered at Closing.

62.     To be sure, none of the advisors were—or should have been—counting items on shelves. Rather, in a transaction of this size, involving a company of this size (even

ignoring the extremely compressed timeline), the Parties must rely on the company's accounting systems to track the receipt of inventory. Accordingly, when the Parties set the threshold amount of Prepaid Inventory, they used the most reliable information available at the time—the Debtors' accounting systems and the accounting methodologies in place to calculate the amount of Prepaid Inventory on its books.[12] To be sure, that methodology was not some arbitrary estimate, but rather it was the same methodology used by Sears prepetition to prepare audited financials and reports to the SEC. The Debtors then used this same methodology to calculate the Prepaid Inventory Shortfall Amount. Buyer did not.

63.    Buyer's deviation from the methodology used during negotiations and at Closing in favor of a post-hoc reconciliation designed to limit Buyer's liability frustrates the Parties' reasonable expectations and purports to deliver to Buyer an arbitrary and unreasonable financial gain. *See* Suppl. Motion to Enforce ¶¶ 23, 27 (citing cases). Accordingly, the Court should honor the Parties' reasonable expectations that resulted from the negotiations of the APA and assess the book value of the Prepaid Inventory using the same valuation methodology that both Parties used when negotiating the threshold targets for those assets. Under that methodology, and after adjusting for the Warranty Receivables credit, the adjusted Prepaid Inventory Shortfall Amount is $55,943,816.

---

[12] The Debtors recently realized that they made an error when calculating the Prepaid Inventory threshold in the APA and overstated it by about $45 million, i.e., the actual amount of Prepaid Inventory available when the threshold was set was approximately only $102 million according to the methodology Sears had used to generate its audited financial reports. As a result of this error, Buyer received a windfall in the form of an approximately $45 million reduction in liabilities. The error was one of execution—not an issue with the methodology or data—and has been rectified in the Debtors' calculation of the $84,426,880 in Prepaid Inventory delivered to Buyer at Closing.

## B.    The Debtors Delivered the Specified Receivables Required Under the APA

64.    Buyer incorrectly claims that the Debtors breached the APA by delivering a different set of Specified Receivables than the Parties agreed to in the APA.[13]  Section 2.1 of the APA sets out the Acquired Assets to be delivered to Buyer at Closing.  *See* APA § 2.1. Included among those Acquired Assets are "all Acquired Receivables," which includes the "Specified Receivables."  *See id.* § 2.1(d).  "Specified Receivables," in turn, are defined as "the accounts receivable set forth on Schedule 1.1(k)."  *Id.* § 1.1.

65.    Schedule 1.1(k) lists thirty specific categories of Specified Receivables that correspond to how the receivables were kept in the Debtors' accounting system.  As of the Effective Date, the aggregate book value of *all* of the *then-outstanding receivables* in *all thirty categories* totaled $255.2 million.  *See* Riecker Tr. 85:6-16.  Because receivables—by their nature—change over time, this snapshot-in-time value of the assets in each of the thirty categories was totaled to set the threshold aggregate target for the Specified Receivables Shortfall Amount.  *See id.* 99:18–24.  Several weeks later, at Closing, the Debtors delivered *all* of the *then-outstanding receivables—in the same thirty categories as are set forth in Schedule 1.1(k)*—which by then had an aggregate book value of $292,083,182, resulting in a Specified Receivables Shortfall Amount of zero.  *See* Good Decl. ¶5.

66.    The crux of Buyer's arguments regarding the Specified Receivables delivered at Closing appears to stem from the fact that it ignored the Debtors' representations during the diligence phase that many of the Specified Receivables would be difficult to collect. On January 6, 2019, the Debtors presented a list of proposed Specified Receivables that included the projected recovery rates for each category and an overall blended recovery rate of 44%.  *See*

---

[13] To the extent Buyer calculated the book value of the Specified Receivables using an accounting methodology different from the one used by the Debtors to prepare the schedule of Specified Receivables (Schedule 1.1(k)), the Court should reject that calculation for all of the reasons set forth in Section II.B, *supra*.

Kamlani Tr. 67:18-24; Friedmann Decl., Ex. J (Remaining Value at SHC Estate in an ESL Transaction).    The presentation made clear that the Debtors believed that the Specified Receivables in the aggregate would be difficult to collect, and that many specific receivables would be impossible to collect.    *See* Riecker Tr. 91:5-22.    For example, the January 6 presentation assigned a 0% recovery rate to a $30 million category of receivables called "All Other Receivables."    *See* Friedmann Decl., Ex. J.

67.    After the January 6 presentation, Buyer had every opportunity to, and did, diligence the Specified Receivables.    *See* Kamlani Tr. 67:8-17; Riecker Tr. 95:13-96:10.    Buyer participated in meetings with the Debtors and their advisors to discuss many of the specific accounts on the Specified Receivables schedule, as well as to understand what was actually in those accounts and the basis for the projected recovery rates.    *See* Riecker Tr. 95:13-96:10. Buyer requested, and was provided additional details about the accounts that comprised the Specified Receivables.    *See id.* at 98:13-99:11.    Based on that diligence, Buyer estimated it would be able to recover the receivables at a much higher rate than the Debtors had projected (i.e., between "60 to 75 percent").    Kamlani Tr. 67:25-68:10.    Then, Buyer—a sophisticated party with intimate knowledge of the assets that comprise the Specified Receivables—accepted the list of Specified Receivables with the understanding that the receivables had "varied recovery expectations," and the categories in that list became Schedule 1.1(k).    *See* Compl. ¶ 61.

68.    Notwithstanding the expected challenges to recover on these Specified Receivables, Buyer concedes that, to date, it already has recovered $85.4 million, which is more than 33.33% of the total Specified Receivables amount the Debtors were required pursuant to Schedule 1.1(k).    *See* Declaration of Nader Tavakoli in Support of Br. ¶ 18.    Accordingly,

Buyer's recoveries to date are consistent with the projected recovery amount projected by the

Debtors in their January 6, 2019 presentation. *See supra.*

69.    Buyer, however, argues that the Debtors breached their obligations by

failing to deliver the exact amounts for each category of Specified Receivables in Schedule

1.1(k) and that much of what the Debtors did deliver were not receivables at all.  Br. ¶ 93,

Compl. ¶ 24.  Buyer's arguments are not supported by the requirements set forth in the APA, and

as the deposition testimony of Buyer's witnesses made clear, the Debtors delivered exactly what

was required.

70.    As an initial matter, the APA only required the Debtors to deliver all of

the available receivables in each of the thirty categories listed in Schedule 1.1(k) in an aggregate

book value amount in excess of $255.2 million, and not to deliver any specific amount in those

discrete categories—which would have been impossible.  *See* Riecker Tr. 101:8-21.  There

simply is no basis in the APA for Buyer's assertion that the Debtors breached the APA by failing

to deliver the exact amounts in each category set forth in Schedule 1.1(k).  Br. ¶ 100.[14]  Nor did

the APA require the Debtors to deliver Specified Receivables with a threshold recovery rate.

71.    The ledger of line-item receivables, including the Specified Receivables,

maintained by the Debtors, necessarily fluctuated on a daily basis as old receivables were paid

and new receivables were generated.  Riecker Tr. 99:18-24.  Indeed, Buyer knew as much.  *See*

Friedmann Decl., Ex. K (E-mail attaching Specified Receivables Analysis).  Six days before the

---

[14] Buyer's argument in this regard tests the limits of absurdity, claiming: "the Specified Receivables ***Shortfall Amount caused by over-delivery*** alone is approximately $60 million."  Br. ¶ 103.  No one could reasonably read Schedule 1.1(k) of the APA and conclude that the Debtors were obligated to deliver *exactly* the specified amounts in each of the specified categories in Schedule 1.1(k).  And certainly no one could conclude that an ***over-delivery*** of assets could cause a shortfall.  APA §§ 1.1 ("Specified Receivables Shortfall Amount" shall mean an amount equal to $255,200,000 *less* the amount of the Specified Receivables delivered to Buyer at Closing); 2.3(k)(vii) ("In the event that the Specified Receivables Shortfall Amount is a *positive number*, Buyer's obligations shall be reduced.") (emphasis added).

Closing, the Debtors sent Buyer a spreadsheet updating the totals for each category of Specified Receivables. *Id.*. The Specified Receivables analysis showed fluctuations within each of the same thirty categories, but also that the total amount of Specified Receivables had grown to approximately $316 million. *Id.* Buyer's reading incorrectly implies that the Debtors should have refused to accept payment of receivables so as not to "over deliver" in any particular category. Likewise, the Debtors would have been required to generate new receivables only in specific categories—and only up to specified amounts—so as to land at the precise amount of specified receivables in each of thirty different categories of receivables over the course of three-and-a-half weeks between the Effective Date and Closing. That absurd suggestion simply is not what the APA requires.

72.    In a similar vein, Buyer argues that the Debtors failed to deliver the "higher-quality receivables" it represented it would, instead delivering higher amounts of low-quality receivables that are more difficult to recover. Compl. ¶¶ 60-63. But the extent to which the amount of any particular Specified Receivables fluctuated from the execution of the APA to the Closing was not only out of the Debtors' control, it also is irrelevant. The Debtors were just required to deliver all of the Specified Receivables available at Closing and the aggregate amount of those receivables had a book value of at least $255.2 million.[15]

73.    Buyer also incorrectly argues that the Debtors breached their obligations under the APA by delivering certain Specified Receivables that were not receivables at all. Br. ¶ 95. But what the Debtors were required to deliver was set forth in the APA, which defines

---

[15] Even if the "quality" of the receivables were relevant, Buyer's own analysis belies its arguments. Specifically, Buyer argues that the two largest accounts that make up over half of the Specified Receivables, totaling a book value of $159.3 million, contains $57.4 million of invalid receivables. Br. ¶ 97. That argument, of course, ignores that (1) approximately 65% of the assets are valid and recoverable receivables, (2) the Debtors only projected a 50% recovery rate in the January 6 presentation for that particular receivable, and (3) to use Buyer's terminology, the Debtors "over-delivered" in this category by approximately $46.8 million. APA Schedule 1.1(k); *see also* Friedmann Decl., Ex. J.

