**Hearing Date: July 11, 2019 at 10 a.m. (prevailing Eastern time)**

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225 2000
Facsimile: (212) 225 3999
Sean A. O'Neal, Esq.
Luke A. Barefoot, Esq.
Andrew Weaver, Esq.

*Attorneys for Transform Holdco LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x

In re                                               :
                                                    :        **Chapter 11**
**SEARS HOLDINGS CORPORATION**, *et al.*,    :
                                                    :        **Case No. 18-23538 (RDD)**
                                                    :
Debtors.[1]                                      :        **(Jointly Administered)**

---------------------------------------------------------- x

**TRANSFORM HOLDCO LLC'S REPLY TO ELM CREEK REAL ESTATE, LLC'S**
**OBJECTION TO DEBTORS' NOTICE OF REJECTION OF CERTAIN UNEXPIRED**

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**LEASES OF NONRESIDENTIAL REAL PROPERTY AND ABANDONMENT OF
PROPERTY IN CONNECTION THEREWITH**

Transform Holdco, LLC ("Transform" or the "Buyer") as Buyer pursuant to the *Order (I)
Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of
Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances,
(III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in
Connection Therewith and (IV) Granting Related Relief* (ECF No. 2507) (the "Sale Order")
approving the sale of certain of the assets of the above-captioned debtors and debtors-in-
possession (collectively, the "Debtors") hereby submits this reply (the "Reply") in support of the
Debtors' *Notice of Rejection of Certain Unexpired Leases of Nonresidential Real Property and
Abandonment of Property in Connection Therewith* (ECF No. 3449) (the "Rejection Notice")
and in response to the *Elm Creek Real Estate, LLC's Objections to Debtors' Notice of Rejection
of Certain Unexpired Leases of Nonresidential Real Property and Abandonment of Property in
Connection Therewith* (ECF No. 3806) (the "Rejection Objection") filed by Elm Creek Real
Estate, LLC (the "Landlord" or "Elm").  In support of the Reply, the Buyer respectfully states as
follows:

**PRELIMINARY STATEMENT**

The Debtors have noticed for rejection certain lease agreements that do not align
with the Buyer's go-forward business.  Since entry of the Sale Order, the Buyer has thoughtfully
and meticulously continued to develop a workable business plan based on the optimal real estate
footprint, which involved evaluating hundreds of leases in order to make informed business
decisions.  These decisions were made intentionally with the hopes of saving an American retail
icon and the tens of thousands of jobs that come with it.

Now, in an attempt to thwart the deadlines and procedures established by this Court, the Landlord asserts that one of the leases noticed for rejection is actually integrated with an agreement that has already been assumed and assigned, and therefore, cannot be rejected. First, the Landlord's misplaced arguments fail to recognize that the time to object has come and gone, as the lease at issue has been assumed and assigned on a stand-alone basis pursuant to an order that has already become final and non-appealable. Indeed, the Landlord raised no objection to the Buyer's assumption and assignment of the assumed lease despite having ample opportunity to do so and despite the grounds for the Rejection Objection being apparent on the basis of the Buyer's filings. Instead of diligently asserting its rights, the Landlord allowed the objection deadline for assumption and assignment to pass and the evidentiary hearing on assumption and assignment to occur with the Landlord affirmatively indicating that it had no objection. Particularly where the Landlord's silence deprived the Buyer of the opportunity to reassess its assignment designation if its integration argument were successful, it cannot now reverse its position and force the Buyer to take assignment of additional obligations.

Even if the Landlord had properly asserted its rights, its arguments are unpersuasive on the merits. The Landlord's integration argument relies heavily on alleged future plans for the properties as well as self-serving statements of subjective intent that is not apparent from the terms of any of the agreements and should be overruled. There are two separate lease agreements, different amounts of rent are paid on each individual parcel, and there are no provisions in the agreements making them reliant on each other. The Landlord has no grounds for contesting the Rejection Notice.

## BACKGROUND

1.        On April 6, 2018, SRC Real Estate (TX) LLC, as seller, and Elm, as buyer,

entered into that certain Real Estate Sale Contract dated April 6, 2018 pursuant to which Elm

bought (i) property located at 1602 Kings Road, Garland, Texas (the "Parking Lot") (ii) property

located at 1501 Kings Road, Garland Texas (the "First Elm Warehouse") and (iii) property

located at 3 Kings Road, Garland, Texas (the "Second Elm Warehouse" and together with the

First Warehouse, the "Elm Warehouses").  The Elm Warehouses are adjacent to each other and

located on the western side of the Parking Lot.  Directly to the east of the Parking Lot is another

warehouse located at 2775 West Miller Road, Garland, Texas (the "Miller Road Warehouse"),

which the Debtors also leased pursuant to a separate lease agreement (the "Miller Road

Warehouse Lease"). *See Third Supplemental Notice of Cure Costs and Potential Assumption and

Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale

Transaction* (ECF No. 2753).

2.        On April 18, 2018, Sears, Roebuck and Co. ("Sears, Roebuck"), as tenant, and

Elm, as landlord, entered into (i) that certain Lease dated April 18, 2019, pursuant to which Elm

leased to Sears, Roebuck the Parking Lot (the "Parking Lot Lease") and (ii) that certain Lease

dated April 18, 2019, pursuant to which Elm leased to Sears, Roebuck both of the Elm

Warehouses (the "Warehouse Lease").[2]

3.        On October 15, 2018, the Debtors filed voluntary petitions for relief under title 11

of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy

---

[2] The Parking Lot Lease is attached hereto as Exhibit A and the Warehouse Lease is attached hereto as Exhibit B. Both documents were attached to the Landlord's proof of claim.

Court for the Southern District of New York (the "Bankruptcy Court").  The Debtors' chapter 11

cases are being jointly administered before the Bankruptcy Court as Case No. 18-23538.

4.      The Debtors filed a motion on November 1, 2018 (ECF No. 429) (the "Sale

Motion") seeking, among other things, the entry of an order pursuant to sections 105, 363 and

365 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9007 and 9008 of the Federal Rules of

Bankruptcy Procedure, and Rules 6004-1, 6005-1 and 6006-1 of the Local Bankruptcy Rules for

the Bankruptcy Court, authorizing and approving procedures for the sale of the Debtors' assets

and for the assumption and assignment of executory contracts or unexpired non-residential real

property leases of the Debtors.

5.      On November 19, 2018, the Bankruptcy Court entered an order (ECF No. 816)

(the "Bidding Procedures Order") approving the global bidding and sale procedures for the sale

of Debtors' assets.

6.      On January 14, 2019, the Debtors commenced an auction for the sale of

substantially all of its assets.  On January 16, 2019, Transform, an entity formed by ESL

Investments Inc. and its affiliates ("ESL") as a vehicle to acquire these and certain non-debtor

assets, was declared the successful bidder at the auction, and on January 18, 2019, the Debtors

filed a notice to this effect (ECF No. 1730).

7.      On February 8, 2019, the Bankruptcy Court entered an *Order (I) Approving the*

*Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the*

*Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing*

*the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection*

*Therewith and (IV) Granting Related Relief* (ECF No. 2507) (the "Sale Order").[3]  Under the

---

[3]      Capitalized terms used but not defined herein have the meanings ascribed to them in the Sale Order.

terms of the Sale Order, Transform is permitted to designate Additional Contracts and

Designatable Leases (together, the "Additional Assigned Agreements") for assumption and

assignment for up to sixty (60) days after the Closing Date, which occurred on February 11,

2019. The Debtors and Transform agreed to extend this period and, on April 12, 2019, the

Debtors filed a *Notice of Amendment to Asset Purchase Agreement Extending Certain Deadlines*

(ECF No. 3171) (the "Extension Notice"), extending the period to designate the Designatable

Leases to May 3, 2019, and the Additional Contracts to May 13, 2019.

8.      On January 23, 2019, the Debtors filed the *Supplemental Notice of Cure Costs*

*and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in*

*Connection with Global Sale Transaction* (ECF No. 1774) (the "Supplemental Cure Notice"),

which proposed a cure amount for the Warehouse Lease. On March 5, 2019, the Debtors filed

the Third Supplemental Cure Notice, which proposed cure amounts for the Parking Lot Lease

and a related license agreement, listed as a single entry on Exhibit B thereto. The Warehouse

Lease was not scheduled on the Third Supplemental Cure Notice and appeared only on the

Supplemental Cure Notice.

9.      On March 13, 2019, the Landlord filed *Elm Creek Real Estate, LLC's Objection*

*to Debtors' Third Supplemental Notice of Cure Costs and Potential Assumption and Assignment*

*of Executory Contracts and Expired Leases in Connection with Sale* (ECF No. 2827) (the "Cure

Objection"). The Cure Objection referenced only the Third Supplemental Cure Notice, stated

that the Landlord did not object to assumption and assignment of the lease agreement included

on the Third Supplemental Cure Notice, and only asserted an objection with respect to the cure

amounts due. *See* Cure Objection, ¶ 3. Despite the absence of any reference to the Warehouse

Lease in the Third Supplemental Cure Notice, the Landlord raised no arguments concerning integration or any asserted relationship between these agreements.

10.    On April 2, 2019, the Bankruptcy Court entered the *Order (I) Authorizing Assumption and Assignment of Certain Executory Contracts and Leases and (II) Granting Related Relief* (ECF No. 3008) (the "Assumption and Assignment Order"). The Assumption and Assignment Order established, among other things, a noticing procedure for the assumption and assignment of Additional Assigned Agreements.

11.    On April 25, 2019, in accordance with the Sale Order and the Assumption and Assignment Order, Transform filed the *Notice of Assumption and Assignment of Additional Designatable Leases* (ECF No. 3369), which designated the Parking Lot Lease and the Miller Road Warehouse Lease for assumption and assignment (the "Designated Lease Notice"). Again, the Warehouse Lease was not included on the Designated Lease Notice or any other assumption and assignment notice filed with the Court. The objection deadline for the Designated Lease Notice was May 3, 2019.

12.    Once again, the Landlord did not file an objection to the Designated Lease Notice on any grounds.

13.    On April 30, 2019, the Debtors filed the *Notice of Rejection of Certain Unexpired Leases of Nonresidential Real Property and Abandonment of Property in Connection Therewith* (ECF No. 3449) (the "Rejection Notice").

14.    On May 6, 2019, the Buyer filed *Transform Holdco LLC's Omnibus Reply in Support of Assumption and Assignment of Designated Leases* on May 6, 2019 (Docket No. 3654) (the "Buyer's Omnibus Reply"), which attached a proposed order for assumption and assignment

of certain leases, including the Parking Lot Lease.[4]  Consistent with the Designated Lease Notice

and the Third Supplemental Cure Notice, the proposed order did not propose assumption and

assignment of the Warehouse Lease.  On May 8, 2019, the Court held an evidentiary hearing (the

"<u>Assumption and Assignment Hearing</u>"), and overruled any remaining objections to assumption

and assignment and granted the relief requested, including with respect to the Parking Lot Lease.

15.    Only after the Court had already approved assumption and assignment of the

Parking Lot Lease on a stand-alone basis, on May 10, 2019, the Landlord filed its Rejection

Objection, asserting, for the first time, certain integration arguments.

16.    Consistent with its ruling on the record at the Assumption and Assignment

Hearing, on May 13, 2019, the Court entered the *Order (I) Authorizing Assumption and*

*Assignment of Certain Leases and (II) Granting Related Relief* (Docket No. 3850) (the "<u>Revised</u>

<u>Assumption and Assignment Order</u>"), pursuant to which the Debtors assumed and assigned the

Parking Lot Lease and the License Agreement to the Buyer.[5]  The Revised Assumption and

Assignment Order has since become final and non-appealable.

## ARGUMENT

A.    <u>The Landlord's Integration Arguments Are Untimely</u>

17.    The Landlord had numerous opportunities to assert any integration arguments

when the Debtors and the Buyer proposed that the Parking Lot Lease be assumed and assigned

on a stand-alone basis.  *See* Third Supplemental Cure Notice; Designated Lease Notice.  Having

failed to submit any arguments or response – and instead affirmatively indicating it had no

objection to such assignment – the Landlord is barred from belatedly asserting any integration

---

[4]    The reply was served on the Landlord via first class mail. *See Affidavit of Service*, Exhibit B (ECF No.
3804).
[5]    The Revised Assumption and Assignment Order establishes a procedure for resolving cure disputes after
assumption and assignment and, therefore, objections to cure were adjourned, including the Cure Objection.

arguments in the context of the Debtors' rejection of the Warehouse Lease. *See* Cure Objection, ¶ 3.

18.     The Designated Lease Notice listed only the addresses associated with the Parking Lot Lease, but the Landlord failed to object to the Designated Lease Notice on any basis, including integration.  *See* Designated Lease Notice, Exhibit 1.  The Rejection Notice was filed on April 30, 2019—three days before the Designated Lease Notice's objection deadline and over a week before the Assumption and Assignment Hearing and, yet, the Landlord remained silent. Any integration argument should have been, and could have been, brought in response to the Buyer's assumption and assignment of the Parking Lot Lease.

19.     Rather than diligently pursue its rights, the Landlord sat on its hands and waited. Now, the Landlord attempts to circumvent the Designated Lease Notice's objection deadline and to collaterally attack the Revised Assumption and Assignment Order by asserting an objection to the Rejection Notice instead.  The Parking Lot Lease has already been assumed and assigned and the Landlord's arguments are untimely.  *See Revised Assumption and Assignment Order*, ¶ 3 ("All objections to the assumption and assignment or designation of the Designated Leases listed on Exhibit A hereof that have not been withdrawn, waived, settled or otherwise resolved as announce to the Court at the Assumption and Assignment Hearing (if any) to consider entry of this Order or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits and with prejudice").

20.     The Landlord has provided no explanation for its course of action and has certainly made no showing of excusable neglect.[6]  The Buyer's decision to assume the Parking

---

[6]     Notably, in order for the Landlord to prove excusable neglect, it would have to show more than mere inadvertence or inattention to the applicable deadlines. *See Canfield v. Van Atta Buick/GMC Truck, Inc.*, 127 F. 3d 248, 250 (2d Cir. 1997) ("But we do not believe that the possibility that a court may properly find excusable neglect on such grounds alters the principle that failure to follow the clear dictates of a court rule will generally not

Lot Lease was intentional and based on the go-forward business plan, which includes using the

Parking Lot to service the Miller Road Warehouse instead of the Elm Warehouses.  Particularly

where the Landlord's Cure Objection expressly stated that it had no objection to the stand-alone

assignment of the Parking Lot Lease, the Buyer had every expectation that there was no

legitimate question of integration. *See* Cure Objection, ¶ 3 ("While Elm does not object to the

assumption and assignment of the Lease and License Agreement, the cure cost schedule

inaccurately states that no cure amount is due with respect to the Lease.").  The Landlord's

delayed reversal of position is an attempt to impede the Buyer's business by forcing it to assume

the Warehouse Lease.

> B.    The Parking Lot Lease and Warehouse Lease are Severable Agreements

21.    Given the procedural issues, the Court does not need to reach the issue of

integration, but even if the Rejection Objection had been properly filed, the Parking Lot Lease

and Warehouse Lease are severable agreements such that the Parking Lot Lease may be assumed

and assigned separate from the Warehouse Lease.

22.    For the purposes of determining whether the Parking Lot Lease and Warehouse

Lease are integrated agreements, the relevant law is Texas state law.  *See In re Adelphia Business*

*Solutions, Inc.*, 322 B.R. 51, 54 (Bankr. S.D.N.Y. 2005) (stating state law governs interpretation

of leases for the purposes of section 365); *see also* Warehouse Lease, ¶ 12 (stating that the

governing law is the law of the state where the property is located); Parking Lot Lease, ¶ 12

(same).  Under Texas law, agreements are severable when they include two or more promises

that can be acted on separately so that failure to perform one does not put the promisor in breach

---

constitute such excusable neglect.").  Indeed, it is unclear how the Landlord can even assert excusable neglect where
its Cure Objection evidences an affirmative consent to assumption and assignment of the Parking Lot Lease on a
stand-alone basis.

of the entire agreement. *See In re Wolflin Oil, L.L.C.*, 318 B.R. 392, 397 (Bankr. N.D. Tex. 2004).

23.    When deciding severability, the primary consideration is the intention of the parties, which is determined based on the language of the contract, surrounding circumstances and whether the parties would have entered into the agreement absent the severed parts. *See Stewart Title Guar. Co. v. Old Republic Nat. Title Ins. Co.*, 83 F. 3d 735, 739 (5th Cir. 1996). Texas courts also consider the subject matter of the agreement and the conduct of the parties. *See In re Wolflin Oil, L.L.C.*, 318 B.R. at 397.

24.    Despite the Landlord's purported intent with respect to the Elm Warehouses and the Parking Lot, the terms of the relevant agreements make clear that the Warehouse Lease and Parking Lot Lease are not intended to be a part of one integrated transaction. *See In re FFP Operating Partners, LP*, No. 03-90171, 2004 WL 3007079 at*2-3, (Bankr. N.D. Tex. Aug. 12, 2004) (finding a lease to be severable despite one of the parties' testimony that he subjectively intended otherwise). First, the parties actually entered into two separate lease agreements, one for the Elm Warehouses and one for the Parking Lot, rather than choosing to negotiate one master lease agreement for all three properties. *In re Wolflin Oil, L.L.C.*, 318 B.R. at 397-400 (finding that six leases entered into pursuant to one asset purchase agreement were severable under Texas Law).

25.    The Parking Lot Lease does not mention the Landlord's obligation to rent the Elm Warehouses and does not contain any cross-default provisions or other similar terms that may demonstrate an intent to treat the leases as part of one transaction. *See id.* at 398 (considering the existence of a cross-default provision as part of the facts and circumstances surrounding the transaction). In addition, the Warehouse Lease and Parking Lot Lease relate to separate

properties and rent is paid for each parcel separate from any other parcel such that there is

independent consideration for each lease.  *See id.* (holding that payment of separate monthly rent

for each store signaled that the leases were severable); *In re Ferguson*, 183 B.R. 122, 125

(Bankr. N.D. Tex. 1995) ("Where the subject matter of the contract is divisible and the

consideration is apportioned, these qualities are consistent with and indicative of a severable

contract).  Therefore, the two leases can be acted on separately, and even if the Landlord

properly asserted its rights, its arguments should be overruled.

## **CONCLUSION**

26.     The Buyer requests that the Court overrule the pending Rejection Objection and

enter the proposed order attached as Annex B to the Rejection Notice with respect to the Parking

Lot Lease.


        Dated: July 3, 2019
        New York, New York

                        CLEARY GOTTLIEB STEEN & HAMILTON LLP


                         */s/ Luke A. Barefoot*_____
                        Sean A. O'Neal
                        Luke A. Barefoot

                        One Liberty Plaza
                        New York, New York 10006
                        Telephone: (212) 225-2000
                        Facsimile: (212) 225-3999

                        *Attorneys for Transform Holdco LLC*

**Exhibit A**

**Parking Lot Lease**

# LEASE

BY AND BETWEEN

**SEARS, ROEBUCK AND CO.,** as tenant

AND

**ELM CREEK REAL ESTATE, LLC**, as landlord

Dated as of April 18, 2018

Property: The following parcel of land all in the City of Garland, Dallas County, Texas 75042:

Parcel 2 = 1602 Kings Road (Sears #447-A)

## LEASE

**THIS LEASE** (this "**Lease**") is made as of the 16 day of April, 2018 ("**Effective Date**"), between **ELM CREEK REAL ESTATE, LLC**, a Texas limited liability company having an office at 4641 Nall Rd, Dallas, Texas 75244 ("**Landlord**") and **SEARS, ROEBUCK AND CO.**, a New York corporation, having an office at 3333 Beverly Road, Dept. 824RE, Hoffman Estates, Illinois 60179 ("**Tenant**").

## W I T N E S S E T H:

**WHEREAS**, pursuant to that certain Real Estate Sale Contract dated as of April 6, 2018, between Tenant, as seller, and Landlord, as buyer (the "**PSA**"), Tenant agreed to sell to Landlord, and Landlord agreed to purchase from Tenant the land more particularly described on **Exhibit A** attached hereto (the "**Property**");

**WHEREAS**, as a condition to the closing pursuant to the PSA, immediately following the sale of the Property by Tenant to Landlord, Landlord is required to lease to Tenant, and Tenant is required to lease from Landlord, the Premises (as defined below) pursuant to the terms and conditions of this Lease; and

**WHEREAS**, the closing under the PSA occurred on the Effective Date and Tenant and Landlord wish to enter into this Lease to complete the transaction.

**NOW, THEREFORE**, Tenant and Landlord agree as follows:

1. **Demise**.

(a)    Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises, all existing parking located on the Property and all easements and appurtenances for the benefit of the Property for the Term. The "**Premises**") shall be defined as the premises described on **Exhibit B** attached hereto.

(b)    The parties hereby agree that Landlord shall have the option (the "**Subdivision Option**") to legally subdivide the Property (the "**Subdivision**") into two separate sites (i) a northern area of the Property (the "**North Site**") and (ii) a southern area of the Property (the "**South Site**"). The Subdivision Option may not be exercised by the Landlord until the expiration of the Initial Term (as defined in Section 2(a) below). Landlord may only exercise the Subdivision Option pursuant to a written notice (the "**Subdivision Notice**") from Landlord to

Tenant. Following Tenant's receipt of the Subdivision Notice, Tenant agrees to cooperate in the process of completing the Subdivision, provided that all costs and expenses to be incurred by either party in connection with the Subdivision shall be borne by the Landlord. The borders of the North Site and South Site shall be subject to the mutual approval of both parties, provided that the parties agree to use good faith efforts to negotiate the final border lines for the Subdivision based on the drawing attached hereto as **Exhibit D** (it being the intent of the parties that (i) the borders of the North Site shall allow the Landlord, when combined with Landlord's adjacent property, a square shaped property and (ii) the Landlord shall provide the Tenant the right to access and use Kings Road/Kenmore Street through a mutual access easement along and over a portion of the North Site and South Site along the border line that gives each site access to Kings Road/Kenmore Street). Tenant shall have the right to review all documents related to the Subdivision prior to the filing or recording of such documents with the local municipality or county. If not previously done, prior to the consummation of the Subdivision, Landlord, at Landlord's sole cost and expense, shall cause the South Site to be paved that is similar in nature and size to the current paved parking area on the North Site (i.e., pavement that can withstand heavy truck traffic). Following the consummation of the Subdivision, (i) the parties shall cause the North Site to be released from this Lease, with the Tenant retaining all rights under this Lease with respect to the South Site and (ii) the Annual Fixed Rent and any Additional Rent shall be adjusted by Landlord to reflect the release of the North Site from the Lease (which adjustment shall be based on the proportionate share of the South Site in comparison to the Property prior to the consummation of the Subdivision).

    2.    **Term**.

        (a)    The initial term of this Lease (the "**Initial Term**") shall commence on the Effective Date and shall expire at midnight on the last day of the fifth (5th) Lease Year, unless (x) sooner terminated as provided in this Lease or (y) extended as provided herein. The time period during which this Lease shall actually be in effect, including any Extension Term, is referred to as the "**Term**").

        (b)    Unless this Lease has expired or has been sooner terminated, or a default has occurred and is continuing at the time any Extension Option is exercised, Tenant shall have the right and option (an "**Extension Option**") to extend the Initial Term for one (1) additional successive period of five (5) years (the "**1st Extension Term**") and one (1) additional successive period expiring on July 31, 2036 (the "**2nd Extension Term**") (the 1st Extension Term and the 2nd Extension Term are herein collectively referred to as an "**Extension Term**"). If Tenant exercises the 2nd Extension Term, the Premises shall be redefined as set forth in Section 36 below and as shown on **Exhibit D** attached hereto and incorporated herein for all purposes. Tenant may only exercise the Extension Option by giving written notice thereof to Landlord of its election to do so no later than one hundred eighty (180) days prior to the then existing expiration date of the Term. It is the intention of the parties hereto to avoid forfeiture of Tenant's rights to exercise any Extension Option through inadvertent failure to give notice of the exercise thereof within the time limits prescribed above. It is also the intention of the parties to allow Landlord sufficient time if Tenant decides not to exercise the Extension Option to find a substitute tenant. Accordingly, if Tenant shall fail to give notice to Landlord of Tenant's election to exercise the Extension Option at least one hundred eighty (180) days prior to the then existing expiration date of the Term, then Tenant's right to exercise its Extension Option shall continue thereafter

until the earlier to occur of (i) Landlord shall have served (not more than forty-five (45)) days prior to the expiration date of the then current Term) upon Tenant a notice directing Tenant to make a decision within thirty (30) days to exercise or decline to exercise the Extension Option and such thirty (30) day period shall have expired with Tenant having failed to exercise or having declined to exercise during such period the Extension Option or (ii) Tenant shall have served upon Landlord a written notice of its election to exercise or not to exercise the Extension Option. Tenant's written notice of its election not to exercise the Extension Option shall cause the Lease to terminate at the expiration of the last day of the then current Term. Without modification of the foregoing, if Tenant does not exercise the Extension Option within the Term or Landlord does not direct Tenant to make a decision to elect within the Term and a holdover results into the next Extension Term period and thereafter Tenant exercises its Extension Option in accordance herewith, then the Term shall nonetheless expire at the end of what would normally have been the next succeeding Extension Term period (it being the intention of the parties that the then-current Term expire on the last day of the next Extension Term period). Notwithstanding such holdover, Tenant may notify Landlord of its intention to not exercise the next Extension Option, thereby terminating this Lease as of the one hundred twentieth (120th) day following delivery of such notification. Tenant shall not be subject to the provisions of Section 24 if any holding over is pursuant to the provisions of this Section 2(b). Upon the request of Tenant or Landlord, the parties hereto will, at the expense of Landlord, execute and exchange an instrument in recordable form setting forth the extension of the Term.

(c)    If the date otherwise scheduled for termination or expiration of this Lease is not a Business Day, the Termination Date shall be on the first Business Day thereafter. A "**Business Day**") means any day other than a Saturday, Sunday or other day on which banks are authorized or required by law to be closed in the jurisdiction in which the Property is located. A "**Lease Year**") means each successive twelve (12) calendar month period commencing on the first day of a calendar month. The first Lease Year shall be the twelve (12) month period commencing on the first day of the calendar month immediately succeeding the month in which the Term of this Lease commences plus any partial calendar month during the calendar month in which the Term of this Lease commences.

3.    **Surrender of Possession; Early Termination By Tenant**.

(a)    **Early Termination by Tenant**. In addition to any early termination of this Lease that may arise under any other section of this Lease, Tenant may elect to terminate this Lease as to all of the Premises or part of the Premises (in which case the Rent shall be adjusted as to reflect the terminated portion of the Premises); provided, that as a condition precedent to such termination, Tenant shall provide not less than ninety (90) days' prior written notice of termination ("**Tenant Termination Notice**") to Landlord.

(b)    **Surrender of Possession**. Upon the first to occur of (i) the expiration of the Term, or (ii) any sooner termination of this Lease pursuant to any other section of this Lease, or (iii) any earlier date as noted in a validly delivered Tenant Termination Notice (the first of such dates being the "**Termination Date**"), Tenant shall surrender possession of the Premises in its "AS-IS," "WHERE-IS" and "WITH ALL FAULTS" condition, free of all subtenants, licensees, leases, subleases, concessionaires and other occupants claiming by, through or under Tenant, including the Tenant Leases, if any, and without any obligation by Tenant to remove any

fixtures, furnishings or equipment or other personal property. On or prior to the Termination Date, Tenant may remove any or all of Tenant's fixtures, furnishings, equipment, merchandise, inventory and other personal property (collectively, "**Tenant's Property**"), and any of the same remaining after the Termination Date shall be deemed abandoned by Tenant and Landlord shall have no liability with respect thereto and Landlord may, at Landlord's expense, dispose of and/or demolish any such personal property without compensation to Tenant.

4.    **Rent**.

(a)    As consideration for this Lease, Tenant shall pay to Landlord annual fixed rent ("**Annual Fixed Rent**") during each Lease Year in the aggregate amounts set forth on **Schedule 1** attached hereto. The Annual Fixed Rent then in effect shall be payable in equal monthly installments ("**Monthly Fixed Rent**") in advance on or prior to the fifth (5th) day of each month. Monthly Fixed Rent shall be prorated on a per diem basis for any portion of a month.

(b)    As "**Additional Rent**" Tenant shall also pay directly to the relevant authority as and when due, Taxes and, upon request by Landlord, shall provide Landlord with reasonable evidence that the same have been paid. For purposes hereof, "**Taxes**" shall mean all taxes and impositions relating to the ownership, leasing and operation of the Property, or any portion thereof, including the land, but excluding any excess profits taxes, franchise taxes, gift taxes, inheritance and succession taxes, estate taxes, documentary transfer taxes, federal or state income taxes, corporate, capital stock or capital gains taxes, penalties incurred as a result of Landlord's failure to pay taxes or to file any tax or informational returns and other taxes to the extent applicable to Landlord's general or net income (as opposed to rents, receipts or income attributable to operations at the Property). Notwithstanding the foregoing, Landlord shall be responsible for all increases in real estate taxes based on or triggered by a change of ownership or the sale of the Property, including pursuant to the PSA, and/or a reassessment of the Property by reason thereof. All real estate taxes for the last year of the Term shall be prorated between the parties on a per diem basis based on the most recent and available real estate tax bill and will be adjusted in cash once the actual taxes are known. Landlord shall give prompt notice to Tenant of all real estate taxes payable by Tenant hereunder of which Landlord at any time has knowledge and shall send copies of all bills and notices received by Landlord in respect of the Premises to Tenant.

(c)    If the Termination Date occurs on any day other than the last day of a calendar month, Tenant will be entitled to a refund in an amount equal to Monthly Fixed Rent and Additional Rent theretofore paid with respect to the Premises allocable on a per-diem basis to the remainder of the month.

(d)    The parties acknowledge and agree that Tenant shall pay for all of its own ordinary operating costs and expenses (such as, but not limited to, utility costs and phone service) in connection with Tenant's use and occupancy of the Premises prior to and during the Term, in accordance with its customary practices, subject to Section 4 and Section 8, and except (i) for costs, expenses and damages resulting from the negligence or willful misconduct by Landlord or its agents, employees or contractors, (ii) with respect to all pre-existing conditions at or affecting the Property, and (iii) as otherwise expressly set forth herein.

(e)    Annual Fixed Rent, Monthly Fixed Rent and Additional Rent shall be collectively referred to herein as "**Rent**".

(f)    Subject to <u>Section 4</u>, all Taxes applicable to the last year of the Term shall be prorated between the parties on a per diem basis based on the most recent and available tax bill and adjusted in cash once actual taxes are known.  Landlord shall give prompt notice to Tenant of all Taxes payable by Tenant hereunder of which Landlord at any time has knowledge. Landlord shall use its reasonable efforts to obtain the cooperation of all taxing authorities to send all bills and notices in respect of the Property directly to Tenant.

(g)    Tenant may, at its own expense, contest or cause to be contested, by appropriate legal proceedings conducted in good faith and with due diligence, any tax (including penalties and interest), assessment, tax lien, forfeiture or other imposition or charge upon or against the Property or any part thereof, including, without limitation, the amount or validity or application, in whole or in part, of any such item, provided that (i) neither the Property nor any interest therein would be in any danger of being sold, forfeited or lost by reason of such proceedings; and (ii) no default under this Lease has occurred and is continuing.  Landlord shall, at the request of Tenant, execute or join in the execution of any instruments or documents necessary in connection with such contest or proceedings, but Landlord shall incur no cost or obligation thereby.

(h)    In light of the fact that Tenant is continuing (i) in occupancy following the Closing Date, and (ii) to control the Tenant Leases and service contracts, except as set forth in the PSA, Tenant and, if applicable, Landlord have not prorated common area maintenance reimbursements or payments under any Ancillary Rights and Agreements (as hereinafter defined), expenses under service contracts, utilities and other customary real property prorations and adjustments as of the Closing.

5.    <u>Alterations; "Going out of Business Sale"; Signage</u>.

(a)    Except as otherwise provided herein, without first obtaining Landlord's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed), Tenant shall not make or cause to be made any alterations to the building structure or building systems or any other material alterations or install any additional permanent fixtures to the Premises. Notwithstanding the preceding sentence, Tenant (and any of its subtenants, licensees or other occupants) shall not be required to obtain any consent from Landlord for: (1) any minor or non-structural alterations to the Premises, (2) placing temporary signs on the Property in connection with its store-closing operations or (3) any non-structural alterations to the Premises in connection with any Necessary Curtailments, or any reduction in business operations or reduction in utilizing space within the Premises. "**Necessary Curtailments**" means repairs, alterations, Ordinary Repairs and any Major Repair/Capital Improvement, Casualty, customary acts or events of force majeure, and events beyond the reasonable control of Tenant. Notwithstanding the foregoing, Tenant, at its expense, may at any time and from time to time make alterations and/or additions to the Premises provided that: (A) the market value of the Premises shall not be reduced or its usefulness impaired, (B) the work shall be done expeditiously and in a good and workmanlike manner, (C) Tenant shall comply with all legal requirements applicable to the work and (D) Tenant shall promptly pay all costs and expenses

and discharge any and all liens arising in connection with the work in accordance with the terms hereof. Notwithstanding the foregoing, Tenant, at its expense, may install or assemble or place on the Premises, and remove and substitute, any items of machinery, equipment, furniture, furnishings, trade fixtures or other Tenant's personal property, including, but not limited to, all conveyer and material handling systems and related equipment, used or useful in Tenant's business.

(b)    Notwithstanding any provision herein to the contrary, but subject to the provisions hereof, Tenant shall have the right to conduct a "going out of business sale" to be completed during the one hundred twenty (120) day period prior to the expiration of the Term or earlier termination of this Lease as provided herein and to cease store operations and to remove Tenant's personal property and prepare for the turnover of possession of the Premises to Landlord pursuant to the provisions of this Lease. Tenant shall have the option to erect and maintain, subject to applicable legal requirements and matters of title to which this Lease is subordinate, at its sole cost and expense, upon any portion of the Property or improvements, signs of such height and other dimensions bearing such legend or inscription as Tenant shall determine.

6.    **Use; Operation**.

(a)    Tenant shall not have any obligation to operate or use or conduct business in or on any of the Premises or be subject to any restrictions on any operation or on the use of or conduct of business on the Premises, and Tenant may use the Premises, if it operates at all, for any lawful use and may downsize its operations and/or cease operations at any time in its sole discretion.

(b)    Without limiting the foregoing, Tenant will continue to enjoy the benefit of all existing easements, parking agreements, rights of access and ingress, and all other rights and benefits as it currently enjoys (including under all applicable REAs and supplemental agreements, if any) with respect to the Property (all of the foregoing, collectively, "**Ancillary Rights and Agreements**"), and in furtherance thereof, Landlord agrees to enforce (and cause its affiliates to enforce) all such Ancillary Rights and Agreements (excluding operating covenants) for the benefit of Tenant. Tenant agrees to continue to comply with the non-monetary provisions (if any) of the Ancillary Rights and Agreements that are applicable to the Premises in accordance with its past practices in the ordinary course of business. Landlord shall not terminate, amend or modify the Ancillary Rights and Agreements without Tenant's consent.

7.    **Access and Cooperation**. Upon not less than five (5) Business Days' prior notice to Tenant, Landlord and its representatives shall have access to the Premises for purposes of a visual inspection during normal business hours; provided, however, that in emergency circumstances Landlord and its representatives may have immediate access to the Premises at any time after making all reasonable attempts to contact Tenant, but otherwise without the necessity of prior notice. In connection with any such access or entry, Landlord and its representatives shall (a) not unreasonably interfere with Tenant's or any subtenant's, licensee's or other occupant's business operations at the Premises (including the business operations pursuant to any Tenant Leases), (b) not conduct any physical testing or invasive studies, and (c) promptly restore or repair any damage occasioned by such access or entry.

WEIL:\96522397\2\73219.0007

8.    <u>**Services and Repairs; Utilities**</u>.

(a)    Tenant shall accept the Premises in its existing condition as of the Effective Date, "as is," "where is," and "with all faults" and without any written or verbal representations or warranties whatsoever, whether express or implied, other than representations and warranties expressly set forth in this Lease, and except for any surviving provisions of the PSA and any ancillary documents executed in connection therewith.

(b)    Subject to the foregoing and the following provisions of this <u>Section 8</u> and the other terms and conditions of this Lease, Landlord shall have no obligation to supply any services or make any ordinary repairs to the Premises or Property, the parties expressly intending that subject to the further provisions of this <u>Section 8</u> and the other terms and conditions of this Lease, Tenant's current arrangements for all other services and general maintenance and ordinary repairs shall continue at Tenant's election unaffected during the Term (and Landlord shall not interfere with same).

(c)    Subject to the provisions hereinafter set forth and <u>Section 5</u>, Tenant and not Landlord shall be responsible for the ordinary repair and maintenance of the Premises (including the parking lot and other common areas), subject to the provisions hereinafter set forth, (i) Tenant shall not be responsible for funding any Major Repair/Capital Improvement to the Premises (including the parking lot and other common areas), and (ii) Tenant shall be responsible for funding any repair which is not a Major Repair/Capital Improvement and which is not covered by net proceeds received by Tenant with respect to applicable insurance, if any ("<u>**Ordinary Repairs**</u>"), subject to an aggregate cap of $150,000 for such Ordinary Repairs in any consecutive twelve (12) month period (the "<u>**Repair/Capital Threshold**</u>").    Any Ordinary Repairs reasonably necessary above such cap will be considered to be a Major Repair/Capital Improvement.

(i)    A "<u>**Major Repair/ Capital Improvement**</u>" shall mean (with respect to one event or one item, or a series of directly related events or items, and not an aggregate of separate unrelated events or separate unrelated items) a repair (to the extent not covered by the net proceeds received by Tenant with respect to applicable insurance, if any) or a capital improvement costing (or which is reasonably estimated to cost) in any case in excess of $300,000.    In the event Tenant acting in good faith determines that a Major Repair/Capital Improvement is appropriate, Tenant may elect not to fund the Major Repair/Capital Improvement and terminate this Lease upon not less than ninety (90) days' prior written notice to Landlord, but, prior to exercising such termination right, Tenant must notify Landlord of the necessity for any such Major Repair/Capital Improvement and the cost (or reasonably estimated cost) of such Major Repair/Capital Improvement.    Landlord shall have the opportunity for a period of ten (10) days after receipt of such notice from Tenant to notify Tenant that Landlord irrevocably commits to fund at Landlord's sole cost and expense the amount of such Major Repair/Capital Improvement in excess of $300,000 (with Tenant funding the first $300,000).    If Landlord timely elects to fund and actually funds such excess within ten (10) days after it provides its election to fund notice to Tenant, then Tenant shall not have a termination right as it relates to such Major Repair/Capital Improvement and shall be obligated to make any such Major Repair/Capital Improvement (subject to the terms and provisions of this Lease and subject to reimbursement by Landlord as set forth above).

(ii)    As set forth above, Tenant's responsibility for funding Ordinary Repairs is subject to the Repair/Capital Threshold. The Repair/Capital Threshold shall be implemented as provided in this Section 8(c)(ii). In the event that Tenant has expended, or is reasonably expected to expend, funds (in a consecutive twelve (12) month period) on Ordinary Repairs in excess of the Repair/Capital Threshold, Tenant may elect not to fund any further Ordinary Repairs for the balance of the twelve (12) consecutive month period at issue and terminate this Lease upon not less than ninety (90) days' prior written notice to Landlord. However, prior to exercising such termination right, Tenant must notify Landlord of the necessity (as reasonably determined by Tenant) for any such Ordinary Repairs and the cost (or reasonably estimated cost) of such Ordinary Repairs. Landlord shall have the opportunity for a period of ten (10) days after receipt of such notice from Tenant to notify Tenant that Landlord irrevocably commits to fund at Landlord's sole cost and expense the amount of such Ordinary Repairs in excess of the Repair/Capital Threshold for the balance of the twelve (12) consecutive month period at issue. If Landlord timely elects to fund and actually funds such excess within ten (10) days after Landlord provides its election to fund notice to Tenant, then Tenant shall not have a termination right as it relates to such Ordinary Repairs for that twelve (12) consecutive month period and shall be obligated to make any such Ordinary Repairs (subject to the terms and provisions of this Lease and subject to reimbursement by Landlord as set forth herein).

(iii)    Except as expressly set forth above and elsewhere in this Lease, Tenant shall have no obligation to make any repairs or replacements or capital expenditures of whatever nature during the Term, but Tenant may do so at any time at its election. Tenant may continue to exercise and enforce exclusively any and all rights of the owner or landlord under the Tenant Leases and the service contracts (including, without limitation, with respect to maintenance and upkeep of the Premises), and Landlord agrees to reasonably cooperate with Tenant at no cost to Landlord in connection therewith.

(d)    Tenant shall pay directly to the utility company(ies), the cost of all utilities consumed by Tenant during the Term.

9.    **Insurance; Casualty**.

(a)    Tenant shall maintain all personal property and liability insurance programs presently in effect or as replaced by Tenant from time to time in accordance with its general corporate policies throughout the Term. Tenant shall maintain commercial general public liability insurance for the common area of the Premises and all-risk property damage insurance covering the Premises and other building improvements on the Premises.

(b)    This Lease shall terminate at the election of Tenant upon the occurrence of a fire or other casualty ("**Casualty**") which results in material damage to the Premises which, in Tenant's sole discretion, interferes with Tenant's use of the Premises, with an appropriate prorated refund to Tenant on a per-diem basis of all prepaid Monthly Fixed Rent and Additional Rent. If Tenant elects not to terminate this Lease in the event of a Casualty which results in material damage to the Premises, all Monthly Fixed Rent and Additional Rent with respect to the portion of the Premises which is damaged shall be abated on a per-square-foot basis. If this Lease is terminated as provided herein, Tenant, at Tenant's election, shall have a period of up to one hundred twenty (120) Business Days (as elected by Tenant), for the purpose of winding

down its business operations and removing any or all of Tenant's personal property at its election from the Property without payment of any Rent. In no event shall Tenant or Landlord be obligated to make any repairs or restorations in the event of damage to the Premises resulting from a Casualty.

(c)    If Landlord shall be advised by a condemning authority or otherwise has knowledge of a proposed condemnation or other taking of the Property (or a portion thereof), then Landlord shall promptly give notice thereof to Tenant. Upon any actual exercise by any governmental power (by legal proceedings or otherwise), by any public or quasi-public authority or by any other Person having the right of eminent domain or a voluntary sale or transfer by Landlord to any of the foregoing either under the threat of exercise of eminent domain or while legal proceedings for condemnation are pending with respect to a material portion of the Premises (i.e., fifteen percent (15%) or more of the parking spaces located at the Premises or any access point used by Tenant for ingress or egress to the Premises) (collectively, a "**Condemnation Action**"), this Lease shall terminate at the election of Tenant, provided that if Landlord can restore equivalent access to the Premises (to Tenant's satisfaction) or replaces any lost parking spaces by providing to Tenant an equal amount of parking spaces on adjacent land owned by the Landlord (to Tenant's satisfaction) then Tenant's termination election shall be rescinded. Tenant, at Tenant's election, shall have a period of up to one hundred twenty (120) Business Days (as elected by Tenant) following its termination of the Lease (but in no event later than the date of the actual Condemnation Action) during which to wind down its business operations and remove any or all of Tenant's Property at its election from the Premises without payment of any Rent. Upon the payment of any award or compensation to Landlord arising from any Condemnation Action, there shall be such division of the proceeds and such other adjustments as the parties may agree upon as being just and equitable under all circumstances regardless of any technical rule of law.

10.    **Default**.

(a)    **By Tenant**.

(i)    Defaults by Tenant are: (A) failing to timely pay Monthly Fixed Rent or Additional Rent, if such Monthly Fixed Rent and/or Additional Rent is not paid within seven (7) Business Days after receipt of written notice from Landlord of nonpayment; or (B) failing to observe or perform any other material obligations of Tenant hereunder for a period of thirty (30) days after receipt of written notice from Landlord of such failure (or such longer period as may be reasonably required to cure such failure, provided that Tenant is diligently prosecuting such cure to completion). As Landlord's sole remedy for a default by Tenant, Landlord may give Tenant written notice of Landlord's intention to terminate this Lease (the "**Default Termination Notice**") at the end of the expiration of thirty (30) days from the date of the giving of such Default Termination Notice, and, in such event, this Lease and the Term shall terminate upon the expiration of such thirty (30) days with the same effect as if the last of such thirty (30) days was the date originally set forth herein for the expiration of the Term. No default shall be deemed to exist under clause (B) during any time the curing thereof is prevented by Necessary Curtailments provided that upon the cessation of such Necessary Curtailments (subject to Section 9) Tenant shall prosecute such cure without further delay.

(ii)    If (A) Tenant becomes bankrupt, makes an assignment for the benefit of creditors, or applies for or consents to the appointment of a trustee or receiver for Tenant or for the major part of its property; (B) a trustee or receiver is appointed for Tenant or for the major part of its property; or (C) any voluntary or involuntary proceedings are filed by or against Tenant under any bankruptcy, insolvency or similar laws, Landlord may give Tenant written notice of intention to terminate this Lease (the "**Bankruptcy Termination Notice**") at the end of the expiration of thirty (30) days from the date of giving such Bankruptcy Termination Notice, and in such event, this Lease and the Term shall terminate upon the expiration of such thirty (30) days with the same effect as if the last of such thirty (30) days was the date originally set forth herein for the expiration of the Term.

(iii)    Subject to the provisions of Section 10(a)(iv) below, upon the termination of this Lease in accordance with the provisions of this Section 10(a), Tenant shall remain liable to Landlord for any portion of the Monthly Fixed Rent and Additional Rent due through the end of the Term (less the net proceeds, if any, of any reletting of the Premises or any part thereof and the avails of any continuing Leases), but in no event shall Tenant be liable for any consequential, special, punitive or other damages, or any other costs, fees or expenses. In any event, Landlord shall make reasonable efforts to mitigate damages.

(iv)    In no event shall Tenant be liable in damages of any kind for any default under this Lease by Tenant and Landlord acknowledges that Landlord's sole and exclusive remedy for any default or breach of this Lease by Tenant shall be Landlord's right to terminate this Lease as set forth in this Section 10. Neither Tenant nor any member, partner (general or limited), manager, officer, director, shareholder or principal of Tenant shall have any personal liability whatsoever for the payment or collection of any judgment requiring the payment of money by Tenant in the event of a default by Tenant with respect to the terms, covenants and conditions of this Lease to be observed and/or performed by Tenant.

(b)    **By Landlord.**  Defaults by Landlord are (i) failing to timely pay any amount to be paid by Landlord hereunder, if such amount is not paid within seven (7) Business Days after receipt of written notice from Tenant of nonpayment; or (ii) failing to observe or perform any other material obligations of Landlord hereunder for a period of thirty (30) days after receipt of written notice from Tenant of such failure (or such longer period as may be reasonably required to cure such failure, provided that Landlord is diligently prosecuting such cure to completion). In the event of any default by Landlord, Tenant may give Landlord written notice ("**Tenant Notice**") of Tenant's intention to (A) cure any or all non-monetary defaults of Landlord, in which event Landlord shall pay to Tenant the reasonable cost of curing the same upon demand, and/or (B) set off against the Rent and all other sums due or becoming due from Tenant to Landlord hereunder, the amount of all sums as to which Landlord is in default, together with the reasonable cost of curing all non-monetary defaults of Landlord in the event Tenant elects to cure the same, at the end of (I) with respect to (A), the expiration of ten (10) Business Days from the date of the giving of such Tenant Notice and (II) with respect to (B), the expiration of five (5) Business Days from the date of giving of such Tenant Notice. Tenant shall also have the option, in the Tenant Notice, to terminate this Lease at the end of the expiration of thirty (30) days from the date of giving such Tenant Notice, and in such event, this Lease and the Term shall terminate upon the expiration of such thirty (30) days with the same effect as if the last of such thirty (30) days was the date originally set forth herein for the expiration of the

Term.  The provisions of this <u>Section 10(b)</u> shall survive the expiration or sooner termination of this Lease.

11.    <u>**Assignment/Subleasing**</u>.

(a)    Tenant shall have the right to assign or sublet (and grant licenses and concessions, department arrangements and other rights) all or any portion of its leasehold interest during the Term without Landlord's approval so long as Tenant (or any successor) remains liable to Landlord for all Rent.

(b)    Tenant shall also have the right, without Landlord's approval, to (i) assign this Lease to Parent or any Subsidiary of Tenant; (ii) assign or transfer all of Tenant's rights and obligations under this Lease (either directly or indirectly, by operation of law or through a merger or other corporate transaction) to any other Person that (1) acquires all or substantially all of the assets of Tenant Holdings Corporation ("<u>**Parent**</u>"), (2) is the surviving entity of a merger with Parent, or (3) results from a consolidation, reorganization or recapitalization of Parent with a solvent corporation, partnership or other legal entity; or (iii) assign or transfer all of Tenant's rights and obligations under this Lease to any Person that concurrently acquires not less than ten (10) Tenant's stores (including the Premises) by purchase, consolidation, merger or spin-off; provided, that in each case the successor tenant (if not the named tenant herein, the "<u>**Unrelated Successor Tenant**</u>") assumes all of Tenant's obligations under this Lease (except that any such Unrelated Successor Tenant shall not be required to comply with any operating covenant provided for herein). In the case of an assignment or transfer in connection with clause (iii) above, Tenant shall not be released from all liability under this Lease unless the assignee has a net worth of not less than $50,000,000 as of the effective date of such assignment or transfer and the assignee assumes in writing the obligations of Tenant under this Lease which arise on and after the date upon which the assignment becomes effective.  As used in this Lease, (x) "<u>**Subsidiary**</u>" means, as to any Person, (i) any corporation more than fifty percent (50%) of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time of determination owned by such Person and/or one or more Subsidiaries of such Person, and (ii) any partnership, limited liability company, association, joint venture or other entity in which such person and/or one or more Subsidiaries of such person has more than a fifty percent (50%) equity interest at the time of determination and (y) "<u>**Person**</u>" or "<u>**person**</u>" means any natural person, partnership, limited partnership, limited liability company, corporation, trust, estate, association, unincorporated association or other entity.

(c)    Landlord shall enter into a non-disturbance agreement with any permitted subtenant in form and substance reasonably satisfactory to the parties thereto whereby Landlord agrees to recognize such subtenant's rights under its sublease so long as such subtenant observes and performs all of its obligations under such sublease and such subtenant agrees to attorn to Landlord. With respect to any sublease, such non-disturbance agreement shall provide that, upon termination of this Lease, (1) subtenant shall pay to Landlord the rent provided for in the sublease and (2) the sublease shall become a direct lease between Landlord and subtenant (except that (a) Landlord shall not be subject to any prior offsets or defenses which subtenant

might have against Tenant (but subject to Landlord's continuing obligations as landlord); (b) Landlord shall not be bound by any rent or additional rent which subtenant might have paid more than one (1) month in advance to Tenant; (c) Landlord shall not be bound by any escrow deposit for taxes, insurance, maintenance, single or payment made under the sublease (including, without limitation, any security deposit) unless Landlord shall have taken actual possession of such sums; (d) Landlord shall not be bound by any prior obligation under the sublease to make any payment to subtenant; (e) Landlord shall not be bound by any surrender or termination or any amendment or modification of the sublease which is made in violation of the terms of this Lease; and (f) Landlord shall not be obligated to commence, complete or perform any construction or make any contributions toward construction or installation of any improvements upon the subleased premises required under the sublease or any expansion or rehabilitation of existing improvements thereon) and the parties will execute and deliver any further reasonable documents as are necessary or desirable to more fully effectuate the foregoing.  In the event a subtenant enters into a direct lease with Landlord, Landlord shall obtain from each of the Ground Lessors and Landlord's Mortgagees an SNDA for the benefit of such subtenant containing provisions substantially similar to those set forth in this Section 11(c).

(d)    In the event of a sale or conveyance by Landlord of the Property (or any portion thereof), the same shall be made subject to this Lease (and any Tenant Leases) and Landlord shall only be released from any liability under this Lease accruing after the date of any such conveyance, provided the assignee shall assume and agree to keep and perform all of the terms of this Lease on the part of Landlord to perform from and after the date of any such conveyance and a copy of the assignment and assumption agreement executed by Landlord and assignee shall be delivered to Tenant.

12.    **Governing Law.**  This Lease shall be governed by and construed in accordance with the laws of the state in which the Property is located applicable to agreements made, and to be wholly performed, in such state.

13.    **Waiver of Trial by Jury**.  LANDLORD AND TENANT EACH HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THEM AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF, OR IN ANY WAY CONNECTED WITH, THIS LEASE OR THE LANDLORD-TENANT RELATIONSHIP, WHETHER ARISING IN CONTRACT, IN TORT OR OTHERWISE.

14.    **Binding Effect**.  Subject to Section 11 above, this Lease shall bind and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

15.    **Complete Agreement; No Oral Modification.**  This Lease may not be altered or terminated, nor may its provisions be waived, except in a writing signed by Tenant and Landlord. This Lease, together with the PSA and the documents referred to in the PSA or executed in connection with the Closing thereunder, represents the entire agreement and understanding of the parties with respect to the subject matter hereof, and completely supersedes and integrates any and all other promises, understandings and agreements between the parties (including all of the same by and between any of the parties' agents and representatives on behalf of the parties), both oral and written.

16.     **Counterparts**. This Lease may be executed in two or more counterparts and by facsimile or electronic signatures which taken together shall constitute collectively one agreement. In making proof of this Lease it shall not be necessary to produce or account for more than one such counterpart with each party's original, facsimile or electronic signature.

17.     **Invalidity**. If any term or provision of this Lease shall to any extent or for any reason be held invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not affect any other provision of this Lease, but this Lease shall be valid and enforceable to the fullest extent permitted by law, subject to such modification hereof as may be necessitated by such invalidity, illegality or unenforceability provided that the purpose and intent hereof is not in any way abrogated.

18.     **Notices**.

(a)     Notices shall be either (i) personally delivered, (ii) sent by a nationally recognized overnight courier delivery service, or (iii) mailed by United States registered or certified mail, return receipt requested, postage prepaid, deposited in a United States post office or a depository for the receipt of mail regularly maintained by the post office. If personally delivered, then such notices shall be effective when received as evidenced by affidavit of the Person making such delivery; if sent by overnight courier delivery service then such notices shall be deemed to have been received by the addressee on the next Business Day following the date so sent; if mailed, then such notices or other communication shall be deemed to have been received by the addressee on the fifth (5th) Business Day following the date deposited with the United States mail. The inability to make delivery because of changed address of which no notice was given or by reason of rejection or refusal to accept delivery of any notice shall be deemed to be receipt of the notice as of the date of such inability to deliver or rejection or refusal to accept. All notices, demands or requests made pursuant to, under or by virtue of this Lease must be in writing and addressed as follows:

If to Tenant:

Sears, Roebuck and Co.
3333 Beverly Road, Dept. 824RE
Hoffman Estates, IL 60179
Attention: President, Real Estate

With copies to:

Sears, Roebuck and Co.
3333 Beverly Road, Dept. 824RE
Hoffman Estates, IL  60179
Attention: Associate General Counsel, Real Estate

If to Landlord:

Elm Creek Real Estate, LLC
4641 Nall Rd.
Dallas, TX 75244

Attn:  Michael Montgomery

With a copy to:

Zane B. Butler
Attorney at Law
522 Colgate Dr.
Allen, Texas 75013

(b)      All notices (i) shall be deemed to have been given on the date that the same shall have been delivered in accordance with the provisions of this Section and (ii) may be given either by a party or by such party's attorneys.  Any party may, from time to time, specify as its address for purposes of this Lease any other address upon the giving of five (5) days' prior notice thereof to the other parties.

19.    **Subject to Existing Agreements.**

(a)      This Lease is subject to all Ancillary Rights and Agreements in effect on the Effective Date with respect to the Premises.

(b)      Upon Landlord's prior written approval, which approval shall be at Landlord's sole discretion, Tenant may, from time to time, upon thirty (30) days' prior written notice to Landlord (at Tenant's cost and expense): (a) grant easements and other rights in the nature of easements, (b) release existing easements or other rights in the nature of easements which are for the benefit of the Property, (c) subdivide or parcelize all or a portion of the Property, (d) dedicate or transfer unimproved portions of the Property for road, highway or other public purposes, (e) execute petitions to have the Property annexed to any municipal corporation or utility district, (f) execute amendments to any covenants and restrictions affecting the Property, and Landlord shall execute and deliver to any person any instrument appropriate to confirm or effect such grants, releases, subdivisions, parcelizations, dedications and transfers to the extent of its interest in the Property (or execute such instrument in its own name); provided, however, that the rights granted to Tenant pursuant to the provisions of this Subsection (and the obligation of Landlord to execute such instrument) are subject to thirty (30) days' prior written notice to Landlord which notice shall include (x) a certificate of an authorized person of Tenant (A) describing such grant, release, subdivision, parcelization, dedication, transfer, petition or amendment, (B) stating that such grant, release, subdivision, parcelization, dedication, transfer, petition or amendment is not detrimental to the proper conduct of the business of Tenant on the Property and does not materially impair the usefulness of the Property for the purposes contemplated and permitted hereby, or materially reduce the fair market value of the Property, or materially impair Landlord's interest in the Property, and (C) stating the consideration, if any, being paid for such grant, release, subdivision, parcelization, dedication, transfer, petition or amendment and (y) duly authorized and binding unconditional undertakings of Tenant that it will remain obligated hereunder to the same extent as if such grant, release, subdivision, parcelization, dedication, transfer, petition or amendment had not been made (including, without limitation, the obligation to pay all Rent in accordance with the terms hereof), and that Tenant will perform all obligations of Landlord under such instrument during the Term.

20.    **Mechanic's Liens**.    Tenant shall not permit any mechanic's, laborer's or materialman's lien to be filed at any time against the Premises or any part thereof by reason of work performed with prior authorization by or on behalf of Tenant or any agent or contractor claiming by, through or under Tenant, which are not bonded or discharged within the later of sixty (60) days (a) of filing or (b) Tenant's actual notice thereof.

21.    **Estoppels**.    At any time and from time to time, upon not less than ten (10) Business Days' prior request, either party (the "**Requesting Party**") may request that the other party (the "**Certifying Party**") furnish to the Requesting Party (and its lenders or purchasers) a certificate (signed by a person duly authorized to sign on behalf of the Certifying Party) certifying as follows: (a) that this Lease is unmodified and in full force and effect (or that this Lease is in full force and effect and modified and setting forth the modifications), (b) the dates to which the Monthly Fixed Rent and any Additional Rent have been paid and the amount thereof then payable, (c) that the Certifying Party does not know of any default in the performance of any provisions of this Lease or specifying any default of which the Certifying Party may have knowledge and stating what action the defaulting party is taking or proposes to take with respect thereto and (d) any other information reasonably requested by the Requesting Party.

22.    **Indemnification; Waiver of Subrogation**.

(a)    Tenant shall indemnify, defend and hold Landlord harmless from and against all claims, actions, damages, liability and expense, including reasonable attorneys' fees ("**Loss**"), in connection with bodily injury, the loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises to the extent caused by any act or omission of Tenant and its agents, contractors, employees, servants or licensees, except to the extent that such Loss is caused by the wrongful or negligent acts or omissions of Landlord, its agents, contractors, employees, servants or licensees (as to all of which Loss Landlord shall indemnify, defend and hold harmless Tenant).

(b)    Landlord shall indemnify, defend and hold Tenant harmless from and against any Loss, in connection with bodily injury, the loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Property (exclusive of the Premises) to the extent caused by any act or omission of Landlord and its agents, contractors, employees, servants or licensees, except to the extent that such Loss is caused by the wrongful or negligent acts or omissions of Tenant, its agents, contractors, employees, servants or licensees (as to all of which Loss Tenant shall indemnify, defend and hold harmless Landlord).

(c)    Each party releases and waives any and every claim and right of recovery against the other which arises or may arise in its favor and against the other party during the Term for any and all loss of or damage to any of its property located within or upon or constituting a part of its respective premises, which loss or damage is customarily covered by the property insurance carried by each party under this Lease, or would have been covered if each party had carried the insurance that such party is required to carry under this Lease. This mutual waiver shall be in addition to, and not in limitation or derogation of, any other waiver or release contained in this Lease with respect to any loss of or damage to property of the parties. Landlord and Tenant agree to furnish to each insurance company which has or will issue property damage

WEIL:\96522397\2\73219.0007

policies on its premises, notice of the terms of the mutual waivers and to have the insurance policies properly endorsed, if necessary, to acknowledge the subrogation waivers.

(d)     The provisions of this Section shall survive the Termination Date.

**23.     Hold Over**.  No holding over by Tenant nor acceptance of Monthly Fixed Rent, Additional Rent or other charges by Landlord shall operate as a renewal or extension of this Lease without the written consent of Landlord.  Should Tenant hold over after the Termination Date without the consent of Landlord (excluding the possible extensions in Section 9 or elsewhere in this Lease), this Lease shall continue in force from month to month, subject to all of the provisions hereof.

**24.     No Restrictions On Tenant Financing**.  Tenant may continue to finance all receivables, inventory and other personal property and enter into financing leases of property and equipment, in the ordinary course of business.

**25.     Subordination; Quiet Enjoyment**.

(a)     Subject to and expressly conditioned upon the provisions of Section 25(b), including receipt of an SNDA from each Landlord's Mortgagee and each Ground Lessor in accordance with Section 25(b) below, this Lease and all rights of Tenant hereunder hereby are made and shall be subject and subordinate in all respects to the lien of all present and future ground leases (collectively, "**Ground Leases**") and mortgages (collectively, "**Landlord's Mortgages**") which may now or hereafter encumber Landlord's interest in the Property, provided that no such Ground Leases or Landlord's Mortgages shall increase any liabilities or obligations nor decrease any rights or remedies of Tenant under or with respect to this Lease.

(b)     Notwithstanding the foregoing or any such subordination, or any other provision contained in this Lease to the contrary, so long as Tenant shall not be in default of the express provisions of this Lease (without reference to any such Ground Leases or Landlord's Mortgages) beyond any applicable grace, notice or cure period, Landlord covenants and agrees that Tenant shall peacefully and quietly possess and enjoy the Premises and all rights of Tenant under this Lease in accordance with all terms and conditions hereof (without reference to Section 25(a) hereof), without let, hindrance or disturbance and free from all rights and claims of Landlord and all of all Persons claiming by or through Landlord, including under any such Ground Leases and Landlord's Mortgages.  As a condition precedent to the subordination of this Lease to the interest of the holders of any such Landlord's Mortgages (collectively, the "**Landlord's Mortgagees**") and the ground lessors under any such Ground Leases (collectively, the "**Ground Lessors**"), Landlord must obtain from each of any such Landlord's Mortgagees and Ground Lessors (each an "**SNDA Party**"), an SNDA which shall (x) provide, among other things, that such SNDA Party, as well as any person who acquires any portion of the Premises in a foreclosure or similar proceeding or in a transfer in lieu of any such foreclosure or a successor owner of the Property (each, a "**Foreclosure Purchaser**"), will not disturb either Tenant's leasehold interest or possession of the Premises in accordance with the terms hereof, nor any of Tenant's rights, privileges and options, and shall give effect to this Lease as if such SNDA Party or Foreclosure Purchaser were the landlord under this Lease so long as there is not then any outstanding and continuing default by Tenant under this Lease which has remained uncured

beyond the time periods specified in Section 10 (except that (a) such SNDA Party or Foreclosure Purchaser shall not be subject to any prior offsets or defenses which Tenant might have against Landlord except related to a Landlord default under Section 10(b)(ii) (but subject to such SNDA Party's or Foreclosure Purchaser's continuing obligations as landlord); (b) such SNDA Party or Foreclosure Purchaser shall not be bound by any rent or additional rent which Tenant might have paid more than one (1) month in advance to Landlord; (c) such SNDA Party or Foreclosure Purchaser shall not be bound by any escrow deposit for taxes, insurance, maintenance, single or payment made under this Lease (including, without limitation, any security deposit) unless such SNDA Party or Foreclosure Purchaser shall have taken actual possession of such sums; (d) such SNDA Party or Foreclosure Purchaser shall not be bound by any prior obligation under this Lease to make any payment to Tenant; (e) such SNDA Party or Foreclosure Purchaser shall not be bound by any surrender or termination or any amendment or modification of this Lease which is made without such SNDA Party's or Foreclosure Purchaser's consent; and (f) such SNDA Party or Foreclosure Purchaser shall be obligated to commence, complete and perform any construction and make any contributions and allowances toward construction or installation of any improvements upon the Property required under this Lease and any expansion or rehabilitation of existing improvements thereon), and (y) also be in form and substance reasonably satisfactory to Tenant.

26.  **Attorneys' Fees**.  In the event of litigation between the parties to enforce this Lease or if any legal action is instituted as a result of a default by either party under this Lease that is not cured within the applicable cure period, the prevailing party in such action shall be entitled to recover from, or be reimbursed by the other party for, its reasonable and actual attorneys' fees and costs, including but not limited to expert witness fees and court costs, through all levels of proceedings.

27.  **Tenant Rights**.  Without limiting the provisions of Section 10(b), nothing herein contained shall constitute a limitation on the right of Tenant, and Tenant shall have the express right, to:  (1) seek and secure injunctive relief for any violation by Landlord of any of the terms of this Lease, or (2) offset and make a deduction from Rent or any other sums due Landlord for any violation by Landlord of any of the terms of this Lease and/or to cure any such violation by Landlord.

28.  **Lease Not to Be Recorded; Memorandum of Lease**.  The parties agree that this Lease shall not be recorded, but the parties shall record the Lease Memorandum concurrently with the execution hereof.

29.  **Discretion**.  Except as otherwise expressly provided herein, any agreement, approval, consent or other determination shall not be effective unless it is in writing and shall be in the sole and absolute discretion of such party.

30.  **Section Headings**.  The headings of the various sections of this Lease have been inserted only for purposes of convenience, are not part of this Lease and shall not be deemed in any manner to modify, explain, expand or restrict any of the provisions of this Lease.

31.  **General Definitional Provisions.**  Unless the context of this Lease otherwise requires, (i) words of any gender are deemed to include each other gender, (ii) words using the

singular or plural number also include the plural or singular number respectively, (iii) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words refer to this entire Lease, (iv) the terms "Article," "Section," "Subsection," "Paragraph" or "clause" refer to the specified Article, Section, Subsection, Paragraph or clause of this Lease, and (v) all references to "dollars" or "$" refer to currency of the United States of America.  The term "including" as used herein shall in all instances mean "including, but not limited to."

     **32.**   <u>**Joint Drafting**</u>.  Each of Tenant and Landlord has been represented by counsel in the negotiation and execution of this Lease, and each of Tenant and Landlord had input in the drafting of this Lease.  For all purposes, this Lease shall be considered to have been jointly drafted by Tenant and Landlord.

     **33.**   <u>**Other Documents**</u>.  Each of the parties agrees to sign such other and further documents as may be necessary or appropriate to carry out the intentions expressed in this Lease.

     **34.**   <u>**Environmental.**</u>     (a) If Tenant becomes aware of a spill or discharge of a Hazardous Material (as such term is defined in the PSA) in concentrations above those allowed under applicable environmental laws (a "<u>**Spill**</u>"), which occurs on or from the Premises during the term of this Lease, Tenant shall give Landlord prompt oral and written notice of such Spill, setting forth in reasonable detail all relevant facts, including, without limitation, a copy of (i) any notice of a violation, or a potential or alleged violation, of any environmental law received by Tenant or any subtenant or other occupant of the Premises; (ii) any inquiry, investigation, enforcement, cleanup, removal, or other action instituted or threatened against Tenant or any subtenant or other occupant of the Premises; and (iii) any claim instituted or threatened against Tenant or any subtenant or other occupant of the Premises.  If a Spill arises out of or relates to Tenant's use and occupancy of the Premises, or if a Spill is caused by the act, negligence or omission of Tenant or Tenant's employees, agents or visitors, then Tenant shall pay all costs and expenses relating to compliance with applicable environmental laws (including, without limitation, the costs and expenses of site investigations and the removal and remediation of such Hazardous Material).  Without relieving Tenant of its obligations under this Lease and without waiving any default by Tenant under this Lease, if Tenant fails or neglects to diligently proceed with addressing a Spill for which it is responsible, Landlord will have the right, but not the obligation, to take such action as Landlord deems necessary or advisable to cleanup, remove, resolve or minimize the impact of or otherwise deal with any Spill on or from the Premises and Tenant shall, on demand, pay to Landlord all costs and expenses incurred by Landlord in connection with any action taken in connection therewith by Landlord. Notwithstanding the foregoing, Tenant shall not be liable for any Spills which are caused by the acts or omissions of the Landlord or its employees, agents or visitors.

     (b) Tenant shall permit the Landlord to cause the Premises to be tested and inspected in connection with the preparation of a Phase II environmental report provided that (i) Landlord provides Tenant two (2) days' notice prior to any testing, (ii) the testing shall not interfere with Tenant's use of the Premises, (iii) Landlord shall cause the investigating party to execute a Phase II Access Agreement (as defined in the Non-Invasive Inspection Agreement) and (iv) the scope of tests to be performed shall be subject to Tenant's prior approval. In the event that the Phase II environmental report identifies an issue which requires remediation, then Landlord, at its sole cost and expense, shall cause such issue to be remediated, provided that such remediation work

shall not be performed by Landlord prior to the Termination Date (other than in the case of an emergency situation or as required by law), provided further that in the event that such environmental issue (as identified in the phase II report) affects an adjacent property, then Tenant shall bear the cost of remediating such issues. Fifty percent (50%) of the Tenant costs to make such remediation on the adjacent property shall be applied to the Repair/Capital Threshold in the year the work is completed and paid for.

(c)    During the Term of this Lease, Tenant shall remain responsible for all maintenance, repair or abatement required, including replacement, or any other action or expense related to existing asbestos in the Premises, to the extent such maintenance, repair or abatement is required due to the actions or inactions of Tenant. Tenant shall indemnify Landlord against all asbestos related claims during the Term of the Lease pursuant to the indemnifications provisions in Section 22(a). Notwithstanding the foregoing, Tenant shall not be responsible for removal or abatement of existing asbestos at the expiration or earlier termination of this Lease.

35.    **2850 Marquis Dr. Parking Lot License.** Landlord and Tenant shall enter into a parking lot license agreement (the "**License Agreement**"), attached hereto as **Exhibit C**, for Tenant's right to use the parking area located on the southern portion of 2850 Marquis Dr., Garland, Texas (the "**Current Parking Area**"). Tenant shall use the Current Parking Area in a manner substantially similar to the manner in which same has been used prior to the date hereof by Tenant. At any time after the Effective Date, Landlord, at Landlord's sole cost and expense, shall have the right to provide and prepare a parking area (the "**New Parking Area**") on the western half of the Premises that is similar in nature and size to the Current Parking Area (i.e., compacted gravel that can withstand heavy truck traffic). Upon completion of the New Parking Area by Landlord, Tenant shall (i) begin to park on the New Parking Area, and (ii) cease to park on the Current Parking Area and relinquish all rights, easements and appurtenances thereto. The License Agreement shall terminate, except for any provisions that survive termination therein, upon the earlier to occur of the following: (i) termination of this Lease, or (ii) completion of the New Parking Area by Landlord.

36.    **2nd Extension Term revised Premises.** Upon Tenant's exercise of the Extension Option for the 2nd Extension Term, the Premises shall be revised to a portion of the Premises as shown on **Exhibit D** and vacate the portion of the Property that is no longer a part of the Premises. In addition, Landlord shall provide a metes and bounds legal description of the revised Premises, which shall be substituted and incorporated into the Lease as the new legal description for the Premises.

**[Signatures appear on the following pages]**

**IN WITNESS WHEREOF,** Landlord and Tenant have executed and delivered this Lease to each other as of the Effective Date.

TENANT:

**SEARS, ROEBUCK AND CO.,** a New York corporation

By: _____

Name: Robert A. Riecker
Title: Chief Financial Officer

**LANDLORD**:

**ELM CREEK REAL ESTATE, LLC,**
a Texas limited liability company

By: _____
      Michael Montgomery, Manager

**EXHIBIT A**

**Legal Description**

**Tract 2: (1602 Kings)**

Being Lot 1, Block 1, Sears Industrial District No. 4, an addition to the City of Garland, Dallas County, Texas, according to the plat recorded in Volume 97132, Page 2923, Map Records, Dallas County, Texas.

Exhibit A-1

## EXHIBIT B

### Premises

The **"Premises"** means the entirety of the Property together with all improvements located thereon. However, the Premises will change, as shown on Exhibit E, if Tenant exercises its option for the 2nd Extension Term.

Exhibit B-1

## EXHIBIT C

Parking Lot License Agreement

## PARKING LOT LICENSE AGREEMENT

**THIS LICENSE AGREEMENT** (this "**License Agreement**") is made as of the ____ day of _____, 2018 ("**Effective Date**"), between **ELM CREEK REAL ESTATE, LLC**, a Texas limited liability company having an office at 4641 Nall Rd, Dallas, Texas 75244 ("**Licensor**") and **SEARS, ROEBUCK AND CO.**, a New York corporation, having an office at 3333 Beverly Road, Dept. 824RE, Hoffman Estates, Illinois 60179 ("**Licensee**").

## W I T N E S S E T H:

**WHEREAS**, pursuant to that certain Real Estate Sale Contract dated as of _____, 2018, between Licensor, as seller, and Licensee, as buyer (the "**PSA**"), Licensee agreed to sell to Licensor, and Licensor agreed to purchase from Licensee the land more particularly described on **Exhibit "A"** attached hereto (the "**Property**"));

**WHEREAS**, as a condition to the closing pursuant to the PSA, immediately following the sale of the Property by Licensee to Licensor, Licensor and Licensee are required to enter into a license agreement for parking on the Premises (as defined below) pursuant to the terms and conditions of this License Agreement; and

**WHEREAS**, the closing under the PSA occurred on the Effective Date and Licensee and Licensor wish to enter into this License Agreement to complete the transaction.

**NOW, THEREFORE**, Licensee and Licensor agree as follows:

SECTION 1.
LICENSED PREMISES

1.01    In consideration of the mutual covenants and agreements of this License Agreement, and other good and valuable consideration, Licensor grants a license to Licensee to use and occupy the following described property ("**Premises**") for parking purposes only on the southern portion of 2850 Marquis Drive, Garland, Texas and as shown on **Exhibit "B"** attached hereto and incorporated herein for all purposes.

1.02    This License Agreement is subject to all existing easements for public roads, channels, highways, public utilities, railroads, pipelines, electrical transmission lines, and all matters of public record.

## SECTION 2.
## TERM

2.01    The term of this License Agreement shall commence on the Effective Date and  shall expire at midnight on the date which is the earlier to occur of the following: (i) the termination date of the lease agreement by and between Licensor, as landlord, and Licensee as tenant, under that certain Lease for the property located at 1602 Kings Road, Garland, Texas, or (ii) five (5) days after the date Licensor gives written notice to Licensee (the "**New Parking Area Notice**") that the new parking area on the western half of 1602 Kings Road is complete and ready for occupancy.

2.02    This License Agreement may be terminated for any reason or no reason by the written agreement of Licensor and Licensee.

2.03    If Licensee shall fail to perform or observe any of its obligations hereunder then Licensor may terminate this License by giving Licensee written notice thereof, in which event this License and all interest of Licensee hereunder shall automatically and immediately terminate. Such rights of Licensor in the case of a default by Licensee hereunder are not exclusive, but are cumulative of all other rights Licensor may have hereunder, at law or in equity; and any one or more of such rights may be exercised separately or concurrently to the extent provided by law.

## SECTION 3.
## RENT

3.01    Licensee shall pay to Licensor, upon the execution of this License Agreement, Ten and No/100 Dollars ($10.00) ("**Rent**").  Time is specifically of the essence of this provision and of every provision of this License.

## SECTION 4.
## PROPERTY DAMAGE LIABILITY AND INDEMNIFICATION

4.01    In the event that any property of the Licensor located in, on, under, or above the Premises, including but not limited to utilities and equipment, are damaged or destroyed during Licensee's use of the Premises, due to the negligence or acts or omissions of Licensee or Licensee's officers, agents, servants, employees, or invitees, Licensee will be responsible for repairs or replacement.

4.02    Licensor is not liable for any loss, damage, or injury of any kind to any person or property of any kind arising from the use of the Premises by Licensee (or any part of them), or caused by any defect in any building, structure, improvement, paving, equipment, building or facility on the Premises OR CAUSED BY OR ARISING FROM ANY ACT OR OMISSION OF LICENSEE, OR OF ANY OF ITS AGENTS, EMPLOYEES, LICENSEES, OR INVITEES, OR BY OR FROM ANY ACCIDENT, FIRE, OR OTHER CASUALTY ON THE LAND, OR BROUGHT ABOUT BY THE LICENSOR'S FAILURE TO MAINTAIN THE LEASED PREMISES IN SAFE CONDITION.

Each party agrees to notify the other party promptly upon the receipt of any claim or lawsuit brought in connection with any injury, death or damages on the Premises. Each party agrees to make its officers, agents, and employees available to the other party at all reasonable times for any statements and case preparation necessary for the defense of any claims or litigation for which the party may be responsible hereunder.

4.03    **LICENSEE AGREES TO DEFEND, INDEMNIFY AND HOLD THE LICENSOR, ITS OFFICERS, AGENTS SERVANTS AND EMPLOYEES, HARMLESS AGAINST ANY AND ALL CLAIMS, LAWSUITS, ACTIONS, COSTS AND EXPENSES OF ANY KIND, INCLUDING, BUT NOT LIMITED TO, THOSE FOR PROPERTY DAMAGE OR LOSS (INCLUDING ALLEGED DAMAGE OR LOSS TO LICENSEE'S BUSINESS AND ANY RESULTING LOST PROFITS) AND PERSONAL INJURY, INCLUDING DEATH, THAT MAY RELATE TO, ARISE OUT OF OR BE OCCASIONED BY (i) LICENSEE'S BREACH OF ANY OF THE TERMS OR PROVISIONS OF THIS LICENSE AGREEMENT OR (ii) ANY NEGLIGENT ACT OR OMISSION OR INTENTIONAL MISCONDUCT OF LICENSEE, ITS OFFICERS, AGENTS, ASSOCIATES, EMPLOYEES, CONTRACTORS (OTHER THAN THE LICENSOR) OR SUBCONTRACTORS, RELATED TO THE PERFORMANCE OF THIS LICENSE AGREEMENT; EXCEPT THAT THE INDEMNITY PROVIDED FOR IN THIS PARAGRAPH SHALL NOT APPLY TO ANY LIABILITY RESULTING FROM THE SOLE NEGLIGENCE OF THE LICENSOR OR ITS OFFICERS, AGENTS, EMPLOYEES OR SEPARATE CONTRACTORS, AND IN THE EVENT OF JOINT AND CONCURRENT NEGLIGENCE OF BOTH LICENSEE AND LICENSOR, RESPONSIBILITY, IF ANY, SHALL BE APPORTIONED COMPARATIVELY IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE TERMINATION OF THIS LICENSE AGREEMENT.**

SECTION 5.
FEDERAL, STATE, AND LOCAL LAWS

5.01    Licensee shall comply with all federal, state and local laws, rules and regulations as, well as with all regulations, restrictions and requirements of the police, fire and health departments now or hereafter in effect which are applicable to its operations.

SECTION 6.
PREMISES ALTERATIONS AND CONDITION

6.01    Licensee shall not make or cause to be made any alterations, additions or improvements to the Premises without the prior written approval of the Licensor.

6.02    Licensee agrees not to take any action that would result in the creation of any lien upon the Licensor property. In the event that a lien is filed, Licensee will take all necessary steps to remove the lien within 10 days of its filing or receiving notice from the Licensor, whichever is later.

6.03    Licensee agrees to accept and use the Premises AS IS. Licensee hereby acknowledges that (a) it accepts the Premises in its present condition, and (b) Licensor has made no representations to it regarding the safeness thereof or suitability for any particular purposes. Licensee hereby agrees to be responsible for maintaining the Premises in the condition in which it is given by Licensor.

## SECTION 7.
## NOTICES

7.01    All notices and/or payments required or permitted under this License Agreement may be given to a party personally or by mail, addressed to such party at the address stated below or to such other address as one party may from time to time notify the other in writing.  Any notice so given shall be deemed to have been received when deposited in the United States mail so addressed with postage prepaid:

If to Licensee:

Sears, Roebuck and Co.
3333 Beverly Road, Dept. 824RE
Hoffman Estates, IL 60179
Attention:  President, Real Estate

With copies to:

Sears, Roebuck and Co.
3333 Beverly Road, Dept. 824RE
Hoffman Estates, IL  60179
Attention:  Associate General Counsel, Real Estate

If to Licensor:

Elm Creek Real Estate, LLC
4641 Nall Rd.
Dallas, TX 75244
Attn:  Michael Montgomery

With a copy to:

Zane B. Butler
Attorney at Law
522 Colgate Dr.
Allen, Texas 75013

## ARTICLE 8.
### GENERAL PROVISIONS

8.01    No Partnership or Joint Venture. Neither Licensor nor Licensee shall be responsible under the Doctrine of Respondeat Superior for the acts and omissions of its officers, agents, servants, contractors, subcontractors, or employees. It is understood and agreed that the Licensor is not involved as a party to any activities that may be carried on by Licensee pursuant to this License Agreement. Licensee acknowledges itself solely responsible for such activities and for all persons and property involved or used in connection with Licensee use of the Premises.

8.02    Force Majeure  If use of the Premises or performing any other covenant or term is delayed by reason of war, civil commotion, act of God, governmental restrictions, regulations, or interference, fire or other casualty, or any other circumstances beyond the Licensor's control or that of the party obligated or permitted under this License Agreement to do or perform the term or covenant, regardless of whether the circumstance is similar to any of those enumerated or not, each party so delayed is excused from performance during the delay period.

8.03    No Waiver. No waiver by either party of any default or breach of any covenant or term of this Lease may be treated as a waiver of any subsequent default or breach of the same or any other covenant or term of this License Agreement regardless of when the breach occurred.

8.04    Applicable Laws. The laws of the State of Texas shall govern this License Agreement and the relationship created hereby. Venue for any action brought to interpret or enforce, or arising out of or incident to, the terms of this License Agreement shall be in Dallas County, Texas.

8.05    Severability of Provisions. If any of the Provisions contained in this License Agreement shall be held, for any reason, to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability, shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

8.06    Assignment Prohibited. Licensee shall not assign this License Agreement, or any right of Licensee under this License, or sublet the Premises, for consideration or no consideration, whether voluntarily, by operation of law, or otherwise, and any attempt to do so shall be void, and any such attempt shall cause immediate termination of this License.

8.07    Sole License Agreement. This License Agreement constitutes the sole and only License Agreement of the parties hereto and supersedes any prior understanding or written or oral License Agreements between the parties respecting the subject matter.

8.08    Multiple Counterparts. This License Agreement may be executed in one or more counterparts, and all so executed shall constitute one (1) and the same agreement, binding upon the parties hereto, and notwithstanding that all of the parties are not signatories to the same counterparts.

EXECUTED this the _____ day of _____, 2018.

**LICENSEE:**

SEARS, ROEBUCK AND CO.,
a New York corporation

By: _____
Name: _____
Title: _____

**LICENSOR:**

**ELM CREEK REAL ESTATE, LLC,**
a Texas limited liability company

By: _____
     Michael Montgomery, Manager

## EXHIBIT A
### To License Agreement

### LEGAL DESCRIPTION OF PROPERTY

**Tract 1: (1501 Kings)**

Being Lot 1, Block 1, Sears Industrial District No. 2, an addition to the City of Garland, Dallas County, Texas, according to the plat recorded in Volumes 78041, Page 409, Map Records, Dallas County, Texas.

**Tract 2: (1602 Kings)**

Being Lot 1, Block 1, Sears Industrial District No. 4, an addition to the City of Garland, Dallas County, Texas, according to the plat recorded in Volume 97132, Page 2923, Map Records, Dallas County, Texas.

**Tract 3: (3 Kings)**

Being Lot 3, Block 1, Sears-Miller Replat an addition to the City of Garland, Dallas County, Texas, according to the plat recorded under Clerk's File No. 201300020593, Real Property Records, Dallas County, Texas.

**TRACT 4: (2850 Marquis Drive)**

BEING a tract of land situated In the BENJAMIN DYE SURVEY, ABSTRACT NO. 415 in the City of Garland, Dallas County, Texas and being the remainder of that called 82.372 acre tract of land described in the deed to Sears Roebuck and Co. recorded in Volume 68194, Page 1835, Deed Retards, Dallas County, Texas, and being more particularly described as follows:

BEGINNING, at a 5/8-Inch iron rod found for the northwest corner of Lot 2R1, Block 1, Sears Industrial District No. 3 Replat, an addition to the City of Garland according to the plat thereof recorded in County Clerk's File Number 20160072804, Real Property Records, Dallas County, Texas; said point being also an angle point in the south right-of-way line of Marquis Drive (60-foot wide public right-of-way at this point);

THENCE, South 00 degrees 53 minutes 08 seconds East with the west line of said Lot 2R1, at a distance of 729.97 feet pass the southwest corner of said Lot 2R1 and the northwest corner of lot 1R, Block 1, Sears Industrial District No. 3 Replat, an addition to the City of Garland according to the plat thereof recorded in County Clerk's File Number 200600272358, Real Property Records, Dallas County, continuing, with the west line of said 1R, in all, a distance of 832.25 feet to the northeast corner of Lot 1, Block 1, Sears Industrial District No. 4, an addition to the City of Garland according to the plat thereof recorded in Volume 97132, Page 2923, Deed Records, Dallas County, Texas;

THENCE, South 89 degrees 19 minutes 04 seconds West, with the north line of said Lot 1, a distance of 524.48 feet to a 1/2-inch iron rod found for the northwest corner of said Lot 1; said point being also on the east right-of-way line of Kings Road (BO-foot wide public right-of-way at this point);

THENCE, North 00 degrees 40 minutes 56 seconds West, with said east right-of-way line, a distance of 348.04 feet to a point for a corner of said right-of-way line;

THENCE, South 89 degrees 19 minutes 04 seconds West, with the right-of-way of said Kings Drive, a distance of 80.00 feet to a corner of said right-of-way line, said point also being on the east line of Lot 1, Block 1, Sears Industrial District No. 2, an addition to the City of Garland according to the plat thereof recorded in Volume 78041, Page 409, Deed Records, Dallas County, Texas;

THENCE, North 00 degrees 40 minutes 56 seconds West, with the east line of said Sears Industrial District No. 2, a distance of 33.24 feet to a 1/2-inch iron rod found for the northeast corner of said Sears Industrial District No. 2;

THENCE, South 89 degrees 17 minutes 20" West, with the north line of said Sears Industrial District No. 2, a distance of 324.77 feet to a point for corner on the west line of said 82,372 acre tract; said point also being on the east line of a called 32.60 acre tract of land described in the deed to Sears Roebuck and Co. recorded in Volume 68194, Page 1839, Deed Records, Dallas County, Texas;

THENCE, North 00 degrees 53 minutes 07 seconds West, with the common line between said 82.372 acre tract and said 32.60 acre tract, a distance of 437.00 feet to a point for corner on said south right-of-way line of Marquis Drive as created by the Right-of-Way Dedication recorded in Volume 85083, Page 3484, Deed Records, Dallas County, Texas;

THENCE, North 87 degrees 49 minutes 45 seconds East with said south right-of-way line, a distance of 928.13 feet to a point (or a corner of said right-of-way line;

THENCE, South 00 degrees 53 minutes 08 seconds East, with said south right-of-way line, a distance of 9.99 feet to the POINT OF BEGINNING;

CONTAINING, 618,934 square feet or 14.209 acres of land, more or less.

## TRACT 5: (3150 Marquis Drive)

BEING a tract of land situated in the BENJAMIN DYE SURVEY, ABSTRACT NO. 415 in the City of Garland, Dallas County, Texas and being a portion of the remainder of that called 32.60 acre tract of land described in the deed to Sears Roebuck and Co. recorded in Volume 68194, Page 1839, Deed Records, Dallas County, Texas, and being more particularly described as follows:

BEGINNING, at a 5/8-inch iron rod found for the northwest corner of Lot 1, Block 1, Sears Industrial District No. 2, an addition to the City of Garland according to the plat thereof recorded in Volume 78041, Page 409, Deed Records, Dallas County, Texas;

THENCE, North 00 degrees 55 minutes 30 seconds West, with the extension of the west line of said Lot 1, a distance of 503.90 feet to a point for corner of the south right-of-way line Marquis Drive (70-foot wide public right-of-way at this point) as created by the Right-of-Way Dedication recorded in Volume 85083, Page 3484, Deed Records, Dallas County, Texas; said point being also on a non-tangent circular curve to the left having a radius of 1255.00 feet;

THENCE, southeasterly, with said south right-of-way line and said curve to the left, through a central angle of 18 degrees 43 minutes 21 seconds, an arc distance of 410.09 feet (chord bears South 81 degrees 18 minutes 07 seconds East, 408.27 feet) to the end of said curve;

THENCE, North 89 degrees 20 minutes 13 seconds East, with said south right-of-way line, a distance of 183.77 feet to a point for corner at the Intersection of said south right-of-way line with the east line of said 32.60 acre tract; said point also being on the west line of a called 82.372 acre tract of rand described In the deed to Sears Roebuck and Co. recorded in Volume 68194, Page 1835, Deed Records, Dallas County, Texas;

THENCE, South 00 degrees 53 minutes 07 seconds East, with the common line between said 82.372 acre tract and said 32.60 acre tract, a distance of 437.00 feet to a point for corner on said north line of Lot1.,

THENCE, South 89 degrees 17 minutes 20" West, with the north line of Lot 1, a distance of 586.00 feet to the POINT OF BEGINNING;

CONTAINING, 265,102 square feet or 6.086 acres of land, more or less.

EXHIBIT "B"
To License Agreement

LEGAL DESCRIPTION OF PREMISES

[A tract of land containing approximately 3.76 acres (verify – measured on DCAD website) out of][A]

BEING a tract of land situated In the BENJAMIN DYE SURVEY, ABSTRACT NO. 415 in the City of Garland, Dallas County, Texas and being the remainder of that called 82.372 acre tract of land described in the deed to Sears Roebuck and Co. recorded in Volume 68194, Page 1835, Deed Retards, Dallas County, Texas, and being more particularly described as follows:

BEGINNING, at a 5/8-Inch iron rod found for the northwest corner of Lot 2R1, Block 1, Sears Industrial District No. 3 Replat, an addition to the City of Garland according to the plat thereof recorded in County Clerk's File Number 20160072804, Real Property Records, Dallas County, Texas; said point being also an angle point in the south right-of-way line of Marquis Drive (60-foot wide public right-of-way at this point);

THENCE, South 00 degrees 53 minutes 08 seconds East with the west line of said Lot 2R1, at a distance of 729.97 feet pass the southwest corner of said Lot 2R1 and the northwest corner of lot 1R, Block 1, Sears Industrial District No. 3 Replat, an addition to the City of Garland according to the plat thereof recorded in County Clerk's File Number 200600272358, Real Property Records, Dallas County, continuing, with the west line of said 1R, in all, a distance of 832.25 feet to the northeast corner of Lot 1, Block 1, Sears Industrial District No. 4, an addition to the City of Garland according to the plat thereof recorded in Volume 97132, Page 2923, Deed Records, Dallas County, Texas;

THENCE, South 89 degrees 19 minutes 04 seconds West, with the north line of said Lot 1, a distance of 524.48 feet to a 1/2-inch iron rod found for the northwest corner of said Lot 1; said point being also on the east right-of-way line of Kings Road (BO-foot wide public right-of-way at this point);

THENCE, North 00 degrees 40 minutes 56 seconds West, with said east right-of-way line, a distance of 348.04 feet to a point for a corner of said right-of-way line;

THENCE, South 89 degrees 19 minutes 04 seconds West, with the right-of-way of said Kings Drive, a distance of 80.00 feet to a corner of said right-of-way line, said point also being on the east line of Lot 1, Block 1, Sears Industrial District No. 2, an addition to the City of Garland according to the plat thereof recorded in Volume 78041, Page 409, Deed Records, Dallas County, Texas;

THENCE, North 00 degrees 40 minutes 56 seconds West, with the east line of said Sears Industrial District No. 2, a distance of 33.24 feet to a 1/2-inch iron rod found for the northeast corner of said Sears Industrial District No. 2;

---

[A] To confirm

THENCE, South 89 degrees 17 minutes 20" West, with the north line of said Sears Industrial District No. 2, a distance of 324.77 feet to a point for corner on the west line of said 82,372 acre tract; said point also being on the east line of a called 32.60 acre tract of land described in the deed to Sears Roebuck and Co. recorded in Volume 68194, Page 1839, Deed Records, Dallas County, Texas;

THENCE, North 00 degrees 53 minutes 07 seconds West, with the common line between said 82.372 acre tract and said 32.60 acre tract, a distance of 437.00 feet to a point for corner on said south right-of-way line of Marquis Drive as created by the Right-of-Way Dedication recorded in Volume 85083, Page 3484, Deed Records, Dallas County, Texas;

THENCE, North 87 degrees 49 minutes 45 seconds East with said south right-of-way line, a distance of 928.13 feet to a point (or a corner of said right-of-way line;

THENCE, South 00 degrees 53 minutes 08 seconds East, with said south right-of-way line, a distance of 9.99 feet to the POINT OF BEGINNING;

CONTAINING, 618,934 square feet or 14.209 acres of land, more or less and as shown on the diagram below (the "Premises"):



**EXHIBIT D**

**LEGAL DESCRIPTION AND DIAGRAM OF**
**PREMISES AFTER TENANT EXERCISES 2ND EXTENSION TERM**

(Upon Tenant's exercise of option for the 2nd Extension Term, Landlord shall provide a new metes and bounds legal description of the Premises as shown on the diagram below.)



## SCHEDULE 1

### Annual Fixed Rent

| Lease Year | Annual Fixed Rent | Monthly Fixed Rent |
|---|---|---|
| 1 | $300,000.00 | $25,000.00 |
| 2 | $300,000.00 | $25,000.00 |
| 3 | $300,000.00 | $25,000.00 |
| 4 | $300,000.00 | $25,000.00 |
| 5 | $300,000.00 | $25,000.00 |
| **If Exercised, 1st Extension Term:** | | |
| 6 | $346,153.85 | $28,846.15 |
| 7 | $346,153.85 | $28,846.15 |
| 8 | $346,153.85 | $28,846.15 |
| 9 | $346,153.85 | $28,846.15 |
| 10 | $346,153.85 | $28,846.15 |
| **If Exercised, 2nd Extension Term:** | | |
| 11 | $400,000.00 | $33,333.33 |
| 12 | $400,000.00 | $33,333.33 |
| 13 | $400,000.00 | $33,333.33 |
| 14 | $400,000.00 | $33,333.33 |
| 15 | $400,000.00 | $33,333.33 |
| 16 | $400,000.00 | $33,333.33 |
| 17 | $400,000.00 | $33,333.33 |
| 18 | $400,000.00 | $33,333.33 |

## PARKING LOT LICENSE AGREEMENT

**THIS LICENSE AGREEMENT** (this "**License Agreement**") is made as of the 18 day of April, 2018 ("**Effective Date**"), between **ELM CREEK REAL ESTATE, LLC**, a Texas limited liability company having an office at 4641 Nall Rd, Dallas, Texas 75244 ("**Licensor**") and **SEARS, ROEBUCK AND CO.**, a New York corporation, having an office at 3333 Beverly Road, Dept. 824RE, Hoffman Estates, Illinois 60179 ("**Licensee**").

## W I T N E S S E T H:

**WHEREAS**, pursuant to that certain Real Estate Sale Contract dated as of April 6, 2018, between Licensor, as seller, and Licensee, as buyer (the "**PSA**"), Licensee agreed to sell to Licensor, and Licensor agreed to purchase from Licensee the land more particularly described on **Exhibit "A"** attached hereto (the "**Property**");

**WHEREAS**, as a condition to the closing pursuant to the PSA, immediately following the sale of the Property by Licensee to Licensor, Licensor and Licensee are required to enter into a license agreement for parking on the Premises (as defined below) pursuant to the terms and conditions of this License Agreement; and

**WHEREAS,** the closing under the PSA occurred on the Effective Date and Licensee and Licensor wish to enter into this License Agreement to complete the transaction.

**NOW, THEREFORE,** Licensee and Licensor agree as follows:

### SECTION 1.
### LICENSED PREMISES

1.01    In consideration of the mutual covenants and agreements of this License Agreement, and other good and valuable consideration, Licensor grants a license to Licensee to use and occupy the following described property ("**Premises**") for parking purposes only on the southern portion of 2850 Marquis Drive, Garland, Texas and as shown on **Exhibit "B"** attached hereto and incorporated herein for all purposes.

1.02    This License Agreement is subject to all existing easements for public roads, channels, highways, public utilities, railroads, pipelines, electrical transmission lines, and all matters of public record.

### SECTION 2.
### TERM

2.01    The term of this License Agreement shall commence on the Effective Date and shall expire at midnight on the date which is the earlier to occur of the following: (i) the termination date of the lease agreement by and between Licensor, as landlord, and Licensee as tenant, under that

License Agreement
3001.07002.10.23002.1

Approx. 3.76 acres
Garland, TX

1

certain Lease for the property located at 1602 Kings Road, Garland, Texas, or (ii) five (5) days after the date Licensor gives written notice to Licensee (the "**New Parking Area Notice**") that the new parking area on the western half of 1602 Kings Road is complete and ready for occupancy.

2.02 This License Agreement may be terminated for any reason or no reason by the written agreement of Licensor and Licensee.

2.03    If Licensee shall fail to perform or observe any of its obligations hereunder then Licensor may terminate this License by giving Licensee written notice thereof, in which event this License and all interest of Licensee hereunder shall automatically and immediately terminate. Such rights of Licensor in the case of a default by Licensee hereunder are not exclusive, but are cumulative of all other rights Licensor may have hereunder, at law or in equity; and any one or more of such rights may be exercised separately or concurrently to the extent provided by law.

SECTION 3.
RENT

3.01    Licensee shall pay to Licensor, upon the execution of this License Agreement, Ten and No/100 Dollars ($10.00) ("**Rent**").  Time is specifically of the essence of this provision and of every provision of this License.

SECTION 4.
PROPERTY DAMAGE LIABILITY AND INDEMNIFICATION

4.01  In the event that any property of the Licensor located in, on, under, or above the Premises, including but not limited to utilities and equipment, are damaged or destroyed during Licensee's use of the Premises, due to the negligence or acts or omissions of Licensee or Licensee's officers, agents, servants, employees, or invitees, Licensee will be responsible for repairs or replacement.

4.02  Licensor is not liable for any loss, damage, or injury of any kind to any person or property of any kind arising from the use of the Premises by Licensee (or any part of them), or caused by any defect in any building, structure, improvement, paving, equipment, building or facility on the Premises OR CAUSED BY OR ARISING FROM ANY ACT OR OMISSION OF LICENSEE, OR OF ANY OF ITS AGENTS, EMPLOYEES, LICENSEES, OR INVITEES, OR BY OR FROM ANY ACCIDENT, FIRE, OR OTHER CASUALTY ON THE LAND, OR BROUGHT ABOUT BY THE LICENSOR'S FAILURE TO MAINTAIN THE LEASED PREMISES IN SAFE CONDITION.

Each party agrees to notify the other party promptly upon the receipt of any claim or lawsuit brought in connection with any injury, death or damages on the Premises.  Each party agrees to make its officers, agents, and employees available to the other party at all reasonable times for any statements and case preparation necessary for the defense of any claims or litigation for which the party may be responsible hereunder.

4.03    **LICENSEE AGREES TO DEFEND, INDEMNIFY AND HOLD THE LICENSOR, ITS OFFICERS, AGENTS SERVANTS AND EMPLOYEES, HARMLESS AGAINST ANY AND ALL CLAIMS, LAWSUITS, ACTIONS, COSTS AND EXPENSES OF ANY KIND, INCLUDING, BUT NOT LIMITED TO, THOSE FOR PROPERTY DAMAGE OR LOSS (INCLUDING ALLEGED DAMAGE OR LOSS TO LICENSEE'S BUSINESS AND ANY RESULTING LOST PROFITS) AND PERSONAL INJURY, INCLUDING DEATH, THAT MAY RELATE TO, ARISE OUT OF OR BE OCCASIONED BY (i) LICENSEE'S BREACH OF ANY OF THE TERMS OR PROVISIONS OF THIS LICENSE AGREEMENT OR (ii) ANY NEGLIGENT ACT OR OMISSION OR INTENTIONAL MISCONDUCT OF LICENSEE, ITS OFFICERS, AGENTS, ASSOCIATES, EMPLOYEES, CONTRACTORS (OTHER THAN THE LICENSOR) OR SUBCONTRACTORS, RELATED TO THE PERFORMANCE OF THIS LICENSE AGREEMENT; EXCEPT THAT THE INDEMNITY PROVIDED FOR IN THIS PARAGRAPH SHALL NOT APPLY TO ANY LIABILITY RESULTING FROM THE SOLE NEGLIGENCE OF THE LICENSOR OR ITS OFFICERS, AGENTS, EMPLOYEES OR SEPARATE CONTRACTORS, AND IN THE EVENT OF JOINT AND CONCURRENT NEGLIGENCE OF BOTH LICENSEE AND LICENSOR, RESPONSIBILITY, IF ANY, SHALL BE APPORTIONED COMPARATIVELY IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE TERMINATION OF THIS LICENSE AGREEMENT.**

## SECTION 5.
## FEDERAL, STATE, AND LOCAL LAWS

5.01    Licensee shall comply with all federal, state and local laws, rules and regulations as, well as with all regulations, restrictions and requirements of the police, fire and health departments now or hereafter in effect which are applicable to its operations.

## SECTION 6.
## PREMISES ALTERATIONS AND CONDITION

6.01    Licensee shall not make or cause to be made any alterations, additions or improvements to the Premises without the prior written approval of the Licensor.

6.02    Licensee agrees not to take any action that would result in the creation of any lien upon the Licensor property.  In the event that a lien is filed, Licensee will take all necessary steps to remove the lien within 10 days of its filing or receiving notice from the Licensor, whichever is later.

6.03 Licensee agrees to accept and use the Premises AS IS. Licensee hereby acknowledges that (a) it accepts the Premises in its present condition, and (b) Licensor has made no representations to it regarding the safeness thereof or suitability for any particular purposes.  Licensee hereby agrees to be responsible for maintaining the Premises in the condition in which it is given by Licensor.

SECTION 7.
NOTICES

7.01    All notices and/or payments required or permitted under this License Agreement may be given to a party personally or by mail, addressed to such party at the address stated below or to such other address as one party may from time to time notify the other in writing.  Any notice so given shall be deemed to have been received when deposited in the United States mail so addressed with postage prepaid:

> If to Licensee:
>
> Sears, Roebuck and Co.
> 3333 Beverly Road, Dept. 824RE
> Hoffman Estates, IL 60179
> Attention:  President, Real Estate
>
>
> With copies to:
>
> Sears, Roebuck and Co.
> 3333 Beverly Road, Dept. 824RE
> Hoffman Estates, IL  60179
> Attention:  Associate General Counsel, Real Estate
>
>
> If to Licensor:
>
> Elm Creek Real Estate, LLC
> 4641 Nall Rd.
> Dallas, TX 75244
> Attn:  Michael Montgomery
>
> With a copy to:
>
> Zane B. Butler
> Attorney at Law
> 522 Colgate Dr.
> Allen, Texas 75013

ARTICLE 8.
GENERAL PROVISIONS

8.01    <u>No Partnership or Joint Venture</u>.  Neither Licensor nor Licensee shall be responsible under the Doctrine of Respondeat Superior for the acts and omissions of its officers, agents, servants, contractors, subcontractors, or employees.  It is understood and agreed that the Licensor is not involved as a party to any activities that may be carried on by Licensee pursuant to this License

Agreement. Licensee acknowledges itself solely responsible for such activities and for all persons and property involved or used in connection with Licensee use of the Premises.

8.02    Force Majeure  If use of the Premises or performing any other covenant or term is delayed by reason of war, civil commotion, act of God, governmental restrictions, regulations, or interference, fire or other casualty, or any other circumstances beyond the Licensor's control or that of the party obligated or permitted under this License Agreement to do or perform the term or covenant, regardless of whether the circumstance is similar to any of those enumerated or not, each party so delayed is excused from performance during the delay period.

8.03    No Waiver. No waiver by either party of any default or breach of any covenant or term of this Lease may be treated as a waiver of any subsequent default or breach of the same or any other covenant or term of this License Agreement regardless of when the breach occurred.

8.04    Applicable Laws. The laws of the State of Texas shall govern this License Agreement and the relationship created hereby. Venue for any action brought to interpret or enforce, or arising out of or incident to, the terms of this License Agreement shall be in Dallas County, Texas.

8.05    Severability of Provisions. If any of the Provisions contained in this License Agreement shall be held, for any reason, to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability, shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

8.06 Assignment Prohibited.  Licensee shall not assign this License Agreement, or any right of Licensee under this License, or sublet the Premises, for consideration or no consideration, whether voluntarily, by operation of law, or otherwise, and any attempt to do so shall be void, and any such attempt shall cause immediate termination of this License.

8.07    Sole License Agreement.  This License Agreement constitutes the sole and only License Agreement of the parties hereto and supersedes any prior understanding or written or oral License Agreements between the parties respecting the subject matter.

8.08    Multiple Counterparts.  This License Agreement may be executed in one or more counterparts, and all so executed shall constitute one (1) and the same agreement, binding upon the parties hereto, and notwithstanding that all of the parties are not signatories to the same counterparts.

**LICENSEE:**

**SEARS, ROEBUCK AND CO.,** a New York corporation

By: _____
Name: Robert A. Riecker
Title: Chief Financial Officer

[Signature page to Garland, TX License]

**LICENSOR:**

**ELM CREEK REAL ESTATE, LLC,**
a Texas limited liability company

By: _____
    Michael Montgomery, Manager

[Signature page to Garland, TX Parking Lot License Agreement]

<u>**EXHIBIT A**</u>
<u>**To License Agreement**</u>

<u>**LEGAL DESCRIPTION OF PROPERTY**</u>

**Tract 1: (1501 Kings)**

Being Lot 1, Block 1, Sears Industrial District No. 2, an addition to the City of Garland, Dallas County, Texas, according to the plat recorded in Volumes 78041, Page 409, Map Records, Dallas County, Texas.

**Tract 2: (1602 Kings)**

Being Lot 1, Block 1, Sears Industrial District No. 4, an addition to the City of Garland, Dallas County, Texas, according to the plat recorded in Volume 97132, Page 2923, Map Records, Dallas County, Texas.

**Tract 3: (3 Kings)**

Being Lot 3, Block 1, Sears-Miller Replat an addition to the City of Garland, Dallas County, Texas, according to the plat recorded under Clerk's File No. 201300020593, Real Property Records, Dallas County, Texas.

**TRACT 4: (2850 Marquis Drive)**

BEING a tract of land situated In the BENJAMIN DYE SURVEY, ABSTRACT NO. 415 in the City of Garland, Dallas County, Texas and being the remainder of that called 82.372 acre tract of land described in the deed to Sears Roebuck and Co. recorded in Volume 68194, Page 1835, Deed Records, Dallas County, Texas, and being more particularly described as follows:

BEGINNING, at a 5/8-lnch iron rod found for the northwest corner of Lot 2R1, Block 1, Sears Industrial District No. 3 Replat, an addition to the City of Garland according to the plat thereof recorded in County Clerk's File Number 20160072804, Real Property Records, Dallas County, Texas; said point being also an angle point in the south right-of-way line of Marquis Drive (60-foot wide public right-of-way at this point);

THENCE, South 00 degrees 53 minutes 08 seconds East with the west line of said Lot 2R1, at a distance of 729.97 feet pass the southwest corner of said Lot 2R1 and the northwest corner of lot 1R, Block 1, Sears Industrial District No. 3 Replat, an addition to the City of Garland according to the plat thereof recorded in County Clerk's File Number 200600272358, Real Property Records, Dallas County, continuing, with the west line of said 1R, in all, a distance of 832.25 feet to the northeast corner of Lot 1, Block 1, Sears Industrial District No. 4, an addition to the City of Garland according to the plat thereof recorded in Volume 97132, Page 2923, Deed Records, Dallas County, Texas;

THENCE, South 89 degrees 19 minutes 04 seconds West, with the north line of said Lot 1, a distance of 524.48 feet to a 1/2-inch iron rod found for the northwest corner of said Lot 1; said point being also on the east right-of-way line of Kings Road (BO-foot wide public right-of-way at this point);

THENCE, North 00 degrees 40 minutes 56 seconds West, with said east right-of-way line, a distance of 348.04 feet to a point for a corner of said right-of-way line;

THENCE, South 89 degrees 19 minutes 04 seconds West, with the right-of-way of said Kings Drive, a distance of 80.00 feet to a corner of said right-of-way line, said point also being on the east line of Lot 1, Block 1, Sears Industrial District No. 2, an addition to the City of Garland according to the plat thereof recorded in Volume 78041, Page 409, Deed Records, Dallas County, Texas;

THENCE, North 00 degrees 40 minutes 56 seconds West, with the east line of said Sears Industrial District No. 2, a distance of 33.24 feet to a 1/2-inch iron rod found for the northeast corner of said Sears Industrial District No. 2;

THENCE, South 89 degrees 17 minutes 20" West, with the north line of said Sears Industrial District No. 2, a distance of 324.77 feet to a point for corner on the west line of said 82,372 acre tract; said point also being on the east line of a called 32.60 acre tract of land described in the deed to Sears Roebuck and Co. recorded in Volume 68194, Page 1835, Deed Records, Dallas County, Texas;

THENCE, North 00 degrees 53 minutes 07 seconds West, with the common line between said 82.372 acre tract and said 32.60 acre tract, a distance of 437.00 feet to a point for corner on said south right-of-way line of Marquis Drive as created by the Right-of-Way Dedication recorded in Volume 85083, Page 3484, Deed Records, Dallas County, Texas;

THENCE, North 87 degrees 49 minutes 45 seconds East with said south right-of-way line, a distance of 928.13 feet to a point (or a corner of said right-of-way line;

THENCE, South 00 degrees 53 minutes 08 seconds East, with said south right-of-way line, a distance of 9.99 feet to the POINT OF BEGINNING;

CONTAINING, 618,934 square feet or 14.209 acres of land, more or less.

**TRACT 5: (3150 Marquis Drive)**

BEING a tract of land situated in the BENJAMIN DYE SURVEY, ABSTRACT NO. 415 in the City of Garland, Dallas County, Texas and being a portion of the remainder of that called 32.60 acre tract of land described in the deed to Sears Roebuck and Co. recorded in Volume 68194, Page 1839, Deed Records, Dallas County, Texas, and being more particularly described as follows:

BEGINNING, at a 5/8-inch iron rod found for the northwest corner of Lot 1, Block 1, Sears Industrial District No. 2, an addition to the City of Garland according to the plat thereof recorded in Volume 78041, Page 409, Deed Records, Dallas County, Texas;

THENCE, North 00 degrees 55 minutes 30 seconds West, with the extension of the west line of said Lot 1, a distance of 503.90 feet to a point for corner of the south right-of-way line Marquis Drive (70-foot wide public right-of-way at this point) as created by the Right-of-Way Dedication recorded in Volume 85083, Page 3484, Deed Records, Dallas County, Texas; said point being also on a non-tangent circular curve to the left having a radius of 1255.00 feet;

THENCE, southeasterly, with said south right-of-way line and said curve to the left, through a central angle of 18 degrees 43 minutes 21 seconds, an arc distance of 410.09 feet (chord bears South 81 degrees 18 minutes 07 seconds East, 408.27 feet) to the end of said curve;

THENCE, North 89 degrees 20 minutes 13 seconds East, with said south right-of-way line, a distance of 183.77 feet to a point for corner at the Intersection of said south right-of-way line with the east line of said 32.60 acre tract; said point also being on the west line of a called 82.372 acre tract of rand described In the deed to Sears Roebuck and Co. recorded in Volume 68194, Page 1835, Deed Records, Dallas County, Texas;

THENCE, South 00 degrees 53 minutes 07 seconds East, with the common line between said 82.372 acre tract and said 32.60 acre tract, a distance of 437.00 feet to a point for corner on said north line of Lot1.,

THENCE, South 89 degrees 17 minutes 20" West, with the north line of Lot 1, a distance of 586.00 feet to the POINT OF BEGINNING;

CONTAINING, 265,102 square feet or 6.086 acres of land, more or less.

## EXHIBIT "B"
### To License Agreement

### LEGAL DESCRIPTION OF PREMISES

[A tract of land containing approximately 3.76 acres (verify – measured on DCAD website) out of][1]

BEING a tract of land situated In the BENJAMIN DYE SURVEY, ABSTRACT NO. 415 in the City of Garland, Dallas County, Texas and being the remainder of that called 82.372 acre tract of land described in the deed to Sears Roebuck and Co. recorded in Volume 68194, Page 1835, Deed Retards, Dallas County, Texas, and being more particularly described as follows:

BEGINNING, at a 5/8-lnch iron rod found for the northwest corner of Lot 2R1, Block 1, Sears Industrial District No. 3 Replat, an addition to the City of Garland according to the plat thereof recorded in County Clerk's File Number 20160072804, Real Property Records, Dallas County, Texas; said point being also an angle point in the south right-of-way line of Marquis Drive (60-foot wide public right-of-way at this point);

THENCE, South 00 degrees 53 minutes 08 seconds East with the west line of said Lot 2R1, at a distance of 729.97 feet pass the southwest corner of said Lot 2R1 and the northwest corner of lot 1R, Block 1, Sears Industrial District No. 3 Replat, an addition to the City of Garland according to the plat thereof recorded in County Clerk's File Number 200600272358, Real Property Records, Dallas County, continuing, with the west line of said 1R, in all, a distance of 832.25 feet to the northeast corner of Lot 1, Block 1, Sears Industrial District No. 4, an addition to the City of Garland according to the plat thereof recorded in Volume 97132, Page 2923, Deed Records, Dallas County, Texas;

THENCE, South 89 degrees 19 minutes 04 seconds West, with the north line of said Lot 1, a distance of 524.48 feet to a 1/2-inch iron rod found for the northwest corner of said Lot 1; said point being also on the east right-of-way line of Kings Road (BO-foot wide public right-of-way at this point);

THENCE, North 00 degrees 40 minutes 56 seconds West, with said east right-of-way line, a distance of 348.04 feet to a point for a corner of said right-of-way line;

THENCE, South 89 degrees 19 minutes 04 seconds West, with the right-of-way of said Kings Drive, a distance of 80.00 feet to a corner of said right-of-way line, said point also being on the east line of Lot 1, Block 1, Sears Industrial District No. 2, an addition to the City of Garland according to the plat thereof recorded in Volume 78041, Page 409, Deed Records, Dallas County, Texas;

THENCE, North 00 degrees 40 minutes 56 seconds West, with the east line of said Sears Industrial District No. 2, a distance of 33.24 feet to a 1/2-inch iron rod found for the northeast corner of said Sears Industrial District No. 2;

---

[1] To confirm

License Agreement
3001.07002.10.23002.1

11

Approx. 3.76 acres
Garland, TX

THENCE, South 89 degrees 17 minutes 20" West, with the north line of said Sears Industrial District No. 2, a distance of 324.77 feet to a point for corner on the west line of said 82,372 acre tract; said point also being on the east line of a called 32.60 acre tract of land described in the deed to Sears Roebuck and Co. recorded in Volume 68194, Page 1839, Deed Records, Dallas County, Texas;

THENCE, North 00 degrees 53 minutes 07 seconds West, with the common line between said 82.372 acre tract and said 32.60 acre tract, a distance of 437.00 feet to a point for corner on said south right-of-way line of Marquis Drive as created by the Right-of-Way Dedication recorded in Volume 85083, Page 3484, Deed Records, Dallas County, Texas;

THENCE, North 87 degrees 49 minutes 45 seconds East with said south right-of-way line, a distance of 928.13 feet to a point (or a corner of said right-of-way line;

THENCE, South 00 degrees 53 minutes 08 seconds East, with said south right-of-way line, a distance of 9.99 feet to the POINT OF BEGINNING;

CONTAINING, 618,934 square feet or 14.209 acres of land, more or less and as shown on the diagram below (the "**Premises**"):



**Exhibit B**

**Warehouse Lease**

# LEASE

## BY AND BETWEEN

## SEARS, ROEBUCK AND CO., as tenant

## AND

## ELM CREEK REAL ESTATE, LLC, as landlord

Dated as of April 16, 2018

Property: The following two (2) parcels of land all in the City of Garland, Dallas County, Texas 75042:

(i)     Parcel 1 = 1501 Kings Road (Sears #8907); and
(ii)    Parcel 3 = 3 Kings Road (which also has an address of 1617 Kings Road), (Sears #8157).

**Sears #8157 and Sears #8907**

## LEASE

THIS LEASE (this "**Lease**") is made as of the 18 day of April, 2018 ("**Effective Date**"), between **ELM CREEK REAL ESTATE, LLC,** a Texas limited liability company having an office at 4641 Nall Rd, Dallas, Texas 75244 ("**Landlord**") and **SEARS, ROEBUCK AND CO.,** a New York corporation, having an office at 3333 Beverly Road, Dept. 824RE, Hoffman Estates, Illinois 60179 ("**Tenant**").

## W I T N E S S E T H:

**WHEREAS**, pursuant to that certain Real Estate Sale Contract dated as of April 6, 2018, between Tenant, as seller, and Landlord, as buyer (the "**PSA**"), Tenant agreed to sell to Landlord, and Landlord agreed to purchase from Tenant the land more particularly described on **Exhibit A-1** attached hereto (the "**1501 Kings Road Property**") and the land more particularly described on **Exhibit A-2** attached hereto (the "**3 Kings Road Property**") (the 1501 Kings Road Property and 3 Kings Road Property are collectively, the "**Property**");

**WHEREAS**, as a condition to the closing pursuant to the PSA, immediately following the sale of the Property by Tenant to Landlord, Landlord is required to lease to Tenant, and Tenant is required to lease from Landlord, the Premises (as defined below) pursuant to the terms and conditions of this Lease; and

**WHEREAS**, the closing under the PSA occurred on the Effective Date and Tenant and Landlord wish to enter into this Lease to complete the transaction.

**NOW, THEREFORE,** Tenant and Landlord agree as follows:

1.    **Demise**.  (a) Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises, all existing parking located on the Property and all additional parking and all easements and appurtenances for the benefit of the Property, except that the use of the existing parking areas by Tenant shall be non-exclusive to the extent other parties have parking rights with regard to such areas on the Effective Date) for the Term.  The "**Premises**" shall be defined as the premises described on **Exhibit B-1** attached hereto (the "**1501 Kings Road Premises**") and described on **Exhibit B-2** attached hereto (the "**3 Kings Road Property Premises**").  The leasing of the Premises under this Lease shall also include Tenant's right to use all parking, access and common areas useful in connection with the Property in a manner substantially similar to the manner in which same have been used prior to the date hereof, to the extent Landlord possesses or has the right to such rights.  All leases together with any license agreements and/or subleases of portions of the Premises (collectively, the "**Tenant Leases**") shall continue to inure to the sole benefit of Tenant through the Termination Date.  For the avoidance of doubt, Tenant expressly retains all rights, remedies and privileges in and to the Tenant Leases for the duration of the Term, including all rents payable under the Tenant Leases. Landlord and Tenant acknowledge and agree that this Lease relates to the 1501 Kings Road Property and the 3 Kings Road Property, but the demise hereunder relates to each such Property separately and individually.  Except as otherwise expressly provided herein, each reference to the Property or the Premises shall be interpreted as a separate reference to the 1501 Kings Road Property or the 3 Kings Road Property, as applicable.

(b)      At any time after the Effective Date, Landlord shall have the right to cause any portion of the Property to be released from the Lease (the "**Landlord Released Parcel**"), without a reduction in rent, provided that (i) Landlord gives written notice to Tenant of the proposed release no less than sixty (60) days prior to the date of the proposed release, (ii) the Landlord Released Parcel is vacant and is not currently being utilized by Tenant in connection with its operations at the Property, (iii) Landlord submits a site plan, subject to Tenant's prior approval, which approval shall not be unreasonably withheld, of Tenant's remaining property (the "**Tenant's Remaining Property**") showing that Tenant's access to, parking on, or utilities at Tenant's Remaining Property are not changed by the proposed release, (iv) the zoning and use at Tenant's Remaining Property shall remain unaffected by the proposed release; (v) Landlord shall present to Tenant a metes and bounds legal description of the Landlord Released Parcel for Tenant's review and approval (if such metes and bounds legal description does not already exist) prior to the release of the Landlord Released Property (vi) Landlord and Tenant shall enter into an amendment of this Lease which shall document the release of the Landlord Released Parcel and (vii) all costs and expenses incurred by Tenant in connection with the release of the Landlord Released Property shall be borne by Landlord. If necessary, simultaneously with the release of Tenant's property, Landlord and Tenant shall enter into a mutual access easement agreement providing free and uninterrupted pedestrian and vehicular ingress to and egress from the Tenant's Remaining Property to and from Kings Road.

2.      **Term**.

(k)      The initial term of this Lease (the "**Initial Term**") shall commence on the Effective Date and shall expire at midnight on the last day of the fifth (5th) Lease Year, unless (x) sooner terminated as provided in this Lease or (y) extended as provided herein. The time period during which this Lease shall actually be in effect, including any Extension Term, is referred to as the "**Term**".

(l)      Unless this Lease has expired or has been sooner terminated, or a default has occurred and is continuing at the time the Extension Option is exercised, Tenant shall have the right and option (an "**Extension Option**") to extend the Initial Term for one additional successive period of five (5) years (the "**Extension Term**").  Tenant may only exercise the Extension Option by giving written notice thereof to Landlord of its election to do so no later than one hundred eighty (180) days prior to the then existing expiration date of the Term.  It is the intention of the parties hereto to avoid forfeiture of Tenant's rights to exercise the Extension Option through inadvertent failure to give notice of the exercise thereof within the time limits prescribed above.  It is also the intention of the parties to allow Landlord sufficient time if Tenant decides not to exercise the Extension Option to find a substitute tenant.  Accordingly, if Tenant shall fail to give notice to Landlord of Tenant's election to exercise the Extension Option at least one hundred eighty (180)  days prior to the then existing expiration date of the Term, then Tenant's right to exercise its Extension Option shall continue thereafter until the earlier to occur of (i) Landlord shall have served (not more than forty-five (45)) days prior to the expiration date of the then current Term) upon Tenant a notice directing Tenant to make a decision within thirty (30) days to exercise or decline to exercise the Extension Option and such thirty (30) day period shall have expired with Tenant having failed to exercise or having declined to exercise during such period the Extension Option or (ii) Tenant shall have served upon Landlord a written notice of its election to exercise or not to exercise the Extension Option.

Tenant's written notice of its election not to exercise the Extension Option shall cause the Lease to terminate at the expiration of the last day of the then current Term. Without modification of the foregoing, if Tenant does not exercise the Extension Option within the Term or Landlord does not direct Tenant to make a decision to elect within the Term and a holdover results into the next Extension Term period and thereafter Tenant exercises its Extension Option in accordance herewith, then the Term shall nonetheless expire at the end of what would normally have been the next succeeding Extension Term period (it being the intention of the parties that the then-current Term expire on the last day of the next Extension Term period). Notwithstanding such holdover, Tenant may notify Landlord of its intention to not exercise the next Extension Option, thereby terminating this Lease as of the one hundred twentieth (120th) day following delivery of such notification. Tenant shall not be subject to the provisions of <u>Section 24</u> if any holding over is pursuant to the provisions of this <u>Section 2(b)</u>. Upon the request of Tenant or Landlord, the parties hereto will, at the expense of Landlord, execute and exchange an instrument in recordable form setting forth the extension of the Term.

(m)    If the date otherwise scheduled for termination or expiration of this Lease is not a Business Day, the Termination Date shall be on the first Business Day thereafter. A "**Business Day**" means any day other than a Saturday, Sunday or other day on which banks are authorized or required by law to be closed in the jurisdiction in which the Property is located. A "**Lease Year**" means each successive twelve (12) calendar month period commencing on the first day of a calendar month. The first Lease Year shall be the twelve (12) month period commencing on the first day of the calendar month immediately succeeding the month in which the Term of this Lease commences plus any partial calendar month during the calendar month in which the Term of this Lease commences.

3.    <u>**Surrender of Possession; Early Termination By Tenant**</u>.

(a)    <u>**Early Termination by Tenant**</u>. In addition to any early termination of this Lease that may arise under any other section of this Lease, Tenant may elect to terminate this Lease as to (i) all of the Premises, or (ii) either or both of the 1501 Kings Road Premises or the 3 Kings Road Property Premises currently being used by Tenant at the time of the execution of this Lease (in which case the Rent shall be adjusted as to reflect the terminated portion of the Premises); provided, that as a condition precedent to such termination, Tenant shall provide not less than ninety (90) days' prior written notice of termination ("**Tenant Termination Notice**") to Landlord. Notwithstanding any provision in this Lease to the contrary, Tenant shall not have the right to terminate the Lease and receive a reduction in Rent on (i) the portion of the Landlord's Released Parcel, or (ii) on a portion of the buildings and parking lot located on 1501 Kings Road Premises or 3 Kings Road Property Premises.

(b)    <u>**Surrender of Possession**</u>. Upon the first to occur of (i) the expiration of the Term, or (ii) any sooner termination of this Lease pursuant to any other section of this Lease, or (iii) any earlier date as noted in a validly delivered Tenant Termination Notice (the first of such dates being the "**Termination Date**"), Tenant shall surrender possession of the Premises in its "AS-IS," "WHERE-IS" and "WITH ALL FAULTS" condition, free of all subtenants, licensees, leases, subleases, concessionaires and other occupants claiming by, through or under Tenant, including the Tenant Leases, if any, and without any obligation by Tenant to remove any fixtures, furnishings or equipment or other personal property. Other than heating, ventilating and

air conditioning systems and equipment (other than racking equipment), plumbing systems and equipment, electrical systems and equipment, on or prior to the Termination Date, Tenant may remove any or all of Tenant's fixtures, furnishings, equipment, merchandise, inventory and other personal property (collectively, "**Tenant's Property**"), and any of the same remaining after the Termination Date shall be deemed abandoned by Tenant and Landlord shall have no liability with respect thereto and Landlord may, at Landlord's expense, dispose of and/or demolish any such personal property without compensation to Tenant.

4.    <u>**Rent**</u>.

(k)    As consideration for this Lease, Tenant shall pay to Landlord annual fixed rent ("**Annual Fixed Rent**") during each Lease Year in the aggregate amounts set forth on **Schedule 1** attached hereto.  The Annual Fixed Rent then in effect shall be payable in equal monthly installments ("**Monthly Fixed Rent**") in advance on or prior to the fifth (5th) day of each month.  Monthly Fixed Rent shall be prorated on a per diem basis for any portion of a month.

(l)    As "**Additional Rent**" Tenant shall also pay directly to the relevant authority as and when due, Taxes and, upon request by Landlord, shall provide Landlord with reasonable evidence that the same have been paid.  For purposes hereof, "**Taxes**" shall mean all taxes and impositions relating to the ownership, leasing and operation of the Property, or any portion thereof, including the land, but excluding any excess profits taxes, franchise taxes, gift taxes, inheritance and succession taxes, estate taxes, documentary transfer taxes, federal or state income taxes, corporate, capital stock or capital gains taxes, penalties incurred as a result of Landlord's failure to pay taxes or to file any tax or informational returns and other taxes to the extent applicable to Landlord's general or net income (as opposed to rents, receipts or income attributable to operations at the Property). Notwithstanding the foregoing, Landlord shall be responsible for all increases in real estate taxes based on or triggered by a change of ownership or the sale of the Property, including pursuant to the PSA, and/or a reassessment of the Property by reason thereof.  All real estate taxes for the last year of the Term shall be prorated between the parties on a per diem basis based on the most recent and available real estate tax bill and will be adjusted in cash once the actual taxes are known.  Landlord shall give prompt notice to Tenant of all real estate taxes payable by Tenant hereunder of which Landlord at any time has knowledge and shall send copies of all bills and notices received by Landlord in respect of the Premises to Tenant.

(m)    If the Termination Date occurs on any day other than the last day of a calendar month, Tenant will be entitled to a refund in an amount equal to Monthly Fixed Rent and Additional Rent theretofore paid with respect to the Premises allocable on a per-diem basis to the remainder of the month.

(n)    The parties acknowledge and agree that Tenant shall pay for all of its own ordinary operating costs and expenses (such as, but not limited to, utility costs and phone service) in connection with Tenant's use and occupancy of the Premises prior to and during the Term, in accordance with its customary practices, subject to <u>Section 4</u> and <u>Section 8</u>, and except (i) for costs, expenses and damages resulting from the negligence or willful misconduct by

Landlord or its agents, employees or contractors, (ii) with respect to all pre-existing conditions at or affecting the Property, and (iii) as otherwise expressly set forth herein.

(o)    Annual Fixed Rent, Monthly Fixed Rent and Additional Rent shall be collectively referred to herein as "**Rent**".

(p)    Subject to Section 4, all Taxes applicable to the last year of the Term shall be prorated between the parties on a per diem basis based on the most recent and available tax bill and adjusted in cash once actual taxes are known.  Landlord shall give prompt notice to Tenant of all Taxes payable by Tenant hereunder of which Landlord at any time has knowledge. Landlord shall use its reasonable efforts to obtain the cooperation of all taxing authorities to send all bills and notices in respect of the Property directly to Tenant.

(q)    Tenant may, at its own expense, contest or cause to be contested, by appropriate legal proceedings conducted in good faith and with due diligence, any tax (including penalties and interest), assessment, tax lien, forfeiture or other imposition or charge upon or against the Property or any part thereof, including, without limitation, the amount or validity or application, in whole or in part, of any such item, provided that (i) neither the Property nor any interest therein would be in any danger of being sold, forfeited or lost by reason of such proceedings; and (ii) no default under this Lease has occurred and is continuing.  Landlord shall, at the request of Tenant, execute or join in the execution of any instruments or documents necessary in connection with such contest or proceedings, but Landlord shall incur no cost or obligation thereby.

(r)    In light of the fact that Tenant is continuing (i) in occupancy following the Closing Date, and (ii) to control the Tenant Leases and service contracts, except as set forth in the PSA, Tenant and, if applicable, Landlord have not prorated common area maintenance reimbursements or payments under any Ancillary Rights and Agreements (as hereinafter defined), expenses under service contracts, utilities and other customary real property prorations and adjustments as of the Closing.

(s)    In the event Landlord obtains a release of the Property as set forth in Section 1(a), then Tenant shall pay Taxes on the land and improvements situated on the Tenant's Remaining Property and Landlord shall pay Taxes on the released property.

5.    **Alterations; "Going out of Business Sale"; Signage**.

(k)    Except as otherwise provided herein, without first obtaining Landlord's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed), Tenant shall not make or cause to be made any alterations to the building structure or building systems or any other material alterations or install any additional permanent fixtures to the Premises. Notwithstanding the preceding sentence, Tenant (and any of its subtenants, licensees or other occupants) shall not be required to obtain any consent from Landlord for: (1) any minor or non-structural alterations to the Premises, (2) placing temporary signs on the Property in connection with its store-closing operations or (3) any non-structural alterations to the Premises in connection with any Necessary Curtailments, or any reduction in business operations or reduction in utilizing space within the Premises. "**Necessary Curtailments**" means repairs,

alterations, Ordinary Repairs and any Major Repair/Capital Improvement, Casualty, customary acts or events of force majeure, and events beyond the reasonable control of Tenant. Notwithstanding the foregoing, Tenant, at its expense, may at any time and from time to time make alterations and/or additions to the Premises provided that: (A) the market value of the Premises shall not be reduced or its usefulness impaired, (B) the work shall be done expeditiously and in a good and workmanlike manner, (C) Tenant shall comply with all legal requirements applicable to the work and (D) Tenant shall promptly pay all costs and expenses and discharge any and all liens arising in connection with the work in accordance with the terms hereof. Notwithstanding the foregoing, Tenant, at its expense, may install or assemble or place on the Premises, and remove and substitute, any items of machinery, equipment, furniture, furnishings, trade fixtures or other Tenant's personal property, including, but not limited to, all conveyer and material handling systems and related equipment, used or useful in Tenant's business.

(l)     Notwithstanding any provision herein to the contrary, but subject to the provisions hereof, Tenant shall have the right to conduct a "going out of business sale" to be completed during the one hundred twenty (120) day period prior to the expiration of the Term or earlier termination of this Lease as provided herein and to cease store operations and to remove Tenant's personal property and prepare for the turnover of possession of the Premises to Landlord pursuant to the provisions of this Lease. Tenant shall have the option to erect and maintain, subject to applicable legal requirements and matters of title to which this Lease is subordinate, at its sole cost and expense, upon any portion of the Property or improvements, signs of such height and other dimensions bearing such legend or inscription as Tenant shall determine.

6.     **Use; Operation**.

(k)     Tenant shall not have any obligation to operate or use or conduct business in or on any of the Premises or be subject to any restrictions on any operation or on the use of or conduct of business on the Premises, and Tenant may use the Premises, if it operates at all, for any lawful use and may downsize its operations and/or cease operations at any time in its sole discretion.

(l)     Without limiting the foregoing, Tenant will continue to enjoy the benefit of all existing easements, parking agreements, rights of access and ingress, and all other rights and benefits as it currently enjoys (including under all applicable REAs and supplemental agreements, if any) with respect to the Property (all of the foregoing, collectively, "**Ancillary Rights and Agreements**"), and in furtherance thereof, Landlord agrees to enforce (and cause its affiliates to enforce) all such Ancillary Rights and Agreements (excluding operating covenants) for the benefit of Tenant. Tenant agrees to continue to comply with the non-monetary provisions (if any) of the Ancillary Rights and Agreements that are applicable to the Premises in accordance with its past practices in the ordinary course of business. Landlord shall not terminate, amend or modify the Ancillary Rights and Agreements without Tenant's consent.

7.     **Access and Cooperation**. Upon not less than five (5) Business Days' prior notice to Tenant, Landlord and its representatives shall have access to the Premises for purposes of a visual inspection during normal business hours; provided, however, that in emergency

circumstances Landlord and its representatives may have immediate access to the Premises at any time after making all reasonable attempts to contact Tenant, but otherwise without the necessity of prior notice. In connection with any such access or entry, Landlord and its representatives shall (a) not unreasonably interfere with Tenant's or any subtenant's, licensee's or other occupant's business operations at the Premises (including the business operations pursuant to any Tenant Leases), (b) not conduct any physical testing or invasive studies, and (c) promptly restore or repair any damage occasioned by such access or entry.

8.    **Services and Repairs; Utilities**.

(a)    Tenant shall accept the Premises in its existing condition as of the Effective Date, "as is," "where is," and "with all faults" and without any written or verbal representations or warranties whatsoever, whether express or implied, other than representations and warranties expressly set forth in this Lease, and except for any surviving provisions of the PSA and any ancillary documents executed in connection therewith.

(b)    Subject to the foregoing and the following provisions of this Section 8 and the other terms and conditions of this Lease, Landlord shall have no obligation to supply any services or make any ordinary repairs to the Premises or Property, the parties expressly intending that subject to the further provisions of this Section 8 and the other terms and conditions of this Lease, Tenant's current arrangements for all other services and general maintenance and ordinary repairs shall continue at Tenant's election unaffected during the Term (and Landlord shall not interfere with same).

(c)    Subject to the provisions hereinafter set forth and Section 5, Tenant and not Landlord shall be responsible for the ordinary repair and maintenance of the Premises (including the parking lot and other common areas), subject to the provisions hereinafter set forth, (i) Tenant shall not be responsible for funding any Major Repair/Capital Improvement to the Premises (including the parking lot and other common areas), and (ii) Tenant shall be responsible for funding any repair which is not a Major Repair/Capital Improvement and which is not covered by net proceeds received by Tenant with respect to applicable insurance, if any ("**Ordinary Repairs**"), subject to an aggregate cap of $150,000 for such Ordinary Repairs in any consecutive twelve (12) month period (the "**Repair/Capital Threshold**"). Any Ordinary Repairs reasonably necessary above such cap will be considered to be a Major Repair/Capital Improvement.

(i)    A "**Major Repair/ Capital Improvement**" shall mean (with respect to one event or one item, or a series of directly related events or items, and not an aggregate of separate unrelated events or separate unrelated items) a repair (to the extent not covered by the net proceeds received by Tenant with respect to applicable insurance, if any) or a capital improvement costing (or which is reasonably estimated to cost) in any case in excess of $300,000. In the event Tenant acting in good faith determines that a Major Repair/Capital Improvement is appropriate, Tenant may elect not to fund the Major Repair/Capital Improvement and terminate this Lease upon not less than ninety (90) days' prior written notice to Landlord, but, prior to exercising such termination right, Tenant must notify Landlord of the necessity for any such Major Repair/Capital Improvement and the cost (or reasonably estimated cost) of such Major Repair/Capital Improvement. Landlord shall have the opportunity for a

period of ten (10) days after receipt of such notice from Tenant to notify Tenant that Landlord irrevocably commits to fund at Landlord's sole cost and expense the amount of such Major Repair/Capital Improvement in excess of $300,000 (with Tenant funding the first $300,000). If Landlord timely elects to fund and actually funds such excess within ten (10) days after it provides its election to fund notice to Tenant, then Tenant shall not have a termination right as it relates to such Major Repair/Capital Improvement and shall be obligated to make any such Major Repair/Capital Improvement (subject to the terms and provisions of this Lease and subject to reimbursement by Landlord as set forth above).

(ii)    As set forth above, Tenant's responsibility for funding Ordinary Repairs is subject to the Repair/Capital Threshold. The Repair/Capital Threshold shall be implemented as provided in this Section 8(c)(ii). In the event that Tenant has expended, or is reasonably expected to expend, funds (in a consecutive twelve (12) month period) on Ordinary Repairs in excess of the Repair/Capital Threshold, Tenant may elect not to fund any further Ordinary Repairs for the balance of the twelve (12) consecutive month period at issue and terminate this Lease upon not less than ninety (90) days' prior written notice to Landlord. However, prior to exercising such termination right, Tenant must notify Landlord of the necessity (as reasonably determined by Tenant) for any such Ordinary Repairs and the cost (or reasonably estimated cost) of such Ordinary Repairs. Landlord shall have the opportunity for a period of ten (10) days after receipt of such notice from Tenant to notify Tenant that Landlord irrevocably commits to fund at Landlord's sole cost and expense the amount of such Ordinary Repairs in excess of the Repair/Capital Threshold for the balance of the twelve (12) consecutive month period at issue. If Landlord timely elects to fund and actually funds such excess within ten (10) days after Landlord provides its election to fund notice to Tenant, then Tenant shall not have a termination right as it relates to such Ordinary Repairs for that twelve (12) consecutive month period and shall be obligated to make any such Ordinary Repairs (subject to the terms and provisions of this Lease and subject to reimbursement by Landlord as set forth herein).

(iii)    Except as expressly set forth above and elsewhere in this Lease, Tenant shall have no obligation to make any repairs or replacements or capital expenditures of whatever nature during the Term, but Tenant may do so at any time at its election. Tenant may continue to exercise and enforce exclusively any and all rights of the owner or landlord under the Tenant Leases and the service contracts (including, without limitation, with respect to maintenance and upkeep of the Premises), and Landlord agrees to reasonably cooperate with Tenant at no cost to Landlord in connection therewith.

(d)    Tenant shall pay directly to the utility company(ies), the cost of all utilities consumed by Tenant during the Term.

9.    **Insurance; Casualty**.

(k)    Tenant shall maintain all personal property and liability insurance programs presently in effect or as replaced by Tenant from time to time in accordance with its general corporate policies throughout the Term. Tenant shall maintain commercial general public liability insurance for the common area of the Premises and all-risk property damage insurance covering the Premises and other building improvements on the Premises.

(l)    This Lease shall terminate at the election of Tenant upon the occurrence of a fire or other casualty ("**Casualty**") which results in material damage to the Premises (the portion of the Premises that is destroyed or damaged is twenty-five percent (25%) or more of the floor area or the floor area of the Premises that is destroyed or damaged materially affects the use and occupancy of the Premises)  with an appropriate prorated refund to Tenant on a per-diem basis of all prepaid Monthly Fixed Rent and Additional Rent.  If Tenant elects not to terminate this Lease in the event of a Casualty which results in material damage to the Premises, all Monthly Fixed Rent and Additional Rent with respect to the portion of the Premises which is damaged shall be abated on a per-square-foot basis.  If this Lease is terminated as provided herein, Tenant, at Tenant's election, shall have a period of up to one hundred twenty (120) Business Days (as elected by Tenant), for the purpose of winding down its business operations and removing any or all of Tenant's personal property at its election from the Property without payment of any Rent.  In no event shall Tenant or Landlord be obligated to make any repairs or restorations in the event of damage to the Premises resulting from a Casualty.

(m)    If Landlord shall be advised by a condemning authority or otherwise has knowledge of a proposed condemnation or other taking of the Property (or a portion thereof), then Landlord shall promptly give notice thereof to Tenant.  Upon any actual exercise by any governmental power (by legal proceedings or otherwise), by any public or quasi-public authority or by any other Person having the right of eminent domain or a voluntary sale or transfer by Landlord to any of the foregoing either under the threat of exercise of eminent domain or while legal proceedings for condemnation are pending with respect to a material portion of the Premises (i.e., twenty-five percent (25%) or more of the floor area of the Premises or the portion of Property taken materially affects the use and occupancy of the Premises) (collectively, a "**Condemnation Action**", this Lease shall automatically terminate, except as provided below, as of the date on which title to the property subject to the Condemnation Action is vested in the condemnor.  Tenant, at Tenant's election, shall have a period of up to one hundred twenty (120) Business Days (as elected by Tenant) after Tenant receives notice a Condemnation Action (but in no event later than the date of the actual Condemnation Action) during which to wind down its business operations and remove any or all of Tenant's Property at its election from the Premises without payment of any Rent.  Upon the payment of any award or compensation to Landlord arising from any Condemnation Action, there shall be such division of the proceeds and such other adjustments as the parties may agree upon as being just and equitable under all circumstances regardless of any technical rule of law.

10.    **Default**.

(k)    **By Tenant**.

(i)    Defaults by Tenant are: (A) failing to timely pay Monthly Fixed Rent or Additional Rent, if such Monthly Fixed Rent and/or Additional Rent is not paid within seven (7) Business Days after receipt of written notice from Landlord of nonpayment; or (B) failing to observe or perform any other material obligations of Tenant hereunder for a period of thirty (30) days after receipt of written notice from Landlord of such failure (or such longer period as may be reasonably required to cure such failure, provided that Tenant is diligently prosecuting such cure to completion).  As Landlord's sole remedy for a default by Tenant, Landlord may give Tenant written notice of Landlord's intention to terminate this Lease (the

"**Default Termination Notice**") at the end of the expiration of thirty (30) days from the date of the giving of such Default Termination Notice, and, in such event, this Lease and the Term shall terminate upon the expiration of such thirty (30) days with the same effect as if the last of such thirty (30) days was the date originally set forth herein for the expiration of the Term.  No default shall be deemed to exist under clause (B) during any time the curing thereof is prevented by Necessary Curtailments provided that upon the cessation of such Necessary Curtailments (subject to Section 9) Tenant shall prosecute such cure without further delay.

(ii)     If (A) Tenant becomes bankrupt, makes an assignment for the benefit of creditors, or applies for or consents to the appointment of a trustee or receiver for Tenant or for the major part of its property; (B) a trustee or receiver is appointed for Tenant or for the major part of its property; or (C) any voluntary or involuntary proceedings are filed by or against Tenant under any bankruptcy, insolvency or similar laws, Landlord may give Tenant written notice of intention to terminate this Lease (the "**Bankruptcy Termination Notice**") at the end of the expiration of thirty (30) days from the date of giving such Bankruptcy Termination Notice, and in such event, this Lease and the Term shall terminate upon the expiration of such thirty (30) days with the same effect as if the last of such thirty (30) days was the date originally set forth herein for the expiration of the Term.

(iii)     Subject to the provisions of Section 10(k)(iv) below, upon the termination of this Lease in accordance with the provisions of this Section 10(k), Tenant shall remain liable to Landlord for any portion of the Monthly Fixed Rent and Additional Rent due through the end of the Term (less the net proceeds, if any, of any reletting of the Premises or any part thereof and the avails of any continuing Leases), but in no event shall Tenant be liable for any consequential, special, punitive or other damages, or any other costs, fees or expenses.  In any event, Landlord shall make reasonable efforts to mitigate damages.

(iv)     In no event shall Tenant be liable in damages of any kind for any default under this Lease by Tenant and Landlord acknowledges that Landlord's sole and exclusive remedy for any default or breach of this Lease by Tenant shall be Landlord's right to terminate this Lease as set forth in this Section 10.  Neither Tenant nor any member, partner (general or limited), manager, officer, director, shareholder or principal of Tenant shall have any personal liability whatsoever for the payment or collection of any judgment requiring the payment of money by Tenant in the event of a default by Tenant with respect to the terms, covenants and conditions of this Lease to be observed and/or performed by Tenant.

(l)     **By Landlord.**  Defaults by Landlord are (i) failing to timely pay any amount to be paid by Landlord hereunder, if such amount is not paid within seven (7) Business Days after receipt of written notice from Tenant of nonpayment; or (ii) failing to observe or perform any other material obligations of Landlord hereunder for a period of thirty (30) days after receipt of written notice from Tenant of such failure (or such longer period as may be reasonably required to cure such failure, provided that Landlord is diligently prosecuting such cure to completion).  In the event of any default by Landlord, Tenant may give Landlord written notice ("**Tenant Notice**") of Tenant's intention to (A) cure any or all non-monetary defaults of Landlord, in which event Landlord shall pay to Tenant the reasonable cost of curing the same upon demand, and/or (B) set off against the Rent and all other sums due or becoming due from Tenant to Landlord hereunder, the amount of all sums as to which Landlord is in default,

together with the reasonable cost of curing all non-monetary defaults of Landlord in the event Tenant elects to cure the same, at the end of (I) with respect to (A), the expiration of ten (10) Business Days from the date of the giving of such Tenant Notice and (II) with respect to (B), the expiration of five (5) Business Days from the date of giving of such Tenant Notice. Tenant shall also have the option, in the Tenant Notice, to terminate this Lease at the end of the expiration of thirty (30) days from the date of giving such Tenant Notice, and in such event, this Lease and the Term shall terminate upon the expiration of such thirty (30) days with the same effect as if the last of such thirty (30) days was the date originally set forth herein for the expiration of the Term. The provisions of this <u>Section 10(l)</u> shall survive the expiration or sooner termination of this Lease.

11.    **<u>Assignment/Subleasing</u>**.

(k)    Tenant shall have the right to assign or sublet (and grant licenses and concessions, department arrangements and other rights) all or any portion of its leasehold interest during the Term without Landlord's approval so long as Tenant (or any successor) remains liable to Landlord for all Rent.

(l)    Tenant shall also have the right, without Landlord's approval, to (i) assign this Lease to Parent or any Subsidiary of Tenant; (ii) assign or transfer all of Tenant's rights and obligations under this Lease (either directly or indirectly, by operation of law or through a merger or other corporate transaction) to any other Person that (1) acquires all or substantially all of the assets of Tenant Holdings Corporation ("**Parent**"), (2) is the surviving entity of a merger with Parent, or (3) results from a consolidation, reorganization or recapitalization of Parent with a solvent corporation, partnership or other legal entity; or (iii) assign or transfer all of Tenant's rights and obligations under this Lease to any Person that concurrently acquires not less than ten (10) Tenant's stores (including the Premises) by purchase, consolidation, merger or spin-off; provided, that in each case the successor tenant (if not the named tenant herein, the "<u>**Unrelated Successor Tenant**</u>") assumes all of Tenant's obligations under this Lease (except that any such Unrelated Successor Tenant shall not be required to comply with any operating covenant provided for herein). In the case of an assignment or transfer in connection with clause (iii) above, Tenant shall not be released from all liability under this Lease unless the assignee has a net worth of not less than $50,000,000 as of the effective date of such assignment or transfer and the assignee assumes in writing the obligations of Tenant under this Lease which arise on and after the date upon which the assignment becomes effective. As used in this Lease, (x) "<u>**Subsidiary**</u>" means, as to any Person, (i) any corporation more than fifty percent (50%) of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time of determination owned by such Person and/or one or more Subsidiaries of such Person, and (ii) any partnership, limited liability company, association, joint venture or other entity in which such person and/or one or more Subsidiaries of such person has more than a fifty percent (50%) equity interest at the time of determination and (y) "**Person**" or "**person**" means any natural person, partnership, limited partnership, limited liability company, corporation, trust, estate, association, unincorporated association or other entity.

(m)    Landlord shall enter into a non-disturbance agreement with any permitted subtenant in form and substance reasonably satisfactory to the parties thereto whereby Landlord agrees to recognize such subtenant's rights under its sublease so long as such subtenant observes and performs all of its obligations under such sublease and such subtenant agrees to attorn to Landlord. With respect to any sublease, such non-disturbance agreement shall provide that, upon termination of this Lease, (1) subtenant shall pay to Landlord the rent provided for in the sublease and (2) the sublease shall become a direct lease between Landlord and subtenant (except that (a) Landlord shall not be subject to any prior offsets or defenses which subtenant might have against Tenant (but subject to Landlord's continuing obligations as landlord); (b) Landlord shall not be bound by any rent or additional rent which subtenant might have paid more than one (1) month in advance to Tenant; (c) Landlord shall not be bound by any escrow deposit for taxes, insurance, maintenance, single or payment made under the sublease (including, without limitation, any security deposit) unless Landlord shall have taken actual possession of such sums; (d) Landlord shall not be bound by any prior obligation under the sublease to make any payment to subtenant; (e) Landlord shall not be bound by any surrender or termination or any amendment or modification of the sublease which is made in violation of the terms of this Lease; and (f) Landlord shall not be obligated to commence, complete or perform any construction or make any contributions toward construction or installation of any improvements upon the subleased premises required under the sublease or any expansion or rehabilitation of existing improvements thereon) and the parties will execute and deliver any further reasonable documents as are necessary or desirable to more fully effectuate the foregoing.  In the event a subtenant enters into a direct lease with Landlord, Landlord shall obtain from each of the Ground Lessors and Landlord's Mortgagees an SNDA for the benefit of such subtenant containing provisions substantially similar to those set forth in this Section 11(m).

(n)    In the event of a sale or conveyance by Landlord of the Property (or any portion thereof), the same shall be made subject to this Lease (and any Tenant Leases) and Landlord shall only be released from any liability under this Lease accruing after the date of any such conveyance, provided the assignee shall assume and agree to keep and perform all of the terms of this Lease on the part of Landlord to perform from and after the date of any such conveyance and a copy of the assignment and assumption agreement executed by Landlord and assignee shall be delivered to Tenant.

12.    **Governing Law.**  This Lease shall be governed by and construed in accordance with the laws of the state in which the Property is located applicable to agreements made, and to be wholly performed, in such state.

13.    **Waiver of Trial by Jury.**  LANDLORD AND TENANT EACH HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THEM AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF, OR IN ANY WAY CONNECTED WITH, THIS LEASE OR THE LANDLORD-TENANT RELATIONSHIP, WHETHER ARISING IN CONTRACT, IN TORT OR OTHERWISE.

14.    **Binding Effect.**  Subject to Section 11 above, this Lease shall bind and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

15.    **Complete Agreement; No Oral Modification.** This Lease may not be altered or terminated, nor may its provisions be waived, except in a writing signed by Tenant and Landlord. This Lease, together with the PSA and the documents referred to in the PSA or executed in connection with the Closing thereunder, represents the entire agreement and understanding of the parties with respect to the subject matter hereof, and completely supersedes and integrates any and all other promises, understandings and agreements between the parties (including all of the same by and between any of the parties' agents and representatives on behalf of the parties), both oral and written.

16.    **Counterparts.** This Lease may be executed in two or more counterparts and by facsimile or electronic signatures which taken together shall constitute collectively one agreement. In making proof of this Lease it shall not be necessary to produce or account for more than one such counterpart with each party's original, facsimile or electronic signature.

17.    **Invalidity.** If any term or provision of this Lease shall to any extent or for any reason be held invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not affect any other provision of this Lease, but this Lease shall be valid and enforceable to the fullest extent permitted by law, subject to such modification hereof as may be necessitated by such invalidity, illegality or unenforceability provided that the purpose and intent hereof is not in any way abrogated.

18.    **Notices.**

(a)    Notices shall be either (i) personally delivered, (ii) sent by a nationally recognized overnight courier delivery service, or (iii) mailed by United States registered or certified mail, return receipt requested, postage prepaid, deposited in a United States post office or a depository for the receipt of mail regularly maintained by the post office. If personally delivered, then such notices shall be effective when received as evidenced by affidavit of the Person making such delivery; if sent by overnight courier delivery service then such notices shall be deemed to have been received by the addressee on the next Business Day following the date so sent; if mailed, then such notices or other communication shall be deemed to have been received by the addressee on the fifth (5th) Business Day following the date deposited with the United States mail. The inability to make delivery because of changed address of which no notice was given or by reason of rejection or refusal to accept delivery of any notice shall be deemed to be receipt of the notice as of the date of such inability to deliver or rejection or refusal to accept. All notices, demands or requests made pursuant to, under or by virtue of this Lease must be in writing and addressed as follows:

If to Tenant:

Sears, Roebuck and Co.
3333 Beverly Road, Dept. 824RE
Hoffman Estates, IL 60179
Attention: President, Real Estate

With copies to:

Sears, Roebuck and Co.

3333 Beverly Road, Dept. 824RE
Hoffman Estates, IL  60179
Attention:  Associate General Counsel, Real Estate


If to Landlord:

Elm Creek Real Estate, LLC
4641 Nall Rd.
Dallas, TX 75244
Attn:  Michael Montgomery

With a copy to:

Zane B. Butler
Attorney at Law
522 Colgate Dr.
Allen, Texas 75013


(b)     All notices (i) shall be deemed to have been given on the date that the same shall have been delivered in accordance with the provisions of this Section and (ii) may be given either by a party or by such party's attorneys.  Any party may, from time to time, specify as its address for purposes of this Lease any other address upon the giving of five (5) days' prior notice thereof to the other parties.

19.     **Subject to Existing Agreements**.

(k)     This Lease is subject to all Ancillary Rights and Agreements in effect on the Effective Date with respect to the Premises.

(l)     Upon Landlord's prior written approval, which approval shall be at Landlord's sole discretion, Tenant may, from time to time, upon thirty (30) days' prior written notice to Landlord (at Tenant's cost and expense): (a) grant easements and other rights in the nature of easements, (b) release existing easements or other rights in the nature of easements which are for the benefit of the Property, (c) subdivide or parcelize all or a portion of the Property, (d) dedicate or transfer unimproved portions of the Property for road, highway or other public purposes, (e) execute petitions to have the Property annexed to any municipal corporation or utility district, (f) execute amendments to any covenants and restrictions affecting the Property, and Landlord shall execute and deliver to any person any instrument appropriate to confirm or effect such grants, releases, subdivisions, parcelizations, dedications and transfers to the extent of its interest in the Property (or execute such instrument in its own name); provided, however, that the rights granted to Tenant pursuant to the provisions of this Subsection (and the obligation of Landlord to execute such instrument) are subject to thirty (30) days' prior written notice to Landlord which notice shall include (x) a certificate of an authorized person of Tenant (A) describing such grant, release, subdivision, parcelization, dedication, transfer, petition or amendment, (B) stating that such grant, release, subdivision, parcelization, dedication, transfer, petition or amendment is not detrimental to the proper conduct of the business of Tenant on the

Property and does not materially impair the usefulness of the Property for the purposes contemplated and permitted hereby, or materially reduce the fair market value of the Property, or materially impair Landlord's interest in the Property, and (C) stating the consideration, if any, being paid for such grant, release, subdivision, parcelization, dedication, transfer, petition or amendment and (y) duly authorized and binding unconditional undertakings of Tenant that it will remain obligated hereunder to the same extent as if such grant, release, subdivision, parcelization, dedication, transfer, petition or amendment had not been made (including, without limitation, the obligation to pay all Rent in accordance with the terms hereof), and that Tenant will perform all obligations of Landlord under such instrument during the Term.

20.    **Mechanic's Liens.**    Tenant shall not permit any mechanic's, laborer's or materialman's lien to be filed at any time against the Premises or any part thereof by reason of work performed with prior authorization by or on behalf of Tenant or any agent or contractor claiming by, through or under Tenant, which are not bonded or discharged within the later of sixty (60) days (a) of filing or (b) Tenant's actual notice thereof.

21.    **Estoppels.**    At any time and from time to time, upon not less than ten (10) Business Days' prior request, either party (the "**Requesting Party**") may request that the other party (the "**Certifying Party**") furnish to the Requesting Party (and its lenders or purchasers) a certificate (signed by a person duly authorized to sign on behalf of the Certifying Party) certifying as follows: (a) that this Lease is unmodified and in full force and effect (or that this Lease is in full force and effect and modified and setting forth the modifications), (b) the dates to which the Monthly Fixed Rent and any Additional Rent have been paid and the amount thereof then payable, (c) that the Certifying Party does not know of any default in the performance of any provisions of this Lease or specifying any default of which the Certifying Party may have knowledge and stating what action the defaulting party is taking or proposes to take with respect thereto and (d) any other information reasonably requested by the Requesting Party.

22.    **Indemnification; Waiver of Subrogation**.

(a)    Tenant shall indemnify, defend and hold Landlord harmless from and against all claims, actions, damages, liability and expense, including reasonable attorneys' fees ("**Loss**"), in connection with bodily injury, the loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises to the extent caused by any act or omission of Tenant and its agents, contractors, employees, servants or licensees, except to the extent that such Loss is caused by the wrongful or negligent acts or omissions of Landlord, its agents, contractors, employees, servants or licensees (as to all of which Loss Landlord shall indemnify, defend and hold harmless Tenant).

(b)    Landlord shall indemnify, defend and hold Tenant harmless from and against any Loss, in connection with bodily injury, the loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Property (exclusive of the Premises) to the extent caused by any act or omission of Landlord and its agents, contractors, employees, servants or licensees, except to the extent that such Loss is caused by the wrongful or negligent acts or omissions of Tenant, its agents, contractors, employees, servants or licensees (as to all of which Loss Tenant shall indemnify, defend and hold harmless Landlord).

(c)    Each party releases and waives any and every claim and right of recovery against the other which arises or may arise in its favor and against the other party during the Term for any and all loss of or damage to any of its property located within or upon or constituting a part of its respective premises, which loss or damage is customarily covered by the property insurance carried by each party under this Lease, or would have been covered if each party had carried the insurance that such party is required to carry under this Lease. This mutual waiver shall be in addition to, and not in limitation or derogation of, any other waiver or release contained in this Lease with respect to any loss of or damage to property of the parties. Landlord and Tenant agree to furnish to each insurance company which has or will issue property damage policies on its premises, notice of the terms of the mutual waivers and to have the insurance policies properly endorsed, if necessary, to acknowledge the subrogation waivers.

(d)    The provisions of this Section shall survive the Termination Date.

**23.    Hold Over**. No holding over by Tenant nor acceptance of Monthly Fixed Rent, Additional Rent or other charges by Landlord shall operate as a renewal or extension of this Lease without the written consent of Landlord. Should Tenant hold over after the Termination Date without the consent of Landlord (excluding the possible extensions in Section 9 or elsewhere in this Lease), this Lease shall continue in force from month to month, subject to all of the provisions hereof.

**24.    No Restrictions On Tenant Financing**. Tenant may continue to finance all receivables, inventory and other personal property and enter into financing leases of property and equipment, in the ordinary course of business.

**25.    Subordination; Quiet Enjoyment**.

(a)    Subject to and expressly conditioned upon the provisions of Section 25(b), including receipt of an SNDA from each Landlord's Mortgagee and each Ground Lessor in accordance with Section 25(b) below, this Lease and all rights of Tenant hereunder hereby are made and shall be subject and subordinate in all respects to the lien of all present and future ground leases (collectively, "**Ground Leases**") and mortgages (collectively, "**Landlord's Mortgages**") which may now or hereafter encumber Landlord's interest in the Property, provided that no such Ground Leases or Landlord's Mortgages shall increase any liabilities or obligations nor decrease any rights or remedies of Tenant under or with respect to this Lease.

(b)    Notwithstanding the foregoing or any such subordination, or any other provision contained in this Lease to the contrary, so long as Tenant shall not be in default of the express provisions of this Lease (without reference to any such Ground Leases or Landlord's Mortgages) beyond any applicable grace, notice or cure period, Landlord covenants and agrees that Tenant shall peacefully and quietly possess and enjoy the Premises and all rights of Tenant under this Lease in accordance with all terms and conditions hereof (without reference to Section 25(a) hereof), without let, hindrance or disturbance and free from all rights and claims of Landlord and all of all Persons claiming by or through Landlord, including under any such Ground Leases and Landlord's Mortgages. As a condition precedent to the subordination of this Lease to the interest of the holders of any such Landlord's Mortgages (collectively, the "**Landlord's Mortgagees**") and the ground lessors under any such Ground Leases (collectively,

the "**Ground Lessors**"), Landlord must obtain from each of any such Landlord's Mortgagees and Ground Lessors (each an "**SNDA Party**"), an SNDA which shall (x) provide, among other things, that such SNDA Party, as well as any person who acquires any portion of the Premises in a foreclosure or similar proceeding or in a transfer in lieu of any such foreclosure or a successor owner of the Property (each, a "**Foreclosure Purchaser**"), will not disturb either Tenant's leasehold interest or possession of the Premises in accordance with the terms hereof, nor any of Tenant's rights, privileges and options, and shall give effect to this Lease as if such SNDA Party or Foreclosure Purchaser were the landlord under this Lease so long as there is not then any outstanding and continuing default by Tenant under this Lease which has remained uncured beyond the time periods specified in Section 10 (except that (a) such SNDA Party or Foreclosure Purchaser shall not be subject to any prior offsets or defenses which Tenant might have against Landlord except related to a Landlord default under Section 10(b)(ii) (but subject to such SNDA Party's or Foreclosure Purchaser's continuing obligations as landlord); (b) such SNDA Party or Foreclosure Purchaser shall not be bound by any rent or additional rent which Tenant might have paid more than one (1) month in advance to Landlord; (c) such SNDA Party or Foreclosure Purchaser shall not be bound by any escrow deposit for taxes, insurance, maintenance, single or payment made under this Lease (including, without limitation, any security deposit) unless such SNDA Party or Foreclosure Purchaser shall have taken actual possession of such sums; (d) such SNDA Party or Foreclosure Purchaser shall not be bound by any prior obligation under this Lease to make any payment to Tenant; (e) such SNDA Party or Foreclosure Purchaser shall not be bound by any surrender or termination or any amendment or modification of this Lease which is made without such SNDA Party's or Foreclosure Purchaser's consent; and (f) such SNDA Party or Foreclosure Purchaser shall be obligated to commence, complete and perform any construction and make any contributions and allowances toward construction or installation of any improvements upon the Property required under this Lease and any expansion or rehabilitation of existing improvements thereon), and (y) also be in form and substance reasonably satisfactory to Tenant.

26.    **Attorneys' Fees**.  In the event of litigation between the parties to enforce this Lease or if any legal action is instituted as a result of a default by either party under this Lease that is not cured within the applicable cure period, the prevailing party in such action shall be entitled to recover from, or be reimbursed by the other party for, its reasonable and actual attorneys' fees and costs, including but not limited to expert witness fees and court costs, through all levels of proceedings.

27.    **Tenant Rights**.  Without limiting the provisions of Section 10(b), nothing herein contained shall constitute a limitation on the right of Tenant, and Tenant shall have the express right to:  (1) seek and secure injunctive relief for any violation by Landlord of any of the terms of this Lease, or (2) offset and make a deduction from Rent or any other sums due Landlord for any violation by Landlord of any of the terms of this Lease and/or to cure any such violation by Landlord.

28.    **Lease Not to Be Recorded; Memorandum of Lease**.  The parties agree that this Lease shall not be recorded, but the parties shall record the Lease Memorandum concurrently with the execution hereof.

29.    **Discretion**.  Except as otherwise expressly provided herein, any agreement, approval, consent or other determination shall not be effective unless it is in writing and shall be in the sole and absolute discretion of such party.

30.    **Section Headings**.  The headings of the various sections of this Lease have been inserted only for purposes of convenience, are not part of this Lease and shall not be deemed in any manner to modify, explain, expand or restrict any of the provisions of this Lease.

31.    **General Definitional Provisions.**  Unless the context of this Lease otherwise requires, (i) words of any gender are deemed to include each other gender, (ii) words using the singular or plural number also include the plural or singular number respectively, (iii) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words refer to this entire Lease, (iv) the terms "Article," "Section," "Subsection," "Paragraph" or "clause" refer to the specified Article, Section, Subsection, Paragraph or clause of this Lease, and (v) all references to "dollars" or "$" refer to currency of the United States of America.  The term "including" as used herein shall in all instances mean "including, but not limited to."

32.    **Joint Drafting**.  Each of Tenant and Landlord has been represented by counsel in the negotiation and execution of this Lease, and each of Tenant and Landlord had input in the drafting of this Lease.  For all purposes, this Lease shall be considered to have been jointly drafted by Tenant and Landlord.

33.    **Other Documents.**  Each of the parties agrees to sign such other and further documents as may be necessary or appropriate to carry out the intentions expressed in this Lease.

34.    **Environmental.**  (a)  If Tenant becomes aware of a spill or discharge of a Hazardous Material (as such term is defined in the PSA) in concentrations above those allowed under applicable environmental laws (a "**Spill**"), which occurs on or from the Premises during the term of this Lease, Tenant shall give Landlord prompt oral and written notice of such Spill, setting forth in reasonable detail all relevant facts, including, without limitation, a copy of (i) any notice of a violation, or a potential or alleged violation, of any environmental law received by Tenant or any subtenant or other occupant of the Premises; (ii) any inquiry, investigation, enforcement, cleanup, removal, or other action instituted or threatened against Tenant or any subtenant or other occupant of the Premises; and (iii) any claim instituted or threatened against Tenant or any subtenant or other occupant of the Premises.  If a Spill arises out of or relates to Tenant's use and occupancy of the Premises, or if a Spill is caused by the act, negligence or omission of Tenant or Tenant's employees, agents or visitors, then Tenant shall pay all costs and expenses relating to compliance with applicable environmental laws (including, without limitation, the costs and expenses of site investigations and the removal and remediation of such Hazardous Material).  Without relieving Tenant of its obligations under this Lease and without waiving any default by Tenant under this Lease, if Tenant fails or neglects to diligently proceed with addressing a Spill for which it is responsible, Landlord will have the right, but not the obligation, to take such action as Landlord deems necessary or advisable to cleanup, remove, resolve or minimize the impact of or otherwise deal with any Spill on or from the Premises and Tenant shall, on demand, pay to Landlord all costs and expenses incurred by Landlord in connection with any action taken in connection therewith by Landlord. Notwithstanding the

foregoing, Tenant shall not be liable for any Spills which are caused by the acts or omissions of the Landlord or its employees, agents or visitors.

(b) Tenant shall permit the Landlord to cause the Premises to be tested and inspected in connection with the preparation of a Phase II environmental report provided that (i) Landlord provides Tenant two (2) days' notice prior to any testing, (ii) the testing shall not interfere with Tenant's use of the Premises, (iii) Landlord shall cause the investigating party to execute a Phase II Access Agreement (as defined in the Non-Invasive Inspection Agreement) and (iv) the scope of tests to be performed shall be subject to Tenant's prior approval, as set forth in the Phase II Access Agreement. In the event that the Phase II environmental report identifies an issue which requires remediation, then Landlord, at its sole cost and expense, shall cause such issue to be remediated, provided that such remediation work shall not be performed by Landlord prior to the Termination Date (other than in the case of an emergency situation or as required by law, in either case Landlord shall work with Tenant as to the scope of work so as not to interrupt Tenant's business operations), provided further that in the event that such environmental issue (as identified in the Phase II environmental report) affects an adjacent property, then Tenant shall bear the cost of remediating such issues as permitted by applicable environmental laws. Fifty percent (50%) of the Tenant costs to make such remediation on the adjacent property shall be applied to the Repair/Capital Threshold in the year the work is completed and paid for.

(c)    During the Term of this Lease, Tenant shall remain responsible for all maintenance, repair or abatement required, including replacement, or any other action or expense related to existing asbestos in the Premises, to the extent such maintenance, repair or abatement is required due to the actions or inactions of Tenant. Tenant shall indemnify Landlord against all asbestos related claims during the Term of the Lease pursuant to the indemnifications provisions in Section 22(a). Notwithstanding the foregoing, Tenant shall not be responsible for removal or abatement of existing asbestos at the expiration or earlier termination of this Lease.

**35.    Side Letter.**    Pursuant to the PSA, Tenant, as seller, and Landlord, as buyer, entered into a Side Letter agreement pertaining to drainage and utilities relative to Parcels 1, 3, 4 and 5 and the Side Letter survived the closing and terminates upon certain conditions contained therein.

**[Signatures appear on the following pages]**

**IN WITNESS WHEREOF,** Landlord and Tenant have executed and delivered this Lease to each other as of the Effective Date.

TENANT:

**SEARS, ROEBUCK AND CO.**, a New York corporation

By: _____

Name: Robert A. Riecker
Title: Chief Financial Officer

**LANDLORD:**

**ELM CREEK REAL ESTATE, LLC,**
a Texas limited liability company

By: _____
        Michael Montgomery, Manager

## EXHIBIT A-1

### Legal Description

Tract 1: (1501 Kings)

Being Lot 1, Block 1, Sears Industrial District No. 2, an addition to the City of Garland, Dallas County, Texas, according to the plat recorded in Volumes 78041, Page 409, Map Records, Dallas County, Texas.

WEIL:\96522389\2\73219.0007

## EXHIBIT A-2

## Legal Description

Tract 3: (3 Kings)

Being Lot 3, Block 1, Sears-Miller Replat an addition to the City of Garland, Dallas County, Texas, according to the plat recorded under Clerk's File No. 201300020593, Real Property Records, Dallas County, Texas.

Exhibit A-2

## EXHIBIT B-1

### Premises

The "**Premises**" means the entirety of the Property together with all improvements located thereon.

WEIL:\96522389\2\73219.0007

## EXHIBIT B-2

### Premises

The "**Premises**" means the entirety of the Property together with all improvements located thereon.

WEIL:\96522389\2\73219.0007

## SCHEDULE 1

### Annual Fixed Rent

| Lease Year | Annual Fixed Rent | Monthly Fixed Rent |
|---|---|---|
| 1 | $854,750.00 | $71,229.12 |
| 2 | $854,750.00 | $71,229.12 |
| 3 | $854,750.00 | $71,229.12 |
| 4 | $854,750.00 | $71,229.12 |
| 5 | $854,750.00 | $71,229.12 |
| If Exercised, Extension Term: | | |
| 6 | $986,250.00 | $82,187.50 |
| 7 | $986,250.00 | $82,187.50 |
| 8 | $986,250.00 | $82,187.50 |
| 9 | $986,250.00 | $82,187.50 |
| 10 | $986,250.00 | $82,187.50 |

Schedule 1