# Friedmann

# *EXHIBIT A*

**In The Matter Of:**

*In Re Sears*
*Holdings*

---

*Kunal Kamlani*
*June 20, 2019*

---



1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Chapter 11 - Case No. 18-23538 (RDD)

5    ------------------------------------------

6    In Re:

7    SEARS HOLDINGS CORPORATION, et al.,

8              Debtors.

9    ------------------------------------------

10

11

12            DEPOSITION OF KUNAL KAMLANI

13

14            Thursday, June 20, 2019

15                 10:00 a.m.

16

17

18

19

20

21   Reported by:

22   Joan Ferrara, RMR, FCRR

23   Job No. 2019-72624a

24

25

1

2                    June 20, 2019

3                    10:00 a.m.

4                    New York, New York

5

6

7           Deposition of KUNAL KAMLANI, held

8   at the offices of Cleary Gottlieb Steen &

9   Hamilton, 450 Park Avenue, New York, New

10  York, before Joan Ferrara, a Registered

11  Merit Reporter, Federal Certified Realtime

12  Reporter and Notary Public of the State of

13  New York.

14

15

16

17

18

19

20

21

22

23

24

25

1

2  A P P E A R A N C E S:

3

4  Attorneys for the Witness:

5  HOLWELL SHUSTER & GOLDBERG, LLP

6              425 Lexington Avenue

7              New York, New York 10017

8  BY:         MATTHEW GURGEL, ESQ.

9              mgurgel@hsgllp.com

10

11

12  Attorneys for Unsecured Creditors:

13  AKIN GUMP STRAUSS HAUER & FELD, LLP

14              One Bryant Park

15              Bank of America Tower

16              New York, New York 10036

17  BY:         JOHN P. KANE, ESQ.

18              jkane@akingump.com

19

20

21

22

23

24                     (Continued)

25

4

1

2  A P P E A R A N C E S:  (Continued)

3

4  Attorneys for Debtors and

5  Debtors-in-Possession:  Sears Holdings

6  Corporation, et al.:

7  WEIL GOTSHAL & MANGES, LLP

8          767 Fifth Avenue

9          New York, New York 10153

10  BY:     JENNIFER CROZIER, ESQ.

11          jennifer.crozier@weil.com

12          JARED R. FRIEDMANN, ESQ.

13          jared.friedmann@weil.com

14          PAUL GENENDER, ESQ.

15          paul.genender@weil.com

16

17

18  Attorneys for ESL Investments, Inc.:

19  CLEARY GOTTLIEB STEEN & HAMILTON, LLP

20          One Liberty Plaza

21          New York, New York 10006

22  BY:     LEWIS LIMAN, ESQ.

23          lliman@cgsh.com

24

25                      (Continued)

1

2  A P P E A R A N C E S:  (Continued)

3

4  ALSO PRESENT:

5          EMILY MORROW, Cleary Summer

6            Associate

7          GABRIELLE KANTER, Weil Summer

8            Associate

9          BRIAN GRIFFITH, M-III

10          JOSEPH FRANTZ, M-III

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2  K U N A L   K A M L A N I,

3       called as a witness, having been duly

4       sworn by a Notary Public, was examined

5       and testified as follows:

6  EXAMINATION BY

7  MS. CROZIER:

8       Q.    Good morning, Mr. Kamlani.

9       A.    Good morning.

10      Q.    You met me a few minutes ago.  My

11  name is Jennifer Crozier.  I'm from Weil

12  Gotshal & Manges, and I represent the

13  Debtors in connection with these cases.

14  Thank you for your time this morning.

15            Now, I know you've been deposed

16  before because I actually sat in on your

17  January deposition in connection with these

18  cases, but nevertheless I'm going to run

19  through some of the deposition ground

20  rules.

21            Okay?

22      A.    Perfect.

23      Q.    So first, you've just been sworn

24  in and so you understand that you are to

25  tell the truth, the whole truth and nothing

1            K. Kamlani

2    below to the definition of "other

3    payables," that definition reads as

4    follows:

5            "Other payables shall mean the

6    accounts payable set forth on Schedule

7    1.1G."

8            Do you see that?

9        A.    I do.

10       Q.    Would you agree with me,

11   Mr. Kamlani, that ordered inventory and

12   other payables are defined separately in

13   the APA?

14           MR. LIMAN:  I'm going to object

15       to the extent it calls for legal

16       conclusions.

17           You can go ahead.

18       A.    Can we look at Schedules 1.1G

19   and -- what was the other one, 1.1F, was

20   it?

21       Q.    F.  We're going to look at those

22   schedules in a moment.  Right now I'm

23   asking you about page 24 of the Asset

24   Purchase Agreement.  I'm asking you whether

25   ordered inventory and other payables are

```
1                    K. Kamlani
2        A.     If you're asking me are these two
3   separate sentences in the APA, the answer
4   is yes, because to the naked eye they're
5   two separate sentence.
6               If you're asking me are they two
7   different concepts, they are not.
8        Q.     That's not what I'm asking you.
9               MS. CROZIER:  So objection to the
10       nonresponsive portion of that answer.
11       A.     What was the responsive portion?
12       Q.     To the naked eye, Mr. Kamlani,
13  you would also agree that these are two
14  separate definitions.
15       A.     They are two separate sentences
16  on the page, yes.
17       Q.     And two separate definitions as
18  well, correct?
19       A.     Yes.
20              MS. CROZIER:  Mark this Kamlani
21       Exhibit 3, please.
22              (Kamlani Exhibit 3, Schedule
23       1.1F, marked for identification, as of
24       this date.)
25  BY MS. CROZIER:
```

1                    K. Kamlani

2        A.    Correct.

3        Q.    And if you will flip the page on

4    that exhibit, you will see Annex 9.

5              Do you see that?

6        A.    I do.

7        Q.    Can you read Annex 9 to me,

8    please?

9        A.    I'm assuming it's Annex 9.  It

10   doesn't say Annex 9.

11       Q.    I'll represent to you --

12       A.    I'll take your word for it.

13       Q.    Fair.

14       A.    It says, "Assumed accounts

15   payable $166 million," which is largely the

16   same number on 1.1F.

17       Q.    Now, I would like you to set

18   Schedule 1.1G and 1.1F next to one another,

19   if you would.

20             Do you agree, Mr. Kamlani, that

21   these are two separate schedules appended

22   to the APA?

23       A.    They are.

24       Q.    And would you also agree,

25   Mr. Kamlani, that 166.0 is a different

1          K. Kamlani

2   number than $166,557,621?

3       A.    I would agree with you that those

4   are two different numbers.

5       Q.    You can set those aside.

6             Now, by January 11th,

7   Mr. Kamlani, you understood that the

8   Debtors were asking Transform to assume up

9   to $166 million of accounts payable in

10  connection with the APA, correct?

11      A.    No.

12      Q.    Mr. Kamlani, will you pull your

13  deposition transcript out again, please.

14      A.    Let me rephrase the answer.

15            Why don't you ask the question

16  again?

17      Q.    By January 11th, you understood

18  that the Debtors were asking Transform to

19  assume up to $166 million accounts payable

20  in connection with the APA?

21      A.    All right, so without speaking to

22  the specific day, the Debtors were asking

23  for us to assume lots of liabilities, of

24  which that was one of them, at a point in

25  time very well could have been the day you

1                    K. Kamlani

2    mentioned.

3        Q.    Okay.  Thank you.  You can set

4    the deposition transcript aside.

5              And you, yourself, understood

6    that the Debtors wanted Transform to assume

7    those accounts payables precisely because

8    the Debtors had administrative solvency

9    concerns, correct?

10             MR. LIMAN:  Objection and vague.

11       A.    The Debtors had lots of concerns.

12   What I was specifically told by Bill

13   Transier was that the Debtors did not want

14   to assume the risk of holding on to assets

15   post close that may or may not cover

16   liabilities to the extent they held those

17   liabilities.

18       Q.    And you also understood,

19   Mr. Kamlani, that the Debtors had concerns

20   about the magnitude of the liabilities with

21   which they might be left after the proposed

22   sale transaction, correct?

23             MR. LIMAN:  Objection.  Vague.

24       A.    They were concerned that the

25   assets they had may not be able to cover

1          K. Kamlani

2          MS. CROZIER:  Exhibit 5, can you

3      mark this as 5, please.

4          (Kamlani Exhibit 5, E-mail dated

5      1/11/19, marked for identification, as

6      of this date.)

7  BY MS. CROZIER:

8      Q.    Mr. Kamlani, I'm showing you what

9  I've marked Kamlani Exhibit 5, which is a

10  January 11, 2019 e-mail from Rajat Prakash

11  to a number of individuals, including

12  Mr. Lampert, Mr. Riecker and yourself,

13  correct?

14      A.    Yes, there are a number of

15  individuals on it, including the ones that

16  you mentioned, yes.

17      Q.    And the subject of the e-mail is

18  daily cash flow forecast 1/11/2019,

19  correct?

20      A.    Correct.

21      Q.    And you received these daily cash

22  flow forecasts daily in the post-petition

23  period, correct?

24      A.    Yes.

25      Q.    Now, I'd like to direct your

32

1                    K. Kamlani

2    attention to the key callouts section of

3    the e-mail.

4              Do you see that?

5        A.    I do.

6        Q.    And look at the very last black

7    bullet in that section.

8              Do you see that?

9        A.    I do.

10       Q.    It reads, "The total AP balance

11   beginning 1/11/2019 is" -- merch 123.9

12   million and non-merch 50.6 million.

13             Do you see that?

14       A.    I do.

15       Q.    Now merchandise -- to be clear,

16   merch refers to merchandise-related

17   accounts payable, correct?

18       A.    Yes.

19       Q.    And you understood that on

20   January 11, 2019?

21       A.    I did.

22       Q.    And non-merch refers to

23   non-merchandise-related accounts payable?

24       A.    Yes.

25       Q.    And you understood that on

1          K. Kamlani

2     January 11, 2019 as well, correct?

3     A.     Yes.

4     Q.     And so you would agree with me

5     then, Mr. Kamlani, that as of January 11,

6     2019, the accounts payable that the Debtors

7     were asking Transform to assume was

8     composed of a portion of merchandise

9     related accounts payable and a portion of

10    non-merchandise-related accounts payable,

11    correct?

12    A.     Not from this document.  There is

13    nothing in this document at any time then

14    or now that informed my thinking that

15    that's what the Debtors were asking us to

16    assume.  The Debtors were asking us to

17    assume in January, pursuant to the

18    conversation we just had, to assume a

19    series of liabilities including accounts

20    payable.  This document has nothing to do

21    with that in my mind.

22    Q.     So you've just testified that in

23    January the Debtors were asking you to

24    assume a series of liabilities, including

25    accounts payable, correct?

34

1                K. Kamlani

2      A.    Correct.

3      Q.    And here in the key call-out

4  section of the daily cash flow forecast,

5  Mr. Prakash divides the total AP balance

6  into 123.9 million of merchandise-related

7  accounts payable and $50.6 million of

8  non-merchandise-related accounts payable,

9  correct?

10     A.    Yes.

11     Q.    Now, merchandise --

12 non-merchandise-related accounts payable

13 constitutes payables associated with

14 services rendered to the company, but for

15 which the company has not yet paid, is that

16 correct?

17     A.    Yes.

18     Q.    Isn't it true, Mr. Kamlani, that

19 as of mid January, you understood that the

20 $166 million of accounts payable that the

21 Debtors had asked the buyer to assume were

22 related to both merchandise and

23 non-merchandise-related accounts payable?

24     A.    That was their request, yes.

25 That was their ask.  It's not ultimately

1          K. Kamlani

2   what was agreed to, but it was their ask.

3          MS. CROZIER:  Move to strike the

4      nonresponsive portion of that answer.

5      Q.    Now notwithstanding everything we

6   have just discussed, Mr. Kamlani --

7      A.    Can I just ask my lawyer a

8   question for a minute since you haven't

9   asked a question?

10          MR. LIMAN:  Yes.  There's no

11      question pending.

12          THE WITNESS:  Well, I can ask the

13      question to both.  If I provide an

14      answer, it's totally fine for them to

15      strike and keep the first three words

16      and strike the last four words?  I

17      mean, how does this work?

18          MR. LIMAN:  That's up to the

19      judge.  Give your complete answer.

20      Let them make whatever noises that

21      they want to make.  That's up to them.

22      It's their time if they want to put

23      stuff on the record.

24          THE WITNESS:  That's fine.

25      A.    I apologize.

1                    K. Kamlani

2      A.    I have no idea what -- well,

3  according to this schedule, yes, as of

4  January 7th, this is what they had in

5  order -- correct, that would be accurate.

6      Q.    Okay.

7            And were Transform to take

8  delivery of all of this ordered inventory

9  and only assume payment obligations with

10 respect to $166 million of it, that would

11 leave the Debtors with a $557,621 bill

12 representing zero assets, correct?

13     A.    It would.

14     Q.    And that wouldn't help with

15 administrative solvency concerns, would it,

16 Mr. Kamlani?

17     A.    In that very specific example,

18 no, it would not.

19     Q.    Mr. Kamlani, because the buyer

20 disputes that it's obligated to assume both

21 up to $166 million in respect of other

22 payables and all payment obligations with

23 respect to ordered inventory, has it ceased

24 paying accounts payable that it beliefs to

25 be the Debtors' responsibility?

58

1                K. Kamlani

2    dollars, tens of millions of dollars.

3           So the underlying assumption that

4    the forecast was going to be right and

5    something had to be managed in order to hit

6    a number is not necessarily correct when

7    every budget they put out every week was

8    beaten by tens of millions of dollars, week

9    after week after week.

10      Q.    And your testimony, sitting here

11   today now, is you had no idea how they were

12   doing that?

13      A.    I have an idea of how they were

14   doing that.  My idea of how they were doing

15   that was if they thought they might spend

16   $50 million, you put out a budget that says

17   you're going to spend $80 million and you

18   spend $50 million and you come ahead by $30

19   million.

20      Q.    You understood, Mr. Kamlani, that

21   the Debtors were managing inventory and

22   payments in order to meet that $850 million

23   closing condition, didn't you?

24      A.    Yes.

25           MS. CROZIER:  Can you mark this

```
 1            K. Kamlani
 2  definition of ordered inventory in the
 3  Asset Purchase Agreement is in part that
 4  the sellers have not taken title or
 5  delivery to that inventory prior to the
 6  closing date?
 7      A.    Yes.
 8      Q.    So you would agree that ordered
 9  inventory within the meaning of the APA is
10  not an asset, correct?
11      A.    Correct.   It's nothing.
12      Q.    Are you generally familiar,
13  Mr. Kamlani, with the adequate assurance
14  deposit that was put in place at the outset
15  of these Chapter 11 cases to provide
16  adequate assurance to the Debtors' utility
17  providers?
18            MR. LIMAN:   Objection to form.
19      A.    At a very, very high level, I'm
20  familiar with the Debtors put deposits with
21  utility companies to make sure that utility
22  companies continued to provide services to
23  the business.
24      Q.    And do you also understand that
25  in the days before closing, the Debtors
```

1            K. Kamlani

2    to figure out what actually exists versus

3    something that doesn't exist.  And what we

4    found is there is a large part of

5    receivables on that schedule that, in fact,

6    do not exist at all.  Again, different from

7    a valuation exercise.

8        Q.    You received a list of the

9    specified receivables that debtors would

10   deliver at closing as early as January 6,

11   2019, correct, Mr. Kamlani?

12       A.    I can't speak to the specific

13   date, but I'm sure on that timeframe.

14       Q.    And the buyer had an opportunity

15   to diligence those specified receivables,

16   isn't that right?

17       A.    We did.

18       Q.    And at the time the Debtors

19   estimated -- the Debtors' estimate of

20   likelihood of recovery with respect to

21   those receivables was in the aggregate 44

22   percent.

23            Do you recall that?

24       A.    That sounds about right.

25       Q.    And subsequent to that, the buyer

1                    K. Kamlani

2    developed its own estimate of the

3    percentage of those specified receivables

4    that the buyer was likely to recover in the

5    aggregate, isn't that right?

6        A.    Yes.

7        Q.    And what was that estimate?  What

8    was the buyer's estimate?

9        A.    Depending on the timeframe, it

10   was in the 60 to 75 percent range.

11       Q.    And how much has the buyer

12   recovered to date with respect to the

13   specified receivables?

14       A.    Roughly $80 million.

15       Q.    And why do you say "roughly"?

16       A.    Because I don't have the number

17   out to a decimal off the top of my head.

18       Q.    Mr. Kamlani, the buyer understood

19   that there was a risk associated with

20   recovering the specified receivables before

21   it execute the APA, correct?

22       A.    We recognized that there was a

23   risk with not being able to collect

24   something that existed.  We did not sign up

25   for the risk to pay for something that did

1                    K. Kamlani

2    fruition, that they only sold the assets

3    for, let's say, 50-cents on the dollar,

4    then they would have had an administrative

5    solvency problem to the tune of $88

6    million.

7              Based on the deal that we struck,

8    the excess liability over the assets is

9    $526,000.  Having said that, based on the

10   way we've always done business, to the

11   extent we actually received $166.5 million

12   of assets, we certainly would have paid the

13   estate for the incremental $500,000.

14             MR. LIMAN:  Okay.  Nothing

15        further.  Thank you for your time.

16             MS. CROZIER:  I have one, maybe

17        two additional follow-up questions.

18   FURTHER EXAMINATION

19   BY MS. CROZIER:

20        Q.    Mr. Kamlani, you testified

21   earlier that ordered inventory within the

22   meaning of the APA was inventory to which

23   the sellers had not taken title or

24   delivery, correct?

25        A.    Correct.

80

                    K. Kamlani

1

2       Q.      The Debtors could have canceled

3   those orders at any time, couldn't they

4   have?

5       A.      As long as they were operating in

6   the ordinary course, yes.

7               MS. CROZIER:  That's all I have.

8   Thank you very much.

9               THE WITNESS:  Thank you.

10              (Time noted:  11:51 a.m.)

11

12

13              _____

14                  KUNAL KAMLANI

15

16  Subscribed and sworn to before me

17  this ____ day of _____, 2019.

18

19  _____

20

21

22

23

24

25

1

2                C E R T I F I C A T E

3   STATE OF NEW YORK      )

4                              : ss.

5   COUNTY OF NEW YORK     )

6

7           I, Joan Ferrara, a Notary Public

8       within and for the State of New York,

9       do hereby certify:

10          That KUNAL KAMLANI, the witness

11      whose deposition is hereinbefore set

12      forth, was duly sworn by me and that

13      such deposition is a true record of the

14      testimony given by the witness.

15          I further certify that I am not

16      related to any of the parties to this

17      action by blood or marriage, and that I

18      am in no way interested in the outcome

19      of this matter.

20          IN WITNESS WHEREOF, I have

21      hereunto set my hand this 20th day of

22      June, 2019.  *Joan Ferrara*

23

24                      _____

25                          Joan Ferrara

1

2   --------------- I N D E X ---------------

3 WITNESS            EXAMINATION BY      PAGE

4 KUNAL KAMLANI   MS. CROZIER         6

5                  MR. LIMAN        77

6                  MS. CROZIER      79

7

8   --------------- EXHIBITS ----------------

9 EXHIBIT                          FOR ID.

10 Exhibit 1  Debtors' Second Request for

11           Production of Documents to

12           Transform Holdco, LLC      13

13 Exhibit 2  Asset Purchase Agreement     19

14 Exhibit 3  Schedule 1.1F          24

15 Exhibit 4  Schedule 1.1G          26

16 Exhibit 5  E-mail dated 1/11/19      31

17 Exhibit 6  Transform transaction weekly

18           tracking slide deck dated

19           1/25/19                50

20 Exhibit 7  E-mail dated 2/4/19       59

21

22

23

24

25

83

DEPOSITION ERRATA SHEET

Case Caption:  In Re: SEARS HOLDINGS

CORPORATION, et al.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury
that I have read the entire transcript of my
Deposition taken in the captioned matter or
the same has been read to me, and the same is
true and accurate, save and except for
changes and/or corrections, if any, as
indicated by me on the DEPOSITION ERRATA
SHEET hereof, with the understanding that I
offer these changes as if still under oath.

_____

KUNAL KAMLANI

Subscribed and sworn to on the _____ day of

_____, 2019, before me,

_____

Notary Public, in and for the State of

_____