# Friedmann

# *EXHIBIT C*

**In The Matter Of:**

*In Re Sears*
*Holdings*

---

*Rob Riecker*
*June 19, 2019*

---



1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Chapter 11 - Case No. 18-23538 (RDD)

5  -----------------------------------------

6  In Re:

7  SEARS HOLDINGS CORPORATION, et al.,

8           Debtor.

9  -----------------------------------------

10

11

12           DEPOSITION OF ROB RIECKER

13

14           Wednesday, June 19, 2019

15                9:00 a.m.

16

17

18

19

20

21

22  Reported by:

23  Joan Ferrara, RMR, FCRR

24  Job No. 2019-72623

25

1

2

3                              June 19, 2019

4                              9:00 a.m.

5                              New York, New York

6

7

8              Deposition of ROB RIECKER,

9   held at the offices of Weil Gotshal

10  & Manges, LLP, 767 Fifth Avenue,

11  New York, New York, before Joan Ferrara,

12  a Registered Merit Reporter, Federal

13  Certified Realtime Reporter and Notary

14  Public of the State of New York.

15

16

17

18

19

20

21

22

23

24

25

1

2  A P P E A R A N C E S:

3

4  Attorneys for Unsecured Creditors:

5  AKIN GUMP STRAUSS HAUER & FELD, LLP

6          One Bryant Park

7          Bank of America Tower

8          New York, New York 10036.

9  BY:     JOHN P. KANE, ESQ.

10         jkane@akingump.com

11

12

13  Attorneys for Debtors and

14  Debtors-in-Possession:  Sears Holdings

15  Corporation, et al.:

16  WEIL GOTSHAL & MANGES, LLP

17         767 Fifth Avenue

18         New York, New York 10153

19  BY:     JARED R. FRIEDMANN, ESQ.

20         jared.friedmann@weil.com

21         JAKE RUTHERFORD, ESQ.

22         jake.rutherford@weil.com

23         JENNIFER CROZIER, ESQ.

24

25                 (Continued)

4

1

2  A P P E A R A N C E S:  (Continued)

3

4  Attorneys for ESL Investments, Inc.:

5  CLEARY GOTTLIEB STEEN & HAMILTON, LLP

6           One Liberty Plaza

7           New York, New York 10006

8  BY:      ABENA A. MAINOO, ESQ.

9           amainoo@cgsh.com

10

11  ALSO PRESENT:

12           Stephen Szrom, Cleary Summer

13             Associate

14           Kimberly Mannausa, Weil Summer

15             Associate

16           Chris Good, M-III

17           Nick Weber, M-III

18           Brian Griffith, M-III

19

20

21

22

23

24

25

1

2   R O B   R I E C K E R,

3        called as a witness, having been duly

4        sworn by a Notary Public, was examined

5        and testified as follows:

6   EXAMINATION BY

7   MR. FRIEDMANN:

8        Q.    Good morning, Mr. Riecker.

9        A.    Good morning.

10       Q.    Now you've been deposed

11  previously in connection with Sears

12  bankruptcy proceedings, correct?

13       A.    Yes.

14       Q.    So I'll just remind you that

15  you've been sworn to tell the truth today,

16  and you understand that it's the same as if

17  you had been sworn to tell the truth in a

18  court.

19            Do you understand that?

20       A.    Yes.

21       Q.    There is a court reporter, of

22  course.  So she'll be recording all of my

23  questions and all of your answers.  We'll

24  just need to be careful to let each other

25  finish their respective questions or

R. Riecker

surety that we've paid property taxes in
every year that they've been on that
campus.

Q.    Since you've been -- how long
have you been working with Sears, both its
prior -- you know, including its prior
iteration pre-bankruptcy?

A.    2005.

Q.    Since 2005, to the best of your
knowledge, has Sears paid property taxes to
the Village of Hoffman Estates in
connection with the Hoffman Estates
Corporate Campus?

A.    To my knowledge, yes.

Q.    And those property taxes are paid
in arrears, correct?

A.    I believe Illinois is arrears
state.

Q.    Meaning that taxes levied for
2017 are paid at some point the following
year during 2018, correct?

A.    That's my understanding.

Q.    Okay.

And those taxes are paid to the

9

```
 1                    R. Riecker
 2    Village of Hoffman Estates in March and
 3    then there's a second payment in June of
 4    the year, correct?
 5              MS. MAINOO:  Objection.
 6        Compound.
 7    BY MR. FRIEDMANN:
 8        Q.    You can answer.
 9        A.    Yes.
10        Q.    Okay.
11              At the end of the year in which
12    the taxes are collected, there are property
13    tax rebates that are disbursed back to
14    Sears so long as Sears meets certain job
15    requirements under the EDA, correct?
16              MS. MAINOO:  Objection.
17        A.    The mechanics of the EDA
18    agreement, as far as holding a number of
19    positions, allows for some form of rebate
20    to come back.  What that rebate is for, I
21    don't know the mechanics of how all of that
22    works.
23        Q.    Okay.
24              And to the best of your
25    knowledge, at least until the Chapter 11
```

1          R. Riecker

2    terms of those accounts payable.

3          In the situation with Sears prior

4    to and in bankruptcy, to say that that

5    mechanic happened exactly that way every

6    time, it's impossible to say that.

7      Q.    Okay.

8          When the company refers to its

9    merchandise accounts payable, in general is

10   that something different than when

11   referring to its ordered inventory?  Are

12   those booked separately?

13          MS. MAINOO:  Objection. Vague.

14     A.    Ordered inventory is not booked

15   into the financial systems of the company,

16   to use your term.  It's not accounted for

17   or recorded in the company's financial

18   statements that get issued.

19     Q.    Because there's nothing to book

20   at that point, it's a plan to, at some

21   point in the future, receive title to

22   inventory that the company has not yet paid

23   for, correct?

24          MS. MAINOO:  Objection.

25     A.    That is correct.

1          R. Riecker

2     Q.    And you wouldn't -- consistent

3  with that, Sears wouldn't enter an unpaid

4  invoice for undelivered goods in the

5  general ledger unless and until it has

6  taken title of those goods and actually

7  paid for those goods, correct?

8          MS. MAINOO:   Objection.

9     A.    That is generally correct.

10  However, we do receive goods for which we

11  have not received bills for, and we do

12  receive bills for which we have not

13  received goods.

14          To the extent that a bill is

15  received and entered into the accounting

16  system, it may be entered into the

17  accounting system in a miscellaneous

18  accounts payable account and then it has to

19  be matched with an invoice, PO, a three-way

20  matching process.

21          So to say that everything happens

22  simultaneously and it works perfectly, it

23  doesn't.  It doesn't for us or any other

24  company.

25     Q.    Okay.

38

1              R. Riecker

2          MS. MAINOO:  When you say can you

3      accurately characterize it, you mean

4      just in terms of what it says about

5      who, who it's from and to?

6          MR. FRIEDMANN:  Only what I've

7      said so far.

8      A.     Yes.

9          MR. FRIEDMANN:  No trick

10      questions for you or him.

11          MS. MAINOO:  I just want to make

12      sure we're all clear.

13          MR. FRIEDMANN:  I appreciate

14      that.

15      BY MR. FRIEDMANN:

16      Q.     Mr. Riecker, is this one of the,

17      best of your knowledge, one of the daily

18      cash flow forecasts that we were discussing

19      just before that were sent to buyer on a

20      daily basis?

21          MS. MAINOO:  Objection.  Lack of

22      foundation.

23      A.     It is sent every day that the

24      banks are open for commercial business.

25      Q.     On every business day they're

1                        R. Riecker

2    getting a copy of this, every bank day?

3        A.    Every bank day.

4        Q.    Non-bank holiday days and

5    non-weekend days.

6        A.    Correct.  It is not a daily.

7        Q.    Understood.

8              Is this, however, one of those

9    daily cash forecasts?

10       A.    Yes.

11       Q.    And if you'll look at under where

12   it has -- first of all, who is Rajat

13   Prakash?

14       A.    Rajat Prakash is the acting

15   treasurer of the company and works in the

16   Treasury area.

17       Q.    And at the time between the

18   bankruptcy petition and the sale to

19   Transform, who did Mr. Prakash report to?

20       A.    He reported to me.

21       Q.    Okay.

22             And if you go back and look at

23   this e-mail which we've marked as Exhibit

24   3, under the key call-out section, the very

25   last bullet point, do you see that?

1                    R. Riecker

2        A.     Yes.

3        Q.     Where it has the total AP balance

4    beginning January 31, 2019.

5               Do you see that?

6        A.     Yes.

7        Q.     And it has merchandise AP of

8    $72.6 million.

9               Do you see that?

10        A.     Yes.

11        Q.     And non-merchandise AP of $61.9

12    million.

13               Do you see that?

14        A.     Yes.

15        Q.     Okay.

16               And does this refresh your

17    recollection as to whether or not in these

18    daily cash forecasts the accounts payable

19    balance was broken out by both merchandise

20    accounts payable and non-merchandise

21    accounts payable?

22               MS. MAINOO:   Objection.

23        A.     What I'm trying to clarify,

24    Jared, is this is an e-mail.   Attached to

25    this e-mail is a file.   That is the file

```
 1                    R. Riecker
 2    that is the daily cash forecast.  This is
 3    just a call-out of those numbers.
 4              I see the call-out of AP here in
 5    the e-mail.  Whether that's on the actual
 6    Excel file attached, I thought that was the
 7    question you were asking me.
 8         Q.    Okay, sure.
 9         A.    That's why I was confused.
10         Q.    Let me rephrase it in a way to
11    make it easier to answer.
12              On every day in which the daily
13    cash forecast was provided to the buyers,
14    to be all of the days in which banks are
15    open, was the company reporting to them a
16    breakout in the total accounts payable
17    balance of merchandise separate from
18    non-merchandise accounts payable?
19              MS. MAINOO:  Objection.
20         A.    Generally, yes.
21         Q.    And those amounts would change on
22    a daily basis, correct?
23              MS. MAINOO:  Objection.
24         A.    Yes.
25         Q.    Was one of the reasons that
```

```
 1                    R. Riecker
 2   during the period between the petition and
 3   the sale to Transform, correct?
 4            MS. MAINOO:  Objection.  Vague.
 5       A.     Trying to split what was ordered,
 6   what was CIA, what was just naturally
 7   coming in, I don't -- the specifics of the
 8   mechanics and how all of that was done, I'm
 9   not -- I'm generally aware, but not aware
10   enough to answer the question with
11   specificity.
12       Q.     To the extent the buyer assumed
13   ordered inventory, they would be assuming
14   both an obligation to take title to
15   inventory that was ordered and also to pay
16   for it, correct?
17            MS. MAINOO:  Objection.  Calls
18        for a legal conclusion.
19       A.     How that is defined in the APA, I
20   don't know.  It's not a definition that I
21   can opine upon.
22       Q.     Mr. Riecker, prior to the
23   closing, Sears separately tracked available
24   cash and unavailable cash, correct?
25            MS. MAINOO:  Objection.  Vague.
```

49

1          R. Riecker

2     A.     That is correct.

3     Q.     Unavailable cash would include

4  cash in escrow, for example?

5          MS. MAINOO:  Objection.  Vague.

6     A.     Yes.

7     Q.     Unavailable cash would also

8  receive credit card receivables?

9     A.     Specificity of that, I don't

10 know.

11    Q.     Unavailable cash would include

12 cash that's posted as collateral?

13          MS. MAINOO:

14    A.     Sometimes yes, sometimes no.

15    Q.     Unavailable cash would include

16 invested cash?

17    A.     I don't believe we had any

18 invested cash.

19    Q.     Theoretically.

20    A.     Theoretically, yes.

21    Q.     Okay.

22          Unavailable cash would include

23 cash in regional banks?

24    A.     The level of specificity here,

25 you're getting into a level of specificity

51

1                    R. Riecker

2       Q.    And if you look down, I think

3  it's the third e-mail down in the chain --

4  maybe it's the fourth -- it's an e-mail

5  dated November 2, 2018 at 8:33 p.m. from

6  Mr. Prakash where he begins, it says Kunal

7  comma.

8             Do you see that?

9       A.    Yes.

10      Q.    And below that, he says, "Please

11 see the specific components of unavailable

12 cash followed by some call-outs."

13            Do you see that?

14      A.    I do.

15      Q.    And is your understanding of this

16 e-mail that Mr. Prakash was providing Mr.

17 Kamlani with the specific components that

18 make up unavailable cash as unavailable

19 cash is tracked by Sears' accounting

20 system?

21            MS. MAINOO:  Objection.  Lack of

22      personal knowledge.

23      A.    Unavailable cash is not tracked

24 by the accounting system.  The accounting

25 system does not define unavailable cash.

52

1          R. Riecker

2     Q.    So where is unavailable cash

3  tracked?

4          MS. MAINOO:   Objection.

5     A.    Unavailable cash was only tracked

6  on this.

7     Q.    On this e-mail?

8     A.    Based on their definition of what

9  they think is unavailable cash.

10    Q.    Okay.

11          And when you say based on their

12  definition, you're referring to what

13  Mr. Prakash lists as unavailable cash,

14  correct?

15    A.    That is correct.

16    Q.    Okay.

17          And as you'll see Mr. Prakash

18  lists several components of unavailable

19  cash, including cash in escrow, credit card

20  receivables, cash posted as collateral,

21  invested cash, cash in regional banks and

22  cash in stores.

23          Do you see that?

24    A.    Yes.

25    Q.    And he totals that unavailable

1                    R. Riecker

2       A.    I believe those are two different

3    terms and have nothing to do with each

4    other.

5       Q.    I'm looking at, just to be clear,

6    the -- on page 2 of Exhibit 3 where it says

7    available cash balance of zero?

8       A.    Yes, it's also on the previous

9    page.

10      Q.    Okay.

11      A.    That has nothing to do with

12   unavailable cash and based on their

13   definitions.

14      Q.    It's separate from unavailable

15   cash, correct?

16            MS. MAINOO:  Objection.

17      A.    It is not unavailable cash.

18      Q.    Double negative there, so I want

19   to make clear we're saying the same thing.

20            Where Exhibit 3 is reporting an

21   available cash balance of zero, that cash

22   balance is not including unavailable cash

23   in any of those categories we just

24   discussed, correct?

25            MS. MAINOO:  Objection.

1                    R. Riecker

2       A.      That's correct.

3       Q.      Okay.

4               Do you have an understanding of

5   the extent to which available cash that was

6   in concentration accounts in the period

7   between the execution of the APA and the

8   closing was swept in order to be applied to

9   outstanding DIP indebtedness?

10              MS. MAINOO:  Objection.  Vague.

11      A.      Could you reask the question,

12  please?

13              MR. FRIEDMANN:  Could you read

14      the question back?

15              (Whereupon, the requested portion

16      was read back by the Court Reporter.)

17              MS. MAINOO:  Same objection.

18              MR. FRIEDMANN:  It's the same

19      question.

20      A.      Define "concentration account,"

21  please.

22      Q.      I'm referring to the debtors'

23  concentration accounts.

24              MS. MAINOO:  Objection.

25      A.      It's still -- there's hundreds of

57

```
1                  R. Riecker
2    accounts.
3        Q.    Again --
4        A.    What's a concentration versus
5    not, I don't -- without seeing it, the
6    delineation of which specific account, I
7    can't define that.
8        Q.    Okay.
9              Again, this is not meant to be as
10   confusing as the question apparently has
11   become.
12             Are you aware of the extent to
13   which available cash of the debtors was
14   swept on a daily basis and applied towards
15   outstanding DIP indebtedness?
16             MS. MAINOO:  Objection.
17       A.    Available cash balances are
18   applied to the DIP balance the next day to
19   reduce the DIP balance.
20       Q.    And was that done on a daily
21   basis, where daily again means whenever the
22   banks are open?
23             MS. MAINOO:  Objection.
24   BY MR. FRIEDMANN:
25       Q.    This is between, by the way, the
```

1                    R. Riecker

2    signing of the APA and the closing.

3        A.    If the available cash sat in an

4    account that was automatically swept by the

5    bank, it would go to pay down the revolver,

6    yes, or the DIP balance, excuse me.

7        Q.    And do you know whether that

8    daily sweep of the available cash balances

9    occurred on the night before the closing to

10   pay down the outstanding DIP indebtedness?

11            MS. MAINOO:   Objection.

12       A.    Sweeps typically occur before 1

13   p.m. Eastern Time.  So the night of, I

14   don't -- I would say no, at the night there

15   was no sweep.

16       Q.    Okay.

17            Change that up a little bit for

18   you.

19            Do you know whether the daily

20   sweep of the available cash balances

21   occurred on the day immediately prior to

22   the closing to pay down the outstanding DIP

23   indebtedness?

24       A.    Most likely.  They're automatic

25   sweeps.

1                    R. Riecker

2        Q.     And that would mean that at 12:01

3    a.m. on the day of the closing, the

4    debtors' accounts would have a zero

5    balance, because if they were swept the

6    prior day and applied to the DIP

7    indebtedness, there would be nothing in

8    that account until new monies were

9    deposited in that account during the course

10   of the following day, correct?

11              MS. MAINOO:  Objection.  Lack of

12       personal knowledge.

13       A.     Not necessarily.

14       Q.     To the best of your knowledge,

15   was every available dollar as of the

16   closing that the debtor had, every

17   available -- sorry, strike that.

18              To the best of your knowledge,

19   was every available dollar that the debtors

20   had at the closing used to pay down the

21   outstanding DIP indebtedness?

22              MS. MAINOO:  Objection.

23       A.     Based upon the automatic sweeps

24   that happened, based on the rules for

25   giving DIP financing, yes.

1          R. Riecker

2      and answered.

3      A.    I do not.

4      Q.    Okay.

5          Mr. Riecker, as the CFO of the

6  debtor -- and again, it's the period

7  between the bankruptcy petition and the

8  closing of the sale to the buyer -- you

9  were familiar that debtors had certain

10  obligations under the Asset Purchase

11  Agreement to provide certain target amounts

12  of inventory and receivables to the buyer

13  at closing, correct?

14          MS. MAINOO:  Objection.

15      A.    Yes.

16      Q.    And you were also aware of

17  debtors' obligations under the Asset

18  Purchase Agreement to pay the DIP credit

19  agreement down to $850 million, correct?

20      A.    Yes.

21      Q.    And during the period between the

22  effective date of the Asset Purchase

23  Agreement and the closing, from your

24  standpoint as the CFO of the debtors, would

25  you agree that the debtors reasonably

1                    R. Riecker

2    managed the amount of inventory in

3    consultation with the buyer in order to

4    satisfy those conditions in the Asset

5    Purchase Agreement?

6              MS. MAINOO:  Objection.  Calls

7        for a legal conclusion.

8        A.    Define "reasonable," please.

9        Q.    From your perspective as the CFO

10   of the debtor at the time, in a manner that

11   allowed the debtor to satisfy the target

12   amounts that were required to be delivered

13   of inventory at the closing and allowed the

14   company to continue as a going concern.

15             MS. MAINOO:  Objection.  Calls

16       for a legal conclusion.

17       A.    Yes.

18       Q.    The decisions that were made,

19   whether -- set aside reasonable or not

20   even -- they were done in full view of the

21   buyer from your perspective, is that fair?

22             MS. MAINOO:  Objection.

23       A.    I don't know what the buyer saw

24   or did not see.

25       Q.    Let's talk about it.  We talked

64

1          R. Riecker

2     already they were getting those daily cash

3     flow forecasts, correct?

4          A.     Yes.

5          Q.     And they were also getting

6     borrowing base forecasts on a daily basis,

7     correct?

8          A.     Yes.

9          Q.     And the borrowing base forecasts

10    were updated on a daily basis with the

11    company's inventory management team,

12    correct?

13         A.     Yes.

14         Q.     Okay.

15              In that same period between the

16    effective date and the -- the effective

17    date of the Asset Purchase Agreement and

18    the closing of the sale to the buyer, would

19    you agree from your perspective as the CFO

20    of the debtors at the time, that the

21    debtors managed the accounts payable in

22    accordance with the cash management

23    policies and practices of Sears that had

24    been in effect prior to the petition date?

25              MS. MAINOO:   Objection.

66

```
 1                    R. Riecker
 2              Was cash flow managed during that
 3  period between the effective date of the
 4  Asset Purchase Agreement and the closing of
 5  the sale with Transform in accordance with
 6  the cash management policies and practices
 7  that were in effect before the petition
 8  date?
 9              MS. MAINOO:  Objection.
10       A.    When you say "cash management
11  policies," you mean some written policy of
12  the company or practices?
13       Q.    Either.
14       A.    Prior to and during bankruptcy,
15  the company did manage its outflow based on
16  inflows.
17       Q.    If we didn't get more granular,
18  we'll get more granular here instead.  It
19  will be easier.
20              In the pre-petition period, Sears
21  routine delayed contractually due payments
22  by as many as 14 business days after the
23  actual due date for that payment, correct?
24              MS. MAINOO:  Objection.  Vague.
25       A.    The company had historically
```

1          R. Riecker

2  delayed payments to vendors.  Just prior to

3  bankruptcy, the days grew to 14 days, but

4  it had not been at that level during a

5  considerable time period prior to

6  bankruptcy.

7     Q.    Okay.  And again, I don't want to

8  be caught up on memory with exact time

9  periods.  We'll use a couple of documents

10  that I don't think will take too long.

11          MR. FRIEDMANN:  Can I have

12     Exhibit O, please, and we'll end up

13     going through R for the next couple of

14     minutes.

15          Exhibit 5, please.

16          (Exhibit 5, E-mail, marked for

17     identification, as of this date.)

18  BY MR. FRIEDMANN:

19     Q.    Mr. Riecker, you're now being

20  handed what we've just marked as Exhibit 5,

21  and I apologize for the very small font.

22  I'm not sure why it printed out that way.

23          This is an August 6, 2018 e-mail

24  from Mr. Prakash to a number of recipients,

25  including yourself and Mr. Lampert at ESL

68

```
1                    R. Riecker
2    and Mr. Kunal and the folks at M-III, et
3    cetera.
4              Do you see that?
5       A.    Yes.
6       Q.    And August 6, 2018 is before the
7    bankruptcy petition, correct?
8       A.    Yes.
9       Q.    About, give or take, two months
10   before the bankruptcy petition?
11      A.    Yes.
12      Q.    Okay.
13            And if you go down to the second
14   bullet under, "Key Assumptions."
15            Do you see that?
16      A.    Yes.
17      Q.    It says, "For most vendors,
18   domestic and import payments have been
19   shifted to an eight-day delay."
20            Do you see that?
21      A.    Yes.
22      Q.    And is that consistent with your
23   recollection what you were discussing
24   before about delaying payments past their
25   payment date for a period shorter than 14
```

69

1          R. Riecker

2     days, but at least past their payment date?

3          MS. MAINOO:  Objection.

4     A.     Yes.

5     Q.     Okay.

6          And when it says an eight-day

7     delay, do you recall if that was eight

8     business days versus eight calendar days?

9     A.     I do not.

10    Q.     Okay.

11         So it could have been either,

12    you're just not sure now?

13    A.     No.

14    Q.     Okay.

15         MR. FRIEDMANN:  Tab P.

16         (Exhibit 6, E-mail, marked for

17         identification, as of this date.)

18    BY MR. FRIEDMANN:

19    Q.     Mr. Riecker, we're handing you

20    what's just been marked as Exhibit 6.  This

21    is an e-mail from Friday, August 10, 2018,

22    so four days later than Exhibit 5.

23         Again, it's an e-mail from

24    Mr. Prakash.  This one does not appear to

25    be sent to you, but as -- but, first of

```
 1                    R. Riecker
 2   all, did I get that part right?
 3       A.     Yes.
 4       Q.     Okay.
 5              And this one, Mr. Prakash reports
 6   just confirming we are moving to a 10
 7   business day delay for all non-exception
 8   vendors.
 9              Do you see that?
10       A.     Yes.
11       Q.     And is that consistent with your
12   recollection that, as you started getting
13   closer to the bankruptcy petition, the
14   amount of time posted due date was
15   increasing in terms of when payments were
16   being made?
17              MS. MAINOO:   Objection.
18       A.     Yes.
19       Q.     Okay.
20              MR. FRIEDMANN:   Q, please.
21              (Exhibit 7, E-mail, marked for
22       identification, as of this date.)
23   BY MR. FRIEDMANN:
24       Q.     Mr. Riecker, we've just marked
25   Exhibit 7.  This is a September 25, 2018
```

71

1                    R. Riecker

2    e-mail again from Mr. Prakash.  This one

3    does include you as one of the recipients.

4            Do you see that?

5        A.    Yes.

6        Q.    Okay.

7            Here we're still in the

8    pre-petition period, but a little bit less

9    than a month from the bankruptcy petition,

10   correct?

11       A.    Yes.

12       Q.    Okay.

13            And here Mr. Prakash reports to

14   thank you and others, "All, we are moving

15   to 14 business day delay for payments to

16   non-exception merchandise and

17   non-merchandise vendors."

18            Do you see that?

19       A.    Yes.

20       Q.    And he's saying, "Anything that

21   would have been paid tomorrow within 11

22   business day delay should now be paid on

23   Monday for a 14 business day delay."

24            Do you see that?

25       A.    Yes.

1                    R. Riecker

2      Q.    And is that consistent with what

3   you were testifying to before, was that as

4   you got closer to the bankruptcy petition,

5   that's when this 14 business day delay in

6   payments was implemented?

7              MS. MAINOO:   Objection.

8      A.     Yes.

9      Q.     Okay.

10             MR. FRIEDMANN:  R, please.

11             (Exhibit 8, E-mail, marked for

12        identification, as of this date.)

13   BY MR. FRIEDMANN:

14      Q.     Mr. Riecker, I've now just handed

15   you what we've marked as Exhibit 8.

16             Once again, this is an e-mail

17   from Mr. Prakash.  This e-mail is also from

18   September 25, 2018.  This e-mail, however,

19   also went to Mr. Lampert at ESL and

20   Mr. Kunal at ESL.

21      A.     Mr. Kamlani.

22      Q.     I'm sorry, what did I say --

23   Mr. Kamlani at ESL, excuse me.

24             And here, Mr. Prakash is

25   reporting in the third bullet point under

```
 1              R. Riecker
 2    gotten through the close?
 3              MS. MAINOO:  Objection.
 4         A.    I do not know.
 5         Q.    Okay.
 6              MR. FRIEDMANN:  We've been going
 7         for about an hour and a half,
 8         although, Rob, I know that you could
 9         probably go straight through.  I'm
10         going to take a short break, figure --
11         I want to be able to go through and
12         figure out if I can just wrap up in
13         the next one, so if you can give us
14         about 10 minutes.
15              MS. MAINOO:  Sure.
16              MR. FRIEDMANN:  And then I think
17         we'll be able to finish up in not much
18         more time.
19              (Recess taken 10:34 a.m. from
20         10:55 a.m.)
21    BY MR. FRIEDMANN:
22         Q.    Mr. Riecker, when did you become
23    the CFO of Sears?  This is in the
24    pre-petition period.
25         A.    April of 2017.
```

78

1           R. Riecker

2      Q.    And in your time as CFO of Sears

3   prior to the filing of the bankruptcy

4   petition, how commonplace was it to delay

5   vendor payments?

6           MS. MAINOO:  Objection.

7      A.    We delayed vendor payments during

8   that timeframe.

9      Q.    Do you recall about --

10     A.    During that timeframe.

11     Q.    During the entirety of that

12  timeframe?

13     A.    Off and on, yes.

14     Q.    I know you said earlier,

15  testified earlier that the 14 business day

16  delay was something that happened closer to

17  the bankruptcy proceeding, but in a period

18  going back early 2018, at that point it was

19  the case that sometimes vendor payments

20  would be late as much as four, five or six

21  days, correct?

22          MS. MAINOO:  Objection.

23     A.    In early 2018?

24     Q.    Yeah.

25     A.    Without going back and seeing

1               R. Riecker

2    specified -- you can put that down -- I

3    want to talk about the specified

4    receivables that were to be provided under

5    the Asset Purchase Agreement.

6               During the negotiation of the

7    target amount of specified receivables that

8    were to be provided by the debtors to the

9    buyer at the close, the debtors agreed to

10   assign the buyer an aggregate of

11   $25,200,000 of book value specified

12   receivables which comprise certain

13   categories of receivables as they were kept

14   in Sears' accounting system, correct?

15               MS. MAINOO:   Objection.

16      A.      That is my understanding.

17      Q.      Okay.

18               And these were all of the other

19   accounts receivable that the debtors had

20   apart from those that were conveyed as part

21   of the borrowing base, correct?

22      A.      I can't verify whether it was

23   all.

24      Q.      These were not handpicked

25   accounts receivable where some would go to

1                  R. Riecker

2    prepare in connection with the negotiation

3    of the Asset Purchase Agreement?

4              MS. MAINOO:  Objection.

5        A.    Define what you mean by help

6    prepare?

7        Q.    That you oversaw or assisted in

8    some manner.

9              MS. MAINOO:  Objection.

10       A.    This was a schedule that was

11   prepared by individuals in our accounting

12   department and I believe provided to M-III.

13       Q.    Okay.

14             So it was prepared by individuals

15   in the accounting department that you

16   supervise and then it was provided to

17   M-III, is that correct?

18             MS. MAINOO:  Objection.

19       A.    I don't have direct supervision

20   of those individuals.

21       Q.    At some level.

22             MS. MAINOO:  Objection.

23   BY MR. FRIEDMANN:

24       Q.    When Schedule, what's now called

25   1.1K, but when the schedule of specified

1          R. Riecker

2   receivables was first prepared, did you

3   understand it to represent the then current

4   estimate much values of certain categories

5   of receivables as they're kept in the

6   ordinary course in accordance with Sears'

7   accepted accounting practices?

8          MS. MAINOO:  Objection.

9     A.    Yes.

10    Q.    And this schedule was provided to

11  the buyer in advance of even the auction

12  that took place here at Weil Gotshal in mid

13  January, correct?

14          MS. MAINOO:  Objection.

15    A.    This specific schedule?

16    Q.    It was not at that point labeled

17  1.1K, but a schedule of the specified

18  receivables, yes.

19          MS. MAINOO:  Objection.

20    A.    Do you have that schedule?

21    Q.    Yeah.

22          (Exhibit 13, Presentation, marked

23      for identification, as of this date.)

24  BY MR. FRIEDMANN:

25    Q.    Mr. Riecker, I've just handed you

1           R. Riecker

2    schedule of their view of the

3    recoverability of the gross amount of the

4    receivable.

5        Q.     So, for example, something that

6    has a zero percent under that column, does

7    that indicate that in the discussions

8    between M-III and the folks in the

9    accounting department who prepared the

10   schedule, they concluded that there was a

11   zero percent chance of recovering on those?

12       A.     Yes.

13       Q.     And likewise, the ledger accounts

14   where they list 50 percent, does that

15   indicate that as between M-III and the

16   folks in Sears' accounting department who

17   prepared this schedule, they thought there

18   was likely a 50 percent chance of being

19   able to recover the total gross book value

20   amount?

21              MS. MAINOO:   Objection.

22       A.     Yes.

23       Q.     Okay.

24              And to be clear, those are

25   basically educated guesses based on

95

```
 1                    R. Riecker
 2              MS. MAINOO:  Objection.  Lack of
 3        personal knowledge.
 4              MR. FRIEDMANN:  Can I finish the
 5        question?
 6              MS. MAINOO:  You paused again.
 7              MR. FRIEDMANN:  I'm trying to be
 8        careful of my wording so you don't
 9        object based on form.
10    BY MR. FRIEDMANN:
11        Q.   Do you recall if the --
12    strike that.
13              Do you recall if the buyer
14    diligenced these specific ledger accounts
15    in advance of executing the APA?
16              MS. MAINOO:  Objection.
17        A.   I do recall a meeting between the
18    debtor, its advisors, a potential buyer and
19    their advisors in which there was a level
20    of detail provided regarding many of these
21    individual ledger account names.
22        Q.   And that was to understand both
23    what's actually in those accounts, correct,
24    as part of that?
25              MS. MAINOO:  Objection.
```

96

1              R. Riecker

2      A.    Yes.

3      Q.    As well as to understand the

4  basis for why we believe the estimated

5  recovery value to be higher or lower,

6  correct?

7              MS. MAINOO:   Objection.

8      A.    I believe it was both, but it was

9  more about what the definitional accounts

10 were.

11             (Exhibit 14, E-mail chain, marked

12      for identification, as of this date.)

13 BY MR. FRIEDMANN:

14      Q.    Mr. Riecker, we've just handed

15 you what's been marked as Deposition

16 Exhibit 14.

17             The top e-mail there is an e-mail

18 from -- I'll have you pronounce his last

19 name?

20      A.    Butz.

21      Q.    Say it again?

22      A.    Butz.

23      Q.    Butz.

24             To a number of recipients,

25 including yourself, as well as folks at

97

```
1                    R. Riecker
2    Moelis, the advisor to the buyer.  It's
3    dated January 7, 2019.
4              Do you see that?
5        A.    Yes.
6        Q.    And can you please tell me what
7    Mr. Butz's position was, or at the time on
8    January 7, 2019, more correctly?
9        A.    He is, I believe, a senior
10   director over the, what I'll term as the
11   back office accounting functions of the
12   company.
13       Q.    And do you know if he was one of
14   the individuals who played some role in the
15   creation of the list of specified
16   receivables that we were just looking at in
17   Exhibit 13?
18       A.    Yes.
19       Q.    Okay.
20             And if you go down to the very
21   beginning of this e-mail chain, which is at
22   the bottom of the second page, it appears
23   to start with what looks like a calendar
24   invite for a conference call.
25             Do you see that?
```

1                R. Riecker

2       A.    Yes.

3       Q.    And this is a conference call

4  that Mr. Butz is on and you're listed there

5  as well, as well as Mr. Kamlani and others

6  from Moelis and M-III and Lazard.

7            Do you see that?

8       A.    Yes.

9       Q.    And the subject of this is,

10 "Receivable Schedule."

11           Do you see that?

12      A.    Uh-huh.

13      Q.    Do you recall there being

14 conference calls with these individuals to

15 discuss this receivable schedule in early

16 January in advance of the auction?

17      A.    Yes.

18      Q.    Okay.

19            And the e-mails that follow,

20 without spending too much time going into

21 detail, but take as long as you need to

22 review them, appear to be a series of

23 e-mails between Mr. Butz and Mr. Kamlani

24 clarifying and providing detail with

25 respect to certain line items.

99

1          R. Riecker

2          Do you see that?

3     A.     Yes.

4     Q.     So would it be fair to say that

5  the buyer had an opportunity to diligence

6  this list of specified receivables provided

7  by the debtor in advance of the auction?

8          MS. MAINOO:   Objection.

9     A.     To what they diligenced or did

10  not diligence, did they have an opportunity

11  to look at information, yes.

12     Q.     Okay.

13          Going back to the -- and we can

14  use the example, I'll use the example of

15  1.1K, which was a single document -- that

16  was Exhibit 12, I think.

17     A.     Yes.

18     Q.     These individual accounts, is it

19  fair to say that you would expect them to

20  fluctuate on a daily basis as receivables

21  are satisfied and new receivables are

22  generated?

23          MS. MAINOO:   Objection.

24     A.     Yes.

25     Q.     So there couldn't be any

101

1                    R. Riecker

2     be subject over the course of a month to

3     fluctuate based on, as I said before,

4     receivables that are satisfied and new

5     receivables that are generated, correct?

6              MS. MAINOO:  Objection.

7        A.    Yes.

8        Q.    As you understood it as the CFO

9     of the debtors, during that period of time

10    between the execution of the APA and the

11    close, what the debtors were expected to

12    provide at closing, based on this schedule,

13    was the total amount of receivables of at

14    least $255.2 million in book value at

15    close, not any individual line item hitting

16    a certain number, correct?

17             MS. MAINOO:  Objection.  Calls

18        for a legal conclusion.

19    BY MR. FRIEDMANN:

20        Q.    You can answer.

21        A.    Yes.

22             MR. FRIEDMANN:  Tab W.

23             (Exhibit 15, E-mail, marked for

24        identification, as of this date.)

25    BY MR. FRIEDMANN:

107

```
 1               R. Riecker
 2   how to calculate each of these specific
 3   categories of receivables?
 4       A.    Yes.
 5       Q.    Okay.
 6             And that accounting methodology
 7   that Sears was using both to calculate this
 8   list of specified receivables but also more
 9   generally, that was a methodology that
10   Sears used when it prepared, for example,
11   its financial statements?
12       A.    Yes.
13       Q.    And those were financial
14   statements that were audited by the
15   accounting firm of Deloitte?
16       A.    Annual audited financial
17   statements.  Not every financial statement
18   we prepared was audited.
19       Q.    Okay.
20             But these were the -- it was
21   using that same methodology when it
22   prepared its annual audited financial
23   statements, correct?
24       A.    Yes.
25       Q.    Okay.
```

109

1        R. Riecker

2    Q.    Okay.

3          If you know, when the buyer

4    calculated the value of the specified

5    receivables that it received from the

6    debtors at closing, it used a different

7    accounting practice than what Sears had

8    been and its team had been using to prepare

9    these, the schedule in the first place,

10   correct?

11         MS. MAINOO:  Objection.

12   A.    I don't know.

13   Q.    You don't know?

14   A.    I do not know.

15   Q.    Okay.

16         To what extent does seasonality

17   affect the amount of inventory that Sears

18   will have on hand at any given time?

19         MS. MAINOO:  Objection.

20   A.    Seasonality is a factor related

21   to balances for many things in the company

22   related to inventory.

23   Q.    And so there are seasons in which

24   you would expect inventory to be higher and

25   seasons in which it would be lower?

1                    R. Riecker

2        we'll be able to wrap up.  I need to

3        check with the team.

4                MS. MAINOO:  Okay.

5                MR. FRIEDMANN:  Thanks, Rob.

6                (Recess taken from 11:39 a.m. to

7        11:47 a.m.)

8    BY MR. FRIEDMANN:

9        Q.    Mr. Riecker, we talked earlier

10   about the extent to which you consulted

11   with M-III during the period of time that

12   M-III was the financial advisor to Sears,

13   the company.

14                My question is, is to what extent

15   now post-sale to Transform you interact or

16   consult with Ernst & Young in the analyses

17   that they're doing?

18                MS. MAINOO:  Objection.

19       A.    I do not interact with Ernst &

20   Young regarding the work that they're

21   currently performing for Transform.

22       Q.    And so do they --

23       A.    And to the extent there is

24   interaction, it's directed at the direction

25   of counsel.

1                    R. Riecker

2        Q.     So to be clear, when they're

3    doing certain analyses, they're not running

4    them by you to, you know, check them to

5    make sure they make sense or consistent

6    with the way the company generally or

7    the -- strike that.

8                So to be clear, Ernst & Young is

9    not coming to you to make sure that

10   whatever analyses they're doing is

11   consistent with the way in which the

12   company, the company's accounting practices

13   work, for example?

14                MS. MAINOO:   Objection.

15        Mr. Riecker testified to that.  To the

16        extent he's consulting with Ernst &

17        Young, it's at the direction of

18        counsel.  So, Jared, I understand your

19        question is with respect to any

20        non-privileged discussions, any

21        discussions not at the direction of

22        counsel?

23   BY MR. FRIEDMANN:

24        Q.     To be clear, yeah, certainly to

25   the extent it's, you know, some kind of --

113

1          R. Riecker

2    well, let me strike that.

3              Yes, I'm just asking about

4    non-privilege issues.

5       A.     Yeah, so I have not seen any of

6    their work product.  I may get an

7    occasional question about who can I go to

8    see to find this or that.  That's generally

9    the interaction with Ernst & Young.

10             MR. FRIEDMANN:  Thank you,

11        Mr. Riecker.  It's a pleasure to see

12        you.  Thank you very much for coming

13        in and thank you.

14             MS. MAINOO:  Thanks.  I just have

15        one question.

16   EXAMINATION BY

17   MS. MAINOO:

18       Q.     Jared asked earlier,

19   Mr. Friedmann asked earlier about your

20   knowledge of any role Mr. Jeff Butz played

21   with respect to the specified receivables.

22             To your knowledge, what role, if

23   any, did Mr. Butz play with respect to the

24   specified receivables schedule?

25       A.     I think just in general of

1                      R. Riecker

2    working with the accounting individual that

3    works in that area for those balance sheet

4    accounts, meaning accounts receivable.

5              MS. MAINOO:  All right.  No

6         further questions from me.

7              MR. FRIEDMANN:  Okay.

8              MS. MAINOO:  Just for the record,

9         I want to note that we'll need to get

10        the witness an opportunity to review

11        the transcript.

12             MR. FRIEDMANN:  Of course.

13             MS. MAINOO:  And I also see that

14        you agree to treat the transcript as

15        confidential?

16             MR. FRIEDMANN:  Once you've had a

17        chance to review it, if you can let us

18        know what about it is confidential we

19        can agree to keep those portions

20        confidential.

21             MS. MAINOO:  Okay.  Thank you.

22             (Continued on next page to

23        include signature and jurat.)

24

25

1           R. Riecker

2           MR. FRIEDMANN:  Thank you.  We

3    can go off the record.

4           (Time noted:  11:51 a.m.)

5

6

7                    _____

8                    ROB RIECKER

9

10   Subscribed and sworn to before me

11   this ____ day of _____, 2019.

12

13   _____

14

15

16

17

18

19

20

21

22

23

24

25

1

2                   C E R T I F I C A T E

3    STATE OF NEW YORK     )

4                              : ss.

5    COUNTY OF NEW YORK    )

6

7            I, Joan Ferrara, a Notary Public

8        within and for the State of New York,

9        do hereby certify:

10           That ROB RIECKER, the witness

11       whose deposition is hereinbefore set

12       forth, was duly sworn by me and that

13       such deposition is a true record of the

14       testimony given by the witness.

15           I further certify that I am not

16       related to any of the parties to this

17       action by blood or marriage, and that I

18       am in no way interested in the outcome

19       of this matter.

20           IN WITNESS WHEREOF, I have

21       hereunto set my hand this 19th day of

22       June, 2019.

23

24                      _____

25                          Joan Ferrara

1

2    --------------- I N D E X ---------------

3    WITNESS              EXAMINATION BY          PAGE

4    ROB RIECKER      MR. FRIEDMANN              5

5                     MS. MAINOO               113

6

7    --------------- EXHIBITS ----------------

8    EXHIBIT                              FOR ID.

9    Exhibit 1   Email chain                 17

10   Exhibit 2   Email chain                 23

11   Exhibit 3   Email chain                 37

12   Exhibit 4   Email chain                 50

13   Exhibit 5   E-mail                      67

14   Exhibit 6   E-mail                      69

15   Exhibit 7   E-mail                      70

16   Exhibit 8   E-mail                      72

17   Exhibit 9   E-mail chain                74

18   Exhibit 10  Asset Purchase Agreement    80

19   Exhibit 11  Schedule 1.1F               81

20   Exhibit 12  Schedule 1.1K               86

21   Exhibit 13  Presentation                88

22   Exhibit 14  E-mail chain                96

23   Exhibit 15  E-mail                     101

24

25

118

1

2                DEPOSITION ERRATA SHEET

3   Case Caption:   In Re: SEARS HOLDINGS

4                CORPORATION, et al.

5

6     DECLARATION UNDER PENALTY OF PERJURY

7            I declare under penalty of perjury

8   that I have read the entire transcript of my

9   Deposition taken in the captioned matter or

10  the same has been read to me, and the same is

11  true and accurate, save and except for

12  changes and/or corrections, if any, as

13  indicated by me on the DEPOSITION ERRATA

14  SHEET hereof, with the understanding that I

15  offer these changes as if still under oath.

16

17

18  _____

19                ROB RIECKER

20

21  Subscribed and sworn to on the _____ day of

22  _____, 2019, before me,

23  _____

24  Notary Public,in and for the State of

25  _____