**Hearing Date: July 18, 2019 at 10:00am (Eastern Time)**
**Supplemental Brief Deadline: July 15, 2019**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

……………………………………………X
                       :

**In re**                       :         **Chapter 11 Case No.**

**SEARS HOLDINGS CORPORATION, et al.,** :         **18-23538 (RDD)**

**Debtors.**[1]         :         **(Jointly Administered)**

                       :

……………………………………………X

**COMMON REPLY MEMORANDUM OF LAW ON BEHALF OF THE SECOND LIEN PARTIES: (A) IN FURTHER SUPPORT OF THEIR REQUESTS TO DETERMINE THE AMOUNT OF THEIR SECOND LIEN SECURED CLAIMS UNDER SECTION 506(a) AND THEIR SECTION 507(b) ADMINISTRATIVE CLAIMS PURSUANT TO BANKRUPTCY RULE 3012; AND (B) IN OPPOSITION TO DEBTORS' MOTION TO SURCHARGE THEIR COLLATERAL PURSUANT TO SECTION 506(c)**

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

# **TABLE OF CONTENTS**

**PAGE**

PRELIMINARY STATEMENT .................................................................................................. 2

ARGUMENT .............................................................................................................................. 5

I.    The Evidence Will Show That There Has Been A Significant
      Diminution in Value of the Second Lien Collateral .......................................................... 5

    A.    The Collateral Value on the Petition Date Was Not 85%
             of Book Value .......................................................................................................... 5

    B.    The Debtors' New Analysis Improperly Excludes Pharmacy
             Receivables and Scripts ......................................................................................... 10

    C.    The Debtors Incorrectly Assume that the L/C Facilities
             Reduced the Value of the Second Lien Parties' Collateral ...................................... 12

    D.    The Debtors Improperly Account For Purported
             Postpetition Interest Payments ................................................................................ 15

II.   The Debtors Have Failed To Provide The Required Legal
      and Factual Support For Their Asserted Section 506(**c**) Surcharge ................................. 15

    A.    The Debtors Have Presented No Evidence Sufficient To
             Meet Their Burden of Proof Under Section 506(c) .................................................. 15

    B.    The Debtors Mistakenly Assume That The Going Concern
             Sale Process Was Necessary to Preserve The Value of
             The Second Lien Collateral ...................................................................................... 18

    C.    The Debtors Have Failed to Prove that the Sale Transaction
             Primarily and Directly Benefitted the Second Lien Parties ...................................... 19

III.  The Equities Cannot Override the Second Lien Parties' Property Rights ......................... 22

    A.    The Doctrine of Unclean Hands Does Not Apply
             Against the Second Lien Parties .............................................................................. 22

    B.    Judicial Estoppel Also Does Not Apply Against the Second Lien Parties ................ 24

    C.    To the Extent Any Estoppel Applies, It Is Against the
             Debtors and Not the Second Lien Parties ............................................................... 26

IV.   The Parties Have Stipulated to a Rule 3012 Hearing ...................................................... 28

CONCLUSION ......................................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

## Rules and Statutes

11 U.S.C. 363(k) ................................................................................................ 21

N.Y. U.C.C. Law § 9-102(a)(48)(B) ................................................................. 11

N.Y. U.C.C. Law § 9-102(a)(64)(A) ................................................................. 11

## Cases

*ACE Am. Ins. Co. v. Am. Guarantee & Liab. Ins. Co.*,
257 F. Supp. 3d 596 (S.D.N.Y. 2017) ............................................................... 23

*Ashmore v. CGI Grp., Inc.*,
923 F.3d 260 (2d Cir. 2019) .............................................................................. 24

*Assocs. Commercial Corp. v. Rash*,
520 U.S. 953 (1997) ............................................................................................ 4

*Balaber-Strauss ex rel. Murphy v. Town of Harrison (In re Murphy)*,
331 B.R. 107 (Bankr. S.D.N.Y. 2005) ............................................................... 23

*Delphi Corp. v. Appaloosa Mgmt. L.P. (In re Delphi Corp.)*,
No. 05-44481(RDD), 2008 WL 3486615
(Bankr. S.D.N.Y. Aug. 11, 2008) (Drain, J.) .................................................... 24, 25

*Dominion Fin. Corp. v. Haimil Realty Corp. (In re Haimil Realty Corp.)*,
546 B.R. 257 (Bankr. S.D.N.Y. 2016) ............................................................... 24

*Eastman Kodak Co. v. Apple Inc. (In re Eastman Kodak Co.)*,
479 B.R. 280 (Bankr. S.D.N.Y. 2012) ............................................................... 23

*First Servs. Grp., Inc. v. O'Connell ex rel. Ceron (In re Ceron)*,
412 B.R. 41 (Bankr. E.D.N.Y. 2009) ................................................................. 17

*Gen. Elec. Credit Corp. v. Levin & Weintraub (In re Flagstaff Foodservice Corp.)*,
739 F.2d 73 (2d Cir. 1984) ................................................................................. 15, 16

**Page(s)**

*Gen. Elec. Credit Corp. v. Peltz (In re Flagstaff Foodservice Corp.)*,
762 F.2d 10 (2d Cir. 1985).................................................................... 20

*Grant v. U.S. Dep't of Defense (In re Grant)*,
No. 15-20330 (JJT), 2017 WL 2960206 (Bankr. D. Conn. July 10, 2017) ...................... 26

*In re 300 Washington St. LLC*,
528 B.R. 534 (Bankr. E.D.N.Y. 2015).................................................... 27

*In re Adelphia Bus. Sols., Inc.*,
341 B.R. 415 (Bankr. S.D.N.Y. 2003).................................................... 28

*In re Aéropostale, Inc.*,
555 BR. 369 (Bankr. S.D.N.Y. 2016).................................................... 21

*In re Allegiance Telecom, Inc.*,
356 B.R. 93 (Bankr. S.D.N.Y. 2006) (Drain, J.)...................................... 24

*In re Bush*,
579 B.R. 688 (Bankr. N.D.N.Y. 2017) ................................................. 24

*In re CCT Commc'ns, Inc.*,
420 B.R. 160 (Bankr. S.D.N.Y. 2009).................................................. 25

*In re Flagstaff*,
29 B.R. 215 (Bankr. S.D.N.Y 1983).................................................... 20

*In re MacDonald*,
128 B.R. 161 (Bankr. W.D. Tex. 1991)................................................. 29

*In re Ralph Lauren Womenswear, Inc.*,
197 B.R. 771 (Bankr. S.D.N.Y. 1996).................................................. 28

*In re Sabine Oil & Gas Corp.*,
555 B.R. 180 (Bankr. S.D.N.Y. 2016).................................................... 4

*In re Yellowstone Mountain Club, LLC*,
410 B.R. 658 (Bankr. D. Mont. 2009) .................................................. 9

*Menorah Congregation & Religious Ctr. v. Feldman (In re Menorah Congregation &
Religious Ctr.)*,
554 B.R. 675 (Bankr. S.D.N.Y. 2016) (Drain, J.)..................................... 17

**Page(s)**

*Merhav Ampal Grp. v. Merhave Ltd. (In re Ampal-Am. Israel Corp.)*,
545 B.R. 802 (Bankr. S.D.N.Y. 2016) ................................................................. 23

*Official Comm. of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Capital, LLC)*,
501 B.R. 549 (Bankr S.D.N.Y. 2013) ................................................................. 4, 9

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) ........................................................................................... 21

*Romley v. Sun Nat'l Bank (In re Two S Corp.)*,
875 F.2d 240 (9th Cir. 1989) .............................................................................. 9

*Specialty Minerals, Inc. v. Pluess-Staufer AG*,
395 F. Supp. 2d 109 (S.D.N.Y. 2005) ................................................................ 23

*Sw. Sec. FSB v. Segner (In re Domistyle, Inc.)*,
811 F.3d 691 (5th Cir. 2015) ............................................................................. 15, 16

*Weinman v. City of Pueblo, Colorado (In re Adam Aircraft Indus., Inc.)*,
No. 12–cv–1573–CMA, 2013 WL 773044 (D. Colo. Feb. 28, 2013) .............................. 9

Wilmington Trust National Association ("Wilmington Trust"), as Indenture Trustee and Collateral Agent; Cyrus Capital Partners, L.P. ("Cyrus"); and ESL Investments, Inc. and certain of its affiliated entities (including JPP, LLC and JPP II, LLC (collectively, "ESL")); (collectively, the "Second Lien Parties") in their capacities as second-lien creditors of Sears Holdings Corporation and certain of its affiliates (collectively, "Sears" or the "Debtors"), by their undersigned counsel, in response to the *Debtors' (I) Opposition to Second-Lien Holders' Requests to Determine Amount of Second-Lien Secured Claims Under Section 506(a) and Section 507(b) Administrative Claims and (II) Reply in Support of Debtors' Rule 3012 Motion to Determine the Amount, If Any, of 507(b) Claims and to Surcharge Second-Line Collateral Pursuant to Section 506(c)*, ECF No. 4381, (the "Debtors' Opposition") and *The Creditors' Committee's (I) Qualified Joinder to the Debtors' Objection to the Second Lien Parties' Requests to Determine Claims Under Section 506(a) and Section 507(b) and Reply in Support of the Debtors' Rule 3012 Motion and (II) Supplemental Objection to the Second Lien Parties' Request to Determine Claims Under Section 506(a) and Section 507(b)*, ECF No. 4385 (the "UCC Joinder"), hereby file this *Common Reply Memorandum of Law On Behalf of the Second Lien Parties: (A) in Further Support of Their Requests to Determine the Amount of Their Second Lien Secured Claims under Section 506(a) and of Their Section 507(b) Administrative Claims Pursuant to Bankruptcy Rule 3012; and (B) in Opposition to Debtors' Motion to Surcharge Their Collateral Pursuant to Section 506(c)* (the "Common Reply Memorandum").[2]  In further support of their requests for relief, the Second Lien Parties respectfully state as follows:

---

[2]     Capitalized terms used but not defined herein shall have the meaning ascribed in *the Common Memorandum of Law On Behalf of the Second Lien Parties:  (A) in Support of Their Requests to Determine the Amount of Their Second Lien Secured Claims under Section 506(a) and their Section 507(b) Administrative Claims Pursuant to Bankruptcy Rule 3012; and (B) in Opposition to the Debtors' Motion to Surcharge Their Collateral Pursuant to Section 506(c)*, ECF No. 4272 ("Common Memorandum") or the Final DIP Order.  In addition to the Common Reply Memorandum, each of the Second Lien Parties has filed a separate reply memorandum largely to discuss unique issues.

## PRELIMINARY STATEMENT

At the beginning of these cases, the Second Lien Parties were granted adequate protection liens specifically to protect their Second Lien Collateral positions from diminution, along with rights under Section 507(b) of the Bankruptcy Code to superpriority administrative claims if the adequate protection they were granted proved inadequate. These protections for specific lien rights in discrete assets (inventory, receivables, proceeds therefrom and associated books and records) were particularly important because it was clear early on that the Debtors had much more in mind than simply maximizing recoveries on the Second Lien Collateral. Rather, from the outset of these cases the Debtors believed that, if it could be achieved, "a single going-concern sale transaction for all or substantially all of the Debtors' businesses would be value maximizing." Debtors' Opp. ¶ 14. ESL also consistently advocated for a value maximizing approach, resulting in $5.2 billion of value being realized by the Debtors' estates in a comprehensive transaction that extended well beyond the mere sale of the Second Lien Collateral. Despite the suggestions in the Debtors' Opposition and the UCC Joinder that this behavior is somehow blameworthy, there is no reason in law, logic or equity why these efforts should somehow cause ESL, much less any other Second Lien Party, to forfeit their adequate protection rights with respect to specific collateral simply because the Debtors chose to include those assets as but one component of a much grander transaction.[3]

Similarly off base are the various strawman arguments the Debtors and the UCC have erected in an effort to justify their proposed Section 506(c) surcharge. Specifically, in an effort

---

[3]    The Debtors and the UCC assert that Cyrus also urged the Debtors to pursue a going concern sale. There is no basis for these assertions. The Debtors and the UCC do not, because they cannot, point to any filings, statements on the record, correspondence or any other evidence made by or on behalf of Cyrus supporting or advocating for a going concern sale. The Debtors and the UCC have concocted these allegations out of thin air, apparently in an effort to paint Cyrus with the same brush as the Debtors and the UCC have painted ESL throughout these cases. Cyrus will address these misplaced allegations separately in its separate reply brief.

to satisfy their extraordinary burden of demonstrating that they are entitled to impose a Section

506(c) surcharge for all the money they have spent in these cases, the Debtors argue that the

Second Lien Parties were the primary beneficiary of the going concern sale because, according

to the Debtors, the Second Lien Parties did better in the going concern sale than they would have

done in a day-one liquidation.  As a threshold matter, the Debtors' comparison of the going

concern sale to a hypothetical day-one liquidation is a false choice.  Nowhere does Section

506(c) impose some sort of "hypothetical chapter 7 liquidation" test.  A debtor could take all

sorts of paths to get a result that yielded better results than a day-one liquidation but still fail to

prove that the expenses incurred in doing so were reasonable, necessary and benefitted the

secured creditor.

     In addition, unlike the bald statements made by the Debtors, the Second Lien Parties

actually put in expert reports demonstrating that it simply is not true that a traditional liquidation

of the Second Lien Collateral (which regularly occurs in the world of retail bankruptcies) would

have yielded a worse result for the Second Lien Parties than the going concern sale.  While the

Debtors, their estates, employees and particular creditors whose obligations were assumed may

have realized substantial value from the going concern sale, viewed solely from the perspective

of the Second Lien Parties and focused solely on recoveries on Second Lien Collateral (as

Section 506(c) mandates), the Debtors have provided no evidence to support their position that

the going concern sale conferred any benefit to the Second Lien Parties beyond the amount of the

credit bid.

     To be clear, the Second Lien Parties are not claiming that they favored a liquidation over

the ultimate going concern sale.  Rather, they are seeking to prevent the Debtors (and the Court)

from relying on the Debtors' false claim that they conferred a benefit on the Second Lien Parties

as the basis for a proposed surcharge that would allow the Debtors to renege on their part of the

adequate protection bargain.

The Second Lien Parties have also never argued that an expense had to be made

exclusively for their benefit in order to qualify under Section 506(c).  Rather, the Second Lien

Parties have merely argued—in accordance with settled law—that an expense must be incurred

'primarily' to benefit the secured party to qualify under Section 506(c), and that an expense

incurred to benefit all parties does not so qualify.  Once these arguments that dominate the

Debtors' Opposition and, even more so, the UCC Joinder, are appropriately disregarded, it is

easy to discern the multiple flaws in the Debtors' efforts to deny the Second Lien Parties their

statutory entitlements.

The Parties all agree in theory that the appropriate methodology for calculating a

diminution in value is by employing a going-concern valuation methodology.  While the Debtors

pay lip service to the proper going concern valuation methodology, however, their own analysis

violates the fundamental precepts of such a valuation, including that the starting point is the

value of the collateral on the petition date, *see Official Comm. of Unsecured Creditors v. UMB*

*Bank, N.A.* (*In re Residential Capital, LLC*), 501 B.R. 549, 592 (Bankr S.D.N.Y. 2013)

("*ResCap*"); Debtors' Opp. ¶ 27; property should be valued in light of its *actual* disposition or

use, *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 963-64 (1997); and a valuation must "take

into consideration the facts and competing interests of [this] case," *In re Sabine Oil & Gas*

*Corp.*, 555 B.R. 180, 199 (Bankr. S.D.N.Y. 2016).

As discussed in further detail below, the evidence will show that the Debtors' collateral

valuation suffers from several fundamental flaws, all of which the Debtors use to artificially

reduce the Petition Date value of the collateral so as to minimize any Section 507(b) claims.

*First*, 85% of book value is not an appropriate methodology by which to value the Second Lien Collateral, either at the Petition Date or any other date. *Second*, the Debtors improperly exclude cash proceeds, pharmacy receivables and scripts from the Second Lien Collateral. *Third*, the Debtors incorrectly assert that the unfunded standby L/C facilities that were undrawn on the Petition Date—and in fact never drawn in any material amounts during these cases—somehow nonetheless constitute senior obligations that reduce the value of the Second Lien Collateral by hundreds of millions of dollars as of the Petition Date.

## ARGUMENT

### I.    THE EVIDENCE WILL SHOW THAT THERE HAS BEEN A SIGNIFICANT DIMINUTION IN VALUE OF THE SECOND LIEN COLLATERAL

#### A.    The Collateral Value on the Petition Date Was Not 85% of Book Value

The Court should reject the Debtors' request to apply an arbitrary 85% discount to the gross book value of the Collateral on the Petition Date. *See* Debtors' Opp. ¶ 25. The Court is required to value the collateral based on its actual disposition, and the Debtors' assertion that this discount "reflect[s] the value that was ultimately recovered on the Collateral at the Sale," Rule 3012 Mot. ¶ 40, is both factually incorrect and temporally misplaced.

The Debtors arrive at their 85% figure via a tortured interpretation of APA provisions that simply do not say what the Debtors hold them out as saying. In short, the Debtors have plucked one component of the purchase price under the APA—the $1.408 billion cash payment line item in Section 3.1(a)(i) of the APA—and arbitrarily allocated it specifically to the total value of inventory and receivables of $1.657 billion to be delivered upon closing in Section 10.9 of the APA, to arrive at the specious conclusion that the closing date inventory and receivables were purchased for cash at the rate of 85% of book value. *See* Debtors' Opp. ¶ 2 n.6. The Debtors' attempt to cherry pick the APA and allocate, without any basis, one specific component

of the purchase price to one specific portion of the purchased assets, is unavailing for several reasons.

*First*, contrary to the Debtors' assertions, no provision in the APA attributes this cash payment to the acquisition of standalone inventory or receivables or otherwise forms a basis for this claim. Section 3.1 of the APA, which sets forth the purchase price, by its terms does *not* allocate among any individual categories of assets the total consideration paid. The $1.408 billion cash consideration, which is reduced pursuant to Section 3.1(a)(iv), is only a portion of the total cash consideration listed in Section 3.1, and the cash consideration on which the Debtors focus in turn is only a small portion of the total $5.2 billion aggregate value delivered in the transaction when taking into account significant liabilities that the Buyer also assumed. The total consideration listed in Section 3.1 is:

> (a) cash in an amount (the "Closing Payment Amount") equal to:

> > (i) $1,408,450,000; *plus*

> > (ii) an amount in cash equal to the Store Cash as of 12:00 a.m. New York City time on the Closing Date; *plus*

> > (iii) the Credit Bid Release Consideration; *less*

> > (iv) the aggregate amount of (A) the credit bid set forth in Section 3.1(b)(ii) *plus* (B) the credit bid set forth in Section 3.1(b)(iv), *plus* (C) the FILO Facility Buyout Amount (if any);

> (b) subject to Bankruptcy Court approval, a credit bid pursuant to Section 363(k) of the Bankruptcy Code of:

> > (i) all outstanding obligations held by Buyer and its Affiliates as of the Closing Date under the IP/Ground Lease Term Loan Facility, *plus*

> > (ii) all outstanding obligations held by Buyer and its Affiliates as of the Closing Date under the FILO Facility, *plus*

> > (iii) obligations held by Buyer and its Affiliates as of the Closing Date under the Real Estate Loan 2020 in an amount equal to $544,000,000, *plus*

6

(iv) obligations held by Buyer and its Affiliates as of the Closing Date in an aggregate amount equal to $433,450,000 under (x) the Second Lien Term Loan; (y) the Second Lien Line of Credit Facility; and (z) the Second Lien PIK Notes, in the case of each of (i), (ii), (iii) and (iv) in exchange for the collateral pledged to secure the applicable debt obligations, including any proceeds from the sale or other disposition of such collateral prior to the Closing Date to which the Liens securing such debt obligations are attached, in the same order of priority and with the same validity, force and effect as the original Liens; *plus*

(c) cash in the amount of the outstanding obligations owed to lenders other than Buyer or its Affiliates as of the Closing Date under (i) the IP/Ground Lease Term Loan Facility (the "IP/Ground Lease Buyout Amount"), (ii) the FILO Facility (the "FILO Facility Buyout Amount"), and (iii) the Real Estate Loan 2020 (the "Real Estate Loan 2020 Buyout Amount"), unless such lender(s) provide written confirmation to the Sellers that such cash payment and the obligations owed to lenders by the Seller under the IP/Ground Lease Term Loan Facility, the FILO Facility or the Real Estate Loan 2020, as applicable, are permanently waived and discharged against the Sellers; *plus*

(d) the Securities Consideration;

(e) the Junior DIP Consideration;

(f) the L/C Facility Consideration; and

(g) the assumption by Buyer of the Assumed Liabilities in accordance with Section 3.5.

Not only is there no support for the Debtors' argument in the plain text of either Section 3.1 or

Section 10.9 (or elsewhere in the APA), Section 10.9 actually provides that, to the extent the

Sellers delivered inventory and receivables with an Inventory Value[4] in excess of $1.657 billion

on the Closing Date, they would be permitted to "reduce such amount to be equal to" the $1.657

billion figure by transferring inventory on a *dollar-for-dollar* basis to the Debtors' going out of

---

[4]      Pursuant to Section 1.1 of the APA:

"Inventory Value" shall mean, with respect to any Inventory of the Sellers, the value of such Inventory valued at the lower of cost or market value on a basis consistent with the Sellers' current and historical accounting practice in effect on the date hereof, per the stock ledger (without giving effect to LIFO reserves and general ledger reserves for discontinued inventory, markdowns, intercompany profit, rebates and discounts, any cut off adjustments, revaluation adjustments, purchase price adjustments or adjustments with respect to the capitalization of buying, occupancy, distribution and other overhead costs reflected on the balance sheet of the Sellers in respect of Inventory).

business ("GOB") stores.  APA § 10.9.  Accordingly, the only inference that can be reasonably

drawn from the APA is that, for purposes of the APA, the Parties thereto valued the collateral at

book value.[5]

Second, although it is simply not possible to extract the price paid for inventory out of

the total $1,408,405,000 cash consideration allegedly paid by ESL in the Sale Transaction, it is

obvious from the overall deal that ESL paid more for those and other assets than the Debtors

claim.  As explained further in the Common Memorandum and the Second Lien Parties' opening

briefs, the Sale Transaction was a complex transaction pursuant to which ESL agreed to not only

pay significant cash consideration and credit bid a substantial amount of its debt, but also to

assume billions of dollars in liabilities from the Debtors, for an aggregate consideration of $5.2

billion.  See Common Mem. 12-13.  If these additional unallocated values are taken into account,

ESL plainly paid significantly more than the Debtors claim for their inventory and receivables

assets.

Third, critically, at the Sale Hearing, when the Court questioned the Debtors' counsel

regarding the fact that, as the Court described, it was "uncontroverted that ESL did not" allocate

the purchase price among assets, Mr. Schrock replied that the Debtors "waived" that requirement

because "we took a global view as to what consideration was being provided to the company and

we understood that the entire business would have to be valued as a whole."  Hr'g Tr. 47:8–

48:10, Feb. 7, 2019.

---

[5]      On the facts here, the Debtors also cannot try to make their case by casual reference to parol evidence.  As set forth in Section 13.4 of the APA, the APA "contain[s] all of the terms, conditions and representations and warranties agreed to by the Parties . . . and supercede[s] all prior and contemporaneous agreements, understandings, negotiations, correspondence, undertakings and communications of the Parties or their representatives, oral or written, respecting such subject matter."

Even if the Debtors had not made that representation to the Court, which should estop

them from now claiming otherwise, courts faced with similar requests to divine the value of

individual assets from the total price paid in a global sale of assets have declined to do so in light

of the inherent uncertainties involved.  For example, in *In re Yellowstone Mountain Club, LLC*,

410 B.R. 658, 660 (Bankr. D. Mont. 2009), a bankruptcy court rejected the debtors' invitation to

value the claim of a secured creditor whose collateral comprised "a substantial portion of the

[d]ebtors' assets" based on the price achieved at a sale of substantially all of the debtors' assets

in a single sale of equity interests in a new corporation.  The court noted that because the debtors

were not just selling the creditor's collateral, but also items such as "leasehold

interests,  unexpired contracts, goodwill, trade names and [property]," the court could not

determine the value of the collateral alone from the sale price.  *Id.* at 661-62[6]; *see also Weinman*

*v. City of Pueblo, Colorado (In re Adam Aircraft Indus., Inc.)*, No. 12–cv–1573–CMA, 2013 WL

773044 at *7 (D. Colo. Feb. 28, 2013) ("Although the total value of the Debtor's assets is

conclusively set at $10 million because that was 'the price a willing buyer in the debtor's trade,

business, or situation would pay to obtain like property from a willing seller,' the total value of

the Debtor's assets provides no information regarding the value of any individual asset

included." (quoting *Rash*, 520 U.S. at 960)).  Because the APA in this case does not allocate the

---

[6]    In so holding, the court distinguished between circumstances in which a *single* asset is sold in an arms-length transaction, in which case the sale price represents the fair market value of that asset. *In re Yellowstone Mountain Club*, 410 B.R. at 661-62. (distinguishing *Romley v. Sun Nat'l Bank (In re Two S Corp.)*, 875 F.2d 240 (9th Cir. 1989)). *ResCap*, 501 B.R. at 603, is not to the contrary.  That case involved the sale of loans in an arms-length transaction pursuant to an asset purchase agreement that established "contractual purchase prices" for each category of loans.  It was therefore appropriate for the court to conclude that the fair market value was "conclusively determined by the price paid" because "the price paid for the whole loans was the result of arm's-length negotiations that established the fair market value of *each category* of loans." *Id.* (emphasis added).  Here, unlike in *ResCap*, the APA does not allocate the purchase price between assets and the total sale price cannot establish the conclusive fair market value of the Second Lien Parties' collateral.

purchase price among individual assets, the Court here cannot rely on the purchase price in the APA for a fair market value of the collateral.

*Fourth*, even if 85% of book value was the fair market value of the collateral at the time of the Sale Transaction (and, as set forth above, it is not), the relevant starting point is the value of the collateral *at the Petition Date*, not the Sale Transaction Closing Date, and the relevant context for that determination is the value of the asset in the Debtors' going concern business, not what price it might be bid for at a bankruptcy auction sale, with no other bidders, occurring three months after the Petition Date.  The relevant context here is that, as the Debtors sold their inventory from the Petition Date onwards, the property to which the Prepetition Second Lien Adequate Protection Liens attached was converted to cash, which remained Second Lien Collateral.  The Debtors' analysis completely ignores the substantial profits beyond the return of book value, which were, in truth and in fact, earned in connection with those sales.

**B.**    **The Debtors' New Analysis Improperly Excludes Pharmacy Receivables and Scripts**

Backtracking without explanation from their analysis in their opening papers, which included pharmacy receivables, the Debtors baldly assert that the gross book value of the Second Lien Collateral as of the Petition Date should be further reduced because they claim that pharmacy receivables and pharmacy scripts are not Second Lien Collateral.  Debtors' Opp. ¶ 2 n.5; *Supplemental Declaration of Brian J. Griffith in Support of the Debtors' (I) Opposition to Second-Lien Holders' Requests to Determine Amount of Second-Lien Secured Claims Under Section 506(A) and Section 507(B) Administrative Claims and (II) Reply in Support of Debtors' Rule 3012 Motion to Determine the Amount, if any, of 507(B) Claims and to Surcharge Second-Lien Collateral Pursuant to Section 506(C)* ¶ 17 n.5, ECF No. 4382 ("<u>Griffith Supp.</u>

Declaration"). Neither of these assertions is supported by any evidence, and neither of these

statements is correct.

Under Section 2.1 of the Amended and Restated Security Agreement among Sears

Holdings Corporation, and certain of its Subsidiaries, as grantors, and Wilmington Trust,

National Association, as Collateral Agent, dated March 20, 2018 (the "2L Security Agreement"),

the Second Lien Parties were granted security interests in the following property of Sears:

> (a) all Credit Card Accounts Receivable;
>
> (b) all Inventory;
>
> (c) all Chattel Paper relating to Credit Card Accounts Receivable;
>
> (d) all Instruments relating to Credit Card Accounts Receivable;
>
> (e) all Documents relating to any Inventory;
>
> (f) all books and records pertaining to the Collateral; and
>
> (g) to the extent not otherwise included, all Proceeds, insurance claims, Supporting
> Obligations and products of any and all of the foregoing and all collateral security and
> guarantees given by any Person with respect to any of the foregoing.

Sears Holdings Corp., Current Report (Form 8-K) (Mar. 23, 2018), Ex. 10.2, 2L Security
Agreement.

The terms "Inventory" and "Proceeds" in the 2L Security Agreement expressly

incorporate the definition of those terms from the New York Uniform Commercial Code ("New

York UCC"). 2L Security Agreement § 1.1(a). The New York UCC in turn broadly defines

"inventory" as "goods" which, *inter alia*, "are held by a person for sale or lease or to be

furnished under a contract of service," N.Y. U.C.C. Law § 9-102(a)(48)(B), and "proceeds" as,

*inter alia*, "whatever is acquired upon the sale, lease, license, exchange, or other disposition of

collateral." N.Y. U.C.C. Law § 9-102(a)(64)(A). Pursuant to this definition, Section 2.1(g) of

the 2L Security Agreement grants a security interest to the Second Lien Parties in any property

Sears received in a sale of any of the foregoing property in which the Second Lien Properties had been granted a security interest (*i.e.,* any Proceeds of Section 2.1(a)-(f)). In the case of pharmacy inventory, the Second Lien Parties were thus granted a security interest in any property Sears received in exchange for it, *including pharmacy receivables*.

Under the terms of the 2L Security Agreement, the Second Lien parties were likewise granted an express security interest in pharmacy scripts. As noted above, Section 2.1(f) of the 2L Security Agreement grants the Second Lien Parties a security interest in "all books and records pertaining to the Collateral." Pharmacy scripts represent a pharmacy's right to fill the prescription of a given individual and are best understood as a form of customer list. *See* Sears Holdings Corp., Quarterly Report (Form 10-Q) (Aug. 20, 2015), Ex. 10.3, Third Amended and Restated Guarantee and Collateral Agreement, dated July 21, 2015. Accordingly, pharmacy scripts are included within the grant of security interest in the books and records pertaining to the Collateral (which includes any books and records pertaining to inventory, of which pharmacy inventory is a part). Furthermore, even if pharmacy scripts were valued as pharmacy receivables, as the Debtors now assert, *see* Debtors' Opp. ¶ 25 n.18 (describing the phrase "Pharmacy Receivables" in Section 10.9 of the APA to "include[] pharmacy scripts"), they would still be included in the Second Lien Collateral package, as demonstrated in the preceding paragraph.

### C.    The Debtors Incorrectly Assume that the L/C Facilities Reduced the Value of the Second Lien Parties' Collateral

As of the Petition Date, the Debtors had two senior priority letter of credit ("L/C") facilities—one under the First Lien Credit Facility (the "ABL L/C Facility") and the Standalone L/C Facility (collectively, the "L/C Facilities"). *See Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York* ¶ 34, ECF No. 3

("Riecker Declaration").  The L/C Facilities consisted of outstanding, but undrawn, stand-by

letters of credit.  As long as they remain undrawn, the L/C Facilities do not give rise to payment

obligations on the part of the Debtors, and they therefore do not diminish the value of the Second

Lien Collateral available to the Second Lien Parties as of the Petition Date.  *See Expert Report of*

*David M. Schulte in Support of Supplemental Memorandum of Law on Behalf of ESL*

*Investments, Inc. in Support of its Requests to Determine the Amount of its Second Lien Secured*

*Claims Under Section 506(a) and its Section 507(b) Administrative Claims Pursuant to*

*Bankruptcy Rule 3012; and in Opposition to the Debtors' Motion to Surcharge its Collateral*

*Pursuant to Section 506(c)* § III.D, ECF No. 4372 ("Schulte Report").

The Debtors' position to the contrary is wrong and inconsistent with their prior positions

before this Court.  When pursuing the initial post-petition financing that primed the Second Lien

Parties and resulted in the Second Lien Adequate Protection Liens and the rights the Second Lien

Parties are now asserting, the Debtors specifically excluded the L/C Facilities from their analysis

of the collateral cushion supporting such relief.  *See Declaration of Robert A. Riecker in Support*

*of Debtors' Omnibus Reply to Objections to Debtors' Motion for Authority to (A) Obtain*

*Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections to Prepetition*

*Secured Parties and (D) Grant Related Relief and in Support of Debtors' Supplemental Motion*

*for Authority to (I) Obtain Junior Postpetition Financing, and (II) Schedule Final Hearing* ¶ 8,

ECF No. 866.

The Debtors' original position was the correct one because the standby L/C Facilities

were never meant to be drawn.  Rather, they were intended to protect against any failure to pay

workers' compensation or certain electric and utility bills.  In a going concern context there was

no likelihood these liabilities would not be paid or that there would be any draw on the standby

L/C Facilities.  In fact, while the L/C Facilities were outstanding, there were no material draws

on the underlying letters of credit.  *See* Schulte Rep. § III.D ("With the benefit of hindsight, only

a *de minimis* portion of the letters of credit were actually drawn during the bankruptcy").

The Debtors' initial position is consistent with the reality that in a going concern, and in

chapter 11 plans of reorganization, it is common for prepetition letters of credit, such as the L/C

Facilities, not to be drawn on but to be cancelled, reissued, or assumed by the new entity instead.

*See* Notice Relating to the Debtors' Joint Plan of Reorganization Under Chapter 11 of the

Bankruptcy Code, *In re Frontier Airlines Holdings, Inc.*, No. 08-11298 (RDD) (Bankr. S.D.N.Y.

Sept. 8, 2019), ECF No. 1058 (plan of reorganization calling for the assumption of each letter of

credit); First Amended Joint Chapter 11 Plan of Reorganization of the Gymboree Corporation

and Its Debtor Affiliates, *In re The Gymboree Corporation*, No. 17-32986 (KLP) (Bankr. E.D.

Va. July 24, 2017), ECF No. 447 (plan of reorganization provided that the $10 million

prepetition letter of credit is deemed assigned to the reorganized debtor or cancelled); Notice of

Successful Bidder at Auction, *In re Delphi Corp.*, No. 05-44481 (RDD) (Bankr. S.D.N.Y. July

27, 2009), ECF No. 18658 (agreement between the debtors and the buyers of substantially all of

the debtors' assets required the buyers to relieve the debtors of all liabilities and obligations

arising out of prepetition letters of credit).  To the extent a buyer purchases a debtors' business as

a going concern, it makes sense for the buyer to also take on these obligations because standby

letters of credit, including the L/C Facilities here, traditionally support integral parts of the go-

forward business such as worker's compensation programs and supplier relationships.  Given the

nature of the L/C Facilities, it is therefore entirely appropriate to disregard them in the

diminution in value analysis.

14

**D.    The Debtors Improperly Account For Purported Postpetition Interest Payments**

The Debtors also offer no explanation for why they believe it is appropriate to take into account a purported $34 million postpetition interest payment when valuing the collateral on the Petition Date.  *See* Debtors' Opp. ¶ 2 n.7.  Not only is this deduction illogical, it is unsupported in two respects.  The Debtors do not claim they actually paid this sum and they do not explain why any payment they made was not covered by the profits made by continual sales of the inventory collateral.

**II.    THE DEBTORS HAVE FAILED TO PROVIDE THE REQUIRED LEGAL AND FACTUAL SUPPORT FOR THEIR ASSERTED SECTION 506(c) SURCHARGE**

**A.    The Debtors Have Presented No Evidence Sufficient To Meet Their Burden of Proof Under Section 506(c)**

Section 506(c) provides a "narrow" and "extraordinary" exception to the "general  rule" that "administrative expenses cannot be satisfied out of collateral property."  *Sw. Sec. FSB v. Segner (In re Domistyle, Inc.)*, 811 F.3d 691, 695 (5th Cir. 2015).  It is the Debtors' burden to prove that the expenses they seek to surcharge fall within the narrow scope of Section 506(c), *See Gen. Elec. Credit Corp. v. Levin & Weintraub (In re Flagstaff Foodservice Corp.)*, 739 F.2d 73, 77 (2d Cir. 1984) *("Flagstaff I")*, and they will not be able to meet that burden here.

In the Debtors' opening brief and supporting declaration, they included a rudimentary, half-page table setting out eleven categories of expenses to be surcharged against the Second Lien Parties, with amounts for each line item ranging from $18 to $712 million, for a total asserted surcharge of *$1.451 billion*.  Rule 3012 Mot. ¶ 44; *Declaration of Brian J. Griffith in Support of the Debtors' Motion to Estimate Certain 507(b) Claims for Reserve Purposes* ¶ 20, ECF No. 4035 ("Griffith Declaration").  As the Second Lien Parties demonstrated in the Common Memorandum, the Debtors' conclusory assertions that all of these expenses were

rendered for the primary and direct benefit of the Second Lien Parties fall far short of meeting the Debtors' high burden. Common Mem. at 20-21. Not only did the Debtors fail to provide *any* evidence demonstrating that each of the substantial expenses in each category was incurred for the primary benefit of the Second Lien Parties and was necessary to preserve the Second Lien Collateral, but they also failed to provide evidence demonstrating that such expenses provided any direct benefit to the Second Lien Parties' collateral *at all*. In their opposition papers, rather than attempt to remedy these deficiencies, the Debtors and their witness instead double-down on their conclusory assertions that all of the proposed $1.451 billion surcharge expenses "were reasonable, necessary, and of direct and primary benefit" to the Second Lien Parties. Debtors' Opp. ¶ 18; *see also* Griffith Supp. Decl. ¶ 18. This is not how the extraordinary remedy of Section 506(c) works.

Taking just one example, the Debtors assert without basis that the Second Lien Parties are responsible for *all* professional fees accrued through the Sale Date. Griffith Decl. ¶¶ 19-20. *First*, professional fees are "the most standard and significant general administrative expense" that must be borne by the *estates*, even with respect to fees incurred in "securing the claim of a creditor." *In re Domistyle, Inc.*, 811 F. 3d at 697. "Saddling unconsenting secured creditors with professional fees" is improper and disfavored because it "would discourage those creditors from supporting debtors' reorganization efforts." *Flagstaff I*, 739 F.2d at 77; *see also id.* ("To hold that mere cooperation with the debtor exposes a secured creditor to payment of all expenses of administration would . . . make it difficult, if not impossible, to induce new lenders to finance a chapter 11 operation." (citation omitted)). *Second*, the professional fees that the Debtors seek to surcharge include substantial fees that are plainly not for the benefit of the Second Lien Parties. *See, e.g., First Interim Fee Application of Lazard Freres & Co. LLC, Investment Banker to the*

*Debtors, For the Period From October 15, 2018 through February 2, 2019* (requesting $20.5 million in payment including over $15 million restructuring fee after unsuccessful solicitation of additional going concern bids), ECF No. 3217.[7]

In addition, Section 506(c) surcharge claims "should be in some sensible proportion to the value of the benefit to be received." *First Servs. Grp., Inc. v. O'Connell ex rel. Ceron (In re Ceron)*, 412 B.R. 41, 52 (Bankr. E.D.N.Y. 2009). Section 506(c) does not apply "where, given the amount of the expense in relation to the value of the creditor's interest in the collateral, a reasonable creditor would not incur it." *Menorah Congregation & Religious Ctr. v. Feldman (In re Menorah Congregation & Religious Ctr.)*, 554 B.R. 675, 697 n.88 (Bankr. S.D.N.Y. 2016) (Drain, J.). The Debtors fail to rise to the considerable challenge of demonstrating that a $1.451 billion surcharge should be applied as the cost of preserving what they claim to be only $373 million worth of collateral. *See* Debtors' Opp. ¶ 2; *see also* Griffith Supp. Decl. ¶ 7. If a third party had emerged from the auction as the going concern buyer, there can be no doubt that the Debtors would bear those transaction expenses rather than charge the third party. Beyond a mere invocation of the statute, the Debtors have proffered no explanation for why the same should not be true here.

---

[7]    As the $51 million professional fees figure in the Debtors' table does not encompass all professional fees accrued through the Sale Date, *see* Griffith Decl. ¶¶ 19-20, the Second Lien Parties can only guess as to which of the substantial professional fees billed thus far the Debtors seek to surcharge, as the Debtors have failed to provide any itemization showing which of the multitude of line items in multiple fee applications make up the asserted $51 million in professional fees. It cannot be the case that professionals are required to submit detailed itemizations and descriptions of their fees in order to be paid out of the estates in a bankruptcy, but it is somehow permissible for the estates to surcharge secured creditors' collateral without providing *any* evidentiary support or explanation showing which of the multitude of detailed itemizations and descriptions the Debtors seek to charge against the Second Lien Parties' collateral.

**B.**    **The Debtors Mistakenly Assume That The Going Concern Sale Process Was Necessary to Preserve The Value of The Second Lien Collateral**

The Debtors' effort to surcharge the Second Lien Collateral for the entire amount of the costs of the going concern sale process reflect the Debtors' blatant misapplication of Section 506(c).  The Debtors readily admit that their calculation of the 506(c) surcharges "reflects . . . the rigorous sale process and efforts to sell the company as a going concern."  Griffith Supp. Decl. ¶ 18.  In this sentence, the Debtors admit that their argument is premised on the notion that the entire going concern sale process was a reasonable, necessary cost of preserving or disposing of the Second Lien Collateral.  This is demonstrably false.  While the going concern sale may have been the Debtors' chosen vehicle for preserving jobs, bundling and selling real estate, intellectual property and other assets and business lines and negotiating for the assumption of hundreds of millions of dollars of liabilities, it absolutely was *not* the only means by which the Debtors could have disposed of the receivables and inventory that comprised the Second Lien Collateral.  The Debtors knew from the outset of the cases (and presumably even well before that) that they could readily dispose of their retail inventory through GOB sales with liquidators; the fact that they chose instead to pursue a comprehensive going concern sale was a function of *choice*, not *necessity*—and absent necessity, Section 506(c) cannot be invoked.

The Debtors repeatedly conflate the efforts they *chose* to take to pursue the broader going concern sale with any efforts that would have been reasonable and necessary under Section 506(c) to preserve or dispose of the specific collateral of the Second Lien Parties.  For example, in attempting to justify inclusion in their surcharge claims of their investment banker's fees of $20.5 million, the Debtors refer to the "success fees earned by the financial advisors in the Sale" as being "standard for the industry."  Griffith Supp. Decl. ¶ 22.  The reference to the "Sale" clearly means the going concern sale and not any efforts to dispose solely of the Second Lien

Collateral, and the Debtors cannot argue with a straight face that they were required to pay an investment banker $20.5 million to sell retail inventory in GOB sales. Similarly, the Debtors proclaim that "the other professional fees incurred accurately reflect the magnitude of this bankruptcy and the enormous effort expended by all involved." *Id.* In short, the Debtors would have the Court accept the absurd premise that the Debtors' pursuit of the comprehensive going concern sale was somehow *necessary* to arrive at a reasonable disposition of the Second Lien Collateral. Clearly the Court should reject that premise.

### C.   The Debtors Have Failed to Prove that the Sale Transaction Primarily and Directly Benefitted the Second Lien Parties

Likewise, the argument that the Second Lien Parties must be the primary beneficiaries of the Sale Transaction because "they got what they wanted," UCC Joinder ¶ 9, has no basis in fact or law. The only thing the Second Lien Parties received from the going concern sale on account of their Second Lien Collateral was a dollar-for-dollar recovery on their approximately $433 million credit bid of Second Lien Debt in a transaction that provided the estates with an aggregate value of *$5.2 billion*. *See* APA § 3.1. Consequently, the Second Lien Debt received roughly eight percent of the benefit of the transaction. The math speaks for itself.

Moreover, the Debtors' assertion that the Second Lien Parties received "100% dollar-for-dollar recovery on their credit bid" conveniently overlooks that the Debtors now seek to ensure that the Second Lien Parties receive no priority recoveries due to their collateral position or adequate protection liens on the remaining $717,500,000 of Second Lien Debt, Debtors' Opp. ¶ 43, despite the fact that an important part of the Debtors' bargain with the Second Lien Parties was the preservation of the Second Lien Parties' Section 507(b) Claims in accordance with the Bankruptcy Code.

19

In *Flagstaff*, despite the fact that only the largest secured creditor and a few minor

reclamation creditors got paid when the estate liquidated, *see In re Flagstaff*, 29 B.R. 215, 217

(Bankr. S.D.N.Y 1983), the Second Circuit still determined that the secured lender had not

benefitted sufficiently to justify a 506(c) surcharge, *Gen. Elec. Credit Corp. v. Peltz (In re*

*Flagstaff Foodservice Corp.)*, 762 F.2d 10, 12-13 (2d Cir. 1985). Here, there is far less evidence

that the Second Lien Parties were the primary beneficiaries of the going concern sale. All parties

are in agreement that multiple stakeholders benefitted from the Sale Transaction. *See* Debtors'

Opp. ¶ 41. Notably, the DIP ABL Lenders (as defined in the Final DIP Order) were paid in full

the remaining amount outstanding, in cash, not through a credit bid, from the proceeds of the

Sale Transaction. *See* Sale Order ¶ 19.[8] In addition, all prepetition first-lien creditors (other than

ESL) were paid in full in cash. And, on a continuing basis, employees kept their jobs and

received severance protection, landlords and suppliers had their leases and contracts assumed

and assigned with Transform paying all cure costs, and vendors continue to make money selling

products and services to the company. *See* Auction Tr. 51:22–52:2, Jan. 15, 2019 ("[MR.

SHROCK:] On the employee front, that was one of the primary benefits we considered with the

ESL Transaction, of course, and the ability to keep everyone employed."); Hr'g Tr. 52:1-5, Feb.

7, 2019 ("[The vendors] will continue to have those relationships moving forward in very large

part as a result of the benefits of this deal"); APA § 2.3(K) (assuming Severance Reimbursement

Obligations); *Order (I) Authorizing Assumption and Assignment of Certain Leases and (II)*

*Granting Related Relief*, ECF No. 3850 (assuming and assigning approximately 600 leases). The

value of these benefits continues to accrue on a daily basis and is incalculable. The Debtors also

---

[8]      It does not follow from the fact that the Debtors waived their rights to seek a Section 506(c) recovery from
those creditors, assuming Section 506(c) even applies to a post-petition lender, that the obligation to pay any Section
506(c) surcharge must flow to someone else.

now specifically acknowledge that their other businesses benefitted from a going concern

resolution of these cases.  *See* Debtors' Opp. ¶¶ 22-23.

The Debtors' continued attempt to deny the Second Lien Parties their Section 507(b)

Claims simply because they credit bid a portion of their debt also has no basis in Section 506(c).

Credit bidding is payment, the forgiveness of secured debt in exchange for property, and it is

legal tender in a 363 sale "unless the court for cause orders otherwise." 11 U.S.C. 363(k).  It is a

secured creditors' right and it is only denied in extraordinary circumstances.  *See RadLAX*

*Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, n. 2 (2012) (describing the ability to

credit bid as a "right" that is a "particularly important" safeguard to secured creditors); *In re*

*Aéropostale, Inc.*, 555 BR. 369, 414-415 (Bankr. S.D.N.Y. 2016) ("The 'modification or denial

of credit bid rights should be the extraordinary exception and not the norm.'").  The Debtors'

conclusion that by exercising their rights to credit bid, the Second Lien Parties somehow become

the primary beneficiaries of the Sale Transaction is not only contrary to the law, but is also, as

this Court observed, entirely illogical.  *See* Hr'g Tr. 130:13-19, Feb. 7, 2019 ("[MR. QURESHI:]

The principle beneficiary of the going concern transaction is ESL. THE COURT: I guess that has

some appeal to people that don't understand bankruptcy law.").  The approximately $433 million

credit bid was not a favor that the Debtors granted to the Second Lien Parties.

The Debtors also argue that "most of the investigation" into ESL's financing transactions

"was necessary to allow ESL to voluntarily credit bid."  Debtors' Opp. ¶ 5.  But the credit bid

was made by the Collateral Agent on behalf of all holders of Senior Second Lien Obligations,

not just by ESL on its own behalf.  And there is no reason why the holders of Second Lien

Obligations, but no other creditors, should be asked to bear these costs.  Moreover, nowhere in

Section 363 does it say that paying for an investigation is necessary to exercise a credit bid, and

the Debtors provide no support for the claim that it is.  There is no reasonable interpretation of the words "primary" or "direct" that would justify a Section 506(c) surcharge in this context.

Finally, the Debtors also improperly point to benefits that ESL received in the sale transaction that were completely unrelated to the Second Lien Collateral.  For example, the Debtors argue that "ESL is the primary beneficiary of increased recovery in the Secure Real Estate Loans (Note A & B) and IP/Ground Lease Term Loan as the majority holder in each facility."  Griffith Supp. Decl. ¶ 23.  There is no question that ESL obtained many benefits under the going concern sale – otherwise it would never have entered into the APA.  But the many components of the transaction that have nothing to do with the Second Lien Parties as Second Lien Parties or with the Second Lien Collateral are entirely irrelevant to the Court's consideration of the Second Lien Parties' rights in their specific collateral or to any efforts by the Debtors to try to surcharge the same.

## III.    THE EQUITIES CANNOT OVERRIDE THE SECOND LIEN PARTIES' PROPERTY RIGHTS

The UCC Joinder argues that the Second Lien Parties should be estopped from recovering on their Section 507(b) Claims simply because they supported the going concern transaction.  Other than ESL, however, no holder of Second Lien Debt took any position with respect to Sale Transaction.  Moreover, there is absolutely nothing inconsistent about the Second Lien Parties' positions.  Neither the doctrine of judicial estoppel nor the doctrine of unclean hands is applicable here and the UCC has not satisfied its burden to invoke either equitable doctrine.

### A.    The Doctrine of Unclean Hands Does Not Apply Against the Second Lien Parties

Unclean hands only applies to bar equitable recovery where the defendant proves:  "(1) that the plaintiff is guilty of immoral, unconscionable conduct directly related to the subject

matter in litigation; (2) that the conduct was relied upon by the defendant; and (3) that the defendant was injured thereby." *Merhav Ampal Grp. v. Merhave Ltd. (In re Ampal-Am. Israel Corp.)*, 545 B.R. 802, 810 (Bankr. S.D.N.Y. 2016) (declining to apply the doctrine) (citation omitted). The doctrine applies to the conduct of a party who "seeks equity," *Eastman Kodak Co. v. Apple Inc. (In re Eastman Kodak Co.)*, 479 B.R. 280, 297 (Bankr. S.D.N.Y. 2012), and will not bar a legal claim. *In re Ampal-Am. Israel Corp.*, 545 B.R. at 810. The party invoking the doctrine of unclean hands bears the burden of proof, *Balaber-Strauss ex rel. Murphy v. Town of Harrison (In re Murphy)*, 331 B.R. 107, 135 (Bankr. S.D.N.Y. 2005), and "[t]he Second Circuit has repeatedly emphasized the narrowness of the doctrine's application." *Specialty Minerals, Inc. v. Pluess-Staufer AG*, 395 F. Supp. 2d 109, 112 (S.D.N.Y. 2005) (holding unclean hands did not apply where alleged misconduct was not "immediately and necessarily" related to the right sought).

As a threshold matter, unclean hands does not apply to the Second Lien Parties because they do not claim a right in equity. To the contrary, the Second Lien Parties have demonstrated that the Debtors' appeal to the equities in an attempt to override the Second Lien Parties' allowed superpriority claims is irrelevant and wrong. *See* Common Mem. at 25-28.

The UCC has also failed to establish, or even allege, any of the elements necessary to invoke the doctrine of unclean hands. *First*, the fact that certain of the Second Lien Parties supported the going concern sale in no way amounts to immoral or unconscionable conduct. *See ACE Am. Ins. Co. v. Am. Guarantee & Liab. Ins. Co.*, 257 F. Supp. 3d 596, 608 (S.D.N.Y. 2017) (unclean hands did not apply where allegations did "not even begin to suggest the type of bad-faith misconduct" needed).[9] *Second*, the UCC has not alleged that they or the Debtors relied on

---

[9]    Though the UCC wrongly describes the Second Lien Parties' conduct as "opportunistic" and "misguided" UCC Joinder ¶¶ 39, 44, the UCC's own depiction of the Second Lien Parties' actions, even if accurate, which it is

any purported bad faith conduct. *Finally*, the UCC has not alleged that unsecured creditors or Debtors were injured by any purported misconduct.

### B.    Judicial Estoppel Also Does Not Apply Against the Second Lien Parties

The UCC's attempt to invoke judicial estoppel here is similarly misplaced. Judicial estoppel requires that the party to be estopped "have taken a position (a) clearly inconsistent with a position that it (b) successfully pursued in a prior proceeding, (c) such that the party would have an unfair advantage in the subsequent proceeding or an unfair detriment would be imposed on its adversary." *In re Allegiance Telecom, Inc.*, 356 B.R. 93, 107 (Bankr. S.D.N.Y. 2006) (Drain, J.). All three prongs of the test must be met. *See Delphi Corp. v. Appaloosa Mgmt. L.P. (In re Delphi Corp.)*, No. 05-44481(RDD), 2008 WL 3486615, at *14 (Bankr. S.D.N.Y. Aug. 11, 2008) (Drain, J.). Judicial estoppel is "primarily concerned with protecting the judicial process" and therefore "relief is granted only when the risk of inconsistent results with its impact on judicial integrity is certain." *Ashmore v. CGI Grp., Inc.*, 923 F.3d 260, 279 (2d Cir. 2019). The UCC bears the burden of proof to establish the elements of estoppel, and has failed to do so here. *See In re Bush*, 579 B.R. 688, 699 (Bankr. N.D.N.Y. 2017).

*First*, to the extent certain holders of the Second Lien Debt supported a going concern sale, such support is not inconsistent at all, much less "clearly inconsistent" with their efforts to now assert their Section 507(b) claims. While ESL was optimistic about the outcome of the going concern transaction, the Second Lien Parties also always recognized and vocalized the need to protect their collateral from a diminution in value. They sought adequate protection of their secured claims from day one of this proceeding, and received superpriority administrative

---

not, does not rise to the "immoral, unconscionable" level required of the doctrine. *See Dominion Fin. Corp. v. Haimil Realty Corp. (In re Haimil Realty Corp.)*, 546 B.R. 257, 275 (Bankr. S.D.N.Y. 2016) (declining to apply the doctrine where conduct did not rise to the level of "inequitable or unconscionable").

claims and adequate protection liens in the Interim DIP Order entered on October 16, 2018 and

the Final DIP Order entered on November 20, 2018. *See* Common Mem. at 6-10 (citing Interim

DIP Order ¶ 17(d); Final DIP Order ¶¶ 17-18). An essential element of the bargain that the

Second Lien Parties entered into in connection with the Sale Transaction was the allowance of

their claims. *See* Sale Order ¶¶ K, L. Certain of the Second Lien Parties have operated in many

different capacities in these cases. In their capacities as Second Lien creditors, they have been

consistent from day one in their efforts to protect their collateral.

*Second*, this Court did not adopt the "position" of any Second Lien Party in the Sale. *See*

*In re Delphi*, 2008 WL 3486615 at *14 (no judicial estoppel where the court did not "adopt" a

party's statement). Rather, the Court had a singular inquiry: "whether the debtor exercised

sound business judgment" in accepting the sale. Hr'g Tr. 214:15-23, Feb. 7, 2019 (citing *In re*

*Advanced Contracting Solutions LLC*, 523 B.R. 285 (Bankr. S.D.N.Y. 2011)). To the extent a

"position"—avoiding liquidation, in the UCC's formulation—was taken in the sale process and

adopted by this Court, that position was the Debtors', not the Second Lien Parties'. The decision

to ultimately pursue a going concern bid was made by Debtors, not by the Second Lien Parties.

*Finally*, the Second Lien Parties do not gain an unfair benefit or cause unsecured

creditors or Debtors an unfair disadvantage through their Section 507(b) Claims. The Second

Lien Parties' right to recover for the diminution in the value of their collateral is not an

advantage, unfair or otherwise, but rather a statutory right approved by the Court.[10] *See, e.g.*,

Final DIP Order ¶17(d). The UCC makes only conclusory allegations that the Second Lien

---

[10]    Unlike the debtor in *In re CCT Commc'ns, Inc.*, 420 B.R. 160 (Bankr. S.D.N.Y. 2009), a case on which the
UCC relies, UCC Joinder ¶¶ 34, 38, 42, the Second Lien Parties were not granted a special dispensation "only
because" of their support for the going concern sale. *Cf. id.* at 170 (estopping debtor from claiming it was not a
small business debtor where "virtually *every* action taken by the Court" had been "on an expedited basis, driven by
the expedited schedule for plan confirmation provided under the Bankruptcy Code for small business debtors.").

Parties would "unfairly benefit at the expense of other interested parties," and fails to describe either the purported unfairness or detriment in any detail.  *See* UCC Joinder ¶¶ 40, 38, 44.

### C.    To the Extent Any Estoppel Applies, It Is Against the Debtors and Not the Second Lien Parties

Any estoppel here bars the Debtors and the UCC—not the Second Lien Parties—from backtracking on their prior representations to, and the prior orders of, the Court.  *First*, the Debtors now attempt to change course on their treatment of the L/C Facilities to deny the Second Lien Parties their  Section 507(b) Claims.  When they sought approval of financing pursuant to the Final DIP Order, the Debtors' Chief Financial Officer stated that the value of the collateral was $2.8 billion and that the ABL Credit Facility claim against the collateral was $1.53 billion. *See* Riecker Decl. ¶ 8.  The $1.53 billion Credit Facility claim excluded the issued and undrawn letters of credit under the ABL Credit Facility.  *Id*.  The Debtors' own analysis suggested that they valued their inventory and receivables at book value and that they did not expect the letters of credit issued under the Stand-Alone L/C Facility to be funded, even in a liquidation.  *See* Schulte Rep. at 13.  The Debtors now argue that the assumption that the L/C Facilities would not be fully drawn or cash collateralized in a liquidation is "incorrect" and "objectively unreasonable."  Griffith Supp. Decl. ¶¶ 6, 13.  The Debtors cannot now adopt a new factual position to serve their current needs.  Their new takes on the Petition Date value of their collateral and how the L/C Facilities should be accounted for are clearly inconsistent with the Debtors' earlier representations on which both the Court and the Second Lien Parties relied. Accordingly, they should be barred.  *See Grant v. U.S. Dep't of Defense (In re Grant)*, No. 15-20330 (JJT), 2017 WL 2960206, at *6 (Bankr. D. Conn. July 10, 2017) (applying judicial estoppel where debtor made clearly inconsistent representations).

*Second*, the Debtors should be estopped from now arguing that the collateral was valued at 85% of book value as part of the going concern sale. The Sale Order was approved based on Debtors' representations that the purchase price was not allocated. Indeed, this issue was discussed extensively at the Sale Hearing, and the Debtors' counsel represented—and the Court adopted and relied on the representation—that the Debtors had *waived* the allocation condition. *See* Hr'g Tr. 47:4-12, Feb. 7, 2019 (THE COURT: One of the provisions of the sale procedures order, all of which are waivable in the exercise of judicial duties, is to require qualified bidders to provide an allocation of what – what assets they're paying what for. **It's uncontroverted that ESL did not do that**. MR. SHROCK: We waived it your Honor. THE COURT: You waived that condition. MR. SHROCK: We did.") (emphasis added). The Debtors now claim, to the contrary, that the $1.408 billion cash payment in Section 3.1(a)(i) of the APA was allocated to inventory and receivables collateral alone, allowing the Debtors to arrive at their 85% valuation of the collateral. This reversal may be convenient for the Debtors but it flies in the face of the APA's plain text as well as the Debtors' representations on the record. Judicial estoppel should bar the Debtors from "deliberately changing positions according to the exigencies of the moment" to now gain an unfair advantage against the Second Lien Parties. *See In re 300 Washington St. LLC*, 528 B.R. 534, 546 (Bankr. E.D.N.Y. 2015) (citing *New Hampshire v. Maine*, 532 U.S. 742, 743 (2001)).

*Third*, the Debtors and the UCC should be estopped from arguing that the adequate protection liens and superpriority claims afforded the Second Lien Parties under the Final DIP Order should somehow not apply now. If the Debtors or the UCC wanted to limit the availability of adequate protection or superpriority claims to the Second Lien Parties, the time to have done that was when the Final DIP Order was negotiated and approved. Having failed to even attempt

27

to do so then, they should be estopped from trying to do so now in order to evade the protections

promised to the Second Lien Parties when the Final DIP Order was entered with their approval.

## IV.    THE PARTIES HAVE STIPULATED TO A RULE 3012 HEARING

In perhaps tacit recognition of the Debtors' lack of support for their attempts to deny the

Second Lien Parties their allowed secured claims and Section 507(b) Claims, the Debtors now

invite the Court to convert this proceeding back into an estimation proceeding, "rule on the

papers the parties have submitted without a hearing and simply determine that the Second-Lien

Holders' claims are $0." Debtors' Opp. ¶ 1. The Court should reject this request for several

reasons.

*First*, the parties have already stipulated, and the Court so-ordered, that the Debtors'

original Estimation Motion would be converted into a Rule 3012 Motion and the Court would

determine the Second Lien Parties' Section 507(b) Claims at a hearing scheduled for July 18,

2019. *See Stipulation and Order Concerning the resolution of Certain Section 507(b) Claims*,

ECF No. 4316; Common Mem. at 4. The Debtors waived whatever right, if any, they had to

seek estimation of the Second Lien Parties' Section 507(b) Claims. They have no right to

unilaterally convert the nature of this proceeding. *Second*, under the Bankruptcy Code,

estimation is only available to resolve claims under Section 502—not Section 507(b). *Third*, the

few courts that have permitted estimation proceedings for administrative claims have explicitly

only done so only to determine plan feasibility, and not for allowance purposes, in light of the

fact that an estimation proceeding would be "inconsistent with the procedural due process to

which [the administrative claimant] would be entitled." *In re Adelphia Bus. Sols., Inc.*, 341 B.R.

415, 418 (Bankr. S.D.N.Y. 2003); *In re Ralph Lauren Womenswear, Inc.*, 197 B.R. 771, 775

(Bankr. S.D.N.Y. 1996) (estimation of administrative claims for voting purposes would not

affect ultimate disposition of claim "due to the fundamental difference between the adjudication

of a claim and its temporary allowance for plan purposes"); *see also In re MacDonald*, 128 B.R.

161, 167 (Bankr. W.D. Tex. 1991) (estimating administrative claim to determine feasibility, but

not ultimate allowance).[11]   *Finally*, the Debtors have provided no authorities supporting the

position that an estimation proceeding is an appropriate means by which to determine whether to

surcharge a secured creditor's collateral, which raises due process concerns similar to those that

have been invoked by courts in the context of estimating administrative claims.

## CONCLUSION

For the reasons set forth above and in the Common Memorandum, the Second Lien

Parties respectfully request that the Court determine their Section 507(b) Claims and their

secured claims in amounts to be determined at the hearing, deny the Debtors' request for a

Section 506(c) surcharge, and grant other such relief as it deems just and proper.

[*Signature Page Follows*]

---

[11]   There would be no basis for any such estimation of ESL's claim here since it has agreed not to require the Debtors to pay its administrative claim expense as a condition to confirming a plan.

Dated: New York, New York
       July 3, 2019

CLEARY GOTTLIEB STEEN &            MILBANK LLP
HAMILTON LLP

By:  */s/ Thomas J. Moloney*            By:  */s/ Thomas R. Kreller*
     Thomas J. Moloney                       Eric R. Reimer (admitted pro hac vice)
     Sean A. O'Neal                          Thomas R. Kreller (admitted pro hac vice)
     Andrew Weaver                           Robert J. Liubicic
     Katherine R. Lynch
     Chelsey Rosenbloom                      *Attorneys for Cyrus Capital Partners, L.P.*
                                             2029 Century Park East, 33rd floor
     *Attorneys for ESL*                     Los Angeles, CA  90067
     One Liberty Plaza
     New York, NY 10006
     Telephone:  (212) 225-2000
     Facsimile:  (212) 225-3999


SEYFARTH SHAW LLP


By:  */s/ Edward M. Fox*
     Edward M. Fox
     Steven Paradise
     Owen Wolfe

     *Attorneys for Wilmington Trust,*
     *National Association, as indenture*
     *trustee and collateral agent*
     620 Eighth Avenue
     New York, NY 10018
     Direct Dial:  (212) 218-4646
     Direct Fax:  (917) 344-1339