Hearing Date: July 18, 2019 at 10:00a.m. (Eastern Time)
Supplemental Brief Deadline: July 15, 2019

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
………………………………………………X
                                          :
In re                                     :    Chapter 11 Case No.
                                          :
SEARS HOLDINGS CORPORATION, et al.,       :    18-23538 (RDD)
                                          :
          Debtors.¹                       :    (Jointly Administered)
                                          :
                                          :
………………………………………………X
```

**SUPPLEMENTAL REPLY MEMORANDUM OF LAW ON BEHALF OF ESL
INVESTMENTS, INC. IN FURTHER SUPPORT OF ITS REQUESTS TO DETERMINE
THE AMOUNT OF ITS SECOND LIEN SECURED CLAIMS UNDER SECTION 506(a)
AND ITS SECTION 507(b) ADMINISTRATIVE CLAIMS PURSUANT TO
BANKRUPTCY RULE 3012; AND IN OPPOSITION TO THE DEBTORS' MOTION TO
SURCHARGE ITS COLLATERAL PURSUANT TO SECTION 506(c)**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**TABLE OF CONTENTS**

**PAGE**

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT ...................................................................................................................................3

I.   The Debtors' Critiques of the Schulte Report's Valuation Approach
     Are Baseless...........................................................................................................................3

II.  There is No Basis in Law or Fact For The Debtors to Surcharge All
     Expenses Incurred Prior to Closing to ESL ..........................................................................7

III. The Debtors Misinterpret The APA's Language With Respect to the
     Available Sources of Recoveries For ESL's Section 507(b) Claims ...................................10

CONCLUSION...............................................................................................................................11

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Assocs. Commercial Corp. v. Rash*,
520 U.S. 953 (1997) .................................................................................................. 4

*Staiano v. Cain ex rel. Lan Assocs. XI, L.P. (In re Lan Assoc. XI, L.P.)*,
192 F. 3d 109 (3d Cir. 1999) ......................................................................................... 7

ESL Investments, Inc. and certain of its affiliated entities (including JPP, LLC and JPP II, LLC (collectively, "ESL")), in their capacities as second lien creditors of Sears Holdings Corporation and certain of its affiliates (collectively, "Sears" or the "Debtors"), by their undersigned counsel, hereby file this Supplemental Reply Memorandum of Law on Behalf of ESL Investments, Inc. in Further Support of Its Requests to Determine the Amount of Its Second Lien Secured Claims Under Section 506(a) and Its Section 507(b) Administrative Claims Pursuant to Bankruptcy Rule 3012; and in Opposition to the Debtors' Motion to Surcharge Its Collateral Pursuant to Section 506(c).[2]

## PRELIMINARY STATEMENT

If these chapter 11 cases were viewed as a play, undoubtedly ESL would be identified as the main character. It does not follow, however, that this production was done for its benefit. If that were true, when it left the stage following its delivery of a successful bid that saved 45,000 jobs and provided $5.2 billion of value to these estates, it would have been greeted with thunderous applause and not a multi-billion dollar complaint. The truth is, this is a case, like most, where all parties acted in their own perceived best interests, and everyone achieved something, but no one obtained everything, that they wanted.

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Common Memorandum of Law On Behalf of the Second Lien Parties in Support of Their Requests to Determine the Amount of Their Second Lien Secured Claims under Section 506(a) and Their Section 507(b) Administrative Claims Pursuant to Bankruptcy Rule 3012; and in Opposition to the Debtors' Motion to Surcharge Their Collateral Pursuant to Section 506(c)*, ECF No. 4272 ("Common Memorandum") and the *Common Reply Memorandum of Law On Behalf of the Second Lien Parties in Further Support of Their Requests to Determine the Amount of Their Second Lien Secured Claims under Section 506(a) and their Section 507(b) Administrative Claims Pursuant to Bankruptcy Rule 3012; and in Opposition to the Debtors' Motion to Surcharge Their Collateral Pursuant to Section 506(c)* ("Common Reply Memorandum"), filed contemporaneously herewith. ESL's *Supplemental Memorandum of Law on Behalf of ESL Investments, Inc. in Support of its Requests to Determine the Amount of its Second Lien Secured Claims Under Section 506(a) and Its Section 507(b) Administrative Claims Pursuant to Bankruptcy Rule 3012; and in Opposition to the Debtors' Motion to Surcharge Its Collateral Pursuant to Section 506(c)*, ECF. No. 4273, is cited as "ESL Supplemental Memorandum."

ESL, in return for its successful bid, wanted a full release; the Debtors and the UCC wanted ESL to abandon its valuable Court-ordered adequate protection rights as part of its sale consideration.  The parties compromised on these issues:  ESL obtained a limited release, and ESL's rights to recover a portion of its Section 507(b) Claims from future litigation proceeds were limited.  These motions are not a forum for the Debtors or the UCC to re-litigate the equities of this Court-approved resolution. Nor, based on this history, is there any justification for anyone to claim these cases were run for the purpose of providing any benefit to ESL, or any expenses were incurred to confer the type of primary direct benefit to the Second Lien Parties that the Second Circuit in *Flagstaff* identified as necessary for any Section 506(c) surcharge.

The key question for the Court to decide on July 18 is the amount, if any, of the diminution in value of the Second Lien Parties' collateral that occurred during these cases.  ESL respectfully submits that the evidence will show a substantial reduction in such value.  The principal difference between the experts of the Second Lien Parties and the Debtors' expert is their valuation of the Second Lien Collateral as of the Petition Date.  Set forth below is a chart that illustrates the differences between ESL's expert, David Schulte and the Debtors' expert, Brian Griffith.

[*Remainder of Page Intentionally Left Blank*]

| $ millions | | Schulte (ESL) | Griffith (Debtors) |
|---|---|---|---|
| **Collateral on the Petition Date:** | | | |
| Cash | | $ 115.5 | $ - |
| Credit card receivables | | 64.2 | 54.8 |
| Pharmacy accounts receivable | | 11.9 | - |
| Pharmacy scripts | | 72.8 | - |
| Inventory (book value) | | 2,690.8 | 2,690.8 |
| Total Collateral at book value | A | $ 2,955.2 | $ 2,745.6 |
| Valuation discount | B | 95.5% book value of GOB inventory  100% for other Collateral | 85% |
| **Collateral Value on the Petition Date** | C=A*B | $ 2,926.0 | $ 2,333.8 |
| **First Lien Debt:** | | | |
| Funded | | $ (1,531.8) | $ (1,531.8) |
| Unfunded ABL L/C Facility | | - | (123.8) |
| Unfunded Stand-Alone L/C Facility | | - | (271.1) |
| Total first lien debt | | $ (1,531.8) | $ (1,926.7) |
| Post petition interest | | - | (34.0) |
| **Total first lien debt and post petition interest** | D | $ (1,531.8) | $ (1,960.7) |
| **Collateral Available to Second Lien Creditors on the Petition Date** | C+D | $ 1,394.2 | $ 373.1 |

As the above chart illustrates, the principal differences between the two experts' approaches are what they include as Second Lien Collateral, how they value the collateral, and how they account for the L/C Facilities. These differences are all addressed in the Common Reply Memorandum, filed contemporaneously herewith. ESL files this supplemental reply memorandum to address issues that are unique to ESL.

## ARGUMENT

### I.   THE DEBTORS' CRITIQUES OF THE SCHULTE REPORT'S VALUATION APPROACH ARE BASELESS

Although the Debtors claim that the Schulte Report's valuation approach offers a "Pollyanna view of Second-Lien Holder recoveries," Griffith Supp. Decl. ¶ 14, none of their substantive critiques has any basis in fact or law. The Debtors' critiques of Mr. Schulte attack arguments he does not make and simply ignore what he actually says in his report.

3

Specifically, as explained in greater detail in the Schulte Report, Mr. Schulte valued the Petition Date inventory collateral, which is a critical component of this dispute, according to its actual use. *See* Schulte Rep. at 9.[3] Notably, the book value the Debtors used to value their inventory for accounting purposes is not in dispute. Mr. Schulte's analysis separately values the inventory in the stores that were intended to continue to be operated as going concerns and the inventory that was present in closing stores that would be subject to GOB sales. *See id.* This approach is consistent with the Supreme Court's guidance in *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 963-64 (1997), that "actual use . . . is the proper guide under a prescription hinged to the property's 'disposition or use'" (citation omitted).

For the going concern stores' inventory, Mr. Schulte chose the Debtor's book value as the appropriate value to be used. *See* Schulte Rep. at 11. As the Schulte Report explains, because these stores operated at a small net profit based on the Debtors' own ordinary course going concern accounting, the gross profits generated from the sale of their inventory (money the Debtors' analysis continues to entirely ignore) funded the costs of achieving a return slightly greater than book value for the inventory. *See id.* Accordingly, as the Schulte Report makes quite clear, its use of book value to calculate the value of the inventory portion of the Second Lien collateral already takes into consideration all of the direct costs necessary to sell and

---

[3]     Mr. Schulte generally relies for his numbers on the general ledger, which also generally ties into the numbers the Debtors reported in their Schedules of Assets and Liabilities. To the extent others use Eligible Collateral derived from the Borrowing Base for their analysis, those amounts are understated because they reflect negotiated contractual exclusions of collateral for purposes of lending funds to the Debtors. Such exclusions, of course, have no impact on the Second Lien Parties' collateral rights or the value of the collateral. The Borrowing Base may also include estimated amounts and not reflect actual balance sheet accounts since the Debtors' may not have a balance sheet available at every point in time. For example, Mr. Griffith draws his credit card receivable numbers from a Borrowing Base (which reflects an amount for credit card receivables based on an estimate of credit card sales from the preceding three days) while Mr. Schulte used the Debtors' own business records as reflected in the most recent general ledger and Schedules of Assets and Liabilities. The minor differences between the numbers should not overshadow the more important valuation points.

maintain the inventory during the bankruptcy cases. *See id.* at 11-12. Furthermore, as the Schulte Report notes, "the book value of inventory approach has its own appeal because it roughly approximates the inventory's replacement value." *Id.* at 11. Mr. Griffith's criticism of this aspect of Mr. Schulte's analysis because it supposedly "assumes the book value for the Go Forward Stores, with no cost deductions," Griffith Supp. Decl. ¶ 14, is plainly incorrect. It continues the Debtors' head-in-the-sand approach, not recognizing the gross profits made on inventory that was actually sold.

For his going concern analysis, Mr. Schulte valued the inventory in the stores with GOB sales in a different way. *See* Schulte Rep. at 10. Again he began by looking at the actual value realized by those sales during the bankruptcy (which exceeded book value) including the deduction of store-level costs incurred in those sales, and that was the approach used by the Debtors pre-filing to account for the results of its GOB sales. *See id.* at 11-12. This accounting approach generally accounts for all store-level costs but does not provide any attribution of corporate overhead. The result of this analysis was to value the inventory at 95.5% of book value. *Id.* at 11; *see also* summary table, *supra*. This number is consistent with the results the Debtors achieved in the numerous GOB sales Sears conducted as it significantly contracted prior to its chapter 11 filing. *See* Schulte Rep. at 10. It is also close to a contemporary analysis done by Tiger, dated September 28, 2018, which estimated that inventory could be liquidated for 94.4% of cost before taking into account corporate overhead. *See id.* at 14-15. The Debtors do not make any meaningful criticism of this going concern analysis because they confuse it with the separate liquidation analysis Mr. Schulte makes with respect to the inventory as a whole.

The only other valuation analysis of the inventory made by Mr. Schulte is a hypothetical exercise, which attempts to determine what recovery the Second Lien Parties would have

5

actually obtained in a liquidation on the Petition Date. *See id*. at 14-17. The Second Lien Parties have no burden of proof on this point. This analysis is only offered to challenge one aspect of the Debtors' argument that because the Second Lien Parties ultimately received more as a result of their credit bid than they would have received as a result of a first-day liquidation, their collateral, alone, should be burdened with all of the expenditures in these cases. While the Second Lien Parties have a number of legal and factual reasons why this proposed surcharge is unjustified, the debate doesn't even begin until the Debtors prove that, in fact, the Second Lien recovery would not have been more than $433 million in a first-day liquidation scenario. The Schulte Report concludes the Debtors cannot come near meeting this burden because the most likely range of realizable values from a first-day liquidation would have been 88%-92% (translating to a Petition Date Second Lien collateral value range of $679.8 million to $786.3 million). *Id.* at 16.[4] Mr. Schulte reached his opinion by valuing the first-day inventory based on a number of data points, including liquidation bids the Debtors actually received for their remaining inventory at the end of the case and the Debtors' own liquidation analysis—and Mr. Schulte's opinion is consistent with the value contained in the Debtors' own analysis. *See id.* at 15. Mr. Schulte did not ignore the so-called equity bids the Debtors received, but, like the Debtors, did not rely upon them because they are fundamentally different from the fee-based bids in that the equity bids transfer risk to the bidders—the rates in the equity bids represent only a floor for recovery, and the Company would share in any recoveries over that minimum value— and because he had other data points. *See id.* at 15.

---

[4] In this context, on a conservative basis, Mr. Schulte assumed the L/C Facilities would be drawn. *See id.* A more realistic scenario based on an in-depth analysis of the standby L/C Facilities (which Mr. Schulte did not perform) demonstrates that only a small amount of the L/C Facilities would actually be funded. *See Expert Report of Marti P. Murray* § A.1, ECF No. 4314.

6

The Debtors also tack onto Mr. Schulte's liquidation analysis expenses that are normally included in the type of best-interest-of-creditors liquidation analysis done to show that unsecured creditors are doing better under a plan than in a liquidation, such as the one the Debtors prepared in connection with the plan in this case. *See* Griffith Decl. ¶ 8. Mr. Griffith includes a laundry list of expenses such as "WARN Act" obligations and chapter 7 trustee fees. *Id.* ¶¶ 8-10. The fallacy in this argument is that the analysis includes some expenses that are not automatically chargeable against a secured party's collateral, and other expenses that are never chargeable at all. For example, under Section 326(a) of the Bankruptcy Code, chapter 7 trustees are not entitled to payment of fees in connection with the sale of fully secured property. *See Staiano v. Cain ex rel. Lan Assocs. XI, L.P. (In re Lan Assoc. XI, L.P.)*, 192 F. 3d 109, 120 (3d Cir. 1999) ("It follows from these principles that a trustee who expends time and effort administering fully encumbered assets should not receive compensation except to the extent that his actions provide an actual benefit to the estate.").

## II. THERE IS NO BASIS IN LAW OR FACT FOR THE DEBTORS TO SURCHARGE ALL EXPENSES INCURRED PRIOR TO CLOSING TO ESL

The Debtors claim that ESL and the other Second Lien Parties should be surcharged for hundreds of millions of expenses incurred between the date of the APA's execution and the closing of the Sale Transaction simply because the Debtors were obligated to "manage[] the business in the ordinary course and . . . to meet certain financial conditions precedent in the APA." Griffith Supp. Decl. ¶ 25. As demonstrated in the Common Memorandum, ESL Supplemental Memorandum, and the Common Reply Memorandum, there is no basis in Section 506(c) for such a broad surcharge. There is also no support in the APA.

*First*, the Debtors' choice of different dates between which ESL is purportedly responsible for all operating expenses of the estates is arbitrary and irrational. *See id.* At

7

beginning of these cases, the Debtors had a choice to pursue a going concern sale or liquidate. In order to pursue a going concern sale, the Debtors were required to continue operating in the ordinary course. The same choice remained present at every moment in these cases until the Debtors chose ESL's sale bid. There is no logic to their assertions that ESL should be required to pay for all expenses after its initial rejected going concern bid on December 28, 2019, or between the execution of the APA on January 17, 2019 and the Closing of the Sale Transaction on February 11, 2019.

*Second*, the Debtors were already bound from the first day of these proceedings by covenants requiring them to operate in the ordinary course by virtue of the DIP orders and the DIP ABL Credit Agreement. *See* Interim DIP Order, Exhibit B, DIP ABL Term Sheet, ECF. No. 101-2; Final DIP Order, Exhibit A, DIP ABL Credit Agreement, ECF No. 955-1.[5] Among other covenants, the DIP ABL Credit Agreement requires the Debtors to operate in compliance with the Approved Budget, DIP ABL Credit Agreement § 603, remain in compliance with all laws, *id.* § 6.01(a), continue to pay taxes, *id.* § 6.01(b), maintain insurance, *id.* § 6.01(c), make no dispositions other than permitted dispositions, *id.* § 602(i), keep proper books of record, § 6.01(f), maintain all properties in good working order, *id.* § 6.01(g), comply with significant reporting requirements, *id.* § 6.01(j), and conduct physical inventories, *id.* § 6.01(c). The same agreement also includes numerous negative covenants that similarly require the Debtors to continue operating in the ordinary course. *See id.* § 6.02. The APA did not change these legal restrictions.

---

[5] The DIP ABL Term Sheet approved by the Court in the Interim DIP Order on October 16, 2018 included a requirement that the Debtors obtain an acceptable stalking horse bid for the sale of the Go Forward Stores by December 15, 2018, in light of "the cash-burn associated with the continued operation of the Debtors' businesses." Interim DIP Order, Ex. B, DIP ABL Term Sheet at D-2.

8

*Third*, even if the Debtors' other arguments were true (as demonstrated above, they are not), there would still be no justification for surcharging ESL based on the ordinary course provision of the APA. Pursuant to Section 8.1 of the APA, the Debtors were obligated to "use commercially reasonable efforts to conduct their business in the Ordinary Course of Business . . . ." APA § 8.1(a). Such provisions are typical for asset purchase agreements because they provide a buyer comfort that the company being bought at signing will be the same company received at closing, and in fact, the proposed asset purchase agreement for the sale of the Sears Home Improvement Business ("SHIP") to Service.com, Inc. contained a similar provision. *See Motion of Debtors for Entry of Order (I)(A) Approving Bidding Procedures for Sale of Sears Home Improvement Business, (B) Approving Stalking Horse Bid Protections (C) Scheduling Auction for and Hearing to Approve Sale of Sears Home Improvement Business, (D) Approving Form and Manner of Notice of Sale, Auction, and Sale Hearing, (E) Approving Assumption and Assignment Procedures, (II) Approving the Sale of Sears Home Improvement Business in Accordance with the Stalking Horse Agreement and (III) Granting Related Relief* Exhibit B § 6.02, ECF No. 450. The Debtors have certainly not claimed that these cases were run for the benefit of the potential buyer of the SHIP assets.

Each and every reciprocal obligation under the APA, including the Debtors' obligation to operate their business in the ordinary course, was fully bargained for by the Parties and the result of an arms-length negotiation. *See* Sale Order ¶ O. At the end of the auction, the Debtors had two choices: (1) accept the bid and enter into the going-concern Sale Transaction that would realize $5.2 billion in value for the estates, or (2) liquidate. The Debtors' decisions to continue to operate and ultimately to accept ESL's bid and enter into the Sale Transaction at all times included decisions to incidentally incur certain operating expenses until any future closing date.

9

These decisions to incur ongoing operating expenses were not for the primary benefit of the Second Lien Parties, and ultimately resulted in one piece of the complex bargain struck by the Parties, and one for which the Debtors received billions of dollars in value in return. The Debtors cannot further improve their bargained-for deal by surcharging hundreds of millions in additional expenses to ESL and the other Second Lien Parties.

### III. THE DEBTORS MISINTERPRET THE APA'S LANGUAGE WITH RESPECT TO THE AVAILABLE SOURCES OF RECOVERIES FOR ESL'S SECTION 507(B) CLAIMS

In ESL's opening supplemental brief, ESL demonstrated that the Debtors' assertions that the APA caps the total recoveries for ESL's Section 507(b) Claims at $50 million are contrary to the plain text of the APA, the structure of the Sale Transaction as a whole, and the Parties' shared understanding during the drafting of the APA. *See* ESL Supp. Mem. at 16-19. In their opposition, the Debtors, based solely on their purposed reading of the text of the APA, now claim that not only are ESL's Section 507(b) Claim recoveries capped at $50 million, but also that ESL's Section 507(b) Claims cannot recover from *any* source except the non-ESL related causes of action. *See* Debtors' Opp. ¶¶ 32-33. This interpretation is not only brand new; it is also plainly wrong. Section 9.13(c) of the APA expressly authorizes ESL to assert any claims it may have "arising under Section 507(b)" without any dollar limit. It then contains two, and only two, contractual limits on distributions on those claims—that no such claims (or any other claims of ESL) shall have recourse to the proceeds of Specified Causes of Action and that any ESL Section 507(b) claims shall be "entitled to distributions of not more than $50 million *from the proceeds of* any Claims or causes of action of the Debtors or their estates." APA § 9.13(c)(ii) (emphasis added). The Debtors' purported reading of this section of the APA ignores its actual terms. It would only be consistent with the plain text if the provision barred ESL from asserting a priority claim under Section 507(b) in an amount in excess of $50 million, if the words "solely"

10

or "exclusively" appeared before the word "entitled," or if the provision included as a final clause that "ESL shall not be entitled to any distributions on any Section 507(b) claims from any other source." The actual words of the provision say nothing of the kind.

The Debtors' interpretation of Section 9.13(c)(ii) is also inconsistent with the very next clause in that section, which states that "it shall not be a condition to confirmation of any chapter 11 plan filed in the Bankruptcy Cases that any ESL Claims arising under Section 507(b) of the Bankruptcy Code be paid in full or in part." *Id.* § 9.13(c)(iii). If ESL were *only* permitted to recover from proceeds of other litigation causes of action—entirely speculative future distributions to the estates—it would be entirely unnecessary to include clause (iii), because there would be no concern that any ESL Section 507(b) Claims could delay confirmation of a plan. Clause (iii) is consistent with ESL's interpretation of the plain text of the APA to cap *only* its recoveries from other litigation causes of action, because it is superfluous unless the Parties anticipated ESL to have substantial Section 507(b) claims that could cause serious issues if the Debtors were required to pay them in full before confirming a plan.

## CONCLUSION

For the reasons set forth above and in ESL's opening papers, ESL respectfully requests that the Court determine its Section 507(b) Claims in the amount of $509,675,975.22, and its secured claim in an amount to be determined at the hearing, deny the Debtors' request for a Section 506(c) surcharge, order a transfer of $60 million from the Winddown Account, rule that Section 9.13 of the APA does not restrict the total recoveries available to ESL's Section 507(b) Claims from all sources to $50 million, and grant other such relief as it deems just and proper.

11

Dated: New York, New York
July 3, 2019

                    CLEARY GOTTLIEB STEEN & HAMILTON LLP

                    By:  */s/ Thomas J. Moloney*
                          Thomas J. Moloney
                          Sean A. O'Neal
                          Andrew Weaver
                          Katherine R. Lynch
                          Chelsey Rosenbloom

                    *Attorneys for ESL*
                    One Liberty Plaza
                    New York, NY 10006
                    Telephone: (212) 225-2000
                    Facsimile: (212) 225-3999