Eric R. Reimer (admitted *pro hac vice*)
Thomas R. Kreller (admitted *pro hac vice*)
Robert J. Liubicic
MILBANK LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000

Brian Kinney
MILBANK LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

*Counsel to Cyrus Capital Partners, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| SEARS HOLDINGS CORPORATION, *et al.*, | Case No. 18-23538 (RDD) |
| Debtors. | (Jointly Administered) |

**REPLY BRIEF OF CYRUS CAPITAL PARTNERS, L.P. IN SUPPORT OF REQUEST TO DETERMINE THE AMOUNT OF SECURED CLAIMS UNDER SECTION 506(a) AND SECTION 507(b) ADMINISTRATIVE CLAIMS PURSUANT TO BANKRUPTCY RULE 3012 AND IN OPPOSITION TO DEBTORS' REQUEST TO SURCHARGE COLLATERAL PURSUANT TO SECTION 506(c)**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Cyrus Capital Partners, L.P. ("Cyrus") respectfully hereby submits this Reply Brief (this "Reply Brief") (A) in support of the Request (the "Request") under Bankruptcy Rule 3012 to determine the amount of its (x) secured claim under section 506(a) of the Bankruptcy Code, and

(y) administrative claim under section 507(b) of the Bankruptcy Code and (B) in opposition to the *Debtors' Motion to Surcharge Cyrus' Collateral Pursuant to Section 506(c) of the Bankruptcy Code* [Dkt. No. 4034] and in response to the *Debtors' (I) Opposition to Second-Lien Holders' Requests to Determine the Amount of Second Lien Claims Under Section 506(a) and Second 507(b) Administrative Claims and (II) Reply in Support of Debtors' Rule 3012 Motion to Determine the Amount, if any, of 507(b) Claims and to Surcharge Second-Lien Collateral Pursuant to Section 506(c)* [Dkt. No. 4381] (the "Debtors' Opposition") and the *Creditors' Committee's (I) Qualified Joinder to the Debtors' Objection to the Second Lien Parties' Requests to Determine Claims Under Section 506(a) and Section 507(b) and Reply in Support of the Debtors' Rule 3012 Motion and (II) Supplemental Objection to the Second Lien Parties' Request to Determine Claims Under Section 506(a) and 507(b)* [Dkt. No. 4385] (the "Committee Joinder"). Cyrus files this individual Reply Brief in addition to and in conjunction with the *Common Reply Memorandum of Law on Behalf of the Second Lien Parties: (A) In Further Support of Their Requests to Determine the Amount of Their Second Lien Secured Claims Under Section 506(a) and Their Section 507(b) Administrative Claims Pursuant to Bankruptcy Rule 3012; and (B) In Opposition to Debtors' Motion to Surcharge Their Collateral Pursuant to Section 506(c)* (the "Common Reply")[1]. In further support of its Request, Cyrus respectfully represents as follows:

**Preliminary Statement**

1. The Debtors have met the Second Lien Parties' assertion of sizable section 507(b) claims with misleading math and misguided notions of surcharge. The Creditors' Committee has weighed in belatedly with the unsubstantiated bluster that has become its hallmark in these cases.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Common Rely.

2

But their collective desperation is not driven by any conviction in the legal or factual underpinnings of their positions on section 507(b) or section 506(c). Instead, they are motivated by the shared knowledge that the Debtors' estates are likely administratively insolvent even before the allowance of section 507(b) claims, and that if the Second Lien Parties are successful with their claims, the Debtors almost certainly will not have the wherewithal to confirm their plan. There can be no doubt that their strategy in the section 507(b) battle, therefore, will be to convince the Court that this fight is not just about diminution in value of the Second Lien Collateral, but that indeed confirmation of the plan is hanging in the balance. The Court should not be distracted with this plea for mercy; the Second Lien Parties possess bargained-for, Court-approved property and adequate protection rights at stake and are entitled to a fair determination of those rights on the merits alone.

2.  That said, as it has been throughout these cases, Cyrus is well aware of the practical realities present here. "Winning" a sizable section 507(b) claim without having a ready source of recovery for the claim does not necessarily count as a victory. While Cyrus reserves all of its rights under section 507(b) and otherwise in connection with the Debtors' efforts to confirm their plan, Cyrus also assures the Court that Cyrus stands ready to work in good faith with the Debtors to advance these cases towards conclusion, including working towards an agreement whereby, under appropriate conditions, Cyrus would be willing to waive its rights to demand payment of any section 507(b) claims in full, in cash as a prerequisite to plan confirmation.

## Introduction

3.  The Court has been asked to determine the diminution in value of the Second Lien Collateral that has occurred since the Petition Date. This determination will establish the

magnitude of the allowed claims of the Second Lien Parties under Bankruptcy Code section 507(b), subject to any determination by the Court that the Second Lien Collateral should be surcharged under Bankruptcy Code section 506(c).

4. The inputs to the section 507(b) claim calculation are discrete and readily ascertainable, and the exercise therefore should be straightforward:

    a.    The measurement period begins on the Petition Date.

    b.    On the Petition Date, the Second Lien Collateral, which was shared with the senior, first lien lenders, consisted of inventory, receivables and proceeds, including cash proceeds, thereof (the "Opening Shared Collateral"). The interests of the Second Lien Parties in the Opening Shared Collateral were subject to senior, first priority liens that secured certain first lien debt obligations that were funded and outstanding as of that date (the "Opening 1L Debt Amount").

    c.    Consequently, the value of the Second Lien Collateral available to the Second Lien Parties on the Petition Date (*i.e.*, the interests of the Second Lien Parties in the Second Lien Collateral that are entitled to adequate protection) equals the value of the Second Lien Collateral minus the Opening 1L Debt Amount (the "Opening 2L Collateral Value"). This number is the starting point against which to measure the occurrence of any diminution in value of the Second Lien Parties' interest in the Second Lien Collateral over the course of the chapter 11 cases.

    d.    To calculate the aggregate diminution in value that occurs over the life of these cases, the Court will compare the Opening 2L Collateral Value to the remaining amount of Second Lien Collateral available to the Second Lien Parties at the applicable ending date (the "Ending 2L Collateral Value"). In this case, the appropriate ending date would appear to be the assumed effective date of the Debtors' chapter 11 plan (assuming such plan is confirmed and becomes effective) (the "Assumed Effective Date").

    e.    The diminution in value calculation is simplified by the fact that, for better or worse, the Debtors have (or will have) disposed of or consumed all, or substantially all, Second Lien Collateral as of the Assumed Effective Date – either because it was sold in the Debtors' stores, sold as part of the Debtors' sale of substantially all of their assets to Transform Holdco (the "Transform Sale") or because it has been dissipated by the Debtors in the period following the closing of that sale. This results in an Ending 2L Collateral Value of zero – which in turn means that the Opening 2L Collateral Value has diminished *in its entirety*.

    f.    The last piece of this equation is to account for the fact that the Second Lien Parties, in a collective action controlled by ESL as majority holder of second lien debt, included as part of the purchase price in the Transform Sale a credit bid of $433.5 million of second lien debt (the "Credit Bid Amount"). Because that credit bid effectively served as a realization of value on account of Second Lien

4

Collateral, that amount must be applied to reduce the otherwise "full" diminution in value calculation.

5. Using actual numbers from the Murray Report,[2] the calculation looks like this:

|  | Minimum Case | Management Case |
|---|---|---|
| Value of Opening Shared Collateral | $2,457,100,000 | $3,001,300,000 |
| Less: Opening 1L Debt Amount | $1,531,800,000 | $1,531,800,000 |
| Equals: Opening 2L Collateral Value | $925,300,000 | $1,469,500,000 |
| Minus: Ending 2L Collateral Value | $0 | $0 |
| Equals: Full Diminution in Value | $925,000,000[3] | $1,469,300,000 |
| Minus: Realization of Value from Credit Bid | $433,500,000 | $433,500,000 |
| Equals: Allowed Diminution in Value Claim | $491,600,000 | $1,035,800,000 |

6. If one stays true to the fundamental Bankruptcy Code concepts at work and a few indisputable facts that are readily ascertainable from the record in these cases, there should be little room for dispute. Admittedly, the valuation of Opening Shared Collateral, like valuation of almost anything, is subject to interpretation and potentially competing methodologies. But even that playing field is pretty well confined here—the Second Lien Collateral consists of discrete assets primarily in the form of inventory, receivables and cash proceeds, and the parties all agree that the appropriate valuation methodology to be applied effectively is a going concern or similar

---

[2] *Expert Report of Marti P. Murray in Support of Memorandum of Law in Support of Request of Cyrus Capital Partners, L.P. to Determine the Amount of Secured Claims under Section 506(a) and Section 507(b) Administrative Claims* ¶¶ 101–02, June 20, 2019 [Dkt. No. 4314] (the "Murray Report").

[3] The Diminution in Value was offset by up to $250,000 paid to Wilmington Trust as Adequate Protection payments.

fair market value analysis, coupled with at least some recognition that orderly GOB sales were taking place that called for slightly different, but still readily available, metrics. Notwithstanding the Debtors' inexplicable attempts to infuse this debate with some sort of "fire sale" scenario, the valuation fight is a skirmish, not a war, on these discrete facts. The Debtors' reference to an uncontrolled "day one" liquidation is especially inapposite, since the Debtors repeatedly preserved the option of "pivoting" to an orderly company-wide liquidation and in fact had a long history, both before and during bankruptcy, of disposing of the Second Lien Collateral through such orderly liquidations at literally hundreds of stores.

7. Beyond that limited Petition Date valuation variability with respect to the Opening Shared Collateral, there is little to argue about. The Opening 1L Debt Amount is easily quantified from the Debtors' own books and records. The Ending 2L Collateral Value is zero—or if the Debtors insist that any exists, then it is encumbered in favor of the Second Lien Parties and is simply a postpetition, secured claim (entitled to payment in full) rather than a section 507(b) superpriority claim (also entitled to payment in full). And the realization of value from the credit bid is similarly noncontroversial—in each of their separate submissions, the Second Lien Parties have accounted for the credit bid amount as a dollar-for-dollar realization of collateral that has the effect of reducing the "full" diminution in value amount that would otherwise exist.

8. This basic diminution in value calculation is a function of the fact that, at bottom, Bankruptcy Code sections 361 to 364 make clear that, from and after the petition date, a secured creditor is entitled to adequate protection of its property rights in collateral to the extent the application of section 362, 363 or 364 results in a decrease in the value of the secured creditor's interest in such property. Section 507(b) makes it equally clear that, in the event such adequate

protection "fails" and the creditor is deprived of a property right, the creditor will be granted the "next best thing" —a superpriority administrative claim—to compensate it for what happened to what started out as an interest in property.

9.   Unfortunately, the Debtors and the Creditors' Committee both conveniently choose to ignore these fundamental bankruptcy principles and basic facts to try to convince the Court to look not at what happened *to* the Second Lien Collateral, but instead to be distracted by what happened *around* the Second Lien Collateral—*i.e.,* the Transform Sale, which involved the sale of all sorts of assets, assumption of all sorts of liabilities and preservation of all sorts of claims bearing no relationship to the Second Lien Collateral and of which the Second Lien Collateral was just a fraction.

10.  The Court should not fall into this poorly laid trap.  The dispute here is about the value of the Second Lien Collateral, then (at the Petition Date) and now (sitting on zero).  It is not about all of the other issues and disputes that were either resolved in the Transform Sale (all of the other non-Second Lien Collateral assets, etc.) or expressly excluded therefrom (the various estate claims that remain with the estates) and have nothing to do with the Second Lien Collateral.  And it is not about that fact that the Debtors and the Creditors' Committee view ESL as a target in disputes wholly unrelated to the Second Lien Collateral.  The fact that ESL, or even Cyrus for that matter, may have benefitted from the Transform Sale in capacities unrelated to their Second Lien Claims simply is not relevant to the straightforward, and Bankruptcy Code-mandated, analysis of the diminution in value of the Second Lien Collateral that occurred over the course of these cases.

11.  In what should just be a contained (and mostly mathematical) debate about whether the Opening 2L Collateral Value exceeded the Ending 2L Collateral Value plus the

7

Credit Bid Amount, the Debtors and the Creditors' Committee instead engage in a smoke-and-mirrors campaign in which they:

- Conflate a going-concern valuation with a liquidation analysis;

- Conflate a net orderly liquidation of the Second Lien Collateral with a "day one" fire-sale liquidation that was never even considered by the Debtors;

- Conflate the alleged value of the Second Lien Collateral as one part of the comprehensive Transform Sale in February with the value of discrete value of that specific collateral at the Petition Date, a full four months earlier;

- Conflate the efforts that would be necessary to preserve and dispose of the Second Lien Collateral with the efforts the Debtors chose to undertake to sell the entirety of the assets purchased in the Transform Sale;

- Conflate expenses chargeable under section 506(c) of the Bankruptcy Code with expenses unrelated to the Second Lien Collateral that the Debtors would simply rather have someone else pay; and

- Conflate the bargained-for rights and obligations of ESL as buyer of substantially all of the Debtors' assets in the Transform Sale with the bargained-for adequate protection rights of all Second Lien Lenders with respect to the Second Lien Collateral.

12. Once one looks beyond these obfuscations, it becomes clear that the Debtors have failed to allege any facts or law that would justify denying the 507(b) Claims made by the Second Lien Parties—or even try to calculate in any honest manner the basic components of the diminution in value equation. Among other things, the Debtors have failed to: provide any credible evidence of the fair market value of the Opening Shared Collateral on the Petition Date; honestly calculate the Opening 1L Debt Amount; or assay anything at all about the Ending 2L Collateral Value.

13. The Debtors' Opposition also lays bare the Debtors' intentional misconstruction of what expenses are potentially surchargeable under Section 506(c) of the Bankruptcy Code. The Debtors readily admit that their calculation of the 506(c) Surcharges "reflects . . . the rigorous sale process and efforts to sell the company as a going concern." *Supplemental*

*Declaration of Brian J. Griffith* ¶ 18, June 27, 2019 [Dkt. No. 4382]. In doing so, the Debtors expose their fundamentally flawed notion that the entire going concern sale process was a reasonable, necessary cost of preserving or disposing of the Second Lien Collateral. This is demonstrably false. The going concern sale clearly was the Debtors' chosen vehicle for preserving jobs, bundling and selling real estate, intellectual property, and other assets and business lines, and negotiating for the assumption of hundreds of millions of dollars of liabilities. And that decision by the Debtors (and its independent board committees) may well have been an appropriate exercise of their fiduciary duties to maximize overall estate value. But, it absolutely was *not* the *only* means by which the Debtors could have disposed of the receivables and inventory that comprised the Second Lien Collateral. The Debtors knew from the outset of the cases (and presumably even well before that) that they could readily dispose of their retail inventory through GOB sales with liquidators; the fact that they *chose* instead to pursue a comprehensive going concern sale for the benefit of the estates as a whole was a function of *choice*, not *necessity*—and absent necessity, Section 506(c) cannot be invoked.

14. Notably, the Debtors' abject failure on this point is highlighted by the astonishing assertion in the Debtors' Opposition (which is completely contrary to the controlling authority interpreting section 506(c)) that "all professional fees incurred by these estates relating to the diminution in value (if any) as raised by the Second-Lien [sic] Holders should undoubtedly be borne by the Second Lien Holders as part of the section 506(c) surchargeable expenses." *See* Debtors' Opposition ¶ 3 n.11, June 27, 2019 [Dkt. No. 4381]. Also, the Debtors' DIP reporting shows that billions of dollars of the Second Lien Collateral were liquidated during the cases, and the Debtors used the proceeds to pay over $1.7 billion in operational and capital expenses.

**Fundamental Defects in the Debtors' Opposition**

15. In addition to the arguments set forth in the Common Reply, Cyrus writes separately to highlight the following fundamental defects in the Debtors' Opposition and the analysis underlying the same. As an overarching matter, the Supplemental Griffith Declaration, on which the Debtors' Opposition relies, contains one unsupported and unsubstantiated assertion after another, providing only three citations over twenty-five paragraphs of testimony.

16. The Supplemental Griffith Declaration baldly asserts that "cash is not Collateral of the Second-Lien Holder." *Supplemental Griffith Decl.* ¶ 16. This incorrect statement is belied by even a cursory reading of the applicable security documents. As would be expected, the grant of security to the Second Lien Holders included not just "Inventory" and "Credit Card Accounts Receivable" but also "to the extent not otherwise included, all Proceeds . . . and products of any and all of the foregoing . . . ."[4] Any cash that the Debtors received "upon the sale, lease license, exchange or other disposition" or was "collected on, or distributed on account of" of the Debtors' Inventory and Credit Card Accounts Receivable constitutes Proceeds under the UCC and is Second Lien Collateral.[5]

17. Similarly, without analysis or citation, Griffith asserts that "pharmacy scripts and pharmacy receivables . . . are not Second-Lien Collateral." *Supplemental Griffith Decl.* ¶ 17. This too is wrong. The prescription drugs that the Debtors sold were Inventory under and as defined in the Second Lien Security Agreement and thus part of the Second Lien Collateral. Pharmacy receivables are then clearly proceeds of such inventory and included in the grant of

---

[4] *See* Amended and Restated Security Agreement Among Sears Holding Corporation, and Certain of Its Subsidiaries, as Grantors and Wilmington Trust, National Association, as Collateral Agent, Sears Holdings Corp., Current Report (Form 8-K) Ex. 10.2, at ¶ 2.1 (Mar. 20, 2018) (the "Second Lien Security Agreement").

[5] N.Y. U.C.C. Law § 9-102(64).

Second Lien Collateral.  Finally, the grant in the Second Lien Security Agreement includes the Debtors' books and records pertaining to the Collateral.  Since the pharmacy scripts are books and records related to the Debtors' prescription drug inventory, they are also part of the collateral granted in the Second Lien Security Agreement.

18.     The Supplemental Griffith Declaration also asserts, without any analysis or citation, that the Murray Report "fails to account for administrative expenses not included in the NOLV value [sic], such as actual corporate overhead, professional fees, DIP-related financing fees, severance obligations, WARN Act obligations, as well as other costs." *Supplemental Griffith Decl.* ¶ 16.  While these expenses might be borne by the Debtors' estates in a liquidation, could affect an enterprise valuation, and, if allowed, would need to be satisfied in full in cash under a plan, the Debtors have failed to allege how they are relevant to a valuation of the Second Lien Collateral, whether on an NOLV basis or otherwise.  These types of overhead costs are not attributable to the specific assets that constitute the Second Lien Collateral and are not surchargeable under section 506(c) either.

19.     Furthermore, this is not a case where the Second Lien Holders are receiving a windfall.  To the contrary, in addition to the consideration the Debtors received in the going-concern Transform Sale, during the course of the cases the Debtors received more than $3.3 billion from their sale of Second Lien Collateral.  While $1.1 billion of this cash was used to purchase additional inventory (and thus became additional Second Lien Collateral), $1.7 billion of the proceeds of the Second Lien Collateral was used to pay the Debtors' operating and capital expenses.  Any consideration of the appropriateness of a 506(c) surcharge must first reflect the reality that the Second Lien Collateral has already effectively been surcharged by the Debtors'

use of proceeds of the Second Lien Collateral to fund their operating and other expenses during these cases leading up to the Transform Sale.

20.     The Supplemental Griffith Declaration also asserts, without basis or citation, that "the entire $395 million aggregate Letters of Credit obligation" should be included in calculating the Opening 1L Debt Amount that sat senior to the Second Lien Holders as of the Petition Date. *Supplemental Griffith Decl.* ¶ 17. Griffith ignores the fact that there were no outstanding reimbursement amounts owed by the Debtors on account of such Letters of Credit as of the Petition Date. However, it is unclear whether any (much less all) of the Letters of Credit would ever be drawn—and if so whether the funds would subsequently be returned to the banks that had issued such Letters of Credit.[6] This is especially true where the Letters of Credit were not used to purchase merchandise but were largely used as utility deposits or to backstop obligations in connection with Customs bonding requirements or workers compensation schemes. Since these claims would cease accruing if the Debtors were to conduct an orderly liquidation, there is no basis to assume that the Letters of Credit would all be called, or if called would not see the funds returned to the applicable First Lien Lenders. Finally, with the benefit of hindsight, we already know that, in fact: (a) only a *de minimis* amount was drawn under the Letters of Credit during the cases; and (b) the Debtors were relieved of their contingent obligations to reimburse the Letters of Credit when Transform assumed those obligations under the APA. In short, including the face amount of undrawn Letters of Credit in the Opening 1L Debt Amount is

---

[6] *See, e.g.*, Notice of Filing of Final Wind Down Budget at 3, In re Linens Holding Co., No. 08-10832 (Bankr. D. Del. May 2, 2008) [Dkt. No. 4489] (projecting that all $23 million of workers compensation letters of credit would be undrawn allowing the cash collateral supporting such letters of credit to return to the estate).

nothing more than a transparent attempt by the Debtors to try to deflate the valid section 507(b) claims of the Second Lien Parties.

21. Finally, the Supplemental Griffith Declaration and the Debtors' Opposition both assume that the alternative to the going-concern sale of approximately 425 stores would be a fire-sale liquidation conducted in chapter 7. This approach is contrary to not only the vast majority of liquidating retailer cases (where liquidation occurs in an orderly fashion in chapter 11 under the guidance of expert professional liquidators), but also to the Debtors' very own vast experience in liquidating 120 stores over the course of the cases and hundreds more in the years prior to the bankruptcy. It is exactly such an orderly liquidation of the Debtors' retail inventory that was the most likely alternative to a going-concern sale, the only alternative that the Debtors' board considered as their alternative to a going concern sale, and in fact is what occurred the Second Lien Collateral that was located at the 120 liquidating stores. Against that backdrop, the notion that a chapter 7 fire sale liquidation was ever a possibility in these cases is absurd. Historically, Sears realized a retail price for its inventory that constituted 138% of cost (although less than the full retail price marked on the goods) and it is assumed that the gross liquidation value of the Inventory would similarly be above cost. Only after deducting the direct costs of liquidation to get the NOLV is the value less than cost.

**Fundamental Defects in the Committee Joinder**

22. The Committee Joinder contains repeated allegations that Cyrus "forcefully advocated against a liquidation" and in favor of a going concern sale to ESL. Committee Joinder ¶ 6. Notably, the Creditors' Committee cannot point to a single court filing or statement on the record by Cyrus taking either of those positions. Cyrus has not been shy about filing papers and appearing in this Court when it had had views to espouse, but Cyrus has never advocated in these

cases for or against a liquidation or for or against a going concern sale. Put simply, the Creditors' Committee has nothing to support its bluster about Cyrus "forcefully advocating" any preference between going concern and liquidation alternatives.

23.     The most the Creditors' Committee can do is to point to Cyrus' decision to provide the Debtors the Junior DIP, and subsequently to agree to roll that Junior DIP over to Transform in connection with the Transform Sale. Despite the Committee's uninformed suppositions, neither of these actions by Cyrus were motivated by a desire to see a going concern sale to ESL.

24.     Cyrus' decision to put up the Junior DIP was driven not by a desire to finance the Debtors through to a sale to ESL, but rather to protect itself from being primed by a different Junior DIP lender. Cyrus ultimately only stepped up to provide the Junior DIP after the Debtors had negotiated and sought approval of a Junior DIP with Great American. The choice Cyrus was faced with was not between a liquidation and a going concern; the choice was between being subordinated to a DIP being provided by a third-party and providing that DIP itself. Like most incumbent prepetition secured lenders, Cyrus chose not to permit a third party lender to intercept its collateral with a priming DIP loan.

25.     Moreover, at the time the Junior DIP was approved, that Junior DIP was not earmarked as financing to get to a sale to ESL. In seeking approval of the Junior DIP, the Debtors themselves made clear that "even if the Debtors pivot to a liquidation, the $350 million in incremental liquidity to be provided by the Junior DIP Financing is critical to see the Debtors through liquidation, fund going out of business sales, and send a message to the market that the Debtors have sufficient capital." *Declaration of Robert A. Riecker in Support of Debtors' Omnibus Reply* ¶ 14, Nov. 23, 2018 [Dkt. No. 866] (the "Riecker Declaration"). Thus, the Junior

DIP, and Cyrus as the Junior DIP lender, were completely agnostic as to liquidation versus going concern sale.

26. Likewise, Cyrus' decision to roll the Junior DIP to Transform as part of the Transform Sale was not because Cyrus favored that sale, but rather because it provided Cyrus with a better, more direct ability to obtain repayment of the Junior DIP. Cyrus' decision was simple: roll the Junior DIP over to Transform, a newly formed and capitalized entity not in bankruptcy, or leave the Junior DIP with the Debtors and face the uncertain prospects of collecting on the Junior DIP in a messy, contested and litigious bankruptcy case that, at that point (*i.e.*, following a failed sale to Transform), would almost certainly be headed for liquidation. As an experienced credit provider, that decision was relatively simple and not at all driven by any affinity for ESL.

## Conclusion

27. Allowance of the Section 507(b) Claims does not need to be a roadblock to confirmation or consummation of a plan in these Cases. As the Court is aware, ESL has agreed to specific limitations and conditions regarding its Section 507(b) Claim that provide the Debtors with flexibility in crafting a confirmable plan. Similarly, Cyrus is willing to work with the Debtors to negotiate a treatment of its Section 507(b) Claim that will protect Cyrus' interests while also allowing the Debtors to confirm and consummate a plan and bring these chapter 11 cases to a close. The Court should make its determination of the Section 507(b) Claims and any Section 506(c) Surcharge amounts on a level playing field, unencumbered by any suggestion that Cyrus is simply seeking to block plan confirmation.

[Remainder of Page Intentionally Blank]

| | |
|---|---|
| Dated: July 3, 2019<br>New York, New York | **MILBANK LLP**<br><br>By:   /s/ DRAFT<br><br>Eric R. Reimer (admitted *pro hac vice*)<br>Thomas R. Kreller (admitted *pro hac vice*)<br>Robert J. Liubicic<br>2029 Century Park East, 33rd Floor<br>Los Angeles, CA 90067<br>Telephone: (424) 386-4000<br><br>Brian Kinney<br>55 Hudson Yards<br>New York, New York 10001<br>Telephone: (212) 530-5000<br>Facsimile: (212) 530-5219<br><br>*Counsel to Cyrus Capital Partners, L.P.* |