Edward M. Fox
Steven Paradise
Owen Wolfe
Seyfarth Shaw LLP
620 Eighth Avenue
New York, NY  10018
Telephone:  (212) 218-4646
Facsimile:  (917) 344-1339
Email:  emfox@seyfarth.com

*Attorneys for Wilmington Trust, National Association,*
*as indenture trustee and collateral agent*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| | ) Case No. 18-23538 (RDD) |
| SEARS HOLDINGS CORPORATION, *et al.,* | ) |
| | ) (Jointly Administered) |
| Debtors.[1] | ) |

**SUPPLEMENTAL REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
THE REQUEST OF WILMINGTON TRUST, NATIONAL ASSOCIATION, AS
INDENTURE TRUSTEE AND COLLATERAL AGENT FOR PAYMENT OF AN
ADMINISTRATIVE EXPENSE PURSUANT TO 11 U.S.C. § 503(a) WITH PRIORITY
OVER ALL OTHER ADMINISTRATIVE EXPENSES PURSUANT TO 11 U.S.C.
§ 507(b) AND FOR ALLOWANCE OF A SECURED CLAIM TO THE EXTENT
OF REMAINING COLLATERAL PURSUANT TO 11 U.S.C. § 506(a) (CORRECTED)**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company LLC (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365) (collectively, the "Debtors").  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

Wilmington Trust, National Association, as indenture trustee and collateral agent ("Wilmington Trust")[2] submits this Supplemental Reply Memorandum of Law in Further Support of the Request of Wilmington Trust, National Association, as Indenture Trustee and Collateral Agent for Payment of an Administrative Expense pursuant to 11 U.S.C. § 503(a) With Priority Over All Other Administrative Expenses Pursuant to 11 U.S.C. § 507(a) and For Allowing of A Secured Claim to the Extent of Remaining Collateral Pursuant to 11 U.S.C. § 506(a).

## INTRODUCTION

The Debtors' position in its Opposition Brief[3] that holders of Prepetition Second Lien Obligations are not entitled to a superpriority claim is premised on the assertion that Inventory should be valued at the Petition Date at 85% of book value because the Inventory was sold to ESL for 85% of book value.  The Debtor's position is based on the completely incorrect assertion that ESL paid $1,408,450,000 for Inventory valued at $1,657,000,000 under the Asset Purchase Agreement.[4]

Under the terms of the APA, however, Transform paid the Debtors total consideration of $5.2 billion for substantially all of the Debtors' assets.  There was no allocation of the purchase price under the APA towards any particular assets.  Thus, there is no basis for the Debtors or

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Supplemental Memorandum of Law of Wilmington Trust, National Association, as Indenture Trustee and Collateral Agent, (I) In Support of Motion Pursuant to Bankruptcy Rule 3012 for Determination of Amount of Secured Claim Pursuant to 11 U.S.C. § 506(a) and Amount of Claim Entitled to Priority Pursuant to 11 U.S.C. § 507(b) and (II) In opposition to Debtors' Motion Pursuant to 11 U.S.C. § 506(c) (the "Wilmington Trust Supplement" [Dkt. No. 4280].

[3] Debtors' (I) Opposition to Second-Lien Holders' Requests to Determine Amount of Second Lien Secured Claims Under Section 506(a) and Section 507(b) Administrative Claims and (II) Reply in Support of Debtors' Rule 3012 Motion to Determine the Amount, If Any, of 507(b) Claims and to Surcharge Second-Lien Collateral Pursuant to Section 506(c) (the "Opposition Brief").  [Dkt. No. 4381].

[4] Asset Purchase Agreement dated as of January 17, 2019 by and among Transform Holdco LLC ("Transform"), Sears Holdings Corporation and Its Subsidiaries Party thereto (the "APA").

their witness, Brian Griffith ("Griffith"), to assume or assert that the $1,408,450,000[5] of cash

paid under the APA as part of the $5.2 billion of total consideration for the Debtors' assets,

should be attributed to the Inventory.

Nevertheless, the Debtors now contradict their express position taken at the hearing on

approval of the APA on February 7, 2019 (the "Sale Hearing") that the $3.9 billion consideration

under the APA, other than the $1.3 billion of credit bids, was attributable to unencumbered

assets, and make other unavailing arguments, in an effort to avoid allowance of a Superpriority

Claim.

## ARGUMENT

### A.    The Debtors' Valuation Arguments Are Incorrect

#### 1.    The $1.408 Billion Cash Amount Cannot Be Allocated to the Inventory and Receivables

According to Griffith, pursuant to Section 10.9 of the APA, the Debtors delivered

Inventory and accounts receivable (the "Receivables") to Transform in an aggregate amount of

$1.657 billion in return for a "purchase price paid by ESL for such inventory and accounts

receivable excluding store cash and credit bid consideration [of] approximately $1.408 billion, or

85% of the required inventory and receivables combined."  Griffith 6/27/19 Dec'l[6] ¶ 7.  The

Debtors buttress Griffith's assertion in footnote 6 of their Opposition Brief, stating that "Pursuant

to section 3.1(a)(1) [of the APA], the purchase price paid by ESL for such inventory and

accounts receivables, excluding store cash and credit bid consideration, was approximately

$1.408 billion, or 85.0% of the required inventory and receivables combined."  Opposition Brief

---

[5] Pursuant to Section 3.1 of the APA, the $1,408,450,000 cash payment would not have actually been paid in the full amount as it was reduced by certain amounts.

[6] Supplemental Declaration of Brian J. Griffith in Support of the Debtors' (I) Opposition to Second-Lien Holders' Requests to Determine Amount of Second-Lien Secured Claims Under Section 506(a) and Section 507(b) Administrative Claims and (II) Reply in Support of Debtors' Rule 3012 Motion to Determine the Amount, If Any, of 507(b) Claims and to Surcharge Second-Lien Collateral Pursuant to Section 506(c) (the "Griffith 6/27/19 Dec'l").

at 3, n. 6.  Thus, it is clear, that Griffith's 85% is derived by reference to the $1,408,450,000 cash payment set forth in section 3.1(a)(i) of the APA.

Griffith's assertion that the $1,408,450,000 cash payment amount is the purchase price for the Inventory and Receivables, however, is wrong.  First, there is no allocation of the purchase price under the APA.  Consequently, Griffith has no basis on which to allocate the $1,408,450,000 cash payment to the purchase of Inventory and Receivables.  Indeed, the Debtors announced in open court that they had waived the allocation provision of the sale procedures order.

> THE COURT: . . .  One of the provisions of the sale procedures order, all of which are waivable in the exercise of fiduciary duties, is to require qualified bidders to provide an allocation of what they're -- what assets they're paying what for.  It's uncontroverted that ESL did not do that.  I have traditionally viewed --
>
> MR. SCHROCK:  We waived it, Your Honor.
>
> THE COURT:  You waived that condition?
>
> MR. SCHROCK:  We did.

Hearing Transcript, February 7, 2019 ("Sale Tr.") 47:2-12.

Moreover, the Debtors conceded at the hearing on February 7, 2019 on approval of the APA (the "Sale Hearing") that the only value attributable to the Inventory and Receivables under the APA was the credit bid of $433,500,000 and that all of the rest of the consideration was provided for unencumbered assets.

> MR. SCHROCK: . . .  The credit bid is $1.3 billion. Everything else here, Your Honor, payment of claims that are senior to unsecured creditors.  Okay, those all have to be paid regardless of whether or not we're here, we're in winddown --
>
> THE COURT:  So just to cut through it, just to do the math, you're saying that basically it's the total value of the ESL deal is $5.2 billion if you subtract a billion three from that --.

MR. SCHROCK:  That's right.

THE COURT:  there's $3.9 billion of value provided for the unencumbered assets.

MR. SCHROCK:  That's right.

Sale Tr. 46:3-15.  Consequently, there is simply no basis for the Debtors or Griffith to assert that the Inventory and Receivables were sold under the APA for 85% of book value.

**2.      The Debtors' Inventory and Receivables Are Not Properly Valued at 85% of Book Value At The Petition Date**

Moreover, even if Griffith's 85% of book value number was correct, there is no basis for Griffith to assert that the Debtors' Inventory and Receivables should be valued at the Petition Date at 85% of book value.  The Debtors cannot and do not dispute that as of the Petition Date, they were operating the majority of their stores as Going Concern Stores selling Inventory at retail.  Consequently, that is the appropriate basis on which to value the Inventory as of the Petition Date as Wilmington Trust's and ESL's experts do.  In re Residential Capital, LLC, 50 B.R. 549, 603 (Bankr. S.D.N.Y. 2013).  Consequently, the Debtors' Inventory must be valued at retail value as of the Petition Date, not 85% of book value.

**3.      Liquidation Value Is Not A Benchmark For Determining Value As Of The Petition Date**

Griffith also argues that an implied 85% of gross book value "far exceeds the value that would have otherwise been obtained in either a winddown or a liquidation scenario."  Griffith Dec'l ¶ 8.  But this assertion is neither true nor relevant.  The Debtors neither intended to, nor did, liquidate.  They intended to operate as a going concern except with respect to the GOB Stores, and did so for four months, selling billions of dollars' worth of inventory at retail, before selling themselves, as a going concern, to ESL.

From the outset of the case, the Debtors intended to maintain the Debtors as a going

concern.  In his First Day Declaration, the Debtors' Chief Financial Officer, Robert Riecker,

stated:  "The Debtors believe that there is a viable path forward for a reorganization around a

smaller footprint of profitable stores."  Declaration of Robert A. Riecker Pursuant to Rule 1007-2

of Local Bankruptcy Rules for Southern District of New York ¶ 15 [Dkt. No. 3].

Similarly, at the First Day Hearing on October 16, 2019, Debtors' counsel, Ray Schrock,

stated

> So it's definitely -- it's a very tough day for the company, but
> we'd like to think that we have a plan that gives Sears a chance
> to reorganize around a smaller footprint and a chance for,
> importantly, many tens of thousands of jobs to be saved.

October 16, 2018 Hearing Transcript ("10/16/18 Tr.") 24:11-16.

Consequently, the appropriate valuation metric for inventory at the Petition Date is retail

value, which is how the Debtors were selling their inventory in their Going Concern Stores.

Associates Com'l Corp. v. Rash, 520 U.S. 953, 963, 117 S. Ct. 1879, 1886 (1997).

Moreover, even at their GOB Stores, the Debtors recovered a higher percentage of book

value on their Inventory, net of selling costs, than Griffith's 85%.[7]  Consequently, there is no

reason to give any credence to the 85% valuation that Griffith asks the Court to accept.  Indeed,

Griffith's assertion that in a liquidation, "inventory floods the market" and there are

complications of "vendor flight" are overblown and nonsensical.  The Debtor only had 628

stores throughout the entire United States at the Petition Date and the stores are geographically

dispersed.  Consequently, the prospect that GOB sales would "flood the market" is unlikely and

did not appear to have any adverse effect on the Debtors' liquidation results at its 262 GOB

Stores.  Nor would "vendor flight" be an issue in a liquidation because the Debtors would not be

---

[7] The GOB Stores net recovery percentage is set forth in the Henrich Report (as hereinafter defined) (under seal).

purchasing new merchandise. Moreover, receivables are not likely to be uncollectible because going out of business sales require payment for merchandise in cash or by credit card. Thus, unquantifiable assertions of "certain" uncollectible receivables are farfetched.

### 4.    Griffith Previously Stated A Higher Collateral Value

Although the Debtors and Griffith now assert that the Total Gross Collateral at the Petition Date was $2.746 billion, Griffith 6/27/19 Dec'l ¶ 7. In the Declaration of Brian Griffith in Support of Debtors' Objection to Motion of Wilmington Trust, National Association, as Indenture Trustee and Collateral Agent to Prohibit or Condition Debtors' Continued Use of Collateral, Including Cash Collateral, dated April 15, 2019 (the "Griffith 4/15 Dec'l") [Dkt. No. 3198], however, Griffith stated that "the Debtors had no more than approximately $2.88 billion of collateral available to secure the first and second lien debt senior to the Second Lien 2019 Notes." Griffith assumed in the Griffith 4/15 Dec'l, that $2.99 billion of funded debt was outstanding under the Debtor's first lien and second lien debt facilities senior to the Second Lien Notes. But Griffith incorrectly included $395 million of undrawn, standby letters of credit in his calculation of the Debtors' outstanding first and second lien debt facilities. Excluding those undrawn, Standby LC's, which had no call on the Second Lien Collateral, the Debtors' first and second lien debt senior to the Second Lien Notes was $2.596 billion by Griffith's analysis, leaving the Second Lien Notes fully collateralized at the Petition Date and entitled to a Section 507(b) claim in the full $91,950,191.25[8] amount owing on the Second Lien Notes.

---

[8] Although the total 507(b) claim sought is $730,386,222.97, if the $50,000,000 cap on ESL's portion of the 507(b) claim applies, the total 507(b) claim payable is approximately $258.3 million.

**5.**     **Griffith's Criticisms of the Second Lien Parties' Experts Are Unfounded**

Griffith also asserts that it was unreasonable for Wilmington Trust's expert, William

Henrich,[9] and the Second Lien Parties' other experts, to exclude "$395 million letters of credit"

from the amount payable out of the collateral to the First Lien because "[i]n a liquidation

scenario, letters of credit are almost always fully drawn or fully cash collateralized . . . ."

Griffith ¶ 13.  But the Debtors were not in a liquidation scenario at the Petition Date and did not

intend to be.  Accordingly, Griffith's invitation to assume a liquidation scenario, with a

concomitant draw on Standby LCs that never happened, should be rejected.

Griffith's only other criticism of the Henrich Report is that it values the collateral at the

Petition Date at a  significantly higher value than the other reports "by grossing up the value of

the inventory in excess of Mr. Schulte's highly inflated valuation."  Griffith  Dec'l ¶ 15.  Griffith

does not dispute that the Gross Margin Henrich uses is taken directly from the Debtors' Gross

Margin assumptions of Griffith's employer, M-III, however.

As for his comparison of Henrich's Report with the other expert's reports, Griffith

ignores that fact that the Murray report used book value of inventory "at a minimum" because

even at that minimal valuation, Cyrus was fully secured at the Petition Date so there was no need

for Murray to go further.  Similarly, Schulte concluded that the net margin of 0.7% at the

Debtors four wall EBITDA[10] positive Going Concern Stores was sufficiently close to Book

Value, and was, by definition of EBITDA, net of selling costs, that it was simply easier to base

his conclusions on book value.  Consequently, Griffith's purported comparisons are not well

founded.

---

[9] Henrich's analysis assumes that $271 million of undrawn, stand-by letters of credit would not be drawn.

[10] EBITDA means earnings before interest, taxes, depreciation and amortization and, by definition, is net of selling costs.

57841237v.2

B.     **The Debtors Fail to Justify Their Proposed 506(c) Surcharges**

1.     **Only Collateral Benefitted Can Be Surcharged**

Griffith again asserts that "the Debtors incurred $1.451 billion in administrative expenses

in their efforts to preserve the value of the Second-Lien Holders' Collateral," Griffith 6/27/19

Dec'l ¶ 18, but he again provides no detailed analysis that establishes what the $1.451 billion

consists of or how it was spent to preserve collateral of the holders of Prepetition Second Lien

Obligations and he admits that not all of the $1.451 billion was spent to preserve the Inventory

and Receivables.

Griffith first tacitly acknowledges this when he states "all expenditures made by the

Debtors after the decision was made to pursue a going concern sale, were made to preserve the

value of the collateral eventually sold to ESL pursuant to the APA."  Griffith 6/27/19 Dec'l ¶ 20.

But not all of the collateral eventually sold to ESL pursuant to the APA was collateral securing

the Prepetition Second Lien Obligations.  All of the assets sold to Transform under the APA

were collateral for the repayment of some debt, but most of it was not collateral securing the

Prepetition Second Lien Obligations.

Indeed, Griffith then explicitly acknowledges that collateral other than Inventory and

Receivables securing the Prepetition Second Lien Obligations benefitted from the sale process.

> Admittedly, the Sale did prevent a substantial number of
> administrative claims; but, benefits would only accrue to the
> other junior stakeholders if unencumbered assets were to
> materialize.  Further still, ESL is the primary beneficiary of
> increased recovery  in the Secure Real Estate Loans (Note A &
> Note B) and IP/Ground Lease Term Loan as the majority holder
> in each facility.

Griffith 6/27/19 Dec'l ¶ 23.  Apparently, Griffith believes it is appropriate to surcharge the

Inventory and Receivables securing the Prepetition Second Lien Obligations for the costs of the

case because, even if the Inventory and Receivables did not benefit from such expenditures,

some other collateral that ESL had a lien on did benefit.  The Debtors, however, can only

"recover from property securing an allowed secured claim for the reasonable, necessary costs

and expenses of preserving, or disposing of, <u>such</u> property to the extent of any benefit to the

holder of such claim . . . ." 11 U.S.C. § 506(c).  Consequently, the Debtors cannot surcharge the

Inventory and Receivables which ESL happens to have an interest in just because ESL had a lien

in other collateral that was preserved or disposed of by the Debtors.

Moreover, it would be manifestly unjust to do so because holders of tens of millions of

dollars of Prepetition Second Lien Obligations secured by the Inventory and Receivables have

nothing to do with ESL and should not be required to bear the costs of preserving other property

on which they do not have a lien.  Neither ESL (nor Cyrus) appear to hold any of the

$89,002,000 in principal amount of the Second Lien Notes and there is no reason why the

Inventory and Receivables securing the Second Lien Notes should be surcharged because of

benefits allegedly provided by the Debtors to other collateral securing other obligations owed to

ESL.

**2.      Griffith's Criticisms of the Experts Concerning 506(c) Costs Are Unfounded**

Griffith criticizes Murray and Schulte for not acknowledging any 506(c) costs

attributable to the Inventory and Receivables and criticizes Henrich for conceding an insufficient

amount of such costs.  Griffith fails to understand, however, that Murray relied, in her report, on

Net Orderly Liquidation Value which, by definition, is net of the costs of liquidation.  Similarly,

Schulte relied on Book Value as a proxy for four wall EBITDA of the Going Concern Stores

which, by definition, is also net of selling costs.  Henrich started with book value adjusted by the

Gross Margin assumed by the Debtors.  Because Henrich's starting point was a gross number,

rather than a net number as used by Murray and Schulte, he then subtracted, based on his

judgment and experience and on the Debtors' financial information, over $650 million of selling, overhead and other costs before reaching his net value for the Inventory and Receivables at the Petition Date. Although Griffith asserts this was not enough, he fails to explain why or provide any support for his assertions.

### 3.    The Going Concern Sale Was For the Debtors' Benefit

The Debtors assert that because the Going Concern sale was for the primary benefit of the holders of Prepetition Second Lien Obligations, they are not entitled to a Superpriority Claim, but this is simply untrue. Indeed, the Sale Transaction was structured to cause $3.9 billion of the $5.2 billion total consideration owing under the APA, or 75% of the total consideration, to be diverted to creditors who are junior to the holders of the Prepetition Second Lien Obligations.

At the hearing on January 18, 2019, Debtors' counsel, Mr. Schrock, announced that the Debtors had declared ESL the successful bidder for the sale of substantially all Debtors' assets and noted, importantly, that the transaction was in the Debtors' best interests:

> This is an extremely important moment for Sears and its 45,000 employees, and the restructuring committee has worked extremely hard to come to the right decision for the benefit of all stakeholders. We completely understand that not everybody is going to agree with the company's decision, but we do believe firmly that this is in the estate's, the company's, and all stakeholders' best interests, and we've come to the best result possible for all concerned.

Transcript of January 18, 2019 Hearing, 12:8-16.[11]

---

[11] At the sale procedures hearing on November 15, 2018, the Debtors counsel, Mr. Schrock, described ESL's activity in connection with a possible transaction and defended considering a transaction with ESL:

> ESL has also been busy during this time. They've been sending inquiries, diligence inquiries, they've been talking to other parties. We've produced, I think, well over 150,000 pages, the Debtors have, in the course of the restructuring subcommittee's investigation. But there's a tremendous amount of activity on the ESL front.

> I know that it's easy to cast aspersions, sometimes, and you see that in the paper around the company's major shareholder, but whether people like it or not, ESL, they're the

57841237v.2

In describing the terms of the sale, the Debtors' investment banker, Brandon Aebersold of Lazard Frères & Co. LLC stated:

> Pursuant to the Successful Bid, ESL has agreed to commit the following as consideration in order to purchase the Debtors' assets and operations:  (i) a cash payment of $885 million; (ii) a credit bid of secured debt facilities totaling $1.3 billion; (iii) an assumption of secured debt totaling $621 million; and (iv) an assumption of administrative liabilities, including for severance obligations and other employee claims, Section 503(b)(9) claims, and post-petition accounts payable and property taxes, of up to $482 million. In addition, the Successful Bid provides the additional benefits to the Debtors of (i) including offers of employment to tens of thousands of employees, (ii) assuming an additional $1 billion of "protection agreement" liabilities related to consumer warranties sold by Sears Home Services, (iii) taking on cure cost obligations associated with assumed contracts, (iv) honoring approximately $81 million of "Shop Your Way" points, gift cards and other customer liabilities, and (v) purchasing up to $17 million of in-store cash.

Declaration of Brandon Aebersold dated February 1, 2019, ¶ 37, [Dkt. No. 2335].

Alan Carr, an independent director of Sears Holdings Corporation, a member of its Restructuring Committee and of its Restructuring Subcommittee stated that "The sale of Sears as a going concern, which includes providing ESL with the Limited Release, offers a greater financial benefit to the Debtors than a wind-down of the Debtors' business." Declaration of Alan J. Carr in Support of Restructuring Subcommittee's Response to the Objection of the Official Committee of Unsecured Creditors to the Sale of Substantially All of the Debtors' Assets to ESL Investments, Inc., executed February 1, 2019 [Dkt. 2321].  William L. Transier, also an independent director and a member of the Restructuring Subcommittee stated:

---

single largest creditor in these cases.  They've loaned the company billions of dollars, and they continue to support the company's operations, and the Restructuring Committee's view is that, listen, if there's a buyer and they can save tens of thousands of jobs, we have an obligation to look at this and look at it very seriously and that's what we're doing.

Transcript of November 15, 2018 Hearing, 29:10-25.

> [W]e approved the Successful Bid because in our business
> judgment, it would maximize value for the estates and their creditors.

Declaration of William L. Transier dated February 1, 2019 [Dkt. No. 2341].

At the hearing on approval of the APA on February 7, 2019, Debtors' counsel,

Mr. Schrock, noted that "the benefits of the sale transaction really do significantly outweigh an

orderly winddown."  February 7, 2019 Hearing Transcript ("2/7/19 Tr."), 48:15-17.

Moreover, Mr. Schrock described the benefits that "ESL and Transform Co. are

providing":

> I think it's worth reiterating just looking at what ESL and
> Transform Co. are providing.  They're committing approximately
> $5.2 billion in the form of cash and noncash consideration including a
> cash payment of approximately $885 million.  There's a credit bid
> pursuant to 363(k) of the Bankruptcy Code of secured debt facilities
> totally (sic) approximately $1.3 billion.  There's the assumption of
> $621 million of senior debt including $350 million of the amounts
> owed under the Junior DIP facility and $271 million of the stand-
> along (sic) LC facility.
>
> Those are all senior claims to general unsecured creditors.
> There's further, the assumption of certain other of the Debtors'
> liabilities in the total amount of approximately $1.3 billion including
> liabilities for warranties and protection agreements or other service
> contracts, certain customer credits to existing customer loyalty
> programs, the Shop Your Way program.  All cure costs are being
> assumed by ESL.  There's up to $43 million of certain severance
> reimbursement obligations.  There's up to $139 million of 503(b)(9)
> claims . . . .

2/7/19 Tr. 40:1-41.4.

Further, Mr. Schrock presented to the court slides entitled the "Consideration Provided by

ESL in the Sale Transaction," (true and correct copy annexed hereto as Exhibit A), and "The

Benefits of the Sale Transaction Outweigh an Orderly Winddown," (true and correct copy

annexed hereto as Exhibit B).

57841237v.2

Finally, at the sale hearing, Paul Basta, counsel to the Restructuring Subcommittee

described some of the benefits to the Debtors from the proposed sale.

> They closed the administrative insolvency gap by hundreds of
> millions of dollars. The deal provides, in our view -- when we looked
> at this, we always look at, is the going concern better than the
> winddown, not is the going concern good. It's is it -- provide a
> proportionally -- an incrementally better alternative.

> Our analysis showed that in the final bid, that third-party
> secured creditors are benefitted compared to a winddown and that's
> not including, obviously, ESL to the tune of $152 million. It's our
> analysis that general unsecured creditors that are getting assumed
> under the deal which include protection agreement and other
> consumer-related claims of $524 million are getting paid under this
> deal and they would not get paid in a winddown.

> . . . . There's a $621 million avoidance of additional
> administrative claims in a reorg versus a winddown, which we think
> is very significant and there are jobs that are being preserved.
> There's also a substantial limitation in ESL's ability to recover from
> litigation proceeds with respect to its deficiency claims.

> We negotiated so that there would be no right of ESL to share
> on any Land's End or Seritage litigation, no right of ESL to share on
> any litigation relating to any ESL misconduct, and we were able to
> cap ESL's 507(b) claim at $50 million which -- of is there's other
> non-ESL litigation recovery, their 507(b) claim is capped.

> . . . . We're getting $35 million of cash. We're getting $52
> million to third-party secured creditors. We're getting $453 million
> of assumption for protection agreement liabilities. We're getting $68
> million of assumption of Shop Your Way liabilities. We're avoiding
> $621 million of administrative expense claims. We are preserving the
> litigation against ESL and other defendants. We're getting the cap on
> "ESL recoveries and we're preserving tens of thousands of jobs.

2/7/19 Tr., 69:1-70:9, 73:12-21.

In view of all of the foregoing statements, it is clear that the Debtors' Going-Concern

Sale was hardly for the primary benefit of the Holders of Prepetition Second Lien Obligations.

The Debtors entered into the APA with Transform because the Debtors believed that it was in the

best interests of the Debtors and their estates to do so.

57841237v.2

More importantly, it is clear that the Debtors structured the Sale Transaction largely to benefit creditors who were junior to the Prepetition Second Lien Obligations. Only $433.5 million, or 8.3% of the $5.2 billion of consideration for the Sale Transaction can be attributed to the Prepetition Second Lien Obligations, and only $1.3 billion, in the aggregate, of the $5.2 billion of total consideration was attributable to credit bids, leaving the balance for payment or assumption of administrative and unsecured claims. Consequently, it can hardly be said that the sale was for the "primary"[12] benefit of the holders of Prepetition Second Lien Obligations.[13]

### 4.      The Assets Were Sold For Fair Consideration

Moreover, the Court specifically found, at the Debtors' behest, that

> The consideration to be paid by the Buyer under the Asset Purchase Agreement including, without limitation, the Credit Bid Amount (as hereinafter defined) and the Credit Bid Release Consideration: (i) constitutes fair and reasonable consideration for the Acquired Assets; (ii) is the highest or best offer for the Acquired Assets; (iii) will provide a greater recovery for the Debtors' estates and creditors than would be provided by any other practically available alternative; . . . .

Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith and (IV) Granting Related Relief (the "Sale Order"), ¶ J. [Dkt. 2507]. Accordingly, even if ESL, not the Debtors and their professionals, were the moving force behind maximizing the value of the Debtors' assets, that hardly

---

[12] "Primary" means "first in importance; chief; principal; as, a primary policy. Webster's New Universal Unabridged Dictionary, 2d ed. Dorset & Baber 1983.

[13] Indeed, it is stranger still that the Debtors and their directors, who have a fiduciary duty to maximize the value of the Debtors' estates, would even suggest that their actions with respect to the sale were taken "at the behest of ESL, supported by Cyrus and with the ability to drag along the minority Second-Lien Holders," Opposition Brief ¶ 19, rather than to maximize the value of the Debtors' estates.

57841237v.2

constitutes a basis to deny the holders of Prepetition Second Lien Obligations a superpriority claim.

The Sale Order finds that Transform paid fair and reasonable consideration for the Debtors' assets and provided the highest or best offer for them.  Consequently, neither Transform nor any of the holders of the Prepetition Second Lien Obligations can be said to have unfairly benefitted from a sale process in which Transform agreed to pay more for the Debtors' assets than any other potential buyer.  Surely this is not a situation that cries out for a court of equity to intervene, even if it could despite the mandatory nature of Section 507(b), especially since the Court has already found the sale to be fair and reasonable on the motion of the Debtors and in the face of staunch opposition by the UCC.

### 5.    The Second Lien Notes Should Not Be Adversely Affected By the Actions of Others

As the Debtors note, ESL, as the holder of a majority of the Senior Second Lien Obligations, had "the ability to drag along the minority Second-Lien Holders."  Opposition Brief ¶ 19.  Those minority holders, including holders of $89,002,000 in principal amount of the Second Lien Notes, which were outstanding long before the other Prepetition Second Lien Obligations came into existence, should not lose any rights under the Final DIP Order and Section 507(b) because of the actions of other creditors secured by the same collateral.  That would surely be inequitable and there is no basis for such a result.

The fact that holders of Prepetition Second Lien Obligations may have benefitted from the Sale Transaction, even if true, is irrelevant to the operation of Section 507(b), which is mandatory in its application.  Moreover, not all holders of Prepetition Second-Lien Obligations have received anything from the Sale Transaction.  Holders of the Second Lien Notes have received nothing to date on account of their Second Lien Notes, even though according to the

16

57841237v.2

Report of William Henrich [Dkt. No. 4279, Ex. J -- under seal] (the "Henrich Report"), the

Report of Thomas Schulte [Dkt. No. 4372] and even the Report of Marti Murray [Dkt. No.

4314], they were fully secured as of the Petition Date.  Accordingly, the Second Lien Notes are

entitled to a Superpriority Claim equal to the amount of their claim under the Second Lien Notes.

## <u>JOINDER</u>

Wilmington Trust joins in the supplemental memoranda of law filed by Cyrus and ESL in

support of allowance of a secured claim and a superiority administrative expense claim in favor

of the Prepetition Second Lien Creditor Parties, to the extent not inconsistent herewith.

## <u>CONCLUSION</u>

For the reasons set forth herein, Prepetition Second Lien Creditor Parties should be

granted an administrative expense claim, in the aggregate, in the amount of $730,386,222

including $91,950,191.25 for benefit of the Prepetition Second Lien 2010 Notes, with priority,

pursuant to 11 U.S.C. § 507(b), over all other administrative expenses, and an allowed secured

claim in the amount of the cash available to the Debtors at the confirmation of any plan, payment

of such secured claim to reduce the Superpriority Claim.


Dated: New York, New York
       July 3, 2019

                              SEYFARTH SHAW LLP

                              By: _/s/ *Edward M. Fox*_____
                                  Edward M. Fox
                                  Steven Paradise
                                  Owen Wolfe
                                  *Attorneys for Wilmington Trust, National*
                                  *Association, as indenture trustee and collateral*
                                  *agent*
                              620 Eighth Avenue
                              New York, NY  10018
                              Telephone:  (212) 218-4646

# EXHIBIT A

# Consideration Provided by ESL in the Sale Transaction

- ESL has agreed to commit approximately $5.2 billion in the form of cash and non-cash consideration, including without limitation the following:
  1. A cash payment of approximately $885 million;
  2. A credit bid pursuant to section 363(k) of the Bankruptcy Code of secured debt facilities totaling up to approximately $1.3 billion;
  3. The assumption of $621 million of senior indebtedness (including $350 million of the amounts owed under the Junior DIP Facility and up to $271 million of the Stand-Alone L/C Facility) into exit facilities, which is equivalent to cash; and
  4. The assumption of certain other of the Debtors' liabilities in the total amount of approximately $1.3 billion, including, among others:
     i. certain liabilities for warranties and protection agreements or other services contracts (other than warranties relating to certain intellectual property) for the goods and services of Sellers sold or performed prior to the closing, including any liabilities owed by Sears Re to any Seller in respect of reinsurance of such warranties and protection agreements;

18-23538-rdd Doc 1441 Filed 01/05/19 Entered 01/05/19 16:33:51 Main Document Pg 20 of 23

ii.   certain customer credits that relate to existing customer loyalty programs, including, Shop Your Way, and any gift cards, gift certificates, merchandise credits, return credits, customer membership or customer loyalty discount programs, coupons, groupons or other similar credits or programs issued by, on behalf of or in relation to Sellers since January 1, 2018;

iii.  all cure costs solely with respect to the agreements that ESL is assuming pursuant to the Asset Purchase Agreement;

iv.   up to $43 million of certain severance reimbursement obligations (which may be reduced in certain circumstances);

v.    up to $139 million of liabilities under section 503(b)(9) of the Bankruptcy Code (which may be reduced in certain circumstances);

vi.   up to $166 million in certain accounts payable (which may be reduced in certain circumstances);

vii.  payables for ordered merchandise not yet received by the Debtors;

viii. certain property taxes;

ix.   certain environmental liabilities, among other potential claims; and

x.    certain mechanic's liens totaling approximately $3.75 million.

# EXHIBIT B

# The Benefits of the Sale Transaction Outweigh an Orderly Winddown

| | Winddown | Sale Transaction |
|---|---|---|
| **Treatment** | | |
| **Debtors' Enterprise** | • GOB remaining stores<br>• Certain businesses or divisions sold in parts<br>• Orderly liquidation of remaining assets | • Sold as a going-concern |
| **Employees** | • A majority, if not all, employees will be terminated<br>• Winddown estate will face significant employee claims | • Tens of thousands of employees offered continued employment<br>• Employee claims (e.g. severance) will be minimized |
| **Protection Agreement Liabilities** | • Protection Agreements will be rejected<br>• Winddown estate will face claims arising from the Protection Agreements | • Assumption of the Protection Agreements<br>• Protection Agreement claims eliminated |
| **Avoidance Actions and Litigation Claims** | • No claims against ESL are released | • Only recharacterization, equitable subordination, and other claims affecting ESL's ability to credit bid are being released<br>• All other claims remain with the Debtors' estates |
| **Second Lien 507(b) Claims** | • Debtors' estimate up to approximately $331 million in section 507(b) claims<br>• Significant litigation in connection with such claims is expected | • Capped at $50 million from proceeds of claims or causes of action with distributions in excess of $50 million treated as an unsecured claim |
| **Vendors** | • No ongoing business relationship<br>• Significant unsecured claims arising from contract rejection, including 503(b)(9) | • Ongoing business relationship<br>• Cure costs paid by the Buyer |
| **General Claims Pool** | • Substantial | • Mitigated by ongoing operations and the assumption of cure costs, 503(b)(9) claims, and Protection Agreements |

# The Benefits of the Sale Transaction Outweigh an Orderly Winddown (cont'd)

| | Winddown | Sale Transaction |
|---|---|---|
| **Assumed Creditor Recoveries** | | |
| **Administrative and Other Priority Claims** | 100% | 100% |
| **DIP ABL Facility** | 100% | 100% |
| **Junior DIP Facility** | 100% | 100% |
| **FILO Term Loan Facility** | 100% | 100% |
| **Stand-Alone L/C Facility** | 100% | 100% |
| **Second Lien 507(b) Claims** | 41% | N/A |
| **Second Lien PIK Term Loan** | 0% | 41% |
| **Second Lien L/C Loans** | 0% | 41% |
| **Second Lien PIK Notes** | 0% | 41% |
| **Second Lien Notes** | 0% | 0% |
| **Consolidated Loans (Note A)** | 100% | 100% |
| **Consolidated Loans (Note B)** | 44% | 60% |
| **IP/Ground Lease Term Loan** | 69% | 100% |
| **General Unsecured Claims** | 0% | 1% |

[1] The assumed creditor recoveries reflect the numbers presented in the Winddown Recovery Analysis (Singh Dec. Ex. 2 to Ex. C).

[2] The Sale Transaction at its baseline provides for 96% recovery on account of administrative claims. But, the Debtors reasonably believe that under a Sale Transaction all administrative claims will be paid in full and the remaining 4% (or approximately $62 million) gap can be bridged with mitigating items such as outperformance of the DIP Budget, maintained inventory levels, etc., as more fully set forth in section III.B herein. Assuming such measures can bridge the gap, the Debtors believe the $35 million received as consideration for the Credit Bid Release will flow to general unsecured creditors. If the gap remains unfilled, the Debtors will utilize the $35 million to fill that gap rather than flowing through the waterfall to general unsecured creditors.

[3] The recovery to general unsecured claims does not take into account any recoveries on account of avoidance actions or proceeds of litigation asserted against ESL and any affiliates.