**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | Chapter 11 |
| In re: | ) | Case No. 18-23538 (RDD) |
| | ) | |
| SEARS HOLDINGS CORPORATION, *et al.*, | ) | (Jointly Administered) |
| | ) | |
| Debtors.[1] | ) | |

## DECLARATION OF THOMAS J. FLYNN SUPPORTING
## MOAC MALL HOLDINGS LLC'S FOURTH SUPPLEMENTAL OBJECTIONS
## AND REPLY TO DEBTOR'S NOTICE OF ASSUMPTION AND
## ASSIGNMENT OF ADDITIONAL DESIGNATABLE LEASES

I, Thomas J. Flynn, declare:

1.      I am an attorney and shareholder with Larkin, Hoffman, Daly & Lindgren, Ltd.  I

am one of the attorneys representing MOAC Mall Holdings LLC ("MOAC"), a landlord of

Debtor Sears, Roebuck and Co. ("Tenant") with respect to retail premises located at a mall in

Bloomington, MN, more popularly known as Mall of America®, which is, upon information and

belief, designated by Tenant as Sears Store No. 1722 ( herein referred to as the "MOAC Lease").

I am competent to testify as to the matters stated herein, which are based on my personal

knowledge.  I submit this declaration in support of MOAC's Fourth Supplemental Objections

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as
follows:  Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears
Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E
Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc.
(6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears
Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742);
Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc.
(2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp.
(0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of
Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133);
KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart
Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit
Corporation (4658); Sears Holdings Publishing Company, LLC (5554); Sears Protection Company (Florida), L.L.C. (4239);
SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge
No. 13, LLC (None); BlueLight.com LLC (None); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533);
Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate
headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

and Reply to Debtor's Notice of Assumption and Assignment of Additional Designatable Leases

(the "Objection") in these chapter 11 cases with respect to the proposed assumption and

assignment of certain leases, including the MOAC Lease, to Transform Leaseco, LLC

("Leaseco"), upon information and belief, an affiliate of Transform Holdco LLC ("Holdco")

(collectively, the "Buyer" or "Transform"), an affiliate of ESL Investments, Inc.

2.      Attached as **Exhibit A** is a true and correct copy of Debtor's Responses and

Objections to MOAC Mall Holdings LLCs' Requests for Admission from the Debtor ("Debtor's

Admissions").

3.      Attached as **Exhibit B** is a true and correct copy of Debtor's Responses and

Objections to MOAC Mall Holdings LLC's Interrogatories to the Debtor ("Debtor's Answers").

4.      Attached as **Exhibit C** is a true and correct copy of MOAC Mall Holdings LLC's

Requests for Admission from Transform Holdco LLC ("Requests for Admissions to Holdco").

5.      Attached as **Exhibit D** is a true and correct copy of MOAC Mall Holdings LLC's

Interrogatories to Transform Holdco LLC ("Interrogatories to Holdco").

6.      Pursuant to the Stipulation and Order by and among Sellers, Buyer, and MOAC

Mall Holdings LLC Extending Time Under 11 U.S.C. § 365(d)(4) for Lease of Nonresidential

Real Property, the deadline to respond to discovery requests was July 2, 2019 [Doc. No. 4354,

¶8].  Holdco failed to respond to any of MOAC's discovery requests.

7.      Attached as **Exhibit E** is a true and correct copy of email correspondence dated

June 3, 2019 regarding Buyer's plans for the leased space at Mall of America.

8.      Attached as **Exhibit F** is a true and correct copy of the Reciprocal Easement

Agreement ("MOAC REA").

[remainder of page intentionally left blank]

2.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  July 8, 2019                 Respectfully submitted,

_/e/ Thomas J. Flynn_
Thomas J. Flynn (30570)
Larkin Hoffman Daly & Lindgren, Ltd.
8300 Norman Center Drive
Suite 1000
Minneapolis, Minnesota  55437-1060
(952) 835-3800
tflynn@larkinhoffman.com

Admitted *pro hac vice* on December 26, 2018

4817-6250-1276, v. 1

3.

# **EXHIBIT A**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Sunny Singh
Jared R. Friedmann
Jessie B. Mishkin

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
:
**In re**                                                    :        **Chapter 11**
:
**SEARS HOLDINGS CORPORATION,** *et al.*,     :        **Case No. 18-23538 (RDD)**
:
**Debtors.**[1]                                              :        **(Jointly Administered)**
:
-------------------------------------------------------------x

### DEBTORS' OBJECTIONS AND RESPONSES TO MOAC MALL HOLDINGS LLC'S REQUESTS FOR ADMISSION FROM THE DEBTOR

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

Pursuant to Federal Rule of Civil Procedure 36 and Federal Rule of Bankruptcy Procedure 7036, Sears Holdings Corporation and its debtor and non-debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, "Debtors"), respectfully respond and object as follows to the Requests for Admissions (the "RFAs") issued by MOAC Mall Holdings LLC ("MOAC") to Debtors on May 17, 2019.

## RESERVATION OF RIGHTS

1.      Debtors submit these responses and objections subject to, without intending to waive, and expressly preserving:  (a) any objections as to the competence, relevance, materiality, privilege, and/or admissibility into evidence of any response herein; (b) the right to object to other discovery procedures involving or relating to the subject matter of the RFAs; and (c) the right to revise, correct, supplement or clarify the responses or any of the objections herein at any time.

2.      Debtors do not admit, adopt, or acquiesce in any factual or legal contention, assertion, assumption, characterization, or implication contained in the RFAs.  By responding to the RFAs, Debtors do not intend to waive, and do not waive, any defenses to the RFAs or any other demand or subpoena, or any case brought by MOAC or any other party.

3.      Debtors intend no incidental or implied admissions by the responses to the RFAs.  Whether Debtors have answered or objected to any particular RFA should not be interpreted as an admission that Debtors accept or admit the existence of any fact(s) set out or assumed by such RFA, that such answer or objection constitutes admissible evidence or that requests for similar information will be treated in a similar fashion.

## GENERAL OBJECTIONS

These General Objections are incorporated into each specific response below as if they were fully repeated therein.

1.      Debtors object to the RFAs, including without limitation, the "Definitions" and "Instructions" therein, to the extent they purport to impose on Debtors obligations different from, broader than, or otherwise inconsistent with those imposed by the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, the local rules of the United States Bankruptcy Court for the Southern District of New York, and/or any other rules, applicable case law, or other court orders governing the proper scope, timing, and extent of discovery in this proceeding.  Debtors further object to the extent that such definitions or instructions purport to enlarge, expand, or alter in any way the plain meaning and scope of any specific RFA where such enlargement, expansion, or alteration renders the RFA vague, ambiguous, overbroad, unduly burdensome, harassing, or incomprehensible, or where such enlarged, expanded, or altered RFA seeks information that is not relevant to the claim or defense of any party.

2.      Debtors object to the RFAs to the extent they seek information not in Debtors' possession, custody, or control and/or not obtainable by means of a reasonably diligent search, including, without limitation, information from documents or things that are not maintained by Debtors in the ordinary course of business, that are no longer maintained by the Debtors, or that are not reasonably accessible due to undue burden or cost.

3.      Debtors object to the RFAs to the extent they seek legal conclusions or require Debtors to form a legal conclusion in order to provide a response.

4.      Debtors object to the RFAs to the extent they seek information not relevant to the subject matter of this pending matter or to the claims or defenses of any party, not proportional to

the needs of the pending matter, or otherwise outside the proper scope of discovery, and/or

constitute an improper "fishing expedition."

5.    Debtors object to the RFAs to the extent they seek the disclosure of information

that was prepared in anticipation of litigation; constitutes attorney work product; discloses the

mental impressions, conclusions, opinions, or legal theories of any attorneys for Debtors;

contains confidential attorney-client communications; is subject to a common interest privilege;

and/or is otherwise privileged, protected, or subject to exemption from disclosure under any

applicable privileges, laws, or rules.  If any privileged information is disclosed pursuant to the

RFAs, the disclosure is inadvertent and the privilege is not waived.

6.    Debtors object to the RFAs to the extent they seek information beyond the scope

of what was maintained in the ordinary course of business, as irrelevant and disproportionate to

the needs of the pending matter.  The above-captioned matter relates to a 1991 lease regarding

the property located at 2000 NE Court, Bloomington Minnesota.

7.    Debtors object to the RFAs as unduly burdensome to the extent that the

information requested is within the knowledge of MOAC or is within the public domain or

otherwise equally available to MOAC and Debtors and thus more conveniently obtained from

MOAC's own files or other sources.

8.    Debtors object to the definition of "and" and "or" as vague, ambiguous, overbroad

and unduly burdensome.

9.    Debtors object to the RFAs insofar as they seek the production of "all" or "any"

information concerning any given subject, on the ground that it is impracticable and otherwise

unduly burdensome for Debtors to locate and review every conceivable responsive document,

even documents stored electronically.  Debtors' responses will comply with the requirements of the Federal Rules of Civil Procedure.

10.     Debtors object to the definition of "assignee" as vague, ambiguous, overbroad and unduly burdensome.

11.     Debtors object to the definition of "communication" as overbroad, unduly burdensome and irrelevant as it fails to relate to any RFA.

12.     Debtors object to the definition of "Debtor," "Debtors," "Sears," "you," or "your" as vague, ambiguous, overbroad and unduly burdensome.

13.     Debtors object to the definition of "MOAC" as overbroad and unduly burdensome.  Debtors further object to the extent that the definition calls for a legal conclusion.

14.     Debtors object to the definition of "lease" as vague, ambiguous, overbroad and unduly burdensome.  As relates to this matter, Debtors define "lease" to refer to the ground lease for the property located at 2000 NE Court, Bloomington Minnesota.

15.     Debtors object to the definition of "relating to" as vague, ambiguous, overbroad and unduly burdensome.  Debtors further object to the extent that the definition calls for a legal conclusion.

## OBJECTIONS AND RESPONSES TO SPECIFIC REQUSTS FOR ADMISSION

Subject to and without waiving the above General Objections, Debtors object and/or respond to each specific RFA as follows:

## RFA NO. 1:

Admit that Mall of America is a mall and shopping center, as shopping center is understood to mean with regard to 11 U.S.C. § 365(b)(3).

**RESPONSE TO RFA NO. 1:**

Subject to and without waiving the foregoing General Objections, Debtors admit that

Mall of America is a mall and shopping center, as shopping center is understood to mean with

regard to 11 U.S.C. § 365(b)(3).

**RFA NO. 2:**

Admit that Sears entered into the Lease with MOAC for the Leased Space in Mall of
America on May 30, 1991.

**RESPONSE TO RFA NO. 2:**

In addition to the foregoing General Objections, Debtors object to RFA No. 2 to the

extent it seeks information protected by the attorney-client privilege, work-product privilege, or

any other applicable privilege or immunity.  Debtors further object to this RFA as irrelevant,

vague and ambiguous, unduly burdensome, and disproportionate to the needs of the pending

matter.

Subject to and without waiving the above objections, Debtors admit that Sears entered

into the Lease with MOAC for the Leased Space in Mall of America on May 30, 1991.

**RFA NO. 3:**

Admit that Sears operated a retail store in all three floors of the Leased Space from the
date Mall of America opened, on or about August 11, 1992, until the store discontinued
operations in connection with the above captioned bankruptcy.

**RESPONSE TO RFA NO. 3:**

In addition to the foregoing General Objections, Debtors object to RFA No. 3 to the

extent it seeks information protected by the attorney-client privilege, work-product privilege, or

any other applicable privilege or immunity.  Debtors further object to this RFA as irrelevant,

vague and ambiguous, unduly burdensome, and disproportionate to the needs of the pending

matter.

Subject to and without waiving the above objections, Debtors admit that Sears operated a retail store in all three floors of the Leased Space from the date Mall of America opened, on or about August 11, 1992, until the store discontinued operations in connection with the above-captioned bankruptcy.

**RFA NO. 4:**

Admit that there is currently no retail or other tenant operating any service open to Mall of America customers in the Leased Space.

**RESPONSE TO RFA NO. 4:**

In addition to the foregoing General Objections, Debtors object to RFA No. 4 to the extent it seeks information protected by the attorney-client privilege, work-product privilege, or any other applicable privilege or immunity.  Debtors further object to this RFA as irrelevant, vague and ambiguous, unduly burdensome, and disproportionate to the needs of the pending matter.

Subject to and without waiving the above objections, Debtors admit that there is currently no retail or other tenant operating any service open to Mall of America customers in the Leased Space.

**RFA NO. 5:**

Admit that the financial condition of the Assignee is not similar to or better than the financial condition of Sears on or about May 30, 1991.

**RESPONSE TO RFA NO. 5:**

In addition to the foregoing General Objections, Debtors object to RFA No. 5 to the extent it seeks information protected by the attorney-client privilege, work-product privilege, or any other applicable privilege or immunity.  Debtors further object to this RFA to the extent it seeks information about the "financial condition of the Assignee"– without limiting the request

to information within Debtors' possession, custody, or control – as irrelevant, vague and ambiguous, unduly burdensome, and disproportionate to the needs of the pending matter. Debtors also object because the phrase "financial condition" is vague and ambiguous in the context of this RFA.

Subject to and without waiving the above objections, Debtors will produce a copy of Debtors' 1991 Form 10-K and Second Quarter Form 10-Q, but aver that information regarding the financial condition of Debtors on or about May 30, 1991 is within the public domain or otherwise equally available to MOAC and Debtors.  *See* Sears, Roebuck & Co., Annual Report (Form 10-K) (Mar. 31, 1992); Sears, Roebuck & Co., Quarterly Report for the Quarterly Period Ended June 30, 1991 (Form 10-Q) (Aug. 16, 1991).  Debtors' response is based on publicly available information and Debtors reserve their rights to supplement or amend this response.

**RFA NO. 6:**

Admit that the operating performance of the Assignee is not similar to or better than the operating performance of Sears on or about May 30, 1991.

**RESPONSE TO RFA NO. 6:**

In addition to the foregoing General Objections, Debtors object to RFA No. 6 to the extent it seeks information protected by the attorney-client privilege, work-product privilege, or any other applicable privilege or immunity.  Debtors further object to this RFA to the extent it seeks information about the "operating performance of the Assignee"– without limiting the request to information within Debtors' possession, custody or control – as irrelevant, vague and ambiguous, unduly burdensome, and disproportionate to the needs of the pending matter. Debtors also object because the phrase "operating performance" is vague and ambiguous in the context of this RFA.

Subject to and without waiving the above objections, Debtors will produce a copy of

Debtors' 1991 Form 10-K and Second Quarter Form 10-Q, but aver that information regarding

the operating performance of Sears on or about May 30, 1991 is within the public domain or

otherwise equally available to MOAC and Debtors.  *See* Sears, Roebuck & Co., Annual Report

(Form 10-K) (Mar. 31, 1992); Sears, Roebuck & Co., Quarterly Report for the Quarterly Period

Ended June 30, 1991 (Form 10-Q) (Aug. 16, 1991).  Debtors' response is based on publicly

available information and Debtors reserve their rights to supplement or amend this response.

**RFA NO. 7:**

Admit that neither you nor, to the best of your knowledge, Transform or the Assignee
have provided information regarding the financial condition or operating performance of Sears
on or about May 30, 1991, to MOAC or the Court in support of the pending motion to assume
and assign the Lease.

**RESPONSE TO RFA NO. 7:**

In addition to the foregoing General Objections, Debtors object to RFA No. 7 to the

extent it seeks information protected by the attorney-client privilege, work-product privilege, or

any other applicable privilege or immunity.  Debtors further object to this RFA as irrelevant,

vague and ambiguous, unduly burdensome, and disproportionate to the needs of the pending

matter.  Debtors also object because the phrases "financial condition" and "operating

performance" are vague and ambiguous in the context of this RFA.  With respect to whether

Transform or the Assignee "have provided information regarding the financial condition or

operating performance of Sears on or about May 30, 1991, to MOAC or the Court in support of

the pending motion to assume and assign the Lease," the information Debtors currently know or

can readily obtain is insufficient to enable them to admit or deny this RFA despite Debtors'

reasonable inquiry.  Debtors' response is based on publicly available information and Debtors

reserve their rights to supplement or amend this response.

Subject to and without waiving the above objections, Debtors admit that Debtors have not provided information regarding the financial condition or operating performance of Sears on or about May 30, 1991, to MOAC or the Court in support of the pending motion to assume and assign the Lease, but aver that information regarding the financial condition or operating performance of Sears on or about May 30, 1991 is within the public domain or otherwise equally available to MOAC and Debtors.

**RFA NO. 8:**

Admit that the Assignee proposes to operate with a "smaller footprint" of fewer stores, as described in Doc. No. 3654, than the Debtor operated on or about May 30, 1991.

**RESPONSE TO RFA NO. 8:**

In addition to the foregoing General Objections, Debtors object to RFA No. 8 to the extent it seeks information protected by the attorney-client privilege, work-product privilege, or any other applicable privilege or immunity.  Debtors further object to this RFA to the extent it seeks information about the Assignee – without limiting the request to information within Debtors' possession, custody or control – as irrelevant, vague and ambiguous, unduly burdensome, and disproportionate to the needs of the pending matter.  The Debtors further object that whether "the Assignee proposes to operate with a 'smaller footprint' of fewer stores as described in Doc. No. 3654" is within the public domain or otherwise equally available to MOAC and Debtors, and aver that Doc. No. 3654 speaks for itself.  Debtors' response is based on publicly available information and Debtors reserve their rights to supplement or amend this response.

**RFA NO. 9:**

Admit that the Buyer does not currently plan for Transform Leaseco LLC to operate as a retail distributor.

**RESPONSE TO RFA NO. 9:**

In addition to the foregoing General Objections, Debtors object to RFA No. 9 to the extent it seeks information protected by the attorney-client privilege, work-product privilege, or any other applicable privilege or immunity.  Debtors further object to this RFA to the extent it seeks information about the Buyer – without limiting the request to information within Debtors' possession, custody, or control – as irrelevant, vague and ambiguous, unduly burdensome, and disproportionate to the needs of the pending matter.  The information Debtors currently know or can readily obtain is insufficient to enable them to admit or deny this RFA despite Debtors' reasonable inquiry.  Debtors' response is based on publicly available information and Debtors reserve their rights to supplement or amend this response.

**RFA NO. 10:**

Admit that any Assignee annual retail sales are less than the annual retail sales of Sears on or about May 30, 1991.

**RESPONSE TO RFA NO. 10:**

In addition to the foregoing General Objections, Debtors object to RFA No. 10 to the extent it seeks information protected by the attorney-client privilege, work-product privilege, or any other applicable privilege or immunity.  Debtors further object to this RFA to the extent it seeks information about "Assignee annual retail sales" – without limiting the request to information within Debtors' possession, custody, or control – as irrelevant, vague and ambiguous, unduly burdensome, and disproportionate to the needs of the pending matter.  The information Debtors currently know or can readily obtain is insufficient to enable them to admit or deny this RFA despite Debtors' reasonable inquiry.  Debtors' response is based on publicly available information and Debtors reserve their rights to supplement or amend this response.

11

**RFA NO. 11:**

Admit that neither Transform nor the Assignee proposes to operate any retail store in the Leased Space without subletting or assigning the Lease to another entity.

**RESPONSE TO RFA NO. 11:**

In addition to the foregoing General Objections, Debtors object to RFA No. 11 to the

extent it seeks information protected by the attorney-client privilege, work-product privilege, or

any other applicable privilege or immunity.  Debtors further object to this RFA to the extent it

seeks information about Transform or the Assignee– without limiting the request to information

within Debtors' possession, custody, or control – as irrelevant, vague and ambiguous, unduly

burdensome, and disproportionate to the needs of the pending matter.  The information Debtors

currently know or can readily obtain is insufficient to enable them to admit or deny this RFA

despite Debtors' reasonable inquiry.  Debtors' response is based on publicly available

information and Debtors reserve their rights to supplement or amend this response.

**RFA NO. 12:**

Admit that you have not provided to MOAC or the Court the identity, financial condition, or operating performance of any proposed tenant that would operate a retail store in the Leased Space in support of the pending motion to assume and assign the Lease.

**RESPONSE TO RFA NO. 12:**

In addition to the foregoing General Objections, Debtors object to RFA No. 12 to the

extent it seeks information protected by the attorney-client privilege, work-product privilege, or

any other applicable privilege or immunity.  Debtors further object to this RFA as irrelevant,

vague and ambiguous, unduly burdensome, and disproportionate to the needs of the pending

matter.  Debtors also object because the phrases "financial condition" and "operating

performance" are vague and ambiguous in the context of this RFA.

Subject to and without waiving the above objections, Debtors admit that Debtors have not provided to MOAC or the Court the identity, financial condition, or operating performance of any proposed tenant that would operate a retail store in the Leased Space in support of the pending motion to assume and assign the Lease.

## RFA NO. 13:

Admit that you have not provided any assurance that all three floors of the Leased Space will be open to Mall of America customers for retail shopping within a reasonable period if the Court approves the pending motion to assume and assign the Lease.

## RESPONSE TO RFA NO. 13:

In addition to the foregoing General Objections, Debtors object to RFA No. 13 to the extent it seeks information protected by the attorney-client privilege, work-product privilege, or any other applicable privilege or immunity.  Debtors further object to this RFA as irrelevant, vague and ambiguous, unduly burdensome, and disproportionate to the needs of the pending matter.

Subject to and without waiving the above objections, Debtors admit that Debtors have not provided any assurance that all three floors of the Leased Space will be open to Mall of America customers for retail shopping within a reasonable period if the Court approves the pending motion to assume and assign the Lease.

## RFA NO. 14:

Admit that assumption and assignment of the Lease is not necessary to support Transform's retail operations for Transform to maintain its financial condition.

## RESPONSE TO RFA NO. 14:

In addition to the foregoing General Objections, Debtors object to RFA No. 14 to the extent it seeks information protected by the attorney-client privilege, work-product privilege, or any other applicable privilege or immunity.  Debtors further object to this RFA to the extent it

seeks information about the "financial condition" of Transform – without limiting the request to information within Debtors' possession, custody, or control – as irrelevant, vague and ambiguous, unduly burdensome, and disproportionate to the needs of the pending matter. Debtors also object because the phrase "financial condition" is vague and ambiguous in the context of this RFA. The information Debtors currently know or can readily obtain is insufficient to enable them to admit or deny this RFA despite Debtors' reasonable inquiry. Debtors' response is based on publicly available information and Debtors reserve their rights to supplement or amend this response.

**RFA NO. 15:**

Admit that Transform's retail operations are not sufficient to maintain Transform's financial condition, which is dependent upon assumption and assignment of the Lease.

**RESPONSE TO RFA NO. 15:**

In addition to the foregoing General Objections, Debtors object to RFA No. 15 to the extent it seeks information protected by the attorney-client privilege, work-product privilege, or any other applicable privilege or immunity. Debtors further object to this RFA to the extent it seeks information about the "financial condition" of Transform – without limiting the request to information within Debtors' possession, custody or control – as irrelevant, vague and ambiguous, unduly burdensome, and disproportionate to the needs of the pending matter. Debtors also object because the phrase "financial condition" is vague and ambiguous in the context of this RFA. The information Debtors currently know or can readily obtain is insufficient to enable them to admit or deny this RFA despite Debtors' reasonable inquiry. Debtors' response is based on publicly available information and Debtors reserve their rights to supplement or amend this response.

Dated: July 2, 2019
     New York, New York

/s Jacqueline Marcus
_____
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Sunny Singh
Jared R. Friedmann
Jessie B. Mishkin

*Attorneys for Debtors
and Debtors in Possession*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 2nd day of July 2019, a true and correct copy of the foregoing was served via email on the following counsel of record:

**LARKIN HOFFMAN DALY & LINDGREN, LTD.**
Thomas J. Flynn
8300 Norman Center Drive
Suite 1000
Minneapolis, Minnesota 55437-1060

*Attorneys for MOAC Mall Holdings LLC*

*/s Dori Y. Cohen*
Dori Y. Cohen

# **EXHIBIT B**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Sunny Singh
Jared R. Friedmann
Jessie B. Mishkin

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                  :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **SEARS HOLDINGS CORPORATION**, *et al.*, | : | **Case No. 18-23538 (RDD)** |
| | : | |
| Debtors.[1] | : | **(Jointly Administered)** |
| | : | |

-------------------------------------------------------------x

## DEBTORS' OBJECTIONS AND RESPONSES TO
## MOAC MALL HOLDINGS LLC'S INTERROGATORIES TO THE DEBTOR

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

Pursuant to Federal Rule of Civil Procedure 33 and Federal Rule of Bankruptcy Procedure 7033, Sears Holdings Corporation and its debtor and non-debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, "Debtors"), respectfully respond and object as follows to the Interrogatories issued by MOAC Mall Holdings LLC ("MOAC") to Debtors on May 17, 2019 (the "Interrogatories").

## RESERVATION OF RIGHTS

1.      Debtors submit these responses and objections subject to, without intending to waive, and expressly preserving:  (a) any objections as to the competence, relevance, materiality, privilege, and/or admissibility into evidence of any response herein; (b) the right to object to other discovery procedures involving or relating to the subject matter of the Interrogatories; and (c) the right to revise, correct, supplement or clarify the responses or any of the objections herein at any time.

2.      Debtors do not admit, adopt, or acquiesce in any factual or legal contention, assertion, assumption, characterization, or implication contained in the Interrogatories.  By responding to the Interrogatories, Debtors do not intend to waive, and do not waive, any defenses to the Interrogatories or any other demand or subpoena, or any case brought by MOAC or any other party.

3.      Debtors intend no incidental or implied admissions by its responses to the Interrogatories.  Whether Debtors have answered or objected to any particular Interrogatory should not be interpreted as an admission that Debtors accept or admit the existence of any fact(s) set out or assumed by such Interrogatory, that such answer or objection constitutes admissible evidence or that requests for similar information will be treated in a similar fashion.

## <u>GENERAL OBJECTIONS</u>

These General Objections are incorporated into each specific response below as if they were fully repeated therein.

1.     Debtors object to the Interrogatories, including without limitation, the "Definitions" and "Instructions" therein, to the extent they purport to impose on Debtors obligations different from, broader than, or otherwise inconsistent with those imposed by the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, the local rules of the United States Bankruptcy Court for the Southern District of New York, and/or any other rules, applicable case law, or other court orders governing the proper scope, timing, and extent of discovery in this proceeding. Debtors further object to the extent that such definitions or instructions purport to enlarge, expand, or alter in any way the plain meaning and scope of any specific Interrogatory where such enlargement, expansion, or alteration renders the Interrogatory vague, ambiguous, overbroad, unduly burdensome, harassing, or incomprehensible, or where such enlarged, expanded, or altered Interrogatory seeks information that is not relevant to the claim or defense of any party.

2.     Debtors object to the Interrogatories to the extent they seek information not in Debtors' possession, custody, or control and/or not obtainable by means of a reasonably diligent search, including, without limitation, information from documents or things that are not maintained by Debtors in the ordinary course of business, that are no longer maintained by the Debtors, or that are not reasonably accessible due to undue burden or cost.

3.     Debtors object to the Interrogatories to the extent they seek legal conclusions or require Debtors to form a legal conclusion in order to provide a response.

4.     Debtors object to the Interrogatories to the extent they seek information not

relevant to the subject matter of this pending matter or to the claims or defenses of any party, not proportional to the needs of the pending matter, or otherwise outside the proper scope of discovery, and/or constitute an improper "fishing expedition."

5.     Debtors object to the Interrogatories to the extent they seek the disclosure of information that was prepared in anticipation of litigation; constitutes attorney work product; discloses the mental impressions, conclusions, opinions, or legal theories of any attorneys for Debtors; contains confidential attorney-client communications; is subject to a common interest privilege; and/or is otherwise privileged, protected, or subject to exemption from disclosure under any applicable privileges, laws, or rules.  If any privileged information is disclosed pursuant to the Interrogatories, the disclosure is inadvertent and the privilege is not waived.

6.     Debtors object to the Interrogatories to the extent they seek information beyond the scope of what was maintained in the ordinary course of business, as irrelevant and disproportionate to the needs of the pending matter.  The above-captioned matter relates to a 1991 lease regarding the property located at 2000 NE Court, Bloomington Minnesota.

7.     Debtors object to the Interrogatories as unduly burdensome to the extent that the information requested is within the knowledge of MOAC or is within the public domain or otherwise equally available to MOAC and Debtors and thus more conveniently obtained from MOAC's own files or other sources.

8.     Debtors object to the Interrogatories to the extent they seek the production of documents in violation of Rule 33 of the Federal Rules of Civil Procedure and Bankruptcy Rule 7033.  Further, Debtors object to the definition of "document" as overbroad, unduly burdensome and irrelevant as the definition of "document" does not apply to any of MOAC's Interrogatories. Debtors' responses will comply with the requirements of the Federal Rules of Civil Procedure.

9.      Debtors object to the definition of "and" and "or" as vague, ambiguous, overbroad and unduly burdensome.

10.     Debtors object to the Interrogatories insofar as they seek the production of "all" or "any" information concerning any given subject, on the ground that it is impracticable and otherwise unduly burdensome for Debtors to locate and review every conceivable responsive document, even documents stored electronically.  Debtors' responses will comply with the requirements of the Federal Rules of Civil Procedure.

11.     Debtors object to the definition of "assignee" as vague, ambiguous, overbroad and unduly burdensome.

12.     Debtors object to the definition of "communication" as overbroad and unduly burdensome to the extent it requires Debtors to search for and produce information conveyed by, *inter alia*, direct conversations, dialogues, discussions, interviews, telegrams, telexes, and cables.

13.     Debtors object to the definition of "Debtor," "Debtors," "Sears," "you," or "your" as vague, ambiguous, overbroad and unduly burdensome.

14.     Debtors object to the definition of "describe" as vague, ambiguous, overbroad and unduly burdensome.

15.     Debtors object to the numerous definitions of "identify" as duplicative, overbroad and unduly burdensome to the extent these definitions impose a burden not required under the Federal Rules of Civil Procedure, Federal Rules of Bankruptcy Procedure, and/or any other rules, applicable case law, or other court orders.  Debtors further object to the numerous definitions of "identify" as irrelevant and incomprehensible to the extent that they do not pertain to any of MOAC's Interrogatories.  Debtors' responses will comply with the requirements of the Federal Rules of Civil Procedure.

16.     Debtors object to the definition of "lease" as vague, ambiguous, overbroad and unduly burdensome.  As relates to the above-captioned matter, Debtors define "lease" to refer to the ground lease for the property located at 2000 NE Court, Bloomington Minnesota.

17.     Debtors object to the definition of "MOAC" as overbroad and unduly burdensome.  Debtors further object to the extent that the definition calls for a legal conclusion.

18.     Debtors object to the definition of "person" as vague, ambiguous, overbroad and unduly burdensome.

19.     Debtors object to the definition of "relating to" as vague, ambiguous, overbroad, unduly burdensome and irrelevant and incomprehensible to the extent that they do not pertain to any of MOAC's Interrogatories.

20.     Debtors object to Instruction number 2 to the extent it imposes a burden not required under the Federal Rules of Civil Procedure, Federal Rules of Bankruptcy Procedure, and/or any other rules, applicable case law, or other court orders.  Debtors' responses will comply with the requirements of the Federal Rules of Civil Procedure.

## OBJECTIONS AND RESPONSES TO SPECIFIC INTERROGATORIES

Subject to and without waiving the above General Objections, Debtors object and/or respond to each specific Interrogatory as follows:

## INTERROGATORY NO. 1:

Identify all persons answering or assisting in answering these interrogatories.

## RESPONSE TO INTERROGATORY NO. 1:

Subject to and without waiving the foregoing General Objections, Debtors' counsel assisted in answering these Interrogatories.

6

**INTERROGATORY NO. 2:**

For each request for admission not fully admitted in response to MOAC Mall Holdings LLC's Requests for Admission from the Debtor, served with these interrogatories, please describe the explanation for your response.

**RESPONSE TO INTERROGATORY NO. 2:**

In addition to the foregoing General Objections, Debtors object to Interrogatory No. 2 to the extent it seeks information protected by the attorney-client privilege, work-product privilege, or any other applicable privilege or immunity.  Debtors further object to this Interrogatory to the extent it seeks information relating to MOAC's Requests For Admissions as duplicative of or cumulative to the responses to those Requests for Admission, and to the extent the Interrogatory seeks information regarding the Lease outside the scope of this matter.

**INTERROGATORY NO. 3:**

Describe the financial condition of Sears on or about May 30, 1991.

**RESPONSE TO INTERROGATORY NO. 3:**

In addition to the foregoing General Objections, Debtors object to Interrogatory No. 3 to the extent it seeks information protected by the attorney-client privilege, work-product privilege, or any other applicable privilege or immunity.  Debtors further object to this Interrogatory to the extent it seeks information about the "financial condition" of Debtors – without limiting the request to information within Debtors' possession, custody, or control – as irrelevant, vague and ambiguous, unduly burdensome, and disproportionate to the needs of the pending matter. Debtors also object because the phrase "financial condition" is vague and ambiguous in the context of this Interrogatory.  Moreover, Debtors further object to the extent that the information sought by this Interrogatory regarding the financial condition of Sears on or about May 30, 1991 is within the public domain or otherwise equally available to MOAC and Debtors.

Subject to and without waiving the foregoing objections, the Debtors will produce a copy of Debtors' 1991 Form 10-K and Second Quarter Form 10-Q, but aver that information regarding the financial condition of Debtors on or about May 30, 1991 is within the public domain or otherwise equally available to MOAC and Debtors.  *See* Sears, Roebuck & Co., Annual Report (Form 10-K) (Mar. 31, 1992); Sears, Roebuck & Co., Quarterly Report for the Quarterly Period Ended June 30, 1991 (Form 10-Q) (Aug. 16, 1991).  Debtors' response is based on publicly available information and Debtors reserve their rights to supplement or amend this response.

### INTERROGATORY NO. 4:

Describe the operating performance of Sears on or about May 30, 1991.

### RESPONSE TO INTERROGATORY NO. 4:

In addition to the foregoing General Objections, Debtors object to Interrogatory No. 4 to the extent it seeks information protected by the attorney-client privilege, work-product privilege, or any other applicable privilege or immunity.  Debtors further object to this Interrogatory to the extent it seeks information about the "operating performance" of Debtors – without limiting the request to information within Debtors' possession, custody, or control – as irrelevant, vague and ambiguous, unduly burdensome, and disproportionate to the needs of the pending matter. Debtors also object because the phrase "operating performance" is vague and ambiguous in the context of this Interrogatory. Moreover, Debtors further object to the extent that the information sought by this Interrogatory regarding the operating performance of Sears on or about May 30, 1991 is within the public domain or otherwise equally available to MOAC and Debtors.

Subject to and without waiving the foregoing objections, the Debtors will produce a copy of Debtors' 1991 Form 10-K and Second Quarter Form 10-Q, but aver that information

regarding the financial condition of Debtors on or about May 30, 1991 is within the public

domain or otherwise equally available to MOAC and Debtors.  *See* Sears, Roebuck & Co.,

Annual Report (Form 10-K) (Mar. 31, 1992); Sears, Roebuck & Co., Quarterly Report for the

Quarterly Period Ended June 30, 1991 (Form 10-Q) (Aug. 16, 1991).  Debtors' response is based

on publicly available information and Debtors reserve their rights to supplement or amend this

response.

## INTERROGATORY NO. 5:

Describe the current financial condition of the Assignee.

## RESPONSE TO INTERROGATORY NO. 5:

In addition to the foregoing General Objections, Debtors object to Interrogatory No. 5 as

premature.  Debtors object to this Interrogatory to the extent it seeks information protected by the

attorney-client privilege, work-product privilege, or any other applicable privilege or immunity.

Debtors further object to this Interrogatory because it seeks information about "the current

financial condition of the Assignee" which is information not within Debtors' possession,

custody, or control, and better obtained from other parties.  Debtors also object because the

phrase "financial condition" is vague and ambiguous in the context of this Interrogatory.

Moreover, Debtors object to this Interrogatory to the extent it seeks information that is irrelevant,

vague and ambiguous, unduly burdensome, and disproportionate to the needs of the pending

matter.

## INTERROGATORY NO. 6:

Describe the current operating performance of the Assignee.

## RESPONSE TO INTERROGATORY NO. 6:

In addition to the foregoing General Objections, Debtors object to Interrogatory No. 6 to

the extent it seeks information protected by the attorney-client privilege, work-product privilege,

or any other applicable privilege or immunity.  Debtors further object to this Interrogatory

because it seeks information about "the current operating performance of the Assignee" which is

information not within Debtors' possession, custody, or control, and better obtained from other

parties.  Debtors also object because the phrase "operating performance" is vague and ambiguous

in the context of this Interrogatory. Moreover, Debtors object to this Interrogatory to the extent it

seeks information that is irrelevant, vague and ambiguous, unduly burdensome, and

disproportionate to the needs of the pending matter.

## INTERROGATORY NO. 7:

Describe Assignee's proposed use for the Leased Space, including, but not limited to the identification of proposed tenant or tenants, which portion, if not all, of the Lease Space each tenant would use, and when that portion would be occupied by the proposed tenant and open to Mall of America customers.

## RESPONSE TO INTERROGATORY NO. 7:

In addition to the foregoing General Objections, Debtors object to Interrogatory No. 7 to

the extent it seeks information protected by the attorney-client privilege, work-product privilege,

or any other applicable privilege or immunity.  Debtors further object to this Interrogatory

because it seeks information about "Assignee's proposed use for the Leased Space," which is

information not within Debtors' possession, custody, or control, and better obtained from other

parties.  Moreover, Debtors object to this Interrogatory to the extent it seeks information that is

irrelevant, vague and ambiguous, unduly burdensome, and disproportionate to the needs of the

pending matter.

10

Dated:  July 2, 2019

New York, New York

/s Jacqueline Marcus

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Sunny Singh
Jared R. Friedmann
Jessie B. Mishkin


*Attorneys for Debtors*
*and Debtors in Possession*

## <u>VERIFICATION</u>

I, Jacqueline Marcus, declare under penalty of perjury that I am counsel of record for Debtors, that I am authorized to make this Verification on behalf of Debtors, and that the information provided in the above Objections and Responses to MOAC Mall Holdings LLC's Interrogatories is true and correct to the best of my knowledge, information and belief. I further state, without prejudice to Debtors' right to object to the disclosure of privileged information protected by the attorney-client privilege and the work-product doctrine, that although the information provided in these responses is not from my personal knowledge, the sources of such information are business records obtained from Sears Holdings Corporation prior to the February 11, 2019 sale.

Dated:  July 2, 2019                        */s Jacqueline Marcus*

                                         Jacqueline Marcus

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 2nd day of July 2019, a true and correct copy of the foregoing was served via email on the following counsel of record:

**LARKIN HOFFMAN DALY & LINDGREN, LTD.**
Thomas J. Flynn
8300 Norman Center Drive
Suite 1000
Minneapolis, Minnesota 55437-1060

*Attorneys for MOAC Mall Holdings LLC*

*/s Dori Y. Cohen*
Dori Y. Cohen

# **EXHIBIT C**

David W. Dykhouse (dwdykhouse@pbwt.com)
PATTERSON BELKNAP WEBB & TYLER, LLP
1133 Avenue of the Americas
New York, New York 10036-6710
Tel:  (212) 336-2000
Fax:  9212) 336-2222

Thomas J. Flynn (tflynn@larkinhoffman.com)
LARKIN HOFFMAN DALY & LINDGREN, LTD.
8300 Norman Center Drive, Suite 1000
Minneapolis, Minnesota 55437-1060
Tel:  (952) 835-3800
Fax:  (952) 896-3333

*Attorneys for MOAC Mall Holding LLC*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| | ) Chapter 11 |
| In re: | ) Case No. 18-23538 (RDD) |
| | ) |
| SEARS HOLDINGS CORPORATION, *et al.*, | ) (Jointly Administered) |
| | ) |
| Debtors.[1] | ) |

**MOAC MALL HOLDINGS LLC'S REQUESTS FOR ADMISSION FROM
TRANSFORM HOLDCO LLC**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows:  Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

MOAC Mall Holdings LLC ("MOAC"), by and through its undersigned counsel, hereby requests and demands that Transform Holdco LLC (the "Buyer" or "Transform"), a party to the contested motion in the above-captioned case of the Debtor to assume and assign certain designatable leases (Doc. No. 3298), as evidenced by and acknowledged in Transform Holdco LLC's Omnibus Reply in Support of Assumption and Assignment of Designated Leases (Doc. No. 3654), admit or deny the following requests for admission within thirty days after service under Bankruptcy Rule 7036, incorporating Fed. R. Civ. P. 36, and permitted in this contested matter by Bankruptcy Rule 9014. MOAC will seek an award of expenses, including attorney fees, under Bankruptcy Rule 7036, incorporating Fed. R. Civ. P. 37, incurred in proving the truth of any of the requests that are denied.

## DEFINITIONS

1.     "And" and "or" refer to both their conjunctive and disjunctive meanings.

2.     "All" and "any" mean "each and every" as well as "any one."

3.     "Assignee" means Transform Leaseco LLC or any other intended assignee, pursuant to the Debtor's pending motion to assume and assign the Lease, and any other persons or entities acting on its behalf, including but not limited to its affiliates, parents, subsidiaries, successors, predecessors, current and former employees, representatives, independent contractors, associates, attorneys, accountants, consultants, advisors, agents, owners, officers, and directors.

4.     "Communication" means any contact whatsoever and any transmission or exchange of words, numbers, graphic material, or other information, either orally, electronically, or in writing, whether made, received, or participated in, and includes without limitation any conversation, correspondence, letter, note, memorandum, inter- or intra-office correspondence, telephone call, telegraph, telegram, telex, telecopy, facsimile, electronic mail, text message,

internet communication, telefax, cable, electronic message, tape recording, discussion, face-to-face meeting, or conference or meeting of any kind whether in person, by audio, video, telephone, or in any other form.

5.      "Buyer," "Transform," "you," or "your" means Transform Holdco LLC and any other persons or entities acting on its behalf, including but not limited to its affiliates, parents, subsidiaries, successors, predecessors, current and former employees, representatives, independent contractors, associates, attorneys, accountants, consultants, advisors, agents, owners, officers, and directors.

6.      "Debtor," "Debtors," or "Sears" means any of the debtors in any of the cases jointly administered with the above captioned Chapter 11 case or identified in footnote 1 of this document and any other persons or entities acting on its behalf, including but not limited to its affiliates, parents, subsidiaries, successors, predecessors, current and former employees, representatives, independent contractors, associates, attorneys, accountants, consultants, advisors, agents, owners, officers, and directors.

7.      "Mall of America" means the mall in Bloomington, Minnesota, popularly known as the Mall of America®.

8.      "MOAC" means MOAC Holdings LLC and any other persons or entities acting on its behalf, including but not limited to its affiliates, parents, subsidiaries, successors, predecessors, current and former employees, representatives, independent contractors, associates, attorneys, accountants, consultants, advisors, agents, owners, officers, and directors.

9.      The "Lease" means the lease between Sears and MOAC, identified with Store # 1722 on Doc. No. 3654-1 in the above captioned matter.

10.     The "Leased Space" means the space subject to the Lease.

11.     "Relating to" means to have to do with, to be of importance to, to involve, or in some manner, direct or indirect, to evidence, define, describe, or explain. The phrase is intended broadly, but not in a way designed to seek information that is irrelevant, or beyond the scope authorized by Fed. R. Civ. P. 26. Any objection on the ground that the request is overbroad, based solely on the use of one or the other of these terms, is inappropriate because that meaning is not intended. The term should be understood and read in its common, dictionary-sense meaning.

## INSTRUCTIONS

The following instructions apply to each specific request for admission unless otherwise explicitly stated.

1.     You must specifically admit or deny each request; any request to which you do not respond will be deemed admitted.

2.     If you cannot admit or deny a request, you must set forth the reasons why you cannot do so.

3.     If you respond to a request with anything other than an unqualified admission, you must set forth any objections to the request.

4.     A denial shall fairly meet the substance of the requested admission.

5.     When good faith requires you to qualify your answer, or deny only part of a request, you must specify the part of the request that is admitted and qualify or deny the remainder.

6.     You may not give lack of information or knowledge as a reason for failing to admit or deny a request, unless you state that you have made a reasonable inquiry and the information known or readily obtainable by you is insufficient to enable you to admit or deny the request.

7.      You may not object to a request solely on the grounds that the request presents a genuine issue of material fact for trial.

8.      The singular and masculine form of a noun or pronoun includes the plural, feminine, or neuter form, where appropriate.

9.      The past tense includes the present tense where the meaning is not distorted and the verb form of a noun or pronoun may be used, as appropriate in a particular context.

10.      Unless specifically defined herein, all words and terms used herein shall be construed and interpreted according to ordinary custom, usage, and meaning.

11.      As set forth in Fed. R. Civ. P. 26(e), these requests are deemed to be continuing in nature and you are required to supplement your responses upon receipt or discovery of additional information or documents pertinent to any of the propounded requests.

## REQUESTS FOR ADMISSION

REQUEST NO. 1:

Admit that Mall of America is a mall and shopping center, as shopping center is understood to mean with regard to 11 U.S.C. § 365(b)(3).

REQUEST NO. 2:

Admit that Sears entered into the Lease with MOAC for the Leased Space in Mall of America on May 30, 1991.

REQUEST NO. 3:

Admit that Sears operated a retail store in all three floors of the Leased Space from the date Mall of America opened, on or about August 11, 1992, until the store discontinued operations in connection with the above captioned bankruptcy.

REQUEST NO. 4:

Admit that there is currently no retail or other tenant operating any service open to Mall of America customers in the Leased Space.

REQUEST NO. 5:

Admit that the financial condition of the Assignee is not similar to or better than the financial condition of Sears on or about May 30, 1991.

REQUEST NO. 6:

Admit that the operating performance of the Assignee is not similar to or better than the operating performance of Sears on or about May 30, 1991.

REQUEST NO. 7:

Admit that neither you nor, to the best of your knowledge, the Debtor have provided information regarding the financial condition or operating performance of Sears on or about May 30, 1991, to MOAC or the Court in support of the pending motion to assume and assign the Lease.

REQUEST NO. 8:

Admit that the Assignee proposes to operate with a "smaller footprint" of fewer stores, as described in Doc. No. 3654, than the Debtor operated on or about May 30, 1991.

REQUEST NO. 9:

Admit that you do not currently plan for Transform Leaseco LLC to operate as a retail distributor.

REQUEST NO. 10:

Admit that any Assignee annual retail sales are less than the annual retail sales of Sears on or about May 30, 1991.

REQUEST NO. 11:

Admit that neither you nor the Assignee propose to operate any retail store in the Leased Space without subletting or assigning the Lease to another entity.

REQUEST NO. 12:

Admit that you have not provided to MOAC or the Court the identity, financial condition, or operating performance of any proposed tenant that would operate a retail store in the Leased Space in support of the pending motion to assume and assign the Lease.

REQUEST NO. 13:

Admit that you have not provided any assurance that all three floors of the Leased Space will be open to Mall of America customers for retail shopping within a reasonable period if the Court approves the pending motion to assume and assign the Lease.

REQUEST NO. 14:

Admit that assumption and assignment of the Lease is not necessary to support Transform's retail operations for Transform to maintain its financial condition.

REQUEST NO. 15:

Admit that Transform's retail operations are not sufficient to maintain Transform's financial condition, which is dependent upon assumption and assignment of the Lease.


Dated:  May 17, 2019                    Respectfully submitted,

                                        */e/ Thomas J. Flynn*
                                        Thomas J. Flynn (30570)
                                        Larkin Hoffman Daly & Lindgren, Ltd.
                                        8300 Norman Center Drive
                                        Suite 1000
                                        Minneapolis, Minnesota  55437-1060
                                        (952) 835-3800
                                        tflynn@larkinhoffman.com

                                        Admitted *pro hac vice* on December 26, 2018

                                        *Attorneys for MOAC Mall Holdings LLC*

4847-0231-3111, v. 1

# **EXHIBIT D**

David W. Dykhouse (dwdykhouse@pbwt.com)
PATTERSON BELKNAP WEBB & TYLER, LLP
1133 Avenue of the Americas
New York, New York 10036-6710
Tel:  (212) 336-2000
Fax:  9212) 336-2222

Thomas J. Flynn (tflynn@larkinhoffman.com)
LARKIN HOFFMAN DALY & LINDGREN, LTD.
8300 Norman Center Drive, Suite 1000
Minneapolis, Minnesota 55437-1060
Tel:  (952) 835-3800
Fax:  (952) 896-3333

*Attorneys for MOAC Mall Holdings LLC*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ) | Chapter 11 |
| In re: ) | Case No. 18-23538 (RDD) |
| ) | |
| SEARS HOLDINGS CORPORATION, *et al.*, ) | (Jointly Administered) |
| ) | |
| Debtors.[1] ) | |

## MOAC MALL HOLDINGS LLC'S INTERROGATORIES TO
## TRANSFORM HOLDCO LLC

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows:  Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

MOAC Mall Holdings LLC ("MOAC"), by and through its undersigned counsel, hereby requests and demands that Transform Holdco LLC (the "Buyer" or "Transform"), a party to the contested motion in the above-captioned case of the Debtor to assume and assign certain designatable leases (Doc. No. 3298), as evidenced by and acknowledged in Transform Holdco LLC's Omnibus Reply in Support of Assumption and Assignment of Designated Leases (Doc. No. 3654), answer the following interrogatories within thirty days after service under Bankruptcy Rule 7033, incorporating Fed. R. Civ. P. 33, and permitted in this contested matter by Bankruptcy Rule 9014. MOAC will seek an award of expenses, including attorney fees, under Bankruptcy Rule 7036, incorporating Fed. R. Civ. P. 37, incurred in proving the truth of any of the requests that are denied.

## DEFINITIONS

1.      "And" and "or" refer to both their conjunctive and disjunctive meanings.

2.      "All" and "any" mean "each and every" as well as "any one."

3.      "Assignee" means Transform Leaseco LLC or any other intended assignee, pursuant to the Debtor's pending motion to assume and assign the Lease, and any other persons or entities acting on its behalf, including but not limited to its affiliates, parents, subsidiaries, successors, predecessors, current and former employees, representatives, independent contractors, associates, attorneys, accountants, consultants, advisors, agents, owners, officers, and directors.

4.      "Buyer," "Transform," "you," or "your" means Transform Holdco LLC and any other persons or entities acting on its behalf, including but not limited to its affiliates, parents, subsidiaries, successors, predecessors, current and former employees, representatives, independent contractors, associates, attorneys, accountants, consultants, advisors, agents, owners, officers, and directors.

5.      "Communication" means any contact whatsoever and any transmission or exchange of words, numbers, graphic material, or other information, either orally, electronically, or in writing, whether made, received, or participated in, and includes without limitation any conversation, correspondence, letter, note, memorandum, inter- or intra-office correspondence, telephone call, telegraph, telegram, telex, telecopy, facsimile, electronic mail, text message, internet communication, telefax, cable, electronic message, tape recording, discussion, face-to-face meeting, or conference or meeting of any kind whether in person, by audio, video, telephone, or in any other form.

6.      "Debtor," "Debtors," or "Sears" means any of the debtors in any of the cases jointly administered with the above captioned Chapter 11 case or identified in footnote 1 of this document and any other persons or entities acting on its behalf, including but not limited to its affiliates, parents, subsidiaries, successors, predecessors, current and former employees, representatives, independent contractors, associates, attorneys, accountants, consultants, advisors, agents, owners, officers, and directors.

7.      "Describe" means to set forth all discoverable "matters" as those terms are used in Federal Rules of Civil Procedure 26, including the reasoning that explains the answer, and identification of all documents, persons, communications, events, and acts relating to the answer.

8.      "Document" has the broadest possible meaning under Federal Rule of Civil Procedure 34, including but not limited to any printed, written, recorded, or graphic matter, however produced or reproduced, including the originals and all non-identical copies, including but not limited to all correspondence, memoranda, hand-written notes, messages, telegrams, diaries, calendars, minutes, books, reports, charts, graphs, ledgers, invoices, worksheets, receipts, tax returns, computer printouts, prospectuses, financial statements, schedules, affidavits, written statements, contracts, canceled checks, transcripts, statistics, surveys, magazine or newspaper

articles, photographs, microfiche, microfilm, video or audio tape recordings, websites, information stored on computer disc or other storage medium, emails, and any other type of electronic or computerized information storage system.

9.      "Identify" means, when used in conjunction with a natural person, to state his or her:

a.      full name;

b.      relationship to Debtor, Assignee, or Transform, e.g., director, officer, employee, independent or third-party contractor;

c.      present or last known address and telephone number; and

d.      name of employer, occupation, job title, business affiliation, and nature of business.

10.      "Identify" means, when used in conjunction with an entity, organization, or anything other than a natural person, to state its:

a.      name under which it customarily does business;

b.      address of its principal place of business;

c.      type of business; and

d.      identity of the person in such organization who is believed to have the most extensive knowledge of the matters in question.

11.      "Identify" means, when used in conjunction with a communication, to state the:

a.      persons who made and received the communication;

b.      date of the communication or when was made;

c.      manner or type of transmission, e.g., email, telephone, fax;

d.      location where the communication took place;

e.      description of the communication's content; and

      f.    documents describing or memorializing the communication.

12.    "Identify" means, when used in conjunction with a document, to state the:

      a.    authors, senders, addressees, and recipients of the document;

      b.    date of the document or when it was made;

      c.    type of document, e.g., chart, memorandum, report;

      d.    subject matter of the document;

      e.    number of pages in the document;

      f.    attachments to the document; and

      g.    past and present custodians of the document.

13.    "Identify" means, when used in conjunction with an event or act, to state the:

      h.    persons who engaged in, were involved with, attended, or witnessed it;

      i.    date of the event or act;

      j.    description of the event or act;

      k.    location where the event or act took place; and

      l.    identify all documents describing or memorializing the event or act.

14.    The "Lease" means the lease between Sears and MOAC, identified with Store # 1722 on Doc. No. 3654-1 in the above captioned matter.

15.    The "Leased Space" means the space subject to the Lease.

16.    "Mall of America" means the mall in Bloomington, Minnesota, popularly known as Mall of America®.

17.    "MOAC" means MOAC Holdings LLC and any other persons or entities acting on its behalf, including but not limited to its affiliates, parents, subsidiaries, successors, predecessors, current and former employees, representatives, independent contractors, associates, attorneys, accountants, consultants, advisors, agents, owners, officers, and directors.

18.    "Person" means any natural person, corporation, partnership, firm, division, association, agency, organization, or group of natural persons, including but not limited to, any person who is your employee, consultant, independent contractor, agent, attorney, or representative.

19.    "Relating to" means to have to do with, to be of importance to, to involve, or in some manner, direct or indirect, to evidence, define, describe, or explain. The phrase is intended broadly, but not in a way designed to seek information that is irrelevant, or beyond the scope authorized by Fed. R. Civ. P. 26. Any objection on the ground that the request is overbroad, based solely on the use of one or the other of these terms, is inappropriate because that meaning is not intended. The term should be understood and read in its common, dictionary-sense meaning.

## INSTRUCTIONS

The following instructions apply to each specific interrogatory unless otherwise explicitly stated.

1.    If you have a good faith doubt as to the meaning or scope of an interrogatory, and your objection is that it is vague or ambiguous, you are encouraged to contact MOAC's counsel in advance of asserting an unnecessary objection. MOAC's counsel will provide you with whatever additional clarification or explanation you need to answer the interrogatory.

2.    If you object that any information is privileged, state all of the facts that you rely upon in support of your objection, with sufficient particularly to assess the validity of your objection, including the:

a.    persons who heard, viewed, or communicated the information;

b.    date of the communication or information;

    c.      type or medium of communication or information, e.g., teleconference, meeting, conversation, presentation;

    d.      subject matter of the communication or information;

    e.      documents relating to the communication or information; and

    f.      the basis for your objection.

3.      If you consider any information confidential, MOAC requests that you disclose it subject to a protective order.

4.      To the extent that you believe any of these interrogatories are objectionable, you must answer those parts of the interrogatory that are not objectionable, separately state the portion of each interrogatory to which you object, and the grounds for the objection.

5.      If you cannot answer any interrogatory fully and completely after exercising the due diligence required by law and the applicable rules to make the inquiry and secure the necessary information, please so state and answer each such interrogatory to the fullest extent possible, specify the portion of each interrogatory that you claim to be unable to answer fully and completely, state the facts upon which you rely to support your contention that you are unable to answer the interrogatory fully and completely, and what knowledge, information, or belief you have concerning the unanswered portion of each such request.

6.      Objection will be made to any attempts to introduce evidence that is sought by these interrogatories for which no timely disclosure is made.

7.      The singular and masculine form of a noun or pronoun includes the plural, feminine, or neuter form, where appropriate.

8.      The past tense includes the present tense where the meaning is not distorted and the verb form of a noun or pronoun may be used, as appropriate in a particular context.

9.    Unless specifically defined herein, all words and terms used herein shall be construed and interpreted according to ordinary custom, usage, and meaning.

10.    As set forth in Fed. R. Civ. P. 26(e), these requests are deemed to be continuing in nature and you are required to supplement your responses upon receipt or discovery of additional information or documents pertinent to any of the propounded requests.

## INTERROGATORIES

INTERROGATORY NO. 1:

Identify all persons answering or assisting in answering these interrogatories.

INTERROGATORY NO. 2:

For each request for admission not fully admitted in response to MOAC Mall Holdings LLC's Requests for Admission from Transform Holdco LLC, served with these interrogatories, please describe the explanation for your response.

INTERROGATORY NO. 3:

Describe the financial condition of Sears on or about May 30, 1991.

INTERROGATORY NO. 4:

Describe the operating performance of Sears on or about May 30, 1991.

INTERROGATORY NO. 5:

Describe the current financial condition of the Assignee.

INTERROGATORY NO. 6:

Describe the current operating performance of the Assignee.

INTERROGATORY NO. 7:

Describe Assignee's proposed use for the Leased Space, including, but not limited to the identification of proposed tenant or tenants, which portion, if not all, of the Lease Space each tenant would use, and when that portion would be occupied by the proposed tenant and open to Mall of America customers.

[remainder of page intentionally left blank]

Dated:  May 17, 2019                Respectfully submitted,

                                    */e/ Thomas J. Flynn*
                                    Thomas J. Flynn (30570)
                                    Larkin Hoffman Daly & Lindgren, Ltd.
                                    8300 Norman Center Drive
                                    Suite 1000
                                    Minneapolis, Minnesota  55437-1060
                                    (952) 835-3800
                                    tflynn@larkinhoffman.com

                                    Admitted *pro hac vice* on December 26, 2018

                                    *Attorneys for MOAC Mall Holdings LLC*

4841-8949-6983, v. 1

# **EXHIBIT E**

## Beeby, Alexander J.

| | |
|---|---|
| **From:** | Massey, Kate <kmassey@cgsh.com> |
| **Sent:** | Monday, June 03, 2019 11:44 AM |
| **To:** | Flynn, Thomas J.; Barefoot, Luke A. |
| **Cc:** | Beeby, Alexander J. |
| **Subject:** | RE: MOAC Mall Holdings LLC's Requests for Admission and Interrogatories │ SDNY Bankr. Case No. 23538 (jointly administered) |

Tom,

By way of follow-up to the below:

Transform's current intent is to continue to market the property and lease each floor.  There are no plans to reopen the store at this location.  We are hopeful to have new tenants in the coming months.  The goal is to sub-lease all three floors, with a primary focus on the ground and second floor.  We are currently in conversations with multiple parties and at this time each floor will likely have a separate tenant.  The process is fluid, and we are happy to keep you apprised of further developments as they happen.

Let us know if further discussions as between counsel would be helpful at this stage.

Best,
Kate

─────

**Kate Massey**
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006
T: +1 212 225 2713
kmassey@cgsh.com  │ clearygottlieb.com
Pronouns: she/her/hers

---

**From:** Massey, Kate
**Sent:** Friday, May 31, 2019 12:25 PM
**To:** 'Flynn, Thomas J.' <tflynn@larkinhoffman.com>; Barefoot, Luke A. <lbarefoot@cgsh.com>
**Cc:** Beeby, Alexander J. <abeeby@larkinhoffman.com>
**Subject:** RE: MOAC Mall Holdings LLC's Requests for Admission and Interrogatories │ SDNY Bankr. Case No. 23538 (jointly administered)

Tom,

We will follow up with our client on the questions you raise in the first paragraph of your note below.

Regarding the check:  it was cut by Transform, not any Debtor entity, so no court authority is required.  However, we would suggest that your client holds the check until the assumption and assignment question is resolved.

Best,
Kate

─────

**Kate Massey**

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006
T: +1 212 225 2713
kmassey@cgsh.com | clearygottlieb.com
Pronouns: she/her/hers

---

**From:** Flynn, Thomas J. [mailto:tflynn@larkinhoffman.com]
**Sent:** Friday, May 31, 2019 11:49 AM
**To:** Massey, Kate <kmassey@cgsh.com>; Barefoot, Luke A. <lbarefoot@cgsh.com>
**Cc:** Beeby, Alexander J. <abeeby@larkinhoffman.com>
**Subject:** RE: MOAC Mall Holdings LLC's Requests for Admission and Interrogatories | SDNY Bankr. Case No. 23538 (jointly administered)

MOAC management can be expected to reach out to Ms. Borden, but they  have asked me to get some preliminary information from you. Basically, they want to know what the current intent for the Mall property is. As you may know, the space is currently dark. Will the assignee reopen the property? How long is that expected to take? Will it be all three floors? Will it be operated as a Sears? Do you intend to sub-lease the space? Do you have a tenant lined up? If so, what kind of business do they operate? Retail sales? Other? If not, how long will it take to get a sub-tenant  and reopen for operations? Will all floors be sub-leased? Are there any other plans for the space?

Also, MOAC has received a check for pre and post-petition CAM, (and other related ongoing expenses). Are you aware of this? We are holding the check. Is there Court authority to pay pre-petition expense at this time? I can check with my client, but was payment made by the assignee? Let me know if there are any issues with MOAC accepting this payment .  We will return it (or at least the pre-petition portion), if it has been improperly paid.

Thank you.

**Thomas J. Flynn**
**Attorney**

direct | 952-896-3362
fax     | 952-896-3333

8300 Norman Center Drive
Suite 1000
Minneapolis, MN 55437-1060



**www.larkinhoffman.com**

---

**From:** Massey, Kate [mailto:kmassey@cgsh.com]
**Sent:** Thursday, May 30, 2019 3:53 PM
**To:** Flynn, Thomas J.; Barefoot, Luke A.
**Cc:** Beeby, Alexander J.
**Subject:** RE: MOAC Mall Holdings LLC's Requests for Admission and Interrogatories | SDNY Bankr. Case No. 23538 (jointly administered)

They should reach out to Jane Borden, President of Real Estate:

Jane.Borden@searshc.com
847.286.5922

**Kate Massey**
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006

**Remainder of email chain
excluded as irrelevant.**

# **<u>EXHIBIT F</u>**

**TABLE OF CONTENTS TO**
**AMENDED AND RESTATED**
**RECIPROCAL EASEMENT AND OPERATING AGREEMENT**
**MALL OF AMERICA**
**BLOOMINGTON, MINNESOTA**

ARTICLE I . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . 3
        A.   AGREED INTEREST RATE . . . . . . . . . . . 4
        B.   AUTOMOBILE PARKING AREA . . . . . . . . . . 4
        C.   BUILDING . . . . . . . . . . . . . . . . . 4
        D.   COMMON AREA . . . . . . . . . . . . . . . . 4
        E.   COMMON BUILDING COMPONENT . . . . . . . . . 5
        F.   DEPARTMENT STORE(S) . . . . . . . . . . . . 5
        G.   DEVELOPER . . . . . . . . . . . . . . . . . 6
        H.   DEVELOPER IMPROVEMENTS . . . . . . . . . . 6
        I.   DEVELOPER MALL STORES . . . . . . . . . . . 6
        J.   ENCLOSED MALL . . . . . . . . . . . . . . . 7
        K.   FLOOR AREA . . . . . . . . . . . . . . . . 7
        L.   HOTEL . . . . . . . . . . . . . . . . . . . 10
        M.   IMPROVEMENTS . . . . . . . . . . . . . . . 10
        N.   INITIAL PLANNED FLOOR AREA . . . . . . . . 10
        O.   MACY'S WING . . . . . . . . . . . . . . . . 10
        P.   MAJORS . . . . . . . . . . . . . . . . . . 10
        Q.   MORTGAGEE AND MORTGAGE . . . . . . . . . . 11
        R.   NORDSTROM WING . . . . . . . . . . . . . . 11
        S.   OCCUPANT . . . . . . . . . . . . . . . . . 11
        T.   OPENING DATE . . . . . . . . . . . . . . . 12
        U.   OPERATE, OPERATED, OPERATING, OPERATION . . . 12
        V.   PARKING STRUCTURE . . . . . . . . . . . . . 13
        W.   PARTY . . . . . . . . . . . . . . . . . . . 13
        X.   PERMISSIBLE BUILDING AREA . . . . . . . . . 13
        Y.   PERIMETER SIDEWALKS . . . . . . . . . . . . 14
        Z.   PERMITTEES . . . . . . . . . . . . . . . . 14
        AA.  PERSON . . . . . . . . . . . . . . . . . . 14
        BB.  PLOT PLAN . . . . . . . . . . . . . . . . . 14
        CC.  PROJECT ARCHITECT . . . . . . . . . . . . . 15
        DD.  SEARS WING . . . . . . . . . . . . . . . . 15
        EE.  STORE OR STORES . . . . . . . . . . . . . . 15
        FF.  TOTAL DEVELOPMENT TRACT . . . . . . . . . . 15
        GG.  TRACT OR TRACTS . . . . . . . . . . . . . . 15

ARTICLE II . . . . . . . . . . . . . . . . . . . . . . . . . 15
    TERM . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARTICLE III . . . . . . . . . . . . . . . . . . . . . . . . . 16
    EASEMENTS . . . . . . . . . . . . . . . . . . . . . . . . 16
        A.   NONEXCLUSIVE EASEMENTS FOR AUTOMOBILE PARKING
            AND INCIDENTAL USES . . . . . . . . . . . . 16
        B.   UTILITIES . . . . . . . . . . . . . . . . . 17
            1.   Separate Utility Lines . . . . . . . . 17
            2.   Common Utility Lines . . . . . . . . . 17
            3.   Future Utility Lines . . . . . . . . . 18
            4.   Location of Easements . . . . . . . . . 18
        C.   CONSTRUCTION EASEMENTS . . . . . . . . . . 18
        D.   DOMINANT AND SERVIENT ESTATES . . . . . . . 19
        E.   ADDITIONAL EASEMENTS . . . . . . . . . . . 20
        F.   OPERATING EASEMENTS . . . . . . . . . . . . 20
        G.   BUILDING ATTACHMENT EASEMENTS . . . . . . . 20

ARTICLE IV . . . . . . . . . . . . . . . . . . . . . . . . . 21
    EXERCISE OF EASEMENTS . . . . . . . . . . . . . . . . . . 21

ARTICLE V . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    IMPROVEMENT PLANS . . . . . . . . . . . . . . . . . . . . 24
        A.   SCOPE OF IMPROVEMENT PLANS . . . . . . . . 24
        B.   SCHEMATIC, PRELIMINARY AND FINAL IMPROVEMENT
            PLANS . . . . . . . . . . . . . . . . . . . 25

       1.   Schematic Improvement Plans . . . . . . .  25
       2.   Preliminary Improvement Plans . . . . . .  26
   C.  GENERAL DESIGN DATA FOR COMMON AREA . . . . .  27
   D.  ENCLOSED MALL DESIGN AND IMPROVEMENT PLANS . .  30
   E.  CONSTRUCTION COMPATIBILITY . . . . . . . . . .  34
   F.  PLANS FOR THE BUILDINGS . . . . . . . . . .  35
   G.  EXERCISE OF APPROVAL RIGHTS . . . . . . . .  36
   H.  ENTRY INTO ENCLOSED MALL . . . . . . . . .  36
   I.  PLANS   IN   ACCORDANCE   WITH   GOVERNMENTAL
      REQUIREMENTS . . . . . . . . . . . . . . .  36
   J.  MAJORS' COURTS . . . . . . . . . . . . . .  37

ARTICLE VI . . . . . . . . . . . . . . . . . . . .  37
  CONSTRUCTION OF DEVELOPER IMPROVEMENTS AND COMMON
  IMPROVEMENT WORK: OPENING DATES OF DEVELOPER MALL STORES
  AND ENCLOSED MALL . . . . . . . . . . . . . .  37
   A.  COMMENCEMENT OF CONSTRUCTION . . . . . . . .  37
   B.  MANNER OF CONSTRUCTION . . . . . . . . . .  40
   C.  COMPLETION OF CONSTRUCTION . . . . . . . .  40
   D.  TIME FOR LEASING AND OPENING OF DEVELOPER MALL
      STORES AND OPENING OF ENCLOSED MALL AND THE
      FAMILY ENTERTAINMENT CENTER . . . . . . . .  41

ARTICLE VII . . . . . . . . . . . . . . . . . . .  42
  CONSTRUCTION OF COMMON AREA . . . . . . . . . . .  42
   A.  SCOPE OF COMMON IMPROVEMENT WORK . . . . . .  42
   B.  SCHEDULING   AND   COMPLETION   OF   COMMON
      IMPROVEMENT WORK . . . . . . . . . . . . .  42
   C.  DESIGN   AND   CONSTRUCTION   OF   PERIMETER
      SIDEWALKS . . . . . . . . . . . . . . . .  43
       1.   Design . . . . . . . . . . . . . . .  43
       2.   Construction . . . . . . . . . . . .  43

ARTICLE VIII . . . . . . . . . . . . . . . . . . .  44
  CONSTRUCTION OF STORES OF MAJORS: OPENING DATES . . . .  44
   A.  CONSTRUCTION . . . . . . . . . . . . . . .  44
   B.  PLAN APPROVAL . . . . . . . . . . . . . .  45
   C.  OPENING DATE OF MAJORS . . . . . . . . . .  49
   D.  STAGING AREA . . . . . . . . . . . . . . .  52

ARTICLE IX . . . . . . . . . . . . . . . . . . . .  53
  FLOOR AREA, USE, OPERATION,
  SIZE AND HEIGHT . . . . . . . . . . . . . . .  53
   A.  FLOOR AREA . . . . . . . . . . . . . . . .  53
   B.  HEIGHTS . . . . . . . . . . . . . . . . .  54
   C.  USES . . . . . . . . . . . . . . . . . .  54
   D.  PROHIBITIONS . . . . . . . . . . . . . . .  55
   E.  NON-INTERFERENCE WITH COMMON AREA . . . . .  57
   F.  FENCES OR OTHER OBSTRUCTIONS . . . . . . . .  58

ARTICLE X . . . . . . . . . . . . . . . . . . . .  58
  GENERAL CONSTRUCTION REQUIREMENTS . . . . . . . . .  58
   A.  INTERFERENCE WITH CONSTRUCTION . . . . . . .  58
   B.  CONSTRUCTION BARRICADES . . . . . . . . . .  59
   C.  SUBMISSION OF SCHEDULE . . . . . . . . . . .  60
   D.  WORKMANSHIP . . . . . . . . . . . . . . .  60
   E.  COORDINATION . . . . . . . . . . . . . . .  60
   F.  MECHANICS' LIENS . . . . . . . . . . . . .  61
   G.  INDEMNITY . . . . . . . . . . . . . . . .  62
   H.  COMMON FOOTINGS . . . . . . . . . . . . . .  62
   I.  MAJOR IMPROVEMENT WORK INSURANCE . . . . . .  63
   J.  DEVELOPER IMPROVEMENT WORK INSURANCE . . . . .  64

ARTICLE XI . . . . . . . . . . . . . . . . . . . .  64
  OPERATION AND MAINTENANCE OF ENCLOSED
  MALL, FAMILY ENTERTAINMENT CENTER AND OTHER COMMON AREA  65
   A.   ENCLOSED MALL - STANDARDS . . . . . . . . .  65

8946-2.251

B.    COMMON AREA - EXCLUSIVE OF ENCLOSED MALL -
        STANDARDS . . . . . . . . . . . . . . . . .   66
C.    AUTOMOBILE PARKING REQUIREMENTS . . . . . . .   68
D.    INDEMNITY . . . . . . . . . . . . . . . . . .   69
E.    PARKING REGULATIONS . . . . . . . . . . . . .   69
F.    MAJORS' CONTRIBUTION TO ENCLOSED MALL AND
        COMMON AREA MAINTENANCE COST . . . . . . . .   73
G.    PERIMETER SIDEWALKS - LANDSCAPING . . . . . .   73
H.    MAJORS' SELF HELP RIGHT . . . . . . . . . . .   73

ARTICLE XII . . . . . . . . . . . . . . . . . . . . . . .   75
    INDEMNIFICATION AND PUBLIC LIABILITY INSURANCE . . . .   75
A.    INDEMNITY - COMMON AREA . . . . . . . . . . .   75
B.    INDEMNITY - STORES . . . . . . . . . . . . .   76
C.    DEVELOPER'S LIABILITY INSURANCE - COMMON
        AREA . . . . . . . . . . . . . . . . . . . .   76
D.    MAJORS' LIABILITY INSURANCE - STORE . . . . .   77
E.    LIABILITY INSURANCE - STORES - HOTELS, FAMILY
        ENTERTAINMENT CENTER . . . . . . . . . . . .   78
F.    BLANKET INSURANCE AND SELF-INSURANCE . . . . .   78
G.    CONTRACTUAL LIABILITY INSURANCE . . . . . . .   79

ARTICLE XIII . . . . . . . . . . . . . . . . . . . . . .   79
    PROPERTY INSURANCE . . . . . . . . . . . . . . . . . .   79
A.    DEVELOPER IMPROVEMENTS . . . . . . . . . . . .   80
B.    MAJORS' IMPROVEMENTS . . . . . . . . . . . . .   80
C.    BLANKET INSURANCE AND SELF-INSURANCE . . . . .   80
D.    MUTUAL RELEASE AND WAIVER OF SUBROGATION . . .   82

ARTICLE XIV . . . . . . . . . . . . . . . . . . . . . . .   83
    COVENANTS AS TO REPAIR, MAINTENANCE,
    ALTERATIONS AND RESTORATION . . . . . . . . . . . . .   83
A.    MAINTENANCE . . . . . . . . . . . . . . . . .   83
B.    DEVELOPER'S RESTORATION . . . . . . . . . . .   83
C.    MAJORS' RESTORATION . . . . . . . . . . . . .   87
D.    STANDARDS OF CONSTRUCTION . . . . . . . . . .   89
E.    LICENSES FOR RECONSTRUCTION . . . . . . . . .   90
F.    CLEARING OF PREMISES . . . . . . . . . . . . .   91
G.    COMMON BUILDING COMPONENTS . . . . . . . . . .   91
H.    LIABILITY OF MORTGAGEE . . . . . . . . . . . .   94

ARTICLE XV . . . . . . . . . . . . . . . . . . . . . . .   95
    FUTURE CONSTRUCTION . . . . . . . . . . . . . . . . .   95
A.    PERMITTED FUTURE CONSTRUCTION . . . . . . . .   95

ARTICLE XVI . . . . . . . . . . . . . . . . . . . . . . .   98
    EXCUSE FOR NON-PERFORMANCE . . . . . . . . . . . . . .   98
A.    FORCE MAJEURE . . . . . . . . . . . . . . . .   98
B.    MAJORS EXCUSED FROM RECONSTRUCTION . . . . . .   98
C.    DEVELOPER EXCUSED FROM RECONSTRUCTION . . . .   99

ARTICLE XVII . . . . . . . . . . . . . . . . . . . . . .   99
    CONDEMNATION . . . . . . . . . . . . . . . . . . . . .   99
A.    TOTAL CONDEMNATION OF A MAJOR'S STORE . . . .   99
B.    PARTIAL CONDEMNATION . . . . . . . . . . . . .   99
C.    TAKING OF ENCLOSED MALL OR DEVELOPER MALL
        STORES . . . . . . . . . . . . . . . . . . .  100
D.    CONDEMNATION OF AUTOMOBILE PARKING AREA . . .  100
E.    DISPUTES . . . . . . . . . . . . . . . . . . .  102
F.    RESTORATION OF DEVELOPER IMPROVEMENTS . . . .  102
G.    DETERMINATION OF AWARD . . . . . . . . . . . .  104
H.    DISTRIBUTION OF AWARD . . . . . . . . . . . .  105

ARTICLE XVIII . . . . . . . . . . . . . . . . . . . . . .  108
    CORRECTION OF SITE DESCRIPTIONS,
    DESCRIPTIONS OF EASEMENTS . . . . . . . . . . . . . .  108
A.    CORRECTION OF SITE DESCRIPTIONS . . . . . . .  108

8946-3.251

ARTICLE XIX . . . . . . . . . . . . . . . . . . . . . . 109
    SIGNS AND ENTRANCES . . . . . . . . . . . . . . . 109
    A.   CRITERIA . . . . . . . . . . . . . . . . . 109
    B.   APPROVAL OF SPECIAL SIGNS . . . . . . . . . 109
    C.   SIGNS ON SHOPPING CENTER TRACT, STORE EXTERIOR
         ENTRANCES AND SIGNS OVER STORE EXTERIOR
         ENTRANCES . . . . . . . . . . . . . . . . . 110

ARTICLE XX . . . . . . . . . . . . . . . . . . . . . . 110
    RULES AND REGULATIONS . . . . . . . . . . . . . . 110

ARTICLE XXI . . . . . . . . . . . . . . . . . . . . . 110
    COVENANTS OF DEVELOPER . . . . . . . . . . . . . 110
    A.   STANDARDS . . . . . . . . . . . . . . . . . 110
    B.   DEVELOPER'S COVENANTS . . . . . . . . . . . 111
    C.   MANAGEMENT COVENANTS . . . . . . . . . . . . 113
    D.   COMPOSITION . . . . . . . . . . . . . . . . 114
    E.   BENEFITS TO MAJORS . . . . . . . . . . . . . 115

ARTICLE XXII . . . . . . . . . . . . . . . . . . . . . 115
    COVENANTS OF MAJORS . . . . . . . . . . . . . . . 115
    A.   STANDARDS . . . . . . . . . . . . . . . . . 115
    B.   MAJORS' COVENANTS AS TO NORDSTROM AND MACY'S . 115
    C.   SEARS' COVENANTS TO DEVELOPER . . . . . . . 123

ARTICLE XXIII . . . . . . . . . . . . . . . . . . . . 129
    TAXES AND ASSESSMENTS . . . . . . . . . . . . . . 129
    A.   PAYMENT OF TAXES . . . . . . . . . . . . . . 129
    B.   TAXES ATTRIBUTABLE TO PARKING . . . . . . . 130
    C.   CONTEST . . . . . . . . . . . . . . . . . . 130
    D.   SPECIAL ASSESSMENTS . . . . . . . . . . . . 131

ARTICLE XXIV . . . . . . . . . . . . . . . . . . . . . 132
    ARBITRATION . . . . . . . . . . . . . . . . . . . 132
    A.   DISPUTES COVERED . . . . . . . . . . . . . . 132
    B.   PROCEDURES . . . . . . . . . . . . . . . . . 132

ARTICLE XXV . . . . . . . . . . . . . . . . . . . . . 133
    TRANSFERS OF INTERESTS, RIGHTS,
             POWERS AND OBLIGATIONS; MORTGAGE . . . . . 133
    A.   LIMITATIONS ON TRANSFER OR ASSIGNMENT . . . 133
    B.   SALE AND LEASEBACK - MORTGAGE . . . . . . . 134
    C.   TRANSFER BY DEVELOPER . . . . . . . . . . . 135
    D.   TRANSFER BY MAJORS . . . . . . . . . . . . . 137
         1.   Mortgage . . . . . . . . . . . . . . . 137
         2.   Transfer by Nordstrom . . . . . . . . . 138
         3.   Transfer by Macy's . . . . . . . . . . 139
         4.   Transfer by Sears . . . . . . . . . . . 142
    E.   RELEASE . . . . . . . . . . . . . . . . . . 144

ARTICLE XXVI . . . . . . . . . . . . . . . . . . . . . 145
    NOTICES . . . . . . . . . . . . . . . . . . . . . 145
    A.   NOTICES TO PARTIES . . . . . . . . . . . . . 145
    B.   MORTGAGEE NOTICE . . . . . . . . . . . . . . 146

ARTICLE XXVII . . . . . . . . . . . . . . . . . . . . 147
    ENTIRE AGREEMENT, AMENDMENT . . . . . . . . . . . 147
    A.   INTEGRATION, METHOD OF AMENDMENT, CONFLICTS . 147
    B.   NO THIRD PARTY BENEFICIARY . . . . . . . . . 148

ARTICLE XXVIII . . . . . . . . . . . . . . . . . . . . 149
    RIGHT TO TERMINATE REA . . . . . . . . . . . . . 149

ARTICLE XXIX . . . . . . . . . . . . . . . . . . . . . 151
    UNPERFORMED COVENANTS . . . . . . . . . . . . . . 151
    A.   DEFAULTS . . . . . . . . . . . . . . . . . . 151
    B.   MANNER OF ACTION . . . . . . . . . . . . . . 152
    C.   NO WAIVER . . . . . . . . . . . . . . . . . 153

031391/S0495/REASears.Cln

iv

8946-4.251

| | | | |
|---|---|---|---|
| D. | "GRACE PERIOD" . . . . . . . . . . . . . | 153 |
| E. | EASEMENT FOR SELF-HELP . . . . . . . . . | 153 |
| F. | SURVIVAL . . . . . . . . . . . . . . . . | 153 |

ARTICLE XXX . . . . . . . . . . . . . . . . . . . 153
    MISCELLANEOUS . . . . . . . . . . . . . . . . 153

| | | |
|---|---|---|
| A. | ATTORNEYS' FEES . . . . . . . . . . . . | 154 |
| B. | BREACH SHALL NOT DEFEAT MORTGAGE . . . . . . | 154 |
| C. | BREACH SHALL NOT PERMIT TERMINATION . . . . | 154 |
| D. | CAPTIONS . . . . . . . . . . . . . . . . | 154 |
| E. | CONSENT . . . . . . . . . . . . . . . . | 154 |
| F. | ESTOPPEL CERTIFICATE . . . . . . . . . . | 155 |
| G. | EXERCISE OF APPROVAL RIGHTS . . . . . . . | 155 |
| H. | GOVERNING LAWS . . . . . . . . . . . . . | 156 |
| I. | INJUNCTIVE RELIEF . . . . . . . . . . . | 156 |
| J. | NO PARTNERSHIP . . . . . . . . . . . . . | 156 |
| K. | NOT A PUBLIC DEDICATION . . . . . . . . . | 156 |
| L. | PAYMENT ON DEFAULT . . . . . . . . . . . | 157 |
| M. | SEVERABILITY . . . . . . . . . . . . . . | 157 |
| N. | SUCCESSORS . . . . . . . . . . . . . . . | 157 |
| O. | TIME OF ESSENCE . . . . . . . . . . . . | 157 |
| P. | WAIVER OF DEFAULT . . . . . . . . . . . | 158 |
| Q. | INDEX ADJUSTMENT DEFINITION . . . . . . . | 158 |
| R. | COUNTERPARTS . . . . . . . . . . . . . . | 159 |
| S. | RECORDING . . . . . . . . . . . . . . . | 160 |
| T. | LIMITED LIABILITY OF DEVELOPER AND EXCULPATION OF PARTNERS . . . . . . . . . . . . . . . . | 160 |
| U. | ORDINANCES . . . . . . . . . . . . . . . | 162 |
| V. | LOCATIVE ADVERBS . . . . . . . . . . . . | 162 |
| W. | TEMPORARY CESSATION OF BUSINESS . . . . . . | 163 |
| X. | EXHIBITS . . . . . . . . . . . . . . . . | 163 |
| X. | ORIGINAL REA SUPERSEDED . . . . . . . . . | 163 |
| Y. | SUPPLEMENTAL AGREEMENT . . . . . . . . . | 163 |

EXHIBITS TO
AMENDED AND RESTATED
RECIPROCAL EASEMENT AND OPERATING AGREEMENT
MALL OF AMERICA
BLOOMINGTON, MINNESOTA

| Exhibit | Description |
|---|---|
| "A" | Total Development Tract/Shopping Center Tract |
| "B" | Plot Plan |
| "C" | Sears Tract |
| "D" | Macy's Tract |
| "E" | Nordstrom Tract |
| "F" | Approved Plans |
| "G" | Critical Construction Milestones |
| "H" | Rules and Regulations |
| "I" | Developer's Work |
| "J" | Parking Management Plan |
| "K" | Sign Criteria |
| "L" | Nationally Recognized Shopping Center Developers |
| "M" | Categories of Occupants for Macy's and Nordstrom |
| "M-1" | Categories of Occupants for Sears |

AMENDED AND RESTATED
RECIPROCAL EASEMENT AND OPERATING AGREEMENT
MALL OF AMERICA
BLOOMINGTON, MINNESOTA

THIS AMENDED AND RESTATED RECIPROCAL EASEMENT AND OPERATING AGREEMENT (the "REA"), made and entered into as of this 30th day of __May__, 1991, by and among Nordstrom, Inc., a Washington corporation ("Nordstrom"), Macy's California, Inc., a Delaware corporation ("Macy's"), Sears, Roebuck and Co., a New York corporation ("Sears"), and Mall of America Company, a Minnesota general partnership ("Developer").

WITNESSETH:

WHEREAS, Developer owns in fee a certain parcel of land situated in the City of Bloomington, County of Hennepin, State of Minnesota, described in Exhibit "A" annexed hereto and shown on the Plot Plan annexed hereto as Exhibit "B" (referred to herein as the "Total Development Tract" or as the "Shopping Center Tract"); and

WHEREAS, Developer and Macy's entered into a Lease Agreement dated as of October 19, 1990, ("Macy's Original Lease"), a memorandum of which was recorded on November 2, 1990, as Document No. 2134522 in the Office of the Registrar of Title of Hennepin County, Minnesota, setting out the terms under which Macy's leases from Developer that certain portion of the Shopping Center Tract shown on Exhibit "B" and described in Exhibit "D" annexed hereto ("Macy's Tract") and the Store to be constructed thereon; and

WHEREAS, Macy's Original Lease was amended, restated and superseded in its entirety by that certain Amended and Restated Lease between Developer and Macy's dated October 30, 1990 (the "Macy's Lease"), a memorandum of which was recorded on December 4, 1990, as Document No. 2140709 in the Office of the Registrar of Title of Hennepin County, Minnesota; and

WHEREAS, Developer and Nordstrom entered into a Lease Agreement dated as of October 12, 1990 ("Nordstrom's Original Lease"), a memorandum of which was recorded on November 2, 1990, as Document No. 2134520 in the Office of the Registrar of Title,

Hennepin County, Minnesota setting out the terms under which Nordstrom leases from Developer that certain portion of the Shopping Center Tract shown on Exhibit "B" and described in Exhibit "E" annexed hereto ("Nordstrom Tract") and the Store to be constructed thereon; and

WHEREAS, Nordstrom's Original Lease was amended, restated and superseded in its entirety by that certain Amended and Restated Lease between Developer and Nordstrom dated October 30, 1990 (the "Nordstrom Lease"), a memorandum of which was recorded on December 4, 1990 as Document No. 2140708 in the Office of the Registrar of Title, Hennepin County, Minnesota; and

WHEREAS, Sears is concurrently herewith entering into that certain Lease Agreement (the "Sears Lease") with Developer (setting out the terms under which Sears shall lease from Developer that certain portion of the Shopping Center Tract shown on Exhibit "B" and described in Exhibit "C" annexed hereto ("Sears Tract") and the Store to be constructed thereon (the Macy's Lease, Nordstrom Lease and Sears Lease are hereinafter jointly referred to as the "Leases" and singly, as a "Lease"); and

WHEREAS, the Parties hereto desire to make an integrated use of their respective Tracts of land and to develop and improve the same as an enclosed mall regional shopping center (the "Shopping Center") and for other uses and purposes consistent with the terms of this REA; and

WHEREAS, Nordstrom desires to construct or cause to be constructed on behalf of Developer, its Store, and thereafter to operate or cause to be operated, as a part of the Shopping Center, a retail facility therein (the "Nordstrom Store"), as provided in the Nordstrom Lease, to be located on the Nordstrom Tract as shown on Exhibit "B"; and

WHEREAS, Macy's desires to construct or cause to be constructed on behalf of Developer, its Store, and thereafter to operate or cause to be operated, as a part of the Shopping Center, a retail facility therein (the "Macy's Store"), as provided in the

Macy's Lease, to be located on the Macy's Tract as shown on Exhibit "B"; and

WHEREAS, Sears desires to construct or cause to be constructed its Store, and thereafter to operate or cause to be operated, as a part of the Shopping Center, a retail facility therein (the "Sears Store"), as provided in the Sears Lease, to be located on the Sears Tract as shown on Exhibit "B"; and

WHEREAS, Developer desires to develop, improve, use, operate and lease the Total Development Tract as an enclosed mall regional shopping center and for other uses and purposes, including, without limitation, hotel and entertainment uses, with the Macy's Tract, Nordstrom Tract and Sears Tract being integrated parts of such development, as more particularly shown on Exhibit "B"; and

WHEREAS, Developer, Nordstrom, Macy's and Sears each desire to grant to and exchange with the other Parties to this REA certain reciprocal easements in, to, over and across their respective Tracts within the Total Development Tract; and

WHEREAS, the Parties to this REA desire to make certain mutual provisions for the construction, maintenance and operation of the Common Area and other buildings and improvements upon the Total Development Tract, and to make certain other covenants and agreements as hereinafter more specifically set forth; and

WHEREAS, Developer, Macy's and Nordstrom entered into that certain Reciprocal Easement and Operating Agreement dated October 30, 1990 (the "Original REA"), which was recorded on December 4, 1990 as Document No. 2140703 in the Office of the Registrar of Title, Hennepin County, Minnesota; and

WHEREAS, the Original REA shall be amended and restated in its entirety by this REA.

NOW, THEREFORE, in consideration of the foregoing, and the covenants and agreements on the part of each Party to the others, as hereinafter set forth, IT IS AGREED, as follows:

ARTICLE I

DEFINITIONS

8946-9.251

As used hereinafter in this REA, the following terms shall have the following respective meanings:

A. <u>AGREED INTEREST RATE</u>. The rate of interest which is one percent (1%) over the rate of interest, averaged on a monthly basis, announced from time to time by The Chase Manhattan Bank, N.A., as its "prime" or "reference" rate of interest computed separately for each month during which the obligation, or any part thereof, upon which such interest is charged remains unpaid hereunder.

B. <u>AUTOMOBILE PARKING AREA</u>. The term "Automobile Parking Area" refers to the Parking Structures and all ground surface Common Area used for the parking of automobiles (including other licensed passenger motor vehicles), if any, and interior roadways, pedestrian stairways, pedestrian bridges connecting a Parking Structure to a Building or the Enclosed Mall, walkways and tunnels, bicycle paths, curbs and landscaping within or adjacent to areas used for parking of motor vehicles, together with all Improvements which at any time are erected thereon, subject to the provisions of Article III-D, all as more particularly shown on the Plot Plan. Such areas shall not include truck ramps and loading and delivery areas.

C. <u>BUILDING</u>. The term "Building" refers to all Improvements to and upon the Total Development Tract including any Hotels and the Family Entertainment Center, or any component Tract thereof (including the Stores), excluding underground utility installations, the Common Area, the Common Utility Lines, the Enclosed Mall (but not the building enclosing the Enclosed Mall), and the landscaping, if any, between the exterior perimeter walls of Buildings and the perimeter sidewalk of such Building. Department Stores which are not Operated by a Major shall be considered Buildings of Developer.

D. <u>COMMON AREA</u>. The term "Common Area" refers to all areas within the Total Development Tract which are made available, as

hereinafter provided, for the general use, convenience and benefit of Developer and all Occupants and Permittees.

In addition to the foregoing, Common Area shall include, but not be limited to, common utility lines and systems; Automobile Parking Area; access roads; aisles; islands; entrances; exits; driveways; Perimeter Sidewalks; landscaped and exterior planted areas; curbs; lighting standards; traffic and parking markings; malls, including the Enclosed Mall; public stairways; escalators; bus stops; taxi stands; public service areas; outside courtyards; public rest rooms not located within the premises of any Occupant; parking areas located outside the Total Development Tract as may be approved by the Parties; and a Common Area maintenance office and Common Area equipment sheds. The Common Area shall include, but not be limited to, all items of Common Area shown on the Plot Plan.

Common Area shall include that portion of the available Permissible Building Area not occupied by Buildings, until such time as construction of Buildings is commenced thereon.

Common Area shall not include truck tunnels, truck parking, turn-around and dock areas, the depressed portions of truck tunnels or ramps serving any Store or rest rooms, emergency exit corridors, stairs, elevators and similar areas contained within any area exclusively appropriated for the use of any single Occupant.

E.    <u>COMMON BUILDING COMPONENT</u>.    The term "Common Building Component" refers to any single Improvement or portion thereof, including, but not necessarily limited to, the Enclosed Mall structure, which is located partly on the Tract of one Person and partly on the Tract of another Person, or which although located entirely on the Tract of one Person provides structural support to improvements on the Tract of another Person.

F.    <u>DEPARTMENT STORE(S)</u>.    "Department Store" means (i) the Majors and (ii) any other Occupant occupying and Operating any of the spaces labeled, "Macy's Department Store", "Nordstrom Department Store", "Sears Department Store" or "Bloomingdale's Department Store" on Exhibit "B" in at least the Minimum Floor Area

described at Article IX-A hereof as a single retail facility with a series of integrated departments for the sale of goods and merchandise of various kinds (including such non-retail activities as may customarily be incidental thereto).

G.  DEVELOPER.  The owner from time to time of fee simple title to the Tracts of the Majors and the Developer Tract; provided, however, that upon conveyance of a portion of the Developer Tract to a Department Store, whether by fee conveyance or lease, the portion of the Developer Tract so conveyed shall automatically (and without the need for amendment to this REA) be excluded from the definition of the Developer Tract (but not from the definition of the Total Development Tract), and the grantee thereof will not be deemed to be the Developer under this REA, but the portion of the Developer Tract so conveyed shall remain subject to the terms, covenants, conditions, restrictions and requirements of this REA which shall bind each and every Person having any fee, leasehold or other interest in any part of the Developer Tract as comprised on the date hereof, at any time or from time to time, subject to Article XXV of this REA.  Notwithstanding anything to the contrary contained herein, the parcels initially leased or conveyed for Department Store or Hotel Operations shall be excluded from the Developer Tract for purposes of this REA effective as of the date such parcels are made subject to this REA, in form reasonably satisfactory to the Majors.

H.  DEVELOPER IMPROVEMENTS.  The term "Developer Improvements" refers to and includes Developer Stores, the Enclosed Mall, the Parking Structure and all other Improvements now or hereafter situated on the Developer Tract as the same may exist from time to time, including any replacements thereof.

I.  DEVELOPER MALL STORES.  The term "Developer Mall Stores" refers to the buildings located on the Developer Tract abutting the Enclosed Mall and designated as Mall Stores on the Plot Plan, Exhibit "B", as the same may exist from time to time, including any replacements thereof.

J.    ENCLOSED MALL.    The term "Enclosed Mall" (sometimes called "Mall") refers to the portion or portions of the malls located in the Total Development Tract which are constructed so that climatic control may be provided therein and/or which are actually enclosed by walls and ceilings, and which are designated as such on the Plot Plan, as the same may exist from time to time, including any replacements thereof but excluding areas marked "Family Entertainment Center" on the Plot Plan (all of which areas are herein referred to as the "Family Entertainment Center").

K.    FLOOR AREA.    The term "Floor Area" refers to the aggregate of the actual number of square feet of floor space of all floors in any Building located on the Total Development Tract exclusively appropriated for use by an Occupant, whether or not actually occupied, including basement space, subterranean areas, balcony and mezzanine space within the exterior facade or exterior line of the exterior walls (including basement walls), except party and interior common walls as to which the center thereof instead of the exterior faces thereof shall be used.

The term "Floor Area" shall not include the following:

1.    The upper levels of any temporary or permanent multi-deck stock areas created and used exclusively for stock storage purposes;

2.    Areas which are used exclusively to house mechanical, electrical (including electrical equipment to operate point of sale equipment), telephone, HVAC and other such building operating equipment, including trash compacting and baling rooms, whether physically separated or whether otherwise required by building codes;

3.    Any Common Area (including employee parking) or any Buildings used solely in connection with the maintenance of the Common Area;

4.    Any (i) Center management office, (ii) Merchants' Association office and/or (iii) community meeting rooms, provided that the sum of (i) and (ii) shall not exceed an

8946-13.251

aggregate of three thousand (3,000) square feet and the sum of (i), (ii) and (iii) shall not exceed an aggregate of seven thousand (7,000) square feet;

5.   Emergency exit corridors or stairs between fire resistant walls required by building codes;

6.   All truck loading areas, truck tunnels and truck parking, turn-around and dock areas and ramps and approaches to such truck loading areas, receiving areas, truck tunnels and truck parking, turn-around and dock areas;

7.   A United States post office not exceeding one thousand (1,000) square feet; and

8.   The Enclosed Mall; and

9.   Any "dead space" which may be created by extending an upper level roof line from the Building wall to an outside parapet wall so long as such space is not used for any purpose other than the hanging or support of mechanical equipment.

No deduction shall be made from Floor Area computed under the foregoing definition by reason of interior columns, stairs, escalators, elevators, dumbwaiters, conveyors or other interior construction or equipment within the Building involved, except as provided above.

After the completion and opening of the respective Buildings of each of Developer (including other Department Stores, Hotels, Developer Mall Stores and the Family Entertainment Center) and each of the Majors, each Party shall, at its sole cost and expense, cause its architect to make a determination as to the number of square feet of Floor Area of each such Party. Such determination shall be completed and furnished to each other Party not later than one hundred twenty (120) days following the date on which the respective Buildings first open for business. In lieu of such determination by a Party's architect, any Party may elect to furnish to the other Party a written certification of its Floor Area, and Developer's certification may rely upon the best information provided to Developer by the other Department Stores,

Hotels, and the Family Entertainment Center. If a Party's certification proves to be incorrect, such Party shall not be in default, but any prorations which were based on the incorrect certification shall be readjusted on the basis of the correct figures when they become available. Such certification by a Party shall be furnished within the time period above provided. If either Party disputes the certification of the other Party, the Party providing the certification shall obtain an architect's certificate as to the disputed Floor Area. Any dispute arising from such determination or certification shall be resolved by arbitration as provided for in Article XXIV. In the event such determination of Floor Area by the Party's architect or certification by a Party shows that any Party has constructed Floor Area in excess of its Initial Planned Floor Area, and provided such excess does not require additional Automobile Parking Area pursuant to Article IX-A hereof, the Parties shall amend Article IX-A hereof to reflect the increased Initial Planned Floor Area of any such Party; provided, however, that the Nordstrom Building (excluding basement space utilized for shipping and receiving and non-selling support areas) shall never exceed two hundred fifty thousand (250,000) square feet of Floor Area, the Macy's Building (excluding basement space utilized for shipping and receiving and non-selling support areas) shall never exceed two hundred eighty thousand (280,000) square feet of Floor Area and the Sears Building (excluding basement space utilized for shipping and receiving and non-selling support areas) shall never exceed two hundred thousand (200,000) square feet of Floor Area. Notwithstanding anything to the contrary contained in this REA, during the period of any damage, destruction, razing, rebuilding, repairing, replacement or reconstruction to, on or of any Building within the Total Development Tract, the Floor Area of such Building shall be deemed to be the same as the Floor Area of such Building immediately prior to such period, and upon the completion of the rebuilding, repairing, replacement or reconstruction of such Building, a new

8946-15.251

determination shall be made of the Floor Area for such Building as provided in the foregoing provisions of this Article I-K.

L.  HOTEL.  The term "Hotel" refers to any hotel Buildings constructed or to be constructed in the Future Hotel Site and Parking shown on the Plot Plan and designated thereon as "hotel" or to all of such Hotel Buildings as the context may indicate. Developer shall have no obligation whatsoever to construct any of such Hotels.

M.  IMPROVEMENTS.  The term "Improvements" refers to all improvements to land of every nature and kind upon the Total Development Tract or any component Tract thereof, including, but not limited to, the Common Area, the Utility Facilities, the Enclosed Mall, the Buildings, the Family Entertainment Center, any Hotel, the Parking Structure and landscaped areas.

N.  INITIAL PLANNED FLOOR AREA.  The term "Initial Planned Floor Area" refers to the amount of Floor Area which Developer and each of the Majors, respectively, anticipate constructing or causing to be constructed on the Developer Tract and the respective Tracts of the Majors, as provided in Article IX-A hereof and also for determining the extent of Common Area initially required for the Total Development Tract.  Notwithstanding anything to the contrary herein contained, Developer shall have no obligation whatsoever to construct any theaters on the Total Development Tract.

O.  MACY'S WING.  The term "Macy's Wing" refers to the portion of the Enclosed Mall, including all retail space, which is located between the Macy's Store and the Nordstrom Store, including the areas labeled "West Street" and "The Market" on Exhibit "B", as well as the portion of the Enclosed Mall which is located between the Macy's Store and the Bloomingdale's Store, including the areas labeled "South Street" and "The Gallery" on Exhibit "B".

P.  MAJORS. The term "Major" or "Majors" refers to Nordstrom and/or Macy's and/or Sears, severally or collectively, as may be appropriate in this REA, and any other Department Store which

8946-16.251

becomes a Party to this REA; provided, however, that in Article XXII-B, the term "Major" or "Majors" refers only to Nordstrom and/or Macy's, severally or collectively, as may be appropriate in Article XXII-B.

Q.    <u>MORTGAGEE AND MORTGAGE</u>.    The term "Mortgagee" means either (i) the mortgagee under a Mortgage or (ii) the trustee and beneficiary under a deed of trust which for the purposes hereof shall constitute a Mortgage, (iii) the fee owner following a Sale and Leaseback, or (iv) the owner of a ground leasehold interest following a Lease and Sub-Leaseback.    The term "Mortgagee" shall not refer to any of the foregoing Persons when in possession of the Tract of any Party.    The term Mortgage" means an indenture of mortgage or deed of trust on a Tract, or a Sale and Leaseback, or a Lease and Sub-leaseback.

A "Sale and Leaseback" means a transaction whereby a Party conveys its interest in such Tract for financing purposes only and such conveyance is followed immediately by a leaseback of the entirety of the Tract or the improvements thereon to such Party, or to a parent, subsidiary or corporate affiliate of such Party.

A "Lease and Sub-leaseback" means a transaction whereby a Party leases its interest in such Tract for financing purposes only and such lease is followed immediately by a sub-leaseback of the entirety of the Tract or the improvements thereon to such Party, or to a parent, subsidiary or corporate affiliate of such Party.

R.    <u>NORDSTROM WING</u>.    The term "Nordstrom Wing" refers to the portion of the Enclosed Mall, including all retail space, which is located between the Nordstrom Store and the Macy's Store, including the areas labeled "West Street" and "The Market" on Exhibit "B", as well as the portion of the Enclosed Mall which is located between the Nordstrom Store and the Sears Store, including the areas labeled "North Street" and "The Green" on Exhibit "B".

S.    <u>OCCUPANT</u>.    The term "Occupant" refers to the Majors, the Operator of the Family Entertainment Center and to any Person from time to time entitled to the use and occupancy of Floor Area in the

031391/S0495/REASears.Cln

11

8946-17.251

Total Development Tract under any lease, deed or other instrument
or arrangement whereunder such Person has acquired rights with
respect to the use and occupancy of any Floor Area; and Developer,
if and so long as it Operates a business in any Floor Area.

T.    OPENING DATE.    The term "Opening Date" as to Macy's,
Nordstrom, Sears and Developer means August 7, 1992, subject to the
conditions to the Majors' obligations to open set forth in this
REA.

U.    OPERATE, OPERATED, OPERATING, OPERATION.    The terms
"Operate", or "Operated", or "Operating", or "Operation" shall mean
(i) as respects Stores, that the respective Stores are open to the
general public for business during their business hours except when
temporarily not so open for business pursuant to Article XVI or
Article XVII hereof, or during any period of reconstruction of any
Store pursuant to the provisions of Article XIV, or by reason of
such reasonable interruptions as may be incidental to the conduct
of its business; and, (ii) as respects the Enclosed Mall, that the
Enclosed Mall is open to the public during the business hours of
the Department Stores, or any of them, and for not less than one-
half (1/2) hour before and after any Department Store shall be open
to the general public for retail business except when temporarily
not so open for business pursuant to Article XVI or Article XVII
hereof, or during any period of reconstruction of the Enclosed Mall
pursuant to the provisions of Article XIV; and (iii) as respects
the Common Area, other than the Enclosed Mall, that the Common Area
is available for the uses contemplated herein and is being operated
and maintained in accordance with the requirements of Article XI
and (iv) as respects the Family Entertainment Center, (x) that all
or a substantial portion of the Family Entertainment Center
including all pedestrian entrances from and access routes through
the Family Entertainment Center to the Enclosed Mall shall be open
for business to the public (with reasonable allowance for staggered
opening times for certain attractions, to correspond to the
expected volume of visitors) at least during the hours that the

8946-18.251

Enclosed Mall is open or is required to be open for business to the public and (y) the Family Entertainment Center is being managed, maintained, operated as a first-class family oriented amusement park or center by a single operator, which is recognized as an operator of first-class family oriented amusement parks or centers of the quality of amusement parks and centers operated by Knotts Berry Farm, Six Flags West, Disneyland, Epcot Center, or which has been approved by the Majors.

V.   PARKING STRUCTURE.  The term "Parking Structure" refers to the multi-level parking structures to be constructed on the Total Development Tract, for the use and benefit of the Total Development Tract, together with incidental and interior roadways, ramps, curbs, walkways and landscaping within or adjacent thereto, together with all Improvements which at any time are erected thereon, as the same may exist from time to time, including any replacements thereof.

W.   PARTY.  The term "Party" refers to Developer and each of the Majors, or their respective successors in interest with respect to their respective Tract, who succeed to their respective rights and obligations pursuant to Article XXV.

X.   PERMISSIBLE BUILDING AREA.  The term "Permissible Building Area" refers to the areas within the Total Development Tract or any component Tract thereof upon which a designated Party may construct either its initial Building, or any future expansion thereof, or its future Building, as provided in this REA, as shown on the Plot Plan.  Unless otherwise expressly shown and indicated on the Plot Plan, the Permissible Building Area on each Party's Tract is the portion of each Party's Tract upon which such Party's Building (including, without limitation, Hotels) is shown on the Plot Plan, together with the height restrictions noted thereon and/or herein.  No (i) construction of any Building outside of Permissible Building Areas will be made without the prior written approval of each of the Parties, (ii) increase in the height of any Building or Parking Structure in excess of that shown on Exhibit

8946-19.251

"B" or provided herein will be made without the prior written approval of each of the Parties, or (iii) revision in the layout or traffic circulation patterns of any Parking Structure from the layout and traffic circulation patterns as shown on Exhibit "B", will be made without the prior written approval of each of the Majors.

Y.    <u>PERIMETER SIDEWALKS</u>.    The term "Perimeter Sidewalks" refers to those areas adjacent to the Stores between exterior Building faces and exterior curb faces, including sidewalks, curbs, curb cuts and ramps for the handicapped, and all other Improvements adjacent to the Buildings of the Parties between exterior Building faces and exterior curb faces, all as shown on the Plot Plan.

Z.    <u>PERMITTEES</u>.    The term "Permittees" refers to Developer and all Occupants and their respective officers, directors, employees, agents, contractors, customers, visitors, invitees, licensees, subtenants and concessionaires.

AA.    <u>PERSON</u>.    The word "Person" refers to and shall include individuals, partnerships, firms, associations and corporations, or any other form of business or government entity, and the use of the singular shall include the plural, and may include where the context may appropriately require any Party.

BB.    <u>PLOT PLAN</u>.    The term "Plot Plan" means the diagram or drawing attached hereto as Exhibit "B" which designates, among other things, the general nature, size, location and/or shape of:

   (a)    the Total Development Tract and each other component Tract of said Total Development Tract and its property lines or boundaries;

   (b)    the Improvements situated, or to be situated on the Total Development Tract, including the Permissible Building Areas, the Building Perimeter Sidewalk, the Common Area, the Parking Structure, the Covered Mall, the Family Entertainment Center, the Buildings, service courts and truck loading docks; and

   (c)    adjoining and/or nearby public streets and highways.

CC. <u>PROJECT ARCHITECT</u>. The term "Project Architect" refers to HGA/KKE Joint Venture between Hammel, Green & Abrahamson and Korsunsky, Krank & Erickson, or such other architect or architects duly licensed in the State of Minnesota, as may from time to time be designated by the Parties hereto.

DD. <u>SEARS WING</u>. The term "Sears Wing" refers to the portion of the Enclosed Mall, including all retail space, which is located between the Sears Store and the Bloomingdale's Store, including the areas labeled "East Street" and "The Rotunda" on Exhibit "B", as well as the portion of the Enclosed Mall which is located between the Sears Store and the Nordstrom Store, including the areas labeled "North Street" and "The Green" on Exhibit "B".

EE. <u>STORE OR STORES</u>. The term "Store" or "Stores" refers to the Building(s), respectively, housing the Nordstrom Store, the Macy's Store, the Sears Store, the Family Entertainment Center, the Department Stores, and/or the Developer Mall Stores, as the context may appropriately require. For purposes of Article XIII of this REA the term "Store" or "Stores" shall be deemed to include the respective truck parking dock areas and the depressed portions of truck ramps, and emergency exit corridors and stairs.

FF. <u>TOTAL DEVELOPMENT TRACT</u>. The term "Total Development Tract" refers to the Developer Tract (which includes the Family Entertainment Center), the Tracts of the Majors, any and all Department Store Tracts and Hotel Tract(s), if any.

GG. <u>TRACT OR TRACTS</u>. The term "Tract" or "Tracts" refers to the Developer Tract, and/or the Total Development Tract, and/or the Nordstrom Tract, and/or the Macy's Tract and/or the Sears Tract, as the context may require.

<u>ARTICLE II</u>

<u>TERM</u>

The term of this REA shall (unless sooner terminated under conditions contained herein) be for a period extending as long as any lease between Developer and a Major or any extension or renewal thereof shall be in effect (the "Term").

## ARTICLE III

### EASEMENTS

A.    NONEXCLUSIVE EASEMENTS FOR AUTOMOBILE PARKING AND INCIDENTAL USES.    Developer hereby grants to the Majors, for their use, and for the use of their respective Permittees, in common with all others entitled to use the same, nonexclusive and irrevocable easements over the Common Area of the Total Development Tract, for ingress to and egress from Total Development Tract, for the passage and parking of vehicles, and for passage and accommodation of pedestrians, on such respective portions of such Common Area as are set aside, maintained and authorized for such use pursuant to the terms of this REA, and for the doing of such other things as are authorized or required to be done on said Common Area pursuant to this REA  Developer further reserves to itself the right to grant such non-exclusive easements over the Common Area of its Tract(s) in compliance with the terms of this REA, for the purposes hereinabove enumerated, to other Occupants of portions of the Total Development Tract, or their Permittees.  The Majors hereby grant to each other and to Developer and their Permittees (and to other Occupants of the Shopping Center and its and their Permittees) non-exclusive rights of entry and easements for use of the Common Area within the Tracts of the Majors for the purposes thereof to whatever extent necessary or appropriate to enable Developer to exercise and fully enjoy all of its rights, powers and privileges pursuant to this REA.

Notwithstanding the foregoing, Developer reserves the right to close off the Common Area of Total Development Tract for such reasonable period or periods of time as may be legally necessary to prevent the acquisition of prescriptive rights by anyone; provided, however, that prior to closing off any portion of the Common Area, as herein provided, Developer shall give written notice to the Majors of its intention so to do, and shall coordinate such closing with all other Parties so that no unreasonable interference with the Operation of the Total Development Tract shall occur.

8946-22.251

Notwithstanding the reservation herein provided for, and the right to grant easements, it is expressly understood and agreed that such reservation and the right to grant easements is limited to nonexclusive use of the surface. Developer hereby reserves the right to eject or cause the ejection from the Common Area of Developer's Tract of any Person or Persons not authorized, empowered or privileged to use the Common Area of such Tract. No Floor Area shall be erected or Operated within the Common Area of any Tract within the Total Development Tract, except as permitted pursuant to Articles V, VI, VII, IX, and XV hereof.

B.   UTILITIES

1.   Separate Utility Lines. Developer hereby grants to the Majors, subject to the provisions of this Article, nonexclusive and irrevocable easements under and across the Common Area of Developer's Tract for the installation, operation, flow and passage, use, maintenance, repair, relocation and removal of utility lines for sanitary sewers, storm drains, water and gas mains, electrical power lines, cable television, telephone lines and other utility lines serving exclusively the Tract of each Major, for the sole purpose of providing such utility service to the Tract of each Major. All of such sewers, drains, mains and lines shall be underground and shall not be located within any Permissible Building Area.

2.   Common Utility Lines. Developer hereby grants to the Majors, for the use of each of the Majors and for the use of their respective Permittees, nonexclusive and irrevocable easements under and across the Common Area of Developer's Tract for the installation, operation, flow and passage, use, maintenance, repair, relocation and removal of sanitary sewers, storm drains, water and gas mains, electrical power lines, cable television, telephone lines and other utility lines for the service of Common Area and for use in common with other parties. All of such sewers, drains, mains and

8946-23.251

lines shall be underground and shall not be located within any Permissible Building Area.

3.   <u>Future Utility Lines.</u>  Developer hereby grants to the Majors, for the use of each of the Majors and for the use of their respective Permittees, nonexclusive and irrevocable easements under and across the Common Area of Developer's Tract for the purposes of installing therein in the future other pipes, not part of the Common Utility Lines as originally constructed, to provide gas, water, fire loops, and hydrants therefor, electric power, other forms of energy, cable television, signal, telephone, sanitary sewer and storm sewer services, or any of them, to or from any present or future facilities on the Developer's Tract.  All such sewers, drains, mains and lines shall be underground and shall not be located within any Permissible Building Area.

4.   <u>Location of Easements.</u>  The location of all easements of the character described in this Article III-B shall be subject to the prior written approval of Developer. Any Major which exercises such easement shall restore Developer's Tract if affected by the construction of such utility facilities to the same condition as such Tract was before the commencement of the construction, including, without limitation, the restoration of pavement.  Upon completion of construction of such utility facilities the Parties shall join in the execution of an agreement, in recordable form, appropriately identifying the type and location of such respective utility facility.

C.   <u>CONSTRUCTION EASEMENTS.</u>  Each Party, with respect to its Tract, hereby grants to each of the other Parties nonexclusive easements for the temporary use of portions of the Common Area of each such respective Tract from time to time for the purpose of the development, construction and reconstruction thereof, pursuant to the provisions of Articles VI, VII, VIII and XIV of this REA; and for the purpose of the construction, reconstruction, erection and

8946-24.251

removal and maintenance on, to, over, under and across each such respective Tract (whether located upon Common Area or otherwise) of (i) Common Building Components, (ii) columns, pedestrian bridges, footings, foundations, supports and common walls to a maximum lateral distance of ten feet (10'), or as otherwise approved and installed in accordance with this REA and (iii) Building facade treatments, covered entrances and walkways, marquees, signs, lights, canopies, roof and building overhangs, and other similar appurtenances to the Building, to a maximum lateral distance of five feet (5'), as any of the foregoing are shown in the working drawings for such Building approved by the Parties pursuant to Article V hereof.  Each Party covenants and agrees, respectively, that its exercise of such easements shall not result in damage or injury to the Buildings or other Improvements of the other Parties, and shall not interfere with the business operation conducted by the other Parties in the Center.  The easements granted in this section shall also extend to minor encroachments of the improvements of one Party onto the Tract of another Party which result from inadvertent errors in design, layout, or construction. The exercise of the rights referred to in this Article III-C shall be in conformity with Articles IV and X hereof.

D.   <u>DOMINANT AND SERVIENT ESTATES.</u>   Each easement granted pursuant to the provisions hereof is expressly for the benefit of the Tract of the grantee, and the Tract so benefitted shall be the dominant estate and the Tract upon which such easement is located shall be the servient estate, but where only a portion thereof is bound and burdened, or benefitted by a particular easement, only that portion so bound and burdened, or benefitted, as the case may be, shall be deemed to be the servient or dominant tenement, as the case may be.  Any easement granted pursuant to the provisions of this Article III may be abandoned or terminated by execution of an agreement so abandoning or terminating the same, by the owners of the dominant and servient estates.

E.    ADDITIONAL EASEMENTS.    Developer shall have the right to grant easements similar to the easements described in this Article III, and access easements and easements for the use and enjoyment of the Common Area on the Developer Tract, and/or ingress to and egress from the Total Development Tract for the passage and parking of vehicles, and for passage or accommodation of pedestrians, to or for the benefit of Improvements shown on the Plot Plan, or any other portion of the Total Development Tract.    Except as herein described, Developer shall not hereafter grant an easement or easements of the type set forth in this Article III for the benefit of any property not within the Total Development Tract without the prior written approval of the Majors.

F.    OPERATING EASEMENTS.    Each of the Majors grants to Developer easements in, upon, over and through the Common Area portions of its respective Tract for the following purposes:

(i)    The development and performance of construction, if any, thereon of portions of the Common Area located on the Tract of such Major; and

(ii)    The management, operation, maintenance, reconstruction and repair of such Common Area pursuant to the applicable provisions of this REA.

The easements provided in this Paragraph F shall terminate as to the Common Area on the Tract of each Major upon the termination of this REA.    The easements granted in this Paragraph F shall only be exercised after reasonable prior notice by Developer to the appropriate Major, and Developer shall use reasonable efforts to exercise (or cause the exercise of) such rights in a manner designed to minimize interference with the Tract of such Major and such Major's business use thereon.

G.    BUILDING ATTACHMENT EASEMENTS.    (a) Each Major grants to Developer the right to have the Enclosed Mall, the Parking Structure and the Developer Buildings abut and attach to its respective Store as shown on the Plot Plan subject to such Major's prior approval of the plans for each such attachment.    Any change

in the manner of such attachment shall be subject to such Major's prior approval of the plans for such attachment. The easements as provided in this Paragraph shall continue so long as Buildings (and the reconstruction and/or replacement thereof) reasonably require or benefit from the same. It is understood and agreed that no attachment or connection easement granted or permitted in this REA will impose a load or stress on the Improvements of the grantor which exceeds the load or stress approved in connection with the approval by a Major and Developer of final plans for such attachment or connection.

(b) Developer grants to the Majors the right to have their respective Stores abut and attach to the Enclosed Mall, the Parking Structure and the Developer Buildings as shown on the Plot Plan subject to Developer's approval of plans for such attachment. Any change in the manner of such attachment shall be subject to Developer's prior approval of the plans for such attachment. The easements as provided in this Paragraph shall continue so long as Buildings (and the reconstruction and/or replacement thereof) reasonably require or benefit from the same. It is understood and agreed that no attachment or connection easement granted or permitted in this REA impose a load or stress on the Improvements of the grantor which exceeds the load or stress approved in connection with the approval by a Major and Developer of final plans for such attachment or connection.

ARTICLE IV

EXERCISE OF EASEMENTS

A.    The exercise of the easements granted pursuant to Article III hereof shall be subject to the following provisions:

1.    The grantee of any of the utility easements shall be responsible, as between the grantor and the grantee thereof, for the installation, maintenance and repair of all sanitary sewers, storm drains, pipes and conduits, cables, mains and lines and related equipment installed by the grantee pursuant

8946-27.251

to such grant and easement.  No Major shall, however, be responsible for the installation or maintenance of utilities which Developer is required to install pursuant to Article VI of this REA.  Any such maintenance and repair shall be performed only after two (2) weeks notice to the grantor of the grantee's intention to do such work, except in the case of emergency, and any such work shall be done without cost or expense to the grantor (except Common Area costs as appropriate) and in such manner as to cause as little disturbance in the use of the Common Area as may be practicable under the circumstances.  Upon the completion of such work, the grantee shall restore the Common Area affected by such work to the same condition as it was before the commencement of the work.  Installation of any utility lines pursuant to easements granted in Article III-B after any Party has opened its Building(s) for business to the public shall be subject to the prior approval of the grantor of such easement as to the timing of such work, which approval (and the scheduling of such work) shall not be unreasonably withheld or delayed, it being the intention of the Parties to schedule such work in a manner that will minimize interference with the business of the grantor.  Except in emergencies, no such work be scheduled to be undertaken between November 1 and January 15.  Further, except in emergencies, during the period from July 10 to August 10 no such work shall be scheduled to be undertaken by Developer or any Occupant if such work interferes with a Major's parking, a Major's access or the operation of a Major's business; and, except in emergencies, such grantor shall give the other party at least thirty (30) days notice of the grantor's intention to install such utilities.

2.  At any time, the grantor of any of the utility easements granted pursuant to Article III shall have the right to relocate on the Common Area portions of the Tract of the

8946-28.251

grantor any such sewers, drains, pipes and conduits, cable, mains and lines and related equipment (and the easements therefor) then located on the Tract of the grantor provided that such relocation shall be performed only after thirty (30) days notice of the grantor's intention to so relocate shall be given to the grantee, and such relocation: (i) shall not interfere with or diminish the utility services to the grantee; (ii) shall not reduce or unreasonably impair the usefulness or function of such utility; (iii) shall be performed without cost or expense to grantee; and (iv) except in an emergency, shall not be performed between November 1 and January 15. Further, except in emergencies, during the period from July 10 to August 10 no such work shall be scheduled by Developer or any Occupant to be undertaken if such work interferes with a Major's parking, a Major's access or the operation of a Major's business; and, except in emergencies, such grantor shall give the other party at least thirty (30) days notice of the grantor's intention to install such utilities. Notwithstanding such relocation, maintenance of the lines, mains and/or equipment located on the Tract of the grantor shall be the obligation of the grantee; provided that if there shall be any material increase in the cost of such maintenance by reason of such relocation, the grantor shall bear the cost of such increase.

3.    The easements granted by Article III hereof shall remain in effect as long as any lease between a Major and Developer is in effect.

4.    Interruption in service of any such easements shall be permitted as a result of any cause or event referred to in Article XVI hereof.

5.    The grantee of any of the utility easements referred to in Article III-B shall be responsible for the repair or restoration of any portion of the Tract of the grantor of such easement necessitated by the exercise of such easement so that

any such affected Tract shall be placed in the same condition as it was prior to the commencement of construction pursuant to such easement.

B.   The Parties agree that in the event the Store of a Major or the Enclosed Mall, as relates to the Developer shall be removed or destroyed, at such time as such Party is not required and does not elect to restore the same pursuant to the provisions of this REA, it will leave in place any foundations not destroyed, which immediately prior to such removal or destruction were shared jointly between such Store and the Store of any Major, or the Enclosed Mall, as the case may be, in accordance with Articles XIV-G and III-C for so long as such other Store, or Enclosed Mall, as the case may be, is in existence, including any period of restoration or reconstruction of same.

Nothing contained in this Article is or shall be determined to impose upon any Party hereto any obligation to reconstruct all or any part of any Store, or the Enclosed Mall, beyond such reconstruction provisions as are otherwise contained in this REA.

C.   Any relocation of any easement shall be made at the expense of the Party requesting such relocation.

D.   Each Party (as a grantee) agrees to use its reasonable best efforts in the exercise of the rights and easements granted in Article III hereof to avoid injury or damage to the Building(s) and Improvements of the grantor, and will repair any damage to the Building(s) and Improvements of the grantor resulting from the use of such easements.  Each Party (as a grantee) agrees to use its reasonable best efforts to exercise the rights and easements granted in Article III hereof in such a manner as to minimize interference with the grantor's use and enjoyment of its Tract or Tracts.

<u>ARTICLE V</u>

<u>IMPROVEMENT PLANS</u>

A.   <u>SCOPE OF IMPROVEMENT PLANS</u>.  Developer shall cause the Project Architect to prepare the general architectural concept of

8946-30.251

the Improvements to the Total Development Tract contemplated herein, for the integrated development of all Common Areas which are contemplated initially will be constructed and such architectural concept will be subject to the prior approval of the Majors, which approval shall not be unreasonably withheld. The Majors have approved the plans described in Exhibits "F-1", "F-2" or "F-3", respectively. From time to time during the course of the preparation of Developer's plans and specifications for construction of the Improvements pursuant to such general architectural concept of the Center, Developer shall cause the Project Architect to submit progressive copies of such plans to the Majors for their review and approval, if required in the first instance, pursuant to the terms of this REA. In the event such plans or revisions (a) provide for the location of Buildings outside of the Permissible Building Area as shown on the Plot Plan, (b) provide for the construction of Buildings in excess of the maximum height therefor as shown on the Plot Plan, (c) materially modify the vehicular traffic circulation within the Total Development Tract, (d) materially modify the automobile parking in the Total Development Tract, (e) provide for Improvements which are materially different in location, size, character, color or materials from the Improvements shown on plans previously approved by the Majors (or if no prior plans had been approved by the Majors), or (f) make any material change to the Common Area, then such plans shall be subject to the Majors' prior written approval, which may be withheld in their sole and absolute discretion.

B.   SCHEMATIC, PRELIMINARY AND FINAL IMPROVEMENT PLANS. The Improvement plans to be delivered by Developer from time to time shall include:

1.   Schematic Improvement Plans. Schematic Improvement Plans which included elevations, materials to be used, perspective renderings reflecting design concepts, graphics, colors, layout of parking and other Common Area Improvements.

Sample boards with colors and materials shall also be submitted.

2. <u>Preliminary Improvement Plans.</u>   Preliminary Improvement plans which were delivered after review of the Schematic Improvement Plans, including plans which show:

(a)  All access roadways, exterior boundary walls or fences, project signs, curbs, curb cuts, entrance driveways, interior roadways, Automobile Parking Area and utility loop systems and lines to serve Common Area Improvements and Floor Area, sanitary sewer lines, storm drains and other drainage lines or systems, including extensions thereof, situated outside the Total Development Tract to connect to established public utility systems, and fire hydrants, lighting facilities and other similar facilities for common use.

(b)  The location of all facilities for common use where the fixing of such location is reasonably possible, and if precise location cannot be shown, specifications for such locations shall be set forth.

(c)  A comprehensive rough grading plan for the entire Total Development Tract, including the size and dimensions of all facilities for common use; storm drains, including area drains, surface drainage installations and taps for building connections, and sanitary sewers for common use, including taps for Building connections.

(d)  A composite parking layout for the entire Total Development Tract, including paving, striping, bumpers, curbs, landscaping, graphics, directional signs, entrance, security systems, location of lighting systems and lighting standards.

(e)  A composite landscaping plan as prepared by a landscape architect specifying overall plant materials and plantings, together with illustrations of all such plantings.

(f)  Improvement of adjacent streets, including traffic signalization, as required by governmental agencies, and other off-site improvements.

031391/S0495/REASears.Cln

26

8946-32.251

(g)   Drawings for storm drains and area drains, including extensions thereof off the Total Development Tract, cable television, sanitary sewers, domestic water, fire protection water, telephone, gas, electric power and other utility lines, conduits and systems, including taps for commercial connections to points designated by the Majors, not closer than five feet (5') from the Building face of the Store of a Major, which may be prepared by the utility companies responsible for such installations or the Project Architect or other architects or engineers, and shall be subject to the approval in writing by the appropriate Major.  All water line systems shall be of such size and standards to meet the necessary fire protective requirements of various fire underwriters, as hereinafter provided.

(h)   The location and extent of Perimeter Sidewalks.  The Perimeter Sidewalks shall be designed and constructed in accordance with Article VII-C hereof.

If a Major has comments to such plans, such Major shall advise the Project Architect of the same within thirty (30) days after receipt of such plans, and may request that the Project Architect call a meeting of both Parties to discuss such comments.

C.   GENERAL DESIGN DATA FOR COMMON AREA.  In the preparation heretofore of all Improvement plans provided for in Articles V-A and V-B and hereafter of any further plans for future development or changes in the Common Area, the following general design data, without limitation, shall be followed, as minimums, unless governmental specifications for such work establish higher standards:

1.   Sewer and other utility lines, conduits or systems shall not be constructed or maintained above the ground level of the Total Development Tract unless such installations are within enclosed structures and conform with requirements of the City, and other applicable governmental or private

agencies having jurisdiction of the work, and are approved by the Parties.

2.    Street improvements, including traffic control devices, shown on Exhibit "B" respecting future and existing streets and roads adjacent to the Total Development Tract shall be made in accordance with the requirements of the City, and other governmental agencies having jurisdiction of the same.

3.    Lighting for the Automobile Parking Area shall be provided by fixtures with area controls on a seven-day program, sufficient to provide the following lighting intensity during the evening hours when the Enclosed Mall, the Store of a Major, the Family Entertainment Center, or any other Department Store is open for business and for at least forty-five (45) minutes thereafter:  an average maintained intensity of two (2) foot candles of lighting in open areas, ten (10) foot candles of lighting at all entrances and exits to the Parking Structures, and five (5) foot candles of lighting within the Parking Structures, or such other minimum foot candle of lighting at any point in the Automobile Parking Area as may be mutually approved by Developer and the Majors or as otherwise set forth in the Parking Management Plan, all measured thirty inches (30") above grade with a uniformity ratio of three to one (3:1) average/minimum.  The ceiling and all vertical surfaces of the Parking Structures shall be painted white.  The lighting system shall be designed so that it can be illuminated at twenty-five percent (25%) of full intensity, uniformly distributed throughout the Automobile Parking Area, during hours of darkness when maximum intensity lighting is not required pursuant to this Section.

4.    The slope in Automobile Parking Area (which shall not be interrupted with retaining walls or embankments forming a break in grade, except as shown on Exhibit "B" hereof) shall not exceed a maximum of ten percent (10%) on ramps without

8946-34.251

parking, five percent (5%) on ramps with parking, and three percent (3%) in other areas of the Automobile Parking Area, unless otherwise shown on Exhibit "B" or on the Improvement plans.

5.   All sidewalks, unenclosed malls and pedestrian aisles shall be of approved materials, and the surface of the Automobile Parking Area and access roads shall be paved by installing a suitable base, surfaced with a concrete bituminous or asphaltic wearing surface, or other approved material.

6.   The surface of that portion of each level of the Enclosed Mall devoted to pedestrian traffic shall be installed in a continuous plane, except as shown on the Improvement plans. The maximum slope in such surface shall not exceed one-half of one percent (0.5%), unless otherwise shown on the Improvement plans.

7.   All fire protective systems shall be installed in accordance with the requirements of local authorities having jurisdiction over such installation and the requirements of Protection Mutual Insurance Company.

8.   The heating, ventilating and cooling system of the Enclosed Mall shall be constructed so as to operate and be capable of maintaining an inside dry bulb temperature of seventy degrees (70°) Fahrenheit, with outside dry bulb temperature of minus fourteen degrees (-14°) Fahrenheit for heating, and the cooling system shall be capable of maintaining seventy-three degrees (73°) Fahrenheit dry bulb and fifty percent (50%) relative humidity inside conditions with outside conditions of ninety-three degrees (93°) Fahrenheit dry bulb and seventy-eight degrees (78°) Fahrenheit wet bulb.   The entire system shall be automatically controlled, designed and operated so as not to unduly drain conditioned air from, or unduly discharge or return air into the Store of a Major.

031391/S0495/REASears.Cln

8946-35.251

9.  The quality of the decorative elements (including lighting, landscaping and irrigation systems for the landscaping), the furnishings and the general architectural character and general design (including, but not by way of limitation, landscaping and decorative elements), the material selection, graphics, the decor and the treatment values, approaches and standards of the interior of the Enclosed Mall and any changes thereto shall be subject to the Majors' approval to the extent that approval is required by Article V-D hereof.

10.  The finished surface of the Enclosed Mall shall be established at the same elevation as the corresponding floor of each adjoining Store at all points adjoining such Store, unless otherwise shown on the approved final Improvement plan.

11.  The requirements of Article XI-C shall be complied with.

D.  <u>ENCLOSED MALL DESIGN AND IMPROVEMENT PLANS.</u>  Developer shall deliver to the Majors general design plans for the Enclosed Mall, and sample boards showing the colors and materials to be used in the Enclosed Mall, which shall be subject to the Majors' prior approval, which approval shall not be unreasonably withheld or delayed.  The Majors have been furnished and have approved the schematic drawings and preliminary Improvement plans for the Enclosed Mall developed from the general design plans for the Enclosed Mall which drawings and plans are more particularly described on Exhibit "F" hereof (the "Approved Plans").

Nordstrom shall not have the right to approve or object to the preliminary Improvement Plans for the portions of the Enclosed Mall which are not part of the Nordstrom Wing unless such preliminary Improvement Plans are materially different from the schematic Improvement Plans for the Enclosed Mall approved by Nordstrom in terms of (a) layout of the Enclosed Mall or (b) character of Improvements.  The general interior construction of, and the elevation of, the Nordstrom Wing of the Enclosed Mall shall be

8946-36.251

consistent and without material deviation from Approved Plans and any future Improvement Plans approved by Nordstrom. With the prior approval of the Developer, which approval shall not be unreasonably withheld or conditioned (but which may be conditioned upon approval from lenders), and upon prior written notice to the other Majors, Nordstrom, at its own expense, shall have the right, but not the obligation, to redecorate and renovate the Nordstrom Court from time to time except that Developer may withhold approval if such redecorating and renovating of the Nordstrom Court (shown upon the Plot Plan) is not architecturally harmonious with the rest of the Nordstrom Wing of the Enclosed Mall, or is not of a level of quality of design or materials consistent with the rest of the Nordstrom Wing of the Enclosed Mall, or adversely affects Occupants or access and the passage of pedestrian traffic in any material way. The Enclosed Mall shall be designed and shall be constructed so as to utilize a first class quality and appearance of construction materials and finish treatments that is consistent throughout the Enclosed Mall.

Macy's shall not have the right to approve or object to the preliminary Improvement Plans for the portions of the Enclosed Mall which are not part of the Macy's Wing unless such preliminary Improvement Plans are materially different from the schematic Improvement Plans for the Enclosed Mall approved by Macy's in terms of (a) layout of the Enclosed Mall or (b) character of Improvements. The general interior construction of, and the elevation of, the Macy's Wing of the Enclosed Mall shall be consistent and without material deviation from Approved Plans and any future Improvement Plans approved by Macy's. With the prior approval of the Developer, which approval shall not be unreasonably withheld or conditioned (but which may be conditioned upon approval from lenders), and upon prior written notice to the other Majors, Macy's, at its own expense, shall have the right, but not the obligation, to redecorate and renovate the Macy's Court from time to time except that Developer may withhold approval if such

031391/S0495/REASears.Cln

31

redecorating and renovating of the Macy's Court (shown upon the Plot Plan) is not architecturally harmonious with the rest of the Macy's Wing of the Enclosed Mall, or is not of a level of quality of design or materials consistent with the rest of the Macy's Wing of the Enclosed Mall, or adversely affects Occupants or access and the passage of pedestrian traffic in any material way.  The Enclosed Mall shall be designed and shall be constructed so as to utilize a first class quality and appearance of construction materials and finish treatments that is consistent throughout the Enclosed Mall.

Sears shall not have the right to approve or object to the preliminary Improvement Plans for the portions of the Enclosed Mall which are not part of the Sears Wing unless such preliminary Improvement Plans are materially different from the schematic Improvement Plans for the Enclosed Mall approved by Sears in terms of (a) layout of the Enclosed Mall or (b) character of Improvements.  The general interior construction of, and the elevation of, the Sears Wing of the Enclosed Mall shall be consistent and without material deviation from Approved Plans and any future Improvement Plans approved by Sears.  With the prior approval of the Developer, which approval shall not be unreasonably withheld or conditioned (but which may be conditioned upon approval from lenders), and upon prior written notice to the other Majors, Sears, at its own expense, shall have the right, but not the obligation, to redecorate and renovate the Sears Court from time to time except that Developer may withhold approval if such redecorating and renovating of the Sears Court (shown upon the Plot Plan) is not architecturally harmonious with the rest of the Sears Wing of the Enclosed Mall, or is not of a level of quality of design or materials consistent with the rest of the Sears Wing of the Enclosed Mall, or adversely affects Occupants or access and the passage of pedestrian traffic in any material way.  The Enclosed Mall shall be designed and shall be constructed so as to utilize a

first class quality and appearance of construction materials and finish treatments that is consistent throughout the Enclosed Mall.

To provide continuity and harmonious architectural treatment in the development or approval of such plans, prior approved Improvement plans shall be followed as a guide in any such additional plans and in the establishment of conditions, standards and architectural treatment under which unimproved areas shall be improved or additional Improvements shall be made.

All Improvement plans shall be dated, and certified by the Project Architect and maintained by it in a safe and convenient place. In the event of designation of another Project Architect, all Improvement plans and other records relating thereto shall be delivered to the new Project Architect at the time of such designation.

In the development of the plans for attachment to the Store of each Major, the Project Architect shall consider the facade of the Store of such Major, the sheathing of any mall columns adjacent to the facade of the Store of such Major, signing requirements of such Major at its Store entrance into its respective Wing of the Enclosed Mall, the insurance requirements of such Major so as to maintain the quality of its usual fire and extended coverage insurance without increased premium, building code requirements, increased or decreased costs of construction of the structure to which attachment is to be made, and the fact that there shall be no seismic loading imposed upon the Store of such Major. The Enclosed Mall shall contain sprinkler protection and shall include any smoke vents required by building code; provided, however, that a request by a Major for a deluge system or a fire protection water curtain not required by building code requirements, or for any additional smoke vents or smoke alarms which a Major may elect, must be made by such Major in a timely manner, to enable such requirement to be included in the plans and specifications for its respective Wing of the Enclosed Mall, and such Major shall reimburse to Developer the costs of installing such items. Each Major shall have the right to

approve, in its sole and absolute judgment, such plans and specifications for attachment of its respective Wing of the Enclosed Mall to its Building, including plans for expansion joints and flashing between its respective Wing of the Enclosed Mall and the Store of each Major, which shall be installed at the expense of Developer, and in such determination, each of the requirements set forth above shall be relevant considerations. In the event plans for such attachment are submitted by Developer and approved by the Major in sufficient time to enable it to construct the Store of such Major so as to receive such attachment, such Major shall so construct its Store. In the event the plans are not submitted in sufficient time, but are thereafter approved, then and in that event the expense of any change in preparing the Store plans and any additional cost in constructing the Store of such Major, or any change or modification therein shall be borne by Developer.

The parties further recognize that the air conditioning and heating specifications of their respective Buildings and the Enclosed Mall are critical and that the same shall be so designed, constructed, Operated and maintained so as not to unduly drain conditioned air from, nor unduly discharge or return air into, Enclosed Mall or Stores located therein, as the case may be, and Developer agrees that Occupants of the Developer Mall Stores and the Hotels shall be similarly required not to unduly drain conditioned air from, or unduly discharge residue or return air into, the Enclosed Mall.

Notwithstanding the rights of the Majors as hereinabove provided, no comments or disapprovals may be predicated on a requirement of a Major which would materially alter the previously approved (as provided in this Article V and in Article VI) general design plans for the Enclosed Mall.

E.    CONSTRUCTION COMPATIBILITY. Subject to the provisions of Article XV pertaining to Developer's future construction, any revision to the location, number of levels, height, and exterior configuration of all Buildings and structures hereafter to be

constructed by each of the Parties on their respective Tracts (the Developer Tract and the Tracts of the Majors) from that shown on Exhibit "B" shall be subject to the prior written approval of the other Parties, which approval shall not be unreasonably withheld. In order to produce an architecturally compatible and unified Total Development Tract, Developer and the Majors each agree to consult with the others concerning the design, construction schedule, color treatment and exterior materials to be used in any future construction and reconstruction of all Buildings and structures on its respective Tract within the Total Development Tract, together with the Hotel Tract and the effect of the proposed improvements on sight lines and traffic circulation, and to consider the views of all the other Parties with respect thereto prior to selecting the specific materials and colors for the Improvements. The design standards for the on-site Improvements, including schematic parking layout, landscaped areas and driveways, shall be uniform for all Tracts within the Total Development Tract so far as the same are to be constructed at or above ground level.

F.    PLANS FOR THE BUILDINGS.  The Parties will cause to be delivered to the Project Architect and to the other Parties, (for information purposes only, with respect to the Stores of the Majors and the other Department Stores) on or before the commencement of construction (or reconstruction, as the case may be) of such Party's Improvements, and, in the case of Developer before construction of any Hotel, the Developer Mall Stores, any other Department Store, and any other Developer Improvement, for such portion of the construction work to be commenced, one (1) copy of its respective proposed plans as respects its exterior design, including color and material of its respective Improvements on its Tract (the Tracts of the Majors and the Developer Tract), and one (1) copy of its respective proposed plans with respect to its air conditioning and heating specifications. The Project Architect and the other Parties shall, within twenty (20) days after the receipt thereof, notify each Party of any exterior design features, color

or material which in the Project Architect's or such Party's reasonable judgment is not compatible in relation to the design concept of the Total Development Tract; provided, however, any such design feature, color or material which conforms to the previously approved plans for such Improvements shall be deemed compatible with the design concept of the Total Development Tract.  In the event of any such notice, each Party agrees to cause its architect thereafter to work in good faith with the Project Architect and the other Parties so that the Buildings to be erected and constructed will be in harmony with the approved architectural general concept of the Shopping Center.  The plans which Developer is required to submit to the Majors pursuant to this Article shall be subject to the Majors' prior approval, which approval shall not be unreasonably withheld; provided, however, that plans for a given Improvement which are prepared in substantial conformity to plans for such Improvement previously approved by a Major, shall require such Major's approval only with respect to features or developments which were not shown on or which are different from those shown on the plans for such Improvement previously approved by such Major.

G.   <u>EXERCISE OF APPROVAL RIGHTS.</u>   Except as expressly provided for in this REA, no Party shall, in exercising its right of comment or approval over the plans and specifications of any other Party, make any unreasonable request, or any request whatever which would unreasonably increase the charges or cost of the work to be performed over the cost to construct the work in accordance with plans previously approved by such Party.

H.   <u>ENTRY INTO ENCLOSED MALL.</u>   Subject to the terms and provisions of Articles VIII-C and XXII-B hereof, each Major shall have an entry into the corresponding level of the Enclosed Mall.

I.   <u>PLANS IN ACCORDANCE WITH GOVERNMENTAL REQUIREMENTS.</u>  All Improvement plans referred to in this REA shall be in accordance with the requirements of all governmental agencies having jurisdiction over the Total Development Tract.

J.    MAJORS' COURTS. Notwithstanding anything to the contrary contained in this Article, each Major shall have the right to approve the design of its own "Court" and the right to approve the design of any changes to the Common Area of the Enclosed Mall in its own "Court" as designated on Exhibit "B" in such Major's sole and absolute discretion, including, without limitation, column locations, ceiling heights, decor, layout, decorative elements, floor elevations, escalator and elevator orientations, lighting, and the furnishings for such portions of the Enclosed Mall, but excluding the store fronts of Occupants of the Developer Mall Stores.  The Majors shall not have the right to disapprove the design of their respective Court based on any requirement that would materially alter any Developer plans for the Enclosed Mall previously approved by such Major.  Plans for the improvements in the Court of each Major shall be submitted by Developer to the respective Major in accordance with the requirements of Article V-D on the schedule required in Article V-F for each Major's approval in accordance with Article V-J.

## ARTICLE VI

### CONSTRUCTION OF DEVELOPER IMPROVEMENTS AND COMMON
### IMPROVEMENT WORK: OPENING DATES OF DEVELOPER MALL STORES
### AND ENCLOSED MALL

A.    COMMENCEMENT OF CONSTRUCTION. Developer shall diligently construct or cause the construction of the Developer Improvements including the "Common Improvement Work" (as defined in Article VII), and consisting of:

(1)    A three (3)-level (with partial fourth level) super-regional enclosed mall shopping center.  Such improvements shall include at least the three (3) Department Store Buildings of the Majors, approximately 1,600,000 square feet of Developer Mall Stores (including theaters, if any), the Family Entertainment Center and the Parking Structures, all in their respective locations shown upon the Plot Plan;

(2)   The shopping center on the Total Development Tract shall include a three level (with partial fourth level) enclosed sprinklered, air-conditioned and heated mall, and the Family Entertainment Center, containing approximately 292,000 square feet of area, all located as shown on the Plot Plan;

(3)   The Improvements to be constructed by Developer shall include all Improvements shown on the Plot Plan except for the Hotels, related Hotel facilities and parking spaces in the area shown as "Future Hotel Site and Parking", which may be included or not at the sole discretion of Developer, and except for any Department Stores to be constructed by a Major (subject to plan approval as required in this REA);

(4)   Developer and the Majors agree that twelve thousand seven hundred fifty (12,750) Parking Spaces are adequate for the Improvements shown on the Plot Plan if the Hotels do not in the aggregate contain more than one thousand (1,000) rooms. Developer shall not, however, be entitled to construct additional Improvements not shown on Exhibit "B" within the Total Development Tract unless Developer provides the number of additional automobile Parking Spaces required to satisfy the parking ratios set forth below with respect to such Improvements. Multi-level Parking Structures with capacity sufficient to provide Parking Area for the Total Development Tract in the following ratios:

(a)   4.5 Parking Spaces for each one thousand (1,000) square feet of Floor Area devoted to retail, including the first 4,500 cinema theater seats; provided, however, that Parking Spaces for all cinema theater seats in excess of 4,500 seats shall be provided in the ratio of one (1) Parking Space for each 2.5 such cinema theater seats;

8946-44.251

(b)  4.5 Parking Spaces for each one thousand (1,000) square feet of Floor Area in the Family Entertainment Center (from and after construction thereof) [the parties hereby agree that the amount of Floor Area in the Family Entertainment Center as initially designed is one hundred thousand (100,000) square feet]; and

(c)  .75 Parking Spaces for each hotel room in any Hotel (from and after construction thereof);

provided, however, that, subject to Articles XIV and XVII, in no event shall the total number of Parking Spaces be less than twelve thousand seven hundred fifty (12,750) Parking Spaces; and

(5)  The Common Improvement Work described in Article V hereof.

(6)  Developer's proposed schedule for construction of such Improvements is attached hereto as Exhibit "G", and Developer agrees to use reasonable efforts to conform to such schedule.  Developer shall be deemed to have commenced the construction referred to in the preceding sentence upon the date that Developer shall have let firm contracts for the construction of such Improvements and Common Improvement Work and shall have commenced the construction of the foundations of such Developer Improvements and Common Improvement Work.

The schedule attached hereto as Exhibit "G" identifies the completion of the pad preparation work for the Tract of each Major, certain portions of the Common Improvement Work, Developer Improvements and off-site work on specific dates as being "Critical Construction Milestones".  Subject to the provisions of Article XVI-A, Developer shall construct all of such work diligently so as to complete the work specified on time, in accordance

with the Critical Construction Milestones and as to Macy's, also in accordance with Exhibit I-1.

B.  <u>MANNER OF CONSTRUCTION.</u>  All work of construction of the Developer Improvements and Common Improvement Work shall be performed in accordance with plans for the Developer Improvements and the Common Improvement Work which shall have been approved by the Majors to the extent such approval is required pursuant to the terms of this REA.

C.  <u>COMPLETION OF CONSTRUCTION</u>.  Developer agrees to complete or cause completion of the Developer Mall Stores and the Family Entertainment Center, to the extent shown on the Plot Plan, and the Enclosed Mall by the Opening Date.  Developer agrees to (i) cause the Parking Structure and related roadways and the exterior Common Areas and so much of the Common Area as must be completed to enable each of the Majors to obtain a temporary certificate of occupancy to be completed at least thirty (30) days prior to the Opening Date and (ii) complete or cause completion of that portion of Developer's Work described in Exhibit "I" attached hereto (including all off site utilities, access roads, traffic signals and other improvements, and all Common Area Improvements) at least seven (7) days prior to the Opening Date.

Developer shall proceed with its work hereunder in strict compliance with all building, zoning and other applicable laws, ordinances, codes, rules and regulations and requirements of all Federal, State and municipal governments and the appropriate departments, commissions, boards and officers thereof, and in such manner that each Party shall be able to obtain the insurance required to be carried pursuant to this REA.  Developer shall cause to be obtained, at its sole expense, all building permits, licenses, and other governmental approvals and authorizations which may be required to permit the construction and occupancy of its Buildings and Improvements to be constructed pursuant to this REA, and each Party agrees to cooperate with the others (at no expense to the cooperating Party) to the extent that such Party may request

8946-46.251

or require such cooperation to obtain any such permit, license, compliance, approval or authorization and in all other respects to the end that each Party's Building and Improvements shall be constructed and the fixtures and equipment may be installed therein as efficiently and expeditiously as possible.

Developer agrees to comply with and conform to the Plans submitted to and reviewed or, with respect to Improvement Plans which a Major had the right to approve, approved by such Major. Developer agrees that, upon completion of its Buildings and Improvements pursuant to this REA and thereafter, it will fully comply with all applicable building and zoning laws and with the requirements of all other applicable laws, rules, orders, notices, codes, ordinances, requirements and rules and regulations of municipal, State, Federal and other governmental authorities, and of the Board of Fire Underwriters, and the appropriate departments, commissions, boards and officers thereof, whether or not the same are now in contemplation of the Parties or require amendments to the aforesaid Plans.

D.    TIME FOR LEASING AND OPENING OF DEVELOPER MALL STORES AND OPENING OF ENCLOSED MALL AND THE FAMILY ENTERTAINMENT CENTER. Developer shall, (i) on the Opening Date, have at least four hundred thousand (400,000) square feet of the Developer Mall Stores, evenly distributed on and throughout all three (3) levels of the Enclosed Mall, either open for business or leased under leases requiring such Occupants to be open for business on such date, provided, however, that Developer shall use its reasonable best efforts to have, on the Opening Date, (x) at least six hundred thousand (600,000) square feet of the Floor Area of the Developer Mall Stores, distributed with at least 228,000 square feet on level one, at least 198,000 square feet on level two and at least 174,000 square feet on level three of the Enclosed Mall, and (y) at least fifty percent (50%) of the total lineal feet of Store frontage located within four hundred (400) feet of the entrance of each Major on each level of the Enclosed Mall either open for business

or leased under leases requiring such Occupants to be open for business on such date, (ii) on the Opening Date, open the Enclosed Mall to the general public and (iii) on the Opening Date, cause the Family Entertainment Center to be completed and open for business to the public.  Developer further agrees to use all reasonable best efforts to (i) have the Occupants of Developer Mall Stores which are so open for business on the Opening Date to be evenly distributed throughout the area of the Enclosed Mall; and (ii) require the Bloomingdale's Department Store (subject to the terms of the Supplemental Agreement entered into among Developer, Nordstrom and Macy's (the "Supplemental Agreement")) and each Major's Store to be open for business to the public on or before the Opening Date.

ARTICLE VII

CONSTRUCTION OF COMMON AREA

A.   SCOPE OF COMMON IMPROVEMENT WORK.   The "Common Improvement Work" shall consist of the following items of work:

(a)  Fill requirements.

(b)  Pad preparation work for each Major's Store.

(c)  Finish grading.

(d)  The Automobile Parking Area, including the Parking Structure, but excluding the pedestrian bridges connecting a Parking Structure to each Major's Building.

(e)  Facilities for surface and subsurface drainage.

(f)  Landscaping.

(g)  Common Utility Lines.

(h)  The Enclosed Mall.

(i)  All amenities such as benches, trash baskets, public telephones, newspaper stands, drinking fountains, bicycle racks, decorative features and similar facilities for the comfort or benefit of the Permittees.

B.   SCHEDULING AND COMPLETION OF COMMON IMPROVEMENT WORK. The performance of the Common Improvement Work shall be scheduled by the Developer in accordance with Exhibit "G", Article VI(A)(6)

031391/S0495/REASears.Cln

42

8946-48.251

and in consultation with the Majors to coordinate such Common Improvement Work with the work of construction of the Stores of the Majors.   The Common Improvement Work shall be completed in accordance with the schedule set forth in Exhibit "G", Article VI(A)(6) and Article VI(C).   Developer has or will obtain all necessary governmental permits for the construction of the Common Improvement Work, and Developer will be responsible for satisfying all conditions precedent to such Common Improvement Work permits, including off-site improvements, as required, and including all environmental approvals for such Common Improvement Work, as required.   Developer will use reasonable efforts to schedule the construction of the Common Improvement Work so as to minimize interference with the construction to be undertaken by each Major under this REA.

    C.   <u>DESIGN AND CONSTRUCTION OF PERIMETER SIDEWALKS</u>. Perimeter Sidewalks shall be designed and improved as follows:

    1.   <u>Design</u>.  The Project Architect shall furnish to each Major general design standards for Perimeter Sidewalks at the Shopping Center, including curbing adjacent thereto.   Each Major, after receipt of such general design standards from the Project Architect, shall cause its architect to prepare proposed plans and specifications as respects Perimeter Sidewalks adjacent to its respective Store, showing sidewalks, retaining walls, earthfill, color and material, which plans and specifications shall be in conformance to the general design standards for such Perimeter Sidewalks so submitted by the Project Architect.

    2.   <u>Construction</u>.  Each Party shall construct or cause the construction of all the Perimeter Sidewalks which lie within its Tract, all of which construction shall be performed at such Party's sole cost and expense in accordance with the plans and specifications with respect thereto, and in accordance with the construction schedule for the Common

8946-49.251

Improvement Work; provided, however, that Developer shall set and construct all curbing adjacent to the Perimeter Sidewalks.

## ARTICLE VIII

### CONSTRUCTION OF STORES OF MAJORS: OPENING DATES

A.   <u>CONSTRUCTION</u>.   (i) Subject to the provisions of this Article VIII, Nordstrom and Macy's agree to construct for the account of the Developer, and Sears agrees to construct for its own account, subject to the provisions of the Leases, (a) its Store on its respective Tract, so that its Store shall be open to the general public for business on the date provided for in Article VIII-C and (b) the pedestrian bridges connecting the Parking Structure to its respective Building (the "pedestrian bridges").

(ii) All work to be performed shall be in accordance with the requirements of this REA, and in accordance with the requirements of Article V-F and this Article VIII.

(iii) The Store of each Major shall consist of three (3) levels and shall contain the approximate number of square feet of Floor Area (such Floor Area may include an additional basement level area for purposes of loading, marking, storage and for other uses related to the Operation of the Store of each Major) shown on the Plot Plan, located entirely within the lines of the building area marked for such Store on the Plot Plan.  The Store of each Major shall have a main entrance abutting, opening and fronting on the Enclosed Mall at each of the three (3) levels thereof, as shown on the Plot Plan.  Construction of the Store of each Major shall be deemed to be substantially complete when construction has been sufficiently completed to permit the Store of each Major to be occupied by the appropriate Major and opened to the public for business as required hereunder.  In no event will the Store of a Major (or any portion thereof) be located outside the Permissible Building Area therefor as shown on the Plot Plan, and in no event will the Store of a Major (or any remodeling, replacement or expansion thereof) exceed three (3) stories in height above grade nor the Permissible Building Area as depicted on the Plot Plan.

8946-50.251

B.    PLAN APPROVAL.    (i) Each Major shall complete the preparation of both preliminary and final plans and specifications (collectively called "Plans") for its respective Store and pedestrian bridges, as well as other matters relating to construction of its Store at its own expense and without cost or expense to Developer.    Such Plans shall be consistent with the provisions of this REA and the general design standards, including the Schematic Improvement Plans and the plans referred to in Article V-F hereof.

(ii) The final plans and specifications for the Store of each Major shall be prepared by each Major's architects and engineers and conform to the Schematic Improvement Plans and the plans referred to in Article V-F hereof.    Upon completion of the Plans for the Store of each Major, and prior to the commencement of construction thereof, said Plans shall be submitted to Developer for informational purposes.    The final plans and specifications for the pedestrian bridges of each Major shall be prepared by each Major's architects and engineers and conform to the Schematic Improvement Plans and the plans referred to in Article V-F hereof. Upon completion of the Plans for the pedestrian bridges for each Major, and prior to the commencement of construction thereof, said Plans shall be submitted to Developer for review and approval of the exterior appearance (including, without limitation, exterior materials and colors) of the pedestrian bridges and the harmony of design and architectural compatibility with the Developer's Buildings, the Building of such Major, and Enclosed Mall, which approval shall not be unreasonably withheld.    In the development of the plans for attachment of pedestrian bridges to the Parking Structure, each Major shall consider Developer's insurance requirements so as to maintain the quality of Developer's usual fire and extended coverage and liability insurance without increased premium, building code requirements, and increased or decreased costs of construction of the structure to which attachment is to be made.    Each Major shall design such pedestrian

8946-51.251

bridge in compliance with Developer's design standards for structural support and attachment to the Parking Structure (the "Attachment Standards) which shall be subject to the Majors' review and reasonable approval. Developer shall have the right to approve the Majors' plans and specifications for attachment of the pedestrian bridges to the Parking Structure, including plans for expansion joints and flashing between the pedestrian bridges and Parking Structure, which approval shall not be unreasonably withheld if such plans and specifications are designed in compliance with Developer's Attachment Standards. In the event plans for such attachment are submitted by the Major and approved by Developer in sufficient time to enable Developer to construct the Parking Structure so as to receive such attachment, Developer shall so construct its Parking Structure. In the event the plans are not submitted in sufficient time, but are thereafter approved, then and in that event the expense of any change in preparing the Parking Structure plans and any additional cost in constructing the Parking Structure, or any change or modification therein shall be borne by the Major submitting such plans. It is understood and agreed that no attachment or connection easement granted or permitted in this REA with respect to the pedestrian bridges shall impose a load or stress on the Improvements of the Developer which exceeds the load or stress approved in connection with the approval by Developer of the final plans for such attachment or connection. Developer shall approve Plans for the Store of each Major and pedestrian bridges if the same are consistent with and in conformity with the Schematic Improvement Plans and the plans for such Store referred to in Article V-F hereof. Each Major agrees to consider in good faith any reasonable comments made by Developer with respect to the exterior design of the Building of each Major and pedestrian bridges. In the event that Developer and a Major shall not agree upon such design and/or architectural features of the Store of such Major and pedestrian bridges, such Major's

8946-52.251

decisions with respect thereto shall be binding upon Developer and shall not be subject to arbitration.

(iii) Nordstrom and Macy's, for the account of the Developer, and Sears, for its own account, shall select and pay for all personnel, labor, materials, equipment, services, utilities and other elements for the construction of its respective Store and pedestrian bridges, as provided in the respective Lease of each Major with Developer, it being the intention of the parties that each Major shall be solely responsible for the planning, supervision, construction and equipping of its Store and pedestrian bridges. Notwithstanding the foregoing, Developer shall, at no expense to the Majors, cause the primary electric power supply serving the Building of each Major to be brought to the transformer serving the Building of each Major in the location shown on the approved final Plans for each such Building, cause water service to be brought to the water meter serving the Building of each Major in the location within five feet (5') from the Building of each Major shown on the approved Plans for the each such Building, and cause all other utilities (including gas, if available) to be brought to locations specified by each Major within five (5) feet of its respective Building. The capacity and size of such utilities shall be as specified by each Major. Developer and the Majors agree to cooperate with one another to the extent reasonably possible so as to avoid labor disputes in connection with the construction of the Stores of the Majors and the Total Development Tract.

(iv) At the request of any Party, each Major shall cause to be furnished to Developer and to any other Major from time to time, the estimated completion date of its said Improvements and progress reports, so that the work referred to hereinafter which is to be done in the Shopping Center on the Total Development Tract by the Parties and the timetable for such work may be coordinated with construction of the Stores of the Majors and pedestrian bridges and the installation of the building equipment.

031391/S0495/REASears.Cln

47

8946-53.251

At request of a Major, Developer likewise shall cause to be furnished to such Major from time to time, the estimated completion date of the Shopping Center on the Total Development Tract, and progress reports, so that the construction of the Store of the Major and the installation of the building equipment and the timetable for such work may be coordinated with the work which is to be done in the shopping center on the Total Development Tract by Developer hereunder. Such reporting shall not relieve Developer of its obligations pursuant to Articles VI(A)(6), VI(E) and VII.

(v)  All fire protection systems in the Stores of the Majors shall be installed in accordance with the requirements of local authorities having jurisdiction over such installation and the requirements of Protection Mutual Insurance Company or other similar casualty insurance rating/underwriting organization selected by each Major and reasonably acceptable to Developer.

(vi) The heating, ventilating and cooling system of the Store of each Major shall be constructed so as to operate and be capable of maintaining an inside dry bulb temperature of seventy degrees (70°) Fahrenheit, with outside dry bulb temperature of minus fourteen degrees (-14°) Fahrenheit for heating, and the cooling system shall be capable of maintaining seventy-three degrees (73°) Fahrenheit dry bulb and fifty percent (50%) relative humidity inside conditions with outside conditions of ninety-three degrees (93°) Fahrenheit dry bulb and seventy-eight degrees (78°) Fahrenheit wet bulb. The entire system shall be automatically controlled, designed and operated so as not to unduly drain conditioned air from, or unduly discharge or return air into the Enclosed Mall.

(vii) Each Major shall proceed with its work hereunder in strict compliance with all building, zoning and other applicable laws, ordinances, codes, rules and regulations and requirements of all Federal, State and municipal governments and the appropriate departments, commissions, boards and officers thereof, and in such manner that each Party shall be able to obtain the insurance

8946-54.251

required to be carried pursuant to this REA.  Each Major shall cause to be obtained, at its sole expense, all building permits, licenses, and other governmental approvals and authorizations which may be required to permit the construction and occupancy of its Buildings and Improvements to be constructed pursuant to this REA, and each Party agrees to cooperate with the others (at no expense to the cooperating Party) to the extent that such Party may request or require such cooperation to obtain any such permit, license, compliance, approval or authorization and in all other respects to the end that each Party's Building and Improvements shall be constructed and the fixtures and equipment may be installed therein as efficiently and expeditiously as possible.

(viii) Each Major agrees to comply with and substantially conform to the Plans to be submitted to Developer.  Each Major agrees that, upon completion of its Building and Improvements pursuant to this REA and thereafter, it will fully comply with all applicable building and zoning laws and with the requirements of all other applicable laws, rules, orders, notices, codes, ordinances, requirements and rules and regulations of municipal, State, Federal and other governmental authorities, and of the Board of Fire Underwriters, and the appropriate departments, commissions, boards and officers thereof, whether or not the same are now in contemplation of the Parties or require amendments to the aforesaid Plans.

C.   OPENING DATE OF MAJORS.  Each Major shall be open for business not later than the Opening Date.  Notwithstanding the foregoing, no Major shall be required to be open for business if Developer is in material default of any of its material obligations under this REA (and has failed to cure such default within all periods allowed hereunder for the curing of defaults and after receiving all notices of default required to have been given hereunder) and unless and until (i) Developer has completed construction of (a) the Enclosed Mall, and (b) the Common Improvement Work as provided for in Article VI, portions of which

8946-55.251

must be completed at least seven (7) and thirty (30) days, respectively, prior to the Opening Date, all as is more particularly described in Article VI-C hereof; (ii) the Enclosed Mall shall be open to the public for pedestrian traffic and fully functional and Operating, including being air conditioned, heated, ventilated, lighted, decorated and landscaped; (iii) in the case of Nordstrom and Macy's, the Bloomingdale's Department Store (subject to the terms of the Supplemental Agreement) and (x) the Nordstrom Store in the case of Macy's, (y) the Macy's Store in the case of Nordstrom, are either open for business or ready to open concurrently with the opening for business of such Major, (iv) in the case of Sears, two other Department Stores are either open for business or ready to open concurrently with the opening for business of Sears; (v) in the case of Nordstrom and Macy's at least twenty-one (21) months shall have elapsed from the date that Developer delivered the entire Tract of such Major to the respective Major in the condition required pursuant to the Lease of such Major, (and Macy's and Nordstrom hereby acknowledge that their respective Tracts were delivered on October 1, 1990 and that, to the respective knowledge of the Majors, their respective Tracts were delivered in the condition required by their respective Leases) (vi) the Family Entertainment Center shall have been completed and opened to the public for business on the Opening Date; (vii) at least 400,000 square feet of Floor Area of the Developer Mall Stores, evenly distributed on and throughout all three levels of the Enclosed Mall, shall have been completed and opened for business to the public or ready to open concurrently with the opening for business of such Major; provided, however, Developer shall use its reasonable best efforts to have (x) at least 600,000 square feet of the Floor Area of the Developer Mall Stores of the Enclosed Mall completed and opened for business to the public or ready to open concurrently with the opening for business of such Major distributed as follows: (a) at least 228,000 square feet on level one, (b) at least 198,000 square feet

8946-56.251

on level two, and (c) at least 174,000 square feet on level three, and (y) at least fifty percent (50%) of the total lineal feet of Store frontage within four hundred (400) feet of the entrance of such Major completed and opened for business to the public or ready to open concurrently with the opening for business of such Major; and (viii) Developer has used its reasonable best efforts to have the following amounts of the Floor Area of the Developer Mall Stores within each of the Nordstrom Wing, the Macy's Wing and the Sears Wing (as the case may be) completed and opened for business to the public or ready to open concurrently with the opening for business of such Major: at least 114,000 square feet on level one, (b) at least 99,000 square feet on level two, and (c) at least 87,000 square feet on level three. If a Major's construction or furnishing of its Store is delayed by the Developer's failure to construct the Enclosed Mall, Parking Structure or any other Common Area Improvements in the vicinity of the Store of such Major, the Opening Date for the Store of such Major shall be delayed by an equivalent amount of time. Anything herein to the contrary notwithstanding, in no event shall a Major be required to initially open for business to the public between November 1 of any calendar year and February 15 of the next calendar year, or during the forty-five (45) day period immediately preceding Easter Sunday or during the period commencing July 7, 1992 and ending on July 31, 1992.

In addition to any other remedies available to Nordstrom and Macy's, if Developer fails to complete all the work required in connection with any of the Critical Construction Milestones identified on Exhibit "G" on or before the dates specified in Exhibit "G", Nordstrom and Macy's may, by mutual agreement, delay the Opening Date of their respective Stores to a date in the spring of 1993 by giving written notice of the new Opening Date to Developer. If Nordstrom and Macy's give such notice to Developer, the dates for completing the work required by the Critical Construction Milestones will be extended by six (6) months for

8946-57.251

purposes of determining whether the Developer's work is on schedule for the rescheduled Opening Date.  If Developer fails to complete all of the work required in any of the Critical Construction Milestones on or before the dates specified in Exhibit "G", as extended pursuant to this section, Nordstrom and Macy's may, by mutual agreement, delay the Opening Date for their respective Stores again to a date approximately six (6) months from the Opening Date by giving written notice of the new Opening Date to Developer, and in such event, the dates for completing the work required by the Critical Construction Milestones will be extended by six (6) months for purposes of determining whether the Developer's work is on schedule for the rescheduled Opening Date. The right of Nordstrom and Macy's to delay the Opening Date in the manner described above may be exercised repeatedly if Developer fails to complete the work required by any of the Critical Construction Milestones on time.  The delay of the Opening Date and the Critical Construction Milestones shall not relieve Developer from any liability to Nordstrom and Macy's for failure to complete its work in a timely manner.  Landlord shall promptly deliver to Sears a copy of any and all notices Landlord receives from Nordstrom and Macy's hereunder.

D.    <u>STAGING AREA</u>. Each Major shall have the right to use the areas designated for use by such Major on Exhibit "B" for construction staging and construction trailer and tool storage areas.  To insure that the Store of each Major and the construction and staging areas attendant thereto are segregated from the remainder of the Shopping Center, each Major shall require its general contractor to erect construction barricades, fences and other devices around active construction areas in accordance with good construction practices and in an attractive manner.  All staging areas shall be surrounded by an exterior grade plywood or woven wire fence, at least six (6) feet in height, and painted a color approved by Developer.  Developer shall have the right, with the respective Major's prior approval (which shall not be

8946-58.251

unreasonably withheld or delayed) to place graphic signage on such fence.

ARTICLE IX

FLOOR AREA, USE, OPERATION,

SIZE AND HEIGHT

A.   FLOOR AREA.   The Initial Planned Floor Area and the Minimum Floor Area for the Improvements within the Total Development Tract is as follows:

|  | Initial Planned Floor Area | Minimum Floor Area |
|---|---|---|
| Bloomingdale's Department Store | 210,000 square feet | 180,000 |
| Macy Department Store | 280,000 square feet | 180,000 |
| Nordstrom Department Store | 220,000 square feet | 180,000 |
| Sears Department Store | 188,000 square feet | 120,000 during Major Operating Period of Sears (at least 50,000 square feet on level one, 50,000 square feet on level two and 20,000 square feet on level three), 100,000 after Major Operating Period of Sears |
| Developer Mall Stores, (including theaters, if any) | 1,600,000 square feet | 720,000 (at least 273,600 square feet on level one, 237,600 square feet on level two and at least 208,800 square feet on level three |
| Family Entertainment Center | 100,000 square feet | 100,000 |
| Hotels | 1,000 rooms | 0 |

8946-59.251

Subject to the provisions of Articles VIII, XIV and XVII hereof, following the Opening Date, each Party shall have, during the term of this REA on its Tract not less than the respective Minimum Floor Area set forth above.

In no event shall a Major have the right to construct (or reconstruct) any Floor Area on its Tract outside of the Permissible Building Area as shown on the Plot Plan, or in excess of three (3) stories in height above grade.  In no event shall Developer have the right to construct (or reconstruct) any Floor Area in excess of the Initial Planned Floor Area for the Improvements within the Total Development Tract shown above, unless Developer complies with the requirements of Article VI-A-4 relating to automobile parking as well as the other requirements of this REA.

B.    HEIGHTS.  The heights of Buildings measured to the top of the parapets in the Total Development Tract shall not exceed those specified in Exhibit "B".  Rooftop mechanical equipment shall be screened so as to be hidden from public view from adjacent streets and highways.  Certain architectural features, such as skylights, escalator atrium features, stair enclosures and mechanical equipment (but not mansard roofs) shall be permitted to project above the height limitation; provided, however, skylights which project above the height limitation shall not be located within fifty feet (50') of the perimeter of a Building.

C.    USES.  So long as a Major or its permitted successors and assigns uses and operates its Building as a Department Store or for such other uses and purposes that are compatible and consistent with (and are not detrimental, injurious or inimical to) the operation of a first-class regional shopping center in at least its Minimum Floor Area pursuant to this REA, neither the Total Development Tract nor any part thereof shall be used, and no Building or other Improvement shall be constructed, maintained or used except for retail, office and service establishments common to first-class multi-level regional shopping centers containing enclosed air conditioned malls, and the portion of the Total

8946-60.251

Development Tract designated on Exhibit "B" as "Future Hotel Site and Parking" and "Family Entertainment Center" may be Operated for Hotel and family entertainment center purposes, respectively, and for no other uses without the Majors' prior written approval, which approval shall not be unreasonably withheld.  Service uses may include financial institutions, brokerage offices, restaurants, health clubs, night clubs, travel and other agencies and similar service establishments.  Developer shall not permit more than ten percent (10%) of the Floor Area of the Developer Mall Stores to be occupied by such service establishments, other than restaurants, without the Majors' prior approval. Notwithstanding the foregoing, so long as a Major uses and operates its Building as a Department Store pursuant to this REA, office use which is permitted in the Total Development Tract shall not include a Building used primarily for general office purposes.

D.    <u>PROHIBITIONS</u>.    No use or operation will be made, conducted or permitted on or with respect to all or any part of the Total Development Tract, which use or operation is obnoxious to or out of harmony with the development or operation of a first-class regional shopping center containing an enclosed air conditioned mall, Hotels and a Family Entertainment Center, including but not limited to, the following:

1.    Any public or private nuisance.

2.    Any noise or sound that is objectionable due to intermittence, beat, frequency, shrillness or loudness except for normal noise incident to the operation of reasonably quiet amusement attractions within the Family Entertainment Center.

3.    Any obnoxious odor.

4.    Any noxious, toxic, caustic or corrosive fuel or gas.

5.    Any dust, dirt or fly ash in excessive quantities.

6.    Any unusual fire, explosion or other damaging or dangerous hazard, including the storage, display or sale of explosives or fireworks.

8946-61.251

7.   Any warehouse (but any area within a Store for the storage of goods intended to be sold at such Store in the Shopping Center shall not be deemed to be a warehouse), assembly, manufacture, distillation, refining, smelting, agriculture or mining operations.  Provided, however, that an Occupant whose primary business is that of the operation of a restaurant shall be permitted to operate a micro brewery within its restaurant, if the Floor Area occupied by the micro brewery does not exceed 2,000 square feet.

8.   Any mobile home or trailer court, labor camp, junk yard, stock yard or animal raising.   Notwithstanding the foregoing, pet shops shall be permitted within the Center, provided that such shops shall be so conducted that there shall be no violation of the other prohibitions of this Article IX-D, including Article IX-D (13), by reason of the operation of such shops.

9.   Any drilling for and/or removal of subsurface substances.

10.  Any dumping of garbage or refuse.

11.   Any commercial laundry or dry cleaning plant, laundromat, veterinary hospital, car washing establishment, bowling alley, mortuary or similar service establishment (except for a laundry plant in a hotel permitted in the Shopping Center which plant serves only the hotel and its guests).

12.  Any automobile body and fender repair work.

13.  Any pet shops within one hundred fifty (150) feet of the entrance of the Building of a Major.

14.  Any kiosks or rolling pushcarts except as authorized pursuant to Article IX-E or approved in writing by Developer and the Majors; provided, however, Nordstrom, Macy's and Sears may operate in their respective Court Areas, or cause to be operated in their respective Court Areas, not more than one (1) moveable pushcart, one (1) pastry cart and two (2) support

carts, for the sale of espresso, baked goods and other food and beverages, together with a single service cart, tables and chairs, which pushcarts will be used only in their respective Court Areas, as shown on Exhibit "B". Developer shall have the right to approve any material modification of the size of such cart or the number of chairs from that shown on the Plot Plan.

E. <u>NON-INTERFERENCE WITH COMMON AREA</u>. So as not to interfere with efficient pedestrian traffic flow in the Enclosed Mall, no selling or retail activity shall be conducted on any level of the Enclosed Mall other than (a) in connection with special events of the Shopping Center Merchants' Association (or Developer, if there be no Merchants' Association), which shall be located (i) in the Enclosed Mall and (ii) in the Court Areas of the Majors with the approval of such Major which approval may be withheld in such Major's sole discretion, (b) by Developer or an affiliate of Developer in the customer service areas labeled "Customer Service Areas" on the Plot Plan, which Customer Service Areas shall be designed so that they are architecturally harmonious with the Enclosed Mall, maintained in a neat and first-class appearance, and used for service and retail selling activities including, without limitation, the rental of lockers, strollers and wheelchairs, coat and package check and the sale of souvenirs, film and other miscellaneous items customarily found in customer service areas located in first-class family oriented amusement parks or centers of the quality of amusement parks and centers operated by Knotts Berry Farm, Six Flags West, Disneyland or Epcot Center, and (c) from moveable pushcarts and from kiosks located only within the permitted areas shown on the Plot Plan (which kiosks and pushcarts shall be designed so that they are architecturally harmonious with the Enclosed Mall and shall be constructed with and continuously maintained in a neat and first-class appearance), provided that not more than the number of pushcarts designated on Exhibit "B" for each area labeled "Kiosk/Rolling Pushcarts" shown on the Plot Plan may be located in such area. If the Plot Plan does not indicate the number of pushcarts which may be operated in a permitted pushcart area, the maximum number of carts which may be operated in such area shall be two (2). No kiosks or pushcarts shall be located in the Court of a Major by Developer or any Occupant other than such Major. No pushcart may be constructed or operated within the Common Area except in compliance with all of the following conditions: (1) All pushcarts will be "see through" type; (2) No pushcart will be erected which has a width greater than four (4) feet or a length greater than four (4) feet or height greater than seven (7) feet; (3) All pushcarts shall be maintained in a clean and orderly

condition and shall not present any unsightly displays; (4) No pushcarts shall contain coin-operated games; (5) When not in use during the hours that the Enclosed Mall is open, pushcarts shall be stored in suitable storage areas outside of the Enclosed Mall; (6) The unobstructed portions of the Enclosed Mall between each pushcart and the Developer Mall Stores shall be at least twelve (12) feet in width.

All special events shall be conducted (i) in good taste, (ii) so as not to interfere with the use of, access to, or obstruct the sight lines to or visibility of the entrances to the Stores or the Enclosed Mall or the signs of the Majors, (iii) so as not to materially impede or interfere with circulation of pedestrians within the Enclosed Mall, the use by Permittees of the Enclosed Mall, or ingress and egress to store entrances located within the Developer Mall Stores, (iv) so as not to create any undue noise or litter and (v) only with the approval of the respective Major as to promotions within the Court Area of such Major , which approval may be withheld in such Major's sole discretion.

F.   FENCES OR OTHER OBSTRUCTIONS.   No fence, structure or other obstruction of any kind (except as may be specifically permitted herein, including without limitation Article XV, or indicated on Exhibit "B", or except for decorative features and customer conveniences as shown on the approved final improvement plans) shall be placed, kept, permitted or maintained upon the Common Areas without the prior written consent of the Majors.

ARTICLE X

GENERAL CONSTRUCTION REQUIREMENTS

A.   INTERFERENCE WITH CONSTRUCTION.   Each Party agrees to use good faith efforts to perform its respective work so as not to (i) cause any increase in the cost of constructing any Improvements on the remainder of the Total Development Tract or any part thereof which is not reasonably necessary, (ii) unreasonably interfere with any construction work being performed on the Total Development Tract or any part thereof, or (iii) unreasonably interfere with the

8946-64.251

use, occupancy or enjoyment of the Total Development Tract or any part thereof (including the Tracts of the Majors) by any other Party , and any other Occupant of the Total Development Tract, and the Permittees of any other Party and such other Occupants.  If any Improvements are constructed with a planned completion date which is after the Opening Date, such construction shall be carried out in accordance with the terms of this REA and shall be done in a manner which does not materially adversely affect access to or the availability of automobile parking for the Store of a Major. Developer shall use its best efforts to require the foregoing standards for all Occupants, and to enforce the same.

Each Party severally agrees to defend and hold the other Parties harmless from all claims, including any action or proceedings, including attorneys' fees, resulting from any accident, injury or loss or damage whatsoever occasioned to any natural Person or to the property of any Person as shall occur by reason of the performance of any such work by such Party.

B.   CONSTRUCTION BARRICADES.   From and after the Opening Date, each Party thereafter commencing the erection or construction of any Building or addition thereto on any portion of the Total Development Tract or any portion thereof which is not fully enclosed by perimeter walls shall erect and construct a solid and painted barricade or chain link barricade at least eight feet (8') in height, surrounding the building or buildings (or portions thereof) so being erected or constructed (or expanded). The Party erecting and constructing such Building shall install a solid plywood construction enclosure, enclosing such Party's entrance to the Enclosed Mall and a solid plywood or chain link fence as a construction barricade around its building exterior in compliance with this Article X-B. Any such construction barricade shall be kept in place, in good condition and repair, until the Building so being constructed is secure from unauthorized intrusion and does not create hazardous conditions.  All barricades shall be painted in colors approved by the Project Architect.  The same requirements

8946-65.251

shall apply during any work of repair or restoration under Article XIV if other Floor Area is being Operated during such time period. Developer shall use its best efforts to require the foregoing standards for all Occupants, and to enforce the same.

C.    <u>SUBMISSION OF SCHEDULE</u>.  Prior to the commencement of the work to be performed by any Party, each Party shall submit to the Project Architect and to the other Parties a time schedule indicating the approximate date or dates when such construction shall commence and be completed, and a plot plan of the Shopping Center showing, as respects the Buildings, utility connections and other Improvements to be constructed by it, material and equipment storage sites; construction shacks, workers parking area and construction access roads and utilities and other temporary Improvements which will be adjacent to and connected to the Tract of such Party.

D.    <u>WORKMANSHIP</u>.    Each Party agrees that all construction which it is to perform hereunder shall be done in a good and workmanlike manner, with first-class materials and in accordance with all applicable laws, rules, ordinances and regulations.  Each Party shall pay all costs, expenses, liabilities and liens arising out of or in any way connected with such construction.  Each Party shall, upon demand, deliver to the other Party evidence of completion of its work in compliance with all applicable laws, ordinances, regulations and rules in compliance with the final plans and all permits, and evidence that all costs, expenses, liabilities and liens arising out of or in any way connected with such construction have been fully paid and discharged of record, or contested in accordance with Article X-F of this REA, in which event any judgment or other process issued in such contest shall be paid and discharged before execution thereof.  Nothing herein shall be deemed to prohibit a Mortgage.

E.    <u>COORDINATION</u>.  Each Party, as respects the respective construction it is to perform, shall use all reasonable efforts to cause its architects and contractors to cooperate and coordinate

8946-66.251

its construction with the architects, contractors and construction work of the other Parties hereto to the extent reasonably practicable, to achieve the objectives set forth in Article X-A.

F.   MECHANICS' LIENS.   In the event any mechanics' liens are filed against the Tract of any Party, the Party for whom the work was performed, or otherwise causing the lien to be filed, hereby covenants to indemnify and hold harmless the other Parties and further covenants to either pay the same and have it discharged of record, promptly, or to take such action as may be required to reasonably and legally object to such lien, or to have the lien removed from the Tract of such other Party, and in all events agrees to have such lien discharged prior to the foreclosure of such lien.   Upon request of the Party or Parties against whose Tract the lien was filed, the Party for whom the work was performed or otherwise causing such lien to be filed agrees to furnish such security as may be required, to and for the benefit of such requesting Party, or any title insurance company designated by such Party to permit a report of title or an endorsement to be issued relating to its Tract without showing thereon the effect of such lien.   The indemnification of a Party who qualifies to self-insure pursuant to Article XII shall be adequate security for such purpose.   For purposes of Articles X-F and X-G, Developer's estate, right and interest in the Tracts of the Department Stores which are not Majors and Landlord's reversionary interest in the Majors' Tracts shall be included as part of Developer's Tract.   The indemnity contained in Articles X-F and X-G which shall be limited to the amount of the lien, interest thereon, plus reasonable attorney's fees and costs incurred in connection with the removal of the lien, is also for the benefit of any title insurance company issuing a title insurance policy upon the Developer Tract or the Tracts of the Majors which insures against the effect of the lien indemnified against as well as for the benefit of the Developer's Mortgagee, which such title insurance company and such Mortgagee may enforce as third party beneficiaries.

G. _INDEMNITY_. (a) Each Party hereby covenants and agrees to indemnify, defend and hold harmless the other Parties and the Tracts of the other Parties from and against all claims, liabilities, losses, damages, costs or expenses, including attorneys' fees, including those in any action or proceedings brought thereon in connection with all claims of lien of laborers or materialmen, or others, for work performed for or supplies furnished to, or arising from or as a result of the death of, or any accident, injury, loss or damage whatsoever caused to any Person, or to the property of any Person, as shall occur by reason of the performance of any construction by or at the request of the indemnitor, except for claims caused by the active negligence or willful wrongdoing of the indemnitee, or its agents, servants or employees.

(b) The indemnitee shall give the indemnitor notice of any suit or proceeding entitling the indemnitee to indemnification pursuant to this Article X-G and the indemnitor shall defend the indemnitee in said suit or proceeding with counsel approved by the indemnitee.

H. _COMMON FOOTINGS_. Should a Party desire to have footings in common with any other Party for any Building on the Tract of such Party, such common footings shall be compatible with the design of the Building to be erected by the grantor Party. If common footings are approved, the first such Party prepared to construct footings for its Building shall, upon request, be furnished by the other Party with all required column loading and anchor information required by the Party first constructing in order to cast same in the common footings at the time of concrete placement. Any approved common footings shall be constructed to the most stringent standards of the Party whose structure will bear on the common footing. The cost of common footings shall be allocated between the Parties in a manner mutually satisfactory to each.

8946-68.251

I. <u>MAJOR IMPROVEMENT WORK INSURANCE</u>. Within sixty (60) days after the date of this REA, each Major shall provide Developer with evidence that such Major or its contractor (the "Contractor") has obtained the insurance coverage set forth below. All such insurance shall provide that the same cannot be canceled without thirty (30) days prior notice to Developer and that Developer shall be named as an additional insured. The insurance coverage set forth above shall include:

1.   Workers' Compensation and Employer's Liability Insurance in Contractor's name with limits of liability as required by law containing a waiver of subrogation executed by the insurance company, if the same can be obtained, in favor of each Party;

2.   Public Liability Insurance (including contingent liability and completed operations), with personal injury and property damage limits of not less than Five Million Dollars ($5,000,000.00).

3.   Comprehensive Automobile Liability Insurance with Employer's Non-Ownership Liability endorsement, with a combined single limit (for both Bodily Injury and Property Damage) of not less than One Million Dollars ($1,000,000.00).

4.   Insurance covering fire, lightning, extended coverage perils, vandalism, malicious mischief and sprinkler leakage during all the period of time any construction of Improvements by such Party is in progress and uncompleted, commonly known as "Builder's Risk Insurance".

5.   The limits of liability set forth above shall be adjusted pursuant to the Index Adjustment in accordance with Article XXX-F.

6.   Upon request, each Major shall include Developer's Mortgagee as an additional insured under the policies of insurance referred to in subsection 2 above.

8946-69.251

J.   DEVELOPER IMPROVEMENT WORK INSURANCE.   Prior to commencement of the work described in this Article X, Developer shall provide each Major with evidence that Developer or its contractor has obtained the insurance coverage set forth below. All such insurance shall provide that the same cannot be canceled without thirty (30) days prior notice to each Party and that each Party shall be named as an additional insured.   The insurance coverage set forth above shall include:

1.   Workers' Compensation and Employer's Liability Insurance in Contractor's name with limits of liability as required by law containing a waiver of subrogation executed by the insurance company, if the same can be obtained, in favor of each Party;

2.   Public Liability Insurance (including contingent liability and completed operations), with personal injury limits of not less than Five Million Dollars ($5,000,000.00).

3.   Comprehensive Automobile Liability Insurance with Employer's Non-Ownership Liability endorsement, with a combined single limit (for both Bodily Injury and Property Damage) of not less than   One Million Dollars ($ 1,000,000.00).

4.   Insurance covering fire, lightning, extended coverage perils, vandalism, malicious mischief and sprinkler leakage during all the period of time any construction of Improvements by such Party is in progress and uncompleted, commonly known as "Builder's Risk Insurance".

5.   The limits of liability set forth above shall be adjusted pursuant to the Index Adjustment in accordance with Article XXXI-D.

6.   Upon request, Developer shall include the Majors' Mortgagees as an additional insured under the policies of insurance referred to in subsection 2 above.

ARTICLE XI

OPERATION AND MAINTENANCE OF ENCLOSED

MALL, FAMILY ENTERTAINMENT CENTER AND OTHER COMMON AREA

A.    ENCLOSED MALL - STANDARDS.    From and after the Opening Date, Developer shall Operate and maintain, or cause to be Operated and maintained, the Enclosed Mall and Family Entertainment Center in good order, condition and repair, without expense to the Majors, except as set forth in the Leases between Developer and each of the Majors.    Developer shall have the right to select, from time to time, a Person or Persons (for purposes of this paragraph called "Operator's Nominee"), to Operate and maintain the Enclosed Mall and Family Entertainment Center; provided, however, that such nomination shall not diminish Developer's responsibility for such Operation and maintenance.    The Developer or the Operator's Nominee, as the case may be, are sometimes referred to herein as the "Operator of the Enclosed Mall."

Without limiting the generality of the foregoing, the Operator of the Enclosed Mall and the Operator of the Family Entertainment Center, in the maintenance and Operation of the Enclosed Mall and Family Entertainment Center respectively, shall observe the following standards:

1.    Maintain the surface thereof smooth and evenly covered with the type of surfacing material originally installed thereon, or such substitute thereof as shall have been approved by the Parties.

2.    Remove all papers, debris, filth and refuse and wash or thoroughly sweep the surface.

3.    Clean lighting fixtures and relamp as needed.

4.    Maintain (i) landscaping as necessary to keep in a first-class thriving condition, and (ii) slopes and grades within the landscaped areas in an attractive condition.

5.    Maintain all signs (excluding those of the Occupants) in a clean and orderly condition, including relamping and repairing as may be required.

6.    Employ security personnel to patrol the Enclosed Mall and Family Entertainment Center, in such numbers and

8946-71.251

during store hours, and such other hours, as necessary and appropriate for such Operation.

7. Maintain and keep in a sanitary condition any public rest rooms and other common use facilities therein.

8. Clean, repair and maintain all utility systems that are a part thereof.

9. Clean and maintain the structure thereof, the roof, skylights, wall surfaces, doors and other appurtenances thereto.

10. Maintain the heating, ventilating and cooling system of the Enclosed Mall and Family Entertainment Center in good order, condition and repair, so that at all times the same shall operate within the standards prescribed in Article V-C-8 and V-D hereof.

B. <u>COMMON AREA - EXCLUSIVE OF ENCLOSED MALL - STANDARDS</u>. From and after the later of the date (i) of the completion of construction of the Common Area, exclusive of the Enclosed Mall, or (ii) when a contractor is no longer required to perform the maintenance thereof, but in no event later than thirty (30) days prior to the Opening Date, Developer shall Operate and maintain or cause to be Operated and maintained the Common Area on all Tracts in the Total Development Tract exclusive of the Enclosed Mall, in good order, condition and repair, and Developer shall have the right to select, from time to time, a Person or Persons, other than Developer (for purposes of this paragraph called "Operator's Nominee"), to Operate and maintain the Common Area exclusive of the Enclosed Mall, provided that such nomination shall not diminish Developer's responsibility for Operating the Common Area exclusive of the Enclosed Mall.  The Developer or the Operator's Nominee, as the case may be, are sometimes referred to herein as the "Operator of the Common Area" exclusive of the Enclosed Mall.

Without limiting the generality of the foregoing, the Operator of the Common Area exclusive of the Enclosed Mall, in the

8946-72.251

maintenance of the Common Area, exclusive of the Enclosed Mall, shall observe the following standards:

1.   Maintain the Parking Structure and maintain the surface of all other Automobile Parking Area and sidewalks (including Perimeter Sidewalks) level, smooth and evenly covered with the type of surfacing material originally installed thereon, or such substitute therefor as shall be in all respects equal thereto in quality, appearance, and durability.   The Parking Structure shall be Operated and maintained in accordance with the requirements of this REA as well as the Parking Management Plan attached hereto as Exhibit "J"

2.   Remove all papers, debris, filth and refuse from the Center and wash or thoroughly sweep paved areas as required.

3.   Maintain such appropriate Automobile Parking Area entrance, exit and directional signs, markers and lights in the Center as shall be reasonably required and in accordance with the practices prevailing in the operation of similar regional shopping centers in the greater Minneapolis-St Paul metropolitan area.

4.   Clean Common Area lighting fixtures of the Center (but not those belonging to premises of Occupants), relamp and reballast as needed, and maintain the lighting system in accordance with the standards set forth in Article V-C-3.

5.   Repaint striping, markers, directional signs, etc., and repair curbs as necessary to maintain in first-class condition.

6.   Maintain (i) landscaping as necessary to keep in a first-class thriving condition (including any automatic irrigation systems installed by Developer), and (ii) slopes and grades within the landscaped areas in an attractive condition.

7.   Clean signs of the Center (but not those of Occupants), including relamping and repairs as needed.

8.   Employ security personnel for Common Area patrol, in such numbers, and during store hours and such other hours as necessary and appropriate and as customary for first class regional shopping centers in similar areas.

9.   Maintain and keep in a sanitary condition any public rest rooms and other common use facilities.

10.   Clean, repair and maintain all utility systems that are part of the Common Area to the extent that the same are not cleaned, repaired and maintained by public utility companies.

11.   Maintain Parking Area lighting and the lighting requirements set forth in Article V-C-3.

12.   Maintain the number of parking spaces required to be located in the Automobile Parking Area in accordance with the standards set forth in Article VIA hereof.

13.   Remove snow and ice as required to permit normal ingress and egress.   Such removal shall be done in such a manner so as to minimize damage to landscaping.

14.   Repaint garages periodically to maintain them in first class condition.

C.   <u>AUTOMOBILE PARKING REQUIREMENTS</u>.   Subject to Articles XIV, XVI, and XVII hereof, there shall be available at no charge within the Automobile Parking Area on the Total Development Tract, at all times from and after the date the construction of the Common Improvement Work is required to be completed pursuant to Article VI-D, not less than the number of automobile parking spaces required in Article VI-A.   The Parking Spaces shall have the dimensions as shown on the Plot Plan.

The Automobile Parking Area shall be open to Permittees and Operated by Developer in accordance with the Parking Management Plan.   If any Major is Operating after 10:30 P.M., it shall pay for the incremental cost of Operation of the Common Area after 11:15 P.M. in the ratio that the Initial Planned Floor Area of the Store of such Major bears to the Initial Planned Floor Area of all

8946-74.251

Persons Operating after 10:30 P.M. For security purposes, during the hours that full lighting is not required, Developer shall keep the Automobile Parking Area lighted in accordance with the Parking Management Plan.

D.   <u>INDEMNITY</u>. Developer agrees to indemnify, defend, and hold each Major and the Tract of each Major harmless from and against any mechanics', materialmen's and/or laborers' liens, and all costs, expenses and liabilities in connection therewith, including attorneys' fees, arising out of the maintenance performed by Developer in respect to the Common Area, pursuant to the provisions of this Article XI, whether performed prior to or after the execution of this REA. In the event that the Tract of a Major shall become subject to any such lien except as the result of any act or omission of such Major, Developer shall at the request of such Major promptly cause such lien to be released and discharged of record, either by paying the indebtedness which gave rise to such lien, or posting such bond or other security as shall be required by law to obtain such release and discharge. Each Major shall give Developer notice of any suit or proceeding entitling such Major to indemnification pursuant to this Article XI-D, and Developer shall defend such Major in said suit or proceeding.

E.   <u>PARKING REGULATIONS</u>. Developer shall at all times Operate the Parking Structure in accordance with the terms and provisions of the Parking Management Plan and there shall be no material change in the provisions of said Parking Management Plan without the prior written consent of the Majors, which consent may be withheld in the sole and absolute discretion of the Majors.

The Parties shall, by mutual agreement, prescribe certain sections within the Common Area, or on other land outside the Common Area within a reasonable distance from the nearest boundary of the Total Development Tract for use as parking space by the Occupants of the Total Development Tract, and the employees, tenants, agents, contractors, licensees and concessionaires of such Occupants. The location of cab stands, cab waiting areas and bus

8946-75.251

loading and unloading areas within the Total Development Tract shall be limited to the locations therefor as shown on the Plot Plan and there shall be no material change in such locations without the prior written approval of the Majors, which approval may be withheld in the sole and absolute discretion of the Majors. Each Party shall require its employees and the employees of its Occupants, agents, contractors, licensees and concessionaires to use only such sections as are so prescribed for parking.  Each Party agrees to use reasonable efforts to enforce the provisions hereof.  No such employee parking areas shall be designated within two hundred feet (200') of any Major Store entrance or any entry into the Enclosed Mall, without the consent of the Party whose Store is located within said distance.

Notwithstanding anything to the contrary in Article II-A or in the preceding paragraph of this Article XI-E, Developer, Macy's and Nordstrom have the right to provide valet parking services provided the following conditions are satisfied in establishing and operating such valet parking service:

1.   Developer obtains the approval of all applicable governmental agencies having jurisdiction over the Total Development Tract with respect to providing such valet parking services;

2.   No more than two hundred and fifty (250) automobile parking spaces may be used for valet parking for the Developer Tract or more than fifty (50) such spaces for valet parking for Macy's or Nordstrom in the Shopping Center.

3.   Upon request of Macy's or Nordstrom, Developer shall designate spaces for valet parking for such Major in an amount equal to the greater of (a) the greatest number of valet parking spaces designated for any other Major in the Shopping Center, and (b) fifty (50) valet parking spaces;

4.   Macy's and Nordstrom with respect to its Department Store, if it operates or causes to be operated a valet parking service or system, and Developer if it operates or causes to

8946-76.251

be operated a valet parking system or service with respect to the Shopping Center, shall (i) defend, indemnify and hold harmless the others from and against all claims and all costs, expenses and liabilities (including reasonable attorneys' fees) incurred in connection with the operation of such valet parking service, (ii) subject to Macy's and Nordstrom's right to self-insure pursuant to this REA, carry contractual liability insurance in an amount at least equal to $5,000,000 covering such Person's obligations pursuant to subsection (i) above naming the other as an additional insured, and (iii) subject to Macy's and Nordstrom;s right to self-insure pursuant to this REA, carry comprehensive general liability insurance, including an automobile liability endorsement in an amount of at least equal to $5,000,000 naming the others as additional insureds;

5.    On or before the Opening Date, counsel to Teachers Insurance and Annuity Association of America shall have rendered an opinion, satisfactory to Teachers Insurance and Annuity Association of America, that the arrangements between Developer and such Major in connection with the provision of such valet parking services shall not result in the receipt by Developer (or any partner in Developer) of "unrelated business taxable income" within the meaning of Section 512 of the Internal Revenue Code of 1986, as amended, and shall not otherwise adversely affect the status of Developer (or any partner in Developer) as an organization described in Section 501(c)(2) of the Internal Revenue Code of 1986, as amended;

6.    The location of valet parking pick-up areas and the location and size of the Automobile Parking Area to be designated for valet parking services shall be limited to the specific locations therefor as shown on the Plot Plan and there shall be no material change in such locations and/or size without the prior written approval of the Majors, which

8946-77.251

approval may be withheld in the sole and absolute discretion of the Majors; and

7.   The operation of any valet parking system shall be subject to and in compliance with the terms of the Parking Management Plan.

Any charge imposed by a Person in connection with valet parking service instituted in accordance with the provisions of this Article XI-E shall be the property of the Person operating such valet parking service.   Any valet parking spaces to be designated for a Major pursuant to this REA shall be so designated without charge to such Major.

Subject to the satisfaction of the foregoing conditions for providing valet parking, Macy's, Nordstrom and Developer shall have the right to provide valet parking in the locations therefor on the parking decks as shown on Exhibit "B".

Notwithstanding anything herein to the contrary, Sears shall have the right, subject to the approval of all applicable governmental agencies having jurisdiction over, or having contractual interests in, the Total Development Tract, to the exclusive use of up to twenty (20) automobile parking spaces in the east Parking Structure, in the locations labeled as "Sears Rental Car Spaces" on Exhibit "B", for the operation of a rental car business.   In the event Sears operates or causes to be operated a rental car business as permitted herein, then Sears shall (i) defend, indemnify and hold harmless the other Parties from and against all claims and all costs, expenses and liabilities (including reasonable attorneys' fees) incurred in connection with the operation of such rental car business; provided, however, that Sears shall not be required to indemnify the other Parties with respect to any acts or omissions of customers of such rental car business; (ii) subject to Sears' right to self-insure pursuant to this REA, carry contractual liability insurance in an amount at least equal to Five Million Dollars ($5,000,000.00) covering Sears' obligations pursuant to subsection (i) above naming the other

8946-78.251

Parties as additional insureds, and (iii) subject to Sears' right to self-insure pursuant to this REA, carry comprehensive general liability insurance, including an automobile liability endorsement in an amount at least equal to Five Million Dollars ($5,000,000.00) naming the other Parties as additional insureds.

F.  MAJORS' CONTRIBUTION TO ENCLOSED MALL AND COMMON AREA MAINTENANCE COST.

The obligation of each Major with respect to its contribution to the cost of maintenance of the Enclosed Mall and Common Area shall be governed by the terms of such Major's Lease.

G.  PERIMETER SIDEWALKS - LANDSCAPING.  The landscaping and landscaping irrigation system which is within Perimeter Sidewalks and Perimeter Sidewalks shall be installed at the sole cost of the Majors.  Thereafter, said items within the Perimeter Sidewalks and the Perimeter Sidewalks shall be maintained by Developer.

H.  MAJORS' SELF HELP RIGHT.

1.  (i)  In the event Developer shall fail or neglect to perform any act or thing herein provided to be performed by it (except those referred to in Articles V, XIV-B, C, D, XXI-A and XXII-A) or shall fail to pay any sum of money required to be paid by it hereunder and such failure shall continue for the grace period specified in Article XI-H (3) after notice from a Major specifying the acts or things to be performed, such Major may (but shall not be required to) perform or pay the same, and Developer, on demand, shall reimburse such Major for the cost thereof, unless the Developer notifies the Major within thirty (30) days after receipt of such notice that it contends it is (or was) not obligated to perform the same, in which case the obligation to perform shall be subject to arbitration in accordance with Article XXIV hereof.  Despite the giving of such notice by the Developer, the Major nevertheless may perform the act in question, but shall not be entitled to reimbursement of its cost until arbitration has been concluded in its favor.  If a Major in good faith shall deem that an emergency is occurring or has occurred so that a default

8946-79.251

requires immediate curing, then only such notice as is hereinafter provided shall be required, and such Major may act promptly and take such action as is necessary to cure the alleged default.  The Majors shall act with reasonable promptness and shall give notice to the Developer of the doing of such work and the alleged default. Such notice, notwithstanding any other provision of this REA, need not be in writing if the giving of a written notice would not be reasonably possible under the circumstance, so long as such notice is given to an officer or responsible official of the Developer. Written confirmation of the action shall be given as soon as reasonably possible. Each Major shall prosecute any work performed by it under the provisions of this Article XI-H (2) diligently to completion.  Nothing in this Article XI-H (2) shall give a Major the right to enter upon Floor Area of Developer or to do work in or in any Store or in the Enclosed Mall (except as provided in Article XI-H (1) (ii) as to the Enclosed Mall).

(ii) If Developer fails to perform any of the covenants on its part to be performed as set forth in Articles XI-A or XI-B, of this REA, a Major may, in an emergency situation, perform the same without prior notice to Developer.  Developer shall, on demand, reimburse such Major for the cost thereof, unless Developer notifies the Major within ten (10) days after its receipt of demand for reimbursement that Developer contends it is (or was) not obligated to perform the same, in which case the obligation to perform shall be subject to arbitration in accordance with Article XXIV hereof.

2.   Any action by a Major taken pursuant to this Article XI-H shall be taken at such times and in such manner as to cause the least practical interference with the business being conducted within the Total Development Tract.  Except for any negligent or willful act or omission, a Major shall not be liable or in any way responsible for any loss, inconvenience, annoyance or damage resulting to the Developer or anyone holding under the Developer for any action taken pursuant to this Article XI-H.

3.   The term "grace period", as used in this Article XI-H shall mean a period of thirty (30) days duration, except that if, because of the nature of the act or thing in question, longer than thirty (30) days is required to do or perform the same, the grace period shall be of the duration required to do or perform the same if commenced with reasonable promptness and thereafter prosecuted diligently to completed.

4.   Developer hereby grants to each Major, for the benefit of the Tract of each Major, a non-exclusive easement over and under any and all Common Areas on the Total Development Tract for all purposes reasonably necessary to enable the Majors (acting directly or through employees, agents, contractors or subcontractors) to exercise its rights under this Article XI-H.

ARTICLE XII

INDEMNIFICATION AND PUBLIC LIABILITY INSURANCE

A.   <u>INDEMNITY - COMMON AREA</u>. Except as otherwise provided to the contrary, the Developer agrees to defend, indemnify and hold harmless each Major from and against all claims and all costs, expenses and liabilities (including reasonable attorneys' fees) incurred in connection with all claims, including any action or proceedings brought thereon, arising from or as a result of the death of or any accident, injury, loss or damage whatsoever caused to any Person, or to the property of any Person, as shall occur (i) in or about the Common Area on the Total Development Tract, exclusive of any Common Area under the exclusive control and maintenance of a Major pursuant to the terms and provisions of this REA and exclusive of the kiosk area in the Court of a Major when being Operated by such Major and (ii) within the Family Entertainment Center. The Majors shall not be entitled to such indemnification for any loss caused to such Major by reason of its negligence or willful wrongdoing. Each Major, severally, agrees to indemnify and defend and hold harmless the Developer from and against all claims and all costs, expenses and liabilities (including reasonable attorneys' fees) incurred in connection with all

claims, including any action or proceedings brought thereon, arising from or as a result of the death of, or any accident, injury, loss or damage whatsoever caused to any person or to the property of any person as shall occur as a result of the use by such Major of the kiosk area in the Court of such Major while such area is under the control and maintenance of such Major pursuant to the terms and provisions of this REA, except for claims caused by the negligence or wrongdoing of the Developer.

The indemnitee shall give the indemnitor notice of any suit or proceeding entitling the indemnitee to indemnification pursuant to this Article XII-A, and the indemnitor shall defend the indemnitee in said suit or proceeding.

B.   <u>INDEMNITY – STORES</u>.   Each Party agrees to defend, indemnify and hold the other Parties harmless from and against all claims and all costs, expenses and liabilities (including reasonable attorneys' fees) incurred in connection with all claims, including any action or proceedings brought thereon, arising from or as a result of the death of, or any accident, injury, loss or damage whatsoever caused to any Person, or to the property of any Person, as shall occur in the respective Buildings of such Party and for purposes of this Article XII-B, the Family Entertainment Center and any Hotel shall be considered a Building of Developer, except for claims caused by the negligence or willful wrongdoing of the indemnitee.   The indemnitee shall give the indemnitor notice of any suit or proceeding entitling the indemnitee to indemnification pursuant to this Article XII-B, and the indemnitor shall defend the indemnitee in said suit or proceeding.

C.   <u>DEVELOPER'S LIABILITY INSURANCE – COMMON AREA</u>.   Developer shall at all times during the term of this REA, maintain, or cause to be maintained, in full force and effect, comprehensive public liability insurance, including contractual liability coverage, covering the indemnity under Article XII-A and automobile liability insurance, covering the Common Area within the Total Development Tract being maintained by Developer, and Operations arising

031391/S0495/REASears.Cln

76

8946-82.251

therefrom, with a financially responsible insurance company or companies, including coverage for any accident resulting in personal injury to or death of any person and consequential damages arising therefrom, and comprehensive property damage insurance, each in the amount of Five Million Dollars ($5,000,000.00) per occurrence as such amount may be adjusted pursuant to the Index Adjustment defined in Article XXXI-D.  Developer shall furnish to each Major, on or before the effective date of any such policy, evidence that the insurance referred to in this Article XII-C is in force and effect and that the premiums therefor have been paid. Such insurance shall name the Majors as additional insureds and shall provide that the insurance may not be canceled or amended without at least thirty (30) days prior written notice being given by the insurer to all Parties.

D.    MAJORS' LIABILITY INSURANCE – STORE.  Each Major shall at all times during the term of this REA, maintain in full force and effect comprehensive public liability insurance, including contractual liability coverage, covering its indemnity under Article XI-B and automobile liability insurance, covering the Store of such Major, and Operations arising therefrom, with a financially responsible insurance company or companies, including coverage for any accident resulting in personal injury to or death of any person and consequential damages arising therefrom, and comprehensive property damage insurance, each in the amount of Five Million Dollars ($5,000,000.00) per occurrence as such amount may be adjusted in accordance with the Index Adjustment defined in Article XXXI-D.  Each Major shall furnish to any other Party, on request, evidence that the insurance referred to in this Article XII-D is in force and effect and that the premiums therefor have been paid. Such insurance shall name Developer and the other Parties as additional insureds and shall provide that the insurance may not be canceled or amended without at least thirty (30) days' prior written notice being given by the insurer to all Parties.

8946-83.251

E.    LIABILITY INSURANCE - STORES - HOTELS, FAMILY ENTERTAINMENT CENTER. Developer shall at all applicable times during the term of this REA, maintain, cause to be maintained or enter into agreements with Occupants who will cause to be maintained, in full force and effect, comprehensive public liability insurance, including contractual liability coverage, covering the indemnity under Article XII-A and automobile liability insurance, covering the Developer Mall Stores, the Hotels (if any) and the Family Entertainment Center within the Center with financially responsible insurance companies, including coverage for any accident resulting in personal injury to or death of any person and consequential damages arising therefrom, and comprehensive property damage insurance, in the amount of Five Million Dollars ($5,000,000.00) per occurrence as such amount may be adjusted pursuant to the Index Adjustment defined in Article XXXI-D. Developer shall furnish to each Major, on request, evidence that the insurance referred to in this Article XII-E is in force and effect and that the premiums therefor have been paid. Developer shall furnish to each Major, on request, evidence that the insurance referred to in this Article XII-E is in force and effect and that the premiums therefor have been paid. Such insurance shall name the Majors as additional insureds and shall provide that the insurance may not be canceled or amended without at least thirty (30) days' prior written notice being given by the insurer to all Parties.

F.    BLANKET INSURANCE AND SELF-INSURANCE. The insurance described in Articles XII-C, XII-D and XII-G may be carried under a policy or policies covering other liabilities and locations of the Parties, or a subsidiary, successor, affiliate or controlling corporation of such Parties. The insurance referred to in Article XII-C, XII-D and XII-G may be carried in whole or in part under any plan of self-insurance from time to time maintained by any Party on condition that such Party has and maintains adequate net worth and net current assets for the risks so self insured against, and that

8946-84.251

such Party shall furnish to the other on request, evidence of the adequacy of said net worth and net current assets (net worth of not less than Two Hundred Million Dollars ($200,000,000.00), and net current assets of not less than One Hundred Million Dollars ($100,000,000.00), each adjusted pursuant to the Index Adjustment defined in Article XXXI-D ["Index Adjustment"] shall in all instances conclusively be deemed to be adequate for the purposes of this Article). The annual report of each Party shall be sufficient evidence of its net worth and net current assets. Each Party shall furnish to the other on request, evidence that the insurance referred to in Article XII-C and XII-D, is in full force and effect and that the premiums therefor have been paid. All policies of insurance carried by any Party pursuant to Articles XII-C, XII-D, or XII-E or policies covering those liabilities required to be insured against by Articles XII-C, XII-D or XII-E shall provide that the same may not be canceled or amended without at least thirty (30) days prior written notice being given by the insurer to each of the other Parties. If a Party elects to self-insure pursuant to the provisions of this Article XII-F or thereafter elects to terminate such self-insurance program, such Party shall give at least thirty (30) days' prior written notice thereof to the other Parties. Anything herein to the contrary notwithstanding, the Parties hereby agree that any plan of self-insurance shall provide each Party with at least the same rights and protections it would have had if insurance had been purchased by the self-insuring Party.

G. <u>CONTRACTUAL LIABILITY INSURANCE.</u> Each Party agrees to maintain Contractual Liability Insurance insuring its obligations set forth in Articles XII-A and XII-B, with the same limits as provided in Articles XII-C, XII-D and XII-E subject to the provisions of Article XII-F.

ARTICLE XIII

<u>PROPERTY INSURANCE</u>

8946-85.251

A.    <u>DEVELOPER IMPROVEMENTS</u>.  Effective upon the commencement of construction of the Developer Improvements and thereafter during the term of this REA, Developer as respects the Developer Mall Stores, the Parking Structure, the Family Entertainment Center and the Enclosed Mall, will carry or cause to be carried broad form all-risk casualty insurance in an amount at least equal to ninety percent (90%) of the replacement cost (exclusive of the cost of excavation, foundations and footings) of such Buildings and Improvements insuring against "all risks" (except loss or damage by earthquake, war or nuclear incident), including, but not limited to: loss or damage by fire, windstorm, cyclone, tornado, hail, explosion, riot, riot attending a strike, civil commotion, malicious mischief, vandalism, aircraft, vehicle, smoke damage and sprinkler leakage.    Such insurance shall be carried with financially responsible insurance companies.

B.    <u>MAJORS' IMPROVEMENTS</u>.  Effective upon the commencement of construction of the Improvements of a Major and thereafter during the Term hereof, each Major, as respects its Store, and the Improvements of such Major, will carry or cause to be carried, broad form all-risk casualty insurance in an amount at least equal to ninety percent (90%) of the replacement cost (exclusive of the cost of excavation, foundations and footings) of such Buildings and Improvements insuring against "all risks" (except loss or damage by earthquake, war or nuclear incident), including, but not limited to: loss or damage by fire, windstorm, cyclone, tornado, hail, explosion, riot, riot attending a strike, civil commotion, malicious mischief, vandalism, aircraft, vehicle, smoke damage and sprinkler leakage. Such insurance shall be carried with financially responsible insurance companies.

C.    <u>BLANKET INSURANCE AND SELF-INSURANCE</u>.    Any insurance required to be carried by Developer pursuant to Article XIII-A may be carried under a policy or policies covering other property owned or controlled by Developer or by a corporation which is the general partner of Developer, or by any subsidiary, successor or

8946-86.251

controlling corporation of a general partner of Developer; provided that such policy or policies allocate to the properties required to be insured by Article XIII-A an amount not less than the amount of insurance required to be carried by Developer with respect thereto. Developer shall furnish to each Major prior to the effective date of any such policy, evidence that the insurance required by Article XIII-A is in force and effect and that the premiums therefor have been paid.

Developer agrees that such policies shall contain a provision that the same may not be canceled without at least thirty (30) days' prior written notice being given by the insurer to the Majors.

Any insurance required to be carried by a Major pursuant to Article XIII-B may be carried under a policy or policies covering other property owned or controlled by such Major or by a corporation which is the general partner of such Major, or by any subsidiary, successor or controlling corporation of a general partner of such Major; provided that such policy or policies allocate to the properties required to be insured by Article XIII-B an amount not less than the amount of insurance required to be carried by such Major with respect thereto. Each Major shall furnish to Developer prior to the effective date of any such policy, evidence that the insurance required by Article XIII-B is in force and effect and that the premiums therefor have been paid. Notwithstanding the foregoing, the insurance required to be carried by a Major pursuant to Article XIII-B may be carried under a policy or policies covering other property owned or controlled by such Major or by any subsidiary, successor or controlling corporation of such Major, or may be carried under any plan of self-insurance from time to time maintained by such Major or its guarantor, or any combination of such blanket or "loss-limit" type insurance and self-insurance, on condition that such Major has and maintains adequate net worth and net current assets for the risks so self-insured against, and that such Major shall furnish to Developer on

8946-87.251

request, evidence of the adequacy of said net worth and net current assets (net worth of not less than Two Hundred Million Dollars ($200,000,000.00), and net current assets of not less than One Hundred Million Dollars ($100,000,000.00), each adjusted pursuant to the Index Adjustment, shall in all instances conclusively be deemed to be adequate for the purposes of this Article). The current annual report of a Major that is audited by an independent certified public accountant shall be sufficient evidence of its net worth and net current assets. If a Major elects to self-insure pursuant to the provisions of this Article XIII-C or thereafter elects to terminate such self-insurance program, it shall give at least thirty (30) days' prior written notice thereof to Developer. A Major shall have no right to self-insure during any period that the foregoing net worth test is not met.

D.  <u>MUTUAL RELEASE AND WAIVER OF SUBROGATION</u>.  Each Party hereby releases and waives any claims against each of the other Parties from any liability for any loss or damage to any or all property, including any resulting loss of rents or profits of each, and of any Occupant claiming its right of occupancy by or through it, located upon the Total Development Tract, which loss or damage is of the type covered by the insurance required to be maintained by it under this Article XIII, regardless of any negligence on the part of the released Person which may have contributed to or caused such loss or damage, and, on behalf of its insurance carrier, waives any right of subrogation that may arise therefrom. If the insurance policy does not allow a waiver of the rights of subrogation of the insurer, each Party covenants that it will obtain for the benefit of each such Person a waiver of any right of subrogation which the insurer of such Person may acquire against any such Person by virtue of the payment of any such loss covered by such insurance.

If any Party is by law, statute or governmental regulation or for any other reason (including insurance company requirements) unable to obtain or otherwise fails to obtain a waiver of the right

8946-88.251

of subrogation for the benefit of each other Party, then, during any period of time when such waiver is unobtainable, or has not been obtained for any reason, or during any period of time when the giving of such waiver would invalidate the insurance coverage of the waiving party, said Party shall be deemed not to have waived any right of subrogation of its insurance carrier against the other Parties, and during the same period of time the other Party shall be deemed not to have waived the right of subrogation of its insurance carrier against such Party who has been unable, or failed for any reason, to obtain such waiver from any claims their insurance carriers may assert which otherwise should have been waived pursuant to this Article XIII-D.

ARTICLE XIV

COVENANTS AS TO REPAIR, MAINTENANCE,

ALTERATIONS AND RESTORATION

A.    MAINTENANCE.  Developer and the Majors shall at all times during the term of this REA, after the completion of construction of their respective Improvements, keep and maintain, or cause to be kept and maintained, all portions of their respective Improvements, in good order, condition and repair (unless it shall be specifically relieved from the obligations so to do as provided in this REA).

B.    DEVELOPER'S RESTORATION.

1.    In the event of the destruction of, or damage to, the Buildings on the Total Development Tract (other than the Building on the Tract of a Major and any Building occupied by a Department Store or a Hotel), (i) at any time during the Major Operating Period of any Major, by fire, windstorm or other casualty, Developer shall promptly and diligently rebuild, repair and restore such Improvements or cause such Improvements to be promptly and diligently rebuilt, repaired and restored so that such Improvements shall be restored substantially to the same size, character, use and location as presently shown on the Plot Plan, and of the general appearance, type and quality, in as good condition and

8946-89.251

constituting an integrated shopping center substantially as it existed prior to the damage or destruction; (ii) after the expiration of all Major Operating Periods by fire, windstorm or other casualty, Developer shall promptly and diligently rebuild, repair and restore such Improvements or cause such Improvements to be promptly and diligently rebuilt and restored so that such Improvements shall be restored substantially to the same size, character, use and location as presently shown on the Plot Plan and of the general appearance, type and quality, in as good condition an constituting an integrated shopping center substantially as it existed prior to the damage or destruction; PROVIDED, HOWEVER, that Developer's obligation to so rebuild, repair and restore any "Major Damage" (as hereinafter defined) after the expiration of all Major Operating Periods shall be limited as follows:

(a) If (i) at least three (3) Department Stores, or their respective successors and assigns, or (ii) any two (2) (and only two (2)) Department Stores or their respective successors and assigns whose Buildings are not on the same side of the Shopping Center (north, south, east or west), shall each by written notice to Developer, given within ninety (90) days after receipt of a request for such covenant given after the date of such casualty, covenant for a period of ten (10) years running from and after the earlier of (i) the date Developer completes rebuilding, restoration and repairs, or (ii) the date which is thirty-six (36) months after the date of such casualty to Operate or cause to be Operated its respective Building as a single use retail operation or as a retail store operating a series of integrated departments for the sale of goods and miscellaneous merchandise and services operating as a single unit and under a single trade name, then Developer shall rebuild, repair and restore the entire Enclosed Mall, the Developer Mall Stores Floor Area, the entire Family Entertainment Center, and the Automobile Parking Area in accordance with Article XIV(B)(4);

(b)   If any two (2) (and only two (2)) Department Stores, or their respective successors and assigns, whose Buildings are on the same side of the Shopping Center (north, south, east or west) shall each by written notice to Developer, given within ninety (90) days after receipt of a request for such covenant given after the date of such casualty, covenant for a period of ten (10) years running from and after the earlier of (i) the date Developer completes rebuilding, restoration and repairs, or (ii) the date which is thirty-six (36) months after the date of such casualty, to Operate or cause to be Operated its respective Building as a single use retail operation or as a retail store operating a series of integrated departments for the sale of goods and miscellaneous merchandise and services operating as a single unit and under a single trade name, then Developer shall rebuild, repair and restore the one-half (1/2) portion of the Enclosed Mall which includes the Buildings of such Department Stores running to the main entrances to the Enclosed Mall in the center of the respective Major's wing on each side of such Department Store, together with the Developer Mall Stores Floor Area within such one-half (1/2) portion of the Enclosed Mall, the entire Family Entertainment Center, and the Automobile Parking Area in accordance with Article XIV(B)(4);

(c)   If any one (1) (and only one (1)) Department Store, or its successors and assigns, shall by written notice to Developer, given within ninety (90) days after receipt of a request for such covenant given after the date of such casualty, covenants for a period of ten (10) years running from and after the earlier of (i) the date Developer completes rebuilding, restoration and repairs, or (ii) the date which is thirty-six (36) months after the date of such casualty, to Operate or cause to be Operated its respective Building as a single use retail operation or as a retail store operating a series of integrated departments for the sale of goods and

8946-91.251

miscellaneous merchandise and services operating as a single unit and under a single trade name, then Developer shall rebuild, repair and restore the one-fourth (1/4) portion of the Enclosed Mall running to the main entrances to the Enclosed Mall in the center of the respective Major's wing on each side of such Department Store which includes the Building of such Department Store together with the Developer Mall Stores Floor Area within such one-fourth (1/4) portion of the Enclosed Mall and the Automobile Parking Area in accordance with Article XIV(B)(4).

2.    Notwithstanding anything to the contrary contained herein if, following a casualty, any Major, or its successors and assigns, shall Operate the Building of such Major for non-retail purposes, then Developer shall not be obligated to rebuild any portion of the Developer Mall Stores Floor Area within the vicinity of such Building, but shall only be obligated to provide (in accordance with the applicable codes) first-class enclosed pedestrian access on the first level from such Building to the portion of the Enclosed Mall and Developer Mall Stores then being Operated.

The term "Major Damage" as used herein shall mean damage or destruction requiring repairs and restoration which would cost more than ten percent (10%) of the full replacement cost (exclusive of costs of excavations, foundations and footings) of the Party's Improvements on the Tract of such Party so damaged as originally constructed and existing prior to such casualty.

3.    Any Building or other Improvements required to be rebuilt, repaired and restored by Developer pursuant to this REA, shall be rebuilt, repaired and restored and ready for occupancy with due diligence, not to exceed thirty-six (36) months from the time when the loss or destruction occurred with respect to Major Damage, and not to exceed one hundred eighty (180) days with respect to any damage which is not Major Damage; subject, however, to unavoidable delays stipulated under the provisions hereof.

4.    In the event of damage or destruction to the Parking Structure, Developer shall repair and restore the Parking Structure to maintain the parking ratios required pursuant to this REA; provided, however, that if the entire Parking Structure is not restored, Developer may provide Automobile Parking Area within the Total Development Tract in substitution for any necessary portion of the Parking Structure, so long as the Majors have approved the location and configuration of such substituted parking and so long as Developer maintains the parking ratios required pursuant to this REA.

5.    In the event of any damage to or destruction of any Hotel Building, Developer shall restore such damage to the extent, if any, required pursuant to this REA, and if not so required, Developer at its sole election, shall either repair and restore such damage or raze and remove such Improvements in accordance with the provisions of Article XIV-E hereof, and upon such razing and removal such area shall be designated as Common Area available for future development and improvement in accordance with Article XV hereof.

6.    In the event of the destruction of or Major Damage to a Department Store Building within the Total Development Tract (other than the Building of a Major), Developer agrees to use its reasonable best efforts to cause such Department Store Operator to restore the damage and continue to Operate the Department Store. The Majors hereby acknowledge that Developer will use its reasonable best efforts to the end that the obligation of such other Department Store Operator to restore any such damage and continue to Operate shall be subject to contractual restrictions and agreements between Developer and such Department Store Operator that are substantially similar to the obligations of the Majors set forth in this Article.

C.    <u>MAJORS' RESTORATION</u>. (1) In the event of the destruction of, or damage to, the Building on the Tract of a Major at any time during the Operating Period of such Major, when (i) the Macy's

Department Store, as to Nordstrom, or the Nordstrom Department Store, as to Macy's, (ii) as to Macy's and Nordstrom, one (1) other Department Store, and as to Sears, two (2) other Department Stores, and (iii) the Enclosed Mall is being Operated or is being restored for Operation as a Department Store or (in the case of the Enclosed Mall) as a Shopping Center, as the case may be, by fire, windstorm or other casualty, such Major shall promptly and diligently rebuild, repair and restore the Building on the Tract of such Major so that there will then be substantially the same number of square feet of Floor Area in the Building on the Tract of such Major in substantially the same location as presently shown on the Plot Plan, in architectural harmony with the balance of the Shopping Center and constituting an integrated Building as the same existed prior to the damage or destruction, and such Major shall promptly resume its Operation in the Building on its Tract for the remainder of its Operating Period.  In the event of the conditions set forth above in (i), (ii) and (iii) of this subparagraph C, or in the event of any such destruction or damage to the Building on the Tract of a Major after the expiration or earlier termination of the Operating Period of such Major, such Major shall not be obligated to rebuild, repair and restore damage and such Major shall be released of its obligations under this REA, but if it elects to do so, its Building on its Tract shall be and remain subject to the terms, provisions and restrictions of this REA, the same as if such damage had not occurred.  If a Major does not repair and restore such damage, such Major shall raze and remove the damaged portion of such Improvements unless instructed not to do so by Developer. Any proceeds of insurance payable to a Major with respect to the damage or destruction of the Building on the Tract of such Major at any time shall be the sole property of such Major.

(2)  Any Building or other improvements required to be rebuilt, repaired and restored by a Major pursuant to this REA shall be rebuilt, repaired and restored and ready for occupancy with due diligence, not to exceed thirty-six (36) months from the

8946-94.251

time when the loss or destruction occurred with respect to Major Damage, and not to exceed one hundred eighty (180) days with respect to any damage which is not Major Damage; subject, however, to unavoidable delays stipulated under the provisions of Article XVI hereof.

D.   STANDARDS OF CONSTRUCTION.   All restoration, repair, rebuilding, maintenance, alterations, additions or improvements (hereinafter for the purposes of this Article only collectively called "work"), performed by any Person pursuant to the provisions of this REA shall be performed in strict compliance with such of the following requirements as are applicable thereto, to-wit:

1.   No such work shall be commenced unless the Party desiring to perform the same has in each instance complied with the appropriate provisions of Article V.

2.   If the work is to a structure which is adjacent to the Enclosed Mall, then during the performance of the work, the Enclosed Mall shall be secured and temporarily enclosed so as not to permit the escaping of air, and upon completion shall have physical integration with the Enclosed Mall.

3.   All work shall be performed in a good and workmanlike manner and shall strictly conform to and comply with:

(a)   The plans and specifications therefor approved as aforesaid to the extent such approval shall have been otherwise required;

(b)   All applicable requirements of laws, codes, regulations, rules and regulations of governmental agencies having jurisdiction thereof and of insurance underwriters; and

(c)   To the extent applicable, the requirements of Articles V, VI, VII, VIII, IX and X.

4.   All such work shall be completed with due diligence, and at the sole cost and expense (except as herein provided to the contrary) of the Party performing the same.

E.    LICENSES FOR RECONSTRUCTION.  It is recognized that from time to time during the term of this REA, each Party may require, and is hereby granted, a temporary license to use portions of the Common Area for the purposes of:

1.    Performing maintenance upon, and making repairs to, and/or making construction alterations, additions and improvements, or razing and replacing the whole or any part of the Developer Improvements or the Stores, respectively, pursuant to this REA (the activities referred to in this subdivision 1 being hereinafter collectively referred to as "construction" solely for the purpose of this Article); and

2.    Obtaining access, ingress and egress to and from the Developer Improvements and the Majors' Stores as the case may be, to carry on such maintenance, repair and construction.

With respect to all purposes for which a temporary license is needed, within a reasonable time prior to the commencement of any such construction, the Party desiring to undertake the same shall submit to the Party whose Tract is to be burdened by such temporary license for approval (which approval shall not be unreasonably withheld) a plot plan of the Total Development Tract on which such Party shall delineate those portions of the Common Area with respect to which such temporary license is reasonably required, together with a description of, and a schedule of, the work and the recipient thereof of such plot plan shall, within ten (10) days thereafter, notify such requesting Party whether it approves or disapproves of the use.  The temporary licensee, in the exercise of its license, shall comply with the applicable requirements of Article X hereof, shall make all reasonable efforts to keep any inconvenience, annoyance, disturbance or loss of business to the minimum reasonably required by the work in question, and upon cessation of such use shall promptly restore the portions of the Common Area so used to the condition in which the same were prior to the time of commencement of such use, including the cleaning of such area of all loose dirt, debris, equipment and construction

031391/S0495/REASears.Cln

90

8946-96.251

materials.  The temporary licensee shall also restore, at its sole cost and expense, any portions of the Total Development Tract which may have been damaged by such construction work promptly upon the occurrence of such damage, and shall at all times during the period of any such construction keep all portions of the Total Development Tract, except that portion of the Developer Improvements and the Majors' Stores, as the case may be, upon which the work is being performed, and except the portions of the Common Area being utilized by such temporary licensee pursuant to this Article, free from and unobstructed by any loose dirt, debris, equipment or construction materials related to such construction.

F.    <u>CLEARING OF PREMISES</u>.  Whenever any Party is not obligated hereunder to restore, repair or rebuild any Building or other Improvement that has been damaged or destroyed and elects not to do so, then such Party, at is sole cost and expense, shall raze such Building and/or Improvement or such part thereof as has been so damaged or destroyed (unless, with respect to a Major's Building, Developer instructs such Major not to so raze), clear the premises of all debris, and all areas not restored to their original use shall be leveled, cleared and improved as Common Area, of like standard as the Common Area of the balance of the Total Development Tract.  Thereafter, said area shall become a portion of the Common Area and be maintained as such at the expense of such Party, until such time as such Party may elect to rebuild thereon.

G.    <u>COMMON BUILDING COMPONENTS</u>.  The following provisions shall apply to the repair, alteration or restoration of Common Building Components:

1.    Each Person owning or leasing any Improvement in the Total Development Tract which contains a Common Building Component shall, subject to the terms of Section XIV-G(5) below, for so long as another Person owns or leases an Improvement which is benefitted by the subject Common Building Component, maintain, repair and restore such Common Building Component at its own cost and expense so that, subject to

8946-97.251

Paragraph 2 of this Article, it shall continue to have the capacity to be so used in common with such benefitted Improvement in question.

2.   Each Person owning or leasing any benefitted Improvement which utilizes any Common Building Component shall not place upon the subject Common Building Component any burden which is in excess of the capacity of the subject Common Building Component, or which will present the use of the Improvement containing the subject Common Building Component for its intended purposes.

3.   Any Person owning or leasing either an Improvement containing a Common Building Component or a benefitted Improvement, as the case may be, may do any work of repair, alteration, restoration, or otherwise with respect to such Improvement, notwithstanding that during the course of performing such work a condition otherwise prohibited by the provisions of this Article may result, if:

(a)   During the course of performance of such work the Person by whom or on whose behalf such work is being done shall, at its own cost and expense, provide such temporary facilities as may be necessary:

(i)   To perform the function performed by the Common Building Component in question, if such work is performed with respect to the Improvement containing the Common Building Component in question, or

(ii)  To increase the capacity of, or supplement, the Common Building Component in question to the extent necessary so that the benefitted Improvement shall not, during the course of performance of such work, either place on such Common Building Component a burden in excess of the capacity thereof for such purpose or otherwise prevent the use of the Improvement containing the

8946-98.251

Common Building Component in question for its intended purposes, if such work is performed with respect to the benefitted Improvement in question; and

(b) At the conclusion of such work there is compliance with the provisions of whichever of subparagraphs 1 or 2 of Article XIV-G is applicable.

4.    Notwithstanding the provisions of subparagraphs 1 and 2 of Article XIV-G, the Person owning or leasing the Improvement with respect to which the work in question was done shall not be liable to the Person owning or leasing such other Improvement affected by such work for any inconvenience, annoyance, disturbance or loss of business to such other Person (or his Occupant) arising out of and during the performance of such work (except that the Person performing such work, or its agents, if negligent, shall be liable), but the Person owning or leasing the Improvement with respect to which such work is being performed shall make all reasonable efforts to keep any such inconvenience, annoyance, disturbance or loss of business to the minimum reasonably required by the work in question.

5.    The terms of this Article XIV-G shall not be construed to require any Person owning or leasing any Improvement which contains a Common Building Component to restore such Improvement in the event of damage or destruction if said Person would not otherwise be required to restore such Improvement under the terms of this REA.  If a Common Building Component is damaged or destroyed, and the Person owning or leasing the Improvement which contains such Common Building component is not otherwise required under this REA to restore such Improvement, the owner or lessee of the Improvement shall not be required to restore the Common Building Component, but shall permit and hereby grants the right and easement to the Person owning or leasing the benefitted Improvement to restore the Common Building Component at its own expense.   If both Persons are required to restore or elect to restore their damaged or destroyed

8946-99.251

Improvements which include a Common Building Component, the cost of restoration of the Common Building Component shall be shared equitably among the Persons who share the Common Building Component.

6.   The covenants contained in this Article XIV-G shall be covenants which run with the land and which are binding upon the owner of the Developer Tract, and tenants of the Tracts of the Majors, as the case may be, which contains a Common Building Component.

H.   <u>LIABILITY OF MORTGAGEE</u>.   Provided that such Mortgagee shall allow such insurance proceeds as are available to be utilized for reconstruction as required in Articles XIV-A and XIV-B, any other provision in this Article to the contrary notwithstanding, it is expressly understood and agreed that the provisions of Articles XIV-A and XIV-B hereof shall be applicable to any Mortgagee of any Tract only in the following instances:

1.   Where any such Mortgagee acquires title by reason of foreclosure, or deed, or assignment in lieu of foreclosure, or by termination of a leaseback in a sale and leaseback transaction, such Mortgagee or the purchaser at a foreclosure sale shall only be obligated for such reconstruction of damage which occurs subsequent to such foreclosure sale or conveyance, or termination of leaseback; provided, however, that where damage or destruction caused by a peril included within the risks enumerated in Article XIII-A and which is required to be insured against under this REA occurs prior to such foreclosure sale or termination of leaseback, any Mortgagee who acquires title by reason of foreclosure or termination of leaseback, or the purchaser at the foreclosure sale, shall be obligated for such reconstruction.

2.   If a Mortgagee which has acquired title in the manner set forth in subparagraph 1 above or the purchaser at a foreclosure sale is not required pursuant to the foregoing subparagraph to restore, repair or rebuild any Improvement

8946-100.251

that has been damaged or destroyed and elects not to do so, then such Mortgagee or purchaser shall raze such Improvement or such part thereof that has been so damaged or destroyed (except that no Mortgagee of a Major shall raze such Major's Building if Developer has instructed such Mortgagee not to do so), clear the premises of all debris, and improve said area at its expense as Common Area, of like standard as the Common Area of the balance of the Total Development Tract. Thereafter said area shall become a portion of the Common Area and be maintained as such, at the expense of such Mortgagee or purchaser, until such time as such Mortgagee or purchaser may elect to rebuild thereon.  Nothing contained in this Article shall be construed to relieve the Party whose interest has been so acquired of its obligations under Article XIV-A and XIV-B hereof.

Nothing contained in this Article shall limit the rights of the Parties under Articles XVI or XXII if there is such limited performance of the provisions of Articles XIV-A or XIV-B by such Mortgagee or purchaser at a foreclosure sale.  Anything to the contrary in this Article XIV notwithstanding, if a leasehold Mortgagee shall be obligated to restore or replace a Building pursuant to this REA, its obligation shall be limited to the amount of the insurance proceeds awarded therefor; provided, however, that if the Mortgagee is self-insured, then such obligation shall be limited to the amount of insurance proceeds which would have been awarded therefor had such Mortgagee not elected to self-insure.

ARTICLE XV

FUTURE CONSTRUCTION

A.    PERMITTED FUTURE CONSTRUCTION.

(1) Developer shall have the right, at its own cost and expense, but subject to the approval of the Majors pursuant to Article V, to alter or expand any Building or to construct an additional Building on the Developer Tract (including one (1) or more Hotels with up to an aggregate of one thousand (1,000) Hotel

8946-101.251

rooms, related Hotel facilities and required parking spaces in the area shown as "Future Hotel Site and Parking" on Exhibit B), after or contemporaneously with the completion of the construction described in the preceding Articles of this REA upon and subject to the following conditions and limitations:

(a)   No alteration or expansion of any Building or construction of any additional Building shall take place outside of the Permissible Building Areas or in excess of the maximum building heights, as shown on the Plot Plan; and

(b)   Developer shall, at its own cost and expense, proceed simultaneously with the construction and completion of both the Building alteration or expansion or additional Building, as the case may be, and additional Parking Spaces sufficient to maintain the parking ratios as required by the provisions of Article VI-A hereof.

(c)   Such additional Improvements shall be subject to the provisions of this REA, including Article IX.

(d)   The location of staging areas and construction access routes, and the scheduling of any work which would interrupt utility service to the Store of a Major, or would interfere with access to the Store of a Major or to the Parking Structure adjacent to a Major's Store shall have been approved by such Major; and

(e)   Such improvements shall be constructed in a manner which minimizes any interference with the construction and operation of the Stores of the Majors to the extent possible.

Prior to the commencement of the expansion of any Building or the construction of a new Building by Developer pursuant to this Article XV-B, Developer shall comply with the plan review and approval process set forth in Article V-B and V-F.

8946-102.251

(2)  The Majors hereby consent to the contemporaneous construction of a Department Store Building and related Improvements within the area designated on the Plot Plan as "BLOOMINGDALE'S DEPARTMENT STORE" (which area shall constitute the Permissible Building Area for such Building, with such minor variations thereof as shall be non-material), and the occupancy and operation of such Building as a part of the Shopping Center, upon and subject to all of the provisions of the REA, including the following conditions and limitations:

(a)  The Building shall comply with the standards of construction provided in this REA .

(b)  All such construction shall be substantially in accordance with the details as shown on the Plot Plan.

(c)  A conveyance or lease of the Department Store Building and/or Permissible Building Area, and such additional land out of the Developer Tract as may be designated by Developer for such purpose (the "Department Store Tract") shall be made to such Department Store Operator and such Department Store Operator and Department Store Tract shall be bound by and subject to the terms of this REA. Developer shall use its good faith efforts to cause Bloomingdale's to become a party to this REA by an amendment or restatement of this REA which is satisfactory to the Majors.

(d)  Developer shall provide and maintain Parking Spaces sufficient to satisfy and maintain the parking required by the provisions of Article VI-A hereof.

(e)  Such Building shall be architecturally harmonious with the Enclosed Mall and the Buildings of the Majors.

(f)  The Floor Area of such Department Store shall not exceed the Initial Planned Floor Area or maximum height set forth with respect to such Store in Article IX.

Developer shall have no further liability or responsibility with regard to such Department Store Tract and Improvements thereon

8946-103.251

after it has conveyed or leased the same as herein provided to a party who has entered into this REA with the Majors, Developer and Hotel Operators, if any, in the Shopping Center.

(3)  At all times during the term of this REA during which no Buildings or other Improvements are erected and operated within any part of the Permissible Building Area (except the area of any expansion by a Major), Developer will use, keep and maintain such areas as Common Area devoted to landscaping or Parking Area.

ARTICLE XVI

EXCUSE FOR NON-PERFORMANCE

A.   FORCE MAJEURE.   Each Party shall be excused from performing any obligation or undertaking provided in this REA, except any obligation to pay any sums of money under the applicable provisions hereof (unless such payment is conditional upon performance of an obligation or undertaking excused by the provisions of this Article XVI), in the event and so long as the performance of any such obligation is prevented or delayed, retarded or hindered by act of God, fire, earthquake, floods, explosion, actions of the elements, war, invasion, insurrection, riot, mob violence, sabotage, inability to procure labor, equipment, facilities, materials or supplies in the open market, failure of transportation, strikes, lockouts, action of labor unions, condemnation, requisition, laws, orders of governmental or civil or military or naval authorities, or any other cause, whether similar or dissimilar to the foregoing, not within the respective control of such Party, and not due to the willful act or neglect of the Party seeking to be excused from such performance.

B.   MAJORS EXCUSED FROM RECONSTRUCTION.   Each Major shall be excused from the performance of its respective obligations set forth in Article XIV-A for and during any period of time (i) in which the Developer shall be in default of its covenants as set forth in Article XIV-B, or (ii) when such Major shall be released from the performance of its obligations under Article XXII-A pursuant to the provisions of Article XXII-B.

C.   <u>DEVELOPER EXCUSED FROM RECONSTRUCTION</u>.  Developer shall be excused from the performance of its obligations set forth in Articles XIV-B for and during any period of time (i) when all Majors are in default of their respective covenants contained in Articles XIV or XXII, or (ii) when reconstruction by the Majors is excused pursuant to Article XIV-G or Article XVI-B, and all Majors elect not to reconstruct their respective Stores.

<u>ARTICLE XVII</u>

<u>CONDEMNATION</u>

A.   <u>TOTAL CONDEMNATION OF A MAJOR'S STORE.</u>

(1)  In the event that all or a substantial part of a Major's Building shall, during the Term of this REA, be taken or damaged by eminent domain, so that it is not feasible to restore the same to a complete architectural and structural unit or to use the Building as a Department Store or other permitted use similar to the Store or other permitted use which was Operated in the Building immediately prior to such condemnation, such Major may elect to be released from its obligations under this REA as of the date of the taking of possession by condemnation and in such event such Major shall not be obligated to restore its Building.

(2)  In the event of a taking to which Article XVII-A(1) shall be applicable, and if such Major elects to cease Operating its Building and to be released from its obligations under the REA, then at the option of Developer, such Major, at its expense shall raze the remainder of its Building and clear away all debris in accordance with good construction practice so that the remainder of its Tract will be left in a safe and sightly condition.

B.   <u>PARTIAL CONDEMNATION OF A MAJOR'S STORE.</u>

(1)   In the event of a condemnation during the Major Operating Period of a Major of part of the Tract of such Major to which Article XVII-A(1) hereof is not applicable, before devoting the proceeds of the condemnation to any other

purpose, such Major shall at its expense promptly and diligently restore and/or replace its Building to a complete architectural and structural unit; and

(2) In the event of the partial condemnation of the Tract of a Major, if (a) the Major's Operating Period has expired, or (b) the Major would be released from its covenant to Operate pursuant to Article XXII-B in accordance with the terms of this REA, then such Major may elect to be released from its obligations under this REA as of the date of taking by condemnation and such Major shall thereupon not be obligated to restore its Building.

C.    <u>TAKING OF ENCLOSED MALL OR DEVELOPER MALL STORES.</u> In the event that all, or a substantial part (more than twenty-five percent (25%) of the Enclosed Mall or twenty-five percent (25%) of the Floor Area in the Total Development Tract should be taken for any public or quasi-public use under any governmental law, ordinance or regulation, or by right of eminent domain, or by voluntary conveyance in lieu thereof, then, and in any of such events, any Major may elect to be released from its obligations under this REA.

D.    <u>CONDEMNATION OF AUTOMOBILE PARKING AREA.</u> If all or any portion of the Automobile Parking Area shall be taken by condemnation, the following provisions shall apply:

(1) If after such condemnation the number of Parking Spaces remaining shall be not less than ninety percent (90%) of the Parking Spaces then required by this REA, Developer shall not be required to replace any of the Parking Spaces so taken;

(2) If after such condemnation the number of Parking Spaces remaining shall be less than ninety percent (90%) of the Parking Spaces then required by this REA, or if Developer, despite its reasonable best efforts, is not able, as a result of governmental requirements, to add sufficient Parking Spaces pursuant to Article XVII(D)(3) hereof to replace the necessary

8946-106.251

Parking Spaces, such Major may elect to be released from its obligations under this REA as of the date of taking by condemnation and shall not be obligated to restore its Building unless Developer elects to and does provide additional parking facilities in accordance with Article XVII(D)(3) hereof so as to provide at least ninety percent (90%) of the Parking Spaces then required by this REA.

(3)  In the case of a condemnation affecting the Automobile Parking Area if and to the extent that Developer is either obligated to or elects to replace Parking Spaces, replacement thereof may be made, at Developer's election, by the acquisition and improvement of land contiguous to the Shopping Center suitable for parking purposes, or by the construction or expansion of multi-level parking facilities. The location of and the plans and specifications for replacement parking pursuant to this Article XVII(D)(3) shall be subject to the reasonable approval of the Majors.  Except as otherwise provided in this Article XVII, if Developer replaces the Parking Spaces pursuant to (2) and (3) of this Article XVII(D) in all events of a condemnation of Automobile Parking Area, each Major hereby waives in favor of the Developer all amounts which such Major would be entitled to receive on account of any condemnation of easement rights. Adjacent land so used for parking shall become part of the Shopping Center Tract and Common Area for purposes of this REA; and

(4)  In the event that all, or a substantial part (more than twenty percent (20%)) of the Parking Spaces on the Shopping Center Tract (unless Developer replaces said Parking Spaces pursuant to this Article XVII(D) hereof) should be taken for any public or quasi-public use under any governmental law, ordinance or regulation, or by right of eminent domain, or any of such events, any Major may elect to be released from its obligations under this REA, which

8946-107.251

election must be made, if at all, within one hundred twenty (120) days following notice of the condemning authority's intention to take such property.

E.   <u>DISPUTES.</u>   Any dispute between Developer and a Major under this Article XVII shall be determined by arbitration pursuant to Article XXIV hereof.

F.   <u>RESTORATION OF DEVELOPER IMPROVEMENTS.</u>   Following a partial condemnation which occurs during Developer's Operating covenant as described in Article XXI-B hereof, when any Major is not in default of its Operating covenant as described in Article XXII-B hereof, all of the covenants, conditions and provisions hereof shall continue in full force and effect; provided, however, that Developer shall, at Developer's sole expense, commence promptly and prosecute with diligence the making of all necessary repairs, alterations and improvements to all Buildings which have been partially taken (other than Buildings on the Tract of a Major), and all Automobile Parking Area and Common Area, in order to constitute the remaining part of the Shopping Center as a complete architectural and functional unit. All such work shall be in accordance with plans and specifications approved by the Majors, which approval shall not be unreasonably withheld. Notwithstanding anything herein to the contrary, Developer's obligation to rebuild or restore following a condemnation after the expiration of the Major Operating Period of each Major shall be limited as follows:

(i)   If (a) at least three (3) Department Stores, or their respective successors and assigns, or (b) any two (2) (and only two (2)) Department Stores or their respective successors and assigns whose Buildings are not on the same side of the Shopping Center (north, south, east or west), shall each by written notice to Developer, given within ninety (90) days after receipt of a request for such covenant given after the date of such condemnation covenant for a period of ten (10) years running from and after the earlier of (i) the date Developer completes rebuilding and restoration or (ii)

8946-108.251

the date which is thirty-six (36) months after the date of such condemnation, to Operate or cause to be Operated its respective Building as a single use retail operation or as a retail store operating a series of integrated departments for the sale of goods and miscellaneous merchandise and services operating as a single unit and under a single trade name, then Developer shall rebuild, repair and restore the entire Enclosed Mall, the Developer Mall Stores Floor Area, the entire Family Entertainment Center, and the Automobile Parking Area in accordance with Article XVII(D)(3);

(ii) If any two (2) (and only two (2)) Department Stores, or their respective successors and assigns, whose Buildings are on the same side of the Shopping Center (north, south, east or west) shall each by written notice to Developer, given within ninety (90) days after receipt of a request for such covenant given after the date of such condemnation, covenant for a period of ten (10) years running from and after the earlier of (i) the date Developer completes rebuilding and restoration or (ii) the date which is thirty-six (36) months after the date of such condemnation, to Operate or cause to be Operated its respective Building as a single use retail operation or as a retail store operating a series of integrated departments for the sale of goods and miscellaneous merchandise and services operating as a single unit and under a single trade name, then Developer shall rebuild, repair and restore the one-half (1/2) portion of the Enclosed Mall which includes the Buildings of such Department Stores running to the main entrance to the Enclosed Mall in the center of the respective Major's wing on each side of such Department Store, together with the Developer Mall Stores Floor Area within such one-half (1/2) portion of the Enclosed Mall, the entire Family Entertainment Center and the Automobile Parking Area in accordance with Article XVII(D)(3);

8946-109.251

(iii)   If any one (1) (and only one (1)) Department Store, or its successors and assigns, shall by written notice to Developer, given within ninety (90) days after receipt of a request for such covenant given after the date of such condemnation, covenant for a period of ten (10) years running from and after the earlier of (i) the date Developer completes rebuilding and restoration or (ii) the date which is thirty-six (36) months after the date of such condemnation, to Operate or cause to be Operated its respective Building as a single use retail operation or as a retail store operating a series of integrated departments for the sale of goods and miscellaneous merchandise and services operating as a single unit and under a single trade name, then Developer shall rebuild, repair and restore the one-fourth (1/4) portion of the Enclosed Mall running to the main entrances to the Enclosed Mall in the center of the respective Major's wing on each side of such Department Store which includes the Building of such Department Store together with the Developer Mall Stores Floor Area within such one-fourth (1/4) portion of the Enclosed Mall and the Automobile Parking Area in accordance with Article XVII(D)(3).

Notwithstanding anything to the contrary contained herein if, following a condemnation, any Major, or its successors and assigns, shall Operate the Building of such Major for non-retail purposes, then Developer shall not be obligated to rebuild any portion of the Developer Mall Stores Floor Area within the vicinity of such Building, but shall only be obligated to provide (in accordance with the applicable codes) first-class enclosed pedestrian access on the first level from such Building to the portion of the Enclosed Mall and the Developer Mall Stores then being Operated.

G.   <u>DETERMINATION OF AWARD</u>.   Whenever a public, quasi-governmental or military authority shall have taken, on a permanent, temporary or emergency basis, the Shopping Center Site or any portion thereof by exercise of the powers of eminent domain,

condemnation or requisition, the resulting damages to be awarded to the Parties (the "Award") shall be determined either by agreement between the condemning authority and all Parties suffering such taking or by judicial judgment, verdict or order in a condemnation action or proceeding.  Notwithstanding the provisions of such agreement, judgment, verdict or order to the contrary, the Award shall be distributed among and to the Parties in accordance with Article XVII-H.

H.    DISTRIBUTION OF AWARD.  With respect to an Award for condemnation of a Party's Tract, or any interest thereof, if a Major exercises its right to be released from its obligations as to its Tract as provided in this Article XVII, such Major shall, subject to and except as otherwise provided under the terms of the lease between such Major and the Developer, be entitled to the entire Award attributable to its interest in its Tract, exclusive of any severance damages awarded to any other Party.

If a party does not have a right to be released from its obligations under this REA or does not elect to exercise such right, the Party receiving the Award shall promptly pay it in trust to a bank or trust company approved by the Parties, having an office in Hennepin County, Minnesota, which shall serve as a trustee, charged with distributing the Award together with any interest accruing thereon among and to the Parties.  The trustee shall distribute the Award among the Parties as follows:

1.    If all or any portion of any Tract shall be condemned, the trustee shall pay the total Award attributable to such Tract, exclusive of any portion of the Award or other compensation paid for any Common Area thereon (or deemed to be paid for any Common Area thereon, pursuant to paragraph 3 below), to the Party with respect to such tract, subject to and except as otherwise provided under the terms of any lease between such Party and the owner of such Tract.

2.    If all or any portion of the Common Area shall be condemned, the trustee shall distribute the portion of the

8946-111.251

Award paid for Common Area (or deemed to be paid for the Common Area, pursuant to paragraph 3 below) to the Parties in the following order of priority:

(a)   The trustee shall first distribute such portion of the Award to Developer for the restoration and repair thereof under Article XVII (after all Parties shall have approved complete plans and specifications for any substituted Common Area in accordance with the applicable requirements of this REA), in progress payments during the progress of Developer's restoration of Common Area and, for full payment of so much of the restoration as the Award will permit, as follows:  (a) at the end of each month, or from time to time as may be agreed upon by the affected Parties, against Developer's architect's certificates, progress payments in an amount which shall be that proportion held in trust which ninety percent (90%) of the payments made or to be made to the contractors or materialmen for work done, material supplied and services rendered during each month or other period bears to the total contract price; and (b) at the completion of the work, the balance of the Award, if any, required to complete the payment for such work; <u>provided</u>, however, that at the time of each such payment (i) there are no liens against the Tract of any Party by reason of such work and that, with respect to the time of payment of any balance remaining to be paid at the completion of such work, the period within which a lien may be filed has expired or the other Parties are satisfied by proof submitted by such Party that all costs of such work theretofore incurred have been paid, (ii) Developer's architect shall certify that all work done is proper and of a quality and class equal to the original work required by this REA and in accordance with the approved plans and specifications therefor, and (iii) such

031391/S0495/REASears.Cln

106

8946-112.251

Developer shall furnish to the trustee evidence satisfactory to said trustee that all previous advances have been devoted to defray the actual cost of such work up to the amount of such cost, or that Developer has actually paid such cost in the amount of all such previous advances. In no event shall the trustee be liable for any amount in excess of the net proceeds of the Award.

(b) Should (a) the cost of such work be less than the Award so held in trust, or (b) no substituted Common Area be provided, the Award or the balance of said Award shall be apportioned between the Parties in accordance with their respective interests in the Tract or Tracts so taken, it being their intent that, subject to the terms of the leases between the Developer and the Majors, severance damages arising from the taking of the reciprocal easements and other rights created by this REA shall be the sole compensable interest created by the integration of the various Tracts into the Shopping Center which shall accrue to Parties who do not have any other property interest in the Tract so taken except such interest created by this REA; provided, however, there shall first be distributed to all Parties any and all reasonable expenses or disbursements each such Party may have incurred or obligated itself for in connection with such condemnation proceedings.

Anything to the contrary in this Article XVII-I notwithstanding, if a Party has a net worth of at least Two Hundred Million Dollars ($200,000,000) and net current assets of at least One Hundred Million Dollars ($100,000,000), as disclosed on the annual report of any Party that is a publicly held corporation and is audited by an independent certified public accountant, payment of such Party's portion of any Award shall be made directly to such Party rather than to the

8946-113.251

trustee as provided in this Article XVII-H.  Anything to the
contrary in this Article XVII-H notwithstanding, Developer's
Mortgagee, if any, shall hold any payment of an Award to
Developer in trust for application under the provisions of
this Article XVII-H.  The fees of the trustee (other than
Developer's Mortgagee) shall be a first charge on the Award.

3.   As between the owner of a Tract, and the Party as to such
tract the Award shall be allocated in accordance with the terms of
the lease between such owner and such Party.

4.   Anything to the contrary in this Article XVII
notwithstanding, if a leasehold Mortgagee shall be obligated to
restore or replace a Building pursuant to this REA, its obligation
shall be limited to the amount of the condemnation proceeds awarded
therefor.

ARTICLE XVIII

CORRECTION OF SITE DESCRIPTIONS,

DESCRIPTIONS OF EASEMENTS

A.   CORRECTION OF SITE DESCRIPTIONS.  It is recognized that
by reason of construction errors, the Developer Improvements, a
Department Store or the Stores of the Majors may not be precisely
constructed within their respective Tracts as described in Exhibit
"A".  As soon as reasonably possible after completion of the
construction of the Developer Improvements, or any such Store, as
the case may be, Developer shall cause an "as built" survey to be
made of the Improvements and the Common Area located on each
Party's Tract showing Tract boundaries.  The cost of any such
survey shall be paid by Developer.  In the event such survey shall
disclose that any Building or Buildings or the Improvements, as the
case may be appropriate, has not been precisely constructed within
its respective Tract, then promptly upon the request of any Party
hereto, the Parties will join in the execution of an agreement, in
recordable form as may be required to accommodate such
encroachments and to memorialize the same with metes and bounds
descriptions of such easements, and to amend Exhibit "A" to this

8946-114.251

REA so as to revise the description of such Tract to coincide with the as-built perimeter of the Buildings and Improvements constructed by the owner of such Tract. Nothing herein contained shall be deemed to relieve or excuse any Party from exercising all due diligence to construct its Floor Area, Common Area and other improvements within its respective Tract as described on Exhibit "A" and as shown on Exhibit "B".

### ARTICLE XIX

### SIGNS AND ENTRANCES

A.   <u>CRITERIA</u>.  Attached hereto, and marked Exhibit "K", are criteria for all signs to be erected within the Shopping Center, and no signs shall be erected in the Shopping Center which do not conform in all respects to said criteria.  It is understood said criteria expressly excludes therefrom, except for specific provisions thereof, the building identification signs on the Stores of the Majors.  All Department Stores shall be treated equally with respect to directional signs in the Shopping Center.

B.   <u>APPROVAL OF SPECIAL SIGNS</u>.  If any Occupant shall request a sign not in accordance with the criteria, such sign shall not be erected without the written consent of the Developer and the Majors, which consent may be withheld in the sole and absolute discretion of the Majors.  Any change made to any initially completed sign which causes the same to not fall within the scope of the sign criteria shall be considered as a new installation, and any deviation from the criteria shall similarly require the approval of the Parties.

Except for neon signs on shops of nationally or regionally recognized retail stores which typically use neon signs for their mall store signs, Developer shall not permit the installation of any exposed neon sign on any Developer Mall Store within one hundred fifty feet (150') of the entrance of the Store of a Major unless, not later than fifteen (15) days prior to the proposed installation of any such exposed neon sign, Developer submits to such Major, for approval, which approval shall not be unreasonably

8946-115.251

withheld, a drawing and description of the location and design of such sign. If such Major fails to deliver to Developer a specific written objection to the location or design of the proposed sign within ten (10) days after Developer's delivery to such Major of the request for such Major's approval, such Major shall be deemed to have consented to the proposed installation.

C.    <u>SIGNS ON SHOPPING CENTER TRACT, STORE EXTERIOR ENTRANCES AND SIGNS OVER STORE EXTERIOR ENTRANCES</u>. The Parties agree that no signs, store exterior entrances or signs over store exterior entrances shall be erected on the Shopping Center Tract unless such signs, store exterior entrances and signs over store exterior entrances shall conform to all governmental regulations and the sign regulations set forth in Exhibit "K" attached hereto and made a part hereof. Notwithstanding the provisions of Exhibit "K", the Majors and all Department Stores shall be entitled to utilize their normal identification signs, subject to receipt of all governmental approvals therefor. All Department Stores shall be treated equally with respect to directional signs in the Shopping Center.

ARTICLE XX

RULES AND REGULATIONS

Each Party severally agrees to observe and comply with, and shall cause its respective Permittees to observe and comply with, such rules and regulations related to the Shopping Center as may be adopted by the mutual agreement of the Parties hereto, from time to time, which approval and agreement shall not be unreasonably withheld. The Parties hereby adopt the rules and regulations attached hereto and marked <u>Exhibit "H",</u> until such time as new and different rules and regulations shall be adopted, as aforesaid. An amendment of such rules and regulations shall not be deemed to be, nor shall it require, an amendment to this REA.

ARTICLE XXI

COVENANTS OF DEVELOPER

A.    <u>STANDARDS</u>. The Parties agree that it is in their mutual best interests that the Shopping Center be developed and maintained

8946-116.251

as an integrated shopping center and mixed use development which will contain a combination of Occupants which (i) represent a sound and balanced diversification of merchandise, (ii) will be of strong financial condition and good repute, and (iii) will fixture, decorate and maintain their respective Store premises in a tasteful and decorous manner, having regard for the general standards of appearance prevailing in the Shopping Center.  In furtherance of such purpose the Parties have agreed to the provisions of Article V, IX, X, XI, this Article XXI and Article XXII-A.  Additionally Nordstrom, Macy's and Developer have agreed to the provisions of Article XXII-B and Sears and Developer have agreed to the provisions of Article XXII-C.

    B.   <u>DEVELOPER'S COVENANTS</u>.

    (1)  Provided that any Major is not in default under its operating covenant set forth in Article XXII hereof and so long as the Store of any Major shall be Operating as a Department Store in the minimum Floor Area specified in Article IX, Developer (a) shall Operate or cause to be Operated a shopping center on the Developer Tract and the Buildings thereon (not including the Department Stores or the Hotel) on each of the three (3) levels thereof including Developer Mall Stores with at least seven hundred twenty thousand (720,000) square feet of the Floor Area, distributed on at least (i) 273,600 square feet on level one, (ii) 237,600 square feet on level two and (iii) 208,800 square feet on level three and (b) shall use its reasonable best efforts to have at least fifty percent (50%) of the total lineal frontage of the Developer Mall Stores on each level within four hundred (400) feet of the entrance of each Major open and Operating and shall use such Tract and Buildings and the Enclosed Mall thereon solely for the purpose of operating and managing, or causing to be operated and managed, a multi-unit retail shopping center consistent with the best practices of shopping center operations, for a period of fifteen (15) years from and

8946-117.251

after the Opening Date, and, subject to the provisions of Article XIV-B and Article XVII, for so long thereafter as (x) as to Macy's and Nordstrom, at least one (1) Major and at least one (1) other Department Store (which may also be a Major) are using their respective Tracts and the Buildings thereon for retail department store purposes (with one Major (other than Sears) utilizing its minimum Floor Area specified in Article IX distributed so as to have no less than fifty thousand (50,000) square feet of Floor Area on each of the three (3) levels, each of which is open directly to the Enclosed Mall, or with Sears utilizing its minimum Floor Area specified in Article IX distributed so as to have no less than 50,000 square feet of Floor Area on each of levels one (1) and two (2) and no less than 20,000 square feet of Floor Area on level three (3)), and (y) as to Sears, at least two (2) other Department Stores are using their respective Tracts and the Buildings thereon for retail department store purposes, but in no event for a period extending past the Term hereof.

(2)  The provisions of this Article XXI shall be subject to all the provisions of this REA, including, without limitation the provisions of Article XV and Article XIV. Any failure to comply with the provisions of this Article for temporary periods of time during which the Enclosed Mall or the Developer Improvements, or any part thereof, is uninhabitable or inoperable because of fire or other casualty, or such Enclosed Mall or Improvements are temporarily closed because of acts beyond Developer's control, shall not be deemed a default under the provisions of this Article XXI, so long as reasonable efforts are being made by Developer to restore such Improvements to the condition in which they were just prior to the occurrence of such casualty or act within the time provided in this REA.

(3)  The Parties acknowledge that damages for the breach of the operating covenants contained in this Article may be

8946-118.251

difficult to ascertain. Accordingly, the Majors shall be entitled not only to damages but also to injunctive relief to enforce the foregoing operating covenants against Developer and to restrain and enjoin any breach or threatened breach thereof.

C.   MANAGEMENT COVENANTS. Developer covenants and agrees, subject to the provisions of Articles XIV and XVII of this REA, and subject to the other provisions of this Article, that as long as Developer is obligated to Operate all or a part of the Shopping Center, Developer shall maintain a quality of management and Operation of the Developer Improvements on each level of the Enclosed Mall in which any Major is Operating at least fifty thousand (50,000) square feet of Floor Area (except that, with respect to the third level, Sears may Operate not less than 20,000 square feet of Floor Area), not less than that generally adhered to in a first class enclosed mall multi-level regional shopping center located in the Minneapolis - St. Paul Metropolitan Area, and that it will manage and Operate, or cause to be managed and Operated, such portions of the Enclosed Mall, the Developer Mall Stores and the Common Area as Developer is obligated to Operate, in the following manner:

(1)  As a complex of retail stores and commercial and service enterprises which is a part of a first class, multi-level regional shopping center development with Enclosed Mall.

(2)  So as, to the extent possible by using its good faith diligent efforts, to:

(a)  Have the Floor Area occupied and open for business in its entirety; and

(b)  Have at all times a diversified mixture and balance of Occupants.

(3)  Under the name of Mall of America and under no other name, without the prior approval of any Major then Operating, which approval shall not be unreasonably withheld.

8946-119.251

(4)   In accordance with rules and regulations prescribed in Exhibit "H" as revised from time to time.

(5)   So as to cause the Developer Mall Stores to be opened when provided for in Article VI-E.

(6)   Except as otherwise permitted in this REA, so as to maintain the layout of the Developer Improvements as set forth on the Plot Plan and within the confines of the Permissible Building Areas and Maximum Building Heights as shown on the Plot Plan and provided herein, and not to withdraw any land from the Developer Tract without the prior approval of any Major then Operating.

(7)   So as to keep the Enclosed Mall and all entrances thereof open and Operating and to provide heating, cooling and ventilation for the Enclosed Mall and to maintain the air conditioning system therein, in such manner so that the temperature and humidity throughout the Enclosed Mall is at a reasonable comfortable level and in accordance with the provisions of Article V-C-8 of this REA, and so as to operate the heating, cooling and ventilation of the Enclosed Mall and maintain such system in a manner which assures that the system will not unduly discharge air out of or return air into any Major's Store and so as not to unduly drain conditioned air from any Major's Store.

(8)   So as not to substantially change, modify or alter in any manner or to any extent whatever, the exterior of the Developer Mall Stores or Enclosed Mall, without the prior approval of the Majors.

D.   <u>COMPOSITION</u>.  Developer agrees that the Majors have an interest in achieving a balanced and diversified grouping of retail stores in the vicinity of their respective Stores.  Developer further acknowledges that in order to assure the maximum flow of pedestrian traffic between each respective Department Store and the Occupants of the Developer Mall Stores, substantial variations of use in the areas close to each Department Store is preferable and that each Department Store may have a preference for a mix of particular categories of tenants to be located in the area adjacent

to its Store.  Developer acknowledges the preference of the Majors as to categories of Occupants within the Court of each Major shown on the Plot Plan, and Developer agrees to use reasonable efforts to select a diversified mix of tenants for the Developer Mall Stores within the Court of each Major from the list of categories of Occupants set forth in Exhibit "M" attached hereto (as to Nordstrom and Macy's) and Exhibit "M-1" attached hereto (as to Sears).

Developer agrees that any agreement by which any Person becomes an Occupant shall contain provisions which will enable the Developer to enforce at least the following provisions of this REA and Developer agrees to use reasonable efforts to enforce such provisions.

1.   Articles IX-C, IX-D, IX-E and IX-F.

2.   Articles XIX of this REA, including the Sign Criteria attached as Exhibit "K"

3.   Article XX of this REA, including the Rules and Regulations attached as Exhibit "H".

E.   <u>BENEFITS TO MAJORS</u>.  Each and all of the provisions of this REA on Developer's part to be performed (whether affirmative or negative in nature) are intended to and shall bind (i) Developer and (ii) the Developer Tract, and shall inure to the benefit of each of the Majors.      ARTICLE XXII

<u>COVENANTS OF MAJORS</u>

A.   <u>STANDARDS</u>.  The Parties agree that it is in their mutual best interests that the Stores of the Majors be developed and maintained as Department Stores as an integral part of the Shopping Center, to permit the Shopping Center to contain a combination of Occupants which represent a sound and balanced diversification of merchandise.

B.   <u>MAJORS' COVENANTS AS TO NORDSTROM AND MACY'S</u>.

(1)   Notwithstanding anything in this REA to the contrary, all references to "Major" or "Majors" in this Article XXII-B only shall be deemed to refer to only Nordstrom

8946-121.251

and/or Macy's, severally or collectively, as may be appropriate in this Article XXII-B.

(2) Provided (i) the Developer shall not be in default under the Operating covenant set forth in Article XXI hereof, (ii) the Bloomingdale's Department Store (subject to the Supplemental Agreement) is open and Operating in at least one hundred eighty thousand (180,000) square feet of Floor Area in the Shopping Center, and the Department Store of one (1) other Major is open and Operating in at least its Minimum Floor Area specified in Article IX, (iii) Bloomingdale's and the other Major are each obligated to Operate their respective Department Stores in the Shopping Center under their respective "Trade Name", as defined below, throughout the "Major Operating Period" of such Major, as that term is defined below and (iv) Developer is using its reasonable best efforts to have at least fifty percent (50%) of the total lineal feet of Store frontage located within four hundred (400) feet of the entrance of such Major on each level of the Enclosed Mall open and Operating, each Major covenants and agrees with Developer and the other Major and their successors and assigns, but not with Sears, it being expressly understood that the Operating covenants of Macy's and Nordstrom shall not run to the benefit of Sears, that: (a) such Major shall, for fifteen (15) years following the Opening Date of its Building (the said fifteen (15) year period or such lesser period as resulting from a termination being the "Major Operating Period" of such Major), Operate, or cause to be Operated in at least its Minimum Floor Area specified in Article IX (such Major's "Minimum Floor Area"), a retail Department Store in the Building of such Major, in at least fifty thousand (50,000) square feet of Floor Area on each of the three (3) levels (each of which is open directly to the Enclosed Mall) under its Trade Name; provided, however, that if at any time either the Bloomingdale's Department Store (or a permitted

8946-122.251

substitute store pursuant to the Supplemental Agreement) or the Department Store of the other Major (or the Department Store of any successor, transferee, assignee or sublessee permitted under the Lease of any Major) ceases to be open and Operating in the Shopping Center under the respective Trade Name of such Department Store or the occupancy of the Developer Mall Store Floor Area on the Developer Tract has not reached or falls below seven hundred twenty thousand (720,000) square feet, distributed on at least two hundred seventy-three thousand six hundred (273,600) square feet on level one, at least two hundred thirty-seven thousand six hundred (237,600) square feet on level two, and at least two hundred eight thousand eight hundred (208,800) square feet on level three of the Enclosed Mall, or Developer fails to use its reasonable best efforts to have at least fifty percent (50%) of the total lineal feet of Store frontage located within four hundred (400) feet of the entrance of a Major on each level of the Enclosed Mall open and Operating, each Major shall continue to Operate and observe and perform its respective Operating covenant contained herein and shall not cease, or exercise any right to cease, Operating unless such condition continues for more than one (1) year after such Major has given written notice to Developer and to any mortgagee of the Developer Tract entitled thereto pursuant to Article XXVI-B hereof that such condition exists, during which period of one (1) year following receipt of such notice Developer shall use its reasonable best efforts to restore the Operation of the required Department Store or occupancy of the required minimum of seven hundred twenty thousand (720,000) square feet of Floor Area of the Developer Mall Stores distributed on at least two hundred seventy-three thousand six hundred (273,600) square feet on level one, at least two hundred thirty-seven thousand six hundred (237,600) square feet on level two, and at least two hundred eight thousand eight hundred (208,800)

8946-123.251

square feet on level three of the Enclosed Mall, and Developer shall use its reasonable best efforts to have at least fifty percent (50%) of the total lineal feet of Store frontage located within four hundred (400) feet of the entrance of such Major on each level of the Enclosed Mall open and Operating.

In the event Developer fails to restore the Operation of the Bloomingdale's Department Store (or the permitted substitute store pursuant to the Supplemental Agreement) and the Department Store of the other Major or the minimum occupancy of the Developer Mall Stores during such one (1) year period or fails to use its reasonable best efforts to have at least fifty percent (50%) of the total lineal feet of Store frontage located within four hundred (400) feet of the entrance of such Major on each level of the Enclosed Mall open and Operating during such one (1) year period, then any Major which has given the one (1) year notice described above may elect by written notice to Developer at any time thereafter to terminate its Operating covenant.

The term "Trade Name" shall mean (i) with respect to Bloomingdale's, "Bloomingdale's" (subject to the Supplemental Agreement), (ii) with respect to Macy's and Nordstrom, "Macy's" and "Nordstrom", respectively, or the name under which such Department Store Operates a majority of its retail department stores in the states of Minnesota, Illinois and Indiana having in excess of one hundred thousand (100,000) square feet of Floor Area; provided, however, that (x) if Macy's is Operating less than five (5) such department stores in Minnesota, Illinois and Indiana, then Macy's Trade Name shall be the name under which at least five (5) of its retail department stores of such size existing as of the date hereof Operate in the northern one-half (1/2) of California, and (y) if Nordstrom is Operating less than four (4) such department stores in Minnesota, Illinois and Indiana, then Nordstrom's Trade Name shall be the name under which a majority of its

8946-124.251

retail department stores of such size Operate in the states of New Jersey, Virginia, Maryland and the District of Columbia, with respect to any other Department Store, the name under which such Department Store Operates a majority of its retail department stores in the states of Minnesota, Illinois and Indiana having in excess of one hundred thousand (100,000) square feet of Floor Area and with respect to any successor, transferee, assignee or sublessee permitted under the Lease of any Major, the name permitted for such successor, transferee, assignee or sublessee in such Lease.

In addition, the Majors further covenant and agree with each other and with Developer that during the remaining term of this REA, after the expiration of the Major Operating Period of such Major, so long as (i) the Shopping Center is being Operated as a first class regional shopping center, (ii) all of the other Department Stores (except Sears) and their respective Tracts are subject to a use restriction substantially the same as the restriction set forth below in this Article XXII-B, (iii) Sears is subject to a use restriction substantially the same as the restriction set forth in Article XXII-C, (iv) at least seven hundred twenty thousand (720,000) square feet of Floor Area of the Developer Mall Stores distributed on at least 273,600 square feet on level one, 237,600 square feet on level two, and 208,800 square feet on level three of the Enclosed Mall on the Developer Tract is being Operated for retail purposes, and (v) Developer has used its reasonable best efforts to have at least fifty percent (50%) of the total lineal feet of Store frontage located within four hundred (400) feet of the entrance of each Major on each level of the Enclosed Mall open and Operating, then each Major, and its respective successors and assigns, shall not use its respective Building or Tract for any use or purpose other than retail purposes customarily found in an enclosed mall shopping center and non-retail

activities customarily incidental thereto or such other uses and purposes that are compatible and consistent with (and are not detrimental, injurious or inimical to) the operation of a first-class regional shopping center on each of the three (3) levels thereof. Except as set forth in the next sentence, if at any time after the expiration of the Major Operating Period of a Major, any of the conditions above set forth in (i), (ii), (iii), (iv) or (v) of this paragraph are not satisfied, such Major shall cease to be subject to the use restriction set forth in this paragraph. Notwithstanding the foregoing, if at any time such occupancy of the Developer Mall Store Floor Area on the Developer Tract falls below seven hundred twenty thousand (720,000) square feet, distributed on at least 273,600 square feet on level one, 237,600 square feet on level two, and 208,800 square feet on level three of the Enclosed Mall or Developer fails to use its reasonable best efforts to have at least fifty percent (50%) of the total lineal feet of Store frontage located within four hundred (400) feet of the entrance of each Major on each level of the Enclosed Mall open and Operating, each Major shall remain subject to the use restriction set forth in this paragraph unless such condition continues for more than one (1) year after such Major has given written notice to Developer and to any mortgagee of the Developer Tract entitled thereto pursuant to Article XXVI-B hereof that such condition exists, during which period of one (1) year following receipt of such notice Developer shall use its reasonable efforts to restore the Operation of the required minimum of seven hundred twenty thousand (720,000) square feet of Floor Area of the Developer Mall Stores distributed on at least 273,600 square feet on level one, 237,600 square feet on level two, and 208,800 square feet on level three of the Enclosed Mall and shall use its reasonable best efforts to have at least fifty percent (50%) of the total lineal feet of Store frontage located within four hundred

8946-126.251

(400) feet of the entrance of each Major on each level of the Enclosed Mall open and Operating.  In the event Developer fails to restore the Operation of the minimum occupancy of the Developer Mall Store Floor Area during such one (1) year period or fails to use its reasonable best efforts to have at least fifty percent (50%) of the total lineal feet of Store frontage located within four hundred (400) feet of the entrance of each Major on each level of the Enclosed Mall open and Operating, then the Major which has given the one (1) year notice described above may elect by written notice to Developer at any time thereafter to terminate the use restriction contained in this paragraph.  If after the expiration of the Major Operating Period of a Major, (i) any Department Store or its Tract is released from or ceases to be subject to a use restriction substantially the same as the restriction set forth above in this Article XXII-B, or (ii) Sears is released from or ceases to be subject to a use restriction substantially the same as the restriction set forth in Article XXII-C hereof, the other Major(s) shall be immediately released from the effect of the use restriction contained in this paragraph.

(3)  The provisions of this Article XXII-B shall be subject to all the provisions of this REA, including, without limitation, Article XV and Article XIV.  Any failure to comply with the provisions of this Article for temporary periods of time during which the Building of a Major, or any part thereof, is uninhabitable because of fire or other casualty or condemnation, or such Building is temporarily closed because of acts beyond such Major's control, shall not be deemed a default under the provisions of this Article, so long as diligent efforts are being made by such Major to promptly restore its Building.

(4)  The Parties acknowledge that damages for the breach of the operating covenants contained in this Article may be

difficult to ascertain.   Accordingly, Developer shall be entitled not only to damages but also to injunctive relief to enforce the foregoing operating covenants against each Major and to restrain and enjoin a breach or threatened breach thereof.

(5)  Nothing herein contained shall be deemed in any way to regulate the manner of a Major's operation of its business on its Tract or the hours or days of such operation, except that each Major shall (subject to the terms of this REA) continuously keep open its entrances to the Enclosed Mall as shown on Exhibit "B" during such Major's business hours.

(6)  Subject to each Major's obligation to Operate a Department Store pursuant to Article XXII-B hereof, each Major may, at any time and from time to time, without the consent of Developer, sublet portions of its respective Building or enter into what are commonly known in the retail department store trade as "leased department agreements" or "concessions" or "licenses".

(7)  Developer agrees with Sears that Developer, without the consent of Sears, which consent shall not be unreasonably withheld or delayed, shall not enter into any agreement with Nordstrom or Macy's which shall terminate, release or modify the Nordstrom or Macy's Operating covenant contained in Article XXII-B(2) hereof.   If Developer should terminate, release or modify such Operating covenants without Sears' consent, which consent shall not be unreasonably withheld or delayed, so as to diminish the obligations of Nordstrom or Macy's so to Operate (excluding any modifications made as a result of any order or decree of any court or governmental agency) then such termination, release or modification shall be null and void and of no force and effect and Sears may secure injunctive relief to prevent implementation thereof or, at its election, seek damages on account of Developer's default.

8946-128.251

Developer covenants to and with Sears that Developer, at its expense, shall exercise such legal remedies (including the prosecution of appeal(s) to final determination) as may be necessary to enforce Nordstrom and Macy's Operating covenants contained in Article XXII-B(2) hereof.  Developer represents that (i) Developer has full authority to enter into the covenants contained in this Article XXII-B(7), (ii) the covenants herein given are made to induce Sears to issue the Sears Operating covenant, and (iii) the giving of these covenants by Developer does not violate any agreement or condition relating to the Nordstrom or Macy's Operating covenants which is in existence or contemplated as of the date hereof.

The provisions of this subparagraph (7) shall not be construed to modify the obligations of Sears under Paragraph XXII-C hereof.

C.   SEARS' COVENANTS TO DEVELOPER.

(1)   Provided (i) the Developer shall not be in default under the Operating covenant set forth in Article XXI hereof, (ii) at least two (2) other Department Stores are open and Operating, and (iii) Developer is using its reasonable best efforts to have at least fifty percent (50%) of the total lineal feet of Store frontage located within four hundred (400) feet of the entrance of Sears on each level of the Enclosed Mall open and Operating, Sears covenants and agrees with Developer its successors and assigns, but not with Macy's or Nordstrom, it being expressly understood that the Operating covenant of Sears shall not run to the benefit of any other Department Store, that: (a) Sears shall, for fifteen (15) years following the Opening Date of its Building (the said fifteen (15) year period or such lesser period as resulting from a termination being the "Major Operating Period of Sears"), Operate, or cause to be Operated in at least its Minimum Floor Area specified in Article IX (Sears'  "Minimum

8946-129.251

Floor Area"), a retail Department Store in the Sears Building, in at least fifty thousand (50,000) square feet of Floor Area on each of levels one (1) and two (2) and at least 20,000 square feet of Floor Area on level three (3) (each of which is open directly to the Enclosed Mall) under the name "Sears" (Sears "Trade Name"); provided, however, that if at any time (x) at least two (2) other Department Stores cease to be open and Operating in the Shopping Center or (y) the occupancy of the Developer Mall Store Floor Area on the Developer Tract has not reached or falls below seven hundred twenty thousand (720,000) square feet, distributed on at least two hundred seventy-three thousand six hundred (273,600) square feet on level one, at least two hundred thirty-seven thousand six hundred (237,600) square feet on level two, and at least two hundred eight thousand eight hundred (208,800) square feet on level three of the Enclosed Mall, or (z) Developer fails to use its reasonable best efforts to have at least fifty percent (50%) of the total lineal feet of Store frontage located within four hundred (400) feet of the entrance of Sears on each level of the Enclosed Mall open and Operating, Sears shall continue to Operate and observe and perform its respective Operating covenant contained herein and shall not cease, or exercise any right to cease, Operating unless such condition continues for more than one (1) year after such Major has given written notice to Developer and to any mortgagee of the Developer Tract entitled thereto pursuant to Article XXVI-B hereof that such condition exists, during which period of one (1) year following receipt of such notice Developer shall use its reasonable best efforts to restore the Operation of the required Department Store or occupancy of the required minimum of seven hundred twenty thousand (720,000) square feet of Floor Area of the Developer Mall Stores distributed on at least two hundred seventy-three thousand six hundred (273,600) square feet on level one, at least two

hundred thirty-seven thousand six hundred (237,600) square feet on level two, and at least two hundred eight thousand eight hundred (208,800) square feet on level three of the Enclosed Mall, and Developer shall use its reasonable best efforts to have at least fifty percent (50%) of the total lineal feet of Store frontage located within four hundred (400) feet of the entrance of Sears on each level of the Enclosed Mall open and Operating. In the event Developer fails to restore the Operation of at least two (2) other Department Stores or the minimum occupancy of the Developer Mall Stores during such one (1) year period or fails to use its reasonable best efforts to have at least fifty percent (50%) of the total lineal feet of Store frontage located within four hundred (400) feet of the entrance of Sears on each level of the Enclosed Mall open and Operating during such one (1) year period, then Sears may elect by written notice to Developer at any time thereafter to terminate its Operating covenant.

In addition, Sears further covenants and agrees with Developer that during the remaining term of this REA, after the expiration of the Major Operating Period of Sears, so long as (i) the Shopping Center is being Operated as a first class regional shopping center, (ii) all of the other Department Stores and their respective Tracts are subject to a use restriction substantially the same as the restriction set forth in Article XXII-B above, (iii) at least seven hundred twenty thousand (720,000) square feet of Floor Area of the Developer Mall Stores distributed on at least 273,600 square feet on level one, 237,600 square feet on level two, and 208,800 square feet on level three of the Enclosed Mall on the Developer Tract is being Operated for retail purposes, and (iv) Developer has used its reasonable best efforts to have at least fifty percent (50%) of the total lineal feet of Store frontage located within four hundred (400) feet of the

8946-131.251

entrance of Sears on each level of the Enclosed Mall open and Operating, then Sears, and its successors and assigns, shall not use the Sears Building or Sears Tract for any use or purpose other than retail purposes customarily found in an enclosed mall shopping center and non-retail activities customarily incidental thereto or such other uses and purposes that are compatible and consistent with (and are not detrimental, injurious or inimical to) the operation of a first-class regional shopping center on each of the three (3) levels thereof; provided, however, nothing contained herein shall require Sears to Operate any retail or non-retail activities on the third (3rd) level of the Sears Building after the expiration of the Major Operating Period of Sears. Except as set forth in the next sentence, if at any time after the expiration of the Major Operating Period of Sears, any of the conditions above set forth in (i), (ii), (iii) or (iv) of this paragraph are not satisfied, Sears shall cease to be subject to the use restriction set forth in this paragraph. Notwithstanding the foregoing, if at any time such occupancy of the Developer Mall Store Floor Area on the Developer Tract falls below seven hundred twenty thousand (720,000) square feet, distributed on at least 273,600 square feet on level one, 237,600 square feet on level two, and 208,800 square feet on level three of the Enclosed Mall or Developer fails to use its reasonable best efforts to have at least fifty percent (50%) of the total lineal feet of Store frontage located within four hundred (400) feet of the entrance of Sears on each level of the Enclosed Mall open and Operating, Sears shall remain subject to the use restriction set forth in this paragraph unless such condition continues for more than one (1) year after Sears has given written notice to Developer and to any mortgagee of the Developer Tract entitled thereto pursuant to Article XXVI-B hereof that such condition exists, during which period of one (1) year following receipt of such

8946-132.251

notice Developer shall use its reasonable efforts to restore the Operation of the required minimum of seven hundred twenty thousand (720,000) square feet of Floor Area of the Developer Mall Stores distributed on at least 273,600 square feet on level one, 237,600 square feet on level two, and 208,800 square feet on level three of the Enclosed Mall and shall use its reasonable best efforts to have at least fifty percent (50%) of the total lineal feet of Store frontage located within four hundred (400) feet of the entrance of Sears on each level of the Enclosed Mall open and Operating.  In the event Developer fails to restore the Operation of the minimum occupancy of the Developer Mall Store Floor Area during such one (1) year period or fails to use its reasonable best efforts to have at least fifty percent (50%) of the total lineal feet of Store frontage located within four hundred (400) feet of the entrance of Sears on each level of the Enclosed Mall open and Operating, then Sears may elect by written notice to Developer at any time thereafter to terminate the use restriction contained in this paragraph.  If after the expiration of the Major Operating Period of Sears, any Department Store or its Tract is released from or ceases to be subject to a use restriction substantially the same as the restriction set forth in Article XXII-B hereof, Sears shall be immediately released from the effect of the use restriction contained in this paragraph.

(2)  The provisions of this Article XXII-C shall be subject to all the provisions of this REA, including, without limitation, Article XV and Article XIV.  Any failure to comply with the provisions of this Article for temporary periods of time during which the Sears Building, or any part thereof, is uninhabitable because of fire or other casualty or condemnation, or such Building is temporarily closed because of acts beyond Sears' control, shall not be deemed a default under the provisions of this Article, so long as diligent

8946-133.251

efforts are being made by Sears to promptly restore its Building.

(3)   Developer and Sears acknowledge that damages for the breach of the operating covenants contained in this Article may be difficult to ascertain.  Accordingly, Developer shall be entitled not only to damages but also to injunctive relief to enforce the foregoing operating covenants against Sears and to restrain and enjoin a breach or threatened breach thereof.

(4)   Nothing herein contained shall be deemed in any way to regulate the manner of Sears' operation of its business on its Tract or the hours or days of such operation, except that Sears shall (subject to the terms of this REA) continuously keep open its entrances to the Enclosed Mall as shown on Exhibit "B" during Sears' business hours.

(5)   Subject to Sears' obligation to Operate a Department Store pursuant to Article XXII-C hereof, Sears may, at any time and from time to time, without the consent of Developer, sublet portions of its Building or enter into what are commonly known in the retail department store trade as "leased department agreements" or "concessions" or "licenses".

(6)   Developer agrees with Nordstrom and Macy's that Developer, without the consent of Nordstrom and Macy's, which consent shall not be unreasonably withheld or delayed, shall not enter into any agreement with Sears which shall terminate, release or modify Sears' Operating covenant contained in Article XXII-C(2) hereof.  If Developer should terminate, release or modify such Operating covenant without the consent of Nordstrom and Macy's, which consent shall not be unreasonably withheld or delayed, so as to diminish the obligations of Sears so to Operate (excluding any modifications made as a result of any order or decree of any court or governmental agency), then such termination, release or modification shall be null and void and of no force and effect and Nordstrom and/or Macy's may secure injunctive

8946-134.251

relief to prevent implementation thereof or at its election, jointly or severally, seek damages on account of Developer's default.

Developer covenants to and with Nordstrom and Macy's that Developer, at its expense, shall exercise such legal remedies (including the prosecution of appeal(s) to final determination) as may be necessary to enforce Sears' Operating covenant contained in Article XXII-C(2) hereof. Developer represents that (i) Developer has full authority to enter into the covenants contained in this Article XXII-C(6), (ii) the covenants herein given are made to induce Nordstrom and Macy's to issue their respective Operating covenants, and (iii) the giving of these covenants by Developer does not violate any agreement or condition relating to Sears' Operating covenant which is in existence or contemplated as of the date hereof.

The provisions of this subparagraph (6) shall not be construed to modify the obligations of Nordstrom and Macy's under Paragraph XXII-B hereof.

### ARTICLE XXIII

### TAXES AND ASSESSMENTS

A.    PAYMENT OF TAXES.

1.    Subject to the terms of the respective Lease between each Major and Developer, each Party shall pay, or cause to be paid, prior to delinquency, all taxes and assessments except as provided in Article XXII-D upon its Tract, and the Buildings and Improvements and personalty owned or leased by such Party in (or constituting part of) the Total Development Tract, provided that if the taxes or assessments or any part thereof may be paid in installments, any Party may pay each such installment as and when the same becomes due and payable. Each Party shall upon the request of any other Party exhibit to such other Party (but a Major shall not be required to provide such information to another Major) for examination, receipts for all taxes and assessments required to be paid by such Party pursuant to this Article XXIII.

031391/S0495/REASears.Cln

8946-135.251

2.   Developer and the Majors shall cooperate with each other and use their respective reasonable efforts to obtain separate assessments for the Tracts of the Majors.

B.   TAXES ATTRIBUTABLE TO PARKING.   In addition to the Majors' payment of the taxes and assessments in accordance with Article XXIII-A, each Major shall also pay to Developer, annually during the term of this REA and so long thereafter as such Major shall have the right to utilize the Parking Structure, a portion of all taxes and assessments assessed against the Parking Structure and the real property constituting a part thereof, which amount shall be the total real estate taxes and assessments for such Parking Structure and real property thereunder multiplied by a fraction, the numerator of which is the number of Automobile Parking Spaces required to be provided for the Store of such Major as a retail Department Store building in accordance with this REA (at the ratio of 4.5 automobile parking spaces for each 1,000 square feet of Floor Area of the Store of such Major), and the denominator of which is the total number of Automobile Parking Spaces in the Parking Structure.   Each Major shall reimburse Developer for this obligation within thirty (30) days after receipt of invoice therefor from Developer (which Developer shall forward no sooner than forty-five (45) days prior to the date such payment is due to the taxing authority), which invoice may be forwarded prior to payment of the tax by Developer which in all events shall show the amount of tax due and Developer's calculation of the reimbursement due by such Major therefor.   Developer shall have all rights and remedies available at law or in equity for failure of a Major to pay such reimbursement within the time permitted therefor.

C.   CONTEST.   If any Party shall deem the taxes and/or assessments assessed against the Parking Structure and the real property constituting a part thereof, or any part thereof, to be paid by such Party, to be excessive or illegal, such Party shall have the right to contest the same at its own cost and expense, and shall have the further right to defer payment thereof so long as

8946-136.251

the validity or the amount thereof is contested in good faith; provided, however, that if at any time payment of the whole or any part thereof shall be necessary in order to prevent the sale of the property for the lien for any such unpaid tax or assessment because of the non-payment thereof, then the contesting Party shall pay or cause to be paid the same in time to prevent such sale.  Any such payment may be paid under protest.  Upon receipt of notice from a Major of its desire to contest any such Impositions, Developer, such Major and other Occupants of the Shopping Center interested in contesting Impositions on all or any portion of the Shopping Center shall meet in good faith prior to filing any contest to such Impositions and attempt in good faith, if possible, to coordinate their respective efforts in contesting such Impositions.

D.    SPECIAL ASSESSMENTS.  Developer shall be responsible, as between Developer and a Major, for the entire cost of any special assessment, impact fee, mitigation fee or payment, development tax or other fee or charge against the Tract of a Major, and/or the Developer Tract, and/or the Improvements thereon levied in connection with the initial or subsequent construction and/or installation of the Common Improvement Work or any off-site improvements required in connection with the initial or subsequent construction or expansion of improvements within the Total Development Tract, whether levied as a special assessment, or as a fee or charge payable in connection with the issuance of any permit or the granting of any right by a municipal or governmental or regulatory authority.  Notwithstanding anything to the contrary contained herein, each Major shall be responsible for the pro rata share of all other assessments and for any utility connection charge, water availability charge and sewer availability charge levied upon or otherwise applicable to the Tract of such Major or any Improvements thereon.  In the event assessments or charges for which a Major is responsible are not separately assessed, such assessments or charges shall be prorated among the Parties on the basis of the percentage that their respective Floor Area bears to

8946-137.251

the total Floor Area in the Total Development Tract.  The Parties shall pay any such assessment in installments if it is possible so to do.

ARTICLE XXIV

ARBITRATION

A.    DISPUTES COVERED.  Any dispute involving Articles V, VI, VII, XIV, XVII and XXX including those arising from lack of approval, controversies or disagreements between the Parties arising from the interpretation or application of this REA and any dispute involving other Articles in this REA which contain specific provisions for arbitration (excluding only the issue of architectural compatibility) shall be resolved by arbitration, as provided herein; provided, however, that any Party may seek prohibitory injunctive relief without first submitting a controversy to arbitration.

B.    PROCEDURES.  Any Party may request a meeting to be attended by any other Party for the purpose of resolving any such dispute between such Parties. If the matter is not resolved at such meeting, or the meeting is not held, any Party to such dispute may within thirty (30) days from the date set for such meeting make a written request to resolve such dispute by arbitration.  Within ten (10) days from the date of receipt of such notice, each Party to such dispute shall select an arbitrator.  Such arbitrators shall meet within ten (10) days after selection for the purpose of resolving the dispute.  If a majority of such arbitrators are unable to agree, an additional arbitrator shall be selected by the designated arbitrators.  If such arbitrators are unable to select such an arbitrator, such arbitrator shall be appointed by the Presiding Judge of the Circuit Court Hennepin County, State of Minnesota, at the request of any such Party.

Within ten (10) days from such appointment, all arbitrators shall meet and determine the matter in dispute and shall resolve the same and all questions pertaining thereto within twenty (20) days from the date of selection of such additional arbitrator.  A

majority decision shall be final at any stage of the proceeding. Each Party to such dispute shall bear its own expense except that relating to the selection and services of the additional arbitrator which shall be borne equally by the Parties to such dispute. In any arbitration proceeding involving Article V hereof, arbitrators having substantial experience in shopping center design, development or operation, as is appropriate, shall be selected as arbitrators.

The decision of the arbitrators may be entered as a judgment in a court of competent jurisdiction. All arbitration conducted under this Article XXIV shall be in accordance with the rules of the American Arbitration Association, to the extent such rules do not conflict with the procedures herein set forth. Except as set forth under the provisions of Article XXIV-A as to prohibitory injunctive relief, to the extent permitted by law, compliance with this Article XXIV is a condition precedent to the commencement by any Party of a judicial proceeding arising out of a dispute which is subject to arbitration hereunder. No damage or costs, including attorneys' fees, shall be awardable in arbitration, but claims for damages, costs and attorneys' fees are reserved for the jurisdiction of the courts.

ARTICLE XXV

TRANSFERS OF INTERESTS, RIGHTS,

POWERS AND OBLIGATIONS; MORTGAGE

A.    LIMITATIONS ON TRANSFER OR ASSIGNMENT. No transfer or conveyance by any Party of all or any part of its Tract (or any interest therein) or assignment of this REA shall be deemed to release such Party from any of its obligations hereunder except as expressly provided in this Article XXV, and (i) if a Major shall assign its interest in its Tract in accordance with this Article XXV, such Major shall be released from all further liability arising under this REA (other than any obligation which may remain to Operate a Department Store under a respective Major's Trade Name (a) for the Major Operating Period of such Major described in

8946-139.251

Article XXII-B or XXII-C, as the case may be, or (b) for the ten (10) year period described in Article XIV-B in connection with either a restoration pursuant to Article XIV-B or a reconstruction pursuant to Article XVII-F) in respect of any period after the last to occur of (x) the date of such transfer, and (y) the date such Major shall no longer have a possessory interest in its Tract, as lessee in possession, and (ii) if Developer shall transfer or convey the Developer Tract at any time after the Opening Date, Developer shall be released, relieved and discharged from all of its covenants, obligations and liabilities under this REA, in respect of any period after the last to occur of (a) the date of such transfer or conveyance, and (b) the date Developer shall no longer have a possessory interest in its Tract, either as owner or lessee in possession.

B.   <u>SALE AND LEASEBACK - MORTGAGE</u>. Notwithstanding anything to the contrary herein contained, if any Party shall (i) convey its Tract and assign its interest under this REA in connection with a Sale and Leaseback, and it or its affiliate shall simultaneously become vested with a leasehold estate or similar possessory interest in its Tract by virtue of a lease made by the grantee, or (ii) shall convey its Tract or its interest therein by way of a Mortgage and retain a possessory interest in its Tract, then, in neither of such events shall the assignee of such Party's interest in such Tract under such Sale and Leaseback or any subsequent owner of its interest in its Tract, or the Mortgagee under any such Mortgage, be deemed to be a Party to this REA or to have assumed or be bound by any of such Party's obligations hereunder for so long as such Party or its affiliate shall retain such possessory interest, and such obligations and the status as a Party hereunder shall continue to remain solely those of such Party or affiliate as the case may be, so long as such Party or its affiliate retains such possessory interest and performance by such Party or its affiliate of any act required to be performed under this REA by it or fulfillment of any condition of this REA by such Party or its

8946-140.251

affiliate shall be deemed the performance of such act or the fulfillment of such condition and shall be acceptable to the Parties hereto with the same force and effect as if performed or fulfilled by such assignee, lessee, subsequent owner, trustee, beneficiary or Mortgagee.

C.    <u>TRANSFER BY DEVELOPER</u>.  Notwithstanding anything to the contrary contained in this REA, Developer may convey its Tract or mortgage its Tract or sell and leaseback its Tract and, in conjunction therewith, may convey, mortgage and/or assign (either absolutely or conditionally) all of its rights, interests and easements under this REA to any such grantee or Mortgagee; provided, however, that any mortgage, charge or encumbrance of Developer's interest shall be subject and subordinate in all respects to this REA.  The grantee or Mortgagee of the Developer Tract or Developer's interest therein shall be liable for the performance of Developer's covenants and obligations hereunder only if and for so long as such grantee or Mortgagee comes into and holds possession of such Tract but not before or after.  Until (1) year after the Opening Date, Developer shall not have the right to directly to indirectly sell, assign or otherwise convey all or any part of its interest in the Shopping Center Tract or to assign, sell or otherwise transfer any of interest in the REA, except as security for existing or additional mortgage financing of the Shopping Center from an Institutional Lender, which financing is subject and subordinate to this REA, or except in connection with admitting a substantial investor (one investing more than Ten Million Dollars [$10,000,000.00]) into ownership of the Shopping Center or Partnership with Developer; PROVIDED, HOWEVER, that such one (1) year shall be extended until such date as Developer has satisfied its reimbursement obligations to each Major under its respective Lease unless any delay by a Major which is not excused under this REA has occurred in completing its Building or satisfying any other of its obligations hereunder prior to said one (1) year date, in which event the one (1) year date shall not be

extended (such date as extended, if extended, shall be referred to as the "Reimbursement Completion Date"). Thereafter, the foregoing restriction shall not be effective and Developer may assign, sell or otherwise transfer all or any part of its interest in this REA or the Shopping Center Tract and from and after the date of such transfer of all its interest, and the delivery to the Majors of an agreement in recordable form and otherwise reasonably satisfactory to the Majors pursuant to which the transferee assumes all of Developer's liability and obligations under this REA, provided Developer is not in material default under this REA, the transferor shall be relieved of all liability and obligations on its part thereafter arising or to be performed by it under this REA. Notwithstanding anything to the contrary contained in this REA, nothing contained herein shall prohibit Developer from entering into any form of financing arrangement including, without limitation, joint venture, partnership, syndication, or sale-leaseback at any time prior to the Opening Date or within one (1) year after the later to occur of (i) the Opening Date or (ii) the Reimbursement Completion Date, or from bringing in a substantial investor as provided above at any time, provided that prior to the Reimbursement Completion Date, Si-Minn Developers Limited Partnership or any entity controlled directly or indirectly by Si-Minn Developers Limited Partnership, Melvin Simon, Herbert Simon and/or Melvin Simon & Associates, Inc. directly or indirectly shall own not less than a twenty-two and five-tenths percent (22.5%) ownership interest in the Shopping Center. Nothing contained herein shall prohibit Developer from selling or leasing the Hotel Building or any department store building to an experienced hotel or department store operator, as the case may be, for the operation of a permitted use on such land, or from transferring the Shopping Center or any interest therein to any entity which is controlled directly or indirectly by Developer or Developer's general partners, so long as Developer or the principals therein shall retain at least a fifty percent (50%) interest in an entity which

8946-142.251

owns at least a forty-five percent (45%) general partnership interest in the Shopping Center. Notwithstanding anything to the contrary contained herein, the provisions of this Article XXV(C) shall not be applicable to any person succeeding to Developer's interest in the Tract of any Major and/or the Shopping Center Tract by means of a foreclosure or deed in lieu of foreclosure so long as the Shopping Center is managed until one (1) year after the Opening Date by Developer or one of the nationally recognized shopping center developers described in Exhibit "L" hereof or another shopping center developer reasonably acceptable to the Majors.

D.    <u>TRANSFER BY MAJORS</u>.

1.    Mortgage.

Notwithstanding anything to the contrary contained in this REA, commencing from and after the Opening Date, any Major may mortgage its interest in its Tract, and, in connection with any such transaction, assign its interest in this REA to such Major's Mortgagee; provided, however, that any mortgage, charge or encumbrance of a Major's interest shall be subject and subordinate in all respects to this REA. If any such Mortgage is foreclosed or a conveyance delivered in lieu of foreclosure, anyone (other than such Major) who has acquired, or shall thereafter acquire, such Major's interest in such Major's Tract shall hold the same free of any affirmative obligation to Operate a retail department store on such Tract under such Major's Trade Name as set forth in Article XXII-B of this REA or Article XXII-C of this REA, as the case may be, but subject to all other terms, provisions, covenants, conditions and restrictions contained in Article XXII-B or XXII-C, as the case may be, and elsewhere in this REA except for the obligation to Operate a retail Department Store on such Tract under such Major's Trade Name; provided, however, that any such successor shall have no liability for any prior existing non-monetary defaults of such Major under this REA.    In the event such Major's Mortgagee succeeds to

the interest of such Major in said Tract, the obligations of
such Major shall be binding upon such successor or any person
claiming by, through or under such successor only during the
period that it is in possession of such Tract and no such
successor or person shall be obligated to pay any amount which
was in default prior to the date such successor or person came
into possession of such Major's Tract.  Notwithstanding the
foregoing provisions of this Article XXV, if a Major is
deprived of possession of its Tract by reason of the
foreclosure of a Mortgage on its Tract or delivery of or
conveyance in lieu of foreclosure, it shall nevertheless
remain obligated for the performance of its covenants and
obligations under this REA, and liable for the breach thereof.

    2.    Transfer by Nordstrom.

From and after the Opening Date, Nordstrom shall have the
right to assign its interest in this REA to any Person which
may succeed to the interest of Nordstrom by merger,
reorganization or consolidation or to any Person which
acquires substantially all of the retail stores which are
being Operated by Nordstrom which have in excess of one
hundred thousand (100,000) square feet of Floor Area in the
Minnesota, Illinois and Indiana area (or if Nordstrom is
Operating less than four (4) department stores in Minnesota,
Illinois and Indiana, then substantially all of the retail
stores which are being operated by Nordstrom which have in
excess of one hundred thousand (100,000) square feet of Floor
Area in the States of New Jersey, Virginia, Maryland, and the
District of Columbia), and upon completion of such
transaction, Nordstrom shall be released from its obligations
hereunder.  For purposes of this paragraph, the sublease by
Nordstrom, for purposes other than for the operation of leased
departments, concessions or licensed services or departments
within the Nordstrom Store, of eighty percent (80%) or more of
the Floor Area of the Nordstrom Store in the aggregate to a

8946-144.251

single entity or to a group of affiliated entities shall constitute an "assignment" of this REA. Notwithstanding anything to the contrary contained in the REA, Nordstrom may mortgage its interest in its Tract and, in connection with such transaction, assign its interest in this REA to Tenant's Mortgagee pursuant to Article XXV of the Nordstrom Lease.

3.    Transfer by Macy's.

(a)    Macy's shall have the right, at any time from and after the Opening Date, and without the consent of Developer, to assign or transfer this REA, or sublet all of its respective Building to any Major Affiliate or Minor Affiliate (hereinafter defined), or to any of the entities to whom transfers are permitted under subparagraph (D)(3)(e) of this Article XXV, subject to the terms and provisions hereof.

(b)    Notwithstanding anything to the contrary in this REA contained, subject to the provisions of Macy's Lease, prior to the expiration of the Major Operating Period with respect to Macy's, and except as permitted in subparagraphs (D)(3)(a), (b), (c) and (e) of this Article XXV, Macy's shall only have the right to assign or transfer this REA or sublet all of its respective Building to a Major Affiliate or an entity to whom a transfer is permitted under subparagraphs (D)(3)(a), (b), (c) and (e) of this Article XXV, and shall only have the right to encumber or mortgage the same after the time that Macy's has completed the construction of and has opened its Store to the public for business. Notwithstanding the foregoing, prior to the expiration of the Major Operating Period with respect to Macy's, a transfer or assignment of this REA or a subletting of all of the Macy's Building may be made to a Major Affiliate or to an entity to which a transfer is concurrently made of at least five (5) stores similar to the retail

department stores being operated by Macy's under the name
"Macy's" in the northern one-half (1/2) of the State of
California or such other name as is then permitted under
this REA.

(c)   For the purposes of this Article XXV, the term
"Major Affiliate" shall mean: (i)   R. H. Macy & Co.,
Inc., Macy's Northeast, Inc. or Macy's South, Inc., (ii)
any corporation which will, as a result of a sale of
assets, merger, sale of stock, consolidation or other
reorganization, except under Bankruptcy Law, succeed to
substantially all of the assets or operating assets of
Macy's and thereby own or lease not less than the Macy's
Store and five (5) other stores similar to the department
stores Operated by Macy's in the northern one-half (1/2)
of the State of California under Macy's Trade Name; or
(iii) any entity owned directly or indirectly by R. H.
Macy & Co., Inc., or any corporate successor thereto;
provided, however, that in order to be a Major Affiliate,
except as otherwise set forth in subparagraph D(3)(b) of
this Article XXV, any entity must, immediately after an
assignment of this REA or a sublease of the Macy's
Building in accordance with the terms of this REA, own or
Operate (or cause to be Operated) the Macy's Department
Store and at least five (5) other stores similar to the
department stores Operated by Macy's in the northern one-
half (1/2) of the State of California under Macy's Trade
Name;

The term "Minor Affiliate" shall mean any Affiliate that
is not a Major Affiliate and which, if it acquires an
interest in Macy's Tract or Macy's, leases it for the
term of a leasehold Mortgage to a Major Affiliate who
covenants to Developer to comply with all terms of this
REA.   Notwithstanding anything to the contrary contained
in   this   REA,   including,   without   limitation,   the

8946-146.251

provisions of subparagraphs (D)(3)(a), (b), (c) and (d) of this Article XXV, except as provided in Section 15.1 of the Macy's Lease, no assignment of this REA to a Major or Minor Affiliate will release either Macy's or such assignee from the obligation under this REA, including but not limited to Article XXII of this REA, during the Major Operating Period of Macy's to Operate the Macy's Department Store (or cause the same to be Operated) under the trade name "Macy's" or such other trade name required by Article XXII, except that any other transferee permitted under this REA during the Major Operating Period of Macy's shall be required to Operate the Macy's Department Store during the Major Operating Period of Macy's in the same name as such other five (5) stores are Operated.

(d)   Subject to the provisions of Article XXV-E, following the expiration, or earlier termination of the Major Operating Period with respect to Macy's, Macy's may transfer or assign its interest in this REA or sublet all or a part of the Macy's Building without the consent of Developer.

(e)   In addition to its rights under the subparagraphs (D)(3)(a), (b) and (c) of this Article XXV, Macy's may:  (i) assign or transfer all or part of its interest in the Macy's Tract and this REA to any corporation which will as a result of a sale of assets, merger, sale of stock, consolidation or other reorganization, except under Bankruptcy Law, succeed to substantially all of the assets or operating assets of Macy's and thereby own or lease not less than the Macy's Store and five (5) other stores similar to the department stores operated by Macy's in the northern one-half (1/2) of the State of California under the name "Macy's" or such other name as is permitted under this REA, in which

8946-147.251

event such successor corporation shall have all the rights and obligations of Macy's hereunder; and/or (ii) after Macy's has completed construction of and has opened the Macy's Department Store for business with the pubic and is operating the same in accordance with this REA, encumber this REA and Macy's Amended and Restated Lease and the leasehold interest of Macy's created by the Amended and Restated Lease and/or Macy's interest in the Macy's Tract to the extent expressly permitted elsewhere in this REA.  Except as otherwise expressly provided in this REA, any transfer or assignment of this REA (other than as permitted without consent in the immediately next preceding sentence or in subparagraph (D)(3)(a), (b), (c) or (d) of this Article XXV) shall require  the prior written consent of Developer.  For purposes of this paragraph, the sublease by Macy's, for purposes other than for the operation of leased departments, concessions, or licensed services or departments within the Macy's Store, of eighty percent (80%) or more of the Floor Area of the Macy's Store in the aggregate to a single entity or to a group of affiliated entities shall constitute an "assignment" of this REA.

4.   Transfer by Sears.

(a)  Except as expressly permitted hereinbelow, Sears shall not have the right during the Major Operating Period of Sears to vacate all or any part of the Sears Building, to lease or sublease all or any substantial portion of the Sears Building, or both, or to assign this REA except that the REA may be assigned, as a whole only, to an Affiliate (as defined below) of Sears or as collateral to a leasehold Mortgagee of either of them and in any event, Sears, Roebuck and Co. shall remain liable for the payment of all sums due from Sears to Developer under this REA and the performance of all other

8946-148.251

obligations of Sears hereunder.    After the Major Operating Period of Sears, Sears shall have the right without Developer's consent, but at all times subject to the applicable provisions of Article XXII hereof, to vacate all or any part of the Sears Building or to lease or sublease all or any portion of the Sears Building or to assign this REA and in any event, Sears, Roebuck and Co. shall remain liable for the payment of all sums due from Sears to Developer under this REA and the performance of all other obligations of Sears hereunder unless its assignee has a net worth or shareholder equity, determined in accordance with generally accepted accounting principles, of at least $50,000,000.00 and executes a written undertaking in recordable form, stating at least that it is made for the benefit of Developer in which said assignee expressly assumes and covenants, effective upon the date of the assignment, to perform and be bound by all of the terms, covenants and conditions under this REA to be performed by Sears (including the provisions of this Article XXII which must and shall remain applicable to any future assignment by the then lessee of the Sears Tract), which Sears shall deliver to Developer.

(b)  for the purposes of this Article XXV-D(4), the term "Affiliate" means any person or entity which controls or is controlled by Sears or is controlled by or control the same person or entity which then controls Sears.  The word "control" includes ownership of stock, shares or interest having the right to exercise more than fifty percent (50%) of the total combined voting power of (1) all classes of stock of a corporation, or (2) all shares of a trust or (3) all interests in a partnership or joint venture.  In no event shall Developer and Sears

8946-149.251

be deemed an Affiliate of the other, or a joint venture or partnership.

E.    <u>RELEASE</u>.  Subject to the provisions of Article XXV-A and Article XXV-D (as to the Majors) and Article XXV-C (as to Developer), if a Party shall sell, transfer or assign all of its interest in its Tract and all of its rights under this REA in accordance with the provisions of this Article, it shall, except as provided in this REA, be released from future obligations hereunder from and after the effective date of such sale, transfer or assignment, provided that the following additional conditions are satisfied: (i) with respect to accrued obligations, any and all amounts which shall then be due and payable by such grantor or assignor to any other Party shall have been paid to such other Party, (ii) such grantor or assignor shall promptly give notice to the other Parties to this REA of any such sale, transfer, conveyance or assignment, and (iii) the transferee shall execute and deliver to the other Parties a written, recordable instrument in which: (A) the name and address of the transferee shall be disclosed; and (B) the transferee shall acknowledge its obligations and undertake to be bound by and subject to this REA and, if the transferor is a Major, any separate agreements between Developer and such Major, and assume all liabilities and obligations hereunder in accordance with the provisions of this REA and such separate agreements.  Failure to deliver and record any such written instrument shall not negate, modify or otherwise affect the liability of any transferee pursuant to the provisions of this REA, but such failure shall constitute a default by the transferee hereunder.

Anything in this Article XXV-E to the contrary notwithstanding, it is expressly understood and agreed that, subject to Article I-H, in the event of any sale, transfer or assignment, no Party or signatory to this REA shall by reason of such sale, transfer or assignment, be released from its obligations to construct improvements pursuant to the requirements of Articles

8946-150.251

VI, VII or VIII, to open the Enclosed Mall, the Family Entertainment Center and/or to open Floor Area within the Developer Mall Stores as provided in Article VI, to open Floor Area as provided in Article VIII, nor shall a Major be released from its covenant to Operate (i) pursuant to Article XXII of this REA, except as otherwise specifically provided in Article XXII-B or XXII-C, as the case may be, or Article XXV-D, or (ii) pursuant to Article XIV after casualty or condemnation.

ARTICLE XXVI

NOTICES

A.   <u>NOTICES TO PARTIES</u>.   Any notice, demand, request, consent, approval, designation, or other communication which any Party is required or desires to give or make or communicate to any other Party shall be in writing and shall be given or made or communicated by personal delivery, or by United States registered or certified mail, return receipt requested, postage prepaid, or by courier or express service guaranteeing overnight delivery, with a signed receipt in each case, addressed, in the case of Developer to:

```
                              MALL OF AMERICA
                              c/o Melvin Simon & Associates, Inc.
                              Attn:  Melvin Simon
                              P.O. Box 7033
                              Indianapolis, Indiana 46207

and with a copy to:           DANN PECAR NEWMAN TALESNICK &
                              KLEIMAN, Professional Corporation
                              Attn:  Philip Pecar
                              One American Square, Suite 2300
                              Box 82008
                              Indianapolis, Indiana 46282

and addressed in the case
of Nordstrom to:
                              NORDSTROM, INC.
                              Attn:  President
                              1501 Fifth Avenue
                              Seattle, Washington 98101

with a copy to:
                              NORDSTROM, INC.
                              Attn:  Real Estate Notices
                              1501 Fifth Avenue
                              Seattle, Washington 98101

and addressed in the case
of Macy's to:                 MACY'S CALIFORNIA, INC.
                              c/o R.H. Macy & Co.
                              151 West 34th Street
```

031391/S0495/REASears.Cln

145

8946-151.251

                              New York, New York  10001
                              Attn:  General Counsel

with a copy to:               MACY'S CALIFORNIA, INC.
                              c/o R.H. Macy & Co.
                              151 West 34th Street
                              New York, New York 10001
                              Attn:  Real Estate Department

with a further copy to:       MACY'S CALIFORNIA, INC.
                              170 O'Farrell Street
                              San Francisco, California  94102
                              Attn:  President

and addressed in the case
of Sears to:                  SEARS, ROEBUCK AND CO.
                              National Manager
                              Real Estate Planning Group
                              Department 824RE, BSC 36-36
                              Sears Tower
                              Chicago, Illinois 60684

with a copy to:               SEARS, ROEBUCK AND CO.
                              Assistant General Counsel
                              Real Estate
                              Department 766 (BSC 45-27)
                              Sears Tower
                              Chicago, Illinois 60684

subject to the right of any Party to designate a different or additional address by notice similarly given. Any notice, demand, request, consent, approval, designation, including any duplicate original, or other communication so sent shall be deemed to have been given, made or communicated, as the case may be, on the date the same was delivered personally, by telecommunicated facsimile or by the United States mail as registered or certified matter, with postage thereon fully prepaid. If any such notice requires any action or response by the recipient, such fact shall be clearly stated in the notice in the manner provided for in Article XXXI-F-3 of this REA.

B.   MORTGAGEE NOTICE.  The Mortgagee under any Mortgage affecting any Tract or any interest therein, shall be entitled to receive notice of any default by any Party, provided that such Mortgagee shall have delivered a copy of a notice in the form hereinafter contained to such Party. The form of such notice shall be as follows:

The undersigned, whose address is _____

_____ does hereby certify that it is the holder of a "Mortgage" (as that term is defined in the REA) between (names of

8946-152.251

parties) dated _____ upon the land or the leasehold estate described on Exhibit "A" attached hereto which Mortgage encumbers the Tract of (Party) in (Name of Shopping Center) and is the trustee, beneficiary or Mortgagee (as that term is defined in the REA) holding the Mortgage in said interest in said land. In the event that any notice shall be given of the default of the Party upon whose Tract this lien applies, a copy thereof shall be delivered to the undersigned who shall have all rights of such Party to cure such default. Failure to deliver a copy of such notice to the undersigned shall in no way affect the validity of the notice of default as it respects such Party, but shall make the same invalid as it respects the interest of the undersigned and its lien upon said property.

Any such notice to a Mortgagee shall be given in the same manner as provided in Article XXVI-A hereof. Giving of any notice of default or the failure to deliver a copy to any Mortgagee shall in no event create any liability on the part of the Party so declaring a default. In the event that any notice shall be given of the default of the Developer and the Developer has failed to cure or commence to cure such default as provided in this REA, then and in that event the Mortgagee of the Developer Tract shall be entitled to receive an additional notice given in the manner provided in Article XXVI-A hereof, that the Developer has failed to cure such default and such Mortgagee shall have thirty (30) days after said additional notice to cure any such default, or, if such default cannot be cured within thirty (30) days, to diligently commence curing within such time and diligently cure within a reasonable time thereafter.

ARTICLE XXVII

ENTIRE AGREEMENT, AMENDMENT

A.    INTEGRATION, METHOD OF AMENDMENT, CONFLICTS. This REA, the respective Leases, the Supplemental Agreement, the Subordination, Non-Disturbance and Attornment Agreement by and among Nordstrom, Developer, The Mitsubishi Bank, Limited, The Mitsui Trust and Banking Company, Limited, Teachers Insurance and Annuity Association of America, and The Chuo Trust & Banking Co., Ltd. ("Nordstrom SNDA"), the Subordination, Non-Disturbance and Attornment Agreement by and among Macy's, Developer, The Mitsubishi Bank, Limited, The Mitsui Trust and Banking Company, Limited, Teachers Insurance and Annuity Association of America, and The Chuo

031391/S0495/REASears.Cln

147

8946-153.251

Trust & Banking Co., Ltd. ("Macy's SNDA") and the Subordination, Non-Disturbance and Attornment Agreement by and among Sears, Developer, The Mitsubishi Bank, Limited, The Mitsui Trust and Banking Company, Limited, Teachers Insurance and Annuity Association of America and The Chuo Trust & Banking Co., Ltd. ("Sears SNDA"), constitute the entire agreement between Developer and the Majors, and there are no covenants, promises, agreements, conditions or understandings, either oral or written between them other than as set forth herein or in the Leases or in the Supplemental Agreement, or in the Nordstrom SNDA or in the Macy's SNDA or in the Sears SNDA.    The Parties hereto agree that the provisions of this REA shall be modified or amended, in whole or in part, only with the consent of all of the Parties, in writing, executed and acknowledged by all of said Parties.    As between Developer and Nordstrom, any conflict between this REA and the Nordstrom Lease shall be controlled by the provisions of the Nordstrom Lease.    As between Developer and Macy's, any conflict between this REA and the Macy's Lease shall be controlled by the provisions of the Macy's Lease.    As between Developer and Sears, any conflict between this REA and the Sears Lease shall be controlled by the provisions of the Sears Lease.    As among Developer, Macy's, Nordstrom and Sears as a whole, the terms and provisions of this REA shall control.    With respect to the Supplemental Agreement, the terms and provisions thereof shall control.

B.    <u>NO THIRD PARTY BENEFICIARY</u>.    Except for the provisions of Articles X-F, X-G, XIV-H, XXV-B, XXVI-B and XXX-B which are for the benefit of a Mortgagee, the provisions of this REA are for the exclusive benefit of the Parties, their successors and assigns, and not for the benefit of any third Person, nor shall this REA be deemed to have conferred any rights, express or implied, upon any third Person.    It is expressly understood and agreed that no modification or amendment, in whole or in part, shall require any consent or approval on the part of any Occupant or Permittee other

than a Party.  No such modification or amendment shall be binding upon any Mortgagee which has delivered a notice in the form set forth in Article XXVI-B to each Party prior to the effective date of such modification or amendment unless such Mortgagee has consented to or approved such modification or amendment.  No such Mortgagee shall unreasonably withhold or delay consent to any such amendment.

ARTICLE XXVIII

RIGHT TO TERMINATE REA

Macy's, Nordstrom or Sears may, at its option, terminate this REA with respect to such Major upon notice to all Parties if any of the conditions set forth below with respect to such Major occur:

(a)  If prior to receipt by such Major of the full payment required to be made by Developer to such Major pursuant to its Lease, the use of the Tract of such Major or any substantial part thereof for the purposes of a Department Store with the number of square feet shown for such Major on the Plot Plan in the manner such Major is allowed to Operate pursuant to the terms of this REA is prohibited or substantially restricted by law;

(b)  As to Nordstrom and Macy's, if Developer falls more than twenty-nine (29) months behind in the completion of any of the work required with respect to the original date set forth in Exhibit "G" for any of the Critical Construction Milestones (defined in Article VI(A)(6) of this REA);

(c)  Subject to any substitution permitted by the Supplemental Agreement, Nordstrom (as to Macy's) or Macy's (as to Nordstrom), prior to completion of the construction of such Major's Store and the Enclosed Mall, terminates this REA as to its Tract, terminates its respective Lease, or is released from its obligations under this REA;

(d)  Notwithstanding anything herein to the contrary, the Parties hereby acknowledge and agree that in the event Nordstrom or Macy's terminates its respective Lease pursuant to the Nordstrom

SNDA or Macy's SNDA, as the case may be, then such Major shall be released from its obligations hereunder;

(e) Notwithstanding anything herein to the contrary, the Parties hereby acknowledge and agree that in the event Nordstrom or Macy's terminates its respective Lease pursuant to the Supplemental Agreement, such Major shall be released from its obligations hereunder.

Thereupon, this REA shall terminate with respect to such Major ten (10) days following the date of such notice.  The Majors' right to terminate for the conditions set forth in this Article XXVIII-A shall be independent rights and failure of a Major to terminate upon the occurrence of such condition shall not affect any other right to terminate this REA as herein provided or such Major's right to terminate in the event of the occurrence of any other condition described in this Article.  If a Major exercises its right to terminate this REA pursuant to this Article, Developer shall, within thirty (30) days after receipt of a schedule of Direct Construction Costs (as defined below), reimburse such Major for all of the actual fees, costs, expenses (including, without limitation, interest upon all such costs at the Agreed Interest Rate during the period from the date such Major actually paid such fees, costs or expenses to the date such costs are reimbursed to such Major by Developer), liabilities (contractual or otherwise) and damages incurred by such Major relating to or arising out of the planning, design, construction, and/or furnishing of such Major's Store located on the Tract of such Major, including, but not limited to, the cost of professional services (including but not limited to architectural, engineering and legal fees and costs), fees paid to governmental, municipal or administrative agencies, labor, and materials provided in connection therewith (collectively "Direct Construction Costs"), less any amounts paid by Developer to such Major pursuant to the provisions of its respective Lease.  If a Major exercises its right to terminate this REA pursuant to this Article, Developer shall also be responsible

8946-156.251

for any actual damages and all losses, actions, claims, penalties, liabilities (contractual or otherwise), settlements, costs, expenses and obligations suffered or incurred by such Major as a direct or indirect result of the termination of the REA or Developer's failure to perform; provided, however, except as specifically referred to below, this remedy shall not include the right to recover such Major's lost profits, but this remedy shall include but not be limited to, all expenses of moving or redirecting inventory to other stores, markdowns on inventory purchased for the Store of such Major, liabilities and obligations to employees (including relocation costs), damages to and claims by third parties, and professional fees and costs incident to any of the foregoing.

ARTICLE XXIX

UNPERFORMED COVENANTS

A.    <u>DEFAULTS</u>.    (1)    In the event a Party to this REA (the "Defaulting Party") shall fail or neglect to perform any act or thing herein provided to be performed by it (except those referred to in Articles V, VIII, XIV-B, C and D, XXI-A and XXII-A) or shall fail to pay any sum of money required to be paid by it hereunder and such failure shall continue for the grace period specified in Article XXIX-D after notice from any other Party to this REA specifying the acts or things to be performed, such other Party may (but shall not be required to) perform or pay the same, and the Defaulting Party, on demand, shall reimburse such other Party for the cost thereof, unless the Defaulting Party notifies the other Party within thirty (30) days after receipt of such notice that it contends it is (or was) not obligated to perform the same, in which case the obligation to perform shall be subject to arbitration in accordance with Article XXIV hereof.    Despite the giving of such notice by the Defaulting Party, the Party claiming the default nevertheless may perform the act in question, but shall not be entitled to reimbursement of its cost until arbitration has been concluded in its favor.    If any Party other than the Defaulting

Party in good faith shall deem that an emergency is occurring or has occurred so that a default requires immediate curing, then only such notice as is hereinafter provided shall be required, and such other Party may act promptly and take such action as is necessary to cure the alleged default.  Any Party performing any action pursuant to the preceding sentence shall act with reasonable promptness and shall give notice to the Defaulting Party of the doing of such work and the alleged default.  Such notice, notwithstanding any other provision of this REA, need not be in writing if the giving of a written notice would not be reasonably possible under the circumstances, so long as such notice is given to an officer or responsible official of the Defaulting Party. Written confirmation of the action shall be given as soon as reasonably possible.  The Party so acting shall prosecute any work performed by it under the provisions of this Article XXIX-A diligently to completion.  Nothing in this Article XXIX-A shall give any Party the right to enter upon Floor Area of any other Party or to do work on or in any Store or in the Enclosed Mall (except as provided in Article XXIX-A(2) as to the Enclosed Mall).

(2)  If Developer fails to perform any of the covenants on its part to be performed as set forth in Articles XI-A or XI-B of this REA, any Major may, in an emergency situation, perform the same without prior notice to Developer.  Developer shall, on demand, reimburse such Major for the cost thereof, unless Developer notifies such Major within ten (10) days after its receipt of demand for reimbursement that Developer contends it is (or was) not obligated to perform the same, in which case the obligation to perform shall be subject to arbitration in accordance with Article XXIV hereof.

B.  <u>MANNER OF ACTION</u>.  Any action by a Party to this REA taken pursuant to this Article XXIX shall be taken at such times and in such manner as to cause the least practical interference with the business being conducted within the Shopping Center. Except for any negligent or willful act or omission, the acting

8946-158.251

Party shall not be liable or in any way responsible for any loss, inconvenience, annoyance or damage resulting to the Defaulting Party or anyone holding under the Defaulting Party for any action taken pursuant to this Article XXIX.

C.    <u>NO WAIVER</u>.  No act or thing done or performed by a Party pursuant to this Article and no omission to act pursuant to this Article shall be construed as a waiver of any default by the Defaulting Party or as a waiver of any covenant, term or condition herein contained or of the performance thereof.

D.    <u>"GRACE PERIOD"</u>.  The term "grace period", as used in this Article XXIX, shall mean a period of thirty (30) days duration, except that if, because of the nature of the act or thing in question, longer than thirty (30) days is required to do or perform the same, the grace period shall be of the duration required to do or perform the same if commenced with reasonable promptness and thereafter prosecuted diligently to completion.

E.    <u>EASEMENT FOR SELF-HELP</u>.  Each Party hereby grants to the other Parties, for the benefit of the Tract of each such other Party, a non-exclusive and irrevocable easement over and under any and all Common Areas on its Tract for all purposes reasonably necessary to enable each such other Party (acting directly or through employees, agents, contractors or subcontractors) to exercise its rights under this Article XXIX.  Such easement shall run with the land, shall constitute a servitude on each grantor's Tract and shall be a benefit appurtenant to each of the other Tracts.

F.    <u>SURVIVAL</u>.  The rights and easements granted under this Article XXIX shall survive the expiration or earlier termination of this REA for the purpose of performing and enforcing compliance with the provisions of any provision of this REA which, by its express terms, is to survive such expiration or termination.

ARTICLE XXX

<u>MISCELLANEOUS</u>

8946-159.251

A.    <u>ATTORNEYS' FEES</u>.  In the event any Party shall institute any action or proceeding, excluding any arbitration proceeding, against the other or others relating to the provisions of this REA, or any default thereunder, then, and in that event, the unsuccessful litigant(s) in such action or proceeding shall reimburse the successful litigant(s) therein for the reasonable expenses of attorneys' fees and disbursements incurred therein by the successful litigant(s).

B.    <u>BREACH SHALL NOT DEFEAT MORTGAGE</u>.  A breach of any of the terms, conditions, covenants, or restrictions of this REA shall not defeat or render invalid the lien of any Mortgage made in good faith and for value, but such term, condition, covenant or restriction shall be binding upon and effective against any Person who acquires title to said property or any portion thereof by foreclosure, trustee's sale or otherwise.

C.    <u>BREACH SHALL NOT PERMIT TERMINATION</u>.  Except as provided in Article XXVIII, it is expressly agreed that no breach of this REA shall entitle any Party to cancel, or rescind or otherwise terminate this REA, but such limitation shall not affect, in any manner, any other right or remedies which the Parties may have hereunder by reason of any breach of this REA.

D.    <u>CAPTIONS</u>.  The captions of the paragraphs and Articles of this REA are for convenience only and shall not be considered nor referred to in resolving questions of interpretation and construction.

E.    <u>CONSENT</u>.  In any instance in which any Party to this REA shall be requested to consent to or approve of any matter with respect to which such Party's consent or approval is required by any of the provisions of this REA, such consent or approval shall be given in writing, and shall not be unreasonably withheld, delayed or denied, unless the provisions of this REA with respect to a particular consent or approval shall expressly provide that the same may be given or refused in the sole and absolute judgment of such Party.

031391/S0495/REASears.Cln

154

8946-160.251

F.  <u>ESTOPPEL CERTIFICATE</u>.  Each Party and signatory hereto hereby severally covenants that upon written requests of any other Party, it will issue to such other Party, or to any Mortgagee, or any other Person specified by such requesting Party, an estoppel certificate stating to the best of its knowledge: (i) whether the Party or signatory to whom the request has been directed knows of any default under the REA, and if there are known defaults, specifying the nature thereof; (ii) whether the REA has been assigned, modified or amended in any way (and if it has, then stating the nature thereof); and (iii) that the REA as of that date is in full force and effect.

G.  <u>EXERCISE OF APPROVAL RIGHTS</u>.

1.  Wherever in this REA approval of any Party is required, and unless a different time limit is provided in any Article of this REA, such approval or disapproval shall be given within thirty (30) days following the receipt of the item to be so approved or disapproved, or the same shall be conclusively deemed to have been approved by such Party.  Any disapproval shall specify with particularity the reasons therefor; provided, however, that wherever in this REA any Party is given the right to approve or disapprove in its sole and absolute discretion it may disapprove without specifying a reason therefor.

2.  Wherever in this REA a lesser period of time is provided for than the thirty (30) day period hereinabove specified, such time limit shall not be applicable unless the notice to the Party whose approval or disapproval is required contains a correct statement of the period of time within which such Party shall act.  Failure to specify such time shall not invalidate the notice but simply shall require the action of such Party within said thirty (30) days.

3.  Any document submitted for the consent or approval of any Party shall contain a cover page prominently reciting the applicable REA Article involved, listing the date mailed,

8946-161.251

and if applicable, containing a statement to the effect that the document or the facts contained within such document shall be deemed approved or consented to by the recipient unless the recipient makes an objection thereto within the correct time specified in such notice, which shall be thirty (30) days unless this REA shall specify a different period. If the time specified in the notice is incorrectly or not set forth, the time limit shall be thirty (30) days unless a longer time period is specified in this REA, in which case the longer period of time shall control. Failure to specify such time shall not invalidate the notice but simply shall require the action of such Party within said thirty (30) day period.

4.    Wherever in this REA provision is made for approval "by the Parties" or "of the Parties", such phrase shall mean the approval of all of the Parties.

H.    <u>GOVERNING LAWS</u>.    This REA shall be construed in accordance with the laws of the State of Minnesota.

I.    <u>INJUNCTIVE RELIEF</u>.    In the event of any violation or threatened violation by any Person of any of the terms, restrictions, covenants and conditions of this REA (whether affirmative or negative in nature), any of the Parties shall have the right to enjoin such violation or threatened violation in a court of competent jurisdiction. Prior to the commencement of any such action, at least five (5) days' written notice of such violation shall be given to the other Party or other Person responsible therefor.

J.    <u>NO PARTNERSHIP</u>.    Neither anything in this REA contained nor any acts of the Parties hereto shall be deemed or construed by the Parties, or any of them, or by any third person, to create the relationship of principal and agent, or of partnership, or of joint venture, or of any association between any of the Parties.

K.    <u>NOT A PUBLIC DEDICATION</u>.    Nothing herein contained shall be deemed to be a gift or dedication of any portion of the Total Development Tract to the general public or for the general public

8946-162.251

or for any public purpose whatsoever, it being the intention of the Parties hereto that this REA shall be strictly limited to and for the purposes herein expressed.

L.  <u>PAYMENT ON DEFAULT</u>.  If pursuant to this REA any Party is compelled or elects to pay any sum of money or do any acts which require the payment of money by reason of any other Party's failure or inability to perform any of the terms and provisions in this REA to be performed by such other Party or Operator, the defaulting Party shall, promptly upon demand, reimburse the paying Party for such sums, and all such sums shall bear simple interest at the Agreed Interest Rate from the date of expenditure until the date of such reimbursement.  Any other sums payable by any Party to any other Party or Operator pursuant to the terms and provisions of this REA that shall not be paid when due shall bear simple interest at the Agreed Interest Rate from the due date to the date of payment thereof.

M.  <u>SEVERABILITY</u>.  If any term, provision or condition contained in this REA shall, to any extent, be invalid or unenforceable, the remainder of this REA (or the application of such term, provision or condition to persons or circumstances other than those in respect of which it is invalid or unenforceable), except those terms, provisions or conditions which are made subject to or conditioned upon such invalid or unenforceable terms, provisions or conditions, shall not be affected thereby, and each term, provision and condition of this REA shall be valid and enforceable to the fullest extent permitted by law.

N.  <u>SUCCESSORS</u>.  This REA shall, except as otherwise provided herein, run with the land, both as respects benefits and burdens created herein, and shall be binding upon and inure to the benefit of the successors and assigns of the respective Parties.

O.  <u>TIME OF ESSENCE</u>.  Time is of the essence with respect to the performance of each of the covenants and agreements contained in this REA.

8946-163.251

P.   <u>WAIVER OF DEFAULT</u>.  No waiver of any default by any Party shall be implied from any omission by any other Party to take any action in respect of such default if such default continues or is repeated.  No express waiver of any default shall affect any default or cover any period of time other than the default and period of time specified in such express waiver.  One or more waivers of any default in the performance of any term, provision or covenant contained in this REA shall not be deemed to be a waiver of any subsequent default in the performance of the same term, provision or covenant or any other term, provision or covenant contained in this REA.  The consent or approval by any Party to or of any act or request by any other Party requiring consent or approval shall not be deemed to waive or render unnecessary the consent to or approval of any subsequent similar acts or requests.  The rights and remedies given to any Party by this REA shall be deemed to be cumulative and no one of such rights and remedies shall be exclusive of any of the others, or of any other right or remedy at law or in equity which any such Party might otherwise have by virtue of a default under this REA, and the exercise of one such right or remedy by any such Party shall not impair such Party's standing to exercise any other right or remedy.

Q.   <u>INDEX ADJUSTMENT DEFINITION</u>.  The term "Index Adjustment" refers to the amount of the proportionate increase or decrease for each year during the Term of this REA in the Implicit Price Deflator of the Gross National Product of the United States (Personal Consumption Expenditures By Major Type of Product Table), issued and published by the United States Department of Commerce (1972=100) (the "Index"), or any successor index thereto, appropriately adjusted.  In the event that the Index is converted to a different standard reference base or otherwise revised, the determination of the adjustment to be made with reference to the Index shall be made with the use of such conversion factor, formula or table for converting the Index as may be published by the Department of Commerce or, if said Department shall not publish the

8946-164.251

same, then with the use of such conversion factor, formula or table as may be published by Prentice Hall, Inc., or other nationally recognized publisher of similar statistical information. If the Index ceases to be published, and there is no successor thereto, then a reasonable substitute index selected by Developer and approved by the Majors shall be utilized; or, if such a substitute index is not available or may not lawfully be used for the purposes stated herein, then based upon a reliable governmental or other non-partisan publication, selected by Developer, and approved by the Majors, evaluating changes in the cost of living or purchasing power of the consumer dollar, if such a publication is available and may be lawfully used for the purposes stated herein. For the purposes of calculating fluctuations in the Index, 1992 shall be considered to be the base year (the "Base Year"). With respect to any amount referred to in this REA to which the Index Adjustment is to be made, such amount shall for the purpose of calculating such adjustment be referred to in this Article XXX-Q as the "Base Amount" and the Base Amount, as adjusted by the application of this Article XXX-Q, shall be referred to herein as the "Adjusted Amount".

The Adjusted Amount shall be determined as follows:

With respect to each time at which the Index Adjustment is to be made, the Base Amount shall be increased or decreased to equal the product obtained by multiplying the Base Amount by a fraction, the numerator of which is the average annual Index for the most recent complete calendar year, and the denominator of which is the average annual Index for the Base Year.

For purposes of this Article XXX-Q, the Base Amount utilized for any initial calculation made hereunder shall continue to be utilized as the Base Amount for each subsequent application of this provision.

R.   UNDERLINE{COUNTERPARTS}. This REA may be signed in several counterparts, each of which shall be deemed an original, and all such counterparts shall constitute one and the same instrument.

8946-165.251

The signature of a Party to any counterpart may be removed and attached to any other counterpart. Any counterpart to which is attached the signatures of all Parties shall constitute an original of this REA.

S. <u>RECORDING</u>. A fully executed and acknowledged copy of this REA shall be recorded in the public records of the county in which the Total Development Tract is located, immediately following execution of this REA by the Parties. The cost of recording shall be shared equally by the Parties.

T. <u>LIMITED LIABILITY OF DEVELOPER AND EXCULPATION OF PARTNERS</u>. Notwithstanding anything contained in this REA to the contrary, if at any time after (a) completion (except for tenant finish in unoccupied spaces) of the construction of the Improvements constituting Phase I (as shown on <u>Exhibit "B"</u>) by Developer, (b) the initial occupancy of at least Six Hundred Thousand (600,000) square feet of the Floor Area of the Developer Mall Stores, (c) the opening of the Shopping Center for business with the general public, (d) the opening of the Majors for business with the general public, and (e) the payment of all sums required to be paid by Developer to a Major under its respective Lease, Developer shall fail to perform or pay any covenant or obligation on its part to be performed or paid hereunder, and as a consequence thereof a Major shall recover a money judgment against Developer such judgment shall be enforced against and satisfied out of (subject to the rights of any Mortgagee whose lien predates the filing of a notice of lis pendens or notice of pendency of such action which results in such judgment) only (i) the proceeds of sale produced upon execution of such judgment and levy thereon against Developer's interest in the Total Development Tract and the Improvements thereon, (ii) the rents, issues or other income receivable from Developer Tract and the Improvements thereon received by Developer after a default together with any rents collected by Developer which are then in advance of the date due, (iii) the consideration received by Developer from the sale of all

8946-166.251

or any part of Developer's interest in the Total Development Tract and Improvements thereon made after such failure of performance (which consideration shall be deemed to include any assets at any time held by Developer to the extent that the value of same does not exceed the proceeds of such sale), (iv) any casualty insurance proceeds or condemnation award payable to Developer as the result of any casualty to or condemnation of all or any portion of the Total Development Tract and the Improvements thereon, which proceeds are not to be used for the reconstruction or rehabilitation of the Improvements; provided, however, that if Developer self-insures, then such casualty insurance proceeds shall be equal to the proceeds Developer would have received had Developer not elected to self-insure, and (v) any public liability insurance proceeds payable to Developer as the result of the liability to a Major which such Major is seeking to enforce; provided, however, that if Developer self-insured, then such public liability insurance proceeds shall be equal to the proceeds Developer would have received had Developer not elected to self-insure. Neither Developer its successors and assigns, nor any of the partners, general or limited, in the limited partnership referred to herein as "Developer", nor any partner, shareholder or joint venturer in any successors or assigns shall be personally liable to a Major, its successors and assigns, or to any other party, for the performance or payment of any covenant, obligation, liability or indebtedness of Developer hereunder or for any judgment thereon. No Major shall seek specific performance of any covenant or obligation by or against Developer or any partner in the Developer partnership hereunder, except to the extent that the same can be enforced _in rem_ against the Developer Tract and Improvements thereon and satisfied from the property specified in clauses (i), (ii), (iii) and (iv) above. It is expressly understood and agreed that nothing in this REA contained shall be construed as creating any personal liability whatsoever against the Developer or the partners in the Developer partnership.

8946-167.251

Each Major, its successors and assigns, and any other owner or holder of any claim or action against Developer under this REA, or any indebtedness, obligation or liability of Developer accruing hereunder, shall look solely to Developer's interest in the Total Development Tract and any Improvements thereon and proceeds therefrom, as aforesaid, for the payment and satisfaction of any such claim, action, indebtedness, obligation or liability, as aforesaid. The provisions of this Article XXX-T are not intended to relieve Developer from the performance of any of its obligations hereunder, but rather to limit Developer's liability as aforesaid, and to relieve and release the partners in the Developer partnership, successors and assigns as Developer and partners, shareholders and venturers in any successor or assign, from any such liability whatsoever, as aforesaid; nor shall any of the provisions of this Article XXX-T be deemed to limit or otherwise affect the Majors' right to obtain injunctive relief or other equitable relief necessary to enforce other rights specifically granted to the Majors in this REA (with the exception of specific performance, which is limited as hereinabove provided). The provisions of this Article XXX-T also shall inure to the benefit of Developer's successors and assigns.

U.   <u>ORDINANCES</u>. Each Party shall, at all times, both during and after the completion of construction of its Improvements, comply with all Federal, State, County and Municipal laws, ordinances, rules and regulations, with all regulations of the local Fire Insurance Rating organizations having jurisdiction or any other organization or board exercising similar functions, respecting the construction, applicable maintenance and operation of its Improvements and with all applicable requirements of Protection Mutual Insurance Company related to the immediate vicinity of the connection between each Major's Store and the Enclosed Mall.

V.   <u>LOCATIVE ADVERBS</u>. The locative adverbs, "herein", "hereunder", "hereto", "hereby", and like words whenever the same

8946-168.251

appear herein means and refer to this REA in its entirety and not to any specific Article, Paragraph, or subparagraph hereof, unless expressly otherwise provided.

W.  <u>TEMPORARY CESSATION OF BUSINESS</u>.  Any temporary cessation of business by any Party, occasioned by the making of required repairs, restoration or rebuilding or permitted alterations or renovations hereunder or by any Force Majeure, shall not constitute a breach on the part of the Party so ceasing business of its covenant to operate as provided in Article XXI or Article XXII of this REA, as the case may be, so long as such Party is proceeding diligently with such work or the necessary efforts to resume operation.

X.  <u>EXHIBITS</u>.  The exhibits to this REA are hereby incorporated by reference into, and made a part of, this REA, as fully as if set forth in full herein.

X.  <u>ORIGINAL REA SUPERSEDED</u>.  This REA amends and restates in its entirety the Original REA and does not affect the priority of the Original REA.

Y.  <u>SUPPLEMENTAL AGREEMENT</u>.  Macy's and Nordstrom hereby acknowledge and agree that, notwithstanding this amendment and restatement of the Original REA, the Supplemental Agreement shall and does remain in full force and effect; provided, however, that each reference therein to "REA" shall be deemed to be a reference to this Amended and Restated Reciprocal Easement and Operating Agreement.

THIS AMENDED AND RESTATED REA has been executed by the Parties as of the day and year first above written.

DEVELOPER:
MALL OF AMERICA COMPANY,
a Minnesota general partnership

By:   SI-MINN   DEVELOPERS   LIMITED
      PARTNERSHIP, General Partner

      By:   SI-MINN, INC.
            General Partner

      By: _____
              Herbert Simon
      Title: President

STATE OF INDIANA        )
                        ) SS:
COUNTY OF MARION        )

On this 13th day of March _____, 1991, before me personally appeared Herbert Simon, to me known to be the President of SI-MINN, INC., an Indiana corporation, as general partner of SI-MINN DEVELOPERS LIMITED PARTNERSHIP, an Indiana limited partnership, as general partner of Mall of America Company, a Minnesota general partnership, the general partnership which executed the foregoing instrument and acknowledged said instrument to be the free and voluntary act and deed of said general partnership, for the uses and purposes therein mentioned, and on oath stated that he was authorized to execute said instrument.

In Witness Whereof I have hereunto set my hand and affixed my official seal the day and year first above written.

Dated: __3/13/91_____

Judy Statom
NOTARY PUBLIC in and for the
State of _____,
residing at _____
My appointment expires:
_____

JUDY STATOM, Notary Public
County of Residence: Marion
Expiration Date: 10-13-92

8946-170.251

THIS AMENDED AND RESTATED REA has been executed by the Parties as of the day and year first above written.

NORDSTROM:
NORDSTROM, INC.,
a Washington corporation

By: _David C Mackie_

Title: _Vice President_

STATE OF WASHINGTON )
                ) SS:
COUNTY OF KING       )

On this _10th_ day of _April_, 1991, before me personally appeared _David C. Mackie_, to me known to be the _Vice President_ of Nordstrom, Inc., a Washington corporation, the corporation that executed the foregoing instrument, and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and on oath stated that he was authorized to execute said instrument.

In Witness Whereof I have hereunto set my hand and affixed my official seal the day and year first above written.

Dated: _April 10, 1991_

_Kathy L. Suznovich_
NOTARY PUBLIC in and for the State of _Washington_
residing at _Seattle_
My appointment expires:
_9-24-94_

THIS AMENDED AND RESTATED REA has been executed by the Parties as of the day and year first above written.

                                    MACY'S:
                                    MACY'S CALIFORNIA, INC.,
                                    a Delaware corporation

                                    By: _____  MYRON E. ULLMAN III

                                    Title: EXECUTIVE VICE PRESIDENT
                                           CORPORATE AFFAIRS

STATE OF NEW YORK    )
                     ) SS:
COUNTY OF NEW YORK   )

        On this _30_ day of _May_____, 1991, before me personally appeared _____, to me known to be the _EXECUTIVE VICE PRESIDENT_ of Macy's California, Inc., the corporation that executed the foregoing instrument, and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and on oath stated that he was authorized to execute said instrument.

        In Witness Whereof I have hereunto set my hand and affixed my official seal the day and year first above written.

Dated: _May 30, 1991_                _____
                                     NOTARY PUBLIC in and for the
                                     State of _____,
                                     residing at_____
                                     My appointment expires:
                                     _____

                              ELSA C. AZIZ
                         Notary Public, State of New York
                                 No. 4514875
                           Qualified in Queens County
                      Certificate Filed in New York County
                      Commission Expires March 30, 1992

8946-172.251

THIS AMENDED AND RESTATED REA has been executed by the Parties as of the day and year first above written.

SEARS:
SEARS, ROEBUCK AND CO.,
a New York corporation

ATTEST:

By: _____
Assistant Secretary ,  _____

By: _____
National Manager
Real Estate Planning Group

STATE OF  Illinois   )
                     ) SS:
COUNTY OF  Cook      )

On this  14th  day of  March  , 1991, before me personally appeared  Ronald B. Ruth  and  Donald J. Jeruc , to me known to be the  National Manager  and  Assistant Secretary, respectively, of Sears, Roebuck and Co., the corporation that executed the foregoing instrument, and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and on oath stated that they were authorized to execute said instrument.

In Witness Whereof I have hereunto set my hand and affixed my official seal the day and year first above written.

Dated:  3/14/91

_____
NOTARY PUBLIC in and for the
State of Illinois ,
residing at  Chicago, IL
My appointment expires:
            10-22-91

" OFFICIAL SEAL "
LILLIAN N. GUNNAR
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 10/22/91

This instrument was prepared by:  Michael J. Gabovitch, attorney-at-law, One American Square, Box 82008, Indianapolis, Indiana 46282.

R. E. DIVISION
LEGAL
Knn

## CONSENT AND JOINDER OF LENDER AND
## SUBORDINATION OF LENDER'S LIEN

TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA, a New York corporation (the "Lender") is the holder of a beneficial interest under that certain mortgage dated as of October 31, 1990, and recorded on November 2, 1990 in the Office of the Registrar of Titles, Hennepin County, State of Minnesota as document number 2134524, (the "Mortgage") upon the real property referred to in the Amended and Restated Reciprocal Easement and Operating Agreement ("Amended REA") set forth above as the "Total Development Tract", which is legally described in Exhibit "A" to the Amended REA.

Lender intends by executing this Consent and Subordination to subordinate the Mortgage to the Amended REA as currently constituted and without regard to any amendments or modifications of the Amended REA.

Lender hereby subordinates to the Amended REA all of its right, title and interest in and to the Total Development Tract and the Mortgage. Accordingly, Lender hereby:  (i) consents to all of the terms, covenants, conditions, requirements, and restrictions of the Amended REA; and (ii) agrees that each and all of the terms, covenants and conditions of the Amended REA shall be covenants running with the land, shall bind the Lender and all of its successors and assigns of its fee interest in the Total Development Tract and shall bind and inure to the benefit of each "Party" under the Amended REA, as such term is defined in the Amended REA.

TEACHERS INSURANCE AND ANNUITY
ASSOCIATION OF AMERICA, a New York
corporation

By: _Ronald Bernhard_____

Title: _Director_____

STATE OF NEW YORK    )
                     ) SS:
COUNTY OF NEW YORK   )

On this _14th_ day of _May_____, 1991, before me personally appeared _Ronald Bernhard_, to me known to be the _Director_ of Teachers Insurance and Annuity Association of America, a New York corporation, the corporation that executed the foregoing instrument and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and on oath stated that he was authorized to execute said instrument.

In Witness Whereof I have hereunto set my hand and affixed my official seal the day and year first above written.

Dated: _May 14, 1991_____

_G. Ann Oliva_____

G. ANN OLIVA
Notary Public, State of New York
No. 8211170
Qualified in Queens County
Certificate Filed in N. Y. County
Commission Expires Nov. 30  1992

NOTARY PUBLIC in and for the
State of _New York_____,
residing at _Staten Island, NY_____
My appointment expires: _____

This instrument was prepared by Michael J. Gabovitch, attorney-at-law, One American Square, Box 82008, Indianapolis, Indiana 46282.

031391/S0495/REASears.Cln

168

8946-174.251

## CONSENT AND JOINDER OF LENDER AND
## SUBORDINATION OF LENDER'S LIEN

THE MITSUBISHI BANK, LIMITED, a banking corporation organized under the laws of Japan, acting through its New York Branch, (the (the "Lender") is the holder of a beneficial interest under that certain mortgage dated as of October 31, 1990, and recorded on November 2, 1990 in the Office of the Registrar of Titles, Hennepin County, State of Minnesota as document number 2134524, (the "Mortgage") upon the real property referred to in the Amended and Restated Reciprocal Easement and Operating Agreement ("Amended REA") set forth above as the "Total Development Tract", which is legally described in Exhibit "A" to the Amended REA.

Lender intends by executing this Consent and Subordination to subordinate the Mortgage to the Amended REA as currently constituted and without regard to any amendments or modifications of the Amended REA.

Lender hereby subordinates to the Amended REA all of its right, title and interest in and to the Total Development Tract and the Mortgage. Accordingly, Lender hereby: (i) consents to all of the terms, covenants, conditions, requirements, and restrictions of the Amended REA; and (ii) agrees that each and all of the terms, covenants and conditions of the Amended REA shall be covenants running with the land, shall bind the Lender and all of its successors and assigns of its fee interest in the Total Development Tract and shall bind and inure to the benefit of each "Party" under the Amended REA, as such term is defined in the Amended REA.

MORTGAGEE:

THE MITSUBISHI BANK, LIMITED, acting through its New York Branch

By: _____
        *TADAAKI HAMADA*

Title: *Senior V.P. and Chief Manager*

STATE OF NEW YORK )
                 ) SS:
COUNTY OF NEW YORK )

On this 25ᵗʰ day of *APRIL*, 1991, before me personally appeared *TADAAKI HAMADA*, to me known to be the *Sr. V.P. and Chief Mgr.* of The Mitsubishi Bank, Limited, a banking corporation organized under the laws of Japan, acting through its New York Branch, the corporation that executed the foregoing instrument and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and on oath stated that he was authorized to execute said instrument.

In Witness Whereof I have hereunto set my hand and affixed my official seal the day and year first above written.

Dated: *4-25-91*            _____
                            NOTARY PUBLIC in and for the
                            State of *New York*,
                            residing at *345 E. 79ᵗʰ, N.Y.N.Y.*
                            My appointment expires:
                            *December 18, 1991*

This instrument was prepared by Michael J. Gabovitch, attorney-at-law, One American Square, Box 82008, Indianapolis, Indiana 46282.

JANICE M. SINKER
Notary Public, State of New York
31-4960223
Qualified in New York County
Commission Expires Dec. 18th, 19___

031391/S0495/REASears.Cln

8946-175.251

CONSENT AND JOINDER OF LENDER AND
SUBORDINATION OF LENDER'S LIEN

THE MITSUI TRUST AND BANKING COMPANY LIMITED, a banking
corporation organized under the laws of Japan, acting through its
New York Branch (the "Lender") is the holder of a beneficial
interest under that certain mortgage dated as of October 31, 1990,
and recorded on November 2, 1990 in the Office of the Registrar of
Titles, Hennepin County, State of Minnesota as document number
2134524, (the "Mortgage") upon the real property referred to in the
Amended and Restated Reciprocal Easement and Operating Agreement
("Amended REA") set forth above as the "Total Development Tract",
which is legally described in Exhibit "A" to the Amended REA.

Lender intends by executing this Consent and Subordination to
subordinate the Mortgage to the Amended REA as currently
constituted and without regard to any amendments or modifications
of the Amended REA.

Lender hereby subordinates to the Amended REA all of its
right, title and interest in and to the Total Development Tract and
the Mortgage. Accordingly, Lender hereby:  (i) consents to all of
the terms, covenants, conditions, requirements, and restrictions of
the Amended REA; and (ii) agrees that each and all of the terms,
covenants and conditions of the Amended REA shall be covenants
running with the land, shall bind the Lender and all of its
successors and assigns of its fee interest in the Total Development
Tract and shall bind and inure to the benefit of each "Party" under
the Amended REA, as such term is defined in the Amended REA.

THE MITSUI TRUST AND BANKING
COMPANY, LIMITED, acting through its
New York Branch

By: _H. Miyamoto_
     HIROAKI  MIYAMOTO
Title: _V. P._

STATE OF NEW YORK )
                  ) SS:
COUNTY OF NEW YORK )

On this _22nd_ day of _April_, 1991, before me
personally appeared, _H. Miyamoto_, to me known to be
the _Vice President_ of The Mitsui Trust and Banking Company,
Limited, a banking corporation organized under the laws of Japan,
acting through its New York Branch, the corporation that executed
the foregoing instrument and acknowledged said instrument to be the
free and voluntary act and deed of said corporation, for the uses
and purposes therein mentioned, and on oath stated that he was
authorized to execute said instrument.

In Witness Whereof I have hereunto set my hand and affixed my
official seal the day and year first above written.

Dated: _April 22, 1991_

_James Crocetto_
NOTARY PUBLIC in and for the
State of _____,
residing at _Queens County, NY_
My appointment expires: _____

JAMES CROCETTO
Notary Public, State of New York
No. 41-4830230
Qualified in Queens County
Certificate Filed in New York County
Commission Expires March 19, 1992

This instrument was prepared by Michael J. Gabovitch, attorney-at-
law, One American Square, Box 82008, Indianapolis, Indiana 46282.

8946-176.251

## CONSENT AND JOINDER OF LENDER AND
## SUBORDINATION OF LENDER'S LIEN

THE CHUO TRUST & BANKING CO., LTD., a banking corporation organized under the laws of Japan, acting through its New York Agency (the "Lender") is the holder of a beneficial interest under that certain mortgage dated as of October 31, 1990, and recorded on November 2, 1990 in the Office of the Registrar of Titles, Hennepin County, State of Minnesota as document number 2134524, (the "Mortgage") upon the real property referred to in the Amended and Restated Reciprocal Easement and Operating Agreement ("Amended REA") set forth above as the "Total Development Tract", which is legally described in Exhibit "A" to the Amended REA.

Lender intends by executing this Consent and Subordination to subordinate the Mortgage to the Amended REA as currently constituted and without regard to any amendments or modifications of the Amended REA.

Lender hereby subordinates to the Amended REA all of its right, title and interest in and to the Total Development Tract and the Mortgage. Accordingly, Lender hereby: (i) consents to all of the terms, covenants, conditions, requirements, and restrictions of the Amended REA; and (ii) agrees that each and all of the terms, covenants and conditions of the Amended REA shall be covenants running with the land, shall bind the Lender and all of its successors and assigns of its fee interest in the Total Development Tract and shall bind and inure to the benefit of each "Party" under the Amended REA, as such term is defined in the Amended REA.

THE CHUO TRUST & BANKING
CO., LTD.,
acting through its New York
Agency

By: _____

Title: _____MANAGER_____

By: _____
    MICHAEL J. HOOVER

Title: Assistant Vice President

STATE OF NEW YORK  )
                ) SS:
COUNTY OF NEW YORK  )

On this 24ᵗʰ day of MAY, 1991, before me personally appeared SADANORI FUKUDA, to me known to be the MANAGER of The Chuo Trust & Banking Co., Ltd., a banking corporation organized under the laws of Japan, acting through its New York Agency, the corporation that executed the foregoing instrument and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and on oath stated that he was authorized to execute said instrument.

In Witness Whereof I have hereunto set my hand and affixed my official seal the day and year first above written.

Dated: ___5/2x/91_____

                              NOTARY PUBLIC in and for the
                              State of New York,
                              residing at New York, New York
                              My appointment expires:

JANICE M. SINKER
Notary Public, State of New York
31-4960223
Qualified in New York County
Commission Expires Dec. 18th, 19___91

8946-177.251

STATE OF NEW YORK      )
                       ) SS:
COUNTY OF NEW YORK     )

On this _24__ day of _May_____, 1991, before me personally appeared _Michael F. Maenza_ to me known to be the _Asst Vice President_ of The Chuo Trust & Banking Co., Ltd., a banking corporation organized under the laws of Japan, acting through its New York Agency, the corporation that executed the foregoing instrument and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and on oath stated that he was authorized to execute said instrument.

In Witness Whereof I have hereunto set my hand and affixed my official seal the day and year first above written.

Dated: _5/24/91_

_____
NOTARY PUBLIC in and for the State of _New York_ residing at _New York, New York_ My appointment expires: _____

JANICE M. SINKER
Notary Public, State of New York
31-4960223
Qualified in New York County
Commission Expires Dec. 18th, 19__91

This instrument was prepared by Michael J. Gabovitch, attorney-at-law, One American Square, Box 82008, Indianapolis, Indiana 46282.

042291/S0495/REASears.Cln

171-A

8946-178.251

EXHIBITS TO
AMENDED AND RESTATED
RECIPROCAL EASEMENT AND OPERATING AGREEMENT
MALL OF AMERICA
BLOOMINGTON, MINNESOTA

| Exhibit | Description |
|---------|-------------|
| "A" | Total Development Tract/Shopping Center Tract |
| "B" | Plot Plan |
| "C" | Sears Tract |
| "D" | Macy's Tract |
| "E" | Nordstrom Tract |
| "F" | Approved Plans |
| "G" | Critical Construction Milestones |
| "H" | Rules and Regulations |
| "I" | Developer's Work |
| "J" | Parking Management Plan |
| "K" | Sign Criteria |
| "L" | Nationally Recognized Shopping Center Developers |
| "M" | Categories of Occupants for Macy's and Nordstrom |
| "M-1" | Categories of Occupants for Sears |

031391/S0495/REASears.Cln

8946-179.251





ELEV. – 878'-0"

PERMISSIBLE SIGN AREA

NOTE: PHASE 1 INCLUDES ALL IMPROVEMENTS SHOWN HEREON EXCEPT THOSE LABELED AS FUTURE





NOTE: PHASE 1 INCLUDES ALL IMPROVEMENTS SHOWN HEREON EXCEPT THOSE LABELED AS FUTURE

PERMISSIBLE SIGN AREA

ELEV. — 878'-0"

EAST PARKING DECK 7 LEVELS

ROOF OF SEARS DEPARTMENT STORE

ROOF OF BLOOMINGDALE'S DEPARTMENT STORE

ROOF OF NORDSTROM DEPARTMENT STORE

ROOF OF MACY'S DEPARTMENT STORE

WEST PARKING DECK 7 LEVELS









ELEV. – 842'-0"

KIOSKS / ROLLING PUSHCARTS
MAJORS COURTS
CUSTOMER SERVICE AREA

NOTE: PHASE 1 INCLUDES ALL IMPROVEMENTS SHOWN HEREON EXCEPT THOSE LABELED AS FUTURE









② TYPICAL STRIPING DETAIL
PD1   NO SCALE

## GENERAL NOTES

1. A.   HORIZONTAL SURFACE ILLUMINATION WITHIN THE PARKING STRUCTURE SHALL AVERAGE EIGHT FOOTCANDLES, AND IN NO LOCATION BE LESS THAN TWO FOOTCANDLES.

   B.   HORIZONTAL SURFACE ILLUMINATION WITHIN STAIR TOWERS, ELEVATOR LOBBIES, AND IN DESIGNATED PEDESTRIAN WALKWAYS SHALL AVERAGE OF TWENTY FOOTCANDLES, AND IN NO LOCATION BE LESS THAN FIFTEEN FOOTCANDLES.

③ SECTION DIAGRAM AT WEST RING ROAD
PD1   NO SCALE







# MALL OF AMERICA

PROPOSED LAND DESCRIPTION
BLOOMINGDALE'S PARCEL — LOT 4

All that part of Lot 1, Block 1, MALL OF AMERICA, according to the recorded plat thereof, and having a radius of 214.00 feet, Hennepin County, Minnesota, described as follows:

PROPOSED LAND DESCRIPTION
DEVELOPER'S PARCEL — LOT 1

All that part of Lot 1, Block 1, MALL OF AMERICA, according to the recorded plat thereof, Hennepin County, Minnesota, described as follows:

PROPOSED LAND DESCRIPTION
NORDSTROM'S PARCEL — LOT 2

All that part of Lot 1, Block 1, MALL OF AMERICA, according to the recorded plat thereof, Hennepin County, Minnesota, described as follows:

PROPOSED LAND DESCRIPTION
SEARS PARCEL — LOT 3

All that part of Lot 1, Block 1, MALL OF AMERICA, according to the recorded plat thereof, Hennepin County, Minnesota, described as follows:

PROPOSED LAND DESCRIPTION
MACY'S PARCEL — LOT 5

All that part of Lot 1, Block 1, MALL OF AMERICA, according to the recorded plat thereof, Hennepin County, Minnesota, described as follows:

C-7059

# MALL OF AMERICA 3RD ADDITION



Sunde Land Surveying Inc.

Q-7058



MALL OF AMERICA
BLOOMINGTON, MINNESOTA
MALL OF AMERICA COMPANY

SIMON
SIMON DEVELOPMENT COMPANY

Triple Five Corporation Ltd.

R.E.A.
AMENDED & RESTATED
RECIPROCAL EASEMENT
AND OPERATING
AGREEMENT
EXHIBIT "B"

5.20.91

263/REA

C-7067

## EXHIBIT "A"

Total Development Tract is described as follows:

Lot 1, Block 1, Mall of America, according to the plat thereof recorded on June 16, 1988 as Document No. 1937920 in the office of the Registrar of Titles, Hennepin County, Minnesota.

051691/s0495/totdev.tct

8946-198.251

Exhibit "C"

"Sears Tract" is described as follows:

All that part of LOT 1, BLOCK 1, MALL OF AMERICA, according to the recorded plat thereof, recorded on June 16, 1988, as Document No. 1937920, in the office of the Registrar of Titles, Hennepin County, Minnesota, described as follows:

Commencing at the most easterly corner in the northerly line of said LOT 1; thence S89°57'08"W (Basis of Bearings-Hennepin County Coordinate System), along the northerly line of said LOT 1 for 949.59 feet to an angle point in said northerly line; thence S39°14'14"E, for 593.30 feet; thence N45°00'00"E for 74.25 feet to the POINT OF BEGINNING.

Thence S45°00'00"E for 95.46 feet;
Thence N90°00'00"E for 109.38 feet:
Thence Northeasterly 41.89 feet along the arc of a curve, concave to the southeast, to a point tangent, said arc having a radius of 118.50 feet, and a central angle of 20°15'16" and being subtended by a chord that bears S34°52'22"W 41.67 feet;
Thence N45°00'00"E for 86.53 feet to a point of curve to the left;
Thence Northerly 156.29 feet along the arc of said curve to a point tangent, said arc having a radius of 99.50 feet, and a central angle of 90°00'00" and being subtended by a chord that bears S00°00'00"W 140.71 feet;
Thence N45°00'00"W for 70.43 feet to a point of curve to the right;
Thence Northwesterly 74.73 feet along the arc of said curve to a point of reverse curve, said arc having a radius of 118.50 feet, and a central angle of 36°08'03" and being subtended by a chord that bears S26°55'58"E 73.50 feet;
Thence Northwesterly 119.98 feet along the arc of said reverse curve to a point tangent, said arc having a radius of 54.50 feet, and a central angle of 126°08'03" and being subtended by a chord that bears S71°55'58"E 97.18 feet;
Thence S45°00'00"W for 238.08 feet to a point of curve to the right;
Thence Southwesterly 46.26 along the arc of said curve, said arc having a radius of 118.50 feet, and a central angle of 22°21'58" and being subtended by a chord that bears S56°10'59"W 45.96 feet;
Thence S45°00'00"E for 169.88 feet to the POINT OF BEGINNING.

EXHIBIT "D"

"Macy's Tract" is described as follows:

All that part of LOT 1, BLOCK 1, MALL OF AMERICA, according to the recorded plat thereof, recorded on June 16, 1988, as Document No. 1937920, in the office of the Registrar of Titles, Hennepin County, Minnesota, described as follows:

Commencing at the most easterly corner in the northerly line of said LOT 1; thence S89°57'08"W (Basis of Bearings-Hennepin County Coordinate System), along the northerly line of said LOT 1 for 949.59 feet to an angle point in said northerly line; thence S44°21'39"W for 621.76 feet; thence S00°00'00"E for 660.00 feet; thence S45°00'00"W for 84.85 feet to the POINT OF BEGINNING;

Thence S45°00'00"E for 191.24 feet;
Thence S37°41'15"W for 170.09 feet to a point of curve to the right;
Thence Southwesterly 71.48 feet along the arc of said curve to a point tangent, said arc having a radius of 75.50 feet, and a central angle of 54°14'55" and being subtended by a chord that bears S64°48'42"W 68.84 feet;
Thence N88°03'50"W for 153.49 feet to a point of curve to the right;
Thence Northwesterly 71.48 feet along the arc of said curve to a point of reverse curve, said arc having a radius of 49.50 feet, and a central angle of 82°44'18" and being subtended by a chord that bears N46°41'41"W 65.43 feet;
Thence continuing Northwesterly 34.99 feet along the arc of said reverse curve to a point tangent, said arc having a radius of 60.50 feet, and a central angle of 33°08'13" and being subtended by a chord that bears N21°53'39"W 34.50 feet;
Thence N38°27'45"W for 155.23 feet to a point of curve to the right;
Thence Northerly 118.72 feet along the arc of said curve to a point tangent, said arc having a radius of 81.50 feet, and a central angle of 83°27'45" and being subtended by a chord that bears N03°16'07"E 108.50 feet;
Thence N45°00'00"E for 107.77 feet to a point of curve to the left;
Thence Northeasterly 50.51 feet along the arc of said curve, said arc having a radius of 104.50 feet, and a central angle of 27°41'39" and being subtended by a chord that bears N31°09'10"E 50.02 feet;
Thence N90°00'00"E for 101.40 feet;
Thence S45°00'00"E for 186.44 feet to the POINT OF BEGINNING.

EXHIBIT "E"

"Nordstrom Tract" is described as follows:

All that part of LOT 1, BLOCK 1, MALL OF AMERICA, according to the recorded plat thereof, recorded on June 16, 1988, as Document No. 1937920, in the office of the Registrar of Titles, Hennepin County, Minnesota, described as follows:

Commencing at the most easterly corner in the northerly line of said LOT 1; thence S89°57'08"W (Basis of Bearings-Hennepin County Coordinate System), along the northerly line of said LOT 1 for 949.59 feet to an angle point in said northerly line; thence S44°21'39"W for 621.76 feet; thence N45°00'00"W for 84.85 feet to the POINT OF BEGINNING.

Thence N45°00'00"E for 155.35 feet;
Thence Northwesterly 20.82 feet along the arc of a curve concave to the Northeast to a point tangent, said arc having a radius of 118.50 feet, and a central angle of 10°04'02", and being subtended by a chord that bears N50°02'01"W, 20.79 feet;
Thence N45°00'00"W for 199.78 feet, to a point of curve to the left;
Thence Northwesterly 64.63 feet along the arc of said curve to a point tangent, said arc having a radius of 75.50 feet, and a central angle of 49°02'55", and being subtended by a chord that bears N69°31'28"W 62.68 feet;
Thence S85°57'05"W for 43.86 feet, to a point of curve to the left;
Thence Southwesterly 121.48 feet along the arc of said curve to a point of reverse curve, said arc having a radius of 93.50 feet, and a central angle of 74°26'28", and being subtended by a chord that bears S48°43'51"W 114.17 feet;
Thence continuing Southwesterly 56.40 feet along the arc of said reverse curve to a point tangent, said arc having a radius of 96.50 feet, and a central angle of 33°29'23", and being subtended by a chord that bears S28°15'18"W 55.60 feet;
Thence S45°00'00"W for 64.53 feet to a point of curve to the left;
Thence Southerly 124.88 feet along the arc of said curve to a point tangent, said arc having a radius of 79.50 feet, and a central angle of 90°00'00", and being subtended by a chord that bears S00°00'00"W 112.43 feet;
Thence S45°00'00"E for 76.54 feet, to a point of curve to the right;
Thence Southeasterly 43.76 feet along the arc of said curve, said arc having a radius of 82.50 feet, and a central angle of 30°23'33" and being subtended by a chord that bears S29°48'14"E 43.25 feet;
Thence S90°00'00"E for 141.17 feet;
Thence N45°00'00"E for 127.28 feet to the POINT OF BEGINNING.

JERDE FINAL DEVELOPMENT SET

DATE          DRAWING NO.          DESCRIPTION

APPROVED PLANS FOR MACY'S

| 12/29/89 | DD1101 | Grand Ave. - Paving Plans |
| | DD1102 | Grand Ave. - Paving Details |
| | DD1201 | Grand Ave. - The Gallery Ceiling Plans |
| | DD1301 | The Gallery |
| | DD1302 | The Gallery - Typ. Bay Details |
| | DD1303 | The Gallery - Bridge Details |
| | DD1304 | Grand Ave. - The Gallery-Marque Tower |
| | DD1305 | Grand Ave. - The Gallery-Marque Tower |
| | DD1306 | Grand Ave. - Gallery Marquee Elevations & Sections |
| | DD1307 | Grand Ave. - Gallery Marquee Plans |
| | DD1308 | Grand Ave. - Gallery Marquee Details |
| | DD1407 | Gallery Food Court Elevations |
| | DD1408 | Gallery Elevations |
| | DD1501 | Grand Ave. Typ. Mall Plans & Details |
| | DD1502 | Grand Ave. Typ. Mall Plans & Details |
| | DD1503 | Grand Ave. Typ. Mall Ridgewalk Details |
| | DD2000 | Paving Plans M1-M4 Bloomingdale's Crt. |
| | DD2001 | Bloomy Crt. Paving Details |
| | DD2101 | Bloomy Crt. Reflected Ceiling Plans |
| | DD2201 | Bloomy Crt. Sections |
| | DD2202 | Bloomy Crt. Guardrail Detail |
| | DD2203 | Bloomy Crt. NTCLB Signage Kiosk & Clktwr |
| | DD2205 | Bloomy Crt. |
| | DD2204 | Bloomy Crt. Pavilion/Clock Details |
| | DD2206 | Bloomy Crt. Miscellaneous Details |
| | DD3000 | Elec. St. Rotunda Sketches |
| | DD3001 | Elec. St. Portal Sketches |
| | DD3101 | Elec. St. Paving Plan |
| | DD3102 | The Rotunda |
| | DD3103 | Elec. St. Paving Plan Revisions |
| | DD3201 | Elec. St. Typ. Mall Refl'd Ceiling Plan |
| | DD3301 | Elec. St. Elevation & Section |
| | DD3302 | Elec. St. Details |
| | DD3303 | Elec. St. Light Bridge Detail |
| | DD3304 | Elec. St. Retail Boutiques |
| | DD3501 | Elec. St. Rotunda Reflected Ceiling |
| | DD3601 | Elec. St. Rotunda Section |
| | DD3602 | Elec. St. Rotunda Escalators/Details |
| | DD3603 | Rotunda Entrance from Knott's |
| | DD3604 | Rotunda Elec. St. Handrail & Fascia Details, Sign & Video Board |
| | DD3605 | Elec. St. Passenger Elevator |
| | DD3606 | Elec. St. Passenger Elev. Details |
| | DD4101 | Sears Court Paving Plan |
| | DD4201 | Sears Court Reflected Ceiling Plan |
| | DD4301 | Sears Court Sections |
| | DD4302 | Sears Court Handrail Details |
| | DD4303 | Sears Court Skylight @ Large Court |
| | DD5000 | |
| | DD5101 | Garden St. West Paving Plan |
| | DD5102 | Garden St. Terrace Paving Plan |
| | DD5103 | Garden St. East Paving Plan |
| | DD5201 | Garden St. West Reflecting Ceiling Plan |
| | DD5202 | Garden St. Terrace Refl'd Ceiling Plan |
| | DD5203 | Garden St. East Refl'd Ceiling Plans |
| | DD5301 | Garden St. West Section |
| | DD5302 | Garden St. West Section |
| | DD5303 | Garden St. Terrace Section |
| | DD5304 | Garden St. Terrace Section |
| | DD5305 | Garden Street |
| | DD5306 | Golf Mtn. & Entry from Knott's |
| | DD5307 | Garden St. East Section |

EXHIBIT "F-1"
Page 1 of 3 Pages

| | |
|---|---|
| DD5308 | Garden St. East Section |
| DD5401 | Typ. Railing & Fascia Details |
| DD5402 | Planter Details |
| DD5403 | Bldg. A/C Plan, Sec. & Details |
| DD5404 | Mall Bldg. "8" & Bldg. "D" Similar |
| DD5405 | Mall Bldg. "E" |
| DD5406 | Bridge Details & Skylight |
| DD5407 | Wall & Bridge Section |
| DD5408 | Garden St. Bldg. "F" |
| DD5409 | Garden St. Bldg. "G" |
| DD5410 | Elevation Tower |
| DD5411 | Foodcourt Gazebo |
| DD5412 | Garden St. Foodcourt Pavilion |
| DD5413 | Pot Trellises |
| DD6001 | Nordstrom Place Floor Plans |
| DD6101 | Nordstrom Place Paving Plans |
| DD6201 | Nordstrom Place Reflected Ceiling |
| DD6301 | Nordstrom Court Section |
| DD6302 | Nordstrom Pl. 1/8" Sect. & Handrail Dtls. |
| DD6303 | Nordstrom Pl. Wall & Handrail Dtls. |
| DD6304 | Nordstrom Pl. Fountain & Pool Dtls @ M1 |
| DD7000 | Market St. Rendering |
| DD7002 | Market St. Paving M2 Edge of Opening |
| DD7003 | Market St. Paving M3 Edge of Opening |
| DD7004 | Market St. M2, M3 Handrail/Facia Plns. |
| DD7101 | Market St. Paving M1 |
| DD7102 | Market St. Paving M2 |
| DD7103 | Market St. Paving M3 |
| DD7201 | Market St. Reflected Ceiling Plans |
| DD7202 | Market St. M3 Refl'd Ceiling Plan |
| DD7300 | Market St. Key Section |
| DD7301 | Market St. Int. Elevations |
| DD7302 | Market St. Int. Section |
| DD7401 | Market St. Int. Elevations |
| DD7402 | Market St. Truss Bridge |
| DD7403 | Market St. Rectangular Kiosk |
| DD7404 | Market St. Round Kiosk |
| DD7405 | Market St. Misc. Detail |
| DD7406 | Market St. Roof Section |
| DD7407 | Market St. Entry Elevation |
| DD8101 | Macy's Crt. Slab Opening/Paving |
| DD8201 | Macy's Crt. Reflacted Ceiling |
| DD8301 | Macy's Crt. 1/8" Sections |
| DD8401 | Macy's Crt. Details |
| DD9011 | Parking Ramp Elevation |
| DD9012 | Parking Elevation |
| DD9100 | Exterior Pkg. North & South |
| DD9101 | Exterior Pkg. No. & So. Plan/Sect. |
| DD9200 | Mall Entrance East & West |
| DD9300 | Exterior Pkg. Bridge to Parking |
| DD9500 | Pkg. Structure Elev./Spandrels |
| DD9502 | Pkg. Structure Core Elev. Sch. A1 |
| DD9900 | Proj. Graphic Prog. Site Plan |
| DD1002 | Neutral Pier Details |
| DD1001 | Handrail Types |

### DESIGN DEVELOPMENT DRAWINGS

| DATE | DRAWING NO. | DESCRIPTION |
|---|---|---|
| 01/24/90 | DD1306 | Grand Ave.-Elec. & Sections The Gallery/Cinema Marquee |
| | DD1307 | Grand Ave./Gallery/Cinema Plans |
| | DD1308 | Grand Ave./Gallery/Cinema Details |
| | DD2001 | Bloomingdale Paving Details |
| | DD2206 | Bloomingdale Details |
| | DD5203 | Garden St. Reflected Ceiling Plan |
| | DD-1 | ML 1&2 Paving Plan-N.E. Quad. |

EXHIBIT "F-1"
Page 2 of 3 Pages

| | |
|---|---|
| DD-2 | ML 1&2 Paving plans S. E. Quad. |
| DD-3 | ML 1&2 Paving Plan S.W. Quad. |
| DD-4 | ML 1&2 Paving Plan N.W. Quad. |
| DD-5 | ML 3 Paving Plans N.E. Quad. |
| DD-6 | ML 3 Paving Plans S.E. Quad. |
| DD-7 | ML 3 Paving Plans S.W. Quad. |
| DD-8 | ML 3 Paving Plans N.W. Quad. |
| DD-9 | Sears & Bloomingdale's Cts. Typ. Sections |
| DD-10 | Nordstrom & Macys Courts Typ. Sections |
| DD-11 | Electric Street Typical Sections |
| DD-12 | Grand Avenue Typical Sections |
| DD-13 | Market Street Typical Sections |
| DD-14 | Garden Street Typical Sections |
| DD-15 | Electric St. & Rotunda Sketches Views A & B |
| DD-16 | Grand Avenue View C |
| DD-17 | Market Street View D |
| DD-18 | Garden Street View E |
| DD-19 | M1/M2 Composite Floor Plan |
| DD-20 | M3 Composite Floor Plan |

| DATE | DRAWING NO. | DESCRIPTION |
|---|---|---|
| 8-10-90 | Con. Pkg "L" | Exterior Landscape Design Plan |

8946-204.251

091890/SHARFILE/S0495MCY.EXF

### Approved Plans for Nordstrom

| | Date | Description |
|---|---|---|
| 1. | 7-09-90 | Sunde Site Composite Survey |
| 2. | 10-26-89 | Site Composite Hotel Study |
| 3. | 10-13-89 | Package D Structural Steel with Specifications PS-1 to PS-10 |
| 4. | Undated (rec'd 4-2-90) | Exterior Envelope Elevations as approved by City of Bloomington |
| 5. | 4-14-89 | Braun Soil Boring Reports with July 12 Letter |
| 6. | 10-31-890 | Cosentini – Mechanical – N.W. Quandrant M1, M2, M3 |
| 7. | 10-31-89 | BRW Coordinate Layout Site Plan |
| 8. | 1-11-90 | Communication Service Plan |
| 9. | 1-22-90 | A507, Wall Sections North |
| 10. | 1-22-90 | Details at Nordstrom (except code separation wall which has not been approved) |
| 11. | 1-22-90 | A231J Service Level Floor Plan N.W. |
| 12. | 1-22-90 | A231J Mall Level One Floor Plan N.W. |
| 13. | 4-6-90 | A233S Mall Level Two Floor Plan N.W. |
| 14. | 4-6-90 | A234 Mall Level Three Floor Plan N.W. |
| 15. | 1-9-90 | A232A Proposed Nordstrom Pad Layout Level 1 |
| 16. | 3-12-90 | CE 106B Utility Layout - Water, Sanitary, Gas |
| 17. | 3-12-90 | CE 115B Storm Sewer Layout |
| 18. | 3-15-90 | E101 Primary Electrical Service Plan - Service Level |
| 19. | 4-25-90 | Parking Structures WA 21-27 |
| 20. | 4-30-8-10-90 | Exterior Landscape Design Plan |
| 21. | T.B.F. | Exterior Sign Design Criteria |

Exhibit "F-2"

8946-205.251

APPROVED PLANS FOR SEARS

| <u>DESCRIPTION</u> | <u>DRAWING #</u> | <u>DATE</u> |
|---|---|---|
| 1) Structural Drawings | S262M-S265M | 06/21/90 |
| | S501M, S506M, S303M, S304M, S311M | 06/28/90 |
| | S314M, S401M, S402M, S316M-S319M, | |
| | S301M, S321M, S322M | 07/09/90 |
| | S220M-S225M, S315M | 07/10/90 |
| | S403M, S404M, S331M | 07/11/90 |
| | S332M | 07/12/90 |
| | S305M, S320M | 07/31/90 |
| 2) Architect-ural Drawings | 35/14-1AG to 40/14AG A221S-A223S, | 05/18/90 |
| | A524S, A724S, A820S, A822S-A824S, A924S, A812S | 06/15/90 |
| | A100M, A220M, A225M, A402M, A509M, A514M | 06/29/90 |
| | 1/8-10 to 22/8-10, A410-A429 | 07/10/90 |
| | 100A, 100B, 101-105 | 07/31/90 |
| 3) East Parking Deck Drawings | C-00, C-02 EA09, EA11, EA21-EA27, EA30-EA33, TAS09, TAS10 | 04/16/90 |
| | TAS22, TAS23, TAS30-TAS33 | 08/01/90 |
| 4) Landscape Drawings | L1-L4 | 06/12/90 |
| 5) Utility Drawings | CE107B, CE108B, CE116B | 05/23/90 |
| | CE106B, CE115B | 01/25/91 |
| 6) Stripping Plan | C11R | 01/10/90 |
| 7) Primary Electrical Service Plan | C23R3 | 01/17/91 |
| 8) Construc-tion Control & Monumenta-tion Drawings | CC100 | 12/12/90 |
| 9) Light Pole & Controller | E601-N | 10/17/90 |
| 10) Sight Lighting | E205-N | 02/01/91 |
| 11) Final Site Grading Plan | C104-A1 | 01/16/91 |

EXHBIIT "F-3"

031191/s0495/ExhF.3

8946-206.251

<u>CRITICAL CONSTRUCTION MILESTONES</u>

A.   CRITICAL CONSTRUCTION MILESTONES FOR MACY'S AND NORDSTROM CONSTRUCTION

1.   a.   As to Macy's, continuous truck access is required from Killebrew Street to entire Macy's exterior perimeter starting 3/1/90 through completion of construction.

     b.   As to Nordstrom, continuous truck access is required from East 81st Street to entire Nordstrom exterior perimeter starting 3/1/90 through completion of construction.

2.   a.   As to Macy's, Macy's Tract pad preparation work completed to Macy's specifications and certified-October 1, 1990; provided, however, temporary utilities and telephone conduit to be installed by November 1, 1990.

     b.   As to Nordstrom, Nordstrom Tract pad preparation work completed to Nordstrom's specifications and certified - November 1, 1990.

3.   Developer, Nordstrom and Macy's shall have entered into a Reciprocal Easement Agreement, in a form mutually satisfactory to the parties thereto, and the REA shall be fully effective on November 1, 1990.

4.   a.   As to Macy's, on or before November 1, 1990, an ALTA leasehold policy of title insurance in a form reasonably satisfactory to Macy's shall have been issued to Macy's insuring the Macy's interest under its respective Lease, Macy's nonexclusive easement rights over the common area under the Lease and the REA, subject to no liens or encumbrances other than those approved by Macy's.

     b.   As to Nordstrom, on or before November 1, 1990, an ALTA leasehold policy of title insurance in a form reasonably satisfactory to Nordstrom shall have been issued to Nordstrom insuring the Nordstrom interest under its respective Lease, Nordstrom's nonexclusive easement rights over the common area under the Lease and the REA, subject to no liens or encumbrances other than those approved by Nordstrom.

5.   On or before November 1, 1990, Macy's and Nordstrom shall have received satisfactory evidence that (i) the Developer has secured its financing for the construction of the Common Areas and Developer's Improvements, (ii) the Developer's construction lender has made an advance under the construction loan, and (iii) that further advances under the construction loan are not subject to conditions other than those which are normal for advances of construction funds in typical construction loans.

6.   a.   As to Macy's, Nordstrom shall have commenced construction of its Department Store in the Shopping Center on or before June 7, 1991, or shall be preparing to commence construction within thirty (30) days thereafter, and shall thereafter be continuing to diligently proceed with construction of its Department Store in the Shopping Center on a schedule that would enable it to complete and open its Department Store in the Shopping Center for business

EXHIBIT "G"
Page 1 of 3 Pages

to the public on or before the Opening Date for the Macy's Department Store.

b. As to Nordstrom, Macy's shall have commenced construction of its Department Store in the Shopping Center on or before June 7, 1991, or shall be preparing to commence construction within thirty (30) days thereafter, and shall thereafter be continuing to diligently proceed with construction of its Department Store in the Shopping Center on a schedule that would enable it to complete and open its Department Store in the Shopping Center for business to the public on or before the Opening Date for the Nordstrom Department Store.

7. 2" temporary water line provided to Macy's Tract and Nordstrom Tract per Macy's and Nordstrom's specifications, respectively - February 1, 1991.

8. 1,000 amps 277/480V 3 Phase temporary power provided to Macy's Tract and Nordstrom Tract per Macy's and Nordstrom's specifications, respectively - February 1, 1991.

9. 20 pairs temporary telephone lines provided to Macy's Tract and Nordstrom Tract per Macy's and Nordstrom's specifications, respectively - February 1, 1991.

10. a. As to Macy's, 30,000 square feet of staging area in the southwest surface parking lot available-February 1, 1991.

    b. As to Nordstrom, 30,000 square feet of staging area in the northwest surface parking lot available-February 1, 1991.

11. Permanent storm and sanitary conditions provided to Macy's Tract and Nordstrom Tract per Macy's and Nordstrom's specifications, respectively - November 1, 1991.

12. Permanent power provided to Macy's Tract and Nordstrom Tract per Macy's and Nordstrom's specifications, respectively - November 1, 1991.

13. Permanent gas connection provided to Macy's Tract and Nordstrom Tract per Macy's and Nordstrom's specifications, respectively - November 1, 1991.

14. a. As to Macy's, unobstructed access to Macy's loading dock is required starting September 1, 1991 and continuous through construction.

    b. As to Nordstrom, unobstructed access to Nordstrom loading dock is required starting November 1, 1991 and continuous through construction.

15. Permanent telephone conduit and cable provided to Macy's Tract and Nordstrom Tract per Macy's and Nordstrom's specifications, respectively - January 1, 1992.

16. a. As to Macy's, permanent water provided to Macy's Tract per Macy's specifications - November 1, 1991.

    b. As to Nordstrom, permanent water provided to Nordstrom Tract per Nordstrom's specifications-February 15, 1992.

17. Cable TV provided to Macy's Tract and Nordstrom Tract per Macy's and Nordstrom's specifications, respectively - June 1, 1992.

EXHIBIT "G"
Page 2 of 3 Pages

B.   CRITICAL CONSTRUCTION MILESTONES:  DEVELOPER'S CONSTRUCTION

1.   Complete site utilities (including, but not limited to, water, sanitary sewer, storm sewer, natural gas, and electrical) - September 1, 1990.

2.   Start structural steel - Bloomingdale's court - May 1, 1990.

3.   Start structural steel - Nordstrom court - October 8, 1990.

4.   Start west parking deck - September 1, 1990.

5.   Start concrete slabs - Macy's court - October 20, 1990.

6.   Start center skylight - Knott's Berry Farm - October 21, 1990.

7.   Start concrete slabs - Nordstrom court - November 1, 1990.

8.   South Street and Bloomingdale's court dried in - December 1, 1990.

9.   Start east parking deck - December 1, 1990.

10.  South and West Streets and Macy's court dried in - July 1, 1991.

11.  North and West Streets and Nordstrom court dried in - July 1, 1991.

12.  Complete tunnel, including wall, slab and roof, to Macy's Truck Dock - September 9, 1991.

13.  Complete mall central plants - December 3, 1991.

14.  Complete mall interior floor finishes - May 1, 1992.

15.  Substantial completion of all mall vertical transportation - April 1, 1992.

16.  Substantial completion of mall mechanical, electrical and plumbing systems through trim - April 1, 1992.

17.  Complete mall fire protection and alarm systems - June 1, 1992.

18.  a.   Temporary certificate of occupancy for parking garages - March 1, 1992.

     b.   Permanent certificate of occupancy for parking garages - July 1, 1992.

19.  Permanent on and off-site project related paving and curbs, street access and traffic control completed - June 1, 1992.

20.  Mall temporary certificate of occupancy (suitable for public occupancy) - July 1, 1992.

EXHIBIT "G"
Page 3 of 3 Pages

## RULES AND REGULATIONS

A.    Common Area.

1.    Except as otherwise reasonably required, all sweeping shall be at intervals before the Stores shall be open for business to the public, using motor driven parking lot vacuum cleaning vehicles where feasible.

2.    All trash and rubbish containers located in the Common Area for the use of Permittees shall be emptied daily and shall be washed at intervals sufficient to maintain the same in a clean condition.

3.    All storm drain catch basins shall be cleaned on a schedule sufficient to maintain all storm drain lines in a free-flowing condition and all mechanical equipment related to storm drain and sanitary sewer facilities shall be regularly inspected and kept in proper working order.

4.    All stairways shall be:  (a) swept and washed at intervals sufficient to maintain the same in a clean condition; (b) inspected at regular intervals and (c) promptly repaired upon the occurrence of any irregularities or worn portions thereof.

5.    All glass, including skylights, plate glass and/or glass-enclosed devices shall be cleaned at intervals sufficient to maintain the same in a clean condition.

6.    All Common Area amenities, benches, and institutional, directional, traffic and other signs shall be inspected at regular intervals, maintained in a clean and attractive surface condition and promptly repaired or replaced upon the occurrence of any defects or irregularities thereto.

7.    When repair or replacement is reasonably required, the improvements on and to the Common Area shall be repaired or replaced with materials, apparatus and facilities of quality comparable to the quality of the

EXHIBIT "H"
Page -1- of 5 Pages

*082990.retta:JDC.MOA.RULES+*

materials, apparatus and facilities repaired or replaced.

8. The Parties shall use all reasonable efforts to require their respective Permittees to comply with all regulations with respect to the Common Area, including, but not by way of limitation, posted speed limits, directional markings and parking stall markings.

B. **Floor Area.** Developer shall use all reasonable efforts to cause all Developer Mall Stores to comply with the following rules and regulations, and Macy's and Nordstrom agree to comply with the following rules and regulations.

1. All Floor Area, including vestibules, entrances and returns, doors, fixtures, windows and plate glass shall be maintained in a safe, neat and clean condition.

2. All trash, refuse and waste materials shall be regularly removed from the premises of each Occupant of the Shopping Center, and until removal shall be stored (a) in adequate containers, which such containers shall be located so as not to be visible to the general public shopping in the Shopping Center, and (b) so as not to constitute any health or fire hazard or nuisance to any Occupant.

3. No portion of the Shopping Center Tract shall be used for lodging purposes.

4. Neither sidewalks nor walkways shall be used to display, store or replace any merchandise, equipment or devices, except for kiosks, rolling pushcarts, and other similar temporary tenants permitted in the REA.

5. No advertising medium shall be utilized which can be heard or experienced outside of the Floor Area, including, without limiting the generality of the foregoing, flashing lights, searchlights, loudspeakers, phonographs, radios or television.

6. No use shall be made of the Shopping Center Tract or any portion or portions thereof, other than the normal

EXHIBIT "H"
Page -2- of 5 Pages

8946-211.251

082990.retta:JDC.MOA.RULES+

use of the Family Entertainment Center, which shall be operated in a manner which does not disturb Occupants of the Shopping Center Tract, which would (a) violate any law, ordinance or regulation, (b) constitute a nuisance, (c) constitute an extra-hazardous use, or (d) violate, suspend or void any policy or policies of insurance on the Stores.

7.    As to the Developer Mall Stores only, all trucks servicing such Developer Mall Stores shall be loaded and unloaded before noon on Mondays through Fridays and not at other times.

8.    All deliveries are to be made to designated service or receiving areas and Occupants shall request delivery trucks to approach their service or receiving areas by designated service routes and drives.

9.    Notwithstanding the foregoing, tractor trailers servicing Developer Mall Stores which must be unhooked or parked must use steel plates under dolly wheels to prevent damage to the asphalt paving surface.  In addition, wheel blocking must be available for use.  No parking or storing of such trailers will be permitted in the Shopping Center Tract outside of the designated receiving areas.

C.    **Conduct of Persons**.

The Parties hereto do hereby establish the following rules and regulations applicable to Common Area:

1.    No Person shall use any roadway, access road, walkway or the Enclosed Mall, except as a means of egress from or ingress to any Floor Area and Automobile Parking Areas within the Shopping Center Tract, or adjacent public streets.   Such use shall be in an orderly manner, in accordance with the directional or other signs or guides.

2.    No Person shall use any Automobile Parking Areas except for the parking of motor vehicles during the period of

EXHIBIT "H"
Page -3- of 5 Pages

8946-212.251
082990.retta:JDC.MOA.RULES+

time such Person or the occupants of such vehicles are customers or business invitees of the retail establishments within the Shopping Center. All motor vehicles shall be parked in an orderly manner within the painted lines defining the individual parking places. During peak periods of business activity, limitations may be imposed as to the length of time for parking use. Such limitations may be made in specified areas.

3.   No Person shall use any utility area, truck court or other area reserved for use in connection with the conduct of business, except for the specific purpose for which permission to use such area is given.

4.   No employee of any business in the Shopping Center shall use any area for motor vehicle parking except the area or areas specifically designated for employee parking for the particular period of time such use is to be made. No employer shall designate any area for employee parking except such area or areas as are designated in writing in accordance with the terms of the REA.

5.   No Person, without the written consent of the Parties, shall in or on any part of the Common Area:

   a.   Vend, peddle or solicit orders for sale or distribution of any merchandise, device, service, periodical, book, pamphlet or other matter whatsoever, except as permitted by law.

   b.   Exhibit any sign, placard, banner, notice or other written material, except for activities as approved in writing by Developer.

   c.   Distribute any circular, booklet, handbill, placard or other material.

   d.   Solicit membership in any organization, group or association or contribution for any purpose.

EXHIBIT "H"
Page -4- of 5 Pages

082990.retta:JDC.MOA.RULES+

e.  Use any Common Area for any purpose when none of the retail establishments within the Shopping Center is open for business or employment, except for special events permitted under the REA.

f.  Throw, discard or deposit any paper, glass or extraneous matter of any kind, except in designated receptacles, or create litter or hazards of any kind.

g.  Except for special events permitted under the REA, use any sound-making device of any kind, or create or produce in any manner noise or sound that is annoying, unpleasant, or distasteful to Occupants or Permittees.

h.  Deface, damage or demolish any sign, light standard or fixture, landscaping material or other improvement within the Shopping Center Tract, or the property of customers, business invitees or employees situated within the Shopping Center Tract.

The listing of specific items as being prohibited is not intended to be exclusive, but to indicate in general the manner in which the right to use the Common Area solely as a means of access and convenience in shopping at the retail establishments in the Shopping Center is limited and controlled by the Parties in the Shopping Center.

EXHIBIT "H"
Page -5- of 5 Pages

8946-214.251

*082990.retta:JDC.MOA.RULES+*

EXHIBIT "I-1"

MALL OF AMERICA — BLOOMINGTON, MINNESOTA

NEW STORE CONSTRUCTION

DEVELOPER'S WORK REQUIREMENTS FOR MACY'S

TEMPORARY FACILITY

1. Temporary stoned (or equivalent) access roadway to be constructed and maintained to Macy's laydown areas and extending around Macy's pad.

2. Macy's contractor laydown area at location designated by Macy's consisting of approximately three acres of either paved area or stoned area connected to the above mentioned access roadway.

3. Provision of a temporary electric service with disconnect switch no more than 50 feet from the Macy's building area, or at Macy's option to Macy's laydown area, at a point designated by Macy's. Electric service to be minimum of 480 Volt, 3 Phase, 60 Cycle, 600 Amps capacity.

4. Provision of construction water either through the permanent water supply system or by means of a construction well to be provided for the Macy's contractor at a point within 50 feet of the Macy's building. Construction water may be supplied by tanker until the permanent water supply system if installed.

5. Provided temporary telephone service to Macy's laydown area.

SITE WORK

1. Developer to provide a properly drained and otherwise suitable building pad for the Macy's building. The elevation of the pad will be at a level designated by Macy's generally between 5 inches and 12 inches below the finished first floor elevation of the Macy's building or as recommended by soils engineer. Provide drawing showing survey of elevation of completed pad on 50 foot grid.

2. The finished first floor elevation of the Macy's building shall be designated by Macy's and based on the agreed upon final finished floor elevation of the mall and parking areas.

3. The loan bearing capacity of the pad shall be not less than 4,000 pounds per square foot at grade and meet the following requirements:

EXHIBIT "I-1"
Page 1 of 5 Pages

a.  In cut areas, soil shall be compacted to meet 92% Modified Proctor minimum.

b.  In fill areas, suitable backfill to be provided, installed and compacted by the Developer in the building pad area. All compaction to be minimum 95% Modified Proctor.

c.  If load bearing capacity of the pad is less than 4,000 pounds per square foot, Developer shall reimburse Macy's for any extra costs incurred by Macy's as a result thereof.

4.  All rock in Macy's pad to be removed by Developer to an elevation 3'-6" below finished slab-on-grade or to a lower elevation if required by Macy's footings or pits. Provide suitable compacted backfill to underside of porous fill or underside of slab-on-grade, as directed by Macy's.

5.  Developer shall provide boring data and soils report with recommendation for foundation design. Developer's soils engineer shall submit compaction report and a certificate verifying that building pad complies with load bearing requirements. Developer shall provide additional borings as reasonably requested by Macy's architect.

6.  Sub-surface of sidewalk areas around building(s) and all parking areas to be equivalent to 90% Modified Proctor.

7.  Provide bench mark(s), location and bearing of the centerline of Macy's mall entrance(s) and the Macy's building line and building corners abutting the mall. Provide drawing showing above data.

8.  Provide sufficient suitable backfill material (as certified by soils engineer), at a location designated by Developer, for backfilling and compaction of Macy's foundation walls.

9.  Grading and drainage of areas beyond Macy's truck dock is to be performed in such manner as to insure water will not run down into Macy's truck dock.

10. All curbs required around the Macy's building per Developer design, subject to Macy's approval.

11. Side parking structure lighting shall be submitted to and approved by Macy's. Approval shall not be unreasonably withheld.

12. Parking stalls to be as approved on the parking plan.

8946-216.251
V0J190/sharfile/S0495/WorkReqs.MOA

## UTILITIES

1. The Developer shall bring water, gas, sanitary sewer, electric conduits, telephone and cable television, and storm drainage piping to a point five feet outside the Macy's building at locations and elevations designated by Macy's. For electrical refer to Item 11 below.

2. One four inch (4") domestic water connection with capacity to supply minimum pressure of 30 PSI under full operating conditions at the top level of the building.

3. Two eight inch (8") sprinkler connections, as required by Macy's insurance underwriters, adequate to maintain 25 PSI residual pressure at the highest sprinklers with a constant flow of 1,500 GMP and in accordance with NFPA requirements, and in each case adequate to meet requirements for superior fire insurance rating for the Macy's building and contents. Connection supply to be from a loop system, and/or two separate sources. Sufficient water pressure and flow shall be provided so that pumps will not be required.

4. Two standpipe connections (if required by regulatory agencies) in accordance with NFPA requirements and local regulations. Sufficient water pressure and flow shall be provided so that pumps will not be required.

5. Water meter vault, if required (meters by Macy's).

6. Gas service and meter vault or pad, if required (meters by Macy's).

7. Three sanitary sewer and four storm drainage connections. An additional storm drainage connection to the receiving dock trench drain and to the perforated pipe at the base of Macy's foundation walls. Macy's truck dock will drain by gravity. Provide required pumps if gravity flow cannot be achieved.

8. Two four inch (4") conduits connecting with the telephone service off the property to a point 5 feet outside the Macy's building. Conduit shall service Macy's directly, and shall not run into, through or under the mall building.

9. One four inch (4") conduit for cable television.

10. Developer shall be responsible for all connection fees for Macy's to tie into water and sewer systems.

11. Electric Power

    a. Developer shall provide full load transformer, service and pad, and also install an additional two (2) empty conduits on primary side of transformer to the service

EXHIBIT "I-1"
Page 3 of 5 Pages

entrance as spares. Wire primary side of each transformer for two (2) separate sources of power, if available. Install sufficiently sized transformers and associated primary wiring and switch gear necessary for a redundant power supply at voltages specified by Macy's. Developer shall contribute to Macy's $75,000 to the cost of the second transformer, primary switch, spare conduits, pads and associated primary wiring. Any costs of the $75,000 will be Macy's obligation. Developer will provide and install all necessary primary conduits, wires, terminals and connections to energize the primary side of both transformers. Macy's will provide and install all necessary secondary conduits, wires and connections to both transformers.

b.   Each service at voltage specified by Macy's to be minimum capacity of 12 watts per square foot of the Macy's building.

c.   Conduits and cables to be run to transformer pad and connected to primary gear. All interconnections of aforementioned equipment to be made by Developer and Macy's accepting service at the secondary side.


MALL CONSTRUCTION

1.   Mall court abutting Macy's building to be a minimum of 60 feet wide and as shown on approved exhibit drawings.

2.   Floor to floor height to be 18 feet.

3.   Any required columns in Macy's court will not obstruct Macy's storefront.

4.   Smoke vents in mall roof if required for superior Macy's insurance rating.

5.   Footings along column line where mall abuts the Macy's store to be constructed in either of the following ways:

a.   Set mall column line abutting Macy's back sufficient distance, e.g., 6 feet to 8 feet to avoid conflict with Macy's footings.

b.   Combined footings to be designed to accommodate Macy's and the mall columns with cost shared by Macy's and Developer.

6.   Install, maintain and guarantee waterproof integrity of expansion joints where mall abuts Macy's at all levels. Developer to be responsible for any damage due to its failure. Macy's will

EXHIBIT "I-1"
Page 4 of 5 Pages

install a keyway in masonry wall abutting the mall.  If Macy's wall
is higher than the mall roof, Developer will provide keyway and
detail of installation.


SCHEDULE OF COMPLETION REQUIREMENTS


1.   Oct. 1, 1990     a.   Building Pad.

2.   Nov. 1, 1990     a.   Temporary Facilities.

3.   Sept. 1, 1991    a.   Storm, sanitary, water, gas conduit,
                           telephone conduit systems for Macy's
                           building and tract.

4.   Nov. 1, 1991     a.   Water and sewer systems active.
                      b.   Permanent electric power for Macy's.

5.   July 1, 1992     a.   Paving of parking lot and interior
                           roads.
                      b.   Curbing.

6.   July 1, 1992     a.   Parking lot striping.
                      b.   Site and parking lot lighting.
                      c.   Off-site access roads and traffic
                           signals.
                      d.   All remaining on- and off-site work.


DRAWINGS - Submittal of:

     All site plans, schematic, preliminary and/or final drawings
required to be submitted for approval in accordance with real
estate and/or operating agreement shall be submitted to:

                      Senior Vice President
                      Planning, Design and Construction
                      Room 1313
                      151 West 34th Street
                      New York, New York 10001

     Preliminary plans and design schemes to be submitted in a
timely order to permit review by Macy's and incorporation of
criticisms in final working drawings.


                         EXHIBIT "I-1"
                      Page 5 of 5 Pages

MALL OF AMERICA
EXHIBIT "I-2"
March 6, 1990

Mall work items to be complete seven days prior to Nordstrom opening:

**A.   Off-Site Work**

-freeway interchanges adjacent to mall

-public streets adjacent to mall

-all traffic control devices, such as signals, signs, paint stripes on public streets adjacent to mall

-all utilities to completely serve the mall and Nordstrom such as electricity, telephone, cable TV, natural gas, water, storm sewer, sanitary sewer

**B.   Site Work**

-all vehicle roads with driveways, service parking areas, maneuvering areas, including such items as paving, curbs, paint striping, signs, traffic control devices

-all pedestrian walkways including such items as paving, paint striping, signs

-all utilities (electricity, telephone, cable TV, natural gas, water, storm sewer, sanitary sewer) for complete service including such items as meters, switches, service rooms, conduits, valves, fire protection signals.

-all common area landscaping including irrigation

-all graphics in addition to the traffic and pedestrian items noted above

-final clean-up and removal of all construction and temporary facilities

-exterior lighting complete and operational

**C.   Mall Building**

-all permits required for opening the mall to the public including temporary or final occupancy permit, vertical transportation permits

-removal of all rubbish and temporary construction offices and trailers

-tenant improvement work confined to within tenant premises or within mall standard barricades to contain noise and dust while assuring pedestrian and vehicle safety to public

-floor, wall, ceiling finishes complete

-all life safety systems complete and operational and approved by the City including any on- and off-site monitoring requirements

-HVAC systems complete and balanced per Lease

-lighting completely operational

Page 1 of 2 Pages

D.   Parking Garages

-all permits issued to allow public occupancy such as occupancy permit, vertical transportation permits

-graphics and paint striping complete

-all lighting, fire and safety alarms and systems operational

-interior painting complete

-final cleaning complete

E.   TENANT'S SCHEDULE AND SPECIFICATIONS FOR UTILITIES

|  | Temporary | Date Required | Permanent |
|---|---|---|---|
| Power (227/480v 3 Phase 4W) | 1,000 amps | 02-01-91 | 6,000 amps |
| Telephone | 20 pairs | 02-01-91 | (2) 4" conduits |
| Cable TV | --- | | 1 1/2" conduit with cable |
| Domestic Water | 2" | 02-01-91 | 4" |
| Sanitary | --- | | (2) 8" |
| Storm | --- | | (3) 12" |
| Gas | --- | | 2,600 MBH with 2PSI pressure |
| Sprinkler | --- | | (2) 8" *** |

*** Developer shall furnish to Nordstrom a sprinkler feed and a fire pump system capable of producing 2300 gpm minimum at 78 psi for the Nordstrom store, or such greater pressure and flow rate as may be required by applicable code requirements.  The fire pump shall be located within the Nordstrom Tenant Tract and shall be owned and operated by Nordstrom.

Page 2 of 2 Pages

091890/SHARFILE/S0495/NordExh.1-2

8946-221.251

## DEVELOPER WORK REQUIREMENTS FOR SEARS

1.00     **SITE DATA AND DEVELOPMENT PLANS** - Developer shall furnish to SEARS two sets of all specifications and prints of each of the drawings and revisions thereof as indicated below as well as all other plans required by other portions of these Technical Specifications. Drawings shall be preferably at a scale of one inch equals fifty feet (1" = 50') and in no case smaller than one inch equals one hundred feet (1" = 100').

1.01     **Topographic Plat of the Center,** shall contain the following information in accordance with these minimum requirements:

a.     The starting benchmark (point of beginning) and other key benchmarks referenced to USGS Datum and/or local municipal datum, with a minimum of one (1) permanent benchmark set adjacent to the center.

b.     Contour lines drawn at two (2) feet intervals. In flat terrain (slopes less than 37) contours shall be drawn at one (1) foot intervals.

c.     Outboundary lines showing monuments, bearings, distances and radii.

d.     The location of pertinent natural physical features such as trees, undergrowth and prominent rock outcroppings.

e.     Existing buildings or obstructions on the property and on neighboring property within 100 feet, area dimensions and appropriate heights shall be noted for line of sight studies.

f.     Rights-of-way and dimensions of all existing and proposed streets and sidewalks within the area of the Center and, unless otherwise specified by SEARS, within the area at least 200 feet beyond each boundary line and to a sufficient distance to show adjacent major streets, highways, ramps, and access roads.

g.     Existing surface and subsurface utilities, including sanitary sewers (show flow lines, size and type of material), storm drains, manholes, catch basins, high voltage transmission towers and/or lines, electric power lines, telephone poles (show pole numbers and indicate transformer cans), telephone lines and street lamp posts.

1.02     **Outboundary Survey of the Center** - (including a complete metes and bounds description of the Center), which shall detail the following information with these minimum requirements:

EXHIBIT "I-3"
Page 1 of 14 Pages

030791/s0495/Exh-I.3

8946-222.251

a.  All angles and bearings shall be to the nearest second and all distances to .01 feet, with minimum error of closure at 1:5000.

b.  One magnetic bearing shall be shown on the survey and if an adopted bearing is used for field work, the adopted line shall be shown.

c.  All boundaries shall be tied to known or record monuments with property corners referenced to offset points if possible. On curved boundary lines, the arc lengths, deltas and radii shall be noted.

d.  All monuments shall be identified as "found", set", or "reset" and described (for example, "iron pipe").

e.  All adjacent streets and major streets, highways, ramps and access roads in the area shall be identified and any private streets shall be so noted. The record width of each street shall be placed adjacent to the street name and any restrictions on access to the Center shall be noted. Restrictions on setbacks required, if any, for building lines of new construction.

f.  All record easements (including utilities) shall be indicated with dimensions, bearings, their purpose, and all restrictions posed by the easement and referenced to the corresponding deed, book and page of recording.

1.03   Soil Boring Plan - Developer shall furnish SEARS with a report of a Soils and Foundation investigation of the SEARS pad area(s). The report shall include boring results from at least seven (7) test borings taken within the SEARS pad areas as located by SEARS or SEARS' Architect. Corrosivity tests shall be a part of the soils engineering report.

Developer shall also test the soil for hazardous wastes, materials and the like, and shall furnish SEARS with a comprehensive analysis of all such substances found. That analysis shall include, but not be limited to, an identification of those substances, as well as their quantity and location on the site.

Developer will also be required to indemnify and hold SEARS harmless from and against any and all claims, losses, expenses and the like arising out of the presence of hazardous substances on the SEARS parcel, either above or below the surface. This will include substances present at the time the soil is tested by the Developer, as well as those which are transported onto the land at a later date, either on or below the surface, by the Developer, those acting at his direction, or

EXHIBIT "I-3"
Page 2 of 14 Pages

030791/s0495/Exh-I.3

8946-223.251

by natural forces such as flowing or seeping water.

1.04   Staging Area and Construction Road Plan - Showing the planned location of the construction road and the designated staging areas, which shall be subject to review and approval by SEARS.

1.05   Temporary Utilities Plan - with reference to location and size and type of material for power, telephone, water, drainage, sediment or retention basins, construction access roads, construction yards and any other like items.

1.06   Permanent Utilities Plan - with reference to location and size and type of material for storm drainage, sanitary sewers, water, natural gas, electric distribution, telephone and cable television.  Indicate outlet invert levels of sewers and catch basins.

1.07   Site Grading Plan - showing existing and new contours drawn at two (2) foot intervals, except in flat terrain (overall slopes less than 3%) contours shall be drawn at one (1) foot intervals. All grading plans shall show initial and new contours referenced to a benchmark or benchmarks.  If contours are overlaid on a reference grid, the initial and final elevation of selected grid corners shall be noted.  All buildings, improvements, roads and highways, including those adjacent to the Center, whether existing or proposed, shall be shown.  The new and initial grades at corners of the building pads and new grades within the limits of the building pad, also curb, gutter, flow line and other pertinent spot elevations, new and/or existing, shall be indicated.

1.08   Paving and Parking Plan - detailing all curbs, retaining walls, berms, striping, parking stall striping (see par. 10.03 this section), signalization, traffic and directional signing, light standards and other parking lot obstructions.  Areas for heavy duty paving and concrete aprons in loading areas shall be indicated.

1.09   Site Lighting Plan - shall show the height and location of light poles, fixtures and type of fixture shieldings as well as all other details of complete lighting arrangement including the wiring of all lights on SEARS Parcel.  Submittal shall include photometric curves, fixture catalog cuts, base details, luminare assembly and other information needed to evaluate the lighting plan, see paragraph 10.04 of this section for requirements.

1.10   Landscaping and Irrigation Plan   - showing the lines and hose bibbs to be installed.

2.00   SEARS CONTRACT LIMIT PLAN - SEARS ARCHITECT shall prepare the "SEARS Contract Limit Plan" which will define the limit of SEARS site responsibility, establish all grades

EXHIBIT "I-3"
Page 3 of 14 Pages

8946-224.251

within that line including each pad and finished floor elevation, locations and elevations as required for all incoming utilities, location of staging area and temporary utilities. The SEARS mall entrance line, outline of SEARS buildings and fenced areas, yard and truck dock drainage locations and the quantity of backfill required. This plan shall become an exhibit to the REA. In the event of inconsistencies, the "SEARS Contract Limit Plan" shall prevail.

3.00    SEARS BUILDING PAD AREA(S) - (by the developer) shall extend to the contract limit line as specified on SEARS Contract Limit Plan. The pad, including that portion of the upper level Truck Court and Outdoor Sales Area which may have slab on grade, shall be graded to eight (8) inches below the finished floor, unless specified differently on SEARS Contract Limit Plan. Pad shall be completed and delivered to SEARS 6 weeks before initiation of construction.

    3.01    ROCK/UNSUITABLE SUB-SOIL - In situations where rock is present on the SEARS building pad, the Landlord/Developer is responsible to remove all rocks within 36" below the level of the pad elevation. If there is unstable or unusual conditions in or surrounding the SEARS building pad the Landlord/Developer shall notify SEARS of that condition and stabilize or rectify the unwanted conditions as necessary.

4.00    GRADING - (by the developer) the subgrades for SEARS pad shall be verified and certified by an independent licensed surveyor and the certification delivered to SEARS. All grading shall be accomplished per approved drawings as indicated in paragraphs 2.00 and 3.00 above and as required by the following:

    4.01    Excavated Material - shall be stockpiled and used for backfill if the Soil's Engineering Report indicates it is suitable. Quantity and location of the stock pile to be as specified by SEARS ARCHITECT. SEARS will backfill against its own buildings and its own retaining walls. Developer must formally qualify suitable soil for backfill usage.

    4.02    Top Soil - excavated during grading of the center and if a Landscape Architect determines it is suitable for use after review of soils analysis shall be stockpiled and made available for use during final landscaping operations. Landscaping around SEARS building inside perimeter sidewalks.

    4.03    Side Slopes - shall be set at such minimum ratios and such precautions shall be taken (for example, sodding and other planting for stabilization) to preserve the integrity of the slopes as the independent soils engineer shall recommend. Excavation for lower level building walls adjacent to upper level parking areas shall be at a 1 to 2 slope, with the toe of slope five (5) feet outside of wall face, unless specified otherwise on SEARS Contract

EXHIBIT "I-3"
Page 4 of 14 Pages

Limit Plan.  Depending on characteristic of soil, a 1 to 1 slope will be acceptable.

4.04    <u>Compaction</u> - Building pad area(s) shall be compacted to not less than ninety-five (95) percent Modified Proctor for cohesion-less soil material and ninety (90) percent Modified Proctor for cohesive soil material in accordance with ASTM-D-1557-70.  All compacted areas shall be verified by an independent professional soils engineer testing laboratory engaged by Developer and a certificate addressed to both the Developer and SEARS indicating compliance with these specifications together with all test data upon which such certification is based shall be furnished to SEARS.  Pad area(s) shall be prepared by Developer to allow for normal earth excavation for all SEARS footings, utility lines, pits, auto lifts, tanks, oil separators, acid neutralizing tanks and other facilities.

4.05    <u>Earth Stabilization and/or Replacement</u> - shall be performed as necessary so that the subsoil at normal footing depth in all building pad area(s) shall have a uniform bearing capacity (dead load plus live load) of 3500 (min) pounds per square foot with a total settlement not to exceed one (1) inch and differential settlements not to exceed three-eights (3/8) inch within twenty-four (24) feet.  If the bearing capacity is less or settlement is greater than herein required and earth stabilization and/or replacement by the Developer is not effective to correct such deficiency, Developer shall compensate SEARS for any increase in building footing and foundation costs over and above conventional spread footings at normal depth. All previous construction shall be removed to normal footing depth or deep enough to insure uniform settlement, whichever is greater.  All utility lines except those required by SEARS shall be removed from the pad area(s).

4.06    <u>Temporary   Sediment   Basins</u>   -   During construction, Developer shall comply with all environmental regulations such as providing temporary sediment basins as needed to prevent silting downstream of the Center.

4.07    <u>Flood Prevention</u> - Site shall be designed to provide an overland flow capacity to prevent flooding of SEARS lower level in the event the site storm sewer systems are overloaded or not functioning.

4.08    <u>Site Landscaping</u> - outside "SEARS Contract Limit".  Developer shall landscape all grade changes.  Finished grades in landscaped areas shall be a maximum slope of two (2) horizontal to one (1) vertical.  Precautions shall be taken to preserve the integrity of all slopes.

EXHIBIT "I-3"
Page 5 of 14 Pages

All landscape drawings shall be forwarded to SEARS and its architect for review before the landscape contract is awarded. Special coordination is required to prevent the trees from obstructing the line of sight of the signage.

Retaining walls, guard rails and berms required at grade changes and receiving areas resulting from site layout are to be Developer's responsibility.

5.00   <u>CONSTRUCTION ROAD AND STAGING AREA</u> (by the developer) – A temporary hard surface, minimum 16 feet wide, construction road connecting to an existing highway adjacent to the Center shall be constructed and maintained in good condition throughout the construction process to provide access to the designated parking and staging areas and to the locations of two (2) of the SEARS exterior walls. These locations should be on opposite sides of the pad and not to the SEARS wall location abutting the Mall. A staging area for workers parking, material storage and contractors' trailers and sheds shall be provided, adjacent to SEARS pad area(s), location as agreed to by SEARS. Staging area shall be at least 28,000 square feet in area, with both the construction road and staging areas constructed with not less than six (6) inch stone bases with a binder course, and completed two (2) weeks before the start of building construction. No relocation of staging area can be required by Developer during the construction period of the SEARS facility. EXCEPTION in final phase of construction, Developer can request moving of construction trailer only to permit any final paving to be accomplished,

6.00   <u>TEMPORARY UTILITIES</u> (by the developer) – Developer shall provide temporary utilities listed below to a location agreeable to SEARS and in accordance with these requirements. SEARS shall pay, or cause its contractors to pay, on the basis of metered use, for the operating costs of the utility services.

6.01   <u>Storm Drainage</u> – Temporary ditches or other means as necessary to divert surface storm water runoff from building pads and staging areas, with temporary drainage facilities shall be maintained by Developer prior to the start of construction by SEARS and until permanent storm sewers have been completed and made operational, Developer to provide temporary storm drainage accessible to SEARS roof leaders.

6.02   <u>Water</u> – As a minimum service, a two (2) inch line at a pressure suitable for use without the need for pumping shall be available to SEARS staging area before the start of construction by SEARS.

6.03   <u>Electricity</u> – Developer shall arrange to have three (3) phase 480v, one and three quarter (1 3/4) watts per square foot of building area, service brought to a pole within the designated staging area(s) as located by SPARS. SEARS contractor will be responsible

EXHIBIT "I-3"
Page 6 of 14 Pages

8946-227.251

for picking up their power from the pole with three phase-four wire and terminating in a weather proof and rain proof fused disconnect switch. Power for trailer hook-up and for construction as stated above shall be available before the start of construction by SEARS.

6.04   <u>Telephone</u> - Developer to provide eight (8) temporary phone lines to SEARS staging area before the start of construction by SEARS.

7.00   <u>TEMPORARY SIGN</u> - Developer shall prepare and erect a temporary sign which shall indicate the names of all Majors in a prominent position

8.00   <u>PERMANENT UTILITIES</u> - All Utility Facilities shall be brought to within five (5) feet of building wall, unless specified differently on SEARS Contract Limit Plan, of each SEARS building by Developer. Said Utility Facilities shall be furnished in accordance with the following requirements and at an elevation and location as specified by SEARS in the Contract Limits Plan:

Developer shall provide all the necessary preliminary coordination with the various utility companies to assure adequate service to the Center. Sanitary Sewer Lines, storm sewer lines and other utility lines, conduits, ducts or systems shall not be constructed or maintained above the ground level of the Center.

8.01   <u>Public Sanitary</u> - sewer service shall be provided at points of entry. Minimum size of pipe shall be 6 inches.

8.02   <u>Storm Sewer</u> - services shall be provided for six (6) to eight (8) points of entry into the SEARS buildings, at least two (2) per each perimeter exposure.

8.03   <u>Storm Sewer and Sanitary Sewer</u> - line inverts shall be sufficiently deep so as to receive all building outflow by gravity including yard drains in any truck dock wells.

8.04   <u>Storm Drainage System and Water Retention Basin</u> - shall be a closed conduit system and shall include lateral connections for building roof drainage, all pertinent inlet and outlet structures, rip-rap and bank protection, with an overall design based on the following:

a.   A minimum regional 25 years storm frequency with a 30 minute time of concentration.

b.   Discharge velocities shall be low enough so as to prevent damage downstream.

*c.   A minimum of 18 inch freeboard shall be maintained between building floor elevation and the water surface resulting from a 100 year frequency storm.

d.   Conduit capacity shall be as to develop

EXHIBIT "I-3"
Page 7 of 14 Pages

8946-228.251

no ponding from a 25 year frequency storm.

e. A hydraulic analysis shall be prepared by a registered civil engineer and shall be submitted to SEARS for review and approval.

f. Water Retention - Should ordinances mandate that SEARS provide rain water retention basins, these water retention basins are to be the sole responsibility and cost of the landlord/developer, including the land area where the retention basin is located.

8.05   Domestic Water - As a minimum, at said point of entry, one service connection from a water line, with a shut-off valve, that shall be a minimum of four (4) inches in diameter.

8.06   Electrical Service - Cables of the sizes and in the quantity deemed necessary for SEARS and the utility company furnishing primary electricity in conduits and ducts and connected to pad mounted transformer or transformer placed in underground vault, in a manner satisfactory to SEARS and said utility company. Separate transformers shall be provided for each Major.

8.07   Cable TV - Cables of the sizes and quantity deemed necessary by SEARS to a point designated, if cable TV is available.

8.08   Telephone - Duct, conduit and manhole structures of the sizes and in the quantity deemed necessary by SEARS and the utility company furnishing the telephone service and terminating at said point of entry. If telephone is fed from mall, it must be underground.

8.09   Natural Gas - Wherever available, the Developer shall cause natural gas line(s) to be installed by the Gas Utility Company. Developer shall provide pipe(s) of adequate size to supply SEARS needs terminated in the SEARS building(s) at a location designated by SEARS.

8.10   Actual Connections With Stubbed Out Utilities - At points of connections will be made by SEARS contractor and permits for these connections obtained by SEARS. Permit fees for building connection will be SEARS responsibility unless fees are contribution to cost of public system improvement or extension thereof to Major's building in which event same will be Developer's responsibility.

8.11   Utilities Shall Be Available At The Time As Stated Below -

EXHIBIT "I-3"
Page 8 of 14 Pages

030791/s0495/Exh-1.3

8946-229.251

a. Sanitary and storm sewers, water, and natural gas shall be available eight (8) months before store opening.

b. Electricity, cable T.V. and telephone shall be available eight (8) months before store opening.

8.12 <u>All Utilities</u> - shall be located so as not to interfere with SEARS future expansion.

9.00 <u>FIRE PROTECTION SYSTEM</u> - All fire protection systems in the Center shall be designated and installed in accordance with the standards of the National Fire Protection Association, Booklet Nos. 13 and -24,. or other nationally recognized standards agreeable to the Majors and also to SEARS and Schirmer Engineering Corp., in addition to any other applicable governmental requirements. All systems shall meet Industrial Risk Insurance, Underwriters requirements for a "highly protected risk classification." Minimum design standards are as follows:

9.01 <u>Water Flow and Fire Loop</u> - At least 1500 GPM at grade level (50 PSIG residual for one-story buildings, 60 PSIG residual for two-story buildings, 65 PSIG residual for three-story buildings; minimum 25 PSIG residual at roof levels in any event) minimum eight (8") inch diameter pipe loop, with sectional valve control and fire hydrants at intervals not in excess of 300 feet, shall be provided.

9.02 <u>Fire Hydrants</u> - in addition to the ones required in paragraph 9.01 above, shall be located opposite each exterior store entrance or as may be required by the local Fire Marshall and Public Health and Safety Offices.

9.03 <u>Underground Water Mains</u> - shall be of a sufficient size to adequately supply both fire protection and domestic demands simultaneously, but in no case they shall be less than ten (10) inches in diameter. All underground vaults and required piping and equipment will be the responsibility of the Developer (Landlord).

9.04 <u>Valved Stub-Outs</u> - The Developer shall provide eight (8) inch diameter pipe loop <u>valved</u> stub-outs, either one or two as determined by SEARS, to within five (5) feet of SEARS building wall at locations and elevations stipulated by SEARS.

9.05 <u>Detector Checks and Water Meter Requirements</u> - shall be established jointly by SEARS and the serving utility company.

10.00 <u>PARKING AREAS</u> (by the developer) Parking spaces as required are to be provided and maintained as indicated by the Parking Module shown on the Site Plan. Open parking lots shall be designed according to the minimum requirements stated herein.

EXHIBIT "I-3"
Page 9 of 14 Pages

10.01    <u>Allowable Slopes in Parking Areas</u> – shall not exceed maximum and 1-1/2% minimum, unless otherwise approved by SEARS. Paving within ten (10) feet of catch basins shall be of uniform slope. Retaining walls or embankments forming a break in grade, shall be approved by SEARS.

10.02    <u>Automobile Parking Stalls</u> – Perpendicular width dimension between center lines or between midpoints parallel lines of adjacent stall stripes shall not be less than nine (9) feet; Minimum width of an aisle plus the depth of parking stalls on each side and measured perpendicular to the aisle shall be as follows:

For 65 degree parking – 54 feet
For 90 degree parking – 60 feet
For 60 degree parking – 55 feet

10.03    <u>Stall Striping</u> – Stalls shall be separated by using parallel lines four (4) inches in width so that the distance between the edges of the inner lines is eight (8) feet and eight (8) inches. Striping shall be one (1) coat of paint, alkyd base synthetic resin, in a color known as "Traffic White". If seal coat is used, it shall be compatible with striping paint compound. Detail of striping shall be shown on paving and parking plan as indicated in Section 1B, Paragraph 1.08. Numbering of parking stall shall be as indicated on SEARS site plan.

10.04    <u>Parking Lot Lighting</u> – (by the developer) minimum design standards are as follows:

a.    Minimum illumination required, as measured 30 inches above the adjacent ground, shall be 0.75 footcandles minimum maintained throughout the entire parking area and one and one-half (1.5) footcandles average maintained to include SEARS Perimeter Sidewalk. One (1) luminaire on poles selected by the parties shall be circuited for security lighting purposes. Approximately 25% of the total luminaires shall be used for this purpose. Types and control of parking lot lights shall be subject to review and approval by SEARS. Drawings as required in Section 1B, Paragraph 1.09 shall indicate all the items required above.

b.    Developers shall recommend the height and location of light poles, fixtures and types of fixture shielding so as to provide maximum lighting at enclosed-mall, SEARS main building and auxiliary building entrances or exits and building inside corners, while minimizing the off-site effect (i.e. glare) on residences and highways. SEARS parking illumination

EXHIBIT "I-3"
Page 10 of 14 Pages

8946-231.251

level will not be lower than other parking areas in the Center.

10.05    Construction Limitations - No building shall-be constructed in the sight line of SEARS building from the shopping center external ring road and main access roads without the prior written consent of SEARS.

10.06    [INTENTIONALLY DELETED]

10.07    Customer Merchandise Pick-un Area - Drive-in service operation which requires approximately 20 parking spaces. Layout location and number to be indicated in the SEARS Contract Limit Plan.

11.00    SITE PAVING, SIDEWALKS, AND CURBS (by the developer) - shall be designated and provided according to the minimum standards stated herein.

11.01    Pavement Design - shall be based on a "Design Period" of twenty (20) years and shall consider such variables as required by local Bearing Ratio of the soil, the anticipated traffic volume and the vehicle mix (i.e., automobiles, single-axle trucks and double-axle trucks). For asphalt paving design guidelines refer to the Asphalt Institute Manual series MS-I and MS-I5, Chapter III. For concrete paving guidelines refer to concrete "Pavement Design for Roads and Streets Carrying all Classes of Traffic" by Portland Cement Association. The surface of parking areas and access roads shall be paved according to design with an asphaltic wearing surface over a suitable base material. All pavement design shall be subject to review and approval by SEARS and shall conform to the recommendations of the soils engineer.

11.02    Paving Classification - In connection with the foregoing, all areas to be paved in the Center are classified as: Heavy duty paving for all ring roads and main driveways, truck loading zones, truck thoroughfares, and access to entrances and exits of Auto Centers. Light duty paving for automobile parking aisles and stalls.

11.03    Curbs - to be provided at entrances, access roads and other areas as required for suitable drainage, shall be six (6) inch curbs with integral 18 inch gutters, however, next to sidewalks and buildings when drainage is not a factor, a straight six (6) inches above the finished paving curbs (without gutter) shall be provided. Parking lot islands and landscape enclosures shall be vertical barrier type curb and all integral type curbs and gutters and verticle barrier type curbs shall be concrete. Asphalt curbs will be permitted at the outer perimeter curb of the Ring Road and with approval of the Major's only. Curbs shall be depressed for handicapped access and customer merchandise pick-up areas.

EXHIBIT "I-3"
Page 11 of 14 Pages

12.00    <u>TRAFFIC SIGNALS</u> (by the developer) - The location of traffic signals shall be determined in coordination with governing agencies and SEARS and be subject to their approval.  For each such approved signal, the Developer shall have a Traffic Signal Design Plan prepared by a licensed engineer, which plan shall be subject to review and approval by SEARS prior to final submission to the appropriate public agencies with whose requirements the plan shall conform.  The plan shall show as a minimum, the geometrics of the entrance/exit, the location of standards, signal heads, controller, power source, detectors and conduit as well as the suggested signal phasing and a wiring diagram, and shall otherwise be in sufficient detail to permit obtaining bids for the installation of the signal.

13.00    <u>TRAFFIC CONTROL SIGNS AND PAVEMENT STRIPING</u> (by the developer) - All traffic control signs such as STOP, YIELD, NO PARKING, ETC., shall be SKOTCHLITE or equivalent reflectorized material, and control signs, pavement striping, and pavement signing shall conform to state standards even if not otherwise applicable. Location of the signs shall be indicated on drawings submitted for all Major's and SEARS approval.

14.00    <u>RETAINING WALLS AND EMBANKMENTS</u> - Where retaining walls and/or embankments are required adjacent to one or more sides of a SEARS building, they shall be constructed as part of site work and at developer's expense.  Retaining walls which are necessary for and part of SEARS depressed dock facilities will be SEARS responsibility only for the retaining wall portion required for the depressed area of dock.  Retaining and other subterranean walls -that are an integral part of the SEARS structure shall also be excluded from the developers responsibility except that developer's independent soils engineer's report shall provide recommendations for design, construction, and treatment of such walls.

14.01    <u>Embankments</u> - At the heal and the toe of the slopes, a curb, or low wall shall be provided for erosion control.  All embankments shall be landscaped.

14.02    <u>Retaining Walls</u> - The type, quality and finished appearance of retaining walls shall be coordinated with nearby building exteriors. Construction of such walls shall follow recommendations contained in the Soils Report prepared by an independent soils engineer.

14.03    <u>Backfill Materials</u> (by the developer) - A sufficient amount for the backfill of retaining walls, including SEARS retaining walls and subterranean structures shall be stockpiled on the site. This material shall be tested and certified by an independent soils engineer as suitable for such a backfill and compaction.

15.00    <u>ENCLOSED HALL</u> - These items, as outlined below, shall apply to any enclosed malls and mall buildings.

15.01    <u>Review of Drawings</u> - SEARS shall have the right to review and approve all interior and exterior plans for any malls, including

EXHIBIT "I-3"
Page 12 of 14 Pages

8946-233.251

without limitation, ornamental structures, landscaping, finishes, lighting, seating arrangement and the courts at each Major's building entrances.

a.   Mall and SEARS Court design and coloration will be submitted to SEARS for review and approval. Design and size of SEARS Court to be equal to courts at other Majors.

b.   Developer to provide and install flashing to reglet in SEARS building at SEARS wall abutting the Mall.

c.   Developer to provide and install expansion joint and coverplate at SEARS mall entrance, and any flooring material required between expansion joint and SEARS mall doors.

d.   Mall roof structure shall not drain onto SEARS roof.

15.02   Expansion Joints - Developer shall install continuous combination seismic/expansion joints through the enclosed malls and mall buildings at the connection with SEARS building, and all plans for all such joints, including structural information, shall be subject to review and approval by SEARS and shall be coordinated by the Project Architect. Developer shall provide flashing at the adjoining parapet wall between SEARS and the mall. Provide seismic design expansion joints only where required by local codes.

15.03   The Temperature in any enclosed mall shall be maintained at 76 degrees dry bulb and 557 relative humidity during the cooling cycle (with outside conditions as indicated in the ASHRAE Handbook 2.57 Design Dry Bulb and Mean Coincident Wet Bulb for this area) and 70 degrees dry bulb during the heating- cycle (with outside conditions as shown in the ASHRAE Handbook for this area).

15.04   Automatic Fire Detection - The heating, ventilating and air conditioning systems for the mall building shall be arranged to create a negative pressure condition with respect to each major building upon automatic detection of fire within the mall's zone.

15.05   Heating, Ventilation and Air Conditioning - Developer and SEARS shall design and maintain their respective heating, ventilating, and air conditioning systems so as to minimize the interchange of air between SEARS building and the enclosed mall during normal operations.

15.06   SEARS Mall Entrances:

a.   SEARS Front at the Mall entrances should not be less than the other majors Mall

EXHIBIT "I-3"
Page 13 of 14 Pages

EXHIBIT "J"

PARKING MANAGEMENT PLAN


MALL OF AMERICA

BLOOMINGTON, MINNESOTA

Fronts and not less than 50 feet wide by 14 feet high.

b.   The minimum distance from SEARS Mall entrances to any obstruction in the Mall court shall be 100 -feet. Interior landscaping and decor should be coordinated with SEARS Architect. SEARS sign visibility should not be blocked from Mall courts.

c.   Entrances to the shopping center courts shall not be located ne>t to the SEARS building.

d.   Within a radius of 150 feet of the SEARS Main Building entrances to the enclosed Mall, the developer will maintain a balanced and diversified grouping of stores selling primarily merchandise approved by SEARS. Theaters, food operation, and Financial Institutions should not be installed within the 200 foot radius from SEARS Mall entrances.

e.   Minimum walking path-fronting SEARS Mall entrance in second floor shall be. not less than 26 feet.

f.   SEARS floor to floor standard height is 18 feet 0 inches. Shopping center court's floor level shall meet SEARS floor levels without the center floor sloping towards the SEARS Building.

16 .00   <u>Contract Limit Line Drawings Check List:</u>   (Cont'd.)

19.   Show finished pad elevations (both levels)   _____

20.   Clearly define locations and cross sections of pad grade changes in plan and section   _____

21.   Show location of TBA (hold parking number spaces 1 to 5 x number of TBA bays)   _____

22.   Show location of sidewalk, truck court and quick service drains   _____

23.   Show locations and utilities for oil interceptor and acid neutralizer.   _____

24.   Indicate berm, retaining walls, and safety guardrails required. Define responsibility in line with R.E.A.   _____

030791/s0495/Exh-I.3

8946-236.251

EXHIBIT "J"

I.    **Introduction**

This Parking Management Plan describes the operation and management of the Parking Structures at Mall of America, pursuant to the REA and in the event of any inconsistency between this Plan and the REA, the REA shall govern. All parking will be located in the Parking Structures and Automobile Parking Area as shown on the Plot Plan. The Plan is solely for the benefit of and is only enforceable by Developer, Macy's California, Inc., Nordstrom, Inc., Sears, Roebuck and Co., and their permitted successors and assignees.

The scope of development at Mall of America will be as follows:

TABLE 1
APPROXIMATE GROSS LEASABLE AREA & PARKING REQUIREMENTS

| Store | Sq. Ft. | Requirement |
|---|---|---|
| Macy's | 280,000 | 4.5/1,000 sq.ft. (1,260 spaces) |
| Nordstrom | 220,000 | 4.5/1,000 sq.ft. (990 spaces) |
| Bloomingdale's | 210,000 | 4.5/1,000 sq.ft. (945 spaces) |
| Sears | 188,000 | 4.5/1,000 sq.ft. (846 spaces) |
| Developer Mall Stores | 1,600,000 | 4.5/1,000 sq.ft. (7,200 spaces) |
| Family Entertain-ment Area | 100,000 | 4.5/1,000 sq.ft. (450 spaces) |
| **Store** | **Sq. Ft.** | **Requirement** |
| Hotels (Future) | 1,000 rooms | .75/room (750 spaces) |
| Total Parking Requirement | | 12,750 |
| Total Available Spaces | | 12,750 |

EXHIBIT "J"
Page 1 of 6 Pages

### TABLE 2
### PARKING DISTRIBUTION

| Parking Areas | Parking Spaces |
|---|---|
| West | 5,897 |
| East | 5,593 |
| North | 436 |
| South | 267 |
| Lower Level | 557 |
| | |
| Total | 12,750 |

II.    **Deck Signage & Graphics**

Deck signage and graphics will be designed to accomplish the following functions:

A.    **Traffic Circulation** - Traffic flow will be two-way and the Parking Structures will utilize express up and down ramps for entry and exit.  There will be multiple points of entry to the site on the first level.  Each will have multiple entry lanes and electronically controlled directional signing that will advise patrons as to available open parking areas. Customers will enter via any of 6 driveways and follow electronic signs to available parking areas in either of the two Parking Structures or surface Automobile Parking Areas. Access to the Parking Structures will be primarily by express ramps with internal circulation via either the express ramps or internal parking ramps.  Electronic Signage will be visible to the customer immediately upon entering the Parking Structures.  The signs will flash information to indicate current parking space availability.

B.    **Color Coded Displays - Parking Structures Only** - To help the customer remember the parking locations, signs designating the Parking Structure, floor level, and the alphabetical designation of the aisle will be displayed throughout the parking area of the Parking Structures.  Each such area will be color coded.  The numbers and letters of each floor will be assigned a different color and the elevator buttons will be color coordinated as to level.  Signs will be posted at each

EXHIBIT "J"
Page 2 of 6 Pages

of the Parking Structure entrances in the elevators reminding parkers of their location before entering the mall.

C. <u>Graphics</u> - Developer will, in consultation with the Majors, implement a graphics program with respect to identification and directional signage within the Parking Structures, and on surface streets and other Automobile Parking Areas.

D. <u>Identification Signs – West Parking Structure Exterior</u> - Macy's and Nordstrom shall have the right to place identification signs for their respective Buildings on the exterior of the west Parking Structure. Sears shall have the right to place identification signs for its Building on the exterior of the east Parking Structure. The Parties shall cooperate in good faith to establish the size and location of such signs.

E. <u>Valet Parking</u> - Developer, Macy's and Nordstrom shall have the right to provide valet parking in the locations therefor on the parking decks as shown on Exhibit "B" in accordance with the terms and provisions of Article XI-E of the REA.

F. <u>Rental Car Business</u> - Sears shall have the right to the exclusive use of up to twenty (20) automobile parking spaces in the east Parking Structure in accordance with the terms and provisions of Article XI-E of the REA.

G. <u>Employee Parking</u> - Developer will establish an educational and enforcement program reasonably satisfactory to the Majors which will promote the use of designated employee parking areas among Occupant employees. Employee parking will be designated as levels P6 and P7 in each of the east and west Parking Structures. South and east lower level parking areas will also be available as employee parking. At peak seasonal parking demands, Developer will endeavor to provide off-site employee parking with a shuttle service.

EXHIBIT "J"
Page 3 of 6 Pages

31991/s0495/srspark.red

8946-239.251

H.   <u>Delivery Traffic</u> - Delivery traffic will be controlled through signage and allowed only in those areas so designated in order to keep them from mingling with shopper traffic. These controls will be enforced by mall security and reviewed on a timely basis by mall manager for any possible adjustments.

I.   <u>Parking Structure Illumination</u> - Lighting for the Automobile Parking Area shall be provided by fixtures with area controls on a seven-day program, sufficient to provide the following lighting intensity during the evening hours when the Enclosed Mall, the Store of a Major, the Family Entertainment Center, or any other Department Store is open for business and for at least forty-five (45) minutes thereafter: an average maintained intensity of two (2) foot candles of lighting in open areas, ten (10) foot candles of lighting at all entrances and exits to the Parking Structures, and five (5) foot candles of lighting within the Parking Structures, or such other minimum foot candle of lighting at any point in the Automobile Parking Area as may be mutually approved by Developer and the Majors or as otherwise set forth in the Parking Management Plan, all measured thirty inches (30") above grade with a uniformity ratio of three to one (3:1) average/minimum. The ceiling and all vertical surfaces of the Parking Structures shall be painted white. The lighting system shall be designed so that it can be illuminated at twenty-five percent (25%) of full intensity, uniformly distributed throughout the Automobile Parking Area, during hours of darkness when maximum intensity lighting is not required pursuant to this Section.

III. <u>Security</u>

Security will be furnished by vehicular patrols, monitored closed-circuit television and a monitored audio system installed at the stairways and elevators. Emergency call boxes will be located at each stair tower on every level of the Parking Structures which

EXHIBIT "J"<br>
Page 4 of 6 Pages

shall be monitored by Mall security. Security monitoring shall be on a twenty-four (24) hour a day basis. The Parking Structures and ground surface Automobile Parking Area will be well lighted during hours of operation.

IV. <u>Maintenance</u>

Developer shall keep, maintain and operate in a good state of repair and operation, in a clean and orderly condition, and reasonably secure and policed in accordance with the standards of first class enclosed mall regional shopping center practice of the geographical area within which the Shopping Center Tract is located, all Automobile Parking Areas as completed, including, but not limited to, the following specific items of maintenance, upkeep and operation:

A. Keeping and maintaining all sidewalks, walkways, stairway, elevators, roadways and parking surfaces on the Shopping Center Tract in a good, safe and clean condition.

B. Removing promptly, to the extent reasonably practicable, snow, ice, surface water and debris. Snow removal on the property will commence when the snow is 2 inches deep and still falling. Developer will monitor local and national weather service forecasts. Snow removal from the Automobile Parking Areas will be done either by placing snow in unused areas of the ground surface Automobile Parking Area or Parking Structures, or removal from the ground surface Automobile Parking Area or Parking Structures, depending on the current and expected weather conditions. Sidewalks and other Common Area pedestrian walk areas will be cleaned by hand and small machine.

C. Keeping all graphics, traffic and directional signs and pavement and striping district and legible.

D. Repairing, replacing and renewing lighting as may be necessary.

E. Caring for and watering of all landscaping and planting areas.

EXHIBIT "J"
Page 5 of 6 Pages

F.   Repainting garages periodically to maintain them in first

class condition.

V.   <u>Charge for Parking</u>

In no event shall a charge be made for parking without the

prior approval of the Majors.

VI.   <u>Capitalized Terms</u>

All capitalized terms herein shall have the meaning as set

forth in the Amended and Restated Reciprocal Easement and Operating

Agreement dated as of ___May 30_____, 19 _91_, by and among

Nordstrom, Inc., Macy's California, Inc., Sears, Roebuck and Co.

and Mall of America Company.

EXHIBIT "J"
Page 6 of 6 Pages

31991/s0495/srspark.red

8946-242.251

## SIGN CRITERIA

**A.** **General Requirements for Developer Mall Store Tenants.**

1. No sign shall be erected, maintained or permitted to be maintained on the Shopping Center Site, or within the Enclosed Mall or on the exterior surface of the buildings or any improvements within the Shopping Center except in conformity with the criteria contained in this exhibit.

2. Three (3) complete sets of sign drawings must be submitted to Developer for written approval before fabrication. Sign drawings must include the following:

   a. Elevation view of storefront showing sign (drawn to accurate scale) with dimensions of height of letters and length of sign.

   b. Color sample of sign panel.

   c. Color sample of sign letters (unless they are to be white).

   d. Cross section view through sign letter and sign panel showing location of sign relative to the storefront line and showing the dimensioned projection of the face of the letter from the face of the sign panel.

   Developer shall not be responsible for the cost of refabrication of signs fabricated, ordered or constructed, that do not conform to the sign criteria.

3. Tenants will be encouraged to design creative and innovative signs that are architecturally and aesthetically harmonious with the design of the Mall. All signs shall be subject to Developer's written approval before fabrication.

4. There shall be no flashing, rotating or moving signs or markers of any type. There shall be no roof-top signs or television antennas on the roof except that the Developer may install a master antenna and satellite dish for use by the Occupants of the Shopping Center. The antennas and satellite dishes will be screened or set back so as to be out of the view of grade level pedestrian and vehicular traffic within the Shopping Center Tract.

5. No banner, posters or other advertising materials shall be affixed to any exterior walls on the Enclosed Mall and Parking Structures or on any exterior door, window or display window.

6. Occupants with an entrance at the exterior of the Enclosed Mall may have an entrance and one (1) sign in the areas labeled "Permissible Sign and Entrance Areas" on Exhibit "B". However, in no event will there be more than one (1) entry and/or sign in each of these designated areas. Provided however, that Macy's shall have the right of approval with respect to exterior entrances and signs within the Permissible Sign and Entrance Area immediately north of the Macy's Building. Nordstrom shall have the right of approval with respect to exterior entrances and signs within the Permissible Sign and Entrance Area immediately south of the Nordstrom Building. Occupants of Mall Level 4 may have one (1) sign in the areas labeled "Permissible Sign Area" on Exhibit "B".

7. Painted or printed signs on the exterior surface of any building shall be prohibited.

EXHIBIT "K"
Page 1 of 5 Pages

8.  Except as provided in paragraph A.7, D.2 or D.3 hereof, only traffic control signs, general directory signs, signs identifying customer entrances, signs identifying Majors and Department Stores, parking signs, and signs of a directional nature will be permitted in exterior Common Area.

9.  All signs must conform with pertinent Federal and State laws, codes and regulations, and all municipal ordinances or regulations in effect at the time the work is to be installed and all electrical parts and materials shall be in accordance with the requirements of the Underwriters Laboratory, Inc., and shall be so labeled.

B.  <u>Exterior Signs for Developer, Developer Mall Store Tenants and Other Occupants.</u>

1.  No sign shall be permitted on the exterior walls of the Shopping Center unless such signs are located within the Permissible Sign Areas or Permissible Sign and Entrance Areas as shown on Exhibit B or as provided in Paragraph A.6 or Paragraph A.8 hereof.  Any signs within the Permissible Sign Areas or Permissible Sign and Entrance Areas shall conform to the following criteria.

    a.  Wording on exterior signs shall be limited to store or trade name only.  Each tenant's customary signature or logo, hallmark, insignia or other trade identification will be respected.

    b.  The size of Developer Mall Store tenant's exterior signs which are permitted pursuant to paragraph A.6 shall be limited.  Such tenant's exterior storefront shall be no greater then thirty feet (30') in length. Tenant's exterior sign shall be centered over the exterior entrance and shall be limited in length to seventy percent (70%) of the storefront or twenty-one feet (21').  Each exterior sign's height shall not exceed the following sizes:  (i) on the exterior walls of the Shopping Center Building facing north, thirty-six inches (36") capitals and twenty-four inches (24") body and shall not project more than twelve inches (12") beyond the storefront; and (ii) on the exterior walls of the Shopping Center Building facing west and east, twenty-four inches (24") capitals and eighteen inches (18") body and shall not project more than twelve inches (12") beyond the storefront.

    c.  All Exterior Tenant Signage shall be constructed as individual internally illuminated letters or logo/trademark components.

    d.  All signs shall provide an evenly distributed lighted surface equal in intensity.  All areas of lighted letters shall be of equal intensity and shall be the same as all other letters in each sign.

C.  <u>Internal Signs for Developer Mall Store Tenants and Other Occupants.</u>

1.  Wording on Mall Store Tenants' signs shall be limited to store or trade name only.  Each party's customary signature or logo, hallmark, insignia, or other trade identification will be respected.

2.  The size of any Developer Mall Store tenant's signs shall be limited.  The scale and concept of the Enclosed Mall requires the use of signs which are not larger than

necessary to be legible from within the mall. Thus, an Occupant's primary sign shall be located within the limits of its storefront and shall not project more than six inches (6") beyond the storefront and shall conform to the following proportionate height criteria:

a.   30' storefront:          18" capitals    12" body

b.   30' to 60' storefront:   24" capital     18" body

c.   60' and over storefront: 30" capital     24" body

In addition to complying with the above criteria, signs in the Enclosed Mall shall be limited in length to 70% of the Occupant's frontage on the mall, and shall in no case exceed a length of 30 feet (30').

Secondary blade signs may be installed at right angles to the Mall storefront(s) provided that they are adjacent to the Occupant's premises and otherwise conform to the provisions of these regulations and criteria. Said signs may not exceed twelve (12) square feet in area and may not be closer than eight feet (8') to the finished floor line.

3.   Painted or printed signs on the exterior surface of any storefront shall be prohibited, except small-scale signs relative to store names and stating store hours which are neatly lettered on the glass of the storefront but subject to Developer's approval and in addition, any non-customer door for receiving merchandise may have in 2-inch block letters, the name of the Occupant.

4.   Public safety decals or artwork on glass in minimum sizes to comply with applicable Code, subject to the approval of Developer, may be used, as required by building codes or other governmental regulations.

5.   Paper signs and stickers are prohibited.

6.   No exposed raceways, ballast boxes or electrical transformers will be permitted except as required by Code.

7.   Sign company names or stamps shall be concealed (Code permitting).

8.   Except as otherwise approved in writing by Developer and by a Major with respect to stores within 150 feet (150') of the entrance of such Major's Building, only one (1) primary sign and one (1) secondary blade sign for an Occupant's location will be permitted within the Enclosed Mall areas; provided, however, that if an Occupant has (a) more than sixty feet (60') of storefront and (b) more than one (1) entrance, such Occupant will be permitted one (1) primary sign and one (1) secondary blade sign for each of its entrances. Corner Occupants may have one (1) primary sign and one (1) secondary blade sign on each side of the corner Occupant's location fronting the Mall.

9.   Signs and identifying marks shall be placed entirely within the boundaries of an Occupant's premises except blade signs as specified in Paragraph C.2 above with no part higher than thirteen feet (13') above the finished floor line, nor shall any projecting sign be located closer than eight feet (8') to the finished floor line, and in no event shall such a sign extend above the wall of parapet upon which it is mounted.

10.  Exposed sign illumination or illuminated sign cabinets or modules are not permitted.

EXHIBIT "K"
Page 3 of 5 Pages

8946-245.251
103090/S0495/REASign.Cln

11. Sign letters may be back-lighted with lamps or tubes entirely concealed within the depth of the letter or may be opaque or translucent plastic face with no visible openings. Maximum brightness allowed for interior (Enclosed Mall) signs will be 100 foot lamberts taken at the letter face and must comply with all building and electrical codes.

12. Except for neon signs on shops of nationally or regionally recognized retail chain stores which typically use neon signs for their mall store signs, exposed neon signs on any Developer Mall Store within one hundred fifty feet (150') of the entrance to the store of a Major are subject to such Major's prior written approval, in accordance with the terms of the REA.

13. Signs of the flashing, blinking, rotating, moving or animated types or audible type signs shall not be permitted.

D.   Majors and Family Entertainment Center.

1. The provisions of this Exhibit K, except as otherwise expressly provided below, shall not be applicable to the identification signs of the Majors and the Family Entertainment Center, it being understood and agreed that the Majors may have their usual identification signs on their buildings, as the same exist on similar buildings; provided, however, there shall be no signs which are flashing, moving or audible, and provided further that such signs must conform with municipal ordinances and regulations in effect at the time the sign is installed.

2. Department Stores and the Family Entertainment Center may install identification signage within the Parking Structures at the bridges to their respective Stores upon obtaining Developer's written consent, which approval shall not be unreasonably withheld. All Department Stores shall be treated equally with respect to identification and directional signage placed in the Parking Structures. Each Major shall have the right to approve the graphics and identification and directional signage in the Parking Structure adjacent to such Major's Building, which approval shall not be unreasonably withheld.

3. Each Major shall have the right to place identification signs for such Major's Building on the exterior of the Parking Structure adjacent to such Major. Developer and the Majors shall cooperate in good faith to establish the size and location of such signs.

4. There shall be no free-standing roof-top signs; however, signs affixed to the sides of mechanical enclosures, penthouses and other building elements shall not be considered free-standing roof signs and shall be permitted if no portions of such signs extend beyond the top and/or sides of such mechanical enclosures.

E.   Signs in Common Areas Other Than on Building.

1. Only traffic control signs, general directory signs and signs identifying the Mall are permitted.

2. No signs will be permitted in the Exterior Common Area around any Buildings except as permitted pursuant to paragraph D hereof or paragraph A.7 or A.8 hereof, and except parking signs, and signs of a directional nature.

EXHIBIT "K"
Page 4 of 5 Pages

3.   Except as provided in paragraph D.2 or D.3 hereof, no signs will be permitted in the Parking Structures.

4.   Developer shall have the right to erect and maintain a reasonable number (not more than six) of pylon-type and/or building mounted signs on the Shopping Center Site, all of which shall bear the name and/or logo of the Shopping Center, the location, size and design of which shall be subject to the prior approval of the Majors, which approval shall not be unreasonably withheld. Developer also shall have the right to erect and maintain two (2) more free-standing theatre pylon signs or attraction boards at the locations to be determined by Developer, the location and design of which shall be subject to the prior approval of the Majors, which approval shall not be unreasonably withheld.

EXHIBIT "K"
Page 5 of 5 Pages

EXHIBIT "L"

Nationally Recognized Shopping Center Developers

The Edward J. DeBartolo Corp.
Youngstown, Ohio

General Growth/Center Companies
Des Moines, Iowa

JMB/Urban Development Co.
Chicago, Illinois

The Rouse Company
Columbia, Maryland

Jacobs, Visconsi & Jacobs Co.
Cleveland, Ohio

The Hahn Company
San Diego

The Taubman Company Inc.
Bloomfield Hills, Michigan

Corporate Property Investors
New York, New York

Homart Development Co.
Chicago, Illinois

The MaceRich Company
Santa Monica, California

May Centers, Inc.
St. Louis, Missouri

The Pyramid Companies
Syracuse, New York

Forest City Commercial Mgmt., Inc.
Cleveland, Ohio

Wilmorite Inc.
Rochester, New York

8946-248.251

### EXHIBIT M

#### CATEGORIES OF OCCUPANTS
#### FOR MACY'S AND NORDSTROM

1. Men's Apparel and Accessories
2. Women's Apparel and Accessories
3. Family Apparel and Accessories
4. Jewelry
5. Unisex Apparel
6. Children's Apparel
7. Hosiery
8. Maternity
9. Shoes
10. Gifts
11. Stationery
12. Bath Accessories
13. Ties
14. Cosmetics
15. Handbags and Luggage
16. Books
17. Cards/Paper Goods
18. Kitchen Boutique
19. Lingerie
20. Candy
21. Sit-down Restaurant (excluding fast food restaurants)
22. Specialty Foods (excluding fast food restaurants)
23. Electronics
24. Fashion Optical

8946-249.251

EXHIBIT M-1

CATEGORIES OF OCCUPANTS
FOR SEARS

1. ready to wear
2. shoe and/or athletic footwear
3. selling and serving restaurant meals for on-premises consumption
4. book store, magazines and newspapers
5. nutrition and health food store
6. children's apparel store
7. fashion accessories sales
8. fashion apparel sales
9. jewelry sales
10. toy sales
11. tobacco sales
12. optical goods sales
13. fabric sales & sewing supplies
14. financial institution (bank or savings & loan)
15. child care facility, children's recreation facility (other than game room), and/or baby-sitting service, provided no such service shall generate such noise as to constitute a nuisance
15. telephone store
17. restaurant - selling of prepared food for on- and off-premises consumption
18. community room
19. arts and crafts or hobby store
20. gift shop, cards & party goods
21. engraving/key shop
22. luggage shop
23. graphics or art gallery
24. cutlery
25. furniture & home furnishings
26. video equipment store
27. audio/stereo store
28. music, record & tape shop
29. piano & organ shop
30. candy or snack food shop
31. bakery selling breads, cakes, cookies & pastries
32. camera shop or photography studio
33. cosmetics, perfume & skincare shop
34. custom shirt shop
35. custom tailor
36. curtains and draperies
37. apothecary/drug store
38. oriental/fine carpet shop
39. florist
40. furrier
41. table top/linen shop
42. cheese & gourmet food shop
43. maternity shop
44. millinery shop
45. optometrist
46. market research office
47. stamp & coin
48. shoe repair
49. sporting goods
50. travel agent

Exhibit M-1
Page 1 of 2

8946-250.251

51.  variety store
52.  watch shop, including repair
53.  hosiery
54.  uniforms
55.  lingerie
56.  handbags
57.  formal wear (sale or rental)
58.  interior decorator
59.  leather goods
60.  fireplace shop
61.  kitchen boutique
62.  bath boutique
63.  riding apparel
64.  stuffed animals
65.  candle shop
66.  needlepoint & knitting
67.  imported gift shop
68.  medical/dental services
69.  bridal shop
70.  junior department store
71.  appliances
72.  china and glassware
73.  any combination of the foregoing uses