**DLA Piper LLP (US)**
Richard A. Chesley
R. Craig Martin
Rachel Ehrlich Albanese
Alana M. Friedberg
1251 Avenue of the Americas, 27th Floor
New York, NY 10020-1104
Phone: (212) 335-4500
Fax: (212) 335-4501

*Attorneys for Transform Holdco LLC*

**Hearing Date and Time:**
**July 11, 2019 at 10:00 A.M.**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x

In re:                                              :        **Chapter 11**
                                                    :
**SEARS HOLDINGS CORPORATION**, *et al.*,[1]        :        **Case No. 18-23538 (RDD)**
                                                    :
                            **Debtors.**            :        **(Jointly Administered)**
                                                    :
---------------------------------------------------------------- x

**TRANSFORM HOLDCO LLC'S REPLY TO MOAC MALL HOLDINGS LLC'S (I) OBJECTION TO SUPPLEMENTAL NOTICE OF CURE COSTS AND POTENTIAL ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH GLOBAL SALE TRANSACTION; (II) SECOND SUPPLEMENTAL AND AMENDED: (A) OBJECTIONS TO DEBTOR'S NOTICE OF ASSUMPTION AND ASSIGNMENT OF ADDITIONAL DESIGNATABLE LEASES, AND (B) OBJECTION TO DEBTOR'S STATED CURE AMOUNT; AND (III) THIRD SUPPLEMENTAL AND AMENDED OBJECTIONS TO DEBTOR'S NOTICE OF ASSUMPTION AND ASSIGNMENT OF ADDITIONAL DESIGNATABLE LEASES**

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); u Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

# Table of Contents

**Page**

PRELIMINARY STATEMENT ................................................................................................2

FACTUAL BACKGROUND .................................................................................................6

   A.     The Mall of America..................................................................................................6

   B.     The Lease, REA, and Option Agreement .......................................................8

ARGUMENT IN REPLY ........................................................................................................12

   A.     Applicable Legal Standards .................................................................................12

   B.     Section 365(b)(3)(A) Does Not Prohibit Assignment Of The Lease............................15

   C.     The Debtors And Transform Leaseco Have Proven Adequate Assurance Of
          Compliance With The Lease.....................................................................................18

   D.     An Assignment To Transform Leaseco Does Not Affect Tenant Mix At The Mall, And
          Thus, Section 365(b)(3)(D) Of The Bankruptcy Code Does Not Prohibit Assignment
          Of The Lease.............................................................................................................20

CONCLUSION........................................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Ames Dep't Stores, Inc.*,
121 B.R. 160 (Bankr. S.D.N.Y. 1990) ........................................................................22

*In re Ames Dep't Stores, Inc.*,
127 B.R. 744 (Bankr. S.D.N.Y. 1991) ..................................................................20, 23

*In re Ames Dep't Stores, Inc.*,
348 B.R. 91 (Bankr. S.D.N.Y. 2006) ........................................................................17

*Androse Assocs. of Allaire, LLC v. The Great Atl. & Pac. Tea Co., Inc (In re Great Atl. & Pac. Tea Co., Inc.)*,
472 B.R. 666 (S.D.N.Y. 2012) ..................................................................................23

*In re New York Chocolate & Confections Co.*,
No. 10-30963-MCR, 2010 WL 4739714 (Bankr. N.D.N.Y. July 15, 2010) ....................19, 21

*Ramco-Gershenson Props., L.P. v. Serv. Merch. Co.*,
293 B.R. 169 (M.D. Tenn. 2003) ........................................................................15, 21

*In re Rickel Home Centers, Inc.*,
240 B.R. 826 (Bankr. D. Del. 1998) ..............................................................5, 13, 21, 22

*In re The Great Atlantic & Pacific Tea Co., Inc.*,
No. 10-24549 (RDD), 2011 WL 6014585 (Bankr. S.D.N.Y. Oct. 11, 2011) ................... 18-19

**Statutes**

11 U.S.C. § 365(b) ........................................................................................12, 16

11 U.S.C. § 365(b)(1)(B) ....................................................................................19

11 U.S.C. § 365(b)(3) ..........................................................................4, 13, 14, 20, 25

11 U.S.C. § 365(b)(3)(A) ....................................................................4, 14, 15, 16, 17

11 U.S.C. § 365(b)(3)(C) ..................................................................................4, 14

11 U.S.C. § 365(b)(3)(D) ..............................................................................14, 20, 23, 24

11 U.S.C. § 365(f) ......................................................................................12, 13, 19, 21

11 U.S.C. § 365(f)(1) ......................................................................................12, 13, 19

11 U.S.C. § 365(f)(2) ................................................................................................................13

11 U.S.C. § 365(f)(3) ..........................................................................................................13, 19

**Other Authorities**

S. Rep. No. 98-70 (1983) .......................................................................................................... 16

Schmitt, *The Bankruptcy Code Requirement of Compliance with Lease*
   *Obligations - Does "'All'" Mean Everything?*, 10 N. Ill. U. L. Rev. 225, 257
   n.13 (1990) ...........................................................................................................................16

**Exhibits**

Ex. A, Mall of America: By the Numbers. ...............................................................................6, 7

Ex. B, Spring 2017 Map + Directory. ........................................................................................7

Ex. C, Relevant Portions of the Lease, REA, and Option Agreement. ...........................................8

Ex. D, *CPI Inflation Calculator, Bureau of Lab. Stats.*,
   https://www.bls.gov/data/inflation_calculator.htm ...............................................................18

Transform Holdco, LLC ("**Buyer**"), for itself and on behalf of its affiliate Transform Leaseco LLC ("**Transform Leaseco**"), as buyer of substantially all of the Debtors' assets under the *Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith and (IV) Granting Related Relief*, dated Feb. 8, 2019 (ECF No. 2507; "**Sale Order**"), submits this reply ("**Reply**") to *MOAC Mall Holdings LLC's (I) Objection to Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* (ECF No. 2199; "**Initial Objection**"); *(II) Second Supplemental and Amended: (A) Objections to Debtor's Notice of Assumption and Assignment of Additional Designatable Leases, and (B) Objection to Debtor's Stated Cure Amount* (ECF No. 3501; "**Supplemental Objection**"); *and (III) Third Supplemental and Amended Objections to Debtor's Notice of Assumption and Assignment of Additional Designatable Leases* (ECF No. 3926; "**Amended Objection**" and, together with the Initial Objection and Supplemental Objection, the "**Objections**"), which were filed by MOAC Mall Holdings LLC ("**MOAC**"). MOAC filed the Objections to oppose the *Notice of Assumption and Assignment of Additional Designatable Leases* (ECF No. 3298; "**Designation Notice**"). Buyer respectfully submits that the Court should deny the Objections for the reasons set forth in this Reply, which supplements *Transform Holdco LLC's Omnibus Reply in Support of Assumption and Assignment of Designated Leases* (ECF No. 3654; "**Omnibus Reply**"), and the accompanying declaration of Michael Jerbich (the "**Declaration**") of A&G Realty Partners.[2]

---

[2]    Transform Holdco contemporaneously has submitted a motion to seal the Declaration, and as such, it is not attached as an exhibit to this Reply.

## PRELIMINARY STATEMENT

Transform Leaseco is the assignee for a lease (as amended or modified, the "**Lease**") identified on the Designation Notice as Store # 1722 at 2000 N.E. Court, Bloomington, Minnesota in the Mall of America ("**Mall**").[3]  The Lease is between Sears, Roebuck and Co. ("**Sears**"), as tenant, and MOAC, as landlord, and is dated May 30, 1991.  In the Designation Notice, the Debtors identified over 660 leases that they would be assigning to Buyer or one of its affiliated entities, including the Lease.  (Designation Notice at Ex. 1.)

During these chapter 11 cases, the Debtors filed a total of seven notices setting out agreements for potential assumption and assignment and stating proposed cure costs.  As is typical of cases of this size and nature, those notices led to a number of objections, including two initial objections from MOAC.  The Initial Objection mostly focused on the proposed cure and asserted that the Debtors' proposal was deficient.  MOAC's Supplemental Objection focused on Buyer's alleged failure to provide adequate assurance of future performance, contending that any assignment must be subject to restrictive covenants in the Lease, but not identifying any such covenants that Buyer sought to eliminate.  Specifically, MOAC contended that the Lease contained provisions applicable to "construction and operation of the premises, the uses to which the premises can be put, numerous and applicable REAs, and other restrictive covenants" related to signage, modification, restoration, and repair of the premises.  (Suppl. Obj. at ¶ D(2).)  MOAC

---

[3]      The documents that complement the Lease are that certain:  (1) Agreement to Grant Option to Lease dated May 30, 1991 by and between Sears, Roebuck and Co. and Minntertainment Company ("**Option Agreement**"); (2) Amended and Restated Reciprocal Easement and Operating Agreement, Mall of America, Bloomington, Minnesota dated May 30, 1991 by and among Sears, Roebuck and Co., Mall of America Company, Nordstrom, Inc., and Macy's California, Inc. as amended by (a) First Amendment to Amended and Restated Reciprocal Easement and Operating Agreement dated December 16, 2010 by and among Sears, Roebuck and Co., MOAC Mall Holdings LLC, Nordstrom, Inc., and Macy's Retail Holdings, Inc.; and (b) Second Amendment to Amended and Restated Reciprocal Easement and Operating Agreement dated December 31, 2013 by and among Sears, Roebuck and Co., MOAC Mall Holdings LLC, Nordstrom, Inc., and Macy's Retail Holdings, Inc. (as amended and/or modified, the "**REA**"); (3) Supplemental Agreement dated May 30, 1991 by and between Sears, Roebuck and Co. and Mall of America Company; and (4) Second Supplemental Agreement dated October 22, 2013 by and between Sears, Roebuck and Co. and MOAC Mall Holdings LLC.

argued from this that the Debtors could only assign the Lease subject to its terms and that it could not be "rewritten." (*Id.*)  MOAC also lumped the "rights of first refusal" with the "shopping center lease" provisions of the Bankruptcy Code, arguing that like payment of rent, utilities, and insurance, any "rights of first refusal" must "be honored as a condition to the assumption and assignment of any lease," including the Lease. (*Id.* at ¶ B(3).)

Buyer's Omnibus Reply adequately addressed MOAC's Initial Objection and Supplemental Objection.  Specifically, Buyer stated that it had provided instructions for obtaining its adequate assurance package and then referenced the extensive proof of adequate assurance of financial and operating performance in the Omnibus Reply. (Omnibus Reply, Annex 1 at 13.)  Buyer further stated that it would pay the undisputed cure amounts and escrow any disputed amounts pending consensual resolution or a Court order. (*Id.*)  Finally, Buyer noted that it has agreed not to seek relief with respect to any restrictive covenants related to the Lease and that the option was an unlawful restraint on alienation that was insufficient to justify denial of the designation of the Lease to Buyer for assignment. (*Id.* at 13-14.)

Ten days after the Omnibus Reply was filed, MOAC filed the Amended Objection, in which it effectively asserted three arguments against assumption and assignment of the Lease.  First*,* MOAC contended that the Debtors and Buyer failed to provide evidence of adequate assurance that Buyer's financial condition and operating performance was similar to Sears' in May 1991, which was when the Lease began. (Am. Obj. ¶ 20.)  However, as demonstrated in the Omnibus Reply, substantial and compelling financial evidence has, in fact, been provided to all of the landlords, including MOAC, that confirms adequate assurance of future performance. (Omnibus Reply, Annex 1 at 13-14.)  Second, MOAC went through, in exacting detail, the potential differences between Transform Leaseco and the way Sears existed in 1991.  However,

this argument overlooks the plain language of the statute, which provides that the financial condition and operating performance only be "similar," not identical.  11 U.S.C. § 365(b)(3)(A). Moreover, what MOAC chooses to ignore is that legislative history and case law developed under section 365(b)(3) of the Bankruptcy Code clarify that this provision was intended to protect owners of shopping centers from the risk of a replacement tenant with inadequate financial resources.   As described below, Transform Leaseco has taken steps to ensure that MOAC *likely has no financial risk during the entire remaining term of the Lease.*   For all of these reasons,  MOAC's argument fails.

Next, MOAC claims that the Debtors and Buyer have failed to prove adequate assurance of lease compliance under section 365(b)(3)(C).  (Am. Obj. ¶ 25.)  While initially conceding that the Bankruptcy Code "permits some suspension of some lease requirements which might otherwise prevent assignment," MOAC then argues that "a lease must be assumed in its entirety," and that therefore Debtor and Buyer must prove that the assignee will comply with all Lease provisions.  (*Id*. ¶ 26.)  As made clear, Transform Leaseco has confirmed that it and any future assignee will honor the restrictions imposed by the Lease.  Not to be deterred, MOAC contends that under the Lease and Option Agreement, the Debtors were obligated to give one year's notice prior to shutting down operations on the third floor of the Mall, and that the space, which was closed post-petition, went dark without any notice being given.  (*Id. ¶* 27.)   Based upon this logic, MOAC claims that no assignment is possible.  (*See id.*)  MOAC then spins this into a provision that relates to the "tenant mix" provisions of the Bankruptcy Code by relying upon a decision that prohibited a shutdown under the specific provisions of the lease documentation.  (*Id*. ¶ 30 (citing *In re Rickel Home Centers, Inc*., 240 B.R. 826 (Bankr. D. Del. 1998)).   Of course here the situation is far different, as the Lease not only permitted Sears to go

dark, but it granted an option to MOAC to sub-lease the property back from Sears if it provided

intent to shut down a specific portion of the leased space.  Thus, even a cursory review of the

*Rickel* case supports the assignment of the Lease.

MOAC finally contends that Transform Leaseco will "not operate a store in the space,"

and thus will not have a "vested interest in the mall's tenant mix."  (*Id*. ¶ 31.)  It is here that

MOAC reveals the real purpose underlying its repeated and extensive objections to the

assumption and assignment of the Lease:  In fact, MOAC acknowledges that the terms under the

Lease, not one of which it cites to, are "extremely favorable" to Sears.  (*Id*. ¶ 32.)  In the end,

MOAC wants to prohibit assignment so *it* can capture the economic value of a replacement

tenant rather than permit Buyer to obtain the benefit of its bargain with the Debtors by allowing

Buyer to designate the Lease to Transform Leaseco who will sub-lease the space to new tenants,

who will assume the obligations under the Lease.

MOAC's argument that the Option Agreement somehow creates a  tenant mix issue that

requires adequate assurance of future performance is simply wrong.  To the extent this provision,

as MOAC contends, attempts to restrain alienation, it is void under the Bankruptcy Code, and

cannot prohibit this Court's approval of the Debtors' assignment of the Lease to Transform

Leaseco.  But, *Transform Leaseco does not intend to strip the Lease of the Option Agreement*;[4] it

merely needs time to find a replacement tenant to occupy the space under the Lease and the

Option Agreement will remain in place.  In short, Transform Leaseco is prepared to address all

issues regarding tenancy of the Mall with suitable tenants who will not only comply with all

Lease provisions, but also with the REA.  Unfortunately, to date, Transform Leaseco has been

---

[4]    It is questionable whether the buy-out provision of the Lease has even been triggered.  MOAC complains
that it has not received notice from Sears of its intent to stop operating the third floor of its store at the Mall;
however, the non-use of that space occurred post-petition.  As assignee, Transform Leaseco intends to lease the
property to a tenant who will operate in the third-floor space so the one-year notice is not required.

unable to complete these efforts due to uncertainty of these matters before the Court and MOAC's continued efforts to chill the ability of Transform Leaseco to find suitable tenants for the Sears location.

In support of this Reply, Transform Leaseco has provided the Declaration of Michael Jerbich, a principal of A&G Realty Partners, the Debtors' real estate consultant and advisor who has been retained to identify suitable tenants to occupy the Sears location. While the Declaration has been submitted under seal, in general terms, it demonstrates that the cure issues and the financial and operational issues raised by MOAC have all been satisfactorily addressed, as they were in the Omnibus Reply. The Declaration also demonstrates that, contrary to MOAC's contentions, Transform Leaseco and any tenant will fully comply with the Lease provisions that are protected under the "shopping center" provisions of the Bankruptcy Code.

For the reasons set forth in the Omnibus Reply and this Reply, the Court should deny MOAC's Objections to the assignment of the Lease to Transform Leaseco.

## **FACTUAL BACKGROUND**

### A.    **The Mall of America**

1.    The Mall is certainly not the type of shopping center that Congress envisioned in the 1970s when it debated and then enacted the Bankruptcy Code in 1978. According to the Mall's 2016 fact sheet, it has numerous tourist-based attractions, such as the Nickelodeon Universe, which is an amusement park located on seven full acres and consists of a roller coaster, a zip line that is over 55 feet tall and 405 feet long, and other rides and attractions. (*See* Ex. A, Mall of America: By the Numbers at 2.) The Mall also has an aquarium and a Crayola Experience, the latter of which is a "larger than an NFL football field" with 25 hands-on attractions and an average length of stay of three and one-half hours. (*Id.*) In addition, the Mall has Flyover America, which "is the longest ride of its kind in the world at approximately ten

minutes long." (*Id.*)  The Mall has also hosted over 8,700 weddings.  (*Id.* at 1.)  According to the Mall's Spring 2017 Map and Brochure, in addition to all of the amusement parks and tourist attractions, the Mall has two hotels, over 50 restaurants, a gaming and entertainment center called Smaaash billed as "American's Adrenaline Arena," a flight simulation ride, an Amazing Mirror Maze consisting of 2,500 square feet of "endless hallways," an 18-hole miniature golf course, and a comedy club.  (*See* Ex. B, Spring 2017 Map + Directory at 4, 5, 6, 14, 15.)  Among the attractions listed as opening soon were a CMX theater with 14 screens, gourmet dining, "an upscale and relaxing experience with high-end décor, oversized reclining seats, gourmet dining options," wine and cocktails; and the Escape Game with unique theme games.  (*Id.* at 12.)

2.　　　The Mall had a far different profile in 1991, when Sears entered into the Lease; there was no internet, laptop computers, tablets, or smart phones.  Indeed, Sears had to build out the portion of the Mall that it ultimately leased under a ground lease that effectively was meant to last for 100 years when all of the options and considerations were taken into account.  At the time Sears signed the Lease in 1991, the Mall was not even open.  (*See Declaration of Richard Hodge Supporting Mall of MOAC Mall Holdings LLC's Amended Objection* ("**Hodge Declaration**")  (ECF No. 3927) ¶ 6.)  It opened in August of 1992, about 15 months after the Lease was signed, and at that time, it only had 330 stores, almost 200 less than it has now.  (*See id.*)  Now, almost 30 years later, the Mall is substantially transformed, (s*ee generally* 2017 Map and Brochure), which means that, under the Lease and the REA, the available uses of the location by Sears and its assignee are almost unlimited.

### B.     The Lease, REA, and Option Agreement

3.     The Lease is part of a suite of documents under which Sears built a part of the Mall.  The initial term of the Lease is for 30 years or until 2022.  (*See* Lease at Art. 3.1(A).)[5] Rent of $10 per Lease year, or $300, has been pre-paid.  (*Id.* at Art. 21.1.)  Since the Lease has seven, 10-year extension options, it is effectively a 100-year lease term.  (*Id.* at Art. 3.2(A).)  In addition to fixed rent (that would only be $1,000 for the full 100-year term), Sears must pay specified property taxes and a defined pro rata share of common area property taxes.  (*Id.* at Art. 23.)  Sears also must pay for the utilities it uses.  (*Id.* at Art. 25.1(A).)  Finally, Sears must contribute towards common area maintenance expenses in an initial amount of $1.10 per square foot of leased space, with the contribution increasing by $.20 per square foot every five Lease years.[6]  (*Id.* at Art. 22.1(A).)  Effectively, Sears makes an aggregate annual payment, based on property taxes, utilities, common area maintenance, and insurance of approximately $1,100,000 per year.

4.     The Lease contains a unique set of use provisions.  While MOAC makes much of generic statements regarding the expectation of MOAC at the inception of the Lease, it does not make actual references to the Lease and REA, which speak clearly regarding the expectations of the relevant constituencies in 1991.  Specifically, Article 4 of the Lease, titled "Uses," incorporates the provisions of Article XXII-A and XXII-C of the REA.  (*Id.* at Art. 4.3.)  These provisions state an intent that the Mall "contain a combination of Occupants which represent a sound and balanced diversification of merchandise."  (REA at Art. XXII-A.)  Sears was only

---

[5]     Relevant portions of the Lease, REA, and Option Agreement are attached as Exhibit C.  We have included as Exhibit C, for the Court's convenience, excerpts of the various provisions of the Lease, REA, and Option Agreement that we reference or cite to, which excerpts may only be a portion of a provision referenced or cited to, and each such excerpt is qualified in its entirety by reference to the full document from which it is excerpted.  The entire Lease and Option Agreement are attached as Exhibits to the Hodge Declaration.

[6]     Article 24 of the Lease makes Sears' participation in (and financial contributions to) the Shopping Center Merchants Association or Promotional Fund strictly optional after the first two years in business.

required to operate as a retail Department Store under the name "Sears" *for the first 15 years*

("**Initial Period**"). (*See id.* at Art. XXII-C.) After the expiration of the Initial Period, Sears may

use the space for any "retail purposes customarily found in an enclosed mall shopping center and

non-retail activities customarily incidental thereto or such other uses and purposes that are

compatible and consistent with (and are not detrimental, injurious or inimical to) the operation of

a first-class regional shopping center." (*Id.* at Art. XXII-C.) Given that the Mall contains not

only traditional retail and restaurants, but also an extensive entertainment complex (including a

roller coaster and water park), hotels, movie theaters, restaurants, tourist attractions, and a transit

center, it is hard to imagine many purposes that would *not* be compatible or consistent with the

Mall's non-retail and incidental activity, dining, and entertainment venues.

5.      The "Use" provision of the Lease also incorporates by reference Article XXI-D of

the REA, which is a covenant from MOAC to Sears that MOAC will use reasonable efforts to

select a diversified mix of tenants near Sear's entrance court from an approved list of categories

of occupants attached to the REA. (Lease at Art. 4.2.) Thus, not only does the Lease *not* contain

the kinds of restrictions on change in use by tenant that a shorter term, non-major lease would

typically include, but the REA actually flips the obligations of tenant and landlord so that *MOAC*

is required to defer to the requirements of Sears as to what other types of the businesses the

tenant wants in proximity to its store. It is inconsistent with this tenant-favorable provision for

MOAC to suggest that Sears has this right but its assignee cannot sub-lease the property,

including the third floor, to others.

6.      Article 4.4(1) of the Lease incorporates the terms of the Option Agreement. The

Option Agreement provides that if after the Initial Period Sears wants to cease operating 20,000

square feet or more on the third floor "for purposes then permitted by the REA," then

Minntertainment Company, an affiliate of MOAC, or its affiliate (collectively, "**Minntertainment**") shall have the exclusive and irrevocable first right and option to sublease said third floor from Sears (presumably so Minntertainment can further sub-lease it to another retail tenant) for the remainder of the Term, in accordance with the Option Agreement. (*Id.* at Art. 4.1(1); Option Agreement ¶ 1.) Sears is required to give notice of such cessation of operations at least one (1) year prior thereto and Minntertainment then has two (2) years to exercise its option. (Option Agreement ¶ 1.) If Minntertainment exercises its option, such sublease shall be on "substantially similar" terms and conditions as the Sears Lease but rent paid by Minntertainment shall be equal to (i) Minntertainment's proportionate share of all real estate taxes, utilities, Common Area Payments and Merchant's Association/Promotional Fund charges which Sears is obligated to pay under its Lease plus (ii) 50% of any minimum and percentage rent which Minntertainment receives from the subtenant after Minntertainment has been fully reimbursed for all costs incurred in obtaining such subtenant. (*Id.* ¶¶ 1-2.)

7.      After the initial 15-year term (which has long since passed), a tenant, including by assignment, is afforded substantial latitude on the use of the store, and in fact, its ability to remain "dark." Section 6.1 of the Lease incorporates Article XXV of the REA, which provides that Sears shall have the right, following the Initial Period, "without Developer's consent . . . to vacate all or any part of the Sears Building or to lease or sublease all or any portion of the Sears Building or to assign this REA." (Lease at Art. 6.1; REA at XXV-D-4-a.)

8.      In summary therefore, the Lease is a long-term lease that is essentially a classic ground lease, granting Sears unique rights in the property that allows it to conduct almost any retail or other activity consistent with the myriad ancillary related services provided in the Mall. Sears may also sub-lease the property or cease operating in certain areas of its Lease. None of

this activity, changing of space used, or changing the use of the property from a traditional department store, enables MOAC to prevent an assignment of the Lease.

9.    Indeed, the Lease specifically contemplated in several provisions the situation where Sears no longer sought to remain in the Mall and the parties were required to act in good faith.  For example, Section 6.3 of the Lease contains a right of first offer provision that, if at any time after the expiration of the Initial Period Sears decides to cease operations and sell its interest in the leased premises, then Sears shall, by giving notice, "first offer to Landlord the right to purchase the same (1) at the price offered to Tenant pursuant to a bona fide offer in a good faith, arms-length transaction . . . or (2) if no such offer has been made to Tenant, at a price equal to the fair market value of Tenant's leasehold estate including the value of its improvements." (*Id.* at Art. 6.3(A).)  While the provision is likely not applicable due to exclusion of "a transfer pursuant to a reorganization, consolidation, merger or liquidation or the transfer of all or substantially all of the assets of Tenant," there is an applicable requirement in Section 6.3(c) for Sears to "***request, and Landlord shall furnish, a written statement that a transfer under the above provisions of this Paragraph 6.3(C) is acknowledged by Landlord as being a transfer hereunder.***" (*Id*. at Art. 6.3(C)(3) (emphasis added).)  In short, its protests aside, MOAC is required by the Lease to acknowledge that Sears' sale of substantially all of its assets to Buyer is permissible under the Lease.  All of MOAC's conduct in these bankruptcy cases has been inconsistent with that provision of the Lease; Buyer respectfully submits that the Lease should simply be enforced in accordance with its terms.

10.    But, even if the right of first refusal were triggered, to the extent MOAC wanted to retain the considerable economic value of the Lease, it should have participated in the Court-approved bidding process to ensure that the price MOAC proposed for the Lease complied with

the terms of the Lease negotiated in 1991, not attempt to manufacture a storyline that simply ignores the parties' mutual contemplation at the time they entered into the Lease, so that MOAC can obtain the rights under the Lease at no cost.

11.     Recognizing full well the virtually unfettered use and transfer provisions of the Lease, MOAC tries to extract provisions from the Option Agreement to contend that Sears has vacated the premises; failed to provide notice and that default cannot be cured, rendering the Lease incapable of assumption and assignment.  Not only does this contention undercut the very terms of the Lease and Option Agreement, but the applicable law, which prohibits restraint on alienation, permits the assignment to the Buyer so long as the Option Agreement travels with the Lease and remains binding on the assignee and any subsequent sub-tenant.  Since the Buyer merely intends to take the assignment of the Lease subject to all of its terms, including the right of first offer in Article 6.3 of the Lease **_and_** the provisions of the Option Agreement, the MOAC Objections should be denied.

## **ARGUMENT IN REPLY**

### A.     **Applicable Legal Standards**

12.     The singular issue before the Court is whether the assignee under the Lease, Buyer and its designee, Transform Leaseco, has met the standards for adequate assurance of future performance as set forth in section 365(b) and (f) of the Bankruptcy Code.

13.     In general, section 365(b) of the Bankruptcy Code requires a debtor seeking to assume an executory contract or unexpired lease to cure any existing defaults under the contract or lease and to provide adequate assurance of future performance.  Section 365(f) establishes the time-honored standards that a debtor must meet in order to assume and assign a lease in three separate sub-sections.  Subsection (f)(1) provides that except as provided in subsection (b) and (c) of section 365 of the Bankruptcy Code, a Debtor may assign a lease notwithstanding a

provision that prohibits, restricts or conditions the assignment of such lease.   11 U.S.C. § 365(f)(1).   Subsection (f)(2) provides that the lease may be assigned if there is adequate assurance of future performance irrespective of whether the lease is in default.   11 U.S.C. § 365(f)(2).   Subsection (f)(3) provides that a lease may not be terminated or modified by an anti-assignment provision.   11 U.S.C. § 365(f)(3).   Section 365(b)(3) of the Bankruptcy Code adds provisions applicable to "shopping centers" to the adequate assurance provisions of subsection (f)(2)(B).   There is nothing in section 365(b)(3) that eliminates subsection (f)(1) or (f)(3) from the analysis to be applied in the context of a "shopping center" lease.   *See generally In re Rickel Home Ctrs., Inc.*, 240 B.R. 826, 831 (D. Del. 1998 ("Section 356(b)(3) [sic] is not meant to be read in isolation.   Rather, Section 365(b)(3) must be read in conjunction with the section that it cross-references, Section 365(f).").   And, when it comes to shopping center leases, a bankruptcy court has latitude to ensure a balance of the assignment of a shopping center lease, as MOAC acknowledges.

14.    Under section 365(b)(3), there are additional adequate assurance provisions generally required for assumption and assignment of a shopping center lease, and Transform Leaseco and MOAC have stipulated that, for the purposes of this litigation, the Mall is a shopping center.[7]  These adequate assurance standards are:

> A.    "[t]hat the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;"
>
> B.    "[t]hat any percentage rent due under such lease will not decline substantially;"

---

[7]    *Stipulation and Order by and Among Sellers, Buyer, and MOAC Mall Holdings LLC Extending Time Under 11 U.S.C. § 365(d)(4) for Lease of Nonresidential Real Property* (ECF No. 4354) ¶ 4.

> C.    "[t]hat assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; and"
>
> D.    "[t]hat the assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center."

11 U.S.C. § 365(b)(3)(A)-(D).  As discussed below, these provisions were intended by Congress to provide an environment in which a bankruptcy court could balance the interests of the debtor with those of the landlord and other tenants in a shopping center.  These provisions were not intended to provide landlords with special rights or to let them veto an assumption and assignment that otherwise fully complies with the lease to be assigned.

15.    Here, section 365(b)(3)(B) is inapplicable because there is no percentage rent due under the Lease.  Section 365(b)(3)(C) is also inapposite because of: (1) the limited restrictions and provisions contained in the Lease; and (ii) Transform Leaseco's agreement that assumption and assignment will be subject to these limited restrictions and provisions.  It is interesting to note, with respect to section 365(b)(3)(C), nowhere does MOAC identify any breach of any other lease, financing agreement, or master agreement related to the Mall if Transform Leaseco subleases its space at the Mall in compliance with the terms of the Lease.

16.    Thus, the two issues before the Court are: (1) whether MOAC would have economic risk as a result of assumption and assignment of the Lease to Transform Leaseco under section 365(b)(3)(A); and (2) whether assumption and assignment of the Lease would negatively impact the tenant mix at the incredibly diverse Mall under section 365(b)(3)(D).  In both cases, the answer is that it would not.

### B.        Section 365(b)(3)(A) Does Not Prohibit Assignment Of The Lease.

17.        MOAC attempts to impose requirements upon Transform Leaseco under section

365(b)(3)(A) that simply do not exist within the statute or applicable case law.[8]  While MOAC

argues at length that Transform Leaseco must replicate Sears' economic performance from 1991,

this argument simply misses the mark, both legally and based upon the factual record, which

confirms that MOAC will likely have *no economic risk* from the assumption and assignment.  To

this end, MOAC is effectively seeking to craft a *per se* bar on the assumption and assignment of

shopping center leases to newly created entities.  Not only does this position ignore the realities

of 21st Century retailing, but the case law is clear that newly formed entities have every right to

assume and assign a shopping center lease if they meet the standards imposed by section

365(b)(3).  *Ramco-Gershenson Props., L.P. v. Serv. Merch. Co.*, 293 B.R. 169, 176-77 (M.D.

Tenn. 2003).  In that case, the district court affirmed the bankruptcy court's ruling that:

> Ramco had adequate assurance of JLPK's financial strength and
> operating performance and, therefore, could not refuse consent to
> the proposed assignment and sublease on that basis.   Adequate
> assurance is to be evaluated on a commercially reasonable standard
> based on information available at the time of the parties['] 
> decision.  It has also been interpreted to mean adequate assurance
> for payment of future rent.   Commercial reasonableness factors
> include the proposed subtenant's financial responsibility, the type
> of business to be conducted on the premises, and whether the
> proposed business competes with that of the lessor or the lessee.

*Id*. (internal citations omitted).

---

[8]        For example, MOAC claims, without any support, that to meet this standard, the Debtors and Transform Leaseco must, at a minimum, provide: "(i) actual or *pro forma* financial statements for the proposed assignee; (ii) projections showing the viability of the proposed tenant, along with supporting documentation and financial support; (iii) the proposed tenant's most recent business plan and cash flow projections; (iv) current financial statements, liquidity analysis, and forecast for the proposed tenant; (v) the specific intended use for the space; (vi) evidence of the tenant's insurance coverage for the premises; (vii) assurance of compliance with applicable requirements and obligations under the applicable lease (whether arising before or after assignment); and (viii) an analysis of the proposed tenant's credit quality and operating capabilities compared to those of Sears at the time the original lease was entered into."   Suppl. Obj. ¶ 8.

18.     The legislative history underlying the shopping center amendments to section 365(b) confirms that the focus of inquiry under section 365(b)(3)(A) is on the financial dependability of the assignee.[9]   The following two excerpts from a Senate Report provide guidance on this issue:

> *4- Operating and financial performance of assignee*
>
> *a. Problem.*—If shopping center space is assigned to a business in poor financial condition, the shopping center and its solvent tenants may soon find themselves dealing with another store in bankruptcy, with all of the attendant problems.   As discussed above, when the trustee assigns space to a store in unsound financial condition, the harm to the landlord and the other tenants is compounded.
>
> *b. Solution.*—Under the code, adequate assurances of the source of rent and other consideration due under the lease must be given. The bill makes clear that this includes assurances that the assignee has an operating and financial performance similar to that of the debtor when the lease was first executed.   This provision was amended by the full Judiciary Committee in 1982 to insure that it would not be interpreted to mean that the assignee must have exactly the same financial posture as the assignor.   Instead, the assignee should have a similar operating and financial performance when all factors, including advertising aggressiveness, profit margins, growth potential, and other financial indicia, are weighed.
>
> 3.   Section 365(b)(3)(A) is amended to require an adequate assurance that any assignee of the lease will have an operating and financial performance, including guarantors, similar to that of the original tenant when the lease was executed.   This provision is intended to prevent a shopping center lease from being assigned to another business in poor financial condition. Such a business might itself soon fail, resulting in a repetition of the problems caused by the bankruptcy of the assignor.

SCPIA, S. Rep. No. 98-70 (1983).

---

[9]     The Senate Judiciary Committee proposed the Shopping Center Protections Improvements Act of 1983 (the "**SCPIA**"), S. Rep. No. 98-70 (1983), "to remedy several substantive and technical problems relating to the operation and assignment of shopping center" leases that arose under the Bankruptcy Reform Act of 1978.   While SCPIA passed in the Senate, it did not pass in the House.   *See* Schmitt, *The Bankruptcy Code Requirement of Compliance with Lease Obligations - Does "'All'" Mean Everything?*, 10 N. Ill. U. L. Rev. 225, 257 n.13 (1990).

19.     As noted in the Omnibus Reply, Buyer, of which Transform Leaseco is an affiliate, is sufficiently capitalized, is relying on the operational expertise of the Debtors' employees, and has provided appropriate guarantees as an affiliate of Transform Holdco.  (*See* Omnibus Reply ¶ 14.)  It is also worth noting that to date, hundreds of leases have been assumed and assigned to a Transform entity, over 40 of which are in shopping centers.   While not judicially determined, this is strong circumstantial support that the adequate assurance package is objectively reasonable.  Finally, what MOAC wants to ignore in its desire to realize the full value of the Lease is that Transform Leaseco has removed *any* economic risk to MOAC, and as a result, the value of the Lease should accrue to Sears' creditors, which is what has occurred under the Court-approved Sale Order.[10]   This is precisely what section 365(b)(3)(A) and Congress intended.

20.     And, were there any questions regarding MOAC's actual intention in this regard, it is once again answered by the Lease and REA.  Specifically, Article XXV-D-4-a of the REA provides that Sears is released from all future liability under the REA if its assignee:  (1) has a net worth or shareholder equity of at least $50 million; and (2) executes a written undertaking in recordable form in which such assignee expressly assumes and covenants to perform and be bound by all the terms and provisions of the REA.  (REA at Art. XXV-D-4-a.)  Thus, by its own

---

[10]     "In a legislative judgment built into the Code, Congress has determined that, subject only to certain statutory safeguards, the value of a debtor's leases should go to the debtor's creditors, and that leases can be sold to achieve that end—with or without landlord consent. Here, [the over-landlord] has shown no legally cognizable basis for interfering with the assumption and assignment of this lease—which is, after all, the norm in bankruptcy, to implement that Congressional policy in order to benefit the general body of the debtor's creditors, and not the single creditor landlord that would like to get a lease back. I fully understand why a landlord would like to terminate a 1973 lease under which it gets a below market rate, but Congress has determined that the economic value in below market leases is to go to creditor bodies generally, and not to a windfall for a single creditor." *In re Ames Dep't Stores, Inc.*, 348 B.R. 91, 98 (Bankr. S.D.N.Y. 2006).

hand, MOAC agreed to the actual financial wherewithal of a potential assignee of the Lease, a figure well below that already confirmed by Transform Leaseco.[11]

### C.    The Debtors And Transform Leaseco Have Proven Adequate Assurance Of Compliance With The Lease.

21.    Next, MOAC inexplicably argues that the Debtors and Transform Leaseco have failed to establish adequate assurance of future performance with respect to the third floor of the Mall, and that Minntertainment has an option with respect to that space. (*See* Am. Obj. ¶ 27.) The terms of the Option Agreement; however, demonstrate that this option is not a basis to prohibit assignment. Specifically, Article 4.4 of the lease incorporates the terms of the Option Agreement, which provides that if after the Initial Period expires, Sears desires to cease to operate at least 20,000 square feet on the third floor then, Minntertainment for a two-year period has the first right and option to sublease the space for the remainder of the term. (Option Agreement ¶ 1.) If Minntertainment exercise that option, then the sublease from Sears must be on "substantially similar terms" as the Lease except that the rent Minntertainment will be required to pay Sears will include 50% of any percentage rent Minntertainment receives from its sub-tenant as well as a proportionate share of taxes, utilities, common area expenses, and the merchant association fees Sears would otherwise pay. (*Id*. ¶¶ 1-2.)

22.    MOAC's position is that the Debtors breached the Lease pre-petition by not providing one year's notice prior to cessation of business. Of course, the Debtors were unable to provide such notice due to the chapter 11 cases,[12] and imposing this requirement would violate

---

[11]    While MOAC could certainly have included an escalation clause, it did not, even though the Lease had seventy years to run. For example, $50 million in 1991 would equate to approximately $93.5 million in 2019. *See* Ex. D, *CPI Inflation Calculator*, *Bureau of Lab. Stats.*, https://www.bls.gov/data/inflation_calculator.htm (last visited July 8, 2019) (indicating that $1 in May of 1991, the month the Lease was signed, was worth $1.86 in February 2019, the month the Sale Order was entered: $50,000,000 x $1.86 = $93,500,000).

[12]    Significantly, this Court previously has included in bidding procedures and global store sale orders express provisions that permit a store to "go dark" during its liquidation notwithstanding lease provisions. *In re The Great*

the anti-assignment provisions of section 365(f) of the Bankruptcy Code. *See In re New York Chocolate & Confections Co.*, No. 10-30963-MCR, 2010 WL 4739714, at ¶ 10 (Bankr. N.D.N.Y. July 15, 2010) ("Without limiting the foregoing, any 'going dark', continuous operating restrictions, minimum purchase requirements and/or other related restrictions in any Assumed Contract are unenforceable anti-assignment clauses under sections 365(f)(1) and (3) of the Bankruptcy Code."). Moreover, to the extent that MOAC is somehow arguing that Transform Leaseco would be required to cure this non-monetary default, again, there is nothing in the law that would support this conclusion. *See* 11 U.S.C. § 365(b)(1)(B) (providing that if there was a default in a lease, then that lease may not be assumed unless compensation or adequate assurance for "actual pecuniary loss" is provided to lease counterparty). Further, a review of the Option Agreement confirms that MOAC has not suffered, nor can it suffer, harm from the cessation of operations on the third floor of the Mall. As drafted, the Option Agreement provides for a one-year notice period from Sears, but a two-year response time from MOAC, thus contemplating at least a 12-month period of vacancy before MOAC even has to exercise its option; additionally, there is no time frame within which MOAC must obtain a subtenant to occupy the vacated third floor premises.

23. At bottom, MOAC is using the Option Agreement as a thinly veiled effort to prevent assignment of *any* space it leased to Sears under the Lease, when MOAC agreed in 1991 that Sears had the right to assign the Lease and that, if it went dark, Minntertainment would sub-lease a portion of the third floor only in accordance with the Option Agreement. Congress did

---

*Atlantic & Pacific Tea Co., Inc.*, No. 10-24549 (RDD), 2011 WL 6014585, at ¶ 10 (Bankr. S.D.N.Y. Oct. 11, 2011) (entering an order containing a provision that permitted stores to "go-dark" and remain "dark" (until assumption and assignment of the applicable lease) despite "any lease restriction, real estate local act, local law, or ordinance to the contrary, and any 'continuous operation' or similar clause in any of the leases (or any lease provision that purports to increase the rent or impose any penalty for 'going dark') [which] may not be enforced against the Debtors or Liquidation Consultant to hinder or interrupt the Store Closing Sales (and the 'going dark' under such leases shall not be a basis to cancel or terminate the leases as against the Debtors)").

not enact the shopping center lease provision in section 365(b)(3) to provide MOAC with a mechanism to terminate the Lease contrary to its terms in order to capture the economic upside of such lease for itself.

24.     During nearly 30 years of occupancy at the Mall, the Debtors fulfilled one of their most significant obligations under the Lease (the construction of the Building) and their remaining material financial responsibilities (*e.g.*, contribution to common area expenses and real estate taxes) as either directly stated in, or incorporated by reference into, the REA.  Thus, assumption of the Lease and the corresponding REA by an entity with a net worth of $50 million represents precisely what MOAC contemplated at the inception of the Lease.  In the end, this is the standard by which these issues should be reviewed.  *See In re Ames Dep't Stores, Inc.*, 127 B.R. 744, 749-50, 752-53 (Bankr. S.D.N.Y. 1991).  As noted in the Jerbich Declaration, any tenant who subleases from Transform Leaseco will be required to acknowledge the Lease and the REA.  Thus, as MOAC agreed that Sears could freely assign the Lease following construction and operation of the store for fifteen years, MOAC's efforts to ignore this Lease provision and craft circuitous legal and factual arguments should fail.

**D.     An Assignment To Transform Leaseco Does Not Affect Tenant Mix At The Mall, And Thus, Section 365(b)(3)(D) Of The Bankruptcy Code Does Not Prohibit Assignment Of The Lease.**

25.     Finally, MOAC argues that the assignment of the Lease to Transform Leaseco should not be authorized by this Court because MOAC currently has the right to exercise its option with respect to the third floor of the property.  This argument is based on the fact that Sears stopped using the third floor under the Lease during the pendency of these cases.  This argument is similarly flawed for a number of reasons.

26.     First, the allegation that "going dark" affects tenant mix and is thus prohibited by section 365(b)(3)(D) of the Bankruptcy Code is inconsistent with applicable law.  *See, e.g.*,

*Ramco-Gershenson Props.*, 293 B.R. at 182 (holding that "going dark" clause had the intent to prevent assignment and noting that "[u]nder 11 U.S.C. § 365(f), the provision is an unenforceable restriction upon assignment."); *see also In re New York Chocolate & Confections Co.*, 2010 WL 4739714, at ¶ 10. The *Ramco* court noted that although the "going dark" provision was "temporarily blocked to permit assignment," it would begin running with the new assignee on the effective date of the assignment, which would "preserve[] the benefit of [the landlord's] bargain, without penalizing either party for the time spent resolving the matter in court." *Ramco-Gershenson Props.*, 293 B.R. at 182.

27.     In an analogous case that MOAC goes to great lengths to distinguish, the United States District Court for the District of Delaware addressed a similar argument where landlords objected to the hardware store debtor's assignment of leases as part of a sale to Staples, an office supply store. *See In re Rickel Home Ctrs.*, 240 B.R. 826. The objecting landlords contended that, among other things, with respect to certain leases, the fact that Staples was going to use only portions of the leased premises assigned to them and either sublease or vacate certain parts of previously occupied property would have a negative impact on tenant mix. *Id*. at 829-30. The court noted that cases had relied on section 365(f) of the Bankruptcy Code "to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive they constitute de facto anti-assignment provisions." *Id*. at 831 (citing *In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1090 (3d Cir. 1990)).

28.     The court then noted that the debtors proffered evidence that showed that the market for home center stores that were not "warehouse"-style retailers was non-existent or in dire straits, and thus the use restrictions requiring this exact type of store were too restrictive and could be struck from the lease. *See id*. at 832. The court further found that although Staples

would operate in a space half the size of one of the debtor's stores, Staples would still satisfy anchor provisions based on Staples' business model and the likely foot traffic that it would bring to the center. *See id*. at 832-33.

29.    On the issue of whether permitting property to be "dark" for some period would affect tenant mix, the *Rickel* court accepted a representation from Staples that it intended to seek tenants that would complement existing tenant mix. *Id*. at 834 n.5. Regarding another objection that allowing a store to go dark would affect tenant mix because there had been no evidence regarding how long the store would be dark, the court noted that the lease in question did not contain any prohibition against going dark. (*Id*. at 834.) Thus, like here, going dark is not prohibited, it simply could trigger the option if Sears or its assignee gave notice it no longer intended to operate in the relevant space, an option that would merely permit Minntertainment to lease a portion of the third floor back from Buyer under the Option Agreement. But, as stated, Transform Leaseco seeks to find a tenant who will not only operate in the third floor of the Sears space at the Mall, but one who will also fit within the broad footprint of the Mall. Moreover, the *Rickel Home* court found that the store was vacant because of the debtor's liquidation, accepted a proffer that Staples would likely take part of the store operation, and that that time period was reasonable, especially since it was in Staples' interest to sublease the property as soon as possible. *Id*. at 835. The court therefore found that the store at issue would not be vacant for an unreasonable period of time and noted that if the time that passed was unreasonable, the landlord could exercise its rights under the lease. *Id*. at 835 n.6.

30.    This last point is important because MOAC suggests it has no recourse if the store remains vacant for an unreasonable period. (*See* Am. Obj. ¶ 30.) Since, as noted, there could be a year of vacancy under the Lease while MOAC decides whether to exercise its option and

thereafter it has an additional two year period to find a tenant, it is not unreasonable and would

be consistent with the Lease and Option Agreement to give Transform Leaseco adequate time to

find a suitable tenant, especially considering the plain fact that the Lease permits Sears to go, and

remain dark during the term of the Lease.  In fact, while three years, or until March 19, 2022, to

find a replacement tenant would appear reasonable, as described in the Jerbich Declaration,

Transform Leaseco is economically incentivized to complete this lease process as quickly as

possible, and believes that it can be accomplished much quicker.

31.    Case law in this Circuit supports the notion that section 365(b)(3)(D) of the

Bankruptcy Code should be interpreted to refer to contractual provisions, not general notions of

tenant mix.  *See In re Ames Dep't Stores, Inc.*, 121 B.R. 160, 165 (Bankr. S.D.N.Y. 1990)

(noting that the legislative history confirms the entire statute refers to contractual protection).

Thus, where a landlord obtains the benefit of its lease bargain post-assignment from a debtor, it

cannot preclude an assignment that fully complies with the lease terms.  *See In re Ames Dep't*

*Stores, Inc.*, 127 B.R. at 752-53 (refusing to look beyond the original bargain in the lease and

noting that the legislative history makes clear that this provision was designed "to ensure that

'the lessor and other tenants [maintain] the benefit of the *original bargain with the debtor*'")

(quoting S. Rep. No. 65, 98th Cong., 1st Sess. 67, 68 (1983)) (emphasis added by court). Where

a lease permits a store to go dark, tenant mix is not affected and the landlord's allegation that

going dark impacts tenant mix has no relevance under section 365(b)(3)(D).  *See Androse*

*Assocs. of Allaire, LLC v. The Great Atl. & Pac. Tea Co., Inc (In re Great Atl. & Pac. Tea Co.,*

*Inc.)*, 472 B.R. 666, 678 (S.D.N.Y. 2012).

32.    Here, Transform Leaseco merely seeks a finding that, based on the terms of the

Lease, the non-occupancy provisions of the Lease do not prohibit assignment, they simply

require notice of intent not to operate to MOAC.  Transform Leaseco submits that since it intends to sublease the third floor of Sears' space at the Mall, the notice provisions under the Option Agreement, and the corresponding option rights, do not apply and there is no need or requirement to give any notice of non-occupancy.  The present non-occupancy is a result of a liquidation and thus the Lease may be assigned *by its terms*.  To the extent the vacancy provision of the Option Agreement were to apply (which it does not) and were to constitute a tenant mix issue (a point for which MOAC has not provided evidence), Transform Leaseco contends that provision would be an unlawful restraint on alienation.  As stated in the Omnibus Reply, the transfer can be approved notwithstanding the provisions in section 365(b)(3)(D) of the Bankruptcy Code.[13]

## **CONCLUSION**

33.    It is especially telling that MOAC is seeking to halt the assumption and assignment of the Lease and REA, thus maintaining the complete economic value of the real estate for itself.  The inequities are stark (*e.g.*, Sears built the building and negotiated for effectively a 100-year ground lease, and after the Initial Period had the right to assign to an affiliate or during its reorganization or liquidation, change use, and sublet).  Article 6.3 of the Lease expressly provides that, if at any time after the expiration of the Initial Period Sears decides to cease operations and sell its interest in the Leased Premises, then Sears shall, by giving MOAC notice, "first offer to Landlord the right to purchase the same (1) at the price offered to Tenant pursuant to a bona fide offer in a good faith, arms-length transaction . . . or (2)

---

[13]    It is noteworthy that nowhere does MOAC complain that the assumption and assignment of the Lease to Transform Leaseco would disrupt the tenant mix at the Mall.  The expansive rights bestowed upon Sears under the Lease and REA and the magnitude and non-traditional mix of the Mall confirm that there is virtually no legitimate use of the Sears' space that could disrupt the tenant mix at the Mall.

if no such offer has been made to Tenant, at a price equal to the fair market value[14] of Tenant's

leasehold estate including the value of its improvements." Thus, to the extent MOAC wishes to

retain the economic upside of the Lease, it should have participated in the sale process. It now

seeks to obtain the same outcome and capture the value of the Lease by misconstruing provisions

of the Bankruptcy Code and simply overlooking the seminal provisions of the Lease and REA.

As the law is clear under section 365(b)(3) of the Bankruptcy Code, that a landlord only gets the

benefit of its contract and may not use those statutory protections to enhance its position over its

contract, MOAC must similarly be held to terms of the applicable leasehold documents.

34.    Transform Leaseco therefore requests that this Court deny MOAC's Objections,

approve Sears' assumption and assignment of the Lease to Transform Leaseco, and grant

Transform Leaseco such other and further relief as is just and appropriate.

Dated: New York, New York
       July 8, 2019

Respectfully submitted,

**DLA Piper LLP (US)**
1251 Avenue of the Americas, 27th Floor
New York, NY 10020-1104
Phone: (212) 335-4500
Fax: (212) 335-4501

By: */s/ R. Craig Martin*
     Richard A. Chesley
     R. Craig Martin
     Rachel Ehrlich Albanese
     Alana M. Friedberg

     *Attorneys for Transform Holdco LLC*

---

[14]    Fair market value shall be determined by averaging the amounts determined to be said fair market value by two independent MAI appraisers, but if there is a difference of more than 10% between such valuations then such appraisers shall select a mutually satisfactory third MAI appraiser who shall submit his or her determination of fair market value, which shall be deemed to be the average of all three such valuations.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he served a copy of the foregoing *Transform Holdco's Reply to MOAC Mall Holdings LLC's (I) Objection to Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction; (II) Second Supplemental and Amended: (A) Objections to Debtor's Notice of Assumption and Assignment of Additional Designatable Leases, and (B) Objection to Debtor's Stated Cure Amount*; and *(III) Third Supplemental and Amended Objections to Debtor's Notice of Assumption and Assignment of Additional Designatable Leases* to the following via U.S. Mail, postage prepaid on July 8, 2019:

_____
/s/ Rachel Ehrlich Albanese
Rachel Ehrlich Albanese