UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re

SEARS HOLDINGS CORPORATION, *et al.*, Debtors.[1]

---

Chapter 11 Case No.

18-23538 (RDD)

(Jointly Administered)

**DECLARATION OF ANDREW D. HEDE IN SUPPORT OF TRANSFORM HOLDCO LLC'S BRIEF IN OPPOSITION TO DEBTORS' SUPPLEMENTAL MOTION TO ENFORCE THE ASSET PURCHASE AGREEMENT AND IN SUPPORT OF THE ADVERSARY COMPLAINT**

I, Andrew D. Hede, declare under penalty of perjury as follows:

1. I respectfully submit this declaration ("Declaration") in support of Transform Holdco LLC's Brief in Opposition to Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement and in Support of the Adversary Complaint.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC(6546); Sears Operations LLC(4331); Sears, Roebuck and Co. (0680); Service Live Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); Max Serv, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); My Gofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); Star West, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); SHC Licensed Business LLC (3718); SHC Promotions LLC (9626); and Sears Brands Management Corporation (5365).

2.      I am a Senior Managing Director of EY Turnaround Management Services LLC, a direct, wholly owned subsidiary of Ernst & Young U.S. LLP and an affiliate of Ernst & Young LLP ("EY").  In January 2019, Transform Holdco LLC ("Transform") retained EY to assist with setting up the newly-formed Transform entities and completing the acquisition of substantially all of Sears' assets.  In addition, at the direction of Cleary Gottlieb Steen & Hamilton LLP ("Cleary"), counsel to Transform, I have been asked to evaluate certain assets that Transform acquired or claims to entitlement to pursuant to the Asset Purchased Agreement dated January 17, 2019, as amended (the "APA").

3.      Since EY's retention, I have devoted substantial time and attention to such transition matters and I have become knowledgeable about and familiar with Sears' day-to-day operations, business and financial affairs, and books and records.  I have more than 25 years of financial and operational restructuring experience in both the United States and Australia, including financial and operational reviews, liquidity management, business and asset divestment, business plan preparation and review, recapitalization strategies and negotiation of reorganization plans.  I have experience across a broad range of sectors and also served in various interim management roles.

4.      Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge of Transform's and the Debtors' pre- and post-Closing operations and finances gleaned during the course of my engagement with Transform; my discussions with Transform's other advisors, other members of EY's team, company management and the Debtors' advisors; my review of relevant documents; and my views based upon my experience.  If called to testify, I would testify competently to each of the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of EY for Transform.

5.     As detailed in the declaration I submitted on March 18, 2019 (Docket No. 2868, "First Hede Declaration"), due to the exigencies of closing the sale transaction on the desired date, rather than establishing a new cash management system, Transform at Closing stepped into the shoes of the majority of the Debtors' existing cash management system and used that system to continue to run the acquired business after Closing. The parties fully recognized prior to Closing that Transform's assumption of the existing cash management system would require the reconciliation and allocation between Transform and the Debtors of certain amounts received into and drawn from that system in order to reflect the allocation of assets called for by the APA.

6.     Since Closing, EY has undertaken this immensely complex process, devoting a very significant number of hours of work to reconcile certain categories of amounts deposited into and drawn from the cash management system following Closing. Among other things, this process has been complicated by the need to: (1) retrieve and compile data from multiple data storage systems; (2) review thousands of lines of such data to resolve a given reconciliation item; and (3) spend substantial time with business unit personnel to analyze the data retrieved from these systems. The complexity of this process was further compounded by the expedited nature of the Closing, as described in the First Hede Declaration, which prevented EY from setting up the customary processes that would be in place during the closing of a transaction of the size and complexity entered by Transform and the Debtors. *See* First Hede Decl. ¶ 7.

7.     Throughout this process, EY has promptly communicated its methodology, findings, and supporting documentation to the Estate and its advisors, including during several telephonic meetings attended by counsel, EY, and Debtors' financial advisor, M-III Partners, LP ("M-III"). To the extent questions or concerns have been raised by Debtors or M-III, EY has

3

promptly investigated and amended the reconciliations, if appropriate. All of the supporting detail for EY's analysis has been produced to the Debtors.

8.  The following table summarizes the amounts that EY has determined are owed to and from Transform based on its analysis, which is now complete. As noted in the table, EY has determined that the Estate currently owes $47,349 to Transform in connection with the reconciliation process. For $858,105 in certain checks that Debtors claim were deposited following Closing and belong to the Estate, EY has been unable to locate information to substantiate that these checks are Estate property. As a result, this amount remains in dispute.

| Description | Status | Owed to Estate ($) | Owed to Transform ($) |
|---|---|---|---|
| Cash in transit | Complete | $22,452,428 | $- |
| Estate checks cleared | Complete | - | 11,444,233 |
| Estate checks not-cleared | Complete | - | 2,355,197 |
| P-Cards (Pre-close transactions) | Complete | - | 3,236,427 |
| Taxes | Complete | - | 2,774,750 |
| Telecom expenses | Complete | - | 1,922,800 |
| Pre-close orders cancelled post-close | Complete | - | 9,578,762 |
| February real estate expense pro-rations | Complete | 11,174,959 | - |
| March GOB store rent payments | Complete | - | 1,598,931 |
| Citi LC facility draw | Complete | - | 1,587,658 |
| Net TSA fees | Complete | - | 1,015,377 |
| April 2019 KERP Payment | Complete | - | 1,131,870 |
| Estate checks deposited into Transform account | Complete | 5,945,069 | - |
| GOB CC Proceeds | Complete | 4,368,957 | - |
| Subtenant Proceeds | Complete | 657,243 | - |
| Total | | $44,598,656 | $36,646,005 |
| Amounts already paid | | (8,000,000) | - |
| Net amount owed | | $- | $47,349 |

9.  The following is a description of each of the categories of reconciled amounts listed in the table above.

- Cash-in-Transit: In the ordinary course of Debtors' business, cash and checks are received in stores, consolidated by store management, and then picked up by armored cars to be delivered and deposited into the store's bank account. In the

4

ordinary course, it could take up to 6 days for cash or checks received at a given store to be deposited into the store's bank account.  Due to this delay, amounts were received into Transform bank accounts post-Closing that were in respect of cash and checks generated by store transactions prior to Closing.  EY has determined that $14.3 million of such amounts were received by Transform.  In addition to the foregoing, amounts were deposited into Transform bank accounts post-Closing that related to transactions at going-out of business stores ("GOB Stores") not acquired by Transform, and also certain receipts and deposits for stores acquired by Transform generated during the pre-Closing period.  EY has determined that these amounts total approximately $8.2 million.

- Estate Checks:  Prior to Closing, Debtors issued approximately $14 million in paper checks that had not cleared as of Closing.  Since Closing, $11,444,233 of these checks have cleared and been paid by Transform due to its assumption of Debtors' cash management system, from which the funds to pay these checks are drawn.  An additional $2,355,197 in checks remain outstanding, but will also be funded by Transform once they clear.

- P-Card Expenses:  Approximately $3.2 million in corporate credit card expenses were incurred by Debtors prior to Closing, which have since been paid by Transform.

- Taxes:  Approximately $2.7 million in tax expenses (primarily sales tax) accrued by the Debtors prior to Closing have been paid by Transform.

- Telecom Expenses:  Approximately $2 million in telecom expenses accrued by Debtors prior to Closing have been paid by Transform (that have not been

separately accounted for in the proration of February rent expenses between Debtors and Transform).

- Pre-Close Orders Post-Closing:  Following Closing, certain pre-Closing orders by customers were cancelled and refunded by Transform in the amount of $9,578,762.

- February Real Estate Expenses: Rent, utilities, and certain other real estate-related expenses incurred during the month of February in connection with properties acquired by Transform were prorated between Debtors and Transform, with the Debtors responsible for expenses incurred between February 1 and February 10, and Transform responsible for the remainder.  In addition, certain utility expenses paid in arrears by Transform for pre-February periods were allocated to Debtors. EY determined that approximately $11.2 million was due from Transform to the Estate in connection with these amounts.

- March GOB Store Rent Payments: Transform paid approximately $1.6 million for March rent payments for GOB Stores owned by Debtors.

- Citi Letter of Credit Facility Fees:  Under section 9.11(c) of Amendment No. 1 to the APA, Debtors are responsible for amounts drawn pre-Closing under the Citi letter of credit facility.  Approximately $1.6 million was drawn by Debtors prior to Closing and is therefore due to Transform.

- TSA Fees: Debtors owe Transform approximately $1 million (on a net basis) in connection with fees incurred for services provided by Transform under the Transition Services Agreement ("TSA") entered between Debtors and Transform.

6

- <u>KERP Payment</u>:  On April 30, 2019, Transform funded a KERP ("Key Employee Retention Program") payment of approximately $3.9 million of which the Debtors owe Transform approximately $1.1 million in relation to the period prior to Closing.

- <u>Credit Card Proceeds from GOB Stores</u>:  EY has determined that Transform received approximately $4.4 million of credit card proceeds from GOB Stores operated by Debtors.

- <u>Other Checks Deposited in Transform Accounts</u>: Debtors' advisors identified approximately $6.8 million in checks deposited into Transform accounts following Closing that Debtors claim are Estate property.  EY has been able to determine that approximately $5.9 million of these checks are properly allocated to the Estate.  EY has been unable to locate information to support Debtors' claim that the remainder of $858,105 in checks is Estate property.

- <u>Subtenant Proceeds</u>:  Debtors' advisors believed that certain sub-tenant proceeds for properties retained by the Estate were deposited into Transform accounts following Closing that Debtors claim are Estate property.  EY has been able to determine that approximately $0.7 million of these proceeds were received by Transform and are Estate property.

10.    In addition to the reconciliation analysis described above,  EY has been directed by Cleary Gottlieb to assess the amount of Prepaid Inventory that was on order as of Closing (and subsequently received post-Closing) so that Transform could determine the extent to which it received less than $147 million in Prepaid Inventory and is therefore entitled to a reduction in

7

liabilities assumed under the APA. In order to accurately quantify the amount of Prepaid Inventory on order at Closing, EY undertook the following multi-step process:

- EY identified all payments issued to all vendors who required payment in advance in the six weeks prior to the Closing. This included vendors who provide merchandise and non-merchandise (*e.g.*, services).

- From the set of payments identified in the first step, EY removed all payments issued for non-merchandise vendors, *i.e.* vendors that do not deliver Prepaid Inventory, as that term is used in the APA.

- For the remaining payments (*i.e.*, those made to merchandise vendors), EY identified all purchase orders associated with the merchandise vendors that received the payments. Thus, EY identified the purchase orders issued to merchandise vendors in the six weeks prior to Closing that require payment in advance for inventory.

- EY identified the inventory that was received in respect of each of those purchase orders, and assessed whether that inventory was received pre-Closing or post-Closing.

11. Based on the foregoing methodology, EY has determined that $194,091,669 in purchase orders were created from December 24, 2018 through February 10, 2019 in respect of merchandise vendors that required payment in advance for inventory. EY further determined that, in respect of those purchase orders issued to vendors who require payment in advance for inventory, $75,152,151 of inventory was physically received from February 11, 2019 forward (meaning it was on order as of the Closing). As a result, based on this methodology, EY has

determined that as of Closing, Debtors had $75,152,151 of Prepaid Inventory on order, which is the amount of Prepaid Inventory that they delivered to Transform at Closing.

12. For financial reporting purposes, Debtors recorded an accounting entry for Prepaid Inventory. Debtors claim to have delivered the amount of Prepaid Inventory that was reflected in this accounting entry as of February 6, 2019. This accounting entry is not an actual count of Prepaid Inventory on order, but rather is a function of the following assumptions that provide a rough approximation of the amount of Prepaid Inventory on order at a given time:

- Following the bankruptcy petition, Debtors determined that it took an average of three weeks for Prepaid Inventory to be physically received after a payment was issued for that inventory. This was an increase from an average of two weeks prior to the bankruptcy petition. I understand that, following Closing, the period has decreased again to two weeks.

- In reality, some CIA vendors deliver inventory within several days, while others can take more than several weeks. As a result, the three week estimate used by Debtors is a only rough blended average of expected delivery times.

- Based on the assumption that Prepaid Inventory took on average three weeks to be delivered after payment was issued for that inventory, Debtors' accounting entry for Prepaid Inventory simply reflected the amount of payments issued for Prepaid Inventory in the three weeks prior to the date on which the accounting entry was recorded. Thus, the accounting entry merely reflects that assumption that any Prepaid Inventory ordered more than three weeks prior to the date of the accounting entry has already been received (and therefore no longer constitutes

9

Prepaid Inventory), while inventory paid for in advance within three weeks of the accounting entry remains outstanding and therefore constitutes Prepaid Inventory.

13. At the direction of Cleary Gottlieb, EY has also assessed the portion of the Adequate Assurance Deposit, as that term is defined in Transform's Adversary Complaint, that relates to assets acquired by Transform pursuant to the APA. Based on information supplied by Transform, the total amount of the Adequate Assurance Deposit is $10,102,753. EY has determined that, of that amount, $3,892,651 was held as a security deposit for utility services provided to properties owned as of Closing by Transform, or leases that were assigned to Transform, while $3,473,854 was held as a security deposit for properties owned or leased as of Closing by the Estate, for a total of $7,366,505.

14. The remainder of the Adequate Assurance Deposit, $2,736,247, is for telecom services, which are not allocated to specific properties in the ordinary course. To allocate this amount between Transform and the Estate, EY used a proration based on the portion of the Adequate Assurance Deposit that is allocated to specific properties (*i.e.*, the $7,366,505 described in the preceding paragraph). Of the $7,366,505, 53% was allocated to Transform ($3,892,651), and 47% was allocated to the Estate ($3,473,854). Applying the same ratio to the Adequate Assurance Deposit, EY has allocated $1,445,904 of the Adequate Assurance Deposit associated with telecom services to Transform, and the remainder, $1,290,344, to the Estate. Based on this methodology, EY has determined that $5,338,555 of the Adequate Assurance Deposit relates to properties acquired by Transform pursuant to the APA.

15. EY has also been directed by Cleary Gottlieb to determine the amount of accounts payable that was outstanding as of Closing, and the portion of this amount that has been paid by Transform since Closing. Based on data sourced from Transform's accounts payable-tracking

10

systems (which were acquired from Debtors at Closing), EY has determined that there was approximately $189 million in post-petition accounts payable outstanding at Closing. Furthermore, based on data from these systems and from Transform's management, Transform has determined that, as of June 17, 2019, $143,331,525 in post-petition accounts payable outstanding at Closing has since been paid for by Transform.  In addition, as of June 21, 2019, $6,892,000 of additional post-petition accounts payable outstanding at Closing has been paid or approved for payment by Transform as part of the assumption and assignment of contracts from Debtors by Transform following Closing.  Of this amount, $3,748,235 has already been paid, and $3,143,765 has been approved for payment.  Accordingly, $150,223,525 in post-petition accounts payable outstanding at Closing has been paid or approved for payment by Transform.

*    *    *

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of knowledge, information, and belief.

Executed on June 25, 2019 in Washington, DC.

Respectfully submitted,

*[signature]*

Andrew D. Hede