**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X
:
In re:                                                       :       Chapter 11
:
SEARS HOLDINGS CORPORATION, *et al.*,[1]   :
:       Case No. 18-23538-rdd
Debtors.                              :
:       (Jointly Administered)
:
:       **Re: Docket No. 4135**
---------------------------------------------------------------X

## DECLARATION OF ANDREW WEAVER IN SUPPORT OF TRANSFORM HOLDCO LLC'S BRIEF IN SUPPORT OF THE ADVERSARY COMPLAINT AND IN OPPOSITION TO DEBTORS' SUPPLEMENTAL MOTION TO ENFORCE THE ASSET PURCHASE AGREEMENT

I, Andrew Weaver, declare under penalty of perjury as follows:

1.        I am an attorney duly admitted to practice before this Court, and I am counsel with

the law firm Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb"), counsel for Transform

Holdco LLC ("Transform").  I respectfully submit this declaration ("Weaver Declaration") in

---

[1]       The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

connection with Transform's Brief in Opposition to Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement and in Support of the Adversary Complaint.

2.      Attached hereto as <u>Exhibit A</u> is a true and correct copy of the 2011 First Installment Property Tax Bill and Payment Receipt, dated February 24, 2012.

3.      Attached hereto as <u>Exhibit B</u> is a true and correct copy of the 2011 Second Installment Property Tax Bill and Payment Receipt, dated July 23, 2012.

4.      Attached hereto as <u>Exhibit C</u> is a true and correct copy of the Minutes of a Meeting of the Restructuring Committee of the Board of Directors of Sears Holdings Corporation, dated January 9, 2019.

5.      Attached hereto as <u>Exhibit D</u> is a true and correct copy of email correspondence with the subject line "Project Blue - APA Amendment" between counsel for Debtors, Paul, Weiss, Rifkind, Wharton & Garrison LLP ("<u>Paul Weiss</u>"), and Cleary Gottlieb, dated February 4, 2019, attaching a Weil, Gotshal & Manges LLP ("<u>Weil</u>") draft of Amendment No. 1 to the Asset Purchase Agreement, dated February 4, 2019, and a redline against the Cleary Gottlieb draft of February 3, 2019.

6.      Attached hereto as <u>Exhibit E</u> is a true and correct copy of email correspondence with the subject line "FW: A $ 14,174,257.58 Sears wire will be sent to Sears tomorrow, Tuesday, February 12, 2013....." between Mary Ann Straley, James Terrell, and Michael Morrie, dated February 12, 2019.

7.      Attached hereto as <u>Exhibit F</u> is a true and correct copy of email correspondence with the subject line "Transform - Post-Closing Reconciliations Update" between counsel for Debtors and Cleary Gottlieb, dated March 26, 2019, attaching a Cleary Gottlieb draft of Post-close Reconciliations, dated March 26, 2019.

2

8.      Attached hereto as <u>Exhibit G</u> is a true and correct copy of email correspondence with the subject line "Transform - Post-Closing Reconciliations Update" between counsel for Debtors and Cleary Gottlieb, dated April 4, 2019, attaching an Excel spreadsheet titled "February Telecom Expense Analysis 3-29-19," dated March 29, 2019; a Cleary Gottlieb draft of Post-close Reconciliations, dated April 4, 2019; an Excel spreadsheet titled "Tax Payments 3-28-19," dated March 28, 2019; and an Excel spreadsheet titled "Canceled Orders Summary_CLEAN 4-2-19," dated April 2, 2019.

9.      Attached hereto as <u>Exhibit H</u> is a true and correct copy of email correspondence with the subject line "RE: Transform - Post-Closing Reconciliations Update" between counsel for Debtors and Cleary Gottlieb, dated April 19, 2019, attaching Letter from Cleary Gottlieb to Weil and its exhibits, dated April 19, 2019.

10.      Attached hereto as <u>Exhibit I</u> is a true and correct copy of email correspondence with the subject line "RE: Transform - Post-Closing Reconciliations Update" between counsel for Debtors and Cleary Gottlieb, dated April 26, 2019, attaching Letter from Cleary Gottlieb to Weil and its exhibit, dated April 26, 2019.

11.      Attached hereto as <u>Exhibit J</u> is a true and correct copy of email correspondence with the subject line "RE: Sears--Diligence List, Call" between counsel for Debtors and Cleary Gottlieb, dated May 1, 2019, attaching the Sears Estate Information Request List, dated May 1, 2019.

12.      Attached hereto as <u>Exhibit K</u> is a true and correct copy of email correspondence with the subject line "RE: Sears--Diligence List, Call" between counsel for Debtors and Cleary Gottlieb, dated May 3, 2019, attaching the Letter from Cleary to Weil, dated May 3, 2019; an Excel spreadsheet titled "Slide #5 Estate Checks Report"; an Excel spreadsheet titled "Slide

3

#9_Canceled Orders Summary Report"; and an Excel spreadsheet titled "Slide #10_RE Expense Pro-Rations Report."

13.    Attached hereto as <u>Exhibit L</u> is a true and correct copy of the Letter from Weil to Cleary Gottlieb, dated May 9, 2019.

14.    Attached hereto as <u>Exhibit M</u> is a true and correct copy of the Letter from Cleary Gottlieb to Weil, dated May 13, 2019.

15.    Attached hereto as <u>Exhibit N</u> is a true and correct copy of the Letter from Weil to Cleary Gottlieb, dated May 15, 2019.

16.    Attached hereto as <u>Exhibit O</u> is a true and correct copy of the Letter from Abena Mainoo of Cleary Gottlieb to Weil, dated May 20, 2019.

17.    Attached hereto as <u>Exhibit P</u> is a true and correct copy of the Letter from Ilya Glinchenko of Cleary Gottlieb to Weil, dated May 20, 2019.

18.    Attached hereto as <u>Exhibit Q</u> is a true and correct copy of the Letter from Weil to Cleary Gottlieb, dated May 21, 2019.

19.    Attached hereto as <u>Exhibit R</u> is a true and correct copy of email correspondence with the subject line "Transform -- reconciliations" between counsel for Debtors and Cleary Gottlieb, dated June 14, 2019, attaching a Cleary Gottlieb draft of Post-close Reconciliation Items, dated June 14, 2019.

20.    Attached hereto as <u>Exhibit S</u> is a true and correct copy of the Letter from Weil to Cleary Gottlieb, dated June 20, 2019.

21.    Attached hereto as <u>Exhibit T</u> is a true and correct copy of the Letter from Cleary to Weil, dated June 26, 2019.

Executed on June 26, 2019 in New York, New York.

Respectfully submitted,

*/s/ Andrew Weaver*
Andrew Weaver

# Exhibit A



## 2011 First Installment Property Tax Bill

| Property Index Number (PIN) | Volume | Code | Tax Year (Payable In) | Township |
|---|---|---|---|---|
| 01-31-202-002-0000 | 001 | 10071 | 2011 (2012) | BARRINGTON |

| Property location and classification for this PIN | | Property Classification 5-90 |
|---|---|---|
| 685   HIGGINS RD | HOFFMAN ESTATES  IL | |

| | 2010 TOTAL TAX | 152,061.47 |
|---|---|---|
| | 2011 ESTIMATE | X   55% |
| | 2011 1ST INSTALLMENT | 83,633.81 |
| | = | 83,633.81 |

TAX CALCULATOR

**PAY ONLY THIS AMOUNT**
**$ 83,633.81**
BY 03/01/12 (on time)

| IF PAID LATE 03/02/12 - 04/01/12 | IF PAID LATE 04/02/12 - 05/01/12 | IF PAID LATE 05/02/12 - 06/01/12 |
|---|---|---|
| $ 84,888.32 | $ 86,142.83 | $ 87,397.34 |

**PAYMENT INFO »**   PAY THIS BILL AT COOKCOUNTYTREASURER.COM OR AT ANY CHASE BANK.

LATE PENALTY
IS 1.5% PER MONTH,
BY STATE LAW.

### DEAR FELLOW TAXPAYER,

This 2011 First Installment Property Tax Bill is due by Thursday, March 1, 2012. Please note that the Illinois Legislature passed a law ordering that the first installment tax bill be calculated at 55% of last year's total property tax obligation. Previous first installment tax bills were calculated at 50%.

Payments can be made:

- Online at **cookcountytreasurer.com**
- At more than 400 Chase Bank locations across Chicagoland
- At 220 participating Community Banks - list available at **cookcountytreasurer.com**

**Do you have a property tax refund?**

It's easy to see if there is a refund available. Have your 14-digit property index number (PIN) available, then:

- Visit **cookcountytreasurer.com**
- Call our 24-hour automated phone system at **312.443.5100** - information available in English, Spanish and Polish

Please take advantage of these quick, easy-to-use refund searches. It may be worth your while!

Sincerely,

*Maria Pappas*

Maria Pappas
Cook County Treasurer

**Cook County Treasurer**
**cookcountytreasurer.com**
312.443.5100

360292

FEB 09 2012
TAX DEPT.

SEARS D  768 B2 109A
3333 BEVERLY RD
HOFFMAN ESTS IL 60192-3322

KEEP UPPER PORTION FOR YOUR

IF YOUR TAXES ARE PAID BY MORTGAGE ESCROW, BE SURE NOT TO DOUBLE PAY.

CHASE ◉ CHASE ◉ CHASE ◉ CHASE ◉ CHASE ◉ CHASE

Special benefits for Chase checking customers! Take advantage of exclusive offers on many Chase products. To learn more visit chase.com/exclusive or talk to a banker today!

By Transaction Summary

***************************************

Transaction #243
Tax Payment-Cook County
Account Number:
                                83,633.81
...................................

JPMorgan Chase Bank, N.A.
Schaumburg Meacham, Branch 000807
1-800-935-9935
Member FDIC, Equal Housing Lender
Please keep your receipt
02/24/2012 16:52

Business Date 02/24/2012
Session #115

Thank you - barbera
Cashbox #05

HIGHLY CONFIDENTIAL



# 2011 First Installment Property Tax Bill

| Property Index Number (PIN) | Volume | Code | Tax Year | (Payable In) | Township |
|---|---|---|---|---|---|
| 01-31-201-003-0000 | 001 | 10071 | 2011 | (2012) | BARRINGTON |

**Property Classification** 5-90

| 2010 TOTAL TAX | 152,042.78 |
|---|---|
| 2011 ESTIMATE X | 55% |
| 2011 1ST INSTALLMENT | 83,623.53 |

**TAX CALCULATOR**

**PAY ONLY THIS AMOUNT**

## $ 83,623.53

BY 03/01/12 (on time)

| IF PAID LATE 03/02/12 - 04/01/12 | IF PAID LATE 04/02/12 - 05/01/12 | IF PAID LATE 05/02/12 - 06/01/12 |
|---|---|---|
| $ 84,877.88 | $ 86,132.23 | $ 87,386.58 |

LATE PENALTY IS 1.5% PER MONTH, BY STATE LAW.

PAY THIS BILL AT COOKCOUNTYTREASURER.COM OR AT ANY CHASE BANK.

**Property location and classification for this PIN**

685  HIGGINS RD    HOFFMAN ESTATES IL    Property Classification 5-90

**PAYMENT INFO »**

DEAR FELLOW TAXPAYER,

This 2011 First Installment Property Tax Bill is due by Thursday, March 1, 2012. Please note that the Illinois Legislature passed a law ordering that the first installment tax bill be calculated at 55% of last year's total property tax obligation. Previous first installment tax bills were calculated at 50%.

Payments can be made:

- Online at **cookcountytreasurer.com**
- At more than 400 Chase Bank locations across Chicagoland
- At 220 participating Community Banks - list available at **cookcountytreasurer.com**

**Do you have a property tax refund?**

It's easy to see if there is a refund available. Have your 14-digit property index number (PIN) available, then:

- Visit **cookcountytreasurer.com**
- Call our 24-hour automated phone system at **312.443.5100** - information available in English, Spanish and Polish

Please take advantage of these quick, easy-to-use refund searches. It may be worth your while!

Sincerely,

*Maria Pappas*

Maria Pappas
Cook County Treasurer

IF YOUR TAXES ARE PAID BY MORTGAGE ESCROW, BE SURE NOT TO DOUBLE PAY.

KEEP UPPER PORTION FOR YOUR

**Cook County Treasurer**
cookcountytreasurer.com
312.443.5100

@ 36292

TAX DEPT

FEB 05 2012

SEARS D 760 B2 109A
3333 BEVERLY RD
HOFFMAN ESTS IL 60192-3322

---

## CHASE

**CHASE**  Special benefits for Chase checking customers! Take advantage of exclusive offers on many Chase products. To learn more visit chase.com/exclusives or talk to a banker today!

My Transaction Summary

Transaction #231
Tax Payment-Cook County
Account Number:          $83,623.53

JPMorgan Chase Bank, N.A.
Schaumburg Meacham, Branch 000807
1-800-935-9935
Member FDIC. Equal Housing Lender
Please keep your receipt
02/29/2012 17:02

Business Date 02/29/2012
Session #105

Thank you - Dimitre
Cashbox #15

HIGHLY CONFIDENTIAL

# Exhibit B



HIGHLY CONFIDENTIAL



# 2011 Second Installment Property Tax Bill

**Property Index Number (PIN)**
01-31-202-002-0000

| Volume | Code | Tax Year (Payable in) | Township |
|---|---|---|---|
| 001 | 10071 | 2011 (2012) | BARRINGTON |

**PAY ONLY THIS AMOUNT**
**$ 69,670.69**
BY 08/01/12 (on time)

| IF PAID LATE 08/02/12 – 09/01/12 | IF PAID LATE 09/02/12 – 10/01/12 | IF PAID LATE 10/02/12 – 11/01/12 |
|---|---|---|
| $ 70,715.75 | $ 71,760.81 | $ 72,805.87 |

LATE PENALTY IS 1.5% PER MONTH, BY STATE LAW.

THANK YOU FOR YOUR FIRST INSTALLMENT PAYMENT OF:
$ 83,633.81 ON 02-24-12
PAY THIS BILL AT COOKCOUNTYTREASURER.COM OR ANY CHASE BANK.

685  HIGGINS RD
HOFFMAN ESTATES  IL

**TRX CALCULATOR**

**2010 Assessed Value**
636,102

| | 2010 Tax | 2010 Rate |
|---|---|---|

KEEP UPPER PORTION FOR YOUR RECORDS

CHASE CHASE CHASE CHASE CHASE

Special benefits for Chase checking customers! Take advantage of exclusive offers on many Chase products. To learn more visit chase.com/exclusives or talk to a banker today!

My Transaction Summary
*********************************
Transaction #54
Tax Payment-Cook County
Account Number:
$69,670.69

JPMorgan Chase Bank, N.A.
Schaumburg Meacham, Branch 000807
1-800-935-9935
Member FDIC, Equal Housing Lender
Please keep your receipt
07/23/2012 11:18

Business Date 07/23/2012
Session #33

Thank you - Sandra
Cashbox #13

IF YOUR TAXES ARE PAID BY MORTGAGE ESCROW, BE SURE NOT TO DOUBLE PAY.

TAX DEPT.
JUL 05 2012



HIGHLY CONFIDENTIAL

# Exhibit C

**Minutes of a Meeting of the**
**Restructuring Committee of the Board of Directors of**
**Sears Holdings Corporation**

**January 9, 2019**

A telephonic meeting of the Restructuring Committee (the "Committee") of the Board of Directors (the "Board") of Sears Holdings Corporation (the "Company") was held on January 9, 2019, beginning at 5:00 p.m. (Eastern).

**Committee Members Present**
- Alan J. Carr
- Paul G. DePodesta
- William L. Transier

**Committee Members Present**
- Revised ESL Bid Letter (see Exhibit A)

With a quorum being present and the meeting having been duly noticed and convened, the Committee was ready to proceed with business. Also present by invitation were Rob Riecker, Chief Financial Officer and member of the Office of the Chief Executive; Luke Valentino, Vice President, Deputy General Counsel and Corporate Secretary; Mohsin Meghji, Chief Restructuring Officer of the Company; Ray Schrock, Jacqueline Marcus, Greg Danilow, Ellen Odoner, Sunny Singh, Jessica Liou and Kaitlin Descovich of Weil, Gotshal & Manges, LLP, attorneys for the Company ("Weil"); Brandon Aebersold and Levi Quaintance of Lazard Frères & Co. LLC, the Company's investment banker ("Lazard"); Paul Basta and Kelley Cornish of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"), counsel to the Subcommittee of the Committee (the "Subcommittee"); Dennis Stogsdill of Alvarez & Marsal, restructuring advisor to the Subcommittee ("A&M"); and Dan Aronson of Evercore Partners, LP, financial advisor to the Subcommittee.





Mr. Aebersold reported on Lazard's calls with other active bidders, who had largely assumed that the January 14th auction would be adjourned.  Mr. Aebersold stated that Lazard and Weil were working to get those bidders into a position to participate in the January auction and to identify stalking horses for assets in the event that ESL was not successful.

There being no further business for the Committee, the meeting was adjourned at approximately 5:30 p.m.

CONFIDENTIAL                                    SEARS_UCC00413791

**Exhibit A**

**Revised ESL Bid Letter**

See attached.

SEARS_UCC00413792

# Exhibit D

**From:** Guthrie, Hayden [mailto:Hayden.Guthrie@weil.com]
**Sent:** Monday, February 4, 2019 9:54 PM
**To:** Allen, Charles W. <callen@cgsh.com>; Austin, Christopher E. <caustin@cgsh.com>; O'Reilly, Benet J. <boreilly@cgsh.com>; O'Neal, Sean A. <soneal@cgsh.com>; Arn, Kristen <karn@cgsh.com>; Gray, Paul <pgray@cgsh.com>; Rosenbloom, Chelsey <crosenbloom@cgsh.com>; Reich, Yaron Z. <yreich@cgsh.com>; Lanzkron, Joseph <jlanzkron@cgsh.com>; Bachand-Parente, Christopher J. <cbachandparente@cgsh.com>; Britton, Robert <rbritton@paulweiss.com>; tlii@paulweiss.com; GRP-Sears-Senior <GRP-Sears-Senior@paulweiss.com>
**Cc:** Project Blue Sasset M&A <ProjectBlueSassetM&A@weil.com>; Project Blue BFR Sales Team <Project.Blue.BFR.Sales.Team@weil.com>
**Subject:** Project Blue - APA Amendment

Cleary / Paul Weiss Teams

Please see attached for an updated draft of the APA Amendment and a redline against the Cleary draft of 02.03.19. Please note that there are a number of open items identified in the draft and the document in its entirety remains subject to ongoing review and comment by Sears.

Kind regards

Hayden

*Weil Draft of February 4, 2019*

# AMENDMENT NO. 1 TO

# ASSET PURCHASE AGREEMENT

This Amendment No. 1, dated as of February [●], 2019 (this "Amendment"), to the Asset Purchase Agreement (the "Purchase Agreement"), dated as of January 17, 2019, by and among Transform Holdco LLC, a Delaware limited liability company (together with any applicable Affiliated Designee, "Buyer"), Sears Holdings Corporation ("SHC" or the "Seller" and together with each of its Subsidiaries party to the Purchase Agreement, the "Sellers") is entered into by and among Buyer and each Seller.  Terms capitalized but not defined herein shall have the meanings given to such terms in the Purchase Agreement.

WHEREAS, Buyer and the Sellers have previously entered into the Purchase Agreement pursuant to which, among other things, Buyer will acquire the Acquired Assets and assume the Assumed Liabilities on the terms and subject to the conditions set forth in the Purchase Agreement; and

WHEREAS, Buyer and the Sellers desire to amend the Purchase Agreement in accordance with Section 13.3 of the Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing, the representations, warranties, covenants and agreements set forth in the Purchase Agreement and this Amendment, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE I    AMENDMENTS

SECTION 1.01.    Section 1.1 of the Purchase Agreement is amended as follows:

(a) The definition of "Acquired Inventory" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Acquired Inventory" shall mean (i) with respect to any Operating Leased Property, all Inventory which is located at, on or in transit to the applicable Operating Lease Property as of the Closing Date, (ii) with respect to any Operating Owned Property, all Inventory which is located at, on or in transit to the Operating Owned Property as of the Closing Date, (iii) with respect to any IP/Ground Lease Property, all Inventory which is located at, on or in transit to the IP/Ground Lease Property as of the Closing Date, (iv) with respect to any Operating Sparrow Properties, all Inventory located at, on or in transit to the Operating Sparrow Properties, and (v) all other Inventory Related to the Business other than Inventory included in clause (ii) of the definition of Excluded Inventory.

(b) The definition of "Buyer Party Release" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety.

(c) The definition of "Designatable Lease" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Designatable Lease" shall mean each of (i) the GOB Leases, the Operating Leases, the Landlord Leases and the Sparrow Subleases and (ii) to the extent applicable to such leases and lease agreements, all non-disturbance agreements with fee owners or senior landlords, subordination, non-disturbance and attornment agreements, waivers and consents in favor of any Seller,  estoppel certificates from landlords under any of the Leases (to the extent assignable), and landlord waivers or other collateral access agreements in favor of any Seller or any asset-based lenders.

(d) The following is added as a new defined term:

"Employee Lease Agreement" shall mean the agreement substantially in the form of Exhibit H.

(e) The definition of "Expenses" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Expenses" shall mean (i) the Buyer Occupancy Costs, if applicable, and (ii) the reasonable and documented out-of-pocket fees, costs and expenses or other disbursements borne by any Seller or its Affiliates incurred or accruing (a) during the Designation Rights Period, to the extent Related to the Operating Leases, Operating Leased Stores, Landlord Leases or Sparrow Leases, (b) to the extent Related to the GOB Leases or GOB Leased Stores following the GOB Period for each such GOB Lease or GOB Leased Store, (c) to the extent Related to the GOB Owned Stores following the GOB Period for such GOB Owned Store, (d) after the Closing, to the extent related to an Additional Contract or any Operating Lease, Operating Leased Store, Landlord Lease or Sparrow Lease or (e) as a result of the Sellers being the tenant or landlord under the Designatable Lease or Additional Contract during, with respect to the GOB Leased Stores, the period commencing after the GOB Period for each such GOB Leased Store and ending at the expiration of the Designation Rights Period, and with respect to any Operating Leased Property, Landlord Lease or Sparrow Lease, during the Designation Rights Period, and any reasonable and documented fees, costs and expenses incurred by any Seller or its Affiliates in connection with any transfer of a Designatable Lease to Purchaser following the Designation Rights Period, but in each case shall not, for the avoidance of doubt, include rejection damages or Cure Costs.

(f) The definition of "GOB Period" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"GOB Period" shall mean with respect to each GOB Leased Store or GOB Owned Store, the period commencing on the Closing Date and ending on the date that the Seller delivers written notice to Buyer that the "going-out-of-business" sale with respect to such GOB Leased Store or GOB Owned Store, as applicable, has been completed and all inventory of the Sellers has been removed from such GOB Leased Store or GOB

2

Owned Store, as applicable. For the avoidance of doubt, the Sellers may deliver any such notice on or prior to the Closing Date.

(g) The following is hereby added as a new defined term:

"Landlord Leases" shall mean each of (i) those leases or lease agreements (including ground leases) related to the Owned Real Property under which any Seller is the lessor (together with all amendments, modifications, supplements and renewals thereof), and (ii) to the extent applicable to such leases and lease agreements, all non disturbance agreements with fee owners or senior landlords, subordination, non disturbance and attornment agreements, waivers and consents in favor of any Seller, estoppel certificates from landlords under any such leases and lease agreements (to the extent assignable), and landlord waivers or other collateral access agreements in favor of any Seller or any asset based lenders.

(h) The definition of "Occupancy Expenses" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Occupancy Expenses" shall mean, with respect to any Lease Premises, Owned Real Property or Sparrow Property, all liquidated costs, expenses, obligations and liabilities under or in connection with the applicable Lease payable or paid by any Seller, including any and all mortgage payments, base rent, percentage rent, additional rent, CAM, utilities, Property Taxes and assessments, costs of continuing the level of maintenance and security required by this Agreement, a pro rata portion of insurance (including public liability and casualty insurance) attributable to such Lease or Lease Premises, Owned Real Property or Sparrow Property and all other categories of expenses, obligations and liabilities arising or accruing under or in connection with such Lease (whether or not billed by the applicable counterparty to such Lease), Owned Real Property or Sparrow Property. For the avoidance of doubt, Occupancy Expenses shall not include any Seller's costs and expenses of (a) any professionals retained in connection with the Bankruptcy Cases or (b) counsel of any kind except to the extent counsel is retained with respect to a Lease, Owned Real Property or Sparrow Property and not the Sellers' other operations.

(i) The definition of "PA Liabilities Services Agreement" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety.

(j) The following is hereby added as a new defined term:

"Proration Date" shall have the meaning given in Section 9.11(a).

(k) The definition of "Securities Consideration" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Securities Consideration" shall mean the securities described in Schedule 9.2.

(l) The following is hereby added as a new defined term:

[AM_ACTIVE 401058988_7]
WEIL:\96900353\5\73217.0003

"Services Agreement" shall mean the agreement substantially in the form attached hereto as Exhibit I.

(l=m) The following are hereby added as new defined terms:

"Sparrow Leases" shall mean the Sparrow Subleases together with the lease listed in Schedule 1.1(r).

"Sparrow Subleases" shall mean each of (i) the leases listed on Schedule 1.1(s) (together with all amendments, modifications, supplements and renewals thereof), and (ii) to the extent applicable to such leases and lease agreements, all non disturbance agreements with fee owners or senior landlords, subordination, non disturbance and attornment agreements, waivers and consents in favor of any Seller, estoppel certificates from landlords under any such leases and lease agreements (to the extent assignable), and landlord waivers or other collateral access agreements in favor of any Seller or any asset based lenders.

(m=n) The definition of "Store Cash" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Store Cash" shall mean any cash of the Sellers in the registers or otherwise held at any Operating Lease Property, any Operating Owned Property or any Sparrow Property, in an amount not to exceed $17,000,000.

(o) The definition of "Second Lien Line of Credit Facility" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Second Lien Line of Credit Facility" shall mean each line of credit facility granted pursuant to an amendment to the Second Lien Credit Agreement.

SECTION 1.02.    Section 2.1(o) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(o)    except as set forth in Section 2.2(r), any and all rights of the Sellers in and to any restricted cash, security deposits, letters of credit, escrow deposits and cash collateral, including cash collateral given to obtain or maintain letters of credit and cash drawn or paid on letters of credit, utility deposits, performance, payment or surety bonds, credits, allowance, prepaid rent or other assets, charges, setoffs, prepaid expenses, other prepaid items and other security (collectively, "Security Deposits"), together with all contracts, agreements or documents evidencing or related to the same (collectively, "Security Deposit Documents"), in each case to the extent related to any Acquired Asset;"

SECTION 1.03.    Section 2.1(p) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

[AM_ACTIVE 401058988_7]
WEIL:\96900353\5\73217.0003

"(p)      any and all Claims (other than returns of merchandise for warranty claims (except, for the avoidance of doubt, to the extent comprising Assumed Liabilities)) of the Sellers as of the Closing that are Related to the Business or any Acquired Asset, excluding any Claims that are, or are Related to, an Excluded Asset or Excluded Liability;"

SECTION 1.04.      Section 2.1(v) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(v)      the release of the Released Estate Claims in accordance with Section 9.13;"

SECTION 1.05.      Section 2.1(bb) of the Purchase Agreement is hereby amended to remove the word "and" at the conclusion of such Section, Section 2.1(cc) of the Purchase Agreement is hereby amended to replace the period at the conclusion of such Section with a semicolon and the following is hereby added as Section 2.1(dd) of the Purchase Agreement:

"(dd)    subject to Section 2.13, any Acquired Foreign Assets; and"

SECTION 1.06.      [The following is hereby added as Section 2.1(ee) of the Purchase Agreement:

"(ee)    any bank accounts of the Sellers as may be agreed by Buyer and the Sellers prior to the Closing Date (but, for the avoidance of doubt, not including any cash in any such bank accounts)."][1]

SECTION 1.07.      Section 2.2(i) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(i)      all Claims, Proceedings, and causes of action of Sellers other than Claims described in Section 2.1(p). Notwithstanding anything to the contrary in Section 2.1(p) or elsewhere, the Excluded Assets shall include (A) all Claims, Proceedings and causes of action of Sellers that did not arise in the Ordinary Course of Business; (B) all Avoidance Actions; (C) all Released Estate Claims; and (D) all Claims, Proceedings, and causes of action described in the second sentence of Section 9.13(e)(ii) (excluding, for the avoidance of doubt, any contractual or commercial claims against Seritage Growth Properties, L.P., Lands' End, Inc. or their respective Affiliates that arose in the Ordinary Course of Business), including any Claims against the Sellers or their directors, officers, insiders or shareholders under any applicable law arising from any pre-petition transaction for breach of fiduciary duty, fraudulent conveyance, or illegal dividend. Nothing in this Section 2.2(i) or in Section 2.1(p) shall affect the scope of the Released Estate Claims, and in the event of any conflict between Section 2.2(i) and Section 2.1(p), on the one hand, and Section 9.13, on the other hand, Section 9.13 shall govern;"[2]

---

[1] **Note to Buyer**: Subject to further review and discussion.
[2] **Note to Draft**: Per Paul Weiss draft of February 4.

5

SECTION 1.08.    Section 2.2(n) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(n)    all bank accounts (except as otherwise provided in Section 2.1(ee);"

SECTION 1.09.    Section 2.2(p) of the Purchase Agreement is hereby amended to remove the word "and" at the conclusion of such Section and Section 2.2(q) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(q)    the SHIP Purchase Agreement Assets (if the SHIP Closing shall have occurred prior to the Closing Date); and"

SECTION 1.10.    The following is hereby added as Section 2.2(r) of the Purchase Agreement:

"(r)    all Adequate Assurance Deposits as defined in the Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Establishing Procedures for Future Utility Services, and (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Service (ECF No. 461) approved by the Bankruptcy Court on November 5, 2018."

SECTION 1.11.    In Section 2.3(i) of the Purchase Agreement, the reference to "Section 9.2" is revised to refer to "Section 9.2(a)".

SECTION 1.12.    Section 2.3(j) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(j)    all Liabilities with respect to the Transferred Employees (i) to the extent arising as a result of an event, action or omission that occurs on or following the Closing Date or (ii) expressly assumed by Buyer and its Subsidiaries pursuant to Section 9.7 (including under the Employee Lease Agreement);"

SECTION 1.13.    Section 2.3(n) of the Purchase Agreement is hereby amended to remove the word "and" at the conclusion of such Section, Section 2.3(o) of the Purchase Agreement is hereby amended to replace the period at the conclusion of such Section with a semicolon and the following is hereby added as Section 2.3(p) of the Purchase Agreement:

"(p)    the claims underlying the mechanics' liens identified in Section 2 of Schedule 6.5; and"

SECTION 1.14.    Section 2.3(k)(x) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(x)    Notwithstanding anything to the contrary herein or in the Approval Order, and for the avoidance of doubt, the Buyer's agreement to pay Assumed 503(b)(9) Claims, Other Payables, or any other administrative or priority claim of the Sellers pursuant to the terms hereof is a general unsecured contractual obligation of the Buyer owed solely to the Sellers;"

6

SECTION 1.15.    Section 2.4(p) of the Purchase Agreement is hereby amended to add the word "and" at the conclusion of such Section, Section 2.4(q) of the Purchase Agreement is hereby amended to replace "; and" at the conclusion of such Section with a period and Section 2.4(r) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(r)    [Reserved]."

SECTION 1.16.    The final paragraph of Section 2.4 is revised to read as follows:

"For the avoidance of doubt, (i) all Taxes of any Seller shall be Assumed Liabilities, regardless of the time and circumstances giving rise to any such Taxes, except for any Tax expressly excluded under Section 2.4(h) or Section 2.4(i) and (ii) the Liabilities of any entity that is an Acquired Foreign Asset shall not be Excluded Liabilities."

SECTION 1.17.    Section 2.9 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 2.9        If, at any time prior to the date that is sixty (60) days after the Closing Date, but in no event later than May 3, 2019 (the "Designation Deadline"), Buyer so determines as to any Contract that is Related to the Acquired Assets or is an IP License, in each case but is not an Initial Assigned Contract (other than (i) any lease of non residential real property and (ii) any Excluded Asset set forth in Section 2.2) (each, an "Additional Contract"), Buyer may elect, after consultation with the Sellers, by written notice delivered to the Sellers, to designate for assignment or assumption and assignment any Additional Contract for no additional consideration.  Upon the designation of any such Additional Contract as an Assigned Agreement pursuant to this Section 2.9, the Sellers will use their reasonable best efforts to assume and assign to the applicable Assignee such Additional Contract so long as the Buyer pays all Expenses accrued post-Closing and all Cure Costs associated with such Additional Contract; provided, however, that nothing herein shall be deemed or construed to obligate the Sellers to retain, or refrain from rejecting or terminating any Lease or Contract after the Designation Deadline that does not constitute an Assigned Agreement.  Notwithstanding anything to the contrary herein, the Sellers shall not be obligated to assume and assign any Contract pursuant to this Section 2.9 with respect to which Buyer fails to satisfy the Bankruptcy Court as to adequate assurance of future performance or for which Consent is required to assume and assign such Additional Contract and such Consent has not been obtained, provide that the Parties shall use their reasonable best efforts to obtain all such Consents. Without duplication of any amounts payable under the Services Agreement, Buyer shall pay all Expenses accrued after the Closing with respect to any Additional Contract that is not ultimately designated as an Assigned Agreement if and to the extent Buyer receives a benefit under such Additional Contract.  If the Sellers also receive a benefit under such Additional Contract after the Closing, Buyer and the Sellers shall allocate a proportionate amount of the Expenses with respect to such Additional Contract to the Sellers (including by netting against amounts owed by Buyer)."

7

SECTION 1.18.        Section 2.11 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 2.11        Rejection of Outbound IP Licenses.  Within seven (7) Business Days after the Closing Date, subject to section 365(n) of the Bankruptcy Code, the Sellers shall file a motion to reject, and take all actions (including actions required under section 365 of the Bankruptcy Code) reasonably necessary to reject any Outbound IP Licenses that (i) are executory Contracts and (ii) are designated by Buyer for rejection at any time prior to the second (2nd) Business Day prior to the Closing Date (such Contracts, "Closing Date Rejected Licenses").  Without limiting the foregoing, promptly following the Designation Deadline, the Sellers shall file a motion to reject, and take all actions (including actions required under section 365 of the Bankruptcy Code) reasonably necessary to reject, any Outbound IP Licenses that (x) are not Closing Date Rejected Licenses, (y) are executory Contracts and (z) are not designated by Buyer for assignment or assumption and assignment as an Assigned Agreement in accordance with the terms of this Agreement or for solely assumption pursuant to Section 9.14(d)."

SECTION 1.19.        Section 2.13(a) and Section 2.13(b) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(a)        On the Closing Date, (i) the Sellers shall use reasonable best efforts to cause each of the Foreign Subsidiaries to sell, transfer, assign, convey and deliver, or cause to be sold, transferred assigned, conveyed and delivered to Buyer or the applicable Assignee, and Buyer or such applicable Assignee shall use reasonable best efforts to purchase, all right, title and interest of each of the Foreign Subsidiaries, in, to or under all assets, properties and rights Related to the Business (other than the Excluded Assets) and any other assets of the type that would have been Acquired Assets had they had been owned by the Sellers as of the Closing Date or minority equity interests in non-U.S. Persons held by Subsidiaries of the Seller (other than any Subsidiary who is a Seller (including, if agreed between Buyer and the Sellers, through transferring the equity of any such Subsidiaries holding such minority equity interests)) (collectively, the "Acquired Foreign Assets"), in each case free and clear of any and all Encumbrances of any kind, nature or description and any Claims, other than Permitted Post-Closing Encumbrances and (ii) subject to and to the extent of the transfer of the Acquired Foreign Assets, Buyer shall assume, effective as of the Closing, and shall timely perform and discharge in accordance with their respective terms all Liabilities (other than Excluded Liabilities) of the type that would have been Assumed Liabilities had the applicable Foreign Subsidiary been a Seller as of the Closing Date.  If the transfer of any Acquired Foreign Assets does not occur at the Closing Date, Seller and Buyer shall use reasonable best efforts to complete such transfer as promptly as practicable and shall enter into such agreements as may be reasonably required to provide Buyer or the applicable Assignee the benefit of such assets until such transfer is consummated.  If, at any time prior to the date that is sixty (60) days after the Closing Date, Buyer determines (in its sole discretion) and notifies the Seller that it is necessary or desirable to acquire all of the equity interests in any Foreign Subsidiary in lieu of the acquisition of assets and assumption of liabilities contemplated by the first sentence of this Section 2.13(a), then the Sellers shall use reasonable best efforts to transfer such equity interests, which equity

8

interests shall be deemed to be Acquired Foreign Assets. If (i) the proposed transfer of any Acquired Foreign Assets triggers any right of first offer, right of first refusal or other preemptive right by a third party and (ii) such third party exercises such right of first offer, right of first refusal or other preemptive right, then the Sellers shall pay or cause to be paid to Buyer any consideration received by the Sellers or their Subsidiaries resulting from such exercise (and such transfer shall be deemed to satisfy the Sellers' obligation to sell, transfer, assign, convey or deliver the applicable Acquired Foreign Asset).

(b)     If, at any time prior to the date that is sixty (60) days after the Closing Date, Buyer determines (in its sole discretion) and notifies the Seller that it is necessary or desirable to acquire other minority equity interests in non-U.S. Persons held by Subsidiaries of the Seller (other than any Subsidiary who is a Seller (including, if agreed between Buyer and Sellers, through transferring the equity of any such Subsidiaries holding such minority equity interests)) so as to ensure that Buyer or the applicable Assignee shall be able to secure the benefit of the applicable Acquired Foreign Assets, Buyer may elect, by written notice delivered to the Sellers, to acquire such other minority equity interests directly from the Seller it being agreed by the Parties that such equity interests will be deemed to be Acquired Foreign Assets for the purposes of this Agreement. Following any such election, Buyer and the Seller shall promptly execute all documentation required to effectuate the purchase and sale of such other minority equity interests under applicable Law. If (i) the proposed transfer of any such other minority equity interests triggers any right of first offer, right of first refusal or other preemptive right by a third party and (ii) such third party exercises such right of first offer, right of first refusal or other preemptive right, then the Sellers shall pay or cause to be paid to Buyer any consideration received by the Sellers or their Subsidiaries resulting from such exercise (and such transfer shall be deemed to satisfy the Sellers' obligation to sell, transfer, assign, convey or deliver the applicable other minority equity interests)."

SECTION 1.20.     Section 3.1(a)(ii) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(ii)    an amount in cash equal to the Store Cash as of 12:01 a.m. New York City time on the Closing Date; *plus*;"

SECTION 1.21.     Section 3.1(b)(iv) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(iv)    obligations held by, or credit bid at the direction of, Buyer and its Affiliates as of the Closing Date in an aggregate amount equal to $433,450,000 under (x) the Second Lien Term Loan; (y) the Second Lien Line of Credit Facility; and (z) the Second Lien PIK Notes,"[3]

---

[3] **Note to Buyer**: The proposed changes to Section 3.3 (Closing Payment) of the Purchase Agreement are unacceptable. The purpose of the Store Cash is to help the Seller pay down the Senior DIP to the level meeting the closing condition.

9

SECTION 1.22.    Section 4.1 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 4.1    Closing Date.  The closing of the sale, transfer, assignment, conveyance and delivery of the Designation Rights and the Sellers' right, title and interest in, to and under the Acquired Assets by the Sellers to Buyer contemplated hereby (the "Closing") shall take place at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153, or at such other place or time as Buyer and the Sellers may mutually agree, on the third (3rd) Business Day following satisfaction or waiver of the conditions set forth in Article X and Article XI (other than those conditions that by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing).  Notwithstanding the immediately preceding sentence, if the Marketing Period has not ended at the time of the satisfaction or waiver of the conditions set forth in Article X and Article XI (other than those conditions that by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing), then the Closing shall occur instead on the date that is the earlier to occur of (x) any Business Day as may be specified by Buyer on no less than two (2) Business Days' prior written notice to the Sellers and (y) two (2) Business Days following the final day of the Marketing Period; provided, however, that if the Marketing Period has ended on or before February 7, 2019 and the conditions set forth in Article X and Article XI have been satisfied or waived (other than those conditions that by their nature are to be satisfied by actions taken at the Closing, but subject to satisfaction or waiver of such conditions at the Closing) then the Closing shall occur on February 8, 2019.  The date on which the Closing actually occurs is referred to as the "Closing Date", and for all purposes under this Agreement and any Transaction Document (including the Occupancy Agreement and the Seller Retained Occupancy Agreement), the Closing Date shall be deemed to be 12:01 a.m., New York City time on the date on which Closing actually occurs.

SECTION 1.23.    Section 4.2(e) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(e)    the Employee Lease Agreement and the Services Agreement, each duly executed by Buyer; and"

SECTION 1.24.    Section 4.3(e) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(e)    a quit claim deed to be recorded with respect to the Owned Real Property, or if a quit claim deed is not acceptable to the title insurer to receive insurable title in a particular jurisdiction, a no-warranty deed;"

SECTION 1.25.    Section 4.3(h) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(h)    all tangible embodiments of the Acquired Intellectual Property, including all (i) Software object code and source code related thereto, (ii) all materials and

10

documentation (in electronic and editable form, to the extent existing in such form) necessary for the use, modification, manufacture, sale and other exploitation of the Acquired Intellectual Property, to the extent not included in Intellectual Property Related Documentation, (iii) all content made available on or through any websites and webpages accessed through any Domain Names or Media Accounts included in the Acquired Intellectual Property and all other audio-visual or written materials (including such archival materials) produced by or on behalf of the Sellers, (iv) all Labeling and Marketing Materials and (v) all Product Catalogs and Manuals;"

SECTION 1.26.    Section 4.3(k) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(k)    a counterpart of each Short Form Assignment provided by Buyer to Seller as of February 4, 2019, duly executed by each applicable Seller (it being understood that post-Closing, the Parties will, in good faith, continue to prepare and execute additional jurisdiction-specific Short Form Assignments provided by Buyer to Seller);"

SECTION 1.27.    Section 4.3(l) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(l)    a counterpart of each IP Power of Attorney provided by Buyer to Seller as of February 4, 2019, duly executed by each applicable Seller (it being understood that post-Closing, the Parties will, in good faith, continue to prepare and execute additional jurisdiction-specific IP Powers of Attorney provided by Buyer to Seller);"

SECTION 1.28.    Section 4.3(n) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(n)    the Employee Lease Agreement and the Services Agreement, each duly executed by the Sellers;"

SECTION 1.29.    Section 4.4 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 4.4    Local Sale Agreements.  Subject to the terms and conditions hereof, to the extent necessary or desirable to effect the Closing on the terms hereof, Buyer or applicable Assignee and relevant Sellers shall, enter into such agreements or instruments, including a sale agreement and no-warranty deed for the Owned Real Property and bills of sale and/or assignment and assumption agreements, providing for the sale, transfer, assignment or other conveyance to Buyer or applicable Assignee, in accordance with the requirements of applicable local Law.  The Sellers and Buyer acknowledge and agree that to the extent applicable law imposes requirements for transferring assets of record, the Parties will reasonably cooperate to satisfy such requirements as to transfer such assets as promptly as reasonably practical after Closing."

SECTION 1.30.    Section 5.1(c)(ii) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

11

"(ii)      The operation of the GOB Owned Stores during the GOB Period and the Sparrow Properties set forth on Schedule 5.1(c)(ii) (collectively, the "GOB Sparrow Properties" and the Sparrow Properties other than the GOB Sparrow Properties, the "Operating Sparrow Properties") during the period commencing on the Closing Date and ending on the date that the Seller delivers written notice to Buyer that the "going-out-of-business" sale with respect to such Sparrow Properties has been completed and all inventory of the Sellers has been removed from such Sparrow Properties shall be governed by the Seller Retained Occupancy Agreement and the Seller shall conduct such operation pursuant to such Seller Retained Occupancy Agreement as the Seller determines in its sole discretion."

SECTION 1.31.      Section 5.2(b) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(b)      Within five (5) Business Days following the date upon which Buyer delivers a Buyer Assumption Notice to the Sellers with respect to any Designatable Lease, together with a related assignment agreement substantially in the form attached hereto as Exhibit E (the "Assignment and Assumption of Lease") executed by the applicable Assignee, the Sellers shall (1) deliver to Buyer and such Assignee a fully executed Assignment and Assumption of Lease and (2) file with the Bankruptcy Court and serve on the applicable lessor(s) and other appropriate notice parties (as applicable) a notice, and shall seek entry by the Bankruptcy Court of the Approval Order in respect of the Designatable Leases subject to such Buyer Assumption Notice.  As of the applicable Designation Assignment Date, except for such obligations and liabilities with respect to such Designatable Leases and the related Lease Premises arising during the Designation Rights Period and except for Buyer's obligations specifically set forth in this Agreement, as between Buyer and the Assignee, Buyer shall have no further obligation or Liability with respect to such Designatable Lease or the related Lease Premises (including any obligation to continue to pay Expenses with respect thereto) and Assignee shall thereafter be solely responsible for all amounts payable or other obligations or liabilities that may be owed in connection with such Designatable Lease or the related Lease Premises; provided, however, that nothing in this sentence shall affect the Sellers' rights against Buyer with respect to such Designatable Lease or the Lease Premises as set forth in this Agreement.;"

SECTION 1.32.      Section 6.6(a) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(a)      Except as would not, individually or in the aggregate, reasonably be expected to  have a Material Adverse Effect, the Sellers have good and marketable fee title to the Owned Real Property, free and clear of all liens (except for Permitted Encumbrances).  None of the Owned Real Property is subject to any leases or tenancies or other rights of occupancy other than the Landlord Leases;"

SECTION 1.33.      Section 8.8(a) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

12

"(a)    [Reserved]."

SECTION 1.34.    Section 8.8(b) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(b)    To the extent permitted by applicable Law, during the Management Services Period, the applicable the Sellers shall remain the manager, controller or operator of each Acquired Property, Occupancy Leased Premise and Sparrow Property solely to the limited extent required for any Permit applicable to such Acquired Property, Occupancy Leased Premise or Sparrow Property (in the case of the Sparrow Properties, solely to the extent of any Sellers' rights related to the Sparrow Properties) to remain effective  (the "Management Services").  Notwithstanding the foregoing, to the fullest extent permitted by applicable Law, each of the Sellers hereby appoints Buyer and its Affiliated Designees as agent of such Seller to manage, control and operate each of (i) the Acquired Properties, (ii) Occupancy Leased Premises and (iii) the Sparrow Properties (in the case of the Sparrow Properties, solely to the extent of any Sellers' rights related to the Sparrow Properties) at which Management Services are being provided (collectively, the "Managed Properties").  Pursuant to their appointment as the Sellers' agent, Buyer and its Affiliated Designees shall be entitled to manage, control and operate each of the Managed Properties as they see fit in their sole discretion and collect and retain all revenues generated by each Managed Property.  In furtherance thereof, the Parties acknowledge and agree that the Sellers shall have no economic interest in the Managed Properties other than the right to receive the Management Services Reimbursements.  As consideration for the provision of the Management Services, Buyer shall reimburse the Sellers, or cause the Sellers to be reimbursed, for any reasonable and documented out-of-pocket costs, fees and expenses incurred at any time in providing the Management Services, including any income and other taxes incurred by the Seller and its Subsidiaries in respect of the payment and receipt of such reimbursement (the "Management Services Reimbursements") and indemnify the Sellers from any Liability arising from the provision of the Management Services, except for any such Liability arising from gross negligence or willful misconduct of the Sellers. For the avoidance of doubt, all employees of the Managed Properties shall be employed by Buyer or its Affiliated Designee and no Seller shall have any authority to take action as an employer with respect to any such employee or to enter into any Contract on behalf of Buyer or any Affiliated Designee except to the extent otherwise provided for pursuant to any arrangement entered into in accordance with Section 9.7(a);"

SECTION 1.35.    The following is hereby added as Section 8.10 of the Purchase Agreement:

"Section 8.10    Sparrow Master Lease.  The Parties hereby agree that the lease set forth on Schedule 1.1(r) shall be assumed by the Sellers and assigned to the Buyer on the Closing Date."

SECTION 1.36.    Section 9.2(a) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

13

"(a)     Unless Buyer makes the election under Section 2.12(b) to treat all the transactions described in Article II as Designated Sale Transactions (resulting in no transfer of the Sellers' Tax attributes to Buyer): (1) Buyer shall provide to the Sellers detailed instructions as to steps to take (or not take) in order to secure and preserve the qualification of any of the transactions set forth in this Agreement as a Tax Reorganization (except if and to the extent Buyer determines otherwise, in accordance with Section 2.12(b), in respect of a given transaction or a particular Seller) and to achieve the Tax Result, including with respect to (i) repayment, cancellation or settlement of, or other actions with respect to, intercompany accounts after the approval of the Bankruptcy Plan and on or before the Closing Date, (ii) the merger of any of the Sellers' Subsidiaries with another Sellers' Subsidiaries after the approval of the Bankruptcy Plan and on or before the Closing Date or conversion of any of the Sellers' Subsidiaries into limited liability companies, (iii) the filing of any Tax elections to treat any such Subsidiaries as disregarded entities for U.S. federal income tax purposes, or otherwise taking an action to establish that such Subsidiaries have liquidated for tax purposes, (iv) implementation of the Distribution Requirement in a manner that is consistent with section 507 of the Bankruptcy Code, (v) satisfaction of the ownership requirements set forth in section 382(l)(5)(A)(ii) of the Code, and (vi) any other instructions that in the reasonable opinion of tax counsel for Buyer are necessary or desirable to ensure the qualification of the Tax Reorganization and the achievement of the Tax Result, and the Sellers shall follow such instructions; provided that (A) such instructions shall not limit the Sellers' discretion or actions in respect of (x) operating the Business and its other Assets in the Ordinary Course of Business and in compliance with the other provisions of this Agreement for all periods through the Closing Date, (y) disposing of any of its Assets if and to the extent permitted under the other provisions of this Agreement (z) taking or refraining from taking any action required by this Agreement or by Law, including if such actions would be inconsistent with its obligations under the Bankruptcy Code, (B) if requested by the Sellers, Buyer's tax counsel shall deliver to the Sellers a Tax Opinion that each and any such transaction (other than any Designated Sale Transactions) qualifies as a Tax Reorganization, and (C) nothing herein shall affect Buyer's liability for Taxes that are Assumed Liabilities; (2) subject to the preceding clause (1), the Sellers agree to cooperate with Buyer in order that, for federal income Tax purposes, the transactions effected pursuant to this Agreement, together with the distributions made by, and liquidation of, the Sellers pursuant to the Bankruptcy Plan, are treated as one or more plans of reorganization under section 368 of the Code and as qualifying as one or more reorganizations under section 368(a)(1)(G) of the Code (except if and to the extent Buyer determines otherwise, in accordance with Section 2.12(b), in respect of a given transaction or a particular Seller); (3) any Tax Return in respect of a Tax imposed on any Seller for which Buyer is liable hereunder shall be prepared by Buyer, a copy of such Tax Return shall be provided to SHC at least thirty (30) days prior to the due date thereof, Buyer shall consider in good faith any reasonable comments provided by the Sellers, the Sellers shall, if necessary for filing, properly execute any such Tax Return, and Buyer shall timely and properly file any such Tax Return and pay the amount of any Taxes shown due on any such Tax Return; and (4) immediately following the Closing, the Sellers shall take the steps with respect to the Securities Consideration described in Schedule 9.2. Consistent with and subject to the foregoing, the Seller shall convert any

14

of the Sellers' Subsidiaries as shall be designated by Buyer to a limited liability company pursuant to instructions provided by Buyer."

SECTION 1.37.    Section 9.3(d) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(d)    As soon as practicable (and in any event within ninety (90) days) after the Closing Date, Buyer shall deliver to the Sellers a schedule allocating the Purchase Price (including any Assumed Liabilities treated as consideration for the Acquired Assets for Tax purposes) (the "Allocation Schedule"). The Allocation Schedule shall allocate the Purchase Price among the Sellers and among the Acquired Assets acquired from each Seller, and shall be prepared in accordance with Section 1060 of the Code if Buyer makes the election under Section 2.12(b) to treat all the transactions described in Article II as Designated Sale Transactions (resulting in no transfer of the Sellers' Tax attributes to Buyer), and in any case shall be prepared in accordance with applicable law to the extent necessary to comply with reporting in respect of applicable Transfer Taxes. The Allocation Schedule shall be deemed final unless the Sellers notify Buyer in writing that the Sellers object to one or more items reflected in the Allocation Schedule within forty-five (45) days after delivery of the Allocation Schedule.  In the event of any such objection, Buyer and the Sellers shall negotiate in good faith to resolve such dispute; provided, however, that if Buyer and the Sellers are unable to resolve any dispute with respect to the Allocation Schedule within sixty (60) days after the delivery of the Allocation Schedule, such dispute shall be resolved by the CPA Firm.  The fees and expenses of the CPA Firm in connection therewith shall be borne equally by Buyer and the Sellers.  Each of Buyer and the Sellers agrees to file its respective federal, state and local Tax returns in accordance with the Allocation Schedule, and any adjustments to the Purchase Price pursuant to this Section 9.3 shall be allocated in a manner consistent with the Allocation Schedule. For the avoidance of doubt, the Parties shall cooperate in determining the portion of the Purchase Price allocable to the Acquired Assets that are subject to a Transfer Tax prior to the due date of the Tax Return required to be filed in connection with such Transfer Taxes; provided, that if the parties do not agree with respect to such determination, such matter shall be resolved in accordance with the determination of the CPA Firm; provided further, that such Tax Return will be adjusted, as applicable, consistent with the procedures described above, to reflect any adjustments to the allocated Purchase Price.  Notwithstanding the foregoing, in the case of any asset for which an allocation of Purchase Price is required earlier than contemplated by the foregoing, the time frame for determination of the allocation of Purchase Price to those assets shall be fixed by the Parties to accommodate such requirement, provided that any such allocation may thereafter be revised for other purposes as appropriate and necessary to reflect the overall final allocation of Purchase Price in the Allocation Schedule."

SECTION 1.38.    Section 9.7 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 9.7    Employment Offers.

15

(a)     Buyer shall make an offer of employment to any Business Employee represented by a labor union and whose terms and conditions of employment are covered by a collective bargaining agreement ("Represented Employees") using reasonable best efforts to comply with the requirements of any such collective bargaining agreement. For any Business Employee not represented by a labor union ("Non-Represented Employees"), Buyer shall, or shall cause any of its Subsidiaries to, (i) no later than five (5) days prior to the date determined under the Employee Lease Agreement (the "Offer Effective Date"), use reasonable best efforts to provide a written offer of employment in a comparable position to, effective as of 11:59 p.m., local time, on the Offer Effective Date, each of such Business Employees, or (ii) to the extent required by and in accordance with applicable Law, enter into employment agreements with each of such Business Employees. Those Business Employees, including both Represented Employees and Non-Represented Employees, who accept such offer of employment on or before the Offer Effective Date in accordance with the provisions of such offer and continue employment with Buyer or any of its Subsidiaries, shall be referred to as "Transferred Employees." At the Closing, Buyer and the Seller shall enter into the Employee Lease Agreement pursuant to which Buyer shall, at Buyer's cost, have the benefit of the Business Employees' (the "Leased Employees") services during the period from the Closing Date through the Offer Effective Date (the "Lease Period") such that Buyer may carry on the operation of the Business from and after the Closing Date. In accordance with the Employee Lease Agreement, and for the avoidance of doubt, Buyer shall timely advance to the Seller the actual, out-of-pocket expenses to be paid or provided by the Seller and its Subsidiaries for wages and benefits associated with the Leased Employees during the Lease Period and any other liabilities attributable to Leased Employees that are incurred by the Seller and its Subsidiaries in connection with the Employee Services (as defined in the Employee Lease Agreement) during the Lease Period such that the Seller is in the same economic position as if the Leased Employees had been hired by Buyer as of the Closing. For the avoidance of doubt, during the Lease Period, the Seller and its Subsidiaries shall continue to provide to each of the Leased Employees compensation and benefits on the same basis as they were provided to such Leased Employee immediately prior to the Closing Date.

(b)     Subject to the last sentence of this Section 9.7(b) and except as otherwise expressly provided in this Section 9.7(b), with respect to each Transferred Employee who remains employed by Buyer or any of its Subsidiaries, Buyer shall, or shall cause any of its Subsidiaries to, provide for the period commencing on the Offer Effective Date and ending on the last day of the Sellers' fiscal year ending in 2020, subject to such Transferred Employee's continued employment with Buyer or any of its Subsidiaries (as applicable) (i) (A) base salary or hourly wage rate and (B) a target short-term cash incentive opportunity, in each of (A) and (B), that is at least equal to the base salary or wages and target short-term cash incentive opportunity, respectively, provided to such Transferred Employee immediately prior to the Closing Date and (ii) a group health and welfare plan and, subject to and in accordance with Section 9.7(k), a 401(k) plan, qualified under Sections 401(a) and 401(k) of the Code ("401(k) Plan"), that are substantially comparable in the aggregate to the group health and welfare plan and 401(k) Plan under which such Transferred Employee participates as of the date hereof. For the avoidance of doubt, (x) the terms of this Section 9.7(b) shall apply notwithstanding anything to the contrary in any non-solicitation or similar agreement currently entered into by Buyer or any of its Affiliates

16

and the Sellers and (y) from and after the date hereof, no such non-solicitation or similar agreement by Buyer and any Seller or any Affiliate thereof entered into prior to the date hereof shall prevent Buyer from hiring (or seeking to hire) any employee of the Sellers. The Parties agree to cooperate in good faith to coordinate the establishment of benefit plans and arrangements so as to satisfy the obligations set forth in this <u>Section 9.7(b)(ii)</u>.

(c)     Except as otherwise provided under the terms of the applicable Employee Plan, each Transferred Employee shall be given credit for all service with the Sellers under all employee benefit plans, programs and policies and fringe benefits of the Business or Buyer or any of its Subsidiaries in which they become participants (i) for purposes of eligibility, participation, and vesting (but not benefit accruals), and (ii) with respect to any vacation and severance plans, programs or arrangements of Buyer or its Subsidiaries, for purposes of determining the level of benefits except to the extent such crediting would result in duplication of benefits with respect to the same period of service.

(d)     If a Transferred Employee becomes eligible to participate in a medical, dental or health plan of Buyer (or its Subsidiaries), Buyer shall, or shall cause its Subsidiaries to, to the extent permitted by (x) applicable Law and (y) the terms of the applicable medical, dental or health plan of Buyer or any of its Subsidiaries in which the Transferred Employee participates following the Closing, cause the plan provider of such plan to (i) waive any preexisting condition limitations to the extent such pre-existing condition limitations would not have been applicable under the applicable medical, dental or health plans of the Sellers as of immediately prior to the Closing Date and (ii) credit any complete or partial satisfaction of any deductible and out-of-pocket expenses incurred by the Transferred Employee and his or her dependents under the applicable Seller's or its Subsidiaries' medical, dental or health plans during the portion of the calendar year in which the Closing Date occurs.  Buyer agrees to use commercially reasonable efforts to cause a medical, dental and health plan provider to provide such waivers and credits contemplated by the first (1st) sentence of this <u>Section 9.7(d)</u>.  If a Transferred Employee becomes eligible to participate in a group term life insurance plan maintained by Buyer or its Subsidiaries, Buyer shall use commercially reasonable efforts to cause such plan to waive any medical certification for such Transferred Employee up to the amount of coverage the Transferred Employee had under the life insurance plan of the Sellers (but subject to any limits on the maximum amount of coverage under Buyer's life insurance plan).

(e)     Except as required by Law or an applicable bargaining agreement or as otherwise agreed in writing by the Parties, Buyer or any of its Subsidiaries shall provide severance and other separation benefits to each Leased Employee and Transferred Employee terminated by Buyer or any of its Subsidiaries within the period commencing on the Closing Date and ending on the last day of the Sellers' fiscal year ending in 2020 that are at least equal to the severance and other separation benefits provided by the Seller and its Subsidiaries to such Leased Employee and Transferred Employee as in effect immediately prior to the Petition Date, it being understood that such severance and other separation benefits do not include any long-term incentive, equity incentive, defined benefit pension or retiree welfare or life insurance benefits.

17

(f)        Except as prohibited by applicable Law, each offer letter shall provide that by accepting employment with Buyer the Business Employee is acknowledging that Buyer is assuming, and Buyer shall assume all vacation days and other paid time off accrued but not yet taken by each Transferred Employee through the Offer Effective Date, in accordance with their terms as of the date hereof.  To the extent that applicable Law prohibits a Transferred Employee's vacation from being assumed by Buyer and requires that a Transferred Employee to be paid for any vacation days and other paid time off accrued but not yet taken by such Transferred Employee as of the Offer Effective Date without regard to any acknowledgement by such Transferred Employee to the contrary, the Sellers shall pay each Transferred Employee for such vacation days.

(g)        The Sellers agree to pay to the Transferred Employees any bonus (including any related payroll Taxes) that such Transferred Employees would have been paid had they remained employees of the Sellers through the date the bonus in respect of the fiscal year ending February 2, 2019.

(h)        Buyer and the Seller agree to cooperate in good faith to ensure that Transferred Employees do not experience a break in health coverage from and after the Closing Date. Buyer shall take commercially reasonable efforts to provide or make available the health coverage required by Section 4980B of the Code available with respect to any individual who is an "M&A Qualified Beneficiary" (as defined in Treasury Regulation Section 54.49806-9 (Q&A 4) of the Code) as the result of the consummation of the Transactions. Notwithstanding the foregoing, Buyer shall take all actions reasonably necessary to ensure that all Leased Employees shall transfer to Buyer's health and welfare plans effective as of the Offer Effective Date, provided, that if any such employee continues coverage under COBRA under the health and welfare benefit plans maintained by the Seller or its Subsidiaries, Buyer shall reimburse the Seller for the positive difference, if any, between (x) the claims incurred and paid under such plan attributable to such employee and any eligible dependents, and (y) the COBRA coverage premiums paid by such employee, with such amount to be determined on a monthly basis. The Seller and Buyer shall negotiate in good faith to agree upon the timing for and the mechanics of reimbursement of all fees, costs and expenses incurred by the Seller pursuant to the immediately foregoing sentence.

(i)        From and after the Closing Date, subject in all respects to the limitations set forth in Section 2.3(k), Buyer shall, within thirty (30) days following written demand by the Seller, with such supporting documentation as Buyer shall reasonably request, reimburse the Sellers for the payment of any cash severance or other cash separation pay, and the Sellers' or their Subsidiaries' portion of any related employment and payroll Taxes, made by any Seller or any Subsidiary of a Seller to any employee of any Seller or their Subsidiaries whose employment with any of the Sellers or their Subsidiaries terminated following the Petition Date or terminates on, or following the Closing Date (it being understood that this does not include any Transferred Employees who shall have become the employees of Buyer and its Subsidiaries and shall be covered by Buyer's obligations as set forth in Section 9.7(b)), to the extent of the cash severance or other cash separation pay that has been paid on or following the Petition Date and prior to the Closing Date or would have been due and payable had such employee's employment been terminated by

18

any of the Sellers or their Subsidiaries immediately prior to the date hereof (the reimbursement Liabilities of Buyer set forth in this Section 9.7(i), including with respect to any related employment and payroll Taxes, the "Severance Reimbursement Obligations").

(j)      The Sellers shall retain liability for all medical, dental and health claims incurred by Transferred Employees (and their dependents) under the employee welfare benefit plans of the Sellers prior to the Closing.  Buyer shall be liable for all medical, dental and health claims incurred by Transferred Employees (and their dependents) under the employee welfare benefit plans of Buyer or any of its Subsidiaries on or after the Employee Effective Date.  For purposes of this Section 9.7(j), a claim shall be deemed to have been incurred on the date on which the medical or other treatment or service was rendered and not the date of the inception of the related illness or injury or the date of submission of a claim related thereto; provided, that claims relating to a hospital confinement that begins on or before the Closing but continues thereafter shall be treated as incurred before the Closing.

(k)    U.S. Savings Plan.

(i)      As soon as practicable following the Closing Date, Buyer shall, or shall cause its Subsidiaries to, establish a new savings plan or designate an existing savings plan qualified under Section 401(a) of the Code and including a cash or deferred feature under Section 401(k) of the Code and a related trust thereunder which shall be exempt under Section 501(a) of the Code ("Buyer's Savings Plan") that will permit participation by all Transferred Employees who are participating in the Seller's or its Subsidiaries' 401(k) Plan ("Seller's Savings Plan") as of the Closing Date.

(ii)      No assets or liabilities of Seller's Savings Plan shall be transferred to Buyer's Savings Plan, other than in connection with a rollover of a Transferred Employee's account balance under Seller's Savings Plan.  Except as could reasonably be expected to cause the Buyer's Savings Plan to cease to qualify under Section 401(a) and 401(k) of the Code or cause the trust to cease to be qualified under Section 501(a) of the Code or otherwise result in the Buyer or its Affiliates incurring any penalties thereunder, Buyer shall permit the Transferred Employees to roll over into Buyer's Savings Plan any rollover distribution (in cash or loan notes of any "eligible rollover distribution" (within the meaning of Section 402(c)(4) of the Code)).  Effective as of the Closing, the Seller shall and shall cause it Subsidiaries to take any action necessary to ensure that the accounts of each Transferred Employee in Seller's Savings Plan shall be fully vested and nonforfeitable.

(l)      The Parties acknowledge and agree that all provisions contained in this Section 9.7 are included for the sole benefit of the respective Parties and shall not create any right (i) in any other person, including any Business Employees, Transferred Employees, current or former employees of the Seller, any participant in any Employee Plan or any compensation or benefit plan, program, agreement or arrangement of Buyer or

19

its Subsidiaries or any beneficiary thereof or (ii) in any other person, to continued employment with Buyer or its Subsidiaries or particular compensation or benefits coverage in any compensation or benefit plan, program, agreement or arrangement of Buyer or its Subsidiaries.  The provisions of this Section 9.7 shall not constitute an amendment to any Employee Plan or any plan, program, agreement or arrangement maintained by Buyer or any of its Subsidiaries.

(m)     The Sellers and Buyer hereby agree to follow the "alternate procedure" for employment tax reporting as provided in Section 5 of Rev. Proc. 2004-53, 2004-34 I.R.B. 320 for each Transferred Employee and to cooperate with each other in furtherance thereof.  Provided that the Sellers provide Buyer with all necessary payroll records for the calendar year which includes the date on which the Transferred Employee commences employment with Buyer, Buyer, and not the Sellers, shall furnish a Form W-2 to each Transferred Employee, disclosing all wages and other compensation paid for such calendar year, and taxes withheld therefrom.

(n)     Effective as of the Offer Effective Date, Buyer shall assume the collective bargaining agreements listed on Schedule 6.9(a)."

SECTION 1.39.     Section 9.11 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:[4]

"Section 9.11 Apportionments.

(a) The Sellers and Buyer shall prorate all items of revenue and expense with respect to the Owned Real Property, the Lease Premises and the Sparrow Properties as of the Closing Date with the Sellers being entitled to all revenues and responsible for all fees, costs and expenses accrued or apportioned up to but not including the Closing Date and Buyer being entitled to all revenues and responsible for all fees, costs and expenses from the Closing Date forward (other than Property Taxes which are governed by Section 9.2(d)); provided, however, that with respect to the GOB Stores the proration date for each GOB Store will be the date that is the first day after the end of the GOB Period for each such GOB Store.  As used herein, the "Proration Date" shall mean the Closing Date with respect to any Owned Real Property, Lease Premises or Sparrow Property that is not a GOB Store and for any GOB Store shall mean the date that is the first day after the end of the GOB Period for such GOB Store.  In order to effectuate the foregoing the following shall apply:

(i) With respect to Owned Real Properties and any  Sparrow Properties that are owned in fee, all rental income will be prorated on a daily basis for the month in which the proration date occurs based on the amounts of rent due for the month in which the Proration Date occurs;

(ii) With respect to all Lease Premises, all Sparrow Properties that are leased, the lease described in Schedule 1.1(r) and all Sparrow Subleases, all rental payments will be prorated on a daily basis for the month in which the proration date occurs based on the amount of rent paid and all rental income will be prorated on a daily

---

[4]     **Note to Sellers**: Proration section subject to further review and discussion.

basis based on the rental amounts due for the month in which the Proration Date occurs; provided, however, that there shall be no proration of rent with respect to each of SRC O.P. LLC, SRC Facilities LLC and SRC Real Estate (TX), LLC that are not "dark" stores as all parties reserve their rights with respect thereto as described in Section 8.9;

(iii) For all Properties and the Sparrow Properties (1) all utilities (including telephone service, water, sewer rents, heat, steam, electric power, gas and CAM payments with respect thereto) will be prorated on a daily basis for the month in which the Proration Date occurs based on the budgeted amounts for each such item set forth in the Sellers' utility plan for each such Property delivered to Buyer prior to the Closing Date (which budgeted amounts shall be based on prior actual use for such Property), (2) payments due under all third party Contracts will be prorated on a daily basis for the month in which the Proration Date occurs based on the amounts due under each such Contract for such month. With respect to all maintenance performed with respect to the Properties and Sparrow Properties in the ordinary course and common area maintenance performed by the Sellers required to be performed by the Sellers under any third-party Contract, to the extent performed by the Sellers the actual third-party costs and expenses incurred by the Sellers with respect to such maintenance will be prorated based on the average amounts thereof for the same calendar month in the past three years for each such respective Property; and.

(iv) For all Lease Premises and Sparrow Subleases, including any Sparrow Properties that are leased, all payments with respect to insurance will be prorated on a daily basis for the month in which the Proration Date occurs based on the amounts paid by the Sellers. [*No proration of insurance will be made with respect to Owned Real Property or owned Sparrow Properties and Buyer will obtain its own insurance as of the Closing Date*.][5]

(f) Nothing contained in this Section 9.11 shall limit or effect any Party's rights or obligations under the Occupancy Agreement or the Seller Retained Occupancy Agreement.

(g) [With respect to the Citi L/C Facility, all letter of credit commitment fees shall be prorated on a daily basis for the month in which the Proration Date occurs based on the amounts paid. All amounts unreimbursed as of the Closing Date under the Citi L/C Facility with respect to drawn letters of credit, along with any accrued interest thereon, will be allocated to the Sellers.][6]

(h) The prorations set forth in this Section 9.11 shall be settled as follows:

(i)    the Seller shall provide Buyer, prior to the Closing Date, a schedule setting forth each item to be prorated pursuant to this Section 9.11, including the total amount and a calculation of such proration to be on account or credit to Buyer and the Seller (the "Prorations Schedule");

---

[5] **Note to Draft**: Insurance plan for Buyer for Owned Properties post-closing to be confirmed.
[6] **Note to Buyer**: Subject to further review by Sears.

(ii)    if after taking into account all prorations set forth on the Prorations Schedule, the net amount of all such prorations would result in a credit to Buyer, then such amount shall reduce the Purchase Price paid by Buyer to the Seller on the Closing Date;

(iii)    if after taking into account all prorations set forth on the Prorations Schedule, the net amount of all such prorations would result in a payment due from Buyer to the Seller, then Buyer shall make such payment to the Seller in cash on the Closing Date; and

(iv)    following the Closing, to the extent the Seller receives any additional invoices with respect to items set forth in this Section 9.11, the Seller shall promptly (but in no event more than five (5) Business Days after receipt) deliver all such invoices to Buyer.

(i) For the avoidance of doubt, (A) to the extent the Seller is obligated to make a payment prior to Closing (including with respect to a Leased Premises) or receives an invoice prior to Closing with respect to any item to be prorated that is due prior to Closing, the Seller shall make such payment and (B) the extent Buyer receives an invoice following Closing, an amount becomes due with respect to an Acquired Asset following Closing, or the Seller receives an invoice prior to Closing that is due and payable following Closing, Buyer shall make all such required payments.  All such payments will be taken into account in the forgoing prorations.  The prorations effected pursuant to this Section 9.11 shall be final and not subject to further adjustment."

SECTION 1.40.    Section 9.13 of the Purchase Agreement is hereby amended as follows:

(a) Section 9.13(b) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(b)    Effective upon the Closing, ESL's Claims against the Debtors arising under (i) the IP/Ground Lease Term Loan Facility; (ii) the FILO Facility; (iii) the Real Estate Loan 2020; (iv) the Second Lien Term Loan; (v) the Second Lien Line of Credit Facility; (vi) the Second Lien PIK Notes and (vii) the Citi L/C Facility (together with the any security interests securing any of the Claims described in the preceding sub-clauses (b)(i)-(vii), collectively, the "ESL Claims") shall each be deemed allowed for all purposes in the Bankruptcy Cases and under the Bankruptcy Code in the amounts set forth on Exhibit G, as reduced by the credit bid set forth in Section 3.1(b)."

(b) Section 9.13(e) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(e)    For the purposes of this Section 9.13, the terms set out below shall be defined as follows:

(i)    "Debtors" means each of the debtors and debtors in possession in the Bankruptcy Cases, including the Sellers.

22

(ii)    "Released Estate Claims" means any and all Claims and causes of action of the Debtors and their estates against ESL arising under (i) sections 363(k), 502(a) or 510(c) of the Bankruptcy Code, (ii) equitable principles of subordination or recharacterization, or (iii) subject to the second sentence of this Section 9.13(e)(ii), any other applicable Law that could be asserted to challenge the allowance of the ESL Claims pursuant to Section 9.13(c).  For the avoidance of doubt the Released Estate Claims do not include (and the allowance of any ESL Claims shall not preclude under any applicable Law or doctrine of collateral estoppel, res judicata, claim or issue preclusion, or otherwise) any other Claims or causes of action of the Debtors or their estates against ESL or any other Person, including any Claims or causes of action (i) for constructive or actual fraudulent transfer under 11 U.S.C. 544(b) or 550(a) or any applicable state or federal Law, for breach of fiduciary duty, or for illegal dividend under 8 Del. C. 170-174 or any other state Law (including, but not limited to, any Claims for damages in connection with the incurrence of any debt described on Exhibit G, or breach of fiduciary duty in connection with the incurrence of any debt described on Exhibit G); (ii) that are related to Lands' End, Inc., the "spin-off" (as such term is defined in the Information Statement of Lands' End, Inc. dated March 18, 2014), Seritage Growth Properties, Inc., Seritage Growth Properties, L.P, or the "Transaction" (as that term is defined in the registration statement on Form S-11 filed by Seritage Growth Properties, which registration statement became effective on June 9, 2015), or (iii) that have been asserted (or may be asserted in connection with these Claims and causes of action) by or on behalf of any party in interest in the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 cases captioned In the Matter of a Plan of Compromise or Arrangement of Sears Canada Inc., 9370-2751 Quebec Inc., 191020 Canada Inc., The Cut Inc., Sears Contact Services Inc., Initium Logistics Services Inc., Initium Commerce Labs Inc., Initium Trading and Sourcing Corp., Sears Floor Covering Centers Inc., 173470 Canada Inc., 2497089 Ontario Inc., 6988741 Canada Inc., 10011711 Canada Inc., 1592580 Ontario Limited, 955041 Alberta Ltd., 4201531 Canada Inc., 168886 Canada Inc., and 3339611 Canada Inc., Ontario Superior Court of Justice Court File No.: CV-17-11846-00CL; and in the cases captioned Sears Canada Inc., by its Court-appointed Litigation Trustee, J. Douglas Cunningham, Q.C. v. ESL Invs. Inc., *et al.*, Ont. Sup. Ct. J. (Commercial List) No.: CV-18-00611214-00CL; Morneau Shepell Ltd. in its capacity as administrator of the Sears Canada Inc. Registered Pension Plan v. ESL Invs. Inc., *et al.*, Ont. Sup. Ct. J. (Commercial List) No.: CV-18-00611217-00CL; FTI Consulting Canada Inc., in its capacity as Court-appointed monitor in proceedings pursuant to the *Companies' Creditors Arrangement Act*, RSC 1985, c. c-36 v. ESL Invs. Inc., *et al.*, Ont. Sup. Ct.

23

J. (Commercial List) No.: CV-18-00611219-00CL; and 1291079 Ontario Ltd. v. Sears Canada Inc., *et al.*, Ont. Sup. Ct. J. No.: 4114/15CP."[7]

SECTION 1.41.    The following is hereby added as Section 10.11 of the Purchase Agreement:

"Section 10.11    Pay-Down of Real Estate 2020 Loan.  To the extent not previously provided, at least one (1) Business Day prior to the Closing Date, the Sellers shall provide to the agent under the Real Estate 2020 Loan all proceeds from the sale or other disposition of collateral pledged to secure the Real Estate 2020 Loan that were closed prior to the Closing Date, including the proceeds held in a segregated account pursuant to paragraph 27 of the *Order (I) Approving the Sale of Certain Real Property, (II) Authorizing the Assumption and Assignment of Certain Unexpired Leases in Connection therewith, and (III) Granting Related Relief* [Docket No. 1393]."

SECTION 1.42.    Section 11.8 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 11.8    [Reserved]."

SECTION 1.43.    The following Schedules are hereby deleted in their entirety and replaced as follows:

(a)    Schedule 1.1(m) is hereby deleted in its entirety and replaced with Exhibit A of this Amendment;

(b)    Schedule 1.1(o) is hereby deleted in its entirety and replaced with Exhibit B of this Amendment;

(c)    Schedule 1.1(p) is hereby deleted in its entirety and replaced with Exhibit C of this Amendment;

(d)    A new "Schedule 1.1(r): Sparrow Master Leases" shall be added as a new Schedule to the Purchase Agreement as set forth on Exhibit D of this Amendment;

(e)    A new "Schedule 1.1(s): Sparrow Subleases" shall be added as a new Schedule to the Purchase Agreement as set forth on Exhibit E of this Amendment;

(f)    A new "Schedule 5.1(c): GOB Sparrow Stores" shall be added as a new Schedule to the Purchase Agreement as set forth on Exhibit F of this Amendment;

(g)    Schedule 6.6(a)(2) is hereby deleted in its entirety and replaced with Exhibit G of this Amendment; and

---

[7] **Note to Draft**: Per Paul Weiss draft of February 4.

[AM_ACTIVE 401058988_7]
WEIL\96900353\5\73217.0003

(h)    Schedule 6.6(c)(2) is hereby deleted in its entirety and replaced with Exhibit H of this Amendment.

## ARTICLE II   MISCELLANEOUS

SECTION 2.01.    This Agreement (including the Exhibits), the Confidentiality Agreement and the other Transaction Documents contain all of the terms, conditions and representations and warranties agreed to by the parties hereto relating to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings, negotiations, correspondence, undertakings and communications of the parties hereto or their representatives, oral or written, respecting such subject matter.

SECTION 2.02.    This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered to the other parties hereto.  Delivery of an executed counterpart of a signature page to this Amendment by facsimile, email in "portable document format" (".pdf") form, or by other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing the original signature.

SECTION 2.03.    The signature page of each party to this Amendment who was not a Party to the Purchase Agreement on the date of the Purchase Agreement shall indicate such party's agreement to be bound by all of the terms of the Purchase Agreement as a Seller thereunder as if such party were a Party on the date of the Purchase Agreement.  In the case of KMart Stores of Illinois LLC, the signature of such party to this Amendment shall also be deemed to replace the signature page for "KMart of Illinois LLC" to the Asset Purchase Agreement.

SECTION 2.04.    Except as otherwise provided herein, the Purchase Agreement shall remain unchanged and in full force and effect.  On and after the date hereof, each reference in the Purchase Agreement to "this Agreement", "herein", "hereof", "hereunder" or words of similar import shall mean and be a reference to the Purchase Agreement as amended hereby, although it shall not alter the dates as of which any provision of the Purchase Agreement speaks.  For example, phrases such as "as of the date hereof" and "as of the date of this Agreement" shall continue to refer to January 17, 2019, the date that the Purchase Agreement was originally executed.

SECTION 2.05.    Article XIII of the Purchase Agreement shall, to the extent not already set forth in this Amendment, apply *mutatis mutandis* to this Amendment.

## [SIGNATURE PAGE FOLLOWS]

[AM_ACTIVE 401058988_7]
WEIL:\96900353\5\73217.0003

IN WITNESS WHEREOF, each of the parties hereto has caused this Amendment to be executed and delivered on its behalf by its duly authorized officer as of the date and year first written above.

**Transform Holdco LLC**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Sears Holdings Corporation**

By:              _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Kmart Holding Corporation**


By: _____

Name:

Title:


*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Kmart Operations LLC**


By: _____

Name:

Title:


*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Sears Operations LLC**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Sears, Roebuck and Co.**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**ServiceLive, Inc.**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**SHC Licensed Business LLC**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**A&E Factory Service, LLC**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**A&E Home Delivery, LLC**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**A&E Lawn & Garden, LLC**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**A&E Signature Service, LLC**

By: _____

Name:

Title:

**FBA Holdings Inc.**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Innovel Solutions, Inc.**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Kmart Corporation**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**MaxServ, Inc.**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Private Brands, Ltd.**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Sears Development Co.**

By:  _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Sears Holdings Management Corporation**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Sears Home & Business Franchises, Inc.**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Sears Home Improvement Products, Inc.**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Sears Insurance Services, L.L.C.**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Sears Procurement Services, Inc.**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Sears Protection Company**


By: _____

Name:

Title:


*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Sears Protection Company (PR), Inc.**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Sears Roebuck Acceptance Corp.**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Sears, Roebuck de Puerto Rico, Inc.**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**SYW Relay LLC**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Wally Labs LLC**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**SHC Promotions LLC**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Big Beaver of Florida Development, LLC**


By:  _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**California Builder Appliances, Inc.**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Florida Builder Appliances, Inc.**


By:                    _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**KBL Holding Inc.**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Kmart of Michigan, Inc.**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Kmart of Washington LLC**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Kmart Stores of Illinois LLC**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Kmart Stores of Texas LLC**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**MyGofer LLC**

By: _____

Name:

Title:

**Sears Brands Business Unit Corporation**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Sears Holdings Publishing Company, LLC**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Sears Protection Company (Florida), L.L.C.**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**SHC Desert Springs, LLC**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**SOE, Inc.**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**StarWest, LLC**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**STI Merchandising, Inc.**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Troy Coolidge No. 13, LLC**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**BlueLight.com, Inc. .**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Sears Brands, L.L.C.**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Sears Buying Services, Inc.**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Kmart.com LLC**


By: _____

Name:

Title:


*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Sears Brands Management Corporation**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**KLC, Inc.**


By: _____

Name:

Title:


*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**SRe Holding Corporation**


By:    _____

Name:

Title:


*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**SRC Sparrow 2 LLC**


By: _____

Name:

Title:

**Sears Reinsurance Company Ltd.**

By: _____

Name:

Title:

Its duly authorized officer

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

## **EXHIBITS**

*Attached.*

[AM_ACTIVE 401058988_7]

WEIL:\96900353\5\73217.0003

*CGSH*Weil *Draft of February ~~3~~4, 2019*

# AMENDMENT NO. 1 TO

# ASSET PURCHASE AGREEMENT

This Amendment No. 1, dated as of February [●], 2019 (this "<u>Amendment</u>"), to the Asset Purchase Agreement (the "<u>Purchase Agreement</u>"), dated as of January 17, 2019, by and among Transform Holdco LLC, a Delaware limited liability company (together with any applicable Affiliated Designee, "<u>Buyer</u>"), Sears Holdings Corporation ("<u>SHC</u>" or the "<u>Seller</u>" and together with each of its Subsidiaries party to the Purchase Agreement, the "<u>Sellers</u>") is entered into by and among Buyer and each Seller. Terms capitalized but not defined herein shall have the meanings given to such terms in the Purchase Agreement.

WHEREAS, Buyer and the Sellers have previously entered into the Purchase Agreement pursuant to which, among other things, Buyer will acquire the Acquired Assets and assume the Assumed Liabilities on the terms and subject to the conditions set forth in the Purchase Agreement; and

WHEREAS, Buyer and the Sellers desire to amend the Purchase Agreement in accordance with Section 13.3 of the Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing, the representations, warranties, covenants and agreements set forth in the Purchase Agreement and this Amendment, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the ~~P~~parties hereby agree as follows:

## ARTICLE I    AMENDMENTS

<u>SECTION 1.01.</u>    Section 1.1 of the Purchase Agreement is amended as follows:

(a) The definition of "<u>Acquired Inventory</u>" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"<u>Acquired Inventory</u>" shall mean (i) with respect to any Operating Leased Property, all Inventory which is located at, on or in transit to the applicable Operating Lease Property as of the Closing Date, (ii) with respect to any Operating Owned Property, all Inventory which is located at, on or in transit to the Operating Owned Property as of the Closing Date, (iii) with respect to any IP/Ground Lease Property, all Inventory which is located at, on or in transit to the IP/Ground Lease Property as of the Closing Date, (iv) with respect to any Operating Sparrow Properties, all Inventory located at, on or in transit to the Operating Sparrow Properties, and (v) all other Inventory Related to the Business other than Inventory included in clause (ii) of the definition of Excluded Inventory.

(b) The definition of "Acquired Property" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

~~"Acquired Property" shall mean shall mean (i) each Lease Premises which is subject to an Acquired Lease, (ii) each Owned Real Property and (iii) each Sparrow Property.~~

(e~~b~~) The definition of "Buyer Party Release" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety.

(d~~c~~) The definition of "Designatable Lease" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Designatable Lease" shall mean each of (i) the GOB Leases, the Operating Leases, the Landlord Leases and the Sparrow Subleases and (ii) to the extent applicable to such leases and lease agreements, all non-disturbance agreements with fee owners or senior landlords, subordination, non-disturbance and attornment agreements, waivers and consents in favor of any Seller,  estoppel certificates from landlords under any of the Leases (to the extent assignable), and landlord waivers or other collateral access agreements in favor of any Seller or any asset-based lenders.

(e~~d~~) The following is added as a new defined term:

"Employee Lease Agreement" shall mean the agreement substantially in the form of Exhibit H.

(f~~e~~) The definition of "Expenses" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Expenses" shall mean (i) the Buyer Occupancy Costs, if applicable, and (ii) the reasonable and documented out-of-pocket fees, costs and expenses or other disbursements borne by any Seller or its Affiliates incurred or accruing (a) during the Designation Rights Period, to the extent Related to the Operating Leases, Operating Leased Stores, Landlord Leases or Sparrow Leases, (b) to the extent Related to the GOB Leases or GOB Leased Stores following the GOB Period for each such GOB Lease or GOB Leased Store, (c) to the extent Related to the GOB Owned Stores following the GOB Period for such GOB Owned Store, (d) after the Closing, to the extent related to an Additional Contract or any Operating Lease, Operating Leased Store, Landlord Lease or Sparrow Lease or (e) as a result of the Sellers being the tenant or landlord under the Designatable Lease or Additional Contract during, with respect to the GOB Leased Stores, the period commencing after the GOB Period for each such GOB Leased Store and ending at the expiration of the Designation Rights Period, and with respect to any Operating Leased Property, Landlord Lease or Sparrow Lease, during the Designation Rights Period, and any reasonable and documented fees, costs and expenses incurred by any Seller or its Affiliates in connection with any transfer of a Designatable Lease to Purchaser following the Designation Rights Period, but in each case shall not, for the avoidance of doubt, include rejection damages or Cure Costs.

2

(gf) The definition of "GOB Period" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"GOB Period" shall mean with respect to each GOB Leased Store or GOB Owned Store, the period commencing on the Closing Date and ending on the date that the Seller delivers written notice to Buyer that the "going-out-of-business" sale with respect to such GOB Leased Store or GOB Owned Store, as applicable, has been completed and all inventory of the Sellers has been removed from such GOB Leased Store or GOB Owned Store, as applicable. For the avoidance of doubt, the Sellers may deliver any such notice on or prior to the Closing Date.

(hg) The following is hereby added as a new defined term:

"Landlord Leases" shall mean each of (i) those leases or lease agreements (including ground leases) related to the Owned Real Property under which any Seller is the lessor (together with all amendments, modifications, supplements and renewals thereof), and (ii) to the extent applicable to such leases and lease agreements, all non disturbance agreements with fee owners or senior landlords, subordination, non disturbance and attornment agreements, waivers and consents in favor of any Seller, estoppel certificates from landlords under any such leases and lease agreements (to the extent assignable), and landlord waivers or other collateral access agreements in favor of any Seller or any asset based lenders.

(ih) The definition of "Occupancy Expenses" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Occupancy Expenses" shall mean, with respect to any Lease Premises, Owned Real Property or Sparrow Property, all liquidated costs, expenses, obligations and liabilities under or in connection with the applicable Lease payable or paid by any Seller, including any and all mortgage payments, base rent, percentage rent, additional rent, CAM, utilities, Property Taxes and assessments, costs of continuing the level of maintenance and security required by this Agreement, a pro rata portion of insurance (including public liability and casualty insurance) attributable to such Lease or Lease Premises, Owned Real Property or Sparrow Property and all other categories of expenses, obligations and liabilities arising or accruing under or in connection with such Lease (whether or not billed by the applicable counterparty to such Lease), Owned Real Property or Sparrow Property.  For the avoidance of doubt, Occupancy Expenses shall not include any Seller's costs and expenses of (a) any professionals retained in connection with the Bankruptcy Cases or (b) counsel of any kind except to the extent counsel is retained with respect to a Lease, Owned Real Property or Sparrow Property and not the Sellers' other operations.

(ji) The definition of "PA Liabilities Services Agreement" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety.

(j) The following is hereby added as a new defined term:

3

"Proration Date" shall have the meaning given in Section 9.11(a).

(jk) The definition of "Securities Consideration" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Securities Consideration" shall mean the securities described in Schedule 9.2.

(kl) The following is hereby added as a new defined term:

"Services Agreement" shall mean the agreement substantially in the form attached hereto as Exhibit I.

(l=m) The following are hereby added as new defined terms:

"Sparrow Leases" shall mean the Sparrow Subleases together with the leases listed in Schedule 1.1(r).

"Sparrow Subleases" shall mean each of (i) the leases listed on Schedule 1.1(s) (together with all amendments, modifications, supplements and renewals thereof), and (ii) to the extent applicable to such leases and lease agreements, all non disturbance agreements with fee owners or senior landlords, subordination, non disturbance and attornment agreements, waivers and consents in favor of any Seller,  estoppel certificates from landlords under any such leases and lease agreements (to the extent assignable), and landlord waivers or other collateral access agreements in favor of any Seller or any asset based lenders.

(m=n) The definition of "Store Cash" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Store Cash" shall mean any cash of the Sellers in the registers or otherwise held at any Operating Lease Property, any Operating Owned Property or any Sparrow Property, in an amount not to exceed $17,000,000.

(no) The definition of "Second Lien Line of Credit Facility" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Second Lien Line of Credit Facility" shall mean each line of credit facility granted pursuant to an amendment to the Second Lien Credit Agreement.

SECTION 1.02.    Section 2.1(po) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(o)    except as set forth in Section 2.2(r), any and all rights of the Sellers in and to any restricted cash, security deposits, letters of credit, escrow deposits and cash collateral, including cash collateral given to obtain or maintain letters of credit and cash drawn or paid on letters of credit, utility deposits, performance, payment or surety bonds, credits, allowance, prepaid rent or other assets, charges, setoffs, prepaid expenses, other

[AM_ACTIVE 401058988_7]
WEIL:\96900353\5\73217.0003

prepaid items and other security (collectively, "Security Deposits"), together with all contracts, agreements or documents evidencing or related to the same (collectively, "Security Deposit Documents"), in each case to the extent related to any Acquired Asset;"

SECTION 1.03.    Section 2.1(p) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(p)    any and all Claims (other than returns of merchandise for warranty claims (except, for the avoidance of doubt, to the extent comprising Assumed Liabilities)) of the Sellers as of the Closing that are Related to the Business or any Acquired Asset, excluding any Claims that are, or are Related to, an Excluded Asset or Excluded Liability;"

SECTION 1.03. Section 2.1(r) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

["(r)    the KCD Notes from SRe Holding Corporation in accordance with Section 2.8(e);"]

SECTION 1.04.    Section 2.1(v) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(v)    the release of the Released Estate Claims in accordance with Section 9.13;"

SECTION 1.05.    Section 2.1(bb) of the Purchase Agreement is hereby amended to remove the word "and" at the conclusion of such Section, Section 2.1(cc) of the Purchase Agreement is hereby amended to replace the period at the conclusion of such Section with a semicolon and the following is hereby added as Section 2.1(dd) of the Purchase Agreement:

"(dd)    subject to Section 2.13, any Acquired Foreign Assets; and"

SECTION 1.06.    [The following is hereby added as Section 2.1(ee) of the Purchase Agreement:

"(ee)    any bank accounts of the Sellers as may be agreed by Buyer and the Sellers prior to the Closing Date (but, for the avoidance of doubt, not including any cash in any such bank accounts)."][1]

SECTION 1.07.    Section 2.2(i) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

---

[1] **Note to Buyer**: Subject to further review and discussion.

[AM_ACTIVE 401058988_7]
WEIL:\96900353\5\73217.0003

"(i)    all Claims, Proceedings, and causes of action of Sellers other than Claims described in Section 2.1(p). Notwithstanding anything to the contrary in Section 2.1(p) or elsewhere, the Excluded Assets shall include (A) all Claims, Proceedings and causes of action ~~that are not Related to the~~ of Sellers that did not arise in the Ordinary Course of Business ~~or any Acquired Asset~~; (B) all Avoidance Actions; (C) all Released Estate Claims; and (D) all Claims, Proceedings, and causes of action described in the second sentence of Section 9.13(e)(ii) (excluding, for the avoidance of doubt, any contractual or commercial claims ~~arising in the Ordinary Course of Business~~ against Seritage Growth Properties, L.P., Lands' End, Inc. or their respective Affiliates ~~Related to the~~ that arose in the Ordinary Course of Business ~~or any Acquired Asset~~), including any Claims against the Sellers or their directors, officers, insiders or shareholders under any applicable law arising from any pre-petition transaction for breach of fiduciary duty, fraudulent conveyance, or illegal dividend. Nothing in this Section 2.2(i) or in Section 2.1(p) shall affect the scope of the Released Estate Claims, and in the event of any conflict between Section 2.2(i) and Section 2.1(p), on the one hand, and Section 9.13, on the other hand, Section 9.13 shall govern;"[2]

SECTION 1.08.    Section 2.2(n) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(n)    all bank accounts (except as otherwise provided in Section 2.1(ee);"

SECTION 1.09.    Section 2.2(p) of the Purchase Agreement is hereby amended to remove the word "and" at the conclusion of such Section and Section 2.2(q) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(q)    the SHIP Purchase Agreement Assets (if the SHIP Closing shall have occurred prior to the Closing Date); and"

SECTION 1.10.    The following is hereby added as Section 2.2(r) of the Purchase Agreement:

"(r)    all Adequate Assurance Deposits as defined in the Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Establishing Procedures for Future Utility Services, and (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Service (ECF No. 461) approved by the Bankruptcy Court on November 5, 2018."

SECTION 1.11.    ~~SECTION 1.10.~~ In Section 2.3(i) of the Purchase Agreement, the reference to "Section 9.2" is revised to refer to "Section 9.2(a)".

---

[2] **Note to Draft**: Per Paul Weiss draft of February 4.

[AM_ACTIVE 401058988_7]
WEIL:\96900353\5\73217.0003

SECTION 1.12.    ~~SECTION 1.11.~~ Section 2.3(j) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(j)    all Liabilities with respect to the Transferred Employees (i) to the extent arising as a result of an event, action or omission that occurs on or following the Closing Date or (ii) expressly assumed by Buyer and its Subsidiaries pursuant to Section 9.7 (including under the Employee Lease Agreement);"

SECTION 1.13.    ~~SECTION 1.12.~~ Section 2.3(n) of the Purchase Agreement is hereby amended to remove the word "and" at the conclusion of such Section, Section 2.3(o) of the Purchase Agreement is hereby amended to replace the period at the conclusion of such Section with a semicolon and the following is hereby added as Section 2.3(p) of the Purchase Agreement:

"(p)    the claims underlying the mechanics' liens identified in Section 2 of Schedule 6.5; and"

SECTION 1.14.    ~~SECTION 1.13.~~ Section 2.3(k)(x) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(x)    Notwithstanding anything to the contrary herein or in the Approval Order, and for the avoidance of doubt, the Buyer's agreement to pay Assumed 503(b)(9) Claims, Other Payables, or any other administrative or priority claim of the Sellers pursuant to the terms hereof is a general unsecured contractual obligation of the Buyer owed solely to the Sellers;"

SECTION 1.15.    ~~SECTION 1.14.~~ Section 2.4(p) of the Purchase Agreement is hereby amended to add the word "and" at the conclusion of such Section, Section 2.4(q) of the Purchase Agreement is hereby amended to replace "; and" at the conclusion of such Section with a period and Section 2.4(r) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(r)    [Reserved]."

SECTION 1.16.    ~~SECTION 1.15.~~ The final paragraph of Section 2.4 is revised to read as follows:

"For the avoidance of doubt, (i) all Taxes of any Seller shall be Assumed Liabilities, regardless of the time and circumstances giving rise to any such Taxes, except for any Tax expressly excluded under Section 2.4(h) or Section 2.4(i) and (ii) the Liabilities of any entity that is an Acquired Foreign Asset shall not be Excluded Liabilities."

7

SECTION 1.17.   SECTION 1.16.  Section 2.89 (e) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:[1]

"(e)   (i) Prior to the Closing, Sears Re shall adopt a plan of liquidation, subject to the approval of the Bermuda Monetary Authority (together with any other approvals required under applicable Law, the "BMA Consent"), that would include the distribution by Sears Re to SRe Holding Corporation of the KCD Notes, PA Liabilities, medium-term notes and commercial paper held by Sears Re, as well as such other assets and liabilities of Sears Re as shall be deemed appropriate or required under the BMA Consent, and/or the transfer of some or all of such [other] assets and Liabilities to other persons, as an initial step.  Sellers shall use reasonable best efforts to obtain the BMA Consent and Buyer shall cooperate in such efforts.  As soon as practicable following receipt of the BMA Consent, Sellers shall effect the distribution from Sears Re to SRe Holding Corporation of the KCD Notes, PA Liabilities, medium-term notes and commercial paper and such other assets and liabilities as shall be deemed appropriate or required under the BMA Consent, and/or shall transfer some or all of such assets and liabilities of Sears Re to other persons.  Immediately following such distribution from Sears Re to SRe Holding Corporation, SRe Holding Corporation shall transfer the KCD Notes to Buyer and Buyer shall assume the PA Liabilities.  Notwithstanding anything to the contrary contained in this Agreement, Seller shall not transfer the KCD Notes to Buyer, and Buyer shall not assume the PA Liabilities from Seller, unless and until Seller has received the BMA Consent and the distribution contemplated above has occurred.  The actions taken under this Section 2.8(e)(i) are taken pursuant to and in accordance with, and subject to the conditions and obligations provided under, Section 9.2(a).

(ii) From the Closing Date until such time as the transfer of the KCD Notes and the assumption of the PA Liabilities occurs, pursuant to the Services Agreement, (A) Buyer shall provide services to the applicable Sellers sufficient to enable Sellers to perform the PA Liabilities and (B) in consideration for such services, Sellers shall pay to Buyer an amount equal to the aggregate of all amounts paid by Buyer to Sellers with respect to any licenses under which Buyer licenses the KCD IP."

SECTION 1.17. Section 2.9 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 2.9          If, at any time prior to the date that is sixty (60) days after the Closing Date, but in no event later than May 3, 2019 (the "Designation Deadline"), Buyer so determines as to any Contract that is Related to the Acquired Assets or is an IP License, in each case but is not an Initial Assigned Contract (other than (i) any lease of non residential real property and (ii) any Excluded Asset set forth in Section 2.2) (each, an "Additional Contract"), Buyer may elect, after consultation with the Sellers, by written notice delivered to the Sellers, to designate for assignment or assumption and assignment any Additional Contract for no additional consideration.  Upon the designation of any

---

[1]   Note to Draft: Subject to Bermuda counsel review.

[AM_ACTIVE 401058988_7]
WEIL:\96900353\5\73217.0003

such Additional Contract as an Assigned Agreement pursuant to this <u>Section 2.9</u>, the Sellers will use their reasonable best efforts to assume and assign to the applicable Assignee such Additional Contract so long as the Buyer pays all Expenses accrued post-Closing and all Cure Costs associated with such Additional Contract; <u>provided</u>, <u>however</u>, that nothing herein shall be deemed or construed to obligate the Sellers to retain, or refrain from rejecting or terminating any Lease or Contract after the Designation Deadline that does not constitute an Assigned Agreement.  Notwithstanding anything to the contrary herein, the Sellers shall not be obligated to assume and assign any Contract pursuant to this <u>Section 2.9</u> with respect to which Buyer fails to satisfy the Bankruptcy Court as to adequate assurance of future performance or for which Consent is required to assume and assign such Additional Contract and such Consent has not been obtained, provide that the Parties shall use their reasonable best efforts to obtain all such Consents. Without duplication of any amounts payable under the Services Agreement, Buyer shall pay all Expenses accrued after the Closing with respect to any Additional Contract that is not ultimately designated as an Assigned Agreement if and to the extent Buyer receives a benefit under such Additional Contract.  If the Sellers also receive a benefit under such Additional Contract after the Closing, Buyer and the Sellers shall allocate a proportionate amount of the Expenses with respect to such Additional Contract to the Sellers (including by netting against amounts owed by Buyer)."

SECTION 1.18.    Section 2.11 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 2.11        <u>Rejection of Outbound IP Licenses</u>.  [Within seven (7) Business Days after] the Closing Date, subject to section 365(n) of the Bankruptcy Code, the Sellers shall file a motion to reject, and take all actions (including actions required under section 365 of the Bankruptcy Code) reasonably necessary to reject any Outbound IP Licenses that (i) are executory Contracts and (ii) are designated by Buyer for rejection at any time prior to the second (2nd) Business Day prior to the Closing Date (such Contracts, "<u>Closing Date Rejected Licenses</u>"). Without limiting the foregoing, promptly following the Designation Deadline, the Sellers shall file a motion to reject, and take all actions (including actions required under section 365 of the Bankruptcy Code) reasonably necessary to reject, any Outbound IP Licenses that (x) are not Closing Date Rejected Licenses, (y) are executory Contracts and (z) are not designated by Buyer for assignment or assumption and assignment as an Assigned Agreement in accordance with the terms of this Agreement or for solely assumption pursuant to <u>Section 9.14(d)</u>."

SECTION 1.19.    Section 2.13(a) and Section 2.13(b) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(a)    On the Closing Date, (i) the Sellers shall use reasonable best efforts to cause each of the Foreign Subsidiaries to sell, transfer, assign, convey and deliver, or cause to be sold, transferred assigned, conveyed and delivered to Buyer or the applicable Assignee, and Buyer or such applicable Assignee shall use reasonable best efforts to purchase, all right, title and interest of each of the Foreign Subsidiaries, in, to or under all assets, properties and rights Related to the Business (other than the Excluded Assets) and any other assets of the type that would have been Acquired Assets had they had been

9

owned by the Sellers as of the Closing Date or minority equity interests in non-U.S. Persons held by Subsidiaries of the Seller (other than any Subsidiary who is a Seller (including, if agreed between Buyer and the Sellers, through transferring the equity of any such Subsidiaries holding such minority equity interests)) (collectively, the "Acquired Foreign Assets"), in each case free and clear of any and all Encumbrances of any kind, nature or description and any Claims, other than Permitted Post-Closing Encumbrances and (ii) subject to and to the extent of the transfer of the Acquired Foreign Assets, Buyer shall assume, effective as of the Closing, and shall timely perform and discharge in accordance with their respective terms all Liabilities (other than Excluded Liabilities) of the type that would have been Assumed Liabilities had the applicable Foreign Subsidiary been a Seller as of the Closing Date.  If the transfer of any Acquired Foreign Assets does not occur at the Closing Date, Seller and Buyer shall use reasonable best efforts to complete such transfer as promptly as practicable following the Closing Date and shall enter into such agreements as may be reasonably required to provide Buyer or the applicable Assignee the benefit of such assets until such transfer is consummated.  If, at any time prior to the date that is sixty (60) days after the Closing Date, Buyer determines (in its sole discretion) and notifies the Seller that it is necessary or desirable to acquire all of the equity interests in any Foreign Subsidiary in lieu of the acquisition of assets and assumption of liabilities contemplated by the first sentence of this Section 2.13(a), then the Sellers shall use reasonable best efforts to transfer such equity interests, which equity interests shall be deemed to be Acquired Foreign Assets.  If (i) the proposed transfer of any Acquired Foreign Assets triggers any right of first offer, right of first refusal or other preemptive right by a third party and (ii) such third party exercises such right of first offer, right of first refusal or other preemptive right, then the Sellers shall pay or cause to be paid to Buyer any consideration received by the Sellers or their Subsidiaries resulting from such exercise (and such transfer shall be deemed to satisfy the Sellers' obligation to sell, transfer, assign, convey or deliver the applicable Acquired Foreign Asset).

(b)    If, at any time prior to the date that is sixty (60) days after the Closing Date, but in no event later than May 3, 2019, Buyer determines (in its sole discretion) and notifies the Seller that it is necessary or desirable to acquire other minority equity interests in non-U.S. Persons held by Subsidiaries of the Seller (other than any Subsidiary who is a Seller (including, if agreed between Buyer and Sellers, through transferring the equity of any such Subsidiaries holding such minority equity interests)) so as to ensure that Buyer or the applicable Assignee shall be able to secure the benefit of the applicable Acquired Foreign Assets, Buyer may elect, by written notice delivered to the Sellers, to acquire such other minority equity interests directly from the Seller it being agreed by the Parties that such equity interests will be deemed to be Acquired Foreign Assets for the purposes of this Agreement.  Following any such election, Buyer and the Seller shall promptly execute all documentation required to effectuate the purchase and sale of such other minority equity interests under applicable Law.  If (i) the proposed transfer of any such other minority equity interests triggers any right of first offer, right of first refusal or other preemptive right by a third party and (ii) such third party exercises such right of first offer, right of first refusal or other preemptive right, then the Sellers shall pay or cause to be paid to Buyer any consideration received by the Sellers or their Subsidiaries resulting

10

from such exercise (and such transfer shall be deemed to satisfy the Sellers' obligation to sell, transfer, assign, convey or deliver the applicable other minority equity interests)."

SECTION 1.20.    Section 3.1(a)(ii) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(ii)    an amount in cash equal to the Store Cash as of 12:01 a.m. New York City time on the Closing Date; *plus*;"

SECTION 1.21.    Section 3.1(b)(iv) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(iv)    obligations held by, or credit bid at the direction of, Buyer and its Affiliates as of the Closing Date in an aggregate amount equal to $433,450,000 under (x) the Second Lien Term Loan; (y) the Second Lien Line of Credit Facility; and (z) the Second Lien PIK Notes,"[3]

SECTION 1.22.    Section 3.34.1 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 3.3    Closing Payment.

(a) At the Closing, Buyer shall:

(i) pay to Sellers by wire transfer of immediately available funds into one or more accounts designated by Sellers an amount in cash equal to the Closing Payment Amount *less* the Deposit Amount *less* the Store Cash Payment Amount *plus* any amounts payable pursuant to Section 3.1(c); and

(ii) deliver the Securities Consideration to the Sellers.

(b)    On the Closing Date, the Sellers shall deliver a statement to Buyer setting forth the Store Cash Payment Amount. On the third (3rd) Business Day following the Closing Date, Buyer shall pay to Sellers by wire transfer of immediately available funds into one or more accounts designated by Sellers an amount in cash equal to the Store Cash Payment Amount."[a]

SECTION 1.23. Section 4.1 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

---

[3] **Note to Buyer**: The proposed changes to Section 3.3 (Closing Payment) of the Purchase Agreement are unacceptable. The purpose of the Store Cash is to help the Seller pay down the Senior DIP to the level meeting the closing condition.

[a]    **Note to Sellers**: Timing of Store Cash payment to be discussed.

"Section 4.1    Closing Date.  The closing of the sale, transfer, assignment, conveyance and delivery of the Designation Rights and the Sellers' right, title and interest in, to and under the Acquired Assets by the Sellers to Buyer contemplated hereby (the "Closing") shall take place at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153, or at such other place or time as Buyer and the Sellers may mutually agree, on the third (3rd) Business Day following satisfaction or waiver of the conditions set forth in Article X and Article XI (other than those conditions that by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing).  Notwithstanding the immediately preceding sentence, if the Marketing Period has not ended at the time of the satisfaction or waiver of the conditions set forth in Article X and Article XI (other than those conditions that by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing), then the Closing shall occur instead on the date that is the earlier to occur of (x) any Business Day as may be specified by Buyer on no less than two (2) Business Days' prior written notice to the Sellers and (y) two (2) Business Days following the final day of the Marketing Period; provided, however, that if the Marketing Period has ended on or before February 7, 2019 and the conditions set forth in Article X and Article XI have been satisfied or waived (other than those conditions that by their nature are to be satisfied by actions taken at the Closing, but subject to satisfaction or waiver of such conditions at the Closing) then the Closing shall occur on February 8, 2019.  The date on which the Closing actually occurs is referred to as the "Closing Date", and for all purposes under this Agreement and any Transaction Document (including the Occupancy Agreement and the Seller Retained Occupancy Agreement), the Closing Date shall be deemed to be 12:01 a.m., New York City time on the date on which Closing actually occurs.

SECTION 1.23.    SECTION 1.24. Section 4.2(e) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(e)    the Employee Lease Agreement and the Services Agreement, each duly executed by Buyer; and"

SECTION 1.24.    SECTION 1.25. Section 4.3(e) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(e)    a quit claim deed to be recorded with respect to the Owned Real Property, or if a quit claim deed is not acceptable to the title insurer to receive insurable title in a particular jurisdiction, a no-warranty deed;"

SECTION 1.25.    SECTION 1.26. Section 4.3(h) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(h)    all tangible embodiments of the Acquired Intellectual Property, including all (i) Software object code and source code related thereto, (ii) all materials and documentation (in electronic and editable form, to the extent existing in such form) necessary for the use, modification, manufacture, sale and other exploitation of the Acquired Intellectual Property, to the extent not included in Intellectual Property Related

12

Documentation, (iii) all content made available on or through any websites and webpages accessed through any Domain Names or Media Accounts included in the Acquired Intellectual Property and all other audio-visual or written materials (including such archival materials) produced by or on behalf of the Sellers, (iv) all Labeling and Marketing Materials and (v) all Product Catalogs and Manuals;"

SECTION 1.26.    Section 4.3(k) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(k)    a counterpart of each Short Form Assignment provided by Buyer to Seller as of February 4, 2019, duly executed by each applicable Seller (it being understood that post-Closing, the Parties will, in good faith, continue to prepare and execute additional jurisdiction-specific Short Form Assignments provided by Buyer to Seller);"

SECTION 1.27.    Section 4.3(nl) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(l)    a counterpart of each IP Power of Attorney provided by Buyer to Seller as of February 4, 2019, duly executed by each applicable Seller (it being understood that post-Closing, the Parties will, in good faith, continue to prepare and execute additional jurisdiction-specific IP Powers of Attorney provided by Buyer to Seller);"

SECTION 1.28.    Section 4.3(n) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(n)    the Employee Lease Agreement and the Services Agreement, each duly executed by the Sellers;"

SECTION 1.29.    SECTION 1.28. Section 4.4 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 4.4    Local Sale Agreements.  Subject to the terms and conditions hereof, to the extent necessary or desirable to effect the Closing on the terms hereof, Buyer or applicable Assignee and relevant Sellers shall, enter into such agreements or instruments, including a sale agreement and no-warranty deed for the Owned Real Property and bills of sale and/or assignment and assumption agreements, providing for the sale, transfer, assignment or other conveyance to Buyer or applicable Assignee, in accordance with the requirements of applicable local Law.  The Sellers and Buyer acknowledge and agree that to the extent applicable law imposes requirements for transferring assets of record, the Parties will reasonably cooperate to satisfy such requirements as to transfer such assets as promptly as reasonably practical after Closing."

SECTION 1.30.    SECTION 1.29. Section 5.1(c)(ii) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(ii)    The operation of the GOB Owned Stores during the GOB Period and the Sparrow Properties set forth on Schedule 5.1(c)(ii) (collectively, the "GOB

13

Sparrow Properties" and the Sparrow Properties other than the GOB Sparrow Properties, the "Operating Sparrow Properties") during the period commencing on the Closing Date and ending on the date that the Seller delivers written notice to Buyer that the "going-out-of-business" sale with respect to such Sparrow Properties has been completed and all inventory of the Sellers has been removed from such Sparrow Properties shall be governed by the Seller Retained Occupancy Agreement and the Seller shall conduct such operation pursuant to such Seller Retained Occupancy Agreement as the Seller determines in its sole discretion."

SECTION 1.31.    SECTION 1.30. Section 5.2(b) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(b)    Within five (5) Business Days following the date upon which Buyer delivers a Buyer Assumption Notice to the Sellers with respect to any Designatable Lease, together with a related assignment agreement substantially in the form attached hereto as Exhibit E (the "Assignment and Assumption of Lease") executed by the applicable Assignee, the Sellers shall (1) deliver to Buyer and such Assignee a fully executed Assignment and Assumption of Lease and (2) file with the Bankruptcy Court and serve on the applicable lessor(s) and other appropriate notice parties (as applicable) a notice, and shall seek entry by the Bankruptcy Court of the Approval Order in respect of the Designatable Leases subject to such Buyer Assumption Notice. As of the applicable Designation Assignment Date, except for such obligations and liabilities with respect to such Designatable Leases and the related Lease Premises arising during the Designation Rights Period and except for Buyer's obligations specifically set forth in this Agreement, as between Buyer and the Assignee, Buyer shall have no further obligation or Liability with respect to such Designatable Lease or the related Lease Premises (including any obligation to continue to pay Expenses with respect thereto) and Assignee shall thereafter be solely responsible for all amounts payable or other obligations or liabilities that may be owed in connection with such Designatable Lease or the related Lease Premises; provided, however, that nothing in this sentence shall affect the Sellers' rights against Buyer with respect to such Designatable Lease or the Lease Premises as set forth in this Agreement.;"

SECTION 1.32.    SECTION 1.31. Section 6.6(a) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(a)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the Sellers have good and marketable fee title to the Owned Real Property, free and clear of all liens (except for Permitted Encumbrances). None of the Owned Real Property is subject to any leases or tenancies or other rights of occupancy other than the Landlord Leases;"

SECTION 1.33.    SECTION 1.32. Section 8.8(a) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(a)    [Reserved]."

[AM_ACTIVE 401058988_7]
WEIL:\96900353\5\73217.0003

SECTION 1.34.       SECTION 1.33. Section 8.8(b) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(b)      To the extent permitted by applicable Law, during the Management Services Period, the applicable the Sellers shall remain the manager, controller or operator of each Acquired Property, Occupancy Leased Premise and Sparrow Property solely to the limited extent required for any Permit applicable to such Acquired Property, Occupancy Leased Premise or Sparrow Property (in the case of the Sparrow Properties, solely to the extent of any Sellers' rights related to the Sparrow Properties) to remain effective  (the "Management Services").  Notwithstanding the foregoing, to the fullest extent permitted by applicable Law, each of the Sellers hereby appoints Buyer and its Affiliated Designees as agent of such Seller to manage, control and operate each of (i) the Acquired Properties, (ii) Occupancy Leased Premises and (iii) the Sparrow Properties (in the case of the Sparrow Properties, solely to the extent of any Sellers' rights related to the Sparrow Properties) at which Management Services are being provided (collectively, the "Managed Properties").  Pursuant to their appointment as the Sellers' agent, Buyer and its Affiliated Designees shall be entitled to manage, control and operate each of the Managed Properties as they see fit in their sole discretion and collect and retain all revenues generated by each Managed Property.  In furtherance thereof, the Parties acknowledge and agree that the Sellers shall have no economic interest in the Managed Properties other than the right to receive the Management Services Reimbursements.  As consideration for the provision of the Management Services, Buyer shall reimburse the Sellers, or cause the Sellers to be reimbursed, for any reasonable and documented out-of-pocket costs, fees and expenses incurred at any time in providing the Management Services, including any income and other taxes incurred by the Seller and its Subsidiaries in respect of the payment and receipt of such reimbursement (the "Management Services Reimbursements") and indemnify the Sellers from any Liability arising from the provision of the Management Services, except for any such Liability arising from gross negligence or willful misconduct of the Sellers. For the avoidance of doubt, all employees of the Managed Properties shall be employed by Buyer or its Affiliated Designee and no Seller shall have any authority to take action as an employer with respect to any such employee or to enter into any Contract on behalf of Buyer or any Affiliated Designee except to the extent otherwise provided for pursuant to any arrangement entered into in accordance with Section 9.7(a);"

SECTION 1.35.       The following is hereby added as Section 8.10 of the Purchase Agreement:

"Section 8.10       Sparrow Master Lease.  The Parties hereby agree that the lease set forth on Schedule 1.1(r) shall be assumed by the Sellers and assigned to the Buyer on the Closing Date."

SECTION 1.36.       SECTION 1.34. Section 9.2(a) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(a)      Unless Buyer makes the election under Section 2.12(b) to treat all the transactions described in Article II as Designated Sale Transactions (resulting in no

15

transfer of the Sellers' Tax attributes to Buyer): (1) Buyer shall provide to the Sellers detailed instructions as to steps to take (or not take) in order to secure and preserve the qualification of any of the transactions set forth in this Agreement as a Tax Reorganization (except if and to the extent Buyer determines otherwise, in accordance with Section 2.12(b), in respect of a given transaction or a particular Seller) and to achieve the Tax Result, including with respect to (i) repayment, cancellation or settlement of, or other actions with respect to, intercompany accounts after the approval of the Bankruptcy Plan and on or before the Closing Date, (ii) the merger of any of the Sellers' Subsidiaries with another Sellers' Subsidiaries after the approval of the Bankruptcy Plan and on or before the Closing Date or conversion of any of the Sellers' Subsidiaries into limited liability companies, (iii) the filing of any Tax elections to treat any such Subsidiaries as disregarded entities for U.S. federal income tax purposes, or otherwise taking an action to establish that such Subsidiaries have liquidated for tax purposes, (iv) implementation of the Distribution Requirement in a manner that is consistent with section 507 of the Bankruptcy Code, (v) satisfaction of the ownership requirements set forth in section 382(l)(5)(A)(ii) of the Code, and (vi) any other instructions that in the reasonable opinion of tax counsel for Buyer are necessary or desirable to ensure the qualification of the Tax Reorganization and the achievement of the Tax Result, and the Sellers shall follow such instructions; provided that (A) such instructions shall not limit the Sellers' discretion or actions in respect of (x) operating the Business and its other Assets in the Ordinary Course of Business and in compliance with the other provisions of this Agreement for all periods through the Closing Date, (y) disposing of any of its Assets if and to the extent permitted under the other provisions of this Agreement (z) taking or refraining from taking any action required by this Agreement or by Law, including if such actions would be inconsistent with its obligations under the Bankruptcy Code, (B) if requested by the Sellers, Buyer's tax counsel shall deliver to the Sellers a Tax Opinion that each and any such transaction (other than any Designated Sale Transactions) qualifies as a Tax Reorganization, and (C) nothing herein shall affect Buyer's liability for Taxes that are Assumed Liabilities; (2) subject to the preceding clause (1), the Sellers agree to cooperate with Buyer in order that, for federal income Tax purposes, the transactions effected pursuant to this Agreement, together with the distributions made by, and liquidation of, the Sellers pursuant to the Bankruptcy Plan, are treated as one or more plans of reorganization under section 368 of the Code and as qualifying as one or more reorganizations under section 368(a)(1)(G) of the Code (except if and to the extent Buyer determines otherwise, in accordance with Section 2.12(b), in respect of a given transaction or a particular Seller); (3) any Tax Return in respect of a Tax imposed on any Seller for which Buyer is liable hereunder shall be prepared by Buyer, a copy of such Tax Return shall be provided to SHC at least thirty (30) days prior to the due date thereof, Buyer shall consider in good faith any reasonable comments provided by the Sellers, the Sellers shall, if necessary for filing, properly execute any such Tax Return, and Buyer shall timely and properly file any such Tax Return and pay the amount of any Taxes shown due on any such Tax Return; and (4) immediately following the Closing, the Sellers shall take the steps with respect to the Securities Consideration described in Schedule 9.2. Consistent with and subject to the foregoing, the Seller shall convert any of

16

the Sellers' Subsidiaries as shall be designated by Buyer to a limited liability company pursuant to instructions provided by Buyer."

SECTION 1.37.    SECTION 1.35. Section 9.3(d) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(d)    As soon as practicable (and in any event within ninety (90) days) after the Closing Date, Buyer shall deliver to the Sellers a schedule allocating the Purchase Price (including any Assumed Liabilities treated as consideration for the Acquired Assets for Tax purposes) (the "Allocation Schedule"). The Allocation Schedule shall allocate the Purchase Price among the Sellers and among the Acquired Assets acquired from each Seller, and shall be prepared in accordance with Section 1060 of the Code if Buyer makes the election under Section 2.12(b) to treat all the transactions described in Article II as Designated Sale Transactions (resulting in no transfer of the Sellers' Tax attributes to Buyer), and in any case shall be prepared in accordance with applicable law to the extent necessary to comply with reporting in respect of applicable Transfer Taxes. The Allocation Schedule shall be deemed final unless the Sellers notify Buyer in writing that the Sellers object to one or more items reflected in the Allocation Schedule within forty-five (45) days after delivery of the Allocation Schedule.  In the event of any such objection, Buyer and the Sellers shall negotiate in good faith to resolve such dispute; provided, however, that if Buyer and the Sellers are unable to resolve any dispute with respect to the Allocation Schedule within sixty (60) days after the delivery of the Allocation Schedule, such dispute shall be resolved by the CPA Firm.  The fees and expenses of the CPA Firm in connection therewith shall be borne equally by Buyer and the Sellers.  Each of Buyer and the Sellers agrees to file its respective federal, state and local Tax returns in accordance with the Allocation Schedule, and any adjustments to the Purchase Price pursuant to this Section 9.3 shall be allocated in a manner consistent with the Allocation Schedule. For the avoidance of doubt, the Parties shall cooperate in determining the portion of the Purchase Price allocable to the Acquired Assets that are subject to a Transfer Tax prior to the due date of the Tax Return required to be filed in connection with such Transfer Taxes; provided, that if the parties do not agree with respect to such determination, such matter shall be resolved in accordance with the determination of the CPA Firm; provided further, that such Tax Return will be adjusted, as applicable, consistent with the procedures described above, to reflect any adjustments to the allocated Purchase Price.  Notwithstanding the foregoing, in the case of any asset for which an allocation of Purchase Price is required earlier than contemplated by the foregoing, the time frame for determination of the allocation of Purchase Price to those assets shall be fixed by the Parties to accommodate such requirement, provided that any such allocation may thereafter be revised for other purposes as appropriate and necessary to reflect the overall final allocation of Purchase Price in the Allocation Schedule."

SECTION 1.38.    SECTION 1.36. Section 9.7 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 9.7        Employment Offers.

[AM_ACTIVE 401058988_7]
WEIL:\96900353\5\73217.0003

(a)    Buyer shall make an offer of employment to any Business Employee represented by a labor union and whose terms and conditions of employment are covered by a collective bargaining agreement ("Represented Employees") using reasonable best efforts to comply with the requirements of any such collective bargaining agreement. For any Business Employee not represented by a labor union ("Non-Represented Employees"), Buyer shall, or shall cause any of its Subsidiaries to, (i) no later than five (5) days prior to the date determined under the Employee Lease Agreement (the "Offer Effective Date"), use reasonable best efforts to provide a written offer of employment in a comparable position to, effective as of 11:59 p.m., local time, on the Offer Effective Date, each of such Business Employees, or (ii) to the extent required by and in accordance with applicable Law, enter into employment agreements with each of such Business Employees. Those Business Employees, including both Represented Employees and Non-Represented Employees, who accept such offer of employment on or before the Offer Effective Date in accordance with the provisions of such offer and continue employment with Buyer or any of its Subsidiaries, shall be referred to as "Transferred Employees." At the Closing, Buyer and the Seller shall enter into the Employee Lease Agreement pursuant to which Buyer shall, at Buyer's cost, have the benefit of the Business Employees' (the "Leased Employees") services during the period from the Closing Date through the Offer Effective Date (the "Lease Period") such that Buyer may carry on the operation of the Business from and after the Closing Date. In accordance with the Employee Lease Agreement, and for the avoidance of doubt, Buyer shall timely advance to the Seller the actual, out-of-pocket expenses to be paid or provided by the Seller and its Subsidiaries for wages and benefits associated with the Leased Employees during the Lease Period and any other liabilities attributable to Leased Employees that are incurred by the Seller and its Subsidiaries in connection with the Employee Services (as defined in the Employee Lease Agreement) during the Lease Period such that the Seller is in the same economic position as if the Leased Employees had been hired by Buyer as of the Closing. For the avoidance of doubt, during the Lease Period, the Seller and its Subsidiaries shall continue to provide to each of the Leased Employees compensation and benefits on the same basis as they were provided to such Leased Employee immediately prior to the Closing Date.

(b)    Subject to the last sentence of this Section 9.7(b) and except as otherwise expressly provided in this Section 9.7(b), with respect to each Transferred Employee who remains employed by Buyer or any of its Subsidiaries, Buyer shall, or shall cause any of its Subsidiaries to, provide for the period commencing on the Offer Effective Date and ending on the last day of the Sellers' fiscal year ending in 2020, subject to such Transferred Employee's continued employment with Buyer or any of its Subsidiaries (as applicable) (i) (A) base salary or hourly wage rate and (B) a target short-term cash incentive opportunity, in each of (A) and (B), that is at least equal to the base salary or wages and target short-term cash incentive opportunity, respectively, provided to such Transferred Employee immediately prior to the Closing Date and (ii) a group health and welfare plan and, subject to and in accordance with Section 9.7(k), a 401(k) plan, qualified under Sections 401(a) and 401(k) of the Code ("401(k) Plan"), that are substantially comparable in the aggregate to the group health and welfare plan and 401(k) Plan under which such Transferred Employee participates as of the date hereof. For the

18

[AM_ACTIVE 401058988_7]
WEIL:\96900353\5\73217.0003

avoidance of doubt, (x) the terms of this Section 9.7(b) shall apply notwithstanding anything to the contrary in any non-solicitation or similar agreement currently entered into by Buyer or any of its Affiliates and the Sellers and (y) from and after the date hereof, no such non-solicitation or similar agreement by Buyer and any Seller or any Affiliate thereof entered into prior to the date hereof shall prevent Buyer from hiring (or seeking to hire) any employee of the Sellers.  The Parties agree to cooperate in good faith to coordinate the establishment of benefit plans and arrangements so as to satisfy the obligations set forth in this Section 9.7(b)(ii).

(c)    Except as otherwise provided under the terms of the applicable Employee Plan, each Transferred Employee shall be given credit for all service with the Sellers under all employee benefit plans, programs and policies and fringe benefits of the Business or Buyer or any of its Subsidiaries in which they become participants (i) for purposes of eligibility, participation, and vesting (but not benefit accruals), and (ii) with respect to any vacation and severance plans, programs or arrangements of Buyer or its Subsidiaries, for purposes of determining the level of benefits except to the extent such crediting would result in duplication of benefits with respect to the same period of service.

(d)    If a Transferred Employee becomes eligible to participate in a medical, dental or health plan of Buyer (or its Subsidiaries), Buyer shall, or shall cause its Subsidiaries to, to the extent permitted by (x) applicable Law and (y) the terms of the applicable medical, dental or health plan of Buyer or any of its Subsidiaries in which the Transferred Employee participates following the Closing, cause the plan provider of such plan to (i) waive any preexisting condition limitations to the extent such pre-existing condition limitations would not have been applicable under the applicable medical, dental or health plans of the Sellers as of immediately prior to the Closing Date and (ii) credit any complete or partial satisfaction of any deductible and out-of-pocket expenses incurred by the Transferred Employee and his or her dependents under the applicable Seller's or its Subsidiaries' medical, dental or health plans during the portion of the calendar year in which the Closing Date occurs.  Buyer agrees to use commercially reasonable efforts to cause a medical, dental and health plan provider to provide such waivers and credits contemplated by the first (1st) sentence of this Section 9.7(d).  If a Transferred Employee becomes eligible to participate in a group term life insurance plan maintained by Buyer or its Subsidiaries, Buyer shall use commercially reasonable efforts to cause such plan to waive any medical certification for such Transferred Employee up to the amount of coverage the Transferred Employee had under the life insurance plan of the Sellers (but subject to any limits on the maximum amount of coverage under Buyer's life insurance plan).

(e)    Except as required by Law or an applicable bargaining agreement or as otherwise agreed in writing by the Parties, Buyer or any of its Subsidiaries shall provide severance and other separation benefits to each Leased Employee and Transferred Employee terminated by Buyer or any of its Subsidiaries within the period commencing on the Closing Date and ending on the last day of the Sellers' fiscal year ending in 2020 that are at least equal to the severance and other separation benefits provided by the

19

[AM_ACTIVE 401058988_7]
WEIL:\96900353\5\73217.0003

Seller and its Subsidiaries to such Leased Employee and Transferred Employee as in effect immediately prior to the Petition Date, it being understood that such severance and other separation benefits do not include any long-term incentive, equity incentive, defined benefit pension or retiree welfare or life insurance benefits.

(f)    Except as prohibited by applicable Law, each offer letter shall provide that by accepting employment with Buyer the Business Employee is acknowledging that Buyer is assuming, and Buyer shall assume all vacation days and other paid time off accrued but not yet taken by each Transferred Employee through the Offer Effective Date, in accordance with their terms as of the date hereof.  To the extent that applicable Law prohibits a Transferred Employee's vacation from being assumed by Buyer and requires that a Transferred Employee to be paid for any vacation days and other paid time off accrued but not yet taken by such Transferred Employee as of the Offer Effective Date without regard to any acknowledgement by such Transferred Employee to the contrary, the Sellers shall pay each Transferred Employee for such vacation days.

(g)    The Sellers agree to pay to the Transferred Employees any bonus (including any related payroll Taxes) that such Transferred Employees would have been paid had they remained employees of the Sellers through the date the bonus in respect of the fiscal year ending February 2, 2019.

(h)    Buyer and the Seller agree to cooperate in good faith to ensure that Transferred Employees do not experience a break in health coverage from and after the Closing Date. Buyer shall take commercially reasonable efforts to provide or make available the health coverage required by Section 4980B of the Code available with respect to any individual who is an "M&A Qualified Beneficiary" (as defined in Treasury Regulation Section 54.49806-9 (Q&A 4) of the Code) as the result of the consummation of the Transactions. Notwithstanding the foregoing, Buyer shall take all actions reasonably necessary to ensure that all Leased Employees shall transfer to Buyer's health and welfare plans effective as of the Offer Effective Date, provided, that if any such employee continues coverage under COBRA under the health and welfare benefit plans maintained by the Seller or its Subsidiaries, Buyer shall reimburse the Seller for the positive difference, if any, between (x) the claims incurred and paid under such plan attributable to such employee and any eligible dependents, and (y) the COBRA coverage premiums paid by such employee, with such amount to be determined on a monthly basis. The Seller and Buyer shall negotiate in good faith to agree upon the timing for and the mechanics of reimbursement of all fees, costs and expenses incurred by the Seller pursuant to the immediately foregoing sentence.

(i)    From and after the Closing Date, subject in all respects to the limitations set forth in Section 2.3(k), Buyer shall, within thirty (30) days following written demand by the Seller, with such supporting documentation as Buyer shall reasonably request, reimburse the Sellers for the payment of any cash severance or other cash separation pay, and the Sellers' or their Subsidiaries' portion of any related employment and payroll Taxes, made by any Seller or any Subsidiary of a Seller to any employee of any Seller or their Subsidiaries whose employment with any of the Sellers or their Subsidiaries terminated following the Petition Date or terminates on, or following the Closing Date (it

20

being understood that this does not include any Transferred Employees who shall have become the employees of Buyer and its Subsidiaries and shall be covered by Buyer's obligations as set forth in Section 9.7(b)), to the extent of the cash severance or other cash separation pay that has been paid on or following the Petition Date and prior to the Closing Date or would have been due and payable had such employee's employment been terminated by any of the Sellers or their Subsidiaries immediately prior to the date hereof (the reimbursement Liabilities of Buyer set forth in this Section 9.7(i), including with respect to any related employment and payroll Taxes, the "Severance Reimbursement Obligations").

(j)    The Sellers shall retain liability for all medical, dental and health claims incurred by Transferred Employees (and their dependents) under the employee welfare benefit plans of the Sellers prior to the Closing.  Buyer shall be liable for all medical, dental and health claims incurred by Transferred Employees (and their dependents) under the employee welfare benefit plans of Buyer or any of its Subsidiaries on or after the Employee Effective Date.  For purposes of this Section 9.7(j), a claim shall be deemed to have been incurred on the date on which the medical or other treatment or service was rendered and not the date of the inception of the related illness or injury or the date of submission of a claim related thereto; provided, that claims relating to a hospital confinement that begins on or before the Closing but continues thereafter shall be treated as incurred before the Closing.

(k)    U.S. Savings Plan.

(i)    As soon as practicable following the Closing Date, Buyer shall, or shall cause its Subsidiaries to, establish a new savings plan or designate an existing savings plan qualified under Section 401(a) of the Code and including a cash or deferred feature under Section 401(k) of the Code and a related trust thereunder which shall be exempt under Section 501(a) of the Code ("Buyer's Savings Plan") that will permit participation by all Transferred Employees who are participating in the Seller's or its Subsidiaries' 401(k) Plan ("Seller's Savings Plan") as of the Closing Date.

(ii)    No assets or liabilities of Seller's Savings Plan shall be transferred to Buyer's Savings Plan, other than in connection with a rollover of a Transferred Employee's account balance under Seller's Savings Plan.  Except as could reasonably be expected to cause the Buyer's Savings Plan to cease to qualify under Section 401(a) and 401(k) of the Code or cause the trust to cease to be qualified under Section 501(a) of the Code or otherwise result in the Buyer or its Affiliates incurring any penalties thereunder, Buyer shall permit the Transferred Employees to roll over into Buyer's Savings Plan any rollover distribution (in cash or loan notes of any "eligible rollover distribution" (within the meaning of Section 402(c)(4) of the Code)).  Effective as of the Closing, the Seller shall and shall cause it Subsidiaries to take any action necessary to ensure that the accounts of each Transferred Employee in Seller's Savings Plan shall be fully vested and nonforfeitable.

21

(l)    The Parties acknowledge and agree that all provisions contained in this Section 9.7 are included for the sole benefit of the respective Parties and shall not create any right (i) in any other person, including any Business Employees, Transferred Employees, current or former employees of the Seller, any participant in any Employee Plan or any compensation or benefit plan, program, agreement or arrangement of Buyer or its Subsidiaries or any beneficiary thereof or (ii) in any other person, to continued employment with Buyer or its Subsidiaries or particular compensation or benefits coverage in any compensation or benefit plan, program, agreement or arrangement of Buyer or its Subsidiaries.  The provisions of this Section 9.7 shall not constitute an amendment to any Employee Plan or any plan, program, agreement or arrangement maintained by Buyer or any of its Subsidiaries.

(m)    The Sellers and Buyer hereby agree to follow the "alternate procedure" for employment tax reporting as provided in Section 5 of Rev. Proc. 2004-53, 2004-34 I.R.B. 320 for each Transferred Employee and to cooperate with each other in furtherance thereof. Provided that the Sellers provide Buyer with all necessary payroll records for the calendar year which includes the date on which the Transferred Employee commences employment with Buyer, Buyer, and not the Sellers, shall furnish a Form W-2 to each Transferred Employee, disclosing all wages and other compensation paid for such calendar year, and taxes withheld therefrom.

(n)    Effective as of the Offer Effective Date, Buyer shall assume the collective bargaining agreements listed on Schedule 6.9(a)."

SECTION 1.39.    SECTION 1.37. Section 9.11 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:[34]

"Section 9.11 Apportionments.

(a) The Sellers and Buyer shall prorate all items of revenue and expense with respect to the Owned Real Property, the Lease Premises and the Sparrow Properties as of the Closing Date with the Sellers being entitled to all revenues and responsible for all fees, costs and expenses accrued or apportioned up to but not including the Closing Date and Buyer being entitled to all revenues and responsible for all fees, costs and expenses from the Closing Date forward (other than Property Taxes which are governed by Section 9.2(d) and any responsibility for costs and expenses pursuant to the Occupancy Agreement and the Seller Occupancy Agreement); provided, however, that with respect to the GOB Stores the proration date for each GOB Store will be the date that is the first day after the end of the GOB Period for each such GOB Store.  As used herein, the "Proration Date" shall mean the Closing Date with respect to any Owned Real Property, Lease Premises or Sparrow Property that is not a GOB Store and for any GOB Store shall mean the date that is the first day after the end of the

---

[34]    **Note to Sellers**: Proration section subject to further review and discussion.

22

GOB Period for such GOB Store. In order to effectuate the foregoing the following shall apply (with the Closing Date for purposes of the below being the "Proration Date"):

(i) With respect to Owned Real Properties and any Sparrow Properties that are owned in fee, all rental income will be prorated on a daily basis for the month in which the proration date occurs based on the amounts of rent due for the month in which the Proration Date occurs;

(ii) With respect to all Lease Premises, all Sparrow Properties that are ground-leased, the lease described in Schedule 1.1(r) and all Sparrow Subleases, all rental payments will be prorated on a daily basis for the month in which the proration date occurs based on the amount of rent paid and all rental income will be prorated on a daily basis based on the rental amounts due for the month in which the Proration Date occurs; provided, however, that there shall be no proration of rent with respect to each of SRC O.P. LLC, SRC Facilities LLC and SRC Real Estate (TX), LLC that are not "dark" stores as all parties reserve their rights with respect thereto as described in Section 8.9;

(iii) For all Properties and the Sparrow Properties (1) all utilities (including telephone service, water, sewer rents, heat, steam, electric power, gas and CAM payments with respect thereto) will be prorated on a daily basis for the month in which the Proration Date occurs based on the budgeted amounts for each such item set forth in the Sellers' utility plan for each such Property delivered to Buyer prior to the Closing Date (which budgeted amounts shall be based on prior actual use for such Property), (2) payments due under all third party Contracts will be prorated on a daily basis for the month in which the Proration Date occurs based on the amounts due under each such Contract for such month. With respect to all maintenance performed with respect to the Properties and Sparrow Properties in the ordinary course and common area maintenance performed by the Sellers required to be performed by the Sellers under any third-party Contract, to the extent performed by the Sellers the actual third-party costs and expenses incurred by the Sellers with respect to such maintenance will be prorated based on the average amounts thereof for the same calendar month in the past three years for each such respective Property; and.

(iv) For all Lease Premises and Sparrow Subleases, including any Sparrow Properties that are ground-leased, all payments with respect to insurance will be prorated on a daily basis for the month in which the Proration Date occurs based on the amounts paid by the Sellers. [*No proration of insurance will be made with respect to Owned Real Property or owned Sparrow Properties and Buyer will obtain its own insurance as of the Closing Date*.]45

---

45 **Note to Draft**: Insurance plan for Buyer for Owned Properties post-closing to be confirmed. Also to be discussed GOB Sparrow Leased Premises.

[AM_ACTIVE 401058988_7]
WEIL:\96900353\5\73217.0003

(f) Nothing contained in this <u>Section 9.11</u> shall limit or effect ~~Buyer's~~<u>any Party's</u> <u>rights or</u> obligations ~~with respect to Buyer~~<u>under the</u> Occupancy ~~Expenses~~<u>Agreement or the</u> <u>Seller Retained Occupancy Agreement</u>.

(g) <u>[</u>With respect to the Citi L/C Facility, all letter of credit commitment fees shall be prorated on a daily basis for the month in which the Proration Date occurs based on the amounts paid.<u>[5]</u>  All amounts unreimbursed as of the Closing Date under the Citi L/C Facility with respect to drawn letters of credit, along with any accrued interest thereon, will be allocated to <u>the</u> Sellers.<u>][6]</u>

(h) The prorations set forth in this <u>Section 9.11</u> shall be settled as follows:

(i)    <u>the</u> Seller shall provide Buyer ~~at least 3 Business Days~~<u>,</u> prior to the Closing Date<u>,</u> a schedule setting forth each item to be prorated pursuant to this <u>Section 9.11</u>, including the total amount and a calculation of such proration to be on account or credit to Buyer and <u>the</u> Seller (the "~~Initial~~<u>Prorations Schedule</u>");

(ii)    ~~If~~ <u>if</u> after taking into account all prorations set forth on the ~~Initial~~ Prorations Schedule, the net amount of all such prorations would result in a credit to Buyer, then such amount shall reduce the Purchase Price paid by Buyer to <u>the</u> Seller on the Closing Date;

(iii)    ~~If~~ <u>if</u> after taking into account all prorations set forth on the ~~Initial~~ Prorations Schedule, the net amount of all such prorations would result in a payment due from Buyer to <u>the</u> Seller, then Buyer shall make such payment to <u>the</u> Seller in cash ~~2~~ ~~Business Days following~~<u>on</u> the Closing <u>Date; and</u>

(iv)    ~~F~~<u>f</u>ollowing the Closing, to the extent <u>the</u> Seller receives any additional invoices ~~or payments~~ with respect to items set forth in this <u>Section 9.11</u>, <u>the</u> Seller shall promptly (but in no event more than ~~2~~<u>five (5)</u> Business Days after receipt) deliver all such invoices ~~and payments~~ to Buyer;<u>.</u>

~~(v) Sixty (60) days following the Closing Date, Buyer shall deliver to Seller an updated Initial Prorations Schedule setting forth all updated proration items reflecting all invoices and payments received within such 60 day period (the  "Updated Prorations Schedule");~~

~~(vi) If the net amount of prorations set forth in the Updated Prorations Schedule results in a payment due from Buyer to Seller (taking into account any credit or payment made following the Initial Prorations Schedule) then Buyer shall make such payment to Seller within 2 Business Days after delivery of the Updated Prorations Schedule.  If the net amount of prorations set forth in the Updated Prorations Schedule~~

---

~~[5]    **Note to Sellers**: Post-closing obligations with respect to letters of credit under Citi L/C Facility being provided for the benefit of Sellers to be addressed in Services Agreement.~~
[6] **Note to Buyer**: Subject to further review by Sears.

~~results in a payment due from Seller to Buyer (taking into account any credit or payment made following the Initial Prorations Schedule) then Seller shall make such payment to Buyer within 2 Business Days after delivery of the Updated Prorations Schedule.~~

(i) For the avoidance of doubt, (A) to the extent the Seller is obligated to make a payment prior to Closing (including with respect to a Leased Premises) or receives an invoice prior to Closing with respect to any item to be prorated that is due prior to Closing, the Seller shall make such payment and (B) the extent Buyer receives an invoice following Closing, an amount becomes due with respect to an Acquired Asset following Closing, or the Seller receives an invoice prior to Closing that is due and payable following Closing, Buyer shall make all such required payments. All such payments will be taken into account in the forgoing prorations. The prorations effected pursuant to this Section 9.11 shall be final and not subject to further adjustment."

SECTION 1.40. ~~SECTION 1.38.~~ Section 9.13 of the Purchase Agreement is hereby amended as follows:

(a) Section 9.13(b) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(b) Effective upon the Closing, ESL's Claims against the Debtors arising under (i) the IP/Ground Lease Term Loan Facility; (ii) the FILO Facility; (iii) the Real Estate Loan 2020; (iv) the Second Lien Term Loan; (v) the Second Lien Line of Credit Facility; (vi) the Second Lien PIK Notes and (vii) the Citi L/C Facility (together with the any security interests securing any of the Claims described in the preceding sub-clauses (b)(i)-(vii), collectively, the "ESL Claims") shall each be deemed allowed for all purposes in the Bankruptcy Cases and under the Bankruptcy Code in the amounts set forth on Exhibit G, as reduced by the credit bid set forth in Section 3.1(b)."

(b) Section 9.13(e) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(e) For the purposes of this Section 9.13, the terms set out below shall be defined as follows:

(i) "Debtors" means each of the debtors and debtors in possession in the Bankruptcy Cases, including the Sellers.

(ii) "Released Estate Claims" means any and all Claims and causes of action of the Debtors and their estates against ESL arising under (i) sections 363(k), 502(a) or 510(c) of the Bankruptcy Code, (ii) equitable principles of subordination or recharacterization, or (iii) subject to the second sentence of this Section 9.13(e)(ii), any other applicable Law that could be asserted to challenge the allowance of the ESL Claims pursuant to Section 9.13(c). For the avoidance of doubt the Released Estate Claims do not include ~~any~~(and the allowance of any ESL Claims shall not preclude under any applicable Law or doctrine of collateral estoppel, res

25

judicata, claim or issue preclusion, or otherwise) any other Claims or causes of action of the Debtors or their estates against ESL or any other Person, including any Claims or causes of action (i) for constructive or actual fraudulent transfer under 11 U.S.C. 544(b) or 550(a) or any applicable state or federal Law, for breach of fiduciary duty (including any Claims for breach of fiduciary duty in connection with the incurrence of any debt described on Exhibit G), or for illegal dividend under 8 Del. C. 170-174 or any other state Law (including, but not limited to, any Claims for damages in connection with the incurrence of any debt described on Exhibit G, or breach of fiduciary duty in connection with the incurrence of any debt described on Exhibit G); (ii) that are related to Lands' End, Inc., the "spin-off" (as such term is defined in the Information Statement of Lands' End, Inc. dated March 18, 2014), Seritage Growth Properties, Inc., Seritage Growth Properties, L.P., or the "Transaction" (as that term is defined in the registration statement on Form S-11 filed by Seritage Growth Properties, which registration statement became effective on June 9, 2015), or (iii) that have been asserted (or may be asserted in connection with these Claims and causes of action) by or on behalf of any party in interest in the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 cases captioned In the Matter of a Plan of Compromise or Arrangement of Sears Canada Inc., 9370-2751 Quebec Inc., 191020 Canada Inc., The Cut Inc., Sears Contact Services Inc., Initium Logistics Services Inc., Initium Commerce Labs Inc., Initium Trading and Sourcing Corp., Sears Floor Covering Centers Inc., 173470 Canada Inc., 2497089 Ontario Inc., 6988741 Canada Inc., 10011711 Canada Inc., 1592580 Ontario Limited, 955041 Alberta Ltd., 4201531 Canada Inc., 168886 Canada Inc., and 3339611 Canada Inc., Ontario Superior Court of Justice Court File No.: CV-17-11846-00CL; and in the cases captioned Sears Canada Inc., by its Court-appointed Litigation Trustee, J. Douglas Cunningham, Q.C. v. ESL Invs. Inc., *et al.*, Ont. Sup. Ct. J. (Commercial List) No.: CV-18-00611214-00CL; Morneau Shepell Ltd. in its capacity as administrator of the Sears Canada Inc. Registered Pension Plan v. ESL Invs. Inc., *et al.*, Ont. Sup. Ct. J. (Commercial List) No.: CV-18-00611217-00CL; FTI Consulting Canada Inc., in its capacity as Court-appointed monitor in proceedings pursuant to the *Companies' Creditors Arrangement Act*, RSC 1985, c. c-36 v. ESL Invs. Inc., *et al.*, Ont. Sup. Ct. J. (Commercial List) No.: CV-18-00611219-00CL; and 1291079 Ontario Ltd. v. Sears Canada Inc., *et al.*, Ont. Sup. Ct. J. No.: 4114/15CP."[7]

SECTION 1.41.    SECTION 1.39. The following is hereby added as Section 10.11 of the Purchase Agreement:

---

[7] **Note to Draft**: Per Paul Weiss draft of February 4.

"Section 10.11       Pay-Down of Real Estate 2020 Loan.  To the extent not previously provided, at least one (1) Business Day prior to the Closing Date, the Sellers shall provide to the agent under the Real Estate 2020 Loan all proceeds from the sale or other disposition of collateral pledged to secure the Real Estate 2020 Loan that were closed prior to the Closing Date, including the proceeds held in a segregated account pursuant to paragraph 27 of the *Order (I) Approving the Sale of Certain Real Property, (II) Authorizing the Assumption and Assignment of Certain Unexpired Leases in Connection therewith, and (III) Granting Related Relief* [Docket No. 1393]."

SECTION 1.42.       SECTION 1.40. Section 11.8 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 11.8       [Reserved]."

SECTION 1.43.       SECTION 1.41. The following Schedules are hereby deleted in their entirety and replaced as follows:

(a)     Schedule 1.1(m) is hereby deleted in its entirety and replaced with Exhibit A of this Amendment;

(b)     Schedule 1.1(o) is hereby deleted in its entirety and replaced with Exhibit B of this Amendment;

(c)     Schedule 1.1(p) is hereby deleted in its entirety and replaced with Exhibit C of this Amendment;

(d)     A new "Schedule 1.1(r): Sparrow Master Leases" shall be added as a new Schedule to the Purchase Agreement as set forth on Exhibit D of this Amendment;

(e)     A new "Schedule 1.1(s): Sparrow Subleases" shall be added as a new Schedule to the Purchase Agreement as set forth on Exhibit E of this Amendment;

(f)     A new "Schedule 5.1(c): GOB Sparrow Stores" shall be added as a new Schedule to the Purchase Agreement as set forth on Exhibit F of this Amendment;

(g)     Schedule 6.6(a)(2) is hereby deleted in its entirety and replaced with Exhibit G of this Amendment; and

(h)     Schedule 6.6(c)(2) is hereby deleted in its entirety and replaced with Exhibit H of this Amendment.

## ARTICLE II   MISCELLANEOUS

SECTION 2.01.     This Agreement (including the Exhibits), the Confidentiality Agreement and the other Transaction Documents contain all of the terms, conditions and representations and warranties agreed to by the parties hereto relating to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings,

[AM_ACTIVE 401058988_7]
WEIL:\96900353\5\73217.0003

negotiations, correspondence, undertakings and communications of the parties hereto or their representatives, oral or written, respecting such subject matter.

SECTION 2.02.    This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the Pparties hereto and delivered to the other Pparties hereto.  Delivery of an executed counterpart of a signature page to this Amendment by facsimile, email in "portable document format" (".pdf") form, or by other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing the original signature.

SECTION 2.03.    The signature page of each Pparty to this Amendment who was not a Party to the Purchase Agreement on the date of the Purchase Agreement shall indicate such Pparty's agreement to be bound by all of the terms of the Purchase Agreement as a Seller thereunder as if such Pparty were a Party on the date of the Purchase Agreement.  In the case of KMart Stores of Illinois LLC, the signature of such party to this Amendment shall also be deemed to replace the signature page for "KMart of Illinois LLC" to the Asset Purchase Agreement.

SECTION 2.04.    Except as otherwise provided herein, the Purchase Agreement shall remain unchanged and in full force and effect.  On and after the date hereof, each reference in the Purchase Agreement to "this Agreement", "herein", "hereof", "hereunder" or words of similar import shall mean and be a reference to the Purchase Agreement as amended hereby, although it shall not alter the dates as of which any provision of the Purchase Agreement speaks.  For example, phrases such as "as of the date hereof" and "as of the date of this Agreement" shall continue to refer to January 17, 2019, the date that the Purchase Agreement was originally executed.

SECTION 2.05.    Article XIII of the Purchase Agreement shall, to the extent not already set forth in this Amendment, apply *mutatis mutandis* to this Amendment.

**[SIGNATURE PAGE FOLLOWS]**

28

IN WITNESS WHEREOF, each of the parties hereto has caused this Amendment to be executed and delivered on its behalf by its duly authorized officer as of the date and year first written above.

**Transform Holdco LLC**

By: _____
Name:
Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

[AM_ACTIVE 401058988_7]

WEIL:\96900353\5\73217.0003

**[Sellers Signature Blocks]**

**Sears Holdings Corporation**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

[AM_ACTIVE 401058988_7]

**Kmart Holding Corporation**

By: _____

Name:

Title:

[AM_ACTIVE 401058988_7]

**Kmart Operations LLC**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**<u>Sears Operations LLC</u>**


<u>By:</u> _____

<u>Name:</u>

<u>Title:</u>

**Sears, Roebuck and Co.**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**<u>ServiceLive, Inc.</u>**


<u>By:</u>            _____

<u>Name:</u>

<u>Title:</u>

*<u>[Signature Page to Amendment No. 1 to Asset Purchase Agreement]</u>*

**SHC Licensed Business LLC**

By: _____

Name:

Title:

**A&E Factory Service, LLC**


By: _____

Name:

Title:

**A&E Home Delivery, LLC**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**A&E Lawn & Garden, LLC**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**A&E Signature Service, LLC**


By:                    _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**FBA Holdings Inc.**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**<u>Innovel Solutions, Inc.</u>**


<u>By:</u>        _____

<u>Name:</u>

<u>Title:</u>

<u>*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*</u>

**Kmart Corporation**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**MaxServ, Inc.**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Private Brands, Ltd.**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Sears Development Co.**

By: _____

Name:

Title:

**Sears Holdings Management Corporation**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Sears Home & Business Franchises, Inc.**


By: _____

Name:

Title:

**<u>Sears Home Improvement Products, Inc.</u>**


<u>By:</u>                    _____

<u>Name:</u>

<u>Title:</u>

*<u>[Signature Page to Amendment No. 1 to Asset Purchase Agreement]</u>*

**<u>Sears Insurance Services, L.L.C.</u>**


<u>By:</u> _____

<u>Name:</u>

<u>Title:</u>


*<u>[Signature Page to Amendment No. 1 to Asset Purchase Agreement]</u>*

**Sears Procurement Services, Inc.**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Sears Protection Company**

By: _____

Name:

Title:

**<u>Sears Protection Company (PR), Inc.</u>**


<u>By:</u>                         _____

<u>Name:</u>

<u>Title:</u>

**<u>Sears Roebuck Acceptance Corp.</u>**

<u>By:</u>  _____

<u>Name:</u>

<u>Title:</u>

*<u>[Signature Page to Amendment No. 1 to Asset Purchase Agreement]</u>*

**Sears, Roebuck de Puerto Rico, Inc.**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**<u>SYW Relay LLC</u>**


<u>By:</u> _____

<u>Name:</u>

<u>Title:</u>

*<u>[Signature Page to Amendment No. 1 to Asset Purchase Agreement]</u>*

**<u>Wally Labs LLC</u>**


<u>By:</u> _____

<u>Name:</u>

<u>Title:</u>

*<u>[Signature Page to Amendment No. 1 to Asset Purchase Agreement]</u>*

**SHC Promotions LLC**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Big Beaver of Florida Development, LLC**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**California Builder Appliances, Inc.**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Florida Builder Appliances, Inc.**

By: _____

Name:

Title:

**<u>KBL Holding Inc.</u>**


<u>By:</u> _____

<u>Name:</u>

<u>Title:</u>

**<u>Kmart of Michigan, Inc.</u>**


<u>By:</u> _____

<u>Name:</u>

<u>Title:</u>

*<u>[Signature Page to Amendment No. 1 to Asset Purchase Agreement]</u>*

**Kmart of Washington LLC**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Kmart Stores of Illinois LLC**


By: _____

Name:

Title:

**Kmart Stores of Texas LLC**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**MyGofer LLC**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Sears Brands Business Unit Corporation**


By:                                         _____

Name:

Title:

**Sears Holdings Publishing Company, LLC**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Sears Protection Company (Florida), L.L.C.**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**SHC Desert Springs, LLC**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**<u>SOE, Inc.</u>**

<u>By:</u> _____

<u>Name:</u>

<u>Title:</u>

*<u>[Signature Page to Amendment No. 1 to Asset Purchase Agreement]</u>*

**StarWest, LLC**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**STI Merchandising, Inc.**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Troy Coolidge No. 13, LLC**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**BlueLight.com, Inc. .**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Sears Brands, L.L.C.**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**<u>Sears Buying Services, Inc.</u>**


<u>By:</u> _____

<u>Name:</u>

<u>Title:</u>

*<u>[Signature Page to Amendment No. 1 to Asset Purchase Agreement]</u>*

**Kmart.com LLC**


By: _____

Name:

Title:

**<u>Sears Brands Management Corporation</u>**

<u>By:</u> _____

<u>Name:</u>

<u>Title:</u>

*<u>[Signature Page to Amendment No. 1 to Asset Purchase Agreement]</u>*

**KLC, Inc.**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**SRe Holding Corporation**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**SRC Sparrow 2 LLC**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**<u>Sears Reinsurance Company Ltd.</u>**


<u>By:</u>         _____

<u>Name:</u>

<u>Title:</u>

                           <u>Its duly authorized officer</u>

# EXHIBITS

*Attached.*

| | |
|---|---|
| **Summary report:** <br> **Litéra® Change-Pro TDC 10.1.0.800 Document comparison done on 2/4/2019 9:47:33 PM** | |
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Transform - Amendment No. 1 to Asset Purchase Agreement (CGSH Incrementa....docx | |
| **Modified filename:** Project Blue - Amendment No. 1 to the APA (Weil Comments 02.04.19)_WEIL_96900353_5.DOCX | |
| **Changes:** | |
| Add | 321 |
| Delete | 126 |
| Move From | 8 |
| Move To | 8 |
| Table Insert | 55 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 518 |

# Exhibit E

**From:** Straley, Mary Ann <IMCEAEX-
O KMART+20CORPORATION OU KIHSITE1 CN RECIPIENTS CN MSTRAL1@namprd12.prod.outlook.com>
**Sent:** Tuesday, February 12, 2013 10:57 AM
**To:** Terrell, James <James.Terrell@searshc.com>; Morrie, Michael <Michael.Morrie@searshc.com>
**Subject:** FW: A███████ Sears wire will be sent to Sears tomorrow, Tuesday, February 12, 2013.....

-----Original Message-----
**From:** Knightly, Kathleen (Contractor)
**Sent:** Tuesday, February 12, 2013 9:40 AM
**To:** Straley, Mary Ann
**Subject:** RE: A███████ Sears wire will be sent to Sears tomorrow, Tuesday, February 12, 2013.....
Yes, at 9:43 AM EST.
Kathleen Knightly
Cash Analyst
Sears Roebuck Acceptance Corp
Phone: (302) 434 3141
Fax: (302) 434 3156
Email: Kathleen.Knightly@searshc.com

**From:** Straley, Mary Ann
**Sent:** Tuesday, February 12, 2013 10:39 AM
**To:** Knightly, Kathleen (Contractor)
**Subject:** RE: A███████ Sears wire will be sent to Sears tomorrow, Tuesday, February 12, 2013.....
Hi….was this just received today?
-----Original Message-----
**From:** Knightly, Kathleen (Contractor)
**Sent:** Tuesday, February 12, 2013 9:35 AM
**To:** Straley, Mary Ann; Houghton-Lynch, Nancy; Johnson, Doretha; Quinn, Jodie
**Cc:** Stollenwerck, Jeff @ Randgp; Terrell, James; Morrie, Michael; Phelan, Bill; Riecker, Rob; Weine, Perry; Stopen, Keith; Brokke, Sonia
**Subject:** RE: A███████ Sears wire will be sent to Sears tomorrow, Tuesday, February 12, 2013.....
The funds have been received. Please see below.

| ███████ FED WIRE CREDIT | FED | 0963309043FF | SAME | 09:43 | 02/12/2013 | STRAIGHT |
|---|---|---|---|---|---|---|

```
        YOUR REF:  130212005018
        REC FROM:  U S BANK NATIONAL ASSOC DUE FROM EP-MN-MN6D TWO MERIDIAN
                   CROSSINGS RICHFIELD MN 55423
          FED ID:  091000022
     B/O CUSTOMER:  NA NAME NOT ENTERED
         B/O BANK:  [Redacted] VLG OF HOFFMAN ESTATES-EDA FYBDS 1900 HASSELL
                   RD HOFFMAN ESTATES,IL,60195
           REMARK:  SEARS TIF NOTE PAYMENTS ATTN: JIM TERRELL REAL ESTATE,
                   ACQUISITIONS DEBIT REF 130212005018
         FED TIME:  09:40
          REC GFP:  [Redacted]
          MRN SEQ:  130212005018
          FED REF:  0212 I1Q73AGC 000424 **VIA FED**
```

Kathleen Knightly
Cash Analyst
Sears Roebuck Acceptance Corp
Phone: (302) 434 3141
Fax: (302) 434 3156
Email: Kathleen.Knightly@searshc.com

**From:** Straley, Mary Ann
**Sent:** Monday, February 11, 2013 2:03 PM
**To:** Houghton-Lynch, Nancy; Johnson, Doretha; Knightly, Kathleen (Contractor); Quinn, Jodie
**Cc:** Stollenwerck, Jeff @ Randgp; Terrell, James; Morrie, Michael; Phelan, Bill; Riecker, Rob; Weine, Perry; Stopen, Keith; Brokke, Sonia
**Subject:** A███████ Sears wire will be sent to Sears tomorrow, Tuesday, February 12, 2013.....
These monies represent the latest EDA note payment. Please advise us when these funds are received, and credit unit # 36726, account
15249. Thanks.

HIGHLY CONFIDENTIAL

# Exhibit F

[FILED UNDER SEAL
PURSUANT TO 7/2/19
ORDER DOCKET #4420]

# Exhibits G - G-5

[FILED UNDER SEAL
PURSUANT TO 7/2/19
ORDER DOCKET #4420]

# Exhibit H

[FILED UNDER SEAL
PURSUANT TO 7/2/19
ORDER DOCKET #4420]

# Exhibit I

[FILED UNDER SEAL
PURSUANT TO 7/2/19
ORDER DOCKET #4420]

# Exhibit J

| | |
|---|---|
| **From:** | Crozier, Jennifer Brooks |
| **To:** | Mainoo, Abena |
| **Cc:** | Genender, Paul; Friedmann, Jared; Singh, Sunny; Liman, Lewis J.; O'Reilly, Benet J.; O'Neal, Sean A.; Barefoot, Luke A.; Lanzkron, Joseph; Glinchenko, Ilya |
| **Subject:** | RE: Sears--Diligence List, Call |
| **Date:** | Wednesday, May 1, 2019 5:37:12 PM |
| **Attachments:** | image001.jpg |
| | 190501 - Estate Request List.pdf |

Abena:

Attached please find the below-referenced diligence list.  Please note that many of the listed items have been requested previously.

We are happy to set up a call if you (or E&Y) have any questions concerning the materials we've requested.

Many thanks,

Jennifer



**Jennifer Brooks Crozier**
**Associate | Weil, Gotshal & Manges LLP**
200 Crescent Court, Suite 300
Dallas, TX 75201-6950
jennifer.crozier@weil.com
+1 214 746 8232 Office
+1 860 910 8900 Mobile
+1 214 746 7777 Facsimile

---

**From:** Mainoo, Abena <amainoo@cgsh.com>
**Sent:** Tuesday, April 30, 2019 8:27 PM
**To:** Friedmann, Jared <Jared.Friedmann@weil.com>
**Cc:** Singh, Sunny <sunny.singh@weil.com>; Liman, Lewis J. <lliman@cgsh.com>; O'Reilly, Benet J. <boreilly@cgsh.com>; O'Neal, Sean A. <soneal@cgsh.com>; Barefoot, Luke A. <lbarefoot@cgsh.com>; Lanzkron, Joseph <jlanzkron@cgsh.com>; Crozier, Jennifer Brooks <Jennifer.Crozier@weil.com>; Glinchenko, Ilya <iglinchenko@cgsh.com>
**Subject:** Re: Sears Call

Okay.  We'll look out for the list and will wait to hear back from you about scheduling the call.

**Abena Mainoo**
Cleary Gottlieb Steen & Hamilton LLP
Assistant: mmontanez@cgsh.com

[One Liberty Plaza, New York NY 10006](#)
T: [+1 212 225 2785](#) | M: [+1 610 733 9885](#)
[amainoo@cgsh.com](#)  |  [clearygottlieb.com](#)

On Apr 30, 2019, at 7:16 PM, Friedmann, Jared <[Jared.Friedmann@weil.com](#)> wrote:

By tomorrow.

---

**From:** Mainoo, Abena <[amainoo@cgsh.com](#)>
**Sent:** Tuesday, April 30, 2019 7:13 PM
**To:** Friedmann, Jared <[Jared.Friedmann@weil.com](#)>
**Cc:** Singh, Sunny <[sunny.singh@weil.com](#)>; Liman, Lewis J. <[lliman@cgsh.com](#)>;
O'Reilly, Benet J. <[boreilly@cgsh.com](#)>; O'Neal, Sean A. <[soneal@cgsh.com](#)>; Barefoot,
Luke A. <[lbarefoot@cgsh.com](#)>; Lanzkron, Joseph <[jlanzkron@cgsh.com](#)>; Crozier,
Jennifer Brooks <[Jennifer.Crozier@weil.com](#)>; Glinchenko, Ilya
<[iglinchenko@cgsh.com](#)>
**Subject:** Re: Sears Call

For our planning purposes, do you expect to send that list tonight, tomorrow, or
later in the week?

**Abena Mainoo**
Cleary Gottlieb Steen & Hamilton LLP
Assistant: [mmontanez@cgsh.com](#)
[One Liberty Plaza, New York NY 10006](#)
T: [+1 212 225 2785](#) | M: [+1 610 733 9885](#)
[amainoo@cgsh.com](#)  |  [clearygottlieb.com](#)

On Apr 30, 2019, at 7:07 PM, Friedmann, Jared <[Jared.Friedmann@weil.com](#)>
wrote:

We'll get you that list asap.

---

**From:** Mainoo, Abena <[amainoo@cgsh.com](#)>
**Sent:** Tuesday, April 30, 2019 7:04 PM
**To:** Friedmann, Jared <[Jared.Friedmann@weil.com](#)>; Singh, Sunny
<[sunny.singh@weil.com](#)>
**Cc:** Liman, Lewis J. <[lliman@cgsh.com](#)>; O'Reilly, Benet J.
<[boreilly@cgsh.com](#)>; O'Neal, Sean A. <[soneal@cgsh.com](#)>; Barefoot,
Luke A. <[lbarefoot@cgsh.com](#)>; Lanzkron, Joseph <[jlanzkron@cgsh.com](#)>;
Crozier, Jennifer Brooks <[Jennifer.Crozier@weil.com](#)>; Glinchenko, Ilya
<[iglinchenko@cgsh.com](#)>
**Subject:** RE: Sears Call

Jared and Sunny:  We would like to discuss all of the issues in our email,
and any others that you have, so that we can try to reach a resolution
without the need to go to court.  We are surprised that you believe that

you do not have the necessary backup.  We provided that to you and are eager to know what information you think you should get that you have not been given.

In addition to the information contained in the decks that we sent on March 26, April 4, April 19, and April 26, we sent you additional information concerning:

- Store cash and armored car cash reconciliation (on March 26);
- Checks (on March 22 and March 26);
- P-Card expenses (on March 26);
- Taxes (on April 4);
- Telecom expenses (on April 4);
- Pre-close orders canceled post-close (on March 26 and April 4); and
- GOB March rent (on March 26).

As to the call, we do not want to have a call just for the purpose of having a call.  That does not seem like a productive way for either of our teams to spend our time.  Let us know when you will be ready for a call.

———

**Abena Mainoo**
Cleary Gottlieb Steen & Hamilton LLP
Assistant: mmontanez@cgsh.com
One Liberty Plaza, New York NY 10006
T: +1 212 225 2785 | M: +1 610 733 9885
amainoo@cgsh.com  |  clearygottlieb.com

---

**From:** Friedmann, Jared [mailto:Jared.Friedmann@weil.com]
**Sent:** Tuesday, April 30, 2019 3:46 PM
**To:** Mainoo, Abena <amainoo@cgsh.com>; Singh, Sunny <sunny.singh@weil.com>
**Cc:** Liman, Lewis J. <lliman@cgsh.com>; O'Reilly, Benet J. <boreilly@cgsh.com>; O'Neal, Sean A. <soneal@cgsh.com>; Barefoot, Luke A. <lbarefoot@cgsh.com>; Lanzkron, Joseph <jlanzkron@cgsh.com>; Crozier, Jennifer Brooks <Jennifer.Crozier@weil.com>
**Subject:** RE: Sears Call

Hi Abena,

Sunny and I are available tomorrow morning at 9:30am, if that works for your team.  In light of the information you provided on Friday night with respect to the February Rent Prorations and the Cash-in-Transit, I'm not sure how much we can resolve at this point.  To date, M-III has not received the back-up for the conclusory statements in "Post-close Reconciliations" deck attached as Exhibit A.  Without that back-up, we have no way to confirm the appropriateness of the purported

reconciliations.   We are preparing a detailed list of the diligence necessary; which should already have been provided without us having to make a request.  We will get that list to you shortly, but in the meantime, E&Y can get started by pulling together the back-up for the amounts reconciled/set-off against the outstanding February Rent Prorations and Cash-in-Transit.

Thanks,
Jared

<image001.jpg>

**Jared R. Friedmann**

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
jared.friedmann@weil.com
+1 212 310 8828 Direct
+1 917 951 8730 Mobile
+1 212 310 8007 Fax

---

**From:** Mainoo, Abena <amainoo@cgsh.com>
**Sent:** Tuesday, April 30, 2019 10:01 AM
**To:** Friedmann, Jared <Jared.Friedmann@weil.com>; Singh, Sunny <sunny.singh@weil.com>
**Cc:** Liman, Lewis J. <lliman@cgsh.com>; O'Reilly, Benet J. <boreilly@cgsh.com>; O'Neal, Sean A. <soneal@cgsh.com>; Barefoot, Luke A. <lbarefoot@cgsh.com>; Lanzkron, Joseph <jlanzkron@cgsh.com>
**Subject:** RE: Sears Call

Jared and Sunny,

We have not heard from you in response to my email from yesterday afternoon asking to schedule a meeting so we could discuss open issues between Transform and Debtors.  We had been hoping to have this discussion last Thursday.  The following is our agenda of items we would like to cover in order to try to come to a resolution without litigation:

1.     Reconciliations, including cash in transit and prorations
2.     Prepaid inventory including the management of inventory outside the ordinary course
3.     Specified receivables
4.     Debtors' purported settlement with the PBGC and the purported PBGC lien
5.     Hoffman Estates

6.    Other payables with respect to ordered inventory (the 166 issue)

Let us know your availability for a meeting.

———

**Abena Mainoo**
Cleary Gottlieb Steen & Hamilton LLP
Assista
One Liberty Plaza, New York NY 10006
T: +1 212 225 2785 | M: +1 610 733 9885
amainoo@cgsh.com | clearygottlieb.com

---

**From:** Mainoo, Abena
**Sent:** Monday, April 29, 2019 1:44 PM
**To:** 'Friedmann, Jared' <Jared.Friedmann@weil.com>; Singh, Sunny <sunny.singh@weil.com>; O'Reilly, Benet J. <boreilly@cgsh.com>; Barefoot, Luke A. <lbarefoot@cgsh.com>; Lanzkron, Joseph <jlanzkron@cgsh.com>
**Subject:** RE: Sears Call

Jared, we're available to discuss the reconciliations today from 4-5 and after 6.  Let us know if you're available then or if we'll need to consider other times.  Thanks.

———

**Abena Mainoo**
Cleary Gottlieb Steen & Hamilton LLP
Assistant: mmontanez@cgsh.com
One Liberty Plaza, New York NY 10006
T: +1 212 225 2785 | M: +1 610 733 9885
amainoo@cgsh.com | clearygottlieb.com

---

**From:** Friedmann, Jared [mailto:Jared.Friedmann@weil.com]
**Sent:** Thursday, April 25, 2019 1:04 PM
**To:** Mainoo, Abena <amainoo@cgsh.com>; Singh, Sunny <sunny.singh@weil.com>; O'Reilly, Benet J. <boreilly@cgsh.com>; Barefoot, Luke A. <lbarefoot@cgsh.com>; Lanzkron, Joseph <jlanzkron@cgsh.com>
**Subject:** RE: Sears Call

We are still in the process of discussing these issues internally and with M-III and need a little more time before a follow-up discussion makes sense.   Can we please reschedule for early next week?

Please let us know what would work on your end and we'll do our best to accommodate your schedule.

Thanks,
Jared

-----Original Appointment-----
**From:** Mainoo, Abena <amainoo@cgsh.com>
**Sent:** Monday, April 22, 2019 7:02 PM
**To:** Mainoo, Abena; Singh, Sunny; Friedmann, Jared; O'Reilly, Benet J.; Barefoot, Luke A.; Lanzkron, Joseph
**Subject:** Sears Call
**When:** Thursday, April 25, 2019 5:30 PM-6:30 PM (UTC-05:00) Eastern Time (US & Canada).

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the "firm" refer to Cleary Gottlieb Steen & Hamilton LLP and its affiliated entities in certain jurisdictions, and the term "offices" includes offices of those affiliated entities.

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the "firm" refer to Cleary Gottlieb Steen & Hamilton LLP and its affiliated entities in certain jurisdictions, and the term "offices" includes offices of those affiliated entities.

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the "firm" refer to Cleary Gottlieb Steen & Hamilton LLP and its affiliated entities in certain jurisdictions, and the term "offices" includes offices of those affiliated entities.

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the "firm" refer to Cleary Gottlieb Steen & Hamilton LLP and its affiliated entities in certain jurisdictions, and the term "offices" includes offices of those affiliated entities.

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the "firm" refer to Cleary Gottlieb Steen & Hamilton LLP and its affiliated entities in certain jurisdictions, and the term "offices" includes offices of those affiliated entities.

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

## Sears Estate Information Request List
05/01/2019

| | Information Request | Cleary 4/26 Exhibit A Reference | Information Request Details |
|---|---|---|---|
| 1) | List of all invoices that make up $180.32mm of AP that was outstanding as of the transaction close | N/A | - Supporting documentation including vendor name, DUNS number, account number, division number, invoice number, invoice date, due date, service period, paid/unpaid status, and date paid if applicable for each invoice |
| 2) | Detail on $4.25mm of "Pre-February utilities" added to rent proration | Page 10 | - Supporting documentation that includes the vendor, store unit, service period, and payment amount for each expense |
| 3) | Detail on $766k added to rent proration that is related to real estate taxes for rejected leases paid by Transform | Page 10 | - Supporting documentation that includes property unit associated with RE tax expense, taxing authority, time period for taxes, and date paid by Transform |
| 4) | Locations for all expenses included in "Detail" tab of "February Telecom Expense Analysis 3-29-19" file | Page 8 | - Store unit numbers for the $1.91mm of telecom expenses with "SEARS" location in spreadsheet provided by Transform |
| 5) | Additional detail on sales tax checks and sales tax ACH debits provided in "Tax Payments 3-28-19" file | Page 7 | - Store unit numbers and time period for each sales tax expense included in $2.83mm of sales tax purported to be owed by the Estate |
| 6) | Sublease proceeds from Estate owned properties that Transform has received since 2/11/19 | N/A | - Support for proceeds received from subtenants at the Riverside, CA location, Vernon, CA location, and any other Estate property that Transform has received proceeds from |
| 7) | Outstanding checks as of transaction close detail | Page 5 | - Support and methodology used to calculate $2.73mm of Kmart rent and Sears rent that is deducted from the total amount owed for Estate checks<br>- Reconciliation of all Estate checks that relate to property taxes and property associated with each payment<br>- Documentation demonstrating $1.1mm of checks paid by the Estate on 2/11/19 are not included in purported amount owed to Transform |
| 8) | P-card transactions detail | Page 6 | - Supporting documentation of P-Card expenses that includes date of transaction, date paid by Transform, and purpose of transaction |
| 9) | Completion of net TSA fees schedule | Page 14 | - Completed TSA fees schedule with supporting documentation that includes EE Medical Benefit Variable Fees, Custom Bond Fees, Surety Bond Fees, Medical Bond Fees, and KCD IP License Reimbursement |
| 10) | Reconciliation of checks that Transform deposited into their bank accounts after the transaction close that may relate to Estate operations | N/A | - General ledger store unit and account mapping, and time period associated with each receipt for the $6.8mm of checks that Transform deposited in the month after transaction close |
| 11) | Confirmation of GOB CC proceeds owed to Estate that were processed from 2/15/19 onward | N/A | - Estate plans to respond to EY's request for additional information on GOB CC proceeds by 5/2/19 EOD |

# Exhibits K & K-2

| From: | Mainoo, Abena |
| --- | --- |
| To: | Crozier, Jennifer Brooks; Friedmann, Jared; Singh, Sunny; Genender, Paul |
| Cc: | Liman, Lewis J.; O'Reilly, Benet J.; O'Neal, Sean A.; Barefoot, Luke A.; Lanzkron, Joseph; Glinchenko, Ilya |
| Subject: | RE: Sears--Diligence List, Call |
| Date: | Friday, May 3, 2019 8:36:34 PM |
| Attachments: | 5.3.2019 Letter from A. Mainoo.pdf |
|  | image001.jpg |
|  | Slide #5 Estate Checks Report.xlsx |
|  | Slide #9_Canceled Orders Summary Report.xlsx |
|  | Slide #10_RE Expense Pro-Rations Report.xlsx |

Dear Jennifer, Jared, Sunny and Paul,

Please see attached.

Thanks,
Abena

───

**Abena Mainoo**
Cleary Gottlieb Steen & Hamilton LLP
Assistant: mmontanez@cgsh.com
One Liberty Plaza, New York NY 10006
T: +1 212 225 2785 | M: +1 610 733 9885
amainoo@cgsh.com  | clearygottlieb.com

---

**From:** Crozier, Jennifer Brooks [mailto:Jennifer.Crozier@weil.com]
**Sent:** Wednesday, May 1, 2019 5:37 PM
**To:** Mainoo, Abena <amainoo@cgsh.com>
**Cc:** Genender, Paul <Paul.Genender@weil.com>; Friedmann, Jared <Jared.Friedmann@weil.com>;
Singh, Sunny <sunny.singh@weil.com>; Liman, Lewis J. <lliman@cgsh.com>; O'Reilly, Benet J.
<boreilly@cgsh.com>; O'Neal, Sean A. <soneal@cgsh.com>; Barefoot, Luke A.
<lbarefoot@cgsh.com>; Lanzkron, Joseph <jlanzkron@cgsh.com>; Glinchenko, Ilya
<iglinchenko@cgsh.com>
**Subject:** RE: Sears--Diligence List, Call

Abena:

Attached please find the below-referenced diligence list.  Please note that many of the listed items
have been requested previously.

We are happy to set up a call if you (or E&Y) have any questions concerning the materials we've
requested.

Many thanks,

Jennifer

**Jennifer Brooks Crozier**
**Associate | Weil, Gotshal & Manges LLP**
200 Crescent Court, Suite 300
Dallas, TX 75201-6950
jennifer.crozier@weil.com
+1 214 746 8232 Office
+1 860 910 8900 Mobile
+1 214 746 7777 Facsimile

---

**From:** Mainoo, Abena <amainoo@cgsh.com>
**Sent:** Tuesday, April 30, 2019 8:27 PM
**To:** Friedmann, Jared <Jared.Friedmann@weil.com>
**Cc:** Singh, Sunny <sunny.singh@weil.com>; Liman, Lewis J. <lliman@cgsh.com>; O'Reilly, Benet J. <boreilly@cgsh.com>; O'Neal, Sean A. <soneal@cgsh.com>; Barefoot, Luke A. <lbarefoot@cgsh.com>; Lanzkron, Joseph <jlanzkron@cgsh.com>; Crozier, Jennifer Brooks <Jennifer.Crozier@weil.com>; Glinchenko, Ilya <iglinchenko@cgsh.com>
**Subject:** Re: Sears Call

Okay.  We'll look out for the list and will wait to hear back from you about scheduling the call.

**Abena Mainoo**
Cleary Gottlieb Steen & Hamilton LLP
Assistant: mmontanez@cgsh.com
One Liberty Plaza, New York NY 10006
T: +1 212 225 2785 | M: +1 610 733 9885
amainoo@cgsh.com  | clearygottlieb.com

On Apr 30, 2019, at 7:16 PM, Friedmann, Jared <Jared.Friedmann@weil.com> wrote:

> By tomorrow.
>
> ---
>
> **From:** Mainoo, Abena <amainoo@cgsh.com>
> **Sent:** Tuesday, April 30, 2019 7:13 PM
> **To:** Friedmann, Jared <Jared.Friedmann@weil.com>
> **Cc:** Singh, Sunny <sunny.singh@weil.com>; Liman, Lewis J. <lliman@cgsh.com>; O'Reilly, Benet J. <boreilly@cgsh.com>; O'Neal, Sean A. <soneal@cgsh.com>; Barefoot, Luke A. <lbarefoot@cgsh.com>; Lanzkron, Joseph <jlanzkron@cgsh.com>; Crozier, Jennifer Brooks <Jennifer.Crozier@weil.com>; Glinchenko, Ilya <iglinchenko@cgsh.com>
> **Subject:** Re: Sears Call
>
> For our planning purposes, do you expect to send that list tonight, tomorrow, or later in the week?

**Abena Mainoo**
Cleary Gottlieb Steen & Hamilton LLP
Assistant: [mmontanez@cgsh.com](mailto:mmontanez@cgsh.com)
[One Liberty Plaza, New York NY 10006](https://maps.google.com)
T: [+1 212 225 2785](tel:+12122252785) | M: [+1 610 733 9885](tel:+16107339885)
[amainoo@cgsh.com](mailto:amainoo@cgsh.com) | [clearygottlieb.com](https://clearygottlieb.com)

On Apr 30, 2019, at 7:07 PM, Friedmann, Jared <[Jared.Friedmann@weil.com](mailto:Jared.Friedmann@weil.com)> wrote:

> We'll get you that list asap.

> **From:** Mainoo, Abena <[amainoo@cgsh.com](mailto:amainoo@cgsh.com)>
> **Sent:** Tuesday, April 30, 2019 7:04 PM
> **To:** Friedmann, Jared <[Jared.Friedmann@weil.com](mailto:Jared.Friedmann@weil.com)>; Singh, Sunny <[sunny.singh@weil.com](mailto:sunny.singh@weil.com)>
> **Cc:** Liman, Lewis J. <[lliman@cgsh.com](mailto:lliman@cgsh.com)>; O'Reilly, Benet B. <[boreilly@cgsh.com](mailto:boreilly@cgsh.com)>; O'Neal, Sean A. <[soneal@cgsh.com](mailto:soneal@cgsh.com)>; Barefoot, Luke A. <[lbarefoot@cgsh.com](mailto:lbarefoot@cgsh.com)>; Lanzkron, Joseph <[jlanzkron@cgsh.com](mailto:jlanzkron@cgsh.com)>; Crozier, Jennifer Brooks <[Jennifer.Crozier@weil.com](mailto:Jennifer.Crozier@weil.com)>; Glinchenko, Ilya <[iglinchenko@cgsh.com](mailto:iglinchenko@cgsh.com)>
> **Subject:** RE: Sears Call

> Jared and Sunny:  We would like to discuss all of the issues in our email, and any others that you have, so that we can try to reach a resolution without the need to go to court.  We are surprised that you believe that you do not have the necessary backup.  We provided that to you and are eager to know what information you think you should get that you have not been given.

> In addition to the information contained in the decks that we sent on March 26, April 4, April 19, and April 26, we sent you additional information concerning:
> - Store cash and armored car cash reconciliation (on March 26);
> - Checks (on March 22 and March 26);
> - P-Card expenses (on March 26);
> - Taxes (on April 4);
> - Telecom expenses (on April 4);
> - Pre-close orders canceled post-close (on March 26 and April 4); and
> - GOB March rent (on March 26).

> As to the call, we do not want to have a call just for the purpose of having a call.  That does not seem like a productive way for either of our teams to spend our time.  Let us know when you will be ready for a call.

> **Abena Mainoo**

Cleary Gottlieb Steen & Hamilton LLP
Assistant: mmontanez@cgsh.com
One Liberty Plaza, New York NY 10006
T: +1 212 225 2785 | M: +1 610 733 9885
amainoo@cgsh.com | clearygottlieb.com

---

**From:** Friedmann, Jared [mailto:Jared.Friedmann@weil.com]
**Sent:** Tuesday, April 30, 2019 3:46 PM
**To:** Mainoo, Abena <amainoo@cgsh.com>; Singh, Sunny <sunny.singh@weil.com>
**Cc:** Liman, Lewis J. <lliman@cgsh.com>; O'Reilly, Benet J. <boreilly@cgsh.com>; O'Neal, Sean A. <soneal@cgsh.com>; Barefoot, Luke A. <lbarefoot@cgsh.com>; Lanzkron, Joseph <jlanzkron@cgsh.com>; Crozier, Jennifer Brooks <Jennifer.Crozier@weil.com>
**Subject:** RE: Sears Call

Hi Abena,

Sunny and I are available tomorrow morning at 9:30am, if that works for your team.  In light of the information you provided on Friday night with respect to the February Rent Prorations and the Cash-in-Transit, I'm not sure how much we can resolve at this point.  To date, M-III has not received the back-up for the conclusory statements in "Post-close Reconciliations" deck attached as Exhibit A.  Without that back-up, we have no way to confirm the appropriateness of the purported reconciliations.   We are preparing a detailed list of the diligence necessary; which should already have been provided without us having to make a request.  We will get that list to you shortly, but in the meantime, E&Y can get started by pulling together the back-up for the amounts reconciled/set-off against the outstanding February Rent Prorations and Cash-in-Transit.

Thanks,
Jared

<image001.jpg>

**Jared R. Friedmann**

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
jared.friedmann@weil.com
+1 212 310 8828 Direct
+1 917 951 8730 Mobile
+1 212 310 8007 Fax

**From:** Mainoo, Abena <amainoo@cgsh.com>
**Sent:** Tuesday, April 30, 2019 10:01 AM
**To:** Friedmann, Jared <Jared.Friedmann@weil.com>; Singh, Sunny
<sunny.singh@weil.com>
**Cc:** Liman, Lewis J. <lliman@cgsh.com>; O'Reilly, Benet J.
<boreilly@cgsh.com>; O'Neal, Sean A. <soneal@cgsh.com>; Barefoot,
Luke A. <lbarefoot@cgsh.com>; Lanzkron, Joseph <jlanzkron@cgsh.com>
**Subject:** RE: Sears Call

Jared and Sunny,

We have not heard from you in response to my email from yesterday
afternoon asking to schedule a meeting so we could discuss open issues
between Transform and Debtors.  We had been hoping to have this
discussion last Thursday.  The following is our agenda of items we would
like to cover in order to try to come to a resolution without litigation:

1.      Reconciliations, including cash in transit and prorations
2.      Prepaid inventory including the management of inventory
        outside the ordinary course
3.      Specified receivables
4.      Debtors' purported settlement with the PBGC and the purported
        PBGC lien
5.      Hoffman Estates
6.      Other payables with respect to ordered inventory (the 166 issue)

Let us know your availability for a meeting.

—

**Abena Mainoo**
Cleary Gottlieb Steen & Hamilton LLP
Assista
One Liberty Plaza, New York NY 10006
T: +1 212 225 2785 | M: +1 610 733 9885
amainoo@cgsh.com  |  clearygottlieb.com

**From:** Mainoo, Abena
**Sent:** Monday, April 29, 2019 1:44 PM
**To:** 'Friedmann, Jared' <Jared.Friedmann@weil.com>; Singh, Sunny
<sunny.singh@weil.com>; O'Reilly, Benet J. <boreilly@cgsh.com>;
Barefoot, Luke A. <lbarefoot@cgsh.com>; Lanzkron, Joseph
<jlanzkron@cgsh.com>
**Subject:** RE: Sears Call

Jared, we're available to discuss the reconciliations today from 4-5 and
after 6.  Let us know if you're available then or if we'll need to consider
other times.  Thanks.

**Abena Mainoo**
Cleary Gottlieb Steen & Hamilton LLP
Assistant: mmontanez@cgsh.com
One Liberty Plaza, New York NY 10006
T: +1 212 225 2785 | M: +1 610 733 9885
amainoo@cgsh.com | clearygottlieb.com

---

**From:** Friedmann, Jared [mailto:Jared.Friedmann@weil.com]
**Sent:** Thursday, April 25, 2019 1:04 PM
**To:** Mainoo, Abena <amainoo@cgsh.com>; Singh, Sunny
<sunny.singh@weil.com>; O'Reilly, Benet J. <boreilly@cgsh.com>;
Barefoot, Luke A. <lbarefoot@cgsh.com>; Lanzkron, Joseph
<jlanzkron@cgsh.com>
**Subject:** RE: Sears Call

We are still in the process of discussing these issues internally and with M-
III and need a little more time before a follow-up discussion makes
sense.   Can we please reschedule for early next week?

Please let us know what would work on your end and we'll do our best to
accommodate your schedule.

Thanks,
Jared

-----Original Appointment-----
**From:** Mainoo, Abena <amainoo@cgsh.com>
**Sent:** Monday, April 22, 2019 7:02 PM
**To:** Mainoo, Abena; Singh, Sunny; Friedmann, Jared; O'Reilly, Benet J.;
Barefoot, Luke A.; Lanzkron, Joseph
**Subject:** Sears Call
**When:** Thursday, April 25, 2019 5:30 PM-6:30 PM (UTC-05:00) Eastern
Time (US & Canada).





This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the "firm" refer to Cleary Gottlieb Steen & Hamilton LLP and its affiliated entities in certain jurisdictions, and the term "offices" includes offices of those affiliated entities.

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the "firm" refer to Cleary Gottlieb Steen & Hamilton LLP and its affiliated entities in certain jurisdictions, and the term "offices" includes offices of those affiliated entities.

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the "firm" refer to Cleary Gottlieb Steen & Hamilton LLP and its affiliated entities in certain jurisdictions, and the term "offices" includes offices of those affiliated entities.

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the "firm" refer to Cleary Gottlieb Steen & Hamilton LLP and its affiliated entities in certain jurisdictions, and the term "offices" includes offices of those affiliated entities.

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the "firm" refer to Cleary Gottlieb Steen & Hamilton LLP and its affiliated entities in certain jurisdictions, and the term "offices" includes offices of those affiliated entities.

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**

One Liberty Plaza
New York, NY 10006-1470
T: +1 212 225 2000
F: +1 212 225 3999

clearygottlieb.com

WASHINGTON, D.C. · PARIS · BRUSSELS · LONDON · MOSCOW
FRANKFURT · COLOGNE · ROME · MILAN · HONG KONG
BEIJING · BUENOS AIRES · SÃO PAULO · ABU DHABI · SEOUL

VICTOR I. LEWKOW
THOMAS J. MOLONEY
DAVID G. SABEL
JONATHAN I. BLACKMAN
YARON Z. REICH
RICHARD S. LINCER
JAMES A. DUNCAN
STEVEN M. LOEB
CRAIG B. BROD
NICOLAS GRABAR
CHRISTOPHER E. AUSTIN
HOWARD S. ZELBO
DAVID E. BRODSKY
ARTHUR H. KOHN
RICHARD J. COOPER
JEFFREY S. LEWIS
PAUL J. SHIM
STEVEN L. WILNER
ERIKA W. NIJENHUIS
ANDRES DE LA CRUZ
DAVID C. LOPEZ
MICHAEL A. GERSTENZANG
LEWIS J. LIMAN
LEV L. DASSIN
NEIL Q. WHORISKEY
JORGE U. JUANTORENA
MICHAEL D. WEINBERGER
DAVID LEINWAND
DIANA L. WOLLMAN
JEFFREY A. ROSENTHAL
ETHAN A. KLINGSBERG
MICHAEL D. DAYAN
CARMINE D. BOCCUZZI, JR.
JEFFREY D. KARPF
KIMBERLY BROWN BLACKLOW
ROBERT J. RAYMOND
SUNG K. KANG
LEONARD C. JACOBY
SANDRA L. FLOW

FRANCISCO L. CESTERO
FRANCESCA L. ODELL
WILLIAM L. MCRAE
JASON FACTOR
JOON H. KIM
MARGARET S. PEPONIS
LISA M. SCHWEITZER
JUAN G. GIRÁLDEZ
DUANE MCLAUGHLIN
BREON S. PEACE
MEREDITH E. KOTLER
CHANTAL E. KORDULA
BENET J. O'REILLY
ADAM E. FLEISHER
SEAN A. O'NEAL
GLENN P. MCGRORY
MATTHEW P. SALERNO
MICHAEL J. ALBANO
VICTOR L. HOU
ROGER A. COOPER
AMY R. SHAPIRO
JENNIFER KENNEDY PARK
ELIZABETH LENAS
LUKE A. BAREFOOT
PAMELA L. MARCOGLIESE
PAUL M. TIGER
JONATHAN S. KOLODNER
DANIEL ILAN
MEYER H. FEDIDA
ADRIAN R. LEIPSIC
ELIZABETH VICENS
ADAM J. BRENNEMAN
ARI D. MACKINNON
JAMES E. LANGSTON
JARED GERBER
COLIN D. LLOYD
COREY M. GOODMAN
RISHI ZUTSHI
JANE VANLARE

DAVID H. HERRINGTON
KIMBERLY R. SPOERRI
AARON J. MEYERS
DANIEL C. REYNOLDS
ABENA A. MAINOO
HUGH C. CONROY, JR.
JOSEPH LANZKRON
MAURICE R. GINDI
KATHERINE R. REAVES
RAHUL MUKHI
RESIDENT PARTNERS

SANDRA M. ROCKS
S. DOUGLAS BORISKY
JUDITH KASSEL
DAVID E. WEBB
PENELOPE L. CHRISTOPHOROU
BOAZ S. MORAG
MARY E. ALCOCK
HEIDE H. ILGENFRITZ
KATHLEEN M. EMBERGER
AVRAM E. LUFT
ANDREW WEAVER
HELENA K. GRANNIS
JOHN V. HARRISON
CAROLINE F. HAYDAY
NEIL R. MARKEL
KENNETH S. BLAZEJEWSKI
ANDREA M. BASHAM
LAURA BAGARELLA
SHIRLEY M. LO
JONATHAN D.W. GIFFORD
SUSANNA E. PARKER
RESIDENT COUNSEL

LOUISE M. PARENT
OF COUNSEL

D: +1 212 225 2785
amainoo@cgsh.com

May 3, 2019

BY E-MAIL

Sunny Singh, Esq.
Jared Friedmann, Esq.
Paul Genender, Esq.
Jennifer Brooks Crozier, Esq.
Weil, Gotshal & Manges LLP

Re: Post-Closing Reconciliation

Dear Sunny, Jared, Paul and Jennifer:

I am writing on behalf of Transform Holdco LLC ("Transform") in response to your April 30 and May 1, 2019 emails.

Your April 30 email suggested that you have not been provided with supporting documents for Transform's reconciliation analysis. As noted in my response to that email, we are surprised at that suggestion. In addition to the reconciliation analyses we provided to you on March 26, April 4, April 19 and April 26, we previously sent you supporting documents concerning:

- Cash reconciliation on March 26;
- Estate checks on March 22 and March 26;
- P-Cards on March 26;
- Taxes on April 4;
- Telecom expenses on April 4;
- Pre-Closing orders canceled post-Closing on March 26 and April 4; and
- March GOB rent on March 26.

To supplement the information we previously sent, we have enclosed updated supporting documents concerning Estate checks and pre-Closing orders cancelled post-Closing.

Singh
Friedmann
Genender
Crozier, p. 2

       Contrary to your statement that M-III has not received back-up information to date, we also sent supporting documents directly to M-III on March 27 at your request. Moreover, M-III has met with EY Turnaround Management Services LLC to discuss Transform's reconciliation and review related information.

       You did not dispute or otherwise respond to any of the information we provided through April 4.  Your statements at the April 18 Bankruptcy Court hearing marked the first time you raised any objections to Transform's reconciliation analysis.  At our suggestion, Cleary and Weil had a call on April 23 to discuss open issues between Transform and the debtors, including the reconciliations.  We later agreed to your request to adjourn the follow-up discussion that was scheduled for April 25, to allow you additional time to consider the issues.

       In response to my email from April 29 about scheduling the follow-up discussion, you stated that you were preparing a detailed list of the information you needed, which you subsequently provided on May 1 (the "May 1 Request").  We have enclosed responses to Requests 2 and 3 of the May 1 Request.  We will respond to the May 1 Request on a rolling basis and currently expect to complete our responses by May 13.

       As we have previously discussed, we would like to address the open issues between Transform and the debtors together, in order to try to achieve a global resolution without litigation.  To that end, we would like to schedule a meeting for the week of May 13. We look forward to receiving your response.

       Very truly yours,

       CLEARY GOTTLIEB STEEN & HAMILTON LLP

       /s/ Abena A. Mainoo

       Abena A. Mainoo, a Partner

Attachments

# Exhibit K-3

[FILED UNDER SEAL
PURSUANT TO 7/2/19
ORDER DOCKET #4420]

# Exhibit K-4

[FILED UNDER SEAL
PURSUANT TO 7/2/19
ORDER DOCKET #4420]

# Exhibit K-5

[FILED UNDER SEAL
PURSUANT TO 7/2/19
ORDER DOCKET #4420]

# Exhibit L

**Weil, Gotshal & Manges LLP**

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

**Jared R. Friedmann**
+1 (212) 310-8828
Jared.Friedmann@weil.com

BY E-MAIL

May 9, 2019

Lewis J. Liman, Esq.
Abena Mainoo, Esq.
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006-1470

Re:     *In re Sears Holdings Corporation, et al.*, Case No. 18-23538 (RDD) and ECF No. 2796

Dear Counsel:

As you know, on May 1, 2019, the Debtors requested that Transform produce information critical for the Debtors' advisors to confirm Transform's so-called reconciliation of the Cash-in-Transit owed to the Debtors, and its proration calculation pursuant to Section 9.11 of the APA (the "**Diligence List**").  The Debtors also would like to amicably resolve disputes regarding these reconciliations without the need for further court intervention, but until Transform provides greater transparency into the methodology and data behind its calculations, the Debtors are unable to meaningfully or productively discuss these issues. All of the information requested on the Diligence List should be readily available to Transform's advisors who would have had to rely on the same to prepare their calculations.  Accordingly, we hope that such information will be produced and provide the clarity necessary to proceed.

We are in receipt of your May 3, 2019 letter, which identified information previously provided to the Debtors and also enclosed certain information purportedly responsive to two of the items on the Diligence List.  Although the Debtors acknowledge previously receiving information on the dates identified in your letter, unfortunately that information is insufficient to allow the Debtors' advisors to confirm either the Cash-in-Transit analysis or the Rent Proration calculations prepared by Transform's advisors.  The four iterations of the reconciliation analyses provided to date contain only a "description of the analysis performed and preliminary conclusions."  *See, e.g.*, Post-Close Reconciliations, p.3 (Mar. 26, 2019); Post-Close Reconciliations, p.3 (Apr. 4, 2019); Post-Close Reconciliations, p.3 (Apr. 19, 2019); Post-Close Reconciliations, p.3 (Apr. 26, 2019).

What the Debtors need—and have repeatedly requested—is the complete backup work done by Transform's advisors to conduct their calculations and to arrive at their conclusions.  To date all of the "backup work" that Transform has provided to the Debtors or M-III lacks key information necessary to confirm the analyses and conclusions.  Specifically, with the respect to the information cited in your letter:

Lewis J. Liman                                                      **Weil, Gotshal & Manges LLP**
Abena Mainoo
May 9, 2019
Page 2

- **Cash Reconciliation:**  If Transform is referring to the Cash-in-Transit files that reconcile Cash-in-Transit from regional bank accounts and individual stores' pre-Closing proceeds that had not arrived in the company's concentration accounts as of the Closing, the Debtors previously indicated that they do not dispute these amounts.  If, instead, Transform is referring to the Post-Close Reconciliation presentation provided on March 26, that file merely describes—in conclusory fashion—cash purportedly owed to Transform.  Neither the 16-slide presentation nor any of the three updates to that presentation allow the Debtors to confirm any amounts owed without the backup information described in this letter and requested in the Diligence List.

- **Estate Checks:**  While the Debtors are in receipt of a list that includes the check numbers, check amounts, and date paid, the Debtors' advisors need information sufficient to (i) understand and confirm the methodology by which Transform's advisors made $2.73 million in deductions for Kmart and Sears rent; (ii) reconcile checks related to property taxes to confirm those payments are the Debtors' responsibility; and (iii) understand why Transform continues to include approximately $1.1 million paid by the Debtors on February 11, 2019 in the amounts owed to Transform (a point Debtors have repeatedly raised with Transform's advisors).

- **P-Cards:**  The information provided does not provide the date Transform paid the expense which is necessary to confirm that Transform has incurred a pre-Closing obligation.

- **Taxes:**  The Debtors need a tax schedule that includes information on the store numbers and tax period to which the payment applies in order to confirm whether these expenses were borne by Transform post-Closing.

- **Telecom Expenses:**  Nearly 85% (or $1.9 million) of the $2.3 million in purported Telecom Expense lists "Sears" in the Unit Number column.  The Debtors need information sufficient to confirm that these amounts relate to expenses incurred at GOB Stores.

Many of these deficiencies can be cured simply by providing the complete list of invoices equaling $180.3 million that were outstanding as of February 11, 2019, with the supporting detail requested in the Diligence List, something the Debtors' advisors repeatedly have requested since March.  Such a list would fill in much of the missing information and allow the Debtors' advisors to confirm whether each asserted setoff is a unique expense and not an obligation assumed by Transform under the APA.

The new information Transform provided on May 3, 2019, also are unsatisfactory for the following reasons:

- The Estate Checks file provided includes the same deficiencies described above.  Further, the file does not account for any post-Closing checks received by Transform for pre-Closing amounts owed to the Debtors.

Lewis J. Liman
Abena Mainoo
May 9, 2019
Page 3

**Weil, Gotshal & Manges LLP**

- The Expense Pro-Rations Report still relies on the same utility expenses provided two days after Closing, which are estimates based on previous budgets. Now that it is May, the actuals are available and Transform should update the proration calculation to reflect the expenses actually incurred by Transform. The file also outlines the $4.25 million pre-February utilities but, again, these amounts cannot be confirmed until the Debtors' advisors have access to the complete list of invoices described above.

- The real estate taxes purportedly paid by Transform on behalf of rejected leases does not include the tax period information necessary to confirm whether these were the Debtors' obligations.

It has now been more than a week since the Debtors provided the Diligence List detailing the information necessary to allow the Debtors to analyze Transform's positions and engage in any settlement discussions. In your letter, you said that you anticipate that Transform would complete its rolling production of responsive material by May 13, 2019, but we have not received anything other than what was attached to your May 3, 2019 letter. We recognize that there may have been some difficulties transferring files via email, so please let us know if this is not the case. We hope to receive all of the information requested promptly.

Should you have any questions, please do not hesitate to contact me. If helpful, we would be happy to arrange a call that also includes M-III and E&Y—whatever will expedite the receipt of this information, which should all be at E&Y's fingertips.

Sincerely,

*/s/ Jared R. Friedmann*
Jared R. Friedmann


cc:    Ray C. Schrock, P.C.
       Sunny Singh
       Paul R. Genender

# Exhibit M

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

One Liberty Plaza
New York, NY 10006-1470
T: +1 212 225 2000
F: +1 212 225 3999

clearygottlieb.com

WASHINGTON, D.C. · PARIS · BRUSSELS · LONDON · MOSCOW
FRANKFURT · COLOGNE · ROME · MILAN · HONG KONG
BEIJING · BUENOS AIRES · SÃO PAULO · ABU DHABI · SEOUL

D: +1 212 225 2785
amainoo@cgsh.com

VICTOR I. LEWKOW
THOMAS J. MOLONEY
DAVID G. SABEL
JONATHAN I. BLACKMAN
YARON Z. REICH
RICHARD S. LINCER
JAMES A. DUNCAN
STEVEN M. LOEB
CRAIG B. BROD
NICOLAS GRABAR
CHRISTOPHER E. AUSTIN
HOWARD S. ZELBO
DAVID E. BRODSKY
ARTHUR H. KOHN
RICHARD J. COOPER
JEFFREY S. LEWIS
PAUL J. SHIM
STEVEN L. WILNER
ERIKA W. NIJENHUIS
ANDRES DE LA CRUZ
DAVID C. LOPEZ
MICHAEL A. GERSTENZANG
LEWIS J. LIMAN
LEV L. DASSIN
NEIL Q. WHORISKEY
JORGE U. JUANTORENA
MICHAEL D. WEINBERGER
DAVID LEINWAND
DIANA L. WOLLMAN
JEFFREY A. ROSENTHAL
ETHAN A. KLINGSBERG
MICHAEL D. DAYAN
CARMINE D. BOCCUZZI, JR.
JEFFREY D. KARPF
KIMBERLY BROWN BLACKLOW
ROBERT J. RAYMOND
SUNG K. KANG
LEONARD C. JACOBY
SANDRA L. FLOW

FRANCISCO L. CESTERO
FRANCESCA L. ODELL
WILLIAM L. MCRAE
JASON FACTOR
JOON H. KIM
MARGARET S. PEPONIS
LISA M. SCHWEITZER
JUAN G. GIRÁLDEZ
DUANE McLAUGHLIN
BREON S. PEACE
MEREDITH E. KOTLER
CHANTAL E. KORDULA
BENET J. O'REILLY
ADAM E. FLEISHER
SEAN A. O'NEAL
GLENN P. MCGRORY
MATTHEW P. SALERNO
MICHAEL J. ALBANO
VICTOR L. HOU
ROGER A. COOPER
AMY R. SHAPIRO
JENNIFER KENNEDY PARK
ELIZABETH LENAS
LUKE A. BAREFOOT
PAMELA L. MARCOGLIESE
PAUL M. TIGER
JONATHAN S. KOLODNER
DANIEL ILAN
MEYER H. FEDIDA
ADRIAN R. LEIPSIC
ELIZABETH VICENS
ADAM J. BRENNEMAN
ARI D. MACKINNON
JAMES E. LANGSTON
JARED GERBER
COLIN D. LLOYD
COREY M. GOODMAN
RISHI ZUTSHI
JANE VANLARE

DAVID H. HERRINGTON
KIMBERLY R. SPOERRI
AARON J. MEYERS
DANIEL C. REYNOLDS
ABENA A. MAINOO
HUGH C. CONROY, JR.
JOSEPH LANZKRON
MAURICE R. GINDI
KATHERINE R. REAVES
RAHUL MUKHI
RESIDENT PARTNERS

SANDRA M. ROCKS
S. DOUGLAS BORISKY
JUDITH KASSEL
DAVID E. WEBB
PENELOPE L. CHRISTOPHOROU
BOAZ S. MORAG
MARY E. ALCOCK
HEIDE H. ILGENFRITZ
KATHLEEN M. EMBERGER
AVRAM E. LUFT
ANDREW WEAVER
HELENA K. GRANNIS
JOHN V. HARRISON
CAROLINE F. HAYDAY
NEIL R. MARKEL
KENNETH S. BLAZEJEWSKI
ANDREA M. BASHAM
LAURA BAGARELLA
SHIRLEY M. LO
JONATHAN D.W. GIFFORD
SUSANNA E. PARKER
RESIDENT COUNSEL

LOUISE M. PARENT
OF COUNSEL

May 13, 2019

BY E-MAIL

Sunny Singh, Esq.
Jared Friedmann, Esq.
Paul Genender, Esq.
Jennifer Brooks Crozier, Esq.
Weil, Gotshal & Manges LLP

Re:  Post-Closing Reconciliation

Dear Sunny, Jared, Paul and Jennifer:

I am writing on behalf of Transform Holdco LLC ("Transform") in response to your May 9, 2019 letter.

As detailed in my May 3 letter, and as recognized by your May 9 letter, Transform has been providing reconciliation analyses and detailed supporting information to Debtors since late-March. That information contained supporting documentation, including information on cash reconciliations, estate checks, p-cards, taxes, telecommunication expenses, pre-closing orders, and March GOB rent.

Transform has devoted and continues to devote significant resources to respond promptly to the May 1 Requests. To that end, I enclosed with my May 3 letter responses to Requests 2 and 3. Enclosed with this letter is information responsive to Requests 1, 3, 7, and 8.

In response to Request 1, we have included with this letter, a file showing our current estimate of the accounts payable balance at Closing and associated payments by Transform, along with supporting information. This analysis currently only captures invoices that had been physically entered as of the Closing date. We are continuing to capture (i) additional invoices not entered as of the Closing date that relate to the pre-Closing period and associated payments by Transform, and (ii) agreements by Transform to pay post-petition, pre-

Singh
Friedmann
Genender
Crozier, p. 2

Closing accounts payable as part of the contract assignment and cure process. Once such amounts are captured, we will update the analysis accordingly.

Your letter asks for a complete list of invoices that were outstanding as of February 11, 2019, with supporting detail. As an initial matter, we dispute that such request has been outstanding since March. It was made for the first time earlier this month. Moreover, collecting that information would impose a substantial burden on Transform and does not appear geared toward providing Debtors with information relevant to the reconciliation process. Transform obtained the information it provided you by querying its systems for the aggregate amounts payable by vendor at the time of Closing and by tracking additional invoices as they came in to determine whether they related to pre-Closing activities. As M-III should know, Transform's AP system does not allow it to automatically generate an invoice level build-up of the open AP balance and therefore to produce such a report the company would need to manually retrieve this data for every vendor in each of its AP systems. This would take at least 3 to 4 weeks to generate and would require significant resources to be devoted. The information we have provided you today should permit you to conduct all the analyses that are necessary. Accordingly, we ask that Debtors reconsider this request or, if not, explain how this information would be necessary for the reconciliation process.

As to Requests 3 and 7, we have included with this letter supporting information on the calculation of the $766,420 in real estate taxes paid by Transform on behalf of the Estate in respect of rejected leases. We have confirmed that all of the checks used to pay for the $766,420 in property taxes were in fact Transform checks. The supporting file provided today includes in column Q the check number for each property tax payment, and in the top corner lists the last check number issued by the Estate, which confirms that the checks listed in column Q were issued by Transform and not by Debtors.

With respect to Request 8, we have included with this letter updated supporting information regarding P-Card transactions, which now includes in column V a description of the purpose of each transaction.

Your May 9 letter also recites certain information that you claim Debtors need in connection with the reconciliation process. Contrary to the contention in your letter, certain of this information has not been outstanding but is raised for the first time in your May 9 letter. It raises the following additional questions and requests:

- Cash Reconciliation: You state that Debtors previously indicated that they did not dispute the figure for Cash-in-Transit from regional bank accounts and individual stores' pre-Closing proceeds that had not arrived in the company's concentration accounts as of the Closing. That is the figure to which we are referring. This item should now be resolved.

- Estate Checks: You ask for information to understand and confirm the methodology by which Transform made $2.73 million in deductions for Kmart and Sears rent. The methodology was as follows: after M-III asked

Singh
Friedmann
Genender
Crozier, p. 3

Transform's advisers to confirm that checks for Kmart and Sears rent were not
included in the list of Estate checks, Transform's advisers reviewed the list of
relevant checks in detail to determine which of those were paid to landlords or
are otherwise covered by rent prorations and eliminated those checks.
Detailed check information, indicating the checks that were eliminated as
being for Kmart and Sears rent, was included in the "Estate Checks Report"
file provided by Transform on May 3, 2019 in the tabs titled "K-Mart Rent"
and "Sears Rent."  We ask that Debtors inform us if they disagree with any of
the information in this schedule.

The second point under Estate Checks, with respect to the reconciliation of
property checks, is referenced above.  The supporting file we provide today
should permit you to make the requested confirmation.

Your third point asks why Transform continues to include approximately $1.1
million paid by Debtors on February 11, 2019, in the amounts owed to
Transform.  We do not know the $1.1 million to which you are referring.  We
also disagree that this request has been "repeatedly raised."

- P-Cards:  We have enclosed with this letter supporting documentation with
  respect to P-Card transactions.  You ask for the date Transform paid a
  particular expense, information that you claim is necessary to confirm that
  Transform has incurred a pre-Closing obligation.  The information we have
  provided is sufficient to permit you to confirm that the obligations Transform
  has incurred are pre-Closing.  The calculation is based on when the P-Card
  charge was incurred.  Transform cannot readily provide the date on which the
  particular expense was paid, nor do Debtors explain why such information
  would be relevant.  In particular, Transform—like most payors on credit card
  debt—does not track the payment to a credit card processor of amounts due to
  particular expenses that underlie those amounts due.  Transform is charged for
  P-Card expenses in an aggregate amount and pays those aggregate expenses
  either when due or in an amount sufficient to stay under the applicable credit
  limits.

- Taxes:  You ask for a tax schedule that includes information on store numbers
  to which a payment applies.  Transform does not have that information.
  Where sales are delivered, sales tax is based on where an item is delivered to a
  customer and not the store from which it is delivered.  Accordingly, the tax
  reported for a specific jurisdiction could relate to multiple store units.  We can
  confirm that the sales tax payments made in February 2019 relate to sales tax
  for fiscal January 2019 and that the Estate should have filed and paid the
  returns.

Singh
Friedmann
Genender
Crozier, p. 4

- **Telecom Expenses**:  You ask for information to confirm that the telecom expenses relate to expenses incurred at GOB Stores.  We ask you to explain the relevance of this information.  To the extent your letter suggests that telecom expenses are subject to reconciliation only if they relate to a GOB store, that position is inconsistent with Section 9.11(iii) of Amendment No. 1 to the APA, which specifically lists "telephone service" for all Properties and the Sparrow Properties as an item subject to proration.

- **Estate Checks file**:  EY is working to provide information regarding post-Closing checks received by Transform for pre-Closing amounts owed to Debtors.  This request was first made on April 16, 2019 and requires input from 8 to 10 business units at Transform regarding approximately $6.8 million in checks.

- **Expense Pro-Rations Report**:  EY is in the process of preparing a response based on the actual utility expenses and we will provide that as soon as it is prepared.  In any event, our understanding is that the actual utility expenses are very close to the estimates of those expenses.

- **Real Estate Taxes**:  The supporting information we provide today on the calculation of the $766,420 in real estate taxes paid by Transform includes in column P the fiscal year associated with each property tax payment.  This is the only time period data available on this point.

Subject to the above, we will continue to respond to the remaining items in the May 1 Requests and the additional requests made in your May 9 letter on a rolling basis.  If it would be helpful to discuss particular items, we are likewise happy to arrange a call between EY and M-III.  We also remain available for a meeting this week to try to achieve a global resolution of the open issues between Transform and Debtors without recourse to litigation.  We look forward to your response.

Very truly yours,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

*/s/ Abena A. Mainoo*
Abena A. Mainoo, a Partner

Attachments

# Exhibit N

# Weil, Gotshal & Manges LLP

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

**Jared R. Friedmann**
+1 (212) 310-8828
Jared.Friedmann@weil.com

BY E-MAIL

May 15, 2019

Lewis J. Liman, Esq.
Abena Mainoo, Esq.
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006-1470

Re: *In re Sears Holdings Corporation, et al.*, Case No. 18-23538 (RDD) and ECF No. 2796

Dear Counsel:

Further to our discussion this morning, we write to respond to your May 13, 2019 letter ("**May 13 Letter**") and the materials provided therewith purportedly addressing the information that the Debtors requested from Transform, some of which was requested months ago, and which was summarized in the Diligence List.[1]

Unfortunately, the May 13 Letter (including the materials provided with it) is an incomplete and insufficient response to the Debtors' longstanding requests for information. Transform continues to ignore its obligations under Section 9.11 of the APA and the Interim Agreement. To date, Transform's so-called "rolling production" of information has yet to fully respond to any of the Debtors' requests. Some requests, such as sublease proceeds (Item #6) and TSA fees (Item #9), remain completely unanswered. This is a serious matter. As you know, it is Transform's burden to justify its continued possession of Estate assets, which it plainly has not been able to do. The Debtors have the absolute right to test Transform's purported justifications for withholding Estate property as part of their obligations to the stakeholders.

The May 13 Letter also incorrectly states that certain information requests were made for the "first time" in our May 9, 2019 Letter and that the Debtors have not explained the necessity of certain requested information. First, none of the Debtors' requests are new. The record is clear that the Debtors have been seeking the requested information for many weeks (and now months). For example, with respect to the Debtors' request for a complete list of invoices outstanding as of February 11, 2019 (which you point out at page two of your letter), that information was requested on March 7, 2019, as reflected in the email

---

[1] All capitalized terms not otherwise defined herein shall have the meanings prescribed to them in the Debtors' most recent correspondence, dated May 9, 2019 ("**May 9 Letter**").

Lewis J. Liman
Abena Mainoo
May 15, 2019
Page 2

**Weil, Gotshal & Manges LLP**

from Chris Good to William Linnane and other Sears employees, attached to this letter as **Exhibit A**.[2] Insofar as you suggest that our prior communications have not adequately explained the need for the requested information, we disagree, but, as we discussed, we do agree with your suggestion that a call between M-III and E&Y would be more productive (and efficient) than us reiterating those reasons here.

Your suggestion that timing is an issue rings hollow. Transform and its financial advisors have had more than sufficient time to collect and produce information to support their purported justifications for withholding of Estate assets. The information requested in the Diligence List does not exceed the scope of information that any experienced financial advisor (including those retained in this matter) would request at the outset of its engagement. Any alleged "substantial burden" Transform would face in producing the information is self-imposed by its refusal to remit to the Estate the assets it continues to wrongfully possess (and apparently cannot put forward the materials that would demonstrate otherwise).

For the avoidance of doubt, to date, none of the requests on the Diligence List has been "resolved." We can discuss further on our call with the financial advisors, but in sum:

- Transform has not provided the complete list of AP invoices or the requested telecom expense information (Items #1 and 4). As M-III has previously indicated, the cash reconciliation cannot be completed until this information—which, again, was first requested nearly ten weeks ago on March 7—is received. *See* Exhibit A.

- The information provided for rejected leases and outstanding checks (Items #3 and #7) does not comply with our specific requests in the Diligence List.

- M-III advises that information regarding sales tax checks and P-Cards information (Items #5 and #8) may be close to being resolved, but that determination is subject to additional analysis and discussions with Transform's financial advisors.

- Prior to May 13, M-III responded to Transform's inquiries regarding GOB Proceeds (Item #11), but the May 13 Letter remains silent with respect to this category.

- The remaining requests were either not addressed at all (Items #6 and #9) or Transform has represented that its advisors will provide the information without providing any projection as to when the Debtors will receive it (Items #2 and #10).

---

[2] This e-mail also calls into question your assertion that providing the list of AP invoices would "take 3 to 4 weeks to generate and would require significant resources." Further down that chain, Jeff Butz explains: "We have the list of invoices by vendor that we are holding." William Linnane later confirms: "We can track what is paid versus outstanding as well. As Jeff said below, we have all the information at Vendor invoice level." *See* Exhibit A.

Lewis J. Liman
Abena Mainoo
May 15, 2019
Page 3

**Weil, Gotshal & Manges LLP**

While the Debtors would prefer that Transform simply provide the requested information, given Transform's actions to date, and the timing, the Debtors can no longer continue to wait while hoping that Transform finally decides to produce the requested information.  It has been two weeks since the Debtors sent the Diligence List, three months since Closing, and, as Transform knows, the Debtors are working toward confirmation in July.  Yet Transform still has not provided: (i) certain Estate assets improperly withheld by Transform; (ii) information repeatedly requested from Transform; and (iii) any assurance that Transform intends to provide that critical information in a timely manner.  If the Debtors do not receive all of the requested information necessary to test Transform's purported justifications for withholding Estate property in the next week, we will at that point have no choice but to seek Court intervention so that we can take possession of the Estate property without further delay.  We await word on your availability for a call with our respective financial advisors to hopefully advance discussions of our outstanding information requests.

Should you have any questions, please do not hesitate to contact me.

Sincerely,

*/s/ **Jared R. Friedmann***

Jared R. Friedmann

cc:  Ray C. Schrock, P.C.
     Paul R. Genender
     Sunny Singh

# *EXHIBIT A*

**From:** Chris Good
**Sent:** Thursday, March 7, 2019 5:41 PM
**To:** Linnane, William <William.Linnane@searshc.com>; Brian Griffith <bgriffith@miiipartners.com>
**Cc:** Phelan, Robert <Robert.Phelan@searshc.com>; rob.riecker <rob.riecker@searshc.com>; Butz, Jeff <Jeff.Butz@searshc.com>
**Subject:** RE: AP at 02/11 - Vendor process draft proposal

William – can we get the list of invoices outstanding at close and what's paid and what's not? The issue is the public dispute going on regarding how much AP NewCo is assuming. We also would propose that we just pay NewCo cash for the overage on whatever the assumed amount is and have NewCo process through its normal batch funding process. Would that work?

Unfortunately though, we can drill down a process but it won't matter until both sides agree on the AP number.

Thanks,
Chris

_____
Christopher A. Good
M-III Partners
130 West 42nd Street, 17th Floor
New York, New York 10036
O:  212.716.1497
M: 252.714.2092
cgood@miiipartners.com

**From:** Linnane, William [mailto:William.Linnane@searshc.com]
**Sent:** Thursday, March 7, 2019 5:36 PM
**To:** Brian Griffith <bgriffith@miiipartners.com>

**Cc:** Chris Good <cgood@miiipartners.com>; Phelan, Robert <Robert.Phelan@searshc.com>;
rob.riecker <rob.riecker@searshc.com>; Butz, Jeff <Jeff.Butz@searshc.com>
**Subject:** RE: AP at 02/11 - Vendor process draft proposal

Hi Brian,

Wanted to follow up here.

Given the resource issue that you are referring to, let us know what you want us to do, on your
behalf and behalf of the Estate, to move this along.

Thanks for your help,

William

---

**From:** Linnane, William
**Sent:** Friday, March 01, 2019 10:21 AM
**To:** Butz, Jeff <Jeff.Butz@searshc.com>; bgriffith@miiipartners.com
**Cc:** cgood@miiipartners.com; Phelan, Robert <Robert.Phelan@searshc.com>; Riecker, Rob
<Rob.Riecker@searshc.com>
**Subject:** Re: AP at 02/11 - Vendor process draft proposal

Hi Brian,

I don't think there is much administration as such. Probably requires per day sending 20-30 emails
that say the same thing: thanks for your email, we acknowledge receipt, please complete this form
and send it back. New Sears will have access to the mailbox, so we can track what is coming in, what
forms come in, etc.

We can track what is paid versus outstanding as well. As Jeff said below, we have all the information
at Vendor invoice level.

If it was done at the end of each day, I think it no more than 30 minutes work. Probably good to
check in between both the Estate and NewCo teams once per week as well. Maybe 3 hours work per
week for first 3-4 weeks. Less work after that.

Best regards,

William

On Feb 28, 2019, at 1:06 PM, Butz, Jeff <Jeff.Butz@searshc.com> wrote:

There are currently 996 vendors on the list.

From the AP side, there is nothing to reconcile.  We have the list of invoices by vendor that we are holding.

Jeff Butz
Sr. Director Acctg Services
(847) 286-6503
Jeff.Butz@searshc.com
3333 Beverly Rd  B5-248A
Hoffman Estates, IL  60179

---

**From:** Brian Griffith [mailto:bgriffith@miiipartners.com]
**Sent:** Thursday, February 28, 2019 12:59 PM
**To:** Linnane, William <William.Linnane@searshc.com>; cgood@miiipartners.com
**Cc:** Phelan, Robert <Robert.Phelan@searshc.com>; Riecker, Rob <Rob.Riecker@searshc.com>; Butz, Jeff <Jeff.Butz@searshc.com>
**Subject:** RE: AP at 02/11 - Vendor process draft proposal

---

**Enterprise Security Team Alert:** This email originated from outside of the organization. Please use caution when opening messages from external sources.

---

How many vendors would you estimate would be in the outstanding AP?  I am not sure M-III would have the capacity to effectively administer this in an appropriate time period if we are talking about more than a hundred vendors.  I would almost think the AP team should remain the main point of contact (with M-III in the loop) as part of the transition services agreement for the estate.  Once the claim is reconciled, then M-III and NewCo could engage in discussion about how best to proceed with payment.

Brian J. Griffith
M-III Partners, LP
212-716-1494

---

**From:** Linnane, William <William.Linnane@searshc.com>
**Sent:** Thursday, February 28, 2019 11:58 AM
**To:** Brian Griffith <bgriffith@miiipartners.com>; Chris Good <cgood@miiipartners.com>
**Cc:** Phelan, Robert <Robert.Phelan@searshc.com>; rob.riecker <rob.riecker@searshc.com>; Butz, Jeff <Jeff.Butz@searshc.com>

**Subject:** AP at 02/11 - Vendor process draft proposal

Hi Brian, Chris,

Following up the discussion earlier today, the high process proposed would look like below.  I am assuming both Miii and NewCo teams both have access to the a █████████████████████

Proposed Process for Estate AP:
- Step 1: Vendor gets a letter stating: "If you have questions about invoices for goods received or services rendered prior to February 11th that remain outstanding, please contact: ██████████████████"
- Step 2: Vendor emails this email address.
- Step 3: Vendor receives an email from a person at Miii or a standard email address at Miii (for example, ███████████████████). This email explains that Miii are working on behalf of Sears Holdings Corporation / the Estate. It requests that the Vendor completes a form to capture all the information needed to match this Post petition AP claim to the Payables.
- Step 4: Vendor completes form and sends to Miii address. Miii acknowledges with a standard response.
- Step 5: In the background, Miii pass forms or a collated summary of forms 3 times per week to NewCo. NewCo matches the information. If a query is generated because the data does not match the AP system , it goes back via Miii to Vendor until resolved. We can iron who does what here.
- Step 6: AP is paid by agreement between Miii and NewCo to first $xm. After $Xm a further discussion required.

Next Steps:
- Feedback on above
- Agree information on the form

Let me know your thoughts.

Best regards,

William

This message, including any attachments, is the property of Sears Holdings Corporation and/or one of its subsidiaries. It is confidential and may contain proprietary or legally privileged information. If you are not the intended recipient, please delete it without reading the contents. Thank you.

This message contains information which may be confidential and privileged. Unless you are the intended addressee (or authorized to receive for the intended addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply email or by calling 212-716-1491 and delete the message.

This message contains information which may be confidential and privileged. Unless you are the intended addressee (or authorized to receive for the intended addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply email or by calling 212-716-1491 and delete the message.

This message, including any attachments, is the property of Sears Holdings Corporation and/or one of its subsidiaries. It is confidential and may contain proprietary or legally privileged information. If you are not the intended recipient, please delete it without reading the contents. Thank you.

This message contains information which may be confidential and privileged. Unless you are the intended addressee (or authorized to receive for the intended addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply email or by calling 212-716-1491 and delete the message.

This message contains information which may be confidential and privileged. Unless you are the intended addressee (or authorized to receive for the intended addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply email or by calling 212-716-1491 and delete the message.

# Exhibit O

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

One Liberty Plaza
New York, NY 10006-1470
T: +1 212 225 2000
F: +1 212 225 3999

clearygottlieb.com

WASHINGTON, D.C. · PARIS · BRUSSELS · LONDON · MOSCOW
FRANKFURT · COLOGNE · ROME · MILAN · HONG KONG
BEIJING · BUENOS AIRES · SÃO PAULO · ABU DHABI · SEOUL

D: +1 212 225 2785
amainoo@cgsh.com

VICTOR I. LEWKOW
THOMAS J. MOLONEY
DAVID G. SABEL
JONATHAN I. BLACKMAN
YARON Z. REICH
RICHARD S. LINCER
JAMES A. DUNCAN
STEVEN M. LOEB
CRAIG B. BROD
NICOLAS GRABAR
CHRISTOPHER E. AUSTIN
HOWARD S. ZELBO
DAVID E. BRODSKY
ARTHUR H. KOHN
RICHARD J. COOPER
JEFFREY S. LEWIS
PAUL J. SHIM
STEVEN L. WILNER
ERIKA W. NIJENHUIS
ANDRES DE LA CRUZ
DAVID C. LOPEZ
MICHAEL A. GERSTENZANG
LEWIS J. LIMAN
LEV L. DASSIN
NEIL Q. WHORISKEY
JORGE U. JUANTORENA
MICHAEL D. WEINBERGER
DAVID LEINWAND
DIANA L. WOLLMAN
JEFFREY A. ROSENTHAL
ETHAN A. KLINGSBERG
MICHAEL D. DAYAN
CARMINE D. BOCCUZZI, JR.
JEFFREY D. KARPF
KIMBERLY BROWN BLACKLOW
ROBERT J. RAYMOND
SUNG K. KANG
LEONARD C. JACOBY
SANDRA L. FLOW

FRANCISCO L. CESTERO
FRANCESCA L. ODELL
WILLIAM L. MCRAE
JASON FACTOR
JOON H. KIM
MARGARET S. PEPONIS
LISA M. SCHWEITZER
JUAN G. GIRÁLDEZ
DUANE MCLAUGHLIN
BREON S. PEACE
MEREDITH E. KOTLER
CHANTAL E. KORDULA
BENET J. O'REILLY
ADAM E. FLEISHER
SEAN A. O'NEAL
GLENN P. MCGRORY
MATTHEW P. SALERNO
MICHAEL J. ALBANO
VICTOR L. HOU
ROGER A. COOPER
AMY R. SHAPIRO
JENNIFER KENNEDY PARK
ELIZABETH LENAS
LUKE A. BAREFOOT
PAMELA L. MARCOGLIESE
PAUL M. TIGER
JONATHAN S. KOLODNER
DANIEL ILAN
MEYER H. FEDIDA
ADRIAN R. LEIPSIC
ELIZABETH VICENS
ADAM J. BRENNEMAN
ARI D. MACKINNON
JAMES E. LANGSTON
JARED GERBER
COLIN D. LLOYD
COREY M. GOODMAN
RISHI ZUTSHI
JANE VANLARE

DAVID H. HERRINGTON
KIMBERLY R. SPOERRI
AARON J. MEYERS
DANIEL C. REYNOLDS
ABENA A. MAINOO
HUGH C. CONROY, JR.
JOSEPH LANZKRON
MAURICE R. GINDI
KATHERINE R. REAVES
RAHUL MUKHI
RESIDENT PARTNERS

SANDRA M. ROCKS
S. DOUGLAS BORISKY
JUDITH KASSEL
DAVID E. WEBB
PENELOPE L. CHRISTOPHOROU
BOAZ S. MORAG
MARY E. ALCOCK
HEIDE H. ILGENFRITZ
KATHLEEN M. EMBERGER
AVRAM E. LUFT
ANDREW WEAVER
HELENA K. GRANNIS
JOHN V. HARRISON
CAROLINE F. HAYDAY
NEIL R. MARKEL
KENNETH S. BLAZEJEWSKI
ANDREA M. BASHAM
LAURA BAGARELLA
SHIRLEY M. LO
JONATHAN D.W. GIFFORD
SUSANNA E. PARKER
RESIDENT COUNSEL

LOUISE M. PARENT
OF COUNSEL

May 20, 2019

BY E-MAIL

Sunny Singh, Esq.
Jared Friedmann, Esq.
Paul Genender, Esq.
Weil, Gotshal & Manges LLP

Re:   Post-Closing Reconciliation

Dear Sunny, Jared and Paul:

I am writing on behalf of Transform Holdco LLC ("Transform") in response to your May 15, 2019 letter concerning the post-Closing reconciliations between Transform and Debtors.

Transform has satisfied its obligations under its March 20 interim agreement with Debtors.  In accordance with the interim agreement, by March 26 Transform made payments of $8 million to Debtors and produced information substantiating its reconciliation to date.  On April 4, we produced updated information showing that, based on Transform's reconciliation to date, Transform did not owe Debtors any amount in respect of the Cash in Transit at Closing when taking into account other cash-related items that Debtors owed Transform and that the analysis in respect of the Proration was ongoing.  On April 26, we provided you with updated information about Transform's reconciliation, showing that Transform owed Debtors $0.7 million with respect to the Proration under Section 9.11 of the APA, Debtors owed Transform $0.5 million with respect to the Cash in Transit at Closing, and Transform had incurred $12.4 million with respect to Debtors' liabilities for tax payments and pre-Closing orders cancelled post-Closing that should be reconciled.

Transform has sought time and again to work cooperatively and in good faith with Debtors to complete the reconciliation process.  On April 1, Transform's advisors Ernst & Young LLP ("EY") met telephonically with Debtors' advisors M-III to discuss Transform's reconciliation analysis and review related information.  On April 15, we proposed a meeting

Singh
Friedmann
Genender, p. 2

between Cleary Gottlieb and Weil Gotshal to discuss the status of the reconciliation and other matters.  You did not respond to our invitation until April 19.  Yet at the April 18 court hearing on credit card reserves you claimed for the first time that Transform was refusing to turn over cash in transit and proration proceeds in violation of the interim agreement.  On April 23, we convened a discussion between Cleary Gottlieb and Weil Gotshal about the reconciliation and other open issues between Transform and Debtors.  At your request, we adjourned the follow-up discussion that was scheduled for April 25, to allow you additional time to consider the issues.  On April 30, for the first time, you suggested that M-III had not received the supporting information for Transform's reconciliation analysis.  You also said you would send a detailed list of the diligence that was necessary for you to confirm Transform's reconciliation, which you subsequently sent on May 1 (the "May 1 Request").

Transform and EY have acted diligently to address Debtors' delayed requests for information.  On April 30, in response to the email you sent earlier that day, I identified the dates on which we previously sent you supporting information concerning Transform's reconciliation analysis.  On May 3, I sent you an initial response to the May 1 Request, as well as information supplementing the materials we previously sent.  On May 13, I sent information responsive to the May 1 Request and to additional requests that you made for the first time on May 9.  We have set forth below the current status of Transform's responses to the May 1 Request.

1. **List of all invoices for AP outstanding as of Closing:  In progress**.  On May 13, we sent a file showing our initial estimate of the accounts payable balance by vendor at Closing and associated payments by Transform, along with supporting information.  As explained, we are continuing to capture additional accounts payable and associated payments and we will update the analysis.

   Although significant time and resources will be required to generate a complete list of invoices that were outstanding as of Closing, with supporting detail, and Debtors have failed to explain why they need this information, we are working on collecting it.  We note that M-III's March 7 email to William Linnane did not provide notice of this request.

2. **Detail on Pre-February utilities:  Complete**.  On May 3, we sent a file including detail on pre-February utilities.

3. **Detail on real estate taxes for rejected leases:  Complete**.  On May 3 and May 13, we sent files including detail on the real estate taxes paid on rejected leases and supporting the calculation of the taxes paid by Transform on behalf of Debtors.  Your May 15 letter states that the information provided does not comply with your specific requests, but it fails to provide any explanation of what information is required.

4. **Locations for all expenses for February Telecom Expense:  In progress**.  We are working on collecting this information.

Singh
Friedmann
Genender, p. 3

5. **Additional detail on sales tax:  Complete**.  On May 13, we confirmed the fiscal period to which the sales tax payments made in February 2019 relate and we explained why Transform does not have information on store numbers to which a payment applies.  Your May 15 letter states that this item "may be close to being resolved, but that determination is subject to additional analysis and discussions with Transform's financial advisors."  This statement fails to provide any explanation of what, if any, additional information is required.

6. **Sublease proceeds:  In progress**.  We are working on collecting this information.

7. **Outstanding checks as of transaction close detail:  Complete pending information from Debtors**.  On May 3 and May 13, we sent files supporting the methodology for the $2.73 million in deductions for Kmart and Sears rent and confirming that all of the checks used to pay for the real estate taxes were in fact Transform checks.  Your May 15 letter states that the information provided does not comply with your specific requests, but it fails to provide any explanation of what information is required.  Although we asked on May 13 for an explanation of your request for documentation regarding $1.1 million of checks paid by the Estate, you have failed to provide any explanation.

8. **P-card transactions detail:  Complete**.  On May 13, we sent a file with supporting information regarding P-card transactions.  Your May 15 letter states that this item "may be close to being resolved, but that determination is subject to additional analysis and discussions with Transform's financial advisors."  This statement fails to provide any explanation of what, if any, additional information is required.

9. **Completion of net TSA fees schedule:  In progress**.  We are working on collecting this information.

10. **Reconciliation of checks that Transform deposited:  In progress**.  We are working on collecting this information.

11. **Confirmation of GOB CC proceeds owed to Estate:  In progress**.  We are working on collecting this information.  As you know, Debtors were originally supposed to provide on May 2 information that EY required to address this request, but Debtors did not provide the information to EY until May 9.

We are hopeful that the meeting today between EY and M-III will advance Transform's efforts to complete the reconciliation process.  As we have stated several times, including in my May 3 and May 13 letters, we also remain available for a meeting between Cleary Gottlieb and Weil Gotshal to try to achieve a global resolution of the open issues between Transform and Debtors without recourse to litigation.  We look forward to your response.

Singh
Friedmann
Genender, p. 4

Very truly yours,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

*/s/ Abena A. Mainoo*
Abena A. Mainoo, a Partner

# Exhibit P

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

WASHINGTON, D.C.

PARIS

BRUSSELS

LONDON

FRANKFURT

COLOGNE

MOSCOW

One Liberty Plaza
New York, NY 10006-1470
T: +1 212 225 2000
F: +1 212 225 3999

clearygottlieb.com

D: +1 212 225 2094
iglinchenko@cgsh.com

ROME

MILAN

HONG KONG

BEIJING

BUENOS AIRES

SÃO PAULO

ABU DHABI

SEOUL

May 20, 2019

<u>BY E-MAIL</u>

Sunny Singh, Esq.
Jared Friedmann, Esq.
Paul Genender, Esq.
Jennifer Brooks Crozier, Esq.
Weil, Gotshal & Manges LLP

Re:  <u>Post-Closing Reconciliation</u>

Dear Sunny, Jared, Paul and Jennifer:

I am writing on behalf of Transform Holdco LLC ("Transform") to memorialize the agreements reached and additional information requests made by Debtors during the teleconference this morning between EY and M-III regarding the ongoing reconciliation process.

This letter tracks the categories of information requested in your May 1 Requests. As detailed further below, we also include with this letter additional information responsive to Requests 4 and 9.

<u>Request 1</u>.  You have requested a complete list of invoices outstanding at Closing and certain supporting detail.  As explained in letters from us dated May 13 and May 20, 2019, and by EY during today's teleconference, retrieving the full list of invoices is a manual process that is expected to take between 3 to 4 weeks.  During the teleconference, we offered to provide a list of invoices that have yet to be paid, which we expect to be more of an automated process that would take between 7 to 10 days to complete.  You explained that you required the full list of invoices in order to assess Debtors' administrative solvency and also to ensure that we are not counting toward the approximately $120 million in AP already paid by Transform items for which Transform is seeking reimbursement from Debtors through the reconciliation process (*e.g.*, pre-February utilities and February telecom expenses).

Without conceding the appropriateness of those requests or that Transform is obligated to satisfy them, we are in the process of gathering the full list of invoices and supporting detail that you have requested, but noted again that it will take 3 to 4 weeks, and requested that you consider whether there are more efficient means of getting you the

Cleary Gottlieb Steen & Hamilton LLP or an affiliated entity has an office in each of the cities listed above.

Singh
Friedmann
Genender
Crozier, p. 2

information Debtors require to complete the reconciliation process.  You reserved all rights, but indicated that you would consider if there are more efficient means of answering your request.  We will also continue to look into more efficient means of providing you with invoice-related information for the purposes articulated by M-III on today's call, and will revert if any are identified.

   As to when this request was first received, the March 7 email attached as Exhibit A to your May 15, 2019 letter did not make a specific request for a full list of invoices at Closing nor did the Transform employees copied on the email understand M-III to be making a specific request for a full list of invoices at Closing.  As EY explained on the call, no request was made or relayed to EY until May 1, 2019, despite EY leading the reconciliation process on Transform's behalf, as Debtors know, and also previously having multiple teleconferences with M-III.  We note that in the March 7 email, M-III did not tie its request to the reconciliation process but rather to "the public dispute going on regarding how much AP NewCo is assuming."  In the future, we request that M-III make all reconciliation-related requests directly to EY, so those requests can be promptly addressed.

   Request 2.  You indicated that the outstanding information you need on the $4.25 million in pre-February utilities will be addressed by the full list of invoices that we have agreed to provide to you.  Our understanding of your request for invoice-specific information in this regard is that you wish to ensure that we are not counting the payments made by Transform in respect of the $4.25 million in pre-February utilities toward the total amount of AP already paid by Transform.

   Request 3.  With respect to the $766,000 in real estate taxes, you requested for the first time today the underlying tax bills and invoices supporting EY's reconciliation of this item.  We agreed to look into providing this information.

   Request 4.  Our understanding is that you require invoice-specific information in respect of February telecom expenses for the same reason as with Request 2.  We have agreed to provide this information.

   In addition, and further to our May 20, 2019 letter, attached with this letter is supporting detail on pre-February telecom expenses that provides the store-number and store-type of the relevant properties.  EY is also working to provide actual utility expenses in relation to the February rent proration.

   Request 5.  With respect to sales tax information, you reiterated your request for information on the store numbers to which the sales tax paid by Transform relates.  As explained in our May 13, 2019 letter and also by EY on today's call, this information is not available because sales tax is reported by jurisdiction and depends on where an item is delivered to a customer, not the store location.  Accordingly, the sales tax paid for a particular jurisdiction may relate to a number of stores.  This request is now complete from our perspective.  Please let us know if you disagree.

Singh
Friedmann
Genender
Crozier, p. 3

     <u>Request 6</u>.  As noted in our May 20, 2019 letter and during today's call, EY is continuing to work through this request regarding sublease proceeds.

     <u>Request 7</u>.  With respect to outstanding checks as of Closing paid by Transform, you explained for the first time today that you believe that some of the checks for which Transform is seeking reimbursement may relate to property tax payments that Transform assumed responsibility for under the APA.  EY agreed to look into this issue.

     As to the $1.1 million in checks purportedly paid by the Estate on February 11, 2019, you for the first time today made reference to an email with Transform employees indicating that $1.1 million in checks were paid by the Estate on February 11, 2019.  We asked and you agreed to provide us a copy of that email.

     Finally, as to the $2.7 million of K-mart and Sears rent checks (which EY has excluded from the reconciliation of the amount owed to Transform), you indicated for the first time today that you believed that there may be certain specific inaccuracies with the list of excluded checks, including certain purported checks to landlords that were not excluded.  You agreed to provide EY with a list of these purported inaccuracies, which EY will review.

     <u>Request 8</u>.  As to P-cards, you indicated for the first time today that the Estate made a payment for P-card expenses on February 8, 2019 and that you wanted to ensure that this was properly reconciled with the amount that EY has determined Debtors owe Transform in respect of pre-Closing P-card expenses.  You agreed to send EY detail of the payment purportedly made on February 8, 2019 and EY agreed to review.

     <u>Request 9</u>.  Included with this letter is the requested TSA fee schedule.

     <u>Requests 10 and 11</u>.  As discussed in our May 20, 2019 letter and during the call today, EY is continuing to work through these two requests.  In particular, as to Request 10, EY explained that this request requires the manual reconciliation of over 1,600 checks identified by M-III.  EY expects to have a better sense of timing on Request 11 by tomorrow.

     We are hopeful that the continued and prompt sharing of information will move Transform and Debtors closer to resolving the outstanding reconciliation issues.  We urge you that when you have identified what you believe to be specific discrepancies (as with respect, *e.g.*, to Requests 7 and 8 above), that you share such specific information with us.  To the extent it would be helpful to schedule another call between EY and M-III, we would be happy to arrange one.  We look forward to receiving the information referenced above from M-III and will continue to work promptly toward addressing Debtors' information requests.

                  Sincerely,

                  */s/ Ilya Glinchenko*

                  Ilya Glinchenko

Attachments

# Exhibit Q

**Weil, Gotshal & Manges LLP**

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

BY E-MAIL

**Jared R. Friedmann**
+1 (212) 310-8828
Jared.Friedmann@weil.com

May 21, 2019

Ilya Glinchenko, Esq.
Lewis J. Liman, Esq.
Abena Mainoo, Esq.
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006-1470

**Re:** *In re Sears Holdings Corporation, et al.*, Case No. 18-23538 (RDD) and ECF No. 2796

Dear Counsel:

We write to respond to your May 20, 2019 letter ("**May 20 Letter**"), which purports to memorialize the agreements reached concerning certain requests on the Debtors' Diligence List (each, a "**Request**") during the call between E&Y and M-III that occurred on May 20, as well as the new information you provided.

At the outset, the Debtors need to correct a mistaken assumption under which it appears Transform and its advisors are operating. During our call, Transform's advisors repeatedly referred to the difficulties of "operating in a vacuum"—incorrectly suggesting it is the Debtors' burden to provide specific examples of discrepancies they have found to facilitate resolution of these reconciliations. This has it backwards. While the Debtors are happy to assist by providing the information requested by Transform, including discrepancies identified in what Transform previously provided, it is ultimately *Transform's* burden to establish its justification for any setoffs. Moreover, *Transform* controls all of the information and has unfettered access to the employees. The numerous mistakes and inconsistencies identified by the Debtors' advisors call into question the methodologies employed by Transform during the reconciliation process. Until the Debtors receive the requested information and can become comfortable with the methodologies used, we are not in a position to discuss a potential resolution.

We respond to the rest of your letter in the order outlined therein. As we endeavored to do on the call, we limited our responses to the information requested rather than wasting more ink on debating when information was first requested or reiterating our positions with respect to the APA. For the avoidance of doubt, we strongly disagree with Transform's characterization of many of the facts, but the back and forth on that topic have become unproductive, as well as moot, in light of the fact that we provided our diligence list on May 1, some three weeks ago. We reserve all rights.

**Request #1:** The Debtors generally agree with your description of the information requested and the timeline you represented would be necessary to fulfill Request #1 on the call. Again, this is ***the most***

Ilya Glinchenko
Lewis J. Liman                                                    **Weil, Gotshal & Manges LLP**
Abena Mainoo
May 21, 2019
Page 2

*critical piece of information requested*.  Time is of the essence.  As we noted on the call, not only are the Debtors concerned with double-counting, but inconsistencies between Transform's calculations of the AP amounts paid through February 21 has raised concerns with the methodology implemented, all of which can be resolved only with the full list of invoices.

The Debtors are willing to consider any information Transform provides that might lead to a more efficient resolution of the Request, but only to the extent that the preparation of such other work will not delay receipt of the information requested in Request #1.

Given the critical nature of this Request, we ask that Transform's advisors provide periodic updates on status and a target date for completion (as soon as available).

**Request #2:**  We generally agree with your description of the information requested, but note that it actually was Transform's advisor that suggested that Request #2 "will be addressed by the full list of invoices" you have agreed to provide.  The Debtors reserve all rights to request additional information, if necessary, to confirm the purported setoff of $4.25 million of pre-February utilities.

**Request #3:**  We agree only with your description of the information the Debtors have requested.  We request that you provide a timeline for when we can expect to receive the underlying tax bills and invoices.

**Request #4:**  We agree only with your description of the information the Debtors have requested.  The AP information in Request #1, likewise, *might* be sufficient to satisfy Request #4.  But the Debtors reserve all rights to request additional information, if necessary, to confirm the purported setoff of approximately $2.3 million of February telecom expense.

In addition, we are in receipt of the supporting detail on pre-February telecom expenses including location number and type, and suggest a follow up call to better understand the information as there appears to be some issues in what was provided.  As examples: (i) roughly $1.7 million of the telecom expenses relate to just 30 of the more than 8,000 line items; (ii) according to the analysis, location number 1688, a go forward store, was charged over $930,000 for telecom expenses in the month of February; and (iii) there are approximately 400 instances in which the location is different than it was in the previously provided information.  We also need to understand what these charges are for and how and if these amounts differ from the approximately $850,000 already included in previous iterations of the February rent proration schedule.

Finally, we request that you provide a timeline for when we can expect to receive the actual utility expenses in relation to the February rent proration.

Ilya Glinchenko
Lewis J. Liman
Abena Mainoo
May 21, 2019
Page 3

**Weil, Gotshal & Manges LLP**

**Request #5:** Based only on Transform's advisors' express representations that the information sought is unavailable, the Debtors will table Request #5 with a full reservation of rights. As noted above, it is Transform's burden to substantiate its right to setoff against Estate assets.

**Request #6:** We request that you provide a timeline for when the Debtors can expect to receive a responsive deliverable for Request #6.

**Request #7:** The Debtors disagree that this was the first time the issue was *explained* to Transform or that any such explanation was necessary to trigger Transform's obligation to provide the information needed to confirm whether property taxes are included in the outstanding checks as of Closing paid by Transform. Please provide a timeline for this deliverable.

Per your request, attached as **Exhibit A** to this letter is the e-mail from M-III to Transform's employees reflecting the $1,057,619.24 paid by the Estate for AP checks on February 11, 2019. Please confirm that the Debtors will be credited this amount for checks paid by the Estate on February 11.

We reiterate our concern that the $2.7 million of K-mart and Sears rent checks we have identified are not the only errors in the methodology Transform has used. For example, a review of previously provided schedules shows that one check paid to Lantana SDC, LLC c/o Saglo Development Company was included in the K-mart Rent amounts, but another check under the exact same payee name (check no. 34000962) was excluded from the K-mart Rent. This is inconsistent with Cleary's assertion that Transform's advisors reviewed the list of relevant checks in detail.

Further, Slide #5 Estate Checks Report for Sears checks includes payments to GS Portfolio Holdings (2017) LLC, 110 North Wacker Drive, Chicago, IL 60606 (Check Nos. 183158, 180243, & 183157). These payments are listed on the "Sears Account" tab and are not included in the "Sears Rent" tab. It is the Debtors' understanding that GS Portfolio Holdings LLC is a JV entity associated with Seritage.

Again, our focus is not on "fixing" the specific line items above—which are merely examples— but, rather, on understanding the methodology used to determine if the problem is systemic. Because of our limited transparency into Transform's financials such an understanding is imperative.

**Request #8:** Per your request, we have attached as **Exhibit B** to this Letter a list of February 7, 2019[1] disbursements by the Estate, including $3,733,282.25 for "PCard." We request that you provide an approximate timeline for your review of this information.

---

[1] On the call, our financial advisor stated the P-Card payment was made February 8, 2019, the correct date is February 7, 2019.

Ilya Glinchenko
Lewis J. Liman                                                    **Weil, Gotshal & Manges LLP**
Abena Mainoo
May 21, 2019
Page 4

**Request #9:**  The Debtors confirm receipt of the TSA Fee Schedule Report on May 20.  The Debtors' advisors have conducted preliminary review of the information. At this time, we are requesting the information necessary to confirm the "EE Medical Benefit Flat Fee" expenses, as well as the four categories for which Transform lists no expenses in "Seller Services," but reserve our right to supplement or modify this request.

**Requests #10–11:**  We request that you provide a timeline for these deliverables.

***********

The May 20 Letter does not mention that the Debtors' advisors sent Transform's advisors the Pre-Closing inventory list—which was the only outstanding deliverable from the Debtors—shortly after the call concluded.  Please confirm receipt.

Toward the end of the call, Transform also represented that it would also seek to setoff KERP payments in its reconciliation.  In the enclosed spreadsheet entitled "KERP Payments – 4-15-19," the Debtors' advisors have calculated the Debtors' KERP responsibilities at $1,131,869.59.  Please let us know immediately if you disagree with this amount.

Finally, in the interest of resolving these disputes and considering Transform's specific request that "M-III make all reconciliation-related requests directly to EY," the Debtors propose a standing, weekly call between EY and M-III to continue to work through the open reconciliation issues.

Should you have any questions, please do not hesitate to contact me.

Sincerely,

*/s/ Jared Friedmann*

Jared R. Friedmann

cc:  Ray C. Schrock, P.C.
    Paul R. Genender
    Sunny Singh

# *EXHIBIT A*

| | |
|---|---|
| **From:** | Joye, Jennifer |
| **To:** | rob.riecker; mmeghji@miiipartners.com; bgriffith@miiipartners.com |
| **Cc:** | Prakash, Rajat; Wells, Paris; Wehby, Andrew; Thomas.Koreis@searshc.com; William.Linnane@searshc.com; Naren.Sinha@searshc.com; Robert.Phelan@searshc.com; Nicholas Weber; Eacevedo@miiipartners.com; Butz, Jeff; RobertB.Walsh@searshc.com; Valentine, Natalie; Hutka, Jeffrey; Espinosa, Daniel; Vangala, Ravikanth; Corbat, Ken; Khan, Aziz |
| **Subject:** | RE: 02/11 Estate Disbursements |
| **Date:** | Monday, February 11, 2019 3:16:01 PM |

Please approve the revised listing. Thanks



**From:** Joye, Jennifer
**Sent:** Monday, February 11, 2019 1:15 PM
**To:** Riecker, Rob <Rob.Riecker@searshc.com>; mmeghji@miiipartners.com; bgriffith@miiipartners.com
**Cc:** Prakash, Rajat <Rajat.Prakash@searshc.com>; Wells, Paris <Paris.Wells@searshc.com>; Wehby, Andrew <Andrew.Wehby@searshc.com>; Koreis, Thomas <Thomas.Koreis@searshc.com>; Linnane, William <William.Linnane@searshc.com>; Sinha, Naren <Naren.Sinha@searshc.com>; Phelan, Robert <Robert.Phelan@searshc.com>; nweber@miiipartners.com; eacevedo@miiipartners.com; Butz, Jeff <Jeff.Butz@searshc.com>; Walsh, Robert B <RobertB.Walsh@searshc.com>; Valentine,

Natalie <Natalie.Valentine@searshc.com>; Hutka, Jeffrey <Jeffrey.Hutka@searshc.com>;
Espinosa, Daniel <Daniel.Espinosa@searshc.com>; Vangala, Ravikanth
<Ravikanth.Vangala@searshc.com>; Corbat, Ken <Ken.Corbat@searshc.com>; Khan, Aziz
<Aziz.Khan@searshc.com>
**Subject:** 02/11 Estate Disbursements

Please approve the following for payment from SHC today.


Thank you



This message, including any attachments, is the property of Sears Holdings Corporation and/or
one of its subsidiaries. It is confidential and may contain proprietary or legally privileged
information. If you are not the intended recipient, please delete it without reading the contents.
Thank you.

This message contains information which may be confidential and privileged. Unless you are the intended addressee (or authorized to
receive for the intended addressee), you may not use, copy or disclose to anyone the message or any information contained in the
message. If you have received the message in error, please advise the sender by reply email or by calling 212-716-1491 and delete
the message.

# *EXHIBIT B*

| | |
|---|---|
| **From:** | Joye, Jennifer |
| **To:** | rob.riecker; mmeghji@miiipartners.com; bgriffith@miiipartners.com |
| **Cc:** | Prakash, Rajat; Wells, Paris; Wehby, Andrew; Thomas.Koreis@searshc.com; William.Linnane@searshc.com; Naren.Sinha@searshc.com; Robert.Phelan@searshc.com; Nicholas Weber; Eacevedo@miiipartners.com; Butz, Jeff; RobertB.Walsh@searshc.com; Valentine, Natalie; Hutka, Jeffrey; Espinosa, Daniel; Vangala, Ravikanth; Corbat, Ken; Khan, Aziz; jboffi@miiipartners.com; cgood@miiipartners.com |
| **Subject:** | 02/07 Disbursements |
| **Date:** | Thursday, February 7, 2019 3:39:34 PM |



AP Payments

This message, including any attachments, is the property of Sears Holdings Corporation and/or one of its subsidiaries. It is confidential and may contain proprietary or legally privileged information. If you are not the intended recipient, please delete it without reading the contents. Thank you.

This message contains information which may be confidential and privileged. Unless you are the intended addressee (or authorized to receive for the intended addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply email or by calling 212-716-1491 and delete the message.

# Exhibit R

[FILED UNDER SEAL
PURSUANT TO 7/2/19
ORDER DOCKET #4420]

# Exhibit S

**Weil, Gotshal & Manges LLP**

BY E-MAIL

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

**Jared R. Friedmann**
+1 (212) 310-8828
Jared.Friedmann@weil.com

June 20, 2019

Lewis J. Liman, Esq.
Abena Mainoo, Esq.
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006-1470

      **Re:**    *In re Sears Holdings Corporation, et al.*, Case No. 18023538 (RDD)

Dear Counsel:

We write to again follow up on the Debtors' May 1, 2019 requests for financial information (the "**Diligence List**") and Transform's *Responses and Objections to the Debtors First Request for Production of Documents* (the "**Responses**").

With respect to the reconciliation of Estate checks paid by Transform post-Close ("**Estate Checks**"), despite our multiple requests, payments related to property taxes for properties assumed by Transform still have not been removed or reconciled from the list of Estate Checks. On the May 20, 2019 call with the Debtors' advisors, Transform's advisors stated that they had not understood this request, but the request was then clarified by the Debtors' advisors. Your Responses, however, still fail to address this issue, and it also is not addressed in the June 14, 2019 Post-Close Reconciliation Items ("**June 14 Post-Close Reconciliation**"). Accordingly, this request remains outstanding. We again request that you reconcile and remove all payments related to property taxes for properties assumed by Transform from the list of Estate Checks.

We also previously requested that Transform reconcile the Estate Checks deposited into Transform's accounts for obligations owed to the Estate at Closing. Your June 14 Post-Close Reconciliation credits the Estate with approximately $5.9 million for checks deposited by Transform for Estate operations. But, as you know, the list of checks you analyzed was provided by the Debtors and does not necessarily reflect the full universe of checks owed to the Estate since it only included checks deposited from Closing until March 18, 2019. To our knowledge, Transform has not conducted any analysis of checks deposited after March 18, 2019. We know for a fact that Transform has continued to deposit Estate checks after March 18, 2019. *See*, *e.g.*, **Exhibit A** (attached). Accordingly, we request that a full reconciliation of post-Closing checks deposited by Transform and owed to the Estate be delivered to the Debtors without further delay.

**Weil, Gotshal & Manges LLP**

June 20, 2019
Page 2

The Debtors still have real concerns about the methodology used by Transform to calculate the telecom expenses.  For example, the first page of **TRFM-00000113**, according to the excel data provided, is a *monthly* invoice for telecom expenses related to a *single store* in Selinas, California, in the amount of $932,268.69.  Based on information provided to the Debtors' advisors during their engagement, as of May 2018, the previous twelve months of utility and telecom expenses for this same store were under $300,000.  Please provide the information necessary to (i) confirm the invoice actually is related to the Sears store in Selinas, California, and (ii), if that is the case, substantiate an annual run rate of over $11 million in telecom expenses for that single storefront.

To the extent it might expedite our receipt of information in response to this letter, we would be happy to have our advisors participate on a call with Transform's advisors.

Should you have any questions, please do not hesitate to contact me.

Sincerely,

*/s/ Jared R. Friedmann*

Jared R. Friedmann

cc:    Paul R. Genender *(of the Firm)*
       Jennifer Brooks Crozier *(of the Firm)*
       Jake R. Rutherford *(of the Firm)*

# Exhibit T

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

One Liberty Plaza
New York, NY 10006-1470
T: +1 212 225 2000
F: +1 212 225 3999

clearygottlieb.com

WASHINGTON, D.C. · PARIS · BRUSSELS · LONDON · MOSCOW
FRANKFURT · COLOGNE · ROME · MILAN · HONG KONG
BEIJING · BUENOS AIRES · SÃO PAULO · ABU DHABI · SEOUL

D: +1 212 225 2785
amainoo@cgsh.com

VICTOR I. LEWKOW
THOMAS J. MOLONEY
DAVID G. SABEL
JONATHAN I. BLACKMAN
YARON Z. REICH
RICHARD S. LINCER
JAMES A. DUNCAN
STEVEN M. LOEB
CRAIG B. BROD
NICOLAS GRABAR
CHRISTOPHER E. AUSTIN
HOWARD S. ZELBO
DAVID E. BRODSKY
ARTHUR H. KOHN
RICHARD J. COOPER
JEFFREY S. LEWIS
PAUL J. SHIM
STEVEN L. WILNER
ERIKA W. NIJENHUIS
ANDRES DE LA CRUZ
DAVID C. LOPEZ
MICHAEL A. GERSTENZANG
LEWIS J. LIMAN
LEV L. DASSIN
NEIL Q. WHORISKEY
JORGE U. JUANTORENA
MICHAEL D. WEINBERGER
DAVID LEINWAND
DIANA L. WOLLMAN
JEFFREY A. ROSENTHAL
ETHAN A. KLINGSBERG
MICHAEL D. DAYAN
CARMINE D. BOCCUZZI, JR.
JEFFREY D. KARPF
KIMBERLY BROWN BLACKLOW
ROBERT J. RAYMOND
SUNG K. KANG
LEONARD C. JACOBY
SANDRA L. FLOW

FRANCISCO L. CESTERO
FRANCESCA L. ODELL
WILLIAM L. MCRAE
JASON FACTOR
JOON H. KIM
MARGARET S. PEPONIS
LISA M. SCHWEITZER
JUAN G. GIRÁLDEZ
DUANE MCLAUGHLIN
BREON S. PEACE
MEREDITH E. KOTLER
CHANTAL E. KORDULA
BENET J. O'REILLY
ADAM E. FLEISHER
SEAN A. O'NEAL
GLENN P. MCGRORY
MATTHEW P. SALERNO
MICHAEL J. ALBANO
VICTOR L. HOU
ROGER A. COOPER
AMY R. SHAPIRO
JENNIFER KENNEDY PARK
ELIZABETH LENAS
LUKE A. BAREFOOT
PAMELA L. MARCOGLIESE
PAUL M. TIGER
JONATHAN S. KOLODNER
DANIEL ILAN
MEYER H. FEDIDA
ADRIAN R. LEIPSIC
ELIZABETH VICENS
ADAM J. BRENNEMAN
ARI D. MACKINNON
JAMES E. LANGSTON
JARED GERBER
COLIN D. LLOYD
COREY M. GOODMAN
RISHI ZUTSHI
JANE VANLARE

DAVID H. HERRINGTON
KIMBERLY R. SPOERRI
AARON J. MEYERS
DANIEL C. REYNOLDS
ABENA A. MAINOO
HUGH C. CONROY, JR.
JOSEPH LANZKRON
MAURICE R. GINDI
KATHERINE R. REAVES
RAHUL MUKHI
RESIDENT PARTNERS

SANDRA M. ROCKS
S. DOUGLAS BORISKY
JUDITH KASSEL
DAVID E. WEBB
PENELOPE L. CHRISTOPHOROU
BOAZ S. MORAG
MARY E. ALCOCK
HEIDE H. ILGENFRITZ
KATHLEEN M. EMBERGER
AVRAM E. LUFT
ANDREW WEAVER
HELENA K. GRANNIS
JOHN V. HARRISON
CAROLINE F. HAYDAY
NEIL R. MARKEL
KENNETH S. BLAZEJEWSKI
ANDREA M. BASHAM
LAURA BAGARELLA
SHIRLEY M. LO
JONATHAN D. W. GIFFORD
SUSANNA E. PARKER
RESIDENT COUNSEL

LOUISE M. PARENT
OF COUNSEL

June 26, 2019

<u>BY E-MAIL</u>

Jared R. Friedmann, Esq.
Paul Genender, Esq.
Jennifer Brooks Crozier, Esq.
Jake R. Rutherford, Esq.
Weil, Gotshal & Manges LLP

Re:  <u>Post-Closing Reconciliation</u>

Dear Jared, Paul, Jennifer and Jake:

I am writing on behalf of Transform Holdco LLC ("<u>Transform</u>") in response to your June 20, 2019 letter concerning the post-Closing reconciliations between Transform and Debtors (the "June 20 Letter").

Transform provides the following responses to your three requests:

1. <u>Estate Checks Paid by Transform Post-Close</u>:  Your letter incorrectly claims that Transform has "fail[ed] to address" the reconciliation or removal of "payments related to property taxes for properties assumed by Transform" from "the list of Estate Checks." Rather, Transform has confirmed that there is no overlap in its reconciliations between the approximately $13.8 million of Estate Checks, issued by Debtors prior to closing but paid by Transform post-closing, and the approximately $766 thousand of property taxes paid by Transform.  *See* TRFM-00000219, 7.0_Estate Checks Report, Tabs "RE Taxes Check Listing" and "K-Mart Account."[1]

---

[1]    If checks cut on account of property taxes were to have also appeared in a log of Estate Checks, which they do not, they would have appeared on the "K-Mart Account" tab because the K-Mart account is the account from which  property taxes are paid.

Friedmann
Genender
Crozier
Rutherford, p. 2

2. <u>Estate Checks Deposited In Transform's Account For Pre-Closing Obligations</u>:  Your June 20 Letter acknowledges that Transform has credited Debtors with approximately $5.9 million out of the approximately $6.8 million that Debtors claim was deposited in Transform accounts for Estate operations.  This process required Transform to undertake a painstaking manual analysis of over 1,600 paper checks.  As Transform previously relayed, for the remainder of the $0.9 million in checks, Transform has been unable to identify information to support the notion that these are Estate property.  We note that Debtors have also failed to respond to our offer, made on June 14, 2019, to discuss a potential resolution of this and other issues.  As we stated in that offer, the reconciliation process is currently net-even between the parties, and agreeing to complete this process now would leave the Estate with the $8 million interim payment made by Transform and avoid the costs of continued work by advisors on these matters.  Apparently ignoring this offer, your June 20 Letter also suggests for the first time that Transform should conduct an analysis of *all* checks deposited after March 18, 2019, seemingly in perpetuity.  This is not practical or commensurate to the needs of this matter, nor have Debtors provided a basis for Transform to believe that other checks have been deposited into its accounts that constitute Estate property.  If there are specific checks that you have concerns about and that you believe should be analyzed, please identify them for our review.  We note that your June 20 Letter did not attach the referenced Exhibit A.

3. <u>Telecom Expenses</u>:  Upon further discussions with Transform's business unit personnel, Transform has determined that the $932,268.69 in telecom expenses referenced in your June 20 Letter relate to approximately 370 store locations.  *See* TRFM-00000113, "4.1_Telecom Invoice Copies" and TRFM-00018191, "4.2 AT&T Invoice Cost Centers."

To the extent it would be helpful, we would be happy to arrange another call between EY and M-III to facilitate resolution of these issues.

Very truly yours,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

*/s/ Abena A. Mainoo*
Abena A. Mainoo, a Partner