Hearing Date and Time:  July 11, 2019 at 10:00 am (Eastern Time)
Response Date and Time:  July 3, 2019 at 4:00 pm (Eastern Time)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X
:
In re                                                             :
:                    Chapter 11 Case No.
SEARS HOLDINGS CORPORATION, *et al.*,                             :
:                    18-23538 (RDD)
Debtors.[1]                                                       :
:                    (Jointly Administered)
:
-----------------------------------------------------------------X

# TRANSFORM HOLDCO LLC'S BRIEF IN SUPPORT OF THE ADVERSARY COMPLAINT AND IN OPPOSITION TO DEBTORS' SUPPLEMENTAL MOTION TO ENFORCE THE ASSET PURCHASE AGREEMENT

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC(6546); Sears Operations LLC(4331); Sears, Roebuck and Co. (0680); Service Live Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); Max Serv, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); My Gofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); Star West, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); SHC Licensed Business LLC (3718); SHC Promotions LLC (9626); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................................ iii

PRELIMINARY STATEMENT ...................................................................................................... 8

BACKGROUND ................................................................................................................................ 9

ARGUMENT ................................................................................................................................... 12

   A.   Transform Assumed Other Payables and Payment Obligations Only for Ordered Inventory ........ 12

     a)   The Plain Language of Section 2.3(k) Supports Transform's Reading of the APA ................... 14

     b)   The Plain Language of Section 2.3 Also Supports Transform ..................................................... 24

     c)   The Remainder of the APA Supports Transform's Interpretation ............................................... 25

     d)   The Parol Evidence Further Supports Transform's Interpretation ............................................. 27

     e)   Debtors Are Trying to Retrade the Deal Out of Remorse ........................................................... 35

     f)   Relief .......................................................................................................................................... 39

     g)   Transform's Obligations (If Any) Are Reduced by Available Cash ........................................... 42

   B.   Transform's Obligation, If Any, to Assume 503(b)(9) Liabilities Is Reduced by
Shortfalls in Prepaid Inventory and Specified Receivables ............................................................ 45

     a)   Debtors Shortchanged Transform on Prepaid Inventory ............................................................ 46

     b)   Debtors Shortchanged Transform on Specified Receivables ..................................................... 52

     c)   Debtors' Responses Are Unavailing .......................................................................................... 56

   C.   A Reconciliation of Assets Respectively Owed by Debtors and Transform to Each Other
Demonstrates That Debtors Owe Assets to Transform .................................................................. 57

   D.   Transform Acquired All of Debtors' Real Property at Hoffman Estates, Illinois ......................... 64

     a)   The APA Provides that Transform Purchased All 16 Lots at Hoffman Estates ......................... 64

     b)   Extrinsic Evidence Further Supports Transform ....................................................................... 68

     c)   Transform Did Not Waive Its Contractual Rights to All Acquired Property at Hoffman
Estates by Its Post-Closing Conduct .............................................................................................. 70

     d)   Transform Has Not Violated the Automatic Stay ...................................................................... 73

   E.   Transform Acquired the Adequate Assurance Deposit ................................................................. 73

   F.   Transform Acquired the Disputed EDA Funds .............................................................................. 78

     a)   The Illinois Action and Turnover Motion Related to the EDA Funds Are Actions and
Claims Acquired by Transform under Section 2.1(p) of the APA .................................................. 78

     b)   The EDA Funds Are Not Tax Credits, Refunds, or Rebates ..................................................... 81

        (i)   The Reimbursement Due to Sears Is Not a Function of Sears' Taxes Paid But of Its
Project Costs .................................................................................................................................. 82

(ii)     The Funds Owed To Sears Are Not Funded Exclusively from Sears' Property
Taxes 83

(iii)    The EDA Funds Do Not Offset Sears' Tax Liability ........................................................ 84

(iv)    The Mechanism to Challenge the Distribution of EDA Funds Differs from the
Mechanism to Challenge Property Taxes or Property Tax Credits .................................... 86

(v)     Debtors Characterize the EDA Funds as Reimbursements, Not Tax Credits .................... 87

(vi)    Under the Bankruptcy Code, Transform Will Acquire the EDA Funds If and When
It Assumes the EDA Agreement Cum Onere ................................................................. 89

(vii)    U.S. Federal Income Tax Law Characterizes the EDA Fund Distributions as
Nontaxable Contributions to Capital and Not Tax Credits ............................................. 90

G.    Debtors Wrongly Assert Transform Is Responsible for Mechanics' Liens It Did Not Agree
to Assume ................................................................................................................. 91

RESERVATION OF RIGHTS ................................................................................................. 94

CONCLUSION ................................................................................................................... 95

# TABLE OF AUTHORITIES

**Page(s)**

## Rules and Statutes

11 U.S.C. § 503(b)(9) ................................................................................. 11

28 U.S.C. § 2201 ............................................................................. 31, 37-38

Illinois Economic Development Area and Tax Increment Allocation Act,
20 Ill. Comp. Stat. 620 (1989) ................................................................. 78

## Cases

3Form, Inc. v. Lumicor, Inc.,
678 F. App'x 1002 (Fed. Cir. 2017) ........................................................ 10

Active Asset Recovery, Inc. v. Real Estate Asset Recovery Servs., Inc.,
No. CIV. A. 15478, 1999 WL 743479 (Del. Ch. Sept. 10, 1999) ................ 85

AgroFresh, Inc. v. MirTech Inc.,
257 F. Supp. 3d 643 (D. Del. 2017) .................................................... 43, 63

Albert v. Alex. Brown Mgmt. Servs., Inc.,
Nos. CIV.A. 762-N, 763-N, 2005 WL 2130607 (Del. Ch. Aug. 26, 2005) ....... 34

Allen v. El Paso Pipeline GP Co, L.L.C.,
113 A.3d 167 (Del. Ch. 2014) ................................................................ 34

Ball v. Soundview Composite Ltd. (In re Soundview Elite Ltd.),
Nos. 13-13098, 14-CV-3179 SAS, 2014 WL 2998529 (S.D.N.Y. July 3, 2014) .............. 57, 66

Barnhart v. Thomas,
540 U.S. 20 (2003) ................................................................................. 10

Bell Atl. Meridian Sys. v. Octel Commc'ns Corp.,
No. Civ. A. 14348, 1995 WL 707916 (Del. Ch. Nov. 28, 1995) ...................... 20

Brokertec Holdings, Inc v. Comm'r,
117 T.C.M. (CCH) 1146 (2019) .............................................................. 83

Citibank, N.A. v. Tele/Resources, Inc.,
724 F.2d 266 (2d Cir. 1983) .................................................................... 82

**Page(s)**

City of Covington v. Covington Landing Ltd. P'ship,
71 F.3d 1221 (6th Cir. 1995) ................................................... 82

Cmty. Unit School Dist. 300 v. Hoffman Estates,
No. 2018 CH 12683 (Ill. Cir. Ct. filed Oct. 10, 2018) ........................ 72

Consolidated Edison Co. of N.Y. v. United States,
10 F.3d 68 (2d Cir. 1993) ...................................................... 84

Delta Air Lines, Inc. v. Bibb (In re Delta Air Lines),
359 B.R. 454 (Bankr. S.D.N.Y. 2006) ........................................ 56

Dittrick v. Chalfant,
948 A.2d 400 (Del. Ch. 2007) .................................................. 43

E. Cont'l Mining & Dev. Ltd. v. Signet Grp. LLC,
No. 13-CV-1930 KBF, 2015 WL 5707145 (S.D.N.Y. Sept. 29, 2015) .......... 63

Eagle Force Holdings, LLC v. Campbell,
187 A.3d 1209 (Del. 2018) ..................................................... 28

Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,
702 A.2d 1228 (Del. 1997) ............................................ 19-20, 43, 63

Elec. Ins. Co. v. Travelers Ins. Co.,
124 A.D.2d 431 (N.Y. 1986) ................................................... 33

Fait v. Regions Fin. Corp.,
655 F.3d 105 (2d Cir. 2011) .................................................... 41

FBI Wind Down, Inc. Liquidating Tr. ex rel. Halperin v. Heritage Home Grp., LLC
(In re FBI Wind Down, Inc.),
252 F. Supp. 3d 405 (D. Del. 2017), aff'd 741 F. App'x 104 (3rd Cir. 2018) ........ 19

Fitzgerald v. Cantor,
1998 WL 842316 (Del. Ch. Nov. 10, 1998) .................................... 44

Hirsch v. London Steamship Owners' Mut. Life Ins. Ass'n Ltd.
(In re Seatrain Lines, Inc.), 198 B.R. 45 (S.D.N.Y. 1996) ..................... 57

iBio, Inc. v. Fraunhofer USA, Inc.,
C.A. No. 10256-VCMR, 2016 WL 4059257 (Del. Ch. July 29, 2016) ........... 83

**Page(s)**

In re The Great Atl. & Pac. Tea Co.,
544 B.R. 43 (Bankr. S.D.N.Y. 2016) (Drain, J.).................................................. 6

In re Sabine Oil & Gas Corp.,
LLC, 734 F. App'x 64 (2d Cir. 2018)............................................................... 6

In re Sanofi Sec. Litig.,
155 F.Supp.3d 386 (S.D.N.Y. 2016)................................................................. 50

In re Woodbridge Group of Companies, LLC,
590 B.R. 99 (Bankr. D .Del. 2018) .................................................................. 64

Interim Healthcare, Inc. v. Spherion Corp.,
884 A.2d 513 (Del. Super. Ct. 2005) ............................................................... 32

Malinowski v. N.Y. State Dep't of Labor (In re Malinowski),
156 F.3d 131 (2d Cir. 1998)........................................................................... 56

Mountaineer Coal Co. v. Liberty Mut. Ins. Co. (In re Mountaineer Coal Co.),
247 B.R. 633 (Bankr. W.D. Va. 2000) ............................................................ 66

Nama Holdings, LLC v. Related WMC LLC,
C.A. No. 7934-VCL, 2014 WL 6436647 (Del. Ch. Nov. 17, 2014) ................. 34, 42

Nemec v. Shrader,
991 A.2d 1120 (Del. 2010) ............................................................................ 33

Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),
4 F.3d 1095 (2d Cir. 1993)............................................................................. 6

Osborn ex rel. Osborn v. Kemp,
991 A.2d 1153 (Del. 2010) ............................................................................ 68

Osram Sylvania Inc. v. Townsend Ventures, LLC,
C.A. No. 8123-VCP, 2013 WL 6199554 (Del. Ch. Nov. 19, 2013).................. 42

Renco Grp., Inc. v. MacAndrews AMG Holdings LLC,
C.A. No. 7668–VCN, 2015 WL 394011 (Del. Ch. Jan. 29, 2015).................... 32

Republic of Argentina v. Weltover, Inc.,
504 U.S. 607 (1992)...................................................................................... 73

**Page(s)**

Resolution Tr. Corp. v. Fidelity & Deposit Co. of Md.,
205 F.3d 615 (3d Cir. 2000)............................................................................    10

S3 Graphics Co. v. ATI Techs., ULC,
Civ. No. 11-1298-LPS, 2015 WL 7307241 (D. Del. Oct. 21, 2015)................................    87

Sabine Oil & Gas Corp. v. HPIP Gonzalez Holdings, LLC
(In re Sabine Oil & Gas Corp.),
550 B.R. 59 (Bankr. S.D.N.Y. 2016), aff'd 567 B.R. 869 (S.D.N.Y. 2017) ......................    6

Salamone v. Gorman,
106 A.3d 354 (Del. 2014) ...........................................................................    12

Saudi Arabia v. Nelson,
507 U.S. 349 (1993)..................................................................................    73

SEC v. KPMG LLP,
412 F. Supp. 2d 349 (S.D.N.Y. 2006).............................................................    17

Shaw Family Archives Ltd. v. CMG Worldwide, Inc.,
486 F. Supp. 2d 309 (S.D.N.Y 2007)..............................................................    11

Shiftan v. Morgan Joseph Holdings, Inc.,
57 A.3d 928 (Del. Ch. 2012)........................................................................    20

Thor Power Tool Co. v. Comm'r of Internal Revenue,
439 U.S. 522 (1979)..................................................................................    41

TWA Res. V. Complete Prod. Servs., Inc.,
C.A. No. N11C-08-100 MMJ, 2013 WL 1304457 (Del. Super. Ct. Mar. 28, 2013)..........    44

United States ex rel. Minge v. Hawker Beechcraft Corp. (In re Hawker Beechcraft, Inc.),
515 B.R. 416 (S.D.N.Y. 2014)......................................................................    16

United States v. Inslaw, Inc.,
932 F.2d 1467 (D.C. Cir. 1991), cert denied, 112 S. Ct. 913 (1992)................................    57, 56

Viking Pump, Inc. v. Liberty Mut. Ins. Co.,
No. CIV.A. 1465-VCS, 2007 WL 1207107 (Del. Ch. Apr. 2, 2007) ................................    64

Westinghouse Credit Corp. v. D'Urso,
278 F.3d 138 (2d Cir. 2002)........................................................................    50, 56

**Page(s)**

**Other Authorities**

Accounts receivable, David L. Scott, Wall Street Words: an A to Z Guide to
Investment Terms for Today's Investor (2003) ..................................................... 46

Commercial, Black's Law Dictionary (11th ed. 2019) ........................................ 73

5 Corbin on Contracts § 24.21 ........................................................................... 12

Illinois Revenue, Appeals, https://www2.illinois.gov/rev/localgovernments/property/
Pages/appeals.aspx (last visited June 24, 2019)................................................... 78

Modern Dictionary for the Legal Profession (3d ed. 2001).................................. 46, 53

New Oxford American Dictionary (2001).............................................................. 46, 53

Other, The American Heritage Dictionary (5th ed. 2019) .................................... 11

Restatement (First) of Restitution § 1 (1937) ....................................................... 33

Tax Credit, Black's Law Dictionary (11th ed. 2019) ........................................... 75

Tax Refund, Black's Law Dictionary (11th ed. 2019)........................................... 75

Transform Holdco LLC (the "Buyer" or "Transform"), the buyer under a certain Asset Purchase Agreement, dated as of January 17, 2019, by and among Sears Holdings Corporation ("SHC" or "Sears"), each of SHC's subsidiaries party thereto (together with SHC, the "Sellers," collectively with respect to SHC's chapter 11 affiliates, the "Debtors," and together with the Buyer, the "Parties"), and Transform (as may be amended, restated, supplemented or modified from time to time, the "APA"),[2] by and through its attorneys, Cleary Gottlieb Steen & Hamilton LLP, submits this brief in support of the Adversary Complaint and in opposition to *Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* [Docket No. 4029] (the "Motion to Enforce").

## PRELIMINARY STATEMENT

1.      Transform's Adversary Complaint alleged that:  (1) Debtors failed to deliver the required amount of Prepaid Inventory, (2) Debtors failed to deliver the required amount of Specified Receivables, (3) Transform acquired the Adequate Assurance Deposit, (4) Transform acquired all of the Debtors' real property at Hoffman Estates, (5) Transform acquired the Debtors' claims to the Hoffman Estates EDA Funds, (6) Debtors wrongly assert Transform is responsible for Mechanics' Liens it did not agree to assume, and (7) Debtors caused Transform to assume Payables beyond those it agreed to assume.  Collectively, this litany of breaches of contract and other wrongs deprived Transform of assets it purchased under the APA, compelled Transform to pay expenses that should have been borne by the Debtors, caused Transform to suffer damages,

---

[2]      The APA refers to the Asset Purchase Agreement filed as Ex. B to the *Order (I) Approving the Asset Purchase Agreement among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection therewith and (IV) Granting Related Relief* [Docket No. 2507] (the "Sale Order"), as amended by the Amendment No. 1 to Asset Purchase Agreement filed as Ex. E to the *Notice of Filing Executed (I) Employee Lease Agreement, (II) Services Agreement, and (III) Amendment No. 1 to the Asset Purchase Agreement* [Docket No. 2599] (the "Notice of Filing of Amendment No. 1 to the APA").  All capitalized terms used but not defined herein shall have the meaning ascribed to them in the APA.

and otherwise deprived Transform of inventory and forced it to divert resources away from its core

businesses in the crucial period following its emergence from bankruptcy.

## **BACKGROUND**

2.      Pursuant to the Global Bidding Procedures Order [Docket No. 816] entered by the

Bankruptcy Court, Transform submitted a definitive going concern bid on December 28, 2018 to

acquire substantially all of Sears' assets in exchange for approximately $4.4 billion in total

consideration.  Intensive negotiations between Transform and the Debtors ensued.

3.      On multiple occasions during the course of these negotiations, the Debtors and

other stakeholders, including the Official Committee of Unsecured Creditors (the "UCC"),

expressed concerns over the administrative solvency of the estates in the event of a going-concern

sale.  To address these concerns, Transform agreed to assume certain liabilities of the estates,

contingent on Debtors' agreement to provide incremental assets or the right to receive those assets

and a dollar-for-dollar reduction in certain liabilities if the Debtors failed to deliver some of the

incremental assets as described in the APA.

4.      Subsequently, beginning on January 14, 2019, the Debtors held an auction for

Sears' assets at which Transform's bid represented the only proposal to maintain Sears as a going

concern.  During the three-day auction, Transform and the Debtors engaged in often contentious

negotiations.  On the final day of the auction, Transform again substantially improved portions of

its offer, while maintaining its offer with respect to other portions.  Specifically, it offered to

assume $120 million in liabilities consisting of the junior DIP rollover, to pay up to $19 million in

transfer taxes, to assume up to $4 million in mechanics' liens, to pay up to $17 million in cash to

purchase the cash that would be located in the stores following Closing, and to pay $35 million in

cash and other good and valuable consideration.  The resulting final bid was valued at $5.2 billion.

5.      Transform's final bid was selected by the Debtors as the winning bid in the early morning hours of January 16, 2019 and memorialized in an Asset Purchase Agreement executed on the following day.  The Debtors and Transform promptly sought Court approval for the Sale Transaction.  The Court held a contested three-day hearing beginning on February 4, 2019 (the "Sale Hearing"), ultimately ruling on February 7, 2019 that the Sale Transaction was in the best interests of the estates and their creditors, and rejecting all objections to the Transaction.[3]  The next day, February 8, 2019, the Court issued a Sale Order authorizing the Sale Transaction based expressly on the terms set forth in the APA.[4]  The Sale Transaction, which had been expected to close on February 8, 2019, ultimately closed on February 11, 2019.

6.      Despite Transform's efforts throughout the sale process to negotiate a deal that would be agreeable to the Debtors but that also would provide Transform the necessary liquidity to operate as a going concern and to satisfy the liabilities it agreed to assume, and Transform's steadfast commitment to preserving Sears as a going concern, the Debtors violated the APA in an attempt to unduly minimize value due to Transform, divert assets that Transform purchased to the Debtors' estates, and impose liabilities on Transform that it did not assume.  Among other violations, the Debtors have continued their attempts to shift $166 million in accounts payable liabilities on Transform, despite contrary terms in the APA, failed to deliver millions of dollars of assets in the form and amount called for by the APA, which Transform obtained in exchange for assuming certain liabilities of the estates, and failed to transfer all the real property known as Hoffman Estates.

---

[3]      Hr'g Tr. 236:21-25, Feb. 7, 2019 ("[T]he value in the ESL transaction . . . clearly exceeds the value to the Estate of a liquidation approached [sic], based on the foregoing analysis.").

[4]      See Sale Order 2-3.

7.      Since February 2019, Transform has been attempting in good faith to resolve the disputed issues under the APA with the Debtors without recourse to litigation, through requests to mediate the disputes and otherwise discuss the issues with the Debtors.  When Debtors refused to engage in productive discussions to resolve certain of these issues, Transform appealed to this Court to assign these matters to mediation.  See *Notice of Transform Holdco LLC's Motion to Assign Matter to Mediation* and *Transform Holdco LLC's Motion to Assign Matter to Mediation* [Docket No. 2766].  While the Court did not grant Transform's motion, it noted that if the Parties could not resolve these disputes amicably, Transform could return to the Court for a determinative decision.  Hr'g Tr. 55:1-3, Mar. 21, 2019 ("And if there's some dispute that you can't resolve, then I'll decide whether it should be mediated or I should just decide it.").

8.      Transform continued to attempt to engage with Debtors to come to some resolution, but it has now become apparent that the time has come where Transform needs to take the Court up on its offer to resolve these disputes.  At the time the APA was negotiated and signed, the parties recognized (and the Court identified) that they were trying to reconcile different, and sometimes competing, interests.  Debtors had an interest in reducing their risk of administrative insolvency.  At the same time, Debtors—and Transform—had a sometimes competing interest in ensuring that enough value be transferred to Transform to ensure it had the liquidity to operate its business as a going concern and to satisfy the obligations and liabilities it was taking on.   To that end, Debtors agreed in the APA to give Transform additional value in exchange for additional obligations Transform would assume and the parties negotiated over the timing of when assets would be delivered and when liabilities would be assumed.  As documented below, since the date of signing, Debtors have attempted in virtually every way possible to retrade the deal.   They did not deliver a significant portion of the inventory they had contracted to provide, depriving

Transform of revenues and cash from inventory and forcing Transform to use much-needed cash

to purchase inventory, and they did not deliver receivables and other assets they had contracted to

provide.  They refused to pay liabilities they had agreed to keep, saddling Transform with them

instead and causing further cost and damage to Transform and its operations.

9.    The Adversary Complaint, filed May 25, 2019 [Docket No. 4033]    (the

"<u>Complaint</u>") seeks to hold Debtors to the deal they signed.  It seeks declaratory relief, specific

performance and damages for Debtors' breaches of the APA.  Only the day prior had Debtors filed

their Motion to Enforce, addressing many of the same issues included in Transform's Complaint.

## ARGUMENT

### A.  Transform Assumed Other Payables and Payment Obligations Only for Ordered Inventory

10.    The plain language of the APA, read in its entirety, as well as its structure, supports

Transform's argument that the language "with respect to the Ordered Inventory" in Section 2.3(k)

modifies both "Other Payables" and "payment obligations."  In brief, Transform agreed to assume

$166 million in obligations (whether or not reduced at the time of Closing to a payable) in

exchange for $166 million in Ordered Inventory.  The clause refers both to payables with respect

to Ordered Inventory and payment obligations with respect to Ordered Inventory because payables

and payment obligations are two different things:  as of Closing, a payable represented a current

obligation, while a payment obligation was a future contingent obligation which would be due

only upon delivery of the Ordered Inventory.  The distinction has accounting relevance but not

substantive relevance with respect to the obligations Transform would assume.  The APA

elsewhere expressly excluded from the Assumed Liabilities "accounts payable incurred in the

Ordinary Course of Business existing on the Closing Date," APA § 2.4(q), language that is

inconsistent with Debtors' newly-minted argument that Section 2.3(k) transferred to Transform accounts payable existing on the Closing Date regardless whether they related to ordered inventory incremental to Debtors' "on the stock ledger" inventory.  Debtors' argument to the contrary is based on a facially faulty reading of the agreement between the parties and fails to confront any of Transform's arguments.

11.     Transform recognizes that the Court has issued a preliminary ruling on this issue. Motion to Enforce ¶ 15.  That ruling was issued in the context of the Sale Hearing, without the benefit of briefing, and in a context in which the issue for the Court was not whether Transform's reading of Section 2.3 was correct but whether Debtors' interpretation was reasonable and the sale should be approved.

12.     Thus, the Court appropriately held that, "given the procedural context of this matter, [the Court could not] conclude that issue, those two different interpretations, dispositively."  Hr'g Tr. 241:11-14, Feb. 7, 2019.  In fact, the Second Circuit has held that a decision on contract interpretation in the context of a summary proceeding is "[i]n no way . . . a formal ruling on the underlying disputed issues, and thus will receive no collateral estoppel effect."  Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).

13.     The Court also cited Sabine Oil & Gas Corp. v. HPIP Gonzalez Holdings, LLC (In re Sabine Oil & Gas Corp.), 550 B.R. 59, 62 (Bankr. S.D.N.Y. 2016), aff'd, 567 B.R. 869 (S.D.N.Y. 2017), aff'd sub nom. Sabine Oil & Gas Corp. v. Nordheim Eagle Ford Gathering (In re Sabine Oil & Gas Corp., LLC, 734 F. App'x 64 (2d Cir. 2018), where the bankruptcy court, in determining a motion to reject a contract, "provided its non-binding analysis on the [underlying contract interpretation] issue, but noted that further proceedings would be necessary in order to enable the Court to render a binding ruling on the issue."  See also In re The Great Atl. & Pac. Tea

Co., 544 B.R. 43, 50 (Bankr. S.D.N.Y. 2016) (Drain, J.) ("[A] summary proceeding . . . 'is not the time or place for prolonged discovery or a lengthy trial with disputed issues' . . . [but] the Court should consider such disputes, in a non-binding way, when deciding whether rejection of the Lease makes good business sense in their light.") (quoting Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993)).

14.     Therefore, the Court rightly concluded during the Sale Hearing that its findings on the interpretation of Section 2.3(k) could not be binding on the Parties going forward.

### a)   The Plain Language of Section 2.3(k) Supports Transform's Reading of the APA

15.     The plain language of the APA supports Transform's interpretation that the obligations Transform assumed for accounts payable and payment obligations under Section 2.3(k) were limited to those for incremental inventory both when Section 2.3(k) is read in isolation and when it is read in context as part of the long list of assumed liabilities in Section 2.3 and as part of the APA as a whole.  Another Section of the APA, Section 2.4(q), expressly excludes from the Assumed Liabilities "accounts payable incurred in the Ordinary Course of Business existing on the Closing Date."

16.     Section 2.3(k) lists a series of assumed liabilities followed by a proviso that modifies them all.  The language of Section 2.3(k), which must be examined in full to analyze what is covered by it, reads as follows:

> [T]he Severance Reimbursement Obligations, Assumed 503(b)(9) Liabilities, Other Payables and all payment obligations with respect to the Ordered Inventory; provided, that:
>
> (i) Buyer shall not be required to make any payments with respect to the Other Payables until the later of (1) the Closing Date and (2) the date that the applicable obligation thereunder becomes due in the Ordinary Course of Business;
>
> (ii) Buyer shall not be required to make any payments with respect to Assumed 503(b)(9) Liabilities until the earlier of (1) the date that is 120 days following the

Closing Date and (2) the date on which a chapter 11 plan of reorganization is confirmed by the Bankruptcy Court with respect to the Debtors;

(iii) Buyer's obligations with respect to the Severance Reimbursement Obligations shall not exceed $43,000,000 in the aggregate, and notwithstanding Section 2.3(k)(i), the timing of such reimbursement shall be made in accordance with Section 9.7(i);

(iv) Buyer's obligations with respect to the Assumed 503(b)(9) Claims shall not exceed $139,000,000 in the aggregate;

(v) Buyer's obligations with respect to the Other Payables shall not exceed $166,000,000 in the aggregate;

(vi) In the event that the Aggregate DIP Shortfall Amount is a positive number, Buyer's obligations to assume the Liabilities described in this clause (k) shall be reduced dollar for dollar by the Aggregate DIP Shortfall Amount in the following order, until the aggregate amount of all such reductions is equal to the Aggregate DIP Shortfall Amount: *first*, the Severance Reimbursement Obligations, *second*, the Other Payables and *third* the Assumed 503(b)(9) Claims. The allocation of any reduction determined in accordance with the previous sentence of (A) the amount of the Assumed 503(b)(9) Claims among any specific Assumed 503(b)(9) Claims and (B) the amount of the Other Payables among any specific Other Payables shall be determined by Buyer in its sole discretion;

(vii) In the event that the Specified Receivables Shortfall Amount is a positive number, Buyer's obligations to assume the Severance Reimbursement Obligations and the Assumed 503(b)(9) Claims shall be reduced dollar for dollar by the Specified Receivables Shortfall Amount in the following order, until the aggregate amount of all such reductions is equal to the Specified Receivables Shortfall Amount: *first*, the Severance Reimbursement Obligations and *second*, the Assumed 503(b)(9) Claims. The allocation of any reduction determined in accordance with the previous sentence of the amount of the Assumed 503(b)(9) Claims among any specific Assumed 503(b)(9) Claims shall be determined by Buyer in its sole discretion;

(viii) In the event that the Warranty Receivables Shortfall Amount is a positive number, Buyer's obligations to assume the Severance Reimbursement Obligations and the Assumed 503(b)(9) Claims shall be reduced dollar for dollar by the Warranty Receivables Shortfall Amount in the following order, until the aggregate amount of all such reductions is equal to the Warranty Receivables Shortfall Amount: *first*, the Severance Reimbursement Obligations and *second*, the Assumed 503(b)(9) Claims. The allocation of any reduction determined in accordance with the previous sentence of the amount of the Assumed 503(b)(9) Claims among any specific Assumed 503(b)(9) Claims shall be determined by Buyer in its sole discretion;

(ix) In the event that the Prepaid Inventory Shortfall Amount is a positive number, Buyer's obligations to assume the Severance Reimbursement Obligations and the Assumed 503(b)(9) Claims shall be reduced dollar for dollar by the Prepaid

Inventory Shortfall Amount in the following order, until the aggregate amount of all such reductions is equal to the Prepaid Inventory Shortfall Amount: *first*, the Severance Reimbursement Obligations and *second*, the Assumed 503(b)(9) Claims.  The allocation of any reduction determined in accordance with the previous sentence of the amount of the Assumed 503(b)(9) Claims among any specific Assumed 503(b)(9) Claims shall be determined by Buyer in its sole discretion; and

(x) Notwithstanding anything to the contrary herein or in the Approval Order, and for the avoidance of doubt, the Buyer's agreement to pay Assumed 503(b)(9) Claims, Other Payables, or any other administrative or priority claim of the Sellers pursuant to the terms hereof is a general unsecured contractual obligation of the Buyer owed solely to the Sellers.

17.    Section 2.3(k) sits in the middle of a long list of liabilities to be assumed by Transform, each of which is separated only by commas or semi-colons and divided into various subsections, except for the last two in the list of liabilities.  Those last two in the list of liabilities are separated by the word "and."   Section 2.3 too must be read as a whole to interpret Section 2.3(k).  Eliminating division of the Section into subsections (as the Court must do in order to interpret it),[5] the Section reads as follows (with the first clause of Section 2.3(k) highlighted and the provisos eliminated and the penultimate "and" highlighted):

Buyer . . . shall timely perform and discharge in accordance with their respective terms the following Liabilities (collectively, the "Assumed Liabilities"):  all Liabilities of the Seller or any of its Subsidiaries arising out of the ownership of the Acquired Assets or operation of the Business or the Acquired Assets on or after the Closing Date that are Related to any Acquired Asset;  all Liabilities arising on or after the Closing Date or Designation Assignment Date, as applicable, relating to the payment or performance of obligations with respect to the Assigned Agreements; all Liabilities arising on or after the Closing Date from or related to any Claim, Action, arbitration, audit, hearing, investigation, suit, litigation or other proceeding (whether civil, criminal, administrative, investigative, or informal and whether pending or threatened or having any other status) arising out of the Assumed Liabilities, the Acquired Assets or the operation of the Business on or after the Closing Date (but not prior to the Closing Date) or relating to facts, actions, omissions, circumstances or conditions existing, occurring or accruing on or after the Closing Date (but not prior to the Closing Date) that are Related to the Acquired Assets or the Assumed Liabilities; Buyer's obligation to pay the Buyer Occupancy Costs; subject to Section 2.8(e), all Liabilities for warranties and protection agreements or other services contracts (other

---

[5]    See APA § 1.2(a) ("The . . . division of this Agreement into . . . other subdivisions . . . shall not affect or be utilized in the construction or interpretation of this Agreement.").

than warranties relating to Intellectual Property) for the goods and services of Sellers sold or performed prior to the Closing, including any Liabilities owed by Sears Re to any Seller in respect of reinsurance of such warranties and protection agreements (the "PA Liabilities"); all Assumed Customer Credits; all Cure Costs solely with respect to the Assigned Agreements; all Excluded Asset-Sale Taxes (except if otherwise provided in Section 2.4(i)); all Liabilities resulting from actions or inactions taken by the Sellers or any Affiliate of Sellers in compliance with Section 9.2(a); all Liabilities with respect to the Transferred Employees (i) to the extent arising as a result of an event, action or omission that occurs on or following the Closing Date or (ii) expressly assumed by Buyer and its Subsidiaries pursuant to Section 9.7 (including under the Employee Lease Agreement); **the Severance Reimbursement Obligations, Assumed 503(b)(9) Liabilities, Other Payables and all payment obligations with respect to the Ordered Inventory**; the Assumed Property Tax Liabilities; the SHIP Purchase Agreement Liabilities (if the SHIP Closing shall not have occurred prior to the Closing Date); all Liabilities relating to amounts required to be paid by Buyer under the Transaction Documents; all Liabilities arising prior to, at or after the Closing Date under or pursuant to any Environmental Law relating to the presence of Hazardous Substances at, on, in, under or migrating to or from any Acquired Asset; the claims underlying the mechanics' liens identified in Section 2 of Schedule 6.5; **and** all fee and reimbursement obligations in connection with any Backstopped Letter of Credit.

APA § 2.3 (emphases added).

18.     All of that language, when read in isolation and together, supports Transform's interpretation. At a minimum, it renders Section 2.3(k) ambiguous. The first sentence of Section 2.3(k) (before the provisos) lists that Transform will assume: "the Severance Reimbursement Obligations, Assumed 503(b)(9) Liabilities, Other Payables and all payment obligations with respect to the Ordered Inventory." The comma between "Assumed 503(b)(9) Liabilities" and "Other Payables and all payment obligations with respect to the Ordered Inventory" is critical and should be dispositive. As used in ordinary grammar, a comma sets off one set of terms from another. See Chicago Manual of Style § 6.19 (17th ed.) ("Items in a series are normally separated by commas."). Thus, as used in Section 2.3(k), the comma reflects that the section covers three separate liabilities each separated from one another: "Severance Reimbursement Obligations," "Assumed 503(b)(9) Liabilities," and "Other Payables and all payment obligations with respect to the Ordered Inventory."

19.    Moreover, under the rule of the last clear antecedent, "with respect to the Ordered Inventory" modifies both "Other Payables" and "all payment obligations."  See Barnhart v. Thomas, 540 U.S. 20, 26 (2003) ("[A] limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows . . . ."); 3Form, Inc. v. Lumicor, Inc., 678 F. App'x 1002, 1007 (Fed. Cir. 2017) ("Because there is no comma separating 'otherwise' and 'compresses,' those terms must be taken together."); Resolution Tr. Corp. v. Fidelity & Deposit Co. of Md., 205 F.3d 615, 646 (3d Cir. 2000) ("[A]s there is no comma between the two phrases, it is clear that they should be read together . . . ."); Shaw Family Archives Ltd. v. CMG Worldwide, Inc., 486 F. Supp. 2d 309, 318 (S.D.N.Y 2007) ("Because there is no comma separating the [two] phrases . . . they are part of a single term or clause and must be construed together.").  Indeed, had the Parties intended "with respect to the Ordered Inventory" to modify only payment obligations, the Parties would have put a comma between "Other Payables" and "all payment obligations" to separate the two.[6]

20.    Furthermore, Debtors' interpretation leaves no room for the inclusion of the modifier "other" before "Other Payables."  Under the rules of construction, that word is used at the end of a list of items to designate "the remaining one of two or more" or of "a different character or quality" and to set the remaining item from those that preceded it.  Other, The American Heritage Dictionary (5th ed. 2019).  It makes sense in the context of Section 2.3(k) because "Other Payables and all payment obligations" was the last liability in a list of three listed in that section and because the Parties intended to set it off from Assumed 503(b)(9) Liabilities.[7]  Whereas by

---

[6]    Cf. APA art. I ("'Citi Card Agreement' shall mean the . . . Restated Program Agreement . . . by and among [Sears], Sears Brands Business Unit Corporation, the Other Sears Parties, and Citibank, N.A."); id. § 8.3(d) ("Buyer shall . . . obtain all Consents required to permit the satisfaction of the conditions in Section 10.4, Section 10.5, Section 11.3, and Section 11.4.").

[7]    This is likewise in keeping with how "other" is used throughout the APA.  See, e.g., APA §§ 2.1(f), 2.1(g), 2.1(o), 2.1(q), 2.2(f), 2.3(e), 2.4(c), 2.4(m), 2.5, 2.7(d); see also id. § 1.1 (definitions of "acquired inventory,"

agreeing to assume 503(b)(9) liabilities, Transform was agreeing to assume liabilities with respect

to "goods received by the debtor within 20 days" before the petition date, 11 U.S.C. § 503(b)(9),

under the "Other Payables" clause, Transform was agreeing to assume liabilities (both current and

future) with respect to inventory that was ordered by Debtors but had not yet been received.

Debtors have no answer for why "other" payables would appear in the middle of a list of liabilities

under their reading, or what these payables are "other" to if not Assumed 503(b)(9) Liabilities in

the sense that they both relate to inventory.

21.     That conclusion also follows from Section 2.3(k) when read as a whole.  See

Salamone v. Gorman, 106 A.3d 354, 374 (Del. 2014) (construing provision in contract "in the

context of the overall structure of the contract"); 5 Corbin on Contracts § 24.21 ("[T]he terms of a

contract are to be interpreted and their legal effects determined as a whole.").  As noted above, the

key feature of Section 2.3(k)—distinguishing it from all of the other subsections that are part of

Section 2.3—is that it lists more than one liability assumed by Transform, each of which is subject

to one or more of the provisos that follows.

22.     Thus, reading Section 2.3(k) as a whole, each of the three liabilities listed in the

first sentence is modified by one or more of the provisos that follows as indicated this time by the

color coding that follows:

> [T]he Severance Reimbursement Obligations, Assumed 503(b)(9) Liabilities, Other
> Payables and all payment obligations with respect to the Ordered Inventory; provided, that:
>
> (i) Buyer shall not be required to make any payments with respect to the Other
> Payables until the later of (1) the Closing Date and (2) the date that the applicable
> obligation thereunder becomes due in the Ordinary Course of Business;
>
> (ii) Buyer shall not be required to make any payments with respect to Assumed
> 503(b)(9) Liabilities until the earlier of (1) the date that is 120 days following the

"action," "assigned agreements," "assignee," "assumed customer credits," "avoidance actions," "books and
records," "confidential information," "consent," "contract," "improvements," "inventory value," "labeling and
marketing materials," "lien," "person," "representative," "tax," and "tax return").

Closing Date and (2) the date on which a chapter 11 plan of reorganization is confirmed by the Bankruptcy Court with respect to the Debtors;

(iii) Buyer's obligations with respect to the Severance Reimbursement Obligations shall not exceed $43,000,000 in the aggregate, and notwithstanding Section 2.3(k)(i), the timing of such reimbursement shall be made in accordance with Section 9.7(i);

(iv) Buyer's obligations with respect to the Assumed 503(b)(9) Claims shall not exceed $139,000,000 in the aggregate;

(v) Buyer's obligations with respect to the Other Payables shall not exceed $166,000,000 in the aggregate;

(vi) In the event that the Aggregate DIP Shortfall Amount is a positive number, Buyer's obligations to assume the Liabilities described in this clause (k) shall be reduced dollar for dollar by the Aggregate DIP Shortfall Amount in the following order, until the aggregate amount of all such reductions is equal to the Aggregate DIP Shortfall Amount: *first*, the Severance Reimbursement Obligations, *second*, the Other Payables and *third*, the Assumed 503(b)(9) Claims. The allocation of any reduction determined in accordance with the previous sentence of (A) the amount of the Assumed 503(b)(9) Claims among any specific Assumed 503(b)(9) Claims and (B) the amount of the Other Payables among any specific Other Payables shall be determined by Buyer in its sole discretion;

(vii) In the event that the Specified Receivables Shortfall Amount is a positive number, Buyer's obligations to assume the Severance Reimbursement Obligations and the Assumed 503(b)(9) Claims shall be reduced dollar for dollar by the Specified Receivables Shortfall Amount in the following order, until the aggregate amount of all such reductions is equal to the Specified Receivables Shortfall Amount: *first*, the Severance Reimbursement Obligations and *second*, the Assumed 503(b)(9) Claims. The allocation of any reduction determined in accordance with the previous sentence of the amount of the Assumed 503(b)(9) Claims among any specific Assumed 503(b)(9) Claims shall be determined by Buyer in its sole discretion;

(viii) In the event that the Warranty Receivables Shortfall Amount is a positive number, Buyer's obligations to assume the Severance Reimbursement Obligations and the Assumed 503(b)(9) Claims shall be reduced dollar for dollar by the Warranty Receivables Shortfall Amount in the following order, until the aggregate amount of all such reductions is equal to the Warranty Receivables Shortfall Amount: *first*, the Severance Reimbursement Obligations and second, the Assumed 503(b)(9) Claims. The allocation of any reduction determined in accordance with the previous sentence of the amount of the Assumed 503(b)(9) Claims among any specific Assumed 503(b)(9) Claims shall be determined by Buyer in its sole discretion;

(ix) In the event that the Prepaid Inventory Shortfall Amount is a positive number, Buyer's obligations to assume the Severance Reimbursement Obligations and the Assumed 503(b)(9) Claims shall be reduced dollar for dollar by the Prepaid

Inventory Shortfall Amount in the following order, until the aggregate amount of all such reductions is equal to the Prepaid Inventory Shortfall Amount: first, the Severance Reimbursement Obligations and second, the Assumed 503(b)(9) Claims. The allocation of any reduction determined in accordance with the previous sentence of the amount of the Assumed 503(b)(9) Claims among any specific Assumed 503(b)(9) Claims shall be determined by Buyer in its sole discretion; and

(x) Notwithstanding anything to the contrary herein or in the Approval Order, and for the avoidance of doubt, the Buyer's agreement to pay Assumed 503(b)(9) Claims, Other Payables, or any other administrative or priority claim of the Sellers pursuant to the terms hereof is a general unsecured contractual obligation of the Buyer owed solely to the Sellers.

With Severance Reimbursement Obligations color-coded as green, Assumed 503(b)(9) Liabilities color-coded as purple, and "Other Payables" (used as a shorthand for Other Payables and all payment obligations) color coded as turquoise, it is apparent that each of the liabilities in Section 2.3(k) is modified by several provisos that follow. "Severance Reimbursement Obligations" is modified by subsections (iii), (vi), (vii), (viii), and (ix). "Assumed 503(b)(9) Liabilities" is modified by subsections (ii), (iv), (vi), (vii), (viii), (ix), and (x). And "Other Payables and all payment obligations with respect to the Ordered Inventory" is modified by subsections (i), (v), (vi), and (x).

23.    Debtors would have had the Parties insert "all payment obligations with respect to the Ordered Inventory" as a separate liability under Section 2.3(k), distinct from "Other Payables," but followed by a null set of provisos. Put otherwise, under Debtors' interpretation, the parties included "all payment obligations with respect to the Ordered Inventory" because it—like "Severance Reimbursement Obligations," "Assumed 503(b)(9) Liabilities," and "Other Payables"—would be subject to the provisos in Section 2.3(k) but then simply forgot to include any provisos modifying "payment obligations" as a distinct liability.

24.    That interpretation makes no sense.  If "all payment obligations with respect to the Ordered Inventory" was not to be modified by one of the provisos in Section 2.3(k), there would have been no reason to list it as one of the group of liabilities in Section 2.3(k).  The parties could have separated it out as its own liability in its own subsection of 2.3, as they did with respect to every other individual liability Transform was assuming.

25.    It is far more sensible to read "Other Payables and all payment obligations with respect to the Ordered Inventory" as a single liability with "Ordered Inventory" modifying both payables and payment obligations, "Other Payables" was used as a shorthand to refer to both in the provisos.

26.    Thus, Section 2.3(k) lists three liabilities, and not four.  The first three clauses of Section 2.3(k) set forth the dates by which Transform must make payments in respect of the Liabilities described in Section 2.3(k).  The timing of Severance Reimbursement Obligations "shall be made in accordance with Section 9.7(i)."  APA § 2.3(k)(iii).  Buyer is not required to make "any payments with respect to Assumed 503(b)(9) Liabilities" until the earlier of 120 days after the Closing Date or confirmation date, whichever is earlier.  Id. § 2.3(k)(ii).  Payments "with respect to the Other Payables" are not due until the later of the Closing Date or the date "the applicable obligation thereunder becomes due in the Ordinary Course of Business."  Id. § 2.3(k)(i).  In context, the reference to "Other Payables" plainly picks up both "Payables" with respect to Ordered Inventory and payment obligations with respect to Ordered Inventory.  Otherwise, the Parties would have left completely undefined Buyer's payment obligations with respect to the "payment obligations" in violation of all rules of contract interpretation.

27.    The following subsections of Section 2.3(k)—Sections 2.3(k)(iii), (iv), and (v)— each contains specific monetary caps limiting Transform's liability for the items listed in the

opening section of 2.3(k). Each of the Severance Reimbursement Obligations, the Assumed 503(b)(9) Claims, and a category called "Other Payables" is listed. There is no separate category for "payment obligations" because "payment obligations" was not an independent liability. The cap is a singular one which applies to both payables and payment obligations with respect to the Ordered Inventory.

28.    Finally, and importantly, one of the most important reasons that the liabilities in Section 2.3(k) are grouped together, and are not listed separately in separate subsections, is that they are each modified by the provisos relating to the reduction of those liabilities accounting to possible shortfalls in the delivery of assets Debtors were required to deliver under the APA. Notably, "payment obligations" is not identified as a standalone item that can be reduced by a shortfall in Debtors' satisfaction of their obligations under the APA as one would expect if it were an independent obligation that alone was modified by "with respect to the Ordered Inventory." Id. § 2.3(k). Rather, it is grouped together with "Other Payables" because Transform agreed to assume only a single liability of payables and payment obligations with respect to the Ordered Inventory.

29.    That conclusion is made even more clear by subsection 2.3(k)(vi) and the use of the definitive article "the" in that subsection. The subsection describes the order in which "*the* Liabilities described in this clause (k)" can be reduced if the Aggregate DIP Shortfall Amount is a positive number. Id. § 2.3(k)(vi) (emphasis added). The order is that the Severance Reimbursement Obligations are first reduced, then "the Other Payables," and finally the Assumed 503(b)(9) Claims. The use of the definitive article "the" (before "Liabilities described") denotes that the subsection includes all of the liabilities described in clause (k), and not just some of them. It thus demonstrates that all of the words in the last clause of the first sentence of Section 2.3(k)

beginning with "Other Payables" were identified to describe a single obligation and that it is that entire antecedent that is modified by "Ordered Inventory."  See United States ex rel. Minge v. Hawker Beechcraft Corp. (In re Hawker Beechcraft, Inc.), 515 B.R. 416, 428 (S.D.N.Y. 2014) ("It is a rule of law well established that the definite article 'the' particularizes the subject which it precedes. . . .  [U]se of the definite article 'the,' as opposed to the indefinite 'a,' 'an,' or 'any,' indicates that Congress intended the term modified to have a single referent.") (citations and internal quotation marks omitted)); SEC v. KPMG LLP, 412 F. Supp. 2d 349, 387-88 (S.D.N.Y. 2006) (use of definite article "the" connotes a singular referent).

30.    Lastly, as amended, Section 2.3(k)(x) states that Buyer's agreement to pay Assumed 503(b)(9) Claims, Other Payables, or any other administrative or priority claim of Sellers is a contractual obligation owed solely to the Sellers.  It again makes no reference to "all payment obligations."

### b)  The Plain Language of Section 2.3 Also Supports Transform

31.    The full language of Section 2.3 also supports Transform.  When this issue was last before the Court and Debtors focused on the language of Section 2.3(k) in isolation, the Court would have noticed an apparent missing "and" between "Assumed 503(b)(9) Liabilities" and "Other Payables and all payment obligations."  If "with respect to Ordered Inventory" modified both payables and payment obligations, then, Debtors suggest, one might have expected the clause to read as follows:

> the Severance Reimbursement Obligations, Assumed 503(b)(9) Liabilities and Other Payables and all payment obligations with respect to the Ordered Inventory.

32.    Of course, however, Section 2.3(k) is not alone.  It sits in the middle of a long list of liabilities assumed by Transform.  And, critically for interpreting Section 2.3(k), none of the other liabilities listed in Section 2.3 is separated by the word "and," except for the last and second-

to-last liability listed in Section 2.3, and Section 1.2 instructs that in interpreting the APA the division of the liabilities into separate subsections is to be disregarded.  Thus, reading Section 2.3 as a whole, the otherwise missing "and" is readily found and the interpretative question raised by Debtors answered: there is no "and" between "Assumed 503(b)(9) Liabilities" and "Other Payables and all payment obligations" because there would be no need for an "and."  The two liabilities are in the middle of the list of liabilities included in Section 2.3.  The "and" appears in Section 2.3—as it should—at the very end of the list, right before the last liability assumed by Transform.

### c)  The Remainder of the APA Supports Transform's Interpretation

33.    If more evidence were needed that the absence of an "and" before "Other Payables" in Section 2.3(k) is not significant, that evidence can be found in a related Section of the APA, Section 2.4(q).  Section 2.4 lists Excluded Liabilities.  Significantly, Section 2.4(q) lists as an Excluded Liability "accounts payable incurred in the Ordinary Course of Business existing on the Closing Date."  It identifies two exceptions to those exclusions:  "Section 2.3(g) (Cure Costs) and 2.3(k) (Severance Reimbursement Obligations, Assumed 503(b)(9) Liabilities ***and*** Other Payables and the payment obligations with respect to the Ordered Inventory)."  APA § 2.4(q) (emphasis added).  The language is telling.  It demonstrates first that payables and payment obligations were considered to be payables as that term was generally used in the APA.

34.    Second, Debtors' argument provides no explanation for why the parties would have included Section 2.4(q) at all.  Under their reading, Section 2.3(k) transferred liability to Transform for all accounts payable existing on the Closing Date up to a cap of $166 million and Transform was required to satisfy those payables on "the date that the applicable obligation thereunder becomes due in the Ordinary Course of Business."  <u>Id.</u> § 2.3(k)(i), (v).  There is no other limitation;

all accounts payable are transferred. But, if that were so, there would have been no need for Section 2.4(q) at all. The Parties could have left it with 2.3(k) alone and the provision that "Other Payables shall not exceed $166,000,000 in the aggregate." The Parties intended to something when adding Section 2.4(q) and what they intended is apparent when Sections 2.4(q) and 2.3(k) are read *in pari materia*. They intended to make clear that Transform would not be liable for accounts payable in the ordinary course of business existing on the Closing date except for Cure Costs, Severance Reimbursement Obligations, Assumed 503(b)(9) Liabilities or when those payables were for incremental inventory.

35.      Finally, the use of the word "and" before "Other Payables" in Section 2.4(q) makes clear that its omission from before "Other Payables" in Section 2.3(k) is a function of the fact that—in Section 2.3(k)—"Other Payables and all payment obligations" is one among a long list of liabilities and is in the middle of that list. Thus, read in context, in both Section 2.3(k) and 2.4(q), the "with respect to the Ordered Inventory" modifies the full clause "Other Payables and the payment obligations." See FBI Wind Down, Inc. Liquidating Tr. ex rel. Halperin v. Heritage Home Grp., LLC (In re FBI Wind Down, Inc.), 252 F. Supp. 3d 405, 422-23 (D. Del. 2017), aff'd 741 F. App'x 104 (3rd Cir. 2018) ("[T]he proper construction was one that harmonized [provisions that address the same subject matter]."). The only reason "and" was not used in Section 2.3(k) is because that subsection falls in the middle of a long list of liabilities where it would only be appropriate to use "and" to separate the last and second-to-last liability.[8]

---

[8]      Debtors have pointed to Section 2.4(a) to argue that this clause reflects Other Payables as a separate obligation from payment obligations with respect to Ordered Inventory. Section 2.4 lists "Excluded Liabilities," i.e., liabilities that Transform has not assumed. The full language of Section 2.4(a) excludes from assumption "all Liabilities of the Seller or any of its Subsidiaries arising out of the ownership of the Acquired Assets or operation of the Business or the Acquired Assets prior to the Closing Date other than Cure Costs, Other Payables, the Assumed 503(b)(9) Claims, Severance Reimbursement Obligations, and Ordered Inventory." Read literally, the clause cannot mean what it says; Ordered Inventory is not a liability assumed by Transform but the right to it is an asset acquired under Section 2.1(x). Thus, for example, Section 2.1(x) gives Transform "the right to receive the Pending

### d) The Parol Evidence Further Supports Transform's Interpretation

36.    To the extent that the APA is not clear, the parol evidence supports Transform's interpretation.  "[W]hen there is uncertainty in the meaning and application of contract language, the reviewing court must consider the evidence offered in order to arrive at a proper interpretation of contractual terms."  Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232 (Del. 1997); Shiftan v. Morgan Joseph Holdings, Inc., 57 A.3d 928, 935 & n.15 (Del. Ch. 2012) (Where a contract is ambiguous, the court "may consider parol evidence for the common understanding of the language in controversy.").  Parol evidence can comprise "evidence pertaining to antecedent agreements, communications of the parties" and "commercial usage in the industry."  Bell Atl. Meridian Sys. v. Octel Commc'ns Corp., No. Civ. A. 14348, 1995 WL 707916, at *6 (Del. Ch. Nov. 28, 1995); Eagle Indus., 702 A.2d at 1233 (a court may consider "evidence of prior agreements and communications of the parties as well as trade usage or course of dealing").

37.    The genesis of what became Section 2.3(k) came in a set of meetings and communications that followed Debtors' determination that Transform's December 28, 2018, bid (the "December 28 Bid") was non-qualifying.  As the Court will recall, that bid would have involved the purchase by Transform of substantially all of Debtors' assets in exchange for an aggregate consideration of up to $4.4 billion.  It did not involve the assumption by Transform of Debtors' severance reimbursement obligations, 503(b)(9) liabilities, or any accounts payable or payment obligations.

38.    Shortly after the submission of the December 28 Bid, Debtors and their advisors voiced their concerns to Transform that accepting the December 28 Bid would leave the estates

Inventory," which is defined to include Ordered Inventory.  "[P]ayment obligations" appears nowhere in Section 2.4(a).  Therefore, this section cannot shed light on the Parties' divergent interpretation.

administratively insolvent, and that Transform would have to provide more value if Debtors were to qualify its bid.  Transform ultimately agreed to assume additional liabilities and obligations in exchange for Debtors' agreement to sell Transform additional assets with which to satisfy those obligations.

39.    The business deal reached between Transform and Debtors was reflected in Transform's bid letter submitted on January 9, 2019 (the "January 9 Bid Letter") and the accompanying draft of the APA.  In its January 9 Bid Letter, Transform offered to assume, in item 1.a, "[u]p to $166 million of payment obligations with respect to goods ordered by Debtors prior to the closing of the proposed transactions (but as to which goods Debtors have not yet taken delivery and title prior to closing)."  *Declaration of Charles W. Allen in Support of Transform Holdco LLC's Brief in Support of the Adversary Complaint and in Opposition to Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* ("Allen Decl."), Ex. A, at 3.  In exchange, Transform asked that Debtors deliver a number of additional Acquired Assets, including in point 2.d:  "Additional inventory with a book value of up to $166 million with respect to which Buyer shall assume payment obligations as described in item 1.a. above (and as to which inventory Debtors have not yet taken delivery and title prior to closing)."  Id., at 4.

40.    The terms of the business deal outlined in the January 9 bid letter were documented in the draft of the APA sent along with the January 9 Bid Letter (the "January 9 Proposed APA"), as well as in the finalized APA, as executed on January 17, 2019 (the "Final APA").  Section 2.3(k) of the January 9 Proposed APA picked up the promise that Transform would pay "Other Payables and all payment obligations with respect to the Ordered Inventory," subject to the cap of $166 million, which was the amount of Ordered Inventory that Debtors would provide in exchange.

41.     That bid followed correspondence between representatives of Debtors and Transform and its advisors in which Debtors clearly explained that they were asking Transform to assume a single set of obligations in the amount of $166 million, called accounts payable and that this accounts payable (unlike the accounts payable in the Excluded Liabilities in Section 2.4(q)) would be in respect of incremental inventory above and beyond the "on the stock ledger" inventory that Transform had already agreed to buy.  There was no mention of a separate, independent, set of obligations called "payment obligations" or that the accounts payable were not in respect of incremental inventory.

42.     Thus, on January 4, 2019, Cullen Murphy of Moelis & Co. ("Moelis")—Transform's financial advisor—asked Debtors' representative—Christopher Good of M-III Partners ("M-III")—whether, with regard to "[t]he A/P that the Company is asking NewCo to assume – will this be delivered preclose?  Said another way is the inventory associated with this A/P in the $1,553 or will it be delivered post close?"  *Declaration of Cullen D. Murphy in Support of Transform Holdco LLC's Brief in Support of the Adversary Complaint and in Opposition to Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* ("Murphy Decl."), Ex. C.  Mr. Murphy communicated his concerns that if Transform closed "the first week of February and these goods have been ordered [meaning the goods for which there were accounts payable pending in early January] then wouldn't most of these goods be in stock by closing?"  Id.  Mr. Good responded by indicating that the accounts payable at closing would be for other goods that would then be in transit and not part of the $1,553 million:  "You'll take whatever that AP is at close no?  And thus there will be other goods in transit at close?"  Id.  Clarifying the business agreement, Mr. Murphy asked:  "So you're saying that the A/P that is outstanding now will be paid off by close and the A/P associated with new goods ordered will be what we are actually

assuming.  And further that those goods will be delivered post close.  Did I get that right?"  Id.
His questions sought confirmation that the accounts payable that Transform would be assuming
under a revised proposal would be in connection with "new goods ordered," not part of the "on the
stock ledger" inventory, and therefore would represent additional value to Transform.  Id.  Mr.
Good's answer was unequivocal: "100% - yes."  Id.

43.     On January 8, 2019, the day before the bid offer, Mr. Kamlani, as the lead negotiator
on behalf of Transform, sent an email to Mr. Good in which Mr. Kamlani asked Mr. Good if he
could "confirm that the $166 of AP is 90%+ for goods that will not be in the Company's possession
as of 2/8."  Murphy Decl., Ex. D.  Mr. Good responded, "yes that is approximately correct."  Id.
Mr. Good's response was again confirmation that Transform was assuming payables in exchange
for inventory and that nearly all that inventory would not be in Debtors' possession at Closing,
meaning that it would be in addition to the "on the stock ledger" inventory Transform would
already be acquiring.  Id.

44.     The shared understanding of the business deal was reflected in a liquidity analysis
sent to potential lenders for the financing of the going concern sale.  See Murphy Decl., Ex. E.  In
the presentation entitled "Summary of Model Adjustments" summarizing changes made to the
liquidity analysis, Moelis wrote that the revised liquidity model "[a]ssumes post close delivery of
$166mm of inventory ***and associated accounts payable***."  Id. (emphasis added).

45.     That background is critical to understanding the language of the APA that was
submitted in the same bid package and simultaneously with the January 9 bid letter.  At Debtors'
first meeting to consider that draft Proposed APA, the Restructuring Committee well understood—
as they were informed by their advisors—that "the draft asset purchase agreement provided with
the Revised ESL Bid did not reflect any changes other than the changes to the economic terms

described in ESL's letter." *Declaration of Andrew Weaver in Support of Transform Holdco LLC's Brief in Support of the Adversary Complaint and in Opposition to Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* ("Weaver Decl."), Ex C.  In other words, the draft APA contained the same economic terms as described in Transform's January 9 Bid Letter—terms that made clear that Transform would agree to assume a single liability of up to $166 million in payment obligations for ordered inventory in exchange for delivery of the $166 million in ordered inventory.  The language of the first clause of Section 2.3(k) of the January 9 draft APA—the language that Debtors' advisors stated reflected the economic terms of that January 9 Bid Letter—is identical to that which appears in the final executed APA, in the middle of the list of liabilities: "Severance Reimbursement Obligations, Assumed 503(b)(9) Liabilities, Other Payables and all payment obligations with respect to the Ordered Inventory."

46.     That shared understanding is further reflected and reinforced by the financial models developed by Transform and shared with Debtors and by the course of negotiation of the APA.  With respect to the financial models, it is worth remembering that Transform's post-Close liquidity was almost as much of a concern to Debtors as it was to Transform.  See Good Dep. 83:12-15, June 20, 2019 ("[E]veryone involved in the situation wanted to make sure that there was sufficient liquidity to make . . . payments.").

47.     Those models, some of which were shared with Debtors, make clear that the only obligation Transform was assuming with respect to accounts payable was in exchange for incremental inventory it would receive.  A summary of model modifications on January 8, 2019— prepared the same date as Mr. Kamlani's communications with Mr. Good—made that clear.  It stated that the updated model as of January 8, 2019 "[a]ssumes post close delivery of $166mm of inventory *and associated accounts payable*."  See Murphy Decl., Ex. E (emphasis added).  So did

the January 23 model, explicitly shared with Debtors before the Sale hearing.  The cover email to

that model explained that the $166 Million Ordered Inventory reflected a cash benefit for

Transform, because it would receive the inventory before having to pay the associated payables.

Id., Ex. G.  It stated that "had [Transform] not assumed the $166mm on the 30, 60, 90 days terms,

[it would] have bought that amount on 10 day terms.  Instead, we benefit from not having to pay

the AP liability back until the schedule requires so."    Id.  The attached model reflected an

immediate increase in inventory on Closing from $1,553 million at the Closing to $1,710.2 million

due to the expectation of receiving $166 million in incremental inventory comprised of the Ordered

Inventory that offset the $166 million of accounts payable that Transform would have to pay over

the ensuing thirty, sixty, and ninety days.  See id., Ex. G.   These same figures were shared with

Debtors on January 16, 2019 prior to signing the APA.  See id., Ex. H.

48.     Significantly, it was not until Alvarez and Marsal North America LLC ("A&M")

raised a concern that Debtors ever identified any concern with Transform's understanding and

model.

49.     The course of the negotiations further confirms that understanding.  As noted, the

first clause of Section 2.3(k) remained unchanged from the January 9 proposed APA draft to the

final executed APA.  It always referred to "Other Payables and all payment obligations with respect

to the Ordered Inventory"—language Debtors admittedly understood to be equivalent to

Transform assuming liability only for those payables backed by incremental inventory that was

not part of the "on the stock ledger" inventory.  APA § 2.3(k).

50.     The few changes that were made to the language of 2.3(k) as a whole (with its

provisos) demonstrate that Transform was assuming liability only with respect to incremental

inventory.  Among those changes were edits with respect to the timing of when Transform would

need to satisfy the assumed liabilities listed in Section 2.3(k), an important issue given the parties'

shared concerns with Transform's post-Close liquidity.    In the January 9 Proposed APA,

Transform proposed that "[b]uyer shall not be required to make any payments with respect to any

Liability described in this clause (k) until the later of (1) the date that is 270 days following the

Closing Date and (2) the date on which a chapter 11 plan of reorganization is confirmed by the

Bankruptcy Court with respect to the Debtors," language that made clear that all of the liabilities

in the first clause of Section 2.3(k) were intended to be modified by the provisos and that would

have given Transform ample cushion to operate the business and generate the liquidity necessary

to satisfy the obligations it was agreeing to assume.  See Allen Decl., Ex. A, at 57.  In and of itself,

this demonstrates that payables and payment obligations was a single liability, both parts of which

were subject to the provisos.

51.    That language was not acceptable to Debtors.  In a revised draft sent to Transform

on January 11, 2019, Debtors proposed a significant shortening of the time period on which the

obligations would be due—Transform would pay the Severance Reimbursement Obligations and

Other Payables on the later of (1) the Closing or (2) the date the obligation became due; and the

Assumed 503(b)(9) Liabilities on the later of (1) sixty days after the Closing or (2) the date on

which a chapter 11 plan of reorganization is confirmed.  See Allen Decl., Ex. B, at 44-45.  There

is no evidence that in breaking up the "any liability" in the first draft into its component parts in

the second, the Parties intended to delete payment obligations from the provisos.  Debtors were

concerned that severance and payment obligations both would be paid when they became due.

52.    In turn, that language was not initially acceptable to Transform and was a subject

of negotiation.  Ultimately Transform requested detail from the Debtors on when payments would

be due in order to ensure it would be able to make them.  Tellingly, and contrary to the position

Debtors are now taking, Debtors provided a single schedule for accounts payable totaling $166 million, reflecting that they understood as did Transform that Transform was assuming a single future payment obligation for up to $166 million.    Murphy Decl. ¶ 24.    Transform was not assuming two separate payment obligations each for $166 million.

53.    Indeed, in several rounds of back-and-forth over this provision, Debtors never suggested that Section 2.3(k) contained a fourth liability of payment obligations separate from payables related to the Ordered Inventory for which the Parties would want to determine when Transform would need to satisfy such liability, something Debtors surely would have said if they believed as they currently claim that there was such a separate liability.

54.    An additional edit made to the APA involved changing references to the "Ordered Inventory Shortfall Amount" to refer instead to the "Prepaid Inventory Shortfall Amount" in Transform's revised proposed APA sent to Debtors in the early morning of January 17, 2019 (the "January 17 Proposed APA").    See Allen Decl., Ex. E.    Transform's counsel, Charles Allen, presented this revised language that changed "Ordered Inventory Shortfall Amount" to "Prepaid Inventory Shortfall Amount" to a group of advisors for Debtors, including representatives of Debtors' legal counsel, Weil Gotshal & Manges LLP ("Weil"), on January 17, 2019.    Counsel from Weil asked Mr. Allen for an explanation concerning the change of "Ordered Inventory Shortfall Amount" to "Prepaid Inventory Shortfall Amount" as reflected in the January 17 Proposed APA.    See Allen Decl. ¶ 15.    Mr. Allen stated that the reference in the waterfall of shortfall reductions in Section 2.3(ix) had always been meant to refer to Prepaid Inventory, and that the prior reference to Ordered Inventory Shortfall Amount was a mistake.    Id.    He explained, as Transform argues now, that the Other Payable obligation was solely with respect to inventory that was incremental and would be on order.    Id.    No shortfall adjustment mechanism was required.

If Debtors failed to deliver the bargained-for amount of Ordered Inventory, there would be no payables for Ordered Inventory for Transform to assume.  Mr. Allen stated that a shortfall amount was required for the Prepaid Inventory, on the other hand, because Prepaid Inventory had no such liability associated with it and therefore no self-executing mechanism by which a shortfall in Prepaid Inventory would reduce the liabilities Transform was assuming.  Id. At that time, no one from Debtors or their advisors objected to Transform's interpretation or stated that there was a separate accounts payable obligation that was not with respect to Ordered Inventory.  To the contrary, they agreed and, on the basis of this explanation, Transform and Debtors agreed to make this change, which was reflected in the final APA.  Id.  It was not until later after the signing and on the eve of the Sale Hearing, in apparent remorse at the deal they had signed, that Debtors asserted their revised interpretation of the agreement.

### e)  Debtors Are Trying to Retrade the Deal Out of Remorse.

55.     Debtors insinuate that Transform has come up with a new interpretation of the APA after its signing out of "remorse."  Motion to Enforce ¶ 17.  The contrary is true.  Not only has Transform taken a consistent position with respect to the interpretation of Section 2.3(k), but Debtors shared that interpretation.  It was only well after the APA was signed that Debtors suddenly changed their position.  See Eagle Force Holdings, LLC v. Campbell, 187 A.3d 1209, 1235 n.180 (Del. 2018) (declining to give weight to "a form of 'after-the-fact professed subjective intent' that our courts typically refuse to consider").

56.     The circumstances of Debtors' new interpretation are revealing.  Transform's business models and liquidity analyses—which were shared with Debtors, their representatives, and the ABL financing parties before and after the signing of the APA—consistently assumed that the $166 million in Other Payables were linked to the $166 million of Ordered Inventory.  There

was no separate free-standing obligation for an additional $166 million in payables not associated

with inventory, which would have thrown the liquidity analyses way off.  Murphy Decl., Ex. H,;

id., Ex. G.  Debtors never questioned this linkage and never raised any issue that Debtors had a

different understanding of the APA from Transform.  In a January 23, 2019 email from Josh

Gruenbaum at Moelis to Mohsin Meghji, the Debtors' Chief Restructuring Officer, attaching

Transform's then-current liquidity analysis and backup, Mr. Gruenbaum described that the $166

Million Ordered Inventory reflected a cash benefit for Transform, because it would be able to sell

the inventory before having to pay the associated payables.  The email also attached a schedule of

the liabilities Transform was assuming and listed "A/P for Post Close Inventory."  Mr. Meghji

never responded to this email.  See id. ¶ 27.  Likewise, Debtors attended the presentations to the

ABL financing parties on January 24, 2019 and did not raise any opposition when Transform's

liquidity analysis was presented to the financing parties representing that Transform had assumed

only one set of $166 million in payables.  *Declaration of Kunal S. Kamlani in Support of Transform*

*Holdco LLC's Brief in Support of the Adversary Complaint and in Opposition to Debtors'*

*Supplemental Motion to Enforce the Asset Purchase Agreement* ("Kamlani Decl.") ¶ 30

57.     It was only well after the Sale that Debtors began changing their tune.  On January

25, 2019, Mr. Good forwarded an email to Moelis from a representative of A&M, advisors to the

Restructuring Subcommittee, who were not directly involved in the negotiations or

communications in which the agreement was struck between Debtors and Transform, noting that

"[i]t essentially seems as though [Transform isn't] picking up any exi[s]ting AP and [is] just taking

inventory which hasn't yet arrived at the Company."  See id., Ex. J.  A&M did not identify any

contractual provision that contradicted Transform's analysis but simply expressed unhappiness

about its result.  In response to A&M, Mr. Good then for the first time relayed a new understanding

of the bargain—that a portion of the payables which Transform was assuming would be for "non merch" and that "[n]ot all of it will have inventory delivered post close but there will still be a significant amount." See id. Even then, Mr. Good explained that Transform would still be getting something of value in connection with assuming these payables, because the "non merch" accounts payable were for services which Debtors had not yet consumed. See id. ¶ 30. It was only after further discussions between Mr. Good and Mr. Murphy that Mr. Good stated that most of the value for which Transform had assumed the Other Payables had been subsumed in the "on the stock ledger" inventory, and therefore of no additional value to Transform. See id. ¶ 32.

58.    In depositions in advance of this hearing, Debtors grasped at straws. First, they claimed—contrary to every representation that they previously made in the course of negotiations—that Other Payables could not possibly be with respect to the Ordered Inventory because there could be no payables associated with Ordered Inventory. See Meghji Dep. 69:4-6, June 21, 2019 ("[W]here you have not taken title or delivery of ordered inventory, there is no payment obligation."). According to Debtors, they could not ever have delivered on an agreement to provide inventory on order in exchange for payables. Whether or not this is a new-found position or Debtors knew it all along, it is clearly contrary both to what Debtors were saying throughout the course of negotiations when they promised incremental ordered inventory in exchange for Transform's assumption of payables for that ordered inventory and with the position they took as late as February 2 of this year in this Court, where they stated that Transform had assumed "payables" under the APA in exchange for "ordered merchandise not yet received by the Debtors." See Debtors' Omnibus Reply in Support of the Going Concern Sale Transaction [Docket No. 2328] ¶ 50 ("ESL has agreed to commit approximately $5.2 billion in the form of cash and non-cash consideration, including . . . up to $166 million in certain accounts payable

(which may be reduced in certain circumstances) [and] *payables* for ordered merchandise not yet received by the Debtors.") (emphasis added).

59.    The issue is irrelevant.  Whether or not there could be current payables in respect of Ordered Inventory at Closing, there is no reason that the Parties could not have contracted to protect against the risk that some of Debtors' obligations with respect to ordered inventory could be considered to be payables and to make sure that regardless whether they were considered payables or simply payment obligations, Transform would be on the hook for them if they related to Ordered Inventory.  Nor is there evidence that Transform knew at the time of the signing of the APA what Debtors apparently are now saying.  To the contrary, the language of the APA and the parol evidence are clear.  If there were no payables or payment obligations for ordered inventory (e.g., if Debtors simply had stopped ordering inventory), Transform would not assume liability for payables or payment obligations with respect to ordered inventory.

60.    Second, Debtors also argued that the payables and payment obligations liability could not be with respect to Ordered Inventory because, they claimed, Debtors would get no value from that agreement.  But that is not what they were claiming and asking for at the time of signing. At the time the APA was negotiated and signed, it was clear that Debtors would receive value for the liabilities Transform was assuming.  That was clear with respect to severance reimbursement obligations and assumed 503(b)(9) liabilities.  And it was equally true with the Section 2.3(k) obligation with respect to payables and payment obligations for Ordered Inventory.  Mr. Kamlani gave an answer to Debtors' question at his deposition:  "The debtors were trying to achieve Transform taking on assets and liabilities because they were concerned that . . . as they sold the assets what they received for them may fall well short of the $166.5 million of liabilities, because they were not in the business of selling the assets."  Kamlani Dep. 78:14-22, June 20, 2019.

61.     The Court should give no weight to these arguments newly-minted for litigation.

**f) Relief**

62.     Given the above, Transform is entitled to the relief it seeks in its Complaint under Counts Six, Seven, Ten and Eleven.  First, Transform is entitled to declaratory judgment that it has only assumed Other Payables with respect to Ordered Inventory.   Under 28 U.S.C. § 2201, this Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought" where "a case of actual controversy" exists.  Here, the Parties dispute Transform's rights and obligations under the terms of the APA.   The Court's determination on these matters will have significant pecuniary consequences for Transform.  Transform has already paid $150,223,525 out of approximately $189 million in post-petition accounts payable outstanding at Closing.  *Declaration of Andrew D. Hede in Support of Transform Holdco LLC's Brief in Support of the Adversary Complaint and in Opposition to Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* ("Hede Decl.") ¶ 15.  Should the Court agree with Transform's reading of Section 2.3(k), Transform would not be obligated to satisfy the remaining $16 million of the $166 million in accounts payable that Debtors would have Transform assume under their reading of the APA.  See also Renco Grp., Inc. v. MacAndrews AMG Holdings LLC, C.A. No. 7668–VCN, 2015 WL 394011, at *4 (Del. Ch. Jan. 29, 2015) (denying motion to dismiss claims for declaratory relief stemming out of contract dispute).

63.     Second, Transform is entitled to damages as a result of Debtors' breaches of the APA.  "Under Delaware law, the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation; and (3) resulting damages."  Interim Healthcare, Inc. v. Spherion Corp., 884 A.2d 513, 548 (Del. Super. Ct. 2005).  Debtors have breached several

provisions of the APA including, but not limited to, Section 2.4. Pursuant to Section 2.4 of the APA, Debtors agreed that Transform shall not be "deemed to assume or become obligated hereunder in any way to pay or perform . . . Liabilities of any Sellers . . . other than the Assumed Liabilities." For the reasons stated above, Transform was not required to assume liabilities with respect to Other Payables beyond those incurred in connection with the Ordered Inventory. Debtors therefore were prohibited from requiring Transform to assume payables other than those incurred in connection with the Ordered Inventory. Debtors breached this obligation. As a result of Debtors' refusal to satisfy post-petition accounts payable unrelated to the Ordered Inventory, Transform became saddled with these obligations in order to avoid further harm to its vendor relations and to its business. Transform has paid or approved for payment $150,223,525 in post-petition accounts payable unrelated to Ordered Inventory outstanding at the Closing. Hede Decl. ¶ 15. Conservatively speaking is therefore entitled to damages in the same amount.

64. Third, and in the alternative, Transform is entitled to damages as a result of the Debtors' unjust enrichment at Transform's expense. Under Delaware law, the elements of unjust enrichment are "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." Nemec v. Shrader, 991 A.2d 1120, 1130 (Del. 2010). Debtors were enriched by Transform's payment of the $150,128,548 in post-petition accounts payable unrelated to Ordered Inventory outstanding at the Closing. Had Transform not satisfied these payables, they would have been left with the Debtors' estates. See Elec. Ins. Co. v. Travelers Ins. Co., 124 A.D.2d 431, 432 (N.Y. 1986) ("[A] person receives a benefit where his debt is satisfied or where he is saved an expense or loss."); Restatement (First) of Restitution § 1 (1937) ("A person confers a benefit upon another if he . . . performs services beneficial to or at the request of the other, satisfies a debt or a duty of

the other, or in any way adds to the other's security or advantage. He confers a benefit not only where he adds to the property of another, but also where he saves the other from expense or loss. The word 'benefit,' therefore, denotes any form of advantage."). Transform was clearly impoverished in connection with Debtors' enrichment in having to expend over $150 million dollars to satisfy payables that it did not bargain for and that under the correct reading of the APA should have remained on the Debtors' books.

65.    There is no justification for Transform assuming payables that Debtors should have satisfied. The evidence described above makes clear that the Parties agreed that Transform would assume payables only with respect to Ordered Inventory. Only through Debtors absconding on their promise and offering a new—and false—interpretation of the APA after its signing, was Transform placed in a position of having to satisfy payables unrelated to Ordered Inventory in order to protect its vendor relations and business interests. Should the Court find that the APA does not provide a remedy at law, then it should still grant Transform damages under a theory of unjust enrichment in the amount of $150,128,548. See Albert v. Alex. Brown Mgmt. Servs., Inc., Nos. CIV.A. 762-N, 763-N, 2005 WL 2130607, at *8 (Del. Ch. Aug. 26, 2005) ("[A]lternative pleading allows a party to seek recovery under theories of contract or quasi-contract . . . when there is doubt surrounding the enforceability or the existence of the contract.").

66.    Lastly, Transform is entitled to damages as a result of the Debtors' breach of the implied covenant of good faith and fair dealing. The elements of a claim for breach of the implied covenant are "a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." Nama Holdings, LLC v. Related WMC LLC, C.A. No. 7934-VCL, 2014 WL 6436647, at *17 (Del. Ch. Nov. 17, 2014) (quoting Fitzgerald v. Cantor, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)). "Implying contract terms is an

'occasional necessity . . . to ensure [that] parties' reasonable expectations are fulfilled.'" Allen v. El Paso Pipeline GP Co, L.L.C., 113 A.3d 167, 184 (Del. Ch. 2014) (quoting Dunlap v. State Farm Fire & Cas. Co., 878 A.2d 434, 442 (Del. 2005)).  Here, the expectations of the parties were clear. Section 2.4 of the APA provides that Transform shall not be "deemed to assume or become obligated hereunder in any way to pay or perform . . . Liabilities of any Sellers . . . other than the Assumed Liabilities."  Transform was only to assume a finite set of liabilities as listed in Section 2.3 and no more.  These liabilities included the singular obligation to assume "Other Payables and all payment obligations with respect to the Ordered Inventory," and did *not* include accounts payable unrelated to inventory Transform was to receive that was incremental to the "on the stock ledger" inventory.  The implication from these provisions, and the expectation of the Parties at signing, was that Debtors would satisfy those obligations and liabilities which Transform did not assume and which would be satisfied in the ordinary operation of the company.  Otherwise, Transform would simply have to cover those liabilities if it wanted to avoid harm to its business operations, thereby rendering the prohibition in Section 2.4 meaningless.  Therefore, Debtors breached this implied covenant of good faith and fair dealing in refusing to satisfy payables that Transform did not assume.  Transform was in turn damaged by this breach in having to satisfy these payables in the amount of $150,128,548 to maintain vendor relations and avoid harm to the business.  It is therefore owed damages in the same amount.

### g) Transform's Obligations (If Any) Are Reduced by Available Cash

67.     Section 2.3(k)(vi) of the APA provides that, "[i]n the event that the Aggregate DIP Shortfall Amount is a positive number, Buyer's obligations to assume the Liabilities described in this clause (k) shall be reduced dollar for dollar by the Aggregate DIP Shortfall Amount in the following order, until the aggregate amount of all such reductions is equal to the Aggregate DIP

Shortfall Amount: *first*, the Severance Reimbursement Obligations, *second*, the Other Payables and *third*, the Assumed 503(b)(9) Claims." The Aggregate DIP Shortfall Amount means "as of the Closing Date, an amount equal to $1,200,000,000 *less* the aggregate amounts required to be paid (net of any available cash) to fully satisfy the existing indebtedness of Seller under both (i) the DIP Credit Agreement and (ii) the Junior DIP Term Loan Agreement." Id. § 1.1.

68.     After Transform submitted its December 28 Bid, Debtors represented to Transform that it would need to assume additional liabilities as the estates would not have sufficient available cash to pay these liabilities following repayment of the DIP loan balances at closing. In order to ensure that Transform was not assuming additional liabilities beyond those necessary to meet the estates' requirements, Transform bargained for the inclusion of the Aggregate DIP Shortfall Amount and reduction mechanism under Section 2.3(k)(vi). This ensured that if, contrary to the Debtors' expectations, the Debtors had excess cash to pay down the existing DIP loan balances prior to the Closing, or otherwise had excess cash on hand, the liabilities that Transform would assume would be reduced by those amounts.

69.     At Closing, Debtors had available cash of approximately $8.5 million. This amount consists of $22.5 million in cash-in-transit as of Closing, minus $14.0 million in checks outstanding as of the Closing date. See Hede Decl. ¶ 9.

70.     The cash-in-transit comprises cash and checks that had been collected at Debtors' retail locations prior to Closing but that were in transit between Debtors' retail locations and its main operating bank accounts as of the Closing (e.g., in armored vehicles bringing the cash and checks to the local banks used by the retail locations).

71.     Cash-in-transit is "available cash" as of Closing, as this cash was within the control of Sears. Guidance by the American Institute of Certified Public Accountants makes clear that

such cash-in-transit should be treated as available cash (and that the amount in respect of outstanding checks should reduce the amount of available cash):[9]

> Inquiry — Should the amount of checks that have been issued and are out of the control of the payor but which have not cleared the bank by the balance sheet date be reported as a reduction of cash?

> Reply — Yes. A check is out of the payor's control after it has been mailed or delivered to the payee. The balance sheet caption "cash" should represent an amount that is within the control of the reporting enterprise, namely, the amount of cash in banks plus the amount of cash and checks on hand and deposits in transit minus the amount of outstanding checks. Cash is misrepresented if outstanding checks are classified as liabilities rather than a reduction of cash.

72. Prior to Closing, the estates issued approximately $14 million in checks that did not clear as of the Closing date. Approximately $11.4 million of these checks have cleared since Closing and have been paid by Transform. Another $2.36 million are currently outstanding and will be paid by Transform to the extent they clear. See Hede Decl. ¶ 9.

73. Accordingly, the Debtors had available cash of at least $8.2 million as of Closing, representing the $22.5 million in cash-in-transit, as reduced by the total amount of estate-issued checks which had yet to clear as of the Closing date. At the Closing, the DIP and Junior DIP balances were $1.2 billion, which would have reduced the Aggregate DIP Shortfall Amount to $0.00. However, once the available cash of $8.5 million is netted out from this balance, as required under the definition, the Aggregate DIP Shortfall Amount becomes $8.5 million. Under Section 2.3(k)(vi), if the Aggregate DIP Shortfall Amount is a positive number, as it is here, Transform's obligations to assume the liabilities in Section 2.3(k) are reduced dollar-for-dollar by that positive amount, first, by the Severance Reimbursement Obligations, second, the Other Payables and third, the Assumed 503(b)(9) Claims. Because Transform's obligation to assume the Severance Reimbursement Obligations has been reduced to $0.00 by the Prepaid Inventory Shortfall Amount,

---

[9]    Am. Inst. of Certified Pub. Accountants, Technical Questions and Answers 7 (2018).

as discussed below, Transform's obligation to assume the Other Payables, if any, is reduced by $8.5 million.  Under 28 U.S.C. § 2201, Transform is entitled to a declaratory judgment to that effect.

**B. Transform's Obligation, If Any, to Assume 503(b)(9) Liabilities Is Reduced by Shortfalls in Prepaid Inventory and Specified Receivables[10]**

74.    Under Section 2.3(k), Transform agreed to assume up to $43 million of Debtors' Severance Reimbursement Obligations and $139 million of Debtors' Assumed 503(b)(9) Claims. Transform's agreement to assume those additional liabilities was subject to Debtors' agreement to deliver a contractually-stated amount of Specified Receivables and the right to receive a contractually-stated amount of Prepaid Inventory.  APA §§ 2.1(d), 2.1(x), 2.3(k)(iii), (iv).  The stated amount of Specified Receivables, defined in the contract as the Specified Receivables Shortfall Amount, was $255,200,000.  Id. § 1.1.  The stated amount of Prepaid Inventory, defined in the contract as the Prepaid Inventory Shortfall Amount, was $147 million.  Id.  The APA provides a mechanism for a shortfall in the amount of Prepaid Inventory and Specified Receivables.  If Debtors delivered less than the contractually-specified amounts of Prepaid Inventory and/or Specified Receivables, Transform's assumption obligations with respect to Severance Reimbursement Obligations and Assumed 503(b)(9) Claims were reduced dollar-for-dollar by the amount of the shortfall.  Id. § 2.3(k).

75.    At Closing, however, Debtors shortchanged Transform on both Prepaid Inventory and on Specified Receivables.  Accordingly, Transform's obligations with respect to Assumed 503(b)(9) Claims should be reduced to by the amount of these substantial shortfalls.

---

[10]    There is no dispute between the Parties that Transform's Severance Reimbursement Obligations—*i.e.*, obligations that Transform assumed under the APA, in return for receipt of certain assets, to reimburse **Debtors** for the amounts that they have **already** paid to employees of old Sears who lost their jobs in the bankruptcy—have been reduced to $0 as a result of the Prepaid Inventory Shortfall Amount.

### a) Debtors Shortchanged Transform on Prepaid Inventory

76.      There is no dispute that Debtors shortchanged Transform on Prepaid Inventory and that Transform's obligations with respect to Assumed 503(b)(9) Claims are to be reduced.  The only question is by how much.

77.      In their Motion to Enforce, Debtors claimed that they delivered $84,426,880 in Prepaid Inventory at Closing, resulting in a Prepaid Inventory Shortfall Amount of $62,573,124. Debtors also claim an excess of Warranty Receivables of $6.6 million, which they assert reduces the Prepaid Inventory Shortfall Amount.  On the basis of those assumptions, Debtors concede that Transform's obligation with respect to Assumed 503(b)(9) Claims is reduced to approximately $83 million.  Motion to Enforce ¶ 19.

78.      Debtors' calculation of Prepaid Inventory is based on an accounting estimate used by Debtors prior to Closing to report, for GAAP financial statement purposes, the amount of Prepaid Inventory on order.  This accounting entry is not an actual count of Prepaid Inventory on order at a given time.  Rather, it is a rough approximation based on the amount of Prepaid Inventory ordered during the trailing three weeks prior to the date on which the accounting entry is made. The approximation is based on the assumption that it takes approximately three weeks for Prepaid Inventory to be delivered.  Thus, Debtors' accounting entry, on which they base their calculation of the Prepaid Inventory Shortfall Amount, is based on the simple assumption that any Prepaid Inventory ordered outside the three week period prior to Closing was delivered prior to Closing and did not constitute Prepaid Inventory, while any Prepaid Inventory ordered within the three week period prior to Closing remained pending and therefore constituted Prepaid Inventory at Closing.  Hede Decl. ¶ 12.

79.    Debtors' reliance on this accounting entry is based on a mistaken premise—that the APA permits the Prepaid Inventory Shortfall Amount to be conclusively determined based on an estimate used solely for financial reporting purposes, prepared solely by Debtors, prior to the Closing, and not on an actual count of inventory.  There is no basis in the APA or governing law for this premise.

80.    Prepaid Inventory is defined under the APA as "all Inventory that has been paid for by Sellers prior to the Closing Date but as to which Sellers have not taken title or delivery as of the Closing Date."  APA § 1.1.  Under Section 2.1(x) of the APA, Transform acquired "the right to receive" Prepaid Inventory.  Those provisions require an actual calculation of the inventory that was paid for by Sellers prior to Closing but as to which Sellers had not taken title or delivery as of the Closing Date.  Debtors have provided no such calculation, but rather rely on the accounting estimate described above.  If inventory was paid for prior to the Closing Date but also received prior to the Closing Date, it would not count against Prepaid Inventory under the definition found in the APA.  Likewise, if inventory was received after the Closing Date but also was paid for after the Closing Date, it would not count against Prepaid Inventory as defined in the APA.  It is only inventory that was paid for before the Closing Date and received after the Closing Date that would count towards the stated amount of $147 million in Prepaid Inventory.

81.    That is precisely the count Transform made following Closing.  As reflected in the attached declaration of Andrew Hede, in an abundance of caution, Transform compiled all payments made for Prepaid Inventory in the six weeks prior to Closing (referred to as "wires").  Hede Decl. ¶ 10.  That calculation was conservative; it was not limited to the three week period provided by Debtors.  Those wires were for so-called cash-in-advance ("CIA") inventory—i.e., inventory for which Debtors had to pay prior to delivery by the vendor.  Some of the inventory

paid for in advance by those wires transmitted prior to Closing was received prior to Closing, and therefore did not count against the $147 million Prepaid Inventory amount. Other wires were for inventory paid for in advance but received after the Closing, thus counting against the Prepaid Inventory amount. Accordingly, Transform determined the actual physical inventory received associated with the wires transmitted in the six weeks prior to Closing, and then assessed the portions of that inventory received either prior to or after Closing. The portion that was ordered prior to Closing but received after Closing constitutes Prepaid Inventory under the APA.

82.    Based on Transform's analysis, the amount of Prepaid Inventory on order as of Closing was only approximately $75 million, see Hede Decl. ¶ 11, resulting in a Prepaid Inventory Shortfall Amount of $72 million, reducing dollar-for-dollar the Severance Reimbursement Obligations and the Assumed 503(b)(9) Claims.

83.    Debtors assume that the number reflected on Debtors' books as an approximation of Prepaid Inventory, for GAAP reporting purposes, in the period immediately before Closing should be used to conclusively establish the amount of Prepaid Inventory they delivered to Transform for APA purposes.[11] But that cannot be. Transform purchased Prepaid Inventory— inventory it would be able to sell and to use as collateral in its borrowing base. It did not purchase an estimate of inventory. That estimate may be sufficient to satisfy the standards of GAAP which do not require a precise count. See, e.g., Fait v. Regions Fin. Corp., 655 F.3d 105, 113 (2d Cir. 2011) (finding that GAAP requirements regarding adequate reserves are based on estimates rather than actual figures); Thor Power Tool Co. v. Comm'r of Internal Revenue, 439 U.S. 522, 544

---

[11]    During their deposition of Transform's CFO, Robert Riecker, who also served as CFO for Debtors, Debtors elicited testimony that confirmed that their calculation of the amount of Prepaid Inventory at Closing was based on the methodology on which Debtors relied for financial reporting purposes. Rather, Transform disputes that Debtors can rely on that accounting entry, which is an estimate for the company's overall financial reporting, to satisfy their obligation under the APA to deliver an actual physical amount of Prepaid Inventory.

(1979) ("'Generally accepted accounting principles' . . . tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management.").

84.    However, there is nothing in the APA that permits Debtors to short Transform on Prepaid Inventory based on a GAAP estimate. Transform bargained to physically receive, and the APA required Debtors to physically deliver, actual Prepaid Inventory at Closing. That the estimate falls within the range of reasonable treatments thus is not enough to satisfy the APA if that estimate is not precise.

85.    That conclusion is apparent from Section 2.3(k)(ix) and the definition of Prepaid Inventory Shortfall Amount itself. The definition of Prepaid Inventory Shortfall Amount is "an amount equal to $147,000,000 less the amount of the Prepaid Inventory as of the Closing Date," and "Prepaid Inventory" is defined as "all Inventory that has been paid for by Sellers prior to the Closing Date but as to which Sellers have not taken title or delivery as of the Closing Date." APA § 1.1. Thus, the definition presupposes a physical count of the inventory that was ordered prior to the Closing Date but as to which Debtors had not taken title. No other interpretation is possible.

86.    In their Motion to Enforce, Debtors do not point to any language in the APA that would permit the use of their accounting estimate to calculate the Prepaid Inventory Shortfall Amount. Rather, their main response is to argue that adhering to the plain terms of the contract would somehow breach the implied covenant of good faith and fair dealing. That response is telling, in and of itself. Debtors implicitly admit that the methodology they use is not contemplated by any of the "express provisions of a specific agreement." Nama Holdings, 2014 WL 6436647, at *16 (quoting Allen v. El Paso Pipeline GP Co., LLC, 2014 WL 2819005, at *10 (Del. Ch. June 20, 2014)); see Osram Sylvania Inc. v. Townsend Ventures, LLC, C.A. No. 8123-VCP, 2013 WL 6199554, at *17-18 (Del. Ch. Nov. 19, 2013) (holding that the covenant of good faith and fair

dealing should be used only to infer "contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated") (quoting Gerber v. Enterprise Products Holdings, LLC, 67 A.3d 400, 421 (Del. 2013)).

87.    Here, the APA required Debtors to deliver a particular "amount" of Prepaid Inventory or else Transform's obligations with respect to liabilities would be reduced.  APA § 1.1. That inventory was to be used to offset the liabilities, meaning the value of actual Prepaid Inventory delivered at Closing was important.  Debtors were not permitted simply to deliver an estimate of what may or may not be physically delivered, as the amount of any over-estimation (which happened here) could not be used to satisfy a liability.  Accordingly, the Court should reject Debtors' estimate.

88.    Debtors' estimation argument fails for another reason.  While Debtors argue that the estimation procedure was ordinary course, the APA specifically provides under Section 13.3 that "[n]o course of dealing between or among the Parties shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights to payment of any Party under or by reason of this Agreement."  Even if did not, blackletter Delaware law provides the same where, as here, the contract at issue is unambiguous.  Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1233 & n.11 (Del. 1997) ("Relevant extrinsic evidence is that which reveals the parties' intent at the time they entered the contract. . . .  [B]ackward-looking evidence gathered after the time of contracting is not usually helpful.") (citation omitted); see also Dittrick v. Chalfant, 948 A.2d 400, 406 (Del. Ch. 2007); AgroFresh, Inc. v. MirTech Inc., 257 F. Supp. 3d 643, 660 (D. Del. 2017) ("Delaware courts are reluctant to hold that parties have modified their agreements verbally or through a course of conduct where there is an express contract clause requiring

amendments to be in writing" and "the existence of an express non-waiver provision precludes a contracting party from arguing that the other party's conduct waived a contractual right").

89.     Thus, any argument by Debtors that Transform (or its principals) knew of the methodology Debtors used for financial reporting is irrelevant as a matter of law to the Parties' obligations under the APA.   And in any event, Debtors have not adduced any evidence that Transform or its principals had actual knowledge of Debtors' technical accounting practices as to Prepaid Inventory.

90.     Notably, Debtors do not argue—and cannot argue—that Debtors' use of the accounting estimation method was discussed or raised during the negotiations of the APA.  Debtors never indicated that they intended to satisfy the requirement under the APA to deliver a specific value of Prepaid Inventory by applying the accounting  methodology used for purposes of the company's balance sheet calculated after the close of month end.   Debtors now argue that Transform "unilaterally decided to calculate the Prepaid Inventory . . . using a new accounting methodology . . . ," Motion to Enforce ¶ 22, but the requirement under the APA has nothing to with an accounting methodology.   The APA requires delivery of a defined amount of Prepaid Inventory, and Transform has counted the actual amount of Prepaid Inventory on order at Closing and subsequently delivered to Transform after Closing.   There is no reason to infer that Transform "would have agreed to [Debtors' methodology] had [the Parties] negotiated the issue." Fitzgerald v. Cantor, No. C.A. 16297-NC, 1998 WL 842316, at *1 n.9 (Del. Ch. Nov. 10, 1998).   Rather, Transform's understanding, consistent with the plain meaning of the APA and common sense, was that the amount of Prepaid Inventory would be determined by *counting the amount of Prepaid Inventory*.  Kamlani Decl. ¶¶ 38-40.

91.     Debtors' citation to *TWA* thus proves inapposite.  There, the court determined that the contract had a "gap" as to the methodology that should be employed to determine certain contingent consideration.  TWA Res. V. Complete Prod. Servs., Inc., C.A. No. N11C-08-100 MMJ, 2013 WL 1304457, at \*10 (Del. Super. Ct. Mar. 28, 2013).  Here, the APA is not silent.  It required the Parties to determine the "amount" of Prepaid Inventory.

### b)  Debtors Shortchanged Transform on Specified Receivables

92.     Pursuant to Section 2.1(d) of the APA, the Debtors were obligated at Closing to deliver to Transform "all Acquired Receivables," which is defined to include the "Specified Receivables."  Specified Receivables, in turn, are defined in the APA as "the accounts receivable set forth on Schedule 1.1(k)."  Id.  Schedule 1.1(k) in turn refers to Annex 11, which contains a list of over 30 accounts or categories with amounts ascribed to each of them.  The sum total of all categories totals $255.2 million.

93.     Accordingly, the APA required Debtors to deliver thirty separate categories of accounts receivable and required Debtors to deliver the amount of each account receivable set forth in Annex 11.

94.     Based on Transform's post-Closing analysis, it is now clear that Debtors did not deliver the $255.2 million of Specified Receivables on Annex 11 and that there is a Specified Receivables Shortfall Amount.

95.     First, as detailed in the declaration of Nader Tavakoli, a number of the entries that make up the $292 million delivered by Debtors are not receivables at all.  These false receivables include, among other things, accounting entries for CIA inventory and prepaid services that had already been received by the Estate prior to Closing (*e.g.*, a receivable for services already rendered by Debtors' counsel, Weil), cash that had already been received by the estates prior to Closing,

and intercompany receivables between different Sears entities that did not represent true receivables from an external third party. They plainly did not qualify as Specified Receivables as of Closing. <u>See generally</u> *Declaration of Nader Tavakoli in Support of Transform Holdco LLC's Brief in Support of the Adversary Complaint and in Opposition to Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* ("<u>Tavakoli Decl.</u>").

96.    Under the APA, Debtors were required to deliver "accounts receivable." Although the parties recognized that Transform would need to make efforts to collect on any of the receivables and that not all of them would be completely collectible, they also agreed that the Debtors would deliver receivables representing amounts actually owed to the company. <u>See Accounts receivable</u>, Modern Dictionary for the Legal Profession (3d ed. 2001) ("Money due from debtors within a relatively short period of time. Accounts receivable are considered as the creditor's current assets."); <u>Accounts receivable</u>, The New Oxford American Dictionary (2001) ("Money owed to a company by its debtors."); <u>Accounts receivable</u>, David L. Scott, Wall Street Words: an A to Z Guide to Investment Terms for Today's Investor (2003) ("Money owed to a business by customers who have bought goods or services on credit. Accounts receivable are current assets that continually turn into cash as customers pay their bills."). Thus, to the extent that a record reflected an item that neither Debtors nor the counterparty believed was owed Debtors at the time of Closing, that item would not qualify as an accounts receivable.

97.    Over fifty percent of the purported Specified Receivables delivered at Closing are contained in two accounts: General Ledger ("G/L") Account Number 11482, which reflected purported receivables from Kmart vendors, and G/L Account Number 11488, which reflected purported receivables from Sears vendors (together, the "CIA AR Accounts"). The Debtors purport to have delivered $83.6 million in respect of Account Number 11482 at Closing and $75.7

million in respect of Account Number 11488 at Closing.  Transform has determined that of the $159.3 million of the purported receivables delivered to Transform at Closing in respect of these accounts, $57.4 million were invalid receivables largely made of purported receivables for CIA inventory that the Debtors had already received prior to Closing.  Tavakoli Decl. ¶¶ 6-15.  A receivable cannot be in respect of items that *have already been* received.  Furthermore, the already-received inventory, to the extent it was not retained by Debtors, was separately purchased by Transform as Acquired Inventory, which includes Inventory that was in the Debtors' possession as of Closing.  An asset cannot count as both Acquired Inventory and a Specified Receivable.  Not only would that be inconsistent with the definition of a receivable, but it would also undermine the structure of the APA and the consideration Debtors promised to deliver to Transform in exchange for entering into the APA.

98.      In addition to substantial entries for already-received CIA inventory, Transform has identified an additional $28.6 million in false receivables as part of the $292 million in purported Specified Receivables delivered by Debtors.  These include, among other entries, a purported $3.8 million receivable *from* Debtors' counsel, Weil (of which $2.8 million is for services that were *already rendered* as of the Closing); two inter-company balances for over $18.8 million that do not reflect any amounts due by a third party; and over $12.3 million in entries for cash amounts that were received into Debtors' accounts prior to Closing.  Tavakoli Decl. ¶¶ 5, 16-17.

99.      Thus, based on Transform's analysis to date, over $86 of the purported Specified Receivables are entries that are not accounts receivable at all.  Tavakoli Decl. ¶¶ 18.  Accordingly, these entries are not Specified Receivables as that term is defined under the APA.  Excluding them from the purported amount of Specified Receivables that Debtors delivered at Closing ($292 million) nets a Specified Receivables Shortfall Amount of $49.2 million.  Under the APA, this

reduces dollar-for-dollar Transform's Severance Reimbursement Obligations and Assumed 503(b)(9) Claims.

100.    Finally, Debtors impermissibly "mixed and matched" receivables, over-delivering in one category and under-delivering in another.  Annex 11 listed the Specified Receivables Debtors were to deliver and Section 2.3(k) provides for a dollar-for-dollar reduction of liabilities if Debtors fall short in any one of these identified categories.  If the Parties had intended Debtors' obligation to be satisfied by delivery of a gross amount of receivables without regard to their nature of identity, there would have been no need to refer in the APA to Annex 11 at all.  The APA could have simply defined a Specified Receivables Shortfall as an amount less than $255 million.  Indeed that is how the APA defined the Prepaid Inventory Shortfall.

101.    Prior to signing, Debtors shared with Transform a list of the accounts receivable with varying likelihoods of collectability ascribed to each category.  Kamlani Decl. ¶¶ 41-42.  There would have been no reason to share such a document or to have put percentages of recovery next to them had Debtors been obliged simply to deliver $255 million of specified receivables no matter their quality.

102.    For example, Annex 11 contemplated that Debtors would deliver $30.0 million of a category of receivables entitled "All Other Receivables."  Transform understood that likelihood of collecting on these receivables was low, since Debtors estimated them to have a 0% recovery rate.  However, instead of transferring $30 million of these receivables, the Debtors purported to deliver more than twice the agreed amount—$67.0 million of "All Other Receivables."  In addition, Annex 11 provided that Debtors would deliver $52.6 million in respect of Account Number 11482 and $59.9 million in respect of Account Number 11488, and that each account had estimated recovery values of fifty percent.  However, Debtors purported to deliver substantially

more than these amounts: $83.6 million and $75.7 million in respect of Account Numbers 11482 and 11488, respectively. Tavakoli Decl. ¶ 6.

103.    In total, at Closing, certain categories of purported Specified Receivables were over-delivered by approximately $97 million relative to the maximum amounts that were permitted by Annex 11 to the APA. This reduced the amount of purported Specified Receivables delivered at Closing from approximately $292 million to approximately $195 million, netting a shortfall of approximately $60 million. Compare Tavakoli Decl., Ex. B (schedule of purported Specified Receivables delivered at Closing) with id., Ex A (Annex 11 to the APA). Thus, the Specified Receivables Shortfall Amount caused by over-delivery alone is approximately $60 million.

104.    In sum, not only did Debtors provide false receivables, for the receivables actually delivered, Debtors failed to deliver the agreed portfolio of Specified Receivables: Debtors over-delivered certain lower quality receivables rather than delivering the higher-quality and more valuable receivables that they were contractually obligated to deliver as part of the Specified Receivables portfolio.

### c) Debtors' Responses Are Unavailing

105.    In the Motion to Enforce, Debtors argue that Transform "has deep familiarity, dating to the pre-petition period, with the receivables constituting the Specified Receivables." Motion to Enforce at 12. But the question is not whether Transform had familiarity with the concept of receivables or how they were recorded on Debtors' books. The question is whether Debtors delivered what they were required to deliver.

106.    Debtors also argue that Transform simply "did not realize just *how* difficult and costly [the purported Specified Receivables] would be to collect." Id. ¶ 24. That is incorrect. Transform fully recognizes that it bore the risk that certain of the Specified Receivables would be

difficult, if not ultimately impossible, to collect. The risk that Transform did not bear, by the express terms of the APA, was that a sizable portion of the purported receivables that Debtors selected, listed, and ultimately chose to deliver would ***not be receivables at all***. The APA obligated Debtors to deliver $255.2 million in "accounts receivable"; to the extent they failed to do so, there is a shortfall amount.

107. As with the Prepaid Inventory amount, Debtors argue that the appropriate methodology to determine whether the purported Specified Receivables that Debtors delivered are in fact receivables is whether those items were reflected as receivables on Sears' balance sheet. Debtors have presented no evidence that the amounts they have allegedly delivered as Specified Receivables were receivables on Sears' balance sheet at a time when Transform's principals could have had knowledge of those receivables (*i.e.*, pre-petition). And even if they did, there is no basis to impute knowledge of those receivables and their complex accounting treatment and methodologies to Transform or its principals, or to have that render a waiver of the APA's requirement that Debtors deliver receivables, and not something else entirely. See In re Sanofi Sec. Litig., 155 F.Supp.3d 386, 407 (S.D.N.Y. 2016) (holding that scienter cannot be inferred solely due to an "executive managerial position" or even "access to the company's internal documentation"). As noted regarding Prepaid Inventory, Section 13.3 of the APA—which provides that the Parties' course of dealing cannot be used to modify the terms of the APA— specifically precludes Debtors' argument.

## C. A Reconciliation of Assets Respectively Owed by Debtors and Transform to Each Other Demonstrates That Debtors Owe Assets to Transform

108. The Debtors misleadingly claim that Transform owes them $35 million in estate assets, pointing to three categories of assets that they claim are owed to them by Transform.

Transform does not dispute that cash-in-transit, February rent proration, and GOB Store credit card proceeds are amounts owed to Debtors. Debtors omit, however, the other assets that they owe to Transform that, as they have admitted, are subject to recoupment. See infra ¶ 119. When these other assets are factored in, Debtors owe Transform approximately $47 thousand.

109.    The Court already has heard many of the material facts relating to this dispute. At the time of Closing, and in order to permit the transaction to close, the parties agreed that the cash management system would be transferred from Debtors to Transform. Such agreement was necessary for the transaction to close on the timetable desired by Debtors and necessary for Debtors to be able to satisfy the DIP requirements. Were the parties to follow a more cumbersome process the transaction would never have closed. *Declaration of Mohsin Y. Meghji in Support of Debtors' (I) Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco LLC and (B) Compel Turnover of Estate Property, and (II) Response to Transform Holdco LLC's Motion to Assign Matter to Mediation, E&Y Memo* (Mar. 11, 2019) [Docket No. 2797] ("First Meghji Declaration"), ¶¶ 6-7; *Declaration of Andrew D. Hede in Support of Transform Holdco LLC's Response to Debtors' Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco LLC and (B) Compel Turnover of Estate Property and Reply in Further Support of Its Motions to Assign Matter to Mediation* [ECF No. 2868] ("First Hede Decl.") ¶ 7.

110.    The transfer of the cash management system required accommodation on both sides. From Debtors' perspective, with the transfer of the cash management system, Transform would come into possession of cash that was in transit at the time of Closing that belonged to Debtors. At the same time Transform would inadvertently inherit checks written on the estates' account that were the obligation of the Debtors but would be satisfied out of the cash that

Transform held after Closing in the transferred cash management system.  First Meghji Decl. ¶ 9;
First Hede Decl. ¶ 8.

111.    Accordingly, recognizing the challenges of allocating assets in the cash
management system to the appropriate entity post-closing, Transform proposed and Debtors
approved a reconciliation process to be carried out by Ernst and Young.  See First Meghji
Declaration, Ex. A ("E&Y Memo"); *Debtors' (I) Motion (A) Enforce Asset Purchase Agreement
and Automatic Stay Against Transform Holdco LLC and (B) Compel Turnover of Estate Property,
and (II) Response to Transform Holdco LLC's Motion to Assign Matter to Mediation* (Mar. 11,
2019) [Docket No. 2796] ¶ 15.  A part of that process was laid out in the First Meghji Decl. ¶ 9
(citing the Exhibit A, the "E&Y Memo" from February 11, 2019).  It was also described in the
First Hede Declaration.  ¶¶ 9-15.

112.    A further part of that process was encapsulated in the agreement that the Parties
reached in advance of the March 21, 2019 hearing on Debtors' First Motion to Enforce, whereby
Transform agreed to pay Debtors $8 million dollars on or before March 26, 2019, to produce
"documents and information reflecting and substantiating Transform's reconciliation," and to pay
any "undisputed" amounts owed above $8 million by April 3, 2019.  See *Declaration of
Christopher A. Good in Support of the Debtors' Supplemental Motion to Enforce the Asset
Purchase Agreement* [Docket No. 4031], Ex. D ("Interim Agreement between Debtors and
Transform Holdco").

113.    Pursuant to that agreement, Transform paid, and Debtors acknowledge receipt of,
the $8 million.  See Motion to Enforce ¶ 32.  Also pursuant to that agreement, on April 4, 2019,
Transform produced updated information to Debtors.  That information showed that, based on
Transform's reconciliation to date, Transform did not owe Debtors any amount in respect of the

cash-in-transit and that the proration reconciliation was ongoing.  In addition, since that time, EY has carried out a reconciliation of numerous other items identified through the process, including reconciliation of approximately 1,600 estate checks, worth roughly $6.8 million, $5.9 million of which Transform has credited to Debtors in its reconciliation.

114.    Debtors assert that Transform owes them $35 million, comprised of: (i) $19.5 million cash-in-transit, (ii) $11.2 million February rent proration, and (iii) $4.4 million of GOB Store credit card proceeds.[12]  Debtors, however, ignore (i) estate checks that were written prior to Closing, but had not yet cleared as of Closing, in an amount of roughly $13.8 million, (ii) corporate card charges for pre-Closing transactions that Transform has paid post-Closing in an amount of roughly $3.2 million, (iii) taxes paid by Transform in respect of pre-Closing charges in an amount of roughly $2.8 million, (iv) telecom expenses of roughly $1.9 million paid by or to be paid by Transform in respect of pre-Closing charges, (v) refunds issued to customers for pre-Closing orders that were cancelled post-Closing in an amount of roughly $9.6 million, (vi) March rent payments related to GOB Stores paid by Transform in an amount of roughly $1.6 million, (vii) Citi L/C Facility letter of credit draws in an amount of roughly $1.6 million, (viii) net TSA fees owed from Debtors to Transform in an amount of roughly $1.0 million, and (ix) $1.1 million for a KERP payment.  See Hede Decl. ¶ 9.

115.    When viewed in full, after a complete reconciliation of amounts owed to and by Debtors, to and by Transform, Debtors owe Transform $47,349.[13]

---

[12]    Transform's reconciliation credits Debtors with $22.5 million cash-in-transit, (ii) $11.2 million February rent proration, (iii) $4.4 million of GOB Store credit card proceeds, (iv) $5.9 million estate checks deposited into the Transform account and (v) $656 thousand subtenant proceeds.  Hede Decl. ¶ 9.
[13]    Separately, there are 277 checks of the roughly 1,600 that Ernst and Young analyzed that Ernst and Young was not able to reconcile.  Transform has been unable to identify information to support that these are estate property or Transform property.  These checks, worth approximately $858 thousand, are therefore not included in the complete reconciliation.  See Hede Decl. ¶ 8.

116.    Debtors cast aspersions about Transform's timely provision of information.  The accusation is false and unfair and Debtors know that.  Not only did Transform provide "documents and information to the Debtors reflecting and substantiating Transform's completed reconciliation of Cash in Transit at Closing owed to the Debtors," Interim Agreement between Debtors and Transform Holdco, but Transform also undertook an extremely time-consuming and laborious analysis of this information.  Resolving even a single piece of the reconciliation required the review of thousands of lines of data and accompanying meetings with various business unit controllers in order to gain context for the data.  The difficulty of the process has been compounded by Debtors' legacy, non-integrated data storage systems and the expedited nature of the Closing that prevented Debtors and Transform from proactively setting up ordinary processes for the transfer of such a business—limitations that M-III would be well aware of as Debtors' financial advisor for the past several years.  Hede Decl. ¶ 7.

117.    Transform also has proactively provided Debtors with routine updates on the reconciliation process from the outset.  Debtors point to a  May 1 list of requests to  suggest that Transform was not willing to provide Debtors with the necessary information.  Debtors omit to note, however that they sent the May 1 request only *after* Transform's reconciliation analysis showed a net amount owed by Debtors to Transform, and after weeks had passed where Transform had been continuously sending information to Debtors without receiving any response from Debtors.

118.    Transform and its advisors bent over backwards to satisfy Debtors' untimely requests.  To that end, Transform provided information to Debtors—and received subsequent requests—as follows:

- On March 26, 2019, Transform provided Debtors with a working draft of post-Closing reconciliations to date.  See Weaver Decl., Ex. F.

- On April 4, 2019, Transform provided Debtors with an updated working draft of post-Closing reconciliations to date, including information that had been provided to M-III earlier in the week.  See id., Ex. G.

- On April 19, 2019, Transform provided Debtors with a further updated working draft of post-Closing reconciliations to date.  See id., Ex. H.

- On April 26, 2019, Transform provided Debtors with the results of its reconciliation and a Final Prorations Schedule.  See id., Ex. I.

- On May 1, 2019, after Transform's reconciliation analysis showed a net amount owed by Debtors to Transform, and after Transform sent four, unanswered communications of information, Debtors provided Transform with a list of information Debtors were seeking (the "May 1 Request"); on May 3, 2019, Transform provided Debtors with an initial response to Debtors' May 1 Request, as well as information supplementing the materials previously sent.  See id., Exs. J, K.

- On May 9, 2019, Debtors requested additional information from Transform.  See id., Ex. L.

- On May 13, 2019, Transform provided Debtors with additional information responsive to the May 1 Request and to the additional requests made on May 9.  See id., Ex. M.

- On May 15, 2019, Debtors asserted that the information Transform provided did not comply with their specific request, without providing any explanation of what information was required.  See id., Ex. N.

- On May 20, 2019, Transform provided Debtors with a clear accounting of the information that had been provided thus far and the items for which the collection of information remained ongoing.  See id., Exs. O, P.

- On May 21, 2019, Debtors confirmed receipt of certain requested information, requested additional information, and asked for anticipated timelines for receiving outstanding information. See id., Ex. Q.

- On May 24, 2019, Debtors filed their motion seeking $35 million.

- On June 14, 2019, Transform's reconciliation having revealed that, far from the $35 million being claimed by the Debtors, the amount in dispute was approximately $47 thousand (owed by Debtors to Transform), Transform reached out to Debtors with a proposal to settle the dispute.  See id., Exs. R.

- On June 20, 2019, Debtors once again requested additional information from Transform, including a new request that Transform carry out an analysis of paper checks deposited by Transform, seemingly in perpetuity.  Despite the impractical nature of certain of its demands, the letter, which points to only three narrow issues remaining in the reconciliation process, speaks to the considerable progress made to date. See id., Ex. S.

- On June 26, 2019, Transform responded to Debtors, answering each of Debtors', presumably final, requests.  See id., Ex. T.

119.    Finally, there is also no merit to Debtors' argument that Transform violated the automatic stay with respect to the assets that it claims.  As Transform previously explained, and as the Court agreed, as a matter of recoupment, Transform is permitted to net the Debtors' obligations in respect of uncleared checks and debits from its eventual obligations to deliver any cash-in-transit above those amounts to the Debtors.  Hr'g Tr. 39:16-18, Apr. 18, 2019 (noting that "adjusting accounts through a reconciliation process, which is recoupment, . . . is not subject to the automatic stay").  Recoupment is appropriate where, as here, "both debts . . . arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations."  See Westinghouse Credit Corp. v. D'Urso, 278 F.3d 138, 147 (2d Cir. 2002) (internal quotation marks and citations omitted).  Courts have consistently held that recoupment is not a violation of the automatic stay.  Malinowski v. N.Y. State Dep't of Labor (In re Malinowski), 156 F.3d 131, 133 (2d Cir. 1998), 156 F.3d 131, 133 (2d Cir. 1998) ("The automatic stay is inapplicable, because funds subject to recoupment are not the debtor's property."); Delta Air Lines, Inc. v. Bibb (In re Delta Air Lines), 359 B.R. 454, 467 (Bankr. S.D.N.Y. 2006).

120.    The reconciliation necessitated by the transfer of the cash management system is a single integrated transaction through which the Parties must account to one another to ensure that funds flowing into and out of the cash management system are properly allocated.  Permitting the Debtors to reap the benefits of the reconciliation process without accounting to Transform would create the very inequitable result that recoupment is intended to prevent.  In addition, the Debtors' repeated assertions that they need additional information, beyond that already provided by

Transform, to assess the results of Transform's reconciliation, demonstrates that there are factual disputes that preclude their claim of a violation of the automatic stay. See, e.g., United States v. Inslaw, Inc., 932 F.2d 1467, 1472 (D.C. Cir. 1991), cert denied, 112 S. Ct. 913 (1992); accord Ball v. Soundview Composite Ltd. (In re Soundview Elite Ltd.), Nos. 13-13098, 14-CV-3179 SAS, 2014 WL 2998529, at *3 & n.36 (S.D.N.Y. July 3, 2014); Hirsch v. London Steamship Owners' Mut. Life Ins. Ass'n Ltd. (In re Seatrain Lines, Inc.), 198 B.R. 45, 50 & n.7 (S.D.N.Y. 1996) (both adopting the reasoning in Inslaw).

### D. Transform Acquired All of Debtors' Real Property at Hoffman Estates, Illinois

#### a) The APA Provides that Transform Purchased All 16 Lots at Hoffman Estates

121.    Under Section 2.1 of the APA, Debtors agreed, as of the Closing Date, to "sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered" to Transform, substantially all of the Debtors' assets including "(c) all Owned Real Property," defined to include "Operating Owned Property." Operating Owned Property was defined in Section 1.1 of the APA as "the real property described in Schedule 1.1(p), including, in each case, all of the right, title and interest of Seller and its Subsidiaries to all Improvements located thereon and all easements and other rights and interests appurtenant thereto and any associated rights to parking."

122.    One of the real properties listed in Schedule 1.1(p), denoted as "Hoffman Estates, Store 490," was comprised of all of the property owned by Sears in the Village of Hoffman Estates, the location of Sears' headquarters. That real property includes both the specific parcel on which Sears' office building was located and the remainder of the land in Hoffman Estates owned by Debtors. The real estate department at Sears considered all of the lots at Hoffman Estates to be a single property. The lot on which Sears' office building is located and the remaining lots in

Hoffman Estates (which are vacant) were purchased together in 1989 in a single transaction when Sears moved its headquarters from the Sears Tower. *Declaration of Jane S. Borden in Support of Transform Holdco LLC's Brief in Support of the Adversary Complaint and in Opposition to Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* ("Borden Decl.") ¶ 11.

123.    All of the lots were listed together when Sears listed its assets upon filing for bankruptcy. Debtors' Schedule of Assets and Liabilities listed property labelled "490" twice: once as "490 Land" and the second as "490 Office Building"[14] and contains no reference to any additional property at Hoffman Estates that the Debtors had an interest in other than property assigned different store numbers, specifically the Day Care Center, the Distribution Center, and the Auto Center. After Transform's December 28 bid was deemed not to be qualifying, the Debtors prepared a list of "Remaining Value at SHC Estate in an ESL Transaction." Kamlani Decl., Ex. L. That document listed 99 properties that were not part of Transform's December 28 bid and thus could be added to a new bid. It did not list any parcels at Hoffman Estates, nor did it indicate that there were any parcels at Hoffman Estates not already included in Transform's December 28 bid, reflecting that the parties all understood the reference to Hoffman Estates Store 490 to encompass all of Sears' owned real property located at Hoffman Estates. Indeed, the first time when anyone from Debtors stated the view that some of the lots were not sold was not until several weeks after Closing and after Transform complained about Debtors' performance under the APA.

124.    Nonetheless, at Closing, the Debtors delivered deeds to only three of the 16 parcels of land that comprise the property owned by Transform at Hoffman Estates that they agreed to sell to Transform, and have refused to deliver the remainder of the deeds. That is a breach entitling Transform to specific performance.

---

[14]    *Schedules of Assets and Liabilities for Sears Holdings Management Corporation* [Docket No. 1637] at 39.

125.    Debtors make several arguments to fight against this conclusion.  First, they suggest that the reference to Store 490 after Hoffman Estates justified their delivery of only 3 of the 16 parcels.  That argument is factually wrong and proves too much.  All of the lots at Hoffman Estates owned by Sears were understood to be Store 490 other than those designated with a different store number.  The 13 lots that Debtors failed to deliver were not designated with any other store number besides Store 490.

126.    In any event, the reference to a store number—which follows all of the owned real property listed in Schedule 1.1(p)—reflects a numbering convention at Sears and was not intended to demarcate the limits of Sears' property ownership.  Sears' primary business was retail and its stores were its primary real estate assets.  To keep track of its business activity, Sears designated each of its stores with a store number.  For example, the Sears at the Parks Mall in Arlington, Texas was numbered 1437.  Borden Decl. ¶ 6.  The Sears at the Riverchase Galleria Mall in Hoover, Alabama was numbered 1136.  Id. ¶ 8.

127.    For accounting and identification purposes, Sears also assigned store numbers to its other properties besides retail stores, including distribution centers, offices, market distribution operations, parts repair service centers, warehouses, retail replenishment centers, and call centers. Id. ¶ 7.  A single store number frequently describes multiple lots.  Id. ¶ 8.

128.    Hoffman Estates is the location of Sears' headquarters:  there is no "store" there. Historically, store number 490 was used for what was then known as the Sears Tower in downtown Chicago.  Id. ¶ 10.  When Sears moved its headquarters to Hoffman Estates, it purchased in a single transaction a property comprised of a number of lots.  This property included the land on which it eventually built its headquarters, and Sears assigned store number 490 to all of that property.  Id. ¶ 11.  As certain portions of the property at Hoffman Estates were converted to specific uses—as

a Day Care Center, Distribution Center, and Auto Center—they were assigned new store numbers, but the remaining property remained part of store number 490.

129.    Consistent with this numbering convention, all sixteen lots were listed together when Sears listed its assets upon filing for bankruptcy.  The figure "490" corresponds with the entries on Debtors' sworn Statements of Assets and Liabilities where they described, under penalty of perjury, the property that Debtors owned or in which they had an interest.  That document listed property labelled "490" twice:  once as "490 Land" and the second as "490 Office Building"[15] and contains no reference to any additional property at Hoffman Estates that the Debtors had an interest in other than property assigned different store numbers, specifically the Day Care Center, the Distribution Center, and the Auto Center.  Debtors did not list the thirteen Hoffman Estate lots they now refuse to deliver as property separate from "490 Land" and "490 Office Building."

130.    In their Motion to Enforce, Debtors also argued that they were not obligated to deliver the thirteen Hoffman Estate lots to Transform because the APA refers to the asset Debtors sold as "Owned Real Property," and that term was further defined under the APA to include "(i) the GOB Owned Stores and (ii) the Operating Owned Properties."  APA § 1.1.  Debtors' syllogism goes (1) they were obligated to deliver only "Owned Property" that was "Operating"; (2) any vacant lots (including the thirteen missing lots) were not "related to, and necessary for, Sears's *operations*"; and (3) therefore Debtors were not obligated to deliver them to Transform.  Motion to Enforce ¶ 43 (emphasis in original); see also id. ¶¶ 45 ("The other thirteen lots in the Hoffman Estates Development are unrelated to the operation of the company and therefore would not be 'Operating Owned Properties'"); id. ¶ 48 ("First, the only properties to be included on Schedule 1.1(p) were those, like 1A, 2, and 3, relating to Sears's operations.").

---

[15]    *Schedules of Assets and Liabilities for Sears Holdings Management Corporation* [Docket No. 1637] at 39.

131.    Debtors' argument fails at every step.  First, under the APA, "headings" such as "Operating Owned Property" are not to "affect or be utilized in the construction or interpretation of this Agreement."  APA § 1.2(a)(v).  "Operating Owned Property" is simply defined to mean "the real property described in Schedule 1.1(p)"—i.e., the specific list of properties described on that Schedule.  The APA does not contain any requirements that any particular property listed in that schedule be operating or otherwise necessary for the business's operations.  Indeed, Schedule 1.1(p) contains numerous properties that were not operating at the time the APA was executed, including three properties that consist solely of vacant land:  (i) Store 3968 in Wasco, CA, (ii) Store 26987 in Chicago, IL, and (iii) Store 31930 in Hialeah, FL.  Borden Decl. ¶ 19.  These properties were transferred to Transform at the Closing without objection.  Thus, if the Debtors are obligated to deliver the thirteen lots in Hoffman Estates because they are listed in Schedule 1.1(p), that obligation cannot be modified, and the reference to "Hoffman Estates" cannot be limited, by the fact that the heading in the APA says "Operating Owned Property."

132.    Second, Debtors' argument is based on a flawed premise and proves too much. Debtors appear to argue that because most of the thirteen lots are vacant, they must not be "related to, and necessary for" Sears's operations.  But Lots 2 and 3, which Debtors transferred at Closing and agree were acquired by Transform, also consist of vacant land.  Borden Decl. ¶ 12; see *Declaration of William C. Gallagher in Support of the Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* [Docket No. 4032] ("Gallagher Decl.") ¶ 8 (stating that Transform acquired Lots 1A, 2, and 3) & Ex. C.  Debtors do not claim that the absence of a structure on those lots excludes them from the transaction.

**b)  Extrinsic Evidence Further Supports Transform**

133.    Debtors further assert that extrinsic evidence prior to signing supports their argument that they were only obligated to deliver some but not all of the lots at Sears' headquarters in Hoffman Estates.  The contrary is true.

134.    Debtors argue that the Intralinks datasite contained documents, including surveys and title commitments, related to store 490 that describe only lots 1A, 2, and 3.  There is a simple explanation for these documents:  only these three lots (and not the other thirteen) served as collateral for a financing transaction.  Borden Decl. ¶ 13.  None of the documents in the datasite purports to list all of the lots that were part of store number 490.  Id.  Conspicuously absent from Debtors' argument is any evidence that the datasite separately addresses the thirteen additional lots at Hoffman Estates.  That is because the only store number associated with these lots is store number 490.  Id. ¶ 14.  There is no other store number associated with the thirteen lots.  Id.

135.    To the contrary, the evidence reflects that the persons with the most familiarity with Debtors' property understood Debtors to be required to deliver all of the lots Debtors owned in Hoffman Estates and not to be leaving any behind.  When Debtors filed their chapter 11 petitions, M-III requested a list of all Sears properties, and the Sears real estate team worked with M-III to assemble such a list.  Id. ¶ 15.  Included in that list was store number 490, Hoffman Estates.  Id.  There was no other store number that referred to any of the 16 lots located in Hoffman Estates because all of those lots were considered to be part of store number 490.  Id.  The real estate group at Sears utilized a database called the Real Estate Property Summary Database ("RE Prop"), which was searchable by store number, to collect and store certain information about each Sears property.  Id. ¶ 8.  The results of a search of RE Prop for owned property at store number 490 is not limited to the three lots transferred by the Debtors, and in fact does not identify any of the sixteen lots at Hoffman Estates separately from store number 490.  Id. ¶¶ 13-14 & Ex. A.  Debtors' argument

now that store number 490 only referred to Lots 1A, 2 and 3 is inconsistent with the experience of Sears employees and the company's internal systems.

136.    In a January 6, 2019 presentation to Transform's representatives, the Debtors provided a preliminary schedule of real estate that would be excluded from the transaction so that Transform could consider whether there were any additional properties to be added to the transaction.  Kamlani Decl. Ex. L.  The schedule listed ninety-nine properties that were "excluded" and by implication identified the properties that were already included.  Importantly, the schedule did not list as excluded any of the thirteen lots at Hoffman Estates that the Debtors are now claiming a right to retain.  The reason is obvious:  the Parties understood those properties already to be part of the deal Transform and the Debtors had negotiated.

### c)    Transform Did Not Waive Its Contractual Rights to All Acquired Property at Hoffman Estates by Its Post-Closing Conduct

137.    Lastly, the Debtors argue that Transform does not have a right to the thirteen lots because even if they were on the list, Transform accepted at Closing and thereafter recorded and paid real estate transfer tax for Lots 1A, 2, and 3.  That argument, however, runs squarely into settled law and the provisions of the APA.  As a matter of settled law, a contractual party's post-signing conduct cannot dictate the meaning of a contract at signing nor constitute a waiver.  See, e.g., Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1233, n.11 (Del. 1997) (stating that backward-looking evidence gathered after the time of contracting does not help in interpreting a contract); E. Cont'l Mining & Dev. Ltd. v. Signet Grp. LLC, No. 13-CV-1930 KBF, 2015 WL 5707145, at *10 (S.D.N.Y. Sept. 29, 2015) (same).

138.    As a corollary, and as a matter of contract, the parties agreed in Section 13.3 of the APA that their post-signing conduct could not change the terms of their agreement:   "[n]o

amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid

or binding unless set forth in writing and duly executed by each Party." The purpose of such a

clause is to promote certainty and not to allow post-closing conduct to change the parties'

contractual obligations.

139.    As the Delaware Chancery Court put it in a decision that long predates the APA:

> Non-waiver clauses serve an important purpose in contract law, which is generally to
> ensure that a party to a contract is given an opportunity to make a thoughtful and informed
> decision about whether or not to enforce a particular contract right. They give a contracting
> party some assurance that its failure to require the other party's strict adherence to a
> contract term during the hectic course of day-to-day business will not result in a complete
> and unintended loss of its contract rights if it later decides that strict performance is
> desirable. Viking Pump, Inc. v. Liberty Mut. Ins. Co., No. CIV.A. 1465-VCS, 2007 WL
> 1207107, at *27 (Del. Ch. Apr. 2, 2007).[16]

140.    That provision played a material and significant role in the transaction. Closings—

particularly closings of transactions that are negotiated and consummated in an extremely

compressed timeframe—can be rushed and hectic. The Court can take judicial notice, from its

own experience, that not every deed or document that a selling party agrees to deliver is present at

the closing, and the omission may not be discovered until after the closing. Under the law, a party

can use the failure to deliver as an excuse to get out of a deal that it no longer wants and refuse to

close. Or it can agree to close and then demand delivery thereafter and sue if performance is not

made. See In re Woodbridge Group of Companies, LLC, 590 B.R. 99, 104 (Bankr. D .Del. 2018)

("Under basic contract principles, when one party to a contract feels that the other contracting

party has breached its agreement, the non-breaching party may either stop performance and assume

the contract is avoided, or continue its performance and sue for damages.").

---

[16]    See also AgroFresh Inc. v. MirTech, Inc., 257 F. Supp. 3d 643, 660 (D. Del. 2017) ("The parties did not
modify the Agreements through their course of conduct. Delaware courts are reluctant to hold that parties have
modified their agreements verbally or through a course of conduct where there is an express contract clause
requiring amendments to be in writing."). The APA is governed by Delaware law.

141.    That is particularly the case here.  In accepting the three lots at Closing, Transform did not waive any rights to the remaining lots it purchased.  It relied instead on Section 2.8(a) of the APA, which provides that after the Closing, "each of the Sellers and Buyer shall use its commercially reasonable efforts to further give full effect to, evidence and record the assignments, waivers, ratifications, consents and agreements granted" therein.  Section 2.8(d) further states that if after the Closing "any Seller or any of their respective Affiliates holds any Acquired Assets . . . the applicable Seller will, and will cause their respective controlled Affiliates to, and will use commercially reasonable efforts to cause their other Affiliates to, (including through the execution and delivery of all appropriate transfer documents) promptly transfer (or cause to be transferred) such Assets . . . for no additional consideration."  In other words, the APA contemplates that assets may be discovered not to have been appropriately transferred and provides that Debtors must cure any mistakes that occurred at the Closing.

142.    Indeed, far from negotiating to keep the 13 vacant lots, Debtors did not take the position that 13 lots owned by Sears at Hoffman Estates were not part of store number 490 until after the Transaction closed.  See Borden Decl. ¶ 18; Kamlani Decl. ¶ 47.  Mo Meghji, Debtors' CRO, testified that he was not even aware that the Debtors did not transfer all of the property at Hoffman Estates until March or April 2019, several weeks after the deal had closed.  Meghji Depo. 22:22–23:8, June 21, 2019.  Debtors have not presented evidence of a single employee or officer of legacy Sears or Transform who has ever endorsed that view.  See Borden Decl. ¶ 18.

143.    Debtors have agreed that a breach of any provision of the APA constitutes irreparable harm to Transform warranting specific performance.  Section 13.14 of the APA states:

Specific Performance.  The Parties acknowledge and agree that (a) irreparable injury, for which monetary damages, even if available, would not be an adequate remedy, will occur in the event that any of the provisions of this Agreement are not performed in accordance with the specific terms hereof or are otherwise breached, and (b) the non-breaching Party

or Parties shall therefore be entitled, in addition to any other remedies that may be available, to obtain (without the posting of any bond) specific performance of the terms of this Agreement by the breaching Party or Parties. If any Proceeding is brought by the non-breaching Party or Parties to enforce this Agreement, the Party in breach shall waive the defense that there is an adequate remedy at Law.

144.    The damages from the Debtors' failure to deliver full title to Hoffman Estates, which Transform purchased in its entirety at Closing, are material and difficult to calculate, and therefore Transform is entitled to specific performance in the delivery of the entirety of the Debtors' real property in Hoffman Estates.

### d)  Transform Has Not Violated the Automatic Stay

145.    The Debtors argue that Transform has violated the automatic stay because it sent a letter to the Debtors accurately asserting that it acquired all of the lots at Hoffman Estates.  Motion to Enforce ¶¶ 51-52 (citing Gallagher Decl., Ex. D).  It is well settled that a matter of contract dispute cannot be converted by Debtors into a purported violation of the automatic stay.  See Ball v. Soundview Composite Ltd. (In re Soundview Elite Ltd.), 543 B.R. 78, 97 (Bankr. S.D.N.Y. 2016); see also United States v. Inslaw, 932 F.2d 1467, 1473 (D.D.C. 1991) ("It is settled law that the debtor cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute."); Mountaineer Coal Co. v. Liberty Mut. Ins. Co. (In re Mountaineer Coal Co.), 247 B.R. 633, 644 (Bankr. W.D. Va. 2000) (Congress did not intend "to convert a matter of contract dispute into a violation of the automatic stay.").

### E.  Transform Acquired the Adequate Assurance Deposit

146.    Under the APA, Debtors agreed to sell Transform, at Closing, "all right, title and interest of Sellers, in, to or under all assets, properties and rights Related to the Business" including "any and all rights of Sellers in and to any . . . security deposits . . . escrow deposits and cash collateral, including cash collateral given to obtain or maintain letters of credit and cash drawn or paid on letters of credit [and] *utility deposits* . . . to the extent related to any Acquired Asset."  APA

§ 2.1 (emphasis added).  These assets are collectively defined as "Security Deposits" under the APA.  See id.

147.    Those Security Deposits include certain "utility deposits" that were established under an order issued by this Court on November 2, 2018 [Docket No. 431] (the "Utility Order"). Specifically, on October 18, 2018, Debtors requested an order by the Court approving, *inter alia*, Debtors' proposed form of adequate assurance for the payment of utility providers, pursuant to Sections 105(a) and 366 of the Bankruptcy Code.  In their motion, Debtors asserted that "[i]n the ordinary course of their business, the Debtors incur utility expenses in connection with the use of various utility services, including electricity, natural gas, water, sewage and telecommunications."[17]   Debtors further argued that "[p]reserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations" and that "any interruption in utility services . . . would seriously disrupt the Debtors' ability to continue operations and service their customers."[18]

148.    The Utility Order authorized Debtors to establish an Adequate Assurance Account in which Debtors would maintain a sum equal to two weeks' worth of the average utility cost for each Utility Provider, approximately $9.24 million (the "Adequate Assurance Deposit").  The Utility Order further established that if "Debtors fail to pay a utility bill when due . . . the Utility Provider may file an application with the Court certifying that payment has not been made and requesting the amount due up to an aggregate maximum equal to the Adequate Assurance Deposit allocable to such Utility Provider."[19]  The Utility Order provided that the Adequate Assurance

---

[17]      See *Motion of Debtors Requesting Entry of an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services, and (III) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Service* [Docket No. 196] ¶ 7.

[18]      Id. ¶ 9.

[19]      Utility Order ¶ 7.

Deposit "shall be returned to the Debtors on the earlier of (i) the Debtors' payment in full of all postpetition obligations due and owing to the applicable Utility Provider, (ii) the Debtors' termination of services with a Utility Provider, or (iii) the conclusion of these chapter 11 cases, if not applied earlier."[20]   The Adequate Assurance Deposit currently exists in an account held by the Debtors and, as of February 11, 2019, Debtors had neither paid in full all postpetition obligations owed to utility providers nor had the Debtors terminated such services.  See *Declaration of Keith Klug in Support of Transform Holdco LLC's Brief in Support of the Adversary Complaint and in Opposition to Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* ("Klug Decl.") ¶¶ 5-6.

149.    After the entry of the Utility Order, Debtors entered into the APA (subsequently incorporated into the Sale Order), pursuant to which Debtors sold to Transform all Security Deposits related to Acquired Assets.  Security Deposits, as defined in the APA, encompasses "utility deposits."  The utility deposits are thus unquestionably acquired Security Deposits pursuant to Section 2.1(o) of the APA.  It is a principal rule of contract interpretation that when a "contract is clear and unambiguous," courts "give effect to the plain-meaning of the contract's terms and provisions."  Osborn ex rel. Osborn v. Kemp, 991 A.2d 1153, 1159-60 (Del. 2010).  Thus, under the plain meaning of Section 2.1(o), Transform acquired the utility deposits along with the other acquired Security Deposits.

150.    Furthermore, under Section 2.1(o), Transform acquired all Security Deposits "to the extent *related* to any Acquired Asset."  APA § 2.1(o) (emphasis added).  Under the APA, Transform acquired a large number of retail locations (including Sears and Kmart stores) and other properties as part of its going-concern acquisition of Debtors' retail business.  See APA § 2.1(b)-

---

[20]    Id. ¶ 4.

18-23538-shl    Doc 4464    Filed 07/08/19    Entered 07/08/19 21:50:27    Main Document
Pg 77 of 96

(c).  The portion of the Adequate Assurance Deposit that secures the continued supply of utility services to these properties is "related" to those Acquired Assets as that term is defined and used in the APA.  See APA § 1.1 (defining "Related" as "owned or held primarily by, required primarily for, *or used, intended for use*, leased or licensed, *primarily in connection with*") (emphasis added). The utility deposits ensure the ability of the acquired properties to enjoy utility services on an uninterrupted basis.  Thus, they were plainly "used" and "intended for use" with those properties: the utility deposits secured the continued supply of utility services to those properties and would be used to pay for the services needed if the Debtors (and now Transform) defaulted on their payments to the Utility Providers.  See Hede Decl. ¶ 14.  Furthermore, the utility deposits were used and intended for use "primarily in connection" with those properties, as that portion of the Adequate Assurance Deposit is specifically allocated to the services provided to specific properties.[21]  Accordingly, the portion of the Adequate Assurance Deposit that secures the continued supply of utility services to the properties acquired by Transform under the APA is a Security Deposit related to an Acquired Asset, and was therefore duly purchased by Transform under Section 2.1(o) of the APA.  Transform is therefore entitled to the amount of the Adequate Assurance Deposit that is related to assets acquired by Transform.

151.  Transform's professionals have determined that $3,892,651 of the Adequate Assurance Deposit was held as a security deposit for utility services provided to properties owned or leased as of Closing by Transform.  See Hede Decl. ¶ 13.  Those professionals have also determined that $1,445,904 of the Adequate Assurance Deposit is associated with telecom services supplied to Transform.  Transform is therefore entitled to the $5,338,555 of the Adequate Assurance Deposit that relates to properties acquired by Transform pursuant to the APA.

---

[21]    See Utility Order ¶ 3.

152.    Debtors are attempting to deprive Transform of the assets it bargained for in contravention of the plain meaning of Section 2.1(o) by claiming entitlement to the Adequate Assurance Deposit.  As explained above, this argument is meritless, and Debtors are aware that the Adequate Assurance Deposit is a Security Deposit under the APA and belongs to Transform to the extent that it secures utility services to Acquired Assets.  On February 4, 2019, Debtors proposed to Transform that it amend the APA to exclude the Adequate Assurance Deposit from the Acquired Assets.  See Weaver Decl., Ex. D.  Transform declined to accept that amendment. See *Notice of Filing Executed (I) Employee Lease Agreement, (II) Services Agreement, and (III) Amendment No. 1 to the Asset Purchase Agreement* [Docket No. 2599] (the "Amendment No. 1"), Ex. E.  Failing to gain Transform's agreement to exclude the Adequate Assurance Deposit, Debtors are now baselessly refusing to transfer the portion of the Adequate Assurance Deposit related to the Acquired Assets that belongs to Transform.

153.    Pursuant to its rights under the APA, Transform has demanded that Debtors relinquish their claim to the portion of the Adequate Assurance Deposit related to assets acquired by Transform.  Debtors have refused that demand.  Accordingly, Transform seeks a declaratory judgment finding the Adequate Assurance Deposit was acquired by Transform to the extent it provided security for the supply of utility services to Acquired Assets and that, upon the release of that portion of the deposit pursuant to the terms of the Utility Order, the released funds, in the amount of $5,338,555, should be turned over to Transform.

**F.  Transform Acquired the Disputed EDA Funds**

      **a)  The Illinois Action and Turnover Motion Related to the EDA Funds Are**

          **Actions and Claims Acquired by Transform under Section 2.1(p) of the APA**

154.     In 1990, in anticipation of its relocation away from the Sears Tower in downtown Chicago, Sears, Roebuck & Co. entered into an Economic Development Agreement with the Village of Hoffman Estates (the "EDA").  The EDA was entered pursuant to the Illinois Economic Development Area Tax Increment Allocation Act, 20 Ill. Comp. Stat. 620 (1989) (the "EDA Act") passed by the State of Illinois the prior year.  The Village of Hoffman Estates offered economic incentives for Sears to relocate its headquarters from downtown Chicago to the Village in the form of annual subsidies (the "EDA Funds") to reimburse Sears for certain costs it incurred in developing the defined project area, including costs for relocating its corporate headquarters to the area and providing certain infrastructure improvements for the Village relating to the area.  The reimbursement is based in part on Sears' incurring the relocation and infrastructure costs and in part on its agreement to satisfy certain conditions, including that Sears maintain at least 4,250 qualifying jobs.  Assuming that Sears satisfies those conditions, it is entitled to reimbursement from a pool comprised of the incremental property taxes collected by the Village from all real property owners within the project area in excess of the amount of taxes the Village collected prior to the relocation and development.  In essence, the Village agreed to share with Sears some of the incremental revenue the Village generated from the relocation and development.

155.     For 2017, the Village did not disburse the EDA Funds intended to compensate Sears for its development and infrastructure costs and, on October 10, 2018, Community Unit School District 300 (the "School District") filed an action in the Circuit Court of Cook County, State of Illinois, seeking declaratory, injunctive, and other relief and alleging that Sears failed to comply

with certain conditions of the EDA, including the requirement that Sears maintain the requisite number of qualifying jobs (the "Illinois Action").[22]  Pending the outcome of the action, the Village is currently holding $7,153,317 in a segregated account.  In that same action, the Debtors filed a cross-motion for summary judgment under the Illinois Code of Civil Procedure, seeking an order that the Village disburse these EDA Funds to Sears.[23]

156.    Debtors also filed a turnover motion in this Court on February 28, 2019, requesting an order that the Village disburse the EDA Funds (the "Turnover Motion").[24]  On May 2, 2019, Transform noticed its assumption and assignment of the EDA with the Village.[25]  On May 6, 2019, the Court ordered the Village to disburse to Sears, Roebuck and Co. $2,508,660.33 of the EDA Funds, and to hold and retain the remainder of the funds pending the resolution of the Debtors' claims for payment of additional EDA Funds.[26]

157.    At the time of the Turnover Motion, the Court did not have before it the question of whether the claim against the Village had been transferred to Transform.  It now does.  Those funds belong to Transform and the right to them was transferred at Closing under the APA.  Under Section 2.1(p) of the APA, Transform acquired "any and all Actions or Claims . . . of Sellers as of the Closing that . . . are against vendors, *counterparties to* leases, licenses or *other contracts*, customers, Transferred Employees or *parties to other commercial relationships of the Business*." APA § 2.1(p) (emphasis added).

---

[22]    See Cmty. Unit School Dist. 300 v. Hoffman Estates, No. 2018 CH 12683 (Ill. Cir. Ct. filed Oct. 10, 2018).

[23]    See id.

[24]    *Motion of Debtors to Compel Turnover of Estate Property* [Docket No. 2715].

[25]    *Notice of Assumption and Assignment of Additional Executory Contracts* [Docket No. 3539].

[26]    *Order Directing Partial Turnover of EDA Funds to Debtors and Reserving Balance Pending Court Order* [Docket No. 3678].

158.    "Action" is defined very broadly under the APA to include "any Claim, action, complaint, suit, litigation, arbitration, appeal, petition, inquiry, hearing, Order, decree, legal proceeding, investigation or other legal dispute, whether civil, criminal, administrative or otherwise, at law or in equity, by or before any Governmental Authority." APA art. I, Definitions.

159.    The APA's definition of "Claims" is even broader. It includes "all rights to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or rights to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, in each case, of whatever kind or description against any Person." *Id.*

160.    The Illinois Action and the Turnover Motion are both "Actions" of the Debtors, and Sears' right to reimbursement for its development and infrastructure costs is a "Claim" of the Debtors against the Village of Hoffman Estates, Debtors' contractual counterparty to the EDA. Any payment of the disputed EDA Funds therefore was transferred to Transform at Closing as either an Action or a Claim against a counterparty to a contract or a party to a commercial relationship of the Business.[27] Nonetheless, the Debtors refuse to transfer the $2,508,660.33 in acquired EDA Funds to Transform.

---

[27]    A "commercial relationship is one [r]esulting or accruing from commerce or exchange." Commercial, Black's Law Dictionary (11th ed. 2019); see Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 614 (1992) (defining "commercial activity" as the type of action by which a private party may engage in "trade and traffic or commerce") (citation omitted); Saudi Arabia v. Nelson, 507 U.S. 349, 360 (1993) (contrasting "commercial activity" with activity that is "peculiar to sovereigns"). Private parties can and frequently do reimburse anchor tenants for moving and project development costs. That such reimbursements are raised through property taxes is irrelevant—practically all government expenditures are in some way funded by tax revenue.

### b) The EDA Funds Are Not Tax Credits, Refunds, or Rebates

161.    Debtors argue in response that the EDA Funds are excluded assets under Section 2.2(h) of the APA because they constitute an "interest in or right to any refund, rebate, or credit of Excluded Asset-Reorganization Taxes," defined by the APA as "[t]axes imposed on or with respect to the Acquired Assets, the Acquired Properties, the Business or the Assumed Liabilities for any Pre-Assignment Tax Period."  This argument fundamentally mischaracterizes the nature of the obligations and rights created by the EDA, which constitute neither credits for taxes paid nor a refund or rebate.

162.    Debtors' argument fails for at least seven reasons.  *First*, under the EDA, the amount of EDA Funds owed to Sears is not a function of the taxes paid by Sears, but of Sears' project costs.  *Second*, the EDA Funds distributed to Sears are not comprised solely of tax revenues from Sears but are comprised of revenues from all real property holders in the project area.  *Third,* the EDA Funds do not offset Sears' tax liability; rather, the annual reimbursement of EDA Funds can exceed and has exceeded Sears' property tax liability for a given year.  *Fourth*, the mechanism to challenge or enforce the distribution of EDA Funds differs from the property tax refund mechanism under State law.  *Fifth*, the parties to the Illinois Action and Turnover Motion, including Debtors themselves, characterize the payment of EDA Funds as subsidies or reimbursements, not tax credits.  *Sixth*, if and when Transform takes assignment of the EDA Agreement, Transform will acquire all of its benefits and burdens, including the disputed EDA Funds.  *Finally*, U.S. federal income tax law characterizes the EDA Funds as nontaxable contributions to capital, not tax credits.

(i)    *The Reimbursement Due to Sears Is Not a Function of Sears' Taxes Paid But of Its Project Costs*

163.    The EDA is not a tax refund, tax credit, or tax rebate agreement.[28] A "tax credit" is "[a]n amount subtracted directly from one's total tax liability, dollar for dollar, as opposed to a deduction from gross income." Tax Credit, Black's Law Dictionary (11th ed. 2019). A "tax refund," is "[m]oney that a taxpayer overpaid and is thus returned by the taxing authority." Tax Refund, Black's Law Dictionary (11th ed. 2019). And a "tax rebate" is synonymous with a "tax refund." Id. ("Also termed 'tax rebate'"). Although as with any contract that a taxpayer has with any municipality, the Village's obligation to Sears is funded—in part—by tax revenues collected from Sears, the amounts Sears is owed is not based or dependent on the property taxes it pays. Rather, the amount owed is based on Sears' costs of relocating its headquarters to Hoffman Estates and providing the infrastructure improvements to the area. A percentage of these costs represents the cap for the total payment of EDA Funds, to be apportioned over a number of years. Even if Sears never paid a cent in property taxes (or any property taxes it paid were not incremental), it may still be owed EDA Funds based on the Village's tax revenues from other property owners.

164.    The EDA Act creates a certain geographic area in the Village of Hoffman Estates which is designated as an "economic development project area."[29] The EDA then creates a dedicated fund known as the "special tax allocation fund" out of which reimbursement costs are paid if Sears satisfies the qualifying conditions and if there are sums from which the reimbursement can be paid. The sums due to Sears, however, are not based on what it has paid into the fund.

---

[28]    A "tax credit" is "[a]n amount subtracted directly from one's total tax liability, dollar for dollar, as opposed to a deduction from gross income." Tax Credit, Black's Law Dictionary (11th ed. 2019). A "tax refund," "[a]lso termed tax rebate," is "[m]oney that a taxpayer overpaid and is thus returned by the taxing authority." Tax Refund, Black's Law Dictionary (11th ed. 2019).

[29]    20 Ill. Comp. Stat. § 620/3(d), 4(a), 4(b)(1)-(3)(c), 4(e), 6(a), 6(b) (2019).

Instead, they are equal to thirty percent of the "economic development project costs" incurred by Sears in relocating to Hoffman Estates—that is, both the cost of acquiring and developing property, as well as other private financing costs.[30]

    *(ii)    The Funds Owed To Sears Are Not Funded Exclusively from Sears' Property Taxes*

165.    The monies owed to Sears in any particular year are not funded exclusively from property taxes paid by Sears.  The special tax allocation fund is comprised of incremental property tax revenues received from *all* real property owners in the economic development project area, not just from Sears.  While, as a functional matter, the EDA Funds allowed Sears to recapture a large portion of the property taxes it paid, that is solely because Sears is a large taxpayer—not because Sears as a taxpayer had a right to a credit, rebate, or refund.  The rationale of the EDA Act and the EDA is that Sears, by contributing to the welfare and economic vitality of Hoffman Estates generally through relocating its office, developing the area, and creating jobs, is entitled to reimbursement of certain of its costs from the increased revenues generated from all relevant property owners based on their enhanced economic vitality.

166.    The mechanics are as follows:  the county clerk calculates the amount by which taxable real property within the economic development project area has appreciated since its last assessed value before the signing of the EDA Act, specifically, the amount by which the value of all the taxable real property in the economic development project area has increased since Sears moved to Hoffman Estates.  The county clerk reassesses the value of such taxable real property every year thereafter to ascertain its current value.[31]  Taxes based on the property's valuation

---

[30]    Id. 3(e).

[31]    Id. 6(a), (b)

before Sears' relocation are paid to the county collector and taxing districts; they are not part of the special tax allocation fund.  Any incremental property taxes are allocated as EDA Funds.[32] The same calculation applies to all property owners in the economic development project area.[33] Depending on the aggregate sum of monies in the fund (made up of all incremental property taxes), there may be a reimbursement.  In particular, under the EDA, as amended in 2012, the Village is entitled to the first $350,000 of EDA Funds or its administrative costs, and the next $5 million is allocated to the Village to pay its own project costs pursuant to Section 7 of the EDA.  If there are monies left over after the disbursements to the Village, fifty-five percent of the remainder is paid to Sears, while the other forty-five percent is split between the relevant taxing districts.[34]

167.    The reimbursement under the EDA is not a refund or rebate or credit.  Under the EDA, the fund is comprised of incremental tax revenues generated from all relevant property owners; there is no segregated account just for the incremental real property taxes paid by Sears. A portion of what Sears receives is funded by funds collected from others.  And Sears is entitled to, and will receive, a reimbursement as long as there are monies in the fund even if it paid no taxes.

*(iii)    The EDA Funds Do Not Offset Sears' Tax Liability*

168.    The EDA Funds do not offset Sears' annual property taxes.  That is, Sears does not receive a property tax bill that is diminished by an amount calculated under the EDA Act.  Rather, Sears is required to pay its property taxes to the Village each year and the Village has a separate contractual obligation to disburse EDA Funds to Sears based upon the terms of the EDA.[35]   The

---

[32]    Id. 4(e)(1), (2).

[33]    Id. 7(2)

[34]    Id. 4(g)(4) (beginning for property taxes paid in 2014, if the total tax liability exceeds property taxes paid in 2013, a different formula set forth in section 4(g)(4) applies).

[35]    Id. 6(b); Weaver Decl., Ex. E.

clearest illustration of this point is that in a given year Sears can, and in fact has, received EDA Funds in excess of the property taxes that it paid into the special tax allocation fund.

169.    The project area consists of taxable real property owned by several taxpayers,[36] and any taxes assessed on the increased value of all taxable real property in the project area are deposited in the special tax allocation fund, not just taxes paid by Sears.[37]  Even though all owners of taxable real property in the project area pay into the EDA Fund, Sears is the only one that receives distributions of EDA Funds.  Therefore, since the payment of EDA Funds to Sears is not directly tied to the amount of property taxes Sears contributes to the special tax allocation fund, Sears may receive more out of the special tax allocation fund than it contributes to it.

170.    This scenario is no mere hypothetical.  In 2013, Sears received distributions of EDA Funds in excess of its relevant property tax liability.  That is, Sears paid total property taxes on February 24, 2012 and July 23, 2012 of $12,393,654.89, but received EDA Funds in the amount of $14,174,257.58 on February 12, 2013.[38]

---

[36]    See Hoffman Estates Illinois, Enterprise Zone & Economic Development Area (EDA), https://www.hoffmanestates.org/ government/ development-services/economic-development/enterprise-zone-economic-development-area-eda (last visited June 24, 2019) (showing Cabelas as a business within the EDA project area); Village of Hoffman Estates, Illinois, Comprehensive Annual Financial Report Fiscal Year Ended December 31, 2017 at 191 (2017) (Cabelas is a principal property taxpayer in Hoffman Estates); see also EDA p.82 (the EDA contemplates the sale of interests in real property in the project area subject to certain restrictions for some sales).

[37]    20 Ill. Comp. Stat 620/4(e)(2) ("That portion, if any, of such taxes which is attributable to the increase in the current equalized assessed valuation of *each* taxable lot, block, tract or parcel of real property in the economic development project area over and above the initial equalized assessed value of each property . . . shall be allocated to and when collected shall be . . . deposit[ed] . . . into . . . the special tax allocation fund . . . .") (emphasis added); see also Village of Hoffman Estates, Illinois, Comprehensive Annual Financial Report VIII (1995) ("EDA incremental taxes are property taxes generated from within the Prairie Stone (Sears) tax increment financing (TIF) district.  The incremental taxes generated by new development, which would have normally gone to all taxing bodies, are given to the Village to pay for infrastructure improvements, debt service, and other costs associated with servicing and improving the TIF district.  There was a 6.9% increase in EDA incremental revenues due to the construction and occupancy of various office buildings in the business park.").

[38]    See Weaver Decl., Exs. A, B, E.

(iv)     *The Mechanism to Challenge the Distribution of EDA Funds Differs from the*

*Mechanism to Challenge Property Taxes or Property Tax Credits*

171.     The disparate mechanisms for challenging EDA Funds and property tax credits

provide further evidence that the former is not the latter.  If Sears, or any other Illinois taxpayer,

objects to the amount of its property taxes, it must file a written complaint with the county board

of review and present evidence of unfair assessment to that board.[39]  By contrast, Section 17.1 of

the EDA provides that "[t]he sole remedies of the Developer in the event of a breach by the Village

in any of the terms of this Agreement shall be: (i) to institute legal action for specific performance

[and] (ii) to maintain an action at law for the Developer's actual (but not consequential or punitive)

damages . . . ."  In short, Sears' remedy in the event of a breach is an action for damages or specific

performance.  It is not a tax credit, refund, or rebate.  And challenges to the failure to distribute

EDA Funds must be filed in a different court and are subject to different remedies than equivalent

challenges to the payment of property tax credits.  Section 8(a) of the EDA Act makes this

distinction explicit by requiring tax abatements and benefits to be repaid pursuant to Illinois tax

law, and not through the dispute mechanism described above.[40]

172.     These distinctions in the EDA Act between the EDA Funds and tax credits make

clear that the EDA Funds are neither a tax credit, rebate, nor refund as defined in the APA.

---

[39]     See Illinois Revenue, Appeals,
https://www2.illinois.gov/rev/localgovernments/property/Pages/appeals.aspx (last visited June 24, 2019).

[40]     EDA Act 8(a) ("Any tax abatement or benefit granted by a taxing district under an agreement entered into
under this Act . . . for the purpose of originating, locating . . . a business facility shall be cancelled if the individual
or entity relocated its entire facility in violation of the agreement, and the amount of the abatements or tax benefits
granted before the cancellation shall be repaid to the taxing district . . . as provided in Section 18-183 of the Property
Tax Code.").

*(v)      Debtors Characterize the EDA Funds as Reimbursements, Not Tax Credits*

173.    In briefing both the Illinois Action and Turnover Motion, the Debtors have repeatedly described the EDA Funds as reimbursements or subsidies, rather than tax credits.  <u>See</u> Response to Plaintiff's Motion for Summary Judgment and Cross-Motion for Summary Judgment 3-4, <u>Cmty. Unit School Dist. 300 v. Hoffman Estates</u>, No. 2018 CH 12683 (Ill. Cir. Ct. May 22, 2019) ("Pursuant to the EDA Act, Sears and the Village also entered into an Economic Development Agreement . . . pursuant to which Sears receives <u>reimbursement incentives</u> for certain approved costs related to the development of the [EDA] . . . .") (emphasis added); Defendant Sears Holdings Corporation's Opposition to Community Unit School District 300's Motion for Summary Judgment and Cross-Motion for Summary Judgment 19, <u>Cmty. Unit School Dist. 300 v. Hoffman Estates</u>, No. 2018 CH 12683 (Ill. Cir. Ct. May 22, 2019) ("The EDA Act was passed to incentivize Sears to move its headquarters to develop the EDA, in part by promising to repay a portion of Sears's development costs."); *Motion of Debtors to Compel Turnover of Estate Property* [Docket No. 2715] ¶ 2 ("The Sears EDA Act provides, among other things, for the payment to holders of notes issued under the Act for the reimbursement of approved EDA costs related to the relocation of Sears's headquarters to the Village, where it is currently located."); <u>id.</u> ¶ 9 ("The Sears EDA Act was originally passed in 1989 to incentivize Sears to relocate its headquarters from downtown Chicago to undeveloped prairie farmland in the Village, where it is currently located.  Pursuant to the Act, the Village and Sears entered into an Economic Development Agreement, under which Sears received subsidies to reimburse it for certain costs related to the building of its corporate campus in the Village and providing certain infrastructure improvements to the Economic Development Area . . . .  Pursuant to a 2012 amendment to extend the Act . . . , Sears remains eligible to receive annual subsidy payments from the Village provided

it meets certain criteria."); *Reply in Support of Debtors' Motion to Compel Turnover of Estate Property* [Docket No. 3161] ("Debtors' Reply") ¶ 10 ("The 1990 Economic Development Agreement between Sears and the Village (the '**EDA Agreement**') provides for Sears to be reimbursed for certain costs it incurred in developing its approximately 200-acre corporate campus and the rest of the 788 acres of land that comprise the EDA."); id. ¶ 13 ("As of 2012, Sears had not yet been fully reimbursed. The EDA Act was amended that year, extending the period of reimbursement for up to 15 years."); id. ¶ 16 ("The property taxes used by the Village to make these reimbursements are paid one year in arrears. As a result, in the ordinary course, Sears's EDA reimbursement for a particular tax year is paid at the end of the following calendar year, after all taxes have been collected for the tax year at issue. As an example, the Village disbursed Sears's 2016 tax year EDA Funds at the end of 2017, following collection of 2016 property taxes in 2017. After taxes are collected, but until the Village disburses the payments, they are held in the Village's Special Tax Allocation Fund."). While Debtors also characterized the distribution of EDA Funds from time to time as a "rebate,"[41] that characterization—in support of their litigation position and without any corresponding analysis—should be given relatively little weight.

---

[41]     See Defendant Sears Holdings Corporation's Opposition to Community Unit School District 300's Motion for Summary Judgment and Cross-Motion for Summary Judgment 1, Cmty. Unit School Dist. 300 v. Hoffman Estates, No. 2018 CH 12683 (Ill. Cir. Ct. May 22, 2019) ("Under the EDA Act, Sears, as the holder of notes issued under the Act, is entitled to annual payment of EDA Funds in the form of property tax rebates as compensation for obligations Sears incurred in developing the 788-acre [EDA] located within the Village."); id. 10-11 ("The EDA Act bases entitlement to the EDA rebates on the year for which the taxes were levied, not the following year when they are ultimately collected, just like other Illinois tax-related statutory schemes. . . . [I]f Sears maintained 4,250 jobs in 2017, it is entitled to its EDA rebate from taxes levied for 2017."); id. 12 ("Sears receives its EDA rebate for a particular tax levy year at the end of the following calendar year . . . ."); id. 23 ("The EDA Act is like any other tax-related statute: the relevant reference for tax-related payments and credits is the conditions during the levy year, not the payment year. This is the common sense interpretation of any tax related statute: a taxpayer (e.g., the owner of a tax-exempt property) is entitled to claim tax benefits (e.g. property tax exemptions or rebates) based on the conditions during the year for which the taxes were levied, regardless of what conditions exist during the year after, when taxes are collected."); see also Riecker Dep. 9:17-22, June 19, 2019 ("The mechanics of the EDA agreement, as far as holding a number of positions, allows for some form of rebate to come back. What that rebate is for, I don't know the mechanics of how all of that works.").

(vi)     *Under the Bankruptcy Code, Transform Will Acquire the EDA Funds If and When It Assumes the EDA Agreement Cum Onere*

174.     On April 11, 2019, the Debtors filed notice that the EDA Agreement was eligible for assumption and assignment. *Sixth Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* [Docket No. 3152]. On May 2, 2019, Transform exercised its right to designate the EDA Agreement for assumption and assignment. *Notice of Assumption and Assignment of Additional Executory Contracts* [Docket No. 3539]. Under § 365 of the Bankruptcy Code, when Transform takes assignment of the EDA Agreement, it will do so *cum onere*—with all the benefits and burdens that come with the EDA Agreement. There can be no doubt that included among those benefits and burdens is the right to the disputed EDA Funds. See City of Covington v. Covington Landing Ltd. P'ship, 71 F.3d 1221, 1226-27 (6th Cir. 1995) ("When the debtor assumes the lease or the contract under § 365, it must assume both the benefits and the burdens of the contract. . . . [T]he Agreement becomes property of the estate in the same shape as it existed prior to bankruptcy, with all of its benefits and burdens.") (quoting In re Village Rathskeller, Inc., 147 B.R. 665, 671 (Bankr. S.D.N.Y. Nov. 20, 1992)) (alteration in original) (internal quotation marks omitted); see also Citibank, N.A. v. Tele/Resources, Inc., 724 F.2d 266, 269 (2d Cir. 1983) ("An assignment does not modify the terms of the underlying contract. . . . Insofar as an assignment touches on the obligations of the other party to the underlying contract, the assignee simply moves into the shoes of the assignor.").

(vii)    *U.S. Federal Income Tax Law Characterizes the EDA Fund Distributions as*
*Nontaxable Contributions to Capital and Not Tax Credits*

175.    For U.S. federal income tax purposes, distributions of the EDA Funds to Sears in the years in question would be nontaxable contributions to Sears' capital subject to Section 118 of the Internal Revenue Code, rather than State tax credits.  26 U.S.C.A. § 118.  Section 118 of the Code and State tax credits have different effects on federal taxable income, meaning that a sum of money such as distributions of the EDA Funds to Sears cannot be characterized as both a payment subject to Section 118 of the Code and a State tax credit for U.S. federal income tax purposes.  Id. That is, a tax credit lowers tax expense and therefore increases federal tax liability, whereas nontaxable contribution to capital has no such effect.  Under Section 118, "[i]n the case of a corporation, gross income does not include any contribution to the capital of the taxpayer."  Id. Payments pursuant to the EDA and other similar State reimbursement programs that encourage businesses to move to certain development areas fall within the definition of nontaxable capital contributions under Section 118 of the Code and are not treated as State tax credits.  Id.

176.    For example, in Brokertec Holdings, Inc v. Comm'r, 117 T.C.M. (CCH) 1146 (2019), the United States Tax Court held that payments pursuant to a very similar economic development program in New Jersey were subject to Section 118 of the Code rather than treated as State tax credits.[42]  New Jersey sought to encourage businesses to move their operations to certain municipalities within the state by awarding a grant equal to 30 to 80 percent of the recipient's employees' State income tax withholdings if the business maintained a minimum employment level.[43]  The court held that, "[a]lthough the grant was based on the withholding tax

---

[42]    Brokertec, 117 T.C.M. at 9-10.

[43]    Id. at 3.

paid by the employees, the grant was not a rebate of the tax paid.  Rather, the grant was paid from the State's general appropriations."[44]

177.    Similarly, in Consolidated Edison Co. of New York v. United States, 10 F.3d 68 (2d Cir. 1993), the Second Circuit held that discounts to Con Edison's New York City property tax liability in exchange for prepaying such taxes do not constitute reductions in Con Edison's tax liability (a tax credit) but instead should be characterized as New York City paying a portion of Con Edison's unreduced property tax liability as consideration for the prepayment.[45]

178.    This logic can be extended to distributions of the EDA Funds to Sears.  Sears' property tax liability was fixed and assessed in full prior to the distribution of the EDA Funds. Therefore, Sears should be treated for the years in question as having paid its property tax liability in full and separately receiving nontaxable capital contributions from the Village in exchange for relocating to Hoffman Estates.

**G.  Debtors Wrongly Assert Transform Is Responsible for Mechanics' Liens It Did Not Agree to Assume**

179.    Under the APA, the parties agreed to apportionment of the claims underlying mechanics' liens.

180.    Section 2.3(p) of the APA, which is contained within the Section regarding Assumption of Liabilities, provides that Transform shall assume liability for "the claims underlying the mechanics' liens identified in Section 2 of Schedule 6.5." Section 2 of Schedule 6.5 lists 36 specific mechanics' liens, identified by store number and address, with details describing the nature and asserted dollar amount of the liens.  See iBio, Inc. v. Fraunhofer USA,

---

[44]    Id.

[45]    Consolidated Edison of N.Y., 10 F.3d at 73.

Inc., C.A. No. 10256-VCMR, 2016 WL 4059257, at *6 & n.59 (Del. Ch. July 29, 2016) (applying canon of *expressio unius est exclusio alterius* in contract dispute); Active Asset Recovery, Inc. v. Real Estate Asset Recovery Servs., Inc., No. CIV. A. 15478, 1999 WL 743479, at *11 (Del. Ch. Sept. 10, 1999) ("[I]f . . . several subjects of a larger class are specifically enumerated, and there are no general words to show that other subjects of that class are included, it may reasonably be inferred that the subjects not specifically named were intended to be excluded.") (quoting Arthur L. Corbin, 3 Corbin on Contracts § 552 at 206 (1960)).

181.    Section 2.4 of the APA provides that "[n]one of Buyer, Any Affiliate of Buyer or any Assignee shall assume" any Liabilities "other than the Assumed Liabilities."

182.    Furthermore, under Section 2.4 of the APA, the Debtors agreed that "[n]one of Buyer, any Affiliate of Buyer or any Assignee shall assume, be deemed to assume or become obligated hereunder in any way to pay or perform . . . all Liabilities of the Seller or any of its Subsidiaries arising out of the ownership of the Acquired Assets or operation of the Business or the Acquired Assets prior to the Closing Date."  Thus, any mechanics' liens other than those listed in Schedule 6.5 expressly remain with the Debtors if they are related to the ownership of an Acquired Asset prior to the Closing Date, which includes any Assigned Agreements (Section 2.1(a)), Acquired Lease Rights (Section 2.1(b)), Owned Real Property (Section 2.1(c)), and all equity interests in the properties owned by SRC O.P. LLC (the "Sparrow Properties") (Section 2.1(s)).

183.    In addition, Section 2.4(b) of the APA provides that "all Liabilities relating to the payment or performance of obligations arising solely out of facts or circumstances in existence prior to the Closing Date" related to Assigned Agreements remain the Debtors' responsibility. Assigned Agreements, as defined in the APA, include all Acquired Leases.  Since any disputed

mechanics' liens with respect to the Acquired Leases arose before Closing, the APA plainly states that any such mechanics' liens related to Acquired Leases are liabilities that remain with the Debtors.  This provision of the APA with respect to the Acquired Leases is additive to Section 2.4(a) referred to above.

184.    Notwithstanding those provisions, Debtors have taken the position that the claims underlying the mechanics' liens on the leased properties which Transform designated as Designatable Leases passed to Transform as part of the APA and did not stay with Debtors.

185.    That position is untenable.  It is inconsistent with the provisions of Sections 2.3(p), 2.4(a), and 2.4(b).  If the parties had intended liability for the claims underlying the mechanics' liens on the leased properties to be transferred to Transform, they could have included those properties in Section 2 of Schedule 6.5.  They did not.  Accordingly, liability for those claims never passed to Transform.

186.    In communication with Transform, Debtors have based their position on the proration section of the APA, Section 9.11(a), which provides for the proration by Sellers and Buyer of "all items of revenue and expense with respect to . . . the Lease Premises."  Section 9.11(a)(vi), governing proration, provides that "Sellers shall be charged for the amount of any underlying mechanics' liens with respect to any Owned Real Property (other than those identified in Section 2 of Schedule 6.5)," but does not contain any language with respect to the charge for the claims underlying mechanics' liens on the leased properties or the Sparrow Properties.  According to Debtors, the exclusion of language making clear that Sellers will bear responsibility for the claims underlying the mechanics' liens on the leased properties and the Sparrow Properties means that responsibility for those claims cannot rest with Debtors.

187.    Debtors' argument reflects a fundamental misreading of Section 9.1 and Amendment No. 1 that contains both Section 9.1 and the reference to Section 2 of Schedule 6.5. The language transferring liability for the claims underlying mechanics' liens in Section 2.3(p) is not limited to claims underlying mechanics' liens for Owned Real Properties.  On its face, it purports to cover all claims underlying mechanics' liens and limits Transform's liability to only those claims underlying the mechanics' liens identified in Section 2 of Schedule 6.5.

188.    The Parties did not in a different provision of that same amendment transfer to Transform liabilities that were not listed in Section 2.3(p) and Section 2 of Schedule 6.5.  Rather, they identified one set of expenses with respect to mechanics' liens that would be prorated according to the dispute resolution mechanisms of Article 9.  They did not by implication provide that other sets of liabilities—which the contract provided should be paid by Debtors—all of a sudden were assumed by Transform.  Indeed, the specific and on-point provision of Section 2.3(p) must govern over the general provisions of Article 9.  See S3 Graphics Co. v. ATI Techs., ULC, Civ. No. 11-1298-LPS, 2015 WL 7307241, at *7 (D. Del. Oct. 21, 2015) ("Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.") (quoting DCV Holdings, Inc. v. ConAgra, Inc., 889 A.2d 954, 961 (Del. 2005)); A.W. Fin. Servs., S.A. v. Empire Res., 981 A.2d 1114, 1131 (Del. 2009) ("[T]he applicable rules of construction [dictate] that specific provisions should prevail over general provisions.").

189.    Debtors therefore wrongly assert that Transform assumed liability for mechanics' liens other than those listed in Section 2 of Schedule 6.5 and Transform is entitled to a declaratory judgment to that effect.

**RESERVATION OF RIGHTS**

190.    Transform reserves its rights to supplement the defenses and arguments set forth in this brief based on its continuing investigation into the Debtors' claims.

## CONCLUSION

191.    For the reasons stated above, Transform requests that the Court award the relief requested in its Adversary Complaint and such other and further relief as is justified under the circumstances and deny the Debtors' Supplemental Motion to Enforce the APA.

Dated:  June 26, 2019
       New York, New York

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**

*/s/ Lewis J. Liman*
Lewis J. Liman
Sean A. O'Neal
Luke A. Barefoot
Abena A. Mainoo
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

*Counsel for Transform Holdco LLC*