**Hearing Date and Time:  July 11, 2019 at 10:00 am (Eastern Time)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
                                                       :
In re                                                  :
                                                       :      Chapter 11 Case No.
SEARS HOLDINGS CORPORATION, *et al.*,                  :
                                                       :      18-23538 (RDD)
Debtors.[1]                                             :
                                                       :      (Jointly Administered)
                                                       :
-------------------------------------------------------X

# TRANSFORM HOLDCO LLC'S REPLY BRIEF IN FURTHER SUPPORT OF THE ADVERSARY COMPLAINT

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC(6546); Sears Operations LLC(4331); Sears, Roebuck and Co. (0680); Service Live Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); Max Serv, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); My Gofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); Star West, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); SHC Licensed Business LLC (3718); SHC Promotions LLC (9626); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ........................................................................................................................... 4

    A.    Transform Assumed Other Payables and Payment Obligations Only for Ordered
Inventory and Debtors' Opposition Fails to Persuade Otherwise................................... 4

      a)   The Contract Language Limits Transform's Obligations with Respect to Accounts
Payable to Those with Respect to the Ordered Inventory ........................................ 5

      b)   Transform's Interpretation Is Consistent with the "Sense" of the APA ....................... 10

      c)   The Parol Evidence Demonstrates That the Only Payable Obligation Transform Agreed
to Assume Was with Respect to the Ordered Inventory ....................................... 14

      d)   Transform's Obligations (If Any) Are Reduced by Available Cash, Which Includes
Cash-in-Transit ................................................................................................... 18

    B.    Transform's Obligation, If Any, to Assume 503(b)(9) Liabilities Is Reduced by
Shortfalls in Prepaid Inventory and Specified Receivables ....................................... 22

      a)   Debtors Shortchanged Transform on Prepaid Inventory.............................................. 22

      b)   Debtors Shortchanged Transform on Specified Receivables....................................... 27

    C.    Debtors Have Failed To Introduce Any Evidence To Support Their Turnover
Claims, And The Evidence In The Record Shows That Debtors Owe Money To Transform . 35

      a)   Further Consideration of Ernst & Young's Analysis Reveals Relatively Few Disputed
Items and No Question As to the Results ............................................................. 39

    D.    Transform Acquired All of Debtors' Real Property at Hoffman Estates, Illinois.......... 47

    E.    Transform Acquired the Adequate Assurance Deposit................................................. 52

    F.   Transform Acquired the Disputed EDA Funds ............................................................. 56

      a)   Transform Acquired the Disputed EDA Funds under Section 2.1(p) of the APA......... 57

      b)   Transform Did Not Waive Its Contractual Right to the EDA Funds ........................... 60

    G.    Debtors Wrongly Assert Transform Is Responsible for Mechanics' Liens It Did Not
Agree to Assume..................................................................................................... 64

RESERVATION OF RIGHTS ................................................................................................. 68

CONCLUSION........................................................................................................................ 68

# TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

11 U.S.C. § 365(d)(4) ......................................................................................... 63

Bankruptcy Code Section 366 ........................................................................... 54, 55

Illinois Economic Development Area Tax Increment Allocation Act, 20 Ill. Comp. Stat. 620 (2017).......................................................................................................... 58

**Cases**

45 John NY, LLC v. HS 45 John LLC (In re HS 45 John LLC),
585 B.R. 64 (Bankr. S.D.N.Y. 2018)................................................................ 61, 64

AgroFresh Inc. v. MirTech Inc.,
257 F. Supp. 3d 643 (D. Del. 2017)................................................................. 61

Alpine Inv. Partners v. LJM2 Capital Mgmt., L.P.,
794 A.2d 1276 (Del. Ch. 2002)........................................................................ 53

Am. Legacy Found. v. Lorillard Tobacco Co.,
831 A.2d 335 (Del. Ch. 2003)........................................................................... 18

Am. Univ. of Antigua–Coll. of Med. v. Leeward Constr. Co., Ltd.,
653 F. App'x 48 (2d Cir. 2016) ......................................................................... 57

Aniero Concrete Co., Inc. v. N.Y.C Const. Auth.,
308 F. Supp. 2d 164 (S.D.N.Y. 2003)............................................................... 37

Arnold v. Soc'y for Sav. Bancorp, Inc.,
650 A.2d 1270 (Del. 1994) ................................................................................ 62

Banc One, Tex., N.A. v. Braymer (In re Braymer),
126 B.R. 499 (Bankr. N.D. Tex. 1991).............................................................. 50

Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.,
448 F.3d 573 (2d Cir. 2006).............................................................................. 62

Branch v. Smith,
538 U.S. 254 (2003) (plurality opinion) ........................................................... 67

Cameron v. City of New York,
598 F.3d 50 (2d Cir. 2010).......................................................................... 22, 31, 60

Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.,
708 A.2d 989 (Del. 1998) ........................................................................... 53

Comet Sys., Inc. S'holders' Agent v. MIVA, Inc.,
980 A.2d 1024 (Del. Ch. 2008)................................................................... 24, 59

Consol. Edison Co. of N.Y., Inc. v. United States,
10 F3d 68 (2d Cir. 1993) ............................................................................ 58

De Luca v. Cuomo (In re Cuomo),
BAP NO. NV-13-1294-PaJuHl, 2014 WL 5358180 (B.A.P. 9th Cir. Oct. 21, 2014)........ 50

Harco Nat'l Ins. Co. v. Arch Specialty Ins. Co.,
No. 06 Civ. 2928 (LBS), 2008 WL 1699755 (S.D.N.Y. Apr. 9, 2008), aff'd, 328 F.
App'x 678 (2d Cir. 2009) ........................................................................... 59

iBio, Inc. v. Fraunhofer USA, Inc.,
C.A. No. 10256-VCMR, 2016 WL 4059257 (Del. Ch. July 29, 2016)............................ 65

In re 1111 Myrtle Ave. Grp., LLC,
598 B.R. 729 (Bankr. S.D.N.Y. 2019)................................................................. 53

In re Drexel Burnham Lambert Grp., Inc.,
123 B.R. 702 (Bankr. S.D.N.Y. 1991)................................................................. 38

In re Explorer Pipeline Co.,
781 A.2d 705 (Del. Ch. 2001)........................................................................ 9, 45

In re Hughes,
281 B.R. 224 (Bankr. S.D.N.Y. 2002)................................................................. 38

Intercept Pharm., Inc. v. Fiorucci,
277 F. Supp. 3d 678 (D. Del. 2017).................................................................... 31

Interim Healthcare, Inc. v. Spherion Corp.,
884 A.2d 513 (Del. Super. Ct.), aff'd, 886 A.2d 1278 (Del. 2005).................................... 29

Khan v. Del. State Univ.,
No. CV-N14C-05-148 AML, 2017 WL 815257 (Del. Super. Ct. Feb. 28, 2017).............. 9, 45, 67

Kisor v. Wilkie,
139 S. Ct. 2400 (2019) ................................................................................. 3

Lorillard Tobacco Co. v. Am. Legacy Found.,
903 A.2d 728 (Del. 2006) ......................................................... 18, 19, 23

Luitpold Pharm., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie,
784 F.3d 78 (2d Cir. 2015) ....................................................... 61, 63, 64

Malinowski v. N.Y. State Dep't. of Labor (In re Malinowski),
156 F.3d 131 (2d Cir. 1998) ........................................................... 36

Mass. Mut. Life Ins. Co. v. United States,
782 F.3d 1354 (Fed. Cir. 2015) ....................................................... 57

NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC,
948 A.2d 411 (Del. Ch. 2007), aff'd, 945 A.2d 594 (Del. 2008) ....................... 31

Nemec v. Shrader,
991 A.2d 1120 (Del. 2010) ............................................................... 23

Obeid v. Hogan,
C.A. No. 11900-VCL, 2016 WL 3356851 (Del. Ch. June 10, 2016) .................. 24

Osborn ex rel. Osborn v. Kemp,
991 A.2d 1153 (Del. 2010) .......................................................... passim

Osram Sylvania Inc. v. Townsend Ventures, LLC,
C.A. No. 8123-VCP, 2013 WL 6199554 (Del. Ch. Nov. 19, 2013) ................... 23

Parker Grp., Inc. v. Bryan,
C.A. No. 5:05-CV-230-C, 2006 WL 8438719 (N.D.Tex. Aug. 11, 2006) .............. 20

R.G. Le Tourneau, Inc. v. Adm'r of Gen. Servs.,
226 F.2d 48 (D.C. Cir. 1955) ........................................................... 57

Russello v. United States,
464 U.S. 16 (1983) ....................................................................... 59

Salvano v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
85 N.Y.2d 173 (1995) ................................................................... 53

Sec. & Exch. Comm'n v. Gruss,
245 F. Supp. 3d 527 (S.D.N.Y. 2017) ............................................. 32, 60

Tr. of Lingo v. Saunders,
No. CIV. A. 00-07-088, 2002 WL 31999355 (Del. C.P. Jan. 18, 2002) .......................... 37

Weiss-Wolf Inc. v. Israel Discount Bank Ltd. (In re Weiss-Wolf, Inc.),
60 B.R. 969 (Bankr. S.D.N.Y. 1986)................................................................. 41

Westinghouse Credit Corp. v. D'Urso,
278 F.3d 138 (2d Cir. 2002)............................................................................. 36

**Other Authorities**

Illinois Constitution Article IX Section 4 ............................................................ 58

Motley Fool, What is Restricted Cash on Financial Statement?, Nasdaq (Jan. 18, 2016)
https://www.nasdaq.com/article/what-is-restricted-cash-on-financial-statements-
cm567092.............................................................................................. 20

Rebate, Black's Law Dictionary (11th ed. 2019) ................................................. 57

Village of Hoffman Estates, Illinois, Comprehensive Annual Financial Report, Fiscal
Year Ended Dec. 31, 2018,
https://www.hoffmanestates.org/home/showdocument?id=21366%20 ........................... 58

Restricted Cash, Investopedia (May 23, 2019),
https://www.investopedia.com/terms/r/restricted-cash.asp ................................. 20

Security, Black's Law Dictionary (11th ed. 2019) ............................................... 54

Security Deposit, Black's Law Dictionary (11th ed. 2019)................................... 54

Security, Merriam-Webster Dictionary (2019)................................................... 54

Transform, [2] by and through its attorneys, Cleary Gottlieb Steen & Hamilton LLP, respectfully submits this reply in further support of the Adversary Complaint.

## PRELIMINARY STATEMENT

1.       As has become emblematic of Debtors' conduct in these proceedings, Debtors' arguments are marked by a single consistent theme.  During the auction, they were concerned about administrative solvency and insisted that acceptance of Transform's arguments now would exacerbate their administrative solvency concerns.  In short, they should win because they have to win.

2.       But, as the Court will recall, in crafting the APA, the Parties balanced Debtors' interest in administrative solvency with Transform's need for value and liquidity to operate a going-concern business.  Without that value and liquidity, Transform would not have been able to commit to operate as a going-concern, to maintain the national chain of retail stores, to satisfy the Assumed Liabilities, and to provide employment to the 45,000 employees who otherwise would have lost their jobs.  Transform's winning bid resolved significant concerns of the Debtors about administrative solvency and also delivered substantially greater value to the estate, including to unaffiliated third party creditors, than the Debtors' hypothetical liquidation analysis would have provided.

3.       Time and again, and, it appears, almost from the moment of signing, Debtors have seized every opportunity to try to chisel away at the APA and at the much-needed and promised value and liquidity they committed to provide Transform.  They have operated outside the ordinary course, in contravention of their contractual obligations under Sections 8.1 and 8.6 of the APA, by

---

[2]       Capitalized terms have the definitions set forth in *Transform Holdco LLC's Brief in Support of the Adversary Complaint and in Opposition to Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* [Docket No. 4464] ("Transform's Br.").

failing to pay virtually any accounts payable in the week before the closing, thereby greatly inflating the amount of accounts payable that Transform had to pay after the Closing,[3] and by reducing orders for inventory that would have served as additional and essential life-blood of Transform's newly operating going concern. The record makes clear Debtors' mindset for these actions: to manage the cash of the company in the days leading up to the Close in order to meet the Closing conditions. But the APA, with its hard-fought and carefully crafted bargain, does not allow Debtors to simply thrust additional burdens onto Transform to meet their needs.[4]

4.     In addition, Debtors have breached the APA by failing to deliver to Transform (1) the required amount of Prepaid Inventory, (2) the required amount of Specified Receivables, (3) the Adequate Assurance Deposit, (4) all of the Debtors' real property at Hoffman Estates, and (5) Debtors' claims to the Hoffman Estates EDA Funds. Even today, after Transform has paid tens of millions of dollars on behalf of the Estate—sums Debtors agree would be subject to set-off— Debtors purport to give Transform no credit for any of those sums based on imaginary and contrived notions that Transform might owe the Estate more money. Moreover, in addition to their refusal to turn over to Transform the assets it rightfully acquired under the APA, Debtors have attempted to saddle Transform with additional liabilities that it did not assume: (1) Debtors wrongly assert Transform is responsible for Mechanics' Liens it did not agree to assume, and (2) Debtors caused Transform to assume Payables beyond those it agreed to assume.

5.     In opposition, Debtors offer a mish-mash of excuses and rationalizations. They cherry-pick APA language in one argument, asking the Court to ignore the compelling parol

---

[3]     Work by Transform's professionals is still being done to determine whether the payables that existed as of the Close, reduced by those payables existing as a result of Debtors' conduct outside the ordinary course, would have reduced the accounts payable below the $166 million cap that Transform agreed to assume.

[4]     The evidence shows that as Closing approached, the Debtors significantly reduced their payments to vendors and purchase of inventory, in breach of their contractual obligations pursuant to Sections 8.1 and 8.6 of the APA.

evidence that contradicts their claim while, in other arguments, asking the Court to rely on parol evidence or to insert contract language such as "ordinary course" that simply does not appear. On many of these issues, Debtors have failed to provide any support for why they do not owe Transform these assets, at times even admitting, as they must, that they do owe Transform at least some portion of these assets. However, rather than engage with Transform on its calculations, or even provide their own, Debtors simply assert that they do not agree with Transform's figures and that Transform should produce more information to allow Debtors to determine whether they might be entitled to set-off for any amounts due to Transform. Debtors' specious arguments as to why they need not deliver rightfully acquired assets to Transform are designed to unfairly deprive Transform of the benefit of its bargain to Debtors' advantage.[5]

6.      Debtors' opposition lays bare their strategy to repeatedly raise the specter of administrative insolvency on the prayer and the whisper that by doing so, somehow, someway, it might convince the Court to ignore inconvenient contract language for them and inconvenient facts. But, as Justice Kagan recently wrote in a different context, "hard interpretive conundrums, even relating to complex rules," or in this case, a complex contract, "can often be solved." Kisor v. Wilkie, 139 S. Ct. 2400, 2415 (2019).

7.      The Court should reject this game of "what's best for Debtors," and instead focus on the terms negotiated between the Parties. The APA was not merely intended to be a savior for Debtors' administrative solvency, despite Debtors' attempts to convince the Court this is the only issue that matters. The APA reflects a hard-fought deal for Transform to realize value and liquidity

---

[5]      Debtors repeatedly argue that Transform has delayed the reconciliation process and resolution of these disputes. But Transform was the one that first brought to the Court's attention the disputed issues in March with its request to assign these matters to mediation because Debtors refused to engage in productive discussions to resolve these issues. See *Notice of Transform Holdco LLC's Motion to Assign Matter to Mediation and Transform Holdco LLC's Motion to Assign Matter to Mediation* [Docket No. 2766]. Debtors' delay in paying accounts payables and other amounts due to Transform have caused real harm to the on-going concern business.

such that it could continue to operate Sears as a going-concern concern and thereby save thousands

of jobs.  Transform is confident that when the Court considers the language of the contract, and

analyzes all of the relevant facts, it will conclude that Transform should prevail on all of the issues

presented.

## ARGUMENT

### A.    Transform Assumed Other Payables and Payment Obligations Only for Ordered Inventory and Debtors' Opposition Fails to Persuade Otherwise

8.    Transform's opening brief demonstrated that the APA,[6] read as a whole, makes

clear that the only accounts payable that Transform assumed at Closing were those arising in

connection with Ordered Inventory.  That conclusion follows from Section 2.4(q)—a provision

Debtors would want to ignore—where the Parties agreed that accounts payable in the ordinary

course were an excluded liability except for the "Severance Reimbursement Obligations, Assumed

503(b)(9) Liabilities and Other Payables and the payment obligations with respect to the Ordered

Inventory."  It also follows from the structure and language of Section 2.3 itself, which includes

"Other Payables and all payment obligations" as one unit in the middle of a long list of Assumed

Liabilities.  It is apparent from the placement of "Other Payables and all payment obligations" in

Section 2.3(k), which is only understandable if payables and payment obligations represented a

single obligation modified by "the Ordered Inventory" and subject to the provisos.  It is clear from

the Schedules, both of which refer to $166 million.  And it is also apparent from the parol evidence

---

[6] The APA refers to the Asset Purchase Agreement filed as Ex. B to the *Order (I) Approving the Asset Purchase Agreement among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection therewith and (IV) Granting Related Relief* [Docket No. 2507] (the "Sale Order"), as amended by the Amendment No. 1 to Asset Purchase Agreement filed as Ex. E to the *Notice of Filing Executed (I) Employee Lease Agreement, (II) Services Agreement, and (III) Amendment No. 1 to the Asset Purchase Agreement* [Docket No. 2599] (the "Notice of Filing of Amendment No. 1 to the APA") and by the Amendment No. 2 to Asset Purchase Agreement filed as Ex. A to the *Notice of Filing Second Amendment to the Asset Purchase Agreement* [Docket No. 3880].

(admissible to the extent there is any ambiguity), which makes clear the *only* accounts payable Transform agreed to assume were those in connection with Ordered Inventory. In short, the Parties made a trade: Transform agreed to assume all of Debtors' obligations with respect to Ordered Inventory—inventory they were required to continue to order as part of their covenant to operate in the ordinary course. In return, Debtors gave Transform the right to the Ordered Inventory. Unsurprisingly, Debtors back away from this trade in order to shore up their administrative solvency concerns and leave Transform with an empty trade.

9.      Unable to explain away either the contract or the contractual negotiations, Debtors attempt to peddle a plain untruth never before mentioned but upon which their argument relies: Other Payables could not be for Ordered Inventory because the ordering of inventory creates no obligations for Debtors either current or contingent and thus there would be no liability for them to transfer. That is demonstrably untrue—the fact that Debtors are forced to resort to such sophistry confirms they have no answer to Transform's claim.

> **a) The Contract Language Limits Transform's Obligations with Respect to Accounts Payable to Those with Respect to the Ordered Inventory**

10.      Debtors argue that "a limiting clause or phrase should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Debtors' Brief in Opposition to Transform Holdco LLC's Adversary Complaint and in Further Support of Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* ¶ 16 [Docket No. 4430] ("Debtors' Opp.") (quoting Lockhart v. United States, 136 S. Ct. 958, 961 (2016)). But waving the last antecedent rule—with which Transform obviously agrees—does Debtors no favors. It merely begs the question what is the "phrase" that immediately precedes the key language "with respect to the Ordered Inventory."

11.    The language of Section 2.3(k), the language of Section 2.3, the language of Section 2.4(q), the APA as a whole, and the parol evidence provide the answer.  They all make clear that the last phrase which is modified by "with respect to the Ordered Inventory" is "Other Payables and all payment obligations."  Debtors poke fun at Transform's quoting the language in the APA at length, Debtors' Opp. ¶ 10, but that contractual language proves Transform's argument.

### (i)    The Language of Section 2.3(k)

12.    First, the language "Other Payables and all payment obligations" is set off from the other liabilities listed in Section 2.3 by a comma and those terms are not separated from each other. In ordinary usage, a comma sets off one set of terms from another.  See Transform's Br. ¶¶ 18-19 (citing cases for the proposition that the lack of a comma separating phrases indicates those phrases are to be read together).  Although the use of the Oxford Comma admittedly is inconsistent throughout the APA, its presence between "Other Payables" and "all payment obligations" would have foreclosed Transform's interpretation; its absence, while perhaps not dispositive, leans in Transform's favor.[7]

13.    Debtors pretend Transform's argument turns solely upon the absence of the Oxford comma.  They ignore that Section 2.3(k) must be read as a whole, with its provisos.  Transform's Br. ¶ 21.  Section 2.3(k) makes sense only if "Other Payables and all payment obligations" is a single liability modified by "with respect to the Ordered Inventory."  For instance, Section 2.3(k)(vi) refers to "the Liabilities described in this clause (k)" as three:  the Severance Reimbursement Obligations, the Assumed 503(b)(9) Claims and the Other Payables.  The use of the definite article here signifies that these three liabilities are the only liabilities in clause (k),

---

[7] Even the example Debtors cite showing the lack of an Oxford Comma undermines their last-antecedent argument: In that example, the prepositional phrase starting with "arising out of the Assumed Liabilities" doesn't just modify the last antecedent "other proceeding," but in fact modifies each item list prior within Section 2.3(c).

which can only be correct if "all payment obligations" is to be read together with "Other Payables."[8]

### (ii)    The Provisos of Section 2.3(k)

14.    Second, Transform's interpretation is also the only interpretation that can explain the inclusion of both "Other Payables" and "all payment obligations" in Section 2.3(k). None of the provisos of Section 2.3(k) applies separately to "all payment obligations with respect to the Ordered Inventory." APA § 2.3(k). Debtors twist themselves in knots to explain that "all payment obligations" need not have been subject to any of the provisos in Section 2.3(k), but that misses Transform's point. The Court is not permitted to indulge the assumption the Parties engaged in meaningless exercises. If "all payment obligations with respect to the Ordered Inventory" was intended to describe a separate liability from Other Payables and not to be part of the same phrase alongside Other Payables, there would have been no reason to include that language in Section 2.3(k) at all. The parties would simply have added another subsection to the long list of liabilities covered by Section 2.3. The provisos are the proverbial "dog that did not bark;" the absence of "all payment obligations" from the provisos signals that "all payment obligations" must be read together with "Other Payables."

15.    Likewise, Debtors have no answer for why, if the $166 million is a one-sided financial obligation that should be reduced dollar-for-dollar by the Aggregate DIP Shortfall Amount, it would not be subject to the other reduction mechanisms in the provisos of Section 2.3(k). Under their reading, Other Payables would function the same way as the Severance Reimbursement Obligations and the 503(b)(9) Liabilities, and therefore the Specified Receivables

---

[8] There is no question that the term "Liability" as defined in the APA is sufficiently broad to cover all payment obligations including those that are contingent, unaccrued, unliquidated, and not yet due or matured. See APA § 1.1.

Shortfall Amount, the Warranty Receivables Shortfall Amount, and the Prepaid Inventory
Shortfall Amount should be equally applicable to Other Payables as to the others. Yet, Other
Payables is omitted from Section 2.3(k)(vii), (viii), and (ix) applying these shortfall amounts.

        **(iii)    Section 2.4(q)**

      16.    Third, try as they might, Debtors cannot erase or explain away Section 2.4(q),
which is fatal to their argument. It explicitly provides that accounts payable in the ordinary course
are an "Excluded Liability" that remains with Debtors, and then limits the exceptions to the
Excluded Liability to those involving "Severance Reimbursement Obligations, Assumed 503(b)(9)
Liabilities and Other Payables and the payment obligations with respect to the Ordered Inventory."
Debtors do not dispute that, in this provision, "with respect to the Ordered Inventory" modifies
both Other Payables and all payment obligations, and thus limits Transform's liability for ordinary
course accounts payable to those "with respect to the Ordered Inventory." Under Debtors'
argument, however, Section 2.3 of the APA adds to the Assumed Liabilities a Liability (for
ordinary course accounts payable) that Section 2.4 of the APA excludes. Debtors offer no reason
for why the Court should accept such a contrived interpretation. The more natural reading, and
the one required by principles of *in pari materia*, is that Section 2.4(q) is intended to omit from
the Excluded Liabilities the one liability with respect to ordinary course accounts payable that
Transform agreed in Section 2.3 to assume—ordinary course accounts payable in respect of the
Ordered Inventory.

      17.    Debtors do not dispute that, under their reading of Section 2.3(k), there would have
been no reason for Section 2.4(q)'s reference to accounts payable (or indeed for Section 2.4(q)) at
all). Section 2.3(k)(v) and Schedule 1.1(g) would have done all the work. They limit the quantity
of the accounts payable obligation to $166 million. Under Debtors' interpretation, Section 2.4(q)

does no more.  But the laws of contract interpretation that bind this Court require it to give the contract an interpretation that gives meaning to all of its language.  Osborn ex rel. Osborn v. Kemp, 991 A.2d 1153, 1159 (Del. 2010) ("We will not read a contract to render a provision or term 'meaningless or illusory.'") (citation omitted); In re Explorer Pipeline Co., 781 A.2d 705, 716 (Del. Ch. 2001) (declining interpretation that would "violate the mandate to attempt to give meaning to all pertinent contractual language"); Khan v. Del. State Univ., No. CV-N14C-05-148 AML, 2017 WL 815257, at *4 (Del. Super. Ct. Feb. 28, 2017) ("[T]his Court construes the contract as a whole, 'gives meaning to every word in the agreement[,] and avoids interpretations that would result in 'superfluous verbiage.'" (citation omitted)).  Transform's interpretation is the only one that does so, which is not surprising, as it reflects the deal the Parties intended, and the Debtors now seek to avoid.

18.     Lacking any other answer, Debtors ultimately ask the Court to conclude that Section 2.4(q) was included "for the avoidance of doubt."  Debtors' Opp. ¶ 28.  But, in addition to violating the rules of contract interpretation, that just substitutes one surplusage problem for another.  The phrase "for the avoidance of doubt" is used at least 48 times.  That phrase is not in Section 2.4(q) because that section is not for avoidance of doubt.  It makes clear that Transform is not liable for accounts payable in the ordinary course except those with respect to the Ordered Inventory as referenced in that section.

19.     Debtors' further response identifies a distinction without a difference.  They state that they "do not contend that they transferred to Buyer *all accounts payables* existing on the Closing Date up to a cap of $166 million," Debtors' Opp. ¶ 28, just that "the Buyer assumed all liabilities associated with up to $166 million of *Other Payables*."  Id.  But that is precisely what Debtors are trying to do—to saddle Transform with $166 million of accounts payable in the

ordinary course, not restricted to those with respect to Ordered Inventory. "Other Payables" is defined under the APA as "the accounts payable set forth on Schedule 1.1(g)," APA § 1.1; Schedule 1.1(g) says only, "See Annex 9, attached," and Annex 9 states in its entirety:

*($ in millions)*

| Assumed Accounts Payable | |
|---|---|
| Assumed Accounts Payable | $166.0 |
| **Total** | **$166.0** |

20.     And Section 2.3(k)(i) does not require Transform to make any payments with respect to the Other Payables until "the date that the applicable obligation thereunder becomes due in the Ordinary Course of Business."

21.     Thus, under Debtors' interpretation, the "Other Payables" that Transform is obligated to assume are precisely those defined as Excluded Liabilities under Section 2.4(q). This cannot be so.

### b) Transform's Interpretation Is Consistent with the "Sense" of the APA

22.     Transform's opening brief anticipated Debtors' newly-minted argument that Other Payables could not be with respect to the Ordered Inventory and demonstrated that it was sophistry. Transform's Br. ¶¶ 58-60. That post-hoc argument contradicted Debtors' prior representations to this Court (before it contrived its new argument): Debtors told the Court that there were payables for Ordered Inventory. *Debtors' Omnibus Reply in Support of the Going Concern Sale Transaction* ¶ 50 [Docket No. 2328] ("ESL has agreed to commit approximately $5.2 billion in the form of cash and non-cash consideration, including . . . ***payables*** for ordered merchandise not yet received by the Debtors.") (emphasis added). Prior to the Sale Hearing, that is also what they told Transform. See *Declaration of Cullen D. Murphy in Support of Transform Holdco LLC's Brief in Support of the Adversary Complaint and in Opposition to Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* [Docket No. 4461] ("<u>Murphy Decl.</u>"), Ex. C (January 5,

2019 email:  Murphy:  "So you're saying that the A/P that is outstanding now will be paid off by close and the A/P associated with new goods ordered will be what we are actually assuming.  And further that those goods will be delivered post close"; Good response:  "100% - yes"); id., Ex. D. (January 9, 2019 email:  Kamlani:  "confirm that the $166 [million] of AP is 90%+ for goods that will not be in the Company's possession as of 2/8"; Good response:  "yes[,] that is approximately correct").  Id., Ex. J. (January 25, 2019 email:  Murphy:  "NewCo is assuming A/P up to 166mm with the inventory backing that up to be delivered post close."; Good response:  "Not all of it will have inventory delivered post close but there will be a significant amount.").  If it turns out Debtors were mistaken in what they told Transform and the Court, that is no reason to make Transform pay *any* old ordinary course accounts payable (excluded by Section 2.4(q)).  It explains the inclusion of the reference to "all payment obligations"—the most natural reading of that language is that the Parties wanted to ensure that Transform pay all liabilities with respect to the Ordered Inventory—other payables and all payment obligations.  Everything.  As long as it was with respect to the Ordered Inventory.

23.    Debtors now try to double down.  They argue that no obligations whatsoever were created from Ordered Inventory because they could simply cancel any outstanding purchase order ("PO") with impunity.  Debtors invoke after-the-fact Mr. Meghji's assertion that "ordered inventory [as defined in the APA] would [not] have come with payment obligations."  Meghji Dep. 38:24-39:2, June 21, 2019.  Hence, Debtors resurrect the fiction that looms over these proceedings, that assuming payment obligations with respect to Ordered Inventory would not have addressed their administrative solvency concerns.  Debtors' Opp. ¶ 33.

24.    This proves too much.  Debtors initially argue that "with respect to the Ordered Inventory" cannot modify "Other Payables" because no payables existed with respect to Ordered

Inventory.  Id. ¶ 22.  But they now say that there are also no payment obligations with respect to Ordered Inventory.  If "with respect to the Ordered Inventory" cannot modify "Other Payables" because there are no payables associated with Ordered Inventory, it cannot modify "all payment obligations," under their logic, for the same reason.  Id.  The modifier would simply hang in the ether.  Clearly, the Parties could not have intended this absurd result.  Moreover, under the Debtors' reading, the words "with respect to the Ordered Inventory" are meaningless, violating the basic canon of contract construction that all contract terms must be given meaning.

25.    At any rate, Debtors would have the Court adopt a plain untruth, one that would damage vendor-retailer relationships forever.  Under the "Universal Terms and Conditions" contracts ("UTCs") that govern the business relationship between Sears and its vendors, see *Supplemental Declaration of Andrew Weaver in Further Support of the Adversary Complaint* ("Supp. Weaver Decl."), the issuance of a purchase order creates "a commitment to purchase [m]erchandise.  See, e.g., Supplemental Weaver Decl., Ex. A at 2; id., Ex. B at 2; id., Ex. C at 2. Once accepted by the vendor, the PO forms a contract that, under the UTC, can be cancelled only if one or more of sixteen specific conditions are met.  Id., Ex. A at 8; id., Ex. B at 8; id., Ex. C at 8.  If those conditions do not occur (and none of them refers to the retailer having filed a petition in bankruptcy), then there is an obligation contingent only upon delivery.  That fits squarely within the APA definition of Liability.

26.    As Mr. Kamlani stated at his deposition, "The Debtors were trying to achieve Transform taking on assets and liabilities because they were concerned that if they kept the assets and liabilities, as they sold the assets what they received for them may fall well short of the $166.5 million of liabilities."  Kamlani Dep. 78:14-20, June 20, 2019.  Had Transform not assumed the right to and payment for the Ordered Inventory, Debtors either would have had to accept title and

12

delivery to that inventory, and incur the liability for the costs, or cancel the orders and risk litigation from vendors for breach of contract. Either way, contrary to Debtors' representations, Ordered Inventory plainly was a factor in Debtors' administrative solvency calculus.

27.    The remainder of Debtors' arguments are either strawmen or plainly wrong. Debtors argue that "[t]he Parties did not specify when Buyer was obligated to make payments with respect to Ordered Inventory because . . . Ordered Inventory is *not a liability*." Debtors' Opp. ¶ 24. But even if the obligation to pay for Ordered Inventory upon delivery is not a liability for GAAP purposes, it is one for APA purposes, as demonstrated above. Transform's agreement to assume that Liability provided real value to the Debtors by relieving them from the payment obligation going forward. And similarly, while Ordered Inventory may not itself yet be an "asset" for accounting purposes, the Parties recognized that fact by providing that Transform would buy not the Ordered Inventory itself but rather "the right to receive" the Ordered Inventory. APA § 2.1(x).[9]

28.    Hence, Debtors' repetitive refrain that the separate schedules for Other Payables and Ordered Inventory shows that the two were separate, unrelated concepts, Debtors' Opp. ¶¶ 12, 18, 26, 28, 34 & n.6, fails to impress. Transform does not dispute that they reflect two different concepts, one a Liability (Other Payables) and one an asset (the right to receive Ordered Inventory), but this in no way proves them unrelated. Moreover, under the APA there was no requirement that the values be the same. The fact that they are 99.67% identical in value to one another however, clearly demonstrates their relationship. What's more, Schedule 1.1(f) presented a snapshot of value as of January 7, 2019, ten days before the signing of the APA, subject to further fluctuation up until the Close. Regardless, the agreement under the APA remains clear: Transform

---

[9] There is no support for Debtors' argument that Ordered Inventory is a liability.

contracted to acquire the right to receive approximately $166 million in inventory to be delivered

post-Close and in exchange, it would assume $166 million in liabilities for that inventory. The

schedules offer no contrary evidence.

### c) The Parol Evidence Demonstrates That the Only Payable Obligation Transform Agreed to Assume Was with Respect to the Ordered Inventory

29.     To the extent any ambiguity remains, it is resolved by the parol evidence:

- Transform's January 9 Bid Letter, which described its bid in language Debtors' *own lawyers* understood to track the APA, made clear that the only $166 million obligation Transform was agreeing to assume was in exchange for Ordered Inventory of that same value. That bid letter followed Debtors' representatives representing that Transform would receive $166 million in inventory (or close to that) in exchange for the assuming of a $166 million liability.

- On the eve of Closing, as Transform explained the correction of changing the "Ordered Inventory Shortfall Amount" to the "Prepaid Inventory Shortfall Amount," Debtors' lawyers agreed with Transform's that "if Debtors failed to deliver the bargained-for amount of Ordered Inventory, the consequence would simply be that Transform would not be obligated to assume the payables and payment obligations associated with the Ordered Inventory that Debtors failed to deliver," and that the Ordered Inventory was "just the inventory delivered with respect to the accounts payable liabilities." *Corrected Declaration of Charles W. Allen in Support of Transform Holdco LLC's Brief in Support of the Adversary Complaint and in Opposition to Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* ¶ 15 [Docket No. 4474] ("Allen Decl."). Transform could only have wanted to make this change if Ordered Inventory was in fact tied to a liability, i.e. Other Payables, that could automatically be reduced if Debtors failed to deliver.

- Transform's understanding of the $166 million liability was embedded into the liquidity analysis it shared with the Debtors prior to and during the Auction. Initially, Debtors' representatives did not take issue with it even as Transform's liquidity analyses consistently assumed that the $166 million in Other Payables were linked to the $166 million of Ordered Inventory. Transform's Br. ¶ 56. Of course, it was only after the APA was signed, *and after objections were raised to Debtors' administrative solvency by the UCC*, that Debtors arrived at their newfound interpretation, which coincidentally would help with their administrative solvency at Transform's expense.

30.     Debtors did not dispute any of this evidence, which the Court should assume is true

for purposes of the hearing. Debtors urge the Court to ignore the language of the January 9 Bid

Letter as "irrelevant," Debtors' Opp. ¶ 32, because Transform still had to win at auction and in

14

order to do so had to increase the value of its bid. But what Debtors ignore is that they understood the January 9 Proposed APA to reflect the terms of that Bid Letter that Transform would receive $166 million in incremental inventory (or close to that) in exchange for the assuming of a $166 million liability. <u>See</u> *Declaration of Andrew Weaver in Support of Transform Holdco LLC's Brief in Support of the Adversary Complaint and in Opposition to Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement*, Ex. C [Docket No. 4463] ("<u>Weaver Decl.</u>") (Minutes of a Meeting of the Restructuring Committee of the Board of Directors of Sears Holdings Corporation) ("[T]he draft asset purchase agreement provided with the Revised ESL Bid did not reflect any changes other than the changes to the economic terms described in ESL's letter."). Moreover, the language that Debtors rely on—that obligating Transform to assume "Other Payables and all payment obligations with respect to the Ordered Inventory"—did not change from the January 9, 2019 draft APA to the Executed APA. The only thing that changed was Debtors' interpretation—but not until long after the signing. At the time of signing, they understood that key language to impose obligations only with respect to Ordered Inventory. Transform's Br. ¶¶ 49-54.[10] Thus, there is no evidence whatsoever that Transform's bid changed with respect to the Assumed Liability from January 9 to February 11. All of the evidence is to the contrary.

31.    Moreover, Debtors do not answer that the changes made to Section 2.3(k) with respect to the timing of when Transform would need to satisfy the assumed liabilities listed in Section 2.3(k) confirms both Parties' understanding that Section 2.3(k) listed three liabilities and not four. <u>See</u> Allen Decl., Ex. A at 57. In their counter-proposal to Transform's proposal concerning "payments with respect to any Liability described in this clause (k)," Allen Decl., Ex.

---

[10] The definitions of Ordered Inventory and Other Payables proposed by Transform in the January 9 Proposed APA assumed their values would be detailed in different disclosure schedules attached to the APA, Allen Decl., Ex. A at 153, and therefore the "inclusion in the APA of two separate schedules" would not, as Debtors argue, in any way have affected Transform's understanding of its January 9 offer. Debtors' Opp. ¶ 34.

A at 57, Debtors broke up the "any liability" language of Transform's into only three liabilities:

the Severance Reimbursement Obligations, the 503(b)(9) Liabilities and Other Payables. Allen

Decl., Ex. B at 44-45.

32.     In its briefing on February 1, 2019 in support of the Sale, ESL noted the differences

between the January 9 bid and the final bid—and they did not include a change with respect to the

liability for Other Payables and payment obligations with respect to Ordered Inventory—because

there was no change:

> The final bid, submitted at the Auction on January 15, provided for over $5.2 billion
> in total consideration, including an additional $120 million in assumed liabilities
> consisting of the junior DIP rollover, an obligation to pay up to $19 million in
> transfer taxes, the assumption of $4 million in mechanics' liens, up to $17 million
> in cash to purchase the cash that will be located in the stores following closing, as
> well as $35 million in cash and other good and valuable consideration, all of which
> supports allowance of ESL's $2.4 billion in secured claims and ESL's right to credit
> bid (the "Credit Bid Release").

*ESL's Omnibus Response in Support of the Going Concern Sale Transaction* ¶ 24 [Doc No. 2352].

ESL's description of additional assumed liabilities did not refer to a separate obligation for $166

million in payables divorced from the concept of Ordered Inventory. That is because Transform

did not assume such a liability. And Debtors never contested this description of the additional

consideration in response to ESL's briefing.

33.     Indeed, about the only evidence Debtors rely on is a January 2, 2019 schedule sent

to Transform. That evidence, however, is easily answered. The January 2, 2019 schedule includes

entries for merchandise-related accounts payable and non-merchandise-related accounts payable,

both of which Debtors characterized as "inventory"—i.e., as goods or services Transform would

receive after Closing (and that would not already have been consumed by Debtors) in order to be

able to satisfy the obligation they had agreed to assume. See Murphy Decl., Ex B. Even if, as a

business matter, Transform would have been prepared to accept some amount of inventory in the

form of non-merchandise inventory, that does not mean Debtors can stiff Transform by not giving

it any inventory to support the accounts payable.  Murphy Decl., Ex. D.  Transform did not agree

simply to give away $166 million for goods and services Debtors already consumed (i.e., for no

value in return).

34.    More important, the January 2 email does not provide evidence with respect to the

language of the APA because it preceded both Debtors' subsequent representations to Transform

documented in an email from M-III to Transform and its representatives that "the A/P associated

with new goods ordered [would] be what [Transform is] actually assuming[, a]nd further that those

goods [would] be delivered post close,"  Murphy Decl., Ex. C, and that "the $166 [million] of AP

is 90%+ for goods that will not be in company's possession as of 2/8," id. ¶ 32, and Transform's

January 9 bid letter and offer that directly followed those representations that contained the offer

to assume $166 million in obligations in exchange for $166 million in Ordered Inventory.  As

stated above, it was that offer that formed the basis for the Parties' consistent and uniform

understanding until after the signing.  It also was that understanding that was expressed in the

conversation among counsel on the eve of signing.  Indeed, Debtors do not identify a single

document prior to signing where they, or any of their representatives, expressed the understanding

that Transform would be assuming two separate obligations—one for payment obligations for

Ordered Inventory and one for ordinary course accounts payable divorced from Ordered

Inventory—in exchange for a single asset (the right to receive $166 million in Ordered

Inventory).[11]

---

[11] Nor do Debtors identify any document where they listed two separate sets of obligations – one for accounts payable and a separate one for payment obligations.

35.     For the reasons explained here and in Transform's Brief in Support of the Adversary Complaint and in Opposition to Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement, Transform assumed a single liability of Other Payables and payment obligations only with respect to Ordered Inventory.  The Debtors' attempts to convince this Court otherwise are borne of desperation regarding their potential administrative insolvency, but find no support in the contract the Parties negotiated—and the deal to which Debtors should be held.

### d) Transform's Obligations (If Any) Are Reduced by Available Cash, Which Includes Cash-in-Transit

36.     Debtors argue that because the physical cash-in-transit existing at the time of Closing could not be used prior to the Close to pay down their DIP indebtedness, it therefore was not "available cash" under the terms of the APA, and thus did not alter the Aggregate DIP Shortfall Amount.  While Debtors ignore the language of the APA in their argument to expand Transform's obligations with respect to ordinary course accounts payable, they just add in language to the APA to deprive Transform even of the benefit of cash that Debtors had in their system at Closing—and that rightfully should reduce Transform's obligations.  Their argument fails, because Debtors' reading does not take into account the plain meaning of "available cash" and the purpose behind including "available cash" in the calculation of the Aggregate DIP Shortfall Amount in the first place.  See Am. Legacy Found. v. Lorillard Tobacco Co., 831 A.2d 335, 344, n.37 (Del. Ch. 2003) ("It bears noting that well established canons of contract interpretation require courts to read a contract as a whole, and consistent with its purposes.").

37.     Debtors ignore that the critical language in Section 2.3(k)(vi) and in the definition of "Aggregate DIP Shortfall Amount" was the product of Debtors' representations that after paying down the DIP Credit Agreement and the Junior DIP Term Loan Agreement to $1.2 billion, they would not have cash to satisfy the additional liabilities Debtors would have to satisfy.  Transform

accepted this representation but with an important caveat to preserve its integrity and the integrity

of that business deal: to the extent that the Debtors were wrong and there was "available cash" in

excess of that needed to pay down the DIP loans to $1.2 billion, and that could have been used to

satisfy the liabilities contrary to Debtors' then expectations, that excess would be Transform's

benefit (by reduction in "the [assumed] Liabilities described" in Section 2.3(k) dollar-for-dollar).[12]

38.    The Debtors' bald assertion that the purpose of Section 2.3(k)(vi) and the Aggregate

DIP Shortfall Amount was to ensure that Debtors would use all of their available cash to reduce

the outstanding DIP indebtedness to $1.2 billion is simply wrong. If that were the case, there

would have been no need for Section 2.3(k)(vi) and the notion of an Aggregate DIP Shortfall

Amount at all. The provisions would be surplusage. The objective would have been satisfied by

the APA provision making a condition of Closing that Debtors pay down their outstanding DIP

indebtedness to $1.2 billion. APA § 10.10.

39.    Once the purpose of Section 2.3(k)(vi) and the notion of the Aggregate DIP

Shortfall Amount are properly understood, Debtors' defense of their right to keep the $22.5 million

of cash that they possessed at Closing, Debtors' Opp. ¶ 24, but that was not yet in their "operating

bank accounts," id. ¶ 47, quickly crumbles. Debtors rely on the dictionary definition of

"available," as "present or ready for immediate use," id. ¶ 48, but that definition does not help

Debtors. In the first instance, the very case law Debtors cite states that Delaware courts will turn

to that dictionary definition only where the term in question "has 'no "gloss" in the [relevant]

industry.'" Lorillard Tobacco Co. v. Am. Legacy Found., 903 A.2d 728, 740 (Del. 2006) (quoting

USA Cable v. World Wrestling Fed'n Entm't, Inc., 766 A.2d 462, 474 (Del. 2000)). Here, such a

---

[12] The mechanism for the reduction of those Liabilities was Section 2.3(k)(vi) and the Aggregate DIP Shortfall Amount, which was defined as an amount as of the Closing Date equal to $1.2 billion "less the aggregate amounts required to be paid (**net of any available cash**) to fully satisfy the existing indebtedness of Sellers under both (i) the DIP Credit Agreement and (ii) the Junior DIP Term Loan Agreement" (emphasis added).

gloss exists.  Available cash is cash that is not "restricted," a term that is commonly understood to be cash that is "legally restricted pursuant to contractual arrangements."[13]  In other words, cash that is not restricted is able to be used.  It is available.  No contract or other legal obligation prevents it from being used.

40.    Although Debtors chide Transform that the word "available" would be surplusage under Transform's interpretation, Debtors' Opp. ¶ 50, that plainly is not true.  Had the APA simply read "cash," then all cash (both restricted and available) would be netted in the DIP Shortfall Amount and Transform would be credited with funds that were committed to a third party and were not really surplus.  That plainly was not the Parties' intent and hence they used the word "available."

41.    Moreover, even under Debtors' dictionary definition, Transform wins.  There is no doubt that the cash here was "present."  It was in Debtors' possession.  That should end the inquiry.  There was no further requirement that it be in Debtors' "operating bank accounts."  Id. ¶ 47.

42.    Furthermore, even if the cash that was in Debtors' systems but not in its operating bank accounts was "not *available* to the Debtors to further pay down the DIP Obligation," Id. ¶ 51, it plainly was and is available for the purpose for which Section 2.3(k)(vi) was drafted—to pay down Debtors' other liabilities.

---

[13] Sears Holdings Corporation, Annual Report (Form 10-K) (Mar. 23, 2018).  See also Parker Grp., Inc. v. Bryan, C.A. No. 5:05-CV-230-C, 2006 WL 8438719, at *4 (N.D.Tex. Aug. 11, 2006) ("Such funds are reflected on Parker Group's financial statements as 'Restricted Cash.'  This is not cash that belongs to Parker Group and thus is *not available* to Parker Group to pay its obligations.") (emphasis added); Alicia Tuovila, Restricted Cash, Investopedia (May 23, 2019), https://www.investopedia.com/terms/r/restricted-cash.asp ("Restricted cash . . . refers to money that is held for a specific purpose and therefore *not available* to the company for immediate or general business use.") (emphasis added); Motley Fool, What is Restricted Cash on Financial Statement?, Nasdaq (Jan. 18, 2016) https://www.nasdaq.com/article/what-is-restricted-cash-on-financial-statements-cm567092, ("*Restricted cash* is money that is reserved for a specific purpose and therefore *not available* for immediate or general business use") (emphasis added).

43.    Indeed, Debtors' interpretation would lead to absurd results and incentives that the Parties did not intend and could never have intended.  Under their interpretation, whether there was an Aggregate DIP Shortfall Amount and whether Transform's responsibility for Assumed Liabilities was reduced under Section 2.3(k)(vi) would depend on the mere fortuity of whether cash that Debtors possessed and that they had the right to use without restriction had yet reached Debtors' operating bank accounts.  Cash that they held in regional bank accounts or that was still in transit would not be "available" cash if those banks did not transmit the funds to the operating bank accounts.  Indeed, under their interpretation, Section 2.3(k)(vi) would not be triggered and Transform's obligations would not be reduced even if Debtors delayed the transit of cash into the operating accounts.

44.    Ultimately, while rejecting parol evidence with respect to the ambiguous language of Section 2.3(k), they rely on it for their contorted interpretation of the Aggregate DIP Shortfall Amount.  In so doing, they not only violate the laws of contract interpretation but also misstate Mr. Riecker's testimony.  Mr. Riecker was not asked for, and regardless could not give, an interpretation of "available cash" under the APA.  Nor did he testify to any general meaning of "available cash."  He further testified that he could not speak to whether unavailable cash would include cash in regional banks.  Riecker Dep. 49:22–50:3, June 19, 2019 (Question:  "Unavailable cash would include cash in regional banks?"  Answer:  "The level of specificity here, you're getting into a level of specificity that I am not able to answer.  If the next question is, you know, in registers --.").  Mr. Riecker did not testify, as Debtors claim, that "in the ordinary course, prior to the Closing, the Debtors tracked 'available cash' separate from 'unavailable cash.'"  Debtors' Opp. ¶ 49.  Mr. Riecker did not state that available cash included only cash in Debtors' operating bank accounts or that it did not include cash-in-transit.  Debtors' Opp. ¶ 49.  He testified that

"[u]navailable cash is not tracked by the accounting system.  The accounting system does not define unavailable cash."  Riecker Dep. 51:23-25, June 19, 2019.[14]  In any event, Mr. Riecker's lay testimony cannot alter the clean language of the APA.  Cameron v. City of New York, 598 F.3d 50, 62 (2d Cir. 2010) (inadmissible lay testimony).

45.    For these reasons, the Court should hold that "available cash" includes cash-in-transit and that Transform's obligations, if any, are reduced by the cash-in-transit in the amount of $8.5 million.

## B. Transform's Obligation, If Any, to Assume 503(b)(9) Liabilities Is Reduced by Shortfalls in Prepaid Inventory and Specified Receivables

### a) Debtors Shortchanged Transform on Prepaid Inventory

46.    Debtors attempt to shortchange Transform on Prepaid Inventory.  But, as with their strained interpretation of the Aggregate DIP Shortfall Amount, with respect to Prepaid Inventory, they offer no basis on which the Court should substitute their *estimate* of Prepaid Inventory delivered at Closing for the actual count of Prepaid Inventory conducted by Ernst and Young on behalf of Transform.  Debtors simply ignore the plain language of the APA.  The Prepaid Inventory Shortfall amount is $72 million.

47.    Under the APA, Transform bargained for the "right to receive" Prepaid Inventory. APA § 2.1(x).  Moreover, Transform's liabilities were to be reduced dollar for dollar by the Prepaid Inventory Shortfall Amount, APA § 2.3(k)(ix), *i.e.*, the "*amount* equal to $147,000,000 less the *amount* of the Prepaid Inventory as of the Closing Date."  Id. § 1.1 (emphasis added).  Transform calculated the Prepaid Inventory Shortfall Amount by counting the *amount* of Prepaid Inventory

---

[14] In response to questions about a single email from November 2018 using the term "unavailable cash," Mr. Riecker testified, "Unavailable cash was only tracked on this." Id. 52:5-6.  In their brief, Debtors take this language out of context, claiming that, "in the only place the Debtors tracked unavailable cash, unavailable cash was considered to include . . . cash in regional banks, and cash in stores."  Debtors' Opp. ¶ 49.

delivered after the Closing. Transform's Br. ¶¶ 80-82; *Declaration of Andrew D. Hede in Support of Transform Holdco LLC's Brief in Support of the Adversary Complaint and in Opposition to Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* [Docket No. 4458] ¶¶ 10-11 ("Hede Decl."); see also Lorillard Tobacco Co., 903 A.2d at 739 (quoting Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co., 616 A.2d 1192, 1195-96 (Del. 1992) ("Clear and unambiguous language . . . should be given its ordinary and usual meaning.")).

48.    Debtors would instead estimate Prepaid Inventory delivered at Closing as "reflected in [an] accounting entry as of February 6, 2019," almost a week before Closing. Hede Decl. ¶ 12. Debtors concede they are using an estimate for accounting purposes, Debtors' Opp. ¶ 60, but point to nothing in the APA providing for the use of such an accounting estimate to determine the Prepaid Inventory Shortfall Amount. Accordingly, the Court should decline to read into the APA a provision that does not exist. See Osborn ex rel. Osborn v. Kemp, 991 A.2d 1153, 1159-60 (Del. 2010) (courts should "give effect to the plain-meaning of the contract's terms and provisions").[15]

49.    Crucially, when the Parties wanted to use Sears' historical accounting practices to value Inventory, they did so. Section 10.9 of the APA explicitly sets a target for the "amount of . . . the Inventory Value of the Acquired Inventory (excluding any Pending Inventory)"[16] and other items. APA § 10.9. Inventory Value is defined in the APA to include "the value of such Inventory valued . . . on a basis consistent with the Sellers' current and historical accounting

---

[15]    The covenant of good faith and fair dealing also does not help Debtors because it is invoked only where there are "developments or contractual gaps that the asserting party pleads neither party anticipated." Osram Sylvania Inc. v. Townsend Ventures, LLC, C.A. No. 8123-VCP, 2013 WL 6199554, at *17 (Del. Ch. Nov. 19, 2013). Debtors make no such showing here, and cannot credibly argue that the Parties did not anticipate that they would need to determine the amount of Prepaid Inventory delivered at Closing. Moreover, courts "will only imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected." Nemec v. Shrader, 991 A.2d 1120, 1126 (Del. 2010).

[16]    Pending Inventory includes Prepaid Inventory. See APA § 1.1.

practice." Id. § 1.1.  Inventory Value is conspicuously absent from the definition of the Prepaid

Inventory Shortfall Amount or Prepaid Inventory.  See Comet Sys., Inc. S'holders' Agent v.

MIVA, Inc., 980 A.2d 1024, 1031 (Del. Ch. 2008) (citation omitted):

> [T]he parties chose to use the phrase "one-time, non-recurring expense" and not
> "extraordinary item in accordance with GAAP practice."  The obvious implication
> is that the parties chose this alternative phrase precisely because they did *not* mean
> "extraordinary item in accordance with GAAP practice," particularly in light of the
> fact that the parties obviously knew how to invoke GAAP standards when they
> wanted to.

Obeid v. Hogan, C.A. No. 11900-VCL, 2016 WL 3356851, at *20 (Del. Ch. June 10,

2016), judgment entered, (Del. Ch. 2016) (declining to read term into agreement where use

of same term in other provision demonstrated parties knew "how to draft language . . . [but]

did not deploy those skills when preparing" provision at issue).

50.    Moreover, Debtors offer no answer to the argument, see Transform's Br. ¶ 88, that

the APA specifically provides under Section 13.3 that "[n]o course of dealing between or among

the Parties shall be deemed effective to modify, amend or discharge any part of this Agreement or

any rights to payment of any Party under or by reason of this Agreement."  APA § 13.3.

51.    The Parties' choice to require Debtors to deliver an "amount" of Prepaid Inventory,

and not just an estimate, was intentional.  APA § 1.1.  Even if Debtors used their historical

accounting practices to set the "target" for the delivery of Prepaid Inventory, Debtors' Opp. ¶¶ 54,

56, 59, 63,[17] they did not provide for those accounting estimates to be used to determine whether

the target was met.  Transform's assumption of liabilities was meant to be offset by actual assets

received in the form of Prepaid Inventory.  See APA § 2.3(ix).  Transform can sell actual inventory

received—it cannot sell an estimate of a good that does not exist in real life.

---

[17]    Debtors point to no evidence that both Parties set these so-called target amounts using Sears' balance sheet.
The testimony of Robert Riecker cited to support this assertion, see Debtors' Opp. ¶¶ 54, 59, refers only to specified
receivables.

52.    The choice of the Parties to require a count rather than to simply use Sears'
historical accounting practices is also consequential.  Debtors do not dispute that the aim of the
accounting practices is to arrive at an accounting estimate—and to do so in the short time frame
that ordinarily is required for the preparation of financial statements and using a materiality
standard based on the entire Sears' balance sheet.  It is not intended to determine the actual amount
of Prepaid Inventory.[18]  Debtors' estimate does not address whether any of that inventory was
actually already received by Sears.  Hede Decl. ¶ 12.  It does not calculate the amount of Prepaid
Inventory actually delivered after the Closing.  Contrary to Debtors' assertion, Debtors' estimate
does not "track the receipt of inventory."  Debtors' Opp. ¶ 62.  Nor does it calculate what Prepaid
Inventory was *delivered* to Transform.  See Id. ¶ 59.

53.    Debtors offer no evidence to undermine Ernst & Young's calculation of the amount
of Prepaid Inventory delivered post-Close.  Debtors attack the integrity of the professionals hired
by Transform and suggest that their results were preordained.  Id. ¶ 60.  But Mr. Hede—hired by
Transform—is a Senior Managing Director at EY Turnaround Management Services LLC, with
more than 25 years of financial and operational restructuring experience across a wide variety of
business sectors in both the United States and abroad, including financial and operational reviews,
liquidity management, business and asset divestment.  Hede Decl. ¶¶ 2-3, see also *Supplemental
Declaration of Andrew D. Hede in Further Support of the Adversary Complaint* ¶ 3 ("Supp. Hede
Decl."). And as to being preordained, the attack is ironic and incorrect.  While Debtors chide
Transform for providing them an "initial analysis," *Declaration of Katherine R. Lynch in Support*

---

[18]    For that reason, Debtors' critique that Ernst & Young did not share its analysis with Transform's CFO and
accountant, Robert Riecker and Jeffrey Butz, is of no moment.  Those two individuals were involved in Sears'
preparation of financial statements; they are not experts in counting inventory.  Ernst & Young worked closely with
Sears' Treasury and Inventory Management teams to develop the methodology and compile the data and analysis.
Supp. Hede Decl. ¶ 7.

*of Transform Holdco LLC's Motion to Assign Matter to Mediation*, Ex. A [Docket No. 2767], and

then revising that initial count to *reduce* the amount of the prepaid inventory shortfall (a revision

in Debtors' favor), Debtors' Opp. ¶ 58, they omit that the basis for the further revision was Ernst

& Young's decision conservatively to expand the time period of wires analyzed to pick up an

additional three weeks that was made without knowing what results that analysis would yield.

Supp. Hede Decl. ¶ 6; <u>see also</u> Hede Decl. ¶ 10.   If Debtors had a different methodology for

counting the Prepaid Inventory, they could have offered it to Transform.[19]   Counting the Prepaid

Inventory was an arduous and painstaking task, and Debtors' attempts to criticize Transform for

its efforts to get the count right fall flat in the face of the non-existent efforts undertaken by Debtors

to count Prepaid Inventory.

54.    Debtors also attack Ernst & Young's methodology and suggest it is no better than

their estimate.   However, Mr. Hede used a counting methodology; he did not estimate the amount

of Prepaid Inventory delivered post-Close.   He took six weeks' worth of pre-Close wires for

merchandise inventory and carefully matched those wires to purchase orders issued during that

period to determine whether the inventory for which the wires were sent was delivered before or

after the Close.  Supp. Hede Decl. ¶ 7; Hede Decl. ¶ 10.  Debtors' conjecture that Prepaid Inventory

may not have been matched during this exercise is flat wrong.  <u>See</u> Debtors' Opp. ¶ 61.  Mr. Hede

matched all wires to inventory delivered pre- and post-Close.  Supp. Hede Decl. ¶¶ 7-8.  And

Debtors' suggestion that there may have been inventory delivered post-Close for which Debtors

---

[19]     In fact, Debtors refused for weeks to provide Transform with any basis for the $84 million of Prepaid
Inventory they contend was delivered at Closing, ultimately admitting in late April after repeated requests to view
their calculations that the only basis for their figure was the Sears balance sheet.  Transform's advisors, consistent
with Transform's position and the APA, asserted that the balance sheet entry bears no relation to what Prepaid
Inventory was actually delivered—and that Transform bargained to receive.  <u>See</u> Supp. Hede Decl. ¶¶ 9-11; <u>id.</u>, Ex.
A ("Telling us how the company calculates it for accounting purposes doesn't help us determine what the Buyer
actually received post-close").

sent a wire a full month and a half earlier is based on no more than rank speculation. See Debtors'

Opp. ¶ 61. They offer no evidence whatsoever that there are any such wires or that Ernst &

Young's decision to use a six-week period—double that used by Debtors themselves in their

accounting estimate—was anything less than reasonable.

55.     While Debtors conclusorily state that Transform has "frustrate[d] the Parties

reasonable expectations" by attempting to give itself an "arbitrary and unreasonable financial

gain," Debtors' Opp. ¶ 63, there is nothing unreasonable or arbitrary about Transform's rigorous

methodology undertaken to count the Prepaid Inventory as precisely as possible (which Debtors

do not even pretend their estimate purports to do). The Court should credit Transform's count and

declare that the Prepaid Inventory Shortfall Amount is $72 million.

### b)    Debtors Shortchanged Transform on Specified Receivables

56.     Debtors shortchanged Transform on Specified Receivables. At the Closing,

Debtors delivered false receivables, including "receivables" in respect of obligations or inventory

already satisfied or delivered prior to Closing, and over-delivered certain lower quality receivables,

including receivables that were never contemplated to be Specified Receivables, in place of more

valuable receivables that they were contractually obligated to deliver. Debtors did not deliver

$255.2 million of Specified Receivables at Closing, and therefore there is a Specified Receivables

Shortfall Amount.

57.     Section 2.1(d) of the APA required the Debtors to deliver "all Acquired

Receivables" to Transform at the Closing. All Acquired Receivables is defined to include

"Specified Receivables," which in turn is defined as "the accounts receivable set forth on Schedule

1.1(k)." Id. § 1.1 Schedule 1.1(k) then refers to Annex 11, which includes a list of 30 categories

of receivables and their respective values, summing to $255.2 million. The plain language of the

APA therefore obligated the Debtors to deliver "accounts receivable," in 30 categories at the amounts identified in Annex 11.

58.    In an effort yet again to dodge their contractual obligations, Debtors offer a plethora of reasons as to why they need not deliver to Transform what the plain language of the APA requires.   Debtors present straw man arguments regarding representations made during the diligence process, Debtors' Opp. ¶ 66, and rely on deposition testimony that is inadmissible and, in any event, does not override the plain language of the APA.  Id.  Debtors also suggest that the items they delivered "were simply taken directly from Sears's prepetition and post-petition accounting system," id. ¶ 73, even though the APA does not contemplate that amounts— particularly identified errors—reflected in the accounting system would be unassailable and the Debtors themselves used a different methodology for determining what receivables to include that was used in the creation of Annex 11.  Finally, Debtors misconstrue Transform's argument about double counting.  Transform is not saying that CIA payments were reflected in Sears' accounting systems as both receivables and prepaid inventory, but rather the Debtors delivered "receivables" in respect of inventory that had already been received by the Debtors prior to closing.  Amounts in respect of those receivables existed on Debtors' accounting systems *solely* due to the Debtors' delay in reconciling their receipt of Prepaid Inventory, a problem that became more acute as the Debtors increasingly had to rely on Prepaid Inventory to sustain their business.  This inventory that was actually received prior to the Closing—but as to which delivery had not yet been recorded in the accounting system—does not constitute a "receivable" in any sense of the term.

### (i)    Debtors Delivered False Receivables at the Closing

59.    Following the Closing, Transform engaged in an extensive, manual reconciliation process to identify and verify which of the Specified Receivables represent actual accounts receivable (even if aged, or representing claims against counterparties that are unlikely or unable

to pay) and which entries do not represent receivables at all—i.e., "false receivables." See *Declaration of Nader Tavakoli in Support of Transform Holdco LLC's Brief in Support of the Adversary Complaint and in Opposition to Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* ¶ 3 [Docket No. 4462] ("Tavakoli Decl.").

60.    Debtors purport to have delivered $292 million in Specified Receivables at the Closing.  Debtors' Opp. ¶ 65.  Of this figure, $159.3 million were purported vendor receivables ($83.6 million in General Ledger ("G/L") Account Number 11482 from Kmart vendors and $75.7 million in G/L Account Number 11488 from Sears vendors).  Transform's work—which Debtors do not appear to contest—demonstrated that at least $57.4 million of this $159.3 million in vendor receivables *had already been satisfied* before the Closing.  Tavakoli Decl. ¶¶ 6-15.  Transform has identified an additional $28.6 million of false receivables, including, among others, a purported $3.8 million receivable from Debtors' counsel for services provided prior to Closing and $18.8 million in intercompany receivables.  Id. ¶¶ 5, 16-17.  In sum, Transform has indisputably demonstrated that at least $86 million of the $292 million in Specified Receivables that Debtors purport to have delivered at Closing were not actually accounts receivable.  Id. ¶ 18.

61.    Debtors' arguments regarding the recovery expectations of Specified Receivables are unavailing.  Debtors' Opp. ¶¶ 66-67.  While Transform fully recognized the possibility that many of the receivables would be difficult, if not impossible, to collect, it was not told during diligence and did not sign up for the risk that some of these purported "receivables" could not be collected because *they had already been satisfied or did not otherwise even exist*.  Furthermore, Transform's opportunity to conduct due diligence is neither here nor there—it does not relieve Debtors of their contractual obligation under the APA to deliver actual receivables at the Closing. See Interim Healthcare, Inc. v. Spherion Corp., 884 A.2d 513, 548 (Del. Super. Ct.) (holding that

the "extent or quality of plaintiffs' due diligence" is irrelevant to the question of whether the defendant fulfilled its contractual obligations under their agreement), aff'd, 886 A.2d 1278 (Del. 2005).

62.     Debtors cite Jeff Butz's deposition testimony for the proposition that a CIA payment is reflected in Debtors' accounting system as either a receivable or Prepaid Inventory, and Debtors therefore argue that Transform was mistaken in claiming that the Debtors improperly double-counted certain of the Specified Receivables as Prepaid Inventory.  Debtors' Opp. ¶ 74. But that testimony does not speak to the issue Transform identified and outlined above.  The $57.4 million was indeed double-counted:  Transform paid for inventory that was on the books but is being asked to give credit for "receivables" that did not exist with respect to the very same inventory.

63.     Accordingly, at least $86 million of the purported Specified Receivables entries are not accounts receivable at all.

> **(ii)     Debtors Failed to Deliver the Agreed-to Portfolio of Specified Receivables**

64.     In addition to delivering a substantial amount of false receivables, Debtors impermissibly mixed-and-matched receivables, over-delivering in certain low-value categories and under-delivering in other high-value categories.   They over-delivered lower quality receivables by approximately $97 million in place of more valuable receivables.  Debtors argue that the APA only obligated them to deliver the Specified Receivables in an aggregate book value in excess of $255.2 million, and that there was no requirement to deliver the specific amounts in respect of the 30 discrete categories identified in Annex 11.  Debtors' Opp. ¶ 70.  But Debtors ignore that a contract "must be read as a whole, and contractual provisions must be interpreted in a way that give[s] effect to every term of the instrument and reconcile[s] all provisions of the

instrument." Intercept Pharm., Inc. v. Fiorucci, 277 F. Supp. 3d 678, 686 (D. Del. 2017) (alteration

in original) (citation omitted); see also NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC,

948 A.2d 411, 418 (Del. Ch. 2007) (courts interpret contractual language such that the "clear,

literal meaning of the terms in a legally binding agreement should be given effect when those terms

establish the parties' common meaning so that a reasonable person in the position of either party

would have no expectations inconsistent with the contract language." (citation omitted)), aff'd,

945 A.2d 594 (Del. 2008).  Annex 11 is a vital portion of the Parties' agreement and forms part of

the promise Debtors made to Transform:  Debtors would deliver certain *specified* deliverables at

the Closing, and those deliverables would be receivables of the type and in the amounts set forth

in Annex 11.  Debtors cannot now reverse course and purport to satisfy their obligation by

delivering any receivables they like irrespective of type or amount.

65.     The only evidence Debtors cite to support their argument that they had no

obligation to deliver the specific amounts identified in Annex 11 is Robert Riecker's deposition

testimony, in which Riecker states his opinion that Debtors' only obligation was to provide

receivables of at least $255.2 million.  See Debtors' Opp. ¶ 70 (citing Riecker Dep. 101:9-21, June

19, 2019).  Riecker, who was formerly Debtors' Chief Financial Officer and currently serves in

the same capacity for Transform, was called to testify in his deposition as a lay witness.  The

Second Circuit has held on numerous occasions that "witnesses may not present testimony in the

form of legal conclusions." Cameron v. City of New York, 598 F.3d 50, 62 (2d Cir. 2010) (citation

omitted).  While the majority of these cases concern expert witnesses, Cameron notes that "the

impropriety of allowing a lay witness to testify in the form of a legal conclusion is all the clearer."

Id. at 62 n.5.  Similarly, with respect to disputed legal issues in a contract, "the question of

interpretation of the contract is for the jury," and any opinion as to that interpretation "is a legal

conclusion and is excluded." Sec. & Exch. Comm'n v. Gruss, 245 F. Supp. 3d 527, 594 (S.D.N.Y.

2017).  Accordingly, the Court should exclude Riecker's deposition testimony on the question of

Debtors' legal obligations pursuant to Annex 11 as inadmissible.

66.    Having failed to identify any admissible evidence in support of their argument,

Debtors contend that it would be absurd to give legal effect to Annex 11 because the amounts

delivered cannot precisely match what was promised under the APA.  Debtors' Opp. ¶¶ 70 n.14,

71.  But Debtors have no license to break the promise they made in the APA, and certainly cannot

fall back on their contrived notion of "fluctuations" to excuse performance.  It is no coincidence

that, as Transform learned after the Closing, Debtors vastly over-delivered certain lower quality

receivables rather than the more valuable receivables that they were contractually obligated to

deliver under the APA.

67.    Debtors' contention that any fluctuations in the categories of Specified Receivables

were out of their control, Debtors' Opp. ¶ 72, is flat-out misleading.  Supra ¶ 71.

68.    Specifically, Debtors purport to deliver certain categories of receivables (many of

which likely are false receivables), even though these receivables were not Specified Receivables,

as they were not of a type included in Annex 11.  On January 6, 2019, prior to signing, Debtors

shared with Transform a schedule of the Specified Receivables with amounts pulled from the end-

of-November balance sheet and varying likelihoods of collectability ascribed to each category.

*Declaration of Kunal S. Kamlani in Support of Transform Holdco LLC's Brief in Support of the*

*Adversary Complaint and in Opposition to Debtors' Supplemental Motion to Enforce the Asset*

*Purchase Agreement* ¶¶ 41-42 [Docket No. 4459] ("Kamlani Decl."); *Declaration of Jeff Butz in*

*Support of Transform Holdco LLC's Reply Brief in Further Support of the Adversary Complaint*

¶ 5 ("Butz Decl.").  That schedule became the basis for Annex 11, which provided (among other

things) that Debtors would deliver $30 million in an account entitled "All Other Receivables." Butz Decl. ¶¶ 5-6.  Transform understood that it would be difficult to collect these receivables, since Debtors had represented that their expected recovery rate was zero percent.  Murphy Decl., Ex. B (Remaining Value Presentation at 6).  As Debtors note, on February 5, 2019, Debtors sent Transform an updated spreadsheet of the totals for each of the Specified Receivables categories based on the end-of-December balance sheet.  Debtors' Opp. ¶ 71.  In the span of a month, the amount reflected in the All Other Receivables account more than doubled from $30 million to $63 million, though approximately $12.8 million of this increase was attributable to the Debtors' aggregating other Specified Receivables into this account.  Compare Tavakoli Decl., Ex. A (Annex 11 to the APA) with *Declaration of Jared R. Friedmann in Support of Debtors' Brief in Opposition to Transform Holdco LLC's Adversary Complaint and in Further Support of Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* [Docket No. 4432]; Butz Decl. ¶ 7.  Friedmann Decl., Ex. K (E-mail attaching February 5, 2019 Specified Receivables spreadsheet).  At Closing, the amount reflected as All Other Receivables, which no longer included the amounts aggregated in the February 5 spreadsheet, inexplicably increased further to $67 million, a $37 million increase since the preparation of Annex 11 and a $16.8 million increase since the February 5 spreadsheet..  Tavakoli Decl., Ex. B (Schedule of purported Specified Receivables delivered at Closing); Butz Decl. ¶ 9.

68.    Contrary to Debtors' claims about "fluctuations" of the account, Debtors' Opp. ¶ 71, this dramatic increase was no happenstance:  Debtors did not include certain categories of receivables in the All Other Receivables account in the January 6 presentation that formed the basis of Annex 11, including categories of "receivables" entitled "Open/Unidentified Items" and "Excluded."  Butz Decl. ¶ 6.  Debtors, however, then included these categories in the All Other

Receivables account in the February 5 spreadsheet delivered to Transform *after* the APA was signed. Butz Decl. ¶ 8. These two categories represented accounting entries that were essentially worthless—one of the entries in the "Excluded" category is an accounting adjustment and others were prepaid expenses—and do not constitute Specified Receivables as that term is defined in the APA. Butz Decl. ¶ 6; see generally Tavakoli Decl. Nevertheless, of the $67 million that Debtors purport to have delivered at Closing in the All Other Receivables account, over $31 million was in respect of these two new categories. Butz Decl. ¶ 9. The fact that Debtors did not include these new so-called receivables in preparing Annex 11, only to subsequently try to include them in the items delivered at the Closing, further demonstrates that these accounting entries were not Specified Receivables: "All Other Receivables" was not intended as some catch-all category into which Debtors could throw worthless "receivables" from the balance sheet—presumably to avoid having to pay a shortfall amount or deliver receivables with actual value.

70.     Debtors' opposition barely pays lip service to the fact that a substantial portion of the amounts they claim to have delivered at Closing were not Specified Receivables. Debtors seem to suggest that their obligation to deliver Specified Receivables could be satisfied by delivering anything identified as a receivable on Sears' accounting systems, whether or not those amounts represented actual receivables or mere accounting entries. Debtors' Opp. ¶ 73. But Debtors were required under the APA to deliver "the accounts receivable set forth in Schedule 1.1(k)," APA § 1.1, and not other "receivables" that were reflected in the Debtors' accounting systems.

71.     Debtors over delivered approximately $97 million of certain lower quality receivables, reducing the amount of purported Specified Receivables delivered at Closing from approximately $292 million to approximately $195 million. Of this amount of lower quality

receivables, over $31 million were not receivables of the type contemplated to be Specified Receivables.

72.     Section 2.3(k) of the APA provides for a dollar-for-dollar reduction of liabilities based on the Specified Receivables Shortfall Amount.  Debtors' delivery of false receivables resulted in a $49.2 million shortfall.  Their delivery of receivables that were never contemplated to be Specified Receivables increases this shortfall to over $80.2 million.

## C.     Debtors Have Failed To Introduce Any Evidence To Support Their Turnover Claims, And The Evidence In The Record Shows That Debtors Owe Money To Transform

73.     In Transform's opening brief, it demonstrated that it was entitled to the return to it of $47,349 in respect of monies it paid on behalf of the Estate post-Close but that should have been paid by the Estate, after taking into account monies Transform owed Debtors in respect of cash in transit at the time of Close.  Transform and Debtors are in the process of reaching an agreement whereby Transform would pay Debtors $7,988,370 in respect of rent proration amounts in advance of reaching a final resolution as to a reconciliation of amounts received into and drawn from the cash management system since Close,[20] increasing the net amount due to Transform under this reconciliation to $8,035,719.  Transform's argument was supported by the work and declaration of Ernst & Young's Senior Managing Director, who has more than 25 years of financial and operational restructuring experience at Ernst & Young / EY Turnaround Management Services, Alvarez & Marsal and Arthur Andersen, and his team.  Supp. Hede Decl. ¶ 3.  In completing its analysis, Ernst & Young devoted a significant number of hours and personnel to, among other

---

[20]     This amount represents the netting of $11,174,959 for February real estate expense pro-rations against $1,598,931 in March GOB store rent payments, $1,587,658 for the Citi Letter of Credit facility draw.  In Debtors' Opposition, they had referred to a net amount of $8,000,547 which included $11,187,136 of rent proration amounts. Debtors' Opp. ¶ 86.  The current number is based on the amounts in EY's calculations.  Second Hede Decl. ¶ 8.

things, retrieving and compiling data from multiple data storage systems, manually reviewing thousands of lines of data, and spending substantial time with business unit personnel, all to identify funds owed either to Transform or to Debtors, and contemporaneously tracking and updating its findings in a presentation, provided to Debtors on multiple occasions.  Hede Decl. ¶¶ 3, 7; Weaver Decl., Ex. F; id., Ex. G; id., Ex. I; id., R [Docket No. 4463] ("Weaver Decl.").  All of the supporting detail for Ernst & Young's analysis has been produced to the Debtors.

74.    In response, Debtors do not deny that they owe Transform millions of dollars for monies Transform paid on the Estate's behalf and that those sums are properly set off against any monies Transform owes the Estate.  Yet, they argue for a one-sided resolution.  They ask the Court immediately to order Transform to turn over the full amount of the cash-in-transit owed by Transform to Debtors.  Debtors' Opp. ¶ 101.  But, at the same time, they would have the Court deny Transform any recoupment for the millions of dollars it has been paying, and continues to pay, on behalf of the Estate.

75.    Debtors offer no support for such an unjust result, which is supported neither by law nor by fact.

76.    As a matter of law, as the Court has acknowledged and Debtors admit, Transform is entitled to setoff amounts owed to it against any amounts owed to Debtors as a matter of recoupment.  Hr'g Tr. 39:16-18, Apr. 18, 2019; see also Malinowski v. N.Y. State Dep't. of Labor (In re Malinowski), 156 F.3d 131, 133 (2d Cir. 1998) ("funds subject to recoupment are not the debtor's property.");  Westinghouse Credit Corp. v. D'Urso, 278 F.3d 138, 147 (2d Cir. 2002) (where "both debts . . . arise out of a *single integrated transaction* . . . it would be *inequitable* for the debtor to enjoy the benefits of that transaction without also meeting its obligations.") (emphasis in original).  Transform's only obligation is to prove the amount of setoff by a preponderance, not

beyond any doubt.  See Aniero Concrete Co., Inc. v. N.Y.C Const. Auth., 308 F. Supp. 2d 164, 190 & n.17 (S.D.N.Y. 2003) (defendant bears the burden of proving its entitlement to reduction of the amount of a claim by setoff by a preponderance of the evidence); Tr. of Lingo v. Saunders, No. CIV. A. 00-07-088, 2002 WL 31999355, at *4 (Del. C.P. Jan. 18, 2002) (Defendants have failed to prove their damages, if any by a preponderance of the evidence, and thus are not entitled to the setoff sought.).

77.    As a matter of fact, Debtors have presented the Court no evidence to cast into doubt the balanced and well-founded conclusions of Ernst & Young as Transform is prepared to demonstrate at the hearing.  Transform paid sales taxes, telecom expenses, and P-Card expenses on behalf of the Estate, and Transform has continued to pay expenses on behalf of the Estate.[21] There is no basis for Debtors' argument that those should be a freebie or that Transform has done insufficient work to demonstrate its entitlement for recoupment for those amounts.  Debtors have offered no evidence that Transform is holding Estate checks delivered post-March 18, 2019. Debtors' argument regarding pre-Close orders cancelled post-Close misunderstands the Transaction.  And Debtors' argument regarding a property tax deduction for the amount of recoupment finds no home in the language of the APA—which Debtors studiously avoid.

78.    Transform and Ernst & Young have spent months gratuitously responding to Debtor's ever-changing demands.[22]  Transform even made senior members of its accounting staff

---

[21]    Most recently, Transform paid $13,335.28 to Citibank for chargebacks completed on the GOB stores after Debtors refused to pay.  Supp. Hede Decl. ¶ 18.

[22]    For example, Debtors originally asked Transform on May 1, 2019 for a "[r]econciliation of checks that Transform deposited into their bank accounts after the transaction close that may relate to Estate operations," specifying that their request was for "checks that Transform deposited in the month after transaction close," Weaver Decl., Ex. J (emphasis added).  Over six weeks later, on June 20, 2019, Debtors made a new request for Transform to reconcile checks deposited into Transform's accounts "after March 18, 2019" for obligations owed to the Estate. Weaver Decl., Ex. S (emphasis added).  Likewise, on May 1, 2019, Debtors requested "detail" for $766,000 in real estate taxes paid by Transform.  Weaver Decl., Ex. J.  But after Transform provided the requested detail, Weaver

(including its Chief Financial Officer) available for interviews by Debtors—interviews they could have used here had they supported any of Debtors' arguments. <u>See</u> Supp. Hede Decl. ¶ 15.

79.     Moreover, it is not that Debtors were without the ability to exercise self-help to call into question Ernst & Young's analysis and the amount of offset if they believed that there was a factual basis to do so. Debtors have had the benefit of Ernst & Young's analysis in one form or another since at least March 26, 2019. <u>See</u> Weaver Decl., Ex. F. They also have had their own tools and M-III Partners' three years of work for the Debtors—had they chosen to use them—to try to cast into doubt Ernst & Young's analysis. Under Section 9.5 of the APA, Debtors bargained for and received the right to "reasonable access . . . to all employees, files, the Books and Records and other materials included in the Potential Acquired Assets for purposes relating to the Bankruptcy Case, the wind-down of the operations of Sellers, the functions of any such trusts or successors, or other reasonable business purposes." They could have exercised that right—had they cared about it or truly believed the pretextual concerns they now raise—to inquire into any number of issues that they now use as a basis to deprive Transform of reimbursement for monies it expended on their behalf. Debtors' Opp. ¶ 96. They could have used the tools provided by Rule 2004 if they truly believed that Transform was in possession of Estate property. <u>See</u> <u>In re Hughes</u>, 281 B.R. 224, 226 (Bankr. S.D.N.Y. 2002) ("[T]he scope of examination allowed under Rule 2004 is broader than discovery allowed under the Federal Rules of Civil Procedure and may be in the nature of a 'fishing expedition.'") (citation omitted); <u>In re Drexel Burnham Lambert Grp., Inc.</u>, 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991) (same). And, after they launched these proceedings, they could have used the Federal Rules of Civil Procedure.

---

Decl., Ex. M, Debtors made a new request for the "underlying tax bills and invoices." Weaver Decl., Ex. P; id. Ex. Q.

80.     It was Debtors who demanded that a "hearing [would] be held to resolve all requests for relief in the Motion to Enforce and in the Adversary Complaint." *Stipulation and Order Concerning (I) Adjourning Pending Deadlines for Motion to Enforce and Adversary Complaint and (II) Setting Briefing Schedule* ¶ 6 [Docket No. 4258].   And it was Debtors who in their Supplemental Motion to Enforce claimed they were entitled to turnover of more than $35 million in purported Estate assets.  It is also Debtors who have demanded this expedited hearing.  Having made their own bed, they must now sleep in it.

81.     The only evidence in the record shows that, when the Parties' debts are netted against one another, Debtors owe Transform $8,035,719[23].  Hede Decl.  Debtors have offered only aspersions and no affirmative evidence that would contradict those conclusions.  As such, the Court should deny Debtors' turnover request and order that $47,349 be paid to Transform.

### a)  Further Consideration of Ernst & Young's Analysis Reveals Relatively Few Disputed Items and No Question As to the Results

82.     The majority of items in Transform's reconciliation, as supported by Ernst & Young's calculations, are not in dispute.  Debtors agree they are due $22,452,428 for cash in transit, $5,945,069 for Estate checks deposited into Transform's account between Closing and March 18, 2019, $4,368,957 for GOB Store credit card proceeds, and $657,243 for subtenant proceeds, totaling $33,423,697 ($8,000,000 of which Transform already paid to Debtors pursuant to the Interim Agreement, making the net total $25,423,697).  Debtors agree that Transform is due $1,015,377 Net TSA fees, and $1,131,870 on account of an April 2019 KERP Payment, and do not dispute Ernst & Young's evidence that Transform paid $1,922,800 of telecom expenses and $2,774,750 of sales, state income, franchise, annual report and business license taxes on behalf of

---

[23]     Factoring in the $7,988,370 payment to be made to Debtors on account of rent proration pursuant to the Parties' pending July 9, 2019 agreement.

Debtors.[24]  The $11,174,959[25] for February real estate expense pro-rations, $1,598,931 in March

GOB store rent payments, and $1,587,658 for the Citi Letter of Credit facility draw are in the

process of being resolved pursuant to the Parties pending July 9, 2019 agreement.

83.    In addition to those sums, Transform is entitled to $3,236,427 in respect of expenses

that Transform has paid for pre-Closing credit card charges, or so-called P-Cards.  Debtors do not

dispute that this category of expenses is properly offset against amounts owed to Debtors,

*Declaration of Christopher A. Good in Support of the Debtors' Brief in Opposition to Transform*

*Holdco LLC's Adversary Complaint and in Further Support of Debtors' Supplemental Motion to*

*Enforce the Asset Purchase Agreement* ¶ 8 [Docket No. 4434] ("Good Supp. Decl."); Debtors'

Opp. ¶ 97, but inexplicably and incorrectly claim that "this analysis is *still* on-going," Debtors'

Opp. ¶ 97 (citing to an April 14, 2019 draft of Ernst & Young's post-Close Reconciliation slide

deck).   However, as Transform previously informed Debtors, this work is complete and the

$3,236,427 reflects a final number.  Hede Decl. ¶ 8.

84.    Ernst & Young worked with Sears' accounting group, specifically the individual

who handles all P-Card processing, to arrive at this number.  Ernst & Young reviewed lists of

payments made to Bank of America on February 22, 2019 and March 7, 2019 to identify payments

paid for transactions that took place prior to Close.[26]  Upon learning from Debtors that Debtors

had made a payment on February 7, 2019 with respect to February 1 transactions, Ernst & Young

excluded those payments from the net amount.  Supp. Hede Decl. ¶ 17

---

[24]    Although footnote 18 in Debtors' Opposition refers to "sales taxes," this appears to be an error and should refer to real estate taxes instead.

[25]    Debtors refer to $11,187,136 of rent proration amounts due to them.  Debtors' Opp. ¶ 86.  It is unclear where this number comes from as it does not match the number provided in Ernst & Young's calculation.  Second Hede Decl. ¶ 8.

[26]    Ernst & Young also looked at P-Card payments for later periods, which did not include payments for any pre-Close transactions.  Id.

85.    Debtors offer no evidence whatsoever to call into question Ernst & Young's calculation.  The declaration of Debtor's representative, Christopher A. Good, states conclusorily that Transform "has not satisfactorily confirmed that it has reconciled other pre-Close payments to ensure that other P-Card payments included in its calculation were not also already paid by the Debtors",  Good Supp. Decl. ¶ 8, that is mere unfounded speculation.  Debtors have offered no evidence that they did pay any of the other P-Card payments.

86.    With respect to the remaining items in dispute, Transform clearly has put sufficient evidence before the Court to determine Transform is entitled to reimbursement.   Debtors' opposition is baseless.

87.    Estate checks deposited after March 18, 2019.  Debtors claim that Transform's entitlement to recoupment for funds it has already expended on behalf of the Estate should be reduced on the speculation that there were additional Estate checks deposited in Transform's account.  However, Debtors offer not a shred of evidence that there are any such Estate checks deposited into Transform's account after March 18, 2019.  Debtors' Opp. ¶ 93.[27]

88.    That failure is fatal to Debtors' argument.  It is not for Transform to wade through the over 1,000 checks it has received since March 2019 to prove the negative.  "The burden of proof in a turnover proceeding under Code § 542 is at all times on the party seeking turnover.  That party must establish a *prima facie* case."  Weiss-Wolf Inc. v. Israel Discount Bank Ltd. (In re Weiss-Wolf, Inc.), 60 B.R. 969, 975 (Bankr. S.D.N.Y. 1986) (citing Gorenz v. State of Illinois Dep't of Agric., 653 F.2d 1179 (7th Cir.1981)); see also 5 Collier on Bankruptcy ¶ 542.03 (16th ed. 2019) (to support a cause of action for turnover, "the trustee has the burden of proof, by a

---

[27]    Indeed, Debtors admit as much.  All they offer in support of their conjecture is a declaration that states "the Debtors have no way of knowing *what* additional amounts *may* still be owed to it."  Good Supp. Decl. ¶ 5 (emphasis added).

preponderance of the evidence, to establish that . . . the property constitutes property of the estate."). Debtors cannot circumvent the Court and exercise self-help by refusing to pay Transform the money it is owed based solely on their conjecture that Transform *may* be in possession of estate property.

89.     On the basis of the record Debtors have placed before the Court, there is no basis for the Court to reduce the sums due Transform for monies Transform expended on behalf of the Estate by any amount in respect of checks Debtors have not identified or discovered.

90.     <u>Pre-close orders, cancelled post-Close</u>.  Debtors' attempt to deprive Transform of credit for the $9,578,762 it has had to refund customers for monies they paid to Debtors pre-Close (and that Debtors are still holding) is based on a fundamental misunderstanding of the business transaction.  Hede Decl. ¶ 8.  Transform is not enjoying a "windfall" from having to refund amounts to customers that Debtors are now enjoying and that it should never have had to pay. Section 2.4 of the APA identified the Liabilities of Seller that were excluded and these were clearly among them.  With limited exceptions not applicable here, Section 2.4(a) provides that among the Excluded Liabilities are "all Liabilities of the Seller or any of its Subsidiaries arising out of the ownership of the Acquired Assets or operation of the Business or the Acquired Assets prior to the Closing Date."  APA § 2.4(a).  The right to return in respect of a purchase order made prior to Closing clearly falls within that category.

91.     What Debtors now complain of, a windfall, is a function of the business deal they negotiated.  Under the APA, Transform bought a set of inventory at Close, a portion of which, it was understood, would be used to satisfy pre-Close orders.  In exchange, Debtors got cash and other consideration for the inventory and other assets sold to Transform.  In addition, Debtors got

to keep the cash that they had received in respect of inventory that Transform would later have to deliver to customers but also kept the liabilities related to those sales.

92.    Debtors' new argument seeks to re-trade the deal.  Under Debtors' argument , Transform would be forced to refund money to customers in respect of pre-Close orders that it turns out were not good orders.  The post-Close cancellation of pre-Close order will not leave Transform with any additional inventory beyond that which it purchased, and paid for, under the APA.[28]  Supp. Hede Decl. ¶ 19

93.    In essence, Debtors seek to walk away with nearly $10 million in cash they received for orders they never fulfilled, while Transform would be forced to pay nearly $10 million in refunds on Debtors' behalf.

94.    <u>Pre-close property tax Estate checks</u>.  Debtors do not dispute that Transform has had to pay $11,444,233 for checks written by Debtors prior to Close that were drawn against Transform's account post-Close, and that such sums are the proper subject of a setoff against any sums owed by Transform to Debtors.  Debtors' Opp. ¶ 96.  But, Debtors argue that amount should be reduced by an undefined amount on account of checks written by the Debtors pre-Close for property taxes.  Debtors' Opp. ¶ 96 (citing APA § 9.11[(a)](v)).

95.    Debtors have again misread the plain language of the APA.  The property tax checks Debtors wrote—if there are any in the $11.5 million of Estate checks Transform has satisfied on behalf of Debtors—were not a gift to Transform.  They were written by Debtors in

---

[28]    If an order was placed pre-Close and the order had yet to ship as of Close, that inventory was included among the inventory that Transform purchased because inventory is removed from Sears' books when it ships, not when an order is placed.  Therefore, the cancellation of an un-shipped order will not result in any additional inventory coming into Transform's possession.  If an order was placed for an item that was not in stock and then the order was cancelled post-Close, the cancellation likewise would not result in Transform receiving any additional inventory-the order would simply be cancelled.  Likewise, even if an order had shipped, such that the inventory was not included among the inventory that Transform purchased but will come into Transform's inventory upon cancellation/return, that inventory can be expected to net out against pre-Close orders that are *not* cancelled where Transform is obligated to ship its inventory without payment.  Supp. Hede Decl. ¶ 19.

discharge of Debtors' contractual obligation, up to the moment of Close, to "conduct their business in the Ordinary Course of Business," including with respect to the payment of property taxes. APA § 8.1(a). They were also paid in discharge of Debtors' obligation "not to take action, without the consent of Buyer . . . with respect to Taxes or Tax matters that is not in the Ordinary Course Of Business and that (A) would materially adversely affect the Potential Acquired Assets, the Properties, Business and the Assumed Liabilities," including Assumed Property Tax Liabilities. APA §§ 8.1(b)(ix), 2.4(l).

96.     Accordingly, they were not, at the moment of Close, Assumed Property Tax Liabilities which Transform assumed at Close. The Assumed Property Tax Liabilities was defined to mean "all Liabilities for Property Taxes payable with respect to any Acquired Property for Pre-Assignment Tax Periods, not to exceed $135,000,000." And "Liability" was defined to mean "any liability, indebtedness, debt" and so forth, all as of the Closing. APA § 1.1. If Debtors had been billed for property taxes prior to Close and had paid those bills, as they were required and would in the ordinary course, prior to Close, they were no longer at the time of Close, an Assumed Property Tax Liability. The notion of Assumed Property Tax Liability was meant to cover taxes that were unpaid and due after Close, but that related to a pre-Close property tax liability.

97.     There is no other way to read the covenant to operate in the ordinary course and not to materially adversely affect Assumed Property Tax Liabilities and the notion of Assumed Property Tax Liabilities. Not even Debtors question that if they wrote a check prior to Close – say on February 6 – and it was cashed in the minutes before Close, it would not be an Assumed Property Tax Liability and Transform would assume no responsibility for it. It would not be a Liability at Closing. The result should be no different if Debtors cut that check on February 6 or February 7, or earlier and the taxing authorities for whatever reason (e.g., stuck in the mail, stuck

in a bureaucratic desk drawer) neglected to cash it until moments after the close on February 11. In either event, Debtors wrote the check intending to pay it; the difference in timing is happenstance and not a matter of substance.

98.    Indeed, to come to a contrary conclusion would require the Court to indulge in at least one of two unacceptable assumptions.  Either the Court would have to assume that the covenant to operate in the ordinary course and not to materially adversely affect the Assumed Property Tax Liabilities only ran until say a week before Close (when the entire period between signing and Close was no more than several weeks), such that Debtors could simply have stopped paying real property taxes and stuck the increased liability on Transform. But that would read a critical condition out of the Parties' agreement – that Transform would assume the post-Close liability for real property taxes in an amount *up to* $135 million so long as Debtors continued to pay real property taxes in the ordinary course up to the moment of Close so that Debtors were not artificially increasing the amount of the Assumed Real Property Tax Liability.  Or the Court would have to indulge the assumption that Debtors wrote checks in the days before Close intending – because they would only be received after Close –to dishonor them.  In other words, Debtors intentionally wrote bad checks.  In either event that would render an important protection for Transform illusory.  See  Osborn ex rel. Osborn v. Kemp, 991 A.2d 1153, 1159 (Del. 2010) ("We will not read a contract to render a provision or term 'meaningless or illusory.'"); In re Explorer Pipeline Co., 781 A.2d 705, 716 (Del. Ch. 2001) (declining interpretation that would "violate the mandate to attempt to give meaning to all pertinent contractual language."); Khan v. Del. State Univ., No. CV-N14C-05-148(AML), 2017 WL 815257, at *4 (Del. Super. Ct. Feb. 28, 2017)

("[T]his Court construes the contract as a whole, 'gives meaning to every word in the agreement[,] and avoids interpretations that would result in 'superfluous verbiage.'" (citation omitted)).[29]

99.     Debtors' argument fails for an independent reason.  Section 2.3(l) of the APA was intended to address the circumstance where a Liability remained post-Close that Debtors had not discharged.  That is a matter readily determined.  The taxing authorities ordinarily (at least usually) know when they have not been paid and can inform Debtors of that fact.  It clearly was not intended to have Transform scour through all of the checks that it paid on behalf of the Estate to determine whether any of those checks may have been cut by the Estate prior to Close for property taxes before Transform is properly reimbursed for any of the expense it has borne on the Estate's behalf.  That would be a near-impossible task. To date, of the approximately *9,300* checks that comprise the $11,444,233 credit due to Transform, Debtors have pointed to just two check beneficiaries that "appear to be . . . property tax authorities," without identifying a single specific check or a net value of any such checks.  Debtors' Opp. ¶ 96; Hede Supp. Decl. ¶ 13. If Transform is wrong in its contractual interpretation above, and Debtors believe that they wrote additional checks prior to Close for which Transform is not entitled to credit, they can avail themselves of the numerous tools in their toolbox to discover those facts – just like they identified the two potential tax authorities, and can bring an action against Transform for violating Section 2.3(l).  In the absence of any such evidence, they should not be allowed to hold up reimbursement of over $11 million that Transform has expended on behalf of the estate, over some undefined amount of property taxes.

---

[29] The pro-ration provision of the APA does not help Debtors.  Debtors' Opp. ¶ 96 (citing APA § 9.11(a)(v)).  It is intended to ensure that if Debtors receive a bill for a real property tax after Close and pay it when Transform should have paid it, Transform will reimburse Debtors and that if Transform receives a real property tax liability post-Close that Debtors should pay (e.g., because the $135 million cap would be breached), Debtors will reimburse Transform.

100.    <u>Uncashed Estate Checks</u>.  With respect to $2,355,197 Estate checks that have not

yet cleared, Debtors "do not dispute that it would owe these amounts if and when any of the checks

are deposited."  Debtors Opp. ¶ 98.  However, as the checks have not yet been deposited, no cash

has yet been drawn from Transform's account thereof, and it may never be—consistent with

Transform's efforts to arrive at the *right* result, not merely the one that yields Transform the

greatest recovery—Transform is in the process of agreeing to place $2,355,197 into an escrow

account, with the funds in escrow to be returned to Debtors if the checks for which escrowed funds

are held are not cashed.  The net amount due to Transform under Ernst & Young's reconciliation

is not affected by any escrow.  Hede Decl. ¶ 8.

101.    Debtors' attempts to undermine the weight of Transform's evidence by pointing to

adjustments made over the past several months are to no avail.  These adjustments only serve to

reinforce the strength of Ernst & Young's process, through which it took into account all available

information, accepted input from the Debtors, and revised or updated its analysis, all in an effort

to arrive at the right result.  Supp. Hede Decl. ¶ 16.

**D.    Transform Acquired All of Debtors' Real Property at Hoffman Estates, Illinois**

102.    Debtors shortchanged Transform on the delivery of the real property of 490

Hoffman Estates that Transform contracted to buy pursuant to APA Section 2.1 and Schedule

1.1(p).  In violation of the APA, Debtors delivered only three of the sixteen lots owned by Debtors

and that comprise 490 Hoffman Estates, delivering the deeds only to Lots 1A, 2, and 3, and not

the remaining thirteen lots.  Once again, Debtors rely on word games that find no basis in the APA

to support their argument.

103.    Debtors' argument that the only properties that they agreed to sell to Transform

were real properties that were operating and/or were related to the Business makes hash of the

language of the APA and would invite the Court improperly to make the factual inquiry as to which

of the sixteen lots—or frankly any other property purchased by Transform—were related to the operations of Sears' business.

104.    Debtors' argument simply ignores plain language.  Under Section 2.1 of the APA, Debtors agreed to sell Transform "all assets, properties and rights Related to the Business other than the Excluded Assets, and the following assets, properties and rights (collectively, the 'Acquired Assets')."  Even assuming that the thirteen missing lots are not "Related to the Business" (and Transform does not concede that), Debtors separately agreed to sell Transform "the following assets" listed in subsections 2.1(a) through (r) and among those Acquired Assets, listed in Section 2.1(c), is the right to "all Owned Real Property."  APA § 2.1.

105.    Critically, Debtors' Response does not offer any evidence to contradict any of the critical facts that give rise to Transform's claim and its right to the remaining thirteen parcels:

(a)    Prior to the petition, Sears considered all sixteen lots owned by Sears at Hoffman Estates—which replaced the Sears Tower (which previously had the identifier 490)—to be part of Store 490.  No employee or officer of legacy Sears or Transform has ever taken the position that the disputed thirteen lots were identified by anything other than Store Number 490.

(b)    At the time Debtors filed their petition, they too considered all sixteen lots to be part of 490, listing "490 Land" and "490 Office Building" in Hoffman Estates on their Schedules of Assets and Liabilities, and no other store number for any of the sixteen lots.

(c)    Shortly before the Auction, Debtors provided to Transform and other interested parties a list of all properties that were excluded from the Transform bid.  The purpose of the list was to determine whether Transform would purchase additional properties, or the Debtors could separately monetize properties, in each case to alleviate concerns about administrative insolvency.  Debtors did not include any of these thirteen lots in their list of remaining "excluded" properties.

(d)    Transform's lead negotiator, Kunal Kamlani, understood Transform to have purchased all of the property owned by Sears at Hoffman Estates.

(e)    There is no evidence that Sears assigned Store Number 490 only to Lots 1A, 2, and 3.

(f)    Sears' Real Estate Property Summary Database ("RE Prop") does not identify any of the sixteen lots in Hoffman Estates separately from Store Number 490 and there is no number that they have other than 490.

106.    Indeed, at deposition, Debtors' Chief Restructuring Officer Mohsin Meghji admitted that it was not until March or April of 2019 that he "became aware" that 490 Hoffman Estates did not include all sixteen lots owned by Sears at that location.  Meghji Dep. 23:8, June 21, 2019.  Debtors' post-hoc reinvention of what constitutes Hoffman Estates should not be countenanced.

107.    As to Debtors' alternative argument, proffered in their Motion to Enforce but now reconfigured in their Opposition, even Debtors now seem to admit that the definition of "Owned Real Property," which includes "Operating Owned Property," which—in turn—is defined as "the real property described in Schedule 1.1(p)," is not limited to "operating" property."  APA § 1.1. They argue that it is limited to those properties described in Schedule 1.1(p) that also are "[r]elated" to the Business.  Debtors' Opp. ¶ 121-22.  But the APA drafters knew how to use the word "related" when they wanted to, and did not include any such qualifier in the definition of "Operating Owned Property."   They defined that term simply to include "the real property described in Schedule 1.1(p)."  APA § 1.1.  And Debtors have no answer to Section 1.2(a)(v) of the APA, which requires that the heading "Operating Owned Property" "shall not affect or be utilized in the construction or interpretation of this Agreement."

108.    Indeed, Debtors do not dispute that other properties that are vacant land fit within the definition of "Operating Owned Properties."  After disputes arose between the parties, the Debtors attempted to cheat Transform out of the thirteen lots that Transform bought.

109.    None of Debtors' other rationalizations is any more persuasive.  In a footnote, Debtors attempt to explain away the contemporaneous listing of all sixteen lots owned by them in Hoffman Estates as either "490 Land" or "490 Office Building" in their Schedules of Assets and Liabilities on the theory that the thirteen lots were always separate from the "490 Land," and that the Sears Real Estate Department made a mistake by failing to list those lots separately.  But that Schedule cannot be so easily wished away:  "The bankruptcy schedules play a critical role in providing the information necessary for the commencement and administration of a bankruptcy case."  De Luca v. Cuomo (In re Cuomo), BAP NO. NV-13-1294-PaJuHl, 2014 WL 5358180, at *11 (B.A.P. 9th Cir. Oct. 21, 2014).  And "[a] debtor has a paramount duty to consider all questions posed on statements or schedules carefully and see that question is answered completely in all respects."  Banc One, Tex., N.A. v. Braymer (In re Braymer), 126 B.R. 499, 503 (Bankr. N.D. Tex. 1991).  The other 13 lots were not listed separately because they were not a separate property. They were part of 490 Land.

110.    Debtors' post-hoc rationalization cannot substitute for competent contemporaneous evidence.  On their theory, the thirteen lots are excluded and the three lots are included because they are the lots on which the headquarters building sits.  Debtors' Opp. ¶ 123.  But the headquarters building sits on Lot 1A and not Lots 2 and 3, and thus the Schedule cannot be explained away on the notion that "Land" refers simply to that on which the headquarters sits.  The far simpler explanation is that which is apparent from the face of the Schedule itself:  490 Land is distinguishable from 490 Office Building because it is in the "Land" in Hoffman Estates.  No

distinction was drawn between the three lots Debtors delivered and the thirteen lots they are withholding.

111.    Next, Debtors rely on the zoning report and land title survey in the Intralinks datasite (a database compiled for purposes of due diligence during the sale process), which identify Lots 1A, 2, and 3 as being part of store number 490 but do not mention the remaining thirteen lots. As a threshold matter, due diligence cannot change the meaning of a contract.  In any event, the zoning report and land title survey covering Lots 1A, 2, and 3 were included in the Intralinks datasite because those lots were previously mortgaged.  Debtors made no representations or warranties regarding the Intralinks datasite, including that it contained documents with respect to every lot in every property to be delivered to Transform.  Nor did the zoning report or land title survey purport to measure the metes and bounds of 490 Hoffman Estates.  There may be many different reasons why the three lots were mortgaged and thus received a zoning report and land title survey, and others were not.[30]  But the Court need not speculate.  It is sufficient that the Intralinks datasite did not purport to be exhaustive and, as a matter of law, it cannot alter the meaning of the APA and Schedule 1.1(p).

112.    Finally, Debtors rehash their argument that Transform waived its right to the thirteen disputed lots by accepting deeds to and paying transfer taxes as to only Lots 1A, 2, and 3 at Closing.  But that simply is not the law.  See Transform's Br. ¶¶ 137-44.  Section 13.3 of the APA and settled law provide that the parties' post-signing conduct cannot change the terms of the contract and that Debtors must deliver afterwards any assets they failed to deliver at Closing, and

---

[30]    For example, the mortgage generally included the most valuable properties or vacant land generally was not mortgaged.

Section 13.14 of the APA entitles Transform to specific performance in the delivery of all sixteen lots.

## E.    Transform Acquired the Adequate Assurance Deposit

113.    Under the plain meaning of the APA, Transform acquired the Adequate Assurance Deposit.  The language of the APA is unambiguous.

114.    Under the APA, Debtors agreed to sell Transform, at Closing, "all right, title and interest of Sellers, in, to or under all assets, properties and rights Related to the Business," APA § 2.1, and "any and all rights of Sellers in and to any restricted cash, security deposits, letters of credit, escrow deposits and cash collateral, including cash collateral given to obtain or maintain letters of credit and cash drawn or paid on letters of credit, utility deposits . . . and other security (collectively, 'Security Deposits') . . . to the extent related to any Acquired Asset."  APA § 2.1(o). The Adequate Assurance Deposit is plainly encompassed by the definition of Security Deposits under the APA; accordingly, Transform acquired the Adequate Assurance Deposit.  See Transform's Br. ¶¶ 149-50; see also Osborn ex rel. Osborn, 991 A.2d at 1159-60 (where "contract is clear and unambiguous," courts "give effect to the plain-meaning of the contract's terms and provisions").  Debtors' arguments to the contrary are unavailing.

115.    Debtors ignore that plain language and attempt to add an "ordinary course" qualifier to the definition of Security Deposit under the APA and assert that the Adequate Assurance Deposit was not acquired by Transform under Section 2.1(o) because it "did not exist in the ordinary course."  Debtors' Opp. ¶ 129.  But the words "ordinary course" make no appearance in Section 2.1(o), even though they appear in other sections of the same agreement, evidencing that the parties knew how to include such a limitation when they wanted to do so.  See APA § 2.1(o).[31]

---

[31]    Debtors ignore, of course, that in their own motion seeking the Adequate Assurance Deposit, they asserted it was related to utility expenses Debtors incur "[i]n the ordinary course of their businesses."  *Motion of Debtors*

"[F]or a court to add a limitation that is not found within the express language of the contract is untenable."  Alpine Inv. Partners v. LJM2 Capital Mgmt., L.P., 794 A.2d 1276, 1286 (Del. Ch. 2002); see also Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co., 708 A.2d 989, 992 (Del. 1998) ("Delaware observes the well-established general principle that . . . it is not the proper role of a court to rewrite or supply omitted provisions to a written agreement"); In re 1111 Myrtle Ave. Grp., LLC, 598 B.R. 729, 737 (Bankr. S.D.N.Y. 2019) (rejecting debtor's request to read a condition into a provision because "[c]ourts may not by construction add or excise terms") (citation omitted); Salvano v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 85 N.Y.2d 173, 182 (1995) ("The court's role is limited to interpretation and enforcement of the terms agreed to by the parties; it does not include the . . . imposition of additional terms.").

116.   Furthermore, "Ordinary Course of Business" is defined in the APA to include "the operation of the Business . . . subject to [] the Filing and all Orders entered in connection therewith."  APA § 1.1.  This belies Debtors' claim that "the Adequate Assurance Deposit did not exist in the ordinary course."  Debtors' Opp. ¶ 129.

117.   Debtors' contention that Transform did not acquire the Adequate Assurance Deposit because Section 2.1(o) does not use the words Adequate Assurance Deposit is of no greater merit.  Debtors' Opp. ¶ 129.  Adequate Assurance Deposit falls within several of the general categories listed (as discussed infra, the Adequate Assurance Deposit can be categorized as a security deposit, utility deposit, cash collateral, escrow deposit, letter of credit or other security). Under standard interpretation principles, each of those general terms is to be accorded their full and fair scope.  See Antonin Scalia & Bryan A. Garner, Reading Law:  The Interpretation of Legal

---

Requesting Entry of an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services, and (III) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Service ¶ 7 [Docket No. 196] ("Utility Motion").

Texts 101 (2012) ("Without some indication to the contrary, general words . . . are to be accorded their full and fair scope.  They are not to be arbitrarily limited.").  There is no basis to read a carve-out into them for security deposits made with permission of the Court, particularly since Section 2.1(o) of the APA contains a broad catch-all to account for any "other security."

118.    Debtors attempt to find significance in the fact that the Adequate Assurance Deposit was created pursuant to Section 366 of the Bankruptcy Code, Debtors' Opp. ¶ 130, but, the APA draws no distinction between security deposits created pre-petition and those entered post-petition, or those created pursuant to a court order.  Importantly, Debtors concede that to the extent there are pre-existing utility deposits (presumably deposited with the utility companies) related to an Acquired Asset, Transform has acquired such deposits under the APA. Id. ¶ 131.  Debtors concede that, as a functional matter, just like a pre-petition utility deposit, without the Adequate Assurance Deposit, utility providers could have discontinued service, "which would seriously jeopardize the Debtors' restructuring efforts and . . . creditor recoveries." Id. ¶ 130 (citations omitted).  Debtors also do not dispute that "utility providers would not have continued services to properties acquired by Buyer absent the Adequate Assurance Deposit."  Id. ¶ 132 n.37.  That is the definition of a security deposit.  See Security, Black's Law Dictionary (11th ed. 2019) ("Collateral given or pledged to guarantee the fulfillment of an obligation; esp., the *assurance* that a creditor will be repaid") (emphasis added); Security, Merriam-Webster Dictionary (2019) ("something given, deposited, or pledged to make certain the fulfillment of an obligation"); Security Deposit, Black's Law Dictionary (11th ed. 2019) ("Money placed with a person as earnest money or security for the performance of a contract").

119.    Debtors now argue that "the Adequate Assurance Deposit was specifically formulated to be distinct from" pre-existing deposits.  Debtors' Opp. ¶ 131.  But Debtors did

consider pre-existing deposits when meeting their adequate assurance of payment obligations under Section 366 and treated them identically to the sums making up the Adequate Assurance Deposit.  In the Utility Motion, Debtors explained that Debtors would deposit "a sum equal to two weeks' worth of the average utility cost for each Utility Provider (*less any amounts already on deposit or supported by a letter of credit with any such Utility Provider* that exceed outstanding prepetition amounts owed to such Utility Provider)."   Utility Motion ¶ 11 (emphasis added). Accordingly, pre-existing deposits or letters of credit (where available) topped up the Adequate Assurance Deposit so that each utility provider would have a total security of two weeks' worth of its average utility cost.[32]

120.    Contrary to Debtors' assertion, the provision in the Utility Order for the return of the Adequate Assurance Deposit upon payment of the obligations due to the provider, termination of services with the provider, or termination of bankruptcy proceedings does not distinguish it from any other security deposit.  *Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services, and (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Service* [Docket No. 461] ("Utility Order").  It is undisputed that the Adequate Assurance Deposit remained outstanding at the time of Closing and

---

[32]       In the exhibits to the *Proposed Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Establishing Procedures for Determining Adequate Assurance Of Payment for Future Utility Services, and (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Service* [Docket No. 395] ("Revised Utility Motion"), the Debtors indicate that two weeks' worth of utilities will equal approximately $10.1 million, but that Debtors will only be depositing approximately $9.2 million as Adequate Assurance Deposit.  See Revised Utility Motion, Ex. 1, at 161; see also Utility Motion, Ex. B, at 332; Utility Order, Ex. 1, at 151.  The approximately $0.9 million difference is supplied by the pre-existing deposits or letters of credit with utility companies.  See, e.g., Revised Utility Motion, Ex. 1, at 178 (showing zero adequate assurance deposit being provided for certain utilities when accounting for letters of credit); Utility Order, Ex. 1, at 129 (same).  The approximately $10.1 million of deposits evaluated by Transform, of which Transform's professionals have determined $5,338,555 belongs to Transform, therefore includes these pre-existing deposits.  See Hede Decl. ¶¶ 3-14.  Accordingly, at least some amount of the $5,338,555 requested indisputably belongs to Transform.

that the right to the funds underlying the Deposit upon satisfaction of the terms of the Order was an asset Debtors could either use or deliver. That the account in which those funds resided was created by court order did not diminish Debtors' ability to use them to induce Transform to sign the APA, nor—with Transform having signed and closed—can that fact diminish Transform's right to enjoy the assets it plainly purchased.

121.    The Court should give effect to the plain meaning of the APA and issue a declaratory judgment finding that the Adequate Assurance Deposit was acquired by Transform.

## F.    Transform Acquired the Disputed EDA Funds

122.    The payment of the disputed EDA Funds was an "Action" or "Claim" that Transform acquired at Closing under Section 2.1(p) of the APA, and these Funds were not tax refunds, rebates, or credits as defined by Section 2.2(h) of the APA. See Transform's Br. ¶¶ 163-78. The total amount of EDA Funds is calculated based on Sears' costs of relocating its headquarters to Hoffman Estates and providing infrastructure improvements to the area, the special tax allocation fund is comprised of incremental property tax revenues from *all* real property owners in the relevant project area, and the mechanism for challenging payments of EDA Funds differs from the mechanism to challenge property tax payments. Moreover, assumption and assignment *cum onere* includes the disputed EDA Funds, and federal income tax law characterizes the payment of EDA Funds as nontaxable contributions to capital.

123.    Debtors make only two arguments. They first argue that the distributions of EDA Funds were "tax rebates" as defined in Section 2.2(h) of the APA, while abandoning any argument that the EDA Funds were "tax credits" or "tax refunds." Second, they argue that Transform did not timely assert a right to the EDA Funds and thereby waived its right to them. Both arguments fail.

### a)    Transform Acquired the Disputed EDA Funds under Section 2.1(p) of the APA

124.    Even under Debtors' definition that a tax rebate is "used to incentivize certain behavior by returning some or all of the taxes paid," Debtors' Opp. ¶ 109,[33] the reimbursed funds are not tax rebates.  A "rebate" must (a) derive from and relate directly to the original payment, see Am. Univ. of Antigua–Coll. of Med. v. Leeward Constr. Co., Ltd., 653 F. App'x 48, 49 (2d Cir. 2016) ("[A] rebate cannot be sought for monies never paid."); R.G. Le Tourneau, Inc. v. Adm'r of Gen. Servs., 226 F.2d 48, 50 (D.C. Cir. 1955) ("The word 'rebate' means reduction, abatement, diminution – specifically, a payment back of a sum or quantity previously collected; it has no significance apart from the antecedent to which it relates."), and (b) return only a part or portion of the purchase price or liability—it cannot exceed the original payment.  See Mass. Mut. Life Ins. Co. v. United States, 782 F.3d 1354, 1367 (Fed. Cir. 2015) ("Reviewing these definitions, it is clear that the term rebate encompasses a return of a *portion* of the [liability].") (emphasis added); Rebate, Black's Law Dictionary (11th ed. 2019) ("A return of a *part* of a payment . . . .") (emphasis added).[34]

125.    Here, it is undisputed that Sears' entitlement to the EDA Funds does not derive from its status as a taxpayer and the amount of the reimbursement it is owed is not based on the taxes it has paid.  The EDA reimburses Sears for capital expenditures it made in developing the

---

[33]    While Black's Law Dictionary defines "tax rebate" and "tax refund" as synonyms, it also defines "rebate" as "[a] return of part of a payment, serving as a discount or reduction," and "refund" as "[t]he return of money to a person who overpaid."  Black's Law Dictionary (11th ed. 2019).

[34]    Here, while the source of the funds the Village uses to satisfy its obligation under the EDA includes Sears' prior property tax payments, that would not distinguish the EDA program from any municipal or government program.  Whether it be a judgment on a slip-and-fall case or a payment on a contract, municipalities fund their obligations through tax revenues raised and monies borrowed based on those tax revenues.  That does not make every contract payment by a municipality a tax rebate.

economic development project area.  Sears would be entitled to reimbursement even if it paid no property taxes at all.

126.    Moreover, the EDA Act makes clear that Sears' tax liability is unaffected by payments of the EDA funds.  See Illinois Economic Development Area Tax Increment Allocation Act, 20 Ill. Comp. Stat. 620/7(2) (2017) (the "EDA Act") ("Nothing in this Section shall be construed as relieving property in economic development project areas from being assessed as provided in the Property Tax Code, or as relieving owners of that property from paying a uniform rate of taxes, as required by Section 4 of Article IX of the Illinois Constitution"); see also Consol. Edison Co. of N.Y., Inc. v. United States, 10 F3d 68 (2d Cir. 1993) (holding payments from New York City to Con Edison in consideration for prepaying its New York City property tax liability do not constitute reductions in that tax liability).  Therefore, payments of the EDA Funds cannot be tax rebates because Sears' tax liability was never reduced.

127.    Debtors point to a paragraph of the Village of Hoffman Estates' 2018 Annual Financial Report that refers to "property tax rebates."  Debtors' Opp. ¶ 109 (emphasis added).  But that paragraph describes a completely different tax abatement program under a different law that bears no relation to the EDA.[35]

128.    When the Village describes the EDA in this same Report, by contrast, it does not characterize EDA payments as "*property tax rebates*."  Hoffman Estates 2018 Annual Financial Report at 27 (describing the EDA payments as designed to "induce the relocation of the

---

[35]    The "tax abatements" described in the Report were paid to several different commercial entities, funded by "sales tax, wholesale vehicle tax, amusement tax, and property tax rebates," and totaled approximately $359,942 for fiscal 2017.  See Debtors' Opp. & n.26 (Village of Hoffman Estates, Illinois, Comprehensive Annual Financial Report, Fiscal Year Ended Dec. 31, 2018 at 83, https://www.hoffmanestates.org/home/ showdocument?id=21366%20 ("Hoffman Estates 2018 Annual Financial Report")).  By contrast, Sears is the only commercial entity that receives EDA Funds, EDA Act § 4(g)(4), only incremental property taxes (not sales tax, wholesale vehicle tax, or amusement tax) are allocated as EDA Funds, id. § 4(e)(1), (2), and Sears received $8,944,465 in EDA Funds in fiscal 2017.  Weaver Decl., Ex. D (2017 email evidencing wire transfer from the Village to Sears).

headquarters of a major retailer to the Village and keeping the jobs within the state"). The fact

that the Village uses the term "property tax rebates" to describe "tax abatements" but not

distributions of EDA Funds thus undermines Debtors' argument: even the Village understands

that EDA Funds are not tax rebates. See Russello v. United States, 464 U.S. 16, 23 (1983)

(applying the canon of construction that courts give meaning to the disparate inclusion or exclusion

of particular language); Comet Sys., Inc. S'holders' Agent v. MIVA, Inc., 980 A.2d 1024, 1031

n.26 (Del. Ch. 2008) (giving meaning to a phrase because "the parties obviously knew how to

invoke" an alternative phrase "when they wanted to"); Harco Nat'l Ins. Co. v. Arch Specialty Ins.

Co., No. 06 Civ. 2928 (LBS), 2008 WL 1699755, at *8-9 (S.D.N.Y. Apr. 9, 2008), aff'd, 328 F.

App'x 678 (2d Cir. 2009) (same).

129.    Debtors present no evidence that the Village has ever characterized the payment of

EDA Funds as "tax rebates." Nor did the Debtors themselves do so in any of their filings in

connection with the *Motion of Debtors to Compel Turnover of Estate Property* [Docket No. 2715]

("Turnover Motion").[36]

130.    Lacking anything more, Debtors ultimately rely on the after-the-fact deposition

testimony of their Chief Restructuring Officer Mohsin Meghji and their former and Transform's

current Chief Financial Officer Robert Riecker characterizing the fund as a "rebate." But Mr.

Meghji is an officer of the company that has taken the legal position in this case that the funds are

rebates. It is not surprising that he would not contradict that position in his testimony in this case.

---

[36]    The Debtors suggest incorrectly that paragraph 9 of their Turnover Motion states that "the EDA Funds are property tax rebates that Sears is eligible to receive under the EDA Act." Debtors' Opposition ¶ 106. That paragraph actually characterizes the EDA payments as reimbursements and subsidies, not tax rebates: "[T]he Village and Sears entered into an Economic Development Agreement, under which Sears received *subsidies* to *reimburse* it for certain costs related to the building of its corporate campus in the Village and providing certain infrastructure improvements to the Economic Development Area ('**EDA**') in connection therewith . . . . Pursuant to a 2012 amendment to extend the Act (the 2012 Amendment') Sears remains eligible to receive annual *subsidy payments* from the Village provided it meets certain criteria." Turnover Mot. ¶ 9 (emphasis added).

The interpretation of the EDA must turn on its terms, not on how Mr. Meghji—who has no special knowledge or expertise regarding the EDA Agreement or the Village's payment of EDA Funds— characterizes those terms.[37]  See Cameron v. City of New York, 598 F.3d 50, 62 (2d Cir. 2010) (inadmissible lay testimony); Sec. & Exch. Comm'n v. Gruss, 245 F. Supp. 3d 527, 594 (S.D.N.Y. 2017) (same).  As to Mr. Riecker, Debtors mischaracterize his testimony.  While he did say that the EDA agreement "allows for some form of rebate to come back," he also candidly admitted that there is no factual basis for any such characterization because he did not "know the mechanics" of the EDA.  Riecker Dep. 9:19-21, June 19, 2019.

131.    Debtors relegate to a footnote the argument that the Village's reimbursement of Sears' costs of acquiring and developing property through payments of EDA Funds does not concern a "commercial relationship"—and for good reason.  They cite no case law for the argument, nor do they address the well settled law, previously cited by Transform, that municipalities can operate as commercial actors.  See Transform's Br. ¶ 160 n.27 (citing Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 614 (1992); Saudi Arabia v. Nelson, 507 U.S. 349, 360 (1993)).  The Village signed a contract promising to provide certain benefits to Sears if Sears provided other benefits to it.  That is, by its obvious terms, a commercial relationship.

### b)    Transform Did Not Waive Its Contractual Right to the EDA Funds

---

[37]    See Hr'g Tr. 150:20–151:3, Apr. 18, 2019 ("This is the reality of being in bankruptcy, Your Honor, is that all the employees who worked there in 2017 unfortunately are no longer all employed by Sears.  So the two women who were responsible for contemporaneously keeping track, on a monthly basis, of our compliance with the EDA Act are not there anymore.  Luckily all of their documents and records are, so Mr. Meghji, as CFO -- CRO of the company, excuse me, gathered all those documents, went through them . . . .").

132.     Debtors argue in the alternative that Transform waived its rights to the EDA Funds by not objecting to the Debtors' Turnover Motion against the Village.[38]  This argument fails under both the terms of the APA and applicable law.

133.     Section 13.3 of the APA provides:  "No amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by each Party . . . ."  The basis of Debtors' waiver argument is that Transform did not raise an objection to the Turnover Motion, and Debtors point to no written waiver executed by both parties.  Under the plain terms of the APA, there was no waiver.  See AgroFresh Inc. v. MirTech Inc., 257 F. Supp. 3d 643, 660 (D. Del. 2017) ("[T]he existence of an express non-waiver provision precludes a contracting party from arguing that the other party's conduct waived a contractual right.").

134.     Even in the absence of such a provision, Debtors would have no legal basis in support of their waiver argument.  "A contractual right may be waived if it is 'knowingly, voluntarily and intentionally abandoned.'"  Luitpold Pharm., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie, 784 F.3d 78, 95 (2d Cir. 2015) (citation omitted).  "[W]aiver should not be lightly presumed and must be based on a clear manifestation of intent to relinquish a contractual protection. . . .  [M]ere silence, oversight or thoughtlessness in failing to object is insufficient to support an inference of waiver."  Id. (citation omitted); see also 45 John NY, LLC v. HS 45 John LLC (In re HS 45 John LLC), 585 B.R. 64, 76 (Bankr. S.D.N.Y. 2018).  Waiver "is essentially a

---

[38]     Debtors entitle this section of their Opposition "Buyer Is Estopped From Asserting Any Rights to the EDA Funds," but nowhere assert any defense based on or cite any case law applying the doctrines of equitable, judicial, or any other form of estoppel.

matter of intent which must be proved." Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue

Shield of N.J., Inc., 448 F.3d 573, 585 (2d Cir. 2006) (citation omitted).[39]

135.    Transform did not knowingly, voluntarily and intentionally abandon its right to the

EDA Funds.  Transform had not taken assumption and assignment of the EDA Agreement as of

the Turnover Motion.  Transform could not waive a right it did not yet have.

136.    Pursuant to Section 2.9 of the APA, Transform had 60 days from Closing—until

April 12, 2019—to provide Debtors with written notice to designate certain contracts for

assumption and assignment.  Debtors noticed a total of 9,786 executory contracts and 1,088 leases

as being eligible for potential assumption and assignment.[40]  The first set of contracts Transform

assumed were with key vendors and suppliers that were critical to Sears' ability to continue to

---

[39]    Debtors rely on New York law as the basis of their waiver argument, see Debtors' Opp. ¶ 120 (citing Gen. Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist., 85 N.Y.2d 232, 236 (1995); Kortright Capital Partners LP v. Investcorp Inv. Advisers Ltd., 257 F. Supp. 3d 348, 359 (S.D.N.Y. 2017)), and their argument fails under New York law, as described below.  The result would be the same under Delaware law, which governs all claims based upon, arising out of, or related to the APA.  APA § 13.8(a); see Arnold v. Soc'y for Sav. Bancorp, Inc., 650 A.2d 1270, 1289 (Del. 1994) ("Waiver is the voluntary and intentional relinquishment of a known right . . . .  It implies knowledge of all material facts and intent to waive.") (citation omitted).

[40]    See Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction [Docket No. 1731]; Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction [Docket No. 1774]; Second Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction [Docket No. 2314]; Third Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction [Docket No. 2753]; Fourth Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction [Docket No. 2995]; Fifth Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction [Docket No. 3097]; Sixth Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction [Docket No. 3152]; Seventh Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction [Docket No. 3330]; Eighth Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction [Docket No. 3453]; Ninth Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction [Docket No. 3972]; Tenth Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction [Docket No. 4147].  This total actually undercounts the total number of contracts and leases reviewed by Transform, as Transform later discovered certain additional contracts and leases that had never been listed on one of the Debtors' cure notices.

operate its business.  Transform also had to address hundreds of non-residential leases that were subject to a statutory assumption deadline under 11 U.S.C. § 365(d)(4).  Debtors filed the Turnover Motion on February 28, 2019.  At the time, the deadline for Transform to exercise its right to take assumption and assignment of the EDA Agreement had not expired.  On April 12, 2019, the deadline to designate certain contracts, including the EDA Agreement, for assumption and assignment was extended until May 13, 2019.  *Notice of Amendment to Asset Purchase Agreement Extending Certain Deadlines* [Docket No. 3171].

137.    The Court held a hearing on the Turnover Motion on April 18, 2019 (the "April 18 Hearing").  Transform noticed its assumption and assignment of the EDA Agreement more than two weeks later, on May 2, 2019.  *Notice of Assumption and Assignment of Additional Executory Contracts* [Docket No. 3539].  The Court then ordered the Village to disburse $2,508,660.33 of the EDA Funds to Debtors on May 6, 2019.  *Order Directing Partial Turnover of EDA Funds to Debtors and Reserving Balance Pending Court Order* [Docket No. 3678].

138.    Between February 28, when the Turnover Motion was filed, and the April 18 Hearing,  Transform was in the process of deciding whether to notice assumption and assignment of more than 10,000 contracts and leases and had not yet done so for the underlying EDA Agreement.[41]  Far from "knowingly, voluntarily, and intentionally abandoning" its contractual right, Luitpold, 784 F.3d at 95, Transform was exercising its contractual right to delay its decision on whether to take on the benefits and burdens of the EDA Agreement.  See APA § 2.9.[42]

---

[41]    The Debtors misleadingly suggest that Transform "sat silent when the Court asked whether any other party objected" at the April 18 Hearing.  Debtors' Opp. ¶ 118.  The question posed by the Court was whether there was anyone else "interested in this except you two, the school district and the Village."  Hr'g Tr. 146:10-15, Apr. 18, 2019.

[42]    Debtors also argue that they have expended resources litigating the Turnover Motion and Illinois Action in reliance on Transform not asserting a claim to the EDA Funds.  But any such reliance—before Transform had made a decision to take assumption of the EDA Agreement, which Debtors knew it had a right to do under the APA—was

139.    Moreover, the Turnover Motion concerned whether Sears maintained the requisite number of full-time equivalent jobs in 2017 and was therefore entitled to the EDA Funds due for 2017, not whether those funds had been acquired under the APA.  Turnover Mot. ¶¶ 1-3.

140.    These facts simply do not provide the basis for implicit waiver of a contractual right, which must not be "lightly presumed."  Luitpold, 784 F.3d at 95.  Judge Lane's recent decision denying summary judgment in In re HS 45 John LLC, 585 B.R. 64 (Bankr. S.D.N.Y. 2018), is on point.  There, the factual basis for waiver was much stronger:  the buyer remained silent in the face of repeated statements by the court and debtor regarding its rights under an asset purchase agreement, and failed to respond when the court directly questioned debtor and invited any other party to chime in on the issue.  In re HS 45 John LLC, 585 B.R. at 76.  Nonetheless, the court rejected debtor's waiver argument, finding that the law disfavored waiver "based on the kind of silence or inaction that occurred here," and that "intent must be manifested more clearly by, for example, the passage of greater time or the active selection of alternative legal options."  Id. at 77.

## G.    Debtors Wrongly Assert Transform Is Responsible for Mechanics' Liens It Did Not Agree to Assume

141.    Under the APA, Transform assumed liability for the claims underlying 36 specific mechanics' liens.  Claims underlying the mechanics' liens on the Lease Premises and the Sparrow Properties remained with the Debtors.  In their efforts to deprive Transform of every penny it could use for its going concern, Debtors ignore the language of the contract they signed.

142.    Sections 2.3 and 2.4 of the APA govern which liabilities Transform did and did not assume.  In the APA, Section 2.3, which addresses Transform's assumption of liabilities, specifically provides that Transform would assume the liability for "the claims underlying the

---

unreasonable, self-serving, and speculative.  Transform took no action that would have reasonably induced such reliance, particularly in light of Transform's acquisition of Actions and Claims under Section 2.1(p) of the APA.

mechanics' liens identified in Section 2 of Schedule 6.5" (i.e., not the Lease Premises or the Sparrow Properties).  APA § 2.3(p).  Under the canon of *expressio unius est exclusio alterius*, this explicit assumption of mechanics' liens identified in Section 2 of Schedule 6.5 implies the exclusion of all other mechanics' liens from Assumed Liabilities.  See iBio, Inc. v. Fraunhofer USA, Inc., C.A. No. 10256-VCMR, 2016 WL 4059257, at *6 & n.59 (Del. Ch. July 29, 2016) (applying *expressio unius* canon).  Debtors contend that the language in the opening paragraph of Section 2.3, which provides that Transform will assume the list of liabilities that follows "[u]pon the terms and subject to the conditions of" the APA, somehow can be used to expand this list of Assumed Liabilities.  Debtors' Opp. ¶ 139.  It cannot.  The language does nothing more than state that if Transform does assume a liability under Section 2.3, it does so subject to the remaining terms of the APA.

143.    If more were needed, Section 2.4(a) of the APA expressly provides that "[n]one of Buyer, any Affiliate of Buyer or any Assignee shall assume, [or] be deemed to assume . . . any Liabilities of any Sellers or any of their respective Affiliates  . . . other than the Assumed Liabilities."[43]  The "Excluded Liabilities" include "all Liabilities of the Seller . . . arising out of the ownership of the Acquired Assets or operation of the Business or the Acquired Assets prior to the Closing Date," APA § 2.4(a), and "all Liabilities relating to the payment or performance of obligations arising solely out of facts or circumstances in existence prior to the Closing Date." APA § 2.4(b).  This would indisputably include the Lease Premises and Sparrow Properties.

---

[43]    In addition, as a default, APA Section 2.1 provides that Debtors shall sell the Acquired Assets to Transform "free and clear of any and all Encumbrances of any kind, nature or description and any Claims, in each case other than Permitted Post-Closing Encumbrances."  The Permitted Post-Closing Encumbrances do not include the liabilities underlying mechanics' liens.  APA § 2.1; Schedule 1.1(i).

144.    Debtors do not dispute that the mechanics' liens omitted from Section 2 of Schedule 6.5 would fall into Excluded Liabilities.  But they still argue that "notwithstanding that Buyer may not have assumed certain liabilities" it "agreed to be responsible for paying, discharging, or bonding over the underlying mechanics' liens on certain properties it acquired."  Debtors' Opp. ¶ 140.  This position makes no sense, and disregards the definition of "Liability" in the APA, which includes any "responsibility . . . or obligation of whatever kind or nature."  APA § 1.1.

145.    Ignoring those relevant APA provisions, Debtors nonetheless claim that amendments to the APA "apportioned to Buyer certain responsibilities in addition to those undertaken," under Section 9.11(a) of the APA.  Debtors' Opp. ¶ 137.  But the sentence they cite only provides that "[t]he Sellers and Buyer shall prorate all items of revenue and expense with respect to the Owned Real Property, the Lease Premises . . . and the Sparrow Properties as of the Closing Date with the Sellers being . . . responsible for all fees, costs and expenses accrued or apportioned up to but not including the Closing Date."  APA § 9.11(a).  It contains no mention of mechanics' liens and does not address Transform's obligations with respect to mechanics' liens.

146.    Debtors also invoke Section 9.11(a)(vi), which provides that "Sellers shall be charged for the amount of any underlying mechanics' liens with respect to any Owned Real Property (other than those identified in Section 2 of Schedule 6.5) that are not paid, discharged by order of the Bankruptcy Court or bonded over in a manner reasonably acceptable to Buyer."  Debtors' Opp. ¶ 138.  Section 9.11(a)(vi) refers to only one set of expenses with respect to mechanics' liens—those pertaining to the Owned Real Property (which under Amended Section 2.3(p) were split between Debtors and Transform).  It is completely silent as to apportionment of mechanics' liens related to the Lease Premises or the Sparrow Properties.  And it says nothing about Transform's responsibilities.  By its terms, the provision nowhere shifts liability for

mechanics' liens with respect to any Lease Premises or Sparrow Properties from the Debtors to Transform that the APA elsewhere assigns to Debtors.

147.    Indeed, Debtors' reading would make Amended Section 2.3(p) completely redundant.   Under their theory, amended Sections 9.11(a) and 9.11(a)(vi) would already make Transform "responsible" for mechanics' liens listed in Section 2 of Schedule 6.5.  But see Osborn ex rel. Osborn v. Kemp, 991 A.2d 1153, 1159 (Del. 2010) ("We will not read a contract to render a provision or term 'meaningless or illusory.'"); Khan v. Del. State Univ., No. CV-N14C-05-148(AML), 2017 WL 815257, at *4 (Del. Super. Ct. Feb. 28, 2017) ("[T]his Court construes the contract as a whole, 'gives meaning to every word in the agreement[,] and avoids interpretations that would result in superfluous verbiage.'") (alteration in original).

148.    Debtors' interpretation would also wipe out the prohibition against saddling Transform with additional liabilities not assumed under Section 2.3 and the specific language in Sections 2.4(a)-(b) prescribing that Transform is not assuming liabilities arising out of the ownership of the Acquired Properties and relating to the Assigned Agreements, to the (undisputed) extent those provisions relate to the mechanics' liens other than those assumed under Amended Section 2.3(p).  This is likewise unsupportable.  See Antonin Scalia & Bryan A. Garner, Reading Law:  The Interpretation of Legal Texts 327 (2012) ("Repeals by Implication are disfavored— 'very much disfavored.'") (quoting James Kent, Commentaries on American Law *467 n.(y1) (Charles M. Barnes ed., 13th ed. 1884)); Branch v. Smith, 538 U.S. 254, 273 (2003) (plurality opinion) ("We have repeatedly stated . . . that absent a clearly expressed . . . intention, repeals by implication are not favored.  An implied repeal will only be found where provisions . . . are in irreconcilable conflict.") (citation omitted).

149.    Debtors again resort to parol evidence but that cannot help them.  They argue that because an earlier draft of the amendment provided that Debtors would be charged for any amount underlying mechanics' liens with respect to "any Potential Acquired Assets,"—defined in the APA as "all assets of Seller of any kind that either (i) constitute an Acquired Asset (other than Leases or Contracts) or (ii) constitute Potential Transferred Agreements"—the later adoption of "Owned Real Property" in the final version signaled the conscious decision of the Parties to narrow Seller's responsibilities with respect to the mechanics' liens.  Debtors' Opp. ¶ 142.  Besides being inadmissible extrinsic evidence, the Parties' acquiescence around the adopted language of "Owned Real Property" does not affect in the slightest the settled understanding from the inclusion of Amended Section 2.3(p) that Transform was to assume solely the labilities for the mechanics' liens listed in Section 2 of Schedule 6.5.

150.    For these reasons, the Court should hold that Debtors are wrong to assert that Transform assumed liabilities for mechanics' liens other than those listed in Section 2 of Schedule 6.5.

## RESERVATION OF RIGHTS

151.    Transform reserves its rights to supplement the defenses and arguments set forth in this brief based on its continuing investigation into the Debtors' claims.

## CONCLUSION

152.    For the reasons stated above, Transform requests that the Court award the relief requested in its Adversary Complaint and such other and further relief as is justified under the circumstances and deny the Debtors' Supplemental Motion to Enforce the APA.

Dated:  July 9, 2019
        New York, New York

**CLEARY GOTTLIEB STEEN &
HAMILTON LLP**

*/s/ Lewis J. Liman*
Lewis J. Liman
Sean A. O'Neal
Luke A. Barefoot
Abena A. Mainoo
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

*Counsel for Transform Holdco LLC*