UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
:
In re                                                             :
                                                                  :   Chapter 11 Case No.
SEARS HOLDINGS CORPORATION, *et al.*,                             :
Debtors.[1]                                                       :   18-23538 (RDD)
                                                                  :
                                                                  :   (Jointly Administered)
                                                                  :
------------------------------------------------------------------x

**SUPPLEMENTAL DECLARATION OF ANDREW D. HEDE IN FURTHER SUPPORT OF THE ADVERSARY COMPLAINT**

I, Andrew D. Hede, declare under penalty of perjury as follows:

1.  I respectfully submit this supplemental declaration ("Supp. Hede Decl.") in Support of the Adversary Complaint.

2.  I am a Senior Managing Director of EY Turnaround Management Services LLC, a direct, wholly owned subsidiary of Ernst & Young U.S. LLP and an affiliate of Ernst & Young LLP ("EY"). In January 2019, Transform Holdco LLC ("Transform") retained EY to assist with setting up the newly-formed Transform entities and completing the acquisition of substantially

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC(6546); Sears Operations LLC(4331); Sears, Roebuck and Co. (0680); Service Live Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); Max Serv, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); My Gofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); Star West, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); SHC Licensed Business LLC (3718); SHC Promotions LLC (9626); and Sears Brands Management Corporation (5365).

all of Sears' assets.  In addition, at the direction of Cleary Gottlieb Steen & Hamilton LLP ("Cleary"), counsel to Transform, I have been asked to evaluate certain assets that Transform acquired or claims to entitlement to pursuant to the Asset Purchased Agreement dated January 17, 2019, as amended (the "APA").

3.      Since EY's retention, I have devoted substantial time and attention to such transition matters and I have become knowledgeable about and familiar with Sears' day-to-day operations, business and financial affairs, and books and records.  I have more than 25 years of financial and operational restructuring experience in both the United States and Australia, including financial and operational reviews, liquidity management, business and asset divestment, business plan preparation and review, recapitalization strategies and negotiation of reorganization plans.  I have experience across a broad range of sectors and also served in various interim management roles.  Prior to Ernst & Young, I was employed at Alvarez & Marsal and Arthur Andersen.

4.      Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge of Transform's and the Debtors' pre- and post-Closing operations and finances gleaned during the course of my engagement with Transform; my discussions with Transform's other advisors, other members of EY's team, company management and the Debtors' advisors, including Debtors' financial advisor, M-III Partners, LP ("M-III"); my review of relevant documents; and my views based upon my professional experience.  If called to testify, I would testify competently to each of the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of EY for Transform.

5.      As detailed in the declaration I submitted on July 8, 2019, *Declaration of Andrew D. Hede in Support of Transform Holdco LLC's Brief in Opposition to Debtors' Supplemental*

*Motion to Enforce the Asset Purchase Agreement and in Support of the Adversary Complaint* [Docket No. 4458] ("Hede Decl."), at Cleary Gottlieb's direction, EY assessed the amount of Prepaid Inventory received by Transform post-Closing so that Transform could determine the amount less than $147 million in Prepaid Inventory that Transform received. EY developed and utilized a methodology to quantify the amount of Prepaid Inventory that Debtors delivered to Transform.

6. Transform began by identifying wires to merchandise vendors in the three weeks prior to Closing. That is the time period used in Debtors' estimate. However, to be conservative and because not all prepaid inventory is received within three weeks, Transform enlarged the parameter to the six-week period prior to Closing.

7. EY meticulously identified each payment issued to merchandise vendors on cash in advance terms, then identified the purchase orders associated with those vendors. Next, EY identified the inventory that was received with respect to each purchase order, and determined whether that inventory was received pre-Closing or post-Closing. EY determined the receipt of inventory using Sears' existing inventory management systems. EY worked closely with Sears' Treasury and Inventory Management teams to develop the methodology and compile the data and analysis. It is typical for businesses to track prepaid inventory on an individual vendor basis and so EY's methodology effectively recreated individual vendor prepaid inventory accounts.

8. Debtors state that Prepaid Inventory that Transform "could not match during the reconciliation . . . may, nonetheless, have been received by [Transform] after Closing." *Debtors' Brief in Opposition to Transform Holdco LLC's Adversary Complaint and in Further Support of Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* ¶ 61 [Docket No. 4430] ("Debtors' Opp."). That is not accurate. EY identified every purchase order related to the

3

payments to merchandise vendors and identified when the associated inventory was received. EY did not encounter any purchase orders that could not be matched to Sears' inventory tracking systems.

9.   Debtors' estimate for the amount of Prepaid Inventory delivered to Transform is taken from Debtors' accounting entry for Prepaid Inventory as of February 6, 2019.  On multiple occasions post-Closing, I specifically requested that Debtors' advisors provide the basis for their $84 million calculation of Prepaid Inventory delivered at Closing.  On April 22, 2019, weeks after I first made this request, Debtors' advisors at M-III informed me that the only basis they could provide for their calculation was this accounting entry from Sears' balance sheet.  See Exhibit A, attached hereto, which is a true and correct copy of email correspondence with the subject line "RE: CIA Inventory" between EY and Debtors' advisors M-III Partners, dated April 22, 2019.  Specifically, Chris Good of M-III told me that the only information that he could provide in response to my request was "Prepaid Inventory in accordance with how the Company calculates it for the Balance Sheet." Ex. A at 1.  Mr. Good asked me if this would "work." Ex. A at 1.

10.  I was surprised by this response.  Specifically, I was surprised that Debtors did not have a calculation for what amount of Prepaid Inventory actually existed at Closing.  I was expecting Debtors to provide support for their calculation of $84 million, which I had understood would be based on an actual reconciliation of wires and associated purchase orders issued for which the inventory had not been received at Closing.  I was also surprised that Debtors believed an accounting entry could substitute for determining what amount of Prepaid Inventory actually existed at Closing.  I expressed my surprise immediately, responding to Chris Good within minutes, explaining that "[t]elling us how the company calculates [Prepaid Inventory] for

4

accounting purposes doesn't help us determine what the Buyer actually received post-close." Ex. A at 1.

11. To date, Debtors have not provided EY with any other basis for their $84 million estimate of Prepaid Inventory delivered at Closing. Debtors have also not provided EY with their count of the amount of Prepaid Inventory actually delivered at Closing. EY explained its counting methodology to Debtors. However, Debtors have not engaged with EY regarding its methodology for counting Prepaid Inventory, nor have Debtors made any suggestions to EY regarding ways to improve the methodology if they challenge its accuracy.

12. As detailed in the *Declaration of Andrew D. Hede in Support of Transform Holdco LLC's Response to Debtors' Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco LLC and (B) Compel Turnover of Estate Property and Reply in Further Support of Its Motion to Assign Matter to Mediation* [Docket No. 2868] ("First Hede Decl.") and the Hede Decl., due to the exigencies of closing the sale transaction on the desired date, rather than establishing a new cash management system, Transform at Closing stepped into the shoes of the majority of the Debtors' existing cash management system and used that system to continue to run the acquired business after Closing. The parties fully recognized prior to Closing that Transform's assumption of the existing cash management system would require the reconciliation and allocation between Transform and the Debtors of certain amounts received into and drawn from that system in order to reflect the allocation of assets called for by the APA.

13. Since Closing, EY has been engaged in the laborious and time-consuming process to reconcile these items, which has evolved as EY has identified additional items requiring reconciliation. Each of the fifteen items reflected in the table in the Hede Decl. ¶ 8, are items EY

5

determined were necessary to include based on our understanding of the cash management system.[2] The numbers in that chart are the result of hundreds of hours spent analyzing thousands of lines of data. For example, the $11,444,233 credit to Transform on account of Estate checks that have been drawn against Transform's account, is comprised of approximately 9,300 individual checks.

14. Throughout the process, EY has made every effort to respond to Debtors' questions and to provide Debtors with the information EY relied upon in performing its calculations. To the extent that Debtors are aware of information that they deem relevant to EY's calculations, EY has repeatedly asked them to provide EY with such information. With limited exceptions, they have not done so.

15. Transform also made senior members of its accounting staff, including its Chief Financial Officer, available for interviews by Debtors. Although Debtors had the opportunity, they did not engage with the detail of our analyses.

16. When Debtors raised questions about EY's reconciliation process, EY thoroughly investigated and adjusted its calculation as needed, whether it resulted in credit to Debtors or to Transform. EY has taken into account all available information, accepted input from the Debtors, and revised or updated its analysis on multiple occasions all in an effort to arrive at the right result.

17. For example, with respect to P-Cards, EY worked closely with Sears' accounting group, specifically the individual who handles all P-Card processing, to identify payments made

---

[2] Pursuant to the Parties' pending July 9, 2019 agreement, under which Transform is in the process of agreeing to pay Debtors $7,988,370 on account of rent pro-ration, three items should be removed from the table: (i) $11,174,959 for February real estate expense pro-rations, (ii) $1,598,931 in March GOB store rent payments, and (iii) $1,587,658 for the Citi Letter of Credit facility draw. This increases the net amount due to Transform from $47,349 to $8,035,719.

6

post-Close that related to transactions that occurred pre-Close. From lists of payments made to Bank of America on February 22, 2019 and March 7, 2019, EY identified payments that related to transactions that took place prior to Close.[3] From this review EY concluded that Transform has paid $3,522,955 on account of pre-Close transactions. Upon learning from Debtors that Debtors had made a payment on February 7, 2019 that related to February 1 transactions (of $367,575), which nevertheless been included in the records of payments from February 22 and March 7, EY excluded those payments from the net amount, resulting in a credit of $3,236,427 on account of P-Card expenses. EY had not been aware of the February 7 payment made by Debtors, who were the ones controlling the company at that time.

18.     More recently, Transform paid $13,335.28 to Citibank for chargebacks completed on the GOB stores after Debtors refused to pay.

19.     Debtors state, for the first time that EY is aware, in their Opposition, that the setoff of $9,578,762 for pre-Close orders that were cancelled post-Close would provide Buyer with a windfall because Buyer, in addition to the setoff amounts, would still get to keep the inventory from any cancelled orders. The post-Close cancellation of pre-Close order will not leave Transform with any additional inventory beyond that which it purchased, and paid for, under the APA. If an order was placed pre-Close and the order had yet to ship as of Close, that inventory was included among the inventory that Transform purchased because inventory is removed from Sears' inventory management system when it ships, not when an order is placed. Therefore, the cancellation of an un-shipped order will not result in any additional inventory coming into Transform's possession. If an order was placed for an item that was not in stock and then the order was cancelled post-Close, the cancellation likewise would not result in Transform

---

[3]     Ernst & Young also looked at P-Card payments for later periods, which did not include payments for any pre-Close transactions.

7

receiving any additional inventory-the order would simply be cancelled. Likewise, even if an order had shipped, such that the inventory was not included among the inventory that Transform purchased but will come into Transform's inventory upon cancellation/return, that inventory can be expected to net out against pre-Close orders that are *not* cancelled where Transform is obligated to ship its inventory without payment.

*   *   *

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on July 9, 2019 in Jacksonville, Florida.

Respectfully submitted,

*/s/ Andrew D. Hede*  
Andrew D. Hede

# Exhibit A

| | |
|---|---|
| **From:** | Andrew D Hede <Andrew.Hede@ey.com> |
| **Sent:** | Monday, April 22, 2019 11:00 AM |
| **To:** | Chris Good |
| **Cc:** | Nicholas Weber; Brian Griffith; Ryan P Rowan; Dwight A Scales; Joseph Weaver; Joseph Frantz |
| **Subject:** | RE: CIA Inventory |

In my prior discussions with Brian, he mentioned a number $84MM as of the closing and you could provide support for that.

I'm a little surprised that you don't have a buildup for whatever you believe existed at the closing.

Telling us how the company calculates it for accounting purposes doesn't help us determine what the Buyer actually received post-close.


**Andrew D. Hede** | Senior Managing Director

EY Turnaround Management Services LLC
Office: +1 212 773 1972 | andrew.hede@ey.com

**From:** Chris Good [mailto:cgood@miiipartners.com]
**Sent:** Monday, April 22, 2019 10:54 AM
**To:** Andrew D Hede <Andrew.Hede@ey.com>
**Cc:** Nicholas Weber <nweber@miiipartners.com>; Brian Griffith <bgriffith@miiipartners.com>; Ryan P Rowan <ryan.rowan@ey.com>; Dwight A Scales <Dwight.A.Scales@ey.com>; Joseph Weaver <Joseph.Weaver@ey.com>; Joseph Frantz <jfrantz@miiipartners.com>
**Subject:** Re: CIA Inventory

Andrew -

What we can send you is Prepaid Inventory in accordance with how the Company calculates it for the Balance Sheet. Does that work?

Best,
Chris

_____
Christopher A. Good
M-III Partners
130 West 42nd Street, 17th Floor
New York, New York 10036
O:  212.716.1497
M: 252.714.2092
cgood@miiipartners.com

On Apr 18, 2019, at 2:03 PM, Andrew D Hede <Andrew.Hede@ey.com> wrote:

>    Thanks. We requested it a number of weeks ago.

Andrew Hede
Senior Managing Director
EY Turnaround Management Services LLC
Office: +1 212-773-1972
Cell: +1 646-491-0540
andrew.hede@ey.com

---

**From:** Chris Good <cgood@miiipartners.com>
**Sent:** Thursday, April 18, 2019 1:00:56 PM
**To:** Andrew D Hede
**Cc:** Nicholas Weber; Brian Griffith; Ryan P Rowan; Dwight A Scales; Joseph Weaver; Joseph Frantz
**Subject:** Re: CIA Inventory

Andrew -

That shouldn't be an issue. Will try to get back to you quickly.

Best,
Chris

_____
Christopher A. Good
M-III Partners
130 West 42nd Street, 17th Floor
New York, New York 10036
O: 212.716.1497
M: 252.714.2092
cgood@miiipartners.com

On Apr 18, 2019, at 1:04 PM, Andrew D Hede <Andrew.Hede@ey.com> wrote:

> M3 Team
>
> Following up again on our previous requests for you to provide your estimate / calculation of CIA inventory that you believed existed as of the closing.
>
> Thanks
>
> Andrew
>
> <image001.gif> **Andrew D. Hede** | Senior Managing Director
>
> EY Turnaround Management Services LLC
> 5 Times Square, New York, NY 10036, United States of America
> Office: +1 212 773 1972 | Cell: +1 646 491 0540 | andrew.hede@ey.com
> Website: http://www.ey.com
> Lindsay Harrison | Phone: +1 212 773 4126 | lindsay.harrison@ey.com

2

Any tax advice in this e-mail should be considered in the context of the tax services we are providing to you. Preliminary tax advice should not be relied upon and may be insufficient for penalty protection.
_____
The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

Notice required by law: This e-mail may constitute an advertisement or solicitation under U.S. law, if its primary purpose is to advertise or promote a commercial product or service. You may choose not to receive advertising and promotional messages from Ernst & Young LLP (except for EY Client Portal and the [ey.com](ey.com) website, which track e-mail preferences through a separate process) at this e-mail address by forwarding this message to [no-more-mail@ey.com](no-more-mail@ey.com). If you do so, the sender of this message will be notified promptly. Our principal postal address is 5 Times Square, New York, NY 10036. Thank you. Ernst & Young LLP

This message contains information which may be confidential and privileged. Unless you are the intended addressee (or authorized to receive for the intended addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply email or by calling 212-716-1491 and delete the message.

This message contains information which may be confidential and privileged. Unless you are the intended addressee (or authorized to receive for the intended addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply email or by calling 212-716-1491 and delete the message.

Any tax advice in this e-mail should be considered in the context of the tax services we are providing to you. Preliminary tax advice should not be relied upon and may be insufficient for penalty protection.
_____
The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

Notice required by law: This e-mail may constitute an advertisement or solicitation under U.S. law, if its primary purpose is to advertise or promote a commercial product or service. You may choose not to receive advertising and promotional messages from Ernst & Young LLP (except for EY Client Portal and the [ey.com](ey.com) website, which track e-mail preferences through a separate process) at this e-mail address by forwarding this message to [no-more-mail@ey.com](no-more-mail@ey.com). If you do so, the sender of this message will be notified promptly. Our principal postal address is 5 Times Square, New York, NY 10036. Thank you. Ernst & Young LLP

This message contains information which may be confidential and privileged. Unless you are the intended addressee (or authorized to receive for the intended addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply email or by calling 212-716-1491 and delete the message.

This message contains information which may be confidential and privileged. Unless you are the intended addressee (or authorized to receive for the intended addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply email or by calling 212-716-1491 and delete the message.