**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------X
                                            :
In re:                                      :    Chapter 11
                                            :
SEARS HOLDINGS CORPORATION, et al.,[1]      :
                                            :    Case No. 18-23538-rdd
                        Debtors.            :
                                            :    (Jointly Administered)
                                            :
                                            :
------------------------------------------------------------X
```

## SUPPLEMENTAL DECLARATION OF ANDREW WEAVER IN FURTHER SUPPORT OF THE ADVERSARY COMPLAINT

I, Andrew Weaver, declare under penalty of perjury as follows:

1.        I am an attorney duly admitted to practice before this Court, and I am counsel with the law firm Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb"), counsel for Transform Holdco LLC ("Transform").   I respectfully submit this declaration ("Supplemental Weaver Declaration") in connection with Transform's Reply Brief in Support of the Adversary Complaint.

---

[1]        The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).

2.      Attached hereto as <u>Exhibit A</u> is a true and correct copy of the contract governing the terms and conditions that apply to all merchandise supplied by vendor HongKong GreatStar International Co., Limited, directly or indirectly through its dealers or distributors, to Kmart Corporation, Sears Brands Management Corporation, Sears, Roebuck and Co. and all other direct and indirect subsidiaries of Sears Holding Corporation, dated November 11, 2015.

3.      Attached hereto as <u>Exhibit B</u> is a true and correct copy of the contract governing the terms and conditions that apply to all merchandise supplied by vendor KUMHO TIRE USA INC, directly or indirectly through its dealers or distributors, to Kmart Corporation, Sears Brands Management Corporation, Sears, Roebuck and Co. and all other direct and indirect subsidiaries of Sears Holding Corporation, dated May 5, 2016.

4.      Attached hereto as <u>Exhibit C</u> is a true and correct copy of the contract governing terms and conditions that apply to all merchandise supplied by vendor Dongbu Daewoo Electronics America Inc, directly or indirectly through its dealers or distributors, to Kmart Corporation, Sears Brands Management Corporation, Sears, Roebuck and Co. and all other direct and indirect subsidiaries of Sears Holding Corporation, dated June 10, 2016.

5.      Attached hereto as <u>Exhibit D</u> is a true and correct copy of email correspondence with the subject line "CashPro Notification Info. Reporting Transaction," dated December 27, 2017.

Executed on July 9, 2019 in New York, New York.

Respectfully submitted,


*/s/ Andrew Weaver*
Andrew Weaver

# Exhibit A

UNIVERSAL TERMS AND CONDITIONS – INTERNATIONAL
Dated: _Nov. 11th_, 2015

Seller: _HongKong GreatStar International Co, limited_        _HongKong_
       Full Legal Name                                        Jurisdiction of Organization (Country or State)

These terms and conditions ("UTC") are effective as of the date set forth above and apply to all Merchandise (defined below) supplied by the undersigned vendor and its affiliates (jointly and severally, "Seller"), directly or indirectly through Seller's dealers or distributors, to Kmart Corporation ("Kmart"), Sears Brands Management Corporation ("Sears Brands"), Sears, Roebuck and Co. ("Sears") and all other direct and indirect subsidiaries of Sears Holdings Corporation (together with Kmart, Sears Brands and Sears, collectively the "Company").

Seller and Company hereby agree as follows:

1.    DEFINITIONS. The following definitions apply in this UTC: (a) "Applicable Laws" means the applicable federal, state and local laws, ordinances, governmental orders, rules, regulations, and prohibitions including for all jurisdictions where Merchandise is sold, delivered or Merchandise Production occurs or will occur; (b) "Approved Outlets" means Company, each Authorized Reseller and each Company Branded Outlet; (c) "Authorized Reseller" means each retailer, wholesaler, and other person (excluding Company and Company Branded Outlets) that Company authorizes to sell or distribute Company Branded Merchandise; (d) "Company Branded Merchandise" means Merchandise marked or labeled with a Company Mark and all Merchandise sold in connection therewith whether or not marked with a Company Mark (e.g., accessories, parts, and other goods supplied by Seller to Company); (e) "Company Branded Outlets" means Company's franchisees and other third parties licensed or otherwise authorized by Company to sell or service Merchandise using a name licensed directly or indirectly from Company (e.g., Sears Authorized Hometown Stores, "Sears Home Appliance Showroom" franchisees); (f) "Company Marks" means all Marks owned or licensed by Company (other than those licensed from Seller), including Sears®, Kmart®, Kenmore®, Craftsman® and DieHard®; (g) "Company Trade Dress" means all cosmetic designs, ornamental appearance and trade dress embodied in or relating to Company Branded Merchandise; (h) "Company Sites" means the Internet sites published by or on behalf of the Company, as well as third party Internet sites on which Company permits Merchandise to be displayed or sold; (i) "Customers" means actual or prospective customers of Approved Outlets; (j) "IP Rights" means all intellectual property rights, that now or hereafter exist (including any pending applications, registrations and the right to file the foregoing), in any jurisdiction worldwide, whether conferred by operation of law, contract or license, including (i) rights of authorship, including copyrights, moral rights, and mask-works, (ii) Marks, (iii) cosmetic designs, ornamental appearance and trade dress, (iv) trade secret rights, (v) inventions and technology (whether patentable or not and whether or not reduced to practice), (vi) confidential and proprietary information, (vii) software and databases, (viii) rights of publicity, (ix) patents, designs, algorithms and other industrial property rights, and (x) "rental" rights and rights to remuneration; (k) "Marks" means all domestic and foreign trademarks, service marks, trade names, logos, domain names, as well as registrations related to the foregoing and applications to register the foregoing; (l) "Merchandise" means the goods, including Company Branded Merchandise and DTC Merchandise, supplied by or on behalf of Seller for resale by Company (including Merchandise provided to Authorized Sellers and Company Branded Outlets), and those described in any applicable Vendor Agreements or Specifications, including all parts, packaging, hangers, containers and Seller Provided Content whether or not they are separately invoiced to Company; (m) "Merchandise Production" means THE development, design, production, manufacture, construction, assembly, packaging, tagging, labeling, shipping and invoicing of Merchandise; (n) "Proprietary Information" means all non-public information (including the terms of each Vendor Agreement) received or observed by Seller or its Personnel, in whatever form, in connection with any Vendor Agreement or any proposed business between Seller and Company, including: (i) all information relating to the Approved Outlets': business plans, strategies, forecasts, analyses, financial information, Electronic Resources, employee information, sales, pricing, cost, inventory, operations, plans and programs; (ii) all trade secrets of the Approved Outlets; (iii) all information relating to Company's Customers, including Customer lists, Customer survey responses and other Confidential Personal Information; (iv) all Specifications furnished by Company; (v) Company's IP Rights, including Company Work Product and all descriptions, and other embodiments thereof, and (vi) and all data and other material Seller receives or creates regarding the foregoing; (o) "Personnel" means the officers, directors, employees, agents, suppliers, licensors, licensees, contractors, subcontractors, and other representatives, from time to time, of a party and its affiliates, and, in the case of Company, those of Company Branded Outlets and Authorized Resellers involved in the sale or servicing of Merchandise; (p) "PO" means a purchase order in writing or processed through Electronic Data Interchange (EDI) issued by Company for the purchase of Merchandise that includes the description, quantities to be purchased, price and other information regarding of Merchandise; (q) "Seller Provided Content" means all content or information regarding Merchandise furnished by or on behalf of Seller (whether in print or electronic form) in connection with the Merchandise, Company Sites or otherwise, including marketing and advertising materials, promotional materials, point of sale displays, content on packaging, product development information and material, all literature, product descriptions, tags, labels, text, graphics, photographs, video and audio, installation and service instructions and training materials, owner's manuals and service manuals; (r) "Seller Marks" means all Marks owned or licensed by Seller (other than those licensed from Company); (s) "Specification" means: (i) the detailed description of Merchandise set forth in any Vendor Agreement, the Vendor Guide, or otherwise provided by Company in writing, (ii) all

V-P  11/18/2015

industry and government standards applicable to the Merchandise, as modified from time to time (including UL, CPSC and other standards for safety and efficiency), (iii) the requirement that the Merchandise meets or exceeds (in terms of quality, features and performance) each sample provided by Seller of such Merchandise and (iv) all performance claims that Seller makes or has made in connection with the Merchandise; (t) "**Vendor Agreement**" means each: (i) PO, written addendum and agreement (e.g., supply agreements, exclusive agreements), existing now or later signed by Company and Seller relating to Merchandise, including this UTC, (ii) Promotional Agreement (as defined below), advertising agreements, and (iii) written amendment, rider, waiver and consent relating to any of the foregoing; and (u) "**Vendor Guide**" means all policies and procedures for doing business with the applicable Company entity (e.g. Sears on behalf of Sears and Sears Brands or Kmart, on behalf of itself), that have been supplied or made available to Seller by or on behalf of the applicable Company entity in print or electronic form as may from time to time be amended by the applicable Company entity including the applicable "Vendor Information Guide" (e.g., the Sears Vendor Information Guide for Merchandise that Sears or Sears Brands receives in the United States or the Sears Holdings International Vendor Information Guide for Merchandise received internationally). Terms used herein and not otherwise defined have the meaning given them in the Uniform Commercial Code as in effect in the State of Illinois (the "**UCC**").

## 2.   VENDOR AGREEMENTS.

2.1   POs. Execution of this UTC does not commit Company to purchase any Merchandise. A commitment to purchase Merchandise only arises when Company issues a PO for specified quantities of Merchandise or signs a Vendor Agreement (other than this UTC) for specific quantities of Merchandise and Company's obligation, if any, is limited in each instance to such quantities. Company Branded Outlets and Authorized Resellers are not authorized to purchase Merchandise directly from Seller under this UTC. Company issued POs that are accepted by Seller become part of and are subject to the terms of this UTC and each other applicable Vendor Agreement.

2.2   Forecasts and Exclusivity. All estimates and forecasts of Approved Outlets' future needs for Merchandise that Company may provide to Seller are: (i) for planning purposes only, (ii) do not in any way represent a commitment by Company and (iii) do not give rise to any obligation or liability of Company. Company is not responsible for actions taken by Seller based on such estimates or forecasts and Seller agrees that reliance by it upon such estimates or forecasts would be unreasonable. Company has no obligation to buy Merchandise exclusively from Seller or to buy Company's requirements for any Merchandise from Seller.

2.3   Incorporation; Construction and Amendment. This UTC and the applicable Vendor Guides are incorporated into each other Vendor Agreement. In the event of any conflict or inconsistency between Vendor Agreements: (a) POs shall control over other Vendor Agreements only as to price, quantity, F.O.B. point and Specifications, and (b) express provisions in other

Vendor Agreements shall control over this UTC, the Vendor Guide(s) and POs; in each case, as to the Merchandise sold under such PO or Vendor Agreement. The Vendor Agreements may be amended or supplemented only by a latter: (x) written Vendor Agreement signed by an authorized representative of each party, or (y) revised Vendor Guide. All POs and other Vendor Agreements are a series of installments of one and the same transaction constituting a single contract between Company and Seller. If any bankruptcy or insolvency proceeding is initiated in respect of Seller and Seller, as debtor in possession, elects to perform any outstanding POs, then Seller, by so accepting and performing any of such POs, will be deemed to have accepted and assumed this UTC and obligations of Seller to Company arising from time to time hereunder.

## 3.   BUSINESS TERMS.

3.1   Specification. Seller, by agreeing to or using any Specification (including any portions, changes or suggestions proposed or provided by Company): (a) adopts it as Seller's own, (b) accepts full responsibility for it, and (c) relieves Company of all responsibility for it. Seller's use of Company provided Specifications is subject to Section 11.3 (Company's IP Rights).

3.2   Price and Shipping. The price for Merchandise includes all costs of Merchandise Production and delivering Merchandise to the F.O.B. point stated in the PO or other Vendor Agreement, including: (a) all duties and taxes (including excise and withholding taxes) payable in any country where Merchandise Production or delivery takes place; (b) all commissions to selling agents; and (c) all other incidental charges, whether or not such charges are itemized on invoices to Company. Seller shall ship only the quantities of Merchandise ordered by Company in the applicable PO and Seller shall make no substitutions or changes without Company's prior written approval. Seller acknowledges that the Vendor Guide requires the payment of fees (each an "**Administrative Fee**") for late or otherwise non-compliant deliveries of Merchandise.

3.3   Invoices. Seller will invoice Company for Merchandise no earlier than the date the invoiced Merchandise departs the F.O.B. Point (the "**Invoice Date**"). If any payment date is a Saturday, Sunday or bank holiday, then Company is not obligated to initiate payment until the next banking day. Company has no obligation to pay any amount first invoiced more than six months after it accrued. Company is not required to pay any disputed charge before the dispute is resolved. Seller shall, if Company desires, accept all payments in U.S. Dollars. Company may make payments using "Electronic Funds Transfer" (EFT) or ePayables (credit card settlement), in accordance with Company's requirements as communicated to Seller.

3.4   Approved Outlets. Company may distribute to each Approved Outlet all information regarding Company Branded Merchandise including product specifications, documentation, inspection results and corrective actions taken by Seller. Each Authorized Reseller and Company Branded Outlet is an intended third-party beneficiary under each Vendor Agreement (including this UTC).

© 2013 Sears Brands, LLC

Li Feng

3.5     Worldwide Distribution and License. Seller authorizes the Approved Outlets to directly and indirectly offer and sell Merchandise, without restriction, through all promotional, advertising and distribution channels, and other methods of sale that now or hereafter exist everywhere in the world, including via telephone, print, television, radio, and the Internet ("**Distribution Channels**"); provided that in the case of Authorized Resellers such authority is limited to Company Branded Products. Except for the IP Rights owned by Company, Seller grants to Company, each Company Branded Outlet and each Authorized Reseller (with respect to Company Branded Merchandise), subject to the terms of the applicable Vendor Agreements, a royalty-free, perpetual, irrevocable, worldwide, non-exclusive license to offer and sell services related to such Merchandise and to use, copy, perform, display, modify, create derivative works of, and otherwise exploit, without an obligation to account, and distribute, with the right to sublicense, in any manner, all Seller IP Rights, all Seller Provided Content, information about or related to Customers (including warranty card information), software, data, studies, performance claims, parts and schematics, summaries and other materials relating to any Merchandise for purposes of marketing, advertising, promoting, selling, servicing and supporting Merchandise through all Distribution Channels and as otherwise desired by Company; provided it is reasonably related to the exercise of Company's rights or the fulfilment of Company's obligations hereunder (including on behalf of the Company Branded Outlets and the Authorized Resellers).

3.6     Seller Provided Content. For all Merchandise appearing on Company Sites, Seller will submit, at Seller's sole cost, the Seller Provided Content (for use on such sites, in advertisements and to otherwise promote such Merchandise), in the format and according to requirements as may be requested by Company from time to time ("**Content Specifications**"). Seller shall not upload to any Company Sites any Seller Provided Content that violates any third party's IP Rights, violates any Applicable Law, or includes any pornographic or other sexually explicit content, obscene content, or content that advocates racial, religious or social intolerance or hatred. At Company's sole cost, Company has the right to make modifications to the Seller Provided Content to the extent Company deems appropriate and necessary to ensure that the Content Specifications are met. Further, Company may use, copy, perform, display, modify, create derivative works of, and otherwise exploit, without an obligation to account, and distribute, with the right to sublicense, in any manner all Seller Provided Content in connection with the sale of Merchandise and other products (regardless of source). Seller will pay Company's standard fee (to Company or its designee) for each SKU of Merchandise that Seller submits to appear on each Company Site.

3.7     Records and Audits. Seller will maintain accurate, legible books, systems and records in connection with Seller's performance of its obligations hereunder. Seller will continue to maintain such customary books, systems and records pertaining to a particular Vendor Agreement for the longer of: (a) all legally required retention periods, and (b) the period ending on the second anniversary of the expiration, cancellation, or termination of such Vendor Agreement. Upon seven (7) business days'

notice to Seller, Company has the right to audit all books, systems and records of Seller in order to verify amounts paid (or payable) to Seller and Seller's performance under each Vendor Agreement, including verification of all reports, statements and invoices issued by Seller. Any such audit shall be conducted during normal business hours without unreasonable burden on Seller's business by Company's corporate internal audit Personnel or by an auditor of nationally recognized standing selected by Company. In addition, if a government agency requests that Company provide records in Seller's possession, or if a government agency conducts an investigation of Company in any way relating to the Merchandise, Seller or any business conducted by Seller, Seller shall be responsible for producing the requested records, and for otherwise fully cooperating with such investigation, at Seller's sole cost.

4.     **DIRECT TO CUSTOMER MERCHANDISE.** If Seller agrees to directly ship Merchandise ("DTC Merchandise") to a Customer ("DTC Customers"), the parties will first execute a DTC Addendum to this UTC; which Addendum will be incorporated herein for all purposes of this UTC.

5.     **CODES OF CONDUCT.** Seller has received, as part of the Vendor Guide, Sears Holdings Corporation's Code of Vendor Conduct ("**Vendor Code of Conduct**") and its Code of Conduct (the "**Code of Conduct**," together with the Vendor Code of Conduct, the "**Codes**") for Company Personnel. Vendor agrees to abide by the Vendor Code of Conduct and acknowledges that Company employees will abide by the Code of Conduct. Seller shall support the Codes and shall not directly or indirectly take any action that may induce a violation of any Applicable Law or the Codes. Seller shall (as provided for in the Vendor Guide) notify Sears Holdings' Office of Compliance in writing within five (5) business days after Seller has knowledge of any violation or attempted violation of the Codes or this Section 5. Seller will cooperate with each request by Company to provide information and documentation regarding any communication or transaction with the Approved Outlets.

6.     **PACKAGING, LABELING, SHIPPING AND BILLING; RISK OF LOSS.**

6.1     Packaging, Labeling, Shipping and Billing. Seller will provide adequate packaging, tagging, labeling, packing, shipping and billing for the Merchandise. Seller shall comply with all packaging, tagging, labeling, packing, shipping and billing requirements requested by Company as well as all requirements established by Applicable Laws, carrier tariffs and product classifications. For Merchandise to be shipped from a point of origin within the United States, Seller shall deliver Merchandise to the F.O.B. point in accordance with the ship date stated in the applicable Vendor Agreements. For Merchandise to be shipped from a point of origin outside the United States, Seller will deliver Merchandise: (a) in accordance with the delivery terms stated in the applicable Vendor Agreements, and (b) on or before the ready date stated in the Vendor Agreement. Seller shall ship all Merchandise in full packs and full shipments in accordance with Company's requirements as set forth in applicable Vendor Agreements (including the applicable Vendor Guide).

Li Feng

6.2     Risk of Loss. All risk of loss or damage to Merchandise remains with Seller until the Merchandise is received by Company (or its representatives) at the F.O.B. point stated in the applicable Vendor Agreement. Seller is solely responsible for all damage to the Merchandise caused by improper loading or improper packaging of the Merchandise.

7.      MANUFACTURING.

7.1     Manufacturing Information. Upon Company's request, Seller shall provide Company with specific information, in such detail as Company may request, as to the location and method of manufacturing or assembly of Merchandise. Seller will notify Company in writing before making any change in the location of manufacturing or assembly of Merchandise and Seller will bear all costs and responsibility for delays resulting from such changes. Without advance notice but during regular business hours, Company and its designated Personnel may periodically: (a) monitor (onsite and remotely) Seller and its Personnel's compliance with each Vendor Agreement (including this UTC) and (b) inspect any facilities at which any Merchandise or any components for Merchandise are manufactured or assembled (including any facilities of Seller and its Personnel) and all Merchandise at any stage of manufacture, assembly or delivery (including at the F.O.B. point). Company may require Seller to have Merchandise inspected by the Company's Personnel and any independent inspectors approved by Company, prior to its shipment to the United States. Such inspection shall be performed at Seller's sole cost. Any inspection, documentation thereof and any corrective action taken by Seller with respect to any Merchandise shall not be deemed an acceptance of such Merchandise by Company or a waiver of any nonconformities or defects in such Merchandise by Seller to deliver Merchandise in accordance with the terms of the applicable Vendor Agreement. Seller is solely responsible, at its sole cost, for the manufacture of (or sourcing of) all Merchandise (including all components thereof).

7.2     Company Branded Merchandise. Prior to employing any Seller or third party production facility to manufacture or assemble Merchandise bearing a Company Mark, Seller shall register such production facility with Company's Global Compliance Office in accordance with the requirements of the applicable Vendor Guide.

8.      PARTS AND SERVICE.

8.1     Parts. Seller shall sell to Company all parts (or their functional equivalents) referenced or included in each Vendor Agreement or any Service Information (defined below) applicable to Merchandise for a period of at least ten (10) years after the date such Merchandise is last shipped by Seller to Company. Company and its Personnel may use any such parts in the performance of warranty service. The price of parts shall be stated in the Vendor Agreement but in no event shall Seller charge Company or its representatives a price greater than the lowest price charged by Seller to any other customer for the same or similar parts sold on substantially similar terms.

8.2     Service. Seller shall provide to Company, in electronic format, all available information relating to Merchandise, including warranty forms, service and owners' manuals, product specifications, parts lists and images, failure mode and effects analyses, exploded parts diagrams, schematics, training materials, technical and service bulletins, service and installation manuals and instructions that are developed by or for Seller (together with any revisions and updates to such information, "Service Information"). Seller authorizes Company and its Personnel to use, reproduce, distribute or sell to the Customers the Service Information without payment of any royalties or other fees to Seller and to provide repair, maintenance and installation services for all Merchandise. With respect to all Merchandise that is serviceable, Seller designates Sears and its designees ("Company Service Provider") as an authorized service provider and shall include Company Service Provider, no less prominently than its other authorized service providers, on all lists or other enumeration of authorized service providers, whether in print, Internet or other medium. Company Service Provider may: (a) advertise that it is an authorized service provider for such Merchandise and (b) provide such repair, maintenance and installation services ("Services") (during and after Seller's warranty period) and may use its Personnel to provide such Services. For Services performed by the Company Service Provider in accordance with Seller's warranty, Seller shall pay Company the rates set forth in the applicable Vendor Agreements (or if none are stated, Company's standard rates for similar Services). Seller represents and warrants that the provision of such Services by Company Service Provider and its Personnel will not violate the rights of any third party.

9.      REPRESENTATIONS AND WARRANTIES. Without limiting or disclaiming any implied representations or warranties, Seller represents, warrants and covenants, as of the effective date of this UTC and each other Vendor Agreement and continuing in effect throughout the term of each Vendor Agreement, that:

9.1     Merchandise. (a) all Merchandise: (i) conforms to its Specifications, (ii) is fit and sufficient for the ordinary purpose for which Merchandise is used, (iii) is free from defects in workmanship, materials and packaging, (iv) is free from defects in construction and design, (v) is fit and sufficient for the purpose stated on any packaging, labeling or advertising, and (vi) is equivalent in materials, quality, fit, finish, workmanship, performance and design to any samples submitted to and approved by Company; (b) upon transfer of the Merchandise to Company, the title for such Merchandise is free and clear of any encumbrance, and (c) all test data and other claim substantiation provided by Seller is accurate and properly described by Seller.

9.2     Advertising. all claims made by Seller in any packaging, labeling, advertising, or other consumer material, including Seller Provided Content, in connection with any Merchandise or Seller Mark relating to Merchandise: (a) comply with Applicable Law, (b) are true and have been substantiated before such claims are made, and (c) contain all applicable warnings and instructions in the assembly, installation, use, repair, servicing and maintenance of the Merchandise.

Li Teng 孙明

9.3 Intellectual Property. (a) all IP Rights (other than IP Rights owned by Company or licensed by Company from third parties) and Seller Provided Content used by Seller in connection with Merchandise or in the Production of Merchandise, are either: (i) owned by Seller or (ii) are licensed by Seller and Seller has the right to license them to Company in connection with such Merchandise and the sale of such Merchandise to the Approved Outlets, for use or further resale and (b) Merchandise, including Seller Provided Content, does not, at any time, infringe any IP Right of any person, corporation or other entity.

9.4 Authority and Compliance with Law. (a) Seller has the right, power and authority to: (i) enter into each Vendor Agreement (including this UTC), (ii) perform its obligations under each Vendor Agreement; and (iii) grant to Company the rights provided under each Vendor Agreement; (b) Seller's execution, delivery and performance of each Vendor Agreement has been duly authorized, are in compliance with each such Vendor Agreement, are legally binding and enforceable in accordance with its terms, and do not violate any other agreement, restriction, or Applicable Laws; (c) all Merchandise strictly complies with, and all Merchandise Production occurs strictly in compliance with, all Applicable Laws, including the Applicable Laws of each jurisdiction outside the United States (each an "Alternative Jurisdiction"), where Seller becomes aware that the Approved Outlets sell (or intend to sell) the Merchandise (unless and until Seller has provided Company with 10 business days' written notice that the Merchandise does not comply with the requirements of such Alternative Jurisdiction); (d) Seller and its Personnel who are involved in Merchandise Production or the installation, repair, display, possession, servicing, use, maintenance, delivery or sale of Merchandise shall each, during the term of each Vendor Agreement, strictly comply with all Applicable Laws, including the Foreign Corrupt Practices Act of 1977, 15 U.S.C. §§ 78dd-1 et. seq., as amended, which Seller acknowledges applies to the business relationship with Company hereunder, and such other national or regional anti-corruption or anti-bribery laws that may apply to either Seller or Seller's business relationship with Company, and those governing the working conditions, wages, hours and minimum age of the work force; (e) Merchandise Production does not involve at any time, in whole or in part, any use of child, convict or forced labor; and (f) all prices charged and allowances made available to Company by Seller are in compliance with U.S. antitrust laws, including the requirements of the Robinson-Patman Act. Seller shall provide Company with a guaranty of compliance with the foregoing in such form as Company may designate with respect to any Merchandise.

9.5 Antidumping. (a) all sales of Merchandise to Company are made at no less than fair value under the United States antidumping law and (b) no government has provided a countervailable subsidy for Merchandise actionable under U.S. law. Seller shall indemnify Company for (x) all antidumping and countervailing duties imposed on all Merchandise that is: (i) sold prior to the date of publication of the International Trade Administration's preliminary determination of sales at less than fair value or prior to the date of publication of the existence of countervailable subsidies and (ii) exported or imported before the date of publication of the International Trade Administration's

final determination of sales at less than fair value or the existence of countervailable subsidies and (y) any expenses (including reasonable attorneys' fees) and administrative costs incurred by the Approved Outlets in their participation in any United States antidumping or countervailable duty proceeding involving any warranted Merchandise.

10. ELECTRONIC PROCESSING. Unless otherwise agreed by Company or as set forth in the applicable Vendor Guide, the parties shall process all POs and other related documents (including invoices and ship notices) and any payments or advances in respect of monetary obligations between Company and Seller electronically, either directly or through a third party provider satisfactory to both parties. Each party will pay its own costs, including the costs of any provider with which it contracts. Seller will include in each invoice (or ship notice, in the absence of an invoice) an appropriate, agreed-upon code, symbol or statement affirming Seller's compliance with all applicable requirements of the Fair Labor Standards Act (as amended), the regulations and orders of the United States Department of Labor issued pursuant thereto and any similar state laws and regulations. Seller shall process all electronic fund transfers and wire transactions in compliance with National Automated Clearing House Association (NACHA) rules and any instructions and procedures that Company may from time to time supply. Neither party is liable to the other for any indirect, special, incidental, exemplary or consequential damages arising or resulting from any delay, omission or error in the electronic transmission or receipt of any documents, even if the other party has been advised of the possibility of such damages.

11. INTELLECTUAL PROPERTY.

11.1 Merchandise with a Company Mark. If Company authorizes Seller to mark or label any Merchandise with a Company Mark, Seller will limit the goods so marked or labeled to quantities set forth in a PO or other applicable Vendor Agreement. Seller will perform all such marking and labeling in accordance with Company's specific written instructions. Seller shall not sell or otherwise dispose of, nor permit the sale or disposal of, any Merchandise bearing any Company Mark (including any Merchandise rejected by Company) to anyone other than Company without first obtaining Company's express written consent and then (a) removing, or otherwise defacing as installed, any Company Mark before such sale or disposal, and (b) complying with such other requirements as Company imposes in its sole discretion. Company may elect, but has no obligation, to purchase from Seller any surplus labels, packaging or other materials bearing any Company Mark. Seller will destroy all such materials that Company does not purchase from Seller at the expiration, cancellation, or termination of the applicable Vendor Agreement (including this UTC). Seller will provide written certification to Company of such destruction.

11.2 Company Work Product. All information and other materials related to Company Branded Products, and all copyrights therein, including marketing, promotional materials, point of sale displays, packaging, software, data, Service Information, Seller Provided Content, performance claims and evaluations, testing protocols and data used to evaluate

© 2013 Sears Brands, LLC

Li Feng

performance claims, database formats, methods used to assemble and maintain electronic product catalogs, and programming related to Company Sites and user applications (e.g., mobile applications) and copies, notes and summaries of the foregoing that are prepared, developed or created by or on behalf of Company or Seller or any of their respective Personnel (collectively, "**Company Work Product**"), will be owned by Company. All Company Work Product will be deemed "work made for hire" as that term may be defined from time to time in Section 101 of the Copyright Act, 17 U.S.C. Section 101 (or any successor). Company will be deemed the author of the Company Work Product, and Company will be the worldwide owner of all right, title and interest therein (including all IP Rights). If for any reason the Company Work Product is found not to have been created as work made for hire, Seller hereby assigns to Company without limitation and without additional compensation, all right, title and interest, including all IP Rights embodied in the Company Work Product and Seller hereby appoints Company as Seller's attorney-in-fact to execute and deliver such documents and take such actions as may be necessary to effectuate such assignment. Seller will obtain Company's prior written approval before developing or implementing any changes to Company Work Product.

11.3    Company's IP Rights.  Seller hereby acknowledges that all: (a) Company Marks, (b) Company Trade Dress, (c) the other IP Rights in all information and materials provided by Company or its Customer's to Seller and (d) other IP Rights owned or licensed by Company (collectively, the "**Company IP Rights**"), in each case, constitute valuable intellectual property which, as between Company and Seller, are owned solely by Company and Seller will not claim any right, title or interest in, or challenge Company's worldwide ownership of the foregoing. Seller has no interest or rights in any Company IP Rights and will not use Company IP Rights except as expressly provided for in a Vendor Agreement or otherwise approved by Company in writing. Seller will not contest or challenge: (x) Company's worldwide ownership and exclusive right to the Company IP Rights; or (y) the validity of any of Company's IP Rights.

11.4    License to Seller.  Company hereby grants to Seller a non-exclusive, revocable, limited license to use the Company's IP Rights for the sole purpose of affixing or incorporating the Company's IP Rights into: (a) any Company Branded Products, in accordance with Company's instructions and (b) any Company Work Product, in accordance with Company's instructions. Seller's use of Company's IP Rights will not confer upon Seller any right or interest therein.

11.5    Restrictions on Use of Company's IP Rights.  Seller will use Company IP Rights only in the performance of Seller's obligations under the Vendor Agreements and in accordance with any restrictions therein. Seller will not distribute to anyone except Company any products or other materials that incorporate or infringe upon any Company IP Rights without Company's specific prior written authorization. All license(s) granted to Seller under each Vendor Agreement are personal to Seller, and Seller will not sublicense those rights without Company's prior written consent. Seller's right to use Company's IP Rights granted to Seller in any Vendor Agreement (or otherwise in writing): (a) is

subject to any Company style and quality control guidelines (as published by Company from time to time) and the prior review and written approval of Company; (b) does not extend to any use that may impair the validity or enforceability of, disparage, or otherwise impair Company's ownership thereof; and (c) does not include the right to incorporate Company's Marks as part of any other Marks, words or symbols. Seller will not register, attempt to register or renew any of Company's IP Rights with the applicable registration body in any jurisdiction unless specifically requested by Company.

11.6    Customer Contact Information.  Seller hereby assigns to Company all of Seller's right, title and interest in and to all telephone numbers, domain name and email addresses, and other contact points (e.g., Twitter and Facebook addresses, collectively ("**Contact Points**") now or hereafter used in connection with Company Branded Products (e.g., on packaging or labeling) or that appear in directories in connection with any Company Mark, effective, unless rejected in writing by Company, upon the termination of Seller's use of such Contact Points or upon Company's request, at which time Seller shall have no further right, title or interest in or to such Contact Points; but Seller will remain liable for all fees and costs relating to such Contact Points incurred prior to the effective date of the assignment. Seller acknowledges that upon such assignment, Company shall have the sole right to and interest in such Contact Points, and Seller hereby appoints Company as Seller's attorney-in-fact to direct third parties (e.g., the telephone company, the Internet domain name registry authority, etc.) to assign such Contact Points to Company, and to execute and deliver such documents and take such actions as may be necessary to effectuate such assignment.

11.7    Other.  Upon expiration, cancellation or termination of the applicable Vendor Agreement and at any time upon Company's demand, Seller will immediately stop using all Company IP Rights and will deliver to Company all Company Work Product and all other information and materials containing or based on Company IP Rights.  Nothing in any Vendor Agreement will bar Company from protecting its rights to the exclusive worldwide ownership of Company IP Rights against unfair competition, infringement or appropriation by anyone, including any use by Seller not expressly authorized by a Vendor Agreement.  Seller will execute and deliver to Company all further documents deemed by Company to be useful in documenting, perfecting or registering each of Company's IP Rights (including transfers of registrations of Company's IP rights that were made in Seller's name).

12.    DEFENSE, INDEMNITY AND NOTICE.

12.1    Defense.  Seller shall, at its sole cost, defend (a) Company, (b) all of Company's past, present and future affiliates, (c) all past, present and future Company Branded Outlets and Authorized Resellers, (d) all past, present, and future Personnel of each of the foregoing entities, and (e) all other persons directly or indirectly involved in the distribution or sale of Merchandise (each an "**Indemnified Party**") against all allegations (including false, fraudulent or groundless allegations) in any claim, action, lawsuit or proceeding between any Indemnified Party and any

© 2013 Sears Brands, LLC

Li Feng

third party, whether or not Seller's obligations under Section 12.2 (Indemnity and Contribution) apply, arising out of or relating to any of the following (collectively, the "Claims"): (i) the infringement, misuse, dilution, misappropriation or other violation of any IP Right in any way relating to or affecting Merchandise (including Seller Provided Content), or any unfair competition involving Merchandise (including Seller Provided Content), (ii) the loss, unauthorized disclosure or unauthorized use of the Confidential Personal Information by Seller, or through Seller Personnel (e.g., compromised login-IDs, etc.), (iii) death of or injury to any person, damage to any property, or any other damage or loss, by whomsoever suffered, resulting or claimed to result in whole or in part from any latent or patent defect in Merchandise, including improper design, manufacture, construction, assembly, installation, repair, display, packaging, service or design of Merchandise, failure of Merchandise to comply with any Specification or samples or with any express or implied warranties of Seller, or any claim of strict liability in tort relating to Merchandise, (iv) each breach (including breaches of Sellers' representations, warranties and covenants) by Seller or its Personnel of a Vendor Agreement (including this UTC), (v) the packaging, tagging, labeling, packing, shipping, delivery and invoicing of Merchandise, (vi) the packaging, labeling or advertising claims made by Seller, (vii) the display, assembly or installation of Merchandise, or (viii) the assertion by a third party of a security interest, right of replevin or other legal interest created by a factoring or other credit arrangement in any amount due Seller under a Vendor Agreement. Despite the foregoing sentence, Seller is not obligated to defend any Indemnified Party in any action, lawsuit or other proceeding where the Claim is based only on the sole negligence of any Indemnified Party in the display, assembly, service, repair or installation of Merchandise. Seller shall retain defense counsel satisfactory to Company and shall diligently and professionally defend each Indemnified Party from each Claim and Seller shall timely provide periodic reports to Company and consult with Company's Personnel in conducting the defense of the Claims and otherwise cooperate fully with the Company's reasonable requests; provided that only with respect to Claims arising under Section 12.1(i) involving IP Rights owned or licensed by Company (except those licensed from Seller) and any claims of unfair competition involving Merchandise, Company may, at its election and at any time, take control of the defense and investigation of said Claims and employ attorneys and other consultants, investigators and experts of its own choice to manage and defend any such Claims at Seller's cost.

12.2    Indemnity and Contribution.  Seller shall hold harmless and indemnify the Indemnified Parties from and against any and all damages, liabilities, losses, costs and expenses (including reasonable attorneys' fees, disbursements and costs of investigation and cooperation) incurred by any of the Indemnified Parties in any claim, demand, action, lawsuit or proceeding arising out of or in any way relating to any Claims; except that Seller is not obligated to indemnify any Indemnified Party for damages awarded based solely on: (a) the negligence of any Indemnified Party in the display, assembly, service, repair or installation of any Merchandise, or (b) the infringement of any IP Right by: (i) any of the materials (other than Seller Provided Content) on Company Sites, or (ii) any use of Company IP Rights

in the manner approved by Company in writing.  If any of Seller's obligations under this Section 12.2 are not enforceable under Applicable Law and an Indemnified Party and Seller are found to be liable to a third party in connection with the Merchandise or any Vendor Agreement, then Company and Seller shall each contribute to the payment of any judgment awarded in favor of such third party in proportion to their comparative degrees of culpability.

12.3    Settlement.    Seller may settle Claims without Company's consent if the only obligation under such settlement is the payment of monies by Seller and such settlement provides for a full release of Company and the Indemnified Parties.  Seller will obtain Company's prior written consent for any other settlements, including one that would place new or different obligations or restrictions on the Indemnified Parties or restrictions upon the sale (or disposition) of the Merchandise.

12.4    Notice.  Seller shall notify Company's General Counsel in writing by certified mail, return receipt requested, within five (5) business days after Seller has: (a) knowledge of any claim or allegation of infringement, misuse, dilution, misappropriation or other violation of any IP Right in any way related to or affecting Merchandise, including Seller Provided Content; (b) knowledge of any safety issue with any Merchandise; (c) knowledge of any allegation by a government agency (including the U.S. Consumer Product Safety Commission, the U.S. Department of Agriculture and the U.S. Food and Drug Administration and such equivalent foreign government agencies, departments and commissions) that the government agency (i) has initiated a formal or informal inquiry, investigation or proceeding in any way related to or affecting Merchandise, or (ii) asserts that Merchandise is not or may not be in compliance with laws; or (d) reported to any government agency that Merchandise is not or may not be in compliance with Applicable Law or contains or may contain a defect that could create a risk of injury or death.

13.    INSURANCE.  Seller will obtain and maintain, at its sole cost, a policy or policies of Commercial General Liability Insurance covering liabilities relating to Merchandise, including products and completed operations, with a broad form vendor's endorsement CG 20 15 04 13  or its equivalent naming Company, and upon request of Company, each Approved Outlet, as additional insureds, in those amounts and with such companies as set forth in the applicable Vendor Guide and containing such other provisions satisfactory to Company. All such policies will be primary and noncontributory and will provide that the coverage thereunder will not be terminated without at least thirty (30) days' prior written notice to Company, and upon request of Company, each Approved Outlet.  Seller will submit proof of insurance evidencing such coverage in advance of or concurrent with its execution of the UTC and upon each policy renewal date.  Neither approval of any of Seller's insurance policies by Company nor Seller's failure to discharge any of its obligations contained herein (including Seller's failure to obtain a broad form vendor's endorsement naming the Approved Outlets specified by Company as additional insureds) will relieve Seller of any obligations contained herein, including Seller's obligations under Section 12 (Defense, Indemnity and Notice), and claims in excess of Seller's policy limits.  If at any time Seller does not

© 2013 Sears Brands, LLC

Li Teng 美華

provide Company with the proof of insurance required hereunder or if, in Company's opinion, such policies do not provide adequate protection for Company and Seller does not furnish evidence of acceptable coverage within fifteen (15) days after Company so notifies Seller, Company has the right, in addition to its rights under Section 14 (Company Remedies), to withhold making any installment payment or advance in respect of any Company's monetary obligations that may be outstanding under any Vendor Agreement until evidence of acceptable coverage is provided.

14.    **COMPANY REMEDIES.** In addition to all other remedies available to Company under the UCC or otherwise, Company may elect to, in its sole discretion, reject, abandon, return, hold or liquidate, at Seller's sole cost and risk, any and all Merchandise which: (a) is not produced, sold, shipped or delivered in compliance with the applicable Vendor Agreements (including this UTC), or otherwise does not conform to the applicable Vendor Agreements, (b) is delivered in excess of the quantities ordered, in broken packs or partial shipments, or in packages or assortments other than as specified, (c) allegedly violates any Applicable Laws (including Alternative Jurisdictions), (d) allegedly infringes any IP Right in any way related to or affecting Merchandise, including Seller Provided Content, or allegedly involves any unfair competition, or (e) in the case of food and other Merchandise with limited shelf life, will, at the time of receipt by Company, expire (or otherwise go bad), in too short a period of time to allow Company a reasonable opportunity to sell such Merchandise (as measured by industry standards, if applicable). Company's right to reject, abandon, return, hold or liquidate Merchandise at Seller's expense shall, without limiting such right, extend to Merchandise supplied to Company that was returned by a Customer for any reason entitling Company to reject or revoke acceptance of such Merchandise. Company may, at its option, require Seller to replace any nonconforming Merchandise or grant Company a full refund or full credit (collectively, "**Refund Credit**"). Seller's obligation to pay Refund Credits shall arise as of the original shipment date. At Company's election, each Approved Outlet may accept nonconforming Merchandise, and Seller shall be liable for any reduced value of such Merchandise or the cost incurred by Company, its Authorized Resellers and its Company Branded Outlets to repair the same. Acceptance of Merchandise by an Approved Outlet shall not relieve Seller of any of its warranty or other obligations hereunder. Company may also charge to Seller all direct and indirect costs incurred by an Approved Outlet as a result of any nonconforming Merchandise or delivery, or an administrative fee in an amount reasonably related to such costs, whether or not Merchandise is rejected by Company (collectively, "**Return Costs**"). Acceptance by an Approved Outlet of replacement Merchandise, a full or partial credit or refund, or Return Costs, shall not relieve Seller of liability for other damages sustained by an Approved Outlet as a result of Seller's failure to deliver conforming Merchandise in a timely manner or arising as a result of any other breach by Seller. Seller will indemnify Company for all losses and costs incurred by Company and the Approved Outlets as the result of any recall, rework or retrofit of Merchandise that is defective or does not otherwise conform to the Specifications.

15.    **CANCELLATION AND TERMINATION.** Company may immediately cancel or terminate each Vendor Agreement (including this UTC) for any Merchandise or any part of Company's obligations under such Vendor Agreement, or cancel or terminate all or any outstanding POs for Merchandise under such Vendor Agreement if: (a) Company reasonably believes that Seller does not have Merchandise that conforms to the terms of the Vendor Agreement and is ready for shipment in the specified quantities and on the delivery dates specified, (b) it is alleged that Merchandise infringes any IP Right, (c) it is alleged that Merchandise was manufactured or supplied to an Approved Outlet in violation of the applicable Vendor Agreement or in violation of any Applicable Laws (including Alternative Jurisdictions), (d) Seller refuses to furnish appropriate guaranties to protect Company as may be requested by Company pursuant to Section 9.4 (Compliance with Law), (e) Seller fails to maintain the insurance required hereunder, fails to name Company (the Authorized Resellers or Company Branded Outlets requested by Company) as additional insureds, or fails to produce evidence thereof, (f) Seller becomes the subject of a voluntary or involuntary case under the Federal Bankruptcy Code or similar state or federal insolvency laws; any creditor of Seller commences an action to enforce or foreclose upon a lien or security interest in property of Seller; or any property of Seller passes into the hands of a creditor of Seller, receiver or assignee for the benefit of creditors, becomes the subject of a levy for taxes or to satisfy a judgment or otherwise is attached for the benefit of a creditor of Seller, (g) Seller ceases the manufacture or assembly of Merchandise or necessary components incorporated into Merchandise, or announces its intention to do so prior to fulfilling all outstanding POs, or otherwise becomes unable for any reason to timely fulfill outstanding POs, (h) Seller commits a material breach of any representation, warranty, covenant, or any other provision of any Vendor Agreement, (i) Seller changes the location of manufacture or assembly of Merchandise without the prior written consent of Company, (j) cancellation or termination is otherwise permitted by the UCC or other Applicable Law, (k) Company reasonably believes that Merchandise or Seller is encumbered by a material adverse consumer perception, (l) Seller defaults under or breaches any other agreement with Company which default or breach would entitle Company to terminate that other agreement, (m) Seller engages in any criminal activity or fraud, threatens public health or harm to an Approved Outlet, Company Mark or commercial reputation, or Seller is or does business with a person who is listed by the U.S. Government on any U.S. Government watch lists, including the U.S. Office of Foreign Assets Control security watch lists, (n) a sale of all or substantially all of the assets of Seller, whether in a single transaction or a series of transactions, (o) the merger or consolidation of Seller with or into a limited liability company, corporation, or other entity; the merger of a limited liability company, corporation, or other entity into Seller, or (p) any other event that results in fifty percent (50%) or more of the total voting power entitled to vote in the election of the board of directors of Seller or the surviving or new entity (or in the event that Seller or the surviving or new entity is not a corporation, the equivalent to the board of directors) being held by a person or persons other than either the shareholders or members of Seller who, individually or as a group, held fifty percent (50%) or more of such voting power immediately prior to such transaction or

© 2013 Sears Brands, LLC



event. For any imported Merchandise that is subject to a customs embargo or quota restriction, Company may cancel or terminate any PO or delay any installment payment or advance in respect of Company's monetary obligations to Seller, if any, under each applicable Vendor Agreement until the embargo is lifted or necessary quota becomes available.

16.   **RECOUPMENT AND SET-OFF.** Company and Seller agree that: (a) Company's monetary obligations to Seller under the Vendor Agreements (including this UTC) shall at all times be net of all Refund Credits, Return Costs, Administrative Fees, Seller obligations under Section 12 (Defense, Indemnity and Notice) and other monetary obligations owing by Seller to Company under any Vendor Agreement or otherwise (collectively, "**Seller's Monetary Obligations**"), and (b) any installment payment or advance made by Company to Seller in respect of any Vendor Agreement while any Seller's Monetary Obligations are outstanding shall be deemed to be an overpayment to Seller to the extent of such outstanding Seller's Monetary Obligations and shall be subject to recoupment and or set-off by Company. Company may elect to use vendor allowance, promotional and similar agreements ("**Promotional Agreements**") to document amounts owing under Vendor Agreements and new subsidies or other amounts Seller agrees to pay; however all Seller's liabilities under a Vendor Agreement shall continue in force and effect regardless of whether the parties sign a Promotional Agreement. Without limiting the foregoing, Company has the right, at all times, to deduct any Seller's Monetary Obligations from any amounts owed to Seller by Company, by debit memo or otherwise (irrespective of whether any such amount is owed to Seller by Kmart, Sears Brands, or Sears) and to pay only the net sum due, if any. Seller shall promptly pay, upon demand, any Seller's Monetary Obligations that remain outstanding after any exercise by Company of its recoupment or set-off rights. For the purpose of Company's exercise of the right of recoupment and set-off only, any raw materials, components and parts supplied by Seller to Company for use in Merchandise, if applicable, shall be deemed to be supplied to Company pursuant to a PO.

17.   **CONFIDENTIALITY.**

17.1   Restrictions on Proprietary Information. All Proprietary Information is the sole and exclusive property of Company. Company hereby grants Seller a limited license to use the Proprietary Information for the sole purpose of performing its obligations hereunder. Seller: (a) will hold in confidence all Proprietary Information, (b) will use all reasonable methods to protect the confidentiality of such Proprietary Information, and (c) shall not in any manner use, reproduce or disclose, directly or indirectly, to any third party at any time any Proprietary Information, except in connection with Seller's performance under a Vendor Agreement (including this UTC). Seller shall only disclose Proprietary Information to its Personnel on a need to know basis and Seller shall be liable for any improper use or disclosure by its Personnel.

17.2   Publicity. Seller will not disclose the existence or terms of any Vendor Agreement or any other information regarding Seller's supply of Merchandise to Approved Outlets in any

advertising, promotional or sales activity or publicity release or other public communication unless Company gives its prior written consent to such action and approves any press release or other publicity materials prior to their dissemination.

17.3   Special Rules for Confidential Personal Information. Seller will hold the following information (which is a subset of Proprietary Information) in the strictest confidence: all information and materials regarding Customers, including names, addresses, phone numbers, user names, email addresses, warranty card information, account numbers, social security numbers, Customer lists, and demographic, financial and transaction information and any data or other material Seller receives or creates regarding the foregoing ("**Confidential Personal Information**"). In addition to Seller's obligations regarding Proprietary Information, Seller: (a) may not disclose Confidential Personal Information to any entity other than the recipient (including affiliates) without Company's prior written permission; (b) will keep Confidential Personal Information in a location separate (e.g., database or table) from Seller's information regarding its customers (even if such information is duplicative) and Seller will not duplicate or incorporate the Confidential Personal Information into its own customer records; and (c) is prohibited from using Confidential Personnel Information to contact the Customers (for marketing or any other purposes); except as approved by Company in writing. In addition, to the extent Seller is given access to Confidential Personnel Information, Seller will establish and maintain written policies and procedures and conduct its operations to ensure: (x) the security, confidentiality and proper disposal of the Confidential Personal Information, (y) protect against any anticipated threats or hazards to the security or integrity of such information, and (z) protect against the loss, unauthorized access to or use of Confidential Proprietary Information. Copies of such policies and procedures will be provided by Seller to Company upon Company's request. Seller will permit Company to audit Contractor's compliance with the provisions of this Section 17.3 at any time during Contractor's regular business hours. A breach of this Section 17.3 is grounds for immediate termination of all Vendor Agreements. In addition, Company is entitled to the recovery of any pecuniary gain realized by Seller from the unauthorized use or disclosure of Confidential Personal Information. Unless otherwise prohibited by Applicable Law, Seller shall (i) immediately notify Company of any legal process served on Seller for the purpose of obtaining Confidential Personal Information and (ii) permit Company adequate time to exercise its legal options to prohibit or limit such disclosure.

17.4   PCI Compliance. To the extent it receives Customer credit card data in connection with any Vendor Agreement, Seller is responsible for (and Seller will maintain the security of) the credit card data Seller possesses and Seller will comply with current Payment Card Industry ("PCI") Data Security Standards (as updated by the PCI from time to time). In the event of a data breach of such credit card information involving Seller, its Personnel or Seller's environment, Seller will immediately notify Company of the breach and cooperate fully with Company, industry and/or government officials, at Seller's sole cost, in a review or forensic investigation (or both) of Seller's environment and processes.

© 2013 Sears Brands, LLC

Li Feng

17.5    Other. Upon either the expiration, cancellation or termination of the applicable Vendor Agreement(s), or a demand by Company, Seller shall deliver to Company immediately all materials containing Proprietary Information in Seller's possession (whether prepared by Company or Seller), in a format and manner prescribed by Company. Seller will immediately notify Company upon the discovery of the loss, unauthorized disclosure or unauthorized use of any Proprietary Information and cooperate with Company, at no additional charge, in the investigation of any such unauthorized disclosure. Company makes no warranty as to the accuracy or completeness of any Proprietary Information, and has no liability to Seller resulting from the provision, contents or use of Proprietary Information. Seller acknowledges that Seller does not have any interest, title, lien or right in any Proprietary Information.

17.6    Computer Access. If Seller is given access, whether on-site or through remote facilities, to any Approved Outlet's computer, communication or electronic data storage system, software or electronic services (collectively, the "Electronic Resources") in connection with any Vendor Agreement, then Seller will limit such access and use solely on a strict need to know basis for the purpose for which it was provided. Seller will not attempt to reverse engineer any Electronic Resource nor access any Electronic Resource other than those specifically required to perform its obligations under the applicable Vendor Agreement. Seller will, upon request, advise Company in writing of the name of each of its Personnel who have been or will be granted such access, and shall strictly follow each Approved Outlet's (as applicable) security rules and procedures for use of such Electronic Resources. All user identification numbers and passwords disclosed to Seller and any information obtained by Seller as a result of Seller's access to, and use of the Electronic Resources are deemed to be, and Seller shall treat them as Proprietary Information. Seller shall cooperate with Company, at Seller's sole cost, in the investigation of any apparent unauthorized access by Seller's Personnel (or through the use of their log-in information) to the Electronic Resources or unauthorized release of Proprietary Information. Seller shall promptly notify Company of any actual or suspected unauthorized access or disclosure.

18.    MISCELLANEOUS.

18.1    Binding Nature and Assignment by Seller. Each Vendor Agreement (including this UTC) will bind and inure to the benefit of the successors, representatives and permitted assigns of the parties hereto. All Vendor Agreements are personal to Seller and Seller shall not assign (by contract, operation of law or otherwise) its rights or obligations under any Vendor Agreement, except with Company's prior written consent, and the failure of Seller to obtain Company's prior written consent shall render any such attempt to assign void and of no force and effect; provided, however, that Seller may assign its right to receive payments from Company, subject to the terms and conditions contained herein. Any factor or permitted assignee, secured creditor or pledgee of Seller shall acquire such interest subject to all of Company's recoupments, set-offs, claims and defenses and all of the terms and conditions contained herein, and Seller shall notify

any such factor, assignee, secured creditor or pledgee of such fact. Company has no obligation to make payments to anyone other than Seller unless and until Seller: (a) notifies Company in writing of the assignment of such installment payments or advances along with the name and address of the person to whom such installment payments or advances should be sent, (b) obtains a separate Company accounts payable number for such installment payments or advances, and (c) uses such accounts payable number on every invoice that Company is to pay directly to the third party. Seller retains responsibility for all allegedly misdirected installment payments or advances that result from Seller's failure to comply with the terms and conditions hereof.

18.2    Relationship of the Parties. Seller is an independent contractor under this UTC and nothing contained in any Vendor Agreement (including this UTC), or done in connection therewith, shall be construed as creating a partnership, agency or joint venture between Company and Seller; and neither party shall become bound by any representation, statement or act of the other party. Seller has no authority to enter into any contract or incur any expense or obligation of any kind in Company's name. Seller is solely responsible for obtaining all real tangible and intangible property, services and other resources (including necessary permits, and licenses) associated with Seller performing its responsibilities under each Vendor Agreement and for paying all taxes assessed against Seller in connection therewith.

18.3    Entire Agreement. The Vendor Agreements between Company and Seller (including the applicable Vendor Guide), contain the entire understanding of Seller and the applicable Company entity (e.g., Kmart, Sears Brands or Sears) with respect to the subject matter therein and may not be supplemented or modified by course of dealing, course of performance, any oral communication between the parties, or any response by Seller, whether oral or written, purporting to modify or supplement the terms of a Vendor Agreement unless such response is in writing and agreed to in writing by a duly authorized representative of the applicable Company entity (i.e., Kmart, Sears Brands or Sears). All prior and contemporaneous discussions and negotiations relating to the Merchandise are merged herein and all future discussions and negotiations relating to Merchandise which occur prior to the signature of any future Vendor Agreement are incorporated therein. Further, the Approved Outlets and their Personnel shall not be bound by any "shrink wrap license," "disclaimers" or "click to approve" terms or conditions contained in any Seller computer system, software or Internet site that Company or its Personnel use.

18.4    Severability. If any provision of any Vendor Agreement (including this UTC), is held to be unenforceable by a court of competent jurisdiction, then that provision shall be deemed modified to the extent necessary to make it enforceable. The unenforceability of any portion of a Vendor Agreement shall not affect the enforceability of the remaining provisions of such Vendor Agreement.

18.5    Cumulative Rights. All rights and remedies under each Vendor Agreement are cumulative, and the exercise of any right

Li Feng

or remedy in a Vendor Agreement does not prejudice the exercise of any other right or remedy under a Vendor Agreement at law or in equity.

18.6    Waiver.  No right of Company under each Vendor Agreement can be waived except as expressly set forth in writing signed by an authorized representative of Company. Company's failure to enforce any of its rights or remedies will not be interpreted as a waiver of subsequent violations of that provision or of any other provision of this Agreement.

18.7    Survival.  Each provision of each Vendor Agreement that would, by its nature, survive the expiration, cancellation or termination of such Vendor Agreement will so survive including: (a) the obligation of either party to pay amounts accrued thereunder and (b) Section 3.5 (Worldwide Distribution and License), Section 3.6 (Seller Provided Content), Section 8 (Parts and Service), Section 9 (Representations and Warranties), Section 11 (Intellectual Property), Section 12 (Defense, Indemnity and Notice), Section 13 (Insurance), Section 14 (Company Remedies), Section 16 (Recoupment and Setoff), Section 17 (Confidentiality) and Section 18 (Miscellaneous) of this UTC.

18.8    Governing Law.  Each Vendor Agreement (including this UTC) shall be construed and enforced in accordance with Illinois law without regard to conflict of law or other legal principles (of Illinois or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Illinois.  Seller and Company agree that the rights and obligations of the parties under each Vendor Agreement are not governed by the United Nations Convention on Contracts for the International Sale of Goods.

18.9    Submission to Jurisdiction.  Seller and Company consent to the personal and subject matter jurisdiction of the state and federal courts located in Cook County, Illinois and agree that the exclusive venue for any dispute concerning each Vendor Agreement (including this UTC) shall be in such courts. All objections to such jurisdiction or venue are hereby waived. Seller consents to service of process as permitted under Illinois law or by certified mail.  Nothing in Section 18.12 or Section 18.13 of this UTC shall be construed to prevent Company from obtaining interim equitable relief from a court of competent jurisdiction pursuant to Section 18.11.

18.10   Waiver of Jury Trial.  [In the event Section 18.12 (Dispute Resolution for International Sellers (other than Chinese Entities) or Section 18.13 (Dispute Resolution for Chinese Sellers), as applicable, are not enforced against Seller, then e]ach party to this Agreement hereby irrevocably waives its right to trial by jury in any legal proceedings arising out of or relating to a Vendor Agreement (including this UTC).

18.11   Equitable Relief.  The parties agree that any actual or threatened: (a) breach of Section 9 (Representations and Warranties), (b) Section 11 (Intellectual Property), or (c) Section 17 (Confidentiality) will cause irreparable harm to the Company and that a remedy at law would be inadequate. Therefore, in addition to all remedies available at law, the Company is entitled

to equitable relief including temporary and permanent injunctive relief and specific performance against the Seller in the event of any threatened or actual violation of such sections of this UTC. Seller waives: (i) any right Seller may have to require Company to post a bond in connection with any such equitable relief; and (ii) all claims for damages resulting from the wrongful issuance of such equitable relief.

18.12   Liquidated Damages.  Seller and Company hereby agree that the Administrative Fees, and other liquidated payments under each Vendor Agreement are not intended by the parties as penalty payments, but are instead intended as liquidated damages to compensate Company should Seller fail to meet its obligations. The parties also agree that these amounts are reasonable and appropriate because of the difficulty, time and cost of determining Company's actual damages resulting from such failure.

18.13   Dispute Resolution for International Sellers (other than Chinese Entities).  This Section 18.13 applies only to Sellers whose legal domicile is a country other than the United States or the People's Republic of China. In such case, all disputes arising out of or relating to the Vendor Agreements (including this UTC), will be resolved: (a) first, by mandatory mediation under the rules and procedures of JAMS, Inc. in Chicago, Illinois and, if mediation is not successful, (b) then, by final and binding arbitration under the rules and procedures of JAMS, Inc. in Chicago, Illinois.  If a dispute continues unresolved for thirty (30) days, either party may request mediation, which shall begin no later than thirty (30) days from the date of such request. The parties will engage in good faith efforts to reach resolution during the course of such mediation. If mediation fails, either party may immediately request binding arbitration.  The parties agree to select a panel of three (3) arbitrators and agree that the official language of the arbitration shall be the English language. Judgment may be rendered on any arbitration award in any court of competent jurisdiction.  The parties hereto agree that the United States District Court for the Northern District of Illinois shall constitute a court of competent jurisdiction and that such court possesses jurisdiction and venue (and is a convenient venue) over any such arbitration award or any issues relating to such mediation or arbitration that are properly within the purview of courts (versus being in the purview of JAMS, Inc., the mediator or arbitrator(s)).  Seller waives all objections to jurisdiction and venue as herein stated.

18.14   Dispute Resolution for Chinese Sellers.  This Section 18.14 applies only to Sellers whose legal domicile is the People's Republic of China (including the Hong Kong Special Administrative Region and the Macau Special Administrative Region). For each such Seller, any dispute arising out of or in connection with any Vendor Agreements (including this UTC), shall be resolved: (a) first, by referral to mediation at the Hong Kong International Arbitration Centre ("HKIAC") in Hong Kong and in accordance with its then current Mediation Rules; and, if mediation is not successful, (b) then, by final and binding arbitration in Hong Kong under the Hong Kong International Arbitration Centre Administered Arbitration Rules in force when the Notice of Arbitration is submitted in accordance with those Rules.  If a dispute continues unresolved for thirty (30) days,

either party may request mediation which shall begin no later than thirty (30) days after the date of such request. The parties will engage in good faith efforts to reach resolution during the course of such mediation. If mediation fails, either party may immediately request binding arbitration. The parties agree to select a panel of three (3) arbitrators and agree that the official language of the arbitration shall be the English language. The arbitral award shall be final and binding upon both parties. Judgment may be rendered on any arbitration award in any court of competent jurisdiction. The parties hereto agree that the courts of Hong Kong shall be one such group of courts of competent jurisdiction and that such courts possess jurisdiction and venue (and are a convenient venue) over any such arbitration award or any issues relating to such mediation or arbitration that are properly within the purview of courts, (versus being in the purview of HKIAC the mediator or arbitrator(s)).

18.15    Waiver of Sovereign Immunity.  To the extent that Seller may in any jurisdiction claim for itself or its assets immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that in any such jurisdiction there may be attributed to itself or its assets such immunity (whether or not claimed), the Seller agrees not to claim and irrevocably waives such immunity to the fullest extent permitted by the laws of that jurisdiction intending, in particular and without limiting the generality of the foregoing, that in any proceedings filed or taken in the People's Republic of China (including the Hong Kong Special Administrative Region and the Macau Special Administrative Region) the foregoing irrevocable waiver of immunity shall have full legal effect, and that in any proceedings filed or taken in the United States of America the foregoing irrevocable waiver of immunity shall have full legal effect and shall be construed in accordance with the United States Foreign Sovereign Immunities Act of 1976.

18.16    Interpretation and Construction.  In this UTC and each other Vendor Agreement: (a) defined terms include the singular and the plural form of the terms, (b) "include", "includes" and "including" are inclusive (e.g., "including without limitation"), (c) "or" is disjunctive but not necessarily exclusive, (d) "shall" and "will" are mandatory, (e) Section headings and labels of defined terms are for convenience only and have no interpretive force, (f) all monies are expressed in and will be calculated and paid in U.S. Dollars, and (g) time shall be of the essence for all deadlines, including ship dates.  The parties agree that the provisions of each Vendor Agreement (including the UTC) will be construed with equal weight against each party (and not just against the drafter).

18.17    Counterparts; Facsimile and Electronic Copies.  This UTC and each other Vendor Agreement may be executed in any number of separate counterparts, all of which, when taken together, will constitute one and the same instrument. The parties agree that a signature transmitted by facsimile or electronic copy (e.g. .PDF) will be effective the same as an original.

IN WITNESS WHEREOF, Seller and Company have each caused this UTC to be executed by its duly authorized representative.

COMPANY
By: Sears Holdings Management Corporation,
     its Agent

By: _____

Print Name:    JOE MARELLI

Title:    VP OPERATIONS

SELLER
Hong Kong Great Stay International Co., Limited
                    Company Name

By: _____ Li Teng _____
                    Signature

Print Name: _____

Title: _____ V. P. _____
         [PLACE SELLER'S NAME/LABEL HERE]

# Exhibit B

**UNIVERSAL TERMS AND CONDITIONS**
With Direct to Customer Terms

Seller: # KUMHO TIRE USA INC    Georgia

Full Legal Name | Jurisdiction of Organization (Country or State)

These terms and conditions ("**UTC**") are effective as of the date the "I Agree" button is clicked below and apply to all Merchandise (defined below) supplied by the above-identified vendor and its affiliates (jointly and severally, "**Seller**"), directly or indirectly through Seller's dealers or distributors, to Kmart Corporation ("**Kmart**"), Sears Brands Management Corporation ("**Sears Brands**"), Sears, Roebuck and Co. ("**Sears**") and all other direct and indirect subsidiaries of Sears Holdings Corporation (together with Kmart, Sears Brands and Sears, collectively the "**Company**").

Seller and Company hereby agree as follows:

1.     DEFINITIONS.  The following definitions apply in this UTC: (a) "**Applicable Laws**" means the applicable federal, state and local laws, ordinances, governmental orders, rules, regulations, and prohibitions including for all jurisdictions where Merchandise is sold, delivered or Merchandise Production occurs or will occur; (b) "**Approved Outlets**" means Company, each Authorized Reseller and each Company Branded Outlet; (c) "**Authorized Reseller**" means each retailer, wholesaler, and other person (excluding Company and Company Branded Outlets), that Company authorizes to sell or distribute Company Branded Merchandise; (d) "**Company Branded Merchandise**" means Merchandise marked or labeled with a Company Mark and all Merchandise sold in connection therewith whether or not marked with a Company Mark (e.g., accessories, parts, and other goods supplied by Seller to Company); (e) "**Company Branded Outlets**" means Company's franchisees and other third parties licensed or otherwise authorized by Company to sell or service Merchandise using a name licensed directly or indirectly from Company (e.g., Sears Authorized Hometown Stores, "Sears Home Appliance Showroom" franchisees); (f) "**Company Marks**" means all Marks owned or licensed by Company (other than those licensed from Seller), including Sears®, Kmart®, Kenmore®, Craftsman® and DieHard®; (g) "**Company Trade Dress**" means all cosmetic designs, ornamental appearance and trade dress embodied in or relating to Company Branded Merchandise; (h) "**Company Sites**" means the Internet sites published by or on behalf of the Company, as well as third party Internet sites on which Company permits Merchandise to be displayed or sold; (i) "**Customers**" means actual or prospective customers of Approved Outlets; (j) "**IP Rights**" means all intellectual property rights, that now or hereafter exist (including any pending applications,  registrations and the right to file the foregoing), in any jurisdiction worldwide, whether conferred by operation of law, contract or license, including (i) rights of authorship, including copyrights, moral rights, and mask-works, (ii) Marks, (iii) cosmetic designs, ornamental appearance and trade dress, (iv) trade secret rights, (v) inventions and technology (whether patentable or not and whether or not reduced to practice), (vi) confidential and proprietary information, (vii) software and databases, (viii) rights of publicity, (ix) patents, designs, algorithms and other industrial property rights, and (x) "rental" rights and rights to

remuneration; (k) "**Marks**" means all domestic and foreign trademarks, service marks, trade names, logos, domain names, as well as registrations related to the foregoing and applications to register the foregoing; (l) "**Merchandise**" means the goods, including Company Branded Merchandise and DTC Merchandise, supplied by or on behalf of Seller for resale by Company (including Merchandise provided to Authorized Sellers and Company Branded Outlets), and those described in any applicable Vendor Agreements or Specifications, including all parts, packaging, hangers, containers and Seller Provided Content whether or not they are separately invoiced to Company; (m) "**Merchandise Production**" means the development, design, production, manufacture, construction, assembly, packaging, tagging, labeling, warehousing, shipping and invoicing of Merchandise; (n) "**Proprietary Information**" means all non-public information (including the terms of each Vendor Agreement) received or observed by Seller or its Personnel, in whatever form, in connection with any Vendor Agreement or any proposed business between Seller and Company, including: (i) all information relating to the Approved Outlets': business plans, strategies, forecasts, analyses, financial information, Electronic Resources, employee information, sales, pricing, cost, inventory, operations, plans and programs; (ii) all trade secrets of the Approved Outlets; (iii) all information relating to Company's Customers, including Customer lists, Customer survey responses and other Confidential Personal Information; (iv) all Specifications furnished by Company; (v) Company's IP Rights, including Company Work Product and all descriptions, and other embodiments thereof, and (vi) and all data and other material Seller receives or creates regarding the foregoing; (o) "**Personnel**" means the officers, directors, employees, agents, suppliers, licensors, licensees, contractors, subcontractors, and other representatives, from time to time, of a party and its affiliates, and, in the case of Company, those of Company Branded Outlets and Authorized Resellers involved in the sale or servicing of Merchandise; (p) "**PO**" means a purchase order in writing or processed through Electronic Data Interchange (EDI) issued by Company for the purchase of Merchandise that includes the description, quantities to be purchased, price and other information relating to the purchase of Merchandise; (q) "**Seller Provided Content**" means all content or information regarding Merchandise furnished by or on behalf of Seller (whether in print or electronic form) in connection with the Merchandise, Company Sites or otherwise, including marketing and  advertising materials, promotional materials, point of sale displays, content on packaging, product development information and material, all literature, product descriptions, tags, labels, text, graphics, photographs, video and audio, installation and service instructions and training materials, owner's manuals and service manuals; (r) "**Seller Marks**" means all Marks owned or licensed by Seller (other than those licensed from Company); (s) "**Specification**" means: (i) the detailed description of Merchandise set forth in any Vendor Agreement, the Vendor

Guide, or otherwise provided by Company in writing, (ii) all industry and government standards applicable to the Merchandise, as modified from time to time (including UL, CPSC and other standards for safety and efficiency), (iii) the requirement that the Merchandise meets or exceeds (in terms of quality, features and performance) each sample provided by Seller of such Merchandise and (iv) all performance claims that Seller makes or has made in connection with the Merchandise; (t) "**Vendor Agreement**" means each: (i) PO, written addendum and agreement (e.g., supply agreements, exclusive agreements), existing now or later signed by Company and Seller relating to Merchandise, including this UTC, (ii) Promotional Agreement (as defined below), advertising agreements, and (iii) written amendment, rider, waiver and consent relating to any of the foregoing; and (u) "**Vendor Guide**" means all policies and procedures for doing business with the applicable Company entity (e.g. Sears on behalf of Sears and Sears Brands or Kmart, on behalf of itself), that have been supplied or made available to Seller by or on behalf of the applicable Company entity in print or electronic form as may from time to time be amended by the applicable Company entity including the applicable "Vendor Information Guide" (e.g., the Sears Vendor Information Guide for Merchandise that Sears or Sears Brands receives in the United States or the Sears Holdings International Vendor Information Guide for Merchandise received internationally). Terms used herein and not otherwise defined have the meaning given them in the Uniform Commercial Code as in effect in the State of Illinois (the "**UCC**").

## 2. VENDOR AGREEMENTS.

2.1    POs.    Execution of this UTC does not commit Company to purchase any Merchandise. A commitment to purchase Merchandise only arises when Company issues a PO for specified quantities of Merchandise or signs a Vendor Agreement (other than this UTC) for specific quantities of Merchandise and Company's obligation, if any, is limited in each instance to such quantities. Company Branded Outlets and Authorized Resellers are not authorized to purchase Merchandise directly from Seller under this UTC. Company issued POs that are accepted by Seller become part of and are subject to the terms of this UTC and each other applicable Vendor Agreement.

2.2    Forecasts and Exclusivity.    All estimates and forecasts of Approved Outlets' future needs for Merchandise that Company may provide to Seller are: (i) for planning purposes only, (ii) do not in any way represent a commitment by Company and (iii) do not give rise to any obligation or liability of Company. Company is not responsible for actions taken by Seller based on such estimates or forecasts and Seller agrees that reliance by it upon such estimates or forecasts would be unreasonable. Company has no obligation to buy Merchandise exclusively from Seller or to buy Company's requirements for any Merchandise from Seller.

2.3    Incorporation; Construction and Amendment.    This UTC and the applicable Vendor Guides are incorporated into each other Vendor Agreement. In the event of any conflict or inconsistency between Vendor Agreements: (a) POs shall control over other Vendor Agreements only as to price, quantity, F.O.B.

point and Specifications, and (b) express provisions in other Vendor Agreements shall control over this UTC, the Vendor Guide(s) and POs; in each case, as to the Merchandise sold under such PO or Vendor Agreement. The Vendor Agreements may be amended or supplemented only by a latter: (x) written Vendor Agreement signed by an authorized representative of each party, or (y) revised Vendor Guide. All POs and other Vendor Agreements are a series of installments of one and the same transaction constituting a single contract between Company and Seller. If any bankruptcy or insolvency proceeding is initiated in respect of Seller and Seller, as debtor in possession, elects to perform any outstanding POs, then Seller, by so accepting and performing any of such POs, will be deemed to have accepted and assumed this UTC and obligations of Seller to Company arising from time to time hereunder.

## 3. BUSINESS TERMS.

3.1    Specification.    Seller, by agreeing to or using any Specification (including any portions, changes or suggestions proposed or provided by Company): (a) adopts it as Seller's own, (b) accepts full responsibility for it, and (c) relieves Company of all responsibility for it. Seller's use of Company provided Specifications is subject to Section 11.3 (Company's IP Rights).

3.2    Price and Shipping.    The price for Merchandise includes all costs of Merchandise Production and delivering Merchandise to the F.O.B. point stated in the PO or other Vendor Agreement, including: (a) all duties and taxes (including excise and withholding taxes) payable in any country where Merchandise Production or delivery takes place; (b) all commissions to selling agents; and (c) all other incidental charges, whether or not such charges are itemized on invoices to Company. Seller shall ship only the quantities of Merchandise ordered by Company in the applicable PO and Seller shall make no substitutions or changes without Company's prior written approval. Seller acknowledges that the Vendor Guide requires the payment of fees (each an "**Administrative Fee**") for late or otherwise non-compliant deliveries of Merchandise.

3.3    Invoices.    Seller will invoice Company for Merchandise no earlier than the date the invoiced Merchandise departs the F.O.B. Point (the "**Invoice Date**"). If any payment date is a Saturday, Sunday or bank holiday, then Company is not obligated to initiate payment until the next banking day. Company has no obligation to pay any amount first invoiced more than six months after it accrued. Company is not required to pay any disputed charge before the dispute is resolved. Seller shall, if Company desires, accept all payments in U.S. Dollars. Company may make payments using "Electronic Funds Transfer" (EFT) or ePayables (credit card settlement), in accordance with Company's requirements as communicated to Seller.

3.4    Approved Outlets.    Company may distribute to each Approved Outlet all information regarding Company Branded Merchandise including product specifications, documentation, inspection results and corrective actions taken by Seller. Each Authorized Reseller and Company Branded Outlet is an intended third-party beneficiary under each Vendor Agreement (including this UTC).

3.5    Worldwide Distribution and License.  Seller authorizes the Approved Outlets to directly and indirectly offer and sell Merchandise, without restriction, through all promotional, advertising and distribution channels, and other methods of sale that now or hereafter exist everywhere in the world, including via telephone, print, television, radio, and the Internet ("**Distribution Channels**"); provided that in the case of Authorized Resellers such authority is limited to Company Branded Products.  Except for the IP Rights owned by Company, Seller grants to Company, each  Company Branded Outlet and each Authorized Reseller (with respect to Company Branded Merchandise), subject to the terms of the applicable Vendor Agreements, a royalty-free, perpetual, irrevocable, worldwide, non-exclusive license to offer and sell services related to such Merchandise and to use, copy, perform, display, modify, create derivative works of, and otherwise exploit, without an obligation to account, and distribute, with the right to sublicense, in any manner, all Seller IP Rights, all Seller Provided Content, information about or related to Customers (including warranty card information), software, data, studies, performance claims, parts and schematics, summaries and other materials relating to any Merchandise for purposes of marketing, advertising, promoting, selling, servicing and supporting Merchandise through all Distribution Channels and as otherwise desired by Company; provided it is reasonably related to the exercise of Company's rights or the fulfillment of Company's obligations hereunder (including on behalf of the Company Branded Outlets and the Authorized Resellers).

3.6    Seller Provided Content.  For all Merchandise appearing on Company Sites, Seller will submit, at Seller's sole cost, the Seller Provided Content (for use on such sites, in advertisements and to otherwise promote such Merchandise), in the format and according to requirements as may be requested by Company from time to time ("Content Specifications").  Seller shall not upload to any Company Sites any Seller Provided Content that violates any third party's IP Rights, violates any Applicable Law, or includes any pornographic or other sexually explicit content, obscene content, or content that advocates racial, religious or social intolerance or hatred.  At Company's sole cost, Company has the right to make modifications to the Seller Provided Content to the extent Company deems appropriate and necessary to ensure that the Content Specifications are met.  Further, Company may use, copy, perform, display, modify, create derivative works of, and otherwise exploit, without an obligation to account, and distribute, with the right to sublicense, in any manner all Seller Provided Content in connection with the sale of Merchandise and other products (regardless of source).  Seller will pay Company's standard fee (to Company or its designee) for each SKU of Merchandise that Seller submits to appear on each Company Site.

3.7    Records and Audits.  Seller will maintain accurate, legible books, systems and records in connection with Seller's performance of its obligations hereunder.  Seller will continue to maintain such customary books, systems and records pertaining to a particular Vendor Agreement for the longer of: (a) all legally required retention periods, and (b) the period ending on the second anniversary of the expiration, cancellation, or termination

of such Vendor Agreement.  Upon seven (7) business days' notice to Seller, Company has the right to audit all books, systems and records of Seller in order to verify amounts paid (or payable) to Seller and Seller's performance under each Vendor Agreement, including verification of all reports, statements and invoices issued by Seller.  Any such audit shall be conducted during normal business hours without unreasonable burden on Seller's business by Company's corporate internal audit Personnel or by an auditor of nationally recognized standing selected by Company.  In addition, if a government agency requests that Company provide records in Seller's possession, or if a government agency conducts an investigation of Company in any way relating to the Merchandise, Seller or any business conducted by Seller, Seller shall be responsible for producing the requested records, and for otherwise fully cooperating with such investigation, at Seller's sole cost.

4.    DIRECT TO CUSTOMER MERCHANDISE.  If Seller directly ships Merchandise ("DTC Merchandise") to a Customer, or to an Approved Outlet for Customer pickup, then the additional terms and conditions contained in the attached Addendum for Direct to Customer Terms (the "DTC Addendum") will apply to such transactions, which additional terms and conditions are incorporated herein for all purposes of this UTC.

5.    CODES OF CONDUCT.  Seller has received, as part of the Vendor Guide, Sears Holdings Corporation's Code of Vendor Conduct ("Vendor Code of Conduct") and its Code of Conduct (the "Code of Conduct," together with the Vendor Code of Conduct, the "Codes") for Company Personnel.  Vendor agrees to abide by the Vendor Code of Conduct and acknowledges that Company employees will abide by the Code of Conduct.  Seller shall support the Codes and shall not directly or indirectly take any action that may induce a violation of any Applicable Law or the Codes.  Seller shall (as provided for in the Vendor Guide) notify Sears Holdings' Office of Compliance in writing within five (5) business days after Seller has knowledge of any violation or attempted violation of the Codes or this Section 5.  Seller will cooperate with each request by Company to provide information and documentation regarding any communication or transaction with the Approved Outlets.

6.    PACKAGING, LABELING, SHIPPING AND BILLING; RISK OF LOSS.

6.1    Packaging, Labeling, Shipping and Billing.  Seller will provide adequate packaging, tagging, labeling, packing, shipping and billing for the Merchandise.  Seller shall comply with all packaging, tagging, labeling, packing, shipping and billing requirements requested by Company, including as specified in the Vendor Guide, as well as all requirements established by Applicable Laws, carrier tariffs and product classifications.  For Merchandise to be shipped from a point of origin within the United States, Seller shall deliver Merchandise to the F.O.B. point in accordance with the ship date stated in the applicable Vendor Agreements.  For Merchandise to be shipped from a point of origin outside the United States, Seller will deliver Merchandise: (a) in accordance with the delivery terms stated in the applicable Vendor Agreements, and (b) on or before the ready date stated in the Vendor Agreement.  Seller shall ship all

Merchandise in full packs and full shipments in accordance with Company's requirements as set forth in applicable Vendor Agreements.

6.2    <u>Risk of Loss</u>.  All risk of loss or damage to Merchandise remains with Seller until the Merchandise is received by Company (or its representatives) at the F.O.B. point stated in the applicable Vendor Agreement.  Seller is solely responsible for all damage to the Merchandise caused by improper loading or improper packaging of the Merchandise.

## 7.    MANUFACTURING.

7.1    <u>Manufacturing Information</u>.  Upon Company's request, Seller shall provide Company with specific information, in such detail as Company may request, as to the location and method of manufacturing or assembly of Merchandise.  Seller will notify Company in writing before making any change in the location of manufacturing or assembly of Merchandise and Seller will bear all costs and responsibility for delays resulting from such changes.  Without advance notice but during regular business hours, Company and its designated Personnel may periodically: (a) monitor (onsite and remotely) Seller and its Personnel's compliance with each Vendor Agreement (including this UTC) and (b) inspect any facilities at which any Merchandise or any components for Merchandise are manufactured or assembled (including any facilities of Seller and its Personnel) and all Merchandise at any stage of manufacture, assembly or delivery (including at the F.O.B. point).  Company may require Seller to have Merchandise inspected by the Company's Personnel and any independent inspectors approved by Company, prior to its shipment to the United States.  Such inspection shall be performed at Seller's sole cost.  Any inspection, documentation thereof and any corrective action taken by Seller with respect to any Merchandise shall not be deemed an acceptance of such Merchandise or a waiver of any nonconformities or defects in such Merchandise by Company and shall not excuse any failure by Seller to deliver Merchandise in accordance with the terms of the applicable Vendor Agreement.  Seller is solely responsible, at its sole cost, for the manufacture of (or sourcing of) all Merchandise (including all components thereof).

7.2    <u>Company Branded Merchandise</u>.  Prior to employing any Seller or third party production facility to manufacture or assemble Merchandise bearing a Company Mark, Seller shall register such production facility with Company's Global Compliance Office in accordance with the requirements of the applicable Vendor Guide.

## 8.    PARTS AND SERVICE.

8.1    <u>Parts</u>.  Seller shall sell to Company all parts (or their functional equivalents) referenced or included in each Vendor Agreement or any Service Information (defined below) applicable to Merchandise for a period of at least ten (10) years after the date such Merchandise is last shipped by Seller to Company.  Company and its Personnel may use any such parts in the performance of warranty service.  The price of parts shall be stated in the Vendor Agreement but in no event shall Seller charge Company or its representatives a price greater than the lowest price charged by Seller to any other customer for the same or similar parts sold on substantially similar terms.

8.2    <u>Service</u>.  Seller shall provide to Company, in electronic format, all available information relating to Merchandise, including warranty forms, service and owners' manuals, product specifications, parts lists and images, failure mode and effects analyses, exploded parts diagrams, schematics, training materials, technical and service bulletins, service and installation manuals and instructions that are developed by or for Seller (together with any revisions and updates to such information, "**Service Information**").  Seller authorizes Company and its Personnel to use, reproduce, distribute or sell to the Customers the Service Information without payment of any royalties or other fees to Seller and to provide repair, maintenance and installation services for all Merchandise.  With respect to all Merchandise that is serviceable, Seller designates Sears and its designees ("**Company Service Provider**") as an authorized service provider and shall include Company Service Provider, no less prominently than its other authorized service providers, on all lists or other enumeration of authorized service providers, whether in print, Internet or other medium.  Company Service Provider may: (a) advertise that it is an authorized service provider for such Merchandise and (b) provide such repair, maintenance and installation services ("**Services**") (during and after Seller's warranty period) and may use its Personnel to provide such Services.  For Services performed by the Company Service Provider in accordance with Seller's warranty, Seller shall pay Company the rates set forth in the applicable Vendor Agreements (or if none are stated, Company's standard rates for similar Services).  Seller represents and warrants that the provision of such Services by Company Service Provider and its Personnel will not violate the rights of any third party.

## 9.    REPRESENTATIONS AND WARRANTIES.  Without limiting or disclaiming any implied representations or warranties, Seller represents, warrants and covenants, as of the effective date of this UTC and each other Vendor Agreement and continuing in effect throughout the term of each Vendor Agreement, that:

9.1    <u>Merchandise</u>.  (a) all Merchandise: (i) conforms to its Specifications, (ii) is fit and sufficient for the ordinary purpose for which Merchandise is used, (iii) is free from defects in workmanship, materials and packaging, (iv) is free from defects in construction and design, (v) is fit and sufficient for the purpose stated on any packaging, labeling or advertising, and (vi) is equivalent in materials, quality, fit, finish, workmanship, performance and design to any samples submitted to and approved by Company; (b) upon transfer of the Merchandise to Company, the title for such Merchandise is free and clear of any encumbrance, and (c) all test data and other claim substantiation provided by Seller is accurate and properly described by Seller.

9.2    <u>Advertising</u>.  all claims made by Seller in any packaging, labeling, advertising, or other consumer material, including Seller Provided Content, in connection with any Merchandise or Seller Mark relating to Merchandise: (a) comply with Applicable Law, (b) are true and have been substantiated before such claims are made, and (c) contain all applicable

warnings and instructions in the assembly, installation, use, repair, servicing and maintenance of the Merchandise.

9.3    Intellectual Property.    (a) all IP Rights (other than IP Rights owned by Company or licensed by Company from third parties) and Seller Provided Content used by Seller in connection with Merchandise or in the Production of Merchandise, are either: (i) owned by Seller or (ii) are licensed by Seller and Seller has the right to license them to Company in connection with such Merchandise and the sale of such Merchandise to the Approved Outlets, for use or further resale and (b) Merchandise, including Seller Provided Content, does not, at any time, infringe any IP Right of any person, corporation or other entity.

9.4    Authority and Compliance with Law.    (a) Seller has the right, power and authority to: (i) enter into each Vendor Agreement (including this UTC), (ii) perform its obligations under each Vendor Agreement; and (iii) grant to Company the rights provided under each Vendor Agreement; (b) Seller's execution, delivery and performance of each Vendor Agreement has been duly authorized, are in compliance with each such Vendor Agreement, are legally binding and enforceable in accordance with its terms, and do not violate any other agreement, restriction, or Applicable Laws; (c) all Merchandise strictly complies with, and all Merchandise Production occurs strictly in compliance with, all Applicable Laws, including the Applicable Laws of each jurisdiction outside the United States (each an "**Alternative Jurisdiction**"), where Seller becomes aware that the Approved Outlets sell (or intend to sell) the Merchandise (unless and until Seller has provided Company with 10 business days' written notice that the Merchandise does not comply with the requirements of such Alternative Jurisdiction); (d) Seller and its Personnel who are involved in Merchandise Production or the installation, repair, display, possession, servicing, use, maintenance, delivery or sale of Merchandise shall each, during the term of each Vendor Agreement, strictly comply with all Applicable Laws, including the Foreign Corrupt Practices Act of 1977, 15 U.S.C. §§ 78dd-1 et. seq., as amended, which Seller acknowledges applies to the business relationship with Company hereunder, and such other national or regional anti-corruption or anti-bribery laws that may apply to either Seller or Seller's business relationship with Company, and those governing the working conditions, wages, hours and minimum age of the work force; (e) Merchandise Production does not involve at any time, in whole or in part, any use of child, convict or forced labor; and (f) all prices charged and allowances made available to Company by Seller are in compliance with U.S. antitrust laws, including the requirements of the Robinson-Patman Act.  Seller shall provide Company with a guaranty of compliance with the foregoing in such form as Company may designate with respect to any Merchandise.

9.5    Antidumping.    (a) all sales of Merchandise to Company are made at no less than fair value under the United States antidumping law and (b) no government has provided a countervailable subsidy for Merchandise actionable under U.S. law.  Seller shall indemnify Company for (x) all antidumping and countervailing duties imposed on all Merchandise that is: (i) sold prior to the date of publication of the International Trade Administration's preliminary determination of sales at less than

fair value or prior to the date of publication of the existence of countervailable subsidies and (ii) exported or imported before the date of publication of the International Trade Administration's final determination of sales at less than fair value or the existence of countervailable subsidies and (y) any expenses (including reasonable attorneys' fees) and administrative costs incurred by the Approved Outlets in their participation in any United States antidumping or countervailable duty proceeding involving any warranted Merchandise.

10.    ELECTRONIC PROCESSING.    Unless otherwise agreed by Company or as set forth in the applicable Vendor Guide, the parties shall process all POs and other related documents (including invoices and ship notices) and any payments or advances in respect of monetary obligations between Company and Seller electronically, either directly or through a third party provider satisfactory to both parties.  Each party will pay its own costs, including the costs of any provider with which it contracts.  Seller will include in each invoice (or ship notice, in the absence of an invoice) an appropriate, agreed-upon code, symbol or statement affirming Seller's compliance with all applicable requirements of the Fair Labor Standards Act (as amended), the regulations and orders of the United States Department of Labor issued pursuant thereto and any similar state laws and regulations.  Seller shall process all electronic fund transfers and wire transactions in compliance with National Automated Clearing House Association (NACHA) rules and any instructions and procedures that Company may from time to time supply.  Neither party is liable to the other for any indirect, special, incidental, exemplary or consequential damages arising or resulting from any delay, omission or error in the electronic transmission or receipt of any documents, even if the other party has been advised of the possibility of such damages.

11.    INTELLECTUAL PROPERTY.

11.1    Merchandise with a Company Mark.    If Company authorizes Seller to mark or label any Merchandise with a Company Mark, Seller will limit the goods so marked or labeled to quantities set forth in a PO or other applicable Vendor Agreement.  Seller will perform all such marking and labeling in accordance with Company's specific written instructions.  Seller shall not sell or otherwise dispose of, nor permit the sale or disposal of, any Merchandise bearing any Company Mark (including any Merchandise rejected by Company) to anyone other than Company without first obtaining Company's express written consent and then (a) removing, or otherwise defacing as installed, any Company Mark before such sale or disposal, and (b) complying with such other requirements as Company imposes in its sole discretion.  Company may elect, but has no obligation, to purchase from Seller any surplus labels, packaging or other materials bearing any Company Mark.  Seller will destroy all such materials that Company does not purchase from Seller at the expiration, cancellation, or termination of the applicable Vendor Agreement (including this UTC).  Seller will provide written certification to Company of such destruction.

11.2    Company Work Product.    All information and other materials related to Company Branded Products, and all copyrights therein, including marketing, promotional materials,

point of sale displays, packaging, software, data, Service Information, Seller Provided Content, performance claims and evaluations, testing protocols and data used to evaluate performance claims, database formats, methods used to assemble and maintain electronic product catalogs, and programming related to Company Sites and user applications (e.g., mobile applications) and copies, notes and summaries of the foregoing that are prepared, underlined developed or created by or on behalf of Company or Seller or any of their respective Personnel (collectively, "**Company Work Product**"), will be owned by Company.  All Company Work Product will be deemed "work made for hire" as that term may be defined from time to time in Section 101 of the Copyright Act, 17 U.S.C. Section 101 (or any successor).  Company will be deemed the author of the Company Work Product, and Company will be the worldwide owner of all right, title and interest therein (including all IP Rights).  If for any reason the Company Work Product is found not to have been created as work made for hire, Seller hereby assigns to Company without limitation and without additional compensation, all right, title and interest, including all IP Rights embodied in the Company Work Product and Seller hereby appoints Company as Seller's attorney-in-fact to execute and deliver such documents and take such actions as may be necessary to effectuate such assignment.  Seller will obtain Company's prior written approval before developing or implementing any changes to Company Work Product.

11.3    <u>Company's IP Rights</u>.  Seller hereby acknowledges that all: (a) Company Marks, (b) Company Trade Dress, (c) the other IP Rights in all information and materials provided by Company or its Customer's to Seller and (d) other IP Rights owned or licensed by Company (collectively, the "**Company IP Rights**"), in each case, constitute valuable intellectual property which, as between Company and Seller, are owned solely by Company and Seller will not claim any right, title or interest in, or challenge Company's worldwide ownership of the foregoing. Seller has no interest or rights in any Company IP Rights and will not use Company IP Rights except as expressly provided for in a Vendor Agreement or otherwise approved by Company in writing. Seller will not contest or challenge: (x) Company's worldwide ownership and exclusive right to the Company IP Rights; or (y) the validity of any of Company's IP Rights.

11.4    <u>License to Seller</u>.  Company hereby grants to Seller a non-exclusive, revocable, limited license to use the Company's IP Rights for the sole purpose of affixing or incorporating the Company's IP Rights into: (a) any Company Branded Products, in accordance with Company's instructions and (b) any Company Work Product, in accordance with Company's instructions. Seller's use of Company's IP Rights will not confer upon Seller any right or interest therein.

11.5    <u>Restrictions on Use of Company's IP Rights</u>.  Seller will use Company IP Rights only in the performance of Seller's obligations under the Vendor Agreements and in accordance with any restrictions therein. Seller will not distribute to anyone except Company any products or other materials that incorporate or infringe upon any Company IP Rights without Company's specific prior written authorization.  All license(s) granted to Seller under each Vendor Agreement are personal to Seller, and Seller will

not sublicense those rights without Company's prior written consent.  Seller's right to use Company's IP Rights granted to Seller in any Vendor Agreement (or otherwise in writing): (a) is subject to any Company style and quality control guidelines (as published by Company from time to time) and the prior review and written approval of Company; (b) does not extend to any use that may impair the validity or enforceability of, disparage, or otherwise impair Company's ownership thereof; and (c) does not include the right to incorporate Company's Marks as part of any other Marks, words or symbols. Seller will not register, attempt to register or renew any of Company's IP Rights with the applicable registration body in any jurisdiction unless specifically requested by Company.

11.6    <u>Customer Contact Information</u>.  Seller hereby assigns to Company all of Seller's right, title and interest in and to all telephone numbers, domain name and email addresses, and other contact points (e.g., Twitter and Facebook addresses, collectively ("**Contact Points**") now or hereafter used in connection with Company Branded Products (on packaging or labeling) or that appear in directories in connection with any Company Mark, effective, unless rejected in writing by Company, upon the termination of Seller's use of such Contact Points or upon Company's request, at which time Seller shall have no further right, title or interest in or to such Contact Points; but Seller will remain liable for all fees and costs relating to such Contact Points incurred prior to the effective date of the assignment.  Seller acknowledges that upon such assignment, Company shall have the sole right to and interest in such Contact Points, and Seller hereby appoints Company as Seller's attorney-in-fact to direct third parties (e.g., the telephone company, the Internet domain name registry authority, etc.) to assign such Contact Points to Company, and to execute and deliver such documents and take such actions as may be necessary to effectuate such assignment.

11.7    <u>Other</u>.  Upon expiration, cancellation or termination of the applicable Vendor Agreement and at any time upon Company's demand, Seller will immediately stop using all Company IP Rights and will deliver to Company all Company Work Product and all other information and materials containing or based on Company IP Rights.  Nothing in any Vendor Agreement will bar Company from protecting its rights to the exclusive worldwide ownership of Company IP Rights against unfair competition, infringement or appropriation by anyone, including any use by Seller not expressly authorized by a Vendor Agreement.  Seller will execute and deliver to Company all further documents deemed by Company to be useful in documenting, perfecting or registering each of Company's IP Rights (including transfers of registrations of Company's IP rights that were made in Seller's name).

12.    DEFENSE, INDEMNITY AND NOTICE.

12.1    <u>Defense</u>.  Seller shall, at its sole cost, defend (a) Company, (b) all of Company's past, present and future affiliates, (c) all past, present and future Company Branded Outlets and Authorized Resellers, (d) all past, present, and future Personnel of each of the foregoing entities, and (e) all other persons directly or indirectly involved in the distribution or sale of Merchandise

(each an "**Indemnified Party**") against all allegations (including false, fraudulent or groundless allegations) in any claim, action, lawsuit or proceeding between any Indemnified Party and any third party, whether or not Seller's obligations under Section 12.2 (Indemnity and Contribution) apply, arising out of or relating to any of the following (collectively, the "**Claims**"): (i) the infringement, misuse, dilution, misappropriation or other violation of any IP Right in any way relating to or affecting Merchandise (including Seller Provided Content), or any unfair competition involving Merchandise (including Seller Provided Content), (ii) the loss, unauthorized disclosure or unauthorized use of the Confidential Personal Information by Seller, or through Seller Personnel (e.g., compromised login-IDs, etc.), (iii) death of or injury to any person, damage to any property, or any other damage or loss, by whomsoever suffered, resulting or claimed to result in whole or in part from any latent or patent defect in Merchandise, including improper design, manufacture, construction, assembly, installation, repair, display, packaging, service or design of Merchandise, failure of Merchandise to comply with any Specification or samples or with any express or implied warranties of Seller, or any claim of strict liability in tort relating to Merchandise, (iv) each breach (including breaches of Sellers' representations, warranties and covenants) by Seller or its Personnel of a Vendor Agreement (including this UTC), (v) the packaging, tagging, labeling, packing, shipping, delivery and invoicing of Merchandise, (vi) the packaging, labeling or advertising claims made by Seller, (vii) the display, assembly or installation of Merchandise, or (viii) the assertion by a third party of a security interest, right of replevin or other legal interest created by a factoring or other credit arrangement in any amount due Seller under a Vendor Agreement. Despite the foregoing sentence, Seller is not obligated to defend any Indemnified Party in any action, lawsuit or other proceeding where the Claim is based only on the sole negligence of any Indemnified Party in the display, assembly, service, repair or installation of Merchandise. Seller shall retain defense counsel satisfactory to Company and shall diligently and professionally defend each Indemnified Party from each Claim and Seller shall timely provide periodic reports to Company and consult with Company's Personnel in conducting the defense of the Claims and otherwise cooperate fully with the Company's reasonable requests; provided that only with respect to Claims arising under Section 12.1(i) involving IP Rights owned or licensed by Company (except those licensed from Seller) and any claims of unfair competition involving Merchandise, Company may, at its election and at any time, take control of the defense and investigation of said Claims and employ attorneys and other consultants, investigators and experts of its own choice to manage and defend any such Claims at Seller's cost.

12.2    Indemnity and Contribution. Seller shall hold harmless and indemnify the Indemnified Parties from and against any and all damages, liabilities, losses, costs and expenses (including reasonable attorneys' fees, disbursements and costs of investigation and cooperation) incurred by any of the Indemnified Parties in any claim, demand, action, lawsuit or proceeding arising out of or in any way relating to any Claims; except that Seller is not obligated to indemnify any Indemnified Party for damages awarded based solely on: (a) the negligence of any Indemnified Party in the display, assembly, service, repair or

installation of any Merchandise, or (b) the infringement of any IP Right by: (i) any of the materials (other than Seller Provided Content) on Company Sites, or (ii) any use of Company IP Rights in the manner approved by Company in writing. If any of Seller's obligations under this Section 12.2 are not enforceable under Applicable Law and an Indemnified Party and Seller are found to be liable to a third party in connection with the Merchandise or any Vendor Agreement, then Company and Seller shall each contribute to the payment of any judgment awarded in favor of such third party in proportion to their comparative degrees of culpability.

12.3    Settlement. Seller may settle Claims without Company's consent if the only obligation under such settlement is the payment of monies by Seller and such settlement provides for a full release of Company and the Indemnified Parties. Seller will obtain Company's prior written consent for any other settlements, including one that would place new or different obligations or restrictions on the Indemnified Parties or restrictions upon the sale (or disposition) of the Merchandise.

12.4    Notice. Seller shall notify Company's General Counsel in writing by certified mail, return receipt requested, within five (5) business days after Seller has: (a) knowledge of any claim or allegation of infringement, misuse, dilution, misappropriation or other violation of any IP Right in any way related to or affecting Merchandise, including Seller Provided Content; (b) knowledge of any safety issue with any Merchandise: (c) knowledge of any allegation by a government agency (including the U.S. Consumer Product Safety Commission, the U.S. Department of Agriculture and the U.S. Food and Drug Administration and such equivalent foreign government agencies, departments and commissions) that the government agency (i) has initiated a formal or informal inquiry, investigation or proceeding in any way related to or affecting Merchandise, or (ii) asserts that Merchandise is not or may not be in compliance with laws: or (d) reported to any government agency that Merchandise is not or may not be in compliance with Applicable Law or contains or may contain a defect that could create a risk of injury or death.

**13.    INSURANCE.** Seller will obtain and maintain, at its sole cost, a policy or policies of Commercial General Liability Insurance covering liabilities relating to Merchandise, including products and completed operations, with a broad form vendor's endorsement CG 20 15 04 13 or its equivalent naming Company, and upon request of Company, each Approved Outlet, as additional insureds, in those amounts and with such companies as set forth in the applicable Vendor Guide and containing such other provisions satisfactory to Company. All such policies will be primary and noncontributory and will provide that the coverage thereunder will not be terminated without at least thirty (30) days' prior written notice to Company, and upon request of Company, each Approved Outlet. Seller will submit proof of insurance evidencing such coverage in advance of or concurrent with its execution of the UTC and upon each policy renewal date. Neither approval of any of Seller's insurance policies by Company nor Seller's failure to discharge any of its obligations contained herein (including Seller's failure to obtain a broad form vendor's endorsement naming the Approved Outlets specified by Company as additional insureds) will relieve Seller of

any obligations contained herein, including Seller's obligations under Section 12 (Defense, Indemnity and Notice), and claims in excess of Seller's policy limits. If at any time Seller does not provide Company with the proof of insurance required hereunder or if, in Company's opinion, such policies do not provide adequate protection for Company and Seller does not furnish evidence of acceptable coverage within fifteen (15) days after Company so notifies Seller, Company has the right, in addition to its rights under Section 14 (Company Remedies), to withhold making any installment payment or advance in respect of any Company's monetary obligations that may be outstanding under any Vendor Agreement until evidence of acceptable coverage is provided.

14.    **COMPANY REMEDIES.** In addition to all other remedies available to Company under the UCC or otherwise, Company may elect to, in its sole discretion, reject, abandon, return, hold or liquidate, at Seller's sole cost and risk, any and all Merchandise which: (a) is not produced, sold, shipped or delivered in compliance with the applicable Vendor Agreements (including this UTC), or otherwise does not conform to the applicable Vendor Agreements, (b) is delivered in excess of the quantities ordered, in broken packs or partial shipments, or in packages or assortments other than as specified, (c) allegedly violates any Applicable Laws (including Alternative Jurisdictions), (d) allegedly infringes any IP Right in any way related to or affecting Merchandise, including Seller Provided Content, or allegedly involves any unfair competition, or (e) in the case of food and other Merchandise with limited shelf life, will, at the time of receipt by Company, expire (or otherwise go bad), in too short a period of time to allow Company a reasonable opportunity to sell such Merchandise (as measured by industry standards, if applicable). Company's right to reject, abandon, return, hold or liquidate Merchandise at Seller's expense shall, without limiting such right, extend to Merchandise supplied to Company that was returned by a Customer for any reason entitling Company to reject or revoke acceptance of such Merchandise. Company may, at its option, require Seller to replace any nonconforming Merchandise or grant Company a full refund or full credit (collectively, "**Refund Credit**"). Seller's obligation to pay Refund Credits shall arise as of the original shipment date. At Company's election, each Approved Outlet may accept nonconforming Merchandise, and Seller shall be liable for any reduced value of such Merchandise or the cost incurred by Company, its Authorized Resellers and its Company Branded Outlets to repair the same. Acceptance of Merchandise by an Approved Outlet shall not relieve Seller of any of its warranty or other obligations hereunder. Company may also charge to Seller all direct and indirect costs incurred by an Approved Outlet as a result of any nonconforming Merchandise or delivery, or an administrative fee in an amount reasonably related to such costs, whether or not Merchandise is rejected by Company (collectively, "**Return Costs**"). Acceptance by an Approved Outlet of replacement Merchandise, a full or partial credit or refund, or Return Costs, shall not relieve Seller of liability for other damages sustained by an Approved Outlet as a result of Seller's failure to deliver conforming Merchandise in a timely manner or arising as a result of any other breach by Seller. Seller will indemnify Company for all losses and costs incurred by Company and the Approved Outlets as the result of any recall, rework or retrofit of

Merchandise that is defective or does not otherwise conform to the Specifications.

15.    **CANCELLATION AND TERMINATION.** Company may immediately cancel or terminate each Vendor Agreement (including this UTC) for any Merchandise or any part of Company's obligations under such Vendor Agreement, or cancel or terminate all or any outstanding POs for Merchandise under such Vendor Agreement if: (a) Company reasonably believes that Seller does not have Merchandise that conforms to the terms of the Vendor Agreement and is ready for shipment in the specified quantities and on the delivery dates specified, (b) it is alleged that Merchandise infringes any IP Right, (c) it is alleged that Merchandise was manufactured or supplied to an Approved Outlet in violation of the applicable Vendor Agreement or in violation of any Applicable Laws (including Alternative Jurisdictions), (d) Seller refuses to furnish appropriate guaranties to protect Company as may be requested by Company pursuant to Section 9.4 (Compliance with Law), (e) Seller fails to maintain the insurance required hereunder, fails to name Company (the Authorized Resellers or Company Branded Outlets requested by Company) as additional insureds, or fails to produce evidence thereof, (f) Seller becomes the subject of a voluntary or involuntary case under the Federal Bankruptcy Code or similar state or federal insolvency laws; any creditor of Seller commences an action to enforce or foreclose upon a lien or security interest in property of Seller; or any property of Seller passes into the hands of a creditor of Seller, receiver or assignee for the benefit of creditors, becomes the subject of a levy for taxes or to satisfy a judgment or otherwise is attached for the benefit of a creditor of Seller, (g) Seller ceases the manufacture or assembly of Merchandise or necessary components incorporated into Merchandise, or announces its intention to do so prior to fulfilling all outstanding POs, or otherwise becomes unable for any reason to timely fulfill outstanding POs, (h) Seller commits a material breach of any representation, warranty, covenant, or any other provision of any Vendor Agreement, (i) Seller changes the location of manufacture or assembly of Merchandise without the prior written consent of Company, (j) cancellation or termination is otherwise permitted by the UCC or other Applicable Law, (k) Company reasonably believes that Merchandise or Seller is encumbered by a material adverse consumer perception, (l) Seller defaults under or breaches any other agreement with Company which default or breach would entitle Company to terminate that other agreement, (m) Seller engages in any criminal activity or fraud, threatens public health or harm to an Approved Outlet, Company Mark or commercial reputation, or Seller is or does business with a person who is listed by the U.S. Government on any U.S. Government watch lists, including the U.S. Office of Foreign Assets Control security watch lists, (n) a sale of all or substantially all of the assets of Seller, whether in a single transaction or a series of transactions, (o) the merger or consolidation of Seller with or into a limited liability company, corporation, or other entity; the merger of a limited liability company, corporation, or other entity into Seller, or (p) any other event that results in fifty percent (50%) or more of the total voting power entitled to vote in the election of the board of directors of Seller or the surviving or new entity (or in the event that Seller or the surviving or new entity is not a corporation, the equivalent to the board of directors) being held by a person or

persons other than either the shareholders or members of Seller who, individually or as a group, held fifty percent (50%) or more of such voting power immediately prior to such transaction or event. For any imported Merchandise that is subject to a customs embargo or quota restriction, Company may cancel or terminate any PO or delay any installment payment or advance in respect of Company's monetary obligations to Seller, if any, under each applicable Vendor Agreement until the embargo is lifted or necessary quota becomes available.

16.    **RECOUPMENT AND SET-OFF.** Company and Seller agree that: (a) Company's monetary obligations to Seller under the Vendor Agreements (including this UTC) shall at all times be net of all Refund Credits, Return Costs, Administrative Fees, Seller obligations under Section 12 (Defense, Indemnity and Notice) and other monetary obligations owing by Seller to Company under any Vendor Agreement or otherwise (collectively, "**Seller's Monetary Obligations**"), and (b) any installment payment or advance made by Company to Seller in respect of any Vendor Agreement while any Seller's Monetary Obligations are outstanding shall be deemed to be an overpayment to Seller to the extent of such outstanding Seller's Monetary Obligations and shall be subject to recoupment and or set-off by Company. Company may elect to use vendor allowance, promotional and similar agreements ("**Promotional Agreements**") to document amounts owing under Vendor Agreements and new subsidies or other amounts Seller agrees to pay; however all Seller's liabilities under a Vendor Agreement shall continue in force and effect regardless of whether the parties sign a Promotional Agreement. Without limiting the foregoing, Company has the right, at all times, to deduct any Seller's Monetary Obligations from any amounts owed to Seller by Company, by debit memo or otherwise (irrespective of whether any such amount is owed to Seller by Kmart, Sears Brands, or Sears), and to pay only the net sum due, if any. Seller shall promptly pay, upon demand, any Seller's Monetary Obligations that remain outstanding after any exercise by Company of its recoupment or set-off rights. For the purpose of Company's exercise of the right of recoupment and set-off only, any raw materials, components and parts supplied by Seller to Company for use in Merchandise, if applicable, shall be deemed to be supplied to Company pursuant to a PO.

17.    **CONFIDENTIALITY.**

17.1    Restrictions on Proprietary Information. All Proprietary Information is the sole and exclusive property of Company. Company hereby grants Seller a limited license to use the Proprietary Information for the sole purpose of performing its obligations hereunder. Seller: (a) will hold in confidence all Proprietary Information, (b) will use all reasonable methods to protect the confidentiality of such Proprietary Information, and (c) shall not in any manner use, reproduce or disclose, directly or indirectly, to any third party at any time any Proprietary Information, except in connection with Seller's performance under a Vendor Agreement (including this UTC). Seller shall only disclose Proprietary Information to its Personnel on a need to know basis and Seller shall be liable for any improper use or disclosure by its Personnel.

17.2    Publicity. Seller will not disclose the existence or terms of any Vendor Agreement or any other information regarding Seller's supply of Merchandise to Approved Outlets in any advertising, promotional or sales activity or publicity release or other public communication unless Company gives its prior written consent to such action and approves any press release or other publicity materials prior to their dissemination.

17.3    Special Rules for Confidential Personal Information. Seller will hold the following information (which is a subset of Proprietary Information) in the strictest confidence: all information and materials regarding Customers, including names, addresses, phone numbers, user names, email addresses, warranty card information, account numbers, social security numbers, Customer lists, and demographic, financial and transaction information and any data or other material Seller receives or creates regarding the foregoing ("**Confidential Personal Information**"). In addition to Seller's obligations regarding Proprietary Information, Seller: (a) may not disclose Confidential Personal Information to any entity other than the recipient (including affiliates) without Company's prior written permission; (b) will keep Confidential Personal Information in a location separate (e.g., database or table) from Seller's information regarding its customers (even if such information is duplicative) and Seller will not duplicate or incorporate the Confidential Personal Information into its own customer records; and (c) is prohibited from using Confidential Personnel Information to contact the Customers (for marketing or any other purposes); except as approved by Company in writing. In addition, to the extent Seller is given access to Confidential Personnel Information, Seller will establish and maintain written policies and procedures and conduct its operations to ensure: (x) the security, confidentiality and proper disposal of the Confidential Personal Information, (y) protect against any anticipated threats or hazards to the security or integrity of such information, and (z) protect against the loss, unauthorized access to or use of Confidential Proprietary Information. Copies of such policies and procedures will be provided by Seller to Company upon Company's request. Seller will permit Company to audit Contractor's compliance with the provisions of this Section 17.3 at any time during Contractor's regular business hours. A breach of this Section 17.3 is grounds for immediate termination of all Vendor Agreements. In addition, Company is entitled to the recovery of any pecuniary gain realized by Seller from the unauthorized use or disclosure of Confidential Personal Information. Unless otherwise prohibited by Applicable Law, Seller shall (i) immediately notify Company of any legal process served on Seller for the purpose of obtaining Confidential Personal Information and (ii) permit Company adequate time to exercise its legal options to prohibit or limit such disclosure.

17.4    PCI Compliance. To the extent it receives Customer credit card data in connection with any Vendor Agreement, Seller is responsible for (and Seller will maintain the security of) the credit card data Seller possesses and Seller will comply with current Payment Card Industry ("**PCI**") Data Security Standards (as updated by the PCI from time to time). In the event of a data breach of such credit card information involving Seller, its Personnel or Seller's environment, Seller will immediately notify Company of the breach and cooperate fully with Company,

industry and/or government officials, at Seller's sole cost, in a review or forensic investigation (or both) of Seller's environment and processes.

17.5 <u>Other</u>. Upon either the expiration, cancellation or termination of the applicable Vendor Agreement(s), or a demand by Company, Seller shall deliver to Company immediately all materials containing Proprietary Information in Seller's possession (whether prepared by Company or Seller), in a format and manner prescribed by Company. Seller will immediately notify Company upon the discovery of the loss, unauthorized disclosure or unauthorized use of any Proprietary Information and cooperate with Company, at no additional charge, in the investigation of any such unauthorized disclosure. Company makes no warranty as to the accuracy or completeness of any Proprietary Information, and has no liability to Seller resulting from the provision, contents or use of Proprietary Information. Seller acknowledges that Seller does not have any interest, title, lien or right in any Proprietary Information.

17.6 <u>Computer Access</u>. If Seller is given access, whether on-site or through remote facilities, to any Approved Outlet's computer, communication or electronic data storage system, software or electronic services (collectively, the "**Electronic Resources**") in connection with any Vendor Agreement, then Seller will limit such access and use solely on a strict need to know basis for the purpose for which it was provided. Seller will not attempt to reverse engineer any Electronic Resource nor access any Electronic Resource other than those specifically required to perform its obligations under the applicable Vendor Agreement. Seller will, upon request, advise Company in writing of the name of each of its Personnel who have been or will be granted such access, and shall strictly follow each Approved Outlet's (as applicable) security rules and procedures for use of such Electronic Resources. All user identification numbers and passwords disclosed to Seller and any information obtained by Seller as a result of Seller's access to, and use of the Electronic Resources are deemed to be, and Seller shall treat them as Proprietary Information. Seller shall cooperate with Company, at Seller's sole cost, in the investigation of any apparent unauthorized access by Seller's Personnel (or through the use of their log-in information) to the Electronic Resources or unauthorized release of Proprietary Information. Seller shall promptly notify Company of any actual or suspected unauthorized access or disclosure.

## 18. MISCELLANEOUS.

18.1 <u>Binding Nature and Assignment by Seller</u>. Each Vendor Agreement (including this UTC) will bind and inure to the benefit of the successors, representatives and permitted assigns of the parties hereto. All Vendor Agreements are personal to Seller and Seller shall not assign (by contract, operation of law or otherwise) its rights or obligations under any Vendor Agreement, except with Company's prior written consent, and the failure of Seller to obtain Company's prior written consent shall render any such attempt to assign void and of no force and effect; provided, however, that Seller may assign its right to receive payments from Company, subject to the terms and conditions contained herein. Any factor or permitted assignee, secured creditor or

pledgee of Seller shall acquire such interest subject to all of Company's recoupments, set-offs, claims and defenses and all of the terms and conditions contained herein, and Seller shall notify any such factor, assignee, secured creditor or pledgee of such fact. Company has no obligation to make payments to anyone other than Seller unless and until Seller: (a) notifies Company in writing of the assignment of such installment payments or advances along with the name and address of the person to whom such installment payments or advances should be sent, (b) obtains a separate Company accounts payable number for such installment payments or advances, and (c) uses such accounts payable number on every invoice that Company is to pay directly to the third party. Seller retains responsibility for all allegedly misdirected installment payments or advances that result from Seller's failure to comply with the terms and conditions hereof.

18.2 <u>Relationship of the Parties</u>. Seller is an independent contractor under this UTC and nothing contained in any Vendor Agreement (including this UTC), or done in connection therewith, shall be construed as creating a partnership, agency or joint venture between Company and Seller; and neither party shall become bound by any representation, statement or act of the other party. Seller has no authority to enter into any contract or incur any expense or obligation of any kind in Company's name. Seller is solely responsible for obtaining all real tangible and intangible property, services and other resources (including necessary permits, and licenses) associated with Seller performing its responsibilities under each Vendor Agreement and for paying all taxes assessed against Seller in connection therewith.

18.3 <u>Entire Agreement</u>. The Vendor Agreements between Company and Seller (including the applicable Vendor Guide), contain the entire understanding of Seller and the applicable Company entity (e.g., Kmart, Sears Brands or Sears) with respect to the subject matter therein and may not be supplemented or modified by course of dealing, course of performance, any oral communication between the parties, or any response by Seller, whether oral or written, purporting to modify or supplement the terms of a Vendor Agreement unless such response is in writing and agreed to in writing by a duly authorized representative of the applicable Company entity (i.e., Kmart, Sears Brands or Sears). All prior and contemporaneous discussions and negotiations relating to the Merchandise are merged herein and all future discussions and negotiations relating to Merchandise which occur prior to the signature of any future Vendor Agreement are incorporated therein. Further, the Approved Outlets and their Personnel shall not be bound by any "shrink wrap license," "disclaimers" or "click to approve" terms or conditions contained in any Seller computer system, software or Internet site that Company or its Personnel use.

18.4 <u>Severability</u>. If any provision of any Vendor Agreement (including this UTC), is held to be unenforceable by a court of competent jurisdiction, then that provision shall be deemed modified to the extent necessary to make it enforceable. The unenforceability of any portion of a Vendor Agreement shall not affect the enforceability of the remaining provisions of such Vendor Agreement.

© 2013 Sears Brands, LLC

18.5    Cumulative Rights.  All rights and remedies under each Vendor Agreement are cumulative, and the exercise of any right or remedy in a Vendor Agreement does not prejudice the exercise of any other right or remedy under a Vendor Agreement at law or in equity.

18.6    Waiver.  No right of Company under each Vendor Agreement can be waived except as expressly set forth in writing signed by an authorized representative of Company.  Company's failure to enforce any of its rights or remedies will not be interpreted as a waiver of subsequent violations of that provision or of any other provision of this Agreement.

18.7    Survival.  Each provision of each Vendor Agreement that would, by its nature, survive the expiration, cancellation or termination of such Vendor Agreement will so survive including:  (a) the obligation of either party to pay amounts accrued thereunder and (b) Section 3.5 (Worldwide Distribution and License), Section 3.6 (Seller Provided Content), Section 8 (Parts and Service), Section 9 (Representations and Warranties), Section 11 (Intellectual Property), Section 12 (Defense, Indemnity and Notice), Section 13 (Insurance), Section 14 (Company Remedies), Section 16 (Recoupment and Setoff), Section 17 (Confidentiality) and Section 18 (Miscellaneous) of this UTC.

18.8    Governing Law.  Each Vendor Agreement (including this UTC) shall be construed and enforced in accordance with Illinois law without regard to conflict of law or other legal principles (of Illinois or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Illinois.   Seller and Company agree that the rights and obligations of the parties under each Vendor Agreement are not governed by the United Nations Convention on Contracts for the International Sale of Goods.

18.9    Submission to Jurisdiction.   Seller and Company consent to the personal and subject matter jurisdiction of the state and federal courts located in Cook County, Illinois and agree that the exclusive venue for any dispute concerning each Vendor Agreement (including this UTC) shall be in such courts. All objections to such jurisdiction or venue are hereby waived. Seller consents to service of process as permitted under Illinois law or by certified mail.  Nothing in Section 18.12 or Section 18.13 of this UTC shall be construed to prevent Company from obtaining interim equitable relief from a court of competent jurisdiction pursuant to Section 18.11.

18.10    Waiver of Jury Trial.  [In the event Section 18.12 (Dispute Resolution for International Sellers (other than Chinese Entities) or Section 18.13 (Dispute Resolution for Chinese Sellers), as applicable, are not enforced against Seller, then e]ach party to this Agreement hereby irrevocably waives its right to trial by jury in any legal proceedings arising out of or relating to a Vendor Agreement (including this UTC).

18.11    Equitable Relief.  The parties agree that any actual or threatened:  (a) breach of Section 9 (Representations and Warranties), (b) Section 11 (Intellectual Property), or (c) Section 17 (Confidentiality) will cause irreparable harm to the Company and that a remedy at law would be inadequate.  Therefore, in addition to all remedies available at law, the Company is entitled to equitable relief including temporary and permanent injunctive relief and specific performance against the Seller in the event of any threatened or actual violation of such sections of this UTC. Seller waives: (i) any right Seller may have to require Company to post a bond in connection with any such equitable relief; and (ii) all claims for damages resulting from the wrongful issuance of such equitable relief.

18.12    Liquidated Damages.   Seller and Company hereby agree that the Administrative Fees, and other liquidated payments under each Vendor Agreement are not intended by the parties as penalty payments, but are instead intended as liquidated damages to compensate Company should Seller fail to meet its obligations.  The parties also agree that these amounts are reasonable and appropriate because of the difficulty, time and cost of determining Company's actual damages resulting from such failure.

18.13    Waiver of Sovereign Immunity.  To the extent that Seller may in any jurisdiction claim for itself or its assets immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that in any such jurisdiction there may be attributed to itself or its assets such immunity (whether or not claimed), the Seller agrees not to claim and irrevocably waives such immunity to the fullest extent permitted by the laws of that jurisdiction intending, in particular and without limiting the generality of the foregoing, that in any proceedings filed or taken in the People's Republic of China (including the Hong Kong Special Administrative Region and the Macau Special Administrative Region) the foregoing irrevocable waiver of immunity shall have full legal effect, and that in any proceedings filed or taken in the United States of America the foregoing irrevocable waiver of immunity shall have full legal effect and shall be construed in accordance with the United States Foreign Sovereign Immunities Act of 1976.

18.14    Interpretation and Construction.  In this UTC and each other Vendor Agreement: (a) defined terms include the singular and the plural form of the terms, (b) "include", "includes" and "including" are inclusive (e.g., "including without limitation"), (c) "or" is disjunctive but not necessarily exclusive, (d) "shall" and "will" are mandatory, (e) Section headings and labels of defined terms are for convenience only and have no interpretive force, (f) all monies are expressed in and will be calculated and paid in U.S. Dollars, and (g) time shall be of the essence for all deadlines, including ship dates.  The parties agree that the provisions of each Vendor Agreement (including the UTC) will be construed with equal weight against each party (and not just against the drafter).

18.15    Counterparts; Facsimile and Electronic Copies.  This UTC and each other Vendor Agreement may be executed in any number of separate counterparts, all of which, when taken together, will constitute one and the same instrument. The parties agree that a signature transmitted by facsimile or electronic copy (e.g. .PDF) will be effective the same as an original.

    © 2013 Sears Brands, LLC

BY CLICKING ON THE "AGREE" BUTTON BELOW AND SUBMITTING THIS APPLICATION SELLER AGREES TO BE CONTRACTUALLY BOUND BY, AND TO PERFORM AND OBSERVE, ALL OF THE OBLIGATIONS AND CONDITIONS IN THIS UTC TO BE PERFORMED AND OBSERVED BY SELLER, AND BY CLICKING ON THE "AGREE" BUTTON YOU CERTIFY THAT YOU (I) HAVE READ AND UNDERSTAND THIS UTC, (II) ARE ACTING ON BEHALF OF SELLER WITH THE INTENTION TO BIND IT TO THIS UTC, AND (III) SELLER HAS DULY AUTHORIZED YOU SO TO ACT.  IF SELLER DOES NOT AGREE, OR IF YOU ARE UNWILLING TO CERTIFY, YOU SHOULD CLICK THE "DO NOT AGREE" BUTTON.

☑ AGREE         ☐ DO NOT AGREE

Date: 05/05/2016 14:54:49

Seller: KUMHO TIRE USA INC

By:    Jerry Ko

Title:  Corp Account & Sales Opt Mangr

## Addendum for Direct to Customer Terms

1.      Scope.  This DTC Addendum contains the additional terms and conditions applicable to Seller supplying DTC Merchandise that Sears Holdings Management Corporation, on behalf of itself and its affiliates ("**SHMC**"), elects to offer to Customers.  Seller is responsible for directly shipping any such DTC Merchandise purchased by SHMC to Customers.  Seller will be solely responsible for handling, warehousing and shipping such DTC Merchandise directly to Approved Outlet Customers or directly to an Approved Outlet's store for Customer pick up.  Capitalized terms used herein, but not defined herein, will have the meaning ascribed to them in the UTC.  Seller's sale of DTC Merchandise and Seller's obligations under this DTC Addendum are subject to "Sears Holdings Dotcom Vendor Information Guide (the "**Dotcom Vendor Guide**"), which is one of the Vendor Guides under the UTC.

2.      **Project Plan; Designated Personnel**.  SHMC and Seller will each appoint an account manager to jointly develop a detailed project plan for implementing the direct shipment of DTC Merchandise (the "**DTC Project Plan**") and to oversee and facilitate the performance of their respective obligations for DTC Merchandise.  Any changes to the DTC Project Plan will require the written approval of both SHMC and Seller.  The account managers will meet at least quarterly to review the implementation of the DTC Project Plan and performance under this DTC Addendum.

3.      **DTC Merchandise Selection**.  SHMC and Seller shall determine in good faith the Merchandise offered by Seller that SHMC may elect to sell as DTC Merchandise; provided that SHMC may remove any or all DTC Merchandise from the Company Sites at any time, without prior written notice, at SHMC's sole discretion.  Seller shall sell to SHMC DTC Merchandise ordered by SHMC pursuant to the UTC.  Seller shall not substitute any DTC Merchandise or add additional DTC Merchandise, in each such case, without SHMC's prior written approval.

4.      Inventory.

        a.      Inventory Management.      Seller will be responsible for all aspects of inventory management.  At all times, Seller shall maintain inventory of DTC Merchandise in quantities, as Seller deems necessary, to fulfill POs in accordance with the service level standards set forth in the Dotcom Vendor Guide.  SHMC and Seller shall meet on a semi-annual basis (or more frequently if requested by SHMC), to discuss whether changes to Seller's inventory management practices are required.  SHMC has no responsibility for any DTC Merchandise in Seller's inventory or possession or for any DTC Merchandise on order by Seller.  SHMC will periodically review the sales history for DTC Merchandise offered by SHMC and may in its sole discretion eliminate SKUs of DTC Merchandise, at any time.

        b.      Forecast.  Seller shall cooperate with SHMC in the development of estimates and forecasts for SHMC's future needs for DTC Merchandise.

5.      Order Fulfillment; Shipping, Returned DTC Merchandise and Risk of Loss.

        a.      Orders.  SHMC shall take all DTC Merchandise orders and will transmit to Seller all information necessary to fulfill DTC Merchandise orders.  Seller shall process and ship DTC Merchandise orders within the required source order processing time provided in the order information transmitted to Seller.

        b.      Shipping.  The F.O.B. point for DTC Merchandise is Seller's manufacturing or distribution facility located in the continental United States.  Seller shall, at SHMC's expense (as provided below) ship DTC Merchandise to Customers, or to an Approved Outlet store for Customer pickup, as applicable, on or before the ship date required by SHMC.  Seller shall ship Merchandise using the SHMC's preferred shipper(s) (to be billed to the SHMC's account) ("**Preferred Shipper**").  If SHMC authorizes the use of non-preferred shippers, Seller shall pay for such shipping and then bill SHMC for Seller's actual out of pocket cost for such shipping.  Seller shall make every attempt to minimize shipping expenses including through order consolidation and other then-current industry best practices.  Once Seller has shipped DTC Merchandise, Seller shall send to SHMC a ship notice that includes order information and tracking number.

        c.      Returned DTC Merchandise. Seller shall accept DTC Merchandise returned by the Customer, or rejected by the Customer at the time of delivery, along with DTC Merchandise returned directly to an Approved Outlet location (collectively, "**Returned DTC Merchandise**").  Costs associated with the shipping and handling of Returned DTC Merchandise shall be borne by Seller.  Seller may elect not to receive Returned DTC Merchandise directly from customers; in which case, Seller will execute the required SHMC exception form indicating the appropriate flow path for Returned DTC Merchandise. Seller shall bear all costs associated with the shipping and handling, and disposal of Returned DTC Merchandise as indicated in the exception form. SHMC shall be responsible for reimbursing Customers for Returned DTC Merchandise, and Seller shall promptly refund SHMC the purchase price for all such Returned DTC Merchandise.  SHMC shall have the risk of loss or damage to Returned DTC Merchandise until such Returned DTC Merchandise is tendered to Seller.

     d.    Reports.  Seller shall provide to SHMC reports in a format and frequency required by SHMC.

6.    **Disaster Recovery Plan**.  Seller shall maintain, routinely test and keep current a disaster recovery plan for Seller's systems and, upon SHMC's request, will make such plan available to SHMC for periodic reviews.

7.    **Subcontracting**.  Seller may not subcontract its obligations related to DTC Merchandise (including its obligations under this DTC Addendum and the Dotcom Vendor Guide) without the prior written consent of SHMC.

     a.    Approved Sub-Contractors.  With respect to any SHMC-approved subcontractors, Seller shall cause such subcontractors to: (a) execute a confidentiality agreement containing provisions substantially similar to those that apply to Proprietary Information under the UTC; and (b) abide by this DTC Addendum (including the UTC). Notwithstanding SHMC's approval of any subcontractor, Seller remains fully responsible for compliance with this DTC Addendum (including the UTC) and for the acts and omissions of Seller and its subcontractors. Seller shall obtain from all its contractors assignments and other appropriate documentation as necessary to establish and confirm SHMC's, or its designee's, ownership of Company Work Product and Company IP Rights.

     b.    Drug-Testing and Background Checks.  Prior to Seller Personnel entering customer premises in connection with DTC Merchandise or any Vendor Agreement, Seller shall ensure adequate drug testing and criminal background checks have been conducted, and shall obtain any other job-relevant consumer reports related to such personnel or subcontractors (to the extent permitted by Applicable Law).  At a minimum, a criminal background check will (to the extent permitted by Applicable Law), consist of the following: a search conducted by a qualified background check service provider, which includes a review of criminal court records of all counties of residence based on the individual's past seven (7) years of residential addresses.  Seller may not assign Personnel with job-relevant adverse information or information that indicates an unreasonable risk to property, safety, or the welfare of individuals or the public to enter the residence or premises of a Customer.  SHMC reserves the right to approve and modify the criteria Seller utilizes to comply with this Section. At a minimum, drug testing means (to the extent permitted by Applicable Law), that each such Seller Personnel has successfully passed a five (5) panel or other SHMC-approved drug test.  In the event of any on-the-job accident and otherwise upon request by SHMC, Seller shall provide reliable evidence documenting that the applicable Seller Personnel successfully passed the required drug testing.

8.    **SHMC Responsibilities**

     a.    Company Site.  SHMC shall be solely responsible for all operating functions with respect to any Company Site including posting, or providing Seller with a mechanism for posting the Seller Provided Content to Company Sites.

     b.    Customers.  SHMC shall be solely responsible for customer order-taking and all aspects of customer billing, collections and customer service, except for any customer service issues related to Seller warranties.  Customers that contact SHMC regarding Seller warranty-related issues will be directed to contact Seller directly.

     c.    SHMC Selling Price.  SHMC will be solely responsible for (i) establishing the selling price for DTC Merchandise and identifying any related gift wrapping or other value-added services; (ii) determining whether any sales or use tax is payable to any governmental authority and, if so payable, the amount of any sales or use tax payable; and (iii) withholding, collecting and remitting to the appropriate governmental authority any sales or use tax that is payable.

9.    **Settlement and Payment**.  A settlement between SHMC and Seller shall be made at the end of each week (Monday through Sunday) in accordance with SHMC's customary accounting procedures; subject to SHMC's rights under the UTC.  Seller shall invoice SHMC for the DTC Merchandise and any shipping costs incurred by Seller that were authorized by SHMC for non-Preferred Shippers. However, the invoiced amount shall be adjusted for (a) such amounts to which SHMC is entitled to receive for the Returned DTC Merchandise and (b) mispicked and not-in-box shipments of DTC Merchandise.

10.    **Termination**.  In addition to SHMC's termination rights under the UTC, each party has the right to terminate this DTC Addendum upon at least sixty (60) days written notice to the other party; provided that such termination shall apply solely to this DTC Addendum and transactions relating to DTC Merchandise as contemplated herein.

# Exhibit C

## UNIVERSAL TERMS AND CONDITIONS
### With Direct to Customer Terms

Seller: **Dongbu Daewoo Electronics America Inc**

Full Legal Name

**New Jersey**

Jurisdiction of Organization (Country or State)

These terms and conditions ("**UTC**") are effective as of the date the "I Agree" button is clicked below and apply to all Merchandise (defined below) supplied by the above-identified vendor and its affiliates (jointly and severally, "**Seller**"), directly or indirectly through Seller's dealers or distributors, to Kmart Corporation ("**Kmart**"), Sears Brands Management Corporation ("**Sears Brands**"), Sears, Roebuck and Co. ("**Sears**") and all other direct and indirect subsidiaries of Sears Holdings Corporation (together with Kmart, Sears Brands and Sears, collectively the "**Company**").

Seller and Company hereby agree as follows:

1.    DEFINITIONS. The following definitions apply in this UTC: (a) "**Applicable Laws**" means the applicable federal, state and local laws, ordinances, governmental orders, rules, regulations, and prohibitions including for all jurisdictions where Merchandise is sold, delivered or Merchandise Production occurs or will occur; (b) "**Approved Outlets**" means Company, each Authorized Reseller and each Company Branded Outlet; (c) "**Authorized Reseller**" means each retailer, wholesaler, and other person (excluding Company and Company Branded Outlets), that Company authorizes to sell or distribute Company Branded Merchandise; (d) "**Company Branded Merchandise**" means Merchandise marked or labeled with a Company Mark and all Merchandise sold in connection therewith whether or not marked with a Company Mark (e.g., accessories, parts, and other goods supplied by Seller to Company); (e) "**Company Branded Outlets**" means Company's franchisees and other third parties licensed or otherwise authorized by Company to sell or service Merchandise using a name licensed directly or indirectly from Company (e.g., Sears Authorized Hometown Stores, "Sears Home Appliance Showroom" franchisees); (f) "**Company Marks**" means all Marks owned or licensed by Company (other than those licensed from Seller), including Sears®, Kmart®, Kenmore®, Craftsman® and DieHard®; (g) "**Company Trade Dress**" means all cosmetic designs, ornamental appearance and trade dress embodied in or relating to Company Branded Merchandise; (h) "**Company Sites**" means the Internet sites published by or on behalf of the Company, as well as third party Internet sites on which Company permits Merchandise to be displayed or sold; (i) "**Customers**" means actual or prospective customers of Approved Outlets; (j) "**IP Rights**" means all intellectual property rights, that now or hereafter exist (including any pending applications, registrations and the right to file the foregoing), in any jurisdiction worldwide, whether conferred by operation of law, contract or license, including (i) rights of authorship, including copyrights, moral rights, and mask-works, (ii) Marks, (iii) cosmetic designs, ornamental appearance and trade dress, (iv) trade secret rights, (v) inventions and technology (whether patentable or not and whether or not reduced to practice), (vi) confidential and proprietary information, (vii) software and databases, (viii) rights of publicity, (ix) patents, designs, algorithms and other industrial property rights, and (x) "rental" rights and rights to

remuneration; (k) "**Marks**" means all domestic and foreign trademarks, service marks, trade names, logos, domain names, as well as registrations related to the foregoing and applications to register the foregoing; (l) "**Merchandise**" means the goods, including Company Branded Merchandise and DTC Merchandise, supplied by or on behalf of Seller for resale by Company (including Merchandise provided to Authorized Sellers and Company Branded Outlets), and those described in any applicable Vendor Agreements or Specifications, including all parts, packaging, hangers, containers and Seller Provided Content whether or not they are separately invoiced to Company; (m) "**Merchandise Production**" means the development, design, production, manufacture, construction, assembly, packaging, tagging, labeling, warehousing, shipping and invoicing of Merchandise; (n) "**Proprietary Information**" means all non-public information (including the terms of each Vendor Agreement) received or observed by Seller or its Personnel, in whatever form, in connection with any Vendor Agreement or any proposed business between Seller and Company, including: (i) all information relating to the Approved Outlets': business plans, strategies, forecasts, analyses, financial information, Electronic Resources, employee information, sales, pricing, cost, inventory, operations, plans and programs; (ii) all trade secrets of the Approved Outlets; (iii) all information relating to Company's Customers, including Customer lists, Customer survey responses and other Confidential Personal Information; (iv) all Specifications furnished by Company; (v) Company's IP Rights, including Company Work Product and all descriptions, and other embodiments thereof, and (vi) and all data and other material Seller receives or creates regarding the foregoing; (o) "**Personnel**" means the officers, directors, employees, agents, suppliers, licensors, licensees, contractors, subcontractors, and other representatives, from time to time, of a party and its affiliates, and, in the case of Company, those of Company Branded Outlets and Authorized Resellers involved in the sale or servicing of Merchandise; (p) "**PO**" means a purchase order in writing or processed through Electronic Data Interchange (EDI) issued by Company for the purchase of Merchandise that includes the description, quantities to be purchased, price and other information relating to the purchase of Merchandise; (q) "**Seller Provided Content**" means all content or information regarding Merchandise furnished by or on behalf of Seller (whether in print or electronic form) in connection with the Merchandise, Company Sites or otherwise, including marketing and advertising materials, promotional materials, point of sale displays, content on packaging, product development information and material, all literature, product descriptions, tags, labels, text, graphics, photographs, video and audio, installation and service instructions and training materials, owner's manuals and service manuals; (r) "**Seller Marks**" means all Marks owned or licensed by Seller (other than those licensed from Company); (s) "**Specification**" means: (i) the detailed description of Merchandise set forth in any Vendor Agreement, the Vendor

Guide, or otherwise provided by Company in writing, (ii) all industry and government standards applicable to the Merchandise, as modified from time to time (including UL, CPSC and other standards for safety and efficiency), (iii) the requirement that the Merchandise meets or exceeds (in terms of quality, features and performance) each sample provided by Seller of such Merchandise and (iv) all performance claims that Seller makes or has made in connection with the Merchandise; (t) "**Vendor Agreement**" means each: (i) PO, written addendum and agreement (e.g., supply agreements, exclusive agreements), existing now or later signed by Company and Seller relating to Merchandise, including this UTC, (ii) Promotional Agreement (as defined below), advertising agreements, and (iii) written amendment, rider, waiver and consent relating to any of the foregoing; and (u) "**Vendor Guide**" means all policies and procedures for doing business with the applicable Company entity (e.g. Sears on behalf of Sears and Sears Brands or Kmart, on behalf of itself), that have been supplied or made available to Seller by or on behalf of the applicable Company entity in print or electronic form as may from time to time be amended by the applicable Company entity including the applicable "Vendor Information Guide" (e.g., the Sears Vendor Information Guide for Merchandise that Sears or Sears Brands receives in the United States or the Sears Holdings International Vendor Information Guide for Merchandise received internationally). Terms used herein and not otherwise defined have the meaning given them in the Uniform Commercial Code as in effect in the State of Illinois (the "UCC").

## 2.    VENDOR AGREEMENTS.

2.1    POs.    Execution of this UTC does not commit Company to purchase any Merchandise.    A commitment to purchase Merchandise only arises when Company issues a PO for specified quantities of Merchandise or signs a Vendor Agreement (other than this UTC) for specific quantities of Merchandise and Company's obligation, if any, is limited in each instance to such quantities. Company Branded Outlets and Authorized Resellers are not authorized to purchase Merchandise directly from Seller under this UTC. Company issued POs that are accepted by Seller become part of and are subject to the terms of this UTC and each other applicable Vendor Agreement.

2.2    Forecasts and Exclusivity.    All estimates and forecasts of Approved Outlets' future needs for Merchandise that Company may provide to Seller are: (i) for planning purposes only, (ii) do not in any way represent a commitment by Company and (iii) do not give rise to any obligation or liability of Company. Company is not responsible for actions taken by Seller based on such estimates or forecasts and Seller agrees that reliance by it upon such estimates or forecasts would be unreasonable. Company has no obligation to buy Merchandise exclusively from Seller or to buy Company's requirements for any Merchandise from Seller.

2.3    Incorporation; Construction and Amendment.    This UTC and the applicable Vendor Guides are incorporated into each other Vendor Agreement.  In the event of any conflict or inconsistency between Vendor Agreements: (a) POs shall control over other Vendor Agreements only as to price, quantity, F.O.B.

point and Specifications, and (b) express provisions in other Vendor Agreements shall control over this UTC, the Vendor Guide(s) and POs; in each case, as to the Merchandise sold under such PO or Vendor Agreement.  The Vendor Agreements may be amended or supplemented only by a latter: (x) written Vendor Agreement signed by an authorized representative of each party, or (y) revised Vendor Guide.  All POs and other Vendor Agreements are a series of installments of one and the same transaction constituting a single contract between Company and Seller. If any bankruptcy or insolvency proceeding is initiated in respect of Seller and Seller, as debtor in possession, elects to perform any outstanding POs, then Seller, by so accepting and performing any of such POs, will be deemed to have accepted and assumed this UTC and obligations of Seller to Company arising from time to time hereunder.

## 3.    BUSINESS TERMS.

3.1    Specification.    Seller, by agreeing to or using any Specification (including any portions, changes or suggestions proposed or provided by Company): (a) adopts it as Seller's own, (b) accepts full responsibility for it, and (c) relieves Company of all responsibility for it.  Seller's use of Company provided Specifications is subject to Section 11.3 (Company's IP Rights).

3.2    Price and Shipping.    The price for Merchandise includes all costs of Merchandise Production and delivering Merchandise to the F.O.B. point stated in the PO or other Vendor Agreement, including: (a) all duties and taxes (including excise and withholding taxes) payable in any country where Merchandise Production or delivery takes place; (b) all commissions to selling agents; and (c) all other incidental charges, whether or not such charges are itemized on invoices to Company.  Seller shall ship only the quantities of Merchandise ordered by Company in the applicable PO and Seller shall make no substitutions or changes without Company's prior written approval.  Seller acknowledges that the Vendor Guide requires the payment of fees (each an "**Administrative Fee**") for late or otherwise non-compliant deliveries of Merchandise.

3.3    Invoices.    Seller will invoice Company for Merchandise no earlier than the date the invoiced Merchandise departs the F.O.B. Point (the "**Invoice Date**").  If any payment date is a Saturday, Sunday or bank holiday, then Company is not obligated to initiate payment until the next banking day. Company has no obligation to pay any amount first invoiced more than six months after it accrued.  Company is not required to pay any disputed charge before the dispute is resolved. Seller shall, if Company desires, accept all payments in U.S. Dollars. Company may make payments using "Electronic Funds Transfer" (EFT) or ePayables (credit card settlement), in accordance with Company's requirements as communicated to Seller.

3.4    Approved Outlets.    Company may distribute to each Approved Outlet all information regarding Company Branded Merchandise including product specifications, documentation, inspection results and corrective actions taken by Seller.  Each Authorized Reseller and Company Branded Outlet is an intended third-party beneficiary under each Vendor Agreement (including this UTC).

3.5    Worldwide Distribution and License. Seller authorizes the Approved Outlets to directly and indirectly offer and sell Merchandise, without restriction, through all promotional, advertising and distribution channels, and other methods of sale that now or hereafter exist everywhere in the world, including via telephone, print, television, radio, and the Internet ("Distribution Channels"); provided that in the case of Authorized Resellers such authority is limited to Company Branded Products. Except for the IP Rights owned by Company, Seller grants to Company, each Company Branded Outlet and each Authorized Reseller (with respect to Company Branded Merchandise), subject to the terms of the applicable Vendor Agreements, a royalty-free, perpetual, irrevocable, worldwide, non-exclusive license to offer and sell services related to such Merchandise and to use, copy, perform, display, modify, create derivative works of, and otherwise exploit, without an obligation to account, and distribute, with the right to sublicense, in any manner, all Seller IP Rights, all Seller Provided Content, information about or related to Customers (including warranty card information), software, data, studies, performance claims, parts and schematics, summaries and other materials relating to any Merchandise for purposes of marketing, advertising, promoting, selling, servicing and supporting Merchandise through all Distribution Channels and as otherwise desired by Company; provided it is reasonably related to the exercise of Company's rights or the fulfillment of Company's obligations hereunder (including on behalf of the Company Branded Outlets and the Authorized Resellers).

3.6    Seller Provided Content. For all Merchandise appearing on Company Sites, Seller will submit, at Seller's sole cost, the Seller Provided Content (for use on such sites, in advertisements and to otherwise promote such Merchandise), in the format and according to requirements as may be requested by Company from time to time ("Content Specifications"). Seller shall not upload to any Company Sites any Seller Provided Content that violates any third party's IP Rights, violates any Applicable Law, or includes any pornographic or other sexually explicit content, obscene content, or content that advocates racial, religious or social intolerance or hatred. At Company's sole cost, Company has the right to make modifications to the Seller Provided Content to the extent Company deems appropriate and necessary to ensure that the Content Specifications are met. Further, Company may use, copy, perform, display, modify, create derivative works of, and otherwise exploit, without an obligation to account, and distribute, with the right to sublicense, in any manner all Seller Provided Content in connection with the sale of Merchandise and other products (regardless of source). Seller will pay Company's standard fee (to Company or its designee) for each SKU of Merchandise that Seller submits to appear on each Company Site.

3.7    Records and Audits. Seller will maintain accurate, legible books, systems and records in connection with Seller's performance of its obligations hereunder. Seller will continue to maintain such customary books, systems and records pertaining to a particular Vendor Agreement for the longer of: (a) all legally required retention periods, and (b) the period ending on the second anniversary of the expiration, cancellation, or termination of such Vendor Agreement. Upon seven (7) business days' notice to Seller, Company has the right to audit all books, systems and records of Seller in order to verify amounts paid (or payable) by Seller and Seller's performance under each Vendor Agreement, including verification of all reports, statements and invoices issued by Seller. Any such audit shall be conducted during normal business hours without unreasonable burden on Seller's business by Company's corporate internal audit Personnel or by an auditor of nationally recognized standing selected by Company. In addition, if a government agency requests that Company provide records in Seller's possession, or if a government agency conducts an investigation of Company in any way relating to the Merchandise, Seller or any business conducted by Seller, Seller shall be responsible for producing the requested records, and for otherwise fully cooperating with such investigation, at Seller's sole cost.

4.    DIRECT TO CUSTOMER MERCHANDISE. If Seller directly ships Merchandise ("DTC Merchandise") to a Customer, or to an Approved Outlet for Customer pickup, then the additional terms and conditions contained in the attached Addendum for Direct to Customer Terms (the "DTC Addendum") will apply to such transactions, which additional terms and conditions are incorporated herein for all purposes of this UTC.

5.    CODES OF CONDUCT. Seller has received, as part of the Vendor Guide, Sears Holdings Corporation's Code of Vendor Conduct ("Vendor Code of Conduct") and its Code of Conduct (the "Code of Conduct," together with the Vendor Code of Conduct, the "Codes") for Company Personnel. Vendor agrees to abide by the Vendor Code of Conduct and acknowledges that Company employees will abide by the Code of Conduct. Seller shall support the Codes and shall not directly or indirectly take any action that may induce a violation of any Applicable Law or the Codes. Seller shall (as provided for in the Vendor Guide) notify Sears Holdings' Office of Compliance in writing within five (5) business days after Seller has knowledge of any violation or attempted violation of the Codes or this Section 5. Seller will cooperate with each request by Company to provide information and documentation regarding any communication or transaction with the Approved Outlets.

6.    PACKAGING, LABELING, SHIPPING AND BILLING; RISK OF LOSS.

6.1    Packaging, Labeling, Shipping and Billing. Seller will provide adequate packaging, tagging, labeling, packing, shipping and billing for the Merchandise. Seller shall comply with all packaging, tagging, labeling, packing, shipping and billing requirements requested by Company, including as specified in the Vendor Guide, as well as all requirements established by Applicable Laws, carrier tariffs and product classifications. For Merchandise to be shipped from a point of origin within the United States, Seller shall deliver Merchandise to the F.O.B. point in accordance with the ship date stated in the applicable Vendor Agreements. For Merchandise to be shipped from a point of origin outside the United States, Seller will deliver Merchandise: (a) in accordance with the delivery terms stated in the applicable Vendor Agreements, and (b) on or before the ready date stated in the Vendor Agreement. Seller shall ship all

Merchandise in full packs and full shipments in accordance with Company's requirements as set forth in applicable Vendor Agreements.

6.2     Risk of Loss. All risk of loss or damage to Merchandise remains with Seller until the Merchandise is received by Company (or its representatives) at the F.O.B. point stated in the applicable Vendor Agreement. Seller is solely responsible for all damage to the Merchandise caused by improper loading or improper packaging of the Merchandise.

7.     MANUFACTURING.

7.1     Manufacturing Information. Upon Company's request, Seller shall provide Company with specific information, in such detail as Company may request, as to the location and method of manufacturing or assembly of Merchandise. Seller will notify Company in writing before making any change in the location of manufacturing or assembly of Merchandise and Seller will bear all costs and responsibility for delays resulting from such changes. Without advance notice but during regular business hours, Company and its designated Personnel may periodically: (a) monitor (onsite and remotely) Seller and its Personnel's compliance with each Vendor Agreement (including this UTC) and (b) inspect any facilities at which any Merchandise or any components for Merchandise are manufactured or assembled (including any facilities of Seller and its Personnel) and all Merchandise at any stage of manufacture, assembly or delivery (including at the F.O.B. point). Company may require Seller to have Merchandise inspected by the Company's Personnel and any independent inspectors approved by Company, prior to its shipment to the United States. Such inspection shall be performed at Seller's sole cost. Any inspection, documentation thereof and any corrective action taken by Seller with respect to any Merchandise shall not be deemed an acceptance of such Merchandise or a waiver of any nonconformities or defects in such Merchandise by Company and shall not excuse any failure by Seller to deliver Merchandise in accordance with the terms of the applicable Vendor Agreement. Seller is solely responsible, at its sole cost, for the manufacture of (or sourcing of) all Merchandise (including all components thereof).

7.2     Company Branded Merchandise. Prior to employing any Seller or third party production facility to manufacture or assemble Merchandise bearing a Company Mark, Seller shall register such production facility with Company's Global Compliance Office in accordance with the requirements of the applicable Vendor Guide.

8.     PARTS AND SERVICE.

8.1     Parts. Seller shall sell to Company all parts (or their functional equivalents) referenced or included in each Vendor Agreement or any Service Information (defined below) applicable to Merchandise for a period of at least ten (10) years after the date such Merchandise is last shipped by Seller to Company. Company and its Personnel may use any such parts in the performance of warranty service. The price of parts shall be stated in the Vendor Agreement but in no event shall Seller charge Company or its representatives a price greater than the

lowest price charged by Seller to any other customer for the same or similar parts sold on substantially similar terms.

8.2     Service. Seller shall provide to Company, in electronic format, all available information relating to Merchandise, including warranty forms, service and owners' manuals, product specifications, parts lists and images, failure mode and effects analyses, exploded parts diagrams, schematics, training materials, technical and service bulletins, service and installation manuals and instructions that are developed by or for Seller (together with any revisions and updates to such information, "Service Information"). Seller authorizes Company and its Personnel to use, reproduce, distribute or sell to the Customers the Service Information without payment of any royalties or other fees to Seller and to provide repair, maintenance and installation services for all Merchandise. With respect to all Merchandise that is serviceable, Seller designates Sears and its designees ("Company Service Provider") as an authorized service provider and shall include Company Service Provider, no less prominently than its other authorized service providers, on all lists or other enumeration of authorized service providers, whether in print, Internet or other medium. Company Service Provider may: (a) advertise that it is an authorized service provider for such Merchandise and (b) provide such repair, maintenance and installation services ("Services") (during and after Seller's warranty period) and may use its Personnel to provide such Services. For Services performed by the Company Service Provider in accordance with Seller's warranty, Seller shall pay Company the rates set forth in the applicable Vendor Agreements (or if none are stated, Company's standard rates for similar Services). Seller represents and warrants that the provision of such Services by Company Service Provider and its Personnel will not violate the rights of any third party.

9.     REPRESENTATIONS AND WARRANTIES. Without limiting or disclaiming any implied representations or warranties, Seller represents, warrants and covenants, as of the effective date of this UTC and each other Vendor Agreement and continuing in effect throughout the term of each Vendor Agreement, that:

9.1     Merchandise. (a) all Merchandise: (i) conforms to its Specifications, (ii) is fit and sufficient for the ordinary purpose for which Merchandise is used, (iii) is free from defects in workmanship, materials and packaging, (iv) is free from defects in construction and design, (v) is fit and sufficient for the purpose stated on any packaging, labeling or advertising, and (vi) is equivalent in materials, quality, fit, finish, workmanship, performance and design to any samples submitted to and approved by Company; (b) upon transfer of the Merchandise to Company, the title for such Merchandise is free and clear of any encumbrance, and (c) all test data and other claim substantiation provided by Seller is accurate and properly described by Seller.

9.2     Advertising. all claims made by Seller in any packaging, labeling, advertising, or other consumer material, including Seller Provided Content, in connection with any Merchandise or Seller Mark relating to Merchandise: (a) comply with Applicable Law, (b) are true and have been substantiated before such claims are made, and (c) contain all applicable

warnings and instructions in the assembly, installation, use, repair, servicing and maintenance of the Merchandise.

9.3    Intellectual Property.  (a) all IP Rights (other than IP Rights owned by Company or licensed by Company from third parties) and Seller Provided Content used by Seller in connection with Merchandise or in the Production of Merchandise, are either: (i) owned by Seller or (ii) are licensed by Seller and Seller has the right to license them to Company in connection with such Merchandise and the sale of such Merchandise to the Approved Outlets, for use or further resale and (b) Merchandise, including Seller Provided Content, does not, at any time, infringe any IP Right of any person, corporation or other entity.

9.4    Authority and Compliance with Law.  (a) Seller has the right, power and authority to: (i) enter into each Vendor Agreement (including this UTC), (ii) perform its obligations under each Vendor Agreement; and (iii) grant to Company the rights provided under each Vendor Agreement; (b) Seller's execution, delivery and performance of each Vendor Agreement has been duly authorized, are in compliance with each such Vendor Agreement, are legally binding and enforceable in accordance with its terms, and do not violate any other agreement, restriction, or Applicable Laws; (c) all Merchandise strictly complies with, and all Merchandise Production occurs strictly in compliance with, all Applicable Laws, including the Applicable Laws of each jurisdiction outside the United States (each an "**Alternative Jurisdiction**"), where Seller becomes aware that the Approved Outlets sell (or intend to sell) the Merchandise (unless and until Seller has provided Company with 10 business days' written notice that the Merchandise does not comply with the requirements of such Alternative Jurisdiction); (d) Seller and its Personnel who are involved in Merchandise Production or the installation, repair, display, possession, servicing, use, maintenance, delivery or sale of Merchandise shall each, during the term of each Vendor Agreement, strictly comply with all Applicable Laws, including the Foreign Corrupt Practices Act of 1977, 15 U.S.C. §§ 78dd-1 et. seq., as amended, which Seller acknowledges applies to the business relationship with Company hereunder, and such other national or regional anti-corruption or anti-bribery laws that may apply to either Seller or Seller's business relationship with Company, and those governing the working conditions, wages, hours and minimum age of the work force; (e) Merchandise Production does not involve at any time, in whole or in part, any use of child, convict or forced labor; and (f) all prices charged and allowances made available to Company by Seller are in compliance with U.S. antitrust laws, including the requirements of the Robinson-Patman Act.  Seller shall provide Company with a guaranty of compliance with the foregoing in such form as Company may designate with respect to any Merchandise.

9.5    Antidumping.  (a) all sales of Merchandise to Company are made at no less than fair value under the United States antidumping law and (b) no government has provided a countervailable subsidy for Merchandise actionable under U.S. law.  Seller shall indemnify Company for (x) all antidumping and countervailing duties imposed on all Merchandise that is: (i) sold prior to the date of publication of the International Trade Administration's preliminary determination of sales at less than

fair value or prior to the date of publication of the existence of countervailable subsidies and (ii) exported or imported before the date of publication of the International Trade Administration's final determination of sales at less than fair value or the existence of countervailable subsidies and (y) any expenses (including reasonable attorneys' fees) and administrative costs incurred by the Approved Outlets in their participation in any United States antidumping or countervailable duty proceeding involving any warranted Merchandise.

10.    ELECTRONIC PROCESSING.    Unless otherwise agreed by Company or as set forth in the applicable Vendor Guide, the parties shall process all POs and other related documents (including invoices and ship notices) and any payments or advances in respect of monetary obligations between Company and Seller electronically, either directly or through a third party provider satisfactory to both parties.  Each party will pay its own costs, including the costs of any provider with which it contracts.  Seller will include in each invoice (or ship notice, in the absence of an invoice) an appropriate, agreed-upon code, symbol or statement affirming Seller's compliance with all applicable requirements of the Fair Labor Standards Act (as amended), the regulations and orders of the United States Department of Labor issued pursuant thereto and any similar state laws and regulations.  Seller shall process all electronic fund transfers and wire transactions in compliance with National Automated Clearing House Association (NACHA) rules and any instructions and procedures that Company may from time to time supply.  Neither party is liable to the other for any indirect, special, incidental, exemplary or consequential damages arising or resulting from any delay, omission or error in the electronic transmission or receipt of any documents, even if the other party has been advised of the possibility of such damages.

11.    INTELLECTUAL PROPERTY.

11.1    Merchandise with a Company Mark.  If Company authorizes Seller to mark or label any Merchandise with a Company Mark, Seller will limit the goods so marked or labeled to quantities set forth in a PO or other applicable Vendor Agreement.  Seller will perform all such marking and labeling in accordance with Company's specific written instructions.  Seller shall not sell or otherwise dispose of, nor permit the sale or disposal of, any Merchandise bearing any Company Mark (including any Merchandise rejected by Company) to anyone other than Company without first obtaining Company's express written consent and then (a) removing, or otherwise defacing as installed, any Company Mark before such sale or disposal, and (b) complying with such other requirements as Company imposes in its sole discretion.  Company may elect, but has no obligation, to purchase from Seller any surplus labels, packaging or other materials bearing any Company Mark.  Seller will destroy all such materials that Company does not purchase from Seller at the expiration, cancellation, or termination of the applicable Vendor Agreement (including this UTC).  Seller will provide written certification to Company of such destruction.

11.2    Company Work Product.  All information and other materials related to Company Branded Products, and all copyrights therein, including marketing, promotional materials,

point of sale displays, packaging, software, data, Service Information, Seller Provided Content, performance claims and evaluations, testing protocols and data used to evaluate performance claims, database formats, methods used to assemble and maintain electronic product catalogs, and programming related to Company Sites and user applications (e.g., mobile applications) and copies, notes and summaries of the foregoing that are prepared, developed or created by or on behalf of Company or Seller or any of their respective Personnel (collectively, **"Company Work Product"**), will be owned by Company. All Company Work Product will be deemed "work made for hire" as that term may be defined from time to time in Section 101 of the Copyright Act, 17 U.S.C. Section 101 (or any successor). Company will be deemed the author of the Company Work Product, and Company will be the worldwide owner of all right, title and interest therein (including all IP Rights). If for any reason the Company Work Product is found not to have been created as work made for hire, Seller hereby assigns to Company without limitation and without additional compensation, all right, title and interest, including all IP Rights embodied in the Company Work Product and Seller hereby appoints Company as Seller's attorney-in-fact to execute and deliver such documents and take such actions as may be necessary to effectuate such assignment. Seller will obtain Company's prior written approval before developing or implementing any changes to Company Work Product.

11.3    Company's IP Rights. Seller hereby acknowledges that all: (a) Company Marks, (b) Company Trade Dress, (c) the other IP Rights in all information and materials provided by Company or its Customer's to Seller and (d) other IP Rights owned or licensed by Company (collectively, the **"Company IP Rights"**), in each case, constitute valuable intellectual property which, as between Company and Seller, are owned solely by Company and Seller will not claim any right, title or interest in, or challenge Company's worldwide ownership of the foregoing. Seller has no interest or rights in any Company IP Rights and will not use Company IP Rights except as expressly provided for in a Vendor Agreement or otherwise approved by Company in writing. Seller will not contest or challenge: (x) Company's worldwide ownership and exclusive right to the Company IP Rights; or (y) the validity of any of Company's IP Rights.

11.4    License to Seller. Company hereby grants to Seller a non-exclusive, revocable, limited license to use the Company's IP Rights for the sole purpose of affixing or incorporating the Company's IP Rights into: (a) any Company Branded Products, in accordance with Company's instructions and (b) any Company Work Product, in accordance with Company's instructions. Seller's use of Company's IP Rights will not confer upon Seller any right or interest therein.

11.5    Restrictions on Use of Company's IP Rights. Seller will use Company IP Rights only in the performance of Seller's obligations under the Vendor Agreements and in accordance with any restrictions therein. Seller will not distribute to anyone except Company any products or other materials that incorporate or infringe upon any Company IP Rights without Company's specific prior written authorization. All license(s) granted to Seller under each Vendor Agreement are personal to Seller, and Seller will

not sublicense those rights without Company's prior written consent. Seller's right to use Company's IP Rights granted to Seller in any Vendor Agreement (or otherwise in writing): (a) is subject to any Company style and quality control guidelines (as published by Company from time to time) and the prior review and written approval of Company; (b) does not extend to any use that may impair the validity or enforceability of, disparage, or otherwise impair Company's ownership thereof; and (c) does not include the right to incorporate Company's Marks as part of any other Marks, words or symbols. Seller will not register, attempt to register or renew any of Company's IP Rights with the applicable registration body in any jurisdiction unless specifically requested by Company.

11.6    Customer Contact Information. Seller hereby assigns to Company all of Seller's right, title and interest in and to all telephone numbers, domain name and email addresses, and other contact points (e.g., Twitter and Facebook addresses, collectively (**"Contact Points"**) now or hereafter used in connection with Company Branded Products (e.g., on packaging or labeling) or that appear in directories in connection with any Company Mark, effective, unless rejected in writing by Company, upon the termination of Seller's use of such Contact Points or upon Company's request, at which time Seller shall have no further right, title or interest in or to such Contact Points; but Seller will remain liable for all fees and costs relating to such Contact Points incurred prior to the effective date of the assignment. Seller acknowledges that upon such assignment, Company shall have the sole right to and interest in such Contact Points, and Seller hereby appoints Company as Seller's attorney-in-fact to direct third parties (e.g., the telephone company, the Internet domain name registry authority, etc.) to assign such Contact Points to Company, and to execute and deliver such documents and take such actions as may be necessary to effectuate such assignment.

11.7    Other. Upon expiration, cancellation or termination of the applicable Vendor Agreement and at any time upon Company's demand, Seller will immediately stop using all Company IP Rights and will deliver to Company all Company Work Product and all other information and materials containing or based on Company IP Rights. Nothing in any Vendor Agreement will bar Company from protecting its rights to the exclusive worldwide ownership of Company IP Rights against unfair competition, infringement or appropriation by anyone, including any use by Seller not expressly authorized by a Vendor Agreement. Seller will execute and deliver to Company all further documents deemed by Company to be useful in documenting, perfecting or registering each of Company's IP Rights (including transfers of registrations of Company's IP rights that were made in Seller's name).

12.    DEFENSE, INDEMNITY AND NOTICE.

12.1    Defense. Seller shall, at its sole cost, defend (a) Company, (b) all of Company's past, present and future affiliates, (c) all past, present and future Company Branded Outlets and Authorized Resellers, (d) all past, present, and future Personnel of each of the foregoing entities, and (e) all other persons directly or indirectly involved in the distribution or sale of Merchandise

(each an "Indemnified Party") against all allegations (including false, fraudulent or groundless allegations) in any claim, action, lawsuit or proceeding between any Indemnified Party and any third party, whether or not Seller's obligations under Section 12.2 (Indemnity and Contribution) apply, arising out of or relating to any of the following (collectively, the "Claims"): (i) the infringement, misuse, dilution, misappropriation or other violation of any IP Right in any way relating to or affecting Merchandise (including Seller Provided Content), or any unfair competition involving Merchandise (including Seller Provided Content), (ii) the loss, unauthorized disclosure or unauthorized use of the Confidential Personal Information by Seller, or through Seller Personnel (e.g., compromised login-IDs, etc.), (iii) death of or injury to any person, damage to any property, or any other damage or loss, by whomsoever suffered, resulting or claimed to result in whole or in part from any latent or patent defect in Merchandise, including improper design, manufacture, construction, assembly, installation, repair, display, packaging, service or design of Merchandise, failure of Merchandise to comply with any Specification or samples or with any express or implied warranties of Seller, or any claim of strict liability in tort relating to Merchandise, (iv) each breach (including breaches of Sellers' representations, warranties and covenants) by Seller or its Personnel of a Vendor Agreement (including this UTC), (v) the packaging, tagging, labeling, packing, shipping, delivery and invoicing of Merchandise, (vi) the packaging, labeling or advertising claims made by Seller, (vii) the display, assembly or installation of Merchandise, or (viii) the assertion by a third party of a security interest, right of replevin or other legal interest created by a factoring or other credit arrangement in any amount due Seller under a Vendor Agreement. Despite the foregoing sentence, Seller is not obligated to defend any Indemnified Party in any action, lawsuit or other proceeding where the Claim is based only on the sole negligence of any Indemnified Party in the display, assembly, service, repair or installation of Merchandise. Seller shall retain defense counsel satisfactory to Company and shall diligently and professionally defend each Indemnified Party from each Claim and Seller shall timely provide periodic reports to Company and consult with Company's Personnel in conducting the defense of the Claims and otherwise cooperate fully with the Company's reasonable requests; provided that only with respect to Claims arising under Section 12.1(i) involving IP Rights owned or licensed by Company (except those licensed from Seller) and any claims of unfair competition involving Merchandise, Company may, at its election and at any time, take control of the defense and investigation of said Claims and employ attorneys and other consultants, investigators and experts of its own choice to manage and defend any such Claims at Seller's cost.

12.2    Indemnity and Contribution. Seller shall hold harmless and indemnify the Indemnified Parties from and against any and all damages, liabilities, losses, costs and expenses (including reasonable attorneys' fees, disbursements and costs of investigation and cooperation) incurred by any of the Indemnified Parties in any claim, demand, action, lawsuit or proceeding arising out of or in any way relating to any Claims; except that Seller is not obligated to indemnify any Indemnified Party for damages awarded based solely on: (a) the negligence of any Indemnified Party in the display, assembly, service, repair or

installation of any Merchandise, or (b) the infringement of any IP Right by: (i) any of the materials (other than Seller Provided Content) on Company Sites, or (ii) any use of Company IP Rights in the manner approved by Company in writing. If any of Seller's obligations under this Section 12.2 are not enforceable under Applicable Law and an Indemnified Party and Seller are found to be liable to a third party in connection with the Merchandise or any Vendor Agreement, then Company and Seller shall each contribute to the payment of any judgment awarded in favor of such third party in proportion to their comparative degrees of culpability.

12.3    Settlement. Seller may settle Claims without Company's consent if the only obligation under such settlement is the payment of monies by Seller and such settlement provides for a full release of Company and the Indemnified Parties. Seller will obtain Company's prior written consent for any other settlements, including one that would place new or different obligations or restrictions on the Indemnified Parties or restrictions upon the sale (or disposition) of the Merchandise.

12.4    Notice. Seller shall notify Company's General Counsel in writing by certified mail, return receipt requested, within five (5) business days after Seller has: (a) knowledge of any claim or allegation of infringement, misuse, dilution, misappropriation or other violation of any IP Right in any way related to or affecting Merchandise, including Seller Provided Content; (b) knowledge of any safety issue with any Merchandise; (c) knowledge of any allegation by a government agency (including the U.S. Consumer Product Safety Commission, the U.S. Department of Agriculture and the U.S. Food and Drug Administration and such equivalent foreign government agencies, departments and commissions) that the government agency (i) has initiated a formal or informal inquiry, investigation or proceeding in any way related to or affecting Merchandise, or (ii) asserts that Merchandise is not or may not be in compliance with laws; or (d) reported to any government agency that Merchandise is not or may not be in compliance with Applicable Law or contains or may contain a defect that could create a risk of injury or death.

13.    INSURANCE. Seller will obtain and maintain, at its sole cost, a policy or policies of Commercial General Liability Insurance covering liabilities relating to Merchandise, including products and completed operations, with a broad form vendor's endorsement CG 20 15 04 13 or its equivalent naming Company, and upon request of Company, each Approved Outlet, as additional insureds, in those amounts and with such companies as set forth in the applicable Vendor Guide and containing such other provisions satisfactory to Company. All such policies will be primary and noncontributory and will provide that the coverage thereunder will not be terminated without at least thirty (30) days' prior written notice to Company, and upon request of Company, each Approved Outlet. Seller will submit proof of insurance evidencing such coverage in advance of or concurrent with its execution of the UTC and upon each policy renewal date. Neither approval of any of Seller's insurance policies by Company nor Seller's failure to discharge any of its obligations contained herein (including Seller's failure to obtain a broad form vendor's endorsement naming the Approved Outlets specified by Company as additional insureds) will relieve Seller of

any obligations contained herein, including Seller's obligations under Section 12 (Defense, Indemnity and Notice), and claims in excess of Seller's policy limits. If at any time Seller does not provide Company with the proof of insurance required hereunder or if, in Company's opinion, such policies do not provide adequate protection for Company and Seller does not furnish evidence of acceptable coverage within fifteen (15) days after Company so notifies Seller, Company has the right, in addition to its rights under Section 14 (Company Remedies), to withhold making any installment payment or advance in respect of any Company's monetary obligations that may be outstanding under any Vendor Agreement until evidence of acceptable coverage is provided.

**14.    COMPANY REMEDIES.** In addition to all other remedies available to Company under the UCC or otherwise, Company may elect to, in its sole discretion, reject, abandon, return, hold or liquidate, at Seller's sole cost and risk, any and all Merchandise which: (a) is not produced, sold, shipped or delivered in compliance with the applicable Vendor Agreements (including this UTC), or otherwise does not conform to the applicable Vendor Agreements, (b) is delivered in excess of the quantities ordered, in broken packs or partial shipments, or in packages or assortments other than as specified, (c) allegedly violates any Applicable Laws (including Alternative Jurisdictions), (d) allegedly infringes any IP Right in any way related to or affecting Merchandise, including Seller Provided Content, or allegedly involves any unfair competition, or (e) in the case of food and other Merchandise with limited shelf life, will, at the time of receipt by Company, expire (or otherwise go bad), in too short a period of time to allow Company a reasonable opportunity to sell such Merchandise (as measured by industry standards, if applicable). Company's right to reject, abandon, return, hold or liquidate Merchandise at Seller's expense shall, without limiting such right, extend to Merchandise supplied to Company that was returned by a Customer for any reason entitling Company to reject or revoke acceptance of such Merchandise. Company may, at its option, require Seller to replace any nonconforming Merchandise or grant Company a full refund or full credit (collectively, "**Refund Credit**"). Seller's obligation to pay Refund Credits shall arise as of the original shipment date. At Company's election, each Approved Outlet may accept nonconforming Merchandise, and Seller shall be liable for any reduced value of such Merchandise or the cost incurred by Company, its Authorized Resellers and its Company Branded Outlets to repair the same. Acceptance of Merchandise by an Approved Outlet shall not relieve Seller of any of its warranty or other obligations hereunder. Company may also charge to Seller all direct and indirect costs incurred by an Approved Outlet as a result of any nonconforming Merchandise or delivery, or an administrative fee in an amount reasonably related to such costs, whether or not Merchandise is rejected by Company (collectively, "**Return Costs**"). Acceptance by an Approved Outlet of replacement Merchandise, a full or partial credit or refund, or Return Costs, shall not relieve Seller of liability for other damages sustained by an Approved Outlet as a result of Seller's failure to deliver conforming Merchandise in a timely manner or arising as a result of any other breach by Seller. Seller will indemnify Company for all losses and costs incurred by Company and the Approved Outlets as the result of any recall, rework or retrofit of

Merchandise that is defective or does not otherwise conform to the Specifications.

**15.    CANCELLATION AND TERMINATION.** Company may immediately cancel or terminate each Vendor Agreement (including this UTC) for any Merchandise or any part of Company's obligations under such Vendor Agreement, or cancel or terminate all or any outstanding POs for Merchandise under such Vendor Agreement if: (a) Company reasonably believes that Seller does not have Merchandise that conforms to the terms of the Vendor Agreement and is ready for shipment in the specified quantities and on the delivery dates specified, (b) it is alleged that Merchandise infringes any IP Right, (c) it is alleged that Merchandise was manufactured or supplied to an Approved Outlet in violation of the applicable Vendor Agreement or in violation of any Applicable Laws (including Alternative Jurisdictions), (d) Seller refuses to furnish appropriate guaranties to protect Company as may be requested by Company pursuant to Section 9.4 (Compliance with Law), (e) Seller fails to maintain the insurance required hereunder, fails to name Company (the Authorized Resellers or Company Branded Outlets requested by Company) as additional insureds, or fails to produce evidence thereof, (f) Seller becomes the subject of a voluntary or involuntary case under the Federal Bankruptcy Code or similar state or federal insolvency laws; any creditor of Seller commences an action to enforce or foreclose upon a lien or security interest in property of Seller; or any property of Seller passes into the hands of a creditor of Seller, receiver or assignee for the benefit of creditors, becomes the subject of a levy for taxes or to satisfy a judgment or otherwise is attached for the benefit of a creditor of Seller, (g) Seller ceases the manufacture or assembly of Merchandise or necessary components incorporated into Merchandise, or announces its intention to do so prior to fulfilling all outstanding POs, or otherwise becomes unable for any reason to timely fulfill outstanding POs, (h) Seller commits a material breach of any representation, warranty, covenant, or any other provision of any Vendor Agreement, (i) Seller changes the location of manufacture or assembly of Merchandise without the prior written consent of Company, (j) cancellation or termination is otherwise permitted by the UCC or other Applicable Law, (k) Company reasonably believes that Merchandise or Seller is encumbered by a material adverse consumer perception, (l) Seller defaults under or breaches any other agreement with Company which default or breach would entitle Company to terminate that other agreement, (m) Seller engages in any criminal activity or fraud, threatens public health or harm to an Approved Outlet, Company Mark or commercial reputation, or Seller is or does business with a person who is listed by the U.S. Government on any U.S. Government watch lists, including the U.S. Office of Foreign Assets Control security watch lists, (n) a sale of all or substantially all of the assets of Seller, whether in a single transaction or a series of transactions, (o) the merger or consolidation of Seller with or into a limited liability company, corporation, or other entity; the merger of a limited liability company, corporation, or other entity into Seller, or (p) any other event that results in fifty percent (50%) or more of the total voting power entitled to vote in the election of the board of directors of Seller or the surviving or new entity (or in the event that Seller or the surviving or new entity is not a corporation, the equivalent to the board of directors) being held by a person or

persons other than either the shareholders or members of Seller who, individually or as a group, held fifty percent (50%) or more of such voting power immediately prior to such transaction or event. For any imported Merchandise that is subject to a customs embargo or quota restriction, Company may cancel or terminate any PO or delay any installment payment or advance in respect of Company's monetary obligations to Seller, if any, under each applicable Vendor Agreement until the embargo is lifted or necessary quota becomes available.

16.    RECOUPMENT AND SET-OFF. Company and Seller agree that: (a) Company's monetary obligations to Seller under the Vendor Agreements (including this UTC) shall at all times be net of all Refund Credits, Return Costs, Administrative Fees, Seller obligations under Section 12 (Defense, Indemnity and Notice) and other monetary obligations owing by Seller to Company under any Vendor Agreement or otherwise (collectively, "Seller's Monetary Obligations"), and (b) any installment payment or advance made by Company to Seller in respect of any Vendor Agreement while any Seller's Monetary Obligations are outstanding shall be deemed to be an overpayment to Seller to the extent of such outstanding Seller's Monetary Obligations and shall be subject to recoupment and or set-off by Company. Company may elect to use vendor allowance, promotional and similar agreements ("Promotional Agreements") to document amounts owing under Vendor Agreements and new subsidies or other amounts Seller agrees to pay; however all Seller's liabilities under a Vendor Agreement shall continue in force and effect regardless of whether the parties sign a Promotional Agreement. Without limiting the foregoing, Company has the right, at all times, to deduct any Seller's Monetary Obligations from any amounts owed to Seller by Company, by debit memo or otherwise (irrespective of whether any such amount is owed to Seller by Kmart, Sears Brands, or Sears), and to pay only the net sum due, if any. Seller shall promptly pay, upon demand, any Seller's Monetary Obligations that remain outstanding after any exercise by Company of its recoupment or set-off rights. For the purpose of Company's exercise of the right of recoupment and set-off only, any raw materials, components and parts supplied by Seller to Company for use in Merchandise, if applicable, shall be deemed to be supplied to Company pursuant to a PO.

17.    CONFIDENTIALITY.

17.1    Restrictions on Proprietary Information. All Proprietary Information is the sole and exclusive property of Company. Company hereby grants Seller a limited license to use the Proprietary Information for the sole purpose of performing its obligations hereunder. Seller: (a) will hold in confidence all Proprietary Information, (b) will use all reasonable methods to protect the confidentiality of such Proprietary Information, and (c) shall not in any manner use, reproduce or disclose, directly or indirectly, to any third party at any time any Proprietary Information, except in connection with Seller's performance under a Vendor Agreement (including this UTC). Seller shall only disclose Proprietary Information to its Personnel on a need to know basis and Seller shall be liable for any improper use or disclosure by its Personnel.

17.2    Publicity. Seller will not disclose the existence or terms of any Vendor Agreement or any other information regarding Seller's supply of Merchandise to Approved Outlets in any advertising, promotional or sales activity or publicity release or other public communication unless Company gives its prior written consent to such action and approves any press release or other publicity materials prior to their dissemination.

17.3    Special Rules for Confidential Personal Information. Seller will hold the following information (which is a subset of Proprietary Information) in the strictest confidence: all information and materials regarding Customers, including names, addresses, phone numbers, user names, email addresses, warranty card information, account numbers, social security numbers, Customer lists, and demographic, financial and transaction information and any data or other material Seller receives or creates regarding the foregoing ("Confidential Personal Information"). In addition to Seller's obligations regarding Proprietary Information, Seller: (a) may not disclose Confidential Personal Information to any entity other than the recipient (including affiliates) without Company's prior written permission; (b) will keep Confidential Personal Information in a location separate (e.g., database or table) from Seller's information regarding its customers (even if such information is duplicative) and Seller will not duplicate or incorporate the Confidential Personal Information into its own customer records; and (c) is prohibited from using Confidential Personnel Information to contact the Customers (for marketing or any other purposes); except as approved by Company in writing. In addition, to the extent Seller is given access to Confidential Personnel Information, Seller will establish and maintain written policies and procedures and conduct its operations to ensure: (x) the security, confidentiality and proper disposal of the Confidential Personal Information, (y) protect against any anticipated threats or hazards to the security or integrity of such information, and (z) protect against the loss, unauthorized access to or use of Confidential Proprietary Information. Copies of such policies and procedures will be provided by Seller to Company upon Company's request. Seller will permit Company to audit Contractor's compliance with the provisions of this Section 17.3 at any time during Contractor's regular business hours. A breach of this Section 17.3 is grounds for immediate termination of all Vendor Agreements. In addition, Company is entitled to the recovery of any pecuniary gain realized by Seller from the unauthorized use or disclosure of Confidential Personal Information. Unless otherwise prohibited by Applicable Law, Seller shall (i) immediately notify Company of any legal process served on Seller for the purpose of obtaining Confidential Personal Information and (ii) permit Company adequate time to exercise its legal options to prohibit or limit such disclosure.

17.4    PCI Compliance. To the extent it receives Customer credit card data in connection with any Vendor Agreement, Seller is responsible for (and Seller will maintain the security of) the credit card data Seller possesses and Seller will comply with current Payment Card Industry ("PCI") Data Security Standards (as updated by the PCI from time to time). In the event of a data breach of such credit card information involving Seller, its Personnel or Seller's environment, Seller will immediately notify Company of the breach and cooperate fully with Company,

industry and/or government officials, at Seller's sole cost, in a review or forensic investigation (or both) of Seller's environment and processes.

17.5    Other.    Upon either the expiration, cancellation or termination of the applicable Vendor Agreement(s), or a demand by Company, Seller shall deliver to Company immediately all materials containing Proprietary Information in Seller's possession (whether prepared by Company or Seller), in a format and manner prescribed by Company. Seller will immediately notify Company upon the discovery of the loss, unauthorized disclosure or unauthorized use of any Proprietary Information and cooperate with Company, at no additional charge, in the investigation of any such unauthorized disclosure. Company makes no warranty as to the accuracy or completeness of any Proprietary Information, and has no liability to Seller resulting from the provision, contents or use of Proprietary Information. Seller acknowledges that Seller does not have any interest, title, lien or right in any Proprietary Information.

17.6    Computer Access.    If Seller is given access, whether on-site or through remote facilities, to any Approved Outlet's computer, communication or electronic data storage system, software or electronic services (collectively, the "Electronic Resources") in connection with any Vendor Agreement, then Seller will limit such access and use solely on a strict need to know basis for the purpose for which it was provided. Seller will not attempt to reverse engineer any Electronic Resource nor access any Electronic Resource other than those specifically required to perform its obligations under the applicable Vendor Agreement. Seller will, upon request, advise Company in writing of the name of each of its Personnel who have been or will be granted such access, and shall strictly follow each Approved Outlet's (as applicable) security rules and procedures for use of such Electronic Resources. All user identification numbers and passwords disclosed to Seller and any information obtained by Seller as a result of Seller's access to, and use of the Electronic Resources are deemed to be, and Seller shall treat them as Proprietary Information. Seller shall cooperate with Company, at Seller's sole cost, in the investigation of any apparent unauthorized access by Seller's Personnel (or through the use of their log-in information) to the Electronic Resources or unauthorized release of Proprietary Information. Seller shall promptly notify Company of any actual or suspected unauthorized access or disclosure.

18.    MISCELLANEOUS.

18.1    Binding Nature and Assignment by Seller.    Each Vendor Agreement (including this UTC) will bind and inure to the benefit of the successors, representatives and permitted assigns of the parties hereto. All Vendor Agreements are personal to Seller and Seller shall not assign (by contract, operation of law or otherwise) its rights or obligations under any Vendor Agreement, except with Company's prior written consent, and the failure of Seller to obtain Company's prior written consent shall render any such attempt to assign void and of no force and effect; provided, however, that Seller may assign its right to receive payments from Company, subject to the terms and conditions contained herein. Any factor or permitted assignee, secured creditor or

pledgee of Seller shall acquire such interest subject to all of Company's recoupments, set-offs, claims and defenses and all of the terms and conditions contained herein, and Seller shall notify any such factor, assignee, secured creditor or pledgee of such fact. Company has no obligation to make payments to anyone other than Seller unless and until Seller: (a) notifies Company in writing of the assignment of such installment payments or advances along with the name and address of the person to whom such installment payments or advances should be sent, (b) obtains a separate Company accounts payable number for such installment payments or advances, and (c) uses such accounts payable number on every invoice that Company is to pay directly to the third party. Seller retains responsibility for all allegedly misdirected installment payments or advances that result from Seller's failure to comply with the terms and conditions hereof.

18.2    Relationship of the Parties.    Seller is an independent contractor under this UTC and nothing contained in any Vendor Agreement (including this UTC), or done in connection therewith, shall be construed as creating a partnership, agency or joint venture between Company and Seller; and neither party shall become bound by any representation, statement or act of the other party. Seller has no authority to enter into any contract or incur any expense or obligation of any kind in Company's name. Seller is solely responsible for obtaining all real tangible and intangible property, services and other resources (including necessary permits, and licenses) associated with Seller performing its responsibilities under each Vendor Agreement and for paying all taxes assessed against Seller in connection therewith.

18.3    Entire Agreement.    The Vendor Agreements between Company and Seller (including the applicable Vendor Guide), contain the entire understanding of Seller and the applicable Company entity (e.g., Kmart, Sears Brands or Sears) with respect to the subject matter therein and may not be supplemented or modified by course of dealing, course of performance, any oral communication between the parties, or any response by Seller, whether oral or written, purporting to modify or supplement the terms of a Vendor Agreement unless such response is in writing and agreed to in writing by a duly authorized representative of the applicable Company entity (i.e., Kmart, Sears Brands or Sears). All prior and contemporaneous discussions and negotiations relating to the Merchandise are merged herein and all future discussions and negotiations relating to Merchandise which occur prior to the signature of any future Vendor Agreement are incorporated therein. Further, the Approved Outlets and their Personnel shall not be bound by any "shrink wrap license," "disclaimers" or "click to approve" terms or conditions contained in any Seller computer system, software or Internet site that Company or its Personnel use.

18.4    Severability.    If any provision of any Vendor Agreement (including this UTC), is held to be unenforceable by a court of competent jurisdiction, then that provision shall be deemed modified to the extent necessary to make it enforceable. The unenforceability of any portion of a Vendor Agreement shall not affect the enforceability of the remaining provisions of such Vendor Agreement.

18.5     Cumulative Rights. All rights and remedies under each Vendor Agreement are cumulative, and the exercise of any right or remedy in a Vendor Agreement does not prejudice the exercise of any other right or remedy under a Vendor Agreement at law or in equity.

18.6     Waiver. No right of Company under each Vendor Agreement can be waived except as expressly set forth in writing signed by an authorized representative of Company. Company's failure to enforce any of its rights or remedies will not be interpreted as a waiver of subsequent violations of that provision or of any other provision of this Agreement.

18.7     Survival. Each provision of each Vendor Agreement that would, by its nature, survive the expiration, cancellation or termination of such Vendor Agreement will so survive including: (a) the obligation of either party to pay amounts accrued thereunder and (b) Section 3.5 (Worldwide Distribution and License), Section 3.6 (Seller Provided Content), Section 8 (Parts and Service), Section 9 (Representations and Warranties), Section 11 (Intellectual Property), Section 12 (Defense, Indemnity and Notice), Section 13 (Insurance), Section 14 (Company Remedies), Section 16 (Recoupment and Setoff), Section 17 (Confidentiality) and Section 18 (Miscellaneous) of this UTC.

18.8     Governing Law. Each Vendor Agreement (including this UTC) shall be construed and enforced in accordance with Illinois law without regard to conflict of law or other legal principles (of Illinois or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Illinois. Seller and Company agree that the rights and obligations of the parties under each Vendor Agreement are not governed by the United Nations Convention on Contracts for the International Sale of Goods.

18.9     Submission to Jurisdiction. Seller and Company consent to the personal and subject matter jurisdiction of the state and federal courts located in Cook County, Illinois and agree that the exclusive venue for any dispute concerning each Vendor Agreement (including this UTC) shall be in such courts. All objections to such jurisdiction or venue are hereby waived. Seller consents to service of process as permitted under Illinois law or by certified mail. Nothing in Section 18.12 or Section 18.13 of this UTC shall be construed to prevent Company from obtaining interim equitable relief from a court of competent jurisdiction pursuant to Section 18.11.

18.10    Waiver of Jury Trial. [In the event Section 18.12 (Dispute Resolution for International Sellers (other than Chinese Entities) or Section 18.13 (Dispute Resolution for Chinese Sellers), as applicable, are not enforced against Seller, then e]ach party to this Agreement hereby irrevocably waives its right to trial by jury in any legal proceedings arising out of or relating to a Vendor Agreement (including this UTC).

18.11    Equitable Relief. The parties agree that any actual or threatened: (a) breach of Section 9 (Representations and Warranties), (b) Section 11 (Intellectual Property), or (c) Section 17 (Confidentiality) will cause irreparable harm to the Company and that a remedy at law would be inadequate. Therefore, in addition to all remedies available at law, the Company is entitled to equitable relief including temporary and permanent injunctive relief and specific performance against the Seller in the event of any threatened or actual violation of such sections of this UTC. Seller waives: (i) any right Seller may have to require Company to post a bond in connection with any such equitable relief; and (ii) all claims for damages resulting from the wrongful issuance of such equitable relief.

18.12    Liquidated Damages. Seller and Company hereby agree that the Administrative Fees, and other liquidated payments under each Vendor Agreement are not intended by the parties as penalty payments, but are instead intended as liquidated damages to compensate Company should Seller fail to meet its obligations. The parties also agree that these amounts are reasonable and appropriate because of the difficulty, time and cost of determining Company's actual damages resulting from such failure.

18.13    Waiver of Sovereign Immunity. To the extent that Seller may in any jurisdiction claim for itself or its assets immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that in any such jurisdiction there may be attributed to itself or its assets such immunity (whether or not claimed), the Seller agrees not to claim and irrevocably waives such immunity to the fullest extent permitted by the laws of that jurisdiction intending, in particular and without limiting the generality of the foregoing, that in any proceedings filed or taken in the People's Republic of China (including the Hong Kong Special Administrative Region and the Macau Special Administrative Region) the foregoing irrevocable waiver of immunity shall have full legal effect, and that in any proceedings filed or taken in the United States of America the foregoing irrevocable waiver of immunity shall have full legal effect and shall be construed in accordance with the United States Foreign Sovereign Immunities Act of 1976.

18.14    Interpretation and Construction. In this UTC and each other Vendor Agreement: (a) defined terms include the singular and the plural form of the terms, (b) "include", "includes" and "including" are inclusive (e.g., "including without limitation"), (c) "or" is disjunctive but not necessarily exclusive, (d) "shall" and "will" are mandatory, (e) Section headings and labels of defined terms are for convenience only and have no interpretive force, (f) all monies are expressed in and will be calculated and paid in U.S. Dollars, and (g) time shall be of the essence for all deadlines, including ship dates. The parties agree that the provisions of each Vendor Agreement (including the UTC) will be construed with equal weight against each party (and not just against the drafter).

18.15    Counterparts; Facsimile and Electronic Copies. This UTC and each other Vendor Agreement may be executed in any number of separate counterparts, all of which, when taken together, will constitute one and the same instrument. The parties agree that a signature transmitted by facsimile or electronic copy (e.g. .PDF) will be effective the same as an original.

BY CLICKING ON THE "AGREE" BUTTON BELOW AND SUBMITTING THIS APPLICATION SELLER AGREES TO BE
CONTRACTUALLY BOUND BY, AND TO PERFORM AND OBSERVE, ALL OF THE OBLIGATIONS AND CONDITIONS IN THIS UTC TO
BE PERFORMED AND OBSERVED BY SELLER, AND BY CLICKING ON THE "AGREE" BUTTON YOU CERTIFY THAT YOU (I) HAVE
READ AND UNDERSTAND THIS UTC, (II) ARE ACTING ON BEHALF OF SELLER WITH THE INTENTION TO BIND IT TO THIS UTC,
AND (III) SELLER HAS DULY AUTHORIZED YOU SO TO ACT.  IF SELLER DOES NOT AGREE, OR IF YOU ARE UNWILLING TO
CERTIFY, YOU SHOULD CLICK THE "DO NOT AGREE" BUTTON.

[✓] AGREE            [ ] DO NOT AGREE

Date: 06/10/2016 14:04:49

Seller: Dongbu Daewoo Electronics America Inc

By:    ARI LEE

Title:  Sales and Marketing

## Addendum for Direct to Customer Terms

1.    <u>Scope</u>. This DTC Addendum contains the additional terms and conditions applicable to Seller supplying DTC Merchandise that Sears Holdings Management Corporation, on behalf of itself and its affiliates ("SHMC"), elects to offer to Customers. Seller is responsible for directly shipping any such DTC Merchandise purchased by SHMC to Customers. Seller will be solely responsible for handling, warehousing and shipping such DTC Merchandise directly to Approved Outlet Customers or directly to an Approved Outlet's store for Customer pick up. Capitalized terms used herein, but not defined herein, will have the meaning ascribed to them in the UTC. Seller's sale of DTC Merchandise and Seller's obligations under this DTC Addendum are subject to "Sears Holdings Dotcom Vendor Information Guide (the "Dotcom Vendor Guide"), which is one of the Vendor Guides under the UTC.

2.    <u>Project Plan; Designated Personnel</u>. SHMC and Seller will each appoint an account manager to jointly develop a detailed project plan for implementing the direct shipment of DTC Merchandise (the "DTC Project Plan") and to oversee and facilitate the performance of their respective obligations for DTC Merchandise. Any changes to the DTC Project Plan will require the written approval of both SHMC and Seller. The account managers will meet at least quarterly to review the implementation of the DTC Project Plan and performance under this DTC Addendum.

3.    <u>DTC Merchandise Selection</u>. SHMC and Seller shall determine in good faith the Merchandise offered by Seller that SHMC may elect to sell as DTC Merchandise; provided that SHMC may remove any or all DTC Merchandise from the Company Sites at any time, without prior written notice, at SHMC's sole discretion. Seller shall sell to SHMC DTC Merchandise ordered by SHMC pursuant to the UTC. Seller shall not substitute any DTC Merchandise or add additional DTC Merchandise, in each such case, without SHMC's prior written approval.

4.    <u>Inventory</u>.

    a.    <u>Inventory Management</u>.    Seller will be responsible for all aspects of inventory management. At all times, Seller shall maintain inventory of DTC Merchandise in quantities, as Seller deems necessary, to fulfill POs in accordance with the service level standards set forth in the Dotcom Vendor Guide. SHMC and Seller shall meet on a semi-annual basis (or more frequently if requested by SHMC), to discuss whether changes to Seller's inventory management practices are required. SHMC has no responsibility for any DTC Merchandise in Seller's inventory or possession or for any DTC Merchandise on order by Seller. SHMC will periodically review the sales history for DTC Merchandise offered by SHMC and may in its sole discretion eliminate SKUs of DTC Merchandise, at any time.

    b.    <u>Forecast</u>. Seller shall cooperate with SHMC in the development of estimates and forecasts for SHMC's future needs for DTC Merchandise.

5.    <u>Order Fulfillment; Shipping, Returned DTC Merchandise and Risk of Loss</u>.

    a.    <u>Orders</u>. SHMC shall take all DTC Merchandise orders and will transmit to Seller all information necessary to fulfill DTC Merchandise orders. Seller shall process and ship DTC Merchandise orders within the required source order processing time provided in the order information transmitted to Seller.

    b.    <u>Shipping</u>. The F.O.B. point for DTC Merchandise is Seller's manufacturing or distribution facility located in the continental United States. Seller shall, at SHMC's expense (as provided below) ship DTC Merchandise to Customers, or to an Approved Outlet store for Customer pickup, as applicable, on or before the ship date required by SHMC. Seller shall ship Merchandise using the SHMC's preferred shipper(s) (to be billed to the SHMC's account) ("Preferred Shipper"). If SHMC authorizes the use of non-preferred shippers, Seller shall pay for such shipping and then bill SHMC for Seller's actual out of pocket cost for such shipping. Seller shall make every attempt to minimize shipping expenses including through order consolidation and other then-current industry best practices. Once Seller has shipped DTC Merchandise, Seller shall send to SHMC a ship notice that includes order information and tracking number.

    c.    <u>Returned DTC Merchandise</u>. Seller shall accept DTC Merchandise returned by the Customer, or rejected by the Customer at the time of delivery, along with DTC Merchandise returned directly to an Approved Outlet location (collectively, "Returned DTC Merchandise"). Costs associated with the shipping and handling of Returned DTC Merchandise shall be borne by Seller. Seller may elect not to receive Returned DTC Merchandise directly from customers; in which case, Seller will execute the required SHMC exception form indicating the appropriate flow path for Returned DTC Merchandise. Seller shall bear all costs associated with the shipping and handling, and disposal of Returned DTC Merchandise as indicated in the exception form. SHMC shall be responsible for reimbursing Customers for Returned DTC Merchandise, and Seller shall promptly refund SHMC the purchase price for all such Returned DTC Merchandise. SHMC shall have the risk of loss or damage to Returned DTC Merchandise until such Returned DTC Merchandise is tendered to Seller.

   d.    Reports. Seller shall provide to SHMC reports in a format and frequency required by SHMC.

6.    Disaster Recovery Plan. Seller shall maintain, routinely test and keep current a disaster recovery plan for Seller's systems and, upon SHMC's request, will make such plan available to SHMC for periodic reviews.

7.    Subcontracting. Seller may not subcontract its obligations related to DTC Merchandise (including its obligations under this DTC Addendum and the Dotcom Vendor Guide) without the prior written consent of SHMC.

   a.    Approved Sub-Contractors. With respect to any SHMC-approved subcontractors, Seller shall cause such subcontractors to: (a) execute a confidentiality agreement containing provisions substantially similar to those that apply to Proprietary Information under the UTC; and (b) abide by this DTC Addendum (including the UTC). Notwithstanding SHMC's approval of any subcontractor, Seller remains fully responsible for compliance with this DTC Addendum (including the UTC) and for the acts and omissions of Seller and its subcontractors. Seller shall obtain from all its contractors assignments and other appropriate documentation as necessary to establish and confirm SHMC's, or its designee's, ownership of Company Work Product and Company IP Rights.

   b.    Drug-Testing and Background Checks. Prior to Seller Personnel entering customer premises in connection with DTC Merchandise or any Vendor Agreement, Seller shall ensure adequate drug testing and criminal background checks have been conducted, and shall obtain any other job-relevant consumer reports related to such personnel or subcontractors (to the extent permitted by Applicable Law). At a minimum, a criminal background check will (to the extent permitted by Applicable Law), consist of the following: a search conducted by a qualified background check service provider, which includes a review of criminal court records of all counties of residence based on the individual's past seven (7) years of residential addresses. Seller may not assign Personnel with job-relevant adverse information or information that indicates an unreasonable risk to property, safety, or the welfare of individuals or the public to enter the residence or premises of a Customer. SHMC reserves the right to approve and modify the criteria Seller utilizes to comply with this Section. At a minimum, drug testing means (to the extent permitted by Applicable Law), that each such Seller Personnel has successfully passed a five (5) panel or other SHMC-approved drug test. In the event of any on-the-job accident and otherwise upon request by SHMC, Seller shall provide reliable evidence documenting that the applicable Seller Personnel successfully passed the required drug testing.

8.    SHMC Responsibilities

   a.    Company Site. SHMC shall be solely responsible for all operating functions with respect to any Company Site including posting, or providing Seller with a mechanism for posting the Seller Provided Content to Company Sites.

   b.    Customers. SHMC shall be solely responsible for customer order-taking and all aspects of customer billing, collections and customer service, except for any customer service issues related to Seller warranties. Customers that contact SHMC regarding Seller warranty-related issues will be directed to contact Seller directly.

   c.    SHMC Selling Price. SHMC will be solely responsible for (i) establishing the selling price for DTC Merchandise and identifying any related gift wrapping or other value-added services; (ii) determining whether any sales or use tax is payable to any governmental authority and, if so payable, the amount of any sales or use tax payable; and (iii) withholding, collecting and remitting to the appropriate governmental authority any sales or use tax that is payable.

9.    Settlement and Payment. A settlement between SHMC and Seller shall be made at the end of each week (Monday through Sunday) in accordance with SHMC's customary accounting procedures; subject to SHMC's rights under the UTC. Seller shall invoice SHMC for the DTC Merchandise and any shipping costs incurred by Seller that were authorized by SHMC for non-Preferred Shippers. However, the invoiced amount shall be adjusted for (a) such amounts to which SHMC is entitled to receive for the Returned DTC Merchandise and (b) mis-picked and not-in-box shipments of DTC Merchandise.

10.    Termination. In addition to SHMC's termination rights under the UTC, each party has the right to terminate this DTC Addendum upon at least sixty (60) days written notice to the other party; provided that such termination shall apply solely to this DTC Addendum and transactions relating to DTC Merchandise as contemplated herein.

# Exhibit D

**Subject:**                    CashPro Notification Info. Reporting Transaction

**From:** CashPro Notifications [mailto:cashproonlinereports@bankofamerica.com]
**Sent:** Wednesday, December 27, 2017 12:05 PM
**To:** Joye, Jennifer <Jenny.Joye@searshc.com>
**Subject:** CashPro Notification Info. Reporting Transaction



# Activity Alert
## Current Day Detail

The following Wire/High Value Payment Incoming transactions for the current business day were reported at 11:01 AM on 12/27/2017.

| | |
|---|---|
| Amount: | $8,944,464.95 USD |
| Account: | ███████████ |
| Bank Reference: | ███████████ |
| Customer Reference: | ████████ |
| Text: | WIRE TYPE:WIRE IN DATE:122717 TIME:1158 ET\|TRN ███████████ SNDR REF ███ REF ███████████\|RELATED REF:ATS OF 17/12/27 ███████████ 1900 HASSELL RD HOFFMAN\|ESTATES IL 60169-6308 ID:687095638\|ORG BK: ID:\|INS BK: ID:\|SND BK:JPMORGAN CHASE BANK NA ID:021000021\|BNF:SEARS ROEBUCK AND COMPANY SEARS CONCENTRATION 3711\|KENNETT PIKE GREENVILLE DE 19807 US ID:004451035468\|BNF BK: ID:\|PAYMENT DETAILS: ████████ |

Thank you for using CashPro Notifications. Visit CashPro Online for additional information.

This alert was generated at **11:01 AM CT on 12/27/2017.**

Do not reply to this email as the email box is not monitored.

This message is solely for the intended recipient(s) and may contain privileged, confidential or proprietary information. If you are not an intended recipient, please delete and destroy all copies, and any use of the information contained in this message is prohibited.This message is not an offer to sell any products or service or a banking or financial intermediation. It is not and should not be relied on by the recipient as a transaction confirmation or account statement. Sender shall not be liable for improper, incomplete or inaccurate information contained in this notification or any delay or failure in its receipt. If you have any questions, please call the phone number on your account statement.

CashPro is a registered trademark of Bank of America Corporation in the United States and other countries.
©