**Hearing Date and Time: August 2, 2019 at 10:00 a.m. (prevailing Eastern Time)**

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225 2000
Facsimile: (212) 225 3999
Luke A. Barefoot, Esq.
Andrew Weaver, Esq.

*Attorneys for Transform Holdco LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------- x
```
In re                                          :
                                               :          **Chapter 11**
**SEARS HOLDINGS CORPORATION**, *et al.*,     :
                                               :          **Case No. 18-23538 (RDD)**
                                               :
            Debtors.[1]                         :          **(Jointly Administered)**
```
------------------------------------------------------- x
```

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**TRANSFORM HOLDCO LLC'S REPLY IN SUPPORT OF
ASSUMPTION AND ASSIGNMENT OF DESIGNATED LEASE FOR STORE
LOCATED AT 2650 EAST OLYMPIC BOULEVARD, LOS ANGELES, CALIFORNIA**

Transform Holdco, LLC ("Transform" or the "Buyer") as the Buyer pursuant to the

*Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing*

*the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and*

*Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory*

*Contracts, and Leases in Connection Therewith and (IV) Granting Related Relief* (ECF No.

2507) (the "Sale Order") approving the sale of certain of the assets of the above-captioned

debtors and debtors-in-possession (collectively, the "Debtors") having previously submitted

*Transform Holdco LLC's Omnibus Reply in Support of Assumption and Assignment of*

*Designated Lease* (ECF No. 3654) (the "Omnibus Reply") hereby submits this additional reply

(the "Reply") in further support of the Sale Order, the Bankruptcy Court's *Order (I) Authorizing*

*Assumption and Assignment of Certain Executory Contracts and Leases and (II) Granting*

*Related Relief* (the "Assumption and Assignment Order") (ECF No. 3008) and in response to the

*Objection to Cure Amount for Store #1008 Filed by Izek Shomof and Aline Shomof Irrevocable*

*Children's Trust Dated February 11, 1999, Vegas Group, LLC, and East River Group, LLC*

(ECF No. 1837) "Cure Objection") and the *Supplemental Cure Objection and Reservation of*

*Rights (Store #1008) Filed by Izek Shomof and Aline Shomof Irrevocable Children's Trust Dated*

*February 11, 1999, Vegas Group, LLC, and East River Group, LLC* (ECF No. 3477) (the

"Supplemental Objection" and together with the Cure Objection, the "Cure Objections") and the

*Declaration of Izek Shomof in Support of Supplemental Cure Objection and Reservation of*

*Rights (Store #1008) Filed by Izek Shomof and Aline Shomof Irrevocable Children's Trust Dated*

*February 11, 1999, Vegas Group, LLC, and East River Group, LLC* (ECF No. 3478) (the

"Shomof Declaration"), all filed by Izek Shomof and Aline Shomof Irrevocable Children's Trust

Dated February 11, 1999, Vegas Group, LLC, and East River Group, LLC (collectively, the

"Landlord," and together with the Buyer, the "Parties").  In support of the Reply, Transform

respectfully states as follows:

## PRELIMINARY STATEMENT[1]

The Debtors and the Buyer seek to assume and assign a lease for an operating store in

Los Angeles, California (the "Lease"), which is a critical part of the Buyer's go-forward business

plan and which presents no cure claims with any basis in law or contract.  On May 13, 2019, the

Debtors assumed and assigned the vast majority of its leases to the Buyer.  Since then, the Buyer

has worked to resolve any remaining objections, but the Landlord continues to assert more than

$7 million in purported cure claims, which find no basis in the law or facts, in an attempt to

recoup construction expenses from the Buyer that Landlord has no right to recover under the

relevant lease agreement.

This store, which occupies a portion of the building located at 2650 East Olympic

Boulevard, Los Angeles, California (the "Building"), was part of a sale-leaseback agreement

entered into in 2004.  The Building and associated property is the subject of certain tax

entitlements in favor of the Landlord tied to a significant development project (the "Project").  In

order to realize the Project, the Landlord must complete a seismic retrofit of the Building,

including the space occupied by the store.

On May 5, 2011, Sears, Roebuck and Co. (the "Tenant") entered into the Amended and

Restated Building Lease (the "2011 Lease")[2] with 10309 Folsom Blvd., LP (the "Former

---

[1]     Capitalized terms used but not defined herein have the meanings ascribed to them in the proposed
Supplemental Assumption and Assignment Order attached hereto as Exhibit A.

[2]     Supplemental Objection, Exhibit A.

Landlord") regarding the portion of the Building containing the store (the "Leased Premises").
Subsequent to the signing of the 2011 Lease, the Landlord purchased the Building from the
Former Landlord.  In 2015, the Landlord and the Tenant entered into the Amendment to
Amended and Restated Building Lease dated as of December 30, 2015 (the "2015
Amendment"), in part to address certain disputes arising under the 2011 Lease.[3]  The 2015
Amendment contemplated certain construction work related to the Project to be completed by the
Landlord at the Landlord's expense and included certain protections for the Tenant's retail
operation during the pendency of such work.  Specifically, the Tenant had authority to approve
the details of any construction work and the Landlord was to undertake the Project in a way that
would minimize disruption to the Tenant's business.

Part of the Landlord's claim for cure relates to a provision of the 2015 Amendment that
provided for the Landlord to advance certain funds to the Tenant in order to facilitate a portion of
the construction work.  Upon timely completion of work satisfactory to the Tenant, the Tenant
would be obligated under the 2015 Amendment to return the associated funds to the Landlord.
If, however, the Landlord failed to complete certain work by the stated deadline, the balance of
any advanced funds would become the Tenant's asset to be used to complete the remaining
work, with the ability to seek additional funds from the Landlord as necessary.  The Landlord
does not dispute that it failed to meet the stated deadline, but it nonetheless seeks the return of
the balance of advanced funds as a cure amount.  The Landlord's failure to timely complete the
work defeats any claim that the Tenant has defaulted under the 2015 Amendment, foreclosing
any cure objection on that basis.

---

[3]        Cure Objection, Exhibit C.

The Landlord also asserts in the Cure Objections that, because of a failure on the part of the Tenant to "cooperate" with the Landlord regarding its efforts to conduct the necessary seismic retrofit, the Landlord has incurred significant consequential damages flowing from the Landlord's asserted failure to secure construction financing for the Project. Specifically, the Landlord claims that the Tenant's lack of a formal response to the Landlord's unreasonable request – made on the eve of the Debtors' bankruptcy filing – that the Tenant shut down for more than six months (without any form of compensation) somehow restricted the Landlord's ability to move forward under the express terms of the 2015 Amendment. However, the Landlord concedes that the 2015 Amendment did not require the Tenant to shut down or otherwise "cooperate" in any way. It is therefore not surprising that the Landlord does not (and cannot) point to any actual default under the 2011 Lease or the 2015 Amendment, but rather seeks to invoke an implied covenant of good faith and fair dealing as the basis for this portion of its Cure Objections. This ignores black-letter law that an implied covenant of good faith and fair dealing cannot alter the plain language of the agreements between the Parties. Without an actual default, the Landlord's claim for additional cure amounts necessarily fails. Moreover, the Landlord admits that the supposed consequential damages are not yet ripe, and it is axiomatic that speculative damages cannot be recovered (and therefore cannot form the basis for any cure objection).

The Landlord also asserts objections for cure amounts that have either already been paid in the ordinary course or are not in dispute and will be paid promptly following assumption and assignment of the 2011 Lease and the 2015 Amendment on the terms provided in the proposed Supplemental Assumption and Assignment Order.

Respectfully, the Bankruptcy Court should overrule the Cure Objections and enter the

proposed order attached hereto as Exhibit A.

## BACKGROUND

**A.    The Agreements**

1.    The 2011 Lease expressly provides:

The parties acknowledge that it is most critical to the successful operation of
Tenant's business at the Premises that Tenant has access, use and enjoyment of
those portions of the Building Parcel shown on the Site Plan as "Tenant's Control
Area", including such rights as are set forth below. Without Tenant's prior approval,
*which may be withheld for any or no reason in its sole discretion*, Landlord shall
not construct or install any improvements or make any changes to Tenant's Control
Area or interfere with or obstruct Tenant's use thereof in any manner
whatsoever . . . .[4]

2.    On December 30, 2015, the Parties entered into the 2015 Amendment in order to

resolve "a number of issues and disputes with respect to the terms of the [2011] Lease."[5]  The

Parties agreed that the 2011 Lease would "remain in full force and effect and shall govern the

relations of the Parties," except that the 2015 Amendment "shall control" in the event of an

express conflict.[6]

3.    The Parties further agreed that the "Landlord shall at [the] Landlord's sole cost

and expense, design, construction and complete all work contained within [the] Agreement" (the

"Construction Obligations").[7]  The Construction Obligations include, among other things, work

related to "Low Voltage Service[s]," "HVAC" systems, "Plumbing," "Facade," "Signage,"

"Freight Elevator" service, "Seismic Work," and "ADA Compliance."[8]  The Construction

---

[4]    2011 Lease at ¶ 2(a)(3) (emphasis added).

[5]    2015 Amendment at ¶ B.

[6]    Id. at ¶ 15.

[7]    Id. at ¶ 2.

[8]    Id. at ¶ 2-11.

Obligations were to be completed "on or before April 1, 2017, . . . unless the date [was] otherwise amended in writing . . . ."[9]

4.      Under the Parties' agreement, the Landlord was to advance $3,250,000 to the Tenant as the "Construction Estimate Deposit."[10]  The 2015 Amendment provided, as for the projects covered by the Construction Estimate Deposit:

> In the event Landlord does not complete the work . . . by April 1, 2017, the remainder of funds in the Construction Fund Escrow shall be released to Tenant, at Tenant's election, so that Tenant can cause the work to be completed and Tenant shall be entitled to payment by Landlord any additional amounts necessary to complete the work. Upon Landlord's completion of the work . . . in a timely manner and its inspection and acceptance by Tenant, any remaining Construction Estimate Deposit funds shall be dispersed to Landlord subject to the review and approval of the parties regarding the amount in question.[11]

5.      The Parties expressly agreed that they could "extend the time for or waive the performance of any obligation" under the 2015 Amendment "only by an instrument in writing."[12]

6.      The Landlord warranted that the Construction Obligations "shall be performed in compliance" with "all applicable laws . . . . and all applicable building, fire and safety codes . . . ."[13]  The Construction Obligations – including "the schedule, authorized hours of construction activity and remediation for work in question" – were to be completed pursuant to the Demolition and Construction Protocols (the "Construction Protocols"), and the Tenant would be

---

[9]      Id. at ¶ 2.

[10]     Id. at ¶ 25.

[11]     Id. at ¶ 25(d).

[12]     Id. at ¶ 23.

[13]     Id. at ¶ 14(a).

permitted to review and approve all final plans and specifications regarding work to be completed pursuant to the Construction Obligations.[14]

7.      The Construction Protocols required that, "[i]n order to achieve agreement on the work to be performed by [the] Landlord pursuant to the Amendment and cause the same to be performed in a good, timely, and workmanlike manner," the Parties "agree to the [] protocol with respect to all demolition and construction work to be performed by the Landlord."[15]  Among other things, the Construction Protocols provided:

> Landlord shall provide two (2) weeks [sic] notice for any demolition or construction work not involving remediation or removal of hazardous materials at the Building Parcel and shall include in that notice the scope of work contemplated a detailed set of plans and specifications for the same together with a schedule, authorized hours of construction activity and remediation plan for the same. Tenant shall have ten (10) business days from receipt of Landlord's both notice and complete, detailed plans and specifications to provide any comments and/or objections. No reply from Tenant within that period shall constitute approval. Landlord may proceed with the work in question after complying with the aforesaid procedures provided the work in question is approved by Tenant or deemed approved by Tenant as aforesaid.[16]

8.      The Parties further agreed, specifically as it related to the Seismic Work described in the 2015 Amendment, that the Landlord's work "shall be conducted in a manner that creates minimal possible visual and noise inconvenience to the Tenant and its customers."[17]

**B.      The Bankruptcy**

9.      On October 15, 2018 (the "Petition Date"), the Debtor and certain of its affiliates (collectively, the "Debtors") filed voluntary petitions for relief under title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the

---

[14]      Id. at ¶ 2.

[15]      Id. at Exhibit C, Section 1.

[16]      Id. at Exhibit C, Section 2(A)-(B).

[17]      Id. at ¶ 8.

Southern District of New York (the "Bankruptcy Court").  The Debtors' chapter 11 cases are being jointly administered before the Bankruptcy Court as Case No. 18-23538-rdd.

10.    The Debtors filed a motion on November 1, 2018 (ECF No. 429) (the "Sale Motion") seeking, among other things, the entry of an order pursuant to sections 105, 363 and 365 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9007 and 9008 of the Federal Rules of Bankruptcy Procedure, and Rules 6004-1, 6005-1 and 6006-1 of the Local Bankruptcy Rules for the Bankruptcy Court, authorizing and approving procedures for the sale of the Debtors' assets and for the assumption and assignment of executory contracts or unexpired non-residential real property leases of the Debtors.

11.    On November 19, 2018, the Bankruptcy Court entered an order (ECF No. 816) (the "Bidding Procedures Order") approving the global bidding and sale procedures for the sale of Debtors' assets.

12.    On January 14, 2019, the Debtors commenced an auction for the sale of substantially all of its assets.  On January 16, 2019, Transform, an entity formed by ESL Investments, Inc. and its affiliates ("Transform" or the "Buyer") as a vehicle to acquire these and certain non-debtor assets, was declared the successful bidder at the auction, and on January 18, 2019, the Debtors filed the *Notice of Successful Bidder and Sale Hearing* (ECF No. 1730) to this effect.

13.    On January 18, 2019, the Debtors filed and served the *Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in*

*Connection with Global Sale Transaction* (ECF No. 1731), identifying the Lease for potential assumption.

14.    On January 25, 2019, the Landlord filed the Cure Objection to the Assumption and Assignment Notices.

15.    On February 8, 2019, the Bankruptcy Court entered the *Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith and (IV) Granting Related Relief* (ECF No. 2507) (the "Sale Order").  Under the terms of the Sale Order, Transform is permitted to designate Additional Contracts and Designatable Leases (together, the "Additional Assigned Agreements") for assumption and assignment for up to sixty (60) days after the Closing Date, which occurred on February 11, 2019.  The Debtors and Transform agreed to extend this period and, on April 12, 2019, the Debtors filed a *Notice of Amendment to Asset Purchase Agreement Extending Certain Deadlines* (ECF No. 3171) (the "Extension Notice"), extending the period to designate the Designatable Leases to May 3, 2019, and the Additional Contracts to May 13, 2019.

16.    On April 2, 2019, the Bankruptcy Court entered the *Order (I) Authorizing Assumption and Assignment of Certain Executory Contracts and Leases and (II) Granting Related Relief* (ECF No. 3008) (the "Assumption and Assignment Order").  The Assumption and Assignment Order established, among other things, a noticing procedure for the assumption and assignment of Additional Assigned Agreements.

17.    On April 19, 2019, Transform filed the *Notice of Assumption and Assignment of Additional Designatable Leases* (ECF No. 3298), which designated the Lease for assumption and

assignment to Transform pursuant to the terms of the Assumption and Assignment Order (ECF No. 3298) (the "Assumption Notice"), subject to the Bankruptcy Court's approval.

18.    On May 1, 2019, the Landlord filed the Supplemental Objection and the Shomof Declaration.  As further described herein, the Cure Objection asserts "[a]n amount not less than $1,474,940.61" comprised of "CAM charges for February 2019," "2018-2019 annual property tax reimbursement," and "Reimbursement balance for Sears TI Construction Expenses,"[18] for a portion of which a check has already been sent, and a portion of which is undisputed by Transform.  The Supplemental Objection asserts a total of $5,696,046.02 in costs incurred to employ "Architects, Engineers and Consultants," "Permit Fees," and "Contractors"[19] as alleged consequential damages incurred in connection with the stalled Project.

19.    On May 13, 2019, the Bankruptcy Court entered the *Stipulation and Order By and Among Sellers, Buyer, and Landlord Izek Shomof and Aline Shomof Irrevocable Children's Trust Dated February 11, 1999, Vegas Group, LLC and East River Group, LLC Extending Time Under 11 U.S.C. § 365(d)(4) for Assumption or Rejection of Lease of Nonresidential Real Property* (ECF No. 3817) extending the Debtors' deadline to assume or reject the lease under Bankruptcy Code Section 365(d)(4) (the "Section 365(d)(4) Period") to June 30, 2019.

20.    On June 11, 2019, the Bankruptcy Court entered the *Stipulation and Order By and Among Sellers, Buyer, and Landlord Izek Shomof and Aline Shomof Irrevocable Children's Trust Dated February 11, 1999, Vegas Group, LLC and East River Group, LLC (I) Extending Time Under 11 U.S.C. § 365(d)(4) for Assumption or Rejection of Lease of Nonresidential Real Property and (II) Setting Briefing Schedule* (ECF No. 4186), further extending the Section

---

[18]    Cure Objection at ¶ 7.

[19]    Supplemental Objection at ¶ 13.

365(d)(4) Period to August 9, 2019, and setting forth a briefing schedule for resolution of the present dispute, including an evidentiary hearing set for August 2, 2019 at 10:00 a.m. (prevailing Eastern Time).

## ARGUMENT

### A.    Transform Will Pay All Valid Cure Amounts

21.    Under the Bankruptcy Code, if there has been a default under an unexpired lease, it cannot be assumed and assigned until such default is cured.[20] Transform has paid, or will pay, the amounts validly asserted as cure, but wholeheartedly disputes that the majority of the amounts asserted in the Cure Objections are properly asserted as cure amounts.

#### 1.    Transform Has Paid the CAM Cure

22.    Landlord asserts in its Cure Objections that $5,270.31 is owed regarding CAM charges for February 2019 (the "CAM Cure"),[21] a check for which amount was previously sent to the Landlord.[22] The CAM Cure appears to be included in the total asserted cure amount listed in the Supplemental Objection despite the fact that such check was issued.

#### 2.    There is No Dispute as to the Property Tax Cure

23.    The Landlord also asserts in its Cure Objection that $44,868.68 is owed as a property tax reimbursement (the "Property Tax Cure").[23] Transform does not dispute the amount

---

[20]    *See* 11 U.S.C. § 365(b); *see also In re Harry C. Partridge, Jr. & Sons, Inc.*, 43 B.R. 669, 671 (Bankr. S.D.N.Y. 1984) ("The Debtor's right to assume an executory contract or unexpired lease where that has been a default is expressly conditioned under 11 U.S.C. § 365(b)(1)(A) upon the debtor's duty to cure the default or provide adequate assurance that the debtor will promptly cure such default.").

[21]    Cure Objection at ¶ 7.

[22]    Transform's internal accounting records reflect that such check has not yet been cashed by the Landlord. To the extent required, Transform will issue a replacement check to the Landlord.

[23]    Cure Objection at ¶ 7.

asserted as Property Tax Cure, and will remit payment within five days of entry of the proposed

Supplemental Assumption and Assignment Order.

**B.        There Is No Default For Any Amounts Related To The Construction
              Estimate Deposit**

24.        There is no dispute that the Landlord did not meet the April 1, 2017 deadline for

work related to the Construction Estimate Deposit.[24]  Therefore Landlord's cure demand for

$1,424,801.62 must be rejected.[25]  While the Landlord asserts that $322,649.80 is presently due

and owing as reimbursement for work that has been completed (the "Alleged Reimbursement

Amount"), and that there is a balance of $1,102,151,82 remaining in the Construction Estimate

Deposit (the "Alleged Deposit Balance"),[26] the Landlord completely ignores the plain language

of the 2015 Amendment when it argues that these amounts must be "used to reimburse Landlord

for construction expenses at the Premises and, accordingly, must be maintained strictly for that

purpose and is part of the Cure Amount."[27]

25.        The 2015 Amendment is clear on its face:  The Landlord forfeits any balance of

the Construction Estimate Deposit if the work is not completed by April 1, 2017.[28]  The

Landlord admits the work was not done by April 1, 2017.  The Landlord does not argue, and has

not produced any evidence, that it was not reimbursed for work completed prior to April 1, 2017.

---

[24]        Shomof Dep. 22:1-22:4 ("Q:  Was all of the work in those sections completed by April 1, 2017?  A:  No.").
Relevant portions of the deposition of Izek Shomof are attached as Exhibit B.

[25]        Cure Objection at ¶ 8.

[26]        The figures asserted by the Landlord do not take account of a total of $265,005.60 that was paid by the
Tenant to third parties between November 2017 and March 2018; its Alleged Reimbursement Amount should be
reduced by at least this amount, not including other expenditures by the Tenant that are reimbursable against the
Construction Estimate Deposit that have not been paid out.

[27]        Cure Objection at ¶ 8.  Furthermore, substantial work remains to be completed under the relevant sections
of the 2015 Amendment, and Tenant has the right to maintain the funds in order to complete such work given the
Landlord's failure to do so.

[28]        2015 Amendment at ¶ 25(d).

13

That is the end of the inquiry.  As the Landlord cannot point to an actual default under the 2015

Amendment, there can be no basis for a cure demand.[29]

26.    To the extent the Landlord may argue that the Tenant continued to discuss

reimbursements with the Landlord after April 1, 2017, or even that it reimbursed the Landlord

for work completed after April 1, 2017,[30] any such accommodation by the Tenant does not waive

the Landlord's obligation to complete the work by the deadline or the Tenant's right to keep the

balance of funds in order to complete the work.[31]  Moreover, the Buyer, following assumption

and assignment of the 2011 Lease and 2015 Amendment, intends to, as a business matter, further

discuss and engage in commercial discussion with the Landlord as to this issue, but that does not

mean the Landlord can assert a valid cure objection related to the return of funds that, under the

2015 Amendment, were released to the Tenant.

---

[29]    11 U.S.C. § 365(b) ("If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee . . . cures, or provides adequate assurance that the trustee will promptly cure, such default . . .").

[30]    The Tenant reserves the right to seek reimbursement for any work completed under the terms of the 2015 Amendment and not properly reimbursed through the Construction Estimate Deposit.

[31]    *See* 2015 Amendment at ¶ 17 ("NO WAIVER.  Unless expressly waived or released in either the Building Lease or in this Amendment or in a separate writing signed by the waiving party, no provision of either the Building Lease or this Amendment shall be deemed to be a waiver by either party of any rights or claims against the other either arising out of the Building Lease, as amended, or out of any other agreement or circumstances . . ."); *see also LF Fashion PTE Ltd. v. California Accessories Grp., LLC*, No. CV 14-8668 PSG (JCX), 2015 WL 12752873, at *6 (C.D. Cal. Nov. 18, 2015) (holding that the plaintiff had not waived its right to payment where the parties had acted inconsistent with the payment terms in the original contract because "[w]aiver always rests upon intent," and "[p]laintiff's conduct, as a whole" did not demonstrate "the intentional relinquishment of a known right . . . .," and that "doubtful cases will be decided against a waiver"); *Thriftimart, Inc. v. Me & Tex*, 123 Cal. App. 3d 751, 54, 177 Cal. Rptr. 24, 26 (Ct. App. 1981) (holding that a landlord's acceptance of rent after a tenant violated terms in a lease did not amount to waiver of the landlord's right to claim forfeiture because the landlord, "from the start, evidenced, not a willingness to waive which would have kept the original lease in force" but instead a "willingness" to reach "terms acceptable to both parties").

### C.    The Landlord Is Not Entitled to Alleged Consequential Damages Where There Is No Alleged Default Under the Agreements

27.    The Landlord, again pointing to no default under the relevant agreements, stretches even further in an attempt to financially benefit from the assumption and assignment process by seeking almost $6 million more in alleged consequential (and completely speculative) damages through the Supplemental Objection.  Specifically, the Landlord seeks an additional $5,696,046.02 in costs related to "Architects, Engineers and Consultants," "Permit Fees," and "Contractors" (together, the "Alleged Supplemental Cure Amount"), attributed to what the Landlord asserts was a failure by the Tenant to cooperate with the construction, but which is effectively a series of missed opportunities and an existing possibility that the Landlord will fail to complete the Project.[32]  The 2015 Amendment is clear as to the fact that all costs associated with the Project are allocated to the Landlord; it contains no affirmative obligation of the Tenant to facilitate, or finance, the Project.[33]

28.    Again, the inquiry here is dictated by the language of the 2015 Amendment and is straightforward.  As the Landlord does not mention – let alone allege – a default under the 2015 Amendment, including the Construction Protocols, there is no basis to seek the additional $5.7 million.[34]  There is simply no obligation under the 2015 Amendment for the Tenant to "cooperate" with the construction of the Project beyond the terms of the Construction Protocols.

---

[32]    Supplemental Objection at ¶ 13.

[33]    See 2015 Amendment at ¶ 2, 3-11, 14.

[34]    Under the plain language of 11 U.S.C. § 365(b), in order for a cure payment to be required as a condition to the assumption and assignment of an unexpired lease, there must be an existing default under that lease.  *See In re Advance Watch Co. Ltd.*, No. 15-12690 (MG), 2016 WL 323367, at *1 (Bankr. S.D.N.Y. Jan. 25, 2016).  ("As required by Bankruptcy Code § 365(b)(1), any monetary amounts by which any executory contract or unexpired lease . . . is *in default* shall be satisfied by payment of the required cure amount by the Purchaser.") (emphasis added).

29.    While it is not necessary to evaluate the relevant facts here, they are not in

dispute.  Importantly:  (1) the Tenant had the absolute right to refuse the Landlord access to its

leased space in order to undertake construction work subject to the terms of the Construction

Protocols;[35] (2) the Landlord never provided the Tenant with specific notice, or with details of a

construction plan, as contemplated by the Construction Protocols;[36] (3) the Landlord sought to

change the terms of the 2015 Amendment by asking the Tenant, less than a month before the

Debtors' bankruptcy cases were filed, to shut down its store for more than six months without

any financial compensation,[37] even though the 2015 Amendment required that the Project would

be undertaken in such a way as to minimize disruption to the Tenant;[38] (4) the 2015 Amendment

contained no requirement for the Tenant to "cooperate" with the Landlord's construction efforts

beyond the terms of the Construction Protocols; (5) the Landlord never obtained the necessary

construction financing to complete the Project;[39] (6) the City of Los Angeles tax entitlements, the

alleged loss of which form part of the Landlord's alleged damages, in fact remain valid as of

today;[40] and (7) the Project is not dead.[41]  On these facts, the Landlord demands almost $6

million in cure costs arising not from the terms of the 2011 Lease or the 2015 Amendment

---

[35]    2011 Lease at ¶ 2(a)(3).

[36]    2015 Amendment at ¶ 2.

[37]    Shomof Dep. 101:13-24 ("Q: … [A]t that meeting you had requested that Sears close for more than six months; is that correct?  A:  This meeting and the meeting before that with Alan Shaw too."); 145:4-22 ("Q:  In your offer, Mr. Shomof, for Sears to shut down did you offer any financial compensation to Sears for the lack of sales or other costs incurred for those six-plus months?  A:  I did not offer cash, but I offer[ed] them gain[s] on the lease, which should have been into the millions of dollars.  Q:  That gain, Mr. Shomof, they were entitled to under the terms of the 2015 amendment, correct?  A:  That gain they're entitled to [by] the 2015 amendment.").

[38]    2015 Amendment at ¶ 8.

[39]    Shomof Dep. 69:10-20 ("Q:  Did you ever have construction financing in place for this project? . . . A:  No. . . . we had [a] condition that we had to meet.").

[40]    Shomof Dep. 120:25-121:3 ("Q:  Okay.  Did the entitlements expire?  A: We were able to salvage it.  Q: And how were you able to salvage it?  A:  By pulling structural permits.").

[41]    Shomof Dep. 146:20-147:7 ("Q:  Mr. Shomof, is the development plan for Boyle Heights that we've been discussing today dead?  . . . A:  . . . [T]he answer is no, it's not dead.").

themselves, but rather from a supposed violation of an implied covenant of good faith and fair dealing.

> 1. *The Landlord Claims Consequential Damages on the Basis of No Default Under the 2011 Lease or the 2015 Amendment*

30.    The Parties entered into the 2015 Amendment approximately two years after the Landlord's acquired the Building from the Former Landlord for the purpose of governing work surrounding the Project.  An important part of the Project relates to entitlements acquired from the City of Los Angeles that the Landlord asserts are "rapidly expiring,"[42] even though the Landlord did not begin to seek construction financing until some point in 2018.[43]  Following a meeting in September 2018, the Landlord sent a letter to the Tenant noting that "[h]opefully, Sears will agree to close from February 1st, 2019, to August 15th, 2019," with no offer to compensate the Tenant for the disruption.[44]  The Tenant's attorney replied that the request did "not appear to be offered in the spirit" of the Parties' prior discussions.[45]  Soon thereafter, the Debtors filed their Chapter 11 cases.  The Landlord alleges that it continued, during the pendency of these cases, to wait for the Tenant's formal refusal of its offer while the Project supposedly lay in the balance.[46]

31.    What the Landlord does not allege, however, is that it followed the terms of the Construction Protocols.  This failure is fatal to any claim for supposed consequential damages.

---

[42]    Supplemental Objection at ¶ 12.

[43]    Shomof Dep. 70:16-23 ("Q:  Is there a reason you didn't begin to seek construction financing in 2017?  A: Yeah.  We had [an] issue with – with the plans. . . . [T]he engineer needed to redesign the whole – reengineer the whole situation.")

[44]    Shomof Dep. 104:14-19; Exhibit 11.

[45]    Shomof Dep. 106:2-21; Exhibit 12.

[46]    Shomof Dep. 146:5-13 ("Q:  And you waited for six months instead of effectuat[ing] your other option, correct?  A:  I waited for four and a half months, hoping to get some kind of answer from them.  Q:  While your construction financing lay in the balance?  A:  And I just kept on asking the construction financing to just hold off another week, another two weeks, another month, but it end[ed] up not happening.").

Beyond the requirement that the Landlord provide the Tenant detailed notice of any "demolition or construction activity," including detailed plans and timing,[47] the Construction Protocols provide that after ten business days, "[n]o reply from Tenant . . . shall constitute approval" of the work plan and permit the "Landlord [to] proceed with the work in question."[48] No plan provided by the Landlord to the Tenant resembled the notice contemplated in the Construction Protocols, as none included the "detailed set of plans," "schedule," or proposal with respect to "authorized hours or construction activity" explicitly described in those protocols.[49] Moreover, no plan requiring the Tenant to vacate its space for six months or more could qualify as a construction plan contemplated under the 2015 Amendment, given that such requirement would violate the express language of the 2011 Lease, providing that the Tenant's "access, use and enjoyment" of its leased space was critical to the agreement between the parties.[50] The Landlord's effort to invoke the covenant of good faith and fair dealing is therefore clearly improper.

32.    The law of California is clear that "an implied covenant of good faith and fair dealing cannot contradict the express terms of a contract."[51] "[C]ourts are not at liberty to impose a covenant directly at odds with a contract's express grant of discretionary power except in those relatively rare instances when reading the provision literally would, contrary to the

---

[47]    Id. at Exhibit C, Section 2.

[48]    Id. at Section 2(A)-(B).

[49]    Id.

[50]    2011 Lease at ¶ 2(a)(3).  Setting aside the fact that the financing was not in place to begin the work, the Landlord effectively concedes that its proposal to the Tenant including the six-month shutdown requirement was not a work plan as contemplated by the Construction Protocols by admitting that it expected the Tenant to respond and negotiate a less extreme solution – not that a non-response by the Tenant would be conclusion per the Construction Protocols of the 2015 Lease.  Shomof Dep. 61:2-18 ("Q:  And under the lease and amendment, there's no obligation for Sears to close for six months; correct?  A:  Absolutely not. . . . All they could have done is continue negotiating with me and say[], Izek, work around us. . . . We are not going to shut down.  And if they [had] said that, I would have maneuvered the whole situation and tried to work with my general contractor that is going to be doing the job to work within Sears' space and not ask[] them to shut down.")

[51]    *Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*, 100 Cal.App.4th 44 (2002) (*citing* (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 374).

18

parties' clear intention, result in an unenforceable, illusory agreement."[52]  The plain language of

the 2011 Lease and the 2015 Amendment (including the Construction Protocols) controls here

and there is no alleged default.

33.     The Landlord invokes *Sachs v. Exxon Co., U.S.A.* (1992) 9 Cal. App. 4th 1491,

for the proposition that the covenant of good faith and fair dealing requires that a party not do

anything that will have the effect of destroying a right of the other party to receive the benefits of

the lease.[53]  In *Sachs*, "[o]ne of the benefits provided to the [landlord] by [the] lease is the

promise of the defendants that they will not violate governmental laws and regulations which

apply to the leasehold."[54]  The Landlord attempts to apply the holding in *Sachs* here by arguing

that the Landlord had an obligation under the 2015 Amendment to comply with governmental

laws and regulations (presumably to complete a seismic retrofit of the Building) and therefore

good faith and fair dealing required the Tenant to cooperate with the necessary construction.[55]

Even setting aside the incredible idea that the Tenant somehow failed to cooperate and

coordinate with the Landlord because it did not formally respond to one offer to shut down its

store for more than six months without any form of compensation, here the Landlord was not

required to rely upon good faith (which was never withheld), as it could have relied (and was in

fact required to rely) upon the plain language of the 2015 Amendment, including the

Construction Protocols.  The implied covenant cannot be used to rewrite the express terms to

which the parties agreed.[56]

---

[52]     Id. at *58 (*citing Third Story Music, Inc. v. Waits* (1995) 41 Cal.App.4th 798, 808).

[53]     Supplemental Objection at ¶ 10.

[54]     *Sachs* at 1498.

[55]     Supplemental Objection at ¶ 11.

[56]     *Storek* at *55 ("[A]n implied covenant of good faith and fair dealing cannot contradict the express terms of a contract.")

34.     The Landlord's failure to follow the provisions of the Construction Protocols

undermines its argument that it was ever "ready, willing, and able" to complete the Project.

Importantly, the Landlord only began to seek construction financing for the Project

(contemplated by the 2015 Amendment signed more than two years earlier) in 2018.[57]  Such

financing appears to have been conditioned on an agreement by the Tenant to close down for a

significant period of time or otherwise alter the Parties' rights under the 2015 Amendment,

among other conditions that were never satisfied.[58]  Having negotiated for construction financing

that imposed a condition to which the Landlord had no entitlement under the 2015 Amendment,

and that was indeed contrary to express lease provisions, the Landlord cannot now claim

damages based on a failure to satisfy that condition.  If the Landlord truly wanted to move

forward with the Project it could have done so.  The Debtors' bankruptcy cases did not create an

opportunity for the Landlord to try and recoup alleged costs incurred for a Project it has not

actively pursued.

### 2.     *The Alleged Supplemental Cure Amount Remains Speculative*

35.     Regardless of the fact that the Landlord alleges no default under the relevant

agreements, it also admits that there are no amounts that were expended and cannot be recouped

such that they would constitute actual damages.  The Landlord implies that its damages stem

from the fact that its entitlements are "rapidly expiring"[59] and that its financing has fallen

---

[57]     Shomof Dep. 69:21-70:4 ("Q:  We'll come back to the checklist and the open conditions that existed in October 2018.  But when did you first begin to seek construction financing for this project?  A:  Probably six months prior.  Maybe even before.  Q:  And how long, in your experience, does it take to obtain construction financing for a project like this?  A:  Six months.")

[58]     Shomof Dep. 69:10-20 ("Q:  Did you ever have construction financing in place for this project?  A: What do you mean by 'in place'?   Completely done, ready to be funded?  Q:  Committed financing.  A:  Committed, yes. Q:  'Committed' meaning you could draw upon the financing?  A:  No.  That's not – we had condition[s] that we had to meet.  And one of the last condition[s], it was us getting some kind of agreement with Sears.")

[59]     Supplemental Objection at ¶ 12.

through.[60]  In fact, the entitlements have not yet expired,[61] and the project could yet move

forward,[62] although it may be more expensive for the Landlord (which costs are expressly

assumed by the Landlord pursuant to the 2015 Amendment).[63]  The Landlord itself admits that

the Project is not yet "dead."[64]

36.    Such facts place the Alleged Supplemental Cure Amount firmly in the category of

speculative damages, which are not recoverable under basic principles of contract law.[65]  If the

Landlord moves forward with the Project – which is still a possibility – then there would be no

damages.  The Landlord's attempted money grab is plainly improper and any objection as to the

Alleged Supplemental Cure Amount should be overruled.

## CONCLUSION

37.    Insofar as each of the Cure Objections has not been otherwise adjourned or

resolved as set forth herein, the Buyer requests that the Court overrule each of the pending Cure

Objections and enter the proposed order attached as Exhibit A.

---

[60]    Shomof Dep. 123:1-3 ("Q:  Do you have plans to begin construction before August?  A:  We have no loan.  We lost the loan.")

[61]    Shomof Dep. 120:25-121:3 ("Q:  Okay.  Did the entitlements expire?  A: We were able to salvage it.  Q: And how were you able to salvage it?  A:  By pulling structural permits.").

[62]    Shomof Dep. 123:11-14 ("Q:  Could you begin the construction without the financing loan?  A:  I can if I want to bring – if I have the money available in my pocket to do it, find people.").

[63]    2015 Lease at ¶ 2 ("Landlord shall at [the] Landlord's sole cost and expense, design, construction and complete all work contained within [the] Agreement . . . ")

[64]    Shomof Dep. 146:20-147:7 ("Q:  Mr. Shomof, is the development plan for Boyle Heights that we've been discussing today dead?  A:  I hate to say – I literally hate to say even maybe.  I'm trying – this is something that is – my [flagship] of my projects, I've done 25 other projects.  This is the biggest one.  This is a – I put my heart and soul into it.  I want to [make] it happen and developed.  I've been through hell with the financing.  I've been through hell with a lot of – getting permits.  It was hard.  The answer is I hope that in some way, I can maybe salvage it.  Q:  So is the answer no, it's not dead?  A:  Yes, the answer is no, it's not dead.").

[65]    *Toporoff Engineers, P.C. v. Fireman's Fund Ins. Co.*, 371 F.3d 105, 109 (2d Cir. 2004) (The rule against "the recovery of uncertain and speculative damages . . . applies where the fact of damages is uncertain.")

Dated: July 9, 2019          CLEARY GOTTLIEB STEEN & HAMILTON LLP
New York, New York

                     */s/ Luke A. Barefoot*_____
                     Luke A. Barefoot
                     Andrew Weaver
                     One Liberty Plaza
                     New York, New York 10006
                     Telephone: (212) 225-2000
                     Facsimile: (212) 225-3999

                     *Attorneys for Transform Holdco LLC*

**Exhibit A**

**Proposed Form of Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re                                          :          Chapter 11
                                               :
SEARS HOLDINGS CORPORATION, *et al.*,          :          Case No. 18-23538 (RDD)
                                               :
                                               :
             Debtors.[1]                       :          (Jointly Administered)
------------------------------------------------------------x

## ORDER (I) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF LEASE OF NONRESIDENTIAL REAL PROPERTY AT 2650 EAST OLYMPIC BOULEVARD, LOS ANGELES AND (II) GRANTING RELATED RELIEF

Upon the motion, dated November 1, 2018 (Docket No. 429) (the "Sale Motion"),[2] filed

by the above-captioned debtors and debtors in possession (the "Debtors") seeking, among other

things, the entry of an order, pursuant to sections 105, 363 and 365 of the United States Bankruptcy

Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, and 9008

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 6004-1, 6005-

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2]  Capitalized terms used herein but not otherwise defined have the meanings given to them in the Asset Purchase Agreement (as defined below) or, if not defined in the Asset Purchase Agreement, the meanings given to them in the Sale Order (as defined below).

1 and 6006-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), authorizing and approving the sale of the Acquired Assets and the assumption and assignment of certain executory contracts and unexpired leases of the Debtors in connection therewith; and the Court having entered this Court's prior order, dated November 19, 2018 (Docket No. 816) including the schedule as revised by the *Global Bidding Procedures Process Letter* filed with the Bankruptcy Court on November 21, 2018 (Docket No. 862) (together, the "Bidding Procedures Order"), approving competitive bidding procedures for the Acquired Assets and granting certain related relief; and Transform Holdco LLC (the "Buyer") having submitted the highest or otherwise best bid for the Acquired Assets, as reflected in the Asset Purchase Agreement (as defined below); and the Court having conducted a hearing on the Sale Motion, which commenced on February 4, 2019, at which time all interested parties were offered an opportunity to be heard with respect to the Sale Motion; and the Court having entered the *Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith, and (IV) Granting Related Relief* (the "Sale Order") on February 8, 2019 (Docket No. 2507); the Court having entered the *Order (I) Authorizing Assumption and Assignment of Certain Executory Contracts and Leases and (II) Granting Related Relief* (the "Assumption and Assignment Order") on April 2, 2019 (Docket No. 3008), pursuant to which the Debtors may assume and assign certain executory contracts or unexpired leases to Buyer or Buyer's Assignee in accordance with the Asset Purchase Agreement, dated as of January 17, 2019 by and among the Buyer and the Sellers party thereto (including each Debtor and certain other subsidiaries of Sears Holdings Corporation, the "Sellers") (as may be

2

amended, restated, amended and restated from time to time, including pursuant to that certain
Amendment No. 1 to Asset Purchase Agreement, dated as of January 17, 2019 by and among the
Buyer and the Sellers, the "Asset Purchase Agreement"); and the Buyer having filed the *Notice of
Assumption and Assignment of Additional Designatable Leases* (Docket No. 3298) (the
"Designated Lease Notice"), pursuant to which the Debtors seek to assume and assign the lease
for store number 1008, located at 2650 East Olympic Boulevard, Los Angeles, California (the
"Designated Lease") in accordance with the Assumption and Assignment Order; and the
counterparty to the Designated Lease having filed the *Objection to Cure Amount for Store #1008
Filed by Izek Shomof and Aline Shomof Irrevocable Children's Trust Dated February 11, 1999,
Vegas Group, LLC, and East River Group, LLC* (Docket No. 1837), the *Supplemental Cure
Objection and Reservation of Rights (Store #1008) Filed by Izek Shomof and Aline Shomof
Irrevocable Children's Trust Dated February 11, 1999, Vegas Group, LLC, and East River Group,
LLC* (Docket No. 3477) and the *Declaration of Izek Shomof in Support of Supplemental Cure
Objection and Reservation of Rights (Store #1008) Filed by Izek Shomof and Aline Shomof
Irrevocable Children's Trust Dated February 11, 1999, Vegas Group, LLC, and East River Group,
LLC* (Docket No. 3478) (collectively, the "Landlord Objections"); and the Buyer having filed
*Transform Holdco LLC's Omnibus Reply in Support of Assumption and Assignment of Designated
Leases* on May 6, 2019 (Docket No. 3654) (the "Buyer's Reply"); and the Court having entered
the *Stipulation and Order By and Among Sellers, Buyer, and Landlord Izek Shomof and Aline
Shomof Irrevocable Children's Trust Dated February 11, 1999, Vegas Group, LLC and East River
Group, LLC Extending Time Under 11 U.S.C. § 365(d)(4) for Assumption or Rejection of Lease of
Nonresidential Real Property* (Docket No. 3817) and the *Stipulation and Order By and Among
Sellers, Buyer, and Landlord Izek Shomof and Aline Shomof Irrevocable Children's Trust Dated*

*February 11, 1999, Vegas Group, LLC and East River Group, LLC (I) Extending Time Under 11
U.S.C. § 365(d)(4) for Assumption or Rejection of Lease of Nonresidential Real Property and (II)
Setting Briefing Schedule* (Docket No. 4186) (together, the "Extension Stipulations"); and the
Court having entered the *Order (I) Authorizing Assumption and Assignment of Certain Leases and
(II) Granting Related Relief* (Docket No. 3850) (the "Revised Assumption and Assignment
Order"), pursuant to which the Debtors assumed and assigned certain unexpired leases to the
Buyer; and the Court having been advised that the Landlord Objections were resolved on the terms
of this proposed order (the "Supplementary Assumption and Assignment Order"); and due notice
of the Sale Motion, the Asset Purchase Agreement, the Sale Order, and the Assumption and
Assignment Order, the Designated Lease Notice, the Revised Assumption and Assignment Order,
Assumption and Assignment Hearing, and this Supplementary Assumption and Assignment Order
having been provided; and, except as otherwise provided for herein, all objections with respect to
the Designated Lease hereto having been withdrawn, resolved, adjourned or overruled as provided
in this Supplementary Assumption and Assignment Order; and it appearing that the relief granted
herein is in the best interests of the Debtors, their estates and creditors and all parties in interest in
these chapter 11 cases; and upon the record of the Supplementary Assumption and Assignment
Hearing and these chapter 11 cases; and after due deliberation; and good cause appearing therefor,
it is hereby

### FOUND AND DETERMINED THAT:

A.    **Fed. R. Bankr. P. 7052**.  The findings and conclusions set forth herein constitute
the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made
applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following
findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the

following conclusions of law constitute findings of fact, they are adopted as such. The Court's findings shall also include any oral findings of fact and conclusions of law made by the Court during or at the conclusion of the Assumption and Assignment Hearing. This Supplementary Assumption and Assignment Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

B. **Jurisdiction and Venue**. This Court has jurisdiction over the Sale Motion, the Sale Transaction and the property of the Debtors' estates, including the Acquired Assets, pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.). This matter is a core proceeding pursuant to 28 U.S.C. § 157. Venue of these chapter 11 cases and the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

C. The Debtors have demonstrated a good, sufficient, and sound business purpose and justification for the immediate assumption and assignment of the Designated Lease consistent with the Sale Order, the Assumption and Assignment Order and this Supplementary Assumption and Assignment Order. Buyer, shall not be subject to the stay provided by Bankruptcy Rules 6004(h) and 6006(d).

D. **Vested Title**. The Designated Lease constitutes property of the Debtors' estates, and title thereto is vested in the Debtors' estates within the meaning of 541(a) of the Bankruptcy Code.

E. **Notice and Opportunity to Object**. Actual written notice of, and a fair and reasonable opportunity to object to and to be heard with respect to the Designated Lease has been given, as required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Asset Purchase Agreement, and the Amended Case Management Order. Pursuant to the Sale Order, and

Assumption and Assignment Order, the Designated Lease Notice was properly served and the counterparty thereto was afforded timely, good, appropriate and sufficient notice and an opportunity to object in accordance with the Sale Order and no further notice need be given with respect to the assumption and assignment of the Designated Lease.

F.    **Cure Notice**.  As evidenced by the certificates of service filed with the Court, the Debtors have served, prior to the Assumption and Assignment Hearing, the *Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* (Docket No. 1731) (the "Cure Notice"), dated January 18, 2019, on the counterparty to the Designated Lease, which provided notice of the Debtors' intent to assume and assign such Designated Lease  and notice of the related proposed Cure Costs upon the non-debtor counterparty to such Designated Lease.  The service of the Cure Notice was timely, good, sufficient and appropriate under the circumstances and no further notice need be given with respect to the Cure Costs for the assumption and assignment of the Designated Lease. *See Affidavit of Service* (Docket No. 1969).  All non-debtor parties to the Designated Lease have had a reasonable opportunity to object both to the Cure Costs listed on the Cure Notice and Designated Lease Notice and, to the assumption and assignment of the Designated Lease to the Buyer or an Assignee, if applicable, in accordance with the Bidding Procedures Order and the Assumption and Assignment Order.

G.    **Assignment or Transfer Agreement**.    Any applicable assignment agreement or any other agreement or instrument of assignment or transfer (an "Assignment or Transfer Agreement") with respect to the Designated Lease was negotiated and proposed in good faith, from arms'-length bargaining positions, and without collusion.  Neither the Debtors, the Buyer nor the Buyer's Assignee (if applicable) have engaged in any conduct that would cause or

permit the assumption, assignment or transfer to the Buyer or an Assignee pursuant to the Assignment or Transfer Agreement and this Supplementary Assumption and Assignment Order, to be avoided under 363(n) of the Bankruptcy Code.

H.    **Assumption and Assignment of Designated Lease**.  The assumption and assignment of the Designated Lease is integral to the Asset Purchase Agreement, is in the best interests of the Debtors and their estates, and represents the valid and reasonable exercise of the Debtors' sound business judgment.

I.    **Waiver of Bankruptcy Rules 6004(h) and 6006(d)**.  The assumption and assignment of the Designated Lease must be approved and consummated promptly in order to preserve the value of the Acquired Assets particularly given the August 9, 2019 deadline pursuant to the Extension Stipulations.  The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval of the assumption and assignment of the Designated Lease in connection with the Sale Transaction as contemplated by the Asset Purchase Agreement and approved pursuant to the Sale Order. Accordingly, there is cause to lift the stay contemplated by Bankruptcy Rules 6004(h) and 6006(d) with regard to this Supplementary Assumption and Assignment Order.

**NOW THEREFORE, IT IS HEREBY ORDERED THAT**:

1.    **Motion is Granted**.  The Sale Motion and the relief requested therein to the extent not previously granted by this Court pursuant to the Bidding Procedures Order and/or the Assumption and Assignment Order and Revised Assumption and Assignment Order is granted and approved solely to the extent set forth herein.

2.    **Findings of Fact and Conclusions**.  The Court's findings of fact and conclusions of law in the Sale Order and Revised Assumption and Assignment Order, and the record of the

hearing with respect to the Sale Order and the Assumption and Assignment Hearing are incorporated herein by reference, solely with respect to the Designated Lease. The Designated Lease constitutes an Acquired Asset. Accordingly, all findings of fact and conclusions of law in the Sale Order and the Revised Assumption and Assignment Order with respect to the Acquired Assets, including any explicitly governing the Initial Assigned Agreements shall apply to the Designated Lease with full force and effect, and as the Buyer or Assignee of such Designated Lease, Buyer and any Assignee are entitled to all of the protections set forth in the Sale Order and Revised Assumption and Assignment Order with respect to Acquired Assets.

3.    **Objections Resolved**.    All objections to the assumption and assignment or designation of the Designated Lease have been resolved; *provided* that any timely filed cure objections that have not already been resolved shall be reserved in accordance with paragraph 11 of this Supplementary Assumption and Assignment Order.

4.    **Notice**. Notice of the proposed assumption and assignment of the Designated Lease was adequate, appropriate, fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006, and the Amended Case Management Order.

5.    **Assumption and Assignment**.    Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Debtors, as well as their officers, employees and agents, are authorized to take any and all actions as may be (i) reasonably necessary or desirable to implement the assumption and assignment of the Designated Lease pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement, the Related Agreements, the Sale Order, and this Supplementary Assumption and Assignment Order or (ii) reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing

to the Buyer's possession or the Buyer's Assignee's possession, if applicable, the Designated Lease.

6.     **Transfer of the Designated Lease Free and Clear**.  Pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, the Debtors are authorized to transfer the Designated Lease in accordance with the terms of the Asset Purchase Agreement and the Sale Order.  The Designated Lease shall be transferred to the Buyer or the Buyer's Assignee, if applicable, in accordance with the terms of the Asset Purchase Agreement, the Sale Order, the Assumption and Assignment Order, and this Supplementary Assumption and Assignment Order and such transfer shall: (i) be valid, legal, binding and effective; (ii) vest the Buyer or the Buyer's Assignee, if applicable, with all right, title and interest of the Debtors in the Designated Lease; and (iii) be free and clear of all Claims against the Debtors (including Claims of any Governmental Authority) in accordance with section 363(f) of the Bankruptcy Code.

7.     This Supplementary Assumption and Assignment Order: (i) shall be effective as a determination that, all Claims against the Debtors have been unconditionally released, discharged and terminated as to the Designated Lease, and that the conveyances and transfers described herein have been effected; and (ii) is and shall be binding upon and govern the acts of all persons, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, county and local officials and all other persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments that reflect that the Buyer or the Buyer's Assignee, as applicable, is the assignee and owner of such Designated Lease free and clear of all Claims, or who may be required to report or insure any title or state of title in or to any lease (all

9

such entities being referred to as "<u>Recording Officers</u>").  All Recording Officers are authorized and specifically directed to strike recorded Claims against the Designated Lease recorded prior to the date of this Supplementary Assumption and Assignment Order.  A certified copy of this Supplementary Assumption and Assignment Order may be filed with the appropriate Recording Officers to evidence cancellation of any recorded Claims against the Designated Lease recorded prior to the date of this Supplementary Assumption and Assignment Order.  All Recording Officers are hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement; *provided* however that nothing in this paragraph 7 or paragraph 9 shall authorize any Recording Officers to take any action with respect to Restrictive Covenants (as defined in the Revised Assumption and Assignment Order).

8.      No holder of any Claim against the Debtors or their estates shall interfere with the Buyer's or Buyer's Assignee's, if applicable, title to or use and enjoyment of the Designated Lease or the premises governed by such Designated Lease based on or related to any such Claim or based on any actions the Debtors have taken or may take in these chapter 11 cases.

9.      If any Person that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Claims against the Debtors or the Designated Lease shall not have delivered to the Debtors as of the time of entry of this Supplementary Assumption and Assignment Order, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or, as appropriate, releases of all Claims the Person has with respect to the Debtors or such Designated Lease or otherwise, then with regard to such Designated Lease: (i) the Debtors are hereby authorized and directed to, and the Buyer is hereby authorized to, execute and file such statements, instruments, releases and

10

other documents on behalf of the person with respect to such Designated Lease; (ii) the Buyer is

hereby authorized to file, register or otherwise record a certified copy of this Supplementary

Assumption and Assignment Order, which, once filed, registered or otherwise recorded, shall

constitute conclusive evidence of the release of all Claims against such Designated Lease; and (iii)

the Buyer may seek in this Court or any other court to compel appropriate persons to execute

termination statements, instruments of satisfaction, and releases of all Claims with respect to such

Designated Lease; provided that, notwithstanding anything in this Supplementary Assumption and

Assignment Order, the Sale Order, or the Asset Purchase Agreement to the contrary, the provisions

of this Supplementary Assumption and Assignment Order shall be self-executing, and neither the

Sellers nor Buyer shall be required to execute or file releases, termination statements, assignments,

consents, or other instruments in order to effectuate, consummate, and implement the provisions

of this Supplementary Assumption and Assignment Order.  This Supplementary Assumption and

Assignment Order is deemed to be in recordable form sufficient to be placed in the filing or

recording system of each and every federal, state, county or local government agency, department

or office.

10.      Subject to the terms of this Supplementary Assumption and Assignment Order, this

Supplementary Assumption and Assignment Order shall be considered and constitute for any and

all purposes a full and complete general assignment, conveyance and transfer by the Debtors of

the Designated Lease acquired under the Asset Purchase Agreement or a bill of sale or assignment

transferring good and marketable, indefeasible title and interest in all of the Debtors' right, title,

and interest in and to such Designated Lease to the Buyer or Buyer's Assignee, if applicable.

11.      **Assumption and Assignment of Designated Lease**.  The Debtors are hereby

authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to assume and

assign the Designated Lease to the Buyer or the Buyer's Assignee, if applicable, free and clear of

all Claims to the extent set forth in the Sale Order, the Assumption and Assignment Order and this

Supplementary Assumption and Assignment Order, to execute and deliver to the Buyer or the

Buyer's Assignee, if applicable, such documents or other instruments as may be necessary to

assign and transfer such Designated Lease to the Buyer or the Buyer's Assignee, if applicable, as

provided in the Asset Purchase Agreement, and to transfer all of the Debtors' rights, title, and

interests in such Designated Lease to the Buyer or the Buyer's Assignee, if applicable.  With

respect to the Designated Lease, all Cure Costs that have not been waived by, or as to which an

objection has been timely filed by, or that have not been otherwise addressed in an alternate

arrangement with, any non-debtor party to the Designated Lease shall be: (i) with respect to the

undisputed amounts, be paid in cash by the Buyer, within five business days of entry of this

Supplementary Assumption and Assignment Order and (ii) with respect to any disputed amounts

asserted in timely filed objections, the Buyer shall establish a cash reserve within five business

days of entry of this Supplementary Assumption and Assignment Order and the Buyer shall pay

or release such amounts promptly upon resolution of any such disputed Cure Cost.  The Buyer and

Designated Lease counterparties shall work in good faith to reconcile any disputes with respect to

Cure Amounts, provided, however, that if either party believes, following good faith discussions,

that an impasse has been reached with respect to any Cure Amounts, such party shall give written

notice the other, and within five days after such notice, in the absence of an agreement, such party

may seek a hearing before the Bankruptcy Court in accordance with the Assumption and

Assignment Order.  All parties' rights and defenses with respect to cure costs disputes that were

timely raised and filed in accordance with the Bidding Procedures Order, the Sale Order and the

Assumption and Assignment Order are fully reserved pending any such hearing and determination

by the Bankruptcy Court.  Payment of Cure Costs (a) with respect to the undisputed cure amounts

or (b) with respect to disputed cure amounts as subsequently agreed by the parties or determined

by the Court, shall: (i) be in full satisfaction and cure of any and all defaults under these Designated

Lease, whether monetary or non-monetary; (ii) compensate the non-Debtor counterparty for any

actual pecuniary loss resulting from such defaults and (iii) shall be made solely by the Buyer and

the Debtors shall have no liability therefor.

           12.      With respect to the Designated Lease, the Buyer, in accordance with the

provisions of the Asset Purchase Agreement, has provided adequate assurance of future

performance under the Designated Lease in satisfaction of sections 365(b) and 365(f) of the

Bankruptcy Code to the extent that any such assurance is required and not waived by the non-

debtor counterparties to such Designated Lease.  Upon entry of this Supplementary Assumption

and Assignment Order with respect to the Designated Lease, the Buyer or Buyer's Assignee, if

applicable, shall be fully and irrevocably vested with all rights, title and interest of the Debtors

under such Designated Lease and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors

shall be relieved from any further liability with respect to breach of such Designated Lease

occurring after such assumption and assignment.  As between the Debtors and the Buyer, the Buyer

shall be solely responsible for any liability arising and owed pursuant to the terms of the

Designated Lease after the Closing.  Buyer or Buyer's Assignee, if applicable, acknowledges and

agrees that from and after the entry of this Supplementary Assumption and Assignment Order,

with respect to the Designated Lease, in accordance with this Supplementary Assumption and

Assignment Order, it shall comply with the terms of the Designated Lease in its entirety, including

any indemnification obligations expressly contained in such Designated Lease (including with

respect to events that occurred prior to the entry of this Supplementary Assumption and

Assignment Order, for which cure costs were not known, liquidated or due and owing as such

date), as to which the Buyer continues to reserve its rights against the Debtors for indemnification

to the extent provided in the Asset Purchase Agreement and the Debtors reserve their respective

rights and defenses with respect to any claims therefor.   The assumption by the Debtors and

assignment to the Buyer or Buyer's Assignee, if applicable, of the Designated Lease shall not be

a default under such Designated Lease.   Subject to the payment of the undisputed Cure Costs and

resolution of any disputed cure amounts as provided in paragraph 11, the non-Debtor party to the

Designated Lease is forever barred, estopped, permanently enjoined from asserting against the

Debtors or the buyer, their affiliates, successors or assigns or the property of any of them, any

default existing as of the date of entry of this Supplementary Assumption and Assignment Order

or that any additional cure amounts are owed as a condition to assumption and assignment.

13.     All of the requirements of sections 365(b) and 365(f), including without limitation,

the demonstration of adequate assurance of future performance and payment of Cure Costs

required under the Bankruptcy Code have been, or will be, satisfied for the assumption by the

Debtors, and the assignment by the Debtors to the Buyer or its designated Assignee, with respect

to the Designated Lease.   Pursuant to the Sale Order, if the proposed Assignee for a Designated

Lease is not the Buyer, the Buyer has delivered to the applicable Designated Lease counterparty

(and delivered by email or facsimile to counsel for the applicable Designated Lease counterparty,

if such counsel has filed a notice of appearance in the Bankruptcy Cases) evidence of adequate

assurance of future performance within the meaning of section 365 of the Bankruptcy Code with

respect to the applicable Designated Lease that is proposed to be assumed and assigned to such

Assignee.

14.    The Buyer and its designated Assignee have satisfied their adequate assurance of future performance requirements with respect to the Designated Lease and in connection therewith have presented sufficient evidence regarding their business plan, the experience and expertise of their management, and demonstrated they are sufficiently capitalized to comply with the necessary obligations under such Designated Lease.  With respect to the Designated Lease, the Buyer shall, as further adequate assurance, within fifteen days after entry of this Supplementary Assumption and Assignment Order (unless the parties otherwise agree), execute and deliver guaranty agreements substantially in the form annexed to the Revised Assumption and Assignment Order as Exhibit B thereto (the "Form of Guaranty").

15.    The assumption of any liabilities under the Designated Lease shall constitute a legal, valid and effective delegation of all liabilities thereunder to the applicable Assignee and, following payment of all amounts required to be paid by agreement of the parties or an order of the Court, and except as expressly set forth in the Asset Purchase Agreement, the Sale Order or this Supplementary Assumption and Assignment Order, shall divest the Debtors of all liability with respect to such Designated Lease for any breach of such Designated Lease occurring after the Closing Date in accordance with Section 2.9 of the Asset Purchase Agreement.

16.    Pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code, the Buyer shall, within five business days after entry of this Supplementary Assumption and Assignment Order, pay to the applicable Designated Lease counterparty all undisputed Cure Costs and other such undisputed amounts required with respect to such Designated Lease.  Upon assumption and assignment of the Designated Lease, the Debtors and their estates shall be relieved of any liability for breach of such Designated Lease after the Closing pursuant to the Asset Purchase Agreement and section 365(k) of the Bankruptcy Code and the Buyer shall be responsible for any costs or

15

expenses (including, without limitation, for royalties, rents, utilities, taxes, insurance, fees, any common area or other maintenance charges, promotional funds and percentage rent) arising under the Designated Lease attributable to (x) the portion of such calendar year occurring prior to such Lease Assignment or (y) for any previous calendar year; provided that, the Buyer reserves all rights against the Debtors for indemnification for such expenses, to the extent provided in the Asset Purchase Agreement and Related Agreements and the Debtors reserve all their respective rights and defenses with respect to any claims therefor.  For the avoidance of doubt, the Buyer will perform under and in accordance with the terms of the Designated Lease from and after entry of this Supplementary Assumption and Assignment Order.

17.    Solely in connection with the Designated Lease and the proposed transfer set forth upon the entry of this Supplementary Assumption and Assignment Order, any provision in the Designated Lease that purports to declare a breach or default as a result of a change or transfer of control or any interest in respect of the Debtors is unenforceable and the Designated Lease shall remain in full force and effect notwithstanding assignment thereof.  Solely in connection with the Designated Lease and the proposed transfer, no sections or provisions of the Designated Lease, that in any way purport to: (i) prohibit, restrict, or condition the Debtors' assignment of such Designated Lease (including, but not limited to, the conditioning of such assignment on the consent of any non-debtor party to such Designated Lease); (ii) provide for the cancellation, or modification of the terms of the Designated Lease based on the filing of a bankruptcy case, the financial condition of the Debtors, or similar circumstances; (iii) provide for additional payments (e.g., so called "profit" sharing/splitting), penalties, fees, charges, or other financial accommodations in favor of the non-debtor third party to such Designated Lease upon assignment thereof; or (iv) provide for any rights of first refusal on a contract counterparty's part, rights of

first offer or any other purchase option or any recapture or termination rights in favor of a contract counterparty, or any right of a Landlord to take an assignment or sublease from a tenant, shall have any force or effect with respect to the grant and honoring of the Designation Rights or the rights under Section 2.9 of the Asset Purchase Agreement in accordance with the Sale Order, this Supplementary Assumption and Assignment Order, and the Asset Purchase Agreement and assignments of Designated Leases by the Debtors in accordance therewith and herewith, because they constitute unenforceable anti-assignment provisions under section 365(f) of the Bankruptcy Code and/or are otherwise unenforceable under section 365(e) of the Bankruptcy Code.  Upon assumption and assignment of the Designated Lease pursuant hereto, the Buyer or Buyer's applicable Assignee shall enjoy all of the rights and benefits, under the Designated Lease as of the date of the entry of this Supplementary Assumption and Assignment Order and shall assume all obligations as of the Closing Date.

18.    Solely in connection with the Designated Lease and notwithstanding anything to the contrary in paragraph 12 or 16 hereof, upon the entry of this Supplementary Assumption and Assignment Order, except as otherwise expressly agreed by the Buyer and the applicable Designated Lease Counterparty, notwithstanding any provision in any Designated Lease that purports to prohibit, restrict or condition such action, (x) the Buyer or the applicable Assignee shall be authorized to: (i) use the applicable Lease Premises, subject to section 365(b)(3) of the Bankruptcy Code, as a retail store or distribution center (and related goods and services); (ii) operate such Lease Premises under the Buyer's trade name or any other trade name which the Buyer owns or is authorized to use (including any of the Debtors' trade names); (iii) subject to the provisions of the applicable Designated Lease, make such alterations and modifications to the applicable Lease Premises (including signage, together with appropriate changes to existing tenant

signage in the respective shopping center or mall, including panels on all pylons, monuments, directional and other ground and off-premises signs where Sellers are currently represented) deemed necessary by the Buyer or such Assignee (subject to all applicable laws including all applicable municipal codes) as are necessary or desirable for the Buyer or such Assignee to conform such Lease Premises to the prototypical retail store or distribution center, as applicable (or such Assignee's typical retail store or distribution center, as applicable); (iv) solely with respect to Lease Premises that are currently "dark," remain "dark" (including partially or fully un-occupied) with respect to such Lease Premises after such assumption and assignment until the date that is necessary to permit the Buyer or such Assignee to take occupancy, remodel, restock, re-fixture, change signage and/or until completion of the work described in clause (iii) above (so long as such date is not more than one hundred fifty (150) days after the entry of this Supplementary Assumption and Assignment Order) or such later date as may be reasonably required for the restoration of the such Lease Premises following any applicable Casualty / Condemnation Event; and (v) exercise, utilize or take advantage of any renewal options and any other current or future rights, benefits, privileges, and options granted or provided to the Debtors under the Designated Lease (including all of the same which may be described or designated as, or purport to be, "personal" to the Debtors or to a named entity in such Designated Lease or to be exercisable only by the Debtors or by a named entity or an entity operating under a specific trade name)  and (y) neither the Buyer nor the applicable Assignee shall have any responsibility or liability for any Excluded Asset-Sale Taxes and Excluded Asset-Reorganization Taxes.

19.     ***Ipso Facto* Clauses Ineffective**.  Except as otherwise specifically provided for by order of this Court or in the Asset Purchase Agreement, the Designated Lease shall be transferred to, and remain in full force and effect for the benefit of, the Buyer or, if applicable, the Assignee

in accordance with its terms, including all obligations of the Buyer or, if applicable, the

Assignee, as the assignee of the Designated Lease, notwithstanding any provision in such

Designated Lease (including, without limitation, those of the type described in sections 365(e)(1)

and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or

transfer.  There shall be no, and the non-Debtor party to the Designated Lease is forever barred

and permanently enjoined from raising or asserting against the Debtors, the Buyer, or, if

applicable, the Assignee, any defaults, breaches, claims, pecuniary losses, rent accelerations,

escalations, assignment fees, increases or any other fees charged to the Buyer, if applicable, the

Assignee, or the Debtors as a result of the assumption or assignment of the Designated Lease

pursuant to this Supplementary Assumption and Assignment Order.

20.    Except as otherwise specifically provided for by order of this Court, upon the

Debtors' assignment of the Designated Lease to the Buyer or Buyer's Assignee, if applicable,

under the provisions of this Supplementary Assumption and Assignment Order and full payment

of all Cure Costs as required under section 365(b) of the Bankruptcy Code, no default shall exist

under the Designated Lease, and no counterparty to the Designated Lease shall be permitted to

declare a default by any Debtor, the Buyer or, if applicable, the Assignee, or otherwise take action

against the Buyer or any applicable Assignee as a result of any Debtor's financial condition,

bankruptcy or failure to perform any of the Debtors' obligations under the Designated Lease.  Any

provision in the Designated Lease that prohibits or conditions the assignment of such Designated

Lease or allows the counterparty thereto to terminate, recapture, impose any penalty, condition on

renewal or extension, refuse to renew, or modify any term or condition upon such assignment,

constitutes an unenforceable anti-assignment provision that is void and of no force and effect

solely in connection with the transfer thereof pursuant to this Supplementary Assumption and

19

Assignment Order.  The failure of the Debtors, the Buyer or, if applicable, the Assignee, to enforce at any time one or more terms or conditions of any Designated Lease shall not be a waiver of such terms or conditions, or of the Debtors', the Buyer's or, if applicable, the Assignee's, rights to enforce every term and condition of the Designated Lease.

21.    To the extent that the Designated Lease is designated to an Assignee, the transaction and the Assignment or Transfer Agreement is undertaken by Assignee without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein shall not affect the validity of such transaction, unless such authorization is duly stayed pending such appeal.  By virtue of the transaction contemplated by the Assignment or Transfer Agreement, Assignee shall not be deemed to (i) be a legal successor, or otherwise be deemed a successor to the Debtors; (ii) have, de facto or otherwise, merged with or into the Debtors; or (iii) be a mere continuation or substantial continuation of the Debtors or the enterprise or operations of the Debtors.

22.    **Waiver of Bankruptcy Rules 6004(h), 6006(d) and 7062**.  Notwithstanding the provisions of Bankruptcy Rules 6004(h), 6006(d), or 7062 or any applicable provisions of the Local Rules, this Supplementary Assumption and Assignment Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply.  Time is of the essence in assuming and assigning the Designated Lease in connection with the Court approved Sale Transaction.  Any party objecting to this Supplementary Assumption and Assignment Order must exercise due diligence in filing an appeal and pursuing a stay within the time prescribed by law, or risk its appeal will be foreclosed as moot.  This Supplementary

Assumption and Assignment Order constitutes a final order upon which the Debtors and the Buyer are entitled to rely.

23.    **Conflicts; Precedence**.  In the event that there is a direct conflict between the terms of this Supplementary Assumption and Assignment Order, the Assumption and Assignment Order, the Sale Order, the Asset Purchase Agreement, or any documents executed in connection therewith, the provisions contained in the Sale Order, the Asset Purchase Agreement, this Supplementary Assumption and Assignment Order, and the Assumption and Assignment Order and any documents executed in connection therewith shall govern, in that order.  Nothing contained in any chapter 11 plan hereafter confirmed in these chapter 11 cases, any order confirming such plan, or in any other order of any type or kind entered in these chapter 11 cases (including, without limitation, any order entered after any conversion of any or all of these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code) or in any related proceeding shall alter, conflict with or derogate from the provisions of the Asset Purchase Agreement, the Assumption and Assignment Order, the Sale Order or the terms of this Supplementary Assumption and Assignment Order.

24.    **Lease Deposits and Security**.  The Buyer shall not be required, pursuant to section 365(l) of the Bankruptcy Code or otherwise, to provide any additional deposit or security with respect to the Designated Lease to the extent not previously provided by the Debtors or to the extent that such deposit or security required under the Designated Lease has already been deposited by Debtors.

25.    **Automatic Stay**.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the provisions of this Supplementary Assumption and Assignment Order.

26.     **Retention of Jurisdiction**.  This Court shall retain exclusive jurisdiction to, among other things, interpret, enforce and implement the terms and provisions of this Supplementary Assumption and Assignment Order, the Sale Order and the Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder (and of each of the agreements executed in connection therewith), to adjudicate disputes related to the Sale Order, this Supplementary Assumption and Assignment Order or the Asset Purchase Agreement (and such other related agreements, documents or other instruments) and to enforce the injunctions set forth herein.

27.     **Settlement Agreements**.  Notwithstanding anything to the contrary in this Supplementary Assumption and Assignment Order, the Asset Purchase Agreement, Sale Order, Assumption and Assignment Order or any Designated Lease Notices, in the event that the Buyer (and/or its direct or indirect affiliates or subsidiaries) (the "Buyer Parties") entered into a settlement or other applicable agreement that by its terms governs the terms of assumption and assignment in connection with the above-captioned proceedings of the Designated Lease (a "Landlord Agreement") with the counterparty to such Designated Lease (including any landlord or other applicable party) (a "Counterparty"), the relationship of the applicable Buyer Parties and applicable Counterparty shall be governed and determined by the terms and conditions of the applicable Landlord Agreement, which shall supersede and control any inconsistent terms or provisions of this Supplementary Assumption and Assignment Order or any other prior Supplementary Assumption and Assignment Order relating to the assumption and/or assignment of the Designated Lease; *provided, however*, that nothing in the applicable Landlord Agreement may alter the provisions of this Supplementary Assumption and Assignment Order relating to the Debtors' or the Sellers' obligations.

28.    **Insurance Obligations**.  To the extent required by the express terms of any Designated Lease, within thirty days hereof, the Buyer shall provide the counterparty to such Designated Lease with any evidence or certificates of insurance that may be required.  Nothing in this Supplementary Assumption and Assignment Order shall waive, withdraw, limit or impair any claims that the Designated Lease counterparty may have against the Debtors, the Buyer or the Buyers' Assignee with respect to claims for indemnification for third parties' claims arising from or related to the use and occupancy of the Designated Lease prior to the entry of this Supplementary Assumption and Assignment Order solely to the extent of available occurrence-based insurance coverage that named the Designated Lease counterparty as an additional insured; provided, for the avoidance of doubt, that the Designated Lease counterparty may pursue such claims only against the insurer(s) that named the Designated Lease counterparty as an additional insured and solely to the extent of such coverage.

Dated:  August  __, 2019
        White Plains, New York

 

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

**Exhibit B**

**Cited Portions of Transcript of Deposition of Izek Shomof**

*IN RE: SEARS HOLDING CORPORATION, et al.*

---

*IZEK SHOMOF*
*June 24, 2019*

---



ELLEN GRAUER
COURT REPORTING CO. LLC
A U.S. Legal Support Company

*Original File 275743.txt*
*Min-U-Script® with Word Index*

Page 1

1  UNITED STATES BANKRUPTCY COURT

2  SOUTHERN DISTRICT OF NEW YORK

3  -------------------------------------------------x

   In re:

4  SEARS HOLDING CORPORATION, et al.,

5          Debtors.

6  Chapter 11

7  Case No. 18-23538(RDD)

8  (Jointly Administered)

9  -------------------------------------------------x

10                 333 South Grand Avenue
                   Los Angeles, California

11                 June 24, 2019
                   11:08 a.m.

12

13

14          DEPOSITION OF IZEK SHOMOF, taken before

15  Donna J. Rudolph, RPR, Certified Shorthand Reporter,

16  in and for the State of California.

17

18

19

20

21

22

23         ELLEN GRAUER COURT REPORTING CO. LLC
           126 East 56th Street, Fifth Floor

24         New York, New York 10022
                   212-750-6434

25                 REF: 275743

Page 2

1  A P P E A R A N C E S :

2

3  CLEARY GOTTLIEB STEEN & HAMILTON LLP

4  For SEARS HOLDING CORPORATION

5      One Liberty Plaza

6      New York, New York  10006

7  BY:  ANDREW WEAVER, ESQ.

8       KATE MASSEY

9       (212)225-2354

10      aweaver@cgsh.com

11      kmassey@cgsh.com

12

13  SULMEYER KUPETZ

14  For IZEK SHOMOF

15      333 South Grand Avenue, Suite 3400

16      Los Angeles, California  90071

17  BY:  DAVID S. KUPETZ, ESQ.

18       CLAIRE K. WU, ESQ.

19       (213)626-2311

20       dkupetz@sulmeyerlaw.com

21       ckwu@sulmeyerlaw.com

22

23  Also Present:

24      Jonathan Shomof

25      Ericson Alviz

Page 3

1  ------------------ I N D E X -------------------

2  WITNESS            EXAMINATION BY           PAGE

3  IZEK SHOMOF        MR. WEAVER              5, 119

4

5

6  --------------- E X H I B I T S ----------------

7  SHOMOF       DESCRIPTION              FOR I.D.

8  Exhibit 1    Original Cure Objection        10

9  Exhibit 2    Supplemental Cure Objection and   12

10             Reservation of Rights (Store No.

11             1008)

12  Exhibit 3    Amended and Restated Building    16

13             Lease

14  Exhibit 4    Amended to Amended and Restated   19

15             Building Lease

16

17  Exhibit 5    Exhibit A to Original Cure      30

18             Objection

19  Exhibit 6    Exhibit D to Original Cure      34

20             Objection

21  Exhibit 7    Declaration of Izek Shomof      51

22  Exhibit 8    Email chain, Bates numbered     81

23             SK 6708 - 6784

24  Exhibit 9    Email chain, Bates numbered     87

25             SK 68008 - 6817

Page 4

1  ------------ E X H I B I T S (Cont'd) -----------

2  SHOMOF       DESCRIPTION              FOR I.D.

3  Exhibit 10   Email chain, Bates numbered     93

4             SK 6818 - 6835

5  Exhibit 11   Jonathan Shomof letter, dated   102

6             9-25-18

7  Exhibit 12   E-mail, Bates numbered SK      105

8             6801 - 6802

9  Exhibit 13   Letter from Mark Cohen, dated  119

10             4-12-19

11  Exhibit 14   E-mail chain, Bates numbered    124

12             SK 6728 - 6731

13  Exhibit 15   E-mail chain, Bates numbered    127

14             SK 6905 - 6923

15  Exhibit 16   Letter from Balboa Financial    129

16             to Izek Shomof, dated 5-22-19

17  Exhibit 17   Bank OZK Closing Checklist,     133

18             revised 10-3-18

19  Exhibit 18   Letter entitled Bank of Ozarks, 139

20             Bates numbered SK 3117 - -397

21

22

23             (EXHIBITS TO BE PRODUCED)

24

25

Page 21

1 different construction projects, replacement and
2 relocation of building systems, HVAC, plumbing,
3 et cetera.
4        Do you see that?
5    A   Yes.
6    Q   Okay.  And looking at Number 2, which is on
7 page 2, it states at the beginning of that paragraph
8 "Landlord shall at landlord's sole cost and expense
9 design, construct, and complete all work contained
10 within this agreement in compliance with the demolition
11 and construction protocols attached hereto as made part
12 hereof as Exhibit C (including without limitation the
13 work described below in sections 3, 4, 5, 6, 7, 8, 10,
14 and 11, subject to the terms of section 9 below) on or
15 before April 1st, 2017, unless a different completion
16 date is explicitly set forth below, in which case a
17 different completion date set forth shall govern, or
18 unless a date is otherwise amended in writing by means
19 of a further amendment to this agreement."
20        Do you see that?
21    A   Yes.
22    Q   Did you understand that the work set forth in
23 sections 3, 4, 5, 6, 7, 8, 10, and 11, subject to
24 section 9, needed to be completed on or before
25 April 1st, 2017?

Page 22

1    A   Yes.
2    Q   Was all of the work in those sections
3 completed by April 1st, 2017?
4    A   No.
5    Q   Was there any amendment in writing to change
6 the date beyond April 1st, 2017?
7    A   I -- should be.  And if it's not, probably was
8 verbal conversation with Steve or Alan.
9    Q   By "Steve" who are you referring to?
10    A   Steve Velkei.
11    Q   And who is Steve Velkei, for the record?
12    A   He's Sears' attorney.
13    Q   Okay.  And who's Alan?
14    A   Alan Shaw, as far as I remember his name, is
15 someone that we met a few times.  And he was, I think,
16 Sears' real estate or construction team, if I'm not
17 mistaken.  100 percent.
18    Q   Okay.  And -- and are you saying that there
19 was a written amendment to this amendment?
20    A   Should be and, if not, definitely was a verbal
21 conversation among many conversation that I had with
22 Steve himself and few conversation we had with Alan
23 Shaw, Mr. Shaw.
24    Q   And what were the natures of those
25 conversations?

Page 23

1    A   Among -- if we're talking about this paragraph
2 here --
3    Q   Uh-huh.
4    A   -- probably among many conversation that this
5 not happening in the -- in 2017 due to us not able to
6 pull permit in time.  So we -- we delayed it to 2018 or
7 2019.
8    Q   Do you recall a specific conversation where
9 this was discussed?
10    A   We had many conversations.
11    Q   Do you recall a specific conversation where
12 this was discussed?
13    A   As of now, no, I don't recall.
14    Q   Did you document these discussions in any way?
15    A   Most likely, yeah.  I would have -- if you
16 have not received those document, we have to dig them
17 out.
18    Q   And how would you have documented these
19 conversations?
20    A   Probably writing notes of our -- what happened
21 in our -- just like my assistant here doing now, writing
22 notes of what happened in the conversation.
23    Q   But you're not aware of an actual amendment to
24 this agreement to change the timeline; is that correct?
25    A   Amendment?  I don't remember.  I'll be honest

Page 24

1 with you.
2    Q   Okay.  And you mentioned the need to pull
3 permits.  We're not talking, obviously, about the
4 seismic work here.  To be fair, it is -- Number 8 is one
5 of those items.  But for each of those items that are
6 listed, did permits need to be pulled for all of these?
7    A   Yes.
8    Q   Okay.  And why couldn't the permits be pulled
9 before April 1st, 2017?
10    A   Remember, it's a thousand units with 200,000
11 square foot of creative office and about a hundred
12 thousand square feet of retail.  And that takes time,
13 more time than we anticipated.  So if we exceeded the
14 time -- the time -- the 2017 time period, we most likely
15 asked for extension or made it clear that it's not
16 happening that date and it would be behind that date.
17    Q   But to be clear, sitting here today, you
18 cannot identify a specific conversation where that
19 agreement was reached?
20    A   As of right now at this moment?
21    Q   Correct.
22    A   No.
23    Q   And sitting here today, you cannot point to
24 any amendment to this document?
25    A   I did not look into it.  I'll be honest with

Page 65

1 please.
2        Develop a plan to be able to do the seismic
3 retrofit without Sears closing down?
4    A   Yes.
5    Q   Okay.  When did you ask your contractor to do
6 that?
7    A   Way before us talking to Sears doing it --
8 shutting down.
9    Q   Okay.
10   A   So we have a plan for shutting it partially --
11 for working partially.
12   Q   Have you ever provided that plan to Sears?
13   A   I believe -- I believe we did.
14   Q   You did?  When?
15   A   I believe.  I'm not sure.
16   Q   Okay.
17   A   If we didn't, it's -- we have to look for it.
18   Q   This plan was done prior to your discussion
19 about shutting down for six months?
20   A   Yes.
21   Q   So at the time when you had the discussion
22 with Sears about shutting down for six months, you had
23 an alternative plan prepared?
24   A   Yes, but the alternative plan would be costly.
25   Q   Costly to whom, sir?

Page 66

1    A   Time-wise costly.
2    Q   Understood.
3    A   To the development.
4    Q   To the development.  Understood.
5        That cost would have been borne by you;
6 correct?
7    A   Yes.
8    Q   So when Sears during those meetings that you
9 referenced said it's doable but will cost you, you did
10 not counter with the proposal of a more limited shutdown
11 that would have included more costs for the landlord;
12 correct?
13   A   Well, if I heard -- if I heard the price of
14 what costly, I would probably counter back.  But it just
15 went.  It ceased.  All conversation ceased right there
16 and then.
17   Q   I understand.
18   A   Because Sears did go into bankruptcy within a
19 week or two after we had that meeting.
20   Q   Correct.
21       I just want to make sure I understand the
22 facts, which is that at the time you asked Sears to shut
23 down for six months with no compensation, you had
24 supposedly an alternative construction plan in place;
25 correct?

Page 67

1    A   Yeah.  We had that all along because that's
2 what the lease says.  The lease says that we are
3 entitled to go into Sears' space in partial.  So we
4 approached Sears to save time.  We told Sears instead of
5 it taking 12 months being in Sears, let us shut down --
6 18 months.  Shut down for 6 months, and let us finish it
7 up within 6 months.
8    Q   I understand.
9        And just so I understand your testimony, it's
10 that you were asking for something that you were not
11 entitled to under the lease; correct?
12   A   Yes.
13   Q   Okay.  In paragraph eight of your declaration,
14 it says that as of March 16, 2019, and prior thereto, as
15 communicated by the landlord to tenant, landlord has
16 been ready, willing, and able to commence the necessary
17 renovation construction at the building.
18   A   Okay.
19   Q   In what ways was the landlord ready, willing,
20 and able?  And I assume you're focused here on the
21 seismic retrofit.
22   A   Yes.
23   Q   In what ways was the landlord ready, willing,
24 and able?
25   A   As far as I remember, at that date the

Page 68

1 landlord did not pull out.  So we were ready and willing
2 to go forward.  And I believe by that time, we already
3 had our seismic retrofit permits on hand.
4    Q   You did?  As of what date?
5    A   I believe maybe a week or two prior to that
6 date.
7    Q   Of which -- March 16?
8    A   March 16.
9    Q   Okay.
10   A   The reason is as far as my recollection, the
11 expiration of our entitlement would have been March 16.
12 And we were able to salvage our entitlement by us
13 pulling the permits.  So probably a couple weeks before
14 that.
15   Q   So prior to -- let's just say into February,
16 early March of 2019, you had not pulled the permits for
17 the seismic retrofit; correct?
18   A   Sometime in February, we pulled the permits.
19   Q   In February.  Prior to that, you had not
20 pulled the permits?
21   A   No, we had not.
22   Q   And the amendment was signed in 2015; correct?
23   A   If it says that, yes.
24   Q   Okay.  Did you have as of March 16, 2019,
25 construction financing in place?

18-23538-shl   Doc 4489   Filed 07/09/19   Entered 07/09/19 18:35:59   Main Document
IN RE: SEARS HOLDING CORPORATION, et al.   Pg 53 of 77

IZEK SHOMOF
June 24, 2019

Page 69

1    A   Repeat your question again.
2    Q   As of March 16, 2019, did you have
3  construction financing in place?
4    A   As of March, they did not pull out on that
5  date or before.  I don't remember exactly when they
6  pulled out.
7    Q   The answer's no, you did not have construction
8  financing in place?
9    A   That's not what I -- my answer is, no.
10   Q   Did you ever have construction financing in
11  place for this project?
12   A   What do you mean by "in place"?  Completely
13  done, ready to be funded?
14   Q   Committed financing.
15   A   Committed, yes.
16   Q   "Committed" meaning you could draw upon the
17  financing?
18   A   No.  That's not -- we had condition that we
19  had to meet.  And one of the last condition, it was us
20  getting some kind of an agreement with Sears.
21   Q   We'll come back to the checklist and the open
22  conditions that existed in October 2018.
23      But when did you first begin to seek
24  construction financing for this project?
25   A   Probably six months prior.  Maybe even before.

Page 70

1    Q   And how long, in your experience, does it take
2  to obtain construction financing for a project like
3  this?
4    A   Six months.
5    Q   So you began seeking construction financing
6  six months prior to when you thought that your
7  entitlements may expire; is that correct?
8    A   I have to look at the document exactly when we
9  reached out for construction financing.
10   Q   Okay.
11   A   We talked to many lenders, but that particular
12  lender, that's the one we chose to go forward with.  I
13  think it's six or seven months prior -- no.  Even more.
14  Even longer.  I have to look into the document the exact
15  dates.
16   Q   Is there a reason you didn't begin to seek
17  construction financing in 2017?
18   A   Yeah.  We had issue with -- with the plans.
19  We were ready and then the plan checker came up with
20  comments in regard to the entitlement with regards to
21  the seismic retrofitting.  And the engineer needed to
22  redesign the whole -- reengineer the whole situation.
23  So that's what delayed the whole project.
24  Architecturally, it was already done, but the engineer
25  was not 100 percent.

Page 71

1    Q   And when was the engineering finalized?
2    A   Probably a week before, two weeks before we
3  got the permits.
4    Q   So were you -- was the landlord ready,
5  willing, and able to begin construction for the seismic
6  retrofitting in October of 2018 when Sears filed for
7  bankruptcy?
8    A   No.
9    Q   Okay.
10   A   If you don't mind, I will -- I pull out the --
11  I want to retrieve the answer no.  And repeat the
12  question again.  I want to make sure I understood it.
13      MR. WEAVER:  May you please repeat the
14  question.
15      (Record read.)
16      THE WITNESS:  No.  No.  As far as I remember,
17  we had some minor issue with the seismic, but we were
18  able to finalize it with that time, more or less.
19  BY MR. WEAVER:
20   Q   You said that the permits were pulled in
21  February of 2019?
22   A   Yeah, right at that time, we were waiting
23  for --
24   Q   Is that when the landlord, in your mind, was
25  ready, willing, and able to begin the construction?

Page 72

1    A   Well, then -- no.  We were willing -- well,
2  let me correct it here again.  We could have started
3  staging.  We were not able to pull the permit up until
4  late January or so.  Sometime mid-January.  So we could
5  have -- we were ready to stage, and everybody was lined
6  up to stage the project, put out the cranes, and
7  basically break ground in a way.  But, actually -- I
8  have to check the record.  Early 2019, we were done.
9    Q   That's my question.  So early 2019, your view
10  is that the landlord was ready, willing, and able to do
11  the seismic retrofitting work?
12   A   I would say probably, yeah.  Probably January,
13  everything done.
14   Q   Okay.  Was the only outstanding item --
15  condition -- was the only outstanding condition for your
16  construction financing an agreement with Sears in early
17  2019?
18   A   No.  Under conditions which were very minor
19  and addressable, that's not 2019.  That occurred way
20  prior on the condition of the construction loan.  The
21  construction loan could have been done probably
22  September, October of 2019 -- '18.
23   Q   I understand.  But I'm asking you --
24   A   That was -- the only conditions was -- there
25  was couple of other minor conditions that it was doable

18-23538-shl   Doc 4489   Filed 07/09/19   Entered 07/09/19 18:35:59   Main Document
IN RE: SEARS HOLDING CORPORATION, et al.   Pg 54 of 77

IZEK SHOMOF
June 24, 2019

Page 73

1  and not an issue.
2  Q   So, Mr. Shomof, your answer is that an
3  agreement with Sears was not the only condition at the
4  beginning of 2019 to you closing your construction
5  financing; correct?
6  A   No.  There was other conditions but very
7  minor.  It's -- I would even not consider it as a big
8  deal at all.
9  Q   They were conditions you had not satisfied;
10  correct?
11  A   Satisfied the lender?
12  Q   Correct.
13  A   We were in the process of satisfying him.
14  Q   But you had not satisfied them at the
15  beginning of 2019; is that correct?
16  A   No.  Not -- don't go 2019.  I'm talking about
17  September of 2018.
18  Q   I'm asking the question, Mr. Shomof.  You said
19  in response to your answer [sic], which was that you
20  were ready, willing, and able to do the seismic retrofit
21  at the start of 2019.  That was your testimony; correct?
22  A   Yes.
23  Q   My question is:  At that very time, did you
24  have open conditions to close on your construction
25  financing other than an agreement with Sears?  It's a

Page 74

1  yes-or-no question.
2  A   I have to revisit it again.
3  Q   You just testified a few moments ago that you
4  did have open -- you called them minor, but you said
5  there were open conditions.
6  A   If anything, there was one minor thing.  I
7  think the general contractor -- which I already signed
8  up another general contractor, which is -- that's not a
9  condition.  It's a done deal.  The only thing that was
10  holding us is basically Sears' agreement.
11  Q   Okay.  Just I want to be -- your testimony
12  today under oath is that the only condition to you
13  closing your construction financing at the start of 2019
14  was an agreement with Sears.  That's it?
15  A   If there was any other condition, it was very
16  minor.
17  Q   That wasn't my question, Mr. Shomof.
18  My question was:  Is it your testimony today
19  under oath that the only condition to you closing your
20  construction financing at the start of 2019 was an
21  agreement with Sears?  It's a yes-or-no question.  If
22  you don't understand the question, I will try to make it
23  more simple.
24  A   No.  I understand the question.  I just don't
25  remember it exactly in detail.  Most likely there was

Page 75

1  another, one minor one.
2  Q   Mr. Shomof, in paragraph 9 of your
3  declaration, you see the chart of the supplemental cure
4  amounts; correct?
5  A   Yes.
6  Q   From the category of architects, engineers,
7  and consultants, when did that -- when did you incur --
8  over what time period did you incur those $4.5 million
9  charges and expenses?
10  A   From the day we started with architectural
11  engineering.
12  Q   And when was that?
13  A   I don't remember the exact date.  Sometime
14  2015 maybe.
15  Q   For the permit fees of 121,000, over what time
16  period did you incur those expenses?
17  A   Along the way.  From 2000- -- there was some
18  demolition permitting.  There is other permits.  And the
19  seismic retrofit permit, I think it was sometime in
20  February of 2019.
21  Q   And the contractors, the million that you have
22  there, what time period did you incur those expenses?
23  A   From 2015 on.  Demolition and all that kind of
24  stuff.
25  Q   So did -- did -- let me step back.

Page 76

1  Is the -- 5 million that you're seeking as
2  a supplemental cure amount related to the seismic
3  retrofitting project or overall construction?
4  A   It's not overall construction.  It's demoing.
5  It's mostly abatement of all the asbestos and all that
6  kind of stuff.
7  Q   So you began working on the project in 2015?
8  A   Yes.
9  Q   Okay.  And were there any issues that occurred
10  resulting from your construction work that interrupted
11  Sears' business during that time period?
12  A   I think once or twice.
13  Q   Once or twice.
14  Mr. Shomof, we discussed this condition as to
15  an agreement with Sears related to your construction
16  financing.
17  What was the specific condition that you
18  needed to satisfy as it related to an agreement with
19  Sears?
20  A   We -- they wanted to see -- they were afraid
21  that this job will take behind three years.  And they
22  understood, which I raised that issue, telling them that
23  with our general contractor, the guy that was going to
24  be doing the seismic retrofitting and all that stuff, he
25  want to do it within six months, be in Sears and out.

Page 97

1  fact of the matter.
2      Q   All I have is, again, the documents.  That's
3  what I'm asking you about.  Okay?
4      A   I know.  The document -- the document does
5  show it.
6      Q   Let me finish.
7      A   The document does show that Steve pleaded
8  guilty.
9      Q   I -- I understand that.  And I have a document
10 here that -- where your attorney asks Sears to do so;
11 correct?
12     A   My attorney asked him to do what?
13     Q   To plead guilty, to take the plea.
14     A   If they were not guilty, would they plead
15 guilty?
16     Q   Well --
17     A   If I asked you to plead guilty on a murder
18 that just occurred, would you plead guilty?
19     Q   Mr. Shomof, again, you don't get to ask the
20 questions.
21     A   Let's be -- let's be realistic here.
22     Q   Well, Mr. Shomof, was it important to get this
23 project financed?
24     A   Very important.
25     Q   Okay.

Page 98

1      A   We did everything possible in our power to get
2  this project going.
3      Q   Do you think it was important to Sears to have
4  this project going?
5      A   I don't think it did.  I don't think they
6  cared.
7      Q   You don't think it -- you don't think they
8  cared?
9      A   No, I don't think they cared.  That's why we
10 are sitting over here.
11     Q   Okay.  So you think that Sears is happy to
12 have the -- no development at the project.  Is that --
13 was that your testimony today?
14     A   The fact of the matter is it shows that they
15 just didn't care.  I pleaded along the way.  If you're
16 pulling e-mails, what -- and I'll pull you tons of other
17 e-mails that you're not concentrating on --
18     Q   I only have so much time.
19     A   -- that show -- that shows how much I pleaded
20 with them to cooperate.
21     Q   Mr. Shomof, this is -- this e-mail chain is
22 taking place November of 2018; correct?
23     A   That's what it looks like, yes.
24     Q   Yeah, so this is after Sears filed for
25 bankruptcy; correct?

Page 99

1      A   Yes.
2      Q   Okay.  And this is at the time you said Steve
3  had no one to speak to at Sears; correct?
4      A   Yes.
5      Q   This is the time when you had no one to speak
6  to at Sears; correct?
7      A   Yes.
8      Q   This was resolved.  Was it not?
9      A   Because --
10     Q   "Yes" or "no," Mr. Shomof?
11     A   It -- Mr. Shomof.  Yes.  Yes, it was
12 resolve --
13     Q   Thank you.
14     A   -- due to Mr. Lampert himself was named on
15 that complaint.  That's why it was resolve.
16     Q   Mr. Shomof, we've talked today about a meeting
17 that took place at the conference room at Sears in
18 September of 2018 where a discussion was held regarding
19 scheduling a plan for the seismic retrofit; correct?
20     A   Yes.
21     Q   And you also testified there was a meeting a
22 few weeks or so before that meeting at Steve's office;
23 correct?
24     A   Correct.
25     Q   Okay.  And I just want to make sure that the

Page 100

1  record's clear.  The meeting at Steve's office, can you
2  name everyone that was in attendance at that meeting?
3      A   I don't -- no.  I remember Steve was there and
4  Alan Shaw was there.  Out of my people, I don't remember
5  who was there.
6      Q   Was there anyone else there on behalf of
7  Sears?
8      A   Maybe.
9      Q   Was there anyone else there representing the
10 landlord?
11     A   Could very much be.  Yes.  I don't remember
12 exactly.  Probably Jonathan was there too.
13     Q   Is it your normal practice to go to a meeting
14 like this by yourself?
15     A   Yes.
16     Q   Okay.  So it's possible you were the only one
17 there?
18     A   Could be.
19     Q   Okay.  Sitting here today, you can't recall?
20     A   No, I cannot.
21     Q   And then the second meeting that took place, I
22 believe, was September 21st at Sears' conference room.
23 Can you tell me everyone who was at that meeting?
24     A   Steve again.  The guy that I don't remember
25 his name.  There was another guy that, again, I don't

18-23538-shl   Doc 4489   Filed 07/09/19   Entered 07/09/19 18:35:59   Main Document
IN RE: SEARS HOLDING CORPORATION, et al   Pg 56 of 77

IZEK SHOMOF
June 24, 2019

Page 101

1 remember his name too.  Jonathan Shomof was there, and I
2 believe Jimmy, too, Jimmy Shomof.
3    Q   Okay.  Was the sole purpose of this meeting to
4 discuss the seismic retrofit construction schedule?
5    A   That's as far as my recollection, yes.
6    Q   Okay.  Do you recall anything else being
7 discussed at that meeting?
8    A   I don't remember if the fire issue or the fire
9 department issue was discussed too.  I don't remember
10 that.
11   Q   Okay.  Anything else that was discussed?
12   A   No, I don't remember.
13   Q   Okay.  And during this meeting in the Sears
14 office -- Sears' office conference room, at that meeting
15 you had requested that Sears close for more than six
16 months; is that correct?
17   A   This meeting and the meeting before that with
18 Alan Shaw too.
19   Q   And can you tell me everything you recall that
20 representatives of Sears said in response to that
21 proposal?
22   A   Everything, I don't remember.  I remember that
23 other person saying it will cost for Sears to shut down.
24 That's what I remember.
25   Q   Do you remember anything else about the

Page 102

1 conversation?
2    A   No.
3    Q   Okay.  How did you leave things at the end of
4 that meeting?
5    A   We have to do a plan, and we'll send it to
6 you.
7    Q   Who's the "we"?  Sorry.
8    A   Us.
9    Q   Okay.
10   A   The landlord.  We have to do a plan, and we'll
11 send it to you to detail, one we are looking for.
12   Q   Okay.  Did you ever prepare that plan?
13   A   I believe Jonathan did.
14   Q   Okay.  Did you ever send it to Sears?
15   A   I believe he did.
16        MR. WEAVER: Mark this next.
17        (Exhibit 11 marked.)
18        MR. WEAVER: Thank you.
19   Q   Mr. Shomof, I'm handing you a document we've
20 marked as Exhibit 11, which is a letter dated
21 September 25th, 2018, on East River Group, LLC,
22 letterhead from Jonathan Shomof.
23        Do you see this?
24   A   Yes.
25   Q   This -- do you remember seeing this document

Page 103

1 at the time it was sent?
2    A   When?
3    Q   Do you remember seeing this when it was sent?
4 Do you recall seeing this?
5    A   Probably, yes.
6    Q   Did you review it before it was sent?
7    A   Most likely I did.
8    Q   Okay.  Do you recall if you ever had any
9 comments on the draft?
10   A   If -- I don't remember exactly, but maybe.
11   Q   Is this the plan that you discussed that you
12 needed -- is this the plan that you sent to Sears
13 following the September 21st meeting?
14   A   Yes.  I mean, that -- that what it says here,
15 we talked to them in that meeting and talked to them in
16 the previous meeting.
17   Q   Okay.
18   A   And then we put it in writing.
19   Q   Right.
20   A   This -- what was put in writing.
21   Q   And you state -- I'm sorry.  You don't state.
22        Joseph [sic] states in the first paragraph
23 that hopefully, the permits will be pulled
24 November 2018.
25        You see that?

Page 104

1    A   You mean Jonathan?
2    Q   Jonathan, sorry.
3    A   Yes.
4    Q   Was it your expectation that the permits be
5 pulled in November 2018?
6    A   Yes.
7    Q   Why'd you expect them to be able to pull the
8 permits?
9    A   Why --
10   Q   Yeah.
11   A   -- did we expect it?  Because that's what our
12 architect was saying.  Our engineer was saying by that
13 date, we will.
14   Q   And you see in the paragraph underneath the
15 numbered paragraphs, it says "Hopefully, Sears will
16 agree to close from February 1st, 2019, to August 15th,
17 2019."
18        You see that?
19   A   Yes, I do.
20   Q   Okay.  Then he says that construction for the
21 Sears store will begin immediately during that time
22 frame.
23   A   Yes.
24   Q   Okay.  Mr. Shomof, had the permits for the
25 work been pulled by February 1st, 2019?

Page 105

1    A    It could have been pulled.
2    Q    What do you mean "could have been pulled"?
3    A    Well, we pulled the permit, I think,
4  February 5th or 10th.
5    Q    Okay.
6    A    The reason we decided to do that, just to
7  preserve our entitlement. We didn't want to pull that
8  if it wouldn't be the issue with the entitlement because
9  we were waiting for financing to pay for the permit fee.
10  But the end of the day, we pull it out of pocket just to
11  preserve our entitlement. But it could have been pulled
12  a month prior or a week prior.
13    Q    To be clear, on the date of this letter was
14  written on December 25th, 2018, you had not finalized or
15  closed on your construction financing; correct?
16    A    Finalized our construction financing? Like I
17  said before and I'm saying it again, our construction
18  financing had a few conditions that the majority of the
19  conditions were very, very, very minor. Could have been
20  done with no -- no issue. The one major issue was the
21  Sears issue, the Sears agreement issue.
22        MR. WEAVER: Let's use tab 13.
23        Let's make this Exhibit Number 12.
24        (Exhibit 12 marked.)
25  ////

Page 106

1  BY MR. WEAVER:
2    Q    Mr. Shomof, we've handed you exhibit marked
3  Number 12, another e-mail chain bearing Bates Number
4  SK 6801 to 6802.
5        Do you see at the bottom of this first page,
6  there appears to be a e-mail from Steve to Jonathan,
7  you, and others?
8    A    Yes.
9    Q    Okay. And this is dated February -- I'm
10  sorry -- Friday, September 28th.
11        You see that?
12    A    Yes.
13    Q    Okay. So he's confirmed receipt of your
14  letter; is that right?
15    A    Yes.
16    Q    And he states "To be clear, this letter does
17  not appear to be offered in the spirit in which we
18  discussed it last week."
19        What did you understand him to mean by "not in
20  the spirit"?
21    A    I don't know.
22    Q    He states that it comes across more as a
23  direction from you as opposed to offering a proposed
24  timeline outlining some of the issues that remain to be
25  negotiated.

Page 107

1    A    So he understood it that way. That was not
2  our intention direction. We told him that's what we
3  talked about. That's how we spelled it out in the
4  letter.
5    Q    And so your understanding was that the letter
6  itself had spelled out the timeline necessary --
7    A    Yes.
8    Q    -- to complete the project?
9        And that it resolved all the issues that you
10  discussed during the meeting prior to sending the
11  letter?
12    A    To preserve all the issue. There's always
13  other issue comes along. But I don't know. Most likely
14  it was. It's a very vague question, you know? From
15  minute to minute, issues can occur. What issues are you
16  talking about?
17    Q    Well, I don't know. You were in the meeting.
18  I wasn't, sir. That's why I'm asking.
19    A    Oh, you talking about the issues of the
20  meeting?
21    Q    Correct.
22    A    Oh, I'm sorry.
23    Q    That Steve seems to be referring to.
24    A    Okay. Well, the issues -- we spelled out the
25  summary of the conversation. We send him that e-mail.

Page 108

1  He understood it differently. So the answer is no, I
2  don't understand what exactly he mean by the spirit of
3  the issue.
4    Q    In the third paragraph, he states "The history
5  of the project is riddled with errors that have put our
6  employees and patrons at risk and breached negotiated
7  protocols, not to mention broken promises about timing.
8  Just two months ago, you notified us that you would
9  likely not pursue this project."
10        Did you ever communicate in sum or substance
11  to Steve or anyone representing Sears that you were not
12  likely to pursue the redevelopment project?
13    A    That's not the way he spelled it out, not at
14  all. When I was sitting down at Steve's office with
15  Alan Shaw, I said it's getting costly because Alan said
16  it may cost you for us to shut down. I said the project
17  is getting costly. Don't bring it to a situation, come
18  with a number that I'm not going to be able to do it.
19    Q    Okay. Well, let's go back because I thought
20  I'd asked you about all the details of that conversation
21  in that meeting. So let's go back to that meeting
22  because I want to make sure I have the complete picture.
23        So during that meeting, did you -- what did
24  you say about the project becoming costly?
25    A    It's for them, you know. When we are talking

Page 109

1  to them about us taking the place for six months --
2      Q   Uh-huh.
3      A   -- they said it may be costly.  So I said our
4  project is getting to be too costly.
5      Q   Uh-huh.
6      A   So don't come back with a number that may not
7  allowing us to do the project.  That was a -- that was
8  something that we were negotiating in a way, talking.
9  It's not -- he understood it, oh, you may not do the
10  project.  I called him verbally right after that.  And I
11  said, Steve, I never said at no time that I may not do
12  the project.  We're very passionate with the project.
13  We have done -- we spent millions of dollars into this
14  project to pull away.  Our intention is not pulling
15  away.  And he knows that.
16     Q   But you didn't send him an e-mail to that
17  effect or a letter; correct?
18     A   Maybe I did.  I don't remember.  I have to
19  look into it.  Did you receive anything like that?
20     Q   Do you recall seeing a letter to that effect
21  to Steve or an e-mail?
22     A   No.
23     Q   You mentioned and testified earlier that if
24  Sears did not close for six months and this project had
25  to be done in stages, that, too, would also increase the

Page 110

1  expense to you.
2      A   Could very much be, yes.
3      Q   Could or would?
4      A   Could.  Most likely would.
5      Q   Mr. Shomof, if Sears did not close for six
6  months, would the project be more expensive for you to
7  complete?
8      A   Maybe lengthier.  It would be lengthier, take
9  longer time.  If we would have finished it in three
10  years, no.  If it would drag behind three years, yes.
11     Q   So my question is you've said that it would
12  take longer to do the project.  By taking longer, would
13  that have been more expensive to the landlord?
14     A   If we pass three years because our
15  construction loan is three years.  If we would pass the
16  three years, it would be.
17     Q   Did you need Sears to close for six months to
18  be able to pass in three years?
19     A   Guaranteed that we are not going to pass in
20  three years if Sears would shut down for six months.  If
21  they would not have shut in six months, it probably
22  would have -- probably would have finish it, but maybe
23  it would exceed the three years, and that's where it'd
24  be more costly.
25     Q   So just to be clear, Mr. Shomof, are you

Page 111

1  saying today that you can't say whether, one way or the
2  other, it would have been more expensive for you to
3  complete the project if Sears didn't shut down for six
4  months?
5      A   No, I'm not in a position to say it definitely
6  would cost us more money.
7      Q   So then -- so if you didn't know it would
8  definitely cost you more money, why not just move ahead
9  with the original agreement?
10     A   You know, you're doing negotiation with Sears.
11  You're working on getting them to shut down, if
12  possible, for three months -- for six months.  All they
13  had to say, sorry, Mr. Shomof, we are not closing for
14  six months.  We are not able unless we are getting "X"
15  amount of dollar.  I would do -- I would go different
16  routes.
17     Q   So what you're saying is this extremely
18  important, very expensive project that you've committed
19  so much to, you simply sat there waiting for five months
20  for Sears to come back and say we're not shutting down
21  for six months without doing anything else?
22         MR. KUPETZ: Objection.  Mischaracterizes the
23  testimony.
24  BY MR. WEAVER:
25     Q   You can answer the question.

Page 112

1      A   Either/or.
2      Q   So you just sat there, waiting?
3      A   We are just sitting there to just hear from
4  them.  We -- we are just waiting for them.  Are we --
5  are we going to be able to get the space?  If they say
6  no, we'll go different route.  In the meanwhile, while
7  we were waiting, we lost our construction loan.
8      Q   Getting back to what I was attempting to
9  ask -- and I -- hopefully, it is clear -- my question's
10  clear -- you're unable to say today whether or not Sears
11  did not close for six months, the project would have
12  cost you more money?
13     A   My answer is we were hoping and it would be
14  preferably if Sears would close for six months for us to
15  be able to finish the job 100 percent within three
16  years.
17     Q   I understand your preference.  But I'm asking
18  whether or not at the time of these negotiations, you
19  had a view of whether or not it would be more expensive
20  for you if Sears did not close for six months.
21     A   It would be more expensive if we -- if we will
22  go over the three years.
23     Q   Okay.  And by not -- by Sears not closing for
24  six months, did it make it a real concern that you would
25  go over three years?

Page 117

1  sitting over here, and that is to be determined in the
2  court of law.
3      Q   Correct.
4      A   So legally, I'm not here to answer any
5  question.
6      Q   Of course.
7      A   Again, that's why I'm presenting -- I'm hiring
8  an attorney to take it to a court of law and let the
9  jury decide if I'm at fault or Sears at fault.
10     Q   And as a landlord who signed the 2015
11 amendment, are you aware of anything that you as the
12 landlord believe that Sears did that was contrary to
13 their obligations under the lease?  Is there something
14 you think they did wrong under the lease and amendment?
15     A   I said -- I answered that question three
16 times.  And I will answer it one more time.
17     Q   It's a "yes" or "no."
18     A   Legally --
19     Q   If you give me "yes" or "no."
20     A   That's not true.  But logically, they have
21 done wrong, yes.
22     Q   Okay.  Logically.  Point to me in either the
23 lease or the 2015 amendment what they logically did
24 wrong.
25     A   If you ask me to point to the lease, I let my

Page 118

1  attorney point to the lease if there is anything there.
2      Q   You do understand, though, regardless, not as
3  a lawyer, but as a landlord, that your rights and
4  obligations of the parties is governed by the lease and
5  the amendment?
6      A   I do understand that.
7          MR. KUPETZ: Objection to the extent you're
8  asking for a legal conclusion.
9          MR. WEAVER: I'm asking for his understanding
10 as the landlord who signed the agreement.
11     Q   Do you understand that that was the agreement
12 that you signed to govern your relationship with Sears?
13     A   If my attorney will agree to it.
14     Q   I'm asking your understanding.
15     A   Most likely, yes.
16     Q   Why do you sign leases as a landlord?
17     A   To govern agreements.
18         MR. WEAVER: Let's take a break.
19         (Lunch recess.)
20 ////
21 ////
22 ////
23 ////
24 ////
25 ////

Page 119

1      LOS ANGELES, CALIFORNIA; MONDAY, JUNE 24, 2019
2                    2:17 P.M.
3
4           (Exhibit 13 marked.)
5
6           EXAMINATION (Continued)
7  BY MR. WEAVER:
8      Q   Mr. Shomof, we've handed you a document that's
9  been marked Exhibit 13, which is an April [sic] 12,
10 2019, letter from Mark Cohen, who, I believe, is your
11 counsel to -- to Steve.
12         MR. KUPETZ: Did you mean to say "February"?
13         MR. WEAVER: I did.
14         MR. KUPETZ: I thought I heard you say
15 "April," but I'm not sure.
16         MR. WEAVER: I did.  It's February 12th, 2019.
17         MR. KUPETZ: Okay.
18 BY MR. WEAVER:
19     Q   Okay.  And it says cc to client.  I assume is
20 you.  Do you recall receiving or seeing this letter?
21         (Reporter seeks clarification.)
22         THE WITNESS: Yes.  I said I do.
23 BY MR. WEAVER:
24     Q   Do you -- the -- last paragraph -- I guess
25 second-to-last paragraph technically -- it says

Page 120

1  East River's entitlements will expire unless
2  construction begins prior to March 16, 2019.
3          Do you see that?
4      A   Yes.
5      Q   At this point, February 12th, 2019, was the
6  landlord doing any construction at the building
7  location?
8      A   I think minor finishing up the demoing,
9  removing of the asbestos and -- if anything.
10     Q   Okay.  So there was no construction taking
11 place at this time?
12     A   Oh, it all depend if you consider it
13 construction or not.
14     Q   Well, this letter says unless construction
15 begins.  That implies to me that construction had not
16 been --
17     A   Construction with permits what he means.
18     Q   Okay.  Did the construction begin prior to
19 March 16, 2019?
20     A   Construction with permits?
21     Q   Whatever's meant by this letter.
22     A   No.
23     Q   Did not?
24     A   No.
25     Q   Okay.  Did the entitlements expire?

IN RE: SEARS HOLDING CORPORATION, et al.

IZEK SHOMOF
June 24, 2019

---

Page 121

1   A   We were able to salvage it.
2   Q   And how were you able to salvage it?
3   A   By pulling structural permits.
4   Q   Okay.  What does "salvage it" mean?  What does
5   that mean now?
6   A   If something was -- was wrecked and you are
7   able to recycle it or salvage it or -- before you trash
8   it, you --
9   Q   Okay.  As it relates to your entitlements,
10  what is the current status?
11  A   We are -- we went and pulled seismic retrofit
12  permit.  And the -- by the time -- from the day that we
13  pulled the seismic retrofit permit, we have six months
14  to start construction.
15  Q   And not to be technical, what does it mean by
16  "start construction"?  Like, what do you have to do
17  within six months?
18  A   Call for inspection.  Call for the inspector
19  to come in and inspect that there we are, started
20  construction.
21  Q   And you stated that the -- the permits were
22  pulled in February; is that correct?
23  A   Yes.
24  Q   One document that's been produced in the case
25  says -- is a permit from February 21st, 2019.  Does that

---

Page 122

1   sound --
2   A   Could be.
3   Q   Okay.  So does that mean from six months from
4   February 21st, 2019, you needed to begin construction
5   for the entitlements?
6   A   I believe so.  Yes.
7   Q   So that would be --
8   A   September, I think.
9   Q   August?
10  A   August or September.  All depend if you
11  counting February into March --
12  Q   August 21st?
13  A   No.  I said September 21st, if I'm not
14  mistaken.
15  Q   So you said you have six months from the date
16  the permit was pulled?
17  A   Six months from August -- from February 21st,
18  so it should be September 21st, if I do the number
19  correctly.
20  Q   To March, April, to May, to June, July, to
21  August --
22  A   That six?
23  Q   -- would be six.
24  A   To August, then.  When did we -- somewhere I
25  was told September.

---

Page 123

1   Q   Do you have plans to begin construction before
2   August?
3   A   We have no loan.  We lost the loan.
4   Q   Okay.  Is that the only reason you're not
5   beginning -- did not have plans to begin construction by
6   August 2019?
7   A   That is the major reason.  I mean, we are --
8   I'm fascinated.  I'll be honest with you.  I lost the
9   loan after the whole aggravation.  So yes, that is --
10  that is the major issue.  We don't have the financing.
11  Q   Could you begin the construction without the
12  financing loan?
13  A   I can if I want to bring -- if I have the
14  money available in my pocket to do it, find people.
15  Q   And when did you lose the financing as you
16  describe it?
17  A   I don't remember.  Sometime at that time, the
18  bank sent us a letter stating that pulling away, and we
19  had some money with them because we gave them about half
20  a million dollar to fees.  So they says we have some
21  money and send us where we should send the money to you.
22  Q   So they sent you a letter?
23  A   They send us -- I believe a letter or e-mail,
24  yeah.
25  Q   Terminating the -- the application?

---

Page 124

1   A   Cutting off the loan, yeah.
2   Q   Okay.  I don't believe we've seen that
3   communication.  So, again, that would be another request
4   we would make.
5   A   I had my lender -- my loan broker send a
6   summary.
7   Q   We're going to get to that in a moment.
8   A   Yeah.
9       MR. WEAVER: Let's mark 18.
10      (Exhibit 14 marked.)
11  BY MR. WEAVER:
12  Q   Mr. Shomof, we're handing you an exhibit
13  marked Number 14, which is another e-mail chain bearing
14  Bates Number SK 6728 through 6731.
15      Focused specifically on the second e-mail,
16  which is February 14, 2019, at 4:14 P.M. from Steve to
17  Mark.  You are not copied on the e-mail, but then Mark
18  forwards it to you as an FYI.
19      Do you see that?
20  A   Yes.
21  Q   Do you remember receiving this e-mail
22  forwarded by Mark?
23  A   Most likely, yes.
24  Q   Do you remember it, sitting here today?
25  A   Not -- not 100 percent.  But yes, most likely

---

Page 141

1  document that you were just looking at, if you go to the
2  signature on page 23 of 27, it was -- has a 2018 date
3  there.
4        MR. WEAVER: Okay.  Thank you.
5    Q   Mr. Shomof, how many -- how many properties
6  are you and your groups landlords over?
7    A   How many individual properties?
8    Q   Yeah.  Ballpark, if necessary.  Are you a
9  landlord on 20 properties?  A hundred properties?  A
10  thousand properties?
11    A   Probably 25, 30.
12    Q   Do any of those involve retail tenants?
13    A   Yes.
14    Q   And in your experience as a landlord with
15  retail tenants, have you ever experienced a situation
16  where a retail tenant has closed for six months or more?
17    A   My tenants --
18    Q   Yeah.
19    A   -- or other tenants?
20    Q   Your tenants.
21    A   My tenants, if they close for six months?  No.
22  And I have an explanation for it.
23    Q   Please.
24    A   I've done a very similar project at
25  609 South Grand with a seismic retrofit with retail

Page 142

1  spaces on the ground floor.  We were negotiating with
2  Carl's Juniors [sic] for them to close for six months.
3  They said, no, we cannot.  We found other routes, and we
4  got it done, completed.  All we need is for them to just
5  say undoable, not just put us on ice.
6    Q   But my question is:  Are you familiar with any
7  of your tenants ever agreeing to close for six months?
8  Is the answer to that no?
9    A   I did not approach -- except Carl's Jr., I did
10  not approach no other ones before Grand.
11    Q   In your experience as a landlord, are you
12  familiar with retail establishments that are not your
13  tenants that have closed for six months or more?
14    A   Yes.
15    Q   Do you have an example?
16    A   Am I familiar with people that shut down for a
17  period of time?  Yes.  I need to think for a second.  I
18  think it even happened to us.  I may take it back.  I
19  cannot recall immediately, but I can come back with
20  few -- a few of them at a later time.
21    Q   When asking Sears to shut down for six or more
22  months, what did you think would happen to the
23  employees?
24    A   What happened to the employees when they shut
25  down thousands of stores?  Did they have concern about

Page 143

1  those employees?
2    Q   I'm asking --
3    A   They just decided to shut down?
4    Q   Let's take a step back, Mr. Shomof.  Your
5  suggestion was they close for six months --
6    A   No.  You asking me a very technical -- trying
7  to put me on the spot in a way of worrying about
8  employees.
9    Q   Mr. Shomof --
10    A   By Sears not allowing me to do the seismic
11  retrofit and having a thousand employees working and
12  doing the renovation, what happened to those employees
13  for heaven's sake?
14    Q   Mr. Shomof, my question is:  Your proposal is
15  that Sears shut down for six months or more and
16  presumably then re-open; is that correct?
17    A   Yes.
18    Q   So what did you think was going to happen to
19  employees for that six-month time period?
20    A   Relocate them to other Sears department store
21  that are still open.
22    Q   Do you know the closest Sears locations to
23  Boyle Heights?
24    A   No, not offhand.  But I've seen many Sears
25  around still open or unless they shut down.

Page 144

1    Q   Did it seem reasonable to you that Sears would
2  be able to shut down for six or more months and then
3  re-open with the same customer base and same sales
4  force?
5    A   Absolutely yes.  And I can explain why.
6    Q   Please do.
7    A   Sears have not put a coat of paint on that
8  location for the past 25 years.  Sears are not in
9  compliance with ADA on that project for many, many
10  years.  I offered to do all that stuff for them.  I
11  offered to renovate.  I offered to replace the ceiling,
12  to replace the carpet.  I offered a lot of things to
13  them in exchange for that, putting a new HVAC system.
14        So -- and the most important one is for them
15  to have a lease, a 99-year lease, with a seismic
16  retrofit building.  And that will give them a bigger and
17  better -- a bigger and better value to the lease.  I
18  pleaded with them in every which way I can.  And they
19  just ignore us big time.
20    Q   I understand, Mr. Shomof, that you feel that
21  it would be in Sears' interest to shut down for six or
22  more months without any form of compensation.  I'm
23  guessing what I'm asking, though, is from this practical
24  matter --
25        MR. KUPETZ: I would just object in terms of

Page 145

1  when you say "without any form of compensation," I think
2  that's mischaracterizing what he said.
3  BY MR. WEAVER:
4      Q   In your offer, Mr. Shomof, for Sears to shut
5  down, did you offer any financial compensation to Sears
6  for the lack of sales or other costs incurred for those
7  six-plus months?
8          MR. KUPETZ: Objection.  Vague and ambiguous.
9  BY MR. WEAVER:
10     Q   You can answer the question.
11     A   I did not offer cash, but I offer them gain on
12  the lease, which should have been into the millions of
13  dollars.
14     Q   That gain, Mr. Shomof, they were entitled to
15  under the terms of the 2015 amendment; correct?
16     A   That gain they're entitled to of the 2015
17  amendment.
18     Q   The value you say that they will get from a
19  retrofitted building is what they bargained for in the
20  2015 amendment where you promised to retrofit the
21  building; correct?
22     A   Yes.
23     Q   So what is the additional value to Sears
24  beyond what they've already obtained from the 2015
25  amendment?

Page 146

1      A   All they could have said is no.  We want
2  5 million, 1 million, 10 million or we don't want
3  nothing.  We are not closing down.  We would have
4  rerouted our other option or exercised our other option.
5      Q   And you waited for six months instead of
6  effectuation your other option; correct?
7      A   I waited for four and a half months, hoping to
8  get some kind of an answer from them.
9      Q   While your construction financing lay in the
10  balance?
11     A   And I kept on asking the construction
12  financing to just hold off another week, another two
13  weeks, another month, but it end up not happening.
14         MR. WEAVER: Take a break and check our notes.
15         MR. KUPETZ: How much time do you want?
16         MR. WEAVER: Well, it depends -- of the break,
17  five, ten minutes.  Thank you.
18         (Brief recess.)
19         MR. WEAVER: Back on the record.
20     Q   Mr. Shomof, is the development plan for Boyle
21  Heights that we've been discussing today dead?
22     A   I hate to say -- I literally hate to say even
23  maybe.  I'm trying -- this is something that is -- my
24  flux sheet of my projects, I've done 25 other projects.
25  This is the biggest one.  This is a -- I put my heart

Page 147

1  and soul into it.  I want to get it happen and
2  developed.  I've been through hell with the financing.
3  I've been through hell with a lot of -- getting permits.
4  It was hard.  The answer is I hope that in some way, I
5  can maybe salvage it.
6      Q   So is the answer no, it's not dead?
7      A   Yes, the answer is no, it's not dead.
8          MR. WEAVER: That's all we have.  We greatly
9  appreciate your time today, Mr. Shomof.  I don't know if
10  your counsel has anything.
11         THE WITNESS: Thank you very much.
12         Do you want to give him the other stuff?
13         MR. KUPETZ: Let's go off the record, take a
14  break.
15         MR. WEAVER: We can go off the record.
16         (The deposition concluded at 3:15 P.M.)
17
18
19
20
21
22
23
24
25

Page 148

1          A C K N O W L E D G M E N T
2
3  STATE OF          )
4                    ) ss.:
5  COUNTY OF         )
6
7          I, IZEK SHOMOF, hereby
8  certify that I have read the transcript of my
9  testimony taken under oath in my deposition;
10  that the transcript is a true, complete and
11  correct record of my testimony, and that the
12  answers on the record as given by me are true
13  and correct.
14
15
16
17     _____
18          IZEK SHOMOF
19
20  Signed and subscribed to before
21  me, this _____ day of _____, ____.
22
23  _____
24  Notary Public, State of _____
25

# East River Group LLC

724 S. Spring St., #802 Los Angeles, CA 90014
Tel# (213) 623-3800   Fax# (213) 534-6625

September 25, 2018

<u>**VIA Certified Mail: 7018 0360 0001 1098 4679 / Return Receipt Requested**</u>

Sears, Roebuck and Co.
3333 Beverly Road
Hoffman Estates, Illinois 60179

**RE: NOTICE OF CONSTRUCTION**

Δ π EXHIBIT __11__
Deponent _I. Shomof_
Date _12.4.19_ Rptr. _DJP_
WWW.DEPOBOOK.COM

Dear Mr Steven Velkei,

It was great meeting with you last week. Based on our meeting on September 21st, 2018, we would like to provide you with more information and dates in regards to the construction process and timeline for the Sears Building and the Sears Store. Hopefully, permits will be pulled in November 2018 and construction will start immediately after that.

*Attached is a site map that shows how we will be staging and phasing the construction as well as ways to avoid interfering with the Sears Store. The sitemap includes:*

1. The area in red is where the construction will begin  at the 1964 portion of the Building once permits are pulled
2. The area in green will be fenced off and will be part of our staging during the life of the construction
3. The area in blue refers to the area we will need to use from time to time (dates are tentative), during the construction that will not interfere during Sears business hours. If the area is needed during business hours, we will make sure to provide a one week notice.
4. The area in yellow is where we will provide pedestrian canopies at the two main entrances to provide protection from any work being done above.

*Hopefully, Sears will agree to close from February 1st, 2019 to August 15 2019. This will drastically shorten the construction in the Sears store.  Construction for the Sears Store would begin immediately during that time frame. Please refer to the attached timeline for the process and dates in regards to the construction for the Sears Store in 2019.*

Please note while construction may impose some challenges, once the project is completed, it will be incredibly beneficial for the future of Sears and the entire area. This development will provide Sears store with the following improvements and benefits:

1- A new HVAC system,
2- A new freight elevator
3- A new main for the electrical system,
4- Exterior painting
5- Parking lots will be resurfaced and restriped
6 - A new 2,600 parking structure
7- Providing ADA access into the Sears Store
8- Seismically retrofitting the building

East River Group LLC

724 S. Spring St., #802 Los Angeles, CA 90014
Tel# (213) 623-3800  Fax# (213) 534-6625

- **Most beneficial is the Seismic retrofit**. Per the city ordinance, the building and store will have to be seismically upgraded within the next 20 years. If the building does not get seismically upgraded, the building and the lease for Sears will have no value to it. (Please refer to the city ordinance attached that explains why this is important).

In addition, the completion of this project will bring tremendous value to the Sears Store. It will bring over 1500 new residents in the building, over 2000 office employees in the 200,000 sq ft of office space and approximately 500 employees to the restaurants/bars at the food hall. In addition, it will become a destination for thousands of new patrons/visitors

We hope we were able to provide you with helpful information in regards to the future of this project.

If you have any questions or require any additional information, please feel free to contact me directly at (310) 780-7434 or by email at jon@shomofgroup.com.

Again, thank you so much for your patience and cooperation through this process.

Sincerely,

Jonathan Shomof
Project Manager
Office: (310) 780-7434
Email: jon@shomofgroup.com



1964 Building Starting Once Permits Pulled (Nov 1 at the latest)

Construction Staging Area

Sears Entry Canopy During Construction

Building Construction Access Only During None Business Hours of Sears

# PROJECT TIMELINE SEARS 2018

PROJECT TITLE

PROJECT MANAGER

COMPANY NAME

DATE



| PHASE | DETAILS | Q1 | | | Q2 | | | Q3 | | | Q4 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
| **1** | PROJECT WEEK: | | | | | | | | | | | | |
| | Demo 1964 Building | | | | | | | | | | | PROJECT START RANGE | |
| **2** | Sesmic Work 1964 Building | | | | | | | | | | | | |

# PROJECT TIMELINE SEARS 2019

PROJECT TITLE
PROJECT MANAGER

COMPANY NAME
DATE

| PHASE | | DETAILS | Q1 2019 | | | Q2 2019 | | | Q3 2019 | | | Q4 2019 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
| | PROJECT WEEK: | Enter the first of the first Monday of each month --> | | | | | | | | | | | | |
| 1 | Demo | Cutting Foundation / Cutting Light wells / Cutting Shear Walls | | S e a r s | | | | | | O u t | | | | |
| 2 | Seismic Work | Excavation / Rebar foundation / Concrete Foundation / Rebar Shear Walls / Concrete Shear Wall / Sanctum Marton Frames | | S h u t | | | | | | o f | | | | |
| 3 | HVAC | Ducting / Rooftop / Startup Testing | | D o w n | | | | | | S e a r s | | | | |
| 4 | Wrap up | Tie Ceiling / Clean Up | | | | | | | | | | | | |

# CITY OF LOS ANGELES
CALIFORNIA

BOARD OF
**BUILDING AND SAFETY
COMMISSIONERS**

—

VAN AMBATIELOS
PRESIDENT

E. FELICIA BRANNON
VICE PRESIDENT

JOSELYN GEAGA-ROSENTHAL
GEORGE HOVAGUIMIAN
JAVIER NUNEZ



ERIC GARCETTI
MAYOR

DEPARTMENT OF
**BUILDING AND SAFETY**
201 NORTH FIGUEROA STREET
LOS ANGELES, CA 90012

—

FRANK M. BUSH
GENERAL MANAGER
SUPERINTENDENT OF BUILDING

OSAMA YOUNAN, P.E.
EXECUTIVE OFFICER

SHOMOF,ERIC TRS ET AL I AND A SHOMOF TRUST LESSOR
206 W 6TH ST APT 100                                        1-1
LOS ANGELES CA 90014-1849                          00051

## ORDER TO COMPLY

**REFERENCE NO.:**        NDC-31
**BUILDING ID NO.:**      494670831382
**EFFECTIVE DATE:**       11/20/17

**COMPLIANCE DATES:**

CHECKLIST:            Within   3 Years from Effective Date
PLAN SUBMITTAL:       Within 10 Years from Effective Date
WORK COMPLETION: Within 25 Years from Effective Date

## SITE ADDRESS: 2650 E OLYMPIC BLVD

Based on an inspection of the site address referenced above and review of departmental records, the Los Angeles Department of Building and Safety (LADBS) has determined that the building(s) located on the above-referenced site fall within the scope of Division 95, Article I, Chapter IX of the Los Angeles Municipal Code (LAMC), LAMC § 91.9500 *et seq.*, titled Mandatory Earthquake Hazard Reduction in Existing Non-Ductile Concrete Buildings (hereinafter, the "Ordinance"), and is therefore required to meet the minimum seismic standards of the Ordinance.

Therefore, you are hereby ordered to comply with the following requirements as set forth in LAMC § 91.9504.2:

1. *Within three (3) years after service of the "Order to Comply" letter described in Section 91.9505 (effective date of this letter), submit on the form provided by the Department a completed checklist for the Department to review and approve.*

2. *Within ten (10) years after service of the "Order to Comply" letter (effective date of this letter), submit a detailed evaluation of the building documenting whether the building meets or exceeds the requirements set forth in Section 91.9508. The evaluation shall include one of the following:*
   a. *Proof that the building was previously retrofitted in conformity with the provisions in either Chapter 85 or Former Chapter 95 (Ordinance 171,260; No. 179,324; No. 179,592; and No. 182,850) of the Los Angeles Building Code; or*
   b. *Proof that the building was previously retrofitted in conformity with the engineering requirements of this division; or*

**Page 2 of 3**
**Effective Date:** 11/20/17
**2650 E OLYMPIC BLVD**

    c. *A report consisting of a structural analysis that shows the building meets the engineering requirements of this division; or*

    d. *A report consisting of a structural analysis and plans for the proposed structural alteration of the building to comply with the engineering requirements of this division; or*

    e. *Plans for demolition of the building.*

3. *Within twenty-five (25) years after service of the "Order to Comply" letter (effective date of this letter), complete all necessary demolition or retrofit work on the building.*

## NOTICE OF RECORDATION OF CERTIFICATE

A CERTIFICATE HAS BEEN FILED WITH THE OFFICE OF THE LOS ANGELES COUNTY RECORDER STATING THAT THE BUILDING(S) ON THE ABOVE-REFERENCED SITE FALL(S) WITHIN THE SCOPE OF THE NON-DUCTILE CONCRETE RETROFIT ORDINANCE 183893, AND THAT THE OWNER HAS BEEN ORDERED TO STRUCTURALLY ANALYZE AND STRUCTURALLY ALTER OR DEMOLISH THE BUILDING(S) PURSUANT TO LAMC § 91.9504.2.

## NON-COMPLIANCE FEE WARNING:

IT IS YOUR REPONSIBILITY TO COMPLY WITH THIS ORDER AND CONTACT THE NON-DUCTILE CONCRETE RETROFIT UNIT LISTED BELOW BEFORE A NON-COMPLIANCE FEE IS IMPOSED. Failure to comply with this order within 15 days from the Compliance Date, may result in the imposition of the fee noted below.

A proposed non-compliance fee in the amount of $660.00 may be imposed for failure to comply with this order within 15 days after the Compliance Date, or any compliance date thereafter, unless an appeal or request for slight modification is filed according to the time limits specified in the "APPEAL PROCEDURES" below.

**NOTE:** FAILURE TO PAY THE NON-COMPLIANCE FEE WITHIN 30 DAYS AFTER THE DATE OF MAILING OF AN INVOICE, MAY RESULT IN A LATE CHARGE OF TWO (2) TIMES THE NON-COMPLIANCE FEE PLUS A 50 PERCENT COLLECTION FEE FOR A TOTAL OF **$2,310.00**. Any person who fails to pay the non-compliance fee, late charge, and collection fee shall also pay interest. Interest shall be calculated at the rate of one percent per month.

## APPEAL PROCEDURES:

Within 60 days from the service date of this order, an owner may appeal the Department's initial determination that a building falls within the scope of the Ordinance. LAMC § 91.9505.5. Such an appeal shall be made in writing to the Board of Building and Safety Commissioners, and shall be accompanied by supporting documents (e.g., building permits for original construction, original construction plans, or proof that building complies with the minimum design standards of the Ordinance).

All other bases for appeals to this order, including appeal of any Department action that is taken incidental to this order, and requests for slight modification may be made pursuant to LAMC §§ *98.0403.1 - 98.0403.2.*

**NOTE:** Except for an appeal of the Department's initial determination that a building falls within the scope of the Ordinance, if an appeal or request for slight modification is not filed within 15 days of a compliance date, or extensions granted therefrom, the determination of the Department to impose and collect a noncompliance fee shall be final. LAMC § 98.0411(b).

**Page 3 of 3**
*Effective Date:* 11/20/17
**2650 E OLYMPIC BLVD**

## NOTICE OF TENANT RELOCATION ASSISTANCE:

Relocation assistance may be required if a tenant is evicted as a result of compliance with an order from a governmental agency. *See* LAMC §§ 151.09.A.11, 163.00-163.07. For more information regarding tenant relocation assistance, call the Los Angeles Housing and Community Investment Department (LAHCID) at 866-557-7368 or go to http://hcidla.lacity.org.

## PENALTY WARNING:

Any person who violates or causes or permits another person to violate any provision of the Los Angeles Municipal Code, including failure to comply with this order, shall be guilty of a misdemeanor, which is punishable by a fine of not more than $1,000.00 and/or six (6) months for each violation. LAMC §§ 11.00(m), 91.103.3.

If you have any questions or require additional information, please contact the Non-Ductile Concrete Retrofit Unit at (213) 978-4475 or email at **ladbs.nonductileconcrete@lacity.org**.

**NON-DUCTILE CONCRETE RETROFIT UNIT
201 N. FIGUEROA ST., SUITE 880
LOS ANGELES, CA 90012**



## NON-DUCTILE CONCRETE BUILDING CHECKLIST

**DEPARTMENT OF BUILDING AND SAFETY**

Order to Comply No./Reference No.: _____

Order to comply date: _____

## BUILDING DATA

Building Address: _____ Date: _____

Building Name: _____

Owner Name: _____

    Email: _____ Phone #: _____

Owner Address: _____

Engineer's Name: _____

    Email: _____ Phone #: _____

Engineer's Address: _____

Building Use: _____

Year Built: _____ Original Design building Code: _____

No. of Stories: _____ Length (ft): _____ Width (ft): _____

Levels below grade: _____ Story Height: _____ Total Height: _____

--------------------------------------------------------------------------------

## CONSTRUCTION DATA

Building designed to 1977 LABC (1976 UBC) or later building code: ☐ Yes ☐ No
(If yes, supporting documentation required to be provided with checklist)

Building elements supporting:   ☐ Structural Concrete Wall   ☐ Concrete Column
concrete floor or roof   ☐ Unreinforced Masonry Wall   ☐ Reinforced Masonry Wall
  ☐ Steel Columns   ☐ Steel Columns encased in Concrete
  ☐ Other _____

| | Structural Concrete | Other |
|---|---|---|
| Type of Floor/Roof: | ☐ | ( ) |
| Roof Materials/Framing: | ☐ | ( ) |
| Intermediate Floors/Framing: | ☐ | ( ) |
| Ground Floor: | ☐ | ( Slab on grade ) |

Please complete information on page-2 and -3.

--------------------------------------------------------------------------------

Seismic Evaluation and Retrofit of Existing Non-ductile concrete Buildings

Previous Building Retrofit:   Date: _____     City of Los Angeles Building Permit No.: _____

Standard Used: _____

Note: Substantiating documentation is required to be included with the checklist

------------------------------------------------------------

## LATERAL-FORCE-RESISTING SYSTEM

|                   |                        | Longitudinal (Long side of Building) | Transverse (Short side of Building) |
|-------------------|------------------------|:---:|:---:|
| Vertical Elements: | Shear Wall             | ☐ | ☐ |
|                   | Moment Resisting Frame  | ☐ | ☐ |
|                   | Other                  | _____ | _____ |

| | | | |
|---|---|---|---|
| Diaphragms: | Concrete | ☐ Yes   ☐ No | |
| | Other material | _____ | |

## IRREGULARITIES

Identify irregularities of building:

| Horizontal Irregularities | Vertical Irregularities |
|---|---|
| ☐ Possible Torsional | ☐ Possible Stiffness-Soft Story |
| ☐ Possible Extreme Torsional | ☐ Possible Stiffness-Extreme Soft Story |
| ☐ Reentrant Corner | ☐ Possible Weight (Mass) |
| ☐ Diaphragm Discontinuity | ☐ Possible Vertical Geometric |
| ☐ Out-of-Plane Offset | ☐ In-Plane Discontinuity in Vertical Lateral Force-Resisting element |
| ☐ Nonparallel System | ☐ Possible Discontinuity in Lateral Strength-Weak Story |
| | ☐ Possible Discontinuity in Lateral Strength-Extreme Weak Story |

------------------------------------------------------------

If the building is determined to be a **"Non-Ductile Concrete Building"**, within ten (10) years after service of the "order to comply", submit a detailed evaluation of the building documenting whether the building meets or exceeds the requirements set forth in Section 91.9508 of Ordinance No. 183,893. The evaluation shall include one of the following:

- (a) Proof that the building was previously retrofitted in conformity with the provisions in either Chapter 85 or former Chapter 95 (Ordinance No. 171,260; No. 179,324; No. 172,592; and No. *182,850) of the Los Angeles Building Code*; or
- (b) Proof that the building was previously retrofitted in conformity with the engineering requirements of this provision; or
- (c) A report consisting of a structural analysis that shows the building meets the engineering requirements of this provision; or

------------------------------------------------------------

(d) A report consisting of a structural analysis and detailed plans for the proposed structural alteration of the building to comply with the engineering requirements of this provision of Chapter-95 (Ordinance-183893); or

(e) Plans for demolition of the building.

## STATEMENT FROM ENGINEER OF RECORD

"I, _____ as the licensed Engineer/Architect for the completion of the
    (Print Name)
LADBS Non-Ductile Building Checklist, have performed the necessary investigation of the building, have reviewed the available construction documents of the building, and have determined that the subject building (IS) (IS NOT) within the scope of LABC Chapter 95, Mandatory Earthquake Hazard Reduction in Existing Non-Ductile Concrete Building (Ordinance No. 183893, effective Nov. 22, 2015).

Signature: _____      Seal:

Date: _____ / _____ / _____

What information is needed to exempt affected building from Non-Ductile Concrete Ordinance:

1) Copy of Building Permit showing application for a new building was submitted to LADBS after January 13, 1977.

2) Copy of historical building plans showing building construction does not include concrete floors and/or roofs supported by concrete walls, concrete columns, or concrete frames with or without masonry infills or any combination thereof. Specific areas of the building construction will need to be verified by non-destructive testing or visual exposure and inspections made by LADBS to verify the building construction is consistent with the building plans. Within 3 years from the service date of the order to comply, a building permit application will need to be submitted to the structural plan check section along with all supporting documentations to verify information provided.

3) Where historical building plans are not available, schematic diagrams showing materials of construction may be used in lieu of historical building plans.

**PURPOSE:** The purpose of this form is to confirm that this building is within the scope of the ordinance.

| DEPARTMENT USE ONLY | |
|---|---|
| **REVIEWED BY:** | **RECEIVED DATE:** _____ / _____ / _____ |



## nitions

### ete Building:

having concrete floors
with or without beams,
te walls and/or concrete
ncrete frames with or
ills, or any combination
it to a permit application
at was submitted before

building by altering or
ments to mitigate the
tisting buildings.



## What is PACE (Property Assessed Clean Energy)?

PACE allows for commercial and residential property owners to obtain financing for seismic retrofit improvements in addition to energy efficiency, water conservation, and renewable energy improvements.

Property owners participating in PACE receive financing through the PACE provider and repay the investment as an assessment added to the property tax bill.

## How does PACE work?

To schedule a one-on-one meeting or to speak with someone to learn more about your options, call (877)785-2237 or email info@lapace.org.

http://lapace.org

## Retrofitting Resources

**LADBS Non-Ductile Concrete Retrofit Program:**

http://ladbs.org/non-ductile

**Ordinances:**
Non-Ductile Concrete Retrofit Ordinance eff. 11/22/15 Ord. 183893:

http://clkrep.lacity.org/onlinedocs/2014/14-1697-S1_ord_183893_11-22-15.pdf
Substantial Structural Damage Ordinance eff. 5/11/16 Ord. 184169:

http://clkrep.lacity.org/onlinedocs/2014/14-1697_ord_184169_5-11-16.pdf

**Structural Engineers Association of Southern California (SEAOSC) Find an Engineer:**

http://www.seaosc.org/find-an-engineer

For additional information, please contact:



**DEPARTMENT OF BUILDING AND SAFETY**

## Non-Ductile Concrete Retrofit Unit
201 N. Figueroa St., Suite 880
Phone: (213)978-4475
Email: ladbs.nonductileconcrete@lacity.org

Office Hours:
7:30 am – 4:30 pm M, T, Th, F
9:00 am – 4:30 pm W
http://ladbs.org/non-ductile

For Tenant Habitability Plan and Cost Recovery Guide, contact the Housing and Community Investment Department (HCIDLA):



## Tenant Habitability Program Unit
(213) 252-1464
hcidla.code.seismic@lacity.org
http://hcidla.lacity.org/tenant-habitability-program

## Cost Recovery Applications & RSO Information
(866) 557-RENT (7368)
hcidla.rso@lacity.org
http://hcidla.lacity.org



# Los Ar
# Non-D
# Conc
# Retr
# Prog

**Property Ow**



DEPARTMENT OF BUI

## t Program

### am about?

program is to reduce the
s of life that may result
f earthquakes on non-
buildings. Non-ductile
e a major contributor to
around the world. In
structed to building code
n the code improvements
ular risk for collapse and
ant life safety hazards.
d concrete buildings are
mited capacity to absorb
ground shaking beyond
c range, causing the
ose and mortality for
gram provides a guide for
d minimum standards to
ance of these buildings.

### affected?

ned that your building
g criteria:

crete floors and/or roofs,
ithout beams, supported
valls and/or concrete
concrete frames with or
ry infills, or any
of; and,

a permit application for
at was submitted to the
e January 13, 1977.
am does not apply to
dwellings or detached

### Services

Non-Ductile Concrete
http://ladbs.org/non-
information:
uestions
Concrete Building

---

### What do I need to do first?

The property owner must hire an engineer
licensed by the State of California to:

• Evaluate the building, complete the LADBS
"Non-Ductile Concrete Building Checklist", and
submit it with the supporting documents
required by the checklist to LADBS Non-
Ductile Concrete Retrofit Unit within three
years from the date of the "Order to Comply"
letter.

### What do I do next?

Within 10 years from the date of the "Order to
Comply" letter, submit proof of previous retrofit in
conformance with Chapter 85 or former 95 of the
Los Angeles Building Code, a structural analysis
showing compliance with the retrofit ordinance,
structural analysis and plans to retrofit, or plans
to demolish the subject building(s) to the LADBS.
Plans and calculations will be checked for
compliance with the Non-Ductile Concrete Retrofit
Ordinance. LADBS will provide guidance for all
necessary steps to obtain the retrofit permit,
which includes obtaining clearances from
pertinent agencies.

The property owner must notify the residential
tenants of the building in writing per HCIDLA
regulations prior to issuance of the building
permit for the building retrofit.

### What do I do after a permit is issued?

Begin construction and request inspections at the
required phases of construction at: http://ladbs.org/

### How do I find ...

**An Engineer?** Please visit the State of
California's Board for Professional Engineers, Land
Surveyors, and Geologists for information
regarding licensed engineers: http://bpelsg.ca.gov
**An Architect?** Please visit the California
Architects Board for information regarding
licensed architects: http://cab.ca.gov
**A Contractor?** Please visit the Contractors State
License Board for information regarding hiring a
contractor and to verify if a contractor is licensed
and insured: http://cslb.ca.gov

---

### How soon do I have to comply?

**3 years**
from the date of the Order to Comply

Submit completed LADBS Checklist along with
the supporting documents required by the
checklist.



**10 years**
from the date of the Order to Comply

Submit:
♦ Proof of previous retrofit, or
♦ Structural analysis and detailed plans
showing full compliance with the
retrofit ordinance, or
♦ Plans to retrofit, or
♦ Plans to demolish.



**25 years**
from the date of the Order to Comply

Complete construction and
obtain Certificate of Compliance.

### Submittal Package

**What should I submit to LADBS?**
The documents required for submittal are:
• Structural analysis/calculation package
• Architectural plans
• Structural plans and construction details
For more details, see the LADBS Information
Bulletin for Submittal Requirements.

---

## Appeal

### What should I do if
is exempt from the

The owner of the buil
60 days of the service
Comply" letter by subm
to the Board of
Commissioners. The
supporting documents
permits for original con
permit and final inspe
prior retrofit that com
Ductile Concrete Retrofit

### What information do
to show my building
the Non-Ductile
Ordinance?

The following documents

• Provide building pe
(new) building sl
submitted to LADBS
13, 1977, or
• Provide proof tha
previously retrofitte
with all the provisio
Chapter 85 or
(Ordinance No. 17
No. 172,592; and No
• Provide a copy of
plans showing buildi
of concrete construc

Specific areas of the bui
need to be verified by n
or visual exposure and
approved by LADBS to
construction is consisten

The provided constructio
and other supporting do
submitted to LADBS and
be required to rev
documentation.



Izek Shomof <izek@shomofgroup.com>

## Sears Store time line
3 messages

**Jonathan Shomof** <jon@shomofgroup.com>                                      Fri, Sep 28, 2018 at 3:36 PM
To: svelkei@bautelaw.com, abaghdishyan@bautelaw.com, Izek Shomof <Izek@shomofgroup.com>, Jimmy Shomof <jimmy@shomofgroup.com>, Leo Pustilnikov <leo@slhinvestments.com>, Marc Cohen <marc@clgapc.com>, Diony Rebuta <diony@shomofgroup.com>, Ericson Alviz <ericson@citifymgt.com>

Hello Steve,

Hope all is well with you
Please include Damian and I believe it was Nikko
Attached is what we spoke about last week.
Please let me know if you have any questions

Thanks

Jonathan  Shomof

Δ π **EXHIBIT** _12_
Deponent _I. Shomof_
Date _6/14/19_ Rptr _DJR_
WWW.DEPOBOOK.COM

### shomof
### group
shomofgroup.com
724 South Spring St Suite 802
Los Angeles, CA 90014
Office: 213-378-1006
Cell: 310-780-7434

📄 **Sears Letter.pdf**
5693K

**Steven A. Velkei** <svelkei@bautelaw.com>                                   Fri, Sep 28, 2018 at 5:59 PM
To: Jonathan Shomof <jon@shomofgroup.com>, Artyom Baghdishyan <abaghdishyan@bautelaw.com>, Izek Shomof <Izek@shomofgroup.com>, Jimmy Shomof <jimmy@shomofgroup.com>, Leo Pustilnikov <leo@slhinvestments.com>, Marc Cohen <marc@clgapc.com>, Diony Rebuta <diony@shomofgroup.com>, Ericson Alviz <ericson@citifymgt.com>

This shall confirm receipt of your letter. I will circulate to Sears.

To be clear, this letter does not appear to be offered in the spirit in which we discussed it last week. It comes across more as a direction from you as opposed to offering a proposed timeline and outlining some issues that remain to be negotiated before the process begins.

The history of this project is riddled with errors that have put our employees and patrons at risk and breached negotiated protocols, not to mention broken promises about timing. Just two months ago, you notified us that you would likely not pursue the project.

Before anything proceeds, we need the fire issue resolved and we then need to come together to agree upon a process to avoid business disruption to Sears and risk to our employees and patrons while the construction is pending. That is a fundamental right under the lease. If we have to go to court to enforce those rights, we will.

Focusing on the fire issue, I do not share your collective optimism that this issue will get resolved quickly. The fire detection system in the rest of the building is not only inactive, but has been dismantled by your crews. I am assuming that affects 1.7 million square feet and puts the store at risk. It has to be resolved first and foremost.

We do share a desire for this project to proceed both for the store and the community. We have expressed that to you. We also understand time is money. But, the project has to be done right and without risk of harm. That requires SK-006801

collaboration.

I have offered to meet your lawyer so we can start to work through these issues and I renew this offer.

Steve

Sent from my Verizon, Samsung Galaxy smartphone
[Quoted text hidden]

---

**Jonathan Shomof** <jon@shomofgroup.com>                                    Mon, Oct 1, 2018 at 1:36 PM
To: Izek Shomof <Izek@shomofgroup.com>, Jimmy Shomof <jimmy@shomofgroup.com>

Just wanted to confirm you saw this email
let me know if you want me to respond?

Jonathan  Shomof

shomof
group
shomofgroup.com
724 South Spring St Suite 802
Los Angeles, CA 90014
Office: 213-378-1006
Cell: 310-780-7434

[Quoted text hidden]

SK-006802