Eric R. Reimer (admitted *pro hac vice*)
Thomas R. Kreller (admitted *pro hac vice*)
Robert J. Liubicic
MILBANK LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000

Brian Kinney
MILBANK LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

*Counsel to Cyrus Capital Partners, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| SEARS HOLDINGS CORPORATION, *et al.*, | Case No. 18-23538 (RDD) |
| Debtors. | (Jointly Administered) |

**MEMORANDUM OF LAW IN SUPPORT OF REQUEST OF CYRUS CAPITAL PARTNERS, L.P. TO DETERMINE THE AMOUNT OF SECURED CLAIMS UNDER SECTION 506(a) AND SECTION 507(b) ADMINISTRATIVE CLAIMS PURSUANT TO BANKRUPTCY RULE 3012 AND IN OPPOSITION TO DEBTORS' REQUEST TO SURCHARGE COLLATERAL PURSUANT TO SECTION 506(c)**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Cyrus Capital Partners, L.P. ("Cyrus") respectfully hereby submits this Memorandum of Law (this "Memorandum") (A) in Support of the Request (the "Request") under Bankruptcy Rule 3012 to determine the amount of its (x) secured claim under section 506 (a) of the

Bankruptcy Code, and (y) administrative claim under section 507(b) of the Bankruptcy Code and (B) in opposition to the Debtors' Motion to surcharge Cyrus' collateral pursuant to section 506(c) of the Bankruptcy Code. Cyrus files this individual Memorandum of Law and its Request in addition to and in conjunction with the *Common Memorandum Of Law On Behalf Of The Second Lien Parties In Support Of Their Requests To Determine The Amount Of Their Secured Claims Under Section 506(A) And Their Section 507(B) Administrative Claims Pursuant To Bankruptcy Rule 3012; And In Opposition To Debtors' Motion To Surcharge Their Collateral Pursuant To Section 506(C)* (the "Common Brief"[1]) in connection with the Rule 3012 Motion and the Proposed Stipulation and Order Concerning the Resolution of Certain Section 507(b) Claims. In support of its Request, Cyrus respectfully represents as follows:

## Preliminary Statement

1.      It is beyond serious debate that the Prepetition Second Lien Credit Parties' interest in the Prepetition Second Lien Collateral has been subject to significant diminution during the pendency of these cases. As demonstrated herein, in the Request, the Expert Report of Marti P. Murray (the "Murray Report") and the Common Brief, on a conservative basis utilizing what essentially is a net orderly liquidation value ("NOLV") analysis, the Prepetition Second Lien Credit Parties' interest has seen diminution of at least $491.6 million and Cyrus' interest in the Prepetition Second Lien Collateral has seen diminution of at least $78.9. Those conservative amounts are almost certainly subject to material upward adjustment (potentially to the full remaining portion of the Cyrus' Prepetition Second Lien Claim) based upon a variety of factors further discussed herein and in the Common Brief.

2.      It is no surprise that the Prepetition Second Lien Collateral suffered significant diminution during these cases. First, fresh retail inventory right before Black Friday is almost axiomatically more valuable than any remaining portion of that inventory weeks into the New Year. Second, and more detrimental to the value of the Prepetition Second Lien Collateral, the

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Common Brief.

2

Debtors funded these cases in large part by selling Prepetition Second Lien Collateral for months following the Petition Date and using the proceeds (also Prepetition Second Lien Collateral) to, in significant part, support portions of the Debtors' businesses and assets wholly unrelated to the Prepetition Second Lien Collateral, pay administrative expenses that rank junior to the Section 507(b) claims of the Prepetition Second Lien Credit Parties, and pursue numerous workstreams having nothing to do with preserving the value of the Prepetition Second Lien Collateral. The Debtors' argument that no such diminution occurred flies directly in the face of both common sense and the straightforward facts of how these cases were conducted.

3. Similarly detached from the simple realities of these cases is the Debtors' argument that any diminution in value that might have occurred should be entirely offset by section 506(c) surcharges against the Prepetition Second Lien Collateral. The Debtors cannot credibly argue that their actions in these case – and the expenses they incurred in pursuing those actions - were driven by any desire to benefit Cyrus, the other Prepetition Second Lien Credit Parties, or their collateral. These cases and the Debtors' energies were never focused on preserving the value of the inventory and accounts receivable that comprised the bulk of the Prepetition Second Lien Collateral. Rather, from the outset, the Debtors followed the very roadmap that they, their advisors, and their Restructuring Subcommittee laid out on the very first day of these cases: liquidate unprofitable stores, sell profitable stores as a going concern, liquidate remaining non-core assets and investigate and preserve potential litigation claims against ESL and others as an additional source of recoveries for the estates.[2]

4. And from the extensive record of the Debtors' "Global Sale Process, the Debtors clearly believe they satisfied their goals, maximizing the value of the estates by consummating a going concern transaction valued at $5.2 billion, generating hundreds of millions of dollars in recoveries and other benefits for a vast array of their constituents having no connection to the Prepetition Second Lien Credit Parties, and preserving litigation claims against ESL and others

---

[2] *See Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules For Southern District of New York* [Docket No. 3] (the "First Day Declaration") at ¶¶ 15-16.

that the Debtors tout as having the potential to generate many more hundreds of millions of dollars for those creditors who might not otherwise have benefited from the sale transaction itself.

5.  In a perverse turn of events, however, the Debtors now choose to downplay all of their successes and instead argue that the primary beneficiaries of their efforts were the Prepetition Second Lien Credit Parties. This about-face is directly contradicted by the entire record in these cases, but most pointedly by those portions of the sale hearing where the Debtors' advocated vigorously – and successfully – to the Court the many and widespread benefits the Debtors were able to achieve for their estates generally – and not just for the Prepetition Second Lien Credit Parties – through there successful achievement of the going concern sale.

6.  It is of no moment to the present dispute that the Debtors' goal to achieve a going concern sale in many respects aligned with the efforts of ESL to acquire the Debtors' businesses and assets as a going concern. ESL wears many hats in these cases, but the only one relevant to the current inquiry is its status as a Prepetition Second Lien Credit Party. And even if ESL's insider status somehow were at play in the Rule 3012 Motion, it is clearly not relevant to the treatment of Cyrus – a non-insider, third party minority Prepetition Second Lien Credit Party – or any other third-party Prepetition Second Lien Credit Party. Cyrus was not a willing participant in the credit bid of a portion of the Prepetition Second Lien Debt that was directed by ESL as the majority holder of those claims, nor was Cyrus otherwise involved in ESL's bid for the Debtors' assets in any capacity other than as a financing source via its agreement to roll over certain debt from the Debtors to ESL's acquisition vehicle in a move that greatly benefited the estates by removing hundreds of millions of dollars of obligations from the estate (including the $350 million junior DIP financing that Cyrus had extended to the Debtors). The Debtors simply cannot assert with a straight face that they were somehow acting (or incurring expenses) in a manner that was primarily or directly for the benefit of Cyrus such that Section 506(c) surcharges may be appropriate.

7. In short, Cyrus and the other Prepetition Second Lien Credit Parties suffered a severe diminution in the value of their interests in the Prepetition Second Lien Collateral as the Debtors pursued their global, going concern sale process to fruition for the benefit of a wide variety of creditor and other constituents. That diminution in value was to be protected by the granting of replacement liens and section 507(b) superpriority administrative claims, not simply ignored by the Debtors when they got to the end of their script. The Debtors' argument to the contrary is based upon frivolous arguments that the Debtors ran the process primarily for the benefit of the Prepetition Second Lien Credit Parties, notwithstanding the Debtors' statements – and the Court's findings - directly to the contrary only months ago at the sale hearing.

## Argument

**A.     Cyrus and the Other Prepetition Second Lien Credit Parties Are Entitled To Substantial 507 (b) Claims As a Result of the Diminution In Value of Their Interests in The Prepetition Collateral From The Petition Date Forward**

8. The calculation of a Section 507(b) diminution in value claim requires an assessment of the value the of the secured creditors' interest in its collateral on both ends of the measurement period. As set forth more fully in the Common Brief, the valuation methodology used by the Debtors in the Estimation Motion utterly fails to comply with applicable case law interpreting section 507(b). As acknowledged by the Debtors, the applicable case law requires the collateral be valued "in light of the purpose of the valuation and of the proposed disposition or use of such property" *In re Residential Capital, LLC*, 501 B.R. 549, 592 (Bankr. S.D.N.Y. 2013) (quoting 11 USC 506(a)(1)). As set forth in the First Day Declaration, the Debtors' proposed use of the Prepetition Second Lien Collateral, which consisted largely of the Debtors' inventory, was to (i) liquidate the inventory in going out of business sales in the stores it was closing, (ii) sell the inventory in the ordinary course in the stores it was attempting to sell and (iii) sell the remaining inventory in the stores it was attempting to sell either as part of a going concern sale or as going out of business liquidations if no going concern buyer could be found.3

---

[3] *See* First Day Declaration at ¶¶15-16. *See also* November 15, 2018 Hr'g Tr. at 35:19-36:1 (Mr. Schrock noting for the Court that the bidding procedures would allow a pivot to a "GOB" process).

5

9. Given that the Prepetition Second Lien Collateral was proposed to be used in several different ways from the Petition Date, several different valuation approaches may be appropriate. At the low end, one could value the collateral on the basis of a net orderly liquidation, a methodology used by the Debtors' Prepetition ABL Lenders (as defined in the Final DIP Order) regularly both before and after the Petition Date to determine the orderly liquidation value of the inventory **net** of the expected costs and expenses expected to be incurred in connection with such liquidation.[4] At the high end, one could value the inventory based on the historic percentage of retail price that the Debtors obtained for such merchandise in the ordinary course of business through its "go forward" stores.

10. The valuation set forth in the Murray Report represents a conservative estimate of the NOLV of the Prepetition Second Lien Collateral in the Debtors' hands on the Petition Date, which in turn provides the foundation for a calculation of the minimum amount of diminution in value that the Prepetition Second Lien Secured Parties suffered in their interests in that collateral over the life of the cases. Cyrus submits that the conclusions in the Murray Report establish the minimum amount of Section 507(b) claims that should be allowed by effectively valuing the Petition Date collateral at a NOLV, with the recognition that such minimum amounts are almost certainly entitled to potentially significant upward adjustments by the Court to take into account, among other things, the going concern nature of the sales of inventory at "go-forward" stores; the fact that there is indisputable, contemporaneous evidence that the Debtors and the UCC themselves actually used inventory valuations that were higher than those utilized in the Murray Report when considering alternatives during the sale process; the fact that the Debtors' historical experience when conducting GOB sales in many cases yielded higher percentage recoveries on inventory than the percentages applied in the Murray Report; and the fact that, as of the Petition Date, there were various categories of inventory that were not "eligible inventory" for borrowing base purposes but that nonetheless had material, though not readily quantifiable, value as

---

[4] *See* Third Amended and Restated Credit Agreement Definitions of "Borrowing Base", "Net Orderly Liquidation Value" and "Net Recovery Rate." Sears Holdings Corp., Quarterly Report (Form 10-Q) Ex. 10.2 at 6, 26 (Aug. 20, 2015).

additional collateral. In other words, the Murray Report establishes a solid "floor" for the Petition Date value of the Prepetition Second Lien Collateral, but substantial evidence will also be presented at trial to justify significant upward adjustments to that conservative floor calculation.

11. Specifically, the Murray Report calculates that the Prepetition Second Lien Collateral had a value of no less than $2,457.1 million as of the Petition Date and that it suffered a diminution of value of no less than $ 491.6 million, of which $78.9 million is attributable to Cyrus' Second Lien Claim.

12. If one were to use a valuation methodology based partially (or entirely) on a higher NOLV as a percentage of the cost of inventory (as both the Debtors and the UCC did when analyzing sale alternatives and which would also be consistent with some of the Debtors' historical results in GOB sales), a higher sales price based upon the Debtors' historical results on the sales of inventory in its "go forward" stores - the Petition Date value of the Collateral would increase materially – and with it the magnitude of the Section 507(b) claims of the Prepetition Second Lien Secured Parties, including Cyrus

13. For example, on November 23, the Debtors filed a declaration of Robert A. Riecker in which he stated that around the Petition Date, the collateral securing the ABL Facility was "valued at $2.8 billion, of which the [NOLV] of the Debtors' inventory was valued at about $2.74 billion." *Declaration of Robert A. Riecker* [Docket No. 866] at ¶8. A $2.74 billion NOLV valuation of the inventory on the Petition Date as the starting point would have resulted in the Prepetition Second Lien Claims held by Cyrus being oversecured as of such date and would yield a 507(b) claim for Cyrus equal to its total Prepetition Second Lien Claim less its ratable portion of the credit bid, or $101 million.

14. The Murray Report uses a NOLV calculated at 88.7% of inventory cost to value inventory. But the record in these cases is replete with other examples of parties using higher percentages of inventory cost. For example, the Debtors' Chief Restructuring Officer assumed, in the context of company-wide wind-down, that the Debtors would realize 90% of the NOLV of

7

inventory sold through GOB sales. *Declaration of Moshin Y. Meghji* [Docket No. 2336] at ¶19. Additionally, when the Debtors' Restructuring Committee evaluated liquidator advisory bids, it received a summary form its advisors that utilized a range of NOLVs from 89.4% to 91.7. See Joint Ex. 101, Minutes of a Meeting of the Restructuring Committee of the Board of Directors of Sears Holdings Corp., Jan. 1, 2019, Bates No. SEARS_UCC00413726; Advisory Bid Comparison, Jan. 1, 2019, Bates No. RS_UCC00002828. This evidence demonstrates the conservative nature of the Murray Report and suggests that upward adjustments could easily be warranted.

**B.      The Debtors' Arguments to Surcharge the Prepetition Second Lien Collateral Contradict the Very Evidence the Debtors Used to Persuade the Court to Approve the Going Concern Sale**

15.     The Debtors' Estimation Motion fails to establish a basis to surcharge the Second Lien Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code. As set forth in the Common Brief, surcharging collateral requires the Debtors to prove that the expense was necessary, reasonable, and expended primarily for the benefit of the secured creditor who directly benefited from the expenditure. *See*, *e.g.*, *In re Flagstaff Foodservice Corp.*, 762 F.2d 10, 12 (2d Cir. 1985). The Debtors cannot meet this burden.

16.     As an initial matter, neither the Estimation Motion nor the Griffith Declaration provides a basis to determine the specific expenses the Debtors assert are surchargeable, instead setting forth only broad categories with no back-up whatsoever. As such there is no way to evaluate whether such expense benefitted specific collateral or if it benefitted the Debtors' estates and other creditors. Indeed, the Second Circuit has noted that the preservation of going concern value through an attempt to reorganize is insufficient to warrant a recovery under section 506(c). *In re Flagstaff Food,* 762 F.2d at 12.

17.     While the Estimation Motion states that "there can be no reasonable dispute that each of the Section 506(c) surcharges was incurred for the purpose of preserving the Collateral", the evidence, including the Debtors' own repeated statements and testimonies prior to and at the sale hearing unequivocally demonstrates the contrary – that the asserted costs incurred by the

8

Debtors were in pursuit of: (a) a going concern transaction that involved the sale of substantially *all* of the Debtors' assets (not just the Prepetition Second Lien Collateral) as well as the assumption or other satisfaction of a wide variety of the Debtors' prepetition and postpetition obligations wholly unrelated to the Prepetition Second Lien Collateral; and (b) a parallel litigation track designed to identify potential litigation recoveries against ESL, again wholly unrelated to the Prepetition Second Lien Collateral.[5]

18.     The Debtors have also failed to establish that the proposed section 506(c) surcharge is even remotely reasonable. On its face, the notion that the Debtors incurred nearly $1.5 billion in costs to preserve inventory and accounts receivable valued somewhere between $2.0 - $3.0 billion is absurd – yet this is what the Debtors now ask the Court to believe.

---

[5] *See Debtors' Omnibus Reply in Support of Motion for Approval of Global Bidding Procedures* [Docket No. 683] at ¶¶6, 7, 11, 14 (winding down at the start of the case would be "a glaring error that could destroy hundreds of millions, and potentially billions, of dollars for these estates"; "the Debtors believe that there is significant going concern value – enterprise wide and within several business units – that may be realized through an efficient sale process and is worth pursuing"; approval of bidding procedures "provides the flexibility and optionality needed for the Debtors to examine multiple paths forward and proceed down the one that, in their business judgment, most likely will create the most value for the most stakeholders"; "the Debtors believe that pursuing GOB sales for all the Debtors' stores now would substantially reduce recoveries on an overall basis to their estates and creditors."); *Declaration of William L. Transier [Docket No. 2341] at ¶34* ("compared to a wind-down, a going-concern sale contemplated by the Revised January 15 ESL Bid would: (i) present the opportunity to preserve tens of thousands of jobs; (ii) preserve the ongoing business relationship with a multitude of vendors; (iii) provide greater recovery for unsecured creditors due to the assumption of certain cure amounts, 503(b)(9) claims, and protection agreements; and (iv) provide significant additional value in excess of a wind-down to secured creditors, plus potentially substantial recoveries from litigation claims against ESL identified by the Restructuring Subcommittee's investigation."); and *Declaration of Alan J. Carr* [Docket No. 2321] at ¶¶31 and 34 (Specifically, as compared to a liquidation, the ESL going-concern bid provides the following benefits to the Debtors' estates and creditors: (a) Non-ESL third party secured creditors will receive an additional $152 million, as illustrated by the recoveries of Cyrus ($113 million) and other third party creditors ($39 million) in the chart below [chart omitted]; (b) Prepetition unsecured creditors will receive an additional $534 million ($453 million for protection agreement liability, $13 million for gift card liability, and $68 million for Shop Your Way liability). This excludes additional recoveries on account of cure claims [chart omitted]; (c) ESL will pay for material administrative claims of the Debtors' estates, and the Debtors will incur materially less administrative claims under the ESL sale versus a liquidation (an aggregate $621 million benefit to the Debtors' estates) as illustrated in the chart below [chart omitted]; (d) As a result of the terms of the Limited Release, nearly all proceeds of the Debtors' preserved litigation claims will inure to the benefit of non-insider creditors; (e) Debtors will receive an additional $35 million in exchange for the Limited Release; and (f) NewCo will extend offers of employment to at least 45,000 of the Debtors' employees."; "The Subcommittee determined that the value of the Debtors' estates will be maximized through a going concern transaction and the accompanying Limited Release."

9

19. Notably, the Debtors' own Chief Restructuring Officer had estimated a 4% surcharge on the eve of the credit bid sale. *Declaration of Moshin Y. Meghji* [Docket No. 2336] ¶¶ 13 and 16. There is no evidence as to why a surcharge should now be imposed that greatly exceeds the estimate made at the time of the sale transaction. Furthermore, there is no explanation of why a valuation which is already, by its very nature, discounted to reflect the costs of liquidating such collateral should be subject to a further surcharge under section 506(c).[6]

20. Additionally, although the Debtors assert that "ESL received what it wanted" in the credit bid sale, that is irrelevant to the imposition of a section 506(c) surcharge generally and is completely irrelevant to the applicability of a section 506(c) surcharge to Prepetition Second Lien Secured Parties other than ESL. The Debtors have failed to produce any evidence that Cyrus is an insider or is any way connected to ESL (other than by having extended credit to or purchasing the debt of the Debtors, receiving a sliver of equity in Transform due to the involuntary credit bid, and extending credit to Transform in a manner that relieved the Debtors of hundreds of millions of dollars of secured debt). And no such evidence exists.

21. Indeed, as the Debtors' own Estimation Motion makes clear, they negotiated the going concern sale, including the second lien credit bid, with Transform, not with Cyrus or any of the other Prepetition Second Lien Secured Parties. Estimation Motion at ¶53. And that is consistent with what occurred: ESL negotiated the credit bid sale and instructed Wilmington Trust, as Second Lien Collateral Agent, to credit bid all of the Second Lien Claims, effectively dragging the minority Prepetition Second Lien Credit Parties along, as it was entitled to do under the applicable credit documents.

---

[6] *See, e.g.,* 1-13 Mitchell Cohen and Kenneth S. Frieze *Contested Valuation in Corporate Bankruptcy* ¶*13.01*(2001) (defining NOLV as "the estimated gross amount, expressed in monetary value, that typically could be realized from a liquidation sale given a reasonable period of time to find a purchaser (or purchasers)" less "the costs of liquidation [including] the direct liquidation costs such as selling commissions, marketing, advertising, sale site preparation, removal supervision, accounting, travel, labor expenses, etc., and the costs of occupancy such as rent or mortgage payments, real estate taxes, utilities, insurance, security services, building maintenance personnel, etc., and reasonable fees or profits for the liquidating agent.")

**C.        To the Extent the Debtors have not Consumed or Dissipated All of the Collateral, Cyrus and the Other Prepetition Second Lien Secured Parties Maintain a Secured Claim In Addition to Their Section 507(b) Claims.**

22.    The 507(b) claim analyzed above assumes that the Debtors will (as of the effective date of a plan) be holding no Prepetition Second Lien Collateral, proceeds thereof, or collateral subject to the Prepetition Second Lien Adequate Protection Liens (as defined in Final DIP Order).  As such, Cyrus assumes that there would be no remaining secured portion of its claim.  If there were any such remaining collateral, it would secure the Prepetition Second Lien Secured Claims giving Cyrus a secured claim for its ratable portion thereof and reducing its 507(b) claim on a dollar-for-dollar basis.

WHEREFORE, Cyrus respectfully requests that the Court (i) grant Cyrus' Request; (ii) disallow any surcharge of the Prepetition Second Lien Collateral (or 507(b) claim) under section 506(c) of the Bankruptcy Code; and (iii) grant such other relief as is just and proper.

Dated: June 18, 2019
       New York, New York

**MILBANK LLP**

By:   /s/ Thomas R. Kreller

Eric R. Reimer (admitted *pro hac vice*)
Thomas R. Kreller (admitted *pro hac vice*)
Robert J. Liubicic
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000

Brian Kinney
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

*Counsel to Cyrus Capital Partners, L.P.*