009143

PORT ARTHUR, TEXAS
CENTRAL MALL

SEARS, ROEBUCK AND CO.
DEPARTMENT STORE SHOPPING CENTER
LEASE AGREEMENT

Draft:   July 10, 1980
Rev:   August 22, 1980
Rev:   September 15, 1980
Rev:   October 10, 1980
Rev:   November 4, 1980
Rev:   November 13, 1980

009144

PORT ARTHUR, TEXAS
CENTRAL MALL

SEARS, ROEBUCK AND CO.
DEPARTMENT STORE SHOPPING CENTER
LEASE AGREEMENT

## CONTENTS

Parties  /  1
Definitions  /  2

   Building  /  2
   Building Perimeter Sidewalk  /  2
   Common Area  /  2
   Common Utility Facilities  /  4
   Department Store  /  4
   DEPARTMENT STORE Tracts  /  4
   Design Criteria  /  4
   Enclosed Mall  /  5
   Floor Area  /  5
   Gross Leasable Area  /  7
   Improvements  /  8
   Mall Tenant  /  8
   Occupant  /  8
   Outdoor Selling Area  /  8
   Parking Area  /  8
   Parking Space  /  9
   Party  /  9
   Permissible Building Area  /  9
   Permittee  /  9
   Plans and Specifications  /  9
   Plot Plan  /  10
   RESERVE Tracts  /  10
   Shopping Center  /  10
   Site Preparation Work  /  11
   TOTAL DEVELOPMENT Tract  /  11

      Shopping Center Tract
         LANDLORD Tract
         DEPARTMENT STORE Tract

         RESERVE Tract

009145

# CONTENTS

## PART ONE – Term and Rent

Article
1   Leased Premises   /   13
        Joint Use
        Reciprocal Easements
2   Delivery   /   14
3   Use   /   15
4   Title and Surveys   /   15
5   Quiet Enjoyment   /   16
6   LANDLORD Access   /   17
7   Term   /   18
8   Rent   /   22
9   Expansion   /   29
10  Abandonment or Holdover   /   29

## PART TWO – Construction

Article
11  Leased Premises   /   31
12  Shopping Center Improvements   /   38
13  Mortgage   /   45
14  Subordination   /   45
15  Future   /   46
16  Insurance   /   51
17  Liens   /   52
18  TENANT Purchase Option
        on LANDLORD Tract   /   53

## PART THREE – Operation

Article
19  Shopping Center Name   /   56
20  Publicity Releases   /   56
21  Tenant Selection   /   56
22  Merchants Association   /   58
23  Enclosed Mall   /   60
24  Common Area   /   63
25  Signs   /   66
26  Utilities   /   69
27  Taxes   /   69
28  Insurance   /   72
29  Maintenance   /   75
30  Leased Premises Destruction   /   81
31  Shopping Center Improvements
        Destruction   /   84
32  TENANT Right of Reimbursement   /   86
33  LANDLORD Operating Period   /   87
34  TENANT Operating Period   /   88

## PART FOUR – General

Article
35  Force Majeure   /   89
36  Eminent Domain   /   89
37  Default   /   92
38  Assignment   /   95
39  Indemnity   /   97
40  Arbitration   /   97

009146

## CONTENTS

PART FOUR - General (Cont'd)

Article
41  Miscellaneous  / 99
        Short Form
        Not Partners
        No Waiver
        Captions
        Governing Law
        Severable Provisions
        Modification
        Counterparts
        LANDLORD Liability
        Default
        Mortgagee Notice
        Estoppel Certificate
        No Public Dedication
        No Third Party Beneficiary
42  Notices  / 102
43  Exhibits  / 103
44  Successors  / 103

Execution Clause  / 104
Arbitration Clause  / 104


EXHIBIT A    Legal Descriptions

             TOTAL DEVELOPMENT Tract
               Shopping Center Tract
                 LANDLORD Tract
                 DEPARTMENT STORE Tract

             RESERVE Tract

EXHIBIT B    Plot Plan

EXHIBIT C    Plans and Specifications

EXHIBIT D    Parking Typical Spacing Layout

009147

SEARS, ROEBUCK AND CO.
DEPARTMENT STORE SHOPPING CENTER
LEASE AGREEMENT


THIS LEASE AGREEMENT dated as of the_____ day of
_____, 19___, by and between:

CENTRAL MALL,

a joint venture composed of Ed Warmack, George Warmack,
John Warmack, Lloyd Hayes, and Hayes, Inc. authorized to
do business in Texas, (hereinafter called "LANDLORD"),
and

SEARS, ROEBUCK AND CO.,

a New York corporation, authorized to do business in
Texas, (hereinafter called "TENANT"),


W I T N E S S E T H:


In consideration of Ten Dollars ($10.00) and
other good and valuable consideration and the mutual
covenants contained herein and intending to be legally
bound hereby, LANDLORD and TENANT hereby agree with each
other as follows:

009148

## Definitions

As used in this LEASE AGREEMENT, the following words and phrases, appearing substantially in the order in which each relates to the others, shall mean:

1   "Building" – all Improvements to and upon the TOTAL DEVELOPMENT Tract or the Shopping Center Tract, or any other component Tract thereof, excluding the Common Area, the Enclosed Mall, the Outdoor Selling Area, if any, between the exterior perimeter walls of Buildings and the Building Perimeter Sidewalk.

2   "Building Perimeter Sidewalk" – sidewalks adjoining either: (1) exterior perimeter walls of the Buildings situated upon the Shopping Center Tract, or (2) landscaping adjacent to the exterior perimeter walls of said Buildings, all as shown on the Plot Plan, "EXHIBIT B".

3   "Common Area" – certain improved portions of the Shopping Center Tract which are for the general use, convenience and benefit of all the Parties hereto (and their tenants, sub-tenants, customers, employees, concession-aires and other Permittees) and not Floor Area intended for the exclusive use of an Occupant (and its customers, concessionaires and other Permittees) including, but not limited to:

(1)   individual Parking Spaces for automo-biles of customers and employees of TENANT and other Occupants, including multi-level Parking Spaces, if any;

(2)   roadways, driveways, aisles, islands, private streets, entrances and exits to and from public roadways and streets to provide vehicular access including in such Parking Spaces;

(3)  sidewalks and walkways to provide pedes-
trian access included in such Parking
Spaces;

(4)  ramps, truckways, loading areas, deliv-
ery passages, truck tunnel and service
corridors connecting therewith;

(5)  landscaped and exterior planted areas
(except landscaping between the exter-
ior perimeter walls of Buildings and the
Building Perimeter Sidewalk;

(6)  curbs, lighting standards, paving, traf-
fic and directional signs and traffic
stripings and markings, as located upon
the Shopping Center Tract;

(7)  all Common Utility Facilities (not loca-
ted within any Building or the Enclosed
Mall, or without the Shopping Center
Tract) serving, or used by, more than
one Party hereto; and

(8)  outside courts and courtyards;

in the Shopping Center, all as shown on the
Plot Plan, "EXHIBIT B", but excluding:

(a)  any portions of the Shopping Center
Tract, which may, from time to time, be
occupied by any duly dedicated public
street or highway;

(b)  such portions of the Shopping Center
Tract, as may be, from time to time,
exclusively appropriated for use as
permanent or temporary Outdoor Selling
Area, as indicated on "EXHIBIT B";

(c)  such portions of the Shopping Center as
shall comprise the areas and spaces in
the Enclosed Mall, the LANDLORD Building
and in TENANT Building; and

> (d)   landscaping between the exterior perim-
> eter walls of Buildings and the Building
> Perimeter Sidewalk.

4   "Common Utility Facilities" - storm drainage
systems, gas pipe lines, water pipe lines,
fire protection systems, underground power
and telephone cables, and similar utilities
serving the Shopping Center Tract and located
either within the Common Area or without the
Shopping Center Tract; but extending to the
Building Perimeter Sidewalk (but not closer
than five (5) feet to Building exterior
walls) on the Tract of each Party.

5   "Department Store" - any Occupant occupying
not less than 80,000 square feet of Gross
Leasable Area; containing a number of
departments for the sale of hard and soft
goods and miscellaneous merchandise and
services and carrying a general line of
apparel, such as suits, coats, dresses and
other garments, and small appliances and
housewares, whether or not such lines (or
full lines thereof) as household furniture,
floor coverings and major appliances are also
carried.

6   "DEPARTMENT STORE Tracts" - land belonging
to or being leased by each DEPARTMENT STORE
or Department Stores; being the Shopping
Center Tract less the DEVELOPER Tract; and
being fully described by metes and bounds on
"EXHIBIT A", and as shown on the Plot Plan,
"EXHIBIT B".

7   "Design Criteria" - drawings or renderings
(including front and side elevations and
perspectives, both exterior and interior of
the Common Area, the Enclosed Mall, the
Buildings, the Outdoor Selling Area, if any,
and the landscaping, if any, between the ex-
terior perimeter wall of Buildings, and the
Building Perimeter Sidewalk) that show

the general appearance to be anticipated in certain Improvements to be constructed.

8    "Enclosed Mall" - (sometimes herein called "Mall" when the context requires "Mall" to mean "Enclosed Mall") the land being a portion of the LANDLORD Tract and the Improvements situated thereon, designated as "Enclosed Mall" on the Plot Plan "EXHIBIT B", including, without limitation, covered and roofed malls, courts and arcades on one (1) level, which are mechanically heated and air conditioned for climatic control; but excluding those areas and Improvements designated or used as kiosks or boutiques (or otherwise for income producing purposes) and service corridors that are part of the Common Area.

9    "Floor Area" - the space in a horizontal plane occupied by the surface of each floor within a completed Building and the space in a horizontal plane occupied by the surface of each floor within a completed kiosk, boutique or similar income producing Improvements not within a Building; said space being measured in square feet determined by the linear dimensions in feet from the outside of the exterior Building perimeter walls to the outside of the exterior Building perimeter walls (except party walls as to which the center thereof, instead of the exterior faces thereof, shall be used), including any such space covered by:

(1)    basements and other similar subterranean areas;

(2)    balconies and mezzanines, other than additional space created by fixture installations designed to increase the usability of space exclusively for stock or storage purposes;

5

009152

(3)   walls and columns;

(4)   elevators, dumb waiters, stairs, escalators and conveyors;

(5)   mechanically heated or air conditioned Outdoor Selling Area; and

(6)   all other similar spaces located within the exterior facade of the exterior perimeter walls;

but excluding any such space covered by:

(a)   the Enclosed Mall;

(b)   electrical and/or mechanical rooms and/or penthouses used to serve any Occupant;

(c)   transformer room or vault;

(d)   junk tire or rubbish storage spaces;

(e)   trash and rubbish storage and/or baling rooms;

(f)   paved or concrete aprons (whether or not covered by canopies) and gasoline pump island located at any Tire, Battery and Accessory (TBA) automotive service station;

(g)   sheds used exclusively for Common Area maintenance purposes;

(h)   truck docks; and

(i)   decked storage areas above floor level; and

(j)   Outdoor Selling Area not mechanically heated or air conditioned.

and the said Floor Area of each Party hereto
shall be certified by said _Party's_ architect
to the other _Party;_ provided that any dispute
about such certification shall be submitted
to arbitration under the provisions of the
Article on Arbitration contained in this
LEASE AGREEMENT.

10  "_Gross Leasable Area_" - _Floor Area_ intended,
and ready, for the exclusive use and occu-
pancy of an _Occupant_, prospective or actual,
measured in square feet, determined by the
linear dimensions in feet, _from_ the center of
joint partitions, party or interior walls (or
the outside of the exterior _Building_ peri-
meter walls, as applicable) _to_ the center of
joint partitions, party or interior walls (or
the outside of the exterior _Building_ peri-
meter walls, as applicable); _excluding_ any
_Floor Area_:

(1)  in any public meeting hall or
auditorium;

(2)  in any public restroom that is neither
leased by an _Occupant_ nor leased by
TENANT;

(3)  in _Shopping Center_ management offices
and in Merchants Association offices,
all of which is not to exceed a total of
3,000 square feet; and

(4)  to be used by, or for the _Occupants_ and
their _Permittees_, in common with each
other;

(5)  to be used for storage purposes not to
exceed a total of 4,000 square feet;

and the said _Gross Leasable Area_ of each _Par-_
_ty_ hereto shall be certified by said _Party's_
architect to the other _Party_, provided that

any dispute about such certification shall be submitted to arbitration under the provisions of the Article on Arbitration contained in this LEASE AGREEMENT.

11    "Improvements" - all improvements to land of every nature and kind upon the TOTAL DEVELOP-MENT Tract or the Shopping Center Tract, or any other component Tract thereof, including the Common Area, the Mall, the Buildings, the Outdoor Selling Area, if any, and the landscaping, if any, between the exterior perimeter wall of Buildings and the Building Perimeter Sidewalk.

12    "Mall Tenant" - any Occupant (other than a Department Store) occupying 80,000 or less square feet of Gross Leasable Area in the Developer          Building.

13     "Occupant" - any person, including either Party hereto, who is legally entitled to the exclusive use and occupancy of any Gross Leasable Area under the rights contained in a deed or a written lease agreement.

14    "Outdoor Selling Area" - the land, being a portion of the Shopping Center Tract and any Improvements situated thereon, that may be, from time to time, exclusively appropriated for permanent or temporary outdoor selling, as designated on the Plot Plan, "EXHIBIT B", or as agreed upon later by consent of all the Parties hereto; said Outdoor Selling Area being exclusive of the Common Area, the Enclosed Mall, and the Buildings and the landscaping, if any, between the exterior perimeter wall of Buildings and the Building Perimeter Sidewalk situated upon the Shopping Center Tract.

15    "Parking Area" - the land area within the Shopping Center Tract intended for the use of

8

009155

permitting automobiles to enter into, park upon, and exit from said Tract, and the Improvements thereon, that is, the paved area to be occupied by the parked automobile, the paved area to be used for bays, aisles, driveways, entrances and exits and landscaped areas and sidewalks, all of which is located upon said land on the Plot Plan, "EXHIBIT B".

16   "Parking Space" - the paved land area marked by painted striping for the use of permitting one automobile to be situated and parked thereon, within the Parking Area, as shown on "EXHIBIT B", Parking Typical Spacing Layout.

17   "Party" - each separate principal business entity making, entering into, and signing this LEASE AGREEMENT, whether or not such business entity is an individual, or individuals (that is, natural person, or persons) a partnership, a joint venture, or a corporation; being either LANDLORD or TENANT; or any successor to any such business entity permitted under the provisions of this LEASE AGREEMENT.

18   "Permissible Building Area" - the land within the TOTAL DEVELOPMENT Tract upon which a designated Party may construct either its initial Building, or any expansion thereof, or its future Building, as provided in this LEASE AGREEMENT, and as shown on the Plot Plan, "EXHIBIT B".

19   "Permittee" - any Occupant, and any officer, director, partner, employee, agent, contractor, customer, patient, client, invitee, licensee, subtenant, or concessionaire of any Occupant.

20   "Plans and Specifications" - complete architectural and engineering drawings and written requirements for the construction of Improvements; including working drawings, Design

Criteria and written requirements for work-
manship and materials, all of which show
details adequate for the commencement and
pursuit of actual construction, as well as,
for a reasonable estimate of the cost there-
of.

21   "Plot Plan" - diagram or drawing that shows
the general nature, size, location, and/or
shape of:

(1)   the TOTAL DEVELOPMENT Tract (including
the Shopping Center Tract and each other
component Tract of said TOTAL DEVELOP-
MENT Tract) its property lines or bound-
aries;

(2)   the Improvements situated, or to be
situated thereon, including the Permis-
sible Building Areas, the Building
Perimeter Sidewalk, the Common Area, and
the Enclosed Mall, the Buildings, the
Outdoor Selling Area, if any, the land-
scaping, if any, between the exterior
perimeter walls of Buildings and the
Building Perimeter Sidewalk; and

(3)   adjoining and/or near-by public streets
or highways;

and being attached hereto as "EXHIBIT B".

22   "RESERVE Tracts" - land belonging to DEVELOP-
ER upon which DEVELOPER contemplates the
construction of certain Improvements in the
future, said Tract being situated within the
TOTAL DEVELOPMENT Tract as a component Tract
thereof, and being fully described by metes
and bounds on "EXHIBIT A", as shown on the
Plot Plan, "EXHIBIT B".

23   "Shopping Center" - the Shopping Center Tract
and all Improvements situated thereon.

009157

24  "Site Preparation Work" - all land clearing,
all land and dirt grading, filling, excava-
tion and compaction (including soil stabili-
zation and all other soil treatment) made and
done to permit the commencement of the con-
struction of Improvements upon the TOTAL DE-
VELOPMENT Tract, or any component Tract
thereof.

25  "TOTAL DEVELOPMENT Tract" - the land contain-
ing the Shopping Center Tract and RESERVE
Tract; all of which is fully described by
metes and bounds on "EXHIBIT A".

(a)  "Shopping Center Tract" - the land con-
taining the LANDLORD Tract and DEPARTMENT
STORE Tract; being the TOTAL DEVELOPMENT
Tract; less RESERVE Tract; and being fully
described by metes and bounds on "EXHIBIT
A".

(1)  "LANDLORD Tract" - land belonging
to LANDLORD, being the Shopping
Center Tract less DEPARTMENT STORE
Tract; and being fully described
by metes and bounds on EXHIBIT A".

(2)  "DEPARTMENT STORE Tract" - land
belonging to or being leased by a
DEPARTMENT STORE, that is being the
Shopping Center Tract less the
LANDLORD Tract; and being fully
described by metes and bounds on
"EXHIBIT A".

(3)  "RESERVE Tract" - land belonging to
LANDLORD upon which LANDLORD con-
templates the construction of cer-
tain Improvements in the future,
said Tract being situated within
the TOTAL DEVELOPMENT Tract as a
component Tract thereof, and being

009158

fully described by metes and bounds
on "EXHIBIT A".

009159

# PART ONE

## Term and Rent

### Article 1 Leased Premises

Paragraph

1.1   LANDLORD hereby leases to TENANT and TENANT hereby leases from LANDLORD, upon and subject to the conditions, covenants and provisions contained in this LEASE AGREEMENT:

> All of that certain Building containing approximately:

> 100,000

> square feet of Gross Leasable Area identified on "EXHIBIT B", Plot Plan, as "Sears Building" including "Sears TBA" (all of which is herein called "Leased Premises"); situated upon approximately:

> 40

> acres of land, comprising the Shopping Center Tract of land (herein called "Shopping Center Tract") which is a part of approximately:

> 76

> acres of land (herein called "TOTAL DEVELOPMENT Tract") located at:

> The intersection of Highways 287, 69, 96, and 365,

more particularly described by subdivision lot and block numbers, if any, and by metes and bounds on "EXHIBIT A", and as more particularly shown on the Plot Plan designated "EXHIBIT B", both of which exhibits are attached hereto and made a part hereof, together with all rights, privileges, easements, rights of ingress and egress, improvements and appurtenances of whatever kind and character, benefiting, belonging or appertaining thereto, including all of such right and appurtenances appertaining to the Shopping Center Tract.

1.2   LANDLORD further grants to TENANT and the Permittees of TENANT the joint right to use and the

13

009160

joint right of access to ingress and egress to and from,
the Common Area and Enclosed Mall situated upon the
Shopping Center Tract (and all other similar rights
belonging or appertaining thereto), as shown and
designated on the Plot Plan, "EXHIBIT B", with other
tenants and the Permittees of the Shopping Center.

1.3   LANDLORD warrants to TENANT that recorded
easements, grants and/or conveyances now permit, or will
permit, prior to the commencement of the Term of this
LEASE AGREEMENT, the grant of the rights and joint
rights to TENANT described in the two preceding Para-
graphs 1.1 and 1.2. LANDLORD further warrants to TENANT
that LANDLORD will not permit, or cause, any disturbance
or nullification of said rights and grants during the
Term hereof.

Article 2 Delivery

Paragraph

2.1   LANDLORD shall, on or before the commence-
ment of the Term hereof, deliver possession of the
Leased Premises to TENANT, ready for occupancy, free and
clear of all tenancies and occupancies, with all the Im-
provements in this LEASE AGREEMENT provided to be made
by LANDLORD on the Leased Premises fully completed.

2.2   In the event the Leased Premises are com-
pleted, but have not been delivered to TENANT upon the
"Completion Date", as defined in this LEASE AGREEMENT,
all as herein provided, then the covenants and obliga-
tions of TENANT herein contained, including the coven-
ants to pay rent, shall abate until the said Leased
Premises are so delivered to TENANT.

2.3   In the event TENANT notifies LANDLORD, in
writing, of TENANT's desire to cancel this LEASE AGREE-
MENT because of LANDLORD's failure to deliver the com-
pleted Leased Premises to TENANT, and LANDLORD does not
deliver the completed Leased Premises to TENANT within
thirty (30) days thereafter, TENANT shall have the right
during the period from the expiration date of the said
thirty (30) days until said premises are so delivered to

14

009161

TENANT, to cancel this LEASE AGREEMENT effective as of
the said "Completion Date", together with all the
obligations of TENANT hereunder, by giving LANDLORD
written notice of such cancellation.


## Article 3 Use

The Leased Premises shall be used for a Sears,
Roebuck and Co. retail department store for the first:
FIFTEEN (15) YEARS
of the Term hereof, and thereafter, for any other lawful
purpose.


## Article 4 Title and Surveys

Paragraph

4.1   Immediately upon the execution of this LEASE
AGREEMENT, LANDLORD shall furnish to TENANT a title re-
port and a title binder (or commitment), together with
copies of recorded documents referred to therein, in an
amount equal to ten (10) times the annual rent payable
pursuant to Paragraph 8.3 (a) in "Article 8 Rent" here-
of, issued by a title company selected by LANDLORD and
licensed to do business in the state wherein the Leased
Premises are located, to insure TENANT's marketable
title in the leasehold estate created hereunder, includ-
ing the survey, free and clear of all liens, encumbranc-
es (except liens and encumbrances acceptable to TENANT,
any such liens being subordinated to this LEASE AGREE-
MENT) and tenancies of any kind, nature and description
except as otherwise provided in section 14.

4.2   TENANT shall have sixty (60) days in which
to notify LANDLORD, in writing, of its approval, or dis-
approval, of said title binder.   In the event TENANT so
approves said title binder, LANDLORD shall, at its ex-
pense, deliver a title insurance policy with TENANT as
named insured based thereon, to TENANT upon closing its
permanent financing, however, not to exceed twelve (12)
months from the opening of TENANT's building.   In the
event TENANT so disapproves said title binder, TENANT
shall notify LANDLORD of reasons, and LANDLORD shall

009162

have sixty (60) days to cure said defects; if LANDLORD
is unable to satisfy TENANT as to title, this LEASE
AGREEMENT shall immediately thereon terminate, become
null and void and of no further force and effect, with
neither Party having any further rights or liabilities
hereunder, but Landlord shall forthwith return to TENANT
all payments theretofore made by TENANT pursuant to this
LEASE AGREEMENT.

4.3    LANDLORD warrants to TENANT that, during the
Term hereof, the Shopping Center Tract may lawfully be
used for a regional Shopping Center and that the Leased
Premises may lawfully be used for a retail department
store.


## Article 5 Quiet Enjoyment

Paragraph
5.1    TENANT, upon paying the rent and all other
sums or charges to be paid by it, as herein provided,
and observing and keeping all covenants, warranties,
agreements and conditions of this LEASE AGREEMENT on its
part to be kept, shall quietly have and enjoy the Leased
Premises during the Term of this LEASE AGREEMENT, with-
out hindrance or molestation by any one lawfully
claiming any right therein.

5.2    LANDLORD represents and warrants to TENANT
that it has fee simple title to the Leased Premises and
the power and authority to execute and deliver this
LEASE AGREEMENT and to carry out and perform all coven-
ants to be performed by it hereunder. LANDLORD further
represents and warrants to TENANT:

> (1)    That the Leased Premises are free from
> all encumbrances, liens, defects in
> title, violations of law, leases, ten-
> ancies, easements, restrictions and
> agreements (except liens and encum-
> brances acceptable to TENANT, any such
> liens being subordinated to this LEASE
> AGREEMENT) except as otherwise provided
> in sections 13 and 14;

16

009163

(2) That at the time of the commnencement
of the Term, sole and undisturbed phy-
sical possession of the entire Leased
Premises shall be delivered to TENANT
free and clear of all liens, defects in
title, encumbrances, restrictions,
agreements, easements, tenancies and
violations of law, provided that the
provisions in this subparagraph shall
not preclude an institutional mortgage
as defined in Article 13;

(3) That at all times TENANT shall have
unobstructed and adequate means of in-
gress and egress to the Leased Premises
from all abutting streets, roads and
highways, except when closed by public
authorities; and

(4) That no law, ordinance or any restric-
tion by any governmental authority
prohibits the use of the Leased Prem-
ises for the purpose of operating a
retail department store, or prohibits
the Shopping Center Tract from being
used for the purpose of operating a
regional shopping center.

5.3   If LANDLORD shall be in default under this
Article, TENANT, in addition to any and all remedies it
may have in law and/or equity, may terminate this LEASE
AGREEMENT upon thirty (30) days' written notice describ-
ing the default to LANDLORD and the latter's failure to
correct, or proceeding to correct, the said default
within said thirty (30) days.

Article 6 LANDLORD Access

Paragraph

6.1   LANDLORD, or LANDLORD's agents and desig-
nees, shall have the right, but not the obligation, to

17

009164

enter upon the Leased Premises, at all reasonable times, to examine same and to exhibit the Leased Premises to prospective tenants, but in the latter case only during the lasts six (6) months of the Term of this LEASE AGREEMENT.

6.2   LANDLORD shall be permitted to affix a "To Let" or "For Sale" sign on the Leased Premises during the last ninety (90) days of the Term of this LEASE AGREEMENT, in such place as shall not interfere with the business then being conducted at the Leased Premises.

Article 7   Term

Paragraph

7.1   The Term of this LEASE AGREEMENT shall be:
FIFTY (50)
years, unless sooner terminated or modified, as herein provided, commencing upon the "Commencement Date", as hereinafter defined.

7.2   For the purpose of this LEASE AGREEMENT, the phrase "Commencement Date" shall mean the date upon which the Term of this LEASE AGREEMENT shall be deemed to commence under the circumstances stipulated in this Article, and the phrase "Completion Date" shall mean the next day after the date upon which the last of all of the following conditions shall have occurred or been performed:

(a)   The Buildings and all Improvements on the Leased Premises shall have been completed in accordance with the provisions of "Article 11 Leased Premises" hereof, and written notice thereof from LANDLORD, accompanied by a certificate of the Architect supervising said construction certifying to such completion, shall have been delivered to TENANT, all in accordance with the provisions of "Article 12 Shopping Center Improvements" hereof;

18

009165

(b)   The improved Parking Spaces for a minimum of:

2,266

automobiles shall have been completed in accordance with the provisions of "Article 12 Shopping Center Improvements" hereof;

(c)   The Enclosed Mall in the Shopping Center shall be completed in accordance with the provisions of "Article 12 Shopping Center Improvements" hereof; and

(d)   The Buildings on the Shopping Center Tract, comprising a minimum amount of:

400,000

square feet of Floor Area, (including Leased Premises) shall be completed and ready for occupancy and obligated to open within a reasonable period, or occupied, in the Shopping Center.

(e)   The construction and widening of Highway 365 is completed along the entire length of the Shopping Center.

7.3 Except as hereinafter provided, TENANT shall open its retail department store in the Leased Premises for the conduct of business with the general public within thirty (30) days following such "Completion Date", and the Term of this LEASE AGREEMENT shall commence upon the first day of the month next following such opening of TENANT's retail department store for the conduct of business with the general public, following such "Completion Date" (unless said opening shall occur on the first day of a month, in which event the Term hereof shall commence upon such date).

7.4 TENANT shall not be obligated to open its retail department store in the Leased Premises at any time between August 1 of any year and February 1 of the

19

009166

following year. If the matters hereinabove enumerated in Subparagraphs (a) to (d), inclusive, of Paragraph 7.2 of this Article, which are required to occur or to be performed prior to the "Commencement Date", shall be completed at a time which would fix the opening date of TENANT's retail department store between August 1 and February 1, TENANT shall not be obligated to open its retail department store or pay any rent or Common Area and Mall maintenance charges whatsoever until February 1. If, however, TENANT does open its retail department store for business following the "Completion Date" between August 1 and February 1, the Term of this LEASE AGREEMENT shall commence upon the first day of the month next following such opening of TENANT's retail department store for the conduct of business with the general public (unless said store is opened for the conduct of business with the general public on the first day of a month, in which event the Term hereof shall commence upon such date).

7.5   Notwithstanding any of the foregoing, TENANT, at its option, may open its retail department store for the conduct of business with the general public in the Leased Premises prior to the "Completion Date" and if TENANT does so open its retail department store upon an optional opening date basis, then the period of time from such opening, to and including the last date of the month following the "Completion Date", shall be deemed to be the "Optional Opening Term". TENANT's occupancy of the Leased Premises under an "Optional Opening Term" shall be under all of the terms, covenants and conditions of this LEASE AGREEMENT, except as follows:

> (a)   The Term of this LEASE AGREEMENT, as established under the provisions of Paragraph 7.1 of this Article, shall not be deemed to have commenced;

> (b)   The rent to be payable by TENANT during such "Optional Opening Term", in lieu of all rent otherwise herein provided to be paid to LANDLORD under the provisions of "Term and Rent

009167

Article 8 Rent" hereof, shall be a sum equal to one and one-fourth percent (1-1/4%) of the "Net Sales" (as defined in "Term and Rent Article 8 Rent") made by TENANT in the Leased Premises during such "Optional Opening Term", if any, and shall be so payable by TENANT to LANDLORD within fifteen (15) days after the end of each month of such "Optional Opening Term";

(c)   In this LEASE AGREEMENT, the provisions relating to payment by TENANT to LANDLORD for any expenses of Common Area or Mall maintenance shall be deleted;

(d)   The entry of TENANT upon the Leased Premises under an "Optional Opening Term" shall not be deemed to be an acceptance by TENANT of the Leased Premises or a waiver of any of TENANT's rights hereunder; and

(e)   If the "Optional Opening Term" shall not have ended, as hereinafter provided, within one (1) year after the commencement thereof, TENANT shall have, and is hereby granted, the option to cancel and terminate this LEASE AGREEMENT at any time thereafter during such "Optional Opening Term" by giving Landlord at least thirty (30) days' prior written notice of its intention so to cancel and terminate.

7.6   Effective upon the first day of the month next following the "Completion Date", as hereinabove defined, the "Optional Opening Term", if any, shall terminate and the Term of this LEASE AGREEMENT, as established under Paragraph 7.1 of this Article, shall commence upon such first day of the month.   Effective

upon such "Commencement Date", the terms and provisions of Subparagraph 7.5 of this Article shall be, and they are hereby, deleted and declared to be of no further force and effect.

7.7 The Term of the LEASE AGREEMENT shall be modified and extended as provided in Paragraph 15.1 (c) of "Construction Article 15 Future".

7.8 TENANT shall have, and is hereby expressly granted, the right to cancel this LEASE AGREEMENT on or after the twentieth (20th) anniversary of this LEASE AGREEMENT. TENANT shall give LANDLORD two (2) years' notice of its intention to cancel this LEASE AGREEMENT. Notwithstanding any other provisions of this LEASE AGREEMENT, TENANT shall not be liable for any further payments, of any kind, to LANDLORD upon the cancellation of this LEASE AGREEMENT.

## Article 8 Rent

Paragraph

8.1 "Lease Year", as used herein, means each of the twelve (12) month periods commencing, respectively, upon the day upon which the Term of this LEASE AGREEMENT shall be deemed to have commenced, and upon the anniversary of such date during the remainder of said Term, except that for the sole purpose of computing Base Rent and Percentage Rent payable hereunder, the first "Lease Year" shall include, in addition to the said twelve (12) month period, the time, if any, between the opening date of TENANT's retail department store upon the Leased Premises and the date of commencement of the Term hereof, excluding any period of time in the "Optional Opening Term", if any.

8.2 "Net Sales", as used herein, means the aggregate amount of all retail sales of goods, wares and merchandise and services made to the public upon the said Leased Premises by TENANT, TENANT's departmental sublessees, concessionaires and licensees occupying space upon said Leased Premises, but deducting or excluding, as the case may be, the following:

22

(1)    Sales of departments or divisions not
       located upon the leased Premises;

(2)    The amount of all sales, use, excise,
       retailers' occupation or other
       similar taxes imposed in a specific
       amount, or percentage rent upon, or
       determined by, the amount of retail
       sales made upon the said Leased
       Premises

(3)    Returns and allowances, as such words
       are known and used by TENANT in the
       preparation of TENANT's profit and
       loss statements;

(4)    Delivery, installation, freight and
       labor charges stated separately to
       the customer;

(5)    Amounts in excess of TENANT's (or of
       its sublessees', concessionaires' and
       licensees') cash sales price charged
       on sales made on credit or under a
       time payment plan;

(6)    Sales of merchandise ordered through
       the use of TENANT's mail order cata-
       logs or filled through catalog order
       channels, rregardless of the place of
       order, payment or delivery;

(7)    Policies of insurance sold on the
       Leased Premises and premiums collect-
       ed on policies of insurance, and all
       amounts collected on investment fund
       shares and/or other securities sold
       upon the Leased Premises;

(8)    Receipts from weighing, and food,
       drink and tobacco vending machines,
       amusement devices, public telephone
       and snack bars, where such snack bars

23

are operated for the use of TENANT's employees only; and

(9)   Sales made through the Commercial and Industrial Sales Department of TENANT (which shall mean sales for industrial or institutional use, sales in bulk or substantially larger quantities than are included in ordinary sales of retail, sales to Federal, State and Municipal Governments and the various departments, branches and agencies thereof, and sales of any other character not normally made by TENANT in the ordinary conduct of its retail department store business and mail order business, which are made by the Commercial and Industrial Sales Department of TENANT).

8.3   TENANT shall pay to LANDLORD, as rent for said Leased Premises, a sum of money equivalent to:

(a)   Base Rent.

(1)   An amount of money equal to the number of square feet of Gross Leasable Area in the Leased Premises as certified by "Architect", multiplied by:

$2.05

per square foot per "Lease Year"; 1/12th of said amount being due, in advance, upon the first day of each and every month of the Term hereof; and

and

(b)   Percentage Rent.

(1)   Two and One-Half Percent (2-1/2%) of the "Net Sales" made by TENANT

24

upon the Leased Premises during any "Lease Year" of the Term hereof, in excess of the annual Base Rent multiplied by forty (40), and up to and including:

$11,000,000

(2)   Two Percent (2%) of the "Net Sales" made by TENANT upon the Leased Premises during any "Lease Year" of the Term hereof, in excess of:

$11,000,000

and up to and including:

$14,000,000

and

(3)   One and One-Half Percent (1-1/2%) of all "Net Sales" made by TENANT upon the Leased Premises during any "Lease Year" of the Term hereof, in excess of:

$14,000,000

if any.

The said Base Rent shall be paid by TENANT in monthly installments before the tenth (10th) day of each month of the Term hereof. The said Percentage Rent shall be paid by TENANT within thirty (30) days after the end of each "Lease Year" during the Term hereof. Each of said rent payments shall be paid or mailed to LANDLORD at:

258 Central Mall

Fort Smith, Arkansas

or to such other payee or address as LANDLORD shall hereafter designate, in writing, to TENANT.

8.4   The audits and annual accounts of TENANT's "Net Sales" made upon the Leased Premises, and the calculations of rent thereon paid to LANDLORD annually, shall be certified by a responsible official of TENANT and submitted to LANDLORD within thirty (30) days after the end of each "Lease Year" of the Term hereof, accompanied by payment of the balance, if any, of rents then shown to be due to LANDLORD under the provisions of Paragraph 8.3 (b) of this Article for the "Lease Year" upon which such accounting is made. Each such annual statement shall show the following items for such "Lease Year":

(a)   The amount of "Net Sales" made by TENANT upon the Leased Premises;

(b)   The amount of rents paid thereon by TENANT; and

(c)   The balance, if any, of rents then shown to be due to LANDLORD, or the overpayment, if any, of rents paid by TENANT, as the case may be.

Proper adjustment shall then be made by TENANT in amounts, if any, then shown to be due to LANDLORD or TENANT, as the case may be, with TENANT applying any overpayment as a credit on the rents next becoming due and payable by TENANT in the subsequent "Lease Year". Each such annual statement of audits, accounts and calculations shall be deemed stated, accepted and final unless objected to and reaudited or recalculated, as hereinafter stipulated.

8.5   In the event LANDLORD is not satisfied with such annual audit, account, or calculation, and gives TENANT written notice to that effect within eighteen (18) months after LANDLORD's receipt thereof, then LANDLORD shall have the right, within sixty (60) days thereafter, at LANDLORD's expense, to cause any reputable certified public accounting firm, mutually satisfactory and approved in writing for that purpose by both Parties to this LEASE AGREEMENT, to reaudit the "Net Sales" made by TENANT upon the Leased Premises during

the period covered by such annual audit and account and
to recalculate said rents payable and such reaudit and
recalculation shall be accepted by Parties to this LEASE
AGREEMENT as final.

8.6   TENANT makes no representation or warranty
as to the sales which it expects to make upon said
Leased Premises, and LANDLORD agrees to hold in confi-
dence all sales figures and other information with re-
spect to TENANT's business, which may be obtained from
TENANT or by means of any inspection or audit of
TENANT's books and records.

8.7   Notwithstanding any other provision herein
contained, in the event TENANT shall, after the first:
FIFTEEN (15)
years of the Term hereof, elect to close its facility
in the Leased Premises, in such event, TENANT shall
remain responsible for the payment of annual rent, which
shall be the sum of the average of the last three (3)
years annual rent paid to LANDLORD from which shall be
deducted those amounts which may be deducted from
percentage rent as set out elsewhere herein.   In such
event, TENANT shall give LANDLORD notice of its intent
to close its building and LANDLORD shall have ninety
(90) days to terminate the LEASE AGREEMENT

8.8   It is understood and agreed, that in addi-
tion to the payments described in this Article to be
made by TENANT to LANDLORD, there may be certain other
payments to be made by TENANT to LANDLORD under the
following provisions of this LEASE AGREEMENT:

(1)   Paragraph 27.4 of "Article 27 Taxes";
and

(2)   Paragraph 29.8 of "Article 29 Mainte-
nance".

(3)   Paragraph 28.6 of "Article 28 Insur-
ance".

8.9   In the event the Leased Premises are expand-
ed as provided for in Article 9 hereof, the rent for the

Leased Premises shall be adjusted to provide a sum of money equivalent to:

(a) Base Rent.

An amount of money equal to the number of square feet of Gross Leasable Area in the Leased Premises as certified by "Architect" multiplied by $2.05 per square foot per "Lease Year"; 1/12th of said amount being due, in advance, upon the first day of the month next follow-ing the opening for business of the ex-panded area and thereafter on the first day of each and every month of the Term hereof; and

(b) Percentage Rent.

(1) Two and One-Half Percent (2-1/2%) of the "Net Sales" made by TENANT upon the Leased Premises during any "Lease Year" of the Term here-of, in excess of the amount equal to the Gross Leasable Area of the expansion of the Leased Premises times $2.50 per square foot times forty (40), plus the amount of Base Rent calculated under Section 8.3 (a) hereof multiplied by forty (40), and up to and including the next three million dollars ($3,000,000) in "Net Sales"; and

(2) Two Percent (2%) of the "Net Sales" made by TENANT upon the Leased Premises during any "Lease Year" of the Term hereof, in ex-cess of the larger amount set forth in the preceding paragraph (b)(1) and up to and including the next three million dollars ($3,000,000) in "Net Sales"; and

(3)   One and One-Half Percent (1-1/2%)
of all "Net Sales" made by TENANT
upon the Leased Premises during
any "Lease Year" of the Term here-
of in excess of the larger amount
set forth in the preceding para-
graph (b)(2).

The rent provided for in this section shall commence
upon the first day of the month next following the
opening for business of the expanded area and shall,
upon its effective date, replace any rent set out in
section 8.3.


## Article 9 Expansion

TENANT shall have the right to expand its Build-
ing up to 36,000 square feet of Floor Area. Said expan-
sion shall be within the Permissible Building lines
shown on "EXHIBIT B". All expense of any such expansion
shall be paid by TENANT, provided, however, that any
such expense may be deducted from any percentage rent
due LANDLORD by TENANT until the entire amount of expan-
sion expense has been deducted and recovered by TENANT.
Said reimbursement shall be subject to and shall not
take priority over TENANT'S deductions or reimbursements
for its expenses in Articles 28 and 29 hereof.


## Article 10 Abandonment or Holdover

Paragraph

10.1 Subject to the provisions contained in Par-
agraph 8.7 "Article 8 Rent", if TENANT abandons said
Leased Premises, LANDLORD shall, without limiting any of
its remedies, use its best efforts to relet the same for
retail purposes and for the best rent obtainable, and if
the total amount received by LANDLORD from such relet-
ting, collecting and necessary repairs, does not equal
or exceed the Base Rent paid to LANDLORD under the pro-
visions of "Article 8 Rent" and the Common Area and Mall
maintenance charges, if any, last paid to LANDLORD under
the provisions of "Construction Article 13 Mortgage"

# Sears

Merchandise Group

*Let us know if we need to do anything.*

National Headquarters
SEARS TOWER
CHICAGO, ILLINOIS 60684

September 19, 1988

Edward K. Willis
C/O Financial Centre Dev. Co.
P. O. Box 56350
Little Rock, Ar.  72215

009170

SUBJECT:  Sales Audit

In accordance with the terms of the lease covering Sears Retail store in
PORT ARTHUR, TX.  #2637                        , we are submitting below an
audit of sales for  9-1-87 - 9-1-88

Our check in the amount of  $ 70 627.28                    will be forwarded to you under
separate cover.

Yours truly,

SEARS, ROEBUCK AND CO.

D. Kupczyk
Controller

DK:sj

Audit of Sales for Rental Computation

| | |
|---|---|
| Rental Net Sales for  9-1-87 - 9-1-88 | 9 769 697.00 |
| 2½% of First   11 000 000.00 | 275 000.00 |
| Less: 12 Months at 17 031.06 | 204 372.72 |
| Net Amount Due Landlord | 70 627.28 |

A SEARS ROEBUCK COMPANY

009182

# PART TWO

## Construction

### Article 11 Leased Premises

Paragraph

11.1   The Parties hereto shall jointly approve, designate and appoint promptly after the execution of this LEASE AGREEMENT, the registered, professional architect and/or engineer to prepare the Plans and Specifications, supervise the construction and perform the duties of architects and/or engineers, in connection with all construction in this LEASE AGREEMENT provided to be done by LANDLORD. For convenience, the said architect shall be hereinafter referred to as "Architect".

11.2   Within ninety (90) days after the execution of this LEASE AGREEMENT, LANDLORD shall furnish to TENANT preliminary Plans and Specifications for the construction of a retail department store Building and other Improvements upon the Leased Premises, showing the foundations, exterior elevations, floors, dimensions of each floor, position of each floor proposed in all Buildings, the proposed exterior construction materials, and such other proposed construction items, methods and materials as TENANT may deem necessary for its review of the preliminary Plans and Specifications to make its recommendations for development of the semi-final Plans and Specifications hereinafter mentioned. Such preliminary Plans and Specifications shall be subject to the approval of TENANT, which approval shall not be unreasonably withheld. Within three (3) weeks after receipt by TENANT of such preliminary Plans and Specifications, TENANT shall give LANDLORD written notice of any objections thereto or its approval thereof. If TENANT shall not deliver such notice within such three (3) weeks' period, such preliminary Plans and Specifications shall be deemed to be approved as submitted. If TENANT makes reasonable objections to such preliminary Plans and Specifications and LANDLORD does not make the requested revisions within three (3) weeks after its receipt of TENANT's written notice that LANDLORD's failure to do so

31

009183

can result in TENANT's cancellation of this LEASE AGREE-
MENT, TENANT may terminate this LEASE AGREEMENT, effec-
tive upon delivery to LANDLORD of written notice of
termination at any time within ten (10) days after such
three (3) weeks' period.

11.3   Within thirty (30) days after approval by
LANDLORD and TENANT of the preliminary Plans and Speci-
fications, hereinabove referred to, LANDLORD shall fur-
nish to TENANT semi-final Plans and Specifications, pre-
pared by "Architect", which shall consist of full work-
ing drawings and specifications of all Buildings to be
constructed by LANDLORD upon the Leased Premises.   Such
semi-final Plans and Specifications shall be subject to
the approval of TENANT.   Within three (3) weeks after
receipt by TENANT of such semi-final Plans and Specifi-
cations, TENANT shall give LANDLORD written notice of
any objections or its approval thereof.   If TENANT shall
not deliver such written notice within such three (3)
weeks' period, the semi-final Plans and Specifications
shall be deemed to be approved as submitted.   If TENANT
makes reasonable objections to the semi-final Plans and
Specifications and LANDLORD does not make the requested
revisions within three (3) weeks after its receipt of
TENANT's written notice that LANDLORD"s failure to do so
can result in TENANT's cancellation of this LEASE AGREE-
MENT, TENANT may terminate this LEASE AGREEMENT effec-
tive upon delivery to LANDLORD of written notice of
termination at any time within ten (10) days after such
three (3) weeks' period.

11.4   Within one hundred and twenty (120) days
after approval by LANDLORD and TENANT of the semi-final
Plans and Specifications, as provided for in Paragraph
(3), LANDLORD shall cause the "Architect" to obtain the
written approval of Schirmer Engineering Corporation,
5940 Touhy Avenue, Niles, Illinois, 60648, of the sprin-
kler drawings in accordance with TENANT's requirements,
as set forth in TENANT's "Design Criteria", a copy of
which criteria shall be furnished to LANDLORD. The ap-
proved semi-final Plans and Specifications, incorpora-
ting the approved sprinkler drawings, shall be, for con-
venience, hereinafter referred to as "Final" Plans and
Specifications and when signed by both LANDLORD and

009184

TENANT, shall be considered attached hereto, designated "EXHIBIT C", and made a part hereof. There shall be no deviation from "EXHIBIT C" without the written approval of both LANDLORD and TENANT. LANDLORD hereby agrees to construct the Leased Premises in accordance with "EXHIBIT C" and all the provisions of this LEASE AGREEMENT pertaining to such construction. In addition, the "Final" Plans and Specifications shall comply with the applicable requirements of the Protection Mutual Insurance Company (formerly known as "Factory Mutual").

11.5   LANDLORD and TENANT further mutually and expressly agree that:

(a)   "EXHIBIT C" shall be drawn in not less than 1/8" scale and shall be approved by TENANT prior to the commencement of construction;

(b)   A construction schedule is to be submitted to, and approved by, TENANT before commencement of construction;

(c)   TENANT shall be informed of the manufacturer and schedule of delivery of major equipment components;

(d)   TENANT's approval of any Plans and Specifications shall not relieve LANDLORD or LANDLORD's obligations under this LEASE AGREEMENT, or be construed as an assumption by TENANT of such obligations; and

(e)   Neither TENANT nor LANDLORD shall be deemed to be in default under the provisions of this LEASE AGREEMENT by reason of failure to meet the time so long as such Party is continuing to exert its best efforts to comply with such time schedules.

33

009185

11.6   In the event LANDLORD shall be notified by TENANT, in writing, of unsatisfactory work or materials or deviation from "EXHIBIT C", or in the event mechanics', materialmen's or laborers' liens shall be placed upon the Leased Premises which may cause unnecessary delay or unfavorable publicity in the construction, and LANDLORD shall fail to correct or discharge the same within fifteen (15) days after its receipt of said written notice, then, and in each of such events, TENANT shall have, and is hereby expressly granted, the right to do so at LANDLORD's expense, and if TENANT shall pay for any expense of correcting or discharging the same, as aforesaid, TENANT shall have the right to reimburse itself for said expenses incurred thereby in the manner hereinafter provided in "Article 32 Tenant Right of Reimbursement". However, anything in this paragraph to the contrary notwithstanding, LANDLORD shall have the right to protest and/or defend against any claims that may be presented and/or filed against the Leased Premises, provided that LANDLORD shall protect, defend and hold TENANT harmless therefrom and as long as such protest and/or defense is being carried on in such manner that TENANT's peaceable and quiet possession and/or the use of the Leased Premises are not being disturbed thereby, TENANT shall not have the right to pay for any expense of correcting or discharging the same, as hereinabove provided.

11.7   LANDLORD shall construct and furnish the Leased Premises, without cost to TENANT, with sewer, storm sewer, drainage facilities and such other utility facilities (including, but not limited to, water, gas and electricity) and meters (unless furnished by the utility companies) to measure the consumption thereof, as shall be necessary and adequate for the use and operation of TENANT of the Buildings and Improvements constructed on the Leased Premises, all of which shall connect to the municipal facilities and shall meet applicable health department regulations. TENANT hereby agrees to pay for all such utility services, indicated by separate meters, to have been consumed by TENANT during the Term hereof, or Optional Opening Period, commencing with the date upon which rent shall be deemed to

34

009186

commence hereunder, all as further set forth in "Article
26 utilities".

11.8  In the event the construction of the Build-
ings and Improvements upon the Leased Premises shall not
have been commenced by LANDLORD within ninety (90) days
after approval by LANDLORD and TENANT of the "Final"
Plans and Specifications and LANDLORD's receipt of TEN-
ANT's written notice that LANDLORD's failure to do so
can result in TENANT's cancellation of this LEASE AGREE-
MENT, then TENANT shall have the right, at any time
within thirty (30) days thereafter, to cancel this LEASE
AGREEMENT, together with all of TENANT's obligations
hereunder, by giving LANDLORD written notice of such
cancellation.  If after the construction of said lease
Buildings and Improvements shall have been commenced,
such construction is not prosecuted diligently and con-
tinuously, in accordance with current accepted standards
of construction, thereafter to:

                    JULY 1, 1981

and LANDLORD's receipt of TENANT's written notice that
LANDLORD's failure to do so can result in TENANT's can-
cellation of this LEASE AGREEMENT, then TENANT shall
have the right, at any time within thirty (30) days
after said date, to cancel this LEASE AGREEMENT, to-
gether with all of TENANT's obligations hereunder, by
giving LANDLORD written notice of such cancellation.
In the event the erection of all Buildings and Improve-
ments upon the Leased Premises, as herein provided to
be erected, have not been completed and the Leased
Premises delivered to TENANT on or before:

                  DECEMBER 1, 1981

and LANDLORD's receipt of TENANT's written notice that
LANDLORD's failure to do so can result in TENANT's can-
cellation of this LEASE AGREEMENT, then TENANT shall
have the right at any time after said date, until said
Buildings and Improvements shall have been completed
and the Leased Premises so delivered to TENANT, to can-
cel this LEASE AGREEMENT, together with all of TENANT's
obligations hereunder, by giving LANDLORD written
notice of such cancellation.

009187

11.9 However, in the event LANDLORD's failure to complete the construction of said Buildings and Improvements on or before:

DECEMBER 1, 1981

as hereinabove provided in Paragraph 11.8 shall be on account of delay occasioned by acts of God, accidents, strikes, floods, inclement weather, fire or other casualty, or unavailability of labor or necessary materials, restrictive governmental, judicial, administrative or legislative orders, rulings, and regulations, said date, or dates, shall be extended by the period of such delay, but in no event shall either the continuance of construction date or the delivery date specified in Paragraph 11.8 above be extended more than (1) year in the aggregate by the provisions of this Paragraph 11.9.

11.10 In the event of any labor dispute in connection with the construction of the leased Buildings and Improvements, LANDLORD agrees to use LANDLORD's best efforts to promptly adjust and settle the same, in order to avoid unfavorable publicity and unnecessary delay.

11.11 LANDLORD agrees to comply with all Federal, State and local laws, ordinances, regulations, permits, rules and regulations applicable to the Leased Premises and to the Shopping Center in connection with any demolition, construction, alteration or repair work done by or for LANDLORD on the Leased Premises or in the Shopping Center.

11.12 LANDLORD shall furnish to TENANT, at no cost to TENANT, fixtures and equipment specified by TENANT which have a purchase price of ONE MILLION AND NO/100 DOLLARS ($1,000,000.00). Said fixtures and equipment shall either be provided lien free at the time of transfer of title from LANDLORD to TENANT as hereinafter set out, or, if there should be a lien on said fixtures at the time of said transfer, LANDLORD agrees to satisfy any indebtedness secured by said lien according to the terms of the agreement with the lienholders and LANDLORD hereby agrees to indemnify and hold TENANT harmless for any and all loss

009188

by TENANT as a result of said lien.  LANDLORD shall be entitled to

investment credit, to the extent provided by law, on the fixtures and

equipment furnished by LANDLORD herein.  Title to the fixtures and

equipment shall remain in LANDLORD until such time as LANDLORD has

completed the depreciation for Federal income tax purposes of such

fixtures and equipment. At the time LANDLORD completes its depreciation

for such fixtures and equipment LANDLORD shall execute a bill of

009189

sale for such fixtures and equipment and convey to TENANT title and equipment. Notwithstanding the above, TENANT shall have the right to replace any of LANDLORD's fixtures and equipment at any time at TENANT's sole expense. LANDLORD shall have no further obligation to provide any fixtures and equipment which has been replaced by TENANT. The parties acknowledge and agree that the cost of fixtures and equipment provided by LANDLORD are to be .considered (for purposes of calculating rent) as part of the Leased Premises, and that no additional rent shall be paid LANDLORD because of the fixtures and equipment furnished pursuant to this section. LANDLORD shall be responsible for any personal property tax levied on the fixtures and equipment which it furnishes herein until title passes to TENANT who then shall be responsible for the taxes.

11.13 In the event the Buildings or Improvements of the Leased Premises have not been completed, all as herein provided, and possession thereof delivered to TENANT on or before:

DECEMBER 1, 1981

then TENANT shall have the right, upon fifteen (15) days' written notice to LANDLORD, to elect to take possession of the Leased Premises (without affecting the date of the commencement of the Term hereof) complete the Buildings and Improvements of the Leased Premises in accordance with the Plans and Specification therefor, and recover TENANT's costs and expenses incurred thereby in the manner hereinafter provided in "Operation Article 32 TENANT's Right of Reimbursement". In the event of such election this LEASE AGREEMENT shall remain in full force and effect and TENANT shall be deemed to waive its right to terminate under section 11.8 hereof.

11.14 LANDLORD shall permit TENANT, at TENANT's option and without charge, to have access to said Buildings during the progress of construction, and before the commencement of the Term hereof, for the purpose of installing fixtures and equipment, storing, removing, and shipping merchandise, supplies, and equipment, and otherwise, making the Leased Premises ready for TENANT's operations, but in so doing, TENANT shall not unreasonably interfere with the completion of said Buildings or Improvements by LANDLORD. During such times as TENANT

37

009190

is so engaged, LANDLORD shall not be liable for injury
to person, or damage to, property (except such injury or
damage as shall be covered by insurance) of TENANT, its
employees, licensees, or invitees, occurring upon the
Leased Premises, unless such injury or damage be caused
by the negligence or omission of LANDLORD, or of LAND-
LORD's employees, agents, servants, and/or contractors.

11.15 Until such time as LANDLORD has completed
construction of the Leased Premises, as herein provided,
and TENANT has accepted possession thereof, the risk of
loss or damage to TENANT's merchandise and fixtures oc-
casioned by fire or other casualty embraced within the
perils insured against under a standard policy of Build-
ers' Risk insurance shall be borne by LANDLORD and LAND-
LORD hereby agrees to obtain, or cause to be obtained,
insurance covering the risk against such loss, provided
that such insurance coverage can be obtained by LANDLORD
at no increase over the costs of the Builders' Risk pol-
icy upon the Leased Premises, TENANT shall notify LAND-
LORD, in writing, monthly, as to the amount of such in-
surance to be carried on TENANT's merchandise and fix-
tures. Such early entry by TENANT under the provisions
of this paragraph shall not constitute an acceptance of
possession or a waiver of any of TENANT's rights here-
under.


Article 12
Shopping Center Improvements

Paragraph
12.1  The Shopping Center shall be constructed in
two (2) phases. The first phase shall be constructed in
such a manner that if the second phase is not construct-
ed, the Shopping Center, as built, will function as a
fully completed first class regional Shopping Center.

The Plot Plan consists of two pages and
shows the construction required and permitted in the
respective phases. Reference to "EXHIBIT B" or Plot
Plan shall mean the plan B-1 or B-2 then under planning,
construction or operation.

009191

LANDLORD shall take all steps and procedures necessary to insure that the businesses open for business in the Shopping Center shall not be adversely affected by any construction of a subsequent phase. LANDLORD shall give TENANT written notice sixty (60) days prior to the commencement of construction of phase 2. All approvals of Plans and Specifications required in this "Article 12 Shopping Center Improvements" shall be applicable to all construction, regardless of the phase then being planned. LANDLORD shall obtain TENANT's approval for the location of all staging areas to be used during construction as well as the access made which will be designated for use by the construction vehicles and personnel. LANDLORD shall obtain TENANT's approval prior to any alteration of the Common Area in preparation of the next phase of construction, which approval will not be unreasonably withheld. It is understood that the Ring Road may be relocated in the second phase of construction, as shown on the Plot Plan; provided, however, the Ring Road shall always be available for vehicular traffic for TENANT and its invitees and employees. LANDLORD shall always provide enough parking spaces to comply with the requirements of "Article 24 Common Area".

All construction shall be within the Permissible Building Areas as shown on the Plot Plan.

The Shopping Center shall be constructed and maintained as shown on the Plot Plan, "EXHIBIT B-1, or B-2," with such variations as may be permitted by such exhibit, or otherwise authorized hereunder. The Shopping Center shall be designed by "Architect" and constructed, or caused to be constructed, by LANDLORD, in accordance with such design. LANDLORD shall maintain, or cause to be maintained, the minimum of square feet of Floor Area in the Shopping Center, exclusive of the RESERVE Tract and exclusive of the Buildings herein leased in the area marked "Building A" on said Plot Plan, as follows:

009192

"EXHIBIT B-1" - 400,000 square feet;
"EXHIBIT B-2" - 650,000 square feet;

along with the Enclosed Mall and Common Areas to provide
at least the number of Parking Spaces hereinafter re-
quired under "Article 24 Common Area" for the joint use
of TENANT and others entitled to use the same, all in
conformity with the Plans and Specifications, Parking
Lot Layout (spaced in accordance with the "Parking
Typical Spacing Layout", as shown on "EXHIBIT B"
attached hereto,) and landscape plans approved by
TENANT, as hereinafter provided.

12.2   Plans and Specifications for any construc-
tion or expansion shall be within the Permissible
Building Area shown on the Plot Plan, and shall be
subject to TENANT's approval (which shall not be
unreasonably withheld) of elevations, locations (if
other than shown on Plot Plan) and exterior construction
of Buildings, structural construction of the Enclosed
Mall and its attachment to TENANT's retail department
store Building, structural construction of all Build-
ings, if any, connecting to TENANT's retail department
store Building, and the layout, construction and land-
scaping of the Common Area.   Such complete Plans and
Specifications for the Shopping Center shall be avail-
able for inspection by TENANT at all reasonable times.
A landscape architect, previously approved by TENANT,
shall be employed by LANDLORD to design the landscaping
for the exterior of the Shopping Center and for the
interior of the Enclosed Mall areas.   At the time of the
opening thereof, there shall be not less than:

180,000

square feet of Floor Area situated upon the Shopping
Center Tract, excluding the RESERVE Tract and excluding
the Leased Premises, completed and ready for tenant oc-
cupancy, or occupied and leased, in part, to shops
fronting on the Enclosed Mall and the Common Area, the
Enclosed Mall shall have been completed and the uses
thereof delivered to TENANT, all as herein provided.

40

009193

12.3    Within ninety (90) days after the date of
the execution of this LEASE AGREEMENT (which date is
herein defined to be the date upon which this LEASE
AGREEMENT, including all exhibits, herein referred to as
parts hereof, are signed by both Parties hereto) LAND-
LORD shall furnish to TENANT "Preliminary" Plans and
Specifications showing elevations, locations and exteri-
or construction of Buildings, structural construction of
the Enclosed Mall and attachment to TENANT's retail de-
partment store Building, structural construction of all
Buildings, if any, connecting to TENANT's retail depart-
ment store Building, and the layout, construction and
landscaping of the Common Areas, all of which shall be
subject to the approval of TENANT, which approval shall
not be unreasonably wihheld.  Within three (3) weeks af-
ter receipt by TENANT of such plans, TENANT shall give
LANDLORD written notice of any objections or its approv-
al thereof.  If TENANT shall not deliver such notice of
objections thereof within such three (3) weeks' period,
such plans shall be deemed to be approved as submitted.
If TENANT makes reasonable objections to such plans and
LANDLORD does not make the requested revisions within
three (3) weeks after its receipt of TENANT's written
notice that LANDLORD's failure to do so can result in
TENANT's cancellation of this LEASE AGREEMENT, TENANT
may terminate this LEASE AGREEMENT, effective upon de-
livery to LANDLORD of written notice of termination at
any time within ten (10) days after such three (3)
weeks' period.

12.4    Within thirty (30) days after approval by
LANDLORD and TENANT of the "Preliminary" Plans and Spec-
ifications, referred to in Paragraph 12.2 of this Arti-
cle, LANDLORD shall furnish to TENANT "Semi-Final" Plans
and Specifications, showing elevations of the Enclosed
Mall and structural drawings of the Enclosed Mall and
all Buildings connecting to TENANT's retail department
store Building upon the Leased Premises, all of which
shall be subject to the approval of TENANT.  Within
three (3) weeks after receipt by TENANT of such plans
and structural drawings, TENANT shall give LANDLORD
written notice of its approval or any objections there-
to.  If TENANT shall not deliver such notice within such
three (3) weeks' period, such plans and structural draw-

41

ings shall be deemed to be approved as submitted. If
TENANT makes reasonalble objections to such plans and
drawings and LANDLORD does not make the requested revi-
sions within three (3) weeks after its receipt of TEN-
ANT's written notice that LANDLORD's failure to do so
can result in TENANT's cancellation of this LEASE AGREE-
MENT, TENANT may terminate this LEASE AGREEMENT, effec-
tive upon delivery to LANDLORD of written notice of
termination at any time within ten (10) days after such
three (3) week period. A major entrance from said En-
closed Mall to TENANT's retail department store Building
in the Leased Premises, so as to permit pedestrian traf-
fic to and from said store and the Enclosed Mall, shall
be maintained at all times during the Term and any re-
newal hereof.

12.5  Within thirty (30) days after approval by
LANDLORD and TENANT of the "Preliminary" Plans and Spec-
ifications, herein above referred to in Paragraph 12.2
of this Article, LANDLORD shall furnish to TENANT "Semi-
Final" Plans and Specifications, showing the construc-
tion and layout of the Common Area. Within three (3)
weeks after receipt by TENANT of such plans, TENANT
shall give LANDLORD written notice of its approval or
any objections thereto. If TENANT shall not deliver
such notice within such three (3) weeks' period, such
plans shall be deemed to be approved as submitted. If
TENANT makes reasonable objections to such plans and
LANDLORD does not make the requested revisions within
three (3) weeks after its receipt of TENANT's written
notice that LANDLORD's failure to do so can result in
TENANT's cancellation of this LEASE AGREEMENT, TENANT
may terminate this LEASE AGREEMENT, effective upon
delivery to LANDLORD of written notice of termination at
any time within ten (10) days after such three (3)
weeks' period. Within ninety (90) days after approval
by LANDLORD and TENANT of the plans referred to in Para-
graph 12.2 of this Article, LANDLORD shall furnish to
TENANT "Semi-Final" Plans, showing the landscaping of
the Common Areas of ths Shopping Center, and TENANT
shall give LANDLORD written notice of its approval, or
any objections thereof, within three (3) weeks after its
receipt of such plans. If TENANT makes reasonable ob-
jections, LANDLORD shall cause its Architect to prepare

42

009195

"Final" Plans and Specifications to incorporate TENANT's requirements, as reflected by all plans hereinabove mentioned, approved by TENANT, and LANDLORD hereby agrees to proceed thereafter to construct, or cause to be constructed, the Shopping Center, including the Enclosed Mall and Common Area Improvements, in accordance with such "Final" Plans and Specifications.

12.6  In connection with said Plans and Specifications, all of said Parking Spaces upon the Shopping Center Tract shall be:

(a)  Basic Asphalt Pavement Specification for Central Mall:

(i)  The entire site shall be cleared of all trees, brush, logs and rubbish. Remove and dispose of 6" of existing soil, roots and vegatation over the entire site. Excavate subrade to maximum depth required by minimum fill requirements;

(ii)  Scarify and compact subgrade to 93% of modified denisty (ASTM D-1557) moisture content of 2% to 5% above optimum moisture conditions to a depth of 7" in heavy traffic area and 6" in light traffic area. Suppoort fabric shall be Dupont Typar #3401 or approved equal;

(iii)  Haul in select fill having a plasticity index less than 10, a clay content not greater than 50%, placed and compacted to 95% of modified density (ASTM D-1556) with a dry density of more than 115 lbs. per cubic foot and a compacted CBR of at least 10, depth of 15" in the heavy traffic

43

009196

             area and 12" in light traffic area;

(iv)  Soil cement base shall be in conformance with Texas Highway Department specification #270, 6% cement, depth of 8" in heavy traffic area and 6" in light traffic area;

(v)  The select material used for the soil cement stabilization will have a plastic index les than 10;

(vi)  Hot mix asphaltic pavement in conformance with Texas HIghway Department specification item #350, type C, depth 3" heavy traffic area and 2" in light traffic area.

(b)  Laid out and marked in accordance with TENANT's Parking Typical Spacing Layout, shown on "EXHIBIT B", as hereinabove provided;

(c)  Provided with lighting which shall have a maintained intensity of one (1) foot candles at 36" above the parking surface; and

(d)  Available for use as necessary for TENANT's business purposes during store hours and for one hour after each day's closing of TENANT's retail department store upon the Leased Premises.

12.7  In addition to the usual remedies for breach of contract, TENANT shall have the right to enforce specific performance and/or to maintain a mandatory injunction against any violation, or proposed violation, by LANDLORD of the covenants contained in this Article. However, except where otherwise expressly provided, violations of any such covenants by LANDLORD shall not con-

stitute grounds for termination of this LEASE AGREEMENT by TENANT.

12.8   The certificate of the Architect, approved by both Parties hereto, as herein provided, shall be conclusive as to the number of square feet of Floor Area and Gross Leasable Area, in each instance in which a determination thereof shall be required under the provisions of "Article 40 Arbitration".

12.9   Neither TENANT nor LANDLORD shall be deemed to be in default under the provisions of this LEASE AGREEEMENT by reason of failure to meet the time so long as such Party is continuing to exert its best efforts to comply with such time schedules.

Article 13 Mortgage          009198

Paragraph

13.1  LANDLORD represents that LANDLORD intends to apply to a savings bank, trust company, insurance company, pension trust fund or other similar lending institutions, or bond financing, for a mortgage loan upon the Leased Premises and/or the LANDLORD Tract, in order to provide the financing for the construction of the Improvements thereon, with the payment of such mortgage to be secured by a mortgage or mortgages, or deeds, or deed of trust covering the same.

13.2  LANDLORD hereby agrees to make all payments upon said loan(s), as and when the same shall become due and payable, and to comply with all of the terms and provisions of the deed(s) of trust securing the same at all times during the Term thereof.

13.3  Upon execution of this LEASE AGREEMENT by the Parties hereto, or as soon thereafter as is feasible, LANDLORD shall furnish TENANT with:

> (1)  A conformed copy of the mortgage(s), as recorded, showing all recordation information;

> (2)  A conformed copy of the note, or notes, evidencing the loan secured by the mortgage; and

> (3)  A written agreement fully executed and acknowledged by LANDLORD and mortgagee(s), in form satisfactory to TENANT, which shall set forth the covenants of LANDLORD and mortgagee(s) to perform all of the obligations relating to the mortgage(s), required by the provisions of this LEASE AGREEMENT.

Article 14 Subordination

THIS LEASE AGREEMENT is subject and subordinate solely to the first lien hereinafter referred to in

45

009199

"Article 13 Mortgage", and all modifications, replace-
ments and extensions of the unpaid balance thereof,
which may hereafter affect the Leased Premises upon the
following conditions that:

(a) For as long as TENANT performs TENANT's
obligations hereunder, TENANT's peace-
able and quiet possession of the Leased
Premises, and all rights herein apper-
taining thereto, be not disturbed on
account of such mortgage, or by reason
of anything done, or caused to be done,
thereunder; and

(b) The mortgage hereinabove mentioned, to
which this LEASE AGREEMENT is subordi-
nate, and any renewals or replacements
thereof, or any agreement extending or
modifying the same, shall contain a
provision whereby the mortgagee shall
agree, acquiesce and consent to the
provisions of "Article 30 Leased Prem-
ises Destruction" and " Article 36
Eminent Domain" hereof.

Article 15 Future

Paragraph

15.1 Notwithstanding any other provisions in this
LEASE AGREEMENT, LANDLORD shall not have the right to
expand any Building, or to construct an additional
Building(s) on the Shopping Center Tract after the com-
pletion of the construction described in the preceding
Articles of this LEASE AGREEMENT. Any construction done
pursuant to Section 12.1 shall be done on the following
conditions:

(a) LANDLORD, at its sole expense, shall
proceed simultaneously with the con-
struction and completion of both the
Building, and additional Parking Spaces
sufficient to maintain the parking

009200

index for the <u>Shopping Center</u> required
by the provisions of "Article 24 Common
Area";

(b)   LANDLORD shall not expand any Building,
or construct any additional Building,
upon its Tract or the Shopping Center
Tract outside its Permissible Building
Area or in the areas between the
streets bounding the <u>Shopping Center</u>
and the Buildings existing, or to be
constructed, as shown on the Plot Plan,
"EXHIBIT B," without prior written
approval of TENANT;

15.2   The location of any such Building expansion,
or additional Building, if outside the Permissible
Building Area, and such additional Parking Spaces per-
mitted in accordance with this Article and the Plot
Plan, "EXHIBIT B," shall be approved by each Party prior
to the beginning of construction; <u>excluding</u> the reloca-
tion of interior walls and any interior remodeling; but
<u>including</u> the relocation or remodeling of the Enclosed
Mall.

15.3   No Party shall withhold approval of any such
location, or relocations, unreasonably or arbitrarily.
The intention of the Parties is that LANDLORD shall be
free to expand its Buildings or construct additional
Buildings; provided such expansion or construction is
done in conformity with the provisions of this LEASE
AGREEMENT, and especially with the provisions for main-
taining the parking index and for the location of any
such Building expansion or additional Buildings within
the Permissible Building Areas, as shown on the Plot
Plan, "EXHIBIT B".

15.4   LANDLORD shall not voluntarily dedicate,
give or cause to be taken, any part of the Parking
Space, roadways, drives, walks or any other portion of
the Common Area on the Shopping Center Tract for any
public or exclusive private use.

47

009201

15.5   LANDLORD shall not expand the Buildings, or construct additional Buildings, upon its Tract or the Shopping Center Tract, except in compliance with the provisions of this Article.

15.6   LANDLORD represents and warrants that each department store Occupant shall be bound to all of the conditions set forth in this Article.

15.7   Lloyd Hayes and Hayes Inc., are members of the joint venture that is the LANDLORD herein, owns RESERVE Tracts A, B, and C, individually and apart from the joint venture.   Lloyd Hayes and Hayes, Inc., owns D, E, and F, and  as owner of the RESERVE Tracts and LANDLORD hereby covenants and agrees with respect to the RESERVE Tracts, that during the term of this Agreement the  RESERVE  Tracts  may  be  developed  and  used individually and/or collectively for any lawful purpose but with the following limitations:

(a)   No Building or other Improvements (i) will be constructed within forty (40') feet of the ex-terior boundaries of the RESERVE Tracts as shown on the Plot Plan; or (ii) outside the "Permissible Building Area" on each RESERVE Tract as shown on the Plot Plan. No "curb cuts," if any, from a RESERVE Tract Parcel to Ring Road shall be made unless TENANT approval has been first obtained in writing except as shown on Plot Plan.

(b)   Pylon signs or free standing signs shall be located as shown on the Plot Plan.  Such signs shall be used to identify restaurants or savings and loan institutions and shall not exceed nineteen (19) feet in height.  Any deviation from this standard shall be subject to TENANT's approval.

(c)   The Parking Area on each of the respec-tive parcels of land comprising the RESERVE Tracts shall contain not less than 5.1 car spaces, such spaces to be constructed as shown on the Plot Plan, for each 1,000 square feet of "Floor Area" on each of the said respec-tive parcels.  All parking shall be at grade level or below.  Provided, however, if a Tract is used for hotel

009202

or motel purposes, parking shall be provided for not less than (1) car space for each room, plus 5 car spaces for every 1,000 square feet of "Floor Area" used for restaurants and other related facilities. Parking for office building uses shall be 3 car spaces for every 1,000 square feet of "Floor Area".

(d)   The RESERVE Tracts shall not be used for any purpose which may cause noxious odors and/or untidiness; and shall be used for purposes not inconsistent with a regional shopping center. The RESERVE Tracts shall be used only for general office uses, retail merchandising uses, professional services and other uses as set out on "EXHIBIT B". LANDLORD shall use the Tracts for the purposes listed unless written consent of TENANT is obtained for different uses.

(e)   Lloyd Hayes and Hayes Inc., and LANDLORD shall maintain or cause their respective RESERVE Tracts to be maintained attractively and in a neat and clean condition and cause the standards of maintenance on the RESERVE Tracts to be substantially the same as required on the Common Area of the Shopping Center.

(f)   The aesthetics of any Building erected on the Reserve Tracts shall be compatible to the architectural treatment of the Shopping Center Buildings.

(g)   In order to make certain that during the term of these restrictions, there will always be a view of the Department Stores within the Shopping Center from the abutting streets, the following restrictions shall also apply to the RESERVE Tracts:

(i)   The acreage of the RESERVE Tract used for one or more Buildings or above-grade structures (hereinafter, "the construction") constructed thereon shall not exceed one-third (1/3) of the total acreage of such RESERVE Tract;

(ii)   The construction constructed on a RESERVE Tract Parcel shall not extend upon or over more than fifty (50%) percent of the length

49

009203

of such RESERVE Tract Parcel along the roadway (whether abutting streets, Ring Road or the "Access Roads" as hereinafter defined), hereinafter collectively referred to as "The Roadway," upon which such parcel fronts;

(iii)   The construction on a RESERVE Tract Parcel shall not present a staggered or checkerboard effect when viewed from the Roadway on which the Parcel fronts. Accordingly:

(x)   There shall, at all times, be maintained between such construction a view corridor ("View Corridor") running from the Roadway on which the RESERVE Tract fronts to the nearest point thereto, measured in a straight line, to the rear of the RESERVE Tract. The width of each View Corridor shall be not less than a distance equal to the sum of fifty (50%) percent of the widths or lengths (whichever is greater) of each area of construction adjoining such View Corridor.

(iv)   The landscaping of the RESERVE Tract shall not materially obstruct (either through original planting or through untrimmed growth) the view of the Shopping Center Site;

(v)   No structure shall be constructed over twenty-one (21') feet in height.

50

As used in this Section, the term "construction" shall not include grade-level parking areas, sidewalks, roadways, landscaped areas or any other similar appurtenances to such Building or structures.

The foregoing use restrictions shall be effective for a term which shall cease with respect to the RESERVE Tracts at such time as no Department Store is being operated in the Leased Premises, unless the fact of no operation is attributable to unavoidable delays. The Parties, Lloyd Hayes and Hayes, Inc., individually further agree that, as no measure of damages can be set for the violation of the use restrictions contained herein, the same may be enforced by injunction suit brought by the TENANT of the Leased Premises, or its successors and assigns, against anyone who may be or become the owner of the said RESERVE Tracts or any part thereof.

Article 16   Insurance

Paragraph

16.1   LANDLORD shall cause each of the contractors performing any work or construction upon the LANDLORD Tract and the RESERVE Tract to carry contractor's protective liability insurance at each of said contractor's sole expense, covering LANDLORD and TENANT, as named insureds, in the minimum limits of:

> (1)   $1,000,000 for death of, or bodily injury to, or personal injury to, one person;

> (2)   $2,000,000 for death of, or bodily injury to, or personal injury to, more than one person, in or resulting from one occurrence; and

> (3)   property damage to the limit of not less than $500,000 for each occurrence;

during the period of time from the beginning of the Site Preparation Work on the Shopping Center Tract, to and

including the completion of the construction of the pro-
posed Improvements on such Tract.

16.2   LANDLORD shall maintain, or cause to be
maintained, Builders' Risk and Workmen's Compensation
insurance during all the period of time any construction
of Improvements upon the Shopping Center Tract is in
progress and completed.   Such insurance shall contain
provisions and be in amounts satisfactory to all Parties
and shall be adequate to protect all Parties from and
against any and all claims for death of, or injury to,
person, or persons, or damage to, or loss of, property,
which may arise upon said Shopping Center Tract during
any periods of construction.

16.3   LANDLORD shall, during any period of expan-
sion, remodeling, extensive repairs or maintenance to
any of the Improvements upon its Tract, maintain, or
cause to be maintained, such insurance as is herein re-
quired to be carried and maintained during the initial
construction period, except that the amounts thereof
shall be reduced or increased, according to the extent
of such expansion, remodeling, repairs or maintenance.


Article 17 Liens

Paragraph
17.1   When, under the provisions of this LEASE
AGREEMENT, any construction is permitted to be performed
and such construction is performed, or when any con-
struction is performed that is not permitted hereunder,
it is understood and agreed tha LANDLORD shall not per-
mit any mechanics' or materialmen's liens, or other
similar liens, to stand against any part of the Shopping
Center Tract, including the RESERVE Tract.

17.2   LANDLORD may bond and contest the validity
and amount of any such lien, but on final determination
of the validity and amount of the lien, LANDLORD shall
immediately pay any judgment rendered, with all proper
costs and charges, and shall have the lien released at
LANDLORD's expense.

009206

## Article 18
### TENANT Purchase Option on LANDLORD TRACT

Paragraph

18.1   In the event LANDLORD shall not have constructed at least:

295,000

square feet of Gross Leasable Area, excluding the Improvements on the Leased Premises, as provided in "Article 12 Shopping Center Improvements," by not later than one (1) year after the beginning of the Optional Opening Term hereof, then and in such event, TENANT shall have, and is hereby granted, the Option to purchase said LANDLORD Tract, by giving LANDLORD written notice of TENANT's intention so to do, at any time within six (6) months after such one (1) year period, at a purchase price comprised of the sum of the following costs theretofore expended by LANDLORD and verified by LANDLORD's accounting records, for and upon such LANDLORD Tract:

    (a)   the cost of the land; and

    (b)   the cost of the Improvements, if any, then situated upon such land, including site Improvements, architectural and engineeering fees;

(which sum shall be hereinafter referred to as the "Purchase Price") and upon such other terms and conditions as are set forth in this Paragraph 18.1, subject to any and all leases and other agreements appearing of record and affecting said LANDLORD Tract, TENANT, within 180 days after the date of said notice of its intention to purchase said LANDLORD Tract (which date within such 180 day period shall be, for convenience, herein called the "Delivery Date") shall forward to:

LAWYER'S TITLE INSURANCE COMPANY

as Escrow Agent (or such other substitute Escrow Agent, as may hereafter be agreed to by LANDLORD and TENANT) as earnest money to be applied upon such "Purchase Price," as sum equal to one-tenth (1/10th) of the "Purchase Price," with instructions to such Escrow Agent to hold

009207

such funds, pending compliance by LANDLORD with the provisions of Paragraph 18.1 and 18.2.

18.2    LANDLORD shall deposit with Escrow Agent, upon such "Delivery Date," a General Warranty Deed, properly executed by LANDLORD (any any other person, firm or corporation whose signature shall be deemed necessary at such time) so as to properly convey to TENANT unencumbered title to the LANLORD Tract, in fee simple and merchantable, with full covenants of warranty and subject only to such exceptions as TENANT shall have previously approved. Provided that Escrow Agent shall have issued its title commitment to TENANT upon said premises, evidencing good and marketable title to LAND-LORD, subject only to exceptions approved by TENANT, Escrow Agent shall, within ten (10) days after such notice of approval by TENANT of such title commitment, notify LANDLORD and TENANT of a "Closing Date," within such ten (10) day period, and upon such "Closing Date," Escrow Agent shall deliver to TENANT the above mentioned properly executed General Warranty Deed to the LANDLORD Tract, together with an Owner's Title Insurance Policy, issued by Escrow Agent, evidencing good and marketable title to said LANDLORD Tract, subject to such exceptions as shall have been previously approved by TENANT.

18.3    TENANT, at its option, may, subject to the approval of the lienholder, assume the remaining unpaid principal balance of any note secured by a first lien on the LANDLORD Tract; in which event TENANT shall there-upon deliver to LANDLORD any funds in excess of such re-maining balance necessary to comprise the total "Pur-chase Price," as hereinabove defined, less any and all delinquent interest and taxes, if any, and prorated closing items herein provided to be chargeable to LAND-LORD. In event lienholder does not allow the assumption of the note by TENANT as set out above, TENANT shall pay to LANDLORD in cash such money. TENANT shall pay the closing costs incurrred or charged by the Escrow Agent for an Owner's Title Insurance Policy, drawing the clos-ing instruments, escrow fee, revenue stamps, if any, and recording fees in connection with the acquisition of the LANDLORD Tract.

18.4    Upon such "Closing Date," LANDLORD shall deliver its deed, conveyance, assignment or release to TENANT of all of LANDLORD's right, title, and interest to any agreements, documents, books, records, and instruments in any way pertaining to the said Shopping Center and to the said LANDLORD Tract.

18.5    In the event that Escrow Agent shall be unable to issue its title commitment evidencing good and marketable title to said LANDLORD Tract, or in the event that TENANT shall be unable to approve such exceptons as shall be set forth in such title commitment, then, and in either of such events, Escrow Agent shall forthwith refund to TENANT, upon TENANT's written request therefor, any and all funds theretofore deposited with Escrow Agent under the provisions of Paragraphs 18.1 and 18.2.

18.6    In the event that LANDLORD, upon the existence of the above mentioned option in TENANT, and upon TENANT's compliance with the provisions of Paragraphs 18.1 and 18.2 above, shall fail to consumate the sale of the LANDLORD Tract for any reason within LANDLORD's reasonable control except TENANT's default under said Paragraphs 18.1 and 18.2, TENANT may enforce specific performance of such provisions or may bring suit for damages against LANDLORD.

18.7    In the event that TENANT, upon LANDLORD's compliance with the provisons of Paragraphs 18.1 and 18.2 (under the circumstances therein recited to be necessary to vest said option in TENANT) shall fail to consumate the purchase of the LANDLORD Tract for any reason except such as are hereinabove set forth in Paragraph 18.3, or except LANDLORD's default under the provisions of Paragraphs 18.1 and 18.2, LANDLORD shall have the right to receive and retain the funds deposited by TENANT with Escrow Agent under the provisions of Paragraph 18.1 as liquidated damages, or LANDLORD may at its option, enforce specific performance of said Paragraphs 18.1 and 18.2.

009209

# PART THREE

## Operation

### Article 19 Shopping Center Name

For identification, public relations, and advertising purposes, the name of the Shopping Center shall be:

CENTRAL MALL

and such name shall not be changed during the Term of this LEASE AGREEMENT, without TENANT's written consent.

### Article 20 Publicity Releases

LANDLORD and TENANT each agree that neither of them shall issue any statement or publicity releases, or otherwise publicize this LEASE AGREEMENT, except in such form and at such time as may be approved by each Party.

### Article 21 Tenant Selection

Paragraph

21.1   LANDLORD, at all times during the Term hereof, shall diligently undertake, in good faith, to maintain, under executed written lease agreements, an aggregate:

295,000

square feet of Gross Leasable Area in the Buildings constructed on the LANDLORD Tract.

21.2   It is in the mutual and best interest of the Parties, and imperative to the maximum utilization of the Shopping Center Tract, that the Shopping Center be developed and maintained as an integrated, first-class, regional shopping center, to contain a combination of merchants and businesses which:

      (1)   represent a sound, balanced and generally compatible diversification of merchandise and services;

56

009210

(2)  are well qualified and willing to di-
rect an intensive and continuous mer-
handising and promotional program;

(3)  will be of strong financial condition
and good repute;

(4)  will efficiently utilize, and not ex-
ceed the capacity of, the available
Parking Spaces, all other portions of
the Common Area, the Enclosed Mall, or
any portion thereof, to obtain the max-
imum amount of business and business
profits; and

(5)  will fixture, decorate and maintain
their respective stores and business
premises in a clean, safe, sightly,
tasteful and decorous manner, having
regard for the general standards of
good appearance prevailing in the
Shopping Center.

21.3  LANDLORD shall obtain leases with qualified
tenants which shall require the tenants to open for bus-
iness on or before October 1, 1981 in at least 60% of
the square feet of Gross Leasable Area in the Buildings
to be constructed on the LANDLORD Tract.

21.4  Any use or occupancy in the area immediately
adjoining TENANT's Building, and not exceeding 150 lin-
eal feet of the Enclosed Mall from TENANT's Building,
shall be for one or more of the following retail pur-
poses:

(1)  Men's Ready to Wear;
(2)  Ladies' Ready to Wear;
(3)  Men's and Ladies' Ready to Wear;
(4)  Men's Shoe sales;
(5)  Ladies' Shoe sales;
(6)  Family Shoe sales;
(7)  Selling and serving restaurant meals
for consumption within the store;
(8)  Athletic Footwear sales;

009211

(9)   Book store;

(10)   Nutrition and Health Food store;

(11)   Children's store;

(12)   Fashion Accessories sales;

(13)   Fashion Apparel sales;

(14)   Jewelry sales;

(15)   Toy sales;

(16)   Tobacco sales;

(17)   Optical goods sales;

(18)   Fabric sales; and

(19)   Financial Insitution (Bank or Savings & Loan).

21.5   The provisions of this Article shall apply to any and all tenancies and occupancies upon land adjacent to the Shopping Center now or later owned or controlled by LANDLORD, its successors and/or assigns, excluding mortgages.   LANDLORD and TENANT shall use its best efforts and avail itself of all legal remedies to prevent any other person, firm or corporation from violaing the provisions of this Article.

21.6   Since damages for violation of the provisions contained in the preceding paragraphs of this Article would be difficult to ascertain and would, in any event, not afford an adequate remedy, such provisions shall be enforceable, to the extent they are in effect, only by injunction or decree for specific performance.


Article 22 Merchants' Association


TENANT shall, prior to the date it opens its Building for business with the general public, examine the organizational structure and by-laws of any "Merchants' Association" formed by LANDLORD for the purpose of promoting business in the Shopping Center, with membership therein offered to tenants and Occupants in the Shopping Center; and TENANT shall join said association and remain an active member thereof during at least the first year of the Term hereof (except as herein otherwise proivided) from the date it opens for business

58

009212

with the general public; provided TENANT determines to
its satisfaction that:

(1)   Membership therein is available to it
on a fair and equitable basis with
annual dues not exceeding five cents
(5¢) per square foot of TENANT's Gross
Leasable Area for retail department
store use;

(2)   LANDLORD and one-hundred percent (100%)
of all other Shopping Center Occupants
engaged in the business of selling
goods, wares, and merchandise and re-
lated services at retail are members of
said association;

(3)   LANDLORD has agreed to pay not less
than twenty five (25%) of the annual
budget of said association, such pay-
ment by LANDLORD would be in addition
to the amounts to be paid by tenants of
LANDLORD and other Occupants of the
Shopping Center (but such requirement
shall be reduced to not less than
twenty-five percent (25%) of the
amounts paid annually by tenants of
LANDLORD and other Occupants of Shop-
ping Center, in the event of any fore-
closure of any first mortgage on the
Shopping Center Tract, or any part
thereof, or the delivery of a deed in
lieu of foreclosure of any first
mortgage);

(4)   Said by-laws shall contain no provision
which would regulate, or empower said
association to regulate, the manner or
hours of operation of TENANT; and

(5)   TENANT shall not be bound by an act or
omission of said Merchants' Associa-
tion; the obligation of TENANT to said
Merchants' Association being to pay

009213

dues in conformance with the provisions
of this Article, and the obligation of
LANDLORD being to discharge any other
charges or assessments that may be
incurred by TENANT by reason of its
membership in said Merchants' Associa-
tion.


## Article 23 Enclosed Mall

### Paragraph

23.1    LANDLORD shall, at its sole cost and ex-
pense, at all times during the Term of this LEASE AGREE-
MENT (subject to the provisions of "Operation Article 29
Maintenance" and subject to acts beyond its control, as
set forth in "General Article 35 Force Majeure"):

> (1)    Keep and maintain the Enclosed Mall in
> a clean, safe and sightly condition and
> in good order and repair, and cause the
> same to be well-lighted, attractive and
> in good appearance at all times when
> TENANT's Building, or any part thereof,
> shall be open and doing business;

> (2)    Keep and maintain the Enclosed Mall
> heating and cooling system in good
> operating condition and use its best
> efforts    (subject    to    governmental
> regulations) to:

> (a)    Cool the Enclosed Mall to the
> average temperature of not more
> than 75 degrees Dry Bulb and to
> produce a relative humidity not
> exceeding 50% when the outside Dry
> Bulb temperature is 95 degrees F.
> and the outside Wet Bulb tempera-
> ture is 78 degrees F. during each
> day of the Term hereof when local
> climatic    conditions    require,
> throughout all hours when the
> TENANT Building, or any part

60

009214

thereof, is open and doing busi-
ness; and

(b) Heat the Enclosed Mall with suffi-
cient heat to maintain therein, an
average temperature of at least 70
degrees F. during each day of the
Term hereof when local climatic
conditions require, throughout all
hours when TENANT Building, or any
part thereof, is open and doing
business;

(3) Obtain the written consent from TENANT
prior to leasing, or permitting occu-
pancy, of certain Gross Leasable Area
on the Enclosed Mall, in accordance
with Paragraph 21.4 of "Operation Arti-
cle 21 Tenant Selection:";

(4) Prohibit any obstruction, plant, booth
or other installation over 5 feet in
height within the Enclosed Mall within
150 feet of TENANT's Building; and pro-
hibit any kiosks in the Enclosed Mall
within 150 feet of TENANT's Building;

(5) LANDLORD shall cause each Occupant of
Gross Leasable Area, which opens on the
Enclosed Mall upon the LANDLORD Tract,
to plan and operate such area in a man-
ner that it shall not unreasonably uti-
lize any heated air or cooled air from
the Enclosed Mall, or unreasonably bur-
den the heating or cooling of air in
the Enclosed Mall. LANDLORD shall
cause the heating and air conditioning
system in the Enclosed Mall to be
planned and operated in a manner that
it shall not unreasonably utilize any
heated air or cooled air from the TEN-
ANT Building, or unreasonably burden
the heating or cooling of air in such

61

009215

Building.   As used in this subparagraph:

(a)   "unreasonably utilize" means utilization by one Occupant of the air of another Occupant to the extent that the cost of heating or cooling of air by the Occupant utilizing such air of another Occupant would thereby be markedly lower; and

(b)   "unreasonably burden" means one Occupant discharging unheated or uncooled air into the Enclosed Mall or the Gross Leasable Area of another Occupant, to such an extent that the cost of heating or air conditioning the Enclosed Mall or such other area of the other Occupant is thereby markedly increased.

23.2   TENANT and LANDLORD shall each use its best efforts to prevent:

(1)   The distribution of any hand bills, or other advertising material, on or about any part of the Enclosed Mall;

(2)   The installation in, on or about the Enclosed Mall premises, of any amplifiers or similar devices or the use in or about any Building in the Enclosed Mall of any advertising medium, which may be heard or experienced outside such Building, such as, flashing lights, spot lights, loud speakers, phonographs or radio broadcasts;

(3)   The burning of any papers, trash or garbage of any kind in the Enclosed Mall;

009216

(4)   The use of any portion, or portions, of
the Enclosed Mall for the purposes of
loading or unloading any truck or other
delivery vehicle, except in those por-
tions designated on each Tract as
"Loading Area" or "Truck Dock" on
"EXHIBIT B"; and

(5)   The distribution, or use, of any
printed, or handwritten, papers or ma-
terials (including magazines and news-
papers) of any kind or character on or
about any part of the Enclosed Mall.

23.3   At all times during the Term, TENANT and
LANDLORD shall each not permit any fence, barricade,
structure, building or other obstruction which unreason-
ably hinders access and walkways in the Enclosed Mall of
any   kind   whatsoever,   placed,   kept,   permitted   or
maintained on or in the Enclosed Mall, or any part
thereof, without the prior written consent from the
other Party which consent shall not be unreasonably
withheld.

### Article 24 Common Area

Paragraph
24.1   At all times during the Term, LANDLORD shall
maintain, or cause to be maintained, upon the Shopping
Center Tract, a minimum parking index of:

5.5

automobile Parking Spaces for each 1,000 square feet of
Gross Leasable Area upon the Shopping Center Tract.

24.2   In the event at any time during the Term,
there shall be a reduction in the Common Area for any
reason other than Eminent Domain as provided for in
"Article 36 Eminent Domain", and there becomes a lesser
number of Parking Spaces than is required under this
Article, LANDLORD shall (simultaneously with the reduc-
tion in such Common Area) provide Parking Spaces, either
multi-level upon its Tract, or upon land which is adja-
cent, contiguous or near-by, constructed as set forth in

009217

"Article 12 Shopping Center Improvements", and being at least in number necessary to re-establish and thereafter maintain the parking index required under this Article.

24.3   At all times during the Term, TENANT and LANDLORD shall each not permit any fence, barricade, structure, building or other obstruction of any kind whatsoever, placed, kept, permitted or maintained on the Common Area, or any part thereof, without the prior written consent from the other Party; except to the extent such obstruction shall be reasonably required:

(1)   In connection with the use of any recorded easements on the Shopping Center Tract;

(2)   In connection with the expansion, repair or replacement of any of the Improvements from time to time locatd in the Shopping Center; or

(3)   In connection with the outdoor selling in those areas marked "Outdoor Selling Area" or "EXHIBIT B"; provided, however, that this restriction shall not preclude outdoor selling on the Common Area, in those instances when all Department Stores and a majority of the Merchants' Association members in the Shopping Center join in a promotional activity for a stipulated period of time to engage in outdoor selling thereon.

24.4   TENANT and LANDLORD shall each use its best efforts to prevent:

(1)   The distribution of any hand bills or other advertising material on or about any part of the Common Area;

(2)   The installation in, on or about the Common Area premises of any amplifiers or similar devices, or the use in or

64

009218

about any Building in the Common Area of any advertising medium which may be heard or experienced outside such Building, such as, flashing lights, spot lights, loud speakers, phonographs or radio broadcasts;

(3)   The burning of any papers, trash or garbage of any kind in the Common Area;

(4)   The use of any portion, or portions, of the Common Area for the purposes of loading or unloading any truck or other delivery vehicle, except in those portions designated on each Tract as "Loading Area" or "Truck Dock" on "EXHIBIT B"; and

(5)   The distribution, or use, of any printed, or handwritten, papers or materials, (including magazines and newspapers of any kind or character on or about any part of the Common Area.

24.5   At all times during the Term of this LEASE AGREEMENT, LANDLORD shall keep and maintain the Parking Spaces as follows:

(1)   Laid out and marked in accordance with TENANT's Parking Typical Spacing Layout, as shown on "EXHIBIT B", as hereinabove provided;

(2)   Provided with lighting which shall have a maintained intensity of one (1) foot candles at 36" above the parking surface; and

(3)   Available for use as necessary for TENANT's business purposes during store hours and for one hour after each day's closing of TENANT's retail department store upon the Leased Premises.

009219

24.6   In accordance with Paragraph 29.9 of "Article 29 Maintenance", the Parties hereto shall not make any charge for the use of any Parking Space and the Parties shall prescribe certain Parking Spaces for use by employees, contractors, licensees and consessionaires.

## Article 25 Signs

LANDLORD shall use its best efforts to prohibit the erection of any sign on the Shopping Center Tract, or on any Building within such Tract; and TENANT shall use its best efforts to prohibit the erection of any sign on its Leased Premises, except in conformity with the following policy:

(1)   There shall be no flashing, rotating or moving signs or markers of any type;

(2)   There shall be no signs painted on the exterior masonry surface of any Building;

(3)   Paper signs in, on behind, or visible through display windows shall not be permitted to remain up, or to be visible, for more than two weeks at a time;

(4)   All signs which front on the Enclosed Mall shall be: (a) not more than four (4) feet in height; (b) approximately flush with the wall of the Building; and (c) of a length which does not exceed 80% of the linear frontage of the store upon which it fronts;

(5)   Signs which are under Building canopies, other than approximately flush with the wall of the Building, shall be: (a) at right angles to the store front; (b) of a design which is uniform

009220

with other signs similarly placed under Building canopies; and (c) not more than five (5) feet wide and eighteen inches high;

(6)    Signs on the Enclosed Mall, other than as provided in Subparagraph (4) above, shall be: (a) at right angles to the store front; (b) of a design which is uniform with and at the same height measured from the floor of the Enclosed Mall; and (c) not more than five (5) feet wide and eighteen inches high;

(7)    There shall be no roof top signs;

(8)    With respect to any Building constructed within the loading and delivery areas, as shown on the Plot Plan, "EXHIBIT B" (in lieu of the requirements set forth in Subparagraphs (4), (5) and (6), signs on the wall of such Building shall be: (a) not more than six inches in height; and (b) approximately flush with the wall of the Building, except that small indentification signs shall be permitted on delivery doors;

(9)    No sign shall be permitted at or on the rear of any Building facing a loading court area, except for delivery identification;

(10)    Any sign on the outside of a Building in the Shopping Center that is visible from any street or highway shall be: (a) not more than five feet in height; (b) approximately flush with the wall of the Building; and (c) of a length which does not exceed 80% of the linear frontage of the store upon which it fronts, or 60 linear feet, whichever is less, and shall be subject to the

67

009221

approval of LANDLORD and TENANT, which approvals shall not be unreasonably withheld;

(11)   Except for directories within the Enclosed Mall, any directory or pylon sign on the Shopping Center site shall be subject to the prior written approval of LANDLORD and TENANT, which approval shall not be unreasonably withheld; it being agreed, however, that LANDLORD hereby approves the right of TENANT to place a pylon sign at TENANT's automobile tire, battery, accessory (TBA) service station; and

(12)   There shall be no paper signs, cardboard signs or portable signs of any kind or character on or about any part of the Common Area or the Enclosed Mall.

68

## Article 26 Utilities

Paragraph

26.1   LANDLORD shall, at its sole expense, provide, or cause to be provided, all Common Utility Facilities, including water, gas, electric, telephone, meters, sanitary sewers and storm sewers to and from the Leased Premises, as approved by TENANT.

26.2   LANDLORD and TENANT shall each make arrangements for and pay, or cause to be paid, any and all charges for utility services supplied on the LANDLORD Tract and on the Leased Premises, respectively.

26.3   LANDLORD shall maintain, or cause to be maintained, in good condition and repair, all Common Utility Facilities located upon the Shopping Center Tract, including the portions of the Common Utility Facilities serving the Leased Premises which are located on the Shopping Center Tract.

## Article 27 Taxes

Paragraph

27.1   LANDLORD shall pay all taxes and assessments of every nature, kind and description, levied and assessed against the Shopping Center Tract and all Improvements thereon, including the Leased Premises, as the same become due, from time to time, during the Term of this LEASE AGREEMENT.

27.2   In the event LANDLORD fails to pay said taxes and assessments, as aforesaid, before the same become delinquent, or TENANT's peaceable possession of the Leased Premises granted under this LEASE AGREEMENT is threatened on account thereof, then, unless LANDLORD immediately pays such taxes and assessments upon being requested to do so by TENANT, TENANT may pay said taxes and assessments.   In such event, LANDLORD shall, upon demand, reimburse TENANT for such payment in the manner provided in "Article 32 TENANT's Right of Reimbursement".

69

009223

27.3    In the event the imposition of any ad valorem taxes upon the Shopping Center Tract and any Improvements thereon, including the Leased Premises, or any other taxes covered by 27.2, shall be deemed by LANDLORD to be improper, illegal or excessive, LANDLORD may, if it so elects, at LANDLORD's expense, dispute and contest the same, and, in such case, such taxes need not be paid until adjudged to be valid; provided, however, that LANDLORD shall protect, defend and hold TENANT harmless from any such adjudication or the failure to pay such taxes. TENANT's quiet and peaceable possession of the Leased Premises shall not, in any event, be disturbed thereby.

27.4    Notwithstanding the other provisions of this Article, in the event the general ad valorem real estate taxes, or any other assessments against the real estate, other than utility districts, levied and assessed by all taxing districts and authorities (excluding taxes on rent, if any) against the Leased Premises and paid by LANDLORD for any calendar year of the Term hereof, after the:

THIRD (3rd)

full calendar year of said Term are so increased to an amount of money which exceeds the amount of money equal to the actual amount of taxes assessed or paid for the third (3rd) full calendar year of the Term hereof, then TENANT shall pay to LANDLORD an amount of money equal to such increase in taxes, within thirty (30) days after receipt by TENANT of satisfactory evidence showing such taxes paid by LANDLORD for the third (3rd) full calendar year of the Term hereof and for the year in which such increase in taxes is claimed by LANDLORD, provided that:

(1)    LANDLORD shall furnish to TENANT such evidence of paid taxes not later than the first day of June of the year next following the year of said increase, if any;

(2)    The valuation placed by said taxing districts and authorities upon the Leased Premises for the year of such

70

009224

increase shall be consistent, uniform and in line with the valuation placed on surrounding or like properties or if not consistent with like properties, LANDLORD has timely protested said assessment;

(3)   TENANT shall have the right, in LANDLORD's name, but at TENANT's expense, to contest the validity or amount of such taxes levied or assessed against the Leased Premises for the first (1st) full calendar year, or any subsequent year, of the Term hereof, conditioned that TENANT will take appropriate legal proceedings which operate to prevent the collection of said taxes, or any part thereof, to satisfy the same, and pending such legal proceedings, LANDLORD shall have the right to pay, remove or discharge the taxes being contested; TENANT agrees to pay any interest and penalty accruing by reason of TENANT's election to contest such taxes, provided that LANDLORD has complied with his obligations under this paragraph.

27.5   LANDLORD hereby agrees to reimburse TENANT for TENANT's payment to LANDLORD incurred in the event of increase in taxes, hereinabove provided for in Paragraph 27.4.  Such reimbursement may be partial or in full, and to effect such reimbursement, TENANT shall have, and is hereby granted, the right to deduct and retain such amount of money, out of the Percentage Rent due LANDLORD.  It is understood and agreed that said reimbursement shall be cumulative from one "Lease Year" to another "Lease Year".

27.6   "The real estate taxes and assessments of every nature, kind and description levied and assessed by all taxing districts and authorities (excluding taxes on rent, if any) against the Leased Premises", as used in this Article, shall mean:

009225

The amount of the real estate taxes and assess-
ments of every nature, kind and description lev-
ied and assessed by all taxing districts and
authorities excluding taxes on rent, if any)
against the LANDLORD Tract multiplied by a frac-
tion, the numerator of which is the Gross Leas-
able Area in the Leased Premises and the denomi-
nator of which is the Gross Leasable Area, plus
the total of the square feet in the area of each
level of the Enclosed Mall, upon the LANDLORD
Tract.


## Article 28  Insurance

Paragraph

28.1   LANDLORD shall, effective with the comple-
tion of construction of each Building, the Enclosed Mall
and all other Improvements upon the Shopping Center
Tract (including the Leased Premises), and thereafter
during the Term of this LEASE AGREEMENT, continuously
keep, or arrange to keep, all Buildings, the Enclosed
Mall and all the other Improvements upon the Shopping
Center Tract insured, at no expense to TENANT, against
loss or damage by fire and such other risks as are from
time to time included in the extended coverage of
insurance policies issued in the locality of the
Shopping Center. Said insurances shall be in amounts at
least sufficient to avoid the effects of co-insurance
provisions of the policies, that is, not less than 80%
of the actual replacement costs excluding the costs of
foundations, underground flues, pipes and drains, if
such costs are properly excludable under current co-
insurance requirements. TENANT shall obtain and keep
adequate insurance covering all fixtures in the Leased
Premises and other Improvements which are installed in
the Leased Premises by TENANT.

28.2  Each Party hereby waives any and every claim
which arises, or may arise, in its favor and against the
other Party during the Term of this LEASE AGREEMENT, for
any and all loss of, or damage to, any of its property
located within or upon, or constituting a part of, the

009226

Shopping Center, which loss or damage is covered by
valid and collectible fire and extended coverage
insurance policies, to the extent that such loss or
damage is recoverable under said insurance policies.
Said mutual waivers shall be in addition to, and not in
limitation or derogation of, any other waiver or release
regarding any loss of, or damage to, the said property
of any Party. Inasmuch as the said mutual waivers will
preclude the assignment of any such claim by way of
subrogation (or otherwise) to an insurance company (or
any other person, firm or corporation) each Party shall
give to each insurance company, which has issued to it,
policies of fire and extended coverage insurance,
written notice of the terms of said mutual waivers, and
shall have said insurance policies properly endorsed, if
necessary, to prevent invalidation of said insurance
coverages by reason of said waivers.

28.3   At all times during the Term hereof,
LANDLORD and TENANT shall, at its sole expense, contin-
uously maintain Comprehensive General Liability Insur-
ance, endorsed to cover personal injury, covering the
Building, or Buildings, Outdoor Selling Area, if any,
and the landscaping, if any, between the exterior peri-
meter wall of Buildings and Building Perimeter Sidewalk,
on its Tract within the Shopping Center Tract. Such in-
surance shall afford protection to LANDLORD and TENANT
as named insured, to the limit of not less than:

> (1)   $1,000,000 for death of, or bodily
> injury to, or personal injury to, one
> person;
>
> (2)   $2,000,000 for death of, or bodily
> injury to, or personal injury to, more
> than one person, in or resulting from
> one occurrence; and
>
> (3)   property damage to the limit of not
> less than $500,000 for each occur-
> rence.

Each Party shall, upon request of the other Party, fur-
nish certificates of such insurance or other satisfacto-
ry written evidence of such insurance at any time during

009227

the Term hereof.  Any policy required hereunder shall provide that such policy shall not be cancellable without at least ten (10) days' prior written notice to the Parties hereto.

28.4  At all times during the Term hereof, LANDLORD shall continuously maintain Comprehensive General Liability Insurance, endorsed to cover personal injury (including false arrest), covering the Common Area and the Enclosed Mall in the <u>Shopping Center</u>.  Such insurance shall afford protection to LANDLORD and TENANT, as named insureds, to the limit of not less than:

> (1)  $1,000,000 for death or bodily injury to, or personal injury to, one person;

> (2)  $2,000,000 for death of, or bodily injury to, or personal injury to, more than one person, in or resulting from one occurrence; and

> (3)  property damage to the limit of not less than $500,000 for each occurrence.

LANDLORD shall deliver to TENANT a copy of said insurance policy, or certificate or other document evidencing its existence, on or prior to the beginning of the Term, and thereafter, not less than fifteen (15) days prior to the expiration dates of the expiring policy, or policies, during the Term.  Any policy required hereunder shall provide that such policy shall not be cancelled without at least ten (10) days' prior notice to TENANT.

28.5  TENANT shall have the right, at its option, to comply with and satisfy its obligations under this Article, by means of self-insurance, but only as and to the extent that any self-insurance is guaranteed by Sears, Roebuck and Co. to LANDLORD.

28.6  Notwithstanding anything to the contrary contained herein, in the event the cost for insurance required to be carried by LANDLORD pursuant to this Article 28, including the Comprehensive General Liabili-

009228

ty Insurance and the insurance on the Improvements in-
curred by LANDLORD in any year subsequent to the third
full calendar year of the Term hereof (hereinafter "Base
Insurance Year") exceeds such insurance cost incurred by
LANDLORD in the Base Insurance Year (hereinafter "Excess
Insurance Cost"), then TENANT shall pay LANDLORD its
proportionate share of the Excess Insurance Cost. TEN-
ANT's share of the Excess Insurance Cost shall be deter-
mined by multiplying the amount of the Excess Insurance
Cost incurred by LANDLORD as of the first day of January
of the year in question by a fraction the numerator of
which is the Gross Leasable Area of the Leased Premises
and the denominator of which is the Gross Leasable Area
contained in the LANDLORD Tract. TENANT's reimbursement
shall be paid to LANDLORD in equal monthly installments,
any and all of which shall become due and payable on the
first business day of each month. TENANT shall have,
and is hereby granted, the right to deduct and retain
such amount of money paid to LANDLORD for its propor-
tionate share of the Excess Insurance Cost, from the
Percentage Rent due LANDLORD in any given year. It is
understood and agreed that said reimbursement shall not
be calculated separately and independently for each
"Lease Year", but that said reimbursement shall be
cumulative from one "Lease Year" to the next "Lease
Year" for the Term hereof.


### Article 29 Maintenance

Paragraph

29.1 At all times during the Term hereof, TENANT
shall, at its sole expense, make all repairs and re-
placements necessary to keep TENANT's Building in good
order and condition, except such as become necessary as
a result of any loss by fire or other casualty and
except such items as LANDLORD is obligated, under the
provisions of this LEASE AGREEMENT, to maintain and
repair, to or upon the Leased Premises which become
necessary for any reason, unless due to the fault or
neglect of LANDLORD.

29.2 TENANT shall keep the Leased Premises in a
clean condition, according to city ordinances and the

009229

direction of the proper public officers during the Term hereof, and upon the termination of this LEASE AGREEMENT shall deliver said Leased Premises to LANDLORD.

29.3   For the immediate protection of property or prevention of injury, where notice to LANDLORD's resident manager is impractical or impossible, TENANT shall have the right, at all times, at its sole option, without prior notice to LANDLORD, to make such reasonable emergency repairs or replacements to and upon the Leased Premises, as TENANT shall deem necessary, and the further right (if the same are LANDLORD's obligations under the provisions and conditions hereof and if the same are not necessitated by the fault or neglect of TENANT) to recover the cost thereof from LANDLORD in the manner hereinafter provided in "Article 32 TENANT's Right of Reimbursement".

29.4   In addition to the maintenance of the Common Area and the Enclosed Mall, herein provided in this Article to be done by LANDLORD, LANDLORD shall, at its sole expense, keep the roof, foundations, exterior walls, floors (excluding floor coverings) sprinkler systems, and structural parts, including plate glass windows if covered by LANDLORD's Fire and Extended Coverage Insurance, and all items contained in said roof, foundations, exterior walls and floors of the Leased Premises in good condition and repair during the Term hereof, and make all repairs and replacements thereon which become necessary for any reason, unless the same shall be necessitated by the fault or negligence of TENANT.

29.5   LANDLORD further covenants that, in the event the Improvements or repairs to be made by LANDLORD upon the Leased Premises, if any, as in this LEASE AGREEMENT provided, or any part, or parts, thereof, are not completed in the time and manner herein provided, or prove at any time, in the case of Improvements during the first (1st) year of the Term hereof, and in the case of repairs, to be defective as to workmanship or materials, LANDLORD shall, without delay, cure such defects and defaults without cost to TENANT. However, irrespective of the time limits stipulated in this Paragraph, LANDLORD shall cure all defects and defaults as to workmanship and materials which are covered by guaran-

76

009230

ties or warranties, regardless of the item covered by such guaranties or warranties, or the time at which such defect and default became known to LANDLORD or TENANT.

29.6    If LANDLORD fails to make or complete said Improvements or such repairs as LANDLORD is herein obligated to make, or to cure the defects which are in this LEASE AGREEMENT provided to be cured by LANDLORD, and thereupon LANDLORD becomes in default under Paragraph 41.10 of "Article 41 Miscellaneous" of this LEASE AGREEMENT, then, TENANT shall have the right, at its sole option, without further notice to LANDLORD, to make or cure the same.    LANDLORD agrees, upon demand, to reimburse TENANT for TENANT's expense incurred thereby, in the manner provided in "Article 32 TENANT's Right of Reimbursement".

29.7    Except as hereinafter expressly provided, from and after the completion of construction of the Leased Premises, LANDLORD shall operate and maintain, or cause to be operated and maintained, the Enclosed Mall and the Common Area in good order, condition and repair, during the Term hereof    In such operation and maintenance, LANDLORD shall observe the following standards:

> (1)    Maintain the surface of the Parking Spaces, the Enclosed Mall and sidewalks level, smooth and evenly covered with the type of surfacing material originally installed thereon, or such substitute thereof as shall be, in all respects, equal thereto in quality, appearance and durability;

> (2)    Remove all papers, debris, filth and refuse and wash or thoroughly sweep paved areas as required and remove and clean all ice and snow;

> (3)    Maintain such appropriate parking area entrance, exit and directional signs, markers and lights, as shall be reasonably required and in accordance with

009231

good, first-class, regional shopping center practices;

(4) Clean lighting fixtures and relamp as needed;

(5) Repaint striping, markers, directional signs, etc., as necessary, to maintain in first-class condition;

(6) Maintain landscaping, as necessary, to keep in a first-class condition;

(7) Employ courteous and uniformed person-nel for security patrol during store hours and such other hours as are deemed necessary by the Parties;

(8) Clean signs of the Shopping Center (as contrasted with those of Occupants) in-cluding relamping and repairs being made as required;

(9) Maintain and keep in a sanitary condi-tion public restrooms, if any, and other common use facilities; and

(10) Clean, repair and maintain all Common utility Facilities to the extent that the same are not cleaned, repaired and maintained by public utilities.

29.8 LANDLORD shall bill TENANT for TENANT's pro-rata share of LANDLORD's net cost and expense (after crediting income derived from charges, if any, collected from any Occupant or Permittee for the right to park ve-hicles in Parking Spaces) of operating and maintaining and the Common Area, based on the proportion that the number of square feet of Gross Leasable Area in the Leased Premises (excluding the Gross Leasable Area in TENANT's automobile tire, battery accessory (TBA) ser-vice station) bears to the total number of square feet of Gross Leasable Area in the Shopping Center (excluding the Gross Leasable Area in TENANT's automobile tire, battery accessory (TBA) service station); provided that

000232

in no event shall the annual amount of said billing
exceed the amount determined by multiplying the number
of square feet in the Gross Leasable Area in the Leased
Premises (excluding the Gross Leasable Area of TENANT's
automobile tire, battery, accessory (TBA) service
station) by:

TWELVE CENTS (12¢)

per square foot per year. On the fifth (5th) anniver-
sary of the date on which TENANT's share of Common Area
Expenses are first payable and each five (5) years after
said anniversary date (adjustment date), said expenses
may be increased not more than ten per cent (10%) of the
Common Area expenses paid annually for the previous year
each adjustment date.

LANDLORD shall bill TENANT for TENANT's prorata
share of LANDLORD's net cost and expense of operating,
maintaining heating and air conditioning the Enclosed
Mall, based on the proportion that the number of square
feet of Gross Leasable Area in the Leased Premises (ex-
cluding the Gross Leasable Area in TENANT's automobile
tire, battery accessory (TBA) service station) bears to
the total number of square feet of Gross Leasable Area
in the Shopping Center (excluding the Gross Leasable
Area in TENANT's automobile tire, battery accessory
(TBA) service station), provided that in no event shall
the annual amount of said billing exceed the amount de-
termined by multiplying the number of square feet in the
Gross Leasable Area in the Leased Premises (excluding
the Gross Leasable Area of TENANT's automobile tire,
battery, accessory (TBA) service station) by:

EIGHT CENTS (8¢)

per square foot per year. On the fifth (5th) anniver-
sary of the date on which TENANT's share of Enclosed
Mall Expenses are first payable and each five (5) years
after said anniversary date (adjustment date), said ex-
penses may be increased not more than ten per cent (10%)
of the Enclosed Mall Expenses paid annually for the
previous year, each adjustment date.

TENANT shall recapture and deduct its contribu-
tions made to LANDLORD for Common Area and Enclosed Mall
expenses set out in this section from Percentage Rent
due LANDLORD if and when net sales on the Leased Premi-

79

009233

ses exceeds Fourteen Millon Dollars ($14,000,000) per
year.

29.9  Such billing, however, shall be monthly and
based upon LANDLORD's actual cost and expense of the
previous month's operation, during which TENANT's
building was open to, and doing business with, the
general public upon the Leased Premises, subject to the
limitation set out in the preceding Section 29.8.  At
the end of each twelve (12) months' period after the
date TENANT's retail department store is open for
business with the general public, LANDLORD shall render
to TENANT a full and complete itemized statement of such
operation and maintenance cost and expense, certified
accurate by a duly authorized representative of
LANDLORD.  TENANT shall have the right, at its sole
expense, exercisable upon ten (10) days' notice to
LANDLORD, to request and make an audit of such books and
records of account, as pertain to any such statement.

29.10  unless the Parties otherwise consent and
agree, in writing, no charge of any type shall be made
to, or collected from, any Occupant or any Permittee for
parking, or the right to park vehicles in the Parking
Spaces.  Permittees shall not be prohibited or prevented
from so parking so long as Parking Spaces are available,
and so long as they do not violate the reasonable rules
and regulations covering the use of the Parking Spaces
promulgated from time to time by the Parties.  The Par-
ties shall, by mutual agreement, prescribe certain sec-
tions within the Common Area, or on other land outside
the Common Area within a reasonable distance from the
nearest boundary of the Shopping Center, for use as
Parking Spaces for the employees, contractors, licensees
and concessionaires to use only such sections as are so
prescribed for parking.  Each Party agrees to use the
reasonable efforts to enforce the provisions hereof.

009234

## Article 30
### Leased Premises Destruction

Paragraph

30.1    During the Term hereof, LANDLORD shall, at its own expense, promptly rebuild, restore and repair the Leased Premises to substantially the same condition in which the Leased Premises existed immediately prior to the date the Leased Premises are damaged, destroyed or rendered unfit for its accustomed uses, by reason of fire, explosion, tornado, earthquake or any other casualty (regardless of whether or not caused by TENANT's negligence), subject to Paragraphs 30.2, 30.3, and 30.4 of this Article.

30.2    After the first fifteen (15) years of the Term hereof, either Party shall have the right to terminate this LEASE AGREEMENT effective as of the date of any casualty, by giving written notice of such termination to the other Party within thirty (30) days from the date of said casualty; provided that the Leased Premises are damaged, destroyed or rendered unfit for its accustomed uses to the extent of more than:

FIFTY PERCENT (50%)

when said percentage is determined by dividing the cost to replace the Improvements of the Leased Premises damaged, destroyed or rendered unfit for its accustomed uses, by the market value of the total Improvements on the Leased Premises immediately prior to said casualty, as said cost and market value are disclosed by certification of a reputable building contractor acceptable to both Parties, or if no acceptable contractor be agreed upon, then the certification of an architect who is acceptable to both Parties and who is a member of the local chapter of the American Institute of Architects; subject to Paragraphs 30.3 and 30.4 of this Article.

30.3    During the last:

THIRTY-FIVE (35)

years of the Term hereof, LANDLORD shall have the right to terminate this LEASE AGREEMENT effective as of the date of any casualty, by giving written notice of such termination to TENANT within forty-five (45) days of the date of said casualty; provided that the Leased Premises

81

009235

are damaged, destroyed or rendered unfit for the
accustomed uses to the extent of more than:

THIRTY PERCENT (30%)

when said percentage is determined in the manner de-
scribed in Paragraph 30.2; except that LANDLORD shall
not have said right to terminate this LEASE AGREEMENT
under the provisions of this Paragraph, in the event
TENANT shall, within thirty (30) days from the date of
said casualty, give written notice that TENANT's
Operating Period shall be extended for ten (10) years
from the date of TENANT's acceptance of the completion
of the rebuilding, restoration and repairing of the
Leased Premises to substantially the same condition in
which it existed immediately prior to said casualty;
subject to Paragraph 30.4 of this Article.

30.4   During the last thirty-five (35) years,
LANDLORD shall have the right to terminate this LEASE
AGREEMENT effective as of the date of any casualty which
is not required under the provisions of this LEASE
AGREEMENT to be covered by insurance and which is not
covered by insurance, by giving written notice of such
termination to TENANT within sixty (60) days of the date
of said casualty, provided that the Leased Premises are
damaged, destroyed or rendered unfit for its accustomed
uses to the extent of more than:

THIRTY PERCENT (30%)

when said percentage is determined in the manner de-
scribed in Paragraph 30.2.

30.5   During the period of time from the date of
any casualty to the date of termination of this LEASE
AGREEMENT under the provisions of this Article, or to
the date of TENANT's acceptance of the completion of the
rebuilidng, restoration and repairing of the Leased
Premises to substantially the same condition in which it
existed immediately prior to said casualty, all rent and
all other charges, such as Common Area and Mall
Maintenance charges payable by TENANT under this LEASE
AGREEMENT, shall abate in the proportion that the part
of the Leased Premises damaged, destroyed or rendered
unfit for its accustomed uses bears to the total Leased
Premises.   If the Leased Premises are destroyed as set
out above, LANDLORD shall promptly commence repair, re-

000236

building, and restoration, and complete said repair, re-
buiding and restoration within one hundred and eighty
(180) days of the date of said casualty.

30.6   The policy, or policies, of fire and casual-
ty insurance required pursuant to "Article 28 Insurance"
hereof shall contain a clause providing that any loss
under the same shall be payable, subject to the limita-
tions set forth in this Article, to the institutional
holder of the mortgage hereinafter referred to in
"Article 13 Shopping Center Improvements", as Trustee;
it being understood, however, that all amounts collected
on any such policy, or policies, shall be made available
to LANDLORD for the reconstruction or repair of any
Building, or Buildings, and other Improvements hereafter
constructed upon the Leased Premises, which may there-
after be damaged or destroyed, and shall be paid out to
LANDLORD by the said Trustee, from time to time, as the
work of rebuilding, reconstructin and repair shall pro-
gress, upon certificates of architects licensed to do
business in the State of:

TEXAS

showing the application of the amount paid for such re-
pairs, rebuilding or restoration.

30.7   In the event the damage is so small that the
insurance award is for less than $50,000.00, then 'the
insurance proceeds shall be paid directly over to LAND-
LORD without the necessity of payment to the Trustee, as
otherwise provided for in this Article. However, the a-
greement of direct payment shall not be construed as re-
lieving LANDLORD of the necessity of repairing such dam-
age in accordance with the provisions hereof. If there
shall be any excess proceeds of an insurance award re-
maining with the Trustee after the reconstruction or re-
pair of such Building, or Buildings, or other Improve-
ments, and if there shall then be no default on the part
of LANDLORD in the performance of its covenants herein
contained, then, and in both of such events, it is a-
greed that such excess proceeds, if any, shall be paid
to LANDLORD.

30.8   In the event LANDLORD fails to promptly re-
pair, rebuild or restore the Leased Premises, as provid-

009237

ed in this Article, then TENANT shall have the right to
terminate this LEASE AGREEMENT, by giving LANDLORD thir-
ty (30) days' prior written notice of such termination.
In the alternative, TENANT, at its sole option, after
prior written notice to LANDLORD may repair, rebuild or
restore said Leased Premises.  If TENANT does so repair
said Leased Premises, it shall have all the rights to
collect insurance proceeds hereinabove granted to LAND-
LORD under the provisions of this Article, provided that
TENANT shall use, for the purpose of repairing, rebuild-
ing or restoring, all or so much as may be necessary, of
such insurance proceeds payable by reason of damage or
destruction to the Leased Premises.  TENANT shall ac-
count to LANDLORD for excess insurance proceeds, if any,
remaining after such repairing, rebuilding or restoring.
In addition, TENANT shall have all rights provided in
"Article 32 TENANT's Right of Reimbursement", with re-
spect to any sum for which it is not reimbursed out of
such insurance proceeds.

      30.9  If the Leased Premises are destroyed as set
out above, and the LEASE AGREEMENT is not terminated as
provided herein, LANDLORD shall promptly commence re-
pair, rebuilding, and restoration, and complete said
repair, rebuilding and restoration within one hundred
and eighty (180) days of the date of said casualty.


                        Article 31
            Shopping Center Improvements Destruction

Paragraph
      31.1  During the Term hereof, as long as TENANT is
operating a business in its building, LANDLORD shall, at
its own expense, promptly commence, within sixty (60)
days of the casualty, to rebuild, restore and repair the
Shopping Center Improvements to substantially the same
condition in which the Shopping Center Improvements
existed immediately prior to the date the Shopping
Center Improvements were damaged, destroyed or rendered
unfit for its accustomed uses, by reason of fire,
explosion, tornado, earthquake or any other casualty
(regardless of whether or not caused by TENANT's
negligence), subject to Paragraph 31.2 of this Article.

                            84

009238

Such rebuilding, restoration and repair shall be completed within one hundred and eighty (180) days of the date of said casualty.

31.2   After the first fifteen (15) years of the Term hereof, either Party shall have the right to terminate this LEASE AGREEMENT, effective as of the date of any casualty, by giving written notice of such termination to the other Party within thirty (30) days from the date of said casualty; provided that the Shopping Center improvements are damaged, destroyed or rendered unfit for its accustomed uses to the extent of more than:

FIFTY PERCENT (50%)

when said percentage is determined by dividing the cost to replace the Improvements of the Shopping Center damaged, destroyed or rendered unfit for its accustomed uses, by the market value of the total Improvements of the Shopping Center immediately prior to said casualty, as said cost and market value are disclosed by certification of a reputable building contractor acceptable to both Parties, or if no acceptable contractor be agreed upon, then the certification of an architect who is acceptable to both Parties and who is a member of the local chapter of the American Institute of Architects.

31.3   During the last thirty-five (35) years of the Term hereof, LANDLORD shall have the right to terminate this LEASE AGREEMENT effective as of the date of any casualty, by giving written notice of such termination to TENANT within forty-five (45) days of the date of said casualty; provided that the Shopping Center Improvements are damaged, destroyed or rendered unfit for the accustomed uses to the extent of more than:

THIRTY PERCENT (30%)

when said percentage is determined in the manner described in Paragraph 30.2; except that LANDLORD shall not have said right to terminate this LEASE AGREEMENT under the provisions of this Paragrpah, in the event TENANT shall, within thirty (30) days from the date of said casualty, give written notice that TENANT's Operating Period shall be extended for ten (10) years from the date of the completion of the rebuilding, restoration and repairing of the Shopping Center Improvements to substantially the same condition in which it existed

009239

immediately prior to said casualty, subject to Paragraph 31.4 of this Article.

31.4   During the last thirty-five (35) years LANDLORD shall not be required to repair, rebuild or restore the Shopping Center Improvements if as of the date of any casualty which is not required under the provisons of this LEASE AGREEMENT to be covered by insurance and which is not covered by insurance, and by giving written notice of such intention not to rebuild, restore or repair to TENANT within sixty (60) days of the date of said casualty, provided that the Shopping Center Improvements are damaged, destroyed or rendered unfit for its accustomed uses to the extent of more than:

THIRTY PERCENT (30%)

when said percentage is determined in the manner described in Paragrpah 31.2.

## Article 32
### TENANT's Right of Reimbursement

**Paragraph**

32.1   In the event LANDLORD fails promptly and fully to perform any of LANDLORD's obligations hereunder after written request by TENANT under the provisions of either Paragraph 29.3 of "Article 29 Maintenance" or Paragraph 41.10 of "Article 41 Miscellaneous" of this LEASE AGREEMENT, then TENANT shall have the right, but not the obligation, to perform the same and to recover from LANDLORD, TENANT's cost and expense, together with interest thereon at the rate of:

TEN PERCENT (10%)

per annum from the time of such performance by TENANT.

32.2   In the event such cost, expense and interest are not paid upon demand, TENANT shall have the right to deduct the same from any installments of rent, then or thereafter payable hereunder.

009240

## Article 33
## LANDLORD Operating Period

Paragraph

33.1   LANDLORD shall use the LANDLORD Tract solely for the purpose of operating and managing, or causing to be operated and managed, a multi-unit retail and commercial facility (being the Shopping Center less the Leased Premises) containing at least:

295,000

square feet of Gross Leasable Area for a period of at least:

TWENTY (20) YEARS

from the date of the opening of TENANT's retail department store for business with the general public upon the Leased Premises, and for as long thereafter as any retail department store is so opened for business upon the Leased Premises, but in any event, for a period of not longer than:

FIFTY (50) YEARS

33.2   The provisions of this Article shall be subject to all the provisions of this LEASE AGREEMENT, such as the provisons of "Article 36 Eminent Domain" and "Article 31 Shopping Center Improvements Destruction". Any failure to comply with the provisions of this Article for temporary periods of time during which the LANDLORD Building, or any part thereof, is uninhabitable because of fire or other casualty, or such Building is closed because of acts beyond LANDLORD's control, shall not be deemed a default under the provisions of this Article, for so long as diligent efforts are being made to restore such Building, if possible, to the condition in which it was just prior to the happening of such casualty or act.

33.3   Throughout the Term of the operating period, LANDLORD shall provide, or cause to be provided, a resident manager for the Shopping Center.

87

009241

## Article 34
## TENANT Operating Period

**Paragraph**

34.1   TENANT shall use the Leased Premises solely
for the purpose of operating a retail department store
under the name being used by the majority of the retail
department stores operated by Sears, Roebuck and Co. for
a period of at least:

FIFTEEN (15) YEARS

from the date of the opening of TENANT's retail depart-
ment store for business with the general public upon the
Leased Premises, but for only so long as LANDLORD com-
plies with the provisions of its Operating Period, and
(other than the first two (2) years after the opening of
TENANT's store for business) at least sixty percent
(60%) of the Gross Leasable Area of the Mall Building is
open and operating and at least one other Department
Store containing at least 80,000 square feet of Gross
Leasable Area is open and operating, or as long as a
retail facility is being operated in Building B, as
shown on "EXHIBIT B-1", containing at least 60,000
square feet of "Floor Area", as provided in this LEASE
AGREEMENT.

34.2   The provisions of this Article shall be sub-
ject to all the provisions of this LEASE AGREEMENT, such
as the provisions of "Article 36 Eminent Domain" and
"Article 30 Leased Premises Destruction".   Any failure
to comply with the provisions of this Article for
temporary periods of time, during which the TENANT
Building, or any part thereof, is uninhabitable because
of fire or other casualty, or such Building is closed
because of acts beyond TENANT's control, shall not be
deemed a default under the provisions of this Article,
for so long as diligent efforts are being made to
restore such Building, if possible, to the condition in
which it was just prior to the happening of such
casualty or act.

009242

PART   FOUR

## General

## Article 35 Force Majeure

In the event that LANDLORD or TENANT shall be delayed, hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, lock-outs, labor disputes, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, the act, failure or default of the other Party, war or other reason beyond their control, then performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay, but in no event for a period of more than one (1) year.

## Article 36 Eminent Domain

## Paragraph

36.1   In the event that all, or a substantial part (more than thirty percent (30%) of the Floor Area, or more than ten percent (10%) of the Floor Area devoted to selling activity, upon the Leased Premises) and/or all, or a substantial part of the Common Area (more than ten percent (10%) of the Parking Spaces) within 300 linear feet of the Leased Premises (unless LANDLORD replaces said Parking Spaces upon land contiguous to, or adjacent to, the Shopping Center Tract) should be taken for any public or quasi-public use under any governmental law, ordinance or regulation, or by right of eminent domain, or any of such events, this LEASE AGREEMENT shall terminate.   TENANT shall thereupon be released from any further liability hereunder, except for rent and any obligations provided for in this LEASE AGREEMENT theretofore accrued.   Such termination shall be effective, at TENANT's option, either on the date notice of the condemning authority's intention to take such property shall have been received by LANDLORD or at any time thereafter, by giving LANDLORD at least thirty (30) days'

89

009243

written notice of TENANT's intention so to terminate. LANDLORD shall repay to TENANT any unearned rent and Common Area and Mall maintenance charges theretofore paid to LANDLORD in advance.

36.2   In the event that less than thirty percent (30%) of the Floor Area and/or less than ten percent (10%) of the Floor Area devoted to selling activity upon the Leased Premises and/or a portion, not in excess of ten percent (10%) of the Parking Spaces within 300 linear feet of the Leased Premises (unless LANDLORD replaces said Parking Spaces upon land contiguous to, or adjacent to, the Shopping Center Tract) should be taken for any public or quasi-public use under any governmental law, ordinance or regulation, or by right of eminent domain, or by private purchase in lieu thereof, then, and in either or any of such events, this LEASE AGREEMENT shall not terminate; however, the rent then payable hereunder and Common Area and Mall maintenance charges payable hereunder during the unexpired portion of the Term hereof shall be reduced in proportion to the area taken, effective upon the date physical possession is taken by the condemning authority.

36.3   In the event that any part of the Common Area (not in close proximity to the Leased Premises) should be taken for any public or quasi-public use under any governmental law, ordinance or regulation, or by right of eminent domain, or by private purchase in lieu thereof, this LEASE AGREEMENT shall not terminate, nor shall the rent or Common Area or Mall maintenance charges payable hereunder be reduced, nor shall TENANT be entitled to any part of the award made for such taking, except that LANDLORD or TENANT may terminate this LEASE AGREEMENT if the part of the Common Area remaining, following such taking, plus any additional Parking Spaces provided by LANDLORD in reasonable proximity to the Shopping Center shall be less than seventy-five percent (75%) of the original amount of the Common Area in said Shopping Center.

36.4   Any election to terminate this LEASE AGREEMENT, following condemnation notices, shall be evidenced by written notice of termination delivered to the other

009244

Party in accordance with the requirements for giving no-
tices, as hereinafter provided in "Article 42 Notices".

36.5   In the event that this LEASE AGREEMENT is
not terminated following a partial condemnation, all of
the covenants, conditions and provisions hereof shall
continue in full force and effect; provided, however,
that LANDLORD shall, at LANDLORD's sole expense, com-
mence promptly and prosecute with diligence the making
of all necessary repairs, alterations and improvements
to all Buildings which have been partially taken in or-
der to constitute the remaining part of the Leased Prem-
ises and Shopping Center as a complete architectural
unit in accordance with Plans and Specifications there-
for, which shall be approved by TENANT prior to any such
repairs and/or alterations.   Such approval shall not be
unreasonably withheld.

36.6   In the event that there shall be any tempo-
rary taking of any part of the Shopping Center, includ-
ing the Leased Premises, by any governmental authority,
for any reason, such as quartering National Guard Troops
during a civil riot, and such temporary taking unreason-
ably interferes with the rights granted under this LEASE
AGREEMENT to either Party, then the covenants under this
LEASE AGREEMENT shall be, as applicable, suspended for
the period of time of such temporary taking.

36.7   All compensation awarded for any taking (or
the proceeds of private sale in lieu thereof) whether
for the whole or a part of the Leased Premises, shall be
the property of LANDLORD and TENANT as their respective
interests may then appear.   LANDLORD shall have no
interest in any award made to TENANT for loss of
business or for the taking of TENANT's fixtures and
equipment within the Leased Premises, for which the
condemning authortiy shall make a separate award for
such items to TENANT.

36.8   Any dispute arising under this Article shall
be settled by agreement, if possible, otherwise by Arbi-
tration as set forth in "Article 40 Arbitration".

009245

## Article 37 Default

Paragraph

37.1   In the event any one or more of the follow-
ing events shall have occurred and shall not have been
remedied, as hereinafter provided:

> (1)   TENANT's failure to pay any install-
> ment of Base Rent, or Percentage Rent,
> when the same shall be due and payable
> and the continuance of such failure for
> a period of thirty (30) days after re-
> ceipt by TENANT of notice, in writing,
> from LANDLORD, specifying in detail the
> nature of such failure; or

> (2)   TENANT's failure to perform any of the
> other covenants, conditions and agree-
> ments herein contained on TENANT's part
> to be kept or performed and the contin-
> uance of such failure without the cur-
> ing of same for a period of forty-five
> (45) days after receipt by TENANT of
> notice, in writing, from LANDLORD, spe-
> cifying in detail the nature of such
> failure, and provided TENANT shall not
> cure said failure as provided in Para-
> graph 37.2 of this Article;

then, LANDLORD may, at its option, and in addition to
and without prejudice to any other rights or remedies
LANDLORD may have at law or in equity, give to TENANT a
notice of election to end the Term of this LEASE AGREE-
MENT upon a date specified in such notice, which date
shall be not less than ten (10) business days (Satur-
days, Sundays and legal holidays excluded) after the
date of receipt by TENANT of such notice from LANDLORD,
and upon the date specified in said notice, the Term and
estate hereby vested in TENANT shall cease and any and
all other right, title and interest of TENANT hereunder
shall likewise cease without further notice or lapse of
time, as fully and with like effect as if the entire
Term of this LEASE AGREEMENT had elapsed, but TENANT

009246

shall continue to be liable to LANDLORD, as hereinafter provided.

37.2   In the event that LANDLORD gives notice of a default of such a nature that it cannot be cured within such forty-five (45) day period, then such default shall not be deemed to continue so long as TENANT, after receiving such notice, proceeds to cure the default as soon as reasonably possible and continues to take all steps necessary to complete the same within a period of time which, under all prevailing circumstances, shall be reasonable.  No default shall be deemed to continue if and so long as TENANT shall be delayed in, or prevented from, curing the same by any cause specified in "Article 35 Force Majeure".

37.3   Notwithstanding anything to the contrary contained in this Article, in the event that any default of TENANT shall be cured in any manner hereinabove provided, such default shall be deemed never to have occurred and TENANT's rights hereunder snall continue unaffected by such default.

37.4   Upon termination of the Term of this LEASE AGREEMENT pursuant to Paragraph 37.1 of this Article, or at any time thereafter, LANDLORD may, in addition to, and without prejudice to any other rights and remedies LANDLORD shall have at law or in equity, re-enter the Leased Premises and recover possession thereof and dispossess any or all Occupants of the Leased Premises in the manner prescribed by the statute relating to summary proceedings or similar statutes; but TENANT, in such case, shall remain liable to LANDLORD, as hereinafter provided.

37.5   In case of any such default, re-entry, expiration and/or dispossess by summary proceedings:

> (1)   The rent shall become due thereupon and be paid to the time of such re-entry, expiration and/or dispossess;

> (2)   LANDLORD may relet the Leased Premises, or any part, or parts, thereof, either in the name of LANDLORD, or otherwise,

93

009247

for a term, or terms, which may, at
LANDLORD's option, be less than or ex-
ceed the period which would otherwise
have constituted the balance of the
Term of this LEASE AGREEMENT and may
grant concession of free rent; and

(3)   TENANT, or the legal representative of
TENANT, shall also pay LANDLORD, as
liquidated damages, for the failure of
TENANT to observe and perform TENANT's
covenants herein contained, any defi-
ciency between the rent hereby reserved
and/or covenanted to be paid including
Percentage Rent calculated on average
of last three (3) years Percentage Rent
paid (or since beginning of term here-
of whichever is shorter) and the net
amount, if any, of the rents collected
on account of the lease, or leases, of
the Leased Premises for each month of
the period which would otherwise have
constituted the balance of the Term of
this LEASE AGREEMENT.

In computing such liquidated damages, there shall be
added to the said deficiency such reasonable expenses as
LANDLORD may incur in connection with reletting, such as
brokerage and preparation for reletting and attorney
fees. Any such liquidated damages shall be paid in
monthly installments by TENANT on the rent day specified
in this LEASE AGREEMENT, and any suit brought to collect
the amount of the deficiency for any month shall not
prejudice, in any way, the rights of LANDLORD to collect
the deficiency for any subsequent month by similar pro-
ceeding. LANDLORD, at LANDLORD's option, may take such
alterations, repairs, replacements and/or decorations in
the Leased Premises as LANDLORD, in LANDLORD's sole
judgment, considers advisable and necessary for the pur-
pose of re-letting the Leased Premises and the making of
such alterations, repairs, replacementa and/or decora-
tions shall not operate or be construed to release TEN-
ANT from liability hereunder, as aforesaid. LANDLORD
agrees to use its best efforts to mitigate all damages

94

009248

and to re-let, the Leased Prmises in the event of any
default specified herein.


Article 38 Assignment

Paragraph

38.1 At any time after:

FIFTEEN (15)

years from and after commencement of the Term hereof,
TENANT shall have the right to assign this LEASE AGREE-
MENT or sublet the Leased Premises, or any part thereof,
for purposes customary to regional shopping centers, but
TENANT shall remain responsible only for the payment of
the average annual rent for the immediate proceeding
three (3) lease years to be paid by TENANT to LANDLORD
under the provisions of "Article 8 Rent" hereof, and for
the payment of the Common Area and Mall maintenance
charge hereinabove provided for in "Article 29 Mainte-
nance".


In the event TENANT contemplates subleasing
or an assignment of this LEASE AGREEMENT, LANDLORD shall
be given ninety (90) days written notice of such inten-
tion, said notice shall reveal the identity of the pro-
posed assignee. LANDLORD shall have the right to termi-
nate this LEASE AGREEMENT prior to any such sublease or
assignment so long as (1) its decision to terminate is
made within said ninety (90) day period and (2) the pro-
posed assignment or sublease is not with a subsidiary or
affiliated company of TENANT.


38.2 TENANT shall further remain responsible for
the performance of all the covenants herein contained to
be performed by TENANT, in no event, however, beyond the
original Term of this LEASE AGREEMENT, unless this LEASE
AGREEMENT is in writing expressly renewed by the Parties
hereto and, then, not beyond such renewal period. TEN-
ANT, and any part to whom this LEASE AGREEMENT may be
assigned or said Leased Premises subleased, as afore-
said, shall have the right to make such non-structural
changes, alterations and improvements and to install
such electric, store and other fixtures and equipment,
on or about the Leased Premises, and any assignee or

95

009249

sublessee shall have the right to post or attach only such signs as shall comply with "Article 25 Signs" here- of (provided, however, that TENANT shall not permit any laborers', mechanics' or materialmen's liens to attach to the Leased Premises by reason thereof, and TENANT shall not make any major alterations affecting the structure of said Buidings without the prior writtten consent of LANDLORD).   All signs, floor coverings and all electric, store and other fixtures and equipment, which may be installed, placed or attached in or about the Leased Premises by TENANT or any assignee or sub- lessee of TENANT shall always remain the property of TENANT or of the assignee or sublessee of TENANT so installing, placing or attaching the same; and upon termination by expiration of time or otherwise of this LEASE AGREEMENT, or at any prior time, or times, TENANT, or such assignee or sublessee of TENANT, shall, if it desires to do so, be permitted to remove all or any of said signs, fixtures and equipment so installed, placed or attached; provided, however, that any damage caused to the Leased Premises by reason of such removal shall be repaired by TENANT or its assignee or sublessee or removing the same.

38.3  LANDLORD shall not sell, assign or convey any part of the Shopping Center Tract or any part of its interest in this LEASE AGREEMENT, prior to the date the construction of the Shopping Center is completed and the Shopping Center is open for business with the general public.  After said date, LANDLORD shall have the right to sell, assign or convey any part of the Shopping Center Tract or any part of its interest in this LEASE AGREEMENT, provided the assignee of this LEASE AGREEMENT is an experienced and reputable shopping center firm or company approved by TENANT, or contract with an experi- enced shopping center management firm to manage the shopping center, which approval shall not be unreason- ably withheld, and such assignee shall execute a written document, in recordable form, in which it shall assume all of the duties and obligations of the LANDLORD, as set out under this LEASE AGREEMENT; and thereupon, LANDLORD shall be released from all of its obligations hereunder accruing thereafter.

96

009250

## Article 39 Indemnity

### Paragraph

39.1 TENANT shall indemnify and save harmless LANDLORD from and against any and all liability, damage, penalties or judgments arising from injury to person or property situated by any one in and about the Leased Premises, resulting from any act, or acts, or omission, or omissions, of TENANT, or TENANT's officers, agents, servants, employees, contractors or sublessees. TENANT shall, at its own cost and expense, defend any and all suits or actions (just or unjust) which may be brought against LANDLORD, in which LANDLORD may be impleaded with others upon any such above mentioned matter, claim, or claims, except as may result from the acts set forth Paragraph 39.2 of this Article.

39.2 Except for its affirmative acts or negligence or the affirmative acts or negligence of its officers, agents, servants, employees or contractors, LANDLORD shall not be responsible or liable for any damage or injury to any property, fixtures, building or other Improvements, or to any person, or persons, at any time on the Leased Premises, including any damage or injury to TENANT or any of TENANT's officers, agents, servants, employees, contractors, customers or sublessees.

## Article 40 Arbitration

### Paragraph

40.1 Whenever, under the provisions of this LEASE AGREEMENT, there is any matter in dispute which cannot be settled by agreement of the Parties, either Party desiring arbitration (hereinafter called "First Party") shall give the other Party (hereinafter called "Second Party") written notice to that effect, describing the matter in dispute to be determined by arbitration, and naming an arbitrator to act for First Party. Unless such matter shall be agreed upon between the Parties in the interim, the Second Party, within ten (10) days af-

009251

ter receipt of such notice, shall name an arbitrator to
act for Second Party by a written notice to First Party
and, concurrently therewith, by notices, in writing,
shall notify each of said arbitrators of their obliga-
tion to appoint a third arbitrator. The two arbitrators
so appointed shall, within thirty (30) days thereafter,
appoint a third arbitrator and make all necessary ar-
rangements for conducting such arbitration.

40.2  If Second Party shall fail or refuse to name
an arbitrator, the arbitrator appointed by First Party
shall act as sole arbitrator, or, at his option, shall
appoint an arbitrator to act for the Second Party. In
the event the arbitrator appointed by First Party shall
be the sole arbitrator, his decision shall be final and
conclusive upon the Parties. In the event the three ar-
bitrators are appointed, in either of the manners set
forth in this Article, the decision of any two of said
three arbitrators shall be final and conclusive upon the
Parties. In the event the first two arbitrators ap-
pointed shall fail to appoint a third arbitrator within
thirty (30) days of the appointment of the second arbi-
trator, or in the event any arbitrator appointed shall
become incapacitated, die or resign, or refuse to act,
at any time before the complete determination of the
matter in dispute, a Judge of competent local jurisdic-
tion shall appoint an arbitrator to fill the vacancy of
the arbitrator not appointed or not acting.

40.3  The cost and expense of the arbitrators and
the arbitration proceeding shall be paid and shared by
the Parties equally. The decision of the arbitrators
shall be in writing, a signed copy thereof shall be de-
livered to each Party and shall be made as promptly as
possible after their appointment, but in no event, later
than thirty (30) days after the date of appointment of
the third arbitrator. If the said arbitrators so ap-
pointed do not make a binding decision within said thir-
ty (30) day period, the appointment of the third arbi-
trator shall be deemed revoked, a new third arbitrator
shall be appointed, as provided in Paragraph 40.1 of
this Article, and the three arbitrators so appointed
shall again act in the same manner and within the same

time limits as though the third arbitrator had not pre-
viously been appointed.

40.4  In the alternative, either Party may elect
that:  Any dispute, controversy or claim arising out of,
or relating to this  LEASE  AGREEMENT,  or  the  breach
thereof, shall be settled by aribtration in accordance
with the Rules of the American Arbitration Association,
and judgment upon the award rendered by the Arbitrator,
or Arbitrators, may be entered in any court having ju-
risdiction thereof.

## Article 41 Miscellaneous

Paragraph

41.1  Short Form.  Each Party, if requested by the
other Party, shall promptly execute, in form appropri-
ate for recording, and shall cause to be recorded, a
short form or memorandum of this LEASE AGREEMENT, satis-
factory in form and substance and in manner of recorda-
tion to both Parties. The fees for such recording shall
be shared equally by both Parties.

41.2  Parties not Partners.  Nothing contained in
this LEASE AGREEMENT shall be construed to make the Par-
ties hereto partners or joint venturers, or to render
either of said Parties liable for the debts or obliga-
tions of the other, except as in this LEASE AGREEMENT
expressly provided.

41.3  No Waiver.  No delay or omission by either
of the Parties in exercising any right or power accruing
upon any non-compliance or failure of performance by the
other Party, under the provisons of this LEASE AGREE-
MENT, shall impair any such right or power or be con-
strued to be a waiver thereof.  A waiver, by either of
the Parties of any covenant, condition, provison or
performance under this LEASE AGREEMENT, shall not be
construed to be a waiver of any succeeding breach there-
of, or of any other covenant, condition, provision or
performance of this LEASE AGREEMENT.

41.4  Captions.  The table of contents preceding
this LEASE AGREEMENT, Article headings, captions and

009253

other similar designations are for convenience and reference only, and in no way define or limit the scope and content of this LEASE AGREEMENT, or in any way affect its provisions.

41.5   Governing Law.   This LEASE AGREEMENT shall be governed by and construed in accordance with the laws of the State of Texas.

41.6   Severable Provisions.   In the event any provision, or any portion thereof, of this LEASE AGREEMENT, or the application thereof, to any person or circumstances, shall, to any extent, be held invalid or unenforceable, the remainder of this LEASE AGREEMENT, all of its other provisions and all portions thereof, and the application thereof, to any other person or circumstances, shall be severed therefrom and shall not be affected thereby, to each such provision, and portion thereof, of this LEASE AGREEMENT shall be valid and enforceable to the fullest extent permitted by law.

41.7   Modification.   No agreement shall be effective to add to, change, amend, modify, waive or discharge this LEASE AGREEMENT, in whole or in part, unless such agreement is in writing and signed by each Party.

41.8   Counterparts.   This LEASE AGREEMENT is executed in several counterparts, each of which shall be deemed an original, and all such counterparts shall together constitute one and the same instrument.

41.9   LANDLORD Liability.   Notwithstanding any other provisions in this LEASE AGREEMENT, LANDLORD shall be fully and individually liable (jointly and severally in the case of individuals or partners, if any) without limitation, for all of the conditions, covenants and provisions of this LEASE AGREEMENT, until the construction of the Shopping Center is completed and the Shopping Center is open for business with the general public; thereafter, LANDLORD shall be fully and individually liable only to the extent of the assets of the Shopping Center Tract and all Improvements thereon.

41.10   Default.   ᴜnless otherwise provided in this LEASE AGREEMENT, no Party shall be deemed to be in

default under this LEASE AGREEMENT, until such Party shall have been given written notice describing the nature of such impending default, and within fifteen (15) days after the receipt of such notice, shall have failed to commence to cure such impending default and to proceed diligently to complete the curing of such impending default as promptly as possible, utilizing all reasonable means to effectuate and expedite the curing of such impending default.

41.11 <u>Mortgagee Notice</u>. Notwithstanding any other provisions in this LEASE AGREEMENT for notices of default under this LEASE AGREEMENT, TENANT shall notify LANDLORD's mortgagee of any default hereunder, in the same manner that other notices are required to be given under this LEASE AGREEMENT, provided, however, that said mortgagee shall have first notified TENANT of its mailng address.

41.12 <u>Estoppel Certificate</u>. Each Party shall furnish the other Party only one estoppel certificate for each mortgagee and each assignee. Said estoppel certificate shall be addressed to such Party's mortgagee holding said Party's permanent loan, and shall be delivered at the time of, or immediately prior to, the closing of such loan; or to such Party's assignee, and shall be delivered at the time of, or immediately prior to, the closing of such assignment.

41.13 <u>No Public Dedication</u>. No provision contained in this LEASE AGREEMENT shall be construed to grant any gift, dedication or any irrevocable rights to the general public or to any public purpose whatsoever, of, in, or to, any portion of the Shopping Center Tract or any Improvements therein; it being the intention of the Parties hereto that this LEASE AGREEMENT shall be strictly limited to, or for, the purposes herein expressed.

41.14 <u>No Third Party Beneficiary</u>. Except as herein specifically provided, no rights, privileges or immunities of either Party hereto shall inure to the benefit of any tenant, customer, employee or invitee of the <u>Shopping Center</u> or any other third party; nor shall

009255

any tenant, customer, employee or invitee of the Shop-
ping Center or any other third party be deemed to be a
third party beneficiary of any of the provisions con-
tained herein.


## Article 42 Notices

### Paragraph

42.1 Any notice, demand, request, consent, ap-
proval or other communication, which either Party hereto
is required, or desires, to give, or make, or communi-
cate to the other, shall be in writing and shall be
given, or made, or communicated by prepaid ■nited States
registered or certified mail (unless otherwise acknow-
ledged in writing by the addressee), addressed, in the
case of LANDLORD, to:

> Ed Warmack
> Central Mall
> Fort Smith, Arkansas

and addressed, in the case of TENANT, to:

> Sears, Roebuck and Co.
> 1000 Belleview Street
> Dallas, .Texas  75295

> Attention:  Real Estate Manager

subject to the right of each Party to designate a
different address by notice similarly given.


42.2 Any such notice, demand, request, consent,
approval or other communication so made shall be deemed
to have been given, made or communicated on the date
actually received by the recipient or addressee of such
notice, as said date is indicated on the return receipt
or indicated in writing by said recipient or addressee.

009258

## Article 43 Exhibits

Prior to the effectiveness of the provisions of
this LEASE AGREEMENT pertaining to exhibits, the exhib-
its shall be signed by the duly authorized officers,
agents or attorneys of each Party and, when so signed,
are thereby incorporated by reference into, and made a
part of, this LEASE AGREEMENT, as fully as if set forth
in full herein.

## Article 44 Successors

Except as herein otherwise expressly provided,
the covenants, conditions and agreements contained in
this LEASE AGREEMENT shall bind and inure to the benefit
of LANDLORD and TENANT and their respective heirs, suc-
cessors, administrators and assigns.

C09257

IN WITNESS WHEREOF, the Parties hereto have caused this LEASE AGREEMENT to be signed and executed as of the day and year first above written, the corporate Party by its duly authorized officers and by affixing its seal.

CENTRAL MALL, A Joint Venture

By _George Warmack_                    By _Ed Warmack_
   George Warmack                           Ed Warmack

By _John Warmack_                      By _Lloyd Hayes_
   John Warmack                             Lloyd Hayes

By _Hayes, Inc._
   Hayes, Inc.

LANDLORD

ATTEST:                                SEARS, ROEBUCK AND CO.

By _____                   By _____
   Assistant Secretary                    Executive Vice President

TENANT                                 LEGAL
                                       APPROVAL
                                       766 SW

The undersigned attorneys have affixed their signatures below to confirm that the provisions of the foregoing LEASE AGREEMENT relating to Arbitration were included therein on advice of counsel.

_____
Attorney for LANDLORD

_____
Attorney for TENANT

As owners of the RESERVE TRACTS D, E, and F, the undersigned joins in this agreement for the purposes set out in Article 15 herein.

_____
Lloyd Hayes, Individually

_____
Hayes, Inc.

ACKNOWLEDGMENTS                                    009258

STATE OF   TEXAS                    )
                                    ) SS
COUNTY OF   JEFFERSON               )

     On this the 7th day of   December   ,19 80, before me,

Gertie Burleson             , the undersigned officer, personally

appeared   Lloyd Hayes          , who acknowledged himself to be the

President          of          Hayes, Inc.          , a corporation

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
           he
and that/XXXX, as such     President     XXXX

being authorized so to do, executed the foregoing instrument for

the purposes therein contained by signing the name of the corporation
           himself
by/ XXXXXXXXXX as     President     XXXX

     IN WITNESS WHEREOF, I hereunto set my hand and official

seal.

                              *Gertie Burleson* (signature)
                              Gertie Burleson        (Notary Public)

My Commission Expires:

     6/30/84

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

STATE OF   TEXAS                    )
                                    )SS
COUNTY OF     JEFFERSON             )

     On this the 7th day of   December     ,19 80 , before me

     Gertie Burleson    , the undersigned officer, personally

appeared         Lloyd Hayes     known to me to be the person

whose name    is    subscribed to the foregoing instrument, and

acknowledged to me that   he   executed the same for the purposes

and consideration therein expressed.

     IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                              *Gertie Burleson* (signature)
                              Gertie Burleson        (Notary Public)

My Commission Expires:

     6/30/84

009259

## ACKNOWLEDGMENTS

STATE OF _____ TEXAS _____ )
                                    )SS
COUNTY OF ____ JEFFERSON _____ )


On this the __2'h__ day of ____December_____,19 80__, before

me _____Gertie Burleson_____, the undersigned officer, personally

appeared ___John Warmack, George Warmack and Ed Warmack

_____ known to me to be the persons   whose

names ___are__subscribed to the foregoing instrument, and

acknowledged to me that__the y___ executed the same for the

purposes and consideration therein expressed.

IN WITNESS WHEREOF, I hereunto set my hand and official

seal.

_Gertie Burleson_____.
Gertie Burleson         (Notary Public)

My Commission Expires:

____6/30/84_____

009260

STATE OF TEXAS          )
                       (
COUNTY OF DALLAS       )

On this the 16th day of December, 1980, before me,
Celeste McCown, the undersigned Notary Public, personally
appeared W. C. LOCHMOELLER, Executive Vice President,
Sears, Roebuck and Co., known to me to be person whose
name is subscribed to the foregoing instrument, and
acknowledged to me that he executed the same for the
purposes and consideration therein expressed.

IN WITNESS WHEREOF, I hereunto set my hand and official
seal.

Celeste McCown, Notary Public in
and for Dallas County, Texas

My commission expires:

12/31/84