LAWTON, OKLAHOMA

SEARS, ROEBUCK AND CO.
DEPARTMENT STORE SHOPPING CENTER
LEASE AGREEMENT

CONTENTS

PART ONE

Term and Rent

Article

    1   Leased Premises    /    13
    2   Delivery    /    15
    3   Use    /    16
    4   Title and Surveys    /    17
    5   Quiet Enjoyment    /    18
    6   ·LANDLORD Access    /    20
    7   Term    /    21
    8   Rent    /    25
    9   Cancellation    /    31
   10   Abandonment or Holdover    /    32

PART TWO

Construction

Article

   11   Leased Premises    /    33
   12   Shopping Center Improvements    /    41
   13   Mortgage    /    47
   14   Subordination    /    48
   15   Future    /    49
   16   Insurance    /    52
   17   Liens    /    54
   18   TENANT Purchase Option
          on LANDLORD Tract    /    55

ii

CONTENTS

PART THREE

Operation

Article
19  Shopping Center Name    /    58
20  Publicity Releases    /    59
21  Tenant Selection    /    60
22  Merchants Association    /    63
23  Enclosed Mall    /    65
24  Common Area    /    69
25  Signs    /    72
26  Utilities    /    75
27  Taxes    /    76
28  Insurance    /    79
29  Maintenance    /    82
30  Leased Premises Destruction    /    87
31  Shopping Center Improvements
      Destruction    /    90
32  TENANT's Right of Reimbursement    /    91
33  LANDLORD Operating Period    /    92
34  TENANT Operating Period    /    94

PART FOUR

General

Article
35  Force Majeure    /    95
36  Eminent Domain    /    96
37  Default    /    100
38  Assignment    /    104
39  Indemnity    /    106
40  Arbitration    /    107

CONTENTS

General (cont'd)

Article
    41  Miscellaneous    /    109
            Short Form
            Not Partners
            No Waiver
            Captions
            Governing Law
            Severable Provisions
            Modification
            Counterparts
            LANDLORD Liability
            Default
            Mortgagee Notice
            Estoppel Certificate
            No Public Dedication
            No Third Party Beneficiary
    42  Notices   /   112
    43  Exhibits   /   113
    44  Successors   /    114

    Execution Clause    /    115
    Arbitration Clause    /    115


EXHIBIT A   Legal Descriptions

            TOTAL DEVELOPMENT Tract

            Shopping Center Tract
                LANDLORD Tract
                DEPARTMENT STORE Tract

EXHIBIT B   Plot Plan

EXHIBIT C   Plans and Specifications

EXHIBIT D   Parking Typical Spacing Layout

LAWTON, OKLAHOMA

SEARS, ROEBUCK AND CO.
DEPARTMENT STORE SHOPPING CENTER
LEASE AGREEMENT

CONTENTS

Parties  /  1

Definitions  /  2

Building  /  5
Building Perimeter Sidewalk  /  5
Common Area  /  5
Common Utility Facilities  /  5
Design Criteria  /  4
Enclosed Mall  /  9
Floor Area  /  9
Gross Leasable Area  /  11
Improvements  /  3
Occupant  /  12
Outdoor Selling Area  /  8
Parking Space  /  8
Party  /  2
Permissible Building Area  /  5
Permittee  /  12
Plans and Specifications  /  3
Plot Plan  /  4
Shopping Center  /  3
Site Preparation Work  /  3
TOTAL DEVELOPMENT Tract  /  2

Shopping Center Tract
LANDLORD Tract
DEPARTMENT STORE Tract

RESERVE Tract

SEARS, ROEBUCK AND CO.
DEPARTMENT STORE SHOPPING CENTER
LEASE AGREEMENT

THIS LEASE AGREEMENT dated as of the __17th__ day
of __August__ , __1978__ , by and between

ED WARMACK and wife, JANE WARMACK

(hereinafter called "LANDLORD"), and

SEARS, ROEBUCK AND CO.

a New York corporation, authorized to do business in:
OKLAHOMA
(hereinafter called "TENANT"),

W I T N E S S E T H:

In consideration of Ten Dollars ($10.00) and other
good and valuable consideration and the mutual covenants
contained herein and intending to be legally bound hereby,
LANDLORD and TENANT hereby agree with each other as follows:

<u>Definitions</u>

As used in this LEASE AGREEMENT, the following words
and phrases, appearing substantially in the order in which
each relates to the others, shall mean:

1   "<u>Party</u>" - each separate principal business
    entity making, entering into and signing
    this LEASE AGREEMENT, whether or not such
    business entity is an individual, or indi-
    viduals (that is, natural person, or per-
    sons) a partnership, a joint venture, or a
    corporation; being either LANDLORD or
    TENANT; or any successor to any such busi-
    ness entity permitted under the provisions
    of this LEASE AGREEMENT.

2   "<u>Shopping Center Tract</u>" - the land which
    which is fully described by metes and bounds
    on "EXHIBIT A".

3   "<u>Site Preparation Work</u>" - all land clearing,
    all land and dirt grading, filling, excava-
    tion and compaction (including soil stabili-
    zation and all other soil treatment) made
    and done to permit the commencement of the
    construction of <u>Improvements</u> upon the <u>Shop-
    ping Center Tract</u>.

2



4   "Improvements" - all improvements to land
of every nature and kind upon the Shopping
Center Tract, including the Common Area,
the Mall, the Buildings, the Outdoor Selling
Area, if any, and the landscaping, if any,
between the exterior perimeter wall of
Buildings and the Building Perimeter Side-
walk.

5   "Shopping Center" - the Shopping Center Tract
and all Improvements situated thereon.

6   "Plans and Specifications" - complete archi-
tectural and engineering drawings and written
requirements for the construction of Improve-
ments; including working drawings, Design
Criteria and written requirements for workman-
ship and materials, all of which show details
adequate for the commencement and pursuit of
actual construction, as well as, for a reason-
able estimate of the cost thereof.

7   "Design Criteria" - drawings or renderings
    (including front and side elevations and
    perspectives, both exterior and interior of
    the Common Area, the Enclosed Mall, the
    Buildings, the Outdoor Selling Area, if any,
    and the landscaping, if any, between the
    exterior perimeter wall of Buildings and
    the Building Perimeter Sidewalk) that show
    the general appearance to be anticipated
    in certain Improvements to be constructed.


8   "Plot Plan" - diagram or drawing that shows
    the general nature, size, location and/or
    shape of:

    (1) the Shopping Center Tract, its
        property lines or boundaries;

    (2) the Improvements situated, or to be situ-
        ated, thereon, including the Permissible
        Building Areas, the Building Perimeter
        Sidewalk, the Common Area, and the En-
        closed Mall, the Buildings, the Outdoor
        Selling Area, if any, the landscaping,
        if any, between the exterior perimeter
        walls of Buildings and the Building
        Perimeter Sidewalk; and

    (3) adjoining and/or near-by public streets
        or highways;

    and being attached hereto as "EXHIBIT B".

4



9   "Permissible Building Area" - the land with-
    in the Shopping Center Tract upon which a
    designated Party may construct either its
    initial Building, or any expansion thereof,
    or its future Building, as provided in this
    LEASE AGREEMENT, and as shown on the Plot
    Plan, "EXHIBIT B".

10  "Building Perimeter Sidewalk" - sidewalks ad-
    joining either: (1) the exterior perimeter
    walls of the Buildings situated upon the
    Shopping Center Tract, or (2) landscaping
    adjacent to the exterior perimeter walls of
    said Buildings, all as shown on the Plot
    Plan, "EXHIBIT B".

11  "Building" - all Improvements to and upon
    the Shopping Center Tract, excluding the
    Common Area, the Enclosed Mall, the Out-
    door Selling Area, if any, between the
    exterior perimeter walls of Buildings and
    the Building Perimeter Sidewalk.

12  "Common Area" - certain improved portions
    of the Shopping Center Tract which are for
    the general use, convenience and benefit of
    all the Parties hereto (and their tenants,
    sub-tenants, customers, employees, con-
    cessionaires and other Permittees) and not
    Floor Area intended for the exclusive use
    and occupancy of an Occupant (and its
    customers, concessionaires and other
    Permittees) including, but not limited to:

(1) individual Parking Spaces for auto-
mobiles of customers and employees of
TENANT and other Occupants, including
multi-level Parking Spaces, if any;

(2) roadways, driveways, aisles, islands,
private streets, entrances and exits to
and from public roadways and streets to
provide vehicular access included in
such Parking Spaces;

(3) sidewalks and walkways to provide
pedestrian access included in such
Parking Spaces;

(4) ramps, truckways, loading areas, delivery
passages, truck tunnel and service cor-
ridors connecting therewith;

(5) landscaped and exterior planted areas
(except landscaping between the exterior
perimeter walls of Buildings and the
Building Perimeter Sidewalk);

(6) curbs, lighting standards, paving, traf-
fic and directional signs and traffic
stripings and markings, as located upon
the Shopping Center Tract;

(7) all Common Utility Facilities (not located
within any Building or the Enclosed Mall,
or without the Shopping Center Tract) serv-
ing, or used by, more than one Party hereto;
and

(8) outside courts and courtyards;

6



in the Shopping Center, all as shown on the
Plot Plan, "EXHIBIT B", but excluding:

(a)  any portions of the Shopping Center Tract,
     which may, from time to time, be occupied
     by any duly dedicated public street or
     highway;

(b)  such portions of the Shopping Center
     Tract, as may be, from time to time,
     exclusively appropriated for use as
     permanent or temporary Outdoor Selling
     Area, as indicated on "EXHIBIT B";

(c)  such portions of the Shopping Center
     as shall comprise the areas and spaces
     in the Enclosed Mall, the LANDLORD
     Building and in TENANT Building; and

(d)  landscaping between the exterior pe-
     rimeter walls of Buildings and the
     Building Perimeter Sidewalk.


13   "Common Utility Facilities" - storm drainage
     systems, gas pipe lines, water pipe lines,
     fire protection systems, underground power
     and telephone cables and similar utilities
     serving the Shopping Center Tract and lo-
     cated either within the Common Area or with-
     out the Shopping Center Tract; but extending
     to the Building Perimeter Sidewalk (but not
     closer than five (5) feet to Building
     exterior walls) on the Tract of each Party.

14   "Parking Space" - a minimum of approxi-
mately 400 square feet of land area within
the Shopping Center Tract intended for the
use of permitting one (1) automobile to
enter into said Tract, to be parked upon
said Tract and to exit from said Tract;
including the Improvements thereon, that
is, the paved area to be occupied by the
parked automobile, a proportionate part
of the paved area to be used for bays,
aisles, driveways, entrances and exits
and a proportionate part of the landscaped
areas and sidewalks, all of which is lo-
cated upon said land (and all of which is
located within the areas designated for
parking on the Plot Plan, "EXHIBIT B").


15   "Outdoor Selling Area" - the land, being a
portion of the Shopping Center Tract and
any Improvements situated thereon, that may
be, from time to time, exclusively appropri-
ated for permanent or temporary outdoor
selling, as designated on the Plot Plan,
"EXHIBIT B", or as agreed upon later by
consent of all the Parties hereto; said
Outdoor Selling Area being exclusive of
the Common Area, the Enclosed Mall, and
the Buildings and the landscaping, if any,
between the exterior perimeter wall of
Buildings and the Building Perimeter Sidewalk
situated upon the Shopping Center Tract.

8



16   "Enclosed Mall" - (sometimes herein called
     "Mall" when the context requires "Mall" to
     mean "Enclosed Mall") designated as "En-
     closed Mall" on the Plot Plan, "EXHIBIT B",
     including, without limitation, covered and
     roofed malls, courts and arcades on one (1)
     or more levels, all of which are mechanically
     heated and air conditioned for climatic con-
     trol; but excluding those areas and Improve-
     ments designated or used as kiosks or boutiques
     (or otherwise, for income producing purposes)
     and service corridors that are part of the
     Common Area.


17   "Floor Area" - the space in a horizontal
     plane occupied by the surface of each floor
     within a completed Building and the space
     in a horizontal plane occupied by the sur-
     face of each floor within a completed kiosk,
     boutique or similar income producing Improve-
     ments not within a Building; said space being
     measured in square feet determined by the
     linear dimensions in feet from the outside
     of the exterior Building perimeter walls to
     the outside of the exterior Building perimeter
     walls (except party walls as to which the cen-
     ter thereof, instead of the exterior faces
     thereof, shall be used) including any such
     space covered by:

     (1) basements and other similar subterranean
         areas;

     (2) balconies and mezzanines, other than ad-
         ditional space created by fixture in-
         stallations designed to increase the
         useability of space exclusively for stock
         or storage purposes;

9



(3) walls and columns;

(4) elevators, dumb waiters, stairs, escalators and conveyors;

(5) mechanically heated or air conditioned Outdoor Selling Area; and

(6) all other similar spaces located within the exterior facade of the exterior perimeter walls;

but excluding any such space covered by:

(a) the Enclosed Mall;

(b) electrical and/or mechanical rooms and/or penthouses used to serve any Occupant;

(c) transformer room or vault;

(d) junk tire or rubbish storage spaces;

(e) trash and rubbish storage and/or baling rooms;

(f) paved or concrete aprons (whether or not covered by canopies) and gasoline pump islands located at any Tire, Battery and Accessory (TBA) automotive service station;

(g) sheds used exclusively for Common Area maintenance purposes;

(h) truck docks; and

(i) decked storage areas above floor level;

and the said Floor Area of each Party hereto shall be certified by said Party's architect to the other Party; provided that any dispute about such certification shall be submitted to arbitration under the provisions of the Article on Arbitration contained in this LEASE AGREEMENT.

18   "Gross Leasable Area" - Floor Area intended,
and ready, for the exclusive use and occu-
pancy of an Occupant, prospective or actual,
measured in square feet, determined by the
linear dimensions in feet, from the center
of joint partitions, party or interior walls
(or the outside of the exterior Building
perimeter walls, as applicable) to the center
of joint partitions, party or interior walls
(or the outside of the exterior Building
perimeter walls, as applicable); excluding
any Floor Area:

(1)  in any public meeting hall or auditorium;

(2)  in any public restroom that is neither
     leased by an Occupant nor leased by
     TENANT;

(3)  in Shopping Center management offices
     and in Merchants Association offices,
     all of which is not to exceed a total
     of 2,000 square feet; and

(4)  to be used by, or for the Occupants and
     their Permittees, in common with each
     other;

and the said Gross Leasable Area of each Party
hereto shall be certified by said Party's
architect to the other Party, provided that
any dispute about such certification shall be
submitted to arbitration under the provisions
of the Article on Arbitration contained in
this LEASE AGREEMENT.

19   "Occupant" - any person, including either
     Party hereto, who is legally entitled to
     the exclusive use and occupancy of any
     Gross Leasable Area under the rights con-
     tained in a deed or a written lease agree-
     ment.


20   "Permittee" - any Occupant, and any officer,
     director, partner, employee, agent, contractor,
     customer, patient, client, invitee, licensee,
     subtenant, or concessionaire of any Occupant.

PART  ONE


Term and Rent


Article 1 Leased Premises


Paragraph
    1.1 LANDLORD hereby leases to TENANT and TENANT hereby
leases from LANDLORD, upon and subject to the conditions, cove-
nants and provisions contained in this LEASE AGREEMENT:

    All of that certain building containing
    approximately:
              117,452
    square feet of Gross Leasable Area for
    retail department store use, comprising of
    approximately:
              14,050
    square feet of Gross Leasable Area for ser-
    vice center use, identified on "EXHIBIT B",
    Plot Plan, as "Sears Building" including
    "Sears TBA", and mechanical room situated
    within the Building (all of which is herein
    called "Leased Premises") located within ap-
    proximately:
              47.05
    acres of land, comprising the Shopping Center
    Tract, located:
        BETWEEN S.W. 1st STREET AND S.W.
        5th STREET, AND BETWEN AVENUE C
        AND AVENUE F, ALL SITUATED IN
        THE CITY OF LAWTON, STATE OF
        OKLAHOMA.

13



more particularly described by subdivision lot and block
numbers, if any, and by metes and bounds on "EXHIBIT A",
and as more particularly shown on the Plot Plan designated
"EXHIBIT B", both of which exhibits are attached hereto
and made a part hereof, together with all rights, privileges,
easements, rights of ingress and egress, improvements and
appurtenances of whatever kind and character, benefiting,
belonging or appertaining thereto; including all of such
right and appurtenances appertaining to the Shopping Center
Tract.

1.2 LANDLORD further grants to TENANT and the
Permittees of TENANT the joint right to use and the joint
right of access to ingress and egress to and from, the
Common Area and Enclosed Mall situated upon the Shopping
Center Tract (and all other similar rights belonging or
appertaining thereto), as shown and designated on the Plot
Plan, "EXHIBIT B", with other tenants and the permittees
of the Shopping Center.

1.3 LANDLORD warrants to TENANT that recorded ease-
ments, grants and/or conveyances now permit, or will permit,
prior to the commencement of the Term of this LEASE AGREEMENT,
the grant of the rights and joint rights to TENANT described
in the two preceding Paragraphs 1.1 and 1.2.  LANDLORD further
warrants to TENANT that LANDLORD will not permit, or cause,
any disturbance or nullification of said rights and grants
during the Term hereof or any renewal thereof.

Term and Rent

## Article 2 Delivery

Paragraph

2.1 LANDLORD shall, on or before the commencement of the Term hereof, deliver possession of the Leased Premises to TENANT, ready for occupancy, free and clear of all tenancies and occupancies, with all the Improvements in this LEASE AGREEMENT provided to be made by LANDLORD on the Leased Premises fully completed.

2.2 In the event the Leased Premises are completed, but have not been delivered to TENANT upon the "Completion Date", as defined in this LEASE AGREEMENT, all as herein provided, then the covenants and obligations of TENANT herein contained, including the covenants to pay rent, shall abate until the said Leased Premises are so delivered to TENANT.

2.3 In the event TENANT notifies LANDLORD, in writing, of TENANT's desire to cancel this LEASE AGREEMENT because of LANDLORD's failure to deliver the completed Leased Premises to TENANT, and LANDLORD does not deliver the completed Leased Premises to TENANT within fifteen (15) days thereafter, TENANT shall have the right during the period from the expiration date of the said fifteen (15) days until said premises are so delivered to TENANT, to cancel this LEASE AGREEMENT effective as of the said "Completion Date", together with all the obligations of TENANT hereunder, by giving LANDLORD written notice of such cancellation.



<u>Term and Rent</u>

Article 3 Use

The Leased Premises shall be used for a Sears, Roebuck
and Co. retail department store for the first:
                    FIFTEEN (15) YEARS
provided that one other department store and sixty percent (60%)
of the mall tenants are then operating.

16



<u>Term</u> and <u>Rent</u>

Article 4 Title and Surveys

<u>Paragraph</u>

4.1 Immediately upon the execution of this LEASE AGREE-
MENT, LANDLORD shall furnish to TENANT a title report and a
title binder (or commitment), together with copies of recorded
documents referred to therein, in an amount equal to ten (10)
times the annual rent payable pursuant to Paragraph 8.1 (a)
in Article 8 hereof, issued by a title company selected by
TENANT and licensed to do business in the state wherein the
Leased Premises are located, to insure TENANT's marketable
title in the leasehold estate created hereunder, including
the survey, free and clear of all liens, encumbrances (ex-
cept liens and encumbrances acceptable to TENANT, any such
liens being subordinated to this LEASE AGREEMENT) and tenancies
of any kind, nature and description.

4.2 TENANT shall have sixty (60) days in which to no-
tify LANDLORD, in writing, of its approval, or disapproval,
of said title binder. In the event TENANT so approves said
title binder, LANDLORD shall, at its expense, deliver the
title insurance policy based thereon, to TENANT within
thirty (30) days from the date of such approval. In the
event TENANT so disapproves said title binder, this LEASE
AGREEMENT shall immediately thereon terminate, become null
and void and of no further force and effect, with neither
Party having any further rights or liabilities hereunder,
but LANDLORD shall forthwith return to TENANT all payments
theretofore made by TENANT pursuant to this LEASE AGREEMENT.

4.3 LANDLORD warrants to TENANT that during the term
hereof, the Shopping Center Tract may lawfully be used for
a regional <u>Shopping</u> <u>Center</u> and that the Leased Premises may
lawfully be used for a retail department store.

Term and Rent

Article 5 Quiet Enjoyment

**Paragraph**
5.1 TENANT, upon paying the rent and all other sums
or charges to be paid by it, as herein provided, and ob-
serving and keeping all covenants, warranties, agreements
and conditions of this LEASE AGREEMENT on its part to be
kept, shall quietly have and enjoy the Leased Premises dur-
ing the Term of this LEASE AGREEMENT, without hindrance or
molestation by any one lawfully claiming any right therein.

5.2 LANDLORD represents and warrants to TENANT that
it has, or will have, fee simple title to the Leased Premises
and the power and authority to execute and deliver this
LEASE AGREEMENT and to carry out and perform all covenants
to be performed by it hereunder.  LANDLORD further represents
and warrants to TENANT:

(1) That the Leased Premises are free from
all encumbrances, liens, defects in
title, violations of law, leases, ten-
ancies, easements, restrictions and
agreements (except liens and encum-
brances acceptable to TENANT, any such
liens being subordinated to this LEASE
AGREEMENT);

(2) That at the time of the commencement
of the Term, sole and undisturbed
physical possession of the entire
Leased Premises shall be delivered
to TENANT free and clear of all
liens, defects in title, encumbrances,
restrictions, agreements, easements,
tenancies and violations of law,
provided that the provisions in this
subparagraph shall not preclude an
institutional first mortgage;



(3) That at all times TENANT shall have
unobstructed and adequate means of
ingress and egress to the Leased
Premises from all abutting streets,
roads and highways, except when
closed by public authorities; and

(4) That no law, ordinance or any restric-
tion by any governmental authority
prohibits the use of the Leased Premises
for the purpose of operating a retail
department store, or prohibits the
Shopping Center Tract from being used
for the purpose of operating a regional
shopping center.

5.3 If LANDLORD shall be in default under this Article,
TENANT, in addition to any and all remedies it may have in law
and/or equity, may terminate this LEASE AGREEMENT upon thirty
(30) days' written notice to LANDLORD and the latter's failure
to correct, or proceeding to correct, the said default within
said thirty (30) days.

Term and Rent


Article 6 LANDLORD Access


Paragraph
       6.1 LANDLORD, or LANDLORD's agents and designees,
shall have the right, but not the obligation, to enter
upon the Leased Premises, at all reasonable times, to ex-
amine same and to exhibit the Leased Premises to prospec-
tive tenants, but in the latter case only during the last
six (6) months of the Term of this LEASE AGREEMENT.


       6.2 LANDLORD shall be permitted to affix a "To Let"
or "For Sale" sign on the Leased Premises during the last
ninety (90) days of the Term of this LEASE AGREEMENT, in
such place as shall not interfere with the business then
being conducted at the Leased Premises.

Term and Rent


Article 7 Term


Paragraph

7.1 The Term of this LEASE AGREEMENT shall be
SEVENTY-FIVE (75)
years, unless sooner terminated or modified, as herein pro-
vided, commencing upon the "Commencement Date", as herein-
after defined.

7.2 For the purposes of this LEASE AGREEMENT, the
phrase "Commencement Date" shall mean the date upon which
the Term of this LEASE AGREEMENT shall be deemed to commence
under the circumstances stipulated in Paragraphs:
7.3 and 7.4
of this Article, and the phrase "Completion Date" shall mean
the next day after the date upon which the last of all of the
following conditions shall have occurred or been performed:

(a) The Buildings and all Improvements on
the Leased Premises shall have been
completed in accordance with the pro-
visions of Article 11 hereof, and writ-
ten notice thereof from LANDLORD, ac-
companied by a certificate of the
Architect supervising said construction
certifying to such completion, shall
have been delivered to TENANT, all in
accordance with the provisions of
Article 12 hereof;

(b) The improved Parking Spaces for a mini-
mum of:
2,968
automobiles shall have been completed in
accordance with the provisions of Article
12 hereof; but not less than 5.5 cars to
1000 square feet of gross leasable area
in the Shopping Center Tract.

 

 

(c) The Enclosed Mall in the Shopping
Center shall be completed in ac-
cordance with the provisions of
Article 12 hereof; and

(d) The Buildings on the Shopping Center
Tract, comprising a minimum amount of
sixty percent (60%) of the total Floor
Area plus at least one other Department
Store shall be completed and occupied
in the Shopping Center.

7.3 Except as hereinafter provided, TENANT shall open
its retail department store in the Leased Premises for the
conduct of business with the general public within thirty (30)
days following such "Completion Date", and the Term of this
LEASE AGREEMENT shall commence upon the first day of the
month next following such opening of TENANT's retail depart-
ment store for the conduct of business with the general
public, following such "Completion Date" (unless said opening
shall occur on the first day of a month, in which event the
Term hereof shall commence upon such date).

7.4 TENANT shall not be obligated to open its retail
department store in the Leased Premises at any time between
~~August~~ _Nov._ 15 of any year and February 7 of the following year.
If the matters hereinabove enumerated in Subparagraphs (a)
to (d), inclusive, of Paragraph 7.2 of this Article, which
are required to occur or to be performed prior to the "Com-
mencement Date", shall be completed at a time which would
fix the opening date of TENANT's retail department store be-
tween November 15 and February 7, TENANT shall not be obli-
gated to open its retail department store or pay any rent
or Common Area and Mall maintenance charges whatsoever un-
til February 7, in which event the Term of this LEASE AGREE-
MENT shall commence upon March 1. If, however, TENANT does

open its retail department store for business following the
"Completion Date" between August 15 and February 7, the
Term of this LEASE AGREEMENT shall commence upon the first
day of the month next following such opening of TENANT's
retail department store for the conduct of business with the
general public (unless said store is opened for the conduct
of business with the general public on the first day of a
month, in which event the Term hereof shall commence upon
such date).

      7.5  Notwithstanding any of the foregoing, TENANT,
at its option, may open its retail department store for
the conduct of business with the general public in the
Leased Premises prior to the "Completion Date" and if
TENANT does so open its retail department store upon an
optional opening date basis, then the period of time from
such opening, to and including the last day of the month
following the "Completion Date", shall be deemed to be the
"Optional Opening Term".  TENANT's occupancy of the Leased
Premises under an "Optional Opening Term" shall be under
all of the terms, covenants and conditions of this LEASE
AGREEMENT, except as follows:

        (a)  The Term of this LEASE AGREEMENT, as
            established under the provisions of
            Paragraph 7.1 of this Article, shall
            not be deemed to have commenced;

        (b)  The rent to be payable by TENANT dur-
            ing such "Optional Opening Term", in
            lieu of all rent otherwise herein
            provided to be paid to LANDLORD under
            the provisions of Article 8 hereof,
            shall be a sum equal to one and one-
            fourth percent (1-1/4%) of the "Net
            Sales" (as that term is hereinafter
            defined in Article 8) made by TENANT
            in the Leased Premises during such
            "Optional Opening Term", if any, and
            shall be so payable by TENANT to LAND-
            LORD within fifteen (15) days after
            the end of each month of such "Optional
            Opening Term";



(c) In this LEASE AGREEMENT, the provisions
relating to payments by TENANT to LAND-
LORD for any expenses of Common Area or
Mall maintenance shall be deleted;

(d) The entry of TENANT upon the Leased
Premises under an "Optional Opening Term"
shall not be deemed to be an acceptance
by TENANT of the Leased Premises or a
waiver of any of TENANT's rights here-
under; and

(e) If the "Optional Opening Term" shall not
have ended, as hereinafter provided, with-
in one (1) year after the commencement
thereof, subject to the provisions of
"General Article 35 Force Majeure", TENANT
shall have, and is hereby granted, the
option to cancel and terminate this LEASE
AGREEMENT at any time thereafter during
such "Optional Opening Term" by giving
LANDLORD at least thirty (30) days' prior
written notice of its intention so to
cancel and terminate.

7.6 Effective upon the first day of the month next
following the "Completion Date", as hereinabove defined, the
"Optional Opening Term", if any, shall terminate, and the
Term of this LEASE AGREEMENT, as established under Para-
graph 7.1 of this Article, shall commence upon such first
day of the month.  Effective upon such "Commencement Date",
the terms and provisions of Subparagraph 7.5 of this Article
shall be, and they are hereby, deleted and declared to be of
no further force and effect.

24



<u>Term and Rent</u>

Article 8 Rent

Paragraph
8.1 TENANT shall pay to LANDLORD for said Leased Premises:

(a) Base Rent:

(1) TWO HUNDRED FIFTY THOUSAND ONE HUNDRED
THIRTY-NINE AND 60/100 DOLLARS ($250,139.60)
per year; 1/12th of said amount. TWENTY
THOUSAND EIGHT HUNDRED FORTY-FOUR AND
97/100 DOLLARS ($20,844.97), being due,
in advance, upon the first day of each
and every month of the Term hereof; and

(b) Percentage Rent:

(1) TWO AND ONE-HALF PERCENT (2-1/2%) of the "Net
Sales" (as hereinafter defined) made by TENANT
upon the Leased Premises during any "Lease
Year" (as hereinafter defined) of the Term
hereof in excess of:
$10,805,584.00
and up to:
$16,500,000.00;

(2) TWO PERCENT (2%) of the "Net Sales" (as
hereinafter defined) made by TENANT upon
the Leased Premises during any "Lease Year"
(as hereinafter defined) of the Term hereof,
in excess of:
$16,500,000.00
and up to:
$19,000,000.00;
and

25

(3) ONE AND ONE-HALF PERCENT (1-1/2%) of the "Net
Sales" (as hereinafter defined) made by TENANT
upon the Leased Premises during any "Lease
Year" (as hereinafter defined) of the Term
hereof, in excess of:
$19,000,000.00.

The said Base Rent shall be paid by TENANT in monthly install-
ments before the tenth (10th) day of each month of the Term
hereof.  The said Percentage Rent shall be paid by TENANT
within thirty (30) days after the end of each "Lease Year"
(as hereinafter defined) during the Term hereof.  Each of
the said rent payments shall be paid or mailed to LANDLORD at:

Mr. Ed Warmack
258 Central Mall
Fort Smith, Arkansas  72901

or to such other payee or address as LANDLORD shall hereafter
designate, in writing, to TENANT.

    8.2 The term "Lease Year", as used herein, means each
of the twelve (12) month periods commencing, respectively,
upon the day upon which the Term of this LEASE AGREEMENT
shall be deemed to have commenced, and upon the anniversary
of such date during the remainder of said Term, except that
for the sole purpose of computing Base Rent and Percentage
Rent payable hereunder, the first "Lease Year" shall include,
in addition to said twelve (12) month period, the time, if
any, between the opening date of TENANT's retail department
store upon the Leased Premises and the date of commencement
of the Term hereof, excluding any period of time in the
"Optional Opening Term", if any.

26

8.3 The expression "Net Sales", as used herein, is hereby defined to mean the aggregate amount of all retail sales of goods, wares and merchandise and services made to the public upon the said Leased Premises by TENANT, TENANT's departmental sublessees, concessionaires and licensees occupying space upon said Leased Premises, but deducting or excluding, as the case may be, the following:

(1) Sales of departments or divisions not located upon the Leased Premises;

(2) The amount of all sales, use, excise, retailers' occupation or other taxes imposed in a specific amount, or percentage rent upon, or determined by, the amount of retail sales made upon the said Leased Premises;

(3) Returns and allowances, as such terms are known and used by TENANT in the preparation of TENANT's profit and loss statements;

(4) Delivery, installation, freight and labor charges stated separately to the customer;

(5) Amounts in excess of TENANT's (or of its sublessees', concessionaires' and licensees') cash sales price charged on sales made on credit or under a time payment plan;

(6) Sales of merchandise ordered through the use of TENANT's mail order catalogs or filled through catalog order channels, regardless of the place of order, payment or delivery;

(7) Policies of insurance sold on the Leased Premises and premiums collected on policies of insurance, and all amounts collected on investment fund shares and/or other securities sold upon the Leased Premises;

27



(8) Receipts from weighing, and food, drink
and tobacco vending machines, amusement
devices, public telephones and snack bars,
where such snack bars are operated for
the use of TENANT's employees only; and

(9) Sales made through the Commercial and
Industrial Sales Department of TENANT.

The phrase "sales made through the Commercial and Industrial
Sales Department of TENANT" shall mean sales for industrial
or institutional use, sales in bulk or substantially larger
quantities than are included in ordinary sales at retail,
sales to Federal, State and Municipal Governments and the
various departments, branches and agencies thereof, and
sales of any other character not normally made by TENANT
in the ordinary conduct of its retail department store
business and mail order business, which are made by the
Commercial and Industrial Sales Department of TENANT.

8.4 The audits and annual accounts of TENANT's "Net
Sales", as above defined, made upon the Leased Premises,
and the calculations of rent thereon paid to LANDLORD an-
nually, shall be certified by a responsible official of
TENANT and submitted to LANDLORD within thirty (30) days
after the end of each "Lease Year" of the Term hereof, ac-
companied by payment of the balance, if any, of rents then
shown to be due to LANDLORD under the provisions of Para-
graph 8.1 (b) of this Article for the "Lease Year" upon
which such accounting is made.  Each such annual statement
shall show the following items for such "Lease Year":

(a) The amount of "Net Sales" made by
TENANT upon the Leased Premises;

(b) The amount of rents paid thereon
by TENANT; and

28



         (c) The balance, if any, of rents then
            shown to be due to LANDLORD, or the
            overpayment, if any, of rents paid
            by TENANT, as the case may be.

Proper adjustment shall then be made by TENANT in amounts,
if any, then shown to be due to LANDLORD or TENANT, as the
case may be, with TENANT applying any overpayment as a
credit on the rents next becoming due and payable by TENANT
in the subsequent "Lease Year". Each such annual statement
of audits, accounts and calculations shall be deemed stated,
accepted and final unless objected to and reaudited or re-
calculated, as hereinafter stipulated.

     8.5 In the event LANDLORD is not satisfied with such
annual audit, account or calculation, and gives TENANT
written notice to that effect within eighteen (18) months
after LANDLORD's receipt thereof, then LANDLORD shall have
the right, within sixty (60) days thereafter, at LANDLORD's
expense, to cause any reputable certified public accounting
firm, mutually satisfactory and approved in writing for
that purpose by both Parties to this LEASE AGREEMENT, to
reaudit the "Net Sales", as herein defined, made by TENANT
upon the Leased Premises during the period covered by such
annual audit and account and to recalculate said rents
payable for such period, and such reaudit and recalculation
shall be accepted by Parties to this LEASE AGREEMENT as
final.

     8.6 TENANT makes no representation or warranty as
to the sales which it expects to make upon said Leased
Premises, and LANDLORD agrees to hold in confidence all
sales figures and other information with respect to TENANT's
business, which may be obtained from TENANT or by means of
any inspection or audit of TENANT's books and records.



8.7 Notwithstanding any other provision herein contained,
in the event TENANT shall, after the first:

FIFTEEN (15)

years of the Term hereof, elect to close its retail department
store in the Leased Premises, in such event, TENANT shall remain
responsible for the payment of annual rent which shall be the
lesser of "the average annual rent of the total rent paid during
the immediately preceding three (3) Lease Years".

30

<u>Term</u> <u>and</u> <u>Rent</u>

Article 9 Cancellation

9.1 TENANT shall have, and is hereby expressly granted, the right to cancel this LEASE AGREEMENT on the twenty-fifth (25th) anniversary of this LEASE AGREEMENT.   TENANT shall give LANDLORD two (2) years' notice of its intention to cancel this LEASE AGREEMENT.

9.2 Notwithstanding any other provisions of this LEASE AGREEMENT, TENANT shall not be liable for any further payments, of any kind, to LANDLORD upon the cancellation of this LEASE AGREEMENT.

31



<u>Term</u> and <u>Rent</u>

Article 10 Abandonment or Holdover

<u>Paragraph</u>

10.1 Subject to the provisions contained in Paragraph
8.7 of Article 8 of this LEASE AGREEMENT, if TENANT abandons
said Leased Premises, LANDLORD shall, without limiting any
of its remedies, use its best efforts to relet the same for
retail purposes and for the best rent obtainable, and if the
total amount received by LANDLORD from such reletting, col-
lecting and necessary repairs, does not equal or exceed the
Base Rent paid to LANDLORD under the provisions of "Term and
Rent Article 8 Rent" and the Common Area and Mall maintenance
charges, if any, last paid to LANDLORD under the provisions
of "Construction Article 13 Mortgage" prior to such abandon-
ment, then TENANT agrees to pay, as damages, all such deficiency.

10.2 LANDLORD shall have, and is hereby granted the
option to terminate this LEASE AGREEMENT at any time after
abandonment, if any, by TENANT of the Leased Premises, by
giving TENANT at least thirty (30) days' prior written notice
of its intention so to terminate.  In the event TENANT does
not vacate the Leased Premises upon the termination of this
LEASE AGREEMENT, such fact shall constitute a tenancy from
month-to-month, unless the Parties hereto mutually agree, in
writing, to the contrary.



P A R T   T W O

Construction

Article 11 Leased Premises

**Paragraph**
    11.1 The Parties hereto shall jointly approve, designate
and appoint promptly after the execution of this LEASE AGREEMENT,
the registered, professional architect and/or engineer who shall be:

to prepare the Plans and Specifications, supervise the construction
and perform the duties of architects and/or engineers, in connec-
tion with all construction in this LEASE AGREEMENT provided to
be done by LANDLORD.  For convenience, the said architect shall
be hereinafter referred to as "Architect".

    11.2 Within ninety (90) days after the execution of
this LEASE AGREEMENT, LANDLORD shall furnish to TENANT pre-
liminary Plans and Specifications, that shall follow speci-
fications furnished LANDLORD by TENANT, for the construction
of a retail department store Building and other Improvements
upon the Leased Premises, showing the foundations, exterior
elevations, floors, dimensions of each floor, position of each
floor proposed in all Buildings, the proposed exterior con-
struction materials, and such other proposed construction
items, methods and materials as TENANT may deem necessary
for its review of the preliminary Plans and Specifications
to make its recommendations for development of the semi-
final Plans and Specifications hereinafter mentioned.  Such

33



preliminary Plans and Specifications shall be subject to the
approval of TENANT, which approval shall not be unreasonably
withheld.  Within three (3) weeks after receipt by TENANT of
such preliminary Plans and Specifications, TENANT shall give
LANDLORD written notice of any objections thereto or its ap-
proval thereof.  If TENANT shall not deliver such notice with-
in such three (3) weeks' period, such preliminary Plans and
Specifications shall be deemed to be approved as submitted.
If TENANT makes reasonable objections to such preliminary
Plans and Specifications and LANDLORD does not make the re-
quested revisions within three (3) weeks after its receipt
of TENANT's written notice that LANDLORD's failure to do so
can result in TENANT's cancellation of this LEASE AGREEMENT,
TENANT may terminate this LEASE AGREEMENT, effective upon
delivery to LANDLORD of written notice of termination at any
time within ten (10) days after such three (3) weeks' period.

11.3 Within thirty (30) days after approval by LANDLORD
and TENANT of the preliminary Plans and Specifications, herein-
above referred to, LANDLORD shall furnish to TENANT semi-final
Plans and Specifications, prepared by the "Architect", which
shall consist of full working drawings and specifications of
all Buildings to be constructed by LANDLORD upon the Leased
Premises.  Such semi-final Plans and Specifications shall be
subject to the approval of TENANT.  Within three (3) weeks
after receipt by TENANT of such semi-final Plans and Specifi-
cations, TENANT shall give LANDLORD written notice of any
objections or its approval thereof.  If TENANT shall not
deliver such written notice within such three (3) weeks'
period, the semi-final Plans and Specifications shall be
deemed to be approved as submitted.  If TENANT makes reason-
able objections to the semi-final Plans and Specifications,
and LANDLORD does not make the requested revisions within
three (3) weeks after its receipt of TENANT's written notice
that LANDLORD's failure to do so can result in TENANT's
cancellation of this LEASE AGREEMENT, TENANT may terminate
this LEASE AGREEMENT, effective upon delivery to LANDLORD of
written notice of termination at any time within ten (10)
days after such three (3) weeks' period.



11.4 Within a reasonable period of time but not later than ninety (90) days after approval by LANDLORD and TENANT of the semi-final Plans and Specifications, as hereinabove provided for in Paragraph 11.3, LANDLORD shall cause the "Architect" to obtain the written approval of Schirmer Engineering Corporation, 5940 Touhy Avenue, Niles, Illinois, 60648, of the sprinkler drawings in accordance with TENANT's requirements, as set forth in TENANT's "Design Criteria", a copy of which criteria will be furnished to LANDLORD. The approved semi-final Plans and Specifications, incorporating the approved sprinkler drawings, shall be, for convenience, hereinafter referred to as "Final" Plans and Specifications and, when signed by both LANDLORD and TENANT, shall be considered attached hereto, designated "EXHIBIT C", and made a part hereof. There shall be no deviation from "EXHIBIT C" without the written approval of both LANDLORD and TENANT. LANDLORD hereby agrees to construct the Leased Premises in accordance with "EXHIBIT C" and all the provisions of this LEASE AGREEMENT pertaining to such construction. In addition, the "Final" Plans and Specifications shall comply with the applicable requirements of the Protection Mutual Insurance Company (formerly known as "Factory Mutual").

11.5 LANDLORD and TENANT further mutually and expressly agree that:

(a) "EXHIBIT C" shall be drawn in not less than 1/8" scale and shall be approved by TENANT prior to the commencement of construction;

(b) A construction schedule is to be submitted to, and approved by, TENANT before commencement of construction;

35



(c) TENANT shall be informed of the
manufacturer and schedule of de-
livery of major equipment com-
ponents;

(d) TENANT's approval of any Plans
and Specifications shall not re-
lieve LANDLORD of LANDLORD's ob-
ligations under this LEASE AGREE-
MENT, or be construed as an assump-
tion by TENANT of such obligations;
and

(e) Neither TENANT nor LANDLORD shall
be deemed to be in default under
the provisions of this LEASE AGREE-
MENT by reason of failure to meet
the time so long as such Party is
continuing to exert its best efforts
to comply with such time schedules.

11.6 In the event LANDLORD shall be notified by TENANT,
in writing, of unsatisfactory work or materials, or deviation
from "EXHIBIT C", or in the event mechanics', materialmen's
or laborers' liens shall be placed upon the Leased Premises
which may cause unnecessary delay or unfavorable publicity
in the construction, and LANDLORD shall fail to correct or
discharge the same within fifteen (15) days after its receipt
of said written notice, then, and in each of such events,
TENANT shall have, and is hereby expressly granted, the right
to do so at LANDLORD's expense, and if TENANT shall pay for
any expense of correcting or discharging the same, as afore-
said, TENANT shall have the right to reimburse itself for
said expenses incurred thereby in the manner hereinafter
provided in Article 32. However, anything in this paragraph



to the contrary notwithstanding, LANDLORD shall have the right
to protest and/or defend against any claims that may be pre-
sented and/or filed against the Leased Premises, provided that
LANDLORD shall protect, defend and hold TENANT harmless there-
from, and as long as such protest and/or defense is being
carried on in such manner that TENANT's peaceable and quiet
possession and/or the use of the Leased Premises are not being
disturbed thereby, TENANT shall not have the right to pay
for any expense of correcting or discharging the same, as
hereinabove provided.

11.7 LANDLORD shall construct and furnish the Leased
Premises, without cost to TENANT, with sewer, storm sewer,
drainage facilities and such other utility facilities (in-
cluding, but not limited to, water, gas and electricity)
and meters to measure the consumption thereof, as shall
be necessary and adequate for the use and operation of TENANT
of the Buildings and Improvements constructed on the Leased
Premises, all of which shall connect to the municipal
facilities and shall meet applicable health department
regulations.  TENANT hereby agrees to pay for all such
utility services, indicated by separate meters, to have
been consumed by TENANT during the Term hereof, commencing
with the date upon which rent shall be deemed to commence
hereunder, all as further set forth in "Operation Article
26 Utilities".

11.8 In the event the construction of the Buildings
and Improvements upon the Leased Premises shall not have been
commenced by LANDLORD within ninety (90) days after approval
by LANDLORD and TENANT of the "Final" Plans and Specifications
and LANDLORD's receipt of TENANT's written notice that
LANDLORD's failure to do so can result in TENANT's cancel-
lation of this LEASE AGREEMENT, then TENANT shall have the

right, at any time within thirty (30) days thereafter, to
cancel this LEASE AGREEMENT, together with all of TENANT's
obligations hereunder, by giving LANDLORD written notice of
such cancellation.   If after the construction of said leased
Buildings and Improvements shall have been commenced, such
construction is not prosecuted diligently and continuously,
in accordance with current accepted standards of construction,
thereafter to:

JANUARY 1, 1979,

and LANDLORD's receipt of TENANT's written notice that LAND-
LORD's failure to do so can result in TENANT's cancellation
of this LEASE AGREEMENT, then TENANT shall have the right,
at any time within thirty (30) days after said date, to cancel
this LEASE AGREEMENT, together with all of TENANT's obli-
gations hereunder, by giving LANDLORD written notice of such
cancellation.   In the event the erection of all Buildings and
Improvements upon the Leased Premises, as herein provided to
be erected, have not been completed and the Leased Premises
delivered to TENANT on or before:

MAY 1, 1979

and LANDLORD's receipt of TENANT's written notice that LAND-
LORD's failure to do so can result in TENANT's cancellation
of this LEASE AGREEMENT, then TENANT shall have the right
at any time after said date, until said Buildings and Im-
provements shall have been completed and the Leased Premises
so delivered to TENANT, to cancel this LEASE AGREEMENT, to-
gether with all of TENANT's obligations hereunder, by giving
LANDLORD written notice of such cancellation.       .

     11.9 However, in the event LANDLORD's failure to
continue construction of the Leased Buildings and Improve-
ments to:

JANUARY 1, 1979,

or in the event LANDLORD's failure to complete the construc-
tion of said Buildings and Improvements on or before:

MAY 1, 1979,

as hereinabove provided in Paragraph 11.8 shall be on account
of delay occasioned by acts of God, accidents, strikes,

38



floods, inclement weather, fire or other casualty, or unavail-
ability of labor or necessary materials, restrictive govern-
mental, judicial, administrative or legislative orders, rulings,
and regulations, said date, or dates, shall be extended by the
period of such delay, but in no event shall either the con-
tinuance of construction date or the delivery date specified
in Paragraph 11.8 above be extended more than one (1) year
in the aggregate by the provisions of this Paragraph 11.9.

11.10 In the event of any labor dispute in connection
with the construction of the leased Buildings and Improve-
ments, LANDLORD agrees to use LANDLORD's best efforts to
promptly adjust and settle the same, in order to avoid un-
favorable publicity and unnecessary delay in a manner
satisfactory to TENANT.

11.11 LANDLORD agrees to comply with all Federal,
State and local laws, ordinances, regulations, permits,
rules and regulations applicable to the Leased Premises
and to the Shopping Center in connection with any demolition,
construction, alteration or repair work done by or for
LANDLORD on the Leased Premises or in the Shopping Center.

11.12 In the event the Buildings or Improvements of
the Leased Premises have not been completed, all as herein
provided, and possession thereof delivered to TENANT on or
before:

                    MAY 1, 1979,

then TENANT shall have the right, upon fifteen (15) days'
written notice to LANDLORD, to elect to take possession of
the Leased Premises (without affecting the date of the com-
mencement of the Term hereof) complete the Buildings and
Improvements of the Leased Premises in accordance with the
Plans and Specifications therefor, and recover TENANT's costs
and expenses incurred thereby in the manner hereinafter
provided in "Operation Article 32 TENANT's Right of Reim-
bursement".

11.13 LANDLORD shall permit TENANT, at TENANT's option
and without charge, to have access to said Buildings during
the progress of construction, and before the commencement of
the Term hereof, for the purpose of installing fixtures and
equipment, storing, removing and shipping merchandise, sup-
plies and equipment, and, otherwise, making the Leased
Premises ready for TENANT's operations, but in so doing,
TENANT shall not unreasonably interfere with the completion
of said Buildings or Improvements by LANDLORD.  During such
times as TENANT is so engaged, LANDLORD shall not be liable
for injury to person, or damage to, property (except such
injury or damage as shall be covered by insurance) of TENANT,
its employees, licensees, or invitees, occuring upon the
Leased Premises, unless such injury or damage be caused by
the negligence or omission of LANDLORD, or of LANDLORD's
employees, agents, servants and/or contractors.

11.14 Until such time as LANDLORD has completed con-
struction of the Leased Premises, as herein provided, and
TENANT has accepted possession thereof, the risk of loss or
damage to TENANT's merchandise and fixtures occasioned by
fire or other casualty embraced within the perils insured
against under a standard policy of Builders' Risk insurance
shall be borne by LANDLORD, and LANDLORD hereby agrees to
obtain, or cause to be obtained, insurance covering the
risk against such loss, provided that such insurance cover-
age can be obtained by LANDLORD at no increase over the
costs of the Builders' Risk policy upon the Leased Premises.
TENANT shall notify LANDLORD, in writing, monthly, as to
the amount of such insurance to be carried on TENANT's
merchandise and fixtures.  Such early entry by TENANT
under the provisions of this paragraph shall not constitute
an acceptance of possession or a waiver of any of TENANT's
rights hereunder.

11.15 LANDLORD represents and warrants to TENANT that
prior to the date of the opening of TENANT's retail department
store for business with the general public, as provided for
in this LEASE AGREEMENT, all improvements required for access
to the Shopping Center, traffic signal equipment, roads and
streets in the vicinity of the Shopping Center shall be in-
stalled or completed in accordance with the recommendation of
traffic engineers approved by TENANT.

Construction


Article 12 Shopping Center Improvements


Paragraph
    12.1 The Shopping Center shall be constructed and
maintained as shown on the Plot Plan, annexed hereto as
"EXHIBIT B", with such variations as be permitted by
such exhibit, or otherwise authorized hereunder.  No change
in "EXHIBIT B" shall invalidate this LEASE AGREEMENT or
affect any provision hereof, other than as reflected by a
revised "EXHIBIT B", signed by both LANDLORD and TENANT.
The Shopping Center shall be designed by "Architect" and
constructed, or caused to be constructed, by LANDLORD, in
accordance with such design.  LANDLORD shall maintain, or
cause to be maintained, a minimum of:
                        140,000
square feet of Floor Area plus at least one (1) other department
store in the Shopping Center, a Mall and Common Areas to pro-
vide at least the number of Parking Spaces hereinafter required
under "Operation Article 24 Common Area" for the joint use of
TENANT and others entitled to use the same, all in conformity
with the Plans and Specifications, Parking Lot Layout (spaced
in accordance with the "Parking Typical Spacing Layout", at-
tached hereto, designated "EXHIBIT D", and hereby made a part
hereof) and landscape plans approved by TENANT, as hereinafter
provided.

    12. Plans and Specifications for any construction
or expansion, within the Permissible Building Area shown
on the Plot Plan, shall be subject to TENANT's approval of
elevations, locations and exterior construction of Buildings,
structural construction of the Enclosed Mall and its attach-
ment to TENANT's retail department store Building, structural

41



construction of all Buildings, if any, connecting to TENANT's
retail department store Building, and the layout, construction
and landscaping of the Common Area.  Such complete Plans and
Specifications for the Shopping Center shall be available
for inspection by TENANT at all reasonable times.  A land-
scape architect, previously approved by TENANT, shall be
employed by LANDLORD to design the landscaping for the ex-
terior of the Shopping Center and for the interior of the
Enclosed Mall areas.  The Shopping Center may ultimately consist
of at least:

511,707

square feet of Floor Area, including the Leased Premises.  At
the time of the opening thereof, there shall be not less than:

327,602

square feet of Floor Area situated upon the Shopping Center
Tract, excluding the Leased Premises, completed and ready for
tenant occupancy, or occupied and leased, in part, to shops
fronting on the Enclosed Mall and the Common Area, the Enclosed
Mall shall have been completed and the uses thereof delivered
to TENANT, all as herein provided.

12.3 Within ninety (90) days after the date of the
execution of this LEASE AGREEMENT (which date is herein
defined to be the date upon which this LEASE AGREEMENT, in-
cluding all exhibits, herein referred to as parts hereof,
are signed by both Parties hereto) LANDLORD shall furnish
to TENANT "Preliminary" Plans and elevations showing ele-
vations, locations and exterior construction of Buildings,
structural construction of the Enclosed Mall and attach-
ment to TENANT's retail department store Building, structural
construction of all Buildings, if any, connecting to TENANT's
retail department store Building, and the layout, construction
and landscaping of the Common Areas, all of which shall be
subject to the approval of TENANT, which approval shall not
be unreasonably withheld.  Within three (3) weeks after



receipt by TENANT of such plans, TENANT shall give LANDLORD
written notice of any objections or its approval thereof.
If TENANT shall not deliver such notice of objections there-
of within such three (3) weeks' period, such plans shall be
deemed to be approved as submitted.  If TENANT makes reason-
able objections to such plans and LANDLORD does not make the
requested revisions within three (3) weeks after its receipt
of TENANT's written notice that LANDLORD's failure to do so
can result in TENANT's cancellation of this LEASE AGREEMENT,
TENANT may terminate this LEASE AGREEMENT, effective upon
delivery to LANDLORD of written notice of termination at
any time within ten (10) days after such three (3) weeks'
period.

    12.4 Within thirty (30) days after approval by LAND-
LORD and TENANT of the "Preliminary" Plans and Specifications,
hereinabove referred to in Paragraph 12.2 of this Article,
LANDLORD shall furnish to TENANT "Semi-Final" Plans and
Specifications, showing elevations of the Enclosed Mall and
structural drawings of the Enclosed Mall and all Buildings
connecting to TENANT's retail department store Building upon
the Leased Premises, all of which shall be subject to the
approval of TENANT.  Within three (3) weeks after receipt
by TENANT of such plans and structural drawings, TENANT
shall give LANDLORD written notice of its approval or any
objections thereto.  If TENANT shall not deliver such notice
within such three (3) weeks' period, such plans and structural
drawings shall be deemed to be approved as submitted.  If
TENANT makes reasonable objections to such plans and drawings
and LANDLORD does not make the requested revisions within
three (3) weeks after its receipt of TENANT's written notice
that LANDLORD's failure to do so can result in TENANT's can-
cellation of this LEASE AGREEMENT, TENANT may terminate this
LEASE AGREEMENT, effective upon delivery to LANDLORD of writ-
ten notice of termination at any time within ten (10) days
after such three (3) weeks' period.  A major entrance from
said Enclosed Mall to TENANT's retail department store Building
in the Leased Premises, so as to permit pedestrian traffic
to and from said store and the Enclosed Mall, shall be main-
tained at all times during the Term and any renewal hereof.

43



12.5 Within thirty (30) days after approval by LAND-
LORD and TENANT of the "Preliminary" Plans and Specifications,
hereinabove referrred to in Paragraph 12.2 of this Article,
LANDLORD shall furnish to TENANT "Semi-Final" Plans and
Specifications, showing the construction and layout of the
Common Area.  Within three (3) weeks after receipt by TENANT
of such plans, TENANT shall give LANDLORD written notice
of its approval or any objections thereto.  If TENANT shall
not deliver such notice within such three (3) weeks' period,
such plans shall be deemed to be approved as submitted.  If
TENANT makes reasonable objections to such plans and LAND-
LORD does not make the requested revisions within three (3)
weeks after its receipt of TENANT's written notice that
LANDLORD's failure to do so can result in TENANT's cancel-
lation of this LEASE AGREEMENT, TENANT may terminate this
LEASE AGREEMENT, effective upon delivery to LANDLORD of
written notice of termination at any time within ten (10)
days after such three (3) weeks' period.  Within ninety (90)
days after approval by LANDLORD and TENANT of the plans
referred to in Paragraph 12.2 of this Article, LANDLORD shall
furnish to TENANT "Semi-Final" Plans, showing the landscaping
of the Common Areas of the Shopping Center, and TENANT shall
give LANDLORD written notice of its approval, or any ob-
jections thereof, within three (3) weeks after its receipt
of such plans.  If TENANT makes reasonable objections, LAND-
LORD shall cause its Architect to prepare "Final" Plans
and Specifications to incorporate TENANT's requirements, as
reflected by all plans hereinabove mentioned, approved by
TENANT, and LANDLORD hereby agrees to proceed thereafter
to construct, or cause to be constructed, the Shopping
Center, including the Enclosed Mall and Common Area Improve-
ments, in accordance with such "Final" Plans and Specifi-
cations.



12.6 In connection with said Plans and Specifications, all of said Parking Spaces upon the Shopping Center Tract shall be:

(a) At ground level suitably paved with a six (6) inch base of crushed gravel, limestone, rock, penetrated, dusted with screenings; covered with at least three (3) inches of plant mix asphalt or paving of equal quality over all truck dock areas, access roads and driveways, and at least two (2) inches of plant mix asphalt or paving of equal quality else- where; above ground level, reinforced concrete decking in accordance with recognized architectural and engineer- ing structural and safety standards;

(b) Laid out and marked in accordance with TENANT's Parking Typical Spacing Lay- out, attached hereto as "EXHIBIT D", as hereinabove provided;

(c) Provided with lighting which shall have a maintained intensity of 1 foot candles, minimum maintained throughout at 30 inches above the parking surface; and

(d) Available for use as necessary for TENANT's business purposes during store hours and for one hour after each day's closing of TENANT's re- tail department store upon the Leased Premises.



12.7 In addition to the usual remedies for breach of
contract, TENANT shall have the right to enforce specific
performance and/or to maintain a mandatory injunction against
any violation, or proposed violation, by LANDLORD of the
covenants contained in this Article.  However, except where
otherwise expressly provided, violations of any such covenants
by LANDLORD shall not constitute grounds for termination of
this LEASE AGREEMENT by TENANT.

12.8 The certificate of the Architect, approved by
both Parties hereto, as herein provided, shall be conclusive
as to the number of square feet of Floor Area and Gross Leas-
able Area, in each instance in which a determination thereof
shall be required under the provisions of this LEASE AGREE-
MENT; subject, however, to the arbitration provisions of
"Operation Article 40 Arbitration".

46



Construction

Article 13 Mortgage

Paragraph

13.1 LANDLORD represents that LANDLORD intends to apply
to a savings bank, trust company, insurance company, pension
trust fund or other similar lending institutions, for a mort-
gage loan upon the Leased Premises and/or the LANDLORD Tract,
in order to provide the financing for the construction of the
Improvements thereon, with the payment of such mortgage to be
secured by a first mortgage or deed of trust covering the same.

13.2 LANDLORD hereby agrees to make all payments upon
said loan, as and when the same shall become due and payable,
and to comply with all of the terms and provisions of the
deed of trust securing the same at all times during the Term
thereof.

13.3 Upon the execution of this LEASE AGREEMENT by the
parties hereto, or as soon thereafter as is feasible, LANDLORD
shall furnish TENANT with:

(1) A conformed copy of the mortgage, as
recorded, showing all recordation in-
formation; and

(2) A conformed copy of the note, or notes,
evidencing the loan secured by the mort-
gage.

47



Construction

Article 14 Subordination

This LEASE AGREEMENT is subject and subordinate solely
to the first lien hereinafter referred to in "Construction
Article 13 Mortgage", and all renewals, modifications, re-
placements and extensions of the unpaid balance thereof, which
may hereafter affect the Leased Premises upon the following
conditions that:

(a) For as long as TENANT performs TENANT's
    obligations hereunder, TENANT's peace-
    able and quiet possession of the Leased
    Premises, and all rights herein appertain-
    ing thereto, be not disturbed on account
    of such mortgage, or by reason of anything
    done, or caused to be done, thereunder;
    and

(b) The mortgage hereinabove mentioned, to
    which this LEASE AGREEMENT is subordinate,
    and any renewals or replacements thereof,
    or any agreement extending or modifying
    the same, shall contain a provision where-
    by the mortgagee shall agree, acquiesce
    and consent to the provisions of "Operation
    Article 30 Leased Premises Destruction"
    and "General Article 36 Eminent Domain"
    hereof.



## Construction

## Article 15 Future

Paragraph
15.1 Notwithstanding any other provisions in this LEASE
AGREEMENT, LANDLORD shall have the right to expand any Building,
or to construct an additional Building on the Shopping Center
Tract after the completion of the construction described in the
preceding Articles of this LEASE AGREEMENT, only upon the fol-
lowing conditions:

   (a) LANDLORD, at its sole expense, shall
    proceed simultaneously with the con-
    struction and completion of both the
    Building expansion, or additional
    Building, and additional Parking Spaces
    (either multi-level upon its own Tract,
    or upon adjacent land), sufficient to
    maintain the parking index for the
    Shopping Center required by the pro-
    visions of "Operation Article 24 Common
    Area"; and

   (b) LANDLORD shall not expand any Building,
    or construct any additional Building,
    upon its Tract or the Shopping Center
    Tract outside its Permissible Building
    Area or in the areas between the streets
    bounding the Shopping Center and the
    Buildings existing, or to be constructed,
    as shown on the Plot Plan, "EXHIBIT B",
    without prior written approval of TENANT.

49



15.2 The location of any such Building expansion, or additional Building, and such additional Parking Spaces, permitted in accordance with this Article and the Plot Plan, "EXHIBIT B", shall be approved by each Party prior to the beginning of construction; excluding the relocation of interior walls and any interior remodeling; but including the relocation or remodeling of the Enclosed Mall.

15.3 No Party shall withhold approval of any such location, or relocations, unreasonably or arbitrarily. The intention of the Parties is that LANDLORD shall be free to expand its Buildings or construct additional Buildings; provided such expansion or construction is done in conformity with the provisions of this LEASE AGREEMENT, and especially with the provisions for maintaining the parking index and for the location of any such Building expansion or additional Buildings within the Permissible Building Areas, as shown on the Plot Plan, "EXHIBIT B".

15.4 LANDLORD shall not voluntarily dedicate, give or cause to be taken, any part of the Parking Space, roadways, drives, walks or any other portion of the Common Area on the Shopping Center Tract for any public or exclusive private use.

15.5 LANDLORD shall not expand the Building, or construct additional Buildings, upon the Shopping Center Tract, except in compliance with the provisions of this Article.

15.6 LANDLORD represent and warrants that each department store Occupant shall be bound to all of the conditions set forth in this Article.

15.7 TENANT shall have the right at any time during the Term hereof to convert all, or any portion of, the "Gross Leasable Area in the Leased Premises for warehouse use" to "Gross Leasable Area in the Leased Premises for retail department store use" (as described in Paragraph 8.1 (a) of "Term and Rent Article 8 Rent") upon the following conditions:

> (1) TENANT shall pay the entire cost and expense of said conversion; provided, however, that LANDLORD shall reimburse TENANT for such cost and expense, upon presentation of written itemization of TENANT's actual expenditures, properly certified by an officer of TENANT.

50

(2) The Base Rent determined at the time
    the Term hereof commences, under the
    provisions of Paragraph 8.1 (a) "Term
    and Rent Article 8 Rent", shall not
    be changed or modified in any manner.

Construction


Article 16 Insurance


Paragraph
16.1 LANDLORD shall cause each of the contractors per-
forming any work or construction upon the Shopping Center Tract
to carry contractor's protective liability insurance at each
of said contractor's sole expense, covering LANDLORD and TENANT,
as named insureds, in the minimum limits of:

(1) $2,000,000 for death of, or bodily
injury to, or personal injury to,
one person;

(2) $2,000,000 for death of, or bodily
injury to, or personal injury to,
more than one person, on or result-
ing from one occurrence; and

(3) property damage to the limit of
not less than $500,000 for each
occurrence;

during the period of time from the beginning of the Site Prepa-
ration Work on the Shopping Center Tract, to and including the
completion of the construction of the proposed Improvements on
such Tract.    The above insurance shall provide for Contractual
Liability covering both Landlord and Tenant as named insureds.


16.2 LANDLORD shall maintain, or cause to be maintained,
Builders' Risk and Workmen's Compensation insurance during all
the periods of time any construction of Improvements upon the
Shopping Center Tract is in progress and uncompleted.    Such
insurance shall contain provisions and be in amounts satis-
factory to all Parties and shall be adequate to protect all
Parties from and against any and all claims for death of, or
injury to, person, or persons, or damage to, or loss of,
property, which may arise upon said Shopping Center Tract
during any periods of construction.

16.3 LANDLORD shall, during any period of expansion, remodeling, extensive repairs or maintenance to any of the Improvements upon its Tract, maintain, or cause to be maintained, such insurance as is herein required to be carried and maintained during the initial construction period, except that the amounts thereof shall be reduced or increased, according to the extent of such expansion, remodeling, repairs or maintenance.



Construction

Article 17 Liens

Paragraph

17.1 When, under the provisions of this LEASE AGREEMENT,
any construction is permitted to be performed and such con-
struction is performed, or when any construction is performed
that is not permitted hereunder, it is understood and agreed
that LANDLORD shall not permit any mechanics' or materialmen's
liens, or other similar liens, to stand against any part of
the Shopping Center Tract.

17.2 LANDLORD may bond and contest the validity and
amount of any such lien, but on final determination of the
validity and the amount of the lien, LANDLORD shall immediately
pay any judgment rendered, with all proper costs and charges,
and shall have the lien released at LANDLORD's expense.

54



Construction

Article 18
TENANT Purchase Option on LANDLORD Tract

Paragraph
       18.1 In the event LANDLORD shall not have constructed
at least:
                            327,602
square feet of Gross Leasable Area, excluding the Improvements
on the Leased Premises, as provided in "Construction Article
12 Shopping Center Improvements", by not later than one (1)
year after the beginning of the Optional Opening Term hereof,
then, and in such event, TENANT shall have, and is hereby
granted, the option to purchase said Shopping Center Tract, by
giving LANDLORD written notice of TENANT's intention so to do,
at any time within six (6) months after such one (1) year
period, at a purchase price comprised of the sum of the follow-
ing costs theretofore expended by LANDLORD and verified by
LANDLORD's accounting records, for and upon such LANDLORD Tract:

        (a) the cost of the land; and

        (b) the cost of the Improvements, if any,
            then situated upon such land, includ-
            ing site Improvements, architectural
            and engineering fees;

(which sum shall be hereinafter referred to as the "Purchase
Price") and upon such other terms and conditions as are set
forth in this Paragraph 18.1, subject to any and all leases
and other agreements appearing of record and affecting said
Shopping Center Tract.  TENANT, within 180 days after the
date of said notice of its intention to purchase said Shopping
Center Tract (which date within such 180 day period shall be,
for convenience, herein called the "Delivery Date") shall for-
ward to:

as Escrow Agent (or such substitute Escrow Agent, as may hereafter

55

be agreed to by LANDLORD and TENANT) as earnest money to be
applied upon such "Purchase Price", a sum equal to one-tenth
(1/10th) of the "Purchase Price", with instructions to such
Escrow Agent to hold such funds, pending compliance by LANDLORD
with the provisions of Paragraph 18.1 and 18.2.

18.2 LANDLORD shall deposit with Escrow Agent, upon such
"Delivery Date", a General Warranty Deed, properly executed by
LANDLORD (and any other person, firm or corporation whose signa-
ture shall be deemed necessary at such time) so as to properly
convey to TENANT unencumbered title to the Shopping Center Tract,
in fee simple and merchantable, with full covenants of warranty,
and subject only to such exceptions as TENANT shall have previous-
ly approved.  Provided that Escrow Agent shall have issued its
title commitment to TENANT upon said premises, evidencing good
and merchantable title in LANDLORD, subject only to exceptions
approved by TENANT, Escrow Agent shall, within ten (10) days
after such notice of approval by TENANT of such title commit-
ment, notify LANDLORD and TENANT of a "Closing Date", within
such ten (10) day period, and upon such "Closing Date", Escrow
Agent shall deliver to TENANT the above mentioned properly
executed General Warranty Deed to the Shopping Center Tract,
together with an Owner's Title Insurance Policy, issued by
Escrow Agent, evidencing good and marketable title to said
Shopping Center Tract, subject only to such exceptions as shall
have been previously approved by TENANT.

18.3 TENANT, at its option, may assume the remaining
unpaid principal balance of any note secured by a first lien
on the Shopping Center Tract; in which event TENANT shall there-
upon deliver to LANDLORD any funds in excess of such remaining
balance necessary to comprise the total "Purchase Price", as
hereinabove defined, less any and all delinquent interest and
taxes, if any, and prorated closing items herein provided to
be chargeable to LANDLORD.  TENANT shall pay the closing costs
incurred or charged by the Escrow Agent for an Owner's Title
Insurance Policy, drawing the closing instruments, escrow fee,
revenue stamps, if any, and recording fees in connection with
the acquisition of the Shopping Center Tract.

18.4 Upon such "Closing Date", LANDLORD shall deliver its deed, conveyance, assignment or release to TENANT of all of LANDLORD's right, title and interest to any agreements, documents, books, records and instruments in any way pertaining to the said Shopping Center.

18.5 In the event that Escrow Agent shall be unable to issue its titlle commitment evidencing good and marketable title to said Shopping Center Tract, or in the event that TENANT shall be unable to approve such exceptions as shall be set forth in such title commitment, then, and in either of such events, Escrow Agent shall forthwith refund to TENANT, upon TENANT's written request therefor, any and all funds theretofore deposited with Escrow Agent under the provisions of Paragraphs 18.1 and 18.2.

18.6 In the event that LANDLORD, upon the existence of the above mentioned option in TENANT, and upon TENANT's compliance with the provisions of Paragraphs 18.1 and 18.2 above, shall fail to consummate the sale of the Shopping Center Tract for any reason except TENANT's default under said Paragraphs 18.1 and 18.2, TENANT may enforce specific performance of such provisions or may bring suit for damages against LANDLORD.

18.7 In the event that TENANT, upon LANDLORD's compliance with the provisions of Paragraphs 18.1 and 18.2 (under the circumstances therein recited to be necessary to vest said option in TENANT) shall fail to consummate the purchase of the Shopping Center Tract for any reason except such as are hereinabove set forth in Paragraph 18.3, or except LANDLORD's default under the provisions of Paragraphs 18.1 and 18.2, LANDLORD shall have the right to receive and retain the funds deposited by TENANT with Escrow Agent under the provisions of Paragraph 18.1 as liquidated damages, or LANDLORD may, at its option, enforce specific performance of said Paragraphs 18.1 and 18.2.

P A R T   T H R E E


<u>Operation</u>


Article 19
Shopping Center Name


For identification, public relations and advertising
purposes, the name of the <u>Shopping</u> <u>Center</u> shall be:


CENTRAL MALL


and such name shall not be changed during the Term of this
LEASE AGREEMENT, without TENANT's written consent.


58



<u>Operation</u>

Article 20
Publicity Releases

LANDLORD and TENANT each agree that neither of them
shall issue any statement or publicity releases, or other-
wise publicize this LEASE AGREEMENT, except in such form and
at such time as may be approved by each Party.

## Operation

### Article 21 Tenant Selection

#### Paragraph

21.1 LANDLORD, at all times during the Term hereof,
shall diligently undertake, in good faith, to maintain,
under executed written lease agreements, an aggregate:

140,000

square feet of Gross Leasable Area in the Buildings con-
structed on the Shopping Center Tract, exclusive of department store

21.2 It is in the mutual and best interest of the
Parties, and imperative to the maximum utilization of the
Shopping Center Tract, that the Shopping Center be developed
and maintained as an integrated, first-class, regional shop-
ping center, to contain a combination of merchants and busi-
nesses which:

    (1) represent a sound, balanced and
        generally compatible diversifi-
        cation of merchandise and services;

    (2) are well qualified and willing to
        direct an intensive and continuous
        merchandising and promotional program;

    (3) will be of strong financial condition
        and good repute;



   (4) will efficiently utilize, and not exceed
       the capacity of, the available Parking
       Spaces, all other portions of Common Area
       and the Mall, or any portion thereof, to
       obtain the maximum amount of business and
       business profits; and

   (5) will fixture, decorate and maintain their
       respective stores and business premises in
       a clean, safe, sightly, tasteful and decor-
       ous manner, having regard for the general
       standards of good appearance prevailing in
       the Shopping Center.

   21.3 In the general planning for the clean, safe, sightly,
tasteful and decorous condition and good appearance of such
integrated, first-class, regional shopping center, the following
conditions shall be met:

   Any arrangement negotiated for an Occupant to
   occupy Gross Leasable Area, that is located on
   the Mall within 150 linear feet of TENANT's
   Building, shall be for one or more of the fol-
   lowing retail purposes: mens ready-to-wear;
   ladies ready-to-wear; mens and ladies ready-
   to-wear; mens shoe sales; ladies shoe sales;
   family shoe sales; selling and serving restau-
   rant meals for consumption within the store;
   athletic footwear sales; book store; nutrition
   and health food sales; cheese house; childrens
   store; fashion accessories sales; fashion ap-
   parel sales; jewelry sales; toy sales; tobacco
   sales; optical goods sales; fabric sales; and
   financial institution (bank or savings and loan).



21.4 The provisions of this Article shall apply to
any and all tenancies and occupancies upon land adjacent
to the Shopping Center now or later owned or controlled by
LANDLORD, its successors and/or assigns, excluding mort-
gagees.  LANDLORD and TENANT shall use its best efforts
and avail itself of all legal remedies to prevent any
other person, firm or corporation from violating the pro-
visions of this Article.

21.5 Since damages for violation of the provisions
contained in the preceding paragraphs of this Article would
be difficult to ascertain and would, in any event, not af-
ford an adequate remedy, such provisions shall be enforce-
able, to the extent they are in effect, only by injunction
or decree for specific performance.

<u>Operation</u>

Article 22 Merchants Association

TENANT shall, prior to the date it opens its Building
for business with the general public, examine the organiza-
tional structure and by-laws of any "<u>Merchants</u> <u>Association</u>"
formed by LANDLORD for the purpose of promoting business in
the <u>Shopping</u> <u>Center</u>, with membership therein offered to
tenants and Occupants in the <u>Shopping</u> <u>Center</u>; and TENANT
shall join said association and remain an active member
thereof during at least the first three (3) years of the Term
hereof (except as herein otherwise provided) from the date
it opens for business with the general public; provided
TENANT determines to its satisfaction that:

(1) Membership therein is available to it
    on a fair and equitable basis with an-
    nual dues not exceeding ten cents (10¢)
    per square foot of TENANT's Gross Leasable
    Area for retail department store use;

(2) LANDLORD and ninety percent (90%)
    of all other <u>Shopping</u> <u>Center</u> Occupants
    engaged in the business of selling goods,
    wares and merchandise and related ser-
    vices at retail are members of said
    association;

(3) LANDLORD has agreed to pay not less
    than twenty percent (20%) of the an-
    nual budget of said association,
    such payment by LANDLORD would be in
    addition to the amounts to be paid by
    tenants of LANDLORD and other Occupants
    of the <u>Shopping</u> <u>Center</u> (but such re-
    quirement shall be reduced to not less

63



than twenty-five percent (25%) of the
amounts paid annually by tenants of
LANDLORD and other Occupants of Shopping
Center, in the event of any foreclosure
of any first mortgage on the Shopping
Center Tract, or any part thereof, or
the delivery of a deed in lieu of fore-
closure of any first mortgage);

(4) Said by-laws provide that each member
shall, at any time, be entitled to a
number of votes approximately propor-
tionate to the money contribution being
made at such time by such member, and
shall contain no provision which would
regulate, or empower said association
to regulate, the manner or hours of
operation of TENANT; and

(5) TENANT shall not be bound by an act or
omission of said Merchants Association;
the obligation of TENANT to said
Merchants Association being to pay dues
in conformance with the provisions of
this Article, and the obligation of
LANDLORD being to discharge any other
charges or assessments that may be
incurred by TENANT by reason of its
membership in said Merchants Association.

64



Operation


Article 23 Enclosed Mall


Paragraph
 23.1 LANDLORD shall, at its sole cost and expense,
at all times during the Term of this LEASE AGREEMENT (sub-
ject to the provisions of "Operation Article 29 Maintenance"
and subject to acts beyond its control, as set forth in
"General Article 35 Force Majeure"):

  (1) Keep and maintain the Enclosed Mall
   in a clean, safe and sightly con-
   dition and in good order and repair,
   and cause the same to be well-lighted,
   attractive and in good appearance at
   all times when TENANT's Building, or
   any part thereof, shall be open and
   doing business;

  (2) Keep and maintain the Enclosed Mall
   heating and cooling system in good
   operating condition and use its best
   efforts to:

  (a) Cool the Enclosed Mall to the aver-
   age temperature of not more than
   $75^\circ$ Dry Bulb and to produce a rela-
   tive humidity not exceeding 50%
   when the outside Dry Bulb tempera-
   ture is $95^\circ$ F. and the outside
   Wet Bulb temperature is $78^\circ$ F.
   during each day of the Term here-
   of when local climatic conditions
   require, throughout all hours
   when the TENANT Building, or any
   part thereof, is open and doing
   business; and

65



    (b) Heat the Enclosed Mall with suf-
ficient heat to maintain therein,
an average temperature of at least
68° F. during each day of the Term
hereof when local climatic con-
ditions require, throughout all
hours when TENANT Building, or any
part thereof, is open and doing
business;

(3) Obtain the written consent from TENANT
prior to leasing, or permitting occupancy,
of certain Gross Leasable Area on the En-
closed Mall, in accordance with Paragraph
21.3 of "Operation Article 21 Tenant
Selection";

(4) Prohibit any obstruction, plant, booth
or other installation over 5 feet in
height within the Enclosed Mall within
150 feet of TENANT's Building; and pro-
hibit any kiosks in the Enclosed Mall
within 150 feet of TENANT's Building;

(5) LANDLORD shall cause each Occupant of Gross
Leasable Area, which opens on the Enclosed
Mall upon the Shopping Center Tract, to plan and
operate such area in a manner that it shall
not unreasonably utilize any heated air or
cooled air from the Enclosed Mall, or un-
reasonably burden the heating or cooling
of air in the Enclosed Mall.  LANDLORD
shall cause the heating and air con-
ditioning system in the Enclosed Mall to
be planned and operated in a manner that
it shall not unreasonably utilize any
heated air or cooled air from the TENANT
Building, or unreasonably burden the
heating or cooling of air in such Building.
As used in this subparagraph:



(a) "Unreasonably utilize" means utiliza-
tion by one Occupant of the air of
another Occupant to the extent that
the cost of heating or cooling of
air by the Occupant utilizing such
air of another Occupant would there-
by be markedly lower; and

(b) "Unreasonably burden" means one Oc-
cupant discharging unheated or uncooled
air into the Enclosed Mall or the
Gross Leasable Area of another Occupant,
to such an extent that the cost of heat-
ing or air conditioning the Enclosed
Mall or such area of the other Occupant
is thereby markedly increased.

23.2 TENANT and LANDLORD shall each use its best
efforts to prevent:

(1) The distribution of any hand bills, or
other advertising material, on or about
any part of the Enclosed Mall;

(2) The installation in, on or about the
Enclosed Mall premises, of any amplifiers
or similar devices, or the use in or about
any Building in the Enclosed Mall of any
advertising medium, which may be heard or
experienced outside such Building, such
as, flashing lights, spot lights, loud
speakers, phonographs or radio broadcasts;

(3) The burning of any papers, trash or gar-
bage of any kind in the Enclosed Mall;

67



(4) The use of any portion, or portions, of
the Enclosed Mall for the purposes of
loading or unloading any truck or other
delivery vehicle, except in those por-
tions designated on each Tract as
"Loading Area" or "Truck Dock" on
"EXHIBIT B"; and

(5) The distribution, or use, of any printed,
or handwritten, papers or materials (in-
cluding magazines and newspapers) of any
kind or character on or about any part of
the Enclosed Mall.

23.3 At all times during the Term, and any renewal
thereof, TENANT and LANDLORD shall each not permit any fence,
barricade, structure, building or other obstruction of any
kind whatsoever, placed, kept, permitted or maintained on
or in the Enclosed Mall, or any part thereof, without the
prior written consent from the other Party which consent
shall not be unreasonably withheld.

63



Operation


Article 24 Common Area


Paragraph
      24.1 At all times during the Term, LANDLORD shall main-
tain, or cause to be maintained, upon the Shopping Center Tract,
a minimum parking index of:
                              5.5
automobile Parking Spaces (allowing at least 400 square feet
per Parking Space, including aisles, driveways, entrances,
exits, landscaped areas and sidewalks) for each 1,000 square
feet of Gross Leasable Area upon the Shopping Center Tract.


      24.2 In the event at an time during the Term there shall
be a reduction in the Common Area for any reason other than
Eminent Domain as provided for in "General Article 36 Eminent
Domain" and there becomes a lesser number of Parking Spaces
than is required under this Article, LANDLORD shall (simul-
taneously with the reduction in such Common Area) provide
Parking Spaces, either multi-level upon its Tract, or upon
land which is adjacent, contiguous or nearby, constructed as
set forth in "Construction Article 12 Shopping Center Improve-
ments", and being at least in number necessary to re-establish
and thereafter maintain the parking index required under this
Article.


      24.3 At all times during the Term, TENANT and LANDLORD
shall each not permit any fence, barricade, structure, building
or other obstruction of any kind whatsoever, placed, kept,
permitted or maintained on the Common Area, or any part there-
of, without the prior written consent from the other Party;
except to the extent such obstruction shall be reasonably
required:


69



(1) In connection with the use of any recorded easements on the Shopping Center Tract;

(2) In connection with the expansion, repair or replacement of any of the Improvements from time to time located in the Shopping Center; or

(3) In connection with the outdoor selling in those areas marked "Outdoor Selling Area" on "EXHIBIT B"; provided, however, that this restriction shall not preclude outdoor selling on the Common Area, in those instances when all Department Stores and a majority of the Merchants Association members in the Shopping Center join in a promotional activity for a stipulated period of time to engage in outdoor selling thereon.

24.4 TENANT and LANDLORD shall each use its best efforts to prevent:

(1) The distribution of any hand bills or other advertising material on or about any part of the Common Area;

(2) The installation in, on or about the Common Area premises of any amplifiers or similar devices, or the use in or about any Building in the Common Area of any advertising medium which may be heard or experienced outside such Building, such as, flashing lights, spot lights, loud speakers, phonographs or radio broadcasts;



(3) The burning of any papers, trash or
garbage of any kind in the Common Area;

(4) The use of any portion, or portions,
of the Common Area for the purposes
of loading or unloading any truck
or other delivery vehicle, except in
those portions designated on each Tract
as "Loading Area" or "Truck Dock" on
"EXHIBIT B"; and

(5) The distribution, or use, of any
printed, or handwritten, papers or
materials (including magazines and
newspapers) of any kind or character
on or about any part of the Common Area.

24.5 At all times during the Term of this LEASE AGREEMENT,
LANDLORD shall keep and maintain the Parking Spaces as follows:

(1) Laid out and marked in accordance with
TENANT's Parking Typical Spacing Layout,
attached hereto as "EXHIBIT D", as herein-
above provided;

(2) Provided with lighting which shall have a
minimum maintained intensity of one (1)
foot candles at 30 inches above the parking
surface; and

(3) Available for use as necessary for TENANT's
business purposes during store hours and
for one hour after each day's closing of
TENANT's retail department store upon the
Leased Premises.

24.6 In accordance with Paragraph 29.9 of "Operation
Article 29 Maintenance", the Parties hereto shall not make
any charge for the use of any Parking Space and the Parties
shall prescribe certain Parking Spaces for use by employees,
contractors, licensees and concessionaires.



Operation


Article 25 Signs


LANDLORD shall use its best efforts to prohibit the erection of any sign on the Shopping Center Tract, or on any Building within such Tract; and TENANT shall use its best efforts to prohibit the erection of any sign on its Leased Premises, except in conformity with the following policy:

(1) There shall be no flashing, rotating or moving signs or markers of any type;

(2) There shall be no signs painted on the exterior masonry surface of any Building;

(3) Paper signs in, on or behind, or visible through display windows shall not be permitted to remain up, or to be visible, for more than two weeks at a time;

(4) All signs which front on the Enclosed Mall shall be: (a) not more than four (4) feet in height, (b) approximately flush with the wall of the Building, and (c) of a length which does not exceed 80% of the linear frontage of the store upon which it fronts;

(5) Signs which are under Building canopies, other than approximately flush with the wall of the Building, shall be: (a) at right angles to the store front, (b) of a design which is uniform with other signs similarly placed under Building canopies, and (c) not more than five (5) feet wide and eighteen inches high;

72



(6) Signs on the Enclosed Mall, other than
    as provided in Subparagraph (4) above,
    shall be: (a) at right angles to the
    store front, (b) of a design which is
    uniform with and at the same height
    measured from the floor of the Enclosed
    Mall, and (c) not more than five (5)
    feet wide and eighteen inches high;

(7) There shall be no roof top signs;

(8) With respect to any Building constructed
    within the loading and delivery areas, as
    shown on the Plot Plan, "EXHIBIT B" (in
    lieu of the requirements set forth in
    Subparagraphs (4), (5) and (6)), signs
    on the wall of such Building shall be:
    (a) not more than six inches in height,
    and (b) approximately flush with the
    wall of the Building, except that small
    identification signs shall be permitted
    on delivery doors;

(9) No sign shall be permitted at or on the
    rear of any Building facing a loading
    court area, except for delivery identi-
    fication;

(10) Any sign on the outside of a Building
    in the Shopping Center that is visible
    from any street or highway shall be:
    (a) not more than five feet in height,
    (b) approximately flush with the wall
    of the Building, and (c) of a length
    which does not exceed 80% of the linear
    frontage of the store upon which it
    fronts, or 60 linear feet, whichever is
    less, and shall be subject to the ap-
    proval of LANDLORD and TENANT, which
    approvals shall not be unreasonably
    withheld;

73



(11) Except for directories within the Enclosed
     Mall, any directory or pylon sign on the
     Shopping Center site shall be subject
     to the prior written approval of LAND-
     LORD and TENANT, which approval shall
     not be unreasonably withheld; it being
     agreed, however, that LANDLORD hereby
     approves the right of TENANT to place
     a pylon sign at TENANT's automobile
     tire, battery accessory (TBA) service
     station; and

(12) There shall be no paper signs, card-
     board signs or portable signs of any
     kind or character on or about any part
     of the Common Area or the Enclosed Mall.

74

## Operation

## Article 26 Utilities

Paragraph
    26.1 LANDLORD shall, at its sole expense, provide, or
cause to be provided, all Common Utility Facilities, includ-
ing water, gas, electric, telephone, meters, sanitary sewers
and storm sewers to and from the Leased Premises, as approved
by TENANT.

    26.2 LANDLORD and TENANT shall each make arrangements
for and pay, or cause to be paid, any and all charges for
utility services supplied on the Shopping Center Tract and on
the Leased Premises, respectively.

    26.3 LANDLORD shall maintain, or cause to be maintained,
in good condition and repair, all Common Utility Facilities
located upon the Shopping Center Tract, including the portions
of the Common Utility Facilities serving the Leased Premises
which are located on the Shopping Center Tract.



Operation

Article 27 Taxes

Paragraph
        27.1 LANDLORD shall pay all taxes and assessments of
every nature, kind and description, levied and assessed against
the Shopping Center Tract and all Improvements thereon, in-
cluding the Leased Premises, as the same become due, from
time to time, during the Term of this LEASE AGREEMENT.


        27.2 In the event LANDLORD fails to pay said taxes
and assessments, as aforesaid, before the same become de-
linquent, or TENANT's peaceable possession of the Leased
Premises granted under this LEASE AGREEMENT is threatened
on account thereof, then, unless LANDLORD immediately pays
such taxes and assessments upon being requested to do so by
TENANT, TENANT may pay said taxes and assessments.  In such
event, LANDLORD shall, upon demand, reimburse TENANT for such
payment in the manner provided in "Operation Article 32
TENANT's Right of Reimbursement".


        27.3 In the event the imposition of any ad valorem
taxes upon the Shopping Center Tract and any Improvements
thereon, including the Leased Premises, shall be deemed by
LANDLORD to be improper, illegal or excessive, LANDLORD may,
if it so elects, at LANDLORD's expense, dispute and contest
the same, and, in such case, such taxes need not be paid
until adjudged to be valid; provided, however, that LANDLORD
shall protect, defend and hold TENANT harmless from any such
adjudication or the failure to pay such taxes.  TENANT's
quiet and peaceable possession of the Leased Premises shall
not, in any event, be disturbed thereby.


        27.4 Notwithstanding the other provisions of this
Article, in the event the general ad valorem real estate
taxes levied and assessed by all taxing districts and
authorities (excluding taxes on rent, if any) against the

Leased Premises and paid by LANDLORD for any calendar year of
the Term hereof after the fourth (4th) full calendar year of
said Term are increased to an amount of money which exceeds
the amount of money equal to the actual amount of taxes assessed
or paid for the third (3rd) full calendar year of the Term here-
of, whichever is the greater, then TENANT shall pay to LANDLORD
an amount of money equal to such increase in taxes, within thirty
(30) days after receipt by TENANT of satisfactory evidence showing
such taxes paid by LANDLORD for the third (3rd) full calendar
year of the Term hereof and for the year in which such increase
in taxes is claimed by LANDLORD, provided that:

> (1) LANDLORD shall furnish to TENANT
> such evidence of paid taxes not
> later than the first day of June
> of the year next following the year
> of said increase, if any;

> (2) The valuation placed by said taxing
> districts and authorities upon the
> Leased Premises for the year of such
> increase shall be consistent, uniform
> and in line with the valuation placed
> on surrounding or like properties;

> (3) Prior to rendering of said Leased
> Premises for the year of 1978 and
> subsequent years of the Term hereof,
> LANDLORD shall secure the approval of
> TENANT as to the values to be reflected
> in such renditions, whenever such values
> differ from those for the preceding year;
> and LANDLORD shall notify TENANT and af-
> ford its representative an opportunity
> to be present and heard at any conference,
> hearing or suit, in which the amount of
> such taxes to be levied and assessed
> against the Leased Premises is fixed
> or increased; and

77



(4) TENANT shall have the right, in LANDLORD's
name, but at TENANT's expense, to contest
the validity or amount of such taxes levied
or assessed against the Leased Premises for
the calendar year of 1978 or any subsequent
year of the Term hereof, conditioned that
TENANT will take appropriate legal proceed-
ings which operate to prevent the collection
of said taxes, or any part thereof, to satisfy
the same, and pending such legal proceedings,
LANDLORD shall have the right to pay, remove
or discharge the taxes being contested; TENANT
agrees to pay any interest and penalty accru-
ing by reason of TENANT's election to contest
such taxes, provided that LANDLORD has com-
plied with his obligations under this paragraph.

27.5 LANDLORD hereby agrees to reimburse TENANT for
TENANT's payment to LANDLORD incurred in the event of increase
in taxes, hereinabove provided for in Paragraph 27.4.  Such
reimbursement may be partial or in full, and to effect such
reimbursement, TENANT shall have, and is hereby granted, the
right to deduct and retain such amount of money out of the
Percentage Rent due LANDLORD.  It is understood and agreed
that said reimbursement shall be calculated separately and
independently for each "Lease Year" and, further, that said
reimbursement shall not be cumulative from one "Lease Year"
to another "Lease Year".

27.6 It is understood and agreed that as used in this
Article the term "the real estate taxes and assessments of every
nature, kind and description levied and assessed by all taxing
districts and authorities (excluding taxes on rent, if any)
against the Leased Premises" shall mean:

The amount of the real estate taxes and assess-
ments of every nature, kind and description
levied and assessed by all taxing districts
and authorities (excluding taxes on rent, if
any) against the Shopping Center Tract multiplied by
a fraction, the numerator of which is the
Gross Leasable Area in the Leased Premises
and the denominator of which is the Gross
Leasable Area, plus the total of the square
feet in the area of each level of the Enclosed
Mall, upon the Shopping Center Tract.

78



<u>Operation</u>


Article 28 Insurance


<u>Paragraph</u>
        28.1 LANDLORD shall, effective with the completion of
construction of each Building, the Enclosed Mall and all
other improvements upon the Shopping Center Tract (including
the Leased Premises), and thereafter during the Term of this
LEASE AGREEMENT, continuously keep, or arrange to keep, all
Buildings, the Enclosed Mall and all the other Improvements
upon the Shopping Center Tract insured, at no expense to
TENANT, against loss or damage by fire and such other risks
as are from time to time included in the extended coverage
of insurance policies issued in the locality of the <u>Shopping
Center</u>.  Said insurance shall be in amounts at least sufficient
to avoid the effects of co-insurance provisions of the policies,
that is, not less than 80% of the actual replacement costs
excluding the costs of foundations, underground flues, pipes
and drains, if such costs are properly excludable under cur-
rent co-insurance requirements.

        28.2 Each Party hereby waives any and every claim
which arises, or may arise, in its favor and against the
other Party during the Term of this LEASE AGREEMENT, for
any and all loss of, or damage to, any of its property
located within or upon, or constituting a part of, the
<u>Shopping Center</u>, which loss or damage is covered by valid
and collectible fire and extended coverage insurance policies,
to the extent that such loss or damage is recover-
able under said insurance policies.  Said mutual waivers



shall be in addition to, and not in limitation or derogation of, any other waiver or release regarding any loss of, or damage to, the said property of any Party.  Inasmuch as the said mutual waivers will preclude the assignment of any such claim by way of subrogation (or otherwise) to an insurance company (or any other person, firm or corporation) each Party shall give to each insurance company, which has issued to it, policies of fire and extended coverage insurance, written notice of the terms of said mutual waivers, and shall have said insurance policies properly endorsed, if necessary, to prevent invalidation of said insurance coverages by reason of said waivers.

28.3 At all times during the Term hereof, TENANT shall, at its sole expense, continuously maintain Comprehensive General Liability Insurance and Contractual Liability Insurance, endorsed to cover personal injury, covering the Building, or Buildings, Outdoor Selling Area, if any, and the landscaping, if any, between the exterior perimeter wall of Buildings and Building Perimeter Sidewalk, on its Tract within the Shopping Center Tract.  Such insurance shall afford protection to LANDLORD and TENANT as named insureds to the limit of not less than:

    (1) $2,000,000 for death of, or bodily injury to, or personal injury to, one person;

    (2) $2,000,000 for death of, or bodily injury to, or personal injury to, more than one person, on or resulting from one occurrence; and

    (3) property damage to the limit of not less than $500,000 for each occurrence;

Each Party shall, upon request of the other Party, furnish certificates of such insurance or other satisfactory written evidence of such insurance at any time during the Term hereof. Any policy required hereunder shall provide that such policy shall not be cancellable without at least ten (10) days' prior written notice to the Parties hereto.

28.4 At all times during the Term hereof, LANDLORD shall continuously maintain Comprehensive General Liability Insurance and Contractual Liability Insurance, endorsed to cover personal injury (including false arrest), covering the Common Area and the Enclosed Mall in the Shopping Center. Such insurance shall afford protection to LANDLORD and TENANT, as named insureds, to the limit of not less than:

(1) $2,000,000 for death of, or bodily injury to, or personal injury to, one person;

(2) $2,000,000 for death of, or bodily injury to, or personal injury to, more than one person, on or resulting from one occurrence; and

(3) property damage to the limit of not less than $500,000 for each occurrence;

LANDLORD shall deliver to TENANT a copy of said insurance policies, or certificates or other documents evidencing their existence, on or prior to the beginning of the Term, and thereafter, not less than fifteen (15) days prior to the expiration dates of the expiring policy, or policies, during the Term. Any policy required hereunder shall provide that such policy shall not be cancelled without at least ten (10) days' prior notice to TENANT.

28.5 TENANT shall have the right, at its option, to comply with and satisfy its obligations under this Article, by means of self-insurance, but only as and to the extent that any self-insurance is guaranteed by Sears, Roebuck and Co. to LANDLORD.

Operation

Article 29 Maintenance

Paragraph

29.1 At all times during the Term hereof, TENANT shall, at its sole expense, make all repairs and replacements necessary to keep TENANT's Building in good order and condition, except such as become necessary as a result of any loss by fire or other casualty and except such items as LANDLORD is obligated, under the provisions of this LEASE AGREEMENT, to maintain and repair, to or upon the Leased Premises which become necessary for any reason, unless due to the fault or neglect of LANDLORD.

29.2 TENANT shall keep the Leased Premises in a clean condition, according to city ordinances and the direction of the proper public officers during the Term hereof, and upon the termination of this LEASE AGREEMENT will deliver said Leased Premises to LANDLORD; subject to the provisions of Paragraphs 29.7, 29.8 and 29.9.

29.3 For the immediate protection of property, or prevention of injury, TENANT shall have the right, at all times, at its sole option, without prior notice to LANDLORD, to make such reasonable emergency repairs or replacements to and upon the Leased Premises, as TENANT shall deem necessary, and the further right (if the same are LANDLORD's obligations under the provisions and conditions hereof and if the same are not necessitated by the fault or neglect of TENANT) to recover the cost thereof from LANDLORD in the manner hereinafter provided in "Operation Article 32 TENANT's Right of Reimbursement".



29.4 In addition to the maintenance of the Common Area
and the Enclosed Mall, herein provided in this Article to be
done by LANDLORD, LANDLORD shall, at its sole expense, keep
the roof, foundations, exterior walls, floors (excluding floor
coverings), sprinkler systems, and structural parts, and all
items contained in said roof, foundations, exterior walls
and floors of the Leased Premises in good condition and repair
during the Term hereof,  and make all repairs and replacements
thereon which become necessary for any reason, unless the
same shall be necessitated by the fault or negligence of
TENANT.

29.5 LANDLORD further covenants that, in the event
the Improvements or repairs to be made by LANDLORD upon the
Leased Premises, if any, as in this LEASE AGREEMENT provided,
or any part, or parts, thereof, are not completed in the time
and manner herein provided, or prove at any time, in the case
of Improvements during the first (1st) year of the Term
hereof, and in the case of repairs, to be defective as to
workmanship or materials, LANDLORD will, without delay, cure
such defects and defaults without cost to TENANT.  However,
irrespective of the time limits stipulated in the foregoing
sentence, LANDLORD shall cure all defects and defaults as
to workmanship and materials which are covered by guaranties
or warranties, regardless of the item covered by such
guaranties or warranties, or the time at which such defect
and default became known to LANDLORD or TENANT.

29.6 If LANDLORD fails to make or complete said Im-
provements or such repairs as LANDLORD is herein obligated
to make, or to cure the defects which are in this LEASE
AGREEMENT provided to be cured by LANDLORD, and thereupon
LANDLORD becomes in default under Paragraph 41.10 of this
LEASE AGREEMENT, then, TENANT shall have the right, at its
sole option, without further notice to LANDLORD, to make
or cure the same.  LANDLORD agrees, upon demand, to reim-
burse TENANT for TENANT's expense incurred thereby, in the
manner provided in "Operation Article 32 TENANT's Right of
Reimbursement".



29.7 Except as hereinafter expressly provided, from
and after the completion of construction of the Leased Premises,
LANDLORD shall operate and maintain, or cause to be operated
and maintained, the Enclosed Mall and the Common Area in good
order, condition and repair, during the Term hereof.  In such
operation and maintenance, LANDLORD shall observe the follow-
ing standards:

> (1) Maintain the surface of the Parking
> Spaces, the Enclosed Mall and side-
> walks level, smooth and evenly
> covered with the type of surfacing
> material originally installed there-
> on, or such substitute thereof as
> shall be, in all respects, equal
> thereto in quality, appearance and
> durability;

> (2) Remove all papers, debris, filth and
> refuse and wash or thoroughly sweep
> paved areas as required and remove
> and clean all ice and snow;

> (3) Maintain such appropriate parking
> area entrance, exit and directional
> signs, markers and lights, as shall
> be reasonably required and in ac-
> cordance with good first-class
> regional shopping center practices;

> (4) Clean lighting fixtures and relamp
> as needed;

> (5) Repaint striping, markers, directional
> signs, etc., as necessary, to maintain
> in first-class condition;

> (6) Maintain landscaping, as necessary, to
> keep in a first-class condition;



    (7) Employ courteous and uniformed person-
        nel for security patrol during store
        hours and such other hours as are
        deemed necessary by the Parties;

    (8) Clean signs of the Shopping Center (as
        contrasted with those of Occupants)
        including relamping and repairs being
        made as required;

    (9) Maintain and keep in a sanitary con-
        dition public restrooms, if any, and
        other common use facilities; and

   (10) Clean, repair and maintain all Common
        Utility Facilities to the extent that
        the same are not cleaned, repaired and
        maintained by public utilities.

    29.8 LANDLORD shall bill TENANT and TENANT shall pay LAND-
LORD for the operation and maintenance of the Enclosed Mall and
the Common Area by the LANDLORD, as required by the amount of
money determined annually by multiplying the number of square
feet of Gross Leasable Area in the Leased Premises for retail
department store use (excluding the Gross Leasable Area in
TENANT's automobile, tire and battery accessory (TBA) service
station and excluding the Gross Leasable Area in the Leased
Premises for warehouse use) by:

TWENTY-FIVE CENTS (25¢)

during the first five (5) years of the Term hereof. After
the fifth (5th) full calendar year of operation of the En-
closed Mall, the Common Area and a retail department store
in the Leased Premises, said billing shall be adjusted
for each five (5) year period of such operation during the
remaining Term of this LEASE AGREEMENT, by use of the Con-
sumer Price Index, All Items (1967=100) issued by the U. S.
Bureau of Labor Statistics Section of the Monthly Labor Re-
view with the final index as base (hereinafter called "Index"),
multiplying the amount of said billing by a fraction, the
numerator of which is the Index for the first full calendar
year immediately preceding the five year period of said ad-
justment, and the denominator of which is the Index for the
first full calendar year immediately after the calendar year
in which TENANT opens for business; provided further, that
any such adjustment shall not exceed 25% of the billing for
the period immediately prior to the period of adjustment.

29.9 Such billing, however, shall be monthly and based upon LANDLORD's actual cost and expense of the previous month's operation, during which TENANT's retail department store was open to, and doing business with, the general public upon the Leased Premises, subject to the limitation set out in the preceding paragraph. At the end of each twelve (12) months' period, after the date TENANT's retail department store is open for business with the general public, LANDLORD shall render to TENANT a full and complete itemized statement of such operation and maintenance cost and expense, certified accurate by a duly authorized representative of LANDLORD. TENANT shall have the right, at its sole expense, exercisable upon ten (10) days' notice to LANDLORD, to request and make an audit of such books and records of account, as pertain to any such statement.

29.10 Unless the Parties otherwise consent and agree, in writing, no charge of any type shall be made to, or collected from, any Occupant or any Permittee for parking, or the right to park vehicles in the Parking Spaces. Permittees shall not be prohibited or prevented from so parking so long as Parking Spaces are available, and so long as they do not violate the reasonable rules and regulations covering the use of the Parking Spaces promulgated from time to time by the Parties. The Parties shall, by mutual agreement, prescribe certain sections within the Common Area, or on other land outside the Common Area within a reasonable distance from the nearest boundary of the Shopping Center, for use as Parking Spaces for the employees, contractors, licensees and concessionaires to use only such sections as are so prescribed for parking. Each Party agrees to use reasonable efforts to enforce the provisions hereof.



Operation

Article 30
Leased Premises Destruction

Paragraph
     30.1 During the Term hereof, LANDLORD shall, at its own
expense, promptly rebuild, restore and repair the Leased Premises
to substantially the same condition in which the Leased Premises
existed immediately prior to the date the Leased Premises are
damaged, destroyed or rendered unfit for its accustomed uses, by
reason of fire, explosion, tornado, earthquake or any other
casualty (regardless of whether or not caused by TENANT's negli-
gence), subject to Paragraphs 30.2, 30.3 and 30.4 of this Article.

     30.2 During the last:
                TWENTY (20)
years of the Term hereof, LANDLORD shall have the right to termi-
nate this LEASE AGREEMENT effective as of the date of any casualty,
by giving written notice of such termination to TENANT within
forty-five (45) days of the date of said casualty; provided that
the Leased Premises are damaged, destroyed or rendered unfit for
its accustomed uses to the extent of more than
                FIFTY PERCENT (50%)
when said percentage is determined in the manner described in
Paragraph 30.2; except that LANDLORD shall not have said right
to terminate this LEASE AGREEMENT under the provisions of this
Paragraph, in the event TENANT shall, within thirty (30) days
from the date of said casualty, give written notice that TENANT
intends to remain on the premises an additional five (5) years
from the date of TENANT's acceptance of the completion of the
rebuilding, restoration and repairing of the Leased Premises
to substantially the same condition in which it existed im-
mediately prior to said casualty; subject to Paragraph 30.4 of
this Article.

87



30.3 During the period of time from the date of any
casualty to the date of termination of this LEASE AGREEMENT
under the provisions of this Article, or to the date of
TENANT's acceptance of the completion of the rebuilding,
restoration and repairing of the Leased Premises to sub-
stantially the same condition in which it existed immediately
prior to said casualty, all rent and all other charges, such
as Common Area and Mall Maintenance charges payable by TENANT
under this LEASE AGREEMENT, shall abate in the proportion that
the part of the Leased Premises damaged, destroyed or rendered
unfit for its accustomed uses bears to the total Leased Premises.

30.4 The policy, or policies, of fire and casualty
insurance required pursuant to Article 28 hereof shall con-
tain a clause providing that any loss under the same shall
be payable, subject to the limitations set forth in this
Article, to the institutional holder of the mortgage herein-
after referred to in Article 13, as Trustee; it being under-
stood, however, that all amounts collected on any such policy,
or policies, shall be made available to LANDLORD for the
reconstruction or repair of any Building, or Buildings, and
other Improvements hereafter constructed upon the Leased
Premises, which may thereafter be damaged or destroyed, and
shall be paid out to LANDLORD by the said Trustee, from
time to time, as the work of rebuilding, reconstruction and
repair shall progress, upon certificates of architects
licensed to do business in the State of:
OKLAHOMA
showing the application of the amount paid for such repairs,
rebuilding or restoration.

30.5 In the event the damage is so small that the in-
surance award is for less than $50,000.00, then the insurance
proceeds shall be paid directly over to LANDLORD without the
necessity of payment to the Trustee, as otherwise provided
for in this Article. However, the agreement of direct payment

shall not be construed as relieving LANDLORD of the necessity
of repairing such damage in accordance with the provisions
hereof.  If there shall be any excess proceeds of an insurance
award remaining with the Trustee after the reconstruction or
repair of such Building, or Buildings, or other Improvements,
and if there shall then be no default on the part of LANDLORD
in the performance of its covenants herein contained, then,
and in both of such events, it is agreed that such excess
proceeds, if any, shall be paid to LANDLORD.

     30.6 In the event the LANDLORD fails to promptly re-
pair, rebuild or restore the Leased Premises, as hereinabove
provided in this Article, then TENANT shall have the right
to terminate this LEASE AGREEMENT, by giving LANDLORD thirty
(30) days' prior written notice of such termination.  In the
alternative, TENANT, at its sole option, after prior written
notice to LANDLORD may repair, rebuild or restore said
Leased Premises.  If TENANT does so repair said Leased
Premises, it shall have all the rights to collect insurance
proceeds hereinabove granted to LANDLORD under the pro-
visions of this Article, provided that TENANT shall use,
for the purpose of repairing, rebuilding or restoring, all
or so much as may be necessary, of such insurance proceeds
payable by reason of damage or destruction to the Leased
Premises.  TENANT shall account to LANDLORD for excess in-
surance proceeds, if any, remaining after such repairing,
rebuilding or restoring.  In addition, TENANT shall have
all rights provided in Article 32 with respect to any sum
for which it is not reimbursed out of such insurance proceeds.

89



Operation

Article 31
Shopping Center Improvements Destruction

Paragraph
31.1 During the Term hereof, LANDLORD shall, at its
own expense, promptly rebuild, restore and repair the Shopping
Center Improvements to substantially the same condition in
which the Shopping Center Improvements existed immediately
prior to the date the Shopping Center Improvements are damaged,
destroyed or rendered unfit for its accustomed uses, by reason
of fire, explosion, tornado, earthquake or any other casualty
(regardless of whether or not caused by TENANT's negligence),
subject to Paragraph 31.2 of this Article.

31.2 During the last Twenty (20) years of the Term here-
of, either Party shall have the right to terminate this LEASE
AGREEMENT, effective as of the date of any casualty, by giving
written notice of such termination to the other Party within
thirty (30) days from the date of said casualty; provided that
the Shopping Center Improvements are damaged, destroyed or
rendered unfit for its accustomed uses to the extent of more
than:

FIFTY PERCENT (50%)
when said percentage is determined by dividing the cost to re-
place the Improvements of the Shopping Center damaged, destroyed
or rendered unfit for its accustomed uses, by the market value
of the total Improvements of the Shopping Center immediately
prior to said casualty, as said cost and market value are dis-
closed by certification of a reputable building contractor ac-
ceptable to both Parties, or if no acceptable contractor be
agreed upon, then the certification of an architect who is
acceptable to both Parties and who is a member of the local
chapter of the American Institute of Architects.

Operation

Article 32
TENANT's Right of Reimbursement

Paragraph
    32.1 In the event LANDLORD fails promptly and fully to
perform any of LANDLORD's obligations hereunder after written
request by TENANT under the provisions of either Paragraph
29.3 or Paragraph 41.10 of this LEASE AGREEMENT, then TENANT
shall have the right, but not the obligation, to perform the
same and to recover from LANDLORD, TENANT's cost and expense,
together with interest thereon at the rate of:
                    TEN PERCENT (10%)
per annum from the time of such performance by TENANT.

    32.2 In the event such cost, expense and interest are
not paid upon demand, TENANT shall have the right to deduct
the same from any installments of rent, then or thereafter
payable hereunder.

91



<u>Operation</u>

Article 33
LANDLORD Operating Period

<u>Paragraph</u>
33.1 LANDLORD shall use the Shopping Center Tract solely for
the purpose of operating and managing, or causing to be
operated and managed, a multi-unit retail and commercial
facility (being the Shopping Center less the Leased Premises)
containing at least:
140,000
square feet of Gross Leasable Area plus at least one (1) other
retail department store for a period of at least:
FIFTEEN (15) YEARS
from the date of the opening of TENANT's retail department
store for business with the general public upon the Leased
Premises (and at least one other retail department store from
one (1) year after the date of said opening) and for as long
thereafter as any retail department store is so opened for
business upon the Leased Premises, but in any event, for a
period of not longer than:
TWENTY-FIVE (25) YEARS
except if TENANT or its assignee shall be operating upon the
Leased Premises.

33.2 The provisions of this Article shall be subject
to all the provisions of this LEASE AGREEMENT, such as the
provisions of "General Article 36 Eminent Domain" and
"Operating Article 31 Shopping Center Improvements Destruction".
Any failure to comply with the provisions of this Article for
temporary periods of time during which the Landlord Building,
or any part thereof, is uninhabitable because of fire or other
casualty, or such Building is closed because of acts beyond
LANDLORD's control, shall not be deemed a default under the
provisions of this Article, for so long as diligent efforts
are being made to restore such Building, if possible, to the
condition in which it was just prior to the happening of such
casualty or act.

92



33.3 Throughout the Term of the operating period, LANDLORD shall provide, or cause to be provided, a resident manager for the Shopping Center.

<u>Operation</u>

Article 34
TENANT Operating Period

<u>Paragraph</u>
       34.1 TENANT shall use the Leased Premises solely for
the purpose of operating a retail department store under the
name being used by the majority of the retail department
stores operated by Sears, Roebuck and Co. for a period of
at least:

FIFTEEN (15) YEARS
from the date of the opening of TENANT's retail department
store for business with the general public upon the Leased
Premises, but for only so long as LANDLORD complies with
the provisions of its Operating Period, as provided in this
LEASE AGREEMENT.

       34.2 The provisions of this Article shall be subject
to all the provisions of this LEASE AGREEMENT, such as the
provisions of "General Article 36 Eminent Domain" and
"Operation Article 30 Leased Premises Destruction". Any
failure to comply with the provisions of this Article for
temporary periods of time, during which the TENANT Building,
or any part thereof, is uninhabitable because of fire or
other casualty, or such Building is closed because of acts
beyond TENANT's control, shall not be deemed a default under
the provisions of this Article, for so long as diligent
efforts are being made to restore such Building, if possible,
to the condition in which it was just prior to the happening
of such casualty or act.

94



P A R T   F O U R

General

Article 35 Force Majeure

In the event that LANDLORD or TENANT shall be delayed,
hindered in, or prevented from, the performance of any act
required hereunder by reason of strikes, lock-outs, labor
disputes, inability to procure materials, failure of power,
restrictive governmental laws or regulations, riots, in-
surrection, the act, failure or default of the other Party,
war or other reason beyond their control, then performance
of such act shall be excused for the period of the delay
and the period for the performance of any such act shall
be extended for a period equivalent to the period of such
delay, but in no event for a period of more than·one (1)
year.



<u>General</u>

Article 36 Eminent Domain

<u>Paragraph</u>
    36.1 In the event that all, or a substantial part (more
than thirty percent (30%) of the Floor Area, or more than ten
percent (10%) of the Floor Area devoted to selling activity,
upon the Leased Premises) and/or all, or a substantial part
of the Common Area (more than ten percent (10%) of the Park-
ing Spaces) within 300 lineal feet of the Leased Premises
(unless LANDLORD replaces said Parking Spaces upon land con-
tiguous to, or adjacent to, the Shopping Center Tract) should
be taken for any public or quasi-public use under any govern-
mental law, ordinance or regulation, or by right of eminent
domain, or by private purchase in lieu thereof, then, and in
either or any of such events, this LEASE AGREEMENT shall
terminate.  TENANT shall thereupon be released from any fur-
ther  liability hereunder, except for rent and any obliga-
tions provided for in this LEASE AGREEMENT theretofore accrued.
Such termination shall be effective, at TENANT's option, either
on the date notice of the condemning authority's intention to
take such property shall have been received by LANDLORD or
at any time thereafter, by giving LANDLORD at least thirty
(30) days' written notice of TENANT's intention so to termi-
nate.  LANDLORD shall repay to TENANT any unearned rent and
Common Area and Mall maintenance charges theretofore paid to
LANDLORD in advance.

    36.2 In the event that less than thirty percent (30%)
of the Floor Area and/or less than ten percent (10%) of the
Floor Area devoted to selling activity upon the Leased Premises
and/or a portion, not in excess of ten percent (10%) of the

96

Parking Spaces within 300 lineal feet of the Leased Premises
(unless LANDLORD replaces said Parking Spaces upon land con-
tiguous to, or adjacent to, the Shopping Center Tract) should
be taken for any public or quasi-public use under any govern-
mental law, ordinance or regulation, or by right of eminent
domain, or by private purchase in lieu thereof, then, and in
either or any of such events, this LEASE AGREEMENT shall not
terminate; however, the rent then payable hereunder and
Common Area and Mall maintenance charges payable hereunder
during the unexpired portion of the Term hereof shall be
reduced in proportion to the area taken, effective upon the
date physical possession is taken by the condemning authority.

36.3 In the event that any part of the Common Area
(not in close proximity to the Leased Premises) should be
taken for any public or quasi-public use under any govern-
mental law, ordinance or regulation, or by right of eminent
domain, or by private purchase in lieu thereof, this LEASE
AGREEMENT shall not terminate, nor shall the rent or Common
Area or Mall maintenance charges payable hereunder be re-
duced, nor shall TENANT be entitled to any part of the award
made for such taking, except that LANDLORD or TENANT may
terminate this LEASE AGREEMENT if the part of the Common
·Area remaining, following such taking, plus any additional
Parking Spaces provided by LANDLORD in reasonable proximity
to the Shopping Center shall be less than seventy-five percent
(75%) of the original amount of the Common Area in said
Shopping Center.



36.4 Any election to terminate this LEASE AGREEMENT, following condemnation notices, shall be evidenced by written notice of termination delivered to the other Party in accordance with the requirements for giving notices, as hereinafter provided in "General Article 42 Notices".

36.5 In the event that this LEASE AGREEMENT is not terminated following a partial condemnation, all of the covenants, conditions and provisions hereof shall continue in full force and effect; provided, however, that LANDLORD shall, at LANDLORD's sole expense, commence promptly and prosecute with diligence the making of all necessary repairs, alterations and improvements to all Buildings which have been partially taken, in order to constitute the remaining part of the Leased Premises and Shopping Center as a complete architectural unit in accordance with Plans and Specifications therefor, which shall be approved by TENANT prior to any such repairs and/or alterations. Such approval shall not be unreasonably withheld.

36.6 In the event that there shall be any temporary taking of any part of the Shopping Center, including the Leased Premises, by any governmental authority, for any reason, such as quartering National Guard Troops during a civil riot, and such temporary taking unreasonably interferes with the rights granted under this LEASE AGREEMENT to either Party, then the covenants under this LEASE AGREEMENT shall be, as applicable, suspended for the period of time of such temporary taking.

36.7 All compensation awarded for any taking (or the proceeds of private sale in lieu thereof) whether for the whole or a part of the Leased Premises, shall be the property of LANDLORD and TENANT as their respective interests may then appear in any such award to LANDLORD, it being agreed

98



that TENANT shall participate in such award to LANDLORD to the
extent of TENANT's investments, if any, in the Building, or
Buildings, upon the Leased Premises, according to the then
value of the portions thereof belonging to TENANT.   LANDLORD
shall have no interest in any award made to TENANT for loss
of business or for the taking of TENANT's fixtures and equip-
ment within the Leased Premises, for which the condemning
authority shall make a separate award for such items to TENANT.

36.8 Any dispute arising under this Article shall be
settled by agreement, if possible, otherwise by Arbitration
as set forth in "General Article 40 Arbitration".

<u>General</u>

Article 37 Default

<u>Paragraph</u>
  37.1 In the event any one or more of the following
events shall have occurred and shall not have been remedied,
as hereinafter provided:

> (1)  TENANT's failure to pay any install-
> ment of Base Rent, or Percentage Rent,
> when the same shall be due and pay-
> able and the continuance of such
> failure for a period of thirty (30)
> days after receipt by TENANT of notice,
> in writing, from LANDLORD, specifying
> in detail the nature of such failure; or

> (2)  TENANT's failure to perform any of
> the other covenants, conditions and
> agreements herein contained on TENANT's
> part to be kept or performed and the
> continuance of such failure without
> the curing of same for a period of
> forty-five (45) days after receipt ·
> by TENANT of notice, in writing, from
> LANDLORD, specifying in detail the
> nature of such failure, and provided
> TENANT shall not cure said failure as
> provided in Paragraph 37.2 of this
> Article;

then, LANDLORD may, at its option, give to TENANT a notice of election to end the Term of this LEASE AGREEMENT upon a date specified in such notice, which date shall be not less than ten (10) business days (Saturdays, Sundays and legal holidays excluded) after the date of receipt by TENANT of such notice from LANDLORD, and upon the date specified in said notice, the Term and estate hereby vested in TENANT shall cease and any and all other right, title and interest of TENANT here-under shall likewise cease without further notice or lapse of time, as fully and with like effect as if the entire Term of this LEASE AGREEMENT had elapsed, but TENANT shall con-tinue to be liable to LANDLORD, as hereinafter provided.

37.2 In the event that LANDLORD gives notice of a de-fault of such a nature that it cannot be cured within such forty-five (45) day period, then such default shall not be deemed to continue so long as TENANT, after receiving such notice, proceeds to cure the default as soon as reasonably possible and continues to take all steps necessary to com-plete the same within a period of time which, under all pre-vailing circumstances, shall be reasonable. No default shall be deemed to continue if and so long as TENANT shall be delayed in, or prevented from, curing the same by any cause specified in "General Article 35 Force Majeure".

37.3 Notwithstanding anything to the contrary contained in this Article, in the event that any default of TENANT shall be cured in any manner hereinabove provided, such default shall be deemed never to have occurred and TENANT's rights hereunder shall continue unaffected by such default.

37.4 Upon termination of the Term of this LEASE AGREE-
MENT pursuant to Paragraph 37.1 of this Article, or at any
time thereafter, LANDLORD may, in addition to, and without
prejudice to any other rights and remedies LANDLORD shall
have at law or in equity, re-enter the Leased Premises and
recover possession thereof and dispossess any or all Occu-
pants of the Leased Premises in the manner prescribed by the
statute relating to summary proceedings, or similar statutes;
but TENANT, in such case, shall remain liable to LANDLORD,
as hereinafter provided.

37.5 In case of any such default, re-entry, expiration
and/or dispossess by summary proceedings:

    (1) The rent shall become due thereupon
       and be paid up to the time of such
       re-entry expiration and/or dispossess;

    (2) LANDLORD may relet the Leased Premises,
       or any part, or parts, thereof, either
       in the name of LANDLORD, or otherwise,
       for a term, or terms, which may, at
       LANDLORD's option, be less than, or
       exceed the period which would other-
       wise have constituted the balance of
       the Term of this LEASE AGREEMENT and
       may grant concession or free rent; and

    (3) TENANT, or the legal representative
       of TENANT, shall also pay LANDLORD,
       as liquidated damages, for the fail-
       ure of TENANT to observe and perform
       TENANT's covenants herein contained,
       any deficiency between the rent here-
       by reserved and/or covenanted to be
       paid and the net amount, if any, of
       the rents collected on account of
       the lease, or leases, of the Leased
       Premises for each month of the period
       which would otherwise have constituted
       the balance of the Term of this LEASE
       AGREEMENT.

102



In computing such liquidated damages, there shall be added to
the said deficiency such reasonable expenses as LANDLORD may
incur in connection with reletting, such as brokerage and
preparation for reletting.  Any such liquidated damages shall
be paid in monthly installments by TENANT on the rent day
specified in this LEASE AGREEMENT, and any suit brought to
collect the amount of the deficiency for any month shall not
prejudice, in any way, the rights of LANDLORD to collect the
deficiency for any subsequent month by similar proceeding.
LANDLORD, at LANDLORD's option, may make such alterations,
repairs, replacements and/or decorations in the Leased
Premises as LANDLORD, in LANDLORD's sole judgment, considers
advisable and necessary for the purpose of re-letting the
Leased Premises and the making of such alterations, repairs,
replacements and/or decorations shall not operate or be con-
strued to release TENANT from liability hereunder, as afore-
said.  LANDLORD agrees to use its best efforts to mitigate
all damages and to re-let the Leased Premises in the event
of any default specified herein.

103



General

Article 38 Assignment

Paragraph
      38.1 At any time after:
                              FIFTEEN (15)
years from and after commencement of the Term hereof, TENANT
shall have the right to assign this LEASE AGREEMENT or sub-
let the Leased Premises, or any part thereof, for retail pur-
poses customary to regional shopping centers, but TENANT shall
remain responsible only for the payment of annual rent which
shall be "the average annual rent for the immediate preceding
three (3) Lease Years", plus the amount of tax reimbursement
payable to LANDLORD by TENANT under the provisions of Para-
graphs 27.4, 27.5 and 27.6 in "Operation Article 27 Taxes";
Percentage Rent, if any, under 8.1 and for the payment of
the Common Area and Mall maintenance charge hereinabove
provided for in "Operation Article 29 Maintenance".  Any
assignment by TENANT shall be by written document in re-
cordable form with a conformed copy of this LEASE AGREEMENT
attached thereto.


      38.2 TENANT shall further remain responsible for the
performance of all the covenants herein contained to be per-
formed by TENANT, in no event, however, beyond the original
Term of this LEASE AGREEMENT.  TENANT, and any Party to
whom this LEASE AGREEMENT may be assigned or said Leased
Premises subleased, as aforesaid, shall have the right to
make such non-structural changes, alterations and improve-
ments and to install such electric, store and other fixtures
and equipment, on or about the Leased Premises, and any
assignee or sublessee shall have the right to post or attach
only such signs as shall comply with "Operation Article 25
Signs" hereof (provided, however, that TENANT shall not permit

any laborers', mechanics' or materialmen's liens to attach to
the Leased Premises by reason thereof, and TENANT shall not
make any major alterations affecting the structure of said
Buildings without the prior written consent of LANDLORD).
All signs, floor covering and all electric, store and other
fixtures and equipment, which may be installed, placed or
attached in or about the Leased Premises by TENANT or any
assignee or sublessee of TENANT shall always remain the
property of TENANT or of the assignee or sublessee of TENANT
so installing, placing or attaching the same; and upon
termination by expiration of time or otherwise of this LEASE
AGREEMENT, or at any time or times, TENANT or such assignee
or sublessee of TENANT, shall, if it desires to do so be per-
mitted to remove all or any of said signs, fixtures and equip-
ment so installed, placed or attached; provided, however, that
any damage caused to the Leased Premises by reason of such
removal shall be repaired by TENANT or its assignee or sub-
lessee so removing the same.                                        

         38.3 LANDLORD shall not sell, assign or convey any
part of the Shopping Center Tract or any part of its in-
terest in this LEASE AGREEMENT, prior to the date the con-
struction of the Shopping Center is completed and the
Shopping Center is open for business with the general public.
After said date, LANDLORD shall have the right to sell,
assign or convey any part of the Shopping Center Tract or
any part of its interest in this LEASE AGREEMENT, provided
the assignee of this LEASE AGREEMENT is an experienced and
reputable shopping center firm or company approved by
TENANT, which approval shall not be unreasonably withheld,
and such assignee shall execute a written document, in
recordable form, in which it shall assume all of the duties
and obligations of the LANDLORD, as set out under this LEASE
AGREEMENT; and thereupon, LANDLORD shall be released from all
of its obligations hereunder accruing thereafter.

<u>General</u>

Article 39 Indemnity

<u>Paragraph</u>
     39.1 TENANT shall indemnify and save harmless LANDLORD
from and against any and all liability, damage, penalties or
judgments arising from injury to person or property situated
by any one in and about the Leased Premises, resulting from
any act, or acts, or omission, or omissions, of TENANT, or
TENANT's officers, agents, servants, employees, contractors,
or sublessees.  TENANT shall, at its own cost and expense,
defend any and all suits or actions (just or unjust) which
may be brought against LANDLORD, in which LANDLORD may be
impleaded with others upon any such above mentioned matter,
claim, or claims, except as may result from the acts set
forth in Paragraph 39.2 of this Article.

     39.2 Except for its affirmative acts or negligence or
the affirmative acts or negligence of its officers, agents,
servants, employees or contractors, LANDLORD shall not be
responsible or liable for any damage or injury to any property,
fixtures, building or other Improvements, or to any person,
or persons, at any time on the Leased Premises, including
any damage or injury to TENANT or to any of TENANT's officers,
agents, servants, employees, contractors, customers or sub-
lessees.

General

Article 40 Arbitration

Paragraph

40.1 Whenever, under the provisions of this LEASE AGREE-
MENT, there is any matter in dispute which cannot be settled
by agreement of the Parties, either Party desiring arbitration
(hereinafter called "First Party") shall give the other Party
(hereinafter called "Second Party") written notice to that
effect, describing the matter in dispute to be determined by
arbitration, and naming an arbitrator to act for First Party.
Unless such matter shall be agreed upon between the Parties
in the interim, the Second Party, within ten (10) days after
receipt of such notice, shall name an arbitrator to act for
Second Party by a written notice to First Party and, con-
currently therewith, by notices, in writing, shall notify each
of said arbitrators of their obligation to appoint a third
arbitrator.  The two arbitrators so appointed shall, within
thirty (30) days thereafter, appoint a third arbitrator and
make all necessary arrangements for conducting such arbitration.

40.2 If Second Party shall fail or refuse to name an
arbitrator, the arbitrator appointed by First Party shall
act as sole arbitrator, or, at his option, shall appoint an
arbitrator to act for the Second Party.  In the event the
arbitrator appointed by First Party shall be the sole arbi-
trator, his decision shall be final and conclusive upon the
Parties.  In the event the three arbitrators are appointed,
in either of the manners set forth in this Article, the
decision of any two of said three arbitrators shall be final
and conclusive upon the Parties.  In the event the first two
arbitrators appointed shall fail to appoint a third arbitrator
within thirty (30) days of the appointment of the second arbi-
trator, or in the event any arbitrator appointed shall become
incapacitated, die or resign, or refuse to act, at any time
before the complete determination of the matter in dispute,
a Judge of competent local jurisdiction shall appoint an arbi-
trator to fill the vacancy of the arbitrator not appointed or
not acting.

40.3 The cost and expense of the arbitrators and the arbitration proceeding shall be paid and shared by the Parties equally.  The decision of the arbitrators shall be in writing, a signed copy thereof shall be delivered to each Party and shall be made as promptly as possible after their appointment, but in no event, later than thirty (30) .days after the date of appointment of the third arbitrator.  If the said arbitrators so appointed do not make a binding decision within said thirty (30) day period, the appointment of the third arbitrator shall be deemed revoked, a new third arbitrator shall be appointed, as provided in Paragraph 40.1 of this Article, and the three arbitrators so appointed shall again act in the same manner and within the same time limits as though the third arbitrator had not previously been appointed.

40.4 In the alternative, either Party may elect that: Any dispute, controversy or claim arising out of, or relating to this LEASE AGREEMENT, or the breach thereof, shall be settled by arbitration in accordance with the Rules of the American Arbitration Association, and judgment upon the award rendered by the Arbitrator, or Arbitrators, may be entered in any court having jurisdiction thereof.

General

Article 41 Miscellaneous

Paragraph

41.1 Short Form. Each Party, if requested by the other Party, shall promptly execute, in form appropriate for recording, and will cause to be recorded a short form or memorandum of this LEASE AGREEMENT, satisfactory in form and substance and in manner of recordation to both Parties. The fees for such recording shall be shared equally by both Parties.

41.2 Parties not Partners. Nothing contained in this LEASE AGREEMENT shall be construed to make the Parties hereto partners or joint venturers, or to render either of said Parties liable for the debts or obligations of the other, except as in this LEASE AGREEMENT expressly provided.

41.3 No Waiver. No delay or omission by either of the Parties in exercising any right or power accruing upon any non-compliance or failure of performance by the other Party, under the provisions of this LEASE AGREEMENT, shall impair any such right or power or be construed to be a waiver thereof. A waiver, by either of the Parties of any covenant, condition, provision or performance under this LEASE AGREE-MENT, shall not be construed to be a waiver of any succeeding breach thereof, or of any other covenant, condition, provision or performance of this LEASE AGREEMENT.

41.4 Captions. The table of contents preceding this LEASE AGREEMENT, Article headings, captions and other similar designations are for convenience and reference only, and in no way define or limit the scope and content of this LEASE AGREEMENT, or in any way affect its provisions.

41.5 <u>Governing Law</u>.  This LEASE AGREEMENT shall be governed by and construed in accordance with the laws of the State of:
                           OKLAHOMA


41.6 <u>Severable Provisions</u>.  In the event any provision, or any portion thereof, of this LEASE AGREEMENT, or the application thereof, to any person or circumstances, shall, to any extent, be held <u>invalid</u> or <u>unenforceable</u>, the remainder of this LEASE AGREEMENT, all of its other provisions and all portions thereof, and the application thereof, to any other person or circumstances, shall be severed therefrom and shall not be affected thereby, and each such provision, and portion thereof, of this LEASE AGREEMENT shall be valid and enforceable to the fullest extent permitted by law.


41.7 <u>Modification</u>.  No agreement shall be effective to add to, change, amend, modify, waive or discharge this LEASE AGREEMENT, in whole or in part, unless such agreement is in writing and signed by each Party.


41.8 <u>Counterparts</u>.  This LEASE AGREEMENT is executed in several counterparts, each of which shall be deemed an original, and all such counterparts shall together constitute one and the same instrument.


41.9 <u>LANDLORD Liability</u>.  Notwithstanding any other provisions in this LEASE AGREEMENT, LANDLORD shall be <u>fully and individually liable</u> (jointly and severally in the case of individuals or partners, if any) without limitation, for all of the conditions, covenants and provisions of this LEASE AGREEMENT, until the construction of the <u>Shopping Center</u> is completed and the <u>Shopping Center</u> is open for business with the general public; thereafter, LANDLORD shall be fully and individually liable only to the extent of the assets of the Shopping Center Tract and all the Improvements thereon.

41.10 <u>Default</u>.   Unless otherwise provided in this LEASE
AGREEMENT, no Party shall be deemed to be in default under
this LEASE AGREEMENT, until such Party shall have been given
written notice describing the nature of such impending default,
and within fifteen (15) days after the receipt of such notice,
shall have failed to commence to cure such impending default
and to proceed diligently to complete the curing of such im-
pending default as promptly as possible, utilizing all reason-
able means to effectuate and expedite the curing of such im-
pending default.

41.11 <u>Mortgagee Notice</u>.   Notwithstanding any other pro-
visions in this LEASE AGREEMENT for notices of default under
this LEASE AGREEMENT, TENANT shall notify LANDLORD's mortgagee
of any default hereunder, in the same manner that other notices
are required to be given under this LEASE AGREEMENT, provided,
however, that said mortgagee shall have first notified TENANT
of its mailing address.

41.12 <u>Estoppel Certificate</u>.   Each Party shall furnish
the other Party only one estoppel certificate for each mort-
gagee and each assignee.   Said estoppel certificate shall be
addressed to such Party's mortgagee holding said Party's
permanent loan, and shall be delivered at the time of, or
immediately prior to, the closing of such loan; or to such
Party's assignee, and shall be delivered at the time of, or
immediately prior to, the closing of such assignment.

41.13 <u>No Public Dedication</u>.   No provision contained in
this LEASE AGREEMENT shall be construed to grant any gift,
dedication or any irrevocable rights to the general public or
to any public purpose whatsoever, of, in, or to, any portion
of the Shopping Center Tract or any Improvements therein; it
being the intention of the Parties hereto that this LEASE
AGREEMENT shall be strictly limited to, or for, the purposes
herein expressed.

41.14 <u>No Third Party Beneficiary</u>.   Except as herein
specifically provided, no rights, privileges or immunities of
either Party hereto shall inure to the benefit of any tenant,
customer, employee or invitee of the <u>Shopping Center</u> or any
other third party; nor shall any tenant, customer, employee or
invitee of the <u>Shopping Center</u> or any other third party be
deemed to be a third party beneficiary of any of the provisions
contained herein.

<u>General</u>

Article 42 Notices

Paragraph
42.1 Any notice, demand, request, consent, approval or
other communication, which either Party hereto is required, or
desires, to give or make or communicate to the other, shall be
in writing and shall be given, or made or communicated by pre-
paid United States registered or certified mail (unless other-
wise acknowledged in writing by the addressee), addressed, in
the case of LANDLORD, to:

     Ed Warmack
     258 Central Mall
     Fort Smith, Arkansas 72901

and addressed, in the case of TENANT, to:

     Sears, Roebuck and Co.
     1000 Belleview Street
     Dallas, Texas, 75295

     Attention:  Real Estate Manager

subject to the right of each Party to designate a different
address by notice similarly given.

42.2 Any such notice, demand, request, consent, approval
or other communication so made shall be deemed to have been
given, made or communicated on the date actually received by
the recipient or addressee of such notice, as said date is in-
dicated on the return receipt or indicated in writing by said
recipient or addressee.

<u>General</u>

Article 43 Exhibits

Prior to the effectiveness of the provisions of this
LEASE AGREEMENT pertaining to exhibits, the exhibits shall
be signed by the duly authorized officers, agents or attorneys
of each Party and, when so signed, are thereby incorporated
by reference into, and made a part of, this LEASE AGREEMENT,
as fully as if set forth in full herein.

113

<u>General</u>

Article 44 Successors

Except as herein otherwise expressly provided, the cove-
nants, conditions and agreements contained in this LEASE AGREE-
MENT shall bind and inure to the benefit of LANDLORD and TENANT
and their respective heirs, successors, administrators and
assigns.

114



IN WITNESS WHEREOF, the Parties hereto have caused this
LEASE AGREEMENT to be signed and executed as of the day and
year first above written, the corporate Party by its duly
authorized officers and by affixing its seal.

Ed Warmack

Jane Warmack

LANDLORD


SEARS, ROEBUCK AND CO.

ATTEST:

By _____          By _____
Assistant Secretary             Executive Vice President

TENANT

The undersigned attorneys have affixed their signatures
below to confirm that the provisions of the foregoing LEASE
AGREEMENT relating to Arbitration were included therein on the
advice of counsel.

_____
Attorney for LANDLORD

_____
Attorney for TENANT

115



ATTORNMENT, NOTICE AND
NON-DISTURBANCE AGREEMENT

STATE OF OKLAHOMA   )
                    )
COUNTY OF COMANCHE  )

KNOW ALL MEN BY THESE PRESENTS:

THIS AGREEMENT made as of the 2nd day of May , 1980,
by and between SEARS, ROEBUCK AND CO., a New York corporation, ("Tenant")
and AETNA LIFE INSURANCE COMPANY ("MORTGAGEE").

W I T N E S S E T H:

WHEREAS, Mortgagee is now the owner and holder of a first mortgage
lien in the amount of Fifteen Million Dollars ($15,000,000.00) (herein-
after referred to as the "Mortgage") on the real property, together with
the buildings and improvements now or hereafter constructed thereon
(collectively known as the "Property"), described in Exhibit "A" attached
hereto and incorporated herein; and

WHEREAS, Tenant is the holder of a Lease dated the 18th day of
August, 1978, amended by Amedment to Lease Agreement dated the 8th day
of December, 1978, (hereinafter collectively referred to as the "Lease")
made between Tenant and ED WARMACK and JANE WARMACK, as Landlord,
(hereinafter called "Landlord") covering a part of the Property (said
part being hereinafter referred to as the "Leased Premises") which
Lease is incorporated herein by reference; and

NOW, THEREFORE, for Ten Dollars ($10.00) and other valuable
consideration, each to the other in hand paid, including the mutual
promises set forth herein, Tenant and Mortgagee hereby agree as follows:

1/   Tenant hereby acknowledges that the Lease and the rights of
the Tenant thereunder are expressly subordinate to the Mortgage and to
any and all renewals and extensions thereof, provided such subordination
shall not increase Tenant's obligations or reduce Tenant's rights
under the lease.

STATE OF OKLAHOMA
COUNTY OF COMANCHE SS
County Clerk, do hereby certify that this is
a true and correct copy of a like instrument
as appears of record in this office on this

MAY - 8 1980

Rose Hines County Clerk
By _____ Deputy