Hearing Date: July 23, 2019 at 10:00am (Eastern Time)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯X

|  |  |
|---|---|
| In re | Chapter 11 Case No. |
| **SEARS HOLDINGS CORPORATION, et al.,** | 18-23538 (RDD) |
| Debtors.[1] | (Jointly Administered) |

⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯X

## MOTION IN LIMINE TO EXCLUDE CERTAIN TESTIMONY AND STRIKE CERTAIN PORTIONS OF THE DECLARATIONS BY THE DEBTORS' FACT WITNESS BRIAN GRIFFITH

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................ 1

ARGUMENT ........................................................................................................................... 3

I.     Mr. Griffith's Purported Valuation of the Second Lien Collateral is Precluded
by the Plain and Unambiguous Language of the APA ..................................................... 3

    A.    The Text of the APA is the Best Evidence of Its Terms, and it Explicitly
Allocates the Entire Purchase Price on a Lump Sum Basis to All of the Acquired
Assets Without Any Separate Allocation ................................................................ 5

    B.    The Debtors Cannot Offer Parol Evidence As to Prior Negotiations
Because the Text of the APA is Unambiguous ........................................................ 7

    C.    In Any Event, the Debtors Have Waived Their Arguments That the APA
Has Purchase Price Allocations ............................................................................... 8

II.    Mr. Griffith Has No Basis For His Opinions Regarding the Scope of the Second
Lien Collateral ................................................................................................................... 9

    A.    Mr. Griffith Cannot Interpret the Meaning of the 2L Security Agreement ............ 10

    B.    Mr. Griffith's Testimony Contradicts the Plain Terms of the 2L Security
Agreement, Which Includes General Pledges of Security Interests That
Encompass Pharmacy Assets ................................................................................. 11

    C.    To the Extent Mr. Griffith's Testimony Relies Upon A Separate Contract
Not Involving the Second Lien Parties, It Is Irrelevant And Inadmissible
Parol Evidence ....................................................................................................... 12

CONCLUSION ..................................................................................................................... 14

# TABLE OF AUTHORITIES

**Cases**                                                                                                                                           **Page(s)**

*Amorgianos v. Nat'l R.R. Passenger Corp*,
    303 F.3d 256 (2d Cir. 2002) ...................................................................................................5

*Bank of China v. NBM LLC*,
    359 F.3d 171 (2d Cir. 2004) ................................................................................................ 4-5

*Gen. Elec. Capital Commercial Auto. Fin., Inc. v. Spartan Motors, Ltd*,
    246 A.D.2d 41 (2d Dep't 1998)........................................................................................12-13

*MBIA Ins. Corp. v. Royal Indem. Co.*,
    426 F.3d 204 (3d Cir. 2005) ...................................................................................................7

*RTN Inv'rs, LLC v. RETN, LLC*,
    C.A. No. 08C-04-007 JRJ, 2011 WL 862268 (Del. Super. Ct. Feb. 10, 2011) ........................7

*Schron v. Troutman Sanders LLP*,
    97 A.D.3d 87 (1st Dep't 2012), *aff'd,* 20 N.Y.3d 430 (2013) ...........................................13-14

*In re Chateaugay Corp.*,
    116 B.R. 887 (Bankr. S.D.N.Y. 1990) ..............................................................................5, 10

*In re Initial Pub. Offering Sec. Litig.*,
    174 F. Supp. 2d 61 (S.D.N.Y. 2001).................................................................................5-6, 11

*In re MarketXT Holdings Corp.*,
    No. 04-12078(ALG), 2011 WL 1422012 (Bankr. S.D.N.Y. Jan. 7, 2011) ...............................4

*In re Sabine Oil & Gas Corp.*,
    555 B.R. 180 (Bankr. S.D.N.Y. 2016) ....................................................................................5

**Statutes**

N.Y. U.C.C. Law § 9-102(a)(48)(B)..............................................................................................11

N.Y. U.C.C. Law § 9-102(a)(64)(A)..............................................................................................11

**Other Authorities**

Fed R. Evid. 701 ....................................................................................................................3, 4, 9

Fed. R. Evid. 702 ..........................................................................................................................9

Fed. R. Evid. 1002 ................................................................................................................5

Wilmington Trust National Association ("Wilmington Trust"), as Indenture Trustee and Collateral Agent; Cyrus Capital Partners, L.P. ("Cyrus"); and ESL Investments, Inc. and certain of its affiliated entities (including JPP, LLC and JPP II, LLC (collectively, "ESL")); (collectively, the "Second Lien Parties") in their capacities as second-lien creditors of Sears Holdings Corporation and certain of its affiliates (collectively, "Sears" or the "Debtors"), by their undersigned counsel, hereby file this *Motion to Exclude Certain Testimony and Strike Certain Portions of the Declarations by the Debtors' Fact Witness Brian Griffith* (the "Motion to Exclude").[2] In further of their requests for relief, the Second Lien Parties respectfully state as follows:

## PRELIMINARY STATEMENT

The Debtors' fact witness, Brian Griffith, seeks to offer improper opinion on all of the critical issues in this proceeding, including:

- the meaning of the APA,

- the value of the Second Lien Collateral[3] on the Petition Date,

- the appropriateness and amount of the Debtors' purported Section 506(c) surcharge, and

- the ultimate issue of the diminution in value of the Second Lien Parties' collateral.

But Mr. Griffith concedes that he is not an expert "in any area" and his opinions are based on his reading of unambiguous documents—namely, (i) the APA, and (ii) the 2L Security Agreement.

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed in *the Common Memorandum of Law On Behalf of the Second Lien Parties: (A) in Support of Their Requests to Determine the Amount of Their Second Lien Secured Claims under Section 506(a) and their Section 507(b) Administrative Claims Pursuant to Bankruptcy Rule 3012; and (B) in Opposition to Debtors' Motion to Surcharge Their Collateral Pursuant to Section 506(c)*, ECF No. 4272 ("Common Memorandum") or the *Common Reply Memorandum of Law On Behalf of the Second Lien Parties: (A) in Support of Their Requests to Determine the Amount of Their Second Lien Secured Claims under Section 506(a) and Their Section 507(b) Administrative Claims Pursuant to Bankruptcy Rule 3012; and (B) in Opposition to Debtors' Motion to Surcharge Their Collateral Pursuant to Section 506(c)*, ECF No. 4439 ("Common Reply Memorandum").

[3] "Second Lien Collateral" has the meaning ascribed to "Collateral" in the 2L Security Agreement.

Accordingly, the Second Lien Parties now move to exclude the subset of Mr. Griffith's testimony that purports to interpret the relevant contracts at issue.

By limiting this Motion to Exclude to Mr. Griffith's testimony relating to contractual interpretation, the Second Lien Parties do not acknowledge, by implication, that Mr. Griffith is somehow qualified to offer, or otherwise has a basis for offering, the many other opinions in his declarations and deposition testimony.  Indeed, Mr. Griffith—as purely a fact witness—is plainly unable to give admissible opinion testimony on the value of the Second Lien Parties' collateral or on the appropriate amount, if any, of a 506(c) surcharge, and the Second Lien Parties reserve their rights to object at the hearing to testimony that Mr. Griffith as a lay witness is unable to give or which lacks an appropriate evidentiary foundation.

The Second Lien Parties selected the narrow issues addressed in this Motion because these issues present pure questions of law, which require the Court's interpretation of legal documents.  The Second Lien Parties understand that prevailing on this Motion to Exclude will not relieve their burden of demonstrating an actual diminution in the value of their Petition Date collateral justifying their adequate protection liens and potential Section 507(b) administrative claims.  Nor will this Motion preclude Mr. Griffith and the Debtors from offering factual testimony relevant to that topic as well as the Debtors' own motion for a Section 506(c) surcharge.  The Second Lien Parties believe, however, that this Motion brings into focus the correct issues for the Court to decide.

The testimony by Mr. Griffith that is the subject of the instant motion is plainly improper. He seeks to offer his own lay interpretation of the unambiguous terms of two crucial contracts in this dispute—the APA and the 2L Security Agreement.  Any purported opinion testimony he offers as to the plain meaning of these contracts is barred by the best evidence rule, and any

2

extrinsic evidence that he seeks to offer is barred by the APA's and 2L Security Agreement's complete agreement clauses and the parol evidence rule. In addition, Mr. Griffith has no basis to offer testimony on the meaning of these contracts as there is no evidence that he played a role in the negotiation or drafting of either agreement and therefore he has no perception on which to base his testimony. *See* Fed R. Evid. 701. For this reason, the Court should strike paragraphs 14 through 17 and Exhibit A from the Griffith Declaration, paragraphs 7, 8 and 14-17 from the Griffith Supplemental Declaration, and exclude any further testimony by Mr. Griffith on these subjects.

## ARGUMENT

### I. MR. GRIFFITH'S PURPORTED VALUATION OF THE SECOND LIEN COLLATERAL IS PRECLUDED BY THE PLAIN AND UNAMBIGUOUS LANGUAGE OF THE APA

This Court should strike Mr. Griffith's opinions on the value of Second Lien Collateral, as these opinions reflect specialized knowledge that Mr. Griffith concedes he does not have. Even if the Debtors tried to proffer these opinions as putative expert testimony, this would be improper as the text of the APA—which Mr. Griffith purports to interpret—is the best evidence of the APA's terms. Mr. Griffith admitted that his opinions are based on the text of the APA. To the extent Mr. Griffith also considered any prior parol evidence, information from prior negotiations is irrelevant and superseded by the unambiguous terms of the APA.

Mr. Griffith has no legal or accounting training, *see* Deposition Transcript of Brian Griffith 17:2-9 ("Griffith Tr."), and he does not even purport to give any expert opinions in this case, *see id.* 19:20-22.[4] Mr. Griffith purports to offer fact testimony to support the Debtors'

---

[4] All excerpts of Mr. Griffith's deposition transcript cited herein are included in the Second Lien Parties' deposition designations.

3

assertion that the Second Lien Collateral should be valued at 85% of book value on the Petition Date because that is purportedly the value recovered from the collateral in the Sale Transaction. *See* Griffith Decl. ¶¶ 14-15; Exhibit A to Griffith Decl.; Griffith Supp. Decl. ¶¶ 7-8. In his deposition, Mr. Griffith testified that he had two bases for this purported valuation: the text of the APA, and prior deal negotiations:

> Q. [Y]ou're basing your opinion based on your reading of the APA, right, that the 85 percent value is the value assigned by the APA; is that correct?
> A. Yes.
> Q. Okay. Apart from your reading of the APA, do you have any other basis to say that the collateral is worth 85 percent of book value?
> A. Yes.
> Q. And what is your other basis?
> A. All of the deal negotiations that had been taking place since accepting the ESL bid contemplated 85 cents on the dollar for the inventory and accounts receivable.
> Q. Apart from the APA and what you claim the deal negotiations reveal, do you have any other basis for relying on the 85 percent number?
> A. Not that I can think of. Those are the main reasons that we are assuming the 85 percent.

Griffith Tr. 81:15-82:12; *see also id.* 256:13-256:25.

Mr. Griffith further testified that he did not include any details about deal negotiations in his declarations in connection with this proceeding because he assumed the APA was "more powerful." *Id.* 82:19-20. When asked how he would have valued the Second Lien Collateral at the Petition Date had "ESL determined not to bid at all at [the] auction," Mr. Griffith responded, "[i]t would be hard to say. I don't know." *Id.* 104:20-105:4.

Even if Mr. Griffith had any independent opinions regarding the value of the Second Lien Collateral at the closing of the Sale Transaction, or at any other date, he would not be qualified to give them. *See, e.g.*, Fed. R. Evid. 701 (requirements for lay opinion testimony); *In re MarketXT Holdings Corp.*, No. 04-12078(ALG), 2011 WL 1422012, at *3 (Bankr. S.D.N.Y. Jan. 7, 2011) (valuation testimony not proper lay testimony under Rule 701); *Bank of China v. NBM LLC,* 359

4

F.3d 171, 181-82 (2d Cir. 2004) (lower court erred in permitting party to proffer "an expert in lay witness clothing" by permitting testimony under Rule 701 that "reflected specialized knowledge" of the witness).[5]

### A. The Text of the APA is the Best Evidence of Its Terms, and it Explicitly Allocates the Entire Purchase Price on a Lump Sum Basis to All of the Acquired Assets Without Any Separate Allocation

Mr. Griffith's testimony is inadmissible to interpret the APA, because the best evidence of the APA's terms is the contract itself. *See* Fed. R. Evid. 1002 ("[a]n original writing . . . is required in order to prove its content. . . ."). Federal Rule of Evidence 1002, the so-called "best evidence rule" is based on the "elementary wisdom . . . that [a] document is a more reliable, complete and accurate source of information as to its contents and meaning than anyone's description." *In re Chateaugay Corp.*, 116 B.R. 887, 905 (Bankr. S.D.N.Y. 1990) (quoting *Gordon v. United States,* 344 U.S. 414, 421 (1953)). The best evidence rule prohibits the admission of "post hoc, self-serving statements about . . . the intent of the parties involved in [a] transaction"—precisely what Mr. Griffith purports to offer here, on the basic principle that "documents speak for themselves." *In re Chateaugay Corp.*, 116 B.R. at 905.

Even if Mr. Griffith were somehow qualified to opine on the value of the Second Lien Collateral—which he has admitted he is not, *see* Griffith Tr. 228:25-229:6—he would still be unable to offer testimony purporting to set forth legal conclusions as to the meaning of the plain terms of the APA. *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 63

---

[5] Mr. Griffith's testimony would be likewise inadmissible if the Debtors change course and seek to offer him as an undisclosed expert at trial. His testimony fails to satisfy the gatekeeping requirements of Federal Rule of Evidence 702 and *Daubert*, which "mandate the exclusion of . . . unreliable opinion testimony" when "an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached." *Amorgianos v. Nat'l R.R. Passenger Corp*, 303 F.3d 256, 266 (2d Cir. 2002); *see also In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 249-50 (Bankr. S.D.N.Y. 2016) (testimony by Brandon Aebersold inadmissible expert testimony under Rule 702 because he failed to identify methodology used or underlying data, and inadmissible lay testimony under Rule 701 because it was based on technical analysis).

5

(S.D.N.Y. 2001) (law "require[es] exclusion of expert testimony that expresses a legal conclusion") (citing *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992)). Indeed, at Mr. Griffith's deposition, his counsel repeatedly objected to questions regarding Mr. Griffith's interpretation of the APA on the grounds that "the document speaks for itself," and the questions "call[ed] for a legal conclusion." *E.g.*, Griffith Tr. 95:11-13; 95:19-21.

The plain text of the APA is clear and unambiguous. By its terms, the APA allocates its entire Purchase Price on a lump sum basis for the purchase of all of the Acquired Assets, and the APA contains no Purchase Price allocation of value to inventory or receivables acquired as part of the purchase. Pursuant to the definitions section of the APA, Acquired Assets "shall have the meaning set forth in Section 2.1," and Purchase Price "shall have the meaning set forth in Section 3.1." APA § 1.1. Section 3.1, in turn, states that "[t]he aggregate purchase price for the purchase, sale, assignment and conveyance of Sellers' right, title and interest in, to and under the Acquired Assets shall consist of the following (collectively, the "Purchase Price")," and then sets out seven different types of consideration in subsections (a) through (g). Subsection (a) provides a calculation for a cash consideration payment to be derived by adding amounts of the consideration provided in romanettes (i) through (iii), reduced by the consideration listed in romanette (iv). Mr. Griffith relies for his 85% valuation figure on the cash payment amount of $1,408,450,000 in Section 3.1(a)(i) as compared to the amount of inventory and receivables to be delivered pursuant to Section 10.9, *see* Griffith Supp. Decl. ¶ 7, but pursuant to the plain terms of the APA, the $1,408,450,000 payment in Section 3.1(a)(i) is not the total cash consideration provided in Section 3.1, or even in subsection (a) of Section 3.1.

In total, Section 3.1 provides over five billion dollars' worth of consideration on a lump sum basis to purchase the Acquired Assets listed in Section 2.1. There are 29 subcategories of

6

assets listed in Section 2.1, and none of the subcategories is comprised solely of Second Lien Collateral. And even if there were one such subcategory of Second Lien Collateral, it would not matter because there is no allocation of the Purchase Price in Section 3.1. Indeed, when questioned regarding where that purported 85% valuation exists in the APA, Mr. Griffith testified that the Second Lien Collateral is "a portion of" Section 2.1(d), but acknowledged that the APA does not allocate any separate price for inventory or receivables. *See* Griffith Tr. 95:2-22. The APA therefore not only provides for no allocation of value to Second Lien Collateral, but any such purported allocation would be inconsistent with the express language of the agreement. *See also, generally* Griffith Tr. 85:6-95:22.

      **B.**      **The Debtors Cannot Offer Parol Evidence As to Prior Negotiations Because the Text of the APA is Unambiguous**

Likewise inadmissible is Mr. Griffith's testimony that purports to offer evidence of pre-signing negotiations of the APA. Under Delaware law, which applies to the APA, "[u]nambiguous written agreements should be enforced according to their terms, without using extrinsic evidence 'to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity.'" *MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 210 (3d Cir. 2005) (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1232 (Del. 1997). "A contract is not ambiguous merely because the parties disagree about its proper interpretation." *Id.* This rule has particular force, where, as here, the contract expressly states that it is a completely integrated writing. *See RTN Inv'rs, LLC v. RETN, LLC*, C.A. No. 08C-04-007 JRJ, 2011 WL 862268, at *13 (Del. Super. Ct. Feb. 10, 2011) ("Delaware courts consistently uphold integration or merger clauses within agreements."). As set forth in Section 13.4 of the APA, the APA "contain[s] all of the terms, conditions and representations and warranties agreed to by the Parties . . . and supersede[s] all prior and contemporaneous agreements, understandings,

negotiations, correspondence, undertakings and communications of the Parties or their representatives, oral or written, respecting such subject matter." The Court should therefore exclude any testimony by Mr. Griffith purporting to explain negotiations pre-dating the signing of the APA.

### C. In Any Event, the Debtors Have Waived Their Arguments That the APA Has Purchase Price Allocations

Even setting aside the clear bars to Mr. Griffith's testimony as to the valuation of inventory and receivables in the APA under the best evidence and parol evidence rules, such testimony would still be barred by the simple fact that the Debtors explicitly waived the purchase price allocation requirement in the APA, and the Court relied on the Debtors' representations as to waiver in approving the Sale Transaction. *See* Common Reply Mem. at 8, 27.[6]

Moreover, the process that resulted in ESL's final bid was long, complicated, had multiple moving parts, and largely consisted of improving the Debtors' overall economic return. Each bid submitted by Transform Holdco LLC was explicitly a lump sum bid that did not allocate any specific value to inventory or receivables. *See* Letter from Transform Holdco LLC to Lazard Freres & Co., LLC, dated December 28, 2018, attached as Exhibit B to Lynch Decl.; Letter from Transform Holdco LLC to Lazard Freres & Co., LLC, dated January 9, 2019, attached as Exhibit C to Lynch Decl. At the Sale Hearing, the Debtors specifically informed the Court prior to its final approval of the sale that there was no allocation in the APA. *See* Common Reply Mem. at 8, 27. The final agreement reflects that there was no purchase price allocation,

---

[6] The Debtors' Global Bidding Procedures, which this Court approved, required any bid for the going concern to "clearly identify . . . with respect to a bid for multiple Assets, the allocation of value in U.S. dollars that the Prospective Bidder associates with each Asset (or group of Assets if such bid is conditioned upon the purchase of all Assets in such group), including a description of any significant assumptions on which such valuation is based." *Order Approving Global Bidding Procedures and Granting Related Relief* at 37-38, ECF No. 816, attached as Exhibit A to the *Declaration of Katherine R. Lynch*, filed herewith ("Lynch Decl.").

8

and Section 13.4 of the APA precludes the Debtors from attempting to offer a different understanding than what the final agreement plainly says. *See* Common Reply Mem. § I.A.

For the foregoing reasons, the Court should strike the following paragraphs of Mr. Griffith's declarations:  Griffith Declaration paragraphs 14-15; Exhibit A to the Griffith Declaration; Griffith Supplemental Declaration paragraphs 7-8; and any similar testimony he purports to offer in his written direct testimony and at trial.

## II. MR. GRIFFITH HAS NO BASIS FOR HIS OPINIONS REGARDING THE SCOPE OF THE SECOND LIEN COLLATERAL

Mr. Griffith also seeks to offer testimony regarding the categories of collateral in the Second Lien Parties' collateral package.  Like his testimony purporting to interpret the APA, any testimony by Mr. Griffith purporting to define the scope of the Second Lien Collateral is inadmissible because it is (i) legal argument, (ii) irrelevant testimony that does not assist the trier of fact, and (iii) improper parol evidence.  *See* Fed. R. Evid. 701 (lay witness testimony must be "rationally based on the witness's perception" and "helpful to clearly understanding the witness's testimony or to determining a fact in issue"); Fed. R. Evid. 702 (expert testimony must be (i) relevant, *i.e.* "help the trier of fact to understand the evidence or to determine a fact in issue," and (ii) reliable, *i.e.* "based on sufficient facts or data" and "the product of reliable principles [which have been] . . . reliably applied . . . to the facts of the case.").  *First*, the scope of the Second Lien Collateral is established by a clear and unambiguous contract, the 2L Security Agreement, and any testimony by Mr. Griffith purporting to interpret that agreement is barred by the best evidence rule and is also an inadmissible legal opinion.  *Second*, Mr. Griffith's testimony is also irrelevant because it contradicts the plain terms of the 2L Security Agreement.  *Finally*, any testimony by Mr. Griffith on the scope of the Second Lien Collateral that relies upon an

9

agreement not involving the Second Lien Parties is inadmissible as irrelevant and as improper parol evidence.

### A.    Mr. Griffith Cannot Interpret the Meaning of the 2L Security Agreement

Mr. Griffith's testimony on the purported scope of the Second Lien Collateral has changed during the course of these proceedings, and while his original valuation of the Second Lien Collateral on the Petition Date included as part of the Second Lien collateral package "approximately $15 million in Pharmacy Receivables," he now contends that the Second Lien Collateral does not include pharmacy receivables or pharmacy scripts. *See* Griffith Supp. Decl. ¶ 7 n.5. Mr. Griffith's only explanation for this change was merely that "further diligence" was conducted but when pressed on what that diligence consisted of, he could only point to a review of the "accounts receivable and the credit card receivable. . . ." *See* Griffith Tr. 37:21-22, 39:22-40:2.

As explained in the Common Reply Memorandum, Section I.B., Section 2.1 of the 2L Security Agreement, dated March 20, 2018, grants the Second Lien Parties security interests, *inter alia*, in "all Inventory . . . all books and records pertaining to the Collateral; and, to the extent not otherwise included, all Proceeds . . . with respect to any of the foregoing." 2L Security Agreement § 2.1, attached as Exhibit D to Lynch Decl. The 2L Security Agreement defines both Inventory and Proceeds in accordance with the New York Uniform Commercial Code (the "UCC"). *Id.* § 1.1(a). Under the best evidence rule, Mr. Griffith cannot offer any self-serving testimony purporting to interpret the terms of the 2L Security Agreement. *See In re Chateaugay Corp.*, 116 B.R. at 905; *supra* § I.A.

Nor is he somehow qualified to assist the Court in interpreting either the 2L Security Agreement or the UCC. *See* Griffith Tr. 33:5-15 ("Q: Do you feel qualified to determine on your own whether or not it is part of the second lien collateral? A: I can offer my opinion. Q: I

10

know you can offer your opinion but do you feel qualified to make that legal judgment? . . . A: Yeah, I can't make a legal conclusion."). Indeed, Mr. Griffith has no apparent understanding of the concept of proceeds under the UCC. *See* Griffith Tr. 41:23-42:6 ("Q: Are you familiar with the concept of what proceeds -- account proceeds are defined under the Uniform Commercial Code of the State of New York? . . . A. Yeah. And I would have to see it, but I can't say that I do."). Regardless, the scope of the Second Lien Collateral is a pure legal question to be determined as a matter of contractual interpretation, and even a qualified expert "may not invade the court's province by testifying on issues of law." *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d at 64.

      **B.**    **Mr. Griffith's Testimony Contradicts the Plain Terms of the 2L Security Agreement, Which Includes General Pledges of Security Interests That Encompass Pharmacy Assets**

Even if Mr. Griffith were somehow qualified to opine on the scope of the Second Lien Collateral (and, as demonstrated above, he is not), his testimony would be irrelevant in any event because it contradicts the plain terms of the 2L Security Agreement. As the Second Lien Parties have demonstrated, *see* Common Reply Mem. § I.B, the 2L Security Agreement is clear and unambiguous in that it grants a security interest in "Inventory" and "Proceeds" as defined by the UCC. *See* 2L Security Agreement § 2.1. "Inventory" is broadly defined as "goods" which, inter alia, "are held by a person for sale or lease or to be furnished under a contract of service." N.Y. U.C.C. Law § 9-102(a)(48)(B). Similarly, "Proceeds" is broadly defined as "whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral." N.Y. U.C.C. Law § 9-102(a)(64)(A). Based on a plain reading of the 2L Security Agreement, Section 2.1(g) grants the Second Lien Parties a security interest in any property the Grantors (as defined in the

11

2L Security Agreement) received from the sale of any of the property in which the Second Lien Parties had been granted a security interest.

The general pledge of Inventory in the 2L Security Agreement encompasses all pharmacy inventory, and the general grant of Proceeds encompasses any property the Debtors received in exchange for pharmacy inventory, including pharmacy receivables. Moreover, Section 2.1(f) of the 2L Security Agreement grants the Second Lien Parties a security interest in "all books and records pertaining to the Collateral," which encompasses pharmacy scripts as the books and records pertaining to the pharmacy inventory collateral. Alternatively, to the extent pharmacy scripts are considered pharmacy receivables, they likewise fall within the category of Proceeds of pharmacy inventory. *See* Common Reply Mem. § I.B.

  **C.** **To the Extent Mr. Griffith's Testimony Relies Upon A Separate Contract Not Involving the Second Lien Parties, It Is Irrelevant And Inadmissible Parol Evidence**

The only purported support that Mr. Griffith has been able to supply for his position that pharmacy assets are excluded from the Second Lien Collateral is an entirely separate contract between entirely separate lenders and the Debtors. As he noted at his deposition, the Third Amended and Restated Guarantee and Collateral Agreement dated as of July 21, 2015, by and among Sears Holdings Corporation and certain other affiliates as Grantors and Bank of America, N.A., Wells Fargo Bank, National Association, and General Electric Capital Corporation as co-collateral agents (the "1L Security Agreement"), specifically includes pharmacy assets as a "separate item," while the 2L Security Agreement does not. *See* Griffith Tr. 40:24-41:22. This position is unavailing for several reasons.

*First*, the 2L Security Agreement has a plain and unambiguous meaning, and general grants of security interests, such as the ones in the 2L Security Agreement, are fully enforceable. *See Gen. Elec. Capital Commercial Auto. Fin., Inc. v. Spartan Motors, Ltd*, 246 A.D.2d 41, 52

12

(2d Dep't 1998) ("Under the UCC, the identification of a secured party's collateral is adequate if it is 'reasonably' specific. Normally, the designation of the generic 'type' of collateral covered by a security agreement will be found to be sufficient."). The 1L Security Agreement is a completely separate agreement negotiated by a different group of lenders. Under New York law, which governs the 2L Security Agreement, *see* 2L Security Agreement § 7.13, even if it were somehow relevant (and it is not), the terms of the 1L Security Agreement are inadmissible parol evidence and cannot be used to interpret the provisions of the 2L Security Agreement. *See Schron v. Troutman Sanders LLP*, 97 A.D.3d 87, 93 (1st Dep't 2012), *aff'd,* 20 N.Y.3d 430 (2013) (parol evidence rule precluded argument as to interdependence of separate, independent contracts executed by different parties).

*Second*, the 2L Security Agreement contains an integration clause expressly prohibiting reliance on the terms of outside contracts such as the 1L Security Agreement. Section 7.12 provides that "[t]his Agreement and the other Security Documents represent the agreement of the Grantors, the Collateral Agent and the other Secured Parties with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Collateral Agent or the other Secured Parties relative to subject matter hereof and thereof not expressly set forth or referred to herein or in the other Security Documents." Security Documents, as defined in the 2L Security Agreement, constitute "this Agreement, the Intercreditor Agreement and each other document entered into to grant a security interest in the Collateral or any other assets to the Collateral Agent for the benefit of the [Second Lien] Parties." As the 1L Security Agreement does not grant any security interests to the Second Lien Parties, its terms are irrelevant to the meaning of the 2L Security Agreement. *See Schron*, 97

13

A.D.3d at 93 ("The merger and integration clauses are explicit and therefore bar the use of parol evidence of the parties' intent and of any other agreements or understandings").

*Third*, the Second Amended and Restated Intercreditor Agreement, dated as of March 20, 2018, by and among Bank of America, N.A. and Wells Fargo Bank, National Association, as ABL Agents, and Wilmington Trust, National Association, as Second Lien Agent (the "Intercreditor Agreement"), attached as Exhibit E to Lynch Decl., which is the only document expressly integrated into the terms of the 2L Security Agreement, *see* 2L Security Agreement § 7.1, only deals with priority and does not purport to limit the scope of the grant of security included in the 2L Security Agreement. There are, therefore, no factual or legal grounds for excluding the pharmacy assets from the Second Lien Collateral and Mr. Griffith's testimony, to the extent it suggests otherwise, is inadmissible.

For the foregoing reasons, the Court should strike the following paragraphs of Mr. Griffith's declarations: Griffith Declaration paragraphs 15-17; Exhibit A to the Griffith Declaration; Griffith Supplemental Declaration paragraphs 7, 17; and any similar testimony he purports to offer in his written direct testimony and at trial.

## CONCLUSION

For the reasons set forth above, the Second Lien Parties respectfully request that the Court strike paragraphs 14 through 17 and Exhibit A from the Griffith Declaration, paragraphs 7, 8 and 17 from the Griffith Supplemental Declaration, exclude any further testimony by Mr. Griffith purporting to interpret the APA or the 2L Security Agreement, and grant other such relief as it deems just and proper.

14

Dated: New York, New York
July 18, 2019

| | |
|---|---|
| CLEARY GOTTLIEB STEEN & HAMILTON LLP | MILBANK LLP |
| By: _/s/ Thomas J. Moloney_<br>Thomas J. Moloney<br>Sean A. O'Neal<br>Andrew Weaver<br>Katherine R. Lynch<br>Chelsey Rosenbloom<br><br>*Attorneys for ESL*<br>One Liberty Plaza<br>New York, NY 10006<br>Telephone: (212) 225-2000<br>Facsimile: (212) 225-3999 | By: _/s/ Thomas R. Kreller_<br>Eric R. Reimer (admitted pro hac vice)<br>Thomas R. Kreller (admitted pro hac vice)<br>Robert J. Liubicic<br><br>*Attorneys for Cyrus Capital Partners, L.P.*<br>2029 Century Park East, 33rd floor<br>Los Angeles, CA 90067 |

SEYFARTH SHAW LLP

By: _/s/ Edward M. Fox_
Edward M. Fox
Steven Paradise
Owen Wolfe

*Attorneys for Wilmington Trust, National Association, as indenture trustee and collateral agent*
620 Eighth Avenue
New York, NY 10018
Direct Dial: (212) 218-4646
Direct Fax: (917) 344-1339

15