WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Paul R. Genender
Jared R. Friedmann
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------x
In re                               :
                                    :        Chapter 11
SEARS HOLDINGS CORPORATION, et al., :
                                    :        Case No. 18-23538 (RDD)
                                    :
              Debtors.¹             :        (Jointly Administered)
                                    :
------------------------------------x
```

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**THE DEBTORS' SUPPLEMENTAL BRIEF ON EXPERT DISCOVERY
AND IN FURTHER SUPPORT OF (I) OPPOSITION TO SECOND-LIEN HOLDERS'
REQUESTS TO DETERMINE AMOUNT OF SECOND-LIEN SECURED CLAIMS
UNDER SECTION 506(a) AND SECTION 507(b) ADMINISTRATIVE CLAIMS AND
(II) REPLY IN SUPPORT OF THE DEBTORS' RULE 3012 MOTION TO DETERMINE
THE AMOUNT, IF ANY, OF 507(b) CLAIMS AND TO SURCHARGE SECOND-LIEN
<u>COLLATERAL PURSUANT TO SECTION 506(C)</u>**

WEIL:\97117178\9\73217.0004

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................................1

ARGUMENT ...............................................................................................................................4

    A.    The Second-Lien Holders Have Not Met Their Burden Under 507(b) ..................4

          i.      Petition Date Inventory Should Be Calculated As 85% of Book
                Value of Inventory and Accounts Receivable .............................................7

          ii.     The 2L Experts Erroneously Include Certain Collateral as Second
                Lien Collateral .........................................................................................12

          iii.    The 2L Experts' Accounting of Senior Obligations Is Incorrect ...............15

    B.    The Second-Lien Holders Do Not Squarely Rebut the Debtors' Positions ...........17

    C.    The Second-Lien Holders' Position Regarding 506(c) Surcharges Ignores
         the Evidence and the Realities of This Case ........................................................20

          i.      Murray and Schulte Do Not Even Calculate Any 506(c)
                Surcharges at All, Thereby Ignoring the Realities of This Case...............20

          ii.     Henrich Acknowledges That There Are 506(c) Surcharges, But His
                Estimate of Them Is Wrong and Ignores the Evidence ...........................21

    D.    Any Post-Closing Date Diminution in Value is Eclipsed by 506(c)
         Surcharges...........................................................................................................23

    E.    The Facts and Record in These Chapter 11 Cases Make Clear that the
         Equities Support the Court not Allowing Any of the Second-Lien Holders'
         507(b) Claims......................................................................................................24

CONCLUSION............................................................................................................................25

WEIL:\97117178\9\73217.0004

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Aerogroup Int'l, Inc.*,
    No. 17-11962 (KJC), 2019 WL 1407007 (Bankr. D. Del. Mar. 26, 2019)............................18

*Assocs. Commercial Corp. v. Rash*,
    520 U.S. 953 (1997)............................................................................................................9, 18

*Bank of N.Y. Tr. Co. NA v. Pac. Lumber Co. (In re Scopac)*,
    624 F.3d 274 (5th Cir. 2010) ...................................................................................................3

*In re Blackwood Assocs., L.P.*,
    153 F.3d 61 (2d Cir. 1988).....................................................................................................20

*In re Flat Out Crazy, LLC*
    (Case No. 13-22094 (RDD)).............................................................................................21, 22

*In re Heritage Highgate, Inc.*,
    679 F.3d 132 (3d Cir. 2012)...................................................................................................18

*In re Kohl*,
    421 B.R. 115 (Bankr. S.D.N.Y. 2009)...................................................................................20

*In re McLean Indus., Inc.*,
    84 B.R. 340 (Bankr. S.D.N.Y. 1988).....................................................................................20

*Official Comm. Of Unsecured Creditors v. UMB Bank, N.A. (In re Residential
    Capital, LLC)*,
    501 B.R. 549 (Bankr. S.D.N.Y. 2013)............................................................................ *passim*

*Sw. Sec., FSB v. Segner (In re Domistyle, Inc.)*,
    811 F.3d 691 (5th Cir. 2015) .................................................................................................20

**Statutes**

11 U.S.C. 503(c)(3).......................................................................................................................24

Bankruptcy Code section 506(c).......................................................................................2, 1, 4, 21

Bankruptcy Code section 507(b) ...............................................................................................1, 4

**Other Authorities**

Fed. R. Evid. 702 .........................................................................................................................19

WEIL:\97117178\9\73217.0004

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (the "**Debtors**"), file this supplemental brief in further (a) opposition to the *Second-Lien Holders' Requests to Determine the Amount of their Second Lien Secured Claims Under Section 506(a) and their Section 507(b) Administrative Claims Pursuant to Bankruptcy Rule 3012* and (b) support of *The Debtors' Motion to Estimate Certain 507(b) Claims for Reserve Purposes* [ECF No. 4034] ("**Rule 3012 Motion**"),[1] which includes, among other things, the Debtors' motion to surcharge the Second-Lien Holders' Collateral pursuant to section 506(c) and, in support, state the matters set forth below.

## PRELIMINARY STATEMENT

1.     After complete discovery of the Second-Lien Holders' three purported experts (whose opinions are unreliable and based on incorrect assumptions, analyses and methodologies), the Second-Lien Holders still have not met their burden to show a 507(b) diminution in value. The Second-Lien Holders' 507(b) claims are still $0.

2.     The Debtors' position is consistent and clear: there has been no diminution in value of the Second-Lien Holders' Collateral[2] from the (October 15, 2018) Petition Date to the

---

[1] All capitalized terms used, but not defined herein, shall have the meanings set forth in the Debtors' Rule 3012 Motion, which was deemed to be a motion pursuant to Bankruptcy Rule 3012 to determine the amount, if any, of the Second-Lien Holders' section 507(b) claims and, pursuant to section 506(c) of the Bankruptcy Code, for a surcharge upon the collateral securing those asserted claims, as set forth in the agreed *Stipulation and Order Concerning the Resolution of Certain Section 507(b) Claims* [ECF No. 4316] ("**Stipulation**"). The Debtors fully incorporate their Rule 3012 Motion and *Debtors' (I) Opposition to Second-Lien Holders' Requests to Determine Amount of Second-Lien Secured Claims Under Section 506(a) and Section 507(b) Administrative Claims and (II) Reply in Support of Debtors' Rule 3012 Motion to Determine the Amount, if any, of 507(b) Claims and to Surcharge Second-Lien Collateral Pursuant to Section 506(c)* [ECF No. 4381], including all arguments and authorities included in the same, by reference in this Supplemental Brief.

[2] The term Collateral, as it's used in this Supplemental Brief, exclusively refers to the collateral held by the Second-Lien Holders pursuant to the Second Lien Security Agreement (as defined below). *See infra* ¶¶ 17-22.

(February 11, 2019) Sale Date. Rather, the Second-Lien Holders received more value for their Collateral pursuant to the Sale than what the Collateral was initially worth when these chapter 11 cases were filed.

3.      This is based on straightforward facts and assumptions, including the fair market value of the Collateral: (a) on the Petition Date—$373 million—derived from the operative borrowing base certificate, compared (b) to the Sale Date—$433.5 million—as reflected in the Credit Bid by the Second-Lien Holders. This methodology used to calculate the Collateral values as of two points in time is consistent and appropriate.

4.      In securing the use of cash collateral, the Debtors preserved an important protection for the Estate and did not grant a section 506(c) waiver to Second-Lien Holders. If the value of the Collateral is not properly calculated to reflect the costs of liquidating or preserving the Collateral, then that would effectively and improperly grant the Second-Lien Holders a 506(c) waiver, which was specifically not granted. But, even assuming, *arguendo*, that the Second-Lien Holders' Collateral was worth more than $373 million on the Petition Date (which it was not), based on any of the Second-Lien Holders' various arguments, any diminution in value is easily outweighed by a 506(c) Surcharge which unquestionably applies. By way of example, Cyrus' own proffered expert acknowledges a $206.7 million 506(c) Surcharge, more than enough to dwarf any alleged diminution in value.

5.      The parties to this dispute are like two ships passing in the night. The Debtors use a consistent methodology based on case law and facts from operative documents and agreements while the Second-Lien Holders offer three separate opinions, each of which is inconsistent with one another, based on incorrect facts and assumptions. The Second-Lien Holders' proffered experts cannot agree on the Petition Date values of the Inventory, Credit Card Receivables, Cash,

and Pharmacy Receivables and do not all agree on the treatment of $395 million of letters of credit ("**L/Cs**") or applicability of a 506(c) surcharge. This issue is far too important to permit such analyses as offered by the Second-Lien Holders.

6.      The opinions offered by the Second-Lien Holders, among other things, incorrectly (1) ignore L/Cs, which are senior obligations and refinanced as part of the Sale Transaction, (2) include Pharmacy Receivables, available cash and Pharmacy Scripts as Collateral (which they are not under the Second Lien Security Agreement), and (3) value the Inventory as of the Petition Date contrary to established case law that collateral must be valued in the hands of the Debtor. Moreover, these opinions ignore the fair market value of the Collateral on the Sale Date, and ignore that the very monies expended by the Debtors permitted a going concern sale to occur—the same Sale which actually allowed the Second-Lien Holders to realize approximately $433.5 million in value.

7.      Importantly, the equities in this case cannot be ignored. The very parties who directly benefited from the Sale, which both ESL and Cyrus insisted upon at all operative times, cannot now complain that they would have received more in a ***hypothetical*** orderly liquidation (which to be clear, they would not have) based on incorrect facts and faulty assumptions. Nor can those very parties ignore the necessarily related costs of the Sale, burdening these Estates with such costs and benefitting from a wind-fall; put simply, the Second-Lien Holders cannot have their cake and eat it too. This is especially true where, as here, ESL and all relevant Second-Lien Holders actively pursued a sale in which they Credit Bid and never once favored a liquidation. The Sale allowed the Second-Lien Holders to realize more value for their Collateral than they otherwise would have under a liquidation or otherwise. . The Second-Lien Holders know that; the Second-Lien Holders argued for the Sale process and every analysis the Debtors conducted

and produced in the course of the Sale process supported the conclusion that the Second-Lien

Holders were the primary beneficiaries of the Sale.  And the monies expended by the Debtors for

the primary benefit of preserving the value of the Collateral did just that—allowing for the Sale,

the Credit Bid, and thereby increasing the value of the Collateral.

## ARGUMENT

### A.    The Second-Lien Holders Have Not Met Their Burden Under 507(b)

8.      The Second-Lien Holders have the burden of proving their 507(b) claim, and they

have wholly failed to meet that burden here.  *Official Comm. Of Unsecured Creditors v. UMB*

*Bank, N.A. (In re Residential Capital, LLC)*, 501 B.R. 549, 591 (Bankr. S.D.N.Y. 2013); *Bank of*

*N.Y. Tr. Co. NA v. Pac. Lumber Co.* (*In re Scopac*), 624 F.3d 274, 284 (5th Cir. 2010).  The

Second-Lien Holders have failed to show that "the aggregate value of [their] collateral diminished

from the Petition Date to the Effective Date."  *In re Residential Capital, LLC*, 501 B.R. at 592.

9.      None of the Second-Lien Holders' three separate expert opinions alter this

conclusion.  In a failed effort to meet their burden of proof under section 507(b) of the Bankruptcy

Code, each of the Second-Lien Holders submitted its own expert report purporting to value the

alleged diminution in the Collateral since the Petition Date.  David M. Schulte (on behalf of ESL),

William Henrich (on behalf of Wilmington Trust), and Marti P. Murray (on behalf of Cyrus)

(collectively, the "**2L Experts**") each submitted purported expert reports and were deposed by the

Debtors' counsel.  *See generally* Expert Report of David M. Schulte in Support of Supplemental

Memorandum of Law on Behalf of ESL Investments, Inc. in Support of its Requests to Determine

the Amount of its Second Lien Secured Claims Under Sections 506(a) and its 507(b)

Administrative Claims Pursuant to Bankruptcy Rule 3012; and in Opposition to the Debtors'

Motion to Surcharges its Collateral Pursuant to Section 506(c) [ECF No. 4286] (hereinafter, the

"**Schulte Report**"); Expert Report of William Henrich in Connection with Assessment of § 507(b) Adequate Protection Claims Asserted by Wilmington Trust, National Association [ECF No. 4279, Ex. J] (hereinafter, the "**Henrich Report**"); Expert Report of Marti P. Murray [ECF No. 4314] (hereinafter, the "**Murray Report**").  However, as explained below and in the concurrently filed the Debtors' *Motion to Strike Second-Lien Holders' Experts in Connection with July 23, 2019 Hearing on Rule 507(b) Determination*, the 2L Experts' opinions should be stricken in their entirety since "the assumptions and inputs they used were seriously flawed" and, as a result, their "conclusions regarding value are not credible."  *In re Residential Capital, LLC*, 501 B.R. at 595.

10.    The table below summarizes, at a high level, the main discrepancies between the 2L Experts and the Debtors' financial advisor, Brian Griffith, who has submitted declarations setting forth factual evidence in support of the Rule 3012 Motion.  As shown in this table and further explained below, the 2L Experts' 507(b) Claims calculations are fundamentally flawed for three key reasons:  (1) they incorrectly value Inventory by assuming a liquidation (rather than a fair market valuation) at the Petition Date and make no adjustment (in the case of Henrich) and a de minimis adjustment (in the case of Schulte) or an improper adjustment (in the case of Murray) to the Gross Value of Inventory (see chart below) and by including inapplicable categories of Inventory; (2) they incorrectly include certain categories of Collateral; and (3) they incorrectly exclude certain senior obligations that should be included.

*** Remainder of page intentionally left blank ***

**507(b) Diminution Calculations**

| ($ in millions) | Griffith | Schulte | Murray | Henrich |
|---|---|---|---|---|
| **Collateral** | | | | |
| Total Inventory or Go Forward Store Inventory (when broken out) [1] | 2,690.8 | 2,039.3 | 2,391.5 | 2,260.9 |
| GOB  Inventory (when broken out) | N/A | 651.6 | N/A | 651.6 |
| GOB Inventory Adjustment % | N/A | 95.5% | N/A | 96.4% |
| GOB Inventory Value[2] | N/A | 622.3 | N/A | 627.9 |
| Inventory in-Transit (when broken out)[3] | N/A | N/A | 74.6 | N/A |
| Gross Inventory | 2,690.8 | 2,661.6 | 2,466.1 | 2,888.8 |
| Inventory NOLV[4] | N/A | N/A | 88.7% | N/A |
| Fair Market Value[5] | 85.0% | N/A | N/A | N/A |
| **Inventory Value[6]** | 2,287.2 | 2,661.6 | 2,195.9 | 2,888.8 |
| *Memo: Inventory Value Percent of Total Book Value* | *85.0%* | *98.9%* | *81.6%* | *107.4%* |
| Credit Card Receivables[7] | 46.6 | 64.2 | 54.8 | 64.3 |
| Cash[8] | - | 115.5 | 123.2 | 116.2 |
| Scripts[9] | - | 72.8 | 72.8 | 72.8 |
| Pharmacy Receivables[10] | - | 11.9 | 10.5 | 14.5 |
| **Total Collateral** | 2,333.8 | 2,926.0 | 2,457.2 | 3,156.6 |
| **First Lien Debt** | | | | |
| Revolving Credit Facility | 836.0 | 836.0 | 836.0 | 836.0 |
| First Lien Letters of Credit | 123.8 | - | - | 123.8 |
| First Lien Term Loan B | 570.8 | 570.8 | 570.8 | 570.8 |
| FILO Term Loan | 125.0 | 125.0 | 125.0 | 125.0 |
| Stand-Alone L/C Facility | 271.1 | - | - | - |
| First Lien Interest | 34.0 | - | - | - |
| Total First Lien Debt | 1,960.7 | 1,531.8 | 1,531.8 | 1,655.6 |
| 2L Debt Remaining Value | 373.1 | 1,394.2 | 925.4 | 1,501.0 |
| Credit Bid | (433.5) | (433.5) | (433.5) | (433.5) |
| Credit Bid Adjusted 2L Debt Collateral Value | (60.4) | 960.7 | 491.9 | 1,067.5 |
| Less: Value of 2L Adequate Protection[11] | - | - | (0.3) | - |
| Total | (60.4) | 960.7 | 492.2 | 1,067.5 |
| 507(b) Claim | - | 960.7 | 492.2 | 1,067.5 |
| 506 (c)[12] | (1,451.0) | - | - | (206.7) |
| Memo: Alternative 506 (c) 1 [12] | (527.0) | - | - | - |
| Memo: Alternative 506 (c) 2 [12] | (273.0) | - | - | - |

WEIL:\97117178\9\73217.0004

[1] Go forward inventory specifically calculated in Schulte and Henrich reports. Griffith uses total stock ledger value. Schulte includes $2,039 book value for go forward store inventory collateral. Schulte's go forward inventory amount is based on incorrect $652mm of GOB inventory book value. Murray uses total net eligible inventory from the Week 36 borrowing base certificate. Henrich applies a 29% gross margin to go-forward book value inventory. Henrich's go forward inventory amount is based on incorrect $652mm of GOB inventory book value. Henrich then includes a 23.4% of inventory at cost selling expense. Henrich's 4-wall EBITDA based on gross margin and selling expense equals 12.4%. The 12.4% margin is significantly higher than the 4-wall EBITDA margin of 6% that is on page 37 of the "Transier Declaration".

[2] GOB inventory is specifically calculated in Schulte and Henrich reports. Schulte applies a 95.5% NOLV to incorrect $652mm GOB inventory value. Henrich applies incorrect NOLV of 96.4% to incorrect $652mm GOB inventory book value. Schulte correctly adjusted NOLV formula in ESL 001 to equal (sales-store costs)/cost of inventory. Henrich's 96.4% NOLV is based on wrong NOLV formula of sales/(cost of inventroy+store costs). Murray does not break out GOB inventory.

[3] Only Murray specifically calculated in-transit inventory. Murray applied a 51.6% NOLV to the $144.6mm in-transit value stated in week 36 borrowing base report. The $144.6 is included in the total stock ledger.

[4] Only Murray uses the 88.7% NOLV listed in the October 6 Tiger report for inventory value, applied exclusively to net eligible inventory, with separate NOLV for in-transit inventory. Schulte and Henrich use NOLV only for GOB store inventory. Griffith uses fair market value, not NOLV.

[5] Only Griffith uses the fair market value realized in the February sale (85% of book value). Schulte, Henrich, and Murray do not use fair market value.

[6] Inventory value is listed collateral value factored into Griffith, Schulte, Murray, and Henrich's diminution calculation.

[7] Griffith's credit card receivable value is 85% of $55mm of eligible credit card receivables listed in Week 36 borrowing base certificate. Murray uses full value of $55mm eligible credit card receivables from borrowing base certificate. Schulte and Henrich both use September 2018 month end general ledger.

[8] Griffith excludes cash from analysis because cash is not second lien collateral. Schulte includes $116mm of cash from September 2018 month end general ledger. Murray cites the Debtors' schedule of assets and liabilities for the listed $123.2mm. Henrich's $116.2mm cash balance is purportedly from "filed Schedules and Statements."

[9] Griffith excludes pharmacy scripts from analysis because they are not second lien collateral. Other experts use $72.8mm value provided by internal Sears valuation, and do not use Tiger's estimate of $27mm.

[10] Griffith excludes pharmacy receivables from analysis because pharmacy receivables are not second lien collateral. Schulte uses amount listed from September 2018 month end general ledger. Murray uses net eligible pharmacy receivables amount listed on Week 36 borrowing base certificate. Henrich uses gross pharmacy receivables amount on Week 36 borrowing base certificate .

[11] Murray includes $250k of Wilmington Trust's professional fees as adequate protection. Griffith, Schulte, and Henrich do not include this value.

[12] Griffith 506(c) calculation includes value referenced in first declaration. Henrich's amount includes $51mm of professional fees, $135.5mm of go-forward corporate expenses, and $20.2mm of liquidation overhead costs. Griffith's 1st alternative 506(c) charge is costs to operate business in ordinary course and consummate sale transaction from December 28 (ESL bid date) and February 11 (consummation of transaction). Griffith's 2nd alternative 506(c) charge is costs to operate business in ordinary curse and consummate sale transaction from January 17 (execution of APA and February 11 (consummation of transaction).

### i.    *Petition Date Inventory Should Be Calculated As 85% of Book Value of Inventory and Accounts Receivable.*

11.    Inventory as of the Petition Date should be calculated as 85% of the book value of the Inventory and Accounts Receivable using the figures set forth in the Week 36 Borrowing Base Certificate. *See* Suppl. Griffith Decl. ¶¶ 7-10 and Exs. A–B. 85% reflects the fair market value that was actually received for the Inventory and Accounts Receivable in the Sale, and the Second-Lien Holders' arguments to the contrary are both disingenuous and unpersuasive. As set forth in the Second Supplemental Declaration of Brian J. Griffith ("**Second Suppl. Griffith Decl.**"), filed contemporaneously with this Supplemental Brief, the APA plainly reflects the 85% figure, as demonstrated in the table below, which references the applicable APA provisions:

| APA Clause | Closing Payment Amount ($) | Description |
|---|---|---|
| 3.1(b)(iv) | $433,450,000 | Second-Lien Credit Bid |
| 3.1(b)(ii) | $125,000,000 | FILO Term Loan Credit Bid |
| 10.10 | $850,000,000 | Maximum DIP ABL Facility Balance |
| 3.1(a)(i) | $1,408,450,000 | Closing Consideration Related to Collateral (Inventory + Receivables) |
| 10.9 | $1,657,000,000 | Delivered Collateral Requirement |
| | **85.000%** | **Closing Consideration Divided by Delivered Collateral Requirement** |

Second Suppl. Griffith Decl. ¶¶ 5–6.  Moreover, ESL's own documents shared with the Debtors during the going concern sale negotiations consistently utilized the 85% figure in this manner.  *Id.* ¶¶ 7–9 and Exs. A–B.  For example, in a January 2, 2019 ESL presentation entitled "Project Transform – ESL Bid Presentation," the 85% figure is found in two places.  *Id.* ¶ 9 and Ex. B.  The first is in footnote 7 on page 4, which states, "7. Assumes purchase of $1,553mm projected book value of inventory at close at 85 cents."  *Id.*  The second place is in footnote 8 on page 4, which states, "8. Assumes purchase of $104mm projected book value of credit card and pharmacy receivables at close at 85 cents."  *Id.*  Those two figures add up to the $1.657 billion number which is in Section 10.9 of the APA.  *Id.* ¶ 9.  Simply put, the record and ESL's own documents make clear that the 85% figure is the fair market value of Inventory and Accounts Receivable in the APA, and the Second-Lien Holders—and especially ESL—should not be heard to argue otherwise to suit their altered purposes now.

12.    Rather than correctly applying an 85% fair market value to the appropriate Inventory—*i.e.*, the book value of Inventory and Accounts Receivable set forth on page 3 of the Week 36 Borrowing Base Certificate—the 2L Experts instead take different approaches that rely on the wrong data and, in doing so, two of the Experts improperly inflate the amount of Inventory used in their 507(b) claims analyses.

13.    **Schulte's Petition Date Inventory Valuation Uses the Wrong Data.**  There are several problems with Schulte's Petition Date inventory valuation.  As an initial matter, Schulte fails to apply the appropriate fair market value analysis that is required in this case.  Second Suppl.

Griffith Decl. ¶ 12;  *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 994–96 (1997); *In re Residential Capital, LLC*, 501 B.R. 549, 592, 594–95.  Not only is his methodology flawed, he also uses the wrong data, thereby significantly overstating his inventory valuation.  Second Suppl. Griffith Decl. ¶ 12.  First, he arrives at a total inventory value of $2.661.5 billion by using an unadjusted go-forward inventory figure of $2,039.2 billion and a slightly adjusted GOB inventory number of $651.6 million (adjusted downward by 4.5% to $622.3 million).  *Id.*  In doing so, Schulte incorrectly starts with and relies on the total stock ledger amount of $2,690.8 billion (without making any more than a nominal adjustment) when he instead should have used the $2,391.5 billion net eligible inventory figure from the borrowing base certificate.  *Id.*; Schulte Report at 10-11.  Then, because Schulte relied on a spreadsheet containing incorrect calculations for GOB inventory, Schulte subtracts the incorrect amount of GOB inventory—$651.6 million, when it should really be an adjusted number of $617.2 million—to reach his $2,039.2 billion figure for go-forward inventory.  Second Suppl. Griffith Decl. ¶ 12.  In other words, his go-forward inventory valuation is overstated by approximately $264.9 million, as shown in the chart below. *Id.*  Further compounding his mistakes, to reach his total inventory value of $2,661.5 billion, Schulte proceeds to improperly use 100% of book value of the incorrect go-forward store inventory ($2,039.3 billion, as explained above), and adds 95.5% (using an incorrect NOLV) of the GOB store inventory ($651.6 million times 95.5% equaling $622.3 million—which, as shown below, is overstated by $32.3 million because it is based on a spreadsheet containing incorrect calculations), thereby creating a total value of $2,661.5 billion, which is overstated by approximately $297.1 million (as shown below). *Id.*; Schulte Report at 10,n.18, 12; *see* Schulte Dep. 116:23-117:7.  This

WEIL:\97117178\9\73217.0004

reflects an approximately 1% adjustment off total book value and is an improper methodology.

Schulte's errors are summarized in the table below:[3]

**Collateral Value at Filing Date**

| $ in millions | Schulte | | Adjusted Schulte | | Variance |
|---|---|---|---|---|---|
| Book Value Inventory | $ 2,690.8 | (Total Stock Ledger) | $ 2,391.5 | (Net Eligible Inventory) | $ (299.3) |
| Less: GOB Inventory | 651.6 | (Incorrect GOB Inventory) | 617.2 | (Actual GOB Inventory) | (34.4) |
| Go Forward Inventory | 2,039.2 | | 1,774.3 | | (264.9) |
| Go Forward % | 100.0% | (100% of Book Value) | 100.0% | (100% of Net Eligible Inventory) | |
| **Value of Go-Forward Inventory** | 2,039.2 | | 1,774.3 | | (264.9) |
| GOB Inventory | 651.6 | (Incorrect GOB Inventory) | 617.2 | (Actual GOB Inventory) | (34.4) |
| GOB NOLV | 95.5% | (Incorrect 95.5% NOLV) | 95.6% | (Correct 95.6% NOLV) | |
| **GOB Value** | 622.3 | | 590.0 | | (32.3) |
| **Total Inventory Value** | $ 2,661.5 | | $ 2,364.3 | | $ (297.1) |

14.     Further, there are also additional expenses required to sell inventory, which he does not consider, such as professional fees and financing fees that are not included in NOLV.  As a result of these errors, Schulte's Petition Date Inventory calculation is overstated by at least $297.1 million, is "seriously flawed," and "not credible."  *In re Residential Capital, LLC*, 501 B.R. at 595.

15.     **Henrich's Petition Date Inventory Valuation Uses the Wrong Data and Applies Incorrect Calculations**.  Henrich's inventory calculation is equally flawed, but in different ways.  First, he applies too high of a margin to the going concern inventory.  Second Suppl. Griffith Decl. ¶ 13.  By doing so, he overstates the value of gross inventory by over $300 million.  *Id.*  Second, Henrich's calculation of GOB liquidation inventory at cost is overstated by $37.9 million.  *Id.*  The value is inflated because he uses a 96.4% NOLV (with the wrong formula),

---

[3] Note that the adjusted total Inventory value of $2,364.3 billion does not reflect an 85% fair market value reduction, but rather corrects facial mistakes in Schulte's analysis.  As explained in Griffith's declarations and the Debtors' previous filings, the correct inventory value should be $2,287.2 billion, not $2,364.3 billion.

instead of the correct 95.6% NOLV.  Second Suppl. Griffith Decl. ¶ 13.  These errors are depicted

in the following table:[4]

**Collateral Value at Filing Date**

| $ in millions | Henrich | | Adjusted Henrich | | Variance |
|---|---|---|---|---|---|
| Total Inventory at Cost | $2,576.2 | (Stock Ledger ex SHS) | $2,391.5 | (Net Eligible Inventory) | $ (184.7) |
| Less GOB at Cost | (651.6) | (Incorrect GOB Inventory) | (617.2) | (Actual GOB Inventory) | 34.4 |
| Equals: Going Concern Inventory at Cost | 1,924.7 | | 1,774.3 | | (150.4) |
| Going concern Inventory Sale Proceeds | 2,710.8 | (29% margin) | 2,499.0 | (29% margin) | (211.8) |
| Less: Going Concern Store Expenses | (449.9) | (23.4% selling expense) | (574.8) | (Back into 6% 4 wall margin) | (124.9) |
| Total Inventory | 2,260.9 | | 1,924.2 | | (336.7) |
| GOB Inventory at Cost | 651.6 | (Incorrect GOB Inventory) | 617.2 | (Actual GOB Inventory) | (34.4) |
| Less: Unrecovered Value at Liquidation sale | (23.7) | (Wrong Store Expenses) | (27.2) | (Correct Store Expenses) | (3.5) |
| **Total Inventory, Liquidation** | 627.9 | (Incorrect 96.4% NOLV) | 590.0 | (Correct 95.6% NOLV) | (37.9) |
| **Total Inventory** | $2,888.8 | | $2,514.3 | | $ (374.5) |

16.    Third, as with the other 2L Experts, there are additional expenses required to sell

Inventory (including bankruptcy expenses and administrative expenses) which Henrich does not

consider.  Henrich Dep. 130:7-131:7.  Thus, because Henrich's methodology is incorrect (it is not

a fair market value approach) and he relied on the wrong data, Henrich's Petition Date inventory

calculation is overstated by at least approximately $375 million and is unreliable.  Second Suppl.

Griffith Decl. ¶ 13.

17.    **Murray's Petition Date Inventory Valuation Uses the Wrong Data**.  Murray's

Petition Date Inventory calculation is less flawed than Schulte's or Henrich's, but still misses the

mark.  Murray relies on the September 28, 2018 Tiger Appraisal ("**Tiger Report**"), but selectively.

On the one hand, Murray relies heavily on the Tiger Report for her 88.7% NOLV figure, which is

nearly 7% lower than the Debtors' 85% of book value.  Murray Report at 6.  On the other hand,

the Tiger Report does not include in-transit inventory.  Second Suppl. Griffith Decl. ¶ 14.

Therefore, adding any amount of in-transit inventory is wrong under the Tiger Report approach,

---

[4] Note that the adjusted amount of total Inventory value of $2,514.3 billion does not reflect an 85% fair market value reduction, but rather corrects facial mistakes in Henrich's analysis.  As explained in Griffith's declarations and the Debtors' previous filings, the correct inventory value should be $2,287.2 billion, not $2,514.3 billion.

but Murray nonetheless adds $74.6 million in in-transit inventory to her calculation.  Murray

Report ¶ 74 and Appx C-1.  As a result, her methodology is flawed, and her Inventory calculation

should be lower.  Also, there are additional expenses required to sell inventory (professional fees,

financing fees), which Murray, in her application of the Tiger Report, does not consider that should

have be included.  *See id.,* Tiger Report at Exhibit A-2.  Murray applies the Tiger Report figures,

which do not include professional and financing fees, but those are necessary expenses associated

with bankruptcy cases and must be accounted for.  Second Suppl. Griffith Decl. ¶ 14.  The

exclusion of these costs from the valuation of collateral, as well as the complete disregard for any

506(c) surcharges, grossly inflates the Second-Lien Holders' recoveries in Murray's report.  *In re

Residential Capital, LLC*, 501 B.R. at 595.

> ### *ii.    The 2L Experts Erroneously Include Certain Collateral as Second Lien Collateral.*

18.    The 2L Experts also erroneously include categories of collateral that should not be

included as Collateral of the Second-Lien Holders.  Henrich Report at 2-3; Schulte Report at 8-9;

Murray Report at ¶¶ 90-91, 93.  Specifically, they include cash, pharmacy scripts, and pharmacy

receivables as Collateral—all of which are *not* Collateral.

19.    The 2L Experts incorrectly include cash, pharmacy scripts, and pharmacy

receivables as second lien collateral based on their read of the *Amended and Restated Security

Agreement* dated March 20, 2018 (hereinafter, the "**Second Lien Security Agreement**").  But, the

Second Lien Security Agreement simply does not support the 2L Experts' strained interpretation.

In fact, despite the Second-Lien Holders' claim in their Common Response Brief that pharmacy

scripts are "expressly included" in the Second Lien Security Agreement, there is no question that

the words "pharmacy scripts" *do not appear* at all in the agreement.  *See* Common Reply [ECF

No. 4439] at 12.

20.    The earlier Third Amended & Restated Collateral Agreement dated July 21, 2015

(hereinafter, the "**First Lien Security Agreement**"), on the other hand, does expressly include

"pharmacy receivables," "pharmacy scripts," and "cash and cash equivalents" in the security

interest grant.  A side-by-side comparison of the two agreements is instructive and shown below:

| First Lien Security Agreement dated July 21, 2015 (emphasis added) | Second Lien Security Agreement dated March 20, 2018 |
|---|---|
| 3.1 Collateral; Grant of Security Interest.<br><br>Each Grantor hereby grants . . . a security interest in, all of the following property . . . :<br><br>(a) all Credit Card Accounts Receivable;<br>(b) all Pharmacy Receivables;<br>(c) all Inventory;<br>(d) all Chattel Paper relating to Credit Card Accounts Receivable and Pharmacy Receivables;<br>(e) all Instruments relating to Credit Card Accounts Receivable and Pharmacy Receivables;<br>(f) all Prescription Lists;<br>(g) all Documents relating to any Inventory;<br>(h) all Deposit Accounts;<br>(i) all cash and cash equivalents;<br>(j) all books and records pertaining to the Collateral; and<br>(k) to the extent not otherwise included, all Proceeds, insurance claims, Supporting Obligations and products of any and all of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing. | 2.1 Collateral; Grant of Security Interest.<br><br>Each Grantor hereby grants . . . a security interest in all of the following property . . . :<br><br>(a) all Credit Card Accounts Receivable;<br>(b) all Inventory;<br>(c) all Chattel Paper relating to Credit Card Accounts Receivable;<br>(d) all Instruments relating to Credit Card Accounts Receivable;<br>(e) all Documents relating to any Inventory;<br>(f) all books and records pertaining to the Collateral; and<br>(g) to the extent not otherwise included, all Proceeds, insurance claims, Supporting Obligations and products of any and all of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing. |

21.    Based on their structure and content, it appears that the Second Lien Security

Agreement was based on the First Lien Security Agreement, as is a common practice for first lien

and second lien facilities.  As a practical matter, all sophisticated first lien and second lien parties,

as they are, would have analyzed each other's security agreements ahead of entering into the

Intercreditor Agreement.  Griffith Second Suppl. Decl. ¶ 16 and Ex. E.  Moreover, the Intercreditor

Agreement differentiates between the first lien collateral (defined as "**ABL Collateral**" that includes the Second Lien Collateral) and second lien collateral (defined as the "**Second Lien Collateral**"), which is customary for intercreditor arrangements in which first lien and second lien collateral do not fully overlap.  In view of the foregoing, it is disingenuous for the Second-Lien Holders to argue that cash, pharmacy scripts, and pharmacy receivables are second lien Collateral. They simply are not.

22.     The fact that cash, pharmacy scripts, and pharmacy receivables are not second lien Collateral, and are instead solely first lien collateral, is significant because the Second-Lien Holders cannot claim to receive the full benefit of collateral exclusive to the senior lenders.  But to the contrary, the Second-Lien Holders not only assert that such collateral (exclusively belonging to senior lenders) would be used to first pay down first lien obligations, but that certain of such collateral is actually second lien Collateral—antithetically to the clearly enumerated categories in the Second Lien Security Agreement.  Accordingly, the 2L Experts' improper inclusion of cash, pharmacy receivables, and pharmacy scripts in their calculations of the second lien collateral overstates the amount by approximately $205 million and renders their opinions unreliable.  *In re Residential Capital, LLC*, 501 B.R. at 595.  Moreover, the Second-Lien Holders have not satisfied their burden to show that cash is unencumbered and, therefore, not available to the senior lenders. *Id.* at 591.

23.     For argument's sake, even if pharmacy scripts were included as Collateral—which they should not be—the 2L Experts use the incorrect number for pharmacy scripts.  Specifically, each of the 2LExperts relies on an undated "Estimated Script Asset Value" document for their pharmacy script number.  *See* Schedule of Estimated Script Asset Value, SEARS_507B_00001508.  Importantly, this document is an internal company estimate, not a

valuation document upon which a lender would rely. The Tiger Report is a more appropriate document on which to rely rather than an internal estimate not prepared for valuation purposes. This is the case because the Tiger Report includes a pharmacy script valuation (*see* Tiger Report at 8), and the Tiger Report provides values that would be considered by a lender. Notably, Murray relied heavily on the Tiger Report in reaching her Inventory valuation, yet offers no reasoned basis for relying on an internal company document for her pharmacy scripts value when she could have used the Tiger Report. Murray Report at App'x C-1, n.11. Thus, the 2L Experts' reliance on the "Estimated Script Value" overstates the Tiger Report number by approximately $10 million, is misplaced and further evidence of their lack of credibility.

### iii.    The 2L Experts' Accounting of Senior Obligations Is Incorrect.

24.    The 2L Experts' senior obligations numbers are also wrong for two key reasons. First, they do not include L/Cs even though those were actual obligations as of the Petition Date. Second, they do not include post-petition interest, which interest should be rightfully included.

25.    There are two L/Cs that the 2L Experts incorrectly omit as senior obligations. Before the Petition Date, Sears obtained a Stand-Alone L/C Facility (hereinafter, the "**Stand Alone L/C Facility**") and a Pre-Petition ABL Facility including a letter of credit facility (hereinafter, the "**1L L/C Facility**"). As of the Petition Date, approximately $124 million was issued under the 1L L/C Facility, and approximately $271 million was issued under the Stand Alone L/C Facility. Second Suppl. Griffith Decl. ¶ 17.

26.    None of the 2L Experts included the Stand-Alone L/C Facility in their calculations of senior obligations and their reasoning for excluding this L/C is flawed. The main reason the 2L Experts proffer for their failure to include this L/C is that it was not significantly drawn at the Petition Date. *See, e.g.*, Schulte Dep. 103:6-12; Henrich Dep. 139:4-9; Murray Report ¶ 41. This

is a red herring.  For one thing, L/Cs do not have to be "funded debt" to be considered senior obligations.  Also, the reality is that the Stand-Alone L/C Facility was cash collateralized by ESL and Cyrus—a fact that the Second-Lien Holders do not dispute, yet seem to ignore in their analyses.  Second Suppl. Griffith Decl. ¶ 19 and Ex. F.  Even if the cash Stand Alone L/C Facility was not drawn, the Debtors or any buyer would have had to refinance the Stand Alone L/C Facility and post cash collateral, as actually happened under the Sale.  In addition, to the extent any amounts are drawn by the Stand-Alone L/C Facility counterparty, ESL would have a senior claim to recovery ahead of any of the Second-Lien Holders on account of the Second Lien Debt.  Second Suppl. Griffith Decl. ¶ 19.  As a result, the Second-Lien Holders and the 2L Experts cannot credibly dispute that the Stand-Alone L/C Facility is a senior obligation.  *See id.* and Ex. F.

27.     Regarding the 1L L/C Facility, it is telling that Henrich included this L/C as $123.8 million of senior obligations.  Henrich Report at Ex. 2B.  Schulte and Murray contend that this L/C should not been included, but their reason for excluding it is, again, flawed.  Schulte Report at 12; Murray Report at ¶ 36.  They ignore the reality of the obligations underlying the L/C, as well as the fact that this L/C restricted the availability to borrow and, as such, can only be viewed as a real, senior obligation.  Second Suppl. Griffith Decl. ¶¶ 2-21.  Perhaps most importantly, the record reflects that the 1L L/C Facility was included as part of the $850 million of outstanding indebtedness under the DIP Credit Agreement that was needed to be paid to close the Sale, and there is no dispute that the $850 million obligation is senior obligations.  Second Suppl. Griffith Decl. ¶ 18.  Simply put, the 2L Experts' failure to include the Stand-Alone L/C Facility and the 1L L/C Facility as senior obligations cannot be squared with the facts, and are yet another example of the unreliability of these Experts' opinions.  *In re Residential Capital, LLC*, 501 B.R. at 595.

28.    Finally, the 2L Experts acknowledge that the L/Cs support potential workers' compensation obligations, yet did not do an analysis as to what those liabilities would be. Murray Report ¶¶ 33–36; Henrich Dep. 109:22-111:5.  In fact, the reality is that these were significant continuing obligations relating to the claims backed by the L/Cs.  Second Suppl. Griffith Decl. ¶ 21.

29.    Another category of senior obligations that the Second-Lien Holders improperly exclude is post-petition interest.  Where, as here, a going concern sale was contemplated at the Petition Date, it is appropriate to include the minimum amount of post-petition interest that would have to be paid in an expedited process—including a 363 sale process—when calculating the senior obligations.  Second Suppl. Griffith Decl. ¶ 22.  This approximately $34 million figure reflects the minimum amount of post-petition interest to be accrued on account of the over-secured senior obligations when contemplating an expected 363 sale process.  *Id.*  But, this illustrative post-petition interest calculation is significantly less than the amount of post-petition interest actually accrued during this time, which was closer to approximately $62 million.  Second Suppl. Griffith Decl. ¶ 23.  The Second-Lien Holders, on the other hand, offer no reasoned basis for excluding post-petition interest from their calculations.  Henrich Dep. 139:10-16; Murray Dep. 67:10-12; *see generally* Schulte Report.  As a result, post-petition interest should be included as senior obligations, and Griffith's estimation of post-petition interest is reasonable.  Second Suppl. Griffith Decl. ¶ 22.

**B.    The Second-Lien Holders Do Not Squarely Rebut the Debtors' Positions**

30.    Revealing the many weaknesses of their arguments, the Second-Lien Holders and the 2L Experts fail to address, let alone squarely rebut, many of the Debtors' positions.  Instead, they continue to offer arguments that are simply irrelevant to the correct analysis.

WEIL:\97117178\9\73217.0004

31.     Perhaps most significantly, the Second-Lien Holders have no meaningful response to the Debtors' position, supported by controlling case law, that the correct approach for valuing the Inventory both on the Petition Date and the Sale Date is using a fair market value.  While the Second-Lien Holders claim that "[t]he Parties all agree in theory that the appropriate methodology for calculating a diminution in value is by employing a going concern valuation methodology," [ECF No. 4439] their actual calculations do not follow this approach, and their criticisms of the Debtors' analysis in this regard ring hollow.

32.     As explained extensively in the Debtors' filings on May 26, 2019 [ECF No. 4034] and June 27, 2019 [ECF No. 4381], the law is clear that valuation of collateral at the Petition Date must be done based on its proposed disposition or use.  *In re Heritage Highgate, Inc.*, 679 F.3d 132, 141 (3d Cir. 2012) (explaining that "the proposed disposition or use of the collateral" by the Debtors is of "paramount" importance to the inquiry).  Where, as here, the parties intended a going concern sale, courts have rejected a liquidation valuation.  *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 994–96 (1997) (rejecting a foreclosure valuation based on similar rationale); *Official Comm. of Unsecured Creditors v. UMB Bank, N.A.* (*In re Residential Capital, LLC*), 501 B.R. 549, 592, 594–95 (Bankr. S.D.N.Y. 2013) (rejecting liquidation valuation where the parties intended to market and sell the properties as a going concern).  Importantly, courts (as this one has stated in this case) acknowledge that the best evidence of value is an actual sale.  *In re Aerogroup Int'l, Inc.*, No. 17-11962 (KJC), 2019 WL 1407007, at *14 (Bankr. D. Del. Mar. 26, 2019) ("The auction result set the value of the collateral.").

33.     Here, the evidence demonstrates that a going concern sale was clearly contemplated at the Petition Date, and there is no question that this is what actually happened in this case.  *See, e.g.*, Aebersold Decl. [ECF No. 4383] ¶¶ 21–23 and Exs. A–C attached.  Accordingly, applying a

fair market value to Inventory assuming a going concern sale at the Petition Date is the correct approach under the law. *In re Aerogroup Int'l, Inc.*, 2019 WL 1407007, at *14. Despite their statements to the contrary, none of the 2L Experts actually did this type of analysis and, therefore, did not follow the controlling law.

34.    The Debtors' decision to ultimately pursue the Sale was made, in part, because the Debtors' creditors would receive greater recoveries than would be provided for any other practically available alternative, including, specifically, a wind-down or liquidation of the business. *See* Aebersold Sale Decl. at ¶ 40 [ECF No. 2335]. The Second-Lien Holders' recovery, as the Debtors largest senior secured creditors, was of course an important consideration, and they particularly benefitted from the Sale.

35.    The Second-Lien Holders argue and the 2L Experts opine that it is appropriate to assume a liquidation scenario at the Petition Date without explaining (as if they could) why a fair market value analysis should not apply (which it does). Significantly, the Second-Lien Holders do not even attempt to refute the cases cited by the Debtors above, and the Second-Lien Holders and the 2L Experts offer no legitimate reason for assuming a liquidation at the Petition Date. The actual record, however, makes abundantly clear that a going concern sale was the Second-Lien Holders' goal. Aebersold Decl. [ECF No. 4383] ¶¶ 21–23 and Exs. A–C; *see also generally* UCC Brief [ECF No. 4385]. Further, because the law requires the valuation at the Petition Date to be done based on proposed disposition, the 2L Experts' failure to do such a valuation here renders their opinions wholly unhelpful and unreliable. *See* Fed. R. Evid. 702; *In re Residential Capital, LLC*, 501 B.R. at 595.

WEIL:\97117178\9\73217.0004

C.     **The Second-Lien Holders' Position Regarding 506(c) Surcharges Ignores the Evidence and the Realities of This Case**

36.     The 2L Experts' analyses with respect to 506(c) surcharges are also wholly deficient.  As explained below, Murray and Schulte do not even calculate any 506(c) surcharges at all, while Henrich acknowledges that that 506(c) surcharges exist, but his provided estimate is incorrect.  At bottom, however, the Second-Lien Holders and the 2L Experts do not, and cannot, meaningfully dispute the fact that expenses were incurred in order to allow them to Credit Bid. Second Suppl. Griffith Decl. ¶ 25.

        **i.     *Murray and Schulte Do Not Even Calculate Any 506(c) Surcharges at All, Thereby Ignoring the Realities of This Case.***

37.     The fact that neither Murray nor Schulte calculate any 506(c) surcharges at all is improper and further evidence of the unreliability of their opinions.  It also concedes the issue to the Debtors.  The law is clear that 506(c) surcharges can be deducted from 507(b) claims, and debtors can recover 506(c) surcharges if such expenses were necessary, reasonable, and of direct and primary benefit to the secured creditor.  *See In re Blackwood Assocs., L.P.*, 153 F.3d 61, 68 (2d Cir. 1988); *In re McLean Indus., Inc.*, 84 B.R. 340, 350 (Bankr. S.D.N.Y. 1988); *In re Kohl*, 421 B.R. 115, 123 (Bankr. S.D.N.Y. 2009).  Importantly, expenses that are for the "primary" benefit of a secured creditor need not be "solely" for the benefit of that creditor to allow 506(c) surcharges.  *See, e.g., Sw. Sec., FSB v. Segner (In re Domistyle, Inc.)*, 811 F.3d 691, 698 (5th Cir. 2015) (internal citation omitted).  Tellingly, the Second-Lien Holders offer no real explanation for their failure to include 506(c) surcharges besides their disingenuous claims that they were not the sole beneficiaries of the Sale.  This Court knows well that was not the case.  And while Murray contends that certain potential 506(c) expenses were accounted for in her value of the collateral, that is simply untrue because the Tiger Report she relied on did not include professional and financing fees.  Tiger Report at A-2.

> ## ii.   *Henrich Acknowledges That There Are 506(c) Surcharges, But His Estimate of Them Is Wrong and Ignores the Evidence.*

38.    Significantly, in his report and deposition testimony, Henrich acknowledges that 506(c) surcharges exist.  Henrich Report at 4; Henrich Dep. 32:20-23.  He also testified at his deposition that there are 506(c) surcharges in this case:

> Q.    And in this proceeding, you believe that there are 506(c) surcharges, don't you?
>
> A.    Yes.

Henrich Dep. 32: 20-23.

39.    In addition, he disagrees with Schulte and Murray's exclusion of 506(c) surcharges from their reports:

> Q.    Are you aware that Mr. Schulte and Ms. Murray don't indicate – their reports don't reflect 506(c) surcharges?
>
> A.    I am aware of that.
>
> Q.    Do you agree with that?
>
> A.    No.

Henrich Dep. 33:11-17.

40.    And in a prior case before this Court, Henrich represented a debtor and he opined that 506(c) surcharges should be charged against a party who was the successful bidder at an auction:

> A.    It was the secured lender essentially wanted the process for free and they were the successful bidder at auction. And so there was a hearing.
>
> . . .
>
> Q.    The party that was opposing the 506(c) surcharge was the successful bidder at an auction?
>
> A.    Yes.

Henrich Dep. 30:8-11, 31:7-10; *see also* Declaration of William H. Henrich in Support of Joint Motion of Debtors and Debtors in Possession and the Official Committee of Unsecured Creditors

WEIL:\97117178\9\73217.0004

for an Order Granting a Surcharge Against the Collateral of Hillstreet Fund IV, L.P. Under Section 506(c) of the Bankruptcy Code ¶ 29 (Case No. 13-22094 (RDD)) [ECF No. 436], *In re Flat Out Crazy, LLC* (Case No. 13-22094 (RDD)) (Bankr. S.D.N.Y. 2013) ("The administration of these Cases and the resounding success of the sale process have directly, primarily and materially benefitted HillStreet.  The costs and expenses comprising the Surcharge are reasonable and they were necessary to preserving and improving the going concern value of HillStreet's collateral pending the sale to and disposing of HillStreet's collateral for an aggregate purchase price far in excess of what HillStreet could have reasonably hoped to achieve on its own through other means.").

41.    Even though Henrich agrees that there are 506(c) surcharges in this case, his estimate of the 506(c) surcharges here is wrong and unreliable.  According to Henrich, there are only $206.7 million in 506(c) surcharges relating to professional fees and certain overhead. Henrich Report at Ex. 2A.  Henrich uses the same amount of professional fees set forth in Griffith's Declaration.  *Id.* at 5; *see* Griffith Decl. ¶ 20.  However, Henrich inexplicably leaves out the remaining categories of 506(c) surcharges considered in the Griffith Declaration, and testified that he has no opinion on the alternative surcharges set forth in the Supplemental Griffith Declaration. *See* Henrich Report at Ex. 2A.  It simply makes no sense for Henrich to cherry-pick certain categories of expenses set forth in Griffith's Declaration and include them as 506(c) surcharges, but exclude everything else Griffith included with no real explanation.  *Id.*  As a result, while Henrich is correct that there are 506(c) surcharges, his calculation of them is incorrect.

42.    Indeed, each of the 2L Experts testified that they did not even attempt to rebut the Debtors' alternative 506(c) calculations of $254 million and $547 million.  Henrich Dep. 134:17-135:5; Murray Dep. 103:20-104:7; Schulte Dep. 121:22-122:18.  As set forth in the Debtors'

June 27, 2019 Opposition and Reply Brief and the accompanying Supplemental Griffith Declaration, between January 17, 2019—the date of the APA's execution—and February 11, 2019—the consummation of the Sale—the Debtors spent approximately $254 million (excluding GOB expenses and professional fees) to operate the business. *See* Debtors' Opp'n and Reply Br. [ECF No. 4381] ¶ 45; Suppl. Griffith Decl. ¶ 25. From December 28, 2018—the date of ESL's first bid—until February 11, 2019—the consummation of the Sale—the Debtors spent approximately $527 million (excluding GOB expenses and professional fees) to operate the business. *Id.* Neither the Second-Lien Holders nor their Experts have considered these alternative calculations, and their failure to do so speaks volumes.

43.    Because there can be no real dispute that 506(c) surcharges are appropriate as a matter of law, and Griffith has provided three alternative calculations of them, the Court can and should award 506(c) surcharges in this case based on the evidence provided by Griffith. *E.g.*, Griffith Decl. ¶¶ 18-23; Suppl. Griffith Decl. ¶¶ 18-25; Second Suppl. Griffith Decl. ¶¶ 24-33. These amounts were unquestionably for the primary and direct benefit of the Second-Lien Holders, and should be awarded to the Debtors as a result. Second Suppl. Griffith Decl. ¶¶ 24-33.

**D.    <u>Any Post-Closing Date Diminution in Value is Eclipsed by 506(c) Surcharges</u>**

44.    Finally, even when post-Closing Date diminution is considered, 506(c) Surcharges—including 506(c) Surcharges incurred prior to the Closing Date, which are outlined elsewhere herein, as well as 506(c) Surcharges incurred post-Closing Date—exceed any diminution. Second Suppl. Griffith Decl. ¶¶ 34-35. The table below reflects the amount of diminution in value since the Closing Date, which includes net post-Closing Date recovery, as well as post-Closing Date expenses related to the Collateral, which are 506(c) Surcharges. *Id.* The 506(c) Surcharges included in this table were necessary to ensure the close of the bankruptcy case, which benefits the Second-Lien Holders.

WEIL:\97117178\9\73217.0004

*** Remainder of page intentionally left blank ***

| Post-Close Diminution | |
|---|---|
| Remaining Wave 3 Inventory at Cost on 2/10/19 | $63,620,000 |
| **2/10/19 - 3/23/19 Total Sales** | **$57,181,000** |
| February Expenses | (4,008,716) |
| March Expenses | (4,102,148) |
| Total Store Level Expenses | (8,110,864) |
| **Net Post-Close Recovery** | **$49,070,136** |
| *Store Level NOLV (%)* | *77.1%* |
| Accrued Payroll | (42,417,407) |
| Select Professional Fees Accrued in Post-Close Period | (13,317,691) |
| Severance and WARN | (11,480,880) |
| Citi L/C Interest & Fees | (2,858,641) |
| **Additional Post-Close Expenses Related To Collateral** | **(70,074,619)** |
| **Remaining Value From GOB Collateral** | **($21,004,484)** |

*Note: Excludes applicable sales tax which would further increase expenses. Inventory and sales data available starting from February 10, 2019; company provides information on weekly basis.*

E.    **The Facts and Record in These Chapter 11 Cases Make Clear that the Equities Support the Court not Allowing *Any* of the Second-Lien Holders' 507(b) Claims[5]**

45.    Bankruptcy courts may look to equitable considerations in determining whether to allow a creditor's 507(b) claim.  See 11 U.S.C. 503(c)(3).  Importantly, nothing in any of the reports or testimony of the 2L Expert or the Second-Lien Holders' briefing alters the conclusion that the Second-Lien Holders have reaped an immense benefit from the Sale, a benefit greater than they would have received if there were a liquidation or otherwise.  The monies spent by the Debtors in furtherance of the Sale directly benefitted the Second-Lien Holders, as seen in their 100% recovery on account of their $433.5 million Credit Bid.  As the parties noted in a previous hearing:

---

[5] The Debtors adopt by reference the equitable arguments made by the *Creditors' Committee's (I) Qualified Joinder to the Debtors' Objection to the Second Lien Parties' Requests to Determine Claims Under Section 506(a) and Section 507(b) and Reply in Support of the Debtors' Rule 3012 Motion and (II) Supplemental Objection to the Second Lien Parties' Request to Determine Claims Under Section 506(a) and Section 507(b)* [ECF No. 4385], pp. 20-26.

WEIL:\97117178\9\73217.0004

> [CYRUS]: And our concern, Your Honor, is [the Debtors] stand[] here and
> says it's a simple waterfall plan. The problem with that is you need water.
> And its not clear there's a whole lot of water here.
>
>       . . .
>
> [DEBTORS]: [The Second-Lien Holders] took all the water, but we're
> trying to deal with that.

Apr. 18, 2019 Hr'g Tr. 10216-103:4.    The Second-Lien Holders—who *are* the primary

beneficiaries of a Sale they urged the Debtors to consummate—now want even more of the

Debtors' assets.    Despite their increased recoveries resulting from the Sale, the Second-Lien

Holders now request millions at the expense of the Debtors and the other stakeholders.    It is clear

that the Second-Lien Holders will not stop until they have drawn the last drop of water from this

well.    On the basis of these equitable considerations—as well as the other arguments advanced

herein—the Court should grant the Debtors' Rule 3012 Motion.

## <u>CONCLUSION</u>

46.    For all of the reasons stated in this Supplemental Brief, the Debtors respectfully

request that the Court:

    a.    Grant the Debtors' Rule 3012 Motion;

    b.    Refuse to allow any recoveries on behalf of the Second-Lien Holders'
asserted 507(b) Claims; and

    c.    Grant the Debtors such other and further relief, at law or in equity, as it
deems just and proper.

Dated: July 18, 2019
New York, New York

                              */s/ Ray C. Schrock*
                              WEIL, GOTSHAL & MANGES LLP
                              767 Fifth Avenue
                              New York, New York  10153
                              Telephone:  (212) 310-8000
                              Facsimile:  (212) 310-8007
                              Ray C. Schrock, P.C.
                              David J. Lender
                              Paul R. Genender
                              Jared R. Friedmann
                              Sunny Singh

                              *Attorneys for Debtors*
                              *and Debtors in Possession*

WEIL:\97117178\9\73217.0004