UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X
:
In re:                                              :        Chapter 11
:
SEARS HOLDINGS CORPORATION, et al.,[1]              :
:        Case No. 18-23538-rdd
Debtors.                         :
:        (Jointly Administered)
:
----------------------------------------------------------------X


**DECLARATION OF KATHERINE R. LYNCH IN SUPPORT OF THE
MOTION IN LIMINE TO EXCLUDE CERTAIN TESTIMONY AND
STRIKE CERTAIN PORTIONS OF THE DECLARATIONS
BY THE DEBTORS' FACT WITNESS BRIAN GRIFFITH**

---

[1]        The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

I, Katherine R. Lynch, declare under penalty of perjury as follows:

1.      I am an attorney duly admitted to practice before this Court, and an associate of the law firm Cleary Gottlieb Steen & Hamilton LLP, counsel for ESL Investments, Inc. and certain of its affiliated entities (including JPP, LLC and JPP II, LLC).

2.      I respectfully submit this declaration in order to provide for the convenience of the Court copies of the documents cited in the *Motion in Limine to Exclude Certain Testimony and Strike Certain Portions of the Declarations by the Debtors' Fact Witness Brian Griffith*, filed contemporaneously herewith.

3.      Attached hereto as <u>Exhibit A</u> is a true and correct copy of the *Order Approving Global Bidding Procedures and Granting Related Relief*, dated November 19, 2018, ECF No. 816.

4.      Attached hereto as <u>Exhibit B</u> is a true and correct copy of the Letter from Transform Holdco LLC to Lazard Frères & Co., LLC, dated December 28, 2018.

5.      Attached hereto as <u>Exhibit C</u> is a true and correct copy of the Letter from Transform Holdco LLC to Lazard Frères & Co., LLC, dated January 9, 2019.

6.      Attached hereto as <u>Exhibit D</u> is a true and correct copy of the Amended and Restated Security Agreement among Sears Holdings Corporation, and certain of its Subsidiaries, as Grantors, and Wilmington Trust, National Association, as Collateral Agent, dated March 20, 2018.

7.      Attached hereto as <u>Exhibit E</u> is a true and correct copy of the Second Amended and Restated Intercreditor Agreement, by and among Bank of America, N.A. and Wells Fargo Bank, National Association, as ABL Agents, and Wilmington Trust, National Association, as Second Lien Agent, dated March 20, 2018.

Executed on July 18, 2019 in New York, New York.

Respectfully submitted,

*/s/ Katherine R. Lynch*
Katherine R. Lynch

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

In re                                            :

                                                 :        **Chapter 11**

**SEARS HOLDINGS CORPORATION,** *et al.,*        :

                                                 :        **Case No. 18-23538 (RDD)**

                                                 :

Debtors.[1]                                      :        **(Jointly Administered)**

---------------------------------------------------------------x

<div align="center">

### ORDER APPROVING
### GLOBAL BIDDING PROCEDURES AND GRANTING RELATED RELIEF

</div>

Upon the motion, dated November 1, 2018 (ECF No. 429) (the "**Motion**"),[2] of

Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the

above-captioned chapter 11 cases (collectively, the "**Debtors**"), pursuant to sections 363 and 365

title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9007,

9008, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and

Rules 6004-1, 6005-1, and 6006-1 of the Local Bankruptcy Rules for the Southern District of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion or the Bidding Procedures.

<div align="center">1</div>

18-23538-rdd    Doc 566    Filed 12/19/18    Entered 12/19/18 10:43:15    Main Document
Pg 2 of 63

New York (the "**Local Rules**"), for an order (i) (a) approving the Global Bidding Procedures, substantially in the form attached hereto as **Exhibit 1**, in connection with sales (each transaction, a "**Sale Transaction**") of the Debtors' assets (the "**Assets**"), (b) authorizing the Debtors to designate one or more stalking horse bidders (each, a "**Stalking Horse Bidder**," and each such bidder's bid, a "**Stalking Horse Bid**") and offer each such bidder certain bid protections including the payment of a Break-Up Fee and certain expenses (collectively, the "**Stalking Horse Bid Protections**"), (c) scheduling auctions of the Assets (each, an "**Auction**") and hearings for approval of the proposed Sale Transactions (each, a "**Sale Hearing**"), (d) authorizing and approving the form and manner of notice of the Sale Transactions, Auctions, and Sale Hearings, substantially in the form attached hereto as **Exhibit 2** (the "**Sale Notice**"), (e) authorizing and approving the procedures for the assumption and assignment of executory contract or unexpired non-residential real property or personal property lease of the Debtors (collectively, the "**Contracts** and **Leases**," and such procedures, the "**Assumption and Assignment Procedures**"), (f) approving the notice to each non-Debtor counterparty (each a "**Counterparty**") to a relevant Contract or Lease regarding the Debtors' potential assumption and assignment of Contracts and Leases and the Debtors' calculation of the amount necessary to cure any monetary defaults under such Contracts and Leases (the "**Cure Costs**"), substantially in the form attached hereto as **Exhibit 3** (the "**Assumption and Assignment Notice**"), and (g) granting related relief, all as more fully set forth in the Motion; and the Court having jurisdiction to decide the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to

2

28 U.S.C. §§ 1408 and 1409; and due and proper notice of the relief requested in the Motion

having been provided in accordance with the Case Management Order; such notice having been

adequate and appropriate under the circumstances, and it appearing that no other or further notice

need be provided; and upon all of the objections to the Motion and the Debtors' reply thereto and

all related pleadings; and the Court having held a hearing to consider the relief requested in the

Motion on November 15, 2018 (the "**Hearing**"); and upon the record of, and representations

made at, the Hearing and all of the proceedings had before the Court; and the Court having

determined that the legal and factual bases set forth in the Motion establish just cause for the

relief granted herein and that the relief set forth herein is in the best interests of the Debtors, their

estates, their creditors, and all parties in interest; and after due deliberation and sufficient cause

appearing therefor,

## IT IS HEREBY FOUND AND DETERMINED THAT:

A.      The Global Bidding Procedures as set forth herein are fair, reasonable, and

appropriate, and are designed to maximize the value of the proceeds of the sale of the Assets.

B.      The Global Bidding Procedures comply with the requirements of Local

Rule 6004-1.

C.      The Assumption and Assignment Procedures are fair, reasonable, and

appropriate, and comply with the provisions of section 365 of the Bankruptcy Code and

Bankruptcy Rule 6006.

D.      The Debtors have articulated good and sufficient business reasons for the

Court to approve (i) the Global Bidding Procedures, (ii) the designation of Stalking Horse

Bidders, (iii) the Stalking Horse Bid Protections, (v) the Sale Notice, (vi) the Assumption and

Assignment Procedures, and (vii) the Assumption and Assignment Notice.

3

E.     Good and sufficient notice of the relief sought in the Motion has been
provided under the circumstances, and no other or further notice is required, except as set forth in
the Global Bidding Procedures and the Assumption and Assignment Procedures.  A reasonable
opportunity to object and be heard regarding the relief granted herein has been afforded to all
parties in interest.

F.     The Assumption and Assignment Procedures, Sale Notice, and
Assumption and Assignment Notice are appropriate and reasonably calculated to provide all
interested parties with timely and proper notice of the Sale Transaction(s), Auction(s), Sale
Hearing(s), Global Bidding Procedures, Assumption and Assignment Procedures, proposed Cure
Costs, potential assumption and assignment of Contracts and Leases, and all relevant important
dates and deadlines with respect to the foregoing, and no other or further notice of the sale of the
Assets or the assumption and assignment of Contracts and Leases in connection therewith shall
be required.

G.     Good and sufficient business reasons exist for the Court to authorize the
Debtors to designate Stalking Horse Bidders and enter into Stalking Horse Agreements (as
hereinafter defined), in each case, in accordance with the terms of this Order and the Global
Bidding Procedures.

H.     The Global Bidding Procedures are reasonably designed to promote active
bidding at and participation in the Auction(s), to ensure that the highest or best value is generated
for the Assets.

4

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND
DECREED THAT**:

1.      The Motion is granted solely to the extent set forth herein.

2.      All objections to the relief granted herein that have not been withdrawn
with prejudice, waived, or settled, and all reservations of rights included in such objections,
hereby are overruled.

3.      The Global Bidding Procedures are hereby approved in their entirety, are
incorporated herein by reference, and shall govern the bids and proceedings related to the sale of
the Assets and the Auction(s).  The failure to specifically include or reference any particular
provision of the Global Bidding Procedures in the Motion or this Order shall not diminish or
otherwise impair the effectiveness of such procedures, it being the Court's intent that the Global
Bidding Procedures are approved in their entirety, as if fully set forth in this Order.  The Debtors
are authorized to take all actions necessary or appropriate to implement the Global Bidding
Procedures in accordance with the terms of this Order and the Global Bidding Procedures.

## Designation of Stalking Horse Bidders

4.      The Debtors are authorized to, in the exercise of their reasonable business
judgment, and after consulting with the Consultation Parties, designate one or more Stalking
Horse Bidders for one or more of the Assets and enter into asset purchase agreements with
Stalking Horse Bidders (each such agreement, a "**Stalking Horse Agreement**") for the sale of
any of the Assets (each such group of Assets, a "**Stalking Horse Package**"), in each case, in
accordance with the terms of this Order and the Global Bidding Procedures.

5.      Subject to the terms of this Order and the Global Bidding Procedures, the
Debtors are authorized to offer each Stalking Horse Bidder certain Stalking Horse Bid

5

Protections, including a break-up fee (a "**Termination Payment**"); provided that, all Termination Payments must be negotiated by the Debtors, after consulting with the Consultation Parties, and no Termination Payment shall exceed three percent (3%) of the cash portion of the purchase price in the applicable Stalking Horse Bid, as set forth in the applicable Stalking Horse Agreement executed by the Debtors.

6. If the Debtors designate a Stalking Horse Bidder with respect to any of the Assets, including the Go Forward Stores, which designation shall be after consultation with the Consultation Parties, the Debtors shall file with the Court, serve on the Sale Notice Parties, and cause to be published on the website maintained by Prime Clerk LLC, the Debtors' claims and noticing agent in these chapter 11 cases, located at https://restructuring.primeclerk.com/Sears (the "**Prime Clerk Website**"), promptly upon execution of a Stalking Horse Agreement (and in no event more than one (1) calendar day following such execution), a Sale Notice setting forth the material terms of such Stalking Horse Agreement, including any Credit Bid and Stalking Horse Bid Protections, and attaching the Stalking Horse Agreement and proposed sale order.

7. Objections to the designation of a Stalking Horse Bidder or any other Stalking Horse Bid Protection pursuant to the terms and provisions of a Stalking Horse Agreement, including any Credit Bid or Termination Payment (each, a "**Stalking Horse Designation Objection**") shall (i) be in writing; (ii) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules; (iii) state, with specificity, the legal and factual bases thereof; and (iv) be filed with the Court and served on the Objection Recipients (a) within ten (10) calendar days after filing and service of the applicable Sale Notice with respect to all Assets other than the Go Forward Stores; provided that if a designated Stalking Horse Bidder is an insider or affiliate of the Debtors, parties in interest will have fourteen (14) calendar days after

6

filing and service of the applicable Sale Notice to file a Stalking Horse Designation Objection with respect to all Assets other than the Go Forward Stores.  Parties in interest shall have until **December 31, 2018, at 4:00 p.m. (Eastern Time)** to file and serve a Stalking Horse Designation Objection with respect to the sale of the Go Forward Stores.

8.      If a timely Stalking Horse Designation Objection is filed and served with respect to an applicable Stalking Horse Agreement in accordance with the Global Bidding Procedures, the proposed Stalking Horse Bidder, the terms of the Stalking Horse Agreements, including any Credit Bid and Stalking Horse Bid Protections provided for under such agreement, shall not be approved until the Stalking Horse Designation Objection is resolved, either by agreement of the objecting party and the Debtors, or by order of the Court resolving such objection.

9.      If no timely Stalking Horse Designation Objection is filed and served with respect to an applicable Stalking Horse Agreement in accordance with the Global Bidding Procedures, the Stalking Horse Bid Protections, including any Termination Payment, will be deemed approved without further order of the Court upon the expiration of the objection deadline, including with respect to any Stalking Horse Bid Protections consistent with this Order; provided that if an affiliate or insider of the Debtors includes a Credit Bid for part or all of their applicable Stalking Horse Bid, the Debtors will schedule a hearing prior to the commencement of the Auction for determination of such affiliate's ability to Credit Bid, and such affiliate shall not be entitled to Credit Bid at the Auction unless it has received an order of the Court approving its ability to Credit Bid prior to the Auction.  Notwithstanding anything to the contrary herein, in the Motion or in the Global Bidding Procedures, for the avoidance of doubt, any affiliate shall be entitled to include a Credit Bid for all or part of its Stalking Horse Bid or Qualified Bid to be

7

submitted by the applicable Bid Deadline and a determination that such Credit Bid constitutes a Qualified Bid may not be made absent an order of the Court.

10.    Absent further order of the Court, no person or entity, other than any applicable Stalking Horse Bidder, shall be entitled to any expense reimbursement or break-up, "topping," termination, or other similar fee or payment by the Debtors for submitting a bid for the Assets, or in any way participating in the Auction or the Debtors' sale process.

## Global Bidding Procedures

11.    The deadline for submitting Qualified Bids (the "**Bid Deadline**") is **December 28, 2018, at 4:00 p.m. (Eastern Time)** with respect to the Go Forward Stores and shall be no earlier than twenty (20) days following service of the applicable Sale Notice for all other Assets; provided that, the Debtors shall have the right, after consulting with the Consultation Parties and consistent with the terms of the DIP ABL Documents (as defined in the DIP ABL Orders), to extend the Bid Deadline for any reason whatsoever, in their reasonable business judgment, for all or certain parties; provided, further that the Debtors shall not extend the Bid Deadline without permission of the Court, unless each of the Consultation Parties agrees to such extension, provided, further that the Debtors are authorized to seek such permission on expedited notice and hearing.  The Debtors shall promptly provide copies of all bids to each of the Consultation Parties, but in no event later than the next calendar day.

12.    For all purposes under the Global Bidding Procedures, any Stalking Horse Bidder authorized as such pursuant to this Order shall be considered a Qualified Bidder, and the applicable Stalking Horse Bid shall be considered a Qualified Bid.  In the event that the applicable Stalking Horse Bid is the only Qualified Bid received by the Debtors in respect of the applicable Stalking Horse Package by the Bid Deadline, the Debtors shall not be required to

conduct an Auction for the applicable Stalking Horse Package, and the applicable Stalking Horse Bidder shall be deemed the Successful Bidder with respect to the Assets included in the applicable Stalking Horse Package as set forth herein.

13.     If, in addition to a Stalking Horse Bid, the Debtors receive at least one Qualified Bid in respect of the applicable Stalking Horse Package by the Bid Deadline, the Debtors shall conduct an Auction of the Assets in the applicable Stalking Horse Package in accordance with the Global Bidding Procedures.

14.     The Debtors may also include Assets not included in an applicable Stalking Horse Bid for bidding and sale at any Auction pursuant to the Global Bidding Procedures, including the Auction for the Go Forward Stores if a Qualified Bid seeks to purchase those Assets.

15.     The Auction will take place at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 on **January 14, 2019, at 10:00 a.m. (Eastern Time)** with respect to the Go Forward Stores, and Auctions will take place within twenty-five (25) days of service of the applicable Sale Notice with respect to all other Assets at a location to be announced, or at such other time and location as the Debtors, after consulting with the Consultation Parties and providing notice to the Sale Notice Parties, may determine in their reasonable business judgment.

16.     All proceedings of an Auction shall be conducted openly, and the Consultation Parties, their professional advisors, and all creditors and other parties in interest shall be permitted to attend; provided that, the Debtors may, in their reasonable business judgment, and after consulting with the Consultation Parties, establish a reasonable limit on the number of representatives and/or professional advisors that may appear on behalf of or

9

accompany Qualified Bidders or other parties in interest at an Auction.  The proceedings of Auctions shall be transcribed and/or video recorded.

17.    Each Qualified Bidder participating in an Auction shall confirm in writing and on the record at the Auction that (i) it has not engaged in any collusion with respect to the submission of any bid or the Auction and (ii) its Qualified Bid represents a binding, good faith, and bona fide offer to purchase the Assets in its bid if selected as a Successful Bidder.

18.    Subject to this Order, the Global Bidding Procedures, and the rights of a Stalking Horse Bidder under its applicable Stalking Horse Agreement, the Debtors shall have the right to, after consulting with the Consultation Parties, in the exercise of their reasonable business judgment, (i) determine which bidders qualify as "Qualified Bidders," and which bids qualify as "Qualified Bids;" (ii) determine the "Baseline Bids;" (iii) determine the amount of each Minimum Overbid; (iv) determine which bids that are Qualified Bids are the Successful Bids and Back-Up Bids; (v) reject any bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Global Bidding Procedures, Bankruptcy Code, this Order, or any other order of the Court, or (c) contrary to the best interests of the Debtors and their estates; (vi) adjourn or cancel the Auction, with respect to all or certain of the Assets, after providing notice of such adjournment or cancellation in accordance with the Global Bidding Procedures; and (vii) adjourn a Sale Hearing after providing notice of such adjournment in accordance with the Global Bidding Procedures.

19.    The Debtors shall have the right, in their reasonable business judgment, after consulting with the Consultation Parties, in a manner consistent with the Debtors' fiduciary duties and applicable law, to modify the Global Bidding Procedures, including by (i) waiving terms and conditions with respect to all Prospective Bidders; (ii) extending the deadlines set forth

therein; (iii) announcing at an Auction modified or additional procedures for conducting the Auction; (iv) providing reasonable accommodations to any Stalking Horse Bidder with respect to such terms, conditions, and deadlines of the bidding and Auction process to promote further bids on any Assets (including extending deadlines as may be required for any applicable Stalking Horse Bidder to comply with any additional filing and review procedures with the Federal Trade Commission in connection with any previous filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976), in each case, to the extent not materially inconsistent with the Global Bidding Procedures and this Order; provided that the Debtors may not extend the December 15, 2018 deadline for the Debtors to secure a Stalking Horse Bidder for Go Forward Stores without permission of the Court, unless each of the Consultation Parties agrees to such extension; provided further that nothing herein shall grant the Debtors the rights to modify the terms of, or constitute a waiver by the DIP ABL Agents or DIP ABL Lenders of any rights under, the DIP ABL Documents or DIP ABL Orders.  Nothing in this Order or the Global Bidding Procedures shall obligate the Debtors to consummate or pursue any transaction with respect to any Asset.

### The Sale Hearings and Sale Objections Deadlines

20.    The applicable Sale Hearing shall be held before the Court on **January 31, 2019 at 10:00 a.m. (Eastern Time)** with respect to the Go Forward Stores and within five (5) days of the applicable Sale Objection Deadline (as defined herein) with respect to all other Assets;[3] provided that, the Debtors may seek an adjournment of the Sale Hearing, as the Debtors, after consultation with the Consultation Parties, deem appropriate in the exercise of their

---

[3] Subject to Court availability.

11

reasonable business judgment.  Any sale to a Back-Up Bidder shall be considered on appropriate notice under the Amended Case Management Procedures Order.

21.    Objections to a proposed Sale Transaction, including any objection to the sale of any Assets free and clear of liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code and entry of a Sale Order (each, a "**Sale Objection**"), excluding Stalking Horse Designation Objections, shall (i) be in writing; (ii) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules; (iii) state, with specificity, the legal and factual bases thereof; and (iv) be filed with the Court and served on the Objection Recipients by no later than (a) with respect to the sale of the Go Forward Stores to a Successful Bidder, including a Stalking Horse Bidder, the later of (x) **January 24, 2019 at 4:00 p.m. (Eastern Time)** and (y) eight (8) days after the filing of the Notice of Auction Results and service of the Adequate Assurance Information and (b) with respect to the sale of all other Assets, including a sale to an applicable Stalking Horse Bidder, within ten (10) days of the filing of the Notice of Auction Results and service of the Adequate Assurance Information (the "**Sale Objection Deadline**"); provided that, the Debtors may extend the Sale Objection Deadline, as the Debtors deem appropriate in the exercise of their reasonable business judgment after consultation with the Consultation Parties. If a timely Sale Objection cannot otherwise be resolved by the parties, such objection shall be heard at the applicable Sale Hearing.

22.    Any party who fails to file with the Court and serve on the Objection Recipients a Sale Objection by the Sale Objection Deadline may be forever barred from asserting, at the applicable Sale Hearing or thereafter, any Sale Objection to the relief requested in the Motion with regard to a Successful Bidder, or to the consummation and performance of the Sale Transaction(s) contemplated by the asset purchase agreement between the Debtors and

the applicable Successful Bidder (including any Stalking Horse Bidder if named a Successful

Bidder), including the transfer of Assets to the Successful Bidder, free and clear of all liens,

claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code. Failure

to object shall constitute consent for the purposes of section 363(f)(2) of the Bankruptcy Code.

**Noticing Procedures**

23.     The Sale Notice is approved, and no other or further notice of the sale of

any Assets, an Auction, the Sale Hearings, or the Sale Objection Deadlines shall be required if

the Debtors serve and publish such notice, in the manner provided in the Global Bidding

Procedures and this Order. The Sale Notice contains the type of information required under

Bankruptcy Rule 2002 and Local Rule 6004-1, and complies in all respects with applicable

provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

24.     The Debtors shall promptly, and in no event later than **November 21,**

**2018**, file on the docket, after consultation with the Consultation Parties, a process letter

identifying the Assets that will be available for sale in connection with the sale of the Go

Forward Stores, as well as a general description of the other Assets available for sale in

connection with these Global Bidding Procedures (which description shall be subject to

modification at any Auction).

25.     Within one (1) calendar day after the (a) execution of a Stalking Horse

Agreement, including with respect to the Go Forward Stores and (b) determination by the

Debtors to auction an asset without a Stalking Horse Bidder, the Debtors shall file with the

Court, serve on the Sale Notice Parties, and cause to be published on the Prime Clerk Website

the Sale Notice, which shall set forth (i) a complete list and general description of the Assets

(subject to modification at any Auction); (ii) the date, time, and place of the (x) Auction and (y) Sale Hearing; (z) Sale Objection Deadlines; and (aa) the procedures for filing Sale Objections.

26.    Within five (5) business days after the execution of a Stalking Horse Agreement with respect to the Go Forward Stores, the Debtors shall cause the information contained in the Sale Notice to be published once in at least one national publication. The Debtors may elect to publish notice of the sales of other Assets in consultation with the Consultation Parties.

27.    Within two (2) business days after the conclusion of the Auction, or as soon as reasonably practicable thereafter, the Debtors shall file with the Court, serve on the Sale Notice Parties (including each Counterparty to a Proposed Assumed Contract (as hereinafter defined) in a Successful Bid and Back-Up Bid and each Counterparty to any known Contracts and Leases that have been or may later be designated by a Successful Bidder for assumption and assignment), and cause to be published on the Prime Clerk Website, a notice containing the results of the Auction (the "**Notice of Auction Results**"), which shall (i) identify the Successful Bidders and Back-Up Bidders; (ii) list all Proposed Assumed Contracts in the Successful Bids and Back-Up Bids; (iii) identify any known proposed assignee(s) of Proposed Assumed Contracts (if different from the applicable Successful Bidder); (iv) list any known Contracts and Leases that may later be designated by a Successful Bidder for assumption and assignment in connection with a Sale Transaction; (v) to the extent practicable, the governing agreement with the Successful Bidder or drafts thereof; and (vi) set forth the deadline and procedures for filing Adequate Assurance Objections (as hereinafter defined) in response to the Notice of Auction Results.

## Assumption and Assignment Procedures

28.     The Assumption and Assignment Notice is reasonable, fair, and appropriate, and contains the type of information required under Bankruptcy Rule 2002, and complies in all respects with applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules, and no other or further notice of the Debtors' proposed Cure Costs or the proposed assumption and assignment of Contracts and Leases (such Contracts and Leases, the "**Proposed Assumed Contracts**") shall be required if the Debtors file and serve such notice (and, subsequently, the Notice of Auction Results) in accordance with the Assumption and Assignment Procedures and this Order.

29.     The Debtors shall, within five (5) days of filing and service of a Sale Notice, or as soon as reasonably practicable thereafter, file with the Court, serve on the Sale Notice Parties, including each applicable Counterparty, and cause to be published on the Prime Clerk Website, the Assumption and Assignment Notice, which shall (i) identify the Proposed Assumed Contracts in the applicable list of Assets or Stalking Horse Bid, as applicable, and, if known, any additional Contracts or Leases that may be designated for assumption and assignment to the applicable bidder (or its known proposed assignee) (including any Stalking Horse Bidder pursuant to the terms and provisions of the applicable Stalking Horse Agreement); (ii) list the Debtors' good faith calculation of the Cure Costs with respect to each Contract and Lease identified on the Assumption and Assignment Notice; (iii) include Adequate Assurance Information for the Stalking Horse Bidder, if applicable, provided that Adequate Assurance Information shall only be served on Counterparties to Contracts or Leases; (iv) expressly state that assumption or assignment of a Contract or Lease is not guaranteed and is subject to Court approval; (v) prominently display the deadline to file a Cure Objection and an applicable

15

Adequate Assurance Objection (each as hereinafter defined); and (vi) prominently display the dates, times, and location of the Sale Hearing(s).

30.    The Debtors shall provide notice to Counterparties whose Contracts or Leases may be designated for assumption and assignment by any Successful Bidder, pursuant to the terms of an asset purchase agreement executed by the Debtors and the applicable Successful Bidder, in a manner consistent with the Assumption and Assignment Procedures, this Order, and all applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

31.    Any objection to the assumption and assignment of a Contract or Lease, the subject of which objection is the Debtors' proposed Cure Costs to cure any outstanding defaults under such Contract or Lease (a "**Cure Objection**") shall (i) be in writing; (ii) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules; (iii) state, with specificity, the legal and factual bases thereof, including the cure amount the objecting Counterparty believes is required to cure defaults under the relevant Contract or Lease; (iv) include any appropriate documentation in support thereof; and (v) be filed with the Court and served on the Objection Recipients (a) **the later of (x) fourteen (14) calendar days after service of the Assumption and Assignment Notice and (y) January 7, 2019** with respect to Cure Objections for Proposed Assumed Contracts in a Stalking Horse Bid for the Go Forward Stores, (b) **within eight (8) calendar days of service of the Debtors' proposed Cure Costs** with respect to Cure Objections for Proposed Assumed Contracts related to a sale of the Go Forward Stores if not provided in a Stalking Horse Bid, and (c) **within fourteen (14) calendar days of service of the Assumption and Assignment Notice** with respect to all other Assets.

32.    If a Cure Objection cannot otherwise by resolved by the parties, the Debtors may, after consulting with the Consultation Parties, (i) assume the Contract(s) or

Lease(s) prior to the resolution of the Cure Objection; provided that the Debtors shall (a) pay to the applicable Counterparty the undisputed portion of the Cure Cost within five (5) business days after entry of the applicable Sale Order and (b) reserve cash in an amount sufficient to pay the disputed portion of the Cure Cost asserted by the applicable Counterparty (or such lesser amount as may be fixed or estimated by the Court or otherwise agreed to by the Counterparty and the Debtors) (the "**Reserve Amount**"), or (ii) adjourn their request to assume the Contract or Lease pending resolution of the Cure Objection (an "**Adjourned Cure Objection**"); provided further that, to the extent the Adjourned Cure Objection is resolved or determined unfavorably to the Debtors, the Debtors may withdraw the proposed assumption of the applicable Contract or Lease after such determination by filing a notice of withdrawal, which, in the case of a Lease, shall be prior to the expiration of the applicable deadline to assume or reject unexpired leases under section 365(d)(4) of the Bankruptcy Code.  The Debtors shall file notice of their intention to reserve for a Cure Cost or to adjourn their request for assumption.  An Adjourned Cure Objection may be resolved after the closing date of the applicable Sale Transaction in the Debtors' discretion.

33.    If a Counterparty fails to file with the Court and serve on the Objection Recipients a timely Cure Objection, the Counterparty shall be forever barred from asserting any objection with regard to the cost to cure any defaults under the applicable Contract or Lease. The Cure Costs set forth in the Assumption and Assignment Notice shall be controlling and will be the only amount necessary to cure outstanding defaults under the applicable Contract or Lease under Bankruptcy Code section 365(b), notwithstanding anything to the contrary in the Contract or Lease, or any other document, and the Counterparty shall be forever barred from asserting any

additional cure or other amounts with respect to such Contract or Lease against the Debtors, the Successful Bidder, or the property of any of them.

34.     In accordance with the Global Bidding Procedures, to qualify as a Qualified Bidder, each Prospective Bidder shall provide with its bid information supporting the Prospective Bidder's (or any other proposed assignee's) ability to comply with the requirement to provide adequate assurance of future performance under Bankruptcy Code section 365(f)(2)(B) and, if applicable, Bankruptcy Code section 365(b)(3), including (i) the Prospective Bidder's financial wherewithal and willingness to perform under Proposed Assumed Contracts and any other Contracts and Leases that may later be designated by the Prospective Bidder (if named a Successful Bidder) for assumption and assignment in connection with a Sale Transaction; and (ii) the identity of any known proposed assignee of applicable Contracts or Leases (if different from the Prospective Bidder) with contact information for such person or entity (such information, "**Adequate Assurance Information**").

35.     If a Stalking Horse Bidder is named a Successful Bidder at the Auction, the Debtors shall, within two (2) business days after the conclusion of the Auction, or as soon as reasonably practicable thereafter, provide or cause to be provided to (i) Counterparties to any additional Proposed Assumed Contracts added to the applicable Stalking Horse Bid at the Auction, and (ii) applicable Counterparties to any known Contracts and Leases that may later be designated by the applicable Stalking Horse Bidder for assumption and assignment pursuant to the terms of the applicable Stalking Horse Agreement, Adequate Assurance Information for the Stalking Horse Bidder.

36.     The Debtors shall, within two (2) business days after the conclusion of the Auction, or as soon as reasonably practicable thereafter, provide or cause to be provided to

18

(i) Counterparties to the Proposed Assumed Contracts included in each Successful Bid (other than a Stalking Horse Bidder), and (ii) Counterparties to any known Contracts and Leases that may later be designated by a Successful Bidder for assumption and assignment pursuant to an asset purchase agreement executed by the applicable Successful Bidder and the Debtors, and (iii) Adequate Assurance Information for such Successful Bidder.

37.     The Debtors shall provide or cause to be provided to applicable Counterparties Adequate Assurance Information on a strictly confidential basis.  Counterparties shall not use any Adequate Assurance Information for any purpose other than to (i) evaluate whether adequate assurance requirements under Bankruptcy Code section 365(f)(2)(B) and, if applicable, Bankruptcy Code section 365(b)(3), have been satisfied, and (ii) to support any Adequate Assurance Objection filed by the Counterparty; provided that, any Adequate Assurance Objection that discloses confidential, non-public information included in the Adequate Assurance Information, which shall be expressly identified as non-public and confidential therein, must be filed with the Court with such confidential, non-public information redacted, unless disclosure of such confidential, non-public information is authorized by the Debtors, the Successful Bidder, and any known proposed assignee(s) of the relevant Contract or Lease (if different from the Successful Bidder), or ordered by the Court.

38.     Any objection to the assumption and assignment of a Proposed Assumed Contract, the subject of which objection is any Stalking Horse Bidder's or Successful Bidder's, as applicable, and/or its known proposed assignee's (if different from the Stalking Horse Bidder's or Successful Bidder's, as applicable) proposed form of adequate assurance of future performance with respect to such Proposed Assumed Contract (an "**Adequate Assurance Objection**"), shall (i) be in writing; (ii) comply with the Bankruptcy Code, Bankruptcy Rules,

and Local Rules; (iii) state, with specificity, the legal and factual bases thereof; (iv) include any appropriate documentation in support thereof; and (v) be filed with the Court and served on the Objection Recipients, including the applicable Stalking Horse Bidder or Successful Bidder, as applicable, and any known proposed assignee of such Proposed Assumed Contract (if different from the Stalking Horse Bidder or Successful Bidder, as applicable) by no later than (a) **the later of (x) fourteen (14) calendar days after service of the Assumption and Assignment Notice and (y) January 7, 2019** with respect to Adequate Assurance Information for a Stalking Horse Bidder for the Go Forward Stores, (b) **eight (8) calendar days after service of the applicable Adequate Assurance Information** with respect to Successful Bidders other than a Stalking Horse Bidder for the Go Forward Stores, and (c) **within fourteen (14) calendar days after service of the applicable Adequate Assurance Information** with respect to all other Assets.

39.     If a timely Adequate Assurance Objection cannot otherwise be resolved by the parties prior to the commencement of the applicable Sale Hearing, such objection and all issues of adequate assurance of future performance with respect to the applicable Proposed Assumed Contract shall be determined by the Court at the Sale Hearing or at a later hearing on a date to be scheduled by the Debtors.

40.     If a Counterparty fails to file with the Court and serve on the Objection Recipients a timely Adequate Assurance Objection, the Counterparty shall be forever barred from asserting any such objection with regard to the Contract or Lease.  The Stalking Horse Bidder or Successful Bidder, as applicable, and/or its known proposed assignee of the Contract or Lease shall be deemed to have provided adequate assurance of future performance with respect to the Contract or Lease in accordance with Bankruptcy Code section 365(f)(2)(B) and, if

20

applicable, Bankruptcy Code section 365(b)(3), notwithstanding anything to the contrary in the Contract or Lease or any other document.

41.     The Debtors' assumption and assignment of a Proposed Assumed Contract to a Successful Bidder (or to a designee of the Successful Bidder) is subject to Court approval and consummation of a Sale Transaction with the applicable Successful Bidder.  Accordingly, absent the closing of a Sale Transaction, the Proposed Assumed Contract shall not be deemed either assumed or assumed and assigned and shall, in all respects, be subject to further administration under the Bankruptcy Code.

42.     The inclusion of a Contract, Lease, or Cure Costs with respect thereto on the Assumption and Assignment Notice or the Notice of Auction Results shall not constitute or be deemed a determination or admission by the Debtors, the Stalking Horse Bidder(s) or Successful Bidders, as applicable, or any other party in interest that such Contract or Lease is an executory contract or an unexpired lease within the meaning of the Bankruptcy Code.  The Debtors reserve all of their rights, claims, and causes of action with respect to each Contract and Lease listed on the Assumption and Assignment Notice and Notice of Auction Results.  The Debtors' inclusion of any Contract or Lease on the Assumption and Assignment Notice or Notice of Auction Results shall not be a guarantee that such Contract or Lease ultimately will be assumed or assumed and assigned.

**General Provisions**

43.     Parties shall serve Counterparties to Contracts and Leases by overnight delivery and by e-mail to counsel for such Counterparties who have filed a notice of appearance in these chapter 11 cases.

44.     All persons and entities (whether or not selected as a Qualified Bidder) that submit a bid for any of the Assets during the sale process, including at an Auction, shall be deemed to have knowingly and voluntarily (i) submitted to the exclusive jurisdiction of this Court with respect to all matters related to the terms and conditions of the transfer of Assets, the Auctions, and any Sale Transaction; (ii) consented to the entry of a final order by the Court in connection with the Motion or this Order (including any disputes relating to the bidding process, the Auctions, and/or any Sale Transaction) to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution; and (iii) waived any right to jury trial in connection with any disputes relating to the any of the foregoing matters.

45.     Prior to mailing and publishing a Sale Notice or an Assumption and Assignment Notice, as applicable, the Debtors may fill in any missing dates and other information, conform the provisions thereof to the provisions of this Order, and make such other, non-material changes as the Debtors deem necessary or appropriate.

46.     Notwithstanding anything in the Motion or this Order to the contrary, any payment made or action taken by any of the Debtors pursuant to the authority granted herein, as well as the exercise of any and all other rights and authorizations granted or approved hereunder, shall be subject in all respects to, as applicable:  (i) the orders approving the Debtors' use of cash collateral and/or post-petition debtor-in-possession financing facilities (collectively, the "**DIP ABL Orders**"); (ii) the other documentation governing the Debtors' use of cash collateral and postpetition financing facilities; and (iii) the Approved Budget (as defined in the DIP ABL Orders).

22

47.     Except with respect to the procedures (including the deadlines set forth in

the Global Bidding Procedures) for consideration of Credit Bids by any insiders or affiliates, the

Debtors' rights are reserved to, in their reasonable business judgment, in a manner consistent

with their fiduciary duties and applicable law and the DIP ABL Documents (as defined in the

DIP ABL Orders), and in consultation with the Consultation Parties, modify these Global

Bidding Procedures; waive terms and conditions set forth herein with respect to all Prospective

Bidders; extend the deadlines set forth herein; announce at the Auction modified or additional

procedures for conducting the Auction; alter the assumptions set forth herein; and provide

reasonable accommodations to any Stalking Horse Bidder with respect to such terms, conditions,

and deadlines of the bidding and Auction process to promote further bids on any Assets

(including extending deadlines as may be required for any Stalking Horse Bidder to comply with

any additional filing and review procedures with the Federal Trade Commission in connection

with its previous HSR Filings), in each case, to the extent not materially inconsistent with these

Global Bidding Procedures and the Global Bidding Procedures Order; provided that the Debtors

may not extend any Bid Deadline without permission of the Court, unless each of the

Consultation Parties agrees to such extension; provided further that nothing herein shall grant the

Debtors the rights to modify the terms of, or constitute a waiver by the DIP ABL Agents or DIP

ABL Lenders of any rights under, the DIP ABL Documents or DIP ABL Orders.  **The Debtors

shall not be obligated to consummate or pursue any transaction with respect to any Asset

pursuant to this Order.**

48.     To the extent there is any inconsistency between the terms of any of the

DIP ABL Orders and this Order, the terms of the DIP ABL Order (or DIP ABL Orders, as

applicable) shall control.

23

49.     Notwithstanding anything to the contrary contained in this Order or in the Global Bidding Procedures or otherwise: (i) any right of the DIP ABL Agents to consent to the sale of any portion of their collateral as set forth in the DIP ABL Credit Agreement, including, without limitation, any Assets, on terms and conditions acceptable to the DIP ABL Agents, are hereby expressly reserved and not modified, waived or impaired in any way by this order or the Global Bidding Procedures; (ii) unless otherwise ordered by the Court, all cash proceeds generated from the sale of any Assets shall be applied in accordance with the terms and conditions of the DIP ABL Documents, the DIP ABL Orders, and the Prepetition ABL Documents, as applicable; and (iii) nothing in this Order or in the Global Bidding Procedures shall amend, modify, or impair any provision of the DIP ABL Orders, or the rights of the Debtors, the DIP ABL Agents or the DIP ABL Lenders thereunder.

50.     Nothing in this Order or the Global Bidding Procedures shall be deemed to authorize or shall be argued to permit the Debtors, their agents or advisors to take any action in connection with an unexpired master lease of nonresidential real property to which a Debtor is a party (each such lease, a "**Master Lease**") or other relief granted in this Order that is not in compliance with, or that would result in a default or breach under, such Master Lease, without either (a) an amendment to or waiver under such Master Lease, in accordance with its terms and all consents required for such amendment or waiver under such Master Lease or (b) the entry of a further order of the Court, in either case, permitting such action; provided that if any property subject to a Master Lease is included in a Sale Transaction and the Debtors or any other party seek to sever a Master Lease applicable to such property, such relief shall be sought by expressly stating that such party is seeking to sever such Master Lease and describing with particularity the Master Lease and any non-Debtor counterparty to that Master Lease will have fourteen (14)

24

calendar days to file and serve an objection to such Sale Transaction; provided further that all rights, remedies, and positions of all parties to any Master Leases are preserved.

51.     Nothing herein shall authorize, absent further order of the Court or agreement among the Debtors and the applicable non-Debtor counterparty, the sale of any real estate rights or assets free and clear of (and shall not extinguish or otherwise diminish) any interests, covenants, or rights applicable to such real estate assets or rights that limit or condition the permitted use of the property such as easements, reciprocal easement agreements, operating or redevelopment agreements, covenants, licenses, or permits (collectively, "**Restrictive Covenants**") that are not executory or that run with the land.  To the extent that the Debtors or any other party seek to sell any real estate rights or assets free and clear of any Restrictive Covenant, the Debtors shall describe with particularity the Restrictive Covenant that the party is seeking to extinguish or otherwise diminish and any non-Debtor counterparty to a Restrictive Covenant will have fourteen (14) calendar days from the filing and service of notice of such requested relief to file and serve an objection thereto. All rights, remedies, and positions of all parties with respect to such relief are preserved.

52.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order.

53.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

Dated: November 19, 2018
      White Plains, New York

                              /s/Robert D. Drain
                              THE HONORABLE ROBERT D. DRAIN
                              UNITED STATES BANKRUPTCY JUDGE

18-23538-shl   Doc 510   Filed 11/19/18   Entered 11/19/18 10:43:18   Main Document
Pg 26 of 68

## Exhibit 1

## Global Bidding Procedures

WEIL:\96790401\21\73217.0004

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re                                                              :
                                                                   :        **Chapter 11**
**SEARS HOLDINGS CORPORATION,** *et al.*,                          :
                                                                   :        **Case No. 18-23538 (RDD)**
                                                                   :
            **Debtors.**[1]                                        :        **(Jointly Administered)**
-----------------------------------------------------------------x

## GLOBAL BIDDING PROCEDURES

      The procedures set forth herein (the "**Global Bidding Procedures**") will be employed in connection with a sale or disposition of certain of the assets of Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**").

      By the *Debtors' Motion for Approval of Global Bidding Procedures* (the "**Motion**"), the Debtors sought, among other things, approval of the Global Bidding Procedures for soliciting bids for, conducting auctions (each, an "**Auction**") of, and consummating sales (each, a "**Sale Transaction**") of their assets, as further described herein.

      On [_____], 2018, the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), entered the an order approving the Motion (ECF No. [___]) (the "**Global Bidding Procedures Order**").[2]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] All capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Motion and the Global Bidding Procedures Order.

To the extent that the Global Bidding Procedures require the Debtors to consult with any Consultation Party in connection with making a determination or taking any action, or in connection with any other matter related to the Global Bidding Procedures or at any Auction, the Debtors shall do so in a regular and timely manner prior to making such determination or taking such action.

# I.
## Description of the Assets

The Debtors are seeking to sell their stores and related assets identified on **Schedule 1** (the "**Go Forward Stores**").  A party who is interested in purchasing any of the Go Forward Stores may submit a bid for all or some of the Go Forward Stores either on a going concern basis or on a liquidation basis.  The Debtors will announce by December 15, 2018 whether they have obtained a Stalking Horse Bidder for the Go Forward Stores.  Parties are also permitted to submit bids for, and the Debtors will consider, in consultation with the Consultation Parties, any other Assets, including bids for liquidation sales or any or all of the Assets, either together with or independent from any bid for all or some of the Go Forward Stores by the Bid Deadline.  Additional details regarding the sale and auction process for the Go Forward Stores and any other assets for sale will be contained in a process letter to be filed with the Court no later than **November 21, 2018**.

Any party interested in submitting a bid for any of the Debtors' Assets should contact the Debtors' investment banker, Lazard Frères & Co., LLC, 30 Rockefeller Plaza, New York, New York 10112 (Attn: Brandon Aebersold and Levi Quaintance (project.blue.rx@lazard.com)).

The sale of any real estate Assets will not be free and clear of (and shall not extinguish or otherwise diminish) any interests, covenants, or rights applicable to such real estate assets or rights that limit or condition the permitted use of the property such as easements, reciprocal easement agreements, operating or redevelopment agreements, covenants, licenses, or permits (collectively, "**Restrictive Covenants**") unless (i) the counterparties to a Restrictive Covenant agree otherwise or (ii) the Court so determines after specific notice that the Debtors are seeking to sell an Asset free and clear of an identified Restrictive Covenant, an opportunity for counterparties to object, and a hearing.

# II.
## Designation of Stalking Horse Bidders

To the extent the Debtors designate a Stalking Horse Bidder with respect to any of the Assets, including the Go Forward Stores, which designation shall be after consultation with the Consultation Parties, the Debtors shall promptly upon execution of a Stalking Horse Agreement (and in no event more than one (1) calendar day following such execution) file a Sale Notice setting forth the material terms of such Stalking Horse Agreement, including any Credit Bid and Stalking Horse Bid Protections, and attaching the Stalking Horse Agreement and proposed sale order.

i.    <u>Objections to Stalking Horse Agreement</u>.  Any objections to the designation of a Stalking Horse Bidder or any other Stalking Horse Bid Protection pursuant to the terms and provisions of a Stalking Horse

2

Agreement, including any Credit Bid or Termination Payment (each, a "**Stalking Horse Designation Objection**") must (i) be in writing; (ii) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules; (iii) state, with specificity, the legal and factual bases thereof; and (iv) be filed with the Court and served on the Objection Recipients within ten (10) calendar days after filing and service of the applicable Sale Notice with respect to all assets other than the Go Forward Stores; provided that if a designated Stalking Horse Bidder is an insider or affiliate of the Debtors, parties in interest will have fourteen (14) calendar days after filing and service of the applicable Sale Notice to file a Stalking Horse Designation Objection. Parties in interest shall have until **December 31, 2018, at 4:00 p.m. (Eastern Time)** to object to the designation of a Stalking Horse Bidder (including any Credit Bid or Stalking Horse Bid Protection) with respect to the sale of the Go Forward Stores.

If a timely Stalking Horse Designation Objection is filed and served in accordance with the preceding paragraph, the proposed Stalking Horse Bid Protections, including any Termination Payment, provided for under such agreement, shall not be approved until the Stalking Horse Designation Objection is resolved, either consensually, by agreement of the objecting party and the Debtors (after consulting with the Consultation Parties), or by order of the Bankruptcy Court resolving such objection.

For the avoidance of doubt, any Stalking Horse Agreement shall not be binding on the Debtors or their estates absent approval (or deemed approval) by the Bankruptcy Court as set forth herein.

ii.    <u>Failure to File Timely Stalking Horse Designation Objection</u>. If no timely Stalking Horse Designation Objection is filed and served with respect to an applicable Stalking Horse Agreement in accordance with the Global Bidding Procedures, the Stalking Horse Bid Protections, including any Termination Payment shall be deemed approved; provided that if an affiliate or insider of the Debtors includes a Credit Bid for part or all of their applicable Stalking Horse Bid, the Debtors will schedule a hearing prior to the commencement of the Auction for determination of such affiliate's ability to Credit Bid, and such affiliate shall not be entitled to Credit Bid at the Auction unless it has received an order of the Court approving its ability to Credit Bid prior to the Auction. Notwithstanding anything to the contrary herein, in the Motion or in the Global Bidding Procedures, for the avoidance of doubt, any affiliate shall be entitled to include a Credit Bid for all or part of its Stalking Horse Bid or Qualified Bid to be submitted by the applicable Bid Deadline and a determination that such Credit Bid constitutes a Qualified Bid may not be made absent an order of the Court.

3

### III.
### Important Dates and Deadlines
### [Assets Other Than Go Forward Stores]

| | |
|---|---|
| **Within ten (10) days of service of the Sale Notice** | Deadline to object to designation of a Stalking Horse Bidder and any Stalking Horse Bid Protections offered to a party that is not an insider or affiliate (including any Credit Bid or Termination Payment) |
| **Within fourteen (14) days of service of the Sale Notice** | Deadline to object to designation of Stalking Horse Bidder and any Stalking Horse Bid Protection offered to an insider or affiliate (including any Credit Bid or Termination Payment) |
| **Within fourteen (14) days of service of the Assumption and Assignment Notice and Adequate Assurance Information for Stalking Horse Bidder, as applicable** | Deadline to object to (i) the Debtors' proposed Cure Costs for Proposed Assumed Contracts in an applicable Stalking Horse Package and (ii) the assumption of and assignment to a Stalking Horse Bidder(s) of any Proposed Assumed Contracts or any Contracts or Leases that may later be designated by a Stalking Horse Bidder for assumption and assignment |
| **No earlier than twenty (20) days following service of the Sale Notice** | Bid Deadline |
| **Subject to Court Availability** | Hearing on Stalking Horse Bidder Objections or Qualification of Affiliate/Insider Credit Bid |
| **Within five (5) days of the Bid Deadline or Court determination** | Deadline for the Debtors to notify Prospective Bidders of their status as Qualified Bidders and announcement of Auction Packages |
| **Not less than twenty-five (25) days following service of the Sale Notice** | Auction |
| **Within two (2) days of the conclusion of the Auction** | Target date for the Debtors to file with the Bankruptcy Court the Notice of Auction Results and to provide applicable Counterparties with Adequate Assurance Information for the Successful Bidders if different than Stalking Horse Bidders |

4

| Ten (10) days following the filing of Notice of Auction Results and service of the Adequate Assurance Information | Deadline to object to (i) the proposed Sale Transaction(s) for Successful Bidders (including Stalking Horse Bidders), (ii) Debtors' proposed Cure Costs for Proposed Assumed Contracts not already included in an applicable Assumption and Assignment Notice, (iii) the assumption of and assignment to a Successful Bidder(s) (including a Stalking Horse Bidder) of any Proposed Assumed Contracts or any Contracts or Leases that may later be designated by such Successful Bidder(s) for assumption and assignment, and (iv) the conduct of the Auction |
|---|---|
| Within five (5) days of the deadline to file Sale Objections | Proposed date of Sale Hearing (subject to the availability of the Court) |

## IV.
## Important Dates and Deadlines
## [Go Forward Stores]

| November 15, 2018 at 10:00 a.m. (ET) | Hearing to consider approval of Global Bidding Procedures and entry of Global Bidding Procedures Order |
|---|---|
| December 5, 2018 | Deadline to Submit Non-Binding Indication of Interest |
| December 15, 2018 | Deadline for the Debtors to designate Stalking Horse Bidder for Go Forward Stores and file a Sale Notice with respect to the Go Forward Stores designating a Stalking Horse Bidder |
| December 28, 2018 at 4:00 p.m. (ET) | Bid Deadline for Go Forward Stores |
| December 31, 2018 at 4:00 p.m. (ET) | Deadline to object to the designation of a Stalking Horse Bidder and any Stalking Horse Bid Protections offered for the Go Forward Stores (including any Credit Bid or Termination Payment) |
| The later of (i) fourteen (14) calendar days after service of the Assumption and Assignment Notice and (y) January 7, 2019 | Deadline to object to (i) proposed Cure Costs for Proposed Assumed Contracts in a Stalking Horse Bid for the Go Forward Stores and (ii) Adequate Assurance Information for Stalking Horse Bidder for Go Forward Stores |
| January 4, 2019 at 4:00 p.m. (ET) | Deadline for the Debtors to notify Prospective Bidders of their status as Qualified Bidders and announcement of Auction Packages |
| January 10, 2019 at 10:00 a.m. (ET) | Proposed date of hearing on Stalking Horse Designation Objections and on objections to the qualification of any Credit Bid by affiliate or insider, if necessary (subject to the availability of the Court) |

| January 14, 2019 at 10:00 a.m. (ET) | Auction for Go Forward Stores to be conducted at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 |
|---|---|
| January 16, 2019 | Target date for the Debtors to file with the Bankruptcy Court the Notice of Auction Results and to provide the applicable Counterparty with Adequate Assurance Information for the Successful Bidder if different than the Stalking Horse Bidder |
| The later of (i) January 24, 2019 at 4:00 p.m. (ET) and (ii) eight (8) days of the filing of the Notice of Auction Results and service of the Adequate Assurance Information | Deadline to object to (i) the proposed Sale Transaction for a Successful Bidder (including a Stalking Horse Bidder), (ii) Debtors' proposed Cure Costs for Proposed Assumed Contracts not included in any Stalking Horse Bid, (iii) the assumption of and assignment to a Successful Bidder that is not a Stalking Horse Bidder of any Proposed Assumed Contracts or any Contracts or Leases that may later be designated by such Successful Bidder for assumption and assignment, and (iv) conduct of the Auction |
| January 29, 2019 at 4:00 p.m. (ET) or two (2) days prior to the Hearing Date | Debtors' Deadline to Reply to Sale Objections |
| January 31, 2019 at 10:00 a.m. (ET) | Proposed date of Sale Hearing (subject to the availability of the Court) |

## V.
## Noticing

### A.    Consultation Parties

Throughout the sale process, the Debtors and their advisors will regularly and timely consult with the following parties (collectively, the "**Consultation Parties**"):

i.    Bank of America, N.A., in its capacity as the administrative agent under the First Lien Credit Facility and DIP ABL Agent and its advisors, including Skadden, Arps, Slate, Meagher & Flom LLP; and Berkeley Research Group, LLC;

ii.    Wells Fargo Bank, National Association, in its capacity as Co-Collateral Agent under the First Lien Credit Facility and Co-Collateral Agent under the DIP ABL Facility (as defined in the DIP ABL Orders) (together with Bank of America, N.A., the "**DIP ABL Agents**") and its advisors, including Choate, Hall & Stewart LLP; and

iii.    the official committee of unsecured creditors appointed in the Debtors' chapter 11 cases (the "**Creditors' Committee**") and its advisors, including Akin Gump Strauss Hauer & Feld LLP.

6

The Debtors shall promptly provide copies of all bids and non-binding indications of interest received by the Debtors to the Consultation Parties, but in no event later than the next calendar day after such bid is received; provided that the Consultation Parties must treat such bids and any related information as confidential and shall not publicly disclose such information without the written consent of the Debtors and the applicable bidder; provided, further that any bids by an insider or affiliate must be provided to the Consultation Parties at the same time such bids are provided to the Debtors.

The Debtors shall not consult with or provide copies of bids regarding any assets to any Consultation Party or any insider or affiliate of the Debtors pursuant to the terms of these Global Bidding Procedures if such party has a bid for the Assets pending, or expressed any written interest in bidding for any of the Assets; provided, however, that if such Consultation Party or insider or affiliate of the Debtors chooses not to submit any bid, then such party may receive copies of all bids following expiration of the latest possible Bid Deadline (as such Bid Deadline may be extended hereunder). Notwithstanding the foregoing, if a member of the Creditors' Committee submits a Qualified Bid (as hereinafter defined), the Creditors' Committee will maintain its consultation rights as a Consultation Party; provided that the Creditors' Committee shall exclude such member from any discussions or deliberations regarding a transaction involving the applicable Assets, and shall not provide any confidential information regarding the Assets or a transaction involving the Assets to the bidding committee member.

For the avoidance of doubt, any consultation rights afforded to the Consultation Parties by these Global Bidding Procedures shall not limit the Debtors' discretion in any way and shall not include the right to veto any decision made by the Debtors in the exercise of their reasonable business judgment. Rights that Consultation Parties may have pursuant to the terms of other agreements or orders of the Court shall not be affected by these Global Bidding Procedures or the Global Bidding Procedures Order.

## B.    Bid Notice Parties

Qualified Bids must be submitted in writing to the following parties (collectively, the "**Bid Notice Parties**"):

   i.    the Debtors (Attn: Rob Riecker (rob.riecker@searshc.com); Luke Valentino (luke.valentino@searshc.com); and Mohsin Meghji (mmeghji@miiipartners.com));

   ii.    counsel to the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, P.C. (ray.schrock@weil.com); Jacqueline Marcus, Esq. (jacqueline.marcus@weil.com); Garrett A. Fail, Esq. (garrett.fail@weil.com); and Sunny Singh, Esq. (sunny.singh@weil.com));

   iii.    the Debtors' investment banker, Lazard Frères & Co., LLC, 30 Rockefeller Plaza, New York, New York 10112 (Attn: Brandon Aebersold and Levi Quaintance (project.blue.rx@lazard.com)); and

7

    iv.      to the extent such bid is submitted by an insider or affiliate of the Debtors, each of the Consultation Parties.

**C.**    **Sale Notice Parties**

The "**Sale Notice Parties**" shall include the following persons and entities:

    i.      the Consultation Parties (as applicable);

    ii.      the Standard Parties (as defined in the *Amended Order Implementing Certain Notice and Case Management Procedures* (ECF No. 405));

    iii.      any governmental authority known to have a claim against the Debtors in these chapter 11 cases;

    iv.      all applicable federal, state, and local taxing and regulatory authorities, including the Internal Revenue Service;

    v.      all environmental authorities having jurisdiction over any of the Assets, including the Environmental Protection Agency;

    vi.      the United States Attorney General;

    vii.      the United States Attorney for the Southern District of New York;

    viii.      the Office of the Attorney General and Office of the Secretary of State in each state in which the Debtors operate;

    ix.      the Antitrust Division of the United States Department of Justice;

    x.      the Federal Trade Commission;

    xi.      Cardtronics USA, Inc.;

    xii.      all entities known or reasonably believed to have asserted a lien, encumbrance, claim or other interest in any of the assets offered for sale;

    xiii.      all Counterparties to Contracts and Leases (including any reciprocal easement agreements) that could be assumed or rejected in connection with a Sale Transaction and any additional Contracts or Leases that may be designated for assumption and assignment;

    xiv.      all persons and entities known by the Debtors to have expressed an interest to the Debtors in a transaction involving any material portion of the Assets during the past twelve (12) months, including any person or entity that has submitted a bid for any material portion of the Assets;

8

xv.     any consumer privacy ombudsman appointed under section 332 of the Bankruptcy Code;

xvi.    all of the persons and entities entitled to notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"); and

xvii.   all other persons and entities as directed by the Bankruptcy Court.

Within one (1) calendar day after the (a) execution of any Stalking Horse Agreement, including with respect to the Go Forward Stores and (b) determination by the Debtors to auction an asset without a Stalking Horse Bidder, the Debtors shall file with the Bankruptcy Court, serve on the Sale Notice Parties, and cause to be published on the Prime Clerk Website a notice (the "**Sale Notice**"), setting forth (i) a complete list and general description of the Assets (subject to modification at any Auction); (ii) the date, time, and place of the (x) Auction and (y) Sale Hearing; (z) Sale Objection Deadlines; and (aa) the procedures for objecting to the proposed Sale Transaction(s)

As soon as reasonably practicable following, but no later than five (5) business days after the execution of a Stalking Horse Agreement with respect to the Go Forward Stores, the Debtors shall cause the information contained in the Sale Notice to be published once in at least one national publication.

**D.      Objection Recipients**

Sale Objections shall be filed with the Bankruptcy Court and served on the following parties (collectively, the "**Objection Recipients**"): (i) the Bid Notice Parties; (ii) the Consultation Parties; and (iii) counsel to the relevant Stalking Horse Bidder, if applicable, or Successful Bidder (as hereinafter defined) at the applicable Auction by no later than (a) with respect to the sale of the Go Forward Stores to a Successful Bidder, including a Stalking Horse Bidder, the later of (x) **January 24, 2019 at 4:00 p.m. (Eastern Time)** and (y) eight (8) days after the filing of the Notice of Auction Results and service of the Adequate Assurance Information and (b) with respect to the sale of all other Assets, including a sale to an applicable Stalking Horse Bidder, within ten (10) days of the filing of the Notice of Auction Results and service of the Adequate Assurance Information (the "**Sale Objection Deadline**"); provided that, the Debtors may extend the Sale Objection Deadline, as the Debtors deem appropriate in the exercise of their reasonable business judgment after consultation with the Consultation Parties.

**E.      Notices Regarding Assumption and Assignment**

The Debtors shall provide all notices regarding the proposed assumption, assignment, and designation of Contracts and Leases in accordance with the Global Bidding Procedures Order

# VI.
## Bidder Qualifications

Each person or entity that desires to participate in any Auction (each, a "**Prospective Bidder**") as determined by the Debtors, after consultation with the Consultation Parties, shall satisfy each of the following eligibility requirements:

### A.    Due Diligence

To be eligible to participate in an Auction, a Prospective Bidder must first execute a confidentiality agreement, in form and substance satisfactory to the Debtors.  Upon execution of a valid confidentiality agreement, any Prospective Bidder identified by the Debtors, after consultation with the Consultation Parties, to be reasonably likely to be a Qualified Bidder (as hereinafter defined) that wishes to conduct due diligence on the Assets may be granted access to confidential information regarding the same, including an information package containing information and financial data with respect to the applicable Assets and access to a data room (the "**Data Room**") with confidential electronic data concerning the Assets.  If the Debtors, after consultation with the Consultation Parties, determine that a Prospective Bidder does not qualify as a Qualified Bidder, the Prospective Bidder shall not be entitled to access to the Data Room or receive additional non-public information regarding the Debtors' businesses, the Assets, or the sale process.

Promptly upon a Prospective Bidder entering into a confidentiality agreement, but in any event no later than the next calendar day following such event, the Debtors will notify each of the Consultation Parties and provide to such Consultation Parties copies of such executed confidentiality agreements.

The Debtors will work to accommodate all reasonable requests for additional information and due diligence access from Prospective Bidders.  All due diligence requests shall be directed to the Debtors' investment banker, Lazard Frères & Co., LLC, 30 Rockefeller Plaza, New York, New York 10112 (Attn: Brandon Aebersold and Levi Quaintance (project.blue.rx@lazard.com)).

### B.    Non-Binding Indication of Interest Date for Go Forward Stores

If you are interested in purchasing any of the Go Forward Stores, whether individually, in combination, or in connection with a Stalking Horse Store Package, you are encouraged contact the Debtors' advisors by **December 5, 2018** (the "**Non-Binding Indication of Interest Date**"), in writing expressing your interest and identifying the Assets in which you are expressing such interest to Lazard Frères & Co., LLC, 30 Rockefeller Plaza, New York, New York 10112 (Attn: Brandon Aebersold and Levi Quaintance (project.blue.rx@lazard.com))

Note that submitting an indication of interest by the Non-Binding Indication of Interest Date does not obligate you to submit a formal bid or to participate in the sale process and does not exempt you from also having to submit a Qualified Bid by the applicable Bid Deadline (defined below) in order to participate in any subsequent Auction for the Assets on which you are indicating an interest, all as described below.

## C.    Bid Deadline

Any Prospective Bidder that intends to participate in an Auction must submit a Qualified Bid (as hereinafter defined) on or before **December 28, 2018, at 4:00 p.m. (Eastern Time)** with respect to the Go Forward Stores and within twenty (20) days of service of the applicable Sale Notice with respect to all other Assets (each, a "**Bid Deadline**") in writing to the Bid Notice Parties.

The Debtors may, in consultation with the Consultation Parties and consistent with the terms of the DIP ABL Documents (as defined in the DIP ABL Orders), extend a Bid Deadline for any reason whatsoever, in their reasonable business judgment, for all or certain Prospective Bidders, provided that the Debtors shall not extend any Bid Deadline without permission of the Court, unless each of the Consultation Parties agrees to such extension, provided, further, that the Debtors are authorized to seek such permission on expedited notice and hearing.  For the avoidance of doubt, any such extension shall not affect any applicable milestones under the DIP ABL Orders.

## D.    Qualified Bid Requirements

To qualify as a "**Qualified Bid**," a bid must (i) be a Stalking Horse Bid, or (ii) be in writing and determined by the Debtors, after consultation with the Consultation Parties, to satisfy the following requirements:

1.    <u>Identification of Bidder</u>.  A Qualified Bid must fully disclose the legal identity of each person or entity bidding for the Assets or otherwise participating in the Auction in connection with such bid (including any equity holders or other financial backers, if the Prospective Bidder is an entity formed for the purpose of submitting bids or consummating a Sale Transaction), and the complete terms of any such participation, and must also disclose any connections, arrangements, or agreements, whether oral or written, with the Debtors, any other known Prospective Bidder or Qualified Bidder, and/or any officer or director of the foregoing.

2.    <u>Proposed APA</u>.  A Qualified Bid must include an executed asset purchase agreement (the "**Proposed APA**") with a redline marked to show any proposed amendments and modifications to the Stalking Horse Agreement (if any).

3.    <u>Purchased Assets</u>.  A Qualified Bid must clearly identify the following:

a.    the Assets to be purchased, including any Contracts and Leases of the Debtors that would be assumed and assigned in connection with the proposed Sale Transaction (all such Contracts and Leases, the "**Proposed Assumed Contracts**");

b.    with respect to a bid for multiple Assets, the allocation of value in U.S. dollars that the Prospective Bidder associates with each Asset

11

(or group of Assets if such bid is conditioned upon the purchase of all Assets in such group), including a description of any significant assumptions on which such valuation is based;

c.      the liabilities, if any, to be assumed, including any debt to be assumed; and

d.      the Credit Bid or Landlord Bid (each as hereinafter defined), or non-cash consideration, if applicable, and/or the cash purchase price of the bid.

4.      <u>Form of Consideration</u>.

a.      <u>Credit Bidding</u>.  Persons or entities holding a perfected security interest in Assets may seek to Credit Bid, to the extent permitted by applicable law and the documentation governing the Debtors' prepetition credit facilities; provided that if an affiliate or insider of the Debtors includes a Credit Bid for part or all of their applicable Stalking Horse Bid, the Debtors will schedule a hearing prior to the commencement of the Auction for determination of such affiliate's ability to Credit Bid, and such affiliate shall not be entitled to Credit Bid at the Auction unless it has received an order of the Court approving its ability to Credit Bid prior to the Auction and compliant with the DIP ABL Orders.  Each of the DIP ABL Agents shall be deemed a Qualified Bidder and shall be entitled to Credit Bid all or a portion of its respective DIP ABL Obligations or Prepetition ABL Obligations (each as defined in the DIP ABL Orders) as applicable, in accordance with section 363(k) of the Bankruptcy Code.

Notwithstanding anything to the contrary herein, in the Motion or in the Global Bidding Procedures, for the avoidance of doubt, any affiliate shall be entitled to include a Credit Bid for all or part of its Stalking Horse Bid or Qualified Bid to be submitted by the applicable Bid Deadline and a determination that such Credit Bid constitutes a Qualified Bid may not be made absent an order of the Court.

b.      <u>Landlord Bid</u>.  Subject to the Debtors' discretion to consider such bids, any bid submitted by a landlord for the purchase of one of more of such landlord's own Leases (each such bid, a "**Landlord Bid**") may include a purchase price comprised of a (i) cash component, and (ii) a non-cash component that represents a valid and undisputed "credit" for any unpaid amounts validly due under such Lease (a "**Landlord Credit**") to reduce the cash consideration for the applicable Lease, but not the Good Faith Deposit (as hereinafter defined) required.

12

c.    <u>Other Non-Cash Consideration</u>. Subject to the Debtors' discretion to consider such bids, in consultation with the Consultation Parties, a bid may be in the form of or include non-cash consideration such as stock or debt securities.

d.    <u>Cash Requirements</u>. All bids must provide sufficient consideration for the payment of any applicable Termination Payment in cash in full. Any Credit Bid must include a cash component sufficient to pay any applicable Termination Payment and all obligations secured by senior liens on the applicable Assets.

5.    <u>Good Faith Deposit</u>. Other than bids that are comprised entirely of a Credit Bid or a Landlord Bid (as permitted hereunder), a Qualified Bid must be accompanied by a "**Good Faith Deposit**" in the form of cash in the amount equal to at least ten percent (10%) of the cash portion of the proposed purchase price. A Good Faith Deposit is required for any bid that includes a cash component, including any bid that is part cash and part Credit Bid or Landlord Bid. The Debtors may require a higher Good Faith Deposit in their discretion, after consultation with the Consultation Parties, as necessary to protect the interests of their estates or to maximize value. Good Faith Deposits shall be deposited prior to the Bid Deadline, with an escrow agent selected by the Debtors (the "**Escrow Agent**"), pursuant to the escrow agreement to be provided by the Debtors to Prospective Bidders, and Qualified Bidders shall provide information reasonably requested by the Escrow Agent to establish the deposit, including KYC information. All Good Faith Deposits shall be held in escrow until no later than ten (10) days after the conclusion of the Auction (except for the Good Faith Deposits of the Successful Bidder(s) and Back-Up Bidder(s)), and thereafter returned to the respective bidders in accordance with the provisions of Part IX of these Global Bidding Procedures.

To the extent that a bid is modified at or prior to the Auction, the bidder must adjust its Good Faith Deposit so that it equals no less than the required deposit to purchase the applicable Assets.

6.    <u>Financial Information</u>. A Qualified Bid must include the following:

a.    a statement that the Prospective Bidder is financially capable of consummating the Sale Transaction(s) contemplated by the Proposed APA;

b.    if applicable, and except for a Landlord Bid, information supporting the Prospective Bidder's (or any other proposed assignee's) ability to comply with the requirement to provide adequate assurance of future performance under Bankruptcy Code section 365(f)(2)(B) and, if applicable, Bankruptcy Code section

13

365(b)(3), including (i) the Prospective Bidder's financial wherewithal and willingness to perform under Proposed Assumed Contracts and any other Contracts and Leases that may later be designated by the Prospective Bidder (if named a Successful Bidder) for assumption and assignment in connection with a Sale Transaction; and (ii) the identity of any known proposed assignee of applicable Contracts or Leases (if different from the Prospective Bidder) with contact information for such person or entity (such information, "**Adequate Assurance Information**"). The Adequate Assurance Information may, but shall not be required to include (a) a corporate organizational chart or similar disclosure identifying ownership and control of the proposed assignee of applicable Contracts and Leases; (b) financial statements, tax returns, and annual reports, (c) any financial projections, calculations, and/or financial pro-formas prepared in contemplation of purchasing leases, (d) the number of stores the proposed assignee operates and al trade names that the proposed assignee uses, (e) the proposed assignee's intended use of the leased premises, (f) the proposed assignee's experience in retail and in operating in-line and/or anchor stores in a shopping center; and (g) a contact person for the proposed assignee; and

c.      sufficient evidence, as reasonably determined by the Debtors, to allow the Debtors, in consultation with the Consultation Parties, to determine that the Prospective Bidder has, or can obtain, the financial wherewithal to consummate the Sale Transactions contemplated in the Prospective Bidder's Proposed APA in a timely manner, including copies of any commitment letters.

7.    <u>Representations and Warranties</u>. A Qualified Bid must include the following representations and warranties:

a.      a statement that the Prospective Bidder has had an opportunity to conduct any and all due diligence regarding the applicable Assets prior to submitting its bid;

b.      a statement that the Prospective Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the Assets in making its bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Assets or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Prospective Bidder's Proposed APA ultimately accepted and executed by the Debtors; and

14

     c.      a statement that it has not engaged in any collusion with respect to the submission of its bid.

8.    <u>Required Approvals</u>. A Qualified Bid must include a statement or evidence (i) that the Prospective Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("**HSR Filings**"), as amended, if applicable, and pay the fees associated with such filings; and (ii) identifying all required governmental and regulatory approvals and an explanation and/or evidence of the Prospective Bidder's plan and ability to obtain all governmental and regulatory approvals required from and after closing an applicable Sale Transaction and the proposed timing for the Prospective Bidder to undertake the actions required to obtain such approvals. A Prospective Bidder further agrees that its legal counsel will coordinate in good faith with the Debtors' legal counsel to discuss and explain the Prospective Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable, and in no event later than the time period contemplated in the Proposed APA.

9.    <u>Authorization</u>. A Qualified Bid must include evidence of corporate authorization and approval from the Prospective Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of a bid, participation in the Auction, and closing of the transactions contemplated by the Prospective Bidder's Proposed APA in accordance with the terms of the bid and these Global Bidding Procedures.

10.    <u>Other Requirements</u>. A Qualified Bid shall

     a.      expressly state that the Prospective Bidder agrees to serve as a back-up bidder (a "**Back-Up Bidder**") if such bidder's Qualified Bid is selected as the next highest or next best bid after the Successful Bid (as hereinafter defined) with respect to the applicable Assets;

     b.      state that the bid is formal, binding, and unconditional (except as set forth in an applicable asset purchase agreement ultimately executed by the Debtors); is not subject to any further due diligence; and is irrevocable until the first business day following the close of a Sale Transaction for the applicable Assets;

     c.      with the exception of any Stalking Horse Bid, expressly state and acknowledge that the Prospective Bidder shall not be entitled to any break-up fee, expense reimbursement, or other bid protection in connection with the submission of a bid for the Assets or otherwise participating in the Auction or sale process, unless

15

<div style="padding-left:4em">

otherwise granted by the Debtors, in consultation with the Consultation Parties, in accordance with these Global Bidding Procedures and approved by the Bankruptcy Court;

d.    expressly waive any claim or right to assert any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code in connection with bidding for the Assets and/or participating in the Auction;

e.    not contain any financing or diligence contingencies of any kind;

f.    be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors in consultation with the Consultation Parties;

g.    a covenant to cooperate with the Debtors to provide pertinent factual information regarding the Prospective Bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements;

h.    include contact information for the specific person(s) the Debtors should contact in the event they have questions about the Prospective Bidder's bid; and

i.    a covenant to comply with the terms of the Global Bidding Procedures and the Global Bidding Procedures Order.

</div>

For the avoidance of doubt, a Stalking Horse Bid is a Qualified Bid that complies with or is exempted from the foregoing requirements.

Notwithstanding the foregoing or anything contained in these Global Bidding Procedures to the contrary, the Debtors reserve the right to, in consultation with the Consultation Parties, consider Landlord Bids (and any bid for less than all of the Assets in a Stalking Horse Bid, each such bid, a "**Partial Bid**," that include Landlord Bids). A Landlord Bid may qualify as a Qualified Bid if such bid complies with the Qualified Bid requirements set forth in Paragraphs 1, 4(b), 6, 7, 9, and 10 of this Section VI.C. For the avoidance of doubt, Landlord Bids shall not be required to include any Adequate Assurance Information with respect to the bidding landlord's ability to perform under its own Lease.

**D.    Qualified Bidders**

A bid received for the Assets that is determined by the Debtors, in consultation with the Consultation Parties, to meet the requirements set forth in Section VI. C above will be

<div align="center">16</div>

considered a "Qualified Bid," and any bidder that submits a Qualified Bid (including any Stalking Horse Bid) will be considered a "**Qualified Bidder**."

The Debtors may, after consulting with the Consultation Parties, amend or waive the conditions precedent to being a Qualified Bidder at any time, in their reasonable business judgment and in consultation with the Consultation Parties, in a manner consistent with their fiduciary duties and applicable law (as reasonably determined in good faith by the Debtors in consultation with their outside legal counsel).

## VII.
## Bid Review Process

The Debtors will evaluate timely bids, at the direction of the Restructuring Committee and in regular and timely consultation with the Consultation Parties and, may, based upon their evaluation of the content of each bid, engage in negotiations with Prospective Bidders who submitted bids, as the Debtors deem appropriate, in their reasonable business judgment, and in a manner consistent with their fiduciary duties and applicable law. In evaluating the bids, the Debtors may take into consideration the following non-binding factors:

1. the amount of the purchase price and Credit Bid, Landlord Credit, and/or other non-cash consideration, as applicable, set forth in the bid;

2. the Assets included in or excluded from the bid, including any Proposed Assumed Contracts;

3. the value to be provided to the Debtors under the bid, including the net economic effect upon the Debtors' estates, taking into account any Stalking Horse Bidder's rights to any Termination Payment;

4. any benefit to the Debtors' bankruptcy estates from any assumption of liabilities or waiver of liabilities, including the release or replacement of letters of credit;

5. the transaction structure and execution risk, including conditions to, timing of, and certainty of closing; termination provisions; availability of financing and financial wherewithal to meet all commitments; and required governmental or other approvals;

6. the impact on employees and employee claims against the Debtors;

7. the impact on trade creditors and landlords; and

8. any other factors the Debtors may reasonably deem relevant consistent with their fiduciary duties.

The Debtors, after consultation with the Consultation Parties, will make a determination regarding which bids qualify as a Qualified Bids, and will notify Prospective Bidders whether they have been selected as Qualified Bidders by no later than **January 4, 2019** with respect to

the Go Forward Stores and within five (5) days of the applicable Bid Deadline with respect to the all other Assets.

The Debtors reserve the right, in consultation with the Consultation Parties, to work with any Prospective Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualified Bid. The Debtors, at the direction of the Restructuring Committee and after consultation with the Consultation Parties, may accept a single bid or multiple Partial Bids for non-overlapping Assets such that, if taken together, would otherwise meet the standards for a single Qualified Bid as to any Assets or combinations of Assets that the Debtors determine to auction (in which event those multiple bidders shall be treated as a single Qualified Bidder for purposes of the Auction). Without the prior written consent of the Debtors, after consulting with the Consultation Parties, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the purchase price or otherwise improve the terms of the Qualified Bid.

At the direction of the Restructuring Committee, and after consultation with the Consultation Parties, the Debtors shall make a determination regarding the following:

    (A)    the Assets and/or any combination of the Assets to be auctioned by the Debtors, which may include any individual Assets or combinations of Assets, including any Stalking Horse Package (each group of Assets, an "**Auction Package**");

    (B)    the highest or best Qualified Bid (or collection of Partial Bids comprising one Qualified Bid) for each Auction Package (each, a "**Baseline Bid**" and, such bidder or group of bidders, a "**Baseline Bidder**") to serve as the starting point at the Auction for such Auction Package; and

    (C)    which bids have been determined to be Qualified Bids and the Auction Package applicable to such Qualified Bid; provided that the Debtors may permit a Qualified Bidder to bid on more than one Auction Package.

As soon as practicable, but in no event later than the next calendar day, the Debtors will provide copies of each Baseline Bid to the Consultation Parties. The Debtors will consult with the Consultation Parties regarding the designation of Baseline Bids and advise the Consultation Parties of the designated Baseline Bids within one (1) calendar day of the Debtors' determination of Baseline Bids.

## VIII.
## Auctions

With respect to any Stalking Horse Package, if no Qualified Bid other than the applicable Stalking Horse Bid is received by the Bid Deadline, the Debtors will not conduct an Auction for the Stalking Horse Package and shall file with the Bankruptcy Court, serve on the Sale Notice Parties, and cause to be published on the Prime Clerk Website a notice indicating that the Auction for the Stalking Horse Package has been canceled and that the Stalking Horse Bidder is

the Successful Bidder with respect to the Stalking Horse Package, and setting forth the date and time of the applicable Sale Hearing.

With respect to Assets not included in any Stalking Horse Package, if only one Qualified Bid is received in respect of such assets by the applicable Bid Deadline, the Debtors may, upon direction from the Restructuring Committee and in consultation with the Consultation Parties, determine to consummate a Sale Transaction with the applicable Qualified Bidder (without conducting an Auction for the applicable Assets) and shall file with the Bankruptcy Court, serve on the Sale Notice Parties, and cause to be published on the Prime Clerk Website a notice identifying the Qualified Bidder and setting forth the terms of the Qualified Bid and the date and time of the applicable Sale Hearing.

**Nothing herein shall obligate the Debtors to consummate or pursue any transaction with respect to any Asset.**

An Auction, if any, will be conducted at the offices of Weil, Gotshal & Manges, LLP, 767 Fifth Avenue, New York, New York 10153 on **January 14, 2018, at 10:00 a.m. (Eastern Time)** with respect to the Go Forward Stores and not less than twenty-five (25) days following service of the applicable Sale Notice with respect to all other Assets at a location to be announced, or at such other time and location as designated by the Debtors, consistent with the terms of the DIP ABL Documents, in consultation with the Consultation Parties and providing notice to the Sale Notice Parties. If held, the proceedings of an Auction will be transcribed and/or video recorded.

## A.    Participants and Attendees

Only Qualified Bidders are eligible to participate in the applicable Auction, subject to other limitations as may be reasonably imposed by the Debtors in accordance with these Global Bidding Procedures.  Qualified Bidders participating in an Auction must appear in person at the Auction, or through a duly authorized representative.  Auctions will be conducted openly, and the Consultation Parties, their professional advisors, and all creditors will be permitted to attend; provided that the Debtors may, in their reasonable business judgment, and after consultation with the Consultation Parties, establish a reasonable limit on the number of representatives and/or professional advisors that may appear on behalf of or accompany each Qualified Bidder and other parties in interest at an Auction.

Each Qualified Bidder participating in an Auction will be required to confirm in writing and on the record at an Auction that (i) it has not engaged in any collusion with respect to the submission of any bid or the Auction and (ii) its Qualified Bid represents a binding, good faith, and bona fide offer to purchase the Assets identified in such bid if selected as the Successful Bidder.

## B.    Auction Procedures

Auctions shall be governed by the following procedures, subject to the Debtors' right to modify such procedures in their reasonable business judgment, in consultation with the Consultation Parties, and in a manner consistent with their fiduciary duties and applicable law:

19

1.   <u>Baseline Bids</u>.  Bidding for each Auction Package shall commence at the amount of the Baseline Bid (or combination of Baseline Bids).

2.   <u>Minimum Overbid</u>.  Qualified Bidders may submit successive bids higher than the previous bid, based on and increased from the applicable Baseline Bid.  The Debtors shall, in consultation with the Consultation Parties, announce at the outset of the Auction the minimum required increments for successive Qualified Bids (each such bid, a "**Minimum Overbid**").  The Debtors may, in their reasonable business judgment, and in consultation with the Consultation Parties, announce increases or reductions to Minimum Overbids at any time during the Auction.

   a.   <u>Stalking Horse Credit for Termination Payment</u>.  If a Qualified Bidder who is not a Stalking Horse Bidder bids at an Auction for a Stalking Horse Package, the applicable Stalking Horse Bidder will be entitled to a "credit" in the amount of the applicable Termination Payment to be counted toward its bid.  The cash and other considerations proposed by such Qualified Bidder must exceed the applicable Stalking Horse Bid by the purchase price contained in the Stalking Horse Bid, plus the Termination Payment, by at least the amount of the Minimum Overbid to advance to the next round of bidding.  To the extent that a Stalking Horse Bidder submits a competing bid for its Stalking Horse Package, the Stalking Horse Bidder will be entitled to a "credit" in the amount of the applicable Termination Payment to be counted toward its bid and the computation of the Minimum Overbid for bidders to advance to the next round of bidding with respect to the Stalking Horse Package.

3.   <u>Highest or Best Offer</u>.  After the first round of bidding and between each subsequent round of bidding, the Debtors, after consulting with the Consultation Parties, shall announce the bid that they believe to be the highest or best offer (or combination of offers) for an Auction Package (each such bid, a "**Leading Bid**").  Each round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a subsequent bid with full knowledge of the Leading Bid.

   Auctions may include open bidding in the presence of all other Qualified Bidders.  All Qualified Bidders shall have the right to submit additional bids and make modifications to their proposed agreements at an Auction to improve their bids, including by bidding on additional Assets not included in their original Qualified Bid.  The Debtors may, in their reasonable business judgment, and in consultation with the Consultation Parties, negotiate with any and all Qualified Bidders participating in an Auction.

20

The Debtors shall have the right, after consultation with the Consultation Parties, to withdraw any Assets from an Auction that are not in a Stalking Horse Package and to determine, in their reasonable business judgment, in consultation with the Consultation Parties, which bid is the highest or best bid and reject, at any time, any bid that the Debtors deem to be inadequate or insufficient, not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, these Global Bidding Procedures, the DIP ABL Documents, any order of the Bankruptcy Court, or the best interests of the Debtors and their estates; except that, if a Stalking Horse Bid as reflected in a Stalking Horse Agreement is the only Qualified Bid received in respect of the applicable Stalking Horse Package, the foregoing shall be inoperative with respect to the Stalking Horse Bid.  No attempt by the Debtors to reject a bid pursuant to this paragraph will modify any rights of the Debtors or the Stalking Horse Bidder under any Stalking Horse Bidder under any Stalking Horse Agreement (although the same may be consensually modified during an Auction).

## C.    Auction Results

1.    <u>Successful Bids</u>.  Immediately prior to the conclusion of an Auction, the Debtors shall, in consultation with the Consultation Parties, (i) determine, consistent with these Global Bidding Procedures, which Qualified Bids constitute the highest or best Qualified Bids for each of the Auction Packages (each such bid, a "**Successful Bid**"); and (ii) notify all Qualified Bidders at the Auction of the identity of the bidders who submitted the Successful Bids (each such bidder, a "**Successful Bidder**") and the amount of the purchase prices and other material terms of the Successful Bids.

A Successful Bidder shall, within one (1) business day after the conclusion of the applicable Auction, submit to the Debtors fully executed revised documentation memorializing the terms of the Successful Bid.  The Successful Bid may not be assigned to any party without the consent of the Debtors after consulting with the Consultation Parties.

2.    <u>Back-Up Bids</u>. Immediately prior to the conclusion of an Auction, the Debtors shall, in consultation with the Consultation Parties, (i) determine, consistent with these Global Bidding Procedures and the DIP ABL Documents, and except as provided in any Stalking Horse Agreement, which Qualified Bid is the next highest or next best Qualified Bid after the Successful Bid for an Auction Package (each such bid, a "**Back-Up Bid**"); and (ii) notify all Qualified Bidders at the Auction of the identities of the Back-Up Bidders and the amount of the purchase prices and other material terms of the Back-Up Bids.

21

The Back-Up Bids shall remain open and irrevocable until the earliest to occur of (i) the first business day after the consummation of a Sale Transaction with the Successful Bidder for the applicable Asset; (ii) forty-five (45) days after the conclusion of the applicable Auction; and (iii) the release of the applicable Back-Up Bid by the Debtors (such date, the "**Back-Up Bid Expiration Date**").  If the Sale Transaction with a Successful Bidder is terminated prior to the Back-Up Bid Expiration Date, the applicable Back-Up Bidder shall be deemed the new Successful Bidder and shall be obligated to consummate the Back-Up Bid as if it were the Successful Bid at the applicable Auction.

The Debtors will, within two (2) business days after the conclusion of an Auction, or as soon as reasonably practicable thereafter, file with the Bankruptcy Court, serve on the Sale Notice Parties, and cause to be published on the Prime Clerk Website a notice of the results of the Auction (the "**Notice of Auction Results**"), which shall (i) identify the Successful Bidders and Back-Up Bidders; (ii) list all Proposed Assumed Contracts in the Successful Bids and Back-Up Bids; (iii) identify any known proposed assignee(s) of Proposed Assumed Contracts (if different from the applicable Successful Bidder); (iv) list any known Contracts and Leases that may later be designated by a Successful Bidder for assumption and assignment in connection with a Sale Transaction; (v) to the extent practicable, the governing agreement with the Successful Bidder or drafts thereof; and (vi) set forth the deadline and procedures for filing Adequate Assurance Objections (as hereinafter defined) in response to the Notice of Auction Results.

## IX.
## Disposition of Good Faith Deposits

### A.    Prospective Bidders

Within three (3) business days after the applicable Bid Deadline, the Escrow Agent shall return to each Prospective Bidder that was determined not to be a Qualified Bidder, as confirmed by the Debtors, such Prospective Bidder's Good Faith Deposit, plus any interest accrued thereon. Upon the authorized return of such Prospective Bidder's Good Faith Deposit, the bid of such Prospective Bidder shall be deemed revoked and no longer enforceable.

### B.    Qualified Bidders

1. <u>Forfeiture of Good Faith Deposit</u>.  The Good Faith Deposit of a Qualified Bidder will be forfeited to the Debtors if (i) the applicable Qualified Bidder attempts to modify, amend, or withdraw its Qualified Bid, except as permitted by these Global Bidding Procedures, during the time the Qualified Bid remains binding and irrevocable under these Global Bidding Procedures; or (ii) the Qualified Bidder is selected as the Successful Bidder and fails to enter into the required definitive documentation or to consummate a Sale Transaction in accordance with these Global Bidding Procedures and the terms of the applicable transaction documents with respect to the Successful Bid.  The Escrow Agent shall release the Good Faith Deposit by wire transfer of immediately available funds to an

22

account designated by the Debtors two (2) business days after the receipt by the Escrow Agent of a written notice by an authorized officer of the Debtors stating that the Qualified Bidder has breached or failed to satisfy its obligations or undertakings.

2. <u>Return of Good Faith Deposit</u>.  With the exception of the Good Faith Deposits of Successful Bidders and Back-Up Bidders, the Escrow Agent shall return to any other Qualified Bidder any Good Faith Deposit, plus any interest accrued thereon, ten (10) business days after the conclusion of the Auction.

3. <u>Back-Up Bidders</u>.  The Escrow Agent shall return a Back-Up Bidder's Good Faith Deposit, plus any interest accrued thereon, within ten (10) business days after the occurrence of the applicable Back-Up Bid Expiration Date.

4. <u>Successful Bidders</u>. The Good Faith Deposit of a Successful Bidder shall be applied against the cash portion of the purchase price of the Successful Bid upon the consummation of the applicable Sale Transaction.

**C.    Escrow Instructions**

The Debtors and, as applicable, the Prospective Bidder, Qualified Bidder, and/or Back-Up Bidder agree to execute an appropriate joint notice to the Escrow Agent providing instructions for the return of any Good Faith Deposit, to the extent such return is required by these Global Bidding Procedures.  If either party fails to execute such written notice, the Good Faith Deposit may only be released by an order of the Bankruptcy Court.

<div align="center">

**X.**
<u>**Sale Hearing**</u>

</div>

At one or more hearings before the Bankruptcy Court (each, a "**Sale Hearing**"), the Debtors will seek the entry of orders authorizing and approving, among other things, the following Sale Transactions (each, a "**Sale Order**"), to the extent applicable:

1. if no other Qualified Bid is received by the Debtors in respect of a Stalking Horse Package, a sale of such assets to the applicable Stalking Horse Bidder pursuant to the terms and conditions set forth in the applicable Stalking Horse Agreement; and

2. with respect to any Assets that are auctioned and/or sold by the Debtors pursuant to these Global Bidding Procedures, a sale of such assets to the applicable Successful Bidder(s).

The Debtors may, in their reasonable business judgment, in consultation with the Consultation Parties and the Successful Bidders (including any Stalking Horse Bidder if named a Successful Bidder), and consistent with the terms of the DIP ABL Documents, adjourn or reschedule any Sale Hearing with sufficient notice to the Sale Notice Parties, including by (i) an announcement of such adjournment at the applicable Sale Hearing or at the Auction, or

<div align="center">23</div>

(ii) the filing of a notice of adjournment with the Bankruptcy Court prior to the commencement of the applicable Sale Hearing; provided that nothing herein shall authorize the Debtors to unilaterally extend any date or deadline set forth in any Stalking Horse Agreement.

Any objections to (A) a proposed Sale Transaction, including any objection to the sale of any Assets free and clear of liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code and/or entry of a Sale Order (a "**Sale Objection**"); (B) the Debtors' proposed Cure Costs set forth in a Notice of Assumption and Assignment (a "**Cure Objection**"); and (C) provision of adequate assurance of future performance with respect to any Proposed Assumed Contracts or Contracts or Leases that may later be designated for assumption and assignment by a Successful Bidder in connection with a Sale Transaction (an "**Adequate Assurance Objection**") must (i) be in writing; (ii) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules; (iii) state, with specificity, the legal and factual bases thereof; (iv) include any appropriate documentation in support thereof; and (v) be filed with the Bankruptcy Court and served on the Objection Recipients by the applicable Sale Objection Deadline.

All Sale Objections not otherwise resolved by the parties shall be heard at the applicable Sale Hearing. Any party who fails to file with the Bankruptcy Court and serve on the Objection Recipients a Sale Objection by the applicable Sale Objection Deadline may be forever barred from asserting, at the Sale Hearing or thereafter, any objection to the relief requested in the Motion with regard to a Successful Bidder, or to the consummation and performance of the Sale Transactions contemplated by any Stalking Horse Agreement, or asset purchase agreement with a Successful Bidder, including the transfer of the Assets to any Stalking Horse Bidder, or Successful Bidder (including any Back-Up Bidder subsequently deemed a Successful Bidder), free and clear of all liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code. Notwithstanding the foregoing, in accordance with the terms of the Global Bidding Procedures Order, the Debtors may, in their discretion, and in consultation with the applicable Counterparty, adjourn Cure Objections to be considered at a later hearing and assign Proposed Assumed Contracts while such objections remain outstanding.

## XI.
## Consent to Jurisdiction and Authority as Condition to Bidding

All Prospective Bidders and any Stalking Horse Bidder shall be deemed to have (i) consented to the core jurisdiction of the Bankruptcy Court to enter any order or orders, which shall be binding in all respects, in any way related to these Global Bidding Procedures, the Auction, or the construction or enforcement of any agreement or any other document relating to the Sale Transactions; (ii) waived any right to a jury trial in connection with any disputes relating to these Global Bidding Procedures, the Auction, or the construction or enforcement of any agreement or any other document relating to the Sale Transactions; and (iii) consented to the entry of a final order or judgment in any way related to these Global Bidding Procedures, an Auction, or the construction or enforcement of any agreement or any other document relating to the Sale Transactions if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

# XII.
## Reservation of Rights

Except with respect to the procedures (including the deadlines set forth in these Global Bidding Procedures) for consideration of Credit Bids by any insiders or affiliates, the Debtors reserve the right to, in their reasonable business judgment, in a manner consistent with their fiduciary duties and applicable law, and in consultation with the Consultation Parties, modify these Global Bidding Procedures; waive terms and conditions set forth herein with respect to all Prospective Bidders; extend the deadlines set forth herein; announce at the Auction modified or additional procedures for conducting the Auction; alter the assumptions set forth herein; and provide reasonable accommodations to any Stalking Horse Bidder with respect to such terms, conditions, and deadlines of the bidding and Auction process to promote further bids on any Assets (including extending deadlines as may be required for any Stalking Horse Bidder to comply with any additional filing and review procedures with the Federal Trade Commission in connection with its previous HSR Filings), in each case, to the extent not materially inconsistent with these Global Bidding Procedures and the Global Bidding Procedures Order; provided that the Debtors may not extend any Bid Deadline without permission of the Court, unless each of the Consultation Parties agrees to such extension; provided further that nothing herein shall grant the Debtors the rights to modify the terms of, or constitute a waiver by the DIP ABL Agents or DIP ABL Lenders of any rights under, the DIP ABL Documents or DIP ABL Orders. **The Debtors shall not be obligated to consummate or pursue any transaction with respect to any Asset**.

All parties reserve their rights to seek Bankruptcy Court relief with regard to the Auction, the Bidding Procedures, and any related items (including, if necessary, to seek an extension of the applicable Bid Deadline). All Consultation Parties will be permitted to seek relief from the Bankruptcy Court on an expedited basis if they disagree with any actions or decision made by the Debtors as part of these Bid Procedures. The rights of all Consultation Parties with respect to the outcome of the Auction are reserved.

# XIII.
## DIP ABL Orders

Notwithstanding anything to the contrary contained in this Order or in the Global Bidding Procedures or otherwise: (i) any right of the DIP ABL Agents to consent to the sale of any portion of their collateral as set forth in the DIP ABL Credit Agreement, including, without limitation, any Assets, on terms and conditions acceptable to the DIP ABL Agents, are hereby expressly reserved and not modified, waived or impaired in any way by this order or the Global Bidding Procedures; (ii) unless otherwise ordered by the Court, all cash proceeds generated from the sale of any Assets shall be applied in accordance with the terms and conditions of the DIP ABL Documents, the DIP ABL Orders, and the Prepetition ABL Documents, as applicable; and (iii) nothing in this Order or in the Global Bidding Procedures shall amend, modify, or impair any provision of the DIP ABL Orders, or the rights of the Debtors, the DIP ABL Agents or the DIP ABL Lenders thereunder

## XIV.
## <u>Sale Is "As Is/Where Is"</u>

      The Assets sold pursuant to these Global Bidding Procedures will be conveyed at the Closing in their then-present condition, **"as is, with all faults, and without any warranty whatsoever, express or implied."**

26

18-23538-shl    Doc 510    Filed 11/19/18    Entered 11/19/18 10:43:18    Main Document
Pg 59 of 68

**Schedule 1**

**The Assets**

1

18-23538-shl   Doc 510   Filed 11/19/18   Entered 11/19/18 10:43:18   Main Document
Pg 54 of 68

**Exhibit 2**

**Sale Notice**

2

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
In re                                          :
                                               :    Chapter 11
SEARS HOLDINGS CORPORATION, *et al.*,          :
                                               :    Case No. 18-23538 (RDD)
                                               :
Debtors.[1]                                    :    (Jointly Administered)
------------------------------------------------------------x

### NOTICE OF SALE, BIDDING PROCEDURES, AUCTION, AND SALE HEARINGS

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

      On [_____], 2018, Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**") filed with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") a motion (ECF No. [__]) (the "**Motion**") for the entry of (i) an order (the "**Global Bidding Procedures Order**")[2] (a) authorizing and approving global bidding procedures (the "**Global Bidding Procedures**"), substantially in the form attached to the Global Bidding Procedures Order as **Exhibit 1**, in connection with the sale or disposition of substantially all of the Debtors' assets (the "**Assets**"); (b) authorizing the designation of stalking horse bidders, (c) scheduling auctions (the "**Auction**") of the Assets and hearings (the "**Sale Hearing**") to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Motion, Global Bidding Procedures Order, and the Bidding Procedures, as applicable. Any summary of the Bidding Procedures Ores or the Bidding Procedures contained herein is qualified in its entirety by the actual terms and conditions thereof. To the extent that there is any conflict between any such summary and such actual terms and conditions, the actual terms and conditions shall control.

consider approval of proposed Sale Transactions; (d) authorizing and approving the form and manner of notice of the sale of the Assets, Auctions, and Sale Hearings; (e) authorizing and approving the form and manner of notice to each non-Debtor counterparty to an executory contract or unexpired lease (collectively, the "**Contracts** and **Leases**") regarding the Debtors' potential assumption and assignment of their Contracts and Leases and of the Debtors' calculation of Cure Costs with respect thereto; (f) authorizing and approving Assumption and Assignment Procedures; and (g) granting related relief; and (ii) entry of orders (each, a "**Sale Order**") authorizing and approving (a) the sale of the Assets free and clear of all liens, claims, interests, and encumbrances; (b) the assumption and assignment of proposed assumed Contracts and Leases (collectively, the "**Proposed Assumed Contracts**"); and (c) granting related relief.

On _____, 2018, the Bankruptcy Court entered the Global Bidding Procedures Order (ECF No. ____).

## <u>Description of the Assets</u>

The Debtors are seeking to sell the following Assets: _____

A complete list of the Assets that are, or potentially will be, available for sale pursuant to the Global Bidding Procedures is attached hereto as **<u>Schedule 1</u>**.

## <u>IMPORTANT DATES AND DEADLINES</u>

- [*<u>Non-Binding Indication of Interest Deadline</u>*. Any person or entity interested in participating in the Auction with respect to the Go Forward Stores must submit a Non-Binding Indication of Interest (as defined in the Global Bidding Procedures) to the Bid Notice Parties (as identified and defined in the Global Bidding Procedures) on or **before December 5, 2018 at 4:00 p.m. (Eastern Time)** (the "**Non-Binding Indication of Interest Deadline**").]

- *<u>Bid Deadline.</u>* Any person or entity interested in participating in the Auction must submit a Qualified Bid to the Bid Notice Parties on or **before [_____], 201[_] at 4:00 p.m. (Eastern Time)** (the "**Bid Deadline**").

- *<u>Auction</u>*. An Auction for the Assets has been scheduled for **[_____], 2019 at 10:00 a.m. (prevailing Eastern Time)** and, if necessary, will be conducted at **[_____]**.

- *<u>Sale Objection Deadlines</u>*. Objections to a proposed Sale Transaction, including any objection to the sale of any Assets free and clear of liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code and/or entry of a Sale Order must be (i) filed in accordance with the Global Bidding Procedures, (ii) filed with the Bankruptcy Court, and (iii) served on the Objection Recipients (as identified and defined in the Global Bidding Procedures) by no later than **[_____], 2019 at 4:00 p.m. (prevailing Eastern Time)** (the "**Sale Objection Deadline**").

- *<u>Sale Hearings</u>*. The Sale Hearing shall be held before the Bankruptcy Court before the Honorable Robert D. Drain on **[_____], 2019 at __:__ [_].m. (prevailing Eastern Time)**.

## Additional Information

Any party interested in submitting a bid for any of the Assets should contact the Debtors' investment banker, Lazard Frères & Co., LLC, 30 Rockefeller Plaza, New York, New York 10112 (Attn: Brandon Aebersold (brandon.aebersold@lazard.com) and Levi Quaintance (levi.quaintance@lazard.com)).

Copies of the Motion, the Global Bidding Procedures Order, and the Global Bidding Procedures may be obtained free of charge at the website dedicated to the Debtors' chapter 11 cases maintained by their claims and noticing agent and administrative advisor, Prime Clerk LLC, located at https://restructuring.primeclerk.com/Sears.

## Reservation of Rights

Except with respect to the procedures (including the deadlines set forth in these Global Bidding Procedures) for consideration of Credit Bids by any insiders or affiliates, the Debtors reserve the right to, in their reasonable business judgment, in a manner consistent with their fiduciary duties and applicable law, and after consultation with the Consultation Parties, modify the Global Bidding Procedures; waive terms and conditions set forth therein; extend the deadlines set forth therein; announce at the Auctions modified or additional procedures for conducting the Auctions; and provide reasonable accommodations to any Stalking Horse Bidder with respect to such terms, conditions, and deadlines of the bidding and auction process to promote further bids by such bidder, in each case, to the extent not materially inconsistent with the Global Bidding Procedures and the Global Bidding Procedures Order; provided that the Debtors may not extend any Bid Deadline without permission of the Court, unless each of the Consultation Parties agrees to such extension; provided further that nothing herein shall grant the Debtors the rights to modify the terms of, or constitute a waiver by the DIP ABL Agents or DIP ABL Lenders of any rights under, the DIP ABL Documents or DIP ABL Orders.  **Except as provided in an applicable Stalking Horse Agreement that has become binding on the Debtors pursuant to these Global Bidding Procedures, the Debtors shall not be obligated to consummate or pursue any transaction with respect to any Asset, with any bidder**.

**FAILURE TO ABIDE BY THE GLOBAL BIDDING PROCEDURES, THE GLOBAL BIDDING PROCEDURES ORDER, OR ANY OTHER ORDER OF THE BANKRUPTCY COURT IN THESE CHAPTER 11 CASES MAY RESULT IN THE REJECTION OF YOUR BID.**

**THE FAILURE OF ANY PERSON OR ENTITY TO FILE AND SERVE AN OBJECTION IN ACCORDANCE WITH THE GLOBAL BIDDING PROCEDURES ORDER BY THE APPLICABLE SALE OBJECTION DEADLINE SHALL FOREVER BAR SUCH PERSON OR ENTITY FROM ASSERTING ANY OBJECTION TO THE MOTION, SALE ORDERS, THE PROPOSED SALE TRANSACTIONS, OR THE DEBTORS' CONSUMMATION OF THE STALKING HORSE AGREEMENT OR ANY OTHER ASSET PURCHASE AGREEMENT EXECUTED BY THE DEBTORS AND A SUCCESSFUL BIDDER AT THE AUCTION.**

Dated _____, 2018

_____
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007

*Attorneys for Debtors and Debtors in Possession*

**Exhibit 3**

**Assumption and Assignment Notice**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re                                          :
                                               :          **Chapter 11**
**SEARS HOLDINGS CORPORATION,** *et al.,*      :
                                               :          **Case No. 18-23538 (RDD)**
                                               :
Debtors.[8]                                    :          **(Jointly Administered)**
------------------------------------------------------------x

## NOTICE OF CURE COSTS AND POTENTIAL ASSUMPTION
## AND ASSIGNMENT OF EXECUTORY CONTRACTS AND
## UNEXPIRED LEASES IN CONNECTION WITH SALE

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

On [_____], 2018, Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**") filed with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") a motion (ECF No. [__]) (the "**Motion**") for the entry of (i) an order (the "**Global Bidding Procedures Order**")[9] (a) authorizing and approving global bidding procedures (the "**Global Bidding Procedures**"), substantially in the form attached to the Global Bidding Procedures Order as **Exhibit 1**, in connection with the sale or disposition of substantially all of

---

[8] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[9] Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Motion, Global Bidding Procedures Order, and the Bidding Procedures, as applicable. Any summary of the Bidding Procedures Ores or the Bidding Procedures contained herein is qualified in its entirety by the actual terms and conditions thereof. To the extent that there is any conflict between any such summary and such actual terms and conditions, the actual terms and conditions shall control.

WEIL:\96790401\21\73217.0004

the Debtors' assets (the "**Assets**"); (b) authorizing the designation of stalking horse bidders, (c) scheduling auctions (the "**Auction**") of the Assets and hearings (the "**Sale Hearing**") to consider approval of proposed Sale Transactions; (d) authorizing and approving the form and manner of notice of the sale of the Assets, Auctions, and Sale Hearings; (e) authorizing and approving the form and manner of notice to each non-Debtor counterparty to an executory contract or unexpired lease (collectively, the "**Contracts** and **Leases**") regarding the Debtors' potential assumption and assignment of their Contracts and Leases and of the Debtors' calculation of Cure Costs with respect thereto; (f) authorizing and approving Assumption and Assignment Procedures; and (g) granting related relief; and (ii) entry of orders (each, a "**Sale Order**") authorizing and approving (a) the sale of the Assets free and clear of all liens, claims, interests, and encumbrances; (b) the assumption and assignment of proposed assumed Contracts and Leases (collectively, the "**Proposed Assumed Contracts**"); and (c) granting related relief.

On _____, 2018, the Bankruptcy Court entered the Global Bidding Procedures Order (ECF No. ___).

**You are receiving this Notice because you may be a Counterparty to a Contract or Lease of the Debtors that either is proposed to be assumed and assigned to a Stalking Horse Bidder or potentially could be assumed and assigned to one or more bidders in connection with a sale of the Debtors' Assets.**

## Stalking Horse Bids

Pursuant to the terms of the Global Bidding Procedures Order, the Debtors may designate Stalking Horse Bidders (as defined in the Global Bidding Procedures) for the Assets [until [_____], 2018.] Notice of any such designation, including the execution of any asset purchase agreement with a Stalking Horse Bidder and the provision of any bid protections in connection therewith, will be provided in accordance with the terms of the Global Bidding Procedures Order.

## Cure Costs

In accordance with the Assumption and Assignment Procedures and the Global Bidding Procedures Order, the Debtors may, in connection with a Sale Transaction with a Successful Bidder (as defined in the Global Bidding Procedures) at the Auction (whether such bidder be the applicable Stalking Horse Bidder or other bidder prevailing at the Auction), seek to assume and assign to the Successful Bidder (or its designated assignee, if applicable) certain Contracts and Leases of the Debtors.

Each of the Contracts and Leases that may be assumed and assigned in connection with a Sale Transaction with a Successful Bidder and the Debtors' calculation of the Cure Costs with respect thereto are set forth on **Exhibit A** hereto.

The inclusion of any Contract or Lease on Exhibit A does not constitute an admission that a particular Contract or Lease is an executory contract or unexpired lease within the meaning of the Bankruptcy Code or require or guarantee that such Contract or Lease ultimately will be assumed or assigned. All rights of the Debtors with respect thereto are reserved.

.

## Objections

### A.  Cure Objections

Any objection to the proposed assumption, assignment, or potential designation of a Contract or Lease identified on <u>Exhibit A</u>, the subject of which objection is the Debtors' proposed Cure Costs must be (i) filed in accordance with the Global Bidding Procedures Order; (ii) filed with the Bankruptcy Court; and (iii) served on the Objection Recipients (as identified in the Global Bidding Procedures) by no later than **[_____] calendar days after receiving service of the Debtors' proposed Cure Costs**.

**IF A COUNTERPARTY FAILS TO FILE WITH THE BANKRUPTCY COURT AND SERVE ON THE OBJECTION RECIPIENTS A TIMELY CURE OBJECTION, THE COUNTERPARTY SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION WITH REGARD TO THE AMOUNT TO CURE ANY DEFAULT UNDER THE APPLICABLE CONTRACT OR LEASE.  THE CURE COSTS SET FORTH ON EXHIBIT A HERETO SHALL BE CONTROLLING AND WILL BE THE ONLY AMOUNT NECESSARY TO CURE OUTSTANDING DEFAULTS UNDER THE APPLICABLE CONTRACT OR LEASE UNDER BANKRUPTCY CODE SECTION 365(B), NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE CONTRACT OR LEASE, OR ANY OTHER DOCUMENT, AND THE APPLICABLE COUNTERPARTY SHALL BE FOREVER BARRED FROM ASSERTING ANY ADDITIONAL CURE OR OTHER AMOUNTS WITH RESPECT TO SUCH CONTRACT OR LEASE AGAINST THE DEBTORS, ANY SUCCESSFUL BIDDER, OR THE PROPERTY OF ANY OF THEM.**

### B.  Adequate Assurance Objections

Adequate Assurance Objections with respect to the assumption and assignment of a Contract or Lease identified on <u>Exhibit A</u> to a Successful Bidder (or its known proposed assignee, if applicable) must be filed in accordance with the preceding paragraph by no later than **[_____], at 4:00 p.m. (Eastern Time).**

**IF A COUNTERPARTY FAILS TO FILE WITH THE BANKRUPTCY COURT AND SERVE ON THE OBJECTION RECIPIENTS A TIMELY ADEQUATE ASSURANCE OBJECTION, THE COUNTERPARTY SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION WITH REGARD TO ADEQUATE ASSURANCE OF FUTURE PERFORMANCE OF THE APPLICABLE CONTRACT OR LEASE. THE SUCCESSFUL BIDDER (OR ITS DESIGNATED ASSIGNEE, IF APPLICABLE) SHALL BE DEEMED TO HAVE PROVIDED ADEQUATE ASSURANCE OF FUTURE PERFORMANCE WITH RESPECT TO THE APPLICABLE CONTRACT OR LEASE IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 365(F)(2)(B), NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE CONTRACT OR LEASE, OR ANY OTHER DOCUMENT.**

### Sale Hearings

The Sale Hearing shall be held before the Bankruptcy Court before the Honorable Robert D. Drain on **[_____], at __:__ [a.m./p.m.] (prevailing Eastern Time)**.

### Additional Information

Copies of the Motion, the Global Bidding Procedures Order, and the Global Bidding Procedures may be obtained free of charge at the website dedicated to the Debtors' chapter 11 cases maintained by their claims and noticing agent and administrative advisor, Prime Clerk LLC, located at https://restructuring.primeclerk.com/Sears.

Dated: [      ], 2018

                                                _____

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Debtors and Debtors in Possession*

# EXHIBIT B

***Transform Holdco LLC***
*c/o ESL Investments, Inc.*
*1170 Kane Concourse, Suite 200*
*Bay Harbor Islands, FL 33154*
*(305) 702-2100*

December 28, 2018

Lazard Frères & Co. LLC
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 632-6479; (212) 632-6418
Attention:  Brandon Aebersold, Managing Director
            Levi Quaintance, Vice President

Ladies and Gentlemen,

This letter indicates the terms upon which Transform Holdco LLC ("Buyer"), a newly formed entity controlled by ESL Investments, Inc. ("ESL"), would be prepared to acquire substantially all of the go-forward retail footprint and other assets and component businesses of Sears Holdings Corporation (together with its subsidiaries, "Sears") as a going concern (the "Going Concern Proposal"). This letter is being submitted in response to the process letter filed with the United States Bankruptcy Court for the Southern District of New York (the "Court") on behalf of the debtors (the "Debtors") in the Chapter 11 cases captioned as *In re Sears Holdings Corporation, et al.*, Case No. 18-23538 (Bankr. S.D.N.Y.) (RDD) on November 21, 2018 (the "Process Letter") [Docket No. 862] and the Global Bidding Procedures (the "Bidding Procedures") set forth in the Global Bidding Procedures Order entered on November 19, 2018 [Docket No. 816].

Sears is an iconic fixture in American retail and we continue to believe in the company's immense potential to evolve and operate profitably as a going concern with a new capitalization and organizational structure. Our proposed business plan envisages significant strategic initiatives and investments in a right-sized network of large format and small retail stores, digital assets and interdependent operating businesses. We believe that our strategy will enable Sears to prosper in an integrated consumer and retail landscape and view a going concern transaction as essential to providing optimal value to creditors and shareholders.

We believe that a future for Sears as a going concern is the only way to preserve tens of thousands of jobs and bring continued economic benefits to the many communities across the United States that are touched by Sears and Kmart stores. We also believe that our Going Concern Proposal creates the best path for creating the most value for the Debtors' estates, including creditors who would receive only minimal or no recoveries in a liquidation. We are prepared to move as quickly as possible to finalize and enter into the definitive agreements for the transactions contemplated by this letter. Our proposed Asset Purchase Agreement for the Going Concern Proposal, executed by Buyer, is being separately provided to Debtors' counsel (the "Asset Purchase Agreement").

We believe there are significant benefits to preserving and maximizing the relationships between and among Sears' retail business and its other operating businesses. Purchasing them together enhances the value and potential of each by continuing to build on long-held commercial relationships and supporting the synergies created by shared marketing, manufacturing, technology and administrative teams, to name just a few. Our Going Concern Proposal includes substantially all of the assets of Debtors. To preserve intact as much as possible of Sears' existing real estate footprint as part of the going concern, we also propose to acquire the equity of non-Debtors SRC O.P., LLC, SRC Facilities LLC and SRC Real Estate (TX), LLC (the "SRC Entities") outside of the bankruptcy process, for total consideration anticipated to be approximately $592,000,000 as of the closing of such acquisition (inclusive of the purchase price for equity and the assumption of all of the outstanding liabilities of the SRC Entities). Furthermore, our Going Concern Proposal contemplates our acquisition of all of the outstanding KCD IP Notes currently held by non-debtor Sears Reinsurance Company Ltd. ("Sears Re"), which are secured by the intellectual property comprising Kenmore and DieHard. Our proposed consideration for the KCD IP Notes is comprised of the assumption of the

Page 2
December 28, 2018

protection agreement liabilities currently reinsured by Sears Re.  We also would be willing to acquire the underlying Kenmore and DieHard intellectual property directly from non-Debtor KCD IP, LLC for additional cash consideration.

1. **Scope of Transaction.**  As discussed above, Buyer proposes to acquire substantially all of the assets of Debtors pursuant to a sale under section 363 of the U.S. Bankruptcy Code.  The purchased assets would include (a) the go-forward retail footprint of approximately 425 stores and related real estate interests (including headquarters and distribution locations) and certain designation rights with regard to additional real estate interests, inventory, infrastructure and material related contracts and (b) Sears Auto Centers, Shop Your Way, Monark, Innovel, Sears Home Services (including the PartsDirect business unit), material related contracts and the KCD IP Notes.  Based on information provided by the Debtors, the Going Concern Proposal is based on the purchased assets including Sears' retail inventory and credit card and pharmacy receivables with a book value of no less than approximately $1.7 billion.

   As part of the transaction contemplated herein, Buyer expects to provide offers of ongoing employment to up to 50,000 Sears employees, depending on any further actions Sears may take between now and closing.  Buyer also expects to reinstate the prepetition Sears severance program for the benefit of all eligible employees that accept their employment offer and to honor the promise made to millions of customers by assuming certain Sears' liabilities relating to protection agreements issued by the Sears Home Services business, gift card liabilities and Shop Your Way points liabilities as described below.

   Our proposal provides that Buyer would have the option to acquire Sears' tax assets, the value of which we have incorporated into the Going Concern Proposal.  Our Going Concern Proposal also assumes, consistent with the Debtors' projections, that the amounts outstanding under the Debtors' first lien ABL DIP facility will be no greater than $850 million at the time of closing the transactions contemplated herein.

2. **Consideration; Other Value.**  The total purchase price for our Going Concern Proposal would provide approximately $4.4 billion in total consideration to Sears, based on information provided by the Debtors.  This consideration would comprise:

   a. $850 million in cash to be funded with the proceeds of a new $1.3 billion ABL facility described in the Debt Commitment;
   b. a credit bid of approximately $1.3 billion[1], consisting of:
      i. approximately $544 million in respect of certain owned real estate assets that are collateral under the Dove Loan Agreement;
      ii. approximately $231 million in respect of certain intellectual property and ground leases and related assets that are collateral under the IP/Ground Lease Loan Agreement;
      iii. approximately $559 million in respect of the acquired inventory and receivables that are collateral under the Second Lien Facilities and the FILO Facility;
   c. the roll-over of (and release of the Debtors with respect to) $501 million of senior indebtedness (up to $230 million of the Junior DIP facility and approximately $271 million of the L/C Facility);[2]
   d. the assumption of all of the outstanding liabilities of the SRC Entities, in the amount of approximately $592,000,000;

---

[1] In the event that Buyer and its Affiliates are not the holder of all of the outstanding obligations under such first lien secured facilities as of the Closing Date, Buyer will pay to the applicable Debtors cash in the amount of any obligations owed to lenders other than Buyer or its Affiliates as of the Closing Date, to be held in separate segregated accounts of the Debtors.  Any liens on such collateral purchased by Buyer shall attach to the proceeds from the sale held in such accounts.  We currently expect that the amount of such cash may be up to approximately $220 million.

[2] Buyer understands that the holders of the amounts outstanding under these facilities have consented, or will consent, to the above-described roll-overs.

    e.    $35 million in cash and rights to purchase up to $100 million of non-voting securities of Buyer as consideration for the release of ESL and certain ESL-related parties from certain liabilities as described further below; and

    f.    the assumption of the Debtors' liabilities with respect to (i) protection agreements issued by Sears Homes Services, (ii) certain gift cards and (iii) accrued points under the Shop Your Way program, in each case on terms to be agreed with the Debtors. We estimate these liabilities to be approximately $1.1 billion.

Over the last several years, ESL has extended more than $2.4 billion of secured financing to the Debtors, which has enabled Sears to continue operations and seek to implement its transformation plan, while significantly reducing the exposure of the Debtors' other creditors (including Sears' pension plan). These secured financings were approved by Sears' board of directors (comprised of a majority of directors independent from management and the company) and also approved by the Related Party Transactions Committee comprised of independent directors and advised by separate and independent financial and legal advisors. As the holder of valid and enforceable liens and claims, the Going Concern Proposal is conditioned on (1) confirmation of Buyer's right to credit bid the secured debt in the amounts described herein (and without any requirement to cash collateralize or otherwise backstop any portion of the credit bid) and (2) a full release by the Debtors of ESL and certain ESL-related parties from any liability related to any prepetition transactions involving ESL. To the extent any parties are challenging Buyer's credit bidding capability for any reason, Buyer requests that such challenges are adjudicated to conclusion at or prior to the sale hearing with regard to the asset purchases.

3.    **Required Approvals.** We anticipate that the consummation of the transactions described in this letter will require expiration or early termination of any waiting periods under the Hart Scott Rodino Antitrust Improvements Act of 1976, and we are ready to make all necessary filings in a timely manner as further described in the Asset Purchase Agreement. To the extent any other governmental or other regulatory approvals are required to purchase the assets described herein, we commit to pursue such approvals as expeditiously as possible, subject to the reasonable assistance of Sears and its applicable advisors. Buyer will cooperate with the Debtors to provide pertinent factual information regarding Buyer's operations as reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements.

4.    **Financial Wherewithal.** We are separately providing executed copies of a debt commitment letter from the lenders named therein (the "Debt Commitment") and an equity commitment letter from ESL (the "Equity Commitment") to Debtors' counsel. Upon receipt of the funds described in the Debt Commitment and the Equity Commitment, Buyer will have sufficient funds available to consummate the transactions contemplated by our Going Concern Proposal.

As you will note, the Debt Commitment includes certain conditions that are not typical for acquisition financings, including a requirement that a $175 million secured real estate loan be funded at closing. We intend to work expeditiously with the lenders to satisfy these conditions as soon as possible. ESL has committed to provide one-half of real estate secured loan (and we have provided Debtors' counsel a copy of a commitment letter for that amount) and we currently expect that other lenders will provide the balance of the commitment in the near term. As a result of these unusual conditions, the Asset Purchase Agreement contains a condition related to the availability of debt financing. We would expect to eliminate this condition at the time the foregoing conditions are satisfied.

We are separately providing to Debtors' counsel (i) a letter executed by the administrative agent for the Dove Loan Agreement that is included in the credit bid authorizing such credit bid, and (ii) a letter executed by the collateral agent for the Second Lien Facilities authorizing the credit bid of the second lien debt.

5.    **Allocation.** The allocation of the proposed consideration to each category of purchased asset (including the inventory and receivables, real estate, intellectual property and ground lease collateral, and the unencumbered assets) is set forth under Item 2 above. Our proposed allocation of value with regard to the proposed purchases of the SRC Entities outside of the bankruptcy process are also noted above.

6. **Alternative Bid Proposal.** As noted above, we have allocated very considerable value to the benefits of preserving Sears as an integrated business that would include both its retail and non-retail components. If we were required to bid on the different component assets separately, the aggregate consideration we would be prepared to offer would be significantly less than we have submitted in our Going Concern Proposal. While we strongly believe that our Going Concern Proposal will provide the best outcome for the Debtors and their creditors and other stakeholders, we also are submitting bids with respect to individual assets in the event that our Going Concern Proposal is not declared a "Qualifying Bid" and subsequently accepted. Accordingly, we are submitting bids to purchase the following assets at the following purchase prices pursuant to the Alternative Asset Purchase Agreement separately provided to Debtors' counsel (the "Alternative APA") solely in the event that the Going Concern Proposal is not qualified or accepted (the "Alternative Proposal"):

   a. Innovel: $5 million in cash, conditioned on the continued operation of at least 250 stores as a going concern;
   b. Sears Home Services:
      i. For substantially all of this business (including Parts Direct, the in-home repair business and assignment and assumption of the Assurant and Cross Country Home Services agreements, but excluding any assumption of liabilities related to protection agreements ): $25 million, conditioned on the continued operation of at least 250 stores as a going concern; and
      ii. For only the Parts Direct business: $5 million plus 50% of the value of the Parts Direct inventory acquired at closing.
   c. Shop Your Way (data and IP only; excludes any assumption of liabilities with respect to accrued points under the program): $100,000 in cash;
   d. Certain intellectual property, including the "Sears" marks and the rights to receive royalties with respect thereto, secured by the IP/Ground Lease Loan Agreement: credit bid of approximately $150 million;
   e. Certain real estate assets, including ground leases, as described in the indication of interest submitted pursuant to the Real Estate Process Letter on the date hereof.

The Equity Commitment also provides that Buyer will have available cash to consummate the purchases of any or all of the assets described above. The Alternative Proposal and the Alternative APA are being provided solely in the event that the purchase of substantially all of the assets of the Debtors as described above is not consummated, and solely for the purpose of establishing Buyer as a qualified bidder in such circumstance. Under no circumstance will we be obligated to enter into both the Alternative APA and the Asset Purchase Agreement or to make any duplicative payments for any of the assets described herein or therein.

7. **Good Faith Deposit.** We have deposited $3,010,000 in cash with the Escrow Agent selected by the Debtors, which represents our estimate of 10% of the cash component of Buyer's Alternative Proposal. Subject to confirmation from the Debtors that they are prepared to declare our Going Concern Proposal as a "Qualifying Bid" pursuant to the Bidding Procedures, Buyer is prepared to deposit additional cash with the Escrow Agent, which, together with the amount previously deposited, would represent 10% of the cash component of the Going Concern Proposal.

8. **Representations and Warranties.** Buyer affirms that it has had an opportunity to conduct any and all due diligence regarding the assets described in this letter. Buyer confirms that it and ESL have relied solely upon their own independent review, investigation, and/or inspection of the relative documents and the assets in submitting this letter and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the assets described in the Asset Purchase Agreement or the Alternative APA or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Asset Purchase Agreement or the Alternative APA. We have not engaged in any collusion with respect to the submission of this letter. The Going Concern Proposal and the Alternative Proposal are not subject to any diligence contingencies of any kind.

Based on the foregoing and our familiarity with the business of the Debtors, we are confident that it can move quickly towards the consummation of a transaction as soon as possible following the conclusion of the auction and approval by the Bankruptcy Court.

We have retained Moelis & Company as financial advisor and Cleary Gottlieb Steen & Hamilton LLP as legal counsel. Please feel free to reach out to any of the below regarding this letter.

<div style="display:flex">

Lawrence S. Chu
Moelis & Company
(212) 883-4588
LC@moelis.com

Christopher E. Austin
Benet O'Reilly
Sean A. O'Neal
Cleary Gottlieb Steen & Hamilton LLP
(212) 225-2000
CAustin@cgsh.com
BOReilly@cgsh.com
SOneal@cgsh.com

</div>

This letter reflects our formal and binding offer for the assets on the terms and subject only to the conditions set forth in the Asset Purchase Agreement or the Alternative APA (as the case may be). We agree to serve as a back-up bidder to the extent the Going Concern Proposal or the Alternative Proposal (as the case may be) is selected as the next highest or next best bid after another successful bidder. We waive any claim or right to assert any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code in connection with bidding for the Assets and/or participating in the Auction. We will not be entitled to any break-up fee and shall only be entitled to the expense reimbursement set forth in the Asset Purchase Agreement or Alternative APA (as the case may be) on the conditions set forth therein if agreed to by the Debtors and approved by the Bankruptcy Court.

If the Going Concern Proposal has not been determined to be a "Qualifying Bid" prior to 4:00 p.m., New York time, on January 4, 2019, the Going Concern Proposal and the executed Asset Purchase Agreement shall automatically terminate and be deemed withdrawn as of such time and notwithstanding anything to the contrary contained in this letter or any other document, none of Buyer, ESL or any of their respective affiliates or representatives shall have any further liability or obligation in respect of the Going Concern Proposal. If the Alternative Proposal has not been determined to be a "Qualifying Bid" prior to 4:00 p.m., New York time, on January 4, 2019, the Alternative Proposal and the executed Alternative APA shall automatically terminate and be deemed withdrawn as of such time and notwithstanding anything to the contrary contained in this letter or any other document, none of Buyer, ESL or any of their respective affiliates or representatives shall have any further liability or obligation in respect of the Alternative Proposal.

December 28, 2018

As always, we remain enthusiastic about the continuation of Sears as a going concern and its future potential. We hope this letter serves as the beginning of an exciting and transformative new chapter for Sears. We are available to discuss any of the foregoing at your convenience.

Very truly yours,

TRANSFORM HOLDCO LLC


_/s/ Edward S. Lampert_____
Edward S. Lampert
Chief Executive Officer

cc:

Sears Holdings Corporation
     Attn.:   Rob Riecker
              Luke Valentino
              Mohsin Meghji

Weil, Gotshal & Manges LLP
     Attn:   Ray C. Schrock, P.C.
              Jacqueline Marcus, Esq.
              Garrett A. Fail, Esq.
              Sunny Singh, Esq.

Bank of America, N.A., consultation party
     Attn:   Stephen J. Garvin and Brian P. Lindblom
and

Skadden, Arps, Slate, Meagher & Flom LLP
     Attn :   Seth E. Jacobson, Esq.


Wells Fargo Bank, National Association, consultation party
     Attn:   Joseph Burt

and

Choate, Hall & Stewart  LLP
     Attn.:   Kevin J. Simard, Esq.

Creditors' Committee, consultation party
     Attn:   Akin Gump Strauss Hauer & Feld LLP
              Ira S. Dizengoff, Esq., Philip C. Dublin, Esq.,
              Abid Qureshi, Esq., Sara L. Brauner, Esq.


[Enclosures]

# EXHIBIT C

***Transform Holdco LLC***
*c/o ESL Investments, Inc.*
*1170 Kane Concourse, Suite 200*
*Bay Harbor Islands, FL 33154*
*(305) 702-2100*

January 9, 2019

Lazard Frères & Co. LLC
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 632-6479; (212) 632-6418
Attention:  Brandon Aebersold, Managing Director
          Levi Quaintance, Vice President

Ladies and Gentlemen,

Reference is made to the definitive bid proposal submitted by Transform Holdco LLC ("Buyer"), a newly formed entity controlled by ESL Investments, Inc. ("ESL") on December 28, 2018 (the "Going Concern Proposal"), which is attached to this letter as <u>Exhibit A</u>.[1]  The Going Concern Proposal on the terms reflected in the December 28, 2018 letter expired in accordance with its terms on January 4, 2019 and this letter (this "Revised Proposal") indicates certain revisions to the terms on which Buyer is prepared to acquire substantially all of the go-forward retail footprint and other assets and component businesses (the "Assets") of Sears as a going concern.  Except as modified by this Revised Proposal, the terms set forth in the Going Concern Proposal are incorporated by reference herein.  This Revised Proposal constitutes a Qualified Bid (as defined in the Bidding Procedures) in accordance with the oral rulings of the Court and the agreements reached among ESL, the Debtors and the Consulting Parties (as defined in the Bidding Procedures) at the Chambers Conference and the Status Conference before the Court on January 8, 2019 (the "Hearing").

This Revised Proposal includes the assumption of additional liabilities that may increase the total purchase price presented by Buyer's proposal by over $600 million, which, together with the purchase price set forth in the Going Concern Proposal, would provide aggregate consideration to the Debtors in excess of $5 billion.  In connection with the Revised Proposal, Buyer is providing counsel to the Debtors with a revised Asset Purchase Agreement (the "Revised Asset Purchase Agreement"), which sets forth in further detail the proposed terms of the Revised Proposal. The Revised Proposal includes the following revisions:

1.  **Assumption of Liabilities.**  In addition to the liabilities described in the Going Concern Proposal, Buyer proposes to assume up to $663 million in additional liabilities identified in consultation with the Debtors. This amount consists of the following, to be paid by Buyer in accordance with the Revised Asset Purchase Agreement:
    a.  Up to $166 million of payment obligations with respect to goods ordered by Debtors prior to the closing of the proposed transactions (but as to which goods Debtors have not yet taken delivery and title prior to closing);
    b.  Up to $139 million of 503(b)(9) administrative priority claims;
    c.  Up to $43 million of additional severance costs to be incurred by the Debtors;
    d.  All cure costs related to contracts to be assumed by Buyer (estimated to be up to $180 million); and
    e.  Up to $135 million of property taxes with respect to the properties to be acquired by Buyer.

In the event that the sum of the amounts outstanding under Debtors' first lien ABL DIP facility and Debtors' junior DIP facility (net of any cash available to pay down such amounts) is less than $1.2 billion at the time of closing the proposed transactions, Buyer's obligation to assume the foregoing liabilities

---

[1]      Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Going Concern Proposal.

shall be reduced dollar-for-dollar to the extent of such shortfall, with such reduction allocated in accordance with the Revised Asset Purchase Agreement.  In a schedule shared with Buyer's representatives on January 6, 2019, the Debtors estimated cash available to pay down such outstanding amounts was $89 million.

2.  **Acquired Assets.**  The Revised Proposal includes the acquisition by Buyer of additional assets that were proposed to be left with the Debtors' estate under the Going Concern Proposal, including:

   a.  Approximately 57 additional real estate properties;
   b.  Accounts receivable with respect to certain home warranties sold in FY 2018 with a book value of approximately $53.6 million;
   c.  Other accounts receivable with a book value of at least $256 million, inclusive of netting for allowances for bad debts;
   d.  Additional inventory with a book value of up to $166 million with respect to which Buyer shall assume payment obligations as described in item 1.a. above (and as to which inventory Debtors have not yet taken delivery and title prior to closing);
   e.  Prepaid inventory with a book value of at least $147 million as to which Debtors have not yet taken delivery and title prior to closing; and
   f.  All of the Debtors' rights relating to the claims set forth in the class actions consolidated in the multi-district litigation *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, No. 1:05-MD-01720 (E.D.N.Y.).

3.  **Release**.  The proposed consideration for the release of liabilities of ESL and certain ESL-related parties as further described in the Going Concern Proposal is comprised of $35 million in cash, and the assumption of the additional liabilities of the Debtors described above.

Buyer is prepared to execute the Revised Asset Purchase Agreement in the form provided to Debtors' counsel, subject to agreement with the Debtors as to the form and substance of the schedules and exhibits to be attached thereto (with such form and substance to be acceptable to Buyer's financing sources).  Buyer is prepared to work with Debtors and their counsel with the goal of reaching such agreement prior to commencement of the Auction.

In addition to the Revised Asset Purchase Agreement. we are separately providing updated executed copies of a debt commitment letter from the lenders named therein with regard to a new ABL facility (the "ABL Commitment"), a debt commitment letter from ESL and funds managed by Cyrus Capital Partners with respect to the rollover of certain debt facilities of the Debtors (the "Rollover Commitment"), a debt commitment letter from ESL and funds managed by Cyrus Capital Partners with respect to a new secured real estate loan (the "Real Estate Commitment"), and an equity commitment letter from ESL (the "Equity Commitment") to Debtors' counsel.  Upon receipt of the funds described in the Debt Commitment, the Rollover Commitment, the Real Estate Commitment and the Equity Commitment, Buyer will have sufficient funds available to consummate the transactions contemplated by our Going Concern Proposal.

We are separately providing to Debtors' counsel with an updated copy of a letter executed by the collateral agent for the Second Lien Facilities authorizing the credit bid of the second lien debt.  The letter executed by the administrative agent for the Dove Loan Agreement provided to Debtors' counsel at the time of the Going Concern Proposal remains in effect.

Pursuant to the Bid Procedures, and subject to the terms of the Escrow Agreement between Buyer, Sears and the Escrow Agent, we have deposited $120 million in cash with the Escrow Agent selected by the Debtors (inclusive of the $17.9 million deposit amount described at the Hearing and the amounts previously deposited at the time of submitting the Going Concern Proposal).  The amounts deposited represent in excess of 10% of the cash component of the purchase price.

Based on the foregoing and our familiarity with the business of the Debtors, we are confident that Buyer can move quickly towards the consummation of a transaction as soon as possible following the conclusion of the Auction and approval by the Court.

This Revised Proposal, together with the Going Concern Proposal which it modifies, reflects our formal and binding offer for the assets on the terms and subject only to the conditions set forth in the Revised Asset Purchase Agreement. We agree to serve as a back-up bidder to the extent the Revised Proposal is selected as the next highest or next best bid after another successful bidder.  We waive any claim or right to assert any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code in connection with bidding for the Assets and/or participating in the Auction.  We will not be entitled to any break-up fee and shall only be entitled to the expense reimbursement set forth in the Revised Asset Purchase Agreement on the conditions set forth therein if agreed to by the Debtors and approved by the Court.

This Revised Proposal and the Revised Asset Purchase Agreement shall automatically terminate and be deemed withdrawn at the earlier of (i) 5:00 p.m., New York time, on January 13, 2019, if Debtors have not confirmed in writing to Buyer that an "Auction" pursuant to the Bidding Procedures will be held on January 14, 2019 at which Buyer shall be allowed to participate and (ii) 5:00 p.m., New York time, on January 16, 2019, if Debtors have not confirmed in writing to Buyer that Buyer has been selected as a "Successful Bidder" (in connection with the transaction contemplated by the Revised Proposal) pursuant to the Bidding Procedures.

Page 4
January 9, 2019

As always, we remain enthusiastic about the continuation of Sears as a going concern and its future potential. We hope this letter serves as the beginning of an exciting and transformative new chapter for Sears. We are available to discuss any of the foregoing at your convenience.

Very truly yours,

TRANSFORM HOLDCO LLC

Edward S. Lampert
Chief Executive Officer

cc:

Sears Holdings Corporation
    Attn.:   Rob Riecker
            Luke Valentino
            Mohsin Meghji

Weil, Gotshal & Manges LLP
    Attn:   Ray C. Schrock, P.C.
            Jacqueline Marcus, Esq.
            Garrett A. Fail, Esq.
            Sunny Singh, Esq.

Bank of America, N.A., consultation party
    Attn:   Stephen J. Garvin and Brian P. Lindblom
and

Skadden, Arps, Slate, Meagher & Flom LLP
    Attn :   Seth E. Jacobson, Esq.

Wells Fargo Bank, National Association, consultation party
    Attn:   Joseph Burt

and

Choate, Hall & Stewart  LLP
    Attn.:   Kevin J. Simard, Esq.

Creditors' Committee, consultation party
    Attn:   Akin Gump Strauss Hauer & Feld LLP
            Ira S. Dizengoff, Esq., Philip C. Dublin, Esq.,
            Abid Qureshi, Esq., Sara L. Brauner, Esq.

[Enclosures]

**Exhibit A**
**Going Concern Proposal**

**Transform Holdco LLC**
*c/o ESL Investments, Inc.*
*1170 Kane Concourse, Suite 200*
*Bay Harbor Islands, FL 33154*
*(305) 702-2100*

December 28, 2018

Lazard Frères & Co. LLC
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 632-6479; (212) 632-6418
Attention:  Brandon Aebersold, Managing Director
             Levi Quaintance, Vice President

Ladies and Gentlemen,

This letter indicates the terms upon which Transform Holdco LLC ("Buyer"), a newly formed entity controlled by ESL Investments, Inc. ("ESL"), would be prepared to acquire substantially all of the go-forward retail footprint and other assets and component businesses of Sears Holdings Corporation (together with its subsidiaries, "Sears") as a going concern (the "Going Concern Proposal").  This letter is being submitted in response to the process letter filed with the United States Bankruptcy Court for the Southern District of New York (the "Court") on behalf of the debtors (the "Debtors") in the Chapter 11 cases captioned as *In re Sears Holdings Corporation, et al.*, Case No. 18-23538 (Bankr. S.D.N.Y.) (RDD) on November 21, 2018 (the "Process Letter") [Docket No. 862] and the Global Bidding Procedures (the "Bidding Procedures") set forth in the Global Bidding Procedures Order entered on November 19, 2018 [Docket No. 816].

Sears is an iconic fixture in American retail and we continue to believe in the company's immense potential to evolve and operate profitably as a going concern with a new capitalization and organizational structure.  Our proposed business plan envisages significant strategic initiatives and investments in a right-sized network of large format and small retail stores, digital assets and interdependent operating businesses.  We believe that our strategy will enable Sears to prosper in an integrated consumer and retail landscape and view a going concern transaction as essential to providing optimal value to creditors and shareholders.

We believe that a future for Sears as a going concern is the only way to preserve tens of thousands of jobs and bring continued economic benefits to the many communities across the United States that are touched by Sears and Kmart stores.  We also believe that our Going Concern Proposal creates the best path for creating the most value for the Debtors' estates, including creditors who would receive only minimal or no recoveries in a liquidation.  We are prepared to move as quickly as possible to finalize and enter into the definitive agreements for the transactions contemplated by this letter.  Our proposed Asset Purchase Agreement for the Going Concern Proposal, executed by Buyer, is being separately provided to Debtors' counsel (the "Asset Purchase Agreement").

We believe there are significant benefits to preserving and maximizing the relationships between and among Sears' retail business and its other operating businesses.  Purchasing them together enhances the value and potential of each by continuing to build on long-held commercial relationships and supporting the synergies created by shared marketing, manufacturing, technology and administrative teams, to name just a few.  Our Going Concern Proposal includes substantially all of the assets of Debtors.  To preserve intact as much as possible of Sears' existing real estate footprint as part of the going concern, we also propose to acquire the equity of non-Debtors SRC O.P., LLC, SRC Facilities LLC and SRC Real Estate (TX), LLC (the "SRC Entities") outside of the bankruptcy process, for total consideration anticipated to be approximately $592,000,000 as of the closing of such acquisition (inclusive of the purchase price for equity and the assumption of all of the outstanding liabilities of the SRC Entities).  Furthermore, our Going Concern Proposal contemplates our acquisition of all of the outstanding KCD IP Notes currently held by non-debtor Sears Reinsurance Company Ltd. ("Sears Re"), which are secured by the intellectual property comprising Kenmore and DieHard.  Our proposed consideration for the KCD IP Notes is comprised of the assumption of the

protection agreement liabilities currently reinsured by Sears Re.  We also would be willing to acquire the underlying Kenmore and DieHard intellectual property directly from non-Debtor KCD IP, LLC for additional cash consideration.

1. **Scope of Transaction.**  As discussed above, Buyer proposes to acquire substantially all of the assets of Debtors pursuant to a sale under section 363 of the U.S. Bankruptcy Code.  The purchased assets would include (a) the go-forward retail footprint of approximately 425 stores and related real estate interests (including headquarters and distribution locations) and certain designation rights with regard to additional real estate interests, inventory, infrastructure and material related contracts and (b) Sears Auto Centers, Shop Your Way, Monark, Innovel, Sears Home Services (including the PartsDirect business unit), material related contracts and the KCD IP Notes.  Based on information provided by the Debtors, the Going Concern Proposal is based on the purchased assets including Sears' retail inventory and credit card and pharmacy receivables with a book value of no less than approximately $1.7 billion.

   As part of the transaction contemplated herein, Buyer expects to provide offers of ongoing employment to up to 50,000 Sears employees, depending on any further actions Sears may take between now and closing.  Buyer also expects to reinstate the prepetition Sears severance program for the benefit of all eligible employees that accept their employment offer and to honor the promise made to millions of customers by assuming certain Sears' liabilities relating to protection agreements issued by the Sears Home Services business, gift card liabilities and Shop Your Way points liabilities as described below.

   Our proposal provides that Buyer would have the option to acquire Sears' tax assets, the value of which we have incorporated into the Going Concern Proposal.  Our Going Concern Proposal also assumes, consistent with the Debtors' projections, that the amounts outstanding under the Debtors' first lien ABL DIP facility will be no greater than $850 million at the time of closing the transactions contemplated herein.

2. **Consideration; Other Value.**  The total purchase price for our Going Concern Proposal would provide approximately $4.4 billion in total consideration to Sears, based on information provided by the Debtors.  This consideration would comprise:

   a. $850 million in cash to be funded with the proceeds of a new $1.3 billion ABL facility described in the Debt Commitment;
   b. a credit bid of approximately $1.3 billion[1], consisting of:
      i. approximately $544 million in respect of certain owned real estate assets that are collateral under the Dove Loan Agreement;
      ii. approximately $231 million in respect of certain intellectual property and ground leases and related assets that are collateral under the IP/Ground Lease Loan Agreement;
      iii. approximately $559 million in respect of the acquired inventory and receivables that are collateral under the Second Lien Facilities and the FILO Facility;
   c. the roll-over of (and release of the Debtors with respect to) $501 million of senior indebtedness (up to $230 million of the Junior DIP facility and approximately $271 million of the L/C Facility);[2]
   d. the assumption of all of the outstanding liabilities of the SRC Entities, in the amount of approximately $592,000,000;

---

[1] In the event that Buyer and its Affiliates are not the holder of all of the outstanding obligations under such first lien secured facilities as of the Closing Date, Buyer will pay to the applicable Debtors cash in the amount of any obligations owed to lenders other than Buyer or its Affiliates as of the Closing Date, to be held in separate segregated accounts of the Debtors.  Any liens on such collateral purchased by Buyer shall attach to the proceeds from the sale held in such accounts.  We currently expect that the amount of such cash may be up to approximately $220 million.
[2] Buyer understands that the holders of the amounts outstanding under these facilities have consented, or will consent, to the above-described roll-overs.

    e.   $35 million in cash and rights to purchase up to $100 million of non-voting securities of Buyer as consideration for the release of ESL and certain ESL-related parties from certain liabilities as described further below; and

    f.   the assumption of the Debtors' liabilities with respect to (i) protection agreements issued by Sears Homes Services, (ii) certain gift cards and (iii) accrued points under the Shop Your Way program, in each case on terms to be agreed with the Debtors. We estimate these liabilities to be approximately $1.1 billion.

Over the last several years, ESL has extended more than $2.4 billion of secured financing to the Debtors, which has enabled Sears to continue operations and seek to implement its transformation plan, while significantly reducing the exposure of the Debtors' other creditors (including Sears' pension plan). These secured financings were approved by Sears' board of directors (comprised of a majority of directors independent from management and the company) and also approved by the Related Party Transactions Committee comprised of independent directors and advised by separate and independent financial and legal advisors. As the holder of valid and enforceable liens and claims, the Going Concern Proposal is conditioned on (1) confirmation of Buyer's right to credit bid the secured debt in the amounts described herein (and without any requirement to cash collateralize or otherwise backstop any portion of the credit bid) and (2) a full release by the Debtors of ESL and certain ESL-related parties from any liability related to any prepetition transactions involving ESL. To the extent any parties are challenging Buyer's credit bidding capability for any reason, Buyer requests that such challenges are adjudicated to conclusion at or prior to the sale hearing with regard to the asset purchases.

3.   **Required Approvals.** We anticipate that the consummation of the transactions described in this letter will require expiration or early termination of any waiting periods under the Hart Scott Rodino Antitrust Improvements Act of 1976, and we are ready to make all necessary filings in a timely manner as further described in the Asset Purchase Agreement. To the extent any other governmental or other regulatory approvals are required to purchase the assets described herein, we commit to pursue such approvals as expeditiously as possible, subject to the reasonable assistance of Sears and its applicable advisors. Buyer will cooperate with the Debtors to provide pertinent factual information regarding Buyer's operations as reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements.

4.   **Financial Wherewithal.** We are separately providing executed copies of a debt commitment letter from the lenders named therein (the "Debt Commitment") and an equity commitment letter from ESL (the "Equity Commitment") to Debtors' counsel. Upon receipt of the funds described in the Debt Commitment and the Equity Commitment, Buyer will have sufficient funds available to consummate the transactions contemplated by our Going Concern Proposal.

As you will note, the Debt Commitment includes certain conditions that are not typical for acquisition financings, including a requirement that a $175 million secured real estate loan be funded at closing. We intend to work expeditiously with the lenders to satisfy these conditions as soon as possible. ESL has committed to provide one-half of real estate secured loan (and we have provided Debtors' counsel a copy of a commitment letter for that amount) and we currently expect that other lenders will provide the balance of the commitment in the near term. As a result of these unusual conditions, the Asset Purchase Agreement contains a condition related to the availability of debt financing. We would expect to eliminate this condition at the time the foregoing conditions are satisfied.

We are separately providing to Debtors' counsel (i) a letter executed by the administrative agent for the Dove Loan Agreement that is included in the credit bid authorizing such credit bid, and (ii) a letter executed by the collateral agent for the Second Lien Facilities authorizing the credit bid of the second lien debt.

5.   **Allocation.** The allocation of the proposed consideration to each category of purchased asset (including the inventory and receivables, real estate, intellectual property and ground lease collateral, and the unencumbered assets) is set forth under Item 2 above. Our proposed allocation of value with regard to the proposed purchases of the SRC Entities outside of the bankruptcy process are also noted above.

6. **Alternative Bid Proposal.**  As noted above, we have allocated very considerable value to the benefits of preserving Sears as an integrated business that would include both its retail and non-retail components. If we were required to bid on the different component assets separately, the aggregate consideration we would be prepared to offer would be significantly less than we have submitted in our Going Concern Proposal.  While we strongly believe that our Going Concern Proposal will provide the best outcome for the Debtors and their creditors and other stakeholders, we also are submitting bids with respect to individual assets in the event that our Going Concern Proposal is not declared a "Qualifying Bid" and subsequently accepted. Accordingly, we are submitting bids to purchase the following assets at the following purchase prices pursuant to the Alternative Asset Purchase Agreement separately provided to Debtors' counsel (the "Alternative APA") solely in the event that the Going Concern Proposal is not qualified or accepted (the "Alternative Proposal"):

    a.    Innovel: $5 million in cash, conditioned on the continued operation of at least 250 stores as a going concern;

    b.    Sears Home Services:

        i.    For substantially all of this business (including Parts Direct, the in-home repair business and assignment and assumption of the Assurant and Cross Country Home Services agreements, but excluding any assumption of liabilities related to protection agreements ): $25 million, conditioned on the continued operation of at least 250 stores as a going concern; and

        ii.    For only the Parts Direct business: $5 million plus 50% of the value of the Parts Direct inventory acquired at closing.

    c.    Shop Your Way (data and IP only; excludes any assumption of liabilities with respect to accrued points under the program): $100,000 in cash;

    d.    Certain intellectual property, including the "Sears" marks and the rights to receive royalties with respect thereto, secured by the IP/Ground Lease Loan Agreement: credit bid of approximately $150 million;

    e.    Certain real estate assets, including ground leases, as described in the indication of interest submitted pursuant to the Real Estate Process Letter on the date hereof.

The Equity Commitment also provides that Buyer will have available cash to consummate the purchases of any or all of the assets described above.  The Alternative Proposal and the Alternative APA are being provided solely in the event that the purchase of substantially all of the assets of the Debtors as described above is not consummated, and solely for the purpose of establishing Buyer as a qualified bidder in such circumstance.  Under no circumstance will we be obligated to enter into both the Alternative APA and the Asset Purchase Agreement or to make any duplicative payments for any of the assets described herein or therein.

7. **Good Faith Deposit.** We have deposited $3,010,000 in cash with the Escrow Agent selected by the Debtors, which represents our estimate of 10% of the cash component of Buyer's Alternative Proposal. Subject to confirmation from the Debtors that they are prepared to declare our Going Concern Proposal as a "Qualifying Bid" pursuant to the Bidding Procedures, Buyer is prepared to deposit additional cash with the Escrow Agent, which, together with the amount previously deposited, would represent 10% of the cash component of the Going Concern Proposal.

8. **Representations and Warranties.**  Buyer affirms that it has had an opportunity to conduct any and all due diligence regarding the assets described in this letter.  Buyer confirms that it and ESL have relied solely upon their own independent review, investigation, and/or inspection of the relative documents and the assets in submitting this letter and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the assets described in the Asset Purchase Agreement or the Alternative APA or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Asset Purchase Agreement or the Alternative APA. We have not engaged in any collusion with respect to the submission of this letter.  The Going Concern Proposal and the Alternative Proposal are not subject to any diligence contingencies of any kind.

Based on the foregoing and our familiarity with the business of the Debtors, we are confident that it can move quickly towards the consummation of a transaction as soon as possible following the conclusion of the auction and approval by the Bankruptcy Court.

We have retained Moelis & Company as financial advisor and Cleary Gottlieb Steen & Hamilton LLP as legal counsel.  Please feel free to reach out to any of the below regarding this letter.

<table>
<tr><td>Lawrence S. Chu</td><td>Christopher E. Austin</td></tr>
<tr><td>Moelis & Company</td><td>Benet O'Reilly</td></tr>
<tr><td>(212) 883-4588</td><td>Sean A. O'Neal</td></tr>
<tr><td>LC@moelis.com</td><td>Cleary Gottlieb Steen & Hamilton LLP</td></tr>
<tr><td></td><td>(212) 225-2000</td></tr>
<tr><td></td><td>CAustin@cgsh.com</td></tr>
<tr><td></td><td>BOReilly@cgsh.com</td></tr>
<tr><td></td><td>SOneal@cgsh.com</td></tr>
</table>

This letter reflects our formal and binding offer for the assets on the terms and subject only to the conditions set forth in the Asset Purchase Agreement or the Alternative APA (as the case may be). We agree to serve as a back-up bidder to the extent the Going Concern Proposal or the Alternative Proposal (as the case may be) is selected as the next highest or next best bid after another successful bidder.  We waive any claim or right to assert any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code in connection with bidding for the Assets and/or participating in the Auction.  We will not be entitled to any break-up fee and shall only be entitled to the expense reimbursement set forth in the Asset Purchase Agreement or Alternative APA (as the case may be) on the conditions set forth therein if agreed to by the Debtors and approved by the Bankruptcy Court.

If the Going Concern Proposal has not been determined to be a "Qualifying Bid" prior to 4:00 p.m., New York time, on January 4, 2019, the Going Concern Proposal and the executed Asset Purchase Agreement shall automatically terminate and be deemed withdrawn as of such time and notwithstanding anything to the contrary contained in this letter or any other document, none of Buyer, ESL or any of their respective affiliates or representatives shall have any further liability or obligation in respect of the Going Concern Proposal.  If the Alternative Proposal has not been determined to be a "Qualifying Bid" prior to 4:00 p.m., New York time, on January 4, 2019, the Alternative Proposal and the executed Alternative APA shall automatically terminate and be deemed withdrawn as of such time and notwithstanding anything to the contrary contained in this letter or any other document, none of Buyer, ESL or any of their respective affiliates or representatives shall have any further liability or obligation in respect of the Alternative Proposal.

     As always, we remain enthusiastic about the continuation of Sears as a going concern and its future potential. We hope this letter serves as the beginning of an exciting and transformative new chapter for Sears. We are available to discuss any of the foregoing at your convenience.

Very truly yours,

TRANSFORM HOLDCO LLC


  /s/ Edward S. Lampert                  
Edward S. Lampert
Chief Executive Officer

cc:

Sears Holdings Corporation
       Attn.:   Rob Riecker
                Luke Valentino
                Mohsin Meghji

Weil, Gotshal & Manges LLP
       Attn:    Ray C. Schrock, P.C.
                Jacqueline Marcus, Esq.
                Garrett A. Fail, Esq.
                Sunny Singh, Esq.

Bank of America, N.A., consultation party
       Attn:    Stephen J. Garvin and Brian P. Lindblom
and

Skadden, Arps, Slate, Meagher & Flom LLP
       Attn :   Seth E. Jacobson, Esq.


Wells Fargo Bank, National Association, consultation party
       Attn:    Joseph Burt

and

Choate, Hall & Stewart  LLP
       Attn.:   Kevin J. Simard, Esq.

Creditors' Committee, consultation party
       Attn:    Akin Gump Strauss Hauer & Feld LLP
                Ira S. Dizengoff, Esq., Philip C. Dublin, Esq.,
                Abid Qureshi, Esq., Sara L. Brauner, Esq.


[Enclosures]

# EXHIBIT D

EXECUTION VERSION

# AMENDED AND RESTATED SECURITY AGREEMENT

among

**SEARS HOLDINGS CORPORATION,**
**and certain of its Subsidiaries,**
as Grantors

and

**WILMINGTON TRUST, NATIONAL ASSOCIATION,**
as Collateral Agent

Dated as of March 20, 2018

**THIS SECURITY AGREEMENT is subject to the terms and provisions of the Amended and Restated Intercreditor Agreement, dated as of March 20, 2018 (as such agreement may be amended, restated, amended and restated, supplemented or otherwise modified from time to time), among Wilmington Trust, National Association, as Second Lien Agent and Bank of America, N.A. and Wells Fargo Bank, National Association, each as an ABL Agent and the other persons from time to time party thereto.**

# TABLE OF CONTENTS

Page

SECTION 1. DEFINED TERMS ......................................................................................................2
    1.1    Definitions ...........................................................................................................2
    1.2    Other Definitional Provisions ............................................................................8
    1.3    Perfection Certificate ..........................................................................................9

SECTION 2. GRANT OF SECURITY INTEREST ........................................................................9
    2.1    Collateral; Grant of Security Interest .................................................................9
    2.2    No Assumption of Liability .................................................................................9

SECTION 3. REPRESENTATIONS AND WARRANTIES ...........................................................9
    3.1    Title; No Other Liens ..........................................................................................9
    3.2    Perfected Liens ..................................................................................................10
    3.3    Jurisdiction of Organization..............................................................................10
    3.4    Credit Card Accounts Receivable .....................................................................10
    3.5    Related Intellectual Property..............................................................................10
    3.6    Dealer Store Inventory ......................................................................................11

SECTION 4. COVENANTS ...........................................................................................................11
    4.1    Delivery of Instruments and Chattel Paper .......................................................11
    4.2    [Intentionally Omitted] ......................................................................................11
    4.3    Maintenance of Perfected Security Interest; Further Documentation................11
    4.4    Changes in Name, etc. .......................................................................................11

SECTION 5. REMEDIAL PROVISIONS.......................................................................................12
    5.1    Certain Matters Relating to Credit Card Accounts Receivable .........................12
    5.2    Communications with Obligors; Grantors Remain Liable ................................12
    5.3    [Intentionally Omitted] ......................................................................................12
    5.4    Application of Proceeds .....................................................................................12
    5.5    Code and Other Remedies .................................................................................13
    5.6    Deficiency ..........................................................................................................15
    5.7    Grant of License in Intellectual Property, Software and other Assets ...............15

SECTION 6. THE COLLATERAL AGENT ...................................................................................17
    6.1    Collateral Agent's Appointment as Attorney-in-Fact, etc. ..............................17
    6.2    Duty of Collateral Agent....................................................................................18
    6.3    Execution of Financing Statements ...................................................................19
    6.4    Authority of the Collateral Agent ......................................................................19
    6.5    Pari Passu Obligations .......................................................................................19

SECTION 7. MISCELLANEOUS ..................................................................................................19
    7.1    Intercreditor Agreement ....................................................................................19
    7.2    Pari Passu Obligations .......................................................................................19
    7.3    Amendments in Writing ....................................................................................20
    7.4    Notices ...............................................................................................................20
    7.5    No Waiver by Course of Conduct; Cumulative Remedies ................................21
    7.6    Enforcement Expenses; Indemnification ...........................................................21
    7.7    Successors and Assigns .....................................................................................22

7.8     [Intentionally Omitted] ...................................................................................22
7.9     Counterparts...................................................................................................22
7.10    Severability .....................................................................................................22
7.11    Section Headings ............................................................................................22
7.12    Integration.......................................................................................................22
7.13    GOVERNING LAW........................................................................................22
7.14    Acknowledgements..........................................................................................22
7.15    Additional Grantors ........................................................................................23
7.16    Releases ...........................................................................................................23
7.17    Jurisdiction, Etc. .............................................................................................23
7.18    WAIVER OF JURY TRIAL...........................................................................24

<u>SCHEDULES</u>

Schedule 1      Grantors; Notice Addresses
Schedule 2      Perfection Matters
Schedule 3      Jurisdictions of Organization

## AMENDED AND RESTATED SECURITY AGREEMENT

THIS AMENDED AND RESTATED SECURITY AGREEMENT, dated as of March 20, 2018 (as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "<u>Agreement</u>"), is made by SEARS HOLDINGS CORPORATION, a Delaware corporation (the "<u>Issuer</u>"), and the subsidiaries of the Issuer from time to time party hereto (the "<u>Subsidiary Obligors</u>" and, together with the Issuer, the "<u>Grantors</u>"), in favor of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent (in such capacity and, together with any successors and assigns, the "<u>Collateral Agent</u>").

<u>W I T N E S S E T H</u>

WHEREAS, the Issuer, the Grantors and the Collateral Agent are party to that certain Security Agreement, dated as of October 12, 2010, as amended by that certain First Amendment to Security Agreement, dated as of September 1, 2016 (as further amended, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "<u>Existing Security Agreement</u>");

WHEREAS, the parties hereto desire to amend and restate the Existing Security Agreement as provided herein;

WHEREAS, reference is made to that certain indenture, dated as of October 12, 2010 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "<u>2010 Indenture</u>"), by and among the Issuer, the Guarantors and WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as successor trustee (in such capacity, the "<u>2010 Trustee</u>") and Collateral Agent, pursuant to which the Issuer issued $1,250,000,000 aggregate original principal of 6 5/8% Senior Secured Notes due 2018 (together with any Exchange Securities (as defined in the 2010 Indenture) and any Additional Notes (as defined in the 2010 Indenture) issued under the 2010 Indenture, the "<u>Senior Secured Notes</u>").

WHEREAS, reference is further made to that certain Second Lien Credit Agreement, dated as of September 1, 2016 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "<u>Second Lien Credit Agreement</u>"), by and among the Issuer, Sears Roebuck Acceptance Corp. and Kmart Corporation, as borrowers, the Guarantors, the lenders from time to time party thereto and JPP, LLC, as administrative agent and collateral administrator (the "<u>Second Lien Credit Agreement Agent</u>"), pursuant to which the borrowers have obtained a term loan in the aggregate amount of $300 million and established an uncommitted line of credit facility.

WHEREAS, reference is further made to that certain indenture, dated as of the date hereof (as amended, amended and restated, supplemented or otherwise modified from time to time, the "<u>2018 Indenture</u>"), by and among the Issuer, the Guarantors and COMPUTERSHARE TRUST COMPANY, N.A., in its capacity as trustee (in such capacity, the "<u>2018 Trustee</u>"), pursuant to which the Issuer issued $169,824,000.00 aggregate principal of 6 5/8% Senior Secured Convertible PIK Toggle Notes due 2019 (together with any PIK Interest Notes (or any increase in the principal amount of a Global Note related to PIK Interest) and any Additional Notes issued under the 2018 Indenture, the "<u>Senior Secured Convertible Notes</u>").

WHEREAS, each of the Issuer and each Subsidiary Obligor is either a primary obligor or has unconditionally guaranteed all of the Secured Obligations.

WHEREAS, from time to time after the date hereof, the Issuer may, subject to the terms and conditions of this Agreement and the other Second Lien Documents, incur additional Junior Second Lien Obligations that are secured by Liens ranking equally and ratably with the Liens securing the existing Secured Obligations and entitled to distributions on an equal and ratable basis with the Senior Secured Notes.

WHEREAS, from time to time after the date hereof, the Issuer may, subject to the terms and conditions of this Agreement and the other Second Lien Documents, incur additional Senior Second Lien Obligations that are secured by Liens ranking equally and ratably with the Liens securing the existing Secured Obligations and entitled to distributions on an equal and ratable basis with the Senior Secured Convertible Notes and the obligations under the Second Lien Credit Agreement.

WHEREAS, this Agreement is given by each Grantor in favor of the Collateral Agent for the benefit of the Secured Parties to secure the payment and performance of all Secured Obligations.

WHEREAS, the Issuer, the other Grantors, the Collateral Agent and the ABL Agents, have entered into that certain Second Amended and Restated Intercreditor Agreement, dated as of the date hereof (as amended, modified, supplemented or restated and in effect from time to time, the "Intercreditor Agreement"), establishing the relative rights and priorities of the Secured Parties and the First Lien Secured Parties in respect of the Collateral.

WHEREAS, each Grantor will receive substantial benefits from the issuance and maintenance of the Secured Obligations and each is, therefore, willing to enter into this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor and the Collateral Agent hereby agree as follows:

SECTION 1.  DEFINED TERMS

1.1    Definitions.

(a)    Unless otherwise defined herein, terms defined in the 2018 Indenture and used herein shall have the meanings given to them in the 2018 Indenture, and the following terms are used herein as defined in the New York UCC: Accounts, Chattel Paper, Control, Documents, Equipment, Fixtures, General Intangibles, Goods, Instruments, Inventory, Proceeds and Supporting Obligations.

(b)    The following terms shall have the following meanings:

"ABL Agents" has the meaning provided in the Intercreditor Agreement.

"ABL Obligations" has the meaning provided in the Intercreditor Agreement.

"ABL Secured Parties" has the meaning provided in the Intercreditor Agreement.

"Additional First Lien Agent" means the Person appointed to act as trustee, agent or representative for the holders of Additional First Lien Obligations pursuant to any Additional First Lien Agreement.

"Additional First Lien Agreement" means any indenture, credit agreement or other agreement, if any, pursuant to which any Grantor has or will incur Additional First Lien Obligations.

"Agreement" has the meaning provided in the preamble hereof.

"Collateral" has the meaning provided in Section 2.1 hereof.

"Collateral Agent" has the meaning provided in the preamble hereof.

"Copyrights" means (i) all copyrights arising under the laws of the United States, any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished, all registrations and recordings thereof, and all applications in connection therewith, including, without limitation, all registrations, recordings and applications in the United States Copyright Office and (ii) the right to obtain all renewals thereof.

"Copyright Licenses" means any written agreement naming any Grantor as licensor or licensee granting any right under any Copyright, including, without limitation, the grant of rights to manufacture, distribute, exploit and sell materials derived from any Copyright.

"Credit Agreement" means the Third Amended and Restated Credit Agreement, dated as of July 21, 2015, among the Issuer, Sears Roebuck Acceptance Corp., Kmart Corporation, the lenders from time to time party thereto, the issuing lenders from time to time party thereto, Bank of America, N.A., as administrative agent, co-collateral agent and swingline lender, Wells Fargo Bank, National Association, as co-collateral agent, together with the related documents thereto (including, without limitation, any guarantee agreements and security documents), in each case as such agreements have been or may be amended (including any amendment and restatement thereof), supplemented or otherwise modified, replaced or refinanced from time to time, including any agreement extending the maturity of, refinancing, replacing or otherwise restructuring (including, without limitation, increasing the amount of available borrowings thereunder or adding Subsidiaries of the Issuer as additional borrowers or guarantors thereunder) all or any portion of the indebtedness under such agreement or any successor or replacement agreement or agreements and whether by the same or any other agent, lender or group of lenders.

"Credit Card Accounts Receivables" means all Accounts together with all income, payments, and proceeds thereof, owed by a credit card payment processor or an issuer of credit cards to the Issuer or any Guarantor resulting from charges by a customer of the Issuer or such Guarantor on credit cards issued by such issuer in connection with the sale of goods by the Issuer or such Guarantor or services performed by the Issuer or such Guarantor.

"Discharge of First Lien Obligations" means the Discharge of ABL Obligations (as defined in the Intercreditor Agreement) and the payment in full in cash of all outstanding Additional First Lien Obligations.

"Discharge of Obligations" means in the case of any series of Secured Obligations, including the Senior Secured Notes, the Senior Secured Convertible Notes and the Second Lien Credit Agreement Obligations, the repayment, discharge or defeasance of such series of Secured Obligations under such agreement or such other event which entitles the Grantors to obtain a release of the Liens securing such Secured Obligations under the Security Documents (including, with respect to the 2010 Indenture and the 2018 Indenture, a discharge or defeasance of the such indenture in accordance with its terms).

"Discharge of Senior Second Lien Obligations" means the occurrence of a Discharge of Obligations with respect to all Senior Second Lien Obligations.

"Event of Default" means (i) an "Event of Default" under and as defined in the 2018 Indenture, the 2010 Indenture or the Second Lien Credit Agreement, or (ii) an "Event of Default" or equivalent term under and as defined in any Junior Second Lien Agreement or any Senior Second Lien Agreement.

"Final Date" means the first date on which a Discharge of Obligations shall have occurred with respect to all of the Secured Obligations.

"First Lien Collateral Agents" means (i) the ABL Agents and (ii) the Additional First Lien Agents.

"First Lien Obligations" means (i) the ABL Obligations and (ii) the Additional First Lien Obligations.

"First Lien Secured Parties" means (i) the ABL Secured Parties and (ii) each Additional First Lien Agent and each holder of Additional First Lien Obligations.

"First Lien Security Agreement" means that certain Third Amended and Restated Guarantee and Collateral Agreement, dated as of July 21, 2015, by and among the Issuer, the grantors party thereto and Bank of America, N.A., Wells Fargo Bank, National Association and General Electric Capital Corporation, as co-collateral agents, as the same has been or may be amended, supplemented or otherwise modified from time to time.

"Grantors" has the meaning provided in the preamble hereof.

"Guarantors" has the meaning provided in the preamble hereof.

"Intellectual Property" means the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including, without limitation, all Copyrights, Copyright Licenses, Patents, Patent Licenses, Trademarks and Trademark Licenses, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Intercreditor Agreement" has the meaning provided in the recitals hereof.

"Issuer" has the meaning provided in the preamble hereof.

"Junior Second Lien Agent" means any Person appointed to act as trustee, agent or representative for the holders of a series of Junior Second Lien Obligations pursuant to any Second Lien Document.

"Junior Second Lien Agreement" means any indenture, credit agreement or other agreement, if any, designated as such by the Issuer pursuant to, and as permitted by, Section 7.2 hereof.

"Junior Second Lien Joinder Agreement" means an agreement substantially in the form of Exhibit I hereto.

"Junior Second Lien Obligations" means (i) the Senior Secured Note Obligations and (ii) any other indebtedness and related obligations, including interest, fees and expenses, of the Issuer or any Subsidiary Guarantor that is secured by a Lien on the Collateral ranking equally and ratably with the

Liens securing the Senior Secured Note Obligations (or by the same Liens that secure the Senior Secured Note Obligations, including hereunder) and that is entitled to distributions on an equal and ratable basis with the Senior Secured Note Obligations pursuant to the Security Documents or otherwise; provided that the representative of such Junior Second Lien Obligations executes a joinder agreement (including, without limitation, pursuant to Section 7.2) or amendment to, or amendment and restatement of, the applicable Security Documents and the Intercreditor Agreement, or enters into an additional intercreditor agreement with the Collateral Agent providing that any amounts received in respect of the Collateral in connection with an enforcement of the Liens securing any Second Lien Obligations (or received in respect of such Liens in any bankruptcy or insolvency proceeding) shall, subject to the Intercreditor Agreement and in accordance with Section 5.4 hereof, after payment of all indemnities, compensation and expenses (including the fees and expenses of counsel and experts) payable to the Collateral Agent, the 2010 Trustee, the 2018 Trustee, the Second Lien Credit Agreement Agent and each other trustee or agent for any class of Second Lien Obligations in their capacities as such (which shall be paid first to the Collateral Agent and then among each such trustee or agent on a pro rata basis), be distributed first to each trustee or agent for a class of Senior Second Lien Obligations for distribution to the holders thereof on a pro rata basis based on the amount of outstanding obligations of each such class until all Senior Second Lien Obligations are paid in full and only thereafter to the 2010 Trustee and each other trustee or agent for a class of Junior Second Lien Obligations for distribution to the holders thereof until all Junior Second Lien Obligations are paid in full and thereafter to Holdings.  At the Issuer's option (as certified to the Collateral Agent, each Junior Second Lien Agent and each Senior Second Lien Agent pursuant to an Officer's Certificate), any indebtedness of the Issuer or the Subsidiary Guarantors secured by a Lien on the Collateral may be Junior Second Lien Obligations.  For the avoidance of doubt, any obligations designated as Junior Second Lien Obligations pursuant to Section 7.2, subject to satisfaction of the requirements set forth therein, shall constitute Junior Second Lien Obligations.

"New York UCC" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"Patents" means (i) all letters patent of the United States, any other country or any political subdivision thereof, all reissues and extensions thereof and all goodwill associated therewith, (ii) all applications for letters patent of the United States or any other country and all divisions, continuations and continuations-in-part thereof and (iii) all rights to obtain any reissues or extensions of the foregoing.

"Patent License" means all agreements, whether written or oral, providing for the grant by or to any Grantor of any right to manufacture, use or sell any invention covered in whole or in part by a Patent.

"Perfection Certificate" means that certain perfection certificate executed and delivered by the Grantors in connection with the execution and delivery of the 2010 Indenture, dated on or about the Issue Date (as defined in the 2010 Indenture).

"Required Secured Parties" means (i) until the Discharge of Senior Second Lien Obligations, the holders of a majority in aggregate principal amount of Senior Second Lien Obligations constituting Secured Obligations, voting together as a single class and (ii) from and after the Discharge of Senior Second Lien Obligations, the holders of a majority in aggregate principal amount of Junior Second Lien Obligations constituting Secured Obligations, voting together as a single class.

"Second Lien Credit Agreement Documents" means the Second Lien Credit Agreement, the Loan Documents (as defined in the Second Lien Credit Agreement) and the Security Documents.

"Second Lien Credit Agreement Obligations" means the collective reference to (i) all obligations, liabilities and indebtedness (including, without limitation, principal, premium, interest (including, without limitation, all interest that accrues after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency, reorganization or similar proceeding of any Grantor at the rate provided for in the respective documentation, whether or not such claim for post-petition interest is allowed in any such proceeding), fees, costs, expenses and indemnities, including the fees and expenses of counsel) owing to the Collateral Agent, the Second Lien Credit Agreement Agent and holders of the loans and other obligations under the Second Lien Credit Agreement Documents and the due performance and compliance by the Grantors with all of the terms, conditions and agreements contained in the Second Lien Credit Agreement Documents; (ii) any and all sums advanced by the Collateral Agent in accordance with any of the Second Lien Credit Agreement Documents in order to preserve the Collateral or preserve its security interest in the Collateral; and (iii) in the event of any proceedings for the collection or enforcement of any indebtedness, obligations or liabilities of the Grantors referred to in clause (i) above, the reasonable expenses of retaking, holding, preparing for sale or lease, selling or otherwise disposing of or realizing on the Collateral, or of any exercise by the Collateral Agent of its rights hereunder, together with reasonable attorneys' fees and court costs.

"Second Lien Documents" means the Second Lien Credit Agreement Documents, the Senior Secured Note Documents, the Senior Secured Convertible Note Documents and any other document or agreement governing any other indebtedness or other obligations that may constitute Secured Obligations, including any applicable Junior Second Lien Agreement and Senior Second Lien Agreement.

"Secured Obligations" means the collective reference to (i) the Senior Secured Note Obligations, (ii) Senior Secured Convertible Note Obligations, (iii) the Second Lien Credit Agreement Obligations, (iv) all other Senior Second Lien Obligations under or in respect of any Senior Second Lien Agreement and any related agreements and documentation, and (v) all other Junior Second Lien Obligations under or in respect of any Junior Second Lien Agreement and any related agreements and documentation.

"Secured Parties" shall mean, collectively, the Collateral Agent, the 2010 Trustee, the holders of Senior Secured Notes, the Second Lien Credit Agreement Agent, the lenders and additional agents under the Second Lien Credit Agreement, the 2018 Trustee, the Holders of Senior Secured Convertible Notes, each Junior Second Lien Agent, each holder of Junior Second Lien Obligations under or pursuant to a Junior Second Lien Agreement, each Senior Second Lien Agent and each holder of Senior Second Lien Obligations under or pursuant to a Senior Second Lien Agreement.

"Securities Act" means the Securities Act of 1933, as amended.

"Security Documents" means this Agreement, the Intercreditor Agreement and each other document entered into to grant a security interest in the Collateral or any other assets to the Collateral Agent for the benefit of the Secured Parties.

"Senior Second Lien Agent" means any Person appointed to act as trustee, agent or representative for the holders of a series of Senior Second Lien Obligations pursuant to any Second Lien Document.

"Senior Second Lien Agreement" means any indenture, credit agreement or other agreement, if any, designated as such by the Issuer pursuant to, and as permitted by, Section 7.2 hereof.

"Senior Second Lien Joinder Agreement" means an agreement substantially in the form of Exhibit I hereto.

"Senior Second Lien Obligations" means the (i) Senior Secured Convertible Note Obligations, (ii) the Second Lien Credit Agreement Obligations, and (iii) any other indebtedness and related obligations, including interest, fees and expenses, of the Issuer or any Subsidiary Guarantor that is secured by a Lien on the Collateral ranking equally and ratably with the Liens securing the obligations in respect of the Senior Secured Convertible Note Obligations (or by the same Liens that secure obligations in respect of the Senior Secured Convertible Note Obligations and Second Lien Credit Agreement Obligations, including hereunder) and that is entitled to distributions on such Lien on an equal and ratable basis with the Senior Secured Convertible Note Obligations and Second Lien Credit Agreement Obligations pursuant to the Security Documents or otherwise; provided that the representative of such Senior Second Lien Obligations executes a joinder agreement or amendment to, or amendment and restatement of, the applicable Security Documents and the Intercreditor Agreement, or enters into an additional intercreditor agreement with the Collateral Agent providing that any amounts received in respect of the Collateral in connection with an enforcement of the Liens securing any Second Lien Obligations (or received in respect of such Liens in any bankruptcy or insolvency proceeding) shall, subject to the Intercreditor Agreement and in accordance with Section 5.4 hereof, after payment of all indemnities, compensation and expenses (including the fees and expenses of counsel and experts) payable to the Collateral Agent, the 2010 Trustee, the 2018 Trustee, the Second Lien Credit Agreement Agent and each other trustee or agent for any class of Second Lien Obligations in their capacities as such (which shall be paid first to the Collateral Agent and then among each such trustee or agent on a pro rata basis), be distributed first to each trustee or agent for a class of Senior Second Lien Obligations for distribution to the holders thereof on a pro rata basis based on the amount of outstanding obligations of each such class until all Senior Second Lien Obligations are paid in full and only thereafter to the 2010 Trustee and each other trustee or agent for a class of Junior Second Lien Obligations for distribution to the holders thereof until all Junior Second Lien Obligations are paid in full and thereafter to Holdings. At the Issuer's option (as certified to the Collateral Agent, each Junior Second Lien Agent and each Senior Second Lien Agent pursuant to an Officer's Certificate), any indebtedness secured by a Lien on the Collateral may be Senior Second Lien Obligations.  For the avoidance of doubt, any obligations designated as Senior Second Lien Obligations pursuant to Section 7.2, subject to satisfaction of the requirements set forth therein, shall constitute Senior Second Lien Obligations.

"Senior Secured Note Documents" means the Senior Secured Notes, any guarantees thereof, the 2010 Indenture and the Security Documents.

"Senior Secured Note Obligations" means the collective reference to (i) all obligations, liabilities and indebtedness (including, without limitation, principal, premium, interest (including, without limitation, all interest that accrues after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency, reorganization or similar proceeding of any Grantor at the rate provided for in the respective documentation, whether or not such claim for post-petition interest is allowed in any such proceeding), fees, costs, expenses and indemnities, including the fees and expenses of counsel) owing to the Collateral Agent, the 2010 Trustee and holders of the Senior Secured Notes under the Senior Secured Note Documents and the due performance and compliance by the Grantors with all of the terms, conditions and agreements contained in the Senior Secured Note Documents; (ii) any and all sums advanced by the Collateral Agent in accordance with any of the Senior Secured Note Documents in order to preserve the Collateral or preserve its security interest in the Collateral; and (iii) in the event of any proceedings for the collection or enforcement of any indebtedness, obligations or liabilities of the Grantors referred to in clause (i) above, the reasonable expenses of retaking, holding, preparing for sale or lease, selling or otherwise disposing of or realizing on the Collateral, or of any

exercise by the Collateral Agent of its rights hereunder, together with reasonable attorneys' fees and court costs.

"Senior Secured Convertible Note Documents" means the Senior Secured Convertible Notes, any guarantees thereof, the 2018 Indenture and the Security Documents.

"Senior Secured Convertible Note Obligations" means the collective reference to (i) all obligations, liabilities and indebtedness (including, without limitation, principal, premium, interest (including, without limitation, all interest that accrues after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency, reorganization or similar proceeding of any Grantor at the rate provided for in the respective documentation, whether or not such claim for post-petition interest is allowed in any such proceeding), fees, costs, expenses and indemnities, including the fees and expenses of counsel) owing to the Collateral Agent, the 2018 Trustee and holders of the Senior Secured Convertible Notes under the Senior Secured Convertible Note Documents and the due performance and compliance by the Grantors with all of the terms, conditions and agreements contained in the Senior Secured Note Convertible Documents; (ii) any and all sums advanced by the Collateral Agent in accordance with any of the Senior Secured Convertible Note Documents in order to preserve the Collateral or preserve its security interest in the Collateral; and (iii) in the event of any proceedings for the collection or enforcement of any indebtedness, obligations or liabilities of the Grantors referred to in clause (i) above, the reasonable expenses of retaking, holding, preparing for sale or lease, selling or otherwise disposing of or realizing on the Collateral, or of any exercise by the Collateral Agent of its rights hereunder, together with reasonable attorneys' fees and court costs.

"Software" means all "software" as such term is defined in the New York UCC used by any Grantor to process, assemble, prepare for sale, market for sale, sell or otherwise dispose of the Collateral, other than software embedded in any category of goods, including all computer programs and all supporting information provided in connection with a transaction related to any program.

"Trademarks" means (i) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers, and all goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof, or otherwise, and all common-law rights related thereto and (ii) the right to obtain all renewals thereof.

"Trademark License" means any agreement, whether written or oral, providing for the grant by or to any Grantor of any right to use any Trademark.

1.2    Other Definitional Provisions.

(a)    The words "hereof," "herein," "hereto" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section and Schedule references are to this Agreement unless otherwise specified.

(b)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(c)    Where the context requires, terms relating to the Collateral or any part thereof, when used in relation to a Grantor, shall refer to such Grantor's Collateral or the relevant part thereof.

-8-

1.3     Perfection Certificate.  The Collateral Agent, each Grantor and each Secured Party agree that the Perfection Certificate and all descriptions of Collateral therein and schedules, amendments and supplements thereto are and shall at all times remain a part of this Agreement.

SECTION 2.  GRANT OF SECURITY INTEREST

2.1     Collateral; Grant of Security Interest.  Each Grantor hereby grants to the Collateral Agent for the equal and ratable benefit of the Secured Parties a security interest in all of the following property now owned, or at any time hereafter acquired, by such Grantor or in which such Grantor now has, or at any time in the future may acquire, any right, title or interest (collectively, the "Collateral"), as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of such Grantor's Secured Obligations:

(a)     all Credit Card Accounts Receivable;

(b)     all Inventory;

(c)     all Chattel Paper relating to Credit Card Accounts Receivable;

(d)     all Instruments relating to Credit Card Accounts Receivable;

(e)     all Documents relating to any Inventory;

(f)     all books and records pertaining to the Collateral; and

(g)     to the extent not otherwise included, all Proceeds, insurance claims, Supporting Obligations and products of any and all of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing.

2.2     No Assumption of Liability.  The security interest in the Collateral granted to the Collateral Agent is granted as security only and shall not subject the Collateral Agent or any other Secured Party to, or in any way alter or modify, any obligation or liability of any Grantor with respect to or arising out of the Collateral.  Anything contained herein to the contrary notwithstanding, each Grantor shall remain liable under any contracts and agreements included in the Collateral, to the extent set forth therein, to perform all of its duties and obligations thereunder to the same extent as if this Agreement and the Second Lien Documents had not been executed, the exercise by Collateral Agent of any of its rights hereunder or any of the Second Lien Documents shall not release any Grantor from any of its duties or obligations under the contracts and agreements included in the Collateral, and the Collateral Agent shall not have any obligation or liability under any contracts, licenses, and agreements included in the Collateral by reason of this Agreement or any of the Second Lien Documents, nor shall Collateral Agent be obligated to perform any of the obligations or duties of any Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

SECTION 3.  REPRESENTATIONS AND WARRANTIES

Each Grantor represents and warrants to the Collateral Agent and the other Secured Parties that:

3.1     Title; No Other Liens.  Except for the security interest granted to the Collateral Agent for the ratable benefit of the Secured Parties pursuant to this Agreement and any other Permitted Lien, such Grantor owns each item of the Collateral free and clear of any and all Liens or claims of others.  No

financing statement or other public notice with respect to all or any part of the Collateral is on file or of record in any public office, except (i) such as have been filed in favor of the Collateral Agent for the ratable benefit of the Secured Parties pursuant to this Agreement or (ii) as are permitted by the Second Lien Documents.

3.2    Perfected Liens.

(a)    The security interests granted pursuant to this Agreement (a) upon completion of the filings specified on Schedule 2 (which, in the case of all financing statements referred to on said Schedule 2, have been delivered to the Collateral Agent in completed form) will constitute valid perfected security interests in all of the Collateral as to which a Lien can be perfected by filing in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, as collateral security for the Secured Obligations, enforceable in accordance with the terms hereof and (b) are prior to all other Liens on the Collateral in existence on the date hereof other than Permitted Liens having priority over the Liens of the Collateral Agent pursuant to applicable law or the Intercreditor Agreement.

(b)    Notwithstanding anything herein to the contrary, prior to the Discharge of First Lien Obligations, the requirements of this Agreement to deliver Collateral and any certificates, instruments or related documents to the Collateral Agent shall be deemed satisfied by delivery of such Collateral and such certificates, instruments or related documents to any First Lien Collateral Agent. The Issuer shall deliver copies of any such certificates, instruments or related documents to the Collateral Agent.

3.3    Jurisdiction of Organization.    On the date hereof, such Grantor's jurisdiction of organization and identification number from the jurisdiction of organization (if any) are specified on Schedule 3. Such Grantor has furnished to the Collateral Agent a charter, certificate of incorporation or other formation document and good standing certificate dated as of a date which is recent to the date hereof.

3.4    Credit Card Accounts Receivable.

(a)    No amount payable to such Grantor under or in connection with any Credit Card Accounts Receivable is evidenced by any Instrument or Chattel Paper which has not been delivered to the Collateral Agent (or, if prior to the Discharge of First Lien Obligations, to any First Lien Collateral Agent for the benefit of the Collateral Agent).

(b)    Except as would not be reasonably expected to result in a material adverse effect on the business or financial condition of the Issuer and its Subsidiaries considered as a whole (a "Material Adverse Effect"), there are no facts, events or occurrences which would impair the validity of any Credit Card Accounts Receivable, or tend to reduce the amount payable thereunder from the face amount of the claim or invoice or statements delivered to the Collateral Agent (or, if prior to the Discharge of First Lien Obligations, to any First Lien Collateral Agent for the benefit of the Collateral Agent) with respect thereto (other than arising in the ordinary course of business).

3.5    Related Intellectual Property.    Such Grantor owns or has a license to use all Intellectual Property which is reasonably necessary to sell the Collateral in the ordinary course. Such Grantor shall take all reasonable and necessary steps to maintain and preserve the benefit of each Trademark License, Copyright License and Patent License which relates to Intellectual Property to the extent that the use of such Intellectual Property would be reasonably necessary in connection with the Collateral Agent's enforcement of any of its remedies under the Second Lien Documents.

-10-

3.6    <u>Dealer Store Inventory</u>.  Except as would not be reasonably expected to result in a Material Adverse Effect, (a) all of the Inventory at each Dealer Store is owned by a Grantor free and clear of any and all Liens or claims of others except for any Permitted Liens, and (b) all such Inventory is subject to a legal, valid and perfected security interest in favor of the applicable Grantor, which is prior to any other Lien on such Inventory.

<div align="center">SECTION 4.  COVENANTS</div>

Each Grantor covenants and agrees with the Collateral Agent and the other Secured Parties that, until the Final Date:

4.1    <u>Delivery of Instruments and Chattel Paper</u>.  If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any Instrument, Chattel Paper or transferable records, such Instrument, Chattel Paper or transferable records, shall be promptly delivered to the Collateral Agent (or, if prior to the Discharge of First Lien Obligations, to any First Lien Collateral Agent for the benefit of the Collateral Agent), duly indorsed in a manner satisfactory to the Collateral Agent (or, if prior to the Discharge of First Lien Obligations, to any First Lien Collateral Agent for the benefit of the Collateral Agent), to be held as Collateral pursuant to this Agreement.

4.2    [Intentionally Omitted].

4.3    <u>Maintenance of Perfected Security Interest; Further Documentation</u>.

(a)    Such Grantor shall maintain the security interest created by this Agreement as a perfected security interest having at least the priority described in <u>Section 3.2</u> and shall defend such security interest against the claims and demands of all Persons whomsoever, subject to the rights of such Grantor under the Security Documents to dispose of the Collateral.

(b)    Each Grantor shall file, and if reasonably requested by the Collateral Agent will execute or authenticate and deliver to the Collateral Agent, all financing or continuation statements, or amendments thereto, and such other instruments or notices, as may be necessary, or as the Collateral Agent may reasonably request, from time to time in order to maintain a perfected security interest in the Collateral owned by such Grantor subject only to (i) Liens securing the First Lien Obligations and (ii) any other Permitted Lien.  Such financing statements may describe the Collateral in the same manner as described herein or may contain an indication or description of collateral that describes such property in any other manner as is necessary, advisable or prudent to ensure the perfection of the security interest in the Collateral granted to the Collateral Agent herein.

(c)    Each Grantor agrees that, in the event any Grantor, pursuant to the First Lien Security Agreement, takes any action to grant or perfect a Lien in favor of any First Lien Collateral Agent in any assets that constitute Collateral (other than Proceeds in the form of cash or cash equivalents) hereunder, such Grantor shall, to the extent reasonable, take a corresponding action to grant or perfect a Lien (subject to the Intercreditor Agreement) in such Collateral in favor of the Collateral Agent to secure the Secured Obligations without the request of the Collateral Agent.

4.4    <u>Changes in Name, etc.</u>  Such Grantor will not, except upon 15 days' prior written notice to the Collateral Agent, the filing of all additional financing statements and other documents necessary to maintain the validity, perfection and priority of the security interests provided for herein and other documents necessary or reasonably requested by the Collateral Agent to maintain the validity, perfection and priority of the security interests provided for herein, change its organizational form from that of a

registered entity to an unregistered entity (or from an unregistered entity to a registered entity), change its jurisdiction of organization from that referred to in Section 3.3 or change its name or organizational form.

## SECTION 5.  REMEDIAL PROVISIONS

5.1     <u>Certain Matters Relating to Credit Card Accounts Receivable</u>.  At the Collateral Agent's request (or, if prior to the Discharge of First Lien Obligations, at the request of any First Lien Collateral Agent for the benefit of the Collateral Agent), at any time after the occurrence and during the continuance of an Event of Default, each Grantor shall deliver to the Collateral Agent (or, if prior to the Discharge of First Lien Obligations, to any First Lien Collateral Agent for the benefit of the Collateral Agent) all original and other documents evidencing, and relating to, the agreements and transactions which gave rise to the Credit Card Accounts Receivable.

5.2     <u>Communications with Obligors; Grantors Remain Liable</u>.

(a)     The Collateral Agent (or, if prior to the Discharge of First Lien Obligations, any First Lien Collateral Agent for the benefit of the Collateral Agent) in its own name or in the name of others may at any time after the occurrence and during the continuance of an Event of Default communicate with obligors under the Credit Card Accounts Receivable to verify with them to the satisfaction of the Collateral Agent the existence, amount and terms of any Credit Card Accounts Receivable.

(b)     Upon the request of the Collateral Agent after the Discharge of First Lien Obligations, at any time after the occurrence and during the continuance of an Event of Default, each Grantor shall notify obligors on the Credit Card Accounts Receivable that the Credit Card Accounts Receivable have been assigned to the Collateral Agent for the benefit of the Secured Parties and that payments in respect thereof shall be made directly to the Collateral Agent.

(c)     Anything herein to the contrary notwithstanding, each Grantor shall remain liable under each of the Credit Card Accounts Receivable to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise thereto.  Neither the Collateral Agent nor any other Secured Party shall have any obligation or liability under any Credit Card Accounts Receivable (or any agreement giving rise thereto) by reason of or arising out of this Agreement or the receipt by the Collateral Agent or any other Secured Party of any payment relating thereto, nor shall the Collateral Agent or any other Secured Party be obligated in any manner to perform any of the obligations of any Grantor under or pursuant to any Credit Card Accounts Receivable (or any agreement giving rise thereto), to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

5.3     [<u>Intentionally Omitted</u>].

5.4     <u>Application of Proceeds</u>.  Subject to the terms of the Intercreditor Agreement, any proceeds received by the Collateral Agent in respect of any sale of, collection from or other realization upon all or any part of the Collateral pursuant to the exercise by the Collateral Agent of its remedies, or received by the Collateral Agent in respect of all or any part of the Collateral in connection with any bankruptcy, insolvency, reorganization or similar proceeding of any Grantor, shall be applied, together with any other sums then held by the Collateral Agent pursuant to this Agreement, as follows:

First, to pay all indemnities, compensation and expenses (including the fees and expenses of counsel and experts) owing to the Collateral Agent in its capacity as such in accordance with the terms of this Agreement and the other Second Lien Documents;

Second, to the 2010 Trustee in its capacity as such in accordance with the terms of the 2010 Indenture, to the Second Lien Credit Agreement Agent in its capacity as such in accordance with the terms of the Second Lien Credit Agreement, to the 2018 Trustee in its capacity as such in accordance with the terms of the 2018 Indenture and to any other Junior Second Lien Agent or Senior Second Lien Agent in its capacity as such in accordance with the terms of the applicable Junior Second Lien Agreement or Senior Second Lien Agreement, in each case ratably;

Third, to ratably pay all amounts owing to holders of Senior Second Lien Obligations (including interest, costs and attorneys' fees owed to the holders of Senior Second Lien Obligations, whether or not a claim is allowed against the Issuer or any Grantor for such interest, fees, indemnification payments, expense reimbursements and other amounts in any related bankruptcy proceeding) in accordance with the terms of the 2018 Indenture, the Second Lien Credit Agreement and any other Senior Second Lien Agreements;

Fourth, to ratably pay all amounts owing to holders of Junior Second Lien Obligations (including interest, costs and attorneys' fees owed to the holders of Junior Second Lien Obligations, whether or not a claim is allowed against the Issuer or any Grantor for such interest, fees, indemnification payments, expense reimbursements and other amounts in any related bankruptcy proceeding) in accordance with the terms of the 2010 Indenture and any other Junior Second Lien Agreements; and

Fifth, to pay the Issuer or to whomsoever may be lawfully entitled to receive the same.

All applications of proceeds pursuant to clause First above, clause Second above, clause Third above and clause Fourth above, respectively, shall be allocated among the applicable Secured Parties on a *pro rata* basis according to the principal, interest and/or other amounts owing in respect of the applicable Secured Obligations owing to such Secured Parties at the time of the distribution.  In the event that any such proceeds are insufficient to pay in full the items described in clauses First through Fourth of this Section 5.4, the Grantors shall remain liable, jointly and severally, for any deficiency.

If, despite the provisions of this Agreement, any Secured Party shall receive any payment or other recovery in excess of its portion of payments on account of the Secured Obligations to which it is then entitled in accordance with this Agreement, such Secured Party shall hold such payment or recovery in trust for the benefit of all Secured Parties for distribution in accordance with this Section 5.4.

Upon the request of the Collateral Agent prior to any distribution under this Section 5.4, each Secured Party shall provide to the Collateral Agent certificates, in form and substance reasonably satisfactory to the Collateral Agent, setting forth the respective amounts referred to in Section 5.4, that each such Secured Party believes it is entitled to receive, and the Collateral Agent shall be fully entitled to rely on such certificates.

5.5    Code and Other Remedies.

(a)    If an Event of Default shall occur and be continuing, the Collateral Agent, on behalf of the Secured Parties, may (and at the direction of the Required Secured Parties shall (subject to any right of the Collateral Agent to require indemnity from such persons prior to taking any enforcement action)) exercise, in addition to all other rights and remedies granted to them in this Agreement and in any other

instrument or agreement securing, evidencing or relating to the Secured Obligations, all rights and remedies of a secured party under the New York UCC or any other applicable law.  Without limiting the generality of the foregoing, the Collateral Agent, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon any Grantor or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), may (and at the direction of the Required Secured Parties shall (subject to any right of the Collateral Agent to require indemnity from such persons prior to taking any enforcement action)) in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Collateral Agent or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  Each purchaser at any such sale shall hold the property sold absolutely, free from any claim or right on the part of any Grantor.  The Collateral Agent shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption, stay, valuation or appraisal on the part of any Grantor, which right or equity is hereby waived and released, and may credit against the purchase price the amount of any claim then due and payable from any Grantor on account of the Secured Obligations owed to the Collateral Agent, and the Collateral Agent may, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to any Grantor therefor.  Each Grantor further agrees, at the Collateral Agent's request, to assemble the Collateral and make it available to the Collateral Agent at the Grantor's sole risk and expense, at places which the Collateral Agent shall reasonably select, whether at such Grantor's premises or elsewhere.  The Collateral Agent shall apply the net proceeds of any action taken by it pursuant to this Section 5.5, after deducting all reasonable costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Collateral Agent hereunder, including, without limitation, reasonable attorneys' fees and disbursements, to the payment in whole or in part of the Secured Obligations, in the order set forth in Section 5.4, and only after such application and after the payment by the Collateral Agent of any other amount required by any provision of law, including, without limitation, Section 9-615(a)(3) of the New York UCC, need the Collateral Agent account for the surplus, if any, to any Grantor.  To the extent permitted by applicable law, each Grantor waives all claims, damages and demands it may acquire against any Collateral Agent arising out of the exercise by them of any rights hereunder.  If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition.  The Collateral Agent shall not be obligated to make any sale or other disposition of any Collateral if it shall determine not to do so, regardless of the fact that notice of sale or other disposition of such Collateral shall have been given.  The Collateral Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned.  Any public sale shall be held at such time or times within ordinary business hours and at such place or places as the Collateral Agent may fix and state in the notice of such sale.  If any of the Collateral is sold, leased, or otherwise disposed of by the Collateral Agent on credit, the Secured Obligations shall not be deemed to have been reduced as a result thereof unless and until payment is finally received thereon by the Collateral Agent.

(b)      If an Event of Default shall occur and be continuing, with respect to any Collateral consisting of Inventory, the Collateral Agent may conduct one or more going out of business sales, in the Collateral Agent's own right or by one or more agents and contractors.  Such sale(s) may be conducted upon any premises owned, leased, or occupied by any Grantor.  The Collateral Agent and any such agent or contractor, in conjunction with any such sale, may augment the Inventory with other goods (all of

which other goods shall remain the sole property of the Collateral Agent or such agent or contractor). Any amounts realized from the sale of such goods which constitute augmentations to the Inventory (net of an allocable share of the costs and expenses incurred in their disposition) shall be the sole property of the Collateral Agent or such agent or contractor and neither any Grantor nor any Person claiming under or in right of any Grantor shall have any interest therein. Each purchaser at any such going out of business sale shall hold the property sold absolutely, free from any claim or right on the part of any Grantor.

(c)     If an Event of Default shall occur and be continuing, with respect to any Collateral consisting of Accounts, the Collateral Agent may: (i) demand, collect and receive any amounts relating thereto, as the Collateral Agent may reasonably determine; (ii) commence and prosecute any actions in any court for the purposes of collecting any such Accounts and enforcing any other rights in respect thereof; (iii) defend, settle or compromise any action brought and, in connection therewith, give such discharges or releases as the Collateral Agent may reasonably deem appropriate; (iv) without limiting the Collateral Agent's rights set forth in <u>Section 6.1</u>, receive, open and dispose of mail addressed to any Grantor and endorse checks, notes, drafts, acceptances, money orders, bills of lading, warehouse receipts or other instruments or documents evidencing payment, shipment or storage of the goods giving rise to such Accounts or securing or relating to such Accounts, on behalf of and in the name of such Grantor; and (v) sell, assign, transfer, make any agreement in respect of, or otherwise deal with or exercise rights in respect of, any such Accounts or the goods or services which have given rise thereto, as fully and completely as though the Collateral Agent was the absolute owner thereof for all purposes.

(d)     If an Event of Default shall occur and be continuing, with or without legal process and with or without prior notice or demand for performance, the Collateral Agent may enter upon, occupy, and use any premises owned or occupied by each Grantor. The Collateral Agent shall not be required to remove any of the Collateral from any such premises upon taking possession thereof, and may render any Collateral unusable to the Grantors. In no event shall the Collateral Agent be liable to any Grantor for use or occupancy by the Collateral Agent of any premises pursuant to this Section 5.5, nor for any charge (such as wages for the Grantors' employees and utilities) reasonably incurred in connection with the Collateral Agent's exercise of its rights and remedies hereunder.

(e)     For purposes of this <u>Section 5.5</u>, a written and fully executed agreement to purchase the Collateral or any portion thereof shall be treated as a sale thereof. The Collateral Agent shall be free to carry out such sale pursuant to such agreement and no Grantor shall be entitled to the return of the Collateral or any portion thereof subject thereto, notwithstanding the fact that after the Collateral Agent shall have entered into such an agreement all Events of Default shall have been remedied and the Secured Obligations paid in full.

(f)     To the extent permitted by applicable law, each Grantor hereby waives all rights of redemption, stay, valuation and appraisal which such Grantor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted. The Collateral Agent shall have no obligation to marshal any of the Collateral or resort to any of the property or assets of any Grantor in any particular manner or order.

5.6     <u>Deficiency</u>. Each Grantor shall remain liable for any deficiency if the proceeds of any sale or other disposition of the Collateral are insufficient to pay its Secured Obligations and the fees and disbursements of any attorneys employed by the Collateral Agent or any other Secured Party to collect such deficiency.

5.7     <u>Grant of License in Intellectual Property, Software and other Assets</u>.

(a)        For the purpose of enabling the Collateral Agent to exercise the rights and remedies under this Section 5 at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, each Grantor hereby (i) assigns and transfers to the Collateral Agent and grants the Collateral Agent, for the benefit of the Collateral Agent and the other Secured Parties, an irrevocable, nonexclusive license (exercisable without payment of royalty or any other compensation to such Grantor or any Affiliate of such Grantor) to use, license or sublicense, any related Intellectual Property now owned or licensed or hereafter owned, licensed or otherwise acquired by such Grantor, and wherever the same may be located, and including in such license access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof and (ii) irrevocably agrees that the Collateral Agent may sell any of such Grantor's Inventory directly to any Person, including, without limitation, Persons who have previously purchased such Grantor's Inventory from such Grantor and in connection with any such sale or other enforcement of the Collateral Agent's rights under this Agreement, may sell Inventory which bears any Trademark owned by or licensed to such Grantor and any Inventory that is covered by any Copyright owned by or licensed to such Grantor and the Collateral Agent may finish any work in process and affix any Trademark owned by or licensed to such Grantor and sell such Inventory as provided herein; provided that, notwithstanding the foregoing, except as provided in any agreement between the Collateral Agent and the owner or licensor of such Intellectual Property, this Agreement shall not constitute a license to use, license or sublicense, any Intellectual Property to the extent such license or sublicense is prohibited by or results in the termination of or requires any consent not obtained under, any contract, license, agreement, instrument or other document evidencing or giving rise to such Intellectual Property, except to the extent that (x) the term in such contract, license, agreement, instrument or other document providing for such prohibition, breach, default or termination or requiring such consent is ineffective under applicable law, or (y) the contract, license, agreement, instrument or other document pursuant to which such Grantor was granted its rights to any such Intellectual Property was issued by a Subsidiary or Affiliate of such Grantor (and is not subject to an applicable constraint in an over-license or other agreement with a third party).

(b)        For the purpose of enabling the Collateral Agent to exercise the rights and remedies under this Section 5 at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, each Grantor hereby assigns and transfers to the Collateral Agent and grants to the Collateral Agent, for the benefit of the Collateral Agent and the other Secured Parties, an irrevocable, nonexclusive license (exercisable without payment of royalty or any other compensation to such Grantor or any other Person) to use, license or sublicense, any Software now owned or licensed or hereafter owned, licensed or otherwise acquired by such Grantor; provided that, notwithstanding the foregoing, except as provided in any agreement between the Collateral Agent and the owner or licensor of such Software, this Agreement shall not constitute a license to use, license or sublicense, any Software to the extent such license or sublicense is prohibited by or results in the termination of or requires any consent not obtained under, any contract, license, agreement, instrument or other document evidencing or giving rise to such Software, except to the extent that (i) the term in such contract, license, agreement, instrument or other document providing for such prohibition, breach, default or termination or requiring such consent is ineffective under applicable law, or (ii) the contract, license, agreement, instrument or other document pursuant to which such Grantor was granted its rights to any such Software was issued by a Subsidiary or Affiliate of such Grantor (and is not subject to an applicable constraint in an over-license or other agreement with a third party).

(c)        Without duplication of the rights granted to the Collateral Agent in clauses (a) and (b) of this Section 5.7, and for the purpose of enabling the Collateral Agent to exercise the rights and remedies under this Section 5 at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, each Grantor hereby assigns and transfers to the Collateral Agent and grants to the Collateral Agent, for the benefit of the Collateral Agent and the other Secured Parties, an

irrevocable, nonexclusive license (exercisable without payment of royalty, rent or any other compensation to such Grantor or any other Person), to use, license or sublicense, any real property or personal property of such Grantor which does not constitute Collateral, including but not limited to, all Equipment, Fixtures, General Intangibles and Goods, whether now or hereafter owned, leased or occupied by such Grantor; provided that, notwithstanding the foregoing, except as provided in any agreement between the Collateral Agent and the owner or licensor of such real or personal property, this Agreement shall not constitute a license to use, license or sublicense, any real or personal property to the extent such license or sublicense is prohibited by or results in the termination of or requires any consent not obtained under, any lease, contract, license, agreement, instrument or other document evidencing or giving rise to such property or any rights therein, except to the extent that (i) the term in such lease, contract, license, agreement, instrument or other document providing for such prohibition, breach, default or termination or requiring such consent is ineffective under applicable law, or (ii) the contract, license, agreement, instrument or other document pursuant to which such Grantor was granted its rights to any such real property or personal property was issued by a Subsidiary or Affiliate of such Grantor (and is not subject to an applicable constraint in an over-license or other agreement with a third party).

## SECTION 6.  THE COLLATERAL AGENT

6.1    Collateral Agent's Appointment as Attorney-in-Fact, etc.

(a)    Each Grantor hereby irrevocably constitutes and appoints the Collateral Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Grantor and in the name of such Grantor or in its own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Agreement, and, without limiting the generality of the foregoing, each Grantor hereby gives the Collateral Agent the power and right, on behalf of such Grantor, without notice to, or assent by such Grantor, to do any or all of the following:

(i)    in the name of such Grantor or its own name, or otherwise, take possession of and indorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any Credit Card Accounts Receivable or with respect to any other Collateral and file any claim or take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Collateral Agent for the purpose of collecting any and all such moneys due under any Credit Card Accounts Receivable or with respect to any other Collateral whenever payable;

(ii)    pay or discharge taxes and Liens levied or placed on or threatened against the Collateral, effect any repairs or any insurance called for by the terms of this Agreement and pay all or any part of the premiums therefor and the costs thereof;

(iii)    execute, in connection with any sale provided for in Section 5.5, any indorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral; and

(iv)    (1) direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due or to become due thereunder as the Collateral Agent shall direct; (2) ask or demand for, collect, and receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral; (3) sign and indorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications, notices and other

documents in connection with any of the Collateral; (4) commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any portion thereof and to enforce any other right in respect of any Collateral; (5) defend any suit, action or proceeding brought against such Grantor with respect to any Collateral; (6) settle, compromise or adjust any such suit, action or proceeding and, in connection therewith, give such discharges or releases as the Collateral Agent may deem appropriate; and (7) generally, sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Collateral Agent was the absolute owner thereof for all purposes, and do, at the Collateral Agent's option and such Grantor's expense, at any time, or from time to time, all acts and things which the Collateral Agent deems necessary to protect, preserve or realize upon the Collateral and the Collateral Agent's and any other Secured Party's security interest therein and to effect the intent of this Agreement, all as fully and effectively as such Grantor might do.

Anything in this Section 6.1(a) to the contrary notwithstanding, the Collateral Agent agrees that it will not exercise any rights under the power of attorney provided for in this Section 6.1(a) unless an Event of Default shall have occurred and be continuing.

(b)     Without limitation to the Collateral Agent's or any other Secured Party's rights to payment, reimbursement or indemnification under any other Security Document, the expenses of the Collateral Agent incurred in connection with actions undertaken as provided in Sections 6.1 and 7.6 shall be payable by any applicable Grantor to the Collateral Agent on demand.

(c)     Each Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.  All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created hereby are released.

6.2     Duty of Collateral Agent.  The applicable provisions of the Second Lien Documents are herein incorporated by reference and shall be applicable to the rights, obligations, privileges, protections, immunities and benefits given to the Collateral Agent hereunder, including without limitation its right to be compensated, reimbursed, and indemnified, and are extended to, and shall be enforceable by, each agent, custodian and other person employed to act on behalf of the Collateral Agent hereunder.  The Collateral Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the New York UCC or otherwise, shall be to deal with it in the same manner as the Collateral Agent deals with similar property for its own account.  The Collateral Agent will not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any Liens on the Collateral.  Neither the Collateral Agent nor any other Secured Party nor any of their respective officers, directors, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Grantor or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof.  The powers conferred on the Collateral Agent and the other Secured Parties hereunder are solely to protect the Collateral Agent's and the other Secured Parties' interests in the Collateral and shall not impose any duty upon the Collateral Agent or any other Secured Party to exercise any such powers.  The Collateral Agent and the other Secured Parties shall be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither they nor any of their officers, directors, employees or agents shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct, as determined by a final and non-appealable judgment of a court of competent jurisdiction.  In furtherance and not in limitation of

the foregoing, Wilmington Trust, National Association hereby agrees to act as Collateral Agent under and as defined in the 2018 Indenture upon and in accordance with the express terms and conditions contained therein and the other Senior Secured Convertible Note Documents, as applicable.

6.3    <u>Execution of Financing Statements</u>.  Each Grantor authorizes the Collateral Agent to file or record financing statements and other filing or recording documents or instruments with respect to the Collateral without the signature of such Grantor in such form and in such offices as the Collateral Agent determines appropriate to perfect the security interests of the Collateral Agent under this Agreement.

6.4    <u>Authority of the Collateral Agent</u>.  Each Grantor acknowledges that the rights and responsibilities of the Collateral Agent under this Agreement with respect to any action taken by the Collateral Agent or the exercise or non-exercise by the Collateral Agent of any request, judgment or other right or remedy provided for herein or resulting or arising out of this Agreement shall, as between the Collateral Agent and the other Secured Parties, be governed by the Second Lien Documents and by such other agreements with respect thereto as may exist from time to time among them, but, as between the Collateral Agent and the Grantors, the Collateral Agent shall be conclusively presumed to be acting as agent for the Secured Parties with full and valid authority so to act or refrain from acting, and no Grantor shall be under any obligation, or entitlement, to make any inquiry respecting such authority.

6.5    <u>Second Lien Obligations</u>.  The Collateral Agent shall be permitted to rely on any certificate, direction or consent delivered by any agent with respect to any series of Secured Obligations under any Second Lien Documents with respect to all matters relating to the relevant Secured Obligations.

## SECTION 7.  MISCELLANEOUS

7.1    <u>Intercreditor Agreement</u>.  Notwithstanding anything herein to the contrary, the Liens and security interests granted to the Collateral Agent pursuant to this Agreement and the exercise of any right or remedy by the Collateral Agent hereunder, in each case, with respect to the Collateral are subject to the limitations and provisions of the Intercreditor Agreement.  In the event of any conflict between the terms of the Intercreditor Agreement and the terms of this Agreement, the terms of the Intercreditor Agreement shall govern and control.  By its execution and delivery of this Agreement, each Junior Second Lien Agent and Senior Second Lien Agent authorizes and directs the Collateral Agent to execute and deliver the Intercreditor Agreement and perform its obligations thereunder, binding such Junior Second Lien Agent and Senior Second Lien Agents and their respective Secured Parties to the terms thereof.

7.2    <u>Second Lien Obligations</u>. On or after the date hereof and so long as not prohibited by the Second Lien Documents with respect to each series of Secured Obligations, the Issuer may from time to time designate any indenture, credit agreement or other contract to be a Junior Second Lien Agreement or Senior Second Lien Agreement and the indebtedness and other obligations thereunder to be secured as Junior Second Lien Obligations or Senior Second Lien Obligations, as applicable, by delivering to the Collateral Agent, each Junior Second Lien Agent and each Senior Second Lien Agent, if any, (a) a certificate signed by an Officer of the Issuer (i) identifying the obligations so designated and the initial aggregate principal amount or face amount thereof, (ii) stating that such agreement is designated as a Junior Second Lien Agreement or Senior Second Lien Agreement, as applicable, and such obligations are designated as (A) Secured Obligations and (B) Junior Second Lien Obligations or Senior Second Lien Obligations, as applicable, for purposes hereof, (iii) representing that such designation of such obligations as Secured Obligations and Junior Second Lien Obligations or Senior Second Lien Obligations, as applicable, complies with the terms of  the Second Lien Documents with respect to each series of Secured Obligations and (iv) specifying the name and address of the Junior Second Lien Agent or Senior Second Lien Agent, as applicable, for such obligations and (b) a fully executed Junior Second Lien Joinder Agreement or Senior Second Lien Joinder Agreement, as applicable.  Each Junior Second Lien

Agent and Senior Second Lien Agent that becomes party hereto pursuant to a Junior Second Lien Joinder Agreement or Senior Second Lien Joinder Agreement agrees that upon the satisfaction of all conditions set forth in the preceding sentence, the Collateral Agent shall act as agent under this Agreement for such Junior Second Lien Agent or Senior Second Lien Agent and the holders of such Junior Second Lien Obligations or Senior Second Lien Obligations, and as Collateral Agent for the benefit of all Secured Parties, including without limitation, any Secured Party that holds any such Junior Second Lien Obligations or Senior Second Lien Obligations, and each such Junior Second Lien Agent or Senior Second Lien Agent, for itself and the other holders of the applicable Junior Second Lien Obligations or Senior Second Lien Obligations, agrees to the appointment, and acceptance of the appointment, of the Collateral Agent as agent for such Junior Second Lien Agent or Senior Second Lien Agent and the holders of such Junior Second Lien Obligations or Senior Second Lien Obligations, as set forth in each Junior Second Lien Joinder Agreement and Senior Second Lien Joinder Agreement and agrees, on behalf of itself and each Secured Party it represents, to be bound by this Agreement and to be subject to, and, if requested, to become a party to, the Intercreditor Agreement.  Notwithstanding the foregoing, it is understood that the Issuer shall not designate, or re-designate, any Senior Second Lien Agreement existing on the date hereof as a Junior Second Lien Agreement (and any related Senior Second Lien Obligations as Junior Second Lien Obligations) without the consent of the applicable Senior Second Lien Agent.

7.3    <u>Amendments in Writing</u>.  None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except in accordance with the provisions of each Junior Second Lien Agreement and Senior Second Lien Agreement.

7.4    <u>Notices</u>.  All notices, requests and demands to or upon the Collateral Agent or any Grantor hereunder shall be given in writing and delivered in person, sent by telecopy, delivered electronically, delivered by commercial courier service or mailed by first-class mail, postage prepaid, addressed as follows:

To the Collateral Agent:

Wilmington Trust, National Association, as Collateral Agent
Global Capital Markets
50 South Sixth Street, Suite 1290
Minneapolis, MN 55402
Attn: Sears Holdings Corporation Administrator

To any Grantor:

Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, Illinois 60179
Facsimile:  (847) 286-2055
Attention:  Treasurer

With a copy to (which shall not constitute notice):

Wachtell Lipton Rosen & Katz
51 West 52nd Street
New York, New York 10019
Facsimile: (212) 403-2000
Attention: Joshua A. Feltman

Any such notice, request or demand to or upon any Junior Second Lien Agent or Senior Second Lien Agent shall be addressed to such Junior Second Lien Agent or Senior Second Lien Agent at its notice address set forth in the applicable Second Lien Document.

7.5    No Waiver by Course of Conduct; Cumulative Remedies.  Neither the Collateral Agent nor any other Secured Party shall by any act (except by a written instrument pursuant to Section 7.1), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Event of Default.  No failure to exercise, nor any delay in exercising, on the part of the Collateral Agent or any other Secured Party, any right, power or privilege hereunder shall operate as a waiver thereof.  No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  A waiver by the Collateral Agent or any other Secured Party of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which the Collateral Agent or such other Secured Party would otherwise have on any future occasion.  The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

7.6    Enforcement Expenses; Indemnification.  Without limitation to the Collateral Agent's or any other Secured Party's rights to payment, compensation, reimbursement or indemnification under any other Security Document:

(a)    each Grantor jointly and severally agrees to pay or reimburse the Collateral Agent and the other Secured Parties for all their costs and expenses incurred in collecting against any Grantor under this Agreement or otherwise enforcing or preserving any rights under this Agreement and the other Security Documents, including, without limitation, the fees and disbursements of the Secured Parties' counsel in accordance with the terms of the Second Lien Documents;

(b)    each Grantor agrees to pay, and to save the Collateral Agent and the other Secured Parties harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all stamp, excise, sales or other taxes which may be payable or determined to be payable with respect to any of the Collateral or in connection with any of the transactions contemplated by this Agreement and the other Security Documents;

(c)    each Grantor agrees to pay, and to save the Collateral Agent and the other Secured Parties harmless from, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement and the other Security Documents other than such as arise from the gross negligence or willful misconduct of such Person; and

(d)    to the fullest extent permitted by applicable Law, no Grantor shall assert, and each Grantor hereby waives, any claim against the Collateral Agent and the other Secured Parties, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Security Document or any agreement or instrument contemplated hereby, or the transactions contemplated hereby or thereby.  Neither the Collateral Agent nor any other Secured Party shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by the Collateral Agent or other Secured Party through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Security Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of the Collateral Agent or other Secured Party as determined by a final and non-appealable judgment of a court of competent jurisdiction.

The agreements in this Section 7.6 shall survive repayment of the Secured Obligations and all other amounts payable under the Security Documents and the other Second Lien Documents, the replacement of the Collateral Agent, the release of the Collateral from the Liens created hereby and the termination of this Agreement.

7.7    Successors and Assigns.  This Agreement shall be binding upon the successors and assigns of each Grantor and shall inure to the benefit of the Collateral Agent and the other Secured Parties and their successors and assigns; provided that no Grantor may assign, transfer or delegate any of its rights or obligations under this Agreement except as permitted by each of the Second Lien Documents.

7.8    [Intentionally Omitted].

7.9    Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or by electronic mail of a "PDF" file shall be effective as delivery of a manually executed counterpart of this Agreement.

7.10    Severability.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

7.11    Section Headings.  The Section headings used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

7.12    Integration.  This Agreement and the other Security Documents represent the agreement of the Grantors, the Collateral Agent and the other Secured Parties with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Collateral Agent or the other Secured Parties relative to subject matter hereof and thereof not expressly set forth or referred to herein or in the other Security Documents.

7.13    GOVERNING LAW.   THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, BUT WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.

7.14    Acknowledgements.  Each Grantor hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Security Documents to which it is a party;

(b)    neither the Collateral Agent nor any other Secured Party has any fiduciary relationship with or duty to any Grantor arising out of or in connection with this Agreement or any of the other Security Document, and the relationship between the Grantors, on the one hand, and the Collateral Agent and the other Secured Parties, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)    no joint venture is created hereby or by the other Security Documents or otherwise exists by virtue of the transactions contemplated hereby among the Secured Parties or among the Grantors and the Secured Parties.

7.15    <u>Additional Grantors.</u> Each Subsidiary of the Issuer that is required to become a party to this Agreement pursuant to Section 4.06 of the 2018 Indenture or pursuant to any other Second Lien Document shall become a Grantor for all purposes of this Agreement upon execution and delivery by such Subsidiary of an Assumption Agreement in the form of <u>Exhibit II</u> hereto to the Collateral Agent.

7.16    <u>Releases.</u>  This Agreement shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon each Grantor and the successors and assigns thereof and shall inure to the benefit of the Collateral Agent and the other Secured Parties and their respective successors, indorsees, transferees and assigns until the Final Date.   In addition, the security interests granted hereunder shall terminate and be released, in whole or in part, (i) as to the obligations under the 2010 Indenture and the Senior Secured Notes, as provided in the 2010 Indenture, (ii) as to the obligations under the Second Lien Credit Agreement, as provided in the Second Lien Credit Agreement, (iii) as to the obligations under the 2018 Indenture and the Senior Secured Convertible Notes, as provided in the 2018 Indenture and (iv) as to any other Junior Second Lien Obligations or Senior Second Lien Obligations that may become Secured Obligations, as provided in the applicable Junior Second Lien Agreement or Senior Second Lien Agreement; <u>provided</u>, <u>however</u>, that this Agreement and the security interest granted herein shall be reinstated if at any time payment, or any part thereof, of any Obligation is rescinded or must otherwise be restored by any Secured Party upon the bankruptcy or reorganization of the Issuer or other Grantor.  At the request and sole expense of any Grantor following any such termination, the Collateral Agent shall deliver to such Grantor any Collateral held by the Collateral Agent hereunder, and execute and deliver to such Grantor such documents as such Grantor shall reasonably request to evidence such termination.

7.17    <u>Jurisdiction, Etc.</u>

(a)    Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any New York State court or federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Security Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in any such New York State court or, to the extent permitted by law, in such federal court. Each Grantor hereby irrevocably consents to the service of process in any action or proceeding in such courts by the mailing thereof by any parties hereto by registered or certified mail, postage prepaid, to the Issuer at its address specified pursuant to Section 13.02 of the 2018 Indenture.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.   Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement or the other Security Documents in the courts of any jurisdiction.

(b)    Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Security Documents in any New York State or federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

7.18    <u>WAIVER OF JURY TRIAL</u>.  EACH GRANTOR AND THE COLLATERAL AGENT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER SECURITY DOCUMENTS OR THE ACTIONS OF THE COLLATERAL AGENT OR ANY OTHER SECURED PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT THEREOF.

7.19    The 2010 Trustee is executing this Agreement solely as Trustee under the 2010 Indenture. All rights, privileges, protections and immunities in favor of the 2010 Trustee under the 2010 Indenture are incorporated herein by reference.  The 2018 Trustee is executing this Agreement solely as Trustee under the 2018 Indenture. All rights, privileges, protections and immunities in favor of the 2018 Trustee under the 2018 Indenture are incorporated herein by reference.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be duly executed and delivered as of the date first above written.

**Grantors:**

SEARS HOLDINGS CORPORATION

By: _____
      Name:  Robert A. Riecker
      Title:  Chief Financial Officer

CALIFORNIA BUILDER APPLIANCES, INC.
FLORIDA BUILDER APPLIANCES, INC.
KMART CORPORATION
KMART HOLDING CORPORATION
KMART OPERATIONS LLC
SEARS OPERATIONS LLC
SEARS, ROEBUCK AND CO.

By: _____
      Name:  Robert A. Riecker
      Title:  Chief Financial Officer

SEARS HOLDINGS MANAGEMENT
CORPORATION
SEARS HOME IMPROVEMENT PRODUCTS,
INC.

By: _____
      Name:  Robert A. Riecker
      Title:  President

SEARS ROEBUCK ACCEPTANCE CORP.

By: _____
      Name:  Robert A. Riecker
      Title:  Vice President, Finance

A&E FACTORY SERVICE, LLC
A&E HOME DELIVERY, LLC
A&E LAWN & GARDEN, LLC
A&E SIGNATURE SERVICE, LLC
KLC, INC.
KMART OF MICHIGAN, INC.
PRIVATE BRANDS, LTD.
SEARS BRANDS MANAGEMENT
CORPORATION
SEARS PROTECTION COMPANY
SEARS PROTECTION COMPANY (FLORIDA),
L.L.C.
SEARS, ROEBUCK DE PUERTO RICO, INC.
SOE, INC.
STARWEST, LLC

By: _____
      Name:  Robert A. Riecker
      Title:  Vice President

KMART.COM LLC

By: BlueLight.com, Inc., its Member

By: _____
      Name:  Robert A. Riecker
      Title:  Vice President

KMART OF WASHINGTON LLC
KMART STORES OF ILLINOIS LLC
KMART STORES OF TEXAS LLC
MYGOFER LLC

By: Kmart Corporation, its Member

By: _____
      Name:  Robert A. Riecker
      Title:  Chief Financial Officer

Signature Page to Security Agreement

**Collateral Agent:**

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Collateral Agent

By: _____

    Name:  Lynn M. Steiner
    Title:  Vice President

**Junior Second Lien Agent:**

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as 2010 Trustee

By: _____

    Name:  Lynn M. Steiner
    Title:  Vice President

**Senior Second Lien Agents:**

COMPUTERSHARE TRUST COMPANY, N.A.,
as 2018 Trustee

By: _____

    Name:
    Title:

JPP, LLC,
as Second Lien Credit Agreement Agent

By: _____

    Name:
    Title:

*[Signature Page to Security Agreement]*

**Collateral Agent:**

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Collateral Agent


By: _____
      Name:
      Title:

**Junior Second Lien Agent:**

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as 2010 Trustee


By: _____
      Name:
      Title:

**Senior Second Lien Agents:**

COMPUTERSHARE TRUST COMPANY, N.A.,
as Trustee


By: _____
      Name:
      Title:


JPP, LLC


By: _____
      Name:
      Title:

*[Signature Page to Security Agreement]*

**Collateral Agent:**

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Collateral Agent

By: _____
       Name:
       Title:

**Junior Second Lien Agent:**

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as 2010 Trustee

By: _____
       Name:
       Title:

**Senior Second Lien Agents:**

COMPUTERSHARE TRUST COMPANY, N.A.

By: _____
       Name:
       Title:

JPP, LLC

By: _____
       Name:  Edward S. Lampert
       Title:  Member

*[Signature Page to Security Agreement]*

Schedule 1

GRANTORS AND NOTICE ADDRESSES OF GRANTORS

| Grantor | Notice Address |
|---|---|
| Sears Roebuck Acceptance Corp. | 3711 Kennett Pike<br>Greenville, DE 19807 |
| Kmart Corporation | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Sears Holdings Corporation | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| A&E Factory Service, LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| A&E Home Delivery, LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| A&E Lawn & Garden, LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| A&E Signature Service, LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| California Builder Appliances, Inc. | 6085 State Farm Dr., Suite 200<br>Rohnert Park, CA 94928 |
| Florida Builder Appliances, Inc. | 1742 W. Atlantic Blvd.<br>Pompano Beach, FL 33069 |
| KLC, Inc. | 5000 San Dario<br>Laredo, TX 78041 |
| Kmart Holding Corporation | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Kmart of Michigan, Inc. | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Kmart of Washington LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Kmart Operations LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Kmart Stores of Illinois LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Kmart Stores of Texas LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Kmart.com LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |

| Grantor | Notice Address |
|---|---|
| MyGofer LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Private Brands, Ltd. | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Sears Brands Management Corporation | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Sears Holdings Management Corporation | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Sears Home Improvement Products, Inc. | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Sears Operations LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Sears Protection Company | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Sears Protection Company (Florida), L.L.C. | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Sears, Roebuck and Co. | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Sears, Roebuck de Puerto Rico, Inc. | Montehiedra Town Center-Kmart 2nd Flr.<br>9410 Avenida Los Romeros<br>San Juan, PR 00926 |
| SOE, Inc. | 9025 S. Kyrene Road<br>Tempe, AZ 85284 |
| StarWest, LLC | 9025 S. Kyrene Road<br>Tempe, AZ 85284 |

Schedule 2

FILINGS

Uniform Commercial Code Filings

UCC-1 Financing Statements to be filed against the Grantors specified below with the Secretary of State of the jurisdictions set forth next to such Grantor's name:

| Grantor | Jurisdiction |
|---|---|
| Sears Roebuck Acceptance Corp. | Delaware |
| Kmart Corporation | Michigan, Puerto Rico and Guam |
| Sears Holdings Corporation | Delaware |
| A&E Factory Service, LLC | Delaware |
| A&E Home Delivery, LLC | Delaware |
| A&E Lawn & Garden, LLC | Delaware |
| A&E Signature Service, LLC | Delaware |
| California Builder Appliances, Inc. | Delaware |
| Florida Builder Appliances, Inc. | Delaware |
| KLC, Inc. | Texas |
| Kmart Holding Corporation | Delaware |
| Kmart of Michigan, Inc. | Michigan |
| Kmart of Washington LLC | Washington |
| Kmart Operations LLC | Delaware |
| Kmart Stores of Illinois LLC | Illinois |
| Kmart Stores of Texas LLC | Texas |
| Kmart.com LLC | Delaware |
| MyGofer LLC | Delaware |
| Private Brands, Ltd. | Delaware |
| Sears Brands Management Corporation | Delaware and Puerto Rico |
| Sears Holdings Management Corporation | Delaware and Puerto Rico |
| Sears Home Improvement Products, Inc. | Pennsylvania |
| Sears Operations LLC | Delaware |
| Sears Protection Company | Illinois |
| Sears Protection Company (Florida), L.L.C. | Florida |

| Sears, Roebuck and Co. | New York, Puerto Rico and Guam |
|---|---|
| Sears, Roebuck de Puerto Rico, Inc. | Delaware and Puerto Rico |
| SOE, Inc. | Delaware |
| StarWest, LLC | Delaware |

Schedule 3

LOCATION OF JURISDICTION OF ORGANIZATION

| Grantor | Jurisdiction of Organization | Identification Number |
|---|---|---|
| Sears Roebuck Acceptance Corp. | Delaware | 0506120 |
| Kmart Corporation | Michigan | 142467 |
| Sears Holdings Corporation | Delaware | 3881360 |
| A&E Factory Service, LLC | Delaware | 3457178 |
| A&E Home Delivery, LLC | Delaware | 3877029 |
| A&E Lawn & Garden, LLC | Delaware | 3748766 |
| A&E Signature Service, LLC | Delaware | 3748765 |
| California Builder Appliances, Inc. | Delaware | 2862479 |
| Florida Builder Appliances, Inc. | Delaware | 2143982 |
| KLC, Inc. | Texas | 1276656 |
| Kmart Holding Corporation | Delaware | 3648953 |
| Kmart of Michigan, Inc. | Michigan | 33800A |
| Kmart of Washington LLC | Washington | 602292492 |
| Kmart Operations LLC | Delaware | 5671829 |
| Kmart Stores of Illinois LLC | Illinois | 00912026 |
| Kmart Stores of Texas LLC | Texas | 800200422 |
| Kmart.com LLC | Delaware | 3138594 |
| MyGofer LLC | Delaware | 4631467 |
| Private Brands, Ltd. | West Virginia | 110640 |
| Sears Brands Management Corporation | Delaware | 0617118 |
| Sears Holdings Management Corporation | Delaware | 4041132 |
| Sears Home Improvement Products, Inc. | Pennsylvania | 2204417 |
| Sears Operations LLC | Delaware | 5671833 |
| Sears Protection Company | Illinois | 61825622 |
| Sears Protection Company (Florida), L.L.C. | Florida | L03000020977 |
| Sears, Roebuck and Co. | New York | NONE |
| Sears, Roebuck de Puerto Rico, Inc. | Delaware | 0561919 |
| SOE, Inc. | Delaware | 3816328 |

| StarWest, LLC | Delaware | 3833707 |

EXHIBIT I

**[Form of]**

**[JUNIOR SECOND LIEN]/[SENIOR SECOND LIEN] JOINDER AGREEMENT**

The undersigned (the "[Junior Second Lien]/[Senior Second Lien] Agent") is the [agent/trustee/representative] for Persons wishing to become "Secured Parties" (the "New Secured Parties") under the Amended and Restated Security Agreement, dated as of March 20, 2018 (as amended and/or supplemented, the "Security Agreement" (terms used without definition herein have the meanings assigned to such terms by the Security Agreement)) among Sears Holdings Corporation, the other Grantors party thereto, Wilmington Trust, National Association, as Collateral Agent (the "Collateral Agent") and the other agents party thereto.

In consideration of the foregoing, the undersigned hereby:

(i)    represents that the [Junior Second Lien]/[Senior Second Lien] Agent has been authorized by the New Secured Parties to become a party to the Security Agreement on behalf of the New Secured Parties under that [DESCRIBE OPERATIVE AGREEMENT] (the obligations thereunder and under the ancillary documents referred to therein, the "New Secured Obligations") and to act as the [Junior Second Lien]/[Senior Second Lien] Agent for the New Secured Parties hereunder and under the Security Agreement;

(ii)    acknowledges that the New Secured Parties have received a copy of the Security Agreement;

(iii)    irrevocably appoints and authorizes the Collateral Agent to take such action as agent on its behalf and to exercise such powers under the Security Agreement and the other Security Documents as are delegated to the Collateral Agent by the terms thereof, together with all such powers as are reasonably incidental thereto; and

(iv)    accepts and acknowledges, for itself and the other New Secured Parties, the terms of the Security Agreement applicable to it and the New Secured Parties and agrees to serve as [Junior Second Lien]/[Senior Second Lien] Agent for the New Secured Parties with respect to the New Secured Obligations and agrees on its own behalf and on behalf of the New Secured Parties to be bound by the terms of the Security Agreement and the other Security Documents applicable to holders of Secured Obligations, with all the rights and obligations of a Secured Party thereunder and bound by all the provisions thereof as fully as if it had been a Secured Party on the effective date of the Security Agreement.

The name and address of the representative for purposes of Section 7.4 of the Security Agreement are as follows:

**[name and address of [Junior Second Lien]/[Senior Second Lien] Agent]**

IN WITNESS WHEREOF, the undersigned has caused this [Junior Second Lien]/[Senior Second Lien] Joinder Agreement to be duly executed by its authorized officer as of the _____ day of _____, 20__.

[NAME]

By: _____
       Name:
       Title:

AGREED TO AND ACCEPTED:

The Collateral Agent hereby acknowledges its acceptance of this [Junior Second Lien]/[Senior Second Lien] Joinder Agreement and agrees to act as Collateral Agent for the New Secured Parties, subject to the terms of the [agency agreement, dated as of _____].

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Collateral Agent

By: _____
    Name:
    Title:

<u>EXHIBIT II</u>

FORM OF ASSUMPTION AGREEMENT

ASSUMPTION AGREEMENT, dated as of [_____, 20\_\_], made by [_____] (the "<u>Additional Grantor</u>"), in favor of WILMINGTON TRUST, NATIONAL ASSOCIATION, as collateral agent (the "Collateral Agent"), for the benefit of the Secured Parties pursuant to the Security Agreement referred to below.  All capitalized terms not defined herein shall have the meaning ascribed to them in such Security Agreement.

<u>W I T N E S S E T H</u>

WHEREAS, Sears Holdings Corporation ("<u>Holdings</u>") and certain of its Subsidiaries (other than the Additional Grantor) have entered into that certain Amended and Restated Security Agreement, dated as of March 20, 2018 (as amended, supplemented or otherwise modified from time to time, the "<u>Security Agreement</u>"), in favor of the Collateral Agent for the benefit of the Secured Parties;

WHEREAS, the Security Agreement and/or the applicable Second Lien Documents (as defined in the Security Agreement) requires the Additional Grantor to become a party to the Security Agreement; and

WHEREAS, the Additional Grantor has agreed to execute and deliver this Assumption Agreement in order to become a party to the Security Agreement.

NOW, THEREFORE, IT IS AGREED:

1.  <u>Security Agreement</u>.  By executing and delivering this Assumption Agreement, the Additional Grantor, as provided in Section 7.15 of the Security Agreement, hereby becomes a party to the Security Agreement as a Grantor thereunder with the same force and effect as if originally named therein as a Grantor and, without limiting the generality of the foregoing, hereby expressly assumes all obligations and liabilities of a Grantor thereunder, and grants to the Collateral Agent for the benefit of the Secured Parties a security interest in all Collateral of such Additional Grantor to secure the Secured Obligations.  The information set forth in <u>Annex 1-A</u> hereto is hereby added to the information set forth in the Schedules to the Security Agreement.  The Additional Grantor hereby represents and warrants that each of the representations and warranties contained in Section 3 of the Security Agreement is, as to such Additional Grantor, true and correct on and as of the date hereof (after giving effect to this Assumption Agreement) as if made on and as of such date.

2.  <u>Governing Law</u>. THIS ASSUMPTION AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, BUT WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.

[Remainder of Page intentionally left blank]

IN WITNESS WHEREOF, the undersigned has caused this Assumption Agreement to be duly executed and delivered as of the date first above written.

[ADDITIONAL GRANTOR]


By: _____
Name:
Title:

Annex 1-A to
<u>Assumption Agreement</u>

<u>Supplement to Schedule 1</u>

<u>Supplement to Schedule 2</u>

<u>Supplement to Schedule 3</u>

# EXHIBIT E

**Exhibit 10.3**

EXECUTION VERSION

SECOND AMENDED AND RESTATED

INTERCREDITOR AGREEMENT

by and among

BANK OF AMERICA, N.A. and
WELLS FARGO BANK, NATIONAL ASSOCIATION,

as ABL Agents,

and

WILMINGTON TRUST, NATIONAL ASSOCIATION,

as Second Lien Agent

Dated as of March 20, 2018

TABLE OF CONTENTS

|  |  | Page No. |
|---|---|---|
| ARTICLE 1 DEFINITIONS | | 3 |
| Section 1.1 | UCC Definitions | 3 |
| Section 1.2 | Other Definitions | 3 |
| Section 1.3 | Rules of Construction | 11 |
| ARTICLE 2 LIEN PRIORITY | | 12 |
| Section 2.1 | Priority of Liens | 12 |
| Section 2.2 | Waiver of Right to Contest Liens | 13 |
| Section 2.3 | Remedies Standstill | 13 |
| Section 2.4 | Release of Liens | 14 |
| Section 2.5 | No New Liens | 14 |
| Section 2.6 | Waiver of Marshalling | 15 |
| ARTICLE 3 ACTIONS OF THE PARTIES | | 15 |
| Section 3.1 | Certain Actions Permitted | 15 |
| Section 3.2 | Agent for Perfection | 15 |
| Section 3.3 | Insurance | 16 |
| Section 3.4 | No Additional Rights For the Loan Parties Hereunder | 16 |
| Section 3.5 | Payments Over | 16 |
| ARTICLE 4 APPLICATION OF PROCEEDS | | 16 |
| Section 4.1 | Application of Proceeds | 16 |
| Section 4.2 | Specific Performance | 18 |
| ARTICLE 5 INTERCREDITOR ACKNOWLEDGEMENTS AND WAIVERS | | 18 |
| Section 5.1 | Notice of Acceptance and Other Waivers | 18 |
| Section 5.2 | Modifications to ABL Documents and Second Lien Documents | 19 |
| Section 5.3 | Reinstatement and Continuation of Agreement | 20 |
| ARTICLE 6 INSOLVENCY PROCEEDINGS | | 21 |
| Section 6.1 | DIP Financing | 21 |
| Section 6.2 | Relief From Stay | 21 |
| Section 6.3 | No Contest; Adequate Protection | 22 |
| Section 6.4 | Asset Sales | 22 |
| Section 6.5 | Separate Grants of Security and Separate Classification | 22 |
| Section 6.6 | Enforceability | 23 |
| Section 6.7 | ABL Obligations Unconditional | 23 |
| Section 6.8 | Second Lien Obligations Unconditional | 23 |
| ARTICLE 7 MISCELLANEOUS | | 24 |
| Section 7.1 | Rights of Subrogation | 24 |
| Section 7.2 | Further Assurances | 24 |
| Section 7.3 | Representations | 24 |

i

| | | |
|---|---|---|
| Section 7.4 | Amendments | 25 |
| Section 7.5 | Addresses for Notices | 25 |
| Section 7.6 | No Waiver; Remedies | 26 |
| Section 7.7 | Continuing Agreement, Transfer of Secured Obligations | 26 |
| Section 7.8 | Governing Law; Entire Agreement | 27 |
| Section 7.9 | Counterparts | 27 |
| Section 7.10 | No Third Party Beneficiaries | 27 |
| Section 7.11 | Headings | 27 |
| Section 7.12 | Severability | 27 |
| Section 7.13 | Attorneys' Fees | 27 |
| Section 7.14 | VENUE; JURY TRIAL WAIVER | 27 |
| Section 7.15 | Intercreditor Agreement | 28 |
| Section 7.16 | No Warranties or Liability | 28 |
| Section 7.17 | Conflicts | 29 |
| Section 7.18 | Information Concerning Financial Condition of the Loan Parties | 29 |
| Section 7.19 | Concerning the Second Lien Agent | 29 |
| Section 7.20 | Amendment and Restatement | 30 |

SECOND AMENDED AND RESTATED INTERCREDITOR AGREEMENT

THIS SECOND AMENDED AND RESTATED INTERCREDITOR AGREEMENT (as amended, supplemented, restated or otherwise modified from time to time pursuant to the terms hereof, this "**Agreement**") is entered into as of March 20, 2018 by and among **BANK OF AMERICA, N.A.**, in its capacity as administrative agent and co-collateral agent and **WELLS FARGO BANK, NATIONAL ASSOCIATION**, as successor to WELLS FARGO RETAIL FINANCE, LLC, in its capacity as co-collateral agent (together with their respective successors and assigns in such capacities, the "**ABL Agents**"), for (i) the financial institutions party from time to time to the ABL Credit Agreement referred to below (such financial institutions, together with their respective successors, assigns and transferees, the "**ABL Lenders**") and (ii) any ABL Bank Product Affiliates and ABL Cash Management Affiliates (each as defined below) (such ABL Bank Product Affiliates and ABL Cash Management Affiliates, together with the ABL Agents and the ABL Lenders, the "**ABL Secured Parties**"), and **WILMINGTON TRUST, NATIONAL ASSOCIATION,** as successor to WELLS FARGO BANK, NATIONAL ASSOCIATION, as collateral agent (in such capacity, and together with its successors and assigns in such capacity, the "**Second Lien Agent**") for (i) itself, (ii) the Original Trustee and the holders of the Original Second Lien Notes issued under that certain Original Second Lien Notes Indenture referred to below (such holders, together with their respective successors, assigns and transferees, the "**Original Noteholders**"), (iii) the New Trustee and the holders of the New Second Lien Notes issued under that certain New Second Lien Notes Indenture referred to below (such holders, together with their respective successors, assigns and transferees, the "**New Noteholders**" and together with the Original Noteholders, the "**Noteholders**"), and (iv) the lenders under the Second Lien Credit Agreement referred to below (such lenders, together with their respective successors, assigns and transferees, the "**Second Lien Lenders**") and the agents for such Second Lien Lenders.

RECITALS:

A. Pursuant to that certain Third Amended and Restated Credit Agreement, dated as of July 21, 2015, by and among Sears Roebuck Acceptance Corp. ("**SRAC**") and Kmart Corporation ("**Kmart**", and together with SRAC, the "**ABL Borrowers**"), Sears Holdings Corporation ("**Holdings**"), the ABL Lenders and the ABL Agents (as such agreement has been or may be amended, supplemented, restated or otherwise modified from time to time in accordance with the terms hereof and thereof, including by that certain First Amendment, dated as of April 8, 2016, that certain Second Amendment, dated as of February 10, 2017, that certain Third Amendment, dated as of December 12, 2017, and that certain Fourth Amendment, dated as of February 7, 2018, the "**ABL Credit Agreement**"), the ABL Lenders have agreed to make certain loans and provide other financial accommodations to or for the benefit of Holdings and certain of its subsidiaries.

B. Pursuant to a certain Third Amended and Restated Guarantee and Collateral Agreement, dated as of July 21, 2015 (as the same has been or may be amended, supplemented, restated and/or otherwise modified, the "**ABL Guarantee and Collateral Agreement**"), by Holdings and certain of its subsidiaries (including, without limitation, the ABL Borrowers) in favor of the ABL Agents for the benefit of the ABL Secured Parties, (1) Holdings and certain of its subsidiaries (collectively, with Holdings, the "**ABL Guarantors**") have guaranteed the

1

payment and performance of the ABL Obligations under the ABL Documents (as hereinafter defined), and (2) the ABL Borrowers and the ABL Guarantors (collectively, the "**ABL Loan Parties**") have granted a security interest and lien in certain of their assets (including, without limitation, credit card accounts receivables, pharmacy receivables, inventory and other assets related thereto) to secure the respective obligations of each of the ABL Loan Parties under the ABL Documents.

C. Pursuant to that certain Indenture, dated as of October 12, 2010, by and among Holdings, as issuer (in such capacity and as issuer of the New Second Lien Notes referred to below, the "**Second Lien Notes Issuer**"), certain subsidiaries of Holdings, as guarantors (in such capacity and as guarantors of the New Second Lien Notes, the "**Second Lien Notes Guarantors**", and together with the Second Lien Notes Issuer, the "**Second Lien Notes Parties**"), Wilmington Trust, National Association, as successor to Wells Fargo Bank, National Association, as trustee (in such capacity, "**Original Trustee**") and the Second Lien Agent, Holdings has issued the Notes (as defined in the Original Second Lien Notes Indenture and referred to herein as the "**Original Second Lien Notes**") and the Original Noteholders have purchased the Original Second Lien Notes (as such agreement may be amended, supplemented, restated or otherwise modified from time to time in accordance with the terms hereof and thereof, the "**Original Second Lien Notes Indenture**").

D. Pursuant to that certain Indenture dated as of the date hereof by and among the Second Lien Notes Issuer, the Second Lien Notes Guarantors, and Computershare Trust Company, N.A., as trustee (in such capacity, the "**New Trustee**"), Holdings has issued the Notes (as defined in the New Second Lien Notes Indenture and referred to herein as the "**New Second Lien Notes**") and the New Noteholders have purchased the New Second Lien Notes (as such agreement may be amended, supplemented, restated or otherwise modified from time to time in accordance with the terms hereof and thereof, the "**New Second Lien Notes Indenture**").

E. Pursuant to that certain Second Lien Credit Agreement dated as of September 1, 2016 by and among SRAC and Kmart, as borrowers (in such capacity, the "**Second Lien Credit Agreement Borrowers**"), Holdings and the other the guarantors party thereto (in such capacity, the "**Second Lien Credit Agreement Guarantors**", and together with the Second Lien Credit Agreement Borrowers, the "**Second Lien Credit Agreement Loan Parties**"), the Second Lien Lenders and JPP, LLC, a Delaware limited liability company, as administrative agent and collateral administrator (in such capacity, the "**Second Lien Credit Agreement Agent**"), the Second Lien Credit Agreement Borrowers have borrowed the Term Loan and have borrowed and may borrow Line of Credit Loans (each as defined in the Second Lien Credit Agreement) (as such agreement may be amended, supplemented, restated or otherwise modified from time to time in accordance with the terms hereof and thereof, including pursuant to that certain First Amendment, dated as of July 7, 2017, that certain Second Amendment, dated as of January 9, 2018 and that certain Third Amendment, dated as of February 7, 2018, the "**Second Lien Credit Agreement**").

F. Pursuant to the Original Second Lien Notes Indenture, the New Second Lien Notes Indenture and the Second Lien Credit Agreement, the Second Lien Loan Parties have entered into that certain Amended and Restated Security Agreement of even date herewith in favor of the Second Lien Agent for the benefit of the Second Lien Agent, the Original Trustee,

2

the New Trustee, the Noteholders, the Second Lien Credit Agreement Agent and the Second Lien Lenders, (as such agreement may be amended, supplemented, restated or otherwise modified from time to time in accordance with the terms hereof and thereof, the "**Second Lien Security Agreement**).

G. Each of the ABL Agents, or predecessors thereof (on behalf of the ABL Secured Parties) and the Second Lien Agent (on behalf of the then-applicable Second Lien Secured Parties) previously entered into that certain Intercreditor Agreement dated October 12, 2010, which agreement was amended and restated pursuant to that certain Amended and Restated Intercreditor Agreement dated as of September 1, 2016 (the "**Existing Intercreditor Agreement**") to agree to the relative priority of Liens on the Collateral (as defined below) and certain other rights, priorities and interests as provided herein.

H. Pursuant to that certain Instrument of Resignation, Appointment, and Acceptance dated June 24, 2014, Wells Fargo Bank, National Association resigned as Second Lien Agent and Wilmington Trust, National Association was appointed and accepted the appointment as successor Second Lien Agent.

I. At this time, each of the ABL Agents (on behalf of the ABL Secured Parties) and the Second Lien Agent (on behalf of the Second Lien Secured Parties) desire to, and do hereby amend and restate the Existing Intercreditor Agreement in its entirety.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, receipt of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.1 UCC Definitions.** Unless otherwise defined herein, all capitalized terms used herein shall have the same meaning herein as in the Uniform Commercial Code.

**Section 1.2 Other Definitions.** Subject to Section 1.1, as used in this Agreement, the following terms shall have the meanings set forth below:

"**ABL Agents**" shall have the meaning assigned to that term in the introduction to this Agreement and shall include any successors thereto as well as any Person designated as the "Agent", "Administrative Agent", "Collateral Agent" or "Co-Collateral Agent" under any ABL Credit Agreement.

"**ABL Bank Products Affiliate**" shall mean any ABL Lender or any Affiliate of any ABL Lender that has entered into a Swap Contract or other Bank Product with an ABL Loan Party with the obligations of such ABL Loan Party thereunder being secured by one or more ABL Collateral Documents, together with their respective successors, assigns and transferees.

"**ABL Borrowers**" shall have the meaning assigned to that term in the recitals to this Agreement.

3

"**<u>ABL Cash Management Affiliate</u>**" shall mean any ABL Lender or any Affiliate of an ABL Lender that provides Cash Management Services to any of the ABL Loan Parties with the obligations of such ABL Loan Parties thereunder being secured by one or more ABL Collateral Documents, together with their respective successors, assigns and transferees.

"**<u>ABL Collateral</u>**" shall mean all Property now owned or hereafter acquired by any Borrower or any Guarantor in or upon which a Lien is granted or purported to be granted to the ABL Agents (and in all events includes the Second Lien Collateral) under any of the ABL Collateral Documents, together with all substitutions, additions, products and Proceeds thereof.

"**<u>ABL Collateral Documents</u>**" shall mean the ABL Guarantee and Collateral Agreement, together with all other security agreements, account control agreements, freight forwarder and/or customs broker's agreements, collateral access agreements, license agreements and other collateral documents executed and delivered in connection with the ABL Credit Agreement, in each case as the same may be amended, supplemented, restated or otherwise modified from time to time.

"**<u>ABL Credit Agreement</u>**" shall have the meaning assigned to such term in the recitals to this Agreement and shall include any other agreement extending the maturity of, consolidating, restructuring, refunding, replacing or refinancing all or any portion of the ABL Obligations, whether by the same or any other agent, lender or group of lenders.

"**<u>ABL Documents</u>**" shall mean the ABL Credit Agreement, the ABL Collateral Documents, all Swap Contracts and other Bank Products between any ABL Loan Party and any ABL Bank Products Affiliate, all Cash Management Services agreements between any ABL Loan Party and any ABL Cash Management Affiliate, those other ancillary agreements to which any ABL Secured Party is a party or beneficiary and all other agreements, instruments, documents and certificates, now or hereafter executed by or on behalf of any ABL Loan Party and delivered to the ABL Agents or any other ABL Secured Party, in connection with any of the foregoing or with the ABL Credit Agreement or the ABL Guarantee and Collateral Agreement, in each case, as the same may be amended, supplemented, restated or otherwise modified from time to time in accordance with the terms hereof and thereof.

"**<u>ABL Guarantee and Collateral Agreement</u>**" shall have the meaning assigned to that term in the recitals to this Agreement and shall also include any other agreement amending or replacing such agreement, whether by the same or any other agent, lender or group of lenders.

"**<u>ABL Guarantors</u>**" shall have the meaning assigned to that term in the recitals to this Agreement and shall also include any other Person who becomes a guarantor under the ABL Guarantee and Collateral Agreement.

"**<u>ABL Lenders</u>**" shall have the meaning assigned to that term in the introduction to this Agreement.

4

"**ABL Loan Parties**" shall have the meaning assigned to that term in the recitals to this Agreement.

"**ABL Obligations**" shall mean all obligations of every nature of each ABL Loan Party from time to time owed to the ABL Secured Parties, or any of them, under any ABL Document, whether for principal, interest, reimbursement of amounts drawn under letters of credit, payments for early termination of Swap Contracts, fees, expenses, indemnification or otherwise, and all other amounts owing or due under the terms of the ABL Documents (including interest, fees, indemnification payments, expense reimbursements and other amounts which, but for the filing of a petition in bankruptcy with respect to such ABL Loan Party, would have accrued on or been payable with respect to any ABL Obligation, whether or not a claim is allowed against such ABL Loan Party for such interest, fees, indemnification payments, expense reimbursements and other amounts in the related bankruptcy proceeding), as amended, restated, modified, renewed, refunded, replaced or refinanced in whole or in part from time to time in accordance with the terms hereof and thereof.

"**ABL Recovery**" shall have the meaning set forth in Section 5.3(a).

"**ABL Secured Parties**" shall have the meaning assigned to that term in the introduction to this Agreement.

"**Affiliate**" shall mean, with respect to a specified Person, any other Person that directly or indirectly through one or more intermediaries Controls, is Controlled by or is under common Control with the Person specified.

"**Agent(s)**" means individually the ABL Agents or the Second Lien Agent and collectively means both the ABL Agents and the Second Lien Agent.

"**Agreement**" shall have the meaning assigned to that term in the introduction to this Agreement.

"**Bank Products**" shall have the meaning provided in the ABL Credit Agreement.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code , as now or hereafter in effect or any successor thereto.

"**Borrower**" shall mean with respect to the ABL Obligations, the ABL Borrowers and, with respect to the Second Lien Obligations, the Second Lien Notes Issuer or the Second Lien Credit Agreement Borrowers, as applicable, and collectively means all of them.

"**Cash Management Services**" shall have the meaning provided in the ABL Credit Agreement.

"**Collateral**" shall mean collectively, all ABL Collateral and all Second Lien Collateral.

"**Control Collateral**" shall mean any Collateral consisting of any Deposit Account, Instruments and any other Collateral as to which a Lien may be perfected through possession or control by the secured party, or any agent therefor.

"**Credit Documents**" shall mean the ABL Documents and the Second Lien Documents.

5

"**Debtor Relief Laws**" shall mean the Bankruptcy Code as now or hereafter in effect or any successor thereto, as well as all other liquidation, conservatorship, bankruptcy, assignment for benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States federal or state law or of any applicable foreign law from time to time in effect affecting the rights of creditors generally.

"**DIP Financing**" shall have the meaning set forth in Section 6.1(a).

"**Discharge of ABL Obligations**" shall mean (a) the payment in full in cash of all outstanding ABL Obligations including, with respect to (i) amounts available to be drawn under outstanding letters of credit issued thereunder (or indemnities or other undertakings issued pursuant thereto in respect of outstanding letters of credit), the cancellation of such letters of credit or the delivery or provision of money or backstop letters of credit in respect thereof in compliance with the terms of any ABL Credit Agreement (which shall not exceed an amount equal to 105% of the aggregate undrawn amount of such letters of credit) and (ii) outstanding ABL Obligations with respect to Bank Products and Cash Management Services (or indemnities or other undertakings issued pursuant thereto in respect of outstanding Bank Products and Cash Management Services) or the delivery or provision of cash collateral in respect thereof in compliance with the terms of any ABL Credit Agreement and (b) the termination of all commitments to extend credit under the ABL Documents.

"**Discharge of Second Lien Obligations**" shall mean the payment in full in cash, or the discharge or defeasance, of all outstanding Second Lien Obligations in accordance with the Original Second Lien Notes Indenture, the Second Lien Credit Agreement, and the New Second Lien Notes Indenture, as applicable.

"**Event of Default**" shall mean an Event of Default as defined in the ABL Credit Agreement, the Original Second Lien Notes Indenture, the New Second Lien Notes Indenture or the Second Lien Credit Agreement, as applicable.

"**Exercise Any Secured Creditor Remedies**" or "**Exercise of Secured Creditor Remedies**" shall mean, except as otherwise provided in the final sentence of this definition:

(a) the taking by any Secured Party of any action to enforce or realize upon any Lien, including the institution of any foreclosure proceedings or the noticing of any public or private sale pursuant to Article 9 of the Uniform Commercial Code or other applicable law;

(b) the exercise by any Secured Party of any right or remedy provided to a secured creditor on account of a Lien under any of the Credit Documents, under applicable law, in an Insolvency Proceeding or otherwise, including the election to retain any of the ABL Collateral or Second Lien Collateral, as applicable, in satisfaction of a Lien;

(c) the taking of any action by any Secured Party or the exercise of any right or remedy by any Secured Party in respect of the collection on, set off against, marshaling of, injunction respecting or foreclosure on the ABL Collateral or Second Lien Collateral, as applicable, or the Proceeds thereof;

6

(d) the appointment on the application of a Secured Party, of a receiver, receiver and manager or interim receiver of all or part of the ABL Collateral or Second Lien Collateral, as applicable;

(e) the sale, lease, license, or other disposition of all or any portion of the ABL Collateral or Second Lien Collateral by private or public sale conducted by a Secured Party or any other means at the direction of a Secured Party permissible under applicable law; and

(f) the exercise of any other right of a secured creditor under Part 6 of Article 9 of the Uniform Commercial Code or under provisions of similar effect other applicable law.

For the avoidance of doubt, none of the following shall be deemed to constitute an Exercise of Secured Creditor Remedies: (i) the filing of a proof of claim in any Insolvency Proceeding or seeking adequate protection (subject to Section 6.3 below), (ii) the exercise of rights by the ABL Agents during the continuance of a Cash Dominion Event (as defined in the ABL Credit Agreement), including, without limitation, the notification of account debtors, depository institutions or any other Person to deliver proceeds of the ABL Collateral to the ABL Agents, (iii) the consent by the ABL Agents to a store closing sale, going out of business sale or other disposition by any Loan Party of any of the ABL Collateral, (iv) the reduction of advance rates or sub-limits by the ABL Agents, or (v) the imposition of Availability Reserves or Inventory Reserves (in each case as defined in the ABL Credit Agreement) by the ABL Agents.

"**Existing Intercreditor Agreement**" shall have the meaning assigned to that term in the recitals to this Agreement.

"**Governmental Authority**" shall mean any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"**Guarantor**" shall mean any of the ABL Guarantors, the Second Lien Notes Guarantors, or the Second Lien Credit Agreement Guarantors, as applicable, and collectively means all of them.

"**Holdings**" shall have the meaning assigned to that term in the introduction to this Agreement.

"**Indebtedness**" shall mean (i) all obligations of a Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments; (ii) the maximum amount of all letters of credit, bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person; (iii) obligations of such Person under any Swap Contract; (iv) indebtedness secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse, and (v) any guarantees of the foregoing.

7

"**Insolvency Proceeding**" shall mean (a) any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors, or (b) any general assignment for the benefit of creditors, composition, marshalling of assets for creditors or other similar arrangement in respect of its creditors generally or any substantial portion of its creditors; in each case covered by clauses (a) and (b) undertaken under any Debtor Relief Laws.

"**Lender(s)**" means individually, the ABL Lenders, the Noteholders, or the Second Lien Lenders, and collectively means all of the ABL Lenders, the Noteholders, and the Second Lien Lenders.

"**Lien**" shall mean, with respect to any asset, any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, encumbrance, collateral assignment, charge or security interest in, on or of such asset.

"**Lien Priority**" shall mean with respect to any Lien of the ABL Secured Parties or the Second Lien Secured Parties in the Collateral, the order of priority of such Lien as specified in Section 2.1.

"**Loan Parties**" shall mean the ABL Loan Parties and the Second Lien Loan Parties.

"**New Noteholders**" shall have the meaning assigned to that term in the introduction to this Agreement.

"**New Second Lien Notes**" shall have the meaning assigned to that term in the recitals to this Agreement.

"**New Second Lien Notes Indenture**" shall have the meaning assigned to that term in the recitals to this Agreement and, subject to the terms of Section 5.2(c), shall include any other agreement extending the maturity of, consolidating, restructuring, refunding, replacing or refinancing all or any portion of the Second Lien Obligations thereunder, whether by the same or any other agent, lender or group of lenders.

"**New Trustee**" shall have the meaning assigned to that term in the recitals to this Agreement.

"**Noteholders**" shall have the meaning assigned to that term in the introduction to this Agreement.

"**Notes**" shall mean the Original Second Lien Notes and the New Second Lien Notes, or any of them.

"**Original Noteholders**" shall have the meaning assigned to that term in the introduction to this Agreement.

"**Original Second Lien Notes**" shall have the meaning assigned to that term in the recitals to this Agreement.

8

"**Original Second Lien Notes Indenture**" shall have the meaning assigned to that term in the recitals to this Agreement and, subject to the terms of Section 5.2(c), shall include any other agreement extending the maturity of, consolidating, restructuring, refunding, replacing or refinancing all or any portion of the Second Lien Obligations thereunder.

"**Original Trustee**" shall have the meaning assigned to that term in the recitals to this Agreement.

"**Party**" shall mean the ABL Agents or the Second Lien Agent, and "**Parties**" shall mean both the ABL Agents and the Second Lien Agent.

"**Person**" shall mean an individual, partnership, corporation, limited liability company, unlimited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"**Proceeds**" shall mean (a) all "proceeds," as defined in Article 9 of the Uniform Commercial Code, with respect to the Collateral, and (b) whatever is recoverable or recovered when any Collateral is sold, exchanged, collected, or disposed of, whether voluntarily or involuntarily.

"**Property**" shall mean any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

"**Second Lien Agent**" shall have the meaning assigned to that term in the introduction to this Agreement and shall include any successor thereto.

"**Second Lien Collateral**" shall mean all "Collateral", as defined in the Second Lien Security Agreement, and any other asset which becomes subject to a Lien securing the Second Lien Obligations.

"**Second Lien Collateral Documents**" shall mean the Second Lien Security Agreement, together with all other security agreements, joinder agreements, account control agreements, freight forwarder and/or customs broker's agreements, collateral access agreements, license agreements and other collateral documents executed and delivered in connection with the Original Second Lien Notes Indenture, the New Second Lien Notes Indenture and the Second Lien Credit Agreement, in each case as the same may be amended, supplemented, restated or otherwise modified from time to time in accordance with the terms hereof and thereof.

"**Second Lien Credit Agreement**" shall have the meaning assigned to that term in the recitals to this Agreement and, subject to the terms of Section 5.2(c) shall include any other agreement extending the maturity of, consolidating, restructuring, refunding, replacing or refinancing all or any portion of the Second Lien Obligations thereunder, whether by the same or any other agent, lender or group of lenders.

"**Second Lien Credit Agreement Agent**" shall have the meaning assigned to that term in the recitals to this Agreement.

9

"**<u>Second Lien Credit Agreement Borrowers</u>**" shall have the meaning assigned to that term in the recitals to this Agreement.

"**<u>Second Lien Credit Agreement Guarantors</u>**" shall have the meaning assigned to that term in the recitals to this Agreement.

"**<u>Second Lien Credit Agreement Loan Parties</u>**" shall have the meaning assigned to that term in the recitals to this Agreement.

"**<u>Second Lien Documents</u>**" shall mean the Original Second Lien Notes Indenture, the New Second Lien Notes Indenture, the Notes, the Second Lien Credit Agreement, the Second Lien Collateral Documents, the Loan Documents (as defined in the Second Lien Credit Agreement), and all other agreements, instruments, documents and certificates, now or hereafter executed by or on behalf of any Second Lien Loan Party or any of its respective Affiliates, and delivered to the Original Trustee, the New Trustee, the Second Lien Credit Agreement Agent, or the Second Lien Agent, in connection with the Original Second Lien Notes Indenture, the New Second Lien Notes Indenture, or the Second Lien Credit Agreement, in each case as the same may be amended, supplemented, restated or otherwise modified from time to time in accordance with the terms hereof and thereof.

"**<u>Second Lien Lenders</u>**" shall have the meaning assigned to that term in the introduction to this Agreement.

"**<u>Second Lien Loan Parties</u>**" shall mean the Second Lien Notes Parties and the Second Lien Credit Agreement Loan Parties.

"**<u>Second Lien Notes Guarantors</u>**" shall have the meaning assigned to that term in the recitals to this Agreement.

"**<u>Second Lien Notes Issuer</u>**" shall have the meaning assigned to that term in the recitals to this Agreement.

"**<u>Second Lien Notes Parties</u>**" shall have the meaning assigned to that term in the recitals to this Agreement.

"**<u>Second Lien Obligations</u>**" shall mean all obligations of every nature of each Second Lien Loan Party from time to time owed to the Second Lien Secured Parties or any of them, under any Second Lien Document, whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to such Second Lien Loan Party, would have accrued on any Second Lien Obligation to the extent a claim is allowed against such Second Lien Loan Party for such interest in the related bankruptcy proceeding), fees, expenses, indemnification or otherwise, and all other amounts owing or due under the terms of the Second Lien Documents, as amended, restated, modified, renewed, refunded, replaced or refinanced in whole or in part from time to time.

"**<u>Second Lien Recovery</u>**" shall have the meaning set forth in Section 5.3(b).

10

"**Second Lien Secured Parties**" shall mean the Second Lien Agent, the Original Trustee, the New Trustee, the Noteholders, the Second Lien Credit Agreement Agent, and the Second Lien Lenders.

"**Second Lien Security Agreement**" shall have the meaning assigned to that term in the recitals to this Agreement.

"**Secured Parties**" shall mean the ABL Secured Parties and the Second Lien Secured Parties.

"**Subsidiary**" shall mean with respect to any Person (the "parent") at any date, any corporation, partnership, joint venture, limited liability company, trust, or other entity (a) of which equity interests representing more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"**Swap Contract**" shall have the meaning provided in the ABL Credit Agreement.

"**Uniform Commercial Code**" shall mean the Uniform Commercial Code as the same may, from time to time, be in effect in the State of New York; provided that to the extent that the Uniform Commercial Code is used to define any term in any security document and such term is defined differently in differing Articles of the Uniform Commercial Code, the definition of such term contained in Article 9 shall govern; provided further that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, publication or priority of, or remedies with respect to, Liens of any Party is governed by the Uniform Commercial Code or foreign personal property security laws as enacted and in effect in a jurisdiction other than the State of New York, the term "Uniform Commercial Code" will mean the Uniform Commercial Code or such foreign personal property security laws as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

**Section 1.3 Rules of Construction.** Unless the context of this Agreement clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the term "including" is not limiting and shall be deemed to be followed by the phrase "without limitation," and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. Article, section, subsection, clause, schedule and exhibit references herein are to this Agreement unless otherwise specified. Any reference in this Agreement to any agreement, instrument, or document shall include all alterations, amendments, changes, restatements, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, restatements, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). Any reference herein to any Person shall be construed to include such Person's successors and assigns. Any reference herein to the repayment in full of an obligation shall mean the payment in full in cash of such obligation, or in such other manner as may be approved in writing by the requisite holders or representatives in respect of such obligation. Any reference herein to a time of day means Eastern time.

11

## ARTICLE 2
### LIEN PRIORITY

**Section 2.1 <u>Priority of Liens.</u>**

(a) Notwithstanding (i) the date, time, method, manner, or order of grant, attachment, or perfection of any Liens granted to the ABL Secured Parties in respect of all or any portion of the ABL Collateral or of any Liens granted to the Second Lien Secured Parties in respect of all or any portion of the Second Lien Collateral and regardless of how any such Lien was acquired (whether by grant, statute, operation of law, subrogation or otherwise), (ii) the order or time of filing or recordation of any document or instrument for perfecting the Liens in favor of the ABL Agents for the benefit of the ABL Secured Parties in any ABL Collateral or the Second Lien Agent for the benefit of the Second Lien Secured Parties in any Second Lien Collateral, (iii) any provision of the Uniform Commercial Code, Debtor Relief Laws or any other applicable law, or of the ABL Documents or the Second Lien Documents, (iv) whether the ABL Agents or the Second Lien Agent, in each case, either directly or through agents, holds possession of, or has control over, all or any part of the Collateral, (v) the date on which the ABL Obligations or the Second Lien Obligations are advanced or made available to the Loan Parties, or (vi) any failure of the ABL Agents or the Second Lien Agent to perfect its Lien in the ABL Collateral or the Second Lien Collateral, as applicable, the subordination of any Lien on the ABL Collateral securing any ABL Obligations or on any Second Lien Collateral securing any Second Lien Obligations, as applicable, to any Lien securing any other obligation of any Borrower or Guarantor, or the avoidance, invalidation or lapse of any Lien on the ABL Collateral securing any ABL Obligations or on any Second Lien Collateral securing any Second Lien Obligations, the ABL Agents, on behalf of themselves and the ABL Secured Parties, and the Second Lien Agent, on behalf of itself and the Second Lien Secured Parties, hereby agree that the following priorities apply to the Collateral:

(A) First, to the ABL Agents and the ABL Lenders to the extent of the ABL Obligations;

(B) Second, to the Second Lien Agent, the Original Trustee, the New Trustee, the Noteholders, the Second Lien Credit Agreement Agent and the Second Lien Lenders to the extent of the Second Lien Obligations.

(b) The ABL Agents, for and on behalf of themselves and the ABL Secured Parties, acknowledge and agree that the Second Lien Agent, for the benefit of itself and the Second Lien Secured Parties, has been, or may be, granted Liens upon the Second Lien Collateral and the ABL Agents hereby consent thereto. The subordination of Lien by the Second Lien Agent in favor of the ABL Agents as set forth herein shall not be deemed to subordinate the Second Lien Agent's Liens to the Liens of any other Person.

12

**Section 2.2 <u>Waiver of Right to Contest Liens.</u>**

(a) The Second Lien Agent, for and on behalf of itself and the Second Lien Secured Parties, agrees that it and they shall not (and hereby waives any right to) take any action to contest or challenge (or assist or support any other Person in contesting or challenging), directly or indirectly, whether or not in any proceeding (including in any Insolvency Proceeding), the validity, priority, enforceability, or perfection of the Liens of the ABL Agents and the ABL Secured Parties in respect of the Collateral or the provisions of this Agreement. The Second Lien Agent, for itself and on behalf of the Second Lien Secured Parties, agrees that none of the Second Lien Agent or the Second Lien Secured Parties will take any action that would interfere with any Exercise of Secured Creditor Remedies undertaken by the ABL Agents or any ABL Secured Party under the ABL Documents with respect to the Collateral. The Second Lien Agent, for itself and on behalf of the Second Lien Secured Parties, hereby waives any and all rights it or the Second Lien Secured Parties may have as a junior lien creditor or otherwise to contest, protest, object to, or interfere with the manner in which the ABL Agents or any ABL Lender seeks to enforce its Liens in any Collateral. The foregoing shall not be construed to prohibit the Second Lien Agent from enforcing the provisions of this Agreement or otherwise acting in accordance with this Agreement.

(b) The ABL Agents, for and on behalf of themselves and the ABL Secured Parties, agrees that it and they shall not (and hereby waives any right to) take any action to contest or challenge (or assist or support any other Person in contesting or challenging), directly or indirectly, whether or not in any proceeding (including in any Insolvency Proceeding), the validity, priority, enforceability, or perfection of the Liens of the Second Lien Agent or the Second Lien Secured Parties in respect of the Second Lien Collateral or the provisions of this Agreement. The foregoing shall not be construed to prohibit the ABL Agents from enforcing the provisions of this Agreement or otherwise acting in accordance with this Agreement.

**Section 2.3 <u>Remedies Standstill.</u>**

(a) The Second Lien Agent, on behalf of itself and the Second Lien Secured Parties, agrees that, from the date hereof until the date upon which the Discharge of ABL Obligations shall have occurred, neither the Second Lien Agent nor any Second Lien Secured Party will Exercise Any Secured Creditor Remedies with respect to any of the Collateral, and will not take, receive or accept any Proceeds of Collateral. From and after the date upon which the Discharge of ABL Obligations shall have occurred, the Second Lien Agent or any Second Lien Secured Party may Exercise Any Secured Creditor Remedies under the Second Lien Documents or applicable law as to any Second Lien Collateral.

(b) Notwithstanding the provisions of Section 2.3(a) or any other provision of this Agreement, nothing contained herein shall be construed to prevent any Agent or any Secured Party from (i) filing a claim or statement of interest with respect to the ABL Obligations or Second Lien Obligations owed to it in any Insolvency Proceeding commenced by or against any Loan Party, (ii) taking any action (not adverse to the Lien Priority of the Liens of the ABL Agents or ABL Secured Parties on the Collateral or the rights of the ABL Agent or any of the ABL Secured Parties to Exercise Any Secured Creditor Remedies in respect thereof) in order to create, perfect, preserve or protect (but not enforce) its Lien on any ABL Collateral or Second Lien Collateral, as applicable, (iii) filing any necessary or responsive pleadings in opposition to any motion, adversary proceeding or other pleading filed by any Person objecting to or otherwise

13

seeking disallowance of the claim or Lien of such Agent or Secured Party, (iv) voting on any plan of reorganization or filing any proof of claim in any Insolvency Proceeding of any Loan Party, or (v) objecting to the proposed retention of the Collateral by the ABL Agents or any other ABL Secured Party in full or partial satisfaction of any ABL Obligations, in each case (i) through (v) above to the extent not inconsistent with the terms of this Agreement.

(c) Each of the Second Lien Agent, each Second Lien Secured Party, the ABL Agents and each ABL Secured Party agrees (i) that it will not institute any suit or other proceeding or assert in any suit, Insolvency Proceeding or other proceeding any claim, in the case of the Second Lien Agent and each Second Lien Secured Party, against either the ABL Agents or any other ABL Secured Party, and in the case of the ABL Agents and each other ABL Secured Party, against either the Second Lien Agent or any other Second Lien Secured Party, seeking damages from or other relief by way of specific performance, instructions or otherwise, with respect to, any action taken or omitted to be taken by such Person with respect to the ABL Collateral or Second Lien Collateral, as applicable, which is consistent with the terms of this Agreement, and none of such Parties shall be liable for any such action taken or omitted to be taken, or (ii) it will not be a petitioning creditor or otherwise assist in the filing of an involuntary Insolvency Proceeding.

**Section 2.4 <u>Release of Liens</u>**. In the event of (A) any private or public sale of all or any portion of the Collateral in connection with any Exercise of Secured Creditor Remedies by the ABL Agents or by the ABL Loan Parties with the consent of the ABL Agents, or (B) any sale, transfer or other disposition of all or any portion of the Collateral, so long as such sale, transfer or other disposition is then permitted by the ABL Documents or consented to by the requisite ABL Lenders, the Second Lien Agent agrees, on behalf of itself and the Second Lien Secured Parties that such sale, transfer or other disposition will be free and clear of the Liens, if any, on such Collateral securing the Second Lien Obligations, and the Second Lien Agent's and the Second Lien Secured Parties' Liens, if any, with respect to the Collateral so sold, transferred, or disposed shall terminate and be automatically released without further action concurrently with, and to the same extent as, the release of the ABL Secured Parties' Liens on such Collateral. In furtherance of, and subject to, the foregoing, the Second Lien Agent agrees that it will promptly execute any and all Lien releases or other documents reasonably requested in writing and provided by the ABL Agents in connection therewith. The Second Lien Agent hereby appoints the ABL Agents and any officer or duly authorized person of the ABL Agents, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power of attorney in the place and stead of the Second Lien Agent and in the name of the Second Lien Agent or in the ABL Agents' own name, from time to time, in the ABL Agents' sole discretion, for the purposes of carrying out the terms of this paragraph, to take any and all appropriate action and to execute and deliver or file any and all documents and instruments as may be necessary or desirable to accomplish the purposes of this paragraph, including any financing statements, endorsements, assignments, releases or other documents or instruments of transfer (which appointment, being coupled with an interest, is irrevocable).

**Section 2.5 <u>No New Liens</u>**. Until the Discharge of ABL Obligations shall have occurred, the parties hereto agree that no Second Lien Secured Party shall acquire or hold any Lien on any assets of any Loan Party securing any Second Lien Obligation which assets are not also subject to the Lien of the ABL Agents under the ABL Documents. If any Second Lien

14

Secured Party shall nonetheless acquire or hold any Lien on any assets of any Loan Party securing any Second Lien Obligation which assets are not also subject to the Lien of the ABL Agents under the ABL Documents, then the Second Lien Agent (or the relevant Second Lien Secured Party) shall, without the need for any further consent of any other Second Lien Secured Party or any Second Lien Loan Party and notwithstanding anything to the contrary in any other Second Lien Document, be deemed to also hold and have held such Lien as agent or bailee for the benefit of the ABL Agents as security for the ABL Obligations (subject to the terms of the ABL Credit Agreement) and shall promptly notify the ABL Agents in writing of the existence of such Lien.

        **Section 2.6 <u>Waiver of Marshalling</u>**. Until the Discharge of ABL Obligations, the Second Lien Agent, on behalf of itself and the Second Lien Secured Parties, agrees not to assert and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to the Collateral or any other similar rights a junior secured creditor may have under applicable law.

## ARTICLE 3
## <u>ACTIONS OF THE PARTIES</u>

        **Section 3.1 <u>Certain Actions Permitted</u>**. The Second Lien Agent and the ABL Agents may make such demands or file such claims in respect of the Second Lien Obligations or the ABL Obligations, as applicable, as are necessary to prevent the waiver or bar of such claims under applicable statutes of limitations or other statutes, court orders, or rules of procedure at any time.

        **Section 3.2 <u>Agent for Perfection</u>**. The ABL Agents, for and on behalf of themselves and each ABL Secured Party, agree to hold all Second Lien Collateral in their possession, custody, or control (or in the possession, custody, or control of agents or bailees for either) as agent for the Second Lien Secured Parties solely for the purpose of perfecting the security interest granted to the Second Lien Agent in such Second Lien Collateral, subject to the terms and conditions of this Section 3.2.

        (b) The Second Lien Agent, for and on behalf of itself and each Second Lien Secured Party, agree to hold all Collateral in their possession, custody, or control (or in the possession, custody, or control of agents or bailees for either) as agent for the ABL Secured Parties solely for the purpose of perfecting the security interest granted to the ABL Agents in such Collateral, subject to the terms and conditions of this Section 3.2.

        (c) None of the ABL Agents, the ABL Secured Parties, the Second Lien Agent, or the Second Lien Secured Parties, as applicable, shall have any obligation whatsoever to the others to assure that the Collateral is genuine or owned by any Borrower, any Guarantor, or any other Person or to preserve rights or benefits of any Person. The duties or responsibilities of the ABL Agents and the Second Lien Agent under this Section 3.2 are and shall be limited solely to holding or maintaining control of the Collateral or Second Lien Collateral, as applicable, as agent for the other Party for purposes of perfecting the Lien held by the Second Lien Agent or the ABL Agents, as applicable. The ABL Agents are not and shall not be deemed to be a fiduciary of any kind for the Second Lien Secured Parties or any other Person. The Second Lien Agent is not and shall not be deemed to be a fiduciary of any kind for the ABL Secured Parties, or any other Person.

15

**Section 3.3 <u>Insurance</u>**. Proceeds of Collateral include insurance proceeds and, therefore, the Lien Priority shall govern the ultimate disposition of casualty insurance proceeds. The ABL Agents and the Second Lien Agent shall each be named as additional insured or loss payee, as applicable, with respect to all insurance policies maintained by the Borrowers or Guarantors relating to the ABL Collateral and Second Lien Collateral, respectively. Until the Discharge of ABL Obligations, the ABL Agents shall have the sole and exclusive right, as against the Second Lien Agent, to adjust settlement of insurance claims in the event of any covered loss, theft or destruction of any Collateral and take other such actions with respect to insurance covering the Collateral as set forth in the ABL Credit Agreement. All proceeds of such insurance shall be remitted to the ABL Agents, and the Second Lien Agent shall cooperate (if necessary) in a reasonable manner in effecting the payment of insurance proceeds in accordance with Section 4.1 hereof. The ABL Agents are hereby authorized to make any endorsements as agent for the Second Lien Agent or any such other Second Lien Secured Parties in accordance with the power of attorney granted pursuant to Section 2.4 above.

**Section 3.4 <u>No Additional Rights For the Loan Parties Hereunder</u>**. If any ABL Secured Party or Second Lien Secured Party shall enforce its rights or remedies in violation of the terms of this Agreement, the Loan Parties shall not be entitled to use such violation as a defense to any action by any ABL Secured Party or Second Lien Secured Party, nor to assert such violation as a counterclaim or basis for set off or recoupment against any ABL Secured Party or Second Lien Secured Party.

**Section 3.5 <u>Payments Over</u>**. So long as the Discharge of ABL Obligations has not occurred, any Collateral or Proceeds thereof received by the Second Lien Agent or any Second Lien Secured Parties in connection with the exercise of any right or remedy (including set off) relating to the Collateral (or otherwise received by the Second Lien Agent in respect of all or any part of the Collateral in connection with any bankruptcy, insolvency, reorganization or similar proceeding of any Loan Party) in contravention of this Agreement shall be segregated and held in trust and forthwith paid over to the ABL Agents for the benefit of the ABL Secured Parties in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct. The ABL Agents are hereby authorized to make any such endorsements as agent for the Second Lien Agent or any such Second Lien Secured Parties. This authorization is coupled with an interest and is irrevocable until such time as this Agreement is terminated in accordance with its terms.

<div align="center">

**ARTICLE 4**
**<u>APPLICATION OF PROCEEDS</u>**

</div>

**Section 4.1 <u>Application of Proceeds.</u>**

(a) <u>Revolving Nature of ABL Obligations</u>. The Second Lien Agent, for and on behalf of itself and the Second Lien Secured Parties, expressly acknowledges and agrees that (i) the ABL Credit Agreement includes a revolving commitment, that in the ordinary course of

<div align="center">16</div>

business the ABL Agents and the ABL Lenders will apply payments and make advances thereunder, and that no application of any Collateral or the release of any Lien by the ABL Agents upon any portion of the Collateral in connection with a permitted disposition by the ABL Loan Parties under any ABL Credit Agreement shall constitute the Exercise of Secured Creditor Remedies under this Agreement; (ii) the amount of the ABL Obligations that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed, and that the terms of the ABL Obligations may be modified, extended or amended from time to time, and that the aggregate amount of the ABL Obligations may be increased, replaced or refinanced, in each event, without notice to or consent by the Second Lien Secured Parties and without affecting the provisions hereof; and (iii) all Collateral received by the ABL Agents may be applied, reversed, reapplied or credited, in whole or in part, to the ABL Obligations at any time. The Lien Priority shall not be altered or otherwise affected by any such amendment, modification, supplement, extension, repayment, reborrowing, increase, replacement, renewal, restatement or refinancing of either the ABL Obligations or the Second Lien Obligations, or any portion thereof.

(b) Application of Proceeds of Collateral. The ABL Agents and the Second Lien Agent hereby agree that all Collateral and all other Proceeds thereof, received by either of them in connection with any Exercise of Secured Creditor Remedies with respect to the Collateral shall be applied,

first, to the payment of costs and expenses of the ABL Agents in connection with such Exercise of Secured Creditor Remedies to the extent provided in the ABL Documents,

second, to the payment of the ABL Obligations in accordance with the ABL Documents until the Discharge of ABL Obligations shall have occurred,

third, to the payment of the Second Lien Obligations in accordance with the Second Lien Documents until the Discharge of Second Lien Obligations shall have occurred, and

fourth, the balance, if any, to the Loan Parties or as a court of competent jurisdiction may direct.

(c) Limited Obligation or Liability. In exercising remedies, whether as a secured creditor or otherwise, the ABL Agents shall have no obligation or liability to the Second Lien Agent or to any Second Lien Secured Party regarding the adequacy of any Proceeds or for any action or omission, except solely for an action or omission that breaches the express obligations undertaken by each Party under the terms of this Agreement. Notwithstanding anything to the contrary herein contained, none of the Parties hereto waives any claim that it may have against a Secured Party on the grounds that any sale, transfer or other disposition by the Secured Party was not commercially reasonable in every respect as required by the Uniform Commercial Code.

17

(d) <u>Turnover of Collateral</u>. Upon the Discharge of ABL Obligations, the ABL Agents shall deliver to the Second Lien Agent or shall execute such documents as the Second Lien Agent may reasonably request (at the expense of the Second Lien Notes Issuer) to enable the Second Lien Agent to have control over any Control Collateral constituting Second Lien Collateral still in the ABL Agents' possession, custody, or control in the same form as received with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct, subject to the reinstatement provisions of Section 5.3 below.

**Section 4.2 <u>Specific Performance</u>**. Each of the ABL Agents and the Second Lien Agent is hereby authorized to demand specific performance of this Agreement, whether or not any Borrower or any Guarantor shall have complied with any of the provisions of any of the Credit Documents, at any time when the other Party shall have failed to comply with any of the provisions of this Agreement applicable to it. Each of the ABL Agents, for and on behalf of itself and the ABL Secured Parties, and the Second Lien Agent, for and on behalf of itself and the Second Lien Secured Parties, hereby irrevocably waives any defense based on the adequacy of a remedy at law that might be asserted as a bar to such remedy of specific performance.

# ARTICLE 5
## INTERCREDITOR ACKNOWLEDGEMENTS AND WAIVERS

**Section 5.1 <u>Notice of Acceptance and Other Waivers</u>.**

(a) All ABL Obligations at any time made or incurred by any Borrower or any Guarantor shall be deemed to have been made or incurred in reliance upon this Agreement, and the Second Lien Agent, on behalf of itself and the Second Lien Secured Parties, hereby waives notice of acceptance, or proof of reliance by the ABL Agents or any ABL Secured Party of this Agreement and notice of the existence, increase, renewal, extension, accrual, creation, or non-payment of all or any part of the ABL Obligations.

(b) None of the ABL Agents, any ABL Secured Party, or any of their respective Affiliates, directors, officers, employees, or agents shall be liable for failure to demand, collect, or realize upon any of the Collateral or any Proceeds, or for any delay in doing so, or shall be under any obligation to sell or otherwise dispose of any Collateral or Proceeds thereof or to take any other action whatsoever with regard to the Collateral or any part or Proceeds thereof. If the ABL Agents or any ABL Secured Party honors (or fails to honor) a request by any Borrower for an extension of credit pursuant to any ABL Credit Agreement or any of the other ABL Documents, whether the ABL Agents or any ABL Secured Party have knowledge that the honoring of (or failure to honor) any such request would constitute a default under the terms of any Second Lien Document or an act, condition, or event that, with the giving of notice or the passage of time, or both, would constitute such a default, or if the ABL Agents or any ABL Secured Party otherwise should exercise any of its contractual rights or remedies under any ABL Documents (subject to the express terms and conditions hereof), neither the ABL Agents nor any ABL Secured Party shall have any liability whatsoever to the Second Lien Agent or any Second Lien Secured Party as a result of such action, omission, or exercise (so long as any such exercise does not breach the express terms and provisions of this Agreement). The ABL Agents and the ABL Secured Parties shall be entitled to manage and supervise their loans and extensions of credit under any ABL Credit Agreement and any of the other ABL Documents as they may, in their sole discretion, deem appropriate, and may manage their loans and extensions of credit without regard to any rights or interests that the Second Lien Agent or any of the

18

Second Lien Secured Parties have in the Collateral, except as otherwise expressly set forth in this Agreement. The Second Lien Agent, on behalf of itself and the Second Lien Secured Parties, agrees that neither the ABL Agents nor any ABL Secured Party shall incur any liability as a result of a sale, lease, license, application, or other disposition of all or any portion of the Collateral or Proceeds thereof, pursuant to the ABL Documents, so long as such disposition is conducted in accordance with mandatory provisions of applicable law and does not breach the provisions of this Agreement.

**Section 5.2 <u>Modifications to ABL Documents and Second Lien Documents.</u>**

(a) The Second Lien Agent, on behalf of itself and the Second Lien Secured Parties, hereby agrees that, without affecting the obligations of the Second Lien Agent and the Second Lien Secured Parties hereunder, the ABL Agents and the ABL Secured Parties may, at any time and from time to time, in their sole discretion without the consent of or notice to the Second Lien Agent or any Second Lien Secured Party, and without incurring any liability to the Second Lien Agent or any Second Lien Secured Party or impairing or releasing the Lien Priority provided for herein, amend, restate, supplement, replace, refinance, extend, consolidate, restructure, or otherwise modify any of the ABL Documents in any manner whatsoever.

(b) The ABL Agents, on behalf of themselves and the ABL Secured Parties, hereby agree that, without affecting the obligations of the ABL Agents and the ABL Secured Parties hereunder, the Second Lien Agent and the Second Lien Secured Parties may, at any time and from time to time, in their sole discretion without the consent of or notice to the ABL Agents or any ABL Secured Party, and without incurring any liability to the ABL Agents or any ABL Secured Party or impairing or releasing the Lien Priority provided for herein, amend, restate, supplement, replace, refinance, extend, consolidate, restructure, or otherwise modify any of the Second Lien Documents in any manner whatsoever except that the following shall require the prior written consent of the ABL Agents:

(1) except as provided in Section 2.5, retain or obtain a Lien on any Property of any Person to secure any of the Second Lien Obligations; or

(2) amend the Second Lien Documents in any manner which would have the effect of contravening the terms of this Agreement or the ABL Documents.

(c) The ABL Obligations and the Second Lien Obligations may be refinanced, in whole or in part, in each case, without notice to, or the consent (except to the extent a consent is required pursuant to Section 5.2(b) above or to permit the refinancing transaction under any ABL Document or any Second Lien Document) of the ABL Agents, the ABL Secured Parties, the Second Lien Agent or the Second Lien Secured Parties, as the case may be, all without affecting the Lien Priority provided for herein or the other provisions hereof, <u>provided</u>, <u>however</u>, that the holders of such refinancing Indebtedness (or an authorized agent or trustee on their behalf) bind themselves in writing to the terms of this Agreement pursuant to such documents or agreements (including amendments or supplements to this Agreement) as the ABL Agents or the Second Lien Agent, as the case may be, shall reasonably request and in form and substance reasonably acceptable to the ABL Agents or the Second Lien Agent, as the case may be, and any such refinancing transaction shall be in accordance with any applicable provisions of both the ABL Documents and the Second Lien Documents (to the extent such documents survive the refinancing).

19

**Section 5.3 <u>Reinstatement and Continuation of Agreement.</u>**

(a) If the ABL Agents or any ABL Secured Party is required in any Insolvency Proceeding or otherwise to turn over or otherwise pay to the estate of any Borrower, any Guarantor, or any other Person any payment made in satisfaction of all or any portion of the ABL Obligations (an "**<u>ABL Recovery</u>**"), then the ABL Obligations shall be reinstated to the extent of such ABL Recovery. If this Agreement shall have been terminated prior to such ABL Recovery, this Agreement shall be reinstated in full force and effect in the event of such ABL Recovery, and such prior termination shall not diminish, release, discharge, impair, or otherwise affect the obligations of the Parties from such date of reinstatement. All rights, interests, agreements, and obligations of the ABL Agents, the Second Lien Agent, the ABL Secured Parties, and the Second Lien Secured Parties under this Agreement shall remain in full force and effect and shall continue irrespective of the commencement of, or any discharge, confirmation, conversion, or dismissal of, any Insolvency Proceeding by or against any Borrower or any Guarantor or any other circumstance which otherwise might constitute a defense available to, or a discharge of any Borrower or any Guarantor in respect of the ABL Obligations or the Second Lien Obligations. No priority or right of the ABL Agents or any ABL Secured Party shall at any time be prejudiced or impaired in any way by any act or failure to act on the part of any Borrower or any Guarantor or by the noncompliance by any Person with the terms, provisions, or covenants of any of the ABL Documents, regardless of any knowledge thereof which the ABL Agents or any ABL Secured Party may have.

(b) If the Second Lien Agent or any Second Lien Secured Party is required in any Insolvency Proceeding or otherwise to turn over or otherwise pay to the estate of any Borrower, any Guarantor, or any other Person any payment made in satisfaction of all or any portion of the Second Lien Obligations (a "**<u>Second Lien Recovery</u>**"), then the Second Lien Obligations shall be reinstated to the extent of such Second Lien Recovery. If this Agreement shall have been terminated prior to such Second Lien Recovery, this Agreement shall be reinstated in full force and effect in the event of such Second Lien Recovery, and such prior termination shall not diminish, release, discharge, impair, or otherwise affect the obligations of the Parties from such date of reinstatement. All rights, interests, agreements, and obligations of the ABL Agents, the Second Lien Agent, the ABL Secured Parties, and the Second Lien Secured Parties under this Agreement shall remain in full force and effect and shall continue irrespective of the commencement of, or any discharge, confirmation, conversion, or dismissal of, any Insolvency Proceeding by or against any Borrower or any Guarantor or any other circumstance which otherwise might constitute a defense available to, or a discharge of any Borrower or any Guarantor in respect of the ABL Obligations or the Second Lien Obligations. No priority or right of the Second Lien Agent or any Second Lien Secured Party shall at any time be prejudiced or impaired in any way by any act or failure to act on the part of any Borrower or any Guarantor or by the noncompliance by any Person with the terms, provisions, or covenants of any of the Second Lien Documents, regardless of any knowledge thereof which the Second Lien Agent or any Second Lien Secured Party may have.

20

## ARTICLE 6
### INSOLVENCY PROCEEDINGS

**Section 6.1 <u>DIP Financing.</u>**

(a) If any Borrower or any Guarantor shall be subject to any Insolvency Proceeding at any time prior to the Discharge of ABL Obligations, and the ABL Agents or any of the ABL Secured Parties shall seek to provide any Borrower or any Guarantor with, or consent to a third party providing, any financing under Section 364 of the Bankruptcy Code or consent to any order for the use of cash collateral constituting Collateral under Section 363 of the Bankruptcy Code (or any similar provision of any foreign Debtor Relief Laws or under a court order in respect of measures granted with similar effect under any foreign Debtor Relief Laws) (each, a "**<u>DIP Financing</u>**"), with such DIP Financing to be secured by all or any portion of the Collateral (including assets that, but for the application of Section 552 of the Bankruptcy Code would be Collateral), then the Second Lien Agent, on behalf of itself and the Second Lien Secured Parties, agrees that it will raise no objection and will not support any objection to such DIP Financing or use of cash collateral or to the Liens securing the same on any basis, including, without limitation, on the grounds of a failure to provide "adequate protection" for the Liens of the Second Lien Agent securing the Second Lien Obligations (and will not request any adequate protection solely as a result of such DIP Financing or use of cash collateral, and will not offer or support any debtor-in-possession financing which would compete with such DIP Financing); provided that (i) the Second Lien Agent retains its Lien on the Collateral to secure the Second Lien Obligations (in each case, including Proceeds thereof arising after the commencement of the case under the any Debtor Relief Laws), subject to the terms of this Agreement, to the Liens in favor of the ABL Secured Parties existing prior to the commencement of such Insolvency Proceeding, to any adequate protection Liens granted in favor of the ABL Obligations, and to the senior priority of the DIP Financing, (ii) all Liens on the Collateral securing any such DIP Financing shall be senior to or on a parity with the Liens of the ABL Agents and the ABL Secured Parties securing the ABL Obligations on the Collateral and (iii) the foregoing provisions of this Section 6.1(a) shall not prevent the Second Lien Agent and the Second Lien Secured Parties from objecting to any provision in any DIP Financing relating to any provision or content of a plan of reorganization or other plan of similar effect under any Debtor Relief Laws.

(b) All Liens granted to the ABL Agents or the Second Lien Agent in any Insolvency Proceeding, whether as adequate protection or otherwise, are intended by the Parties to be and shall be deemed to be subject to the Lien Priority and the other terms and conditions of this Agreement.

**Section 6.2 <u>Relief From Stay</u>**. Until the Discharge of ABL Obligations has occurred, the Second Lien Agent, on behalf of itself and the Second Lien Secured Parties, agrees not to seek relief from the automatic stay or any other stay in any Insolvency Proceeding in respect of any portion of the Collateral without the ABL Agents' express written consent.

21

**Section 6.3 <u>No Contest; Adequate Protection</u>**.

(a) The Second Lien Agent, on behalf of itself and the Second Lien Secured Parties, agrees that, prior to the Discharge of ABL Obligations, none of them shall contest (or support any other Person contesting) (i) any request by the ABL Agents or any ABL Secured Party for adequate protection of its interest in the Collateral, (ii) subject to Section 6.1(a) above, any proposed provision of DIP Financing by the ABL Agents and the ABL Secured Parties (or any other Person proposing to provide DIP Financing with the consent of the ABL Agents) or (iii) any objection by the ABL Agents or any ABL Secured Party to any motion, relief, action, or proceeding based on a claim by the ABL Agents or any ABL Secured Party that its interests in the Collateral are not adequately protected (or any other similar request under any law applicable to an Insolvency Proceeding), so long as any Liens granted to the ABL Agents as adequate protection of its interests are subject to this Agreement.

(b) Notwithstanding the foregoing provisions in this Section 6.3, in any Insolvency Proceeding, if the ABL Secured Parties (or any subset thereof) are granted adequate protection with respect to the Collateral in the form of additional collateral (even if such collateral is not of a type which would otherwise have constituted Collateral), then the ABL Agents, on behalf of themselves and the ABL Secured Parties, agrees that the Second Lien Agent, on behalf of itself or any of the Second Lien Secured Parties, may seek or request (and the ABL Secured Parties will not oppose such request) adequate protection with respect to its interests in such Collateral in the form of a Lien on the same additional collateral, which Lien will be subordinated to the Liens securing the ABL Obligations on the same basis as the other Liens of the Second Lien Agent on Collateral.

**Section 6.4 <u>Asset Sales</u>**. The Second Lien Agent agrees, on behalf of itself and the Second Lien Secured Parties, that it will not oppose any sale consented to by the ABL Agents of any Collateral pursuant to Section 363(f) of the Bankruptcy Code (or any similar provision under the law applicable to any Insolvency Proceeding or under a court order in respect of measures granted with similar effect under any foreign Debtor Relief Laws) so long as the Liens of the Parties attach to the proceeds of such sale consistent with the Lien Priority set forth herein on the assets sold and such proceeds are otherwise applied in accordance with this Agreement.

**Section 6.5 <u>Separate Grants of Security and Separate Classification</u>**. Each Second Lien Secured Party and each ABL Secured Party acknowledges and agrees that (i) the grants of Liens pursuant to the ABL Collateral Documents and the Second Lien Collateral Documents constitute two separate and distinct grants of Liens and (ii) because of, among other things, their differing rights in the Collateral, the Second Lien Obligations are fundamentally different from the ABL Obligations and must be separately classified in any plan of reorganization (or other plan of similar effect under any Debtor Relief Laws) proposed or adopted in an Insolvency Proceeding. To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the ABL Secured Parties and the Second Lien Secured Parties in respect of the Collateral constitute only one secured claim (rather than separate classes of senior and junior secured claims), then the Second Lien Secured Parties hereby acknowledge and agree that all distributions shall be made as if there were separate classes of ABL Obligation claims and Second Lien Obligation claims against the Loan Parties, with the effect being that, to the extent that the aggregate value of the Collateral is sufficient (for this purpose ignoring all claims held by the other Secured Parties), the ABL Secured Parties shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing in respect of post-petition interest that is available from the Collateral before any distribution is made in respect of the claims held by the

22

Second Lien Secured Parties from such Collateral, with the Second Lien Secured Parties hereby acknowledging and agreeing to turn over to ABL Secured Parties amounts otherwise received or receivable by them to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the aggregate recoveries.

**Section 6.6 <u>Enforceability</u>**. The provisions of this Agreement are intended to be and shall be enforceable under Section 510(a) of the Bankruptcy Code.

**Section 6.7 <u>ABL Obligations Unconditional</u>**. All rights of the ABL Agents hereunder, and all agreements and obligations of the Second Lien Agent and the Loan Parties (to the extent applicable) hereunder, shall, except as otherwise specifically provided herein, remain in full force and effect irrespective of:

(i) any lack of validity or enforceability of any ABL Document;

(ii) any change in the time, place or manner of payment of, or in any other term of, all or any portion of the ABL Obligations, or any amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of any ABL Document;

(iii) any exchange, release, voiding, avoidance or non perfection of any security interest in any Collateral or any other collateral, or any release, amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding, restatement or increase of all or any portion of the ABL Obligations or any guarantee or guaranty thereof; or

(iv) any other circumstances that otherwise might constitute a defense available to, or a discharge of, any Loan Party in respect of the ABL Obligations, or of any of the Second Lien Agent or any Loan Party, to the extent applicable, in respect of this Agreement.

**Section 6.8 <u>Second Lien Obligations Unconditional</u>**. All rights of the Second Lien Agent hereunder, all agreements and obligations of the ABL Agents and the Loan Parties (to the extent applicable) hereunder, shall, except as otherwise specifically provided herein, remain in full force and effect irrespective of:

(i) any lack of validity or enforceability of any Second Lien Document;

(ii) any change in the time, place or manner of payment of, or in any other term of, all or any portion of the Second Lien Obligations, or any amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of any Second Lien Document (but solely to the extent permitted pursuant to Section 5.2(b) above);

(iii) any exchange, release, voiding, avoidance or non perfection of any security interest in any Collateral, or any other collateral, or any release, amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding, restatement or increase of all or any portion of the Second Lien Obligations or any guarantee or guaranty thereof; or

23

(iv) any other circumstances that otherwise might constitute a defense available to, or a discharge of, any Loan Party in respect of the Second Lien Obligations, or of any of the ABL Agents or any Loan Party, to the extent applicable, in respect of this Agreement.

# ARTICLE 7
## MISCELLANEOUS

**Section 7.1 <u>Rights of Subrogation</u>**. The Second Lien Agent, for and on behalf of itself and the Second Lien Secured Parties, agrees that no payment to the ABL Agents or any ABL Secured Party pursuant to the provisions of this Agreement shall entitle the Second Lien Agent or any Second Lien Secured Party to exercise any rights of subrogation in respect thereof until the Discharge of ABL Obligations.

**Section 7.2 <u>Further Assurances</u>**. The Parties will, at their own expense and at any time and from time to time, promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that either Party may reasonably request, in order to protect any right or interest granted or purported to be granted hereby or to enable the ABL Agents or the Second Lien Agent to exercise and enforce their rights and remedies hereunder; <u>provided</u>, <u>however</u>, that no Party shall be required to pay over any payment or distribution, execute any instruments or documents, or take any other action referred to in this Section 7.2, to the extent that such action would contravene any law, order or other legal requirement or any of the terms or provisions of this Agreement, and in the event of a controversy or dispute, such Party may interplead any payment or distribution in any court of competent jurisdiction, without further responsibility in respect of such payment or distribution under this Section 7.2.

**Section 7.3 <u>Representations</u>**. The Second Lien Agent represents and warrants to the ABL Agents, that it has entered into this Agreement pursuant to the provisions of the applicable Second Lien Documents and the directions of the Second Lien Loan Parties, the Noteholders, the Original Trustee, the New Trustee, the Second Lien Lenders and the Second Lien Credit Agreement Agent as stated therein, that it has the requisite power and authority under the Second Lien Documents to enter into, execute, deliver, and carry out the terms of this Agreement on behalf of itself and the Second Lien Secured Parties and that this Agreement shall be binding obligations of the Second Lien Agent and the Second Lien Secured Parties, enforceable against the Second Lien Agent and the Second Lien Secured Parties in accordance with its terms (it being understood that such representation as it relates to the Noteholders or the Second Lien Lenders is made based solely on the representation made by the Noteholders or the Second Lien Lenders, as applicable, pursuant to the express terms of the applicable Second Lien Documents). The ABL Agents represent and warrant to the Second Lien Agent that they have the requisite power and authority under the ABL Documents to enter into, execute, deliver, and carry out the terms of this Agreement on behalf of themselves and the ABL Secured Parties and that this Agreement shall be binding obligations of the ABL Agents and the ABL Secured Parties, enforceable against the ABL Agents and the ABL Secured Parties in accordance with its terms.

24

**Section 7.4 <u>Amendments</u>**. No amendment or waiver of any provision of this Agreement nor consent to any departure by any Party hereto shall be effective unless it is in a written agreement executed by the Second Lien Agent and the ABL Agents and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

**Section 7.5 <u>Addresses for Notices</u>**. Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and may be personally served, telecopied, or sent by overnight express courier service or United States mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of a telecopy or three (3) days after deposit in the United States mail (certified, with postage prepaid and properly addressed). For the purposes hereof, the addresses of the parties hereto (until notice of a change thereof is delivered as provided in this Section) shall be as set forth below or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

| | |
|---|---|
| Loan Parties: | Sears Holdings Corporation<br>3333 Beverly Road<br>Hoffman Estates, Illinois 60179<br>Facsimile: (847) 286-2055<br>Attention: Treasurer<br><br>With a copy to:<br><br>Wachtell, Lipton, Rosen & Katz<br>51 West 52nd Street<br>New York, New York 10019<br>Facsimile: (212) 403-2000<br>Attention: Joshua A. Feltman |
| ABL Agents: | Bank of America, N.A.<br>100 Federal Street<br>Boston, Massachusetts 02109<br>Attention: Stephen J. Garvin<br><br>With a copy to:<br><br>Skadden, Arps, Slate, Meagher & Flom LLP<br>155 North Wacker Drive, Suite 2700<br>Chicago, IL, 60606<br>Attention: Seth Jacobson<br>Fax: 312-407-8511<br><br>and: |

25

Wells Fargo Bank, National Association
One Boston Place, 19th Floor
Boston, Massachusetts 02108
Attention: Joseph Burt

With a copy to:

Choate, Hall & Stewart LLP
Two International Place
Boston, Massachusetts 02110
Attention: Kevin J. Simard

Second Lien Agent:    Wilmington Trust, National Association
Corporate Capital Markets
50 South Sixth Street, Suite 1290
Minneapolis, MN 55402
Telephone: 612-217-5667
Facsimile: 612-217-5651
Attention: Sears Holdings Corp. Administrator

**Section 7.6 <u>No Waiver; Remedies</u>.** No failure on the part of any Party to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

**Section 7.7 <u>Continuing Agreement, Transfer of Secured Obligations</u>.** This Agreement is a continuing agreement and shall (a) remain in full force and effect until the earlier of the Discharge of ABL Obligations (subject to Section 4.1(d)) or the Discharge of Second Lien Obligations, (b) be binding upon the Parties and their successors and assigns, and (c) inure to the benefit of and be enforceable by the Parties and their respective successors, transferees and assigns. Nothing herein is intended, or shall be construed to give, any other Person any right, remedy or claim under, to or in respect of this Agreement or any Collateral. All references to any Loan Party shall include any Loan Party as debtor-in-possession and any receiver or trustee for such Loan Party in any Insolvency Proceeding. Without limiting the generality of the foregoing clause (c), the ABL Agents, any ABL Secured Party, the Second Lien Agent, or any Second Lien Secured Party may assign or otherwise transfer all or any portion of the ABL Obligations or the Second Lien Obligations, as applicable, to any other Person that is permitted to be an assignee pursuant to the applicable credit documents (it being acknowledged that the ABL Obligations or the Second Lien Obligations may not be assigned in whole or in part to any Borrower, any Guarantor or any Affiliate of any Borrower or any Guarantor or any Subsidiary of any Borrower or any Guarantor, or to any other Person, in each case that is not permitted under the terms of the applicable credit documents to hold such ABL obligations or Second Lien Obligations), and such other Person shall thereupon become vested with all the rights and obligations in respect thereof granted to the ABL Agents, the Second Lien Agent, any ABL Secured Party, or any Second Lien Secured Party, as the case may be, herein or otherwise. The

26

ABL Secured Parties and the Second Lien Secured Parties may continue, at any time and without notice to the other parties hereto, to extend credit and other financial accommodations, lend monies and provide Indebtedness to, or for the benefit of, any Loan Party on the faith hereof.

**Section 7.8 <u>Governing Law; Entire Agreement</u>**. The validity, performance, and enforcement of this Agreement shall be governed by and construed in accordance with the laws of the State of New York, but without giving effect to applicable principles of conflicts of law to the extent that the applicable of the law of another jurisdiction would be required thereby. This Agreement constitutes the entire agreement and understanding among the Parties with respect to the subject matter hereof and supersedes any prior agreements, written or oral, with respect thereto.

**Section 7.9 <u>Counterparts</u>**. This Agreement may be executed in any number of counterparts, and it is not necessary that the signatures of all Parties be contained on any one counterpart hereof, each counterpart will be deemed to be an original, and all together shall constitute one and the same document. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic (i.e. "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

**Section 7.10 <u>No Third Party Beneficiaries</u>**. This Agreement is solely for the benefit of the ABL Agents, ABL Secured Parties, Second Lien Agent and Second Lien Secured Parties. No other Person (including any Borrower, any Guarantor or any Affiliate of any Borrower or any Guarantor, or any Subsidiary of any Borrower or any Guarantor) shall be deemed to be a third party beneficiary of this Agreement.

**Section 7.11 <u>Headings</u>**. The headings of the articles and sections of this Agreement are inserted for purposes of convenience only and shall not be construed to affect the meaning or construction of any of the provisions hereof.

**Section 7.12 <u>Severability</u>**. If any of the provisions in this Agreement shall, for any reason, be held invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement and shall not invalidate the Lien Priority or the application of Proceeds and other priorities set forth in this Agreement.

**Section 7.13 <u>Attorneys' Fees</u>**. The Parties agree that if any dispute, arbitration, litigation, or other proceeding is brought with respect to the enforcement of this Agreement or any provision hereof, the prevailing party in such dispute, arbitration, litigation, or other proceeding shall be entitled to recover its reasonable attorneys' fees and all other costs and expenses incurred in the enforcement of this Agreement, irrespective of whether suit is brought.

**Section 7.14 <u>VENUE; JURY TRIAL WAIVER.</u>**

(a) EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF

27

OR RELATING TO THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT SHALL AFFECT ANY RIGHT THAT ANY ABL SECURED PARTY OR ANY SECOND LIEN SECURED PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT, ANY SECOND LIEN DOCUMENTS, OR ANY ABL DOCUMENTS AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(b) EACH PARTY HERETO HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. EACH PARTY HERETO REPRESENTS THAT IT HAS REVIEWED THIS WAIVER AND IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(c) EACH PARTY TO THIS AGREEMENT IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 7.5. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

**Section 7.15 Intercreditor Agreement**. This Agreement is the Intercreditor Agreement or the Existing Intercreditor Agreement, as applicable, referred to in the ABL Credit Agreement, the Second Lien Credit Agreement, the Original Second Lien Notes Indenture and the New Second Lien Notes Indenture. Nothing in this Agreement shall be deemed to subordinate the obligations due to (i) any ABL Secured Party to the obligations due to any Second Lien Secured Party or (ii) any Second Lien Secured Party to the obligations due to any ABL Secured Party (in each case, whether before or after the occurrence of an Insolvency Proceeding), it being the intent of the Parties that this Agreement shall effectuate a subordination of Liens but not a subordination of Indebtedness.

**Section 7.16 No Warranties or Liability**. The Second Lien Agent and the ABL Agents acknowledge and agree that neither has made any representation or warranty with respect to the execution, validity, legality, completeness, collectability or enforceability of any other ABL Document or any Second Lien Document. Except as otherwise provided in this Agreement, the Second Lien Agent and the ABL Agents will be entitled to manage and supervise their respective extensions of credit to any Loan Party in accordance with law and their usual practices, modified from time to time as they deem appropriate.

28

Section 7.17 **Conflicts**. In the event of any conflict between the provisions of this Agreement and the provisions of any ABL Document or any Second Lien Document, the provisions of this Agreement shall govern.

Section 7.18 **Information Concerning Financial Condition of the Loan Parties.** Each of the Second Lien Agent and the ABL Agents hereby assumes responsibility for keeping itself informed of the financial condition of the Loan Parties and all other circumstances bearing upon the risk of nonpayment of the ABL Obligations or the Second Lien Obligations. The Second Lien Agent and the ABL Agents hereby agree that no party shall have any duty to advise any other party of information known to it regarding such condition or any such circumstances. In the event the Second Lien Agent or the ABL Agents, in their sole discretion, undertakes at any time or from time to time to provide any information to any other party to this Agreement, (a) they shall be under no obligation (i) to provide any such information to such other party or any other party on any subsequent occasion, (ii) to undertake any investigation not a part of its regular business routine, or (iii) to disclose any other information, (b) they make no representation as to the accuracy or completeness of any such information and shall not be liable for any information contained therein, and (c) the Party receiving such information hereby agrees to hold the other providing Party harmless from any action the receiving Party may take or conclusion the receiving Party may reach or draw from any such information, as well as from and against any and all losses, claims, damages, liabilities, and expenses to which such receiving Party may become subject arising out of or in connection with the use of such information.

(b) The Loan Parties agree that any information provided to the ABL Agents, the Second Lien Agent, any ABL Secured Party or any Second Lien Secured Party may be shared by such Person with any ABL Secured Party, any Second Lien Secured Party, the ABL Agents or the Second Lien Agent notwithstanding a request or demand by such Loan Party that such information be kept confidential; provided that such information shall otherwise be subject to the respective confidentiality provisions in the ABL Credit Agreement, the Second Lien Credit Agreement, the Original Second Lien Notes Indenture and the New Second Lien Notes Indenture, as applicable.

Section 7.19 **Concerning the Second Lien Agent.**

Notwithstanding any term herein to the contrary, it is hereby expressly agreed and acknowledged that the agreements set forth herein by the Second Lien Agent are made solely in its capacity as collateral agent under the Original Second Lien Notes Indenture, the New Second Lien Notes Indenture and the Second Lien Security Agreement and related Second Lien Documents pursuant to the provisions of the Second Lien Documents and the directions of the Second Lien Loan Parties and the Second Lien Secured Parties, as stated therein, and not in its individual capacity. The Second Lien Agent shall not have any duties, obligations, or responsibilities under this Agreement except as expressly set forth herein, and shall have the benefit of all exculpatory provisions, presumptions, indemnities, protections, benefits, immunities or reliance rights contained in the Second Lien Documents in the acceptance, execution, delivery and performance of this Agreement as though fully set forth herein.

29

**Section 7.20 <u>Amendment and Restatement</u>.**

Effective upon the execution and delivery of this Agreement, the terms and provisions of the Existing Intercreditor Agreement shall be and hereby are amended, restated, and superseded in their entirety by the terms and provisions of this Agreement. Each of the Loan Parties, the ABL Agents, the Second Lien Agent, the ABL Secured Parties and the Second Lien Secured Parties hereby confirms and agrees that all references in any of the ABL Documents or the Second Lien Documents to "the Intercreditor Agreement", "thereto", "thereof", "thereunder", "therein", or words of like import referring to the Existing Intercreditor Agreement shall mean this Agreement.

[SIGNATURE PAGES FOLLOW]

30

IN WITNESS WHEREOF, the ABL Agents, for and on behalf of themselves and the ABL Lenders, and the Second Lien Agent, for and on behalf of itself, the Noteholders, the Second Lien Lenders and their applicable agents and trustees, have caused this Agreement to be duly executed and delivered as of the date first above written.

**BANK OF AMERICA, N.A.**, in its capacity as an ABL Agent

By: _____ /s/ Brian Lindblom
Name: Brian Lindblom
Title:  Director

**WELLS FARGO BANK, NATIONAL ASSOCIATION**, in its capacity as an ABL Agent

By: _____ /s/ Joseph Burt
Name: Joseph Burt
Title:  Director

**WILMINGTON TRUST, NATIONAL ASSOCIATION**, in its capacity as the Second Lien Agent

By: _____ /s/ Lynn M. Steiner
Name: Lynn M. Steiner
Title:  Vice President

Signature Page to Intercreditor Agreement

ACKNOWLEDGMENT

     Each Borrower and each Guarantor hereby acknowledges that it has received a copy of this Agreement and consents thereto, agrees to recognize all rights granted thereby to the ABL Agents and the Second Lien Agent, and will not do any act or perform any obligation which is not in accordance with the agreements set forth in this Agreement. Each Borrower and each Guarantor further acknowledges and agrees that it is not an intended beneficiary or third party beneficiary under this Agreement and (i) as between the ABL Secured Parties and the ABL Loan Parties, the ABL Documents remain in full force and effect as written and are in no way modified hereby, and (ii) as between the Second Lien Secured Parties and the Second Lien Loan Parties, the applicable Second Lien Documents remain in full force and effect as written and are in no way modified hereby.

<div align="right">

**SEARS ROEBUCK ACCEPTANCE CORP.**, as ABL Borrower, Second Lien Credit Agreement Borrower and Guarantor

By: _____ /s/ Robert A. Riecker
Name: Robert A. Riecker
Title:  Vice President, Finance

**KMART CORPORATION**, as ABL Borrower, Second Lien Credit Agreement Borrower and Guarantor

By: _____ /s/ Robert A. Riecker
Name: Robert A. Riecker
Title:  Chief Financial Officer

**SEARS HOLDINGS CORPORATION**, as Second Lien Notes Issuer and Guarantor

By: _____ /s/ Robert A. Riecker
Name: Robert A. Riecker
Title:  Chief Financial Officer

</div>

Acknowledgement — Intercreditor Agreement

**CALIFORNIA BUILDER APPLIANCES, INC.**
**FLORIDA BUILDER APPLIANCES, INC.**
**KMART HOLDING CORPORATION**
**KMART OPERATIONS LLC**
**SEARS OPERATIONS LLC**
**SEARS, ROEBUCK AND CO.**

By: _____ /s/ Robert A. Riecker
Name:                         Robert A. Riecker
Title:                        Chief Financial Officer

**SEARS HOLDINGS MANAGEMENT CORPORATION**
**SEARS HOME IMPROVEMENT PRODUCTS, INC.**

By: _____ /s/ Robert A. Riecker
Name:                         Robert A. Riecker
Title:                        Chief Financial Officer

Acknowledgement — Intercreditor Agreement

**A&E FACTORY SERVICE, LLC**
**A&E HOME DELIVERY, LLC**
**A&E LAWN & GARDEN, LLC**
**A&E SIGNATURE SERVICE, LLC**
**KLC, INC.**
**KMART OF MICHIGAN, INC.**
**PRIVATE BRANDS, LTD.**
**SEARS BRANDS MANAGEMENT CORPORATION**
**SEARS PROTECTION COMPANY**
**SEARS PROTECTION COMPANY (FLORIDA), L.L.C.**
**SEARS, ROEBUCK DE PUERTO RICO, INC.**
**SOE, INC.**
**STARWEST, LLC**

By: _____ /s/ Robert A. Riecker
Name:                  Robert A. Riecker
Title:                  Vice President

**KMART.COM LLC**

By: Bluelight.com, Inc., its Member

By: _____ /s/ Robert A. Riecker
Name:                  Robert A. Riecker
Title:                  Vice President

**KMART OF WASHINGTON LLC**
**KMART STORES OF ILLINOIS LLC**
**KMART STORES OF TEXAS LLC**
**MYGOFER LLC**

By: Kmart Corporation, its Member

By: _____ /s/ Robert A. Riecker
Name:                  Robert A. Riecker
Title:                  Chief Financial Officer

Acknowledgement — Intercreditor Agreement