WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Paul R. Genender
Jared R. Friedmann
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------------------x | | |
| In re | : | |
| | : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | : | |
| | : | **Case No. 18-23538 (RDD)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |
| ------------------------------------------------------------x | | |

**SECOND SUPPLEMENTAL DECLARATION OF BRIAN J. GRIFFITH IN SUPPORT OF THE DEBTORS' SUPPLEMENTAL BRIEF ON EXPERT DISCOVERY AND IN FURTHER SUPPORT OF (I) OPPOSITION TO SECOND-LIEN HOLDERS' REQUESTS TO DETERMINE AMOUNT OF SECOND-LIEN SECURED CLAIMS UNDER SECTION 506(a) AND SECTION 507(b) ADMINISTRATIVE CLAIMS AND (II) REPLY IN SUPPORT OF THE DEBTORS' RULE 3012 MOTION TO DETERMINE THE AMOUNT, IF ANY, OF 507(b) CLAIMS AND TO SURCHARGE SECOND-LIEN COLLATERAL PURSUANT TO SECTION 506(c)**

I, Brian J. Griffith, make this declaration under 28 U.S.C. § 1746:

1. I submit this second supplemental declaration ("**Second Supplemental Declaration**") in support of the *Debtors' Supplemental Brief on Expert Discovery and in Further Support of (I) Opposition to Second-Lien Holders' Requests to Determine Amount of Second-Lien Secured Claims Under Section 506(a) and Section 507(b) Administrative Claims and (II) Reply in Support of the Debtors' Rule 3012 Motion to Determine the Amount, if Any, of 507(b) Claims and to Surcharge the Second-Lien Collateral Pursuant to Section 506(c)* ("**Supplemental Brief**"),

filed concurrently with this Second Supplemental Declaration, and as a supplement to the *Supplemental Declaration of Brian J. Griffith in Support of the Debtors' Motion to Estimate Certain 507(b) Claims for Reserve Purposes* [ECF No. 4382] ("**Supplemental Declaration**") and *Declaration of Brian J. Griffith in Support of the Debtors' Motion to Estimate Certain 507(b) Claims for Reserve Purposes* [ECF No. 4035] ("**Declaration**").[1]  Together, this Second Supplemental Declaration, the Supplemental Declaration and the Declaration comprise my direct testimony for the July 23, 2019, hearing on the Rule 3012 Motion.

        2.      I have been a Managing Director of M-III Advisory Partners, LP ("**M-III**") for the past five years.  As Managing Director at M-III, I am responsible for leading deal teams where we are retained by either creditors or debtors.  Assignments range from operational improvement to distressed situations both in and out of court.  Depending on the assignment, deal responsibilities range from short-term profit improvement roles to multi-year turnaround advisory assignments in numerous industries, including: retail, financial services, real estate development, healthcare, energy, consumer products, manufacturing, automotive, and food services.  Typical areas of focus on debtor engagements are treasury, cash forecasting, process improvement, cost reductions, development of strategic alternatives, and negotiations with creditors and parties-in-interest.  Prior to my current role with M-III, I served in interim management roles, including as a chief financial officer and chief restructuring officer.

---

[1] All capitalized terms not otherwise defined in this Second Supplemental Declaration shall have the meanings prescribed to them in the Supplemental Brief, the APA, the Plan, or the *Declaration of Robert A. Riecker* [ECF No. 3], as appropriate.  *Order (I) Approving the Asset Purchase Agreement among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection therewith and (IV) Granting Related Relief* [ECF No. 2507]; *Order (I) Approving Disclosure Statement, (II) Establishing Notice and Objection Procedures for Confirmation of the Plan, (III) Approving Solicitation Packages and Procedures for Distribution Thereof, (IV) Approving the Forms of Ballots and Establishing Procedures for Voting on the Plan, and (V) Granting Related Relief* [ECF No. 4392].

3.      In October 2018, the Debtors[2] retained M-III to provide the Debtors and their other professionals with financial advisory services in connection with the Debtors' evaluation and development of strategic alternatives to wind-down and liquidation. Specifically, M-III has advised the Debtors regarding the value of, among other things, potential adequate protection claims held by Cyrus Capital Partners, L.P. ("**Cyrus**"), ESL Investments, Inc. ("**ESL**"), and Wilmington Trust, N.A., as collateral agent of certain prepetition second-lien debt on its own behalf and on behalf of all other Prepetition Second Lien Credit Parties ("**Collateral Agent**," collectively with Cyrus and ESL, the "**Second-Lien Holders**"), pursuant to section 507(b) of the Bankruptcy Code and as permitted by the Final DIP Order ("**507(b) Claims**"). M-III performed this analysis in connection with the Motion to Estimate, Rule 3012 Motion, and the Second-Lien Holders' allegations regarding their purported, aggregate amount of 507(b) Claims and in connection with potentially applicable 506(c) surcharge amounts.

4.      Except as otherwise indicated, all statements in this Second Supplemental Declaration are based upon my personal knowledge of the Debtors' operations and finances

---

[2] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

acquired during the course of my engagement with the Debtors; my discussions with other members of the M-III team and the Debtors' other advisors; my review of relevant documents; and my views based upon my experience. If called to testify, I would testify competently to each of the facts set forth in this Second Supplemental Declaration. I am authorized to submit this Second Supplemental Declaration on behalf of M-III for the Debtors.

### Collateral Valuation Methodology

5.      As set forth in my Supplemental Declaration, the Second-Lien Holders' Collateral as of the Petition Date was worth at 85% of book value under a fair market value approach. Under the APA, and as detailed below, the Collateral—inventory and credit cards accounts receivables—was purchased for 85% of book value, representing their fair market value in a going concern transaction on the Closing Date. The Second-Lien Holders' Credit Bid can only be allocated to the purchase of the collateral it is secured by – namely inventory and credit card receivables – which confirms the purchase price of 85% of book value.

6.      The 85% fair market value of the inventory and credit card accounts receivables is reflected in the APA. Based on the APA ¶ 3.1(a), cash consideration (excluding the store cash and Credit Bid release consideration) was approximately $1.408 billion, less the amount Credit Bid on the FILO Term Loan ($125 million), less the amount Credit Bid on the Second-Lien Debt ($433.5 million)—which equals $850 million. As a condition to closing the Sale, the maximum allowed DIP ABL Facility balance was $850 million. The DIP ABL Facility was secured by a first lien on inventory and credit card accounts receivables, thus ESL would not have been able to Credit Bid the subordinated FILO Term Loan or Second-Lien Debt (which had subordinated liens on the same collateral) without repaying the DIP ABL Facility in full. Based on this logic, one could reasonably interpret that total consideration under the APA for the

inventory and credit card accounts receivables is $850 million, plus $125 million, plus $433.5 million, which equals approximately $1.408 billion. Also according to APA ¶ 10.9, the Debtors were required to deliver an aggregate amount of $1.657 billion in Inventory Value, Credit Card Accounts Receivable, and Pharmacy Receivables. $1.408 billion is 85% of $1.657 billion. This math is illustrated in the table below, which includes references to the applicable APA provisions setting forth these numbers:

| APA Clause | Closing Payment Amount ($) | Description |
|---|---|---|
| 3.1(b)(iv) | $433,450,000 | Second-Lien Credit Bid |
| 3.1(b)(ii) | $125,000,000 | FILO Term Loan Credit Bid |
| 10.10 | $850,000,000 | Maximum DIP ABL Facility Balance |
| 3.1(a)(i) | $1,408,450,000 | Closing Consideration Related to Collateral (Inventory + Receivables) |
| 10.9 | $1,657,000,000 | Delivered Collateral Requirement |
|  | 85.000% | **Closing Consideration Divided by Delivered Collateral Requirement** |

7. Additionally, several other documents provide further support for the fact that the value of the Second-Lien Holders' Collateral in a going-concern context should be 85% of book value, as eventually reflected in the APA. In presentations prepared by ESL dated December 2018 and January 2, 2019 leading up to the APA, the valuation of the inventory is explicitly listed in footnotes in both presentations.

8. For example, in the December ESL presentation entitled "Project Transform – Sources and Uses," a true and correct copy of which is attached as **Exhibit A**, the 85% is set forth in two places. The first place is in footnote 7 on page 2, which states, "7. Assumes purchase of $1,503mm projected book value of inventory on 2/1/2019 at 85 cents." The second place is in footnote 8 on page 2, which states, "8. Assumes purchase of $104mm projected book value of credit card and pharmacy receivables on 2/1/2019 at 85 cents."

9. Similarly, in the January 2, 2019 ESL presentation entitled "Project Transform – ESL Bid Presentation," a true and correct copy of which is attached as **Exhibit B**, the 85% is set forth in two places. The first place is in footnote 7 on page 4, which states, "7. Assumes

purchase of $1,553mm projected book value of inventory at close at 85 cents." The second place is in footnote 8 on page 4, which states, "8. Assumes purchase of $104mm projected book value of credit card and pharmacy receivables at close at 85 cents." Notably, those two figures add up to the $1.657 billion number which is in Section 10.9 of the APA.

10. Thus, the 85% was not only accounted for in the APA, but it was also consistently recognized and a basis used during the negotiations.

**Problems with 2L Experts' Inventory Valuations**

11. My team and I prepared the following chart comparing my factual calculations to the opinions offered by the Second-Lien Holders' experts:

| | 507(b) Diminution Calculations | | | |
|---|---|---|---|---|
| ($ in millions) | Griffith | Schulte | Murray | Henrich |
| **Collateral** | | | | |
| Total Inventory or Go Forward Store Inventory (when broken out) [1] | 2,690.8 | 2,039.3 | 2,391.5 | 2,260.9 |
| GOB Inventory (when broken out) | N/A | 651.6 | N/A | 651.6 |
| GOB Inventory Adjustment % | N/A | 95.5% | N/A | 96.4% |
| GOB Inventory Value [2] | N/A | 622.3 | N/A | 627.9 |
| Inventory in-Transit (when broken out) [3] | N/A | N/A | 74.6 | N/A |
| Gross Inventory | 2,690.8 | 2,661.6 | 2,466.1 | 2,888.8 |
| Inventory NOLV [4] | N/A | N/A | 88.7% | N/A |
| Fair Market Value [5] | 85.0% | N/A | N/A | N/A |
| **Inventory Value** [6] | 2,287.2 | 2,661.6 | 2,195.9 | 2,888.8 |
| *Memo: Inventory Value Percent of Total Book Value* | *85.0%* | *98.9%* | *81.6%* | *107.4%* |
| Credit Card Receivables [7] | 46.6 | 64.2 | 54.8 | 64.3 |
| Cash [8] | - | 115.5 | 123.2 | 116.2 |
| Scripts [9] | - | 72.8 | 72.8 | 72.8 |
| Pharmacy Receivables [10] | - | 11.9 | 10.5 | 14.5 |
| **Total Collateral** | 2,333.8 | 2,926.0 | 2,457.2 | 3,156.6 |
| **First Lien Debt** | | | | |
| Revolving Credit Facility | 836.0 | 836.0 | 836.0 | 836.0 |
| First Lien Letters of Credit | 123.8 | - | - | 123.8 |
| First Lien Term Loan B | 570.8 | 570.8 | 570.8 | 570.8 |
| FILO Term Loan | 125.0 | 125.0 | 125.0 | 125.0 |
| Stand-Alone L/C Facility | 271.1 | - | - | - |
| First Lien Interest | 34.0 | - | - | - |
| Total First Lien Debt | 1,960.7 | 1,531.8 | 1,531.8 | 1,655.6 |
| 2L Debt Remaining Value | 373.1 | 1,394.2 | 925.4 | 1,501.0 |
| Credit Bid | (433.5) | (433.5) | (433.5) | (433.5) |
| Credit Bid Adjusted 2L Debt Collateral Value | (60.4) | 960.7 | 491.9 | 1,067.5 |
| Less: Value of 2L Adequate Protection [11] | - | - | (0.3) | - |
| Total | (60.4) | 960.7 | 492.2 | 1,067.5 |
| 507(b) Claim | - | 960.7 | 492.2 | 1,067.5 |
| 506 (c) [12] | (1,451.0) | - | - | (206.7) |
| Memo: Alternative 506 (c) 1 [12] | (527.0) | - | - | - |
| Memo: Alternative 506 (c) 2 [12] | (273.0) | - | - | - |

[1] Go forward inventory specifically calculated in Schulte and Henrich reports. Griffith uses total stock ledger value. Schulte includes $2,039 book value for go forward store inventory collateral. Schulte's go forward inventory amount is based on incorrect $652mm of GOB inventory book value. Murray uses total net eligible inventory from the Week 36 borrowing base certificate. Henrich applies a 29% gross margin to go-forward book value inventory. Henrich's go forward inventory amount is based on incorrect $652mm of GOB inventory book value. Henrich then includes a 23.4% of inventory at cost selling expense. Henrich's 4-wall EBITDA based on gross margin and selling expense equals 12.4%. The 12.4% margin is significantly higher than the 4-wall EBITDA margin of 6% that is on page 37 of the "Transier Declaration".

[2] GOB inventory is specifically calculated in Schulte and Henrich reports. Schulte applies a 95.5% NOLV to incorrect $652mm GOB inventory book value. Henrich applies incorrect NOLV of 96.4% to incorrect $652mm GOB inventory book value. Schulte correctly adjusted NOLV formula in ESL 001 to equal (sales-store costs)/cost of inventory. Henrich's 96.4% NOLV is based on wrong NOLV formula of sales/(cost of inventroy+store costs). Murray does not break out GOB inventory.

[3] Only Murray specifically calculated in-transit inventory. Murray applied a 51.6% NOLV to the $144.6mm in-transit value stated in week 36 borrowing base report. The $144.6 is included in the total stock ledger.

[4] Only Murray uses the 88.7% NOLV listed in the October 6 Tiger report for inventory value, applied exclusively to net eligible inventory, with separate NOLV for in-transit inventory. Schulte and Henrich use NOLV only for GOB store inventory. Griffith uses fair market value, not NOLV.

[5] Only Griffith uses the fair market value realized in the February sale (85% of book value). Schulte, Henrich, and Murray do not use fair market value.

[6] Inventory value is listed collateral value factored into Griffith, Schulte, Murray, and Henrich's diminution calculation.

[7] Griffith's credit card receivable value is 85% of $55mm of eligible credit card receivables listed in Week 36 borrowing base certificate. Murray uses full value of $55mm eligible credit card receivables from borrowing base certificate. Schulte and Henrich both use September 2018 month end general ledger.

[8] Griffith excludes cash from analysis because cash is not second lien collateral. Schulte includes $116mm of cash from September 2018 month end general ledger. Murray cites the Debtors' schedule of assets and liabilities for the listed $123.2mm. Henrich's $116.2mm cash balance is purportedly from "filed Schedules and Statements."

[9] Griffith excludes pharmacy scripts from analysis because they are not second lien collateral. Other experts use $72.8mm value provided by internal Sears valuation, and do not use Tiger's estimate of $27mm.

[10] Griffith excludes pharmacy receivables from analysis because pharmacy receivables are not second lien collateral. Schulte uses amount listed from September 2018 month end general ledger. Murray uses net eligible pharmacy receivables amount listed on Week 36 borrowing base certificate. Henrich uses gross pharmacy receivables amount on Week 36 borrowing base certificate .

[11] Murray includes $250k of Wilmington Trust's professional fees as adequate protection. Griffith, Schulte, and Henrich do not include this value.

[12] Griffith 506(c) calculation includes value referenced in first declaration. Henrich's amount includes $51mm of professional fees, $135.5mm of go-forward corporate expenses, and $20.2mm of liquidation overhead costs. Griffith's 1st alternative 506(c) charge is costs to operate business in ordinary course and consummate sale transaction from December 28 (ESL bid date) and February 11 (consummation of transaction). Griffith's 2nd alternative 506(c) charge is costs to operate business in ordinary curse and consummate sale transaction from January 17 (execution of APA and February 11 (consummation of transaction).

12. When valuing the Inventory at the Petition Date, none of the 2L Experts applies a fair market value analysis. Schulte's Petition Date Inventory valuation uses the wrong data and is highly inflated. Schulte fails to apply a fair market value analysis. He also uses the wrong data, thereby a significantly overstating his inventory valuation. First, he arrives at a total inventory value of $2.661.5 billion by using an unadjusted go forward inventory figure of $2,039.2 billion and a slightly adjusted GOB inventory number of $651.6 million (adjusted downward by 4.5% to $622.3 million). In doing so, Schulte incorrectly starts with and relies on the total stock ledger amount of $2,690.8 billion (without making any more than a nominal adjustment) when he instead should have used the $2,391.5 billion net eligible inventory figure from the borrowing base certificate. Then, because Schulte relied on a spreadsheet containing incorrect calculations for GOB inventory, Schulte subtracts the incorrect amount of GOB inventory—$651.6 million, when it should really be an adjusted number of $617.2 million—to reach his $2,039.2 billion figure for

go-forward inventory. In other words, his go-forward inventory valuation is overstated by approximately $264.9 million, as shown in the chart below. Further compounding his mistakes, to reach his total inventory value of $2,661.5 billion, Schulte proceeds to improperly use 100% of book value of the incorrect go-forward store inventory ($2,039.3 billion, as explained above), and adds 95.5% (using an incorrect NOLV) of the GOB store inventory ($651.6 million times 95.5% equaling $622.3 million—which, as shown below, is overstated by $32.3 million because it is based on a spreadsheet containing incorrect calculations), thereby creating a total value of $2,661.5 billion, which is overstated by approximately $297.1 million (as shown below). This reflects an approximately 1% adjustment off total book value and is an improper methodology. There are also additional expenses required to sell inventory that he does not consider, such as professional fees and financing fees, which are not included in NOLV. Schulte's errors are summarized in the table below:[3]

| $ in millions | Collateral Value at Filing Date | | | | |
|---|---|---|---|---|---|
| | Schulte | | Adjusted Schulte | | Variance |
| Book Value Inventory | $ 2,690.8 | (Total Stock Ledger) | $ 2,391.5 | (Net Eligible Inventory) | $ (299.3) |
| Less: GOB Inventory | 651.6 | (Incorrect GOB Inventory) | 617.2 | (Actual GOB Inventory) | (34.4) |
| Go Forward Inventory | 2,039.2 | | 1,774.3 | | (264.9) |
| Go Forward % | 100.0% | (100% of Book Value) | 100.0% | (100% of Net Eligible Inventory) | |
| **Value of Go-Forward Inventory** | 2,039.2 | | 1,774.3 | | (264.9) |
| GOB Inventory | 651.6 | (Incorrect GOB Inventory) | 617.2 | (Actual GOB Inventory) | (34.4) |
| GOB NOLV | 95.5% | (Incorrect 95.5% NOLV) | 95.6% | (Correct 95.6% NOLV) | |
| **GOB Value** | 622.3 | | 590.0 | | (32.3) |
| **Total Inventory Value** | $ 2,661.5 | | $ 2,364.3 | | $ (297.1) |

13. Henrich's Petition Date Inventory valuation also uses the wrong data and is highly inflated. First, he applies too high of a margin to the going-concern inventory. By doing so, he overstates the value of gross inventory by over $300 million. Second, his calculation of

---

[3] The adjusted total inventory value of $2,364.3 billion does not reflect an 85% fair market value reduction, but rather corrects mistakes in Schulte's analysis. As I stated in my previous declarations, the correct inventory value should be $2,287.2 billion, not $2,364.3 billion.

GOB liquidation inventory at cost is overstated by $37.9 million, meaning his GOB Stores figure of $627.9 million is similarly overstated by $37.9 million. The value is inflated because he used a 96.4% NOLV (with the wrong formula) instead of the correct 95.6% NOLV. Third, Henrich does not consider additional expenses required to sell inventory, including bankruptcy expenses and administrative expenses. Henrich's errors are summarized in the table below:[4]

| $ in millions | Henrich | | Adjusted Henrich | | Variance |
|---|---|---|---|---|---|
| **Collateral Value at Filing Date** | | | | | |
| Total Inventory at Cost | $2,576.2 | (Stock Ledger ex SHS) | $2,391.5 | (Net Eligible Inventory) | $ (184.7) |
| Less GOB at Cost | (651.6) | (Incorrect GOB Inventory) | (617.2) | (Actual GOB Inventory) | 34.4 |
| Equals: Going Concern Inventory at Cost | 1,924.7 | | 1,774.3 | | (150.4) |
| Going concern Inventory Sale Proceeds | 2,710.8 | (29% margin) | 2,499.0 | (29% margin) | (211.8) |
| Less: Going Concern Store Expenses | (449.9) | (23.4% selling expense) | (574.8) | (Back into 6% 4 wall margin) | (124.9) |
| Total Inventory | 2,260.9 | | 1,924.2 | | (336.7) |
| GOB Inventory at Cost | 651.6 | (Incorrect GOB Inventory) | 617.2 | (Actual GOB Inventory) | (34.4) |
| Less: Unrecovered Value at Liquidation sale | (23.7) | (Wrong Store Expenses) | (27.2) | (Correct Store Expenses) | (3.5) |
| **Total Inventory, Liquidation** | 627.9 | (Incorrect 96.4% NOLV) | 590.0 | (Correct 95.6% NOLV) | (37.9) |
| **Total Inventory** | $2,888.8 | | $2,514.3 | | $ (374.5) |

14. Murray relies heavily on the Tiger Report for certain things, such as the 88.7% NOLV, but then deviates from the Tiger Report in other regards. For example, the Tiger Report does not include in-transit inventory, yet Murray adds $74.6 million in in-transit inventory to her calculation. Another flaw in Murray's calculation is that she fails to include additional expenses required to sell inventory, including professional fees and financing fees.

### Categories of Second-Lien Holder Collateral

15. As noted in my Supplemental Declaration, the Second-Lien Holder Collateral consists of inventory and credit card accounts receivables. Cash and cash equivalents, pharmacy scripts, and pharmacy receivables are solely First Lien Collateral and are not Second-Lien Holder Collateral. This is clear from the plain language in the applicable security agreements.

---

[4] The adjusted amount of total inventory value of $2,514.3 billion does not reflect an 85% fair market value reduction, but rather corrects mistakes in Henrich's analysis. As I stated in my previous declarations, the correct inventory value should be $2,287.2 billion, not $2,514.3 billion.

The *Third Amended & Restated Collateral Agreement* dated July 21, 2015 (hereinafter, the "**First Lien Security Agreement**"), a true and correct copy of which is attached as **Exhibit C**, expressly identifies cash and cash equivalents, pharmacy scripts, and pharmacy receivables as subject to a first lien security interest. In contrast, the *Amended and Restated Security Agreement* dated March 20, 2018 (hereinafter, the "**Second Lien Security Agreement**"), a true and correct copy of which is attached as **Exhibit D**, does not include any of these items. Notably, the First Lien Security Agreement was executed approximately three years before the Second Lien Security Agreement. Also, the fact that the language in the later Second Lien Security Agreement relating to the categories of collateral subject to a security interest is identical to the First Lien Security Agreement except with respect to cash and cash equivalents, pharmacy receivables, and pharmacy scripts, suggests to me that these items were intentionally excluded from the Second Lien Security Agreement.

16.   Based on my experience, as a practical matter, all sophisticated first lien and second lien parties would have analyzed each other's security agreements ahead of entering into the Intercreditor Agreement. *See* Second Amended and Restated Intercreditor Agreement ("**Pre-Petition 1L/2L Intercreditor Agreement**"), a true and correct copy of which is attached as **Exhibit E**.

### Letters of Credit ("L/Cs")

17.   Before the Petition Date, Sears obtained a Pre-Petition ABL Facility including a letter of credit facility (hereinafter, the "**1L L/C Facility**") and a Stand-Alone L/C Facility (hereinafter, the "**Stand-Alone L/C Facility**"). As of the Petition Date, $124 million was issued under the 1L L/C Facility, and $271 million was issued under the Stand-Alone L/C Facility.

18. The 1L L/C Facility was rolled into the Senior DIP Facility, which has superpriority status and is a claim that must be paid before the Second-Lien Debt. *See* Final DIP Order ¶ 5. Notably, Mr. Henrich agrees that the Senior DIP Facility (or Debt under DIP Credit Agreement) should be included as a senior debt obligation. The amount outstanding under the 1L L/C Facility restricted the amount of debt the Debtors could borrow under the DIP ABL. The APA executed on January 17 required that $850 million or less of debt under the Senior DIP Credit Agreement. The 1L L/C Facility was included in the $850 million amount. Therefore the 1L L/C Facility is considered within the "existing indebtedness of Sellers" referenced in Section 10.10 of the APA.

19. Moreover, the Stand-Alone L/C Facility is cash collateralized by ESL and Cyrus, as reflected in the Cash Collateral Agreement, a true and correct copy of which is attached as **Exhibit F**. Thus, to the extent any amounts are drawn by the Stand-Alone L/C Facility counterparty, ESL would have a claim senior to the Second-Lien Holders. And even if the cash Stand Alone L/C Facility was not drawn, the Debtors or any buyer would have had to refinance the Stand Alone L/C Facility and post cash collateral, as actually happened under the Sale.

20. Together, these L/C facilities comprise approximately $395 million, and there are significant ongoing obligations associated with these L/C facilities, which are material obligations. As evidence that the L/Cs are real obligations that should be considered senior debt obligations, at least $9.1 million was actually drawn on the L/Cs during the chapter 11 cases, as Ms. Murray acknowledges in her report at ¶ 38. Also, the table below shows the significant ongoing annual insurance payment obligations to the Estate for these facilities (and the detailed backup reflecting these amounts is attached as **Exhibit G**):

| Line Type | State | Yearly Amount[1] |
|---|---|---|
| Chubb Auto | All | $773,410 |
| Chubb Workers Comp | All | $17,582,111 |
| **Total Chubb** | | **$18,355,521** |
| State Self Funding Plans | All | $7,947,397 |
| **Total Backed by L/Cs** | | **$26,302,918** |

(1) Based on payments made from 2/1/18 through 1/31/19.

21. Finally, as Mr. Henrich acknowledged in his deposition (Henrich Dep. 110:8-11) and Ms. Murray acknowledges at ¶¶ 33-36 of her report, the majority of these L/Cs are for workers' compensation, among other things. As a practical matter, workers' compensation obligations last for approximately twenty or thirty years, as there are actual disbursements every time a claim is filed, so these were significant continuing obligations relating to the claims backed by the L/Cs.

## Post-Petition Interest

22. As set forth in my Supplemental Declaration, approximately $34 million in post-petition interest should be included as senior obligations. This amount of post-petition interest is reasonably included because it is the estimated minimum amount of interest that would have to be paid to the senior secured lenders in an expedited 363 sale process with time to market the assets, notice parties, qualify bids, and conduct a competitive auction, subject to a final court approval. To reach the approximately $34 million figure, I included three months of interest, as shown below:

| ($ in millions) | | Effective Rate | Interest P.A | 1 Month Of Interest | 3 Months of Interest |
|---|---|---|---|---|---|
| **Total 1st Lien Debt** | 1,926.8 | 7.1% | 137.5 | 11.5 | 34.4 |

23. Notably, this illustrative amount of post-petition interest is less than the actual amount of post-petition interest accrued through February 11, 2019, which was $62 million,[5] including interest from the Junior DIP totaling approximately $12 million.

### Section 506(c) Surcharges

24. Mr. Henrich agrees that 506(c) Surcharges are appropriate in this case, as reflected in his report (Henrich Report at 5) and deposition testimony (Henrich Dep. 32:20-23).

25. The surcharges identified in my Declaration and Supplemental Declaration were spent to allow the Second-Lien Holders to Credit Bid—which allowed for a dollar-for-dollar recovery in the amount of $433.5 million—and, but for these expenses, their Credit Bid in this amount would not have been possible.

26. The table below reflects a breakdown of the items included in the approximately $254 million and $527 million surcharge figures set forth in ¶ 25 of my Supplemental Declaration (and the detailed backup reflecting these amounts is attached as **Exhibit H**):

| 506(c) Expenses | | | Total |
|---|---|---|---|
| Beginning Date | 12/28/2018 | 1/18/2019 | 12/28/2018 |
| End Date | 1/17/2019 | 2/9/2019 | 2/9/2019 |
| Employee Payroll, Benefits and Taxes | $ (124) | $ (108) | $ (232) |
| Rent, Occupancy Expenses, Property Taxes and Property Maintenance | (64) | (88) | (152) |
| Logistics and Supply Chain Costs | (29) | (12) | (41) |
| Utility & Telephone Expenses | (11) | (8) | (18) |
| Advertising Expenses | (8) | (7) | (15) |
| Employee Travel and Business Expenses | (4) | (9) | (13) |
| Equipment Expenses (Fuel and Truck Maintenance) | (10) | (5) | (15) |
| Security Services, Fire Protection and Waste Services | (1) | (12) | (13) |
| DIP Interest and Financing Fees | (23) | (6) | (29) |
| Total | $ (273) | $ (254) | $ (527) |

Note:
The information is based on Sears disbursement data with the exclusion of professional fees and GOB store operating expenses.
GOB store operating expenses are based on store level expenses on weekly basis

---

[5] The $62 million of interest was included within the $94 million of DIP interest and financing fees related 506(c) surcharges listed in the Griffith Declaration. The remaining $32 million was related to financing fees.

27. Professional fees for Debtors' counsel and the Restructuring Subcommittee's counsel directly related to the Sale were $7,705,510.50 for the month of January 2019 alone. This figure does not include fees for financial advisors earned in connection with the Sale Process and Closing, as those event-based fee structures make it difficult to allocate fees to a precise time period.

28. Regarding the $1.451 billion of potential 506(c) Surcharges described in my Declaration (the detailed backup for which is attached as **Exhibit I**), Sears employees produced daily cash reporting materials that included categories of cash disbursements each day. These files were the "Daily AP Bridge file" and the "FY file." These files were the basis for actualizing the Debtors' cash flow forecast that was used to test permitted variances under the Final DIP Order. Based on the Debtors' understanding of the operations and categorization of expenses, certain categories of expenses were included that were necessary and reasonable for the preservation of the Second-Lien Holders' collateral (inventory and credit card accounts receivables). The financial and legal advisors of the Debtors determined that the going-concern sale executed with Transform was the highest value that could be realized in this process, including compared to a liquidation commencing on the Petition Date. Therefore, all expenses related to the operations of the going-concern stores and the overhead costs associated with the going-concern stores were included as potential 506(c) expenses.

29. The Debtors' selected categories included the following:

   a. <u>Employee Payroll, Benefits and Taxes</u>. Employees were critical to maintain the corporate organization as well as sell and maintain inventory.

   b. <u>Rent, Occupancy Expenses, Property Taxes and Property Maintenance</u>. Costs associated with real estate were required as the physical footprint of the 425 remaining stores that were sold were a critical aspect of Transform's going-concern bid.

    c.    <u>Logistics and Supply Chain Costs</u>. Well stocked stores and deliveries to customers were needed to preserve value of the Debtors' assets.

    d.    <u>Professional Fees</u>. Professional fees were required to pursue sale process and conduct efficient bankruptcy process.

    e.    <u>DIP Interest and Financing Fee</u>. Financing fees and interest payments were needed as the Debtors were reliant on debt financing to fund their operations.

    f.    <u>Critical Vendor Payments</u>. Critical vendor payments were needed to maintain vendor relations with important vendors.

    g.    <u>Utility & Telephone Expenses</u>. Necessary to maintain store infrastructure.

    h.    <u>Advertising Expenses</u>. Maintaining the brand and market access to customers was essential to preserving the value of the collateral.

    i.    <u>Employee Travel and Business Expenses</u>. P-Card related expenses were necessary day-to-day operating expenses paid for by employees.

    j.    <u>Equipment Expenses (Fuel and Truck Maintenance)</u>. Related to operating going-concern assets and preserving value of logistics fleet.

    k.    <u>Security Services, Fire Protection and Waste Services</u>. Required to preserve value of stores and avoid stolen inventory.

30.    Excluded categories were:

    a.    <u>Licensing payments to vendors</u>. Licensing payments relate to intellectual property agreements related to inventory sold during case.

    b.    <u>Utility deposits</u>. Deposits were required as part of the bankruptcy as adequate assurance and did not preserve the going-concern business.

31.    For the 506(c) eligible categories, the Debtors evaluated the operating expenses that were incurred in relation to going-concern stores. The Debtors used by-store level data for the 425 stores that were included in Transform's bids. The Debtors only included expenses for the 425 stores and removed expenses related to the GOB Stores.

32. Similarly, the Debtors removed any professional fees related to the GOB store process. The calculation of applicable professional fees was narrowly tailored. My team and I calculated professional fees for purposes of the 506(c) Surcharge, with assistance from Counsel. With M-III's guidance, Weil reviewed all of the applications for compensation for fees incurred by the Debtors and isolated only those expenses that dealt directly with the going-concern sale process by using the task codes included in those filings. For example, for Weil's fees, we included only two task codes—"Asset disposition" and "Hearing and Court Matters"—to the exclusion of thirty-four other task codes, for a total of $14,927,627. A similar process was conducted for FTI Consulting, Inc. and Paul, Weiss, Rifkind, Wharton & Garrison LLP. None of the UCC's legal fees were included. This conservative approach excluded certain expenses that are arguably attributable to preserving the value of the Second-Lien Holders' Collateral—*e.g.*, approximately $1.4 million for "Customer, Supplier, and Vendor Issues."

33. For professionals that bill on a fixed basis, such as Evercore Group LLC, the investment banker to the Restructuring Subcommittee, we calculated the number of hours attributable to the sale process as a ratio to the total and applied that ratio to the fixed fee. In the case of Evercore, this resulted in including $400,000 of the $1,000,000 fixed fee. We calculated a similar ratio for Lazard and Houlihan Lokey Capital, Inc., attributing only the percentage of fees attributable to the sale process.

### Post-Closing Calculation

34. The following table reflects any potential diminution in value of the Second-Lien Collateral since the Closing Date, which includes net post-Closing Date recovery of GOB inventory and the corresponding expenses associated with the same and moving the Estate toward its conclusion, which benefits the Second-Lien Holders.

| Post-Close Diminution | |
|---|---:|
| Remaining Wave 3 Inventory at Cost on 2/10/19 | $63,620,000 |
| **2/10/19 - 3/23/19 Total Sales** | **$57,181,000** |
| February Expenses | (4,008,716) |
| March Expenses | (4,102,148) |
| Total Store Level Expenses | (8,110,864) |
| **Net Post-Close Recovery** | **$49,070,136** |
| *Store Level NOLV (%)* | *77.1%* |
| Accrued Payroll | (42,417,407) |
| Select Professional Fees Accrued in Post-Close Period | (13,317,691) |
| Severance and WARN | (11,480,880) |
| Citi L/C Interest & Fees | (2,858,641) |
| **Additional Post-Close Expenses Related To Collateral** | **(70,074,619)** |
| **Remaining Value From GOB Collateral** | **($21,004,484)** |

*Note: Excludes applicable sales tax which would further increase expenses. Inventory and sales data available starting from February 10, 2019; company provides information on weekly basis.*

35. Even when post-Closing Date diminution is considered, 506(c) Surcharges—including 506(c) Surcharges incurred prior to the Closing Date, which are outlined elsewhere herein, as well as 506(c) Surcharges incurred post-Closing Date—exceed any diminution.

Dated: July 18, 2019　　　　　　　　　　By: */s/ Brian J. Griffith*
　　　　New York, New York　　　　　　　　　　Brian J. Griffith
　　　　　　　　　　　　　　　　　　　　　　　Managing Director
　　　　　　　　　　　　　　　　　　　　　　　M-III Advisory Partners, LP