WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Paul R. Genender
Jared R. Friedmann
Sunny Singh

*Attorneys for Debtors
and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————x
In re                                                 :
                                                      :        **Chapter 11**
**SEARS HOLDINGS CORPORATION,** *et al.*,             :
                                                      :        **Case No. 18-23538 (RDD)**
                                                      :
          **Debtors.**[1]                             :        **(Jointly Administered)**
————————————————————————x


# THE DEBTORS' MOTION TO STRIKE SECOND-LIEN HOLDERS' EXPERTS IN CONNECTION WITH JULY 23, 2019 HEARING ON RULE 507(b) DETERMINATION

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession

in the above-captioned chapter 11 cases (the "**Debtors**"), file this Motion to Strike[1] the Second-

Lien Holders' Experts in connection with the July 23, 2017, hearing on Rule 507(b) determination

and, in support, state the matters set forth below.

## **PRELIMINARY STATEMENT**

1.      The Second-Lien Creditors have proffered three experts in an effort to meet their

burden under Rule 507(b).  Each of these experts should be stricken because their opinions are

unreliable, lack credibility and do not assist the trier of fact.  Each rely on mistaken and faulty

assumptions, flawed methodologies and inconsistent information in an effort to support Rule

507(b) claims which do not properly exist.  For these reasons, as further explained below and in

the concurrently filed *Debtors' Supplemental Brief on Expert Discovery and in Further Support*

*of (I) Opposition to Second-Lien Holders' Requests to Determine Amount of Second-Lien Secured*

*Claims Under Section 506(a) and Section 507(b) Administrative Claims and (II) Reply in Support*

*of the Debtors' Rule 3012 Motion to Determine the Amount, if Any, of 507(b) Claims and to*

*Surcharge the Second-Lien Collateral Pursuant to Section 506(c)* ("**Supplemental Brief**"), the

---

[1]     All capitalized terms not otherwise defined in this Second Supplemental Declaration shall have the meanings
prescribed to them in the *Debtors' Supplemental Brief on Expert Discovery and in Further Support of (I)
Opposition to Second-Lien Holders' Requests to Determine Amount of Second-Lien Secured Claims Under
Section 506(a) and Section 507(b) Administrative Claims and (II) Reply in Support of the Debtors' Rule 3012
Motion to Determine the Amount, if Any, of 507(b) Claims and to Surcharge the Second-Lien Collateral Pursuant
to Section 506(c)* ("**Supplemental Brief**"), the APA, the Plan, or the *Declaration of Robert A. Riecker* [ECF No.
3], as appropriate. *See Order (I) Approving the Asset Purchase Agreement among Sellers and Buyer, (II)
Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and
Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in
Connection therewith and (IV) Granting Related Relief* [ECF No. 2507]; *Order (I) Approving Disclosure
Statement, (II) Establishing Notice and Objection Procedures for Confirmation of the Plan, (III) Approving
Solicitation Packages and Procedures for Distribution Thereof, (IV) Approving the Forms of Ballots and
Establishing Procedures for Voting on the Plan, and (V) Granting Related Relief* [ECF No. 4392].

Debtors request the Court strike the opinions of David Schulte, William Henrich and Marti Murray

(the "**Experts**") offered in this case.

2.     On April 18, 2019, this Court recognized that the 507(b) inquiry in this case is

relatively straightforward and should be handled without great expense:

> THE COURT: [G]iven the actual outcome of the sale and the related
> GOB sales, [reconciling the 507(b) claims] should be a much easier
> process. So again, it's not something that I think parties should
> spend a lot of time and money on trying to negotiate . . . .
> . . .
> THE COURT:  [U]nlike when it was being discussed during the sale
> hearing, when I was asked to compare alternatives as far as 507(b)
> claims are concerned, we don't have an alternative scenario here.
> ***We actually have the facts***, so I think it's a lot easier to decide at
> this point.

Apr. 18, 2019 Hr'g Tr. 22:8-21 (emphasis added).

3.     The Debtors followed the straightforward approach suggested by this Court and

which is consistent with applicable law by applying math to the facts of this case to determine any

purported diminution in value of the Second-Lien Holders' Collateral and the amount of any Rule

506(c) surcharge.  Notably, this situation is different from *In re Residential Capital*, which required

expert testimony to determine the value of a diverse pool of financial assets, including equity

interests, promissory notes and debt instruments, and myriad other assets subject to consent

requirements as a condition of sale.  *Official Comm. of Unsecured Creditors v. UMB Bank, N.A.*

*(In re Residential Capital, LLC)*, 501 B.R. 549, 563 (Bankr. S.D.N.Y. 2013).  This case is different

from *In re Sabine Oil & Gas Corp.*, in which parties relied on experts to value oil and gas assets

from scratch using a methodology that considered net asset value, present value and risk

adjustments, predictability categories, and Reserve Adjustment Factors.  555 B.R. 180, 200

(Bankr. S.D.N.Y. 2016).

4.     By contrast, the Rule 507(b) analysis in this case involves a simple determination of the delta between two "snapshots" of the value of a defined pool of collateral, mostly consisting of inventory.  Further, determining the fair market values of the Second-Lien Holders' Collateral on those two dates—the Petition Date and Sale Date—requires zero speculation and minimal analysis.  Rather, the value on the Sale Date is what was paid by a willing buyer to a willing seller and the corresponding fair market value on the Petition Date is derived from a straightforward computation of what the Debtors submit are undisputed facts.

5.     The Second-Lien Holders took three entirely different and misplaced approaches: offering three separate experts reports to address the same set of facts each containing distinct and inconsistent approaches, and each offering an overstated and flawed diminutions in value.[2]  Each expert's approach is fundamentally flawed and if allowed into evidence would confuse the issues, protract these proceedings, and prolong the inevitable conclusion that there was no diminution in value or, alternatively, if there were a diminution, it was dwarfed by a Rule 506(c) surcharge.

6.     *First*, each expert takes a markedly different approach to overstating the value of the Collateral on the Petition Date, mostly repurposing the valuation work done by other appraisal experts—such as Tiger Capital Group ("**Tiger**")—and cobbling those figures together with the Debtors' ledger values in a manner devoid of reason. *See, e.g.,* Supp. Br. ¶¶ 12, 23. *Second,* each expert's approach contains materially flawed assumptions that manufacture and overstate the purported diminution, including by not conducting a fair market analysis of the Collateral on the

---

[2] *See generally* Expert Report of David M. Schulte in Support of Supplemental Memorandum of Law on Behalf of ESL Investments, Inc. in Support of its Requests to Determine the Amount of its Second Lien Secured Claims Under Sections 506(a) and its 507(b) Administrative Claims Pursuant to Bankruptcy Rule 3012; and in Opposition to the Debtors' Motion to Surcharges its Collateral Pursuant to Section 506(c) [ECF No. 4372] (the "**Schulte Report**"); Expert Report of William Henrich in Connection with Assessment of § 507(b) Adequate Protection Claims Asserted by Wilmington Trust, National Association [ECF No. 4279] (the "**Henrich Report**"); Expert Report of Marti P. Murray [ECF No. 4314] (the "**Murray Report**").

Petition Date, ignoring senior debt obligations, and improperly including certain obligations as second lien debt. *See id.* ¶¶ 24-29. ***Third,*** and finally, each expert's purported diminution in value is divorced from reality—*e.g.*, claiming the Second-Lien Holders were *oversecured*—ignoring countless countervailing data points and general industry knowledge of the costs and expenses bankrupt entities incur. *See, e.g.,* Schulte Report at 13.

7.      Most importantly, the opinions offered by the Second-Lien Holders' experts invade the province of this Court.  These opinions do not assist the Court by offering a unique valuation perspective of niche or difficult-to-value assets.  *See, e.g.*, *In re Residential Capital, LLC*, 501 B.R. at 563.  Instead, the experts simply mangle the multiple inventory appraisals done by Tiger—with its over 40 years' of experience and appraisal of over $30 billion in assets annually[3] and ignore key documents such as the operative borrowing base certificate as of the Petition Date.  This Court can weigh the evidence and apply the law without the misguided and flawed opinions of these three proffered experts.

8.      Further, with respect to the Rule 506(c) Surcharges, two of the three experts summarily conclude that ***not one penny*** of the significant expenditures incurred by the Debtors were for the primary and direct benefit of the Second-Lien Holders.  The Debtors submit that the determination of what constitutes a primary and direct benefit is a legal determination that rests squarely on the shoulders of this Court.  The Wilmington Trust Expert, William Henrich, properly concludes that a 506(c) Surcharge *is* appropriate, but he excludes many expenses the Debtors indisputably incurred to preserve the value of the Second-Lien Holders' Collateral.

---

[3] *About Us*, *Careers*, TIGER CAPITAL GROUP, https://www.tigergroup.com/about-us/careers/ (last visited July 17, 2019); *About Us*, *Overview*, TIGER CAPITAL GROUP, https://www.tigergroup.com/about-us/ (last visited July 17, 2019).

9.    A comparison of the different approaches to the straightforward factual calculations done by the Debtors' witness, Brian Griffith, is instructive:

| **507(b) Diminution Calculations** | | | | |
|---|---|---|---|---|
| ($ in millions) | Griffith | Schulte | Murray | Henrich |
| **Collateral** | | | | |
| Total Inventory or Go Forward Store Inventory (when broken out) [1] | 2,690.8 | 2,039.3 | 2,391.5 | 2,260.9 |
| GOB Inventory (when broken out) | N/A | 651.6 | N/A | 651.6 |
| GOB Inventory Adjustment % | N/A | 95.5% | N/A | 96.4% |
| GOB Inventory Value[2] | N/A | 622.3 | N/A | 627.9 |
| Inventory in-Transit (when broken out)[3] | N/A | N/A | 74.6 | N/A |
| Gross Inventory | 2,690.8 | 2,661.6 | 2,466.1 | 2,888.8 |
| Inventory NOLV[4] | N/A | N/A | 88.7% | N/A |
| Fair Market Value[5] | 85.0% | N/A | N/A | N/A |
| **Inventory Value**[6] | 2,287.2 | 2,661.6 | 2,195.9 | 2,888.8 |
| *Memo: Inventory Value Percent of Total Book Value* | *85.0%* | *98.9%* | *81.6%* | *107.4%* |
| Credit Card Receivables[7] | 46.6 | 64.2 | 54.8 | 64.3 |
| Cash[8] | - | 115.5 | 123.2 | 116.2 |
| Scripts[9] | - | 72.8 | 72.8 | 72.8 |
| Pharmacy Receivables[10] | - | 11.9 | 10.5 | 14.5 |
| **Total Collateral** | 2,333.8 | 2,926.0 | 2,457.2 | 3,156.6 |
| **First Lien Debt** | | | | |
| Revolving Credit Facility | 836.0 | 836.0 | 836.0 | 836.0 |
| First Lien Letters of Credit | 123.8 | - | - | 123.8 |
| First Lien Term Loan B | 570.8 | 570.8 | 570.8 | 570.8 |
| FILO Term Loan | 125.0 | 125.0 | 125.0 | 125.0 |
| Stand-Alone L/C Facility | 271.1 | - | - | - |
| First Lien Interest | 34.0 | - | - | - |
| Total First Lien Debt | 1,960.7 | 1,531.8 | 1,531.8 | 1,655.6 |
| 2L Debt Remaining Value | 373.1 | 1,394.2 | 925.4 | 1,501.0 |
| Credit Bid | (433.5) | (433.5) | (433.5) | (433.5) |
| Credit Bid Adjusted 2L Debt Collateral Value | (60.4) | 960.7 | 491.9 | 1,067.5 |
| Less: Value of 2L Adequate Protection[11] | - | - | (0.3) | - |
| Total | (60.4) | 960.7 | 492.2 | 1,067.5 |
| 507(b) Claim | - | 960.7 | 492.2 | 1,067.5 |
| 506 (c)[12] | (1,451.0) | - | - | (206.7) |
| Memo: Alternative 506 (c) 1 [12] | (527.0) | - | - | - |
| Memo: Alternative 506 (c) 2 [12] | (273.0) | - | - | - |

WEIL:\97117232\3\73217.0004

[1] Go forward inventory  specifically calculated in Schulte and Henrich reports. Griffith uses total stock ledger value. Schulte includes $2,039 book value for go forward store inventory collateral.  Schulte's go forward inventory amount is based on incorrect $652mm of GOB inventory book value. Murray uses total net eligible inventory from the Week 36 borrowing base certificate.  Henrich applies a  29% gross margin to go-forward book value inventory. Henrich's go forward inventory amount is based on incorrect $652mm of GOB inventory book value. Henrich then includes a 23.4% of inventory at cost selling expense. Henrich's 4-wall EBITDA based on gross margin and selling expense equals 12.4%. The 12.4% margin is significantly higher than the 4-wall EBITDA margin of 6% that is on page 37 of the "Transier Declaration".

[2] GOB inventory is specifically calculated in Schulte and Henrich reports.  Schulte applies a 95.5% NOLV to incorrect $652mm GOB inventory book value. Henrich applies incorrect NOLV of 96.4% to incorrect $652mm GOB inventory book value. Schulte correctly adjusted NOLV formula in ESL 001 to equal (sales-store costs)/cost of inventory. Henrich's 96.4% NOLV is based on wrong NOLV formula of sales/(cost of inventroy+store costs). Murray does not break out GOB inventory.

[3] Only Murray specifically calculated in-transit inventory. Murray applied a 51.6% NOLV to the $144.6mm in-transit value stated in week 36 borrowing base report. The $144.6 is included in the total stock ledger.

[4] Only Murray uses the 88.7% NOLV listed in the October 6 Tiger report for inventory value, applied exclusively to net eligible inventory, with separate NOLV for in-transit inventory. Schulte and Henrich use NOLV only for GOB store inventory. Griffith uses fair market value, not NOLV.

[5] Only Griffith uses the fair market value realized in the February sale (85% of book value). Schulte, Henrich, and Murray do not use fair market value.

[6] Inventory value is listed collateral value factored into Griffith, Schulte, Murray, and Henrich's diminution calculation.

[7] Griffith's credit card receivable value is 85% of $55mm of eligible credit card receivables listed in Week 36 borrowing base certificate. Murray uses full value of $55mm eligible credit card receivables from borrowing base certificate. Schulte and Henrich both use September 2018 month end general ledger.

[8] Griffith excludes cash from analysis because cash is not second lien collateral. Schulte includes $116mm of cash from September 2018 month end general ledger. Murray cites the Debtors' schedule of assets and liabilities for the listed $123.2mm. Henrich's $116.2mm cash balance is purportedly from "filed Schedules and Statements."

[9] Griffith excludes pharmacy scripts from analysis because they are not second lien collateral. Other experts use $72.8mm value provided by internal Sears valuation, and do not use Tiger's estimate of $27mm.

[10] Griffith excludes pharmacy receivables from analysis because pharmacy receivables are not second lien collateral. Schulte uses amount listed from September 2018 month end general ledger. Murray uses net eligible pharmacy receivables amount listed on Week 36 borrowing base certificate. Henrich uses gross pharmacy receivables amount on Week 36 borrowing base certificate .

[11] Murray includes $250k of Wilmington Trust's professional fees as adequate protection. Griffith, Schulte, and Henrich do not include this value.

[12] Griffith 506(c) calculation includes value referenced in first declaration. Henrich's amount includes $51mm of professional fees, $135.5mm of go-forward corporate expenses, and $20.2mm of liquidation overhead costs. Griffith's 1st alternative 506(c) charge is costs to operate business in ordinary course and consummate sale transaction from December 28 (ESL bid date) and February 11 (consummation of transaction). Griffith's 2nd alternative 506(c) charge is costs to operate business in ordinary curse and consummate sale transaction from January 17 (execution of APA and February 11 (consummation of transaction).

10.     The 2L Experts' opinions should be stricken in their entirety since "the assumptions and inputs they used were seriously flawed" and, as a result, their "conclusions regarding value are not credible." *In re Residential Capital, LLC*, 501 B.R. at 595.

## ARGUMENT AND AUTHORITIES

11.     The Court serves an important gatekeeping function that inquires into the relevance and **reliability** of any expert testimony. *Kumho Tire Co. Ltd. V. Carmichael*, 526 U.S. 137, 152 (1999).  Courts must "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.*  As such, an expert must provide a "reliable" methodology that serves as an adequate basis to support a conclusion. *Dupont Flooring Sys. v. Discovery Zone, Inc.*, 98 Civ. 5101 (SHS), 2005 LEXIS 81

(S.D.N.Y. Jan. 4, 2005) (citing Fed. R. Evid. 702, 403; *Kumho Tire*, 526 U.S. at 137; *Daubert v.*

*Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).   Expert testimony that is speculative or

conjectural should be excluded.  *In re Young Broad, Inc.*, 430 B.R. 99, 124 (Bankr. S.D.N.Y. 2010)

(citing *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)).   Unsupported or

unfounded assumptions should likewise be excluded.  *Id.*

12.     Further, expert testimony "must be carefully circumscribed to assure that the expert

does not usurp either the role of the trial judge as to the applicable law or the role of the jury in

applying that law to the facts before it.  *Pereira v. Cogan*, 281 B.R. 194, 198 (S.D.N.Y. 2002)

(quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)). "[A]n expert's testimony

on issues of law is inadmissible."  *Id.* (granting motion to exclude as to ultimate opinions for the

jury).

A.     **The 2L Experts' Testimony is Unhelpful and Unreliable and Should Be Stricken**

13.     Rather than correctly applying an 85% fair market value to the appropriate

Inventory and Accounts Receivable on the Petition Date—*i.e.*, the book value of Inventory and

Accounts Receivable set forth on page 3 of the Week 36 Borrowing Base Certificate—the 2L

Experts instead take unfounded approaches that rely on the wrong data and, in doing so, at least

two of the 2L Experts improperly inflate the amount of Inventory used in their 507(b) claims

analyses.

### *i.    Petition Date Inventory Valuation*

14.     Each of the 2L Experts' Petition Date Inventory valuation methodologies is

fundamentally flawed and unreliable, as none of them apply the type of fair market value analysis

that is required here.  *See In re Young Broad, Inc.*, 430 B.R. at 124 (explaining that test for

admissibility is whether the "particular opinion is based on valid reasoning and reliable

methodology"). Moreover, the analyses they do perform are replete with errors and rely on the wrong data, all of which makes their opinions unhelpful and not credible.

15.    Schulte's Petition Date Inventory valuation contains numerous errors and is unreliable. ***First***, as an initial matter, Schulte fails to apply the appropriate fair market value analysis that is appropriate in this case. Not only is his methodology flawed, he also uses the wrong data, thereby a significantly overstating his inventory valuation. First, arrives at a total inventory value of $2.661.5 billion by using an unadjusted go-forward inventory figure of $2,039.2 billion and a slightly adjusted GOB inventory number of $651.6 million (adjusted downward by 4.5% to $622.3 million). In doing so, Schulte incorrectly starts with and relies on the total stock ledger amount of $2,661.5 billion (without making any more than a nominal adjustment) when he instead should have started with the $2,391.5 billion net eligible inventory figure from the borrowing base certificate. Schulte Report at 12.

16.    ***Second***, because Schulte relied on a spreadsheet containing incorrect calculations for GOB inventory, Schulte subtracts the incorrect amount of GOB inventory—$651.6 million, when it should really be an adjusted number of $617.2 million—to reach his $2,039.2 billion figure for go-forward inventory. In other words, his go-forward inventory valuation is overstated by approximately $264.9 million, as shown in the chart below. Further compounding his mistakes, to reach his total inventory value of $2,661.5 billion, Schulte proceeds to improperly use 100% of book value of the incorrect go-forward store inventory ($2,039.3 billion, as explained above), and adds 95.5% (using an incorrect NOLV) of the GOB store inventory ($651.6 million times 95.5% equaling $622.3 million—which, as shown below, is overstated by $32.3 million because it is based on a spreadsheet containing incorrect calculations), thereby creating a total value of $2,661.5 billion, which is overstated by approximately $297.1 million (as shown below). Schulte Report

at 12. This reflects an approximately 1% adjustment off total book value and is an improper methodology. Schulte Report at 10, n.18; *see* Schulte Dep. 116:23-117:7. These errors are summarized in the table below:[4]

| | **Collateral Value at Filing Date** | | | | | |
|---|---|---|---|---|---|---|
| *$ in millions* | **Schulte** | | **Adjusted Schulte** | | | **Variance** |
| Book Value Inventory | $ 2,690.8 | (Total Stock Ledger) | $ 2,391.5 | (Net Eligible Inventory) | | $ (299.3) |
| Less: GOB Inventory | 651.6 | (Incorrect GOB Inventory) | 617.2 | (Actual GOB Inventory) | | (34.4) |
| Go Forward Inventory | 2,039.2 | | 1,774.3 | | | (264.9) |
| Go Forward % | 100.0% | (100% of Book Value) | 100.0% | (100% of Net Eligible Inventory) | | |
| **Value of Go-Forward Inventory** | 2,039.2 | | 1,774.3 | | | (264.9) |
| GOB Inventory | 651.6 | (Incorrect GOB Inventory) | 617.2 | (Actual GOB Inventory) | | (34.4) |
| GOB NOLV | 95.5% | (Incorrect 95.5% NOLV) | 95.6% | (Correct 95.6% NOLV) | | |
| **GOB Value** | 622.3 | | 590.0 | | | (32.3) |
| **Total Inventory Value** | $ 2,661.5 | | $ 2,364.3 | | | $ (297.1) |

17.    ***Third***, there are also additional expenses required to sell inventory, which Schulte does not consider, such as professional fees, and financing fees that are not included in NOLV. As a result of these errors, Schulte's Petition Date Inventory calculation is overstated by approximately $300 million, and his opinion is "seriously flawed," and "not credible." *In re Residential Capital, LLC*, 501 B.R. at 595.

18.    Henrich's Inventory calculation is equally flawed, but in different ways. ***First***, he applies too high of a margin to the going-concern inventory. By doing so, he overstates the value of gross inventory by over $300 million. ***Second***, Henrich's calculation of GOB liquidation inventory at cost is overstated by $37.9 million. Henrich Dep. 96-97. The value is inflated because he uses a 96.4% NOLV (with the wrong formula), instead of the correct 95.6% NOLV. *Id.* The

---

[4] Note that the adjusted total inventory value of $2,364.3 billion does not reflect an 85% fair market value reduction, but rather corrects facial mistakes in Schulte's analysis. As explained in Griffith's declarations and the Debtors' previous filings, the correct inventory value should be $2,287.2 billion, not $2,364.3 billion.

fact that he uses the wrong formula to calculate NOLV is significant, and another indication of

Henrich's unreliability.  These errors are depicted in the following table:[5]

**Collateral Value at Filing Date**

| $ in millions | Henrich | | Adjusted Henrich | | Variance |
|---|---|---|---|---|---|
| Total Inventory at Cost | $2,576.2 | (Stock Ledger ex SHS) | $2,391.5 | (Net Eligible Inventory) | $ (184.7) |
| Less GOB at Cost | (651.6) | (Incorrect GOB Inventory) | (617.2) | (Actual GOB Inventory) | 34.4 |
| Equals: Going Concern Inventory at Cost | 1,924.7 | | 1,774.3 | | (150.4) |
| Going concern Inventory Sale Proceeds | 2,710.8 | (29% margin) | 2,499.0 | (29% margin) | (211.8) |
| Less: Going Concern Store Expenses | (449.9) | (23.4% selling expense) | (574.8) | (Back into 6% 4 wall margin) | (124.9) |
| Total Inventory | 2,260.9 | | 1,924.2 | | (336.7) |
| GOB Inventory at Cost | 651.6 | (Incorrect GOB Inventory) | 617.2 | (Actual GOB Inventory) | (34.4) |
| Less: Unrecovered Value at Liquidation sale | (23.7) | (Wrong Store Expenses) | (27.2) | (Correct Store Expenses) | (3.5) |
| **Total Inventory, Liquidation** | 627.9 | (Incorrect 96.4% NOLV) | 590.0 | (Correct 95.6% NOLV) | (37.9) |
| **Total Inventory** | $2,888.8 | | $2,514.3 | | $ (374.5) |

19.     ***Third***, as with the other 2L Experts, there are additional expenses required to sell

inventory (including bankruptcy expenses and administrative expenses) which Henrich does not

consider.  Henrich Dep. 130:7-131:4.  Thus, because Henrich's methodology is incorrect (it is not

a fair market value approach) and he relied on the wrong data, Henrich's Petition Date Inventory

calculation is overstated by at least $375 million and is unreliable.

20.     Murray's Petition Date Inventory calculation is less flawed than Schulte's or

Henrich's, but still misses the mark.  Murray relies on the Tiger Report, but selectively.  On the

one hand, Murray relies heavily on the Tiger Report for her 88.7% NOLV figure.  On the other

hand, the Tiger Report does not include in-transit inventory, so adding any amount of in-transit is

wrong under the Tiger Report approach, but Murray nonetheless adds $74.6 million in in-transit

inventory to her calculation.  Murray Report ¶ 74.  As a result, her methodology is flawed, and her

Inventory calculation should be lower.  Also, there are additional expenses required to sell

inventory (professional fees, financing fees), which Murray does not consider that should have be

[5] Note that the adjusted amount of total inventory value of $2,514.3 billion does not reflect an 85% fair market value reduction, but rather corrects facial mistakes in Henrich's analysis.  As explained in Griffith's declarations and the Debtors' previous filings, the correct inventory value should be $2,287.2 billion, not $2,514.3 billion.

included.  *See* Tiger Report at Exhibit A-2.  Murray applies the Tiger Report figures, which do not

include professional and financing fees, but those are necessary expenses associated with

bankruptcy cases and must be accounted for.  The exclusion of these costs from the valuation of

collateral, as well as the complete disregard for any 506(c) surcharges, grossly inflates the 2L

creditors' recoveries in Murray's report.  *In re Residential Capital, LLC*, 501 B.R. at 595.

### ii.    Other Flaws in the 2L Experts' Opinions

21.    There are numerous other issues with the 2L Experts' opinions, all of which render

them unreliable.  For example, the 2L Experts' opinions are fundamentally flawed since they all

include cash, pharmacy scripts, and pharmacy receivables as Second Lien Collateral based on their

improper assumptions made about the governing security agreements.  *In re Young Broad, Inc.*,

430 B.R. 99, 124 (expert testimony based on unfounded assumptions excluded).  Even if it were

appropriate to include any of these categories—which it is not—they also inappropriately rely on

an inflated number in a company document to value pharmacy scripts when they should have relied

on a contemporaneous Tiger appraisal instead.  The contemporaneous Tiger appraisal is more

reliable since it is a document that a bank relied on, and the 2L Experts' failure to do so further

illustrates the unreliability of their opinions.  These mistaken assumptions overstate the alleged

diminution by over $200 million.

22.    In addition, before the Petition Date, Sears obtained a Stand-Alone L/C Facility

(hereinafter, the "**Stand-Alone L/C Facility**") and a Pre-Petition ABL Facility including a letter

of credit sublimit (hereinafter, the "**1L L/C Facility**").  None of the 2L Experts included the Stand-

Alone L/C Facility in their calculations of senior debt, and Schulte and Murray improperly

excluded the 1L L/C Facility from their calculations of senior debt when even Henrich agrees that

it should be included as senior debt.  For all the reasons explained in the Debtors' Supplemental

Brief, these two L/Cs are clearly senior debt obligations, and the 2L Experts' failure to consider both of them as such is yet another example of the unreliability of their opinions. The flawed assumption by the 2L Experts as to the treatment of the two L/Cs alone caused the diminution amounts suggested by Schulte and Murray to be overstated by $395 million and Henrich's to be overstated by $271 million. Also, none of the 2L Experts included any post-petition interest as a senior obligation when they should have, thereby further improperly inflating each of their alleged diminution calculations by at least $34 million.

23.    Finally, neither Schulte nor Murray calculates any 506(c) Surcharges, which is once again illustrative of their unreliability as experts. While Murray maintains that she included certain expenses in her collateral calculation such that they would not need to be surcharged, the reality is that she did not. Murray Dep. 102:3-18. In fact, the Tiger appraisal that Murray relies on for her collateral valuation does not include professional fees and financing fees, so those fees must be factored in as 506(c) Surcharges, and Murray's and Schulte's failure to include them is improper. Moreover, while Henrich at least concedes that surcharges exist, his calculation of them is vastly understated. As set forth in the Debtors' Supplemental Brief, Henrich's inclusion of only a cherry-picked subset of surcharges from the categories provided by Brian Griffith in his Declaration makes no sense. As a result, his $206.7 million surcharge amount should be higher.

24.    Given the significance of the many flaws in the 2L Experts' opinions, the Debtors respectfully request that the Court strike their opinions in their entirety since they will serve no purpose but to confuse the issues, and they are not necessary, reliable or credible.

## CONCLUSION

25.    For all of the reasons stated in this Motion, the Debtors respectfully request that the

Court grant the Motion in its entirety, enter the proposed order, and grant the Debtors such other

and further relief, at law or in equity, as it deems just and proper.


Dated: July 18, 2019
       New York, New York

                                    _/s/ Ray C. Schrock_____
                                    WEIL, GOTSHAL & MANGES LLP
                                    767 Fifth Avenue
                                    New York, New York  10153
                                    Telephone:  (212) 310-8000
                                    Facsimile:  (212) 310-8007
                                    Ray C. Schrock, P.C.
                                    David J. Lender
                                    Paul R. Genender
                                    Jared R. Friedmann
                                    Sunny Singh

                                    *Attorneys for Debtors*
                                    *and Debtors in Possession*

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                             :

In re                           :          **Chapter 11**

                             :

**SEARS HOLDINGS CORPORATION,** *et al.*,  :          **Case No. 18-23538 (RDD)**

                             :

           Debtors.[1]         :          **(Jointly Administered)**

                             :

------------------------------------------------------------x

### ORDER GRANTING DEBTORS' MOTION TO STRIKE 2L EXPERTS

Upon consideration of the *Debtors' Motion to Strike Second-Lien Holders' Experts in Connection with July 23, 2019 Hearing on Rule 507(b) Deteriminations* ("**Motion**"); and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the relief

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

sought in the Motion and the opportunity for a hearing thereon having been provided in accordance with the Amended Case Management Order; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having held a hearing to consider the relief requested in the Motion on July 23, 2019 (the "**Hearing**"); and upon the record of the Hearing, and upon all of the proceedings had before the Court; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein and that such relief is in the best interests of the Debtors, their estates, their creditors, and all parties in interest; and after due deliberation and sufficient cause appearing therefor, it is

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted.

2.      David M. Schulte's [ECF No. 4372] report and testimony shall be stricken in their entirety.

3.      William Henrich's [ECF No. 4279] report and testimony shall be stricken in their entirety.

4.      Marti P. Murray's [ECF No. 4314] report and testimony shall be stricken in their entirety.

5.      This Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order.

Dated: _____, 2019
          White Plains, New York

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE