**Hearing Date: July 23, 2019 at 10:00a.m. (Eastern Time)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

……………………………………………X

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 Case No. |
| **SEARS HOLDINGS CORPORATION, et al.,** | : | 18-23538 (RDD) |
| Debtors.[1] | : | (Jointly Administered) |
|  | : |  |

……………………………………………X

**DECLARATION OF DAVID M. SCHULTE IN SUPPORT OF ESL'S REQUESTS TO DETERMINE THE AMOUNT OF ITS SECOND LIEN SECURED CLAIMS UNDER SECTION 506(a) AND ITS SECTION 507(b) ADMINISTRATIVE CLAIMS PURSUANT TO BANKRUPTCY RULE 3012; AND ESL'S JOINDER TO THE MOTION OF WILIMINGTON TRUST, NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE AND COLLATERAL AGENT TO PROHIBIT OR CONDITION DEBTORS' CONTINUED USE OF COLLATERAL, INCLUDING CASH COLLATERAL; AND IN OPPOSITION TO THE DEBTORS' MOTION TO SURCHARGE ESL'S COLLATERAL PURSUANT TO SECTION 506(c)**

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

I, David M. Schulte, declare under penalty of perjury as follows:

1.      I respectfully submit this declaration ("Declaration") to aid the Court in deciding ESL's Requests to Determine the Amount of Its Second Lien Secured Claims Under Section 506(a) and Its Section 507(b) Administrative Claims Pursuant to Bankruptcy Rule 3012 and the *Joinder of ESL Investments, Inc. to Motion of Wilmington Trust, National Association, as Indenture Trustee and Collateral Agent to Prohibit or Condition Debtors' Continued Use of Collateral, Including Cash Collateral*, ECF No. 3134; and in opposition to the Debtors' Motion to Surcharge Its Collateral Pursuant to Section 506(c).

2.      I am the founder and managing member of Chilmark Partners, LLC ("Chilmark"). Chilmark is an investment banking firm specializing in the reorganization of troubled companies. Over the past 35 years, Chilmark has advised companies or their creditors across a wide spectrum of industries, and has managed two private equity funds.

3.      I have over 39 years of experience in the restructuring business both as an advisor and an investor.  As an advisor, I have represented companies, banks, bondholders, and investors requiring guidance through all aspects of the financial restructuring process including debt and equity financings, mergers and acquisitions, asset divestitures, creditor negotiations, management retention, strategic and business planning, and operational restructuring.

4.      As an investor, I oversaw investments in 14 companies with a cumulative value of over $7 billion.  I have led teams acquiring portfolio companies and have provided strategic analysis, management support, merger and acquisition advice, and financing expertise to numerous companies.  As a result of this extensive business experience I have developed substantial valuation expertise.

5.     I also have significant experience in the retail industry which is also relevant to this assignment.  I led the acquisition of Revco D.S., a drug store retailer, and served on its board of directors.  I also led the acquisition of Broadway Stores (formerly known as Carter Hawley Hale), which was a department store chain operating primarily on the West Coast.  Subsequent to the acquisition, I served on Broadway Stores' board of directors and ultimately helped negotiate its sale to Federated Department Stores for $1.6 billion.  More recently, I served as an Independent Director of an intellectual property holding company of Toys "R" US, Inc. during its chapter 11 proceeding.

6.     Prior to forming Chilmark, I was Senior Vice President of Salomon Brothers, Inc. where I created and ran Salomon Brothers' Corporate Reorganization Group.  Before joining Salomon Brothers, I was an Executive Vice President at Northwest Industries, where I had operating responsibilities for four divisions.

7.     I graduated *summa cum laude* from Williams College and received a J.D. from Yale Law School, where I was Editor-in-Chief of the Yale Law Journal.  After graduating law school, I served as a clerk for U.S. Supreme Court Justice Potter Stewart.

8.     I have given testimony as an expert in two other cases in the last 5 years:  *Lehman Brothers Holdings Inc. v. JP Morgan Chase Bank N.A.*, No. 08-bk-13555-scc (Bankr. S.D.N.Y.) and *Oaktree Principal Fund V, LP v. Warburg Pincus LLC*, No. 15-cv-08574-PSG-MRWx (C.D. Cal.).

9.     At the direction of Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb"), counsel to ESL, on June 18, 2019, I submitted the *Expert Report of David M. Schulte in Support of Supplemental Memorandum of Law on Behalf of ESL Investments, Inc. in Support of its Requests to Determine the Amount of its Second Lien Secured Claims under Section 506(a) and*

2

*its Section 507(b) Administrative Claims Pursuant to Bankruptcy Rule 3012; and in Opposition*

*to the Debtors' Motion to Surcharge its Collateral Pursuant to Section 506(c)*, ECF No. 4372

("Schulte Report").

10.    Since submitting the Schulte Report, I have updated certain portions of it on the

basis of additional information that I was made aware of and to correct minor errors including

those in source material and citations as explained herein ("Amended Schulte Report").  The

Amended Schulte Report is attached as Exhibit A and incorporated herein by reference.

11.    As further detailed in the Amended Schulte Report, after analyzing the materials

set forth at Appendix B of the Amended Schulte Report, I reached the following conclusions:

    a.    After allowing for payment in full of Sears' two first lien-based lending facilities

        (the "First Lien Debt"), the value of the collateral securing Sears' $1.151 billion

        of second lien borrowings (respectively, the "Second Lien Collateral" and

        "Second Lien Debt") as of October 15, 2018 (the "Petition Date") was

        approximately $1.4 billion.  Accordingly, the Second Lien Debt was fully secured

        as of the Petition Date.  A portion of that debt was satisfied by the $433 million

        that was credit bid in the going concern sale (the "Transform Transaction").  The

        second lien holders (the "Second Lien Parties") will be entitled to a 507(b)

        administrative claim equal to $718 million minus whatever additional value is

        available to satisfy their adequate protection liens, including their adequate

        protection lien on the Winddown Account described below.

    b.    If Sears had liquidated on the Petition Date and assuming its letters of credit had

        fully funded (a very conservative assumption), the Second Lien Parties' recovery

        would have been $700–$800 million.

    c.  The expenses incurred to preserve a going concern transaction were not for the primary and direct benefit of the Second Lien Parties.  Additionally, the Debtors' approach essentially asserts that the Second Lien Creditors should not receive the benefit of the margin from the sale of their collateral.  By ignoring this margin and charging expenses against the cost basis of the Second Lien Collateral, the Debtors' approach burdens the Second Lien Collateral with the same expenses twice.

12.    Separate and apart from the analysis and conclusions contained in the Amended Schulte Report, counsel for ESL requested that I perform additional analysis to quantify the amount by which the value of the Second Lien Parties' cash collateral (the "Second Lien Cash Collateral") has diminished or will diminish subsequent to April 6, 2019.[2]  For purposes of this analysis, I have been asked by counsel to assume that amounts in the Debtors' operating account on April 4, 2019 and all subsequent cash receipts constitute Second Lien Cash Collateral.[3]  Based on the Debtors' most recent winddown budget dated July 10, 2019, the value of the Second Lien Cash Collateral will have declined by approximately $39 million between April 4, 2019 and July 20, 2019, and is projected to decline by an additional $71 million subsequent to July 20, 2019.

**The Amended Schulte Report**

13.    Set forth below is a chart that summarizes the First Lien Debt and collateral items and value I considered in reaching my conclusions.

---

[2] For purposes of this analysis, I have included $8 million of pro-rated rent that was paid prior to July 20, 2019, but had been forecasted to be paid after July 20, 2019 in the most recent wind-down budget.  I have also excluded the amount the Debtors budgeted to receive on account of pro-rated rent subsequent to July 20, 2019.

[3] This analysis is different than that contained within Section VI of the Amended Schulte Report, in which I only considered cash receipts related to certain line items in the Debtors' wind-down budget.

| CALCULATION OF COLLATERAL VALUE ON PETITION DATE | |
| --- | --- |
| $ millions **Collateral** | **Collateral Value** |
| Cash | $        116 |
| Credit card receivables | 64 |
| Pharmacy receivables | 12 |
| Pharmacy scripts | 73 |
| Inventory | 2,664 |
| **Total Collateral** | **$      2,928** |

| APPLICATION OF COLLATERAL VALUE ON PETITION DATE | | |
| --- | --- | --- |
| $ millions **Debt** | Petition Date Outstanding | Application of Collateral Value |
| ABL Revolving Facility | $        836 | $        836 |
| First Lien Term Loan B | 571 | 571 |
| FILO Term Loan | 125 | 125 |
| **Total funded First Lien Debt** | **$     1,532** | **$     1,532** |
| Second Lien Debt | 1,152 | 1,152 |
| **TOTAL** | **$     2,683** | **$     2,683** |
| *Memo: excess Collateral value over debt* | | *$        245* |

14.     For purposes of the above analysis, I have not included certain unfunded standby

letter of credit facilities (the "L/C Facilities"), which largely supported the Debtors' payment

obligations of workers compensation awards, based on my opinion that the obligations supported

by those L/C Facilities would be satisfied in the normal course of business so long as Sears or a

successor was operating substantially as a going concern.  This view is consistent with the

position that the Debtors' Chief Financial Officer, Robert Riecker, took when he did not include

those contingent First Lien Debts in his declaration to the Court explaining the Company's first

lien debt structure for purposes of obtaining an order authorizing Debtors to use cash collateral

and to obtain postpetition financing.  In his declaration he made the following statement

regarding the amount of First Lien Debt: "Around the Commencement Date, the Prepetition

5

ABL Facility collateral was valued at approximately $2.8 billion (of which the net orderly

liquidation value ("NOLV") of the Debtors' inventory was valued at about $2.74 billion) with

approximately $1.53 billion borrowed against it under the Prepetition ABL Facility." *See

Declaration of Robert A. Riecker in Support of Debtors' Omnibus Reply to Objections to

Debtors' Motion for Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral,

(C) Grant Certain Protections to Prepetition Secured Parties and (D) Grant Related Relief and

in Support of Debtors' Supplemental Motion For Authority to (I) Obtain Junior Postpetition

Financing, And (II) Schedule Final Hearing*, ECF No. 866, ¶ 8.

15.    During my deposition, I incorrectly stated that the general ledger was the source

of the inventory book value in my report.  As indicated in the Amended Schulte Report, I

sourced the inventory book value of $2,691 million from Mr. Griffith's declaration.  *Declaration

of Brian J. Griffith in Support of the Debtors' Motion to Estimate Certain 507(b) Claims for

Reserve Purposes*, ECF No. 4035, Ex. A.  I note that the amount used by Mr. Griffith agrees to

the "Total Stock Ledger Inventory" on the borrowing base certificate dated October 18, 2018,

which is not materially different than the $2,677 million that appears on the general ledger.  It is

my understanding that the book value the Debtors used to value their inventory for accounting

purposes is not in dispute.

16.    To determine the Petition Date value of the Second Lien Collateral, I valued the

inventory collateral according to its intended use.  My analysis separately valued the inventory in

the stores that were intended to continue to be operated as going concerns (the "Go-Forward

Stores") and the inventory that was present in closing stores that would be subject to going-out-

of-business ("GOB") sales as shown in the following chart:



17.     For the inventory in the Go-Forward Stores, I applied the book value which approximates replacement cost.  I valued the inventory in the GOB stores in a different way.  I began by looking at the actual value realized by those sales during the bankruptcy (which exceeded book value) and also deducted the store-level costs incurred in connection with those sales.  The result of this analysis was to value the inventory at 95.6% of book value.  This number is consistent with the results the Debtors achieved in the numerous going-out-of-business sales Sears conducted as it significantly contracted prior to its chapter 11 filing as shown in the chart below.

## GOB Inventory Recovery Rates

| Per $ of Inventory @ Cost | 2014 | 2015 | 2016 | 2017 | 2018 YTD |
|---|---|---|---|---|---|
| Gross Recovery Rate | 1.21 | 1.23 | 1.18 | 1.17 | 1.18 |
| Net Recovery Rate | 0.98 | 1.00 | 0.96 | 0.95 | 0.95 |
| | | | | | |
| Goods Available for Sale ($/Store) | $ 1,967,884 | $ 2,181,171 | $ 2,358,050 | $ 2,504,950 | $ 2,354,191 |
| Total Inventory @ Cost Sold ($ M) | 394.6 | 101.4 | 564.4 | 945.2 | 442.6 |

**\*Net Recovery Rate levels remain strong over period of time**

2017 Based on 6 waves covering 377 out of 423 stores closed
2018 Based on 3 waves covering 188 out of 236 Stores closed

1

ESL_507B_00000002

18.     My initial report relied on a summary document that was provided with certain summation errors in it.  As a result of these errors, the book value of the GOB stores' inventory was reflected as $652 million instead of the correct $617 million. Because the error overstated the amount of GOB stores inventory, my initial report also understated the amount of the Go-Forward inventory.  After correcting these errors in the summary document, attached hereto as Exhibit B, and applying the correct amounts to my framework for valuing the inventory, the Petition Date value of the Second Lien Collateral increased by $2.1 million, as reflected in the Amended Schulte Report.

19.     Using the above-described valuation methods and adding together the value of the Go-Forward Stores' and GOB stores' inventory, the total value of the Second Lien Collateral inventory was $2,663.6 billion.

20.     Based on materials provided by the Debtors, I further determined that the other portions of the Second Lien Collateral had the following Petition Date values:

    a.  Credit Card Receivables: $64.2 million;

    b.  Pharmacy Receivables: $11.9 million;

    c.  Pharmacy Scripts: $72.8 million.

21.     A chart showing how my team and I sourced these values is shown below:

| Non-Inventory Collateral | Source | Amount |
|---|---|---|
| Cash | General Ledger | $     116 |
| Credit card receivables | General Ledger | 64 |
| Pharmacy receivables | General Ledger | 12 |
| Pharmacy scripts | SEARS_507B_ 00001508 | 73 |
| **Total Non-Inventory Collateral** | | **$     264** |

[4]

22.     Accordingly, the total value of the Second Lien Collateral as of the Petition Date was $2,928.1 billion.

23.     I understand there may be a dispute as to whether cash is included in Second Lien Collateral.  For purposes of my analysis, I assumed that the portions of First Lien Collateral not shared with the Second Lien Collateral, including cash, would be used to pay down the First Lien Debt before any other collateral because they are more liquid assets.

---

[4] Attached hereto as Exhibit C is excerpts from the General Ledger bates-stamped SEARS_507B_00001510.

24.     After deducting the amount of Second Lien Collateral necessary to satisfy the First Lien Debt, I concluded that, as of the Petition Date, the value of the Second Lien Collateral was $1.396 billion.  Accordingly, the Second Lien Parties were oversecured by $244.8 million.

25.     Since the Petition Date, the value of the Second Lien Collateral has significantly declined.  Taking into account the $433 million that was credit bid in the Transform Transaction, the collateral diminution was $962.8 million minus whatever remaining Second Lien Collateral exists as of July 23, 2019 (the "Hearing Date") or that may come into the estate thereafter.

**Diminution of Second Lien Cash Collateral since the Motion Date**

26.     In addition to the opinions and analyses contained within the Amended Schulte Report, I have been asked to perform an analysis of the diminution of Second Lien Cash Collateral subsequent to April 4, 2019 (the "Motion Date") assuming that all assets of the second lien obligors are collateral of the Second Lien Parties, including their cash, as a result of the replacement liens granted by the Final DIP Order.  (ECF No. 952.)  I understand that, pursuant to the *Stipulation and Order Concerning Debtors' Continuing Use of Cash Collateral*, ECF No. 4287, the Second Lien Parties were granted a replacement lien on the Winddown Account to the extent any diminution of Second Lien Cash Collateral occurred between the Motion Date and the Hearing Date.  Since the Motion Date, when Wilmington Trust filed its motion to prevent the continued use of cash collateral (ECF No. 3050), the Debtors have continued to use Second Lien Cash Collateral.  According to the Debtors' Weekly Budget Variance Report, dated July 10, 2019, the Debtors held $5 million of cash in their operating account as of April 6, 2019.  In addition, from April 7, 2019 through July 20, 2019, the Debtors have received, or are projected to receive, approximately $34 million in cash proceeds net of $3 million of GOB operating costs. Over that same period, the Debtors are projected to spend all of that cash, resulting in an

aggregate diminution of approximately $39 million in Second Lien Cash Collateral between April 7, 2019 and July 20, 2019.

27.      From July 21, 2019, through December 31, 2019, the Debtors are projected to receive <u>and to spend</u> an additional $71 million in cash proceeds that I understand will also constitute Second Lien Cash Collateral as a result of the Final DIP Order's replacement liens.

[*continued on next page*]

| Collateral Inflows | Start Date | 4/7/2019 | 7/21/2019 | | Total |
|---|---|---|---|---|---|
| | End Date | 7/20/2019 | 12/31/2019 | | |
| Wave 3 GOB Inflows | | $ - | $ 9 | | $ 9 |
| Cash In Transit Proceeds | | - | 20 | | 20 |
| Credit Card Receivables | | 15 | - | | 15 |
| Real Estate Asset Sales | | 9 | 19 | | 28 |
| Excess Inventory Proceeds | | - | 6 | | 6 |
| Utility Deposit | | - | 10 | | 10 |
| Hoffman Estates Tax Credit | | 3 | 3 | | 6 |
| Calder Statue | | - | 4 | | 4 |
| Pro-Rated Rent | | - | - [1] | | - |
| Other Proceeds | | 2 | - | | 2 |
| **Total Collateral Inflows, per Budget** | | **$ 29** | **$ 71** | | **$ 100** |
| Less: GOB Operating Costs | | (3) | - | | (3) |
| **Net Collateral Inflows, per Budget** | | **$ 26** | **$ 71** | | **$ 97** |
| Add: Pro-Rated Rent | | 8 [1] | - | | 8 |
| **Net Collateral Inflows, adjusted** | | **$ 34** | **$ 71** | | **$ 105** |

| Diminution Calculation | 4/7/2019 | 7/21/2019 | | Total |
|---|---|---|---|---|
| | 7/20/2019 | 12/31/2019 | | |
| Cash in operating account, beginning of period | $ 5 | - | | $ 5 |
| Net Collateral inflows over the period | 34 | 71 | | 105 |
| Less: cash in operating account, end of period | - [2] | - | | - |
| **Diminution of Collateral during period** | **$ 39** | **$ 71** | | **$ 110** |

[1] The Budget forecasts Pro-Rated Rent to be received during the week ended August 3, 2019, which is assumed to be after the Determination Date. Transform Holdco actually made a payment of $8 million to the Debtors on account of Pro-Rated Rent prior to the Determination Date. For purposes of this analysis, it is assumed that no other amounts will be received on account of Pro-Rated Rent.

[2] The Budget projects $0 in the operating account as of 7/20/2019. This analysis assumes that cash received on account of pro-rated rent is not in the operating account on the Determination Date. To the extent that there is cash in the operating account, it would constitute Collateral of the Second Lien Creditors.

## The Debtors' Imposition of 506(c) Surcharges

28.    In addition to the going concern analysis which was designed to show the value of the Second Lien Collateral for purposes of the Second Lien Parties' 507(b) claim, I also performed a hypothetical liquidation exercise, which attempts to determine what recovery the

Second Lien Parties would have actually obtained in a liquidation on the Petition Date. I offered this analysis only to refute the Debtors' argument that because the Second Lien Parties purportedly received more as a result of their credit bid than they would have received as a result of a first-day liquidation, their collateral, alone, should be burdened with all of the expenditures in these cases. I concluded the Debtors have no basis for this argument because the most likely range of realizable values from an orderly liquidation would have been 88%–92% (translating to a Petition Date Second Lien collateral value range of $705.5 million to $813.2 million).[5] I reached my opinion by considering a number of data points, including the Debtors' own liquidation analysis, appraisals performed for lenders, the Company's historical experience, and liquidation bids the Debtors actually received for their remaining inventory at the end of the case. Two of those bids estimated that the overhead, royalty and liquidator fees required to support the inventory liquidation would be approximately 3% of the inventory's book value, which I considered in selecting the range of 88%–92%.

29.    It is also plainly unreasonable for the Debtors to seek to charge their proposed list of 506(c) expenses totaling approximately $1.4 billion against the Second Lien Collateral. The Debtors, with no explanation, ignore the fact that all of the direct costs associated with preserving the value of the Second Lien Collateral were already deducted in my calculation of the Second Lien Collateral value.

30.    As detailed in the Amended Schulte Report, the Second Lien Collateral was historically sold at a 38% markup to cost when sold in the normal course of its business, and even the inventory sold in GOB stores was sold with an 18% markup. The Debtors ignore the

---

[5] These amounts increased by approximately $26 million in the Amended Schulte Report compared to my original report. My original report erroneously applied the 88% - 92% discount to the value that I computed for inventory as opposed to the correct application of the inventory's book value.

fact that the proceeds from these markups were available to replace inventory and pay all of the expenses directly associated with the sale of inventory.

31.    Between the Petition Date and the date of the Transform Transaction, the Debtors collected approximately $2.3 billion in cash from the sale of inventory.[6]  These proceeds were available to cover approximately $547 million of direct costs related to the sale of that inventory, as well as costs to replace inventory and overhead.[7]

32.    Many of the 506(c) expenses that the Debtors seek to charge against the Second Lien Collateral may have nothing to do with it.  That is because Sears Holdings had a number of assets and businesses that were not related to the inventory collateral including real estate, intellectual property, the auto center business, and Innovel.  Furthermore, many of these assets and businesses were sold in the Transform Transaction.  It is not clear based on the documents produced by the Debtors that the $1.4 billion of alleged 506(c) expenses did not include direct and indirect costs associated with those assets and businesses.

## Mr. Griffith's Critiques Of My Opinions Are Baseless

33.    I have reviewed the *Supplemental Declaration of Brian J. Griffith in Support of the Debtors' (I) Opposition to Second-Lien Holders' Requests to Determine Amount of Second-Lien Secured Claims Under Section 506(a) and Section 506(b) Administrative Claims and (II) Reply in Support of Debtors' Rule 3012 Motion to Determine the Amount, if Any, of 507(b) Claims and to Surcharge Second-Lien Collateral Pursuant to Section 506(c)*, ECF No. 4382. Nothing therein has caused me to change any of my opinions.

---

[6] $2.3 billion calculated as (a) $734.1 million of GOB proceeds plus (b) $1.565.7 million of revenue at Go-Forward Stores.  See Henrich Depo. Ex. 3 and Amended Schulte Report Appendix F, respectively.
[7] $547 million calculated as (a) $144.0 million of GOB expenses plus (b) $403 million of operating expenses at Go-Forward Stores.  See Henrich Depo. Ex. 3 and Amended Schulte Report Appendix F, respectively.

34.     As an initial matter, Mr. Griffith offered no meaningful criticism of my going concern analysis, which he confused with the separate hypothetical liquidation analysis I described above, and which I performed simply to demonstrate that the Second Lien Parties would have recovered more value from a liquidation on the Petition Date than they ultimately recovered as a result of the Transform Transaction.

35.     Mr. Griffith's criticism of my calculations of the Petition Date value of the Second Lien Collateral inventory because they supposedly fail to include cost deductions is incorrect.  As indicated above, my calculations already take into consideration all of the direct costs necessary to sell and maintain the inventory during the bankruptcy cases including store-level employee payroll, rent, utility and telephone expenses, advertising, and security services.

36.     To the extent Mr. Griffith criticizes my calculations for their purported failure to account for corporate overhead, his critique is unavailing.  As Mr. Griffith acknowledged in his deposition, the Debtors' own store-level EBITDA analysis also does not attribute overhead expenses because "[t]he exercise was done to determine how much cash a store network could throw off and how much overhead it could support to determine if you could make it a profitable enterprise."  Griffith Dep. Tr. 116:2-7.  Moreover, Mr. Griffith's critique ignores the 0.7% four-wall EBITDA margin that the Go-Forward Stores realized between the Petition Date and the Transform Transaction that is not included in the inventory book value, and is thus available to contribute to the overhead.  It is worth noting that the use of book value also excludes other store-level revenue generated by the inventory that is likewise available to contribute to the overhead.  As an example, on page 27 of the Amended Schulte Report, I reference data previously presented by the Debtors that indicates that vendor discounts and rebates are not included in its four-wall EBITDA analysis despite the fact that those values are earned by selling

inventory in stores.  That unattributed income category alone equals 25–30% of the Home

Office/Corporate SG&A portion of corporate overhead the Debtors claim should be attributed to

the inventory value.  It is also reasonable to assume that the Debtors' other businesses should

also be contributors to that overhead.

37.     In performing the hypothetical liquidation scenario, I also did not, contrary to Mr.

Griffith's assertion, ignore the so-called equity bids the Debtors received.  Rather, I did not rely

upon them because the recovery rates in the equity bids represent a discounted floor value taking

into account the transfer of risk to the equity bidder.  The Debtors themselves determined this

was not an economically attractive method of pursuing the liquidation option.  Furthermore, the

nominal equity bid percentages would be understated to the extent that recoveries exceeded a

minimum value over which the Debtors would share in the upside.

38.     Mr. Griffith also asserted that my hypothetical liquidation analysis failed to

account for expenses that are normally included in the type of best-interest-of-creditors

liquidation analysis done to show that unsecured creditors are doing better under a plan than in a

liquidation, such as the one the Debtors prepared in connection with the plan in this case.  In this

context, Mr. Griffith included expenses such as "WARN Act" obligations and chapter 7 trustee

fees.  Mr. Griffith offers nothing to support his claim, however, that such expenses could be

properly surcharged to the Second Lien Collateral.

39.     Lastly, I note that during my deposition the Debtors challenged the $72.8 million

value I attributed to the Petition Date value of the pharmacy scripts on the basis of an inventory

appraisal by Tiger, dated September 28, 2019 which purports to indicate a Petition Date value of

$27 million.  Assuming the business record I relied on in forming my opinion as to the Petition

Date value of the pharmacy scripts, attached hereto as Exhibit D, which the Debtors produced in

response to Cleary Gottlieb's request to Debtors for documents sufficient to show the Petition

Date value of the pharmacy script does not reflect the correct Petition Date value (which I

believe it does), a later-in-time appraisal performed by Tiger, dated February 4, 2019, reflects

that the Petition Date value was at least $54 million when applying its reappraised value of $10

per script to the scripts that were housed at pharmacies that closed between the Petition Date and

the Transform Transaction.

                                    *        *        *

        Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of knowledge, information, and belief.

Executed on July 18, 2019.

                                                    Respectfully submitted,


                                                    /s/ David M. Schulte_____

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| | ) |
| SEARS HOLDINGS CORPORATION, *et al.*,[1] | ) Case No. 18-23538 (RDD) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**AMENDED AND RESTATED EXPERT REPORT OF DAVID M. SCHULTE IN
SUPPORT OF ESL'S REQUESTS TO DETERMINE THE AMOUNT OF ITS SECOND
LIEN SECURED CLAIMS UNDER SECTION 506(A) AND ITS SECTION 507(B)
ADMINISTRATIVE CLAIMS PURSUANT TO BANKRUPTCY RULE 3012; AND
ESL'S JOINDER TO THE MOTION OF WILMINGTON TRUST, NATIONAL
ASSOCIATION, AS INDENTURE TRUSTEE AND COLLATERAL AGENT TO
PROHIBIT OR CONDITION DEBTORS' CONTINUED USE OF COLLATERAL,
INCLUDING CASH COLLATERAL; AND IN OPPOSITION TO THE DEBTORS'
MOTION TO SURCHARGE ITS COLLATERAL PURSUANT TO SECTION 506(C)**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

# TABLE OF CONTENTS

I.      Introduction .......................................................................................................... 3

II.     Professional Qualifications ................................................................................. 4

III.    The Value of the Second Lien Collateral............................................................ 7

        A.    Framework ................................................................................................ 7

        B.    The Value of the Non-Inventory Collateral ............................................. 8

        C.    The Value of the Inventory Collateral ..................................................... 9

        D.    Calculation of the Second Lien Collateral as of the Petition Date ....... 12

        E.    Calculation of the Diminution of Value of the Second Lien Collateral .............. 13

IV.     How would the Second Lien Creditors have fared if the Collateral was
        liquidated on the Petition Date? ....................................................................... 14

V.      Post-Sale Diminution in Value of Second Lien Collateral ............................... 17

VI.     Were the expenses incurred to preserve a going concern transaction
        incurred for the primary benefit of Second Lien Creditors?............................. 19

VII.    Is the Debtors' Calculation of 506(c) charges against the Second Lien Collateral
        reasonable?........................................................................................................ 20

        A.    Griffith's Calculation ignores the Retail Markup ................................. 20

        B.    Griffith's Calculation of Costs Exceeds the Overall Costs
              Incurred by Debtors ............................................................................. 202

VIII.   Appropriateness of Griffith's Collateral Valuation Approach......................... 22

IX.     Conclusion ....................................................................................................... 23

Appendix A:  Background ......................................................................................... 25

Appendix B:  List of Documents Relied Upon .......................................................... 35

Appendix C:  Secured Debt Issued Prior to Bankruptcy ........................................... 39

Appendix D:  Transform Transaction Consideration.................................................. 40

Appendix E:  Calculation of Retail Markup .............................................................. 41

Appendix F:  EBITDA Margin of Go-Forward Stores............................................... 42

Appendix G:  Calculation of Value of Second Lien Collateral in Hypothetical Petition
             Date Liquidation ................................................................................. 43

Appendix H:  Debtors' Weekly Cash Flow Budget..................................................... 44

## I.    Introduction

Not long ago, it would have been hard to believe that one of America's most iconic retailers could find itself in bankruptcy. At its peak, Sears Holdings Corporation (together with its subsidiaries, "Sears Holdings" or the "Company") operated around 4,000 Sears and Kmart stores throughout the country, employed approximately 300,000 people, boasted an equity market capitalization of nearly $30 billion and even had its name on the tallest skyscraper in its hometown of Chicago. It was not just a behemoth in retailing; it was part of the American fabric.

But times changed. Like many other brick-and-mortar retailers, Sears Holdings struggled to adapt to an increasingly competitive retail environment as online shopping became more popular. Traffic to big box retailers like Sears and Kmart declined, and revenue and margins soon followed. As its financial performance deteriorated, Sears Holdings was forced to sell certain of its assets and issue additional debt to fund losses while it attempted to stage a turnaround.

As part of this effort, Sears Holdings raised approximately $4 billion of debt in the three years preceding its bankruptcy, all of which was secured by specific assets pledged as collateral.[2] This collateral included some assets that were relatively liquid (e.g. receivables and inventory) as well as some that were less liquid (e.g. intellectual property and real estate). Borrowing against these types of assets is neither uncommon nor surprising given Sears Holdings' situation. For the Company, doing so allowed it to generate much-needed liquidity. For investors providing new money to Sears Holdings, lending on a secured basis gave them confidence that they could recover value if the Company could not satisfy all of its obligations. ESL Investments, Inc. and/or its affiliates (collectively, "ESL") were significant shareholders of Sears Holdings as well as providers of financing to Sears Holdings in the years preceding its bankruptcy. In certain situations, ESL provided funding to Sears Holdings on its own, but in most situations lending was done in concert with unaffiliated third parties. In many cases, ESL provided financing on a first-lien basis, but it also provided financing on a second-lien basis.

On October 15, 2018 (the "Petition Date"), Sears Holdings filed for Chapter 11 relief. As a result, secured creditors were halted from taking enforcement actions such as foreclosure of their collateral. The Bankruptcy Code does, however, provide a mechanism by which "adequate protection" is granted to secured creditors, including through the ability to assert a priority administrative claim for any diminution in the value of their collateral during the pendency of the bankruptcy case not recoverable from replacement liens ("507(b) Claim"). In the case of Sears Holdings' bankruptcy, the second lien creditors' ability to assert these claims was memorialized in the order approving the Company's access to cash collateral and post-petition financing.[3]

I have been asked by counsel for ESL to provide my opinion with respect to four topics:

---

[2] See Appendix C for a summary of secured debt issued in the years leading up to Sears Holdings' bankruptcy.

[3] *Final Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (ECF No. 952) (the "Final DIP Order").

3

1)      What was the value of the collateral securing Sears' second lien debt as of the Petition Date and to what extent, if any, has it diminished since that date resulting in a Section 507(b) Claim?

2)      What would have been the second lien creditors' recovery if instead Sears had liquidated on the Petition Date?

3)      What, if any, diminution in value resulted or will result from the Debtors' continued use of the second lien creditors' cash collateral subsequent to April 4, 2019?

4)      What, if any, expenditures by the Debtors were made primarily for the benefit of the second lien creditors and what, if any, direct increase in the value of the collateral securing such claims did they achieve?

In addition, counsel for ESL asked that I opine as to the appropriateness of the calculations reflected in the *Declaration of Brian J. Griffith in Support of the Debtors' Motion to Estimate Certain 507(b) Claims for Reserve Purposes*, dated May 26, 2019 (ECF No. 4035) (the "Griffith Declaration").

In summary, my conclusions are as follows:

1)      After allowing for payment in full of the first lien debt, the value of the collateral securing Sears' $1.15 billion of second lien debt as of the Petition Date was approximately $1.4 billion. Taking into account the $433 million that was credit bid in the 363 transaction, and assuming that no other amounts are available to satisfy second lien creditors, the collateral diminution was $963 million and the second lien creditors' 507(b)(9) claim is $718 million.  Each of those amounts would be reduced dollar-for-dollar to the extent that there are other assets available to satisfy second lien creditors.

2)      If Sears had liquidated on the Petition Date and assuming its letters of credit had fully funded (a very conservative assumption), the second lien creditors' recovery would have been $700 - $ 800 million.

3)      The second lien creditors' collateral diminished $59 million from the Debtor's continued use of the second lien collateral after April 4th.

4)      The expenses incurred to preserve a going concern transaction were not for the primary benefit of the second lien creditors. Additionally, the 506(c) expenses the Debtors charge against the second lien collateral cost-basis are not reasonable because, for example, the proceeds from the sale of the second lien collateral – inclusive of the retail markup – have been used to fund the direct expenses.

## II.    Professional Qualifications

I am the founder and managing member of Chilmark Partners, LLC ("Chilmark"). Chilmark is an investment banking firm specializing in the reorganization of troubled companies. Over the past

35 years, Chilmark has advised companies or their creditors across a wide spectrum of industries, and has managed two private equity funds.

I have over 39 years of experience in the restructuring business both an advisor and an investor. As an advisor, I have represented companies, banks, bondholders, and investors requiring guidance through all aspects of the financial restructuring process including debt and equity financings, mergers and acquisitions, asset divestitures, creditor negotiations, management retention, strategic and business planning, and operational restructuring. I have led or supervised advisory assignments with respect to a number of companies (either as advisor to the company or to creditors of the company), including:

- ACT Manufacturing, Inc.
- Adelphia Communications Corporation
- Alpha Portland Industries, Inc.
- AMI Holdings, Inc./IdentityNow
- AM International
- AM-Law Newspapers Corporation
- Apex Oil Company
- Barber-Greene Company
- Brooks Fashion Stores
- Carson Pirie Scott
- Castle & Cooke, Inc.
- Chrysler (1980, 2009)
- Clark Oil and Refining Corporation
- Contigroup Companies, Inc.
- Cook Inlet Region, Inc.
- Covanta Energy Corporation
- Denver-Rio Grand Western Railroad
- Edison Brothers Stores, Inc.
- Evans Transportation Company
- Fruit of the Loom, Ltd.
- Genesis Health Ventures, Inc.
- Global Marine Inc.
- Heartland Wireless Communications, Inc.
- Ideal Basic Industries, Inc.
- Idearc Inc.
- Innovative Mattress Solutions, Inc.
- International Harvester
- Interstate Bakeries Corporation
- Iridium LLC
- Itel Rail Corporation
- Lodgian, Inc.
- Long John Silver Restaurants, Inc.
- Massey-Ferguson Limited
- Merisant Company
- Middle South Utilities
- Mobile Media Corporation
- Monsanto Electronic Materials Corporation
- Niagara Mohawk Power Corp.
- North American Car Corporation
- Oakland Tribune, Inc.
- Overseas Shipholding Group, Inc.
- Precision Partners Holding Company
- Raymond International, Inc.
- Recycled Paper Greetings
- Revco D.S., Inc.
- Seattle Times Company
- SI Corporation, Inc.
- SIRVA, Inc.
- Seatrain Lines
- SuperMedia Inc.
- Tower Records
- Toys "R" Us, Inc.
- USG Corporation
- Wellman, Inc.
- Westpoint Stevens, Inc.
- Wickes Companies
- XO Communications, Inc.
- Zapata Corporation

As an investor, I oversaw investments in 14 companies with a cumulative value of over $7 billion. I have led teams acquiring portfolio companies and have provided strategic analysis, management

support, merger and acquisition advice, and financing expertise to companies including, but not limited to: Broadway Stores, Inc., ContinentalAFA Dispensing Company; Fuel Systems Holdings LLC; International Knife & Saw, Inc.; Jacor Communications, Inc.; Midway Airlines Corporation; Nutramax Products, Inc.; Quality Food Centers, Inc.; Phillips & Temro Holdings LLC; Revco D.S., Inc.; Santa Fe Energy Resources, Inc.; Scott Sports Group, Inc./Schwinn Bicycle Company; Sealy Corporation; Simonds Industries Inc.; and The Wellbridge Company.

I have significant experience in the retail industry. I led the acquisition of Revco D.S., a drug store retailer, and served on its board of directors. I also led the acquisition of Broadway Stores (formerly known as Carter Hawley Hale), which was a department store chain operating primarily on the West Coast. Subsequent to the acquisition, I served on Broadway Stores' board of directors and ultimately helped negotiate its sale to Federated Department Stores for $1.6 billion. More recently, I served as an Independent Director of an intellectual property holding company of Toys "R" US, Inc. during its Chapter 11 proceeding.

I have served as Chairman of the Board of Jacor Communications, Inc. and Nutramax Products Inc. and have served on the boards of directors of: Broadway Stores, Inc.; Fuel Systems Holdings LLC; Midway Airlines Corporation; Phillips & Temro Holdings LLC; Revco D.S., Inc.; Santa Fe Energy Resources, Inc.; Scott Sports Group Inc./Schwinn Bicycle Company; Sealy Corporation; Wickes Companies, Inc.; the Wellbridge Company; and California Proton Therapy Center, LLC.

Prior to forming Chilmark, I was Senior Vice President of Salomon Brothers, Inc., where I created and ran Salomon Brothers' Corporate Reorganization Group. Before joining Salomon Brothers, I was an Executive Vice President at Northwest Industries, where I had operating responsibilities for four divisions.

I graduated *summa cum laude* from Williams College and received a J.D. from Yale Law School, where I was Editor-in-Chief of The Yale Law Journal. After graduating law school, I served as a clerk for U.S. Supreme Court Justice Potter Stewart.

I have not authored any publications in the last 10 years. I have given testimony as an expert in two other cases in the last 5 years: *Lehman Brothers Holdings Inc. v. JPMorgan Chase Bank N.A.*, No. 08-bk-13555-scc (Bankr. S.D.N.Y.) and *Oaktree Principal Fund V, LP. v. Warburg Pincus LLC*, No. 15-cv-08574-PSG-MRWx (C.D. Cal.).

Chilmark is being compensated for my time at the rate of $1,195 per hour. I have been assisted in this assignment by other professionals from Chilmark. Hourly rate for other professionals working on this matter range from $425 to $1,050 per hour. Chilmark's compensation is not dependent in any way upon my conclusions or the outcome of this case.

My opinions are based on the materials referenced in this report. A list of the materials I have considered is included in Appendix B to this report. I reserve the right to change my conclusions or opinions in light of my ongoing review of the materials I have considered or should any additional information be provided to me in the future, and to supplement or amend them to address any additional expert opinions offered in this litigation.

6

### III.    The Value of the Second Lien Collateral

#### A.    Framework[4]

As of the Petition Date, Sears Holdings had approximately $1.15 billion of second lien borrowings (the "Second Lien Debt") and two first lien asset based lending facilities with substantially similar collateral (the "First Lien Debt"). The First Lien Debt consisted of:

- An asset-based credit facility (the "ABL Credit Facility") which included:

  o A revolving facility (the "ABL Revolving Facility") with $836 million outstanding on the Petition Date;
  o A letter of credit facility (the "ABL L/C Facility") with $124 million of undrawn letters of credit issued but not funded on the Petition Date;
  o A term loan (the "First Lien Term Loan B") with $571 million outstanding on the Petition Date; and
  o A first-in, last-out term loan (the "FILO Term Loan") with $125 million outstanding on the Petition Date.

- A standby letter of credit facility (the "Stand-Alone L/C Facility") with $271 million of undrawn letters of credit issued but not funded on the Petition Date.

The First Lien Debt was secured on a first priority basis by cash, deposit accounts, credit card receivables, pharmacy receivables, inventory, and pharmacy scripts (the "First Lien Collateral").[5] Based on discussions with ESL's counsel, I understand that the Second Lien Debt was secured on a second lien basis by a substantial portion of the First Lien Collateral, including the credit card receivables, pharmacy receivables, inventory, and pharmacy scripts (the "Second Lien Collateral," and together with the First Lien Collateral, the "Collateral").[6] By virtue of its second lien position, the amount of the Second Lien Collateral available to satisfy Second Lien Debt depends on the dollar amount of the claims ranking ahead of the Second Lien Debt. For funded debt such as term loans and revolvers, determining the amount of such claims is relatively straightforward. But Sears Holdings also had undrawn letters of credit pursuant to the ABL L/C Facility and Stand-Alone L/C Facility, both of which, if funded, would have liens senior to the Second Lien Debt. This requires a determination of whether undrawn letters of credit should be considered in arriving at the value of Second Lien Collateral available to holders of Second Lien Debt (the "Second Lien Creditors").

Letters of credit represent promises by an issuing bank to fund a contingent liability for the benefit of a third party. They are issued to an entity's counterparties to provide assurance that they will receive payment if that entity is unable to make that payment itself, and are typically only funded if a specific underlying obligation has not been not satisfied. In the case of Sears Holdings, its

---

[4] See Appendix A for a detailed description of the debt referenced in this section.

[5] For purposes of my analysis, the priority scheme within the First Lien Debt is not relevant.

[6] The focus of my opinion is on a certain subset of the Company's overall debt that was secured by liens on the Second Lien Collateral. Accordingly, my opinion does not require a detailed analysis of certain other debt which was secured by real estate assets or intellectual property and ground leases, as well as debt that had been issued on an unsecured basis long before the bankruptcy.

letters of credit were posted to guarantee certain workers' compensation insurance policies and other obligations including relationships with utility providers.[7]

###### B.    The Value of the Non-Inventory Collateral

- **Cash**: **$115.5 million**

  I based the cash balance used in my analysis on the general ledger provided by the Debtors, which shows $115.5 million of cash on or around the Petition Date after excluding:

  - $281.0 million which was restricted and segregated for the benefit of the Pension Benefit Guarantee Corporation[8], and
  - $64.2 million of credit card deposits in transit, which I addressed separately (see below).[9]

- **Credit Card Receivables**: **$64.2 million**

  The general ledger provided by the Debtors shows that Sears Holdings had approximately $64.2 million of credit card deposits in transit on or around the Petition Date.[10] I have assumed that 100% of this amount was collectible, which is consistent with the Company's ability to account for credit card receivables as cash on its balance sheet.[11]

- **Pharmacy Receivables**: **$11.9 million**

  The general ledger provided by the Debtors shows that Sears Holdings had $14.5 million of pharmacy receivables and $2.6 million of reserves for uncollectible accounts.[12] The net number, or $11.9 million, therefore represents the Company's value of the pharmacy receivables for accounting purposes as of the Petition Date. This amount is very close to the $10.5 million of net eligible pharmacy accounts receivable shown in the Company's borrowing base calculation dated October 18, 2018.[13]

---

[7] *Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York* 22 (ECF No. 3) ("Riecker First Day Decl.") ("The letters of credit issued under the Stand-Alone L/C Facility are posted to guarantee certain workers' compensation insurance policies and other obligations."); *see also* Summary of Letters of Credit, ESL_507B_00000004.

[8] *Schedules of Assets and Liabilities for Sears Holdings Corporation Case No. 18-23538 (RDD)* (ECF No. 1609) ("The restricted cash balance ($281.9 million) at Debtor Sears Holdings Corporation represents amounts in an escrow account held for the benefit of the PBGC. This restricted cash was disbursed to the PBGC in November 2018.").

[9] General Ledger, SEARS_507B_00001510.

[10] *Id.*

[11] Sears Holdings Corp., Annual Report (Form 10-K) 42 (Mar. 23, 2018) (where credit card deposits in transit are classified in the Company's cash balance: "Credit card deposits in transit include deposits in transit from banks for payments related to third-party credit card and debit card transactions.").

[12] General Ledger, SEARS_507B_00001510.

[13] Sears Holdings Corporation Borrowing Base Certificate as of October 13, 2018, SEARS_507B_00001430.

- **Pharmacy Scripts**: $72.8 million

  Pharmacy scripts represent the ability for a pharmacy to fulfill prescriptions written by medical professionals for specific customers. Although they are not recorded as an asset on the balance sheet, they have value and could be sold to nearby pharmacies in the event of a liquidation. ESL's counsel requested that the Debtors provide a calculation of value for the pharmacy scripts as of the Petition Date, and received a file which appears to compute a value of $72.8 million for those scripts.[14]

### C.    The Value of the Inventory Collateral

The appropriate methodology to value inventory is on the basis of its intended use.[15] If a retailer is operating in the normal course as a going concern, it will have ample time and resources to sell most of its inventory. But if it is liquidating, there may be time and cost pressures that require inventory to be sold at a discount. Typically, the value of a company's inventory is higher when it is operating as a going concern, and the liquidation value can be thought of as a floor on the value of inventory.

On the Petition Date, Sears Holdings announced: 1) the closure of 142 stores with corresponding going-out-of-business ("GOB") sales; and 2) its plan to continue operating its remaining viable stores (the "Go-Forward Stores") as a going concern.[16] It later announced an additional 40 and 80 stores closures in November and December, respectively, bringing the total store closings to 262 during the Chapter 11 case.[17] Consistent with valuing inventory based on its intended use, I first performed a calculation to estimate the inventory attributable to Go-Forward stores versus GOB stores. With the benefit of hindsight, I know that $617 million of inventory at book value was sold in GOB sales during the bankruptcy case.[18] To estimate the book value of inventory in Go-Forward

---

[14] *See* Schedule of Estimated Script Asset Value, SEARS_507B_00001508.

[15] The Debtors seem to agree. *See The Debtors' Motion to Estimate Certain 507(b) Claims for Reserve Purposes* ¶¶ 35-36 (ECF No. 4034) ("Estimation Motion") (where the Debtors state: "[C]ollateral must be valued in the hands of the Debtors, and 'the proposed disposition or use of the collateral' by the Debtors is of 'paramount' importance to the inquiry.") (quoting *In re Heritage Highgate, Inc.*, 679 F.3d 132, 141 (3d Cir. 2012)). The Debtors also reference *In re Residential Capital*: "the Court held that, because the parties intended to market and sell the properties as a going concern, a fair market valuation was appropriate." *Id.* ¶ 36 (citing *Official Comm. of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Capital)*, 501 B.R. 549, 594-95 (Bankr. S.D.N.Y. 2013)). Importantly, however, I disagree with the Debtors' use of an 85 cent valuation metric to value the Collateral as of the Petition Date. See section VIII of this report for details.

[16] Riecker First Day Decl. ¶ 15 ("Unfortunately, the Debtors must close 142 stores that operate at significant losses at the outset of these Chapter 11 Cases and conduct going-out-of-business sales with respect to those stores" and "[t]he Debtors believe that there is a viable path forward for a reorganization around a smaller footprint of viable stores. Approximately 400 of the Debtors' stores are four-wall EBITDA positive (before any lease concessions)—the Debtors intend to sell these and other viable stores, or a substantial portion thereof, as a going concern pursuant to section 363 of the Bankruptcy Code.").

[17] *Notice of Intent to Conduct Store Closing Sales* (ECF No. 576) (40 stores announced in November); *Notice of Intent to Conduct Store Closing Sales* (ECF No. 1444) (80 stores plus 5 Sears Auto Centers and 1 distribution center).

[18] Exhibit 3 to July 2, 2019 deposition of William Henrich ("Henrich Depo. Ex. 3") which is based on ESL_507B_00000001. Henrich Depo. Ex. 3 modified ESL_507B_00000001 to correct a summation error and to calculate net recovery based on inventory book value instead of revenue.

Stores as of the Petition Date, I subtracted this $617 million from the total Petition Date book value of inventory of $2,691 million.[19]

| | |
|---|---|
| Book value of inventory on Petition Date | $ 2,690.8 |
| Less: book value of inventory sold in GOB sales | 617.2 |
| **Estimated book value of Petition Date inventory at Go-Forward Stores** | **$2,073.6** |

With this split between the book value of Go-Forward Stores inventory and GOB stores inventory as a starting point, I considered three approaches to inventory valuation:

1) **Gross retail proceeds** – the retail value of the inventory before consideration of costs to sell it.

2) **Net retail proceeds** – the retail value of the inventory less costs to sell it.

3) **Book value** – the amount recorded on the books for accounting purposes, which is typically calculated as the lower of cost or net realizable value.

   1. *Gross Retail Proceeds*

      Go-Forward Stores:
      To estimate the gross realizable value of inventory in the Go-Forward Stores on the Petition Date, I applied the 37.7% markup Sears Holdings typically realized on the sale of its inventory.[20] Applying this markup to the $2.074 billion book value of the inventory in the Go-Forward Stores on the Petition Date yields a Petition Date inventory value of $2.856 billion.

      GOB stores:
      With the benefit of hindsight, I know that the gross proceeds achieved in the GOB stores during the bankruptcy were 118.9% of book value.[21] I applied this amount to the $617 million book value of inventory sold in GOB sales to arrive at a Petition Date inventory value of $734 million in the GOB stores.[22]

---

[19] The book value of inventory on the Petition Date was $2,691 million according to the Griffith Declaration. I note that this amount matchesthe inventory amount shown on the borrowing base certificate (SEARS_507B_00001430) and is close to the $2,677 million shown on the general ledger (SEARS_507B_00001510).  For purposes of my analysis, I value the inventory in all 262 GOB stores on a liquidation basis, even though only 142 GOB stores were announced on the Petition Date. Had I instead applied a liquidation value to the inventory at the 142 GOB stores, I would have arrived a higher inventory value.

[20] Based on information contained in Sears Holdings Corporation Inventory Appraisal by Tiger Capital Group dated September 28, 2018 for inventory as of October 6, 2018 (SEARS_507B_00001287). See Appendix E for calculations. I note that the historical margin of 27.4% that implies the 37.7% markup is not materially different than the 26.5% margin achieved by the Go-Forward stores during the bankruptcy as shown in Appendix F.

[21] Henrich Depo. Ex. 3

[22] *Id.*

10

2.      *Net Retail Proceeds*

Go-Forward Stores:
To estimate the net value of inventory at the Go-Forward Stores on the Petition Date, I examined the profitability of the 425 Go-Forward Stores. According to documents provided by the Debtors, these stores generated a 0.7% four-wall EBITDA margin between October 2018 and January 2019.[23] I then applied the 0.7% EBITDA margin to the $2.074 billion book value of the Petition Date inventory at the Go-Forward Stores to estimate a Petition Date inventory value of $2.088 billion.

GOB Stores:
For inventory at GOB stores, I again considered the actual results of the GOB sales. I applied the net recovery achieved in the GOB sales, 95.6%, to the $617 million of book value of the inventory at the GOB stores to arrive at a Petition Date value of $590 million.[24]

3.      *Book Value*

I made no adjustment to the Company's book value of inventory.

4.      *Summary of Inventory Valuation Methods*

Of the three approaches I considered, the net retail value approach is perhaps the most intellectually appealing. Because it includes both expected proceeds and expected costs, it provides the best theoretical valuation of the inventory in the hands of the retailer. A weakness of the net value approach is that it requires estimates that are difficult to make. For example, as of the Petition Date, no one knew exactly what margin would be achieved from the sale of Sears Holdings inventory in the future. Even with the benefit of hindsight, determining the margin achieved on the sale of inventory requires judgments about which costs to include as necessary to achieve those sales. My analysis relied on the margin using the Company's store-level financials, which I believe to be the best available indicator of the costs of selling the inventory.[25]

For the Go-Forward stores, the value I calculated using the net retail value approach was very close to the inventory's book value. For retailers like Sears Holdings that are constantly replacing inventory throughout the year, the book value approach has its own appeal because it roughly approximates the inventory's replacement value. It also requires fewer estimates. For those reasons, and because it is the most conservative approach, I selected book value as the number to apply to the inventory at the Go-Forward Stores.

For the GOB stores, I considered that the actual value achieved in the GOB sales after deducting store-level costs was below the inventory's book value. For purposes of this analysis, I applied the

---

[23] See Appendix F for details.
[24] Henrich Depo. Ex. 3. 95.6% recovery is calculated as $734 million generated in GOB sales minus $144 million of GOB expenses, divided by $617 million of goods sold.
[25] *See* Appendix F.

net retail value approach to the GOB store inventory, which results in a lower value than if I had applied book value.

| PETITION DATE INVENTORY VALUATION APPROACHES | | | |
|---|---|---|---|
| $ millions | Gross Retail Value | Net Retail Value | Book Value |
| Go-Forward Stores | $ 2,856.1 | $ 2,088.2 | $ 2,073.6 |
| GOB stores | 734.1 | 590.0 | 617.2 |
| Total | $ 3,590.2 | $ 2,678.3 | $ 2,690.8 |

| VALUE OF INVENTORY ON PETITION DATE | | |
|---|---|---|
| Inventory | Selected Method | Value |
| Go-Forward Stores | Book Value | $ 2,073.6 |
| GOB stores | Net retail value | 590.0 |
| **Total** | | **$ 2,663.6** |

It is worth noting that an alternative approach to this exercise would be to value the inventory component of the Second Lien Collateral at its gross retail value, and then apply the direct costs necessary to sell and maintain that inventory during the bankruptcy case against that value. The approach taken here does not require consideration of any such charge (a "506(c) Surcharge") because the starting point was not based upon the gross value. See section VII for my discussion of the Debtors' flawed approach to their calculation of a 506(c) Surcharge against the Second Lien Collateral.

### D.    Calculation of the Second Lien Collateral as of the Petition Date

I believe it is reasonable to assume that the obligations underlying the ABL L/C Facility and Stand-Alone L/C Facility would be satisfied in the normal course of business so long as Sears Holdings or a successor operating substantially all its assets continued as a going concern. Because Sears Holdings intended to pursue a reorganization or going concern sale of its viable stores as of the Petition Date, it is proper to exclude the unfunded letters of credit when determining the value available to satisfy the Second Lien Debt.[26]

The Debtors have agreed with this perspective. When seeking approval of the DIP financing, the Debtors' Chief Financial Officer ("CFO") noted that the value of the Collateral was $2.8 billion, and that the ABL Credit Facility claim against that Collateral was $1.53 billion.[27] The latter

---

[26] Riecker First Day Decl. ¶ 15 ("The Debtors believe that there is a viable path forward for a reorganization around a smaller footprint of profitable stores. Approximately 400 of the Debtors' stores are four-wall EBITDA positive (before any lease concessions)—the Debtors intend to sell these and other viable stores, or a substantial portion thereof, as a going concern pursuant to section 363 of the Bankruptcy Code.").

[27] *Declaration of Robert A. Riecker in Support of Debtors' Omnibus Reply to Objections to Debtors' Motion for Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections to Prepetition*

amount *excludes* the issued and undrawn letters of credit under the ABL Credit Facility. Separately, the Debtors performed analysis that suggested that they did not expect all the letters of credit issued under the Stand-Alone L/C Facility to be funded even in a liquidation scenario.[28] With the benefit of hindsight, only a de minimis portion of the letters of credit were actually drawn during the bankruptcy.[29] This supports the notion that undrawn letters of credit should not be included in the calculation of First Lien Debt for purposes of determining the Collateral value available to Second Lien Debt.

The sum of the Collateral components that I considered is $2.928 billion as of the Petition Date. At this value and with $1.532 billion of First Lien Debt against it, the $1.152 billion of Second Lien Debt was oversecured by $244.8 million as of the Petition Date.

| CALCULATION OF COLLATERAL VALUE ON PETITION DATE | |
|---|---|
| $ millions<br>**Collateral** | **Collateral Value** |
| Cash | $        115.5 |
| Credit card receivables | 64.2 |
| Pharmacy receivables | 11.9 |
| Pharmacy scripts | 72.8 |
| Inventory | 2,663.6 |
| **Total Collateral** | **$      2,928.1** |

| APPLICATION OF COLLATERAL VALUE ON PETITION DATE | | | |
|---|---|---|---|
| $ millions<br>Debt | Petition Date<br>Outstanding | Application of<br>Collateral Value | Recovery<br>% |
| ABL Revolving Facility | $        836.0 | $        836.0 | 100% |
| First Lien Term Loan B | 570.8 | 570.8 | 100% |
| FILO Term Loan | 125.0 | 125.0 | 100% |
| **Total funded First Lien Debt** | **$     1,531.8** | **$     1,531.8** | **100%** |
| Second Lien Debt | 1,151.5 | 1,151.5 | 100% |
| **TOTAL** | **$     2,683.3** | **$     2,683.3** | **100%** |
| *Memo: excess Collateral value over debt* | | *$        244.8* | |

### E.    Calculation of the Diminution of Value of the Second Lien Collateral

As discussed in the previous section, the value of the Collateral on the Petition date was $2.928 billion against which there was $1.531 billion of funded First Lien Debt. As a result, the value of

---

Secured Parties and (D) Grant Related Relief and in Support of Debtors' Supplemental Motion for Authority to (I) Obtain Junior Postpetition Financing, and (II) Schedule Final Hearing ¶ 8 (ECF No. 866) ("Riecker Supp. Decl").
[28] Creditor Recovery Considerations, dated Dec. 17, 2018, SEARS_507B_00000063 at 082.
[29] Approximately $9.1 million of letters of credit were drawn during the bankruptcy case. Summary of Letters of Credit Draws, ESL_507B_00000021.

the Collateral securing the Second Lien Debt was $1.396 billion. Certain Second Lien Creditors credit bid a portion of the Second Lien Debt in the Company's sale of substantially all its assets to Transform Holdco LLC ("Transform," and the "Transform Transaction"). There are now minimal assets to satisfy the Second Lien Debt, and the Debtors wind-down analysis projects that these will diminish to near zero by the end of the bankruptcy.[30] After giving consideration for the $433.5 million credit bid, the value of the Second Lien Collateral has diminished or will diminish by $962.8 million.

| DIMINUTION OF THE VALUE OF SECOND LIEN COLLATERAL | |
|---|---|
| $ millions | |
| Value of Collateral on the Petition Date | $ 2,928.1 |
| Less: funded First Lien Debt on the Petition Date | (1,531.8) |
| Value of Second Lien Collateral on the Petition Date | $ 1,396.3 |
| Less: credit bid of Second Lien Debt in Transform Transaction | (433.5) |
| Less: anticipated assets available to satisfy Second Lien Debt at the end of the bankruptcy | - |
| **Diminution of the value of Second Lien Collateral** | **$ 962.8** |

Compared to their oversecured position at the Petition Date, the Debtors' projections suggest there will be very little or no value available to satisfy the claims of Second Lien Creditors at the end of the bankruptcy case.[31] The Second Lien Creditors are therefore entitled to a diminution claim calculated as the fully secured face amount of Second Lien Debt on the Petition date of $1,152 million minus the $433 million credit bid, or $718 million. To the extent that there is cash or other assets to satisfy Second Lien Debt at the end of the bankruptcy case, the amount of the diminution claim would be reduced on a dollar-for-dollar basis.

## IV.   How would the Second Lien Creditors have fared if the Collateral was liquidated on the Petition Date?

I considered four data sources to estimate Sears Holdings' hypothetical recovery on the inventory if the Company had liquidated on the Petition Date:

Appraisals performed for lenders: The lenders under the ABL Credit Facility retained the appraisal firm Tiger Capital Group ("Tiger") to perform regular inventory appraisals. In its report for inventory dated September 28, 2018, Tiger estimated that the retail store inventory could be liquidated for 94.4% of cost before taking into account corporate overhead.[32] This forecast was remarkably close to the 95.6% that the Company actually realized.[33] Tiger estimated that the

---

[30] See Appendix H for the Debtors' wind-down budget which projects that the cash available to satisfy Second Lien Debt will diminish to $3 million by December 2019.
[31] *Id.*
[32] SEARS_507B_00001287 at 1308.  Tiger excludes various items from its analysis that it highlights could provide potential additional recoveries to the lenders. These include: ocean in-transit inventory, lay-away inventory, unshipped merchandise and prescription lists. Tiger estimates that, in total, these assets could be worth $328 million.
[33] *See supra* at 11 and n.24.

corporate overhead, royalty and fees would reduce the recovery by about 3.1%, bringing the net recovery for retail store inventory to 91.3%.[34]

Debtors' liquidation analysis: In its winddown analysis presented in advance of the hearing on the Transform Transaction, the Debtors assumed a 90% recovery on inventory after deducting expenses related to the inventory liquidation.[35]

Third party bids: In late December 2018, Sears Holdings solicited bids from liquidators for closing its 505 remaining stores. Four liquidation groups submitted bids: Tiger/Great American, Hilco/Gordon Brothers, Abacus, and SB360.[36,37] These bids came in two forms:

- "Equity Bids," in which the liquidator guaranteed a minimum percentage of the inventory's book value, and the Company shared in any amounts over that minimum after covering the liquidator's fee.
- "Fee Bids," in which the liquidator charged a straight fee as a percentage of the book value of the inventory.

The various bids are summarized below. The guaranteed minimum percentages in the equity bids were lower than the recoveries projected in the fee bids. This is because in an equity bid, the liquidator agrees to purchase the inventory and is therefore taking a greater risk. Equity bids reduce the risk to Sears Holdings but are generally more expensive as a result.[38] The Debtors observed that the equity bids provided significantly lower recovery than the available fee bids.[39]

---

[34] SEARS_507B_00001287.  Tiger also evaluated the liquidation of items such as repair parts, commercial sales products and Sears Home Improvement products, which it describes as "wholesale" liquidations. Tiger assumes a significantly lower recovery for those assets, averaging approximately 20% of book value. Also included in wholesale inventory are Pharmacy Receivables, which are assumed to recover 90% of book value. When the wholesale assets are included in the overall appraisal, the net recovery drops to 88.7% of book value.

[35] *Declaration of Mohsin Y. Meghji* (ECF No. 2336) ("Meghji Decl."), Ex. D, Sears Holdings Corporation Wind Down Recoveries Presentation, dated Jan. 14, 2019.

[36] Indicative Bid Summary: Project Blue, dated Dec. 17, 2018, SEARS_507B_00000089, at 089-090; Hilco Merchant Resources, LLC & Gordon Brothers Retail Partners, LLC Bid Proposal Letter, dated Dec. 28, 2018, Sears_507B_00000837.

[37] Tiger originally submitted separate bids but combined their bids on December 14, 2018, Tiger Capital Group, LLC Bid Proposal Letter, dated Dec. 14, 2018, SEARS_507B_00001523, and revised their bid on December 18, 2018, Tiger Capital Group, LLC Revised Bid Proposal Letter, dated Dec. 18, 2018, SEARS_507B_00000911. The December 18, 2018 bid is shown here.

[38] Assuming the Debtors recover a net 95% after direct costs, the total recovery under the equity bids would have been approximately 86%. For example, in the Hilco/Gordon bid, the Debtors would be guaranteed 82% and then Hilco/Gordon would receive the next 5%. Any amounts over 87% would then be split evenly. In this example, the parties would split the 8% between 95% and 87% and the additional 4% of recovery can be added to the Debtors' guaranteed 82% to yield a total recovery of 86%.

[39] Project Blue – Liquidation Bids Review, dated Dec. 2018 (produced by Debtors without bates numbers).

| Bidder | Equity Bids | | | Estimated Recovery in Fee Bid |
| | Guaranteed Rate | Fee | Split of Excess | |
| --- | --- | --- | --- | --- |
| Tiger/Great American | 79% | 3% | 50% | 89.6% |
| Hilco/Gordon Brothers | 82% | 5% | 50% | 89.0% |
| Abacus | n/a | n/a | n/a | 92.0% |
| SB360 | n/a | n/a | n/a | 91.8% |

Source: Project Blue – Liquidation Bids Review, dated Dec. 2018 (produced by Debtors without bates numbers).

I note that the estimated recovery in the fee bids are in line with the Debtors' liquidation estimate of 90%.

The Company's historical experience: Over the three years prior to the bankruptcy, Sears Holdings closed over 700 stores.[40] The Company's net recovery rate on the inventory in these closures averaged approximately 95%, which is consistent with the net recovery in the GOB sales during the bankruptcy.[41] In assessing the liquidation value of the inventory at the Petition Date, I reduced the 95% recovery rate by 3% based on Tiger and Abacus estimates of the overhead, royalty and liquidator fees.

Based on this data, I estimate the Petition Date recovery rate of inventory would have been 88% - 92% of book value in a liquidation after consideration of overhead, royalty and liquidator fees.

Unlike in the going concern valuation discussed earlier, some or all of the letters of credit may have funded in a liquidation. To the extent they did, the letters of credit would have been secured by a first lien claim on the Collateral. As noted in the previous section of this report, certain analysis prepared by the Debtors assumed that, even in a liquidation, $95 million of the letters of credit would not be drawn.[42] A further analysis may show that very few letters of credit here would have been fully drawn in a liquidation. For the purposes of my calculation, however, I have made the most conservative assumption that the letters of credit would be fully drawn.

| $ millions | Inventory as % of Book Value | | |
| | 88% | 90% | 92% |
| --- | --- | --- | --- |
| Petition Date Collateral Value on a liquidation basis | $ 2,632.3 | $ 2,686.2 | $ 2,740.0 |
| Less: First Lien Debt including letters of credit | 1,926.8 | 1,926.8 | 1,926.8 |
| **Petition Date Second Lien Collateral Value on liquidation basis** | **$ 705.5** | **$ 759.4** | **$ 813.2** |
| *As % of Second Lien Debt outstanding* | *61%* | *66%* | *71%* |

*See Appendix G for detailed calculations*

Had Sears chosen to liquidate as of the Petition Date, there would have been sufficient Second Lien Collateral to provide a meaningful recovery to the Second Lien Debt even after taking into account the direct and indirect costs associated with liquidating the Collateral. Furthermore, the

---

[40] GOB Inventory Recovery Rates, ESL_507B_00000002.
[41] Compare to 95.6% earlier in report, *supra* p. 11 and n.24.
[42] Creditor Recovery Considerations, dated Dec. 17, 2018, SEARS_507B_00000063 at 082.

16

recoveries for the Second Lien Creditors would have been greater than the $433 million that was ultimately credit bid in the Transform Transaction four months later.

While the success of the going concern bid may have benefited the Sears Holdings estate in general and many of its stakeholders, it produced a worse outcome for the holders of Second Lien Debt. It is therefore difficult to see how any of the expenses or losses incurred to preserve Sears Holdings as a going concern economically benefited the Second Lien Creditors.

## V.    Post-Sale Diminution in Value of Second Lien Collateral

Following approval of the Debtors' motion to access cash collateral and obtain postpetition financing on October 16, 2018, the Second Lien Creditors were granted replacement liens on proceeds of the Second Lien Collateral ("Postpetition Second Lien Collateral").[43] In addition, an account (the "Wind-Down Account") was established and funded with the proceeds of certain unencumbered assets to pay for costs associated with winding down the estate.[44] The Wind-Down Account was not part of the Postpetition Second Lien Collateral.

I have been asked by counsel to ESL to opine on any potential diminution in value of the Postpetition Second Lien Collateral following the Transform Transaction. On April 4, 2019 (the "Motion Date"), Wilmington Trust, acting as collateral agent for the Second Lien Debt, filed a motion to prohibit or limit the Debtors' use of cash that was part of the Postpetition Second Lien Collateral.[45] The Debtors and certain Second Lien Creditors entered into a stipulation (the "Stipulation")[46] whereby the Debtors may use this cash collateral according to an agreed upon budget (the "Post-Close Budget").[47] In return, Second Lien Creditors will receive a lien on the Debtor's Wind-Down Account (which was not previously a component of the Postpetition Second Lien Collateral) if the Court determines the Postpetition Second Lien Collateral has diminished in value subsequent to the Motion Date.[48]

Today, the Postpetition Second Lien Collateral consists almost entirely of cash.[49] The majority of Go-Forward Stores' inventory and receivables collateral has been transferred to Transform, and the GOB sales are essentially complete. The Post-Close Budget does, however, project a small amount of additional cash receipts from the sale of certain Postpetition Second Lien Collateral, including "wave 3 GOB inflows," "cash in transit proceeds", and "credit card receivables", among others.[50] To date, the Debtors have already received $14 million in Credit Card Receivables.[51] In total, the Post-Close Budget suggests that there will be $60 million of cash receipts on account of the sale of these items, which is partially offset by $3 million in disbursements described as "GOB operating costs."[52] The net cash realized from the proceeds of this Postpetition Second Lien

---

[43] Final DIP Order.
[44] *Id.*
[45] *Motion of Wilmington Trust, National Association, as an Indenture Trustee and Collateral Agent to Prohibit or Condition Debtors' Continued Use of Collateral, Including Cash Collateral* (ECF No. 3050).
[46] *Proposed Stipulation and Order Concerning Debtors' Continuing Use of Cash Collateral* (ECF No. 4155).
[47] See Appendix H for the Debtors' winddown budget.
[48] *Id.* ¶ 2.
[49] See Appendix H for the Debtors' winddown budget.
[50] *Id.* Ex. A
[51] See Appendix H for the Debtors' winddown budget.
[52] *Id.*

Collateral is therefore forecasted to be $57 million. When added to $5 million of cash in the Debtors' operating account around the Motion Date, the cash amount of Postpetition Second Lien Collateral is expected to be $62 million between the Motion Date and the end of the case.[53]

For the purposes of calculating the collateral available at the Determination Date, as defined in the Stipulation, I have been instructed by counsel to assume that the Determination Date is the end of the Post-Close Budget period, which is December 31, 2019. At that time, the cash balances forecasted in the operating account and Wind-Down Account are projected to be zero and $3 million, respectively.[54] The diminution in the value of Postpetition Second Lien Collateral in the period following the Motion Date is therefore $59 million.

| PROJECTED CASH FLOWS RELATED TO POSTPETITION SECOND LIEN COLLATERAL | | | |
|---|---|---|---|
| $ millions | | | 4/4/2019 - 12/31/2019 |
| **Projected Cash Receipts** | | | |
| Wave 3 GOB inflows | | $ | 9 |
| Cash in transit proceeds | | | 20 |
| Credit card receivables | | | 14 |
| Cash in stores | | | - |
| Excess inventory proceeds | | | 6 |
| Pro-rated rent* | | | 11 |
| Total Receipts | *A* | $ | 60 |
| **Projected Cash Disbursements** | | | |
| GOB operating costs | *B* | $ | (3) |
| **Projected Net Cash Flow From Postpetition Second Lien Collateral** | *C=A+B* | **$** | **57** |
| | | | |
| **Forecasted Postpetition Second Lien Collateral as of the Motion Date** | | | |
| Cash in Operating Account on 4/6/2019 | *D* | $ | 5 |
| Net Cash Flow in Period | *E=C* | | 57 |
| Second Lien Collateral as of Motion Date | *F=D+E* | $ | 62 |
| | | | |
| **Forecasted Postpetition Second Lien Collateral at the Determination Date** | | | |
| Projected operating account balance as of 12/31/2019 | *G* | $ | - |
| Projected Wind-Down Account as of 12/31/2019 | *H* | | 3 |
| Subtotal | *I=G+H* | **$** | **3** |
| | | | |
| **Diminution in Postpetition Second Lien Collateral** | *I-F* | **$** | **(59)** |

* Partial return of rent payments originally made with collateral proceeds

---

[53] All values derived from Cash Collateral – Weekly Budget Variance Report, dated July 10, 2019 (produced by Debtors without bates numbers).  See Appendix H.

[54] *Id*

It is important to note that this diminution calculation is already included in the diminution claim I calculated in section III of this report.

## VI.    Were the expenses incurred to preserve a going concern transaction incurred for the primary benefit of Second Lien Creditors?

As described in section IV, Second Lien Creditors were worse off as a result of the Transform Transaction as compared to a hypothetical Petition Date liquidation. On the Petition Date, however, the Debtors determined that keeping the stores open, using the Collateral, and incurring store-level and corporate overhead expenses until a going concern transaction could be completed was in the best interest of the estate.[55] And according to the Debtors, the going concern sale achieved in the Transform Transaction allowed Sears Holdings to significantly reduce its unsecured claim base, improve the value of some of its unencumbered assets, and obtain Transform's agreement to assume or reimburse many of the obligations that would otherwise be borne by the estate.[56] In advocating for the going concern sale in February 2019, the Debtors and the independent committee of its board of directors (the "Restructuring Subcommittee") put forward separate pieces of analysis showing recoveries for the various stakeholders in the Transform bid as compared to a liquidation at the time of the going concern sale.[57] Importantly, all of this analysis was done as of the time of the going concern sale, *several months after the Petition Date*. It compared the going concern sale to a liquidation at that time.

I have not evaluated creditor recoveries in a liquidation as of the sale date. Even by the Debtors' and the Restructuring Subcommittee's own analyses, however, the benefits of the going concern sale accrue to a large number of constituents that were not Second Lien Creditors.

---

[55] Riecker First Day Decl. ¶ 15

[56] Meghji Decl. ¶ 53

[57] *Id.*; *Declaration of Alan J. Carr in Support of Restructuring Subcommittee's Response to the Objection of the Official Committee of Unsecured Creditors to the Sale of Substantially All of the Debtors' Assets to ESL Investments, Inc.* (ECF No. 2321).

| INCREASED RECOVERY FROM GOING CONCERN SALE | | |
|---|---|---|
| $ millions<br>Creditor/Claim | Meghji<br>Declaration | Carr<br>Declaration |
| Senior DIP | $        - | $        - |
| Junior DIP | - | - |
| FILO | - | - |
| Citi LC Facility | - | 24 |
| Second Lien Lenders | 314 | 433 |
| Second Lien Notes | - | - |
| Dove Real Estate Loans | 115 | 115 |
| Ground Lease & IP Loans | 72 | 72 |
| Protection Agreement, SYW & Gift Cards | 1,090 | 534 |
| Cure Costs | 200 | 200 |
| Debtors Cash | 35 | 35 |
| **Total**[*] | **$    1,826** | **$    1,413** |

*In addition, Meghji estimates the debtor will have $699 million fewer admin. and other priority claims*

According to the Debtors' and Restructuring Subcommittee's analyses, the vast majority of the increased returns accrued to parties other than the Second Lien Creditors. Furthermore, their analysis does not quantify the benefit of keeping 45,000 individuals employed as a result of the Transform Transaction. The benefits of the transaction accrued to many stakeholders, and, in total, those dwarfed any benefit that the Debtors allege may have accrued to the Second Lien Lenders.

## VII.    Is the Debtors' Calculation of 506(c) charges against the Second Lien Collateral reasonable?

Griffith's approach to 506(c) charges is flawed. He asserts that there were $1.451 billion in direct expenses attributable to the preservation and disposition of the Second Lien Collateral.[58] Ignoring the fact that the going concern sale was neither directly nor primarily for the benefit of the Second Lien Creditors, this analysis is flawed in at least two respects:

### A.    Griffith's Calculation ignores the Retail Markup

Griffith ignores the fact that the Second Lien Collateral was sold at a markup to cost and that this markup covers the expenses associated with selling the Second Lien Collateral. As discussed previously, Sears has historically realized approximately 38% more than cost when it sells its inventory in the normal course of its business.[59] The proceeds from this markup are available to replace inventory and pay expenses. Furthermore, the Go-Forward Stores are profitable, meaning that the direct expenses of selling the Collateral were fully funded by the profits from those sales.[60]

---

[58] Griffith Decl. ¶ 20
[59] See Appendix E.
[60] Riecker First Day Decl. ¶ 15 (approximately 400 stores are profitable).

20

Between the Petition Date and the date of the Transform Transaction, the Debtor collected $3.32 billion in cash from the sale of inventory in both the going concern and GOB stores.[61] These proceeds were used to purchase $1.1 billion of new inventory and pay $1.7 billion of expenses, whether or not those expenses had anything to do with the sale of the inventory.[62] The markup included in the proceeds from the sale of the Second Lien Collateral, in other words, has already been used to fund the Debtors' direct costs incurred by selling the collateral.

| | DIP Budget Actuals*<br>10/20/18 - 2/9/19 | Griffith Charges Against<br>Secured Lien Collateral |
|---|---|---|
| Total Cash Receipts | 3,322 | |
| Merchandise Vendors Disbursements | (1,094) | |
| Other Operating Disbursements & Cap Ex | (1,752) | (1,255) |
| Operating Cash Flow | 476 | (1,255) |
| | | |
| Chapter 11 | | |
| Professional Fees | (25) | (51) |
| Critical Vendor Payments | (51) | (51) |
| KEIP/KERP | (4) | - |
| Utility Deposits | (10) | - |
| Interest & Financing Fees | (97) | (94) |
| Total Non-Operating | (187) | (196) |
| | | |
| **Total Cash Flow before Financing** | **289** | **(1,451)** |

*Actuals through 2/2/19.  Includes 1 week of forecast.

Griffith essentially asserts that the Second Lien Creditors should not receive the benefit of the margin from the sale of their collateral. By ignoring this margin and charging expenses against the cost basis of the Second Lien Collateral, Griffith is burdening the Second Lien Collateral with the same expenses twice. Taken to its logical end, Griffith's approach implies that the markup proceeds bypass the Second Lien Creditors and become an unencumbered asset of the estate while the cost basis of the Second Lien Collateral is reduced by the same amount.

A framework whereby a secured lender's collateral can disappear, the expenses incurred in making it disappear can be used to eliminate any replacement liens, and the profit margin becomes unencumbered assets of the estate leads to irrational economic results. This cannot be the correct interpretation of the rules or calculation of 506(c) charges and the analysis in the Griffith Declaration should be disregarded.

---

[61] Project Blue – Rolling Cash Flow Budget (Week 16), dated Feb 6 2019, ESL_507B_00000005-011.
[62] Id.

### B.    Griffith's Calculation of Costs Exceeds the Overall Costs Incurred by the Debtors

As shown in the previous section, the DIP cash flow reports indicate that the operations of the business resulted in a positive cash flow of $476 million. After adjusting for the use of the GOB sale proceeds of $634 to pay down the DIP credit facility, the implied negative cash flow during the pendency of the bankruptcy was $158 million before restructuring expenses.[63] By ignoring the retail markup and the fact that inventory can turn more than one time over a 4 month period, Griffith is essentially applying more 506(c) Charges than the Debtors incurred on a net operating basis.

Erroneously applying all of the net costs associated with operating the business, let alone the much greater gross expenses, as a 506(c) charge would lead to an illogical economic outcome. Using this methodology would result in a 506(c) charge that offsets 507(b) diminution in value claims in almost every case because the expenses can increase even as the inventory level stays the same. As the Court observed in the Sabine Oil & Gas bankruptcy, this outcome would essentially eliminate the concept of 507(b) claims:[64]

> The Court agrees with the Debtor that adopting the Committee's position that all costs of the Debtors' businesses should be included in the valuation of Reserves would render section 506(c) of the Code meaningless because, in that case, all costs and expenses of the Debtors' entire business – not just the "reasonable and necessary" costs of "preserving" a secured lender's collateral as provided for in section 506(c) – could be surcharged against such collateral.

## VIII.  Appropriateness of Griffith's Collateral Valuation Approach

Griffith has taken the position that the proper value of the inventory at the Petition Date is the amount paid by Transform when it acquired the assets of Sears Holdings four months after the Petition Date.[65] Griffith also asserts that the inventory was valued at 85% of book value in that transaction.[66] I am aware of certain references to an 85% value during the negotiation process, but relying on these references for an entirely different purpose now is improper.[67] The Transform Transaction was complex, comprehensive, and highly negotiated. Transform acquired multiple businesses and assets for an aggregate consideration of $5.2 billion, including cash, credit bids of secured debt, and assumption of liabilities. Attempting to isolate one piece of this massive transaction ignores the reality that the inventory was not purchased in a vacuum. For example, the buyer may have been willing to purchase the inventory and other collateral for a higher value in exchange for concessions in other aspects of the negotiation. Accordingly, the "deal lingo" of 85% for the inventory and other collateral does not necessarily mean that was its value as of the Transform Transaction.

The Debtors considered many bids for components of the overall Sears Holdings enterprise including the inventory, but Transform was the only party to bid for substantially all the estate's

---

[63] Project Blue – Rolling Cash Flow Budget (Week 16), dated Feb. 6, 2019, ESL_507B_00000005-011.
[64] *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 265 n. 387 (Bankr. S.D.N.Y. 2016).
[65] Griffith Decl. ¶ 14
[66] Estimation Motion ¶ 40; Griffith Decl. ¶ 13-14.
[67] Project Transform ESL Bid Presentation, Jan. 2, 2019, ESL_507B_00000022.

assets. Certain components of the Transform bid were enhanced by the fact that it was willing to continue operating the business as a going concern. For example, over the course of the negotiations between the Debtors and Transform, the Debtors asked Transform to assume a greater amount of administrative 503(b)(9) claims, accounts payable and severance reimbursement expenses.[68] Each of these added to the value of the Transform Transaction. Alternatively, the Debtors could have negotiated the same total consideration by having Transform increase the size of its second lien credit bid, but they did not do so. With so many moving pieces involved in the transaction, it is difficult to apply a simple price to one asset. This difficulty is highlighted in the record at the Sale Hearing in which neither the Debtors nor the buyer attributed or allocated the global bid on a separate asset / business unit basis.[69]

Aside from cherry picking a purported value out of a complex negotiation, the Debtors' approach is conceptually flawed. Even if the 85% number were correct at the time of the sale, which it is not, the Debtors' approach assumes that the value of the inventory did not decline during the case. That is the very essence of this matter, and assuming away the dispute is not a credible or valid analysis.

## IX.    Conclusion

The Debtors received the benefit of the Second Lien Collateral with the expectation that the Second Lien Creditors would be allowed 507(b) claims to the extent the value of their collateral diminished.[70] With that expectation in place, the Second Lien Creditors saw no need to object to the Debtors' use of their collateral to pursue a value maximizing transaction for all stakeholders. Now, after having achieved that favorable result, the Debtors are trying to deny the Second Lien Creditors the benefit of the bargain. Meanwhile, the Debtors continue to deplete the remaining assets that could otherwise be used to satisfy Second Lien Debt. This is, in fact, the scenario that 507(b) of the Bankruptcy Code is designed to prevent. Without it, the Second Lien Creditors would soon find themselves in the position of the Jarndyce family in Charles Dickens' Bleak House:

> "Mr. Kenge," said Allan, appearing enlightened all in a moment. "Excuse me, our time presses. Do I understand that the whole estate is found to have been absorbed in costs?"

> "Hem! I believe so," returned Mr. Kenge. "Mr. Vholes, what do you say?"

> "I believe so," said Mr. Vholes.

> "And that thus the suit lapses and melts away?"

> "Probably," returned Mr. Kenge. "Mr. Vholes?"

> "Probably," said Mr. Vholes.

---

[68] Kamlani Dep. 197:3–202:25, Jan. 23, 2019; Aebersold Dep. 98:5-24, Jan. 31, 2019.
[69] Hr'g Tr. 74:3-10, 111:17-112:16, Feb. 4, 2019; Hr'g Tr. 198:19-199:2, 282:23-283:11, Feb. 6, 2019.
[70] Final Dip Order ¶ 18(d).

Executed on July 18, 2019

/s/ David M. Schulte

David M. Schulte

24

# APPENDIX A
### BACKGROUND[71]

**Sears Holdings' Businesses and Assets**

Sears Holdings evolved from a mail order catalog company in the early part of the twentieth century to become one of the nation's largest brick and mortar retailers. Prior to the recent sale to Transform, it operated retail stores under the Sears and Kmart banners, as well as several other businesses with varying degrees of integration. The below descriptions of the business relate to the businesses operated by Sears Holdings or its subsidiaries as of the Sale Date.

*Retail*

- Sears and Kmart Brick and Mortar Stores: As of the Petition Date, Sears Holdings operated 687 Sears and Kmart stores in 49 states, Puerto Rico, Guam and the U.S Virgin Islands. The company's Sears stores were typically located in traditional shopping malls and offered a wide range of products, including soft goods (e.g. clothing, jewelry, and footwear) and hard goods (e.g. appliances, lawn and garden equipment, and tools). Kmart stores were smaller in size and generally located in strip malls. They offered a variety of discount merchandise, and some had in-store pharmacies.

- Sears Auto Centers: Sears Auto Centers provided automotive repair and maintenance services as well as aftermarket parts, including tires, batteries, and accessories. There were over 200 Sears Auto Center locations across 38 states and Puerto Rico, which were typically freestanding structures separate and apart from Sears stores.[72]

- Ecommerce: Sears Holdings sold millions of items online through its ecommerce platform. This merchandise included inventory held by Sears Holdings, as well as products from drop-ship vendors and third-party sellers.

- Shop Your Way: Shop Your Way was a data, analytics, marketing and rewards program. Members earned points for shopping at certain stores including Sears and Kmart, and could redeem those points for goods and services from Sears Holdings and certain third-party partners. Sears managed Shop Your Way as an integrated consumer-facing business unit and partnered with other business to provide personalized marketing opportunities.

---

[71] Unless otherwise noted, the descriptions in this appendix are based upon: Sears Holdings Corporation form 10-Ks, 10-Qs, Riecker First Day Decl., *Disclosure Statement for Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* (ECF No. 3895), *Declaration of Kunal S. Kamlani in Support of ESL's Omnibus Response in Support of the Going Concern Sale Transaction* (ECF No. 2356) ("Kamlani Decl."), Ex. B, Business Plan, dated Jan. 24, 2019 ("Business Plan"), and Meghji Decl., Ex. A, Preliminary Business Plan, dated December 2018 ("Preliminary Business Plan").

[72] Business Plan at 65.

## Sears Home Services

Sears Home Services provided service contracts, parts, and in-home repairs for appliances, lawn & garden equipment, HVAC systems, and other hard goods. It was broken into five segments:

- Service Contracts Segment: provided protection agreements and extended warranties to specific products, as well as home warranties that cover HVAC systems and appliances.

- In-Home Repair Segment: provided in-home repair services to customers with warranties from Sears Holdings or third parties, as well as to customers without warranties who paid for those services out of pocket.

- PartsDirect Segment: sold replacement parts for appliances and lawn & garden equipment on its own website and through online retailers such as Amazon and eBay.

- Franchise Segment: franchisor for independent home services providers of carpet & air duct care, garage solutions, handyman solutions, and maid services.

- Home Improvement: provided home improvement services focusing on major renovations such as HVAC replacement, roofing replacement, window replacement, vinyl siding replacement, garage door replacement, and kitchen and bathroom remodeling.

## Financial Services

Sears Holdings' Financial Services business provided consumer credit cards, gift cards, third-party payment options, layaway, and other services such as check cashing and bill pay. Approximately half of the revenue attributable to the financial services segment was derived from an agreement with Citibank for co-branded credit cards.[73]

## Other Businesses

Sears Holdings had a number of distinct business units that were not directly related to its traditional retail operations. In many instances, these units catered to businesses as opposed to existing retail customers.

- Innovel: Innovel was a nationwide logistics, delivery and installation business with approximately 2,200 employees. It offered warehousing and fulfillment solutions on a business-to-business and business-to-consumer basis. Innovel could complete 2-day delivery to 85% of households in the United States, and was well suited to deliver and install bulky items.

- Monark: Monark was a distributor of premium appliances serving architects, designers, builders and homeowners. It had 20 showrooms in Arizona, California, Florida and Nevada.

---

[73] In May 2018, Sears Holdings extended the agreement with Citibank through November 2025 and received $425 million which, for accounting purposes, is being amortized as revenue as the performance obligations under the agreement are satisfied. Preliminary Business Plan at 36.

- <u>Kenmore:</u> Kenmore was an appliance brand that marketed refrigerators and freezers, washers and dryers, ranges and ovens, dishwashers, and other smaller appliances. It outsourced the manufacturing of its products to third party original equipment manufacturers, and sold through Sears stores and certain third-party channels, including Amazon. Through Kenmore Direct, Sears sold Kenmore products directly to home builders and property managers.

- <u>Diehard:</u> DieHard was primarily an automotive battery brand, though it also used its name to market other products, such as work boots and tires. All of these products were manufactured by third parties, and were sold primarily through Sears Holdings distribution channels, including Sears Automotive Centers.

<u>*Relative Size and Profitability of Business Units*</u>

As noted in Sears Holdings' December 2018 business plan, it was a retailer with "an integrated network of businesses using its retail footprint to prove synergistic value to many businesses." The non-traditional businesses contributed substantial earnings and operational heft to the overall Sears Holdings ecosystem, which was managed and supported by corporate functions on a networked basis. So while the Go-Forward retail stores generated positive earnings before overhead, they were but one part of the consolidated Sears Holdings machine.

| $ millions | 2017 Actual | | 2018 Est. | | 2019 Forecast | |
|---|---|---|---|---|---|---|
| Go-Forward Retail EBITDA[(a)] | $ | 135 | $ | 35 | $ | 117 |
| All other 4 wall EBITDA + Online | | (84) | | (163) | | (6) |
| Shop Your Way (SYW) | | 160 | | 142 | | 94 |
| Sears Auto Center | | 83 | | 45 | | 42 |
| Vendor Discounts and Other Adjustments | | 238 | | 183 | | 92 |
| **Total Retail EBITDA** | **$** | **532** | **$** | **242** | **$** | **339** |
| Home Services | | 222 | | 123 | | 183 |
| Financial Services | | 68 | | 99 | | 44 |
| Kenmore/Craftsman/DieHard | | (2) | | (10) | | 3 |
| Monark | | 3 | | (3) | | 1 |
| Supply Chain and Innovel | | (326) | | (291) | | (228) |
| Home Office / Corporate SG&A | | (1,052) | | (786) | | (317) |
| **Total EBITDA** | **$** | **(555)** | **$** | **(626)** | **$** | **25** |

Source: Exhibit C to the Declaration of Mohsin Y. Meghji (Doc. 2336 filed on 2/1/2019)

(a) Go-Forward Retail EBITDA includes 505 go-forward stores in 2018 and 425 stores in 2019

Though it was not segregated into a specific business unit, the Company's owned and leased real property represented a significant asset of the overall enterprise. A December 2018 business plan prepared by ESL identified 425 Go-Forward retail stores, 196 Sears Auto Center locations, 119 locations in the supply chain utilized by Innovel and 48 Sears Home Services locations. It also

identified over 53 million square feet of owned and leased space with appraised value of approximately $1.9 billion.[74]

### *Sears Holdings' Pre-Petition Capital Structure*

At the time of its bankruptcy filing, Sears Holdings and its affiliates had more than $5 billion of funded debt obligations.[75] The focus of the following pages is on a certain subset of that debt which was secured by all or some of the Collateral. It excludes unsecured debt, as well as debt secured by real estate assets, intellectual property.

| $ millions | FY 2011 1/28/2012 | FY 2012 2/2/2013 | FY 2013 2/1/2014 | FY 2014 1/31/2015 | FY 2015 1/30/2016 | FY 2016 1/28/2017 | FY 2017 2/3/2018 | Petition Date 10/15/2018 |
|---|---|---|---|---|---|---|---|---|
| **ABL Credit Facility:** | | | | | | | | |
| ABL Revolving Facility | $ 838 | $ 749 | $ 1,323 | $ 213 | $ 797 | $ - | $ 271 | $ 836 |
| ABL L/C Facility | 626 | 754 | 661 | 667 | 652 | 464 | 377 | 124 |
| First Lien Term Loan A | - | - | 1,000 | 990 | 980 | 970 | 400 | - |
| First Lien Term Loan B | - | - | - | - | - | 750 | 571 | 571 |
| FILO Term Loan | - | - | - | - | - | - | - | 125 |
| **Total ABL Credit Facility - Funded Only** | **$ 838** | **$ 749** | **$ 2,323** | **$ 1,203** | **$ 1,777** | **$ 1,720** | **$ 1,242** | **$ 1,532** |
| *Memo: Total ABL Credit Facility - Funded & LCs* | *$ 1,464* | *$ 1,503* | *$ 2,984* | *$ 1,870* | *$ 2,429* | *$ 2,184* | *$ 1,619* | *$ 1,656* |
| | | | | | | | | |
| ***Stand-Alone L/C Facility*** | | | | | | *$ 200* | *$ 271* | *$ 271* |
| | | | | | | | | |
| **Second Lien Obligations:** | | | | | | | | |
| Second Lien Notes* | $ 1,237 | $ 1,237 | $ 1,238 | $ 1,238 | $ 302 | $ 303 | $ 303 | $ 89 |
| *Second Lien PIK Notes* | - | - | - | - | - | - | - | *175* |
| Second Lien Term Loan | - | - | - | - | - | 300 | 300 | 317 |
| Second Lien Line of Credit Loans | - | - | - | - | - | - | 500 | 570 |
| **Total Second Lien Obligations** | **$ 1,237** | **$ 1,237** | **$ 1,238** | **$ 1,238** | **$ 302** | **$ 603** | **$ 1,103** | **$ 1,152** |
| | | | | | | | | |
| **Total - Funded Only** | **$ 2,075** | **$ 1,986** | **$ 3,561** | **$ 2,441** | **$ 2,079** | **$ 2,323** | **$ 2,345** | **$ 2,683** |
| *Memo: Total - Funded & LCs* | *$ 2,701* | *$ 2,740* | *$ 4,222* | *$ 3,108* | *$ 2,731* | *$ 2,987* | *$ 2,993* | *$ 3,078* |

Orange Highlights represent undrawn letters of credit
*Book value shown for fiscal years 2010-2017

### *ABL Credit Facility*

In 2011, Sears Holdings entered into the ABL Credit Facility which was secured on a first priority basis by the First Lien Collateral consisting of cash, deposit accounts, credit card receivables, pharmacy receivables, inventory, and pharmacy scripts. The ABL Credit Facility initially consisted of the ABL Revolving Facility and the ABL L/C Facility. As of the Petition Date, there were $836 million of borrowings on the ABL Revolving Facility and $124 million of undrawn letters of credit issued under the ABL L/C Facility.

The ABL Credit Facility has been amended over time. Certain of these amendments allowed for additional borrowings under the ABL Credit Facility, including:

- First Lien Term Loan A: In October 2013, Sears Holdings borrowed $1.0 billion under a senior secured term loan facility (the "First Lien Term Loan A") and used the proceeds to repay existing revolver borrowings. Sears Holdings repaid $570 million of the First Lien Term Loan

---

[74] Kamlani Decl., Ex. A, Lender Presentation, Jan. 24, 2019.
[75] Note: this includes Sparrow debt (which was issued by non-Debtor entities) but excludes undrawn letters of credit.

A in fiscal 2017, including $245 million which was funded from the proceeds of Sears Holdings' sale of the Craftsman brand to Stanley Black & Decker. The remainder of the First Lien Term Loan A was repaid in fiscal 2018 prior to the Petition Date.

- First Lien Term Loan B: In April 2016, Sears Holdings borrowed $750 million under the First Lien Term Loan B and used the proceeds to repay existing revolver borrowings. Sears Holdings repaid $179 million of the First Lien Term Loan B in fiscal 2017, including a portion which was funded from the proceeds of Sears Holdings' sale of the Craftsman brand to Stanley Black & Decker. As of the Petition Date, there were $571 million of borrowings outstanding on the First Lien Term Loan B.

- FILO Term Loan: On March 21, 2018, Sears Holdings borrowed $125 million under the FILO Term Loan from lenders including affiliates of ESL, and it used the proceeds to reduce outstanding borrowings on the ABL Revolving Facility. As of the Petition Date, there were $125 million of borrowings outstanding on the FILO Term Loan.

*Stand-Alone L/C Facility*

On December 28, 2016, Sears Holdings entered into the Stand-Alone L/C Facility which provided up to $500 million of letters of credit from affiliates of ESL. Obligations under the Stand-Alone L/C Facility were initially secured by the Collateral and certain real estate assets, but pursuant to an amendment in 2017, the real estate collateral was released. In any enforcement action with respect to the Collateral, proceeds from such collateral were to be applied to obligations under the Stand-Alone L/C Facility only after all obligations under the ABL Credit Facility were repaid in full.[76] As of the Petition Date, there were $271 million of letters of credit outstanding under the Stand-Alone L/C Facility. These letters of credit were posted to guarantee certain workers' compensation insurance policies and other obligations.[77]

*Second Lien Debt*

Second Lien Notes

In October 2010, Sears Holdings issued $1.25 billion of 6 5/8% notes due October 15, 2018 (the "Second Lien Notes"), including $250 million that were issued to the Company's pension plan. The Second Lien Notes were secured by the Second Lien Collateral on a lien that is junior to the liens on the Collateral that secures the ABL Credit Facility and Stand-Alone L/C Facility. Sears Holdings used the proceeds from the issuance of Second Lien Notes to repay borrowings outstanding on the ABL Credit Facility; to fund working capital requirements and capital expenditures; and for general corporate purposes.[78] On August 3, 2015, shortly after receiving $2.7 billion of gross proceeds from the sale of real estate to Seritage Growth Properties, Sears Holdings commenced a tender offer for up to $1.0 billion of Second Lien Notes. Approximately $936 million of Second Lien Notes were validly tendered and not validly withdrawn, and the tender offer was

---

[76] *Disclosure Statement for Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* 25 (ECF No. 3895).

[77] *See supra* note 7.

[78] Sears Holding Corp., Annual Report (Form 10-K) (Mar. 11, 2011).

consummated on August 28, 2015. Following the tender, the book value of the remaining Second Lien Notes was $302 million.

In February 2018, Sears Holdings commenced a private exchange (the "Exchange") of $170 million of its Second Lien Notes for new notes ("Second Lien PIK Notes"). The Second Lien PIK Notes accrued interest in kind, matured one year later than the Second Lien Notes, and were convertible to Sears Holdings common stock at a conversion price of $5.00 per share. Also as a result of the Exchange, the Second Lien Notes were amended such that their liens on the Second Lien Collateral were subordinated to the Company's other Second Lien Debt.

In July 2018, a holder of $45 million of Second Lien Notes tendered those notes in exchange for a like amount of Second Lien Line of Credit Loans (defined below). As of the Petition Date, the outstanding principal amount on the Second Lien Notes and Second Lien PIK Notes was $89 million and $175 million, respectively.

### Other Second Lien Debt

On September 1, 2016, Sears Holdings entered into a second lien credit agreement (the "Second Lien Credit Agreement"), pursuant to which it borrowed $300 million from funds affiliated with ESL under a term loan due July 2020 (the "Second Lien Term Loan"). Sears Holdings used the proceeds of the Second Lien Term Loan for general corporate purposes. Borrowings under the Second Lien Credit Agreement were secured by the Second Lien Collateral on a pari passu basis with the Second Lien Notes.

In connection with the Exchange, the Second Lien Credit Agreement was amended to provide Sears Holdings with the option to pay interest on the Second Lien Term Loan in kind, and to allow conversion into common stock on the same terms as the Second Lien PIK Notes. Also as a result of the Exchange, the Second Lien Term Loan's liens on the Second Lien Collateral were effectively made senior to the Second Lien Notes.

On July 7, 2017, the Second Lien Credit Agreement was amended to allow the company to borrow line of credit loans (the "Second Lien Line of Credit Loans") which were secured by the Second Lien Collateral on pari passu basis with the Second Lien Term Loan and the Second Lien Notes. During fiscal year 2017, Sears Holdings received aggregate proceeds of $610 million from Second Lien Line of Credit Loans, including $200 million from affiliates of ESL. Sears Holdings also made repayments of $110 million in fiscal years 2017 on Second Lien Line of Credit Loans. Net proceeds were used for the repayment of indebtedness and for general corporate purposes.

In July 2018, a holder of $45 million of Second Lien Notes exchanged such notes for a like amount of Second Lien Line of Credit Loans.

As of the Petition Date, the outstanding principal amount on the Second Lien Term Loan was $317 million. As of the Petition Date, the outstanding principal amount on the Second Lien Line of Credit Loans was $570 million, inclusive of the $45 million issued in connection with the July 2018 exchange.

### *The Sears Holdings Bankruptcy*

Sears Holdings entered bankruptcy operating 687 stores on the Petition Date under both the Sears and Kmart brands. In his declaration filed on the Petition Date, CFO Robert Riecker highlighted that there was a profitable core retail footprint; that the Debtors intended to sell the viable stores as a going concern pursuant to a section 363 auction; that the Debtors were in discussion with ESL for a stalking horse bid; and that the Debtors were looking at monetizing the other non-retail businesses.[79]

#### *DIP Financing*

#### *Senior DIP Financing*

On the Petition Date Sears Holdings filed a motion to obtain approval for a $1.83 billion senior secured superpriority priming debtor-in-possession asset based credit facility ("Senior DIP"). The Senior DIP credit facility was dated November 29, 2018 and consisted of the rollup of the pre-petition ABL Revolving Facility, ABL L/C Facility and First Lien Term Loan B, as well as new incremental funding of $188 million in a revolving asset-based facility and $112 million in an asset-based term loan. The incremental amounts were funded upon the entry of an order approving the Senior DIP.

At the time the Debtors were seeking entry of a final order for the Senior DIP Facility, the Debtors highlighted the following to the court:

- The Debtors needed financing in order to determine the best and most value maximizing path forward;

- Non-obligor Debtor entities (i.e. Debtor entities and businesses that are not party to the pre-petition ABL Credit Facility) would benefit from the DIP financing provided to the Debtors and without it, the Debtors would liquidate;[80] and

- The prepetition Collateral value was approximately $2.8 billion against outstanding ABL Credit Facility debt of $1.53 billion.[81] In short, the Debtors highlighted that all the various businesses and assets of the Debtors, including substantial unencumbered real estate assets, were funded by the ABL Credit Facility which in turn was over-secured by the prepetition Collateral supporting the borrowings.

---

[79] Riecker First Day Decl. ¶ 15

[80] Innovel was specifically identified as a business unit that requires funding provided by the pre-petition credit facilities in order to operate its business. "For example, Innovel Solutions, Inc. ("Innovel"), a debtor entity that was not an obligor under the Prepetition ABL Facility, operates a separate logistics business that provides delivery and distribution services to third-party vendors, such as Amazon, Costco, Home Depot, and others. Innovel depends on the operational support and cash management systems of the obligors under the Prepetition ABL Facility in its everyday operations. Innovel also uses distribution centers owned and/or operated by other Sears entities. Without the funding made available under the DIP ABL Facility and the DIP ABL Facilities, Innovel would be unable to conduct its day-to-day operations." Riecker Supp. Decl. ¶ 11.

[81] Riecker Supp. Decl. ¶ 8.

31

*Junior DIP Financing*

In addition to the Senior DIP, the Debtors sought to raise additional financing through a junior DIP facility (the "Junior DIP") in order to provide the Debtors with "the flexibility necessary to operate their businesses as a going concern." Ultimately the Debtors raised $350 million of Junior DIP borrowings which were secured by a senior lien on specified unencumbered assets pari passu with Senior DIP liens, as well as junior liens on pre-petition ABL collateral, other unencumbered assets, and other collateral with prepetition liens.

In its motion seeking approval of the Junior DIP, the Debtors noted that the Junior DIP was necessary "to continue their ordinary course operating expenses and finance the chapter 11 cases" and argued that "without such financing the Debtors cannot afford to continue to operate and will be forced to liquidate their operations in a value destructive manner." Robert Riecker, the CFO of Sears Holdings, added that the "incremental liquidity to be provided by the Junior DIP will allow the Debtors to continue operating in the ordinary course with a larger number of stores while they try to secure a buyer for a substantial part of their business as a going concern."[82]

*GOB Sales*

On October 26, 2018 the Court entered an interim order to approve procedures for store closings to enable the Debtors to sell inventory, furniture, fixtures and equipment at any of its stores. The order approved store closing procedures and authorized the Debtors to retain a liquidation consultant to assist in conducting GOB sales at its stores, distribution centers and other non-retail locations that the Debtors determined should be closed in order to preserve liquidity and maximize the value of the estate. The Debtors hired Abacus Advisors Group L.L.C. ("Abacus") as liquidation consultant and selected 142 stores to close. Abacus had extensive experience conducting liquidation sales for the Sears Holdings, having liquidated over 800 Sears and Kmart stores over the past 16 years.[83] The Debtors noted that Abacus has historically achieved gross inventory sales of approximately $1.10 – $1.20 per dollar of inventory in those liquidation sales.[84] Under the store closing order, the Debtors were authorized to close additional stores so long as sufficient notice was given. The Debtors issued notice of additional store closures on November 11, 2018 and December 28, 2018 in which they identified 40 and 80 stores, respectively. At the conclusion of the notice period, the Debtors and Abacus commenced GOB sales for the identified stores.

The Debtors realized significant proceeds from the sale of inventory in the GOB sales. The GOB inventory liquidation at 262 stores yielded the following results[85]:

---

[82] Riecker Supp. Decl. ¶ 13.
[83] *Motion of Debtors for Approval of (I) Procedures for Store Closing Sales and (II) Assumption of Liquidation Consulting Agreement* ¶ 7 (ECF No. 23).
[84] *Id.* ¶ 25
[85] Henrich Depo. Ex. 3

| | $ millions | % of Book Value |
|---|---|---|
| *Book value of inventory sold in GOB sales* | $    617.2 | *100.0%* |
| **Retail value realized in GOB sales** | $    734.1 | **118.9%** |
| GOB expenses | (144.0) | |
| **Net recovery in GOB sales** | $    590.0 | **95.6%** |

## *Going Concern Sale Process*

On November 1, 2018, a few weeks after the Petition Date, the Debtors filed a motion seeking authority to conduct an auction for the sale of their remaining assets. The motion noted that the Debtors intended to utilize every reasonable effort to sell the approximately 400 EBITDA-positive stores as a going concern. Additionally, the Debtors intend to market and sell certain of their other assets, such as intellectual property and specialty businesses. The Debtors highlighted that:

> "the proposed procedures are not a declaration by Sears to liquidate the Company at fire sale prices—far from it. On the contrary, the proposed procedures are intended to provide the Debtors an efficient mechanism to monetize assets as and when the Debtors decide to auction and sell their Assets."[86] On November 19, 2018, the Court approved bid procedures for the sale of Sears Holdings' assets as a going concern.

After an extensive marketing process, the Debtors received multiple bids for certain of its discrete businesses.[87] On January 14, 2019 the Debtors conducted an auction that concluded on January 17, 2019 with Transform as the winning bidder. The Transform bid was finalized after a multiple rounds of bidding with significant economic improvements for the Debtors between the initial bid on January 9 and the ultimate winning bid. After a three day sale hearing, the Court entered the sale order approving the sale on February 8, 2019. The sale to Transform closed on February 11, 2019.

The Transform Transaction for 425 Go-Forward retail stores and the other affiliated businesses represented an aggregate value of approximately $5.2 billion in the form of cash and non-cash consideration, which included the assumption of approximately $1.8 billion of liabilities.[88] The Debtors ultimately determined that the Transform Transaction was superior to a wind-down and liquidation of the assets that existed at that date.

## *Post- Closing Events*

Subsequent to closing the Transform Transaction, the Debtors have attempted to monetize the remaining assets available to the estate, and have pushed forward with a plan of reorganization. I am aware that there are contractual disputes between the Debtors and Transform regarding the conduct of business prior to the closing of the Transform Transaction and the requirements of the

---

[86] *Debtors' Motion for Approval of Global Bidding Procedures* ¶ 4 (ECF No. 429).
[87] *Declaration of Brandon Aebersold* 21 (ECF No. 2335).
[88] See Appendix D.

Transform asset purchase agreement. I have not reviewed or addressed any of these allegations in forming my opinion.

On April 4, 2019, Wilmington Trust, acting as collateral agent for the Second Lien Debt, filed a motion to prohibit or limit the Debtors' use of cash collateral. In connection with a procedural path to resolve this dispute, I am aware that there was a stipulation among the Debtors and the Second Lien Creditors whereby the parties agreed to a weekly cash flow budget that contains a forecast of receipts and disbursements through the expected closing of the bankruptcy cases.

The budget is contained as Appendix H to this report.

# APPENDIX B
## LIST OF DOCUMENTS RELIED UPON

**Court Filings**

- *Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York* (ECF No. 3)
- *Debtors' Motion for Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections to Prepetition Secured Parties, and (D) Schedule Second Interim Hearing and Final Hearing* (ECF No. 7)
- *Motion of Debtors for Approval of (I) Procedures for Store Closing Sales and (II) Assumption of Liquidation Consulting Agreement* (ECF No. 23)
- *Interim Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* (ECF No. 101)
- *Declaration of Robert A. Riecker in Support of Debtors' Omnibus Reply to Objections to Debtors' Motion for Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections to Prepetition Secured Parties and (D) Grant Related Relief and in Support of Debtors' Supplemental Motion for Authority to (I) Obtain Junior Postpetition Financing, and (II) Schedule Final Hearing* (ECF No. 866)
- *Interim Order Approving (I) Procedures for Store Closing Sales and (II) Assumption of Liquidation Consulting Agreement* (ECF No. 337)
- *Debtors' Application for an Order Authorizing the Retention and Employment of Alvarez & Marsal North America, LLC as Financial Advisor for the Debtors Nunc Pro Tunc to the Petition Date* (ECF No. 423)
- *Debtors' Motion for Approval of Global Bidding Procedures* ¶ 4 (ECF No. 429)
- *Notice of Intent to Conduct Store Closing Sales* (ECF No. 576)
- *Debtors' Supplemental Motion for Authority to (I) Obtain Junior Postpetition Financing, and (II) Schedule Final Hearing* (ECF No. 872)
- *Final Order Approving (I) Procedures for Store Closing Sales and (II) Assumption of Liquidation Consulting Agreement* (ECF No. 876)
- *Final Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (ECF No. 955)
- *Action Time, Inc.'s Motion for Turnover of Funds Being Held in Trust by Debtor, SHC Licensed Business, LLC* (ECF No. 1444)
- *Schedules of Assets and Liabilities for Sears Holdings Corporation* (ECF No. 1609)
- *Declaration of Alan J. Carr in Support of Restructuring Subcommittee's Response to the Objection of the Official Committee of Unsecured Creditors to the Sale of Substantially All of the Debtors' Assets to ESL Investments, Inc.* (ECF No. 2321)
- *Declaration of Brandon Aebersold* (ECF No. 2335)
- *Declaration of Mohsin Y. Meghji* (ECF No. 2336)

- *Declaration of Mohsin Y. Meghji* (ECF No. 2336), Ex. D, Sears Holdings Corporation Wind Down Recoveries Presentation, dated Jan. 14, 2019
- *Declaration of Mohsin Y. Meghji* (ECF No. 2336), Ex. E, Sears Holdings Corporation Discussion Materials: Wind Down Recoveries Presentation, dated Jan. 12, 2019
- *Declaration Kunal S. Kamlani in Support of ESL's Omnibus Response in Support of the Going Concern Sale Transaction* (ECF No. 2356)
- *Motion to Prohibit or Condition Debtors' Continued Use of Collateral, Including Cash Collateral* (ECF No. 3050)
- *Second Supplemental Declaration of Mohsin Y. Meghji in Support of the Debtors' Motion to Enforce* (ECF No. 3080)
- *Disclosure Statement for Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* (ECF No. 3895)
- *The Debtors' Motion to Estimate Certain 507(b) Claims for Reserve Purposes* (ECF No. 4034)
- *Declaration of Brian J. Griffith in Support of the Debtors' Motion to Estimate Certain 507(b) Claims for Reserve Purposes* (ECF No. 4035)
- *Proposed Stipulation and Order Concerning the Resolution of Certain Section 507(b) Claims* (ECF No. 4102)
- *Disclosure Statement for Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors* (ECF No. 4042)
- *Proposed Stipulation and Order Concerning Debtors' Continuing Use of Cash Collateral* (ECF No. 4155)

## SEC Filings
- Sears Holdings Corp., Annual Report (Form 10-K) (Mar. 11, 2011)
- Sears Holdings Corp., Annual Report (Form 10-K) (Mar. 14, 2012)
- Sears Holdings Corp., Annual Report (Form 10-K) (Mar. 20, 2013)
- Sears Holdings Corp., Annual Report (Form 10-K) (Mar. 18, 2014)
- Sears Holdings Corp., Annual Report (Form 10-K) (Mar. 17, 2015)
- Sears Holdings Corp., Annual Report (Form 10-K) (Mar. 21, 2017)
- Sears Holdings Corp., Annual Report (Form 10-K) (Mar. 23, 2018)
- Sears Holdings Corp., Quarterly Report (Form 10-Q) (Dec. 13, 2018)

## Documents Produced by Debtors
- Additional Value Required (SEARS_507B_00000005)
- Creditor Recovery Considerations, dated Dec. 17, 2018 (SEARS_507B_00000063)
- Indicative Bid Summary: Project Blue, dated Dec.17, 2018 (SEARS_507B_00000089)
- Project Blue – Liquidation Sale Process Update (SEARS_507B_0000095)
- Wind Down Recoveries, dated Jan. 12, 2019 (SEARS_507B_00000176)
- Claim Analysis, dated Jan. 6, 2019 (SEARS_507B_00000472)
- Project Blue – Sources and Uses (SEARS_507B_00000476)
- Tiger Capital Group, LLC & Great American Group, LLC Bid Proposal Letter, Dec. 14, 2018 (SEARS_507B_00001523)
- Project Blue – Liquidation Bids Review, dated Dec. 2018 (SEARS_507B_00181230)
- Abacus Indication of Interest, dated Dec. 15, 2018 (Sears_507B_00000128)

- Abacus Indication of Interest, dated Dec. 28, 2018 (Sears_507B_00001080)
- Abacus Supervision Marketing and Timing Document (Sears_507B_00000114)
- SB360 Proposal Letter, dated Dec. 28, 2018 (Sears_507B_00000955)
- Sears Liquidation Analysis (Sears_507B_00000131)
- Great American Group, LLC, Hilco Merchant Resources, LLC & Gordon Brothers Retail Partners, LLC Bid Proposal Letter, dated Dec. 28, 2018 (SEARS_507B_00000837)
- Additional Value Required, dated Jan. 16, 2019 (SEARS_507B_00000846)
- Debtors Comparison of Wind-down vs. ESL Bid (SEARS_507B_00000859)
- Wind Down Recoveries, dated Jan. 12, 2019 (SEARS_507B_0000864)
- Project Blue – Discussion Materials, dated Jan. 11, 2019 (SEARS_507B_00000879)
- Project Blue – Discussion Materials, dated Jan. 6, 2019 (SEARS_507B_00000908)
- Tiger Capital Group, LLC & Great American Group, LLC Bid Proposal Letter, Dec. 18, 2018 (SEARS_507B_00000911)
- All Tiger Inventory Appraisals:
  o dated June 7, 2018
  o dated Apr. 13, 2017
  o dated Oct. 25, 2017
  o dated Dec. 22, 2017
  o dated Sept. 28, 2018 (SEARS_507B_00001287)
- 507b Calculation (SEARS_507B_00001429)
- Store-Level Financials (SEARS_507B_00001511)
- Sears Holdings Corp. Borrowing Base Certificate, dated Oct. 13, 2018 (SEARS_507B_00001430)
- Schedule of Estimated Script Asset Value, dated Oct. 15, 2018 (SEARS_507B_00001508)
- General Ledger (SEARS_507B_00001510)

**Documents Produced by Debtors without Bates-stamps**
- Revised Liquidator Indicative Bids, dated Dec. 19, 2018
- Tiger Capital Group, LLC & Great American Group, LLC Bid Proposal Letter, Dec. 28, 2018
- Cash Collateral – Weekly Budget Variance Report, dated June 11, 2019

**Documents Being Produced by ESL**
- Summary of GOB Recovery Rates Post Ch. 11 Bankr. Filing, ESL_507B_00000001
- GOB Inventory Recovery Rates, ESL_507B_00000002
- Summary of Letters of Credit, ESL_507B_00000004
- Project Blue – Rolling Cash Flow Budget (Week 16), dated Feb. 6, 2019, ESL_507B_00000005
- Project Blue – Weekly Flash Report (DIP Budget Week 16), dated Feb. 6, 2019, ESL_507B_00000013
- Summary of Letters of Credit Draws, ESL_507B_00000021
- Project Transform ESL Bid Presentation, dated Jan. 2, 2019, ESL_507B_00000022
- Second Lien Agent Credit Bid Letter, dated Apr. 26, 2019, ESL_507B_00000042

**<u>Sale Related Documents</u>**
- Debtors Sale Hearing Closing Presentation, dated Feb. 7, 2019
- UCC Sale Hearing Closing Presentation, dated Feb. 7, 2019
- Deposition Transcript of Kunal Kalmani, dated Jan. 23, 2019
- Deposition Transcript of Brandon Aebersold, dated Jan. 31, 2019
- Deposition Transcript of Mohsin Meghji, dated Jan. 29, 2019
- Deposition Transcript of Alan Carr, dated Jan. 29, 2019
- Deposition Transcript of William Transier, dated Jan. 29, 2019
- Asset Purchase Agreement, dated Jan. 17, 2019

**<u>Other:</u>**
- *In re Sabine Oil & Gas Corp.*, 555 B.R. 180 (Bankr. S.D.N.Y. 2016)
- Sale Hearing Transcript, dated Feb. 4, 2019
- Sale Hearing Transcript, dated Feb. 6, 2019
- Sale Hearing Transcript, dated Feb. 7, 2019
- Exhibit 3 to July 2, 2019 deposition of William Henrich

# APPENDIX C
## SECURED DEBT ISSUED PRIOR TO BANKRUPTCY

$ millions

| Debt Facility | Collateral | Issue Date | Amount |
|---|---|---|---|
| First Lien Term Loan B | ABL Collateral | Apr 2016 | $ 750 |
| FILO Term Loan | ABL Collateral | Mar 2018 | 125 |
| Second Lien Term Loan | Second Lien Collateral | Sep 2016 | 300 |
| Second Lien Line of Credit | Second Lien Collateral | Jul 2017 | 610 |
| IP/Ground Lease Term Loan | IP / Ground Lease | Jan 2018 | 210 |
| Real Estate Loan Facility due 2017 | Real Estate | Apr 2016 | 500 |
| Real Estate Loan Facility 2020 | Real Estate | Jan 2017 | 500 |
| Incremental Real Estate Loan Facility | Real Estate | Oct 2017 / Mar 2018 | 300 |
| Sparrow Term Loan | Real Estate | Mar 2018 | 200 |
| Sparrow Mezzanine Loans* | Real Estate | Mar 2018 / 2H 2018 | 513 |
| **Total** | | | **$ 4,008** |

*Note: The Sparrow Mezzanine Loans were secured by a pledge of the equity in the direct parent
company of the entities that owned the properties which secured the Sparrow Term Loan.

# APPENDIX D
## TRANSFORM TRANSACTION CONSIDERATION

**ASSUMED LIABILITES IN TRANSFORM TRANSACTION**

$ millions

| | | | |
|---|---|---:|---|
| 503(b)(9) claims | $ | 139 | (A) |
| Accounts payable | | 196 | (A) |
| Severance & WARN | | 28 | (A) |
| Property taxes | | 135 | (A) |
| Cure costs | | 200 | (A) |
| Transfer taxes | | 19 | (A) |
| Mechanics liens | | 4 | (A) |
| Warranties and protection agreements | | 1,009 | (B) |
| Customer credits and SYW customer programs | | 81 | (B) |
| **Total assumed liabilities in Transform Transaction** | **$** | **1,811** | |

***Sources:***

(A)    *Declaration of Mohsin Y. Meghji* (ECF No. 2336) Exhibit G, page 2
(B)    *Declaration of Mohsin Y. Meghji* (ECF No. 2336) Exhibit E, page 7

# APPENDIX E

## CALCULATION OF RETAIL MARKUP

The Tiger report dated September 28, 2018 contains the following description of the Company's gross margin:

> "Kmart Corporation reported a gross margin of 29.2% on net sales of $4.48 billion for the 12 months ended June 2018. The margin for the Sears Full Line banner was 25.7% on net sales of $5.28 billion, while the margin at Sears Auto Centers was 30.2% on net sales of $315.6 million."[89]

Based on that description, I have calculated the historical retail markup to be 37.7% as follows:

| MARGIN ACCORDING TO TIGER REPORT | | | | |
|---|---|---|---|---|
| $ millions | Net sales | Gross Margin | Weight | Weighted Avg. |
| Kmart Corporation | $    4,480 | 29.2% | 0.44 | 13.0% |
| Sears Full Line banner | 5,280 | 25.7% | 0.52 | 13.5% |
| Sears Auto Centers | 316 | 30.2% | 0.03 | 0.9% |
| Total Sales | $   10,076 | | | **27.4%** |

| CALCULATION OF MARKUP | |
|---|---|
| Weighted average Gross Margin *(see above)* | 27.4% |
| Markup (1/[1-gross margin]-1) | 37.7% |

---

[89] Tiger Asset Intelligent, Sears Holdings Corporation Inventory Appraisal Net Orderly Liquidation Value, dated Sept. 28, 2018, SEARS_507B_00001287, at -302.

# APPENDIX F
## EBITDA MARGIN OF GO-FORWARD STORES

The following is a summary of the financial results of the 425 Go-Forward stores based upon store-level financials provided by the Debtors.[90] Those financials show that, over the four-month period starting in October 2018 and ending in January 2019, the Go-Forward stores generated an EBITDA margin of 0.7%.

| $ millions | October | November | December | January | Total |
|---|---|---|---|---|---|
| Total revenues | $    320.5 | $    435.8 | $    554.0 | $    255.4 | $ 1,565.7 |
| Gross margin | $     95.9 | $    120.3 | $    145.4 | $     52.9 | $   414.5 |
| Gross margin % | 29.9% | 27.6% | 26.2% | 20.7% | 26.5% |
| Operating expenses* | (97.1) | (101.0) | (120.8) | (84.2) | (403.0) |
| EBITDA | $     (1.1) | $     19.4 | $     24.6 | $    (31.3) | $    11.5 |
| EBITDA margin | (0.4)% | 4.5% | 4.4% | (12.3)% | **0.7%** |

*Includes REIT related charges

---

# APPENDIX G

CALCULATION OF VALUE OF SECOND LIEN COLLATERAL IN HYPOTHETICAL PETITION DATE
LIQUIDATION

**COLLATERAL AS OF PETITION DATE**

*(US$ millions)*

| Collateral Component | Petition Date Book Value* | Liquidation Percentage | Petition Date Liquidation Value | | |
|---|---|---|---|---|---|
| | | | Inventory 88% | Inventory 90% | Inventory 92% |
| Cash | $    115.5 | 100% | $    115.5 | $    115.5 | $    115.5 |
| Credit card receivables | 64.2 | 100% | 64.2 | 64.2 | 64.2 |
| Pharmacy receivables, net of reserves | 11.9 | 100% | 11.9 | 11.9 | 11.9 |
| Pharmacy scripts* | 72.8 | 100% | 72.8 | 72.8 | 72.8 |
| Inventory | 2,690.8 | 88% - 92% | 2,367.9 | 2,421.7 | 2,475.5 |
| **Total Collateral** | **$    2,955.2** | | **$    2,632.3** | **$    2,686.2** | **$    2,740.0** |

**RECOVERY WATERFALL IN A PETITION DATE LIQUIDATION**

*(US$ millions)*

| Debt | Petition Date Outstanding | | Application of Collateral | | |
|---|---|---|---|---|---|
| | | | Inventory 88% | Inventory 90% | Inventory 92% |
| ABL Revolver | $    836.0 | | $    836.0 | $    836.0 | $    836.0 |
| ABL Term Loan | 570.8 | | 570.8 | 570.8 | 570.8 |
| ABL L/C Facility | 124.0 | | 124.0 | 124.0 | 124.0 |
| FILO Facility | 125.0 | | 125.0 | 125.0 | 125.0 |
| Standalone L/C Facility | 271.0 | | 271.0 | 271.0 | 271.0 |
| **Total First Lien Debt** | **$    1,926.8** | | **$    1,926.8** | **$    1,926.8** | **$    1,926.8** |
| **Second Lien Debt** | **$    1,151.5** | | **$    705.5** | **$    759.4** | **$    813.2** |
| *% of 2L Debt Outstanding* | | | *61%* | *66%* | *71%* |
| **TOTAL** | **$    3,078.3** | | **$    2,632.3** | **$    2,686.2** | **$    2,740.0** |

*Pharmacy script value not carried on the Company's balance sheet.*

# APPENDIX H

## DEBTORS' WEEKLY CASH FLOW BUDGET

# Weekly Cash Flow Budget – Base Case (actualized through 7/8/19)

The following is a weekly cash flow budget table with columns organized by month (February, March, April, May, June, July, August, September, October, November, December) and a Total column. Row labels are as follows:

**CASH RECEIPTS**
- Wave 3 GOB Inflows
- Cash In Transit Proceeds
- Credit Card Receivables
- Cash In Stores
- Real Estate Asset Sales
- Excess Inventory Proceeds
- ESL Closing Proceeds
- TSA Proceeds
- SHIP Deposit
- Utility Deposit
- Hoffman Estates Tax Credit
- Collar Statue
- Pro-Rated Rent
- ESL Severance Assumption
- ESL 503(b) Assumption
- Other Proceeds
- Total OldCo Receipts

**CASH DISBURSEMENTS**
- OldCo Accrued Payroll & Benefits
- Taxes
- GOB Operating Costs
- Professional Fee Carve Out Funding
- Post-Petition Payables
- 503(b)(9) Claims
- TSA Disbursements
- Franchise Tax
- Severance & WARN
- US Trustee Fees
- Board Fees
- Net Pre-Petition Inventory Shortfall
- Other Potential Liabilities
- Other Liabilities and Expenses
- Total OldCo Disbursements

**PASS-THROUGH RECEIPTS**
- NewCo Payroll Remittance
- NewCo Licensing Remittance
- Total Pass-Through Receipts

**PASS-THROUGH DISBURSEMENTS**
- NewCo Payroll
- Licensing Payments For NewCo
- Total Pass-Through Disbursements

Net Cash Flow

- Beginning Available Cash
- Change In Available Cash
- Ending Available Cash

**ENDING CASH BALANCES**
- OldCo Operating Accounts
- Consignment Accounts
- Wind-Down Account
- Professional Fee Carve Out Account
- Total Cash

# EXHIBIT B

# GOB Results

Note: this document is sourced from Exhibit 3 to Henrich Deposition, and is adjusted to correct a summation error in the original file (ESL_507B_0000001) and to calculate Net Recovery as the sum of GOB sales and Total GOB Expenses divided by Goods Available at Cost.

**GOB Store Performance (Post-Ch. 11 Bankruptcy Filing)**

| Announce Date | Store Format | # GOB Stores | GOB Sales | Goods Available at Cost | Goods Available per Store | Gross Recovery % | Total GOB Expenses | GOB Expense per Store | Net Recovery % |
|---|---|---|---|---|---|---|---|---|---|
| 10/15/18 | FLS | 77 | $ 251,199,766 | $ 205,725,578 | $ 2,671,761 | 122.1% | $ 49,128,863 | $ 638,037 | 98.2% |
| | Kmart | 65 | $ 197,658,880 | $ 171,692,459 | $ 2,641,422 | 115.1% | $ 36,852,757 | $ 566,965 | 93.7% |
| | FLS+Kmart | 142 | $ 448,858,646 | $ 377,418,037 | $ 2,657,874 | 118.9% | $ 85,981,620 | $ 605,504 | 96.1% |
| 11/8/18 | FLS | 29 | $ 71,762,679 | $ 58,587,791 | $ 2,020,269 | 122.5% | $ 12,736,335 | $ 439,184 | 100.7% |
| | Kmart | 11 | $ 40,583,110 | $ 34,358,332 | $ 3,123,485 | 118.1% | $ 8,281,100 | $ 752,827 | 94.0% |
| | FLS+Kmart | 40 | $ 112,345,789 | $ 92,946,123 | $ 2,323,653 | 120.9% | $ 21,017,435 | $ 525,436 | 98.3% |
| 12/27/18 | FLS | 43 | $ 98,267,824 | $ 81,372,001 | $ 1,892,372 | 120.8% | $ 20,878,800 | $ 485,553 | 95.1% |
| | Kmart | 37 | $ 74,586,254 | $ 65,463,890 | $ 1,769,294 | 113.9% | $ 16,155,319 | $ 436,630 | 89.3% |
| | FLS+Kmart | 80 | $ 172,854,078 | $ 146,835,891 | $ 1,835,449 | 117.7% | $ 37,034,119 | $ 462,926 | 92.5% |
| Totals | FLS | 149 | $ 421,230,269 | $ 345,685,370 | $ 2,320,036 | 121.9% | $ 82,743,998 | $ 555,329 | 97.9% |
| | Kmart | 113 | $ 312,828,244 | $ 271,514,681 | $ 2,402,785 | 115.2% | $ 61,289,175 | $ 542,382 | 92.6% |
| | FLS+Kmart | 262 | $ 734,058,513 | $ 617,200,051 | $ 2,355,725 | 118.9% | $ 144,033,173 | $ 549,745 | 95.6% |

Used as gross value of GOB inventory in Schulte's Gross Retail Value approach.

Used as book value of GOB inventory in Schulte's Book Value approach.

Used in the calculation of GOB inventory in Schulte's Net Retail Value approach.

# EXHIBIT C



### Excerpts from General Ledger
(SEARS_507B_00001510)

External Analysis
SHC Internal Consolidation
Reporting Divisions
2018 Actuals
HTD(Sep)

| | | |
|---|---|---|
| A01101 Cash in Stores | | 17,550,018 |
| A01103 Cash in Bank | | 81,494,011 |
| A01104 Invested Cash | | 11,565,848 |
| A01105 Cash Posted as Collateral | | 4,848,896 |
| A01106 Credit Card Deposits in Transit | | 64,279,939 |
| A01122 Pharmacy Receivables | | 14,510,723 |
| 11120 A/R - Pharmacy Recble Reserve | | (2,623,114) |

**Cash**
$116 million

**Credit Card Receivables**
$64 million

**Pharmacy Receivables**
$12 million

# EXHIBIT D

| Store Count | Estimated Script Asset Value | | |
|---|---|---|---|
| 140 | $ 72,804,891 | $ 19,545,607 | $ 92,350,497 |

| Location # | City | State | Estimated Asset Value | Estimated Inventory Liquidation Value | Estimated Asset Value with Inventory Liquidation Value |
|---|---|---|---|---|---|
| 7752 | YAUCO | PR | $ 1,700,585 | $ 203,008 | $ 1,903,593 |
| 7705 | TAMUNING | GU | $ 1,239,148 | $ 484,652 | $ 1,723,800 |
| 4026 | ST JOSEPH | MO | $ 968,566 | $ 518,230 | $ 1,486,796 |
| 7784 | VEGA ALTA | PR | $ 1,275,051 | $ 180,545 | $ 1,455,595 |
| 3954 | WALNUTPORT | PA | $ 1,038,794 | $ 235,575 | $ 1,274,369 |
| 9662 | EPHRATA | PA | $ 1,009,565 | $ 201,783 | $ 1,211,347 |
| 4494 | TRUJILLO ALTO | PR | $ 1,028,825 | $ 170,892 | $ 1,199,717 |
| 7570 | BAYAMON | PR | $ 973,814 | $ 210,166 | $ 1,183,980 |
| 7413 | ST CROIX | VI | $ 864,111 | $ 299,917 | $ 1,164,028 |
| 7446 | CAYEY | PR | $ 1,025,058 | $ 128,449 | $ 1,153,507 |
| 3982 | LEMOORE | CA | $ 969,923 | $ 162,032 | $ 1,131,955 |
| 7677 | WELLSVILLE | NY | $ 832,348 | $ 286,882 | $ 1,119,230 |
| 7676 | SIDNEY | NY | $ 734,400 | $ 330,995 | $ 1,065,395 |
| 4188 | CHARLESTON | WV | $ 831,891 | $ 209,034 | $ 1,040,925 |
| 3810 | WILLOW STREET | PA | $ 865,814 | $ 161,395 | $ 1,027,208 |
| 3851 | RACINE | WI | $ 643,569 | $ 323,818 | $ 967,387 |
| 4751 | TEHACHAPI | CA | $ 839,880 | $ 109,040 | $ 948,920 |
| 9746 | GRASS VALLEY | CA | $ 805,362 | $ 134,659 | $ 940,020 |
| 7673 | STEVENSVILLE | MD | $ 579,323 | $ 321,288 | $ 900,611 |
| 7665 | CAROLINA | PR | $ 759,157 | $ 126,243 | $ 885,400 |
| 7255 | SOMERSET | KY | $ 771,397 | $ 109,788 | $ 881,185 |
| 7033 | LEWISTON | ID | $ 719,238 | $ 154,865 | $ 874,104 |
| 7788 | BAYAMON | PR | $ 744,009 | $ 122,952 | $ 866,961 |
| 7031 | MENOMINEE | MI | $ 708,051 | $ 158,615 | $ 866,666 |
| 7083 | NEW CASTLE | PA | $ 698,552 | $ 166,248 | $ 864,801 |
| 7741 | PONCE | PR | $ 724,846 | $ 136,966 | $ 861,812 |
| 7006 | TWIN FALLS | ID | $ 698,428 | $ 138,763 | $ 837,191 |
| 9689 | INTERNATIONAL FA | MN | $ 674,585 | $ 138,211 | $ 812,796 |
| 7246 | RICHMOND | IN | $ 609,092 | $ 203,131 | $ 812,223 |
| 3911 | COLUMBIA | PA | $ 654,494 | $ 154,357 | $ 808,851 |
| 7768 | GUAYNABO | PR | $ 679,209 | $ 129,458 | $ 808,668 |
| 7626 | WAYNESVILLE | NC | $ 616,057 | $ 189,662 | $ 805,718 |
| 3993 | JUANA DIAZ | PR | $ 680,082 | $ 111,371 | $ 791,453 |
| 7017 | ROSWELL | NM | $ 603,900 | $ 182,661 | $ 786,561 |
| 3725 | FREEDOM | CA | $ 646,920 | $ 137,173 | $ 784,093 |
| 3266 | KINGSTON | PA | $ 635,912 | $ 140,492 | $ 776,404 |
| 7783 | HATO REY | PR | $ 670,154 | $ 102,377 | $ 772,531 |
| 3841 | MARSHALL | MI | $ 640,869 | $ 130,246 | $ 771,115 |
| 4844 | RIO PIEDROS | PR | $ 646,380 | $ 124,025 | $ 770,405 |
| 4442 | CHARLESTON | WV | $ 594,457 | $ 171,846 | $ 766,303 |
| 7229 | GRAYSON | KY | $ 585,166 | $ 181,110 | $ 766,276 |
| 7616 | LEXINGTON | SC | $ 598,334 | $ 157,473 | $ 755,807 |
| 9420 | BRONX | NY | $ 570,655 | $ 176,131 | $ 746,786 |
| 4741 | BATAVIA | NY | $ 537,549 | $ 209,114 | $ 746,663 |
| 3172 | HAGERSTOWN | MD | $ 606,406 | $ 127,694 | $ 734,100 |
| 7419 | CAGUAS | PR | $ 595,662 | $ 137,833 | $ 733,495 |
| 9354 | GRIFFITH | IN | $ 573,798 | $ 153,965 | $ 727,764 |
| 4782 | CLINTON | OK | $ 559,329 | $ 159,525 | $ 718,855 |
| 4113 | ERIE | PA | $ 585,443 | $ 127,093 | $ 712,536 |
| 4713 | TOWANDA | PA | $ 567,914 | $ 139,335 | $ 707,249 |
| 7209 | EAST LIVERPOOL | OH | $ 522,152 | $ 173,408 | $ 695,560 |

| Store Count | Estimated Script Asset Value | | |
|---|---|---|---|
| 140 | $ 72,804,891 | $ 19,545,607 | $ 92,350,497 |
| Location # | City | State | Estimated Asset Value | Estimated Inventory Liquidation Value | Estimated Asset Value with Inventory Liquidation Value |
|---|---|---|---|---|---|
| 7372 | LEECHBURG | PA | $ 541,274 | $ 153,439 | $ 694,713 |
| 7477 | MARIETTA | OH | $ 565,228 | $ 124,449 | $ 689,676 |
| 3136 | SHILLINGTON | PA | $ 516,614 | $ 168,549 | $ 685,163 |
| 4048 | SPRINGFIELD | IL | $ 544,029 | $ 137,400 | $ 681,429 |
| 3963 | ELIZABETHTOWN | PA | $ 527,968 | $ 149,024 | $ 676,992 |
| 9220 | ALGONA | IA | $ 487,565 | $ 187,922 | $ 675,487 |
| 3713 | COVINGTON | GA | $ 527,718 | $ 145,389 | $ 673,108 |
| 7699 | LEBANON | PA | $ 515,631 | $ 152,524 | $ 668,155 |
| 3886 | ASHEVILLE | NC | $ 523,869 | $ 140,357 | $ 664,226 |
| 4112 | ASHEVILLE | NC | $ 520,242 | $ 137,948 | $ 658,189 |
| 7717 | WAYNESBORO | VA | $ 534,046 | $ 116,114 | $ 650,160 |
| 9593 | OSCODA | MI | $ 487,468 | $ 157,360 | $ 644,828 |
| 4433 | QUINCY | IL | $ 528,702 | $ 115,986 | $ 644,687 |
| 3268 | WILKES BARRE | PA | $ 535,638 | $ 108,120 | $ 643,759 |
| 7169 | SALINA | KS | $ 476,128 | $ 161,739 | $ 637,867 |
| 7030 | KALISPELL | MT | $ 533,506 | $ 104,149 | $ 637,656 |
| 9394 | FAJARDO | PR | $ 518,954 | $ 112,147 | $ 631,101 |
| 7223 | METAIRIE | LA | $ 546,272 | $ 78,237 | $ 624,509 |
| 4736 | CASPER | WY | $ 485,086 | $ 133,765 | $ 618,852 |
| 3592 | LAS VEGAS | NV | $ 495,651 | $ 117,957 | $ 613,608 |
| 3750 | WAUPACA | WI | $ 469,855 | $ 142,927 | $ 612,782 |
| 4453 | PUEBLO | CO | $ 482,691 | $ 129,360 | $ 612,051 |
| 4304 | FLORISSANT | MO | $ 486,997 | $ 123,243 | $ 610,240 |
| 9619 | MOREHEAD CITY | NC | $ 464,511 | $ 140,644 | $ 605,155 |
| 4814 | HAVRE | MT | $ 493,546 | $ 105,271 | $ 598,817 |
| 7068 | MIDLAND | MI | $ 494,225 | $ 100,350 | $ 594,575 |
| 9438 | PLEASANT HILLS | PA | $ 437,857 | $ 148,540 | $ 586,397 |
| 4170 | RAPID CITY | SD | $ 430,989 | $ 150,594 | $ 581,584 |
| 3692 | OCONOMOWOC | WI | $ 445,320 | $ 130,071 | $ 575,391 |
| 9621 | LEBANON | TN | $ 457,283 | $ 117,111 | $ 574,394 |
| 7746 | CARLISLE | PA | $ 471,406 | $ 100,958 | $ 572,364 |
| 3823 | JASPER | IN | $ 435,323 | $ 127,900 | $ 563,223 |
| 3819 | HASTINGS | MI | $ 438,411 | $ 108,260 | $ 546,671 |
| 7289 | STEGER | IL | $ 427,320 | $ 118,936 | $ 546,256 | Closing September |
| 4470 | WEST LONG BRANC | NJ | $ 380,063 | $ 164,984 | $ 545,047 |
| 3484 | ELKVIEW | WV | $ 379,689 | $ 143,751 | $ 523,440 |
| 3529 | PITTSBURGH | PA | $ 398,949 | $ 122,867 | $ 521,816 |
| 7043 | ROCK HILL | SC | $ 424,648 | $ 92,245 | $ 516,893 |
| 7767 | CHARLES CITY | IA | $ 400,431 | $ 114,648 | $ 515,079 |
| 7566 | ARECIBO | PR | $ 410,137 | $ 100,496 | $ 510,633 |
| 4871 | FARMINGVILLE | NY | $ 363,531 | $ 145,209 | $ 508,740 |
| 3088 | KENOSHA | WI | $ 411,023 | $ 96,347 | $ 507,370 |
| 4490 | SAN JUAN | PR | $ 413,405 | $ 90,957 | $ 504,362 |
| 4016 | GREENVILLE | SC | $ 386,086 | $ 118,057 | $ 504,143 |
| 7460 | KNOXVILLE | TN | $ 343,288 | $ 155,151 | $ 498,439 |
| 7397 | GROVE CITY | OH | $ 392,815 | $ 99,505 | $ 492,321 |
| 9348 | NORRIDGE | IL | $ 404,363 | $ 79,388 | $ 483,751 |
| 4214 | DES PLAINES | IL | $ 352,343 | $ 126,138 | $ 478,481 |
| 4064 | NO VERSAILLES | PA | $ 386,377 | $ 92,101 | $ 478,478 |
| 4141 | W COLUMBIA | SC | $ 360,471 | $ 116,384 | $ 476,855 |
| 4732 | AGUADILLA | PR | $ 428,234 | $ 46,189 | $ 474,422 |
| 9549 | MORGANTON | NC | $ 350,086 | $ 123,041 | $ 473,127 |
| 4381 | BRIDGEVIEW | IL | $ 366,286 | $ 94,761 | $ 461,047 |
| 3361 | ALLENTOWN | PA | $ 359,709 | $ 101,179 | $ 460,888 |

| Store Count | | | Estimated Script Asset Value | | |
|---|---|---|---|---|---|
| 140 | | | $ 72,804,891 | $ 19,545,607 | $ 92,350,497 |
| Location # | City | State | Estimated Asset Value | Estimated Inventory Liquidation Value | Estimated Asset Value with Inventory Liquidation Value |
| 7042 | VALPARAISO | IN | $ 355,334 | $ 100,930 | $ 456,264 |
| 3785 | TABB | VA | $ 337,860 | $ 117,645 | $ 455,505 |
| 3239 | KANSAS CITY | MO | $ 345,309 | $ 110,082 | $ 455,391 |
| 7749 | NEW YORK | NY | $ 317,935 | $ 135,740 | $ 453,676 |
| 3829 | ST. THOMAS | VI | $ 391,915 | $ 60,865 | $ 452,781 |
| 4395 | CUDAHY | WI | $ 328,486 | $ 107,659 | $ 436,145 |
| 4863 | GILLETTE | WY | $ 311,843 | $ 121,666 | $ 433,509 | Closing September
| 3862 | BOHEMIA | NY | $ 273,877 | $ 143,596 | $ 417,473 |
| 7644 | HARRISON | OH | $ 320,275 | $ 88,687 | $ 408,962 |
| 3882 | MAYAQUEZ | PR | $ 326,617 | $ 80,520 | $ 407,137 |
| 4399 | SILVER SPRINGS | MD | $ 287,197 | $ 114,400 | $ 401,597 |
| 4450 | RALEIGH | NC | $ 270,706 | $ 127,262 | $ 397,969 |
| 3155 | BELLEVILLE | MI | $ 303,009 | $ 83,278 | $ 386,287 |
| 3808 | STATESVILLE | NC | $ 291,905 | $ 91,276 | $ 383,181 |
| 7274 | MAULDIN | SC | $ 286,782 | $ 94,525 | $ 381,307 |
| 4150 | ALTOONA | PA | $ 281,312 | $ 93,165 | $ 374,477 |
| 9794 | SAINT GEORGE | UT | $ 285,314 | $ 82,623 | $ 367,937 |
| 3147 | KINGSPORT | TN | $ 256,085 | $ 111,354 | $ 367,438 |
| 3097 | COUNCIL BLUFFS | IA | $ 286,560 | $ 78,358 | $ 364,918 |
| 3256 | BALTIMORE | MD | $ 239,317 | $ 118,707 | $ 358,024 |
| 7649 | RIPON | WI | $ 231,078 | $ 125,096 | $ 356,174 |
| 3667 | RALEIGH | NC | $ 261,983 | $ 92,783 | $ 354,766 |
| 3707 | LAKE HAVASU CITY | AZ | $ 253,703 | $ 93,397 | $ 347,100 |
| 3308 | LAKE ORION | MI | $ 252,208 | $ 93,975 | $ 346,183 |
| 3896 | SAN GERMAN | PR | $ 256,597 | $ 85,014 | $ 341,611 |
| 3424 | GAINESVILLE | FL | $ 251,183 | $ 88,487 | $ 339,670 |
| 7329 | LOVELAND | CO | $ 244,675 | $ 93,303 | $ 337,978 |
| 7321 | BRADENTON | FL | $ 202,694 | $ 123,141 | $ 325,835 |
| 3820 | CHARLEVOIX | MI | $ 237,614 | $ 80,509 | $ 318,122 |
| 3021 | AUBURN | ME | $ 224,903 | $ 83,437 | $ 308,340 |
| 3317 | BOCA RATON | FL | $ 233,405 | $ 72,170 | $ 305,575 |
| 7777 | NEW YORK | NY | $ 185,358 | $ 117,287 | $ 302,645 |
| 3379 | WATERFORD | MI | $ 220,528 | $ 78,518 | $ 299,046 |
| 7208 | CLEMMONS | NC | $ 195,757 | $ 70,651 | $ 266,408 |
| 4858 | CAGUAS | PR | $ 192,088 | $ 70,867 | $ 262,955 |