**Hearing Date: July 23, 2019 at 10:00am (Eastern Time)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

······················································· X
                        :

                        :

In re                   :          Chapter 11 Case No.

    **SEARS HOLDINGS CORPORATION, et al.,**  :          18-23538 (RDD)

          **Debtors.**[1]      :          (Jointly Administered)

                        :

                        :

······················································· X

## COMMON SUPPLEMENTAL BRIEF OF THE SECOND LIEN PARTIES ADDRESSING DISCOVERY: (A) IN CONNECTION WITH THEIR REQUESTS TO DETERMINE THE AMOUNT OF THEIR SECOND LIEN SECURED CLAIMS UNDER SECTION 506(a) AND THEIR SECTION 507(b) ADMINISTRATIVE CLAIMS PURSUANT TO BANKRUPTCY RULE 3012; AND (B) IN OPPOSITION TO DEBTORS' MOTION TO SURCHARGE THEIR COLLATERAL PURSUANT TO SECTION 506(c)

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ............................................................................................................. 3

I.     DETERMINATION OF DIMINUTION IN VALUE CLAIMS REQUIRES AN
       ACCURATE *VALUATION* OF TOTAL COLLATERAL, MINUS AN
       ACCURATE *CALCULATION* OF OUTSTANDING SENIOR CLAIMS, *EACH
       AS OF THE PETITION DATE.*  THE SECOND LIEN PARTIES' EXPERTS
       PROVIDE BOTH.  THE DEBTORS' FACT WITNESSES PROVIDE NEITHER.. 3

       A.     The Second Lien Parties' Experts Take Different Paths But Reach
              Similar, Credible Conclusions on Valuation ....................................... 4

       B.     In Stark Contrast to the Experts for the Second Lien Parties, The
              Debtors' Fact Witnesses Are Not Qualified, Nor Do They Even
              Attempt to Value the Second Lien Collateral as of the Petition Date ............. 7

              1. Discovery Demonstrates That Mr. Griffith's Testimony Regarding Section
                 507(b) Matters Should Be Struck, As It Is Not Admissible Opinion
                 Testimony by a Lay Witness Under FRE 701. ................................. 8

              2. Mr. Griffith's Attempt to Value Inventory As Of the Petition Date Via a
                 Flawed Lay Interpretation of the APA Entered into Several Months Later
                 Should be Disregarded. .................................................................. 10

              3. Mr. Griffith's Belated Attempt to Exclude Pharmacy Receivables From
                 Second Lien Collateral Is Based on Hearsay ............................... 11

       C.     Calculation of the Outstanding First Lien Senior Claims as of the
              Petition Date ......................................................................................... 11

              1. Without Basis or Analysis, Mr. Griffith Includes $395.0 Million Of
                 *Undrawn* Letters of Credit as Funded Debt as of the Petition Date.......... 12

              2. Mr. Griffith's Inclusion of Post-Petition Interest as a Prepetition
                 Obligation is both Absurd and Inconsistent with His Prior Testimony in
                 These Cases.................................................................................... 14

       D.     Having Studiously Avoided Any Serious Effort To Calculate Second
              Lien Collateral Value As of the Petition Date, Mr. Griffith Instead
              Turns His Focus To A Discussion Of a Potential "Day-One
              Liquidation"—A Topic That is Both Irrelevant And With Which He
              Admits He Has No Experience.......................................................... 15

II.    DISCOVERY DEMONSTRATES THAT THE DEBTORS CANNOT MEET
       THEIR BURDEN UNDER SECTION 506(C) ............................................. 19

A.      As a Threshold Matter, Mr. Griffith's Testiomy Regarding Section 506(c) Should be Struck as Inadmissible Lay Opinion and for Lak of Basis ................................................................................................ 19

B.      Any Amounts That Could Be Appropriately Surcharged Against the Second Lien Collateral Have Already Been Taken Into Account by the Second Lien Parties' Experts As Part Of Their Valuations ......................... 23

D.      Both of Debtors' Witnesses Conceded A Going Concern Sale Was Not Necessary to Dispose of the Second-Lien Collateral. ...................................... 24

E.      Debtors Improperly Seek to Surcharge the Costs of the Entire Going Concern Sale, Which Involved Far More than the Second-Lien Collateral ................................................................................................ 24

F.      The Second Lien Parties Are Not the Primary Beneficiaries of the Sale Transaction................................................................................................ 25

III.    AMOUNT REQUIRED TO BE TRANSFERRED FROM THE WIND-DOWN ACCOUNT TO ACCOUNT FOR DIMINUTION IN VALUE OF THE SECOND LIEN COLLATERAL................................................................................................ 27

CONCLUSION ................................................................................................ 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorgianos v. National R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002).................................................................................................23

*Boucher v. U.S. Suzuki Motor Corp.*,18
   73 F.3d 18 (2d Cir. 1996)....................................................................................................18

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*,
   650 F. Supp. 2d 314 (S.D.N.Y. 2009)..................................................................................18

*In re Flagstaff Foodservice Corp.*,
   762 F.2d 10 (2d Cir. 1985)...................................................................................................19

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997).......................................................................................................18, 23

*Banker v. Nighswander*,
   37 F.3d 866 (2d Cir. 1994)......................................................................................................9

*Pierce v. F.R. Tripler & Co.*,
   955 F.2d 820 (2d Cir. 1992)....................................................................................................9

*Reed Constr. Data Inc. v. McGraw-Hill Cos.*,
   49 F. Supp. 3d 385 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016).........................11

*In re Sabine Oil & Gas Corp.*,
   555 B.R. 180 (Bankr. S.D.N.Y. 2016).................................................................................20

**Other Authorities**

Fed. R. Evid. 602 ......................................................................................................................8

Fed. R. Evid. 701 ......................................................................................................................9

Wilmington Trust National Association ("Wilmington Trust"), as Indenture Trustee and

Collateral Agent; Cyrus Capital Partners, L.P. ("Cyrus"); and ESL Investments, Inc. and certain

of its affiliated entities (including JPP, LLC and JPP II, LLC (collectively, "ESL"));

(collectively, the "Second Lien Parties") in their capacities as second-lien creditors of Sears

Holdings Corporation and certain of its affiliates (collectively, "Sears" or the "Debtors"), by

their undersigned counsel hereby file this *Common Supplemental Brief of the Second Lien*

*Parties Addressing Discovery: (A) In Connection With Their Requests to Determine the Amount*

*of Their Second Lien Secured Claims Under Section 506(a) and of Their Section 507(b)*

*Administrative Claims Pursuant to Bankruptcy Rule 3012; and (B) In Opposition to Debtors'*

*Motion to Surcharge Their Collateral Pursuant to Section 506(c).*[2]  In further support of their

requests for relief, the Second Lien Parties respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Second Lien Parties submit this joint submission pursuant to the Rule 3012

Stipulation to preview the principal factual issues to be determined at trial in light of the

deposition testimony that has occurred to date.

2.      For the Section 507(b) inquiry, the Court has been asked principally to determine

the value of the 2L Collateral available to the Second Lien Credit Parties as of the Petition Date,

as that value is the interest for which the Second Lien Parties are entitled to adequate protection.

---

[2]      Capitalized terms used but not defined herein shall have the meaning ascribed in the *Common Memorandum of Law On Behalf of the Second Lien Parties: (A) in Support of Their Requests to Determine the Amount of Their Second Lien Secured Claims under Section 506(a) and their Section 507(b) Administrative Claims Pursuant to Bankruptcy Rule 3012; and (B) in Opposition to the Debtors' Motion to Surcharge Their Collateral Pursuant to Section 506(c)*, (Dkt. No. 4272) ("Common Memorandum") or the Final DIP Order.

All citations to exhibits (abbreviated "JX") are exhibits included on the Joint Exhibit list to be submitted to the Court on July 19, 2019.

That exercise requires that the Court value the assets that comprised the 2L Collateral and then subtract the amount of senior claims secured by liens on those same assets, in each case as of the Petition Date.

3.      The evidence, like the deposition testimony, will show that: (a) the Second Lien Parties have provided the Court with all information necessary to make that determination; but (b) the Debtors have studiously sidestepped that straightforward analysis—for the simple reason that it does not yield the answer they want.

4.      For the Section 506(c) inquiry, the Court has been asked to determine the extent to which the value of the 2L Collateral benefited from the Debtors' incurrence of reasonable, necessary costs or expenses to preserve or dispose of those assets.  The answer to this question is obvious to anyone who has been paying attention:  until closing of the sale of substantially all of the Debtors' assets to Transform in early February, these cases were funded entirely by proceeds from the Debtors' sale of inventory at its retail stores.  In other words, the Debtors have been "living off of" profits generated by 2L Collateral, not off of any unencumbered assets that might otherwise be a source of recovery for unsecured creditors.  In this context, the notion of a surcharge of the very collateral that the Debtors have been consuming is incongruous to say the least.  But even beyond that undeniable reality, the evidence will also show, as the deposition testimony does, that the Debtors have failed to satisfy their burden to identify with specificity any reasonable or necessary costs the estates have incurred to preserve or dispose of the 2L Collateral—or any resulting benefit to the 2L Collateral.

5.      The evidence will also show, as the deposition testimony does, that the Debtors cannot argue with a straight face that the Second Lien Parties were the primary beneficiaries of the sale process run by the Debtors and for which the Debtors now seek to surcharge the 2L

Collateral.  In convincing the Court to approve the hard-fought and meticulously crafted going

concern sale to Transform just months ago, the Debtors themselves extolled the vast array of

benefits to the estates and its diverse constituents of the going concern transaction they

negotiated by and through their independent directors and advisors and valued at well in excess

of $5 billion.  Try as they might, the Debtors' witnesses cannot now walk away from what they

presented to the Court then to now argue instead that the Debtors pursued the sale only due to the

alleged urgings and for the purported benefit of ESL or any other Second Lien Parties.

7. In short, the Debtors have not—because they cannot—put forth any competent

evidence to rebut the Section 507(b) diminution in value claims established by the Second Lien

Parties and their respective experts.  And the Debtors have not—because they cannot, especially

in light of the record of the February sale hearing and now at deposition—put forth any

competent evidence that the "going concern" sale was undertaken at the sole insistence of ESL

or any other Second Lien Parties or as a reasonable or necessary vehicle to preserve or dispose of

the discrete 2L Collateral consisting of nothing more than retail inventory, receivables and

proceeds thereof.

## ARGUMENT

## I.    DETERMINATION OF DIMINUTION IN VALUE CLAIMS REQUIRES AN ACCURATE *VALUATION* OF TOTAL COLLATERAL, MINUS AN ACCURATE *CALCULATION* OF OUTSTANDING SENIOR CLAIMS, *EACH AS OF THE PETITION DATE*.  THE SECOND LIEN PARTIES' EXPERTS PROVIDE BOTH. THE DEBTORS' FACT WITNESSES PROVIDE NEITHER.

7. To be reliable and accurate, any calculation of the Second Lien Parties'

diminution in value claims must (i) begin with a valuation of the total collateral at the Petition

Date, and (ii) subtract from the total collateral the outstanding senior claims.  The three experts

for the Second Lien Parties did just that:  they valued the collateral as of the Petition Date.  These

experts—working independently and using different approaches—all opined as to the existence of substantial secured claims.  Debtors, in turn, provide the Court with no admissible evidence to rebut these valuations or to support their assertion that the value of the 2L claims is zero. Instead, Debtors proffer two lay witnesses:  Mr. Aebersold, who performed no valuation whatsoever; and Mr. Griffith, who offers merely a "summary output"—the components, data, and inputs for which he was largely unable to describe.

A.  **The Second Lien Parties' Experts Take Different Paths But Reach Similar, Credible Conclusions on Valuation.**

8.      The charts below demonstrate that the three experts for the Second Lien Parties all opined as to the existence of substantial secured claims, despite using different and sound approaches.  Two of the experts—ESL's expert David Schulte, and Wilmington Trust's expert William Henrich—rely on a store-level EBIDTA analysis to conclude that the Second Lien Parties were fully secured, with a significant collateral cushion, at the Petition Date.  The third expert, Cyrus's expert Marti Murray, relied on a more conservative (in approach and in fact) third-party borrowing base appraisal analysis to apply a net orderly liquidation value ("NOLV") approach to create a bare "minimum case" collateral value.  Using this minimum case, Ms. Murry still found a reasonable range of values within which the Second Lien Parties were largely or fully secured.

## Going Concern Value based on Store-Level EBITDA Analysis

| $ millions<br>All amounts as of the Petition Date | Schulte<br>(ESL)<br>Adjusted | | Henrich<br>(Wilmington Trust)<br>Adjusted | |
|---|---|---|---|---|
| Cash | $ | 116 | $ | 116 |
| Credit card receivables | | 64 | | 64 |
| Pharmacy accounts receivable | | 12 | | 15 |
| Pharmacy scripts | | 73 | | 73 |
| Inventory | | 2,691 | | 2,691 |
| **Total Collateral before adjustments** | $ | 2,955 | $ | 2,959 |
| **Adjustments** | | 95.6% applied to book value of GOB inventory.<br><br>100% for other Collateral. | | 95.6% book value of GOB inventory. 29% markup to book value of Go-Forward inventory minus 23.3% of costs. Overhead charges of 3.1% of GOB inventory and 5.0% of Go-Forward inventory. |
| **Collateral Value** | $ | 2,928 | $ | 3,129 |
| Less: funded first lien debt | | (1,532) | | (1,532) |
| **Collateral Available to 2Ls** | $ | 1,396 | $ | 1,598 |

## Going Concern NOLV Valuation

| $ millions<br>All amounts as of the Petition Date | Murray<br>(Cyrus) | | | |
|---|---|---|---|---|
| | Min. Claim | | Debtors Value | |
| Cash | $ | 123 | $ | 123 |
| Credit card receivables | | 55 | | 55 |
| Pharmacy accounts receivable | | 11 | | 11 |
| Pharmacy scripts | | 73 | | 73 |
| Inventory | | 2,691 | | 2,740 |
| **Total Collateral before adjustments** | $ | 2,952 | $ | 3,001 |
| **Adjustments** | | Excludes certain inventory items from the borrowing base report. "Net eligible inventory" of $2,391.5 valued at 88.7%. In-transit inventory of $144.6 valued at 51.6% | | Inventory valued at $2.74 billion based on Riecker declaration. |
| **Collateral Value** | $ | 2,457 | $ | 3,001 |
| Less: funded first lien debt | | (1,532) | | (1,532) |
| **Collateral Available to 2Ls** | $ | 925 | $ | 1,470 |

9.      As discussed below, the Debtors muster no competent valuation evidence of their own to rebut the Second Lien Parties' experts.  Instead, Debtors, at most, assert that the above calculations fail to take into account any of the expenses incurred in maintaining and disposing of the 2L Collateral from the Petition Date onwards.  *See Suppl. Decl. of Brian J. Griffith* ¶ 14, June 27, 2019 (Dkt. No. 4382) ("Griffith Suppl. Decl.").  This is simply not true.

10.      ESL's expert Mr. Schulte uses actual results and the Debtors' own four-wall, store level EBITDA accounting methodology.  He calculated separately for the going concern stores and the GOB stores the net retail value, *i.e.*, "the retail value of the inventory less costs to sell it." *Amended Expert Rep. of David M. Schulte*, filed herewith ("Schulte Rep.") at 10.  Mr. Schulte ultimately chose to use the Debtors' book value of inventory for the go forward stores because, among other reasons, it produced a lower, more conservative value than the actual "net retail" number.  *Id.*  Because the gross profits generated from inventory sales (which the Debtors' analysis ignores) funded the costs of achieving a return slightly higher than the inventory's book value, the Debtors' book value already takes into consideration all of the direct costs necessary to sell and maintain the inventory during these cases.[3]  For the GOB stores, Mr. Schulte used the actual value realized by GOB sales, which also includes the deduction of store-level costs incurred in those sales, and closely approximates the Debtors' actual experience running substantial GOB sales.  *See id.*

---

[3]      The use of book value also excludes other store-level revenue generated by the inventory that is likewise available to contribute to the overhead.  For example, data previously presented by the Debtors indicates that vendor discounts and rebates are not included in their four-wall EBITDA analysis despite the fact that those values are earned by selling inventory in stores.  *See* Schulte Rep. at 27.  That unattributed income category alone equals 25-30% of the Home Office/Corporate SG&A portion of corporate overhead the Debtors claim should be attributed to the inventory value.  *See id.*

11.    Wilmington Trust's expert, Mr. Henrich, applied a similar approach. Mr. Henrich but relied on a look forward basis using the Debtors' own gross margin projections from Mr. Griffith's employer, M-III, to determine net revenues at go-forward stores to calculate the value of the 2L Collateral at the Petition Date.  *See* Rep. of Wilmington Trust National Association for Payment of an Admin. Expense Pursuant to 11 U.S.C. §503(a), Ex. J. (Report of Mr. Henrich), at 216 (Dkt. No. 4279) ("Henrich Rep.").  Mr. Henrich then deducted from those projections both store level costs and a 5% attribution of general corporate overhead.  *See generally* Henrich Rep.

12.    Cyrus's expert Marti Murray, in turn, takes a "doubly" conservative approach to establish her "minimum case" by starting with a borrowing base that already significantly discounts the overall collateral base (the ABL borrowing base is inherently designed to leave significant collateral "cushion" beyond the 1L debt).  She then applies the equally conservative NOLV assumptions, even though significant portions of the inventory continued to be sold at retail prices through go forward stores.[4]  *See generally* Report of Marti M. Murray ("Murray Rep.").

**B.    In Stark Contrast to the Experts for the Second Lien Parties, The Debtors' Fact Witnesses Are Not Qualified, Nor Do They Even Attempt to Value The Second Lien Collateral as of the Petition Date.**

13.    In contrast to the Second Lien Parties' experts, the Debtors offer no expert testimony to support a competing valuation of the 2L Collateral at the Petition Date.  Instead, the Debtors offered two purported fact witnesses.

---

[4]    As a result, Debtors' lay witness, Brian Griffith, implicitly acknowledged that his proposed Section 506(c) surcharge does not apply to Ms. Murray's analysis by admitting he did not include any expenses related to GOB stores because such "expenses would be captured as part of the NOLV on the GOBs that were in process."  Griffith Tr. 118:7-24, July 10, 2019.

14.     The Court can disregard the Debtors' first fact witness, Brandon Aebersold. Mr. Aebersold admitted he had no opinion on the value of the 2L Collateral at the Petition Date.[5]

15.     The other fact witness, Brian Griffith, based his purported opinion exclusively on an incomplete and inaccurate understanding of the APA and the negotiations that led up to the signing of that agreement.[6]  Even if Mr. Griffith's testimony is not excluded for that reason, it is irrelevant for Section 507(b) purposes because any valuation that might be imputed from his tortured reading of the APA would at best represent a purported valuation of the 2L Collateral as but one component of a much broader transaction that occurred several months *after* the Petition Date—and so would be irrelevant to the value of the 2L Collateral as of the Petition Date.

**1.      Discovery Demonstrates That Mr. Griffith's Testimony Regarding Section 507(b) Matters Should Be Struck, As It Is Not Admissible Opinion Testimony By a Lay Witness Under FRE 701.**

16.     Mr. Griffith is a lay witness, not an expert.  At deposition, he described himself as a "fact witness," and testified that he "would not call [himself] an expert *in any area*."[7]  He further testified that he is "not sure [he] would qualify as an expert."  Griffith Tr. 17:10–16.

17.     As a lay witness, Mr. Griffith's testimony is only permissible to the extent is it based on his personal knowledge.  *See* Fed. R. Evid. 602.  To the extent Mr. Griffith is testifying about his opinions, those opinions must be (i) rationally based on his perception, (ii) helpful to clearly understanding his testimony or determining a fact in issue, and (iii) not based on

---

[5]      *See* Aebersold Tr. 12:3-24, July 10, 2019.

[6]      That opinion by Mr. Griffith is the subject of a separate *Motion to Exclude Certain Testimony and Strike Certain Portions of the Declarations by the Debtors' Fact Witness Brian Griffith*, filed contemporaneously herewith.

[7]      Griffith Tr. 17:10–16 (emphasis added); *id.* 19:20–22.

scientific, technical, or other specialized knowledge within the scope of Federal Rule of Evidence 702.  *See* Fed. R. Evid. 701.

18.    Mr. Griffith's Section 507(b) analysis fails to meet these standards in almost all respects.  Much of Mr. Griffith's analysis constitutes improper lay opinion.  And whatever aspects of his analysis do not nonetheless are irrelevant and methodologically unsound, given that his analysis both (i) understates the extent and value of the 2L Collateral on the Petition Date and (ii) overstates the amount of senior claims on the 2L Collateral on the Petition Date.  The Court should therefore give Mr. Griffith's testimony regarding components of the Section 507(b) analysis little to no weight

19.    In addition, it bears noting that Mr. Griffith's 507(b) analysis in his original declaration states that it is based on "[t]aking many of Cyrus's assumptions as true . . . ."  *See Decl. of Brian J. Griffith* ¶ 13, May 26, 2019 (Dkt. No. 4035) ("Original Declaration" or "Griffith Declaration").  At deposition, Mr. Griffith testified that these assumptions were taken from **confidential settlement communications**—specifically, from an "initial Cyrus offer" made during "settlement discussions."  Griffith Tr. 165:15–166:4.  Mr. Griffith admitted that he used these values to determine his alleged diminution of value of the 2L Collateral.[8] Mr. Griffith's disregard for the confidentiality of settlement communications is another reason why his testimony should be discredited.

---

[8]    Griffith Tr. 166:18–23 ("Q. So you used Cyrus values from the initial Cyrus offer to come up with an alleged amount of diminution value of 2L collateral, correct?  A. That was the -- yes, that was what we did.").  *See Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 826–27 (2d Cir. 1992) (evidence of a compromise offer is not admissible under Rule 408 if offered to prove the "amount" of the claim); *Banker v. Nighswander*, 37 F.3d 866, 872 (2d Cir. 1994) (district court did not abuse its discretion in barring the introduction of a settlement offer for the purpose of proving amount of liability).

**2.     Mr. Griffith's Attempt to Value Inventory As Of The Petition Date
Via a Flawed Lay Interpretation of the APA Entered into Several
Months Later Should be Disregarded.**

20.     Mr. Griffith contends that Sears inventory, which is 2L Collateral, should be
valued at 85% of book value, because that is supposedly the value realized on that collateral in
the February 2019 Sale Transaction with ESL.[9]  Even if Mr. Griffith's valuation metric of 85%
of book value was correct (which it is not), Section 507(b) requires Mr. Griffith to value the 2L
Collateral *as of the Petition Date*, not the date of the Sale Transaction several months later.
Indeed, when asked if he could point to any authority to support the appropriateness of valuing
the 2L Collateral as of the Petition Date "based on what someone might have paid for that
collateral about four months later," Mr. Griffith admitted, "No, I can't, not off the top of my
head, no."[10]  Mr. Griffith's inventory valuation is therefore irrelevant, not helpful to the trier of
fact, and methodologically unsound.

21.     Even if Mr. Griffith were an expert witness, which he is not, his conclusion that
2L Collateral should be valued as of the date of the Sale Transaction, rather than the Petition
Date, would be inadmissible as unreliable, because an expert may not "'cherry-pick' the time-
frame or data points so as to make [his] ultimate conclusion stronger." *Reed Constr. Data Inc. v.
McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 400 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir.
2016).  Other than cherry-picking, there is no other explanation for Mr. Griffith's decision to

---

[9]     *See* Griffith Suppl. Decl. ¶ 20 (referring to the "value of the collateral eventually sold to ESL
pursuant to the APA").  Mr. Griffith's 85% metric is based on (i) his purported interpretation of the APA
that flouts the plain text of that agreement, and (ii) alleged parol evidence, which is inadmissible given the
unambiguous language of the APA.  As noted, the Second Lien Parties request by separate motion that
the Court strike this and other aspects of Mr. Griffith's Declarations.

[10]     Griffith Tr. 223:12–18.

value the 2L Collateral as of the Petition Date using a contrived metric as of the date of the Sale Transaction.

### 3.    Mr. Griffith's Belated Attempt to Exclude Pharmacy Receivables From Second Lien Collateral Is Based on Hearsay.

22.    Mr. Griffith included $15 million of pharmaceutical receivables as 2L Collateral in his Original Declaration.[11]  In his Supplemental Declaration, Mr. Griffith reversed course and removed those receivables, claiming they are not 2L Collateral.[12]  It appears that Mr. Griffith's belated exclusion of the pharmacy receivables is based on hearsay.  He testified that the idea to exclude the pharmacy receivables "probably" came from "a member of my team," but he could not recall from whom.[13]  Accordingly, this portion of his opinion testimony lacks any permissible basis.

23.    It is apparent that Mr. Griffith does not purport to offer a reliable valuation of the 2L Collateral as of the Petition Date.  For this reason, his 507(b) analysis is unreliable from the outset, and the Court should give it little to no weight.

### C.    Calculation of the Outstanding First Lien Senior Claims as of the Petition Date.

24.    Once the value of the 2L Collateral is determined, the second step in the "diminution in value" calculation is to subtract from that value the amount of any senior claims that encumber the 2L Collateral and thereby reduce the value of the 2L Collateral available to the Second Lien Parties—again, as of the Petition Date.  The Second Lien Parties are all in agreement on this point, simply using the amount of secured, IL debt outstanding as of the

---

[11]    *See* Griffith Suppl. Decl. ¶ 7 n.5; Griffith Tr. 31:23–32:4.

[12]    *See* Griffith Suppl. Decl. ¶ 7 n.5.

[13]    Griffith Tr. 37:11–16.

Petition Date of $1.532 billion.  This amount comes straight from the Declaration of Robert A.

Riecker dated November 23, 2018, which was submitted in reply and in further support of

Debtors' request to obtain post-petition financing.[14]

25.    Remarkably, Mr. Griffith disagrees, choosing instead to try to lard on: (a) an

additional $395.0 million in the form of letters of credit that were wholly undrawn as of the

Petition Date; and (b) $34.0 million of *postpetition* interest that could not possibly have been due

and owing *as of the Petition Date*.[15]  Neither of these attempted additions holds water.

> **1.    Without Basis or Analysis, Mr. Griffith Includes $395.0 Million Of *Undrawn* Letters of Credit as Funded Debt as of the Petition Date.**

26.    As of the Petition Date, the Debtors' apparently maintained borrowing capacity

under letters of credit ("LCs") totaling approximately $395 million.  If drawn, the LCs

potentially could create IL debt obligations ranking senior to the secured claims of the Second

Lien Parties.  Until drawn, any obligations of the Debtors under the LCs are nothing more than

contingent, unliquidated claims.

27.    As of the Petition Date, there were no amounts drawn under the LCs.[16]

28.    Nonetheless, Mr. Griffith includes the entirety of $395 million in LCs as funded

debt as of the Petition Date.  In Mr. Griffith's flawed analysis, this reduces the 2L Section 507(b)

Claim dollar for dollar.

---

[14]    JX 109 (*Declaration of Robert A. Riecker in Support of Debtors' Omnibus Reply to Objections to Debtors' Motion for Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections to Prepetition Secure Parties and (D) Grant Related Relief And in Support of Debtors' Supplemental Motion For Authority to (I) Obtain Junior Postpetition Financing, And (II) Schedule Final Hearing* ¶ 8, Nov. 23, 2018 (Dkt. No. 866)) ("Around the Commencement Date, the Prepetition ABL Facility collateral was valued at approximately $2.8 billion (of which the net orderly liquidation value ('NOLV') of the Debtors' inventory was valued at about $2.74 billion) with approximately $1.53 billion borrowed against it under the Prepetition ABL Facility.").

[15]    *See* Griffith Suppl. Decl. ¶¶ 7, 13 (emphasis added).

[16]    *See* Schulte Rep. at 7, 28.

29.     Mr. Griffith does this because, as he asserts in his Supplemental Declaration, he assumes that "*in a liquidation scenario*, letters of credit are almost always fully drawn or cash collateralized."[17]

30.     Mr. Griffith's Declaration says nothing about how LCs would be treated in a going concern sale or even in an orderly liquidation, and indeed at his deposition he conceded that in a going concern sale the LCs would *not* be drawn:

> **Q.** Am I correct that, in neither declaration, you give any opinion as to what would occur in a going concern scenario concerning the L/Cs?
> [Objection.]
> **A.** I think we show them being assumed [by the buyer] in our analysis.
> . . .
>
> **Q.** Okay. So if they are assumed, they're not drawn, correct?
> **A.** They remain an obligation, yes.[18]

31.     Even if Mr. Griffith's views were relevant, they lack a sufficient basis. Mr. Griffith does not know how much of the LCs had been drawn as of the Petition Date.[19]  He further conceded that he could not comment on the tables included in Ms. Murray's expert report that categorize and analyze the LCs.[20]  He also conceded that he did not conduct any diligence whatsoever to investigate whether the amount of LCs actually drawn during this case was only $9 million, as noted by Ms. Murray.[21]

32.     Moreover, at his deposition Mr. Griffith changed his formulation that LCs would

---

[17]     *See* Griffith Suppl. Decl. ¶ 13 (emphasis added).

[18]     Griffith Tr. 136:23–137:22 (emphasis added).

[19]     Griffith Tr. 248:5-16.

[20]     Griffith Tr. 128:12–17.

[21]     Griffith Tr. 131:23–132:18 ("Q. Did you not investigate to see whether she's right? A. No, I was not looking into this table.").

"almost always" be fully drawn in a liquidation, to "may be" fully drawn.[22]  When asked for the

basis for his stated view, Mr. Griffith pointed to (i) what he believes transpired in the Circuit

City bankruptcy proceedings—a case with which he conceded he had no personal involvement—

and (ii) "[d]iscussions with colleagues"[23]—which is clearly hearsay.  And, in any event, Mr.

Griffith could not point to "any instance, in an orderly chapter 11 liquidation, of a retailer where

letters of credit were fully drawn."[24]

<b>2.    Mr. Griffith's Inclusion of Post-Petition Interest as a Prepetition Obligation is both Absurd and Inconsistent with His Prior Testimony in These Cases.</b>

33.    Mr. Griffith did not include post-petition interest in the 1L Debt in his Original

Declaration.

34.    In his Supplemental Declaration, Mr. Griffith reversed course and added $34

million of post-petition interest to the 1L Debt, which reduces the 2L Section 507(b) Claim

dollar for dollar.[25]

---

[22]    Griffith Tr. 176:14–177:15 ("Q. In your view, are letters of credit always fully drawn in an orderly liquidation scenario?  A. They potentially would be, yes.  Q. But they would potentially not be, correct?  MR. GENENDER: Objection, form.  A. I would assume that they would be drawn if you're in a liquidation and maybe not able to perform under the obligations that are associated with those L/Cs.  Q. So is it your testimony that, in an orderly chapter 11 liquidation scenario, letters of credit are almost always fully drawn?  A. At some point, they may be. It would depend on -- it would depend on if the estate is administratively solvent or not, and if they are able to continue to perform their duties under the obligations of those L/Cs.  Q. Okay. So in an orderly chapter 11 scenario, letters of credit may be fully drawn, correct?  MR. GENENDER: Objection, form, misstates.  A. Yes.").

[23]    Griffith Tr. 178:2–10; 178:24–179:5. ("Q. Again, I'm asking for the basis of your view.  What's your basis, experience, education, something else?  A. My understanding is Circuit City still has litigation going on around their L/Cs, and it's been a while.  It's part of it.  Discussions with colleagues.  That's kind of the basis.  Q. You are a fact witness, right?  A. I am.) (Q. Are you personally involved with the Circuit City case? A. I am not.").

[24]    Griffith Tr. 178:24–179:5. ("Q. Can you point me to any instance, in an orderly chapter 11 liquidation, of a retailer where letters of credit were fully drawn?  A. I can't say, sitting here, that I can.").

[25]    *See* Griffith Suppl. Decl. ¶ 13.

35.     Mr. Griffith's belated decision to burden the Petition Date value of senior claims with $34 million of post-petition interest is flawed and unreliable.  First, even though Section 507(b) effectively requires Debtors to measure the value of the 2L Collateral as of the Petition Date, Mr. Griffith conceded that "by including that [post-petition] number, [he is] no longer showing a snapshot as of the petition date."[26]

36.     Mr. Griffith also admitted that he was not "aware of any authority in the literature supporting the idea that [he] can include post-petition interest when measuring the amount of a claim as of the petition date."[27]

37.     Finally, it appears that Mr. Griffith's inclusion of the $34 million is based on hearsay.  At deposition, Mr. Griffith testified—after multiple privilege instructions from his counsel—that the post-petition interest was added to his analysis after "*we* went back and did additional diligence," that "it was an issue that was raised," and "I don't recall who raised it . . . ."[28]

**D.      Having Studiously Avoided Any Serious Effort To Calculate Second Lien Collateral Value As Of The Petition Date, Mr. Griffith Instead Turns His Focus To A Discussion Of a Potential "Day-One Liquidation"—A Topic That is Both Irrelevant And With Which He Admits He Has No Experience.**

38.     Despite his resistance to engage in any meaningful valuation of the 2L Collateral, Mr. Griffith posits that the Second Lien Parties failed to perform a liquidation analysis.  In so doing, he suggests that the relevant benchmark is a "day-one" liquidation.  Mr. Griffith's suggestion is irrelevant.  In his Original Declaration, he correctly noted that the Section 507(b) analysis centered on "assessing the fair market value of the Collateral in the hands of the Debtors

---

[26]     Griffith Tr. 49:3–6.

[27]     Griffith Tr. 184:20–185:5.

[28]     Griffith Tr. 48:2–49:2.

at both the Petition Date and the Effective Date."[29]  His introduction of a hypothetical liquidation

is thus befuddling.  It is also based on mere speculation, as he conceded he has no specialized

knowledge or even personal experience with liquidations of retailers on which he bases this

suggestion.  Even worse than that:  this suggestion is a blatant red herring.

39.    Mr. Griffith's Supplemental Declaration includes multiple paragraphs of analysis

about the costs, risks, and uncertainties inherent in a liquidation of a retailer, which he suggests

the Second-Lien Parties' experts ignored.  *See, e.g.*, Griffith Suppl. Decl. ¶ 9 (claiming risks of

"inventory flood[ing] the market," "complications with vendor flight and contraction," and

uncollectible receivables); *see also id.* ¶¶ 8, 10, 11.  Mr. Griffith specifically suggests the risks

inherent in a liquidation undercut Ms. Murray's use of an 88.7% NOLV in her expert report.  *See

id.* ¶ 11.  Mr. Griffith testified that his analysis is based on only "a general understanding of how

liquidations of retailers work."[30]

40.    As an initial matter, Mr. Griffith's analysis is irrelevant given that the Second-

Lien Parties' experts did not perform liquidation analyses.  In addition, Mr. Griffith's analysis

constitutes improper lay witness testimony, as it contains opinions about areas of specialized

knowledge related to liquidations of retailers.[31]  This is the province of expert testimony, and Mr.

Griffith is not an expert.[32]

41.    And even if it were proper for Mr. Griffith to testify about an area of specialized

---

[29]    Griffith Original Decl. 13.

[30]    Griffith Tr. 220:10-20; 222:16–23.

[31]    *See, e.g.*, Griffith Suppl. Decl. ¶ 8 (referencing "administrative claims incurred in a liquidation"
and "WARN Act liabilities"); *id.* ¶ 9 (referencing "margins in a fire-sale"); *id.* ¶ 10 (claiming a chapter 7
liquidation would "further limit[]" recoveries and result in loss of key employees, "less efficient inventory
management, higher inventory shrinkage, and significant logistical challenges.").

[32]    Griffith Tr. 17:10–16.

knowledge, he conceded he actually lacks personal knowledge of the risks and costs inherent in a

liquidation of a retailer. When asked if he had ever been personally engaged in (i) a chapter 7

liquidation of a retailer, (ii) a chapter 11 orderly liquidation of a retailer, or (iii) a fire-sale

liquidation of a retailer, Mr. Griffith answered "No," "No," and "No." [33] Nor could Mr. Griffith

articulate the difference between a "wind-down" and a "liquidation,"[34] despite using those terms

in his Supplemental Declaration.

42.    Finally, Mr. Griffith failed to actually quantify his purported risks and costs.[35] He

conceded that he did not attempt to quantify (i) by how much a wind-down would reduce overall

recoveries, (ii) by how much lower margins would be in a so-called "fire sale," or (iii) how much

WARN Act-related severance liabilities would be incurred.[36]

43.    Accordingly, even if relevant (which they are not), Mr. Griffith's conclusions

concerning the costs and reduced recoveries in a liquidation lack any reliable basis and are

improper. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (opinion "connected to

existing data only by the *ipse dixit* of the expert" should be excluded); *Boucher v. U.S. Suzuki*

*Motor Corp.*, 73 F.3d 18, 21–22 (2d Cir. 1996) (expert testimony should be excluded if

---

[33]    Griffith Tr. 219:23–220:9 ("Q. Have you ever personally been engaged in a fire sale liquidation of a retailer? A. No. Q. Have you ever personally been engaged in a chapter 11 orderly liquidation of a retailer? A. I have not. Q. Have you ever been engaged in a chapter 7 liquidation of a retailer? A. No.").

[34]    Griffith Tr. 174:9–15 ("Q. What's the difference, if there is one, between wind-down and liquidation scenario? A. I'd say they're pretty similar. Q. As you sit here right now, can you name any difference for me? A. Not off the top of my head.").

[35]    Griffith Tr. 219:10–25.

[36]    Griffith Tr. 219:10–221:8 ("Q. By how much would a wind-down reduce overall recoveries? A. It's hard to say. I don't have that quantified. Q. You haven't attempted to quantify it, right? A. No, I have not. Q. Then you say in the next sentence, "The margins in a fire sale would be lower." Do you see that? A. Yes. Q: How much lower? A. I don't have that quantified. […] What analysis did you do to write that portion of paragraph 8? A. We just understood. We knew, from working with the company, that there was a material amount of WARN Act-related severance liabilities that would be incurred. Q. How much WARN Act liability would be incurred in an orderly liquidation of Sears? A. I don't have that number here.").

"speculative or conjectural"); *see also Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 321 n.4 (S.D.N.Y. 2009) (rejecting lay opinion declaration regarding damages where opinion was not based on witness's "own personal knowledge or rationally based on his own perceptions, thus demonstrating that his opinions cannot satisfy the requirements of Rules 602 and 701 for lay opinion testimony.") (quotations omitted).

44.     Finally, Mr. Griffith asserts that "[t]he market's view" of the supposed liquidation risks discussed above "is reflected in the equity bids' guaranteed rates received by the Debtors during the Sale," which rates ranged from 79% to 82%.[37]   He speculates that to avoid these risks, "it is *possible* that Debtors would have accepted an equity bid for the liquidation of the company."[38]   In fact, the record shows that in December 2018 the Debtors *rejected* the equity bids as non-conforming,[39] a fact of which Mr. Griffith conceded at deposition he was not aware.[40]   Moreover, the record shows that Debtors' counsel recommended to the Restructuring Committee that in the event Debtors pivoted to a liquidation, they should engage as liquidators Abacus and SB360—liquidators who submitted fee-based, *not* equity-based, bids projecting recoveries of 90.2%–93.7%.[41]   Mr. Griffith was present at that meeting.[42]

---

[37]     Griffith Suppl. Decl. ¶ 9.

[38]     *Id*. ¶ 11 (emphasis added).

[39]     *See* JX 17 (Project Blue—Liquidation Bids Review, at 8, December 2018) ("[B]oth equity bids provide a guaranteed payout that is significantly lower than the net recovery before liquidator fees projected to be achieved in a self-liquidation / final GOB process[.]").

[40]     Griffith Tr. 207:13–15 ("Q. So you were not aware that the equity bids were non-conforming?  A. That's right.").

[41]     *See* JX 16 (DRAFT – Minutes of the Meeting of the Restructuring Committee of the Board of Directors of Sears Holdings Corp., at 1, Jan. 5, 2019, Bates No. SEARS_UCC00413723) ("Jan. 5 Meeting Minutes"); Project Blue – Liquidation Bids Review at 3, December 2018.

[42]     *See* JX 16 (Jan. 5 Meeting Minutes, at 1).

## II.    DISCOVERY DEMONSTRATES THAT THE DEBTORS CANNOT MEET THEIR BURDEN UNDER SECTION 506(C).

45.    A debtor seeking a Section 506(c) surcharge for reasonable and necessary costs and expenses of preserving or disposing of collateral for the benefit of the creditor has the burden to prove "that its funds were expended primarily for the creditor and that the creditor directly benefited from the expenditure." *In re Flagstaff Foodservice Corp.*, 762 F.2d 10, 12 (2d Cir. 1985). "[A] debtor does not meet this burden of proof by suggesting possible or hypothetical benefits." *Id.* It is clear that the Debtors have failed to produce admissible evidence sufficient to meet such burden.

### A.    As a Threshold Matter, Mr. Griffith's Testimony Regarding Section 506(c) Matters Should Be Struck As Inadmissible Opinion and for Lack of Basis.

46.    Mr. Griffith states the remarkable view that Debtors incurred $1.451 billion of costs to maintain and preserve $2.357 worth of 2L Collateral.[43] His Original Declaration, at Paragraph 20, includes a chart parsing those costs into 11 separate categories, such as "Logistics and Supply Chain Costs," and "Utility and Telephone Expenses," each of which has its own expense amount.[44] Mr. Griffith's testimony concerning his Section 506(c) analysis should be struck, on multiple grounds.

47.    First, to the extent Mr. Griffith bases his opinion as to the 506(c) surcharge on any "specialized knowledge" he purportedly acquired through his work on the Debtors' bankruptcy or his prior experience working on other bankruptcies,[45] that opinion is inadmissible as lay opinion testimony under Federal Rule of Evidence 701(c). The analysis and determination of

---

[43]    *See* Griffith Decl. Ex. A.  As discussed supra ¶ 4, Mr. Griffith subsequently reduced this number to $2.334 billion when he decided to remove $15 million in Pharmacy Receivables.  *See* Griffith Suppl. Decl. ¶ 7.

[44]    Griffith Decl. ¶ 20.

[45]    *See* Griffith Tr. 17:10–16.

which expenses incurred by the Debtors were both for the primary benefit of the Second Lien

Creditors and reasonable and necessary to maximize the value of the 2L collateral by definition

requires "specialized knowledge," as the judgment requires experience and the concomitant

ability to assess the necessity and beneficiary of expenditures.  *See In re Sabine Oil & Gas*

*Corp.*, 555 B.R. 180, 249 (Bankr. S.D.N.Y. 2016) (rejecting under Rule 701 lay testimony of

Brandon Aebersold concerning "technical" means by which witness valued warrants at issue).

As a fact witness, Mr. Griffith is unable to testify about this issue.

48.    Second, Mr. Griffith's 506(c) analysis is not based on his personal knowledge.

Mr. Griffith admitted that his 506(c) numbers are based on an analysis consisting of a series of

after-the-fact assumptions made by Mr. Griffith and his "team."  *See* Griffith Tr. 280:19–24;

281:25–282:15.  Similarly, he stated that his colleagues participated in determining which

surcharges were necessary:

> **Q:** You talk about -- you say, 'to calculate the applicable 506(c) surcharges, M-III
> included only those charges which were reasonable and necessary and of direct and
> primary benefit to the second lienholders.' Again, who at M-III?
> **A:** Myself and the team that was working on this.
>
> **Q:** Then you say, 'To do so, M-III included only the actual expenses directly related
> to the collateral and paid through the sale date.' Again, M-II us you; is that right?
> **A.** Yes.
>
> **Q**: And your team?
> **A.** Yes.[46]

And he was unable to articulate how he came to his conclusion regarding the 506(c) surcharge

beyond that he and his team had used certain assumptions regarding the appropriate amount to be

charged.  *See* Griffith Tr. 119:17–121:11.

---

[46]    Griffith Tr. 278:18–279:9.

49.    Indeed, at least one of the cost categories—for "Professional Fees," totaling $51 million—was determined and prepared entirely by Debtors' counsel:

> **Q.** With respect to the 51 million of professional fees, I believe your testimony was that you went through the total professional fees and pulled out task codes or fees relating to task codes relating to M&A transaction; is that right?
> **A.** I didn't personally do it. But yes, that's what was done.
>
> **Q.** Who did it?
> **A.** Counsel had done this part of it.
>
> **Q.** Counsel did it. Do you know which professionals were included in this 51 million?
> **A.** It was the professionals that had time codes associated with the sales transaction, is my understanding.
>
> **Q.** Did that include Akin Gump?
> **A.** I don't know the answer to that.
>
> **Q.** Did it include Houlihan Lokey?
> **A.** I don't know the answer to that.
> . . .
> **Q.** *So you don't really, sitting here today, have any idea what makes up this 51 million except to the extent you've described*?
> **A.** *That's right*.[47]

To the extent Mr. Griffith did not personally perform the analysis that purportedly supports the 506(c) conclusions in his declaration—which he did not—he cannot reliably testify about it as he lacks the requisite personal knowledge under Federal Rule of Evidence 602.  And because there is no way to assess the basis for Mr. Griffith's opinion and because he admits that others came up with certain of his assumptions, Debtors cannot prove that Mr. Griffith's opinion concerning

---

[47]    Griffith Tr. 283:21–285:2 (emphasis added).

the appropriate 506(c) surcharge is rationally based on his perceptions. Accordingly, Mr. Griffith's opinion is inadmissible and should be struck.

50.     Third, Mr. Griffith provides no explanation of the methodology he, his team, and Debtors' counsel used to determine the expenses to include in his 506(c) surcharge analysis. At deposition, Mr. Griffith testified that his chart of 506(c) costs is merely a "summary output" of expenses that "appear to directly relate to store operations and monetization of the collateral."[48] Mr. Griffith was unable to provide any further detail on which specific expenses of the Debtors were included or excluded from his summary chart.[49] Other than pointing to his chart and testifying that he and his team identified "all necessary, reasonable expenses that were incurred to maximize the value [of the collateral]," Mr. Griffith was unable to explain how he and his team arrived at their numbers. *See* Griffith Tr. 120:17–121:3. He confirmed that there was no other written output and that the chart constituted the "entire written analysis of the amounts that [he] assume[s] from the total should be section 506(c) surcharges."[50] Thus, even if Mr. Griffith were an expert, his chart would still be improper. *See Gen. Elec. Co. v. Joiner*, 522 U.S. at 146 (where opinion "is connected to existing data only by the *ipse dixit* of the expert," the "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered"); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 270 (2d Cir. 2002) (expert testimony appropriately excluded where there was a "significant 'analytical gap'" between the opinions and data used to reach the conclusions). Mr. Griffith's inability to explain the bases for

---

[48]     Griffith Tr. 279:21–282:15.

[49]     Griffith Tr. 278:18–283:20.

[50]     Griffith Tr. 281:8–12.

and methodology behind his opinion is not helpful to clearly understanding his testimony or

determining a fact in issue.

51.    For the foregoing reasons, the Court should strike the following paragraphs of Mr.

Griffith's declarations: Griffith Declaration paragraphs 18–23; Griffith Supplemental Declaration

paragraphs 18–25; and any similar testimony he purports to offer in his written direct testimony

and at trial.

**B.    Any Amounts That Could Be Appropriately Surcharged Against The Second
Lien Collateral Have Already Been Taken Into Account By the Second Lien
Parties' Experts As Part Of Their Valuations.**

52.    As discussed above, the Second Lien Parties' experts' valuation methodologies

already took into consideration the purported costs that Mr. Griffith claims they ignored.

Namely, (i) Mr. Schulte chose to use the Debtors' book value of inventory going forward—

which takes into consideration all of the direct costs necessary to sell and maintain the inventory

during these cases;[51] (ii) Mr. Henrich used a similar approach to Mr. Schulte's but on a look

forward basis uses the Debtors' gross margin projections to determine gross revenues; he then

deducted from those revenues both store level costs of $457.2 million and a 5% attribution of

general corporate overhead;[52] and (iii) Ms. Murray starts with the borrowing base that already

significantly discounts the overall collateral base and then applies the equally conservative net

orderly liquidation value assumptions, even though significant portions of the inventory

continued to be sold at retail prices through go forward stores.[53]  As a result of Ms. Murray's

---

[51]    *See* Schulte Rep. at 11–12.

[52]    *See* Henrich Rep. at 5 ("For ongoing stores, I used a metric based on my experience in the retail
sector. Rather than the 3.1% of inventory cost used for the GOB's, I have used a much larger amount to
represent the greater costs of operating a going concern.  In this instance, I have used 5% of gross sales as
the corporate expense component to support the ongoing operations.  This corporate overhead amount
totals $135.5 million.")

[53]    *See Expert Report of Marti P. Murray* ¶¶ 43, 74, Jun. 18, 2019 (Dkt. No. 4505) ("Murray Rep.").

conservative approach, Mr. Griffith implicitly acknowledged that his proposed Section 506(c)

surcharge does not apply to Ms. Murray's analysis by admitting he did not include any expenses

related to GOB stores because such "expenses would be captured as part of the NOLV on the

GOBs that were in process." Griffith Tr. 118:7–24. Accordingly, Mr. Griffith's criticisms about

the Second Lien Parties' experts' purported failure to consider the costs associated with selling

the 2L Collateral are inapt and irrelevant.

### C.    Both of Debtors' Witnesses Conceded A Going Concern Sale Was Not Necessary to Dispose of the Second-Lien Collateral.

53.    Notably, both of Debtors' witnesses conceded at deposition that Debtors could

have disposed of the 2L Collateral without engaging in a going concern sale. For example, Mr.

Aebersold stated:

> **Q.** Would you agree that a going concern sale was not the only way for the company to dispose of inventory?
> **A.** I would agree with that.
>
> **Q.** Would you agree that a going concern sale was not the only way to dispose of receivables?
> **A.** A going concern sale wasn't the only alternative.[54]

Mr. Griffith did not disagree.[55] Thus, the $1.451 billion of costs claimed by Mr. Griffith, which

are the costs of basically getting to a going concern sale, were not "necessary" as required under

Section 506(c).

### D.    Debtors Improperly Seek to Surcharge the Costs of the Entire Going Concern Sale, Which Involved Far More than the Second-Lien Collateral.

54.    In his Supplemental Declaration, Mr. Griffith stated that "the Debtors incurred

$1.451 billion in administrative expenses in their efforts to preserve the value of the Second-Lien

---

[54]    Aebersold Tr. 76:21–77:5.

[55]    *See* Griffith Tr. 231:8–12 (Q. Could the company have sold the 2L collateral without engaging in a going concern sale? [Objection] A. It's possible.).

Holders' Collateral."[56]  But Mr. Griffith also states, in the very same paragraph, that his $1.451

billion calculation "reflects [] the Debtors' the rigorous sale process and efforts to sell the

company as a going concern."[57]  The "rigorous process" of the going concern sale to ESL, of

course, involved a *$5.2 billion* transaction that included the sale of not just the 2L Collateral, but

numerous additional assets having nothing to do with the 2L Collateral as Mr. Griffith admitted

in his deposition.  *See* Griffith Tr. 231:17–22.  Although at his deposition Mr. Griffith conceded

that the costs of getting to a going concern sale exceeded the costs of preserving the 2L

Collateral, Mr. Griffith nonetheless stated that he "believe[s] a surcharge of 1.451 billion should

be applied to whatever the diminution in value of the Second Lien collateral is."[58]  Mr. Griffith's

belief that the Second Lienholders should be surcharged the costs of a going concern sale—

which exceeded the costs of preserving the $2.3 billion worth of collateral—is improper and

blatantly contrary to Section 506(c).

  **E.**  **The Second Lien Parties Are Not the Primary Beneficiaries of the Sale Transaction.**

  55.  The Debtors' argument with respect to their asserted Section 506(c) surcharge

cannot succeed unless they show that, of all of the many stakeholders involved, including many

with junior priority interests, it was the Second Lien Debt that primarily and directly benefitted

from the Sale Transaction.  The Debtors have not even begun to meet their burden of proof on

this issue.  *See Common Mem. of Law on Behalf of the Second Lien Parties* § II.A, June 18, 2019

---

[56] Griffith Suppl. Decl. ¶ 18.

[57] Griffith Suppl. Decl. ¶ 18.

[58] Griffith Tr. 234:12–16 ("Q. My question was, you believe a surcharge of 1.451 billion should be applied to whatever the diminution in value of the 2L collateral is, correct? A. Yes.").

(Dkt. No. 4272) ("Common Mem."); *Common Reply Mem. on Behalf of the Second Lien Parties* § II, July 3, 2019 (Dkt. No. 4439) ("Common Reply Mem.").

56.    *First*, Mr. Griffith acknowledged that as a result of the Sale Transaction, senior debtholders were repaid, employees kept their jobs, and substantial benefits were given to creditors with priority below that of the Second Lien Holders. *See* Griffith Tr. 159:2–160:23. Indeed, he acknowledged that:

- Pre-petition unsecured creditors will receive an additional $534 million (excluding recoveries on account of accrued claims);

- ESL will pay for material administrative claims of the Debtors' estates;

- Nearly all proceeds of the Debtors' preserved litigation claims will inure to the benefit of non-insider creditors, in exchange for a limited release; and

- NewCo will extend offers of employment to at least 45,000 of Debtors' employees.[59]

57.    *Second*, the Debtors' arguments as to the actual benefit received by the Second Lien Parties are belied by simple math. The aggregate value of the Sale Transaction was approximately $5.2 billion—only a fraction of which constituted the Second Lien Parties' approximately $433 million credit bid. Mr. Griffith similarly acknowledged that other parties received value through the Sale Transaction. *See* Griffith Tr. 160:19–23 ("Q. Now, so the benefits of this transaction went far beyond the benefits to the second lien holders, right? A. According to this, there were other parties that had benefit."); *id.* 162:7–10 ("Q. Are you claiming that this was really done for the benefit of the 2Ls? A. It was certainly part of the reason.").

---

[59]    *See* Griffith Tr. 159:2–160:23

58.    *Finally*, the Debtors' argument that the Second Lien Parties primarily benefitted

from the Sale Transaction simply because they credit bid a portion of the Second Lien Debt has

no support in fact or law.  Even if this were true—which it is not—it would seriously undermine

the protections granted to secured creditors under Section 363(k).  *See Suppl. Mem. of Law On*

*Behalf of ESL Investments, Inc.* 13, Jun. 18, 2019 (Dkt. No. 4273) ("ESL Suppl. Mem.").

## III.    AMOUNT REQUIRED TO BE TRANSFERRED FROM THE WIND-DOWN ACCOUNT TO ACCOUNT FOR DIMINUTION IN VALUE OF THE SECOND LIEN COLLATERAL.

59.    Since April 4, 2019, the date upon which the Second Lien Parties were granted a

replacement lien on the Wind-down Account as a result of the Debtors' substantial and ongoing

spenddown of the Second Lien Parties' collateral,[60] the Debtors have continued to consume the

Second Lien Parties' cash collateral.  The diminution in the amount of this collateral should be

recognized as a lien and those funds should now be turned over to the Second Lien Parties from

the Wind-down Account in accordance with the Agreed Cash Collateral Stipulation.[61]

---

[60]    As this Court is aware, the Agreed Cash Collateral Stipulation was so ordered following the filing of *Wilmington Trust's Motion to Prohibit or Condition Debtors' Continued Use of Collateral, Including Cash Collateral*, (Dkt. No. 3050) ("Wilmington Motion"), which was joined by ESL and Cyrus forming the basis for the request of a transferred amount from the Wind-Down Account.  *See Joinder of ESL Investments, Inc. to Motion of Wilmington Trust, National Association, as Indenture Trustee and Collateral Agent to Prohibit or Condition Debtors' Continued Use of Collateral, Including Cash Collateral,* Apr. 11, 2019 (Dkt. No. 3134)*; Joinder of Cyrus Capital Partners, L.P. to Motion of Wilmington Trust, National Association, as Indenture Trustee and Collateral Agent to Prohibit or Condition Debtors' Continued Use of Collateral, Including Cash Collateral*, Apr. 11, 2019 (Dkt. No. 3142).  The Second Lien Parties refer the Court to the referenced pleadings for additional information forming the basis for this argument.

[61]    The so-ordered *Stipulation and Order Concerning Debtors' Use of Cash Collateral* (Dkt. No. 4287) (the "Agreed Cash Collateral Stipulation"), provides that "the Prepetition Second Lien Collateral Agent, on behalf of itself and the other Prepetition Second Lien Credit Parties, shall be granted a Prepetition Second Lien Adequate Protection Lien solely to the extent of the Interim Second Lien Diminution in Value (as defined below) on the Wind-Down Account if, and only if, the Court determines any Second Lien Diminution in Value has occurred between [April 4, 2019] and the date of the Determination."  JX 29 (Agreed Cash Collateral Stipulation ¶ 2).

60.    The amount of Second Lien Parties' adequate protection claims pursuant to Section 507(b) of the Bankruptcy Code will be determined as follows:  the total amount of secured 2L debt, minus the 2L credit bid ($433,450,000), minus the amount they receive from the Wind-down Account and minus any amount available from collateral pledged to support the Second Lien Parties' adequate protection liens granted pursuant to the Interim and Final DIP Orders.  As of June 22, 2019, the Debtors estimated that the Wind-Down Account held approximately $53 million.  *Disclosure Statement for Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors* at 4, July 9, 2019 (Dkt. No. 4478).  The diminution in value of the Second Lien Parties' collateral from April 4, 2019 through July 20, 2019 is approximately $39 million.[62]  *See* Schulte Declaration, filed herewith. Accordingly, the $39 million must be transferred from the Wind-Down Account for the benefit of the Second Lien Parties.

## CONCLUSION

For the reasons set forth above, the Second Lien Parties respectfully request that the Court determine their Section 507(b) Claims and their secured claims in amounts to be determined at the hearing, deny the Debtors' request for a Section 506(c) surcharge, and grant other such relief as it deems just and proper.

---

[62]    The Second Lien Collateral is estimated to diminish by another $71 million from July 21, 2019 through December 31, 2019, leading to a total reduction of $110 million in the value of the Second Lien Collateral since April 4, 2019 and nothing herein limits the Second Lien Parties' ability to recover on account of such additional diminution in value.  As further detailed in the Schulte Declaration filed contemporaneously herewith, certain of these amounts are based on the Debtors' weekly forecasting.  In relying on those figures, which include amounts that the Debtors expect to recover from Transform, ESL is not conceding any of its rights with respect to the pending adversary proceeding relating to the Asset Purchase Agreement between the Debtors and Transform, and ESL and its affiliates reserve all rights in respect thereof.  Nor is ESL waiving any right to object to the expenditure of these funds to the extent they are 2L Collateral.

Dated:    New York, New York
          July 18, 2019


CLEARY GOTTLIEB STEEN &             MILBANK LLP
HAMILTON LLP

By:  *Thomas J. Moloney*                By:  *Eric R. Reimer*
     Thomas J. Moloney                       Eric R. Reimer (admitted pro hac vice)
     Sean A. O'Neal                          Thomas R. Kreller (admitted pro hac vice)
     Andrew Weaver                           Robert J. Liubicic
     Katherine R. Lynch
     Chelsey Rosenbloom                      *Attorneys for Cyrus Capital Partners, L.P.*
                                             2029 Century Park East, 33rd floor
     *Attorneys for ESL*                     Los Angeles, CA  90067
     One Liberty Plaza
     New York, NY 10006
     Telephone:  (212) 225-2000
     Facsimile:  (212) 225-3999



SEYFARTH SHAW LLP


By:  *Edward M. Fox*
     Edward M. Fox
     Steven Paradise
     Owen Wolfe

     *Attorneys for Wilmington Trust,*
     *National Association, as indenture*
     *trustee and collateral agent*
     620 Eighth Avenue
     New York, NY 10018
     Direct Dial:  (212) 218-4646
     Direct Fax:  (917) 344-1339