Edward M. Fox
Steven Paradise
Owen Wolfe
Seyfarth Shaw LLP
620 Eighth Avenue
New York, New York 10018
Phone: 212-218-5500
Fax: 212-218-5526
Email: emfox@seyfarth.com

*Attorneys for Wilmington Trust, National Association,*
*as indenture trustee and collateral agent*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SEARS HOLDINGS CORPORATION, *et al.,* | ) | Case No. 18-23538 (RDD) |
|  | ) |  |
|  | ) | (Jointly Administered) |
| Debtors.[1] | ) |  |

---

**SUPPLEMENTAL MEMORANDUM OF LAW OF WILMINGTON TRUST,
NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE AND
COLLATERAL AGENT, (I) IN SUPPORT OF MOTION PURSUANT TO
BANKRUPTCY RULE 3012 FOR DETERMINATION OF
AMOUNT OF SECURED CLAIM PURSUANT TO 11 U.S.C. § 506(a) AND
AMOUNT OF CLAIM ENTITLED TO PRIORITY PURSUANT TO 11 U.S.C. § 507(b)
AND (II) IN OPPOSITION TO DEBTORS' MOTION PURSUANT TO 11 U.S.C. § 506(c)**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365) (collectively, the "Debtors").  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

# TABLE OF CONTENTS

Page(s)

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 3

    The 2010 Notes ................................................................................................... 3

    The Security Agreement ...................................................................................... 3

    The Bankruptcy Filing ........................................................................................ 5

    Use of Cash Collateral and Adequate Protection................................................ 5

ARGUMENT .............................................................................................................. 7

I.     DETERMINATION OF AMOUNT OF SECURED CLAIM AND
       SUPERPRIORITY CLAIM............................................................................7

      A.    The Prepetition Second Lien Credit Parties, Including The Prepetition
            Second Lien 2010 Notes Holders, Are Entitled To A Superpriority
            Claim...............................................................................................................11

II.    DEBTORS DO NOT MEET THE HEAVY BURDEN OF SEEKING
       RECOVERY OF EXPENSES UNDER SECTION 506(C) ..............................14

      A.    The Expenditures Must Have Been Reasonable and Necessary..........................16

      B.    Debtors' Sale of Inventory Did Not Primarily Benefit Wilmington Trust
            and Debtors Failed to Properly Identify the Expenses Pertinent to
            Wilmington Trust ............................................................................................17

III.   AT A MINIMUM, THE SALE EXPENSES SHOULD BE PRORATED
       AMONG ALL PARTIES WHO DIRECTLY BENEFITTED FROM THE
       SALE...............................................................................................................19

JOINDER ................................................................................................................. 20

CONCLUSION.......................................................................................................... 21

57501810v.1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

Associates Com'l Corp. v. Rash,
    520 U.S. 953, 117 S. Ct. 1879, 138 L. Ed. 2d 148 (1997)...................................................7, 13

In re Bailey Tool & Mfg. Co.,
    No. 16-30503-BJH, 2018 WL 550581 (Bankr. N.D. Tex. Jan. 23, 2018).............................11

In re Blackwood Assocs., L.P.,
    153 F.3d 61 (2d Cir. 1998)...................................................................................................11

In re Ceron,
    412 B.R. 41 (Bankr. E.D.N.Y. 2009)......................................................................15, 16, 17

In re Croton River Club, Inc.,
    162 B.R. 656 (Bankr. S.D.N.Y. 1993).............................................................................14, 15

Dewsnup v. Timm,
    502 U.S. 410 (1992)...............................................................................................................8

In re Emons Indus., Inc.,
    50 B.R. 692 (Bankr. S.D.N.Y. 1985)....................................................................................14

In re Fiberglass Indus., Inc.,
    74 B.R. 738 (Bankr. N.D.N.Y. 1987) ..............................................................................15, 16

In re Flagstaff Foodservice Corp.,
    762 F.2d 10 (2d Cir. 1985)...........................................................................................15, 16, 17

General Elec. Credit Corp. v. Levin & Weintraub (In re Flagstaff Foodservice
Corp.),
    739 F.2d 73, 10 C.B.C.2d 1309, 1312-14 (2d Cir. 1984) ...............................................14, 18

In re Kohl,
    421 B.R. 115 (Bankr. S.D.N.Y. 2009) ................................................................................15

In re Lorick,
    No. 1-16-45645-NHL, 2018 WL 3854139 (Bankr. E.D.N.Y. Aug. 9, 2018).........................15

In re Mary Holder Agency, Inc.,
    No. 11-34280 MBK, 2012 WL 4434362 (Bankr. D.N.J. Sept. 24, 2012) ..............................11

In re Motors Liquidation Co.,
    576 B.R. 325 (S.D.N.Y. 2017).............................................................................................7

In re Muncy,
   No. 09 17583, 2010 Bankr. LEXIS 1718 (Bankr. S.D. Ohio June 4, 2010)............................7

In re Parque Forestal, Inc.,
   949 F.2d 504 (1st Cir. 1991), overruled on other grounds ....................................................19

In re Residential Capital, LLC,
   501 B.R. 549 (Bankr. S.D.N.Y. 2013) .........................................................................8, 11, 12

In re Sabine Oil & Gas Corp.,
   547 B.R. 503 (Bankr. S.D.N.Y. 2016) .................................................................................8, 12

Urban Communicators PCS Ltd. P'ship v. Gabriel Capital, L.P.,
   394 B.R. 325 (S.D.N.Y. 2008)...................................................................................................8

In re Wiltwyck Sch.,
   34 B.R. 270 (Bankr. S.D.N.Y. 1983) ......................................................................................18

**Statutes**

11 U.S.C.A. § 506 .........................................................................................................................14

11 U.S.C. § 50(b) ...........................................................................................................................11

11 U.S.C. § 363(a) ...........................................................................................................................4

11 U.S.C. § 503(b)(9) .......................................................................................................................3

*11 U.S.C. § 506(a)* .................................................................................................................1, 3, 7

11 U.S.C. § 506(a)(1) .......................................................................................................................7

11 U.S.C. § 506(b) ............................................................................................................................2

*11 U.S.C. § 506(c)* ..................................................................................1, 14, 15, 16, 17, 18, 19

11 U.S.C. § 507(a) ............................................................................................................................3

11 U.S.C. § 507(b) ...........................................................................................................1, 3, 11, 12

*11 U.S.C. § 507(b) and (II)* ...........................................................................................................1

U.S.C. title 11 Chapter 11 ................................................................................................................4

Bankruptcy Code sections 502(d), 544, 546, 547, 548, 549, 550 and 553 .....................................6

Bankruptcy Code sections 1107(a) and 1108 ..................................................................................5

**Other Authorities**

*Bankruptcy Rule 3012* ....................................................................................................1

Fed. R. Bankr. P. 3012 ....................................................................................................1

Final DIP Order ¶13. DIP ABL ......................................................................................5

Local Bankruptcy Rules Rule 1007-2..............................................................................9

Order Concerning the Resolution of Certain Section 507(b)............................................1

57501810v.1

Wilmington Trust, National Association, as indenture trustee and collateral agent ("Wilmington Trust"), by and through its undersigned counsel, hereby files this *Supplemental Memorandum of Law of Wilmington Trust, National Association, as Indenture Trustee and Collateral Agent, (I) In Support of Motion Pursuant to Bankruptcy Rule 3012 for Determination of Amount of Secured Claim Pursuant to 11 U.S.C. § 506(a) and Amount of Claim Entitled to Priority Pursuant to 11 U.S.C. § 507(b) and (II) In Opposition to the Debtors' Motion Pursuant to 11 U.S.C. § 506(c)*[2] (this "Memo of Law"), and in support thereof states as follows:

## INTRODUCTION

Although the Debtors acknowledge in the Rule 3012 Motion[3] that the determination of the amount the secured claim of the Prepetition Second Lien Credit Parties (the "Secured Claim") pursuant to 11 U.S.C. § 506(a) and the amount of their administrative expense claim for diminution in value of their Secured Claim with priority over all other administrative expense claims pursuant to 11 U.S.C. § 507(b) (a "Superpriority Claim") must be based on the use of the Prepetition Second Lien Collateral, the Debtors completely misapply the standards that they acknowledge should be used when calculating such amounts.

Based on the valuation standards the Debtors say should apply, the Prepetition Second Lien Credit Parties, including the Prepetition Second Lien 2010 Notes Holders, were fully secured at the Petition Date and are entitled to a Superpriority Claim pursuant to 11 U.S.C. § 507(b) in the full amount of the Prepetition Second Lien Obligations of $1,163,886,222.97

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Common Memorandum of Law on Behalf of the Second Lien Parties in Support of Their Requests to Determine the Amount of Their Secured Claims Under Section 506(a) and Their Section 507(b) Administrative Claims Pursuant to Bankruptcy Rule 3012; and In Opposition to Debtors' Motion to Surcharge Their Collateral Pursuant to Section 506(c) (the "Common Brief").

[3] Pursuant to the Stipulation and Order Concerning the Resolution of Certain Section 507(b) Claims (the "Stipulation") [see Dkt. No. 4102 at 5-9], the Debtors agreed to withdraw The Debtors' Motion to Estimate Certain 507(b) Claims for Reserve Purposes (the "Rule 3012 Motion") [Dkt. No. 4034] insofar as it sought estimation, and deem the Rule 3012 Motion a motion pursuant to Fed. R. Bankr. P. 3012 and 11 U.S.C. § 506(c).

1

(based on proof of claim amounts) as set forth in notes 9, 10 and 11 herein, net of the $433.5 million amount of the credit bid for inventory (the "Credit Bid") made in connection with the purchase of the Debtors' assets (the "Sale Transaction") by Transform Holdco LLC ("Transform").

The Debtors claim that their inventory is easily valued based on the Debtors' sale history because the inventory has already been sold. Nevertheless, the Debtors completely ignore that history during the first four months of the case and assert, instead, that because the Credit Bid was agreed to by the Debtors at 85% (of book value,[4] presumably), the Debtors' Inventory at the Petition Date should also be valued at 85% of book value. For four months commencing on the Petition Date, however, the Debtors ran their businesses as a going concern and sold their inventory at retail in their going concern stores (the "Going Concern Stores") at a 29% gross margin. Even at their going out of business stores (the "GOB Stores"), the Debtors sold their inventory at 96.4% of book value net of store operating liquidation expenses, which is significantly higher than the 85% of book value[5], asserted in the Griffith May Dec'l[6], which was sworn to after those sales had been completed. Thus, the Debtors significantly understate the value of their inventory at the Petition Date, leading them to understate the amount of the Superpriority Claim owing to the Prepetition Second Lien Credit Parties.

Moreover, the Debtors assert an entitlement pursuant to 11 U.S.C. § 506(c) to recover costs allegedly extended to preserve the value of the inventory, even though they fail to establish that such costs directly benefitted the Collateral, and could have sold the inventory on the first day of the case for more than 85% of its book value without incurring any costs to preserve it.

---

[4] The lower of cost or market.

[5] It is not clear if Debtors' 85% figure is gross or net, but it is presumably a gross number since the Debtor seeks to surcharge the collateral pursuant to 506(c).

[6] Declaration of Brian J. Griffith in Support of the Debtors' Motion to Estimate Certain 507(b) Claims for Reserve Purposes, sworn to May 26, 2019 (the "Griffith May Dec'l") [Dkt. No. 4035].

2

Moreover, the Debtors overallocate and misallocate costs of the bankruptcy case to the

inventory, despite the fact that all other creditor constituencies, including creditors secured by

collateral other than inventory, administrative claimants pursuant to 11 U.S.C. § 503(b)(9), and

unsecured creditors, all benefitted from these alleged expenses of preservation of the Debtors'

estates.

## **BACKGROUND**

### The 2010 Notes

Pursuant to an indenture dated as of October 12, 2010 (as amended from time to time, the

"2010 Indenture") between Sears Holdings Corporation ("Sears"), the Guarantors Party thereto

(the "Guarantors")[7] and Wells Fargo Bank, National Association ("Wells Fargo"), as trustee and

collateral agent, Sears issued the 6-5/8 Senior Secured Notes due 2018 (the "Second Lien

Notes").

Pursuant to an Instrument of Resignation, Appointment, and Acceptance dated as of June

25, 2014, by and among Sears, Wilmington Trust and Wells Fargo, Wilmington Trust became

the successor indenture trustee (the "Prepetition Second Lien Notes Trustee") with respect to the

Second Lien Notes.

### The Security Agreement

Pursuant to the Amended and Restated Security Agreement dated as of March 20, 2018,

(the "Security Agreement") among Sears, the Guarantors and Wilmington Trust, as collateral

agent (the "Prepetition Second Lien Collateral Agent"), the Prepetition Second Lien Collateral

---

[7] Twenty-eight subsidiaries of Sears Holdings Corporation were Guarantors of the Second Lien Notes and grantors under the Security Agreement (as hereinafter defined) as of the Petition Date.  See accompanying Request of Wilmington Trust, National Association, as Indenture Trustee and Collateral Agent for Payment of Administrative Expense Pursuant to 11 U.S.C. § 503(b) with Priority Over All Other Administrative Expenses Pursuant to 11 U.S.C. § 507(b) and for Allowance of Secured Claim to the Extent of Remaining Collateral Pursuant to 11 U.S.C. § 506(a) (the "Administrative Expense Claim") filed contemporaneously herewith  by Wilmington Trust.

57501810v.1

Agent holds a security interest in the Collateral[8] (as defined in the Security Agreement),

including Cash Collateral (as defined in 11 U.S.C. § 363(a)), to secure repayment of (i) the fees

and expenses of the Second Lien Collateral Agent, (ii) the fees and expenses of the Second Lien

Credit Facility Agent and the Second Lien Trustees, (iii) the Second Lien Credit Facility

Claims,[9] and the Second Lien PIK Notes,[10] and (iv) the Second Lien Notes.[11]  The security

interest in the Collateral was perfected as set forth in Exhibit 1 to the Administrative Expense

Claim.

---

[8] Section 2.1 of the Security Agreement states:

> 2.1  <u>Collateral; Grant of Security Interest</u>.  Each Grantor hereby grants to the Collateral Agent for the equal and ratable benefit of the Secured Parties a security interest in all of the following property now owned, or at any time hereafter acquired, by such Grantor or in which such Grantor now has, or at any time in the future may acquire, any right, title or interest (collectively, the "<u>Collateral</u>"), as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of such Grantor's Secured Obligations:

> (a)  all Credit Card Accounts Receivable;

> (b)  all Inventory;

> (c)  all Chattel paper relating to Credit Card Accounts Receivable;

> (d)  all Instruments relating to Credit Card Accounts Receivable;

> (e)  all Documents relating to any Inventory;

> (f)  all books and records pertaining to the Collateral; and

> (g)  to the extent not otherwise included, all Proceeds, insurance claim, Supporting Obligations and products of any and all of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing.

[9] Pursuant to the Proofs of Claim filed by JPP, LLC executed December 24, 2018 and filed with Prime Clerk LLC, on January 4, 2019, the Second Lien Credit Facility Claims totaled $890,683,112.72 at the Petition Date.

[10] Pursuant to Proofs of Claim filed by Computershare Trust Company, N.A., as Indenture Trustee for the Second Lien PIK Notes executed April 1, 2019 and filed with Prime Clerk LLC on April 21, 2019, the amount due and owing on the Second Lien PIK Notes totaled $181,252,919 at the Petition Date.

[11] Pursuant to Proofs of Claim filed by Wilmington Trust, as Indenture Trustee and Collateral Agent for the Second Lien Notes executed February 20, 2019 and electronically filed on the Bankruptcy Court's Claims Register on February 20, 2019, see, e.g., Claim No. 64-1, the amount due and owing on the Second Lien Notes totaled $91,950,191.25 at the Petition Date.

## The Bankruptcy Filing

On October 15, 2018 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under Chapter 11 of title 11, U.S.C. in the United States Bankruptcy Court for the Southern District of New York, (the "Bankruptcy Court").

The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## Use of Cash Collateral and Adequate Protection

On November 30, 2018, pursuant to the Debtors' Motion for Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections to Prepetition Secured Parties; and (D) Schedule Second Interim Hearing and Final Hearing, dated October 15, 2018 [Dkt. No. 7] (the "DIP Financing Motion"), the Bankruptcy Court entered the Final DIP Order.

As adequate protection of the interest of the Prepetition Second Lien Credit Parties, the Final DIP Order provides:

> Pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Second Lien Credit Parties in the Prepetition Second Lien Collateral, against the aggregate net diminution in value, if any, resulting from the DIP ABL Loan Parties' use, sale or lease (or other decline in value to the extent permitted under the Bankruptcy Code) of such collateral, the imposition of the automatic stay, the priming of the Prepetition Second Lien Facilities Liens and the subordination to the Carve-Out (collectively, the Second Lien Diminution in Value," and, collectively with the ABL Diminution in Value, the 2018 FILO ABL Diminution in Value and the Prepetition LC ABL Diminution in Value, the "Diminution in Value"), each Prepetition Second Lien Loan Party, pursuant to the Interim Order, granted and hereby grants to the Prepetition Second Lien Collateral Agent on behalf of itself and the other Prepetition Second Lien Credit Parties to the Extent of any applicable Second Lien Diminution in Value, if any, a valid and perfected replacement and additional security interest in, and liens on (the "Prepetition Second Lien Adequate Protection Liens," and together with the Prepetition ABL Facilities Adequate Protection Liens, the 2018 FILO Adequate Protection Liens, and the Prepetition LC Facility Adequate

5

Protection Liens, the "<u>Adequate Protection Liens</u>") all DIP ABL
Collateral[12] owned by the Prepetition Second Lien Loan Parties.

Final DIP Order ¶17(d).

As additional adequate protection of the interests of the Prepetition Second Lien Credit

Parties, the Final DIP Order also provides:

> Pursuant to section 507(b) of the Bankruptcy Code, as adequate
> protection of the interests of the Prepetition Second Lien Credit
> Parties in the Prepetition Second Lien Collateral, including any
> Cash Collateral, on behalf of itself and the other Prepetition
> Second Lien Credit Parties, the Prepetition Second Lien Collateral
> Agent, pursuant to the Interim Order, was granted an allowed
> administrative claim against the Prepetition Second Lien Loan
> Parties' estates under section 503(b) of the Bankruptcy Code with
> superpriority pursuant to Section 507(a) and (b) of the Bankruptcy
> Code to the extent of any Second Lien Diminution in Value (the
> "<u>Prepetition Second Lien Facilities Adequate Protection Claims</u>,"
> and together with the Prepetition ABL Adequate Protection
> Claims, the Prepetition 2018 FILO Adequate Protection Claims,
> and the Prepetition LC Facility Adequate Protection Claims, the
> "<u>Adequate Protection Claims</u>") to the extent that the Prepetition
> Second Lien Adequate Protection Liens are insufficient to protect
> the Prepetition Second Lien Credit Parties' interests in the
> Prepetition Second Lien Collateral . . . .  Except as set forth herein,
> the Prepetition Second Lien Facilities Adequate Protection Claims
> shall have priority over all administrative expense claims and
> priority general unsecured claims against the Prepetition Second
> Lien Loan Parties or their estates, now existing or hereafter arising,
> to the fullest extent permitted under the Bankruptcy Code . . . .

Final DIP Order ¶ 18(d).

On or about February 11, 2019, the Debtors closed on the Sale Transaction with

Transform and sold substantially all of their assets to Transform.  Even after the closing of the

---

[12] "DIP ABL Collateral" is defined to mean "Prepetition ABL Collateral and all other assets of the DIP ABL Loan
Parties, whether now owned or hereafter acquired, and all proceeds thereof, including all deposit accounts, securities
accounts, cash and cash equivalents of the DIP ABL Loan Parties . . . ."  Final DIP Order ¶13.  DIP ABL Collateral
includes the proceeds of "the DIP ABL Loan Parties' Claims and causes of action arising under sections 502(d),
544, 546, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any other avoidance or similar action under the
Bankruptcy Code or similar state law (the "Avoidance Actions").  <u>Id.</u> ¶ 13 (ii).

6

Sale Transaction, the Debtors continued to spend the Cash Collateral securing the Prepetition

Second Lien Obligations after the Approved Budget annexed to the Final DIP Order had expired.

## ARGUMENT

### I.    DETERMINATION OF AMOUNT OF SECURED CLAIM AND SUPERPRIORITY CLAIM

The starting point for the determination of a creditor's secured claim or its superpriority

claim is the value of the Debtors' collateral at the Petition Date.

The Bankruptcy Code provides that

> An allowed claim of a creditor secured by a lien on property in
> which the estate has an interest, or that is subject to setoff under
> section 553 of this title, is a secured claim to the extent of the value
> of such creditor's interest in the estate's interest in such property,
> or to the extent of the amount subject to setoff, as the case may be,
> and is an unsecured claim to the extent that the value of such
> creditor's interest or the amount so subject to setoff is less than the
> amount of such allowed claim.  Such value shall be determined in
> light of the purpose of the valuation and of the proposed
> disposition or use of such property, and in conjunction with any
> hearing on such disposition or use or on a plan affecting such
> creditor's interest.

11 U.S.C. § 506(a)(1).

As the Supreme Court has explained "As we comprehend § 506(a), the "proposed

disposition or use of the collateral is of paramount importance to the valuation question."

Associates Com'l Corp. v. Rash, 520 U.S. 953, 962, 117 S. Ct. 1879, 1885, 138 L. Ed. 2d 148

(1997) ("The Debtor in this case elected to use the collateral to generate an income stream.  That

actual use, rather than a foreclosure sale that will not take place, is the proper guide under a

prescription hinged to the property's 'disposition or use.'"  Id. 520 U.S. at 963, 117 S. Ct. at

1886); In re Motors Liquidation Co., 576 B.R. 325, 423 (S.D.N.Y. 2017) ("The Supreme Court

has emphasized that 'actual use, rather than a foreclosure sale' or some other event 'that will not

take place, is the proper guide' in valuing collateral." Quoting Assocs. Commercial Corp. v.

7

Rash, 520 U.S. 953, 954 (1997)); see In re Muncy, No. 09 17583, 2010 Bankr. LEXIS 1718, at

*6-8 (Bankr. S.D. Ohio June 4, 2010) ("Forced sale or liquidation value is inappropriate where

the debtor proposes to retain and use the collateral being valued.  A going concern value has

been used instead.  While a forced sale standard for appraising collateral may comport with the

economic realities in a liquidation case, that standard may be altogether unsuitable in

circumstances where the collateral consists of inventory and accounts receivable, the debtor

continues to operate, and reasonable prospects persist that the debtor can continue to generate

and collect accounts receivable and replace inventories in the ordinary course of business.")

(quoting Bankruptcy Service, L. Ed. § 6A:9).  In other words, use of liquidation value for

purposes of valuing collateral, when liquidation was not contemplated, as the Debtors attempt

here, is improper.

Rather, "[W]here collateral was actually sold during the pendency of the case (and where

the terms of the sale were fair and arrived at on an arm's-length basis), the actual sale price

should be used to measure the property's value, as contrasted to some 'earlier hypothetical

valuation.'"  Urban Communicators PCS Ltd. P'ship v. Gabriel Capital, L.P., 394 B.R. 325, 336

(S.D.N.Y. 2008) (recognizing foregoing principle is consistent with Dewsnup v. Timm, 502 U.S.

410, 417 (1992), in which the Supreme Court stated that "[a]ny increase over the judicially

determined valuation during bankruptcy rightly accrues to the benefit of the creditor, not to the

benefit of the debtor and not to the benefit of other unsecured creditors"); In re Residential

Capital, LLC, 501 B.R. 549, 593 (Bankr. S.D.N.Y. 2013) ("the proper valuation methodology

must account for the proposed disposition of the collateral." Id.)  "Where, as here, an asset is

sold in an arm's-length transaction, the fair market value of such asset is conclusively

determined by the price paid."  In re Residential Capital, LLC, 501 B.R. at 603; In re Sabine Oil

& Gas Corp., 547 B.R. 503, 578 (Bankr. S.D.N.Y. 2016).

8

Here, on the Petition Date, the Debtors operated 687 retail stores. Riecker Dec'l[13] ¶ 25. Of those, the Debtors identified 142 that required prompt closure, Riecker Dec'l ¶ 96, with the inventory to be liquidated at Store Closing Sales (as defined in the Riecker Dec'l). Riecker Dec'l ¶ 92. The remaining 545 stores[14] (less any additional GOB Stores, the "Going Concern Stores") continued to operate in the ordinary course of business, selling the Inventory at retail. This was consistent with the statement of Robert Riecker, the Chief Financial Officer of Sears Holdings Corporation, that "The Debtors believe that there is a viable path forward for a reorganization around a smaller footprint of profitable stores." Riecker Dec'l ¶ 15.

To that end, in order to support the Debtors' operations as a going concern, the Debtors obtained debtor in possession financing from their first lien lenders in the amount of $1,830,378,380, Final DIP Order at 2, which included $300 million of new money, and obtained an additional $350 million of junior debtor-in-possession financing from Cyrus Capital LLC. Final Junior DIP Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing and (B) Grant Secured Priming Liens and Superpriority Administrative Expense Claims; (II) Modifying the Automatic Stay; and (III) Granting Related Relief at 2 [Dkt. No. 1436]. The Debtors also sought and obtained numerous orders to enable them to continue their business in the ordinary course, including an Order Authorizing Debtors to (I) Maintain and Administer Prepetition Customer Programs, Promotions, and Practices, and (II) Pay and Honor Related Prepetition Obligations, [Dkt. No. 135].

For almost four months after the Petition Date, the Debtors operated their retail business at their Going Concern Stores in the ordinary course. According to the Debtors' Rolling Cash

---

[13] Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York executed October 15, 2018 (the "Riecker Dec'l") [Dkt. No. 3].

[14] The Debtors announced a second wave of 40 store closings on November 8, 2018 [Dkt. No. 516] and a third wave of 80 store closing on December 28, 2018 [Dkt. No. 1444] (collectively with the initial 142 stores closing, the "GOB Stores").

Flow Budget dated January 30, 2019, through the week ending January 26, 2019,[15] the Debtors

generated Normal Course Net Merchandise Receipts of $2,432 billion (plus an additional

forecasted $121 million of Normal Course Net Merchandise Receipts for the weeks ending

2/2/19 and 2/9/19).[16]  Also according to the Rolling Cash Flow Budget dated January 30, 2019,

the Debtors had an Ending Stock Level Inventory of $1,668 billion for the week ending January

26, 2019 and a forecast Ending Stock Level Inventory of $1,644 billion for the week ending

February 9, 2019.[17]  In short, at the Petition Date, with the exception of the Wave 1 GOB Stores,

the Debtors were operating as a retail establishment selling billions of dollars' worth of inventory

to customers at retail prices.  Consequently, the Debtors' inventory at the Petition Date must be

valued, as a starting point, at cost plus the Debtors' gross margin of 29% for a beginning

inventory value of $2.710.8 billion.  Inventory sold at GOB stores added an additional net $651.6

million for a total in excess of $3.362 billion. Additional Collateral besides Inventory increased

the total value of the Collateral securing repayment of the Prepetition Second Lien Obligations.

---

[15] Through January 30, 2019, the Debtors prepared and provided to Wilmington Trust Rolling Cash Flow Budgets on a weekly basis as required pursuant to paragraphs 19(e) and 22 of the Final DIP Order, with actual information through the week ended January 26, 2019 and forecast information thereafter through March 16, 2019. Notwithstanding the Debtors obligations under the Final DIP Order, the Debtors did not provide any further reporting after January 30, 2019, until March 7, 2019, when they provided to Wilmington Trust a document entitled "Project Blue - Estate Tracker" dated March 7, 2019, which included a "Budget Summary" which commenced with the week ending February 16, 2019, after the sale of the Debtors' assets to Transform had closed.  After numerous requests for the actual information for the last two weeks ending February 2, 2019 and February 9, 2019 prior to the closing of the Sale Transactions, the Debtors finally provided information in summary fashion for those missing two weeks in a report dated May 13, 2019.  Among other things, the May 13, 2019 report omitted separate line items for sales at Going Concern and GOB Stores, Gross Margin at Going Concern Stores and Beginning Inventory and Ending Stock Level Inventory.

[16] Through the week ending January 26, 2019, the Debtors also reported $615 million of GOB Store proceeds (and forecast $39 million of additional GOB Store proceeds for the weeks ending 2/2/19 and 2/9/19.

[17] Through January 26, 2019, the Debtors purchased $1,010 billion of additional inventory, which was forecast to increase by an additional $107 million for the weeks ending February 2, 2019 and February 9, 2019, for a total of $1,117 billion of post-petition merchandise purchases.

57501810v.1

At the Petition Date, the Prepetition ABL Facilities were outstanding in the principal amount of $1.656 billion[18] according to the Riecker Dec'1, plus outstanding standby letters of credit (the "Standby LC's") in the amount of $271 million.  Riecker Dec'l at 22.  These Standby LC's were posted to guarantee certain workers' compensation insurance policies and other obligations.  Riecker Dec'l at 22.  Because the Standby LC's were undrawn at the Petition Date, however, they are not properly charged against the Collateral at that time.

At the Petition Date, the Prepetition Second Lien Obligations totaled $1,151.5 billion[19], according to the Riecker Dec'1 at 24-26.  Thus, the total amount of combined, outstanding Prepetition ABL Facilities and Prepetition Second Lien Credit Obligations secured at the Petition Date by the Collateral was $2,807.5 billion.

A.      **The Prepetition Second Lien Credit Parties, Including The Prepetition Second Lien 2010 Notes Holders, Are Entitled To A Superpriority Claim**

To the extent that adequate protection, when given, is, or becomes, insufficient to provide adequate protection to the secured creditor, the secured creditor may assert an administrative expense claim against the debtor-in-possession, with priority over all other administrative expense claims pursuant to 11 U.S.C. § 507(b), for the diminution in value of its collateral.  11 U.S.C. § 507(b); see In re Residential Capital, LLC, 501 B.R. 549, 589 (Bankr. S.D.N.Y. 2013); see also In re Mary Holder Agency, Inc., No. 11-34280 MBK, 2012 WL 4434362, at *3 (Bankr. D.N.J. Sept. 24, 2012) ("the superpriority of section 507(b) is intended to compensate the secured claimant for the difference between the adequate protection provided by the debtor and any actual decrease in the value of the collateral occurring during the pendency of the bankruptcy action."); In re Bailey Tool & Mfg. Co., No. 16-30503-BJH, 2018 WL 550581, at *4

---

[18] According to paragraph H.b. of the Final DIP Order at 10-11, the aggregate outstanding principal amount of the Prepetition ABL Facilities was $1,530,378,380.  The Debtor's Schedule list the amount as "underdetermined."

[19] According to proofs of claim filed by the Prepetition Second Lien Credit Agreement Lenders, the Prepetition Second Lien 2018 Indenture Trustee and Wilmington Trust as Prepetition Second Lien 2019 Indenture Trustee, the Prepetition Second Lien Obligations totaled $1,163,886,222.97 at the Petition Date.

11

(Bankr. N.D. Tex. Jan. 23, 2018) ("only the shortfall remaining is entitled to superpriority status."); In re Blackwood Assocs., L.P., 153 F.3d 61, 68 (2d Cir. 1998); see also In re Bailey Tool & Mfg. Co., No. 16-30503-BJH, 2018 WL 550581, at *4 (Bankr. N.D. Tex. Jan. 23, 2018) (secured creditor may assert a superpriority administrative expense claim but "only to the extent such diminution is in excess of the adequate protection received.").

Pursuant to the Final DIP Order, the Prepetition Second Lien Credit Parties are entitled to a Superpriority Claim for the aggregate net diminution in value, if any, resulting from the DIP ABL Loan Parties' use, sale or lease (or other decline in value to the extent permitted under the Bankruptcy Code) of such collateral, the imposition of the automatic stay, the priming of the Prepetition Second Lien Facilities Liens and the subordination to the Carve-Out (collectively, the Second Lien Diminution in Value. Final DIP Order ¶¶ 18(d) and 17(d). "To establish their entitlement to an adequate protection claim, the [secured creditors] must show that the aggregate value of their collateral diminished from the Petition Date to the Effective Date." In re Residential Capital. LLC, 501 B.R. at 592.

The value of the adequate protection claim is calculated as the fair market or going concern value of the Prepetition Second Lien Credit Parties' interest in the Collateral as of the Petition Date less the value of the Collateral as of the date of the sale of the Debtors assets. See Sabine Oil & Gas Corporation, 547 B.R. at 578.

Here, aside from the amount of the credit bid of $433,500,000, the Prepetition Second Lien Credit Parties have received no recovery from their Collateral, and except for any Cash Collateral available at the date of confirmation of a plan, to the extent anticipated in the budget annexed to the Stipulation dated June 7, 2019 [Dkt. No. 4155], any other replacement collateral, such as proceeds of avoidance actions, is entirely speculative. Consequently, the Prepetition

12

Second Lien Credit Parties are entitled to a Superpriority Claim under 11 U.S.C. § 507(b) in the amount of $718 million, of which $91,950,191.25 is attributable to the Second Lien Notes.

The Debtors argue that the Prepetition Second Lien Credit Parties cannot establish any diminution in value of the Collateral because they "received far more in the sale than they otherwise would have recovered in a liquidation scenario . . . ." Rule 3012 Motion ¶ 33. But liquidation value is clearly not the proper starting point for determining the value of the Collateral of a Debtor which is a going concern. Associates Commercial Corp. v. Rash, 520 U.S. 953, 963, 117 S. Ct. 1879, 1886 (1997) ("the debtor in this case elected to use the collateral to generate an income stream. That actual use, rather than a foreclosure sale that will not take place, is the proper guide under a prescription hinged to the property's "disposition or use." Id.)[20]

The Debtors then agree in paragraph 39 of the Rule 3012 Motion that "the most appropriate . . . methodology to value any 507(b) claims . . . is the fair market value of the Collateral in the hands of the Debtors at both the Petition Date and the Effective Date." Rule 3012 Motion ¶ 39. But they then value "the collateral at 85% -- an amount which reflects the value that was ultimately recovered on the Collateral at the sale -- at both the Petition Date and the Effective Date" and conclude that "the gross Collateral value was $2,287 billion at the Petition Date and $1,323 billion at the Effective Date." Motion ¶ 40.

The Debtors' approach, however, of valuing the collateral at the Petition Date at 85%, presumably of book value, simply because that's what the collateral was supposedly ultimately sold for, is nothing more than an artifice to deny the Prepetition Second Lien Credit Parties a

---

[20] The Debtors articulate the correct test, Motion ¶¶ 35-37, but argue that because "there was no going-concern bid as of the entry of the Final DIP Order and the Debtors pivoted to a liquidation approach several times . . ." a liquidation analysis [is] more appropriate. Rule 3012 Motion at 15, n. 19. This argument ignores the fact that the Debtors intended to, and did, operate their businesses as a going concern as of the Petition Date, as the Debtor concede in ¶ 38 of the Rule 3012 Motion, and for four months thereafter.

claim for diminution in value by applying the same valuation at the Petition Date as was realized at the sale date. Such a methodology would always deny the secured creditor a claim for diminution in value of its collateral.

Moreover, use of 85% of book value is not market value; it is less than liquidation value. Attached to the Declaration of Brian Griffith in Support of Debtors' Objection to Motion of Wilmington Trust, National Association, as Indenture Trustee and Collateral Agent to Prohibit or Condition Debtors' Continued Use of Collateral, Including Cash Collateral executed on April 15, 2019 (the "Griffith April 15 Dec'l") [Dkt. No. 3198], as Exhibit 1, is the Debtors' Borrowing Base Certificate as of October 13, 2018, which lists NOLV (Net Orderly Liquidation Value) of the Debtors' inventory as 88.70% of Net Eligible Inventory.[21]

## II.    DEBTORS DO NOT MEET THE HEAVY BURDEN OF SEEKING RECOVERY OF EXPENSES UNDER SECTION 506(C)

The Debtors assert a claim pursuant to 11 U.S.C. § 506(c) for $1,451 billion of expenses that they claim are chargeable against the Collateral as costs and expenses incurred by the Debtors in preserving the Collateral.

Pursuant to 11 U.S.C. § 506(c), "[t]he trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property." 11 U.S.C. § 506(c). It is the trustee's burden to demonstrate "the necessity of the expense, its reasonableness, and the existence and extent of any benefit to the secured creditor." 5 Collier on Bankruptcy,

---

[21] According to the Griffith April 15 Dec'l, the Debtors had "$2.88 billion of collateral available to secure the first and second lien debt senior to the Second Lien 2019 Notes," which Griffith stated was approximately $2.99 billion of funded debt. This amount included $271 million of Standby Letters of Credit, however, which were undrawn at the Petition Date. Consequently, the actual outstanding obligations secured by the Collateral were $2.719 billion, which is less than Griffith's $2.88 billion of Collateral value, leaving all of the Prepetition Second Lien Obligations fully secured at the Petition Date by Griffith's analysis.

14

¶ 506.05[9], p. 506-130 (16th ed. 2012); General Elec. Credit Corp. v. Levin & Weintraub (In re
Flagstaff Foodservice Corp.), 739 F.2d 73, 77, 10 C.B.C.2d 1309, 1312-14 (2d Cir. 1984)
(finding the appellees failed to satisfy their burden of proof under Section  506(c)); In re Croton
River Club, Inc., 162 B.R. 656, 659 (Bankr. S.D.N.Y. 1993); In re Emons Indus., Inc., 50 B.R.
692, 694–95 (Bankr. S.D.N.Y. 1985) ("The benefit to the secured party which must be shown to
prevail under Bankruptcy Code § 506(c) imposes a heavy burden on the party seeking to invade
the secured party's collateral."); In re Campbell Mills, Inc., No. 95 CIV. 902(JFK), 1995 WL
581663, at *2 (S.D.N.Y. Oct. 4, 1995) ("the burden is on the [Section 506(c)] movant to prove
that he is entitled to recover fees and expenses from property securing an allowed secured
claim."). This burden of proof for Section 506(c) claimants is a "heavy one."  In re Croton River
Club, Inc., 162 B.R. 656, 659 (Bankr. S.D.N.Y. 1993).  "A creditor's oversecured status and
ability to charge expenses to a debtor are essential to answering this question, and often create a
high hurdle for a movant to overcome …because increases to the value of collateral that do not
increase the yield to the creditor cannot be said to inure to that party's benefit."  In re Lorick, No.
1-16-45645-NHL, 2018 WL 3854139, at *5-6 (Bankr. E.D.N.Y. Aug. 9, 2018).

In the Second Circuit, to recover costs under Section 506(c), a claimant must show that:
(1) the expenses and amount expended are "reasonable" and "necessary" to the preservation or
disposal of the property respectively, and (2) the expenditures directly benefitted the creditor.
See In re Flagstaff Foodservice Corp., 762 F.2d 10, 11 (2d Cir. 1985) any benefits that accrued to
the creditor from the attempted reorganization "were incidental to the reorganization efforts and
beyond the scope of [S]ection 506(c)."); In re Ceron, 412 B.R. 41, 48 (Bankr. E.D.N.Y. 2009); In
re Kohl, 421 B.R. 115, 123 (Bankr. S.D.N.Y. 2009).  Notably, the Section 506(c) claimant does
not meet this burden of proof "by [merely] suggesting possible or hypothetical benefits."  In re
Flagstaff Foodservice Corp., 762 F.2d 10, 11 (2d Cir. 1985) (finding that "proof of direct

15

benefits sought and received by GECC [was] completely lacking in [the] case."); <u>In re Fiberglass</u>
<u>Indus., Inc.</u>, 74 B.R. 738, 749 (Bankr. N.D.N.Y. 1987) ("[p]roof of direct benefit is required and
an applicant's burden under Code § 506(c) is not met by suggesting possible or hypothetical
benefits."); <u>In re Ceron</u>, 412 B.R. 41, 52 (Bankr. E.D.N.Y. 2009).  Rather, the Section 506(c)
claimant must quantifiably establish that it expended funds directly to benefit the secured
creditor(s) in its preservation or disposal of the collateral.  In re Flagstaff Foodservice Corp., 29
B.R. 215, 219 (Bankr. S.D.N.Y. 1983); In re Fiberglass Indus., Inc., 74 B.R. 738, 749 (Bankr.
N.D.N.Y. 1987) (finding the "benefit" to be realized at some point in the future is too uncertain
and speculative at this time to warrant recovery of costs under Section 506(c).").

### A.      The Expenditures Must Have Been Reasonable and Necessary

Under Section 506(c), the Debtors must demonstrate that the expenditures were
"reasonable and necessary to the preservation or disposal of the property."  In re Flagstaff
Foodservice Corp., 762 F.2d 10, 12 (2d Cir. 1985); In re 680 Fifth Ave. Assocs., 154 B.R. 38, 43
(Bankr. S.D.N.Y. 1993) ("courts construe [Section 506(c)] narrowly and determine whether
Section 506(c) is applicable based on the facts of each case.").  "Expenses are 'necessary' to the
extent that they relate to the preservation or disposition of the secured creditor's collateral, and
then only to the extent they are not attributable to any unwarranted delay by a party other than
the secured creditor."  See 5 Collier on Bankruptcy, ¶ 506.05[2], p. 506-118.  Furthermore,
expenses are necessary "only if there is equity in the collateral for the benefit of the estate, and
unnecessary if there is no equity."  In re Ceron, 412 B.R. 41, 48 (Bankr. E.D.N.Y. 2009) (where
the trustee moved for turnover of funds and there was some equity leftover from the estate, the
court found that the expenses were necessary).

On the other hand, determining if incurred expenses are "reasonable" "requires a more
detailed assessment."  In re Ceron, 412 B.R. 41, 52 (Bankr. E.D.N.Y. 2009).  To be

57501810v.1

"reasonable", the incurred expense must be "in some sensible proportion to the value of the benefit received." In re Ceron, 412 B.R. 41, 52 (Bankr. E.D.N.Y. 2009) (where the record failed to indicate the remaining equity available for the estate at the time the trustee sought turnover of the funds as well as the amount of the trustee's claim against the funds, the court found that the "record [fell] short of demonstrating that the entire amount sought by the [t]rustee [was] reasonable."). If the expenditure does not bear any "relation to the collateral or was not essential to preserve or increase the value of the collateral," the expense was not necessary. See 5 Collier on Bankruptcy, ¶ 506.05[4], p. 506-119 (emphasis added); In re Felt Mfg. Co., Inc., 402 B.R. 502, 523 (Bankr. D.N.H. 2009).

Here, Debtors fail to meet the heavy burden of demonstrating that the amounts expended were "reasonable" and/or "in some sensible proportion to the value of the benefit received." In re Ceron, 412 B.R. 41, 52 (Bankr. E.D.N.Y. 2009). The Debtors provided no explanation on how they arrived at their numbers or which category of expenses pertained to and/or directly benefitted the Collateral. The Debtors merely provide lump sum numbers with no specific breakdown of costs by line item from among the millions of dollars in costs incurred in this case. Consequently, the Debtors have completely failed to establish that their requested 506(c) costs are either reasonable or necessary.

**B.    Debtors' Sale of Inventory Did Not Primarily Benefit Wilmington Trust and Debtors Failed to Properly Identify the Expenses Pertinent to Wilmington Trust**

Pursuant to Section 506(c), the trustee must also demonstrate that its funds were expended primarily for the benefit of the secured creditor and that the secured creditor directly benefitted from the expenditure. In re Flagstaff Foodservice Corp., 762 F.2d 10, 12 (2d Cir. 1985) (emphasis added); In re Flagstaff Foodservice Corp., 29 B.R. 215, 219 (Bankr. S.D.N.Y. 1983). The direct "benefit" to the secured creditor must be shown quantitatively - not in a

17

"qualitative, or generalized sense." In re Flagstaff Foodservice Corp., 29 B.R. 215, 219 (Bankr. S.D.N.Y. 1983). However, any benefits that accrue to the secured creditor from reorganization are incidental to the reorganization efforts and beyond the scope of Section 506(c). In re Flagstaff Foodservice Corp., 739 F.2d 73, 76 (2d Cir. 1984); see also In re W. Post Rd. Properties Corp., 44 B.R. 244, 247 (Bankr. S.D.N.Y. 1984) (where trustee sought to have the mortgagee pay 40% of the costs and expenses attributed to the sale under Section 506(c), the court found that liquidation expense were not incurred for the benefit of the secured claim holder because the trustee's motive for the sale was to "maximize the estate as a result of a prompt sale, which would serve the interests of all parties.").

None of the Debtors' actions here were for the sole benefit of the Prepetition Second Lien Creditors, did not relate solely to the Collateral, and were not "reasonable" and "necessary" to the preservation of the Collateral. The continued operation of the  Debtors' business preserved real estate values, Declaration of Mohsin Y. Meghji (Meghji Dec'1) ¶ 36, [Dkt No. 2336], preserved avoidance actions for the benefit of unsecured creditors, provide for payment of 503(b)(9) and other Administrative expense claims, allowed vendors to continue to sell product to the Debtors and preserved the jobs of 45,000 employees. Therefore, the Prepetition Second Lien Creditors cannot be asked to pay for all of the expenses incurred with respect to the bankruptcy case and the sale, which benefitted all of the Debtors' creditor constituencies. See e.g., In re Campbell Mills, Inc., No. 95 CIV. 902(JFK), 1995 WL 581663, at *3-4 (S.D.N.Y. Oct. 4, 1995) (finding that the debtor could not recover the expenses of the equipment sale from the secured creditor because the "primary object of the sale of the [e]quipment was to benefit the [d]ebtor's entire estate by the abatement of NationsBank's claim and the enlargement of money available to unsecured creditors. The fact that there was not enough money from the sale of the creditors to fully satisfy NationsBank, let alone the unsecured creditors, [was] irrelevant."); In re

18

Wiltwyck Sch., 34 B.R. 270, 275 (Bankr. S.D.N.Y. 1983) (where the debtor sought to forestall a

foreclosure sale, the court found that the "negotiated sale … was primarily for the benefit of the

debtor and its unsecured creditors [and that] any benefit received [by the creditor] as a result of

the delay in disposing of the property was too remote or indefinite to charge [the creditor]

without its consent with preservation and disposition expenses under Code §  506(c)).

## III.    AT A MINIMUM, THE SALE EXPENSES SHOULD BE PRORATED AMONG ALL PARTIES WHO DIRECTLY BENEFITTED FROM THE SALE

At a minimum, the requested 506(c) expense must be allocated across all of the creditors

constituencies in this case.  With respect to the allocation of Section 506(c) expenses, " as

between a secured creditor, other parties, and the estate, the allocation of the necessary expenses

of preserving and disposing of the secured creditor's collateral may vary, depending on a number

of factors including whether the secured creditor is over or underscored, and whether the relevant

expense benefitted property other than the secure creditor's collateral."  See 5 Collier on

Bankruptcy, ¶ 506.05[9] - [11], p. 506-130-31; see also In re Myers, 24 F.2d 349, 351 (2d Cir.

1928) (finding that the "mortgagee's share of the lien is not chargeable with the general expenses

of administration of the estate, but only with a ratable proportion of the expenses of sale and of

so much else as actually helped to preserve the property or its proceeds.").  Thus, "if the relevant

expense was incurred in part for the benefit of an undersecured creditor, and in part for the

benefit of property that is not the secured creditor's collateral but belongs to other parties, it may

be appropriate to prorate the expense between [and/or among] the secured creditor and the other

parties … who received the benefit of the [sale/services]."  See 5 Collier on Bankruptcy, ¶

506.05[9] - [11], p. 506-130-31; In re Parque Forestal, Inc., 949 F.2d 504, 512 (1st Cir. 1991),

overruled on other grounds, In re Atlas IT Exp. Corp., 761 F.3d 177 (1st Cir. 2014).  The

"rationale underlying this proration" is that "the secured creditor should not be made to bear the

entire cost of an expense that provided a benefit to both itself and others."  See 5 Collier on

19

Bankruptcy, ¶ 506.05[9] - [11], p. 506-130-31 (citing In re Parque Forestal, Inc., 949 F.2d 504, 512 (1st Cir. 1991), overruled on other grounds, In re Atlas IT Exp. Corp., 761 F.3d 177 (1st Cir. 2014) ("given this equitable division of cost between [the parties], … the [district] court met the requirement of § 506(c)); see also In re W. Post Rd. Properties Corp., 44 B.R. 244, 247 (Bankr. S.D.N.Y. 1984) (the "trustee may not shift to the mortgagee the expenses which the debtor previously agreed to bear because Tremont is entitled to rely upon its rights under the mortgage. The stipulation between the parties … whereby Tremont consented to the trustee's auction sale, cannot be characterized as a consent by Tremont to being charged with a pro rata share of the liquidation expenses.").

In the instant case, pursuant to the Asset Purchase Agreement the Debtors sold substantially all of their assets, the vast bulk of which constituted other creditors' collateral. Consequently, the Debtors may not seek to solely recover expenses from the Prepetition Second Lien Obligations.  The Prepetition Second Lien Creditors cannot, and should not, be made to bear the entire expense that provided a benefit to the entire estate and its many secured and unsecured creditors.

Thus, contrary to Debtors' misguided assertions, this Court should not hold the Prepetition Second Lien Credit responsible for Debtors' expenses when numerous lenders, creditors, vendors, employees and other parties benefitted from the sale.

## JOINDER

Wilmington Trust joins in the memorandum of law filed by Cyrus Capital Partner, L.P. and ESL Investments, Inc. in support of allowance of a secured claim and a superiority administrative expense claim in favor of the Prepetition Second Lien Creditor Parties, to the extent not inconsistent herewith.

20

## CONCLUSION

For the reasons set forth herein, Prepetition Second Lien Creditor Parties should be granted an administrative expense claim, in the aggregate, in the amount of $730,386,222 including $91,950,191.25 for benefit of the Prepetition Second Lien 2010 Notes, with priority, pursuant to 11 U.S.C. § 507(b), over all other administrative expenses, and an allowed secured claim in the amount of the cash available to the Debtors at the confirmation of any plan, payment of such secured claim to reduce the Superpriority Claim.

Dated: New York, New York
       June 18, 2019

                              SEYFARTH SHAW LLP


                              By:  ___/s/ Edward M. Fox_____
                                   Edward M. Fox
                                   Steven Paradise
                                   Owen Wolfe
                                   *Attorneys for Wilmington Trust, National*
                                   *Association, as indenture trustee and collateral*
                                   *agent*
                                   620 Eighth Avenue
                                   New York, NY 10018
                                   Direct Dial:  (212) 218-4646
                                   Direct Fax:   (917) 344-1339
                                   Email:  emfox@seyfarth.com

57501810v.1