# EXHIBIT "A"

# Master Software and Services Agreement

Execution Copy

# KANA SOFTWARE, INC.
# MASTER SOFTWARE AND SERVICES AGREEMENT

**THIS MASTER SOFTWARE AND SERVICES AGREEMENT** (**"Agreement"**) is made by and between KANA Software, Inc., a Delaware corporation (**"Vendor"**), with offices at 181 Constitution Drive, Menlo Park CA 94025, and **Sears Holdings Management Corporation,** for itself and for the benefit of its Affiliates (the **"Customer"**), with offices at 3333 Beverly Road, Hoffman Estates, Illinois 60179 and this Agreement will be effective as of May 23, 2006 (the **"Effective Date"**).

**WHEREAS,** Vendor is interested in licensing certain software and/or providing certain services to Customer; and

**WHEREAS,** the parties wish to set forth the terms and conditions under which Customer may order and Vendor may provide certain software and/or services through this Agreement;

**NOW THEREFORE**, in consideration of the premises and the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## 1. DEFINITIONS.

Capitalized terms used herein will have the meaning ascribed to them herein whenever they are used in this Agreement, or any Appendixes or Procurement Documents hereto. Certain terms are defined in **Appendix 1 (Glossary)** attached hereto. Other capitalized terms are defined in the context in which they are used.

## 2. PROCUREMENT DOCUMENTS.

2.1. **General Description**. This Agreement is a general description of the terms and conditions upon which Customer and/or its Affiliates may from time-to-time procure Software and Services from Vendor. Except as set forth in a particular Procurement Document, Customer makes no promises or representations whatsoever as to the amount of business Vendor can expect at any time under this Agreement. Any estimates or forecasts of Customer's or its Affiliates future needs for Software and Services are for Customer' planning purposes only and Customer will have no liability for Vendor's reliance thereon. The parties intend that they will enter into a Procurement Document to this Agreement before Vendor provides any Software and/or Services to Customer or its Affiliates. Customer will be under no obligation to compensate Vendor for Software and Services not described in a Procurement Document or other written agreement executed by both parties. Notwithstanding the foregoing, if Vendor licenses any Software or provides any Services to Customer or its Affiliates in the absence of a Procurement Document or other written agreement, this Agreement will nevertheless apply to such Software and/or Services.

2.2. **Procurement Documents.** If Customer elects to procure Software, Implementation Services or Maintenance Services from Vendor on the terms and conditions contained in this Agreement, then Customer will issue either a Purchase Order and/or a Statement of Work to Vendor for such Software or Services. Any orders for: (a) Services other than Implementation Services or Maintenance Services, and (b) any orders for Software, Implementation Services or Maintenance Services subject to terms and conditions in addition to or different from those contained in this Agreement (other than price), will be subject to the execution of a Statement of Work.

2.2.1 **Purchase Orders.** Customer may place orders for certain Software and Services (as described above), by issuing to Vendor a written, or electronic, purchase order, signed or (in the case of electronic transmission) sent by a Customer' authorized representative (each a "**Purchase Order**") which will contain the price, description of the Software, Services, delivery location, Specifications and quantity of the Software and/or Services being procured by Customer. Purchase Orders will be deemed accepted by Vendor upon the earlier of: (a) a written or electronic acceptance by Vendor, (b) expiration of five business days without a notice of rejection by Vendor, or (c) shipment or delivery of the applicable Software/Service. Customer may include the delivery location for Software/Services in the Purchase Order or in a writing delivered separately (in which case such delivery list will be deemed to be part of the Purchase Order). A SOW may provide that any Purchase Order issued for the types of Software or Services described therein will be subject to such SOW.

2.2.2 **[Intentionally Omitted].**

2.2.3 **Statements of Work.** In addition, the parties may enter into a written statement of work, which must be executed by both parties to be effective (each a "**Statement or Work**"), for Services under this Agreement. An example of a SOW is attached hereto as **Appendix 2.2.3** (Form of SOW).

2.2.4 **Change Order Procedure.** If either party believes that a change in a Procurement Document (whether in time frames, costs or deliverables) is necessary or desirable, such party will submit a written change request to the other (a "**Change Request**"). In the event of a Customer-initiated Change Request, Vendor will promptly provide Customer with a written quote describing in detail: (a) the modifications to the Software or Customer' computer system that will be required as a result of the Change Request including changes in Software, equipment, if any, and Services; (b) the effect, if any, on overall system performance and the Specifications, (c) the effect, if any, of the Change Request on the applicable Milestones; and (d) an estimate of the effect of such change on the costs of the Project to implement each Change Request. If Vendor submits a Change Request to Customer, such Change Request will include the foregoing information. Changes to a Procurement Document will not become effective unless an amendment to the Procurement Document (each an "**Amendment**"), is executed by both parties. Absent the execution of such an Amendment, the parties will proceed to fulfill their obligations under this Agreement.

2.3. **Relationship Between Contract Documents**. Each Procurement Document will be subject to the terms and conditions of this Agreement.

2.3.1 **Purchase Orders**. Other than: (a) a description of the Software/Services being procured, (b) price, (c) quantity (d) delivery location, and (e) Specifications, a Purchase Order will not contain any additional or different terms or conditions and this Agreement will control over any such inconsistent terms in a Purchase Order.

2.3.2 **SOWs**. SOWs may include additional or different terms and conditions than this Agreement; provided that in order for any such terms to control over this Agreement, they must be expressly stated in such SOW. In all other cases, this Agreement will control over any different or inconsistent terms in a Procurement Document.

2.3.3 **No Additional Terms**. No additional terms contained in any invoice, order acknowledgment, other correspondence, or verbal communication, between the parties will be valid and such additional or conflicting terms are deemed rejected by the parties unless such terms are contained in a SOW, an Amendment, or other written agreement executed by both parties.

2.4. **Ordering Affiliates**. Affiliates of Customer may license Software and/or procure Services from Vendor under the terms and conditions of this Agreement, provided that such Affiliate enters into a Procurement Document for such Software and/or Services referencing this Agreement. Any Affiliate who enters into such a Procurement Document with Vendor will be deemed to be "Customer" hereunder for purposes of such procurement; provided that such Procurement Document(s), together with this Agreement, will constitute a separate contract and Vendor will look solely to such Affiliate (and not to Customer) for satisfaction of any liability arising under or relating to such procurement by an Affiliate.

2.5. **Authorized Resellers**. To the extent that Customer or its Affiliates procure any Software or Maintenance Services from Vendor's authorized resellers, Customer' rights, and remedies will be governed by this Agreement, and such reseller will be deemed to be Vendor's agent.

3. **SOFTWARE.**

3.1. **License Grant**. Vendor hereby grants to Customer and its Authorized Users a non-exclusive, non-transferrable (except to Affiliates or as otherwise provided by this Agreement), worldwide, fully paid up (subject to payment of the applicable license fees), multi-site, enterprise-wide, perpetual and irrevocable (except as otherwise provided in Section 14) license to access and use and, subject to Section 3.2 below, copy the Software and subject to the License Types identified in the applicable Procurement Document, subject to the terms of this Agreement. No right of sublicense is granted to Customer; provided, however, that Customer may permit Third Party vendors, outsourcers and other service providers to access and/or use the

Software pursuant to the rights granted to Customer and its Authorized Users hereunder solely on behalf, and then solely for the benefit, of Customer as agreed to between Customer and such Third Parties.

3.2. **Copies**. Customer may copy the Software as required for non-production backup, disaster recovery, and archival purposes. Other copies, for example for distribution of Software to Authorized Users, testing, training, development and/or other similar purposes if purchased will be covered by the applicable Procurement Document. Any such copies may be stored off-site and if for non-production backup, disaster recovery, and/or archival purposes, will not be included in determining the number of copies in use by Customer under any per-copy license or pricing arrangement. Customer will not remove any copyright notices or other proprietary notices appearing in the Software. If Customer loses or damages the media containing the Software, Vendor will provide replacement copies of such Software, at no additional charge other than for replacement media.

3.3. **Source Code Escrow Agreement**. If required under the applicable Procurement Document, Vendor will deposit Source Code with its third party escrow agent pursuant to the terms of a source code escrow agreement to be executed by the parties and by Vendor's Source Code escrow agent acceptable to Customer (the "**Source Code Escrow Agreement**"). Any such Source Code Escrow Agreement will be deemed supplementary to this Agreement and a material breach of thereof will be deemed to be a material breach of this Agreement. If the Source Code is delivered to Customer pursuant to the Source Code Escrow Agreement, Customer and its Authorized Users will have the right to use and modify the Source Code solely to support its use of the Software to the same extent licensed hereunder and thereafter all references herein to Software will include the Source Code.

3.4. **No Reverse Engineering**. Absent the delivery to Customer of the Source Code pursuant to the Source Code Escrow Agreement, Customer will not reverse engineer the Software in any manner except as reasonably required to interface the Software with other software or systems used by Customer, or as otherwise permitted under Applicable Laws.

3.5. **New Locations**. Customer will have the right to transfer, at any time, without prior notice to or consent of Vendor, the Software to any location which is owned or controlled by Customer or by any Customer Affiliates, Third Party disaster recovery providers or outsourcers, so long as such transfer does not violate any restriction set forth in this Agreement or the applicable Procurement Document.

3.6. **Site Preparation**. Vendor will, upon Customer' request, provide to Customer the Specifications for the proper installation and operation of the Software, including if requested by Customer, a list of any compatible hardware and/or software

4. **SERVICES.**

4.1 **Implementation Services, Committed Resources and Testing**. If set forth in the applicable Procurement Document, Vendor will implement the Software subject to the terms of a

mutually agreed upon Procurement Document including all Milestones (if applicable) set forth therein (collectively, the "**Implementation Services**").  From the Effective Date of such a Procurement Document Vendor will make available Vendor Personnel, who are qualified and competent, to complete the implementation of the Software in accordance with the applicable Procurement Document. Charges for such Implementation Services will be set forth in the applicable Procurement Document. The parties may also provide, in an applicable Statement of Work that Vendor will perform certain testing Services in accordance with a test plan described therein.  Such testing may include pre- and post- production phases, unit testing, functional testing, operational testing, business acceptance testing and such other procedures as are agreed to by the parties.

4.2.  **Development Services**.  The parties may agree, pursuant to a Procurement Document, that Vendor will develop new Software or modifications to existing Software for Customer as part of the Deliverables (collectively, "**Developments**").  Unless otherwise stated in a Procurement Document, any such Services will be compliant with the Customer' system development methodology, as designated by Customer to Vendor, from time to time ("**SSDM**") and Vendor will use SSDM templates provided by Customer.  Unless otherwise provided in the Procurement Document, Vendor will incorporate such Developments into future Enhancements of the Software.  Customer' rights to such Developments will be subject to **Section 9.2** (Deliverables) below.

4.3.  **Training**.  Upon Customer' request, Vendor will provide Customer and its Authorized Users with training on the use and operation of the Software at Customer' facilities. Customer will pay Vendor the fees set forth in the applicable Procurement Document for such training.

4.4.  **Product Assistance**.  Prior to Acceptance and during the Warranty Period or any period for which Customer is entitled to receive Maintenance Services for the applicable Software, Vendor will, at no additional charge, answer questions by Customer Personnel regarding the day-to-day operation of the Software and the development and implementation by Customer and its Personnel of interfaces with the Software ("**Know-How**").  Know-How may include any of the following, but will not include attendance at Vendor's training programs (which is covered under **Section 0**):

4.4.1  Data files, file and data definitions and relationships, data definition Specifications, data models, interfaces, program architecture, program structure, sequence and organization, screen displays, reference and user manuals, design and functional Specifications relating to the Software;

4.4.2  Maintenance, support utilities and tools relating to the Software;

4.4.3  Security requirements and methodologies relating to the Software;

4.4.4  Such other material as Customer may reasonably request.

4.5. **APIs**. Customer will have the right to interface the Software and to use it in conjunction with other software, programs, routines and subroutines developed or acquired by Customer. Upon Customer' request, and in accordance with a mutually agreed upon Procurement Document, Vendor will cooperate and work with Customer and, if necessary, Third Parties, as reasonably required to interface the Software with other systems, equipment and software used by Customer. Customer and any of Customer Authorized Users will have the right to access the Documentation, data base structures, data models, data schema, table structures, object libraries and other data and other elements of the Software as required for such purposes. Vendor will not have any ownership interest in any software, program, routine or subroutine developed by Customer or acquired by Customer from a Third Party other than Vendor by virtue of its having been interfaced with or used in conjunction with any Software.

4.6. **Other Services**. The parties may agree, in an appropriate Statement of Work, for the Vendor to provide other Services to Customer.

4.7. **Implementation Delays**. If Vendor has failed to meet a Milestone identified in the Procurement Document, then in addition to any other rights and remedies that may be available to Customer, at no additional cost to Customer and at Customer' option, Vendor will provide to Customer all necessary additional Vendor Personnel to accelerate performance as may be required or necessary to timely achieve the next Milestone or, if there is no next Milestone, to achieve the missed Milestone as soon as is practicable.

4.8. **Customer Responsibilities**. References to Customer' responsibilities in a Procurement Document (other than Customer' promise to pay for the Software and Services procured thereunder), are intended solely for purposes of indicating what is not Vendor's responsibility, and will not in any circumstance constitute grounds for a claim of breach of such Procurement Document by Customer. Customer' failure to perform any responsibility assigned to Customer will, however, to the extent such non-performance impedes Vendor's ability to perform, limit Vendor's responsibilities under the Procurement Document and may affect the timelines for any Deliverables thereunder. Vendor will promptly notify Customer in writing if Customer fails to perform such responsibilities.

## 5. ACCEPTANCE.

5.1. **Acceptance Period**. Unless otherwise provided in the Procurement Document, Customer will have a thirty (30) day period from the date the Software is fully operational in a production environment on Customer' computer systems ("**Acceptance Period**"), to inspect and test the Software to determine whether it meets the applicable Specifications.

5.2. **Defects and Correction**. If Customer discovers a Defect in the Software, Customer will provide, in reasonable detail, a notice of such Defect to Vendor's Project manager (or other representative). Once such notice has been given, the Acceptance Period will be suspended, and Vendor will have a reasonable period (not to exceed 30 days) to correct the Software. Once Vendor has delivered the corrected Software to Customer, the Acceptance Period

will resume; provided that, if required, the Acceptance Period will be extended to provide Customer with a minimum of 30 days to accept or reject the Software after delivery of such corrected Software by Vendor. If Vendor fails to correct a material Defect, Customer may reject the Software.

5.3. **Acceptance and Rejection**. If Customer has not accepted or rejected the Software prior to the end of the original (without extension) Acceptance Period, then Customer may at any point thereafter during the extended Acceptance Period reject the Software by providing a written notice to Vendor. If Customer does not give notice of rejection of the Software within the Acceptance Period (including any extension thereto), the Software will be deemed to have been accepted as the last day of such Acceptance Period ("**Acceptance**"). Any Acceptance will not prejudice Customer' other rights under this Agreement (e.g., representations, warranties, Maintenance Services, etc.). Additionally, in the event Customer is procuring multiple types of Software as part of the same Project, whether under one or multiple Procurement Documents (collectively, a "**System**"), and Customer rejects any of the Software which are part of the System, then Customer will have the right to reject the entire System. If Customer rejects the Software pursuant to **Section 5.2** (Defects and Correction) or this Section, Customer will be entitled to: (a) declare that a material breach has occurred, (b) receive a full refund of all amounts paid for such Software (or the System, if Customer rejects the System), and (c) all Related Services and Customer will have no further obligation to pay any amounts due to Vendor in connection therewith.

5.4. **Post Acceptance Correction of Defects**. Vendor will correct any Defects remaining to be corrected following Customer's Acceptance in accordance with the Maintenance Service obligations.

## 6. REPRESENTATIONS AND WARRANTIES.

6.1. **General**. Vendor represents, warrants and covenants (as to future performance) to Customer as follows:

6.1.1 **Authority**. That: (a) Vendor has full power and authority to enter into this Agreement, to carry out its obligations under this Agreement and to grant the rights and licenses granted to Customer in this Agreement; (b) there are no outstanding assignments, grants, licenses, encumbrances, obligations or agreements (whether written, oral or implied) that are inconsistent with this Agreement and the rights granted or transferred herein; and (c) Vendor's compliance with the terms and conditions of this Agreement will not violate any Applicable Laws or any Third Party agreements.

6.1.2 **Warranty Period and Defects**. That, for the period of time specified in the applicable Procurement Document, or if no time frame for a warranty is specified therein, ninety (90) days from Acceptance of the Software (the "**Warranty Period**"), the Software will contain the functionality, and will operate in accordance with the applicable Specifications in all material respects. During the Warranty Period, upon notice from Customer, Vendor will correct any failure of the applicable Software or the System to

operate in accordance with this warranty by providing additional software and/or services to Customer at no additional cost to Customer. In the event Vendor is unable to correct such a Defect within 30 calendar days, Vendor will replace the defective Software with Software that functions properly or, at Customer option, Customer may return the Software and then Vendor will promptly refund to Customer all of the fees paid by Customer for: (a) such Software and (b) any Related Services (provided, however, with respect to Maintenance, Customer shall only be refunded any unused portion). Upon return of the fees set forth above, Customer will return or at Vendor's direction destroy such Software.

6.1.3 **Quality**. That Vendor will perform all Services: (a) in a good, workmanlike and professional manner using people fully familiar with the Software and the underlying technology; (b) in accordance with the Procurement Document and any mutually agreed upon Milestones identified in the Procurement Documents; and (c) in compliance with all Applicable Laws.

6.1.4 **Infringement.** That all Software, including Third Party Software, and all Deliverables provided hereunder are either owned free and clear of any encumbrances or licensed to Vendor with the right to sublicense to Customer and its Authorized Users (in accordance with **Section 3.1** (License Grant) or are in the public domain, and the use thereof by Customer and its Authorized Users will not infringe or misappropriate any proprietary rights of any Third Party; provided that Vendor will not be responsible for any infringement or misappropriation caused by a Customer Combination. Further, that as of the Effective Date of this Agreement, there is no action, suit, claim, investigation or proceeding pending, or to the best of Vendor's knowledge, threatened against, by or affecting Vendor, the Software or the Deliverables which, if adversely decided, might adversely affect: (a) Vendor's ability to enter into this Agreement; (b) Vendor's performance of its obligations herein; or (c) Customer' and its Authorized Users use of the Software or the Deliverables. Vendor further represents and warrants that it does not know of any basis for any such action, and that the Software, the Deliverables, and the manner in which Vendor has conducted its business do not, and will not, constitute an infringement or misappropriation of any Intellectual Property right of any Third Party; provided that Vendor will not be responsible for any infringement or misappropriation caused by a Customer Combination.

6.1.5 **Unauthorized Code.** That the Software and the Deliverables will be free, at the time of receipt by Customer, of any Unauthorized Code.

6.1.6 **Documentation.** That upon delivery of the Software (or such sooner period as is requested by Customer), Vendor will provide to Customer all Documentation for the Software and that such Documentation is detailed and complete and accurately describes the functional and operational characteristics of the Software. Customer and its Authorized Users will have the right to use, copy, modify and make derivative works of such Documentation; provided that Customer does not remove any copyright notices or other proprietary notices appearing in such Documentation and will treat such

Documentation as the Confidential Information of Vendor. In addition, if Vendor provides Enhancements to the Software, Vendor will provide to Customer updated versions of all such Documentation (which will accurate and at least as detailed as the Documentation issued to Customer with the initial version of the Software).

6.1.7 **Third Party Software Licenses.** That no additional Third Party Software licenses or license fees other than those specifically itemized in the applicable Procurement Document or the Specifications are required in order for Customer and its Authorized Users to operate the Software or the Deliverables.

6.2. **Disclaimer**. EXCEPT AS OTHERWISE PROVIDED FOR HEREIN OR IN A PROCUREMENT DOCUMENT, VENDOR DISCLAIMS ALL OTHER EXPRESS OR IMPLIED WARRANTIES, INCLUDING THE WARRANTIES OF NON-INFRINGEMENT, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

6.3 **Pass-Through**. Vendor hereby assigns to Customer all assignable warranties, representations and indemnities granted to Vendor by Third Parties in the Third Party Software and Embedded Third Party Software or any components thereof, and all remedies for breach of such warranties, representations and indemnities. To the extent that Vendor is not permitted to assign any of such warranties and indemnities to Customer, Vendor will enforce such warranties and indemnities on behalf of Customer to the extent Vendor is permitted to do so under the terms of the applicable Third Party agreements.

7. **SOFTWARE MAINTENANCE.**

7.1. **Maintenance Services**. For the term identified in a Procurement Document (including **Appendix 8.1**), but if no term is identified then during the Warranty Period and thereafter for as long as Customer desires and elects to receive Maintenance Services, Vendor will provide the support and maintenance Services set forth in **Appendix 7.1** (Maintenance Services), and the applicable Procurement Document ("**Maintenance Services**").

7.2. **Maintenance Fees**. Vendor will provide all Maintenance Services at the rates set forth in **Appendix 8.1** or the applicable Procurement Document ("**Maintenance Fees**"); provided that the Maintenance Fees will not increase, for the first three (3) years of the Agreement from the Effective Date. Thereafter, Maintenance Fees will be subject to an annual increase equal to the increase, if any, in the Consumer Price Index-All Urban Consumers, for the prior calendar year on a non-cumulative basis.

7.3. **Term and Termination**. Maintenance Services will be provided for one-year terms for a minimum of five years commencing from the date identified in the Procurement Document, but if no date is set forth, from Customer Acceptance of the Software. Thereafter, Customer will have the right to renew the Maintenance Services for successive one (1) year terms upon written notice to Vendor; provided that Vendor is then offering Maintenance Services for such Software. Customer will have the right to discontinue receiving Maintenance Services at any time upon 30 calendar days' notice to Vendor. In the event Software is licensed on a per

copy basis, Customer may discontinue Maintenance Services for one or more licensed copies (with a proportionate decrease in the Maintenance Fees). In the event of such termination by Customer, Customer will receive a proportionate refund of any prepaid but unused Maintenance Fees. Subsequent to any such termination, Customer may, at its option, reinstate the Maintenance Services by providing notice to Vendor. In such event, Customer will pay to Vendor (a) the fees (which shall not include any penalty charges) Customer would have paid had Maintenance Services been renewed and (b) the fees for the next twelve (12) month term for such Software.

7.4. **Software Features and Functionality**. If Vendor in any Enhancement deletes material features or functionality from any Software previously licensed to Customer and transfers the same (either directly or through an agreement with a Third Party) to other or new products, the portion of those other or new products that contains the features or functionality in question, or the entire product, if such features and functionality cannot be separated out, will be: (a) provided to Customer as an Enhancement at no cost to Customer if Customer is covered by Maintenance; and (b) covered under the Maintenance Services applicable to the original Software at no additional cost to Customer.

7.5. **Defects**. During any period in which Customer is entitled to receive Maintenance Services, the Software will contain the functionality, and will operate in accordance with, and conform to, the applicable Specifications. Vendor will not be responsible for correction of errors caused by modifications made to the Software by Customer.

7.6. **Maintenance Standards**. Vendor will perform the Maintenance Services at least according to the quality standards of the Software as of the date of the applicable Procurement Document, and otherwise in a good, workmanlike and professional manner using qualified people fully familiar with the Software.

## 8. COMPENSATION TERMS.

8.1. **License and Maintenance Fees for Software**. The license fees and Maintenance Fees applicable to Software procured hereunder will be set forth in **Appendix 8.1** attached hereto and incorporated herein by reference and in the applicable Procurement Document. Unless otherwise set forth in such Appendix 8.1 or Procurement Document, Vendor will invoice Customer for the Software license fees upon delivery of such Software.

8.2. **Fees and Expenses for Services**. The fixed fee or hourly labor rate for Services hereunder will be set forth in the applicable Procurement Document. For each hourly engagement, the rates set forth in each Procurement Document will remain in effect for the term thereof and will not be changed except by mutual agreement of the parties. For time and material engagements, Vendor will only invoice Customer for time spent in the performance of the Services (e.g., travel time is not billable). Customer agrees to pay Vendor's reasonable travel expenses in performing any Services in accordance with Customer's Travel and Expense Policy attached hereto as **Appendix 8.2** (Travel and Expense Policy) and incorporated herein by this reference. Vendor will not be entitled to any compensation or reimbursement in connection with

the Software or Services unless such amounts are explicitly set forth in the applicable Procurement Document or are approved by Customer in writing. Customer has no obligation to pay any fees or expenses invoiced more than twelve (12) months after they accrue.

8.3. **Taxes**. Vendor will calculate and remit, and Customer will pay, all sales and use taxes resulting from this Agreement, subject to **Appendix 8.3** (Illinois Software Taxes) attached hereto and incorporated herein. Taxes for each applicable jurisdiction will be separately stated on the invoice by tax category (e.g., invoices for Software will separately list license fees, Maintenance Services and other Services).

8.4. **[Intentionally Omitted]**

8.5. **Invoice Format**. All fees payable to Vendor under this Agreement will be detailed, categorized and clearly stated on an invoice, in a form reasonably acceptable to Customer, in accordance with this Agreement. Except as provided in the applicable Procurement Document, Vendor will invoice Customer on a monthly basis for Software delivered, Services performed and reimbursable expenses incurred, per a Procurement Document, during the prior month. The parties agree to mutually develop procedures for invoicing formats and methods for invoice reconciliation in the event of dispute. Vendor will provide such supporting detail as may be reasonably requested by Customer. Without limiting the generality of the foregoing, and unless otherwise provided for in an Procurement Document, all invoices will comply with the following: (a) the invoice will contain transaction level detail sufficient to enable Customer to validate and verify the charges and will include accurate "bill to" designators; (b) the invoice will be provided in soft copy and in a consistent manner suitable for input to a mechanized process (e.g., as a fixed or delimited flat file or other mutually agreed upon file format); and (c) invoices will be delivered promptly (i.e., within 10 business days of the end of the billing period). Vendor will submit all invoices to the following address:

*Services Invoices*:
Sears Holdings Management Corporation
Reference: Kana Software/John DiCecco
Accounts Payable
P.O. Box 957437
Hoffman Estates, Illinois 60195

*Software Invoices:*
SPS, Inc.
Accounts Payable
Suite 1000
4849 Greenville Ave.
Dallas, Texas 75206-4166

or to such other address as may be specified by Customer upon notice to Vendor. Each invoice must reference the Customer IT Manager, applicable Procurement Document number and, if

available, the Project name identified in the applicable Procurement Document; provided that Customer provides such information to Vendor.

8.6. **Method of Payment and Timing**. Unless otherwise provided by the Procurement Document, Customer will initiate payment of all undisputed and properly invoiced amounts within 60 calendar days after receipt of a proper and correct invoice, unless such 60th day is a Saturday, Sunday or bank holiday, in which case Customer will initiate payment on the next banking day; provided that if Acceptance is applicable to the Procurement Document and the Acceptance Period for Software has been extended under **Section 5.2** (Defects and Correction), then the payment date will be extended so that payment for such Software will be due 10 days after Customer has Accepted such Software. In the event of a dispute with regard to any portion of an invoice, the undisputed portion will be paid as provided herein. Customer has no obligation to pay any charges or expenses invoiced more than twelve (12) months after they accrue, except to the extent they are for taxes which Customer is obligated to pay pursuant to **Section 8.3** of this Agreement and which are imposed after such period. All amounts payable under this Agreement will be payable in U.S. Dollars.

8.7. **Records**. Vendor will: (a) retain records to document the Software and Services provided and fees paid or payable by Customer under this Agreement until the later of (i) three (3) years after billing, and (ii) final resolution of any actively pending disputes between the parties relating to Vendor's charges; and (b) upon reasonable notice from Customer, provide Customer with reasonable access to such records and documents.

9. **OWNERSHIP OF DELIVERABLES.**

9.1. **Software**. Subject only to the license granted pursuant to this Agreement, title to the Software will not be affected by this Agreement and will at all times remain with Vendor and its Third Party licensors, if applicable.

9.2. **Deliverables**. Subject only to the following, title to all Deliverables will not be affected by this Agreement and will at all times remain with Vendor (or, with Vendor's licensor); provided that Vendor will not obtain any ownership right in any concepts, works, information, data and other ideas and materials provided to Vendor by, or on behalf of, Customer, its Affiliates and their Personnel. Vendor hereby grants to Customer a perpetual, unrestricted worldwide, royalty free (subject only to the fees provided for in the Procurement Document), irrevocable (except as otherwise provided herein), non-exclusive right and license, to copy, use, modify and sub-license all Deliverables, to the same extent as if Customer were the sole owner thereof, without an obligation to account to Vendor.

9.3. **General Knowledge**. This Agreement will not preclude Vendor from using: (a) the Deliverables, or (b) its general knowledge, skills and experience for its other clients; provided, in each case, however, that Vendor does not use in connection therewith any of Customer' Confidential Information.

9.4. **Customer Data**. Vendor understands and acknowledges that Customer will have the right to, among other things: (a) manage, modify, maintain and update pre-existing data and information; and (b) generate, manage, modify, maintain and update additional data and information (collectively, "**Customer Data**") using the Software. Customer Data will be treated as Customer Confidential Information, and Customer will retain all right, title and interest in and to all Customer Data.

9.5. **No Liens**. No mechanics' or other lien, or notice creating such lien, or claim or action thereon will be filed by Vendor, or any person or entity acting through Vendor, for Software, Services or Deliverables under this Agreement. Where applicable, Vendor will, upon request of Customer, deliver to Customer, contemporaneously with any payment, recordable partial waivers of lien for any partial payments, and a recordable final waiver of lien for the final payment.

## 10. PERSONNEL.

10.1. **Independent Contractor**. The relationship of Vendor and its Personnel to Customer will be that of independent contractors and nothing set forth in this Agreement will be deemed or construed to render the parties as joint venturers, partners or employer and employee. Vendor's Personnel are neither employees nor agents of Customer and are not eligible to participate in any employment benefit plans or other conditions of employment available to Customer' employees. Vendor will be solely responsible for making or causing to be made all deductions and withholdings from its Personnel's salaries and other compensation. Vendor will have exclusive control over its Personnel and over the labor and employee relations, and the policies relating to wages, hours, working conditions or other conditions of its Personnel. Vendor will have the exclusive right to hire, transfer, suspend, lay off, recall, promote, assign, discipline, discharge and adjust grievances with its Personnel. At any time, however, Customer will have the right to require Vendor to remove from any Customer Project any Personnel objectionable to Customer for any lawful reason.

10.2. **Staffing**. Vendor will consult with Customer on all Personnel decisions which relate to each Project, and will staff each Project with Personnel possessing sufficient skill, experience and ability to perform the Services required to comply with the applicable Procurement Document (and any agreed upon Milestones).

10.3. **Key Personnel**. If requested by Customer, Vendor will identify key individuals, including Vendor's employees, agents and subcontractors ("**Key Personnel**"), in the applicable Statement of Work. Customer reserves the right to approve or reject the appointment of and replacements for all Key Personnel. Vendor will not remove Key Personnel from any Customer' Project without Customer' consent; provided that this prohibition will not apply to re-assignments outside of the Vendor's control (e.g., death, disability, voluntary resignation, termination by Vendor of such Personnel for cause, etc).

## 11. CONFIDENTIALITY.

11.1. **Confidential Business Information.**

11.1.1 **Definition.** "**Confidential Business Information**" means any information, whether disclosed in oral, written, visual, electronic or other form, disclosed by, or on behalf of, a party or such party's Affiliates and their Personnel (the "**Disclosing Party**") to the other party, or such party's Affiliates (the "**Receiving Party**") or to Receiving Party's Personnel, or which the Receiving Party or its Personnel observe in connection with this Agreement, whether before or after the date of this Agreement; which (a) if in tangible form or other media that can be converted to readable form, is marked clearly as "confidential" (or with a similar term) when disclosed, or (b) if oral or visual, is identified as "confidential" (or with a similar term) at the time of disclosure and is promptly summarized in a writing marked as such thereafter. Customer' Confidential Business Information will include, without the need to mark it as such, Customer or its Affiliates': business plans, strategies, forecasts, projects, analyses; financial information; employee and vendor information; system designs and requirements, architectures, structure and protocols (including all hardware, software and specifications and documentation related thereto); and other business processes and proprietary information. This **Section 11** (Confidentiality) will also apply to any information exchanged between the parties regarding proposed business, regardless of whether the parties enter into a contract regarding such proposed business. The Software will be deemed to be the Confidential Business Information of Vendor and the terms and existence of this Agreement will also be Confidential Business Information of each party.

11.1.2 **Failure to Denote as Confidential.** If the Disclosing Party fails to denote Confidential Business Information as "confidential" (or with a similar term) prior to disclosure, and later does so, the Receiving Party will, after receiving such notice, treat such information as Confidential Business Information of the other party to the extent such untimely notice does not prejudice the Receiving Party.

11.1.3 **Treatment of Confidential Business Information.** The Receiving Party will use the same care and discretion to avoid disclosure, publication or dissemination of any Confidential Business Information received from the Disclosing Party as the Receiving Party uses with its own similar information that it does not wish to disclose, publish or disseminate. Further, the Receiving Party will: (a) use the Disclosing Party's Confidential Business Information only in connection with the Receiving Party's performance of its obligations or its full enjoyment of its rights hereunder, and (b) not disclose the Disclosing Party's Confidential Business Information except to its Personnel, who have a need to know such Confidential Business Information in connection with the performance of the Receiving Party's obligations or the full enjoyment of its rights hereunder. Vendor will restrict disclosure of Customer' Confidential Business Information to its Personnel who have executed a written agreement by which they agree to be bound by terms substantially similar to this Section. In any case, the Receiving Party is liable for any unauthorized disclosure or use of Confidential Business Information by any of its Personnel.

11.1.4 **Exceptions to Confidential Treatment.** The obligations under this Section do not apply to any Confidential Business Information that the Receiving Party can demonstrate:

(a) the Receiving Party possessed prior to disclosure by the Disclosing Party, or its Affiliates, without an obligation of confidentiality;

(b) is or becomes publicly available without breach of this Agreement by the Receiving Party;

(c) is independently developed by the Receiving Party without use of any Confidential Business Information of the Disclosing Party; or

(d) is received by the Receiving Party from a Third Party that does not have an obligation of confidentiality to the Disclosing Party or its Affiliates.

11.1.5 **Disclosure.** If, in the reasonable opinion of its legal counsel, a Receiving Party is: (a) required by law to disclose any Confidential Business Information of the other party in connection with any legal proceeding, or (b) such disclosure would be material in any legal proceeding concerning the Confidential Business Information, the Services provided for hereunder, or this Agreement; then the Receiving Party may disclose such information to the arbitrator, court or other governmental authority, as the case may be; provided, in each case, the Receiving Party will notify the other party a reasonable time prior to such disclosure and will allow the Disclosing Party a reasonable opportunity to seek appropriate protective measures.

11.1.6 **Duration.** The Receiving Party's obligations under this **Section 11.1** (Confidential Business Information) will survive the termination/completion of the applicable Procurement Document for a period of five years from the date that the applicable Confidential Business Information was initially disclosed.

11.2. **Confidential Personal Information.**

11.2.1 **General.** Vendor agrees that all information about Customer or its Affiliates' individual customers provided by Customer or its Affiliates to Vendor, including but not limited to names, addresses, telephone numbers, account numbers, customer lists, and demographic, financial and transaction information ("**Confidential Personal Information**"), will be deemed confidential. This **Section 11.2** (Confidential Personal Information) will not apply to information independently developed by Vendor without the use of Confidential Personal Information, provided that Vendor is not using such information on Customer or its Affiliates behalf. In the event information may be deemed to be both Customer Business Information and Customer Confidential Personal Information, the provisions of this **Section 11.2** will control.

11.2.2 **Treatment of Confidential Personal Information.** Vendor will use Confidential Personal Information only as necessary to perform the Services and its other obligations under this Agreement. Vendor will not duplicate or incorporate the Confidential Personal Information into its own records or databases. Vendor will restrict disclosure of Confidential Personal Information to its Personnel who have a need to know such information to perform the Services and who have first agreed in writing to be bound by terms substantially similar to this **Section 11.2** (Confidential Personal Information). Vendor is liable for any unauthorized disclosure or use of Confidential Personal Information by any of its Personnel.

11.2.3 **Non-Disclosure of Confidential Personal Information.** Vendor will not disclose the Confidential Personal Information to any Third Party, including an affiliate of Vendor, agents, independent contractors or a permitted subcontractor, without prior written consent of Customer and the written agreement of such Third Party to be bound by terms substantially similar to this **Section 11.2** (Confidential Personal Information). Unless otherwise prohibited by law, Vendor will: (a) immediately notify Customer of any legal process served on Vendor for the purpose of obtaining Confidential Personal Information; and (b) permit Customer or its Affiliates adequate time to exercise its legal options to prohibit or limit such disclosure.

11.2.4 **Vendor Policies for Confidential Personal Information.** Vendor will establish and maintain written policies and procedures designed to ensure: (a) the security and the confidentiality of the Confidential Personal Information; (b) protect against any anticipated threats or hazards to the security or integrity of such information; and (c) protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to any customer. Copies of such policies and procedures will be provided to Customer upon Customer' request.

11.2.5 **Vendor Notification for Confidential Personal Information.** Vendor will notify Customer promptly upon the discovery of the loss, unauthorized disclosure or unauthorized use of the Confidential Personal Information and will indemnify Customer and its Affiliates and hold Customer harmless for such loss, unauthorized disclosure or unauthorized use, including attorney's fees.

11.2.6 **Customer Audit Rights.** Vendor will permit **Customer** to audit Vendor's compliance with the provisions of this **Section 11.2** (Confidential Personal Information) at any time during Vendor's regular business hours.

11.2.7 **Vendor Breach.** A breach of this **Section 11.2** (Confidential Personal Information) will be grounds for immediate termination of this Agreement. In addition, Customer and/or its Affiliates will be entitled to the recovery of any pecuniary gain realized by Vendor from the unauthorized use or disclosure of Confidential Personal Information.

11.3. **Return or Destruction of Confidential Information**. Within 10 days following the earlier of: (a) termination or expiration of this Agreement, or (b) completion of a Project for which the Confidential Personal Information has been provided, Vendor will, at Customer's discretion, either return Customer's Confidential Information, and all copies/derivatives thereof, to Customer; certify in writing to Customer that such Confidential Information, and that all copies/derivatives, have been destroyed in such a manner that it cannot be retrieved.

## 12. DEFENSE, INDEMNIFICATION AND INFRINGEMENT

12.1. **Defense and Indemnification**. Vendor will defend, indemnify and hold harmless Customer and its Affiliates, and their respective Personnel, successors and assigns (collectively, the "**Indemnified Parties**"), against all liabilities, damages, awards, losses, costs and expenses (including costs and attorney's fees) arising out of any claims, demands, suits, or causes of action by Third Parties (hereinafter "**Claims**"), which result or are claimed to result in whole or in part from (a) any negligent act or omission of Vendor or its Personnel that results in damage to person or tangible property including death; (b) all claims of Vendor's employees, agents, and subcontractors, whether for injury, death, compensation, social security, pension, unemployment compensation, etc.; (c) any breach of Section 11 (Confidentiality), and Section 12 (Defense, Indemnification and Infringement) of this Agreement by Vendor or its Personnel; (d) the violation of any Intellectual Property rights of Third Parties caused by Vendor, its Personnel or resulting from the Services provided by Vendor or Customer use of the Software in accordance with its Documentation provided that Vendor will not be required to defend, indemnify or hold harmless the Indemnified Parties for any such violation caused by a Customer Combination; or (e) the violation by Vendor or its Personnel of any law or regulation. However, Vendor will not be liable for damage to Third Parties to the extent such damage was caused by the negligence or willful misconduct of Customer as determined in a final, non-appealable order of a court of competent jurisdiction.

12.2. **Infringement**. In the event the Software is held or is likely to be held to constitute an infringement, Vendor, at its own expense, will first use reasonable and prompt efforts to: (a) procure for Customer the right to continue to use the Product; (b) modify the Software so that it is non-infringing and of at least equivalent performance and functionality; or (c) upon adequate showing to Customer that both of the foregoing options are not commercially feasible, to either provide functionally equivalent replacement Software to Customer or reimburse Customer for Software license fees and any unused prepaid Maintenance Fees paid for such infringing Software, prorated over the three year lifespan of such Software. Provided, however, that if the infringing claim accrues or arises during the first twelve (12) months from the Effective Date whether the claim is known or unknown, and Vendor is unable to satisfy such claim through 12.2 (a) or 12.2 (b) Customer shall be entitled to a refund of: (i) all Software License fees paid; (ii) all prepaid Maintenance Fees; and (iii) all Services fees paid in connection with the implementation of the Software. Customer' rights under this Section will be in addition to and will not limit Customer' rights under **Section 12.1** (Defense and Indemnification). This **Section 12.2** does not apply to any infringement caused by a Customer Combination.

12.3. **Procedures**. Vendor has the right to control the defense of any Claim; provided, however, that Customer will have the right to participate in such defense (at Customer's cost) and may advise in the selection of counsel. Upon Vendor's request, Customer will reasonably cooperate in such defense and Vendor will reimburse Customer for its reasonable out-of- pocket expenses in providing such cooperation. Customer will provide prompt notification of any Claim; provided, however, that any delay by Customer in giving such notice will not relieve Vendor of its obligations pursuant to this **Section 12** (Indemnification and Infringement), except to the extent that Vendor demonstrates actual damage caused by such delay.

12.4. **Independent Obligation**. The obligations of Vendor to defend, indemnify and hold harmless, the Indemnified Parties under this **Section 12** (Indemnification and Infringement) will be independent of each other and any other obligation of the parties hereunder.

13. **INSURANCE.**

13.1. **Required Insurance**. Vendor will obtain and maintain the following insurance (or any higher coverage required by Applicable Law). Each such policy must be primary and non-contributory over all other insurance maintained by Customer:

13.1.1 Commercial General Liability must be written on an occurrence basis, with coverage including premises/operations, contractual, personal and advertising injury, and products/completed operations liabilities, with limits of not less than $5,000,000 per occurrence, $5,000,000 aggregate (products/completed operations), and $5,000,000 general aggregate. Customer will be named as an additional insured. Limits of liability requirements may be satisfied by a combination of Commercial General Liability and Umbrella Excess Liability policies.

13.1.2 Motor Vehicle Liability insurance for owned, non-owned and hired vehicles, with limits of not less than $100,000 per person/per accident.

13.1.3 Workers' Compensation insurance, including coverage for all costs, benefits, and liabilities under Workers' Compensation and similar laws which may accrue in favor of any person employed by Vendor, for all states in which the Project or work to be performed is located, and Employer's Liability insurance with limits of liability of not less than $100,000 per accident or disease and $500,000 aggregate by disease. Vendor warrants and represents that its subcontractors will maintain Workers' Compensation and Employer's Liability insurance, and Vendor further agrees to indemnify Customer for any loss, cost, liability, expense and/or damage suffered by Customer as a result of the failure of Vendor's subcontractors to maintain such insurance.

13.1.4 Fidelity Bond or Criminal Insurance covering employee dishonesty with limits of not less than $500,000 per loss.

13.1.5 Professional Liability or Errors & Omissions Insurance with limits of not less that $3,000,000 per claim.

13.2. **Policies**. Insurance will be purchased from companies having a rating of A-VII or better in the current BEST'S INSURANCE REPORTS published by A.M. Best Company. Policies of insurance will provide that they will not be canceled or materially changed without at least 30 calendar days' prior written notice to Customer. Vendor will deliver to Customer, on or before the Effective Date, a certificate of insurance evidencing the required coverage under this Agreement (which certificate will be attached hereto as **Appendix 13.2** on each insurance policy renewal thereafter. Additionally, any approval by Customer of any of Vendor's insurance certificates will not relieve Vendor of any obligation contained in this Agreement, including, without limitation, liability under this Section or under **Section 12** (Defense, Indemnification and Infringement), for claims in excess of described limits.

## 14. TERM AND TERMINATION.

14.1. **Term**. This Agreement will become effective as of the Effective Date and will continue in full force and effect thereafter for a period of five years (the "**Term**"), unless earlier terminated as provided for herein. Upon expiration or termination of this Agreement pursuant to **Section 14.3** (Termination for Convenience), the terms of this Agreement will survive for purposes of any Procurement Documents that are still in effect as of such date; provided that no new Procurement Documents will be entered into after such expiration/termination.

14.2. **Termination for Cause**.

14.2.1 **Agreement**. In the event of a material breach of this Agreement by a party, the other party may terminate this Agreement in accordance with **Section 14.2.3** (Notice and Cure) below. Termination of this Agreement for cause will automatically terminate all Procurement Documents.

14.2.2 **Procurement Documents**. In the event of a material breach of a Procurement Document by a party, the other party may terminate such Procurement Document in accordance with **Section 14.2.3** (Notice and Cure) below. Upon termination of a Procurement Document for cause, the terminating party will have the option, in its sole discretion, of terminating for cause any related Procurement Documents (e.g., Maintenance Services related to a Software license).

14.2.3 **Notices and Cure**. A party seeking to terminate this Agreement and/or a Procurement Document due to the material breach must first give the breaching party written notice specifying the breach. If the breaching party fails to cure the breach within 30 days of the date of the notice, then the non-breaching party may thereafter notify the breaching party in writing that it is terminating for cause this Agreement or the Procurement Document(s), as applicable. Any such termination will be effective as of the date specified in such termination notice.

14.2.4 **Termination Charges**. No termination charges will apply to any termination under this **Section 14.2** (Termination for Cause).

14.3. **Termination For Convenience**.

14.3.1 **Agreement**. Customer will have the right to terminate this Agreement, without cause, by providing 60 calendar days' written notice to Vendor and such termination will be without penalty, obligation for further payment, liability or damages of any nature whatsoever, except as set forth in **Section 14.3.3** (Customer Obligations).

14.3.2 **Procurement Document**. Customer will have the right to terminate Services under any Procurement Document or other signed agreement, without cause, by providing written notice to Vendor, and such termination will be without penalty, obligation for future payment, liability or damages of any nature whatsoever, except as set forth in **Section 14.3.3** (Customer Obligations).

14.3.3 **Customer Obligations**. Upon termination of this Agreement and/or any Procurement Document without cause pursuant to this **Section 14.3** (Termination for Convenience), Customer will be liable only for (as applicable): (a) Software licensee fees (which will be prorated on a daily basis solely for Software licensed on a non-perpetual basis), subject to Customer right to reject such Software pursuant to **Section 5** (Acceptance), if applicable; and (b) any Service fees earned for Services actually performed and related expenses incurred prior to the date of such termination.

14.4. **Effect of Expiration/Termination**.

14.4.1 **Non-Perpetual License**. Any non-perpetual license(s) granted herein shall remain in effect unless terminated as provided herein. Upon termination of this Agreement, all non-perpetual licenses and rights granted hereunder shall terminate, Customer will cease all use of the Software, and Customer shall immediately return to Vendor the Software, all duplicates, the Documentation and any other Confidential Business Information provided by Vendor, together with any and all documents, notes and other materials relating to the Software and a signed written statement certifying that Customer has returned to Vendor, and is no longer in possession of, any of the foregoing.

14.4.2 **Perpetual Licenses**. Notwithstanding anything to the contrary in this Agreement or any Procurement Document, neither expiration nor termination of this Agreement or any Procurement Document will terminate any perpetual licenses granted under this Agreement, provided, however, Customer use of the perpetual licenses shall be subject to the applicable terms and conditions of this Agreement governing the use of the perpetual licenses which shall survive termination. Notwithstanding Section 14.2.3 (Notices and Cure), in the event that Customer breaches its confidentiality obligations with respect to Vendor's Confidential Business Information and or license restrictions with respect to a perpetual license, as set forth herein and Customer is unable to cure such breach as determined by Customer in its sole, absolute and unfettered discretion, Vendor shall have the right to terminate the perpetual license that was the subject of the non-curable breach.

14.4.3 **Transition Rights.** Upon expiration or termination of this Agreement by either party for any reason, Vendor will provide Customer reasonable transition Services ("**Transition Services**"), for up to 3 months after such termination (the "**Transition Period**"), relating to the transition from the Software to another system, including Maintenance Services and all other Services necessary for an orderly conversion of the Software/System. For Services which Customer was receiving from Vendor prior to such expiration/termination, the fees applicable to such Transition Service will be the rates which Customer was paying prior to such expiration/termination. For all other Transition Services, Vendor will not charge Customer fees in excess of the Vendor's then standard rates (taking into account the average discount Vendor provides to its similarly sized customers). Customer' payment of any such Transition Services fees will not be a waiver of Customer' right to claim such amount as damages, in the event Vendor has breached this Agreement or the applicable Procurement Document. Notwithstanding anything to the contrary in this Agreement, termination of this Agreement will not terminate any licenses granted under this Agreement until expiration of the Transition Period.

15. **LIMITATION OF LIABILITY.**

15.1. **Limitation Upon Types of Recoverable Damages**. **NEITHER PARTY WILL BE LIABLE FOR ANY CONSEQUENTIAL, INDIRECT, EXEMPLARY, OR PUNITIVE DAMAGES, REGARDLESS OF WHETHER THE CLAIM GIVING RISE TO SUCH DAMAGES IS BASED UPON BREACH OF WARRANTY, BREACH OF CONTRACT, NEGLIGENCE OR STRICT LIABILITY, EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY THEREOF. MOREOVER, EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, IN NO EVENT WILL EITHER PARTY'S (OR THEIR AFFILIATES') LIABILITY UNDER THIS AGREEMENT EXCEED THE AGGREGATE FEES PAID (OR TO BE PAID) BY CUSTOMER TO VENDOR UNDER THIS AGREEMENT.**

15.2. **Exclusions from Limitations of Liability**. Notwithstanding anything contained herein to the contrary, the limitations of liability contained in this **Section 15** (Limitation of Liability) will not apply to: (a) Vendor's defense and indemnification obligations under **Section 12** (Indemnification and Infringement); (b) personal injury, including death, and damage to tangible property caused by the negligent or intentional acts of a party, its Affiliates or their Personnel; or (c) either party's obligation to pay litigation costs and attorneys' fees incurred by the other party in enforcing the terms of this Agreement as set forth in **Section 17.4** (Attorneys' Fees).

16. **DISABLEMENT OF SOFTWARE / HARDWARE.**

Except during and in conjunction with Maintenance Services or any other authorized servicing or support, in no event will Vendor, its Personnel, or anyone acting on its behalf, disable or otherwise impair the functionality or performance of (or permit or cause any embedded mechanism to disable or impair the functionality or performance of) the Software or any other

hardware or software owned or utilized by Customer or its Affiliates without the written permission of a corporate officer of Customer.

## 17. MISCELLANEOUS.

17.1. **Agreement Binding; Assignment**. Upon signature of both parties, this Agreement will be binding upon and inure to the benefit of the parties and their successors and permitted assigns; provided, however, that no assignment by either party will be of any force except with the prior written consent of the other party, which may be withheld only "for cause." For purposes of this **Section 17.1** only, the following will constitute "cause": (a) the other party's uncured material breach of this Agreement; (b) the non-assigning party's reasonable conclusion that the assigning party's proposed assignee lacks the resources or experience to perform the assigning party's ongoing and future obligations under this Agreement, or (c) the attempted assignment is to a competitor of the non-assigning party.

17.2. **Governing Law**. The rights and duties of the parties will be governed by the local law of the State of Illinois, excluding any choice-of-law rules that would require the application of the laws of any other jurisdiction. Vendor consents to service of process in the same manner as notice may be given under **Section 17.3** (Notices) below.

17.3. **Notices**. All notices required or permitted to be given by one party to the other under this Agreement will be sufficient if sent by: (a) hand delivery; (b) certified mail, return receipt requested; (c) nationally recognized overnight courier service; or (d) facsimile with electronic confirmation to the sender, to the applicable party at its address(es) or facsimile number(s) set forth below:

| | |
|---|---|
| If to Customer: | Sears Holdings Management Corporation<br>3333 Beverly Road, Mail Station: B6-157B<br>Hoffman Estates, Illinois 60179<br>Attn.: Senior V.P. & C.I.O.<br>Facsimile: (847) 286-1185 |
| With a copy to: | Sears Holdings Management Corporation<br>3333 Beverly Road, Mail Station: B5-212B<br>Hoffman Estates, Illinois 60179<br>Attn.: General Counsel<br>Facsimile: (847) 286-5421 |
| If to Vendor: | KANA Software, Inc.<br>181 Constitution Drive<br>Menlo Park, CA 94025<br>Attn: General Counsel<br>Facsimile: (650) 614-8301 |

All notices will be effective: (w) when delivered personally; (x) three (3) business days after being sent by certified mail; (y) the first business day after being sent by a nationally recognized courier; or (z) on the same business day on which it is sent by facsimile; provided such transmittal is complete before 5 p.m. (C.S.T.) and is followed by notice under subsection (a), (b) or (c) above. Either party may change its notice information by giving proper notice of such change to the other party, provided that such notice will only be effective upon receipt. If this Section states no notice information for Vendor, notice will be effective if given to Vendor at the address specified in this Agreement's introductory paragraph or Vendor's address last known to Customer.

17.4. **Attorneys' Fees**. In the event of an alleged breach of this Agreement, the prevailing party will be entitled to reimbursement of all of its costs and expenses, including reasonable attorneys' fees, costs and expenses incurred in connection with such dispute, claim or litigation, including any appeal therefrom. For purposes of this Section, the determination of which party is to be considered the prevailing party will be decided by the court of competent jurisdiction or independent party (i.e., mediator or arbitrator) that resolves such dispute, claim or litigation.

17.5. **Online Access**. If Vendor is given access, whether on-site or through remote facilities, to any Customer' or its Affiliates computer or electronic data storage system, in connection with the Software/Services under this Agreement, Vendor will limit such access and use solely to performing its obligations within the scope of this Agreement and will not attempt to access any computer system, electronic file, software or other electronic services other than those specifically required to accomplish its obligations under this Agreement. Vendor will limit such access to those of its Personnel who need to have such access in connection with this Agreement, will, upon Customer' request, advise Customer in writing of the name of each such Personnel who will be granted such access, and will strictly follow all Customer' security rules and procedures for use of Customer' electronic resources. All user identification numbers and passwords disclosed to Vendor and any information obtained by Vendor as a result of Vendor's access to, and use of, Customer' computer and electronic storage systems will be deemed to be, and will be treated as, Customer' Confidential Information. Vendor will cooperate with Customer in the investigation of any apparent unauthorized access by Vendor to Customer' computer or electronic data storage systems or unauthorized release of Customer' Confidential Information by Vendor.

17.6. **Security Policies**. Vendor and Customer agree that their Personnel, while working at or visiting the premises of the other party, will comply with all the internal rules and regulations of the other party communicated in writing to the visiting party's Personnel, including security procedures, and all Applicable Laws.

17.7. **Severability**. If any provision of this Agreement is determined to be unenforceable, the parties intend that this Agreement be enforced as if the unenforceable provisions were not present and that any partially valid and enforceable provisions be enforced to the extent that they are enforceable.

17.8. **Subcontractors**. Vendor acknowledges that it is the commitment of Customer to successfully bring minorities and women into the American economic system by doing business with qualified minority and women sources. In furtherance of Customer' aforesaid commitment, if Vendor utilizes the services of subcontractors, Vendor will use reasonable efforts to utilize subcontractors that are qualified minority-owned and/or women-owned sources. Except as to providers of Embedded Third Party Software, Vendor will obtain Customer' written consent, which Customer will have the right to withhold in its sole discretion, before entering into any agreement with any Third Party, including its Affiliates, to supply any of the Software or Services to Customer.

17.9. **Advertising**. Vendor will not, without Customer' prior written consent, use the names, service marks and/or trademarks of Customer or any of its Affiliates, or publicize the existence of this Agreement in any manner, including in any advertising, publicity release or sales presentation.

17.10. **No Waiver; Cumulative Remedies**. The failure of either party to insist, in any one or more instances, upon the performance of any of the terms, covenants, or conditions of this Agreement or to exercise any right hereunder, will not be construed as an election or remedies, waiver, or relinquishment of the future performance of any rights, and the obligations of the party with respect to such future performance will continue in full force and effect. Except as otherwise provided herein, all remedies provided for in this Agreement will be cumulative and in addition to and not in lieu of any other remedies available to either party at law, in equity or otherwise.

17.11. **Entire Agreement**. This Agreement, together with all Appendixes and Procurement Documents thereto, constitutes the complete, final and exclusive statement of the terms of this Agreement among the parties pertaining to the subject matter hereof and supersede all prior agreements, understandings, negotiations and discussions of the parties Furthermore, this Agreement will supersede, and Customer will not be bound by, any "shrink wrap license" which is bundled with the Software, the Documentation, the Deliverables or any "disclaimers" or "click to approve" terms or conditions now or hereafter contained in the Software, the Documentation, the Deliverables or any web site which Customer uses in connection with Vendor's Software or Services. No modification or rescission of this Agreement will be binding unless executed in writing by the party to be bound thereby. Each Appendix and Procurement Document will be subject to the terms of this Agreement.

17.12. **Software License Rights in Bankruptcy**. Failure by Customer to assert its right to retain its benefits to the Intellectual Property embodied in the Software and the Source Code pursuant to Section 365(n)(1)(B) of the Bankruptcy Code with respect to an executory contract rejected by Vendor or Vendor's trustee in bankruptcy will not (absent Customer' written waiver of such rights) be construed by the courts as a termination of such contract (or the related Software license rights) by Customer under Section 365(n)(1)(A) of the Bankruptcy Code.

17.13. **Interpretation**. The Section and Section headings of this Agreement and of any Appendixes and Procurement Documents under this Agreement are for convenience only and

will not be deemed part of this Agreement. As used in this Agreement (including any Appendixes or Procurement Documents hereto): (a) any defined terms include the plural as well as the singular, and (b) references to the word "include" and its derivatives (including, "e.g.") will be deemed to mean "including but not limited to". The parties agree that any principle of construction or rule of law that provides that an agreement will be construed against the drafter of the agreement in the event of any inconsistency or ambiguity in such agreement will not apply to the terms and conditions of this Agreement.

17.14. **Export Controls**. Vendor and Customer will comply with all applicable export control laws of the United States with respect to the Software and/or Services. Upon Customer' request, Vendor will identify which export laws (and the applicable classifications related thereto) apply to Vendor's Software. Vendor will cooperate with Customer in obtaining any regulatory approvals, permits, or licenses that are necessary to enable Customer to exercise its rights herein.

17.15. **Third Party Beneficiaries**. Other than the Customer' Affiliates, there are no third party beneficiaries to this Agreement.

17.16. **Survival**. Any terms of this Agreement that would, by their nature, survive the termination of this Agreement will so survive including **Section 3** (Software), **Section 0** (APIs), **Section 6** (Representations and Warranties), **Section 8** (Compensation Terms), **Section 9** (Ownership of Deliverables), **Section 10** (Personnel), **Section 11** (Confidentiality) **Section 12** (Defense, Indemnification and Infringement), **Section 13** (Insurance), **Section 14** (Term and Termination), **Section 15** (Limitation of Liability), **Section 16** (Disablement of Software/Hardware) and **Section 17** (Miscellaneous).

17.17. **Signatures**. This Agreement may be executed in counterparts, which together will constitute one and the same agreement. Each party will have the right to rely on a facsimile signature on this Agreement, and each party will, if the other party so requests, provide, after such transmission, an originally signed copy of this Agreement to the other party.

***Signature Page Follows***

**IN WITNESS WHEREOF,** Vendor and Customer have caused this Agreement to be executed, as of the Effective Date, by persons duly authorized.

**CUSTOMER:**
**Sears Holdings Management Corporation**

By: Karen Austin
Name: KAREN AUSTIN
Title: CIO
Date: 5/25/06

**VENDOR:**
**Kana Software, Inc.**

By: John M. Thompson
Name: JOHN THOMPSON
Title: CFO
Date: 5/26/06

***Signature Page – Master Software and Services Agreement***

# APPENDIX 1

## GLOSSARY

"**Affiliate(s)**" will mean, at the applicable time: (a) any person, firm, corporation, partnership (including general partnerships, limited partnerships, and limited liability partnerships), limited liability company, joint venture, business trust, association or other entity that directly or indirectly controls, is controlled with or by or is under common control with, a party, and, (b) as to Customer: (i) any entity that is: (x) managed, operated or directed by Customer, (y) is licensed to do business using the Customer' name (e.g., Customer' dealer stores), or (z) does business within a Customer' store, and (ii) any businesses divested or spun-off by Customer for a period of 12 months following such divestiture or spin-off. For purposes of the foregoing, "control" will mean, with respect to a corporation, the ownership, directly or indirectly, of 50% or more of the voting power to elect directors thereof or, for purposes of foreign corporations, if less than 50%, the amount allowed by applicable law; and with respect to any other entity, power to direct the management of such entity.

"**Agreement**" will mean this Master Software and Services Agreement inclusive of all Procurement Documents, Appendixes, and other documents incorporated herein by reference.

"**API**" will mean application programming interfaces, including any interfaces necessary to achieve interoperability between the Software and any other Customer' proprietary or Third Party software or systems.

"**Applicable Laws**" means any applicable laws, regulations, court or administrative orders or decrees of any federal, state, local or other governmental unit which has jurisdiction in such circumstance.

"**Authorized User(s)**" will mean: (a) Customer, (b) Customer' Affiliates, and (c) the Personnel of any of the foregoing entities.

"**Confidential Information**" will mean "**Confidential Business Information**" and/or "**Confidential Personnel Information**" as such terms are defined in **Section 11** (Confidentiality).

"**Defect**" will mean any failure of the Software to operate in accordance with the Specifications in all material respects.

"**Deliverables**" will mean all ideas, concepts, works, information, data, software and other materials supplied, conceived, originated, prepared, generated or required to be delivered by Vendor pursuant to the applicable Procurement Document, including, APIs, Developments, all written reports, requirements documents, specifications, program materials, flow charts, notes, outlines and all intermediate and partial versions thereof developed and any Know-How delivered to Customer. Deliverables do not include the Vendor's Software licensed to Customer pursuant to this Agreement.

"**Developments**" will have the meaning set forth in **Section 0** (Development Services) of this Agreement.

"**Documentation**" will mean, collectively: (a) all of the written, printed, electronic or other format materials published or otherwise made available by Vendor that relate the functional, operational and/or performance capabilities of the Software; and (b) all user, operator, system administrator, technical, support and other manuals and all other written, printed, electronic or other format materials published or otherwise made available by Vendor that describe the functional, operational and/or performance capabilities of the Software. Documentation does not include Source Code.

"**Embedded Third Party Software**" will mean any Third Party Software provided by Vendor to Customer that constitutes an integral part of the Software licensed to Customer by Vendor pursuant to this Agreement.

"**Enhancements**" will mean any new Software, releases, improvements, modifications, upgrades (e.g., ver. 1 to ver 1.1, 1.1.1 or 2.1), updates, patches, updated data, fixes and additions to the Software that Vendor makes available to its customers who are eligible to receive maintenance or support services from time-to-time to correct deficiencies and/or improve or extend the capabilities, including, but not limited to, increases in the speed, efficiency or ease of operation of the Software, and will include any replatformed software, whether on different operating systems or equipment; <u>provided</u>, however, that Enhancements will not include new, separate product offerings. The terms "Software" will be deemed to include any Enhancements for purposes of this Agreement.

"**Intellectual Property**" means any patents and patent applications, know how processes, designs, industrial design rights, trademarks, servicemarks, tradenames, trade dress, copyrights, mask works, trade secrets, inventions and technology (whether or not patentable), confidential and proprietary information, domain names, software, databases and other collections and compilations of data, rights of publicity/privacy, or other intellectual property conferred by contract or by any Applicable Law.

"**Key Personnel**" will have the meaning set forth in **Section 10.3** (Key Personnel) of this Agreement.

"**License Type**" will mean the number and type of license purchased by Customer as identified in a Procurement Document.

"**Maintenance Fees**" will have the meaning set forth in **Section 7.1** (Maintenance Services) of this Agreement.

"**Maintenance Services**" will have the meaning set forth in **Section 7.1** (Maintenance Services) of this Agreement.

"**Milestone**" means (if and when applicable) any deadline set forth in a Procurement Document or a timeline agreed upon by the parties in writing.

"**Personnel**" will mean the directors, officers, employees, partners, agents, advisers, independent contractors and subcontractors of a party and its Affiliates, or another entity, as applicable; provided that the Personnel of Vendor and its Affiliates will not be deemed to be Personnel of Customer.

"**Procurement Documents**" means Purchase Orders or Statements of Work.

"**Project**" will mean the Customer initiative for which the applicable Software and Services are being procured.

"**Purchase Order**" will have the meaning set forth in **Section 2.2.1** (Purchase Orders) of this Agreement.

"**Related Services**" means any Services purchased in connection with Software procured hereunder regardless of whether such Services are stated in the same Procurement Document as the Software, or in other Procurement Documents (e.g., Maintenance, implementation or training Services, etc.). All such Procurement Documents, together with this Agreement, will constitute a single integrated agreement.

"**Customer Combination**" means use of the Software, Services, or Deliverables with hardware or software that is provided by Customer unless the applicable Procurement Document states that Customer will be using such hardware or software in connection with the Services or such hardware or software is provided to Customer by Vendor or its Affiliates.

"**Services**" will mean, individually or collectively, any professional or other services that may be provided by Vendor to Customer including installation, implementation, integration, testing, development, conversion, training, consulting and Maintenance Services. Services will include Related Services.

"**Software**" will mean all software that is supplied or made available to Customer by Vendor under this Agreement and all Documentation related thereto, including all software, APIs, Embedded Third Party Software and Third Party Software identified in the applicable Procurement Document, and all Enhancements thereto.

"**Source Code**" will mean the source statements (rather than object code) for the Software and other deposit material related thereto as further identified in any Source Code Escrow Agreement entered into between the parties pursuant to **Section 3.3** (Source Code Escrow Agreement) and the applicable Procurement Document. Customer acknowledges that Vendor may not have rights to the source code of Third Party Software.

"**Specifications**" will consist of: (a) any specifications and any specific Customer' requirements contained in the Procurement Document (if any), (b) any technical specifications and Documentation which Vendor makes publicly available and which are in effect as of the effective

date of the applicable Procurement Document (or the date any Enhancement is provided to Customer). In the event of any inconsistency between the "Specifications" contained in the Procurement Document and any Specifications Vendor makes generally available, the Specifications in the Procurement Document will control. Upon Customer' request, Vendor will provide copies of all applicable Specifications. No limitations contained within the publicly available "Specifications" which conflict with the scope of the license granted herein will apply (e.g. limitations on the number of users, etc.); unless such terms are stated in the applicable Procurement Document.

"**Statements of Work**" or "**SOWs**" will have the meaning set forth in **Section 2.2.3** (Statements of Work) of this Agreement.

"**System**" will have the meaning set forth in **Section 2.2.3** (Statements of Work) of this Agreement.

"**Third Party**" will mean persons, corporations and entities other than Customer, Vendor or any of their Affiliates.

"**Third Party Software**" will mean any Software that is proprietary to a Third Party, excluding all Embedded Third Party Software.

"**Unauthorized Code**" will mean any feature, routine or device that is intended or designed, either automatically, upon the occurrence of a certain event, upon the taking of or failure to take a certain action or under the control of a third person that is not a Customer Personnel, (a) to disrupt the operation of Software, any Deliverable or any other Customer software, hardware or data, (b) to cause Software, any Deliverable to be unintentionally destroyed, erased, damaged or otherwise made inoperable, or (c) to permit a Third Person that is not a Customer Personnel to destroy, erase, damage or otherwise render inoperable the Software, any Deliverable or any other Customer software, hardware or data, and will include any computer virus, worm, trap door, back door, time bomb, malicious program, or any mechanism such as software locks password checking, CPU serial number checking or time dependency, introduced by the provider of the applicable Software, or Deliverable that could hinder Customer' freedom to fully exercise its license rights to such Software or Deliverable.

"**Warranty Period**" will have the meaning set forth in **Section 6.1.2** (Warranty Period and Defects) of this Agreement.

***End of Appendix***

# APPENDIX 2.2.3

## FORM OF STATEMENT OF WORK

**SOW #[___]**
**([Project Name])**

This Statement of Work [___] ("**SOW**") is made as of the date of the last signature below ("**SOW Date**").

Between:

| Sears Holdings Management Corporation "**Customer**") with a place of business at: 3333 Beverly Road, Mail Station B6-157B Hoffman Estates, Illinois 60179 | and | **[Insert Supplier Name]** ("**Supplier**") with a place of business at: ____________ ____________ |
|---|---|---|

This SOW is incorporated as part of, and is governed by the terms and conditions of, that certain Master Services Agreement dated [____________], 2006, between Supplier and Customer ("**Agreement**").

| Sears Holdings Management Corporation | **[Insert Supplier Name]** |
|---|---|
| By: ____________ | By: ____________ |
| Name: ____________ (Print) | Name: ____________ (Print) |
| Title: ____________ | Title: ____________ |
| Date: ____________ | Date: ____________ |

***End of Cover Page***

1. **Software**.

   (a) **Licensed Software.**

   (b) **Additional License Restrictions.** [Delete if none]

2. **Specifications**.

   (a) Supplier's Documentation and Specifications for the Software are:

   (b) Customer's additional requirements are (e.g., environment necessary for the Software to be run):

3. **Maintenance Services. [Describe any applicable Maintenance Services].**

4. **Other Services**.

   (a) **Service Description**. The Services are **[Please provide a description (e.g., installation, maintenance, etc – include where and when they are to be provided, as well as any test plans]**:

   (b) **Deliverables**. The Deliverables are **[Please provide description of the deliverables expected to be completed]**

   (c) **Term.** The Services shall commence on the SOW Date and shall be completed by **[TBD]**. The following additional Milestones shall apply to this SOW: **[TBD]**

   **[Please include any significant intermittent points in development related to the deliverables and expected dates of completion]**

5. **Source Code Escrow. [Delete if not needed]**

6. **Charges and Expenses. [Please outline fees and any related schedule of payment]**:

   (a) **Software.**

   (b) **Maintenance Fees**

   (c) **Other Services.**

**[If T&M use the following chart]**

| Labor Category | Hourly Rate per |
| --- | --- |

| | **Person** |
|---|---|
| | |

**[If Fixed Bid use the following chart]**

| **Project Title** | **Fixed Bid (including expenses)** |
|---|---|
| | |

(d) **Reimbursable Expenses**. Expenses to be reimbursed by Customer under this SOW, if any, are as follows:

(e) **Not to Exceed**. Total charges (including reimbursable expenses) under this SOW shall not exceed $[__________] without Customer's prior written approval.

(f) **Payment Schedule. [Complete if Milestone Payments, or other terms that differ from MSA terms (e.g., monthly in arrears]**

**[If T&M describe payment schedule below:]**

**[If Fixed Bid use the following]**

Payment shall be based upon completion of the Milestones designated above. Invoices may be submitted as follows:

| **Completed Milestone** | **% of Fixed Bid Price** |
|---|---|
| | |
| | |
| | |

7. **Personnel**.

(a) **Approved Subcontracts. [If any – otherwise delete this subsection]**

(b) **Key Personnel**. The following are Supplier Personnel designated "**Key Personnel**:" **[list if any – otherwise delete this subsection]**. Customer is entitled to approve or reject the appointment of (and replacements for) all Key Personnel. Supplier may not remove Key Personnel from any Project without Customer's consent; except for reasons outside of the

Supplier's control (e.g., such person's death, disability, resignation, termination for cause by Supplier, etc).

8. **<u>Not an Offer</u>**. This SOW shall only be binding if it is signed by both Customer and Supplier.

***End of SOW***

# APPENDIX 7.1

## MAINTENANCE SERVICES

1.     **GENERAL.**     During the Warranty Period, and/or for the period identified in the Procurement Document, and thereafter during all times Customer has engaged Vendor to provide the Maintenance Services, Vendor will provide the following Maintenance Services in accordance with this Appendix.

2.     **ENHANCEMENTS.**     As long as Customer has engaged Vendor to provide the Maintenance Services, Vendor will provide to Customer, without additional charge, copies of the Software and Documentation revised to reflect any and all Enhancements to the Software made by Vendor during the Maintenance Services period, as soon as such Enhancements are made generally available to Vendor's other customers covered by support.

3.     **CATEGORIES OF DEFECTS.** All Defects will be categorized by Customer according to the category definitions outlined below.  In the event Vendor disagrees with Customer's classification of any Defect, such dispute will be resolved in accordance with a mutually agreed upon dispute resolution process.

   **Severity 1 Defect**. A Severity 1 Defect arises when the Software is unable to function properly in a production environment due to a failure of the Software to conform to the Documentation and/or Specifications and the impact of the reported deficiency is such that the Customer is unable to perform critical business operations in a production environment.

   **Severity 2 Defect**. A Severity 2 (production environment) Defect arises when a Software problem exists which materially impacts Customer's business operations, although the Software is substantially operational and such deficiency has created a significant, negative impact on the Customer's productivity or service level.

   **Severity 3 Defect**. A Severity 3 Defect arises when a production environment Software problem exists which does not materially impact Customer' business operation. Customer impact, regardless of product usage, is minimal loss of operational functionality or implementation resources.

   **Severity 4 Defect**. The impact of the reported deficiency is such that Customer submits a Software information request, software enhancement or documentation clarification which has no operational impact.  The implementation or use of the Software by the Customer is continuing and there is no negative impact on productivity.

4.     **TELEPHONE AND E-MAIL SUPPORT.** Vendor will, at no additional cost, provide to Customer unlimited telephone support (via a toll-free telephone number) and e-mail support relating to the installation, implementation, configuration, use and operation of the Software or

any problems therewith. Telephone support will be available on a continuous basis during Business Hours (as defined below) excluding Customer Holidays ("**Support Hours**"). In addition, Customer shall be granted electronic access to Kana Extranet (for access to customer support knowledge base and other electronic support tools).

5.   **INITIAL RESPONSE; INTERIM RESOLUTION; FINAL RESOLUTION.** For purposes of this Appendix:

"**Initial Response**" means the time it takes from Customer's initial fax, e-mail or telephone call notification of the Defect until Vendor responds to the appropriate Customer Personnel.

"**Interim Resolution**" means the time it takes Vendor to apply a functional resolution to the reported Defect measured from the time at which the initial notification was made, meaning Vendor provides Customer with a temporary fix or workaround that solves a reported Defect and that can be used by Customer with minimal inconvenience and minimal impact on Customer' business operations.

"**Resolution**" means Vendor provides a correction, patch, and/or fix or modification of the Software that corrects the Defect.

"**Business Hours**" means 6 am to 6 pm Pacific Time. For Premium Support, "Business Hours" means 24/7 Telephone/Pager Support for Severity 1 reported Defects.

6.   **DEFECT RESPONSE AND RESOLUTION PROCEDURE.** For purposes of the table below:

"**Effort**" means continuous and uninterrupted commercially reasonable efforts during normal business hours.

"**Hours**" means consecutive hours during normal business hours.

| Severity Level | Initial Response | Interim Resolution | Final Resolution |
|---|---|---|---|
| **Severity 1 Defect** | Efforts to respond within 1 Hour; not to exceed 3 Hours | Vendor will commence work on resolving the deficiency within one (1) hour of notification and will engage staff with the aim of achieving an acceptable resolution within 24 Hours. | Patch and/or next maintenance Release |

| Severity Level | Initial Response | Interim Resolution | Final Resolution |
|---|---|---|---|
| **Severity 2 Defect** | Efforts to respond within 4 Hours; not to exceed 6 Hours | Vendor will commence work on resolving the deficiency within four (4) hours of notification and will engage staff with the aim of achieving an acceptable resolution within 48 business Hours. | Future Maintenance Release |
| **Severity 3 Defect** | Efforts to respond within 6 Hours; not to exceed 8 Hours | Vendor will commence work on resolving the deficiency within one (1) business day of notification and will engage staff during business hours until an acceptable resolution is achieved. | Future Maintenance or General Availability (GA) Release or at the discretion of Kana |
| **Severity 4 Defect** | Efforts to Respond within 1 business day, not to exceed 2 business days | N/A | Future Maintenance of General Availability (GA) Release or at the discretion of KANA |

7. **SUPPORTED PATCHES.** The Vendor may provide "Software Patches" that fix Defects that may or may not have been reported. Any Software Patch that is delivered as a Final Resolution to a Defect, whether reported or not, will be warranted in accordance with the same warranty of the original Software. The Vendor will provide in writing any and all Defects that this Software Patch resolves.

If a Software Patch is not rolled into the subsequent version of the product, the Vendor will continue to warrant the Software Patch for the life of the Maintenance agreement.

8. **SERVICE CREDITS.** The Service Credits, if any, will be credited by Vendor to Customer as set forth in the following tables:

| Severity Level | Initial Response Service Credit | Maximum Monthly Initial Response Service Credit |
|---|---|---|
| **Severity 1 Defect** | 2% of monthly Maintenance Fees | 10% of monthly Maintenance Fees |

| Severity Level | Initial Response Service Credit | Maximum Monthly Initial Response Service Credit |
|---|---|---|
| **Severity 2 Defect** | 1% of monthly Maintenance Fees | 5% of monthly Maintenance Fees |
| **Severity 3 Defect** | N/A | N/A |
| **Severity 4 Defect** | N/A | N/A |

For each hour after the expiration of the time periods set forth in the table above for which Vendor fails to provide an Initial Response for a Severity 1 Defect or Severity 2 Defect, Vendor will grant Customer a credit in an amount equal to the percentage of Customer's monthly Maintenance Fee specified in the Initial Response Service Credit column in the table above (**"Initial Response Service Credit"**). The maximum amount of Initial Response Service Credits that Customer may accrue will be limited to the percentage of monthly Maintenance Fees identified in the Maximum Monthly Initial Response Service Credit column in the table above (**"Maximum Monthly Initial Response Service Credit"**). Credits may be applied towards the Maintenance Fee for the next Maintenance period.

9. **ON-SITE SUPPORT**. Upon request of Customer, Vendor will provide on-site support on a mutually agreed time frame between the parties, not to exceed five (5) calendar days, where telephone support fails to correct a Severity 1 reported Defect as set forth in **Section 6** of this Appendix.

10. **SERVICE CREDITS**. Vendor's failure to meet the requirements, including the timeframes, set forth in **Section 6** of this Appendix will be subject to the Service Credits, if any, set forth in **Section 8** of this Appendix. Service Credits will be deducted from amounts due to Vendor, and will be deemed an adjustment to the fee for such Maintenance Services. The parties agree that any Service Credits are not damages nor are they intended to be punitive in nature, but rather are measurement tools used to highlight the lower level of performance received by Customer.

11. **SERVICE LEVEL CREDIT REPORTING.** If a Service Level Credit is due from KANA, Customer will notify KANA in writing within five (5) days of the end of each month. Upon written notice of such failure by Customer within such five (5) day period, Customer shall have the right to receive the Initial Response Service Credit applicable to that month's Maintenance Services, provided, however, in such a case, the failure has to have occurred in a "live" commercial production environment following completion of the applicable implementation project.

12. **ESCALATION.**

*Severity Level 1:* For all Severity Level 1 calls, Vendor will participate on Customer's status calls. For any Severity Level 1 call that is not resolved within twenty-four (24) hours of notification to Vendor, Vendor's support engineer will designate the support call as "hot" and the problem will be escalated to Vendor's Account Manager and Vendor's Director of Support Operations. If there is not an Interim Resolution to the problem within one (1) day, the problem will be escalated to the *Vice President-Customer Support* and to the *Vice President-Engineering*. These VP's will identify additional resources to work on the problem. After two (2) days of escalation, the problem will be escalated to the CEO.

*Severity Level 2.* For any Severity Level 2 call that is not resolved within 5 Business Days of notification to Vendor, Vendor's support engineer will designate the support call as 'hot' and the problem will be escalated to Vendor's *Account Manager* and Vendor's *Director of Customer Support*. If there is not an Interim Resolution to the problem within two (2) days, the problem will be escalated to the *Vice President-Customer Support* and to the *Vice President-Engineering*. These VPs will identify additional resources to work on the problem. After three (3) days of escalation, the problem will be escalated to the CEO.

***End of Appendix***

**APPENDIX 8.1**
**License and Maintenance Fees**

See attached which is incorporated herein by reference as a Procurement Document under the Agreement.

*Execution Copy*

## Appendix 8.1

**License and Maintenance Fees**
For Contact Center, IQ and Response

| Description | License Type | Total Cost of License Fee(s) |
|---|---|---|
| **Software License** | | |
| Contact Center- Perpetual | Production Server, Development Server, and User | $370,000 |
| IQ- Perpetual | Production Server, Development Server, and User. Also includes 10 Reporting Users | $300,000 |
| Response- Perpetual | Production Server, Development Server, and User. Also includes 10 Reporting Users. | $200,000 |
| **License Fee Sub-Total** | | **$870,000** |
| | | |
| **Maintenance Fee for Premium Maintenance (18% of Net License Fee)** | | |
| 1st Year Maintenance Fee (for all 3 KANA Products) | 24x7/ Updates and Upgrades | $66,600- Contact Center<br>$54,000- IQ<br>$36,000- Response |
| **1st Year Total Annual Cost** | | **$156,600** |
| | | |
| 2nd Year Maintenance Fee (for all 3 KANA Products) | 24x7/ Updates and Upgrades | $66,600- Contact Center<br>$54,000- IQ<br>$36,000- Response |
| **2nd Year Total Annual Cost** | | **$156,600** |
| | | |
| 3rd Year Maintenance Fee (for all 3 KANA Products) | 24x7/ Updates and Upgrades | $66,600- Contact Center<br>$54,000- IQ<br>$36,000- Response |
| **3rd Year Total Annual Cost** | | **$156,600** |
| | | |
| **Invoicing /Payment Terms** | | |
| Payment Terms | | Net 60<br>from receipt of correct invoice<br>OR<br>In Customer's sole discretion, 2% Net 10 Option from receipt of a correct invoice. |
| **Payment Structure** | | |
| Software Licenses | | Invoiced after Certificate of Acceptance is provided to KANA |

*Execution Copy*

| | | |
|---|---|---|
| Maintenance Fee | | Invoiced on an Annual Basis in advance as follows:<br><br>**Contact Center**- after applicable Warranty Period expires<br>**IQ**- after applicable Warranty Period expires<br>**Response**- after applicable Warranty Period expires |
| Professional Services | | Invoiced pursuant to payment terms outlined in the SOW. |

Capitalized terms not otherwise defined below in Section 1 (below) shall have the meanings ascribed to them in the Master Software and Services Agreement dated May 23, 2006 between the parties (the "**Agreement**").

1. **Definitions.** For purposes of this Appendix 8.1, the following additional terms are defined as follows:

"Standard Maintenance" consists of 6:00am – 6:00pm PT support and is priced at 15% of net License Fee for each of the Software Products purchased hereunder.

"Premium Maintenance" consists of 24x7 support and is priced at 18% of net License Fee for each of the Software Products purchased hereunder.

"Sears Holdings eCommerce Platform"- consists of all the activities associated with the selling and fulfilling of goods and services via the Sears Holdings eCommerce platform. Sears Holdings businesses not utilizing the eCommerce platform, such as Lands' End and Home Services, as of the end of the Unlimited Use Period for the Contact Center Software (as defined in Section 2.b. below) are excluded from the definitions of Contact Center Perpetual License, IQ Perpetual License and Response Perpetual License.. Licensing for additional business units will be at the costs outlined in Section 2.b. (Additional Licensing Fees) herein.

"Software"- as used in this Appendix, "Software" shall refer to the following KANA Products: (i) Contact Center, (ii) IQ, and (iii) Response.

"Concurrent User" means each person that is using the Software (provided that being logged in to the Software shall be deemed use of the Software) at any specific time.

"Seasonal Concurrent User" means a User at Customer who accesses the Software during the peak season commencing November 1st and expiring February 1st of each year.

"Reporting User" means each unique person that is enabled to access the reports functionality of the Software.

"User" means the number and type of User (Concurrent, Seasonal and Reporting) identified in a Procurement Document and as further defined in accordance with this Appendix.

**2. Terms**

**a. Use and Restrictions.**

*Execution Copy*

- The parties agree that the Licenses described herein may be used, in whole or in part, by Customer and its Authorized Users to support the Sears Holdings eCommerce Platform.
- Production Server Licenses. Customer may install a single copy of the Software for each Production Server License purchased. Customer may use each Production Server License purchased on two Production Servers that are load balanced (50%).
- Development Server Licenses. The Development Server license authorizes Customer to install and use as many copies of the Software on development Servers to support (i) development, (ii) quality assurance and (iii) production staging. Customer shall not use such Software for production use.

**b. Licenses Granted**

**KANA IQ License.** KANA grants Customer a perpetual license in KANA IQ which includes both CustomerIQ and AgentIQ and Customer may use an unlimited number of Application Licenses, Development Server Licenses and User Licenses of such during a two year period commencing on February 1, 2007 or the Acceptance of the Statement of Work implementing Contact Center, whichever is earlier (the "**Unlimited Use Period**"). Upon completion of the Unlimited Use Period, the perpetual license for KANA IQ (Customer and Agent) shall be established at that number of User Licenses that Customer actually uses during such Unlimited Use Period using the peak number of Users established during this period as the baseline ("**IQ Perpetual License**"). The parties will cooperate in good faith in determining this number and documenting such in an amendment to this Appendix. Customer acknowledges that the KANA IQ License is for use with up to 10 Reporting Users. The terms of Section 5 of the Agreement are modified so that the Acceptance Period for IQ shall be deemed to commence upon Delivery (defined below) and shall end ten (10) business days thereafter.

Additional License Fees: Customer acknowledges that additional license fees (and related maintenance) will be due for the IQ Product above the IQ Perpetual License established above. Vendor agrees to make available the following pricing for additional Users:

IQ Concurrent Seat License, Concurrent User: $700/user (plus 18% Premium Maintenance)
IQ Concurrent Seat License, Seasonal User: $325/user (plus 18% Premium Maintenance)

This pricing, including Maintenance may not be increased for a three (3) year period commencing at the completion of the Unlimited Use Period described above.

**KANA Response License.** KANA grants Customer a perpetual license in KANA Response. Customer may use an unlimited number of Application Licenses, Development Server Licenses and User Licenses for a two year period commencing on February 1, 2007 or the Acceptance of the Statement of Work implementing Contact Center, whichever is earlier (the "**Unlimited Use Period**"). Upon completion of the Unlimited Use Period, the perpetual license for KANA Response shall be established at that number of Application Licenses, Development Server Licenses and User Licenses that Customer actually uses during the Unlimited Use Period using the peak number of Users established during this period as the baseline (the "**Response Perpetual License**"). The parties will cooperate in good faith in determining this number and

*Execution Copy*

documenting such in an amendment to this Appendix. Customer acknowledges that the KANA Response License is for use with up to 10 Reporting Users. The terms of Section 5 of the Agreement are modified so that the Acceptance Period for Response shall be deemed to commence upon Delivery (defined below) and shall end ten (10) business days thereafter.

Additional License Fees: Customer acknowledges that additional license fees (and related maintenance) will be due for the Response Product above the Response Perpetual License. Vendor agrees to make available the following pricing for additional Users:

Response Concurrent Seat License, Concurrent User: $700/user (plus 18% Premium Maintenance)
Response Concurrent Seat License, Seasonal User: $325/user (plus 18% Premium Maintenance)

This pricing, including Maintenance may not be increased for a three (3) year period commencing at the completion of the Unlimited Use Period described above.

**KANA Contact Center License.** Subject to the terms of the Agreement (including Acceptance), KANA hereby grants Customer a perpetual license to use the KANA Contact Center Software. Customer may use an unlimited number of Application Licenses, Development Server Licenses and User Licenses for a two year period commencing on the Acceptance of the Statement of Work implementing Contact Center (the "**Unlimited Use Period**"). Upon completion of the Unlimited Use Period, the perpetual license for KANA Contact Center shall be established at that number of User Licenses that Customer actually uses during the Unlimited Use Period using the peak number of Users established during this period as the baseline (the "**Contact Center Perpetual License**"). The parties will cooperate in good faith in determining this number and documenting such in an amendment to this Appendix. Customer acknowledges that additional license fees (and related maintenance) will be due for any Software above the Contact Center Perpetual License. Vendor agrees to make available the following pricing for additional Users:

Additional License Fees: Customer acknowledges that additional license fees (and related maintenance) will be due for the Response Product above the Response Perpetual License. Vendor agrees to make available the following pricing for additional Users:

Contact Center Concurrent Seat License, Concurrent User: $700/user (plus 18% Premium Maintenance)
Contact Center Concurrent Seat License, Seasonal User: $325/user (plus 18% Premium Maintenance)

This pricing, including Maintenance may not be increased for a three (3) year period commencing at the completion of the Unlimited Use Period described above.

**c. Payment.** Payments will be made pursuant to the terms of Section 8.6 of the Agreement unless Customer elects in its sole discretion to utilize the 2% Net 10 payment option offered by KANA. This 2% Net 10 payment option may be utilized by Customer with any invoice (License Fees, Maintenance Fees, or Additional License Fees). In addition, if Customer utilizes the 2% Net 10

payment option for the License Fee payment of the IQ and Response Products, the training described in Section e below will be provided by KANA at no additional cost to Customer.

**d. Delivery.** Delivery of Software and Documentation will be provided by FTP with Delivery being deemed to occur when Licensor makes the Software available to Customer for electronic download.

**e. Training.** At no additional cost to Customer (inclusive of all expenses) if Customer elects to use the 2% Net 10 payment option for the invoice representing the License Fees for IQ and the Response Product, KANA shall provide one (1) week of onsite training to twenty (20) Customer associates on all three (3) KANA Products. The training agenda will be mutually agreed to by the parties. In the event that Customer fails to comply with the 2% Net 10 option in exchange for the no cost training, the training will be provided by KANA at a price to be mutually agreed to by the parties.

**f. Case Study.** At Customer sole option, Customer may participate in a one (1) case study regarding the Software products licensed by Customer and its choice of KANA. The extent and details of the case study will be mutually agreed to by the parties.

*[Signature Page Follows]*

*Execution Copy*

**IN WITNESS WHEREOF,** Vendor and Customer have caused this Appendix 8.1 to be executed, as of the Effective Date, by persons duly authorized.

**CUSTOMER:**
**Sears Holdings Management Corporation**

By: Karen Austin
Name: KAREN AUSTIN
Title: CIO

**VENDOR:**
**Kana Software, Inc.**

By: John M. Thompson
Name: JOHN THOMPSON
Title: CFO

*Signature Page – Appendix 8.1*



# APPENDIX 8.2

## CUSTOMER TRAVEL AND EXPENSE POLICY

This establishes Customer's minimum requirements and guidelines for reimbursement of third party out-of-pocket travel expenses. This applies to consultants, contractors and other service providers who submit travel expenses to Customer. Future reference to these individuals is made collectively as "service providers".

All service providers who require travel and lodging have the responsibility to ensure that their travel expenses are appropriate, reasonable, and documented. All expenses will be reviewed and are subject to Customer's approval. All supporting detail (i.e., receipts, ticket stubs, etc.) must be retained by the service provider and be made available for review by Customer upon request. Expenses incurred by Customer and its employees in association with training and services rendered to the service provider's associates and representatives, including cost of telephone video conference calls, will be reimbursed or credited to Customer by the service provider.

### A. Air Transportation

1. Travelers shall use discount, economy or coach class. When possible, travelers should plan business trips in advance to secure reduced fares.
2. Travelers are strongly encouraged to accept the lowest priced flight available within a 3-hour window. This includes alternate airports, connections, one-stop flights, etc.
3. Nonrefundable tickets are normally the least expensive alternative for airfare and should be utilized.
4. Upgrades and first class or business class travel will NOT be reimbursed.
5. Travel accident insurance purchased by the traveler is not reimbursable.

### B. Ground Transportation

1. Travelers must use courtesy or other scheduled services provided by the hotel (if available) for travel between the hotel and airport. Such service is generally free or less expensive than other transportation.
2. A private car limousine service will NOT be reimbursed unless the rate is lower that that of commercial taxi service.
3. Economy or Compact cars should be rented unless the size of the group makes them impractical. Rental cars should be shared whenever feasible.
4. Optional insurance coverage is NOT reimbursable.
5. Refueling should be done prior to returning the vehicle. Fuel expenses charged during check-in will be reimbursed at the local average price.
6. Local travel and mileage will NOT be reimbursed except when the distance to the Customer work location is greater than to the service provider's local office. The current mileage reimbursement rate is $.33 per mile.

7. The following suppliers have negotiated rates between the Hoffman Estates office and O'Hare airport:

| Taxi Service | **Phone** | **Rate** |
|---|---|---|
| American Taxi | (847) 255-9614 | $30 for 1st person, $0 for each additional person in same car from same location. |
| My Chauffeur | (847) 376-6100 | **Shared Ride Only**. $28.30 for 1st person, $5.50 for each additional |
| Hoffman Estates Limo | (847) 515-7400 | $30 for 1st person, $5 for each additional person. Add'l. $2.00 surcharge only for rides from O'Hare to Hoffman Estates. |

## C. Lodging

1. Overnight accommodations should be at moderately priced facilities.
2. The use of luxury or premium accommodations is not permitted, and will not be reimbursed.
3. If a reserved room will NOT be used, it is the traveler's responsibility to notify the hotel directly, prior to the hotel's cancellation deadline. Failure to cancel a hotel reservation will result in a "no-show" charge that will NOT be reimbursed. If the "no-show" is caused or forced by Customer, Customer will pay the "no-show" charge.
4. Special rates have been negotiated with several nearby hotels:

| Hotel | City | Telephone | Rate | Breakfast | Shuttle to Office | Free Internet |
|---|---|---|---|---|---|---|
| Hampton Inn | Elgin | (847) 931-1940 | $59.00 | yes | no | yes |
| Courtyard | West Dundee | (847) 429-0300 | $62.00 | no | yes | yes |
| Holiday Inn & Suites | Elgin | (847) 488-9000 | $69.00 | yes | yes | yes |
| Wingate Inn | Schaumburg | (847) 882-5000 | $69.00 | yes | no | yes |
| Baymont Inn | Hoffman Estates | (847) 882-8848 | $64.00 | yes | no | yes |
| TownPlace Suites | Elgin | (847) 608-6320 | $60.00 | yes | yes | yes |

Consultants can take advantage of these discounts by calling air, hotel, and car rental companies directly (unless indicated otherwise), or by calling American Express Travel at (800) 265-1658 or Global Experts in Travel at 1-800-320-4245

## D. Meals

1. Travelers will NOT be reimbursed for any meals unless on overnight-travel status.
2. Actual, reasonable meal expenses up to $30.00 per day will be reimbursed. For Downtown Chicago, Boston, Los Angeles, New York, San Diego, San Francisco, Seattle, Washington D. C., and International destinations reasonable meal expenses up to $50 per day will be reimbursed.

3. Under no circumstances will meals for local staff be reimbursed.

**E. Miscellaneous**

**Miscellaneous charges are the responsibility of the traveler and will NOT be reimbursed. Below is a partial listing of some miscellaneous expenses that are not reimbursable.**

- Laundry or dry cleaning
- Excessive personal or faxes
- Non-business related shipping
- Child care or pet care fees
- Non-business related miscellaneous
- Mini-bar expenses
- Theft of loss of personal property
- Movies
- Valet service
- Traveler check fees
- House sitting fees
- Health club
- Personal travel insurance

# APPENDIX 8.3

## ILLINOIS SOFTWARE TAXES

The following terms and conditions are incorporated into this Agreement for all Software which has a situs for tax purposes within Illinois (e.g., Software that is installed at locations within Illinois):

1. Customer has limited duplication rights with respect to the Software, although Customer can make a limited number of back up copies for its internal use. Furthermore, Customer is limited to the uses for the Software specified in this Agreement.

2. Customer is prohibited from licensing, sublicensing, or transferring the Software to a Third Party (other than a related Third Party).

3. Vendor will provide a new copy of the Software to Customer at minimal or no charge if Customer loses or damages the Software.

4. If the license granted under this Agreement is not a perpetual license, Customer must destroy or return all copies of the Software to Vendor upon the termination of or at the end of the license period.

1.Because the Software license granted under this Agreement which are subject to this Appendix satisfy section 86 Illinois Administrative Code 130.1935(a)(1), no sales tax will be due on charges in connection with this Software license for any Software licensed for use in Illinois, or for related maintenance agreements or updates, as this transaction is not considered a taxable retail sale. Furthermore, no sales tax will be shown on any invoice with respect to charges for Software licensed for use in Illinois, or for related maintenance agreements or updates, as no sales tax is due.

***End of Appendix***

# APPENDIX 13.2

## INSURANCE CERTIFICATE

**[Vendor to Provide]**

# Addendum

This addendum ("**Addendum**") is entered into as of the date of last signature below ("**Addendum Effective Date**"), and is attached to and incorporated into the Master Software and Services Agreement ("**Agreement**") effective May 23, 2006 by and between Verint Americas Inc., successor corporation to KANA Software, Inc. ("**Verint**"), and Sears Holdings Management Corporation ("**Customer**").

For and in consideration of the representations and promises of the parties set forth herein, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

**1. Addendum.** This Addendum consists of this Signature Page, the following Schedules, and any Purchase Orders or SOW's for SaaS Services (defined on Schedule A attached hereto) executed during the term of this Addendum:

- ☒ Schedule A Definitions
- ☒ Schedule B SaaS Terms and Conditions
- ☒ Schedule C Service Levels
- ☒ Schedule D Information Security
- ☒ Schedule E Shop Your Way Vendor Engagement Program
- ☒ Schedule F Customer Travel Expense Policy

**2. Definitions.** Any defined terms used herein shall be as defined in this Addendum, and if not so defined, shall have the same meaning as specified in the Agreement.

**3. General.** The terms and conditions of this Addendum apply to and control solely with respect to the SaaS Services specified on a Purchase Order or SOW. In the event of a conflict between the terms and conditions of this Addendum and any other terms and conditions of the Agreement, the terms and conditions of this Addendum shall prevail, but solely with respect to the SaaS Services specified on a Purchase Order or SOW. This Addendum is subject to all other terms and conditions contained in the Agreement, and all non-conflicting terms and conditions in the Agreement are hereby incorporated by reference and shall herein control. This Addendum shall not be effective until executed by an authorized representative of each party.

**THIS ADDENDUM SHALL NOT BE EFFECTIVE UNTIL EXECUTED BY AN AUTHORIZED REPRESENTATIVE OF EACH PARTY.**

**IN WITNESS WHEREOF,** Customer and Verint have caused this Addendum to be executed by their duly authorized representatives as of the Addendum Effective Date.

| **VERINT AMERICAS INC.** | **SEARS HOLDINGS MANAGEMENT CORPORATION** |
| --- | --- |
| DocuSigned by: Lynn Machleit 347FB9359A994BD... | DocuSigned by: Steven Sissel F70E57A2EA8A400... |
| NAME SIGNED | NAME SIGNED |
| Lynn Machleit VP, Finance | Steven Sissel VP Member Services Organizatic |
| NAME & TITLE PRINTED | NAME & TITLE PRINTED |
| 4/26/2016 | 4/28/2016 |
| DATE | DATE |

Brian Leslie, Esq. - Negotiated Terms

Digitally signed by Brian Leslie, Esq. - Negotiated Terms
DN: cn=Brian Leslie, Esq. - Negotiated Terms, o=Verint Systems Inc., ou=Approval for Signature, email=brian.leslie@verint.com, c=US
Date: 2016.04.28 20:01:23 -04'00'

## SCHEDULE A
## DEFINITIONS

This Schedule A is made a part of the Addendum signed by the parties on the Signature Page to which this Schedule A is attached. All capitalized terms shall have the meaning ascribed to them, including the following:

1 **Access Rights.** The type and quantity of SaaS access rights applicable to the SaaS Services, each as procured by Customer on a Purchase Order.

2 **Access Term.** The annual term for which Verint has contractually agreed to provide Customer with access to the SaaS Services in accordance with a Purchase Order or SOW.

3 **Customer Data.** All data either provided by Customer or entered on its behalf through use of the SaaS Services, or generated by the SaaS Services on behalf of Customer.

4 **Customer Environment.** The computing environment separately procured, prepared and maintained by Customer for the access and use of the SaaS Services, as further specified in Section 3.2 of Schedule B.

5 **Designated Employees.** A reasonable number of Customer Personnel (including Customer's system administrator), who have received training from Verint. Designated Employees may be changed by notice to Verint.

6 **Documentation.** Verint's documentation describing the specifications and use of the SaaS Services and any software provided.

7 **Error.** A failure of the SaaS Service to substantially conform to the Documentation, that Verint can replicate or Customer can duplicate.

8 **Error Correction.** Revisions, modifications, alterations, and additions to the SaaS Services, installed by Verint in the Hosted Environment as bug fixes or workarounds to resolve Errors.

9 **Fees.** The SaaS Service Fees and/or other fees as specified in this Addendum, in the Agreement, or in a Purchase Order or SOW

10 **Hosted Environment.** Verint or its third party's technical environment required to operate and provide access to the relevant SaaS Services, as further specified in Section 3.2 of Schedule B.

11 **Personnel.** With respect to Customer, each Customer employee, including employees of (i) Customer's Affiliates, (ii) each subsidiary and business that is divested by Customer or its Affiliates, but only for a period of thirty six (36) months, (iii) is licensed to do business using the Customer's or its Affiliate's name, (iv) does business with one of Customer's or its Affiliates' retail businesses as a licensee, or (v) independent contractors of Customer or its Affiliates (each not a competitor of Verint), under obligations of confidentiality and nondisclosure which Customer authorizes to use the SaaS Services purchased and/or the Access Rights procured hereunder; with respect to Verint, each Verint employee or subcontractor under obligations of confidentiality and nondisclosure which performs on behalf of Verint hereunder.

12 **SaaS Use Rights.** To the extent specified on a Purchase Order or SOW, and subject to the payment of all SaaS Service Fees, the quantity of specific Access Rights(s) granted to Customer for use during the applicable Access Term.

13 **SaaS Services.** The online services offered by Verint and specified on a Purchase Order, as more fully described in the Documentation.

14 **SaaS Service Fees.** In US dollars, the fees due to Verint, as further specified in the Purchase Order or SOW for use of the SaaS Services to the extent of the SaaS Use Rights.

15 **Service Levels.** The service level commitments from Verint with respect to the maintenance and support of the Hosted Environment and SaaS Services.

16 **Signature Page.** The cover page of this Addendum specifying the Schedules expressly incorporated into the Addendum, the general terms of the Addendum, and containing the signature of each party's authorized representative manifesting assent to the terms and conditions of this Addendum.

17 **Updates.** Periodic improvements or additions to the SaaS Services, including Error Corrections and other changes to the SaaS Services, that may be provided hereunder, but excluding any new feature or substantial additional functionality available for the SaaS Service, which, in Verint's sole discretion, is subject to additional fees.

18 **Verint Intellectual Property.** All Intellectual Property rights in the SaaS Services, software, Documentation, Hosted Environment and all other Confidential Information provided by Verint hereunder.

**SCHEDULE B**

**GENERAL TERMS AND CONDITIONS**

This Schedule B is made a part of the Addendum signed by the parties on the Signature Page to which this Schedule B is attached. The following general terms and conditions shall apply to this Addendum:

**1 ACCESS RIGHTS.**

**1.1 Access Use Rights.** During the Access Term, and solely for Customer's internal business use, Verint grants to Customer a non-exclusive, non-transferable, non-assignable, personal right to use the SaaS Services specified in a Purchase Order or SOW through internet access, up to the extent of the SaaS Use Rights specified in that Purchase Order or SOW. Customer's internal business shall include the entities described in Section 11 of Schedule A. With respect to the Documentation applicable to the SaaS Services, Customer may make a reasonable number of copies of the Documentation solely as needed for Customer's internal business purposes.

**1.2 Restrictions.** Customer acknowledges and agrees that the use rights provided hereunder do not grant any rights not explicitly expressed. All other such rights and interests in Verint Intellectual Property (including any derivatives thereto) are expressly reserved, owned by and remain vested in Verint and its third party vendor(s), and except for the limited use rights granted hereunder, Customer shall not assert any right, title, or interest in or to any Verint Intellectual Property, or portion thereof. Without limiting the foregoing, Customer acknowledges and agrees that no rights or any other interests are provided to Customer with respect to: **(i)** rights in or to the Hosted Environment or SaaS Services beyond those rights specified in Purchase Order or SOW, **(ii)** rights to provide access or use of the Hosted Environment and SaaS Services to any other party, including, without limitation, any uses in the nature of a service bureau or application services provider, **(iii)** rights to obtain possession of a copy of any component of the Hosted Environment or any software used to provide or perform the SaaS Services, or **(iv)** representations, warranties or other third party beneficiary rights from any Verint third party vendor.

**2 TERM.** This Addendum shall commence on the Addendum Effective Date and shall continue for the duration of the Agreement, unless earlier terminated in accordance with Section 9. An Access Term shall commence upon the effective date of the applicable Purchase Order or SOW, and shall continue for twelve (12) months thereafter, or as otherwise specified on the applicable Purchase Order or SOW. Each Access Term upon expiration shall automatically renew for additional annual terms at Verint's then current rates, unless either party provides the other with no less than sixty (60) days prior written notice of its intent to not renew.

**3 VERINT RESPONSIBILITIES.**

**3.1 Procedures and Technical Protocols.** Verint will specify to Customer procedures according to which Customer may establish and obtain access to and use the features and functions of the SaaS Services, including, without limitation, provision of any access codes, passwords, technical specifications, connectivity standards or protocols, or any other relevant procedures, to the limited extent any of the foregoing may be necessary for Customer to obtain access to the SaaS Service via the Internet.

**3.2 SaaS Services.** Verint will bear responsibility, at its own cost and expense, for the procurement, preparation, hosting, operation and maintenance of all facilities, hardware, software, telecommunication services, and all other technical requirements (the "**Hosted Environment**") necessary to provide access to and use of the SaaS Services; provided that Customer will be responsible for procuring and/or operating computer systems, software and telecommunications services meeting such minimum technical requirements (the "**Customer Environment**") as Verint may specify in the Documentation to access the Hosted Environment.

**3.3 Installation and Integration Services.** With respect to any access to the Hosted Environment and use of the SaaS Services requiring integration and other services by and between Customer's systems and the Hosted Environment, Verint agrees to perform those services to the extent specified on a Purchase Order or SOW.

**3.4 Acceptance.** Customer will have a sixty (60) day period from the date the SaaS Service is available in production in the Hosted Environment, and if applicable, at the initial Customer Environment site ("**Acceptance Period**"), to inspect and test the SaaS Service to determine whether it meets in all material respects the specifications as described in the Documentation ("**Acceptance Criteria**"). If Customer discovers the SaaS Service does not meet the Acceptance Criteria (a "**Defect**"), Customer will provide, in reasonable detail, a notice of such Defect to Verint's project manager (or other representative). Once such notice has been given, the Acceptance Period will be suspended, and Verint will have a reasonable period (not to exceed 30 days) to correct the SaaS Services. Once Verint has delivered the corrected SaaS Services to Customer, the Acceptance Period will resume; provided that, if required, the Acceptance Period will be extended to provide Customer with a minimum of 30 days to accept or reject the SaaS Services after delivery of such corrected SaaS Services by Verint. If Verint fails to correct a material Defect, Customer may reject the SaaS Service, terminate the Agreement and/or this Addendum and receive a refund of all monies paid for that Access Term. In the event Customer neither accepts or rejects the SaaS Service by the end of the Acceptance Period, the SaaS Service shall be deemed accepted; provided, all of Verint's obligations with respect to Support (including the provision of Error Corrections) shall still apply. Notwithstanding the foregoing, rejection under the terms of the Agreement of Software that is purchased contemporaneously on a Purchase Order, and specifically for integrated use with the SaaS Service on that Purchase Order, will result in automatic rejection of the SaaS Services.

**3.5 Support.** As part of the SaaS Services, Verint shall, either directly, or through its applicable third party vendor(s), provide support for the Hosted Environment and SaaS Services in accordance with the terms and conditions of this Section.

**3.5.1 Support and Updates.** In addition to establishing and maintaining the Hosted Environment, Verint shall maintain the components of the Hosted Environment with all current Updates that Verint deems necessary for the SaaS Services. Verint shall use commercially reasonable efforts to implement any required Error Corrections. Access to the SaaS Services and maintenance of the Hosted Environment shall be in accordance with the Service Levels specified in Schedule C, and Customer shall, in accordance with the terms of Schedule C, have access to support through Verint's standard telephone, email and web support services.

**3.5.2 Backup and Recovery of Data.** As a part of the SaaS Services, Verint shall maintain a backup of all Customer Data that Verint is required to retain as a part of the SaaS Services. In the event the Customer Data becomes corrupt, Verint shall use commercially reasonable efforts to remediate and recover such corrupt data.

**3.6 Security.** Verint shall, either directly, or through its third party service provider, implement and maintain commercially reasonable security precautions to prevent unauthorized access to the Customer Data that is retained within the Hosted Environment.

**4 CUSTOMER DATA.** Verint acknowledges it receives no ownership or, except to the extent specified herein, other rights in any Customer Data, and all rights, title and interest in such Customer Data remain with Customer. Verint shall not, and shall not permit its third party vendor(s) to disclose Customer Data to any third party, or make any use of the Customer Data, unless authorized by the Customer or if Verint is required to do so by law or court order. Verint may access Customer Data from time to time solely for purposes of support, administration and invoicing related to Customer's use of the SaaS Services, and to aggregate information regarding Customer Data for planning purposes. Customer agrees that Customer is solely responsible for: **(a)** obtaining any Customer Data and other information Customer provides while using the SaaS Services, **(b)** obtaining all rights necessary to use the Customer Data, and **(c)** the accuracy, completeness, quality, integrity, legality, reliability, appropriateness and copyright of all Customer Data. By providing any Customer Data or other information, Customer agrees that it will not, and represents and warrants that such information does not **(i)** violate any intellectual property rights, publicity rights, confidentiality or trade secret rights, or any other legal or equitable rights; **(ii)** violate any law, rule, order, judgment or regulation to which Customer or the Customer Data may be subject; and **(iii)** violate in any way Customer's obligations in Section 5.2 below. Customer

acknowledges and agrees that Verint is not responsible or liable for any unlawful, harassing, defamatory, privacy invasive, abusive, threatening, offensive, harmful, vulgar, obscene, tortuous, hateful, racially, ethnically or otherwise objectionable information, or content, or information or content that infringes or may infringe any copyright, patent, moral right, trade secret, confidential information, trademark right or any other right of a third party. Verint may remove any violating content posted on the SaaS Services or transmitted through the SaaS Services, without notice to Customer.

**5 CUSTOMER RESPONSIBILITIES.**

**5.1 Passwords.** All access codes and passwords are personal to the individual to which it is issued. Customer and its Personnel are responsible for maintaining the confidentiality and security of all access codes and passwords issued, and ensuring that each access code and password is only used by the individual authorized. To the extent Verint assigned Customer with administrative rights to create access codes and passwords for its Personnel, Customer shall be responsible for issuing such passwords.

**5.2 Use of SaaS Services.** Customer shall be solely responsible for the actions of its Personnel while using the SaaS Services and the contents of its transmissions through the SaaS Services (including, without limitation, Customer Data), and any resulting charges. Customer agrees: **(i)** to abide by all local, state, national, and international laws and regulations applicable to Customer's use of the SaaS Services, including without limitation all laws and administrative regulations (including, all U.S. and applicable foreign) relating to the control of exports of commodities and technical and/or personal data; **(ii)** not to upload or distribute in any way files that contain viruses, corrupted files, or any other similar software or programs that may damage the operation of the Hosted Environment, SaaS Services or another's computer; **(iii)** not to use the SaaS Services for illegal purposes; **(iv)** not to interfere or disrupt networks connected to the Hosted Environment or SaaS Services; **(v)** not to post, promote or transmit through the SaaS Services any unlawful, harassing, defamatory, privacy invasive, abusive, threatening, offensive, harmful, vulgar, obscene, tortuous, hateful, racially, ethnically or otherwise objectionable information or content of any kind or nature; **(vi)** not to transmit or post any material that encourages conduct that could constitute a criminal offense or give rise to civil liability; **(vii)** not to interfere with another customer's use and enjoyment of the SaaS Services or another entity's use and enjoyment of similar services; **(viii)** not to engage in contests, chain letters or post or transmit "junk mail," "spam," "chain letters," or unsolicited mass distribution of email through or in any way using the SaaS Services; and **(ix)** to comply with all regulations, policies and procedures of networks connected to the SaaS Services.

**5.3 SaaS Services Restrictions.** Except as otherwise specified in this Addendum, expressly permitted in writing by Verint, or otherwise cannot be precluded under mandatory applicable law, Customer shall not, and shall not permit any other party to:

**a.** Disassemble, decompile, decrypt, or reverse engineer, or in any way attempt to discover or reproduce source code for, any part of the SaaS Services; adapt, modify, or prepare derivative works based on any of the Verint Intellectual Property; or use any of the Verint Intellectual Property to create any computer program or other material that performs, replicates, or utilizes the same or substantially similar functions as the SaaS Service;

**b.** Alter, remove, or suppress any copyright, confidentiality, or other proprietary notices, marks or any legends placed on, embedded or otherwise appearing in or on any Verint Intellectual Property; or fail to ensure that all such notices and legends appear on all full or partial copies of Verint Intellectual Property or any related material;

**c.** Sell, sublicense, lease, assign, delegate, transfer, distribute, encumber or otherwise transform any Verint Intellectual Property or any of the rights or obligations granted to or imposed on Customer hereunder.

**6 FEES.** Verint shall invoice Customer monthly in advance for the initial Access Term (and any extensions thereof) after acceptance of the SaaS Services as described in Section 3.4. Verint shall invoice Customer for all other fees, assessments and expenses provided for under this Addendum in accordance with the terms of the Agreement.

**7 WARRANTIES; DISCLAIMER.**

**7.1 Limited Performance Warranty.** Verint warrants to Customer that during any Access Term, the SaaS Services will be accessible by Customer, and the SaaS Services will perform substantially in accordance with the Documentation. Customer's exclusive remedy under this Section shall be for Verint to use commercially reasonable efforts to correct any Errors; provided, in the event Verint is unable to correct that nonconformity, Customer shall have the right to terminate the remaining Access Term and receive a pro rata refund of any remaining prepaid SaaS Service Fees applicable to those SaaS Services.

**7.2 Disclaimer of Warranties.** THE LIMITED WARRANTY AND EXCLUSIVE REMEDY SET FORTH IN SECTION 7.1 ARE MADE FOR THE BENEFIT OF CUSTOMER ONLY, AND ARE EXPRESSLY SUBJECT TO CUSTOMER'S PAYMENT OBLIGATIONS TO VERINT AND CUSTOMER'S OBLIGATIONS TO MAINTAIN ITS CUSTOMER ENVIRONMENT. VERINT MAKES NO AND DISCLAIMS ALL OTHER WARRANTIES, REPRESENTATIONS, OR CONDITIONS, WRITTEN OR ORAL, OR EXPRESS, IMPLIED, OR STATUTORY, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, TITLE, INTEROPERABILITY, DATA ACCURACY, OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO ANY PRODUCT, SERVICES, SUPPORT, OR ANY COMPONENTS THEREOF. WITHOUT LIMITING THE FOREGOING, VERINT DOES NOT WARRANT THAT ALL ERRORS CAN BE CORRECTED, OR THAT OPERATION OF THE SAAS SERVICE SHALL BE UNINTERRUPTED OR ERROR-FREE.

**8 INDEMNIFICATION.**

**8.1 Verint Indemnification.** Verint, at its sole expense, shall defend, indemnify and hold harmless Customer from any action based upon a claim that the SaaS Service used as permitted infringes any valid third-party U.S. patent, copyright, trade secret, or other proprietary right, and shall reimburse Customer for all damages, costs, and expenses (including reasonable attorneys' fees) awarded against Customer pursuant to any such actions. If the SaaS Service becomes, or in Verint's opinion is likely to become, subject of such a claim of infringement, Verint shall be entitled, at Verint's sole option, to either procure the right for Customer to continue to use the SaaS Service, or replace or modify it so that it becomes non-infringing. If neither of the foregoing is commercially and reasonably available to Verint, Verint may terminate the SaaS Service and refund to Customer a pro rata refund of any remaining prepaid SaaS Service Fees applicable to those SaaS Services. Verint shall have no obligation or liability hereunder for any claim resulting from: **(i)** modification of the SaaS Service **(a)** by any party other than Verint, or **(b)** by Verint in accordance with Customer's designs, specifications, or instructions; **(ii)** use of the SaaS Service other than as granted in this Addendum; or **(iii)** use of the SaaS Service in conjunction with other products or services not provided by Verint or necessary for the operation of the SaaS Service, where such infringement would not have occurred but for such use; or **(iv)** use of a version of the SaaS Service other than the then-current version where Customer has requested the prior version remain in use.

**8.2 Customer Indemnity.** Customer, at its sole expense, shall defend, indemnify and hold harmless Verint from any action by a third party based upon a claim resulting from any breach of Sections 4 or 5.2 by Customer, its Affiliates or Personnel of either, and shall reimburse Verint for all damages, costs, and expenses (including reasonable attorneys' fees) awarded against Verint pursuant to any such actions.

**8.3 Conditions.** Each party's indemnification obligations hereunder are contingent upon the indemnified party providing the indemnifying party with prompt written notice of the claim; complete control of the defense of and the right to settle such claim; and all available information, assistance, authority, and cooperation to enable the defense or settlement of such claim. This Section sets forth the exclusive remedy of the indemnified party against the indemnifying party, and the complete liability of indemnifying party with respect to any action or claim indemnified hereunder. Each party's obligations under this Section shall be excluded from any limitations on that party's liability under the Agreement.

**9 TERMINATION.**

**9.1 Service Suspension.** In the event Customer **(i)** fails to pay Verint any amounts past due, or **(ii)** is in breach of Section 5.2, Verint shall have the right to immediately suspend without notice any or all related SaaS Services provided to Customer hereunder.

**9.2 Access Term Termination.** Customer may terminate then current Access Term for convenience, provided: (i) such right to terminate for convenience shall not vest until after the initial Access Term (or if the initial

Access Term is greater than one (1) year, after the initial one (1) year period), and (ii) Customer must provide to Verint no less than ninety (90) days written notice of its intent to terminate.

**9.3** **Addendum Termination.** This Addendum may be terminated as follows:

**a.** By Verint immediately if Customer breaches Sections 5.2, or 5.3; or

**b.** By either party for material breach hereof which has not been cured within thirty (30) days after written notice of such breach; or

**c.** By either party at any time if the other party makes an assignment for the benefit of creditors, or commences or has commenced against it any proceeding in bankruptcy or insolvency.

**9.4** **Effects of Termination.**

**a.** **Termination of Addendum.** Upon termination of this Addendum, and except to the extent specified herein, **(i)** all fees due to Verint for the current Access Term and any other amounts due Verint shall be immediately paid, and **(ii)** all Customer rights to access and use any of the SaaS Services and SaaS Use Rights shall immediately terminate without right of refund **(iii)** in the event of Termination under 9.2, Customer will only be liable for any fees for use of SaaS Services up to the date of termination and services actually performed .

**b.** **Customer Data.** Upon termination of this Addendum for any reason other than Customer's breach, Customer may request that Verint conduct a mass export of Customer Data. Subject to Customer paying Verint for all service fees applicable to such work, Verint agrees to provide such services at its then current rates. Notwithstanding the foregoing, after thirty (30) days from termination, Verint may delete and destroy all Customer Data without notice or liability to Customer.

**c.** **Transition Services**. During the Term of this Addendum and upon expiration or termination of this Addendum by either party for any reason, Verint will provide Customer, or Personnel, as the case may be, all reasonable transition Services ("Transition Services") requested by Customer, for up 6 months after such termination (the "Transition Period"), relating to the transition from the SaaS Services to another system or provider, including all other Services necessary for an orderly conversion of the SaaS Service; provided however, that Customer is current on its payment obligations hereunder, and places Purchase Order with Verint for such Transition Services. Such services may include month to month extensions of existing SOW's. For Services which Customer was receiving from Verint prior to such expiration/termination, the fees applicable to such Transition Service will be the rates which Customer was paying prior to such expiration/termination. For all other Transition Services, Verint will not charge Customer fees in excess of the Verint's then standard rates.

**d.** **Survival.** Subject to the other provisions of this Section 9.3, provisions herein which by their context and content are intended to survive termination or expiration hereof shall so survive, including the Signature Page, Schedule A, and Sections 1.2, 4, 5, 6, 7.2, 8, and 9 of Schedule B.

**SCHEDULE C**
**SERVICE LEVELS**

This Schedule C is made a part of the Addendum signed by the parties on the Signature Page to which this Schedule C is attached.

1 **SERVICE AVAILABILITY.** Verint will use commercially reasonable efforts to ensure that the SaaS Services will be available 24 hours per day, 7 days per week, excluding any Scheduled Downtime. The SaaS Service availability shall be measured as the total number of minutes in a month, minus the total number of minutes in that month that comprise Schedule Downtime ("**Scheduled Uptime**"). Daily system logs will be used to track Scheduled Downtime and any other SaaS Service outages. A minimum of seven (7) days advance notice will be provided for all scheduled downtime to perform system maintenance, backup and upgrade functions for the SaaS Services (the "**Scheduled Downtime**"). Scheduled Downtime will not exceed eight (8) hours per month and will be scheduled in advance during off-peak hours (based on ET). Verint will notify Customer administrator via email of any Scheduled Downtime that will exceed two (2) hours. The duration of Scheduled Downtime is measured, in minutes, as the amount of elapsed time from when the SaaS Services are not available to perform operations, to when the SaaS Services become available to perform operations.

2 **SUPPORT.** During any Access Term, Verint shall provide support to Customer and with respect to the SaaS Services and Hosted Environment as follows:

a. **Support Access**. Customer's Designated Employees shall have direct access via telephone to Verint's support center during hours. Customer may also designate up to ten (10) additional Personnel to have access to the web support services knowledge base and user forum services.

b. **Support Assistance.** Verint will answer questions by Customer Personnel regarding the day-to-day operation of the SaaS Services and the development and implementation by Customer and its Personnel of interfaces with the SaaS Services ("**Know-How**"). Know-How may include any of the following:

- Data files, file and data definitions and relationships, data definition specifications, data models, interfaces, program architecture, program structure, sequence and organization, screen displays, reference and user manuals, design and functional specifications relating to the SaaS Services;
- Maintenance, support utilities and tools relating to the SaaS Services;
- Security requirements and methodologies relating to the SaaS Services;
- Such other material as Customer may reasonably request.

To the extent such Know-How is generally provided to Verint's SaaS Services subscribers at no charge, Verint will provide such Know-How at no additional charge; otherwise, Customer shall place a Purchase Order with Verint for Advice Line Services. Attendance at Verint's training programs are not included within the definition of the term "Know How" and will be separately documented in a Purchase Order if requested by Customer.

b. **Support Hours.** Verint shall make available telephone technical assistance relating to the installation, implementation, configuration, use and operation of the SaaS Services or any problems therewith. Telephone support will be available for Severity 1 Errors on a 24 x 7 basis, and otherwise during the following times: Monday to Friday, from 8am to 8pm Eastern time.

c. **Contact Details.** Customer's Designated Employees may contact Verint technical support personnel during the support hours at the following contact information:

| Telephone | Email |
|---|---|
| 1-800-494-8637 | contactcenter@verint.com |

3 **SERVICE LEVELS.**

3.1 **Categories of Errors.**

| Application Severity Level | Software Severity Definition |
|---|---|
| Severity 1 Error | Error in a production environment causing the Software to be completely down and inoperable. |
| Severity 2 Error | Error in a production environment causing intermittent system down and inoperability, or a major part of the Software functionality to be generally unavailable. |
| Severity 3 Error | Error in the Software causing low business impact or minor functionality to be unavailable. |
| Severity 4 Error | Error in the Software not affecting normal business operations. |

3.2 **Initial Response; Resolution.**

"**Initial Response**" means the time it takes from Customer's initial fax, e-mail or telephone call notification of the Error until Verint responds to the appropriate Customer Personnel.

"**Resolution**" means the time it takes Verint to apply a functional resolution to the reported Error measured from the time at which the initial notification was made, meaning Verint provides Customer with a temporary fix, workaround or final correction or modification of the SaaS Service that solves a reported Error and that can be used by Customer with minimal or no inconvenience and impact on Customer's business operations.

3.3 **Response and Resolution Times.** The following provides the response and resolution times provided by Verint for each Error type:

"**Initial Response Time**" means the time it takes from Customer's initial fax, e-mail or telephone call notification of the Error until Verint responds to the appropriate Customer Personnel.

"**Resolution Time**" means the time it takes Verint to apply a functional resolution to the reported Error measured from the time at which the initial notification was made, meaning Verint provides Customer with a Resolution.

3.4 **Error Response and Resolution Procedure.** For purposes of the table below:

"**Effort**" means continuous and uninterrupted commercially reasonable efforts during normal business hours.

"**Hours**" means consecutive hours during normal business hours.

| Severity Level | Initial Response Time | Resolution Time |
|---|---|---|
| Severity 1 Error | Within 3 Hours | 24 Hours, or as otherwise agreed to by the parties |
| Severity 2 Error | Within 6 Hours | 5 business days, or as otherwise agreed to by the parties |
| Severity 3 Error | Within 8 Hours | 30 calendar days, or as otherwise agreed to by the parties |
| Severity 4 Error | Within 2 business days | Within the next release, or as otherwise agreed to by the parties |

4 **Service Level Credits.**

4.1 **Calculation.** If Verint does meet not the Initial Response Time or Resolution Times, and subject to the exceptions specified below, Customer will be entitled, upon written request, to a service level credit ("**Service Credit**") to be calculated as follows:

| Severity Level | Initial Response Service Credit | Max Monthly Initial Response Service Credit | Resolution Service Credit | Max Monthly Resolution Service Credit |
|---|---|---|---|---|
| **Severity 1 Error** | 2% of monthly SaaS Service Fees | 10% of monthly SaaS Service Fees | 10% of monthly SaaS Service Fees | 30% of monthly SaaS Service Fees |
| **Severity 2 Error** | 1% of monthly SaaS Service Fees | 5% of monthly SaaS Service Fees | 5% of monthly SaaS Service Fees | 15% of monthly SaaS Service Fees |

Customer shall only be eligible to request Service Credits if it notifies Verint in writing within thirty (30) days from the end of the month for which Service Credits are due. In the event after such notification Verint determines that Service Credits are not due, or that different Service Credits are due, Verint shall notify Customer in writing on that finding. Service Credits will be applied to the next invoice following Customer's request and Verint's confirmation of available credits. Service Credits shall be Customer's sole and exclusive remedy in the event of any failure to meet the Service Levels.

**4.2 Exceptions.** Customer's right to receive Service Credits, and the inclusion of any minutes in the calculation of Service Credits are conditioned upon: **(i)** prompt payment by Customer of all Fees, **(ii)** Customer performing all Customer obligations (including, without limitation, establishing and maintaining the Customer Environment), **(iii)** Customer agreeing to use of the most current version of the SaaS Service, and the following shall not be included in any such calculation:

- Intentional shutdowns due to emergency interventions and/or responses to security incidents
- Any Severity Level being caused by the failure of any third party vendors, the Internet in general, or any emergency or force majeure event
- Configuration changes initiated by Customer
- Environmental impact issues within the Customer's business facility;
- The acts or omissions of the Customer, its employees, agents, consultants, suppliers or end-users
- A force majeure event or any other cause outside of Verint's control.

**SCHEDULE D**
**INFORMATION SECURITY**

At a minimum and as specified herein, Verint shall provide security for all data and communication systems in support of the Agreement or Procurement Document to which this Appendix is attached ("**Appendix**"). This Appendix should be a part of any contract with Verint that will store, transmit (send/receive/pass-through) or process Customer data.

Verint's security efforts will include, without limitation:

**Logical Access Controls:** Verint agrees to employ effective logical access control measures over all systems used to create, transmit, or process Customer Confidential Information), including but not limited to:

- User authentication must use unique identifiers ("**User ID's**") consistent with individual accountability; shared User ID's do not provide the level of accountability required by Customer;
- A complex password policy, including the prohibition of clear-text credentials must be enforced;
- User access rights/privileges to information resources containing Customer Confidential Information must be granted on a need-to-know basis consistent with role-based authorization.
- User access to Customer Confidential Information must be removed immediately upon user separation or role transfer eliminating valid business need for continued access.
- Default passwords and security parameters must be changed in third-party products/applications used to support Customer Confidential.
- Two-factor authentication such as token devices, smart cards, biometrics, or public keys shall be used to secure all remote administrative access to Customer Confidential Information.

**Network Security Architecture:** Verint agrees to employ effective network security control measures over all systems used to create, transmit, or process Customer Confidential Information including but not limited to:

- Firewalls shall be operational at all times and shall be installed at the network perimeter between Verint's internal (private) and public (Internet) networks.
- Properly configured and monitored IDS/IPS (Intrusion Detection/Prevention Systems) must be used on Verint's network.
- Databases must be logically or physically separated from the web server, and the database may not reside on the same host as the web server, where applicable.
- The database and other information systems used for the purposes of processing Customer Confidential Information must have only those services/processes and ports enabled to perform routine business. All other services/processes on the host must be disabled.
- All information systems, repositories, etc. used for Customer by Verint, or its business partners, must be physically located in a controlled data center environment used for the purpose of protecting information systems.
- Secure channels (e.g., SSL, SFTP, SSH, IPSEC, etc.) must be used at all times.

**Physical Access Controls:** Verint agrees to maintain servers, databases, and other hardware and/or software components that store information related to Customer's business activities in an access controlled and consistently monitored Data Center secured by appropriate alarm systems, which will not be commingled with another unrelated party's software or information. The facility storing Customer data must follow best practices for infrastructure systems to include fire extinguishing, temperature control and employee safety.

**Risk Assessment/Audit:** At no additional cost, Verint agrees to provide responses to a risk assessment questionnaire (if provided by Customer), participate in vulnerability scans of their network and / or application (upon notification).

- Verint agrees to perform regular security vulnerability assessments and shall provide Customer with results of a current security assessment by an accredited third-party (e.g., penetration test results of internet-facing devices, SSAE 16-Type II reports, ISO 27001 certification, etc.) as well as action plans describing how Verint will address all identified security vulnerabilities affecting systems used to store, process or otherwise access Customer Confidential Information.
- To the extent applicable, Verint agrees to maintain appropriate PCI certifications of its data security controls.
- Verint will permit Customer or its designee to conduct audits of Customer's data maintained or stored by the Verint.

**Security Policy:** Verint agrees to maintain and enforce security policies consistent with security best practices, and all applicable regulatory and legal security and privacy requirements, including but not limited to Massachusetts 201 CMR 17.00 et. seq. "Standards for the Protection of Personal Information of Residents of the Commonwealth". Upon request, Verint shall provide copy of current

security policy and standards as well as security architecture. Verint shall comply with Customer's Privacy Policy with respect to any Customer customer personal information it receives.

**Training and Awareness**: Verint agrees to provide necessary training to ensure security awareness in Verint personnel that are directly or indirectly engaged in handling Customer Information and systems, onsite or remotely.

**Protection of Customer Confidential Information**: In addition to what may be described in the Agreement or Procurement Document to which this Appendix is attached, where applicable, Verint agrees to protect Customer Confidential Information as it would its own. For purposes of clarity, Customer Confidential Information may include, but is not limited to, the following:

- Credit Card numbers
- Credit Card Validation Codes
- Personal Identification (PIN) numbers
- Loyalty Card Numbers with or without any associated PIN or Access Code
- Checking Account number (alone or in combination with checking account routing information)
- Bank Account number (alone or in combination with routing information)
- Drivers License Number or State-issued Identification Card Number
- Customer or Employee Names, in whole or in part
- Customer or Employee Postal Address
- Customer or Employee email address
- Date of Birth
- Social Security Numbers
- Health Insurance Card or Policy Identification Number
- Medical or Health Information
- Personal Telephone Number (when used with a customer/employee name or address)

Additionally, Verint agrees to adhere to the following controls surrounding the use and protection of Customer Confidential Information:

- Customer Confidential Information must be encrypted with key sizes of 256-bit for symmetric and 2048-bit for asymmetric encryption.
- Clear text (ftp, telnet, etc.) protocols may not be used to access or transfer Customer Confidential information. Customer Confidential Information must be encrypted when stored on portable media, which by way of example shall include USB Sticks, Portable hard drives, Laptops, DVD/CDs, and when transmitted on wireless networks or across public networks.
- Customer Confidential Information may not be copied, sold or used for solicitation purposes by the Verint or its business partners. Customer Confidential Information may only be used in conjunction with and within the scope of the Procurement Document or the Agreement to which this Appendix is attached.
- Customer Confidential Information (data) must be segregated from other Verint customers, systems, or applications unrelated to Customer. Appropriate data security controls must be used over data at rest, including, access controls and encryption.
- Where applicable, Payment Card information must be masked on display rendering in a manner consistent with the Payment Card Industry Data Security Standard (PCI-DSS), the Fair and Accurate Credit Transaction Act (FACTA) and all other applicable laws and regulations.
- Verint must disclose where Customer data will be stored and processed. Storage and Processing of Customer Confidential Information shall take place within the United States.

**System Monitoring**: Verint agrees to regularly audit and monitor information systems processing Customer's business activities to ensure the protection of Customer's information. Monitoring includes, but is not limited to, potential breaches or hacking activity and access to devices. Verint must have defined processes for security alerting, escalation and remediation that are consistent with the Services procured pursuant to the Agreement. Verint must ensure that event logs with Customer data are not provided to other subscribers. If Verint using virtual machines, it must ensure there is granular monitoring of traffic that is crossing the virtual machine backplanes.

**Vulnerability Management Controls:** Verint agrees to employ effective vulnerability management control measures over all of its systems used to create, transmit, or process Customer Confidential Information, including; but, not limited to:

- Third-party vulnerability scans or audits of any external-facing (public) infrastructure devices.
- Annual third-party assessment of applications or processes supporting Customer's customer credit card information.
- Deploy and maintain currency of up-to-date commercially available anti-virus, anti-spam, anti-malware software on all information system components including personal computers, laptops, and interconnecting networks, where applicable, used for the purpose of managing Customer Confidential Information. Additionally, provide for regular scanning for viral infections and update virus signature files frequently.
- Maintain a standard patch management process and practice to ensure the protection of any devices used to access, process or store Customer Confidential Information. Verint agrees to provide Customer a summary of patch management program upon request.
- Regularly auditing and monitoring to ensure the protection of Customer Confidential Information.
- Any security breach that involves Customer Confidential Information must be reported to Customer in accordance with the Notice provision of the Agreement without unreasonable delay. Verint shall immediately perform a root cause analysis as well as provide detailed information about measures taken by the Verint to prevent future breaches. All efforts to rectify or resolve the situation must include subsequent and regular notification for the reported incident.
- Within 1 hour of suspected fraudulent or malicious activity occurring on the Verint site, Verint will notify the Customer's Security Operations Center at securityops@searshc.com or by phone at 312-357-9390 to inform the Customer team about the activity. Any request by the Customer team for such information will be provided to SHC within two hours.
- Verint agrees to provide full cooperation with Customer and in the event of a data breach involving Customer Confidential Information including, but not limited to: server log information showing network and application traffic.
- Vulnerabilities discovered by the Customer's or Verint's Security Scanning tools must be resolved by following the schedule outlined below (the level of vulnerability will be determined by Customer):
  - ***P1 Vulnerabilities***: A successful exploit of this vulnerability may result in catastrophic and significant physical or property damage or loss. Or, there may be a catastrophic and significant loss of revenue or productivity (e.g., Denial of Service Attack, exploit 'kits' exist, buffer overflows high jacking, or source code exposure, etc.). Such a vulnerability must be resolved before a site launch or within 8 hours of discovery if the application is currently publically available.
  - ***P2 Vulnerabilities***: A successful exploit of this vulnerability may result in moderate physical or property damage, or, there may be a moderate loss of revenue or productivity to the organization (e.g., Weak encryption, or possible phishing opportunity, etc.). Such vulnerability must be resolved within 7days of site launch or within 4 hours of discovery if the application is currently publically available.
  - ***P3 Vulnerabilities***: A successful exploit of this vulnerability may result in minor physical or property damage. Or, there may be a minor loss of revenue or productivity to the organization (e.g., FTP use or missing service pack, etc.). Such vulnerability must be resolved within 30 days of a site launch or within 8 hours of discovery if the application is currently publically available.

**Data Recovery and Availability**: Verint must provide detailed disaster recovery and business continuity plans that support the pre-defined recovery time objective (RTO) / recovery point objective (RPO) requirements defined by Customer.

- Verint must utilize industry best practices for data, services, and communications recoverability. Data and applications must be replicated across multiple independent sites and alternate communication channels must be available.
- Verint is expected to validate and verify their existing capabilities through realistic scenario testing. Verint must agree to participate in periodic recovery testing with Customer. Proof of successful testing of the Verint plan must be provided to Customer upon request.
- Verint systems must be device (computer machine) and provider independent in order to ensure portability and successful recovery of applications and backup or restoration services, or both.
- Verint must provide company name, address, and contact information on all third-party relationships as well as services provided by each wherever those services create, transmit or process Customer Confidential Information.

**Data Destruction:** Verint shall ensure that residual magnetic, optical, or electrical representation of Customer Confidential Information that has been deleted may not be retrieved or reconstructed when storage media is transferred, become obsolete or is no longer usable or required by Customer.

- Verint data retention and destruction must comply with applicable laws or regulations.

- Customer information stored on Verint media (e.g., hard drive, optical discs, digital media, tapes, paper, etc.) must be rendered unreadable or unattainable using the NIST Guidelines for Media Sanitization (Special Pub 800-88), prior to the media being recycled, disposed of, or moved off-site.

**Application Verint:** This section applies to the Verints that provide application software hosted at Customer or offsite at the Verint facility. Verint agrees to adhere to the following controls surrounding application development:

1. Verint must provide supporting documentation that commonly accepted web application security guidelines and frameworks are used for developing Internet-facing applications (e.g. Open Web Application Security Project [OWASP], SANS).
2. Verint must provide a data flow diagram that demonstrates all security controls in place.
3. Verint must demonstrate how Internet-facing applications are tested for security vulnerabilities and remediated prior to the source code being promoted to production.
4. Verint must allow penetration testing and/or application source code review to be performed by Customer, when requested or allow a third party to perform the same.
5. Verint must provide supporting documentation describing how fraud is detected and prevented when requested by Customer.
6. Verint agrees to supply within the requested timeframe, and demonstrate full cooperation with Customer, pertaining to all inquires deemed necessary by Customer to determine the risk of any third-party systems and procedures related to and affecting Customer. This includes, but is not be limited to, inquiries pertaining to s, server logs sanitized of sensitive information but showing application traffic, operating systems, applications, databases, network configuration, data encryption algorithms being utilized, fraud detection and prevention controls, physical inspection of facilities, incident response procedures, and disaster recovery measures.
7. Verint agrees to allow all relevant sites to be monitored by Customer or a third-party for availability and performance.

**Personnel Roles and Responsibilities:** Verint agrees to identify in writing the person who will be responsible for overall security of the application development, management, and update process throughout the Contract period. The person identified shall be a single technical resource serving as project Security Lead. The Security Lead shall confirm in writing the security of each deliverable. The Security Lead shall confirm to Customer in writing that the software meets the security requirements, all security activities have been performed, and all identified security issues have been documented and resolved. Any exceptions to the confirmation status must be fully documented with the delivery.

**SCHEDULE E**

**Shop Your Way Vendor Engagement Program**

Verint agrees to encourage each of its employees to engage in the Shop Your Way Program through Verint's participation in at least 12 promotional efforts (as set forth below) during each calendar year this Agreement is in effect (pro-rated for any partial years).

Promotional efforts include the following. The number to the left of such item indicates the number of times Verint has agreed to participate in such effort during each calendar year of this Agreement:

| # | SYW Promotional Effort |
|---|---|
| 8 | Email to Verint's Employees promoting the Shop Your Way Program |
| 2 | Posting signage and/or Intranet postings regarding Shop Your Way Program |
| ___ | Articles on Shop Your Way Program in Verint's newsletters |
| ___ | On-Site enrollment opportunities at Verint's locations |
| 2 | Other promotional efforts mutually agreed to by the parties |

Customer will provide electronically all related Shop Your Way program descriptions and materials for these promotions, which will explain the Shop Your Way benefits and any information necessary to enroll. Verint will not alter program descriptions and materials, but will provide information reasonably necessary for Customer to create the program descriptions specific to Vendor employees.

Verint agrees to begin promotions for the Shop Your Way Program to its employees within sixty (60) days following the execution of this Agreement. Customer reserves the right to request and be granted a periodic review on a quarterly basis with Verint's executive level members (Vice President level and up) to discuss Verint's overall promotion and participation in the program.

Verint has appointed the following individual as its point of contact for the Shop Your Way Vendor Engagement program and this individual will be responsible for overseeing Verint's efforts to encourage its employees to engage in the Shop Your Way Program. Verint additionally will maintain an appointed individual in the event of employee turnover.

Name: Anne Patton
Title: Vice President Communications
Phone number: 678-243-4815
E-mail address: anne.patton@verint.com

DocuSign Envelope ID: 7E27B7D8-714C-A5-4801-48BB9-E3B54D1B50AC

**SCHEDULE F**

**CUSTOMER TRAVEL EXPENSE POLICY**

Where agreed on a Purchase Order or in a SOW, Customer shall reimburse Verint for all actual out-of-pocket travel expenses as reasonably incurred by Verint in connection with its performance of Services and in conformance with the Customer Travel Expense Policy attached to this Schedule F; provided, Verint may submit its compliant expenses with its invoices, and shall not be obligated to complete the specific expense reports contained therein.

[see attached]

VERINT PROPRIETARY AND CONFIDENTIAL INFORMATION

# Third-Party Service Provider Travel Requirements & Expense Reporting Policy

This establishes Sears Holdings minimum requirements for reimbursement of third party out-of-pocket travel expenses, where required by contractual agreement. This applies to consultants, contractors and other service providers who submit authorized, reimbursable travel expenses to Sears Holdings. Future reference to these individuals is made collectively as "service providers".

All service providers subject to reimbursement of third-party out-of-pocket travel expenses have the responsibility to ensure that their expenses are appropriate, reasonable, and documented. All expenses are subject to Sears Holdings' approval and adherence to the following. In the event of a conflict between the contract and these requirements, the terms of the contract shall prevail.

## A. Invoice Processing

Prior to submitting any invoice for payment, regardless of the invoice payment processing arrangements set forth in the agreement, a summary report with line item detail (see Exhibit A) must be sent to the Sears Holdings business contact for the project for their review and approval.

## B. Receipt Requirements

Itemized receipts are required for all transactions greater than $75 and for all airline ticket purchases/changes. Individual receipts submitted for payment to SHC must be retained by the supplier (hard copy or scanned image) for a period up to three years following the end of the project term.

| C. Reimbursable | Not Reimbursable |
|---|---|
| **Air Travel** | |
| ○ Economy Class Travel<br>○ Business Class travel over 12 flight hours<br>○ Reasonable baggage fees | ○ First Class Travel<br>○ Airline Upgrade Charges<br>○ Early Boarding<br>○ Airport Club Lounges<br>○ Stand-by or Same-day Change fees (refer to section D)<br>○ Any other airline offerings, i.e. purchase miles, seats, etc. |
| **Lodging** | |
| ○ Room & tax at moderately-priced hotels, such as Hampton Inn, Holiday Inn Express, Fairfield Inn<br>○ Health Club/Fitness Center fees not to exceed $10 per day | ○ Luxury/premium hotel expenses<br>○ Personal incidentals i.e. in-room movies, etc.,<br>○ No show charges |
| **Ground Transportation** | |
| ○ Taxi or shared limousine to/from the airport<br>○ Compact rental car is required unless the size of group requires a larger vehicle<br>○ Vehicle damage insurance and liability insurance on **international** rentals only<br>○ Rental car refueling prior to returning the vehicle<br>○ Personal Car Mileage consistent with IRS guidelines (http://www.irs.gov/publications/p463/ch04.html) will be reimbursed at the current SHC rate of $0.42 per mile | ○ Private car limousine or limousine service rented on an hourly or hourly-plus basis<br>○ Luxury/Premium rental cars<br>○ Rental car insurance on domestic rentals<br>○ GPS rental<br>○ Convenience refueling when returning rental car<br>○ Mileage for normal daily commute |
| **Meals** | |
| ○ Meals while on overnight travel status<br>   ○ Up to $36 (inclusive of tax & gratuity) per day<br>   ○ Up to $60 (inclusive of tax & gratuity) per day in Boston, Chicago (downtown only), Honolulu, Los Angeles, NY, San Diego, San Francisco, Seattle, Washington, D.C., all international destinations | ○ Meals for day trips<br>○ Meals in excess of daily limits<br>○ Meals for local staff or SHC associates |
| **Miscellaneous** | |
| ○ Airport parking – SHC negotiated off-site or Long term<br>○ SHC business related telephone expenses<br>○ Internet service fees (e.g., hotel, airport wireless, in-flight, Hot Spot) required for SHC business – up to $13 per day | ○ Personal travel insurance<br>○ Personal entertainment, i.e. movies<br>○ Theft or loss of personal property<br>○ Valet service, Laundry or dry cleaning |

| | ○ Any unreasonable, unaccounted for, or unexplained expenses |
|---|---|

**D. Air Transportation**

- When possible, travelers should plan business trips at least 14 days in advance to secure reduced fares.
- Travelers are strongly encouraged to accept the lowest priced flight available within a 2 hour window. This includes alternate airports, connections, one-stop flights, etc. If lowest fares are not utilized, reimbursement may be subject to further review, resulting in partial reimbursement.
- When non-refundable tickets are the least expensive airfare, they must be utilized.
- If a trip is cancelled or postponed, airline tickets must be cancelled before the time of departure.
- Additional airfares, and other fees due to changes, will be reimbursed only if the change was requested by Sears Holdings, and the additional expense was approved in advance by Sears Holdings.
- Only a reasonable number of travelers will be reimbursed. This is subject to pre-approval.

**E. Ground Transportation**

- Travelers should use courtesy or other scheduled services provided by the hotel (if available) for travel between the hotel and airport.
- Economy or compact cars should be rented unless the size of the group makes them impractical. Rental cars should be shared whenever feasible.

**F. Lodging**

- Providers within reasonable travel distance from their daily workplace are expected to return to their daily workplace. Individual circumstances will determine what is reasonable but generally a trip of 100 miles or less one-way does not require an overnight stay.
- Consult the SHC business project contact for any negotiated hotel rates in your travel destination (from SHC Travel intranet site - 2012 SHC Preferred Hotel Program)
- If a reserved room will not be used, it is the traveler's responsibility to notify the hotel directly, prior to the hotel's cancellation deadline. Failure to cancel a hotel reservation will result in a "no-show" charge that will not be reimbursed. Same applies to departure date changes not made prior to check-in which result in early check-out fees.
- Use of corporate apartments or extended stay properties is acceptable if the cost is the same or less than staying in a SHC preferred/approved hotel and approved by the Sears Holdings business contact for the project.

**G. Meals**

- Meal expense limits:
  - $36 (inclusive of tax & gratuity)
    - Individual meal limit of $5 breakfast, $9 lunch and $16 dinner applies when the travel schedule includes partial travel days.
- Exceptions:
  - $60 (inclusive of tax & gratuity) in Boston, Chicago (Downtown only), Honolulu, Los Angeles, New York, San Diego, San Francisco, Seattle, Washington, D. C., and International destinations including Puerto Rico and Canada
    - Individual meal limit of $7 breakfast, $13 lunch and $30 dinner applies when the travel schedule includes partial travel days.

| Meal Reimbursement Times | | | |
|---|---|---|---|
| **Trip** | **Breakfast** | **Lunch** | **Dinner** |
| Overnight | Depart home/workplace prior to 6:30 am | Depart home/workplace before 11:00am or return home/workplace after 1:00pm | Return home/workplace after 7:00pm or depart from home/workplace before 5:00pm |

For questions contact: Sears Holdings Corporation at (847) 286-2500, and request the Travel Department

# EXHIBIT A

| Company Name: | Traveler Name: | Traveler's Title |
|---|---|---|
| **Business Purpose of Trip:** | **Statement of Work #:** | **Invoice #:** |

| Line | Date of Travel | Traveled From | To | Airline Ticket | Lodging | Rental Car/Bus/ Taxi | *Meals Brkfst | Lunch | Dinner | Total | Personal Vehicle # Miles | x ** | Airport Parking/ Tolls | Misc. *** | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | $ | $ | $ | $ | $ | $ | $0.00 | | $ | $ | $ | $0.00 |
| 2 | | | | | | | | | | $0.00 | | | | | $0.00 |
| 3 | | | | | | | | | | $0.00 | | | | | $0.00 |
| 4 | | | | | | | | | | $0.00 | | | | | $0.00 |
| 5 | | | | | | | | | | $0.00 | | | | | $0.00 |
| 6 | | | | | | | | | | $0.00 | | | | | $0.00 |
| 7 | | | | | | | | | | $0.00 | | | | | $0.00 |
| 8 | | | | | | | | | | $0.00 | | | | | $0.00 |
| 9 | | | | | | | | | | $0.00 | | | | | $0.00 |
| 10 | | | | | | | | | | $0.00 | | | | | $0.00 |
| 11 | | | | | | | | | | $0.00 | | | | | $0.00 |
| 12 | | | | | | | | | | $0.00 | | | | | $0.00 |
| 13 | | | | | | | | | | $0.00 | | | | | $0.00 |
| 14 | | | | | | | | | | $0.00 | | | | | $0.00 |
| 15 | | | | | | | | | | $0.00 | | | | | $0.00 |
| | **TOTAL** | | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $0.00 | $0.00 | $0.00 | $0.00 |

* Group meals (includes more than one person) must be documented on page 5

** Multiply miles times current SHC mileage reimbursement rate.

*** Details regarding miscellaneous expenses must be documented on page 5

**The following receipts must be attached:**

Itemized receipts are required for all transactions greater than $75 and for all airline ticket purchases/changes

**Expenses for items outside of policy will be deducted from the total reimbursement.**

**GROUP MEALS**

**All columns must be completed for each business meal and expense. (Expense paid for other individuals)**

| Line # from page 1 | Date of Travel | $ Amount | Type of Expense (Check One) Breakfast | Lunch | Dinner | Misc | Explanation of Expense/ Business Purpose | Attendee Names/ Business Relation to Company | Name of Establishment and City |
|---|---|---|---|---|---|---|---|---|---|
| | | $ | $ | $ | $ | $ | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**Business Meals**

If meal expense includes anyone other than you, complete the above "Explanation of Business Meals and Miscellaneous Expenses"

DocuSign SECURED

## Certificate Of Completion

Envelope Id: 727E7D874CA548018BB9EBB54D1B50AC
Subject: Verint Americas Inc - CW2314040 - Addendum
Source Envelope:
Document Pages: 17
Certificate Pages: 2
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-06:00) Central Time (US & Canada)

Signatures: 2
Initials: 0

Status: Completed

Envelope Originator:
Sears - Contract Management - P
3333 Beverly Rd.
Hoffman Estates, IL 60179
pitchaimani.marimuthu@searshc.com
IP Address: 115.110.116.14

## Record Tracking

Status: Original
4/26/2016 4:27:39 AM

Holder: Sears - Contract Management - P
pitchaimani.marimuthu@searshc.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Lynn Machleit<br>Lynn.Machleit@verint.com<br>VP, Finance<br>Security Level: Email, Account Authentication (None)<br><br>Electronic Record and Signature Disclosure:<br>Not Offered via DocuSign<br>ID: | DocuSigned by:<br>Lynn Machleit<br>347FB9359A994BD...<br><br>Using IP Address: 63.247.71.66 | Sent: 4/26/2016 10:20:36 AM<br>Viewed: 4/26/2016 10:21:18 AM<br>Signed: 4/26/2016 10:21:34 AM |
| SHC Contract Management - P<br>pitchaimani.marimuthu@searshc.com<br>We can change here<br>SHMC<br>Security Level: Email, Account Authentication (None)<br>Electronic Record and Signature Disclosure:<br>Not Offered via DocuSign<br>ID: | Completed<br><br>Using IP Address: 203.91.192.5 | Sent: 4/26/2016 10:21:36 AM<br>Viewed: 4/28/2016 4:52:39 PM<br>Signed: 4/28/2016 4:52:43 PM |
| Steven Sissel<br>steven.sissel@searshc.com<br>VP Member Services Organization<br>Security Level: Email, Account Authentication (None)<br><br>Electronic Record and Signature Disclosure:<br>Not Offered via DocuSign<br>ID: | DocuSigned by:<br>Steven Sissel<br>F70E57A2EA8A400...<br><br>Using IP Address: 166.76.0.1 | Sent: 4/28/2016 4:52:45 PM<br>Viewed: 4/28/2016 4:53:35 PM<br>Signed: 4/28/2016 4:53:49 PM |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
| --- | --- | --- |
| David Bertolino<br>salesadmin@verint.com<br>VP Finance<br>800 Northpoint Parkway, Alpharetta GA 30005<br>Security Level: Email, Account Authentication (None)<br>Electronic Record and Signature Disclosure:<br>Not Offered via DocuSign<br>ID: | COPIED | Sent: 4/26/2016 10:20:37 AM<br>Viewed: 4/26/2016 10:21:10 AM |
| Christopher Kretschmer<br>Christopher.Kretschmer@searshc.com<br>Security Level: Email, Account Authentication (None)<br>Electronic Record and Signature Disclosure:<br>Not Offered via DocuSign<br>ID: | COPIED | Sent: 4/26/2016 10:21:36 AM |
| Christopher Kretschmer<br>Christopher.Kretschmer@searshc.com<br>Security Level: Email, Account Authentication (None)<br>Electronic Record and Signature Disclosure:<br>Not Offered via DocuSign<br>ID: | COPIED | Sent: 4/28/2016 4:52:45 PM |
| Christopher Kretschmer<br>Christopher.Kretschmer@searshc.com<br>Security Level: Email, Account Authentication (None)<br>Electronic Record and Signature Disclosure:<br>Not Offered via DocuSign<br>ID: | COPIED | Sent: 4/28/2016 4:53:51 PM |
| Procurement Savings Team<br>ProcurementSavings@searshc.com<br>Security Level: Email, Account Authentication (None)<br>Electronic Record and Signature Disclosure:<br>Not Offered via DocuSign<br>ID: | COPIED | Sent: 4/28/2016 4:53:51 PM |
| SHC Contract Management<br>shccontractmgmt@searshc.com<br>Security Level: Email, Account Authentication (None)<br>Electronic Record and Signature Disclosure:<br>Not Offered via DocuSign<br>ID: | COPIED | Sent: 4/28/2016 4:53:51 PM |

| Notary Events | | Timestamp |
| --- | --- | --- |

| Envelope Summary Events | Status | Timestamps |
| --- | --- | --- |
| Envelope Sent | Hashed/Encrypted | 4/28/2016 4:53:51 PM |
| Certified Delivered | Security Checked | 4/28/2016 4:53:51 PM |
| Signing Complete | Security Checked | 4/28/2016 4:53:51 PM |
| Completed | Security Checked | 4/28/2016 4:53:51 PM |

# Amendment

**AMENDMENT TO ORDER NO. 397323-4**
**BETWEEN VERINT AMERICAS INC. AND SEARS HOLDING MANAGEMENT CORPORATION**
**DATED APRIL 29, 2016**

This Amendment to Order No. 397323-4 (the "Amendment") is made as of the 6th day of June, 2018 by and between Verint Americas Inc. ("Verint") and Sears Holdings Management Corporation ("Customer").

WHEREAS, Verint and Customer are parties to that certain Order No. 397323-4 dated April 29, 2016 (the "Order").

WHEREAS, Customer has licensed certain software products and has certain SaaS access rights to SaaS Services under this Order;

WHEREAS, for SaaS Services, under Section 2 of the Order, the Access Term commenced on May 10, 2017;

WHEREAS, Customer desires to reduce the number of Named Employee licenses for SaaS access rights in accordance with Section 7.1 of the Order, and Verint has agreed to such reduction.

NOW THEREFORE, for good and valuable considerations, the receipt and sufficiency of which is hereby acknowledged by the parties:

1. Section 7.1 of the Order shall be amended to add the following language at the end thereof:

   "If Customer desires to reduce the number of Named Employee licenses or SaaS Services, Customer shall complete the attached Exhibit A (License and SaaS Services Reduction Notice) and deliver to Verint at least 30 days prior to each Access Term anniversary date. For avoidance of doubt, the reduction in the number of Name Employee licenses on each anniversary date shall only apply for the three (3) year Access Term commencing May 21, 2017 and ending May 20, 2020.

2. Customer and Verint hereby agree that on the last day prior to the first anniversary date of the Access Term, Customer's SaaS Access Rights under the Order included the following:

| Part# | SaaS Item Description | Units | UOM |
|---|---|---|---|
| 93-530-8635 | Dedicated Infrastructure up to 3500 Named Employees - Single Tenant SaaS | 1.00 | Installed Copies |
| 93-530-8628 | Verint Advanced Desktop Analytics - SaaS | 3,440.00 | Named Employee |
| 93-530-8629 | Verint Screen Capture - SaaS | 3,440.00 | Named Employee |
| 93-530-8632 | Verint Speech Analytics - SaaS | 3,440.00 | Named Employee |
| 89-180-8613 | Verint Quality Management Bundle - SaaS | 3,440.00 | Named Employee |
| 93-530-8627 | Verint Performance Management - SaaS | 2,200.00 | Named Employee |

3. Customer and Verint agree that commencing on the first anniversary date of the Access Term, SaaS Access Rights and Fees under Section 2 of the Order shall be as follows:

| Part# | SaaS Item Description | Units | UOM | Monthly Per Unit Fee |
|---|---|---|---|---|
| 93-530-8635 | Dedicated Infrastructure up to 3500 Named Employees - Single Tenant SaaS | 1.00 | Installed Copies | $4,821.46 |
| 93-530-8628 | Verint Advanced Desktop Analytics - SaaS | 3,096.00 | Named Employee | $5.79 |
| 93-530-8629 | Verint Screen Capture - SaaS | 3,096.00 | Named Employee | $3.86 |
| 93-530-8632 | Verint Speech Analytics - SaaS | 3,096.00 | Named Employee | $13.50 |
| 89-180-8613 | Verint Quality Management Bundle - SaaS | 3,096.00 | Named Employee | $13.60 |

| 93-530-8627 | Verint Performance Management - SaaS | 1,980.00 | Named Employee | $5.79 |
|---|---|---|---|---|

This Amendment incorporates by references and shall be controlled by the terms and conditions of the Order, and except as expressly stated herein, all terms and conditions of the Order shall remain in full force and effect.

**IN WITNESS WHEREOF,** Customer and Verint have caused this Amendment to be executed by their duly authorized representatives as of the last date executed below.

**VERINT AMERICAS INC.**

DocuSigned by: Lynn Machleit
347FB935DA9943D

NAME SIGNED

VP, Finance

NAME & TITLE PRINTED

6/12/2018

DATE

**SEARS HOLDINGS MANAGEMENT CORPORATION**

DocuSigned by: Pat Welter
8D3F105695946A...

NAME SIGNED

Senior Director MSO Technology

NAME & TITLE PRINTED

6/13/2018

DATE

Approved by Sharon Snyder

Digitally signed by Approved by Sharon Snyder
DN: cn=Approved by Sharon Snyder, o=Verint Americas, Inc., ou=Legal, email=sharon.snyder@verint.com, c=US
Date: 2018.06.06 17:06:12 -04'00'

**Exhibit A**

**Verint Services Inc.**
**License and/or SaaS Services Reduction Notice ("Notice")**

**Customer:** Sears Holdings Management Corporation
**Verint Order No.**: 397323-4 ("Order")
**Access Term Commencement Date**: May 10, 2017

1. On the day before the second anniversary of the Access Term Commencement Date, SaaS services for Customer include the following:

| Part# | SaaS Item Description | Units | UOM | Monthly Per Unit Fee |
|---|---|---|---|---|
| 93-530-8635 | Dedicated Infrastructure up to 3500 Named Employees - Single Tenant SaaS | 1.00 | Installed Copies | $4,821.46 |
| 93-530-8628 | Verint Advanced Desktop Analytics - SaaS | 3,096.00 | Named Employee | $5.79 |
| 93-530-8629 | Verint Screen Capture - SaaS | 3,096.00 | Named Employee | $3.86 |
| 93-530-8632 | Verint Speech Analytics - SaaS | 3,096.00 | Named Employee | $13.50 |
| 89-180-8613 | Verint Quality Management Bundle - SaaS | 3,096.00 | Named Employee | $13.60 |
| 93-530-8627 | Verint Performance Management - SaaS | 1,980.00 | Named Employee | $5.79 |

2. Customer desires and Verint agrees that, pursuant to Section 7.1 of the Order to reduce the number of Named Employees and request that commencing on the second anniversary date of the Access Term, Section 2 under SaaS Services Rights and Fees shall be as follow:

**[Customer to Complete]**

| Part# | SaaS Item Description | Units | UOM | Monthly Per Unit Fee |
|---|---|---|---|---|
| 93-530-8635 | Dedicated Infrastructure up to 3500 Named Employees - Single Tenant SaaS | 1.00 | Installed Copies | $4,821.46 |
| 93-530-8628 | Verint Advanced Desktop Analytics - SaaS | | Named Employee | $5.79 |
| 93-530-8629 | Verint Screen Capture - SaaS | | Named Employee | $3.86 |
| 93-530-8632 | Verint Speech Analytics - SaaS | | Named Employee | $13.50 |
| 89-180-8613 | Verint Quality Management Bundle - SaaS | | Named Employee | $13.60 |
| 93-530-8627 | Verint Performance Management - SaaS | | Named Employee | $5.79 |

Upon execution by the parties hereunder, the Order shall be amended in accordance with the terms hereof, and except as expressly stated herein, all terms and conditions of the Order shall remain in full force and effect.

| SEARS HOLDINGS MANAGEMENT CORPORATION | AGREED AND ACCEPTED BY VERINT AMERICAS INC. |
|---|---|
| DocuSigned by: Pat Welter | DocuSigned by: Lynn Machleit 347FB3359A094BD... |
| NAME SIGNED | NAME SIGNED |
| Senior Director MSO Technology | VP, Finance |
| NAME & TITLE PRINTED | NAME & TITLE PRINTED |
| 6/13/2018 | 6/12/2018 |
| DATE | DATE |



This addendum ("**Addendum**") is entered into as of the date of last signature below ("**Addendum Effective Date**"), and is attached to and incorporated into the Master Software and Services Agreement ("**Agreement**") effective May 23, 2006 by and between Verint Americas Inc., successor corporation to KANA Software, Inc. ("**Verint**"), and Sears Holdings Management Corporation ("**Customer**").

For and in consideration of the representations and promises of the parties set forth herein, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Addendum.** This Addendum consists of this Signature Page, the following Schedules, and any Purchase Orders or SOW's for SaaS Services (defined on Schedule A attached hereto) executed during the term of this Addendum:

- ☒ Schedule A Definitions
- ☒ Schedule B SaaS Terms and Conditions
- ☒ Schedule C Service Levels
- ☒ Schedule D Information Security
- ☒ Schedule E Shop Your Way Vendor Engagement Program
- ☒ Schedule F Customer Travel Expense Policy

2. **Definitions.** Any defined terms used herein shall be as defined in this Addendum, and if not so defined, shall have the same meaning as specified in the Agreement.

3. **General.** The terms and conditions of this Addendum apply to and control solely with respect to the SaaS Services specified on a Purchase Order or SOW. In the event of a conflict between the terms and conditions of this Addendum and any other terms and conditions of the Agreement, the terms and conditions of this Addendum shall prevail, but solely with respect to the SaaS Services specified on a Purchase Order or SOW. This Addendum is subject to all other terms and conditions contained in the Agreement, and all non-conflicting terms and conditions in the Agreement are hereby incorporated by reference and shall herein control. This Addendum shall not be effective until executed by an authorized representative of each party.

**THIS ADDENDUM SHALL NOT BE EFFECTIVE UNTIL EXECUTED BY AN AUTHORIZED REPRESENTATIVE OF EACH PARTY.**

**IN WITNESS WHEREOF,** Customer and Verint have caused this Addendum to be executed by their duly authorized representatives as of the Addendum Effective Date.

| VERINT AMERICAS INC. | SEARS HOLDINGS MANAGEMENT CORPORATION |
|---|---|
| DocuSigned by: Lynn Machleit | DocuSigned by: Steven Sissel |
| NAME SIGNED 347FB9359A994BD... | NAME SIGNED F70E57A2EA8A400... |
| Lynn Machleit VP, Finance | Steven Sissel VP Member Services Organizatic |
| NAME & TITLE PRINTED | NAME & TITLE PRINTED |
| 4/26/2016 | 4/28/2016 |
| DATE | DATE |

Brian Leslie, Esq. - Negotiated Terms

Digitally signed by Brian Leslie, Esq. - Negotiated Terms
DN: cn=Brian Leslie, Esq. - Negotiated Terms, o=Verint Systems Inc., ou=Approval for Signature, email=brian.leslie@verint.com, c=US
Date: 2016.04.28 20:01:23 -04'00'

## SCHEDULE A
## DEFINITIONS

This Schedule A is made a part of the Addendum signed by the parties on the Signature Page to which this Schedule A is attached. All capitalized terms shall have the meaning ascribed to them, including the following:

1 **Access Rights.** The type and quantity of SaaS access rights applicable to the SaaS Services, each as procured by Customer on a Purchase Order.

2 **Access Term.** The annual term for which Verint has contractually agreed to provide Customer with access to the SaaS Services in accordance with a Purchase Order or SOW.

3 **Customer Data.** All data either provided by Customer or entered on its behalf through use of the SaaS Services, or generated by the SaaS Services on behalf of Customer.

4 **Customer Environment.** The computing environment separately procured, prepared and maintained by Customer for the access and use of the SaaS Services, as further specified in Section 3.2 of Schedule B.

5 **Designated Employees.** A reasonable number of Customer Personnel (including Customer's system administrator), who have received training from Verint. Designated Employees may be changed by notice to Verint.

6 **Documentation.** Verint's documentation describing the specifications and use of the SaaS Services and any software provided.

7 **Error.** A failure of the SaaS Service to substantially conform to the Documentation, that Verint can replicate or Customer can duplicate.

8 **Error Correction.** Revisions, modifications, alterations, and additions to the SaaS Services, installed by Verint in the Hosted Environment as bug fixes or workarounds to resolve Errors.

9 **Fees.** The SaaS Service Fees and/or other fees as specified in this Addendum, in the Agreement, or in a Purchase Order or SOW

10 **Hosted Environment.** Verint or its third party's technical environment required to operate and provide access to the relevant SaaS Services, as further specified in Section 3.2 of Schedule B.

11 **Personnel.** With respect to Customer, each Customer employee, including employees of (i) Customer's Affiliates, (ii) each subsidiary and business that is divested by Customer or its Affiliates, but only for a period of thirty six (36) months, (iii) is licensed to do business using the Customer's or its Affiliate's name, (iv) does business with one of Customer's or its Affiliates' retail businesses as a licensee, or (v) independent contractors of Customer or its Affiliates (each not a competitor of Verint), under obligations of confidentiality and nondisclosure which Customer authorizes to use the SaaS Services purchased and/or the Access Rights procured hereunder; with respect to Verint, each Verint employee or subcontractor under obligations of confidentiality and nondisclosure which performs on behalf of Verint hereunder.

12 **SaaS Use Rights.** To the extent specified on a Purchase Order or SOW, and subject to the payment of all SaaS Service Fees, the quantity of specific Access Rights(s) granted to Customer for use during the applicable Access Term.

13 **SaaS Services.** The online services offered by Verint and specified on a Purchase Order, as more fully described in the Documentation.

14 **SaaS Service Fees.** In US dollars, the fees due to Verint, as further specified in the Purchase Order or SOW for use of the SaaS Services to the extent of the SaaS Use Rights.

15 **Service Levels.** The service level commitments from Verint with respect to the maintenance and support of the Hosted Environment and SaaS Services.

16 **Signature Page.** The cover page of this Addendum specifying the Schedules expressly incorporated into the Addendum, the general terms of the Addendum, and containing the signature of each party's authorized representative manifesting assent to the terms and conditions of this Addendum.

17 **Updates.** Periodic improvements or additions to the SaaS Services, including Error Corrections and other changes to the SaaS Services, that may be provided hereunder, but excluding any new feature or substantial additional functionality available for the SaaS Service, which, in Verint's sole discretion, is subject to additional fees.

18 **Verint Intellectual Property.** All Intellectual Property rights in the SaaS Services, software, Documentation, Hosted Environment and all other Confidential Information provided by Verint hereunder.

## SCHEDULE B
## GENERAL TERMS AND CONDITIONS

This Schedule B is made a part of the Addendum signed by the parties on the Signature Page to which this Schedule B is attached. The following general terms and conditions shall apply to this Addendum:

**1 ACCESS RIGHTS.**

**1.1 Access Use Rights.** During the Access Term, and solely for Customer's internal business use, Verint grants to Customer a non-exclusive, non-transferable, non-assignable, personal right to use the SaaS Services specified in a Purchase Order or SOW through internet access, up to the extent of the SaaS Use Rights specified in that Purchase Order or SOW. Customer's internal business shall include the entities described in Section 11 of Schedule A. With respect to the Documentation applicable to the SaaS Services, Customer may make a reasonable number of copies of the Documentation solely as needed for Customer's internal business purposes.

**1.2 Restrictions.** Customer acknowledges and agrees that the use rights provided hereunder do not grant any rights not explicitly expressed. All other such rights and interests in Verint Intellectual Property (including any derivatives thereto) are expressly reserved, owned by and remain vested in Verint and its third party vendor(s), and except for the limited use rights granted hereunder, Customer shall not assert any right, title, or interest in or to any Verint Intellectual Property, or portion thereof. Without limiting the foregoing, Customer acknowledges and agrees that no rights or any other interests are provided to Customer with respect to: **(i)** rights in or to the Hosted Environment or SaaS Services beyond those rights specified in Purchase Order or SOW, **(ii)** rights to provide access or use of the Hosted Environment and SaaS Services to any other party, including, without limitation, any uses in the nature of a service bureau or application services provider, **(iii)** rights to obtain possession of a copy of any component of the Hosted Environment or any software used to provide or perform the SaaS Services, or **(iv)** representations, warranties or other third party beneficiary rights from any Verint third party vendor.

**2 TERM.** This Addendum shall commence on the Addendum Effective Date and shall continue for the duration of the Agreement, unless earlier terminated in accordance with Section 9. An Access Term shall commence upon the effective date of the applicable Purchase Order or SOW, and shall continue for twelve (12) months thereafter, or as otherwise specified on the applicable Purchase Order or SOW. Each Access Term upon expiration shall automatically renew for additional annual terms at Verint's then current rates, unless either party provides the other with no less than sixty (60) days prior written notice of its intent to not renew.

**3 VERINT RESPONSIBILITIES.**

**3.1 Procedures and Technical Protocols.** Verint will specify to Customer procedures according to which Customer may establish and obtain access to and use the features and functions of the SaaS Services, including, without limitation, provision of any access codes, passwords, technical specifications, connectivity standards or protocols, or any other relevant procedures, to the limited extent any of the foregoing may be necessary for Customer to obtain access to the SaaS Service via the Internet.

**3.2 SaaS Services.** Verint will bear responsibility, at its own cost and expense, for the procurement, preparation, hosting, operation and maintenance of all facilities, hardware, software, telecommunication services, and all other technical requirements (the "**Hosted Environment**") necessary to provide access to and use of the SaaS Services; provided that Customer will be responsible for procuring and/or operating computer systems, software and telecommunications services meeting such minimum technical requirements (the "**Customer Environment**") as Verint may specify in the Documentation to access the Hosted Environment.

**3.3 Installation and Integration Services.** With respect to any access to the Hosted Environment and use of the SaaS Services requiring integration and other services by and between Customer's systems and the Hosted Environment, Verint agrees to perform those services to the extent specified on a Purchase Order or SOW.

**3.4 Acceptance.** Customer will have a sixty (60) day period from the date the SaaS Service is available in production in the Hosted Environment, and if applicable, at the initial Customer Environment site ("**Acceptance Period**"), to inspect and test the SaaS Service to determine whether it meets in all material respects the specifications as described in the Documentation ("**Acceptance Criteria**"). If Customer discovers the SaaS Service does not meet the Acceptance Criteria (a "**Defect**"), Customer will provide, in reasonable detail, a notice of such Defect to Verint's project manager (or other representative). Once such notice has been given, the Acceptance Period will be suspended, and Verint will have a reasonable period (not to exceed 30 days) to correct the SaaS Services. Once Verint has delivered the corrected SaaS Services to Customer, the Acceptance Period will resume; provided that, if required, the Acceptance Period will be extended to provide Customer with a minimum of 30 days to accept or reject the SaaS Services after delivery of such corrected SaaS Services by Verint. If Verint fails to correct a material Defect, Customer may reject the SaaS Service, terminate the Agreement and/or this Addendum and receive a refund of all monies paid for that Access Term. In the event Customer neither accepts or rejects the SaaS Service by the end of the Acceptance Period, the SaaS Service shall be deemed accepted; provided, all of Verint's obligations with respect to Support (including the provision of Error Corrections) shall still apply. Notwithstanding the foregoing, rejection under the terms of the Agreement of Software that is purchased contemporaneously on a Purchase Order, and specifically for integrated use with the SaaS Service on that Purchase Order, will result in automatic rejection of the SaaS Services.

**3.5 Support.** As part of the SaaS Services, Verint shall, either directly, or through its applicable third party vendor(s), provide support for the Hosted Environment and SaaS Services in accordance with the terms and conditions of this Section.

**3.5.1 Support and Updates.** In addition to establishing and maintaining the Hosted Environment, Verint shall maintain the components of the Hosted Environment with all current Updates that Verint deems necessary for the SaaS Services. Verint shall use commercially reasonable efforts to implement any required Error Corrections. Access to the SaaS Services and maintenance of the Hosted Environment shall be in accordance with the Service Levels specified in Schedule C, and Customer shall, in accordance with the terms of Schedule C, have access to support through Verint's standard telephone, email and web support services.

**3.5.2 Backup and Recovery of Data.** As a part of the SaaS Services, Verint shall maintain a backup of all Customer Data that Verint is required to retain as a part of the SaaS Services. In the event the Customer Data becomes corrupt, Verint shall use commercially reasonable efforts to remediate and recover such corrupt data.

**3.6 Security.** Verint shall, either directly, or through its third party service provider, implement and maintain commercially reasonable security precautions to prevent unauthorized access to the Customer Data that is retained within the Hosted Environment.

**4 CUSTOMER DATA.** Verint acknowledges it receives no ownership or, except to the extent specified herein, other rights in any Customer Data, and all rights, title and interest in such Customer Data remain with Customer. Verint shall not, and shall not permit its third party vendor(s) to disclose Customer Data to any third party, or make any use of the Customer Data, unless authorized by the Customer or if Verint is required to do so by law or court order. Verint may access Customer Data from time to time solely for purposes of support, administration and invoicing related to Customer's use of the SaaS Services, and to aggregate information regarding Customer Data for planning purposes. Customer agrees that Customer is solely responsible for: **(a)** obtaining any Customer Data and other information Customer provides while using the SaaS Services, **(b)** obtaining all rights necessary to use the Customer Data, and **(c)** the accuracy, completeness, quality, integrity, legality, reliability, appropriateness and copyright of all Customer Data. By providing any Customer Data or other information, Customer agrees that it will not, and represents and warrants that such information does not **(i)** violate any intellectual property rights, publicity rights, confidentiality or trade secret rights, or any other legal or equitable rights; **(ii)** violate any law, rule, order, judgment or regulation to which Customer or the Customer Data may be subject; and **(iii)** violate in any way Customer's obligations in Section 5.2 below. Customer

acknowledges and agrees that Verint is not responsible or liable for any unlawful, harassing, defamatory, privacy invasive, abusive, threatening, offensive, harmful, vulgar, obscene, tortuous, hateful, racially, ethnically or otherwise objectionable information, or content, or information or content that infringes or may infringe any copyright, patent, moral right, trade secret, confidential information, trademark right or any other right of a third party. Verint may remove any violating content posted on the SaaS Services or transmitted through the SaaS Services, without notice to Customer.

**5 CUSTOMER RESPONSIBILITIES.**

**5.1 Passwords.** All access codes and passwords are personal to the individual to which it is issued. Customer and its Personnel are responsible for maintaining the confidentiality and security of all access codes and passwords issued, and ensuring that each access code and password is only used by the individual authorized. To the extent Verint assigned Customer with administrative rights to create access codes and passwords for its Personnel, Customer shall be responsible for issuing such passwords.

**5.2 Use of SaaS Services.** Customer shall be solely responsible for the actions of its Personnel while using the SaaS Services and the contents of its transmissions through the SaaS Services (including, without limitation, Customer Data), and any resulting charges. Customer agrees: **(i)** to abide by all local, state, national, and international laws and regulations applicable to Customer's use of the SaaS Services, including without limitation all laws and administrative regulations (including, all U.S. and applicable foreign) relating to the control of exports of commodities and technical and/or personal data; **(ii)** not to upload or distribute in any way files that contain viruses, corrupted files, or any other similar software or programs that may damage the operation of the Hosted Environment, SaaS Services or another's computer; **(iii)** not to use the SaaS Services for illegal purposes; **(iv)** not to interfere or disrupt networks connected to the Hosted Environment or SaaS Services; **(v)** not to post, promote or transmit through the SaaS Services any unlawful, harassing, defamatory, privacy invasive, abusive, threatening, offensive, harmful, vulgar, obscene, tortuous, hateful, racially, ethnically or otherwise objectionable information or content of any kind or nature; **(vi)** not to transmit or post any material that encourages conduct that could constitute a criminal offense or give rise to civil liability; **(vii)** not to interfere with another customer's use and enjoyment of the SaaS Services or another entity's use and enjoyment of similar services; **(viii)** not to engage in contests, chain letters or post or transmit "junk mail," "spam," "chain letters," or unsolicited mass distribution of email through or in any way using the SaaS Services; and **(ix)** to comply with all regulations, policies and procedures of networks connected to the SaaS Services.

**5.3 SaaS Services Restrictions.** Except as otherwise specified in this Addendum, expressly permitted in writing by Verint, or otherwise cannot be precluded under mandatory applicable law, Customer shall not, and shall not permit any other party to:

**a.** Disassemble, decompile, decrypt, or reverse engineer, or in any way attempt to discover or reproduce source code for, any part of the SaaS Services; adapt, modify, or prepare derivative works based on any of the Verint Intellectual Property; or use any of the Verint Intellectual Property to create any computer program or other material that performs, replicates, or utilizes the same or substantially similar functions as the SaaS Service;

**b.** Alter, remove, or suppress any copyright, confidentiality, or other proprietary notices, marks or any legends placed on, embedded or otherwise appearing in or on any Verint Intellectual Property; or fail to ensure that all such notices and legends appear on all full or partial copies of Verint Intellectual Property or any related material;

**c.** Sell, sublicense, lease, assign, delegate, transfer, distribute, encumber or otherwise transform any Verint Intellectual Property or any of the rights or obligations granted to or imposed on Customer hereunder.

**6 FEES.** Verint shall invoice Customer monthly in advance for the initial Access Term (and any extensions thereof) after acceptance of the SaaS Services as described in Section 3.4. Verint shall invoice Customer for all other fees, assessments and expenses provided for under this Addendum in accordance with the terms of the Agreement.

**7 WARRANTIES; DISCLAIMER.**

**7.1 Limited Performance Warranty.** Verint warrants to Customer that during any Access Term, the SaaS Services will be accessible by Customer, and the SaaS Services will perform substantially in accordance with the Documentation. Customer's exclusive remedy under this Section shall be for Verint to use commercially reasonable efforts to correct any Errors; provided, in the event Verint is unable to correct that nonconformity, Customer shall have the right to terminate the remaining Access Term and receive a pro rata refund of any remaining prepaid SaaS Service Fees applicable to those SaaS Services.

**7.2 Disclaimer of Warranties.** THE LIMITED WARRANTY AND EXCLUSIVE REMEDY SET FORTH IN SECTION 7.1 ARE MADE FOR THE BENEFIT OF CUSTOMER ONLY, AND ARE EXPRESSLY SUBJECT TO CUSTOMER'S PAYMENT OBLIGATIONS TO VERINT AND CUSTOMER'S OBLIGATIONS TO MAINTAIN ITS CUSTOMER ENVIRONMENT. VERINT MAKES NO AND DISCLAIMS ALL OTHER WARRANTIES, REPRESENTATIONS, OR CONDITIONS, WRITTEN OR ORAL, OR EXPRESS, IMPLIED, OR STATUTORY, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, TITLE, INTEROPERABILITY, DATA ACCURACY, OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO ANY PRODUCT, SERVICES, SUPPORT, OR ANY COMPONENTS THEREOF. WITHOUT LIMITING THE FOREGOING, VERINT DOES NOT WARRANT THAT ALL ERRORS CAN BE CORRECTED, OR THAT OPERATION OF THE SAAS SERVICE SHALL BE UNINTERRUPTED OR ERROR-FREE.

**8 INDEMNIFICATION.**

**8.1 Verint Indemnification.** Verint, at its sole expense, shall defend, indemnify and hold harmless Customer from any action based upon a claim that the SaaS Service used as permitted infringes any valid third-party U.S. patent, copyright, trade secret, or other proprietary right, and shall reimburse Customer for all damages, costs, and expenses (including reasonable attorneys' fees) awarded against Customer pursuant to any such actions. If the SaaS Service becomes, or in Verint's opinion is likely to become, subject of such a claim of infringement, Verint shall be entitled, at Verint's sole option, to either procure the right for Customer to continue to use the SaaS Service, or replace or modify it so that it becomes non-infringing. If neither of the foregoing is commercially and reasonably available to Verint, Verint may terminate the SaaS Service and refund to Customer a pro rata refund of any remaining prepaid SaaS Service Fees applicable to those SaaS Services. Verint shall have no obligation or liability hereunder for any claim resulting from: **(i)** modification of the SaaS Service **(a)** by any party other than Verint, or **(b)** by Verint in accordance with Customer's designs, specifications, or instructions; **(ii)** use of the SaaS Service other than as granted in this Addendum; or **(iii)** use of the SaaS Service in conjunction with other products or services not provided by Verint or necessary for the operation of the SaaS Service, where such infringement would not have occurred but for such use; or **(iv)** use of a version of the SaaS Service other than the then-current version where Customer has requested the prior version remain in use.

**8.2 Customer Indemnity.** Customer, at its sole expense, shall defend, indemnify and hold harmless Verint from any action by a third party based upon a claim resulting from any breach of Sections 4 or 5.2 by Customer, its Affiliates or Personnel of either, and shall reimburse Verint for all damages, costs, and expenses (including reasonable attorneys' fees) awarded against Verint pursuant to any such actions.

**8.3 Conditions.** Each party's indemnification obligations hereunder are contingent upon the indemnified party providing the indemnifying party with prompt written notice of the claim; complete control of the defense of and the right to settle such claim; and all available information, assistance, authority, and cooperation to enable the defense or settlement of such claim. This Section sets forth the exclusive remedy of the indemnified party against the indemnifying party, and the complete liability of indemnifying party with respect to any action or claim indemnified hereunder. Each party's obligations under this Section shall be excluded from any limitations on that party's liability under the Agreement.

**9 TERMINATION.**

**9.1 Service Suspension.** In the event Customer **(i)** fails to pay Verint any amounts past due, or **(ii)** is in breach of Section 5.2, Verint shall have the right to immediately suspend without notice any or all related SaaS Services provided to Customer hereunder.

**9.2 Access Term Termination.** Customer may terminate then current Access Term for convenience, provided: (i) such right to terminate for convenience shall not vest until after the initial Access Term (or if the initial

Access Term is greater than one (1) year, after the initial one (1) year period), and (ii) Customer must provide to Verint no less than ninety (90) days written notice of its intent to terminate.

**9.3 Addendum Termination.** This Addendum may be terminated as follows:

**a.** By Verint immediately if Customer breaches Sections 5.2, or 5.3; or

**b.** By either party for material breach hereof which has not been cured within thirty (30) days after written notice of such breach; or

**c.** By either party at any time if the other party makes an assignment for the benefit of creditors, or commences or has commenced against it any proceeding in bankruptcy or insolvency.

**9.4 Effects of Termination.**

**a. Termination of Addendum.** Upon termination of this Addendum, and except to the extent specified herein, **(i)** all fees due to Verint for the current Access Term and any other amounts due Verint shall be immediately paid, and **(ii)** all Customer rights to access and use any of the SaaS Services and SaaS Use Rights shall immediately terminate without right of refund **(iii)** in the event of Termination under 9.2, Customer will only be liable for any fees for use of SaaS Services up to the date of termination and services actually performed .

**b. Customer Data.** Upon termination of this Addendum for any reason other than Customer's breach, Customer may request that Verint conduct a mass export of Customer Data. Subject to Customer paying Verint for all service fees applicable to such work, Verint agrees to provide such services at its then current rates. Notwithstanding the foregoing, after thirty (30) days from termination, Verint may delete and destroy all Customer Data without notice or liability to Customer.

**c. Transition Services.** During the Term of this Addendum and upon expiration or termination of this Addendum by either party for any reason, Verint will provide Customer, or Personnel, as the case may be, all reasonable transition Services ("Transition Services") requested by Customer, for up 6 months after such termination (the "Transition Period"), relating to the transition from the SaaS Services to another system or provider, including all other Services necessary for an orderly conversion of the SaaS Service; provided however, that Customer is current on its payment obligations hereunder, and places Purchase Order with Verint for such Transition Services. Such services may include month to month extensions of existing SOW's. For Services which Customer was receiving from Verint prior to such expiration/termination, the fees applicable to such Transition Service will be the rates which Customer was paying prior to such expiration/termination. For all other Transition Services, Verint will not charge Customer fees in excess of the Verint's then standard rates.

**d. Survival.** Subject to the other provisions of this Section 9.3, provisions herein which by their context and content are intended to survive termination or expiration hereof shall so survive, including the Signature Page, Schedule A, and Sections 1.2, 4, 5, 6, 7.2, 8, and 9 of Schedule B.

## SCHEDULE C
## SERVICE LEVELS

This Schedule C is made a part of the Addendum signed by the parties on the Signature Page to which this Schedule C is attached.

1 **SERVICE AVAILABILITY.** Verint will use commercially reasonable efforts to ensure that the SaaS Services will be available 24 hours per day, 7 days per week, excluding any Scheduled Downtime. The SaaS Service availability shall be measured as the total number of minutes in a month, minus the total number of minutes in that month that comprise Schedule Downtime ("**Scheduled Uptime**"). Daily system logs will be used to track Scheduled Downtime and any other SaaS Service outages. A minimum of seven (7) days advance notice will be provided for all scheduled downtime to perform system maintenance, backup and upgrade functions for the SaaS Services (the "**Scheduled Downtime**"). Scheduled Downtime will not exceed eight (8) hours per month and will be scheduled in advance during off-peak hours (based on ET). Verint will notify Customer administrator via email of any Scheduled Downtime that will exceed two (2) hours. The duration of Scheduled Downtime is measured, in minutes, as the amount of elapsed time from when the SaaS Services are not available to perform operations, to when the SaaS Services become available to perform operations.

2 **SUPPORT.** During any Access Term, Verint shall provide support to Customer and with respect to the SaaS Services and Hosted Environment as follows:

a. **Support Access**. Customer's Designated Employees shall have direct access via telephone to Verint's support center during hours. Customer may also designate up to ten (10) additional Personnel to have access to the web support services knowledge base and user forum services.

b. **Support Assistance.** Verint will answer questions by Customer Personnel regarding the day-to-day operation of the SaaS Services and the development and implementation by Customer and its Personnel of interfaces with the SaaS Services ("**Know-How**"). Know-How may include any of the following:

- Data files, file and data definitions and relationships, data definition specifications, data models, interfaces, program architecture, program structure, sequence and organization, screen displays, reference and user manuals, design and functional specifications relating to the SaaS Services;
- Maintenance, support utilities and tools relating to the SaaS Services;
- Security requirements and methodologies relating to the SaaS Services;
- Such other material as Customer may reasonably request.

To the extent such Know-How is generally provided to Verint's SaaS Services subscribers at no charge, Verint will provide such Know-How at no additional charge; otherwise, Customer shall place a Purchase Order with Verint for Advice Line Services. Attendance at Verint's training programs are not included within the definition of the term "Know How" and will be separately documented in a Purchase Order if requested by Customer.

b. **Support Hours.** Verint shall make available telephone technical assistance relating to the installation, implementation, configuration, use and operation of the SaaS Services or any problems therewith. Telephone support will be available for Severity 1 Errors on a 24 x 7 basis, and otherwise during the following times: Monday to Friday, from 8am to 8pm Eastern time.

c. **Contact Details.** Customer's Designated Employees may contact Verint technical support personnel during the support hours at the following contact information:

| Telephone | Email |
|---|---|
| 1-800-494-8637 | contactcenter@verint.com |

3 **SERVICE LEVELS.**

3.1 Categories of Errors.

| Application Severity Level | Software Severity Definition |
|---|---|
| Severity 1 Error | Error in a production environment causing the Software to be completely down and inoperable. |
| Severity 2 Error | Error in a production environment causing intermittent system down and inoperability, or a major part of the Software functionality to be generally unavailable. |
| Severity 3 Error | Error in the Software causing low business impact or minor functionality to be unavailable. |
| Severity 4 Error | Error in the Software not affecting normal business operations. |

3.2 **Initial Response; Resolution.**

"**Initial Response**" means the time it takes from Customer's initial fax, e-mail or telephone call notification of the Error until Verint responds to the appropriate Customer Personnel.

"**Resolution**" means the time it takes Verint to apply a functional resolution to the reported Error measured from the time at which the initial notification was made, meaning Verint provides Customer with a temporary fix, workaround or final correction or modification of the SaaS Service that solves a reported Error and that can be used by Customer with minimal or no inconvenience and impact on Customer's business operations.

3.3 **Response and Resolution Times.** The following provides the response and resolution times provided by Verint for each Error type:

"**Initial Response Time**" means the time it takes from Customer's initial fax, e-mail or telephone call notification of the Error until Verint responds to the appropriate Customer Personnel.

"**Resolution Time**" means the time it takes Verint to apply a functional resolution to the reported Error measured from the time at which the initial notification was made, meaning Verint provides Customer with a Resolution.

3.4 **Error Response and Resolution Procedure.** For purposes of the table below:

"**Effort**" means continuous and uninterrupted commercially reasonable efforts during normal business hours.

"**Hours**" means consecutive hours during normal business hours.

| Severity Level | Initial Response Time | Resolution Time |
|---|---|---|
| Severity 1 Error | Within 3 Hours | 24 Hours, or as otherwise agreed to by the parties |
| Severity 2 Error | Within 6 Hours | 5 business days, or as otherwise agreed to by the parties |
| Severity 3 Error | Within 8 Hours | 30 calendar days, or as otherwise agreed to by the parties |
| Severity 4 Error | Within 2 business days | Within the next release, or as otherwise agreed to by the parties |

4 **Service Level Credits.**

4.1 **Calculation.** If Verint does meet not the Initial Response Time or Resolution Times, and subject to the exceptions specified below, Customer will be entitled, upon written request, to a service level credit ("**Service Credit**") to be calculated as follows:

| Severity Level | Initial Response Service Credit | Max Monthly Initial Response Service Credit | Resolution Service Credit | Max Monthly Resolution Service Credit |
|---|---|---|---|---|
| Severity 1 Error | 2% of monthly SaaS Service Fees | 10% of monthly SaaS Service Fees | 10% of monthly SaaS Service Fees | 30% of monthly SaaS Service Fees |
| Severity 2 Error | 1% of monthly SaaS Service Fees | 5% of monthly SaaS Service Fees | 5% of monthly SaaS Service Fees | 15% of monthly SaaS Service Fees |

Customer shall only be eligible to request Service Credits if it notifies Verint in writing within thirty (30) days from the end of the month for which Service Credits are due. In the event after such notification Verint determines that Service Credits are not due, or that different Service Credits are due, Verint shall notify Customer in writing on that finding. Service Credits will be applied to the next invoice following Customer's request and Verint's confirmation of available credits. Service Credits shall be Customer's sole and exclusive remedy in the event of any failure to meet the Service Levels.

4.2 **Exceptions.** Customer's right to receive Service Credits, and the inclusion of any minutes in the calculation of Service Credits are conditioned upon: **(i)** prompt payment by Customer of all Fees, **(ii)** Customer performing all Customer obligations (including, without limitation, establishing and maintaining the Customer Environment), **(iii)** Customer agreeing to use of the most current version of the SaaS Service, and the following shall not be included in any such calculation:

- Intentional shutdowns due to emergency interventions and/or responses to security incidents
- Any Severity Level being caused by the failure of any third party vendors, the Internet in general, or any emergency or force majeure event
- Configuration changes initiated by Customer
- Environmental impact issues within the Customer's business facility;
- The acts or omissions of the Customer, its employees, agents, consultants, suppliers or end-users
- A force majeure event or any other cause outside of Verint's control.

**SCHEDULE D**
**INFORMATION SECURITY**

At a minimum and as specified herein, Verint shall provide security for all data and communication systems in support of the Agreement or Procurement Document to which this Appendix is attached ("**Appendix**"). This Appendix should be a part of any contract with Verint that will store, transmit (send/receive/pass-through) or process Customer data.

Verint's security efforts will include, without limitation:

**Logical Access Controls:** Verint agrees to employ effective logical access control measures over all systems used to create, transmit, or process Customer Confidential Information), including but not limited to:

- User authentication must use unique identifiers ("**User ID's**") consistent with individual accountability; shared User ID's do not provide the level of accountability required by Customer;
- A complex password policy, including the prohibition of clear-text credentials must be enforced;
- User access rights/privileges to information resources containing Customer Confidential Information must be granted on a need-to-know basis consistent with role-based authorization.
- User access to Customer Confidential Information must be removed immediately upon user separation or role transfer eliminating valid business need for continued access.
- Default passwords and security parameters must be changed in third-party products/applications used to support Customer Confidential.
- Two-factor authentication such as token devices, smart cards, biometrics, or public keys shall be used to secure all remote administrative access to Customer Confidential Information.

**Network Security Architecture:** Verint agrees to employ effective network security control measures over all systems used to create, transmit, or process Customer Confidential Information including but not limited to:

- Firewalls shall be operational at all times and shall be installed at the network perimeter between Verint's internal (private) and public (Internet) networks.
- Properly configured and monitored IDS/IPS (Intrusion Detection/Prevention Systems) must be used on Verint's network.
- Databases must be logically or physically separated from the web server, and the database may not reside on the same host as the web server, where applicable.
- The database and other information systems used for the purposes of processing Customer Confidential Information must have only those services/processes and ports enabled to perform routine business. All other services/processes on the host must be disabled.
- All information systems, repositories, etc. used for Customer by Verint, or its business partners, must be physically located in a controlled data center environment used for the purpose of protecting information systems.
- Secure channels (e.g., SSL, SFTP, SSH, IPSEC, etc.) must be used at all times.

**Physical Access Controls:** Verint agrees to maintain servers, databases, and other hardware and/or software components that store information related to Customer's business activities in an access controlled and consistently monitored Data Center secured by appropriate alarm systems, which will not be commingled with another unrelated party's software or information. The facility storing Customer data must follow best practices for infrastructure systems to include fire extinguishing, temperature control and employee safety.

**Risk Assessment/Audit:** At no additional cost, Verint agrees to provide responses to a risk assessment questionnaire (if provided by Customer), participate in vulnerability scans of their network and / or application (upon notification).

- Verint agrees to perform regular security vulnerability assessments and shall provide Customer with results of a current security assessment by an accredited third-party (e.g., penetration test results of internet-facing devices, SSAE 16-Type II reports, ISO 27001 certification, etc.) as well as action plans describing how Verint will address all identified security vulnerabilities affecting systems used to store, process or otherwise access Customer Confidential Information.
- To the extent applicable, Verint agrees to maintain appropriate PCI certifications of its data security controls.
- Verint will permit Customer or its designee to conduct audits of Customer's data maintained or stored by the Verint.

**Security Policy:** Verint agrees to maintain and enforce security policies consistent with security best practices, and all applicable regulatory and legal security and privacy requirements, including but not limited to Massachusetts 201 CMR 17.00 et. seq. "Standards for the Protection of Personal Information of Residents of the Commonwealth". Upon request, Verint shall provide copy of current

security policy and standards as well as security architecture. Verint shall comply with Customer's Privacy Policy with respect to any Customer customer personal information it receives.

**Training and Awareness**: Verint agrees to provide necessary training to ensure security awareness in Verint personnel that are directly or indirectly engaged in handling Customer Information and systems, onsite or remotely.

**Protection of Customer Confidential Information**: In addition to what may be described in the Agreement or Procurement Document to which this Appendix is attached, where applicable, Verint agrees to protect Customer Confidential Information as it would its own. For purposes of clarity, Customer Confidential Information may include, but is not limited to, the following:

- Credit Card numbers
- Credit Card Validation Codes
- Personal Identification (PIN) numbers
- Loyalty Card Numbers with or without any associated PIN or Access Code
- Checking Account number (alone or in combination with checking account routing information)
- Bank Account number (alone or in combination with routing information)
- Drivers License Number or State-issued Identification Card Number
- Customer or Employee Names, in whole or in part
- Customer or Employee Postal Address
- Customer or Employee email address
- Date of Birth
- Social Security Numbers
- Health Insurance Card or Policy Identification Number
- Medical or Health Information
- Personal Telephone Number (when used with a customer/employee name or address)

Additionally, Verint agrees to adhere to the following controls surrounding the use and protection of Customer Confidential Information:

- Customer Confidential Information must be encrypted with key sizes of 256-bit for symmetric and 2048-bit for asymmetric encryption.
- Clear text (ftp, telnet, etc.) protocols may not be used to access or transfer Customer Confidential information. Customer Confidential Information must be encrypted when stored on portable media, which by way of example shall include USB Sticks, Portable hard drives, Laptops, DVD/CDs, and when transmitted on wireless networks or across public networks.
- Customer Confidential Information may not be copied, sold or used for solicitation purposes by the Verint or its business partners. Customer Confidential Information may only be used in conjunction with and within the scope of the Procurement Document or the Agreement to which this Appendix is attached.
- Customer Confidential Information (data) must be segregated from other Verint customers, systems, or applications unrelated to Customer. Appropriate data security controls must be used over data at rest, including, access controls and encryption.
- Where applicable, Payment Card information must be masked on display rendering in a manner consistent with the Payment Card Industry Data Security Standard (PCI-DSS), the Fair and Accurate Credit Transaction Act (FACTA) and all other applicable laws and regulations.
- Verint must disclose where Customer data will be stored and processed. Storage and Processing of Customer Confidential Information shall take place within the United States.

**System Monitoring:** Verint agrees to regularly audit and monitor information systems processing Customer's business activities to ensure the protection of Customer's information. Monitoring includes, but is not limited to, potential breaches or hacking activity and access to devices. Verint must have defined processes for security alerting, escalation and remediation that are consistent with the Services procured pursuant to the Agreement. Verint must ensure that event logs with Customer data are not provided to other subscribers. If Verint using virtual machines, it must ensure there is granular monitoring of traffic that is crossing the virtual machine backplanes.

**Vulnerability Management Controls:** Verint agrees to employ effective vulnerability management control measures over all of its systems used to create, transmit, or process Customer Confidential Information, including; but, not limited to:

- Third-party vulnerability scans or audits of any external-facing (public) infrastructure devices.
- Annual third-party assessment of applications or processes supporting Customer's customer credit card information.
- Deploy and maintain currency of up-to-date commercially available anti-virus, anti-spam, anti-malware software on all information system components including personal computers, laptops, and interconnecting networks, where applicable, used for the purpose of managing Customer Confidential Information. Additionally, provide for regular scanning for viral infections and update virus signature files frequently.
- Maintain a standard patch management process and practice to ensure the protection of any devices used to access, process or store Customer Confidential Information. Verint agrees to provide Customer a summary of patch management program upon request.
- Regularly auditing and monitoring to ensure the protection of Customer Confidential Information.
- Any security breach that involves Customer Confidential Information must be reported to Customer in accordance with the Notice provision of the Agreement without unreasonable delay. Verint shall immediately perform a root cause analysis as well as provide detailed information about measures taken by the Verint to prevent future breaches. All efforts to rectify or resolve the situation must include subsequent and regular notification for the reported incident.
- Within 1 hour of suspected fraudulent or malicious activity occurring on the Verint site, Verint will notify the Customer's Security Operations Center at securityops@searshc.com or by phone at 312-357-9390 to inform the Customer team about the activity. Any request by the Customer team for such information will be provided to SHC within two hours.
- Verint agrees to provide full cooperation with Customer and in the event of a data breach involving Customer Confidential Information including, but not limited to: server log information showing network and application traffic.
- Vulnerabilities discovered by the Customer's or Verint's Security Scanning tools must be resolved by following the schedule outlined below (the level of vulnerability will be determined by Customer):
    - ***P1 Vulnerabilities***: A successful exploit of this vulnerability may result in catastrophic and significant physical or property damage or loss. Or, there may be a catastrophic and significant loss of revenue or productivity (e.g., Denial of Service Attack, exploit 'kits' exist, buffer overflows high jacking, or source code exposure, etc.). Such a vulnerability must be resolved before a site launch or within 8 hours of discovery if the application is currently publically available.
    - ***P2 Vulnerabilities***: A successful exploit of this vulnerability may result in moderate physical or property damage, or, there may be a moderate loss of revenue or productivity to the organization (e.g., Weak encryption, or possible phishing opportunity, etc.). Such vulnerability must be resolved within 7days of site launch or within 4 hours of discovery if the application is currently publically available.
    - ***P3 Vulnerabilities***: A successful exploit of this vulnerability may result in minor physical or property damage. Or, there may be a minor loss of revenue or productivity to the organization (e.g., FTP use or missing service pack, etc.). Such vulnerability must be resolved within 30 days of a site launch or within 8 hours of discovery if the application is currently publically available.

**Data Recovery and Availability**: Verint must provide detailed disaster recovery and business continuity plans that support the pre-defined recovery time objective (RTO) / recovery point objective (RPO) requirements defined by Customer.

- Verint must utilize industry best practices for data, services, and communications recoverability. Data and applications must be replicated across multiple independent sites and alternate communication channels must be available.
- Verint is expected to validate and verify their existing capabilities through realistic scenario testing. Verint must agree to participate in periodic recovery testing with Customer. Proof of successful testing of the Verint plan must be provided to Customer upon request.
- Verint systems must be device (computer machine) and provider independent in order to ensure portability and successful recovery of applications and backup or restoration services, or both.
- Verint must provide company name, address, and contact information on all third-party relationships as well as services provided by each wherever those services create, transmit or process Customer Confidential Information.

**Data Destruction:** Verint shall ensure that residual magnetic, optical, or electrical representation of Customer Confidential Information that has been deleted may not be retrieved or reconstructed when storage media is transferred, become obsolete or is no longer usable or required by Customer.

- Verint data retention and destruction must comply with applicable laws or regulations.

- Customer information stored on Verint media (e.g., hard drive, optical discs, digital media, tapes, paper, etc.) must be rendered unreadable or unattainable using the NIST Guidelines for Media Sanitization (Special Pub 800-88), prior to the media being recycled, disposed of, or moved off-site.

**Application Verint:** This section applies to the Verints that provide application software hosted at Customer or offsite at the Verint facility. Verint agrees to adhere to the following controls surrounding application development:

1. Verint must provide supporting documentation that commonly accepted web application security guidelines and frameworks are used for developing Internet-facing applications (e.g. Open Web Application Security Project [OWASP], SANS).
2. Verint must provide a data flow diagram that demonstrates all security controls in place.
3. Verint must demonstrate how Internet-facing applications are tested for security vulnerabilities and remediated prior to the source code being promoted to production.
4. Verint must allow penetration testing and/or application source code review to be performed by Customer, when requested or allow a third party to perform the same.
5. Verint must provide supporting documentation describing how fraud is detected and prevented when requested by Customer.
6. Verint agrees to supply within the requested timeframe, and demonstrate full cooperation with Customer, pertaining to all inquires deemed necessary by Customer to determine the risk of any third-party systems and procedures related to and affecting Customer. This includes, but is not be limited to, inquiries pertaining to s, server logs sanitized of sensitive information but showing application traffic, operating systems, applications, databases, network configuration, data encryption algorithms being utilized, fraud detection and prevention controls, physical inspection of facilities, incident response procedures, and disaster recovery measures.
7. Verint agrees to allow all relevant sites to be monitored by Customer or a third-party for availability and performance.

**Personnel Roles and Responsibilities:** Verint agrees to identify in writing the person who will be responsible for overall security of the application development, management, and update process throughout the Contract period. The person identified shall be a single technical resource serving as project Security Lead. The Security Lead shall confirm in writing the security of each deliverable. The Security Lead shall confirm to Customer in writing that the software meets the security requirements, all security activities have been performed, and all identified security issues have been documented and resolved. Any exceptions to the confirmation status must be fully documented with the delivery.

**SCHEDULE E**

**Shop Your Way Vendor Engagement Program**

Verint agrees to encourage each of its employees to engage in the Shop Your Way Program through Verint's participation in at least 12 promotional efforts (as set forth below) during each calendar year this Agreement is in effect (pro-rated for any partial years).

Promotional efforts include the following. The number to the left of such item indicates the number of times Verint has agreed to participate in such effort during each calendar year of this Agreement:

| # | SYW Promotional Effort |
|---|---|
| 8 | Email to Verint's Employees promoting the Shop Your Way Program |
| 2 | Posting signage and/or Intranet postings regarding Shop Your Way Program |
| ___ | Articles on Shop Your Way Program in Verint's newsletters |
| ___ | On-Site enrollment opportunities at Verint's locations |
| 2 | Other promotional efforts mutually agreed to by the parties |

Customer will provide electronically all related Shop Your Way program descriptions and materials for these promotions, which will explain the Shop Your Way benefits and any information necessary to enroll. Verint will not alter program descriptions and materials, but will provide information reasonably necessary for Customer to create the program descriptions specific to Vendor employees.

Verint agrees to begin promotions for the Shop Your Way Program to its employees within sixty (60) days following the execution of this Agreement. Customer reserves the right to request and be granted a periodic review on a quarterly basis with Verint's executive level members (Vice President level and up) to discuss Verint's overall promotion and participation in the program.

Verint has appointed the following individual as its point of contact for the Shop Your Way Vendor Engagement program and this individual will be responsible for overseeing Verint's efforts to encourage its employees to engage in the Shop Your Way Program. Verint additionally will maintain an appointed individual in the event of employee turnover.

Name: Anne Patton
Title: Vice President Communications
Phone number: 678-243-4815
E-mail address: anne.patton@verint.com

## SCHEDULE F
## CUSTOMER TRAVEL EXPENSE POLICY

Where agreed on a Purchase Order or in a SOW, Customer shall reimburse Verint for all actual out-of-pocket travel expenses as reasonably incurred by Verint in connection with its performance of Services and in conformance with the Customer Travel Expense Policy attached to this Schedule F; provided, Verint may submit its compliant expenses with its invoices, and shall not be obligated to complete the specific expense reports contained therein.

[see attached]

## Third-Party Service Provider Travel Requirements & Expense Reporting Policy

This establishes Sears Holdings minimum requirements for reimbursement of third party out-of-pocket travel expenses, where required by contractual agreement. This applies to consultants, contractors and other service providers who submit authorized, reimbursable travel expenses to Sears Holdings. Future reference to these individuals is made collectively as "service providers".

All service providers subject to reimbursement of third-party out-of-pocket travel expenses have the responsibility to ensure that their expenses are appropriate, reasonable, and documented. All expenses are subject to Sears Holdings' approval and adherence to the following. In the event of a conflict between the contract and these requirements, the terms of the contract shall prevail.

### A. Invoice Processing

Prior to submitting any invoice for payment, regardless of the invoice payment processing arrangements set forth in the agreement, a summary report with line item detail (see Exhibit A) must be sent to the Sears Holdings business contact for the project for their review and approval.

### B. Receipt Requirements

Itemized receipts are required for all transactions greater than $75 and for all airline ticket purchases/changes. Individual receipts submitted for payment to SHC must be retained by the supplier (hard copy or scanned image) for a period up to three years following the end of the project term.

| C. Reimbursable | Not Reimbursable |
|---|---|
| **Air Travel** | |
| o Economy Class Travel<br>o Business Class travel over 12 flight hours<br>o Reasonable baggage fees | o First Class Travel<br>o Airline Upgrade Charges<br>o Early Boarding<br>o Airport Club Lounges<br>o Stand-by or Same-day Change fees (refer to section D)<br>o Any other airline offerings, i.e. purchase miles, seats, etc. |
| **Lodging** | |
| o Room & tax at moderately-priced hotels, such as Hampton Inn, Holiday Inn Express, Fairfield Inn<br>o Health Club/Fitness Center fees not to exceed $10 per day | o Luxury/premium hotel expenses<br>o Personal incidentals i.e. in-room movies, etc.,<br>o No show charges |
| **Ground Transportation** | |
| o Taxi or shared limousine to/from the airport<br>o Compact rental car is required unless the size of group requires a larger vehicle<br>o Vehicle damage insurance and liability insurance on **international** rentals only<br>o Rental car refueling prior to returning the vehicle<br>o Personal Car Mileage consistent with IRS guidelines (http://www.irs.gov/publications/p463/ch04.html) will be reimbursed at the current SHC rate of $0.42 per mile | o Private car limousine or limousine service rented on an hourly or hourly-plus basis<br>o Luxury/Premium rental cars<br>o Rental car insurance on domestic rentals<br>o GPS rental<br>o Convenience refueling when returning rental car<br>o Mileage for normal daily commute |
| **Meals** | |
| o Meals while on overnight travel status<br>  o Up to $36 (inclusive of tax & gratuity) per day<br>  o Up to $60 (inclusive of tax & gratuity) per day in Boston, Chicago (downtown only), Honolulu, Los Angeles, NY, San Diego, San Francisco, Seattle, Washington, D.C., all international destinations | o Meals for day trips<br>o Meals in excess of daily limits<br>o Meals for local staff or SHC associates |
| **Miscellaneous** | |
| o Airport parking – SHC negotiated off-site or Long term<br>o SHC business related telephone expenses<br>o Internet service fees (e.g., hotel, airport wireless, in-flight, Hot Spot) required for SHC business – up to $13 per day | o Personal travel insurance<br>o Personal entertainment, i.e. movies<br>o Theft or loss of personal property<br>o Valet service, Laundry or dry cleaning |

| | o Any unreasonable, unaccounted for, or unexplained expenses |
|---|---|

**D. Air Transportation**

- When possible, travelers should plan business trips at least 14 days in advance to secure reduced fares.
- Travelers are strongly encouraged to accept the lowest priced flight available within a 2 hour window. This includes alternate airports, connections, one-stop flights, etc. If lowest fares are not utilized, reimbursement may be subject to further review, resulting in partial reimbursement.
- When non-refundable tickets are the least expensive airfare, they must be utilized.
- If a trip is cancelled or postponed, airline tickets must be cancelled before the time of departure.
- Additional airfares, and other fees due to changes, will be reimbursed only if the change was requested by Sears Holdings, and the additional expense was approved in advance by Sears Holdings.
- Only a reasonable number of travelers will be reimbursed. This is subject to pre-approval.

**E. Ground Transportation**

- Travelers should use courtesy or other scheduled services provided by the hotel (if available) for travel between the hotel and airport.
- Economy or compact cars should be rented unless the size of the group makes them impractical. Rental cars should be shared whenever feasible.

**F. Lodging**

- Providers within reasonable travel distance from their daily workplace are expected to return to their daily workplace. Individual circumstances will determine what is reasonable but generally a trip of 100 miles or less one-way does not require an overnight stay.
- Consult the SHC business project contact for any negotiated hotel rates in your travel destination (from SHC Travel intranet site - 2012 SHC Preferred Hotel Program)
- If a reserved room will not be used, it is the traveler's responsibility to notify the hotel directly, prior to the hotel's cancellation deadline. Failure to cancel a hotel reservation will result in a "no-show" charge that will not be reimbursed. Same applies to departure date changes not made prior to check-in which result in early check-out fees.
- Use of corporate apartments or extended stay properties is acceptable if the cost is the same or less than staying in a SHC preferred/approved hotel and approved by the Sears Holdings business contact for the project.

**G. Meals**

- Meal expense limits:
  - $36 (inclusive of tax & gratuity)
    - Individual meal limit of $5 breakfast, $9 lunch and $16 dinner applies when the travel schedule includes partial travel days.
- Exceptions:
  - $60 (inclusive of tax & gratuity) in Boston, Chicago (Downtown only), Honolulu, Los Angeles, New York, San Diego, San Francisco, Seattle, Washington, D. C., and International destinations including Puerto Rico and Canada
    - Individual meal limit of $7 breakfast, $13 lunch and $30 dinner applies when the travel schedule includes partial travel days.

| Meal Reimbursement Times | | | |
|---|---|---|---|
| **Trip** | **Breakfast** | **Lunch** | **Dinner** |
| Overnight | Depart home/workplace prior to 6:30 am | Depart home/workplace before 11:00am or return home/workplace after 1:00pm | Return home/workplace after 7:00pm or depart from home/workplace before 5:00pm |

For questions contact: Sears Holdings Corporation at (847) 286-2500, and request the Travel Department

# EXHIBIT A

| Company Name: | Traveler Name: | Traveler's Title | |
|---|---|---|---|
| Business Purpose of Trip: | | Statement of Work #: | Invoice #: |

| Line | Date of Travel | Traveled From | To | Airline Ticket | Lodging | Rental Car/Bus/ Taxi | *Meals Brkfst | Lunch | Dinner | Total | Personal Vehicle # Miles | x ** | Airport Parking/ Tolls | Misc. *** | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | $ | $ | $ | $ | $ | $ | $0.00 | | $ | $ | $ | $0.00 |
| 2 | | | | | | | | | | $0.00 | | | | | $0.00 |
| 3 | | | | | | | | | | $0.00 | | | | | $0.00 |
| 4 | | | | | | | | | | $0.00 | | | | | $0.00 |
| 5 | | | | | | | | | | $0.00 | | | | | $0.00 |
| 6 | | | | | | | | | | $0.00 | | | | | $0.00 |
| 7 | | | | | | | | | | $0.00 | | | | | $0.00 |
| 8 | | | | | | | | | | $0.00 | | | | | $0.00 |
| 9 | | | | | | | | | | $0.00 | | | | | $0.00 |
| 10 | | | | | | | | | | $0.00 | | | | | $0.00 |
| 11 | | | | | | | | | | $0.00 | | | | | $0.00 |
| 12 | | | | | | | | | | $0.00 | | | | | $0.00 |
| 13 | | | | | | | | | | $0.00 | | | | | $0.00 |
| 14 | | | | | | | | | | $0.00 | | | | | $0.00 |
| 15 | | | | | | | | | | $0.00 | | | | | $0.00 |
| | **TOTAL** | | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $0.00 | $0.00 | $0.00 | $0.00 |

* Group meals (includes more than one person) must be documented on page 5

** Multiply miles times current SHC mileage reimbursement rate.

*** Details regarding miscellaneous expenses must be documented on page 5

**The following receipts must be attached:**

Itemized receipts are required for all transactions greater than $75 and for all airline ticket purchases/changes

**Expenses for items outside of policy will be deducted from the total reimbursement.**