**Hearing Date and Time: August 2, 2019 at 10:00 a.m. (prevailing Eastern Time)**

David S. Kupetz
Claire K. Wu
**SulmeyerKupetz**
A Professional Corporation
333 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Tel: (213) 626-2311
Fax: (213) 629-4520

*Counsel for Izek Shomof and Aline Shomof Irrevocable
Children's Trust Dated February 11, 1999,
Vegas Group, LLC, and East River Group, LLC*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| SEARS HOLDING CORPORATION, *et al.*, | Case No. 18-23538 (RDD) |
| Debtors.[1] | (Jointly Administered) |

**LANDLORD'S REPLY TO "TRANSFORM HOLDCO LLC'S REPLY IN SUPPORT OF
ASSUMPTION AND ASSIGNMENT OF DESIGNATED LEASE FOR STORE LOCATED
AT 2650 EAST OLYMPIC BOULEVARD, LOS ANGELES, CALIFORNIA"**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

Izek Shomof and Aline Shomof Irrevocable Children's Trust Dated February 11, 1999, Vegas Group, LLC, and East River Group, LLC (collectively, "Landlord"), hereby submit their reply to "Transform Holdco LLC's Reply in Support of Assumption and Assignment of Designated Lease for Store Located at 2650 East Olympic Boulevard, Los Angeles, California" (ECF No. 4489) (the "Transform Response") filed by Transform Holdco, LLC ("Transform" or the "Buyer"), as follows:[2]

## INTRODUCTION

1.      This Reply is filed in accordance with the scheduling Stipulation and Order (ECF No. 4186) executed and presented by Transform, Landlord, and the above-captioned debtors (the "Debtors").

2.      Landlord is the lessor and debtor Sears, Roebuck and Co., a New York corporation ("Sears" or "Tenant"), is the lessee of part of the iconic Sears building located at 2650 East Olympic Boulevard in Boyle Heights, Los Angeles, California (the "Building"), Store No. 1008 (the "Premises"), under the terms of that certain Amended and Restated Building Lease dated May 5, 2011 (the "2011 Lease"),[3] as amended pursuant to that certain amendment known as "Amendment to Amended and Restated Building Lease" between Landlord and Sears Roebuck, dated as of December 30, 2015 (the "Amendment"[4] and collectively with the 2011 Lease, the "Lease").

## CONCESSIONS MADE IN TRANSFORM RESPONSE

3.      On January 18, 2019, the Debtors served their "Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Transform Response.

[3] The 2011 Lease is attached as Exhibit A to Landlord's "Supplemental Cure Objection and Reservation of Rights (Store #1008) Filed by Izek Shomof and Aline Shomof Irrevocable Children's Trust Dated February 11, 1999, Vegas Group, LLC, and East River Group, LLC" (ECF No. 3477) ("Landlord's Supplemental Cure Objection").

[4] The Amendment is attached as part of Exhibit C to Landlord's "Objection to Cure Amount for Store #1008 Filed by Izek Shomof and Aline Shomof Irrevocable Children's Trust Dated February 11, 1999, Vegas Group, LLC, and East River Group, LLC" (ECF No. 1837) ("Landlord's Initial Cure Objection").

Global Sale Transactions" (the "Cure Notice") (ECF No. 1731). In the Cure Notice, the Debtors

do not list any amount as the cure amount for the Lease.[5]

4.    On April 19, 2019, Transform filed a "Notice of Assumption and Assignment of

Additional Designatable Leases (the "Cure/Designation Notice") (ECF No. 3298). In the

Cure/Designation Notice, Transform lists $0.00 as the "Proposed Cure Amount" due to Landlord

with respect to the Lease.[6]

5.    In the Transform Response, it is conceded for the first time that $44,868.68 is due

and owing to Landlord under the Lease for reimbursement of real property taxes.

6.    The Transform Response also asserts for the first time, without any supporting

evidence, that a check has been issued to pay Landlord $5,270.31 for February 2019 CAM

charges, and Transform acknowledges that the check has not been cashed. The Transform

Response states that the Buyer is prepared to issue a replacement check.

### CONSTRUCTION REIMBURSEMENT CURE OBLIGATION

7.    As set forth in Landlord's Initial Cure Objection and in the Declaration of Izek

Shomof (the "Shomof Declaration") submitted in support of this Reply, Landlord deposited

$3,250,000 (the "Construction Estimate Deposit") with Sears that is to be used strictly for

reimbursement of specified tenant improvement construction expenses at the Premises. Of that

sum, $1,825,198.38 has been reimbursed to Landlord for construction expenses incurred for the

Premises. There is a remaining balance of the funds deposited with Sears solely for

reimbursement of construction expenses at the Premises in the sum of $1,424,801.62.

8.    The tenant improvement construction work to be done at the Premises and

reimbursed from the Construction Estimate Deposit is limited to work related to Sections 3 (low

---

[5] At page 1 of 10, No. 2, Exhibit "B" of the Cure Notice.

[6] At page 6 of 13, No. 3, Exhibit 1 of Transform's Cure/Designation Notice.

voltage service), 4 (HVAC), 5 (plumbing), 6 (façade), and 7 (signage) of the Amendment and upon completion of that work, the remainder of the deposit is to be returned to Landlord.  See ¶ 25(d) of the Amendment.  At all times, it was contemplated that the Construction Estimate Deposit included a buffer beyond the amount that would be required to do the specified work.

9.      As set forth in Landlord's Initial Cure Objection, with respect to the Debtors' construction expense reimbursement obligation, the sum of $322,649.80 is due and owing from Tenant to Landlord at this time.  The balance of the funds deposited by Landlord with Sears in the sum of $1,102.151.82 is required to be used for reimbursement of construction expenses at the Premises and, accordingly, must be maintained strictly for that purpose and is part of the cure amount owing to Landlord, with any excess amounts beyond what is necessary to complete the work to be returned to Landlord.

10.     As set forth in the Shomof Declaration and Exhibits 1-10 thereto, all amounts billed by Landlord and paid by Tenant from the Construction Estimate deposit placed by Landlord with Sears were invoiced to Sears and paid by Sears after April 1, 2017.  Exhibit 1 to the Shomof Declaration is a chart listing invoices and payments already made from the Construction Estimate Deposit.

11.     Nonetheless, the Buyer argues in the Transform Response that "Landlord did not meet the April 1, 2017 deadline for work related to the Construction Estimate Deposit. ... Therefore Landlord's cure demand for $1,424,801.62 must be rejected."[7]  In support of this assertion, Transform cites and quotes from ¶ 25(d) of the Amendment.  That provision provides:

> In the event Landlord does not complete the work contemplated is Sections 3, 4, 6, and 7 [Low Voltage Service, HVAC, Façade and Signage] by April 1, 2017, the remainder of funds in the Construction Fund Escrow shall be released to Tenant, at Tenant's

---

[7] Transform Response, p. 13.

election, so that Tenant can cause the work to be completed and
Tenant shall be entitled to payment by Landlord any additional
amounts necessary to complete the work. Upon Landlord's
completion of the work described in Sections 3, 4, 5 [Plumbing],
6, and 7 in a timely manner and its inspection and acceptance by
Tenant, any remaining Construction Estimate Deposit funds shall
be dispersed to Landlord subject to the review and approval of the
parties regarding the amount in question.

12.    Contrary to Transform's apparent assertions, the language of ¶ 25(d) of the

Amendment does not state that Landlord must complete the work by April 1, 2017, or the

Construction Estimate Deposit will be forfeited to Sears. Further, the language does not provide

that Landlord will not be paid for specified work done and expenses incurred after April 1, 2017.

Nowhere does ¶ 25(d) say that any unused portion of the Construction Estimate Deposit will not

be returned to Landlord upon completion of the specified work (work with regard to Sections 3,

4, 5, 6, and 7 as referenced in ¶ 25(d)).

13.    Rather, ¶ 25(d) provides Tenant with the right, after April 1, 2017, <u>at Tenant's</u>

<u>Election</u>, to use funds from the Construction Estimate Deposit to directly pay third parties to

cause the work to be completed. As set forth in the attached Declaration of Izek Shomof and as

reflected in the Exhibits thereto, Tenant never made any such election.[8]

14.    Pursuant to the above-quoted provision of the Amendment (¶ 25(d) of the

Amendment) Sears never elected that the remainder of the Construction Estimate Deposit be

released to Tenant. Instead, Sears repeatedly and consistently elected as part of an unvarying

course of performance to have Landlord continue to do the work at the Premises covered by the

---

[8] The Amendment provides for the Construction Estimate Deposit provided by Landlord to Sears to be placed by
Sears with a third party title company. However, Sears and Landlord agreed that Sears would hold the funds and
make reimbursements to Landlord. *See, e.g.*, payments made directly by Sears to reimburse Landlord as reflected in
Exhibits 3, 5, 8, and 10 to the Shomof Declaration and the May 11, 2017, email from Sears' representative to
Landlord stating "[i]f we were to follow the lease [which we are not doing] and have a 3rd party title company hold
the escrow ...." Exhibit 11 to Shomof Declaration.

Construction Estimate Deposit after April 1, 2017, and to have Landlord reimbursed for such work from the Construction Estimate Deposit.

15.    As set forth in the Shomof Declaration and Exhibit 12 thereto, Sears communicated with Landlord on a regular and continual basis by email, telephone, and in-person meetings to coordinate with and request Landlord to do construction work at the Premises for which Landlord was and/or would be reimbursed from the Construction Estimate Deposit. In reliance on Tenant's representations, requests, conduct, and performance, Landlord performed such work, and Tenant partially reimbursed Landlord from the Construction Estimate Deposit as set forth above, in the Shomof Declaration, and in the exhibits thereto. This occurred after April 1, 2017, and constitutes the course of performance of Tenant and Landlord under the Lease.

16.    It is undisputed that California law governs the Lease.[9]  Under California law, course of performance evidence can supplement, qualify or modify contrary terms in the contract. "California case law recognizes that course of performance evidence is allowed to explain or supplement integrated contracts even when the contract is unambiguous." *Letizia v. Facebook Inc.*, 267 F. Supp. 3d 1235, 1253 (N.D. Ca. 2017). Further, Section 1856(c) of the California Code of Civil Procedure provides that terms of a contract "may be explained or supplemented ... by course of performance."

17.    With respect to the construction given to a contract by the acts and conduct of the parties, the California Supreme Court has said that "actions speak louder than words. ... [E]ven if it be assumed that the words standing alone might mean one thing to the members of this court, where the parties have demonstrated by their actions and performance that to them the

---

[9] See section 11(j) of the 2011 Lease.

contract meant something quite different, the meaning and intent of the parties should be

enforced." *Crestview Cemetery Assn. v. Dieden*, 54 Cal. 2d 744, 754 (1960).

18.     A California Court of Appeals has summarized the impact of

course of performance on contracts under California law as follows:

> The use of "course of performance" evidence as extrinsic evidence
> is acknowledged in case law and was ultimately codified in Code of
> Civil Procedure section 1856. (Cal. Law Revision Commission,
> reprinted at 20A West's Ann. Code of Civ. Proc. (2007 ed.) foll. §
> 1856, p. 11.) As with all extrinsic evidence, course of performance
> evidence can be used not only to interpret an ambiguity, but also to
> reveal one in language otherwise thought to be clear. (Ibid.)

> While the parol evidence rule provides that terms set forth in an
> integrated writing "may not be contradicted by evidence of any
> prior agreement or of a contemporaneous oral agreement" (Code
> Civ. Proc., § 1856, subd. (a)), the statute goes on to provide that the
> terms set forth in an integrated writing "maybe explained or
> supplemented by course of dealing or usage of trade or by course of
> performance." (Code Civ. Proc., § 1856, subd. (c).) The Law
> Revision Commission comments note that "[i]t is expected that the
> courts will look to the definition[] in Commercial Code Section[]
> 1205 ... for guidance in interpreting the meaning of the term[] ...
> 'course of performance.' " (Cal. Law Revision Com. com.,
> reprinted at 20A West's Ann. Code of Civ. Proc. (2007 ed.) foll. §
> 1856, p. 11.) The referenced California Uniform Commercial Code
> section was subsequently renumbered to section 1303. It defines a
> "course of performance" as "a sequence of conduct between the
> parties to a particular transaction that exists if: (1) the agreement of
> the parties with respect to the transaction involves repeated
> occasions for performance by a party; and (2) the other party, with
> knowledge of the nature of the performance and opportunity for
> objection to it, accepts the performance or acquiesces in it without
> objection." (Cal. U. Com. Code, § 1303, subd. (a).)

> Not only is a course of performance relevant "in ascertaining the
> meaning of the parties' agreement," it may "supplement or qualify
> the terms of the  agreement" (Cal. U. Com. Code, § 1303, subd. (d))
> or "show a waiver or modification of any term inconsistent with the
> course of performance." (Cal. U. Com. Code, § 1303, subd. (f); see
> Wagner v. Glendale Adventist Medical Center (1989) 216 Cal.
> App. 3d 1379, 1388 [265 Cal. Rptr. 412] [conduct antithetical to a
> term of a written contract which induces the other party to rely on
> the conduct can amount to a modification of the contract].)

*Employers Reinsurance Co. v. Superior Court*, (2008) 161 Cal. App. 4th 906, 920-21, 74 Cal.

Rptr. 3d 733, 2008 Cal. App. LEXIS 482.

19.    Furthermore, emphasizing the overriding importance of course of performance,

the California Court of Appeals stated:

> The conduct of the parties after execution of the contract  and
> before any controversy has arisen as to its effect affords the most
> reliable evidence of the parties' intentions. This rule of practical
> construction is predicated on the common sense concept that
> 'actions speak louder than words.'

*Employers Reinsurance Co. v. Superior Court*, 161 Cal. App. 4th 906, at 921 (quotations and

citations omitted).

20.    As indicated above and in the Shomof Declaration and as reflected in the exhibits

thereto, Sears communicated with Landlord on a regular and continual basis by email, telephone,

and in-person meetings to coordinate with and request Landlord to do construction work at the

Premises for which Landlord was and/or would be reimbursed from the Construction Estimate

Deposit. The primary point person and representative for Sears in these communications was

Dolores M. Guarnaccia of Sears ("Ms. Guarnaccia"). Her title was "Director, Construction –

Real Estate" for Sears and the email address she used in communications with Landlord and its

representatives was Dolores.Guarnaccia@searshc.com.

21.    Ms. Guarnaccia communicated with Landlord on behalf of Sears on an ongoing

basis with regard to the tenant improvement construction work to be done at the Premises and

reimbursement for such work from the Construction Estimate Deposit. In the first part of 2017,

it was obvious that the tenant improvement construction work at the Premises covered by the

Construction Estimate Deposit would not be completed by April 1, 2017. Ms. Guarnaccia

acknowledged that Sears accepted this modification to the construction schedule in discussions

with Landlord representatives. On April 25, 2017, at 9:16 a.m. she sent an email on behalf of

Sears to Landlord, stating "I'll talk to legal about getting you the additional time." See Exhibit

13 to Shomof Declaration.

22.    Stating that she had spoken to "legal" at Sears, Ms. Guarniccia in an email sent on

May 11, 2017, at 2:17 p.m., confirmed to Landlord that Sears was not using the April 1, 2017

date as a date for completion of the tenant improvement construction work at the Premises,

stating in pertinent part:

> **I spoke with legal and here are my remarks: ... HVAC: the
> outside date per the amendment was already missed, you were
> to be fully installed by April 1st 2017. With that being the case,
> I am asking that the HVAC and Seismic be done at the same
> time. ... The expense of moving product and fixtures will be
> double if we need to do twice. ... Seismic: are you still on track
> to have the permit later this year with a construction start in
> the Sears space January 2018? ... Reimbursement for HVAC
> equipment: I need all of the invoices showing that the
> equipment has been paid for, any contracts for maintenance
> that were purchased with the equipment.** If we were to follow
> the lease and have a 3rd party title company hold the escrow, these
> would be the requirement and if Sears was to ask for
> reimbursement, I feel that we would be required to submit the same.

Exhibit 11 to Shomof Declaration (emphasis added). Accordingly, Sears was even seeking to

delay the work by Landlord on the HVAC so that it could be done, for the convenience of

Tenant, at the same time as the seismic work that would be done later (and which was not

covered by the Construction Estimate Deposit nor subject to ¶ 25(d)).

23.    Further, in the same May 17, 2017 email message, Ms. Guarnaccia, on behalf of

Sears, in addition to seeking to delay the HVAC work, acknowledged that other work covered by

the Construction Estimate Deposit was in process of being completed and that there was no

dispute with regard to the ongoing work, stating:

> **Computer room: The computer room has been fully built, is there
> and ETA when the data line will be pulled? Leo has been provided
> with all of the vendors to complete the work required ... Store
> Layout: Store Planning is working on an update, per the last CAD**

8

**file submitted, they have some questions on the rooms that are on the premier of the sales floor to know what to convert them to. We should have something in the next week or 2, then follow that up with a cost estimate. ... Signs: after the installation of the tower signs, 1 side the "S"'s are not lite, is there an ETA on when those will be repaired?**

Exhibit 11 to Shomof Declaration (emphasis added).

24.    Subsequently, in June 2017 and November 2017, Ms. Guarnaccia and other Sears representatives came to the Premises to meet in-person with Landlord's representatives and discuss ongoing tenant improvement construction work to be done at the Premises and paid for from the Construction Estimate Deposit. See Shomof Declaration and Exhibits 14-15 thereto. In March of 2018, ongoing discussions were occurring with Ms. Guarnaccia regarding Landlord obtaining the seismic permit. See Shomof Declaration Exhibit 16 thereto.

25.    As set forth in the Shomof Declaration and Exhibits 2-10 thereto, with respect to amounts already paid by Sears to Landlord from the Construction Estimate Deposit for reimbursement of construction expenses incurred by Landlord, Sears was invoiced by Landlord as follows:  (1) invoice # 08-001PR, dated 8/16/17, in the sum of $1,522,861.81; (2) invoice # 08-002PR, dated 8/16/17, in the sum of $1,044,688.06;[10] (3) invoice # 08-002A, dated 8/16/17, in the sum of $18,853.07; (4) invoice # 08-003PR, dated 8/16/17, in the sum of $79,941.17; and (5) invoice # 04-002PR, dated 4/10/18, in the sum of $283.483.50. Exhibit 1 to Shomof Declaration is a chart listing invoices and payments with respect to payments already made from Construction Estimate Deposit.

26.    As set forth in the Shomof Declaration and exhibits thereto, with respect to amounts already paid by Sears to Landlord from the Construction Estimate Deposit for reimbursement of

---

[10] Certain invoices include unpaid amounts carried over from prior invoices. Invoice # 08-002PR in the amount of $1,044,688.06, reflected the unpaid balance at that time from the initial invoice (invoice # 08-001PR). See chart attached as Exhibit 1 to Shomof Declaration reflecting invoices and payments with respect to payments already made from Construction Estimate Deposit.

construction expenses incurred by Landlord, Sears paid Landlord as follows: (1) $478,173.75 (check # 848265 dated 8/18/17)(this was a partial payment on the initial tenant improvement construction invoice # 08-001PR, leaving a balance of $1,044,688.06 on the initial invoice); (2) $983,599.96 (check # 848647 dated 2/17/18) (this was payment relating to the second invoice - invoice # 08-002PR); (3) $79,941.17 (check # 131200470 dated 6/15/18); (4) $283,483.50 (check # 131203210 dated 6/20/18). See Exhibits 3, 5, 8, and 10 to Shomof Declaration.

27.    Additionally, pursuant to Landlord's invoice # 10-001PR dated January 23, 2019, payment is due from Tenant to Landlord for reimbursement of construction expenses at the Premises in the sum of $322,649.80. This invoice is attached as Exhibit 17 to the Shomof Declaration. The amount reflected in the invoice is due and owing to Landlord for reimbursement of construction work at the Premises covered by the Construction Estimate Deposit and has not been paid.

28.    The Construction Estimate Deposit, in accordance with ¶ 25(d) of the Amendment, is to provide for reimbursement of work identified in Sections 3, 4, 5, 6, and 7 of the Amendment. That work has been completed, except for some remaining work on HVAC (Section 4 of the Amendment) and plumbing (Section 5 of the Amendment). Photos showing the completed work for Sections 3 (low voltage service/server room), 6 (façade), and 7 (signage) are attached as Exhibits 18 (server room) and 19 (façade and signage), respectively, to the Shomof Declaration.

29.    The HVAC work is approximately 75% complete. The remaining approximate 25% of the job includes labor to install condensers into the Premises occupied by Sears. All compressors are installed and all equipment has been purchased and is stored by Landlord at the Building. Photos of HVAC equipment installed on the roof of the Building are collectively attached as Exhibit 20 to the Shomof Declaration. Photos of HVAC equipment purchased by Landlord and stored at the Building waiting to be installed in the Premises are collectively attached as Exhibit 21 to the Shomof Declaration.

30.    Other than the HVAC work, the only remaining work to be done covered by the
Construction Estimate Deposit is plumbing (Section 5 of the Amendment).    Landlord requires
access to the Premises occupied by Sears in order to complete the plumbing work.  Landlord
estimates that it will cost approximately $75,000 to complete the remaining plumbing work.

31.    As stated above, the current unused balance of the Construction Estimate Deposit
is 1,424,801.62. After payment to Landlord for work already completed, as set forth above and
in the Shomof Declaration, in the sum of 322,649.80, the balance of the Construction Estimate
Deposit will be reduced to $1,102,151.82. From that sum, Landlord should be paid
approximately $300,000 for remaining HVAC work and approximately $75,000 for remaining
plumbing work once allowed access to the Premises occupied by Sears to complete the work.  At
that point, all of the work covered by the Construction Estimate Deposit will be finished and the
estimated balance of approximately $727,152 is to be returned to Landlord.  There is no
legitimate basis for Tenant or Transform to retain any unused balance of the Construction
Estimate Deposit, which was a fund provided by Landlord to Tenant strictly limited to use for
reimbursement of constructions expenses at the Premises for work in connection with Sections 3,
4, 5, 6, and 7 of the Amendment.  The course of performance and conduct of Tenant and
Landlord, including the request of Sears to Landlord to delay work at the Premises, demonstrates
that Transform's argument that Landlord is not entitled to be reimbursed from the Construction
Estimate Deposit for work done after April 1, 2017.

32.    In order for the Lease to be assumed and assigned to Transform, Buyer must
honor all obligations of Tenant, including (without limitation) the obligations to pay for work
done at the Premises from the Construction Estimate Deposit and to return the amount of the
unused deposit (as estimated above) to Landlord.

11

## VIOLATION OF COVENANT OF GOOD FAITH AND FAIR DEALING

33.    As set forth in Landlord's Supplemental Cure Objection, the Lease arises out of a

a sale-leaseback transaction, in which it was contemplated that Landlord would rehabilitate and

renovate the Building.

34.    With respect to the lease of the Premises and "Tenant's Control Area," the 2011

Lease expressly provides:

> The parties acknowledge that it is most critical to the successful
> operation of Tenant's business at the Premises that Tenant has
> access, use and enjoyment of those portions of the Building Parcel
> shown on the Site Plan as 'Tenant's Control Area", including such
> rights as are set forth below. *Without Tenant's prior approval,*
> *which may be withheld for any or no reason in its sole discretion,*
> *Landlord shall not construct or install any improvements or make*
> *any changes to Tenant's Control Area or interfere with or obstruct*
> *Tenant's use thereof in any manner whatsoever . . . .*

2011 Lease at ¶ 2(a)(3) (emphasis added).

35.    With respect to Construction Protocols, the Amendment expressly provides:

> Landlord shall provide two (2) weeks notice for any demolition or
> construction work not involving remediation or removal of
> hazardous materials at the Building Parcel and shall include in that
> notice the scope of work contemplated a detailed set of plans and
> specifications for the same together with a schedule, authorized
> hours of construction activity and remediation plan for the same.
> Tenant shall have ten (10) business days from receipt of Landlord's
> both notice and complete, detailed plans and specifications to
> provide any comments and/or objections. *No reply from Tenant*
> *within that period shall constitute approval. Landlord may proceed*
> *with the work in question after complying with the aforesaid*
> *procedures provided the work in question is approved by Tenant or*
> *deemed approved by Tenant as aforesaid.*

Amendment, at Exhibit C, Section 2(A)-(B) (emphasis added).

36.    Prior to Sears entering Chapter 11, Landlord was in discussions with Sears

regarding the planned rehabilitation of the Building, including the seismic retrofitting, new

HVAC system, ADA compliant access, new freight elevator, and other improvements to and

work to be done at the Premises. The discussions during the several months prior to the

commencement of Chapter 11 cases by Sears were being conducted with counsel for Sears,

Steven A. Velkei of Baute Crochetiere Hartley & Velkei, located in Los Angeles.

37.    As part of those discussions, Landlord's representatives sent to Mr. Velkei a letter

dated September 25, 2018 (see Exhibit 22 to Shomof Declaration) explaining Landlord's desire

to commence construction promptly, explaining the dramatic and necessary improvements that

would greatly benefit the leasehold interest held by Sears if the work was able to proceed,

providing (among other things) a site map showing how staging and construction would proceed,

as well as ways to avoid interfering with the Sears store, attaching a timeline for the process and

dates in regards to the construction, and including a request for Sears to agree to close for

approximately 6 months in order to drastically shorten the construction period in the Sears store.

38.    This request to close was neither a requirement nor a demand made upon Sears. It

was, instead, a request made to shorten the timeline for the construction process, for what

Landlord believed to be the benefit of both parties – and if Sears had responded to Landlord's

proposal and said that Sears would not close down, *or provided any substantive response to

Landlord at all*, Landlord would have gone another route.[11]

39.    Further, contrary to Transform's mischaracterization in its Response, Landlord did

not ask Tenant to shut down its store for six months "without any financial compensation."[12] As

---

[11] Exhibit 23 to Shomof Declaration. Shomof Dep. 61:11-20 ("A: All they could have done is continue negotiating with me and says, Izek, work around us. We're allowing to give you the space what the lease says. We are not going to shut down. And if they would have said that, I would have maneuvered the whole situation and tried to work with my general contractor that is going to be doing the job to work within Sears' space and not asking them to shut down. The problem with it occurred that they just stopped negotiating, stopped talking to us due to Sears' bankruptcy."); 62:2-14; 64:13-21 ("A: ...So, if we would have known that it's a definitely no, no with Sears shutting down for six months, we would go the route of doing it partially. We will talk to the general contract that this job needs to be done partially. And I would ask for Sears to let's make a – the agreement stating that we are going to go in with – eight months in and out or a year in and out. But when Sears refuse to talk and no one to talk to, that's where the whole thing fell apart.").

[12] Transform Response, p. 16.

set forth in the Shomof Declaration, to the extent Sears had responded to Landlord at all, and

indicated or discussed with Landlord what the cost, if any, would be for an agreement by Sears

to shut down, Landlord would have negotiated with Sears in good faith.[13]

40.    As set forth in the Shomof Declaration and Exhibit 24 thereto, Sears led Landlord

to believe, and Landlord reasonably relied on the belief, that Sears would work with and

cooperate with Landlord to move the redevelopment project forward, and Buyer cannot now

reasonably argue that Sears' actions did not have the effect of destroying the Project.

Specifically, following a meeting in September 2018, Mr. Velkei wrote to Landlord in an email:

> We do share a desire for this project to proceed both for the store
> and the community. We have expressed that to you. We also
> understand time is money. But, the project has to be done right
> and without risk of harm. That requires collaboration.

See Exhibit 24 to Shomof Declaration. Soon thereafter, the Debtors filed their Chapter 11 cases.

41.    By such communications, Sears induced Landlord to incur and continue to incur

expenses to move the redevelopment project forward by indicating that Sears would collaborate

with Landlord, and then subsequently, after the commencement of the Chapter 11 cases, going

silent and declining to provide any further substantive response to Landlord.

42.    Further, following Sears' commencement of the Chapter 11 cases, Mr. Velkei

advised the Landlord that the business people at Sears he was dealing with were either no longer

with the company or not in ongoing contact with him.[14]    He then suggested that Landlord reach

---

[13] Exhibit 23 to Shomof Declaration. Shomof Dep. 62:2-14 ("A: I asked Sears to shut down, and they asked me –
they said it will cost you. And I says I'm already contributing a lot to this. And if they would have said definitely it
will cost you "X" amount of dollar, I would – may say okay. I have no choice. I need to get it done. But the point –
the whole point here, it's not about Sears wanting money and I said no and that's when it fell apart. It's that Sears did
not say it will only need to be with money. Sears did not say you can only do it partially or otherwise do it partially.
I would – I would revisit the whole situation and just do it partially, if needed.").

[14] Exhibit 23 to Shomof Declaration. Shomof Dep. 62:15-19 ("Q: Did you make any proposal other than Sears
shutting down for six months without compensation? A: There was no one to talk to. I mean, it's basically Sears. I
spoke to Steve repeatedly, and Steve says, Izek, I have no one to talk to.").

out to bankruptcy counsel for Sears in an effort to resume discussions regarding work to be done at the Premises.

43.    Accordingly, counsel for Landlord reached out to counsel for Sears with correspondence dated December 11, 2018 (see Exhibit 25 to Shomof Declaration) to make such request, and also telephonically communicated with counsel for Sears. However, neither Sears nor its counsel were willing to engage in any substantive communications regarding the Premises nor regarding tenant improvement construction work remaining to be done at the Premises.

44.    As a result of such failure by Tenant to substantively respond or communicate, Landlord in its Initial Cure Objection (ECF No. 1837), at ¶ 10, put Sears on notice that Tenant's cooperation was needed in order to avoid killing the redevelopment project and thereby causing the loss of all the amounts expended to move forward with the project.[15]

45.    In the Transform Response, Buyer mischaracterizes the relevant facts, which Landlord seeks to correct and address herein. Significantly: (1) while Tenant had the right under the terms of the Lease to refuse Landlord access to its leased space in order to undertake construction work, *that discretion needed to be exercised in good faith and in accordance with fair dealing*;[16] (2) Landlord did provide to Tenant notice of its proposed construction work, by letter dated September 25, 2018 (see Exhibit 22 to Shomof Declaration), which letter (a) attached a site map showing how Landlord would be staging and phasing the construction as well as ways to avoid interfering with the Sears store, (b) attached a timeline and dates in regards to the

---

[15] Landlord's Initial Cure Objection, at ¶ 10 ("The lack of cooperation from Tenant regarding the necessary renovations, if it continues, will be the direct cause of Landlord losing the entitlements it secured from the City of Los Angeles in March of 2016. In the event that Landlord loses the entitlements as a result of not being able to renovate the Building due to the lack of cooperation from Sears Roebuck, Landlord will suffer a catastrophic financial loss that would result in significant financial liability for the Debtors and would substantially increase the Cure Amount set forth above ...").

[16] *IP Global Invs. Am., Inc. v. Body Glove IP Holdings, LP*, 2018 U.S. Dist. LEXIS 194461, at *18 ("Where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing.") (internal citations omitted).

construction, and (c) requested Sears agree to close for approximately 6 months in order to

drastically shorten the construction in the Sears store – this letter was part of an ongoing course

of discussions and performance between Landlord and Sears concerning, among other details,

the construction schedule and authorized hours of construction activity, as contemplated by the

Construction Protocols; (3) Landlord's request for Sears to close for a certain period of time was

not an attempt by Landlord to change the terms of the Amendment, but rather, as set forth above,

a request made to shorten the timeline for the construction process, for what Landlord believed to

be the benefit of both parties[17] – and if Sears had responded to Landlord's proposal and said that

Sears would not close down, *or provided any substantive response to Landlord at all*, Landlord

would have gone another route, and as to any related cost, would have negotiated in good faith

with Sears any financial compensation needed for an agreement to shut down; (4) while the

Amendment contained no requirement for Tenant to "cooperate" with Landlord's construction

efforts, as a practical matter, how could Landlord have provided (and ultimately proceeded with)

construction plans that did not "interfere with or obstruct Tenant's use" of its area,[18] without any

response or cooperation from Tenant as to how to stage that construction – had Landlord simply

proceeded with the construction without any response from Tenant, it is inconceivable that

Tenant would not have raised the issue that Landlord was interfering or obstructing Tenant's use

and enjoyment of its area; (5) Landlord was in the process of finalizing necessary construction

financing, and **the remaining major outstanding issue prior to such finalization was an**

---

[17] Allowing the redevelopment of the project to proceed would have dramatically benefitted Sears. The project would have created 1030 residential units, 200,000 square feet of retail space, and a community of 4,000 people. Additionally, Tenant's leasehold interest would have benefitted greatly from the seismic retrofit of the Building. See Exhibit 28 to the Shomof Declaration for a book about the project, including an illustrated depiction of the project.

[18] 2011 Lease, at ¶ 2(a)(3).

**agreement with Sears to work inside Tenant's space**[19] – *and Sears was not substantively responding to or communicating with Landlord at all* – thereby preventing Landlord from obtaining the financing that Buyer now (in circular reasoning) cites as an argument against Landlord; (6) the City of Los Angeles tax entitlement will expire as of September 16, 2019;[20] and (7) as set forth in further detail below and in the Shomof Declaration, the Project is no longer viable, and the consequential damages sought by Landlord are ripe.

46.    As respects the implied covenant of good faith and fair dealing:

> "Where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing." *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1394 n.16, 272 Cal. Rptr. 387 (1990), as modified on denial of reh'g (Oct. 31, 2001) (quoting *Kendall v. Ernest Pestana, Inc.*, 40 Cal. 3d 488, 500, 220 Cal. Rptr. 818, 709 P.2d 837 (1985))(citations omitted)). Breach of an express contractual provision is not a prerequisite to a claim for breach of the implied covenant. *Brehm v. 21st Century Ins. Co.*, 166 Cal. App. 4th 1225, 1236, 83 Cal. Rptr. 3d 410 (2008). **Rather, "the covenant is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract.".** . . .

*IP Global Invs. Am., Inc. v. Body Glove IP Holdings, LP*, 2018 U.S. Dist. LEXIS 194461, at *18-19 (emphasis added).

47.    In the Transform Response, Buyer cites to *Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*, 100 Cal. App. 4th (2002), for the proposition that the implied covenant of good faith

---

[19] Exhibit 26 to Shomof Declaration. Shomof Dep. 105:13-21 ("Q: To be clear, on the date of this letter was written on December 25th 2018, you had not finalized or closed on your construction financing; correct? A: Finalized our construction financing? Like I said before and I'm saying it again, our construction financing had a few conditions that the majority of the conditions were very, very, very minor. Could have been done with no -- no issue. The one major issue was the Sears issue, the Sears agreement issue.").

[20] If Landlord relied on the structural permit that was pulled on February 21, 2019, Landlord would only have until August 21, 2019 to start construction or lose its entitlements. However, by applying for a plan check extension for the change of use portion of the entitlements (which plan check extension was approved), Landlord was able to temporarily salvage the entitlements, and the expiration of the entitlements was moved to September 16, 2019 (see Exhibit 27 to Shomof Declaration).

and fair dealing cannot be used to rewrite the express terms of a contract.[21]  Transform, however,

fails to highlight the exception to the rule, i.e., that the implied covenant can contradict the

express terms of a contract in those instances when "reading the provision literally would,

contrary to the parties' clear intention, result in an unenforceable, illusory agreement."[22]

48.    Here, pursuant to the terms of the 2011 Lease, Landlord shall not construct or

install any improvements or make any changes to the Sears store, or interfere or obstruct

Tenant's use thereof in any manner whatsoever, without Tenant's prior approval, which may be

withheld for any or no reason in its sole discretion.  Pursuant to the terms of the Amendment, if

Landlord provided a notice, as contemplated by the Construction Protocols, and Tenant did not

provide any response, such lack of response would be deemed approval by the Tenant.

49.    Based on the above, however, as a practical matter, Landlord cannot provide

"detailed constructions plans" that do not "interfere with or obstruct" Tenant's use of its area,

without any response or cooperation from Tenant as to how to stage that construction.  Simply

put, Landlord cannot reasonably comply with the above provisions.  If Landlord had proceeded

with the work in question, without any agreement from Sears as to how to stage the construction,

it is inconceivable that Sears would not have raised the issue that Landlord was interfering or

obstructing the use and enjoyment of its area.  Therefore, reading the provisions literally, results

in an agreement where Landlord, while hypothetically able proceed with a multi-million dollar

renovation project without any agreement or cooperation or communication from Tenant for

entry into its space, authorized construction hours, or a schedule, is not able to proceed with such

project as a practical matter.  In short, the plain language of the 2011 Lease and the Amendment,

which Transform repeatedly argues controls, creates in effect an implausible reality.

---

[21] Transform Response, pp. 18-19.

[22] *Id.* at 58.

50.     Further, to the extent the Court agrees with Transform's argument that there was

no default or technical transgression of the express covenants in the Lease, Landlord submits that

the failure of Sears to cooperate or (at a minimum) even respond to Landlord, constitutes conduct

that frustrated Landlord's rights to the benefits of the Lease.[23]

51.     Finally, Buyer argues in the Transform Response that the supposed consequential

damages are not yet ripe."[24]  To the contrary, however, Landlord submits that the consequential

damages are indeed ripe.  While at the time of the Deposition of Izek Shomof, Landlord was

hopeful in stating that the redevelopment project was not yet dead (as Landlord had been in

recent contact with investors interested in doing a joint venture), since that time, the investors

proposing a joint venture left as no agreement with Sears was ever made to permit access for the

work in question.  As of the filing of this Reply, Landlord's hopes for the project are gone, as the

entitlements and permits are set to expire on September 16, 2019.  Further, based on Landlord's

inability to obtain a response from Sears allowing Landlord to work within Tenant's space,

Landlord's construction lender pulled out and the redevelopment project has failed.[25]

52.     In conclusion, Landlord's Cure Objections are not, as Transform attempts to

argue, an attempt to financially benefit from the assumption and assignment process, nor are they

an attempt to "recoup alleged costs incurred for a project that Landlord has not actively

pursued."[26]  To the contrary, Landlord funded and has put forth every effort to get the necessary

construction financing in place for the project, pull the necessary permits, secure entitlements,

---

[23] *IP Global Invs. Am., Inc. v. Body Glove IP Holdings, LP*, 2018 U.S. Dist. LEXIS 194461, at *18-19.

[24] Transform Response, p. 5.

[25] See ¶ 51 of the Shomof Declaration for a timeline of events relating to the construction loan.

[26] Transform Response, p. 20.

submit plans, engage the services of architects, engineers, consultants, and contractors, in order

to prepare for the renovation construction, and more.  As stated by Landlord's representative:

> ". . . I've done 25 other projects.  This is the biggest one.  This is a
> – I put my heart and soul into it.  I want to get it happen and
> developed.  I've been through hell with the financing:  I've been
> through hell with a lot of – getting permits.  It was hard."[27]

53.    It is not disputed that Landlord incurred the costs/losses set forth in Landlord's

Supplemental Cure Objection for "Architects, Engineers, and Consultants," "Permit Fees," and

"Contractors."  For Buyer to now argue that Landlord is seeking to financially benefit, or that

Landlord failed to actively pursue the project, is not well-taken.  Buyer's arguments seek to

deprive the Landlord from recovering real dollars that were spent by Landlord and invested into

a project that ultimately did not come to fruition, as a direct result of the Tenant's conduct.

## CONCLUSION

54.    For the reasons set forth above, Landlord's cure objections should be sustained.

Dated: July 26, 2019          By: /s/ David S. Kupetz
     Los Angeles, California      David S. Kupetz
                        **Sulmeyer**Kupetz
                        A Professional Corporation
                        333 South Grand Avenue, Suite 3400
                        Los Angeles, California 90071
                        Tel:  (213) 626-2311
                        Email: dkupetz@sulmeyerlaw.com

                        *Counsel for Izek Shomof and Aline Shomof Irrevocable*
                        *Children's Trust Dated February 11, 1999,*
                        *Vegas Group, LLC, and East River Group, LLC*

---

[27] Exhibit 29 to Shomof Declaration.  Shomof Dep. 146:24-147:1-4.