**Hearing Date and Time: August 2, 2019 at 10:00 a.m. (prevailing Eastern Time)**

David S. Kupetz
Claire K. Wu
**Sulmeyer**Kupetz
A Professional Corporation
333 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Tel: (213) 626-2311
Fax: (213) 629-4520

*Counsel for Izek Shomof and Aline Shomof Irrevocable
Children's Trust Dated February 11, 1999,
Vegas Group, LLC, and East River Group, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>SEARS HOLDING CORPORATION, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 18-23538 (RDD)<br><br>(Jointly Administered)<br><br>Re: ECF No. 3477 |

**DECLARATION OF IZEK SHOMOF IN SUPPORT OF LANDLORD'S REPLY TO "TRANSFORM HOLDCO LLC'S REPLY IN SUPPORT OF ASSUMPTION AND ASSIGNMENT OF DESIGNATED LEASE FOR STORE LOCATED AT 2650 EAST OLYMPIC BOULEVARD, LOS ANGELES, CALIFORNIA"**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

DAP\ 2676646v1

I, Izek Shomof, declare under penalty of perjury as follows:

1. I am over the age of eighteen years old, and am a resident of the County of Los Angeles, State of California. I am the authorized representative of the Izek Shomof and Aline Shomof Irrevocable Children's Trust Dated February 11, 1999, the Managing Member of Vegas Group, LLC, and the Managing Member of East River Group, LLC.

2. I submit this declaration in support of the *Landlord's Reply to "Transform Holdco LLC's Reply in Support of Assumption and Assignment of Designated Lease for Store Located at 2650 East Olympic Boulevard, Los Angeles, California*" (ECF No. 4624) (the "Landlord Reply"). Capitalized but undefined terms used in my declaration have the meanings ascribed to them in the Landlord Reply.

3. These facts are based upon my own personal knowledge, in my capacity as representative of the Izek Shomof and Aline Shomof Irrevocable Children's Trust Dated February 11, 1999, Vegas Group, LLC, and East River Group, LLC (collectively, "Landlord"), and/or the business records of Landlord, unless stated upon information and belief, and as to those such facts, I am informed and believe that they are true.

4. I am authorized to submit this declaration on behalf of Landlord. If I were called to testify in this matter, I could and would truthfully testify to each of the facts set forth herein to the best of my knowledge. I direct and supervise all actions and activities of Landlord, including maintenance of Landlord's books and records.

5. Landlord is the lessor and debtor Sears, Roebuck and Co., a New York corporation ("Sears" or "Tenant"), is the lessee of part of the iconic Sears building located at 2650 East Olympic Boulevard in Boyle Heights, Los Angeles, California (the "Building"), Store No. 1008 (the "Premises"), under the terms of that certain Amended and Restated Building Lease dated May 5, 2011 (the "2011 Lease"), as amended pursuant to that certain amendment known as

"Amendment to Amended and Restated Building Lease" between Landlord and Sears Roebuck, dated as of December 30, 2015 (the "Amendment" and collectively with the 2011 Lease, the "Lease").

6. On January 18, 2019, the above-captioned debtors (the "Debtors") served their "Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transactions" (the "Cure Notice") (ECF No. 1731).

7. At page 1 of 10, No. 2, of Exhibit "B" of the Cure Notice, the Debtors do not list any amount as the cure amount for the Lease.

8. On April 19, 2019, Transform Holdco, LLC ("Transform" or the "Buyer") filed a "Notice of Assumption and Assignment of Additional Designatable Leases (the "Cure/Designation Notice") (ECF No. 3298).

9. At page 6 of 13, No. 3, of Exhibit 1 of Transform's Cure/Designation Notice, Transform lists $0.00 as the "Proposed Cure Amount" due to Landlord with respect to the Lease.

10. On July 9, 2019, Transform filed "Transform Holdco LLC's Reply in Support of Assumption and Assignment of Designated Lease for Store Located at 2650 East Olympic Boulevard, Los Angeles, California" (ECF No. 4489) (the "Transform Response").

11. From my review of the Transform Response, it is conceded by Transform for the first time that $44,868.68 is due and owing to Landlord under the Lease for reimbursement of real property taxes.

12. From my review of the Transform Response, it is also asserted by Transform for the first time that a check has been issued to pay Landlord $5,270.31 for February 2019 CAM charges, and Transform acknowledges that the check has not been cashed. In the Transform Response, Transform states that it is prepared to issue a replacement check.

13. As set forth in Landlord's Initial Cure Objection, and in this Declaration, Landlord deposited $3,250,000 (the "Construction Estimate Deposit") with Sears to be used strictly for reimbursement of specified tenant improvement construction expenses at the Premises. Of that sum, $1,825,198.38 has been reimbursed to Landlord for construction expenses incurred for the Premises. There is a remaining balance of the funds deposited with Sears solely for reimbursement of construction expenses at the Premises in the sum of $1,424,801.62.

14. Under ¶ 25(d) of the Amendment, the tenant improvement construction work to be done at the Premises and reimbursed from the Construction Estimate Deposit is limited to work related to Sections 3 (low voltage service), 4 (HVAC), 5 (plumbing), 6 (façade), and 7 (signage) of the Amendment and, upon completion of that work, the remainder of the deposit is to be returned to Landlord. This was always the understanding of the parties. Further, at all times, it was contemplated that the Construction Estimate Deposit included a buffer beyond the amount that would be required to do the specified work.

15. As set forth in Landlord's Initial Cure Objection (ECF No. 1837), with respect to the Debtors' construction expense reimbursement obligation, the sum of $322,649.80 is due and owing from Tenant to Landlord at this time. The balance of the funds deposited by Landlord with Sears in the sum of $1,102.151.82 is required to be used for reimbursement of construction expenses at the Premises and, accordingly, must be maintained strictly for that purpose and is part of the cure amount owing to Landlord, with any excess amounts beyond what is necessary to complete the work to be returned to Landlord.

16. As set forth in Exhibits 1-10 attached hereto, all amounts billed by Landlord and paid by Tenant from the Construction Estimate Deposit placed by Landlord with Sears were invoiced to Sears and paid by Sears after April 1, 2017. **Exhibit 1** is a chart prepared under my direction accurately listing those invoices and payments with respect to payments already made

from the Construction Estimate Deposit. **Exhibits 2, 4, 6, 7, and 9** are copies of the invoices identified on the chart. **Exhibits 3, 5, 8, and 10** are copies of documents evidencing the payments identified on the chart. All of these exhibits are documents prepared or received and maintained in the regular course of Landlord's business activities.

17. Buyer argues in the Transform Response that "Landlord did not meet the April 1, 2017 deadline for work related to the Construction Estimate Deposit. ... Therefore Landlord's cure demand for $1,424,801.62 must be rejected." In support of this assertion, Transform cites and quotes from ¶ 25(d) of the Amendment. Contrary to Transform's apparent assertions, the language of ¶ 25(d) of the Amendment does not state that Landlord must complete the work by April 1, 2017, or the Construction Estimate Deposit will be forfeited to Sears. Further, the language does not provide that Landlord will not be paid for specified work done and expenses incurred after April 1, 2017. Nowhere does ¶ 25(d) say that any unused portion of the Construction Estimate Deposit will not be returned to Landlord upon completion of the specified work (work with regard to Sections 3, 4, 5, 6, and 7 as referenced in ¶ 25(d)).

18. Rather, ¶ 25(d) of the Amendment provides Tenant with the right, after April 1, 2017, <u>at Tenant's Election</u>, to use funds from the Construction Estimate Deposit to directly pay third parties to cause the work to be completed. Tenant never made any such election.

19. Paragraph 25(d) of the Amendment provides for the Construction Estimate Deposit provided by Landlord to Sears to be placed by Sears with a third party title company. However, Sears and Landlord agreed that Sears would hold the funds and make reimbursements to Landlord. *See, e.g.*, payments made directly by Sears to reimburse Landlord as reflected in Exhibits 3, 5, 8, and 10 attached hereto, and the May 11, 2017, email from Sears' representative to Landlord stating "[i]f we were to follow the lease [which we are not doing] and have a 3rd party

DAP\ 2676646v1                                             5

title company hold the escrow ...." **Exhibit 11** attached hereto is a copy of that May 11, 2017 email.

20. Sears never elected that the remainder of the Construction Estimate Deposit be released to Tenant. Instead, Sears repeatedly and consistently elected as part of an unvarying course of performance to have Landlord continue to do the work at the Premises covered by the Construction Estimate Deposit after April 1, 2017, and to have Landlord reimbursed for such work from the Construction Estimate Deposit.

21. Prior to the commencement of the above-captioned Chapter 11 cases, Sears communicated with Landlord on a regular and continual basis by email, telephone, and in-person meetings to coordinate with and request Landlord to do construction work at the Premises for which Landlord was and/or would be reimbursed from the Construction Estimate Deposit. **Exhibit 12** is a sampling of those communications between Sears and Landlord and, accordingly, does not include each and every communication between Sears and Landlord with regard to construction work to be done at the Premises, as the inclusion of all such communications would be voluminous. Certain of the emails and correspondence included in Exhibit 12 are also attached to this Declaration as stand-alone exhibits.

22. In reliance on Tenant's representations, requests, conduct, and performance, Landlord performed construction work at the Premises, and Tenant partially reimbursed Landlord from the Construction Estimate Deposit as set forth above and in the exhibits hereto. This occurred after April 1, 2017.

23. The primary point person and representative for Sears in the communications with Landlord was Dolores M. Guarnaccia of Sears ("Ms. Guarnaccia"). Her title was "Director, Construction – Real Estate" for Sears and the email address she used in communications with Landlord and its representatives was Dolores.Guarnaccia@searshc.com.

24. Ms. Guarnaccia communicated with Landlord on behalf of Sears on an ongoing basis with regard to the tenant improvement construction work to be done at the Premises and reimbursement for such work from the Construction Estimate Deposit. In the first part of 2017, it was obvious that the tenant improvement construction work at the Premises covered by the Construction Estimate Deposit would not be completed by April 1, 2017. Ms. Guarnaccia acknowledged that Sears accepted this modification to the construction schedule in discussions with Landlord representatives. On April 25, 2017, at 9:16 a.m. she sent an email on behalf of Sears to Landlord, stating "I'll talk to legal about getting you the additional time." **Exhibit 13** is a copy of that April 25, 2017 email.

25. Stating that she had spoken to "legal" at Sears, Ms. Guarniccia in an email sent on May 11, 2017, at 2:17 p.m. (Exhibit 11 attached hereto), confirmed to Landlord that Sears was not using the April 1, 2017 date as a date for completion of the tenant improvement construction work at the Premises, stating in pertinent part:

> **I spoke with legal and here are my remarks: ... HVAC: the outside date per the amendment was already missed, you were to be fully installed by April 1st 2017. With that being the case, I am asking that the HVAC and Seismic be done at the same time. ... The expense of moving product and fixtures will be double if we need to do twice. ... Seismic: are you still on track to have the permit later this year with a construction start in the Sears space January 2018? ... Reimbursement for HVAC equipment: I need all of the invoices showing that the equipment has been paid for, any contracts for maintenance that were purchased with the equipment.** If we were to follow the lease and have a 3rd party title company hold the escrow, these would be the requirement and if Sears was to ask for reimbursement, I feel that we would be required to submit the same. [emphasis added]

26. As set forth in the May 11, 2017 email from Ms. Guarnaccia (Exhibit 11 attached hereto), Sears was even seeking to delay the work by Landlord on the HVAC so that it could be

done, for the convenience of Tenant, at the same time as the seismic work that would be done later (and which was not covered by the Construction Estimate Deposit nor subject to ¶ 25(d)).

27. Further, in the same May 17, 2017 email message (Exhibit 11 attached hereto), Ms. Guarnaccia, on behalf of Sears, in addition to seeking to delay the HVAC work, acknowledged that other work covered by the Construction Estimate Deposit was in process of being completed and that there was no dispute with regard to the ongoing work, stating:

> **Computer room: The computer room has been fully built, is there an ETA when the data line will be pulled? Leo has been provided with all of the vendors to complete the work required ... Store Layout: Store Planning is working on an update, per the last CAD file submitted, they have some questions on the rooms that are on the premier of the sales floor to know what to convert them to. We should have something in the next week or 2, then follow that up with a cost estimate. ... Signs: after the installation of the tower signs, 1 side the "S"'s are not lite, is there an ETA on when those will be repaired? [emphasis added]**

28. Subsequently, in June 2017 and November 2017, Ms. Guarnaccia and other Sears representatives came to the Premises to meet in-person with Landlord's representatives and discuss ongoing tenant improvement construction work to be done at the Premises and paid for from the Construction Estimate Deposit. **Exhibits 14 and 15** are copies of email correspondence between Sears representatives and Landlord's representatives describing and/or scheduling those in-person meetings.

29. In March of 2018, ongoing discussions were occurring with Ms. Guarnaccia regarding Landlord obtaining the seismic permit. **Exhibit 16** is a copy of that email correspondence.

30. With respect to amounts already paid by Sears to Landlord from the Construction Estimate Deposit for reimbursement of construction expenses incurred by Landlord, Sears was invoiced by Landlord as follows: (1) invoice # 08-001PR, dated 8/16/17, in the sum of

$1,522,861.81; (2) invoice # 08-002PR, dated 8/16/17, in the sum of $1,044,688.06;[2] (3) invoice # 08-002A, dated 8/16/17, in the sum of $18,853.07; (4) invoice # 08-003PR, dated 8/16/17, in the sum of $79,941.17; and (5) invoice # 04-002PR, dated 4/10/18, in the sum of $283.483.50. See Exhibits 2, 4, 6, 7, and 9, hereto.

31. With respect to amounts already paid by Sears to Landlord from the Construction Estimate Deposit for reimbursement of construction expenses incurred by Landlord, Sears paid Landlord as follows: (1) $478,173.75 (check # 848265 dated 8/18/17)(this was a partial payment on the initial tenant improvement construction invoice # 08-001PR, leaving a balance of $1,044,688.06 on the initial invoice); (2) $983,599.96 (check # 848647 dated 2/17/18) (this was payment relating to the second invoice - invoice # 08-002PR); (3) $79,941.17 (check # 131200470 dated 6/15/18); (4) $283,483.50 (check # 131203210 dated 6/20/18). See Exhibits 3, 5, 8, and 10 hereto.

32. Pursuant to Landlord's invoice # 10-001PR dated January 23, 2019, payment is due from Tenant to Landlord for reimbursement of construction expenses at the Premises in the sum of $322,649.80. The amount reflected in the invoice is due and owing to Landlord for reimbursement of construction work at the Premises covered by the Construction Estimate Deposit and has not been paid. **Exhibit 17** is a copy of that January 23, 2019 invoice.

33. The Construction Estimate Deposit, in accordance with ¶ 25(d) of the Amendment, is to provide for reimbursement of work identified in Sections 3, 4, 5, 6, and 7 of the Amendment. That work has been completed, except for some remaining work on HVAC (Section 4 of the Amendment) and plumbing (Section 5 of the Amendment). **Exhibits 18** (server room) and **19**

---

[2] Certain invoices include unpaid amounts carried over from prior invoices. Invoice # 08-002PR in the amount of $1,044,688.06, reflected the unpaid balance at that time from the initial invoice (invoice # 08-001PR). *See* chart attached as Exhibit 1 reflecting invoices and payments with respect to payments already made from Construction Estimate Deposit.

DAP\ 2676646v1                                                                                     9

(facade and signage), contain photos taken under my direction showing the completed work for Sections 3 (low voltage service/server room), 6 (façade), and 7 (signage).

34. The HVAC work is approximately 75% complete. The remaining approximate 25% of the job includes labor to install condensers into the Premises occupied by Sears. All compressors are installed and all equipment has been purchased and is stored by Landlord at the Building. **Exhibit 20** contains photos taken under my direction of HVAC equipment installed on the roof of the Building. **Exhibit 21** contains photos taken under my direction of HVAC equipment purchased by Landlord and stored at the Building waiting to be installed in the Premises.

35. Other than the HVAC work, the only remaining work to be done covered by the Construction Estimate Deposit is plumbing (Section 5 of the Amendment). Landlord requires access to the Premises occupied by Sears in order to complete the plumbing work. Landlord estimates that it will cost approximately $75,000 to complete the remaining plumbing work.

36. As stated above, the current unused balance of the Construction Estimate Deposit is 1,424,801.62. After payment to Landlord for work already completed, in the sum of 322,649.80, the balance of the Construction Estimate Deposit will be reduced to $1,102,151.82. From that sum, Landlord should be paid approximately $300,000 for remaining HVAC work and approximately $75,000 for remaining plumbing work once allowed access to the Premises occupied by Sears to complete the work. At that point, all of the work covered by the Construction Estimate Deposit will be finished and the estimated balance of approximately $727,152 is to be returned to Landlord.

37. The Construction Estimate Deposit is a fund provided by Landlord to Tenant strictly limited to use for reimbursement of constructions expenses at the Premises for work in connection with Sections 3, 4, 5, 6, and 7 of the Amendment. At all times the understanding of

the parties, was and is that Landlord would be reimbursed from the Construction Estimate Deposit for work done after April 1, 2017, and that the unused balance of the Construction Estimate Deposit would be returned to Landlord.

38. The Lease arises out of a portion of a sale-leaseback transaction, in which it was contemplated that Landlord would rehabilitate and renovate the Building.

39. Prior to Sears entering Chapter 11, Landlord was in discussions with Sears regarding the planned rehabilitation of the Building, including the seismic retrofitting, new HVAC system, ADA compliant access, new freight elevator, and other improvements to and work to be done at the Premises, including structural upgrades in conformance with Ordinance 183893. The discussions regarding redevelopment of the property during the several months prior to the commencement of Chapter 11 cases by Sears were being conducted with counsel for Sears, Steven A. Velkei of Baute Crochetiere Hartley & Velkei, located in Los Angeles.

40. As part of those discussions, Landlord's representatives (at my instruction) sent to Mr. Velkei a letter dated September 25, 2018 explaining Landlord's desire to commence construction promptly, explaining the dramatic and necessary improvements that would greatly benefit the leasehold interest held by Sears if the work was able to proceed, providing (among other things) a site map showing how staging and construction would proceed, as well as ways to avoid interfering with the Sears store, and including a request for Sears to agree to close for approximately 6 months in order to drastically shorten the construction in the Sears store. **Exhibit 22** is a copy of that September 25, 2018 letter.

41. This request to close was neither a requirement nor a demand made upon Sears. It was, instead, a request made to shorten the timeline for the construction process, for what I believed to be the benefit of both parties – and if Sears had responded to Landlord's proposal and said that Sears would not close down, *or provided any substantive response to Landlord at all,*

Landlord would have gone another route. **Exhibit 23** hereto, includes cited portions of the Transcript of my deposition conducted on June 24, 2019.

42. Further, Landlord did not ask Tenant to shut down its store for six months "without any financial compensation." To the extent Sears had responded to Landlord at all, and indicated or discussed with Landlord what the cost, if any, would be for any agreement by Sears to shut down, Landlord would have negotiated with Sears in good faith. See **Exhibit 23** hereto, which includes cited portions of the Transcript of my deposition conducted on June 24, 2019.

43. Sears led Landlord to believe that Sears would work with and cooperate with Landlord to move the redevelopment project forward. Landlord relied upon representations of Sears that it would collaborate with Landlord to move the redevelopment project forward. For example, following a meeting in September 2018, Mr. Velkei wrote to Landlord: "We do share a desire for this project to proceed both for the store and the community. We have expressed that to you. We also understand time is money. But, the project has to be done right and without risk of harm. That requires collaboration." **Exhibit 24** is a copy of that September 28, 2018 email from Mr. Velkei.

44. By such communications, Sears induced Landlord to incur and continue to incur expenses to move the redevelopment project forward by indicating that Sears would collaborate with Landlord, and then subsequently, upon the commencement of the Chapter 11 cases, Sears went silent and failed to provide any further substantive response to Landlord.

45. Further, following Sears' commencement of the Chapter 11 cases, Mr. Velkei advised Landlord that the business people at Sears he was dealing with were either no longer with the company or not in ongoing contact with him. He then suggested that Landlord reach out to bankruptcy counsel for Sears in an effort to resume discussions regarding work to be done at the

Premises. See **Exhibit 23,** which includes cited portions of the Transcript of my deposition conducted on June 24, 2019.

46. Accordingly, at my direction, counsel for Landlord reached out to counsel for Sears with correspondence dated December 11, 2018 making the above request. **Exhibit 25** is a copy of that December 11, 2018 correspondence. I am also informed, and based thereon believe, that counsel for Landlord telephonically communicated with counsel for Sears. However, following commencement of the Chapter 11 cases, despite Landlord's efforts, neither Sears nor its counsel engaged in any substantive communications with Landlord regarding the Premises nor regarding construction work to be done at the property.

47. As a result of such failure to substantively respond or communicate, Landlord in its Initial Cure Objection (ECF No. 1837), at ¶ 10, put Sears on notice that Tenant's cooperation was needed in order to avoid killing the redevelopment project and thereby causing, at a minimum, the loss of all the amounts expended to move forward with the project.

48. Due to the lack of cooperation from Tenant, construction at the Building did not begin prior to March 16, 2019, Landlord lost the construction financing it was in the process of finalizing, and the entitlements Landlord secured from the City of Los Angeles (which Landlord obtained an extension of) are rapidly expiring.

49. As of March 16, 2019 (and prior thereto, as communicated by Landlord to Tenant), Landlord had been ready, willing, and able to commence the necessary renovation construction at the Building. Among other things, Landlord had secured entitlements from the City of Los Angeles, was in the process of finalizing loan documents, pulled building permits and submitted plans, and engaged and funded the necessary services of architects, engineers, consultants, and contractors in order to prepare for the renovation construction. As a direct result of Tenant's failure to respond to and cooperate with Landlord, Landlord lost the construction financing that

was in the process of being finalized and was otherwise in place for necessary renovation and rehabilitation of the Building, and lost the amounts expended by Landlord to be prepared to move forward with the necessary construction that was to be done at the Building. Landlord would have been able to timely begin the renovation construction, but for the failure of Sears to cooperate.

50. In the Transform Response, Buyer mischaracterizes the relevant facts. Significantly: (1) while Tenant had the right under the terms of the Lease to refuse Landlord access to its leased space in order to undertake construction work, that discretion was not exercised in good faith and in accordance with fair dealing; (2) Landlord did provide to Tenant notice of its proposed construction work, by letter dated September 25, 2018, which letter (a) attached a site map showing how Landlord would be staging and phasing the construction as well as ways to avoid interfering with the Sears store, (b) attached a timeline and dates in regards to the construction, and (c) requested Sears agree to close for approximately 6 months in order to drastically shorten the construction in the Sears store – this letter was part of an ongoing course of discussions and performance between Landlord (through myself and my team) and Sears concerning, among other details, the construction schedule and authorized hours of construction activity, as contemplated by the Construction Protocols; (3) Landlord's request for Sears to close for a certain period of time was not an attempt by Landlord to change the terms of the Amendment, but rather, as set forth above, a request made to shorten the timeline for the construction process, for what I believed to be the benefit of both parties – and if Sears had responded to Landlord's proposal and said that Sears would not close down, *or provided any substantive response to Landlord at all*, Landlord would have gone another route, and as to any related cost, would have negotiated in good faith with Sears any financial compensation needed for an agreement to shut down; (4) while the Amendment contained no requirement for Tenant to

"cooperate" with Landlord's construction efforts, as a practical matter, I do not believe Landlord could have provided (and ultimately proceeded with) construction plans that did not "interfere with or obstruct Tenant's use" of its area, without any response or cooperation from Tenant as to how to stage that construction – had Landlord simply proceeded with the construction without any response from Tenant, it is inconceivable that Tenant would not have raised the issue that Landlord was interfering or obstructing Tenant's use and enjoyment of its area; (5) Landlord was in the process of finalizing necessary construction financing, and *the remaining major outstanding issue prior to such finalization was an agreement with Sears to work inside Tenant's space – and Sears was not substantively responding to or communicating with Landlord at all* – thereby preventing Landlord from finalizing the financing that Buyer now uses as an argument against Landlord; (6) the City of Los Angeles tax entitlement is rapidly expiring, and will expire as of September 16, 2019; and (7) as set forth in further detail below, the Project is no longer viable. See **Exhibit 26,** which includes cited portions of the Transcript of my deposition conducted on June 24, 2019. **Exhibit 27** is a copy of the plan check extension for the change of use portion of the entitlements, reflecting the expiration date for the entitlements.

51. Allowing the redevelopment of the project (the "Project") to proceed would have dramatically benefitted Sears. The project would have created 1030 residential units, 200,000 square feet of retail space, and a community of 4,000 people. See **Exhibit 28** hereto for a book regarding the project that was put together at my request and pursuant to my direction and which includes an illustrated depiction of the project. Additionally, Tenant's leasehold interest would have benefitted greatly from the seismic retrofit of the Building. However, based on Landlord's inability to obtain a response from Sears allowing Landlord to work within Tenant's space, Landlord's construction lender pulled out and the redevelopment project failed. The following outlines the chronology pertaining to the Landlord's construction loan for the Sears Boyle Heights

project and context regarding an agreement with Sears allowing Landlord to access the Tenant's space being a condition of closing the construction loan:

- 06/14/2018 loan application for $200 million fully executed by lender (Bank of the Ozarks) and borrower

- 06/27/2018 borrower is notified that bank loan committee has approved the loan, which required no additional borrower equity for the closing of the loan, loan closer assigned by bank

- 6/29/2018 closing checklist issued indicating completion of bank's credit committee approval

- 6/29/2018 first draft of loan documents issued by lender's counsel

- 07/03/2018 bank's counsel asks about status of agreement with Sears for Landlord to obtain access to Tenant's space and a new checklist is issued requiring such an agreement with Sears

- 07/10/2018 updated checklist circulated for status call listing agreement with Sears involving access to Tenant's space as a condition of closing

- 07/11/2018 comments submitted by borrower's counsel to lender's counsel on 138-page construction loan agreement (primary governing loan document)

- 07/24/2018 updated checklist circulated for status call listing agreement with Sears involving access to Tenant's space as a condition of closing

- 07/26/2018 revised loan agreement sent by lender's counsel to borrower's counsel

- 07/30/2018 appraisal complete satisfying valuation conditions of loan

- 07/31/2018 through 10/09/2018 numerous additional status calls and updated checklist occurred and each and every one included agreement with Sears involving access to Tenant's space as a condition of closing.

- 10/09/2018 the final updated checklist was circulated for a status call, still listing and agreement with Sears for access to the tenant's space as a condition of closing

- 10/15/2018 Sears filed for bankruptcy and Sears ceased all substantive communication with Landlord. Counsel for the bank were subsequently put on hold. No additional all-hands status calls occurred after the Sears bankruptcy filing. Approximately six months after the last all-hands status call, the bank terminated the loan application due to lack of progress with regard to obtaining any agreement with Sears allowing Landlord access to tenant's space.

52. While at the time of my deposition conducted on June 24, 2019, I had been hopeful when stating that the redevelopment project was not yet completely dead (as I had been in recent contact with investors interested in doing a joint venture), since that time, the investors proposing a joint venture left as no agreement with Sears was ever made to permit access for the work in question. As of the filing of Landlord's Reply, my hopes for the project are gone, as the entitlements and permits are set to expire on September 16, 2019.

53. Landlord and I have put forth every effort to get the necessary construction financing in place for the redevelopment project, pulled the necessary permits, secured entitlements, submitted plans, engaged and funded the services of architects, engineers, consultants, and contractors, in order to prepare for the renovation construction, and more. See **Exhibit 29**, which includes cited portions of the Transcript of my deposition conducted on June 24, 2019.

54. Based upon a review of the books and records of Landlord, Landlord incurred the following losses due to Tenant's lack of cooperation and the resultant inability to commence renovation construction:

| Supplemental Cure Amount (as of April 15, 2019) | |
|---|---|
| Architects, Engineers and Consultants | $4,559,194.82 |
| Permit Fees | $121,851.20 |
| Contractors | $1,015,000.00 |
| **TOTAL** | $5,696,046.02[3] |

55. The total cure amount for the Lease is an amount not less than **$7,170,986.63**. However, Landlord's actual damages caused by the failure of Sears to respond to and/or cooperate with Landlord will increase substantially when the entitlements for the Project are officially lost and the value of the property will be severely harmed.

56. As set forth in the Landlord Reply and herein, Landlord spent and invested a significant amount of funds actively pursuing the Project. The conduct of Sears, in failing to communicate or respond to Landlord in any substantive manner, had the direct result of killing the Project.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 25, 2019
Los Angeles, California



IZEK SHOMOF

---

[3] This amount is in addition to the $1,474,940.61 asserted in the Landlord's previously filed Cure Objection.