COZEN O'CONNOR  
*Attorneys for Scents of Worth, Inc.*  
Frederick E. Schmidt, Jr.  
277 Park Avenue  
New York, NY 10172  
(212) 883-4900  
(646) 588-1552 (fax)  
eschmidt@cozen.com

Hearing Date: August 22, 2019 at 10:00 a.m.  
Objection Deadline: August 15, 2019 at 4:00 p.m.

**UNITED STATES BANKRUPTCY COURT**  
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| SEARS HOLDINGS CORPORATION, *et al.*, | Case No. 18-23538 (RDD) |
| Debtors.[1] | (Jointly Administered) |

**MOTION TO COMPEL PAYMENT OF PROCEEDS OF POST-PETITION
SALES OF CONSIGNED GOODS TO SCENTS OF WORTH, INC.**

Scents of Worth, Inc. f/k/a Model Imperial, Inc. ("**SOW**"), as and for its motion (the "**Motion**") seeking entry of an order substantially in the form annexed hereto as Exhibit "A" (the "**Order**"), directing the above-captioned debtors and debtors in possession (collectively, the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LL/C (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

LEGAL\40782700\1

"**Debtors**") to account for all Consigned Goods (hereafter defined) and to remit to SOW all amounts required under the terms of the Contract (hereafter defined) from the proceeds of the Debtors' post-petition sales of goods supplied by SOW to the Debtors on consignment (the "**Consignment Proceeds**"), together with such other and further relief that this Court deems just and proper, respectfully represents as follows.

1. By this Motion, SOW seeks payment of approximately $2.4 million in post-petition Consignment Proceeds which, as set forth below, the Debtors were required to segregate and hold in trust for the benefit of SOW pursuant to interim and final orders of this Court. In addition to SOW's interest in the Consignment Proceeds as beneficiary of a Court-imposed trust, SOW also holds the equivalent of a purchase money security interest in the Consigned Goods (defined below) which interests attached to the Consignment Proceeds, as well as an administrative expense claim arising out of the Debtors' post-petition sale of the Consigned Goods. The Debtors, therefore, have no legitimate grounds to withhold payment of the Consignment Proceeds to SOW.

## BACKGROUND

2. SOW and Kmart Corporation ("**Kmart**") have had a longstanding and lengthy business relationship with each other. As part of that relationship, on or about August 31, 2000, SOW and Kmart entered into a *Merchandise Supply Agreement* (as thereafter amended, the "**Prior Contract**") pursuant to which SOW would be the sole supplier to Kmart of certain designer brand name fragrances and perfume products. Paragraph 1(b) of the Prior Contract provided that the products to be supplied by SOW were to be supplied on a consignment basis. Paragraph 2 of the Prior Contract provided that SOW was to supply to begin supplying consigned goods to Kmart beginning on September 11, 2000.

3. Scents of Worth timely filed a UCC-1 financing statement to perfect its interests in the consigned goods to be delivered pursuant to the Prior Contract. A copy of the UCC-3 continuation statement (file # 2008133220-4) filed by SOW with the Michigan Secretary of State on August 25, 2008 is annexed as Exhibit B to the *Declaration of Mike Katz in Support of the Motion to Compel Payment of Proceeds of Post-Petition Sales of Consigned Goods to Scents of Worth, Inc.* (the "**Katz Declaration**") filed herewith as Exhibit B.[2] A copy of the Prior Contract is annexed to the Katz Declaration as Exhibit A.

4. On or about January 1, 2014 following a series of amendments to the Prior Contract, Kmart and SOW entered into a new *Distribution and Supply Agreement* (as thereafter amended, the "**Contract**") pursuant to which SOW would be the exclusive supplier and distributor of certain fragrances and perfume products, on a consignment basis (such goods that were in the Debtors' possession as of the Petition Date (hereafter defined) are hereafter referred to as the "**Consigned Goods**"). A copy of the Contract is annexed as Exhibit C to the Katz Declaration. Pursuant to the terms of the Contract, Kmart was to realize a gross margin on each sale of Consigned Goods of 28% of the selling price of such goods.[3]

---

[2] The UCC-3 references file 2004008749-4 as the initial financing statement filed by SOW. Pursuant to section 440.9515(5) of the Michigan Compiled Laws, the UCC-3 statement continued the effectiveness of the initial 2004 financing statement until 2014, the 5-year anniversary date of the initial financing statement. *See MCL 440.9515(5)* ("…upon timely filing of a continuation statement, the effectiveness of the initial financing statement continues for a period of 5 years commencing on the day on which the financing statement would have become ineffective in the absence of a filing").

[3] For the avoidance of doubt, SOW does not seek to deprive the Debtors' estates of the 28% margin that they would be otherwise contractually entitled to in accordance with the terms of the Contract on postpetition sales of Consigned Goods. The term "Consigned Goods" does not include the 28% gross margin due to Kmart under the terms of the Contract.

5. SOW properly perfected its consignment interests by filing a new UCC financing statement with the Michigan Department of State (Document Number 2013179478-4)[4] on December 20, 2013. SOW further provided written notice of the consignment and of the UCC filing to Wells Fargo Bank, NA, which Kmart identified in the Contract as the only creditor having a security interest in any of its inventory at the time. Copies of the financing statement and the notification to Wells Fargo Bank, NA are annexed to the Katz Declaration as Exhibits D and E respectively.

6. On October 15, 2018 (the "**Petition Date**"), the Debtors each filed voluntary petitions under chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Court**"). According to Kmart's internal purchasing/accounting system (the "**Workbench System**"), approximately $2,384,237.00 in Consigned Goods was in the Debtors' possession on October 13, 2018 – two days prior to the Petition Date. The precise amount of Consigned Goods in the Debtors' possession on the Petition Date is not presently known to SOW, though it is believed that the amount does not materially differ from the amount of Consigned Goods in the Debtors' possession on October 13, 2018.

7. On October 26, 2018, the Court entered an *Interim Order Approving (i) Procedures for Store Closing Sales and (ii) Assumption of Liquidation Consulting Agreement* [ECF # 337] (the "**Interim Store Closing Order**") and on November 19, 2018, the Court entered a *Final Order Approving (i) Procedures for Store Closing Sales and (ii) Assumption of Liquidation Consulting Agreement* [ECF # 823] (the "**Final Store Closing Order**" or, together with the Interim Store

---

[4] Although the Contract provides that Illinois law governs the construction, interpretation, and enforcement of the Contract, the UCC financing statement was filed in Michigan because Kmart is a Michigan corporation *See Uniform Commercial Code* § 9-307 made relevant here by § 440.9307 of the *Michigan Compiled Laws* (the "**MCL**").

4

Closing Order, the "**Store Closing Orders**"). The Interim Store Closing Order that was agreed upon by the Debtors and various consignment vendors resolved various objections filed by consignment vendors, including an objection filed by SOW [ECF # 224].

8. The Store Closing Orders each provide, *inter alia*, that consignment vendors, like SOW, are to be paid in the ordinary course of business from the proceeds of post-petition sales of consigned goods, regardless of whether the goods are sold pursuant to store closings or any other sale. Further, the Store Closing Orders directed the Debtors to establish a separate segregated account in which proceeds of the sale of consigned goods were to be placed and held in trust for the benefit of consignment vendors, such as SOW. Specifically, and paragraphs 36 and 37 of the Final Store Closing Order[5] provide:

> 36. The Debtors are authorized to sell goods and merchandise shipped to the Debtors pursuant to a consignment agreement with a consignment vendor, whether delivered to the Debtors prepetition or postpetition (the "**Consignment Merchandise**"), in connection with the Store Closings *or any other sale by the Debtors of Consigned Merchandise* and notwithstanding any other provision of the Order, consignment vendors shall be paid in the ordinary course of business from the allocable proceeds solely from the postpetition sale of such Consignment Merchandise in accordance with the terms of the applicable consignment agreements (the "**Vendor Proceeds**"), whether such goods were delivered to the Debtors prepetition or postpetition. *The Debtors are directed to establish a separate, segregated account which shall be funded with the reported amount of Vendor Proceeds and all payments made to consignment vendors shall be made from such account* (the "**Reserve Account**"), *with the Vendor Proceeds therein to be held in trust for the benefit of the Consignment Vendors*.
>
> 37. For the avoidance of doubt, notwithstanding anything to the contrary in the Interim DIP Order or the Final DIP Order, any properly perfected, noticed and valid consignment interest (as defined under the Uniform Commercial Code (the "**UCC**")) in and to the Consignment Merchandise or Consignment Merchandise shipped postpetition pursuant to this Order the Vendor Proceeds and

---

[5] Paragraphs 34 and 35 of the Interim Store Closing Order contains substantially the same language as paragraphs 36 and 37 of the Final Store Closing Order.

the Reserve Account shall not be subject to any DIP Liens or Adequate Protection Liens (each as defined in the Interim DIP Order) granted under the Interim DIP Order or the Final DIP Order.

*Final Store Closing Order*, ¶¶ 36 and 37 (italicized emphasis added).

9. According to the Workbench System, as of February 9, 2019, the total value of Consigned Goods with the Debtors was approximately $1,049,303. The Debtors, therefore, sold approximately $1,334,934.00 in Consigned Goods between October 13, 2018 and February 9, 2019. Substantially all of those sales appear to have been post-petition sales of Consigned Goods to the Debtors' customers. Pursuant to the terms of the Store Closing Orders, the Debtors were required to segregate the proceeds from those sales and to hold them in trust for the benefit of SOW.

10. On February 8, 2019, the Court entered an *Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith and (IV) Granting Related Relief* [ECF # 2507] pursuant to which the Debtors thereafter sold substantially all of their assets to Transform Holdco LLC ("**Transform Holdco**"). Upon information and belief, the sale of the Debtors' assets to Transform Holdco closed on February 11, 2019.

11. It appears that all Consigned Goods then remaining in the Debtors' possession (the "**Remaining Consigned Goods**") were included in the assets that were sold by the Debtors to Transform Holdco. According to the Workbench System, as of February 9, 2019 – two days prior to the closing on the sale of the Debtors' assets to Transform Holdco – the total amount of Consigned Goods in the Debtor's possession was $1,049,303. Like the proceeds from post-petition sales of Consigned Goods to the Debtors' customers, the proceeds from the Debtors' sale of Remaining Consigned Goods to the Buyer were required to be segregated and placed in a

6

separate account to be held in trust for the benefit of SOW pursuant to the terms of the Store Closing Orders.

12. On April 17, 2019, the Debtors filed a *Notice of Rejection of Executory Contracts* [ECF # 3268] which listed the Contract as one of the executory contracts to be rejected, pursuant to the terms of the Court's order granting certain expedited procedures for the rejection of executory contracts [ECF # 3044]. On May 8, 2019, the Court entered an order approving the rejection of certain executory contracts, including the Contract [ECF # 3755].

## JURISDICTION

13. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## ARGUMENT

**I. THE CONSIGNMENT PROCEEDS WERE TO BE HELD IN TRUST BY THE DEBTORS PURSUANT TO COURT ORDER AND SHOULD BE IMMEDIATELY REMITTED TO SOW**

### a. SOW is the Beneficiary of a Court-Imposed Trust

14. The Debtors should be directed to immediately remit all of the Consigned Proceeds to SOW. The Court, in the Store Closing Orders, directed the Debtors to segregate "Vendor Proceeds" and to hold such proceeds in trust for the benefit of "Consignment Vendors." *See Final Store Closing Order*, ⁋ 36.

#### i. SOW is a "Consignment Vendor"

15. The term *Consignment Vendors* is not defined in the Store Closing Orders. From the context thereof, however, it is clear that such term refers to vendors that deliver to the Debtors *Consignment Merchandise*. SOW delivered to Consignment Merchandise to the Debtors.

LEGAL\40782700\1

16. The Store Closing Orders define *Consignment Merchandise* as "goods and merchandise shipped to the Debtors pursuant to a consignment agreement with a consignment vendor, whether delivered to the Debtors prepetition or postpetition." *See Final Store Closing Order*, ¶ 36. SOW delivered various fragrance and perfume products to the Debtors pursuant to the Contract. Paragraph 3 of the Contract provides that such products were delivered under a consignment. Specifically, the Contract provides, in relevant part:

> **Consignment**. The Products[6] will be supplied on a Consignment Basis. Supplier[7] and Kmart have been parties to similar consignment arrangements on an ongoing basis beginning August 31, 2000 … This Agreement is intended to create a true consignment of the Products and not to evidence a purchase and sale of merchandise. The Products delivered to Kmart will at all times remain the property of Supplier until sold to Kmart customers.

17. Because SOW shipped the Consigned Goods pursuant to the terms of a consignment agreement (the Contract), SOW is a *Consignment Vendor*.

### ii. The Consignment Proceeds Constitute *Vendor Proceeds* as Defined Under the Store Closing Orders

18. The Consignment Proceeds owed to SOW constitute *Vendor Proceeds* as defined by the terms of the Store Closing Orders. The term *Vendor Proceeds* is defined as "allocable proceeds solely from the postpetition sale of such Consignment Merchandise in accordance with the terms of the applicable consignment agreements". *See Final Store Closing Order*, ¶ 36.

19. All of the Consignment Proceeds resulted from post-petition sales by the Debtors of SOW's Consigned Goods. Moreover, as set forth above, the Consigned Goods qualify as *Consignment Merchandise* under the Store Closing Orders. Lastly, the sale of Consigned Goods

---

[6] The term "Products" is defined under paragraph 1 of the Contract as "prestige designer and celebrity brand name fragrances and perfume products" identified on Exhibit A thereto "and such other products as may be mutually agreed to by the parties from time to time."

[7] The term "Supplier" is defined in the preamble to the Contract as Scents of Worth, Inc., the movant herein.

8

by the Debtors is pursuant to the terms of the Contract. The Consignment Proceeds sought by SOW, therefore, constitute *Vendor Proceeds* which must be held in trust for the benefit of SOW.

### iii. The Debtors Were Required to Establish a Segregated Reserve Account and Place the Consignment Proceeds Therein

20. The Store Closing Orders further required the Debtors to open up a *Reserve Account*, defined as a "separate, segregated account which shall be funded with the reported amount[8] of Vendor Proceeds". *See Final Store Closing Order*, ¶ 36. Presumably, the Debtors have complied with their obligations and have segregated the Consignment Proceeds and placed them into the Reserve Account.

### b. The Consigned Proceeds Are Not Property of the Estate

21. The Consigned Proceeds are not property of the Debtors' estates because such proceeds were ordered by this Court to be held in trust for the benefit of SOW. *See e.g. Bergier v. I.R.S.*, 496 U.S. 53, 59, 110 S.Ct. 2258, 110 L.E.D.2d 46 (1990) (a debtor "does not own an equitable interest in property he holds in trust for another, [so] that interest is not 'property of the estate.'"); *Grede v. FCStone, LLC*, 867 F.3d 767, 779 (7th Cir. 2017) ("Under the Bankruptcy Code, property held in trust by the debtor for a third party is not property of the debtor's bankruptcy estate*.*"); *In re Peregrine Financial Group, Inc.*, 487 B.R. 498, 512-13 (Bankr. N.D. Ill. 2013) (Section 541(d) of the Bankruptcy Code "describes the classic express trust situation in which a trustee holds bare legal title to property for the benefit of another who holds equitable title to the trust property"); *In re Ward*, 300 B.R. 692, 698 (Bankr. S.D. Ohio 2003) ("An express trust, from

---

[8] Paragraph 36 of the Store Closing Order does not contain any other reference to "reported" Vendor Proceeds. Paragraph 40 thereof, however, provides that "[t]he Debtors and the DIP lenders shall agree on appropriate reporting on the inventory from consignment vendors who have been identified to the DIP Lenders (the "**Designated Consignment Vendors**"). SOW, having filed a limited objection [ECF # 224] to the Debtors' motion seeking entry of the Store Closing Orders, would have necessarily been known to the DIP Lenders and would thus be one of the "Designated Consignment Vendors". Counsel to various objecting consignment vendors, together with Debtors' counsel and counsel to the DIP Lenders, negotiated and crafted the language in the Store Closing Orders regarding consignments.

9

LEGAL\40782700\1

its inception, excludes a beneficiary's ownership interest from being a part of the property which constitutes a debtor's estate in a bankruptcy case").

22. Because the Debtors were required to hold the Consignment Proceeds in trust for the benefit of SOW, the Debtors have no interest in such funds.

## II. THE DEBTORS' POSTPETITION LENDERS HAVE NO INTEREST IN THE CONSIGNMENT PROCEEDS

23. Not only do the Debtors hold no interest in the Consignment Proceeds, but neither do the Debtors' post-petition lenders (the "**DIP Lenders**"). Paragraph 37 of the Final Store Closing Order (paragraph 36 of the Interim Store Closing Order), provides, in relevant part, that

> …any properly perfected, noticed and valid consignment interest (as defined under the Uniform Commercial Code (the "**UCC**")) in and to the Consignment Merchandise … and pursuant to this Order, the Vendor Proceeds and the Reserve Account shall not be subject to any DIP Liens or Adequate Protection Liens (each as defined in the Interim DIP Order) granted under the Interim DIP Order or the Final DIP Order.

24. SOW's consignment interest in the Consignment Merchandise was a valid consignment interest under the section 440 of the Michigan Consolidated Laws (Michigan's Uniform Commercial Code (the "**UCC**")), and was properly perfected and noticed.

### a. The Prepetition Supply of Consignment Merchandise by SOW to Kmart Constituted a "Consignment" Under the UCC

25. Section 440.9102(t) of the MCL defines a "consignment" as follows:

> (t) "Consignment" means a transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale and that meets all of the following:
>
> (i) The merchant deals in goods of that kind under a name other than the name of the person making delivery, is not an auctioneer, and is not generally known by its creditors to be substantially engaged in selling the goods of others.
>
> (ii) With respect to each delivery, the aggregate value of the goods is $1,000.00 or more at the time of delivery.

10

  (iii) The goods are not consumer goods immediately before delivery.

  (iv) The transaction does not create a security interest that secures an obligation.

MCL § 440.9102(t).

26. The consignment of Consigned Goods by SOW to the Debtors meets all of the forgoing requirements. Kmart deals in perfumes and fragrances under a name other than Scents of Worth, is not an auctioneer, and is not generally known by its creditors to be substantially engaged in selling the goods of others. The aggregate value of the Consigned Goods is well in excess of $1,000.00. The Consigned Goods were held by SOW, a merchandise supplier, immediately before delivery and thus were not consumer goods at that time. Lastly, although a security interest was created in connection with the consignment transaction,[9] the transaction was not intended solely to create a security interest that secures an obligation.

27. Section 440.9102(u) of the MCL (UCC § 9-102(u)) defines a "consignor" to mean "a person that delivers goods to a consignee in a consignment." MCL 440.9102(u). SOW, having delivered the Consigned Goods to the Debtors pursuant to the Contract, is a *consignor* pursuant to MCL § 440.9102(u).

  b. **SOW's Consignment Interest in the Consignment Merchandise Was Properly Perfected and Noticed**

28. Section 440.9103(d) of the MCL (UCC § 9-103(d)) provides that "[t]he security interest of a consignor in goods that are the subject of a consignment is a purchase-money security interest in inventory." MCL § 440.9103(d).

---

[9] Pursuant to MCL 440.1201(ii) a "Security Interest" includes "any interest of a consignor".

29. Section 440.9324(2) of the MCL (UCC § 9-324(b)) provides for consignment interests to have priority over conflicting security interests in inventory, in relevant part, as follows:

> … a perfected purchase-money security interest in inventory has priority over a conflicting security interest in the same inventory, and … also has priority in identifiable cash proceeds of the inventory to the extent the identifiable cash proceeds are received on or before the delivery of the inventory to a buyer, if all of the following are met:
>
> (a) The purchase-money security interest is perfected when the debtor receives possession of the inventory.
>
> (b) The purchase-money secured party sends an authenticated notification to the holder of the conflicting security interest.
>
> (c) The holder of the conflicting security interest receives the notification within 5 years before the debtor receives possession of the inventory.
>
> (d) The notification states that the person sending the notification has or expects to acquire a purchase-money security interest in inventory of the debtor and describes the inventory.

MCL § 440.9324(2).

30. As set forth above, and as evidenced in Exhibits D and E to the Katz Declaration, SOW's consignment interest in the Consigned Goods was properly perfected by the filing of a UCC-1 financing statement with the Michigan Department of State and SOW provided valid written notice of its consignment interest to Wells Fargo Bank, NA (the "**Prepetition Lender**"). The consignment interest in the Consigned Goods was, therefore, properly perfected, noticed and valid pursuant to the terms of the Uniform Commercial Code.

    c. **SOW's Vendor Proceeds and the Corresponding Funds in the Reserve Account Need Not be Perfected and Noticed**

31. Unlike Consignment Merchandise (the perfection and noticing of which would have occurred pre-petition pursuant to the Uniform Commercial Code), the prohibition on the

attachment of DIP Liens and Adequate Protection Liens to Vendor Proceeds and the Reserve Account is not conditioned on proper perfection and notice. This makes perfect sense as the Vendor Proceeds and the Reserve Account were postpetition creations of the Store Closing Orders. Therefore, rather than being protected by pre-petition perfection and noticing, as consignment interests in *Consignment Merchandise* were, Vendor Proceeds and the Reserve Account are protected by the terms of the Store Closing Orders.

32.     The only requirement for the protection of post-petition proceeds of *Consigned Merchandise* consigned merchandise from the attachment of DIP Liens and Adequate Protection Liens, is that such proceeds constitute "Vendor Proceeds" under the Store Closing Orders. As discussed above, the Consignment Proceeds constitute "Vendor Proceeds" under the Store Closing Orders which were likewise required to be deposited in the Reserve Account. SOW's interests in the Consignment Proceeds and Reserve Account were, therefore, protected from the post-petition attachment of DIP Liens and Adequate Protection Liens.

### III. THE POSTPETITION LAPSE OF SOW'S UCC STATEMENT DOES NOT DEFEAT SOW'S INTERESTS

33.     It is of no legal significance that SOW's UCC filing lapsed on December 20, 2018.[10] SOW's priority in the Consigned Goods as against holders of pre-petition security interests, the Debtors in bankruptcy and postpetition lenders is protected by operation of the "freeze rule" under which the priority of security interests is determined as of the Petition Date. In addition to preservation under the freeze rule, SOW's priority as against the Debtors is maintained under section 9-515(c) of the UCC (MCL § 440.9515(3)), which provides that lapsed financing statements only lose priority as against purchasers of the collateral for value, not as

---

[10] MCL 440.9515(1) provides that a filed financing statement is effective for a period of five years from the date of filing. SOW filed its financing statement on December 20, 2013.

against trustees (debtors-in-possession) in bankruptcy. Lastly, as set forth above, SOW's priority as against post-petition lenders is preserved under the terms of the Store Closing Orders.

### a. Under the "Freeze Rule", Valid Liens Do Not Lose Validity Due to Postpetition Notice Lapse

34. The priority of SOW's consignment interests as against pre-petition lenders, the Debtors in bankruptcy and post-petition lenders was not affected by the postpetition lapse of its financing statement. It has been long established in the Second Circuit and elsewhere that valid liens existing as of the petition date do not lose validity post-petition. *See, Lockhart v. Garden City Bank & Trust Co.*, 116 F.2d 658, 661 (2d Cir. 1940) ("in general no creditors' liens acquire validity after the filing of the petition ....It should equally follow, we believe, that liens good at this time do not lose their validity as against the trustee, unless the statute so expressly provides"); *In re Halmar Distributors, Inc.*, 968 F.2d 121, 126-27 (1st Cit. 1992) (applying freeze rule and noting that in bankruptcy proceedings, "the trustee an existing creditors gain knowledge of the perfected security interest on the date the bankruptcy petition is filed … Consequently, filing a continuation statement served no purpose…"); *Avant Petroleum, Inc. v. Banque Paribas*, 853 F.2d 140, 144 (2d Cir. 1988) ("The rationale for eliminating the requirement for filing continuation statements during insolvency proceedings is that such a filing is not needed to protect potential creditors when the funds have been placed openly in the possession and control of the court."); *In re Chaseley's Foods, Inc.*, 726 F.2d 303, 308 (7th Cir. 1983) ("… a refiling of a security interest after the filing of a bankruptcy petition would serve no useful purpose since the rights of prepetition creditors and the trustee in bankruptcy were fixed at the time of the filing of the petition … A bankruptcy proceeding eliminated the need for further refiling; both before and after the amendment of § 9-403(2)"); *In re Essex Construction , LLC*, 591 B.R. 630, 635 (Bankr. D. Md. 2018) ("This

principle, which many courts refer to as the "freeze rule," dictates that security interests are determined as of the petition date").

35. On the Petition Date, SOW's consignment interests were properly perfected and noticed and, as set forth above, had priority over all security interests in inventory collateral as of that date. Due to the application of the "freeze rule", the priority of those interests remained unaffected by the subsequent postpetition lapse of SOW's financing statement.

### b. Even Without Application of the Freeze Rule, Creditors of Lapsed Financing Statements Continue to Have Priority Over Debtors

36. SOW's priority in the Consigned Goods as against the Debtors as trustees in bankruptcy is not, pursuant to the terms of the Uniform Commercial Code, affected by the post-petition lapse of its financing statement.

37. Section 440.9515(3) of the MCL sets forth the effect of a lapsed financing statement as follows:

> (3) The effectiveness of a filed financing statement lapses on the expiration of the period of its effectiveness unless before the lapse a continuation statement is filed pursuant to subsection (4). Upon lapse, a financing statement ceases to be effective and any security interest or agricultural lien that was perfected by the financing statement becomes unperfected, unless the security interest is perfected otherwise. *If the security interest or agricultural lien becomes unperfected upon lapse, it is deemed never to have been perfected as against a purchaser of the collateral for value.*

MCL § 440.9515(3) (emphasis added).

38. Outside of bankruptcy proceedings, the lapse of SOW's financing statement would therefore cause it to lose priority as against a purchaser of collateral for value. A trustee is not a "purchaser for value." *See In re Highland Constr. Mgmt Svces, LP*, 497 at 837 ("A lien creditor is not a purchaser because he has not purchased anything. The creation of a judicial lien is not a ***voluntary*** transaction") (emphasis in original). Instead, a trustee is defined under MCL §

15

440.9102(yy) as a "lien creditor". *See* MCL § 440.9102(yy) (lien creditor definition includes a "trustee in bankruptcy from the date of filing of the petition").

39.     The lapsing of a financing statement means only that it is treated as though it had never been perfected as against the holder of a junior security interest as a purchaser for value. *See In re Highland Constr. Mgmt Svces, LP*, 497 B.R. 829, 836 (Bankr. E.D. Va. 2013) (where a financing statement lapses, "[i]t is simply treated as if it had not been perfected as to the junior secured creditor. As to all others, the reality prevails – it was and continues to be perfected on a retrospective basis"). The lapse has no effect on a debtor or trustee in bankruptcy *See Mostoller v. CitiCapital Commercial Corp. (In re Stetson & Assoc., Inc.)*, 330 B.R. 613, 619-20 (Bankr. E.D. Tenn. 2005) (secured party with pre-petition perfected security interest had priority over trustee in bankruptcy even though secured lender's financing statement lapsed post-petition).

40.     The prior version of the UCC (UCC § 9-403 rather than UCC § 9-515) contained a provision that the lapsing of a financing statement caused the holder of such lapsed interest to be deemed never to have been perfected as against either a purchaser for value or a lien creditor. The current version, however, dropped the reference to a lien creditor such as a trustee in bankruptcy. The *Highland* Court noted the impact of this change:

> The prior version of Va.Code (1950) § 8.9A–515(c), Va.Code (1950) § 8.9–403, contained the same last sentence, but also included lien creditors as well as purchasers for value. Lien creditors and secured parties are treated separately in various provisions of both Revised Article 9 and its predecessor. The deletion of lien creditors from the last sentence must have meaning and that was to remove them from the deemed never perfected status of secured parties.

*In re Highland Constr. Mgmt. Svces., LP*, 497 B.R. at 836.

41.     Because the Debtors would be considered lien creditors rather than purchasers for value, the lapsing of SOW's financing statement has no impact of its priority over the Debtors in

16

the Consigned Goods. *Id.* at 838 ("under the Uniform Commercial Code, a secured party whose financing statement lapses … retains his priority as to all lien creditors who obtained a judicial lien prior to the lapse of the financing statement").

### c. Postpetition Filing of Continuation Statements Although Permissible, Is Not Required

42. Although creditors may file UCC-3 continuation statements without running afoul of the automatic stay, the filing of such statements is not required for consignment liens to remain valid. *See In re Essex Construction , LLC*, 591 B.R. at 640 ("… because the current 11 U.S.C. § 362(b)(3) *allows* a creditor to file a continuation statement does not mean the creditor is *required* to file the continuation statement"). As the Seventh Circuit observed in *Chaseley's Foods*, in addressing whether a secured creditor's failure to file a continuation statement postpetition affected its secured priority:

> [t]he "notice" purpose of the continuation statement requirement is not served once a bankruptcy petition is filed. The only parties which can possibly be injured by failure to file a continuation statement once a bankruptcy proceeding is pending are creditors who obtain their liens after the financing statement expires. However, because the trustee takes possession of the debtor's property once a petition is filed, and this possession is open and notorious, these creditors should not need the protection of a continuation statement

*In re Chaseley's Foods, Inc.*, 726 F.2d 303, 308 (7th Cir. 1983).

43. The filing of a UCC-3 by SOW here would be just as superfluous, if not more so, than described by the *Chaseley's* Court. Here, as of the Petition Date, the Debtors and all parties with pre-petition interests in Kmart's inventory were well aware of SOW's perfected interests in the Consigned Goods. Indeed, very early in the cases, SOW filed an objection [ECF # 224] advising all parties in interest, including the Debtors' proposed postpetition lenders, of SOW's perfected consignment interests. Indeed, the Debtors' post-petition lenders participated in

resolving SOW's objection (as well as similar objections raised by other consignment vendors) and in the crafting of the Store Closing Orders, which expressly prohibited the attachment of DIP Liens and Adequate Protection Liens to Consignment Merchandise, Vendor Proceeds and the Reserve Account. SOW's filing of a continuation statement, therefore, would have served no useful purpose, and was not required in order to preserve SOW's consignment rights.

## CONCLUSION

44. As set forth above, the Debtors hold the Consignment Proceeds in trust for SOW and neither they, nor any other party, has any interest in the Consignment Proceeds that is superior to SOW. Accordingly, SOW respectfully submits that the Debtors should be directed by the Court to immediately account for all Consigned Goods in their possession as of the Petition date and further directed to remit the full amount of the Consignment Proceeds to SOW. SOW further requests such other and further relief as the Court deems just and proper.

Dated: New York, New York
      July 29, 2019

                              COZEN O'CONNOR
                              *Attorneys for Scents of Worth, Inc.*

                              By: */s/ Frederick E. Schmidt, Jr.*
                              Frederick E. Schmidt, Jr.
                              277 Park Avenue
                              New York, NY 10172
                              Phone: 212-883-4948
                              Facsimile: 646-588-1552
                              Email: eschmidt@cozen.com