**Hearing Date and Time: August 12, 2019 at 10:00 a.m. (Eastern Time)**
**Objection Date and Time: August 5, 2019 at 4:00 p.m. (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x

| | | |
|---|---|---|
| In re | : | |
| | : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION**, *et al.*, | : | |
| | : | **Case No. 18-23538 (RDD)** |
| | : | |
| Debtors.[1] | : | **(Jointly Administered)** |

---------------------------------------------------------------- x

## NOTICE OF HEARING ON MOTION OF DEBTORS
## FOR MODIFICATION OF RETIREE BENEFITS

      **PLEASE TAKE NOTICE** that a hearing on the annexed motion (the "**Motion**"),

of Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

the above-captioned chapter 11 cases (collectively, the "**Debtors**"), for entry of an order pursuant to section 1114 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), authorizing the modification of retiree benefits, all as more fully set forth in the Motion, will be held before the Honorable Robert D. Drain, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, Courtroom 118, 300 Quarropas Street, White Plains, New York, 10601-4140 (the "**Bankruptcy Court**") on **August 12, 2019 at 10:00 a.m. (Eastern Time)** (the "**Hearing**"), or as soon thereafter as counsel may be heard.

   **PLEASE TAKE FURTHER NOTICE** that any responses or objections (the "**Objections**") to the Motion shall be in writing, shall conform to the Bankruptcy Rules and the Local Bankruptcy Rules for the Southern District of New York, shall be filed with the Bankruptcy Court (a) by attorneys practicing in the Bankruptcy Court, including attorneys admitted pro hac vice, electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov), and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and shall be served in accordance with the *Amended Order Implementing Certain Notice and Case Management Procedures*, entered on November 1, 2018 (ECF No. 405), so as to be filed and received no later than **August 5, 2019 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

   **PLEASE TAKE FURTHER NOTICE** that if no Objections are timely filed and served with respect to the Motion, the Debtors may, on or after the Objection Deadline, submit to

the Bankruptcy Court an order substantially in the form of the proposed order annexed to the

Motion, which order may be entered without further notice or opportunity to be heard.

        **PLEASE TAKE FURTHER NOTICE** that any objecting parties are required to

attend the Hearing, and failure to appear may result in relief being granted upon default.

Dated: July 29, 2019
     New York, New York

        */s/ Jacqueline Marcus*
        WEIL, GOTSHAL & MANGES LLP
        767 Fifth Avenue
        New York, New York  10153
        Telephone:  (212) 310-8000
        Facsimile:  (212) 310-8007
        Ray C. Schrock, P.C.
        Jacqueline Marcus
        Garrett A. Fail
        Sunny Singh

        *Attorneys for Debtors*
        *and Debtors in Possession*

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
In re                                              :
                                                   :          **Chapter 11**
**SEARS HOLDINGS CORPORATION**, *et al.*,          :
                                                   :          **Case No. 18-23538 (RDD)**
                                                   :
                   Debtors.[1]                     :          **(Jointly Administered)**
-------------------------------------------------------------x

<u>**MOTION OF DEBTORS FOR MODIFICATION OF RETIREE BENEFITS**</u>

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and, together with their non-debtor affiliates, the "**Company**"), respectfully represent as follows in support of this motion (the "**Motion**"):

### Preliminary Statement

1.     Since February 11, 2019, when they effected a sale of substantially all of their assets to Transform Holdco LLC ("**Transform**"), the Debtors have worked with their stakeholders to formulate a liquidating chapter 11 plan that provides for distributions to their stakeholders in accordance with their respective priorities. The Debtors' efforts culminated in the filing of the *Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors* (ECF No. 4476) (the "**Plan**") and the related disclosure statement (ECF No. 4478) (the "**Disclosure Statement**"). The Disclosure Statement was approved by the Court by order dated June 28, 2019 [ECF No. 4392] and the Debtors commenced solicitation of votes regarding the Plan on July 5, 2019. The hearing to consider confirmation of the Plan is scheduled for August 16, 2019 (the "**Confirmation Hearing**").

2.     As the Court is aware, ensuring that the Debtors are able to conclude these cases by confirmation of a chapter 11 plan has been one of the highest priorities for the Debtors and their professionals. If the Debtors were to continue to provide the retiree benefits in accordance with the Retiree Plan, they would not have sufficient funds to do so.

3.     It was in this context, that the Debtors had to make a business decision regarding the treatment of the Sears Retiree Group Life Insurance Plan (the "**Retiree Plan**"). Given the Debtors' limited cash resources and the fact that the Plan provides for all of the

2

Debtors' assets to be transferred to a liquidating trust on the effective date, the Debtors determined that they cannot maintain the Retiree Plan, nor pay the premiums associated with the underlying insurance policies.

4.     In accordance with section 1114 of the Bankruptcy Code, the Debtors made a proposal to the Retiree Committee (as defined herein), for modification of the benefits under the Retiree Plan.  The Debtors' proposal, a copy of which is annexed hereto as **Exhibit A** (the "**Proposal**") is based on the most complete and accurate information available, and the justification for the Proposal has been provided to the Retiree Committee.  To date, the Retiree Committee has not accepted the Proposal.  The Debtors have met the substantive and procedural requirements for relief under section 1114 of the Bankruptcy Code.  Modification of the Retiree Plan in accordance with the Proposal is necessary for confirmation of the Plan, which treats all stakeholders fairly and equitably.  The Debtors have commenced good faith negotiations with the Retiree Committee with respect to the Proposal and intend to continue negotiations with the Retiree Committee pending the hearing on this Motion.   If those discussions do not lead to a consensual modification of retiree benefits, the Debtors request that the Court enter an order permitting the proposed modifications to the Retiree Plan as set forth in the Proposal.

## Background

5.     Beginning on October 15, 2018 (the "**Commencement Date**") and continuing thereafter, each of the Debtors commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3

4.      On October 24, 2018, the United States Trustee for Region 2 (the "**U.S. Trustee**") appointed an official committee of unsecured creditors (the "**Creditors' Committee**").  No trustee or examiner has been appointed in these chapter 11 cases.

5.      On July 9, 2019, the U.S. Trustee appointed the Official Committee of Retirees with Life Insurance Benefits of the Sears Holdings Corporation (the "**Retiree Committee**").

6.      The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

7.      The Debtors and Transform entered into an asset purchase agreement, dated as of January 17, 2019 (as amended, the "**Asset Purchase Agreement**") for the sale of substantially all of the Debtors' assets (the "**Sale Transaction**").

8.      On February 8, 2019, the Bankruptcy Court entered the *Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith and (IV) Granting Related Relief* (ECF No. 2507).  The Sale Transaction closed on February 11, 2019.

9.      Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for*

WEIL:\97125911\9\73217.0004

*Southern District of New York*, sworn on October 15, 2018 (the "**Riecker Declaration**") (ECF

No. 3).[2]

## Jurisdiction

10.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012

(Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before

this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

11.      By this Motion, pursuant to section 1114(g) of the Bankruptcy Code, the

Debtors request authority to modify retiree benefits in accordance with the terms of the Proposal.

12.      A proposed form of order granting the relief requested herein is annexed

hereto as **Exhibit B** (the "**Proposed Order**").

## The Sears Retiree Group Life Insurance Plan

13.       Sears Holdings sponsored the Retiree Plan, which provided retiree life

insurance benefits to certain retired employees of the Debtors covered under the "Allstate

Financial Supplemental Group Life Plan for Retirees" (the "**Allstate Policy**") or the "Securian

Financial Group Life Insurance Policy" (the "**Securian Policy**," and, together with the Allstate

Policy, the "**Policies**").  As of March 15, 2019, the Allstate Policy covered twelve retirees, who

are former senior executives, and the Securian Policy covered approximately 29,000 retirees.

The death benefit payable with respect to retirees who are covered under the Allstate Policy is

between $356,080 and $2,680,000, while the death benefit payable to retirees who are covered

under the Securian Policy is between $5,000 and $14,500.

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms
in the Riecker Declaration.

5

14.    To maintain the coverage provided under the Policies, the Debtors would be required to pay an annual premium under the Allstate Policy of $647,821.00, and a monthly premium under the Securian Policy of approximately $1.3 million.  The Debtors made all premium payments required under the respective policies for the period through December 31, 2018.

15.    The Debtors determined that, given the financial circumstances of their estates, they could no longer justify paying the significant premiums for the Policies.  The Debtors recognized that, whether through termination or rejection, they would need to terminate any further post-petition obligations under the Retiree Plan.

16.    On March 7, 2019, the Board of Directors of Sears Holdings approved the termination of the Retiree Plan, effective as of March 15, 2019.  On March 8, 2019, Sears posted on the Sears Holdings Corporation Alumni webpage a "Notice – Termination of Retiree Life Insurance Plan" to notify all Retiree Plan participants of the termination of the Retiree Plan.  A copy of the notice is annexed hereto as **Exhibit C**.  In the notice, Sears also provided retirees with information regarding the opportunity to convert coverage under the Securian Policy to individual life insurance policies, which conversion option has been offered to retirees by Securian.

17.    Notwithstanding the termination of the Retiree Plan, the Allstate Policy has been amended by Sears, Roebuck and Co. ("**SRC**") and Allstate Life Insurance Company ("**Allstate**") to extend the grace period under the Allstate Policy to August 1, 2019, at no cost to the Debtors, to cover retirees until that date, while Allstate and the Debtors work to resolve how covered retirees can maintain coverage at their own cost.

6

18.     As of the date of the termination of the Retiree Plan, the Debtors had unpaid premium obligations relating to the Retiree Plan of approximately $3.9 million and approximately $647,821, with respect to the Securian Policy, and the Allstate Policy, respectively.

19.     After termination of the Retiree Plan, the Debtors were advised that in 2001, SRC entered into a Stipulation of Settlement (In Re: Sears Retiree Group Life Insurance Litigation Civil Action No. 97 C 7453) (the "**Stipulation**"), in connection with the reduction of certain retiree life insurance benefits available to eligible retirees at that time.  Paragraph 3.1 of the Stipulation appears to limit SRC's ability to accelerate the rate of reduction in the amount of life insurance for any Class Member (as defined therein).  Paragraph 3.4 of the Stipulation further provides that Sears will amend the Plan and the SPD within a reasonable period after approval of the Stipulation to the extent necessary to incorporate, *inter alia*, paragraph 3 thereof. Paragraph 3.4 also appears to limit SRC's right to amend, modify, cancel or terminate any right conferred upon a Class Member, or to diminish the value of the benefit granted to Class Members under the Stipulation.

20.     On June 25, 2019, the Court entered an order authorizing the U.S. Trustee to appoint an official committee of retired employees to act as the authorized representative of Class Members under the Stipulation, and approving a budget for the committee not to exceed $250,000, provided that requests for reasonable increases for cause may be sought with the Court [ECF No. 4357] (the "**Retiree Committee Order**").

21.     In accordance with the Retiree Committee Order, the U.S. Trustee appointed the Retiree Committee.

7

## The Proposal

22.     After the appointment of the Retiree Committee, the Debtors contacted counsel for the Retiree Committee, and, in light of the approaching Confirmation Hearing and the Debtors' financial condition, discussed the terms of modification of the Retiree Plan that would enable the Debtors to confirm the Plan.

23.     On July 22, 2019, the Debtors sent a letter to the Retiree Committee (the "**Proposal**") proposing to terminate the Retiree Plan effective March 15, 2019 (the "**Termination Date**"). The Proposal included the following components:

a.     Coverage for Class Members Who Have Died Between the Termination Date and Entry of the Proposed Order. The Debtors propose granting the estate of any Class Member that dies between the Termination Date and the date of the entry of a final order approving the modification of the Retiree Plan, and whose benefits under the Securian Policy have not been paid by Securian, an allowed administrative expense claim in the chapter 11 case of Sears Roebuck & Co. ("**SRC**") in the amount of $5,000 (the "**Administrative Expense Claim**"). The Debtors estimate that fewer than 25 Class Members have died during the relevant period and, therefore, granting the estates of such members administrative expense claims does not impose an undue burden on the Debtors' estates or jeopardize confirmation of the Plan.

b.     Other Class Members. The Debtors propose granting each remaining Class Member an allowed general unsecured claim in the chapter 11 case of SRC in the amount of $5,000 (the "**Retiree Unsecured Claims**"). The Debtors estimate that the aggregate amount of the Retiree Unsecured Claims arising from the Proposal will be approximately $144,875,000.

c.     The Debtors shall use commercially reasonable efforts to assist the Retiree Committee in determining which Class Members are entitled to Administrative Expense Claims and Retiree Unsecured Claims, to the extent the Debtors have access to such information.

24.     To assist the Retiree Committee in evaluating the Proposal, the Debtors provided the Retiree Committee with a copy of the Debtors' Liquidation Analysis, which also is attached as Exhibit E-1 to the Disclosure Statement (the "**Liquidation Analysis**"). As set forth

8

in the declaration of William Murphy, filed in support of the Motion, and as reflected in the Liquidation Analysis, the Debtors expect to have distributable proceeds in the estimated amount of $334 million on the effective date of the Plan. That cash will be used to pay all administrative claims, as well as Post-Conversion Professional Fees, Secured Claims, 507(b) Claims, Priority Tax Claims, Priority Non-Tax Claims, and PBGC Liquidating Trust Priority Interests (as each such term is defined in the Disclosure Statement), leaving approximately $132 million available for distribution to the Debtors' unsecured creditors. The Debtors estimate that holders of general unsecured claims will receive distributions under the Plan of 2.3% to 2.7% of their claims, depending on the applicable Debtor. As demonstrated by the Liquidation Analysis, every dollar of additional administrative expense claims reduces the recovery to holders of general unsecured claims. In a similar, although less substantial way, granting the Retirees Unsecured Claims reduces the pro rata distribution available to holders of general unsecured claims. The Debtors and their professionals were mindful of these considerations when they formulated the Proposal which, they believe, arrives at an appropriate balance of the interests of Class Members and holders of general unsecured claims. Moreover, implementation of the Proposal will assist the Debtors in avoiding conversion of the cases to cases under chapter 7 of the Bankruptcy Code, and the diminution in value attendant thereto as reflected in the Liquidation Analysis.

## Negotiations With The Retiree Committee

25.    Due to the fact that the Retiree Committee was so recently appointed, it was not in a position to engage in dialogue with the Debtors prior to delivery of the Proposal. The necessity of having the retiree benefits modified prior to the Confirmation Hearing meant that the Debtors were compelled to file this Motion before the Retiree Committee was in a position to have a meaningful negotiation with the Debtors since receipt of the Proposal.

9

26.    As of the date hereof, the Retiree Committee has not responded to the Proposal.  The Debtors intend to continue to respond to all reasonable information requests made by the Retiree Committee and to negotiate with the Retiree Committee prior to the hearing to be held with respect to this Motion.

## **BASIS FOR RELIEF**

27.    Section 1114(e) of the Bankruptcy Code prohibits a debtor from modifying retiree benefits absent either a court order modifying the retiree benefits or an agreement between the debtor and the authorized representative of the recipients of the retiree benefits permitting such modification.  Section 1114(e)(1) provides, in pertinent part, as follows:

> (A) [T]he court, on motion of the trustee or authorized representative, and after notice and a hearing, may order modification of [retiree benefits] pursuant to the provisions of subsections (g) and (h) of this section, or

> (B) [T]the trustee and the authorized representative of the recipients of those benefits may agree to modification of such payments, after which such benefits as modified shall continue to be paid by the trustee.

11 U.S.C. § 1114(e)(1).

28.    Pursuant to section 1114(g) of the Bankruptcy Code, the Bankruptcy Court shall enter an order modifying retiree benefits if the Bankruptcy Court finds that:

> (1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (f);

> (2) the authorized representative of the retirees has refused to accept such proposal without good cause; and

> (3) such modification is necessary to permit the reorganization of the debtor and assures that all creditors, the debtor, and all of the affected parties are treated fairly and equitably, and is clearly favored by the balance of the equities….

11 U.S.C. § 1114(g).

10

29.     Pursuant to section 1114(f) of the Bankruptcy Code, the Bankruptcy Code,

(1) Subsequent to filing a petition and prior to filing an application seeking modification of the retiree benefits, the trustee shall—

(A) make a proposal to the authorized representative of the retirees, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the retiree benefits that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (k)(3), the representative of the retirees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1), and ending on the date of the hearing provided for in subsection (k)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such retiree benefits.

30.     All of the conditions required by section 1114(g) of the Bankruptcy Code have been met by the Debtors, thus supporting the Court's entry of an order authorizing termination of the Retiree Plan effective March 15, 2019 in accordance with the terms of the Proposal.

### **The Proposed Termination Is Necessary to Permit Confirmation of the Plan**

31.     The standard applied to any unilateral modification of retiree benefits is whether "such modification is necessary to permit the reorganization of the debtor and assures that all creditors, the debtor, and all of the affected parties are treated fairly and equitably, and is clearly favored by the balance of the equities." 11 U.S.C. § 1114(g)(3).  The Second Circuit has interpreted the necessity requirement of section 1114 of the Bankruptcy Code to require the debtor to show "that its proposal is made in good faith, and that it contains necessary, but not absolutely minimal, changes that will enable the debtor to complete the reorganization process

successfully." *See Truck Drivers Local 807, Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers v. Carey Transp. Inc.*, 816 F.2d 82, 90 (2d Cir. 1987) (interpreting section 1113 of the Bankruptcy Code).[3]

32.     Courts have struggled over the application of this standard, as well as the comparable standard set forth in Section 1113 of the Bankruptcy Code, in the case of a liquidation under chapter 11 of the Bankruptcy Code.   See, e.g., *In re Chicago Constr. Specialties, Inc.*, 510 B.R. 205, 216–18 (Bankr. N.D. Ill. 2014) (noting that "the majority of cases dealing with section 1113 are of the nonliquidating variety, . . . [and] the majority of opinions addressing section 1113 address it in the context of a debtor's reorganization," but that, in a liquidation, the factors for section 1113(c) relief "must be applied contextually, rather than strictly" with "the impending liquidation of the Debtor firmly in mind"); *In re United States Truck Co. Holdings*, 2000 Bankr. LEXIS 1376, at *28 (Bankr. E.D. Mich. Sept. 29, 2000) ("[A]pplying § 1113 to a liquidating Chapter 11 . . . is somewhat problematic because many of the § 1113 requirements and the case law interpreting them focus on or presuppose efforts to rehabilitate an ongoing business [but] . . . [t]hese standards must necessarily be construed, if possible, in a way that gives them meaning in this liquidation setting."); *In re Ionosphere Clubs, Inc.*, 134 B.R. 515, 522 (Bankr. S.D.N.Y. 1991) (finding that the "consistent premise underlying § 1114 is that a reorganization is in progress."); *In re GF Corp.*, 115 B.R. 579, 585 (Bankr. N.D. Ohio 1990) ("[T]he standard that 'modification is necessary to permit the reorganization of the debtor'…, so key to the congressional consideration of this provision, is robbed of its meaning

---

[3] The substantive requirements for terminating retiree benefits under section 1114 of the Bankruptcy Code are essentially the same as the substantive requirements for rejecting collective bargaining agreements under section 1113 of the Bankruptcy Code.   *See In re Horsehead Indus., Inc.*, 300 B.R. 573, 583 (Bankr. S.D.N.Y. 2003) (indicating that section 1113 interpretations apply equally to section 1114); *In re Ionosophere Clubs, Inc.*, 134 B.R. 515, 520 (Bankr. S.D.N.Y. 1991).

12

when the debtor proposes to liquidate or where, as here, the [debtor in possession's] intention to

liquidate is made evident by the necessary sale of substantial assets before plan confirmation.").[4]

33.    This Court previously observed the different application of section 1114 in

the context of a liquidating chapter 11 debtor:

> [I]t's not the case here, the anticipated case here, that a retirees committee
> would be doing the type of work that a retirees committee would be doing
> in the context of a reorganizing case where you're evaluating, as a union
> would evaluate, and negotiating a request by the debtor to cut benefits in
> order to enable the debtor to continue in business which is a much more
> expensive protracted process that involves financial professionals and
> multi-party negotiations and the like. This is -- I mean, the debtors'
> argument is pretty -- it's going to be pretty clear, which is there won't be a
> debtor to fund these benefits in the future."

Transcript of Record at 47-48, *In re In re Sears Holdings Corporation*, Case No. 18–23538

(RDD) (Bankr. S.D.N.Y. June 20, 2019).[5]

34.    Consistent with that approach, courts have found that "'necessary to an

effective reorganization' means, in the context of a liquidation, necessary to the Debtor's

liquidation." *Chicago Constr. Specialties*, 510 B.R. at 216–18; *accord In re Family Snacks, Inc.*,

257 B.R. 884, 896 (B.A.P. 8th Cir. 2001) (concluding, in the context of a liquidating case, that

"'necessary to permit the reorganization of the debtor' means 'necessary to accommodate

confirmation of a Chapter 11 plan'"); *Ionosphere Clubs*, 134 B.R. at 522 (discussing inability to

apply section 1114's analogous "necessary to permit the reorganization of the debtor" language

to a debtor liquidating under chapter 11 if that language is construed literally).

---

[4] The *GF Corp* court also found that "[t]hese discrepancies indicate that when Congress enacted § 1114, it considered little of the workings of the Bankruptcy Code other than the situation which was immediately before it, the LTV filing. Section 1114 may speak directly to another LTV, but its application to the vast majority of cases will be much more troublesome. Unfortunately, § 1114 addresses a specific concern alone, and it is inattentive to the overall objectives of the Bankruptcy Code." *GF Corp.*, 115 B.R. at 585.

[5] A copy of the relevant pages of the Transcript of Record is attached hereto as **Exhibit D**.

13

35.     In these chapter 11 cases, substantially all of the Debtors' assets already have been sold to Transform.  Pursuant to the Plan, any remaining assets will be liquidated and the proceeds will be distributed to the Debtors' stakeholders, in accordance with their respective interests, as reflected in the Plan.  The Debtors' cash projections reflect that they have insufficient cash with which to pay the past due amounts owed under the Securian Policy, let alone funds to make payments under the Retiree Plan *ad infinitum*.

36.     The Debtors clearly cannot continue to maintain the Retiree Plan and be reasonably assured that they will have sufficient funds to pay the secured, administrative, and priority claims that must be paid pursuant to section 1129(a)(9) of the Bankruptcy Code on the effective date of the Plan.  Absent termination of the Retiree Plan, satisfying the requirements for confirmation of the Plan will likely be impossible.  The modifications reflected in the Proposal, therefore, represent the only logical treatment of the Retiree Plan under the circumstances.

### The Proposed Termination Treats All Creditors, Debtors, and All Affected Parties Fairly and Equitably

37.     The purpose of the fair and equitable requirement of section 1114 of the Bankruptcy Code is to "force[] the debtor to spread the hurt" and ensure that the "burden of saving the debtor, or enabling its reorganization, [is] borne by shared sacrifice to a similar degree, taking into account the particular, competitive, marketplace positions of every constituency."  *In re Frontier Airlines Holdings, Inc.*, No. 08-11298 (RDD), 2008 WL 5110927, at *14 (Bankr. S.D.N.Y. Nov. 14, 2008) (Drain, J.) *vacated sub nom. Teamsters Airline Div. v. Frontier Airlines, Inc.*, No. 09 CIV. 343 (PKC), 2009 WL 2168851 (S.D.N.Y. July 20, 2009); *see also Carey Transp. II*, 816 F.2d at 90 (citing *In re Century Brass Prods., Inc.*, 795 F.2d 265, 273 (2d Cir. 1986)); *Horsehead Indus.*, 300 B.R. at 584 (Bankr. S.D.N.Y. 2003).  Comparatively fair treatment does not require the debtor to propose identical modifications to the rights of each

14

of its constituencies, *see In re Nw. Airlines Corp.,* 346 B.R. 307, 325 (Bankr. S.D.N.Y. 2006),

nor does it require constituencies to share the financial burden equally – they must share in a

"similar degree." *See Carey Transp. II*, 816 F.2d at 90.

40.    In the Debtors' chapter 11 cases, all constituents are bearing a heavy

burden to support the Debtors' efforts to confirm the Plan.  This is not a situation, as in *LTV*,

where the Debtors are attempting to reorganize on the backs of the retirees. *See, e.g., Ionosphere

Clubs*, 134 B.R. at 517, *citing* 134 CONG. REC. S6823, S6825 (daily ed. May 26, 1988)

(Statement of Sen. Metzenbaum) (noting that legislative history indicates that "the enactment of

§ 1114 would make it clear that "reorganizing companies may never unilaterally cut off retiree

insurance benefits," because "the burden of turning a company around should not rest on the

backs of retirees.""").  The Debtors' general unsecured creditors will likely receive distributions

representing only a small fraction of their claims, and the interests of equity holders are being

cancelled.  Other than with respect to retirees who have passed away after March 15, 2019 and

before entry of the Proposed Order, the Proposal treats all retirees similarly.  No distinction is

made under the Proposal between retirees covered by the Allstate Policy and those covered by

the Securian Policy.

### The Balance of the Equities Clearly
### Favors the Proposed Termination

41.    The United States Court of Appeals for the Second Circuit, in the section

1113 context, has directed courts to consider six factors (many of which are inapplicable here) in

reviewing the balance of the equities:

a.    The likelihood and consequence of liquidation if rejection is not permitted;

b.    The likely reduction in the creditors' claims if the bargaining agreement remains in force;

15

  c.  The likelihood and consequences of a strike if the bargaining agreement is voided;

  d.  The possibility and likely effect of any employee claims for breach of contract if rejection is approved;

  e.  The cost-spreading abilities of the various parties, taking into account the number of employees covered by the bargaining agreement and the manner in which various employees' wages and benefits compare with those of others in the industry; and

  f.  The good or bad faith of the parties in dealing with the debtor's financial dilemma.

*See Carey Transp. II*, 816 F.2d at 92-93 (quoting *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 525-26 (1984)). *See also Horsehead Indus.*, 300 B.R. at 585. "[T]he primary question in a balancing test is the effect the rejection of the agreement will have on the debtor's prospects for reorganization." *Northwest Airlines*, 346 B.R. at 329 (quoting *Kentucky Truck Sales*, 52 B.R. at 806).

  42.  Failure to terminate the Retiree Plan will make it more difficult for the Debtors to confirm the Plan, and may lead to a conversion of the Debtors' cases. As reflected in the Disclosure Statement, conversion of the Debtors' chapter 11 cases will reduce distributions to the Debtors' creditors. It is clear that Section 1114 would not be applicable in a chapter 7 case. As Judge Lifland noted in the *Ionosphere* case*:*

> Since there are no material differences between the mechanics of liquidation in Chapter 11 or Chapter 7, Congress could not have intended the results of such liquidations to differ so markedly by enhancing the claim of retirees in one instance (a Chapter 11 liquidation) but not the other (a Chapter 7 liquidation). Accordingly, where the debtor is completely liquidating its assets in Chapter 11 in contemplation of a final distribution to creditors, that debtor should not be compelled to continue paying retiree benefits, in full, on a priority basis.

> Applying § 1114 as requested by the Retiree Committee to liquidating Chapter 11 cases involving a large work force, in most instances, can result in the depletion of all, or substantially all of an estate's assets. In many cases, there would be insufficient funds even to pay administration

16

> creditors to complete the liquidation, and little or no funds for distribution
> to other general unsecured creditors. Such a result would be in violation of
> the overall objectives of the Bankruptcy Code to pursue the greatest
> benefit for all creditors of the estate and to promote a fair and equitable
> distribution.

*Ionosphere Clubs,* 134 B.R. at 523.   As Judge Lifland noted, it would be incongruous if the

interpretation of section 1114 were one that required a conversion to chapter 7 to preserve a

recovery for general unsecured creditors.   *Id*. at 525.   And, as reflected in the Liquidation

Analysis, conversion of the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy

Code would result in a drastic reduction of recoveries for general unsecured creditors from an

estimated 2.3% to 2.7%, to an estimated .5% to .9%, depending on the Debtor.   Such an outcome

is not in the best interests of the retirees or the Debtors' estates and their creditors, and the

balance of equities clearly weighs in favor of terminating the Retiree Plan.

### The Good Cause Requirement

43.    To modify retiree benefits, the debtor must demonstrate that the

authorized representative refused to accept the debtor's proposal "without good cause." 11

U.S.C. § 1114(g)(2).  Courts determining whether there was good cause to reject a proposal will

consider, among other things, the respective positions and conduct of the debtor and the

authorized representative, the terms of the proposal that was rejected, and the context in which

the authorized representative decided to reject it.   *In re Pinnacle Airlines Corp*., 483 B.R. 381,

409 (Bankr. S.D.N.Y. 2012), as corrected (Nov. 29, 2012).  The burden lies with the authorized

representative to articulate in detail its reasons for declining to accept the debtor's proposal.  *See*

*Carey Transp. II*, 816 F.2d at 92; *Horsehead Indus.*, 300 B.R. at 585 (where union rejects

proposal that is necessary, fair and equitable, it must explain the reasons for its opposition); *See*

*In re Royal Composing Room, Inc.*, 62 B.R. 403, 407 (Bankr. S.D.N.Y. 1986) *aff'd,* 78 B.R. 671

(S.D.N.Y. 1987) *aff'd,* 848 F.2d 345 (2d Cir. 1988) (noting that if, prior to the 1113 hearing, a

17

union has not articulated and discussed in detail with a debtor its reasons for refusing to accept

its proposal in whole or part, it will be found to have refused the proposal without good cause).

44.    Additionally, no response by the representative to a debtor's proposal

within a reasonable time period may constitute a refusal without good cause.  *See In re Maxwell*

*Newspapers*, 981 F.2d 85, 91 (2d Cir. 1992) (interpreting section 1113 of the Bankruptcy Code).

45.    Once the authorized representative has satisfied its burden to explain, the

Court must decide whether the decision to reject was made on a permissible basis, *i.e.*, whether

the proposal failed to satisfy the statutory requirements or the debtor had engaged in

inappropriate conduct.  *See, e.g.*, *Pinnacle Airlines*, 483 B.R. at 409 (noting that the Court must

determine "whether the union's decision to reject the debtor's proposal was out of intransigence

or unwillingness to recognize economic realities, on the one hand, or by reason of statutory or

economic deficiencies in the debtor's proposal (or inappropriate debtor negotiating conduct), on

the other.").  Good cause does not exist where the authorized representative has decided to reject

"from the viewpoint of [the retirees'] self-interest."  *Carey Transp. II*, 816 F.2d at 92.  In

addition, retirees do not have "good cause" for rejecting the debtor's proposal on the basis of

demands that are not economically feasible or alternatives that would permit the debtor to

reorganize successfully.  *See Royal Composing*, 62 B.R. at 407; *Nw Airlines*, 346 B.R. at 328;

*see also Maxwell Newspapers,* 981 F.2d at 89-90 ("[A] union will not have good cause to reject

an employer's proposal that contains only those modifications essential for the debtor's

reorganization.").

46.    To date, the Debtors have not received a formal response from the Retiree

Committee to the Proposal.  Given the limited time period that they have had to respond, the

Debtors do not contend that the Retiree Committee's failure to respond to the Proposal

constitutes rejection without good cause. Rather, the Debtors submit that the Retiree Committee

will not be able to establish good cause, and reserve the right to supplement the Motion to update

the Court prior to the hearing on this Motion.

### The Debtors Have Complied with the Procedural
### Requirements of Section 1114(f) of the Bankruptcy Code

47.    The Proposal complies with the substantive requirements of section

1114(f)(1)(A) of the Bankruptcy Code:  (1) the proposed modifications are clearly necessary to

confirmation of the Plan; and (2) all parties are treated fairly and equitably.  Moreover, the

Creditors' Committee is generally supportive of the Proposal.

48.    The Debtors have also complied with the procedural requirements of

section 1114(f) of the Bankruptcy Code.  Any proposal under section 1114 must be "based on

the most complete and reliable information available at the time of such proposal." 11 U.S.C. §

1114(f)(1)(A).    The breadth and depth of the requisite information will vary with the

circumstances.  *See In re Mesaba Aviation, Inc.*, 341 B.R. 693, 714 (Bankr. D. Minn. 2006).

Courts have commonly found this requirement satisfied where a debtor has relied on information

such as cost analyses for the proposed modifications and financial statements its business.  *See*,

*e.g., In re Carey Transportation,* 50 B.R. 203, 208–09 (Bankr. S.D.N.Y. 1985) (proposal met

standard when debtor made relevant financial records available prior to hearing).  The Debtors'

Proposal was made based on the most complete and reliable information available to the Debtors

at the time it was made -- the information included in the Disclosure Statement.

49.    Section 1114(f)(1)(B) requires that the debtor provide the Retiree

Committee "with such relevant information as is necessary to evaluate the proposal." 11 U.S.C.

§ 1114(f)(1)(B).  The information can be provided at any time prior to the hearing, including

after the initial proposal is made.  *Frontier Airlines*, 2008 WL 5110927 at *17-18 (citing 7

19

*Collier on Bankruptcy* ¶ 1113.04[2] at 1113–27–28) ("[I]n considering whether the debtor has provided the requisite information, the court is not limited to information the debtor has conveyed to the union subsequent to filing a petition and prior to filing a motion seeking rejection."). The breadth and depth of the requisite information will vary with the circumstances, but, generally, a debtor must provide enough information to "test and confirm the fundamental premise underlying the [debtor's] proposals." *See Id.* at *17-18. However, where the debtor is in particularly dire financial circumstances, and has the goal of obtaining whatever concessions it can to improve its financial condition, it need only provide enough information to allow the authorized representative to verify the its precarious financial condition. *See id.* at *18 (citing *Carey Transp. I*, 50 B.R. at 208–09 (Bankr. S.D.N.Y. 1985)).

50.    In accordance with section 1114(f)(1)(B) of the Bankruptcy Code, the Debtors have provided the Retiree Committee with relevant information necessary to evaluate the Proposal. The Debtors have explained their financial condition, the need for the requested modifications, and the treatment of other constituencies. Additionally, the Debtors will respond to reasonable requests by the Retiree Committee for further information.

51.    Finally, the Debtors will make themselves available to meet and confer in good faith with the Retiree Committee as required by section 1114(f)(2) of the Bankruptcy Code.

## **Notice**

52.    Notice of this Motion will be provided in accordance with the procedures set forth in the *Amended Order Implementing Certain Notice and Case Management Procedures*, entered on November 1, 2018 (ECF No. 405). The Debtors respectfully submit that no further notice is required.

WEIL:\97125911\9\73217.0004

53.    No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry the Proposed Order and such other and further relief as is just.

Dated:  July 29, 2019
        New York, New York

*/s/ Jacqueline Marcus*
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors and Debtors in Possession*

21

**<u>Exhibit A</u>**

**Proposal**

**Weil, Gotshal & Manges LLP**

Jacqueline Marcus
+1 (212) 310-8130
jacqueline.marcus@weil.com

July 22, 2019

James N. Lawlor
Cassandra Postighone
Wollmuth Maher & Deutsch LLP
500 Fifth Avenue
New York, NY 10110
Email: jlawlor@wmd-law.com
       CPostighone@WMD-LAW.com

Michael M. Mulder
The Law offices of Michael M. Mulder
1603 Orrington, Suite 600
Evanston, IL 60201
Email: mmmulder@mmulderlaw.com

Re: Proposal Pursuant to Section 1114 of the Bankruptcy Code

Dear Jim, Michael, and Cassandra:

As you know, Sears Holdings Corporation ("**Sears Holdings**") and certain of its affiliates, as debtors and debtors in possession (the "**Debtors**") recently filed the *Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors* (ECF No. 4476) (the "**Plan**") and the *Modified Second Disclosure Statement for Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* (ECF No. 4478) (the "**Disclosure Statement**"). The confirmation hearing on the Plan is scheduled for August 16, 2019 (the "**Confirmation Hearing**"). Copies of the Disclosure Statement and the Plan can each be accessed online at https://restructuring.primeclerk.com/sears.

The Plan is a liquidating chapter 11 plan. As reflected in the Disclosure Statement, the Debtors anticipate a distribution to holders of general unsecured claims of approximately 2.3% to 2.7% of their claims, depending on the applicable debtor. *See* Exhibit E-1 to the Disclosure Statement, a copy of which is attached hereto as **Exhibit A**.

As we discussed, because of the Debtors' limited remaining funds, and because the Debtors will cease operations as of the effective date of the Plan, the Debtors do not have the wherewithal to continue to sponsor the Sears Retiree Group Life Insurance Plan (the "**Retiree Plan**").

James N. Lawlor                                                    **Weil, Gotshal & Manges LLP**
July 21, 2019
Page 2

Accordingly, in accordance section 1114 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), the Debtors hereby submit to the Official Committee of Retirees with Life Insurance Benefits of the Sears Holdings Corporation, the proposal for the modification of the Retiree Plan (the "**Proposal**"), attached hereto as **Exhibit B**. The Debtors believe that implementation of the terms of the Proposal is necessary to permit the confirmation of the Plan and to avoid liquidation of the Debtors under chapter 7 of the Bankruptcy Code. Please note that the Proposal does not yet have the approval of the Official Committee of Unsecured Creditors.

We are available to meet with you at your earliest convenience to discuss the Proposal, and can provide further information you may need to evaluate the Proposal.

If the Retiree Committee choses to accept the Proposal, we will prepare and provide a draft settlement agreement.

If the Retiree Committee declines to accept the Proposal, the Debtors intend to file a motion to modify the Retiree Plan in accordance with section 1114 of the Bankruptcy Code. We expect that any such motion will be heard by the Bankruptcy Court prior to the Confirmation Hearing.

Given the short time frame with which we are dealing, kindly contact us as soon as possible if you have any questions about the Proposal.

Sincerely,

Jacqueline Marcus

cc:    Nicholas Pappas
       Stephen Margolis
       Olga Peshko

**Exhibit A**

## LIQUIDATION ANALYSIS FOR SEARS HOLDINGS CORPORATION, ET AL.
### (PLAN SETTLEMENT)

### I.    Best Interests Test

Under the "best interests" of creditors test set forth by section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a chapter 11 plan unless each holder of a claim or interest either (i) accepts the Plan[1] or (ii) receives or retains under the Plan property of a value, as of the effective date, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on the effective date. *See* 11 U.S.C. § 1129(a)(7).   Accordingly, to demonstrate that the Plan satisfies the "best interests" of creditors test, the Debtors have prepared the following hypothetical liquidation analysis (the "*Liquidation Analysis*") based upon certain assumptions discussed in the Disclosure Statement and in the accompanying notes to the Liquidation Analysis.

The Liquidation Analysis estimates potential cash distributions to holders of Allowed Claims in a hypothetical chapter 7 liquidation of the Debtors' assets (the "*Assets*") on a consolidated basis in accordance with the Plan Settlement.   Asset values discussed in the Liquidation Analysis may differ materially from values referred to in the Plan and Disclosure Statement.   The Debtors prepared the Liquidation Analysis with the assistance of their financial and legal advisors.

The Debtors believe that each class of creditors will receive not less than the value that they would receive in a chapter 7 liquidation of the Assets because of, among other reasons, the fees payable to a chapter 7 trustee and chapter 7 estate professionals.

### II.    Approach and Purpose of the Liquidation Analysis

The determination of the costs of, and proceeds from, the hypothetical liquidation of the Assets in a chapter 7 case is an uncertain process involving significant estimates and assumptions that, although considered reasonable by the Debtors and their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management and their advisors.   The Liquidation Analysis is also based on the Debtors' and their advisors' best judgment of how numerous issues in the liquidation process would be resolved.   Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation.   In addition, the Debtors' management and their advisors cannot judge with any degree of certainty the recovery that may result from litigation claims in a chapter 7 liquidation.   The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good faith estimate of the proceeds that would be generated if the Debtors liquidated in accordance with chapter 7 of the Bankruptcy Code.   The Liquidation Analysis is not intended, and should not be used, for any other purpose.

All of the limitations and risk factors set forth in the Disclosure Statement are applicable to this Liquidation Analysis and are incorporated by reference herein.   In particular, the underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants in accordance with the standards promulgated by the American Institute of Certified Public Accountants.   No independent appraisals were conducted in preparing the Liquidation Analysis.   NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATIONS OR WARRANTIES THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS

---

[1] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Plan or the Disclosure Statement, to which this Liquidation Analysis is attached as Exhibit E-1 .

REPRESENTED IN THE LIQUIDATION ANALYSIS.    ACTUAL RESULTS COULD VARY
MATERIALLY.

The Liquidation Analysis reflects the estimated Cash proceeds, net of liquidation-related costs that would
be available if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.    The Debtors'
liquidation proceeds would be distributed in accordance with sections 726 and 1129(b) of the Bankruptcy
Code.

The Liquidation Analysis includes estimates for costs and Claims that could be asserted and Allowed in a
chapter 7 liquidation, including Administrative Expense Claims, wind down costs, trustee and professional
fees required to facilitate the wind down of the Debtors' Estates in a value maximizing manner that
otherwise would not exist in a chapter 11.    The Debtors' estimate of Allowed Claims set forth in the
Liquidation Analysis should not be relied upon for any other purpose, including determining the value of
any distribution to be made on account of Allowed Claims under the Plan.    NOTHING CONTAINED IN
THE LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION,
ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS.    THE ACTUAL AMOUNT
OR PRIORITY OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY
DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THE LIQUIDATION
ANALYSIS.

## III. Global Assumptions

The Liquidation Analysis should be read in conjunction with the following global assumptions:

### 1.    Conversion Date and Appointment of a Chapter 7 Trustee

The Liquidation Analysis assumes conversion of the Debtors' Chapter 11 Cases to chapter 7 liquidation
cases on or about July 31, 2019 (the "*Conversion Date*").    On the Conversion Date, it is assumed that the
Bankruptcy Court would appoint one chapter 7 trustee (the "*Trustee*") to oversee the wind down of all of
the Estates on a consolidated basis.    Should multiple Trustees be appointed to administer the Estates, lower
recoveries and higher administrative costs could result from a large duplication of effort by each trustee
and their professionals and distributions to creditors would be further reduced and delayed.    The basis of
the Liquidation Analysis is the Debtors' estimated cash balance and Assets as of the Conversion Date and
the net costs to execute the administration of the wind down of the Estates on a consolidated basis. The
Liquidation Analysis reflects the wind down and liquidation of substantially all of the Debtors' remaining
Assets and the distribution of available proceeds to holders of allowed Claims during the period after the
Conversion Date.

### 2.    Trustee Fees

The Trustee would be compensated in accordance with section 326 of the Bankruptcy Code.    The
Liquidation Analysis estimates the Trustee's fees based on 3% of all distributed proceeds (excluding
professional fees).    However, the arrangements with the Trustee may result in a different percentage.

### 3.    Chapter 7 Trustee Professionals

The Liquidation Analysis assumes that the Trustee would retain its own professionals to assist in the
liquidation and wind down of the Debtors' Estates.    Although the Trustee may retain certain of the Debtors'
existing professionals for discrete projects, it is assumed that the trustee's primary legal, accounting,
consulting and other support would be provided by new professionals.    Nevertheless, given that the Debtors
existing professionals have been managing the orderly wind down of their Estates, and have stayed current

2

on tax filings, regulatory and judicial inquiries, and financial records for all of the Debtors' entities and bank accounts, it is reasonable to expect that the Trustee will require the assistance of some portion of the Debtors' professionals and/or their employees to assist during the transition period while the Trustee gets up to speed on the Debtors and their Estates, including on the various litigation claims, due to their institutional knowledge. Given that the Trustee and, to the extent applicable, the Trustee's professionals must familiarize themselves with the Debtors, their Estates, their Assets and the Claims asserted against them, it is anticipated that the Debtors' Estates would incur significant incremental professionals' fees in the context of a chapter 7 liquidation.

The Liquidation Analysis assumes that distributions are made from a consolidated pool of assets in accordance with the Plan Settlement in both the chapter 11 and chapter 7 scenarios. The Liquidation Analysis assumes that the Trustee would execute the same settlement of disputes relating to whether the Debtors should be substantively consolidated, for the same reasons why such settlement is proposed in the chapter 11 scenario. As described in further detail in the Disclosure Statement, the Debtors believe there would be significant difficulties and costs that would be borne by the Estates in order to disentangle the prepetition Intercompany Claims on a debtor-by-debtor basis, with no guarantee of success. However, in a chapter 7, the Trustee may have to investigate and potentially litigate whether the Debtors' Estates should be wound down on a deconsolidated basis in a chapter 7 liquidation, an investigation the Debtors' chapter 11 professionals have already undertaken. In particular, the Debtors' chapter 11 professionals have spent a significant amount of time analyzing and understanding Intercompany Claims, which may have to be repeated by The Trustee and its professionals.

This Liquidation Analysis assumes an incremental $30 million of professional fees will be required for these reasons under a chapter 7 liquidation.

### 4.    Start-Up Time

Given the complexity of the Chapter 11 Cases and the underlying assets and Claims, it is anticipated that the Trustee and any newly retained professionals may require up to three (3) to six (6) months to familiarize themselves with the Debtors' Estates, the assets, the Claims and related matters before they begin pursuing remaining assets, if any, or litigating Claims.

### 5.    Chapter 7 Process

On the Conversion Date, it is assumed that the Trustee would conduct the liquidation of the Estates, during which time all of the Debtors' remaining Assets would be sold or monetized, and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with the priority scheme under section 726 of the Bankruptcy Code. Under section 704 of the Bankruptcy Code, a Trustee must, among other duties, collect and convert property of the Estates as expeditiously as is compatible with the best interests of parties in interest, which could result in potentially distressed recoveries.

The Liquidation Analysis assumes that the actual liquidation of Assets of the Debtors is predominately completed as of the Conversion Date, excluding Avoidance and Litigation Action (defined below) proceeds, which are expected to be prosecuted over approximately the following 12 to 24 months.

Approximately 19,814 Claims were filed against the Debtors as of June 13, 2019, in amounts totaling approximately $85 billion (including duplicate Claims and estimated amounts for certain unliquidated claims). The Debtors estimate that a Trustee will require at least an additional 12 to 18 months to reconcile Claims and initiate litigation. Therefore, a large number of the Claims in these cases will be reconciled, valued, negotiated and settled, and/or litigated to conclusion only after the Asset recovery work is mostly complete. It is possible that some Distributions could be made prior to such period, but Claims would be

3

subject to reserves. It is not uncommon in large cases for liquidations to last many years while chapter 7 trustees prosecute difficult Claims-related and other litigation.

### 6. Total Assets

The Debtors' total Assets available for distribution consist of expected cash proceeds from the sale of almost all of their material Assets, plus unrealized value from future and ongoing avoidance and litigation actions (the "*Avoidance and Litigation Actions*"). The gross recoveries on Avoidance and Litigation Actions are presumed to be 25% less in a chapter 7 scenario as compared to the chapter 11 scenario because the Debtors assume that there is a higher likelihood of settlement and pressure to expedite recoveries in a chapter 7 scenario. The amount assumed for such gross recoveries and distributions in this Liquidation Analysis is for illustrative purposes only and realized recoveries may be materially higher or lower in amount. Total Assets available for distribution (the "*Distributable Proceeds*") across all entities is estimated to be approximately $334 million in the chapter 11 scenario and $276 million in the chapter 7 scenario. Professional fees relating to recovery of the proceeds of Avoidance and Litigation Actions are netted out of the value of such proceeds in the Liquidation Analysis based upon the assumption that such fees will be invoiced on a rolling basis as such Avoidance and Litigation Actions are prosecuted.

The Professional Fee Carve-out Account cash balance of $48 million at the Conversion Date is excluded from Distributable Proceeds.

The Liquidation Analysis assumes that proceeds from any Avoidance and Litigation Actions will be the last dollars received post-Conversion Date.[2]

### 7. Claims Estimates

In preparing the Liquidation Analysis, the Debtors have preliminarily estimated an amount of Allowed Claims for each class based upon a review of the Debtors' filed claims and estimated balance sheet.

#### a. Section 507(b) Claims

For purposes of the Liquidation Analysis, 507(b) Claims are assumed to be zero in both a chapter 7 and chapter 11 scenario. However, 507(b) Claims may be materially higher in a chapter 7 scenario, thereby reducing recoveries for all junior claimholders in the chapter 7 scenario. The existence and value of such Claims is subject to litigation and the determination of the Bankruptcy Court on the allowance and value, if any, may impact the recoveries in both chapter 7 and 11 scenarios.[3]

#### b. Priority Non-Tax Claims

Priority Non-Tax Claims represent the Debtors' best estimate of these claims at the time of this filing before claim reconciliation has been completed.

---

[2] The estimate of total Assets provided in the Liquidation Analysis is for illustrative purposes only, and should not be deemed to reflect the Debtors' view as to the value of Avoidance and Litigation Actions.

[3] Under the Plan, ESL 507(b) Priority Claims are subject to the ESL 507(b) Cap as described in the Plan and Disclosure Statement. The Debtors believe that the ESL 507(b) Cap would continue to apply to any ESL 507(b) Priority Claims in a chapter 7 liquidation scenario.

4

### c.    Administrative Expense Claims

Administrative Expense Claims include 503(b)(9) Claims and U.S. Trustee fees. The approximately $77 million of estimated 503(b)(9) Claims represents $181 million of total estimated 503(b)(9) Claims reduced by $139 million of liabilities assumed by ESL pursuant to the Asset Purchase Agreement and increased by the net remaining Prepaid Inventory Shortfall Amount (as defined in the Asset Purchase Agreement) of $35 million.

### d.    PBGC Claims

The Liquidation Analysis assumes that the PBGC Settlement would be effectuated in both the chapter 11 and chapter 7 scenarios. The PBGC Claims in both scenarios therefore reflect the amounts agreed pursuant to the PBGC Settlement. The PBGC Liquidating Trust Priority Interest is a $97.5 million beneficial interest in the Liquidating Trust granted to the PBGC, which entitles the PBGC to and is secured by the first $97.5 million of Net Proceeds of (i) Specified Causes of Action and (ii) Other Causes of Action arising under Chapter 5 of the Bankruptcy Code, in each case after payment in full of senior claims. In addition, the PBGC has an Allowed General Unsecured Claim in the aggregate amount of $800 million.

As described in the Plan and Disclosure Statement, pursuant to the Plan Settlement, PBGC will not participate in any distributions of Excess PBGC Amounts, which shall be distributed to the applicable holders otherwise entitled to share in such recoveries in accordance with the Plan.

### e.    General Unsecured Claims

General Unsecured Claims are estimated based on the Debtors' book value of liabilities adjusted for certain filed Claims. These claims could vary materially from the estimate used in the Liquidation Analysis after claims reconciliation is completed.

As described in the Plan and Disclosure Statement, pursuant to the Plan Settlement, certain holders of General Unsecured Claims against Kmart Corp. and guarantee claims against Kmart Stores of Illinois LLC, and Kmart of Washington LLC will be provided with a Plan Settlement Premium in both chapter 7 and chapter 11 scenarios.

### f.    ESL Unsecured Claims

The Liquidation Analysis assumes ESL Claims, including ESL Unsecured Claims, are not entitled to any recovery of proceeds from the Specified Causes of Action in accordance with the Asset Purchase Agreement. The ESL claims shown could vary materially from the estimate used in the Liquidation Analysis after claims reconciliation is completed.

As described in the Plan and Disclosure Statement, pursuant to the Plan Settlement, certain holders of ESL Unsecured Claims against Kmart Stores of Illinois LLC, and Kmart of Washington LLC will be provided with a Plan Settlement Premium in both chapter 7 and chapter 11 scenarios.

### g.    Intercompany Interests, Subordinated Securities Claims, and Existing SHC Interests

Intercompany Interests, Subordinated Securities Claims, and Existing SHC Equity Interests are excluded from the Liquidation Analysis. Given estimated total Assets available for distribution are approximately $334 million in a chapter 11 scenario and $276 in a chapter 7 scenario, and total claims senior to these

5

interests are estimated to be greater than $6.5 billion, these classes are highly unlikely to receive any recovery.

### Conclusion

The Debtors have determined that confirmation of the Plan will provide all creditor classes and interest holders with a recovery that is not less than what they would otherwise receive in connection with a hypothetical liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

The attached Liquidation Analysis shall apply to all 53 Debtors; the Liquidation Analysis reflects, where applicable, creditor classes affected by the Plan Settlement Premium.[4]

---

[4] To the extent necessary, the Debtors are prepared to supplement, as needed, the Liquidation Analysis at the confirmation hearing.

6

**Liquidation Analysis: Plan Settlement**

*($ in millions)*

| | Class | Chapter 7 Scenario | | | Chapter 11 Scenario | | |
|---|---|---|---|---|---|---|---|
| | | | Recovery | | | Recovery | |
| | | Value ($) | ($) | (%) | Value ($) | ($) | (%) |
| **Distributable Proceeds (1)** | | **$276** | | | **$334** | | |
| Post-Conversion Professional Fees | N/A | $40 | $40 | 100.0% | $10 | $10 | 100.0% |
| **Distributable Proceeds after Professional Fees** | | **$236** | | | **$324** | | |
| Chapter 7 Trustee Fees | N/A | $7 | $7 | 100.0% | $0 | $0 | N/A |
| **Net Distributable Proceeds** | | **$229** | | | **$324** | | |
| Secured Claims | Class 2 | $0 | $0 | N/A | $0 | $0 | N/A |
| **Proceeds Available after Other Secured Claims** | | **$229** | | | **$324** | | |
| 507(b) Claims (2) | N/A | $0 | $0 | N/A | $0 | $0 | N/A |
| **Proceeds Available after 507(b) Claim** | | **$229** | | | **$324** | | |
| 503(b)(9) Claims | N/A | 77 | 77 | 100.0% | 77 | 77 | 100.0% |
| US Trustee Fees | N/A | 1 | 1 | 100.0% | 1 | 1 | 100.0% |
| **Total Administrative Claims** | | **$78** | **$78** | **100.0%** | **$78** | **$78** | **100.0%** |
| **Proceeds Available after Administrative Claims** | | **$151** | | | **$247** | | |
| Priority Tax Claims | N/A | $15 | $15 | 100.0% | $15 | $15 | 100.0% |
| **Proceeds Available after Priority Tax Claims** | | **$136** | | | **$232** | | |
| Priority Non-Tax Claims | Class 1 | $2 | $2 | 100.0% | $2 | $2 | 100.0% |
| **Proceeds Available after Priority Non-Tax Claims** | | **$134** | | | **$230** | | |
| PBGC Liquidating Trust Priority Interest (3) | Class 3 | $98 | $98 | 100.0% | $98 | $98 | 100.0% |
| **Proceeds Available after PBGC Priority Interests** | | **$37** | | | **$132** | | |
| PBGC Unsecured Claims | Class 3 | $800 | $6 | 0.7% | $800 | $20 | 2.5% |
| General Unsecured Claims (Kmart Corp) | Class 4 | 1,210 | 11 | 0.9% | 1,210 | 33 | 2.7% |
| General Unsecured Claims (All Other) | Class 4 | 2,313 | 12 | 0.5% | 2,313 | 53 | 2.3% |
| Non-ESL Guarantee Unsecured Claims (Kmart Corp) | Class 4 | 417 | 4 | 0.9% | 417 | 11 | 2.6% |
| Non-ESL Guarantee Unsecured Claims (Kmart III) | Class 4(B) | 417 | 0 | 0.1% | 417 | 1 | 0.2% |
| Non-ESL Guarantee Unsecured Claims (Kmart Wash) | Class 4(B) | 417 | 0 | 0.0% | 417 | 0 | 0.0% |
| ESL Unsecured Claims (Kmart Corp) (4) | Class 5 | 1,761 | 5 | 0.3% | 1,761 | 14 | 0.8% |
| ESL Unsecured Claims (Kmart III) (4) | Class 5 | 1,761 | 0 | 0.0% | 1,761 | 1 | 0.1% |
| ESL Unsecured Claims (Kmart Wash) (4) | Class 5 | 1,761 | 0 | 0.0% | 1,761 | 0 | 0.0% |
| **Total Unsecured Claims** | | **$6,502** | **$37** | **0.6%** | **$6,502** | **$132** | **2.0%** |
| **Proceeds Available after Unsecured Claims** | | **$0** | | | **$0** | | |
| **Recovery by Class** | | | | | | | |
| Class 1: Priority Non-Tax Claims | | $2 | $2 | 100.0% | $2 | $2 | 100.0% |
| Class 2: Secured Claims | | N/A | N/A | N/A | N/A | N/A | N/A |
| Class 3: PBGC Claims | | 800 | 103 | 12.9% | 800 | 118 | 14.7% |
| Class 4: General Unsecured Claims (Kmart Corp) | | 1,210 | 11 | 0.9% | 1,210 | 33 | 2.7% |
| Class 4: General Unsecured Claims (All Other) | | 2,313 | 12 | 0.5% | 2,313 | 53 | 2.3% |
| Class 4: Non-ESL Guarantee Unsecured Claims (Kmart Corp) | | 417 | 4 | 0.9% | 417 | 11 | 2.6% |
| Class 4 (B): Non-ESL Guarantee Unsecured Claims (Kmart III) | | 417 | 0 | 0.0% | 417 | 1 | 0.2% |
| Class 4 (B): Non-ESL Guarantee Unsecured Claims (Kmart Wash) | | 417 | 0 | 0.0% | 417 | 0 | 0.0% |
| Class 5: ESL Unsecured Claims (Kmart III) (4) | | 1,761 | 5 | 0.3% | 1,761 | 14 | 0.8% |
| Class 5: ESL Unsecured Claims (Kmart Corp) (4) | | 1,761 | 0 | 0.0% | 1,761 | 1 | 0.1% |
| Class 5: ESL Unsecured Claims (Kmart Wash) (4) | | 1,761 | 0 | 0.0% | 1,761 | 0 | 0.0% |
| Class 6: Intercompany Claims | | N/A | N/A | N/A | N/A | N/A | N/A |
| Class 7: Intercompany Interests | | N/A | N/A | N/A | N/A | N/A | N/A |
| Class 8: Subordinated Securities Claims (5) | | N/A | N/A | 0.0% | N/A | N/A | 0.0% |
| Class 9: Existing SHC Equity Interests (5) | | N/A | N/A | 0.0% | N/A | N/A | 0.0% |

*Note: All values that are exactly zero appear as "0". Percentage recoveries are approximate. "N/A" means the amount is not calculable or excluded from analysis.*

*(1) See section 6 in the Global Assumptions for further detail.*

*(2) See section 8(a) in the Global Assumptions for further detail.*

*(3) See section 8(d) in the Global Assumptions for further detail.*

*(4) See section 8(f) in the Global Assumptions for further detail.*

*(5) See section 8(g) in the Global Assumptions for further detail.*

**Exhibit B**

CONFIDENTIAL
SUBJECT TO FRE 408
July 22, 2019

**Proposed Terms for Modification of the Retiree Plan**
**Necessary to Permit Confirmation of the Debtors' Proposed Joint Chapter 11 Plan**

Sears Holdings Corporation and certain of its affiliates, as debtors and debtors in possession (the "**Debtors**"), propose that the Sears Retiree Group Life Insurance Plan (the "**Retiree Plan**") be modified, as follows:

1. **Effective Date of Termination**: The Retiree Plan shall be terminated effective March 15, 2019 (the "**Termination Date**").

2. **Relief for Class Members under the Stipulation of Settlement** (In Re: Sears Retiree Group Life Insurance Litigation Civil Action No. 97 C 7453) (the "**Stipulation**"):

   a. The estate of any Class Member that dies between the Termination Date and the date of the entry of a final order approving the modification of the Retiree Plan, and whose benefits under the Securian Financial Group Life Insurance Policy (the "**Securian Policy**") are not been paid by Securian, will receive an allowed administrative expense claim in the Debtors' cases in the amount of $5,000 (the "**Administrative Expense Claim**"). The Retiree Committee shall file a single proof of claim in the Debtors' chapter 11 cases for all Class Members entitled to the Administrative Expense Claims, setting forth each Class Member, on or before September 30, 2019.

   b. Each remaining Class Member will receive an allowed general unsecured claim in the Debtors' cases in the amount of $5,000 (the "**General Unsecured Claims**"). The Retiree Committee shall file a single proof of claim in the Debtors' chapter 11 cases for all Class Members entitled to the General Unsecured Claims, setting forth each Class Member, on or before September 30, 2019.

   c. The Debtors shall use commercially reasonable efforts to assist the Retiree Committee in determining which Class Members are entitled to Administrative Expense Claims and General Unsecured Claims, to the extent the Debtors have access to such information.

**Exhibit B**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
In re                                          :
                                               :          **Chapter 11**
**SEARS HOLDINGS CORPORATION,** *et al.,*      :
                                               :          **Case No. 18-23538 (RDD)**
                                               :
             **Debtors.**[1]                   :          **(Jointly Administered)**
----------------------------------------------------------------x

## ORDER AUTHORIZING MODIFICATION OF RETIREE BENEFITS

Upon the motion, dated July 29, 2019 (ECF No. [__]) (the "**Motion**")[2] of Sears

Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-

captioned chapter 11 cases (collectively, the "**Debtors**"), pursuant to sections 105(a) and 363(b)

of title 11 of the United States Code (the "**Bankruptcy Code**"), for an order authorizing

modification of retiree benefits, all as more fully set forth in the Motion; and the Court having

jurisdiction to decide the Motion and the relief requested therein pursuant to 28 U.S.C. §§

157(a)-(b) and 1334(b) and the Amended Standing Order of Reference M-431, dated January 31,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the relief requested in the Motion having been provided in accordance with the Amended Case Management Order; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having held a hearing to consider the relief requested in the Motion on August 12, 2019 (the "**Hearing**"); and upon the record of the Hearing, and upon all of the proceedings had before the Court; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein and that the relief requested is in the best interests of the Debtors, their estates, their creditors, and all parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted as set forth herein.

2.      The Debtors are authorized, pursuant to section 1114 of the Bankruptcy Code, to terminate the Retiree Plan effective March 15, 2019.

3.      The Debtors are authorized to implement, and perform under, the terms of the Proposal attached hereto as **Exhibit 1**, and to take any and all actions that may be reasonably necessary or appropriate to effectuate the same, perform all obligations contemplated under the Proposal, and carry out this Order.

4.      Nothing contained in the Motion or this Order or any payment made pursuant to the authority granted by this Order is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any

appropriate party in interest's rights to dispute any claim, or (c) an assumption under section 365

or any other section of the Bankruptcy Code of, or a post-petition re-affirmation of, the Retiree

Plan, the Policies, or any other agreement.

      5.     The Debtors are authorized to take all actions necessary to effectuate the

relief granted in this Order.

      6.     The Court shall retain jurisdiction to hear and determine all matters arising

from or related to the implementation, interpretation, and/or enforcement of this Order.


Dated:  August [___], 2019
      White Plains, New York


                                    _____
                                    THE HONORABLE ROBERT D. DRAIN
                                    UNITED STATES BANKRUPTCY JUDGE

WEIL:\97125911\9\73217.0004

## **Exhibit C**

**Termination Notice**

WEIL:\97125911\9\73217.0004

**NOTICE - TERMINATION OF RETIREE GROUP LIFE INSURANCE PLAN**

Sears Holdings Corporation is terminating the Sears Retiree Group Life Insurance Plan (the "Plan"), which provides life insurance benefits to eligible retirees of Sears and its affiliates. The termination will be effective on March 15, 2019. Plan benefits are currently provided under group insurance policies issued to Sears by Securian Financial Group and Allstate Life Insurance Company, which are being cancelled. We have been informed by Securian that you will have the opportunity to convert your coverage to individual life insurance policies effective as of March 15, 2019, at your own cost. You will be receiving information from Securian about your conversion option, and the cost of this coverage, in the coming days.

## Exhibit D

**Transcript of Record**



Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 18-23538-rdd

5

6  - - - - - - - - - - - - - - - - - - - -x

7

8  In the Matter of:

9

10  SEARS HOLDINGS CORPORATION, et al.,

11

12              Debtors.

13

14  - - - - - - - - - - - - - - - - - - - -x

15

16              United States Bankruptcy Court

17              300 Quarropas Street, Room 248

18              White Plains, New York

19

20              June 20, 2019

21              10:06 AM

22

23  B E F O R E:

24  HON. ROBERT D. DRAIN

25  U.S. BANKRUPTCY JUDGE

Page 42

1    think when this whole thing gets played out, I'm not sure of

2    the best way for the retirees to be protected.  There's

3    going to have to be a -- I'm not sure the retirees, given

4    their age, et cetera, are going to be in a position to

5    participate in the bankruptcy the way your typical creditor

6    would.  There might have to be a special process developed.

7    But that wouldn't have to go on prior to confirmation.

8    There could be a reserve established of some sort.

9                THE COURT:  Well, I'm sorry.  I thought you were

10   just still for the fact that they need a committee because

11   they need a committee.

12               MR. GERSON:  They need a committee.  Need a

13   committee --

14               THE COURT:  With a --

15               MR. GERSON:  -- to work that out.

16               THE COURT:  With a lawyer, yeah.  Okay.

17               MR. GERSON:  Thank you, Your Honor.

18               THE COURT:  Okay.

19               MS. MARCUS:  Jacqueline Marcus again, Your Honor,

20   for Sears.

21               Your Honor, the decision to terminate the

22   retirees' plan was certainly a difficult one for the

23   debtors.  The facts here are very different than the

24   circumstances of most of the cases that we've all read about

25   termination of benefits under 1114.

Page 43

1          The debtors sold substantially all of their assets

2     on February 11th.  In the context of the sale negotiations,

3     the debtors tried to get the buyer to assume these life

4     insurance benefits but the buyer wasn't willing to do that.

5     There's simply no corpus here from which to pay death

6     benefits to 29,000 former Sears employees.  And while the

7     benefit itself to which each employee is entitled is not all

8     that large, when you multiply that by 29,000 employees, it

9     turns out to be a huge number.

10          With respect to the suggestion that the debtors

11     establish a reserve, if we were to do that, it would be $145

12     million and the debtors clearly don't have that kind of

13     money.

14          The suggestion that the debtors would have to pay

15     retiree benefits or make payments for this claim in

16     perpetuity --

17          THE COURT:  No.

18          MS. MARCUS:  -- it's just unrealistic.

19          THE COURT:  But we're here just on the motion to

20     form a committee.

21          MS. MARCUS:  Okay.  Well, I guess our point, Your

22     Honor, and our objection is that the purpose of appointing a

23     committee under 1114 and the whole 1114 process as laid out

24     in the Code, really doesn't make sense in the context of

25     these cases.

1          THE COURT:  But there's cases acknowledge that and

2     then nevertheless say that's what Congress said.

3          MS. MARCUS:  I can't really quibble with that,

4     Your Honor.

5          THE COURT:  With the one exception of the case

6     that Judge Lifland disagreed with.

7          MS. MARCUS:  I can't take issue with that, Your

8     Honor, because that's what they say.

9          THE COURT:  Right.

10          MS. MARCUS:  I would note that in the cases where

11     there was a question of whether 1114 applies in a

12     liquidating Chapter 11, it was actually the debtors who were

13     arguing that 1114 should apply and the employees who were

14     arguing that it shouldn't apply.  So the context was a bit

15     different.

16          THE COURT:  Right.

17          MS. MARCUS:  We just don't think that there's any

18     practical point to be served by the appointment of a

19     committee.  And many of the things that were alluded to a

20     few moments ago can be done without a committee.  So to the

21     extent -- and I can't tell the Court today that all of those

22     retirees received notice of the bar date.  I just don't

23     know.  But if they haven't, then the debtors, of course --

24          THE COURT:  Right.

25          MS. MARCUS:  -- would be prepared to extend the

1   bar date for those retirees to allow them to file claims.

2          THE COURT:  But it doesn't seem to me that there

3   is a risk that if the 1114 process isn't gone through --

4   and, of course, Congress did provide that it could be gone

5   through quickly.  A court will rule that these claims go on

6   as administrative expenses through whenever a plan is

7   confirmed.  And then you have also 1129(a)(13) which may

8   prohibit confirmation of a plan.

9          So there's risk in taking a position that only one

10  Court has ever taken before and that Court has been

11  criticized for taking it which is that in liquidation, you

12  shouldn't appoint a retirees committee.

13         MS. MARCUS:  Let me get back to the question of

14  whether the benefits have vested, Your Honor.

15         THE COURT:  Right.

16         MS. MARCUS:  I don't think there's any question

17  although the evidence isn't the strongest.  We don't dispute

18  that the stipulation of settlement is actually the

19  stipulation of settlement.

20         THE COURT:  Right.

21         MS. MARCUS:  That was entered into.  But what we

22  haven't found is any indication that the debtors, in fact,

23  went forward and amended the plan to provide that the

24  benefits would not be changed.

25         THE COURT:  Right.

 1              MS. MARCUS:  We're at a little bit of a

 2      disadvantage given the transition to Transform.  But we have

 3      been working with the employees who are now Transform

 4      employees to find anything we can find regarding the

 5      administration of a plan.  And we just haven't been able to

 6      find any amendments.

 7              The movants mentioned that all we've provided is

 8      that SPD, the summary of plan document -- the summary plan

 9      document.  We don't think there is something called the

10      retiree plan separate and apart from that SPD.  And it says

11      in two places that the benefits are subject to change if the

12      debtors -- in the debtors' discretion.

13              THE COURT:  And that's post-2002.

14              MS. MARCUS:  It was 2007, I believe.

15              THE COURT:  Right.  Well, so let me -- so is the

16      debtors' argument that the stipulation isn't the plan itself

17      and so it isn't really covered by 1114?

18              MS. MARCUS:  That is the debtors' argument, Your

19      Honor --

20              THE COURT:  Okay.

21              MS. MARCUS:  -- that the stipulation, in fact,

22      uses --

23              THE COURT:  That this is just a contract claim.

24              MS. MARCUS:  It's a breach claim, exactly.  The

25      stipulation --

1           THE COURT:  All right.

2           MS. MARCUS:  -- actually didn't say the plan is

3    hereby amended.  It said the debtors shall amend the plan to

4    provide, et cetera.

5           THE COURT:  Oh, there's probably principles of

6    ERISA that would apply to that, I'm assuming, right?  Maybe

7    not?  I don't know.

8           MS. MARCUS:  I'm not sure, Your Honor, although we

9    have had our ERISA experts involved and they haven't noted

10   anything that would apply.

11          THE COURT:  Okay.  Okay.

12          MS. MARCUS:  Finally, Your Honor, you know, our

13   alternative argument is if the Court sees fit to appoint a

14   committee in light of the debtors' cash position, in

15   particular, we would ask that the Court do what it did in

16   Delphi and limit the amount that the committee's

17   professionals are entitled to spend as well as the scope --

18          THE COURT:  Well, let me just elaborate on that a

19   bit.  When you say in light of the debtors' cash position, I

20   think it's more in light of the fact that the debtors are,

21   in fact, liquidating.  So as Judge Lifland said in

22   Ionosphere, it's not the case here, the anticipated case

23   here, that a retirees committee would be doing the type of

24   work that a retirees committee would be doing in the context

25   of a reorganizing case where you're evaluating, as a union

1      would evaluate, and negotiating a request by the debtor to

2      cut benefits in order to enable the debtor to continue in

3      business which is a much more expensive protracted process

4      that involves financial professionals and multi-party

5      negotiations and the like.  This is -- I mean, the debtors'

6      argument is pretty -- it's going to be pretty clear, which

7      is there won't be a debtor to fund these benefits --

8                  MS. MARCUS:  That's correct.

9                  THE COURT:  -- in the future.

10                 MS. MARCUS:  I suspect if there's any role for a

11     retiree committee, it would really be determining the amount

12     of the claims of the retirees --

13                 THE COURT:  And/or arguing the debtors' point

14     about vesting and/or arguing what the claim actually is.  I

15     mean, it's still not clear to me when the dollar numbers are

16     cited whether that -- maybe this is -- maybe I just don't --

17     I'm missing a key point about these two insurance plans.

18                 Is the class the only beneficiary of these two

19     plans?  Or do the insurance arguably apply to other folks,

20     too?  In other words, when you're paying the premiums, are

21     you paying it for every retiree including those after 1997

22     or is it just for these --

23                 MS. MARCUS:  Well, it's --

24                 THE COURT:  -- people?

25                 MS. MARCUS:  -- only -- I think that the premiums

1      are probably for every retiree.

2                  THE COURT:  Okay.

3                  MS. MARCUS:  But that -- the stipulation of

4      settlement --

5                  THE COURT:  Right.

6                  MS. MARCUS:  -- only applies to those people who

7      had vested --

8                  THE COURT:  Right.  So --

9                  MS. MARCUS:  -- before because what happened was

10     there was a change in the reduction of the benefit --

11                 THE COURT:  Right.

12                 MS. MARCUS:  -- for those people.

13                 THE COURT:  So to me, that would be a role that a

14     retiree committee would play, too, which is, okay, who is

15     covered by 1114.  You know, I think this committee would be

16     those -- would be representing those who are in the class

17     and if the debtors and the committee counsel disagree on

18     who's in the class and what the premiums are, you know,

19     monthly premiums -- the monthly premiums are high here for

20     one group at least.  They're high for both.  Then that would

21     be sorted out, too.

22                 MS. MARCUS:  I don't know that there's any dispute

23     on that issue, though, Your Honor.  Nobody's come forward

24     who's a more recent retiree and taken issue with the

25     termination of the plan.

1            THE COURT:  No.  I understand but the debtors are

2    saying that the monthly cost is x.  But that covers

3    everybody.  Maybe.  But the monthly cost, if it's just the

4    people covered by the stipulation might be x minus a

5    question mark.  And you and a retiree committee that

6    represents those people may have to sort out what that is.

7            MS. MARCUS:  That's true, Your Honor.

8            THE COURT:  It may be easy to do because you know

9    who the people are.

10           MS. MARCUS:  Well, that hasn't seen --

11           THE COURT:  There's a list.

12           MS. MARCUS:  That hasn't been so easy for us to

13    determine --

14           THE COURT:  All right.  Well, I mean --

15           MS. MARCUS:  -- but it turns out we think we do

16    know who they are.

17           THE COURT:  I mean, there is a -- there's an

18    exhibit referred to in the stipulation.

19           MS. MARCUS:  The exhibit to the stipulation --

20    it's a little morbid.  But my understanding is the exhibit

21    to the stipulation had 70,000 names on it.

22           THE COURT:  Yeah.

23           MS. MARCUS:  It's gigantic.

24           THE COURT:  Right.

25           MS. MARCUS:  And over time, because these were

```
 1   elderly people --

 2              THE COURT:  Right.  So you have to figure out --

 3              MS. MARCUS:  -- the size of this --

 4              THE COURT:  -- who's still around from that

 5   exhibit.

 6              MS. MARCUS:  That's correct.

 7              THE COURT:  So that's a function, too.  Okay.  All

 8   right.

 9              MS. MARCUS:  Thank you, Your Honor.

10              THE COURT:  Does anyone have anything further to

11   say on this?

12              MR. GERSON:  I just want to add, Your Honor, that

13   your inclination was correct.  Under ERISA, you just don't

14   look at the four corners of the "plan" to figure out what

15   the plan document is.  Very often, there is decisions where

16   provisions in state law that are in conflict with the plan

17   terms but are not preempted because ERISA preserves.  State

18   insurance laws are viewed as becoming provisions of the

19   plan.

20              Also, you have the situation in Devlin where --

21              THE COURT:  In what?

22              MR. GERSON:  Devlin.  The Second Circuit case --

23              THE COURT:  Right.

24              MR. GERSON:  -- in Devlin.  It's not just the four

25   corners of the plan.  People can get vested --
```

```
 1                THE COURT:  Right.  No.  I --
 2                MR. GERSON:  You understand.
 3                THE COURT:  I mean, I have vivid memories of
 4     listening to my ERISA partners and thinking to myself they
 5     must feel the same way when I explain bankruptcy law to
 6     them.  So I'm sure there's some issue there somewhere.
 7     That's why ERISA partners --
 8                MR. GERSON:  Thank you.
 9                THE COURT:   -- are interesting people.
10                MR. GERSON:  I'm sorry to revive bad memories for
11     you.
12                THE COURT:  No, no.  They're good memories.
13     They're interesting issues.  It's just they're complicated
14     sometimes.
15                MR. LAWLOR:  I won't mention anything about ERISA,
16     Your Honor.
17                THE COURT:  Okay.
18                MR. LAWLOR:  I just note that we attached a letter
19     to our reply dated 2010 which was sent by the insurance
20     company to retirees that expressly mentions the settlement
21     agreement and the litigation.  So --
22                THE COURT:  Right.
23                MR. LAWLOR:  -- everybody was aware that that was
24     governing -- it was a governing document.  So I suspect that
25     no matter what we find, we're going to find that the
```