TOGUT, SEGAL & SEGAL LLP  
One Penn Plaza, Suite 3335  
New York, New York 10119  
Telephone: (212) 594-5000  
Fax: (212) 967-4258  
Frank A. Oswald  
Neil Berger  

HEARING DATE: AUGUST 16, 2019  
AT: 10:00 A.M.

*Counsel to Tannor Capital Advisors LLC*

**UNITED STATES BANKRUPTCY COURT**  
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | Chapter 11 |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | Case No. 18-23538 (RDD) |
| Debtors.[1] | **(Jointly Administered)** |

**OBJECTION OF TANNOR CAPITAL ADVISORS LLC TO CONFIRMATION OF THE MODIFIED SECOND AMENDED JOINT CHAPTER 11 PLAN OF SEARS HOLDINGS CORPORATION AND ITS AFFILIATED DEBTORS**

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); SHC Licensed Business LLC (3718); SHC Promotions LLC (9626); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND .............................................................................................................................2

    I.    The Chapter 11 Cases .........................................................................................................2

    II.    The Sale Transaction with Transform Holdco LLC and Pending Disputes.......................3

    III.    The Debtors' Plan and Disclosure Statement .....................................................................5

    IV.    The TPCF Claims ................................................................................................................9

OBJECTION ................................................................................................................................10

    I.    The Debtors Have Not Demonstrated that the Plan Complies with Section
        1129(a)(9) of the Bankruptcy Code ...................................................................................10

    II.    The Plan Is Not Feasible Pursuant to Section 1129(a)(11) of the
        Bankruptcy Code ...............................................................................................................14

CONCLUSION ..............................................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*In re Adelphia Business Solutions,*
  341 B.R. 415 (Bankr. S.D.N.Y. 2003) ............................................................................... 14

*In re Am. Capital Equip., LLC,*
  688 F.3d 145 (3d Cir. 2012) .............................................................................................. 11

*In re Scott Cable Commc'ns, Inc.,*
  227 B.R. 596 (Bankr. D. Conn. 1998) ............................................................................... 10

*In re Teligent, Inc.,*
  282 B.R. 765 (Bankr. S.D.N.Y. 2002) .......................................................................... 10, 13

*JP Morgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC*
  *(In re Charter Commc'ns, Inc.),* 419 B.R. 221 (Bankr. S.D.N.Y. 2009) ............................ 13

*Midway Airline Parts, LLC v. Midway Airlines Corp. (In re Midway),*
  406 F.3d 229 (4th Cir. 2005) ............................................................................................. 10

*Pan Am Corp. v. Delta Air Lines,*
  175 B.R. 438 (Bankr. S.D.N.Y. 1994) ............................................................................... 10

*Quarles v. U.S. Trustee,*
  194 B.R. 94 (W.D. Va. 1996) ............................................................................................ 11

*Sherman v. Harbin (In re Harbin),*
  486 F.3d 510 (9th Cir. 2007) ............................................................................................. 11

**Statutes**

11 U.S.C. § 1129 ................................................................................................................. 9, 11, 13

11 U.S.C. § 1129(a)(7) .................................................................................................................. 2

11 U.S.C. § 1129(a)(9) .................................................................................................. 1, 9, 10, 14

11 U.S.C. § 503(b)(1) .................................................................................................................... 7

11 U.S.C. § 507(b) .................................................................................................................. 7, 12

**Rules**

Fed. R. Bankr. P. 1015(b) .............................................................................................................. 2

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Tannor Capital Advisors LLC ("TCA"), is the general partner of Tannor Partners Credit Fund, LP ("TPCF"), the holder of claims entitled to administrative priority pursuant to section 503(b)(9) of title 11 of the United States Code (the "Bankruptcy Code"), and by its undersigned counsel, hereby submits this Objection (the "Objection") to confirmation of the *Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors* [ECF No. 4476] (the "Plan"),[2] and respectfully represents:

## PRELIMINARY STATEMENT

The Plan may not be confirmed because the Debtors have failed to satisfy the requirement set forth in section 1129(a)(9) of the Bankruptcy Code that all Administrative Expense Claims will be paid in full on the Effective Date of the Plan or upon allowance of such claims, under either the "Substantive Consolidation Settlement" or the "Deconsolidated Scenario."

Indeed, as proposed, the Plan fails to state unequivocally that the Administrative Expense Claims will be paid on the Effective Date. Moreover, neither the Plan, the Plan Supplements [ECF No. 4632], nor the Disclosure Statement (defined below) demonstrate or establish that the Debtors have sufficient assets to pay all allowed Administrative Expense Claims on the Effective Date or to fully reserve for them.

Rather, the Plan's provision for payments in full to holders of Administrative Expense Claims is conditional because it is: (a) based upon undisclosed and unknown assumptions concerning the Administrative Expense Claims, which the Debtors contend reduce the amount of 503(b)(9) Claims (defined below) from $1.36 billion to $181 million; (b)

---

[2] Capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

contingent upon the resolution of ongoing disputes in the Transform Litigation (defined below); (c) reliant on the use of the Wind Down Account, the balance of which appears to be insufficient to fully address all Allowed Administrative Expense Claims on the Effective Date; and (d) proposed without regard to costs associated with litigating potential disputes concerning claims in these cases.

Based upon the foregoing, and what is discussed below, TCA respectfully submits that the Plan is not confirmable based upon facts presently known and in the record, and the Debtors have not demonstrated a non-contingent, funded ability to satisfy the strict requirement that administrative creditors receive payment in full in cash on the effective date of the plan.[3]

## BACKGROUND

**I.     The Chapter 11 Cases**

1.     Beginning on October 15, 2019 (the "Petition Date") and continuing thereafter, each of the Debtors commenced with this Court a voluntary case (together, the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code in this Court (the "Court"). The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.     On October 24, 2018, the United States Trustee for Region 2 appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee"). No trustee or examiner has been appointed in these Chapter 11 cases (collectively, the "Bankruptcy Cases").

3.     The Debtors' Bankruptcy Cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

---

[3] In light of this failure, the Debtors have also not yet and, absent additional evidence, cannot establish that confirmation of the Plan is in the best interests of creditors, as required by Bankruptcy Code section 1129(a)(7).

2

## II. The Sale Transaction with Transform Holdco LLC and Pending Disputes

4. The record in the Chapter 11 Cases demonstrates that on January 17, 2019, the Debtors entered into the Asset Purchase Agreement (as amended, restated, supplemented, or otherwise modified from time to time, the "Asset Purchase Agreement") with Transform Holdco LLC ("Transform"), an entity controlled by ESL Investments, Inc. ("ESL"), the controlling shareholder of the Debtors prior to the Petition Date, to sell substantially all of their assets. *See* Disclosure Statement, § I.B. The Debtors are liquidating their remaining assets, and are not seeking to reorganize. *See id.*

5. Among other things, the Asset Purchase Agreement provides that, on the closing date of the Sale Transaction described in the Asset Purchase Agreement, Transform would assume certain liabilities, including the Assumed 503(b)(9) Liabilities (as defined in the Asset Purchase Agreement), subject to a dollar-for-dollar reduction if certain assets were not delivered at closing.

6. Transform's obligations regarding the Assumed 503(b)(9) Claims (as defined in the Asset Purchase Agreement) may not exceed $139 million in the aggregate. *See* ECF No. 2507, Ex. A (Asset Purchase Agreement) at § 2.3(k)(iv). However, pursuant to the Asset Purchase Agreement, Transform's Assumed 503(b)(9) Liabilities may also be reduced in the event that there is positive Aggregate DIP Shortfall Amount, Specified Receivables Shortfall Amount, Warranty Receivables Shortfall Amount, or Prepaid Inventory Shortfall Amount,[4] and in that event, the allocation of any reduction of the amount of the Assumed 503(b)(9) Claims "shall be determined by the Buyer in its sole discretion…." *Id.* at § 2.3(k)(vi)-(ix).

---

[4] The "Prepaid Inventory Shortfall" is defined as "an amount equal to $147,000,000 less the amount of the Prepaid Inventory as of the Closing Date." ECF No. 2507, Ex. A (Asset Purchase Agreement) at § 1.1. The "Specified Receivables Shortfall Amount" is defined as "an amount equal to $255,200,000 less the amount of the Specified Receivables delivered to [Transform] at Closing." *Id.*

3

7. On February 8, 2019, the Court entered an order approving the Sale Transaction and the Asset Purchase Agreement [ECF No. 2507].

8. On February 11, 2019, the Debtors and Transform closed and completed the Sale Transaction and substantially all of the Debtors' assets were transferred to Transform. *See* Disclosure Statement, § I.B.

9. The Debtors and Transform are currently engaged in litigation (the "Transform Litigation") regarding disputes arising from the Asset Purchase Agreement. On May 25, 2019, Transform filed a complaint against the Debtors [ECF No. 4033], alleging among other things, that the Debtors (a) delivered only approximately $75 million in Prepaid Inventory to Transform, creating a Prepaid Inventory Shortfall of at least $72 million; and (b) failed to deliver accounts constituting Specified Receivables of the type and in the amount agreed, *see* ECF No. 4033, ¶¶ 48, 50, 57, and as a consequence, Transform's obligations to assume the Severance Reimbursement Obligations and the Assumed 503(b)(9) Liabilities is reduced to $0. *See* ECF No. 4033, ¶¶ 52 ("Together with the reductions from the Specified Receivables Shortfall Amount, Transform's obligations to satisfy the Severance Reimbursement Obligations (estimated to be $20 million) and the Assumed 503(b)(9) Claims are reduced to $0.00."), 66 ("As a consequence of the Defendants' conduct, the amount of Specified Receivables actually delivered by the Defendants is estimated to be short by well in excess of an amount that, when added to the Prepaid Inventory Shortfall Amount, would reduce Transform's obligation to assume the Severance Reimbursement Obligations and the Assumed 503(b)(9) Liabilities to $0.00."); *see also* ECF No. 4480, p. 22 ("Transform's Obligation, ***If Any***, to Assume 503(b)(9) Liabilities Is Reduced by Shortfalls in Prepaid Inventory and Specified Receivables") (emphasis supplied).

4

10. While the Debtors have disputed Transform's allegations, the Transform Litigation has not yet been concluded.

### III. The Debtors' Plan and Disclosure Statement

11. On July 9, 2019, the Debtors filed the Plan [ECF No. 4476] and the *Disclosure Statement for Modified Second Amended Joint Chapter 11 Plan of Sears Holding Corporation and Its Affiliated Debtors* [ECF No. 4478] (the "Disclosure Statement").[5]

12. The Plan contemplates a deposit account at Bank of America, N.A. (the "Wind Down Account") to hold amounts that will be available and used only to satisfy the wind down costs of the Debtors and the Liquidating Trust. *See* Plan, § 1.192. As of June 22, 2019, the balance of the Wind Down Account was approximately $53 million. *See* Disclosure Statement, § 1.B.

13. Section 2.1 of the Plan provides that, except to the extent that a holder of an Allowed Administrative Expense Claim agrees otherwise, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim) shall receive cash in an amount equal to such Allowed Administrative Expense Claim. *See* Plan, § 2.1(a).

14. However, the treatment and means for payment of Allowed Administrative Expense Claims in the Plan is conditional, risky, and unlikely. Specifically, holders of Administrative Expense Claims will be paid:

> (x) first out of the Wind Down Account; and (y) ***if the amount available for Distribution pursuant to the foregoing clause (x) is insufficient*** to remit all Distributions required to be made to such holders pursuant to this sentence, ***subject to*** the payment in full of any Allowed ESL 507(b) Priority Claims and Other 507(b) Priority Claims in accordance with Sections 2.4 and 2.5 of the Plan, respectively, from the Net Proceeds of Total Assets; provided, that,

---

[5] On June 28, 2019, the Court entered an order approving the Debtor's initial disclosure statement. [ECF No. 4392].

5

for the avoidance of doubt Administrative Expense Claims shall be paid on the latest of (i) the Effective Date, (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, and (iii) the next Distribution Date after such Administrative Expense Claim becomes an Allowed Administrative Expense Claim. For the avoidance of doubt, this Section 2.1 shall not govern Distributions on Allowed ESL 507(b) Claims and Other 507(b) Priority Claims and Distributions on such Claims shall be governed by Sections 2.4 and 2.5 of the Plan, respectively. [Plan, § 2.1(a) (emphasis supplied)]

15. In accordance with the Asset Purchase Agreement, holders of Allowed Administrative Expense Claims arising under section 503(b)(9) shall be paid:

(x) first by or on behalf of the Debtors on or after the date that Transform or any of its subsidiaries satisfies any amounts that may be owed pursuant to section 2.3(k)(iv) of the Asset Purchase Agreement up to $139 million in the aggregate, *as may be reduced*, dollar-for-dollar by, as applicable, the Aggregate DIP Shortfall Amount, Specified Receivables Shortfall Amount, Warranty Receivables Shortfall Amount and Prepaid Inventory Shortfall Amount (as those terms are defined in the Asset Purchase Agreement) and less any amounts previously satisfied by the Transform or any of its subsidiaries, and (y) if the amount available for Distribution pursuant to the foregoing clause (x) is insufficient to remit all Distributions required to be made to such holders pursuant to this sentence, in accordance with Section 2.1(a). [Plan, § 2.1(b) (emphasis supplied)].

16. Pursuant to the Plan, Allowed Fee Claims shall be satisfied in full from (a) the proceeds of the Carve Out Account (as defined in the DIP Order), and (b) net proceeds of the Total Assets. As set forth in the Plan, such Fee Claims will be paid:

in full, in Cash, by the Debtors or Liquidating Trust, as applicable, in such amounts as are Allowed by the Bankruptcy Court (i) on the date upon which an order relating to any such Allowed Fee Claim is entered or as soon as reasonably practicable thereafter; or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim, the Debtors (subject to the consent of the Creditors' Committee, not to be unreasonably withheld), or the Liquidating Trustee, as applicable, (x) first out of the Carve Out Account; and (y) if the amount available for

6

> Distribution pursuant to the foregoing clause (x) is insufficient to remit all Distributions required to be made to such holders pursuant to this sentence, from the Net Proceeds of Total Assets. Notwithstanding the foregoing, any Fee Claims that are authorized to be paid pursuant to any administrative orders entered by the Bankruptcy Court may be paid at the times and in the amounts authorized pursuant to such orders. [Plan, § 2.2(b).][6]

17. As of June 22, 2019, the Debtors estimated that the Administrative Expense Claims, excluding any claim entitled to administrative priority under section 507(b) of the Bankruptcy Code, total approximately $468 million in the aggregate for all of the Debtors. *See* Disclosure Statement, § IV.T. However, this estimate attributed only $181 million to claims against the Debtors asserting administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Claims"), *see id.,* notwithstanding that as of June 19, 2019, holders of 503(b)(9) Claims filed 2,540 proofs of claim totaling approximately $1.36 billion, and the Debtors' analysis of those claims has not been completed, nor have there been filings of objections to administrative claims. *See id.* The Debtors have not provided their reconciliation of the Administrative Expense Claims, specifically the 503(b)(9) Claims and claims asserted pursuant to Bankruptcy Code section 503(b)(1). Nor have the Debtors publicly disclosed which Administrative Expense Claims they believe may be allowed, despite asserting that a preliminary analysis has been conducted sufficient to support the Debtors' estimation of allowable Administrative Expense Claims. That analysis should be provided to the Court, TPCF, and other parties in interest prior to the Confirmation Hearing.[7]

---

[6] The Plan is unclear regarding how Allowed Fee Claims will be paid should the Carve Out Account ultimately be insufficient, creating room for the possibility that the Plan discriminates against one set of Administrative Expense Claims, the 503(b)(9) Claims (defined below), while it pays other administrative creditors in full, and thereby is not proposed in good faith pursuant to section 1129(a)(3) of the Bankruptcy Code.

[7] The Debtors' conclusory statements concerning the projected total allowed amount of the 503(b)(9) Claims to date are insufficient. *See* Disclosure Statement, § IV.T.

7

18. In addition, Transform has asserted that the ESL 507(b) Priority Claims, which pursuant to Section 2.1(a) of the Plan must be satisfied before other Administrative Expense Claims are paid, could exceed $50 million and can be paid from the Debtors' general assets. *See* Disclosure Statement, § I.B, n.11. Further, Wilmington Trust, National Association, as Indenture Trustee and Collateral Agent for the Second Lien Lenders, has sought a Rule 3012 determination of secured claims and administrative claims pursuant to 11 U.S.C § 506(a) and 507(b) [ECF No. 4279], which could total as much as $50 million, and thus further imperil the Debtors' ability under the Plan to pay in full all administrative claims as required by section 1129(a)(9) of the Bankruptcy Code.

19. When the Disclosure Statement was filed, the Debtors estimated that the assets available to satisfy Administrative Expense Claims totaled approximately $487 million, which were comprised of, among other things, Transform's agreement to assume up to $263 million[8] of liabilities (subject to reduction in accordance with the Asset Purchase Agreement), $69 million in various operating accounts, $69 million in the professional fee Carve Out Account, and $39 million in cash and inventory currently being withheld by Transform. *See id.* Accordingly, a significant portion of the amount that the Debtors assert is available to satisfy Administrative Expense Claims is attributable to Transform's assumed liabilities, which Transform now disputes, and the assets shown on the balance sheet in the Debtors' latest filed monthly operating report are insufficient to satisfy confirmation needs, rendering satisfaction of

---

[8] The $263 million is comprised of (i) $139 million of 503(b)(9) Claims, (ii) $13 million in severance costs, (iii) $166 million in Accounts Payable, less $55 million in Prepaid Inventory Shortfall. *See id.*

claims held by TPCF and other administrative creditors highly speculative. *See* ECF No. 4590, p. 14-15.[9]

20. In addition, in the event that Transform's obligation to satisfy 503(b)(9) Claims is reduced rather than eliminated, "[t]he allocation of any reduction . . . of the amount of the Assumed 503(b)(9) Claims among any specific Assumed 503(b)(9) Claims ***shall be determined by Buyer in its sole discretion***...." ECF No. 2507, Ex. A (Asset Purchase Agreement), at 2.3(k)(vii)-(ix) (emphasis supplied). No information has been provided to the entire body of claim holders regarding the assumed 503(b)(9) Claims by Transform while they receive benefits under the proposed Plan.

21. On July 26, 2019, the Debtors filed the *Notice of Filing of Plan Supplement in Connection with the Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors* [ECF No. 4632].

## IV. The TPCF Claims

22. TPCF is the holder of timely file 503(b)(9) claims in the aggregate amount of $940,267.60 (collectively, the "TPCF Claims"). A schedule of the TPCF Claims is annexed hereto as **Exhibit A**.

23. The Debtors are required to pay the full amount of the TPCF Claims in cash on the Effective Date of the Plan pursuant to section 1129(a)(9) of the Bankruptcy Code. TPCF does not consent to confirmation of a plan that does not pay the TPCF claims in full in cash on the Effective Date.

---

[9] The Debtors' liquidation analysis, contained in Exhibit E-1 of the Disclosure Statement, explains: "Administrative Expense Claims include 503(b)(9) Claims and U.S. Trustee fees. The approximately $77 million of estimated 503(b)(9) Claims represents $181 million of total estimated 503(b)(9) Claims reduced by $139 million of liabilities assumed by ESL pursuant to the Asset Purchase Agreement and increased by the net remaining Prepaid Inventory Shortfall (as defined in the Asset Purchase Agreement) of $35 million." *Id.* at Ex. E-1, at § III.7(c)

9

**OBJECTION**

24. The Plan may not be confirmed because the proponents have not satisfied the requirements of section 1129 of the Bankruptcy Code. Absent a segregated reserve for the full amount of all of the administrative expense claims in the Chapter 11 Cases, the Plan violates section 1129(a)(9) and 1129(a)(11) of the Bankruptcy Code.

### I. The Debtors Have Not Demonstrated that the Plan Complies with Section 1129(a)(9) of the Bankruptcy Code

25. The Plan cannot be confirmed until the Debtors demonstrate their ability to satisfy the clear and unambiguous requirement that, on the Effective Date, holders of Administrative Expense Claims will be paid in full in cash on account of such claims, unless they have agreed otherwise. Indeed, there appears to be a significant risk of the Debtors' administrative insolvency on both an individualized and a consolidated basis.

26. The timing and payment of administrative claims is governed by section 1129(a)(9)(A) of the Bankruptcy Code, which requires that with respect to administrative expense claims, "on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim, unless the "holder of a particular claim has agreed to a different treatment of such claim. 11 U.S.C. § 1129(a)(9); *see also* 11 U.S.C. § 507(a)(2); *Midway Airline Parts, LLC v. Midway Airlines Corp. (In re Midway),* 406 F.3d 229, 242 (4th Cir. 2005) (noting that "an administrative expense claim under § 503(b) must be paid in cash on the effective date of the plan in a chapter 11 proceeding"); *Pan Am Corp. v. Delta Air Lines*, 175 B.R. 438, 483 (Bankr. S.D.N.Y. 1994) (referring to Bankruptcy Code section 1129(a)(9) as the "administrative solvency" requirement and stating that "[b]y itself, administrative insolvency would have prevented confirmation of the Joint Plan."); *see also In re Teligent, Inc.*, 282 B.R. 765, 722 (Bankr. S.D.N.Y. 2002) (noting, when a debtor tried

to pay administrative claimants less than full payment, that any administrative creditors solicited by the debtors could prevent confirmation by refusing the different treatment and demanding payment in full); *In re Scott Cable Commc'ns, Inc.*, 227 B.R. 596, 600 (Bankr. D. Conn. 1998) ("The code's confirmation scheme elevates allowed administrative claims to a dominant priority such that unless the holders agree to a different treatment, a plan cannot be confirmed without full payment of those claims even if there are no estate assets to pay them.").

27. The Plan does not provide for such different treatment, and creditors can take no comfort in the Debtors' assurances of administrative solvency, which, if achievable at all, can only occur under the Substantive Consolidation Settlement, a highly favorable outcome of the Transform Litigation, and with uncertain proceeds from litigation and causes of action that will be pursued by a Liquidation Trust after confirmation and the Effective Date of the Plan.

28. The Debtors' reliance upon would-be, prospective outcomes and recoveries from litigation is insufficient to meet their burden of satisfying the confirmation requirements of Bankruptcy Code section 1129. *See e.g.*, *In re Am. Capital Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012) ("A plan will not be feasible if its success hinges on future litigation that is uncertain and speculative, because success in such cases is only possible, not reasonably likely.") (quoting *Sherman v. Harbin (In re Harbin)*, 486 F.3d 510, 519 (9th Cir. 2007)); *Quarles v. U.S. Trustee*, 194 B.R. 94, 97 (W.D. Va. 1996) (stating that a debtor's premise "that outcomes in pending litigation favorable to him will cure his financial ills is pure speculation" and concluding that the debtor did not have a reasonable likelihood of effectuating a reorganization).

29. To the contrary, even a cursory examination of the Debtors' projections reveals the thin reed of their financial position. Indeed, the Creditors' Committee recently

11

observed that "there remains a significant possibility that any plan confirmed in these cases will require concessions by the Debtors' administrative creditors." ECF No. 4239, ¶ 2; *see also* ECF No. 4636, ¶ 17 (Declaration in Support of Motion of Debtors for Modification of Retiree Benefits).

30. The Debtors are liquidating, and nothing in their monthly operating reports points to an improvement in their financial condition. Even with the proposed subordination or elimination of postpetition Intercompany Claims, numerous unresolved and highly contested issues will affect, and potentially erode, each of the sources of cash that the Debtors forecast will be available for payment of administrative claims. Those issues include:

31. *First,* there are substantial risks associated with numerous contingencies for which the Debtors must obtain favorable outcomes, including, among others, the reconciliation of the 503(b)(9) Claims and the extent of allowed claims under section 507(b) of the Bankruptcy Code. As set forth above, the Debtors have exposure to approximately $1.36 billion of 503(b)(9) Claims. Without articulating their reasoning, the Debtors set the aggregate expected total of 503(b)(9) Claims at $181 million. *See* Disclosure Statement, § IV.T. However, TPCF can put no faith in the unsupported assertions by the Debtors or the Debtors' speculation concerning 503(b)(9) Claims amounts based solely on preliminary analysis.

32. *Second,* the Plan is premised upon the Debtors winning virtually every one of the ongoing disputes with Transform concerning the extent of Transform's obligations to the Debtors under the Asset Purchase Agreement, the amount of the claims by holders Second Lien Debt and ESL's 507(b) Priority Claims, and losing any one of the material disputes with Transform could render the Debtors administratively insolvent on an individualized or consolidated basis.

33. Should Transform prevail even partially in its litigation against the Debtors, the funds available to pay 503(b)(9) Claims would be dramatically reduced and potentially fall short of the amount needed to satisfy all allowed 503(b)(9) Claims. The Transform Litigation is hotly contested and may likely continue beyond the Confirmation Hearing. Until the disputes in the Transform Litigation are resolved, the Debtors cannot demonstrate by a preponderance of the evidence their ability to pay, or reserve for, the 503(b)(9) Claims. *See, e.g., JP Morgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns, Inc.),* 419 B.R. 221, 244 (Bankr. S.D.N.Y. 2009) (observing that plan proponent bears the burden of establishing by a preponderance of the evidence that a plan meets the requirements of section 1129 of the Bankruptcy Code).

34. *Third,* the Wind Down account balance is woefully short of the Debtors' estimate of the cash available in the Wind Down Account. Accordingly, should Transform prevail on its claims against the Debtors – even in part – or should the Debtors' assumptions concerning reconciliation of the 503(b)(9) Claims be incorrect, the assets available in the Wind Down Account are likely to be insufficient to satisfy the Administrative Expense Claims in full.

35. *Fourth and finally,* the Debtors have not included costs associated with litigating disputes with respect to each type of Administrative Expense Claims, which further compounds the risk of administrative insolvency. If the Debtors' assumptions are inaccurate as to known administrative claims, the risk that 503(b)(9) Claims will not be paid in full increases. In addition, in the event of reductions under the Asset Purchase Agreement, Transform – in its sole discretion – may reduce the amount of 503(b)(9) Claims that it will satisfy.

36. For these reasons, the Debtor have not demonstrated that the proposed treatment of administrative claims under the Plan is feasible or satisfies the requirements of

13

section 1129 of the Bankruptcy Code.  This failure renders the Plan unconfirmable as a matter of law.  *See, e.g.*, *In re Teligent, Inc.*, 282 B.R. at 722.

## II. The Plan Is Not Feasible Pursuant to Section 1129(a)(11) of the Bankruptcy Code

37. Section 1129(a)(11) of the Bankruptcy Code requires that, as a condition of conformation of a plan:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).  This condition is "commonly referred to as the feasibility requirement." *In re Adelphia Business Solutions,* 341 B.R. 415, 421 (Bankr. S.D.N.Y. 2003).

38. Accordingly, the Debtors must demonstrate that the Plan's provision for the payment in full of all Allowed Administrative Expense Claims is feasible.  While the Plan purports to provide that each holder of an Allowed Administrative Expense Claim will be paid in full (absent an agreement to accept other treatment), for the reasons stated above, the Debtors have not demonstrated by a preponderance of the evidence their ability to satisfy the TPCF Claims and other administrative claims.  TPCF respectfully submits that to do so, the Debtors must demonstrate their capacity to pay or reserve for all claims entitled to administrative expense priority assuming worst-case scenarios for the Transform Litigation and other sources of assets to comply with Bankruptcy Code sections 1129(a)(9) and (11).

39. Based upon the foregoing, confirmation of the Plan must be conditioned on the establishment of a segregated reserve that will be funded upon confirmation with enough liquidity to satisfy the Allowed Administrative Expense Claims, including the TPCF Claims.

## CONCLUSION

**WHEREFORE**, TPCF respectfully requests that the Court enter an Order (i) denying confirmation of the Plan or, in the alternative, condition confirmation of the Plan upon the establishment of a cash reserve that will be used solely to satisfy the Allowed Administrative Expense Claims, and (ii) granting TPCF such other and further relief as the Court deems appropriate.

Dated:  New York, New York
        July 31, 2019

                                              TANNOR CAPITAL ADVISORS LLC

                                              By its Attorneys:
                                              TOGUT, SEGAL & SEGAL LLP
                                              By:

                                              */s/ Neil Berger*
                                              FRANK A. OSWALD
                                              NEIL BERGER
                                              One Penn Plaza, Suite 3335
                                              New York, New York 10119
                                              Telephone: (212) 594-5000
                                              Fax: (212) 967-4258

# EXHIBIT A

**(TPCF Claims)**

| TPCF Claims | | | |
|---|---|---|---|
| **Claim No.** | **Date** | **Debtor** | **Claim Value** |
| 471 | 10/18/2018 | Sears Holdings Corporation | $183,648.00 |
| 518 | 10/19/2018 | Sears, Roebuck and Co. | $80,640.00 |
| 581 | 10/19/2018 | Sears, Roebuck and Co. | $183,648.00 |
| 822 | 10/21/2018 | Sears Holdings Corporation | $80,640.00 |
| 1069 | 10/25/2018 | Sears Holdings Corporation | $94,223.00 |
| 1597 | 10/24/2018 | Sears Holdings Corporation | $9,360.00 |
| 2271 | 11/1/2018 | Sears Holdings Corporation | $9,289.41 |
| 5413 | 11/26/2018 | Sears Holdings Corporation | $3,683.04 |
| 5535 | 11/27/2018 | Sears Brands, L.L.C. | $3,010.95 |
| 5956 | 12/8/2018 | Kmart Corporation | $7,704.00 |
| 6138 | 12/11/2018 | Sears Holdings Corporation | $4,239.36 |
| 6729 | 12/20/2018 | Sears, Roebuck and Co. | $133,790.77 |
| 6794 | 12/26/2018 | Sears Holdings Corporation | $81,480 |
| 7450 | 1/8/2019 | Sears, Roebuck and Co. | $30,000.00 |
| 11282 | 3/18/2019 | Sears Holding Corporation | $34,911.07 |

**Total:** $940,267.60