Paul J. Labov
**FOLEY & LARDNER LLP**
90 Park Avenue
New York, New York 10016-1314
Telephone: (212) 682-7474
Facsimile: (212) 687-2329
E-mail: plabov@foley.com

Erika L. Morabito (admitted *pro hac vice*)
**FOLEY & LARDNER LLP**
3000 K. Street, N.W., Suite 600
Washington, D.C. 20007-5109
Telephone: (202) 295-5300
E-mail: emorabito@foley.com

*Counsel to Whitebox Asymmetric Partners, LP;*
*Whitebox Multi-Strategy Partners, LP; Hain*
*Capital Investors Master Fund, Ltd. and; Cherokee*
*Debt Acquisition, LLC.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br>SEARS HOLDINGS CORPORATION, *et al.*,<br>Debtors.[1] | Chapter 11<br><br>Case No. 18-23538 (RDD)<br>(Jointly Administered) |

**OBJECTION TO MODIFIED SECOND AMENDED JOINT CHAPTER 11 PLAN OF**
**SEARS HOLDING CORPORATION AND ITS AFFILIATED DEBTORS**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC (5554); Sears STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816); The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

Whitebox Asymmetric Partners, LP, Whitebox Multi-Strategy Partners, LP, Hain Capital Investors Master Fund, Ltd., and Cherokee Debt Acquisition, LLC (collectively, the "Priority Claimant Consortium"),[2] by and through their undersigned counsel, hereby submit this Objection to the *Modified Second Amended Joint Chapter 11 Plan Of Sears Holding Corporation* and its Affiliated Debtors (the "Plan") [D.E. #4476],[3] proposed by Sears Holding Corp. and its affiliates in these jointly administered cases (collectively, the "Debtors").[4]

## PRELIMINARY STATEMENT

1. Quite simply, as a matter of law, the Debtors cannot confirm the Plan (or any plan) by running a non-consensual "Bluelight Special" on their administrative claims. Yet that is exactly what they propose to do here.

2. After months of hard-fought negotiations with various stakeholders, the Debtors have filed a plan of liquidation designed to end these bankruptcy cases. As of the Objection Deadline, however, the Debtors have not resolved their disputes with either Transform Holdco LLC ("Transform") – in connection with claims under the APA (defined below) – or Cyrus Capital Partners, ESL Investments, and Wilmington Trust Co. (collectively, the "Second Lien Parties") – in connection with their Adequate Protection Claims. Given the resulting uncertainty of these disputes, and for the many reasons set forth herein, the Debtors are not able to confirm a plan of liquidation today that conforms to the requirements of section 1129 of the Bankruptcy Code as a matter of law. While the Priority Claimant Consortium remains hopeful that a resolution can be

---

[2] The members of the Priority Claimant Consortium collectively hold a significant percentage of the total amount of estimated Administrative Expense Claims.

[3] A Plan supplement was filed on July 29, 2019 [D.E. #4632].

[4] Any capitalized terms not otherwise defined have the definition ascribed to them in the Plan.

reached that would allow the Debtors to promulgate a confirmable Plan, unfortunately the Plan before the Court today cannot be confirmed for several reasons.

3. First, the Debtors have not established that they can fund all administrative claims, *even if* the outstanding disputes with Transform and the Second Lien Parties are resolved. To the contrary, the Debtors and the Committee have indicated that the Plan will not likely satisfy section 1129 without significant concessions by administrative claim holders. *See* D.E. ##3429, 4636. But, there is no indication that these administrative claim holders will accept any impairment. Indeed, as the Plan is currently proposed, the Priority Claimant Consortium (whose members hold a significant amount of Administrative Expense Claims) have not consented to this treatment. For this reason alone, the Plan is not confirmable.

4. Second, regardless of whether or not the Transform APA provides for payment of 503(b)(1) or 503(b)(9) claims, the terms of the APA do not establish or satisfy the Debtors' obligations to confirm a plan under section 1129 of the Bankruptcy Code. Stated simply, a resolution of the Transform Dispute (defined below) is not determinative as to whether the Debtors have satisfied the requirements to confirm a plan under section 1129 of the Bankruptcy Code. Clearly, from a "cash" perspective, the resolution of the Transform Dispute is critical, but it is not determinative as to whether or not the Debtors can confirm the Plan.

5. Third, despite knowing that they will need support and concessions from administrative creditors, the Debtors, incredulously, seek to pay professionals in full while pushing similarly situated administrative claimholders into a Disputed Claims Reserve - one they are unable (or unwilling) to adequately fund. Here again, the Plan falls short. Even if the Debtors were able to surmount a severe funding deficit, which they cannot, the Debtors have impermissibly created two

classes of administrative expense claims. For this additional reason, the Plan today is not confirmable.

6. Only upon resolving the current deficiencies in the Plan as set forth in more detail below, will the Debtors be able to confirm a plan. While the Priority Claimant Consortium understands the dynamics and head winds in this regard, a plan simply cannot be confirmed that pays professionals in full, provides money to unsecured creditors and leaves administrative claimants "holding the bag." That said, the Priority Claimant Consortium has indicated to both the Debtors and the Committee that it remains ready, willing, and able to discuss a construct that does satisfy all of the elements of section 1129 of the Bankruptcy Code such that the Plan (if modified) could ultimately garnish the support of all of administrative creditors and be confirmed.

## BACKGROUND

### I.     The Chapter 11 Cases

7. The Debtors commenced voluntary cases under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") beginning on October 15, 2018, in the United States Bankruptcy Court for the Southern District of New York (the "Court").

8. On October 16, 2018, the Court entered an order administratively consolidating the Debtors' bankruptcy cases for procedural purposes only, pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") [D.E. #118].

9. The Debtors are authorized and continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

10. On October 24, 2018, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee"). No trustee or examiner has been appointed in these Chapter 11 cases.

11. On November 30, 2018, the Court entered the *Final Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, And (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (the "Final DIP Order") [D.E. #952]. The Final DIP Order provides certain protections to the Debtors' estates, including the sequestration of cash from the proceeds of unencumbered collateral into a Wind-Down Account as well as the establishment of a "Carve-Out" account for professional fee claims. *See* Final DIP Order at ¶¶ 23 and 21, respectively. Neither the DIP Lender, ESL, nor any other secured claim or adequate protection claim holder is entitled to or otherwise able to seek payment from these accounts. *Id.*

## II. Transform Holdco LLC

12. The Debtors' strategy at the outset of these cases was to either (i) reorganize around a smaller footprint, or (ii) sell substantially all of their operating assets to the highest and best bidder. By late Fall 2018, the Debtors recognized that the costs and time associated with pairing down the operating assets into a feasible operation was futile, and pivoted to focusing on a sale of the assets – or subset of the assets – to the highest and best bidder.

13. On January 17, 2019, with their cash runway evaporating, the Debtors entered into an Asset Purchase Agreement (the "APA") with Transform, an "insider" entity as defined by section 101(31) of the Bankruptcy Code.

14. On February 8, 2019, the Court entered an order approving the Sale Transaction and the Asset Purchase Agreement [D.E. #2507]. The Sale Transaction closed on February 11, 2019.

15. Almost immediately after closing, the Debtors and Transform began to dispute their respective understandings of provisions in the APA that governed payment of certain obligations,

including, among other things, payment of 503(b)(9) and 503(b)(1) claims and severance obligations (the "Transform Dispute").

16. The parties quickly turned to litigation to resolve this dispute, with Transform filing a Complaint against the Debtors [D.E. #4033] and the Debtors engaging in motion practice with Transform [D.E. #4034] to resolve these issues. That litigation is still ongoing. *See, e.g.*, D.E. ##4029, 4430, and 4464.

17. To date, there has been no final resolution of these issues. On July 11, 2019, in an oral ruling, the Court ordered the parties to meet and confer regarding the dispute. To the extent the parties are not able to resolve the Transform Dispute, the Court will hold a hearing on the issues on August 12, 2019. Thus, the Court may ultimately resolve the Transform Dispute.

18. While not determinative as to whether or not the Debtors can ultimately satisfy all of the obligations of section 1129 of the Bankruptcy Code, the Debtors' practical ability to confirm the Plan is in large part premised upon a resolution of the Transform Dispute. Specifically, the Liquidation Analysis provides that $319,000,000 of Administrative Expenses are being assumed by Transform. But even if the Debtors are victorious in the Transform Dispute, as predicted in the Liquidation Analysis, the Debtors have not and cannot establish that they will be able to pay Allowed Administrative Expense Claims. Further, the Debtors have not and cannot show that they have the ability to fund a Disputed Claims Reserve for the full amount of disputed Administrative Expense Claims that currently exist.

### III. The 2L's and 507(b) Dispute

19. In addition to the Transform Dispute, the Debtors are embroiled in an adequate protection fight with the Second Lien Parties. The Second Lien Parties have asserted a 507(b) claim totaling approximately $201 million. Further, ESL Investments asserted that its 507(b) claim was not

capped by the APA. The Debtors asserted that collateral was subject to a surcharge under section 506(c).

20. On August 1, 2019, in an oral ruling, the Court denied the Debtors' request to surcharge ESL Investments, Cyrus Capital Partners, and Wilmington Trust Co., for more than $1.4 billion in estate expenses under section 506(c). However, the Court noted the Second Lien Parties may have superpriority claims under section 507(b) and asked the parties to apply a specific formula to determine the amount of these claims. Also, the Court capped ESL's superpriority claim at $50 million pursuant to the term of the APA.

21. Thus again, the Debtors' ability to confirm the Plan may in large part depend on their financial wherewithal to resolve and pay adequate protection claims to the Second Lien Parties. Although these claims will not be entitled to draw from the Wind-Down or Carve-Out Accounts, without paying these claims in full, the Debtors will not be able to confirm the Plan absent concessions by the Second Lien Parties.

### IV. The Plan

22. On July 9, 2019, the Debtors filed the Plan, along with the corresponding Disclosure Statement for Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors (the "Disclosure Statement") [D.E. #4478].

23. The Plan contains nothing more than a restatement of the Bankruptcy Code provision on the treatment of Administrative Expense Claims, *to wit*, – if an Administrative Expense Claim is Allowed on the Effective Date, that claim will be paid on the Effective Date. *See* Plan § 2.1(a); 11 U.S.C. §1129(a)(9)(A).

24. Importantly, the Plan suggests that only "Allowed" Administrative Expense Claims will be paid in full in cash on the Effective Date, while "Disputed" claims – those that are not

technically allowed – are apparently placed into a Disputed Claims Reserve. Section 1.51 indicates that a claim is Disputed if it is neither allowed nor disallowed under the Plan or a final order. Section 12.1 allows the Debtors 180 days after the effective date to object to claims including 503(b)(9) claims. Therefore, there is incentive for the Debtors to delay consideration of 503(b)(9) claims. In essence, the Debtors may have created a construct where no Administrative Expense Claims will be "Allowed" on the Effective Date; therefore, seeking to provide a "backdoor" mechanism that would allow the Plan to meet the requirements of 507(a)(2) and thus, 1129(a)(9). Tellingly, there is **no provision in the Plan** requiring the Debtors to fund a Disputed Claims Reserve for *Administrative Expense Claims.*

25. Moreover, it appears that the Debtors are attempting to delay reconciliation and/or payment of Administrative Expenses, – even those they know exist – in favor of confirmation, while also trying to seed a litigation trust with $25,000,000 for the benefit of Committee Counsel and ostensibly, unsecured creditors. *See* D.E. #4632 (naming Akin Gump Strauss Hauer & Feld LLP as counsel for the Liquidating Trust). *See also* Plan §§1.51 and 12.1 (provisions when read together incentivize Debtors to not allow claims prior to the Effective Date), § 2.1 (silent as to whether Disputed Administrative Expense Claims Reserve will be funded and paid prior to funding the Liquidating Trust).

26. In short, the Debtors and the Committee, through the Plan Settlement in Section 9.2 of the Plan, have designed a plan that disposes of the requirements of the Bankruptcy Code, in favor of a "kicking the can" approach that will undoubtedly funnel significant dollars to professionals. In this respect, the Plan is carried on the backs of certain administrative creditors – those that are not professionals.

## V. The Priority Claimant Consortium

27. The Priority Claimant Consortium is made up of multiple creditors who hold a variety of priority claims classified as section 503(b) claims under the Bankruptcy Code. In the aggregate, these claims total approximately $35,000,000 to $40,000,000. Pursuant to Bankruptcy Code section 1129(a)(9), and given that the Priority Payment Consortium holds administrative claims, the Priority Payment Consortium is not technically considered a "class" of claims that votes to accept or reject the Plan. This is only true because the Bankruptcy Code predicates confirmation of any Chapter 11 plan on the Administrative Expense Claim holders being paid in full and thus, unimpaired. Nevertheless, as the Priority Claimant Consortium holds Administrative Expense Claims – indeed a significant amount – it is entitled to object to the Plan to the extent the Plan does not satisfy the requirements of section 1129 of the Bankruptcy Code.

## LEGAL ARGUMENT

28. The current Plan cannot be confirmed as a matter of law. A plan may only be confirmed if it satisfies all of the requirements for confirmation under section 1129 of the Bankruptcy Code. *See In re Fur Creations by Varriale, Ltd.*, 188 B.R. 754, 760 (Bankr. S.D.N.Y. 1995). The burden to prove that the Plan complies with the statutory requirements for confirmation is on the Debtors. *Id.* at 760. As shown below, the Plan cannot be confirmed because it violates the requirements of sections 1129(a)(1), 1129(a)(9), 1129(a)(11) of the Bankruptcy Code.

**A. The Plan Violates Bankruptcy Code Section 1129(a)(1)**

29. The Plan does not comport with Bankruptcy Code section 1129(a)(1) because it does not comply with the applicable provisions of title 11. Section 1129(a)(1) explicitly states that the court may only confirm a plan if "[t]he plan complies with the applicable provisions of [title 11]." *See* 11 U.S.C. §1129.

9

30. As discussed in greater detail below, the Plan violates several sections of the Bankruptcy Code.

### 1. The Plan Violates Section 507 of the Bankruptcy Code

31. Section 507 of the Bankruptcy Code sets forth the priority of payment for each class of creditor. The priority scheme is sacrosanct in bankruptcy and may only be disturbed if parties agree to other treatment or through specific mechanisms not in use in the Plan. *See Czyzewski v. Jevic Holding Corp.*, 137 S.Ct. 973, 978 (2017).

32. It is black letter law that the priority scheme requires that administrative expenses are paid prior to general unsecured claims. *See* 11 U.S.C. §§ 507(2)-(3).

33. Notwithstanding the Supreme Court's clear ruling, the Debtors here are seemingly trying to skip over certain administrative creditors, including the Priority Claimant Consortium.

34. Section 10.13 of the Plan – the Committee Settlement - states "[o]n the Effective Date, the Liquidating Trust is expected to be funded with cash in an amount equal to $25 million; provided that, for avoidance of doubt, this Section 10.13 shall not be a condition precedent to the Plan."

35. However, there is **no provision in the Plan** requiring the Debtors to fund a Disputed Claims Reserve for ***Administrative Expense Claims*** based on the estimated Disputed Administrative Expense Claims prior to funding the $25,000,000 Liquidating Trust.

36. In essence, the Debtors and the Committee have impermissibly categorized certain Administrative Expense Claims as "Disputed" thus allowing them to technically conform to the requirements of 507(a)(2). This is simply a ruse as the Debtors and the Committee are acutely aware. As noted in their Disclosure Statement, the Debtors are aware of at least $686,000,000 of Allowed Administrative Expenses. *See* Disclosure Statement § T (Debtors estimate $468 million

in Administrative Expense Claims, not including an additional $214 million in professional fees nor any amount of currently estimated 507(b) claims).

37. Adding insult to injury, the Plan is entirely unclear as to whether or not Administrative Expense Claim holders are entitled to seek payment at all – let alone priority payment – from the Liquidating Trust. Indeed, Administrative Expense claimants are not listed as a named party who has a Liquidating Trust Interest in section 1.107 of the Plan. Therefore, not only is the Liquidating Trust potentially being funded with money that should otherwise be used to fund a Disputed Claims Reserve, the Administrative Expense claimants may not even be able to recover from the Liquidating Trust.[5]

38. Moreover, because the Plan as currently drafted allows General Unsecured Creditors access to proceeds from the Liquidating Trust and does not provide for a full Disputed Claims Reserve for estimated Administrative Expenses prior to funding that Trust, the Plan grants improper priority to General Unsecured Creditors and should not be confirmed. *See In re Jevic Holding Corp.*, 137 S.Ct. at 978 (finding court must follow the priority scheme in structured dismissals, just as the court must follow the priority scheme when confirming a plan); *Dish Network Corp. v. DBSD N. Am., Inc.* (*In re DBSD N.A., Inc.*), 634 F.3d 79, 88 (2d Cir. 2010) (reversing confirmation order on absolute-priority grounds). Therefore, this Court should deny confirmation because the Debtors cannot meet priority requirements in section 507 of the Bankruptcy Code.

---

[5] The language of the Plan is unclear. For example, while Administrative Expense Claimants are not listed as parties with an interest in the Liquidating Trust, Section 1.119 of the Plan indicates that at least as to PBGC, Administrative Expense Claimants have a higher priority in seeking Liquidating Trust Assets.

**2. The Plan Violates Section 503 of the Bankruptcy Code**

39. The Debtors' Plan also violates section 503(b) of the Bankruptcy Code. Section 503(b) enumerates and provides for the allowance of administrative expense claims. However, unlike section 507 of the Bankruptcy Code, Section 503 of the Bankruptcy Code does not contain a ranking of priority for payment of administrative expense claims.

40. Thus, all administrative claims are entitled to the same priority, and therefore, must be paid ratably. *See In re Breitburn Energy Partners LP,* 582 B.R. 321, 358 (Bankr. S.D.N.Y. 2018) (stating Bankruptcy Code "requires equality of treatment…[the Bankruptcy Code] is satisfied if claimants in the same class have the same opportunity for recovery."); *In re Barron*, 73 B.R. 812, 813-14 (S.D. Cal. 1987) (noting "it is clearly the law….that all administrative expenses incurred under 11 U.S.C. § 503(b) are entitled to *equal treatment* upon the conclusion of a Chapter 11 proceeding." (emphasis added)); *In re Alloy Metal Wire Works*, *Inc*., 60 B.R. 21, 24 (Bankr. E.D. Pa. 1986) (administrative claims entitled to *pro rata* treatment).

41. Here again, the Plan fails. By all accounts, the Plan does not treat the Administrative Expense claimants ratably. Instead, professional fee claims – another form of administrative expense – appears to be entirely covered. *See* Plan § 2.2(b) (noting Allowed Fee Claims shall be paid in full), § 2.2(c) (establishing Carve-Out to pay estimated Fee Claims for services rendered prior to the Effective Date).

42. While the Priority Claimant Consortium understands the value and significance of attorneys and financial advisors in connection with the Chapter 11 proceedings, these advisors must understand the value provided by those who support the Debtors' operations post-petition. As administrative claimants take risk, so too do estate professionals.

43. Moreover, any reliance by the Debtors and the Committee on a Carve-Out is misplaced.

44. The "Carve-Out," and the concomitant account established to fund payments to professionals, do not in any way suggest that the DIP Lender, or any other secured creditor is agreeing to reduce obligations due and owing to them. Indeed, paragraph 21(g)(v) of the Final DIP Order provides that payments to professionals and funding of the "Carve-Out" Account - are not truly "carve-outs", but rather, were payments out of the cash collateral without a corresponding reduction of the obligations that are owed to the secured lenders.

45. Paragraph 21(g)(ii) of the Final DIP Order states that "any such funding of the Carve-Out shall be added to, and made a part of, the DIP ABL Secured Obligations secured by the DIP ABL Collateral and shall otherwise be entitled to the protections granted under the DIP Orders, the DIP ABL Loan Documents, the Bankruptcy Code, and applicable law."

46. This indicates that the payment of the Carve-Out does not reduce the obligations owed to the lenders, and the payment of the Carve-Out does not subordinate the lenders' liens to the rights of professionals. Thus, the plain language of the Plan indicates that the "Carve-Out" is not that at all, and instead is simply an agreement to allow the professionals to use the Lenders' cash collateral subject to the Budget. *See In re Blackwood Associates, L.P.*, 187 B.R. 856, 860 (Bankr. E.D.N.Y. 1995) (a carve-out is defined as "to set aside, cut into pieces or reserve something, which typically belongs to someone else, for a specific purpose; typically to pay professionals or the U.S. Trustee." (citations omitted)).

47. A lender permitting estate assets to pay professional fees and expenses, without a corresponding reduction in the amount of the Debtors' obligation, does not constitute an actual carve-out because the money is not being set aside, rather the money is just allowed to be used to pay professionals. Therefore, the Amended Plan does not comply with section 503(b) and violates

13

section 1129(a)(1) since the professionals should be paid pro rata with the creditors in the 503(b) class since their fees are not truly carved-out. *See In re Breitburn Energy Partners LP,* 528 B.R. at 358 (stating Bankruptcy Code "requires equality of treatment…[the Bankruptcy Code] is satisfied if claimants in the same class have the same opportunity for recovery."); *In re Barron*, 73 B.R. at 813-14 (noting "it is clearly the law….that all administrative expenses incurred under 11 U.S.C. § 503(b) are entitled to *equal treatment* upon the conclusion of a Chapter 11 proceeding." (emphasis added)).

### 3. The Plan Violates Section 1129(a)(9) of the Bankruptcy Code

48. Besides ignoring the sections 503 and 507 of the Bankruptcy Code, the Plan also violates section 1129(a)(9) of the Bankruptcy Code. The Plan does not provide for full payment of Allowed Claims as a condition precedent to the Effective Date. Section 1129(a)(9)(A) of the Bankruptcy Code states that unless a holder of a claim consented to different treatment "with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim."

49. Section 1129(a)(9) mandates that for a plan to be confirmed, each holder of an allowed administrative expense claim, unless agreed otherwise, must be paid in cash equal to the allowed amount of such claim on the effective date of the plan. *In re Molycorp Inc.*, 562 B.R. 67, 77 (Bankr. D. Del. 2017). Therefore, "if the secured parties desire confirmation, the administration claims must be paid in full in cash even if it means invading their collateral." *Id*. at 78 (quoting *In re Emons Industries, Inc.,* 76 B.R. 59, 60 (Bankr. S.D.N.Y. 1987)). Therefore, "in the context of a plan confirmation, a cap on the amount to be paid towards administrative expenses may only be

14

approved after obtaining the administrative claimants' consent." *In re Molycorp Inc.*, 562 B.R. at 78.

50. Section 2.1(a) of the Plan states that Allowed Administrative Expense Claims may receive payment "on the latest of (i) the Effective Date, (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, and (iii) the next Distribution Date after such Administrative Expense Claim becomes an Allowed Administrative Expense Claim." However, this does not comport with the plain language of the Code because the Debtors may allow an Administrative Expense Claim two weeks before the Effective Date, however the Plan as currently written would not require that Allowed Administrative Expense Claim to be paid on the Effective Date as required by section 1129(a)(9)(A) and the Priority Claimant Consortium will not consent to any other type of treatment. *See also* 7 Collier on Bankruptcy, § 1129.02[a] (administrative expense payments must be made in cash on the effective date, "[t]he only exception will be if 'the holder of a particular claim has agreed to a different treatment of such claim.'").

51. As discussed above, the Debtors have not demonstrated that their treatment of Administrative Expense Claims under the Plan satisfies the requirements of section 1129(a)(9). Therefore, this Court should not confirm the Plan.

### C. The Plan Violates Section 1129(a)(11)

52. The Plan is further unconfirmable because it fails to satisfy the feasibility requirement in section 1129(a)(11). The requirement that holders of the payment of the Allowed Administrative Expense Claims is contingent upon a series of overly optimistic assumptions that are made to make the Debtors appear administratively solvent for purposes of confirming the Plan. *See, e.g., Quarles v. U.S. Trustee*, 194 B.R. 94, 97 (W.D.Va. 1996) (premising the plan on favorable litigation

outcomes does not provide a reasonable likelihood of effectuating a reorganization); *In re Am. Capital Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012) ("A plan will not be feasible if its success hinges on future litigation that is uncertain and speculative, because success in such cases is only possible, not reasonably likely." (citations omitted)).

53. For example, the Debtors have moved at a glacial pace when dealing with Administrative Expense Claims. Approximately $1.36 billion of 503(b) claims were filed; however, for purposes of the Plan, the Debtors only expects a total of $468 million, many of which will not be paid on the effective date because the Debtors has not stated whether the claim is allowed or disallowed.

54. Similarly, even assuming the Debtors are able to get the Administrative Expenses down to $468 million (not including professional fees), the current projections are premised upon the Debtors prevailing in their ongoing disputes with Transform under the APA. *See* Plan § 2.1(b) (holders of 503(b)(9) claims will first be paid by Transform based on the APA, and if that is insufficient, then Wind-Down Account, and then the Net Proceeds of Total Assets).

55. If Transform prevails even in the slightest, the funds available to pay the 503(b)(9) claims could be dramatically reduced. Further, to the extent the Debtors are relying on the Wind-Down Account, that account is also likely insufficient to be able to pay Administrative Expense Claim, not to mention establishing a reserve. The latest public disclosure shows that the Wind-Down Account only has a balance of approximately $53 million. *See* Disclosure Statement § 1.B. Therefore, the Debtors' ability to pay or reserve for 503(b)(9) claims is contingent on a variety of factors including the Transform Asset Purchase Agreement litigation, and the Debtors' ability to properly estimate the amount of allowed claims. Since the Plan is based on a variety of contingencies, it is not feasible and therefore cannot meet the feasibility requirements of section 1129(a)(11).

4832-9561-1038.1

**D. The Plan Improperly Deems Consent to Third-Party Releases**

56. Section 15.9(b) of the Plan improperly deems that the Released parties are released by creditors that abstain from voting on the Plan but do not opt-out of releases on their ballots. Further there is no provision for creditors that are statutorily deemed to accept the Plan, including Administrative Expense Claim holders, to opt-out of those releases. If a creditor does not affirmatively vote, courts have held that creditor cannot consent to the releases in the Plan. *See In re SunEdison, Inc.*, 576 B.R. 453, 461 (Bankr. S.D.N.Y. 2017). In light of the fact that the Priority Claimant Consortium cannot opt-out of the third party releases based on their supposedly "unimpaired" status, this Court should not bind the Priority Claimant Consortium to the third party releases in the Plan. *In re Chassix Holdings, Inc.,* 553 B.R. 64, 81 (Bankr. S.D.N.Y. 2015) (indicating a release is an impairment and if "unimpaired classes" do not have the ability to vote, they could not be deemed to have consented to the third party release).

57. Additionally, the releases are overly broad and include the Release Parties' successors and assigns, managed accounts or funds, and all of their respective postpetition officers, postpetition directors, postpetition principals, postpetition employees, postpetition agents, postpetition trustees, postpetition advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and persons' respective heirs, executors, estates, servants, and nominees including the Restructuring Committee, Restructuring Subcommittee, and each of its respective members. *See* Plan §§ 1.134-135. The Court must have subject matter jurisdiction to approve these third party releases and the Debtors have not shown that the Court has this jurisdiction over the variety of persons who qualify as Released Parties. *See In re SunEdison, Inc.*, 576 B.R. at 463.

4832-9561-1038.1

### E. The Plan's Injunction Provisions Improperly Denies Creditors the Right to Setoff and Recoupment

58. The expansive injunction provision in section 15.8 of the Plan is overbroad in seeking to prohibit rights of setoff and recoupment and should not be approved – especially considering the Plan allows the Debtors to assert those same rights. *See* Plan §11.16. Courts hold the statutory rights in section 553 in high regard and have noted that those rights take precedence over the effects of a discharge in section 1141. *See In re Luongo*, 259 F.3d 323, 333 (5th Cir. 2001); *Carolco Television Inc. v. Nat'l Broadcasting Co.* (*In re De Laurentiis Entertainment Group Inc.*), 963 F.2d 1269, 1276 (9th Cir. 1992) (noting setoff rights survive plan confirmation). Courts have similarly held that recoupment is unaffected by a debtor's discharge.); *Folger Adam Security, Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 257-261 (3d Cir. 2000) (recoupment defense survives the sale of debtor's assets, even when free and clear.); *In re Madigan*, 270 B.R. 749, 754 (9th Cir. BAP 2001). The Plan should not limit setoff or recoupment rights for creditors while preserving the same for Debtors – that result is unjust, inequitable, and flies in the face of the support for those concepts in case law and the Bankruptcy Code.

### RESERVATION OF RIGHTS

59. The Priority Claimant Consortium is reserving its rights to amend this objection and to adopt the arguments made in other objections filed in connection with the Confirmation Hearing, including objections made at the Confirmation Hearing. Moreover, all rights and further objections are reserved given the uncertainty of the Transform Dispute and resolution of the Second Lien Parties' Adequate Protection Claims.

**CONCLUSION**

WHEREFORE, for the foregoing reasons, the Priority Claimant Consortium respectfully requests this Court sustain the Objection, deny confirmation of the Debtors' Plan, and grant any other relief this Court deems necessary.

Date:  August 2, 2019
       New York, New York

/s/ Paul J. Labov
Paul J. Labov
**FOLEY & LARDNER LLP**
90 Park Avenue
New York, New York 10016-1314
Telephone: (212) 682-7474
Facsimile: (212) 687-2329
E-mail: plabov@foley.com

-and-

Erika L. Morabito (*pro hac vice*)
**FOLEY & LARDNER LLP**
3000 K. Street, N.W., Suite 600
Washington, D.C. 20007-5109
Telephone: (202) 295-5300
E-mail:  emorabito@foley.com

*Counsel to Whitebox Asymmetric Partners, LP; Whitebox Multi-Strategy Partners, LP; Hain Capital Investors Master Fund, Ltd. and; Cherokee Debt Acquisition, LLC.*

4832-9561-1038.1