Edward M. Fox
Steven Paradise
Owen R. Wolfe
Seyfarth Shaw LLP
620 Eighth Avenue
New York, New York 10018
Phone: 212-218-5500
Fax: 212-218-5526
Email: emfox@seyfarth.com

*Attorneys for Wilmington Trust, National Association,*
*as indenture trustee and collateral agent*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| SEARS HOLDINGS CORPORATION, et al., | Case No. 18-23538 (RDD) |
| Debtors.[1] | (Jointly Administered) |

### OBJECTION OF WILMINGTON TRUST, NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE TO CONFIRMATION OF DEBTORS' JOINT MODIFIED SECOND AMENDED CHAPTER 11 PLAN OF LIQUIDATION

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); SHC Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); SHC Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................... 1

BACKGROUND ........................................................................................................... 1

ARGUMENT ................................................................................................................. 5

I.    SUBSTANTIVE CONSOLIDATION SHOULD NOT BE GRANTED
      BECAUSE DEBTORS FAIL TO SATISFY EITHER OF THE SECOND
      CIRCUIT'S TWO FACTORS REQUIRED FOR SUBSTANTIVE
      CONSOLIDATION ............................................................................................. 5

      A.    Holders of the Second Lien Notes Did Not View All of the Separate
            Debtor Entities as a Single Entity ............................................................ 9

      B.    The Debtors' Affairs are not Hopelessly Entangled ............................. 11

      C.    Substantive Consolidation of the Debtors' Estates is Inequitable and
            Unduly Prejudicial to the Remaining Creditors ................................... 14

II.   THE PROPOSED PBGC SETTLEMENT VIOLATES PROVISIONS OF THE
      BANKRUPTCY CODE AND SHOULD BE REJECTED ................................. 17

      A.    Substantive Consolidation Cannot Be "Settled" as Part of a Non-Existent
            Dispute With the PBGC .......................................................................... 17

      B.    PBGC's Classification and Settlement Unfairly Discriminates Against
            Other Creditors and Is Not Reasonable ................................................ 19

            i.     PBGC is No Different than Other Unsecured Creditors ............. 19

            ii.    The PBGC Claim is Improperly Classified in Violation of Section
                   1122 ............................................................................................. 20

      C.    Even if the PBGC Settlement Conforms to the Absolute Priority Rule, the
            Settlement Does Not Satisfy Rule 9019 Factors .................................... 22

III.  THE DEBTORS' PLAN HAS NOT BEEN PROPOSED IN GOOD FAITH AND
      VIOLATES PUBLIC POLICY ......................................................................... 25

      A.    Section 11.6 of the Plan Violates Public Policy ................................... 25

RESERVATION OF RIGHTS ...................................................................................... 27

CONCLUSION ............................................................................................................ 28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

<u>In re 599 Consumer Elecs., Inc.</u>,
195 B.R. 244 (S.D.N.Y. 1996).................................................................................9

<u>Ad Hoc Committee of Personal Injury Asbestos Claimants v. Dana Corp.</u>,
412 B.R. 53 (S.D.N.Y. 2008)...............................................................................26

<u>In re ADPT DFW Holdings, LLC</u>,
574 B.R. 87 (Bankr. N.D. Tex. 2017).................................................................9, 11

<u>In re Augie/Restivo Baking Co., Ltd.</u>,
860 F.2d 515 (2d Cir. 1988)...........................................................................*passim*

<u>In re Bos. Post Rd. Ltd. P'ship</u>,
21 F.3d 477 (2d Cir. 1994)...................................................................................18

<u>In re Breitburn Energy Partners LP</u>,
582 B.R. 321 (Bankr. S.D.N.Y. 2018).................................................................26

<u>Chem. Bank New York Tr. Co. v. Kheel</u>,
369 F.2d 845 (2d Cir. 1966).................................................................................14

<u>In re Constellation Enterprises LLC</u>,
587 B.R. 275 (D. Del. 2018)................................................................................20

<u>In re Cousins</u>,
No. 09 CIV 1190 RJS, 2010 WL 5298172 (S.D.N.Y. Dec. 22, 2010) ..................23

<u>Czyzewski v. Jevic Holding Corp.</u>,
137 S. Ct. 973, 197 L. Ed. 2d 398 (2017) ....................................................19, 20, 21

<u>Daskal v. 1584 Fulton, LLC</u>,
No. 14-CV-7402 KAM, 2015 WL 6442338 (E.D.N.Y. Oct. 23, 2015) ..................23

<u>In re Drexel Burnham Lambert Grp. Inc.</u>,
138 B.R. 723 (Bankr. S.D.N.Y. 1992)....................................................................8

<u>In re Food Fair, Inc.</u>,
10 B.R. 123 (Bankr. S.D.N.Y. 1981).....................................................................13

<u>In re Glob. Vision Prod., Inc.</u>,
No. 07 CV. 12628, 2009 WL 2170253 (S.D.N.Y. July 14, 2009)................22, 23, 24

57618022v.10

In re GMG Capital Partners III, L.P.,
    503 B.R. 596 (Bankr. S.D.N.Y. 2014) ................................................................21

In re Gucci,
    174 B.R. 401 (Bankr. S.D.N.Y. 1994) ................................................................14

In re Iridium Operating LLC,
    478 F.3d 452 (2d Cir. 2007) ..........................................................................23, 24

In re Jennifer Convertibles, Inc.,
    447 B.R. 713 (Bankr. S.D.N.Y. 2011) ..................................................................8

John Hancock Mutual Life Ins. Co. v. Route 37 Bus Park Assocs.,
    987 F.2d 154 (3d Cir. 1993) ...............................................................................21

In re Lafayette Hotel P'ship,
    227 B.R. 445 (S.D.N.Y. 1998), aff'd, 198 F.3d 234 (2d Cir. 1999) .....................20

In re Leslie Fay Cos., Inc.,
    207 B.R. 764 (Bankr. S.D.N.Y. 1997) ..................................................................11

In re LightSquared Inc.,
    513 B.R.56 (Bankr. S.D.N.Y. 2014) .....................................................................20

In re Nutraquest, Inc.,
    434 F.3d 639 (3d Cir. 2006) .................................................................................22

Official Comm. of Unsecured Creditors v. Am. Tower Corp. (In re Verestar, Inc.),
    343 B.R. 444 (Bankr. S.D.N.Y. 2006) ...................................................................8

Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.
    Anderson,
    390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968) ...............................................22

In re Republic Airways Holdings Inc.,
    565 B.R. 710 (Bankr. S.D.N.Y. 2017), aff'd, 582 B.R. 278 (S.D.N.Y. 2018),
    appeal withdrawn, No. 18-1255, 2019 WL 1950004 (2d Cir. Mar. 20, 2019) ............... passim

In re Sabine Oil & Gas Corp.,
    555 B.R. 180 (Bankr. S.D.N.Y. 2016) ...................................................................23

In re TCI 2 Holdings, LLC,
    428 B.R. 117 (Bankr. D.N.J. 2010) .................................................................22, 23

In re W.R. Grace & Co.,
    729 F.3d 311 (3d Cir. 2013) .................................................................................26

57618022v.10

In re W.T. Grant Co.,
    119 B.R. 898 (S.D.N.Y 1990) ................................................................................27

Windels Marx Lane & Mittendorf, LLP v. Source Enters., Inc. (In re Source
    Enters., Inc.),
    392 B.R. 541 (S.D.N.Y. 2008) ..............................................................................11

In re Worldcom,
    2003 WL 23861928 ....................................................................................8, 14, 25

In re Worldwide Direct, Inc.,
    334 B.R. 112 (Bankr. D. Del. 2005) ......................................................................27

**Statutes**

11 U.S.C. § 1123(a)(1) ...................................................................................................25

11 U.S.C. § 1123(a)(2) ...................................................................................................25

11 U.S.C. § 1123(a)(3) ...................................................................................................25

U.S.C. title 11 Chapter 11 ................................................................................................2

15 U.S.C. § 77aaa et seq. ...............................................................................................27

Bankruptcy Code § 105 ..................................................................................................15

Bankruptcy Code § 507(a)(2) ........................................................................................25

Bankruptcy Code § 507(a)(3) ........................................................................................25

Bankruptcy Code § 507(a)(8) ........................................................................................25

Bankruptcy Code § 507(b) .............................................................................................26

Bankruptcy Code § 1107(a) .............................................................................................2

Bankruptcy Code § 1108 ..................................................................................................2

Bankruptcy Code § 1122 .........................................................................................*passim*

Bankruptcy Code § 1122(a) ...........................................................................................21

Bankruptcy Code § 1123 ................................................................................................25

Bankruptcy Code § 1123(a) ......................................................................................24, 25

Bankruptcy Code § 1123(a)(4) ................................................................................*passim*

iv

Bankruptcy Code § 1129 ..........................................................................................24, 25

Bankruptcy Code § 1129(a)(1) ......................................................................................24

Bankruptcy Code § 1129(a)(4) ................................................................................17, 21

Bankruptcy Code § 1129(a)(7) ......................................................................................20

Bankruptcy Code § 1129(a)(10) ....................................................................................18

Bankruptcy Code § 1129(b)...........................................................................................17

Bankruptcy Code § 1129(b)(2) ......................................................................................20

**Other Authorities**

Bankruptcy Reorganizations, 44 Stan. L. Rev. 69, 123 (1991) .....................................20

Bankruptcy Rule 9019 ...............................................................................6, 22, 23, 24

57618022v.10

## PRELIMINARY STATEMENT

Wilmington Trust, National Association, as indenture trustee ("Wilmington Trust"), by

and through its undersigned counsel, hereby files this *Objection of Wilmington Trust, National*

*Association, as Indenture Trustee to Debtors' Chapter 11 Joint Modified Second Amended Plan*

(the "Objection") in opposition to confirmation of the *Modified Second Amended Joint Chapter*

*11 Plan of Sears Holdings Corporation and its Affiliated Debtors* [Dkt. No. 4476], and in

support thereof states as follows:

## BACKGROUND

### The 2010 Notes

1.     Pursuant to an Indenture dated as of October 12, 2010 (as so amended

from time to time thereafter, the "Indenture") among Sears Holdings Corporation ("Sears"), the

Guarantors Party thereto, and Wells Fargo Bank, National Association ("Wells Fargo"), as

trustee and collateral agent, Sears issued $1,250,000,000 of 6-5/8 Senior Secured Notes due 2018

(the "Second Lien Notes").

2.     Pursuant to an Instrument of Resignation, Appointment, and Acceptance

dated as of June 25, 2014, by and among Sears, Wilmington Trust and Wells Fargo, Wilmington

Trust became the successor indenture trustee (the "Prepetition Second Lien Notes Trustee") with

respect to the Second Lien Notes.

3.     Pursuant to the terms of the Indenture, repayment of the Notes is

guaranteed by each of Sears, Roebuck and Co., Kmart Holding Corporation, Kmart Operations

LLC, Sears Operations LLC, A&E Factory Service, LLC, A&E Home Delivery, LLC, A&E

Lawn & Garden LLC, A&E Signature Service, LLC, Kmart Corporation, Private Brands, Ltd.,

Sears Holdings Management Corporation, Sears Home Improvement Products, Inc., Sears

Protection Company, Sears Roebuck Acceptance Corp., Sears, Roebuck de Puerto Rico, Inc.,

California Builder Appliances, Inc., Florida Builder Appliances, Inc., KLC, Inc., Sears

Protection Company (Florida), L.L.C., Kmart of Washington LLC, Kmart Stores of Illinois LLC,

Kmart Stores of Texas LLC, Mygofer LLC, Kmart of Michigan, Inc., SOE, Inc., Starwest, LLC,

Kmart.com LLC, Sears Brands Management Corporation (collectively, the "Guarantors").

### The Bankruptcy Filing

      4.     On October 15, 2018, each of the Debtors filed voluntary petitions for

relief under Chapter 11 of title 11, U.S.C. in the United States Bankruptcy Court for the Southern

District of New York (the "Bankruptcy Court").

      5.     The Debtors continue to operate their businesses and manage their

properties as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.

      6.     As of the Petition Date, the Issuer and each Guarantor was, and remains,

indebted to the Indenture Trustee in the amount of Ninety-One Million, Nine Hundred Fifty

Thousand, One Hundred Ninety-One and 25/100 Dollars ($91,950,191.25), consisting of

Eighty-Nine Million, Two Thousand and 00/100 Dollars ($89,002,000.00) in principal amount

plus Two Million, Nine Hundred Forty-Eight Thousand, One Hundred Ninety-One and 25/100

Dollars ($2,948,191.25) of accrued and unpaid interest owing with respect to the Second Lien

Notes as of the Petition Date.

### The Plans and Disclosure Statements

      7.     On February 8, 2019, the Debtors filed a Notice of Filing of Settlement

Term Sheet with Pension Benefit Guaranty Corporation [Dkt. No. 2529] having annexed as

Exhibit A thereto the PBGC Settlement Term Sheet (the "PBGC Term Sheet"), setting forth the

Debtors' proposed resolution of the claim of the Pension Benefit Guaranty

Corporation("PBGC") against the Debtors (the "PBGC Settlement"). Pursuant to the PBGC

57618022v.10

Term Sheet, the Debtors agreed not to propose a chapter 11 plan that seeks to substantively

consolidate any Debtors' estates.

8.    On April 17, 2019, the Debtors filed their Joint Chapter 11 Plan of Sears

Holdings Corporation and its Affiliated Debtors (the "Initial Plan") [Dkt. No. 3275].  The Initial

Plan did not propose to substantively consolidate the estates of any of the Debtors.

9.    On April 17, 2019, the Debtors also filed their Disclosure Statement for

the Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors in Support of

the Plan (the "Initial Disclosure Statement") [Dkt. No. 3276].

10.    On May 3, 2019, the Debtors filed a Notice of Filing of Exhibits to the

Disclosure Statement for Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated

Debtors [Dkt. No. 3618], which included a Recovery Analysis as Exhibit C to the Disclosure

Statement and a Liquidation Analysis (the "Liquidation Analysis") as Exhibit D to the

Disclosure Statement.

11.    On May 16, 2019, the Debtors filed their Amended Joint Chapter 11 Plan

of Sears Holdings Corporation and its Affiliated Debtors (the "First Amended Plan") [Dkt.

No. 3894].

12.    On May 16, 2019, the Debtors also filed their Disclosure Statement for

Amended Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors (the

"First Amended Disclosure Statement") [Dkt. No. 3895], which included an amended

Liquidation Analysis (the "Amended Liquidation Analysis") as Exhibit C thereto.

13.    On June 28, 2019, the Debtors filed their Second Amended Joint Chapter

11 Plan of Sears Holdings Corporation and its Affiliated Debtors (the "Second Amended Plan")

[Dkt. No. 4389].

3

14.    On June 28, 2019, the Debtors also filed their Disclosure Statement for Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors (the "Second Amended Disclosure Statement") [Dkt. No. 4390].

15.    On June 28, 2019, the Court entered the *Order (I) Approving Disclosure Statement, (II) Establishing Notice and Objection Procedures for Confirmation of the Plan, (III) Approving Solicitation Packages and Procedures for Distribution Thereof, (IV) Approving the Forms of Ballots and Establishing Procedures for Voting on the Plan, and (V) Granting Related Relief* (the "Disclosure Statement Order") [Dkt. No. 4392].

16.    On June 28, 2019, the Official Committee of Unsecured Creditors of Sears Holdings Corporation *et al* (the "Creditors' Committee) filed a Letter In Support of the Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors ("Committee Letter") [Dkt. No. 4395].

17.    On July 9, 2019, the Debtors filed their Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors (the "Plan") [Dkt. No. 4476].[2]

18.    On July 9, 2019, the Debtors also filed their Disclosure Statement for Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors (the "Disclosure Statement") [Dkt. No. 4478].

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

57618022v.10

## ARGUMENT

**I.    SUBSTANTIVE CONSOLIDATION SHOULD NOT BE GRANTED BECAUSE DEBTORS FAIL TO SATISFY EITHER OF THE SECOND CIRCUIT'S TWO FACTORS REQUIRED FOR SUBSTANTIVE CONSOLIDATION**

19.    The Initial Plan provided for, and sought approval of, the PBGC Settlement.  The PBGC Settlement initially provided that upon approval of the Initial Plan, "the PBGC will receive an Allowed General Unsecured Claim against each Debtor in the amount of $800 million in satisfaction of the UBL claim" and a "beneficial interest in the Liquidating Trust, which shall entitle PBGC to, and be secured by, the first $80 million of Net Proceeds of" certain claims.  Initial Disclosure Statement, Article IV. O.

20.    The Initial Plan did not seek to substantively consolidate the Debtors' estates.

21.    In their First Amended Plan, the Debtors proposed to substantively consolidate their respective estates pursuant to a "Substantive Consolidation Settlement".  In defense of what can best be characterized as an "overnight change of plans", the Debtors asserted that "the Debtors and the PBGC agreed to certain modifications to the PBGC Settlement terms in exchange for the settlement of disputes and potential litigation regarding whether the Debtors should be substantively consolidated."  First Amended Disclosure Statement, Article IV. U. at 53.

22.    In exchange for the PBGC's support of the Substantive Consolidation Settlement, the Debtors agreed to increase the amount of the PBGC Liquidating Trust Priority Interest from $80 million to $97.5 million.  First Amended Disclosure Statement, IV. U. at 54.

23.    In addition, if the Substantive Consolidation Settlement was not approved, the First Amended Plan would "revert to a joint plan of liquidation of the Debtors for

5

administrative purposes only, and constitute a separate Chapter 11 plan of liquidation for each Debtor." *See* Article V. D. 1.(b) of the First Amended Disclosure Statement at 63.

24.    In the Second Amended Plan, the Substantive Consolidation Settlement became the "Plan Settlement" and the Debtors proposed what can best be characterized as a "partial substantive consolidation". Under this "partial substantive consolidation" structure, the Debtors sought to consolidate and/or treat all separate claims against any Debtor as a "single claim entitled to a single recovery against the Liquidating Trust Assets," save for the claims of Kmart Corp., Kmart Stores of Illinois LLC, Kmart of Washington LLC, and Sears Holdings Corp.

25.    The Debtors seek the Court's approval of substantive consolidation under the Bankruptcy Rule 9019 standard and assert that the Plan Settlement is "fair and equitable".

26.    The Debtors fail to sufficiently justify their reason(s) for entering into their settlement with the PBGC providing for substantive consolidation given that the parties originally reached an agreement that prohibited substantive consolidation, the Initial Plan did not provide for substantive consolidation and the Plan will revert to an unconsolidated plan in the event the Court does not approve the Plan Settlement. Indeed, it is difficult to understand how substantive consolidation could be necessary if the Plan can revert to an unconsolidated plan if the Court does not approve the Plan Settlement.

27.    The Debtors cannot bypass the Second Circuit's standard for evaluating substantive consolidation by incorporating substantive consolidation into a "settlement," particularly with the PBGC Settlement. The Debtors appear to acknowledge as much by asserting that the Plan constitutes a motion pursuant to Rule 9019 with respect to the approval of the "PBGC Settlement" and the "Plan Settlement." Modified Second Amended Disclosure

6

Statement IV. V. at 63. But in the same breath, the Debtors seemingly argue in the alternative - that they satisfy their burden of proof either under Rule 9019 or under the Second Circuit's test for substantive consolidation under <u>Augie/Restivo</u>. *See* Modified Second Amended Disclosure Statement, p. 64.

28.    Specifically, the Debtors contend that the Plan Settlement is equitable because it purportedly provides "stakeholder with certainty, as well as prompt and maximum distributions, without potentially cost-prohibitive and time-consuming litigations regarding the complex issues of substantive consolidation." *See* Modified Second Amended Disclosure Statement, p. 64.

29.    The Second Circuit's strict standard for substantive consolidation, which "should be used sparingly," is the standard this Court should utilize to evaluate the Debtors' request for substantive consolidation in the Modified Second Amended Plan. <u>Augie/Restivo Baking Co., Ltd.</u>, 860 F.2d 515, 518-520 (2d Cir. 1988); <u>In re Republic Airways Holdings Inc.</u>, 565 B.R. 710, 716 (Bankr. S.D.N.Y. 2017), <u>aff'd</u>, 582 B.R. 278 (S.D.N.Y. 2018), <u>appeal withdrawn</u>, No. 18-1255, 2019 WL 1950004 (2d Cir. Mar. 20, 2019).

30.    In *In re Augie/Restivo Baking Co.*, the Second Circuit set forth two key factors to determine whether substantive consolidation is appropriate: whether (i) "creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit"; or, (ii) whether "the affairs of the debtors are so entangled consolidation will benefit all creditors." <u>In re Augie/Restivo Baking Co., Ltd.</u>, 860 F.2d 515, 518-520 (2d Cir. 1988) (reversing upon finding that consolidation impaired the rights of certain creditors and unfairly benefitted the rights of certain creditors); <u>In re Republic Airways Holdings Inc.</u>, 565 B.R. 710, 717 (Bankr. S.D.N.Y. 2017), <u>aff'd</u>, 582 B.R. 278 (S.D.N.Y. 2018), <u>appeal withdrawn</u>,

7

No. 18-1255, 2019 WL 1950004 (2d Cir. Mar. 20, 2019) (citing Augie/Restivo, 860 F.2d at 518);

see also In re Worldcom, 2003 WL 23861928, at *35–36.

31.    In order to determine whether these factors have been met, bankruptcy

courts "considered a variety of factors," including:

> [t]he presence or absence of consolidated financial statements;
> [t]he unity of interest and ownership among various corporate
> entities; [t]he degree of difficulty in segregating and ascertaining
> individual assets and liabilities; [t]he transfers of assets without
> formal observance of corporate formalities; [t]he commingling of
> assets and business functions; [t]he profitability of consolidation at
> a single physical location; and [t]he disregard of legal formalities.

In re Republic Airways Holdings Inc., 565 B.R. 710, 716–17 (Bankr. S.D.N.Y. 2017), aff'd, 582

B.R. 278 (S.D.N.Y. 2018), appeal withdrawn, No. 18-1255, 2019 WL 1950004 (2d Cir. Mar. 20,

2019) (citing In re Worldcom, 2003 WL 23861928, at *35 (citing Augie/Restivo, 860 F.2d at

518); see also In re Drexel Burnham Lambert Grp. Inc., 138 B.R. 723, 764 (Bankr. S.D.N.Y.

1992); In re Jennifer Convertibles, Inc., 447 B.R. 713, 723 (Bankr. S.D.N.Y. 2011) (considering

the two main consolidation factors in Augie/Restivo).

32.    .    The Second Circuit's test for substantive consolidation is "in the

disjunctive." In re Republic Airways Holdings Inc., 565 B.R. 710, 717 (Bankr. S.D.N.Y. 2017),

aff'd, 582 B.R. 278 (S.D.N.Y. 2018), appeal withdrawn, No. 18-1255, 2019 WL 1950004 (2d

Cir. Mar. 20, 2019) (citing Official Comm. of Unsecured Creditors v. Am. Tower Corp. (In re

Verestar, Inc.), 343 B.R. 444, 463 (Bankr. S.D.N.Y. 2006)).  Thus, "the satisfaction of either

prong can justify substantive consolidation." In re Republic Airways Holdings Inc., 565 B.R.

710, 717 (Bankr. S.D.N.Y. 2017), aff'd, 582 B.R. 278 (S.D.N.Y. 2018), appeal withdrawn, No.

18-1255, 2019 WL 1950004 (2d Cir. Mar. 20, 2019) (citing Official Comm. of Unsecured

Creditors v. Am. Tower Corp. (In re Verestar, Inc.), 343 B.R. 444, 463 (Bankr. S.D.N.Y. 2006));

see also In re ADPT DFW Holdings, LLC, 574 B.R. 87, 95-96 (Bankr. N.D. Tex. 2017) ("No

8

single element or group of elements is determinative in the court's inquiry... [t]he presence of either factor is sufficient to order substantive consolidation.").

33.    Nevertheless, it is the debtor's burden of proof to demonstrate that substantive consolidation is appropriate in a given case.  In re Republic Airways Holdings Inc., 565 B.R. 710, 717 (Bankr. S.D.N.Y. 2017), aff'd, 582 B.R. 278 (S.D.N.Y. 2018), appeal withdrawn, No. 18-1255, 2019 WL 1950004 (2d Cir. Mar. 20, 2019).

34.    In Augie/Restivo, the Second Circuit noted that:

> Creditors who make loans on the basis of the financial status of a separate entity expect to be able to look to the assets of their particular borrower for satisfaction of that loan. Such lenders structure their loans according to their expectations regarding that borrower and do not anticipate either having the assets of a more sound company available in the case of insolvency or having the creditors of a less sound debtor compete for the borrower's assets. Such expectations create significant equities. Moreover, lenders' expectations are central to the calculation of interest rates and other terms of loans, and fulfilling those expectations is therefore important to the efficiency of credit markets. Such efficiency will be undermined by imposing substantive consolidation in circumstances in which creditors believed they were dealing with separate entities.

See 860 F.2d at 520.

35.    In the instant case, the Debtors fail to demonstrate that either of the Augie/Restivo factors are satisfied.

**A.    Holders of the Second Lien Notes Did Not View All of the Separate Debtor Entities as a Single Entity**

36.    The first prong, whether creditors relied on a separate existence of the debtors, is "applied from the creditors' perspective" - not the Debtors'.  In re 599 Consumer Elecs., Inc., 195 B.R. 244, 249 (S.D.N.Y. 1996).  "The inquiry is whether creditors treated the debtors as a single entity, not whether the managers of the debtors themselves, or consumers viewed the [debtors] as one enterprise."  In re Republic Airways Holdings Inc., 565 B.R. 710,

9

717 (Bankr. S.D.N.Y. 2017), aff'd, 582 B.R. 278 (S.D.N.Y. 2018), appeal withdrawn, No. 18-1255, 2019 WL 1950004 (2d Cir. Mar. 20, 2019).

37.    The holders of Second Lien Notes, as well as the Debtors' other first and second lien lenders clearly understood that the Debtors were separate entities, as evidenced by their requirement of guaranties of their obligations from each of the Guarantors.[3]  Although the Debtors operated largely under the Sears and Kmart names, when lenders extended credit, they did so with a credit particular entity, and insisted on guaranties from other entities.  They did not lend to a single entity with the expectation that that would constitute a loan to all of the Debtor entities.

38.    Moreover, the Debtors provide no specific facts to support their assertion to the contrary and therefore fail to meet their burden of proof for the first factor under Augie/Restivo. See Augie/Restivo Baking Co., Ltd., 860 F.2d at 520 (wherein Augie's and Restivo were once two separate entities that later consolidated pursuant to an acquisition agreement, the court found that it was "undisputed that Union's loans to Augie's were based solely upon Augie's financial condition, and that, at the time the loans were made, Union had no knowledge of the [acquisition] negotiations between Augie's and Restivo.").

39.    Where, as here, creditors knowingly made loans to the Debtors' separate entities and no "irremediable commingling of assets as occurred, a creditor cannot be made to sacrifice the priority of its claims against its debtor by fiat based on the bankruptcy court's speculation that it knows the creditors interests better than does the creditor itself." See Augie/Restivo Baking Co., Ltd., 860 F.2d at 520.

---

[3] See p. 65 of the Modified Second Amended Disclosure Statement.

10

B.    **The Debtors' Affairs are not Hopelessly Entangled**

40.    The Debtors also fail to satisfy the second Augie/Restivo factor - hopeless

entanglement of affairs. The Debtors' affairs are not entangled to the degree that

disentanglement of their affairs is either "impossible" and/or "hopeless".

41.    "Under the second prong, courts typically analyze whether the debtors

have demonstrated either an operational or a financial entanglement of business affairs." In re

Republic Airways Holdings Inc., 565 B.R. 710, 717 (Bankr. S.D.N.Y. 2017), aff'd, 582 B.R. 278

(S.D.N.Y. 2018), appeal withdrawn, No. 18-1255, 2019 WL 1950004 (2d Cir. Mar. 20, 2019)

(citing In re Leslie Fay Cos., Inc., 207 B.R. 764, 780 (Bankr. S.D.N.Y. 1997) (finding that "it is

clear that creditors dealt with Leslie Fay companies as a consolidated unit and did not rely on

any subsidiaries' separate identity in extending credit, and that the "debtors' operations, cash,

and decision-making were all shared such that it would be detrimental to the estates to attempt to

disentangle those operations."); see also Windels Marx Lane & Mittendorf, LLP v. Source

Enters., Inc. (In re Source Enters., Inc.), 392 B.R. 541, 552 (S.D.N.Y. 2008) (noting that the

"sole purpose [of substantive consolidation] is to ensure the equitable treatment of all creditors,"

and that courts will consider "whether the entities share costs or obligations; fail to observe

corporate formalities; or, in the case of a subsidiary and parent, fail to act independently.").

42.    The Second Circuit has recognized that "substantive consolidation should

be used only after it has been determined that **all** creditors will benefit because untangling is

either impossible or so costly as to consume the assets." Augie/Restivo, 860 F.2d at 518 (where

the Second Circuit found that substantive consolidation was not justified under either factor

because Augie's assets were "traceable even though the business functions had been

consolidated.") (emphasis added)); compare In re ADPT DFW Holdings, LLC, 574 B.R. 87, 97

(Bankr. N.D. Tex. 2017) (finding by a preponderance of the evidence: (i) that the creditors

11

"tended to deal with the [d]ebtors as a single economic unit and did not rely on their separate identity in extending credit … (ii) [and that] the liabilities and contracts of the [d]ebtors were a tangled mess to try to unsort … and that (iii) separating the [d]ebtors would be prohibitive and hurt all creditors.").

43.    In the instant case, the Debtors contend in the Modified Second Amended Disclosure Statement that their "operational and financial affairs are inextricably tied and that any disentanglement efforts are likely to be time-consuming, expensive and ultimately may not produce a clear benefit to the Debtors' Chapter 11 cases." *See* Modified Second Amended Disclosure Statement, p. 64.  To support such conclusory assertions, the Debtors state:

> For example, while the Debtors' accounting systems identify the entities to which intercompany payables are due or from which intercompany receivables are due in the ordinary course, the millions of entries are netted automatically by the accounting system and are not summarized by Debtor.  The intercompany balances are consolidated for all intercompany transactions recorded for each Debtor over time, aggregated into one net balance of either a receivable or payable for each Debtor that it has collectively with all of the other entities and either reported as a net receivable or payable.  Because the Debtors' financial statements were historically prepared with the view to creating one consolidated report for all Debtors, the Debtors cannot readily identify the particular Debtor entity to which intercompany balances are owed, and vice versa.  Effectively, each existing intercompany balance is a consolidated intercompany balance for each Debtor.

Modified  Second Amended Disclosure Statement at 65.

44.    Even if this constitutes entanglement, given that the Debtors admit that intercompany transfers were automatically netted, such entanglement does not make it "impossible" or "hopeless" other than because the Debtors wish to now try to examine the many netted transactions, for no seemingly necessary reason other than to create the expense that justifies substantive consolidation. *See e.g.,* <u>Augie/Restivo</u>, 860 F.2d at 520-521.

12

45.    Moreover, the Debtors have previously acknowledged that their estates are not hopelessly entangled. *See e.g.,* Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York (the "Riecker Dec'l") [Dkt. No. 3], pp. 4, 14 ( "in 2004, Sears merged with Kmart Holding Corporation," and that "in connection with the merger, Sears Holdings was formed to serve as the parent entity of the post-merger company."); *see also* Riecker Dec'l, ¶¶ 67, 93 ("in the ordinary course of business, the Debtors utilize an integrated, centralized cash management system to collect, concentrate, and disburse funds generated by their operations [and that the] Cash Management System is composed of 154 bank accounts maintained at various financial institutions and is designed to accommodate different business divisions and to collect, organize, and track various forms of cash receipts and disbursements.").

46.    In particular, Mr. Riecker certified that:

> [Their] Cash Management System enables the Debtors to efficiently collect and disburse cash generated by their business, pay their financial obligations, centrally control and monitor corporate funds and available cash, comply with the requirements of their financing agreements, ... and obtain accurate account balances and other financial data.

Riecker Dec'l ¶ 67.

> Debtors have engaged in a systematic review of each of the Debtors' stores and analyzed their profitability and market impact ... In analyzing their stores, the Debtors considered ... current occupancy costs, historical and projected store profitability, recent and projected sales trends, the geographic market in which the store is located.

Riecker Dec'l ¶ 93 (emphasis added).

47.    Thus, previously, Debtors have acknowledged and/or certified that their cash management system, among other things, enabled them to control, monitor corporate funds

13

and systematically review each of their stores/entities to analyze their profitability. Yet, Debtors now contend for the first time in their First Amended Plan that their cash management system and/or resources are antiquated and would provide them with inaccurate data.

48.    Moreover, the Debtors' desire to substantively consolidate their estates seems more likely driven by the fact that certain of their estates are administratively insolvent absent consolidation with other estates that are not administratively insolvent.

49.    Thus, the Court should find that the Debtors' proposal to substantively consolidate their estates is not justified under either prong of the Second Circuit's Augie/Restivo test.

C.    **Substantive Consolidation of the Debtors' Estates is Inequitable and Unduly Prejudicial to the Remaining Creditors**

50.    Alternatively, if this Court were to find that the Debtors satisfied either of the Second Circuit's two disjunctive factors required for substantive consolidation, the Debtors still would not be justified in substantively consolidating their estates due to the inequitable treatment and undue prejudice that substantive consolidation would pose on Debtors' remaining creditors.

51.    In addition to the Augie/Restivo test, courts consider whether substantive consolidation "will yield an equitable treatment of creditors without any undue prejudice to any particular group" when determining if substantive consolidation is justified. In re Republic Airways Holdings Inc., 565 B.R. 710, 717 (Bankr. S.D.N.Y. 2017), aff'd, 582 B.R. 278 (S.D.N.Y. 2018), appeal withdrawn, No. 18-1255, 2019 WL 1950004 (2d Cir. Mar. 20, 2019) (citing In re Food Fair, Inc., 10 B.R. 123, 127 (Bankr. S.D.N.Y. 1981)). The Debtors implicitly acknowledge as much by virtue of their arguments centered on "equity" and "benefit" with

14

respect to consolidation in their Modified Second Amended Disclosure Statement. *See id.* pp.
64-66.

52.     "As an equitable remedy, courts may order substantive consolidation
where the benefits to creditors outweigh the harm." *See* In re Republic Airways Holdings Inc.,
565 B.R. 710, 717 (Bankr. S.D.N.Y. 2017), aff'd, 582 B.R. 278 (S.D.N.Y. 2018), appeal
withdrawn, No. 18-1255, 2019 WL 1950004 (2d Cir. Mar. 20, 2019) (citing In re Worldcom,
2003 WL 23861928, at *35 (citing Augie/Restivo, 860 F.2d at 518–19)).

53.     Since substantive consolidation "may [very well] place creditors of one
debtor on parity with creditors of a less solvent debtor," courts in the Second Circuit have
recognized that the "power to consolidate should be used sparingly because of the possibility of
unfair treatment of creditors of a corporate debtor who have dealt solely with that debtor without
knowledge of its interrelationship with others."[4] In re Republic Airways Holdings Inc., 565 B.R.
710, 716 (Bankr. S.D.N.Y. 2017), aff'd, 582 B.R. 278 (S.D.N.Y. 2018), appeal withdrawn, No.
18-1255, 2019 WL 1950004 (2d Cir. Mar. 20, 2019); *see also* Augie/Restivo, 860 F.2d 515-520;
*contra* In re Gucci, 174 B.R. 401, 413 (Bankr. S.D.N.Y. 1994) (finding that it is "abundantly
clear" that all of the entities were alter egos of Gucci because all of the entities were controlled
by one person, Paolo Gucci, and that creditors failed to set forth sufficient facts to demonstrate
that the creditors will in fact be prejudiced by substantive consolidation).

---

[4] In re Republic Airways Holdings Inc., 565 B.R. 710, 716 (Bankr. S.D.N.Y. 2017), aff'd, 582 B.R. 278 (S.D.N.Y. 2018), appeal withdrawn, No. 18-1255, 2019 WL 1950004 (2d Cir. Mar. 20, 2019) (quoting Chem. Bank New York Tr. Co. v. Kheel, 369 F.2d 845, 847 (2d Cir. 1966) (finding that "the expense and difficulty amounting to practical impossibility and reconstructing the financial records of the debtors to determine intercorporate claims, liabilities and ownership of assets," and that "in the rare case such as this, where the interrelationships of the group are hopelessly obscured and the time and expense necessary even to attempt to unscramble them so substantial as to threaten the realization of any net assets for all the creditors, equity is not helpless to reach a rough approximation of justice to some rather than deny any to all.").

57618022v.10

54.    Accordingly, in examining the equitable treatment of creditors, courts in the Second Circuit use a balancing test "to determine whether the relief achieves the best results for all creditors." In re Republic Airways Holdings Inc., 565 B.R. 710, 717 (Bankr. S.D.N.Y. 2017), aff'd, 582 B.R. 278 (S.D.N.Y. 2018), appeal withdrawn, No. 18-1255, 2019 WL 1950004 (2d Cir. Mar. 20, 2019) (noting that "substantive consolidation factors should be evaluated within the larger context of balancing the prejudice resulting from the proposed consolidation against the effect of preserving separate debtor entities.").

55.    Here, the Debtors propose the substantive consolidation of the Debtors' estates, under the guise of a "Plan Settlement."  If approved, this so-called "settlement" of substantive consolidation will limit the ability of the Holders of Second Lien Notes from receiving recoveries on a Debtor-by-Debtor basis as they were promised and limit the extent of their recoveries from each Debtor that is indebted to them.

56.    While bankruptcy courts may have the authority to substantively consolidate under Section 105 of the Bankruptcy Code[5], such authority is not properly exercised to substantively consolidate when doing so would severely harm other creditors. Id.  The parties' course of dealing, creditors' expectations during such course, and the impact of consolidation itself collectively do not justify consolidation.

57.    Moreover, to the extent the Debtors purport to have addressed certain of the inequities stemming from their Plan Settlement, they have failed to do so.

58.    Section 9.2(a)(i) of the Plan provides that "all Assets of the Debtors shall be consolidated and treated as Liquidating Trust assets."

---

[5] In re Republic Airways Holdings Inc., 565 B.R. 710, 716 (Bankr. S.D.N.Y. 2017), aff'd, 582 B.R. 278 (S.D.N.Y. 2018), appeal withdrawn, No. 18-1255, 2019 WL 1950004 (2d Cir. Mar. 20, 2019).

16

59.     Section 9.2(a)(ii) of the Plan provides that "all guarantee claims . . . will not be entitled to Distributions from the Liquidating Trust."

60.     Section 9.2(a)(vii) of the Plan, however, provides that "holders of . . . General Unsecured Claims, Guarantee Claims (which is not defined) . . . shall share in the applicable Total Assets as follows:. . . ."

61.     Section 1.104 of the Plan defines Liquidating Trust Assets, however, to include "Total Assets":

> 1.104 "Liquidating Trust Assets" means from and after the Effective Date all assets of the Debtors that are not distributed on or prior to the Effective Date (including, for the avoidance of doubt, the Total Assets), which shall be described in the Liquidating Trust Agreement.

Plan § 1.104.

62.     Consequently, although Section 9.2(a)(vii) of the Plan purports to enhance recoveries for holders of General Unsecured and Guaranty Claims (which are undefined) through distributions of Total Assets, they will never be able to receive them because, upon the Effective Date of the Plan, the "Total Assets" become Liquidating Trust Assets which, pursuant to Section 9.2(a)(ii) of the Plan, cannot be distributed to "all guarantee Claims" from the Liquidating Trust.

## II.     THE PROPOSED PBGC SETTLEMENT VIOLATES PROVISIONS OF THE BANKRUPTCY CODE AND SHOULD BE REJECTED

### A.     Substantive Consolidation Cannot Be "Settled" as Part of a Non-Existent Dispute With the PBGC

63.     When the Debtors filed their First Amended Plan providing for the Substantive Consolidation Settlement, they explained that "after filing of the initial Plan and Disclosure Statement on April 17, 2019, the Debtors and the PBGC agreed to certain modifications to the PBGC Settlement terms in exchange for the settlement of disputes and

17

potential litigation regarding whether the Debtors should be substantively consolidated." First

Amended Disclosure Statement p. 53.

> 64.    In Section I.B. of the Disclosure Statement, the Debtors state:

> The Plan contemplates a Wind Down of the remaining assets of the
> Debtors' estates - primarily litigations claim - and a distribution to
> creditors in accordance with the absolute priority rule and certain
> settlements, as described herein.  Specifically, **the Plan
> incorporates and provides for the approval of a proposed
> settlement of inter-estate and inter-creditor issues, [1]
> including whether the assets and liabilities of the Debtors
> should be substantively consolidated, [2] including a proposed
> settlement with the Pension Benefit Guaranty Corporation,** as
> modified . . . .

Disclosure Statement, I. B. at 2.

> 65.    The Debtors cannot be permitted to preempt the Second Circuit's strict

standards for substantive consolidation by stowing away the proposed substantive consolidation

of their estates as a sub-component of their PBGC Settlement, even if it has since been renamed

the Substantive Consolidation Settlement or the "Plan Settlement".  Debtors cannot attempt to

substantively consolidate their estates as if substantive consolidation is, and always has been, a

sub-component of the PBGC Settlement.  The Debtors' requests for approval of the PBGC

Settlement did not initiate substantive consolidation and, in fact, specifically prohibited it, until

the Debtors decided to buy a "settlement" of a non-existent dispute by paying the PBGC an

additional $17.5 million secured recovery.  The PBGC's Settlement is not now, and never was, a

resolution of the "substantive consolidation issue" but rather, a proposed resolution of the claims

of the PBGC, and it cannot provide the vehicle for approval of a non-existent dispute.

18

**B.    PBGC's Classification and Settlement Unfairly Discriminates Against Other
Creditors and Is Not Reasonable**

**i.    PBGC is No Different than Other Unsecured Creditors**

66.    There is no legal basis for PBGC to have a priority claim and/or be treated differently than other unsecured creditors because the PBGC's claim is no different from any other unsecured creditor.  The Debtors' separate and, in the case of $97.5 million of its claim, priority classification of the PBGC's claim despite its status as an unsecured claim, is improper and unjustified.  By granting PBGC a significant priority claim pursuant to the PBGC Settlement in spite of PBGC's status as an unsecured creditor, the Debtors unfairly and disparately treat PBGC differently than similarly situated creditors, which constitutes a lack of good faith pursuant to sections 1122 and 1123(a)(4).

67.    Originally, PBGC asserted an unsecured claim against the Debtors in the amount of $1.4 billion for unfunded benefit liabilities.  PBGC, agreed to reduce its $1.4 billion unsecured claim to $800 million in return for receiving an $80 million priority claim, which has since been increased to $97.5 million.

68.    The Debtors' treatment of PBGC as set forth in the PBGC Settlement appears to be an attempt by the Debtors to ensure that their Modified Second Amended Plan has the support of an impaired accepting class.  *See* In re Bos. Post Rd. Ltd. P'ship, 21 F.3d 477, 482 (2d Cir. 1994) (noting "similar claims may not be separately classified solely to engineer an assenting impaired class.").[6]

---

[6] In Chapter 11 cases, courts "cannot confirm a plan that contains priority-violating distributions over the objection of an impaired creditor class." Czyzewski v. Jevic Holding Corp., 137 S. Ct. 973, 976, 197 L. Ed. 2d 398 (2017) (citing §§ 1129(a)(7), (b)(2)); In re Constellation Enterprises LLC, 587 B.R. 275, 278 (D. Del. 2018).

57618022v.10

ii.    **The PBGC Claim is Improperly Classified in Violation of Section 1122**

69.    Likewise, to be confirmable, the Debtors' Plan must also satisfy the criteria set forth in 11 U.S.C. § 1122.

70.    "One of the cardinal principles underlying bankruptcy law is equality of treatment of similarly situated creditors." *See* 7 Collier ¶ 1122.03, p. 1122-6 (Richard Levin & Henry J. Sommer eds., 16th ed.) ("Collier") (noting that this principle is codified in section 1123(a)(4)). "Classification claims in conformity with the requirements of section 1122 is [therefore] a prerequisite to confirmation of a plan in chapter 11." Id.

71.    Section 1122 "governs the classification of claims or interests in a chapter 11 plan - namely, the ability to classify substantially similar claims in the same class for purposes of voting and treatment." *See* 7 Collier ¶ 1122.01, p. 1122-3, (citing John Hancock, 987 F.2d 154 (3d Cir 1993) ("noting that the dual purpose of section 1122 and classification is voting to determine whether a plan can be confirmed … and treatment of claims under the plan.")).

72.    Section 1122 is "[a]n important corollary" to section 1123(a)(4), which requests that a plan provide the same treatment for each claim or interest within a class, unless the holder agrees to less favorable treatment of its claim or interest." *See* 7 Collier ¶ 1122.02, p. 1122-4. This is largely because "[i]n many instances, being able to treat creditors differently is dependent upon being able to first classify them differently.

73.    In designating classes of claims and interests for purposes of section 1123(a)(1), the proponent of a plan must comply with the classification standards contained in section 1122." *See* 7 Collier ¶ 1122.02, p. 1122-5.

20

74.    Though the Bankruptcy Code does not "address . . . whether all substantially similar claims must be placed in the same class," courts determine on a case-by-case basis whether section 1122(a) "requires all claims of a particular type to be included within a single class or whether the subsection merely requires that claims included within a class be of the same type." *See* 7 Collier ¶ 1122.03[1][a], p. 1122-7 (citing In re Lafayette Hotel P'ship, 227 B.R. 445, 449 (S.D.N.Y. 1998), aff'd, 198 F.3d 234 (2d Cir. 1999) ("Although [section 1122] explicitly prohibits the placement of dissimilar claims in the same class, it does not address the issue of whether similar claims must be placed in the same class." However, the "Second Circuit has addressed this concern and held that while it is impermissible for a debtor to form a separate class of unsecured creditors for the sole purpose of obtaining an assenting class of impaired creditors, such separate classification will be allowed where the debtor can provide "credible proof of a legitimate reason for separate classification of similar claims.") (citing In re Boston Post Road Ltd. Partnership, 21 F.3d 477, 483 (2d Cir. 1994) (emphasis added)).

75.    In order not to place all substantially similar claims and interests in the same class, the plan proponent must articulate a "reasonable justification" for such separate classification and the separate classification must not "offend one's sensibility of due process and fair play." *See e.g.,* 7 Collier ¶ 1122.03[1][a], p. 1122-7 (Richard Levin & Henry J. Sommer eds., 16th ed.) (citing In re LightSquared Inc., 513 B.R.56, 83 (Bankr. S.D.N.Y. 2014) ("[S]eparate classification of otherwise substantially similar claims and interests is appropriate so long as the plan proponent can articulate a 'reasonable' (or 'rational') justification for separate classification …However, the 'separate classification of substantially similar … claims … [must not] offend one's sensibility of due process and fair play.")).

21

76.     The Debtors have not yet provided a legitimate reason for their separate classification of PBGC from other similar unsecured creditors.  Instead, the Debtors appear to have created a separate class consisting of the PBGC, for the sole purpose of obtaining an accepting class of impaired creditor(s).

77.     Thus, in the instant case, the Debtors have failed to demonstrate by a preponderance of the evidence that their proposed Plan is confirmable under sections 1122, 1123 and 1129.  The Court should therefore find that the Debtors' Plan is not confirmable for the aforementioned reasons.

### C.     Even if the PBGC Settlement Conforms to the Absolute Priority Rule, the Settlement Does Not Satisfy Rule 9019 Factors

78.     "Settlements are favored, but the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them."  In re TCI 2 Holdings, LLC, 428 B.R. 117, 135–36 (Bankr. D.N.J. 2010) (citing In re Nutraquest, Inc., 434 F.3d 639, 644 (3d Cir. 2006)).  With respect to evaluating a settlement under Bankruptcy Rule 9019 standards, "[a] bankruptcy court is required to make an 'informed and independent judgment' in determining whether a settlement is fair and equitable."  In re Glob. Vision Prod., Inc., No. 07 CV. 12628 (RDD), 2009 WL 2170253, at *5 (S.D.N.Y. July 14, 2009) (wherein the appellant asserted that the bankruptcy court erred when it approved the settlement agreement "because there was no evidence that the [t]rustee exercised his business judgment.") (quoting Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968)).

57618022v.10

79.     Based on the framework set forth in TMT Trailer Ferry[7], courts in the

Second Circuit have established the following seven factors for evaluating settlements under the

Rule 9019 standard: "(1) the probability of success should the issues be litigated, versus the

present and future benefits of the settlement without the delay and expense of litigation and

subsequent appeals; (2) the likelihood of complex and protracted litigation if the settlement is not

approved (with its attendant expense, inconvenience, and delay), including the difficulty in

collecting on the judgment; (3) the interests of the creditors, including the degree to which

creditors support the proposed settlement; (4) whether other interested parties support the

settlement;(5) the competency and experience of counsel supporting, and the experience and

knowledge of the court in reviewing, the settlement; (6) the nature and breadth of the releases to

be obtained by officers and directors; and (7) the extent to which the settlement is the product of

arms-length bargaining."  In re Glob. Vision Prod., Inc., No. 07 CV. 12628 (RDD), 2009 WL

2170253, at *5 (S.D.N.Y. July 14, 2009) (citing In re Iridium Operating LLC, 478 F.3d 452, 462

(2d Cir. 2007) (citations omitted)); see also In re Cousins, No. 09 CIV 1190 RJS, 2010 WL

5298172, at *4 (S.D.N.Y. Dec. 22, 2010) (noting the "bankruptcy court must make independent

determinations in approving a settlement."); Daskal v. 1584 Fulton, LLC, No. 14-CV-7402

KAM, 2015 WL 6442338, at *6 (E.D.N.Y. Oct. 23, 2015) (citing In re Iridium Operating LLC,

478 F.3d 452, 462 (2d Cir. 2007); In re Sabine Oil & Gas Corp., 555 B.R. 180, 258 (Bankr.

S.D.N.Y. 2016).

80.     "The burden is on the proponent to establish that the settlement may be

approved." In re TCI 2 Holdings, LLC, 428 B.R. 117, 135–36 (Bankr. D.N.J. 2010).

---

[7] See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424, 88 S.Ct.
1157, 20 L.Ed.2d 1 (1968).

81.     With respect to the first factor for Rule 9019 approval - the balance between the litigation's likelihood of success and the settlement's future benefits - the PBGC Settlement is not in the best interest of the Debtors' estate based on the probability of success. Unlike the circumstances in <u>Global</u>, in the instant case, PBGC does not have significant litigation claims as Debtors contend, particularly since the sale of the Debtors' assets closed months ago. *See e.g.,* <u>In re Glob. Vision Prod., Inc.</u>, No. 07 CV. 12628 (RDD), 2009 WL 2170253, at *5 (S.D.N.Y. July 14, 2009) (noting that "GVP has significant litigation claims which also need funding or litigation on a contingency fee basis, because the estate is essentially insolvent.").

82.     With respect to the second Rule 9019 factor - the chances that the litigation will be complex and protracted - the risks associated with litigating PBGC's asserted claim for $1.4 billion and KDC's purported administrative expense claim are nowhere as catastrophic as Debtors contend.  Based on the evidence Debtors have provided to date, the evidence does not demonstrate that litigation of PBGC's claims would be lengthy and/or entail significant costs and risks to Debtors' estates. *See e.g.,* <u>In re Glob. Vision Prod., Inc.</u>, No. 07 CV. 12628 (RDD), 2009 WL 2170253, at *5 (S.D.N.Y. July 14, 2009) (finding "given the risks associated with litigating the claims and the harmful consequences that could result-not to mention the time and expense in pursuing the litigation-the Court agrees with the Bankruptcy Court that these first two factors support approval of the Settlement Agreement.").

83.     "The third factor asks the bankruptcy court to evaluate whether the settlement is in the interests of the creditors and the degree to which creditors support the proposed settlement." <u>In re Glob. Vision Prod., Inc.</u>, No. 07 CV. 12628 (RDD), 2009 WL 2170253, at *6 (S.D.N.Y. July 14, 2009). "The fourth factor looks to what extent other parties in

24

interest support the settlement." In re Glob. Vision Prod., Inc., No. 07 CV. 12628 (RDD), 2009

WL 2170253, at *6 (S.D.N.Y. July 14, 2009).

84.     In the instant case, applying the Rule 9019 criteria set forth above, overall,

the factors do not weigh in favor of approval of the PBGC Settlement Agreement.  As the

foregoing discussion of the Iridium factors demonstrates, the PBGC Settlement is not in the best

interest of all creditors, is not fair and it is not reasonable.

## III.    THE DEBTORS' PLAN HAS NOT BEEN PROPOSED IN GOOD FAITH AND VIOLATES PUBLIC POLICY

85.     "Section 1129(a)(1) provides that the court may confirm a plan only if the

plan complies with the applicable provisions of chapter 11." See 7 Collier ¶ 1122.02, p. 1122-4

(Richard Levin & Henry J. Sommer eds., 16th ed.).

### A.    Section 11.6 of the Plan Violates Public Policy

86.     Pursuant to Article XI, Section 11.6 of the Modified Second Amended

Plan, Indenture Trustees will not be entitled to reimbursement of their fees and expenses incurred

during the Debtors' bankruptcy cases in the event they took certain positions in these cases.[8]

Section 11.6 provides in pertinent part:

> The Debtors and the Creditors' Committee agree to negotiate in
> good faith the payment of fees and expenses incurred by the
> Indenture Trustees and Second Lien Agent during the pendency of
> the Chapter 11 Cases; provided that, such parties shall not be
> entitled to reimbursement of any fees and expenses incurred during
> the Chapter 11 Cases related to objecting to or otherwise
> challenging the Disclosure Statement, the Plan, the Sale, the
> Debtors' post-petition financing, the Debtors' use of cash collateral
> or asserting administrative expense claims (including under section
> 507(b) of the Bankruptcy Code).

---

[8] Although the prohibition does not seem to apply to Indenture Trustees who may have supported such actions as members of the Creditors Committee.

25

87.    This paragraph of Section 11.6 of the Plan should be prohibited as violative of public policy.

88.    The Trust Indenture Act of 1939 ("Act") was enacted to protect the rights of holders of publicly issued debt by requiring the issuance of such debt by means of a qualifying indenture between the issuer and an indenture trustee meeting the qualifications of the Act.  *See* 15 U.S.C. § 77aaa et seq.; *see generally* In re Worldwide Direct, Inc., 334 B.R. 112, 129 (Bankr. D. Del. 2005).  "An indenture trustee has a fiduciary duty to the noteholders and is required to act with the same care as if it owned the investment."  In re Worldwide Direct, Inc., 334 B.R. 112, 129 (Bankr. D. Del. 2005).

89.    It is unclear whether Section 11.6 of Plan is intended as another means for Indenture Trustees to be paid, or whether this provision is intended to supersede other provisions within the Plan that otherwise allow the Indenture Trustees to enforce the payment provisions and lien rights of their indentures, *see e.g.*, Article IX, Section 9.8 and Article XI, Section 11.1 of the Plan.  To the extent it is the latter, the provision violates Fed. R. Bankr. P. 3021 and purports to interfere with the rights of the indenture trustees and their respective noteholders under their respective indentures.

90.    Second, Section 11.6 of the Plan purports to reward or punish Indenture Trustees for acting (or not acting) in certain ways during the case which may be in conflict with their fiduciary obligations.  Accordingly, the Court should not confirm the Plan so long as the payment of fees and expenses of any indenture trustee under the Plan is predicated on the positions it took in this case in the exercise of its fiduciary duty.[9]  To do otherwise would permit

---

[9] Wilmington Trust does not suggest that any Indenture Trustee acting in this case has in any way been deficient in satisfying its fiduciary obligations.

26

57618022v.10

debtors to try to encourage indenture trustees to set aside the interest of their noteholders by dangling payment of their fees as a reward for "good" behavior.

91.    Thus, for the aforementioned reasons, the Court should not confirm the Debtors' Plan unless the second paragraph of Section 11.6 of the Plan is modified to remove from the criteria the positions taken by an indenture trustee in the fulfillment of its fiduciary duty.

## RESERVATION OF RIGHTS

92.    This Objection to the Debtors' Plan is submitted without prejudice to, and with a full reservation of, Wilmington Trust's rights to object to confirmation of the Plan on any basis, or to supplement this Objection in writing or at the hearing thereon including, without limitation, in the event the Debtors amend or otherwise modify the Disclosure Statement and/or Amended Plan.

57618022v.10

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, Wilmington Trust respectfully requests

that this Court (i) find that the Plan may not be confirmed; and (ii) grant Wilmington Trust such

other relief as the Court deems just, proper and equitable.


Dated: New York, New York
August 2, 2019

SEYFARTH SHAW LLP

By:    /s/ Edward M. Fox
Edward M. Fox
Steven Paradise
Owen Wolfe

*Attorneys for Wilmington Trust, National
Association, as indenture trustee*
620 Eighth Avenue
New York, NY 10018
Direct Dial:  (212) 218-4646
Direct Fax:   (917) 344-1339
Email:  emfox@seyfarth.com

57618022v.10