DAVIDOFF HUTCHER & CITRON LLP  
605 Third Avenue  
New York, New York 10158  
(212) 557-7200  
David H. Wander, Esq. (dhw@dhclegal.com)  
Garrett Kingman, Esq. (gk@dhclegal.com)  
*Attorneys for Pearl Global Industries Ltd.*

**Hearing Date and Time:**  
August 16, 2019 at 10:00 am (EST)

UNITED STATES BANKRUPTCY COURT  
SOUTHERN DISTRICT OF NEW YORK  
----------------------------------------------------------X  
In re:                                                                     Chapter 11

SEARS HOLDING CORPORATION, *et al.*,          Case No. 18-23538 (RDD)

                                    Debtors.[1]                     (Jointly Administered)  
----------------------------------------------------------X

# OBJECTION BY PEARL GLOBAL INDUSTRIES LTD. TO CONFIRMATION OF MODIFIED SECOND AMENDED JOINT CHAPTER 11 PLAN OF SEARS HOLDINGS CORPORATION AND ITS <u>AFFILIATED DEBTORS</u>

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); SHC Licensed Business LLC (3718); SHC Promotions LLC (9626); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND .............................................................................................................................. 2

    A.    The Chapter 11 Filing ............................................................................................. 2

    B.    October 15, 2018 Letter to Vendors by Sears CFO ......................................................... 2

    C.    Debtors' Initial List of Allowed §503(b)(9) Claims and "Guaranty of Payment" to Foreign Vendors............................................................................................................. 3

    D.    The Vendor Comfort Order ........................................................................................ 4

    E.    The Asset Purchase Agreement and § 503(b)(9) Claims ................................................ 5

    F.    Procedures Order for § 503(b)(9) Claims Kicked the Can Down the Road .................... 5

    G.    Section 503(b)(1) "Inducement" Claims .................................................................... 6

    H.    The Plan and Payment of Administrative Expenses Including §503(b)9) Claims .......... 7

ARGUMENT ................................................................................................................................... 9

    POINT I ........................................................................................................................... 9

    THE PLAN VIOLATES § 1129(a)(9)........................................................................... 9

    POINT II ......................................................................................................................... 12

    THE PLAN IS NOT FEASIBLE PURSUANT TO SECTION 1129(A)(11) ...................... 12

CONCLUSIONS............................................................................................................................. 13

# **TABLE OF AUTHORITIES**

## **Cases**

*In re Adelphia Business Solutions,* 341 B.R. 415 (Bankr. S.D.N.Y. 2003) .................................. 12

*In re Am. Capital Equip., LLC*, 688 F.3d 145 (3d Cir. 2012) ........................................................ 10

*In re Prudential Energy Co.,* 58 B.R. 857 (Bankr. S.D.N.Y. 1986) ............................................... 12

*In re Scott Cable Commc'ns, Inc.*, 227 B.R. 596 (Bankr. D. Conn. 1998) ...................................... 9

*In re Teligent, Inc.*, 282 B.R. 765 (Bankr. S.D.N.Y. 2002) ....................................................... 9, 11

*JP Morgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC
    (In re Charter Commc'ns, Inc.),* 419 B.R. 221 (Bankr. S.D.N.Y. 2009) ................................. 11

*Midway Airline Parts, LLC v. Midway Airlines Corp. (In re Midway),*
    406 F.3d 229 (4th Cir. 2005) ..................................................................................................... 9

*Pan Am Corp. v. Delta Air Lines*, 175 B.R. 438 (Bankr. S.D.N.Y. 1994) ...................................... 9

*Quarles v. U.S. Trustee*, 194 B.R. 94 (W.D. Va. 1996) ................................................................ 10

*Sherman v. Harbin (In re Harbin)*, 486 F.3d 510 (9th Cir. 2007) ................................................ 10

## **Statutes**

§§1129(a) (7) and (9) ........................................................................................... 1, 9, 10, 11

§503(b)(1) ................................................................................................................... passim

§503(b)(9) ................................................................................................................... passim

11 U.S.C. § 1129(a)(11) ....................................................................................................... 12

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Pearl Global Industries, Ltd. ("Pearl Global"), an administrative expense claimant under §§503(b)(1) and (b)(9)[2] of the Bankruptcy Code,[3] by its attorneys, Davidoff Hutcher & Citron LLP, submits the following objection to the Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors ("Plan"), and represents and says:

## PRELIMINARY STATEMENT

1. The Plan may not be confirmed because it violates §§1129(a) (7) and (9) of the Bankruptcy Code. The Debtors' estates are administratively insolvent and the Plan is not feasible.

2. The critical issue relating to §503(b)(9) claims remains unresolved and the amount of these claims is too large for the Debtors to satisfy the feasibility requirement for confirmation. The Debtors kicked the can down the road, so as to avoid the gatekeeping issue for allowance or disallowance of §503(b)(9) claims (e.g whether vendor claims should be evaluated under the Third Circuit's *World Imports* analysis or that of the lower courts in that case). Accordingly, the Debtors will need to adequately reserve for these claims.

3. In addition to the unresolved §503(b)(9) claims, there are unresolved administrative claims under §503(b)(1), including Pearl Global's "inducement" claim totaling $961,625.92 relating to goods ordered pre-petition but received by the Debtors post-petition. According to the Debtors, there are $63 million of claims relating to goods ordered pre-petition but provided to the Debtors post-petition. Because the Debtors have refused, to date, to engage

---

[2] Pearl Global filed two §503(b)(9) claims totaling $630,897: (i) a claim against Sears for $134,673 and (ii) a claim against Kmart for $496,224.

[3] Pearl Global was the Debtors' largest vendor in India and its third largest supplier of women's apparel in the world.

1

in discovery on this issue, it is presently unknown how many of these claimants also have valid inducement claims under §503(b)(1). Accordingly, the Debtors will need to adequately reserve for these claims.

4. Therefore, it appears impossible for the Debtors to present a sufficient record for the Court to find, by a preponderance of the evidence, that the Plan is feasible.

## BACKGROUND

**A.    The Chapter 11 Filing**

5. On October 15, 2018, Sears filed for chapter 11 protection. Notably, this bankruptcy was not an emergency filing but, rather, a slow slide into bankruptcy over many years during which time Sears' demise was widely reported in the financial news. In fact, Sears has been liquidating outside of a formal bankruptcy proceeding for many years prior to the commencement of this case. Accordingly, Sears' had plenty of time to plan for this bankruptcy.

**B.    October 15, 2018 Letter to Vendors by Sears CFO**

6. A significant amount of goods sold by Sears was manufactured by foreign vendors who usually shipped their goods by boat. The amount of time to deliver these goods, from loading the goods overseas to unloading them in the United States, usually took more than twenty (20) days. This worldwide supply chain was critical to Sears' business and its ability to continue in chapter 11, whether to reorganize or sell its assets as a going concern.

7. Thus, when this case was filed, Sears was very concerned that foreign vendors might stop their goods in transit,[4] or refuse to provide goods post-petition, if they did not receive assurances that payment would be made for goods delivered after the bankruptcy filing.

---

[4] On the Petition Date, $961,625.92 worth of Pearl Global's goods were in transit under various prepetition orders from the Debtors.

661761v.5                                        2

8.  To induce its vendors not to stop goods in transit, Sears sent a "Letter to Vendors" dated October 15, 2019, by Robert Riecker, its Chief Financial Officer, to various vendors[5] stating:

> **We do not anticipate any impact to vendor payments:** We intend to pay vendors in the ordinary course for all goods and services provided on or after the filing date. Invoices for these goods and services should be submitted through the ordinary channels, and payments will be processed in accordance with the terms of our purchase order or contract. Claims for amounts owed, for goods delivered, and services rendered prior to the filing date will be determined by the Court.

**Exhibit A** (emphasis in the original).

9.  Also, Sunaina Kapoor, the Debtors' employee responsible for direct communications with Pearl Global, sent an email to Pearl Global, on October 18, 2018, quoting, almost entirely, Mr. Riecker's statement about payment for all goods and services "provided" on or after the filing date":

> The company intends to pay our vendors in the ordinary course for all goods and services provided on or after the filing date. Invoices for these goods and services should be submitted through the ordinary channels, and payments will be processed in accordance with the terms of our purchase order or contract. Claims for amounts owed, for goods delivered, and services rendered prior to the filing date will be determined by the Court.

**Exhibit B**.

C.  **Debtors' Initial List of Allowed §503(b)(9) Claims and "Guaranty of Payment" to Foreign Vendors**

10. Apparently, in preparation for its bankruptcy filing, Sears prepared a list of vendors entitled to §503(b)(9) claims. On October 18, 2019, Michael Mcelwee, Director of Sourcing-Sears and Kmart Women's Apparel, told Mr. Kapoor, among others, that he could sort

---

[5] Counsel for Pearl Global has requested the Debtors to provide a list of all vendors to whom the Letter to Vendors was sent but, to date, the Debtors have refused to provide this list.

this information for women's apparel vendors so as to show each vendor their allowed §503(b)(9) shipments:

> Hi All,
>
> This is an update on the pre-petition payments. Would like you to know that all goods received up to **20 days prior** to the 10/15 filing are guaranteed to pay 100% by the court.
> Attached you will find the vendor receipts list that shows which vendors orders are guaranteed. You can sort to show your vendors. *This is good news!*

**Exhibit C** (emphasis in original). Mr. Kapoor then repeated this "pre-petition guarantee" (see the subject line of the email) to at least one foreign vendor, Eskay International PVT LTD, stating:

> Sharing payment update for your reference:
>
> Quote……………………
> This is an update on the pre-petition payments. Would like you to know that all goods received up to **20 days prior** to the 10/15 filing are guaranteed to pay 100% by the court.
> Attached you will find the vendor receipts list that shows which vendors orders are guaranteed. You can sort to show your vendors. *This is good news!*
> Unquote………………..

**Exhibit D** (emphasis in original).

### D. The Vendor Comfort Order

11. On November 20, 2018, upon motion by the Debtors,[6] the Court entered an order to give comfort to vendors about payment for their goods: the *Final Order Authorizing Debtors*

---

[6] Paragraph "19" of the Debtors' motion (Doc 14) stated:

> Prior to the Commencement Date, and in the ordinary course of business, the Debtors ordered approximately $162 million in Merchandise from suppliers and vendors that will not be delivered until on or after the Commencement Date (the "Prepetition Orders"). These suppliers and vendors may be concerned that, because the Debtors' obligations under the Prepetition Orders arose prior to the Commencement Date, such obligations will be treated as general unsecured claims in these Chapter 11 Cases. Accordingly, certain vendors may refuse to provide goods to the Debtors (or may recall shipments thereof) purchased pursuant to the Prepetition Orders unless the Debtors issue substitute purchase orders postpetition or obtain an order of the Court providing that all undisputed obligations of the Debtors arising from the postpetition delivery of goods subject to

*to (I) Pay Prepetition Claims of (A) Shippers, Warehousemen, and Other Non-Merchandise Lien Claimants, and (B) Holders of PACA/PASA Claims, and (II) Confirm Administrative Expense Priority for Prepetition Orders Delivered to the Debtors Postpetition, And Satisfy Such Obligations in the Ordinary Course of Business* (the "Vendor Comfort Order") [Doc. No. 843]. Paragraph "8" of the Vendor Comfort Order provided that:

> All undisputed obligations of the Debtors arising from the postpetition delivery or shipment [] of goods under the Prepetition Orders are granted administrative expense priority status pursuant to section 503(b)(1)(A) of the Bankruptcy Code, and the Debtors are authorized, but not directed, to pay such obligations in the ordinary course of business consistent with the parties' customary practices in effect prior to the Commencement Date.

**E.    The Asset Purchase Agreement and §503(b)(9) Claims**

12.    On February 11, 2019, after Court approval, the Debtors sold substantially all of their assets to Transform Holdco LLC ("Transform"), pursuant to an Asset Purchase Agreement dated January 17, 2019 ("APA"). Pursuant to the APA, Transform agreed to assume up to $139 million of §503(b)(9) claims.[7] However, the APA failed to explain how Transform would or could know which §503(b)(9) claims to pay. Also, the Disclosure Statement does not explain which §503(b)(9) claims Transform should pay or, otherwise, how Transform should know or decide which §503(b)(9) claims it should pay.

**F.    Procedures Order for §503(b)(9) Claims Kicked the Can Down the Road**

13.    According to the Debtors, $1.36 billion in §503(b)(9) claims have been filed. However, according to the Debtors, there are many duplicate claims and other reasons why most of these claims should not be allowed.  Further, according to the Debtors, allowed §503(b)(9)

---

Prepetition Orders are afforded administrative expense priority status under section 503(b) of the Bankruptcy Code. (emphasis added).

[7] This $139 million payment obligation was subject to potential offsets that could significantly reduce the amount of this payment.

661761v.5                                                   5

claims should total only $181 million.  However, the Debtors have not provided their analysis of these claims.

14.  Furthermore, the Debtor's obtained an order from the Court barring any §503(b)(9) claimant from filing a motion to allow their claim.  *See* Doc 2673, ¶20. Instead, the Debtors sought to address these claims through a claims resolution process. *See id.*, ¶19(a)-(c). The Debtors were required to provide monthly reports, beginning April 1, 2019, showing their progress in resolving these claims.[8] The Disclosure Statement does not provide any information about these reports.

### G.   Section 503(b)(1) "Inducement" Claims

15.  Pearl Global filed a motion for allowance of an administrative expense claim in the amount of $961,625.93, pursuant to §503(b)(1), relating to goods ordered by Sears pre-petition but delivered post-petition. Several other vendors filed similar motions and the Debtors opposed all of them. On May 21, 2019, the Court denied these motions, to the extent they were based upon the argument that the enactment of §503(b)(9) in 2005 with BAPCPA, should change the legal analysis the courts have used to resolve §503(b)(1) claims based upon goods ordered pre-petition but received by debtors in possession post-petition.

16.  However, Pearl Global's §503(b)(1) motion included an additional argument based upon an "inducement" theory and the Court ruled that the record on this issue needed to be developed.  Because the Debtors have, to date, refused to engage in discovery on this issue, they will need to reserve, in full, for this claim.  Also, it is presently unknown how much of the $63 million in goods ordered pre-petition but delivered to the Debtors post-petition may be subject to similar inducement claims under §503(b)(1).

---

[8] Counsel for Pearl Global has requested copies of these monthly reports but the Debtors have refused to provide them.

661761v.5                                6

**H.   The Plan and Payment of Administrative Expenses Including §503(b)9) Claims**

17.   Section 2.1 of the Plan provides that, except to the extent that a holder of an Allowed Administrative Expense Claim agrees otherwise, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim) shall receive cash in an amount equal to such Allowed Administrative Expense Claim. *See* Plan, § 2.1(a). Specifically, holders of Administrative Expense Claims will be paid:

> (x) first out of the Wind Down Account; and (y) *if the amount available for Distribution pursuant to the foregoing clause (x) is insufficient* to remit all Distributions required to be made to such holders pursuant to this sentence, *subject to* the payment in full of any Allowed ESL 507(b) Priority Claims and Other 507(b) Priority Claims in accordance with Sections 2.4 and 2.5 of the Plan, respectively, from the Net Proceeds of Total Assets; provided, that, for the avoidance of doubt Administrative Expense Claims shall be paid on the latest of (i) the Effective Date, (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, and (iii) the next Distribution Date after such Administrative Expense Claim becomes an Allowed Administrative Expense Claim. For the avoidance of doubt, this Section 2.1 shall not govern Distributions on Allowed ESL 507(b) Claims and Other 507(b) Priority Claims and Distributions on such Claims shall be governed by Sections 2.4 and 2.5 of the Plan, respectively. [Plan, § 2.1(a)]

18.   In accordance with the APA, holders of Allowed Administrative Expense Claims arising under §503(b)(9) shall be paid:

> (x) first by or on behalf of the Debtors on or after the date that Transform or any of its subsidiaries satisfies any amounts that may be owed pursuant to section 2.3(k)(iv) of the Asset Purchase Agreement up to $139 million in the aggregate, *as may be reduced*, dollar-for-dollar by, as applicable, the Aggregate DIP Shortfall Amount, Specified Receivables Shortfall Amount, Warranty Receivables Shortfall Amount and Prepaid Inventory Shortfall Amount (as those terms are defined in the Asset Purchase Agreement) and less any amounts previously satisfied by the Transform or any of its subsidiaries, and (y) if the amount available for Distribution

> pursuant to the foregoing clause (x) is insufficient to remit all Distributions required to be made to such holders pursuant to this sentence, in accordance with Section 2.1(a). [Plan, § 2.1(b)].

19. Pursuant to the Plan, Allowed Fee Claims shall be satisfied in full from (a) the proceeds of the Carve Out Account (as defined in the DIP Order), and (b) net proceeds of the Total Assets. As set forth in the Plan, such Fee Claims will be paid:

> in full, in Cash, by the Debtors or Liquidating Trust, as applicable, in such amounts as are Allowed by the Bankruptcy Court (i) on the date upon which an order relating to any such Allowed Fee Claim is entered or as soon as reasonably practicable thereafter; or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim, the Debtors (subject to the consent of the Creditors' Committee, not to be unreasonably withheld), or the Liquidating Trustee, as applicable, (x) first out of the Carve Out Account; and (y) if the amount available for Distribution pursuant to the foregoing clause (x) is insufficient to remit all Distributions required to be made to such holders pursuant to this sentence, from the Net Proceeds of Total Assets. Notwithstanding the foregoing, any Fee Claims that are authorized to be paid pursuant to any administrative orders entered by the Bankruptcy Court may be paid at the times and in the amounts authorized pursuant to such orders. [Plan, § 2.2(b).]

20. As of June 22, 2019, the Debtors estimated that the Administrative Expense Claims, excluding any claim entitled to administrative priority under §507(b) of the Bankruptcy Code, total approximately $468 million for all of the Debtors. *See* Disclosure Statement, § IV.T.

21. However, this estimate included only $181 million in §503(b)(9) claims and, presumably, it did not include Pearl Global's §503(b)(1) inducement claim nor any of the other potential inducement claims from the $63 million pool of claimants.

22. When the Disclosure Statement was filed, the Debtors estimated that the assets available to satisfy Administrative Expense Claims would total approximately $487 million.

However, this includes Transform's agreement to assume up to $263 million of liabilities (subject to reduction in accordance with the APA), $69 million in various operating accounts, $69 million in the professional fee Carve Out Account, and $39 million in cash and inventory being withheld by Transform. Transform has disputed the amounts the Debtors claim are owed under the APA and these issues are the subject of ongoing litigation before the Court, as well as litigation relating to §507(b) claims, the results of which are still pending.

## ARGUMENT

## POINT I

## THE PLAN VIOLATES § 1129(a)(9)

23. The Plan violates §1129(a)(9) because holders of allowed administrative expenses will not be paid in full, on the effective date, nor will there be sufficient funds in reserve to pay any such claims that are disputed if and when such claims are allowed.[9] *See Midway Airline Parts, LLC v. Midway Airlines Corp. (In re Midway),* 406 F.3d 229, 242 (4th Cir. 2005) (noting that "an administrative expense claim under §503(b) must be paid in cash on the effective date of the plan in a chapter 11 proceeding"); *Pan Am Corp. v. Delta Air Lines*, 175 B.R. 438, 483 (Bankr. S.D.N.Y. 1994) (referring to Bankruptcy Code section 1129(a)(9) as the "administrative solvency" requirement and stating that "[b]y itself, administrative insolvency would have prevented confirmation of the Joint Plan."); *see also In re Teligent, Inc.*, 282 B.R. 765, 722 (Bankr. S.D.N.Y. 2002) (noting, when a debtor tried to pay administrative claimants less than full payment, that any administrative creditors solicited by the debtors could prevent confirmation by refusing the different treatment and demanding payment in full); *In re Scott*

---

[9] The timing and payment of administrative claims is governed by §1129(a)(9)(A) of the Bankruptcy Code, which requires that, with respect to administrative expense claims, "on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim," unless the "holder of a particular claim has agreed to a different treatment of such claim. 11 U.S.C. § 1129(a)(9).

*Cable Commc'ns, Inc.*, 227 B.R. 596, 600 (Bankr. D. Conn. 1998) ("The code's confirmation scheme elevates allowed administrative claims to a dominant priority such that unless the holders agree to a different treatment, a plan cannot be confirmed without full payment of those claims even if there are no estate assets to pay them.").

24. No matter how much they try to manipulate the numbers, the Debtors will be unable to establish administrative solvency under the record that will be before the Court.[10] The Debtors made a conscious decision to avoid any resolution of issues underlying hundreds of millions of dollars of administrative claims and, by kicking the can down the road, they will be unable to satisfy §1129(a)(9).

25. It is undisputed that filed §503(b)(9) claims total *in excess of $1.3 billion dollars* and, while the Debtors may argue that allowed §503(b)(9) claims will total only $181 million, *see* Disclosure State, § IV.T., there is no support for this billion dollar plus reduction in §503(b)(9) claims.[11]

26. In addition to the huge amount of unresolved §503(b)(9) claims, the Debtors have ignored the §503(b)(1) inducement claims which could total in excess of $50 million.[12]

27. In addition to the unresolved issues relating to the §503(b)(9) claims and

---

[10] Any reliance upon prospective outcomes and recoveries from avoidance claims and the Lampert/ESL Lawsuit is insufficient for the Debtors to meet their burden of satisfying §1129(a)(9). *See e.g.*, *In re Am. Capital Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012) ("A plan will not be feasible if its success hinges on future litigation that is uncertain and speculative, because success in such cases is only possible, not reasonably likely.") (quoting *Sherman v. Harbin (In re Harbin)*, 486 F.3d 510, 519 (9th Cir. 2007)); *Quarles v. U.S. Trustee*, 194 B.R. 94, 97 (W.D. Va. 1996) (stating that a debtor's premise "that outcomes in pending litigation favorable to him will cure his financial ills is pure speculation" and concluding that the debtor did not have a reasonable likelihood of effectuating a reorganization).

[11] The Debtors should be required to produce all of the monthly reports showing what progress has been made to reduce the pool of §503(b)(9) claims. Also, it should be relatively easy for the Debtors to identify all of the duplicate claims and tabulate the total amount. Whatever information supports the Debtor's purported reduction in §503(b)(9) claims by over one billion dollars also be disclosed.

[12] This could be a very significant number, since there are up to $63 million in claims that could fall within this category. The Debtors should know how many vendors received the Letter to Vendors or the fee guarantee.

661761v.5                                    10

§503(b)(1) inducement claims, the Debtors numbers simply will not withstand scrutiny at the confirmation hearing. Even the Creditors' Committee recently observed that "there remains a significant possibility that any plan confirmed in these cases will require concessions by the Debtors' administrative creditors." ECF No. 4239, ¶ 2; *see also* ECF No. 4636, ¶ 17 (Declaration in Support of Motion of Debtors for Modification of Retiree Benefits). [13]

28. Simply put, the Debtors cannot demonstrate by a preponderance of the evidence their ability to pay, or reserve for, the §503(b)(9) Claims. *See, e.g., JP Morgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns, Inc.),* 419 B.R. 221, 244 (Bankr. S.D.N.Y. 2009) (observing that plan proponent bears the burden of establishing by a preponderance of the evidence that a plan meets the requirements of section 1129 of the Bankruptcy Code).

29. The Wind Down account balance, as of the confirmation hearing, is likely to be short, by a large amount, of the cash needed for confirmation. Among other deficiencies, it appears that the Debtors have not included costs associated with litigating disputes with Administrative Expense Claims, which apparently will involve both the attorneys for the Debtors as well as the attorneys for the Creditors Committee, and these undisclosed costs will add to the risk of administrative insolvency.

30. In sum, the Debtor have not demonstrated that the proposed treatment of administrative claims under the Plan satisfies the requirements of §1129(a)(9) of the Bankruptcy Code and this failure renders the Plan unconfirmable as a matter of law. *See, e.g.*, *In re Teligent,*

---

[13] While the Creditors Committee may have recognized that the only way a Plan can be confirmed in this case will be for the Debtors to negotiate with the administrative creditor body, so that they accept different treatment than that required under §1129(a)(9)(A), the Debtors have chosen a different strategy based upon their misguided view that the Court is, somehow, so invested in having a Plan confirmed that it will run roughshod over the foreign vendors' rights. Then, after confirmation, the Debtors will pick off the foreign vendors one at a time. Since hope springs eternal, Pearl Global is cautiously optimistic that the Debtors will soon realize that a different path should be taken, one that results in a plan the administrative vendor group can support.

*Inc.*, 282 B.R. at 722.

## POINT II

## THE PLAN IS NOT FEASIBLE PURSUANT TO SECTION 1129(A)(11)

31.     Section 1129(a)(11) of the Bankruptcy Code contains the "feasibility requirement" for conformation of a plan and it requires that:

> [c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11); *In re Adelphia Business Solutions,* 341 B.R. 415, 421 (Bankr. S.D.N.Y. 2003). The purpose of the feasibility require "is to protect creditors against unrealistic plans that have little or no chance of success. *In re Adelphia Business Solutions,* 341 B.R. at 421. "[A] plan based on impractical or visionary expectations cannot be confirmed." *Id.* (quoting *In re Prudential Energy Co.,* 58 B.R. 857, 862 (Bankr. S.D.N.Y. 1986)).

32.     By a preponderance of the evidence, the Debtors must demonstrate that the Plan's provision for the payment of all allowed administrative expense claims is feasible. This requires cash payments upon the effective date or appropriate cash reserves. However, the Debtors have not demonstrated, by a preponderance of the evidence, their ability to pay or reserve for Pearl Global's administrative claims, along with the other administrative claims that that must be paid or protected by an adequate reserve.

33.     Notably, no objections to §503(b)(9) claims have been filed. Even more importantly, no estimation motions have been filed. Thus, it will be procedurally impossible for the Debtors to develop a sufficient record for the Court to even rule on feasibility. On what basis

will the Court be able to estimate $1.36 billion of filed §503(b)(9) claims at $181 million?[14]

34.     It appears that the Debtors must win every dispute with Transform and the second lien lenders, and every other contingency and uncertainty, as of the transmittal of the Disclosure Statement, must fall in the Debtors favor for any possible feasibility of the Plan and, even then, most of the Debtors' estates will still be insolvent. And if the Debtors' have understated the projected expenses of the wind down, which we believe they have, then establishing the requisite proof of administrative solvency seems all but impossible.

35.     Accordingly, the Plan cannot be confirmed because it is not feasible as required by §1129(a)(11).

## CONCLUSIONS

Denying confirmation of the Plan does not mean that this case must be converted to a chapter 7 liquidation. The Debtors should negotiate with the administrative creditor body in an effort to reach a consensual Plan.

Dated: New York, New York
       August 2, 2019

DAVIDOFF HUTCHER & CITRON LLP

By:    /s/ David H. Wander
       David H. Wander
       605 Third Avenue
       New York, New York 10158
       (212) 557-7200
       dhw@dhclegal.com
       *Attorneys for Pearl Global Industries Ltd.*

---

[14] While the Court may have wide latitude in the manner in which it conducts the claim estimation process under Section 502, *see Adelphia*, 341 B.R. at 422-23, there still must be some modicum of due process. In *Adelphia*, Judge Gerber conducted a two-day evidentiary hearing on the feasibility of a large administrative claim that was critical to the issue of feasibility.

661761v.5                                13