**Exhibit A**

# GROUND LEASE

dated as of January ___8___, 2001

*Rent Commencement
date   2/20/2002*

by and between

WARM SPRINGS PROMENADE, L.L.C.

and

SEARS, ROEBUCK AND CO.

## TABLE OF CONTENTS

I - DEFINITIONS. ……………………………………………………………1
II - LEASE PROVISIONS ………………………………………………………6

2.01    Conditions to Lease……………………………………………………6

2.02    Lease of Premises ……………………………………………………8

2.03    Tenant's Control Area …………………………………………………8

2.04    Use ……………………………………………………………………8

2.05    Terms and Options ……………………………………………………9

2.06    Rent ……………………………………………………………………10

2.07    Title and Survey………………………………………………………10

2.08    Premises Free From Tenancies/Zoning    …………………………………11

2.09    Quiet Enjoyment …………………………………………………    11

III - CONSTRUCTION ………………………………………………………11

3.01    Landlord's Improvements……………………………………………11

3.02    Construction of Tenant's Store Building……………………………………12

3.03    Construction of Entire Tract …………………………………………………13

3.04    Mechanics Liens …………………………………………………………13

IV - LANDLORD'S REPRESENTATIONS AND WARRANTIES …………………………13

4.01    Landlord as Owner……………………………………………………13

4.02    Landlord's Authority …………………………………………………13

4.03    Encumbrances …………………………………………………………13

4.04    Compliance with Laws …………………………………………………13

4.05    Due Diligence …………………………………………………………13

| 4.06 | Available Utilities | 14 |
| | V - LANDLORD'S OPERATIONAL PROVISIONS | 14 |
| 5.01 | Parking | 14 |
| 5.02 | Landlord's Operating Covenant | 14 |
| 5.03 | Future Development | 14 |
| 5.04 | Access Roads | 15 |
| | VI - TENANT'S OPERATIONAL PROVISIONS | 15 |
| 6.01 | Opening Date | 15 |
| 6.02 | Continuous Operation | 15 |
| 6.03 | Tenant's Operating Covenant | 16 |
| 6.04 | Licensees, Subtenants, Concessionaires | 16 |
| 6.05 | No Restrictions Outside the Shopping Center | 16 |
| 6.06 | Tenant's Store Operations/Hours | 16 |
| 6.07 | Parking | 17 |
| 6.08 | Future Development | 17 |
| 6.09 | Signs | 17 |
| 6.10 | Utilities | 17 |
| 6.11 | Compliance with Law. | 17 |
| 6.12 | Merchant's Association/Marketing Fund | 17 |
| 6.13 | Landlord's Right to Recapture | 17 |
| 6.14 | Rear Truck Access | 19 |
| | VII - SHOPPING CENTER CONTROLS/MAINTENANCE | 18 |
| | VIII - DAMAGE AND DESTRUCTION | 22 |

8.01    Damage and Destruction of Shopping Center ..................................................22

8.02    Damage and Destruction of Tenant's Store Building..........................................23

IX - INDEMNIFICATION AND INSURANCE    ................................................23

9.01    Indemnification ..............................................................................................23

9.02    Tenant's Insurance..........................................................................................24

9.03    Landlord's Insurance ......................................................................................25

9.04    Waivers of Subrogation ..................................................................................26

X - REAL ESTATE TAXES AND ASSESSMENTS    ......................................26

10.01   Real Estate Taxes on the Shopping Center ......................................................26

10.02   Real Estate Taxes on the Premises...................................................................27

10.03   Tax Incentives ................................................................................................27

10.04   Indemnity by Landlord ...................................................................................27

10.05   Indemnity by Tenant ......................................................................................27

XI - DEFAULTS AND REMEDIES ................................................................28

11.01   Defaults..........................................................................................................28

11.02   Remedies ........................................................................................................29

XII - EMINENT DOMAIN    ..........................................................................29

12.01   Total Condemnation........................................................................................29

12.02   Partial Condemnation......................................................................................29

12.03   Condemnation Awards.....................................................................................29

XIII - HAZARDOUS MATERIALS ................................................................30

13.01   Landlord's Representations and Warranties......................................................30

13.02   Landlord's Covenants......................................................................................30

13.03  Tenant's Covenants ................................................................................................30

XIV - END OF TERM        ...................................................................................31

14.01  Effect of Tenant's Holding Over .................................................................31

14.02  Redelivery of Premises ................................................................................31

14.03  Disposition of Improvements at End of Term ..............................................31

XV - GENERAL PROVISIONS        .....................................................................31

15.01  Notices .........................................................................................................31

15.02  Waiver..........................................................................................................32

15.03  Memorandum of Lease and Transfer and Recording Taxes...........................32

15.04  Assignment and Subletting ..........................................................................32

15.05  Successors and Assigns.................................................................................33

15.06  Encumbrance of Tenant's Leasehold Interest ...............................................33

15.07  Time of the Essence .....................................................................................33

15.08  Broker ..........................................................................................................33

15.09  Captions .......................................................................................................33

15.10  Governing Law .............................................................................................33

15.11  No Partnership .............................................................................................34

15.12  Severability ..................................................................................................34

15.13  Authority ......................................................................................................34

15.14  Subordination, Non-disturbance and Attornment Agreement .......................34

15.15  Estoppel Certificates ....................................................................................34

15.16  Construction..................................................................................................34

15.17   Survival of Indemnities.......................................................................................................34

15.18   Non-Recourse to Landlord ……………………………………………………………35

15.19  Enforcement Costs…………………………………………………………………… 35

# GROUND LEASE

THIS GROUND LEASE (this "**Lease**") is made and entered into as of January 8, 2001, by and between **WARM SPRINGS PROMENADE, L.L.C.** ("**Landlord**"), and **SEARS, ROEBUCK AND CO.** ("**Tenant**").

## Recitals

A.   Landlord is the owner of approximately 34 acres of land located at West Warm Springs Road and Julia Drive in the City of Henderson, Clark County, Nevada, as designated as the **"Entire Tract"** on the site plan attached hereto as **Exhibit "A"** and incorporated herein by this reference (the "**Site Plan**").

B.   Landlord wishes to lease to Tenant and Tenant wishes to lease from Landlord the Premises (as hereinafter defined), which constitutes a portion of the Entire Tract.

C.   Landlord intends to develop the Entire Tract as a retail shopping development (the "**Shopping Center**") known as Warm Springs Promenade.

D.   Tenant intends to construct a one-level store building containing approximately 121,310 square feet on the Premises (**"Tenant's Store Building"**).

E.   After construction of Tenant's Store Building, Landlord's Improvements (as defined herein) and the balance of the improvements shown on the Site Plan, the Shopping Center will contain approximately 371,000 square feet of Gross Leasable Area (as hereinafter defined).

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the parties agree as follows:

## I - DEFINITIONS

1.01   **"Access Points"** are those points of ingress to, and egress from the Shopping Center to public or private roads, as identified on the Site Plan.

1.02   **"Blackout Period"** means the period between November 1 of any year and February 1 of the following year or between May 1 and July 15 of any year.

1.03   **"Building Pad"** is defined in Section 3.01(a) hereof.

1.04   **"Commencement Date"** is defined in Section 2.04(a) hereof.

1.05   **"Common Areas"** means all exterior portions of the Entire Tract that may from time to time be available for the general non-exclusive use, convenience and benefit of Tenant, and other owners, tenants and occupants of the Entire Tract, including, without limitation, truck ramps, loading facilities and docks, automobile parking areas, access roads, sidewalks, traffic lanes, bus stations, taxi stations, parcel pickup areas, entrances and

exits from and to public roads, landscaping, and utility facilities. No barrier which would prevent access across the Entire Tract shall be permitted unless approved by Landlord and Tenant in writing.

1.06    **"Entire Tract"** is defined in the Recitals of this Lease.

1.07    **"Environmental Laws"** means all federal, state and local laws, statutes, ordinances, regulations, criteria, guidelines, rules, standards, rules of common law now or hereafter in effect, and in each case as amended, and any judicial or administrative order, consent, decree or judgment relating to the regulation and protection of human health, safety, the environment and natural resources.

1.08    **"Fixed Rent"** is defined in Section 2.05(a) hereof.

1.09    **"Force Majeure"** or **"force majeure events"** shall mean any prevention, delay or stoppage of work which is a direct result of causes (except financial) beyond the reasonable control of the party obligated to perform, including acts of God (but excluding rain, winds and other typical weather conditions), labor strikes, inability to obtain labor and/or materials or reasonable substitutes therefor (but only if such materials were timely ordered in the first instance), government actions or restrictions, civil disturbances, war or casualty, of which the party intending to seek an extension as a result of such condition or event has given the other party written notice within ten (10) days of the occurrence or event, in which event such party shall be allowed such additional period of time to complete such work as is reasonably necessary, but in no event more time than is equivalent to the actual time lost as a result of such condition or event.

1.10    **"Gross Leasable Area"** means the total number of square feet of floor space covered and enclosed within a particular store or building on the Entire Tract, whether rented or rentable, measured to the outside of the exterior walls of the store or building, to the center line of party walls and to the exterior of walls abutting exit or service corridors, but not including Common Areas, exterior open truck docks, outdoor sales areas, garden shop areas, mall offices or enclosures used exclusively for mechanical equipment or non-structural mezzanines.

1.11    **"Hazardous Material"** means any hazardous or toxic substance, chemical, material or waste, or any pollutant, contaminant or other substance, that is or becomes defined, listed, or regulated by Environmental Laws, including, without limitation, polychlorinated biphenyls, asbestos, radioactive materials and petroleum, crude oil or any fraction thereof.

1.12    **"Initial Term"** is defined in Section 2.04(a) hereof.

1.13    **"Julia Drive"** is the roadway adjacent on the west boundary at the Shopping Center. This is a public street but may become a private roadway; if it becomes private Landlord shall, throughout the Term, service and maintain, or cause to be serviced and maintained such easements or rights which are appropriate to maintain continuous access to and ingress and egress over Julia Drive from the Shopping Center.

1.14    **"Landlord's Improvements"** is defined in Section 3.01 hereof.

1.15    **"Landlord's Parcel"** means the Entire Tract less the Premises .

1.16  "**Lease Year**" shall mean any period of 12 consecutive months during the Term that begins on the first day of the first full calendar month after the Opening Date or on any anniversary of such date.

1.17  "**Leasehold Encumbrance**" is defined in Section 15.06 hereof.

1.18  "**Leasehold Estate**" means all of Tenant's right, title and interest in the Premises and under this Lease.

1.19  "**Leasehold Lender**" is defined in Section 15.06 hereof.

1.20  "**Major Store**" means any or all of the store buildings designated as Major A, B, C and E on the Site Plan, as those spaces may be reconfigured as provided for in this Lease.

1.21  "**Net Sales**" means gross retail sales of merchandise made by Tenant from Tenant's Store Building and deducting or excluding (as the case may be):

➢ All returns, cancellations, and allowances;

➢ Rental Charges, including but not limited to, charges for or pursuant to rentals of automobiles, tools and other merchandise and equipment;

➢ Charges to customers for or pursuant to services, deluxing, delivery, installation, installed business sales, or inspection;

➢ Amounts, debits or charges of, for or pursuant to maintenance or service agreements (currently known as "Maintenance Agreements"), or for replacement or repair parts of merchandise furnished without additional charge in connection with repairs or replacements pursuant to warranties, guarantees, good will adjustments or Maintenance Agreements;

➢ All sales ordered through the use of or from catalogs, the internet, or other electronic means, or filled through channels regardless of the place of order, payment or delivery ("Off-Site Sales");

➢ Finance charges or other amounts in excess of Tenant's (or its concessionaires' or licensee's) cash sales price charged on, for or pursuant to sales made on credit or under a time payment or layaway plan;

➢ The amount of all sales, use, excise, retailers' occupation, or other similar taxes imposed in a specific amount of percentage upon, or determined by, the amount of sales made from Tenant's Store Building;

➢ Sales of departments, divisions or offices not located in Tenant's Store Building, even though administratively controlled therefrom;

➢ Amounts received for, or in connection with, the making of personal loans and the rendering of other financial services, including transactions through ATMs, and

premiums, proceeds, commissions, payments and other amounts received, collected or charged for or in connection with the sale of policies of insurance or investment fund shares and other securities, whether or not sold on or from the Tenant's Store Building;

➢ Contract sales, as hereinafter defined, regardless whether Tenant maintains an office, showroom or samples for the merchandise, or whether made on or from the Tenant's Store Building;

➢ Receipts from vending, weighing machines, amusement devices and public telephones;

➢ Receipts from sales of tickets for admission to entertainment, sporting or other similar events, from sales of licenses issued by governmental agencies and from collection of utility bills and check cashing, gifts and prizes;

➢ Receipts from the operation of eating facilities primarily available for employee use and not generally open to the public;

➢ Receipts from the sale of merchandise or gift certificates and purchase coupons; however, the sale of merchandise made by Tenant from Tenant's Store Building, paid for with gift certificates or purchase coupons, is included in Net Sales, unless otherwise excluded;

➢ Fees for building and like permits in connection with sales of merchandise or services;

➢ Amounts credited on the purchase price of merchandise by reason of merchandise traded in, or employee or other discounts;

➢ Unclaimed funds and property;

➢ Sales made by Tenant's subtenants, concessionaires and licensees;  provided, such areas shall not exceed 25%, in the aggregate, of the sales area of Tenant's Store Building.

➢ Commercial sales of truck tires made through Sears Truck Tire Division;

➢ The amount of all governmentally required levies for parking if passed on to customers, and/or all parking revenues;

➢ Commissions or amounts received in conjunction with the sale, leasing or financing of real estate.

The phrase "contract sales" means sales of goods or merchandise made to persons or entities other than the general public (e.g., sales made to or on behalf of builders or contractors, whether

local or national, or allowances given to customers of such builders or contractors) and including, but not limited to, sales of merchandise made to industrial, commercial or institutional purchasers or to governmental or quasi-governmental bodies, and sales of goods manufactured to the purchaser's specifications whether or not installed by Tenant. These sales are generally known as "Contract Sales".

All of the terms utilized in this Section, including "returns", "allowances", "Contract Sales" and installed business sales, will have the meaning used by Tenant in the normal course of its business.

Within sixty (60) days after the end of each Lease Year, Tenant will furnish to Landlord a statement of Tenant's Net Sales and the payment of Percentage Rent, if any, payable for that Lease Year. If the Commencement Date is other than the first day of a calendar month, all Net Sales from the Commencement Date to the first day of the month next following shall be included in the Percentage Rent for the first Lease Year. Landlord will have one hundred and twenty (120) days following its receipt of Tenant's statement of Net Sales within which to notify Tenant of Landlord's dissatisfaction with Tenant's statement or else Landlord will be deemed to have accepted Tenant's statement as correct. If Tenant's Net Sales for the period are reported at less than $12,000,000, and Landlord is dissatisfied with Tenant's statement of Net Sales, Landlord may, at Landlord's expense, cause an impartial, reputable firm of certified public accountants, nationally known and doing business on a nationwide basis, reasonably satisfactory and approved in writing by both Landlord and Tenant, to audit Tenant's Net Sales for the period covered by the statement within ninety (90) days after the giving of notice. If the auditor does not submit a detailed report to Landlord and Tenant in support of its findings within one hundred thirty-five (135) days after its selection and approval by the  Tenant's statement of Net Sales will be deemed correct and conclusive. Time, wherever specified in this Section, is deemed to be of the essence.

Tenant makes no representation or warranty as to the amount of sales or mix of merchandise and services which it expects to make from Tenant's Store Building. Landlord will hold in confidence all sales figures and other information obtained from Tenant or upon the inspection and audit of Tenant's books and records.

1.22    "**Opening Date**" means the date on which Tenant opens its business in Tenant's Store Building to the public.

1.23    "**Partial Lease Year**" means the period, if any, commencing with the Opening Date and continuing through the last day before the first Lease Year of the Term, and the portion of the Term, if any, after the last Lease Year of the Term.

1.24    "**PBA**" or "permissible building area" means those areas of the Shopping Center shown on the Site Plan to be, or proposed to be, improved with buildings, or so improved with buildings, as permitted by this Lease.

1.25    "**Premises**" is defined in Section 2.02 hereof.

1.26    "**Prime Rate**" means, at any time, the rate of interest most recently published as the "Prime Rate" in the Money Rates section of the Wall Street Journal.

1.27    **"Real Estate Taxes"** means ad valorem real property taxes and does not include any special assessments relating to the initial construction of the Shopping Center, other than Tenant's Store Building, and does not include any estate, gift, inheritance, succession, franchise, income or excess profits taxes which may be payable by Landlord or Landlord's legal representative, successors or assigns and any tax that might become due on account of ownership of property other than the Entire Tract that might become a lien on any part of the Entire Tract or collectable out of the same.

1.28    **"Rent,"** unless otherwise limited by the context, shall mean Fixed Rent, Additional Rent, and Percentage Rent.

1.29    **"Shopping Center"** is defined in the Recitals of this Lease.

1.30    **"Site Criteria"** means Sears Construction Criteria – Company Owned or Ground Leased - Developer Responsibilities dated October 5, 1999, revised 1/4/00, attached hereto as **Exhibit "B".**

1.31    **"Site Plan"** is defined in the Recitals of this Lease.

1.32    **"Tenant's Control Area"** is defined in Section II of this Lease.

1.33    **"Tenant's Hazardous Material"** means Hazardous Material brought or released (or permitted to be brought or released) onto the Premises by Tenant, its agents, contractors or employees.

1.34    **"Tenant's Improvement"** means any building or other permanent improvement (including replacements thereof) installed, affixed or attached in or to the Premises (including, without limitation, plumbing fixtures or equipment, heating, ventilating or air conditioning equipment, floor coverings affixed to the floors and paneling, tile or other similar materials affixed to the walls or ceilings), but does not include Tenant's inventory or stock in trade, such trade fixtures, electrical fixtures or other property that, under the terms hereof, may be removed by Tenant upon termination or expiration of the Term or any fixtures or other improvements installed by or at the expense of Landlord.

1.35    **"Tenant's Pro Rata Share"** means a fraction, the numerator of which is the land area, in square feet, of the Premises, and the denominator of which is the total land area of the Entire Tract.

1.36    **"Tenant's Store Building"** is defined in the Recitals of this Lease.

1.37    **"Term"** is defined in Section 2.04(a) hereof.

1.38    **"Turnover Date"** means the date on which Landlord tenders to Tenant the Building Pad and actual possession of the Premises, provided that:  (a) the Building Pad shall have been completed in accordance with the requirements of the Site Criteria and this Lease, except for minor punch list items accepted by Tenant; and (b) Landlord shall have performed all of the obligations to be performed by Landlord under Section 3.01 hereof.

## II - LEASE PROVISIONS

2.01    <u>Conditions to Lease.</u> Intentionally omitted.

2.02    <u>Lease of Premises.</u> Landlord hereby leases to Tenant and Tenant hereby leases from Landlord approximately 9.65 acres of land situated in the Shopping Center and more particularly described in **Exhibit "C"** attached hereto and by this reference incorporated herein and as shown on the Site Plan (the **"Premises"**). Landlord further grants to Tenant all non-exclusive rights, appurtenances, servitudes, charges, easements, rights of ingress and egress, parking, loading, unloading, licenses and hereditaments thereto, including, without limitation, rights of ingress and egress over Julia Drive. Landlord further grants to Tenant during the Term a non-exclusive easement for parking the vehicles of Tenant, its customers, employees and business invitees, and for access, use, ingress and egress for vehicles and pedestrians in common with the other tenants and occupants of the Entire Tract and their respective customers, employees and business invitees, over the Common Areas, including, without limitation, all parking areas, alleys, roadways, sidewalks, walkways, landscaped areas and surface water drainage systems and for use of parking lot lighting, all as shown on the Site Plan and as provided for in the REA.

2.03    <u>Tenant's Control Area.</u> The parties acknowledge and agree that Tenant shall have control, to the extent provided for in this Lease, with regard to the Access Points, and any changes to the Shopping Center within the area designated as **"Tenant's Control Area"** on the Site Plan. If any Access Point is relocated for any reason whatsoever, then Tenant's Control Area shall be revised to include such Access Points, as relocated.

(a)    Landlord agrees that, except as may be required by governmental authorities having jurisdiction, it will not perform or allow within the Tenant's Control Area, any changes to the Site Plan as currently configured which would (i) materially and adversely impact the parking count or configuration of parking within the Tenant's Control Area; (ii) materially and adversely affect the visibility of the Tenant's Store Building; or (iii) affect ingress to or egress from the Premises to public roads or to Julia Drive.

(b)    Tenant shall be notified in writing prior to any party or person undertaking any Changes, as defined herein, within Tenant's Control Area.

(c)    Tenant shall have thirty (30) days from its receipt of such notice of proposed Change within which to object, with reasonable specificity, to the proposed Change. If Tenant does not object to the proposed change within such thirty day period, then Tenant shall be deemed to have consented to such Change.

(d)    Any one or more of the following changes proposed within Tenant's Control Area (**"Changes"**) shall require Tenant's prior consent:
i.    changes to the Site Plan, including changes to the size or configuration of the parking spaces or the Access Points;
ii.    any construction, reconstruction, or alteration of the improvements and/or the Common Areas, including landscaping; and
iii.    any changes which would materially affect the visibility of the Tenant's Store Building from any public road or from Julia Drive.

(e)    The foregoing rights of Tenant with regard to Tenant's Control Area shall be recorded against the Landlord's Parcel in the Memorandum of Lease, and shall run with the land until this Lease expires or is terminated.

2.04    Use.

(a)    Tenant's Store Building.  The Tenant's Store Building may be used by Tenant for the sale, servicing and storing of merchandise, all other items or services normally sold in department stores and all other lawful retail uses.

(b)    The Shopping Center.  Pads A, B and F of the Shopping Center, as shown on the Site Plan, shall be used for retail and compatible service uses consistent with a first class shopping center.  Those uses listed on **Exhibit "D"**, attached hereto and made a part hereof **("Permitted Uses")** shall be acceptable uses for Pads A, B and F within the Shopping Center.  No party shall allow, within the Shopping Center, any "Prohibited Use" as shown on **Exhibit "E"**, attached hereto and made a part hereof.

2.05    Term and Options

(a)    Initial Term.  The initial term of this Lease shall be twenty (20) Lease Years (the **"Initial Term"**) and shall commence on the date (the **"Commencement Date"**) that is the earlier of (i) the Opening Date or (ii) the date that is 360 days after the Turnover Date.  As used herein, **"Term"** and **"Term of this Lease"** refer to such Initial Term and to any extension thereof as hereinafter provided.  Upon the request of either party to this Lease, Landlord and Tenant shall enter into a supplemental agreement setting forth the Commencement Date.

(b)    Options to Extend.  Provided Tenant is not in material default under this Lease beyond any applicable cure periods, Landlord grants to Tenant four (4) consecutive options to extend the Initial Term for periods of ten (10) years each. Each option can be exercised by Tenant giving Landlord written notice of the exercise thereof at least 360 days before the expiration of the then-existing Term; provided, however, that if Tenant shall fail to give such notice within such 360-day time limit, Tenant's right to exercise its option shall nevertheless continue until 30 days after Landlord shall have given Tenant notice of Landlord's election to terminate such option, and Tenant may exercise such option at any time until the expiration of such 30-day period.  It is the intention of the parties to avoid forfeiture of Tenant's rights to extend the Term of this Lease under any of the options set forth in this Section 2.04(b) through inadvertent failure to give notice thereof within the time limits prescribed.

2.06    Rent

(a)    Fixed Rent.  As of the Commencement Date, Tenant shall pay Landlord fixed rent for the Premises **("Fixed Rent")** as follows:

| Lease Year | Annual Rent | Monthly Rent |
|---|---|---|
| 1-10 | $350,000 | $29,167 |
| 11-20 | $400,000 | $33,333 |
| Option 1 | | |
| 21-30 | $440,000 | $36,667 |
| Option 2 | | |
| 31-40 | $484,000 | $40,333 |
| Option 3 | | |
| 41-50 | $532,400 | $44,367 |
| Option 4 | | |
| 51-60 | $585,640 | $48,803 |

*[Handwritten annotations in right margin: "29333.66", "2/20/2002 — 2/28/2012", "3/1/2002 — 2/28/2022"]*

(b)   Percentage Rent. In addition to Fixed Rent, Tenant shall pay Landlord as percentage rent two percent (2%) of Net Sales between $0 and $12,000,000 ("**Percentage Rent**") with respect to each Lease Year or Partial Lease Year during the Initial Term of this Lease.

(c)   Additional Rent. Tenant's obligation for the payment of Real Estate Taxes and the Julia Drive Payment, as defined herein, shall be Additional Rent under this Lease.

(d)   Payment.

(i)   Fixed Rent for each Lease Year shall be due and payable in advance in equal monthly installments on or before the first day of each month in such Lease Year, without notice or demand, or right of set-off, except as specifically provided in this Lease.  Tenant agrees to pay a late charge of $250 for any monthly payment of Fixed Rent received by Landlord after the tenth day of the month, provided no late charge shall be due for the first late payment of Fixed Rent in any Lease Year.

(ii)   Percentage Rent for any Lease Year or Partial Lease Year during the Initial Term shall be paid in monthly estimated installments, subject to adjustment at the end of each Lease Year based on actual Net Sales for the subject period .  Landlord or Tenant, as applicable, shall pay the additional Percentage Rent, or refund any overpayment of Percentage Rent, within thirty (30) days after the final adjustment. No Percentage Rent shall be due for any period after the expiration of the Initial Term of this Lease.

(iii)   In the manner provided for notices in this Lease, Landlord will, from time to time, designate some one person, firm or corporation to receive rent payments.  Rent will be made payable to Landlord and mailed to the following address:

*[Handwritten: over paid $166.66 /month]*

Warm Springs Promenade, L.L.C.
c/o Kimco Realty Corporation
P.O. Box 5020
3333 New Hyde Park Road, Suite 100
New Hyde Park, New York  11042-0020

until the address is changed by written notice from Landlord.  Landlord's Federal Employer Identification Number is 51-0395459.

(e)    If Tenant should cease continuous operations within Tenant's Store Building after the expiration or termination of Tenant's Operating Covenant, then for the balance of the Initial Term, Tenant shall pay as Rent (i) Fixed Rent, plus (ii) the average of the Percentage Rent paid by Tenant for the three (3) previous Lease Years.  During any option term, Tenant shall pay Fixed Rent only.

2.07    Title and Survey.

(a)    Promptly after the date hereof, Landlord shall deliver to Tenant an ALTA 1970 Form B Owner's Policy of title insurance with a leasehold policy conversion endorsement, if available, or, if such an endorsement is not available, an ALTA 1970 Form B leasehold policy of title insurance insuring the Leasehold Estate (the **"Title Policy"**), issued by First American Title Insurance Company (the **"Title Company"**). Landlord and Tenant shall each pay one half of the cost of the Title Policy, in the amount of $10,700,000.  Tenant may, at Tenant's sole expense request such endorsements to the Title Policy as Tenant may desire.  The Title Policy shall be subject only to:  (i) the matters listed on **Exhibit "F-1"** attached hereto and by this reference incorporated herein, with respect to the Premises; and (ii) the matters listed on **Exhibit "F-2"** attached hereto and by this reference incorporated herein, with respect to the rest of the Entire Tract.

(b)    Promptly after the date hereof and at Landlord's sole cost, Landlord shall deliver to Tenant and the Title Company a survey of the Premises dated after the date hereof and certified to the Title Company and Tenant as having been prepared in accordance with ALTA Standards and showing the location of all utility easements and the location of all utility lines on the Premises or servicing the Premises; and (c) copies of current real estate tax bills related to the Entire Tract and copies of all recorded documents disclosed in the Title Policy.

2.08    Premises Free From Tenancies/Zoning.  On the Turnover Date, Landlord shall deliver actual possession of the Premises to Tenant free of all tenancies and occupancies and zoned to permit the construction and operation of a retail store of the size allowed pursuant to this Lease.  If the Premises are not so free of tenancies and zoned on the Turnover Date, then Tenant may terminate this Lease upon notice to Landlord.

2.09    Quiet Enjoyment.  Throughout the Term, Tenant shall have the right to peaceably and quietly have, hold and enjoy the Premises as against Landlord and any person claiming by, through or under Landlord or claiming title paramount to that of Landlord.

## III - CONSTRUCTION

3.01    Landlord's Improvements.  In entering into this Lease and in constructing Tenant's Store Building on the Premises, Tenant is relying upon Landlord's covenant to complete the following improvements on the Entire Tract (the **"Landlord's Improvements"**) within the time periods provided for herein.

(a)    Building Pad.  Subject to force majeure events, on or before March 15, 2001, Landlord shall complete the building pad for Tenant's Store Building (the **"Building Pad"**) in accordance with the Site Criteria.  The Building Pad shall be constructed by Landlord in such a manner so that: (i) Tenant has vehicular access to the Building Pad for its construction vehicles; (ii) the Building Pad complies with the Site Criteria, including, without limitation, the elevation and location; and (iii) all temporary utility facilities and construction areas for Tenant's construction of Tenant's Store Building are in place as required in the Site Criteria and fully usable for Tenant's construction of Tenant's Store Building.  Landlord shall provide Tenant with a Building Pad certification in the form attached hereto as **Exhibit "G"**, attached hereto and made a part hereof, promptly after Tenant accepts the Building Pad.

(b)    On-Site and Off-Site Improvements.  Landlord shall perform all on-site and off-site improvements to the Entire Tract, including the Premises, as shown on the Site Plan and as provided in the Site Criteria and as necessary for Tenant to construct Tenant's Store Building and to operate its store therein, including, but not limited to, all surveying and engineering work, and all work necessary to bring all utility lines to within five feet of the Building Pad in accordance with the Site Criteria.  Landlord shall perform any required modifications to perimeter streets and access roads and, within Tenant's Control Area shall complete parking lot paving, striping and parking lot lighting, landscaping and curbing and irrigation systems.  Subject to force majeure events, Landlord shall substantially complete all such work (excepting seasonal landscaping) at its sole cost and expense on or before February 14, 2002, and thereafter diligently pursue final completion.

(c)    Governmental Approvals.  Landlord shall obtain all necessary consents, permits and approvals of governmental authorities, including Site Plan approval and zoning approvals for the construction of Landlord's Improvements (excluding the building permit for Tenant's Store Building).   Landlord shall file all environmental impact reports and all other necessary documents as required to permit commencement of operation of Tenant's businesses on the Premises.  If Landlord does not obtain all such consents, permits and approvals by the Turnover Date, and thereafter fails to secure such consents and approvals within thirty (30) days after written notice from Tenant, then Tenant may terminate the Term of this Lease by giving notice to Landlord of such termination.

(d)    Third Party Consents and Approvals.  Landlord shall obtain all necessary consents and approvals of lenders or other private parties with approval rights of the Site Plan, the construction to be performed by Landlord hereunder, the construction of Tenant's Store Building and all other transactions contemplated hereunder. Landlord shall certify that it has secured all necessary approvals to Tenant in writing.  If Landlord does not obtain all such consents and approvals on or before the Turnover Date, and thereafter fails to secure such consents and approvals within thirty (30) days after written notices from Tenant, then Tenant may terminate the Term by giving notice to Landlord of such termination.

(e)    Outside Date for Turnover Of Building Pad.  Subject to force majeure events, if the Turnover Date shall not have occurred on or before April 15, 2001, then, at Tenant's option, the Term shall not thereafter commence, this Lease shall terminate and Landlord and Tenant shall have no further obligations or liabilities hereunder other than liabilities that may have arisen before such date.  Tenant may exercise such option by giving notice of such exercise to Landlord.

3.02    Construction of Tenant's Store Building

(a)    Construction.  After the Turnover Date, Tenant shall have access to the Premises. Subject to force majeure events, Tenant will use its best efforts to complete construction of, and open in Tenant's Store Building on or before the first anniversary of the Turnover Date.

(b)    Landlord shall have the right to review the architectural plans and elevations for Tenant's Store Building to insure architectural compatibility with the balance of the Shopping Center.

(c)    Construction Staging Areas.  Tenant may use areas of the Premises   as construction staging areas.  Upon reasonable prior notice from Landlord, Tenant agrees to relocate such staging areas as necessary to allow Landlord to complete its improvements to the Premises.

3.03    Construction on Entire Tract.  Except for the construction referenced in Sections 3.01 and 3.02 (a), other construction on the Entire Tract shall be subject to the terms of this Lease.

3.04    Mechanics Liens.

(a)    Tenant shall keep the Premises and the Entire Tract free and clear of any and all mechanics', materialmen's and other liens for or arising out of, or in connection with, work or labor claimed to have been done, services performed or materials or appliances used or furnished for or in connection with any construction, repairs or operations of Tenant on or about the Premises.  Tenant shall, subject to the provisions below, promptly and fully pay and discharge any such lien.  Tenant shall indemnify and hold Landlord harmless against all such liens and claims of liens and suits or other proceedings pertaining thereto.

(b)    Landlord shall keep the Premises free and clear of any and all mechanics', materialmen's and other liens for or arising out of, or in connection with, work or labor claimed to have been done, services performed or materials or appliances used or furnished for or in connection with any construction, repairs or operations of Landlord on or about the Entire Tract.  Landlord shall, subject to the provisions below, promptly and fully pay and discharge any such lien.  Landlord shall indemnify and hold Tenant harmless against all such liens and claims of liens and suits or other proceedings pertaining thereto.

(c)    If Tenant or Landlord, as applicable, elects to contest any such lien, it shall notify the other party of its intention to do so within sixty (60) days after such party receives notice of such lien. The responsible party shall, within sixty (60) days after the final determination of the validity thereof, satisfy and discharge such lien to the extent held valid; provided that in any event the satisfaction and discharge of any such lien shall be made before execution is had on any judgment rendered thereon.  In the event of any such contest which may affect the Entire Tract or the Premises, as applicable, the responsible party shall protect and indemnify the other party against all loss, expense and damage, excluding consequential damages, resulting therefrom and shall post such bond or provide such other assurances as the Title Company may reasonably require to insure over such liens.

## IV - LANDLORD'S REPRESENTATIONS AND WARRANTIES

Landlord represents and warrants to Tenant that, as of the date of this Lease or as of the Turnover Date, as applicable:

4.01    Landlord as Owner.  Landlord is the owner of the Entire Tract.  As of the date of its execution of this Lease, no further consents are required and Landlord's execution of this Lease does not violate any contract, mortgage, lease, operating agreement or any other written or oral agreement to which Landlord is a party or to which the Entire Tract or any portion thereof is subject.

4.02    Landlord's Authority.  Landlord has the full right and lawful authority to enter into and perform its obligations under this Lease.

4.03    Encumbrances.  Landlord has not created and has no actual knowledge, after reasonable inquiry, of any easements, restrictions, mortgages and other liens, encumbrances or defects in title:  (i) affecting the Premises, other than the matters listed in **Exhibit "F-1"** hereto; and (ii) affecting the rest of the Leasehold Estate, other than the matters listed in **Exhibit "F-2"** hereto.

4.04    Compliance with Laws.   To Landlord's actual knowledge, the Premises are in full compliance with all applicable laws, regulations and ordinances.

4.05    Due Diligence.  To Landlord's actual knowledge, the reports and test results listed in **Exhibit "H"**, attached hereto and by this reference incorporated herein, are all environmental reports and environmental test results for the Entire Tract that are within

Landlord's possession or control or within the possession or control of Landlord's agents, employees, contractors or attorneys.

4.06    Available Utilities.    All utilities, including gas, electric, telephone, water and sewer sufficient to meet Tenant's Site Criteria, are available at the Premises.

## V - LANDLORD'S OPERATIONAL PROVISIONS

5.01    Parking.    Landlord shall not charge for the use of any parking spaces on the Landlord's Parcel except as may be required by law.    Landlord shall not change the location or configuration of any access points into the Shopping Center shown on the Site Plan to be within Tenant's Control Area except with the written consent of Tenant, which consent may be given or withheld by Tenant in Tenant's sole and absolute discretion, or as may be required by law. Landlord shall provide sufficient surface parking on the Landlord's Parcel to provide not less than five (5) parking spaces (having a width of not less than nine feet) per 1,000 square feet of Gross Leasable Area (the **"Required Parking Ratio"**) on the Landlord's Parcel, in accordance with the Site Criteria.

5.02    Landlord's Operating Covenant.    Landlord shall throughout the Term operate and maintain the Entire Tract as a first-class shopping center as provided in Section 7.03.

(a)    Landlord shall use commercially reasonable efforts to keep all store space in the Shopping Center leased and substantially used for retail sales and services of the type typically found in first class shopping centers in the Las Vegas and Reno, Nevada areas.

(b)    No kiosks, push carts or other vending facilities of any type shall be permitted within Tenant's Control Area, except in the locations specifically designated on the Site Plan, if any, or as approved in writing between Landlord and Tenant.

5.03    Future Development/Excluded Uses.

(a)    Except within the areas designated as "Permissible Building Area" on the Site Plan, Landlord shall not construct or permit the construction of any improvements on the Entire Tract without the written consent of Tenant, which consent may be given or withheld by Tenant in Tenant's sole and absolute discretion.

(b)    So long as Tenant is operating  a Sears department store within Tenant's Store Building, Landlord shall not lease or sell any building or space within the Shopping Center for any other department store use. For purposes of this Lease, "department store" shall mean a retail store occupying at least 120,000 square feet of gross leasable area in the Shopping Center for the sale of a variety of hard and/or soft goods and miscellaneous merchandise and services, substantially similar to those department stores found in shopping centers containing at least 500,000 square feet of GLA in the Las Vegas, Nevada metropolitan area.  The foregoing restriction is not intended to exclude merchants who carry such products or merchandise as an incidental portion of their business within the

Shopping Center.

5.04   Access Roads.  Landlord shall not restrict, alter or otherwise impede the flow of truck traffic along the rear (south) of the Shopping Center, fronting Kelso Dunes Road, or vehicular traffic along the roadway immediately in front of the Major Store buildings.

## VI - TENANT'S OPERATIONAL PROVISIONS

6.01   Opening Date.  Subject to force majeure events, Tenant shall open Tenant's Store Building to the public for business not later than 365 days after the Turnover Date; provided, however, that:

(a)   All of Landlord's Improvements, other than seasonal landscaping, have been substantially completed; and

(b)   Tenant shall not be obligated to open Tenant's Store Building to the public for business during a Blackout Period.

6.02   Continuous Operation.  For purposes of Section 6.03, to "continuously operate" means to keep floor area within the Shopping Center fully stocked and open to the public for business during reasonable business hours, excluding periods of reconstruction, renovation, repair or alteration and such other reasonable interruptions as may be incidental to the conduct of its business.

6.03   Tenant's Operating Covenant.  Subject to the other provisions of this Lease, Tenant will, from and after the Opening Date and for the first ten (10) years of the Initial Term after the Opening Date, continuously operate or cause to be operated in Tenant's Store Building a retail store, under the name of Sears or such other name as Sears may then be operating in the majority of its like retail stores in the State of Nevada ("**Tenant's Operating Covenant**"). Tenant's Operating Covenant is subject to the following conditions:

(a)   Landlord is not in default of Landlord's Operating Covenant; or

(b)   At least 75% of the floor area of the Major Store space at the Shopping Center is leased and operating; provided, Landlord may cure a breach of this condition by entering into a contract with a replacement tenant to operate in not less than 50% of the floor area of the Major Store space it is replacing within twelve (12) months thereafter, so long as such replacement tenant has opened for business within the Major Store space within eighteen (18) months after the initial cessation of continuous operations.

(c)   If, at any time during Tenant's Operating Covenant, Landlord has not met all of the foregoing conditions, then Tenant's Operating Covenant shall terminate.

(d)   Tenant's Operating Covenant is personal to Landlord and not assignable, except to a successor Landlord who acquires title to the Premises or to a mortgagee in possession.

S:\gfilice\Henderson,NV Ground Lease FINAL.dot   15

(e)     Tenant's Operating Covenant is conditioned upon Landlord not entering into an agreement with a third party whereby the third party is granted the right, either directly or indirectly, to enforce Tenant's Operating Covenant.

6.04    <u>Licensees, Subtenants, Concessionaires</u>.    Subject to the provisions of Section 1.20, Tenant may operate Tenant's Store Building in whole or in part by licensees, subtenants or concessionaires.

6.05    <u>No Restrictions Outside the Shopping Center</u>.  Nothing contained herein shall be deemed to impose any radius or other restriction on the activities of Tenant outside of the Shopping Center.

6.06    <u>Tenant's Store Operations/Hours</u>. The hours of business, the number and types of departments to be operated in Tenant's Store Building, the particular contents, wares and merchandise to be offered for sale and the services to be rendered, the methods and extent of merchandising and storage thereof, and the manner of operating Tenant's Store Building shall, in every respect whatsoever, be within the sole and absolute discretion of Tenant.

6.07    <u>Parking</u>.  Tenant shall not charge for the use of any parking spaces on the Premises except as may be required by law.  Tenant shall not change the location or configuration of any access points into the Shopping Center shown on the Site Plan to be within the Premises except with the written consent of Landlord, which consent may be given or withheld by Landlord, in Landlord's sole and absolute discretion, or as may be required by law. Tenant shall provide sufficient surface parking on the Premises in order to comply with the Required Parking Ratio.

6.08    <u>Future Development</u>. Except within the areas designated as "Permissible Building Area" on the Site Plan, Tenant shall not construct or permit the construction of any improvements on the Premises without the written consent of Landlord, which consent may be given or withheld by Landlord in Landlord's sole and absolute discretion.

6.09    <u>Signs</u>.  Landlord shall assist with and cooperate with Tenant's efforts to obtain signage permits, including, but not limited to, the following:

(a)     <u>Pre-Opening</u>.    Subject to compliance with applicable laws, and before the Opening Date, Tenant may place and maintain temporary signs and banners on the Premises and outside Tenant's Store Building to announce Tenant's opening. Tenant shall remove such temporary signs on or promptly after the Opening Date.

(b)     <u>After Opening</u>.    Subject to compliance with applicable laws, Tenant may install and maintain signage on the Premises consistent with signage at Tenant's stores similar to Tenant's Store Building.  Tenant's sign panel shall be displayed on at least one pylon sign and two monument signs along Warm Springs Road.

(c)     <u>Tent Sales</u>.  Tenant shall have the right to place temporary signs and banners on the Premises to promote its periodic tent sales.  Such tent sales shall be:  i) within the area of the Premises shown on the Site Plan; ii) conducted no more often than

four (4) times in any calendar year; iii) each shall extend no more than 30 days in duration; and iv) none shall be conducted in the period of 11/15 through 12/31.

(d)  <u>Shopping Center Signage.</u> Signage for other tenants or owners of the Entire Tract shall be subject to the provisions of Section VII of this Lease.

6.10  <u>Utilities</u>. Tenant shall contract in its own name and promptly pay for all water, sewer, gas, heat, light, power, telephone service and other public utilities of every kind that Tenant desires to be furnished to the Premises throughout the Term and Landlord shall have no responsibility of any kind for any thereof.

6.11  <u>Compliance with Law</u>. Tenant shall comply with all federal, state and local governmental laws, rules, regulations and ordinances applicable to Tenant's use of the Premises.

6.12  <u>Merchants' Association/Marketing Fund.</u>

(a)  Commencing on the Commencement Date and continuing for three (3) years thereafter, Tenant shall maintain membership in the Shopping Center Merchants' Association and/or marketing fund. Tenant's sole obligation for such membership shall be to pay to Landlord or to such Association, as the case may be, an annual contribution of $2,000.00 per year, in equal monthly installments. All monies received by Landlord or said Association pursuant to this Section shall be used solely for the purpose of advertising the Shopping Center and for promotional services in connection with the Shopping Center.

(b)  Landlord shall have no obligation to establish a Merchants' Association or marketing fund. Except as set forth above, in no event shall Tenant be required to be a member of any Shopping Center Merchants' Association or to make any payment to a promotional fund or marketing fund. After the third anniversary of the Commencement Date, Tenant shall not be required to maintain its membership or to make any contribution.

6.13  <u>Landlord's Right to Recapture</u>.

(a)  Should Tenant for a period in excess of twelve (12) consecutive months cease operating its retail store at the Shopping Center, other than as provided in this Lease, Landlord shall have the right, but not the obligation, on prior notice to Tenant, to recapture the Premises at its then appraised fair market value. If within thirty (30) days of Landlord's written notice electing this option the parties are unable to agree on a value then Landlord shall designate an M.A.I. appraiser who is engaged in appraisal work in the State of Nevada and who is experienced in the appraisal of similar properties. Within ten (10) days following Landlord's appointment of an appraiser, Tenant shall appoint an M.A.I. appraiser who is engaged in appraisal work in the State of Nevada and who is experienced in the appraisal work of similar properties. The two M.A.I. appraisers so selected shall, within ten (10) days following the selection of the second of such appraisers, together select an M.A.I. appraiser who is engaged in appraisal work in the State of Nevada and who is experienced in the appraisal of similar properties. If the first two M.A.I. appraisers are unable to select a third M.A.I. appraiser, the Chief

Judge of the U.S. District Court where the Premises is located, upon application of either Landlord or Tenant, shall select the third M.A.I. appraiser.

(b)    Each of the three (3) appraisers shall forthwith proceed, separately, individually and independently, to appraise and fix and report in writing to Landlord and Tenant the fair market value of the Premises, Tenant's Store Building, and Tenant's leasehold created by this Lease in its then condition without ongoing retail operation within Tenant's Store Building. Each appraiser shall submit in writing to each of Landlord and Tenant a copy of his final written appraisal as promptly as possible, and in all events not later than thirty (30) days after the designation of the third appraiser. Landlord and Tenant shall pay the cost of their respective designated appraiser. The cost of the third appraiser shall be borne equally by Landlord and Tenant.

(c)    The fair market value of the Premises, Tenant's Store Building, and Tenant's leasehold created by this Lease shall be the average of the three appraisals; provided that if any one appraisal varies from the average of the two appraisals closest in value by more than 15%, then that appraisal shall be disregarded and the average of the two appraisals closest in value shall determine the value (the **"Recapture Purchase Price"**).

(d)    Landlord shall have thirty (30) days after the determination of the Recapture Purchase Price within which to confirm its intent to purchase the Premises from Tenant at the Recapture Purchase Price.

(e)    If Landlord makes such election as provided herein, the parties shall close the transaction within thirty (30) days after the date of Landlord's notice at a time and place mutually acceptable to the parties. At the closing, the parties shall execute a termination of this Lease and Tenant shall quit claim its interest in the Tenant's Store Building to Landlord, without warranty, and this Lease shall be terminated as of that date. Landlord shall pay to Tenant the Recapture Purchase Price.

(f)    If Landlord elects not to purchase the Premises for the Recapture Purchase Price or fails to give any notice of its election within the time provided, then Landlord shall have no further right thereafter to the recapture the Premises pursuant to the terms of this section, and Landlord shall pay the cost of its appraiser and the third appraiser; Tenant shall pay for its appraiser only.

6.14    Access Roads. Tenant shall not restrict, alter or otherwise impede the flow of truck traffic along the rear (south) of the Shopping Center, fronting Kelso Dunes Road or vehicular traffic along the roadway immediately in front of Tenant's Store Building.

## VII - SHOPPING CENTER CONTROLS / MAINTENANCE

7.01    After Landlord's initial construction of the Common Areas, as shown on the Site Plan, Landlord and Tenant agree that Tenant shall be responsible for the maintenance of the

Common Areas on the Premises and Landlord shall be responsible for the maintenance of the Common Areas on the Landlord's Parcel. Landlord agrees that so long as any of the improvements constructed by Landlord in the Common Areas on the Premises are under warranty, or if any defect shall arise related to materials or installation of such improvements, then after notice from Tenant, Landlord shall pursue such remedy or warranty before Tenant shall be obligated to pay any such costs; provided, if Landlord is unable, after good faith efforts, to cause such work to be completed under such warranty within sixty (60) days, then the responsible party shall perform such work, subject to reimbursement, if available, from the contractor or supplier.

7.02    <u>Shopping Center Controls.</u>  Subject to the terms of Tenant's Control Area, the parties agree as follows:

(a)     <u>Building Area</u>.  Except for appurtenant loading or delivery docks, buildings and building appurtenances shall only be located within the limit lines for the Permissible Building Areas shown on the Site Plan.

(b)     <u>Floor Area</u>. Except for Tenant's Store Building, no building shall exceed 120,000 square feet of gross leasable area unless approved by Tenant in writing, which approval may be arbitrarily withheld.

(c)     <u>Maximum Height</u>.  Except for towers, parapets, screening (including architectural elements to screen roof-top equipment) and other similar structures, no building shall exceed twenty eight (28) feet in height.

(d)     <u>Maintenance</u>.  After completion of construction, Landlord and Tenant each covenant and agree to maintain and keep the building improvements and building appurtenances (hereinafter, "building improvements"), if any, located on its Parcel in first-class condition and state of repair, in compliance with all governmental laws, rules, regulations, orders, and ordinances exercising jurisdiction thereover, and in compliance with the provisions of this Lease. Specific standards for maintenance of Common Areas shall be as provided for in this Section.

(e)     <u>Maintenance of Julia Drive</u>.  Should Julia Drive become a private roadway and Landlord is obligated to maintain Julia Drive, then Tenant agrees to pay the lesser of (i) $.08 per square foot of GLA in Tenant's Store Building, and (ii) Tenant's Pro Rata Share of the actual maintenance costs incurred by Landlord (the **"Julia Drive Payment"**).  Tenant shall make such payment within thirty (30) days after its receipt of an invoice from Landlord with reasonable supporting documentation.  The Julia Drive Payment shall increase by $0.02 per square foot of GLA of Tenant's Store Building at the end of every five year period of the Term, commencing as of the first day of the sixth Lease Year and then at the end of each five Lease Years thereafter.  As an example, as of the start of the sixth Lease Year, the Julia Drive Payment shall increase from $0.08 per square foot of GLA of Tenant's Store Building to $0.10 per square foot of GLA of Tenant's Store Building.

(f)     Casualties.  Subject to the provisions of this Lease, in the event any of the building improvements are damaged by fire or other casualty (whether insured or not), the party upon whose Parcel such building improvements are located immediately shall remove the debris resulting from such event and provide a sightly barrier, and within a reasonable time thereafter shall either (i) repair or restore the building improvements so damaged to a complete unit, such repair or restoration to be performed in accordance with all provisions of this Lease, (ii) erect other building improvements in such location, such construction to be performed in accordance with all provisions of this Lease, or (iii) demolish the damaged portion and/or the balance of such building improvements and restore the cleared area to either a hard surface condition or a landscaped condition in which event the area shall be Common Area until a replacement building is erected.

(g)     Parking Area Levies.  Neither Landlord nor Tenant shall impose, or permit imposition of, any charge or fee on, or exact or permit exaction of any other consideration in exchange for the right to enter or depart from the Shopping Center, or park a motor vehicle in the parking areas, unless such charge or fee is lawfully ordered by appropriate governmental authority having jurisdiction over the Shopping Center.

(h)     Shopping Center Signs.  Subject to compliance with applicable codes and laws, signage at the Shopping Center shall conform with the criteria designated at **Exhibit "I"**, attached hereto and made a part hereof.  Notwithstanding the foregoing, Tenant shall have the right to approve any signage within Tenant's Control Area.  Landlord shall maintain the common signage at the entrances of the Shopping Center, as shown on the Site Plan.

(i)     Common Area Lighting.  Lighting for the Common Area on each party's Parcel (other than lighting required for Shopping Center security) shall remain on each day commencing at least one-half (1/2) hour before darkness and thereafter until 10:00 p.m. (or such later time as agreed to by the parties).  Common Area security lighting shall remain on each day during hours of darkness for security purposes.  If any applicable law, rule, statute or ordinance then in effect restricts the hours or amount of lighting herein specified, then the standard prescribed by such restriction shall be adhered to while in effect. The cost of electrical service for Common Area lighting for the Landlord's Parcel and the Premises shall be paid by Landlord and Tenant, respectively.

(j)     Right of Landlord or Tenant to Take Over Common Area Maintenance.  If either Landlord or Tenant fails to maintain the Common Areas on its Parcel in the manner provided for in this Section, then the other party may give written notice of such failure.  If the party to whom the notice is sent does not commence to cure such failure within thirty (30) days from the date of such notice, then the other party may send a second notice.  If the party to whom the notice is sent does not commence to cure such failure within fifteen (15) days from the date of such

second notice, then the other party shall have the right, but not the obligation, to perform such maintenance or cause a third party contractor to perform such maintenance of the other party's parcel. All costs reasonably incurred by such curing party shall be paid and/or reimbursed by the other party within 30 days of receipt of an invoice for such costs, with reasonable supporting documentation. If such charges are not paid within such thirty day period, then it shall be deemed additional rent, if the other party is Tenant, or if Landlord, Tenant shall have the right to off-set such costs from rent or other charges otherwise due to Landlord under the terms of this Lease.

(k)    Parking Ratio and Requirements. The parties agree that the Shopping Center as a whole, and the Premises and Landlord's Parcel individually, shall comply with the Required Parking Ratio. Notwithstanding the foregoing, any use that may require a greater ratio of parking shall conform with such required ratio. Each party shall have the right to reconfigure parking within its Parcel, so long as the Required Parking Ratio is maintained, provided that the layout and size of parking within the Tenant's Control Area shall not be reconfigured without the prior written consent of the Tenant.

7.03    Maintenance. The Common Areas shall be maintained to the following standards:

(a)    all hard-surfaced portions of the Common Areas and improvements shall be swept at reasonable intervals sufficient to maintain the same in a clean condition before the retail stores within the Entire Tract open for daily business with the public;

(b)    all sidewalks shall be swept and washed at intervals sufficient to maintain the same in a clean condition, and all surface waters shall be promptly removed;

(c)    all public trash and rubbish containers located in the Common Areas for the use of invitees shall be emptied at reasonable intervals, and shall be washed at intervals sufficient to maintain the same in a clean condition;

(d)    all landscaping shall be properly maintained, including irrigation, removal of weeds and foreign matter, and trimming, removal and replacement of dead plant materials;

(e)    all hard-surfaced markings shall be inspected at regular intervals and promptly repainted as they become unsightly or indistinct from wear and tear or other cause;

(f)    all sewer catch basins shall be cleaned on a schedule sufficient to maintain all sewer lines in a free flowing condition; and all mechanical equipment which is part of storm and sanitary sewer facilities shall be regularly inspected and kept in proper working order;

(g)    all asphalt paving shall be inspected at regular intervals and maintained in a good condition;

(h)    all surface utility facilities servicing the Common Areas, including, but not by way of limitation, hose bibs, standpipes, sprinklers and domestic water lines shall be inspected at regular intervals and promptly repaired or replaced, as the occasion may require, or upon the occurrence of any defect or malfunctions;

(i)    all common utility facility amenities, benches and institutional, directional, traffic and other signs shall be inspected at regular intervals and maintained in a clean and attractive condition; and

(j)    all lamps on lighting standards or otherwise on the Common Areas shall be inspected at regular intervals, and all lamps shall be promptly replaced when no longer properly functioning.

## VIII - DAMAGE AND DESTRUCTION

8.01    Damage and Destruction of Shopping Center

(a)    Common Areas. If there is a casualty to any of the elements comprising the Common Areas, then the party on whose parcel such damage has occurred shall be responsible for the repair or replacement of such damage.  On any such casualty, each party shall be required to repair or restore such Common Areas located on such party's respective Parcel.

(b)    Major Stores. If there is a casualty to any of the buildings identified as Major Stores, then, if such casualty occurs during Tenant's Operating Covenant, Landlord shall be obligated to repair or restore at least 60% of the aggregate Gross Leasable Area of the Major Stores as existed prior to the casualty. Notwithstanding the foregoing, Landlord may, on written request to Tenant, request either a different configuration to the Major Store buildings or request to consolidate or reduce the size of such Majors.  Tenant shall respond to such request within thirty (30) days of receipt, so long as the request includes reasonable detail as to the proposed changes to the Major Stores. Notwithstanding the foregoing, the reconfigured Major Stores cannot be consolidated to more than 120,000 s.f. in any one building space, and shall otherwise conform with the applicable provisions of this Lease.

(c)    Pads. If there is a casualty to any improvements located on the pads at the Shopping Center, or to Shops B or Building D-1, Landlord shall have no obligation to replace such buildings, provided that the site is promptly cleared and paved over by Landlord for parking.  In such event, the pad shall be considered Common Area and maintained as provided for in this Lease.

(d)    Tenant's Right to Terminate. If Landlord fails to replace any building required to be replaced within a reasonable period of time after the date of the casualty, then Tenant may send notice to Landlord.  If Landlord does not then complete such repair within one hundred twenty (120) days after the date of such notice from Tenant subject to force majeure events, then Tenant shall have the right to

terminate this Lease.

(e)    Construction Requirements.  Any building or other improvements that Landlord is required to rebuild or repair pursuant to this Lease will be rebuilt and ready for occupancy within 18 months from the time of the loss or destruction subject to force majeure events.  Work, repair or reconstruction, once started by Landlord, will be carried through continuously and diligently to conclusion.

8.02    Damage and Destruction of Tenant's Store Building

(a)    Restoration.  If Tenant's Store Building is damaged or destroyed by fire or other catastrophe during the first eight years of Tenant's Operating Covenant, then Tenant shall replace or restore Tenant's Store Building within 24 months from the date of the casualty, subject to force majeure events.  After the expiration or earlier termination of Tenant's Operating Covenant, Tenant shall have no obligation to rebuild and restore Tenant's Store Building.

(b)    Recapture.  If Tenant's Store Building is damaged or destroyed by fire or other catastrophe after the first eight years of Tenant's Operating Covenant, and Tenant does not operate in Tenant's Store Building for twelve consecutive months after such casualty (excluding periods during which Tenant is seeking permits or approvals to rebuild, or is in the process of rebuilding Tenant's Store Building), the Landlord shall have the right to elect to recapture the Premises, in its "as is" condition, in the manner provided in Section VI of this Lease.

(c)    Tenant's Lease Obligations.  Except as provided in Section 8.01(d) and Section 8.02(b) hereof, the damage, destruction or partial destruction of any building or other improvement which is part of the Premises shall not release Tenant from its obligations under this Lease.

8.03    Site Clearance.  If any buildings are not required to be rebuilt pursuant to Section 8.01 or Section 8.02, the properties will be promptly cleared and left in a sightly and safe condition.


## IX - INDEMNIFICATION AND INSURANCE

9.01    Indemnification

(a)    Landlord's Indemnity and Defense Obligations.

(i)    Landlord waives any right of contribution and shall indemnify Tenant, its directors, officers, employees and agents against, and hold Tenant, its directors, officers, employees and agents harmless from, all claims, actions, losses, damages, costs, expenses and liabilities (except those caused by the willful misconduct or negligent acts or omissions of Tenant,

its agents, contractors or employees), arising out of actual or alleged injury to or death of any person or loss of or damage to property in or upon the Landlord's Parcel or caused by the willful misconduct or negligent acts of Landlord, its agents, contractors or employees, including injury to or death of, or loss of or damage to any property of, Tenant, its directors, officers, employees, agents, invitees, licensees or others.

(ii)    Landlord shall defend Tenant, its directors, officers, employees and agents against any and all claims and actions described in Section 9.01(a)(i) hereof.

(b)    <u>Tenant's Indemnity and Defense Obligations</u>

(i)    Tenant waives any right of contribution and shall indemnify Landlord, its constituent partners, and its and their directors, officers, employees and agents against, and hold Landlord, its constituent partners, and its and their directors, officers, employees and agents harmless from, all claims, actions, losses, damages, costs, expenses (including, but not limited to, attorneys' fees) and liabilities (except those caused by the willful misconduct or negligent acts or omissions of Landlord, its agents, contractors or employees), arising out of actual or alleged injury to or death of any person or loss of or damage to property in or upon the Premises or caused by the willful misconduct or negligent acts of Tenant, its agents, contractors or employees, including injury to or death of, or loss of or damage to any property of, Landlord, its directors, officers, employees, agents, invitees, invitees, licensees or others.

(ii)    Tenant shall defend Landlord, its constituent partners, and its and their directors, officers, employees and agents against any and all claims and actions described in Section 9.01(b)(i) hereof.

9.02    <u>Tenant's Insurance</u>.  Subject to Tenant's right to self-insure, Tenant shall pay for and maintain, during the Term of this Lease, the following policies of insurance covering the Premises, which insurance shall be obtained from insurers rated "A-VIII" or better by Best's Insurance Reports or its equivalent:

(a)    Workers' Compensation Insurance covering all costs, benefits and liabilities under State Workers' Compensation and similar laws for employees of Tenant and Employer's Liability Insurance, with limits of $500,000 per accident or disease and $500,000 aggregate by disease.

(b)    Commercial General Liability Insurance covering Tenant's operations at the Premises, including, but not limited to, coverage for premises/operations, products/completed operations, contractual and personal/advertising injury liabilities with combined single limits of $5,000,000 per occurrence, for bodily injury and property damage, including Landlord as additional insureds (as defined in ISO 20 26 11 85).

(c)    "All-Risk" Property Insurance upon Tenant's Store Building, building improvements, personal property owned by Tenant and improvements on the Premises owned by Tenant, including, but not limited to, those perils generally covered on a Causes of Loss - Special Form, including fire, extended coverage, windstorm, vandalism, malicious mischief, and sprinkler leakage coverage in the amount of 90% of full replacement cost, including Landlord as an additional insured, as its interest may appear.

Subject to Tenant's right to self-insure, Tenant shall pay for and maintain, or require its contractor to maintain, during the construction of Tenant's Store Building, a policy of builder's risk insurance on Tenant's Store Building in an amount equal to the full replacement cost of such improvements, including Landlord as an additional insured, as its interest may appear.

Anything contained herein to the contrary notwithstanding, Tenant has the right to self-insure any of Tenant's insurance obligations under this Lease provided that Tenant has a net worth of at least $100,000,000.

No insurance policy obtained by Tenant to satisfy the requirements of this Section 9.02 shall be subject to cancellation or material change without at least 30 days' prior written notice to Landlord. The insurance provided by such insurance policy shall be deemed primary insurance with respect to the Premises, and any insurance provided by or on behalf of Landlord shall be in excess of any insurance provided by such policy. On written request of Landlord, Tenant shall furnish Landlord insurance certificates evidencing the polices required to be maintained hereunder (or, in the event Tenant has elected to self-insure, a statement that Tenant has elected to self-insure and evidence of the amount of Tenant's net worth).

9.03    Landlord's Insurance.   Landlord shall pay for and maintain, from the date of this Lease through the end of the Term, the following policies of insurance covering the Landlord's Parcel, which insurance shall be obtained from insurers rated "A-/VIII" or better as defined in the then-current edition of Best's Insurance Reports (or the equivalent thereof if Best's Insurance Reports is no longer published):

(a)    If Landlord has employees working on the Entire Tract, Workers' Compensation Insurance covering all costs, statutory benefits and liabilities under State Workers' Compensation and similar laws for employees of Landlord, and Employer's Liability Insurance with limits of $500,000 per accident or disease and $500,000 aggregate by disease. In addition, Landlord shall require that all contractors hired by Landlord maintain the same Workers' Compensation Insurance and Employer's Liability Insurance for such contractor's employees and will require all subcontractors to maintain such insurance and Landlord agrees to indemnify, defend and hold Tenant harmless from any loss, injury, damage or liability that Tenant may suffer as a result of any such contractor or subcontractor failing to maintain such insurance.

(b)    Commercial General Liability Insurance covering Landlord's operations on the Landlord's Parcel with coverage for premises/operations, products/completed operations, contractual and personal/advertising injury liabilities with combined

single limits of $5,000,000 per occurrence for bodily injury and property damage, including Tenant as an additional insured (as defined in ISO Form CG 20 26 11 85 or its equivalent).

(c)     If Landlord uses leased or owned motor vehicles on the Landlord's Parcel, Motor Vehicle Liability Insurance with coverage for all owned, non-owned and hired vehicles with combined single limits of liability of $3,000,000 per occurrence for bodily injury and property damage.

(d)     "All-Risk" property insurance with commercially reasonable deductibles upon all buildings, building improvements and personal property owned by Landlord and all alterations on the Landlord's Parcel, including but not limited to, those perils generally covered by Causes of Loss - Special Form, including fire, extended coverage, wind storm, vandalism, malicious mischief, sprinkler leakage, flood and earthquake coverage in the amount of 90% of the full replacement cost and with ordinance and law coverage.

The specified limits of insurance may be satisfied by any combination of primary or excess/umbrella liability insurance policies.

No insurance policy obtained by Landlord to satisfy the requirements of this Section 9.03 shall be subject to cancellation or material change without at least 30 days' prior written notice to Tenant. The coverage provided by such insurance policy shall be deemed primary insurance as to the Entire Tract (other than the Premises) and any insurance provided by or on behalf of Tenant shall be in excess of any insurance provided by such policy. Landlord shall furnish Tenant, or cause to be furnished to Tenant, concurrently with the execution of this Lease, and prior to the inception of each successive policy period, insurance certificates evidencing the insurance required to be maintained hereunder. Landlord may carry all insurance required hereunder under one or more blanket policies.

9.04    Waivers of Subrogation.    Any other provisions herein to the contrary notwithstanding, Landlord and Tenant each releases the other and, on behalf of its insurers, waives its entire right to recovery against the other for loss or damage to the waiving party and its property located on the Entire Tract to the extent that the loss or damage is customarily insurable by a Special Form property insurance policy, including any bodily injury, personal injury, death, or loss of use, to the extent covered by insurance. Landlord and Tenant agree to furnish to each insurance company that has or will issue Special Form policies on their respective portions of the Entire Tract notice of the terms of the mutual waivers contained herein and to have the insurance policies properly endorsed, if necessary, to acknowledge the subrogation waivers contained herein.

## X - REAL ESTATE TAXES AND ASSESSMENTS

10.01    Real Estate Taxes on the Shopping Center.    Landlord shall pay, prior to delinquency, all Real Estate Taxes and special assessments against the Entire Tract and the Premises, except as provided for in Section 10.02. Tenant shall have no obligation to pay Real Estate Taxes on any part of the Shopping Center except the Premises.

10.02  <u>Real Estate Taxes on the Premises.</u>  From and after the Commencement Date, Tenant shall be responsible for Real Estate Taxes (but not special assessments other than as related to Tenant's Store Building) and any tax on the personal property of Tenant related to the Premises.

(a)  <u>Creation of Separate Tax Parcel.</u>  Landlord shall use reasonable efforts to cause the Premises (including Tenant's Improvements) to be assessed for Real Estate Taxes as a separate tax parcel on or before the Commencement Date.

(b)  <u>Taxes with Separate Tax Parcel.</u>  Tenant shall pay directly to the taxing authority Real Estate Taxes on the Premises (including Tenant's Improvements) for any period after the Commencement Date during which the Premises constitute a separate tax parcel.  With Landlord's consent, which shall not be unreasonably withheld, Tenant may contest any such Real Estate Taxes and, if permitted under applicable law, may withhold payment pending resolution of such contest.

(c)  <u>Taxes without Separate Tax Parcel.</u>  Landlord shall pay Real Estate Taxes levied on the Entire Tract (or any real property that includes the Premises) and Tenant's Improvements with respect to any period during which the Premises are not separately assessed for Real Estate Taxes.  In such event, Tenant shall reimburse Landlord for that portion of Real Estate Taxes paid by Landlord levied with respect to the Premises for the period after the Commencement Date, subject to Tenant's right to audit.  The amount of such reimbursement shall be negotiated between Landlord and Tenant on an equitable basis.  Tenant shall pay Landlord any reimbursement due under this Section 10.02(c) after receiving evidence of payment of such Real Estate Taxes by Landlord and within thirty (30) days after the parties have agreed upon the amount due from Tenant.

(d)  <u>Disposition of Rebates.</u>  Tenant shall be entitled to receive its pro rata share of any net rebates awarded to Landlord on account of any taxes paid by Landlord for which Landlord has been reimbursed by Tenant.  Landlord will, on the request of Tenant, execute any receipts, assignments or other acquittances that may be necessary to secure the recovery of any such rebates, and will pay over to Tenant any such rebates that may be received by Landlord, after deducting the reasonable costs incurred by Landlord.

10.03  <u>Tax Incentives.</u>  Any tax or financial incentives which are received by Landlord attributable to Tenant's presence at the Shopping Center (including, but not limited to sales tax and property tax rebates, property tax exemptions, and refunds based upon incremental sales) shall be passed through to Tenant by Landlord.

10.04  <u>Indemnity by Landlord.</u>  Landlord shall indemnify Tenant against and hold Tenant harmless from any Real Estate Taxes levied on the Entire Tract, except for Real Estate Taxes payable by Tenant hereunder.

10.05  <u>Indemnity by Tenant.</u>  Tenant shall indemnify Landlord against and hold Landlord harmless from any Real Estate Taxes payable by Tenant hereunder.

## XI - DEFAULTS AND REMEDIES

11.01  Defaults

    (a)    Non-Payment of Rent.  If Tenant defaults in the payment of rent or any other amount payable to Landlord hereunder and fails to cure the default within 30 days of its receipt of written notice of default by Tenant, Landlord may bring suit to recover rent due, plus interest at the Prime Rate, and unpaid after the 30-day period.  Landlord's suing to recover rent shall not waive or affect any other right or remedy that Landlord may have at law or in equity.

    (b)    Failure to Meet other Obligations.  If Tenant is in default in performing any of the terms or provisions of this Lease, other than the provisions for the payment of rent or any other amount payable to Landlord hereunder, receives written notice of the default from Landlord, and fails to cure the default within 30 days  after receipt of such notice by Tenant or, if such default is of a character as to require more than 30 days to cure and Tenant fails to use reasonable diligence in curing the default after receipt of such notice, then Landlord, in addition to any other remedies that Landlord may have, may cure the default and recover from Tenant the full amount so expended by Landlord plus interest at the Prime Rate.

    (c)    Landlord's Default.  If Landlord is in default in performing any of the terms or provisions of this Lease, receives written notice of such default from Tenant, and fails to cure such default within 30 days after receipt of such notice or, if such default is of a character as to require more than 30 days to cure and Landlord fails to use reasonable diligence in curing such default after receipt of such notice, then Tenant, in addition to any other remedies that Tenant may have, may cure such default, at the expense of Landlord, and may deduct from all amounts payable by Tenant under this Lease all sums expended by Tenant in connection therewith, plus interest at the Prime Rate, until Tenant is reimbursed in full.

    (d)    Equity Proceedings.  If any of the covenants, conditions or other provisions of this Lease are breached, Landlord or Tenant shall have the right to obtain an injunction or other appropriate judicial relief against the other.

    (e)    Tenant's Performance of Landlord's Obligations.  If, at any time, Tenant (i) in good faith takes the position that Landlord has failed to perform its obligations under this Lease; (ii) undertakes to cure such failure on the part of Landlord to perform such obligations; and (iii) withholds rent and/or other charges to the extent permitted under the terms of this Lease after Tenant cures a default of Landlord in order to receive reimbursement for the funds expended in undertaking such cure, then, in such event, Landlord shall not have the right to terminate this Lease or to evict Tenant for the non-payment of rent or other charges nor shall Landlord have the right to commence a proceeding for forcible entry and detainer or other similar action to recover possession of the Premises from Tenant for such non-payment until such dispute is resolved.  In the event that a court of competent jurisdiction rules that Tenant did not have the right to withhold rent or other payments to Landlord under the terms of this Lease, then, upon the issuance of such a judgment, Tenant shall pay to Landlord the amount so withheld plus interest at the Prime Rate.

11.02   Remedies

    (a)    All remedies conferred on Landlord and Tenant shall be deemed cumulative and no one exclusive (unless otherwise provided herein) of the other, or of any other remedy conferred by law.

    (b)    At any time that Sears, Roebuck and Co., or an affiliate, is no longer tenant under this Lease, then in addition to the remedies stated herein for a default by Tenant, Landlord shall have the right of eviction and other rights as may be provided under applicable law.

## XII - EMINENT DOMAIN

12.01   Total Condemnation.  If the entire Premises and/or all or substantially all of the Major Store space on the Landlord's Parcel are appropriated or taken under the power of eminent domain by any public or quasi-public authority, or if access to the Shopping Center from any of the Access Points is taken and not adequately replaced or relocated, in Tenant's commercially reasonable determination, then the Term of this Lease shall terminate and expire as of the date of such taking, and Landlord and Tenant shall thereupon be released from any liability thereafter accruing hereunder.

12.02   Partial Condemnation.

    (a)    If a portion of the Premises shall be so appropriated or taken and the remainder of the Premises shall not, in Tenant's reasonable commercial determination, be suitable for the use then being made of the Premises by Tenant, or if any portion of the parking area of the Premises is taken such that the parking ratio on the Premises would be reduced to less than 4.5 spaces/1000 s.f. of GLA, or any Access Point is taken and not replaced or substituted by Landlord to Tenant's reasonable satisfaction, or if such taking reduces the number of parking spaces within Tenant's Parcel Pick-up Area, as shown on the Site Plan, to less than 15 spaces, then Tenant shall have the right to terminate this Lease as of the date of such taking on giving to Landlord notice of such termination within 45 days after Landlord has given Tenant notice of such appropriation or taking.  If Tenant does not exercise such right of termination, then this Lease shall continue in full force and effect as to the part not taken, and Landlord or Tenant, as applicable, shall restore the remainder of the Common Areas of the Shopping Center, and Fixed Rent shall be adjusted proportionately as to any loss of the Premises.

    (b)    If all or a portion of the improvements, other than the Major Stores,  on the Landlord's Tract are taken, then Landlord shall promptly replace, and restore the Shopping Center, or raze the improvements which have been adversely impacted and clear and pave the affected areas as parking areas.

12.03   Condemnation Awards.  In any condemnation, Landlord and Tenant each may seek and obtain separate awards.

## XIII - HAZARDOUS MATERIALS

13.01    <u>Landlord's Representations and Warranties</u>.  Landlord hereby represents and warrants to Tenant that to Landlord's actual knowledge, except as may be disclosed in the materials listed in **Exhibit "G"** attached hereto, no Hazardous Material has been used, disposed of or is located on or in either the buildings constructed, if any, in the Entire Tract or the soil and ground water on or under the Entire Tract and that there are no underground storage tanks on or under the Entire Tract.

13.02    <u>Landlord's Covenants</u>

    (a)    Landlord shall comply with all Environmental Laws with respect to  the Entire Tract (other than Tenant's Hazardous Material), including, without limitation, any requirement to perform repair, cleanup or detoxification work or prepare any closure or other plans, and shall diligently pursue to completion all such work. Landlord shall pay all costs and expenses of such compliance and performance except for costs and expenses relating to Tenant's Hazardous Material.

    (b)    Landlord waives any right of contribution and shall indemnify Tenant, its directors, officers, employees and agents against, and hold Tenant, its directors, officers, employees and agents harmless from, any and all claims, actions and liabilities arising from (i) Hazardous Material brought or released (or permitted to be brought or released) onto the Entire Tract by Landlord, its agents, contractors or employees or (ii) the breach of any representation, warranty or covenant contained in Section 13.01 hereof or this Section 13.02, and all costs and expenses, including attorneys' fees, paid or incurred by Tenant in defending or otherwise responding to, such claims, actions and liabilities.

    (c)    Landlord shall diligently pursue any responsible parties in connection with the performance of any cleanup, repair, detoxification or other remedial action with respect to Hazardous Material to which Landlord is not obligated to take any action.

13.03    <u>Tenant's Covenants</u>.  Tenant hereby covenants to Landlord as follows:

    (a)    Tenant shall comply with all Environmental Laws with respect to Tenant's Hazardous Material including, without limitation, performance of any repair, cleanup or detoxification work and the preparation of any closure or other plans, and shall diligently pursue to completion all such work and shall pay all costs and expenses of such compliance and performance.

    (c)    Tenant waives any right of contribution and shall indemnify Landlord, it constituent partners and its and their officers, employees and agents against, and hold Landlord, its constituent partners and its and their directors, officers, employees and agents harmless from, any and all claims, actions and liabilities arising from Tenant's Hazardous Material and all costs and expenses, including attorneys' fees, paid or incurred by Landlord in defending or otherwise responding to, such claims, actions and liabilities.

## XIV - END OF TERM

14.01   Effect of Tenant's Holding Over.  Any holding over after the expiration of the Term of
this Lease shall be construed to be a tenancy from month to month, at 150% of the
monthly rental required to be paid by Tenant for the period immediately prior to such
expiration and shall otherwise be on the terms and conditions herein specified, so far as
applicable.

14.02   Redelivery of Premises.  Tenant shall, at the expiration or sooner termination of the Term
of this Lease, peaceably and quietly quit and surrender to Landlord the Premises in
broom clean condition subject to the other provisions of this Lease.

14.03   Disposition of Improvements at End of Term.   Upon expiration or termination of the
Term, Landlord shall become the owner of Tenant's Improvements.

## XV - GENERAL PROVISIONS

15.01   Notices.  Notices shall be in writing and shall be deemed given:  (a) two business days
after being deposited with the United States Postal Service, as registered or certified mail,
return receipt requested, bearing adequate postage, or (b) one business day after being
deposited with a reputable overnight express carrier (e.g. Federal Express, Airborne,
Express Mail, UPS) for guaranteed next business day delivery, or (c) upon receipt if
personally delivered.  Notices shall be addressed as follows:

| | |
|---|---|
| Tenant: | Sears, Roebuck and Co.<br>3333 Beverly Road<br>Department 824RE<br>Hoffman Estates, Illinois  60179<br>Attn: Vice President - Real Estate |
| Copy to: | Sears, Roebuck and Co.<br>3333 Beverly Road<br>Department 766X<br>Hoffman Estates, Illinois  60179<br>Attn: Associate General Counsel - Real Estate |
| For Real<br>Estate Tax<br>Invoices: | Sears, Roebuck and Co.<br>Real Estate Taxes<br>Department 768TAX<br>3333 Beverly Road<br>Hoffman Estates, Illinois  60179 |
| For Rent and<br>Other Real<br>Estate Invoices: | Sears, Roebuck and Co.<br>Real Estate Payments<br>Department 824RE<br>3333 Beverly Road<br>Hoffman Estates, Illinois  60179 |

|  | |
|---|---|
| With a copy to: | Sears Store Manager<br>Sears, Roebuck and Co. |
| Landlord: | Warm Springs Promenade, L.L.C.<br>c/o Kimco Realty Corporation<br>3333 New Hyde Park Road, Suite 100<br>New Hyde Park, New York 11042-0020 |
| With a copy to: | Warm Springs Promenade, L.L.C.<br>c/o Kimco Realty Corporation<br>3333 New Hyde Park Road, Suite 100<br>New Hyde Park, New York 11042-0020<br>Attn: Legal Dept. |

or to any other address furnished in writing by any of the foregoing. However, any change of addresses furnished shall comply with the notice requirements of this Section 15.01 and shall include a complete outline of all current addresses to be used for all parties.

15.02   Waiver.   No provision of this Lease will be deemed waived by either party unless expressly waived in writing signed by the waiving party. No waiver shall be implied by delay or any other act or omission of either party. No waiver by either party of any provision of this Lease shall be deemed a waiver of such provision with respect to any subsequent matter relating to such provision, and consent respecting any action by a party shall not constitute a waiver of the requirement for obtaining such party's consent respecting any subsequent action. Acceptance of rent by Landlord shall not constitute a waiver of any breach by Tenant of any term or provision of this Lease. No acceptance of a lesser amount than the rent herein stipulated shall be deemed a waiver of Landlord's right to receive the full amount due, nor shall any endorsement or statement on any check or payment or any letter accompanying such check or payment be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the full amount due.

15.03   Memorandum of Lease and Transfer and Recording Taxes.   Upon execution of this Lease, a memorandum of this Lease in the form of **Exhibit "J"** attached hereto and by this reference incorporated herein shall be executed by both parties and Landlord shall record such memorandum. Landlord will pay all transfer and recording taxes, charges and assessments levied, assessed or incurred upon execution, delivery or recordation of this Lease or such memorandum, as they become due.

15.04   Assignment and Subletting.   Subject to the terms of Tenant's Operating Covenant, Tenant shall have the right to assign this Lease or sublease Tenant's Store Building, without the prior consent of Landlord. In such event, Tenant shall still remain liable for all obligations under the Lease for the remainder of the initial term as well as any exercised

option periods.

15.05   Successors and Assigns.  The covenants and conditions herein contained shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

15.06   Encumbrance of Tenant's Leasehold Interest.  Tenant may, without Landlord's consent, grant a lien on or a security interest in its leasehold interest in the Premises, its right, title and interest in this Lease and in any and all buildings and improvements thereon (a **"Leasehold Encumbrance"**), as security for any indebtedness or obligation of Tenant provided that the grantee of such Leasehold Encumbrance is an institutional lender (a **"Leasehold Lender"**).  If a Leasehold Lender shall have given Landlord notice of the creation of a Leasehold Encumbrance, Landlord shall give to such Leasehold Lender a copy of each notice of any claimed default by Tenant at the same time and whenever any such notice is given to Tenant, addressed to such Leasehold Lender at the address last furnished to Landlord.  Such Leasehold Lender shall thereupon have a period of 30 days more, after service of such notice upon it, for remedying the default or causing the same to be remedied, than is given Tenant after service of such notice upon it. Such Leasehold Lender, in case Tenant shall be in default hereunder, shall, within such period and otherwise as herein provided, have the right to remedy such default, or cause the same to be remedied. Landlord will accept performance by the Leasehold Lender of any covenant, condition or agreement on Tenant's part to be performed hereunder with the same force and effect as though performed by Tenant. If the Leasehold Lender cannot reasonably take the action required to cure the default without being in possession of the Premises, the time of Leasehold Lender to cure the default shall be deemed extended to include the period of time required by such Leasehold Lender to obtain such possession with due diligence; provided, however, that during such period all other obligations of Tenant under this Lease, including the payment of rent and other sums required to be paid by Tenant, are being duly performed. No Leasehold Lender shall become liable under the provisions of this Lease, unless and until such time as it becomes, and then only for as long as it remains, the owner of the Leasehold Estate.

15.07   Time of the Essence.  Time is of the essence of this Lease, and of each and every covenant, term, condition and provision hereof.

15.08   Broker.  Landlord and Tenant represent to each other that neither has dealt with any broker in connection with the negotiation or execution of this Lease.  Each party hereto shall indemnify, defend and hold the other party harmless from and against any loss, cost, expense or damage arising from any claim for commission or other compensation made by any broker with whom the indemnifying party has dealt.

15.09   Captions.  The captions used in this Lease are for convenience only and are not a part of this Lease and do not in any way limit or amplify the terms and provisions of this Lease.

15.10   Governing Law.  This Lease shall be interpreted and construed under the laws of the State of Nevada.

15.11  <u>No Partnership</u>.  Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent or of partnership or of joint venture or of any association between Landlord and Tenant and neither the method of computation of rent nor any other provision contained in this Lease or any acts of the parties hereto shall be deemed to create any relationship between Landlord and Tenant other than the relationship of landlord and tenant.

15.12  <u>Severability</u>.  Any provision or provisions of this Lease that are or become illegal or legally void shall in no way affect, impair or invalidate any other provision hereof, and the remaining provisions of this Lease shall nevertheless remain in full force and effect.

15.13  <u>Authority</u>.  Each party hereto represents and warrants to the other that it has all requisite corporate or partnership authority, as the case may be, to enter into and perform this Lease.

15.14  <u>Subordination, Non-disturbance and Attornment Agreement</u>.  Landlord shall not record any mortgage or deed of trust against the Sears Parcel without Tenant's prior written consent.  If Tenant does consent, then any lender (a **"Mortgagee"**) shall enter into an agreement with Landlord and such Mortgagee substantially in the form of **Exhibit "K"** attached hereto and by this reference incorporated herein.

15.15  <u>Estoppel Certificates</u>.  Either party shall, within 30 days after receipt of a written request from the other, provide an estoppel certificate substantially in the form of **Exhibit "L"** attached hereto and by this reference incorporated herein.

15.16  <u>Construction</u>.  Each party hereto has participated in the preparation of this Lease and it should be interpreted without reference to any rule of construction requiring that it be construed against the drafter.

15.17  <u>Survival of Indemnities</u>.  Each obligation of either party to this Lease to indemnify, defend or hold the other party harmless from any claim or liability shall survive the expiration or termination of the Term of this Lease.

15.18  <u>Non-Recourse to Landlord</u>.  Notwithstanding anything to the contrary contained in this Lease, in the event of any default or breach by Landlord with respect to any of the terms, covenants and conditions of this Lease to be observed, honored or performed by Landlord, Tenant shall look solely to the estate and property of Landlord in the land and buildings owned by Landlord comprising the Entire Tract, including any rent or other income derived therefrom, for the collection of any judgment (or any other judicial procedures requiring the payment of money by Landlord), it being agreed that Landlord shall not be personally liable for any such judgment and no other property or assets of Landlord shall be subject to levy, execution or other procedures for the satisfaction of Tenant's remedies.

15.19  <u>Enforcement Costs.</u>  In the event legal action is instituted by Landlord or Tenant to enforce the terms of this Lease or arising out of the breach of any covenant or condition contained in this Lease, the prevailing party will be entitled to receive from the other

party all costs incurred, including, but not limited to, reasonable attorney's fees to be determined by the court in which the action is brought.

IN WITNESS WHEREOF, the parties have caused this Lease to be duly executed and delivered as of the day and year first above written.

**WARM SPRINGS PROMENADE, L.L.C.**
By:  KIMCO DEVELOPERS, INC.
Its: Managing Member

By: _____
    Jerald Friedman
Its:    ~~Executive Vice~~ President

**SEARS, ROEBUCK AND CO.**

By: _____

Exhibits:

Exhibit "A"    Site Plan
Exhibit "B"    Site Criteria
Exhibit "C"    Legal Description of Premises
Exhibit "D"    Excluded Uses
Exhibit "E"    Prohibited Uses
Exhibit "F-1"    Encumbrances Affecting Premises
Exhibit "F-2"    Encumbrances Affecting Entire Tract
Exhibit "G"    Pad Certification
Exhibit "H"    Environmental Reports and Test Results
Exhibit "I"    Signage Standards
Exhibit "J"    Form of Memorandum of Lease
Exhibit "K"    Form of Non-Disturbance Agreement
Exhibit "L"    Estoppel Certificate

# EXHIBIT "A"

## SITE PLAN

To be shown:

    Recital A – Entire Tract

    1.01    Access Points

    1.24    PBA

    2.02    Premises

    2.03    Tenant's Control Area

    3.01    On Site and Off Site Improvements

    6.09    Tent Sales Area

    7.02(g) Shopping Center Signs

    12.02(a)  Parcel Pick-Up Area