UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
:
In re                                                          :
                                                               :       Chapter 11 Case No.
SEARS HOLDINGS CORPORATION, *et al.*,                          :
Debtors.[1]                                                    :       18-23538 (RDD)
                                                               :
                                                               :       (Jointly Administered)
                                                               :
---------------------------------------------------------------X

### SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF TRANSFORM HOLDCO LLC'S ADVERSARY COMPLAINT

1.  Transform Holdco LLC ("Transform") respectfully submits this supplemental memorandum of law in support of its *Adversary Complaint*, ECF No. 4033. The memorandum is limited to two of the items left open at the hearing on July 11, 2019: the meaning of the term "available cash" within the definition of "Aggregate DIP Shortfall Amount" and whether Debtors violated Section 8.6 of the Asset Purchase Agreement, dated as of January 17, 2019 (as may be amended, restated, supplemented or modified from time to time, the "APA")[2] by either

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC(6546); Sears Operations LLC(4331); Sears, Roebuck and Co. (0680); Service Live Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); Max Serv, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); My Gofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); Star West, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); SHC Licensed Business LLC (3718); SHC Promotions LLC (9626); and Sears Brands Management Corporation (5365).

[2] All capitalized terms used but not defined herein shall have the meaning set forth in the APA.

failing to make timely payments of accounts payable or to act in the ordinary course with respect to accounts payable in the three week period between the signing of the APA on January 17, 2019 and Closing on February 11, 2019.[3]

### I.    Available Cash, As Used in the APA, Includes Cash-In-Transit.

2.    At the hearing on July 11, 2019, the Court stated that it would consider parol evidence on the meaning of "available cash." Hr'g. Tr. at 297:20-21, July 11, 2019. That term appears in the definition of the Aggregate DIP Shortfall Amount:

> "Aggregate DIP Shortfall Amount" shall mean, as of the Closing Date, an amount equal to $1,200,000,000 *less* the aggregate amounts required to be paid (net of any available cash) to fully satisfy the existing indebtedness of Sellers under both (i) the DIP Credit Agreement and (ii) the Junior DIP Term Loan Agreement. APA, § 1.1.

3.    The other provisions that are relevant to the definition of the Aggregate DIP Shortfall Amount are Section 10.10, which requires as a condition of Closing that the aggregate balance be no greater than $850,000,000 under the DIP Credit Agreement and $350,000,000 under the Junior DIP Term Loan, and Section 2.3(k)(vi). Section 2.3(k)(vi) provides for a dollar-for-dollar reduction of the amount of Assumed Liabilities transferred to Transform based on the excess cash held by Debtors at the time of the Closing beyond that necessary to pay down the outstanding DIP balances to $1.2 billion. It reads as follows:

> In the event that the Aggregate DIP Shortfall Amount is a positive number, Buyer's obligations to assume the Liabilities described in this clause (k) shall be reduced dollar for dollar by the Aggregate DIP Shortfall Amount in the following order, until the aggregate amount of all such reductions is equal to the Aggregate DIP Shortfall Amount: *first*, the Severance Reimbursement Obligations, *second*, the Other Payables and *third*, the Assumed 503(b)(9) Claims. The allocation of any reduction determined in accordance with the previous sentence of (A) the amount of the Assumed 503(b)(9) Claims among any specific Assumed 503(b)(9) Claims and (B) the amount of the Other Payables among any specific Other Payables shall be determined by Buyer in its sole discretion.

---

[3]    Transform continues to engage the Debtors to resolve these and other issues in this litigation.

2

4. As demonstrated by the accompanying declaration of Kunal Kamlani, the lead negotiator for Transform, the parol evidence reflects that the purpose of the available cash provision was to ensure that if—contrary to the expectations of Debtors at the time—Debtors would be left with more cash at the time of the Closing than necessary to pay down the DIP Credit Agreement and Junior DIP Term Loan to $1.2 billion and that cash would be available to pay Debtors' Severance Reimbursement Obligations, Other Payables or 503(b)(9) Liabilities, it would be used for that purpose rather than simply retained by Debtors. This purpose was explicitly discussed with Debtors: On or around January 4, 2019, Transform's principals, Edward Lampert and Kunal Kamlani, spoke by phone with Debtors' Chief Restructuring Officer, Mohsin Meghji, and discussed the Parties' disagreement over how much cash Debtors would likely have at the Closing to satisfy its closing conditions and liabilities that would remain with the estates. Mr. Kamlani and Mr. Lampert then proposed that Transform would be willing to assume additional liabilities of the Debtors, but that if Debtors underestimated the amount of cash it would have at the Closing to satisfy its liabilities, Transform's obligation to assume the liabilities would be reduced by such an amount. Mr. Meghji agreed to including such a mechanism in the APA. *See Supplemental Declaration of Kunal S. Kamlani in Support of Transform Holdco LLC's Adversary Complaint* ("Supplemental Kamlani Decl."), ¶ 11.

5. That understanding is further supported by other parol evidence: In describing what would become the Aggregate DIP Shortfall Amount mechanism in its bid letter of January 9, 2019, Transform wrote that "[i]n a schedule shared with Buyer's representatives on January 6, 2019, the Debtors estimated cash available to pay down such outstanding amounts [under the Debtors' first lien ABL DIP facility and Debtors' junior DIP facility] was $89 million." *See id.*, Ex. C. In that referenced schedule, Debtors set out the liabilities that would remain with the

estates, along with sources of cash that could be used to pay down those liabilities. Among those sources was $89 million of "company cash"—the same $89 million referred to in the bid letter as constituting available cash. This amount was not tied to the ABL DIP or the Junior DIP balances, also listed on the schedule; it was provided as a value that would offset the administrative and priority claims generally. *See id.*, Ex. A. In other places where Debtors used the phrase "company cash," they did so to refer to "cash in regional banks, cash-in-transit, and cash in stores." *See id.*, Ex. B. Lastly, contemporaneously with the signing of the APA, Mr. Kamlani conferred with his advisors over the purpose behind the Aggregate DIP Shortfall Amount, writing in an email to Cullen Murphy of Moelis & Co. that, "we said [to Debtors,] that's fine, we will take [additional liabilities] but if you end up with more cash tha[n] you expect, we should get the credit b/c that is cash that you otherwise would have had to deal with the liabilities that we took." *See id.*, Ex. D. *See also United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 836 (Del. Ch. 2007) ("[A] court may consider the subjective understanding of one party that has been objectively manifested and is known or should be known by the other party.").

6. Cash-in-transit belonged to the Debtors. It was "available cash" that the Debtors could use to satisfy their liabilities. While that cash may not have been deposited in the Debtors' central bank account until a few days after the Closing, many of the Debtors' liabilities that arose pre-Closing likewise were not payable until after the Closing. It would defeat the entire purpose of Section 2.3(k)(vi), and be contrary to the parties' agreement as reflected both in the terms of the APA and the parol evidence, to allow the Debtors simply to retain cash without any reduction in Transform's obligations based on the mere happenstance that the cash remained in transit at

4

the Closing. Under the agreed upon terms of the APA, the cash-in-transit constituted "available cash" and reduced Transform's Assumed Liabilities.

## II. Debtors Breached Their Obligations Under the APA By Failing to Make Timely Payments of Accounts Payable and Manage Payables in the Ordinary Course

7.  Section 8.6 of the APA reads in pertinent part as follows:

The Sellers shall make all payments in respect of payables of the Business (including rent payments and sales taxes) arising from the date of this Agreement until the Closing Date in all material respects on a timely basis and shall otherwise manage the accounts payable of the business in accordance with the Sellers' cash management policies and practices (as in effect prior to the Petition Date) in the Ordinary Course of Business; provided that Seller's obligations pursuant to this Section 8.6 with respect to taxes are limited to taxes that are not Assumed Liabilities.

8.  The evidence attached by Transform hereto demonstrates that Debtors violated that covenant in two material respects and that Transform is entitled to relief from satisfying the remaining amounts of outstanding accounts payable and an administrative claim.

9.  It is undisputed that Debtors delayed payments on accounts payable that became due and owing before the Closing. Between the signing of the APA and the Closing, Debtors and their advisors implemented strategies to manage the business in an effort to meet the closing conditions set forth in the APA. In particular, the APA gave Transform the right to refuse to close the transaction in the event that the aggregate balance under Debtors' DIP agreements was greater than $1.2 billion. APA § 10.10. Debtors primarily managed their financials and operations in a way that would allow them to satisfy this closing condition. With regard to accounts payable, Debtors initially planned to reduce expenditures by managing down disputed payables and reducing non-essential spending. *See Declaration of Robert A. Riecker in Support of Transform Holdco LLC's Adversary Complaint* ("Riecker Decl.") ¶ 7.

5

10. However, starting about two weeks before the Closing, Debtors and their advisors began discussing delaying payments on accounts payable to preserve cash to pay down the DIP balances. *Id*. ¶¶ 8-9. Debtors implemented this plan in the week leading up to the Closing. On February 4, 2019, M-III and the Debtors' management decided to "delay[] certain payments contractually due on Feb 5th, Feb 6th, Feb 7th, by 3 business days." *Id*., Ex. E. *Despite initially projecting to disburse $158 million in payments for the week ending February 8, 2019, Debtors instead disbursed only $57 million, more than $100 million less than they had projected. See Second Supplemental Declaration of Andrew D. Hede in Support of Transform Holdco LLC's Adversary Complaint* ("Second Supplemental Hede Decl."), Ex. A. After removing non-disbursements for forecasted cash-in-advance inventory payments, Debtors failed to make disbursements for $89 million in accounts payable, approximately $50 million of which Transform has had to satisfy since the Closing to maintain business relationships with the affected vendors, placing an enormous strain on Transform. *See id*.[4]

11. This, in and of itself, is a breach of the APA. Section 8.6 contains two obligations Debtors must satisfy: (1) to pay payables arising from the date of the Agreement until the Closing Date in all material respects on a timely basis, and (2) to otherwise manage the accounts payable of the business in accordance with the Sellers' cash management policies and practices (as in effect prior to the Petition Date) in the Ordinary Course of Business. While Debtors did in fact operate outside the ordinary course, as demonstrated below, their obligation to satisfy payables on a timely basis was unmodified by the "ordinary course" clause of the second

---

[4] At the Closing, Debtors had $189 million in accounts payable on their books. Transform has to date satisfied $150 million in such pre-Closing payables arising from the Debtors' operations. *See Declaration of Andrew D. Hede in Support of Transform Holdco LLC's Brief in Opposition to Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement and in Support of the Adversary Complaint* ¶ 15, ECF No. 4458.

6

obligation. "[A] limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003).

12. Further, under Debtors' estimation of what constitutes "ordinary course" practices, it would make no sense to have that concept modify an obligation to make "timely" payments. As they themselves admit, "[t]he length of [their] prepetition payment delays was extended as much as . . . fourteen business days, as the company approached bankruptcy." *Debtors' Brief in Opposition to Transform Holdco LLC's Adversary Complaint and in Further Support of Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* ¶ 43, ECF No. 4430 ("Debtors' Opposition"). Section 8.6 governs Debtors' conduct in the three weeks (or sixteen business days) between the signing of the APA and the Closing. If Debtors were able to delay payments by up to fourteen business days, the obligation to make "timely" payments on accounts payable would be rendered a practical nullity. The parties could not have intended such a result. *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) ("We will not read a contract to render a provision or term 'meaningless or illusory.'") (citation omitted).

13. Rather, the APA means what it says. *Id.* at 1159-60 (holding that where the "contract is clear and unambiguous," courts "give effect to the plain-meaning of the contract's terms and provisions"). It required Debtors to "make payments in respect of payables . . . on a timely basis"—i.e., *on time* as they became due. *See* TIMELY, Black's Law Dictionary (11th ed. 2019) (defining timely as "[w]ithin a specified deadline; in good time; seasonable"); *Timely*, Oxford English Dictionary (3rd ed. 2012) (defining timely as "[s]ufficiently early, in good time; (now chiefly *U.S. Law*) by a fixed time or deadline"). *See also Thor 725 8th Ave. LLC v. Goonetilleke*, 138 F. Supp. 3d 497, 513 (S.D.N.Y. 2015) ("Where an agreement sets a defined deadline, the contractual word 'timely' has been held to connote action within that defined time

7

frame."), *aff'd*, 675 F. App'x 31 (2d Cir. 2017); *La Barbera v. Bestech Transp., LLC*, No. CV 07-4699(ENV)(MDG), 2011 WL 1316153, at *1 (E.D.N.Y. Mar. 8, 2011) ("[A] contribution payment is deemed timely if it is made promptly by the employer on the due date established."). This litigation over its course has dealt with a number of complicated and difficult issues over the interpretation of various provisions of the APA. This is not one of them.

14. Moreover, *in addition* to failing to make timely payments, Debtors failed to manage payables "in accordance with the Sellers' cash management policies and practices . . . in the Ordinary Course of Business." The covenant to manage payables in accordance with the ordinary course of business was a critical element of the contract. There were only approximately three weeks between the signing of the APA and Closing. Transform bargained for, and reasonably expected, Debtors to honor the obligation to act in the ordinary course for each of those three weeks. They failed to do so for a third of that three-week period. Debtors have argued that because they had delayed payments in the period leading up to the Petition Date, their decision to delay payments in the week leading up to the Closing was in the "ordinary course" as defined by the APA. *See* Debtors' Opposition, ¶¶ 41-45. Debtors' conduct in the three-week period prior to Closing is not remotely akin to their conduct during the pre-petition period. Debtors did far more in the three-week period between signing and Closing than simply delay payables for a few days as in the past. In the past, Debtors began delaying payments when the company lacked availability under its revolver. *See* Riecker Decl., ¶ 14. Here, Debtors took an entirely different tack: Despite having over $130 million in excess availability at the beginning of the week ending February 8, and $90 million at the end, Riecker Decl., Ex. G, Debtors decided over a week before the Closing to delay payments on accounts payable in order to ensure they would satisfy the closing condition of paying down the DIP balances to $1.2

8

billion and then implemented the plan at the beginning of the week when the Closing was anticipated.

15.    In short, the Debtors chose to violate one covenant in order to satisfy another. But each covenant was independent from the other, and Debtors were required to satisfy both. Debtors' prior conduct of delaying payments in one circumstance, where the Debtors lacked the availability under the revolver to satisfy payables, does not mean that the delay of payments in a completely different one, where the Debtors *did* have that availability, constitutes conduct in the ordinary course. The obligation to act in the ordinary course for a few weeks would be illusory if Debtors could simply stop making payments mid-way through that period.

16.    Transform anticipates that Debtors will argue the decision to stop payments was made in consultation with Transform. *See* Debtors' Opposition, ¶ 44. As a factual matter, Transform was not consulted over this decision in any meaningful way. Its principals did not take part in the actual decision-making at all. *See* Supplemental Kamlani Decl., ¶ 24; Riecker Decl., ¶ 13. Transform only became aware of the decision, after the fact, once it had been made when it received the Daily Cash Flow Forecast report on February 4, 2019, *see* Riecker Decl., Ex. E, and even this information was given reluctantly. *See id.*, ¶ 13.

17.    At any rate, the Debtors' consultation over their delay of payables is irrelevant. The consultation obligation appears in the provision regarding orders for inventory, i.e., conduct that gives rise to payables, in Section 8.1 of the APA, but not in the provision governing the payment of trade payables in Section 8.6. *See U.S. Bank v. ILDA, LLC,* No. 13-CV-3082, 2014 WL 4290543, at *3 (S.D.N.Y. Aug. 29, 2014) ("When a contract includes a phrase in one provision but not in another parallel provision, the court presumes that the drafters acted intentionally and intended a difference in meaning."); *cf. Bates v. United States*, 522 U.S. 23, 29–

9

30 (1997). The parties' inclusion of the consultation obligation with regard to ordering inventory was for good reason. Transform and Debtors had a shared interest in the inventory that would be ordered that would create liabilities in the future and give Transform inventory in the future. On the other hand, there was no reason for consultation with respect to accounts payable, i.e., monies that were already owed. There was no shared interest—only conflicting interests which were resolved by the language that required Debtors to make payments on a timely basis as well as otherwise manage payables in the ordinary course. Therefore, Transform's receipt of the Daily Cash Flow Forecast informing it of Debtors' decision to delay payments after Debtors had made that decision in no way waives or ameliorates Debtors' breach of the obligations under Section 8.6.[5]

18.    Once Transform became aware of Debtors' breach, it exercised its rights. While it would have been within Transform's rights not to close, there was nothing that required it to exercise that option or limited it to that option. Transform had the right to close and sue for damages—which it has done. *See In re Woodbridge Group of Companies, LLC*, 590 B.R. 99, 104 (Bankr. D. Del. 2018) ("Under basic contract principles, when one party to a contract feels that the other contracting party has breached its agreement, the non-breaching party may either stop performance and assume the contract is avoided, or continue its performance and sue for damages.").

## CONCLUSION

19.    For the reasons stated above, Transform requests that the Court award the relief requested in its Adversary Complaint and such other and further relief as is justified under the circumstances.

---

[5]    *See also*, APA § 13.3 ("No amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by each Party.").

| | |
|---|---|
| Dated: August 6, 2019<br>New York, New York | **CLEARY GOTTLIEB STEEN & HAMILTON LLP**<br><br>*/s/ Lewis J. Liman*<br>Lewis J. Liman<br>Sean A. O'Neal<br>Luke A. Barefoot<br>Abena A. Mainoo<br>One Liberty Plaza<br>New York, New York 10006<br>Telephone:  (212) 225-2000<br>Facsimile:  (212) 225-3999<br><br>*Counsel for Transform Holdco LLC* |