UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
                                                               :
**In re**                                                      :        **Chapter 11 Case No.**
                                                               :
**SEARS HOLDINGS CORPORATION, *et al.*,**                      :        **18-23538 (RDD)**
**Debtors.**[1]                                                :
                                                               :        **(Jointly Administered)**
                                                               :
                                                               :
---------------------------------------------------------------X

### SUPPLEMENTAL DECLARATION OF KUNAL S. KAMLANI IN SUPPORT OF TRANSFORM HOLDCO LLC'S ADVERSARY COMPLAINT

I, Kunal S. Kamlani, declare under penalty of perjury as follows:

1.      I respectfully submit this declaration ("Declaration") in support of Transform

Holdco LLC's Adversary Complaint.

2.      I am the President of ESL Investments, Inc. ("ESL"), which controls certain

investment funds that, together with Edward S. Lampert, ESL's Chief Executive Officer, own a

majority of the equity of Transform Holdco LLC ("Transform").  Other investors include funds

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC(6546); Sears Operations LLC(4331); Sears, Roebuck and Co. (0680); Service Live Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); Max Serv, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); My Gofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); Star West, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); SHC Licensed Business LLC (3718); SHC Promotions LLC (9626); and Sears Brands Management Corporation (5365).

affiliated with Cyrus Capital Partners LP.  Transform purchased substantially all of the
businesses and assets of Sears Holdings Corp. ("SHC") and its affiliated debtors and debtors in
possession (collectively, the "Debtors") pursuant to section 363(b) of title 11 of the United States
Code (the "Sale Transaction") and the Asset Purchase Agreement dated as of January 17, 2019
by and among Transform, SHC and its subsidiaries party hereto, as amended (the "APA").

3.      Following the Debtors' filing of a Chapter 11 Petition in the Bankruptcy Court on
October 15, 2018, the Debtors and ESL engaged in extensive negotiations over the terms of the
Sale Transaction, lasting from approximately late November 2018 through January 17, 2019,
ending in what became the APA.  During that time, I engaged extensively in the negotiations
surrounding the APA and the Sale Transaction, working closely with Transform's advisors at
Moelis & Company ("Moelis"), an independent investment bank, and the law firm Cleary
Gottlieb Steen & Hamilton LLP ("Cleary").  Together, we interfaced with representatives of M-
III Partners, LP ("M-III") (including Mohsin Meghji, the Debtors' Chief Restructuring Officer),
Lazard Frères & Co. LLC ("Lazard"), Weil, Gotshal & Manges LLP ("Weil"), legal counsel for
the Debtors, and Debtors' Restructuring Committee (the "Restructuring Committee") and its
advisors.

4.      All statements in this Declaration are based upon my personal knowledge of
discussions regarding the circumstances surrounding the negotiations and closing of the Sale
Transaction (the "Closing") and my review of relevant documents.  If called to testify, I would
testify competently to each of the facts set forth in this Declaration.

5.      Section 2.3(k)(vi) of the APA contains a provision by which Transform's
assumption of liabilities is reduced by the "Aggregate DIP Shortfall Amount," which is defined
in the APA as "an amount equal to $1,200,000,000 less the aggregate amounts required to be

paid (net of any available cash) to fully satisfy the existing indebtedness of Sellers under both (i) the DIP Credit Agreement and (ii) the Junior DIP Term Loan Agreement." In plain terms, Transform is entitled to a dollar-for-dollar reduction in the liabilities it assumed by the amount that equals the "available cash" plus the difference between $1.2 billion and the aggregate DIP balance on the day of Closing to the extent that the latter is a positive number.

6.      That provision had its genesis in the discussions that followed the rejection of Transform's December 28, 2018 definitive going-concern bid (the "December 28 Bid"). The December 28 Bid was rejected as non-qualifying because Debtors and the Restructuring Committee expressed the concern, among others, that it would leave the estates administratively insolvent.

7.      In the aftermath of the rejection of the December 28 Bid, I had numerous conversations with the Debtors on a new deal structure pursuant to which Transform would assume additional liabilities that would have been left with the estates under the December 28 Bid in exchange for the delivery of additional value to Transform in the form of assets that it could use to generate the necessary revenue to satisfy those liabilities.

8.      The notion of the Aggregate DIP Shortfall Amount and that Transform's obligations to assume liabilities would be reduced in the event that the Aggregate DIP Shortfall Amount was a positive number, as well as the notion that the Aggregate DIP Shortfall Amount would be increased by "available cash," was critical to those discussions. During the negotiations that led to Transform's revised bid, Debtors represented that they would not generate enough cash to meet the closing conditions of the APA to pay down a DIP balance of $1.2 billion and have cash available to pay down their administrative expenses. Transform expressed skepticism about that representation and believed that Debtors would have more cash

than they forecasted which would be available to satisfy their administrative expenses. The compromise was the Aggregate DIP Shortfall Amount. Transform was prepared to accept Debtors' representation subject to the understanding that if—contrary to Debtors' expectations—Debtors would have excess cash to satisfy the administrative expenses that Transform was willing to assume, Transform's obligations with respect to those expenses would be reduced dollar-for-dollar. That provision was designed to protect Transform against the risk that Debtors underestimated how much cash they would have to satisfy the administrative expenses or overestimated the amount of liabilities that they represented they needed Transform to assume. In my view, the inclusion of the Aggregate DIP Shortfall Amount provision led to a fair and symmetrical result as Debtors got Transform to assume additional liabilities which Debtors' forecasted they would be unable to pay, and Transform was able to take those forecasts at face-value with the protection that it would ultimately not assume the total amount of the liabilities if the cash forecast proved conservative.

9.      The parties negotiated a separate covenant that Debtors could not have outstanding DIP obligations of greater than $1.2 billion at the Closing, and Section 2.3(k) reduced Transform's obligations if Debtors had an outstanding DIP balance of less than $1.2 billion. Therefore the inclusion of the concept of "available cash" in Aggregate DIP Shortfall Amount was not introduced by Transform to ensure that Debtors' DIP obligations were paid down regardless of the amount. It was introduced solely in the context of assuming additional liabilities based on Debtors' forecast that they would not have available cash in their system to pay down any liabilities once they had paid off their DIP obligations. If Debtors had cash left over which they could use to satisfy the administrative expenses after satisfying the DIP obligation, Transform would get a dollar-for-dollar reduction in the liabilities it assumed under

4

Section 2.3(k). In short, if Debtors had, in actuality, *more* cash than they estimated to pay down the DIP obligations, Transform would get a reduction in the liabilities it assumed; it had already agreed to pay to Debtors a fixed amount to satisfy the 1L ABL DIP and agreed to the rollover of the Junior DIP, and that additional cash should instead have been used to pay down obligations that Debtors required Transform to assume.

10.     The Aggregate DIP Shortfall Amount was therefore a mechanism which would give Transform comfort in taking Debtors at their word with regard to how much cash the company would generate before the Closing—without having to do its own costly and time-consuming diligence—while at the same time ensuring that it would not be assuming greater costs than were necessary to meet Debtors' demand that Transform's bid allow it to remain administratively solvent. Given that the Debtors stated their principal concern was their ability to satisfy remaining liabilities, this construct allowed them to be indifferent as to whether their cash forecast was accurate because if they had excess cash then they would have the ability to satisfy more liabilities than they thought, and if they had less cash, then Transform was obligated to assume the liabilities it contractually agreed to satisfy.

11.     To the best of my recollection, Transform first raised the idea of the Aggregate DIP Shortfall Amount with Debtors on or around January 4, 2019. Around that time, I participated in a call, together with Edward Lampert, with Mr. Meghji, where we conveyed to Mr. Meghji that in reviewing Debtors' forecasts, we believed Debtors would have means to pay down their DIP obligations and still have additional funds to satisfy remaining liabilities.[2]

---

[2]     This included a review of the Debtors' daily cash forecasts. In those forecasts, Debtors broke down cash into "available" and "unavailable cash." However, this binary approach was not the one by which Transform considered what cash Debtors would have as available to pay its liabilities. Rather, cash that was not restricted, i.e. not held for a specific purpose, would be available to Debtors to satisfy their liabilities, regardless of where that cash happened to be located at the moment of the Closing.

Because Mr. Meghji disagreed with our assessment, we proposed to Mr. Meghji including a mechanism into the APA whereby if Transform were to assume Debtors' liabilities, that assumption of liabilities would be reduced by the amount of cash which Debtors would have available to satisfy those liabilities on and after the Closing. We did not limit our proposal to cash that was in operating accounts. If the cash was in the operating accounts, it would be used to pay down the DIP. Rather, we proposed that if, contrary to Debtors' representations and expectations, after satisfying the DIP covenant Debtors had cash available that Debtors could use to satisfy the administrative expenses, Debtors should use the cash for those purposes and Transform's obligations with respect to assumed liabilities would be reduced dollar-for-dollar. Transform's proposal would allow the parties to move forward without having to confirm one side's position over the other, and Mr. Meghji accepted that proposal. Further developments in the negotiation process confirmed this mutual understanding of the Aggregate DIP Shortfall Amount provision.

12.   On January 6, Debtors provided Transform a presentation setting forth the assets that would have remained with the estates under Transform's December 28 Bid and a schedule summarizing administrative and solvency claims that Debtors stated needed to be satisfied. See Exhibit A, attached hereto, which is a true and correct copy of email correspondence dated January 6, 2019 attaching Debtors' presentation entitled "Remaining Value at SHC Estate in an ESL Transaction" and a presentation entitled "Discussion Materials – Project Blue" (the "Administrative Claims Schedule").

13.   The Administrative Claims Schedule estimated, among other things, that Debtors had an ABL 1L DIP balance of $950 million and noted that Transform's December 28 Bid reduced the outstanding value by $850 million. Additionally, it estimated that the balance of the

Junior DIP facility was $350 million and that the December 28 Bid would reduce it by $230 million.

14.     On the right hand column, Debtors estimated the additional value needed above the value provided by the December 28 Bid in order for the estates to satisfy all of the claims listed in the schedule's left hand column and remain administratively solvent.  This figure of $680 million was reduced by various "other sources of value" including $89 million in "company cash."  This value was not tied to the ABL DIP or the Junior DIP balances; it was provided as a value that would offset the administrative and priority claims generally.  My understanding was that this referred to cash that could be used to satisfy the administrative claims and was not limited to cash in the operating accounts or that could be used to satisfy the DIP.

15.     M-III used this phrase "company cash" elsewhere.  After the signing of the APA, M-III prepared slide-decks entitled "Transform Transaction – Weekly Tracking" (the "Closing Trackers"), which set forth certain current financial metrics for the company and compared those metrics with set targets the company would need to achieve by the Closing.  Each of these Closing Trackers contained a slide labeled "Opportunity and Actions" which described potential actions that the company could take to reach its closing targets.  On the "Opportunities and Actions" slide in the Closing Tracker from February 3, 2019, M-III wrote next to the line-item for "cash," "company cash," and then, "cash in-transit, in regional banks and stores."  See Exhibit B, attached hereto, which is a true and correct copy of email correspondence from Joseph Frantz to Leena Munjal et al., dated February 4, 2019, attaching the Closing Tracker dated February 3, 2019.

### B.    The January 9 Bid

16.    Through these negotiations with the Debtors, Transform ultimately agreed to increase the value of its offer by assuming additional liabilities in exchange for acquiring additional assets.  The Aggregate DIP Shortfall Amount mechanism was included in this new offer.

17.    The outline and principal terms of Transform's final bid (the "Revised Proposal") were reflected in a January 9, 2019 bid letter from Transform to Lazard (the "January 9 Bid Letter").  See Exhibit C, attached hereto, which is a true and correct copy of the January 9 Bid Letter.  Under the January 9 Bid Letter, Transform agreed to assume up to $663 million in additional liabilities in exchange for additional inventory, real estate properties, receivables, and other assets.

18.    The Revised Proposal included a mechanism for a reduction of the liabilities, on a dollar-for-dollar basis, that Transform would assume if the sum of the amounts outstanding under the Debtors' first lien ABL DIP facility and Debtors' junior DIP facility (net of any cash available) was less than $1.2 billion at the Closing.  This was memorialized in the January 9 draft proposal of the APA as the "Aggregate DIP Shortfall Amount."  The January 9 Bid Letter noted that, "[i]n a schedule shared with Buyer's representatives on January 6, 2019, the Debtors estimated cash available to pay down such outstanding amounts was $89 million."  This was a clear reference to the $89 million of "company cash" referred to in the Administrative Claims Presentation—a figure, not tied to the DIP facility balances, but represented by Debtors as available to pay down the existing administrative and priority claims generally.

19.    The Aggregate DIP Shortfall Amount was therefore a safety valve bargained for by Transform.  It ensured that Transform was not overpaying for the assets of the Debtors, faced

with the unprovable specter of administrative insolvency, and alleviated the need to conduct time-consuming and costly diligence to evaluate Debtors' assertions. Instead, if Debtors were wrong about the amount of cash available to pay down administrative claims at the Closing—and in fact had more than anticipated—Transform's proposal made sure that Debtors would not gain the windfall of that mistake after insisting to Transform on the necessity of it assuming additional liabilities. Rather, as the Aggregate DIP Shortfall Amount provides for, Transform's obligations to assume liabilities would be reduced dollar-for-dollar by the cash available to satisfy those liabilities.

20.     This is precisely the logic I conveyed to one of Transform's advisors, Cullen Murphy of Moelis, just prior to the signing of the APA. In explaining the potential offset of the Aggregate DIP Shortfall Amount, I wrote:

> Our logic was that they told us, based on their numbers which we accepted for face value, that they would be Admin Insolv b/c they would not have the cash to deal with the liabilities. So we said thats fine we will take them but if you end up with more cash that you expect we should get the credit b/c that is cash that you otherwise would have had to deal with the liabilities that we took.

See Exhibit D, attached hereto, which is a true and correct copy of email correspondence between myself and Cullen Murphy, dated January 17, 2019 12:21 A.M.

21.     Transform was not just concerned with Debtors' ability to pay down the DIP balances; it was concerned generally that after paying down an aggregate DIP balance of no more than $1.2 billion, Debtors be required to use any cash that could be used to pay administrative expenses for that purpose.

22.     It would not have mattered to Transform whether, at the Closing, the available cash could be used to directly pay down the DIP balances. So long as Debtors could use it to pay down *any* liability, Transform believed it should be entitled to the reductions in the liabilities it

had agreed to assume based on Debtors' representations that failing to do so would leave the estates administratively insolvent.  Transform explained this position to, and it was accepted by, the Debtors, and it was on this basis that the Aggregate DIP Shortfall Amount was included in Transform's January 9 Bid and ultimately adopted in the final APA.

23.    At the Closing, $22.5 million belonged to the Debtors as cash-in-transit.  Under the terms of Transform's agreement with the Debtors, this constituted "available cash" as Debtors could use this amount to pay the Severance Reimbursement Obligations, 503(b)(9) Liabilities and Other Payables which Transform had agreed to assume.  It did not matter whether that cash was in an operating account, a regional bank account, or in transit, because it could be used to pay for liabilities which Transform agreed to pay on the representation that Debtors could not.  Per Section 2.3(k) of the APA, Transform is entitled to a $22.5 million dollar-for-dollar reduction in its assumption of those liabilities.

*        *        *

24.    It is my understanding that in the week prior to the Closing, Debtors delayed payments of accounts payable that had become due and owing.  Before the Petition Date and after the Closing, I was involved in decisions regarding the timing of payments on accounts payable.  However, between the Petition Date and the Closing, I was not involved in any decisions to delay payments on accounts payable, nor did any person from the Debtors or M-III consult with me or, to my knowledge, anyone else at Transform over these decisions.

*        *        *

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on August  5  , 2019 in Coral Gables, Florida.

Respectfully submitted,

Kunal S. Kamlani

# Exhibit A

| From: | Hwangpo, Natasha |
|---|---|
| To: | Schrock, Ray; O"Neal, Sean A.; Munz, Naomi; Odoner, Ellen; mmeghji@miiipartners.com; pbasta@paulweiss.com; Aebersold, Brandon; Quaintance, Levi; cadams@miiipartners.com; Singh, Sunny; cgood@miiipartners.com; O"Reilly, Benet J.; Allen, Charles W.; Lanzkron, Joseph; Adam Waldman; LC@moelis.com; Cullen.Murphy@moelis.com; Josh.Gruenbaum@moelis.com; Austin, Christopher E.; Britton, Robert |
| Subject: | RE: Sears - Schedule Discussion [Confidential; Subject to FRE 408] |
| Date: | Sunday, January 6, 2019 8:18:38 PM |
| Attachments: | 2018.01.06 RemainCo Asset Summary - ESL Transaction.pdf |
| | 2019.01.06 ESL Bid Value Required  vDraft2.pdf |

**Highly Confidential; Subject to FRE 408**

Attached is an additional schedule for tonight's discussion.  Re-attaching both documents here for easy reference.



Natasha S. Hwangpo

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
natasha.hwangpo@weil.com
+1 212 310 8715 Direct
+1 702 501 8088 Mobile
+1 212 310 8007 Fax

---

**From:** Hwangpo, Natasha
**Sent:** Sunday, January 6, 2019 8:00 PM
**To:** Schrock, Ray <Ray.Schrock@weil.com>; O'Neal, Sean A. <soneal@cgsh.com>; Van Groll, Paloma <Paloma.VanGroll@weil.com>; DiDonato, Phil <Philip.DiDonato@weil.com>; Munz, Naomi <Naomi.Munz@weil.com>; Odoner, Ellen <ellen.odoner@weil.com>; mmeghji@miiipartners.com; pbasta@paulweiss.com; Aebersold, Brandon <brandon.aebersold@lazard.com>; Quaintance, Levi <levi.quaintance@lazard.com>; cadams@miiipartners.com; Singh, Sunny <sunny.singh@weil.com>; cgood@miiipartners.com; O'Reilly, Benet J. <boreilly@cgsh.com>; Allen, Charles W. <callen@cgsh.com>; Lanzkron, Joseph <jlanzkron@cgsh.com>; Adam Waldman <Adam.Waldman@moelis.com>; LC@moelis.com; Cullen.Murphy@moelis.com; Josh.Gruenbaum@moelis.com; Austin, Christopher E. <caustin@cgsh.com>
**Subject:** RE: Sears - Schedule Discussion [Confidential; Subject to FRE 408]

**Highly Confidential; Subject to FRE 408**

In advance of our call, please find attached the schedule to be discussed.



Natasha S. Hwangpo

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
natasha.hwangpo@weil.com
+1 212 310 8715 Direct
+1 702 501 8088 Mobile
+1 212 310 8007 Fax


-----Original Appointment-----
**From:** Hwangpo, Natasha
**Sent:** Sunday, January 6, 2019 7:51 PM
**To:** Hwangpo, Natasha; Schrock, Ray; O'Neal, Sean A.; Van Groll, Paloma; DiDonato, Phil; Munz, Naomi; Odoner, Ellen
**Cc:** mmeghji@miiipartners.com; pbasta@paulweiss.com; Aebersold, Brandon; Quaintance, Levi; cadams@miiipartners.com; Singh, Sunny; cgood@miiipartners.com; O'Reilly, Benet J.; Allen, Charles W.; Lanzkron, Joseph; Adam Waldman; LC@moelis.com; Cullen.Murphy@moelis.com; Josh.Gruenbaum@moelis.com; Austin, Christopher E.
**Subject:** Sears - Schedule Discussion [Confidential; Subject to FRE 408]
**When:** Sunday, January 6, 2019 8:30 PM-9:00 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** 1-888-235-7501,,2123108715


Dial In Information

-
Domestic
Dial in: 1-888-235-7501
Passcode: 212-310- 8715#

International
Dial in: 1-206-445-0084
Passcode: 212-310- 8715#


Mobile  888.235.7501,,2123108715#

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.



Preliminary Draft; Subject to Material Change

# Remaining Value at SHC Estate in an ESL Transaction

January 6th, 2019



[Confidential: Prepared at the Request of Counsel; Preliminary Draft]

# Executive Summary

- We have done a preliminary review of the remaining assets left behind for the SHC estate under ESL's going concern bid, which include the following:
  - Real Estate[1]
  - Unencumbered Accounts Receivable ("AR") [2]
  - Cash-in-Advance ("CIA") Prepaid Inventory
  - Credit Card ("CC") Tort Claim[3]

| Asset | Book Value [4] | Estimated Collected Value | Recovery (%) |
|---|---|---|---|
| Real Estate [1] | $155 | $155 | 100% |
| Unencumbered AR [2] | 376 | 164 | 44% |
| CIA Prepaid Inventory | 171 | 171 | 100% |
| CC Tort Claim [3] | 35 | 35 | 100% |
| **Total** | **$737** | **$525** | **71%** |

Note: Analysis excludes $13mm insurance payment and $15mm from First Data.
1) Assumes same valuation for Book Value and Estimated Collected Value.
2) Net recovery of ~44% on gross notional amount of ~$376mm. The $376mm gross total excludes a $(39)mm offset allowance for bad debt; bad debt allowance is 100% included in net recovery of $164mm.
3) Per estimate from Lazard and initial bids received. Assumes low end of $35-50mm valuation range.
4) Book value represents the estimated market value for real estate and CC tort claims.

[Confidential: Prepared at the Request of Counsel; Preliminary Draft]

# Real Estate: Preliminary Schedule of Real Estate Excluded from ESL Bid and Estimated Valuations

*Estimates are preliminary, and subject to change*

- **Our current gross value estimate for properties excluded from the ESL bid is approximately $155mm**

    - Excluded Real Estate with Identifiable Value

        - Our $155M estimate is informed by assuming the lesser of (1) current high offer value, (2) JLL appraised value and (3) BOV, where available

            - 99 of 433 properties have currently identifiable value

            - $104M (67%) of value based on first round offers

        - Upside in these values lies in a couple of larger properties where current offer is considerably below appraised value or BOV

        - Downside in these values reflects the fact that offers are indicative and not committed

            - Downside risk mitigated by diversity of pool and low average price

    - Additional Excluded Properties

        - The remaining excluded properties (approximately 330) have no assumed value

            - Generally term is too short or rental rate too high for leases to have value

            - Approximately 150 of these are leases on the 142 and 40 GOB stores

3

# Real Estate: Preliminary Schedule of Real Estate Excluded from ESL Bid and Estimated Valuations (cont'd)

| Excluded Real Estate with Value | | | | | | Count | 66 | 6 | 45 | 99 |
|---|---|---|---|---|---|---|---|---|---|---|
| 99 | | | | | | Subtotal | $103,727,447 | $69,800,000 | $63,239,755 | $154,512,202 |
| Count | Unit | RE ID | Name | St | Format | 10K Own/L/GL | Current High Offer | JLL Value | BOV | Low Value (1) |
| 1 | 470 | 47000 | MANTENO | IL | Other-CDFC | Owned | $10,659,597 | $24,600,000 | | $10,659,597 |
| 2 | 3793 | 379300 | Miami | FL | Kmart | Lease | $9,000,000 | | | $9,000,000 |
| 3 | 3699 | 369900 | Apple Valley | CA | Kmart | Lease | $5,900,000 | $12,500,000 | | $5,900,000 |
| 4 | 1075 | 107500 | Daytona Beach | FL | FLS | Owned | | $5,900,000 | | $5,900,000 |
| 5 | 62538 | 6253800 | TUSTIN | CA | UUP Sears Essentials/Grand | Lease | $7,000,000 | $5,600,000 | | $5,600,000 |
| 6 | 26731 | 2673100 | Dublin | OH | UUP SAC Freestanding | Owned | | | $4,450,000 | $4,450,000 |
| 7 | 2374 | 237400 | Vineland | NJ | UUP FLS | Owned | | | $3,950,000 | $3,950,000 |
| 8 | 2451 | 245100 | Greeley | CO | UUP FLS | Owned | | | $3,905,000 | $3,905,000 |
| 9 | 1353 | 135300 | De Witt/Syracuse | NY | UUP FLS | Owned | $5,000,000 | | $3,900,000 | $3,900,000 |
| 10 | 3544 | 354400 | Salem | VA | UUP Kmart | Owned | $3,900,000 | $4,000,000 | | $3,900,000 |
| 11 | 30920 | 3092000 | Chicago | IL | UUP Kmart | Owned | | | $3,850,720 | $3,850,720 |
| 12 | 61540 | 6154000 | INDIANAPOLIS | IN | UUP FLS | Owned | | | $3,779,040 | $3,779,040 |
| 13 | 61237 | 6123700 | HOUSTON | TX | UUP FLS | Owned | $3,600,000 | | | $3,600,000 |
| 14 | 30900 | 3090000 | New Lenox | IL | UUP Kmart | Owned | $3,400,000 | | | $3,400,000 |
| 15 | 1150 | 115000 | Westland | OH | UUP FLS | Owned | $3,150,000 | | | $3,150,000 |
| 16 | 7415 | 741500 | Springfield | VA | Kmart | Lease | $3,000,000 | | | $3,000,000 |
| 17 | 1610 | 161000 | Northgate | OH | FLS | Owned | | | $3,000,000 | $3,000,000 |
| 18 | 1251 | 125100 | Lithonia | GA | UUP FLS | Owned | $2,750,000 | | | $2,750,000 |
| 19 | 30961 | 3096100 | Greensboro | NC | UUP Closed - RRC/RDC | Owned | $2,700,000 | | | $2,700,000 |
| 20 | 1310 | 131000 | Elyria | OH | UUP FLS | Owned | $2,550,000 | | | $2,550,000 |
| 21 | 6233 | 623300 | Covina | CA | UUP SAC Freestanding | Owned | $2,500,000 | | | $2,500,000 |
| 22 | 7461 | 746100 | Clarksville | TN | UUP Kmart | GL | $2,500,000 | | | $2,500,000 |
| 23 | 30961 | 3096103 | GREENSBORO | NC | UUP Distribution/Warehouse | Lease | $2,300,000 | | | $2,300,000 |
| 24 | 1863 | 186300 | Johnstown | PA | UUP FLS | Owned | | | $2,198,628 | $2,198,628 |
| 25 | 30941 | 3094100 | Sioux Falls | SD | UUP Kmart | Owned | | | $2,125,000 | $2,125,000 |
| 26 | 30918 | 3091800 | Jackson | MI | UUP Kmart | Owned | $2,100,000 | | | $2,100,000 |
| 27 | 26185 | 2618500 | Clarksville | IN | UUP Kmart | Owned | | | $2,087,400 | $2,087,400 |
| 28 | 1755 | 175500 | Boynton Beach | FL | FLS | Lease | $2,000,000 | | | $2,000,000 |
| 29 | 1475 | 147500 | Durham | NC | FLS | Owned | $1,916,667 | $17,200,000 | | $1,916,667 |
| 30 | 1370 | 137000 | Eastland | OH | UUP FLS | Owned | | | $1,900,000 | $1,900,000 |
| 31 | 61510 | 6151000 | Calumet City | IL | UUP FLS | Owned | | | $1,823,660 | $1,823,660 |
| 32 | 6579 | 657900 | Spokane | WA | Freestanding | Owned | $1,655,000 | | | $1,655,000 |
| 33 | 30934 | 3093400 | Memphis | TN | UUP Kmart | Owned | $1,600,000 | | | $1,600,000 |
| 34 | 26987 | 2698700 | Chicago        * | IL | UUP Vacant Land | Owned | | | $1,500,000 | $1,500,000 |
| 35 | 30949 | 3094900 | Natchez | MS | UUP Kmart | Owned | | | $1,500,000 | $1,500,000 |
| 36 | 4810 | 481000 | Metairie | LA | Kmart | Lease | $1,400,000 | | | $1,400,000 |
| 37 | 31903 | 3190300 | Fort Atkinson | WI | UUP Kmart | Owned | $1,300,000 | | | $1,300,000 |
| 38 | 3413 | 341300 | Kent | WA | Kmart | Lease | $1,300,000 | | | $1,300,000 |
| 39 | 6874 | 687400 | HOUSTON | TX | UUP SAC Detached | Owned | | | $1,300,000 | $1,300,000 |
| 40 | 1722 | 172200 | Bloomington | MN | FLS | GL | | | $1,269,470 | $1,269,470 |
| 41 | 3256 | 325600 | Baltimore | MD | Kmart | Lease | $1,250,000 | | | $1,250,000 |
| 42 | 61106 | 6110600 | Jackson | MS | UUP FLS | Owned | | | $1,200,000 | $1,200,000 |
| 43 | 30957 | 3095700 | Springdale | AR | UUP Kmart | Owned | | | $1,199,000 | $1,199,000 |
| 44 | 2632 | 263200 | Fairview Hts | IL | Detached | Owned | | | $1,184,580 | $1,184,580 |
| 45 | 31900 | 3190000 | Sterling | IL | UUP Kmart | Owned | $1,100,000 | | | $1,100,000 |
| 46 | 68235 | 6823500 | PHOENIX | AZ | UUP Retail Warehouse | Owned | $1,100,000 | | | $1,100,000 |
| 47 | 9676 | 967600 | Streetsboro | OH | UUP Kmart | Owned | $1,099,999 | | | $1,099,999 |
| 48 | 443 | 44300 | WILKES BARRE | PA | RRC | Lease | $1,000,000 | | | $1,000,000 |
| 49 | 3527 | 352700 | Philadelphia | PA | Kmart | Lease | $1,000,000 | | | $1,000,000 |

1) Low Value assumes the lesser of current high offer, JLL appraisal value and BOV value, where available.

# Real Estate: Preliminary Schedule of Real Estate Excluded from ESL Bid and Estimated Valuations (cont'd)

| | | | | | **Count** | 66 | 6 | 45 | 99 |
|---|---|---|---|---|---|---|---|---|---|
| **Excluded Real Estate with Value** | | | | | | | | | |
| 99 | | | | | **Subtotal** | $103,727,447 | $69,800,000 | $63,239,755 | $154,512,202 |
| **Count** | **Unit** | **RE ID** | **Name** | **St** | **Format** | **10K Own/L/GL** | **Current High Offer** | **JLL Value** | **BOV** | **Low Value (1)** |
| 50 | 8780 | 878000 | Mira Loma | CA | RSC | Lease | $1,000,000 | | | $1,000,000 |
| 51 | 8781 | 878100 | Chambersburg | PA | RSC | Lease | $1,000,000 | | | $1,000,000 |
| 52 | 1041 | 104100 | Omaha | NE | FLS | GL | $1,000,000 | | | $1,000,000 |
| 53 | 4893 | 489300 | Ellenton | FL | Kmart | Lease | $1,000,000 | | | $1,000,000 |
| 54 | 1514 | 151400 | Niagara Falls | NY | UUP FLS | Owned | $1,000,000 | | $1,900,000 | $1,000,000 |
| 55 | 2940 | 294000 | Franklin | OH | UUP FLS | Owned | | | $1,000,000 | $1,000,000 |
| 56 | 26596 | 2659600 | Memphis/Hickory | TN | UUP FLS | Owned | | | $1,000,000 | $1,000,000 |
| 57 | 30901 | 3090100 | Lansing | IL | UUP Kmart | Owned | | | $962,680 | $962,680 |
| 58 | 7439 | 743900 | Council Bluff | IA | UUP SAC Freestanding | Owned | $975,000 | | $845,060 | $845,060 |
| 59 | 2936 | 293600 | Chicago | IL | Detached | GL | $800,000 | | | $800,000 |
| 60 | 26717 | 2671700 | Newport News | VA | UUP SAC Freestanding | Owned | $750,000 | | $850,000 | $750,000 |
| 61 | 1261 | 126100 | Midwest City | OK | UUP FLS | Owned | $700,000 | | $2,600,000 | $700,000 |
| 62 | 6784 | 678400 | Matteson | IL | Freestanding | Owned | | | $699,138 | $699,138 |
| 63 | 26985 | 2698500 | Chicago | IL | UUP Vacant Land | Owned | | | $665,379 | $665,379 |
| 64 | 6488 | 648800 | Mayaguez | PR | UUP Vacant Land | Owned | | | $650,000 | $650,000 |
| 65 | 2332 | 233200 | San Antonio | TX | Freestanding | Owned | $620,000 | | $680,000 | $620,000 |
| 66 | 2001 | 200100 | Piqua | OH | FLS | GL | $450,000 | | | $450,000 |
| 67 | 7916 | 791603 | Eureka | CA | UUP Vacant Land | Owned | | | $450,000 | $450,000 |
| 68 | 7916 | 791604 | Eureka | CA | UUP Vacant Land | Owned | | | $450,000 | $450,000 |
| 69 | 1130 | 113000 | Janesville | WI | FLS | GL | $400,000 | | | $400,000 |
| 70 | 30927 | 3092700 | Macomb | IL | UUP Kmart | Owned | $400,000 | | $2,250,000 | $400,000 |
| 71 | 26588 | 2658800 | Salem | OH | UUP FLS | Owned | | | $400,000 | $400,000 |
| 72 | 3968 | 396800 | Wasco | CA | UUP Vacant Land | Owned | | | $300,000 | $300,000 |
| 73 | 9245 | 924500 | Cheboygan | MI | UUP Kmart | Owned | | | $300,000 | $300,000 |
| 74 | 1388 | 138800 | Costa Mesa | CA | FLS | Lease | $250,000 | | | $250,000 |
| 75 | 6303 | 630300 | BANGOR | ME | Retail Warehouse | Owned | $250,000 | | | $250,000 |
| 76 | 4351 | 435100 | Rochester | MN | Kmart | Lease | $250,000 | | | $250,000 |
| 77 | 30958 | 3095800 | EL CENTRO | CA | UUP Vacant Land | Owned | | | $250,000 | $250,000 |
| 78 | 3978 | 397800 | Peachtree City | GA | Kmart | Lease | $200,000 | | | $200,000 |
| 79 | 3998 | 399800 | Dinubi | CA | UUP Vacant Land | Owned | | | $125,000 | $125,000 |
| 80 | 4490 | 449000 | San Juan | PR | Kmart | Lease | $110,452 | | | $110,452 |
| 81 | 1618 | 161800 | Modesto | CA | FLS | Lease | $100,000 | | | $100,000 |
| 82 | 2298 | 229800 | Merced | CA | FLS | Lease | $100,000 | | | $100,000 |
| 83 | 2323 | 232300 | Hyannis | MA | FLS | Lease | $100,000 | | | $100,000 |
| 84 | 9381 | 938100 | Huntington | NY | Kmart | Lease | $100,000 | | | $100,000 |
| 85 | 7471 | 747100 | Placerville | CA | Kmart | Lease | $100,000 | | | $100,000 |
| 86 | 2145 | 214500 | Port Charlotte | FL | FLS | Lease | $79,184 | | | $79,184 |
| 87 | 37563 | 3756300 | Washington Courthouse | OH | UUP Vacant Land | Owned | | | $65,000 | $65,000 |
| 88 | 3251 | 325100 | Indianapolis | IN | Kmart | GL | $53,848 | | | $53,848 |
| 89 | 3628 | 362803 | Tolleson | AZ | UUP Vacant Land | Owned | $51,600 | | | $51,600 |
| 90 | 37914 | 3791400 | Chicago | IL | Office | Lease | $50,000 | | | $50,000 |
| 91 | 3982 | 398203 | Lemoore | CA | UUP Vacant Land | Owned | $25,000 | | $250,000 | $25,000 |
| 92 | 4721 | 472103 | Coalinga | CA | UUP Vacant Land | Owned | $25,000 | | $275,000 | $25,000 |
| 93 | 1034 | 103400 | Ross Park | PA | UUP FLS | Lease | $10,000 | | | $10,000 |
| 94 | 1134 | 113400 | Milford | CT | FLS | Lease | $10,000 | | | $10,000 |
| 95 | 3589 | 358903 | Cleveland | OH | UUP Vacant Land | Owned | $10,000 | | $150,000 | $10,000 |
| 96 | 2226 | 222600 | Murfreesboro | TN | FLS | Lease | $1,100 | | | $1,100 |
| 97 | 7067 | 706700 | Fort Myers | FL | UUP Kmart | Lease | $1,000,000 | | $0 | $0 |
| 98 | 31930 | 3193003 | HIALEAH | FL | UUP Vacant Land | Owned | $1,000,000 | | $0 | $0 |
| 99 | 3982 | 398200 | Lemoore | CA | Kmart | Lease | $25,000 | | $0 | $0 |

1) Low Value assumes the lesser of current high offer, JLL appraisal value and BOV value, where available.

# Other Receivables: Preliminary Schedule and Estimated Recovery Value

*($ in millions)*

| Book Entry # | Ledger Account Name | Gross Amount ($) | Recovery (%) | Net Recovery ($) | Description / Comments / Notes |
|---|---|---|---|---|---|
| 11482 | A/P Vendor Reclass Post | $52.6 | 50% | $26.3 | Kmart vendor receivables (net debit reclassification, i.e. a positive receivable balance after all debits netted against all credits for vendors) |
| 11488 | Return Merchandise Receivable | 59.9 | 50% | 29.9 | Sears vendor receivables (net debit reclassification, i.e. a positive receivable balance after all debits netted against all credits for vendors) |
| 11300 | Svc Contr 3rd Party Warranties | 53.6 | 80% | 42.9 | Home Warranty Sales commission due from Cross Country over next 11 months |
| 11390 | A/R CUSTOMER RECEIVABLES | 41.5 | 50% | 20.8 | $34mm Monark (paid over time for big high end construction jobs; recieve money when job is complete); $4mm home warranty (paid in installments); $3.5mm intercompany adjustment |
| 11395 | SHO Receivable Inv/PA/SPP | 34.7 | 80% | 27.8 | Sears Hometown and Outlet; when items pulled out of a DC, recievable shows up; billed weekly, paid every 10 days |
| 11364 | Wholesale A/R Receivables | 22.8 | 50% | 11.4 | KCD Business receivables; over $8mm pertains to Amazon |
| 11129 | A/R NCC-OEM | 10.3 | 50% | 5.1 | National Claims Center recievables (related to Home Services) |
| 11300 | Sears Home Improvement | 8.0 | 50% | 4.0 | Sears Home Improvement - receivables related to contracts; paid over time but mostly at time of completion |
| 11490 | A/R PA INSTALLMENT | 4.8 | 50% | 2.4 | Protection agreement installment receivables; generally over 11 months |
| 11300 | 09987 SEARS ONE CARD CLEARANCE | 6.3 | 90% | 5.6 | Financial services related; travel / debit card |
| 11300 | 08500 FINANCE RELATED EXP | 6.8 | 50% | 3.4 | Non-CIA vendors with net money due due status at Kmart |
| 11300 | Fulfilment, SC & Sourcing | 7.2 | 50% | 3.6 | UPS Rebate received by Company every year at end of January or 1st of February |
| 11368 | CSI Receivable | 0.0 | 50% | 0.0 | Vender allowances; Kmart side only |
| 11333 | A/R CITI OTHER RECEIVABLES | 5.8 | 90% | 5.2 | Other fees / receivables with Citi |
| 11420 | A/R WEX COMMERCIAL CREDIT | 3.4 | 50% | 1.7 | Receivables related to companies that do business w/ Sears Auto |
| 11475 | A/R - Other Companies | 3.5 | 50% | 1.8 | Service Live; pending jobs that will be paid when completed |
| 11330 | A/R NEW ACCOUNT BOUNTY | 2.7 | 90% | 2.5 | Commission on new credit card accounts w/ Citi |
| 11331 | A/R CREDIT SALES REVENUE | 2.5 | 90% | 2.2 | Fees from Citi when Sears credit card is used |
| 11128 | A/R NCC-AE | 2.8 | 50% | 1.4 | National Claims Center recievables (related to Home Services) |
| 11255 | A/R - 3RD PARTY GIFT CARDS | 4.8 | 50% | 2.4 | Receivables related to fees from third party gift cards (mainly Blackhawk) |
| 11305 | A/R LICENSED BUSINESSES | 1.4 | 50% | 0.7 | SHIP-related receivables; normally paid when job is complete |
| 11300 | Parts Direct | 2.3 | 50% | 1.2 | Parts Direct division related receivables |
| 11365 | A/R - Merchandise Allowance | 2.1 | 50% | 1.0 | Vendor allowances; paid by invoice versus deduction from account |
| 11367 | A/R VENDOR ALLOWANCE - IMPORT | 1.7 | 50% | 0.9 | Vendor allowances; paid by invoice versus deduction from account (for foreign venders) |
| 11140 | A/R - Sub-Tenants | 1.9 | 50% | 0.9 | Rent from sub-tenants at Kmart and Sears locations (mostly Sears) |
| 11220 | A/R - Coupons | 1.0 | 50% | 0.5 | Paid within 21 days of coupon redemption from 3rd party coupon company (highly current as what stores don't submit is written off); netted against allowance / reserve |
| 11252 | A/R - Store Receivable | 1.3 | 50% | 0.7 | Layaway; receivables related to payments required by customer over time before item is received |
| 11256 | WHY NOT LEASE IT RECEIVABLE | 0.6 | 50% | 0.3 | Receivable from "Why Not Lease It", which provides third party credit to store customers on items; settles within 5 days |
| 11131 | A/R 3rd Party Retail Installat | 0.6 | 50% | 0.3 | Home Services receivables |
| 11253 | ACCRUED OVER/SHORTAGES | 0.5 | 90% | 0.4 | Timing issue on cash counted in stores; overnight timing difference |
| 11170 | A/R - Freight Claims | 0.5 | 50% | 0.2 | COD shipments with damage where SHC pays vendor upfront and then has to later collect from carrier |
| 15340 | A/R WU Wire Transfer Payout | 0.2 | 90% | 0.1 | Western Union wires that go through treasury; settled daily |
| 11335 | A/R - WIC | 0.2 | 75% | 0.2 | Food stamps; Reimbursement from state |
| 11290 | A/R - Loans and Advances | 0.1 | 25% | 0.0 | Employee payroll advances |
| 11300 | Service Contracts PA | 0.1 | 25% | 0.0 | Service Contracts division protection agreement installments |
| 11250 | A/R - Bad Checks | 0.1 | 0% | – | Bounced checks; third party will chase down; netted against allowance / reserve |
| NA | All Other Recievables | 30.0 | 0% | – | Miscellaneous; includes non-receivables and other potentially not recoverable items |
| 11332 | 0% FINANCE (NETS 11330/1) | (4.8) | 100% | (4.8) | Offset against Citi accounts (11330, 11331, 11333) to provide customers with 0% interest financing |
| A0112 | Allowance for Bad Debt | (38.8) | 100% | (38.8) | Allowance for Bad Debt |
| | **Total** | **$337.3** | | **$164.4** | |

6

Note: Balance from Company as of 12/1/2018. Analysis excludes $13mm insurance payment and $15mm from First Data.

[Confidential: Prepared at the Request of Counsel; Preliminary Draft]

## CIA Prepaid Inventory: Preliminary Schedule

| Top 20 Non-Merchandise Vendors | | |
|---|---|---|
| ($ in millions) | | |
| **Duns #** | **Vendor Name** | **Total** |
| 395280 | GOOGLE INC | $9.0 |
| 114442648 | ICROSSING INC | $2.8 |
| 706893 | MICROSOFT ONLINE INC | $1.6 |
| 1200443 | HASBRO INC | $1.3 |
| 518753 | TERADATA CORPORATION | $1.2 |
| 41707563 | SUNBEAM PRODUCTS INC | $0.9 |
| 72818347 | YANG MING MARINE TRANSPORT | $0.8 |
| 22312628 | APPLICA CONSUMER PRODUCTS | $0.6 |
| 3155454 | SPRINGS GLOBAL US INC | $0.4 |
| 1661222 | CONAIR CORPORATION | $0.4 |
| 79695521 | GBG BEAUTY LLC | $0.4 |
| 714075 | INTERNATIONAL PACKAGING | $0.3 |
| 37704855 | KEURIG GREEN MOUNTAIN INC | $0.3 |
| 916152424 | TATA CONSULTANCY SERVICES | $0.3 |
| 80211920 | LSC COMMUNICATIONS US LLC | $0.2 |
| 440768 | ACXIOM | $0.2 |
| 612757070 | MOHAWK CARPET DISTRIBUTION | $0.2 |
| 33079757 | MEYER CORP | $0.2 |
| 714531 | EBATES PERFORMANCE MARKETING | $0.2 |
| 744342 | IDEAVILLAGE COM | $0.1 |
| NA | Other Vendors | $2.3 |
| **Total** | | **$23.6** |

| Top 20 Merchandise Vendors | | |
|---|---|---|
| ($ in millions) | | |
| **Duns #** | **Vendor Name** | **Total** |
| 1288075 | WHIRLPOOL CORPORATION | $42.3 |
| 1163823 | THE EUREKA COMPANY | $27.1 |
| 4196515 | MTD PRODUCTS INC | $6.7 |
| 613620 | SAMSUNG ELECTRONICS AMERICA | $3.7 |
| 348334 | ICON HEALTH & FITNESS INC | $3.5 |
| 116145681 | HANESBRANDS INC UNDERWEAR | $3.0 |
| 1902212 | PROCTER & GAMBLE DISTRIBUTING | $2.3 |
| 3219367 | HANESBRANDS INC SOCK | $2.2 |
| 1029195471 | HANESBRANDS INC CHAMPION | $2.1 |
| 70094818 | LG ELECTRONICS U S A INC | $2.0 |
| 4961041 | GENERAL ELECTRIC - GEA | $1.9 |
| 9138033 | CLOROX SALES CO | $1.8 |
| 9109273 | LEVI STRAUSS & CO | $1.8 |
| 8029498 | WILLIAMSON DICKIE MFG CO | $1.7 |
| 134544 | BRIGGS & STRATTON POWER | $1.3 |
| 95443321 | HUSQVARNA OUTDOOR PRODUCTS | $1.2 |
| 38204020 | SIMMONS COMPANY | $1.2 |
| 2347102 | JOHNSON & JOHNSON CONSUMER | $1.2 |
| 83922229 | ICON HEALTH & FITNESS | $1.1 |
| 1000471433 | ELLISON FIRST ASIA LLC | $1.1 |
| NA | Other Vendors | $38.2 |
| **Total** | | **$147.4** |

- CIA Prepaid Inventory represents inventory purchased under cash-in-advance payment terms that SHC has not yet received. The current balance is $171mm

CONFIDENTIAL

## DISCUSSION MATERIALS

# Project Blue

 

PROJECT BLUE

**The following summarizes the administrative and other priority claims that the estate needs to satisfy, sources of value available to address these claims and the incremental value required after these sources are applied (other than for settlement and release)**

| Admin & Other Priority Claims Uses of Value | | Less: ESL Value [1] | Remaining Claims | Additional Value Required after Application of Other Sources of Value | |
|---|---|---|---|---|---|
| **Admin** | | | | **Additional Value Required** | **$680** |
| 503(b)(9) | $139 | $-- | $139 | Less: ESL Proposed Cash Contribution | (35) |
| Accounts Payable | 166 | (125) | 41 | Less: Company Cash | (89) |
| Severance and Employee Claims | 43 | -- | 43 | Less: Professional Fee Carve-out Account | (95) |
| WARN | 18 | -- | 18 | Less: MTN Sale Proceeds | (81) |
| Franchise Taxes | 3 | -- | 3 | Less: SHIP Sale Proceeds | (45) |
| Property Taxes | 135 | (100) | 35 | **Administrative Claim Backstop Requested [2]** | **$335** |
| RemainCo Winddown Costs | 80 | -- | 80 | | |
| **Total Admin** | **$583** | **($225)** | **$358** | **Required Deposit** | **$120** |
| | | | | | |
| **Other** | | | | | |
| ABL DIP | $950 | ($850) | $100 | | |
| Junior DIP | 350 | (230) | 120 | | |
| Professional Fees | 102 | -- | 102 | | |
| Cure Costs | 150 | (150) | -- | | |
| **Total Other** | **$1,552** | **($1,230)** | **$322** | | |
| | | | | | |
| **Total** | **$2,135** | **($1,455)** | **$680** | | |

Source: MIII projection of administrative and other priority claims; ESL proposal.
[1] Includes value provided by ESL via assumption of liabilities and/or debt paydown.
[2] Requested Administrative Claim Backstop does not include amounts necessary for settlement and release but is inclusive of Restructuring Subcommittee support for Court order to allow ESL to credit bid claims included in ESL bid.




# Exhibit B

| | |
|---|---|
| **From:** | Phelan, Robert |
| **To:** | Valentino, Luke |
| **Subject:** | FW: Daily Touchbase on Close Metrics |
| **Date:** | Monday, June 17, 2019 12:43:41 PM |
| **Attachments:** | 190204 - Closing Conditions Deliverables.pdf |
| | 2019.2.3 Transaction Tracking vF.pdf |

**From:** Joseph Frantz [mailto:jfrantz@miiipartners.com]
**Sent:** Monday, February 04, 2019 10:56 AM
**To:** Munjal, Leena <Leena.Munjal@searshc.com>; Sinha, Naren <Naren.Sinha@searshc.com>; mmeghji@miiipartners.com; cgood@miiipartners.com; bgriffith@miiipartners.com; Riecker, Rob <Rob.Riecker@searshc.com>; Prakash, Rajat <Rajat.Prakash@searshc.com>; Ladley, Gregory <Gregory.Ladley@searshc.com>; Phelan, Robert <Robert.Phelan@searshc.com>; Koreis, Thomas <Thomas.Koreis@searshc.com>; Butz, Jeff <Jeff.Butz@searshc.com>; dstogsdill@alvarezandmarsal.com; ngrossi@alvarezandmarsal.com; Jonathan B. Boffi <jboffi@miiipartners.com>; eacevedo@miiipartners.com
**Subject:** RE: Daily Touchbase on Close Metrics

**Enterprise Security Team Alert:** This email originated from outside of the organization. Please use caution when opening messages from external sources.

All,

Please find attached a summary specifically of closing condition inventory, receivable, and pharmacy deliverables for discussion on today's call. We have also attached yesterday's tracker.

Please note the difference of 15 million in the inventory and receivables related to the 5-day roll-forward of inventory which is intentionally left blank in the Closing Conditions Deliverable tracker.

Thanks,
Joseph


_____

Joseph L. Frantz, CFA
M-III Partners, LP
130 W 42nd St. | 17FL
New York, NY 10036
M: (917) 224-4901
O: (212) 430-2049
jfrantz@miiipartners.com

-----Original Appointment-----
**From:** Munjal, Leena <Leena.Munjal@searshc.com>

**Sent:** Tuesday, January 22, 2019 2:24 PM
**To:** Munjal, Leena; Sinha, Naren; mmeghji@miiipartners.com; cgood@miiipartners.com; bgriffith@miiipartners.com; Riecker, Rob; Prakash, Rajat; Ladley, Gregory; Phelan, Robert; Koreis, Thomas; Butz, Jeff; Joseph Frantz; dstogsdill@alvarezandmarsal.com; ngrossi@alvarezandmarsal.com; Jonathan B. Boffi; eacevedo@miiipartners.com
**Subject:** Daily Touchbase on Close Metrics
**When:** Monday, February 4, 2019 11:00 AM-11:30 AM (UTC-06:00) Central Time (US & Canada).
**Where:** Leena's Office B6-145B, Dial in: 14695264293,,,3590575# PIN 1627

This message, including any attachments, is the property of Sears Holdings Corporation and/or one of its subsidiaries. It is confidential and may contain proprietary or legally privileged information. If you are not the intended recipient, please delete it without reading the contents. Thank you.

This message contains information which may be confidential and privileged. Unless you are the intended addressee (or authorized to receive for the intended addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply email or by calling 212-716-1491 and delete the message.

This message contains information which may be confidential and privileged. Unless you are the intended addressee (or authorized to receive for the intended addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply email or by calling 212-716-1491 and delete the message.

*Value under Article X, Section 10.9*

($ in Millions)

| Borrowing Base Calendar Date (Input) | 2/1/2019 |
|---|---|

| | Beginning | Receipts | COGS | Ending | Current Source/ Notes | Responsible Parties |
|---|---|---|---|---|---|---|
| Total Stock Ledger Inventory as of February 2, 2019 | | | | 1,643 | 1.31 Borrowing Base Forecast | TJ Koreis, Scott Martin, Naren Sinha |
| Total Inventory Receipts and COGS on February 3, 2019 | 1,643 | | | 1,643 | TBU | TJ Koreis, Scott Martin, Naren Sinha |
| Total Inventory Receipts and COGS on February 4, 2019 | 1,643 | | | 1,643 | TBU | TJ Koreis, Scott Martin, Naren Sinha |
| Total Inventory Receipts and COGS on February 5, 2019 | 1,643 | | | 1,643 | TBU | TJ Koreis, Scott Martin, Naren Sinha |
| Total Inventory Receipts and COGS on February 6, 2019 | 1,643 | | | 1,643 | TBU | TJ Koreis, Scott Martin, Naren Sinha |
| Total Inventory Receipts and COGS on February 7, 2019 | 1,643 | | | $1,643 | TBU | TJ Koreis, Scott Martin, Naren Sinha |
| | | | | | | |
| Less: Forecasted Remaining GOB Inventory: | | | | (65) | Waiting on Revised Estimate from NW | Nick Weber, Naren Sinha |
| Adj. Total Stock Ledger Inventory as of February 7, 2019: | | | | $1,578 | | |
| | | | | | | |
| Forecasted BB-Eligible Credit Card Receivables | | | | $28 | Forecast Email from Paris Wells | Rajat Prakash, Jon Goodin, Anthony Minor, Mollie Huron |
| First Data Holdback Receivables | | | | 30 | Email from Mollie Huron 2/3/19 | Rajat Prakash, Jon Goodin, Anthony Minor, Mollie Huron |
| Other Holdback Receivables (Amex, etc.) | | | | 5 | Email from Mollie Huron 2/3/19 | Rajat Prakash, Jon Goodin, Anthony Minor, Mollie Huron |
| Blue Tarp & Discover > 5 days, Cards with Recourse | | | | 7 | Email from Mollie Huron 2/3/19 | Rajat Prakash, Jon Goodin, Anthony Minor, Mollie Huron |
| Pharmacy Receivables | | | | 7 | 1.31 Borrowing Base Forecast | Naren Sinha, [Pharmacy Business Manager] |
| Pharmacy Script Value | | | | 37 | Tiger Inventory Appraisal dated 2/4/19 | Joseph Frantz |
| Deliverable Value | | | | $1,692 | | |
| | | | | | | |
| Closing Threshold | | | | $1,657 | | |
| | | | | | | |
| *Cushion (Gap)* | | | | 35 | | |

CONFIDENTIAL - DO NOT DISTRIBUTE

2/4/2019

      

# Transform Transaction - Weekly Tracking

February 3 2019



## Admin Solvency Tracker

***Under the revised estimates, the Company is projecting a ~($35mm) administrative shortfall; the Company has identified ~$125mm of potential mitigating items***

| | Original Estimate | ESL Assumed Liabilities | Original Gap | Change in Estimates | Identified Variance | Revised Gap | Potential Mitigating Items | Notes |
|---|---|---|---|---|---|---|---|---|
| **Admin & Other Priority Claims** Uses of Value | | | | | | | | |
| **Claims** | | | | | | | | |
| 503(b)9 | $ 173 | $ (139) | $ (34) | $ (10) | $ - | $ (44) | $ 5 | (1) |
| Accounts Payable | 196 | (166) | (30) | - | 27 | (3) | - | |
| Accrued Payroll | - | - | - | - | (39) | (39) | - | (2) |
| Other Liability Accruals | - | - | - | - | - | - | - | |
| Severance & WARN | 28 | (43) | - | 8 | - | - | - | (3) |
| Franchise Taxes | 3 | - | (3) | - | - | (3) | - | |
| Property Taxes | 135 | (135) | - | - | - | - | - | |
| RemainCo Winddown Costs | 80 | - | (80) | - | - | (80) | - | |
| **ABL DIP** | 950 | (850) | (100) | 10 | 30 | (60) | 34 | (4) |
| Company Cash Available at Close | - | - | 50 | - | - | 27 | 5 | |
| Net Projected DIP Balance | - | - | - | - | - | (33) | $ 39 | |
| Junior DIP | 350 | (350) | - | - | - | - | - | |
| Professional Fees | 108 | - | (108) | 5 | - | (103) | - | (5) |
| Cure Costs | 200 | (200) | - | - | - | - | - | |
| Transfer Taxes (Purchase Price Deduction | 19 | (19) | - | - | - | - | - | |
| Mechanics' Liens (Purchase Price Deduction) | 4 | (4) | - | - | - | - | - | |
| Specified Receivables Shortfall | - | - | - | - | - | - | - | |
| Warranty Receivable Shortfall | 3 | - | - | (3) | - | (3) | - | |
| Prepaid Inventory Shortfall | - | - | - | (49) | 23 | (26) | - | |
| UCC Release Cash Consideration | 35 | (35) | - | - | - | - | - | |
| **Total** | 2,283 | (1,941) | (305) | (39) | 41 | (334) | 44 | |
| **Additional Value Identified** | | | | | | | | |
| Company Cash Available Post Close | 29 | - | 29 | 12 | - | 41 | 5 | |
| Professional Fee Carve-Out Account | 108 | - | 108 | (5) | - | 103 | - | |
| MTN Sale Proceeds | 81 | - | 81 | - | - | 81 | - | |
| U-Haul Sale Proceeds | 7 | - | 7 | - | - | 7 | - | |
| Insurance Proceeds | 13 | - | 13 | (13) | - | - | - | |
| SHIP Security Deposit | 6 | - | 6 | - | - | 6 | - | |
| Specified Receivables | - | - | - | - | - | - | 20 | (6) |
| Prepaid Rent | - | - | - | - | 25 | 25 | - | |
| Prepaid Insurance | - | - | - | - | - | - | - | |
| Prepaid Marketing | - | - | - | - | - | - | - | |
| Other Asset Accruals | - | - | - | - | - | - | - | |
| GOB Inventory Post-Close | - | - | - | - | 35 | 35 | 56 | (7) |
| **Total** | 244 | - | 244 | (6) | 60 | 298 | 81 | |
| **Solvency / (Gap)** | 244 | - | $ (61) | $ (44) | $ 101 | $ (35) | $ 125 | |

## Admin Solvency Tracker Notes

(1) New estimate reflects movement of $20mm in critical vendor payments to ABL DIP; potential mitigating items reflect $5mm in opportunity identified through the application of trapped vendor credits, and mitigation of amounts owed to 503(b)(9) claimants through identified cure payments

(2) Severance paid through payroll system so accrued payroll includes ~$8mm of January severance payments

(3) Reduced by $8mm to reflect January severance payments paid through payroll system

(4) Pipeline initiatives of $34mm relate to $15mm of Operating Receipts, $10mm of Operating Disbursements, and $9mm of Amazon Inventory

(5) Revised to reflect latest professional fee estimate

(6) Assumes 50% collection of $41mm overage on specified receivables

(7) Consists of $11mm upside to existing 80 store GOB forecast and 90% NOLV on $50mm of inventory transferred due to delivering $50mm excess New ABL Collateral as shown on page 4 ($1,707mm vs $1,657mm)

## Conditions to Close Summary

| Conditions to Close | | | | | | Potential Mitigating Items | | Notes |
|---|---|---|---|---|---|---|---|---|
| | Projected Balance at Close | Target per APA | Cushion / (Gap) | Identified Favorable Variance | Revised Cushion / (Gap) | | | |
| New ABL Collateral | $ 1,707 | $ 1,657 | $ 50 | $ - | $ 50 | $ | 3 | (1) |
| Specified Receivables | 296 | 255 | 41 | - | 41 | | - | (A) |
| Warranty Receivables | 51 | 54 | (3) | - | (3) | | - | (A) |
| Prepaid Inventory | 98 | 147 | (49) | - | (49) | | - | (A) (B) |
| ABL DIP | 940 | 850 | (90) | 57 | (33) | $ | 39 | (2) |
| Junior DIP | $ 350 | $ 350 | $ - | $ - | $ - | $ | - | |

**Notes:**

(1) Inventory balance of $1,597mm per SHC Inventory Management. Gross credit card and pharmacy receivables of $77mm. Assumes $11.00/Script Pharmacy Asset Valuation, Mitigating Item of increase to $13.00/Script for 3.3mm Scripts

(2) Identified variance of $30mm related to critical as well as $27mm of cash available at close. Pipeline initiatives of $34mm relate to $15mm of Operating Receipts, $10mm of Operating Disbursements, $9mm of Amazon Inventory; in addition, there may be $5mm of additional cash available at close, which could potentially offset any remaining DIP shortfall

(A) In the event the Company delivers less than the target amount for these items, there will be a dollar for dollar reduction in ESL's obligation to first assume Severance liabilities, then 503(b)(9) claims. To the extent the Company delivers excess Prepaid Inventory or Warranty Receivables at close, this excess amount can be used to offset any shortfall in the other dollar for dollar.

(B) Updated to reflect 1/31/19 estimate from SHC Accounting

4

# Opportunity and Actions

| | Identified Favorable Variance | Identified Opportunity | Potential Actions | Responsible Parties | Comments |
|---|---|---|---|---|---|
| **RX Scripts** | $12mm | $3mm | Script Appraisal | Rob Riecker<br>Brian Griffith | Currently estimated at $11.00/script, opportunity to increase to $13.00/script |
| **Inventory** | NA | $50mm | Sale of excess inventory<br>Transfer to GOB<br>Reduce or cancel P.O.s<br>Increase receiving days to 6 days per week | TJ Koreis<br>Brian Griffith<br>Chris Good | Inventory potentially higher in DIP budget than target |
| **Specified Receivables** | NA | $20mm | Negotiate credit balance down with vendors or convert to cash | Trent Bonnell<br>Jon Boffi<br>Chris Good<br>Bob Phelan | Convert A/R to cash to the extent above required target<br>Use 503(b)(9) negotiation to reduce A/R credits<br>Look at timing of SHO, Citi and other AR payments |
| **503(b)(9)** | NA | $5mm | Prioritize based on<br>trapped vendor credits<br>Mitigate through vendor cures | Trent Bonnell<br>Enrique Acevedo | Use critical vendor payments to reduce 503(b)(9) liability<br>Potential to use A/R credits to offset balances |
| **Accounts Payable** | NA | NA | Maintain current AP ($169mm) | Jeff Butz<br>Chris Good | Manage down disputed payables and reduce non-essential spend<br>Look at cash prepetition cash deposits with vendors |
| **Property Tax** | NA | NA | Active management of property taxes | Mike Morrie<br>Brian Griffith | Property-by-property review of tax liability in process; updated view by mid-week ending 1/25/19 |
| **Prepaid and Other Assets** | NA | NA | Monetization of any additional assets | Chris Good<br>Jon Boffi | Prepaid and other assets on the balance sheet not identified in APA |
| **Cash** | NA | NA | Company Cash<br>Excess Store Cash | Rajat Prakash<br>Chris Good<br>Naren Sinha | Cash in-transit, in regional banks and stores; ESL will pay for a maximum of $17mm in store cash |
| **Senior DIP Balance** | $40mm | $34mm | Operating Receipts ($15mm)<br>Operating Disbursement ($10mm)<br>Amazon Inventory ($9mm) | Rob Riecker<br>Naren Sinha<br>Rajat Prakash<br>Bob Walsh<br>Brian Griffith<br>Wesley Sima<br>TJ Koreis | Actively managing operating disbursements and potential conservatism in SG&A forecast, as well as receipt outperformance |
| | $27mm | $5mm | Cash Available at Close | | |
| | NA | $35mm | Holdback Receivables ($35mm) | Mo Meghji | Credit card holdback release<br>Look at other holdback release opportunities |

# Exhibit C

**Transform Holdco LLC**
*c/o ESL Investments, Inc.*
*1170 Kane Concourse, Suite 200*
*Bay Harbor Islands, FL 33154*
*(305) 702-2100*

January 9, 2019

Lazard Frères & Co. LLC
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 632-6479; (212) 632-6418
Attention:  Brandon Aebersold, Managing Director
               Levi Quaintance, Vice President

Ladies and Gentlemen,

Reference is made to the definitive bid proposal submitted by Transform Holdco LLC ("Buyer"), a newly formed entity controlled by ESL Investments, Inc. ("ESL") on December 28, 2018 (the "Going Concern Proposal"), which is attached to this letter as Exhibit A.[1]  The Going Concern Proposal on the terms reflected in the December 28, 2018 letter expired in accordance with its terms on January 4, 2019 and this letter (this "Revised Proposal") indicates certain revisions to the terms on which Buyer is prepared to acquire substantially all of the go-forward retail footprint and other assets and component businesses (the "Assets") of Sears as a going concern.  Except as modified by this Revised Proposal, the terms set forth in the Going Concern Proposal are incorporated by reference herein.  This Revised Proposal constitutes a Qualified Bid (as defined in the Bidding Procedures) in accordance with the oral rulings of the Court and the agreements reached among ESL, the Debtors and the Consulting Parties (as defined in the Bidding Procedures) at the Chambers Conference and the Status Conference before the Court on January 8, 2019 (the "Hearing").

This Revised Proposal includes the assumption of additional liabilities that may increase the total purchase price presented by Buyer's proposal by over $600 million, which, together with the purchase price set forth in the Going Concern Proposal, would provide aggregate consideration to the Debtors in excess of $5 billion.  In connection with the Revised Proposal, Buyer is providing counsel to the Debtors with a revised Asset Purchase Agreement (the "Revised Asset Purchase Agreement"), which sets forth in further detail the proposed terms of the Revised Proposal. The Revised Proposal includes the following revisions:

1. **Assumption of Liabilities.**  In addition to the liabilities described in the Going Concern Proposal, Buyer proposes to assume up to $663 million in additional liabilities identified in consultation with the Debtors. This amount consists of the following, to be paid by Buyer in accordance with the Revised Asset Purchase Agreement:

   a. Up to $166 million of payment obligations with respect to goods ordered by Debtors prior to the closing of the proposed transactions (but as to which goods Debtors have not yet taken delivery and title prior to closing);

   b. Up to $139 million of 503(b)(9) administrative priority claims;

   c. Up to $43 million of additional severance costs to be incurred by the Debtors;

   d. All cure costs related to contracts to be assumed by Buyer (estimated to be up to $180 million); and

   e. Up to $135 million of property taxes with respect to the properties to be acquired by Buyer.

In the event that the sum of the amounts outstanding under Debtors' first lien ABL DIP facility and Debtors' junior DIP facility (net of any cash available to pay down such amounts) is less than $1.2 billion at the time of closing the proposed transactions, Buyer's obligation to assume the foregoing liabilities

---

[1]       Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Going Concern Proposal.

shall be reduced dollar-for-dollar to the extent of such shortfall, with such reduction allocated in accordance with the Revised Asset Purchase Agreement. In a schedule shared with Buyer's representatives on January 6, 2019, the Debtors estimated cash available to pay down such outstanding amounts was $89 million.

2. **Acquired Assets.** The Revised Proposal includes the acquisition by Buyer of additional assets that were proposed to be left with the Debtors' estate under the Going Concern Proposal, including:
   a. Approximately 57 additional real estate properties;
   b. Accounts receivable with respect to certain home warranties sold in FY 2018 with a book value of approximately $53.6 million;
   c. Other accounts receivable with a book value of at least $256 million, inclusive of netting for allowances for bad debts;
   d. Additional inventory with a book value of up to $166 million with respect to which Buyer shall assume payment obligations as described in item 1.a. above (and as to which inventory Debtors have not yet taken delivery and title prior to closing);
   e. Prepaid inventory with a book value of at least $147 million as to which Debtors have not yet taken delivery and title prior to closing; and
   f. All of the Debtors' rights relating to the claims set forth in the class actions consolidated in the multi-district litigation *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, No. 1:05-MD-01720 (E.D.N.Y.).

3. **Release**. The proposed consideration for the release of liabilities of ESL and certain ESL-related parties as further described in the Going Concern Proposal is comprised of $35 million in cash, and the assumption of the additional liabilities of the Debtors described above.

Buyer is prepared to execute the Revised Asset Purchase Agreement in the form provided to Debtors' counsel, subject to agreement with the Debtors as to the form and substance of the schedules and exhibits to be attached thereto (with such form and substance to be acceptable to Buyer's financing sources). Buyer is prepared to work with Debtors and their counsel with the goal of reaching such agreement prior to commencement of the Auction.

In addition to the Revised Asset Purchase Agreement. we are separately providing updated executed copies of a debt commitment letter from the lenders named therein with regard to a new ABL facility (the "ABL Commitment"), a debt commitment letter from ESL and funds managed by Cyrus Capital Partners with respect to the rollover of certain debt facilities of the Debtors (the "Rollover Commitment"), a debt commitment letter from ESL and funds managed by Cyrus Capital Partners with respect to a new secured real estate loan (the "Real Estate Commitment"), and an equity commitment letter from ESL (the "Equity Commitment") to Debtors' counsel. Upon receipt of the funds described in the Debt Commitment, the Rollover Commitment, the Real Estate Commitment and the Equity Commitment, Buyer will have sufficient funds available to consummate the transactions contemplated by our Going Concern Proposal.

We are separately providing to Debtors' counsel with an updated copy of a letter executed by the collateral agent for the Second Lien Facilities authorizing the credit bid of the second lien debt. The letter executed by the administrative agent for the Dove Loan Agreement provided to Debtors' counsel at the time of the Going Concern Proposal remains in effect.

Pursuant to the Bid Procedures, and subject to the terms of the Escrow Agreement between Buyer, Sears and the Escrow Agent, we have deposited $120 million in cash with the Escrow Agent selected by the Debtors (inclusive of the $17.9 million deposit amount described at the Hearing and the amounts previously deposited at the time of submitting the Going Concern Proposal). The amounts deposited represent in excess of 10% of the cash component of the purchase price.

Based on the foregoing and our familiarity with the business of the Debtors, we are confident that Buyer can move quickly towards the consummation of a transaction as soon as possible following the conclusion of the Auction and approval by the Court.

This Revised Proposal, together with the Going Concern Proposal which it modifies, reflects our formal and binding offer for the assets on the terms and subject only to the conditions set forth in the Revised Asset Purchase Agreement. We agree to serve as a back-up bidder to the extent the Revised Proposal is selected as the next highest or next best bid after another successful bidder.  We waive any claim or right to assert any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code in connection with bidding for the Assets and/or participating in the Auction.  We will not be entitled to any break-up fee and shall only be entitled to the expense reimbursement set forth in the Revised Asset Purchase Agreement on the conditions set forth therein if agreed to by the Debtors and approved by the Court.

This Revised Proposal and the Revised Asset Purchase Agreement shall automatically terminate and be deemed withdrawn at the earlier of (i) 5:00 p.m., New York time, on January 13, 2019, if Debtors have not confirmed in writing to Buyer that an "Auction" pursuant to the Bidding Procedures will be held on January 14, 2019 at which Buyer shall be allowed to participate and (ii) 5:00 p.m., New York time, on January 16, 2019, if Debtors have not confirmed in writing to Buyer that Buyer has been selected as a "Successful Bidder" (in connection with the transaction contemplated by the Revised Proposal) pursuant to the Bidding Procedures.

Page 4
January 9, 2019

As always, we remain enthusiastic about the continuation of Sears as a going concern and its future potential. We hope this letter serves as the beginning of an exciting and transformative new chapter for Sears. We are available to discuss any of the foregoing at your convenience.

Very truly yours,

TRANSFORM HOLDCO LLC

Edward S. Lampert
Chief Executive Officer

cc:

Sears Holdings Corporation
      Attn.:    Rob Riecker
                Luke Valentino
                Mohsin Meghji

Weil, Gotshal & Manges LLP
      Attn:    Ray C. Schrock, P.C.
                Jacqueline Marcus, Esq.
                Garrett A. Fail, Esq.
                Sunny Singh, Esq.

Bank of America, N.A., consultation party
      Attn:    Stephen J. Garvin and Brian P. Lindblom
and

Skadden, Arps, Slate, Meagher & Flom LLP
      Attn :    Seth E. Jacobson, Esq.

Wells Fargo Bank, National Association, consultation party
      Attn:    Joseph Burt

and

Choate, Hall & Stewart  LLP
      Attn.:    Kevin J. Simard, Esq.

Creditors' Committee, consultation party
      Attn:    Akin Gump Strauss Hauer & Feld LLP
                Ira S. Dizengoff, Esq., Philip C. Dublin, Esq.,
                Abid Qureshi, Esq., Sara L. Brauner, Esq.

[Enclosures]

**<u>Exhibit A</u>**
**<u>Going Concern Proposal</u>**

***Transform Holdco LLC***
*c/o ESL Investments, Inc.*
*1170 Kane Concourse, Suite 200*
*Bay Harbor Islands, FL 33154*
*(305) 702-2100*

December 28, 2018

Lazard Frères & Co. LLC
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 632-6479; (212) 632-6418
Attention:  Brandon Aebersold, Managing Director
        Levi Quaintance, Vice President

Ladies and Gentlemen,

        This letter indicates the terms upon which Transform Holdco LLC ("Buyer"), a newly formed entity controlled by ESL Investments, Inc. ("ESL"), would be prepared to acquire substantially all of the go-forward retail footprint and other assets and component businesses of Sears Holdings Corporation (together with its subsidiaries, "Sears") as a going concern (the "Going Concern Proposal").  This letter is being submitted in response to the process letter filed with the United States Bankruptcy Court for the Southern District of New York (the "Court") on behalf of the debtors (the "Debtors") in the Chapter 11 cases captioned as *In re Sears Holdings Corporation, et al.*, Case No. 18-23538 (Bankr. S.D.N.Y.) (RDD) on November 21, 2018 (the "Process Letter") [Docket No. 862] and the Global Bidding Procedures (the "Bidding Procedures") set forth in the Global Bidding Procedures Order entered on November 19, 2018 [Docket No. 816].

        Sears is an iconic fixture in American retail and we continue to believe in the company's immense potential to evolve and operate profitably as a going concern with a new capitalization and organizational structure.  Our proposed business plan envisages significant strategic initiatives and investments in a right-sized network of large format and small retail stores, digital assets and interdependent operating businesses.  We believe that our strategy will enable Sears to prosper in an integrated consumer and retail landscape and view a going concern transaction as essential to providing optimal value to creditors and shareholders.

        We believe that a future for Sears as a going concern is the only way to preserve tens of thousands of jobs and bring continued economic benefits to the many communities across the United States that are touched by Sears and Kmart stores.  We also believe that our Going Concern Proposal creates the best path for creating the most value for the Debtors' estates, including creditors who would receive only minimal or no recoveries in a liquidation.  We are prepared to move as quickly as possible to finalize and enter into the definitive agreements for the transactions contemplated by this letter.  Our proposed Asset Purchase Agreement for the Going Concern Proposal, executed by Buyer, is being separately provided to Debtors' counsel (the "Asset Purchase Agreement").

        We believe there are significant benefits to preserving and maximizing the relationships between and among Sears' retail business and its other operating businesses.  Purchasing them together enhances the value and potential of each by continuing to build on long-held commercial relationships and supporting the synergies created by shared marketing, manufacturing, technology and administrative teams, to name just a few.  Our Going Concern Proposal includes substantially all of the assets of Debtors.  To preserve intact as much as possible of Sears' existing real estate footprint as part of the going concern, we also propose to acquire the equity of non-Debtors SRC O.P., LLC, SRC Facilities LLC and SRC Real Estate (TX), LLC (the "SRC Entities") outside of the bankruptcy process, for total consideration anticipated to be approximately $592,000,000 as of the closing of such acquisition (inclusive of the purchase price for equity and the assumption of all of the outstanding liabilities of the SRC Entities).  Furthermore, our Going Concern Proposal contemplates our acquisition of all of the outstanding KCD IP Notes currently held by non-debtor Sears Reinsurance Company Ltd. ("Sears Re"), which are secured by the intellectual property comprising Kenmore and DieHard.  Our proposed consideration for the KCD IP Notes is comprised of the assumption of the

protection agreement liabilities currently reinsured by Sears Re. We also would be willing to acquire the underlying Kenmore and DieHard intellectual property directly from non-Debtor KCD IP, LLC for additional cash consideration.

1. **Scope of Transaction.** As discussed above, Buyer proposes to acquire substantially all of the assets of Debtors pursuant to a sale under section 363 of the U.S. Bankruptcy Code. The purchased assets would include (a) the go-forward retail footprint of approximately 425 stores and related real estate interests (including headquarters and distribution locations) and certain designation rights with regard to additional real estate interests, inventory, infrastructure and material related contracts and (b) Sears Auto Centers, Shop Your Way, Monark, Innovel, Sears Home Services (including the PartsDirect business unit), material related contracts and the KCD IP Notes. Based on information provided by the Debtors, the Going Concern Proposal is based on the purchased assets including Sears' retail inventory and credit card and pharmacy receivables with a book value of no less than approximately $1.7 billion.

   As part of the transaction contemplated herein, Buyer expects to provide offers of ongoing employment to up to 50,000 Sears employees, depending on any further actions Sears may take between now and closing. Buyer also expects to reinstate the prepetition Sears severance program for the benefit of all eligible employees that accept their employment offer and to honor the promise made to millions of customers by assuming certain Sears' liabilities relating to protection agreements issued by the Sears Home Services business, gift card liabilities and Shop Your Way points liabilities as described below.

   Our proposal provides that Buyer would have the option to acquire Sears' tax assets, the value of which we have incorporated into the Going Concern Proposal. Our Going Concern Proposal also assumes, consistent with the Debtors' projections, that the amounts outstanding under the Debtors' first lien ABL DIP facility will be no greater than $850 million at the time of closing the transactions contemplated herein.

2. **Consideration; Other Value.** The total purchase price for our Going Concern Proposal would provide approximately $4.4 billion in total consideration to Sears, based on information provided by the Debtors. This consideration would comprise:

   a. $850 million in cash to be funded with the proceeds of a new $1.3 billion ABL facility described in the Debt Commitment;
   b. a credit bid of approximately $1.3 billion[1], consisting of:
      i. approximately $544 million in respect of certain owned real estate assets that are collateral under the Dove Loan Agreement;
      ii. approximately $231 million in respect of certain intellectual property and ground leases and related assets that are collateral under the IP/Ground Lease Loan Agreement;
      iii. approximately $559 million in respect of the acquired inventory and receivables that are collateral under the Second Lien Facilities and the FILO Facility;
   c. the roll-over of (and release of the Debtors with respect to) $501 million of senior indebtedness (up to $230 million of the Junior DIP facility and approximately $271 million of the L/C Facility);[2]
   d. the assumption of all of the outstanding liabilities of the SRC Entities, in the amount of approximately $592,000,000;

---

[1] In the event that Buyer and its Affiliates are not the holder of all of the outstanding obligations under such first lien secured facilities as of the Closing Date, Buyer will pay to the applicable Debtors cash in the amount of any obligations owed to lenders other than Buyer or its Affiliates as of the Closing Date, to be held in separate segregated accounts of the Debtors. Any liens on such collateral purchased by Buyer shall attach to the proceeds from the sale held in such accounts. We currently expect that the amount of such cash may be up to approximately $220 million.

[2] Buyer understands that the holders of the amounts outstanding under these facilities have consented, or will consent, to the above-described roll-overs.

  e.  $35 million in cash and rights to purchase up to $100 million of non-voting securities of Buyer as consideration for the release of ESL and certain ESL-related parties from certain liabilities as described further below; and

  f.  the assumption of the Debtors' liabilities with respect to (i) protection agreements issued by Sears Homes Services, (ii) certain gift cards and (iii) accrued points under the Shop Your Way program, in each case on terms to be agreed with the Debtors. We estimate these liabilities to be approximately $1.1 billion.

Over the last several years, ESL has extended more than $2.4 billion of secured financing to the Debtors, which has enabled Sears to continue operations and seek to implement its transformation plan, while significantly reducing the exposure of the Debtors' other creditors (including Sears' pension plan). These secured financings were approved by Sears' board of directors (comprised of a majority of directors independent from management and the company) and also approved by the Related Party Transactions Committee comprised of independent directors and advised by separate and independent financial and legal advisors. As the holder of valid and enforceable liens and claims, the Going Concern Proposal is conditioned on (1) confirmation of Buyer's right to credit bid the secured debt in the amounts described herein (and without any requirement to cash collateralize or otherwise backstop any portion of the credit bid) and (2) a full release by the Debtors of ESL and certain ESL-related parties from any liability related to any prepetition transactions involving ESL. To the extent any parties are challenging Buyer's credit bidding capability for any reason, Buyer requests that such challenges are adjudicated to conclusion at or prior to the sale hearing with regard to the asset purchases.

3.  **Required Approvals.** We anticipate that the consummation of the transactions described in this letter will require expiration or early termination of any waiting periods under the Hart Scott Rodino Antitrust Improvements Act of 1976, and we are ready to make all necessary filings in a timely manner as further described in the Asset Purchase Agreement. To the extent any other governmental or other regulatory approvals are required to purchase the assets described herein, we commit to pursue such approvals as expeditiously as possible, subject to the reasonable assistance of Sears and its applicable advisors. Buyer will cooperate with the Debtors to provide pertinent factual information regarding Buyer's operations as reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements.

4.  **Financial Wherewithal.** We are separately providing executed copies of a debt commitment letter from the lenders named therein (the "Debt Commitment") and an equity commitment letter from ESL (the "Equity Commitment") to Debtors' counsel. Upon receipt of the funds described in the Debt Commitment and the Equity Commitment, Buyer will have sufficient funds available to consummate the transactions contemplated by our Going Concern Proposal.

As you will note, the Debt Commitment includes certain conditions that are not typical for acquisition financings, including a requirement that a $175 million secured real estate loan be funded at closing. We intend to work expeditiously with the lenders to satisfy these conditions as soon as possible. ESL has committed to provide one-half of real estate secured loan (and we have provided Debtors' counsel a copy of a commitment letter for that amount) and we currently expect that other lenders will provide the balance of the commitment in the near term. As a result of these unusual conditions, the Asset Purchase Agreement contains a condition related to the availability of debt financing. We would expect to eliminate this condition at the time the foregoing conditions are satisfied.

We are separately providing to Debtors' counsel (i) a letter executed by the administrative agent for the Dove Loan Agreement that is included in the credit bid authorizing such credit bid, and (ii) a letter executed by the collateral agent for the Second Lien Facilities authorizing the credit bid of the second lien debt.

5.  **Allocation.** The allocation of the proposed consideration to each category of purchased asset (including the inventory and receivables, real estate, intellectual property and ground lease collateral, and the unencumbered assets) is set forth under Item 2 above. Our proposed allocation of value with regard to the proposed purchases of the SRC Entities outside of the bankruptcy process are also noted above.

6. **Alternative Bid Proposal.** As noted above, we have allocated very considerable value to the benefits of preserving Sears as an integrated business that would include both its retail and non-retail components. If we were required to bid on the different component assets separately, the aggregate consideration we would be prepared to offer would be significantly less than we have submitted in our Going Concern Proposal. While we strongly believe that our Going Concern Proposal will provide the best outcome for the Debtors and their creditors and other stakeholders, we also are submitting bids with respect to individual assets in the event that our Going Concern Proposal is not declared a "Qualifying Bid" and subsequently accepted. Accordingly, we are submitting bids to purchase the following assets at the following purchase prices pursuant to the Alternative Asset Purchase Agreement separately provided to Debtors' counsel (the "Alternative APA") solely in the event that the Going Concern Proposal is not qualified or accepted (the "Alternative Proposal"):

    a. Innovel: $5 million in cash, conditioned on the continued operation of at least 250 stores as a going concern;

    b. Sears Home Services:

        i. For substantially all of this business (including Parts Direct, the in-home repair business and assignment and assumption of the Assurant and Cross Country Home Services agreements, but excluding any assumption of liabilities related to protection agreements ): $25 million, conditioned on the continued operation of at least 250 stores as a going concern; and

        ii. For only the Parts Direct business: $5 million plus 50% of the value of the Parts Direct inventory acquired at closing.

    c. Shop Your Way (data and IP only; excludes any assumption of liabilities with respect to accrued points under the program): $100,000 in cash;

    d. Certain intellectual property, including the "Sears" marks and the rights to receive royalties with respect thereto, secured by the IP/Ground Lease Loan Agreement: credit bid of approximately $150 million;

    e. Certain real estate assets, including ground leases, as described in the indication of interest submitted pursuant to the Real Estate Process Letter on the date hereof.

The Equity Commitment also provides that Buyer will have available cash to consummate the purchases of any or all of the assets described above. The Alternative Proposal and the Alternative APA are being provided solely in the event that the purchase of substantially all of the assets of the Debtors as described above is not consummated, and solely for the purpose of establishing Buyer as a qualified bidder in such circumstance. Under no circumstance will we be obligated to enter into both the Alternative APA and the Asset Purchase Agreement or to make any duplicative payments for any of the assets described herein or therein.

7. **Good Faith Deposit.** We have deposited $3,010,000 in cash with the Escrow Agent selected by the Debtors, which represents our estimate of 10% of the cash component of Buyer's Alternative Proposal. Subject to confirmation from the Debtors that they are prepared to declare our Going Concern Proposal as a "Qualifying Bid" pursuant to the Bidding Procedures, Buyer is prepared to deposit additional cash with the Escrow Agent, which, together with the amount previously deposited, would represent 10% of the cash component of the Going Concern Proposal.

8. **Representations and Warranties.** Buyer affirms that it has had an opportunity to conduct any and all due diligence regarding the assets described in this letter. Buyer confirms that it and ESL have relied solely upon their own independent review, investigation, and/or inspection of the relative documents and the assets in submitting this letter and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the assets described in the Asset Purchase Agreement or the Alternative APA or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Asset Purchase Agreement or the Alternative APA. We have not engaged in any collusion with respect to the submission of this letter. The Going Concern Proposal and the Alternative Proposal are not subject to any diligence contingencies of any kind.

Based on the foregoing and our familiarity with the business of the Debtors, we are confident that it can move quickly towards the consummation of a transaction as soon as possible following the conclusion of the auction and approval by the Bankruptcy Court.

We have retained Moelis & Company as financial advisor and Cleary Gottlieb Steen & Hamilton LLP as legal counsel.  Please feel free to reach out to any of the below regarding this letter.

Lawrence S. Chu
Moelis & Company
(212) 883-4588
LC@moelis.com

Christopher E. Austin
Benet O'Reilly
Sean A. O'Neal
Cleary Gottlieb Steen & Hamilton LLP
(212) 225-2000
CAustin@cgsh.com
BOReilly@cgsh.com
SOneal@cgsh.com

This letter reflects our formal and binding offer for the assets on the terms and subject only to the conditions set forth in the Asset Purchase Agreement or the Alternative APA (as the case may be). We agree to serve as a back-up bidder to the extent the Going Concern Proposal or the Alternative Proposal (as the case may be) is selected as the next highest or next best bid after another successful bidder.  We waive any claim or right to assert any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code in connection with bidding for the Assets and/or participating in the Auction.  We will not be entitled to any break-up fee and shall only be entitled to the expense reimbursement set forth in the Asset Purchase Agreement or Alternative APA (as the case may be) on the conditions set forth therein if agreed to by the Debtors and approved by the Bankruptcy Court.

If the Going Concern Proposal has not been determined to be a "Qualifying Bid" prior to 4:00 p.m., New York time, on January 4, 2019, the Going Concern Proposal and the executed Asset Purchase Agreement shall automatically terminate and be deemed withdrawn as of such time and notwithstanding anything to the contrary contained in this letter or any other document, none of Buyer, ESL or any of their respective affiliates or representatives shall have any further liability or obligation in respect of the Going Concern Proposal.  If the Alternative Proposal has not been determined to be a "Qualifying Bid" prior to 4:00 p.m., New York time, on January 4, 2019, the Alternative Proposal and the executed Alternative APA shall automatically terminate and be deemed withdrawn as of such time and notwithstanding anything to the contrary contained in this letter or any other document, none of Buyer, ESL or any of their respective affiliates or representatives shall have any further liability or obligation in respect of the Alternative Proposal.

As always, we remain enthusiastic about the continuation of Sears as a going concern and its future potential. We hope this letter serves as the beginning of an exciting and transformative new chapter for Sears. We are available to discuss any of the foregoing at your convenience.

Very truly yours,

TRANSFORM HOLDCO LLC

 /s/ Edward S. Lampert
Edward S. Lampert
Chief Executive Officer

cc:

Sears Holdings Corporation
   Attn.:   Rob Riecker
            Luke Valentino
            Mohsin Meghji

Weil, Gotshal & Manges LLP
   Attn:    Ray C. Schrock, P.C.
            Jacqueline Marcus, Esq.
            Garrett A. Fail, Esq.
            Sunny Singh, Esq.

Bank of America, N.A., consultation party
   Attn:    Stephen J. Garvin and Brian P. Lindblom
and

Skadden, Arps, Slate, Meagher & Flom LLP
   Attn :   Seth E. Jacobson, Esq.

Wells Fargo Bank, National Association, consultation party
   Attn:    Joseph Burt

and

Choate, Hall & Stewart  LLP
   Attn.:   Kevin J. Simard, Esq.

Creditors' Committee, consultation party
   Attn:    Akin Gump Strauss Hauer & Feld LLP
            Ira S. Dizengoff, Esq., Philip C. Dublin, Esq.,
            Abid Qureshi, Esq., Sara L. Brauner, Esq.


[Enclosures]

# Exhibit D

| | |
|---|---|
| **From:** | Kunal Kamlani |
| **To:** | Murphy, Cullen |
| **Subject:** | [EXT] Re: Offset |
| **Date:** | Thursday, January 17, 2019 12:22:23 AM |

At the time we made a trade we assumed several liabilities and had a forecast that indicated when you added the 1L plus a full draw on the JR DIP you got to about $1.2Bn. That forecast was based on their numbers. When you did the same math using the Daily Cash Report I believe we were getting to something like $1.150Bn. Since we had more faith in the Daily Report than the DIP Budget given the DIP Budget was being beat by several hundred million dollars we said we would take the liabilities (need to check but I think we took well over $100M of liabilities on this trade) and said at the same time that if the ABL+JR DIP comes in below $1.2Bn then we should get a dollar for dollar credit against the liabilities we assumed.

Our logic was that they told us, based on their numbers which we accepted for face value, that they would be Admin Insolv b/c they would not have the cash to deal with the liabilities. So we said thats fine we will take them but if you end up with more cash that you expect we should get the credit b/c that is cash that you otherwise would have had to deal with the liabilities that we took. Do you and Josh remember this trade?

KSK

On Jan 17, 2019, at 12:05 AM, Murphy, Cullen
<Cullen.Murphy@moelis.com<mailto:Cullen.Murphy@moelis.com>> wrote:

I just want to make sure I remember the logic behind the purchase price offset correctly. The point was: we're fixing our purchase price at 850mm regardless of the 1L outstanding because that was the forecast, but had we known it would be lower we would have bid less cash and more credit bid of 2L.

The way to remedy this is to offset the cash purchase by a reduction in liability assumption since we can't reduce the 850 if 1L comes in light. Similar principle with overall 1L and junior dip combined.

Trying to work through math with lawyers and want to make sure I understand the logic when we had thought of it.

Cullen


Sent with BlackBerry Work
(www.blackberry.com<https://urldefense.proofpoint.com/v2/url?u=http-3A__www.blackberry.com&d=DwIF-g&c=6ldJ3EG4a4nVimLYnfpfYA&r=0tSUXDfU7J-8gCyxVbRRVQ&m=RYBeqTCZ1Zq5Uusb83eEFgTSpdZORq1eO8-hc1FS_Rw&s=N56Btq33PMc_ng13X53D2ajtSj0CjhCQMRr1t2k-gI8&e=>)

Disclaimer: Click here<https://urldefense.proofpoint.com/v2/url?u=http-3A__www.moelis.com_SitePages_EmailDisclaimer.aspx_&d=DwIF-g&c=6ldJ3EG4a4nVimLYnfpfYA&r=0tSUXDfU7J-8gCyxVbRRVQ&m=RYBeqTCZ1Zq5Uusb83eEFgTSpdZORq1eO8-hc1FS_Rw&s=m32RBON5GSJDOZt2sGksdsVLEbNCIyL6tvPfnr4Czso&e=> for important information about Moelis & Company and this e-mail.