Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   CASE NO. 18-23538-rdd

4   - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   SEARS HOLDINGS CORPORATION,

8

9           Debtor.

10  - - - - - - - - - - - - - - x

11

12

13               U.S. Bankruptcy Court

14               300 Quarropas Street

15               White Plains, New York 10601

16

17               May 21, 2019

18               10:27 AM

19

20

21  B E F O R E :

22  HON ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  NAROTAM RAI

Page 2

1    Notice of Agenda of Matters Scheduled for Hearing on May 21,

2    2019 at 10:00 a.m.

3

4    Application of Fee Examiner, Pursuant to Section 327(a) of

5    the Bankruptcy Code, Bankruptcy Rule 2014, and Local

6    Bankruptcy Rules 2014-1 and 2016-1, for the Entry of an

7    Order Authorizing the Retention and Employment of Ballard

8    Spahr LLP as Counsel to the Fee Examiner, Nunc Pro Tune to

9    the Appointment Date filed by Paul E. Hamer on behalf of Fee

10   Examiner(document #3682)

11

12   Motion of Debtors for Order Shortening Notice with Respect

13   to Debtors' Motion for Authorization and Approval of (I)

14   Settlement between Debtors and The Chubb Companies, (II)

15   Debtors' Entry into the Transaction Documents, and (III)

16   Related Relief (document #3615)

17

18   Debtors' Motion for Authorization and Approval of (I)

19   Settlement between Debtors and The Chubb Companies, (II)

20   Debtors' Entry into the Transaction Documents, and (III)

21   Related Relief (document #3614)

22

23

24

25

Page 3

```
1   Notice of Presentment of Debtors Motion for Authority to

2   Assume Unexpired Leases of Nonresidential Real Property

3   (document #3376) Objection of 7200 Arlington Associates LLC

4   (document #3595)

5

6   Debtors Motion for Authority to Assume Unexpired Leases of

7   Nonresidential Real Property (related document(s)3376)

8

9   Objection of 7200 Arlington Associates LLC (document #3595)

10

11  Notice of Presentment of Order (I) Authorizing Assumption

12  and Assignment of Lease of Non-Residential Real Property and

13  (II) Granting Related Relief, with Exhibit A (related

14  document(s)3624, 3008, 3665, 3811)

15

16  Notice of Presentment of Stipulation among Buyer, Seller,

17  and Brookfield Property REIT Inc. filed by Ryan Zachary

18  Gelber on behalf of Transform Holdco LLC. (document #3913)

19

20

21

22

23

24

25
```

Page 4

1    Motion of FTI Consulting Canada Inc., for Relief From the

2    Automatic Stay for the Purpose of Joining Sears Holdings

3    Corporation as a Defendant in Existing Litigation Pending

4    Before the Ontario Superior Court of Justice (Commercial

5    List) and to Liquidate Certain Claims Against Sears Holdings

6    Corporation in Such Existing Litigation filed by Eric C.

7    Daucher on behalf of FTI Consulting Canada Inc. (document

8    #3237)

9

10   Motion of Liberty Insurance Corporation of Relief from the

11   Automatic Stay (document #3294)

12

13   Motion of Rosa Melgar for Relief from the Automatic Stay

14   (document #2960)

15

16   Motion of Apex Tool Group, LLC to Allow and Compel Immediate

17   Payment of Administrative Expense Claim Pursuant to 11

18   U.S.C. 503(b)(1)(a) and 11 U.S.C. 503(b)(9) filed by Gregg

19   M. Galardi on behalf of Apex Tool Group, LLC (document

20   #1491)

21

22   Debtors' Omnibus Objection (document #3883)

23

24

25

1    Motion of Milton Manufacturing, LLC to Allow and Compel

2    Payment of Administrative Expense Claim Under 11 U.S.C.

3    §503(b) For Craftsman Branded Goods Delivered to the Debtor

4    Postpetition filed by Joel D. Applebaum on behalf of Milton

5    Manufacturing, LLC (document #1477)

6

7    Motion to Allow and Compel Payment of Administrative Expense

8    Claim Under 11 U.C. Sec. 503(b) for Jaclyn Smith Branded and

9    Private Label Goods Delivered to the Debtor Post-Petition

10   (ECF #3323)

11

12   Debtors' Omnibus Objection (document #3883)

13

14   Motion of Gokaldas Exports Ltd. to Allow and Compel Payment

15   of Administrative Expense Claims (document #3670)

16

17   Motion by Pearl Global Industries Ltd. to Allow and Compel

18   Payment of Administrative Expense Claim (document #3604)

19

20   Notice of Assumption and Assignment of Additional

21   Designatable Leases (related document(s)3008, 1731, 3097,

22   2753, 2314, 2995, 3152, 1774) filed by Luke A Barefoot on

23   behalf of Transform Holdco LLC. (document #3298)

24

25   Transcribed by:  Sherri L. Breach, Cert*D-397

Page 6

1   A P P E A R A N C E S :

2   CLEARY, GOTTLIEB, STEEN & HAMILTON, LLP

3        Attorneys for Transform Holdco LLC & its affiliates

4        One Liberty Plaza

5        New York, New York 10006

6

7   BY:  LUKE A. BAREFOOT, ESQ.

8

9   BALLARD SPAHR, LLP

10        Attorneys for Unspecified

11        919 North Market Street, 11th Floor

12        Wilmington, Delaware 19801

13

14   BY:  LAUREL D. ROGLEN, ESQ.

15

16   THE SARACHEK LAW FIRM

17        Attorneys for Mien Ltd.

18        101 Park Avenue, 27th Floor

19        New York, New York 10178

20

21   BY:  JOSEPH SARACHEK, ESQ.

22

23

24

25

Page 7

```
1    PBGC

2         Attorneys for the Pension Benefit Guaranty Corporation

3         1200 K Street NW

4         Washington, D.C. 20005

5

6    BY:  MICHAEL BAIRD, ESQ.

7

8    CLARK HILL, PLLC

9         Attorneys for Milton Manufacturing, LLC

10        210 Carnegie Center, Suite 102

11        Princeton, New Jersey 08540

12

13   BY:  NOLA R. BENCZE, ESQ.

14

15   AKIN, GUMP, STRAUSS, HAUER & FELD, LLP

16        Attorneys for Unsecured Creditors' Committee

17        One Bryant Park

18        New York, New York 10036

19

20   BY:  SARA L. BRAUNER, ESQ.

21        ABID QURESHI, ESQ.

22

23

24

25
```

1   BUCHANAN, INGERSOLL & ROONEY, PC

2        Attorneys for Gokolas Exports Ltd

3        640 Fifth Avenue, 9th Floor

4        New York, New York 10019

5

6   BY:  JACQUELINE M. WEYAND, ESQ.

7

8   SEYFARTH SHAW, LLP

9        Attorneys for Wilmington Trust

10        620 Eighth Avenue

11        New York, New York 10018

12

13   BY:  EDWARD M. FOX, ESQ.

14

15   ROPES & GRAY, LLP

16        Attorneys for Apex Tools

17        1211 Avenue of the Americas

18        New York, New York 10036

19

20   BY:  GREGG M. GALARDI, ESQ.

21

22

23

24

25

Page 9

1    GELBER & SANTILLO

2         Attorneys for Unspecified

3         347 West 36th Street, Suite 805

4         New York, New York 10018

5

6    BY:  R. ZACHARY GELBER, ESQ.

7

8    MCKOOL SMITH, PC

9         Attorneys for Winners Industries Ltd

10        One Bryant Park, 47th Floor

11        New York, New York 10036

12

13   BY:  H. JEFFREY SCHWARTZ, ESQ.

14

15   HUGHES, HUBBARD & REED

16        Litigation Trustee for Sears Canada Inc. & Class Action

17        Representative

18        One Battery Park Plaza

19        New York, New York 10044

20

21   BY:  DUSTIN P. SMITH, ESQ.

22        NEIL J. OXFORD, ESQ.

23

24

25

Page 10

```
1    ALLEN & OVERY, LLP

2         Attorneys for Morneau Shepell Ltd

3         1221 Avenue of the Americas

4         New York, New York 10020

5

6    BY:  LAURA R. HALL, ESQ.

7         JOSEPH BADTKE-BERKOW, ESQ.

8

9    WEIL, GOTSHAL & MANGES, LLP

10        Attorneys for Debtors

11        767 Fifth Avenue

12        New York, New York 10153

13

14   BY:  JACQUELINE MARCUS, ESQ.

15        MATTHEW SKRZYNSKI, ESQ.

16        OLGA F. PESHKO, ESQ.

17        GARRETT FAIL, ESQ.

18

19   NORTON ROSE FULBRIGHT US, LLP

20        Attorneys for FTI, Canadian Monitor

21        1301 Avenue of the Americas

22        New York, New York 10019

23

24   BY:  ERIC DAUCHER, ESQ.

25        FRANCISCO VAZQUEZ, ESQ.
```

1    DAVIDOFF HUTCHER & CITRON, LLP

2         Attorneys for Pearl Global

3         605 Third Avenue

4         New York, New York 10158

5

6    BY:  DAVID H. WANDER, ESQ.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  I just want to make sure, is the

3    microphone on?  Is the green light on?

4            MS. MARCUS:  I think it -- the green light is

5    green.

6            THE COURT:  Yes.  Okay.  All right.

7            MS. MARCUS:  The first item on the agenda this

8    morning is an uncontested matter.  It's the application of

9    the fee examiner for the entry of an order authorizing the

10   retention and employment of Ballard Spahr.

11           A certificate of no objection was filed by Ballard

12   Spahr and I understand that the order was submitted to the

13   Court on Thursday.  We left it on the agenda, Your Honor,

14   because it hadn't been signed yet.  I know --

15           THE COURT:  Okay.

16           MS. MARCUS:  -- you had a busy weekend, so --

17           THE COURT:  I think I may have set it in

18   yesterday.  In any event I'll grant it with the admonition

19   or hope that most of the work here will be done by the fee

20   examiner himself and that the law firm will be assisting him

21   only on matters such as will be appropriate under the

22   circumstances.  I think Mr. Harner is quite an experienced

23   lawyer and can do most of this work himself.

24           MS. MARCUS:  Your Honor, Ms. Roglen is here on

25   behalf of Ballard Spahr.  I don't know if she --

1          THE COURT:  No.  I don't --

2          MS. MARCUS:  -- wants to add anything.

3          THE COURT:  I don't need anything else other --

4          MS. MARCUS:  Okay.

5          THE COURT:  -- than that.  So that order will get

6     entered shortly.

7          MS. MARCUS:  Okay.  Thank you, Your Honor.

8          Items 2 and 3 on the agenda, Your Honor, should be

9     taken together.  Item 3, going a little bit out of order, is

10    the debtors' motion for authorization and approval of a

11    settlement between the debtors and the Chubb Companies, and

12    the debtors' entry into certain transaction documents

13    related to that.

14          The Item Number 2 on the agenda is the most to

15    shorten time related to that motion.

16          THE COURT:  Right.

17          MS. MARCUS:  We haven't had any objections to

18    either the substantive motion or the request for the order

19    shortening time.

20          THE COURT:  Okay.  I will grant the motion to

21    shorten.  As most of you know my practice is not to grant

22    these ex parte unless I absolutely have to do, and to do

23    something in between which is -- if I think there's a

24    potential basis to shorten I'll schedule the hearing on the

25    motion to shorten with the same time as the underlying

Page 14

1   relief, giving people a chance to say this should be heard

2   on longer notice.

3           But that wasn't the case here.  So I'll grant that

4   motion.

5           I've reviewed the underlying motion as well.  I

6   guess the only issue is the dollar amount, everyone is

7   agreed that's the potential exposure?  There's no more risk

8   for the debtor in any event?

9           MS. MARCUS:  That's correct, Your Honor.  The --

10           THE COURT:  And --

11           MS. MARCUS:  The arrangements basically replace

12   the insurance that the debtors had through Sears and through

13   a Chubb affiliate --

14           THE COURT:  Right.

15           MS. MARCUS:  -- with a new direct policy.  So the

16   total amount of coverage is the same and there's no cost to

17   the debtors.  It just stayed the same.

18           THE COURT:  Right.  It's just a pass through

19   transaction.

20           MS. MARCUS:  That's correct.

21           THE COURT:  So I will grant that motion.  You can

22   email both of those orders to chambers.

23           MS. MARCUS:  Thank you, Your Honor.

24           Item 4 on the agenda, Your Honor, is the debtors'

25   motion which was originally framed as a motion for authority

Page 15

1    to assume unexpired leases of non-residential real property,

2    ECF Number 3376.  It pertains to three leases relating to

3    property located in Riverside, California.

4           These leases were not sold to transform pursuant

5    to the asset purchase agreement.  At the time we filed the

6    motion we were cognizant of the impending 365(d)(4) deadline

7    and we didn't have a proposed transaction in hand that was

8    signed and ready to be filed with the Court.

9           You might recall, Your Honor, that at the hearing

10   on May 8th I mentioned that we might be amending the relief

11   sought in that motion.

12          After we filed the motion we were able to enter

13   into an agreement for the assignment of the lease with

14   Brixton Capital.  When the landlord for the property, which

15   had objected to the assumption motion, learned of the

16   proposed transaction it indicated that it was prepared to

17   outbid Brixton.

18          Last Thursday, May 16th, we had what I'll call a

19   mini-auction for the property, and after two rounds of

20   bidding the landlord emerged as the successful bidder.

21          As a result on Friday we filed a notice of hearing

22   together with a supplement to the motion changing the relief

23   requested to approval of the assumption and assignment of

24   the leases to the landlord's designee, and we also filed a

25   revised proposed order that provides the requested relief.

1        I might add, Your Honor, that the professionals

2   for the creditors' committee were kept in the loop as this

3   process unfolded.  And I think they were supportive of the

4   debtors' approach.

5        THE COURT:  Okay.

6        MS. MARCUS:  As reflected in the supplement the

7   landlord has agreed to pay the debtors' $1,265,000 for the

8   leases and to waive any cure payments or adequate assurance

9   of future performance.

10        In addition to seeking the authorization to assume

11   and assign the leases, the debtors are seeking authorization

12   to pay Brixton Capital $30,000 in legal fees.  The debtors

13   had agreed to seek such authorization in order to persuade

14   Brixton to participate in the auction.

15        Brixton's interest in the property and its

16   participation in the auction clearly enhanced the value

17   provided to the debtors' estates.  Consequently, we believe

18   that payment of the fee is appropriate under Section 363 of

19   the Bankruptcy Code.

20        THE COURT:  Right.  And Brixton's bid was -- it

21   went up to a 1,130,000 and that enabled the auction to

22   happen.

23        MS. MARCUS:  That's correct, Your Honor.

24        THE COURT:  Okay.  Does anyone have anything to

25   say on this motion?

Page 17

1              All right.  I will grant the modified relief

2      requested by the debtors approving the -- in essence the

3      sale of the lease to the landlord on the terms outlined and

4      the payment of the $30,000 to the -- to Brixton --

5              MS. MARCUS:  Thank you, Your Honor.

6              THE COURT:  -- that facilitated the auction.

7              MS. MARCUS:  Thank you.

8              Item Number 5 on the agenda will actually be

9      handled by Mr. Barefoot on behalf of Cleary.

10             THE COURT:  Okay.

11             MR. BAREFOOT:  Good morning, Your Honor.  Luke

12     Barefoot from Cleary Gottlieb Steed & Hamilton for Transform

13     Holdco and its affiliates.

14             THE COURT:  Right.

15             MR. BAREFOOT:  Your Honor, on Agenda Item Number

16     5, this concerns Store Number 26741 in Amherst, New York.

17     Your Honor may remember at the conclusion of the assumption

18     and assignment hearing on May 8th there was a brief

19     discussion about this property.  We had filed a -- what was

20     then a pending stipulation to extend the time under Section

21     365(d)(4).  The designee, Transform's designee needed to

22     take assignment of the lease objected to that extension.  It

23     was entered into with the current landlord.

24             I'm pleased to report that that objection was

25     subsequently resolved by a revised stipulation that provided

Page 18

1    for shorten time for the landlord to file its cure cost

2    objections.  Those cure costs have now been agreed to

3    between the designee and Transform.  And we submitted a

4    revised form of order that's substantially in the form that

5    Your Honor entered on May 8th, but that is tweaked to

6    address the specific circumstances of this lease.

7            That proposed order was submitted on notice of

8    presentment at Docket Item 3939.  Like some of our other

9    notices of presentment this was noticed for hearing today,

10   not in compliance with the time requirements that would

11   otherwise apply under the case management order.

12           THE COURT:  All right.  Let me just make -- what

13   is left then with regard to this lease?  Any -- are there

14   any -- there -- what open disputes, if any, are remaining?

15           MR. BAREFOOT:  There are none, Your Honor.

16           THE COURT:  There are none.

17           MR. BAREFOOT:  This is an entirely consensual one.

18           THE COURT:  So the landlord's -- put it

19   differently, the stipulation I thought provided deadlines

20   for certain things to happen and the hearing to happen in

21   case there were objections.  But, in fact, there are no

22   objections?

23           MR. BAREFOOT:  There was an objection from the

24   landlord that asserted approximately $9,000 in cure costs.

25   Transform has agreed to pay those cure costs --

```
 1                    THE COURT:  Okay.

 2                    MR. BAREFOOT:  -- as part of the transaction with

 3       the designee.

 4                    THE COURT:  All right.  Very well.

 5                    I just want to make sure, does anyone want to be

 6       heard on this motion?

 7                    All right.  I'll grant the relief as modified

 8       including the shortened notice given the context here.  So

 9       you can submit that order to chambers.

10                    MR. BAREFOOT:  Thank you, Your Honor.

11                    THE COURT:  Okay.

12                    MR. BAREFOOT:  With Your Honor's permission I

13       would like to take something that was on the contested

14       portion of the calendar out of order.

15                    Item Number 17 on the contested portion, it

16       concerns Store Number 7471 in Placerville, California.  I'm

17       pleased to report that this is now an entirely consensual

18       assumption and assignment.

19                    Your Honor, there was a stipulation entered by the

20       Court on May 13th at Docket Item 3852 that provided for an

21       extension of time to assume or reject and to address the

22       landlord's objections on a number of grounds, including cure

23       and adequate assurance.

24                    That stipulation set the hearing on the assumption

25       and assignment of the Placerville lease for today.  I'm
```

Page 20

1    pleased to report that we have agreed on a form of order

2    that again substantively mirrors in all respects Your

3    Honor's order entered on May 13th with respect to the bulk

4    of the leases.

5              That was set down for hearing today, so it has not

6    been filed on notice of presentment, but it has been agreed

7    to by the landlord, the debtors and Transform.  And with

8    Your Honor's permission following the hearing we would

9    propose to submit it to chambers.

10             THE COURT:  Okay.  And that, again, is the matter

11   that appears on 17 on the agenda?

12             MR. BAREFOOT:  That's correct, Your Honor.

13             THE COURT:  The cure objection --

14             MR. BAREFOOT:  I would just like to --

15             THE COURT:  -- cure objection of Alan Robbins?

16             MR. BAREFOOT:  Correct, with respect to the --

17             THE COURT:  And so that's --

18             MR. BAREFOOT:  -- Placervile, California --

19             THE COURT:  All right.  So that's been resolved.

20             All right.  Very well.  So I'll look for that once

21   the notice period passes.

22             MR. BAREFOOT:  Thank you, Your Honor.

23             I would propose to turn the podium over to my

24   colleague, Zack Gelber, who will address Item Number 6.

25             THE COURT:  Okay.

Page 21

 1          MR. GELBER:  Good morning, Your Honor.  Zack

 2   Gelber on --

 3          THE COURT:  Good morning.

 4          MR. GELBER:  -- behalf of Transform Co from Gelber

 5   & Santillo as conflicts counsel.

 6          We are here on a notice of presentment of a

 7   stipulation between the debtor and Transform as buyer and

 8   Brookfield REIT.

 9          THE COURT:  Right.

10          MR. GELBER:  The parties have agreed consensually

11   and there have been no objections to two main points.  One

12   is to extend the hearing date from today, May 21st to May

13   29th with respect to any disputes.  And the second is that

14   Exhibit A to the May 13th order had erroneously designated

15   eight leases for assignment and assumption that the parties

16   all agree were designated erroneously.  We would like to

17   remove those consensually and set them down with the other

18   leases between Brookfield and the debtor for May 30 -- for

19   the May 31st deadline for the debtor to determine whether to

20   assume those leases.

21          THE COURT:  Okay.  Very well.

22          MR. GELBER:  I would note, Your Honor, this is

23   also on a less than the eight days required under the case

24   management order.

25          THE COURT:  Right, but essentially it's an

Page 22

```
 1   adjournment and --

 2           MR. GELBER:  Yes.

 3           THE COURT:  -- you can email that order to

 4   chambers.  I'll grant it.

 5           MR. GELBER:  Thank you, Your Honor.

 6           THE COURT:  Okay.

 7           MS. MARCUS:  That brings us, Your Honor, to the

 8   contested matters for today's hearing, and the first one is

 9   the motion of FTI Consulting Canada.

10           THE COURT:  Can I -- I understood that the next

11   one that's Number 8 on the agenda was actually adjourned,

12   motion of William Juiris; is that --

13           MS. MARCUS:  That's correct --

14           THE COURT:  -- right?

15           MS. MARCUS:  -- Your Honor.

16           THE COURT:  All right.  So --

17           MS. MARCUS:  That happened late yesterday.

18           THE COURT:  Okay.  So then we should -- I just

19   want to make sure there's no one on the phone or no one here

20   on that matter.

21           Then let's go back to the FTI Consulting lift stay

22   motion.

23           MR. DAUCHER:  Good morning, Your Honor.  Eric

24   Daucher from Norton Rose Fulbright on behalf of FTI

25   Consulting Canada Inc. --
```

Page 23

1              THE COURT:  Good morning.

2              MR. DAUCHER:  -- in its capacity as court-

3        appointed monitor for Sears Canada Inc. and a number of its

4        affiliates in proceedings under Canada's company's creditors

5        arrangement which is currently pending before the Ontario

6        Superior Court of Justice Commercial List.

7              With me in the courtroom today are U.S. Counsel

8        for the monitors co-movants.  We have Neil Oxford of Hughes,

9        Hubbard & Reed who is here on behalf of the litigation

10       trustee and also the class action representatives.  And we

11       have Laura Hall of Allen & Overy who is here on behalf of

12       the Pension Plan Administrator.

13             THE COURT:  Okay.

14             MR. DAUCHER:  We are before Your Honor today of

15       course on the Canadian plaintiffs', as we are calling

16       ourselves, motion for relief from the automatic stay.

17             That motion is supported by a declaration from Mr.

18       Steven Bissell (ph) of FTI Consulting Canada, again, in its

19       capacity as monitor of Sears Canada.  We would like to begin

20       by moving Mr. Bissell's declaration into evidence.  Mr.

21       Bissell is in the courtroom here today and is available for

22       cross-examination as necessary.

23             THE COURT:  Okay.  Does anyone have any objection

24       to that?

25             MS. MARCUS:  Your Honor, on behalf of the debtors

Page 24

1    Jacqueline Marcus again.  The debtors do take issue with

2    some of the statements in Mr. Bissell's declaration.  But

3    given that those statements are immaterial to the resolution

4    of the motion today we will forego our opportunity to cross-

5    examine.

6              THE COURT:  Okay.  I think you had pointed out

7    some of those already.  But in any event I'll -- I read the

8    declaration and I'll admit it.

9              MR. DAUCHER:  And we have extra hard copies

10   available if Your Honor would like a hard copy, otherwise we

11   can just proceed.

12             THE COURT:  That's okay.

13             MR. DAUCHER:  Okay.

14             And, Your Honor, as we set out in the motion the

15   Canadian plaintiffs are in the midst of a litigation before

16   the Canadian Court related to what we've termed the 2013

17   dividend.  And that was a transfer which was approved in

18   November 2013 of approximately $509 million Canadian dollars

19   from Sears Canada to its shareholders, including Sears

20   Holdings.

21             And although the Canadian plaintiffs each have

22   distinct claims related to that transfer, because the

23   Canadian Court has recognized the importance of efficiency

24   here, all of the claims are being jointly case managed

25   together.  That's currently set for a trial scheduled to

Page 25

1    kick off beginning on February 3rd of 2020.

2              Now the missing piece of that litigation, the one

3    thing that really prevents all of the Canadian plaintiffs'

4    claims from being definitively resolved in a single

5    proceeding in a single forum is the absence of Sears

6    Holdings as a defendant.

7              And the reason for that absence is the potential

8    application of the automatic stay which the Canadian

9    plaintiffs have been careful to respect.

10             THE COURT:  Can I interrupt you on that?

11             MR. DAUCHER:  Of course.

12             THE COURT:  It's clear to me that a fair amount

13   has already happened in these three actions.  In fact, one

14   of them has been pending for some -- well, for four years.

15   There's a discovery schedule with document production to be

16   complete by June 30th.  Depositions scheduled tentatively

17   for September 2019, and as you said a joint trial for

18   February.

19             That suggests to me perhaps that while taking

20   discovery from Sears Holdings may be important, the parties

21   -- it didn't jump out at the parties that having Sears

22   Holdings as a live defendant was important because it seems

23   like they proceeded without them for a while at least.

24             MR. DAUCHER:  On that, Your Honor, and I -- my

25   colleague will ultimately speak a little further on the

Page 26

1    current status of the Canadian litigation.  But I can say a

2    few things, which is Sears Holdings wasn't initially named

3    as a defendant in three of the actions --

4              THE COURT:  Right.

5              MR. DAUCHER:  -- specifically because of the

6    automatic stay.  In the fourth action, the one that has been

7    pending for a great deal of time, Sears Holdings was named

8    as a defendant and that was only voluntarily stayed as

9    against Sears Holdings.

10             In addition, Sears Holdings has been participating

11   in those proceedings, I won't say quite from the beginning,

12   but from the early stages.  They've been on the service

13   list.  Their lawyers have appeared.  In fact --

14             THE COURT:  But not since the start of the

15   bankruptcy -- of this Chapter 11 case?

16             MR. DAUCHER:  Oh, no.  Even since the start of

17   these Chapter 11 cases.

18             THE COURT:  Okay.

19             MR. DAUCHER:  In fact, if you look at Exhibit D to

20   our reply brief you'll see an order issued by Justice

21   McCughen (ph) holding in abeyance additional progress in the

22   litigation upon the motion of Sears Holdings pending

23   disposition of this motion.

24             So the parties were aware.  Sears Holdings was

25   certainly aware that it could ultimately end up in this

Page 27

1    litigation.  The Canadian Court has taken steps to ensure

2    this is written down in black and white that Sears Holdings

3    is not prejudiced by the current advancement of the

4    litigation and that it's just being held up until this

5    motion is resolved.

6            THE COURT:  Okay.

7            MR. DAUCHER:  Frankly, Your Honor, we initially

8    hoped that this motion wouldn't be necessary.  We thought

9    that what we were proposing, that Canadian plaintiffs'

10   claims can be resolved in one trial, one proceeding, one

11   court.  It made so much sense that we could do this on

12   consent.  Unfortunately, after a couple of weeks of

13   consideration -- and we did give the debtors and the

14   committee weeks to consider this -- they turned us down.

15           So let's talk a little bit about why we believe

16   this makes so much sense.

17           First, we think that one litigation is better than

18   two.  Why would we want to expend limited estate resources,

19   not just of one estate, we have insolvent estates on both

20   sides of the border pursuing two litigations when you could

21   have one?  Why would we want to take up court time of two

22   busy courts rather than one running through two proceedings?

23   And why would we want to create a risk of inconsistent

24   judgments on the very same questions of fact and the very

25   same questions of law by heading into two proceedings?  We

1    don't.

2            Second, we think it makes sense to defer to the

3    Court with the greater expertise in the particular claims at

4    issue in the Canadian litigation.  And we're already before

5    a specialized Canadian Court with enormous expertise in the

6    particular types of Canadian law causes of action that the

7    Canadian plaintiffs are pursuing.

8            Why would we put this Court in the position of

9    having to second guess the decisions of a Canadian Court?

10   Why would we put the parties in the position of potentially

11   having the decisions of the Canadian Court second guessed on

12   issues of Canadian law?  Again, we wouldn't.

13           Given that posture, we think that the SONOX

14   factors overwhelmingly favor relief from the automatic stay.

15   I know Your Honor is familiar with those factors and I'm not

16   going to rehash them.  We've set out in -- at length both in

17   our motion papers and our reply why we believe the factors

18   overwhelmingly favor granting relief from the stay for the

19   limited purposes that we've requested.

20           THE COURT:  Which is to liquidate the claim?

21           MR. DAUCHER:  Which is purely to liquidate the

22   claim.

23           THE COURT:  And as I understand it at this point

24   the claim is -- you've -- not all the plaintiffs, but a

25   claim has been filed in this case based on the facts or some

Page 29

1     of the facts that are asserted in the pending actions.  But

2     it's a general unsecured claim.  It's not for a specific

3     property, right?

4              MR. DAUCHER:  That's correct, Your Honor.

5              THE COURT:  Okay.

6              MR. DAUCHER:  And I will say I believe each of the

7     four plaintiffs have, in fact, submitted claims in these

8     cases.

9              The debtors and the committee apparently disagree

10    with our plan.  They don't seem to think that one litigation

11    is preferable for -- to two.  And yet when we read their

12    objection and then we -- when we read the committee's

13    joinder what we were really struck by is the number of our

14    core assertions that went entirely unanswered.

15             So, for example, with one narrow exception related

16    to a punitive damages claim the debtors and the committee

17    don't actually dispute that granting relief from the stay

18    would allow all of the Canadian plaintiffs' claims to be

19    resolved as against all parties.  That's factor one.

20             Now we concede that the debtors have raised a good

21    point on the punitive damages claim and it's for that reason

22    and to ensure that the Canadian Court can, in fact, resolve

23    the issue as against all of the parties fully without

24    further action before this Court that the Canadian

25    plaintiffs are willing to waive their punitive and exemplary

Page 30

1    damages claims as against Sears Holdings.

2            So with that I think the debtors' concerns on that

3    front are fully resolved.

4            Next, there's no suggestion that lifting the

5    automatic stay will delay distribution in these cases.  To

6    the contrary, waiting to resolve the Canadian plaintiffs'

7    claims until after the adversary proceeding is resolved,

8    that's a recipe for delaying creditor --

9            THE COURT:  Well --

10           MR. DAUCHER:  -- distributions

11           THE COURT:  -- when you say the adversary

12   proceeding you mean the ones that started here?

13           MR. DAUCHER:  Correct.  The adversary proceeding

14   as the debtors have defined in their objection.

15           THE COURT:  Okay.

16           MR. DAUCHER:  And that -- waiting until that is

17   resolved seems to be what they're driving at as they say

18   repeatedly, well, we need to determine what creditor

19   recoveries are before we can move forward (indiscernible).

20   Then we've got a very long sequence of events and it's going

21   to be an awfully long time before our claims are liquidated.

22   All the while we have a Canadian insolvency estate that has

23   completed virtually every task.  Resolving this asset is one

24   of the few remaining tasks that needs to be done in Canada

25   and it's just not right to hold that open for potentially

Page 31

1    years on end when the issue could be resolved in a timely

2    manner.

3              THE COURT:  Can I -- I just want to make sure, the

4    claims against Sears Holdings is -- I'm going to use

5    shorthand.  It's essentially a fraudulent transfer claim,

6    right?  I mean, that's not the term under Canadian law, but

7    it's essentially a fraudulent transfer claim?

8              MR. DAUCHER:  The monitor's claim I would say is

9    most similar to what we would call a constructive fraudulent

10   transfer claim.  That's --

11             THE COURT:  Right.

12             MR. DAUCHER:  That's correct.  There are

13   differences between Canadian law and U.S. law on that front

14   obviously.  But the monitor's claim at least is most like a

15   constructive fraudulent transfer claim.

16             The pension party's claims are substantially

17   different.  There you're talking about complex and evolving

18   breach of fiduciary duty claims.  There is a relatively

19   recent case from the Canadian Supreme Court that apparently

20   really started the wheels turning in this area of Canadian

21   law.  So I won't venture to say what that's most similar to,

22   but it's substantially different from a fraudulent transfer

23   claim.

24             And the litigation trustee and the class action

25   representative have different claims, too.

1              THE COURT:  So Holdings was a substantial

2     shareholder --

3              MR. DAUCHER:  That's correct.

4              THE COURT:  -- and received a substantial

5     dividend.

6              MR. DAUCHER:  That is correct.

7              THE COURT:  It's a fiduciary to whom or is that

8     what's evolving in Canada?

9              MS. HALL:  If I could address that?

10             MR. DAUCHER:  I'll cede the podium momentarily to

11    my colleague, Laura Hall.

12             MS. HALL:  Hi, Your Honor.  I'm Laura Hall for the

13    pension administrator.

14             THE COURT:  Right.

15             MS. HALL:  The theory there is Sears Canada itself

16    was administering its own pension plan.  And in connection

17    with issuing the distribute -- the dividend at issue it's

18    alleged that the shareholders of Sears Canada induced and

19    aided and abetted its breach of its fiduciary duties to the

20    plan.

21             THE COURT:  Who -- when you say its, who do you

22    mean?

23             MS. HALL:  So Sears --

24             THE COURT:  Sears --

25             MS. HALL:  -- Canada had fiduciary duties as

1      administrators --

2              THE COURT:  Right.

3              MS. HALL:  -- of its own plan.  The directors of

4      Sears Canada and its shareholders who are in -- you know,

5      the ESL parties and the shareholder being Sears Hold Co. are

6      alleged to have induced Sears Canada --

7              THE COURT:  So it's like an aiding and --

8              MS. HALL:  -- to give the --

9              THE COURT:  It's an aiding and abetting --

10             MS. HALL:  Exactly.

11             THE COURT:  -- of breach of fiduciary duty.

12             MS. HALL:  Yeah.

13             THE COURT:  Okay.  And this is an evolving

14     concept under Canadian law?

15             MR. DAUCHER:  That's correct, Your Honor.

16             THE COURT:  Okay.

17             MR. DAUCHER:  So the delay in distributions,

18     that's, I think, factor two in our favor.

19             There's also no dispute that the Canadian

20     plaintiffs' claims are largely focused on the conduct of

21     third parties, although we apparently have a quibble around

22     how broad or narrow Factor 6 is.  But we think that's Factor

23     6 in our favor.

24             The debtors and the committee acknowledge that the

25     Canadian litigation will not result in a subordinated claim

Page 34

1    and will not result in avoidable judicial lien.  That's

2    Factors 8 and 9 in our favor.

3              And perhaps most importantly the debtors admit

4    that granting relief from the stay would avoid needless and

5    duplicative litigation.  That's Factors 7 and 10.

6              Their only complaint on that front seems to be

7    that granting relief from the stay will not also resolve

8    their own adversary proceeding.  But the debtors admit that

9    adversary proceeding arises from --

10             THE COURT:  I --

11             MR. DAUCHER:  -- different facts.

12             THE COURT:  I actually don't think that's their

13   main issue.  I think their -- well, Ms. Marcus can tell me,

14   but I think their main issue is they think that the Sears

15   Holdings part of this litigation is not particularly

16   important in the Canadian context, but would cost a lot of

17   money at this point that may not be well spent by anybody on

18   either side given the uncertainty about the level of

19   distributions.

20             It's not really -- I don't see -- maybe I'm

21   missing it.  I don't see a tie in whereby issues in the

22   adversary proceeding in front of me will be determined in

23   the Canadian litigation.  So I don't think that's their

24   issue.  I think it's just a --

25             MR. DAUCHER:  But they actual --

1           THE COURT:  -- a money issue.

2           MR. DAUCHER:  But they actually -- I agree that

3    they are separately raising a money issue.  But they

4    actually make the point repeatedly in their brief that, and

5    we're looking at paragraphs 27 and 70 in their brief where

6    they acknowledge that granting relief from the stay will

7    eliminate duplicative litigation for the Canadian

8    plaintiffs, but will not resolve it, will not eliminate

9    duplicative litigation for the debtors.  And they

10   specifically cite the existence of the adversary proceeding.

11          So that may not be convincing.  I agree it's not

12   convincing.  But it's what they put down on -- in their

13   papers.

14          THE COURT:  Okay.

15          MR. DAUCHER:  And I agree as well when you say

16   that it doesn't seem that resolving issues in Canada will

17   resolve issues in the adversary proceeding or vice versa.

18   That's right.  The debtors admit that the adversary

19   proceeding arises from different facts than does the

20   Canadian litigation.  We couldn't agree more.  They're

21   separate.

22          But we think those unanswered points alone are

23   sufficient to establish at least a prima facie case for

24   relief from the automatic stay.  But I think it's worth

25   looking in detail at what the debtors and the committee to

1     some extent have raised in opposition.

2              First they suggest that the motion should be

3     denied because granting the Canadian plaintiffs relief from

4     the stay risks affording us some sort of improper

5     distributional advancement.  That's just not correct.  As

6     Your Honor observed at the outset, what we've done is

7     request relief from the stay, to add Sears Holdings as a

8     defendant, and to liquidate our claims.  Any claim that we

9     ultimately obtain against Sears Holdings is going to have to

10    ultimately be recovered through these Chapter 11 cases.

11             And there are any number of decisions from courts

12    in this district, from courts elsewhere in the Second

13    Circuit that make the point that prejudice to any other

14    creditors is managed or eliminated by limiting a request for

15    relief from the stay purely to liquidating that --

16    liquidating the claim in another forum.

17             THE COURT:  I think that overstates it, but that's

18    fine.

19             MR. DAUCHER:  I'm looking specifically at --

20             THE COURT:  No.  But you wouldn't spend $100 to

21    liquidate a claim that's only going to get five.  So it

22    depends.

23             MR. DAUCHER:  It does, Your Honor.  And I think

24    the math there is instructive.  We have $500 million

25    Canadian dollars on the table in these disputes, slightly

Page 37

1   more than that.  Even at the two and a half percent

2   recoveries that the debtors are currently projecting, and

3   the debtors are projecting recoveries for unsecured

4   creditors, but even at that two and a half percent recovery

5   level, that's twelve and a half million dollars Canadian of

6   potential recoveries on these claims.

7          The entire litigation budget in Canada for not

8   just Sears Holdings, but the entire litigation as against

9   all the parties is publicly disclosed at 12 million Canadian

10  which includes incidentally the buffer for adverse costs.

11  So this piece of the claim alone, even if recoveries really

12  are as low as two and a half percent, stands to entirely

13  cover the cost of the entire litigation in Canada, not just

14  against Sears Holdings.

15         So if it's a cost benefit analysis this Court's

16  performing, we're clearly on the right side of that

17  analysis.

18         I've already discussed a little bit the debtors'

19  point or the debtors' suggestion that we need to somehow

20  eliminate all potential other litigation, whether we need to

21  solve the adversary proceeding for them by granting it

22  through relief from the stay.  Obviously we don't think

23  that's right.  But it's worth looking at just how very

24  different these transactions are, these litigations are,

25  excuse me.

Page 38

1           The Canadian litigation and the adversary

2     proceeding concern different events, arise under different

3     law, and have the debtors in opposite postures.  In the

4     adversary proceeding the debtors are attacking any number of

5     transactions.  They're not attacking the 2013 dividend.

6     That's why the debtors admit that "the claims in the

7     adversary proceeding and the dividend litigation" -- meaning

8     the Canadian litigation -- "arise from different events."

9     That's the debtors' objection at paragraph 29.

10           And again at paragraph 70, "The transactions at

11    issue in the dividend litigation and the adversary

12    proceeding differ."

13           The adversary proceeding also asserts causes of

14    action under the Bankruptcy Code, Delaware law, New York

15    law, Illinois law, but not Canadian.  The Canadian

16    litigation, by contrast, involves claims exclusively under

17    Canadian law.  So Canadian law isn't something this Court

18    would have to determine if relief from the stay is granted.

19           Then in the adversary proceeding, this is maybe

20    the most obvious point, the debtors are the plaintiffs.

21    They're asserting that various wrongdoing occurred to --

22    related to all of these different transactions and that

23    assets were stripped out of the U.S. debtors.

24           In the Canadian litigation, by contrast, Sears

25    Holdings would be a defendant who would presumably be

Page 39

1    arguing that no such wrongdoing occurred with respect to the

2    2013 dividend in which assets were taken from Sears Canada

3    and transferred to Sears Holdings.

4           And as I began with, it's simply not our burden to

5    solve every piece of litigation the debtors are involved in.

6    We need to reduce duplicative litigation and the debtors

7    have admitted in black and white at paragraph 70 of their

8    objection that granting relief from the stay would eliminate

9    at least some duplicative litigation.  So I think that's

10   another point in our favor.

11          Now, third, they've claimed that the Canadian

12   Court is not the specialized tribunal and I've got to say I

13   found this one surprising.  In support of that assertion

14   they pointed to the website of the Ontario Superior Court of

15   Justice as a whole, which indicates --

16          THE COURT:  No.  The issue is  not the nature of

17   the court.  It's the application of Canadian law.

18          MR. DAUCHER:  Correct.  Specific types of -- so

19   specific types of Canadian law claims and whether that

20   particular court is the best suited to handle it.  And

21   there, you know, we could walk through it at length.  We've

22   laid it out in our reply brief.  But I think what's most

23   telling is you have a decision from the Ontario Court of

24   Appeals which says "The commercial list is a specialized

25   court."  And that it's entitled to "deference even from

Page 40

1    Canadian Appellate Courts."  That's the Western Large case

2    that's attached as Exhibit A to our reply brief.

3           So the question is whether this litigation is

4    currently pending before a specialized tribunal with

5    expertise in these areas, complex questions of Canadian

6    commercial law, complex questions of Canadian insolvency

7    law.  The Canadian appellate courts themselves have said in

8    black and white, yes, the commercial list is that court, not

9    the Ontario Superior Court as a whole, but the commercial

10   list where this litigation is pending, unquestionably a

11   specialized court.

12          But we can go further than that, which is that the

13   debtors have acknowledged that the factor may weigh in our

14   favor if it doesn't just involve -- if the litigation

15   doesn't just involve garden variety causes of action under

16   Canadian law, but whether there's unsettled questions of

17   Canadian law.  And the monitor's publicly disclose, and this

18   was in its 27th report, it's also mentioned again in our

19   reply brief, that it's claim involves an important question

20   of Canadian law as to which there is very little precedent.

21   And that's whether a trans -- whether a dividend, such as

22   the 2013 dividend, can as a matter of law constitute a

23   transfer at an under value.

24          The pension administrator's claims as we discussed

25   a little bit earlier also involve awfully complex and

Page 41

1    rapidly evolving questions of Canadian law.

2            And given that these are both complex questions,

3    unsettled questions, frankly, important questions of

4    Canadian law it would just be improper for any U.S. Court to

5    get out ahead of the Canadian courts on the issues or to

6    second guess what the Canadian courts are doing.

7            So to be clear, the Canadian plaintiffs don't

8    dispute that in the right circumstances it's appropriate for

9    this Court to decide issues of Canadian law.  We know Your

10   Honor is capable of doing that.  It's just that this isn't

11   the right context.  We have a specialized Canadian court.

12   We have evolving and complex questions of Canadian law.  And

13   we have a litigation on these very legal issues and these

14   very facts that's already going forward.  The right thing to

15   do is to make sure that the court with the greatest

16   expertise in these particular issues and facts is the one

17   that manages the whole litigation.  That's unquestionably

18   the Canadian court.

19           The debtors have fourth argued that somehow

20   granting our motion would open the flood gates to additional

21   motions for relief from the stay.  That's a general

22   assertion.  They could and do make it in support of any

23   number of oppositions to motions for relief from the stay.

24   It's not particularized our facts at all.  It should be

25   given no weight.

Page 42

1          It also ignores the fact that to the extent

2     there's a risk of flood gates being opened, I would say

3     those flood gates are opened.  Last I checked they've

4     already filed three omnibus objections to motions for relief

5     from the stay.  People aren't shy about filing those

6     motions, and granting our motion isn't going to encourage

7     them any further.

8          But it also just ignores the Canadian plaintiffs

9     are situated differently and, frankly, the debtors know this

10    which is why they're filing individual objections to our

11    motion whereas we're not -- and rather than lumping us into

12    the omnibus objections.

13         The Canadian plaintiffs are not individual self

14    interested as they termed us creditors looking to obtain an

15    advantage.  We're fiduciaries or court officers representing

16    very broad constituencies involved in the proceedings of

17    Sears Canada.  This Court, courts in this district, have

18    regularly recognized that Canadian monitors act with

19    fiduciary duties to all stakeholders.

20         We're here in furtherance of those duties, trying

21    to make sure that the Canadian plaintiffs' claims are

22    litigated in as efficient a manner as possible.  And we come

23    with orders from the Canadian court respectfully requesting

24    that this Court extend assistance to the monitor, to the

25    litigation trustee, in execution of those duties.

1          So it's just simply not the case that there's this

2     potential avalanche I think was their term of similarly

3     situated parties waiting to file motions.  The Canadian

4     plaintiffs stand apart of it.

5          And, anyway, the debtors in this court are more

6     than capable of dealing with motions from non-similarly

7     situated parties who don't deserve relief from the stay.

8          And, finally, and I know I've taken up a fair

9     amount of time, the debtors and the committee have suggested

10    that the motion is premature, that the Court should give

11    them more time to determine creditor recoveries before

12    allowing us to proceed.

13         They've already at least projected that there will

14    be meaningful creditor recoveries as we discussed.  And

15    counsel for the monitor's co-movant, the litigation trustee,

16    can, if the Court is so inclined, provide some additional

17    detail on the current status of the Canadian litigation and

18    why it's very important that we receive relief at this time.

19         I'll simply say this.  The Canadian litigation

20    needs to move forward, and if it doesn't move forward now,

21    we risk losing this one narrow opportunity to capture cost

22    efficiencies by having everything resolved in one single

23    proceeding.

24         Unless Your Honor has any further questions.

25         THE COURT:  Well, I would like to hear the current

Page 44

1    projection of the schedule of this litigation if I granted

2    the motion.

3            MR. DAUCHER:  I'll cede the podium to my colleague

4    --

5            THE COURT:  I mean, it's --

6            MR. DAUCHER:  -- Neil Oxford.

7            THE COURT:  -- already the third week of May and

8    document discovery is kind of ready to be done by the end of

9    June.  So I just want to get a sense of how realistic that

10   is.

11           MR. DAUCHER:  Thank you.

12           MR. OXFORD:  Good morning, Your Honor.  Neil

13   Oxford of Hughes, Hubbard & Reed for the litigation trustee,

14   Douglas Cunningham, and for the class representative as

15   well.

16           Picking up on your last question to Mr. Daucher,

17   the time table will be unaffected if Your Honor were to lift

18   the stay and Sears Holding was to be joined as a defendant

19   in the litigation.  As Mr. Daucher mentioned there was a

20   hearing in front of Mr. -- Justice McCughen in April where

21   Sears Holding appeared and requested not an adjournment of

22   the whole proceedings, but an adjournment simply of certain

23   motions to strike pending the outcome of the motion that

24   this Court is hearing today.

25           Out of respect for judicial economy and principles

1    of comity Justice McCughen granted that motion.  That did

2    not, I think, Mr. Daucher mentioned that the proceedings in

3    Canada are being held up.  I would say it differently.  I

4    think that's actually not correct.  Mr. -- Justice McCughen

5    made no adjustments to the overall timetable.  That overall

6    timetable remains in place.  As Your Honor has suggested

7    there's going to be discovery very shortly and the various

8    interim steps between now and trial --

9             THE COURT:  Have the parties taken discovery of

10   anyone else as -- to meet the June 30th deadline?

11            MR. OXFORD:  I don't believe so.

12            THE COURT:  Okay.  All right.

13            MR. OXFORD:  I don't believe so.  But just on that

14   point, Your Honor, as I understand it Justice McCughen at

15   that hearing has stated that if the timetable were to slip

16   for any reason, and we all agree it's a fairly aggressive

17   timetable, it would slip only by a matter of weeks.  So

18   we're still looking at a trial in the spring of 2020.

19            THE COURT:  Okay.  And why -- there's two months

20   in between close of document discovery and deposition.  Is

21   that customary or is that just because it's summertime or --

22       (Laughter)

23            MR. OXFORD:  Having (indiscernible) in Canada I

24   don't remember getting a summer off, Your Honor.

25            THE COURT:  Okay.

Page 46

1          MR. OXFORD:  The discovery works a little

2     differently than it does down here, so there's not -- there

3     are depositions as I understand it or examinations of a --

4     of representative witnesses and then there's a slightly

5     complicated and to me unfamiliar process of sorting out the

6     objections to that testimony and filling in blanks in that

7     testimony.

8          So I think that may be why there's that gap.

9          The other point I did just want to mention is that

10    Canadian counsel for the U.S. debtors when they appeared

11    before Justice McCughen repeatedly assured the Court that if

12    leave was granted to lift the stay and to join Holdings as

13    we urge the Court to do, they would try hard not to blow up

14    the schedule and would work to fit in within existing

15    timetables.

16         So as I understand it we are looking very fairly,

17    very squarely at a spring trial in Canada against the

18    (indiscernible) existing defendants.  And in our submission

19    it makes much more sense to do that against defendant number

20    15 as well.

21         THE COURT:  Okay.

22         MR. OXFORD:  Just to pick up on one other question

23    that the Court asked Mr. Daucher, which is why Holdings was

24    not joined kind of ab initio and whether there should be any

25    negative inferences from that, I think the Court was

Page 47

1   wondering whether that was indicative of their relative

2   importance, I would submit not.

3          The short answer to your -- Your Honor's question

4   is that at the time these claims were approved by the

5   Canadian Court which was late December of 2018 there was

6   still an ongoing sale process.  The bankruptcy in the United

7   States was still in a, really in its infancy.  And we

8   thought it was more appropriate to wait until the sale had

9   been confirmed and a plan was in place for -- to appear

10  before Your Honor and to request relief from the stay.

11         So it was really out of respect for the ongoing

12  Chapter 11 process.  And it's also really just a matter of

13  months.  We're talking less than three months between when

14  the Canadian claims were allowed to go forward against the

15  other 14 defendants and when we first started discussions

16  with the U.S. debtors and the UCC to add the 15 defendants.

17         So in my submission no negative inference can or

18  should be made.

19         THE COURT:  Okay.

20         MR. OXFORD:  Okay.  So I think I've probably

21  covered a lot of what I was intending to say already, so

22  I'll be as brief as I can.  I just have three points.

23         The first one is that despite their efforts to

24  suggest otherwise, the U.S. debtors are by no means a

25  stranger to the Canadian litigation.  They have been

Page 48

1    monitoring it since the get go.

2            In December 3, 2018 there was a hearing in front

3    of Justice Haney concerning the appointment of the

4    litigation trustee and permission for the monitor to proceed

5    with the transfer at undervalue claims.  And we were in

6    attendance at that hearing.

7            After the litigation was approved, as I think Mr.

8    Daucher mentioned, there was a request by Holdings canceling

9    Canada to be added to the service list, which happened.  As

10   I mentioned in mid-March we started discussions with the UCC

11   and with the debtors in the hope that they would agree to

12   this motion.

13           So in short answer what's been going on in Canada

14   is a process that has not been foreign by any means to the

15   U.S. debtors.  They've been very aware of what's been going

16   on really for the last six months.

17           THE COURT:  Okay.

18           MR. OXFORD:  That leads to my second point which

19   is there is no reason to delay a decision on the stay.  The

20   U.S. debtors and the UCC have had plenty of time to make up

21   their mind.  They've had six months, in fact.  They don't

22   need any more time.  They know exactly what those claims are

23   and they can take their position on that.

24           I would suggest, Your Honor, that that is of

25   particular importance here where a delay is essentially a

Page 49

1   denial of the motion.  We have a limited opportunity.  The

2   bankruptcy universe has aligned such that it is an

3   appropriate time to join Holdings to the existing litigation

4   without suffering any meaningful delay up there, if any

5   delay at all.

6           But that window is closing.  The train is leaving

7   the station.  The horse is about the leave the barn.  Pick

8   your metaphor, whatever you want.  It's a one-time

9   opportunity that the Court has here.

10          That brings me to my third point, that this motion

11  is a real opportunity for this Court to save a very

12  significant amount of judicial resources and of the parties'

13  resources.  We're off to the races in Canada.  It's set down

14  for an eight week trial, complicated issues, four claims,

15  many witnesses, probably a dozen or more witnesses.  We're

16  going to be doing that in Canada in February, certainly in

17  the spring of 2020.  And then if the stay isn't lifted,

18  we're going to come back down to White Plains and we're

19  going to do it all again.

20          THE COURT:  You won't have an eight week trial,

21  that's for sure.

22      (Laughter)

23          MR. OXFORD:  Something of a relief to me, Your

24  Honor.

25          So in my respectful submission it's hard to think

Page 50

1    of a more clear cut waste of the parties' resources.

2            The U.S. debtors admit that it's a waste of the

3    Canadian parties' resources and they say, in Canada that

4    doesn't matter.  Respectfully, we disagree.  As Mr. Daucher

5    says, it matters a great deal.  The parties who are before

6    you represent the creditors or the Sears Canada bankruptcy

7    estate.  These are the people who lost their pensions.

8    These are the people who lost their livelihood.  So I do not

9    think we should be so cavalier about these resources.

10           It's not, however, just our resources.  I think

11   it's the resources of the U.S. debtors as well.  There's

12   some fuzzy math going on here.  I -- it's clear that the

13   U.S. debtors have been monitoring what's going on in Canada,

14   as is appropriate.  Absolutely they should.  They're -- on

15   their theory of the case they're going to have the same

16   trial again before Your Honor at some point in the future.

17   So they're monitoring it.

18           Then they're going to have to try it again.  Under

19   no circumstances, I would submit, does common sense allow

20   anyone to conclude that monitoring one trial and doing it

21   again is cheaper than just doing it once over.

22           THE COURT:  Well, there is a natural alternative

23   which is that they continue to monitor the trial.  They see

24   how it turns out vis-à-vis the other parties and then they

25   resolve it with you all, depending on how it turns out, not

1    in a trial, but as people usually do in a negotiation.

2              MR. OXFORD:  That is certainly one alternative.

3    But it's by no means guaranteed --

4              THE COURT:  No, it isn't.  That's true.

5              MR. OXFORD:  And I think we have the right to

6    press our point not only in Canada against the existing 14

7    defendants.  We have a right to press it against Holdings.

8    And if we can get a good settlement, you know, obviously

9    that would be something we would consider.  But --

10             THE COURT:  Well, they would resolve the claim in

11   the context of what already had happened in Canada.

12             MR. OXFORD:  They might resolve the claim.

13             THE COURT:  They might.  That's the issue.  They

14   wouldn't --

15             MR. OXFORD:  They might.

16             THE COURT:  -- be bound to.  And so there is a

17   risk that there would be further adjudication here.

18             MR. OXFORD:  Yeah.  There's a very significant

19   risk.  I mean, if they're participating in the Canadian

20   court proceedings, they don't have a voice.  They don't have

21   any objections to the evidence that comes in.  They might

22   totally disagree with it.  They might think that Your Honor

23   might make a different evidentiary ruling and that would

24   change the outcome of the case.  There's -- you know,

25   there's a lot of maybes and a lot of uncertainties.

Page 52

1            THE COURT:  The law would be clear, though.

2            MR. OXFORD:  The law may very well be clear.

3     Again, that's -- that assumes that Holdings doesn't take

4     issue with any of those rulings as they apply to them.

5     Again, they're not the before the Court --

6            THE COURT:  It's hard for me to imagine --

7            MR. OXFORD:  -- in Canada.

8            THE COURT:  -- that after a Canadian court had

9     ruled on these issues that I would disagree with it as a

10    matter of -- as an interpretation of the law.

11           MR. OXFORD:  It's a fair point, Your Honor.  The

12    law may be more clear after we've been to trial in Canada.

13           THE COURT:  How much of the eight weeks do you

14    think would actually involve Holdings?

15           MR. OXFORD:  I think Holdings would have to be

16    there --

17           THE COURT:  It's in the middle of the whole thing.

18           MR. OXFORD:  -- for the whole part of it that

19    their claim includes joint and several liability claims by

20    the litigation trustee.  So I think they have to be there

21    for the whole piece of the trial.

22           THE COURT:  It doesn't sound like it was a

23    controlling shareholder just reading the facts.  I mean, if

24    you're talking about a fiduciary, maybe a different concept

25    in Canada, but there is a point where it held that the vast

1    majority of the stock, but there were subsequent --

2              MR. OXFORD:  Yeah.  As I --

3              THE COURT:  -- transactions --

4              MR. OXFORD:  -- understand they were the majority

5    shareholder, Your Honor.

6              THE COURT:  The whole time?

7              MR. OXFORD:  For the relevant period.

8              THE COURT:  During the dividend?

9              MR. OXFORD:  In 2013.  Yeah.

10             THE COURT:  Okay.  All right.  Okay.

11             All right.  Thank you.  I appreciate the --

12             MR. OXFORD:  Thank you.  Those are my submissions

13   unless the --

14             THE COURT:  Okay.

15             MR. OXFORD:  -- Court has questions.  Thank you.

16             MS. MARCUS:  Good morning, Your Honor.  Again --

17             THE COURT:  Good morning.

18             MS. MARCUS:  -- Jacqueline Marcus on behalf of the

19   debtors.

20             Rather than belabor everything, all the arguments

21   that we made in our objection, Your Honor, which essentially

22   boil down to the fact that we don't believe the Canadian

23   plaintiffs have established that the SONOX factors justify

24   the relief requested.

25             I just want to respond to a couple of the

Page 54

1    statements made by Mr. Daucher and Mr. Oxford.

2            First, Your Honor, I -- you hit the nail right on

3    the head when you asked your first question which was,

4    couldn't the Canadian plaintiffs have sought to sue Sears

5    Holdings Corporation back in December when they filed their

6    Canadian actions.  And of course those actions would have

7    been barred by the automatic stay.  But if they thought that

8    Sears Holdings was a critical defendant at that point, they

9    could have filed a motion for relief from the stay back

10   then.

11           Second, Your Honor, the statements that Sears

12   Holdings has been participating in Canada is really very

13   much of an overstatement.  Of course we have Canadian

14   counsel that is monitoring, I'll call it more like watching

15   what's going on in Canada.  And, in fact, some of our early

16   discussions were should we do anything or should we just let

17   that proceeding take its path without any participation at

18   all.  Obviously, the more prudent course was to make sure

19   that nothing happening there would be prejudicing the

20   defendants.

21           Third, with respect to the specialized court, we

22   have cited cases which indicate that a court like the

23   Canadian court, I think it's called the Commercial List, is

24   not the kind of specialized court that the SONOX factors

25   elude to.  The SONOX factors relate more to courts like the

Page 55

1     Patent Court or the Tax Court.

2               In addition, the fact that a Canadian court has

3     issued a ruling that says that the Commercial List is a

4     specialized court shouldn't really bear any weight in this

5     court for application of the SONOX factors.

6               THE COURT:  But isn't the question that -- I mean,

7     I look at this as fundamentally a situation where unlike my

8     interpretation of applicable Delaware law, for example, I

9     would have to take expert testimony of Canadian law and I

10    think that's a major difference.

11              MS. MARCUS:  We don't disagree with that, Your

12    Honor.

13              THE COURT:  Okay.

14              MS. MARCUS:  But I think your point that you made

15    at the end of the colloquy about the fact that if the

16    Canadian litigation proceeds and then we're back before the

17    Court liquidating the claims we may know the answer on the

18    Canadian law was very well taken and very important to the

19    Court's consideration here.

20              And in addition, Your Honor, as you well know,

21    liquidation of claims against the debtor is one of the core

22    matters before a bankruptcy court and we think you are the

23    specialized court for determining what claims should be

24    allowed against the debtors.

25              With respect to --

1                THE COURT:  Well, how is this except maybe worse

2       for the debtors, different than a situation where the

3       recipient of an alleged avoidable transfer is a debtor in

4       say Florida and the transferor is a debtor say in New York?

5       I mean, it has to get liquidated somewhere.  They're both

6       bankruptcy estates.  The one difference here is that foreign

7       law would apply.

8                MS. MARCUS:  Right.  I mean, I don't think it's

9       very different, but I also don't think -- it shouldn't be

10      worse for the debtor than if that were the case of just

11      dueling U.S. bankruptcy cases.

12               THE COURT:  Well, all right.  But on the other

13      hand, both courts sort of have core jurisdiction over the

14      matter.

15               MS. MARCUS:  Uh-huh.

16               THE COURT:  And at that point I think you would

17      just look at the impact on the estate where the motion is

18      made.  And looking here I -- there's a statement in the

19      brief that the debtors submitted that if the dividend

20      litigation is stayed as against them, their obligation to

21      participate in discovery will be much more limited.

22               But, I mean, are we -- what is the magnitude we're

23      talking about here in terms of costs?  I don't really have a

24      sense of that, as to whether -- particularly, let me add one

25      more fact.

1        The trial here isn't slated to begin until next

2    February.  It's not going to be any earlier than next

3    February.

4        MS. MARCUS:  Uh-huh.

5        THE COURT:  By then it's clear to me that the

6    debtors will have a pretty good idea and/or a -- you know, a

7    liquidation trustee or a litigation trustee of their -- the

8    asset side of their estate and should be able to negotiate,

9    I would think.

10        MS. MARCUS:  Yes, Your Honor.  So let me start

11    with that one and then I want --

12        THE COURT:  And --

13        MS. MARCUS:  -- to go back --

14        THE COURT:  And a cost --

15        MS. MARCUS:  -- to the --

16        THE COURT:  -- of the trial seems to be the big

17    cost here, not the prep work.

18        MS. MARCUS:  Well, I think the cost of everything

19    leading up to February and, of course, because right now we

20    don't know what the exact recoveries of course are going to

21    be --

22        THE COURT:  Right.

23        MS. MARCUS:  -- hopefully we'll know that by

24    February.  But now is when we have to make the determination

25    as to allocation of resources in defending if you were to

1    grant relief --

2            THE COURT:  Right.

3            MS. MARCUS:  -- from the stay.

4            And so the point was made about, I think Mr.

5    Daucher gave the example of the $12 million, an estimated

6    potential recovery for the Canadian debtors of $12 million

7    and the cost -- Canadian maybe -- and the Canadian cost of

8    pursuing a litigation.

9            THE COURT:  Right.

10           MS. MARCUS:  But that's from the Canadian debtors

11    --

12           THE COURT:  No.  I --

13           MS. MARCUS:  -- point, not from --

14           THE COURT:  -- I understand.

15           MS. MARCUS:  -- our point.

16           THE COURT:  But I --

17           MS. MARCUS:  Right.

18           THE COURT:  It seems to me -- that's why I'm

19    asking the question.  It seems to me that if the debtors

20    would have to -- would -- I would think the debtors would --

21    I would lift the stay to have the debtors -- even if I

22    didn't lift the stay generally, I would lift the stay so

23    that discovery could be taken of the debtors as to the facts

24    on the transfer.

25           So at least between that and the point where

Page 59

```
 1    you're gearing up for a trial in December and January, the
 2    trial being in February, it wouldn't seem to me that there
 3    would be a huge amount of money incurred.
 4            I don't know, you tell me, I don't have any sense
 5    of that.
 6            MS. MARCUS:  I don't either, Your Honor.
 7            THE COURT:  Okay.
 8            MS. MARCUS:  Unfortunately, Canadian counsel isn't
 9    here.
10            THE COURT:  All right.
11            MS. MARCUS:  I did want to go back to when you
12    were talking about the dueling better, you know, which court
13    should hear a case.
14            THE COURT:  Right.
15            MS. MARCUS:  The Canadian plaintiffs have said on
16    numerous occasions that Sears Holdings Corporation is not
17    the principal target of the Canadian litigation, that the
18    principal claims are not against Sears Holdings, they've
19    said it multiple times.  And if that's the case when the
20    Court applies the factors and balances the harms, I think
21    it's incumbent upon the Court to think about a fact that
22    they've said that Sears Holdings is not critical to their
23    case and that's something that the Court should take into
24    account.
25            With respect to the Sonax factors, I did want to
```

Page 60

1    respond with respect to --

2              THE COURT:  That would argue that some time

3    between now and well before February 3rd both parties would

4    have incentive to settle then, right?  I would think.

5              MS. MARCUS:  We're always interested in settling.

6              THE COURT:  Okay.

7              MS. MARCUS:  With respect to factor one under the

8    Sonax factors complete resolution of the issues --

9              THE COURT:  Oh, can I interrupt you one more time?

10             MS. MARCUS:  Sure.

11             THE COURT:  If I don't lift the stay, there's not

12   that same incentive, right, because Sears Holdings is just

13   sort of holding out there.

14             MS. MARCUS:  That same incentive right now for us,

15   but certainly either at the conclusion of the Canadian

16   litigation or any time between now and then the debtors

17   would want to avoid the expenses and the lay of litigation

18   of the claims.

19             THE COURT:  Am I right, I should have asked you

20   this question.  Sears Holdings is not in our U.S. terms, a

21   necessary party, right?  You could have this litigation

22   without Sears Holdings?

23             MR. DAUCHER:  Your Honor, not -- Eric Daucher on

24   behalf of the monitor.  Not being an expert in Canadian law,

25   but I would say the litigation is going forward or has been

Page 61

1    going forward without our participation.

2             THE COURT:  Okay.  And no one's argued it as far

3    as I can see that it's a necessary party.

4             MR. DAUCHER:  I think that's right, Your Honor.

5             THE COURT:  Okay.

6             MS. MARCUS:  Okay.  That's a factor one.

7             THE COURT:  Right.

8             MS. MARCUS:  So make a concession, so.  We have

9    conceded in our papers and I think it would be foolish for

10   us not to concede that if relief from the stay were granted

11   complete resolution of the issues might be possible, but we

12   note that the Court would be considering, I'll call it, some

13   of the same nucleus of facts in connection with the

14   adversary proceeding.

15            But in that regard and with respect to the

16   importance of factor one, Judge Bernstein in Breitburn

17   Energy has made some interesting comments about factor one,

18   and if you wouldn't mind, Your Honor, I'd like quote 571

19   Bankr. Reporter 59 at page 69, where Judge Bernstein said,

20   "If joining a debtor as a defendant in a multi-defendant

21   case meant that judicial economy always mandated stay

22   relief, this factor would subsume the other --"

23            THE COURT:  Right.

24            MS. MARCUS:  "-- Sonax factors in many cases and

25   force a debtor to defend against unsecured claims possibly

Page 62

1       in multiple venues."

2                   THE COURT:  Clearly.

3                   MS. MARCUS:  The other statement that Judge

4       Bernstein made in Breitburn, and in that case he granted

5       relief from the stay with respect to certain claims and

6       rejected relief from the stay, with respect to the assertion

7       of certain tort claims.

8                   He noted as follows, "The movement remains free to

9       pursue its unstayed claims against the non-debtor

10      counterclaim defendants and file a proof of claim in this

11      court, while the debtors avoid the time and expense of

12      participating in a trial involving numerous parties, when

13      the ultimate distribution to the unsecured class may prove

14      that the value of the claim in bankruptcy dollars is not

15      worth the expense to either party of litigating it."  And

16      that's at 571 Bankr. Reporter at 69.

17                  THE COURT:  Right.

18                  MS. MARCUS:  The other statement that was made was

19      that resolution of the claim against Sears Holding is

20      holding up the completion of the Canadian insolvency

21      proceedings.  And given that the Canadian plaintiffs have

22      only sought relief to liquidate the claim, not to enforce

23      the claim, I can't imagine how that Canadian proceeding can

24      be wrapped up until we're really done with the Sears case

25      and know what the distribution on that claim would be.  So I

Page 63

1    don't think that that's a compelling factor.

2         Let's see if I had anything else.  I would also

3    note, Your Honor, that there were a couple of the Sonax

4    factors that weren't mentioned by the Canadian plaintiffs,

5    one of which is a claim covered by insurance.  And the

6    answer is that while the individual director defendants are

7    covered by the company's directors' and officers' insurance,

8    the actual entity, Sears Holdings Corporation is not, so the

9    debtors would have to pay the litigation expenses out of

10   pocket, as opposed to being able to look to insurance.

11        The other factor, factor 11 is whether parties are

12   ready for trial.  While trial may be eminent, being

13   scheduled for February, the parties are not ready for trial.

14   This is not a case or I should say with respect to three of

15   these actions, it's not a case where the debtor was a

16   defendant in litigation prior to the commencement of its

17   Chapter 11 case.  And the litigation had proceeded up to the

18   point of trial.  Many of the cases cited by the Canadian

19   plaintiffs have that fact pattern, that's not the case here.

20        And with that, Your Honor, we believe that the

21   stay relief should be denied --

22        THE COURT:  Okay.

23        MS. MARCUS:  -- and the Court should determine

24   that the Sonax factors don't justify the relief requested.

25        THE COURT:  I want to make sure I'm not missing

Page 64

1   something.  I -- there -- counsel for the Canadian

2   plaintiffs are right, there are references in the debtor's

3   objection to the adversary proceeding in front of me, that

4   asserts under U.S. law somewhat similar claims but related

5   to different transactions at different times.

6           I didn't get the sense that the debtors were

7   concerned about any preclusive effect on that litigation

8   that would stem from their participation in the Canadian

9   litigation, right.  That's not an issue?

10          MS. MARCUS:  That's not our argument, Your Honor.

11          THE COURT:  Okay.  So that adversary proceeding

12  would just go ahead and separately.

13          MS. MARCUS:  Yes, but the question is, you know,

14  could we spare the court getting embroiled in the nucleus of

15  facts related to whether and to what extent there was, you

16  know, a plan to divert assets from either Sears or from

17  Sears Canada for the benefit of certain shareholders.  That

18  general theme exists in both litigations.

19          THE COURT:  But it's really a pretty remote theme.

20  I mean, it's --

21          MS. MARCUS:  They are different claims, Your

22  Honor.

23          THE COURT:  Yeah.  I mean, it's not even, you

24  know, like --

25          MS. MARCUS:  The --

```
 1              THE COURT:  -- my sweet, Lord, and one fine day,
 2      it's not the same -- it's not even the same tune really.
 3              MS. MARCUS:  Yeah, the adversary proceeding
 4      concerns a Sears Canada transaction in 2012.
 5              THE COURT:  Right.
 6              MS. MARCUS:  And the Canadian litigation involves
 7      the 2013 dividend.
 8              THE COURT:  Okay.
 9              MS. MARCUS:  Sears Canada is involved but it's a
10      different transaction.
11              THE COURT:  Right.  Does the -- but the 2012, is
12      that a Canadian transaction, Canadian law transaction or
13      U.S. transaction?
14              MS. MARCUS:  I think it was another dividend or
15      recap.
16              MS. HALL:  I thought it was the U.S. law spin-off
17      of the Canadian shares to the shareholders of Sears
18      Holdings, but --
19              UNIDENTIFIED:  It is, so it's U.S. law.
20              MS. MARCUS:  Thank you, Your Honor.
21              MS. HALL:  I think Mr. Qureshi or Ms. Brauner.
22              THE COURT:  Okay.
23              MS. BRAUNER:  Good morning, Your Honor, Sara
24      Brauner, Akin Gump on behalf of the committee.
25              Just very briefly, we rise to echo the points that
```

Page 66

1    Ms. Marcus made and to highlight only a couple of points

2    that were made in the Canadian plaintiffs reply that we

3    believe are either misguided or disingenuous or belied by

4    the specific facts here.

5          The first is, and this was said a number of times

6    in the Canadian plaintiff's papers that the debtor's

7    disclosure statement, namely the most recent disclosure

8    statement that was filed conclusively demonstrates that

9    there are material recoveries for unsecured creditors.

10          Respectfully as Your Honor is aware, and as the

11    debtors are certainly aware, the committee does not

12    necessarily share that view, and has very real concerns that

13    we are looking at administrative insolvency, not just on a

14    deep consolidated basis, but also on a consolidated basis.

15          So the assumption that there must be recoveries

16    here and therefore there's no issue at this juncture of

17    determining claims unfortunately may be incorrect.  And

18    there are a number of contingencies worth hundreds of

19    millions of dollars, both in the debtor's estimate and in

20    ours that could push one way or the other the availability

21    of such recoveries.

22          Similarly the point that the committee is somehow

23    disingenuous by believing there are potentially recoveries

24    here as a result of the litigation is inaccurate.  Just

25    because there may be valuable causes of action that would be

Page 67

1    pursued by the trust, by the debtors, by some combination

2    does not in turn mean that there are recoveries for

3    unsecured creditors at each debtor entity or overall.

4            The next point, there's a lot of focus on --

5            THE COURT:  Can I -- Holdings is Holdings, it's

6    above everything.

7            MS. BRAUNER:  Holdings is Holdings, that's right.

8            THE COURT:  Okay.

9            MS. BRAUNER:  The second point that permeates a

10   lot of these pleadings is back and forth on judicial economy

11   and is it more convenient as the Canadian plaintiffs say to

12   have one trial instead of two.  And Ms. Marcus touched on

13   this, there is no circumstance under which there will be one

14   trial, uncertain of the underlying facts here.  The real

15   question is will Holdings have to defend in two

16   jurisdictions.

17           THE COURT:  That's what I don't -- that was the

18   question I asked Ms. Marcus.  I'm having a hard time seeing

19   that.  Why would there be --

20           MS. BRAUNER:  So it's --

21           THE COURT:  -- the same issues, why would there be

22   -- put it differently, why would there be -- why wouldn't

23   there -- why would that happen, I don't understand.  Is it

24   different transactions?

25           MS. BRAUNER:  Your Honor is correct and Canadian

Page 68

1    plaintiffs are correct that they are different causes of

2    action, primarily by way of the fact that we're dealing with

3    different laws.  The transactions certainly are not the same

4    transactions.  I think it does come down to, in some

5    respects, the theory of the cases.

6              You have a course of conduct of similar players,

7    you have as Ms. Marcus eluded to perhaps an argument of

8    asset stripping that pervaded a number of years and numerous

9    transactions.  And so while yes, there are certainly

10   distinct fact patterns and distinct transactions here, the

11   real question is, how convenient on balance or inconvenient

12   is it to resolve the Sears Holdings issues in connection

13   with a trial that necessarily regardless of what happens in

14   Canada will be proceeding in the U.S.

15             And the relative harm, balance, however you want

16   to frame it to Sears Holdings having the ability to litigate

17   the limited and probably removable from the remainder of the

18   Canadian action claims, in connection with similar

19   discoveries, similar facts before Your Honor or a U.S.

20   Court.

21             That's not to say the legal issues are the same

22   and we agree with Ms. Marcus that Your Honor is correct,

23   there will be a need for Canadian law declarations here of

24   some sort, to the extent this Court addresses Canadian law

25   issues.

1          But I think the point that Your Honor made about

2     perhaps keeping Sears Holdings out of the Canadian

3     litigation, allowing the litigation to proceed and

4     reassessing at a time when perhaps there is a lot more

5     clarity on number of issues that could be gating items here

6     perhaps makes some sense --

7          THE COURT:  Although the issue is we don't --

8          MS. BRAUNER:  -- and potential to dual litigation.

9          THE COURT:  The problem is we don't have any

10    assurance that that would happen.

11         MS. BRAUNER:  That's correct.  But I think --

12         THE COURT:  You know, just as a matter of trial

13    strategy I'm not sure you'd want to be on offense or defense

14    in the same trial.

15         MS. BRAUNER:  Do you want to be on offense and

16    defense in two different jurisdictions on the same issue?  I

17    mean it's --

18         THE COURT:  Maybe so.  Maybe so actually.

19         MS. BRAUNER:  I mean I think the question really

20    comes down to when you look at the parties in the United

21    States, you look at the debtors whose financial position is,

22    you know, challenging at best, and you look at

23    understandably a financial position of parties in Canada

24    that perhaps does not fare much better, you're going to have

25    two trials.

Page 70

1              The question is, in how many different places does

2    Holdings, and frankly, do Holdings creditors have to

3    litigate.  And that's something that I think might be a

4    little bit lost.  To the extent that there are actions

5    proceeding in the United States whether they're commenced by

6    the debtors or a liquidating trust or some other party in

7    interest, there's a real opportunity for unsecured creditors

8    to participate in things that will directly impact creditor

9    recoveries.

10             And as Your Honor is aware, the committee and

11   unsecured creditors have strong views about the course of

12   conduct and the governance that took place prior to the

13   petition date, and basically precluding that participation

14   by conducting this in Canada for costs and other --

15             THE COURT:  But again --

16             MS. BRAUNER:  -- efficiency reasons is tricky.

17             THE COURT:  -- you're on defense --

18             MS. BRAUNER:  You are.

19             THE COURT:  -- and it's different law and

20   different procedures.

21             MS. BRAUNER:  That's right.  But in order for the

22   creditors to participate separately from the debtors which

23   may be something that ultimately the creditors need to do,

24   it would be yet another set of counsel to get up to speed

25   and to participate in presumably not so much discovery but

Page 71

1    in preparation for trial and participation in trial.

2             So it's just on balance, to the extent there is an

3    easy way to resolve or at least a convenient way to resolve

4    some of these issues here, we just believe it should be a

5    consideration.

6             THE COURT:  Okay.

7             MS. BRAUNER:  Thank you, Your Honor.

8             THE COURT:  All right.  Thanks.

9             Okay.  Anything else?

10            MR. OXFORD:  Your Honor, if I may just address a

11   couple of few points for the record.  Neil Oxford, Hughes

12   Hubbard Reed for the litigation trustee.

13            Just picking up on Ms. Brauner's point, I confess

14   I'm a little confused about participation of the creditor's

15   committee in the Canadian litigation.  As I understand the

16   plan, the committee is going to dissolved in a couple of

17   months anyway, so I don't think --

18            THE COURT:  Well, a representative of creditors.

19   Just like the -- I mean, we don't have the monitor, but you

20   have a litigation trustee, for example.

21            MR. OXFORD:  Who may be able to --

22            THE COURT:  One of the plaintiffs is a litigation

23   trustee in Canada.

24            MR. OXFORD:  Perhaps in consultation with the

25   debtor, Your Honor, I take the Court's point.

Page 72

```
 1              Two quick points, we're happy to talk settlement

 2    any time, any day.  I think the universal rule applies in

 3    Canada just as it does here, nothing focuses parties' mind

 4    on settlement like a trial date.  So we would respectfully

 5    say yes to that, lifting the stay would be the best way to

 6    focus the mind to get involved in the litigation, and it

 7    also captures the proficiencies that we discussed earlier

 8    with Your Honor.

 9              If there's a partial lift of the stay just to

10    allow discovery, I'm -- then ultimately there is no

11    settlement, which we would all obviously hope there is, then

12    all of those efficiencies are lost, my horses left the barn

13    and is galloping around the field, and that opportunity is

14    for cost savings that has been lost.

15              THE COURT:  Okay.

16              MR. OXFORD:  And just one last thought.  If -- and

17    I'm not suggesting Your Honor should have any concerns about

18    the conduct of the case in Canada, Your Honor may consider

19    if it's appropriate to have a discussion with Justice

20    McKewen (ph) who is the case management judge up there.  I

21    raise it only for the Court's consideration.

22              THE COURT:  For litigation of this kind do you

23    know what professionals normally charge per hour in Canada?

24              UNIDENTIFIED:  We're consulting with one Canadian

25    lawyer in the court, Your Honor.
```

Page 73

1           MR. DAUCHER:  Your Honor, I'm informed that the

2      rate would typically at the higher end be between 750 and

3      1,000 Canadian per hour --

4           THE COURT:  Okay.

5           MR. DAUCHER:  -- so 70 percent of that and change

6      for U.S. purposes.

7           THE COURT:  Okay.  All right.  I have before me a

8      motion by the plaintiffs in four pending litigations that

9      are all being administered by one judge in the Canadian

10     commercial court in connection with the CCAA case of Sears

11     Canada for relief from the automatic stay, so that a debtor

12     in this case, Sears Holdings Corporation, can be joined as a

13     defendant in three of those pending litigations and that

14     litigation can proceed against it in the fourth which was a

15     prepetition litigation where Sears Holdings had already been

16     named as a defendant.

17          Normally the automatic stay remains in place in

18     Chapter 11 cases with respect to unsecured claims, which is

19     what these unliquidated claims are, as would be asserted

20     against Sears Holdings in Canada.

21          However, Section 362(d)(1) of the Bankruptcy Code

22     provides in part that upon request of a party in interest

23     and after notice of a hearing, the Court shall grant relief

24     from the stay quote for cause.  Cause is not defined in the

25     Code itself, but the 2nd Circuit has laid out various

Page 74

1    factors that a Court should consider when being asked to

2    lift the stay to permit an unsecured claim to be liquidated

3    in another forum.

4            See In Re Sonax Industries, Inc., 907 F2d 1280,

5    1286, 2nd Circuit 1990, "One, where the relief would result

6    in partial or complete issue resolution; two, lack of

7    connection with or interference with the bankruptcy case;

8    three, whether the other proceeding involves the debtor as a

9    fiduciary; four, whether a specialized tribunal with

10   necessary expertise has been established to hear the cause

11   of action; five, whether the debtor's insurer has assumed

12   full defense responsibility; six, where the action primarily

13   involves third parties; seven, whether litigation in another

14   forum would prejudice interest of other creditors; eight,

15   whether a judgment arising from the action is subject to

16   equitable subordination; nine, whether the movant's success

17   in the other proceeding would result in a judicial lien

18   avoidable by the debtor; ten, the interest of judicial

19   economy and expeditious and economical resolution of

20   litigation; eleven, whether parties are ready for trial in

21   the other proceeding; and twelve, the impact of the stay on

22   parties and the balance of the harms."

23           As with many multi-factor tests, one needn't apply

24   all of the factors, some of which will never -- will not be

25   present as is the case here.  And as a practical matter many

Page 75

1    of these factors all focus on the same set of issues, which

2    for purposes of this motion really come down to the impact

3    of lifting the stay on the debtor's estate and the conduct

4    of this Chapter 11 case and the effect of not lifting the

5    stay on the movants.

6         To my mind questions of judicial economy, partial

7    or complete resolution, and the like is a subset of those

8    types of issues because the administration of a bankruptcy

9    case is all about efficiency and resolving matters fairly,

10   but expeditiously and efficiently.

11        Having heard the parties and also reviewed their

12   lengthy and informative briefing, which includes also a

13   concession or agreement by the Canadian plaintiffs that they

14   will waive any claim for punitive or exemplary damages, thus

15   obviating the need for this Court to review those types of

16   damages, if in fact, awarded and to consider whether they

17   should be subordinated or not.

18        I conclude that the stay should be lifted to

19   permit the claim or claims to be liquidated in the Canadian

20   proceeding.  I say that primarily because I believe that

21   these claims although also asserted in this case in light of

22   the bar date established by the Court are primarily and in

23   fact I believe wholly Canadian law claims, and ultimately of

24   far greater importance to Canada than the U.S.

25        They involve issues of the corporate governance of

Page 76

1    Canadian companies and transfers that may or may not be

2    avoidable under Canadian law.  It appears clear to me and is

3    acknowledged by one of the plaintiffs that such claims at

4    this time at least are uncertain under Canadian law or that,

5    in other words, at least in some respects, the Canadian

6    court would be acting on a relatively blank slate in

7    deciding such issues.

8              Given that fact, I believe that I would

9    appropriately decline to adjudicate such a claim if there is

10   a parallel proceeding that also would not unduly disrupt or

11   impair the case before me.

12             See generally the discussion in In Re Picard, 917

13   F3d 85, 2nd Circuit 2019 at 103.  There, of course, the 2nd

14   Circuit determined that to the contrary the claims at issue

15   were in fact centered under U.S. law, but the Court's

16   thoughtful analysis of how U.S. courts should approach

17   issues that are fundamentally governed by and the primary

18   importance to a foreign country gives me guidance here.

19             I further conclude that lifting the stay would not

20   unduly affect the conduct in an adverse way of this Chapter

21   11 case.  The Canadian court has already laid out I think

22   more than a tentative schedule for the litigation which

23   contemplates the completion of document discovery at the end

24   of June, the completion of examinations, which are not

25   exactly like our depositions but close enough in September

1    of this year, and a trial in early February.

2           It's clear to me that the debtors would be at a

3    minimum monitoring that process.  Further, the debtors seem

4    to acknowledge in their objection that they also might

5    properly be subject to discovery in that process, even if

6    not named as a defendant.

7           Clearly, the costs of participating at that level

8    as opposed to a named defendant would be less for the

9    debtors, but I believe that one way or another, these claims

10   do need to be liquidated.  And the costs of liquidating such

11   claims if one went to trial would be at least as high I

12   believe here, if not higher.

13          It also appears to me that the opportunities to

14   reach a settlement of these claims, taking into account not

15   only the claims merits, but also the cost of litigation and

16   the ultimate likely cents on the dollar recovery of any

17   liquidated damages result are far from precluded, and in

18   fact, will be as likely if I lift the stay as if I do not.

19          It appears to me that most of the costs would take

20   place fairly soon before and during the trial which is

21   projected to be for several weeks.  At that point, discovery

22   will have been complete and the plaintiffs all but whom are

23   fiduciaries for a bankrupt estates and creditors would have

24   an incentive as would the debtor to negotiate at that point

25   to avoid additional costs.

1         It also does not appear to me that the conduct of

2    this litigation would have any preclusive effect on the

3    highly important to this case pending adversary proceedings

4    and any further adversary proceedings that are contemplated

5    by estate fiduciaries.

6         The result obviously I don't believe would be

7    entitled to any preclusive effect and even the application

8    of comity would be tenuous as to those other causes of

9    action since they appear to me to be governed by U.S. law

10   and involve totally different fact patterns.

11        I appreciate that at this particular time in these

12   cases the debtors are relatively cash poor.  And that is a

13   concern because lawyers always want to have assurance that

14   they will be paid.  On the other hand, again, it appears to

15   me that the early stages of the litigation here will not be

16   particularly costly to the debtors above the costs that they

17   would be incurring anyway if I did not lift the stay in

18   monitoring the litigation and/or and participating discovery

19   as a non-party to it.

20        Each one of these types of cases really involves a

21   detailed factual analysis as shown by my colleague Judge

22   Bernstein in not only the Breitburn case cited during oral

23   argument, 571 B.R. 59, Bankr. S.D.N.Y. 2018, but also In Re

24   Sun Edison, Inc., 557 B.R. 303, Bankr. S.D.N.Y. 2016.

25        In that case, for example, the debtors were highly

Page 79

1    focused on developing a plan, selling their assets, et

2    cetera and had a legitimate concern about opening the

3    floodgate for other litigation if a stay was lifted here.

4            In that case also, the litigant was seeking to

5    pursue litigation that was in many respects the crux of the

6    whole case, which clearly the bankruptcy court wanted to

7    keep a finger on.

8            In Breitburn, the issues really focused on

9    efficiency and the position of the various or the options on

10   how the various claims could be liquidated.  Here, I don't

11   believe that this ruling will open the floodgate, in fact, I

12   have not granted stay relief I believe in any of the other

13   instances where litigants have moved for relief from the

14   stay except where there's a clear light to insurance.  And I

15   frankly don't see any reason to deviate from that course at

16   this point.

17           However, given that this litigation is clearly

18   more important as a matter of Canadian law and while it is

19   not a case where discovery is completed, in fact, it really

20   hasn't started, it is fair to say that a trial will occur in

21   this matter I believe as soon as or faster than the trial

22   would occur in my case on these claims, and will not

23   interfere sufficiently with my case to prevent that from

24   happening or to sever Sears Holdings from the process.

25           So in light of all of that, I'll grant the motion

Page 80

1  as modified in the papers and lift the stay to let the

2  claims be liquidated.

3          So I'll ask counsel for the movants to submit the

4  order.  You don't need to formally settle the order, but you

5  should circulate it to counsel for the committee and the

6  debtors, so that they can make sure it's consistent with my

7  ruling.

8          MS. PESHKO:  Your Honor, for the record, Olga

9  Peshko, Weil Gotshal for the debtors.

10         THE COURT:  Good morning.

11         MS. PESHKO:  As stated earlier in the record, Your

12 Honor, the next item on the agenda is adjourned.

13         THE COURT:  Right.

14         MS. PESHKO:  That's the William Juiris motion for

15 relief from the stay.

16         So the next item we have is the motion of Liberty

17 Insurance Corporation for relief from the stay.  Its counsel

18 is appearing, I can see the floor.

19         THE COURT:  Okay.  Is anyone here on the phone for

20 Liberty Insurance?

21     (No response)

22         THE COURT:  All right.  Well, maybe they decided

23 not to speak given one of my remarks during the last hearing

24 with my ruling.  Let me just check to make sure they're not

25 on the call in list.  I don't believe they are and I think

Page 81

1    that's understandable because the motion is really couched

2    as a request to lift the stay so it'd go against insurance.

3              MS. PESHKO:  That's right.

4              THE COURT:  But there isn't any insurance.

5              MS. PESHKO:  No.

6              THE COURT:  As stated by the debtor's objection.

7    So I will deny the motion based on those facts.

8              MS. PESHKO:  Thank you, Your Honor, we'll submit

9    an order.

10             The next item is the motion of Rosa Melgar for

11   relief from the stay.

12             THE COURT:  Okay.  Is anyone here or on the phone

13   for Ms. Melgar?

14        (No response)

15             THE COURT:  All right.  I believe that's

16   understandable as well, this is the same type of motion.

17   The motion was made in the hopes that there would be

18   available insurance to cover this claim.  However, as stated

19   in the debtor's objection to the motion, there isn't.

20   That's clear from the attachment to the motion and in light

21   of that, and in light of the status of the litigation in

22   that, that the movant is requesting the stay be lifted to

23   let proceed, I'll deny the motion.

24             As noted in the two cases I cited in my ruling,

25   the Breitburn and Sun Edison case, it's the rare case where

1    the stay is lifted to permit litigation to proceed and the

2    facts just don't warrant it here.

3            MS. PESHKO:  Thank you, Your Honor, we'll submit

4    an order.

5            THE COURT:  Okay.

6            MS. PESHKO:  The next motion is a motion of

7    Winters Industry for allowance and payment of administrative

8    expense claims, Your Honor.

9            THE COURT:  Okay.

10           MR. FAIL:  Good morning, Your Honor, Garrett Fail,

11   Weil Gotshal & Manges for the record.

12           Before we turn to the next item in isolation, the

13   next and final six items on the agenda are all related, Your

14   Honor.

15           THE COURT:  Right.

16           MR. FAIL:  They're agenda items 11 through 16.

17   Your Honor will note that the debtors filed an omnibus

18   objection to all of the motions, that's at Docket No. 38B3.

19   There was a lot of paper already, we felt we would

20   consolidate the reply to synthesize the arguments that were

21   made and reduce the burden on the Court.

22           In the objection we summarized and responded to

23   the various requests.  There are essentially three points

24   that were made by various parties.  In general, the parties

25   sought the allowance of claims pursuant to 503(b)(1) of the

Page 83

1    Bankruptcy Code.  They sought in the alternative allowance

2    of claims for the same claims under Section 503(b)(9).

3    These are for prepetition claims, and then they sought

4    payment, one party in one part of the motion sought payment

5    for post-petition claims.

6              As the debtor set forth in their objections none

7    of the parties is entitled to a claim pursuant to Section

8    503(b)(1) under the 2nd Circuit definition of administrative

9    expense claims.

10             With respect to the 503(b)(9) requests, the

11   debtors made clear their position that claimants can't use

12   an inappropriate motion practice to cut short the debtors,

13   and all parties in interest time to reconcile and allow

14   claims or to avoid the automatic stay.

15             And third, with respect to one part of one

16   movant's motion we explained why a particular payment wasn't

17   made.

18             Your Honor, the UCC has joined with a qualified

19   joinder, the debtor's position agreeing importantly with

20   respect to the 503(b)(1) analysis and with respect to the

21   process for 503(b)(9) claims to be reconciled and allowed.

22             I assume that the Court has reviewed the pleadings

23   and is familiar with the case law.  As the 2nd Circuit has

24   instructed, priority should be narrowly construed because

25   any priority given to one creditor is done to the detriment

Page 84

1    of all other creditors.

2            I'll defer to the Court as to the most efficient

3    means to proceed this morning, but didn't want to have one

4    party go without introducing them altogether.  I'm also

5    happy to answer any questions the Court may have of the

6    debtors at this point.

7            THE COURT:  Okay.  I have two orders dealing with

8    claim procedures in this case.  There's an order dated

9    February 22, 2019, the bar date order which in addition to

10   setting a bar date for claims generally sets it for claims

11   under Section 503(b)(9) of the Code, and sets out a

12   procedure for then dealing with those types of claims.

13           I also have an order dated March 28, 2019 that

14   lays out claim objection procedures, claims settlement

15   procedures and claims hearing procedures.  It's clear to me

16   that the first order applies to 503(b)(9) claims and I don't

17   think anyone's disputing that.

18           Are the debtors asserting that to the extent a

19   claim is a 503(b)(1) claim, the latter order, the March 28th

20   order should govern?

21           MR. FAIL:  Your Honor, these parties -- instead of

22   speaking in the abstract, with respect to these parties'

23   motions I believe they filed proofs of claim for each of

24   them.

25           THE COURT:  Okay.

1          MR. FAIL:  They've asserted that they were

2     prepetition claims.  In those claims, they've asserted in

3     some instances probably 503(b)(9) priority, they're also

4     asking for 503(b)(1) priority for the same facts and

5     circumstances.

6          THE COURT:  Okay.

7          MR. FAIL:  We don't believe that they're 503(b)(1)

8     claims and we don't believe that creditors should add or

9     enhance a priority to get to the head of the line to then

10    reconcile a general unsecured.

11         THE COURT:  Well, maybe I wasn't clear in my

12    question.  It sounds like you want me to decide today, the

13    others -- the claimants clearly do, whether they have

14    asserted a 503(b)(1) claim, and not to channel them into the

15    claims objection and settlement procedures in the March 28th

16    order.

17         MR. FAIL:  Your Honor, that's the debtor's

18    request.  We think the law is clear on the --

19         THE COURT:  So you'd like to get the issue done

20    with?

21         MR. FAIL:  To prevent additional motions or

22    requests.

23         THE COURT:  Okay.

24         MR. FAIL:  If Your Honor wants to defer them all,

25    the debtor's position would be that's fine too.

1              THE COURT:  Well, it may not make a lot of sense

2    because there seems to be --

3              MR. FAIL:  Sought some certainty, we thought that

4    was an easier issue.

5              THE COURT:  The one point that I am hesitating

6    over is that outside of a common fact pattern, which is that

7    the transaction was entered into prepetition, I don't think

8    I should be deciding today anything else under 503(b)(1).

9    And there -- I mean, you may contend, for example, that a

10   claim didn't fall under 503(b)(1) for some other reason,

11   other than the fact that it was a prepetition transaction.

12   That's not really believed or dealt with in these claims I

13   don't think that are before me today.

14             MR. FAIL:  Right.  Your Honor, the debtor's

15   position is that the movant bears the burden to prove his

16   claim.  Each of the motions is pending requesting 503(b)(1),

17   we're simply saying those motions should be denied in part

18   with respect to that.

19             THE COURT:  In other words, just to be -- to get

20   down to the nitty gritty --

21             MR. FAIL:  Yeah.

22             THE COURT:  -- I don't think that what I should be

23   doing today is going through particular invoices and saying,

24   oh, yes, this is post-petition, oh, yes, this is

25   prepetition.

1          MR. FAIL:  We agree.

2          THE COURT:  That should be the claims procedures.

3          MR. FAIL:  We agree.

4          THE COURT:  What I should be going through today,

5    I gather both sides want me to do, is to deal with the legal

6    issue that the claimants have raised, which is that as long

7    as goods are received by the debtor post-petition,

8    notwithstanding when the transaction actually occurred or

9    the consideration was provided, they have a post-petition

10   claim.

11         MR. FAIL:  Your Honor used the word received.  The

12   word received is open to interpretation --

13         THE COURT:  It's not in the statute.

14         MR. FAIL:  That's our point, Your Honor.  And --

15         THE COURT:  It's not 503(b)(1).

16         MR. FAIL:  That's our point.

17         THE COURT:  But that's the only issue that I think

18   is before --

19         MR. FAIL:  So I would say the appearance --

20   they're saying --

21         THE COURT:  -- me today.

22         MR. FAIL:  I agree, Your Honor, and I think we

23   just heard -- I hope we've heard your answer on that.  The

24   appearance of goods in America doesn't determine 503(b)(1)

25   priority where we've taken title, ordered, and incurred an

Page 88

1    obligation prepetition.

2              And so the -- you know, a deviation from the clear

3    2nd Circuit Southern District precedent would add ten to a

4    hundred million dollars of additional claims that the

5    debtors can't afford in these cases.

6              THE COURT:  Okay.

7              MR. FAIL:  I'll cede the podium, Your Honor, but

8    I'm happy to answer any other questions.

9              THE COURT:  Okay.

10             MR. SCHWARTZ:  If I may, Your Honor, Jeffrey

11   Schwartz with Cole Smith on behalf of Winters Limited and to

12   be clear for the record, I've not asked you to look at an

13   invoice today.

14             THE COURT:  Okay.

15             MR. SCHWARTZ:  I had filed this motion on behalf

16   of my client in December.  I, at the debtor's request,

17   didn't press to have it heard because of the pending

18   matters.  And then a couple of months ago, the debtors told

19   me that they agreed with the amount of the claims to the

20   penny.

21             THE COURT:  I'm sorry?

22             MR. SCHWARTZ:  They agreed to the amount of the

23   claim to the penny, but they were applying as to the

24   administrative claim and obviously there are administrative

25   claims asserting and 503(b)(9) claims that we're asserting.

1     And I just filed the initial reply just to present to the

2     Court that fundamental question, is the Court applying

3     constructive receipt, I'm talking about 503(b)(1) not

4     503(b)(9) --

5               THE COURT:  Right, because 503(b)(9) is governed

6     by my February order.

7               MR. SCHWARTZ:  Right.  So I'm not putting that

8     before the Court now.

9               THE COURT:  Okay.

10              MR. SCHWARTZ:  The interpretation of 503(b)(1)

11    under applicable Supreme Court and 2nd Circuit law, does

12    require harmonization of two sections in the same section,

13    harmonization.

14              So you have under the 2005 Act, you have Congress

15    acting, Congress amended together in a separate subchapter

16    546(c) and added 503(b)(9).  (b)(9) then -- so Congress has

17    established a policy as to vendor claims.

18              Congress had determined and I'm cutting to the

19    chase here, Congress had determined that vendor claims when

20    they're at least interpreted by the 3rd Circuit the actual

21    receipt rule that vendor claims prepetition based agreements

22    when the goods are delivered actually received by the debtor

23    in 20 days preceding the petition date, those goods are

24    entitled to 503(b)(9) administrative priority.

25              So then what the debtors have posited to you, and

Page 90

1    I understand, this estate currently is essentially

2    administrative insolvent.  I understand that they don't have

3    the money to pay these claims, and we're not looking for

4    money today.  Winters is not asking you to order these

5    claims to be allowed and paid today.  I understand all of

6    that.  And I think most of my colleagues do.

7            THE COURT:  Most do, I think there are a couple of

8    requests for immediate payment.

9            MR. SCHWARTZ:  And I winced when I read that

10   because look at the disclosure statement, you'd know that

11   this is one of these --

12           THE COURT:  Right.

13           MR. SCHWARTZ:  -- novel situations where 139

14   million of 503(b)(9) money is to come from the buyer, as

15   well as 166 million of other payables' money as well as

16   there's 52 million of cash being withheld, cash inventory

17   being withheld by the buyer, and given the fact that the

18   estate has filed a claim for $2 billion accusing the buyer

19   controlling insiders of actual fraud, self-dealing, lack of

20   good faith, as appropriate fiduciary one can't really be

21   saying why that, that that's going to be resolved any time

22   soon, if past is prolong and we see in the disclosure

23   statement that's listed as an asset at face, and I don't

24   know, I haven't talked to any claims buyers, but it's hard

25   to imagine anyone would pay face for that.

1          So I get the distress --

2          THE COURT:  Okay.

3          MR. SCHWARTZ:  -- the administrative distress and

4    I think my colleagues do, but there's always hope, Your

5    Honor.

6          So I just want a couple -- for the record, I want

7    to make hyper abundantly clear that when the debtor says six

8    movants impermissible seek to leap ahead of thousands of

9    other creditors in both priority of payment and priority of

10   the loss of the prepetition claims that's false, it's just

11   untrue.

12         I'm just trying to get -- Your Honor referred to

13   fairness early.  Your Honor referred to clarity of law

14   earlier on today's docket.  And the point is, there are

15   plenty of administrative claimants who were they to have

16   this clarity, I mean, what would my client do if Your Honor

17   determines 503(b)(1) that it's still the constructive

18   receipt rule and then by implication under 503(b)(9) its

19   constructive receipt rule.

20         Your Honor said last month that, oh, three to five

21   years out, maybe there will be a couple of cents or three

22   cents, some nominal amount.  So are they going to pay legal

23   fees to get these claims, you know, allowed an amount.  I

24   already know what the amount is anyway.

25         The only reason any party, any of the foreign

Page 92

1    vendors is here is -- including -- I'm here on behalf of my

2    client is simple.  503(b)(9) as interpreted by the 3rd

3    Circuit is clear, there is an absolute obligation in

4    interpreting the law per the Supreme Court and the 2nd

5    Circuit.  And all these cases they've cited are pre-2005.

6              THE COURT:  No, they're not.  Listen, I'm going to

7    cut through this.

8              MR. SCHWARTZ:  Yeah.

9              THE COURT:  The 2nd Circuit -- I'm sorry, the 2nd

10   Circuit has not ruled on the proper interpretation of the

11   word received in Section 503(b)(9).

12             MR. SCHWARTZ:  Yes, Your Honor.

13             THE COURT:  And right now, as far as the 3rd

14   Circuit is concerned two judges ruled on way, they happen to

15   be trial judges, and the 3rd Circuit ruled the other.

16             But one thing is clear, they were interpreting a

17   word.  The word was received.  That's in the specific

18   provision, 503(b)(9), received.  And the 3rd Circuit's case,

19   World Import was all about what Congress meant when it used

20   that word, the word received in 503(b)(9).

21             MR. SCHWARTZ:  Yes, Your Honor.

22             THE COURT:  It assumed, that is the 3rd Circuit

23   assumed that it was incorporating UCC law as then known as

24   an implied meaning for the word received, whereas the trial

25   court said, well, since foreign vendors don't use the UCC,

Page 93

1    that maybe you should apply the convention on contracts.

2    And the inco (ph) terms governing it, which are incorporated

3    in it.  But it's all geared to interpreting a word in one

4    statutory section, 503(b)(9).  That word doesn't appear in

5    503(b)(1).  503(b)(1) as interpreted by the circuit and by

6    the district and by others after 2005, has a very different

7    formulation.

8              Which says, "after notice of a hearing, there

9    should be allowed administrative expenses including the

10   actual necessary costs and expenses of preserving the

11   estate."  And the 2nd Circuit has held that that includes

12   two things, actual and necessary and estate.  So you have to

13   have a transaction with the estate, with the debtor in

14   possession or the trustee.  It's a totally different

15   statutory framework.

16             Now so I think your argument just comes down to

17   well, there are illogical results because of how 503(b)(9)

18   is drafted and interpreted by the 3rd Circuit.  It's not the

19   first time Congress has done something like that, but they

20   certainly didn't rewrite 503(b)(9) notwithstanding that

21   there was extensive case law interpreting it just as I've

22   said including against very sympathetic parties, including

23   pension beneficiaries and retirees where notwithstanding

24   that the pension withdrawal claim occurs, arises post-

25   petition, their claims except for the work they did post-

Page 94

1      petition are prepetition claims.

2              It would be totally illogical for me to assume

3      that Congress somehow rewrote out of the Code all of that

4      case law and intended that provision to somehow now be

5      interpreted to include the word received in it, as

6      interpreted by the 3rd Circuit, it just doesn't make any

7      sense.

8              MR. SCHWARTZ:  May I respectfully submit to Your

9      Honor that when the goods are delivered post-petition that's

10     to a debtor in possession --

11             THE COURT:  But the transaction is prepetition.

12     When a --

13             MR. SCHWARTZ:  Performance is post-petition when

14     the goods are received by the debtor in possession.

15             THE COURT:  No, the transaction is a prepetition

16     transaction.  There are lots of times when things happen

17     post-petition.  Friendville, for example, McFarlands, but

18     the consideration was prepetition, there was a contract

19     prepetition.  There was a purchase order prepetition.  It

20     couldn't be clearer under the case law.

21             MR. SCHWARTZ:  I'm trying to put out the

22     consideration is provided post-petition to the debtors.

23             THE COURT:  If the goods had not been delivered,

24     the debtors would have had a prepetition lawsuit against the

25     client -- your client.

Page 95

1          MR. SCHWARTZ:  Right.

2          THE COURT:  That was the transaction, the

3     contract, the prepetition contract.  It was performing --

4     your client and all the other parties who have made this

5     argument were performing a prepetition agreement.  It wasn't

6     an agreement with the estate, it wasn't an agreement with

7     the debtor in possession.

8          MR. SCHWARTZ:  May I respectfully submit the

9     estate accepted the goods.

10         THE COURT:  But based on a prepetition contract.

11         MR. SCHWARTZ:  But they got the goods, they have

12    to receive the consideration.

13         THE COURT:  It doesn't matter.  It doesn't --

14         MR. SCHWARTZ:  So the estate said --

15         THE COURT:  Do you have any case that supports

16    this or don't, right, because you haven't cited any?

17         MR. SCHWARTZ:  Well, the 3rd Circuit decision --

18         THE COURT:  That's under 503(b)(9).

19         MR. SCHWARTZ:  Correct.

20         THE COURT:  Interpreting -- and it's crystal clear

21    that they're trying to deal with a specific word under

22    503(b)(9), not with policy, just with the matter of

23    statutory construction --

24         MR. SCHWARTZ:  Well --

25         THE COURT:  -- trying to figure out what the word

1    received means.

2          MR. SCHWARTZ:  The 3rd Circuit did say it was

3    dealing with policy that 2702, the UCC was incorporated in

4    546(c) and that in 2005 the Congress enacted an amendment to

5    546(c) and also enacted 503(b)(9) which did establish a

6    policy as to vendors.

7          THE COURT:  No, they don't say that.  In fact,

8    they do not say that, sir.  They say, in the context of

9    Section 503(b)(9) -- I'm sorry, the context of Section

10   503(b)(9) is clear, "It is an exception to the general

11   bankruptcy reclamation scheme established by Section 546(c),

12   given the interrelationship between these two provisions and

13   our holding that Congress meant for terms used in Section

14   546(c) to bear the definition used in the Uniform Commercial

15   Code at the time of (indiscernible) enactment.  It follows

16   that the UCC definitions also apply to the Section 503(b)(9)

17   exception."

18          And then they have a footnote that says, "We note

19   we did not in Mirren (ph) --" I'm sorry, "We note as we did

20   in Mirren that our reliance on the UCC in determining the

21   time of receipt does not mean that the definition of receipt

22   under the Bankruptcy Code is a matter of state law and might

23   change when individual state to alter its laws, rather

24   Congress intended to use the UCC definition at that time;

25   i.e., when it enacted the statute, physical possession, and

Page 97

1    it is not subject to change absent an amendment to the

2    Bankruptcy Code."

3            It's all about 503(b)(9), it's just trying to

4    figure out what Congress meant by using that word.  It

5    doesn't have anything to do with 503(b)(1).  It's all in the

6    context of 503(b)(9).  Nothing about vendors generally.

7            And again, I'll go back, I guess vendors are

8    important like every other creditor is important, but I

9    doubt Congress views anyone more important than pensioners

10   and retirees.  It's enacted special statutes in certain

11   circumstances where they benefit, nevertheless, under the

12   case law even though the liability is crystallized when the

13   plan is terminated, the claim is post-petition only for

14   their post-petition work, that portion of it.  The rest is

15   prepetition.

16           MR. SCHWARTZ:  Right.  Yes, Your Honor.

17           THE COURT:  They didn't change the law in other

18   words.  They didn't create a special vendor category other

19   than 503(b)(9).

20           MR. SCHWARTZ:  I don't mean to vex Your Honor --

21           THE COURT:  I'm not vexed, I just don't -- it

22   doesn't -- I don't see anything to this.  There's no special

23   vendor protection other than 503(b)(9) which is very

24   special, it created a whole new category of administrative

25   expenses, the only administrative expense that's

1    prepetition.

2              MR. SCHWARTZ:  There's a general statutory

3    construction subsection should be harmonized, basically what

4    you're sanctioning here is that if Sears or KMart or any one

5    of the debtors had decided as New Co would transform

6    whatever it's called now, they've sent out a letter to get

7    around 503(b)(9) for whatever Chapter 11 or whatever other

8    purpose they have, dealing with bills of lading so that they

9    establish an agent and so forth.

10             So the idea here is that if Sears had 19 days

11   before the petition date, said, okay, we're going to take

12   half of the common carrier's delivering goods, and we're

13   told, come back on October 16th that that would be then

14   those would just be general unsecured claims.

15             THE COURT:  Yeah.  I mean, that's -- Congress

16   drafted this exception, and it is an exception.  And there

17   are ways around it.  I doubt they really thought through all

18   the ways around it, in fact, I'm pretty sure they didn't.

19   And probably the people that were trying to get this in said

20   to themselves, we better get as good as we can get.

21             MR. SCHWARTZ:  For the record, when there's a

22   position that it's an anomalous result I would assume

23   plausible result, it could never be imputed to Congress,

24   just stating it for the record.

25             THE COURT:  Well, okay.  But I will respond that

Page 99

1    special purpose legislation often has this effect.  It does

2    create anomalous results, but it's special purpose

3    litigation, it itself is anomalous, it doesn't mean that the

4    whole rest of the structure of the Bankruptcy Code has to be

5    turned on its axis to accommodate it.  It's a special

6    purpose exception, it doesn't go beyond that.

7             MR. SCHWARTZ:  Thank you, Your Honor.

8             THE COURT:  Okay.  Thank you.

9             MR. GALARDI:  Your Honor, for the record, Greg

10   Galardi of Ropes and Gray on behalf of Apex.

11            I've heard Your Honor and I'm not going to try to

12   vex you.  What I'm really going to do is -- and I understand

13   that when Congress does special litigation it has anomalous

14   results, we did argue and we believe there is a 503(b)(1)

15   basis based on 2nd Circuit law.

16            And I want to point to Your Honor cases we did

17   cite, and a case that actually does support the proposition

18   from the 9th Circuit with respect to 503(b)(1).

19            First, Your Honor, if you go to Chattooga 296

20   B.R. Reporter at 656, though the Court didn't conclude that

21   there was a claim and instead had an evidentiary hearing, it

22   specifically took on Verizon and it says, the Court can

23   nevertheless find that ACC used the service in question that

24   it wanted them and it needed them and it did so post-

25   petition knowingly and willingly.

Page 100

1          You have Judge Bernstein's decision that's cited

2     in that case, Patient Education Media, that also looked to

3     whether the post-petition conduct induced the performance

4     post-petition.

5          THE COURT:  But Patient Education Media was the

6     sound stage case, where they just left the sound stage there

7     and they used it.

8          MR. GALARDI:  I understand, Your Honor.  But here

9     we have the following difference.  First, in the cases that

10    they were cited, Your Honor could look at the 9th Circuit

11    case, Coastal Trading case, 744 F2d 686 where the 9th

12    Circuit actually said that UCC acceptance that occurred

13    after the petition date constituted an event and a

14    transaction that could give rise to the 503(b)(1) claim.

15         So that -- you may not agree with that case --

16         THE COURT:  Well, the 2nd Circuit doesn't agree

17    with it, it's the --

18         MR. GALARDI:  The 2nd Circuit hasn't ruled on

19    exactly that point, Your Honor.

20         THE COURT:  But it's the -- if you have a

21    prepetition transaction it's not with the estate.

22         MR. GALARDI:  Your Honor, what you said is a

23    prepetition transaction and I hate to say this, but you put

24    the rabbit in the hat.  Because what Chattooga says, which

25    is again, 296 B.R. 656, it's not whether you had a contract

Page 101

1    or transaction, but it is to go beyond that and to say, what

2    would a post-petition event and could they constitute a

3    transaction not in the sense of the contract.  That is

4    significant.  The underlying theory is to encourage vendors

5    to deal with the post-petition estate, going on achieving

6    those goals requires satisfying the legitimate expectations

7    of those who supply post-petition goods and services.  For

8    those reasons, it is circumstances surrounding the post-

9    petition delivery and receipt of goods, rather than either

10   the presence or absence of a contract for the delivery of

11   contractual privity that is determinative.  That's what we

12   have argued.

13            THE COURT:  How are they being induced?

14            MR. GALARDI:  Your Honor, there's a first day

15   order that Your Honor I came before you and you said --

16            THE COURT:  The first day order is a separate

17   issue.

18            MR. GALARDI:  No.

19            THE COURT:  But you argue the pre and post point,

20   that's really -- they have to deliver.

21            MR. GALARDI:  Actually you don't have to deliver,

22   Your Honor.

23            THE COURT:  They have the -- and otherwise, they

24   have a reclamation order.

25            MR. GALARDI:  No, they also have a right to stop

Page 102

1    shipment when the goods haven't had the title past.  Those

2    are two valuable legal rights defenders gave up.

3            The debtor instead says, we don't want to go

4    through that disruption, we don't want to go through that

5    litigation, we don't need thousands, and on the other side,

6    where you have the thousands of lift stays, we want to

7    resolve this and we're going to say if you ship or deliver

8    post-petition you'll be paid in the ordinary course of

9    business.

10            THE COURT:  Okay.  That's the November 20th order.

11            MR. GALARDI:  That's the November 20th order, it's

12    also when I came -- no, actually I think it's -- Your Honor,

13    I came back on the shipping, we qualified it, it was the

14    second day, yes, November 20th.

15            THE COURT:  Right.

16            MR. GALARDI:  We had this discussion in the

17    transcript --

18            THE COURT:  That order I didn't think we were

19    going to be dealing with today.  That needs to be dealt with

20    in a separate context.

21            MR. GALARDI:  Well, but, Your Honor, that exactly

22    is the context because our position is, with that order,

23    with us coming in and saying exactly what we said, Your

24    Honor said --

25            THE COURT:  Well, I'm sorry, Mr. Galardi, the main

Page 103

1    thrust of -- maybe everyone else's of your colleagues, on

2    your side of the table this time was not really based on

3    that.  It's based on this theory that receipt is somehow

4    been elevated now into delivery.

5              I appreciate the issues raised by the November

6    20th order.  There are two conflicting paragraphs in that

7    order, for example.  The debtors assert that there were

8    discussions back and forth on the record, that's really not

9    in front of me today.  I'm going to deal with that another

10   day.

11             MR. GALARDI:  But, Your Honor, here's the issue.

12   You're being asked to rule today.  And maybe I am excluded

13   from this, but you're being asked to rule today that there

14   was no, and I want to understand a final order, there is no

15   503(b)(1) for any vendor who delivered.  What I am

16   suggesting --

17             THE COURT:  I'm not saying that.

18             MR. GALARDI:  Okay.

19             THE COURT:  What I'm saying is, there is no

20   503(b)(1) based on a theory that if you -- separate and

21   apart from this order, separate and apart from the November

22   20th order, on the theory that you are entitled to an

23   administrative claim because you delivered post-petition as

24   a matter of law.

25             MR. GALARDI:  That somehow receipt, so somehow

Page 104

1    there has to be consistency, I understanding that, and

2    that's why we said we're not going to fight it, and it's 3rd

3    Circuit and everything else.

4              THE COURT:  But the separate issue, the effect of

5    the order that's for another day.  To me, that's a more

6    complicated issue and, you know, I had like seven of these,

7    I think you might have been the only one that raised that

8    point and I'd rather deal with that separately.

9              MR. GALARDI:  And I think -- so then we would ask

10   if Your Honor just to move forward with that at some point

11   in the not too distant future because I did --

12             THE COURT:  That's fine.

13             MR. GALARDI:  -- raise it back in November ---

14             THE COURT:  That's fine.

15             MR. GALARDI:  -- and our motion has been pending.

16             THE COURT:  But there are a lot of other issues

17   related to that, like --

18             MR. GALARDI:  Understood.

19             THE COURT:  -- what were the discussions, who did

20   what, that's the type of thing that I think people should be

21   talking about.

22             MR. GALARDI:  Your Honor --

23             THE COURT:  You know, the Indian company, Pearl

24   says we were told X, Y and Z, I don't know if that's true or

25   not, I think it depends, because the order itself is just a

Page 105

1    starting point.  The order has two conflicting provisions.

2    So it may be a case-by-case determination.

3            Your Honor, again as we've said in our papers and

4    I'll leave it for another day, we actually don't think when

5    you make a public statement of the sort, and I'm not sure

6    what two inconsistent remarks you're saying --

7            THE COURT:  Well, I'll read them, paragraph 8

8    says, "All undisputed obligations of the debtors arising

9    from the post-petition delivery or shipment," so it has the

10   word delivery, there's a typo, by, of goods under the

11   uppercase prepetition uppercase orders, are granted

12   administrative expense priority status pursuant to Section

13   503(b)(1)(A) of the Bankruptcy Code.

14           And then it goes on to say, and the debtors are

15   authorized, but not directed to pay such obligations in the

16   ordinary course of business, consistent with the parties

17   customary practices in effect prior to the commencement

18   date.

19           Now, prepetition orders itself, that term isn't

20   defined in this order.

21           MR. GALARDI:  Correct.

22           THE COURT:  Second, though, paragraph 12 says,

23   "notwithstanding entry of this order, nothing herein shall

24   create, nor is intended to create any rights in favor of or

25   enhance the status of any claim held by any party."

Page 106

1          MR. GALARDI:  Your Honor, I guess we'll have the

2     dispute later, but if the debtor is going to take the

3     position a reservation of rights, when you have that

4     specific undefined.

5          THE COURT:  They have taken the position.

6          MR. GALARDI:  I understand, but it's your order,

7     Your Honor, that's why I was here in November to ask for

8     exactly that clarification, knowing exactly that this would

9     be the debtor's change of position, and that's why we think

10    judicial estoppel applies --

11         THE COURT:  Well --

12         MR. GALARDI:  -- and we don't need an evidentiary

13    hearing on this.

14         THE COURT:  Well, I would need to go through the

15    transcript of that hearing.  But in addition to that, I

16    think that there may be issues with individual creditors.  I

17    don't know what they were actually told.  I don't know if

18    they were told, oh, forget about that order, for example, or

19    forget about paragraph 12, so.

20         MR. GALARDI:  Yes, Your Honor, I mean, I guess

21    we'll do that but then we're going to be having, for

22    example, my client probably has $7 million in administrative

23    claims, whether they're 503(b)(1) or (9) this will come up

24    again in the not too distant future --

25         THE COURT:  Well, perhaps but they'll -- it's not

Page 107

1    a blanket ruling in other words.

2            MR. GALARDI:  It should be a blanket rule, Your

3    Honor, with all due respect when a debtor publishes an order

4    to all of the vendors an intention to give them, and Your

5    Honor and I have practiced where it's out of an abundance of

6    caution, to give them an order so we can shove it -- give it

7    to the vendors and let it --

8            THE COURT:  It's a five page order, it's not that

9    hard to read.

10           MR. GALARDI:  Exactly and it's not that hard to

11   convince shippers and vendors to ship based on that order,

12   which is exactly what the practice the debtors do.

13           THE COURT:  Well, I don't know.

14           MR. GALARDI:  Okay.

15           THE COURT:  I mean, it depends I think.  Some

16   vendors might be delighted to ship because they're going to

17   get paid at least for what they have in their inventory.

18           MR. GALARDI:  That's fine, Your Honor, we'll --

19           THE COURT:  And then they keep doing it, and they

20   get a new order, the Indian company for example, got an

21   order that three times as large as what they shipped.

22           MR. GALARDI:  Yes, Your Honor.

23           THE COURT:  Really, I mean, I think at that point

24   people should be going through the claims resolution process

25   --

Page 108

1          MR. GALARDI:  But this is --

2          THE COURT:  -- and this is a point to raise as

3     part of that process.

4          MR. GALARDI:  Well, but the claims resolution

5     process is addressed to prepetition claim.

6          THE COURT:  Well --

7          MR. GALARDI:  This goes to administrative claims.

8     It's not a 503(b)(1), this goes directly to what should have

9     been paid in the ordinary course.

10         THE COURT:  But I don't think it's a case where

11    you can do it as it's teed up before me today.  I don't have

12    any witnesses, I think you would want to talk to the debtors

13    first about it.  You say you have either 503(b)(9) or

14    503(b)(1) you want to liquidate and decide which is which

15    and see what your area is, I mean it's --

16         MR. GALARDI:  Well, Your Honor, I think we'd be

17    prepared to put up witnesses at the next hearing very

18    rapidly on the (b)(1).  It's not a simple overlap issue.

19    There is no dispute over the --

20         THE COURT:  Well, there may not be, there may not

21    be, but at least normally people try to quantify what

22    they're fighting over in bankruptcy and --

23         MR. GALARDI:  Our first motion did, it said $5.4

24    million in 503(b)(1) and $1.7 million, this issue has been

25    out there.  We were prepared again, Your Honor had the sale

Page 109

1   hearing, you had all these hearings --

2              THE COURT:  Right.

3              MR. GALARDI:  -- we're prepared to come back in

4   very short order and put on evidence with respect to the

5   claims.

6              THE COURT:  Okay.  That's fine.

7              MR. FAIL:  Your Honor --

8              THE COURT:  I just suggest that maybe you go

9   through it with the debtor first.

10             MR. GALARDI:  We have tried.

11             THE COURT:  Okay.  All right.  And are these

12  potential claims that Transform's picking up?

13             MR. GALARDI:  No.

14             THE COURT:  No, they're not, okay.

15             MR. FAIL:  Your Honor, just so they don't pile up,

16  I'll just add a couple of rebuttal points.

17             First in terms of the process, the debtors don't

18  believe that admin claimants can properly file motions and

19  appear at their discretion on 14 days' notice.  If people

20  aren't paid there's contested matters that need to be

21  commenced, but the debtors aren't inviting that, the debtors

22  will work and review issues.

23             Mr. Galardi and his clients, all of these parties

24  and movants, and understand the complexity of the issue, and

25  the way that they've interrelated 503(b)(1) to 503(b)(9) we

Page 110

1      sought to provide them the clarity for 503(b)(1) and I think

2      Your Honor's ruling today has gone very far to that end.

3                    With respect to the allegation that the final

4      order could have influenced any party, but that point in

5      time I believe the allegations in the -- in Apex's motion

6      were that the goods were delivered, so I mean the parties --

7                    THE COURT:  But those were the factual issues that

8      --

9                    MR. FAIL:  -- before they move going -- I agree --

10                   THE COURT:  -- depend on each vendor.

11                   MR. FAIL:  -- factual issues, I'm just saying the

12     parties should be cautioned about making statements about

13     reliance that occurred after the fact.  Our position on that

14     has been very clear from the very first minute it was

15     raised.  Any party that would have asked us would have been

16     directed to the paragraph that said you're not going to get

17     an increased priority.

18                   There was reference to the Chattooga case, but the

19     citation that was given referred -- it was familiar, because

20     I read all the 50 cases that were cited last night again, it

21     was the Adelphia Business Solutions case.  And the issue in

22     that case that was being determined had nothing to do with

23     delivery or shipment.  It had to do with two different

24     debtors and Verizon saying one of them owed me money, and

25     there were defenses, one saying was the other, it was a

1     contract with the other, has nothing to do with this

2     whatsoever.  Whatsoever.

3           And then there was also reference to the Coastal

4     Trading case, which other courts have distinguished and said

5     isn't binding and isn't definitive.

6           So for another day, for another time for 503(b)(9)

7     but I don't want to leave the record mistaken that the

8     debtors accept any of the statements that were made.

9           THE COURT:  Okay.

10          MS. BENCZE:  I've sort of been going out of turn,

11    Your Honor.  Nola Bencze with Clark Hill and I represent

12    Milton Manufacturing.

13          I heard you loud and clear, Your Honor.  We

14    reserve any rights as to our 503(b)(9) and that obviously

15    will be decided in accordance with your Judge's order.

16          I've heard the arguments, in our papers we did

17    point to that order, the November 20th order as part of the

18    inducement.  The use of the term of inducement, actually,

19    Your Honor, is coming from the Adelphia Business Solutions

20    case which debtor's counsel just mentioned, as well as Jar

21    Tram (ph), and perhaps Jar Tram is a case you may recall

22    because it dealt with the Yellow Pages a prepetition

23    contract.

24          And the Yellow Page vendor, you know, ran the ads

25    post-petition and it turned out the debtors didn't want

Page 112

1      them, and said we never wanted them.  And the significance

2      about that, Your Honor, is that the transaction with the

3      debtor in possession is satisfied by either inducement to do

4      the post-petition transaction, or where the benefit is

5      knowingly accepted, and I'm quoting Adelphia Business

6      Solutions, as well as Jar Tram.

7              I think that's significant here because the debtor

8      surely accepted the goods when it arrived at its facilities,

9      sold them, and used them to carry on whatever was necessary

10     to operate the Chapter 11.

11             THE COURT:  The debtor borrowed money that it had

12     in its bank account prepetition that it used post-petition.

13     Your logic would suggest that is also an administrative

14     expense.

15             MS. BENCZE:  Well, I don't know that I would agree

16     with you on that, because the borrowed money is in their

17     bank account based on a whole set of different

18     relationships.

19             THE COURT:  But it used it post-petition, so it

20     can't be the post-petition use.

21             MS. BENCZE:  No, it's not the post-petition use,

22     Your Honor, perhaps I misexplained that.  It's the fact that

23     it was welcomed and wanted.

24             THE COURT:  I'm sure they wanted the money too.

25             MS. BENCZE:  I do, Your Honor, I see what you're

1    asking me, I really don't agree with the analogy.

2              THE COURT:  Okay.

3              MS. BENCZE:  Because to me the money in the bank

4    account, maybe at this point, my life (indiscernible) so,

5    you know, how that money got there and so on and so forth,

6    but I don't see it, so I apologize.

7              But that's the cases we were relying on, they were

8    not -- I mean, I definitely see the end world in Ports (ph)

9    case, but that was not what we relied upon.  We were relying

10   upon what had been previously held in the 2nd Circuit.

11             So I wanted to bring that to your attention.

12             THE COURT:  Okay.

13             MS. BENCZE:  And I guess ask a question, Your

14   Honor.  What -- I hear our discussion here, I hear you feel

15   there needs to be another day in regard to determination as

16   to the November 20th motion.

17             THE COURT:  Order.

18             MS. BENCZE:  I'm sorry, order.

19             THE COURT:  Right.

20             MS. BENCZE:  What is happening today with the

21   503(b)(1)?  I mean, what are -- is this being put off for

22   another day?

23             THE COURT:  Well, I mean, no one -- I don't know

24   what you're expecting.  Every vendor as far as its reliance

25   on this order is different.  So clearly I wasn't going to

Page 114

1    decide that today.  I did have this one legal issue which

2    was posited to me, which is simply based upon when a debtor

3    actually gets physical possession of goods decides whether

4    it's a pre or post-petition claim and I'm happy to have

5    ruled on that, because I think that's just not correct as a

6    matter of law.

7              Other than that, I don't know what -- you know,

8    it's just not -- it's not teed up properly before me at this

9    point.

10             MS. BENCZE:  Well, we have other counsel, Your

11   Honor, thank you, Your Honor.

12             MR. FAIL:  Your Honor, just on the process point,

13   the debtors haven't objected to the claim so if the debtors

14   will review the claim --

15             THE COURT:  I mean they're filed administrative

16   claims.

17             MR. FAIL:  If they were, they were; if they

18   weren't, a motion doesn't give it an ability to file or an

19   amendment to a claim but we'll review them.  Although Milton

20   did not make the argument for Alliance, I'm not sure why

21   it's being brought up if it was supposed to be today.

22             THE COURT:  Okay.

23             MR. FAIL:  Milton raised that point, there are

24   2,000 claims asserting 503(b)(9) that we're processing.

25   We'll evaluate and we'll object or we'll allow or we'll

1    negotiate in due course.

2              THE COURT:  Well, these are not -- I mean, the

3    503(b)(9)'s will be dealt with separately.  There's no one's

4    here pushing the 503(b)(9) claim today.  It's the 503(b)(1)

5    claims.  They do -- I mean, there's no administrative

6    expense bar date.

7              MR. FAIL:  Right, so there were two -- there were

8    only two parties, Pearl and Apex that were asserting it and

9    we could figure out if we need to schedule a hearing --

10             THE COURT:  Right.

11             MR. FAIL:  -- or agree to wait and see.

12             THE COURT:  And you're --

13             MR. FAIL:  It may be moot if we agree that they

14   have a 503(b)(9) in certain circumstances.

15             THE COURT:  Well, I think Apex says it's not moot

16   because there's a difference, like one's 5 and one's 2

17   million.

18             You're Pearl, right?

19             MR. WANDER:  Well, I'm David Wander.

20             THE COURT:  Well, I know but you're representing

21   Pearl, I'm sorry.

22             MR. WANDER:  Yes, Your Honor, David Wander of

23   Davidoff Hutcher & Citron, counsel for Pearl Global

24   Industries.  I will be very brief, Your Honor.

25             THE COURT:  Okay.

Page 116

1          MR. WANDER:  First, I want the record to be clear,

2     whatever we put in our motion, the relief we were seeking,

3     we're not -- we did not come to court today to ask Your

4     Honor for a ruling to pay our client, even if you ruled in

5     our favor on the legal issue.

6          THE COURT:  Right.

7          MR. WANDER:  The time to go over the invoices is

8     for another day.

9          THE COURT:  Okay.

10          MR. WANDER:  I put in my reply, I only disagree

11     with Your Honor on one item so to speak, which is I do

12     believe that in order for the case to move forward and

13     confirmation of the plan that has been filed and amended

14     that there needs to be a ruling on both the 503(b)(9) issue

15     and World Imports and receive that issue, as well as the

16     503(b)(1).  I recognize that that's not going to happen

17     today, but that's what we had said we needed today.

18          THE COURT:  Well, clearly I will at a minimum have

19     to estimate the allowed administrative expenses for

20     confirmation purposes.

21          MR. WANDER:  Correct, correct.  So we did make the

22     inducement claim where the Indian company that Your Honor

23     referred to.

24          THE COURT:  Right.

25          MR. WANDER:  And I'm going to be very brief

Page 117

1    because I do agree that this is not for today.  I just want

2    to be clear that my client's inducement claim is not based

3    on the order of the Court.  Okay.  And I wasn't representing

4    my client at that time, I don't believe they had counsel.

5           My client's inducement claim is based on the e-

6    mail that was sent to my client and all the foreign buyers

7    and I just want that to be understood, and I believe that

8    may be a difference in our papers, but not necessarily a

9    difference in the positions of the claimants because that e-

10   mail was addressed to I believe all foreign vendors.

11          So I just want that to be -- the record to be

12   clear as we go forward with the discovery in discovery or

13   whatever procedure they propose, that our reliance was based

14   on the e-mail that was sent to our client, and we believe

15   the other foreign vendors.

16          I do believe we should have some order on the

17   503(b)(1) issue, just as a matter of the record, but as far

18   as our motion I'll continue with the debtor's counsel with

19   regard to the inducement claim and wait for the 503(b)(9) to

20   be teed up whenever Your Honor does it.

21          THE COURT:  Okay.  I mean, I think -- I mean,

22   obviously the debtors have filed a plan, you're in plan

23   discussions, contemplating a confirmation hearing.  You

24   should give some thought with the committee on how to deal

25   with these issues in sort of a global context as part of

Page 118

1    confirmation.

2            MR. FAIL:  Thank you, Your Honor, we will and

3    we're looking at the claims as they were asserted, parties

4    asserted claims in ways that are favorable and we're going

5    to address those that were asserted, not hypotheticals.

6    Obviously Mr. Wander referred to a record, I assume, and the

7    Court should only take that to mean his statement.  There

8    are no facts in evidence with respect to any correspondence.

9            THE COURT:  Absolutely.  But people should be

10   turning to facts, I mean, it takes two for example, not just

11   one party.

12           MR. SARACHEK:  Your Honor, Joe Sarachek on behalf

13   of Mien.  Really two points and I won't repeat, and we are

14   all talking the 503(b)(9) creditors and, you know, with

15   respect to Mien in particular, just so it's clear, the order

16   of Mien and it's a small order, but it had -- it

17   reverberates throughout like China I'd say, and I have a

18   bunch of Chinese clients, their order was prepetition.  The

19   goods were delivered post-petition, they were at the freight

20   forwarder.  The freight forwarder was not going to release

21   those goods to Sears absent, my understanding is, receiving

22   your November 20th order.

23           Sears subsequently recognized that the goods came

24   post-petition, and they, Sears, believed that they were only

25   obligated to pay Mien post-petition some time in February.

Page 119

1    They at one point said, we're going to pay you and then they

2    got into this whole --

3            MR. FAIL:  Your Honor, I'm going to --

4            MR. SARACHEK:  Wait, wait one second.  Well, the

5    point is, Sears acknowledged that they did not have receipt

6    of the goods.  And Sears, in fact, said, oh, no, this is

7    ESL's obligation, Your Honor.

8            THE COURT:  Look, it's -- I know you're an officer

9    of the court but this isn't evidence.

10           MR. SARACHEK:  Well, it's in an affidavit, Your

11   Honor.

12           THE COURT:  Well, but it's still not evidence.  I

13   don't have that person here.

14           MR. SARACHEK:  I understand.  I want -- I need to

15   emphasize to the Court that --

16           THE COURT:  And they'd be happy to have ESL pay

17   for it, that doesn't mean that they accept that it's a post-

18   petition claim, they're happy to have ESL pay for it.  I

19   don't think that matters.

20           MR. SARACHEK:  Your Honor, I need to emphasize to

21   the Court --

22           THE COURT:  I'm happy to have ESL pay for it, too,

23   I mean, you know.

24           MR. SARACHEK:  Well, so would we and June 1st

25   according to the Court's previous order they're obligated to

1    pay $139 million --

2              THE COURT:  Right.

3              MR. SARACHEK:  -- and candidly we have been

4    reaching out to Weil throughout this process.  We have not

5    gotten any satisfaction of assurance of payment, and quite

6    frankly, we're really quite all of us uncertain where the

7    claims resolution process is.  And the reverberations are

8    that many of our clients are facing insolvency themselves.

9    And that's a real fact.

10             So if they're not paid, whether it's on the small

11   amount or on the larger amount, there are consequences, Your

12   Honor.

13             THE COURT:  Okay.

14             MR. SARACHEK:  And we're not getting any

15   satisfaction from dealing with debtor's counsel because

16   we're not getting any clarity, notwithstanding and you've

17   referred to that you have these two orders on 503(b)(9),

18   well, we've called them umpteen times to discuss resolution

19   and some certainty, and we have no certainty.

20             And so, you know, cutting through all the red

21   tape, we're all here because we do need certainty on behalf

22   of our clients.  We weren't expecting you to order that they

23   pay us today, but we do need some certainty.

24             THE COURT:  Okay.

25             MR. SARACHEK:  Thank you.

Page 121

1                    THE COURT:  Okay.

2                    MS. WEYAND:  Thank you, Your Honor, Jacqueline

3      Weyand from Buchanan Ingersoll and Rooney, on behalf of

4      Gokoldas.

5                    I think the arguments have been set forth by my

6      colleagues here today.  The one distinct fact to that is

7      different from us is that we do have a post-petition claim.

8      In December of 2018 we were called to ship approximately

9      $850,000 worth of goods to the debtor, and it's very clear

10     that's after the petition date, so these amounts are

11     entitled to administrative expense priority, because they

12     constitute post-petition transactions.

13                    THE COURT:  Has the debtor objected to that?

14                    MS. WEYAND:  At this time, we have not been paid

15     and --

16                    THE COURT:  No, payment is another story.

17                    MS. WEYAND:  I don't have an objection in writing,

18     no.

19                    THE COURT:  Okay.

20                    MR. FAIL:  Your Honor, Garrett Fail for the

21     record.  I think we said in our pleadings to the extent that

22     the invoices match books and records we believe it would be

23     entitled to administrative expense priority.  We haven't

24     done the reconciliation, there were thousands of vendors,

25     and as Your Honor knows, the debtors have transferred their

Page 122

1    employees to the buyer who have other responsibilities and

2    we're working the best we can to do reconciliation.  But the

3    best use of -- and the best efficiency is not going to be

4    obtained by responding to one-off inquiries.

5              So we don't dispute that this is a post-petition

6    payment, and we said in our reply that this is tied up with

7    our dispute with the buyer in terms of the post-petition

8    liabilities that we believe the buyer has assumed.

9              MS. WEYAND:  And, Your Honor, may we just ask for

10   some clarity on this issue as soon as possible.

11             THE COURT:  Okay.

12             MS. WEYAND:  Thank you.

13             THE COURT:  So is anyone looking for payment,

14   immediate payment?  Are you looking for immediate payment?

15   I'm trying to figure --

16             MS. WEYAND:  If Your Honor is inclined to grant

17   it, then yes.

18             THE COURT:  Okay.  All right.

19             MR. FAIL:  Your Honor, and so then we would oppose

20   that request --

21             THE COURT:  Right.

22             MR. FAIL:  -- for the reasons set forth in our

23   pleading --

24             THE COURT:  Any objection.

25             MR. FAIL:  -- and the obvious facts.

Page 123

```
 1              THE COURT:  Okay.

 2              MR. SARACHEK:  We were, Your Honor.

 3              THE COURT:  Okay.

 4              MR. SARACHEK:  Mien was.

 5              THE COURT:  Okay.

 6              MR. SARACHEK:  Of $14,000.

 7              THE COURT:  Okay.  Well, all right, anyone else?

 8         (No response)

 9              THE COURT:  Okay.  I have before me a number of

10    motions by trade creditors, vendors of the debtors for the

11    allowance and payment of an administrative expense under

12    Section 503(b)(1) of the Bankruptcy Code.

13              As I noted during oral argument a couple of those

14    motions seek also immediate payment of the administrative

15    expense, to the extent that it is allowed.  There are three

16    orders in place in this case that are relevant to these

17    motions.

18              There's a final order authorizing the debtors to

19    pay prepetition claims and confirm administrative expense

20    priority for prepetition orders, to move into the debtor's

21    post-petition and satisfy such obligations in the ordinary

22    course of business, that's dated November 20th, 2018.

23              There is an order dated February 22nd, 2019 that

24    in part has procedures for resolving claims under Section

25    503(b)(9) of the Bankruptcy Code as well as asserting --
```

Page 124

1    requiring that those claims be asserted by the bar date.

2              And then finally there's an order dated March

3    28th, 2019 dealing with claim objection procedures

4    generally.

5              One common issue has been raised in the motions

6    that I read as an attempt to move certain claims that may or

7    may not be 503(b)(9) claims which if allowed are, in fact,

8    accorded an administrative expense priority on the same

9    level as 503(b)(1) claims.  But under my February order,

10   need to be resolved pursuant to the procedures in that

11   order.

12             One aspect again of the motions before me seeks to

13   take claims that might fall under 503(b)(9) because the

14   agreement under which the claim, the goods were provided was

15   a prepetition agreement into the 503(b)(1) category.

16             In addition to that, and in addition to the couple

17   of motions that seek immediate payment of any allowed

18   administrative expense claim, certain of the motions state

19   that notwithstanding the prepetition nature of the

20   transaction between the vendor and the debtor, the debtor

21   engaged in certain conduct that turned that prepetition

22   transaction into a post-petition administrative expense

23   transaction under 503(b)(1), either based on the November

24   20th, 2018 order or other post-petition representations that

25   were made to the particular vendor.

Page 125

1          I have determined that that latter category of

2     administrative expense claim cannot be decided today, but

3     requires case-by-case determination based on the evidence

4     applicable to the particular transaction or the particular

5     vendor.

6          No claimant has the ability today to get that

7     evidence before me, and I should therefore not consider that

8     aspect of its argument today.

9          I can decide today the issue of whether any

10    allowed administrative expense should be paid now and I will

11    lay that out on the record since there are a couple of

12    requests for that.  And the debtors have acknowledged that

13    they will pay undisputed administrative expenses at some

14    point, they just object to them being paid now.

15         It's well established that the timing of

16    distributions for administrative expense payments other than

17    at the close of the case under Section 1129(a) of the

18    Bankruptcy Code which requires unless agreed to a different

19    treatment by the administrative expense creditor to be paid

20    at the earlier -- I'm sorry, at the later of the effective

21    date of the plan or the allowance of the claim, is within

22    the discretion of the Court.

23         As the leading treatise on bankruptcy states,

24    generally courts have held that the timing for payment of

25    administrative claims is a matter to be determined within

Page 126

1    the discretion of the bankruptcy court.  Factors influence

2    the exercise of this discretion may include the status of

3    the case, the ability of the debtor to pay such claims, and

4    the particular needs of the administrative claimants, and

5    the probability that future administrative claims may not be

6    paid in full.

7            The latter point is especially important.  Courts

8    generally recognize that the timing of an administrative

9    expense payment should be used to ensure the orderly and

10   equal distribution among creditors similarly situated, and

11   the need to prevent erase to a debtor's assets, if there is

12   a doubt as to the administrative solvency of the debtor

13   overall.

14           See generally In Re Korea Cho Sun Daily Times, 337

15   B.R. 773, 784 Bankr. E.D.N.Y 2005 and In Re Shehigh (ph),

16   392 B.R. 62, 67 through 68, Bankr. S.D.N.Y. 2008.  See also

17   In Re Baptist Medical Center of New York, Inc., 52 B.R. 417,

18   421, E.D.N.Y. 1985 affirmed 781 F2d 973, 2nd Circuit 1986.

19           In this case there is a serious question on a

20   debtor-by-debtor level as to the debtor's administrative

21   solvency, was readily -- particularly at this time where the

22   purchaser of substantially all of the debtor's assets

23   Transform has not made the payments under the asset purchase

24   agreement.

25           And in addition, certain creditors have asserted

Page 127

1    very large administrative expenses under 507(b) of the

2    Bankruptcy Code, which under the plain terms of that section

3    take priority over other administrative expenses under

4    Section 507.

5              So in the exercise of my discretion I believe that

6    it would be improper to direct the payment of any particular

7    administrative expense at this point.

8              Even where, as is asserted, by Mien, M-I-E-N, one

9    of the movants, that non-payment will have a material

10   adverse effect on it.  That is one of the factors a Court

11   should consider, but given the number of administrative

12   expense creditors and the fact that non-payment will

13   adversely affect any administrative expense creditor I don't

14   believe it is dispositive here.

15             I will also rule on the one remaining issue that

16   was raised I believe in all of the pending motions, which is

17   whether under the Bankruptcy Code a vendor who enters into a

18   prepetition agreement with a debtor but delivers the goods

19   so that they are actually received in the possession or

20   constructive possession of the debtor post-petition, as a

21   matter of law has a post-petition administrative expense

22   claim under Section 503(b)(1) of the Bankruptcy Code.

23             The burden of proving entitlement to a priority

24   payment as an administrative expense rests with the party

25   requesting it, In Re Bethlehem Steel Corp., 479 F3d 161,

Page 128

1    172, 2nd Circuit 2007.  And unless there is a contrary

2    policy under the Bankruptcy Code, specific policy that is,

3    specifically enunciated, the application of Section

4    503(b)(1) to a particular set of facts should be narrowly

5    construed because of the overriding policy that the debtors

6    limited resources will be equally distributed among the

7    creditors and a hundred percent statutory priority violates

8    that policy and takes money out of the general creditor

9    bodies' pocket.

10           See Trustees of Amalgamated Insurance Fund v

11   McCrawlings, Inc. (ph), 789 F2d 98, 101, 2nd Circuit 1986 --

12   I'm sorry at 100, 2nd Circuit 1986 and In Re Ace Elevator

13   Company, Inc., 347 B.R. 473, Bankr. S.D.N.Y. 2006.

14           As stated by the district court in In Re Hostess

15   Brands, Inc., 498 B.R. 406, Bankr. S.D.N.Y. 2013, "the case

16   law governing the grant of administrative expenses well

17   established in the 2nd Circuit.  Section 507 of the

18   Bankruptcy Code gives first priority to administrative

19   expenses allowed under 11 U.S.C. Section 503(b) defined as

20   including 'the actual necessary costs and expenses of

21   preserving the estate including wages, salaries or

22   commissions for services rendered after commencement of the

23   case.'

24           "An expense is administrative only if it arises

25   out of a transaction between the creditor and the bankrupt's

Page 129

1    trustee or debtor in possession.  And only to the extent

2    that the consideration supporting the claimant's right to

3    payment was both supplied to and beneficial to the debtor in

4    possession in the operation of the business."  Hostess, 499

5    B.R. at 411, quoting from McFarland, 789 F2d at 101.

6           McFarland's and Judge Ramos go on to say at the

7    same page of Hostess, "A debt is not entitled to priority

8    simply because the right to payment arises after the debtor

9    in possession has begun managing the estate.  Rather it must

10   be a post-petition transaction between the claimant and the

11   debtor in possession and the considerations supporting the

12   right to payment must have been both supplied to and

13   beneficial to the debtor in possession in the operation of

14   the business post-petition."

15          Here it was argued that Congress somehow changed

16   that general rule supported by the plain language of Section

17   503(b) or derived from the plain language of Section

18   503(b)(1), when in 2005 it enacted Sections -- revised

19   Sections 546 and 503(b)(9) of the Bankruptcy Code.

20          The movants contend that because it has been

21   interpreted that a claim entitled to administrative expense

22   under Section 503(b)(9) arises when the debtor or its agent

23   takes physical possession of the goods, that physical

24   possession of the goods being obtained post-petition also

25   gives rise to administrative expense under Section 503(b)(1)

Page 130

1    of the Code.

2            This argument is misguided.  Section 503(b)(9)

3    with special purpose, special interest legislation adopted

4    specifically to favor dealers of goods as an exception to

5    the general requirement under Section 503(b)(1) as

6    previously articulated by the McFarlands and Hostess Courts,

7    that the transaction and the consideration both be with the

8    debtor or debtor in possession post-petition.

9            503(b)(9) gives a priority based on prepetition

10   conduct.  And it is narrowly drafted and differently drafted

11   than Section 503(b)(1).  It uses a term which was the term

12   construed by the 3rd Circuit upon which the movants rely on.

13   In Re World Imports Limited, 862 F3d 338, 3rd Circuit 2017,

14   to be focused on a specific word in that section, which does

15   not appear in Section 503(b)(1).

16           Section 503(b)(9) gives an administrative expense

17   priority to the value -- "the value of any goods received by

18   the debtor within 20 days before the date of the

19   commencement of the case under this title, in which goods

20   have been sold to the debtor in the ordinary course of such

21   debtor's business."

22           As was entirely appropriate the Court in World

23   Imports Limited interpreted the meaning of the word received

24   in Section 503(b)(9).  Which was open to different

25   interpretations because it's not defined in the Bankruptcy

1    Code.

2            It determined, overruling the bankruptcy court and

3    the district court that received in Congress' mind must have

4    meant the general use of that term in the then existing form

5    of the Uniform Commercial Code.  Therefore, it means taking

6    physical possession of the goods either by the debtor or its

7    agent; i.d. at Section -- at pages 343 through 344.

8            That section of the Code and that interpretation

9    are entirely separate from what is the issue here, which is

10   whether a claim arises under Section 503(b)(1) of the Code,

11   and therefore it would not apply here under these facts.

12           It's not clear to me whether the 2nd Circuit would

13   adopt that interpretation either, but that's in fact

14   irrelevant for purposes of the matter before me today since

15   no 503(b)(9) issues are before me.

16           It's argued by the movants that interpreting

17   Section 503(b)(9) according to its plain terms would be

18   based on the 3rd Circuit's interpretation of Section

19   503(b)(9) need to anomalous results where certain assets,

20   certain goods, excuse me, delivered outside of either the

21   applicable petition date or the 20-day window would not be

22   entitled to a priority, or would be entitled to a priority.

23           There was anomalous results are insufficient

24   however for me to conclude that Congress decided to change a

25   long established interpretation of Section 503(b)(1) which

Page 132

1    it was obviously fully aware of when it enacted Babseifer

2    (ph) in 2005, to develop a special general rule under (b)(1)

3    as opposed to (b)(9) for vendor claims.

4           And indeed, the Courts have continued to apply the

5    McFarlands' definition after 2005 including District Judge

6    Ramos in the Hostess case I quoted from, from 2013.

7           It continues to be the case that a debtor in

8    possession or trustee needs to engage in a post-petition

9    transaction or post-petition conduct that then is in

10   addition beneficial to the estate to give rise to an

11   administrative expense under Section 503(b)(1).

12          The mere fact of delivery post-petition where the

13   transaction was entered into prepetition is insufficient to

14   give rise to such a claim.  So I will deny that aspect of

15   the motions without ruling on the others that I've reserved

16   decision on.  And the debtors can submit an order consistent

17   with that.  You don't need to formally settle an order, but

18   you should circulate it to the movants.

19          MR. FAIL:  Thank you very much, Your Honor.

20          THE COURT:  Okay.  That's the end of the agenda,

21   correct?

22          MR. FAIL:  That is the end of today's agenda.

23          THE COURT:  Okay.  Very well, thank you.

24   (Proceedings concluded at 1:27 p.m.)

25                              * * * * *

```
                                                           Page 133

 1                          I N D E X

 2

 3                          RULINGS

 4                                                            Page

 5    Application of Fee Examiner, Pursuant to Section        12

 6    327(a) of the Bankruptcy Code, Bankruptcy Rule 2014,

 7    and Local Bankruptcy Rules 2014-1 and 2016-1, for

 8    the Entry of an Order Authorizing the Retention and

 9    Employment of Ballard Spahr LLP as Counsel to the

10    Fee Examiner, Nunc Pro Tune to the Appointment Date

11    filed by Paul E. Hamer on behalf of Fee Examiner

12    (document #3682)

13

14    Motion of Debtors for Order Shortening Notice with      14

15    Respect to Debtors' Motion for Authorization and

16    Approval of (I) Settlement between Debtors and

17    The Chubb Companies, (II) Debtors' Entry into the

18    Transaction Documents, and (III) Related Relief

19    (document #3615)

20

21    Debtors' Motion for Authorization and Approval          14

22    of (I) Settlement between Debtors and The Chubb

23    Companies, (II) Debtors' Entry into the

24    Transaction Documents, and (III) Related Relief

25    (document #3614)
```

1                         I N D E X

2

3                         RULINGS

4                                                      Page

5    Notice of Presentment of Debtors Motion for Authority    17

6    to Assume Unexpired Leases of Nonresidential Real

7    Property (document #3376)

8

9    Debtors Motion for Authority to Assume Unexpired    17

10   Leases of Nonresidential Real Property (related

11   document(s)3376)

12

13   Notice of Presentment of Order (I) Authorizing    19

14   Assumption and Assignment of Lease of Non-Residential

15   Real Property and (II) Granting Related Relief,

16   with Exhibit A (related document(s)3624, 3008, 3665,

17   3811)

18

19   Notice of Presentment of Stipulation among Buyer,    22

20   Seller, and Brookfield Property REIT Inc. filed by

21   Ryan Zachary Gelber on behalf of Transform Holdco

22   LLC. (document #3913)

23

24

25

Page 135

1                          I N D E X

2

3                            RULINGS

4                                                          Page

5    Motion of FTI Consulting Canada Inc., for Relief        73

6    From the Automatic Stay for the Purpose of Joining

7    Sears Holdings Corporation as a Defendant in

8    Existing Litigation Pending Before the Ontario

9    Superior Court of Justice (Commercial List) and

10   to Liquidate Certain Claims Against Sears Holdings

11   Corporation in Such Existing Litigation filed by

12   Eric C. Daucher on behalf of FTI Consulting Canada

13   Inc. (document #3237)

14

15   Motion of Liberty Insurance Corporation of Relief       81

16    from the Automatic Stay (document #3294)

17

18   Motion of Rosa Melgar for Relief from the               81

19   Automatic Stay (document #2960)

20

21   Motion of Apex Tool Group, LLC to Allow and            123

22   Compel Immediate Payment of Administrative Expense

23   Claim Pursuant to 11 U.S.C. 503(b)(1)(a) and 11

24   U.S.C. 503(b)(9) filed by Gregg M. Galardi on behalf

25    of Apex Tool Group, LLC (document #1491)

```
                                                        Page 136

  1                          I N D E X

  2

  3                            RULINGS

  4                                                       Page

  5    Debtors' Omnibus Objection (document #3883)        123

  6

  7    Motion of Milton Manufacturing, LLC to Allow and   123

  8    Compel Payment of Administrative Expense Claim Under

  9    11 U.S.C. §503(b) For Craftsman Branded Goods Delivered

 10    to the Debtor Postpetition filed by Joel D. Applebaum

 11    on behalf of Milton Manufacturing, LLC (document

 12    #1477)

 13

 14    Motion to Allow and Compel Payment of Administrative  123

 15    Expense Claim Under 11 U.C. Sec. 503(b) for Jaclyn

 16    Smith Branded and Private Label Goods Delivered to

 17    the Debtor Post-Petition (ECF #3323)

 18

 19    Debtors' Omnibus Objection (document #3883)        123

 20

 21    Motion of Gokaldas Exports Ltd. to Allow and Compel  123

 22    Payment of Administrative Expense Claims (document

 23    #3670)

 24

 25
```

1                        I N D E X

2

3                        RULINGS

4                                                    Page

5    Motion by Pearl Global Industries Ltd. to Allow and      123

6    Compel Payment of Administrative Expense Claim

7    (document #3604)

8

9    Notice of Assumption and Assignment of Additional        20

10   Designatable Leases (related document(s)3008, 1731,

11   3097, 2753, 2314, 2995, 3152, 1774) filed by Luke A

12   Barefoot on behalf of Transform Holdco LLC. (document

13   #3298)

14

15

16

17

18

19

20

21

22

23

24

25

Page 138

1                           C E R T I F I C A T I O N

2

3          We, Sherri Lynn Breach and Sheila Orms, certify that

4     the foregoing transcript is a true and accurate record of

5     the proceedings.

6
      Sherri L        Digitally signed by Sherri L
7                      Breach
                       DN: cn=Sherri L Breach, o, ou,
      Breach           email=digital1@veritext.com,
                       c=US
8     _____  Date: 2019.05.23 14:10:15 -04'00'
      _____

9     Sherri L. Breach

10    AAERT Certified Electronic Reporter & Transcriber CERT*D-397

11
      Sheila           Digitally signed by Sheila Orms
                        DN: cn=Sheila Orms, o, ou,
12                      email=digital1@veritext.com,
      Orms              c=US
                        Date: 2019.05.23 14:11:11 -04'00'
13    _____

14    Sheila Orms

15

16    Date:  May 23, 2019

17

18

19

20

21

22    Veritext Legal Solutions

23    330 Old Country Road

24    Suite 300

25    Mineola, NY 11501