Specified Receivables as "the accounts receivable set forth on Schedule 1.1(k)."  APA § 1.1.
There is no dispute that at Closing the Debtors delivered everything they had in each of the
categories of Specified Receivables on Schedule 1.1(k), all of which were simply taken directly
from Sears's prepetition and post-petition accounting system.  The time to object to the nature of
the specific receivables included on Schedule 1.1(k) was prior to the execution of the APA, not
after the Closing.

74.      Finally, in its Adversary Complaint, Buyer claimed that the Debtors
improperly double-counted as Specified Receivables the same inventory that was delivered at
Closing as Prepaid Inventory.  Compl. ¶ 58.  But this erroneous assertion appears to have been
the result of Buyer's financial advisors not sharing their analyses with Buyer's CFO or members
of Buyer's financial team.  Riecker Tr. 111:14-112:7; Butz Tr. 25:20-26:19.  As a result, the
Debtors were forced to take the deposition of Buyer's Senior Director of Accounting Services,
Jeffrey Butz, to correct the record.  Mr. Butz testified that per Sears's longstanding accounting
practices, a Cash-in-Advance ("**CIA**") payment can be reflected in the Debtors' accounting
systems as *either* a receivable *or* as Prepaid Inventory—*but never both simultaneously*.  Butz
Tr. 18:25-19:7.  Accordingly, the Specified Receivables delivered by the Debtors that track
prepaid inventory *were not*, and indeed, *could not*, be the same inventory delivered as Prepaid
Inventory.  In light of Mr. Butz's candid testimony, Buyer appears to have abandoned this
argument, which does not appear in its Brief.

75.      In sum, the Debtors complied with their obligation under the APA to
deliver all of the then-outstanding Specified Receivables in the thirty categories in Schedule
1.1(k) in an aggregate book value amount in excess of $255.2 million.  As a result, Buyer is not

entitled to any reduction of the liabilities it assumed in § 2.3 of the APA as the result of a Specified Receivables Shortfall Amount or any consequential damages.

## III.    Buyer Continues to Withhold Estate Property in Violation of the Automatic Stay

76.    As noted in the Debtors' Supplemental Motion to Enforce [ECF No. 4029], for more than four and a half months now—and despite innumerable meetings, meet-and-confers, negotiations, letters, interim agreements, and requests—Buyer has refused, in violation of the automatic stay, to turn over to the Debtors tens of millions of dollars in Estate assets that are critical to the Debtors' ability to wind-down the operations of the Estate and confirm the Plan.

### A.    Buyer Was Required Under the APA to Turnover February Rent Proration Amounts More Than Four Months Ago

77.    As set forth in the Motion to Enforce—the first motion filed by the Debtors for turnover of February Rent Proration Amounts—the APA sets out a two-part process to true-up the February Rent Proration.[16]  The APA states, in relevant part:

> (iii)    during the *seven (7) Business Day period following the Closing Date*, *Buyer and Seller shall work in good faith* to account for each of the items set forth in the Initial Prorations Schedule (taking into account any additional invoices, payments and requests for payment received during such period) *and shall reasonably cooperate to agree on an updated calculation of such prorations to be on account or credit to Buyer and Seller* (the "Post-Closing Prorations Schedule");
>
> (iv)    if the net amount of prorations set forth in the Post-Closing Prorations Schedule results in a payment due from Buyer to Seller then Buyer *shall make such payment to Seller within 1 Business Day* after the end of such seven (7) Business Day period following Closing . . . ;

---

[16] Because the Debtors had already paid rent for the full month of February as of the Closing Date, the APA entitles the Debtors to a reimbursement of prorated rent from Buyer for the portion of February 2019 after Closing during which the Debtors were no longer in possession of certain leased premises.  APA § 9.11(d).

(v) ***seventy-five (75) days following the Closing Date***, Buyer shall deliver to Seller an updated calculation of the Post-Closing Prorations Schedule setting forth all updated proration items reflecting all invoices and payments received within the period following Closing and accounting for all amounts owed by Buyer and Seller pursuant to the Occupancy Agreement and the Seller Occupancy Agreement (the "Final Prorations Schedule");

(iv) . . . If the net amount of prorations set forth in the Final Prorations Schedule results in a payment due from Seller to Buyer (taking into account any credit or payment made following the Final Prorations Schedule) then ***Seller shall make such payment to Buyer within 1 Business Day*** after delivery of the Final Prorations Schedule.

APA § 9.11(d) (emphases added).

78.     Simply put, under the APA, Buyer was expressly required to make an initial payment to the Debtors according to the Post-Closing Prorations Schedule by February 28, 2019 (i.e., seven business days after Buyer's advisors received the amended Initial Proration Schedule on February 19, 2019).[17] Per the APA, any discrepancies later identified are then to be trued-up—regardless of the beneficiary—in the Final Prorations Schedule, 75 days after Closing.

79.     On February 20, 2019—exactly seven business days after Closing—Buyer's own advisors confirmed that the Post Closing Prorations Schedule was satisfactory and that the Debtors would receive a $16,187,136 million payment on February 22, 2019, as set forth in the APA.  Meghji Enforce Decl., Ex. C.  Despite the Debtors' adherence to the scheduling and notice requirements under the APA, as well as Buyer's advisors' agreement that the payment would be made, Buyer never made the rent proration payment after it became due under the APA.  *Id.* ¶ 18.

---

[17] Prior to the Closing, the Debtors' advisors provided Buyer's advisors with a copy of the rent proration schedule required under the APA (later finalizing the schedule on February 19, 2019).  *Declaration of Mohsin Y. Meghji in Support of Debtors' First Motion to Enforce* ¶ 17 [ECF No. 2797] ("**Meghji Enforce Decl.**").

80.    Pursuant to the Parties' "interim agreement," in late March, Buyer paid the Debtors $5 million toward the total rent proration amount, but has not turned over the remaining $11.2 million owed since at least February 28, 2019.

81.    Over that period, Buyer has lodged a series of inconsistent excuses for its continued failure to turn over the rent proration amounts, none of which justify its breach of the APA or its violation of the automatic stay.   The latest, as set forth in Buyer's Brief, is premised on Buyer conflating the outstanding rent proration amounts due with the separate "Cash-in-Transit" amounts Buyer owes to the Debtors (discussed *infra*) and then setting off those amounts against a series of other items that it alleges the Debtors owe to Buyer, many of which are completely unrelated to rent proration and the properties.   Br. ¶ 114; APA § 9.11(a). Pursuant to Buyer's calculation, after applying these unrelated setoffs and reconciliations, the entire outstanding $11.2 million of rent proration is cancelled out.   Br. ¶ 114.   But that is not the way the APA works.

82.    As noted above, under § 9.11(d), the approximately $16.2 million preliminary rent proration amount was to be transferred to the Debtors in late February. Thereafter, the burden was on Buyer to provide sufficient evidence that there were amounts that should be reconciled against the preliminary proration amount (e.g., for certain utilities or rent payments made by Buyer for going-out-of-business stores ("**GOB Stores**") for the month of March).   And then, some 75 days later, the Parties would conduct a reconciliation of those items and thereafter a payment would be due either to the Debtors, or more likely to Buyer.

83.    But Buyer has turned the process set forth in the APA on its head.   First, Buyer refused to turn over the preliminary rent proration amount in February when that $16.2 million payment was due under the plain terms of the APA.   Then, Buyer provided a series

of conclusory analyses with insufficient (and in some cases nonexistent) backup and took the position that, based on its own analyses—including a number of unrelated setoffs—Buyer was not required to pay any rent proration amounts beyond the $5 million already paid pursuant to the Parties' interim agreement.[18]

84.    In doing so, Buyer both improperly shifted the burden of seeking any disputed rent proration amounts onto the Debtors, while also providing itself with a more than $11 million interest-free loan over the last several months—money that should have been in the Estate.

85.    Although there are certain setoffs to the remaining approximately $11.2 million rent proration amounts that the Debtors agree are proper, the Court should order Buyer to turn over the rest with the understanding that the Debtors will consider any additional reconciliation amounts if and when sufficient information is provided evidencing the appropriateness of such reconciliation, as required under the APA.  Buyer could, of course, seek this Court's assistance should any disputes arise in that regard.

86.    Specifically, the Debtors concede that the remaining $11,187,136 of rent proration amounts due to the Debtors should be reconciled against:  (i) $1,598,931 for rent payments made by Buyer for GOB Stores in the month of March; and (ii) $1,587,658 for the Citi Letter of Credit facility draw, which reconciliation is specifically provided for in § 9.11(c). Accordingly, the Court should order Buyer to immediately turn over the remaining $8,000,547 in Rent Proration that Buyer is withholding in breach of the APA and in violation of the automatic stay.

---

[18] For example, Buyer purports to have identified approximately $4.3 million of pre-February utility expenses and sales taxes paid on behalf of the Estate.  But Buyer—and in spite of multiple requests—has not provided the invoices and tax period information that would allow the Debtors to confirm these expenses.

**B.    Buyer is Withholding in Excess of $30.4 Million of Estate Property in Violation of the Automatic Stay**

87.    Buyer's financial advisors have calculated that, as a result of the Debtors' cash management system being transferred to Buyer, the following property of the Estate ended up in Buyer's possession:

- Cash-in-Transit in the amount of $22,452,428;

- Credit Card proceeds from GOB Stores in the amount of $4,368,957;

- Estate checks deposited into Buyer's account in the amount of $5,945,069; and

- Proceeds from subtenants in the amount of $657,243.

*See* Declaration of Andrew Weaver in Support of Transform's Br. ("**Weaver Decl.**"), Ex. R (Post close Reconciliation Items, dated June 14, 2019).

88.    Together, these amounts total $33,423,697, which must be netted against the $3 million of Cash-in-Transit that Buyer paid the Debtors in late March in connection with the Parties' "interim agreement."

89.    But Buyer has refused to turn over the outstanding $30.4 million to the Estate claiming that it is offset by a number of liabilities owing to Buyer.  Br. ¶ 114;[19] *see* Weaver Decl., Ex. R.

90.    As an initial matter, and as discussed at length in the Debtors' prior briefing on this issue, it is Buyer's burden to justify its failure to turn over Estate property; yet for more than four months, Buyer has not produced sufficient evidence to support its withholding of such property and therefore must be compelled to immediately turn over that property to the Debtors.  *See, e.g.*, *Weber v. SEFCU (In re Weber)*, 719 F.3d 72, 81 (2d Cir. 2013)

---

[19] As noted above, Buyer combines and conflates these amounts owed with February Rent Prorations owed to the Debtors, and applies a number of purported reconciliations to the combined amounts to calculate that the Debtors owe Buyer $47,349.  Br. ¶ 115.

("[Section 542 provides] without qualification that anyone in possession of the property of the estate 'shall deliver' it [to the Debtor.]").

91.     Buyer claims to have provided all of the necessary information to support its setoffs.  *See* Br. ¶ 118.  Buyer has provided a good deal of information, but it has yet to provide all of the information necessary to substantiate its reconciliations—claiming the requested information either doesn't exist, is too burdensome, or, worse yet, wrongly shifting the burden and stating that ***the Debtors have not "provided a basis" for the information***.  Weaver Decl., Ex. T.

92.     Significantly, while some of the items to be reconciled will cause Buyer to owe less (e.g., checks written by the Debtors pre-Closing that were cashed post-Closing), other items will cause Buyer to owe the Debtors more (e.g., checks written to the Debtors, but deposited post-Closing into Buyer's accounts).

93.     With respect to the latter example, only after the Debtors inquired about the issue did Buyer's advisors confirm that Buyer is in possession of approximately $5.9 million in Estate checks deposited into Buyer's bank accounts.  Good Suppl. Decl. ¶ 4; Weaver Decl., Ex. R.  Specifically, the checks were identified only after the Debtors' advisor obtained a list of checks deposited by Buyer from the date of the Closing through March 18, 2019 and requested this audit be conducted.  Good Suppl. Decl. ¶ 5.  As it turned out, over 85% of those amounts deposited were for obligations owing to the Debtors.  *Id.* .  To date, Buyer has refused to perform the same audit checks received after March 18, 2019.  *Id.*; *see also* Weaver Decl., Ex. T. Accordingly, the Debtors have no way of knowing what additional amounts may still be owed to it. Good Suppl. Decl. ¶ 5.

42

94.    In general, Buyer's analyses and calculations of amounts supposedly owed by the Debtors to Buyer have constantly changed. *Id.* at 6. In virtually every instance when the Debtors' advisors have pushed back on certain aspects of Buyer's reconciliations, Buyer's advisors have had to either concede that certain offsets were improper or that additional funds were owed to the Debtors. *Id.* The Estate checks deposited into Buyer's bank accounts discussed above is a prime example.

95.    Many of Buyer's other so-called setoffs and reconciliations are plainly improper.[20] Most egregious is the setoff of some $9,578,762 for pre-Close orders that were cancelled post-Close. As an initial matter, nothing in the APA that this is an obligation of the Debtors. In addition, this setoff, if allowed, would provide Buyer with a windfall because Buyer, in addition to the setoff amounts, would still get to keep the inventory from any cancelled orders.

96.    With respect to the $11,444,233 which Buyer claims it is owed for checks written by the Debtors pre-Close, but paid by Buyer post-Close, the Debtors do not dispute that in principal, some of these obligations are owed to Buyer. But, to date, Buyer has not been able to satisfactorily demonstrate that it removed checks for property taxes, an obligation Buyer separately assumed under the APA, *see* § 9.11(v), and which therefore should not be reconciled against amounts owed by Buyer to the Debtors. Good Suppl. Decl. ¶ 7. In fact, the list of checks provided to the Debtors includes a significant number of checks that appear to be made out to property tax authorities—e.g., Dallas County Tax Assessor, El Paso City Tax Assessor. *Id.*

97.    With respect to other offsets, Buyer still has not provided sufficient information to confirm the accuracy of the amounts to be reconciled. *Id.* at 8. For example, Buyer claims it should offset some $3,155,380 for "P-Cards"—i.e., employee expense.

---

[20] The Debtors agree that (i) $1,015,377 in net Transactions Services Agreement fees and (ii) $1,131,870 for April 2019 KERP Payment are owed by the Debtors to Buyer and should be offset against any amounts owed.

Although the Debtors do not dispute that pre-Closing employee expenses paid by Buyer should be offset against amounts owed to the Debtors, it was only after the Debtors identified certain P-Card expenses that were satisfied by a pre-Closing payment made by the Debtors (on February 8, 2019) that Buyer then removed approximately $400,000 from its offset. *Id.*. Buyer has not satisfactorily confirmed that it has reconciled other pre-Close payments to ensure that other P-Card payments included in its calculation were not also already paid for by the Debtors. *Id.* Indeed, Buyer concedes that this analysis is *still* on-going. *See* Weaver Decl., Ex. R (listing the status as "pending").

98.     Buyer also identified $2,355,197 of checks written by the Debtors pre-Closing, but that have not yet been cashed. *Id.* To the extent these checks are not for property taxes, the Debtors do not dispute that it would owe these amounts if and when any of the checks are deposited. However, to the extent those checks are never deposited, the amounts of those uncashed checks belong to the Debtors, not Buyer. But Buyer sets off the amount of these checks against the amount it owes to the Debtors, assuming that the checks eventually will get cashed, and providing a windfall to Buyer in the event they are not. *Id.* With respect to these checks, the amounts outstanding should be placed in an escrow fund. Buyer should be permitted to draw down on that escrow fund as the checks are cashed and any amounts remaining in the escrow fund six months after the Closing—the latest date banks would have any obligation to pay those checks[21]—should be released to the Estate.

99.     It is clear that Buyer has no incentive to complete the reconciliation process because Buyer's delays have allowed it to float the amounts it owes to the Debtors, essentially giving it a four-month interest free loan to fund its operations and increase its

---

[21] Under applicable Illinois law: "A bank is under no obligation . . . to pay a check, other than a certified check, which is presented more than 6 months after its date, but it may charge its customer's account for a payment made thereafter in good faith." 810 ILCS 5/4–404.

availability under its revolver in violation of the automatic stay, all at the Debtors' direct expense.  With plan confirmation fast-approaching, Buyer must be ordered to turn over these Estate funds now.

100.    Without complete information, neither the Debtors (nor the Court) can determine what the precise amount of any setoff or reconciliation should be against the approximately $30.4 million that Buyer has calculated it owes to the Debtors.  As noted above, although Buyer has identified a number of potentially legitimate setoffs, with only two exceptions, the proper amount of those setoffs remains unclear, and items that likely will add to the amounts owed to the Debtors (e.g., checks deposited after March 18, 2019) have not yet been accounted for.

101.    Buyer has had more than enough time to justify its offset and reconciliation calculations.  To date, however, Buyer has either refused or is simply unable to provide the information necessary to substantiate its claims.  In the meantime, Buyer should not be permitted to continue withholding Estate property in violation of the automatic stay.  Accordingly, the Court should order the immediate turnover of $33,423,697 that Buyer has calculated it owes to the Debtors.

## IV.    Buyer Is Attempting To Misappropriate Assets It Did Not Acquire

### A.    Buyer Has No Right to the 2017 EDA Funds

102.    As the Court is aware, for the last several months, the Debtors have expended significant Estate resources seeking turnover from the Village of Hoffman Estates (the "**Village**") of more than $9.6 million in Estate funds comprised of property taxes levied and

collected for the 2017 tax year (the "**EDA Funds**").[22]  Debtor Sears, Roebuck & Co., as the

holder of notes issued under the Economic Development Area and Tax Increment Allocation

Act, 20 ILCS 620/1 *et seq.* (the "**EDA Act**" or the "**Act**"), is entitled to annual payment of EDA

Funds in property tax rebates as compensation for obligations Sears incurred in developing the

788-acre Economic Development Area (the "**EDA**") located within the Village and to incentivize

it to "maintain 4,250 jobs" during the relevant tax year.  *See id.* § 4.5.

103.    In the ordinary course, EDA Funds for a particular tax year are paid out at

the end of the following calendar year, after all property taxes have been collected for the year at

issue.  Sears fully paid, prepetition in 2018, the Village property taxes levied against it in 2017.

The specific EDA Funds at issue here are the tax rebates owed to Sears in connection with its

compliance with the EDA Act's jobs requirement in 2017.  Accordingly, the Village—which

does not contest Sears's right to the EDA Funds based on Sears's certification of its 2017 jobs

compliance—normally would have disbursed those tax rebates to Sears in December 2018 or

early 2019 following Sears's certification of its compliance with the jobs requirements.[23]

104.    But, on October 10, 2018, Community Unit School District 300 (the

"**School District**"), a school district located in the Village, filed a complaint in the Circuit Court

of Cook County, Illinois (the "**Illinois Action**") seeking a declaratory judgment that Sears did

not comply with the jobs requirement and that the "millions of dollars in property tax rebates"

that Sears would have otherwise received not be disbursed to Sears by the Village from the

---

[22] Unless otherwise noted, defined terms in this section shall have the meanings ascribed to them in the *Motion of Debtors to Compel Turnover of Estate Property* ("**Turnover Motion**") [ECF No. 2715].  Further details regarding the facts and circumstances of the litigation described in this section can be found in the Turnover Motion.  *Id.*

[23] *See generally* Turnover Motion; *see also* Riecker Tr. 8:10-23 (testifying that since at least 2005, Sears paid property taxes to the Village in connection with the Hoffman Estates corporate campus in arrears, meaning that taxes levied for 2017 are paid at some point the following year)); Meghji Tr. 56:23-57:5 (Q: "And is it your understanding that Sears' eligibility for that economic development agreement credit was based on the number of workers with 35 or more hours a week employed by Sears, Sears' contractors and attendant companies at Hoffman Estates?" A. "In general, yes.").

Village's special tax allocation fund. *See* ECF No. 652-2 ¶¶ 40-54. As a result, the Village did not disburse EDA Funds owed to Sears for tax levy year 2017.

105.    To collect this Estate property for the benefit of its stakeholders, the Debtors filed the Turnover Motion, which led to the recovery of some $2,508,660.33 of the 2017 EDA Funds, and, pursuant to the Court's Order on the School District's Abstention Motion [ECF No. 3362], the Debtors are actively litigating in Illinois State Court to collect the remaining portion of those EDA Funds.

### 1.    The EDA Funds Are Excluded Assets Under the Plain Language of the APA

106.    As set forth more fully in the briefing on the Turnover Motion, the EDA Funds are property tax rebates that Sears is eligible to receive under the EDA Act. *See* Turnover Motion ¶ 9; *see also* Meghji Tr. 68:2-11 (the EDA Funds are a "rebate of the property taxes paid by Sears"); Riecker Tr. 8:10-15, 9:11-20 ("the EDA Agreement . . . allows for some form of rebate to come back"). Buyer claims that it acquired the 2017 EDA Funds pursuant to § 2.1(p) of the APA. But, refunds, credits, or rebates of taxes that were paid by the Debtors pre-Closing—like the property tax rebates from the 2017 EDA Funds—were expressly carved out of the APA as Excluded Assets. *See* APA § 2.2(h).[24]

107.    Section 2.1 makes clear that "Excluded Assets" were not assigned to Buyer under the APA. And, § 2.2(h) specifically includes in such "Excluded Assets":

---

[24] Unlike the issue that this Court confronted with respect to the Parties' dispute regarding Credit Card Accounts Receivable," (*see, e.g.,* ECF Nos. 2796, 2919, 3079), where the Court found that the Reserve Accounts at issue were both "Security Deposits" and "Credit Card Accounts Receivable," (*see* Friedmann Decl., Ex. L (Apr. 18, 2019 Hr'g Tr.) ("**Apr. 18 Tr.**") 79:19-80:17), here, to reject Buyer's claim, the Court need only determine that either (a) the EDA Funds are "tax rebates" and therefore "Excluded Assets," or (b) the Debtors' right to payment of the EDA Funds from the Village is not a claim or action against "parties to other commercial relationships of the Business" and therefore the EDA Funds are not an "Acquired Asset." *See infra* note 25.

> **any interest in or right to any refund, rebate or credit of Excluded Asset-Reorganization Taxes** (including, for the avoidance of doubt, with respect to any Taxes for which Sellers remain liable) . . . ;

APA § 2.2(h) (emphasis added).  "Excluded Asset-Reorganization Taxes" include:

> (i) Taxes imposed on or with respect to the Excluded Assets . . . for any taxable period, other than any Tax to the extent such Tax would have been reduced or eliminated had the Sellers' Tax attributes not transferred to Buyer . . . (ii) Taxes imposed on or with respect to the Acquired Assets, the Acquired Properties, the Business or the Assumed Liabilities for any Pre-Assignment Tax Period . . . .

APA §1.1.  As set forth above, the EDA Funds are an "interest in or right" of Sears to a tax "rebate" for property taxes fully paid by Sears pre-Closing, and accordingly are Excluded Asset-Reorganization Taxes.  The EDA Funds fall squarely within this definition because they are a rebate on property taxes imposed on Acquired Assets (*i.e.*, Sears's campus in Hoffman Estates) for a Pre-Assignment Tax Period, as well as on taxes with respect to Excluded Assets (*see infra* § IV.B for discussion of the Non-Operational Hoffman Estates lots not acquired by Buyer).  Accordingly, the EDA Funds are Excluded Assets to which Buyer has no right whatsoever.[25]

108.    Buyer, nevertheless, asserts a series of arguments seeking to avoid the plain language and import of § 2.2(h), each aimed at suggesting that the annual rebate of property taxes from the EDA Funds is something other than a "tax rebate."  All of these arguments are meritless.

---

[25] Even if the EDA Funds were not Excluded Assets, Section 2.1(p) by its terms could not apply because that provision only includes "Actions or Claims" against "*parties to other commercial relationships of the Business.*"  As Buyer acknowledges, a "commercial relationship" results from "commerce or exchange."  Br. n.27.  "Commerce" is defined as "The exchange of goods and services, esp. on a large scale involving transportation between cities, states, and countries."  BLACK'S LAW DICTIONARY (11th ed., 2019).  No one disputes that Sears is a commercial entity, but Buyer conveniently ignores that the Village indisputably is a municipal actor.  Accordingly, while the Village and Sears are parties to a municipal agreement that contains various economic terms and incentives, the relationship does not involve trade, buying, or selling, and is not appropriately categorized as a "commercial" relationship as opposed to a *civic* one.

109.    *First*, Buyer attempts to read the term "rebate" right out of the contract by suggesting that a "tax rebate" and a "tax refund" are the same thing.  Br. ¶ 163.  This impermissible construction would require the Court to improperly ignore terms in the agreement and create a "surplusage," rather than "give effect to all of the terms of the instrument."  *GRT, Inc. v. Marathon GTF Tech., Ltd.*, No. 5571-CS, 2012 WL 2356489, at *4 (Del. Ch. Jun. 21, 2012); *see also Tang Capital Partners, LP v. Norton*, No. 7476-VCG, 761-VCG, 2012 WL 3072347, at *5 (Del. Ch. July 27, 2012) ("General rules of construction favor giving meaning to each term in a contract and avoiding superfluity.").  They are, in fact, two separate concepts, and while they may sometimes overlap, they are not coextensive.  Whereas a "tax refund" is generally associated with an overpayment of taxes, "tax rebates," as that term is used by the Village, are used to incentivize certain behavior by returning some or all of the taxes paid.  As described in the Village's 2018 Annual Financial Report, "The Village has entered into economic incentive agreements with commercial entities whereby the Village has agreed to reimburse the commercial entities for certain unique infrastructure costs incurred by the commercial entities ***through*** sales tax, wholesale vehicle tax, amusement tax and ***property tax rebates***."[26]

110.    *Second*, although Buyer concedes that the Special Tax Allocation Fund is funded in part by property taxes paid by Sears, it claims that the EDA Funds paid to Sears are not a tax rebate because they are not funded exclusively from property taxes paid by Sears.  Br. ¶¶ 165-67.  But, Buyer fails to explain why this is so and cites nothing in support of its *ipse dixit*.

---

[26] *See, e.g.*, Village of Hoffman Estates Comprehensive Annual Financial Report Fiscal Year Ended December 31, 2018 at p. 47, https://www.hoffmanestates.org/home/showdocument?id=21366 (last visited July 1, 2019) (emphasis added); *see also* Village of Hoffman Estates Comprehensive Annual Financial Report Fiscal Year Ended December 31, 2017 at p. 47, https://www.hoffmanestates.org/home/showdocument?id=19107 (last visited July 1, 2019) (same); Village of Hoffman Estates Comprehensive Annual Financial Report Fiscal Year Ended December 31, 2016 at p. 48, https://www.hoffmanestates.org/home/showdocument?id=17132 (last visited July 1, 2019) (same).

The simple fact is that the EDA Funds payments were designed and intended to be property tax rebates.  That the Village staggered its payment obligations and fashioned the funding of its commitment to rebate Sears's property taxes through taxes paid by others (all of whom stand to benefit from Sears's maintaining the threshold number of jobs) in no way alters the character of the payments as tax rebates.[27]

111.    *Third*, Buyer cites to a single instance in which Sears received a property tax rebate from under the EDA Act that was greater than the amount it had paid into the funds in that particular year.  *Id.* ¶¶ 169-70.  Here again, Buyer neither explains why this fact would preclude these payments from being "tax rebate" nor does it cite anything in support of this position.  Pointing to the way the calculation of Sears's rebate worked out in a single year—out of the thirty years since the EDA was established in 1989—ignores the extent to which over the entire period, Sears has paid more in property taxes than it received back in property tax rebates.

112.    *Fourth*, Buyer's assertion that the EDA Funds are not Excluded Assets because the mechanism to challenge the distribution of EDA Funds differs from the mechanism to challenge property taxes or property tax credits (*id.* ¶¶ 171-72) is disingenuous at best.  The fact that mechanisms for challenging to the entitlement to tax "credits," (*id.*) is different than the procedures for remedying a failure of the Village to disburse tax rebates owed from the EDA Funds is of no moment.  The two are inapposite.  Moreover, the parties to the EDA Agreement were free set up whatever dispute mechanisms they wished.

113.    *Fifth*, Buyer notes the unremarkable fact that the parties to the disputes concerning the EDA Funds have at times referred to the rebates that Sears receives from the

---

[27] Buyer misleadingly argues that the EDA Funds are not a tax "rebate" because there is a cap on total payment of EDA Funds (up to a percentage of Sears's costs of relocating to and developing in the Village). Br. ¶¶ 163-64. The Village contracted to repay to Sears the property tax. That is a *rebate*. The fact that the Village established a cap on the maximum aggregate amount to be rebated does not render the payments something other than tax rebates.

EDA Funds as reimbursements.  *See id.* ¶ 173.  But the fact that the property tax rebates were established to incentivize Sears to develop in the Village by reimbursing Sears for development costs in the EDA does not preclude them from being "tax rebates."[28]  The parties to the underlying dispute—*i.e.,* the Village, the Debtors, and the School District—interchangeably have referred to these payments as reimbursements, EDA Funds, EDA Payments, and "property tax rebates" in their pleadings, Annual Reports, and elsewhere.  Some of those examples are included in footnote 41 of Buyer's Brief.  And as Buyer also notes, its own CFO, who previously also served as the CFO of pre-petition Sears and of the Debtors, also referred to the EDA Funds as "rebates" – because that is what they are.  *See id.* n.41.

114.    *Sixth*, the assertion that Buyer will acquire the right to collect EDA Funds if and when it assumes the EDA Agreement (*id.* ¶ 174-75) may be relevant as to future EDA Funds, but is meaningless here if the Court finds that the 2017 EDA Funds are Excluded Assets.[29]

115.    *Seventh*, Buyer's focus on the treatment of tax credits under U.S. Federal Income Tax law is likewise inapposite.  How a particular tax rebate under state or local law is or

---

[28] Contrary to Buyer's assertion, municipally-enacted economic incentives for development are regularly effected by way of and considered tax "rebates" throughout Illinois.  *See, e.g.*, https://www.rigov.org/270/New-Construction-Tax-Incentives-Program (last visited July 1, 2019) ("The New Housing Construction Property Tax Rebate Program is a financial incentive from the City of Rock Island to buyers of newly constructed single-family homes or condominiums.  This is a reimbursement program with funds paid to the homeowner after the annual property taxes are paid in full"); https://www.romeoville.org/491/Incentives (last visited July 1, 2019) ("A tax rebate will be considered when a retail operation is projected to generate a significant amount of tax to the Village based on the municipal share of the total sales tax generated.  The Village will consider sharing a portion of the municipal sales tax with the retailer for a specified number of years based on the type of retailer, the gap it will fill in the Village's inventory of retail, and the total amount of sales tax expected to be generated"); https://www.chicagotribune.com/suburbs/naperville-sun/ct-nvs-naperville-tax-incentives-st-0204-20180206-story.html (last visited July 1, 2019) (municipal officials describing City of Naperville's economic incentive plans to retain or attract businesses as tax "rebates.").

[29] Any claim with respect to entitlement to any EDA Funds owed with respect to tax payments made by the Debtors in tax levy year 2018 are not yet ripe, as Sears has not yet certified to the Village its compliance with certain conditions under the EDA Act and EDA Agreement that would entitle it to tax rebates for tax levy year 2018.  The Debtors expressly reserve all rights with respect to the 2018 EDA Funds if and when they become disbursable as property tax rebates to Sears.

is not treated for U.S. federal income tax purposes does not govern the characterization or treatment of such rebate under the APA.

116.    For all of these reasons, Buyer did not acquire and has no right to the 2017 EDA Funds, which remain property of the Debtors' Estate.

### 2.    Buyer Is Estopped From Asserting Any Rights to the EDA Funds

117.    The Debtors filed the Turnover Motion—which was premised on the Debtors' assertion that the EDA Funds are Estate property subject to turnover—a few weeks after the going-concern sale to Buyer closed.  Notably, Buyer—which was indisputably on notice of the Turnover Motion—and even participated in some of the discovery related to that motion[30]—raised *no* objection to the Debtors' assertions therein that the EDA Funds were Estate assets.  In fact, only the School District opposed the Turnover Motion, arguing that "the relief sought by the Debtors . . . must be denied because Sears does not qualify for the tax rebate under the special tax incentive act" because Sears allegedly failed to maintain a certain number of jobs, "a statutory and contractual prerequisite for the tax rebate."  *Community Unit School District 300's (I) Objection to Debtors' Motion to Compel Turnover of Estate property, and (II) Reply to Debtors' Objection to Motion of Community Unit School District 300 For Relief From the Automatic Stay or, in the Alternative, Abstention* [ECF No. 2996] at 1, 2.

118.    Not only did Buyer not file any objection to the Turnover Motion, Buyer sat silent when the Court asked whether any other party objected to the approximately

---

[30] Buyer's counsel also worked collaboratively with the Debtors in connection with the Turnover Motion to collect discovery, respond to the School District's subpoenas, and prepare witnesses leased from the Debtors to Buyer.  But, at no time did Buyer even suggest that it, and not the Debtors, owned the right to collect the EDA Funds.  *See,* Friedmann Decl., Ex. O (April 2, 2019 and April 10, 2019 Emails).  The Debtors sought Buyer's cooperation because they understood there to be a common interest with Buyer to the extent Buyer was going to become the "developer" in place of Sears under the EDA Act and therefore had a potential interest in the EDA Funds in *future* years, and subject to the parties' agreement that employees leased from Sears to Buyer would be available to assist the Debtors in discovery.  In fact, the Debtors were provided additional liberty to discuss these EDA Funds issues with leased employees working for Buyer because the issues were unrelated to the disputed APA issues between Buyer and the Debtors.  *See id.*

$2.5 million portion of EDA Funds being turned over to the Debtors during the April 18, 2019

oral argument, which took place during an omnibus hearing that Buyer's attorneys appeared at

(and argued other motions).  *See* Apr. 18 Tr. 142:1-144:16, 146:11-147:7.[31]

119.    In reliance on Buyer not asserting a claim to the 2017 EDA Funds, the

Debtors have expended significant resources litigating to recover the approximately

$7.15 million that remains in the possession of the Village's Special Tax Allocation Fund.

Clearly, had Buyer made known its position that it had acquired these tax rebates—by objecting

to the Turnover Motion, asserting such a claim when the Court asked if any other parties

objected to the EDA Funds being turned over to the Debtors, or otherwise advising the Debtors

of this position—the Debtors very well may have decided not to waste Estate resources to collect

property that it may have already sold to Buyer.  In fact, the very first time Buyer took the

position that it had acquired the EDA Funds was in a May 20, 2019 letter—after the Debtors

already had spent significant resources litigating these issues (post-Closing) in this Court and in

Illinois.  *See* Friedmann Decl., Ex. M at 3.

120.    Either Buyer improperly remained silent so that it could sit back while the

Estate expended its limited resources to litigate these issues on Buyer's behalf, or it only recently

ginned up this fanciful argument in an effort to grab at any assets it could.  Either way, Buyer's

inexcusable failure to timely assert a right to the EDA Funds constitutes a complete waiver of

any purported rights to those funds.  *See Gen. Motors Acceptance Corp. v. Clifton-Fine Cent.

Sch. Dist.*, 85 N.Y.2d 232, 236 (N.Y. 1995) (waiver is "the voluntary and intentional

abandonment of a known right," and may be established by a "failure to act so as to evince an

---

[31] Buyer disingenuously asserts that "at the time of the Turnover Motion, the Court did not have before it the question of whether the claim against the Village had been transferred to Buyer.  It now does." Br. ¶ 157.  Of course, the only reason that this issue did not come up in connection with the Turnover Motion is that Buyer failed to object to the motion and then sat silent when the issue was discussed in Court.

intent not to claim a purported advantage"); *Kortright Capital Partners LP v. Investcorp Investment Advisers Ltd.*, 257 F. Supp. 3d 348, 359 (S.D.N.Y. 2017) (same).

> **B.    The Debtors' Hoffman Estates Campus Was Not Sold as a "Buy 3, Get 13 for Free!"**

121.    In its Adversary Complaint and Brief in Support, Buyer asserts that it has "acquired all of [the Debtors'] real property in Hoffman Estates" and that it is therefore justified in its attempts to exercise control over properties in the Hoffman Estates Development that the Debtors contend were not transferred to Buyer under the APA.  Compl. ¶ 76; Br. ¶¶ 121-44. However, § 2.1(c) of the APA and the corresponding Schedule 1.1(p) make clear that Buyer only acquired those parcels in the Hoffman Estates Development that ***relate to the operation of Sears's business***—that is, lots 1A, 2, and 3—and not the other thirteen subdivided lots in the Development (the "**Non-Operating Lots**").

122.    Section 2.1 of the APA, which governs the Parties' "purchase and sale of the Acquired Assets," provides that, on the Closing Date, the Debtors will sell and Buyer will buy "all right, title and interest of [the Debtors] in, to or under all assets, properties and rights ***Related to the Business***[32] other than the Excluded Assets," including "all Owned Real Property." APA § 2.1(c) (emphasis added).  The APA defines "Owned Real Property" as "(i) the GOB Owned Stores and (ii) the ***Operating*** Owned Properties" and further defines "***Operating*** Owned Properties" as "the real property described in Schedule 1.1(p)."  *Id.* § 1.1 (emphasis added). Schedule 1.1(p), entitled "Operating Owned Properties," obligates the Debtors to convey Store # 490 in Hoffman Estates, Illinois to Buyer in connection with the Sale Transaction.  *Id.* at Schedule 1.1(p).

---

[32] The APA's definition of "Business" is provided by the recitals, and includes, *inter alia*, Sears's retail operations, specialty operations, home service solutions providers, intellectual property operations, appliance distribution, inventory infrastructure, and websites.  APA § 1.1.  Notably absent from the definition of "Business" is undeveloped real-estate holdings such as the Non-Operating Lots.

123.    As its title suggests, Schedule 1.1(p) includes those of the Debtors'
properties that are related to SHC's *operations*.  As of Closing, the Non-Operating Lots were not
in any way related to SHC's operations.  Supplemental Declaration of William C. Gallagher
("**Gallagher Decl.**") ¶ 5.  Lots 1A, 2, and 3, on the other hand, were related to SHC's operations:
they were the lots associated with Sears's headquarters.  *Id.*  Buyer, in its Brief in Support and in
the Declaration of Jane Borden, mischaracterizes that two of these three lots as "vacant."  *See* Br.
¶ 122; Borden Decl. ¶ 11; *see also* Gallagher Decl. ¶ 6.  That is inaccurate.  The road that allows
for major ingress and egress to Sears's headquarters—including its security booth—runs across
one of the two lots Buyer claims is vacant.  The other lot contains baseball fields, a basketball
court, and volleyball courts that are associated with Sears's headquarters for use by its
employees as well as another road that allows for ingress and egress to Sears's headquarters.  *Id.*
Both lots are within the security gates surrounding Sears's headquarters.  *Id.; see also* Gallagher
Decl. Ex. A (Sears & Prairie Stone POA Ownership Drawing).  In any event, whether the lots are
"vacant" is of no moment.  The criterion for inclusion on or exclusion from Schedule 1.1(p) was
not whether a subject property was vacant; rather, as the plain language of the APA and
Schedule 1.1(p) makes clear, the criterion was whether a subject property was *related to SHC's
operations*.

124.    Buyer also asserts in its Brief and in the Borden Declaration that the Sears
real estate department always "considered all of the lots at Hoffman Estates to be a single
property."  *See* Br. ¶ 122; Declaration of Jane S. Borden in Support of Transform's Br. ("**Borden
Decl.**") ¶ 11.  But that assertion is then belied by the very next paragraph of the Borden
Declaration in which Ms. Borden acknowledges that Buyer knew that Hoffman Estates was
subdivided into lots, and that only three of the sixteen lots—Lots 1A, 2, and 3—were mortgaged

in connection with the Dove transaction.  Borden Decl. ¶ 12.  Accordingly, this self-serving assertion made for the first time in the Borden Declaration is unavailing and does not advance Buyer's position.

125.    The Debtors and their advisors considered what was referred to as "Site 490" in connection with the Debtors' sale of the Sears business as a going concern to refer only to Lots 1A, 2, and 3 in the Hoffman Estates Development.  Gallagher Decl. ¶ 7.  Moreover, as noted in the Supplemental Motion to Enforce, Site 490 was clearly identified in the documents disclosed in the Intralinks datasite (an organized database of company-related documents accessible to potential purchasers for purposes of due diligence during the sale process), including without limitation surveys and title commitments, as Lots 1A, 2, and 3.  *Id.*  For example, a DLA Piper ordered zoning report for Site 490, included in Intralinks, represented "Sears 490" as comprised of Lots 1A, 2, and 3.  *Id.* ¶ 8; *see also id.* Ex. B (Mar. 29, 2018 EMG Zoning Report for Sears 490 – Hoffman Estates, IL).  Additionally, a Sears 490 Survey in Intralinks as of December 7, 2018 shows that the Non-Operating Lots were not to be included in the properties conveyed to any buyer.  *Id.* ¶ 9; *see also id.* Ex. C (Mar. 27, 2018 ALTA/NPS Land Title Survey, Sears 490 ("**Sears 490 Survey**")).  The Survey describes only parcels 1A, 2, and 3 and is tagged as Sears 490.  *Id.* ¶ 9; *see also id.* Ex. C. (Sears 490 Survey).  Buyer, for its part, has pointed to no evidence beyond Ms. Borden's self-serving and conclusory declaration that shows that "490" was associated with more than just Lots 1A, 2, and 3.[33]

---

[33] The Statement of Assets and Liabilities to which Buyer refers does not, contrary to Buyer's assertion, suggest that "490" refers to all sixteen subdivided lots in Hoffman Estates.  The statement of Assets and Liabilities lists "490 Office Building" and "490 Land" as part of the Debtors' real property assets.  "Office Building" refers to the Sears' headquarters, and "Land" refers to the land on which the headquarters sits.  Jan. 17, 2019 Debtors' Statement of Assets and Liabilities [ECF No. 1637].  The failure of Sears's Real Estate Department to include all of the other properties at Hoffman Estates (i.e., the non-Operating Lots) in the Debtors' Statement of Assets and Liabilities does not justify Buyer now receiving a windfall "buy three, get thirteen for free" deal at the expense of all other stakeholders, especially when nothing in the APA supports such a result.

126.   Finally, and as discussed in the Debtors' Supplemental Motion to Enforce, on February 28, 2019, the Debtors delivered and Buyer, through counsel, reviewed and approved a deed to *only* Lots 1A, 2, and 3.  No deed was provided for the Non-Operating Lots since they were not part of the deal.  *See* Declaration of William C. Gallagher [ECF No. 4032] ("**Gallagher Decl.**") ¶ 9.  On March 18, 2019, Buyer recorded the deed to Lots 1A, 2, and 3 with the Cook County Recorder of Deeds and, the same day, paid a real estate transfer tax, or "stamp tax," as to Lots 1A, 2, and 3.  *Id.*  Buyer first expressed its belief that it had acquired all the property at Hoffman Estates in a March 26, 2019 letter, around the time Buyer concocted a series of so-called disputed APA issues, all in an effort to avoid liabilities it plainly had agreed to assume and also to grab at assets beyond those it had bargained for.   In that letter, Buyer's counsel reiterated the unambiguous terms that close the case on this dispute: "Schedule 1.1(p) ('Operating Owned Properties') lists the Hoffman Estates property as store number '490' in the city of 'Hoffman Est.' in the state of 'IL.'"  *Id.* Ex. D (Mar. 26, 2019 Letter from A. Weaver to E. Odoner, et al. Re: Hoffman Estates).

127.   At bottom, the APA unambiguously obligated the Debtors to convey to Buyer only their operating owned properties in Hoffman Estates, Illinois—Lots 1A, 2, and 3— and no others.  Accordingly, the Court should enjoin Buyer from further interfering, in violation of the automatic stay, with the Debtors' use and enjoyment of the Non-Operating Lots and deny Buyer's request for a judgment declaring that Buyer acquired all the Debtors' real property in the Hoffman Estates Development.

### C.   Buyer Did <u>Not</u> Acquire the Adequate Assurance Deposit

128.   Buyer alleges that because under § 2.1(o) of the APA, it acquired all "utility deposits" that provides a basis for it also to take the Adequate Assurance Deposit created by the Debtors pursuant to the Court's order [ECF No. 431] (the "**Utility Order**") for the express

purpose of ensuring the continued service of utilities during the chapter 11 cases and compliance with § 366 of the Bankruptcy Code. *See* Compl. ¶¶ 69-75; Br. ¶¶ 146-53. Buyer attempts to show itself to be reasonable by limiting its claim to the Debtors' funds in the Adequate Assurance Deposit to the extent such deposits relate to the properties acquired by Buyer. *See* Compl. ¶¶ 69-75; Br. ¶¶ 146-53. But, Buyer has no right to take any of these funds from the Estate.

129.    *First*, although § 2.1(o) enumerates numerous types of security deposits that were acquired by Buyer, including utility deposits, the items listed are all security deposits that may exist in the ordinary course—*e.g.*, if a specific utility provider was holding the Debtors' funds as some type of security deposit. The Adequate Assurance Deposit did not exist in the ordinary course, and nothing suggests that § 2.1(o) includes the Adequate Assurance Deposit, a Court-ordered creature of chapter 11 set up pursuant to § 366 of the Bankruptcy Code. In fact, although Section 2.1(o) spells out eleven (11) different forms of security deposits including "utility deposits," it does *not* list the Adequate Assurance Deposit as an Acquired Asset, even though it was created over two months before the APA was entered into, as Buyer itself highlights in its brief. Br. ¶ 149.[34] If the Parties had intended that the Adequate Assurance Deposit constitute an Acquired Asset, it would have been listed in § 2.1(o) or another subsection of 2.1.[35]

---

[34] Section 2.1(o) states in relevant part "any and all rights of Sellers in and to any . . . security deposits . . . including cash collateral given to obtain or maintain letters of credit and cash drawn or paid on letters of credit, utility deposits, performance, payment or surety bonds, credits, allowance, prepaid rent or other assets, charges, setoffs, prepaid expenses, other prepaid items and other security (collectively, "Security Deposits") . . . in each case to the extent related to any Acquired Asset . . . ." APA § 2.1(o).

[35] Buyer points to its rejection of a proposal by the Debtors to amend the APA that would have expressly listed as an Excluded Asset the Adequate Assurance Deposit as extrinsic evidence that further supports its interpretation of the APA. Br. ¶ 152. However, Buyer's argument ignores the more obvious interpretation, derived from what Buyer itself agrees is the "clear and unambiguous" language of the APA, that Section 2.1(o) does not and was not intended to transfer the Adequate Assurance Deposit to Buyer because it is not a "Security Deposit," and so the Debtors did not need to further push an initial proposal to further amend that language.

130.    *Second*, Buyer is wrong in asserting that the Adequate Assurance Deposit

falls within § 2.1(o) as either a "utility deposit" specifically, or a "security deposit" generally.

The Utility Order and the accompanying motion in support of same,[36] made clear that the

Adequate Assurance Deposit was a bankruptcy-specific, Code-created solution to the problem of

Utility Providers (as defined therein) potentially "altering, refusing, or discontinuing service on

account of any unpaid prepetition charges" during the chapter 11 cases, which would "seriously

jeopardize the Debtors' restructuring efforts and . . . creditor recoveries."   Utility Order ¶ 9;

Utility Motion ¶ 9; *see also Long Island Lighting Co. v. Great Atl. & Pac. Tea Co. (In re Great

Atl. & Pac. Tea Co.)*, No. 11-CV-1338 (CS), 2011 WL 5546954, at *5 (S.D.N.Y. Nov. 14, 2011)

(collecting cases finding that the determination of what constitutes adequate assurance is left to

bankruptcy courts to make).  As noted above, the Adequate Assurance Deposit is the result of a

procedure created under § 366 of the Bankruptcy Code as a new form of relief solely for the

purpose of protecting debtors from utility service cutoffs upon a bankruptcy filing while

providing utility companies with adequate assurance that debtors would pay for postpetition

services.  *See* H.R. Rep. No. 95-595, at 350 (1978), reprinted in 1978 U.S.C.C.A.N. 5963, 6306.

131.    The Utility Motion further made clear that the Adequate Assurance

Deposit was specifically formulated to be distinct from the type of "utility deposits" that the

Debtors might have established directly with service providers in the ordinary course of

business:  "The Debtors intend to pay postpetition obligations owed to the Utility Providers in a

timely manner.  The Debtors expect that cash flows from operations, cash on hand, and the

proceeds of their debtor-in-possession financing facilities (the "**DIP Facilities**") will be

---

[36] *Motion of the Debtors Requesting Entry of an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Establishing Procedures for Determining Adequate Assurance of Payment For Future Utility Services, and (III) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Service* [ECF No. 196] ("**Utility Motion**").

sufficient to pay postpetition obligations related to their utility services in the ordinary course of business." Utility Motion ¶ 10. The Adequate Assurance Deposit is a separate, Court-established fund maintained in a segregated account controlled by the Debtors—not deposited directly with the utilities—to ensure that providers continued to provide services to the Debtors, without the Debtors being faced with numerous demands for security deposits from various providers. Of course, to the extent such deposits already existed, there is no dispute that Buyer acquired those security deposits if "related to an Acquired Asset."

132. Courts likewise have recognized the special purpose of mechanisms like the Adequate Assurance Deposit—requiring adequate assurance payments to utility providers—is to ensure "that the utility is not subject to an unreasonable risk of nonpayment for postpetition services" (*In re Adelphia Business Sols., Inc.*, 280 B.R. 63, 80 (Bankr. S.D.N.Y 2002)), which is similar but distinct from a security deposit outside that very narrow and bankruptcy-specific purpose. *See id.* at 82-83 (finding that "whether the utilit[y] demanded deposits in the past" is a "merely historical" consideration and is not central to the adequate assurance inquiry).[37]

133. *Third,* the Utility Order expressly states that the Adequate Assurance Deposit "shall be returned to the Debtors upon the earlier of: (i) the Debtors' payment in full of all postpetition obligations due and owing to the applicable Utility Provider, (ii) the Debtors' termination of services with such Utility Provider, or (iii) the conclusion of these chapter 11 cases, if not applied earlier." Utility Order at Ex. 2, ¶ B.3. Pursuant to that provision, if the Debtors have paid all postpetition obligations due and owing, the Debtors' terminated services, or the chapter 11 cases are concluded—or put differently, if the Utility Provider no longer bears

---

[37] Buyer's assertion that utility providers would not have continued services to properties acquired by Buyer absent the Adequate Assurance Deposit (*see* Declaration of Keith Klug in Support of Buyer's Br. ¶ 5), even if true, is irrelevant to this dispute. In any event, it plainly would be Buyer's sole responsibility to secure the continued provision of utility services following its acquisition of the applicable properties.

the risk attendant with a counterparty in chapter 11—there is no further need for adequate assurance protections.  The existence of and intent behind this return provision further evince that the Adequate Assurance Deposit was a distinct arrangement under the auspices of the Bankruptcy Code, and not an ordinary course security deposit.  Further, this return provision of the Utility Order is self-effectuating—meaning the Adequate Assurance Deposit amounts are automatically returned to the Debtors upon payment of all outstanding postpetition amounts and converted to cash assets, which were not transferred to Buyer under the APA.

134.    Further, the mechanisms by which the utility companies may increase or recover the Adequate Assurance Deposit distinguish it from a security deposit.  The Utility Order expressly provides that any Utility Provider may request additional assurance from the Debtors. *Id.* at Ex. 2, ¶ B.6.  Additionally, the Utility Order provides that the Debtors and the utility companies may seek judicial intervention if the Debtors and utility companies cannot resolve a request for additional assurance within the established Resolution Period.  *Id.* at Ex. 2, ¶ B.9. And, the Utility Provider may not discontinue, alter, or refuse service to the Debtors pending resolution of a dispute over a request for additional assurance.  *Id.* at Ex. 2, ¶ B.10.  These are not characteristics of a security deposit held by a third party in the ordinary course.

135.    In sum, the Parties never agreed nor intended that the Adequate Assurance Deposit be acquired by Buyer.

## V.    Buyer Is Responsible For Paying, Discharging Or Bonding Over Mechanics' Liens Not Related to Owned Real Property

136.    Buyer's attempts to evade responsibility under the APA for Mechanics' Liens that it agreed to pay should be rejected.  The Amended APA provides that the Debtors are responsible for the payment or discharge of mechanics' liens with respect to only a certain subset of the properties transferred to Buyer.  *See* Amended APA § 9.11(a)(vi).  In spite of that

governing provision, Buyer is attempting to avoid its responsibility by arguing that the only

mechanics' liens that it is responsible for were 36 liens specifically identified in § 2 of Schedule

6.5 to the APA.  Br. ¶ 180 (citing APA § 2.3(p), which provides that Buyer shall assume liability

for "the claims underlying the mechanics' liens identified in Section 2 of Schedule 6.5.").[38]

137.   As an initial matter, there is no dispute that Buyer assumed the liens

identified in § 2 of Schedule 6.5.   But, Buyer incorrectly argues that those liens enumerated in

Schedule 6.5 are the only ones Buyer agreed to pay.   Buyer bases its argument on § 2.4 of the

APA, which provides that Buyer did not assume liabilities other than the "Assumed Liabilities"

set forth in APA § 2.3 (including § 2.3(p)).[39]   However, these assertions ignore Amended APA §

9.11(a)(vi)—which apportioned to Buyer certain responsibilities in addition to those undertaken

in § 2.4—and is applicable to the liens at issue.

138.   Section 9.11(a) of the Amended APA, entitled "Apportionments," was

added on or around February 7, 2019.  It provides:

> The Sellers and Buyer shall prorate all items of revenue and expense with respect
> to the Owned Real Property, the Lease Premises . . . and the Sparrow Properties
> as of the Closing Date with the Sellers being entitled to all revenues and
> responsible for all fees, costs and expenses accrued or apportioned up to but not
> including the Closing Date and Buyer being entitled to all revenues and
> responsible for all fees, costs and expenses from the Closing Date forward . . . .
> In order to effectuate the foregoing the following shall apply . . . .

Amended APA § 9.11(a).  Section 9.11(a)(vi) then provides:

---

[38] Section 2 of Schedule 6.5 provides that "The following mechanic's liens have been alleged or asserted against the Potential Acquired Assets" and lists 36 liens.  "Potential Acquired Assets" are "all assets of Seller of any kind that either (i) constitute an Acquired Asset (other than Leases or Contracts) or (ii) constitute Potential Transferred Agreements."   APA § 1.1.   "Potential Transferred Agreement" is defined as "(i) all Leases and (ii) all other Contracts Related to the Business to which a Seller is a party and all IP Licenses, excluding, in each case" certain items not applicable here.

[39] The first paragraph of Section 2.4 provides: "None of Buyer . . . shall assume, be deemed to assume or become obligated hereunder in any way to pay or perform (whether as a successor to any Seller or otherwise) any Liabilities of any Sellers or any of their respective Affiliates of any kind or nature, known, unknown, contingent or otherwise, whether direct or indirect, matured or unmatured, other than the Assumed Liabilities, (the foregoing including the following, the "Excluded Liabilities") . . . ."  APA § 2.4.

> ***Sellers shall be charged for the amount of any underlying mechanics' liens
> with respect to any Owned Real Property (other than those identified in
> Section 2 of Schedule 6.5) that are not paid, discharged by order of the
> Bankruptcy Court or bonded over in a manner reasonably acceptable to Buyer***;
> provided, however, that the amount to be prorated pursuant to this subparagraph
> (vi) shall not be reflected or taken into account in the Initial Proration Schedule or
> the initial proration but shall be reflected in the Final Proration Schedule.

Amended APA § 9.11(a)(vi) (emphasis added).  Accordingly, the Debtors and Buyer agreed to

prorate as between them fees, costs and expenses with respect to (i) the Owned Real Property,

(ii) the Lease Premises, and (iii) the Sparrow Properties acquired by Buyer under the APA.  They

further agreed that the Debtors would take on the charge for the amount of any underlying

mechanics' liens *only* with respect to any *Owned Real Property* acquired by Buyer.[40]  That

means, perforce, that Buyer agreed to be charged for the amount of any underlying mechanics'

liens with respect to any Lease Premises or Sparrow Properties acquired by Buyer.[41]

      139.    Nothing in Sections 2.3(p) or 2.4(a)-(b) of the APA are to the contrary.

The opening paragraph of § 2.3 provides that it is "[u]pon the terms and subject to the

conditions" of the rest of the APA.  *Id.* § 2.3.  Accordingly, that Buyer expressly assumed certain

liabilities listed in § 2 of Schedule 6.5 does not mean that it did not also contract to be

responsible to pay or discharge other mechanics' liens.  Pursuant to § 9.11(a)(vi), the Debtors

would continue to be responsible for mechanics' liens on Owned Real Property (other than those

---

[40] "Owned Real Property" is defined as "(i) the GOB Owned Stores and (ii) the Operating Owned Properties." APA § 1.1. "Lease Premises" are "each of the Sellers' or its Subsidiaries' leased real properties that is an Initial Assigned Lease or a Designatable Lease." *Id.* Owned Real Property and Lease Premises that are subject to an Acquired Lease are each "Acquired Property" under the APA, *id.*, and each of the underlying mechanics liens at issue is with respect to Owned Real Property and Lease Premises that were subject to an Acquired Lease. "Sparrow Properties" are real properties set forth on Schedule 1.1(q) to the APA. *Id.*

[41] Buyer tries to evade the application of Section 9.11(a)(vi) by arguing that the exclusion of Lease Premises and Sparrow Properties from the proration scheme of that section did not cause Buyer to assume the underlying mechanics' liens on those properties. *See* Br. ¶¶ 186-88.  But, that fact does not change the concurrent fact that Buyer did agree, under Section 9.11(a) to prorate expenses related to each of "Owned Real Property, the Lease Premises…and the Sparrow Properties" and further agreed, under sub-Section 9.11(a)(vi), that the Seller would only be responsible for expenses as to mechanics' liens on the Owned Real Property category governed by the Section (*see supra*) – regardless of whether they otherwise had assumed liability for those liens under Section 2.3(p).  *See* APA § 9.11(a), (a)(vi).

listed in Schedule 6.5), and Buyer would be responsible for mechanics liens on other types of properties it acquired.  § 9.11(a)(vi) also expressly carved out from the Debtors' responsibility for any payment for underlying mechanics' liens identified in § 2 of Schedule 6.5, which further demonstrates that § 2.3(p) of the APA is intended to be read *in conjunction* with the apportionment regime in § 9.11(a)(vi).

140.    Similarly, Sections 2.4(a) and (b) do not eliminate Buyer's obligations under § 9.11(a)(vi), pursuant to which—notwithstanding that Buyer may not have assumed certain liabilities—Buyer agreed to be responsible for paying, discharging, or bonding over the underlying mechanics' liens on certain properties it acquired, other than Owned Real Property. Buyer's reading of the APA would require the Court to ignore the specific terms and conditions that the Parties attached to the payment of mechanics' liens, including the omission of an entire (highly relevant) section, and would "violate the cardinal rule . . . that, where possible, a court should give effect to all contract provisions." *Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, No. 254, 2012, 2012 WL 2819464 (Del. Supr., May 14, 2012) (emphasis in original) (internal quotations omitted).[42]

141.    Relying on this indefensible reading, Buyer has refused to abide by the required apportionment of the charges for underlying mechanics' liens with respect to Lease Premises and Sparrow Properties under § 9.11(a)(vi).  By correspondence dated February 7, 2019, Buyer demanded that the Debtors address certain listed mechanics' liens pursuant to § 9.11(a)(vi) of the APA.  In response, the Debtors advised that Buyer's demand that the Debtors pay or discharge thirty-seven (37) of the mechanics' liens on Lease Premises or Sparrow

---

[42] Buyer is of course correct that the applicable rules of construction state that specific provisions govern over more general ones in an agreement (Br. ¶ 188 (citing cases)).  But, as to the relevant issue—who is responsible for paying, discharging, or bonding certain underlying mechanics' liens on properties acquired by Buyer—§ 9.11(a)(vi) is the more specific provision.

Properties was, in fact, in contravention of § 9.11(a)(vi). The Debtors further explained that because under § 9.11(a)(vi) they are only responsible for paying or discharging the mechanics' liens on Owned Real Property, Buyer's assertion that the Debtors are required to pay, discharge or bond over those other 37 mechanics' liens is inconsistent with the plain language of the Amended APA. *See* Friedmann Decl., Ex. P (May 13, 2019 Letter).[43]

142. As set forth above, the plain language of § 9.11(a)(vi) clearly and unambiguously provides that the Debtors are responsible for paying or discharging only those mechanics' liens on Owned Real Property, and not Lease Premises or Sparrow Properties acquired by Buyer (regardless of whether those liens were listed on Schedule 6.5). However, to the extent extrinsic evidence is relevant, the Parties' drafting history further supports the Debtors' interpretation. On February 7, 2019, the Debtors revised the draft Amended APA § 9.11(a)(vi), which had provided that the Debtors would be charged for any amount underlying mechanics' liens with respect to "any Potential Acquired Assets,"—defined in the APA as "all assets of Seller of any kind that either (i) constitute an Acquired Asset (other than Leases or Contracts) or (ii) constitute Potential Transferred Agreements." APA § 1.1. The Debtors' revision—which Buyer accepted in the final version of the Amendment to the APA—narrowed the Sellers' responsibility to payment or discharge of just those mechanics' liens with respect to "Owned Real Property." *See* Friedmann Decl., Ex. Q (Feb. 7, 2019 Redline of APA). That final revision accurately reflects the Parties' intent that Buyer would be responsible for paying, discharging, or bonding over underlying mechanics' liens with respect to all Acquired Assets

---

[43] Buyer also sought to have Seller pay, discharge, or bond nine (9) mechanics' liens expressly identified in Section 2 of Schedule 6.5, and four (4) notices of commencement, which by definition are not mechanics' liens. *See id.* It is not clear in the Adversary Complaint whether Buyer intends to include this last category in its claim for declaratory judgment with respect to mechanics' liens. *See* Compl. ¶¶ 181-86. In contrast, the Debtors did pay or discharge, or agreed to pay or discharge, ten (10) mechanics' liens that were required to be addressed by the Debtors pursuant to Section 9.11(a)(vi). *See* Friedmann Decl, Ex. P.

other than the Owned Real Property, in addition to assuming the mechanics' liens listed on

Schedule 6.5.

## CONCLUSION

For the foregoing reasons, the Debtors respectfully request that the Court issue an order

(i) compelling Buyer to perform its obligations under § 2.3(k) of the APA—that is, to assume up

to $166 million of Other Payables **and** all payment obligations with respect to Ordered

Inventory; (ii) finding that the adjusted Prepaid Inventory Shortfall Amount is $55,943,816; (iii)

finding that the Aggregate DIP Shortfall Amount is $243,249; (iv) finding that the Specified

Receivables Shortfall Amount is zero dollars; (v) compelling Buyer to immediately turnover

$8,000,547 in respect of outstanding February Rent Proration; (vi) compelling Buyer to

immediately turnover $30,423,697 in Estate property being withheld in violation of the

automatic stay; (vii) finding that Buyer has no rights to the 2017 EDA funds (viii) enjoining

Buyer from taking any further actions to (a) exercise control over the thirteen lots in the Hoffman

Estates Development that Buyer did not acquire under the APA, or (b) interfere with the

Debtors' use, enjoyment, or right to dispose of those thirteen lots, (ix) finding that Buyer did not

acquire the Adequate Assurance Deposit, (x) finding that Buyer is responsible for paying,

discharging or bonding over Mechanics' Liens not related to Owned Real Property (xi)

dismissing Buyer's Adversary Complaint; and (xii) granting the Debtors such other and further

relief, at law or in equity, to which they are entitled, including, but not limited to, their attorneys'

fees incurred as a result of Buyer's repeated and continuous violations of the automatic stay.

## RESERVATION OF RIGHTS

The Debtors reserve all of their rights, claims, defenses, and remedies, including, without

limitation, their rights to amend, modify, or supplement this Motion, to seek discovery, and

introduce any evidence in any hearing with respect to this Motion. Further, the Debtors reserve

all claims, causes of action, damages, rights, remedies, and/or defenses in connection with Buyer's violation of the automatic stay.

WHEREFORE, the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as is just.

Dated: July 3, 2019
      New York, New York

**/s/ Sunny Singh**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Paul R. Genender
Jared R. Friedmann
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                              :
In re                                         :        Chapter 11
                                              :
SEARS HOLDINGS CORPORATION, *et al.*,         :        Case No. 18-23538 (RDD)
                                              :
        Debtors.[1]                           :        (Jointly Administered)
                                              :
-------------------------------------------------------------x

## ORDER (I) ENFORCING ASSET PURCHASE AGREEMENT AND AUTOMATIC STAY AGAINST BUYER AND COMPELLING TURNOVER OF ESTATE PROPERTY AND (II) DISMISSING ADVERSARY COMPLAINT

Upon the motion, dated May 24, 2019 [ECF No. 4029] (the "**Motion**")[2] of Sears

Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-

captioned chapter 11 cases (collectively, the "**Debtors**"), for entry of an order (the "**Order**")

enforcing the Asset Purchase Agreement and in opposition to Transform Holdco LLC's

*Adversary Complaint* [ECF No. 4033], pursuant to sections 105, 362, 541, and 542 of chapter 11

of title 11 of the United States Code (the "Bankruptcy Code"); and the response [ECF No. [●]] of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

Transform Holdco LLC ("**Transform**"), along with Transform's supporting declarations (collectively, the "**Response**"), which was the sole objection to the Supplemental Motion to Enforce; and upon the Debtors' brief in opposition to *Transform Holdco LLC's Brief In Support of the Adversary Complaint And In Opposition To Debtors' Supplemental Motion To Enforce The Asset Purchase Agreement* [ECF No. [●]], along with the Debtors' supporting declarations; and the Court having jurisdiction to decide the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the relief sought in the Motion and the opportunity for a hearing thereon having been provided in accordance with the Amended Case Management Order; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having held a hearing to consider the relief requested in the Motion on July 11, 2019 (the "Hearing"); and upon the record of the Hearing, and upon all of the proceedings had before the Court; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein and that such relief is in the best interests of the Debtors, their estates, their creditors, and all parties in interest; and after due deliberation and sufficient cause appearing therefor,

### IT IS HEREBY ORDERED THAT:

1.      The Motion is granted to the extent set forth herein.

2.      Pursuant to the unambiguous terms of the APA, Transform shall assume $166,000,000 in respect of Other Payables;

3.      Pursuant to the unambiguous terms of the APA, Transform shall assume all payment obligations with respect to Ordered Inventory;

4.      The adjusted Prepaid Inventory Shortfall Amount is $55,943,816;

5.      The Aggregate DIP Shortfall Amount is $243,249;

6.      The Specified Receivables Shortfall Amount is zero dollars

7.      Transform is directed to turn over to the Debtors $8,000,547 in respect of outstanding February Rent Proration within one (1) business day of the entry of this Order;

8.      Transform is directed to turn over to the Debtors $30,423,697 in Estate property being withheld in violation of the automatic stay within one (1) business day of the entry of this Order;

9.      Transform has no rights to the 2017 EDA Funds;

10.     Transform is permanently enjoined from taking any further actions to (a) exercise control over the thirteen lots in the Village of Hoffman Estates, Illinois development that Transform did not acquire under the APA, or (b) interfering with the Debtors' use, enjoyment, or right to dispose of those thirteen lots;

11.     Transform did not acquire the Adequate Assurance Deposit;

12.     Pursuant to the unambiguous terms of the APA, Transform is responsible for paying, discharging, or bonding over mechanics' liens not related to Owned Real Property;

13.     The Adversary Complaint is dismissed with prejudice;

14.     The Debtors are entitled to recover damages under 11 U.S.C. § 362(k)(1), including costs and attorneys' fees; and

15.     Within seven (7) days of receipt of the Debtors' billing records, Transform shall pay the Debtors' costs and attorneys' fees incurred as a result of Transform's willful violations of the automatic stay.

16.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

Dated: _____, 2019
      White Plains, New York

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE