Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 18-23538-rdd

4    Adv. Case No. 19-08262-rdd

5    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

6    In the Matter of:

7

8    SEARS HOLDINGS CORPORATION,

9

10           Debtor.

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   TRANSFORM HOLDCO LLC,

13                Plaintiff,

14           v.

15   SEARS HOLDINGS CORPORATION et al.,

16                Defendants.

17   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18

19

20

21

22

23

24

25

Page 2

1                     United States Bankruptcy Court

2                     300 Quarropas Street, Room 248

3                     White Plains, NY 10601

4

5                     July 11, 2019

6                     10:11 AM

7

8

9

10

11

12   B E F O R E :

13   HON ROBERT D. DRAIN

14   U.S. BANKRUPTCY JUDGE

15

16   ECRO:   NAROTAM RAI

17

18

19

20

21

22

23

24

25

1  HEARING re Notice of Agenda of Matters Scheduled for Hearing

2  on July 11, 2019 at 10:00 a.m.

3

4  HEARING re Notice of Assumption and Assignment of Additional

5  Designatable Leases (ECF #3298)

6

7  HEARING re MOAC Mall Holdings LLC's Second Supplemental and

8  Amended Objections (ECF #3501)

9

10  HEARING re MOAC Mall Holdings LLC's Third Supplemental and

11  Amended Objections (ECF #3926)

12

13  HEARING re MOAC Mall Holdings LLC's Fourth Supplemental and

14  Amended Objections (ECF #4450)

15  Transform Holdco LLC's Reply (ECF #4454)

16

17  HEARING re Motion to Exceed Page Limit for Transform Holdco

18  LLC's Reply to MOAC Mall Holdings LLC's Objections to

19  Assumption and Assignment (ECF #4455)

20

21  HEARING re Application of Team Worldwide Corporation, a

22  Creditor, for Entry of an Order Pursuant To Rule 2004 of The

23  Federal Rules of Bankruptcy Procedure Requiring the

24  Production of Documents by and an Examination of the Debtors

25  (ECF #4346)  Debtors' Objection (ECF #4429)

Page 4

1   HEARING re Debtors' Supplemental Motion to Enforce the Asset

2   Purchase Agreement (ECF #4029)

3

4   HEARING re Adversary proceeding: 19-08262-rdd Transform

5   Holdco LLC v. Sears Holdings Corporation et al Pre-trial

6   Conference

7   Debtors' Brief In Opposition (ECF #4430)

8

9   HEARING re Joinder of the Official Committee of Unsecured

10   Creditors to Debtors' Supplement Motion to Enforce the Asset

11   Purchase Agreement and Debtors' Brief in Opposition

12   (ECF #4436)

13   Transform Holdco LLC's Brief (ECF #4464)

14   Transform Holdco LLC's Reply (ECF #4480)

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 5

1    A P P E A R A N C E S :

2

3   CLEARY GOTTLIEB STEEN & HAMILTON LLP

4        Attorneys for Transform Holdco LLC

5        One Liberty Plaza

6        New York, NY 10006

7

8   BY:  ANDREW WEAVER

9        SAMUEL LEVANDER

10        PASCALE BIBI

11        LEWIS J. LIMAN

12        MARGOT G. MOONEY

13        ABENA MAINOO

14        SEAN A. O'NEAL

15        LUKE A. BAREFOOT

16

17   AKIN GUMP STRAUSS HAUER & FELD LLP

18        Attorneys for Unsecured Creditors' Committee

19        One Bryant Park

20        New York, NY 10036

21

22   BY:  SARA L. BRAUNER

23        PHIL DUBLIN

24        IRA DIZENGOFF

25        JOSEPH SORKIN

Page 6

1    WEIL, GOTSHAL & MANGES LLP

2         Attorneys for Sears Holdings Corp. and its Affiliates

3         767 Fifth Avenue

4         New York, NY 10153

5

6    BY:  JACQUELINE MARCUS

7         PAUL R. GENENDER

8

9    SEYFARTH SHAW

10        Attorneys for Wilmington Trust Association, as

11        Indenture Trustee and Collateral Agent

12        620 8th Avenue

13        New York, NY 10018

14

15   BY:  EDWARD M. FOX

16

17   VEDDER PRICE

18        Attorneys for Village of Hoffman Estates

19        1633 Broadway, 31st Floor

20        New York, NY 10019

21

22   BY:  MICHAEL L. SCHEIN

23

24

25

1    PATTERSON BELKNAP WEBB & TYLER LP

2         Attorneys for MOAC Mall Holdings

3         1133 Avenue of the Americas

4         New York, NY 10036

5

6    BY:  DAVID W. DYKHOUSE

7

8    DLA PIPER LLP (US)

9         Attorneys for Transform Holdco

10        1251 Avenue of the Americas

11        New York, NY 10020

12

13   BY:  RACHEL EHRLICH ALBANESE

14        RICHARD A. CHESLEY

15

16   DIAMOND MCCARTHY LLP

17        Attorneys for Team Worldwide Corporation

18        Two Houston Center

19        909 Fannin Street, 37th Floor

20        Houston, TX 77010

21

22   BY:  CHARLES M. RUBIO

23

24

25

```
 1   M-III PARTNERS, LP

 2         Attorneys for the Debtors

 3         130 West 42nd Street, 17th Floor

 4         New York, NY 10036

 5

 6   BY:  WILLIAM GALLAGHER

 7

 8   WITNESSES:

 9

10   KUNAL S. KUNDANI

11   JANE S. BORDEN

12   WILLIAM GALLAGHER

13   NADER TAVAKOLI

14   ANDREW HEDE

15   CHRISTOPHER GOOD

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2            THE COURT:  Please be seated.  Okay, good morning.

 3    In Re Sears Holdings Corporation, et al.

 4            MR. SCHROCK:  Good morning, Your Honor.

 5            THE COURT:  Good morning.

 6            MR. SCHROCK:  Ray Schrock, Weil, Gotshal for the

 7    Debtors.  We have a number of items on the agenda today.  I

 8    think the first part of the agenda should be pretty quick,

 9    and then we have the APA dispute, which I think will take

10    the majority of the hearing.

11            THE COURT:  Okay.  Can I interrupt you just for a

12    second?

13            MR. SCHROCK:  Oh, of course.

14            THE COURT:  Sorry, go ahead.

15            MR. SCHROCK:  No worries.  One quick announcement

16    just for the Court and parties-in-interest.  We have begun

17    soliciting votes on Sears' plan of liquidation; that began

18    last Friday.  We've also filed just a slightly modified

19    version of the plan with just a couple of clarifying changes

20    that were requested.  That will not impact solicitation

21    because the way we are soliciting, people are clicking on

22    the, you know, to get the documents; they're not getting

23    paper versions, and it just goes to the amended plan, but

24    it's just a couple of clarifying changes on Kmart guaranty

25    claims.
```

1               THE COURT:  Okay.

2               MR. SCHROCK:  With that, Your Honor, absent any

3     questions, I can turn it over to Miss Marcus for the first

4     item.

5               THE COURT:  No, that's fine.  Why don't we just

6     file the agenda.

7               MR. SCHROCK:  Okay.

8               MS. MARCUS:  Good morning, Your Honor.  Jacqueline

9     Marcus, Weil, Gotshal & Manges, on behalf of Sears Holdings

10    Corporation, it's affiliated Debtors.

11              THE COURT:  Good morning.

12              MS. MARCUS:  The first item is a status conference

13    regarding the notice of assumption and assignment, and

14    that's going to be handled by Mr. Barefoot from Cleary.

15              THE COURT:  Okay.

16              MR. CHESLEY:  Your Honor, Richard Chesley, DLA, on

17    behalf of Transform, Your Honor.

18              THE COURT:  Good morning.

19              MR. CHESLEY:  We'll be very brief.  We are here on

20    the status conference.  Mr. Flynn is here on behalf of the

21    Mall of America.  The motion has been fully briefed before

22    the Court.  Parties have, however, have now begun to have

23    some settlement negotiations, and we are hopeful of

24    furthering those in the next week to 10 days.

25              We have spoken to the Court's chambers, who has

Page 11

1    graciously told us if we're not able to get this resolved,

2    we could have this heard on August 22nd.  Our plan is to try

3    to get this resolved so we do not see you on August 22nd,

4    and we would put a stipulation before the Court confirming

5    these dates and extending the 365(d)(4) deadline.

6           THE COURT:  Okay.  So the parties have agreed to

7    extend the date to assume or reject --

8           MR. CHESLEY:  Yes, Your Honor.

9           THE COURT:  -- to comply with that schedule.  One

10   other thing I think I have to say on this, unless someone

11   from Mall of America wants to say anything is, I guess it's

12   conceivable that you could resolve most, but not all.

13           If that's the case, as soon as you know that,

14   there's still an open issue or two, let me know so that

15   we're not preparing on the whole thing.  Because, you know,

16   obviously, a number of different (indiscernible) have

17   objections that the parties have been dealing with.  They've

18   been narrowing them down, I can tell from the supplemental

19   briefing.  Hopefully, you'll resolve the whole thing.

20           MR. CHESLEY:  We will, Your Honor.  To the extent

21   we do have isolated issues, we'll apprise the Court

22   immediately.

23           THE COURT:  Okay.

24           MR. CHESLEY:  Thank you, Your Honor.

25           THE COURT:  Thanks.

Page 12

1          MR. CHESLEY:  And may we be excused, Your Honor?

2          THE COURT:  Yes.

3          MR. CHESLEY:  Thank you.

4          MR. BAREFOOT:  Good morning, Your Honor.  Luke

5    Barefoot from Cleary Gottlieb Steen & Hamilton for Transform

6    Holdco and its affiliates.  Your Honor, we have a few other

7    lease assignment related matters.  Your Honor, just to set

8    the stage, you may recall that at the May 8th hearing, we

9    left with approximately 50 lease -- leases from

10   approximately 50 store locations where the 365(d)(4)

11   deadline was adjourned, and that was pundit for subsequent

12   resolution.

13          Since that time, we've had 21 lease locations that

14   have been successfully assumed and assigned with the

15   objections resolved.  And today, I have leases for five more

16   locations where we have resolved objections: first, for

17   Lansing, Michigan -- store 1170; the warehouse location in

18   Ontario, California -- store 8629; Brooklyn, New York --

19   store 1114; and then the two locations in Manhattan at Penn

20   Station and Astor Place -- stores 7749 and 7777.

21          We have resolved all the objections with the

22   landlords for those locations, and we have revised forms of

23   orders.  I'm happy to hand them up or we can just submit

24   them to your chambers.

25          THE COURT:  No.  You should email them to chambers

1    like you've been doing.

2            MR. BAREFOOT:  We'll do that, Your Honor.  That

3    means there are approximately 26 remaining locations.

4    That's a little bit misleading because 16 of those are at a

5    single master lease with a single landlord.  We're

6    continuing to try to work through those, as many as

7    consensually as we can.  Some of those do present bespoke

8    issues where we already have a briefing schedule and will be

9    before Your Honor on those in the next two months.

10           THE COURT:  Okay.

11           MR. BAREFOOT:  But we're hoping that we can

12   resolve as many of those and submit them on notice of

13   presentment.

14           THE COURT:  Okay, that's fine.

15           MR. BAREFOOT:  Thank you, Your Honor.

16           THE COURT:  Thanks for the update.

17           MS. MARCUS:  Your Honor, the next matter on the

18   agenda is listed as an uncontested matter.  It's No. 2.  I

19   don't think you need to do anything with respect to that.

20   It's related to the page limit.

21           THE COURT:  If Transform wants to submit a longer

22   brief, it can do that.  You can submit the order for that.

23           MR. BAREFOOT:  Thank you, Your Honor.

24           THE COURT:  Although you know what Mark Twain

25   said, right?  "If I had more time, this would be shorter."

Page 14

1              MS. MARCUS:  Turning to the contested matters,

2     Your Honor.  The next matter is the application of Team

3     Worldwide for a Rule 2004 order.

4              THE COURT:  Right.

5              MR. RUBIO:  Good morning, Your Honor.  Charles

6     Rubio on behalf of Team Worldwide.  Team Worldwide is a

7     company that designs and manufactures products, including

8     inflatable mattresses.  Team Worldwide owns U.S. patents,

9     and Team Worldwide has patent infringement claims against

10    certain of the Sears Debtors.

11             Team Worldwide has previously commenced a lawsuit

12    against Walmart for similar claims.  And during that Walmart

13    litigation, the manufacturers of these products intervened

14    on the basis that they had agreements with Walmart that

15    provided that they would indemnify Walmart against patent

16    infringement claims brought against them.  They also noted

17    in that litigation that they had similar agreements with

18    other U.S. retailers.

19             Just after the Debtors filed their Chapter 11

20    plan, we contacted the Debtors to obtain copies of those

21    agreements.  We note that in Schedule G of the Sears,

22    Roebuck -- the Sears, Roebuck Holdings company schedules,

23    they actually have two of these manufacturers listed in

24    them.

25             So we contacted them in order to obtain these to

Page 15

1    determine what the indemnification claims are.  We don't

2    know things like if there are separate purchase orders that

3    are each individual contract, if these are executory

4    contracts.  We don't know if the indemnification provisions

5    include cost of defense.  So there's a lot of provisions

6    that we don't know what would necessarily be included in

7    there, so we reached out to the Debtor soon after they filed

8    their plan in order to obtain copies of them.

9            We had been in discussions with the Debtors.  But

10   in light of the upcoming deadline of the confirmation

11   hearing and being that we haven't received any documents

12   from the Debtors, we decided to formalize the discovery

13   request and bring it before the Court so we can have it

14   formalized and have a process here in order to actually get

15   documents and not waive our rights before that.

16           The reason why this is critical is that, under the

17   current plan, the indemnification rights appear to be lost.

18   So how it works is that there's a discharge --

19           THE COURT:  Can you walk me through that?  Your

20   motion actually didn't cite any language to support that

21   contention.

22           MR. RUBIO:  Yeah.  So there's a discharge of all

23   claims under the plan.  So I guess this is pretty typical,

24   even though this is a liquidating plan; whether the

25   discharge is permissible, that's another issue.  But under

Page 16

1    this plan, if there's a discharge, then how it would work is

2    that we would have direct claims against Sears, and then

3    Sears would then have a back-to-back claim under the

4    indemnification agreement.  So having a discharge of our

5    claim against Sears would then prevent the back-to-back

6    claim, which would effectively discharge the parties

7    indemnifying Sears for these claims.

8               THE COURT:  Okay.  Well, the -- but you want this

9    information to sue these people directly?  I don't

10   understand why -- I'm still having a hard time understanding

11   why you're seeking this information, other than to sue these

12   manufacturers directly for infringing on the patent.

13              MR. RUBIO:  We're proposing a modification to the

14   plan to provide a route, so that these indemnification

15   claims are preserved, and we don't have to bring -- collect

16   against our general unsecured claims and our item claims

17   against the Debtors.  But rather, again, we provided an

18   alternative here that basically it provides an assignment of

19   these indemnification rights to Team Worldwide so that Team

20   Worldwide, in Sears' shoes, can then pursue these claims and

21   that they're preserved, and we don't have to collect against

22   the estates.

23              THE COURT:   Right.  But that may be a valid

24   solution to your issue, but I don't understand the basis for

25   the discovery here.  I mean, it seems to me that what you're

1   doing is you're using 2004 to take discovery really aimed at

2   a third party based on just what the Debtors' relationships

3   with that third party.

4           MR. RUBIO:  These are contract.

5           THE COURT:  And that's an overreach.

6           MR. RUBIO:  So these are contracts between the

7   Debtors and the manufacturers whereby the manufacturer --

8           THE COURT:  Yeah, I understand.  But the purpose

9   of it is not -- it doesn't seem to be covered by Rule 2004.

10  The aim is really to get information about the manufacturers

11  so that you could pursue claims against them.

12          MR. RUBIO:  And the objection --

13          THE COURT:  Why is that -- why should the Debtor

14  be concerned about that?

15          MR. RUBIO:  So as part of the Debtors' estates,

16  the estates would include these indemnification rights and

17  these are valuable rights of the estates, which would offset

18  administrative expense claims and general unsecured claims

19  that are being asserted, or that will be asserted in the

20  case of the administration claim against the Debtor.  So

21  these indemnification claims are valuable for rights of the

22  Debtors' estates.

23          THE COURT:  Right.  Well, if that's the case, the

24  Debtors can pursue them.

25          MR. RUBIO:  So what we're saying is that if we go

1    to confirmation and we raise the issue that, hey, they're

2    effectively discharging our claim and they have these

3    indemnification rights that they would be able to recover

4    and pay us on account of these claims.  But by discharging

5    it, we're not able to pursue them, in which case, they're

6    not able to -- or they wouldn't then invoke their

7    indemnification rights.  They're effectively cutting off our

8    ability to ultimately recover against the indemnifying

9    manufacturers.

10            So this is really a property of the estate issue,

11   because these indemnification claims are property and rights

12   of the Debtors' bankruptcy estates, and we just don't have

13   that information.  So what we would be -- we'd be put in a

14   situation where we'd be making an objection at the

15   confirmation hearing without having the actual evidence of

16   the indemn- --

17            THE COURT:  Well, so you take discovery under 9014

18   and the Part VII rules incorporated in 9014 as part of the

19   confirmation hearing.

20            MR. RUBIO:  So we note in our application that if

21   the Court determines that 2004 is an improper basis that we

22   have been using, the contested procedures and the case

23   management procedures order.  So really, we're viewing this

24   as a form of re-substance here.  I mean, at the end of the

25   day, we're asking for copies of these certain agreements.

1    And we provided a list of 38 manufacturers to facilitate the

2    Debtors' review and be able to identify them; also, two of

3    them are listed on Schedule G.

4             THE COURT:  Is that all you're seeking, just the

5    contracts with the vendors?

6             MR. RUBIO:  That is what we started with.  And so,

7    Your Honor, let me clarify this.  I'm of the approach that

8    you do all your discovery when you need to do it, so you

9    don't try to do it piecemeal.  So, yes, we would be

10   satisfied with that information because that's the initial

11   information that we asked for.

12            When we filed our 2004, we took a broader brush

13   because we don't know if we're going to have follow-up

14   questions or anything like that.  But if you want us to take

15   it piecemeal and just ask for any contracts with those 30

16   manufacturers, we're fine with that.  But we would want to

17   reserve our rights in the event that there's additional

18   information that we need to explain that, that we would need

19   that follow-up information.  But initially, yes, that is all

20   we asked for the Debtors was to look for the 38 manufacturer

21   contracts.

22            THE COURT:  In any event, that's what you're

23   asking for at this point.

24            MR. RUBIO:  I will limit the request to that at

25   this point.

1          THE COURT:  Okay.  All right.

2          MS. MARCUS:  Jacqueline Marcus again, Your Honor,

3     for the Debtors.  Your Honor, I think you hit the nail on

4     the head with your comments.  This Rule 2004 request, as far

5     as we can tell, is a request for information that will

6     solely benefit Team Worldwide, and in particular in

7     connection with litigation that they are pursuing or want to

8     pursue against the manufacturers.

9          I'll note that they already have litigation that

10    was filed just a couple of months ago against nine other

11    retailers.  And it seems to us that they're taking advantage

12    of the fortuity of the Sears bankruptcy to try to get

13    information that they're really not entitled to and that

14    they, as you noted, is inconsistent with the purpose of Rule

15    2004.

16          We don't know if the supply agreements that Team

17    Worldwide is asking for even exist, and we don't know

18    whether they have the indemnification language that

19    apparently was in the Walmart agreements.

20          As Your Honor knows, the Debtors are laboring with

21    very few -- I think we have 26 -- employees left;

22    substantially, all of our employees have been transferred to

23    Transform.  And we are very busy preparing for all of the

24    tasks associated with confirmation of the plan.

25          I'll also note, Your Honor, that the idea that

Page 21

1    somehow our indemnifica- -- the Debtors' indemnification

2    rights are jeopardized under the plan, I don't see it.  I

3    don't know where that comes from.

4              THE COURT:  IAU would still have -- the Debtors

5    would have the right to indemnification; it's just that it

6    would be limited to, I guess, the amount that you'd be

7    paying as part of a claim recovery to Team Worldwide.

8              MS. MARCUS:  Right.  And the plan -- you know, the

9    idea that the plan needs to be modified, we don't see it.

10   There are references to third-party releases, there are no

11   not consensual third-party releases, and these vendors are

12   not within the definition of released parties in any event,

13   in addition to the fact that that's a confirmation issue

14   rather than an issue for today.

15             THE COURT:  Well, are the Debtors searching for

16   this -- I mean, how can -- how would the Debtors go about

17   searching, now that we know it's limited to the 38 vendors?

18             MS. MARCUS:  Which it wasn't, Your Honor.

19             THE COURT:  I understand.

20             MS. MARCUS:  The request for a lot more than that.

21             THE COURT:  I understand.

22             MS. MARCUS:  We have asked the Debtors, the

23   employees who are now working for Transform.  They did some

24   initial work.  They weren't able to find anything.

25             THE COURT:  Well, let me just stop you right

1   there.  Is this information within the Debtors' control or

2   is it within Transform's control?

3          MS. MARCUS:  It's within Transform's control.

4          THE COURT:  Does the -- other than good will, do

5   the Debtors have the ability to direct Transform to find

6   these contracts?

7          MS. MARCUS:  There is a transition services

8   agreement that allows us to make certain requests of

9   Transform and we pay for that, of course.

10          THE COURT:  Okay, right.

11          MS. MARCUS:  But it's not as easy as simply

12   pushing a button.  And the fact that there are two entries

13   of Schedule G may just mean that there were purchase orders

14   with those entities, not the kind of supply agreements to

15   which Team Worldwide is alluding.

16          THE COURT:  Right.  But as far as burdensomeness

17   is concerned, you can make the request to Transform for the

18   -- if there are any vendor agreements, not purchase orders,

19   but vendor agreements for these 38 listed parties; then they

20   would go look for it on the computer system?

21          MS. MARCUS:  We have everybody here, so if

22   theoretically, you know, we could make that request and we

23   have made the request, in fact.

24          THE COURT:  Right.  And potentially, that would be

25   beneficial to the Debtors because then you'd know whether

Page 23

1    the Debtors would have rights against these entities.

2            MS. MARCUS:  Sure.  I mean, as part of the

3    confirmation process, we're going to be looking at any

4    executory contracts and determining which ones need to be

5    assumed because, otherwise, they're going to be rejected

6    under the plan.

7            THE COURT:  Okay.  There's no suggestion that

8    there's any confidentiality restrictions on this with the

9    vendors, right?

10           MS. MARCUS:  Not having seen the agreements.

11           THE COURT:  Not that you know of.  So, obviously,

12   that would.  Did you give notice to the vendors of your

13   motion?

14           MR. RUBIO:  Of the 2004, Your Honor?

15           THE COURT:  Yeah.

16           MR. RUBIO:  No, not up to this point.

17           THE COURT:  Okay.

18           MR. RUBIO:  Unless they're otherwise provided.

19           THE COURT:  All right.

20           MS. MARCUS:  And, Your Honor, I also note that

21   Team Worldwide has filed a stay relief motion, which will be

22   on on August 22nd.

23           THE COURT:  Right.

24           MS. MARCUS:  And, again, you know, the pending

25   proceeding rule that you can't proceed by 2004 when you have

1    a contested matter should also preclude the entry of the

2    order that they're seeking here.

3              THE COURT:  When's that on; it's on for July what?

4              MS. MARCUS:  I believe it's on for the next

5    omnibus hearing, which is August 22nd.

6              THE COURT:  August, okay.  Well, that's to be able

7    to pursue the patent infringement litigation in District

8    Court; that's the basis for the claim, right?

9              MS. MARCUS:  To name Sears as a defendant, as well

10   as, I believe, the vendors or the alleged vendors.

11             THE COURT:  But is it to pursue the litigation or

12   just to name them as a nominal defendant?

13             MR. RUBIO:  It's to name them as a nominal

14   defendant, Your Honor.  Again, like in the Walmart

15   litigation, we named Walmart, and then the manufacturers

16   intervened on their behalf on the basis of these

17   indemnification provisions.

18             THE COURT:  I'm not intending to argue this now.

19             MR. RUBIO:  Sure.

20             THE COURT:  I just want to understand how the

21   pending proceeding rule would apply.  It doesn't sound like

22   it does.  I mean, they're just basically, from what I'm

23   being told today, they just want to name Sears but not

24   pursue it just to have it in the caption, but their claim

25   against Sears would be liquidated in the bankruptcy case.

1    Is that how the motion is couched?

2              MR. RUBIO:  What we're proposing is that if we

3    could pursue this, then we will not collect our claim

4    against Sears in the bankruptcy estate.  We would

5    exclusively --

6              THE COURT:  When you say pursue this, what do you

7    mean, the discovery or the lift stay?

8              MR. RUBIO:  Oh, I'm sorry, the liquidation of the

9    claim in the bankruptcy case.  We would not pursue the

10   liquidation of the claim in the bankruptcy case; we would

11   liquidate that claim in the District Court.

12             THE COURT:  Oh, well, that's not going to work.

13             MR. RUBIO:  Okay.

14             THE COURT:  I can tell you right now, that's not

15   going to work.  You file the claim here.

16             MR. RUBIO:  Understood.  So as part of this, we're

17   saying that we're not going to collect on the claim.  We're

18   seeing it similar to when someone has coverage by an

19   insurance policy, an insurance company would indemnify.

20   You could -- we're not collecting against --

21             THE COURT:  So you can waive the claim, except in

22   respect of indemnity?

23             MR. RUBIO:  I want to be very careful here, is

24   that we're not saying -- we're saying we're going to waive

25   collection of the claim.

1            THE COURT:  Right.

2            MR. RUBIO:  Okay, okay.

3            THE COURT:  Except to the extent you can --

4    waiving collection, except through indemnification.

5            MR. RUBIO:  Correct, Your Honor.

6            THE COURT:  All right.

7            MR. RUBIO:  That would be the proposal.

8            THE COURT:  All right.

9            MS. MARCUS:  Your Honor, the pending proceeding to

10   which I was referring was the contested matter on the

11   automatic stay.

12           THE COURT:  Right.

13           MS. MARCUS:  As opposed to the --

14           THE COURT:  It doesn't sound like this discovery

15   really affects that.  It might have before when there was a

16   lot of other relationship with vendor documents being sought

17   or documents relating to relationships with the vendors

18   being sought.  But if it's just these -- whether they're

19   vendor agreements with these 38, it doesn't sound like it

20   would be worth.

21           And in any event, the representation is that Team

22   Worldwide Corporation is not pursuing any monetary recovery

23   directly from the Debtor.  So in that sense and consistent

24   with that agreement, it seems that (a) this would be covered

25   by the broad language of 2004, since it a matter that

Page 27

1    affects the administration of the Debtors' estate; in other

2    words, the quid pro quo for Team Holdco's agreement not to

3    seek recovery except through indemnification is, the Debtor

4    trying to make these contracts available to it.

5            And it also appears that, as far as the balancing

6    of the burden and the good cause showing, which the case law

7    requires, now that it's been clarified, it doesn't sound

8    like it's that much of a burden to the Debtors.

9            MS. MARCUS:  The time period for the proposed

10   order --

11           THE COURT:  The time period doesn't make sense.  I

12   think that's something that you're going to have to work out

13   with Holdco.  But I -- you don't need that; you've already

14   worked out the deal.  It's on the record today with regard

15   to your plan objection.

16           MR. RUBIO:  The assumption is that these

17   indemnification rights exist.  But, I mean, as long as they

18   exist, that's the deal we've proposed to the Debtors

19   already.

20           THE COURT:  Right.  So it doesn't really affect

21   the timing of the objection to the plan.

22           MR. RUBIO:  So there's some modifications --

23           THE COURT:  To the extent they exist, they exist;

24   and if they don't, they don't.  And either way, the

25   objection is moot because it's resolved by what's been laid

1    on the record.

2              MR. RUBIO:  Right.  So if there's no

3    indemnification rights, we would continue with our claim;

4    but if there were indemnification rights, we would do the --

5              THE COURT:  Well, that's not what you just told

6    me.

7              MR. RUBIO:  Well, I'm not intending to wai- --

8    again, this is -- I'm not intending to waive my clients'

9    claims absolutely here.

10             THE COURT:  You told me that you were waiving

11   collection, except through the indemnification.

12             MR. RUBIO:  Yes, Your Honor.  I don't -- that's

13   the purpose of the discovery.  I don't know if there's

14   indemnification rights.  I think that there's a strong

15   likelihood, but I don't know that that's the case at this

16   point.  So, again, I don't want to -- if this happens to be

17   a --

18             THE COURT:  All right.  But as far as the timing

19   point is concerned, it really doesn't matter.  You could lay

20   out the argument as you've just laid it out and the deal as

21   you've just laid it out and you don't actually have to have

22   this information as part of that prosecution of the

23   objection.  What you're really doing is trying to fix the --

24   whether there's indemnification rights there worth pursuing.

25   And if it's just to make the request of Transform to look in

1    the files to find the 38 vendors and whether there's a

2    vendor agreement, that doesn't seem to be particularly a

3    burden here.

4            So when I first read this application and the

5    Debtors' response, it seemed to me that it actually fit

6    pretty well into two of Judge Bernstein's opinions, both

7    from the Sun Edison case, 562 B.R. 243 (Bankr. S.D.N.Y.

8    2017) and 572 B.R. 42 (Bankr. S.D.N.Y. 2017), both of which

9    -- one, discovery is being sought by the Debtor, one

10   discovery is being sought by a third party.

11           Judge Bernstein, I think, clearly correctly said

12   that 2004 doesn't reach so far as to allow a Debtor or a

13   third party to take discovery from participants in third-

14   party liquidation involving claims that either the Debtor

15   doesn't own or that don't affect the Debtors' estate in a

16   meaningful way.

17           And on top of that, he weighed, as many courts do,

18   the burden that discovery would take, even if it does fit

19   within Rule 2004.  I think you've gotten it within Rule 2004

20   now based on the agreement you've laid out.  But as far as

21   burdensomeness is concerned, the seven days (a) it's not

22   necessary, and (b) it is awfully burdensome to expect people

23   to provide the documents in that manner and/or object on the

24   bases of privilege or confidentiality.

25           So I'll grant the application as modified on the

1    record.  But it should be, it's just documents you're

2    looking for, so it should be 21 days to produce them.  And

3    producing here is the vendor agreements for the 38 vendors

4    within the Debtors' possession, custody or control.  The

5    Debtors have represented to me that it's only the latter

6    point that applies and it's only to the extent that the

7    transition services agreement provides for it, so they'll be

8    making the request to Transform.

9           MS. MARCUS:  And just for clarification, Your

10   Honor, there's not going to be a deposition, right?  We're

11   only --

12          THE COURT:  Right.  It's just the 38 vendor --

13   looking for the 38 vendor agreements.  So you can email that

14   order to chambers with a -- you should run it by Miss Marcus

15   first.

16          MR. RUBIO:  I will do that.

17          THE COURT:  All right.  You probably should run it

18   by Transform's counsel first.  I also think you should

19   provide a copy -- I'm sorry.  My standard form of Rule 2004

20   order provides that you serve the document subpoena under

21   2004(c), a copy of the order and the application on the

22   party providing it.  Here, we have that because it's the

23   Debtor.  But I'm going to ask you to also serve it on the 38

24   vendors and Transform's counsel, since they'll be --

25   Transform's the party to the vendor services agreement that

Page 31

```
 1   has the records.

 2            MS. MARCUS:  Thank you, Your Honor.

 3            MR. RUBIO:  We will do that, Your Honor.

 4            THE COURT:  Okay.

 5            MR. RUBIO:  May I be excused, Your Honor?

 6            THE COURT:  Yes.

 7            MR. RUBIO:  Thank you.

 8            MR. FRIEDMANN:  Good morning, Your Honor.  Jared

 9   Friedmann from Weil, Gotshal & Manges on behalf of the

10   Debtors.  The next item we have on the agenda is Debtors'

11   supplemental motion to enforce the asset purchase agreement.

12            As Your Honor knows, the parties have agreed to

13   handle at the same time Debtors' supplemental motion to

14   enforce the asset purchase agreement, along with the

15   adversary complaint filed by Transform, given the

16   overlapping issues and given the need to have these issues

17   resolved expeditiously.

18            Your Honor, we provided this morning a chart of

19   the 11 issues that we had discussed with you at our

20   prehearing conference on, I guess it was Tuesday afternoon.

21   The days are all mixed together.  It lists out 11 issues.  I

22   have some good news to report, which is that one of the 11

23   issues has been resolved, so we are down to 10.

24            THE COURT:  Okay.

25            MR. FRIEDMANN:  And with respect to that, with
```

1    Your Honor's permission, I'd like to read into the record

2    the key terms of that settlement.

3              THE COURT:  Okay.

4              MR. FRIEDMANN:  And it affects, with respect to

5    the 11 issues that it affects, the one in the chart that is

6    referenced as rent prorated on the third page of the chart.

7              THE COURT:  Okay.

8              MR. FRIEDMANN:  The key terms of the settlement

9    are as follows: Transform to wire $8 million on Monday, July

10   15th for prorated rent for February of 2019 to the Debtors

11   without any condition on how the Debtors could use the money

12   or what account it would be placed in, and to escrow $2.4

13   million for uncashed checks; escrow to be released to

14   Transform upon cashing and to be released to Sears after the

15   applicable (indiscernible) period terminated.

16             THE COURT:  I'm sorry.  The uncashed checks isn't

17   a rent proration; that's another part of another category.

18             MR. FRIEDMANN:  Actually, yeah.  So it resolves

19   entirely the rent proration issue.

20             THE COURT:  It's part of the reconciliations.

21             MR. FRIEDMANN:  It resolves $2.4 million of the

22   reconciliation issue.  So they're now, from the Debtors'

23   perspective, instead of they're a $30.4 million issue,

24   they're now a $28 million issue on the reconciliation issue.

25             THE COURT:  Okay.

1              MR. FRIEDMANN:  The transfer of the $8 million

2       remains subject to Transform's setoff, recoupment, and other

3       rights it may have, including as to how the cash is actually

4       used, as well as the Debtors' rights and defenses to same.

5       Second, Sears to immediately transfer all the deeds for the

6       Brooklyn deed parcels upon the making of the payment

7       described in Item 1.  And, Your Honor, there was an

8       adversary complaint filed, I believe, yesterday by

9       Transform, which this provision would now moot that

10      adversary complaint, so that's more good news.

11              THE COURT:  That was related to the Brooklyn --

12              MR. FRIEDMANN:  Correct.

13              THE COURT:  -- real property.  Okay.

14              MR. FRIEDMANN:  And third, all other rights of the

15      parties in respect of the APA disputes are fully reserved,

16      including with respect to the remaining issues on cash and

17      transit, alleged stay violation, and other proration issues

18      and Hoffman Estates.

19              THE COURT:  Okay.  I'm glad you've reached that

20      agreement.  On their rent proration, the $8 million that's

21      to be paid, that's a nice round number; it's not the exact

22      number that the Debtors were claiming.  Are the parties'

23      rights reserved as to any other rent prorations above or

24      below that?

25              MR. FRIEDMANN:  Our position is that this

Page 34

1    satisfies the rent proration amounts due.

2                THE COURT:  Okay.  And what about Transform; does

3    it satisfy Transform on the rent proration too, or is that

4    one of the rights that's reserved?

5                MR. LIMAN:  Your Honor, we're satisfied with --

6    Lewis Liman on behalf of Transform Holdco.

7                THE COURT:  Okay.  So this resolves the rent

8    proration dispute.

9                MR. LIMAN:  It does.  I think Mr. Friedmann -- we

10   agree obviously with what Mr. Friedmann stated.  I think he

11   captured, but I apologize if I missed it, that the transfer

12   of the 8 million remains subject to Transform's setoff,

13   recoupment, and other rights it may have, including as to

14   how the cash is used.  And there are --

15               THE COURT:  That's why I was asking.  It's subject

16   to Transform's rights, except with respect to rent

17   proration.

18               MR. LIMAN:  That's right.

19               THE COURT:  Okay, all right.

20               MR. LIMAN:  I just wanted to highlight that there

21   may be issues not ripe for today with respect to --

22               THE COURT:  Setoff issues and other issues.

23               MR. LIMAN:  Setoff and how the monies are used.

24               THE COURT:  Right, for other types of claims.

25               MR. LIMAN:  And it's our expectation that once the

Page 35

1    Brooklyn deeds are transferred, we'll be able to dismiss the

2    Complaint that was filed yesterday.

3              THE COURT:  Okay.  And similarly, the Debtors'

4    rights are preserved, except with respect to the rent

5    proration issue and the 2.4 million and the agreement on the

6    delivery of the Brooklyn deed.

7              MR. FRIEDMANN:  That's correct.  And with respect

8    to those, obviously, our rights are preserved with respect

9    to any rights we have in connection with the fact that the

10   $8 million was not paid until today.

11             THE COURT:  Right, sure.

12             MR. FRIEDMANN:  And the efforts we've had to make

13   to get to this point.

14             THE COURT:  Okay.  All right, very well.  Okay.

15             MR. FRIEDMANN:  So, Your Honor, that eliminates

16   one of the 11 issues; that means there are still 10 left.

17   And, as I mentioned earlier, the parties prepared a chart,

18   which hopefully the Court will find helpful as we go through

19   today.  As the chart notes, all 10 issues are listed here.

20   The parties agree that these are the 10 remaining issues.

21   The parties, you know, agree in terms of what testimony has

22   been submitted by each side on each issue.

23             And also, to the extent they anticipate any live

24   cross-examination today, one issue that the parties have not

25   full agreement is the order in which we should proceed

Page 36

1    today.  So the order that is before you is Debtors' position

2    as to the order in which we should proceed, which we submit

3    makes the most sense because it leads off with the $166

4    million ordered inventory versus other payable issue which,

5    frankly, is the largest issue right now between us being

6    able to confirm the plan or not being able to.

7              It then, after addressing that with ordinary

8    course and available cash, which are really the kind of

9    breach of contract associated claims that affect that $166

10   million accounts payable issue.  We then propose to address

11   all the issues that involve witness testimony so that we

12   could have the witnesses come up just once; to the extent

13   there's cross-examination, have those cross-examinations.

14             Argue following that, prepaid inventory, specified

15   receivables, and the reconciliation issue, followed by the

16   Hoffman Estates issue, which has different witnesses who

17   would then be able to testify.  And then the last issues all

18   are ones in which neither party anticipates there being any

19   live cross-examination, which are the Hoffman Estates issue,

20   the adequate assurance deposit issue, mechanics lien.  And

21   finally, last but not least, my favorite, the EDA funds

22   issue.

23             THE COURT:  Okay.

24             MR. LIMAN:  Your Honor, one or two housekeeping

25   matters, and then with respect to the schedule.  With

1    respect to housekeeping, one other item has to do with

2    exhibits.  Your Honor was given a list of joint exhibits,

3    plus a list of exhibits from Transform Holdco.  I'm pleased

4    to report that we've now agreed on all of the exhibits, and

5    we have a supplemental list of exhibits that I could pass up

6    listing those for Your Honor.

7            THE COURT:  So are there any in the Transform

8    Holdco binder that are not agreed at this point?

9            MR. LIMAN:  No.  I think they are all agreed, Your

10   Honor.

11           THE COURT:  Okay.  All right, that's fine.  And

12   then my -- I think my only other question is, I know you

13   have a list here.  I have binders.  I want to make sure that

14   all the exhibits on your list are actually in the binders.

15           MR. LIMAN:  I believe they are.

16           THE COURT:  Okay.

17           MR. LIMAN:  We have gone through them to try to

18   confirm.

19           THE COURT:  As far as you know, they are.

20           MR. LIMAN:  As far as I know.

21           THE COURT:  All right.  There's nothing that's

22   been subsequently added or subtracted.

23           MR. LIMAN:  There are with respect to

24   housekeeping, also a couple of other items.

25           THE COURT:  So that means that all of the binders

1    I have, which includes the binder that says Transform on it,

2    the two binders, are now agreed to be admissible.

3            MR. LIMAN:  That's correct, maybe with one caveat.

4    There is, with respect to the deposition testimony.

5            THE COURT:  Okay.

6            MR. LIMAN:  There is an exh- -- there is an

7    objection that we have with respect to a portion of Mr.

8    Meghji's testimony; that's referenced -- that objection is

9    referenced in Footnote 3.  It has to do with his testimony

10   regarding the 166 item, and our view that if the -- twofold:

11   one, if the Court is going to receive parol evidence, it

12   should be two-sided; and the second is that we've asked that

13   we have the opportunity to depose Mr. Meghji -- not to

14   depose him, but to cross-examine Mr. Meghji in front of you

15   with respect to that testimony.  I don't think Your Honor

16   needs to reach that issue today, but I just note the

17   objection.

18           THE COURT:  Okay.  Well, I think that raises one

19   other point, which is the exhibits, with the caveat that you

20   just said, are agreed to be admissible.  On the other hand,

21   depending on the issue, one or both of the parties have

22   contended that under applicable law, the agreement is clear

23   on its face and I'm precluded from considering parol

24   evidence.  I'm assuming that their agreement as to

25   admissibility doesn't waive those arguments, and you just --

1    as you just said.

2            MR. LIMAN:  No, Your Honor.  Our view is that

3    those arguments would be preserved.

4            THE COURT:  So, for example, the portions of the

5    testimony for Debtors and Transform on the $166 million

6    issue may be admissible, but it may, depending on my view of

7    the document, not be properly considered.

8            MR. LIMAN:  That's correct, Your Honor.

9            THE COURT:  Okay.

10           MR. LIMAN:  Just one other housekeeping matter,

11   and then with respect to the order, just a clarification

12   with respect to what Mr. Friedmann said.  As the document in

13   front of Your Honor reflects, the testimony that is listed

14   in this document is intended to assist the Court for

15   purposes of today's hearing.

16           We did not list under that, under the 166, the

17   declarations of Mr. Kamlani, Mr. Murphy, and Mr. Allen, who

18   are relevant to the 166.  But pursuant to the conference we

19   had with Your Honor, we did not bring the latter two to the

20   court today, pending the Court's determination with respect

21   to parol evidence.  But I don't want the schedule to be

22   misunderstood that --

23           THE COURT:  Okay.

24           MR. LIMAN:  -- this is the limit of our testimony.

25           THE COURT:  Okay.

1          MR. LIMAN:  With respect to order, Your Honor, the

2     simple request that we have is we've got six witnesses here.

3     It's not clear that there's going to be cross-examination

4     with respect to all of them.  Our view is that we'd like to

5     get those six witnesses out of the way, and then there

6     should be plenty of time to turn to the 166 issue, but I

7     would like to let them go home.  All of them would be

8     prepared once they come up and affirm their declaration and

9     are subject to any cross-examination to leave, except for

10    Mr. Kamlani, I think, who planned to stay for the day.

11         THE COURT:  Okay.  Well, you're prepared either

12    way, right?  This is a request of anyone being surprised.

13    You knew that there was that issue, both of you?

14         MR. FRIEDMANN:  That's correct, Your Honor.

15         THE COURT:  All right.  I think even though the

16    $166 million issue is the $166 million issue, the big issue,

17    there's some merit in taking live testimony on discreet

18    issues first.  And my suggestion would be to take the

19    testimony on the specified receivables in the Hoffman

20    Estates issue, and then hear from -- well, let me ask you a

21    question.  I'm sorry.  Does the testimony on prepaid

22    inventory at all bleed over into specified receivables?

23         MR. FRIEDMANN:  Not with respect to the cross-

24    examinations that are anticipated.

25         THE COURT:  Okay, all right.  So why don't we hear

1    from either --

2            MR. FRIEDMANN:  The one caveat I will make,

3    though, is that those two witnesses, you will notice, are

4    the same two witnesses on the reconciliation issue.

5            THE COURT:  Right.  No, I understand.

6            MR. FRIEDMANN:  And I would suggest let's have

7    them come up.  We'll ask all the questions everybody has,

8    and then let them be done.

9            THE COURT:  That's fair.  I just -- just in terms

10   of timing, why don't we take Ms. Borden and Mr. Gallagher

11   first on Hoffman Estates.

12           MR. LIMAN:  Your Honor, I'm going to step aside

13   for the other lawyers for Transform Holdco.  Mr. Kamlani is

14   a -- has a short portion of his declaration with respect to

15   specified receivables.  My question is whether you would

16   like to have him come up and just affirm his declaration,

17   get that piece of testimony done.

18           THE COURT:  Well, we have a lot of declarations

19   here by people.  Are the -- let's see.

20           MR. LIMAN:  He also is a witness with respect to

21   Hoffman Estates.

22           THE COURT:  Right.  But --

23           MR. FRIEDMANN:  Your Honor, if it makes it easier

24   for the Court.  For most of these declarants, we won't have

25   any objection to their declarations being accepted.

1          THE COURT:  No, I know, but I just wanted to make

2    a different point.  Which is, when I normally take direct

3    testimony by declaration or affidavit, the witness is on the

4    stand.  I ask him or her whether sitting there today -- one

5    of these declarations was submitted yesterday, but a couple

6    were submitted third week of June -- was there anything they

7    wanted to change in their declaration and are they --

8    knowing it's otherwise going to be used as their direct

9    testimony.  Are all of the declarants here in person today?

10         MR. LIMAN:  They are, Your Honor, with the

11   exception of Mr. Murphy and Mr. Allen, but those are both

12   related to the 166.  So all of the declarants whose

13   testimony are relevant to the issues being heard today are.

14         THE COURT:  Okay.  All right.  Well, so, Mr.

15   Kamlani, do you want to come up the stand please, which is

16   that bench over there.  Would you raise your right hand,

17   please?  Do you swear or affirm to tell the truth, the whole

18   truth, and nothing but the trust, so help you God?

19         MR. KAMLANI:  I do.

20         THE COURT:  And could you spell your name for the

21   record, please?

22         MR. KAMLANI:  Kunal, K-U-N-A-L, last name Kamlani,

23   K-A-M-L-A-N-I.

24         THE COURT:  Okay.  Mr. Kamlani, you have submitted

25   a couple of declarations in connection with this adversary

Page 43

1    proceeding/contested matter that is intended to serve as

2    your direct testimony in the matter; one dated June 25th,

3    2019 and that might be it.  The rest is your deposition, I

4    believe.  Just confirm that.  Yes.  So obviously, that

5    wasn't that long ago.  But sitting here today on July 11th,

6    is there anything in that declaration that you wish to

7    change as your direct testimony?

8              MR. KAMLANI:  No, there isn't.

9              THE COURT:  Okay, very well.  So you could sit

10   down again.

11             MR. KAMLANI:  Thank you.

12             MR. LIMAN:  Your Honor, we would move the

13   declarations into evidence.

14             THE COURT:  That's fine.  As Mr. Kamlani's direct

15   testimony, which I'm considering on these designated

16   paragraphs.  So then, you want to call Jane Borden?

17             MR. WEAVER:  Good morning, Your Honor.  Andrew

18   Weaver, Cleary Gottlieb Steen & Hamilton, on behalf of

19   Transform.  At this point in time, we'd like to ask Miss

20   Jane Borden to take the stand.

21             THE COURT:  Okay.  Would you raise your right

22   hand, please?  Do you swear or affirm to tell the truth, the

23   whole truth, and nothing but the truth, so help you God?

24             MS. BORDEN:  Yes.

25             THE COURT:  Okay.  And Miss Borden, it's B-O-R-D-

Page 44

1    E-N, right?

2              MS. BORDEN:  B-O-R-D-E-N.

3              THE COURT:  Miss Borden, you submitted declaration

4    in support of Transform Holdco's brief in opposition to the

5    Debtors' supplemental motion to enforce the asset purchase

6    agreement.  I have it at Tab L in my binder, and it's dated

7    June 25th, 2019.  Sitting here today on July 11th, is there

8    anything in that you'd like to change as your direct

9    testimony?

10             MS. BORDEN:  No.

11             THE COURT:  Okay.  So that will constitute your

12   direct testimony.

13             MR. WEAVER:  Thank you, Your Honor.  Just should

14   we move for admission?

15             THE COURT:  Yes.  It's admitted as Ms. Borden's

16   direct testimony.

17             MR. WEAVER:  Thank you.  She's available for

18   cross.

19             THE COURT:  Do you have cross?

20             MR. FRIEDMANN:  Yes, Your Honor.  Jared Friedmann

21   again from Weil, Gotshal on behalf of the Debtors.  With the

22   Court's permission, Jennifer Brooks Crozier will be taking

23   this cross-examination, and her pro hac vice application is

24   in process right now.

25             THE COURT:  Okay.

1            MR. FRIEDMANN:  I can promise you that Weil,

2   Gotshal will assure that all fees are paid, and everything

3   is finalized. But with the Court's permission, I'll have her

4   take this cross-examination.

5            THE COURT:  That's fine.

6            MR. FRIEDMANN:  Thank you.

7            MS. CROZIER:  Thank you, Your Honor.  Jennifer

8   Crozier, Weil, Gotshal & Manges for the Debtors.  Good

9   morning, Ms. Borden.

10               CROSS-EXAMINATION OF MS. BORDEN

11   BY MS. CROZIER:

12   Q    Ms. Borden, you're the president of Sears' real estate

13   group or division, correct?

14   A    That's correct.

15   Q    And you've served in that capacity since June 15th,

16   2018, correct?

17   A    Yes.

18   Q    Now, before your tenure at Sears, you were senior vice

19   president of real estate for 24-Hour Fitness; is that

20   correct?

21   A    That's correct.

22   Q    And so, to be clear, Ms. Borden, when you stated in

23   your declaration that in your role as president of Sears'

24   real estate, you have, quote "always" unquote, considered

25   Store 490 to encompass all property owned by Sears at

Page 46

1    Hoffman Estates.  Hoffman Estates, or rather always refers

2    to a period of time dating back to June 2018, correct?

3    A    That was my period of time that I was employed, yes.

4    Q    Now, you also testify in your declaration that in your

5    capacity as president of Sears' real estate, you devoted

6    substantial time and attention to the Debtors' sales of

7    certain of their properties to Transform in connection with

8    the sale transaction, correct?

9    A    That's correct.

10   Q    And so, you understand, Ms. Borden, the diligence in

11   connection with the Debtors' sale process included an

12   electronic data room that contained documents related to

13   Sears' assets and operations.

14   A    That's correct.

15   Q    And that electronic data room is called Intralinks; is

16   that right?

17   A    Yes.

18   Q    And you also understand then that the store numbers on

19   Schedule 1.1(p) to the APA corresponded to documents in

20   folders in the Intralinks data site, correct?

21   A    Yes.  But there may or may not have been documents in

22   the Intralinks data site for properties on that schedule.

23   Q    Okay.  But you do understand that the store numbers on

24   Schedule 1.1(p) did correspond to documents in folders in

25   the Intralinks data site, correct?

Page 47

1   A    To the extent there were documents for a certain

2   property, yes.

3   Q    Okay.  And you would agree with me, Ms. Borden, that

4   the documents in the Intralinks folder for site 490 related

5   only to Lots 1(a), 2 and 3 in the Hoffman Estates

6   development, correct?

7   A    My understanding is that the documents in Intralinks

8   for 490 did relate to those three parcels.

9   Q    And isn't it true, Ms. Borden, that the documents in

10  the Intralinks data site that corresponded to the store

11  numbers on Schedule 1.1(p), those were provided by the

12  Sears' real estate group, correct?

13  A    So documents in the Intralinks data site were provided

14  by Sears and our professional outside counsel, yes.

15  Q    And is it also fair to say that your real estate or

16  Sears' real estate group made an effort to ensure the

17  documents in the Intralinks site were complete and accurate?

18  A    Well, we told all parties going into the Intralinks

19  data site that we provided the documents that we had

20  available to us, but we didn't make representations that

21  everything was in there with regard to any site.

22  Q    Okay.  And so, your testimony sitting here today is

23  that Sears' real estate group made no efforts to ensure that

24  the documents in the Intralinks data site were complete and

25  accurate.

Page 48

1   A      No, that's not my testimony.

2   Q      Okay.  So did the Sears' real estate group make an

3   effort to ensure that the documents in Intralinks were

4   complete and accurate?

5   A      We made an effort to ensure that the documents in

6   Intralinks were all the documents we had available to us.

7   Q      Thank you.

8          MS. CROZIER:  No further questions, Your Honor.

9          THE COURT:  Okay.  Any redirect?

10         MR. WEAVER:  Very briefly, Your Honor.

11              REDIRECT EXAMINATION OF MS. BORDEN

12  BY MR. WEAVER:

13  Q      Ms. Borden, you were asked questions about the

14  documents in the Intralinks site as part of the process

15  before the sale transaction.  Do you know mechanically how

16  those documents were pulled?

17         THE COURT:  I'm sorry, were what?

18         MR. WEAVER:  How those documents were pulled into

19  the Intralinks site, the process.

20  A      I'm not exactly sure.  I understand there was a

21  previous data site, virtual data site with documents, and

22  many of them were pulled from that and put into Intralinks.

23  Q      And the documents that were in the Intralinks site

24  related to folders for 490, were those associated with the

25  financing that existed for Lots 1(a), 2 and 3?

1    A    That's my understanding.  The financing that was done

2    prior to my arrival at the company, but in spring of last

3    year, 2018.

4    Q    And do you know the time period of the documents that

5    existed in Intralinks for Store 490, what general period of

6    time those documents were created?

7    A    So the referenced documents for 490 are, I think

8    they're dated March of 2018.

9                MR. WEAVER:  No further questions, Your Honor.

10               THE COURT:  Okay.  You can step down.

11               MS. BORDEN:  Okay.

12               THE COURT:  Okay.  And we have Mr. Gallagher here?

13               MR. FRIEDMANN:  Yes, Your Honor.

14               THE COURT:  Okay.  You can come up to the stand,

15   sir.  Would you raise your right hand, please?  Do you swear

16   or affirm to tell the truth, the whole truth, and nothing

17   but the truth, so help you God?

18               MR. GALLAGHER:  I do.

19               THE COURT:  Okay.  And could you spell your name

20   please for the record?

21               MR. GALLAGHER:  William, W-I-L-L-I-A-M, Gallagher,

22   G-A-L-L-A-G-H-E-R.

23               THE COURT:  Okay.  And, Mr. Gallagher, you

24   submitted a declaration as your direct testimony in this

25   adversary proceeding in a contested matter dated July 3,

1    2019.  Sitting here today, July 11th, is there anything that

2    you wish to change?

3              MR. GALLAGHER:  I do not.

4              THE COURT:  So that would serve as your direct

5    testimony.

6              MR. GALLAGHER:  Yes.

7              THE COURT:  Okay, so it also is admitted.

8              MR. WEAVER:  Your Honor, the cross-examination

9    will be with my colleague, Mr. Levander.

10             MR. LEVANDER:  Thank you, Your Honor.  Your Honor,

11   with your permission, I'd like to hand the witness a binder

12   that has his declarations in the exhibits, as well as a few

13   joint exhibits about which I might ask some questions today.

14   And I also have copies of that same binder for Your Honor

15   and Mr. Gallagher's counsel.

16             THE COURT:  You said declarations in the plural.

17   Are you referring to the May declaration also?

18             MR. LEVANDER:  That's correct.

19             THE COURT:  Okay, May 2019.

20             MR. FRIEDMANN:  Your Honor, for clarification, we

21   are submitting both of those declarations.  They're both

22   related to the issues before you today, so I'm not sure if

23   the --

24             THE COURT:  All right.  Well, let me ask you -- it

25   wasn't on the list, so I didn't ask him about it.  Mr.

1    Gallagher, are you familiar with your May 24, 2019

2    declaration also in this matter?

3              MR. GALLAGHER:  I am.

4              THE COURT:  It's at Tab B in my notebook.  Sitting

5    here today on July 11th, was there anything in that

6    declaration you would like to change as your direct

7    testimony?

8              MR. GALLAGHER:  No.

9              THE COURT:  Okay, fine.  So, yes, you can hand him

10   that book.

11             MR. LEVANDER:  Thank you, Your Honor.

12             THE COURT:  Provide me a copy and Debtors' counsel

13   a copy.

14             MR. LEVANDER:  I apologize for the size and

15   weight, Your Honor.  There are only a few documents in here.

16             THE COURT:  Okay.

17             MR. LEVANDER:  One of them is the order with the

18   APA disclosure schedules.  That is a quite lengthy document.

19             THE COURT:  Right, okay.

20             MR. LEVANDER:  So that accounts for most of the

21   size.  There are only a few documents in the binder.

22             THE COURT:  Okay.

23                  CROSS-EXAMINATION OF MR. GALLAGHER

24   BY MR. LEVANDER:

25   Q    Good afternoon -- good morning, Mr. Gallagher.  We

Page 52

1    switched the order, caught me off guard.  My name is Sam

2    Levander and I represent Transform Holdco LLC in this case.

3    Mr. Gallagher, you are currently a managing director at M-

4    III, right?

5    A    Correct.

6    Q    You began working at M-III just in October of 2018,

7    right?

8    A    Yes.

9    Q    Before or after Sears filed for bankruptcy?

10   A    Just after.

11   Q    On what date?

12   A    I believe my official start date was Monday -- it might

13   have been the same day -- 16th, 15th?

14   Q    October 15th?

15   A    Yeah.

16   Q    So that's less than four months before the closing

17   occurred on February 11th, 2019, correct?

18   A    That sounds correct, yes.

19   Q    And you only started working for and on behalf of Sears

20   and the Debtors in October of 2018 as well, correct?

21   A    Correct.

22   Q    Before October 2018, had you ever been employed by

23   Sears in any capacity?

24   A    I had not.

25   Q    Before October 2018, had you ever done any work for or

Page 53

1    on behalf of Sears' real estate department?

2    A    No, I had not.

3    Q    Before October 2018, had you ever done any kind of work

4    whatsoever for or on behalf of Sears?

5    A    No.

6    Q    All right.  Mr. Gallagher, are you familiar with the

7    operating owned property schedule in the asset purchase

8    agreement or the APA?

9    A    Generally, yes.

10   Q    And that is Schedule 1.1(p) to the APA?

11   A    That sounds right.

12   Q    And one of the properties in Schedule 1.1(p) is Store

13   No. 490, Hoffman Estates, right?

14   A    That sounds correct, yes.

15   Q    Sears owns 16 lots in Hoffman Estates, right?

16   A    That is correct as to what we have now realized, yes.

17   Q    So the answer to the question is yes.

18   A    Yeah.

19   Q    And your testimony is that Store No. 490, Hoffman

20   Estates, has listed in Schedule 1.1(p) only applies to 3 of

21   those 16 lots, right?

22   A    Correct.

23   Q    And that, therefore, Transform only acquired 3 of those

24   16 lots.

25   A    Yes.

Page 54

1    Q    And those lots that were acquired are Lots 1(a), 2 and

2    3?

3    A    Yes.

4    Q    And your testimony is that only those three acquired

5    lots, 1(a), 2 and 3, related to the operations of Sears'

6    business.

7    A    Correct.

8    Q    And while the other 13 lots, the currently disputed

9    lots, did not relate to the operation of Sears' business.

10   A    Correct.

11   Q    Sears' headquarters is actually on Lot 1(a), right?

12   A    That's my understanding, yes.

13   Q    And there are no buildings on Lots 2 and 3?

14   A    There are no specific buildings that I'm aware of the

15   two front lots, there might be 1 and 3.  The building might

16   be on 2, by the way.

17   Q    Which building might be on 3?

18   A    The headquarters might be on Lot 2.  It might be 1 and

19   3 are the front lots on Beverly Road.

20   Q    In any event, there are no buildings on two of those

21   three lots, correct?

22   A    There are no buildings.  There are some amenities and

23   roads on the lots.

24   Q    You testified that one of those two lots is related to

25   the operation of Sears' business because it contains

Page 55

```
1    baseball fields, a basketball court and a volleyball court?

2    A    I testified that I believe those lots are related to

3    more of the building because it's the natural entrance to

4    the property.  The road to the property with the security

5    gate runs through one of the lots, and there are amenities

6    that are for the use of Sears' employees on one of the other

7    lots.

8    Q    But for one of the lots, the basis is that there are

9    amenities on that lot.

10   A    And its proximity; the primary entrance to the property

11   runs right through it.  There's signage right on Beverly

12   Road that identifies that that is the primary entrance to

13   the Sears location that transitions through those two lots.

14   Q    So when did you come to understand that there were lots

15   in Hoffman Estates that Transform -- that, in your

16   testimony, Transform did not acquire?

17   A    Not until a letter was sent stating so or objecting to

18   the transfer in March.

19   Q    And is your testimony today that these 13 lots are

20   associated with a store number other than 490?

21   A    My testimony is that the 13 lots have nothing to do

22   with the operation, and that the association to 490 is not

23   relevant.

24   Q    What store number are those 13 lots associated with?

25   A    They are associated with 490.
```

1              THE COURT:  I'm sorry, say that.

2              MR. GALLAGHER:  They are associated with 490.

3    There's a single number for all of Hoffman Estates.

4              MR. LEVANDER:  That's all.  I have no further

5    questions.

6              THE COURT:  Okay.  Any redirect?

7              MR. FRIEDMANN:  No redirect, Your Honor.

8              THE COURT:  Okay.  I have a question, Mr.

9    Gallagher.  Are you familiar with the tax benefit issues

10   related to Hoffman Estates?

11             MR. GALLAGHER:  So I have read and I've heard a

12   little bit about the EDA, the Economic Development Agency,

13   for that site.

14             THE COURT:  Right.

15             MR. GALLAGHER:  I don't know the specifics of how

16   tax dollars work.  And in some ways, there's an obligation

17   to generate revenues, I believe, I think is what I read.

18   But I don't know the specifics, Your Honor.

19             THE COURT:  So knowing that answer, I probably

20   know the answer to my next question.  Does the -- to your

21   knowledge, does the continued ownership by one entity of all

22   16 lots, as opposed to just 3, affect that arrangement in

23   any way?

24             MR. GALLAGHER:  I don't believe it would, but I

25   don't know the specifics.

1           THE COURT:  Okay, all right.  Does anyone want to

2      ask any question on that?  Okay.  You can step down, sir.

3           MR. FRIEDMANN:  Is it, Your Honor, agreeable to

4      arguing this point now?

5           THE COURT:  No.  I was about to ask both of you

6      that question.  Obviously, the testimony is fresh in

7      everyone's mind, so I'm happy to go either way with how

8      people want to do this.  Are you -- are the two of you

9      involved in any of the other matters that are on the

10     calendar today?

11          MR. FRIEDMANN:  The lawyers, Your Honor?

12          THE COURT:  Yes.

13          MR. LIMAN:  Yes.

14          THE COURT:  You are, okay.

15          MR. FRIEDMANN:  I'm not, Your Honor.

16          THE COURT:  All right.  Well, I leave it up to

17     you.  I'm happy to hear oral argument on these piecemeal or

18     hear all the evidence and then go back to it.

19          MR. FRIEDMANN:  Your Honor, I deferred really to

20     the request for Transform's counsel before.  The goal is to

21     get all the witnesses done and have --

22          THE COURT:  Right.

23          MR. FRIEDMANN:  -- do this because it's going

24     quickly.  Hopefully, we can maintain that pace.

25          THE COURT:  All right.  Well, this wasn't

1    voluminous testimony.  I think I can keep it in my head for

2    another few hours.  So why don't we go to --

3              MR. FRIEDMANN:  That's fine, Your Honor.  Thank

4    you.

5              THE COURT:  Why don't we go to Mr. Tavakoli then

6    and the specified receivables issue.  Could you raise your

7    right hand, please?  Do you swear or affirm to tell the

8    truth, the whole truth, and nothing but the truth, so help

9    you God?

10             MR. TAVAKOLI:  I do.

11             THE COURT:  Okay.  Could you spell your name for

12   the record, please?

13             MR. TAVAKOLI:  Nader, N-A-D-E-R, Tavakoli, T-A-V-

14   A-K-O-L-I.

15             THE COURT:  Okay.  And, Mr. Tavakoli, I have your

16   declaration in support of Transform Holdco's brief in

17   support of the adversary complaint and in opposition to

18   Debtors' supplemental motion to enforce the asset purchase

19   agreement.  It's dated June 26, 2019, and it would serve as

20   your direct testimony in this adversary proceeding and

21   contested matter.  Sitting here today on July 11th, is there

22   anything you'd wish to change in it?

23             MR. TAVAKOLI:  No, Your Honor.

24             THE COURT:  All right.  So that'll be your direct

25   testimony and it's admitted as such.  So do you wish to

Page 59

1    cross-examine?

2              MR. FRIEDMANN:  Yes, Your Honor.

3              THE COURT:  Okay.

4                   CROSS-EXAMINATION OF MR. TAVAKOLI

5    BY MR. FRIEDMANN:

6    Q    Good morning, Mr. Tavakoli.

7    A    Good morning.

8    Q    You were engaged to assist with, among other things,

9    the collection of specified receivables as identified in the

10   asset purchase agreement, correct?

11   A    That's right.

12   Q    And did part of that also entail trying to calculate

13   the amount of specified receivables that were delivered at

14   the time of closing by the Debtors to Transform?

15   A    I'm not sure I understand your question.

16   Q    Do you understand that, as part of the asset purchase

17   agreement, the Debtors were required to transfer certain

18   specified receivable accounts to Transform?

19   A    I do.

20   Q    And you understand that under the APA, the amount of

21   specified receivables to be provided were supposed to have a

22   book value of at least $255.2 million?

23   A    I've seen that information, yes.

24   Q    Was part of your engagement to determine whether or not

25   the Debtors did, in fact, deliver specific receivables to

Page 60

1    Transform at closing in an amount up to a book value of

2    $255.2 million?

3    A    No, I don't think specifically that task.  I mean, we,

4    as I said in my declaration, we went through the process of

5    trying to validate actual receivables because, as we began

6    to get into the collection process, it was clear that there

7    were significant issues with some of the buckets.  But I'm

8    not sure that I would answer the specific question you're

9    asking me in the affirmative.

10   Q    So it's fair to say that you don't have a -- you're not

11   here to testify as to the amount of specified receivables

12   that were delivered by the Debtor to Transform at the close,

13   correct?

14           MS. MAINOO:  Objection.  Your Honor, this calls

15   for interpretation of the APA and a legal conclusion.

16           THE COURT:  No, I don't think so.  It's just what

17   it is he's testifying to.  Do you want to hear that question

18   again or do you remember it?

19           MR. TAVAKOLI:  No, I think I understand the

20   question, Your Honor.

21   A    I'm not completely sure of the definition of specified

22   receivables.  I wasn't there for the negotiations and, quite

23   honestly, I haven't studied the definition.  My testimony

24   really revolves around what portion of the 255 constituted

25   what I would call valid receivables, so that there was a

Page 61

1    receivable to collect that had a chance to collect on the

2    part of Transform in the go-forward process.

3    Q    Mr. Tavakoli, in the declaration that was just

4    submitted as your direct statement -- as your direct

5    testimony here, you say in Paragraph 5: "At closing, the

6    Debtors purport to have delivered 292 million of specified

7    receivables."  Do you recall including that statement in

8    your declaration?

9    A    I do.

10   Q    Okay.  And you just testified that you're not sure what

11   specified receivables means in the context of the asset

12   purchase agreement?

13   A    I think my inference from your question was you were

14   asking me to opine on whether those specified receivables

15   within the definition of the APA were delivered.  And I'm

16   not meaning to quibble with you, but I view that as a very

17   technical issue.  So I don't know everything that went into

18   the definition of specified receivables, expectations as to

19   specified receivables and so on.  I have looked at the APA

20   and I affirm that that was in my declaration, sure.

21   Q    Okay.  And Mr. Tavakoli, no one's looking to quibble

22   here.  I'm just trying to be clear what you are able to

23   testify to and what you're not based on the work that you

24   actually conducted, and I only want to ask you question

25   about the work you did, not anything else.  And that's why

Page 62

1    I'm trying to understand is whether or not you did the work

2    to be able to determine what the amount of specified

3    receivables, as that's defined in the APA, were delivered --

4    that were delivered from the Debtors to Transform at the

5    closing.

6    A    I think I can answer that in the affirmative, if what

7    you mean is did we do the work within all of the 33 buckets

8    that constituted the specified receivables to determine

9    which were actually receivables; yes, we did that work.

10   Q    And did you determine what the book value was of the

11   specified receivables that the Debtors transferred to

12   Transform as of the closing?

13   A    I'm not sure what you mean by book value.

14   Q    Well, there are 33 buckets you were just referring to,

15   right?

16   A    Yup.

17   Q    Those are all like accounting line entries.

18   A    Yes.

19   Q    Okay?  And if you add them all together, you got a

20   total?

21   A    Yes.

22   Q    When I'm talking about the book value, I'm talking

23   about totaling all of those entries together to get an

24   aggregate number.  Were you -- with that clarification, let

25   me give you the question again.  Was part of your engagement

Page 63

1    to assess what the book values were of each of the line

2    items that were delivered by the Debtor to Transform at

3    closing to determine what the aggregate book value was of

4    the specified receivables that the Debtors transferred to

5    Transform at the close?

6    A    So as a finance person, I think of book value as a

7    technical term.  That would mean that this was assets on the

8    Debtors' balance sheet, and I can't answer that question.

9    If you're simply asking me whether the numbers on the piece

10   of paper that were given to us as constituting the specified

11   receivables add up to 292, I think the answer to that is

12   yes.

13   Q    And do you know if those numbers came from the Debtors'

14   balance sheet?

15   A    I don't.

16   Q    Okay.  The process that you've engaged in to do what I

17   believe you described as a manual reconciliation to process,

18   identify, and substantiate various specified receivables,

19   how long have you spent on that?

20   A    Well, my team consists of two people, each of whom has

21   over 25 years of payables receivables experience working

22   with me, and I was overseeing the process for the most part,

23   in touch with them daily either in person or on the phone.

24   And I think we said in the declaration that in total, we

25   spent about 14- to 1500 hours on this assignment.

Page 64

1    Q     And over what period of time has your team spent that

2    14- to 1500 hours?

3    A     So we started out our assignment in early March.  And,

4    you know, the assignment zigged and zagged and morphed over

5    time, but I would say since the beginning of March.

6    Q     So since the beginning of March, your team has devoted

7    on average several hundred hours a month to working on this

8    reconciliation of the specified receivables that were

9    delivered by the Debtor to Transform at closing?

10   A     Yes, sir.

11   Q     And your efforts, by the way, are still ongoing,

12   correct?

13   A     Well, we stopped around June 26th.  So we're assessing,

14   I think, with Transform what the best process is going

15   forward given where we are now in the assessment of the

16   receivables.

17   Q     And you've used a number of different reconciliation

18   methodologies to determine the values of the different

19   accounts receivables that were transferred as part of the

20   specified receivables, correct?

21   A     I think we -- two essential methodologies; one with

22   respect to accounts 11482, the Kmart basket, one with

23   respect to 11488, the Sears basket, and then a different

24   methodology for the other 31 or so baskets of accounts

25   receivable.  But I'd say, in terms of methodology, there

Page 65

1    were two essential methodologies.

2    Q    Okay.  And both of these methodologies were different

3    than how Sears was reporting on its balance sheet how it was

4    calculating the amount of specified receivables, correct, in

5    any of those 33 baskets?

6    A    I don't know that.

7              MR. FRIEDMANN:  No further questions, Your Honor.

8              THE COURT:  Okay.  Any redirect?

9              MS. MAINOO:  Briefly, Your Honor.

10             REDIRECT EXAMINATION OF MR. TAVAKOLI

11   BY MS. MAINOO:

12   Q    Good morning.  My name is Abena Mainoo from Cleary,

13   Gottlieb.  I represent Transform.  Good morning, Mr.

14   Tavakoli.

15   A    Good morning.

16   Q    Mr. Tavakoli, can you explain what your mandate was

17   when Transform hired you?

18   A    It was a dual mandate; in essence, to assist with the

19   reconciliation and negotiation of cure claims and other

20   claims on the top 200 vendors, and then also to assist with

21   the reconciliation collection of the specified receivables.

22   Q    And what was the scope of your mandate specifically

23   with respect to the specified receivables?

24   A    Well, we really started out trying to assist in the

25   collection process.  And then, given the vagaries of the

Page 66

1   receivables, the accounts receivable and the complexity of

2   the systems, it became largely reconciliation, and then

3   working with the business units and the account owners to

4   help them facilitate with the collection after we'd gone

5   through the reconciliation process.

6           MS. MAINOO:  No further questions.

7           THE COURT:  Okay.

8           MR. FRIEDMANN:  One further.

9           THE COURT:  Sure.

10              RECROSS-EXAMINATION OF MR. TAVAKOLI

11   BY MR. FRIENDMAN:

12   Q   Mr. Tavakoli, you were just asked about your mandate.

13   Under the mandate that you have with Transform, how are you

14   compensated?  Is it by the hour, is it contingency fee;

15   what's the structure?

16   A   No, there is no contingency fee.  I'm paid an hourly

17   fee for this assignment.

18           THE COURT:  Mr. Tavakoli, in your declaration at

19   Paragraph 8 and 9, you used a term intended.  So in

20   Paragraph 8, it says, "As detailed further below, the vendor

21   AR accounts generally record positive balance entries for

22   payments made for CIA inventory."  That's cash in advance.

23   And then the next sentence says, "Once that inventory is

24   received, those entries are intended to be reconciled with

25   the amount of it received in inventory."

1              And then the next paragraph, it says, "The vendor

2     AR accounts were intended to function in the following

3     manner, in respect of what was placed with CIA inventory."

4     Whose intention are you referring to there?

5              MR. TAVAKOLI:  Well, it would have been the Debtor

6     prior to the closing and Transform's post-closing.

7              THE COURT:  How do you know that?

8              MR. TAVAKOLI:  Conversations, communications with

9     the team.  Jeff Butz and his team at Sears, (indiscernible).

10             THE COURT:  Okay.  And then on -- let me just turn

11    to the right page.  In paragraph -- well, let me put it this

12    way.  There's some -- on Pages 12 and 13, you deal with

13    items that fall into -- which you characterize as 28.6

14    million in invalid receivables, which includes 12.3 million

15    collected by the estate prior to closing.

16             And I just want to make sure -- there are a couple

17    of these where it says money was received or prepaid.  In

18    each of those instances, it's your testimony that the money

19    that was received or prepaid was received by the Debtor

20    directly, as opposed to by Transform?

21             MR. TAVAKOLI:  In those cases where it's indicated

22    as such, Your Honor.  And we have I think in the exhibits

23    the actual email communications with the team owners were

24    put in there to verify that.

25             THE COURT:  Okay.  So, for example, on the bottom

1    of Page 13, there's $500,451 that it said on June 11, Dawn

2    Holter confirmed that the balance was received on December

3    21, 2018 into a temporary account for unapplied cash.  That

4    would have been at Sears?  I mean, it doesn't say that

5    specifically, but I'm assuming that in each of these cases,

6    you mean it was received or prepaid to Sears.

7                   MR. TAVAKOLI:  Yes, Your Honor.

8                   THE COURT:  Okay.

9                   MR. TAVAKOLI:  I think there's one or two that are

10   intercompany accounts.

11                  THE COURT:  Right, that's a different category.

12                  MR. TAVAKOLI:  Yup.

13                  THE COURT:  Okay.  Any cross on that?

14                  MR. FRIEDMANN:  No, Your Honor, only that we move

15   to strike Paragraphs 8 and 9 as admissible hearsay based on

16   the answers to the witness regarding the source of the

17   information that was just from talking to others and not his

18   direct knowledge.

19                  THE COURT:  Okay.  Any response on that?

20                  MS. MAINOO:  Your Honor, in response, the source

21   of the information in Paragraphs 8 and 9 is based on

22   business records, and I can ask Mr. Tavakoli to establish

23   that.

24                  THE COURT:  Well, it's the intent part.  The

25   dollar numbers I understand.  It was intended to be dealt

Page 69

1    with in a certain way is what I was asking about.

2              MS. MAINOO:  Okay.

3              MR. TAVAKOLI:  Your Honor, can I just answer that?

4              THE COURT:  Well, let me -- give your lawyers a

5    chance to.

6              MS. MAINOO:  And so, just to be clear as to Mr.

7    Friedman's objection.

8              THE COURT:  It's not as to anything other than the

9    references to intent.

10             MS. MAINOO:  The reference to intent, okay.

11             THE COURT:  Right, okay.  All right, so that's

12   sustained.  All right, you can step down.

13             MR. TAVAKOLI:  Thank you, Your Honor.

14             THE COURT:  Okay.  So then we have Messrs. Hede

15   and Good for the prepaid inventory and estate property

16   reconciliations.

17             MR. FRIEDMANN:  Mr. Good is here, Your Honor.

18             THE COURT:  Okay.  So why don't we call Mr. Hede

19   first.

20             MR. FRIEDMANN:  And just as a matter of

21   housekeeping, both Mr. Hede and Mr. Good also identified as

22   providing testimony on prepaid inventory.  So I would

23   suggest that their testimony now cover all of them.

24             THE COURT:  Yeah, no, it's going to cover both of

25   those topics.

Page 70

1          MR. FRIEDMANN:  Thank you.

2          THE COURT:  Unless you all have another book for

3     me, I'm going to take a second to get my copies of his

4     declaration.  Okay.  Would you raise your right hand,

5     please?  Do you swear or affirm to tell the truth, the whole

6     truth, and nothing but the truth, so help you God?

7          MR. HEDE:  Yes, I do.

8          THE COURT:  And could you spell your name for the

9     record?

10          MR. HEDE:  Andrew, A-N-D-R-E-W, last name, Hede,

11     H-E-D-E.

12          THE COURT:  Okay.  And Mr. Hede, you submitted two

13     declarations here.  I actually think this chart has the

14     wrong date for it.  I think it's actually June 25th, as

15     opposed to June 26th, and then July 9th is your supplemental

16     declaration.  Sitting here today, is there anything in those

17     declarations you'd like to change?

18          MR. HEDE:  No, there is not.

19          THE COURT:  All right.  So they will constitute

20     your direct testimony.

21          MR. FRIEDMANN:  May I proceed, Your Honor?

22          THE COURT:  Yes.

23               CROSS-EXAMINATION OF MR. HEDE

24     BY MR. FRIEDMANN:

25     Q    Good morning, Mr. Hede.

Page 71

1    A    Good morning.

2    Q    In your declaration that was submitted as part of your

3    direct, or as your direct examination I should say, you

4    testified that for financial reporting purposes, the Debtors

5    reported an accounting entry for prepaid inventory; is that

6    correct?

7    A    That's correct.

8    Q    And those accounting entries for prepaid inventory that

9    were used for financial purposes by Debtors, those were used

10   prepetition for the financial reporting that was given to

11   their auditors, correct?

12   A    That's my understanding.

13   Q    And that's also the accounting entry that was used for

14   financial reporting purposes to the SEC; is that correct?

15   A    That's generally my understanding.

16   Q    Okay.  And that would include the period of time when

17   Mr. Lampert was the CEO of Sears.

18   A    I believe so.

19   Q    And that would also include during the period of time

20   when Mr. Kamlani was on the audit committee of Sears,

21   correct?

22   A    I can't specifically say as to whether Mr. Kamlani

23   served as a member of the audit committee.  I don't know.

24   Q    Okay.  Now, when Ernst & Young came in to take a look -

25   - well, strike that and move back.  Am I correct that one of

1    the many things that Ernst & Young is going to do in this

2    case is to determine the amount of prepaid inventory, the

3    amount prepaid of inventory that was delivered by the

4    Debtors to Transform at the close?

5    A    I classified the amount of prepaid inventory that was

6    received after the close.

7    Q    When you did that analysis, you didn't simply rely on

8    the accounting entries for prepaid inventory that the

9    Debtors had historically used for financial reporting

10   purposes, correct?

11   A    That's correct.

12   Q    Instead, you developed your own methodology for

13   determining the amount of prepaid inventory that was

14   delivered after the close, as you say, from Debtors to

15   Transform, correct?

16   A    That's correct.

17   Q    This methodology that you developed for determining the

18   amount of prepaid inventory that was delivered by Debtors to

19   Transform after the close, that was a methodology that was

20   different than the one used by the Debtors in, you know,

21   both pre- and post-petition in the ordinary course of

22   tracking prepaid inventory during the course of a year,

23   correct?

24   A    I don't agree with the characterization as to tracking

25   both prepaid inventory.

1  Q    Accounting for the amount of prepaid inventory that

2  they reported was in the company at any given time.

3  A    From an accounting perspective, yes.

4  Q    Okay.  So they had some ordinary course of how they

5  kept track -- sorry -- how they accounted for how much

6  prepaid inventory was in the company at any given time.

7  That was not what you did; you had a different methodology,

8  which I assume you believe was the better way to do it.

9  A    Correct, and just to clarify that when you refer to

10  accounting, I would refer to it as a, from a financial

11  reporting perspective, as opposed to actually physically

12  counting inventory.

13  Q    No one was going on the shelves and counting one

14  washing machine, two washing machines, right?

15  A    Correct.

16  Q    I didn't mean to put washing machines on a shelf;

17  they're too heavy.  You were also taking records from the

18  Debtors' accounting systems, now Transform's accounting

19  systems.  You just were -- you had a different methodology

20  as to how to take that information and account for the

21  amount of prepaid inventory delivered after close, correct?

22  A    That's correct, with the exception of, I believe that

23  we used additional information sources beyond what the

24  Debtors had used in terms of their calculations, so we used

25  additional information.

1    Q    Okay.  One of the sources you were not using when you

2    were developing was you were not running this methodology by

3    Transform's CEO, Mr. Riecker; is that correct?

4    A    That's correct.

5    Q    And you also were not running that methodology by Mr.

6    Butz, who had been an employee at Sears for about 30 years

7    probably at the time this engagement began; is that correct?

8    A    I can't testify as to how long he's been an employee,

9    but you're correct that we did not run it by him.

10   Q    In determining, from Ernst & Young's perspective, the

11   amount of prepaid inventory that was delivered by the

12   Debtors to Transform after closing, how much time did you

13   spend on that or your team spent on that?

14   A    A significant number of hours, because it basically

15   required a recreation of the prepaid inventory records

16   because the company had not ever maintained a running

17   account sort of on the basis as to what their prepaid

18   inventory was.

19   Q    Could you give at all as a ballpark figure of the

20   number of hours spent on this project?

21   A    Hundreds.

22   Q    Hundreds of hours.  Over what period of time?

23   A    I'd say a couple of months.

24   Q    A couple of months; sounds like a lot of work.  Mr.

25   Hede, another one of the projects that your team is focused

1    on was examining estate checks that were deposited into

2    Transform's account after the closing, correct?

3    A    Correct.

4    Q    Okay.  And in examining estate checks that were

5    deposited into Transform's accounts after closing, you

6    determined that a little bit more than $5.9 million worth of

7    estate checks ended up in Transform's accounts after

8    closing, correct?

9    A    Correct.

10   Q    But then in your declaration, which was just submitted

11   as your direct testimony, you also identified that there was

12   another 868,105 checks -- worth of checks that Debtors claim

13   were also deposited in Transform's account that belonged to

14   the estate for which Ernst & Young has not been able to

15   locate the information to substantiate that -- whether or

16   not these are estate checks or Transform property, correct?

17   A    I'd characterize it a little differently.

18   Q    Please.

19   A    When the request was first received from Debtors'

20   advisors, it was to send us a list of checks, which was

21   basically every paper check that had been deposited post-

22   closing at the sale.  When we went and reviewed those

23   checks, we made a determination that approximately 5.9

24   million did appear to be estate property and the balance

25   that was -- we were unable to, you know, identify any

Page 76

1    evidence that would, you know, classify them as estate

2    property.  So I'd just like to clarify that it was never --

3    the argument was never made that they are estate property.

4    Q    And, again, I'm not suggesting that they used --

5    determined that they were estate property.  I think what you

6    said is you didn't have enough evidence to substantiate that

7    they were estate property, correct?

8    A    That's correct.

9    Q    Did you have evidence to substantiate they were

10   definitely Transform property?

11   A    I believe so.

12   Q    Okay.  So there's this set of about $858,105 worth of

13   checks that you don't have enough information determined

14   right now whether or not they are checks that should belong

15   to the estate or whether or not they should belong to

16   Debtors, correct?

17   A    That's correct.

18   Q    Okay.  But when you decided how much was owed to the

19   estate, you only credited the estate with the ones that you

20   were able to determine definitely belonged to the estate,

21   correct?

22   A    That's correct.

23   Q    The other 500- -- I'm sorry, $858,105, you kept on the

24   Transform side of the ledger, correct?

25   A    I don't think we put them on any side of the ledger.

1   We highlighted them as being unresolved or potentially still

2   in dispute between the parties.

3   Q    Well, so your assessment of those checks is not

4   complete yet?

5   A    Our assessment is that we've not been able to obtain

6   any information that would determine them to be estate

7   property (indiscernible).

8   Q    Are you still working to try to figure out who they

9   belong to?

10  A    No.

11  Q    No, okay, so your assessment is complete.  You decided

12  that at this point, that $858,105 will stay with Transform

13  and not go to Debtors because Ernst & Young couldn't figure

14  out whether or not they're estate property or Transform

15  property, correct?

16  A    I don't think it's for me to make that determination.

17  Q    But your analysis is complete at this point.

18  A    Yes.

19  Q    Who is making that determination?

20  A    I believe that some of it ultimately is going to be

21  decided by this Court, I would expect.

22  Q    I'm sorry, look, that's for sure on most issues.  But

23  my question is, there are -- you got to a point of your

24  analysis where you said, look, I don't have enough

25  information with respect to this, I'll call it,

1    approximately $860,000 worth of checks to figure out if they

2    belong to Debtors or if they belong to Transform.  I don't

3    know what else to do.  Who then made the decision that,

4    therefore, we're not going to credit them back to the

5    estate, and instead for now they're going to stay with

6    Transform?

7    A    I expect that that will likely be, in conjunction with

8    discussions with counsel.

9    Q    Counsel made that decision, as far as you know.

10   A    I can't say what decision counsel made or what was

11   found with respect to counsel.

12   Q    By the way, of the checks that you were able to

13   determine were, in fact, estate checks that had been

14   transferred into Transform -- that had been deposited,

15   excuse me, to Transform's account, that represented about 85

16   percent of the checks that you had looked at, correct?

17   A    Roughly, yes.

18   Q    Okay.  And the checks you looked at only were -- you

19   only looked at checks going out until March 18th, 2019; is

20   that correct?

21   A    They were the checks that the Debtors' advisors asked

22   us to review.

23   Q    Okay.  And you haven't looked at any checks from after

24   March 18th, 2019, correct?

25   A    That's correct, with, you know, discussions with the

1     Debtors' advisors. We've said on multiple occasions, if

2     they're specific and these are not just related to these

3     checks that you would like us to search for or review, we're

4     more than happy to look for them.  I would expect that the

5     Debtors have, you know, a fairly good understanding of funds

6     that they expect to have received.

7     Q    Well, you're aware that Debtors made the request since,

8     in the first month after the close, 85 percent of the checks

9     ended up -- at least 85 percent belonged to the estate.

10    You're aware that Debtors asked Transform's advisors to take

11    a look at maybe the next couple of months to see whether or

12    not those checks also belonged to the estate, correct?

13            MS. BIBI:  Objection, asked and answered.

14            THE COURT:  Well, have the Debtors made a request

15    to look beyond the March date?

16            MR. HEDE:  Yes, they have.

17            THE COURT:  Oh, okay.  I think that's a different

18    answer than they got before, so it's good we clarified that.

19    Q    But you haven't conducted any analysis beyond March

20    18th, 2019, have you?

21    A    That's correct.  Our response to that request is that

22    this is a company that receives, you know, a high number of

23    checks on, you know, a daily basis.  We felt that that was,

24    you know, burdensome to continue to review every single

25    check that came in and our response was on that basis.  But

1   if the Debtors had specific things that they would like us

2   to review or to search for then we'd be more than happy to

3   make that inquiry.

4   Q    Mr. Hede, in your experience, if between closing and

5   March 18th, at least 85 percent of the checks that were

6   deposited to Transform's accounts you were able to

7   substantiate definitely belonged to the estate, wouldn't you

8   think that in the period following March 18th, 2019 there

9   also would be at least some percentage of checks that also

10  were deposited into Transform's account that belong to the

11  estate?

12  A    Also, but I can't definitely say.

13  Q    Well, you know for a fact, there are at least some,

14  right?

15  A    I only know -- I'm only aware of one definitely.

16  Q    So you're aware of at least one.  So definitely,

17  there's at least one, correct?

18  A    Yes.

19  Q    Okay.  And there may be more.

20  A    Potentially.  I don't know definitely.

21  Q    But to date, neither Transform nor its advisors has

22  made any effort to look at any more checks from after March

23  18th, 2019 to determine whether or not checks that were

24  deposited into Transform's accounts actually are property of

25  the estate, correct?

Page 81

1    A    Correct.

2              MR. FRIEDMANN:  Nothing further, Your Honor.

3    Thank you.

4              THE COURT:  Okay.  Any redirect?

5              MS. BIBI:  Good morning, Your Honor.  I'll be

6    brief.  Pascale Bibi from Cleary Gottlieb Steen & Hamilton.

7    I represent Transform.

8                   REDIRECT EXAMINATION OF MR. HEDE

9    BY MS. BIBI:

10   Q    Good morning, Andrew -- Mr. Hede.  I'm going to go back

11   to talk about prepaid inventory.

12             THE COURT:  You're going to have to speak a little

13   louder.  I'm having a hard time hearing.

14   Q    I'm going to go back to speak to you about prepaid

15   inventory.  Debtors asked you about the estimate that they

16   used to calculate prepaid inventory.  Do you think the

17   Debtors' estimate is the right way to count prepaid

18   inventory?

19   A    No, I do not.

20   Q    Why not?

21   A    The Debtors' estimate was purely based on an accounting

22   entry, which is essentially used as a proxy for the amount

23   of prepaid inventory at any one time.  It's for GAAP

24   purposes only, as opposed to, you know, a, you know, running

25   count of prepaid inventory.

1    Q    Why is counting the actual amount of prepaid inventory

2    important?

3    A    Transform obviously under the APA contracted to buy a

4    certain amount of prepaid inventory.  They, you know,

5    obviously wanted to determine what that exact amount was.

6    To use Mr. Friedman's example, you can sell washing

7    machines, but you can't sell an accounting provision.

8    Q    When did you learn they were using the GAAP accounting

9    provision to count their prepaid inventory?

10   A    Not definitely until April.

11   Q    What was your reaction when you learned that?

12   A    I was extremely surprised in relation to something that

13   you have an economic benefit -- an economic impact to other

14   parts of the transaction that the Debtors and their advisors

15   had not maintained sort of their running count of what

16   prepaid inventory was at the closing.

17   Q    Do you know if M-III partners, the Debtors' advisors,

18   ever did any work to see if three weeks, the amount in their

19   accounting estimate was a good number to use to calculate

20   prepaid inventory?

21   A    I can't specifically say.

22   Q    Did you work with anyone at Sears to develop your

23   methodology?

24   A    We worked with the treasury and the inventory

25   management groups to well understand sort of the wire of

Page 83

1    funds, and also sort of counting towards the way it was

2    received.  And, obviously, you know, obtained extensive

3    amounts of information from them in our analysis.

4    Q    Just one more question.  Did Debtors ever give you any

5    feedback on your counting methodology?

6    A    No, they did not.

7    Q    Thank you.  Let's talk about reconciliation then.  So

8    Debtors talked a lot about checks being counted before March

9    18th that you determined belonged to the estate.  Did you

10   find that at least 85 percent of those checks belonged to

11   the estate?

12   A    I believe it was approximately.  I don't have the

13   numbers in front of me or a calculator, but I believe that

14   was, you know, in the ballpark.

15   Q    Is there any information the Debtors could give you to

16   help you figure out what these checks are?

17   A    No.

18   Q    Is there any information they could give you --

19   A    Sorry, I can't hear the question.

20   Q    Is there any information Debtors could give you to help

21   you to figure out which checks belonged to the estate?

22   A    As I said earlier, if the Debtors could narrow down

23   potentially the nature of the checks and potentially the

24   payor, that would sort of, you know, narrow the process down

25   and what we need to search for.  Like when, you know, there

Page 84

1    was one specific example of that there was no issue.  We

2    confirmed it was Debtor property and actually we paid over

3    the funds to the Debtors.

4    Q    Can you explain what happened with that one specific

5    example you mentioned?

6    A    It was in relation to I believe the cancellation of

7    sale of the liquor licenses in the State of Michigan.  The

8    Debtors and their advisors reached out specifically in

9    relation to that amount.  We confirmed that it had been

10   deposited and the funds were transferred back to the

11   Debtors.

12   Q    So we've talked a lot about these checks, but what kind

13   of checks did Sears receive?  What items are these,

14   generally?

15   A    Estate checks are these proceeds that relate to things

16   such as tax refunds, insurance proceeds, refunds, and

17   obviously refunds can be permits, et cetera.  Typically the

18   challenge with them is that unfortunately the person doesn't

19   write on the check memo what it relates to.  So it's a

20   fairly -- it's a manual and time-consuming process to go

21   back and find out the nature of those checks.

22   Q    Would you know that Sears was expecting insurance

23   proceeds or a tax refund?

24   A    Generally, yes.  Obviously, for larger items, there's

25   normally an expectation that you're going to receive

1    something.  Obviously from time to time, a check arrives in

2    the mail, obviously Sears is a very large company, when you

3    factor in all of their business units.

4    Q    Who would be best-placed to know if the check was

5    coming?  The Debtors, or Transform?

6    A    Sorry, can you rephrase the--

7    Q    Who would be best-placed to know if a check was coming,

8    the Debtors or Transform?

9    A    If it was an estate check, I would say the Debtors

10   would obviously be best placed.

11           MS. BIBI:  Thank you.

12           MR. FRIEDMANN:  Brief re-cross, if I may, Your

13   Honor?

14           THE COURT:  Okay.

15              RE-CROSS EXAMINATION OF ANDREW HEDE

16   BY MR. FRIEDMANN:

17   Q    All of the former employees of the Debtors all went to

18   go work for Transform, correct?

19   A    I believe the majority.  There was testimony earlier

20   that there are still some employees that (indiscernible) are

21   left.

22   Q    Transform didn't take all of Sears's employees?

23   A    My understanding was that there were certain employees

24   that remained with the estate, so.

25   Q    Does Transform have access to all of the former Debtor

Page 86

1    employees that are now working at Transform?

2    A    Obviously, yes.

3    Q    And so working as Transform's advisor, as E&Y, you're

4    able to speak to any of these former employees of the

5    Debtors who are now working at Transform?

6    A    Yes.

7    Q    And have you consulted them to help you out with your

8    check reconciliation projects?

9    A    Extensively.

10   Q    Mr. Riecker one of those employees?

11   A    No.

12           MR. FRIEDMANN:  Thank you.

13           MS. BIBI:  Your Honor, may I re-direct?

14           THE COURT:  Okay.

15             RE-DIRECT EXAMINATION OF ANDREW HEDE

16   BY MS. BIBI:

17   Q    In your experience, why do you believe that the Debtors

18   are better situated to identify whether the checks belong to

19   the estate?

20   A    Obviously after a transaction of this size,

21   substantially all of the assets purchased by obviously the

22   buyer of the business, you will typically have a situation

23   that obviously the estate has knowledge as to what assets

24   were not acquired.

25           In my experience, having done this on a number of

Page 87

1    occasions, you build up a model list of what your residual

2    assets are, and seek to monetize those for the purposes of

3    the estate.  And our expectation would be that the Debtors'

4    advisors would have done something similar in relation to

5    obviously larger items such as real estate, but things such

6    as any receivables, refunds, et cetera, that were not

7    acquired by Transform.

8    Q    And you mentioned the Debtors' Advisors, M-III

9    Partners?

10   A    Yes.

11   Q    What's your understanding of their role in this case?

12        THE COURT:  I'm sorry, the understanding of what?

13   Q    What's his understanding of M-III Partners' role in

14   this case and their responsibilities to the estate?

15   A    I believe in relation to the estate, they're obviously

16   the primary group, and obviously Mr. Meghji's serving as the

17   chief restructuring officer in relation to the winding of

18   the estate, and obviously monetizing remaining assets.

19   Q    Is it their responsibility to maximize the estate's

20   value?

21   A    Yes.

22   Q    Do you expect them to look for estate assets, as part

23   of their responsibility?

24   A    My expectation is that they're looking under every

25   rock, for every possible potential source of value for the

1    estate.

2    Q    And so they should be looking for property of the

3    estate, if it's missing?

4    A    Yes.

5         MS. BIBI:  No further questions.

6         THE COURT:  Mr. Hede, in your July 9th

7    declaration, you state that, in Paragraph 12, due to the

8    exigencies of closing the sale transaction on the desired

9    date, rather than establishing a new cash management system,

10   Transform at closing stepped into the shoes of the majority

11   of the Debtors' existing cash management system, and used

12   the system to continue to run the acquired business after

13   closing.  What did you mean by using the phrase the majority

14   of?

15        MR. HEDE:  Obviously the Debtors had a very large

16   cash management system in terms of number of bank accounts.

17   I won't bore you with the details regarding the short period

18   of time, and et cetera, but we identified the accounts that

19   were necessary for the assets that were being acquired.  Any

20   bank accounts that were either related to something such as

21   GOB store, or something that wasn't critical for running the

22   business, we left funds with the estate.

23        THE COURT:  Okay, and is this the cash management

24   system that Transform is still using?  Has it been altered,

25   or is it the same system?

1              MR. HEDE:  I would say that it's largely the same

2      as what acquired. Obviously some changes in relation to new

3      accounts, but it's largely the same.

4              THE COURT:  Okay, and in Paragraph 7, you say it

5      is typical for businesses to track prepaid inventory on an

6      individual vendor basis.  And so EY's methodology

7      effectively recreated individual vendor prepaid inventory

8      accounts.  I take it from that statement that Sears, the

9      Debtors as a whole, didn't track prepaid inventory on an

10     individual vendor basis?

11             MR. HEDE:  That's correct.

12             THE COURT:  So when you said EY's methodology

13     effectively recreated individual vendor prepaid inventory

14     accounts, how did you go about doing that?

15             MR. HEDE:  Your Honor, I'll take a step further

16     back.  How you would typically look at prepaid inventory on

17     a vendor basis is that you would -- you obviously book the

18     wire, or the industry payment, which obviously creates the

19     prepaid inventory.  When the inventory comes in, that

20     reduces the amount of the prepayment, which you can see on

21     an individual vendor-by-vendor basis the amount of prepaid

22     inventory.

23             What we did was to take the wires that were issued

24     in the six weeks prior to the closing on an individual

25     vendor basis, match those with the purchase orders that were

Page 90

1    issued, and then look at inventory that was received when it

2    was received, pre- and post-closing, to come up with the

3    individual vendor basis.

4         So for example, the numbers I'm using are

5    hypothetical.  If Whirlpool received $20 million worth of

6    wires during that period of time, they would then issue

7    purchase orders for approximately that number as well.  We

8    would then match the actual receipt of the inventory.  If

9    $15 million had been received by Whirlpool prior to the

10   closing, then the prepaid -- the amount that was received

11   post-close, which equals to the prepaid inventory would be

12   the remaining five million.

13        THE COURT:  And all that data was readily

14   available?

15        MR. HEDE:  It was readily available.  It's from

16   multiple sources.  The wire detail comes from Treasury. It's

17   not linked to the actual purchase order.  The two run

18   separately.  The purchase order data is available in terms

19   of what purchase order was issued, and then Sears maintains

20   a matching system in relation to inventory.  Obviously, the

21   amount of --

22        THE COURT:  The matching system of what?  I'm

23   sorry, matching system of what?

24        MR. HEDE:  They match it to inventory.  So

25   obviously the amount of inventory they receive, when ten

Page 91

1   washing machines come in, they get matched to a purchase

2   order.  Once it's all received, the purchase order cancels

3   itself out.  So by taking those three data sources, we can

4   see what inventory was received before the closing and

5   purchased by Transform, and what was actually prepaid and

6   not received until after the closing.

7          THE COURT:  Is your work on this check-able?

8          MR. HEDE:  It's been provided to the Debtors.

9          THE COURT:  Okay.  Are there any assumptions built

10   into it, like LIFO or FIFO, as far as matching them up?

11          MR. HEDE:  No, it's purely based on obviously the

12   wire, the dollar amount, the dollar the purchase order was,

13   the original cost.  There's no allowances, or potential, to

14   your example, LIFO or FIFO product.

15          THE COURT:  And they tie right into specific items

16   of inventory?

17          MR. HEDE:  Yes, we tie them, for the purchase

18   orders during this period of time, we tie them at 99 percent

19   in terms of the inventory that was received, and when it was

20   received.

21          THE COURT:  Okay.  And the Debtors, and I believe

22   make a point that the six weeks is somewhat arbitrary, or --

23   why was six weeks chosen?

24          MR. HEDE:  The Debtors have maintained a three-

25   week period.  We decided to double that to six weeks for the

1   purposes of the analysis.  That was the reason why we took

2   it, we doubled it.

3            THE COURT:  Is that because they have a turnover,

4   somewhere between three and six weeks?  I just -- why would

5   you choose either of them?

6            MR. HEDE:  So the three weeks, the origin of the

7   three weeks is that three weeks is essentially the average

8   time in which inventory is received, recognizing that some

9   inventory is received quicker than within three weeks of the

10  wire, and some is received longer.  From a historical

11  purpose, when my understanding is at the time of the

12  bankruptcy filing, they were using two weeks, that was

13  increased to three post-petition, and has been reduced to

14  two, post-closing.

15           So that was the origin of the three weeks,

16  recognizing that if some items are received in a shorter

17  period of time, some of them are potentially received

18  longer.  That's why we took the approach which we thought

19  was conservative, to double it, to identify wires and

20  purchase orders for six weeks.

21           THE COURT:  All right, okay.  Any, any cross on

22  that?

23                 CROSS-EXAMINATION OF ANDREW HEDE

24  BY MR. FRIEDMANN:

25  Q    Mr. Hede, you just described the methodology that Ernst

Page 93

1    & Young used to recreate the original vendor prepaid

2    inventory accounts.  That all, that process you did all

3    post-close, I assume?

4    A    Yes.

5    Q    So that methodology that you describe, that was not

6    available to ESL at the time, or to Debtors when they

7    negotiated the APA, right?  You hadn't created that yet?

8    A    That's correct, because it was our understanding, also

9    based on certain documents that I've seen, that the Debtors

10   were maintaining a vendor-by-vendor reconciliation of

11   prepaid inventory at any one time.  We had that

12   understanding until mid- to late-April when after some

13   questioning by us M-III told us that they simply relied on

14   the balance sheet calculation.

15   Q    Okay, so when the peg was set at $147 million worth of

16   prepaid inventory, that the Debtors were required to provide

17   to Transform, right after the close, they weren't using your

18   methodology yet, because you didn't come up with that until

19   April, right?

20   A    We weren't even there when the negotiation happened,

21   so.

22           MR. FRIEDMANN:  Thank you.

23           THE COURT:  Do you have any redirect?

24           MS. BIBI:  Nothing further, Your Honor.

25           THE COURT:  Okay, you can step down, Mr. Hede.

Page 94

1    Okay, and then we could call Christopher Good, Chris Good?

2    Okay, would you raise your right hand, please?  Do you swear

3    or affirm to tell the truth, the whole truth, and nothing

4    but the truth, so help you God?

5              MR. GOOD:  Yes, I do.

6              THE COURT:  Okay, and it's G-O-O-D?

7              MR. GOOD:  That's correct.

8              THE COURT:  Christopher Good, okay.  Mr. Good, you

9    submitted a supplemental declaration dated July 3 in this

10   adversary proceeding, contested matter, as well as a

11   declaration dated May 24th, 2019.  Both are intended to be

12   your direct testimony.  Sitting here today on July 11th, is

13   there anything you wish to change on those?

14             MR. GOOD:  No.

15             THE COURT:  Okay, so those declarations will be

16   admitted as his direct testimony.

17        (Good Declarations Admitted into Evidence)

18             CROSS-EXAMINATION OF CHRISTOPHER GOOD

19   BY MS. MAINOO:

20   Q    Good morning, Mr. Good.

21   A    Good morning.

22   Q    The Transform team provided M-III with a list of checks

23   deposited by Transform through mid-March, correct?

24   A    Through March 18th, yes, that's correct.

25   Q    And the Transform team agreed to M-III's request to do

1    an audit of those checks, right?

2    A    Of the checks through March 18th, yes.

3    Q    And the Transform team did the audit, right?

4    A    They performed an audit of the checks, I think there's

5    a certain number of those that are still undeterminable, but

6    yes, they performed an audit of the checks.

7    Q    And as a result of that audit, Transform credited

8    Debtors for $5.9 million in estate checks, right?

9    A    Yes, 5.9 million.

10   Q    Transform and its advisors have been responsive to

11   issues raised by the Debtors and their advisors, right?

12   A    Can you define responsive?  I think on some issues,

13   yes, on some issues, no.

14   Q    In your declaration, you said, in virtually every

15   instance when the Debtors' advisors have pushed back, by its

16   advisors, have had to either concede, or that additional

17   funds were owed, Transform and its advisors were responsive

18   to issues raised by Debtors and their advisors, right?

19   A    They have responded to our requests.  I think in that

20   statement that was made that virtually every instance, and

21   that was in regards to the fact that the vast majority of

22   the line items have changed over time, since the original

23   presentation we received from EY.

24   Q    And the Debtors' identified P-card expenses that were

25   satisfied by a pre-closing payment by Debtors to Transform

1    and its advisors, is that right?

2    A     Yes, there was a payment that was identified.

3    Q     And Transform credited the Debtors for that amount?

4    A     Yes, they did.

5    Q     Let's talk about your complaints about Transfer's

6    reconciliation process.  In your work for the estate, you're

7    focused on finding property for the estate?

8    A     That's one of our focuses, yes.

9    Q     It's your main focus, right?

10   A     I'd say maximizing value for the estate is our main

11   focus.

12   Q     And you're committed to making diligent efforts to

13   maximize value for the estate?

14   A     Yes.

15   Q     Your declaration says, in response to certain requests,

16   Transform has said the requested information does not exist.

17   You don't know if that information exists, do you?

18   A     Could you be more specific?

19   Q     So in Paragraph 3 of your declaration, you said while

20   buyer has provided a good deal of information, has yet to

21   provide all of the information necessary to substantiate its

22   reconciliations, claiming the requested information either

23   doesn't exist, is too burdensome, or worse yet, that the

24   Debtors have not provided a basis for the information.

25          So my question is, you say that -- you're

1   complaining that Transform has said that the requested

2   information does not exist.  But you, yourself, and M-III do

3   not know if the requested information exists, do you?

4   A    I would say for example, checks deposited after March

5   18th, that information is definitely available.

6   Q    And was your request just for checks deposited after

7   March 18th?

8   A    We were hoping that we could just have the same

9   analysis where the 5.9 was credited, because 85 percent of

10  the checks were estate property.  We were hoping that we

11  could just continue that analysis post-March 18th,

12  especially in light of the fact that we know that there were

13  checks, or at least one check post-March 18th that was

14  property of the estate.

15  Q    You were hoping that EY would do that analysis for you?

16  A    They had done analysis before, and so we were hoping

17  that they would extend that analysis.

18  Q    And you have access directly to Transform employees,

19  correct?

20  A    We were able to make requests to them, but EY at this

21  point has much better access to Transform's employees than

22  we do.

23  Q    You have access to information from Transform under

24  both the Transition Services Agreement and the APA, right?

25  A    Yes, we do, but post-the sale, the well of cooperation

1   is not the same as it was pre-sale.

2   Q    So have you requested information, have you requested

3   access to information from Transform to enable you to do the

4   reconciliation of checks, for instance?

5   A    You've asked for the checks, post-March 18th.  We don't

6   have the checks.  We can't do the analysis ourselves, if we

7   wanted to.

8   Q    So you've asked for the checks so that you can do the

9   analysis yourselves?

10  A    We've asked for the checks so we can see it.  We before

11  went through the checks ourselves and noticed checks that

12  were property of the estate.  That's why we asked the

13  analysis to be done.  So if we did receive those, we would

14  review them.

15  Q    That's a separate question.  Did you ask for the checks

16  so that you could do the analysis, or did you ask for EY to

17  do the analysis for you?

18  A    I think both.  I mean, we're kind of doing it in

19  concert.

20  Q    You say in your declaration that Transform has not

21  shown that it removed checks for property taxes.  What's the

22  basis for your view that property taxes should be credited

23  to the Debtors?

24  A    I think similar to specified receivables were prepaid.

25  It's one of the other liabilities being assumed in the

Page 99

1    transaction, there's up to 135 million of property taxes.

2    That number was calculated based upon accrued property

3    taxes, which was calculated by Mike Morrie at the company.

4            So looking at that number, we just assumed that

5    whatever the accrued property tax amount at the close of the

6    transaction, up to $135 million, would have been assumed,

7    and thus any checks related to property taxes, they had not

8    ben cashed, obviously they had not been removed from the

9    accrued property tax balance, and thus would be kind of a

10   double-count.

11           So we assumed that those checks should be removed

12   as Transform is assuming up to $135 million of property

13   taxes, as long as we were operating in the ordinary course,

14   which we believe we did.

15   Q    So you're assuming that the checks for property taxes

16   should have been removed, based on your interpretation of

17   the APA?

18   A    I would say collectively, our counsel's interpretation

19   of the APA and our team collectively.  Not -- my personal

20   interpretation of the APA is not important here.

21   Q    And that interpretation of the APA is disputed, right?

22   A    On property taxes?

23   Q    Correct.

24   A    I'm not sure.

25   Q    You also testified in your declaration that Transform

Page 100

```
 1    has not confirmed, it has reconciled other pre-close

 2    payments to ensure that other P-card payments included in

 3    its calculations were not also already paid for by the

 4    Debtors.  Mr. Good, you're not aware of any other P-card

 5    payments that were already paid for by the Debtors, are you?

 6    A    As I sit here now, no, I'm not.

 7    Q    To your knowledge, M-III is not aware of any other P-

 8    card payments that were already paid for by the Debtors?

 9    A    To my knowledge, no.

10    Q    M-III has not identified to Transform any other P-Card

11    payments that were already paid for by the Debtors, right?

12    A    Even though we don't know of any more, no, we have not.

13             MS. MAINOO:  No further questions, thank you.

14             THE COURT:  Any re-direct?

15             RE-DIRECT EXAMINATION OF CHRISTOPHER GOOD

16    BY MR. FRIEDMANN:

17    Q    Mr. Good, has your access to the leased employees that

18    are on working for Transform changed since the various APA

19    disputes have arisen?

20    A    Yes.  I would say it has.

21    Q    Can you explain how it's changed?

22    A    They're not as quick to respond and provide information

23    as they were pre-close.  It's clear that whenever there's

24    something that might be in dispute, I'm sure they're

25    probably talking to counsel.  I'd be speculating, but it's
```

1    just, it's evident in our side they're -- for some reason or

2    another they're not as responsive as before.

3                MR. FRIEDMANN:  Thank you.

4                THE COURT:  So Mr. Good, you were here for Mr.

5    Hede's testimony, right?

6                MR. GOOD:  Yes, I was.

7                THE COURT:  He said that he provided the Debtors

8    with basically the underlying work so that you could cross-

9    check E&Y's calculation under their methodology of the

10   prepaid inventory.  Do you agree with that statement?

11               MR. GOOD:  That it's been provided?

12               THE COURT:  Yeah, enough so that you could check

13   to see whether it was a method -- sound, a sound

14   methodology.

15               MR. GOOD:  I believe that his calculations have

16   been provided.  Where it's difficult to say that we could

17   check it completely, it's that there are lot of nuances in

18   the systems where A, there's a lot of them, B, things can be

19   classified differently.  So there seems like there's a lot

20   of areas where there could be potential pitfalls.  So it

21   would be more than just reviewing an Excel sheet.  We would

22   need to go and spend time with the company and check it more

23   than just reviewing that.

24               THE COURT:  Could you give me an example of where

25   their judgment calls are -- I think that's what you were

Page 102

1    suggesting?

2          MR. GOOD:  Yeah, for example, one piece that was

3    concerning is that it wasn't ran by Jeff Butz.  And in the

4    beginning, he says that he takes the wires, and separates

5    out non-merchandise wires from merchandise wires.  In my

6    experience, I've seen merchandise wires being classified as

7    non-merchandise wires in the company.  So if it hasn't gone

8    through the AP team, and classifies those, I'm concerned

9    that there could potentially have been wires for merch that

10   have been incorrectly categorized as non-merch being removed

11   from the analysis.

12         THE COURT:  Had the Debtors requested that type of

13   access to do that type of due diligence?

14         MR. GOOD:  No, we have not, because we have been

15   under the impression that we should be operating using the

16   financial accounting metrics that are coming from the

17   accounting team.

18         THE COURT:  Okay.  So what you got, then was Excel

19   spreadsheets of various categories of -- that go to make up

20   the prepaid inventories.

21         MR. GOOD:  For Mr. Hede's calculation, yes.

22         THE COURT:  Okay, there's just Excel spreadsheets.

23         MR. GOOD:  I've not gone through them in full

24   detail, but they're Excel spreadsheets, yeah.

25         THE COURT:  Okay.  And you asked, and you also in

Page 103

1    your declaration discussed P-cards.  What if anything, at

2    this point, and I appreciate it's been a moving process,

3    your May declaration I think identified things that you've

4    since gotten more information on, as discussed in your July

5    declaration.  What if anything more do you believe you need

6    or would be needed to verify the accuracy of the P-card

7    cancellations?

8            MR. GOOD:  I think just verifying that there

9    aren't any other payments, I don't think that would be a

10   large process, I think it's something --

11           THE COURT:  How, how would you go about doing

12   that?

13           MR. GOOD:  Check with the Treasury team to see if

14   there are any payments we made before, just to confirm.

15           THE COURT:  Okay, and on the other categories that

16   you say that the response so far has been inadequate,

17   leaving aside the check issue, at this point, what would you

18   -- do you believe you need to verify the accuracy of the

19   closed inquiries that are listed in Mr. Hede's declaration?

20           MR. GOOD:  I agree the checks are obviously the

21   large outstanding, those are the biggest numbers.

22           THE COURT:  Right.  Anything besides that, or the

23   P-cards that I've just discussed?

24           MR. GOOD:  We'd want to spend some time with EY to

25   confirm something like the telecom expense.  For example,

Page 104

1     there was a million-dollar invoice that got put towards a

2     GOB store, but apparently it was for several hundred stores.

3     So just want to make sure that we're not getting hit with

4     some of those.  But for the others, I would say outside of

5     the ones on the checks, we're definitely closer to resolving

6     those.

7               THE COURT:  Okay.  So has this been an iterative

8     process, so that you would expect for those last few things

9     you would be able to do it?  Or have you been told we're

10    done now by E&Y, and we're not going to give you any more

11    access or information?

12              MR. GOOD:  I think it was marked complete a couple

13    days ago.  So I'm assuming if we -- hopefully we can reach

14    out, and iterate on this, and complete it.

15              THE COURT:  Okay, any questioning on that?

16              RE-CROSS EXAMINATION OF CHRISTOPHER GOOD

17    BY MS. MAINOO:

18    Q    Yes, Your Honor.  Mr. Good, are you aware of agreeing

19    that on April 12th, 2019, amending the asset purchase

20    agreement, and providing access to members of the Transport

21    Finance Team for M-III and the Debtors?

22    A    To be honest, I'm not a hundred percent aware of that

23    agreement?

24    Q    Are you 20 percent aware of it?

25    A    Maybe some number less than that?  I honestly did not -

Page 105

1     -

2     Q    Okay, so pursuant to this agreement on April 12th,

3     Transform agreed to provide reasonable access to Rob

4     Riecker, Jeff Butz, Jason Barnes, Bill Archambault, Jennifer

5     Joye, Anthony Minor, Molly Huron, and Ken (indiscernible),

6     does that ring a bell for you?

7     A    Was that -- I don't recall an exact agreement.

8     Q    And also pursuant to this agreement, Transform made Mr.

9     Riecker available for a meeting with M-III and the Debtors.

10    Are you familiar with that?

11    A    Yes, we had a call, I believe April 1st, I do remember

12    that.

13    Q    And since then, have you asked to get access to any of

14    those employees and been denied access by Transform?

15    A    No, I have not been denied access to any employee?

16    Q    Has M-III asked for access to any of these employees

17    and denied access?

18    A    Not that I'm aware of.

19    Q    Do you know what is included in any -- do you know what

20    categories of accounts are included in merch and non-merch?

21    You were testified earlier about those categories.

22    A    Categories?

23    Q    What's included -- what did you mean when you refer to

24    merch?

25    A    Merchandise inventory.  Tangible goods that would be

1    sold by Sears.

2    Q    And what did you mean when you referred to non-merch?

3    A    Services.

4            MS. MAINOO:  No further questions, thank you.

5            THE COURT:  Okay.

6            RE-DIRECT EXAMINATION OF CHRISTOPHER GOOD

7    BY MR. FRIEDMANN:

8    Q    Just one question, Mr. Good.  You mentioned before that

9    when you were responding to the Court's question about

10   judgment calls that may have be made by E&Y when they were

11   analyzing, using their new methodology for the prepaid

12   inventory, you said based on your experience, and I want to

13   clarify what you meant by your experience.  What period of

14   time does that cover, that you were working with Sears?

15   A    I've been involved with Sears since April -- late April

16   2016.

17           THE COURT:  Okay, you can step down.

18           MR. GOOD:  Thank you.  I'm sorry, did you have

19   another question?

20           MS. MAINOO:  I don't have any other questions,

21   Your Honor.  I'd like to admit -- I move to admit the April

22   12th, 2019 letter agreement amending the APA --

23           THE COURT:  I think it's already -- I think I have

24   all the amendments in the record already.  It's on the

25   docket too, so it's fine.

1              MS. MAINOO:  All right, thank you, Your Honor.

2              THE COURT:  Okay, so I'm assuming after all of

3        that, that neither side has any additional evidence that it

4        wants to submit on the Hoffman Estates specified

5        receivables, estate property reconciliations and prepaid

6        inventory issues?

7              MR. LIMAN:  Your Honor, with respect to specified

8        receivables, Mr. Butz submitted a declaration.  I believe

9        we've been told that there's no cross-examination requested,

10       but we would ask that that declaration --

11             THE COURT:  Well, that's already here, though, I

12       think.  I mean, I have excerpts from his deposition, as well

13       as Paragraphs 2 through 9 of his declaration.

14             MR. LIMAN:  (indiscernible)

15             THE COURT:  I should be clear, I have the evidence

16       on this page.  I'm just wondering in light of the testimony,

17       whether anybody wants to introduce any additional evidence

18       besides what I've already been directed to?  No?

19             MR. LIMAN:  No, Your Honor.

20             THE COURT:  Okay, all right, so the record's

21       closed on those issues.  So it's 12:30. The rest is

22       basically oral argument, right?  We have no more witnesses.

23             MR. LIMAN:  I think Mr. Klug is here.  Again, I

24       don't think there's any cross-examination requested with

25       respect to him, but as long as we don't have to -- what I'd

Page 108

1    like to do is if Your Honor wants him to sit at the table

2    and affirm the declaration, to get that done so we can let

3    that go.  If Your Honor's prepared to dispense with that,

4    then that would be fine as well.

5              THE COURT:  He's on the adequate assurance point?

6              MR. LIMAN:  Mr. Klug is on adequate assurance, Mr.

7    Butz is on specified receivables.

8              THE COURT:  All right, Mr. Klug, would you come up

9    to the stand, please?  Would you raise your right hand,

10   please?  Do you swear or affirm to tell the truth, the whole

11   truth, and nothing but the truth, so help you God?

12             MR. KLUG:  I do.

13             THE COURT:  And it's Keith, K-L-U-G, Klug?

14             MR. KLUG:  Klug.

15             THE COURT:  Klug, okay.  So Mr. Klug, I have your

16   June 25th, 2019 declaration in this adversary proceeding,

17   contested matter.  It pertains to the adequate assurance,

18   363 deposit issue.  Sitting here today, on July 11th, is

19   there anything you'd like to change in it as your direct

20   testimony?

21             MR. KLUG:  No, Your Honor.

22             THE COURT:  All right, so it's admitted as his

23   direct testimony.

24        (Klug Declaration Admitted into Evidence)

25             THE COURT:  And so you can step down.  And then

Page 109

```
 1    Mr. Butz, are you here, also?

 2              MR. LIMAN:  I mispronounced. It's Mr. Butz.

 3              THE COURT:  Butz, Butz, Butz.

 4              MR. LIMAN:  Butz.

 5              THE COURT:  The transcript, they put it the same

 6    way three times, and they don't know what we're talking

 7    about.  Raise your right hand, please.  Do you swear or

 8    affirm to tell the truth, the whole truth, and nothing but

 9    the truth, so help you God?

10              MR. BUTZ:  I do.

11              THE COURT:  And it's B-U-T-Z?

12              MR. BUTZ:  Correct.

13              THE COURT:  Okay, Jeff.  So I have a declaration

14    of yours dated June 9th, which has been offered as your

15    direct testimony on the specified receivables issue.

16    Sitting here today on July 11th, is there anything that you

17    would want to change in that as your direct testimony?

18              MS. MAINOO:  Your Honor, one correction, the

19    declaration --

20              THE COURT:  It's really July 9th, right?

21              MS. MAINOO:  Exactly.  It's --

22              THE COURT:  Just on the sheet it's June 9th.  So

23    anything come to you in the last two days that makes you

24    want to change your declaration?

25              MR. BUTZ:  No changes.
```

Page 110

1            THE COURT:  Okay, so it's admitted also.

2        (Jeff Butz Declaration Admitted)

3            THE COURT:  So you can step down, sir.  Okay.  All

4    right, so should we take a break for lunch, and then have

5    oral argument on all of these?  As far as oral argument is

6    concerned, why don't we save the 161 for last, and do the

7    others in the order that they came up today, and then the

8    remaining ones?

9            MAN 1:  What time would you like us back, Judge?

10           THE COURT:  It's roughly 12:30, so how about 1:30?

11   Does that make sense for people?  Okay.

12       (Recess)

13           THE COURT:  Please be seated.  Okay, good

14   afternoon.  We're back on the record in In Re Sears Holdings

15   Corporation et al., and the adversary proceeding/contested

16   matter involving APA disputes.  So I think where we left

17   off, we were about to have oral argument on each of these

18   disputes.

19           MR. FRIEDMANN:  Your Honor, Jared Friedmann, Weil

20   Gotshal & Manges on behalf of the Debtor.  Just a point of

21   clarification, for the benefit of the lawyers who have the

22   pleasure of arguing these various disputes, is would it be

23   Your Honor's preference for us to do one dispute at a time,

24   such that we'll argue, they'll argue, and then we'll move to

25   the next -- okay.

1                  THE COURT:  Yes, yeah.

2                  MR. FRIEDMANN:  Okay.  We thought that was the

3       case, but we wanted to clarify.  So Your Honor, the first

4       dispute that we'll be discussing today involves the 13

5       additional plots of land that make up Hoffman Estates, which

6       the -- which Transform now claims to have acquired the three

7       lots:  Lot A, Lot 1A, excuse me, Lot 2, and Lot 3, on which

8       the Sears Headquarters itself sits, as well as some other

9       surrounding lands, which do include, as Mr. Gallagher

10      testified, the main entrances to the campus, and also some

11      additional facilities for the benefit of the employees.

12                 And what Mr. Gallagher's undisputed testimony also

13      is that those three plots of land are surrounded by the main

14      gates, and that those are -- when we went through that,

15      that's when you're at, quote-unquote, "Sears' Headquarters".

16      As you also heard testimony, the truth of the matter is,

17      Debtors didn't even know about these other 13 lots until

18      they got a letter from Cleary suggesting that ESL's

19      position, or Transform's position was that it was acquired.

20                 THE COURT:  Well, you mean Debtors didn't even

21      know --

22                 MR. FRIEDMANN:  They were not on the radar when --

23                 THE COURT:  Transform's position, or you didn't

24      know it was divided into 16 lots?

25                 MR. FRIEDMANN:  They didn't know that there was

Page 112

1    something beyond the gates of Sears, that was available to

2    be sold at that point.

3              THE COURT:  Okay.

4              MR. FRIEDMANN:  Is, they had these three lots,

5    which were provided by the property group, and had -- they

6    had, excuse me, they had zoning reports and surveys showing

7    these three lots, and there was never any reference to

8    anything other than these three lots throughout the

9    negotiation process.  It was never part of this transaction.

10   It was not part of the diligence.  There are no documents

11   that Transform points to that suggests that there was any

12   discussion of anything beyond these three lots throughout

13   the course of the transaction.

14             THE COURT:  So the plot attachments to Mr.

15   Gallagher's declaration that show 13 lots were not in the

16   due diligence room?  Or is there any testimony that they

17   were or weren't?

18             MR. FRIEDMANN:  I don't believe that there's any

19   testimony on the record that this particular, this

20   particular plot was in the due diligence room.

21             At the end of the day, Your Honor, effectively you

22   have, you have a lack of the meeting of the minds here.  You

23   have Transform now, purporting to have believed that they

24   got these extra 13 lots along with the three that were

25   certainly sold to them, and there's nothing in the APA that

Page 113

1    suggests that, there's nothing in any parol evidence that's

2    even been pointed to that, suggests that.

3           The only thing they point to is the declaration of

4    Jane Borden, which has several self-serving statements of

5    someone who now works at Transform, but actually was only

6    there for about three months before the petition date saying

7    historically, this is what we believe 490 meant.  But no

8    other documents to support that position.  The APA, on the

9    other side is pretty clear as to what the intentions of the

10   parties were here.

11          There was a lot of properties that were owned by

12   the Debtors, and when we entered the APA to sell a going

13   concern business, the key was selling Transform properties

14   that were necessary to now operate a going concern business:

15   stores, warehouses, without a doubt the headquarters, but

16   not every piece of property that we own, so that's why it

17   was clarified as to what would be provided.

18          Section 2.1(c) of the APA and Schedule 1.1(p) make

19   clear that Transform only acquired those parcels in the

20   Hoffman Estates development that relate to the operation of

21   Sears' business, and that is Lots 1A, 2 and 3.  The other 13

22   lots have absolutely nothing to do with Sears' business.

23          THE COURT:  Well, that's on the heading, right, to

24   the schedule?

25          MR. FRIEDMANN:  Well, it was also based on the

Page 114

```
 1    definition in 2.1(c).

 2              THE COURT:  Okay.

 3              MR. FRIEDMANN:  I'm sorry, 2.1(c) is --

 4              THE COURT:  Well, it's all owned real property,

 5    which includes, when you go to the definition, operating

 6    owned properties.  And when you look at operating owned

 7    properties, the --

 8              MR. FRIEDMANN:  I said the real property described

 9    in Schedule 1.1(p).

10              THE COURT:  Right, but it doesn't --

11              MR. FRIEDMANN:  1.1(p) is also referred to,

12    entitled operating owned properties.  Look, I agree --

13              THE COURT:  All I'm saying is when you look at

14    operating owned property, it doesn't say all property used

15    in the operation of the seller's business.  It says shall

16    mean the real property described on Schedule 1.1(p).

17              MR. FRIEDMANN:  That's correct.

18              THE COURT:  There's nothing -- so I think you're

19    deriving the attention from the headings, in other words.

20              MR. FRIEDMANN:  Well, I'm driving from the, the

21    whole purpose of the APA, which was to sell a going concern

22    business, and but the readings are not an accident here.

23    These were what the parties believed to be the operating

24    aspects of it, and Sears' headquarters clearly is part of

25    the operations of the business.  These other 13 lots are --
```

Page 115

1    anybody would want them, but they have absolutely nothing to

2    do with the -- with Sears' business.

3              THE COURT:  Well, they get -- they get designated

4    leases, though, too, which they're not going to be using.

5              MR. FRIEDMANN:  Judge, it was a negotiation.

6    Certain things were specifically referenced that were not

7    part of the business, that also were transferred via the

8    APA.  These 13 lots are not mentioned anywhere in the APA.

9    And Your Honor, we would submit that the burden is on buyers

10   to prove that they acquired these lots.  And there is

11   nothing in the APA, there's no evidence whatsoever that they

12   did so.

13             As I mentioned, the only evidence they have is one

14   person in their real estate group saying, this is what they

15   believe it to be, and everything else is to the contrary.

16   The fact that there is nothing in the diligence file about

17   anything other than those three plots of land, the fact that

18   the survey shows that the other property, Hoffman Estates

19   development outside of 1, 2 and 3 were not included in the

20   properties to be conveyed to Transform.

21             At the end of the day also, the APA signed, deeds

22   are prepared, they're only prepared for the three lots, A1,

23   2 and 3.  And Transform doesn't say, well, wait a second,

24   these are only for the three lots that are the operating

25   properties.  What about all those other 13 non-operating

1    parties?  Not a word about that.  Why?  Because no one had

2    the belief, and no one understood at that point that that

3    was being transferred.

4         This only came up a month later when all these

5    disputes arose, and every party's trying to grab that thing,

6    and trying to make arguments that they think will allow them

7    to get more out of this deal than they had bargained for.

8    But one thing that was not bargained for here were these

9    other 13 lots.  It's clear from the face of the APA, and

10   from the evidence that Your Honor heard.  Thank you.

11        THE COURT:  Okay. But before you sit down --

12        MR. FRIEDMANN:  Please.

13        THE COURT:  I asked Mr. Gallagher this, and he

14   didn't really know, it wasn't part of his responsibility.

15   Is there anything in the record to suggest that the benefit

16   of the EDA arrangement goes away if you break up Hoffman

17   Estates into the enclosed building and the easements on the

18   one hand, and the other 13 parcels on the other?

19        MR. FRIEDMANN:  There may or may not be anything

20   in the record, especially if we look back to all the EDA

21   issues that were in front of you.  my understanding, and

22   Michael Schein, who is the lawyer for the Village is here as

23   well, is that the --

24        THE COURT:  I'm sure that he wants to jump into

25   this.

1              MR. FRIEDMANN:  But my understanding, and correct

2      me if I got this wrong, but that the benefits inure to the

3      developer, which doesn't require that they own all of

4      Hoffman Estates, just that it maintain its status as a

5      developer, which we would be assigning that right to

6      Transform, as soon as they assume and assign the EDA

7      agreement, they would take over that role as a developer,

8      and could continue to operate and be a party to the EDA

9      agreement, holding just the three lots that were transferred

10     to them as part of the EDA.

11             THE COURT:  I guess the underlying premise of the

12     EDA was job-related, right?

13             MR. FRIEDMANN:  That's correct.  It was -- we

14     developed the EDA as a whole, with the, obviously the result

15     of that being the creation of jobs, and certainly now the

16     entitlement to receive the EDA is directly tied to the jobs

17     in a given year that are retained there.

18             THE COURT:  Okay.

19             MR. FRIEDMANN:  Thank you. I got a thumb's up from

20     Michael Schein for the record, so I think I probably stated

21     that correctly.

22             THE COURT:  I saw him going like that, so.

23             MR. WEAVER:  Good afternoon, Your Honor.  Andrew

24     Weaver from Clearly Gottlieb Steen & Hamilton on behalf of

25     Transform.

Page 118

1              THE COURT:  Good afternoon.

2              MR. WEAVER:  Your Honor, it's a simple question.

3     It's whether or not these 13 plots of land are included in

4     the phrase 490 Hoffman Estates, included in Schedule 1.1(p).

5     That's the question.

6              And to the extent there may have been a hint of

7     ambiguity, that ambiguity was removed this morning, when Mr.

8     Gallagher was on the stand, and he testified under oath that

9     yes, in fact, all 16 plots of land are categorized as 490.

10    That is what he testified to.  490 applies, the store number

11    490 applies to all 16 plots of land.  Therefore there is no

12    need to go beyond the plain language of the APA.

13             And that fact is underscored by the reality that

14    everyone, everyone involved, did not understand that there

15    were plots of land owned by Sears at Hoffman Estates that

16    were not transferred.  Mr. Meghji testified that he first

17    became aware that certain parcels of land in Hoffman Estates

18    that were excluded from that transaction, he learned that in

19    March or April, after the deal.

20             Mr. Gallagher testified this morning, he first

21    became aware, in response to the question of when he came to

22    understand that there were lots in Hoffman Estates that

23    Transform did not require, he understood that again, when he

24    got the letter in March.  So Your Honor, there's -- there

25    can be no debate, because there is no ambiguity.

Page 119

1              Now, what the Debtors would like to do is

2     completely turn the language of the APA on top of itself.

3     Now, I think Your Honor was suggesting this with your

4     questions of Mr. Friedmann, but they derive their whole

5     argument out of the heading of Schedule 1.1(p).  That's the

6     basis of their entire argument, and that schedule heading is

7     operating owned properties.

8              But as Your Honor I'm sure is well aware, Section

9     1.2(a)(5) of the APA makes very clear that the headings

10    cannot be used to interpret the agreement.  That's not a

11    basis.  What they would have us do is have an individual

12    trial on each of these 125 properties listed, to determine

13    whether or not they are in fact operating owned properties.

14    And it begs the question, Your Honor, why are the three

15    vacant lots that undisputedly were transferred on Schedule

16    1.1(p), why are they related to the operations of Sears, but

17    not these 13 lots in Hoffman Estates?

18              THE COURT:  Well, I think that's easily answered,

19    but I think it's probably irrelevant, as you say.  It's

20    answered, because it's the headquarters, and you can't get

21    to the headquarters until you go through the easement.  But

22    I tend to agree with you, I don't see any requirement that

23    there be operations or not in the reference to 1.1(p).

24              MR. WEAVER:  I just want to clarify the point I

25    was making, Your Honor, that the comparisons between the

Page 120

1    three vacant lots that were transferred under Schedule

2    1.1(p) that aren't at Hoffman Estates, there's testimony in

3    the record that three of those properties --

4              THE COURT:  Oh, other properties --

5              MR. WEAVER:  In other parts of the country --

6              THE COURT:  No, fine.  I thought you were saying

7    that --

8              MR. WEAVER:  I wasn't talking about the baseball

9    diamonds and the volleyball courts, no, Your Honor.

10             THE COURT:  Okay, okay.

11             MR. WEAVER:  But there were three admitted

12   properties.

13             THE COURT:  Yeah, yeah, I got it, I got it.

14             MR. WEAVER:  Elsewhere.

15             THE COURT:  I got it.

16             MR. WEAVER:  Your Honor, the Debtors make a lot

17   out of the Interlinks due diligence site.  But again, Your

18   Honor, the lack of ambiguity here means we don't even get to

19   that point.

20             But even addressing their arguments, there's

21   nothing in the APA that incorporates the due diligence files

22   in the Interlinks data site. There's no basis to interpret

23   the APA based upon what may or may not have been included in

24   the due diligence Interlinks site.  The Debtors do not point

25   to any representation whatsoever, because none was made,

1    that the information in the database was complete and

2    exhaustive.  It is just not a basis.

3              Now, it is undisputed, Your Honor, that there were

4    there lots at Hoffman Estates that were mortgaged.  They

5    were part of an unrelated financing transaction, and those

6    documents are in the Interlinks data site.  But the absence

7    of any documents as it relates to the other 13 lots does not

8    mean definitively that those lots are not 490.  Mr.

9    Gallagher admitted today that all of the lots at Hoffman

10   Estates are 490.

11             THE COURT:  See, I -- the reason I'm scrambling a

12   little bit up here, obviously I don't have his transcript,

13   but my notes have him saying whether the 13 are associated

14   with 490 is not relevant, because it's not operating.  I'm

15   not sure he admits -- and in fact, he says in his

16   declaration quite the opposite, Site 490 compared three, of

17   16 subdivided lots.  So I'm not sure --

18             MR. WEAVER:  I understand.  I believe the question

19   was, the question was whether or not another store, another

20   store number applied to those 13 lots.

21             THE COURT:  Oh yes, that's true, there's no other

22   store number, I --

23             MR. WEAVER:  He said, he said 490 is in fact the

24   store number that applies to those lots.

25             THE COURT:  Well, the -- I think that the

Page 122

1    difference, and I think it's an important one, is that I

2    don't think he says 490 means the whole Hoffman Property.

3                MR. WEAVER:  He may not be saying that as to

4    what's in Schedule 1.1(p), Your Honor, but he, I believe he

5    did say, respectfully, that --

6                THE COURT:  No, he did say no store number for the

7    rest, for the 13, but --

8                MR. WEAVER:  And I believe he went a step further.

9                THE COURT:  Okay.

10               MR. WEAVER:  And said that 490 is a number that's

11   used for all -- they're all encompassed within one store

12   number.  I believe that's what his testimony was, Your

13   Honor.

14               THE COURT:  See, that's, that's what -- I don't

15   have it down that way.  But is there anything in the record

16   that shows that other property of Sears, or maybe Sears

17   doesn't have other property, it wouldn't be a store, but

18   that there's other property that's not characterized as a

19   store?

20               MR. WEAVER:  You mean like distribution centers,

21   and --

22               THE COURT:  Yeah.

23               MR. WEAVER:  Daycare, and things like that?

24               THE COURT:  Yeah.

25               MR. WEAVER:  Well those, those were included, and

Page 123

1    there are store numbers that do apply.  Are you asking

2    specifically whether or not they're --

3            THE COURT:  Well, I think part of the argument

4    assumes that because Mr. Gallagher testified that there's no

5    different store number, different than 490, that corresponds

6    to the 13 properties at issue, 13 parcels at issue, I think

7    you're assuming that it has to be part of 490 then.  But

8    that's assuming that every property that Sears owned had a

9    store number associated with it.

10           MR. WEAVER:  Well, there is testimony to that

11   effect, Your Honor.  Ms. Borden's direct declaration

12   testifies that the process at Sears is to assign store

13   numbers to all owned property, and I can find that reference

14   for you in just a moment, Your Honor.

15           MR. FRIEDMANN:  Paragraph 7, (indiscernible).

16           MR. WEAVER:  Thank you, Mr. Friedman, Paragraph 7

17   in her declaration.  We know they assign numbers to, store

18   numbers to the daycare center.  We know they assign store

19   numbers to the distribution centers.  Earlier you heard Mr.

20   Barefoot this morning talking about how we resolved a lease

21   to a warehouse that had a store number that he read into the

22   record.  That's what Sears does.

23           And Mr. Friedmann can call the testimony self-

24   serving, but it's undisputed that Ms. Borden did testify

25   that when she was president of Sears real estate, she

Page 124

1      understood Store 490 to apply to all of the lots.  It, it's

2      a question of, what did Sears consider to be 490?  I don't

3      know what other evidence we can provide to Your Honor other

4      than someone who was working at Sears at the time.

5      Admittedly she was --

6                THE COURT:  It wasn't clear to me that she'd ever

7      really thought about it.  It's pretty clear to me that no

8      one thought about it.

9                MR. WEAVER:  Your Honor, that may be an issue as

10     to the negotiations, there's no evidence that this issue was

11     discussed in the tail end of negotiations.  But as to the

12     nature of how Sears operated by assigning store numbers to

13     its properties, and the fact that the headquarters had Store

14     Number 490 assigned to it, and that all this property at

15     Hoffman Estates was purchased at the same time, for all

16     those reasons, Your Honor, I think it takes -- there is no

17     ambiguity.

18                We cannot, we cannot attempt to define each of the

19     properties by trying to come up with some test that's not

20     workable.  Your Honor can't sit here and determine whether

21     or not each property --

22                THE COURT:  I understand that point.

23                MR. WEAVER:  And so what we're left with is the

24     contract, and the question is, is there any evidence as to

25     what 490 means, and the evidence, I think, Your Honor, is

Page 125

1    not controverted.

2           THE COURT:  Okay.

3           MR. WEAVER:  Just quickly as to the point related

4    to the actual transfer of the three lots, a mistake

5    happened, Your Honor, I mean, Your Honor can appreciate the

6    size and scale of what was happening during this

7    transaction.  When it was discovered that all the lots were

8    not transferred to Transform, Transform immediately notified

9    under the provision of the APA, which provides for this very

10   mechanism, Your Honor.  So it's not as if this was not

11   anticipated or expected.  The contract contemplates a

12   situation just like this.  Thank you, Your Honor.

13          MR. FRIEDMANN:  Your Honor, what's clear about

14   Paragraph 7 that Mr. Weaver points to is that Sears assigns

15   store numbers to stores, and distribution centers, and

16   offices, and nothing that actually had something to do with

17   the operations.  Yes, 490 was what was assigned to the

18   headquarters, and what 490 means just beyond it just being

19   the headquarters I think clearly is ambiguous in this

20   agreement.  Mr. Weaver points to the fact that there are

21   other vacant lots that are on Schedule 1.1(p).  We don't

22   dispute that.  Those lots are individually identified,

23   though, separately.  So there's a -- here --

24          THE COURT:  With a store number?

25          MR. FRIEDMANN:  Do they have store numbers?  Or

Page 126

1    maybe they're together with -- or maybe they're parking lots

2    adjacent to stores.  The point is --

3                THE COURT:  Well, can you show me those?  Because

4    that might be significant.

5                MR. WEAVER:  (indiscernible)

6                THE COURT:  Is it in 1.1(p) or somewhere else?

7                MR. WEAVER:  (indiscernible)

8                THE COURT:  Do you have any that --

9                MR. WEAVER:  Your Honor, Ms. Borden testifies in

10   Paragraph 19, (indiscernible) store numbers that are vacant,

11   and those store numbers correspond to store numbers in

12   1.1(p).

13               THE COURT:  Okay.  So they were assigned a store

14   number, also.

15               MR. FRIEDMANN:  Okay.  But at the need of the day,

16   Your Honor, what you have here is clear a lack of meeting of

17   the minds, this nothing that when only three deeds were

18   provided in connection with these stores, that there was

19   some mistake, if 15 deeds had been provided, and one was

20   missing, you may miss that.  When there are --

21               THE COURT:  But it's not a mutual mistake, right?

22   It's just, one party thought they had a deal that was

23   different than what is documented.

24               MR. FRIEDMANN:  It's a complete lack of meeting of

25   the minds, is that the -- all the information available, and

Page 127

1    everything that was negotiated was that they were getting

2    the headquarters, and that that was 490, and that everything

3    that was provided in the diligence file showed those being

4    just three properties.

5            And now all of a sudden, we have Transform coming

6    here saying we bought three, we get the other 13 for free.

7    And there's nothing in the APA that suggested that those

8    were included as well.  We have again, the only testimony, I

9    don't know that it's fair, maybe it wasn't the -- the only

10   testimony of Jane Borden, she's now a Transform employee at

11   will.  I understand why she would say that look,

12   historically, that's the answer.

13           THE COURT:  I understand, but you did have the

14   opportunity to cross-examine her on whether there are any

15   properties that are designated as not store properties, and

16   didn't, and whether these are recorded in any other way, and

17   I don't think you did that either.

18           MR. FRIEDMANN:  Nothing in the APA whatsoever

19   suggests that this was intended to include these other 13

20   properties.  Nothing in the parol evidence suggests it was

21   supposed to include these other 13 properties.  It's only a

22   month later, after the close, that this idea comes out, that

23   can we make an argument that this includes these other 13 as

24   well.

25           THE COURT:  Well, I think Transform's counsel is

1    right, that basically that's what Mr. Meghji and Mr.

2    Gallagher also testified to.  Because they didn't, didn't --

3            MR. FRIEDMANN:  It was not, it was never --

4            THE COURT:  They didn't think about this --

5            MR. FRIEDMANN:  Never was there, because --

6            THE COURT:  They didn't, they didn't know there

7    were 13 other properties either, right?

8            MR. FRIEDMANN:  There was never any discussion of

9    anything being transferred than the headquarters of the

10   three properties.  So, and we went to the negotiating table.

11   The idea was yes --

12           THE COURT:  I think the testimony was different

13   than that, which is -- when did you first realize about the

14   13 properties?

15           MR. FRIEDMANN:  Only after -- there was a lot of

16   properties that Sears owned. Some of which was included in

17   this transaction, a lot of which was not.  Clearly included

18   in this transaction was Sears Headquarters, and Sears

19   Headquarters, during the course of the negotiation, has

20   never pointed to a single document that suggests anybody was

21   discussing Sears Headquarters has being anything other than

22   just those three lots during the entire process.

23           We know that Transform likes parol evidence.

24   You've got huge binders on your desk there providing that.

25   Not a single page in there is any parol evidence showing

1    that there was a discussion that 490 was anything but these

2    three lots.

3              THE COURT:  Okay.

4              MR. FRIEDMANN:  Thank you, Your Honor.

5              MR. WEAVER:  Your Honor, the reason that it was

6    not discussed is because it was understood.  The people who

7    run Sears, who were operating Sears --

8              THE COURT:  Well, we don't have any parol evidence

9    about the negotiations, right?

10             MR. WEAVER:  I don't think it was negotiated, Your

11   Honor.  I think --

12             THE COURT:  It's just made out in the schedule.

13             MR. WEAVER:  It's made out in the schedule.  In a

14   transaction like this, you put together schedules -- the

15   seller knows they're selling, and the buyer knows they're

16   buying, that's why you do it.  The fact that we're even

17   having this discussion indicates why the path that the

18   Debtor wants to go on is not workable, and it is not in the

19   spirit or in the plain language of the APA.

20             THE COURT:  Okay.

21             MR. WEAVER:  Thank you, Your Honor.

22             THE COURT:  All right, so the first of the

23   disputes between Transform, the buyer, and the Sears Debtors

24   over the meaning and enforcement of their asset purchase

25   agreement as amended pertains to Section 2.1(a) of the

Page 130

1      agreement, which lists among the transferred assets to

2      Transform all -- this is a defined term -- owned real

3      property.

4              In the definitions section of the agreement, 1.1

5      owned real property includes, or is defined as one the GOB-

6      owned stores, and two, the operating owned properties.  And

7      the operating owned properties are defined as the real

8      property described in Schedule 1.1(p), including in each

9      case all the right title and interest of seller and the

10     subsidiaries to all improvements located thereon, and other

11     easements, rights and interest appurtenant thereto, and any

12     associated rights to parking.

13             So notwithstanding the heading, owned -- I'm

14     sorry, operating owned properties means the property

15     described in Schedule 1.1(p).  The parties dispute whether

16     Schedule 1.1(p), when it lists Store Number 490, Hoffman

17     Estates in Illinois, means all of the 16 parcels of land

18     comprising the generic term, Hoffman Estates, or instead,

19     Sears Headquarters and the two adjacent parcels that have

20     the entrances, as well as some land that employees can use

21     for playing baseball, and basketball, and some other,

22     perhaps outbuildings.

23             The Debtor contends that based on the headings,

24     and an unstated, that is, not stated in the agreement, but

25     implicit overall purpose, that Transform was buying Sears'

Page 131

1    operating assets, the vacant land that's not included in the

2    three parcels that I've just mentioned can't be meant by the

3    reference on Schedule 1.1(p).

4            There are a number of problems with that analysis.

5    First, as I said, the headings don't count in the agreement.

6    Second, Transform bought property other than property that

7    was going to be used as an operating part of its business,

8    including as set forth on 1.1(p), as set forth in the

9    uncontroverted testimony of Ms. Borden.  Even if I were to

10   read an overall purpose into the agreement, it's belied by

11   those facts.

12           So I believe the issue comes down to simply what

13   did the parties mean, when they put Store Number 490,

14   Hoffman Estates, Illinois on Schedule 1.1(p)?  Based again

15   on the uncontroverted testimony of Ms. Borden, and her

16   declaration, including Paragraph 7, it appears to me that

17   Sears denominated all of its properties, not just stores,

18   but all sorts of other properties, including as set forth on

19   Exhibit 1.1(p), other vacant properties, nearly vacant land

20   as a store.

21           Given that uncontroverted fact, it appears clear

22   to me and unambiguous that by designating the property here

23   as Store 490, Sears meant the entire Hoffman Estates

24   property, and not just the three parcels that appeared in

25   the Interlink materials in the due diligence site, or

Page 132

1    otherwise.  The Debtors obviously had as much information

2    about their properties as Transform did, and certainly could

3    have negotiated a carveout from Store 490 to include the

4    other 13 properties, if they wanted to, but they didn't.

5            It is also the case that the Debtors' witness, Mr.

6    Gallagher, testified that at least that no other store

7    denomination was given for the other 13 properties, and

8    certainly that, when combined with Ms. Borden's testimony,

9    supports my ruling.  My ruling is also somewhat supported by

10   the fact that the Debtors' schedules did not break out the

11   Hoffman Estates properties, but rather scheduled them as

12   land, and a building.  I don't believe that rises to the

13   level of estoppel, as argued in the briefing by Transform,

14   but it does highlight that Sears looked at this property as

15   a whole.

16           I say it doesn't rise to the level of estoppel,

17   because the function of schedules is to reasonably identify

18   the assets to parties in interest, and to give parties a

19   proper opportunity to investigate the Debtors' schedules to

20   see whether they're accurate.  See generally, In Re Frontier

21   Insurance Group, Inc. 585 B.R. 685 at 701 through 02, Bankr.

22   S.D.N.Y. 2018, and the cases and authorities cited therein.

23           But it appears that again, based on how the

24   parties consistently dealt with their real property, how it

25   was denominated here, and the plain language of the

Page 133

1    operative provisions of the agreement, that whether either

2    side thought that Transform was acquiring the entire Hoffman

3    Estates set of 16 properties, the agreement said it did, and

4    accordingly, it did.

5           So I think the next issue, and I've lost my page,

6    there we go, is the specified receivables point?

7           MR. FRIEDMANN:  Yes, Your Honor.  Your Honor, the

8    issue with specific receivables stems from the buyer's

9    desire to recalculate, with another financial advisor, the

10   value of the assets of the specified receivables it received

11   at close in a manner different from the way the company's

12   own accounting systems calculated the value of the specified

13   receivables at close.  Mr. Tavakoli testified he actually

14   wasn't exactly sure what specified receivables are defined

15   as under the APA, and we'll leave that at that.

16          But it is important for us to know what specified

17   receivables are on the APA, and they're defined to mean the

18   accounts receivable set forth in Schedule 1.1(k), and

19   Schedule 1.1(k) lists out about 30 specific categories of

20   receivables that correspond to exactly how those receivables

21   were kept in Debtors' accounting systems.  That's what

22   listed in 1.1(k), and the amounts that are listed in 1.1(k)

23   was the book value of those accounts at the time of the

24   execution of the APA.

25          These, as the undisputed testimony before you

1    shows, that methodology to calculate that book value is

2    exactly the same methodology that Debtors used prepetition

3    when it prepared its audited financials, when it reported to

4    the SEC, and most importantly, it was the methodology that

5    was used when 1.1(k) was set as the peg to which the Debtors

6    had to deliver a certain amount of specified receivables in

7    order to avoid what the APA refers to as a specified

8    receivables shortfall.

9            And the peg was set at a book value of $255.2

10   million in order to avoid a specified receivable shortfall,

11   meaning if they delivered more than that, that simply would

12   inure to the benefit of Transform, who would receive a great

13   amount of specified receivables, but if they delivered less

14   than that, it would be offset against other liabilities,

15   such as severance and 503(b)(9) claims.

16           The buyers had an opportunity to diligence these

17   accounts in advance of the execution of the APA, of the

18   testimony of Mr. Kamlani shows during negotiations of the

19   APA, the Debtors provided with the preliminary list of the

20   ten-current amounts in the accounting systems of the

21   unencumbered receivables as early as January 6th.  It's in

22   Kumlani's transcript, 67, 813.  The schedule reflected the

23   exact same 30 categories that would eventually be reflected

24   in Schedule 1.1(k).  At that point, they had a book value in

25   of an excess of $330 million, and that's shown in Joint

1      Exhibit 86.

2              The Debtors also expected that the specified

3      receivables would have varying recovery letters, recovery

4      levels, excuse me, which as Mr. Riecker explained, was

5      understood by all parties as they discussed this, and was

6      input with diligence.  There's no belief that a particular

7      receivable would stay the same during the 25 days between

8      the execution of the agreement and the closing, because

9      every day new receivables come in, other receivables are

10     satisfied.

11             On January 6th, when these initial specified

12     receivables were presented to ESL at the time, they were

13     presented with recovery rates ranging from zero percent to

14     90 percent, and an overall blended recovery rate of 44

15     percent.  The bottom line was, no one expected if you

16     received $255.2 million of specified receivables, that you'd

17     be able to turn around and collect $255.2 million.  These

18     were just values on the books, but some of them were known

19     to be much more likely to recover much less.

20             And that's why, as both Mr. Riecker and Mr.

21     Kamlani testified, buyer was given the opportunity

22     (indiscernible) and in fact did diligence, these specified

23     receivables, in the weeks leading up to the execution of the

24     APA.  In fact, as Mr. Riecker testified, the buyer consulted

25     with Debtors regarding the details of the 30 ledger

1    accounts, as well as what was actually in those accounts, so

2    not just what the numbers were on a  given day, but what it

3    was that made up those accounts, and the basis of the

4    estimated recoveries, according to Debtors.

5          And based on that diligence, Transform accepted

6    the list, which is then reflected in 1.1(k), at that point,

7    at the time of execution, having a book value of $255.2

8    million, which as I mentioned before, is where the shortfall

9    threshold was set at.  25 days later from the execution, we

10   get to the closing, and at that point, Debtors delivered all

11   of the then-outstanding receivables in those exact same 30

12   categories, which at that point had an aggregate book value

13   of around 292,083,182.

14         As I mentioned before, everything went to

15   Transform, even though it was more than where the threshold

16   amount was set, and as Mr. Riecker testified at his

17   deposition, buyer gave everything.  It wasn't a situation

18   where they kept certain receivables for themselves, because

19   there were so many.  Everything that was those 30 accounts,

20   which was delivered, which was exactly what the APA

21   required.

22         All of the Debtors' calculations of the value of

23   the specified receivables, both when the $255.2 million peg

24   was set, and when they calculated the 292 million and change

25   that was delivered at closing, all came directly from the

Page 137

1    Debtors' accounting systems.

2         THE COURT:  Well, can I interrupt you?

3         MR. FRIEDMANN:  Please.

4         THE COURT:  I mean, maybe you're just about to get

5    to this.  The definition of the specified receivables does

6    say the accounts receivable, and then it has reference to

7    Schedule 1.1(k).  And I understand you've been addressing

8    Transform's argument that 1.1(k) has to mean you have to

9    deliver the specific numbers by each category on 1.1(k).

10   But it also says accounts receivable.

11        Mr. Tavakoli's declaration says that two chunks of

12   accounts, so-called accounts receivable weren't accounts

13   receivable, and he separates them into 28.6 million, which

14   include 12.3 million of accounts that were actually

15   collected before the closing, so they couldn't be

16   receivable, and then a number, another 16.3 million that are

17   just not -- they're in company accounts, and things like

18   that.  so that's one group, and then the -- and I frankly am

19   fairly sympathetic with that argument, because it's hard to

20   see how those could be accounts receivable.

21        The second point is, there's another 54, 57.4 that

22   is not properly charged, because it's in respect to already-

23   received CIA inventory.  So can you address both of those

24   two points?

25        MR. FRIEDMANN:  Yeah, I think I can address them

Page 138

1    together, Your Honor, it's that these were accounts

2    receivable as they were kept by the company prepetition,

3    post-petition.  They had specific lines in their accounting

4    systems, and some of them contained, for better or for

5    worse, what were called accounts receivable, but really had

6    no value.

7             THE COURT:  Well, no, it's one thing to say it's

8    not collectable.  By analogy, credit card issuers will

9    report a debt to the credit reporting agencies as zero

10   dollars.  In their nomenclature, that doesn't mean they

11   wouldn't -- off, that they're not going to be able to

12   collect it.  It just means that they think that it's only

13   worth zero dollars.  That's not what I'm focusing on.  I'm

14   focusing on whether these items were even accounts

15   receivable, since that's part of the definition.

16            MR. FRIEDMANN:  They were considered accounts

17   receivable in the finance reporting that Debtors did

18   prepetition, and its audited financials by Deloitte, and in

19   its SEC reporting.  There was nothing that when the company

20   went into petition that we started doing differently, and

21   all of a sudden things that were not considered accounts

22   receivable before pre-petition we started calling --

23            THE COURT:  Well --

24            MR. FRIEDMANN:  So, and the idea was that we

25   understood that some of these were real receivables, some of

1    them might not have been.  And the idea was look, we're

2    giving everything.  There are certain receivables, the

3    specified receivable's a bit of misnomer, because there are

4    receivables that actually were specified.  This is really

5    everything else, it just happened to all be specified and

6    (indiscernible).  You have all these other accounts.  Some

7    are good, some are bad, some are unclear.

8              THE COURT:  Is there anywhere where the APA says

9    either of these two things, this is A, it's determined as

10   per the company's reporting, or as per the due diligence

11   materials you received?  Or alternatively, B, these are

12   specified accounts receivable and we all know that some of

13   them aren't even accounts receivable?

14             MR. FRIEDMANN:  Well, that was the purpose of

15   having the Schedule 1.1(k), and of not just giving that

16   schedule, but having that whole diligence process before.

17   And keep in mind here, the individual diligence in the

18   company are the same individuals who actually ran the

19   company prepetition.

20             So they had some background here that a third

21   party might not have.  I could understand if it was a real

22   third-party buyer who all of a sudden came in here and said

23   well, you guys are calling these accounts receivable.  These

24   are the same people who owned the company beforehand, and

25   who were -- one of whom was the CEO, one of whom was on the

Page 140

1    audit committee when these were considered accounts

2    receivable.

3              But again, we didn't say take our word for it.

4    They were diligence, there was multiple phone calls and

5    meetings to understand the details of what was in these

6    things, to understood, some of them were worth something,

7    some of them were not, that's why --

8              THE COURT:  Did that include the Debtors pointing

9    out that these debts have already been paid?

10             MR. FRIEDMANN:  My understanding is that any

11   diligence questions that were asked, and there were a lot of

12   them, mostly led by Mr. Kamlani, everything was responded,

13   to the best of the available information we had.  They had

14   full access, whereas E&Y is not allowed to talk to Mr.

15   Riecker, for some reason.  That was not the case here, as

16   they had full access to the CFO and everybody else in our

17   accounting department to get information, as well as

18   obviously through M-III.

19             THE COURT:  But again, the definition, specified

20   receivables, shall mean the accounts receivable, set forth

21   on Schedule 1.1(k).

22             MR. FRIEDMANN:  Right, accounts receivable is not

23   defined here.  This is not a defined term, accounts -- it's

24   simply defined as whatever's on 1.1(k), so --

25             THE COURT:  But it's preceded by the phrase,

Page 141

1    accounts receivable.

2              MR. FRIEDMANN:  Correct.

3              THE COURT:  And I think people normally view an

4    account receivable as not something that's already been

5    paid.

6              MR. FRIEDMANN:  I think that's a fair point, Your

7    Honor.  For the purpose, though, of 1.1(k), there were

8    these, all these accounts which were kept by the company, as

9    accounts receivable, for better or worse.  The idea was at

10   closing, you're getting all of them.  We don't think it's

11   worth anywhere near 255.2 --

12             THE COURT:  I get that completely, but I'm having

13   a hard time seeing that bar get included, providing

14   something that wasn't an account receivable.

15             MR. FRIEDMANN:  Look, whereas on Hoffman Estates,

16   there clearly was no meeting of the minds, because there

17   wasn't perfect information between the two, here there was

18   perfect information.  Now, the perfect information may have

19   led to the fact that we're calling things accounts

20   receivable that aren't really accounts receivable, but

21   everybody knew what they were.  What everyone --

22             THE COURT:  Where is that in the record?  Is there

23   any admission, any disclosure that items on 1.1(k) included

24   amounts that had already been collected?

25             MR. FRIEDMANN:  First of all, Your Honor, the

1    other thing I can say is that the nature of these also,

2    amounts that may have already been collected could be not

3    collected one day, but then collected the next day, and

4    there is a lag time in between some of these.

5         So some of the reasons that there are issues here

6    is that the way in which the company processes information,

7    there are lag times that get cleared up at the end of every

8    month.  So you do end up, given the particular day you

9    happen to pick, that you'd have that on certain days, and by

10   the end of the month, they've cleared.

11        THE COURT:  Well, but if you go to, if you go to

12   Schedule 1.1(k), and you can just pick any of these, well,

13   let's use the Tavakoli 12.3 million.  Well, let's use the

14   intercompany receivable ones first.  Where on 1.1(k) does

15   that fall in?  Is that other receivables?  There's this

16   India Entities, and Sears Holding Management Corporation,

17   $9.993071.  Is that -- does that show up on Schedule 1.1(k),

18   that type of intercompany obligation?

19        MR. FRIEDMANN:  I don't know the standing here

20   right now, Your Honor, I couldn't honestly answer that

21   question for you.  From our perspective, is these were

22   accounts that were -- the amounts were fluctuating, the

23   actual accounts were always the same, and the quality of the

24   accounts varied greatly.  And when is any (indiscernible) --

25   some of them -- and again, (indiscernible) --

1          THE COURT:  I get your point about the quality.  I

2     don't really have a problem with that.  but I don't --

3          MR. FRIEDMANN:  The only --

4          THE COURT:  Frankly, I, maybe --

5          MR. FRIEDMANN:  The only --

6          THE COURT:  Maybe, I'm missing something here.  I

7     thought what you were going to do is say yes, we agree, some

8     of these aren't accounts receivable, because they have been

9     paid.  But maybe some of these others really are properly on

10    1.1(k), because A, they haven't been paid, and B, it's not

11    double-counting, and they're owed.

12         MR. FRIEDMANN:  I think maybe the point is this,

13    Your Honor.  Debtors didn't pick and choose what would go on

14    1.1(k).  It wasn't like we said all right, these are real

15    accounts receivable, so we're going to put them on 1.1(k),

16    and these we all know are not real accounts receivable, so

17    we're not going to include them.  We took everything that

18    was left after we had divvied up what was going to

19    Transform, and everything that was left went on the

20    schedule.  For better or worse, it went on here.

21         THE COURT:  Okay, so I'm going to go back to my

22    prior question, then.  Did -- is there anything in the

23    record to show that Transform knew that everything that was

24    left as laid onto Schedule 1.1(k) included, and it would be

25    included in the individual amounts, you know, because it was

Page 144

1    pegged to a point when those were actually accounted for

2    accounts receivable.  So did that include accounts

3    receivable that had already been paid?

4            MR. FRIEDMANN:  So I think the January 6th

5    presentation, which is a joint exhibit.  It is Exhibit, I

6    think it's Page 6, I believe.

7            THE COURT:  Okay.

8            MR. FRIEDMANN:  It's Page 6, I believe, of this

9    exhibit, or actually it's -- well, based on the Bates

10   Number, it's 7, but it's 6 in the presentation.  The top

11   line says other receivables, preliminary schedule and

12   estimated recovery value.

13           THE COURT:  Okay.

14           MR. FRIEDMANN:  Maybe other receivables would have

15   been a better term to have made its way into the APA,

16   instead of accounts receivable.

17           But again, this is showing you the information

18   that was provided initially, for each of the accounts that

19   were, as I said, left over, that accounts created by Sears

20   prepetition and which our view was that we were going to

21   give them everything we had.  Whatever else was in the

22   account systems, which we inherited.  We didn't create these

23   accounts.  We inherited them from prepetition Sears, and we

24   knew that there were issues, as were described in

25   description and comments here, and following this

Page 145

1    presentation, we provided an opportunity for the buyer to

2    further diligence this.

3           So if your question is, did they absolutely know a

4    particular fact, the answer is if they didn't know, they

5    certainly should have known.  They had every opportunity in

6    the world to ask about these, and if there was a particular

7    account that they believed, these are not really accounts

8    receivable and don't belong on this list, the time to have

9    said that was before we signed the APA, not after the deal

10   closed.

11          And that didn't happen.  They understood what

12   these receivables were, because we inherited them from the

13   same people who ran the company beforehand.  They diligenced

14   this, they knew exactly what they were getting, and they

15   accepted it.  And then we ultimately provided to them at

16   close all of those exact same accounts, for better or worse,

17   in an amount that was above the threshold that we were

18   required to provide.

19          All right, and by the way, it was only on February

20   25th that we finally got a letter saying wait a second,

21   there are some issues with these accounts.  At close,

22   everybody understood that it was exactly what we had looked

23   at, 25 days later -- 25 days earlier, excuse me, that

24   everything was provided.  These are the accounts, here they

25   are, they're yours now, and there's more book value to them

Page 146

1    now than there was 25 days later.  It could have gone up or

2    down; it happened to have gone up.

3              THE COURT:  How can you give book value to an

4    account that's been paid?

5              MR. FRIEDMANN:  It's the book value that was in

6    their accounting system at the time.  And again, it's -- we

7    did not create this.  We inherited.  This is exactly the way

8    it was maintained, when these same accounts where being used

9    to report the financials audited by Deloitte.  It was the

10   same values that were given, in order to report to the SEC.

11             We accepted it.  We said look, we think there are

12   issues here, take a look, ask the questions you want to ask.

13   Get comfortable with what you're getting here, but buyer

14   beware, they're your accounts.

15             THE COURT:  Okay, are there any other arguments

16   counter to the analysis in the Tavakoli declaration

17   pertaining to this issue?  For example, Mr. Tavakoli says

18   that the 9.99 million of accounts receivable relating to an

19   intercompany transaction between Sears India Entities and

20   Sears Holding Management Corporation is not a valid

21   receivable because it does not relate to any external third-

22   party receivables.  I actually didn't see a carveout for

23   non-third-party receivables, for example.

24             And it seemed in the briefing that you were

25   arguing that the 57.4 million relating to the CIA inventory

Page 147

1  really wasn't double-counting, and that should be treated as

2  an account receivable.  Are you giving up on those

3  arguments?  Are you giving up on those arguments, or are you

4  still making those arguments?

5          MR. FRIEDMANN:  Your Honor, I understand that

6  there's -- and this is, again, a historic issue in their

7  accounting systems, that when items are received, you know,

8  a cash payout in advance, there's a receivable created on

9  the books when the cash is paid out, and the receivable

10  doesn't always get extinguished right away.  It sometimes it

11  takes a while to, and maybe not at all, because they're not

12  able to match it up right away.

13          Now, Mr. Tavakoli have the benefit of spending

14  1500 hours going through this stuff to find things that

15  frankly, in the 25 days between the execution of the APA and

16  the close, was not ever going to happen, but I think the,

17  for us the --

18          THE COURT:  I'm sorry.  I missed that part.

19          MR. FRIEDMANN:  That he was able to, with the

20  benefit of four months and unlimited resources and 1500

21  hours, he was able to identify things and find these issues

22  that in the short period of time we had we didn't.

23          But I think the key is that whatever problems

24  there were with these accounts at close, were the same

25  problems with those accounts just 25 days earlier.  So, you

Page 148

1    know, if we had a car that only had three wheels and you

2    looked at, you say it has three wheels, and when we

3    delivered it, it still only had three wheels 25 days later,

4    it's exactly you bargained for and agreed to, is that you

5    knew it had problems.  It wasn't -- this was not a brand-new

6    car.  These weren't receivables.  They had a lot of issues.

7    We told them they had issues.  But the point was, we're

8    going to give you everything.

9            And the key for all this was we just want to make

10   sure, and it's the expectation of the parties that right

11   now, as of the signing, these accounts, for better or worse,

12   are worth $255.2 million on your books.  We want to make

13   sure that 25 days later, nothing's changed, and we still are

14   getting $255.2 million.  What we don't want is you to tell

15   us these accounts totaled $255.2 million at execution, and

16   then we get to close, and you say, oh, now we only have $100

17   million, so those could be (indiscernible) on everything.

18           So, the whole point of this provision was, you're

19   getting everything.  With respect to these accounts, at

20   execution, it's $255.2 million, whatever they are.  And we

21   want to know that 25 days later, there's no games getting

22   on.  We're getting exactly what we expected to buy.  And if

23   we get less, then we get a dollar per dollar shortfall

24   payment.  And that's what this is.

25           It wasn't about are these good accounts, are they

Page 149

1    bad accounts, are they real receivables, are they not real

2    receivables?  It was just a way of pegging what we had at

3    execution to make sure that we operated in the ordinary

4    course and they got the same thing 25 days later when we

5    sold the company.  It turned out we had even more specified

6    receivables than we did at the time of the execution.

7           There's a lot of arguments that are raised by the

8    buyer about the fact that the -- well, the $297 million

9    amount is obviously more than the $255 million amount, and

10   the amounts in the individual accounts changed.

11          There is nothing in the APA whatsoever that

12   suggests that any of those individual line items are

13   expecting the exact same amount.  And frankly, as Mr.

14   Riecker testified, there would be no expectation that that

15   could ever happen.  As these numbers fluctuate all the time,

16   they're going to go up, they're going to go down, which is

17   why the parties didn't negotiate when we said you'd get

18   exactly at execution what you get at sale.  We didn't

19   negotiate it at each individual line.  We negotiated for an

20   aggregate amount of $255.2 million worth of book value.

21          I think one of the other key things to point out

22   is that in terms of getting what they expected to get, the

23   June 6th presentation that I was just showing Your Honor

24   estimated an aggregate recovery of about 44 percent on

25   these.

Page 150

1          Mr. Tavakoli's declaration suggests they've

2     already collected over $85 million on these receivables.

3     So, they are already up to collecting 33 percent on that,

4     which demonstrates that it's what we told them it was.

5     There was no smoke and mirrors here.  There was nothing to

6     suggest these are something they aren't.  Exactly what we

7     told them and exactly what we suggested would be their

8     recovery is bearing out, that they're already at 33 percent

9     recovery on these receivables.

10          Unless Your Honor has any other questions, we rest

11     on that.

12          THE COURT:  I asked Mr. Tavakoli this on the

13     payments, whether in fact all of these instances in his

14     declaration where he says there's been payment -- I asked

15     him to confirm whether the payment was to Sears or is being

16     held by Transform.  And his answer was to Sears.  Do you

17     have anything to dispute that?

18          MR. FRIEDMANN:  These are payments, the specified

19     receivables that they're collecting?

20          THE COURT:  Right.  Well, for example, there was

21     an 8.87 receivable balance, and on May 14, 2019,3:30:13

22     Jennifer Joye from the Treasury Group confirmed that two

23     wires were received in account -- gives the number.  On

24     February 6, it received $6.87 million, and on February 2, it

25     received $2 million.

Page 151

1          So, the it, I'm assuming is Sears.  And I asked

2     Mr. Tavakoli that, as opposed to Transform.

3          MR. FRIEDMANN:  I'm looking over to my client to

4     track these things closer than that, Your Honor.

5          THE COURT:  It's on Page 12.  There's a similar

6     thing right below there, $2.111 million is deposited in

7     Sears Roebuck National Claims Center account at Bank of

8     America, but not recorded in a timely manner.  You know,

9     again, I don't know if -- I'm assuming, based on his

10    testimony, that this money is all in Sears' possession.

11         MR. FRIEDMANN:  When you're saying Sears, you mean

12    Debtors?

13         THE COURT:  Yeah.

14         MR. FRIEDMANN:  Okay.

15         THE COURT:  Yeah.

16         MR. FRIEDMANN:  Give me one moment

17    (indiscernible).

18         Your Honor, we don't have information to doubt

19    what Mr. Tavakoli is testifying to.  I think the issue is

20    that, again, this is a point in time, so there is --

21         THE COURT:  And no, I understand your argument.

22    I'm just --

23         MR. FRIEDMANN:  Well, there's lag on both sides

24    is.  What I want to be clear about is that there are some

25    things that are not Accounts Receivable anymore; they've

1    already been collected.  There are also things that aren't

2    yet reflected in there that end up in there as well

3    eventually.  So, there is --

4              THE COURT:  Well, I'm sorry.  Let me make sure I

5    understand that.  Are you saying that the $292 million that

6    was certified at closing could actually grow?

7              MR. FRIEDMANN:  It could be understating what

8    actually ends up being in those accounts.

9              THE COURT:  How is that?

10             MR. FRIEDMANN:  It could -- it's an accounting

11   process.  It's not -- again, we're not counting everything.

12   The accounting process has lag in it.  As things come in

13   and, you know, they're matched up and ordered.  And

14   therefore, there's always some lag in terms of what

15   receivables are in and what comes out.

16             So, yes, is that there are some things that are

17   stale at any given point in time, and there are some things

18   that are not yet reflected on any given point in time.

19             MS. MAINOO:  Objection, Your Honor.  Mr. Friedmann

20   is arguing based on information that's not on the record.

21             THE COURT:  Yeah, I don't -- where do you get that

22   from?  I mean, there is a certification in closing that

23   there was $292 and change.

24             MR. FRIEDMANN:  And that is what -- at closing,

25   that is what the current records reflected.

Page 153

```
 1              THE COURT:  So --

 2              MR. FRIEDMANN:  An hour later -- or a day later is

 3     probably a better example -- all those numbers shifted.

 4              THE COURT:  Well, but --

 5              MR. FRIEDMANN:  And some of them shifted up and

 6     some of them shifted down.

 7              THE COURT:  The amount owing, how would that go

 8     up?

 9              MR. FRIEDMANN:  The amount being owed to Sears?

10              THE COURT:  Yeah.

11              MR. FRIEDMANN:  I assume new receivables being

12     created that were not yet recorded, and therefore not yet

13     reflected in that particular accounting entry and accounting

14     line.

15              THE COURT:  So, are you saying that the Debtors

16     should get credit for those?

17              MR. FRIEDMANN:  No.

18              THE COURT:  As long as they --

19              MR. FRIEDMANN:  We're not -- not at all.  We're

20     saying that it's -- this was based on two snapshots.  There

21     was a snapshot of execution and a snapshot it close.  Both

22     of them had (indiscernible).  But those are the two

23     snapshots using the exact same accounting methodology,

24     again, for better or worse, on both days.  And that's the

25     way we can ensure that what was promised at execution is
```

Page 154

1    what was delivered at closing.  That was the purpose of all

2    this, is here are these accounts, there are lags, there are

3    issues.  But here's what they are as of today, snapshot.

4            And when we do another snapshot 25 days from now

5    at close, we have an obligation as the Debtor to seller here

6    to make sure that the aggregate value of those accounts,

7    whatever might be in there, is at least $255.2 million.

8            THE COURT:  Let me ask you a different question.

9    If Sears generated and Accounts Receivable preclosing that

10   didn't appear in the 292 calculation because it hadn't hit

11   the books yet, and then there's a payment on it post-

12   closing, who does that go to?

13           MR. FRIEDMANN:  It would go to Transform.

14           THE COURT:  Okay.  And you're saying that if --

15   that simply because there was a post-closing payment on it

16   on an account receivable that had been on your list --

17           MR. FRIEDMANN:  They were getting the benefit of

18   those receivables.

19           THE COURT:  No, no, let me finish.

20           MR. FRIEDMANN:  I'm sorry.

21           THE COURT:  The closing was when?  What was the

22   date?

23           MR. FRIEDMANN:  12:01 AM on February 11th was the

24   closing date.

25           THE COURT:  February 11th?  Okay.  So, these are

Page 155

1    all payments before the closing date that are referred to

2    here in Mr. Tavakoli's declaration.

3              MR. FRIEDMANN:  That's our understanding that's

4    what he's referring to.

5              THE COURT:  All right.  So that --

6              MR. FRIEDMANN:  Yes, a receivable that was created

7    before that closing date.  But the payment didn't come

8    through until after 12:01 on February 11th?

9              THE COURT:  Right.

10             MR. FRIEDMANN:  Absolutely, it belongs to

11   Transform.  That's what they acquired --

12             THE COURT:  Okay.  But they're not --

13             MR. FRIEDMANN:  -- is the --

14             THE COURT:  But they're not --

15             MR. FRIEDMANN:  -- accounts receivable.

16             THE COURT:  -- saying that that reduces the

17   specified receivables.  They're just saying that payments

18   before the closing date reduce the specified receivables.

19             MR. FRIEDMANN:  They are saying that there are --

20   some of these accounts on February 11th didn't reflect

21   payments from February 6th, which they were able to identify

22   --

23             THE COURT:  Right.

24             MR. FRIEDMANN:  -- in May.

25             THE COURT:  Right.

1        MR. FRIEDMANN:  I'm sure that is accurate.  I'm

2   sure that there are things that were not reflected from

3   February 6, which I think was a Thursday or Friday, until --

4   on the books on Monday morning at 12:01.  And likewise --

5        THE COURT:  So, what's the rationale for letting

6   the Debtor get both the money and the credit for the

7   accounts receivable?

8        MR. FRIEDMANN:  Because likewise, the same thing

9   as with -- on the date of execution, the same issue arose.

10  If they had studied the -- you're applying two different

11  methodologies.  If you apply the same methodology Mr.

12  Tavakoli did to the specified receivables as of the

13  execution date, he'd be finding all the same issues, and

14  then he'd be getting even again.

15        The problem is applying two different

16  methodologies here.  You're not comparing apples and apples

17  anymore.  So, yes, he's going to find the same kind of thing

18  where there's going to be a receivable that was, you know, a

19  couple days before the execution date.  It wouldn't be

20  reflected there yet.

21        And our position is that in order to be held to

22  delivering what we promised to deliver, you've got to

23  measure it the same way.  You can't measure it based on the

24  accounting books and records for one of those two poles, and

25  then go to the other pole and say here's a whole new

1    methodology for seeing if you did the same thing.  It just

2    doesn't work.

3              THE COURT:  So, you're saying that if I were to

4    adopt Mr. Tavakoli's methodology, then you would be entitled

5    to say, well, all those pre-closing receivables should go

6    into the 292 calculation?

7              MR. FRIEDMANN:  We wouldn't be entitled to

8    anything.

9              THE COURT:  Well, I'm just saying, if I adopted

10   his methodology.

11             MR. FRIEDMANN:  If we took his methodology, it

12   would need to be applied to both moments in time.

13             THE COURT:  Right.

14             MR. FRIEDMANN:  And then it would -- we would get

15   the benefit of it on the execution analysis, the same way

16   Transform is trying to take the benefit of it on the close

17   analysis.

18             Your Honor, my partner, Mr. Schrock, points out a

19   fuller answer to a question you asked me before.  So, for

20   the benefit of the Court, you asked about whether or not

21   there was anything else regarding what Transform should've

22   known about the quality of the accounts and things of that

23   nature.  Section 6.13 discusses financial statements and

24   discusses -- I'm not going to read the entire portion into

25   the record -- but it talks about the fact that the

Page 158

1    consolidated financial statements of Sears Holding Company

2    and its subsidiaries had been prepared in accordance with

3    (indiscernible) and consistently applied during the periods

4    and dates involved.  And it goes on from there to talk about

5    it complying as to form in all material respects with

6    applicable accounting requirements in the published rules

7    and regulations of the SEC, with respect thereto, and

8    (indiscernible) present in all material respects in the

9    consolidated claims all positions of Sears Holding Company

10   and its subsidiaries, and of the dates thereof and the

11   consolidated results and operations and cash flows for the

12   periods then ended.

13           Then 6.15 makes clear that there are no

14   representations or warranties, except for the

15   representations or warranties contained in this Article 6

16   and in the other transaction documents, as applicable.

17   Neither sellers nor any other person on behalf of seller

18   makes any express or implied representation or warranty to

19   respect to sellers, its subsidiaries, the business, the

20   acquired assets, the assumed liabilities.  This transaction

21   is with respect to any information provided by or on behalf

22   of sellers to buyer, and seller disclaims any other

23   representations or warranties, whether made by seller or an

24   affiliate of seller, or any of their respective officers,

25   directors, employees, agents or representatives, except for

Page 159

1    the representations and warranties contained in this article

2    and in the transaction documents applicable.

3               And then under Section (b), there's clearly

4    another briefing which disclaims all liability and

5    responsibility for the representations, warranties,

6    projections, et cetera, and statements made.

7               So, I just wanted to give the -- point the Court

8    to those two provision as well in connection with your prior

9    question.

10              THE COURT:  Okay.

11              MS. MAINOO:  Good afternoon, Your Honor, Your

12   Honor.  Abena Mainoo, on behalf of Transform.

13              As Your Honor stated, the definition of specified

14   receivables begins with, "Specified receivables shall mean

15   the accounts receivable."  Debtors now seem to be making

16   admissions that they were calling things accounts receivable

17   that aren't really accounts receivable.  But that's not the

18   deal that Transform made.

19              Debtors' argument suggests that Transform just

20   bought accounting entries.  To be clear, we're not claiming

21   fraud.  The issue is that there was a shortfall in the

22   specified receivables that Debtors delivered.

23              Debtors shortchanged Transform on the specified

24   receivables they delivered in two ways.  First, Debtors

25   delivered items that were not specified receivables.  And

Page 160

1    second, Debtors did not deliver what they agreed to deliver,

2    pursuant to Schedule 1.1(k) and Annex 11.

3            Under the APA, Transform acquired specified

4    receivables.  Going back to the definition of specified

5    receivables, there are two parts of it.  The first, as we've

6    discussed, is that it means accounts receivable.  And the

7    second part of the definition of specified receivables is

8    that it's those accounts receivable that are set forth on

9    Schedule 1.1(k).

10           Section 2.3(k) of the APA provides a mechanism for

11   reducing Transform's obligations to assume certain

12   liabilities if the specified receivables shortfall amount

13   was a positive number.

14           So, why did Transform buy specified receivables?

15   Transform sought to buy the opportunity to collect

16   receivables.  Transform understood there would be risk.  As

17   Mr. Friedmann mentioned, the Debtors provided Transform with

18   a schedule of the recovery rates for the accounts specified

19   in the schedule.  But what Transform did not do was take the

20   risk that it would not be able to collect on items or

21   accounts because they were not receivables.

22           Debtors argue that Transform knew they had issues,

23   but there's nothing in the record supporting that.  As we've

24   seen, the only thing in the record is the schedule of

25   recovery rates that was part of the January 6th

1    presentation, which only speaks to how collectible specific

2    accounts or items are, not whether they are receivables at

3    all.

4            Debtors also argue that Transform could and did

5    due diligence and should have known that there were

6    apparently items on the specified receivables schedule that

7    were not in fact accounts receivable.  But they don't say

8    just how this diligence would have revealed that fact.  And

9    in fact, they also argued that there were issues that

10   Transform was only able to determine, based on months of --

11   I'll start again.

12           THE COURT:  No, the 1500 hours it took

13   (indiscernible).

14           MS. MAINOO:  The 1500 hours, exactly.  The 1500

15   hours, after months of work, months after the closing.

16           THE COURT:  May I -- I'm going to cut to the chase

17   on this because...

18           MS. MAINOO:  Sure.

19           THE COURT:  Why are intercompany receivables from

20   non-Debtor entities not specified receivables under the

21   agreement?  Mr. Tavakoli lists almost $18 million, over $18

22   million of those as -- it is, in his declaration, as not

23   being specified receivables on the basis that they're

24   encumbered receivables.  One's from the Indian -- Sears

25   India -- I'm sorry, it's just -- I'm sorry.  It's just that.

Page 162

1    It's not the other $8.8.  It's just the $9.93.

2            MS. MAINOO:  I believe Your Honor is referring to

3    the page (indiscernible) --

4            THE COURT:  Twelve, yeah.

5            MS. MAINOO:  Okay.

6            THE COURT:  The first bullet on Page 12.

7            MS. MAINOO:  Right, and, sorry, you've read this

8    just as well, Your Honor.  Mr. Tavakoli explains that the

9    intercompany receivable relates to a transaction between

10   Sears entities and is not --

11           THE COURT:  So, it's India.

12           MS. MAINOO:  Between Sears India entities and

13   Sears Holding Management Corporation.

14           THE COURT:  Right.

15           MS. MAINOO:  And thus is not a valid receivable

16   because it does not relate to external third-party

17   receivables.

18           THE COURT:  Right.  I didn't see anything about

19   external third-party receivables in the definitions.  I

20   guess I don't understand, either company accounts with the

21   Debtors, or I'm not even sure there, because you could have

22   signed the claim to -- in fact, probably did sign the claim.

23   But non-Debtor entity?  At least in -- where does that fit

24   into the definitions as being excluded from?

25           MS. MAINOO:  I -- my understanding is that it's

Page 163

1    based on the definition of accounts receivable and the idea

2    that these intercompany receivables would not be collectable

3    and would just reflect an accounting adjustment.

4            THE COURT:  Okay.  Well -- but again, there's a

5    difference between collectability and something not being an

6    account receivable at all.

7            MS. MAINOO:  Right.

8            THE COURT:  And I think Transform took the risk on

9    the first and didn't on the second.

10           MS. MAINOO:  Understood.  And just to clarify, my

11   understanding is that these intercompany receivables would

12   just reflect accounting adjustments and not receivables.

13           THE COURT:  And then I think there's -- the

14   definitions were somewhat peculiar here.  Specified

15   receivables shall be the accounts receivable set forth on

16   1.1(k).

17           MS. MAINOO:  Right.

18           THE COURT:  Specified receivable shortfall amount,

19   which is right underneath it here on part one, it says:

20   "Shall be an amount equal to $255,200,000, less the amount

21   of the specified receivables delivered to buyer at close,"

22   so the phrase is: "delivered to buyer at close."

23           MS. MAINOO:  Okay.

24           THE COURT:  And then the popular section is roman

25   vii on Page 41, that talks about the deducts, if it's not --

Page 164

1   if it's positive.  But we're saying that basically, it

2   required a snapshot, right?  Based on reality at the

3   closing.

4           MS. MAINOO:  We're saying that --

5           THE COURT:  So, I mean, you're saying that if

6   something had been paid before the closing, it's no longer

7   accounts receivable.

8           MS. MAINOO:  Correct.

9           THE COURT:  Okay.  And I understand that argument.

10  But I think there's an equally valid point, which is if

11  something didn't appear in the $292 million, that actually

12  was an account receivable at the time of the closing, the

13  Debtor should get credit for that because the operative

14  thing is the day of the closing, not the accounting exercise

15  that parties went into -- the Debtor went into to develop

16  the $292.

17          MS. MAINOO:  But there's nothing in the record

18  suggesting that --

19          THE COURT:  The Debtors didn't believe they --

20  that that's the way you should do it.  But if I adopt Mr.

21  Tavakoli's approach, which I think is consistent with the

22  agreement, I think you'd have to do that.  You'd actually

23  have to look at what the actual AR was that would fit into

24  these categories, right?

25          MS. MAINOO:  Just a minute, Your Honor.  Your

Page 165

1    Honor, we don't think that would qualify as a specified

2    receivable for the purposes of the shortfall.  You know,

3    perhaps it wasn't considered --

4              THE COURT:  What -- why?

5              MS. MAINOO:  Because the definition of specified

6    receivables, as you were to say, is tied to Schedule 1.1(k),

7    which in turn cites to Annex 11, and we think that specified

8    receivables should be interpreted in tandem with the

9    specified receivable shortfall amount.  In other words, the

10   Debtors cannot just purport to deliver 255.2.

11             THE COURT:  Well, I agree.  So, is the actual

12   accounts, so that means you could actually -- the $292 is

13   just a starting point, and then people spend 1500 hours due

14   diligence-ing it, and decide whether -- you know, what

15   really happened.  The Debtors have taken their position

16   consistently that that whole thing was a waste of time

17   because their business is pretty much steady state and it'll

18   all come out in the wash, which is why GAAP lets them report

19   it this way, i.e., there's -- for every account receivable

20   that's reported for GAAP purposes, that's been paid, in

21   fact, and therefore you can say it's not merely an account

22   receivable, there's a newly-generated account receivable

23   that is not reported for GAAP purposes, and so, let's just

24   do it the way we've done it.  It all basically evens out.

25             MS. MAINOO:  One other point, Your Honor, is I

Page 166

1    think that argument credits to the idea that there were

2    these constant fluctuations in the specified receivables,

3    which is an argument that Debtors put forward.  But what

4    we've been able to determine, and this is confirmed in the

5    Jeff Butz declaration, is that Debtors withheld two

6    categories of purported specified receivables from their

7    January 6th presentation, which they recognized were not

8    accounts receivable that they then purported to deliver to

9    Transform at closing.  And this caused a jump in the

10   accounts receivable that Debtors purported to have delivered

11   by $30 million dollars.  So, the suggestion that there's

12   this constant fluctuation is actually not borne out.

13            THE COURT:  Well, it's natural that debts get paid

14   after you report them.  I mean, Mr. Tavakoli reflects them,

15   and in some large numbers, here.  And it's just -- it's

16   equally natural that debts get owed by the account Debtors -

17   -

18            MS. MAINOO:  And then Your Honor --

19            THE COURT:  -- during the period that you're

20   reporting them.  So --

21            MS. MAINOO:  -- there may well be deductions.  Our

22   position is just that they should be addressed separately

23   and not taken out of the specified receivables shortfall

24   amount.

25            THE COURT:  But what does that say that in the

Page 167

1   specified receivable shortfall amount?  It doesn't provide

2   for that.  I mean, if you're going to go with reality, as

3   opposed to GAAP --

4           MS. MAINOO:  Right.

5           THE COURT:  -- it should be on both sides.  I

6   mean, it should be relatively easy, I would think, to track

7   all the accounts receivable that were generated before the -

8   - I'm sorry, after the $292 million and before the closing.

9           MS. MAINOO:  Well, and Your Honor, just to be

10  clear, we did not buy all of Debtors' accounts receivable.

11  We bought the specified receivables (indiscernible)

12          THE COURT:  No, I know.  It would be limited to

13  those categories on 1.1, Annex 11.  And then again raised

14  the question, is that really what the parties intended, or

15  did they intend to go with just the report?  Now, to me, the

16  plain language uses the term, "accounts receivable" and it's

17  hard to say an account -- it doesn't say accounts receivable

18  according to Debtors or, you know, prior recording practice.

19          MS. MAINOO:  And that's elsewhere in the APA --

20          THE COURT:  It says that in some sections.

21          MS. MAINOO:  Exactly.

22          THE COURT:  I appreciate that.

23          MS. MAINOO:  For instance, and that's very

24  valuable.

25          THE COURT:  But I think it's sauce for the goose

Page 168

1    and sauce for the gander.  So, you -- you know, that would

2    include accounts receivable that wouldn't be tracked on the

3    Debtors' GAAP, but would be created before the closing.

4              MS. MAINOO:  But -- and again, Your Honor, there's

5    no evidence of this delay, and it sounds --

6              THE COURT:  It's just common sense that that would

7    happen.

8              MS. MAINOO:  -- deficient.

9              THE COURT:  I mean, it's consistent with Mr.

10   Tavakoli's declaration, who says that there were payments

11   after it was generated, before the closing.

12             MS. MAINOO:  And again, I'm speculating.  I don't

13   understand that to be Debtors' argument.  I understand their

14   argument to be --

15             THE COURT:  Well, no, it became Debtors' argument

16   halfway through the oral argument, but that's not a reason

17   to say it shouldn't -- it isn't valid.  The Debtor, perhaps,

18   it benefits the Debtor or perhaps because it makes common

19   sense that you don't spend another 1500 hours looking at

20   this issue, says just go with how the parties have looked at

21   this always.  But the agreement doesn't say that, so --

22             MS. MAINOO:  And there's no evidence that this is

23   how the parties have looked at it, obviously.

24             THE COURT:  Fine.

25             MS. MAINOO:  So, briefly, Debtors delivered items

```
 1    that were not -- unless you have more questions, Your Honor.

 2              THE COURT:  No.

 3              MS. MAINOO:  Debtors delivered items that were not

 4    specified receivables.  They delivered items that were not

 5    accounts receivable, i.e., money owed to the company.  This

 6    includes cash received pre-closing and CIE inventory already

 7    received pre-closing.  They also purported to deliver items

 8    that just reflected accounting adjustments, which were not

 9    billed.  In addition, as I started to address first --

10              THE COURT:  Can we deal with that part, accounting

11    adjustments which were not owed?

12              MS. MAINOO:  Yes.

13              THE COURT:  Is that just the fee point?

14              MS. MAINOO:  This is -- so I'm looking at Page 11

15    of Mr. Tavakoli's declaration --

16              THE COURT:  Right, that's the Weil Gotshal fee

17    point?

18              MS. MAINOO:  It is.

19              THE COURT:  I understand that.

20              MS. MAINOO:  Right.

21              THE COURT:  I mean, that's not really accounts

22    receivable.  Weil Gotshal is not going to pay the Debtors,

23    right?

24              MS. MAINOO:  Right.  It's also --

25              MAN:  No, Your Honor.
```

Page 170

1                    (Laughter in the Courtroom)

2                    MS. MAINOO:  It also includes pre-paid balances,

3        which is on Page 13 of Mr. Tavakoli's affidavit, or

4        declaration.

5                    THE COURT:  Right.

6                    MAN:  We would take them up on that.

7                    (Judge laughs)

8                    THE COURT:  Okay.

9                    MS. MAINOO:  And I was starting to say earlier,

10       Your Honor, Debtors also delivered items that were -- just

11       were not on Annex 11 at all.  Counsel for Debtors said they

12       delivered to Transform whatever was on 1.1(k), but we know

13       from Mr. Butz's work that, in fact, that's not the case

14       because Debtors did pick and choose what was delivered to

15       Transform, including at $30 million dollars of so-called

16       "all other receivables" that were not actually receivables.

17                    THE COURT:  But that -- but again, that's -- I

18       think you're making the same point in two different ways.

19       Right?  I mean, if they've already paid, it's not an account

20       receivable, so it doesn't matter that it is added again

21       because it's not real.

22                    MS. MAINOO:  No, no, no.  The point is that the

23       language of the APA matters, and the APA defines specified

24       receivables with reference to Schedule 1.1(k) and Annex 11,

25       which listed 30 specific categories of items, including

1    amounts, and that -- amounts that were not included on Annex

2    11 were later delivered.

3              THE COURT:  Well, what really doesn't make any

4    sense, to me at least, that they'll be held to those amounts

5    in each category.  That just doesn't make sense to me.  I

6    mean, that means that you get penalized for delivering more

7    in a category?  I mean, it just doesn't -- it doesn't --

8              MS. MAINOO:  No, the argument is that they

9    delivered more in that category to avoid -- in an effort to

10   avoid a specified receivable shortfall.

11             THE COURT:  No, but the other -- the -- and what

12   if -- I mean, but we're saying that it had to be fixed in

13   each category, whereas, in fact, Transform benefits from

14   getting more in many of the categories.  It actually

15   benefits from that, because those are more collectable.  To

16   me, it's just an aggregate number.

17             MS. MAINOO:  So, I'll just point you to Mr. Butz's

18   declaration, Your Honor, which explains why Transform did

19   not get value by receiving these items that were identified

20   as excluded, and all other items, in Paragraph 9.  Actually,

21   I'll point back to Paragraph 6 of Mr. Butz's declaration, in

22   which he explains that these two categories of accounting

23   entries, the "Open/Unidentified Items" and "Excluded" items,

24   which Debtors later added to what they purported to deliver

25   at closing, included certain accounting adjustments and

Page 172

1    other prepaid items written off over a period of time, which

2    were not treated as accounts receivable.

3                THE COURT:  I understand that, but they're already

4    out, as far as I'm concerned, because they're not accounts

5    receivable.  But I don't think that suggests that the

6    parties bound themselves, in each case, to this specific

7    dollar amount in the schedule, because it really doesn't

8    make much sense to do it that way.

9                MS. MAINOO:  But the parties --

10               THE COURT:  It just doesn't work that way.  When

11   we arrive --

12               MS. MAINOO:  What the parties bound themselves to,

13   was that Debtors would deliver accounts receivable.

14               THE COURT:  Yes. I agree with that.  And that

15   they'd get credit for all accounts receivable that they

16   delivered.

17               MS. MAINOO:  And there's no indication in the

18   record that they have not gotten credit for accounts

19   receivable.

20               THE COURT:  It hasn't -- the analysis hasn't been

21   done.  Mr. Tavakoli didn't look at that.  So, I guess he's

22   going to have to spend another 1500 hours looking at that.

23   I mean, that's the only answer, right?  Okay.  Unless the

24   parties just want to go with where they are.

25               MS. MAINOO:  Your Honor, just to reiterate a point

Page 173

1    I tried to make earlier.  The point is that the Debtors

2    would get the benefit of those credits.  Our argument, our

3    position, is that that should not reduce the specified

4    receivable shortfall amount.

5            THE COURT:  But why?  Does it -- the specified

6    receivables shortfall amount is not limited to just the

7    calculation which occurred and asserting, which is actual

8    accounts receivable delivered at closing, but only as

9    identified by the Debtor in its schedule at closing, as

10   opposed to what, actually, they are.  Again, I think -- I

11   think either it was you or Mr. Friedmann said two very

12   different methodologies are at work, here.  Debtors are

13   doing this based on accounting entries.

14           MS. MAINOO:  Right.

15           THE COURT:  And you're doing it based on actual

16   analysis.  But the actual analysis isn't going to -- it

17   hasn't included newly-created AR, I don't think.  Newly-

18   created between the schedule that the Debtors gave and the

19   closing date.  And clearly, Transform is getting the benefit

20   of those.  The Debtors aren't saying that they're going to

21   keep those.  Those (indiscernible) that Transform's gotten

22   since then.

23           MS. MAINOO:  Well, again, there's no evidence that

24   --

25           THE COURT:  I know, because it hasn't been done.

Page 174

1    It needed to be done.

2            Okay, I think I have enough on this, unless

3    someone has some other point.

4            MS. MAINOO:  Thank you, Your Honor.

5            THE COURT:  All right.  The next issue that the

6    parties have with each other, next dispute, that is, is with

7    regard to the operation of § 2.3 little roman vii, which

8    provides for a credit taken against certain obligations that

9    Transform would otherwise have under the APA to pay certain

10   implied orderlies of the Debtors.  The credit would be a

11   trigger that, in the event a defined (indiscernible)

12   specified receivable shortfall amount.  That's defined in §

13   1.1 of the agreement, as if it shall be an amount equal to

14   $255,200,000, less the amount of the specified receivables

15   delivered to the buyer at closing.

16           So, again, if the specified receivables delivered

17   to the buyer at closing are in excess of that amount,

18   there's no credit.  It's the short specified receivable is

19   lower than that amount, then the -- Transform has the right

20   to (indiscernible) the liabilities in § 2.3 when it said

21   specified receivables is defined as the accounts receivable

22   set forth in Schedule 1.1(k).  1.1(k) actually incorporates

23   Annex 11.  It lists 32 categories of receivables including

24   "all other receivables," that add up to $255.2 million.

25   That was submitted number at the time the parties came up

1    with this -- the aggregate number, the parties came up with

2    this construct.

3            The Debtors argue that, as long as, on their

4    traditional GAAP accounting and financial reporting

5    methodology, they have, in fact, delivered such "accounts

6    receivable," and I'll put quotation marks around the term

7    "accounts receivable," at the closing, then they satisfy

8    their condition and there's no shortfall.  They certified

9    over $292 million of such accounts receivable being

10   delivered at closing.

11           Transform contends to the contrary, two things.

12   First that the accounts receivable had to be specifically

13   delivered in the amounts set forth as against each category

14   on Annex 11, and secondly, that they have to be actual

15   accounts receivable, not "accounts receivable" in quotes for

16   GAAP purposes.  That is, if although it would be proper to

17   report an item as an account receivable, even though it

18   turned out to have been paid or prepaid, or be simply an

19   accounting matter rather than an actual account receivable,

20   such as an amount prepaid for services where the

21   (indiscernible) has not yet submitted invoices, it will not

22   count as an accounts receivable, in lay terms, certainly,

23   and therefore, anything like that should be deducted from

24   the $292 million.

25           As to the first argument, i.e. that every category

Page 176

1    has to be the amount stated in Annex 11, I accept the

2    Debtors' logic that Annex 11 moves in those itemized numbers

3    to come up with an aggregate number, and it is the aggregate

4    number that is the key.  I say this because the Debtors

5    really have (indiscernible) and control over accounts

6    receivable other than, as I'll get to, reporting something

7    that actually isn't an account receivable.  And secondly,

8    that the buyer actually has -- that the buyer's

9    interpretation would lead to an odd resolved debt, the

10   Debtors punished for providing accounts receivable in excess

11   of the amount in any particular category, and there's

12   actually more collectable than other categories.  It's just

13   not logical that the parties would bind themselves to such

14   an approach, as opposed to looking at the aggregate number.

15          On the other hand, accounts receivable in the

16   definition is not in quotes, it's not stated "accounts

17   receivable for GAAP purposes," or as reported by the Debtors

18   in their financial reporting, and I take it to mean,

19   therefore, that the natural layman's reading of it, accounts

20   receivable, applies, which means that it's an account

21   receivable meaning the account where there's not yet been

22   paid, as of the closing.  This is certainly consistent with

23   the logic of the agreement.

24          On the other hand, taking such a logical approach,

25   I believe, while warranted, also means that the Debtor may

1    well be shortchanged in that it's not getting credit for

2    accounts receivable that may well have been generated that

3    didn't get into the $292 million certification, but that

4    were, in fact, in existence, prior to closing, that the

5    buyer actually got the benefit of, and that, therefore,

6    should not be left out of the calculation to add up to the

7    $255.2 million.

8            I also believe that, while most of the deductions

9    for not-valid accounts receivable take in view Mr.

10   Tavakoli's analysis, are correct.  Those attributable to

11   intercompany transactions where there actually is an account

12   receivable isn't carved out anywhere in the parties'

13   agreement.  So, therefore, those deductions, which I think

14   appear both on Page 12 and Page 13, should be added back in.

15   Clearly, this will lead to more work, which suggests that

16   maybe the parties ought to agree on the Debtors' formulation

17   of this, as opposed to incurring the cost and delay of the

18   further analysis, but I think that's up to them.  I don't

19   think the agreement compels that result, although it may be

20   a practical result.  So, that's my (indiscernible) on this

21   issue.

22           I will say further, this goes -- and I'm giving

23   you a, I guess a picture into my thinking about the next

24   issue, if it's going to come up for today's calendar, that

25   if the parties stick with my interpretation of the agreement

Page 178

1     and don't go back to the GAAP treatment of this, there needs

2     to be a clear process where designated, knowledgeable people

3     on both sides, and that clearly includes Mr. Tavakoli and

4     his team, work on these issues together.  And my preliminary

5     thinking on this, and we can discuss it more in the next

6     iteration was, if that doesn't happen, within the next ten

7     days, I'll appoint an examiner, the cost of whom will be

8     split between the parties, to do it.  I'm just, you know,

9     the parties have one shot to do it on their own now that

10    they know, at least what I think the proper analysis should

11    be.  If they can't work together to do it, then I'll appoint

12    someone who will do it who's objective and they'll each pay

13    for half of it.

14         So, let's move, then, to I think, the Estate

15    property reconciliations issue, as it still exists.  Because

16    again, part of that's what resolved before we started this

17    hearing.

18         MR. FRIEDMANN:  Yeah, Your Honor.  So, the issue

19    does still exist, but the numbers have shifted a little bit

20    in light of the partial settlement agreement this morning

21    regarding the, I guess, the Estate checks that have not yet

22    cleared, but that were going into the escrow as discussed.

23         So, this is an issue, Your Honor, that we've been

24    back to you a couple of times now.  We initially moved on

25    this months ago, and it's really as a result of the Debtors'

Page 179

1   cash management system being transferred to buyer and buyers

2   also depositing Estate proceeds.  We've ended up with a

3   whole lot of property of the Estate in buyer's possession.

4   And none of the following numbers I'm going to review with

5   you are in dispute, because they're all coming straight from

6   Mr. Hede's declaration of June 25th, 2019.

7           The Cash in transit, and that's $22,452,428;

8   Credit Card proceeds from GOB stores and that's at

9   $4,368,957; Estate checks that were deposited to Buyer

10  account in the amount of $5.945,069; and Proceeds from

11  Subtenants in the amount of $657,243.  That totals

12  $33,423,697.  Now, that now needs to be netted against two

13  things.  First, there was a $3 million-dollar payment by the

14  Buyer to Debtors as an interim agreement, and then in

15  addition, the $2.4 million-dollar settlement of this morning

16  is now going in escrow.  So, now there's $28 million-dollar

17  of Estate property that, indisputably, is being held by

18  Transform.

19          Of course, Buyer has refused to turn over these

20  monies, in violation of the automatic stay, on the basis

21  that it claims various set-offs based on a number of

22  different liabilities.  You heard today already about the

23  Estate checks after March 18, 2019.  As you heard the

24  testimony of Mr. Hede, in the month or so between the

25  closing and March 18th, 85 percent of the checks that were

1    received and deposited into Transform's accounts ended up

2    belonging to the Estate.  There was another $858,105,

3    representing about 277 checks, which Mr. Hede testified, he

4    wasn't sure who gets them, so the conclusion was,

5    apparently, Transform is just keeping that money.  A

6    reconciliation clearly needs to happen of those checks as

7    well.

8            Even more troubling is the fact that they've drawn

9    this hard line in the sand of March 18, 2019, and have

10   refused subsequent requests by Debtors to reconcile checks

11   there afterwards.  It's not conceivable that in the first 30

12   days or so, 30 plus days, after the closing, 85 percent, at

13   least, of the checks actually were Estate checks that were

14   being deposited by Transform, and then suddenly, the drop-

15   off right after that would go to zero.  It may not be 85

16   percent, but there is some percentage.  Mr. Hede was aware

17   of at least one check, and I'm certain it's a lot more than

18   that, and that's a reconciliation that has to happen.

19           The Buyers take the position that it's Debtors

20   obligation to make a prima facie showing that we're entitled

21   to those monies and that they shouldn't have the burden of

22   going through that reconciliation, and they've really got

23   this upside down.  They're the ones holding Estate property.

24   They're the ones refusing to turn over the Estate property

25   on the basis of purported reconciliations.  Those include --

Page 181

1   some of those Estate properties being held are these checks,

2   and the fact that 85 percent of the checks between close and

3   March 18, 2019 were, in fact, determined to be Estate

4   property is pretty clear prima facie evidence that it

5   warrants them going and taking a look at the next couple of

6   months as well, and finding checks in addition to the check

7   that Mr. Hede did concede he already was aware of.

8           Another item of -- other reconciliation I'd like

9   to talk about are what are called pre-close orders that were

10  canceled post-close.  To the extent that a canceled order is

11  an excluded liability, which is what the buyer claims, under

12  the APA, no one forced the buyer to assume those liabilities

13  on the Debtors' behalf and pay back those.  Just to be

14  clear, this is an example of something where, pre-closing,

15  someone had a deposit or paid money for an item, and that

16  before the item was shipped, the buyer of that item canceled

17  their order.  They have a claim against the Estate if it's

18  an excluded liability.  What the APA does not provide for is

19  that Transform can make a payment to that canceled buyer and

20  then go to the Debtor and ask to be reimbursed for that.

21          The decision to, on their own, make that payment,

22  was a business decision.  And frankly, perhaps, a good one.

23  They didn't want members of Shop Your Way to be upset that

24  when they went to cancel their order, instead of getting

25  money back, they were told, give Weil Gotshal a call or file

Page 182

1    a claim with the clerk in White Plains.  So, instead, they

2    decided to pay those individuals, which is fine, but there's

3    no obligation in the APA for us to reimburse them for that,

4    and therefore, that is not a proper set-off against the

5    Estate property that they're holding.

6            THE COURT:  They're not subjugated?

7            MR. FRIEDMANN:  I'm sorry?

8            THE COURT:  They're not subjugated?

9            MR. FRIEDMANN:  They may be.

10           THE COURT:  So, do they have a set-off right?

11           MR. FRIEDMANN:  Perhaps, but the bottom line is,

12   if there was a claim against us -- they were in control of

13   the company at that point, and they were the ones making the

14   decision to pay back that buyer.  Some of these claims of

15   information produced by Transform's advisors go back years.

16   So, the -- it's not even clear whether or not they actually

17   paid this money back, or they were just cleaning up their

18   books.  The point is, is that they were in control, they

19   were making decisions, they weren't consulting us, for sure,

20   about it.  Instead, at the end of the day, they're saying

21   there were all these canceled orders, post-close.  We're

22   holding that against you.  We're deducting that from the

23   money we otherwise agree we owe you.

24           THE COURT:  Are you saying that you don't have

25   proof that they didn't make the payments?  I mean, that they

Page 183

1    did make the payments.

2          MR. FRIEDMANN:  We don't have proof that they did

3    make the payments.

4          THE COURT:  That they did make the payments?

5          MR. FRIEDMANN:  Yes.

6          THE COURT:  Okay.

7          MR. FRIEDMANN:  Another issue are, they called

8    Estate checks cleared, and there's a deduction for a total

9    of $11,444,233 on that basis.  Our issue with their -- and

10   these are, to be clear, checks that were written pre-close

11   by the Debtors and were cashed against the accounts that

12   were transferred to Transform post-close.  And in theory, we

13   don't have an issue with the concept that if we wrote a

14   check pre-close, it was cashed against our account post-

15   close, they were in control of it.  We understand that that

16   should be deducted against it.

17         The problem we have is that they were including

18   checks for property taxes, and here's where that becomes an

19   issue is that, as Your Honor noticed, under the APA, the

20   Buyer assumed all liabilities for property taxes.  That's

21   2.4(l), up to, but not to exceed, $135 million dollars.  As

22   far as we know, the property taxes that they took on the

23   liability for have gotten nowhere near approaching that

24   cutoff.

25         So, what was taken on was, as of the closing, any

Page 184

1   outstanding liability for property taxes on the books of

2   Debtors, they assumed.  They're taking the position now that

3   well, they -- a check was cut pre-closing, we didn't assume

4   that.  But that's not the way the APA works.  It focuses on

5   the books and records of the company and what liabilities

6   there were as of 12:01 on February 11th.  And, as Transform

7   no doubt appreciates and knows, that that liability doesn't

8   come off the books --

9           THE COURT:  Assuming you operated in the ordinary

10  course.

11          MR. FRIEDMANN:  Yeah, assuming I operated in the

12  ordinary course, the fact that we were sending these checks

13  out up until the day before the close, or the Friday before

14  the close, I think, demonstrates that we were operating in

15  the ordinary course, and I don't think there's any

16  allegation that property taxes were not being paid in the

17  ordinary course.

18          But, as of 12:01, on February 11th, that's when

19  you have to look at the books and records of the company and

20  see what outstanding tax liabilities there were, and that's

21  what was assumed.  So, to the extent that Debtors -- sorry,

22  that Buyers now not -- is not assuming those and instead,

23  it's using those amounts against the Estate property that

24  they otherwise agree they owe to the Estate is plainly

25  improper, and ignores and shirks their obligation to take on

Page 185

1    the liability for the outstanding property taxes.

2         There's an argument in Buyer's brief that suggests

3    that we -- there only are maybe two of these checks that we

4    believe are written to taxing authorities, but there's

5    significantly more.  The example of two was preceded by

6    e.g., suggesting it was just an example.  In fact, there are

7    upwards of 100 of these checks that we have -- that we're

8    aware of, which have not been reconciled to pull out the

9    ones that are for property tax that existed as a liability

10   at the time of the close.

11        So, those really represent the three main

12   categories of concern that we have, and the point, Your

13   Honor, here is that this deal closed on February 11th, 2019,

14   some five months ago now, and this reconciliation still

15   hasn't been completed.  All that while, the monies that

16   Transform ended up with in their possession that belong to

17   the Debtor because of the transfer of the cash management

18   system, has been held by them in violation of the automatic

19   stay.

20        And it continues today, and although Mr. Good

21   suggested that progress has been made, we're nowhere near

22   being complete.  This analysis of the March 18th checks, for

23   example, hasn't even started.  The point is, this can't go

24   on forever, is that for the last five months, they've

25   basically had an interest-free loan at the expense of the

Page 186

1   Debtors, holding onto this money while they have taken their

2   time to try to reconcile this, with obviously no incentive

3   to do so, because the longer it takes, the longer they hold

4   onto that money.

5          And what we're asking for today, Your Honor, is

6   for you to shift that balance, to have them immediately pay

7   over the outstanding $28.4 million dollars that they agree

8   are owed the Estate, and the Estate will agree, once the

9   reconciliation is completed, to pay back to Transform any

10  amounts of that are due in light of any proper

11  reconciliations.  But that money should not be -- continue

12  to sit with Transform indefinitely.  And instead, I think

13  that will incentivize Transform to complete their analysis

14  very quickly, and get us to the appropriate resolution here,

15  while preventing any further abuse of the automatic stay,

16  which was designed to prevent exactly what's going on, here.

17         THE COURT:  You haven't addressed the prepaid

18  inventory shortfall issue.

19         MR. FRIEDMANN:  We had that as a separate topic,

20  Your Honor.  You want me to address that as part of this?

21         THE COURT:  Well, okay, let me just deal with the

22  reconciliations at this point, okay.

23         MR. FRIEDMANN:  Yeah, just -- yeah.

24         THE COURT:  That's fine.  When do you think all

25  the reconciliations should have been done by?

1           MR. FRIEDMANN:  Given the amount of manpower they

2    have put towards coming up with new ways of calculating

3    prepaid inventory and specified receivable, just so they

4    could create a different methodology to compare to what

5    everybody agreed is the way we calculated at the beginning

6    of the agreement, that's how the (indiscernible) is set, had

7    they put the same effort towards this, we would have had

8    this resolved long ago.  The problem is, is that on this

9    one, there's no incentive to figure it out, because the

10   longer they wait --

11          THE COURT:  Well, I'm just trying to figure out

12   when.  I mean, rather than have $28 million dollars in

13   unrestricted funds delivered to the Debtor, we could

14   conceive of a methodology that says that each side owes 9

15   percent judgment interest on -- pre-judgment interest on

16   what they owe once it's determined.  Both sides.  And -- but

17   I'm trying to figure out, if I do that, when would that

18   start?  It wouldn't start on February 12th.  Maybe it would

19   start March 12th.  I don't know.

20          MR. FRIEDMANN:  We didn't expect the

21   reconciliation to happen overnight.  We reached interim

22   agreement with Transform with the express idea that, at that

23   point, which was in March 20th or so, so the idea was by

24   early April, they would finish their reconciliation.  They

25   made that initial payment of $3 million dollars, which I

1   referenced earlier, with the idea -- and we said, fine.

2   We'll give you a little more time, you need more time.  They

3   said, by, I think it was April 4th, they would be able to

4   give us the rest of the reconciliation.  That clearly did

5   not happen, and now we're May, June, July, three months

6   later, we still haven't gotten these monies.

7          And again, there is no incentive for Transform to

8   get it done because they've benefitted from sitting on this

9   $30 million dollars or whatever it might be.  And the

10  concern we have, really, is that the -- we don't know if

11  it's, at the end of the day, it's going to be more or less

12  than the -- I guess it's the $28 million-dollar

13  (indiscernible) right now because when they reconcile the

14  rest of those checks, the amount they owe us may go up.  So,

15  there's certainly -- look, there are areas that we would

16  agree without much work, we could agree that the set-offs,

17  you know, with respect to P-cards or telecom expenses or the

18  KERP payment, those kind of things, we don't really have an

19  issue with right now.

20         The problem is, is that we can't just deduct that

21  from their starting point number, because the starting point

22  number may also go up when they reconcile against the checks

23  that they've pulled out -- or that they've failed to pull

24  out that are property taxes, or when they do the analysis of

25  all the checks from after March 18th that may have been

1   deposited in the Transform account but they relate to

2   Debtors.

3               THE COURT:  Okay.

4               MR. FRIEDMANN:  So, Your Honor, for that reason,

5   we respectfully request that the $28 million dollars be

6   turned over to Debtors, and we believe that that will

7   encourage very quickly, Transform to finalize the rest of

8   the reconciliation.  Thank you.

9               MS. MOONEY:  Good afternoon, Your Honor.  Margot

10  Mooney, Cleary Gottlieb Steen & Hamilton on behalf of

11  Transform.  Your Honor, frankly, the Debtors' argument that

12  we're violating the automatic stay is absurd.  As you've

13  said before, as you've recognized, adjusting accounts

14  through a reconciliation process, which is recoupment, is

15  not subject to automatic stay, and Debtors themselves have

16  acknowledged that there are several credits to Transform

17  that are appropriate.  Therefore, the total amount, I think

18  it was $28.8 million, that they gave just now, is not an

19  amount that is entirely owed to Debtors, if at all.

20              And as, funds that are subject to recoupment are

21  not Estate property.  "That's in re Malinowski"

22              THE COURT:  But in the meantime, Transform does

23  have the benefit of the money.

24              MS. MOONEY:  Actually, when you look at the

25  reconciliation that Ernst & Young, Mr. Hede put together, we

Page 190

1    are owed money by the Debtors, not the other way around.

2            THE COURT:  But it has the benefit of the money

3    that it owes the Debtors.

4            MS. MOONEY:  But I don't think that that money is

5    owed to the Debtors.  I think that money that is subject to

6    recoupment is not Estate property.

7            THE COURT:  Well, I guess that's why, it seems to

8    me -- that may ultimately be the case, but then maybe both

9    sides, at this point, since it's dragged on probably two and

10   half months more than it should, should be paying interest

11   on what they owe.  And maybe it'll all come out in the wash

12   and one side will only be paying, you know, $100,000 of

13   interest, but it seems to me that there is a potential there

14   for (indiscernible) incentive.

15           MS. MOONEY:  Well, right now, what the Debtors are

16   asking for is a one-sided resolution, for them to get --

17           THE COURT:  I understand that.

18           MS. MOONEY:  All of the funds owed to them, while

19   denying Transform any recoupment.

20           THE COURT:  It just postpones the fight until the

21   combination date.

22           MS. MOONEY:  So, we just wanted to walk through

23   the remaining issues.  As you heard, there are very few

24   things that remain in dispute, but to respond to the points

25   that --

Page 191

1              THE COURT:  And at least, in going through the --

2     excuse me, going through the list that he did, none of these

3     -- except, perhaps, for the canceled post-closing orders --

4              MS. MOONEY:  The pre-close orders cancelled post-

5     close.

6              THE COURT:  -- raises a legal issue, right?  These

7     are just accounting issues?  I'm not talking about GAAP

8     accounting, I'm talking about basic accounting.

9              MS. MOONEY:  Right.  I think with respect to the

10    Estate checks that have already cleared, Debtors seek to

11    exclude any that were on account of property taxes --

12             THE COURT:  Right.

13             MS. MOONEY:  And I think that that has no --

14             THE COURT:  Why is that a legal issue?

15             MS. MOONEY:  The legal issue there is whether or

16    not property taxes have any -- whether or not the fact that

17    these checks were for property taxes have any bearing on the

18    fact that they were checks written by the Debtors prior to

19    closing that were drawn on Transform's accounts post-

20    closing, and whether they should be treated any differently

21    because of the fact, if they are, in fact, property taxes

22    (indiscernible).

23             THE COURT:  Well, can you remind me, what is the

24    section where Transform assumes up to $135 million of --

25    it's 2.3 something, I assume.  Or maybe it's in 6, I forget.

Page 192

1           MS. MOONEY:  It's 1.1, the definition of assumed

2    taxable property tax liabilities.

3           THE COURT:  Right.  But the operative section

4    (indiscernible)?

5           MS. MOONEY:  2.3 though is the assumed

6    liabilities, which is where, I mean, it's clear that assumed

7    liabilities are --

8           THE COURT:  I'm sorry, I didn't hear what section.

9           MS. MOONEY:  I'm sorry.  2.3 --

10           THE COURT:  Right.

11           MS. MOONEY:  -- and then (l) is the --

12           THE COURT:  2.3(l).  Let me get to that.

13           MS. MOONEY:  Yes.

14           THE COURT:  Assumed property tax liabilities.

15    That just takes you back to the definition --

16           MS. MOONEY:  Right.  And that's where it becomes

17    clear that the assumed property tax liabilities are assumed

18    property tax liabilities as of close, and as the Debtors

19    have acknowledged, they were writing checks in the lead up

20    to the close, and in the APA they're required to pay

21    property taxes in the ordinary course of business, which

22    that's under 8.1(a) is the ordinary course requirement, and

23    also 8.1(b) little romanette ix provides that they're

24    prohibited from taking any action that would materially

25    adversely affect the Potential Acquired Assets, the

Page 193

1    Properties, Business and the Assumed Liabilities of which

2    the assumed property tax liabilities are included.

3                THE COURT:  Right, but is there any allegation

4    that they did that?  That they held the checks back out of

5    the ordinary course?

6                MS. MOONEY:  No, I don't believe that they were

7    holding them back.  They were written, and they were sent,

8    and if they were -- had they been cashed at the moment

9    before closing, they would have been liabilities of the

10   Debtors.

11               THE COURT:  Right, but they weren't.

12               MS. MOONEY:  But does it -- the --

13               THE COURT:  I mean, the definition says,

14   liabilities for property taxes payable, and liabilities

15   means amount owed, any liability.  So, it's owed.  I mean,

16   that seems to be a no brainer to me.

17               MS. MOONEY:  I believe that, at Sears, once they

18   write the check, it's not on their books anymore, and they

19   were --

20               THE COURT:  It's owed.  It's a liability owed.

21   It's owed.

22               MS. MOONEY:  In order to --

23               THE COURT:  The taxing authority doesn't have it.

24               MS. MOONEY:  Right, but in order to accept that,

25   you would have to accept that they were writing checks with

Page 194

1    the intention that they would not be drawn -- that they were

2    signing them in their name with the intention that they

3    would be drawn on Transform's books.  The -- whether a check

4    sat in a drawer because of some bureaucratic reason or it

5    was in the mail or something, that shouldn't change the

6    liability, whose burden the liability is, purely because of

7    --

8            THE COURT:  Well, it's still a liability.  I mean,

9    to put it differently, if they had written the check -- well

10   -- I mean, they got permission to do this.  But if they had

11   written the check pre-petition but it hadn't been cashed, it

12   would be a pre-petition liability.  They got authority to

13   pay pre-petition debt for taxes, but (indiscernible) that's

14   why they had to get it.  So, I think -- I don't think that's

15   a legal issue.  I think it's just an accounting issue, and

16   the parties should -- my take on this is similar to the one,

17   as I told you before, parties can have 10 days to bring this

18   to a head, with the responsible people meeting, no games on

19   either side, whether it needs to go through this, sit down

20   and go through it.  If you can't do it in 10 days, I'll

21   appoint an examiner.  Both sides pay half, and 9 percent

22   interest from April 15th on the obligations that run either

23   way.  Net in, net out, maybe one side will end up paying,

24   you know, millions of dollars in interest, I don't know.

25           MS. MOONEY:  Thank you, Your Honor.

1          THE COURT:  Okay, thanks.  But to be clear, to me,

2      this is just a numbers counting issue.  There are no real

3      issues here, at this point.  There -- you know, you've got

4      to look at all the pre-closing checks and you've got to look

5      at the -- pick a reasonable time for the post-March 18th,

6      I'm thinking June or July, you know, and rent's really easy.

7      There needs to be some reasonableness involved here, in

8      terms of looking at it.  And frankly, it's another way of

9      saying -- that's why -- another reason I'm thinking of an

10     examiner, if the parties want to pay for an examiner to do

11     what you all should have done, then hopefully, one side is

12     not going to require doing what's unnecessary because then

13     the examiner will be doing it and you're going to be paying

14     half of that.  So, hopefully, you won't do that.

15          MS. MOONEY:  Thank you, Your Honor.

16          THE COURT:  We need both sides not doing that.

17     Okay.

18          MR. FRIEDMANN:  Your Honor, now, with your

19     permission, I'll address the prepaid inventory.

20          THE COURT:  Okay.

21          MR. FRIEDMANN:  So, I have a feeling I know where

22     we're going to end up on this, but we'll argue it anyway

23     first.  The prepaid inventory, there was a shortfall amount

24     set at $147 million dollars, less the amount for the prepaid

25     inventory.  So, here again, there was a peg set at $140

Page 196

1    million dollars at the time of the execution of the APA, and

2    the parties were obliged to deliver, at the time of close,

3    $147 million dollars of prepaid inventory at close, same as

4    what they had in the beginning, they'd have at the end.

5          Now, this $147 million dollars was not just picked

6    out of a hat.  It's not a random number.  They would have

7    probably picked something rounder like $150, had they done

8    that.  The way that they got $147 million dollars is that's

9    exactly what was on the company's books and records using

10   their accounting methodology, that same accounting

11   methodology that Debtors used pre-petition, the same one

12   they used throughout the bankruptcy, the only one that

13   existed when they negotiated the $147 million dollars

14   because as Mr. Hede testified, when they negotiated the APA

15   and picked that $147 million dollars, he hadn't even

16   entertained yet some of the methodology that he came up with

17   to calculate prepaid inventory and spent all that time, no

18   one could have conceived of that yet.

19          So, the reasonable expectations of the party when

20   they agreed that they would -- that at closing, Debtor would

21   have to deliver $147 million dollars' worth of pre-inventory

22   at closing, was that the calculation to get to that $147

23   million dollars or something short of it, which is, by the

24   way, where we ended up, would be calculated in the exact

25   same way it was when the $147 million dollars was identified

Page 197

1    in the first place.

2            THE COURT:  Well, except it doesn't say that.  I

3    mean, this is kind of déjà vu all over again.

4            MR. FRIEDMANN:  Right, so that's what I was

5    predicting.

6            THE COURT:  I know.  And I think -- I mean, don't

7    respond to this yet, but I think the -- when the Transform

8    side makes a good point that there are -- there's at least

9    one section in the agreement where the parties do

10   specifically incorporate that type of methodology.  So, they

11   do it there, they don't do it here, the implication is --

12           MR. FRIEDMANN:  With respect to prepaid inventory,

13   though, it's a little bit different and the reason is, is

14   that -- and maybe not, there.  Maybe they should apply to

15   both, but inventory, which is incorporated after -- prepaid

16   inventory is defined as shall mean all inventory, and that

17   goes on to explain that it's been paid for by the seller

18   prior to the closing date, to which the seller has not taken

19   title or delivery as of the closing date.  Inventory is then

20   defined, capital I, same Inventory as in prepaid Inventory,

21   to talk about, "reflected on the stock ledger" is the

22   language used when inventory is discussed.

23           So, this notion that there is no connection at all

24   to the accounts and books and records of the company I'm not

25   sure is entirely fair.  I think that that certainly was the

Page 198

1    intent of the parties, and that's how they got to the $147,

2    is they used that methodology, and there certainly is

3    nothing in the agreement that suggests that some other

4    methodology should be used after the fact.

5            THE COURT:  But isn't there -- maybe it's getting

6    late in the afternoon, but isn't there a specific carve-out

7    in the methodology for prepaid inventory?  I have to -- is

8    there one?

9            MS. MAINOO:  Yes, Your Honor.  There is one at

10   10.9.

11           THE COURT:  Excuse me, which section?

12           MS. MAINOO:  10.9.

13           THE COURT:  10.9, yeah.  So, let me -- I want to

14   make sure I understand your argument, Mr. Friedmann.  I

15   think -- turning to that section.

16           MS. MAINOO:  10.9 cites back the (indiscernible)

17   inventory, which is defined in 2.1 as prepaid inventory.

18   That's what it looks like.

19           THE COURT:  Well, yeah.  It's the inventory

20   receivables is the (indiscernible) matter of the inventory

21   value of the acquired inventory, excluding any pending

22   inventory.  So, I guess your point is that you would value

23   all inventory this way?  Because --

24           MR. FRIEDMANN:  It's -- well, it's specifically

25   referenced here.

Page 199

1              THE COURT:  Because exclude -- because pending

2      inventory is excluded, it's not excluded in the valuation

3      methodology.  It's just excluded from the acquired

4      inventory, which you valued all the same way?

5              MR. FRIEDMANN:  Look, I -- our view is that the

6      parties came up with a peg.  Again, it's the same point, I

7      think, even though it wasn't terribly excessively made,

8      apparently, previously, but they came up with a peg at $147

9      million dollars as what the company had.  The question was,

10     we're buying this company, what does it have right now, so

11     that we can make sure that, in the next 25 days you operate

12     in the ordinary course and we get the same thing that we

13     think we're buying.  And they determined that what the

14     company had, using the company -- based on the company's

15     books and records, at the day that the APA was executed, was

16     $147 million dollars of prepaid inventory.

17              It was then incumbent upon the Debtor to deliver

18     that amount 25 days later at close.  But to figure out

19     whether or not they delivered what they sold when they

20     executed the APA, you've got to measure it the same way.

21              THE COURT:  Okay.  I guess what I'm saying is,

22     inventory value, that defined term, is consistent with the

23     seller's current and historical accounting practice.  That's

24     how it has (indiscernible) inventory value is a defined

25     term.  When you go to prepaid inventory shortfall amount, it

Page 200

1    doesn't use the term, "inventory value".

2              MR. FRIEDMANN:  It does not.

3              THE COURT:  It just says an amount equal to $147

4    million less the amount of prepaid inventory, and that shall

5    mean all inventory has been paid, and I just want to make

6    sure, when we say inventory, inventory shall mean not

7    inventory value, but inventory shall mean goods reflected on

8    the stock ledger of the seller.

9              MR. FRIEDMANN:  To be honest, it's a bit of a

10   misnomer with respect to prepaid inventory because prepaid

11   inventory isn't actually on a stock ledger yet.

12             THE COURT:  Right, so, it just seems to me that

13   the valuation point actually, here is -- I understand that

14   the parties used a number, $147 million, that came off of

15   the company's books which didn't have on them the

16   calculation that he didn't want to get.

17             MR. FRIEDMANN:  Of course not.

18             THE COURT:  So -- but I'm not sure that fits into

19   the definition of prepaid inventory shortfall.  Now, maybe

20   it does.

21             MR. FRIEDMANN:  Well, the prepaid shortfall

22   inventory requires us to provide amounts equal to $147

23   million dollars, and the question is, what's the

24   methodology?  And it does not state a methodology.  We can

25   agree on that, so the question is --

1           THE COURT:  Right, in the (indiscernible) method

2    defined term, "inventory value" but it could have easily

3    said, shall mean an amount equal to $147 million, less the

4    amount of prepaid inventory as of the closing date,

5    calculated as per the inventory value.  It doesn't say that.

6           MR. FRIEDMANN:  Absolutely, Your Honor, and in

7    retrospect, that would have made this clearer.  Instead,

8    what we're forced to focus on is what would the reasonable

9    expectations of the parties is, it certainly --

10          THE COURT:  But can we just go by what the

11   document says?

12          MR. FRIEDMANN:  Well, the document doesn't say how

13   to calculate it.  The document just says $147 million

14   dollars of prepaid inventory.

15          THE COURT:  Right, okay.

16          MR. FRIEDMANN:  And that $147 million dollars, the

17   only way that that -- the company, so we have to look at

18   what the ordinary course was in the company, whenever the

19   company was reporting on what their prepaid inventories

20   amount were in the pre-petition period, during the post-

21   petition period, they were always doing the same thing.

22   They were taking this -- they were doing this calculation

23   based off their books and records.  The only time it was

24   ever calculated a different way is when, after the close,

25   Ernst & Young is hired to come in and say, hey, can you come

Page 202

1    in and take a look at this and see if you can get a number

2    down, because then we get a dollar-for-dollar set-off?

3            That's the only time anybody did that.  No one

4    suggested, at the time of the execution of the APA that,

5    look, if we're going to set a peg, let's figure out what's

6    really in the company right now, and let's bring in Ernst &

7    Young and maybe we'll close this deal four months from now,

8    because we couldn't do that.  There was no time for it.

9    They had to rely on the available methods under the

10   circumstances.  Here, as Your Honor will remember from the

11   sale hearing, this deal had to get done quickly or 45,000

12   people or so were out of a job because we were liquidating.

13   They had to come up with saying, what does this company look

14   like right now, because that's what you're going to have to

15   deliver to us in a really short period of time, maybe the

16   time between the execution and the close here is nigh.

17           THE COURT:  I think you could -- we couldn't even

18   say that the $147 million-dollar number, because that's the

19   best number they had at the time, but they didn't,

20   certainly, say that they were going to follow that same

21   approach.

22           MR. FRIEDMANN:  If they had all the time in the

23   world, Ernst & Young could have been hired then and come up

24   with what the specified receivable amount -- I'm sorry, what

25   the prepaid inventory amount was then, and they could have

```
 1    negotiated over whether or not that was reasonable, but --
 2              THE COURT:  But they also could have said, this is
 3    how we would do it.  Anyway --
 4              MR. FRIEDMANN:  And they failed.  There's no doubt
 5    that they failed to set forth a specific methodology so
 6    instead, we're forced to live with whatever the reasonable
 7    expectations of the parties were then, and there was not a
 8    single person who could possibly probably testify that when
 9    they sat there negotiating this APA, the way they were
10    thinking about prepaid inventory being negotiated is what
11    Andrew Hede would come up with two or three months later.
12              THE COURT:  When was he hired?
13              MR. FRIEDMANN:  I think he testified it was after
14    the close.  I don't know what the timing was.  It certainly
15    was -- he was not hired prior to the APA being assigned.
16              MAN:  When did they hire Ernst & Young?
17              MR. FRIEDMANN:  After closing.
18              MAN:  It was pre-closing.
19              MR. FRIEDMANN:  Pre-close?
20              (Overlapping voices)
21              MR. FRIEDMANN:  Post-execution, pre-close?
22              THE COURT:  All right.
23              MR. FRIEDMANN:  So, after the negotiation was set
24    and after $147 million was set as a peg.
25              THE COURT:  Well, that may just be -- there was
```

Page 204

1    not a mutual mistake, they were just (indiscernible).

2              MR. FRIEDMANN:  Well, because the (indiscernible)

3    this methodology, they didn't come up with until later.  He

4    testified in April.  For some reason, I remember hearing

5    that.

6              THE COURT:  Okay.

7              MR. FRIEDMANN:  Thank you.

8              THE COURT:  Okay.  Before we -- I'm sorry, go

9    ahead and sit down.  Mr. Good testified that the company

10   really hasn't been able to vet the Excel spreadsheet to do

11   the due diligence.  He got it recently.  Whether it had the

12   ability or didn't have the ability to meet with people to

13   look into merch and non-merch and those sorts of things,

14   that hasn't been done yet.  I didn't get the impression that

15   -- though that E&Y's methodology is, on its face, improper

16   or inaccurate or -- (indiscernible).

17             MR. FRIEDMANN:  Look, I don't know that it is,

18   however, we're not suggesting that it is.  I think what our

19   concern is, certainly with some of the judgments they have

20   to make, the one Mr. Good referred to about merch versus

21   non-merch, particularly in light of the fact that both Mr.

22   Riecker and Mr. -- I'm going to mispronounce his name, I

23   apologize.  Mr. Butz, both testified that they'd been

24   isolated from E&Y.  So, there's been this effort for, you

25   know, whatever reason, I don't want to assume that there is

Page 205

1    intent, but for E&Y to do this calculation and make these

2    judgments without talking to the two people most

3    knowledgeable about this information, so, because of that,

4    look, E&Y is obviously a very reputable firm.  They've been

5    siloed off from talking to the people who most would be able

6    to help them make those judgments, for whatever reason, and

7    that would give us very -- that would give us pause to

8    accept their analysis.

9         THE COURT:  Do you have the same issue here as in

10   the payables?  I mean, I'm sorry, as in the accounts

11   receivable where you used a, in essence, a GAAP methodology

12   and E&Y is using an actual methodology, and in doing so,

13   they're not crediting you with -- or they're starting with

14   just your numbers and not your (indiscernible)?  Or maybe we

15   don't know.

16        MR. FRIEDMANN:  What they're working off of, the

17   books and records of the company, they're doing the

18   methodology different.  As you heard, we were using the

19   methodology that the company was using throughout the post-

20   petition period, which was this three-week analysis.  E&Y

21   (indiscernible) to do a six-week analysis.  They've had the

22   benefit of months and months and months to try to figure

23   this out.  I don't know, again, if there is an exact,

24   precise count and I think that's difficult, given the fact

25   that there's always goods that are on ships from China or on

Page 206

1    trucks going to stores.

2           Again, the idea was, what's the best available

3    information that the companies had at the time of execution,

4    and then what is the reasonable expectation of the parties?

5    From the perspective of Transform, the reasonable

6    expectation was, we're going to get exactly what we think

7    we're buying.  We're looking at the company right now, we've

8    diligence-d it, you're going to deliver that to us 25 days

9    from now, and if you deliver less, we're going to get right

10   for that.  And for us, it was, when that's going to be

11   measured, we're going to use the same stick.

12           THE COURT:  You use it most often in this

13   argument.  The reasonable expectations of the parties.  How

14   does that fit in as a legal concept?  Does that fit in if I

15   find it either ambiguous, or is this a way -- I understand

16   that -- I understand the concepts of mutual mistake and

17   unilateral mistakes.  I don't understand the reasonable

18   expectations of the parties point.  I'm not sure -- I'd put

19   it in, I'm not sure how you're mediated.  Do I have to find

20   this provision to be ambiguous before I advise?

21           MR. FRIEDMANN:  Your Honor, it's ambiguous to the

22   extent that it does not support the methodology.  We -- I

23   don't know that that's ambiguous.  To the point, I think

24   it's clear.  It doesn't set forth the methodology.

25           THE COURT:  Well, we may then just assume that --

Page 207

1  we just -- a reasonable accurate methodology?  I mean, I --

2  I don't have the sense that the methodology that the company

3  has used is the most accurate methodology.

4          MR. FRIEDMANN:  No, it's not the most accurate,

5  but again, it wasn't -- the key wasn't getting -- it wasn't

6  as though there's some magic to $147 million dollars of

7  prepaid inventory.  The magic is getting the -- it's -- the

8  shortfalls are the key.  The key is that what we had at the

9  time of execution, we'd have at the time of closing, and

10  then if there was any difference, there would be a credit.

11  It could have been pegged at $120, it could have been pegged

12  at $97.  The point is, whatever it was the day of execution,

13  was what we had to deliver.  And that's why it being

14  precisely -- so, when we had it at $147, it turned out that

15  if Andrew Hede had come in three months before instead of

16  three months after to do his analysis, he would have said,

17  oh, it's not really $147, it's really only $79 million.

18          Okay, the same point would have been, well, then,

19  we've got to deliver $79 million under the Hede methodology,

20  and the same set-off would be in place, because if we missed

21  that, it'd be dollar-for-dollar.  So, the $147 is just a peg

22  to make sure that we're not doing anything differently in

23  those 25 days, and we're not suddenly not running the

24  company properly, or looting it, and they're getting a worse

25  deal than they think they signed.  They were getting exactly

1    what they bargained for, and if there was any difference,

2    they'd get the shortfall.  But it's not fair to apply that

3    to the Debtors when you come in and you're measuring the

4    shortfall using a totally different stick.  And that's the

5    problem, because that upsets the reasonable expectations of

6    the Debtors, and that's where it comes in.

7              THE COURT:  Okay.

8              MR. FRIEDMANN:  Thank you, Your Honor.

9              THE COURT:  Okay.

10             MS. MAINOO:  Your Honor, I'll try to cut to the

11   chase.  Mr. Friedmann argued that no one expected that, in

12   the course of negotiations, that the prepaid inventory

13   shortfall would be calculated other than using the company's

14   accounting records.  But Mr. Kamlani testified that this is

15   what he expected.  And if you'll indulge me, I will cite to

16   Mr. Kamlani's declaration on which he says, in Paragraph 38,

17   that Transform could only get incremental value from

18   inventory if the inventory was received and was not part of

19   the on-the-stock ledger at the time of closing, but became

20   part of the ledger thereafter.  Transform bargained for

21   inventory and not for an estimate of inventory.

22             Mr. Kamlani goes on to say that he understands

23   that, since the closing, Debtors have taken the position

24   that they are not required to deliver $147 million of

25   prepaid inventory, but that it is sufficient that Debtors'

1    accounting records reflect that they have $147 of prepaid

2    inventory in the books.  "This was not the transaction I

3    negotiated," Mr. Kamlani says, and Transform would never

4    have agreed to that transaction, which would have given

5    Debtors and Debtors alone the right to set the amount of

6    inventory without there being any opportunity for there to

7    be account after the transaction closed.

8           THE COURT:  Although, they do have the ordinary

9    course obligation, so they couldn't do it, play games with

10   it.

11          MS. MAINOO:  Can you clarify your question, Your

12   Honor?

13          THE COURT:  Well, the last part, which you read

14   Mr. Kamlani says the reason, right, that he would never

15   agree to letting the company use its accounting methodology

16   is that in (indiscernible) control of the company, that

17   that's tempered by the fact that the company has to act in

18   the ordinary course.

19          MS. MAINOO:  And (indiscernible) requires that the

20   ordinary course prevention mitigates against that, and as

21   you know, we have issues with respect to the ordinary

22   course, as well.  But Mr. Kamlani also explains that if the

23   Debtors were, indeed, correct that it was sufficient to rely

24   on their accounting records to establish a prepaid inventory

25   amount, then there would have been no need for an adjustment

1   mechanism in the APA to reduce this Debtors' reimbursement

2   obligations and assume 503(b)(9) liabilities.  The sole

3   reason that the APA included that provision -- this

4   provision, excuse, was so that Transform could do account of

5   the inventory after the close to ensure that the amount of

6   inventory Debtors said they would deliver was, in fact, what

7   was delivered.  To the extent that the amount the inventory

8   was short, this adjustment mechanism provided for an offset.

9           THE COURT:  Well, I mean, there isn't -- there

10   clearly is an adjustment mechanism, but couldn't he just as

11   logically say that this, as Mr. (indiscernible) says, that

12   this is just to prevent the Debtors' inventory from a

13   measure anyone understood, from going down, as opposed to

14   measuring it in a different way?  I mean, they did come up

15   with $147 million, and it wasn't a (indiscernible) warranty.

16   So, I guess the point is, what's really a function of the

17   shortfall?  Is it inventory-based, or is it basically the

18   ordinary course base to a regularly based?

19           MS. MAINOO:  And Mr. Kamlani testified that it was

20   inventory-based.  Debtors had a chance to cross-examine him,

21   they did not.  But I think Your Honor's question also goes

22   to what did the APA contemplate?  And the APA provisions

23   contemplate that the prepaid inventory shortfall would be

24   calculated and not assumed.  Pursuant to § 2.1(x), Transform

25   bargained for the right to receive prepaid inventory.  And

1   prepaid inventory is defined in the APA as: "all inventory

2   paid for by the Sellers prior to the closing date, as to

3   which the Sellers have not taken title or delivery as of

4   closing."  The reason it was important to --

5          THE COURT:  And "inventory" there isn't accounting

6   inventory, it's the real thing.

7          MS. MAINOO:  Exactly.  And that is -- Mr. Hede

8   testified before, you can sell a fridge.  You cannot sell an

9   accounting entry.

10          Another point to touch on in response to Debtors'

11   arguments is about the methodology that they said they used

12   and that they said the understood the parties had a shared

13   understanding with respect to.  First, the Debtors suggest

14   that this so-called methodology of using the accounting

15   estimate to estimate or approximate prepaid inventory was

16   the methodology used all along by the company.  One point

17   Mr. Hede also spoke to earlier, and testified to, was that

18   the company, in fact, changed its own practice from two to

19   three weeks during the bankruptcy.  So, that the lies, the

20   suggestion that --

21          THE COURT:  Is the going from three to six, how

22   does that affect -- does it really -- who benefits from

23   that?

24          MS. MAINOO:  Is that a question for me, Your

25   Honor?

1          THE COURT:  It's for everyone.  Both sides.  Going

2     six (indiscernible) right?

3          MS. MAINOO:  Yes.  Right, and Mr. Hede expanded --

4     he used the six weeks to be conservative for the benefit of

5     the Debtors.

6          THE COURT:  Right, okay.

7          MS. MAINOO:  Another reason that the actual

8     inventory is critically important is that the $147 million

9     that Transform was supposed to receive in prepaid inventory

10    was important for Transform's financing.

11         THE COURT:  Well, I had a question about that, and

12    I confess, I haven't read the deposition excerpts yet.  But

13    as far as the financing is concerned, is there anything in

14    the record as to whether the lenders were looking at

15    accounting/financial reporting type of methodology for the

16    inventory, or actual account?

17         MR. LIMAN:  Your Honor, if I may, I can answer

18    that question.

19         THE COURT:  Okay.

20         MR. LIMAN:  It was in the actual count there is in

21    the record the documents given to the banks.  Those look at

22    cash flows, not at GAAP accounting.  The cash flows build

23    into the models the notion of $147 of prepaid inventory.

24    So, it's not GAAP accounting, it's not the notion of what's

25    a GAAP liability with GAAP calculations.  It's $147 million

Page 213

1   of inventory into the cash flow statements.  And Mr. Kamlani

2   actually could testify to it.

3            THE COURT:  It was actual inventory?

4            MR. LIMAN:  Actual inventory.  Mr. Kamlani is here

5   and he could answer those questions if Your Honor has them,

6   but that is built into the model that was given to the

7   lenders, and that's why the figure of $147 million, it's not

8   just ordinary course.

9            THE COURT:  Do we have the -- we don't have the

10  loan agreement, right?

11           MR. LIMAN:  We don't, but the exhibit that

12  reflects the calculations is in the record.  I don't know

13  offhand the number.

14           MR. FRIEDMANN:  The documents also -- the

15  obligations are not contingent upon the debt financing.

16           THE COURT:  No, I understand that.  I'm just --

17  the deal requires -- but just react to the comment that the

18  $147 is important to the financing.

19           MR. FRIEDMANN:  To be clear, the lenders were

20  lending on inventory, and the inventory numbers they were

21  getting were right from the books.  There was no Ernst &

22  Young doing this analysis when they were (indiscernible).

23           THE COURT:  No, but I -- I think my question went

24  to whether the lender's covenant, or borrowing base, or

25  however they formulate it, was based on a number of $147 or

Page 214

1    something in that neighborhood that was premised on a GAAP

2    calculus of that number, or actual inventory, which they

3    have the right to go and audit, just like any market.

4              MR. FRIEDMANN:  They based on GAAP, Your Honor.

5              THE COURT:  How do we know that?

6              MR. LIMAN:  That's -- that -- excuse me, that's

7    just not collected.

8              THE COURT:  Well, (indiscernible).  Where is that

9    in the record?  How do I know that?

10             MR. FRIEDMANN:  It is in GAAP (indiscernible).

11             THE COURT:  No, I'm asking -- you told me where

12   yours is.  I bet they didn't -- where that statement came up

13   from the Debtors' counsel.

14             MR. SCHROCK:  Your Honor, it's Ray Schrock, for

15   the record.  So, I presume that the lenders do have, in

16   fact, the ability to go back and count inventory.  You know,

17   they always do.  They conduct appraisals and the lender

18   would have the ability to do that.  My points was just that

19   I looked at it in the agreement as an allocation of

20   (indiscernible).

21             THE COURT:  No, I understand that.  I think that's

22   a -- I understand your point, too, but I just wanted to make

23   --

24             MR. SCHROCK:  Okay, understood.  I think it's

25   (indiscernible) the lenders, I'm sure, have the ability to

Page 215

1    go count inventory.  I'm sure -- we can stipulate to that.

2            THE COURT:  I know.  These provisions don't

3    exactly tally up, but when we're -- what the -- the real

4    argument you're making, as (indiscernible) is making to me,

5    is that this was the expectations of the parties, and making

6    a list of why it really was the expectations of the parties

7    and why it was that this $147 million is important for the

8    lending relationship.  And I think, based on reality as

9    opposed to GAAP, is the case.

10           MS. MAINOO:  Your Honor, Debtors also argued that

11   the fact that EY did not work with Mr. Riecker or Mr. Butz

12   somehow undermines the methodology that EY used.  But EY,

13   the declaration that Mr. Hede submitted, in his declaration

14   he testifies that EY worked closely with Sears, with

15   Treasury and Inventory Management teams to develop the

16   methodology and compile the data and analysis that it

17   (indiscernible) inventory.

18           THE COURT:  (indiscernible) but this is all --

19   when was this provided, when was the Excel spreadsheet

20   provided?

21           MS. MAINOO:  I -- a couple minutes to look into

22   that, Your Honor.

23           THE COURT:  I think it was in July.

24           MS. MAINOO:  Which Excel spreadsheet specifically?

25           THE COURT:  The outcome of the analysis.

1          MS. MAINOO:  So you're saying, when was it shared

2     with M-III?

3          THE COURT:  Yeah.  I know they had discussions

4     along the way, but I think it was provided quite recently,

5     wasn't it?

6          MS. MAINOO:  No, but I'm making the separate

7     point, right, the Debtors seem to be arguing that Ernst &

8     Young should have consulted with the company, with Rob

9     Riecker and Jeff Butz at Sears and my point is that Ernst &

10    Young did consult with Sears's finance team.

11         THE COURT:  Some of them.

12         MS. MAINOO:  With the Treasury and Inventory

13    Management teams.

14         THE COURT:  Okay.

15         MS. MAINOO:  Just a minute.  Mr. -- as you heard,

16    Your Honor, Mr. Hede testified, and there is no reason to

17    question the methodology that he used or his matching

18    process.  And again, Debtors had the opportunity to

19    (indiscernible).

20         THE COURT:  Mr. Hede said -- well, there is,

21    because the Debtor was seeking backup.

22         MS. MAINOO:  Mr. Hede -- Mr. Good testified that

23    its nuances suggested that it's really hard to do that work.

24         THE COURT:  Right.

25         MS. MAINOO:  But that did not question the

Page 217

1      integrity of that office (indiscernible).

2              THE COURT:  Has Mr. Hede been deposed?

3              MS. MAINOO:  The Debtors did not notice Mr. Hede's

4      deposition.

5              THE COURT:  Okay.

6              MS. MAINOO:  And they had an opportunity --

7              THE COURT:  When was the last date for

8      depositions?

9              MS. MAINOO:  June 21st was the cutoff for

10     discoveries.

11             THE COURT:  And when did he provide his Excel

12     analysis?

13             MS. MAINOO:  He put in two declarations.

14             MR. FRIEDMANN:  Your Honor, I can represent that

15     we received of (indiscernible) of several hundred files

16     about an hour before discovery closed -- (indiscernible)

17             THE COURT:  On the 21st?

18             MR. FRIEDMANN:  So -- yeah, so the --

19             THE COURT:  Okay, so --

20             MR. FRIEDMANN:  -- we didn't have the opportunity

21     for that deposition, unfortunately.

22             THE COURT:  Okay.

23             MS. MAINOO:  But we also had that compressed

24     discovery schedule at the Debtors' request, and Debtors --

25     (indiscernible).

1          THE COURT:  No, I understand all of that.  I just

2     -- I think there's a bit of a -- I accept Mr. Good's

3     testimony that probably, he had an ongoing obligation, which

4     they have been honoring in fits and starts, to work with

5     each other, and I also accept, although he didn't say this,

6     that that has been interrupted by the differences in legal

7     interpretations that they had taken.  And I understand that.

8     There's no reason to do Work Stream X if you believe Work

9     Stream X is completely irrelevant.  Or, you know, to spend a

10    lot of Sears' money and extend the discovery deadline to vet

11    Work Stream X if you think it's irrelevant.

12          MS. MAINOO:  Your Honor, (indiscernible) further

13    questions.

14          MR. LIMAN:  Your Honor, just for the record, I

15    made reference to a document.  It's Joint Exhibit 32A and

16    it's the page having to do with monthly budget and a 2020 --

17          THE COURT:  This is the presentation to the lender

18    group or the lender agent?

19          MR. LIMAN:  Correct, correct.  Reflecting the 148

20    million, actually, in inventory.

21          THE COURT:  Okay.  Anything more on this.

22          MR. LIMAN:  No, Your Honor.

23          THE COURT:  Okay.  The next issue that I'll

24    address is the parties' dispute over how to calculate a term

25    defined in Section 121 Page 27 of the APA, namely, Prepaid

1    Inventory Shortfall amount.  That is defined as "Shall meet

2    an amount equal to $147 million, less the amount of the

3    prepaid inventory, as of the closing date." That calculus

4    then ties into another crediting mechanism in Section 2.3K

5    little Roman ix of the APA.

6           This is not as easily determined on the face of

7    the agreement as the dispute over Specified Accounts

8    Receivable, given the language of this provision.  I say

9    that because the whole issue here is how to value the

10   prepaid inventory, a term that actually doesn't even appear

11   in the definition.  It just says "the amount of prepaid

12   inventory." Although both sides, I believe, interpret the

13   word amount as equating to value.  They just disagree on how

14   to value it.  The Debtors value it based on their ordinary

15   course of valuation methodology for inventory, which is

16   GAAP-based and financial reporting-based.

17          They say that it is -- on that basis, that the

18   parties came up with a $147 million trigger amount or

19   threshold amount and that, therefore, it should be used to

20   calculate the actual amount in this section.  The

21   (indiscernible) transform is that the Debtors know how to

22   specific, as did Transform -- the parties, therefore, knew

23   how to specify that type of valuation methodology because

24   they used it in the definition of inventory value, another

25   defined term that appears on Page 19, which is the value of

Page 220

1    such inventory at the lower cost or market value on a basis

2    consistent with the seller's current and historical

3    accounting practice, in effect, on the date hereof per the

4    stock lender -- ledger.  That doesn't apply here, and the

5    definition of prepaid inventory shortfall further does not

6    specify a particular methodology.

7              The Debtors contend, nevertheless, that this is

8    what both parties understood and that, therefore, that's how

9    I should read this provision.  There's testimony that's

10   uncontroverted to the contrary by Transform's main

11   representative, Mr. Kamlani.  It seems to me that the

12   parties knew how to bind themselves to a methodology that is

13   not necessarily accurate, although perfectly fine for GAAP

14   and financial reporting purposes, and chose not to.  I

15   assume, therefore, that, as per the plain meaning of the

16   agreement, a methodology that actually properly reflects the

17   value of prepaid inventory is what the parties intended.

18   That's point one.

19             Point two is that Transform contends that Ernst &

20   Young's calculation of this amount using a methodology tied

21   to actual inventory and vendor information is, in fact,

22   accurate.  I am not satisfied that that's the case based on

23   this record.  I am reasonably satisfied, however, based on

24   Mr. Good's testimony as well as Mr. Hede's, that the

25   methodology could be sufficient due diligenced with proper

1    cooperation between the parties with the right people

2    involved to address any judgment calls and otherwise due

3    diligence to methodology, which I don't think the Debtors

4    have had an opportunity to do, given what's been delivered

5    to them.  And reasonable assumptions as to whether they

6    should have dropped everything to do it before now.

7           So, as a legal matter, I conclude that the GAAP

8    financial reporting approach is not the approach that is

9    intended by the plain meaning of the document.  That,

10   secondly, E&Y's methodology might be an appropriate approach

11   based on actual valuation approaches but that the Debtors

12   should be entitled to due diligence.  And, again, the

13   parties have ten days to do that.  And, if not, it'll be

14   part of an examiner's job to do that.

15          And, again, I don't think -- I think -- I'll put

16   it differently -- I think Mr. Hede's testimony establishes

17   in my mind that there's no apples and oranges risk here as

18   there is with the specified accounts receivable.  But,

19   obviously, if the Debtors' GAAP approach actually left out

20   prepaid inventory, it should come in because now we're using

21   their real life actual numbers approach, and that should be

22   part of the due diligence and the ultimate calculation.

23          Okay.  Does anyone want to take a short break

24   since we've been at this for four hours?

25          MAN 1:  Please, Your honor.

Page 222

1          THE COURT:  Okay.  Why don't we take about a ten-

2     minute break?

3          (Recess)

4          THE COURT:  Okay, we're back on the record in In

5     Re:  Sears Holding Corp.  As far as remaining issues are

6     concerned, I think we have on this list adequate assurance

7     deposit, ADA funds, available cash, ordinary course, and 166

8     million issue.

9          MR. FRIEDMANN:  I don't if you said mechanics

10    liens, Your Honor.

11         THE COURT:  Sorry?

12         MR. FRIEDMANN:  Did you say mechanics liens?

13         THE COURT:  Oh.  Did I miss mechanics liens?

14    Okay, I missed mechanics liens.

15         MR. FRIEDMANN:  It's always the forgotten one.

16         THE COURT:  Yes, mechanics liens.

17         MR. FRIEDMANN:  If I can make a proposal, Your

18    Honor?

19         THE COURT:  Okay.

20         MR. FRIEDMANN:  Especially given the time.  We

21    would propose to do -- we can do (indiscernible) thought --

22    we can do 166 ordinary course and available cash altogether

23    because they really all relate to each other.  So, if we can

24    address that next, then we'll just be left with the other

25    three, which all that should be pretty quick.

1            THE COURT:  Okay, that's fine.

2            MR. FRIEDMANN:  Great.  So, Your Honor, with

3    respect to the $166 million accounts payable dispute, as

4    Your Honor I'm sure remembers, Your Honor provided a summary

5    ruling on this issue back on February 7th.  Since that time,

6    some 61 pages later, the litigating issue has consumed an

7    extraordinary amount of the Debtors' time and limited

8    resources.  But at the end of the day, the buyer's evermore

9    lengthy, convoluted, at times colorful arguments on the

10   issue cannot prevail.  Because, very simply, 2.3K of the APA

11   is ambiguous.  The Court suggested it agreed with that at

12   the sale hearing on February 7th and even the buyer at the

13   conference on Tuesday afternoon, Mr. Liman, counsel for

14   Transform, also stated that he believes 2.3K is clear -- of

15   course, in Transform's favor.

16            Accordingly, under black letter Delaware law, the

17   Court should not look beyond the four corners of the APA to

18   determine the parties' intent with respect to the meaning of

19   Section 2.3K.  2.3K unambiguously obligates the buyer to

20   assume both up to $166 million of other payables and all

21   payment obligations with respect to ordered inventory.

22   These two categories of obligations are listed as separate

23   obligations in Section 2.3 of the APA, they're defined

24   separately in the APA they're set forth in separate

25   schedules of the APA.  1.1F sets forth ordered inventory,

Page 224

1     1.1G sets forth other payables.

2            And Your Honor recognized exactly as much at the

3     February 7th sale hearing when you stated that it's

4     reasonable to assume that the Debtors' interpretation of 2.3

5     would prevail in a proper litigation because the two

6     categories of obligations are listed as separate obligations

7     in 2.3 -- in Section 2.3 of the APA, it's defined separately

8     in the APA, and because 2.3K little v's cap of 166 million

9     applies only to other payables and to all payment

10    obligations with respect to the order inventory.

11           Notwithstanding, the unambiguous terms of Section

12    2.3K of the APA and Your Honor's prior determination at the

13    sale hearing, the buyer maintains that Section 2.3K sets

14    forth only three categories of obligations and not four.

15    One being the severance reimbursement obligation, two being

16    the assumed 503B9 liabilities, and three being this other

17    payables and all payment obligations with respect to the

18    order inventory all combined.

19           Essentially, the buyer argues that the APA is only

20    obligated  to assume up to 166 million payables with respect

21    to ordered inventory.  And in support of that argument, the

22    buyer asserts that the limiting phrase or modifier with

23    respect to the order inventory modifies the term "other

24    payables".

25           But other payables is defined as accounts payable

Page 225

1    as set forth in 1.1G.  And that's why this argument really

2    defies law and logic and in many respects the English

3    language.  And I know there's been a lot of talk about the

4    last antecedent rule, and Oxford commas and definite

5    articles, and coordinating conjunctions.  But the bottom --

6    at the bottom of it all is, Your Honor, the buyer's

7    interpretation of the APA has to make sense, and it doesn't.

8              As an initial matter, there are no accounts

9    payable associated with ordered inventory.  Ordered

10   inventory in the AP is inventory that the seller has ordered

11   but has neither paid nor taken title to or delivery of.

12   Under basic double entry bookkeeping methods, and the Sears

13   team used those, the Sears team did not enter such inventory

14   into the company's general ledger.

15             As Mr. Riecker, who at the time was the Debtors'

16   CFO and is now the buyer's CFO, admitted in this deposition

17   order inventory is not booked into Sears financial systems

18   or accounted for in the company's financial statements.  Mr.

19   Riecker also admitted that ordered inventory is at most a

20   plan to at some point in the future receive Title Two

21   inventory that the company has not yet paid for.

22             Mr. Kamlani, ESL's president, also stated in his

23   deposition that ordered inventory is nothing.  It's at 60 --

24   Page 64, Lines 8-11 in Mr. Kamlani's deposition.  Because

25   none of the goods that comprise ordered inventory were

Page 226

1   associated with accounts payable, the phrase with respect to

2   ordered inventory cannot modify other payables, and the

3   buyer's argument fails.

4          Also, as I mentioned, there are two separate

5   schedules.  If the buyer's obligations with respect to other

6   payables or a subset of its obligations with respect to

7   ordered inventory that the buyer claims, there would've been

8   no need for the parties to have included two separate

9   schedules reflecting -- and one reflecting the other

10  payables at all.  In fact, how is it that the buyer could be

11  at the same time agreeing to pay only up to a cap of $166

12  million for something that it also agreed to assume all

13  payment obligations for with no maximum whatsoever?  Your

14  Honor, the answer is simple.  It's because the buyer agreed

15  to assume two different things.

16         The buyer also argues that Section 2.3 sets forth

17  three obligations instead of four because the APA does not

18  provide for a dollar for dollar reduction in the buyer's

19  obligations with respect to ordered inventory, so the

20  Debtors deliver fewer assets at closing than was targeted in

21  the APA, unlike some of the other buyers assumed

22  liabilities.

23         But the parties would not have provided a dollar

24  for dollar reduction in the buyer's obligation with respect

25  to ordered inventory because unlike other payables or

Page 227

1      severance to reimbursement obligations, or assumed 503B9

2      liabilities, ordered inventory at the end of the day is a

3      zero sum game.  The buyer's not paying something for

4      nothing; it's paying something for something.  For every

5      dollar the buyer pays, it receives a dollar's worth of

6      inventory, inventory that it can then try to sell for $1.10.

7      And so it makes sense that the parties agreed that the

8      buyers should not be entitled to any dollar for dollar

9      reduction in obligations with respect to the ordered

10     inventory.

11             Finally, Your Honor, the buyer knew before

12     executing the APA that the remaining -- that remaining

13     administratively solvent post-closing was obviously one of

14     the Debtors' foremost concerns.  The buyer's promise to

15     assume payment obligations with respect to ordered inventory

16     would not address Debtors' administrative solvency concerns

17     at all.

18             As Mr. Kamlani stated at his deposition, had the

19     buyer not agreed to assume payment obligations with respect

20     to ordered inventory, the Debtors could have canceled all

21     purchase orders associated with that inventory had had no

22     associate payment obligations at all.  It's just one more

23     reason why the buyer's argument at Section 2.3K obligates it

24     to assume only payment obligations with respect to ordered

25     inventory makes no sense.

Page 228

1          In conclusion on this point, Your Honor, and as we

2    set forth further in our brief, the buyer really would have

3    its cake and eat it too.  It wants to acquire substantially

4    all of the Debtors' assets by promising to assume additional

5    liabilities, and then over the last several months, we found

6    it trying to litigate itself out of those promises, ensuring

7    that those additional liabilities fell to Debtors.  But the

8    ambiguous terms of the APA stand in the buyer's way.

9    Section 2.3K plainly obligates the buyer to assume both $166

10   million of other payables and all payment obligations with

11   respect to the ordered inventory.  The Debtors, therefore,

12   respectfully request that the Court reject the buyer's

13   position and grant Debtors supplement motion to enforce the

14   APA with respect to Section 2.3K.

15          I'll move on to ordinary course, unless Your Honor

16   has any questions for me about this section.

17          MR. LIMAN:  Unless Your Honor wants to hear...

18          THE COURT:  Well, I have a question first.  Does

19   the -- does the dispute over the prepaid inventory relate to

20   this in any way?  Have the parties given any thought to

21   that?  No?  I'm looking at the puzzled...

22          MR. FRIEDMANN:  I'm looking at them.  We've been

23   discussing how things interact a lot lately.  I know that

24   prepaid inventory can actually affect specified receivables,

25   which should make our discussions very exciting over the

1    next ten days.  But it does not -- I don't believe it

2    affects the accounts payable.

3                THE COURT:  Okay.  Okay, how closely does

4    available cash and ordinary course tie into this?

5                MR. FRIEDMANN:  The way that they tie in is that

6    their argument is made in the alternative by the buyer.

7    They suggest that if it turns out that they are, in fact,

8    required to do what we say the APA (indiscernible) requires

9    them to do, which is take on these accounts payable, they

10   then have argued, one, that we did not break the ordinary

11   course, and, two, that there was all this available cash

12   available on 1201 on February 11th, that all should be

13   offset against the $166 million.

14               THE COURT:  But that's just a...  The latter point

15   is just an offset.  It doesn't tie into the --

16               MR. FRIEDMANN:  That's correct.  That's correct.

17               THE COURT:  Okay.

18               MR. FRIEDMANN:  So, I'm happy if you want to --

19               THE COURT:  So, why don't we deal with the -- it

20   ties into the formula for the DIP shortfall amount.

21               MR. FRIEDMANN:  That's correct.

22               THE COURT:  But otherwise, it doesn't tie into the

23   dispute about the definition of ordered inventory and other

24   payables and how that works in Section 2.3K.  So, why don't

25   we just deal with that issue then?

Page 230

1          MR. LIMAN:  May it please the Court, Lewis Liman

2     again.  Your Honor, I don't want -- it's late in the day and

3     I take it I don't have to rehearse the law about preliminary

4     rulings versus final rulings and the like.

5          THE COURT:  I haven't ruled on this issue yet.

6     There's a ruling on it in the context of whether it made

7     sense for the Debtors to proceed with the transaction, but I

8     didn't predict the ultimate -- I didn't decide the ultimate

9     issue a la Orion Pictures.

10          MR. LIMAN:  What I would like to do is give Your

11     Honor seven reasons why this clause is at least ambiguous.

12     The APA is at least ambiguous if not -- it reads in favor of

13     the -- of Transform.  But I'd like to start off, before I

14     get to those seven reasons, with the argument that Mr.

15     Friedmann concluded with, which had to do with sense.  And I

16     was struck by the argument and struck, frankly, by the irony

17     throughout the day today on the argument that there's been

18     all of this argument on various provisions about the

19     reasonable expectations of the parties and the sense of the

20     contract, where we've been arguing plain language, plain

21     language.  And on the other side, except for this issue,

22     we've been hearing reasonable expectations of the parties.

23          THE COURT:  Right, they haven't won on those,

24     though.

25          MR. LIMAN:  That's correct, Your Honor.

Page 231

1              THE COURT:  Okay.

2              MR. LIMAN:  And they shouldn't have -- and we

3     should win on the plain language.  But let me address the

4     sense -- because sense is an issue that Your Honor can think

5     about and consider without parol evidence.  You do need to

6     make sense of a contract.  And, Your Honor, the evidence

7     with respect to this and the -- both the testimonial

8     evidence and the documentary evidence is very compelling

9     with respect to what the sense is of this provision.  And

10    I'd like to address that in two ways:  What was the sense of

11    it from the Debtors' perspective?  And what was the sense of

12    it from Transform's perspective?

13             Now, from the Debtors' perspective, what you've

14    heard today, frankly, is a contrived after-the-fact

15    explanation.  What we were told during the time, and that is

16    sensible, is that purchase orders for ordered inventory

17    creates an obligation and it creates a liability.  It

18    creates it as a matter of fact and it creates it as a matter

19    of contract.

20             The Debtors' concern pre-closing was that they had

21    an obligation to continue to order inventory in the ordinary

22    course, and they had an interest in ordering inventory in

23    the ordinary course.  Now, Mr. Friedmann would have you

24    believe that those purchase orders do not create obligations

25    and, frankly, that's a falsehood.  That's just 100 percent

1    untrue.

2         You don't need the vendor agreements that we put

3    before Your Honor to know that that's not true.  Common

4    sense says that it's not true.  But the vendor agreements

5    also say when you have a purchase order, there is a

6    contractual obligation that is created.  And that

7    contractual obligation is one that the Debtors could not get

8    out of under the terms of the agreement.  They would have a

9    contractual liability.  If the vendors delivered, they would

10   have to take that merchandise.

11        And that plainly created a risk to them.  A risk

12   with respect to administrative solvency, and a risk with

13   respect to the business.  Because they're ordering millions

14   of dollars of ordered inventory that if the -- that if we

15   don't take that, it ends up creating a risk from their --

16   from their perspective.

17        It also -- you heard Mr. Friedmann say all this

18   stuff about double-entry bookkeeping and the fact that it

19   doesn't create a liability.  That may be true as a matter of

20   GAAP, but most of what we've been talking about today is as

21   a matter of contract, and that's what you have to look at as

22   a matter of contract.  And if you look at the definition of

23   liability, this ordered -- obligations with respect to

24   ordered inventory plainly creates a liability under the APA

25   -- under the APA's definition of liability, which includes

Page 233

1    claims that can be unaccrued and contingent.

2              Two other things I want to correct with respect to

3    the record that I want to get to.

4              THE COURT:  How does that help your cause?

5              MR. LIMAN:  Well, because I think the -- their

6    argument with respect to sense turns on the notion that they

7    were not getting anything from an agreement on our part to

8    take on payables and payment obligations with respect to

9    ordered inventory.  I don't understand that argument,

10   frankly.

11             THE COURT:  I think it's more that they're not

12   getting the inventory.

13             MR. LIMAN:  Excuse me?

14             THE COURT:  I thought it was more that they

15   weren't getting the inventory.  That it was going to the

16   buyer eventually.

17             MR. LIMAN:  Well, I think their -- I think their

18   argument, as I understand it, is they're not getting

19   anything from it.  They did make an analogy about double-

20   entry bookkeeping and liability, and I just wanted to

21   correct that for the record because that statement, Your

22   Honor, is untrue.  But there is a risk from their

23   perspective.

24             THE COURT:  But is the ordered inventory, by in

25   large, something that the Debtor gets to keep the benefit of

Page 234

1    under this transaction?

2            MR. LIMAN:  It's something that the Debtors, but

3    for this provision, could have been stuck with.  And rather

4    --

5            THE COURT:  Well, they could have but then they'll

6    say they negotiated this provision so they weren't.

7            MR. LIMAN:  They say they're not worried about

8    that.  What I say, Your Honor, and what they said at the

9    time is that if they were -- if we decided not to take

10   ordered inventory, they're stuck with it.  And let me direct

11   your attention to this part of the record, Kamlani's

12   testimony, deposition testimony, Pages 77-78.

13           He was asked whether from your perspective,

14   Transform's agreement to assume liabilities of 166 million

15   in payables and payment obligations for ordered inventory

16   of, roughly, 166.5 million would help with Debtors'

17   insolvency.  He recalled being asked those questions.

18           Question:  In your mind, would Transform's

19   assumption of liability for 166 million in payables and

20   payment -- payable obligations for ordered inventory of

21   166.5 million have helped the Debtors' administrative

22   insolvency issues?

23           Answer:  The Debtors were trying to achieve

24   Transform taking on assets and liabilities because they were

25   concerned that if they kept the assets and liabilities as

1    they sold the assets, what they received for them may well

2    fall short of the 166.5 million because they were not in the

3    business of selling the assets.

4              I'll break from the testimony for a second.  They

5    have going out of business operations.  If they get

6    inventory, it's not worth very much to them.  Question --

7              THE COURT:  Well, but -- under this agreement, who

8    gets the inventory?

9              MR. LIMAN:  Under this agreement, we get the -- we

10   get the inventory, we take on the obligations.   But for

11   this agreement, but for this clause, we would have the right

12   to say we don't want that inventory and they would be stuck.

13   That's what it achieved from their perspective.

14             THE COURT:  But that's not what the parties

15   bargained for.

16             MR. LIMAN:  What the parties bargained for --

17   correct.

18             THE COURT:  Is that your client would take on the

19   inventory.

20             MR. LIMAN:  What the parties bargained for was

21   that we would take on the inventory and we would take on the

22   payables and payment obligations with respect to that

23   inventory.  I was addressing, Your Honor -- and let me just

24   make sure I've addressed it --

25             THE COURT:  Well, to me, that justifies why that

Page 236

1   obligation is unlimited and there's a cap on the other one.

2           MR. LIMAN:  It's not unlimited, Your Honor.

3           THE COURT:  Okay.

4           MR. LIMAN:  It's limited by -- to 166 million.

5   It's limited to 166 million by the provisos to 2.3K.

6           THE COURT:  But as far as the sense of the

7   agreement goes, that doesn't make any sense.

8           MR. LIMAN:  It does, Your Honor.

9           THE COURT:  If your client has the right to take

10  the whole shooting match --

11          MR. LIMAN:  We don't --

12          THE COURT:  -- and is taking the whole shooting

13  match, then it should pay for it.

14          MR. LIMAN:  We don't have the right to take the

15  whole shooting match, Your Honor.  We only have the right to

16  take the shooting match up to what was calculated as of

17  January 9th to be 166.5.  That's in the schedule and we,

18  obviously, in the ordinary course have been fluctuating

19  around that number.  We don't have the right to all of the

20  ordered inventory.  We have the right to what we assume, and

21  under the APA, we've got the right to be -- all we've got

22  the right to as to ordered inventory is the 166.5,

23  approximately.

24          THE COURT:  Where is that?  Is that in the Assets

25  Purchased?

Page 237

1          MR. LIMAN:  It is Section 2.1...

2          THE COURT:  2.1?

3          MR. LIMAN:  X.  We receive the right to receive

4   the pending inventory.  You have to do a little bit of work

5   through this agreement.

6          THE COURT:  Okay.  And so pending inventory means

7   the ordered inventory and the prepaid inventory --

8          MR. LIMAN:  And then you go to the definition of

9   ordered inventory, which then takes you to the -- to

10  Schedule 1.1F, which takes you to the schedule that has the

11  --

12         THE COURT:  Right.  But it says "of the type".

13         MR. LIMAN:  It does say "of the type", Your Honor.

14         THE COURT:  Right.

15         MR. LIMAN:  Your Honor, I think we can all agree

16  that there are areas of this contract -- Mr. Friedmann

17  agrees that -- and as Your Honor has mentioned, that could

18  be -- could have been better written.  The question is

19  whether there's ambiguity here.  So --

20         THE COURT:  Well, but there's no limitation on

21  your right to inventory, except as described by type in this

22  category.  Then there's another type.

23         MR. LIMAN:  Your Honor, what I'd also like to

24  address -- I don't think that that's the correct read, but I

25  would like to move on to the other --

Page 238

1              THE COURT:  Okay, but is it -- but why isn't it?

2              MR. LIMAN:  Because I think that what the contract

3      ties the ordered inventory to is to the schedule which

4      refers to, approximately, 166 million.  That's been the view

5      of the Debtors throughout --

6              THE COURT:  But it doesn't -- but it doesn't limit

7      it to that.  I mean, if -- do we know how much inventory

8      there is?

9              MR. LIMAN:  Well, Your Honor, if you were to

10     assume a contract, then pursuant to the assumption

11     provisions we might get some additional inventory.  In terms

12     of how much inventory there is, I don't know the answer to

13     that.

14             THE COURT:  I mean, this is why I wonder whether

15     it didn't tie into the E&Y analysis.  I don't know.  But it

16     --

17             MR. LIMAN:  I don't -- I don't know the amounts of

18     ordered inventory at closing.  Let me address, though, the

19     sense of this provision from Transform's perspective.

20     Because from Transform's perspective, the contract was

21     clearly structured --

22             THE COURT:  I'm sorry.  Does anyone know whether

23     the inventory value that has been transferred to Transform

24     is greater or less than 200 and -- the number on the

25     Schedule F?  266-something?

Page 239

```
 1            MR. LIMON:  166?  The amount of ordered inventory

 2   for close?

 3            THE COURT:  I'm sorry.  Whatever is on the

 4   schedule.  166,557,621?

 5            MR. SCHROCK:  Your Honor, Ray Schrock.  I'm sure

 6   we know -- because, frankly, on this provision --

 7            THE COURT:  Did anyone pay attention to that?  I

 8   mean, is that -- I mean, I think what Mr. Liman is saying is

 9   that they're not entitled to anything above that number.

10   The Debtors are.  Did anyone ever actually do that

11   calculation?

12            MR. LIMAN:  Your Honor, I think we can provide --

13   I think -- I'm told it's around 150 million or so of ordered

14   inventory.  1-5-0.  I mean, from their perspective,

15   obviously, there's going to be an interest in not ordering a

16   lot of inventory because if the transaction falls through,

17   then they're stuck with that.  Right?  As Your Honor

18   recalls, there was -- it was a very real question whether

19   this transaction was going to close.  And if the transaction

20   did not close, they would have been stuck with that

21   inventory.  So, just as a commercial matter, parties trying

22   to control the risk, they're not going to be ordering a lot

23   of inventory.  And I think they were not ordering a lot of

24   inventory.

25            I would like to get to both the sense of the
```

Page 240

1    provision from our perspective and then the seven different

2    reasons why we believe the contract is ambiguous.  From --

3    and maybe what I will do, because it's late in the day, and

4    to conserve time, is I'll talk about the sense of the

5    provision from our perspective when I talk about the

6    different contractual provisions.  Because I do think that's

7    the first place Your Honor needs to look.

8            And the first place that I would look is not in

9    2.3K at all.  I would look in 2.4Q.  Under the excluded

10   liabilities section, Justice Kagan wrote.  It would've been

11   of a different context about the obligation to read

12   difficult documents, and this is a -- not an easy document,

13   in my experience.

14           Critical bits -- actually, every sentence of 2.4Q

15   is critical but what I'd like to do is direct your attention

16   first to the bottom two sentences of 2.4Q.  Remember, this

17   is the excluded liabilities, and the excluded liability with

18   the exception that I'll get to in a moment, is accounts

19   payable incurred in the ordinary course of business existing

20   on the closing date.

21           That's important because that reflects the party's

22   intention that as a general matter, accounts payable in the

23   ordinary course would be an excluded liability.

24           THE COURT:  I'm sorry.  What?

25           MR. LIMAN:  It's 2.4Q.

1          THE COURT:  Q?

2          MR. LIMAN:  Q.  Let me wait a second.  2.4 starts

3     on Page 42.  And it talks about "None of the buyer, any

4     affiliate of the buyer or any assignee shall assume, be

5     deemed to assume, or be obligated to assume any of the

6     following." And then it lists a number of excluded

7     liabilities.

8          And then if you read all the way down to Q, you

9     get to "Accounts payable incurred in the ordinary course of

10    business existing on the closing date." I'm going to get to

11    the exceptions in a moment, but I do want to pause on that

12    language.  Because what that language reflects is that as a

13    general matter, accounts payable in the ordinary course

14    would be on the Debtors' accounts and would not be assumed

15    by us.

16         Now, there is an exception to that.  The clause

17    starts off with the words "other than".  And in common

18    English language, I would hazard to tell Your Honor that the

19    "other than" connotes a subset of what is the excluded

20    liability.  And it refers to there the subset of 2.3G and a

21    subset 2.3K that includes severance reimbursement

22    obligations, assumed 503B9 liabilities, and other payables

23    and payment obligations with respect to the ordered

24    inventory.

25         There are two separate points I want to make with

Page 242

1    respect to this clause and two separate reasons why we think

2    this favors us, and at a minimum, creates ambiguity.  The

3    first reason is that -- has to do with what the Debtors'

4    interpretation is of other payables.  Their interpretation

5    has to be that other payables mean accounts payable incurred

6    in the ordinary course.  How do you know that?  You know

7    that through 2.3K.  If you go back to 2.3K, and 2.3K says

8    that we're not required to make any payments with respect to

9    other payables until the later of the closing date or the

10   date the obligation -- obligations thereunder become due in

11   the ordinary course.  And that's what they've stuck us with.

12   That's been their position, that we're stuck with other

13   payables in the ordinary course of business.

14            You would have to read this clause to say

15   something like -- other than the -- you'd have to read it to

16   say that buyers are obligated to assume accounts payable

17   only up to 166 million, or other payables up to 166 million.

18   But, Your Honor, if you want to read the contract as a...

19   Let me pause there for a second.  Because that is the only

20   limitation --

21            THE COURT:  Can I interrupt you?

22            MR. LIMAN:  Yes.

23            THE COURT:  The Debtor argues I think with some

24   cogency that 166 million of other payables are assumed by

25   the buyer.  And so they're not included in the general

Page 243

1   provision of invoiced accounts payable in the ordinary

2   course.  That's why there's a dollar limitation on other

3   payables.  They are -- they are, in fact, ordinary course

4   payables but there's a cap.

5           MR. LIMAN:  Yeah, that's their interpretation.

6           THE COURT:  Well, why doesn't that make perfect

7   sense?

8           MR. LIMAN:  And if that was what the parties were

9   trying to do with respect to accounts payable, they would

10  have done exactly what they did with respect to the assumed

11  real estate taxes, tax liability.  What they did with

12  respect to the assumed real estate tax liability is they

13  said we're only assuming the real estate tax liability up to

14  135 million.  It was not listed as an excluded liability.  I

15  grant you that that's the Debtors' interpretation, but what

16  I'm saying is that the Debtors' interpretation --

17          THE COURT:  But -- but 2.3K, that's what it

18  actually does.  And then has the -- 5 says, "Buyer's

19  obligations with respect to the payables shall not exceed

20  166 million."

21          MR. LIMAN:  Your Honor, if you were -- if this

22  contract was just 2.4Q, because I think you do -- I mean,

23  our argument is that these are excluded liabilities under

24  2.4Q.  They argue they're included under 2.3K.  We argue

25  that they are excluded under the plain language of 2.4Q.

Page 244

1    And what the 2.4Q says is that they are -- and what it

2    defines...  So, the point number one is to give meaning to

3    both of these provisions.  To give meaning to both of these

4    provisions and avoid them from being surplusage.  The only

5    way to read them is to say that the other payables are

6    modified by ordered inventory.

7            And I'm not making that up, Your Honor.  That's

8    not coming from Lewis Liman, that's coming from the Debtors.

9    That's coming from the Debtors when they say in their papers

10   -- we ask the question, what does 2.4Q do?  And they say,

11   2.4Q is there for avoidance of doubt.  That's their

12   argument.  The second point, Your Honor --

13           THE COURT:  Well, it avoids the doubt that there's

14   any obligation in respect of accounts payable in excess of

15   166 million, that the buyer's liable for.

16           MR. LIMAN:  It absolutely does that but it does

17   something more, and it has to do something more under the

18   rules of contract interpretation that we're bound by,

19   they're bound by, frankly, Your Honor is bound by -- which

20   is to give meaning to every word.  And to avoid

21   interpretations that are for avoidance of doubt,

22   particularly --

23           THE COURT:  Well, let's just do this.  So, 2.3K is

24   the provision that says what are assumed liabilities, right?

25           MR. LIMAN:  Correct.

1          THE COURT:  All right, so those are the

2    liabilities that the buyer is assuming.  That's one

3    function.  2.3K, buyer assumes these liabilities.  It

4    doesn't say buyer doesn't assume any other liability.  It

5    doesn't say these are -- everything else is excluded.

6    That's in 2.4.  So, they each serve their own function.  One

7    is assume, one is exclude.

8          MR. LIMAN:  But, Your Honor, what I'm trying to do

9    is --

10          THE COURT:  I think we're going to move off of

11   this point.  It's not working.  I mean, you may be able to

12   convince someone else of it, but I doubt it.  You're not

13   convincing me on this one.  We should move on.

14          MR. LIMAN:  Let me move on to the other points.

15   But I think what we're trying to do is answer the question

16   whether other payables in all payment obligations is a

17   single thing --

18          THE COURT:  I agree.  And I think the last ten

19   minutes helped convince me that they're not.

20          MR. LIMAN:  Well, the one thing I would say with

21   respect to 2.4Q is that they put meaning on the use of the -

22   - the absence of the word "and" in 2.3K.  That word "and" is

23   in 2.4Q.  Let me move on.

24          THE COURT:  And?

25          MR. LIMAN:  And.  When you use "and" it usually

 1    separates out two different things.  Page 44.

 2            THE COURT:  Okay.  And so it does separate out

 3    other payables and payment obligations with respect to the

 4    ordered inventory in 2.4Q.  And in -- so, where...

 5            MR. LIMAN:  2.3K, that word "and" is not there.

 6    Now, when we were last in front of Your Honor on this --

 7            THE COURT:  But -- I'm sorry, 2.3K.  "Other

 8    payables and all payment obligations with respect to

 9    (indiscernible) inventories."  It is there.

10            MR. LIMAN:  The point that I'm trying to make,

11    Your Honor --

12            THE COURT:  You mean the "and" in front of "other

13    payables", is that what's missing?  In front of "other

14    payables"?

15            MR. LIMAN:  That's what their argument was the

16    last time around.  And that the absence of the "and"

17    connotes that it is -- that the presence of the "and"

18    between "other payables" and "payment obligations" is

19    meaningful.

20            THE COURT:  Well...  It doesn't really change the

21    meaning in either sense, to me.

22            MR. LIMAN:  Let me go through the other reasons,

23    Your Honor, why we think that there's ambiguity with respect

24    to this contract.  Your Honor, the context of this is that

25    in terms of the reasonable expectations of the parties, the

Page 247

1  language that Your Honor is interpreting was understood by

2  both parties.  This is undisputed to mean that payables were

3  only with respect to ordered inventory.  That's --

4          THE COURT:  Only with respect to what?

5          MR. LIMAN:  Only with respect to ordered

6  inventory.  That's from their board minutes and that's from

7  a January 9th --

8          THE COURT:  But this is their (indiscernible)

9  evidence we're talking about now?  Okay.

10         MR. LIMAN:  Correct.  The question is whether --

11  whether you can -- you can blind your eyes to that.  I want

12  to turn your attention now to 2.4(k)(vi).  I'm sorry,

13  2.3(k)(vi).  2.3(k)(vi) refers to the liabilities described

14  in this Clause K.  And I think we've already established, I

15  hope, that a payment obligation with respect to ordered

16  inventory is a Liability, capital L, under the APA.  I don't

17  think anybody should dispute that.

18         THE COURT:  I'm sorry.  Is a liability?

19         MR. LIMAN:  Is a liability.  I don't think anybody

20  should dispute that.  I think that's just a fact.  Now, in

21  order to read 2.3(k)(vi) the way that the Debtors would have

22  you read it, it would have to say something like buyer's

23  obligations to assume some of the liabilities, or certain of

24  the liabilities, or the liabilities described below.  But it

25  doesn't do that.  Mr. Friedmann makes fun of me for using --

Page 248

1    talking about the definitive article, but, you know, Your

2    Honor, I'm just a lawyer.  I use the rules that the courts

3    tell me to use.  And one of the rules the courts tell me to

4    use is when a word "the liabilities described in this Clause

5    K" is used -- it's intended to encompass all of the

6    liabilities described in this Clause K.

7            And that's important because -- because the

8    liabilities that are then described as the ones that -- that

9    are reduced refer to severance reimbursement obligations

10   assumed 503(b)(9) claims and in other payables.  Meaning,

11   Your Honor, that other payables has to be something that

12   encompassed that whole clause.  It is a single thing.

13   There's no other way to give meaning to the parties using

14   the word "the liabilities described in this Clause K."

15            THE COURT:  What whole...?  What whole clause?

16   I'm sorry.  I didn't -- what whole clause?

17            MR. LIMAN:  The whole clause, "other payables and

18   all payment obligations." The question that we're addressing

19   is whether other payables and all payment obligations is a

20   single unit or two separate units.  If you read them as a

21   single unit, you can make sense of the language of

22   2.3(k)(vi).  If you don't read them as a single unit, it's

23   difficult to make sense of that language.

24            THE COURT:  Why?

25            MR. LIMAN:  Because then it would not read "the

Page 249

1    liabilities described in this Clause K." It would say the

2    liabilities below, it would say certain of the liabilities,

3    but it would not use a definitive article "the liabilities

4    described in this Clause K." That's what the laws of the,

5    you know, contract tell us.

6            THE COURT:  I still don't get it.  I mean, there's

7    a specific waterfall that you follow as far as what you're

8    crediting against, as far as the assumption of liabilities.

9            MR. LIMAN:  But one of the things that's not in

10   that waterfall is payment obligations with respected to

11   ordered inventory.  That's the point.

12           THE COURT:  Right.  Again, to me, that proves the

13   Debtors' case, not your case.  Because, again, the other

14   payables is capped, it's a capped number.  So that's the

15   thing you cut back on first.

16           MR. LIMAN:  But --

17           THE COURT:  I mean, not for a second.  Actually,

18   the first thing you'd cut back on is the assumed 503B9

19   claims, which is another capped number.

20           MR. LIMAN:  But this doesn't have payment

21   obligations with respect to the ordered inventory capped --

22           THE COURT:  I know.

23           MR. LIMAN:  And that's --

24           THE COURT:  So, I mean, the parties know the

25   difference.

Page 250

1          MR. LIMAN:  But no, Your Honor, that is one

2    inference you can draw.

3          THE COURT:  Right.

4          MR. LIMAN:  That is undoubtedly one inference you

5    can draw.  The question for Your Honor is whether the

6    opposite inference, which is that when the word "the

7    liabilities" described in Clause K is used, and then it's

8    followed by a series of liabilities, those liabilities that

9    it's followed by are intending to encompass the entirety of

10   the liabilities described in Clause K.

11         Debtors' argument is, no, it only encompasses

12   certain of the liabilities described in Clause K.  Our

13   argument, based on plain English, is that it has to, as a

14   matter of plain English --

15         THE COURT:  I'm sorry.  Let me -- let me just see

16   where you and I disagree with this.  There's a certain set

17   of obligations that the buyer has under Clause K, or certain

18   obligations under Clause K that the buyer has agreed to

19   assume, right?  So far we're on the same page.

20         MR. LIMAN:  That's correct.  Correct.

21         THE COURT:  All right.  So, if the DIP -- if the

22   aggregate DIP shortfall is a positive number, then that

23   group of liabilities that the buyer has agreed to assume in

24   all of Clause K shall be reduced dollar for dollar by the

25   aggregate DIP shortfall in the following order.

Page 251

1           First, the severance reimbursement obligations,

2    which is a capped number, right?

3           MR. LIMAN:  That's correct.

4           THE COURT:  I think it's -- what is it, 45

5    million?  I think.  Something like that.

6           MR. LIMAN:  It is --

7           THE COURT:  Anyway, it's a capped number.

8           MR. LIMAN:  It's a capped number, Your Honor.  It

9    was 43 million.

10           THE COURT:  All right, 43 million.  Second, the

11    other payables, which is a capped number, 166 million.

12    Then, third, the assumed 503B9 claims, another capped

13    number.  Now, are you saying that because it doesn't then

14    say and then fourth, the ordered inventory, that that means

15    that the whole phrase should be read together?  Is that what

16    you're saying?  The --

17           MR. LIMAN:  No.

18           THE COURT:  -- other payables and ordered

19    inventory?

20           MR. LIMAN:  No, what I'm saying is twofold.  First

21    of all, I don't, frankly, understand the significance of the

22    cap with respect to the three items.  The second thing that

23    I'm saying is that in order to give meaning to the language

24    of the liabilities described, the better interpretation

25    would be that one picks up all of the liabilities described

Page 252

1  in Clause K.  That's what the rules of grammar would say.

2  And that the inference that you should draw from the fact --

3  this is where we are not on the same page -- the inference

4  that you should draw from the fact that it does not list

5  payment obligations with respect to the ordered inventory.

6  We said we were not picking up the payment -- that the

7  payment obligations with respect to the ordered inventory

8  and the payables with respect to the ordered inventory were

9  the same thing.  What the parties were trying to do was to

10 cap the liability with respect to the ordered inventory and

11 trying to make it clear that whatever form those obligations

12 took -- whether they took the form of something that at the

13 time of closing is payable or payment obligation, we would

14 take it on.  Frankly, Your Honor, that makes sense to --

15          THE COURT:  Wouldn't it be a lot -- wouldn't it

16 have been a lot easier just to have said either in the

17 definition or in 5, the other payables and the payment

18 obligations with respect to the ordered inventory in the

19 aggregate, than going through all of this?

20          MR. LIMAN:  Absolutely.

21          THE COURT:  I mean --

22          MR. LIMAN:  There's no question that this

23 provision is not well written.

24          THE COURT:  Well, but it seems perfectly logical

25 to me, given the economic deal, that the buyer gets the

Page 253

1   ordered inventory, that there's no crediting there.  There's

2   no crediting because it's the buyers.  And that's why there

3   shouldn't be any crediting mechanism for that.

4           MR. LIMAN:  And in fairness, Your Honor, that's

5   not an inference you can draw without hearing --

6           THE COURT:  Well, no, but --

7           MR. LIMAN:  Listen to me for a second, Your Honor.

8           THE COURT:  Okay.

9           MR. LIMAN:  If I might.  You can't throw that

10  inference without hearing the testimony of the witnesses who

11  --

12          THE COURT:  But that's the context.  It's just a

13  logical thing.

14          MR. LIMAN:  No, it is not.  It is not the context.

15  It's not the deal that the parties struck.  It's not the

16  transaction that the parties struck.  The testimony is

17  unambiguous with respect to this.  It was not the economic

18  deal that they struck.  There is no reason to assume an

19  additional 166 million for payables.  This was a deal that

20  was carefully balanced where every obligation that we took

21  on was matched with an asset on the other side.

22          They would have this read -- that is absolutely

23  correct, Your Honor.  Every obligation we took on was

24  matched with an asset on the other side.  And they would

25  have this clause read -- they would have us take on 166

Page 254

1   million of accounts payable without any countervailing value

2   contrary to what we -- what 2.4Q limited for us -- without

3   any other value.  And in amounts -- the amount here is huge.

4          You know, if you talk about severance, severance

5   was 43 million.  The amount of 503B9 was 139 million.  Real

6   estate was 135 million.  We got value for all of those

7   items.  What they would have you believe is that all of a

8   sudden in between January 9th and January 17th, somehow we

9   agreed to just give them $166 million.  That was not the

10  case.  It blew all of our financing models.  We had to

11  finance at the last minute to make this deal work.

12         Now, you know, Your Honor might conclude that

13  that's all --

14         THE COURT:  What was the aggregate of their

15  shortfall?

16         MR. LIMAN:  The -- well, that's a matter that we

17  are now arguing over in terms of the amount of available

18  cash.  In our view it was, I think, $8.5 million in terms of

19  the aggregate.

20         THE COURT:  This provision really is about

21  peanuts.

22         MR. LIMAN:  I'm not referring to the provision of

23  what it's about.  I'm referring to it in terms of the way in

24  which you can hear the evidence that says that what's

25  happening here is they're trying to re-trade the deal and

1    stick us with something that we never agreed to, and that

2    resulted in our financing having to be blown up.

3              I'd like to turn now to 2.3K itself and 2.3 as a

4    whole.  If you look through 2.3 as a whole, which you did

5    not look through the last time because it wasn't brought to

6    your attention.  If you remember, this came up as one item

7    among many, many other items during the sale hearing.

8              If you look through that provision, each and every

9    clause refers to a separate liability.  2.3... It's ripped

10   out a page of my (indiscernible)...so, I'm sorry.  But if

11   you look at 2.3A, it's all liabilities arising out of the

12   ownership of the acquired assets.  If you look to 2.3B,

13   that's, again, a single liability.  2.3C, 2.3D, 2.3F, G,

14   etc.  You get down to 2.3K and the first thing that should

15   strike you is that 2.3K is different from all of other

16   clauses that both preceded and followed.  The way in which

17   it is different is that it groups everything together.  And

18   it groups everything together because it's -- all of those

19   things are subject to a proviso.

20             The only reason for liabilities to be included in

21   that 2.3K is if they're modified by that proviso.  If not,

22   there's no reason for them to be in 2.3K at all.  And

23   because, otherwise, Your Honor, it would be an easy thing.

24   If they were trying to get what they wanted, they would put

25   2.3 -- put it at the very end, 2.3P, all payment obligations

Page 256

1    with respect to the ordered inventory.  Not modified by any

2    proviso.

3           They put it in that clause.  They put it in that

4    clause for a reason.  The reason is that each of those items

5    was modified by at least one of those provisos.  The parol

6    evidence, if you were to look at it, would show you that as

7    originally drafted, K1 actually referred to the liabilities,

8    meaning, the liabilities that were included other payables

9    and all payment obligations.  It was redrafted.  All of the

10   provisions are in these -- severance reimbursement

11   obligations, assumed 503B9 liabilities, and then our

12   interpretation, not their interpretation -- our

13   interpretation "other payables and payment obligations with

14   respect to the ordered inventory."  They don't like it

15   because what that would mean is that with respect to each of

16   these items where other payables is referred to, it would

17   limit our liability to, in (v), 166 million.  It would give

18   us a right to reduction under the waterfall.  But that was

19   the only reason for the inclusion of that provision in 2.3K.

20   You can't explain why it would be in there unless it is all

21   with respect to a single liability.

22           There are a couple more things that I think I'd

23   like to mention.  And I think, Your Honor, what this shows

24   is that you have to look at the parol evidence, because if

25   you look at this -- at this clause, most of the provisions

1    would be -- could be -- would be written the way they were

2    under our interpretation.  Some favor us.

3           If you look at 2.3(k)(vii), (viii) and (ix), those

4    exclude -- they do not list in there other payables.  Now,

5    under their interpretation other payables should function

6    the same as severance reimbursement and assumed 503(b)(9)

7    liabilities...  That, I think, actually, was the point Your

8    Honor made.  That all of those items were capped.  In fact,

9    they're all lower numbers than the other payables.

10           It does not mention other payables.  And that's --

11    and there's no reason for that other than if other payables

12    and all payment obligations are modified by ordered

13    inventory.  Or put another way, the reason why other

14    payables is not in 2.3(k)(vii), (viii) and (ix) is because

15    there was a self-reinforcing cap with respect to the other

16    payables.  It had to do with the ordered inventory.  The

17    last two points --

18           THE COURT:  I'm sorry.  You have to explain that

19    to me.  How does that tie in to specified receivables and

20    warranty receivables shortfall?

21           MR. LIMAN:  The way it ties in, Your Honor, is

22    that the logic of the specified receivables and warranty

23    receivables is that those provisions, unlike -- the DIP

24    shortfall provision have a specific function.  The DIP

25    shortfall provision had to do with protecting against the

1    risk that they had more cash than they were representing

2    that they had.  That was the purpose of the DIP shortfall

3    provision.

4           And that's the reason why, with respect to the DIP

5    shortfall provision, there is a reference to the other

6    payables.  Because if they had more money than they said

7    that they had, then the economics on which the deal was

8    built was wrong and they would have to recut the deal.

9    Essentially, they would give us the excess above the amount

10    to pay down the DIP to the 1.2 billion.

11           The function of the specified receivables, the

12    warranty receivables shortfall amounts, and the prepaid

13    shortfall amounts was that those would compensate us if they

14    delivered less than what they said that they would deliver.

15    Let's say they delivered zero with respect to prepaid

16    inventory, if they delivered zero with respect to specified

17    receivables, under their interpretation, you would max out

18    the severance reimbursement obligation, you would max out

19    the 503B9 obligation, and we still would be stuck with 166

20    million of accounts payable.

21           There's no business logic for that decision.  If

22    the purpose of that shortfall was intended to compensate us

23    for a shortfall through the liabilities that we were

24    assuming, there's no reason why you would treat other

25    payables, accounts payable, different from severance

Page 259

1    reimbursement obligations or the assumed 503B9 liabilities.

2            Remember, their view was it's just a block of 166

3    million.  There's no logic for having that...

4            THE COURT:  Well, it's part of -- the logic is

5    it's part of the purchase price.

6            MR. LIMAN:  Well, right, but you have to -- that

7    would be their logic if we just gave them 166 million

8    excess.  But why -- but why would we -- why would the

9    parties distinguish accounts payable from assumed 503B9 live

10   bonus?  What's the logic of that?  That's not something that

11   they've ever answered.

12           THE COURT:  Because those are smaller numbers, I

13   guess.  But could I -- does ordered inventory appear

14   anywhere else in the agreement?

15           MR. LIMAN:  It does, Your Honor.  It appears in

16   2.1X with respect to what we're buying.  (indiscernible)

17   2.1X refers back to the pending inventory, which then refers

18   to the ordered inventory.

19           Now, I'm not saying, Your Honor, that this is a

20   perfectly written contract.  This is a contract that people

21   wrote, you know, over several days without sleep and there

22   are things that could have been better drafted.  But there's

23   just no evidence whatsoever that all of a sudden they

24   decided to stick us with and we agreed to take the

25   additional 166 million, which would blow these assumed 503B9

1    liabilities and severance reimbursement liabilities, real

2    estate liability out the water.

3           Now, I do want to mention -- respond to a couple

4    of their points because they said something like there is no

5    payables for ordered inventory.  And if Your Honor is going

6    to receive that evidence, I think Your Honor has to receive

7    the evidence that they told us precisely the contrary and

8    that they told Your Honor precisely the contrary.

9           And the last argument -- they make this argument

10   about there being two schedules.  And I think, frankly,

11   that's a little bit of a red herring.  There is a redundancy

12   but it's not the redundancy or the problem that's created by

13   the schedule for ordered inventory and the schedule for

14   other payable.  It's a redundancy that's created by there

15   being a schedule for other payables, which says 166 million.

16   And then 2.3K, which says that other payables is capped at

17   166 million.

18           You know, sitting here today, I don't know that --

19   I can tell you the history of how those schedules were

20   added.  I can't give you a logic to why there was a schedule

21   for other payables when there was a cap of 166 million in

22   the contract.  Parties exchange schedules sometimes when

23   they don't need to.  It's not a very satisfactory answer but

24   it's not an answer that has any bearing on the question

25   before Your Honor.

Page 261

1              THE COURT:  So you're saying they're not the same

2       thing?

3              MR. LIMAN:  I'm saying that -- I'm saying that the

4       two schedules relate to each other.  They obviously relate

5       to each other.  The reason why the other payables was capped

6       at 166 million was because their estimate as of January 9 --

7       there's an interesting tidbit with respect to January 9.

8       Their estimated January 9 was that their ordered inventory

9       would be 166 million.  The interesting little tidbit is that

10      that schedule, unlike the specified receivables schedule has

11      an "as of" date.  The "as of" date is January -- is January

12      9.  So, there's not a representation that we would be

13      getting necessarily the full 166 million -- it would be

14      about 166 million.  And there's no coincidence that those

15      two numbers bear a relationship with each other if the 166

16      million doesn't find any home other than to be in

17      relationship to the inventory that they were asking us to

18      take on -- what they said that they would be able to deliver

19      after the close.

20             THE COURT:  But what's the home for the other

21      payable schedule then?

22             MR. LIMAN:  What's the home for the other payable

23      schedule?  Your Honor, under either interpretation, under

24      their interpretation, under our interpretation, there is no

25      home for it.  Under their interpretation --

Page 262

1          THE COURT:  Well, it's in the agreement.  It must

2     mean something, right?  And that's the term used in the

3     carve out.

4          MR. LIMAN:  Well, it's used in -- there really is

5     -- it doesn't -- I don't think anything contracts

6     (indiscernible) let me tell you the reason why.  The reason

7     why is that 2.3K5 says the buyer's obligation with respect

8     to other payables shall not exceed 166 million in --

9          THE COURT:  Right.  That's not a tie-in to the

10    schedule.  I understand that.  It's just a fixed number.

11          MR. LIMAN:  It's a fixed number.

12          THE COURT:  Right.  Right.

13          MR. LIMAN:  And the other payables is in --

14          THE COURT:  But then why would have the schedule

15    in the first place?

16          MR. LIMAN:  I don't know when you have the

17    schedule with respect to the other payables.  The question

18    you might ask is why do you have a schedule with respect to

19    the ordered inventory?  Because, you know, if your other

20    payables is going to be capped at 166 and that's going to be

21    limited with respect to ordered inventory --

22          THE COURT:  Maybe it ties into the ordinary

23    course?  I don't know.  We haven't gotten to that point yet.

24          MR. LIMAN:  Yeah, I think -- I think that's what

25    it is.  I think it is what ties into the ordinary course and

Page 263

1    the parties' expectation with respect to what we're taking

2    on.  Now, there's no doubt that the deal that was struck by

3    the parties here is that we were taking on the liability for

4    accounts payable and we were getting something in return.

5            The evidence that we've proffered establishes

6    that, I think, beyond peradventure.  You would be required,

7    Your Honor, to ignore that if you find that the language is

8    clear and unambiguous.  We don't disagree with that.  What

9    we do disagree with is that given the number of different

10   provisions here that are in tension with the buyer's

11   interpretation -- that Your Honor should hear that evidence.

12   It may be that after Your Honor hears that evidence, Your

13   Honor comes to the conclusion that the economic deal is what

14   they say it was.  I don't think that this is an instance

15   where, frankly, Your Honor fairly can decide this issue,

16   where you should decide this issue, without giving my client

17   an opportunity to be heard with respect to the deal that

18   they say they struck.  They can reject it, they can be

19   cross-examined.  I really think -- I really, really think

20   you should hear it.  We have the witnesses ready.

21           MR. SCHROCK:  Your Honor, Ray Schrock for the

22   Debtors.  Just really quick.  You know, we -- we didn't put

23   in parol evidence.  And I've heard a lot of parol evidence

24   in on the course of counsel's argument.  This particular

25   point, it was a deal point in the course of the

Page 264

1    negotiations.  I know Mr. Liman wasn't there.  I happened to

2    be there.

3            THE COURT:  No, I don't want to hear any of this.

4            MR. SCHROCK:  Okay.  I will -- Your Honor, with

5    all due respect, I just have to tell the Court that this --

6    assuming these liabilities, this was one thing that we were

7    very focused on, being very clear in the agreement.  I think

8    Mr. Liman has already admitted that, listen, the schedule

9    doesn't even have a home.  You write it right out of the

10   agreement, if you accept their interpretation of the

11   agreement.  Other payables means 166.  It's part of the

12   purchase price.  We think there is no parol evidence that's

13   necessary.

14           THE COURT:  I really -- I think we're going over

15   all ground.

16           MR. SCHROCK:  Okay.

17           THE COURT:  I'm going to rule on this discrete

18   issue now.  I appreciate that there are setoff issues as

19   well as ordinary course issues that haven't yet been

20   addressed, but I think this is a discrete issue.  The

21   parties agree, as they must because it's consistent with the

22   law governing this agreement, which is obviously between

23   sophisticated parties, that if the agreement is clear on its

24   face and unambiguous and that doesn't include ambiguity

25   simply asserted by the parties but objectively clear on its

Page 265

1   face, then I should not delve into any extraneous or parol

2   evidence.

3           I think that's especially important in the context

4   of this particular transaction, which is, after all, a

5   bankruptcy sale noticed to thousands of parties and subject

6   to review by thousands of parties who have the right to

7   object.  And which, in fact, did receive objections from

8   various parties based on their review of the agreement in

9   its plain terms.

10          In addition, the agreement followed an extensive

11  process of negotiations, drafts, redrafts, rejections,

12  modifications, and ultimate acceptance.  And that accepted

13  version was the one that was put before the Court on notice

14  to all the parties in interest.  So, it seems to me that the

15  agreement's plain terms need to be followed, as I've been

16  following them throughout the day with regard to all of

17  these issues, even if one could make at least a callable

18  argument that what the parties really intended was something

19  that the agreement doesn't actually say.

20          Here the issue pertains to whether, under Section

21  2.3K of the asset purchase agreement, the buyer Transform

22  assumed not only liabilities for Other Payables, a defined

23  term, capitalized term, Other Payables, but also all payment

24  obligations with respect to Ordered Inventory, another

25  defined term or a separate defined term.

Page 266

1          It appears clear to me from the relevant language

2     of the agreement, first and foremost, Section K, which

3     includes not only the introduction to Section K but also

4     Sections K1 through O or, I'm sorry, 1 through X or ten,

5     little Roman x, but also Section 2.4A and 2.4Q.  And, of

6     course, the definitions themselves of the two terms, which

7     the Debtors state really are two separate terms, two

8     separate concepts -- and Transform says are really one

9     concept.  And those definitions are found in Section 1.1 at

10    Page 24.

11          This is relevant for two reasons.  One is that

12    Section 2.3K Roman V caps buyer's obligations with respect

13    to Other Payables, without saying anything about Ordered

14    Inventory, at 166 million.  And then the crediting section

15    that follows it, 2.3K6, also provides for credit in the

16    event of an aggregate DIP shortfall as against the

17    obligation of assumed other payables, but does not refer to

18    payment obligations with respect to ordered inventory that,

19    according to the Debtors, are assumed under the agreement.

20          I conclude that the parties intended, by the

21    language that they agreed to, that these terms were two

22    separate and distinct terms, that each was assumed, i.e.,

23    Other Payables was assumed in the amount capped at 166

24    million, and Ordered Inventory payment obligations was

25    assumed in an uncapped amount.  There's no other reason to

Page 267

1    have the two definitions used in these provisions the way

2    they are actually used, which I believe is carefully.  And

3    that's the clear and obvious reading.

4          The buyer argues that 2.4Q would really be

5    surplusage under those circumstances.  As I said during oral

6    argument, it appears to me to be exactly to the contrary.

7    That, in fact, the carve out from 2.4Q for liabilities

8    assumed with respect to Other Payables and the payment

9    obligations with respect to Ordered Inventory is there for a

10   reason.  And the reference then to Other Accounts Payable

11   being not assumed liabilities, clearly refers to accounts

12   payable in excess of $166 million, which clearly means that

13   that section is not surplusage since that's the only section

14   that specifies that that is not -- that that is an excluded

15   liability.  Whereas 2.3K refers to an assumed liability and

16   doesn't say about any other liability being excluded.

17          I will also note that 2.4A provides that "Excluded

18   liabilities shall include all liabilities of the seller

19   other than other payables, comma, the assumed 503B9 claims,

20   comma, severance reimbursement obligations, comma, and

21   ordered inventory" -- again, separating the terms clearly

22   and unambiguously as separate -- separate obligations that

23   are being assumed by the buyer.

24          I don't believe there's any other logical

25   interpretation of the agreement just based on the wording of

Page 268

1   the agreement.  It would be remarkably easy to draft the

2   language as Transform would have it be interpreted, and I

3   believe it's perfectly appropriate to assume that if this

4   point was as important to the buyer as it has contended, it

5   would have insisted on such drafting.  Mainly, either using

6   one defined term -- and that's especially the case since

7   Ordered Inventory is used separately in the agreement

8   apparently only once and not in a meaningful way that would

9   require it to be separately defined for purposes of this

10  provision in 2.1x.

11          But, more importantly, it would be absolutely a

12  cinch to draft this phrase in one way or another to say that

13  "Other Payables and all payment obligations with respect to

14  Ordered Inventory in the aggregate not to exceed 166

15  million," with respect to both terms together.  Because

16  that's not done and because the terms are used separately,

17  where accounts and logically one or the other is used

18  without derogating from that logic, it's clear to me that

19  the parties' agreement provides what it say -- that the

20  buyer assumes liability for Ordered Inventory payment

21  obligations, all of them, and Other Payables separately, not

22  to exceed $166 million.

23          Again, 2.1K could have been remarkably easily

24  drafted to say, "Buyer's obligations with respect to Other

25  Payables and Ordered Inventory in the aggregate shall not

1    exceed 166 million." The parties certainly know how to say

2    in the aggregate since they put it at the end of that

3    clause, but they don't add the term "All payment obligations

4    with respect to the Ordered Inventory."

5              I think these rulings to the extent that the

6    canons of interpretation are particularly meaningful comply

7    or are consistent with the last antecedent rule both in

8    respect of 2.3K's introductory clause as well as 2.3A.  But

9    again, canons of interpretation are like, as the professor

10   said, picking out your friends at a cocktail party to talk

11   to.  The main point is the plain language of the contract.

12   And I just can't ignore the separate definitions, the

13   separate use of the terms, and the fact that that's the

14   obvious reading.  So, I will grant the Debtors' motion on

15   that -- on that aspect of the disputed issues.

16             That leaves the calculation of the aggregate DIP

17   shortfall, which hinges on available cash, and that aspect

18   of the definition as well as the ordinary course reference.

19             MR. LIMAN:  Your Honor, with respect to the

20   ordinary course, and given the lateness of the hour, maybe

21   we can take that off Your Honor's plate.  We have a footnote

22   in our brief that indicates that work is still ongoing.

23   We've had discussions with the Debtors about it.  And my

24   suggestion is that we treat that the same as we're treating

25   the reconciliation and --

1          THE COURT:  Okay.  But is it fair to say that, you

2     know, basically non-payment over a week isn't that in the

3     ordinary course?  You have to do something on top of that to

4     make it out of the ordinary course?

5          MR. LIMAN:  I think it's fair to say that -- yeah,

6     it has to be something on top of that, something different

7     from that.

8          THE COURT:  All right.  And again, there's the

9     communication part.  So basically, what you're looking at

10    now is whether there's something the Debtors did secretly or

11    not in consultation with Transform, and outside of the

12    general six-day, one-week issue?

13         MR. LIMAN:  And I think we have the parameters of

14    that, and we can have conversations and --

15         THE COURT:  All right.

16         MR. LIMAN:  -- hopefully, avoid the need --

17         THE COURT:  Well, look, I --

18         MR. LIMAN:  -- to bring it to Your Honor.

19         THE COURT:  It is 6:20.  I don't have any more

20    facts than just that, what we just agreed upon.  So, I'm not

21    sure there's anything more for me to agree to here.  I don't

22    know when you're going to conclude.  I don't even know if

23    the Debtors thought you were doing more analysis on that

24    point.

25         MR. FRIEDMANN:  I don't think it's appropriate,

Page 271

1    Your Honor.  We closed discovery back on June 21st on these

2    issues.  We got all the expert reports afterwards.  We've

3    already been a little behind the ball on stuff, and at this

4    point --

5                THE COURT:  It seems to me that this isn't a

6    discovery issue.  This is an issue that if Transform finds

7    out something -- and look, all of the Debtors' employees are

8    working with Transform basically now --

9                MR. FRIEDMANN:  Right.

10               THE COURT:  -- and then it'll come up before we

11   finish with this.  But it doesn't seem to me at this point

12   to be a basis for a setoff.  There's no facts that you say

13   are a basis for a setoff on this point.

14               MR. FRIEDMANN:  I think that that's right --

15               THE COURT:  All right

16               MR. FRIEDMANN:  -- and I think that this would be

17   (indiscernible) --

18               THE COURT:  So, this would be a -- so, you'd make

19   a payment, and then you'd have a claim.

20               MR. LIMAN:  I think that's right.

21               THE COURT:  Okay.  And that's the relief you are

22   seeking, so --

23               MR. LIMAN:  And, you know, it's -- we've all been

24   working on a lot of things.

25               THE COURT:  Okay.

Page 272

```
 1                    MR. LIMAN:  We've been working on it a lot to

 2       satisfy them.

 3                    THE COURT:  All right.  So, then we have the

 4       available cash issue.

 5                    MR. FRIEDMANN:  Right.

 6                    THE COURT:  Which is not a defined term in the

 7       agreement, right?  I mean, most of the time when I'd see

 8       available cash, it's a defined term.

 9                    MR. FRIEDMANN:  That's correct.

10                    THE COURT:  Okay.  So, it's a lower-case term

11       that's used in a definition.

12                    MR. FRIEDMANN:  And Your Honor, where this is

13       relevant is that the buyer argues that now it's obligated to

14       assume the $166 million of other payables, that it should be

15       reduced by the available cash held by the Debtors at

16       closing.  I believe Mr. Liman said before, they suggested

17       that was $8.5 million.  I think your reaction to it, it

18       could be peanuts.  It's actually very peanut shells.  It's

19       really -- the DIP shortfall is really $243,249, because at

20       closing, the amount of available cash was zero.

21                    The testimony of Mr. Riecker, the CFO at the time,

22       was that every dollar available was used to pay down the

23       DIP.  What ended up happening is when every dollar went to

24       pay down the DIP, we actually overpaid down the DIP by

25       $243,249.  That creates an aggregate DIP shortfall as well.
```

1    And it's a bizarre term, but that is in fact the way the

2    agreement works.

3              THE COURT:  So, that doesn't mean he bounced a

4    check.  That means that --

5              MR. FRIEDMANN:  No.  We paid more than we had to.

6              THE COURT:  All right.

7              MR. FRIEDMANN:  What happened was we -- the way it

8    worked, every night we swept all of our cash to pay off the

9    DIP.  That happened one last time --

10             THE COURT:  You paid too much.  You overpaid the

11   DIP?

12             MR. FRIEDMANN:  We overpaid by $243,249.

13             THE COURT:  All right.

14             MR. FRIEDMANN:  That actually inures to the

15   benefit to the benefit of Transform.  So, there is in fact a

16   DIP shortfall, but it's approximately $243,000.

17             THE COURT:  I'm sorry, what --

18             MR. FRIEDMANN:  The testimony of Mr. Riecker is

19   also clear that the available --

20             THE COURT:  Why is that?  I know it's late, but

21   why is that?  If you -- I thought the aggregate DIP

22   shortfall is the part where the DIP wasn't paid.

23             MR. FRIEDMANN:  The idea was that we had available

24   cash to us, and therefore, they didn't need to take on as

25   much of the obligation, so much of the liabilities.

1          THE COURT:  But did they take it on if it was

2     already paid?

3          MR. FRIEDMANN:  The --

4          THE COURT:  If you all paid it, why would they

5     have taken it on in that amount?

6          MR. FRIEDMANN:  What happens is --

7          THE COURT:  Or if you prepaid it or overpaid it?

8          MR. FRIEDMANN:  By overpaying -- we had to -- the

9     way that it was set up under -- was it 10.9? -- is we had to

10    get some very specific targets.

11         THE COURT:  Okay.

12         MR. FRIEDMANN:  If I remember it was 1.657.  Part

13    of that was we had to hit the DIP exactly.  It was a

14    challenge, I can tell you, to say the least, for my friends

15    at M-III, where they were trying to get all the receivables

16    at the right amounts and get the DIP shortfall at the right

17    amount.  And they pulled it off.  Kudos to them.  10.10 is

18    where this comes in.

19         THE COURT:  All right.  Because the aggregate

20    shortfall DIP amount definition just says a $1.2 billion,

21    less the aggregate amount that's required to be paid, net of

22    any available cash, to fully satisfy the existing

23    indebtedness of sellers under both the DIP credit agreement

24    and the junior DIP.  It doesn't refer to 10.10, Section 10,

25    or anything like that.

Page 275

1           MR. FRIEDMANN:  I'm sorry, are you looking -- is

2    that the (indiscernible) shortfall --

3           THE COURT:  Right.

4           MR. FRIEDMANN:  -- which is (indiscernible) not

5    equal to $1.2 billion dollars less the aggregate amounts

6    required to be paid to fully satisfy the existing

7    indebtedness of sellers under both 1, the DIP credit

8    agreement, and 2, DIP term loan agreement.  I think you have

9    to cross-reference to 10.10, if I remember correctly.

10          THE COURT:  Well, where is that?  It's not in the

11   definition.  I don't think it's in 2.3(k)(IX).

12          MR. FRIEDMANN:  It refers to the...  Sorry, I

13   don't know these highlights.  I have to keep finding them

14   again.  Oh, it's --- in 110, it's got outstanding DIP

15   indebtedness.  They got rid of amount required to be paid to

16   fully satisfy existing indebtedness of sellers.  Under (a),

17   the DIP credit agreement shall be no greater than $803,000,

18   and (b), the junior term loan agreement.  Actually, $850

19   million -- thank you -- and (b), the DIP term loan agreement

20   be no greater than $350 million, exclusive of any accrued

21   and unpaid interest thereon.  So, take it to the $1.2

22   million.

23          We were not allowed -- we were penalized for ever

24   paying that.  We were not to pay more than that.  And we, in

25   fact -- not intentionally -- but as it turned out, paid

1    more.

2              THE COURT:  I'm sorry, but this says the agreement

3    shall be no greater than.

4              MR. FRIEDMANN:  Right, so we --

5              THE COURT:  Required to be -- but you didn't --

6    this wasn't required.  This means that you can't let the DIP

7    get above $1.2 billion.  I don't see why you don't get the

8    money back that you overpaid.  Anyway, it's not what the

9    parties agreed.  But I'm just laying that out for you.  I

10   don't...  I can understand why they don't want the DIP to be

11   more than $1.2 billion.

12             MR. FRIEDMANN:  Right.

13             THE COURT:  But that's what it was.  It just so

14   happened that you paid than $1.2 billion.  But that's not to

15   anyone's detriment under these documents, other than the

16   Debtors.

17             MR. FRIEDMANN:  Being reminded, I think the idea

18   was that we were estimating how much money we would need,

19   and they wanted to ensure we wouldn't overestimate how much

20   we needed.  And this was a way of --

21             THE COURT:  Well, did you pay more than $1.2

22   billion, or did you pay less than $1.2 billion?  Anyway, I

23   just -- I would urge the parties to look at those sections--

24             MR. FRIEDMANN:  Right.

25             THE COURT:  -- and see whether in fact you have

1    run afoul of anything by overpaying.

2            MR. FRIEDMANN:  If it turns out that the $243,000

3    comes back to us, that would be great for the Debtors and

4    the estate.

5            THE COURT:  But the issue at hand is --

6            MR. FRIEDMANN:  The issue at hand is what we had

7    left after we overpaid it.

8            THE COURT:  Right.

9            MR. FRIEDMANN:  But the fact that we overpaid it

10    should clue everybody in on the fact that --

11            THE COURT:  You weren't supposed to have any

12    available cash left.

13            MR. FRIEDMANN:  Right.  And we didn't.  And

14    available cash, though it's not defined in the agreement, it

15    is a term that was used at the company, and we went to the

16    best source for that, which was again, the CFO, Rob Riecker,

17    who did explain that the company maintained available cash

18    balances and unavailable cash balances separately.

19            The buyers suggest that unavailable -- first I

20    think they argue in their first brief that they're basically

21    the same cashes, available cash is the same.  That's clearly

22    not the case.  Available, as we've heard Mr. Liman argue

23    time and time again today, every word has to have some

24    meaning.  So, available has to have some meaning.  It can't

25    be the same as just cash.

Page 278

1          Likewise, their argument in their supplemental

2    brief was that unavailable cash restricted cash, but that's

3    inconsistent with Mr. Riecker's testimony.  It's also

4    inconsistent with what Joint Exhibit 97 states, and that's

5    the email between Rajat Prakash and the accounting team at

6    Sears and Mr. Kamlani, where Mr. Prakash is explaining that

7    things that are unavailable cash of the company are things

8    such as cash in regional banks, or cash in stores.

9          THE COURT:  Why would cash in regional banks not

10   be available?  I understand the general concept of

11   restricted cash, that you can't use it for some reason --

12         MR. FRIEDMANN:  Because you don't have --

13         THE COURT:  -- because you're restricted from

14   using it.  But --

15         MR. FRIEDMANN:  At 12 --

16         THE COURT:  -- can't you use it if it's in your

17   bank account?

18         MR. FRIEDMANN:  That's the point.  At 12:01 AM on

19   February 11th, the time where you have to look at what the

20   available cash was, our operating account had nothing in it.

21   Everything that was in there had been swept to pay off the

22   DIP --

23         THE COURT:  But is the --

24         MR. FRIEDMANN:  -- $243,000 more than it had be.

25         THE COURT:  But is the operating account the only

1   source for cash that can be used at that time?

2          MR. FRIEDMANN:  That's how the company considers

3   it.  So, everything else is the money that's in regional

4   storage -- it's cash in transit.  It's not yet brought into

5   the general operating account.

6          THE COURT:  Okay.  That's one category.  I don't

7   understand why you can't also use general cash in a separate

8   bank account, unless it's a special account for payroll

9   purposes or something like that.

10          MR. FRIEDMANN:  Theoretically, I guess they could.

11   The point is here that we had an operating account during

12   the course of the -- during the course of us running the

13   company as a Debtor in possession.  And that operating

14   account, at the time it was closed, was empty.

15          THE COURT:  I know.  But --

16          MR. FRIEDMANN:  There was nothing -- we couldn't -

17   - if we wanted to pay the DIP off more than we did, we

18   couldn't have.  It was empty at that point.  If we wanted to

19   --

20          THE COURT:  Why couldn't you have -- where are the

21   regional -- the regional banks?  I don't know, it's Wells

22   Fargo in Ashtabula.  You could have called them up and say,

23   send this money to the DIP.

24          MR. FRIEDMANN:  Correct.  The point is, though,

25   the company considered those types of funds --

Page 280

1          THE COURT:  All right.

2          MR. FRIEDMANN:  -- unavailable to us.

3          THE COURT:  But in terms of actual availability,

4    it could've been done.

5          MR. FRIEDMANN:  It could have.  It would've taken

6    time --

7          THE COURT:  Yeah, but it --

8          MR. FRIEDMANN:  -- to get the money over there.

9          THE COURT:  Well, I understand.

10         MR. FRIEDMANN:  But again, that money would've

11   then not been available.  The question is, that morning,

12   what else was available?

13         THE COURT:  Well, why do we know that you couldn't

14   have sent a wire instruction to Wells Fargo in Ashtabula to

15   send whatever's in that account to the DIP agent?

16         MR. FRIEDMANN:  My understanding is at that point,

17   we were collecting every penny we could find everywhere in

18   the company to try to pay down this DIP.  So, there was a --

19   in fact, it was being reported to the UCC and to eventually

20   the buyer, showing all the efforts we were having to try to

21   collect this money.  So, whatever -- because we were trying

22   to collect money in Israel.  We were trying to get

23   everything.

24         THE COURT:  Just let me back up.  There's cash in

25   transit, there's cash in company bank accounts.  Is there

1    any other cash that people are disputing that could have

2    been arguably termed available cash on the closing date?

3              MR. FRIEDMANN:  Not that they've referenced.  I

4    can tell you that the company considers to be unavailable

5    cash any cash that was in escrow, any credit card

6    receivables --

7              THE COURT:  Right.

8              MR. FRIEDMANN:  -- cash posted as collateral, you

9    know.

10             THE COURT:  Yeah.  I mean, that's -- yeah.

11             MR. FRIEDMANN:  So, those are --

12             THE COURT:  Those are typical restricted cash

13   exceptions to available cash.

14             MR. FRIEDMANN:  Correct.  And then the regional

15   banks and the cash in stores.

16             THE COURT:  All right.  And the cash in stores,

17   why isn't that tappable on the closing date?

18             MR. FRIEDMANN:  It is tappable if you can get it

19   and bring it to your account.

20             THE COURT:  Well, but I'm assuming it -- you were

21   saying it can't be?

22             MR. FRIEDMANN:  Right.  Well, you can't take every

23   dollar out of the store, right?  There's some amount that

24   has to stay there because if someone comes and pays with a

25   $100 bill, you know, change.

Page 282

1              THE COURT:  I understand that.

2              MR. FRIEDMANN:  So, there's some money there.

3              THE COURT:  Right.

4              MR. FRIEDMANN:  So, the idea was pull in as much

5     as you could --

6              THE COURT:  Okay.

7              MR. FRIEDMANN:  -- while still allowing the

8     company to operate in the ordinary course.  It was another

9     obligation we had.

10              THE COURT:  Okay.  Right.

11              MR. FRIEDMANN:  And that was what was going on, is

12     that --

13              THE COURT:  Are there similar requirements for the

14     bank accounts?  Or did you -- just haven't looked at that

15     yet?

16              THE COURT:  Similar requirements for...?  I'm

17     sorry.

18              THE COURT:  Well, I don't know if you have a need

19     to keep bank accounts open in regional banks to run the

20     stores, and then if there's a minimal balance?  You know,

21     things like that.

22              MR. FRIEDMANN:  My understanding is that they do,

23     and that was a lot of the whole cash management system that

24     we handed over to Transform at the close.

25              THE COURT:  Okay.

Page 283

1          MR. FRIEDMANN:  Which gets us into our other

2     issue.

3          THE COURT:  Okay.  Were there any cash equivalents

4     that were available at that time?  I guess not.  You can't

5     really pay down a DIP with a cash equivalent.

6          MR. FRIEDMANN:  That's the thing.  It was being

7     measured as actual dollars in an account that if you go to

8     pay off something.

9          THE COURT:  Well, is there any -- was there any

10    cash equivalent?  No one's argued that there were any cash

11    equivalents.

12         MR. FRIEDMANN:  Not that I'm aware of, no.

13         THE COURT:  Okay.  Okay.

14         MR. LIMAN:  Your Honor, a few points.  First of

15    all, it just is not true that every available dollar was

16    taken to pay down the DIP.  There was, for example, $11

17    million that they got through a credit card settlement that

18    they took into a reserve account and did not use to pay the

19    DIP.

20         THE COURT:  But --

21         MR. LIMAN:  We're not -- this dispute doesn't turn

22    on that, but it's just not the case.

23         THE COURT:  But that was -- that had to be kept in

24    reserve, right?

25         MR. LIMAN:  That was put in a reserve account.

1              THE COURT:  Under those agreements?  So, that

2      would be restricted cash.

3              MR. LIMAN:  You know, I don't know the answer to

4      that.  But let me address the interpretation of available

5      cash, because I think here is one where the rules that Your

6      Honor just enunciated with respect to 2.3(k) favors us.

7              They made a loud noise about Mr. Riecker's

8      testimony.  And there's both law and testimony with respect

9      to this.  I mean, of course, contract law says that when you

10     have an undefined term and there is a consistent, unvarying

11     interpretation given by both parties to certain language,

12     that language is deemed to be interpreted.

13             We don't disagree with that proposition.  But

14     that's the standard that you have to measure their testimony

15     against.  And if you look at the testimony of Mr. Riecker,

16     what he says on Page 51, Line 23, is, "Unavailable cash is

17     not tracked by the accounting system.  The accounting system

18     does not define unavailable cash.  QUESTION:  So, where is

19     unavailable cash tracked?  ANSWER:"  -- and he's referring

20     to this (indiscernible) November email -- "Unavailable cash

21     is only tracked on this.  QUESTION:"  --

22             THE COURT:  I'm sorry -- on this?

23             MR. LIMAN:  Meaning a single email.

24             THE COURT:  Okay.

25             MR. LIMAN:  Single email.

Page 285

1          THE COURT:  All right.

2          MR. LIMAN:  And then he says -- and then he goes

3    on, based on what they think is unavailable cash at that

4    time.  So, I just don't think that their reference to Mr.

5    Riecker solves the problem for Your Honor.

6          THE COURT:  Okay.

7          MR. LIMAN:  It just doesn't solve the problem.  I

8    think one has to resort to questions about what is the

9    purpose of putting in the available cash, giving contracts

10   sensible meanings.

11          Now, this is one where if what they were trying to

12   do is to say that it was available cash to pay down the DIP,

13   or cash that was available in their operating accounts,

14   those would have been very easy words to add.  Same rules

15   that, you know, we've been applying all day.  Those would

16   have been very easy words to add.

17          That would not have been agreeable to my client

18   for an important reason.  And that takes you to the question

19   of how you interpret this and what's the purpose of this

20   provision.  I don't think that there's any dispute that the

21   purpose of this provision is to respond on the accelerated

22   basis that this deal was negotiated on to the Debtors'

23   representation that they would not have any money left after

24   paying down the DIP to $1.2 billion.  And therefore, we

25   needed to take on that amount of the liabilities.

Page 286

1                 And as I referenced in my --

2                 THE COURT:  Well, except it doesn't say that

3      either.  It says net of available cash.  And available cash

4      has a pretty well understood meaning.

5                 MR. LIMAN:  It does, Your Honor.  In every case

6      that I've been involved in, and I assume that many of the

7      cases that you've seen in this courtroom have distinguished

8      between cash that is available to pay off general

9      obligations, and cash that is restricted.  It's in locked

10     boxes, it's in segregated accounts.  It's dedicated for a

11     particular purposes.  It can't be used for general purposes.

12                Every case that I've been involved in, that's been

13     the concept of available cash versus restricted cash.

14                THE COURT:  Right.

15                MR. LIMAN:  It is the common understanding of what

16     is available cash.  It is the interpretation that makes

17     sense in this circumstance, because if it's not the

18     interpretation, then imagine what the incentives are.

19                I mean, they say that they paid every penny.  We

20     say that they didn't.  They said they paid every penny

21     because the other stuff was in transit, but --

22                THE COURT:  Well --

23                MR. LIMAN:  -- another way of putting what they're

24     saying is that their only incentive was to get as much cash

25     out of what's in transit in order to pay down the DIP, keep

Page 287

1    whatever is in the other --

2              THE COURT:  But that's not what's alleged.

3              MR. LIMAN:  It's --

4              THE COURT:  It isn't alleged that they manipulated

5    their cash.

6              MR. LIMAN:  It's not alleged, but -- and to be

7    clear, I'm not alleging bad faith on their part.  I am --

8              THE COURT:  I know.  But there is an ordinary

9    course obligation here.  It's tempered by, you know,

10   discussions with management.  But it seems to me that

11   available cash doesn't just entail an operating account, one

12   operating account.  It's cash that is available as of the

13   closing date to, you know --

14             MR. LIMAN:  But that's the question.

15             THE COURT:  -- and so that would include, I think,

16   money in bank accounts that are not special purpose

17   restricted accounts.  Not just the operating account, but

18   you know, the Wells Fargo bank in Alabama, or whatever.

19             As far as cash in the stores, I don't know if

20   you're even arguing about that.

21             MR. LIMAN:  Yeah, we are --

22             THE COURT:  I think you're arguing about cash in

23   transit, right?

24             MR. LIMAN:  We're arguing that there -- about cash

25   in transit.

Page 288

```
 1              THE COURT:  All right.

 2              MR. LIMAN:  I think most of this was cash in

 3      transit.

 4              THE COURT:  All right.  So, I don't think it's

 5      cash in the stores.  I think the only issue is cash in

 6      transit.

 7              MR. LIMAN:  And the proposition we're arguing is

 8      essentially that that would give them a windfall.

 9              THE COURT:  But how is that available?

10              MR. LIMAN:  Because every one of the obligations

11      that they would have us take on, they could use that cash

12      for.  I resort again to the common definition of available

13      cash.  It doesn't mean --

14              THE COURT:  Well, let me just take a look at --

15      the aggregate DIP shall mean as of the closing date, an

16      amount equal to $1.2 billion, less the aggregate amount

17      required to be paid, net of any available cash, to fully

18      satisfy the existing indebtedness.

19              So, I think this is as of the closing date, right?

20              MR. LIMAN:  It is as of the closing date.  And if

21      they have cash that was in restricted accounts, then that's

22      fine, but if --

23              THE COURT:  But if it's in transit, is it really

24      available to pay?

25              MR. LIMAN:  Yes, I think it is.
```

1          THE COURT:  Could they have said to the DIP agent,

2     wait until tomorrow?

3          MR. LIMAN:  I think they could have said he got

4     cash that is in transit, we'll give that to you.  I don't

5     know --

6          THE COURT:  So, you're saying that's a cash

7     equivalent?

8          MR. LIMAN:  I don't know whether the --

9          THE COURT:  I mean cash does --

10         MR. LIMAN:  I --

11         THE COURT:  Available cash includes cash

12    equivalents.

13         MR. LIMAN:  I don't know that they would be able

14    to -- it does include cash equivalents.  I don't know that

15    they would be able to say that to the DIP agent.  And

16    that's, to be clear, not my argument.

17         THE COURT:  Okay

18         MR. LIMAN:  My argument is that available cash

19    means cash that is not restricted to other purposes.  And

20    the reason why you have to give it that interpretation is

21    because of the purpose of this clause to protect against the

22    claim that they would have excess money.  And my point about

23    the manipulation was not that they actually manipulated.  I

24    don't think that they actually did manipulate, Your Honor.

25         THE COURT:  Right.

1          MR. LIMAN:  Because I think they had the same

2     understanding of this provision that we did.  That's the

3     reason why I think if you're adopting an interpretation that

4     says the parties used the notion available cash, not just

5     for this case, but frankly, for every other case, what

6     you're going to be doing is establishing a rule that gives

7     the parties an incentive to keep money in one place where it

8     wouldn't be accessible as of the closing date and not on

9     another.  And that's just not fair.

10          THE COURT:  But if it's just cash in transit,

11     they're not doing it.  They're not putting their thumb on

12     that.  That's just in transit.

13          MR. LIMAN:  But Your Honor, that's kind of not my

14     point.

15          THE COURT:  I mean, there's no incentive, in other

16     words.

17          MR. LIMAN:  That's my point.  That's my point.

18          THE COURT:  No, I'm saying they don't have an

19     incentive, because they --

20          MR. LIMAN:  Sure, they do.

21          THE COURT:  But there's --

22          MR. LIMAN:  Sure --

23          THE COURT:  They're not doing anything.  It's just

24     in transmit.

25          MR. LIMAN:  Absolutely, they would have an

Page 291

1    incentive.

2              THE COURT:  Well, where was the cash before?

3              MR. LIMAN:  The cash, I think, was in stores

4    before.  And they --

5              THE COURT:  In the stores?

6              MR. LIMAN:  Yeah.  And they absolutely would have

7    an incentive if the -- if this read cash in the operating

8    accounts, or cash that could be sent immediately to satisfy

9    the DIP, they absolutely 100 percent would have --

10             THE COURT:  No, but that's where the ordinary

11   course aspect comes in.  This isn't in terms of payables,

12   the six-day payable practice.  This is if they told their

13   stores, delay paying us until February 15th after the

14   closing, then you guys win.

15             MR. LIMAN:  Your Honor, there's a reason why the

16   ordinary course covenant doesn't do it and it didn't do it

17   in the drafting of it.

18             THE COURT:  Okay.  Why is that?

19             MR. LIMAN:  Because the ordinary course covenants

20   requires, frankly, Your Honor, just establish when you're

21   talking about ordinary course requires proof, it requires

22   people to take testimony, to take evidence and --

23             THE COURT:  Right.

24             MR. LIMAN:  -- and the like.

25             THE COURT:  So, if you have all of those people --

1              MR. LIMAN:  But, no, I mean -- but, Your Honor,

2      that's not right.

3              THE COURT:  I mean, who would have sent out that

4      message?

5              MR. LIMAN:  That's not right.

6              THE COURT:  No?

7              MR. LIMAN:  When parties draft contracts, they

8      rely on the ordinary course covenant as a default provision

9      --

10             THE COURT:  I'm sorry to interrupt you, but in

11     terms of the proof issue, that might generally be the case,

12     but wouldn't it be someone at the top that would have

13     instructed the stores to delay the payment?

14             MR. LIMAN: I don't know, Your Honor.  It could be

15     somebody at the top.  It could be somebody who thinks, gee,

16     this is a good deal.  I mean, most of my practice, Your

17     Honor, is in the white-collar area.  I don't appear on --

18             THE COURT:  I don't know --

19             MR. LIMAN:  And I have --

20             THE COURT:  -- if the cashier or the treasurer of,

21     you know, the Sears down the street in White Plains would

22     have thought about this.

23             MR. LIMAN:  Your Honor, again, that's my -- my

24     argument is not that they were permitted to act outside the

25     ordinary course.  My argument is that if you try to give

Page 293

1    this a sensible interpretation, the question is where do you

2    divide the line?  Do you divide it operating versus regional

3    accounts?  Divide it regional accounts versus cash in

4    transit?  Divide it cash in transit versus stores?  And

5    what's the neutral principle?

6            THE COURT:  I'm tilted about 50/50 on cash in

7    transmit.

8            MR. LIMAN:

9            THE COURT:  And I think that perhaps the ordinary

10   course tilted in your favor and otherwise -- I mean, it's

11   not really available for the transaction, right?  It's not

12   available to pay the banks.

13           MR. LIMAN:  It may not be available for that part

14   of the transaction, but the purpose of this provision was to

15   provide a -- it was a proxy for doing due diligence on the

16   representation of how much cash they had.

17           THE COURT:  That's fine.

18           MR. LIMAN:  And if it's to serve as a proxy, then

19   the function has to -- the dividing line is the neutral

20   principle has to be one that says is this deducted to other

21   purposes.  It can't be --

22           THE COURT:  See, I'm not so sure of that.

23           MR. LIMAN:  It can't be the speed at which it's

24   available, because otherwise, Your Honor, it would create

25   the kinds of incentives that those would be policed by the

Page 294

```
 1     ordinary course covenants.

 2               THE COURT:  Right.

 3               MR. LIMAN:  But that's cold comfort to a client in

 4     my client's position, who would in that instance have to

 5     figure out that they were acting outside of the ordinary

 6     course.

 7               THE COURT:  Normally, that's the case.  But you

 8     have the former CEO, I think you have the former CFO, you

 9     have all of -- you know?

10               MR. LIMAN:  You put your finger on it by saying,

11     normally that's the case.  And when you interpret the

12     contract, that's the (indiscernible) reply.

13               THE COURT:  I guess -- let me ask you a different

14     question, which is, is there parol evidence on this point on

15     defining net available cash?

16               MR. LIMAN:  There is.

17               THE COURT:  There is?

18               MR. LIMAN:  Yes.  We didn't offer it, but there --

19               THE COURT:  No, I understand.

20               MR. LIMAN:  There absolutely is.

21               MR. SCHROCK:  Judge, just because the hour is

22     late, I just wanted to...  There is store cash they're

23     purchasing store cash, and that's a defined term.  So --

24               THE COURT:  Well, they get that anyway.

25               MR. SCHROCK:  Right, they get that anyway.  So, at
```

Page 295

1    this point (indiscernible) who has an incentive, you know,

2    listen, they're purchasing it.  So, obviously we can't -- I

3    know we can't pay off a DIP credit facility, and I would

4    hope the parties would stipulate the cash that's in transit

5    and by definition not available on the closing date, we

6    don't have an ability to --

7              MR. LIMAN:  Your Honor --

8              MR. SCHROCK:  -- to get that cash.

9              MR. LIMAN:  -- Mr. Schrock, I think, actually has

10   just made our point, which is that if there is cash, they're

11   creating the incentive to --

12             THE COURT:  No, but if your client gets that cash

13   --

14             MR. LIMAN:  It doesn't get it if it's not -- if

15   it's between the store and the operating accounts.

16             THE COURT:  I thought --

17             MR. LIMAN:  I don't think he said that, Your Honor

18   (indiscernible) --

19             THE COURT:  I thought you said this very cash

20   would be store cash.

21             MR. SCHROCK:  The cash that's in the stores is

22   being --

23             THE COURT:  But this is in the ether, right?

24             MR. SCHROCK:  Right.

25             THE COURT:  This is in transit?

Page 296

1          MR. SCHROCK:  Right.

2          THE COURT:  So, who gets that?

3          MR. SCHROCK:  My point was when we were talking

4    about, you know, parties keeping things in the store.

5    They're going to be purchasing the cash --

6          THE COURT:  Right.  But it's not like -- I thought

7    you were saying that Transform has its cake and is eating it

8    too.  That's not really the case.

9          MR. SCHROCK:  I mean, what's --

10         THE COURT:  You know what?  I actually think this

11   is an ambiguous term.

12         MR. SCHROCK:  Okay.

13         THE COURT:  It's a term that does have a general

14   meaning.

15         MR. SCHROCK:  Right.

16         THE COURT:  But the parties may well have meant

17   something specific here.  Normally, it's a defined term.

18   So, I think I should have parol evidence on this, what they

19   meant by this parenthetical.  I think we understand that

20   it's as of the closing date.  I think we understand it's not

21   restricted.

22         I think we're really limiting this to cash in

23   transit, and everything else is not available cash, other

24   than money that's in a bank account that could be used to

25   make the payment on the closing, you know, i.e. not a

Page 297

1    payroll account, not a special purpose tax account, or an

2    escrow account, or anything like that.  Okay.

3              MR. LIMAN:  How would you like to handle the

4    remaining -- they're small issues --

5              THE COURT:  Well, I mean, we have that issue and

6    we have -- I think the only -- oh, the adequate assurance,

7    the EDA, and the mechanics liens.  I will give you my

8    preliminary ruling without any explication of it on each of

9    these.

10             MR. LIMAN:  Do we each get a chance to argue the -

11   -

12             THE COURT:  You'll get a chance to then decide

13   what you want to do, whether you want to continue to argue

14   these.

15             I think under the plain language of the document,

16   the adequate assurance deposits go to the buyer.  There may

17   be aspects related to that that fit into other formulas.

18   But they're a deposit.  And they're not specifically carved

19   out, and there's no ordinary course exception, or out of the

20   ordinary course exception for the deposit.

21             I believe the EDA rights belong to the Debtor

22   under the specific language, which I frankly don't see how

23   you could really write it any more specific than the

24   applicable provisions that has the refund rebate, refers to

25   the taxes, et cetera.  I think that's clear and I think it

1    supersedes the general language of the claim.

2            As far as mechanics liens are concerned, I'm more

3    open to hearing argument on this, but I believe that that

4    issue, if we're talking about mechanics liens that arose

5    pre-closing, I think those are the Debtors' responsibility.

6            Again, you all should discuss what you want to do

7    with those three issues and the parol evidence on available

8    cash and see where you want to go.  But as far as all the

9    other issues are concerned, you know, I guess I'll look for

10   an order.  Unless you want to have it all wrapped up so that

11   there's no issues about an interlocutory order.

12           I think you're back here -- I know, you should

13   talk to Ms. Lee.  You could conceivably be back here in a

14   week or so.  I think she had like July 20th free for

15   something.  I'm not sure, frankly.

16           MR. SCHROCK:  We have a hearing on the 23rd --

17           THE COURT:  23rd, that's it.

18           MR. SCHROCK:  -- for the 507(b) issues, but I know

19   we were talking about having another day if we had to break

20   apart this hearing.

21           THE COURT:  So, talk with her about timing on

22   that.

23           MR. SCHROCK:  Okay.

24           THE COURT:  If we could resolve all of this in a

25   matter of, you know, a couple of weeks, there's no reason to

Page 299

1   have two orders.

2           MR. SCHROCK:  Yeah.

3           THE COURT:  We should just have one order on

4   everything.

5           MR. SCHROCK:  That works, Judge.  Thank you.

6   Thank you very much.  Thanks for staying late.

7           THE COURT:  Well, I must say, we packed a lot into

8   one day.

9           MR. SCHROCK:  The stamina is always as impressive,

10  Your Honor.

11          THE COURT:  That reflects the quality of the

12  lawyers.

13          (Whereupon these proceedings were concluded at

14  6:53 PM)

15

16

17

18

19

20

21

22

23

24

25

Page 300

1                          I N D E X

2

3                          RULINGS

4                                              Page        Line

5

6    Application of Team Worldwide

7    for a Rule 2004 Granted                   29          25

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 301

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5   Sonya Ledanski         Digitally signed by Sonya Ledanski Hyde
                           DN: cn=Sonya Ledanski Hyde, o, ou,
6   Hyde                   email=digital@veritext.com, c=US
                           Date: 2019.08.09 14:26:58 -04'00'
7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  July 22, 2019

[& - 166]                                                                      Page 1

## &

**&**  5:3,17 6:1 7:1
10:9 12:5 31:9
43:18 45:8 71:24
72:1 74:10 75:14
77:13 81:6 93:1
110:20 117:24
189:10,25 201:25
202:6,23 203:16
213:21 216:7,9
220:19

## 0

**02**  132:21

## 1

**1**  33:7 47:5 48:25
54:1,5,11,15,18
110:9 115:19
221:25 266:4
275:7
**1-5-0**  239:14
**1.1**  46:19,24 47:11
53:10,12,20
113:18 114:9,11
114:16 118:4
119:5,16,23 120:2
122:4 125:21
126:6,12 130:4,8
130:15,16 131:3,8
131:14,19 133:18
133:19,22,22
134:5,24 136:6
137:7,8,9 139:15
140:21,24 141:7
141:23 142:12,14
142:17 143:10,14
143:15,24 160:2,9
163:16 165:6
167:13 170:12,24
174:13,22,22
192:1 266:9
**1.10.**  227:6

**1.1f**  223:25
237:10
**1.1g**  224:1
**1.1g.**  225:1
**1.2**  119:9 258:10
274:20 275:5,21
276:7,11,14,21,22
285:24 288:16
**1.657.**  274:12
**10**  10:24 31:23
35:16,19,20
194:17,20 274:24
**10.10**  274:17,24
275:9
**10.9**  198:13,16
274:9
**10.9.**  198:10,12
**100**  148:16 185:7
231:25 281:25
291:9
**100,000**  190:12
**10006**  5:6
**10018**  6:13
**10019**  6:20
**10020**  7:11
**10036**  5:20 7:4 8:4
**10153**  6:4
**10601**  2:3
**10:00**  3:2
**10:11**  2:6
**11**  2:5 3:2 14:19
31:19,21,22 32:5
35:16 68:1 160:2
165:7 167:13
169:14 170:11,24
171:2 174:23
175:14 176:1,2
283:16
**11,444,233**  183:9
**110**  275:14
**1114**  12:19
**1133**  7:3

**11482**  64:22
**11488**  64:23
**11501**  301:23
**1170**  12:17
**11th**  43:5 44:7
50:1 51:5 52:17
58:21 94:12
108:18 109:16
154:23,25 155:8
155:20 184:6,18
185:13 229:12
278:19
**12**  67:12 88:7
151:5 162:6
177:14 278:15
**12.3**  67:14 137:14
142:13
**120**  207:11
**1201**  229:12
**121**  218:25
**125**  119:12
**1251**  7:10
**12:01**  154:23
155:8 156:4 184:6
184:18 278:18
**12:30**  107:21
110:10
**12th**  104:19 105:2
106:22 187:18,19
**13**  54:8 55:19,21
55:24 67:12 68:1
111:4,17 112:15
112:24 113:21
114:25 115:8,25
116:9,18 118:3
119:17 121:7,13
121:20 122:7
123:6,6 127:6,19
127:21,23 128:7
128:14 132:4,7
170:3 177:14
**130**  8:3

**135**  99:1,6,12
183:21 191:24
243:14 254:6
**139**  254:5
**14**  63:25 64:2
150:21
**140**  195:25
**147**  93:15 195:24
196:3,5,8,13,15
196:21,22,25
198:1 199:8,16
200:3,14,22 201:3
201:13,16 202:18
203:24 207:6,14
207:17,21 208:24
209:1 210:15
212:8,23,25 213:7
213:18,25 215:7
219:2,18
**148**  218:19
**15**  90:9 126:19
**150**  196:7 239:13
**1500**  63:25 64:2
147:14,20 161:12
161:14,14 165:13
168:19 172:22
**15th**  32:10 45:15
52:13,14 194:22
291:13
**16**  13:4 53:15,21
53:24 56:22
111:24 118:9,11
121:17 130:17
133:3
**16.3**  137:16
**161**  110:6
**1633**  6:19
**166**  36:3,9 38:10
39:5,16,18 40:6
40:16,16 42:12
222:7,22 223:3,20
224:8,20 226:11
228:9 229:13

234:14,19 236:4,5
238:4 239:1
242:17,17,24
243:20 244:15
251:11 253:19,25
254:9 256:17
258:19 259:2,7,25
260:15,17,21
261:6,9,13,14,15
262:8,20 264:11
266:14,23 267:12
268:14,22 269:1
272:14
**166,557,621** 239:4
**166.5** 234:16,21
235:2 236:22
**166.5.** 236:17
**16th** 52:13
**17th** 8:3 254:8
**18** 161:21,21
179:23 180:9
181:3
**18-23538** 1:3
**18th** 78:19,24
79:20 80:5,8,23
83:9 94:24 95:2
97:5,7,11,13 98:5
179:25 185:22
188:25 195:5
**19** 126:10 219:25
**19-08262** 1:4 4:4
**1:30** 110:10
**1a** 111:7 113:21
**1st** 105:11

## 2

**2** 13:18 47:5 48:25
54:1,5,13,16,18
107:13 111:7
113:21 115:19,23
150:24,25 275:8
**2.1** 113:18 114:1,3
129:25 198:17
210:24 237:2

**2.1...** 237:1
**2.111** 151:6
**2.1k** 268:23
**2.1x** 259:16,17
**2.1x.** 268:10
**2.3** 160:10 174:7
174:20 191:25
192:5,9,12 223:23
224:4,7,7 226:16
247:13,13,21
248:22 255:3,4,25
257:3,14 275:11
284:6
**2.3...** 255:9
**2.3a** 255:11
**2.3a.** 269:8
**2.3b** 255:12
**2.3c** 255:13
**2.3d** 255:13
**2.3f** 255:13
**2.3g** 241:20
**2.3k** 219:4 223:10
223:14,19 224:8
224:12,13 227:23
228:9 240:9
241:21 242:7,7
243:17 244:23
245:3 246:5 255:3
255:14,15,21,22
260:16 265:21
266:12 267:15
**2.3k.** 223:19
228:14 229:24
236:5 242:7
243:24 245:22
246:7 256:19
**2.3k5** 262:7
**2.3k6** 266:15
**2.3k's** 269:8
**2.3p** 255:25
**2.4** 32:12,21 35:5
179:15 183:21
241:2 247:12

**2.4.** 245:6
**2.4a** 266:5 267:17
**2.4q** 240:14
243:22 244:1,10
244:11 245:21
254:2 267:4,7
**2.4q.** 240:9,16,25
243:24,25 245:23
246:4 266:5
**20** 90:5 104:24
**200** 65:20 238:24
**2004** 3:22 14:3
17:1,9 18:21
19:12 20:4,15
23:14,25 26:25
29:12,19,19 30:19
30:21 300:7
**2016** 106:16
**2017** 29:8,8
**2018** 45:16 46:2
49:3,8 52:6,20,22
52:25 53:3 68:3
132:22
**2019** 2:5 3:2 32:10
43:3 44:7 50:1,19
51:1 52:17 58:19
78:19,24 79:20
80:8,23 94:11
104:19 106:22
108:16 179:6,23
180:9 181:3
185:13 301:25
**2019,3:30:13**
150:21
**2020** 218:16
**20th** 187:23
298:14
**21** 12:13 30:2 68:3
**21st** 217:9,17
271:1
**22** 301:25
**22,452,428** 179:7

**22nd** 11:2,3 23:22
24:5
**23** 284:16
**23rd** 298:16,17
**24** 45:19 51:1
266:10
**243** 29:7
**243,000** 273:16
277:2 278:24
**243,249** 272:19,25
273:12
**248** 2:2
**24th** 94:11
**25** 63:21 135:7
136:9 145:23,23
146:1 147:15,25
148:3,13,21 149:4
154:4 199:11,18
206:8 207:23
300:7
**255** 60:24 149:9
**255,200,000**
163:20 174:14
**255.2** 59:22 60:2
134:9 135:16,17
136:7,23 141:11
148:12,14,15,20
149:20 154:7
174:24 177:7
**255.2.** 165:10
**25th** 43:2 44:7
70:14 108:16
145:20 179:6
**26** 13:3 20:21
58:19
**266** 238:25
**26th** 64:13 70:15
**27** 218:25
**277** 180:3
**28** 32:24 179:16
187:12 188:12
189:5

**[28.4 - 9]**                                                                                    Page 3

**28.4**  186:7
**28.6**  67:13 137:13
**28.8**  189:18
**29**  300:7
**292**  61:6 63:11
　　136:24 152:5,23
　　154:10 157:6
　　164:11,16 165:12
　　167:8 175:9,24
　　177:3
**292,083,182**
　　136:13
**297**  149:8

## 3

**3**  38:9 47:5 48:25
　　49:25 53:20,23
　　54:2,5,13,15,17
　　54:19 56:22 94:9
　　96:19 111:7
　　113:21 115:19,23
　　179:13 187:25
**30**  19:15 74:6
　　133:19 134:23
　　135:25 136:11,19
　　166:11 170:15,25
　　180:11,12 188:9
**30.4**  32:23
**300**  2:2 301:22
**31**  64:24
**31st**  6:19
**32**  174:23
**3298**  3:5
**32a**  218:15
**33**  62:7,14 65:5
　　150:3,8
**33,423,697**  179:12
**330**  134:25 301:21
**350**  275:20
**3501**  3:8
**363**  108:18
**365**  11:5 12:10
**37th**  7:19

**38**  19:1,20 21:17
　　22:19 26:19 29:1
　　30:3,12,13,23
　　208:16
**3926**  3:11

## 4

**4**  11:5 12:10
**4,368,957**  179:9
**4029**  4:2
**41**  163:25
**42**  29:8 241:3
**42nd**  8:3
**43**  251:9,10 254:5
**4346**  3:25
**44**  135:14 149:24
　　246:1
**4429**  3:25
**4430**  4:7
**4436**  4:12
**4450**  3:14
**4454**  3:15
**4455**  3:19
**4464**  4:13
**4480**  4:14
**45**  251:4
**45,000**  202:11
**490**  45:25 47:4,8
　　48:24 49:5,7
　　53:13,19 55:20,22
　　55:25 56:2 113:7
　　118:4,9,10,11
　　121:8,10,14,16,23
　　122:2,10 123:5,7
　　124:1,2,14,25
　　125:17,18 127:2
　　129:1 130:16
　　131:13,23 132:3
**4th**  188:3

## 5

**5**  61:5 119:9
　　243:18 252:17
**5.9**  75:6,23 95:8,9
　　97:9

**5.945,069**  179:10
**50**  12:9,10
**50/50**  293:6
**500**  76:23
**500,451**  68:1
**503**  134:15 210:2
　　248:10 257:6
**503b9**  224:16
　　227:1 241:22
　　249:18 251:12
　　254:5 256:11
　　258:19 259:1,9,25
　　267:19
**507**  298:18
**51**  284:16
**54**  137:21
**562**  29:7
**57.4**  137:21
　　146:25
**572**  29:8
**585**  132:21

## 6

**6**  144:6,8,10
　　150:24 156:3
　　158:15 171:21
　　191:25
**6.13**  157:23
**6.15**  158:13
**6.87**  150:24
**60**  225:23
**61**  223:6
**620**  6:12
**64**  225:24
**657,243**  179:11
**67**  134:22
**685**  132:21
**6:20**  270:19
**6:53**  299:14
**6th**  134:21 135:11
　　144:4 149:23
　　155:21 160:25
　　166:7

## 7

**7**  89:4 123:15,16
　　125:14 131:16
　　144:10
**701**  132:21
**767**  6:3
**77-78**  234:12
**77010**  7:20
**7749**  12:20
**7777**  12:20
**79**  207:17,19
**7th**  223:5,12
　　224:3

## 8

**8**  32:9 33:1,20
　　34:12 35:10 66:19
　　66:20 68:15,21
**8-11**  225:24
**8.1**  192:22,23
**8.5**  254:18 272:17
**8.8.**  162:1
**8.87**  150:21
**803,000**  275:17
**813**  134:22
**85**  78:15 79:8,9
　　80:5 83:10 97:9
　　150:2 179:25
　　180:12,15 181:2
**850**  275:18
**858,105**  76:12,23
　　77:12 180:2
**86**  135:1
**860,000**  78:1
**8629**  12:18
**868,105**  75:12
**8th**  6:12 12:8

## 9

**9**  66:19 68:15,21
　　107:13 134:15
　　171:20 187:14
　　194:21 210:2
　　248:10 257:6

261:6,7,8,12
**9.93.** 162:1
**9.99** 146:18
**9.993071.** 142:17
**90** 135:14
**9014** 18:17,18
**909** 7:19
**97** 207:12 278:4
**99** 91:18
**9th** 70:15 88:6
109:14,20,22
236:17 247:7
254:8

**a**

**a.m.** 3:2
**a1** 115:22
**abena** 5:13 65:12
159:12
**ability** 18:8 22:5
204:12,12 214:16
214:18,25 295:6
**able** 11:1 18:3,5,6
19:2 21:24 24:6
35:1 36:6,6,17
61:22 62:2 75:14
76:20 77:5 78:12
80:6 86:4 91:7
97:20 104:9
135:17 138:11
147:12,19,21
155:21 160:20
161:10 166:4
188:3 204:10
205:5 245:11
261:18 289:13,15
**absence** 121:6
245:22 246:16
**absent** 10:2
**absolutely** 28:9
113:22 115:1
145:3 155:10
201:6 244:16
252:20 253:22

268:11 290:25
291:6,9 294:20
**absurd** 189:12
**abuse** 186:15
**accelerated**
285:21
**accept** 176:1
193:24,25 205:8
218:2,5 264:10
**acceptance**
265:12
**accepted** 41:25
136:5 145:15
146:11 265:12
**access** 85:25
97:18,21,23 98:3
100:17 102:13
104:11,20 105:3
105:13,14,15,16
105:17 140:14,16
**accessible** 290:8
**accident** 114:22
**account** 18:4
32:12 66:3 68:3
73:20 74:17 75:2
75:13 78:15 80:10
141:4,14 144:22
145:7 146:4 147:2
150:23 151:7
154:16 163:6
164:12 165:19,21
165:22 166:16
167:17 170:19
175:17,19 176:7
176:20,21 177:11
179:10 183:14
189:1 191:11
209:7 210:4
212:16 278:17,20
278:25 279:5,8,8
279:11,14 280:15
281:19 283:7,18
283:25 287:11,12

287:17 296:24
297:1,1,2
**accounted** 73:5
144:1 225:18
**accounting** 62:17
71:5,8,13 72:8
73:1,3,10,18,18
81:21 82:7,8,19
102:16,17 133:12
133:21 134:20
137:1 138:3
140:17 146:6
147:7 152:10,12
153:13,13,23
156:24 158:6
159:20 163:3,12
164:14 169:8,10
171:22,25 173:13
175:4,19 191:7,8
191:8 194:15
196:10,10 199:23
208:14 209:1,15
209:24 211:5,9,14
212:15,22,24
220:3 278:5
284:17,17
**accounts** 36:10
51:20 59:18 64:19
64:22,24 66:1,21
67:2 68:10 75:5,7
80:6,24 88:16,18
88:20 89:3,8,14
93:2 105:20
133:18,23 134:17
136:1,1,3,19
137:6,10,12,12,12
137:14,17,20
138:1,5,14,16,21
139:6,12,13,23
140:1,20,22,23
141:1,8,9,19,20
142:22,23,24
143:8,15,16 144:2

144:2,16,18,19,23
145:7,16,21,24
146:8,14,18
147:24,25 148:11
148:15,19,25
149:1,10 151:25
152:8 154:2,6,9
155:15,20 156:7
157:22 159:15,16
159:17 160:6,8,18
160:21 161:2,7
162:20 163:1,15
164:7 165:12
166:8,10 167:7,10
167:16,17 168:2
169:5,21 172:2,4
172:13,15,18
173:8 174:21
175:5,7,9,12,15
175:15,22 176:5
176:10,15,16,19
177:2,9 180:1
183:11 189:13
191:19 197:24
205:10 219:7
221:18 223:3
224:25 225:8
226:1 229:2,9
240:18,22 241:9
241:13,14 242:5
242:16 243:1,9
244:14 254:1
258:20,25 259:9
263:4 267:10,11
268:17 280:25
282:14,19 285:13
286:10 287:16,17
288:21 291:8
293:3,3 295:15
**accrued** 99:2,5,9
275:20
**accuracy** 103:6,18

**accurate** 47:17,25
48:4 132:20 156:1
207:1,3,4 220:13
220:22 301:4
**achieve** 234:23
**achieved** 235:13
**acknowledged**
189:16 192:19
**acquire** 55:16
228:3
**acquired** 53:23
54:1,4 86:24 87:7
88:12,19 89:2
111:6,19 113:19
115:10 155:11
158:20 160:3
192:25 198:21
199:3 255:12
**acquiring** 133:2
**act** 209:17 292:24
**acting** 294:5
**action** 192:24
**actual** 18:15 60:5
67:23 82:1 90:8
90:17 125:4
142:23 164:23
165:11 173:7,15
173:16 175:14,19
205:12 212:7,16
212:20 213:3,4
214:2 219:20
220:21 221:11,21
280:3 283:7
**ada** 222:7
**add** 62:19 63:11
174:24 177:6
269:3 285:14,16
**added** 37:22
170:20 171:24
177:14 260:20
**addition** 21:13
169:9 179:15
181:6 265:10

**additional** 3:4
19:17 73:23,25
95:16 107:3,17
111:5,11 228:4,7
238:11 253:19
259:25
**address** 36:10
137:23,25 169:9
186:20 195:19
218:24 221:2
222:24 227:16
231:3,10 237:24
238:18 284:4
**addressed** 166:22
186:17 235:24
264:20
**addressing** 36:7
120:20 137:7
235:23 248:18
**adequate** 36:20
108:5,6,17 222:6
297:6,16
**adjacent** 126:2
130:19
**adjourned** 12:11
**adjusting** 189:13
**adjustment** 163:3
209:25 210:8,10
**adjustments**
163:12 169:8,11
171:25
**administration**
17:20 27:1
**administrative**
17:18 227:16
232:12 234:21
**administratively**
227:13
**admissibility**
38:25
**admissible** 38:2
38:20 39:6 68:15

**admission** 44:14
141:23
**admissions**
159:16
**admit** 106:21,21
**admits** 121:15
**admitted** 44:15
50:7 58:25 94:16
94:17 108:22,24
110:1,2 120:11
121:9 225:16,19
264:8
**admittedly** 124:5
**adopt** 157:4
164:20
**adopted** 157:9
**adopting** 290:3
**adv** 1:4
**advance** 66:22
134:17 147:8
**advantage** 20:11
**adversary** 4:4
31:15 33:8,10
42:25 49:25 58:17
58:20 94:10
108:16 110:15
**adversely** 192:25
**advise** 206:20
**advisor** 86:3
133:9
**advisors** 75:20
78:21 79:1,10
80:21 82:14,17
84:8 87:4,8 95:10
95:11,15,16,17,18
96:1 182:15
**affect** 27:20 29:15
36:9 56:22 192:25
211:22 228:24
**affidavit** 42:3
170:3
**affiliate** 158:24
241:4

**affiliated** 10:10
**affiliates** 6:2 12:6
**affirm** 40:8 41:16
42:17 43:22 49:16
58:7 61:20 70:5
94:3 108:2,10
109:8
**affirmative** 60:9
62:6
**afoul** 277:1
**afternoon** 31:20
51:25 110:14
117:23 118:1
159:11 189:9
198:6 223:13
**agencies** 138:9
**agency** 56:12
**agenda** 3:1 9:7,8
10:6 13:18 31:10
**agent** 6:11 218:18
280:15 289:1,15
**agents** 158:25
**aggregate** 62:24
63:3 136:12
149:20,24 154:6
171:16 175:1
176:3,3,14 250:22
250:25 252:19
254:14,19 266:16
268:14,25 269:2
269:16 272:25
273:21 274:19,21
275:5 288:15,16
**ago** 20:10 43:5
104:13 178:25
185:14 187:8
**agree** 34:10 35:20
35:21 47:3 72:24
101:10 103:20
114:12 119:22
143:7 165:11
172:14 177:16
182:23 184:24

186:7,8 188:16,16
200:25 209:15
237:15 245:18
264:21 270:21
**agreeable** 57:3
285:17
**agreed** 11:6 31:12
37:4,8,9 38:2,20
94:25 105:3 148:4
160:1 187:5
196:20 209:4
223:11 226:12,14
227:7,19 250:18
250:23 254:9
255:1 259:24
266:21 270:20
276:9
**agreeing** 104:18
226:11
**agreement** 4:2,11
16:4 22:8 26:24
27:2 29:2,20 30:7
30:25 31:11,14
33:20 35:5,25
38:22,24 44:6
53:8 58:19 59:10
59:17 61:12 97:24
104:20,23 105:2,7
105:8 106:22
117:7,9 119:10
125:20 129:25
130:1,4,24 131:5
131:10 133:1,3
135:8 161:21
164:22 168:21
174:13 176:23
177:13,19,25
178:20 179:14
187:6,22 197:9
198:3 213:10
214:19 219:7
220:16 232:8
233:7 234:14

235:7,9,11 236:7
237:5 259:14
262:1 264:7,10,11
264:22,23 265:8
265:10,19,21
266:2,19 267:25
268:1,7,19 272:7
273:2 274:23
275:8,8,17,18,19
276:2 277:14
**agreements** 14:14
14:17,21 18:25
20:16,19 22:14,18
22:19 23:10 26:19
30:3,13 232:2,4
284:1
**agreement's**
265:15
**agrees** 237:17
**ahead** 9:14 204:9
**aim** 17:10
**aimed** 17:1
**akin** 5:17
**al** 1:15 4:5 9:3
110:15
**alabama** 287:18
**albanese** 7:13
**allegation** 184:16
193:3
**alleged** 24:10
33:17 287:2,4,6
**alleging** 287:7
**allen** 39:17 42:11
**allocation** 214:19
**allow** 29:12 116:6
**allowances** 91:13
**allowed** 140:14
275:23
**allowing** 282:7
**allows** 22:8
**alluding** 22:15
**altered** 88:24

**alternative** 16:18
229:6
**alternatively**
139:11
**altogether** 222:22
**ambiguity** 118:7,7
118:25 120:18
124:17 237:19
242:2 246:23
264:24
**ambiguous**
125:19 206:15,20
206:21,23 223:11
228:8 230:11,12
240:2 296:11
**amended** 3:8,11
3:14 9:23 129:25
**amending** 104:19
106:22
**amendments**
106:24
**amenities** 54:22
55:5,9
**america** 10:21
11:11 151:8
**americas** 7:3,10
**amount** 21:6
59:13,20 60:1,11
62:2 65:4 66:25
72:2,3,5,13,18
73:1,21 74:11
81:22 82:1,4,5,18
84:9 89:20,21
90:10,21,25 91:12
96:3 99:5 134:6
134:13 136:16
145:17 149:9,9,13
149:20 153:7,9
160:12 163:18,20
163:20 165:9
166:24 167:1
172:7 173:4,6
174:12,13,14,17

174:19 175:20
176:1,11 179:10
179:11 187:1
188:14 189:17,19
193:15 195:23,24
199:18,25 200:3,4
201:3,4,20 202:24
202:25 209:5,25
210:5,7 219:1,2,2
219:11,13,18,19
219:20 220:20
223:7 229:20
239:1 254:3,5,17
258:9 266:23,25
272:20 274:5,17
274:20,21 275:15
281:23 285:25
288:16,16
**amounts** 34:1
83:3 133:22
134:20 141:24
142:2,22 143:25
149:10 171:1,1,4
175:13 184:23
186:10 200:22
238:17 254:3
258:12,13 274:16
275:5
**analogy** 138:8
233:19
**analysis** 72:7
77:17,24 79:19
83:3 92:1 97:9,11
97:15,16,17 98:6
98:9,13,16,17
102:11 131:4
146:16 157:15,17
172:20 173:16,16
177:10,18 178:10
185:22 186:13
188:24 205:8,20
205:21 207:16
213:22 215:16,25

217:12 238:15
270:23
**analyzing** 106:11
**andrew** 5:8 8:14
43:17 70:10 81:10
85:15 86:15 92:23
117:23 203:11
207:15
**annex** 160:2 165:7
167:13 170:11,24
171:1 174:23
175:14 176:1,2
**announcement**
9:15
**answer** 53:17
56:19,20 60:8
62:6 63:8,11 69:3
79:18 127:12
142:20 145:4
150:16 157:19
172:23 212:17
213:5 226:14
234:23 238:12
245:15 260:23,24
284:3,19
**answered** 79:13
119:18,20 259:11
**answers** 68:16
**antecedent** 225:4
269:7
**anthony** 105:5
**anticipate** 35:23
**anticipated** 40:24
125:11
**anticipates** 36:18
**anybody** 107:17
115:1 128:20
202:3 247:17,19
**anymore** 151:25
156:17 193:18
**anyone's** 276:15
**anyway** 195:22
203:3 251:7 276:8

276:22 294:24,25
**ap** 102:8 225:10
**apa** 9:9 33:15
46:19 51:18 53:8
53:10 59:20 60:15
61:15,19 62:3
82:3 93:7 97:24
99:17,19,20,21
100:18 106:22
110:16 112:25
113:8,12,18
114:21 115:8,8,11
115:21 116:9
118:12 119:2,9
120:21,23 125:9
127:7,18 129:19
133:15,17,24
134:7,17,19
135:24 136:20
139:8 144:15
145:9 147:15
149:11 160:3,10
167:19 170:23,23
174:9 181:12,18
182:3 183:19
184:4 192:20
196:1,14 199:15
199:20 202:4
203:9,15 210:1,3
210:22,22 211:1
218:25 219:5
223:10,17,23,24
223:25 224:7,8,12
224:19 225:7
226:17,21 227:12
228:8,14 229:8
230:12 232:24
236:21 247:16
**apart** 298:20
**apa's** 232:25
**apologize** 34:11
51:14 204:23

**apparently** 20:19
104:2 161:6 180:5
199:8 268:8
**appear** 15:17
75:24 154:10
164:11 177:14
219:10 259:13
292:17
**appeared** 131:24
**appears** 27:5
131:16,21 132:23
219:25 259:15
266:1 267:6
**apples** 156:16,16
221:17
**applicable** 32:15
38:22 158:6,16
159:2 297:24
**application** 3:21
14:2 18:20 29:4
29:25 30:21 44:23
300:6
**applied** 121:20
157:12 158:3
**applies** 30:6 53:20
118:10,11 121:24
176:20 224:9
**apply** 24:21 123:1
124:1 156:11
197:14 208:2
220:4
**applying** 156:10
156:15 285:15
**appoint** 178:7,11
194:21
**appraisals** 214:17
**appreciate** 103:2
125:5 167:22
264:18
**appreciates** 184:7
**apprise** 11:21
**approach** 19:7
92:18 164:21

176:14,24 202:21
221:8,8,10,19,21
**approaches**
221:11
**approaching**
183:23
**appropriate**
186:14 189:17
221:10 268:3
270:25
**approximate**
211:15
**approximately**
12:9,10 13:3
75:23 78:1 83:12
90:7 236:23 238:4
273:16
**appurtenant**
130:11
**april** 82:10 93:12
93:19 104:19
105:2,11 106:15
106:15,21 118:19
187:24 188:3
194:22 204:4
**ar** 66:21 67:2
164:23 173:17
**arbitrary** 91:22
**archambault**
105:4
**area** 292:17
**areas** 101:20
188:15 237:16
**aren't** 173:20
**arguably** 281:2
**argue** 24:18 36:14
110:24,24 160:22
161:4 175:3
195:22 243:24,24
277:20,22 297:10
297:13
**argued** 132:13
161:9 208:11

argued 215:10 229:10
283:10
**argues** 224:19
226:16 242:23
267:4 272:13
**arguing** 57:4
110:22 146:25
152:20 216:7
230:20 254:17
287:20,22,24
288:7
**argument** 28:20
57:17 76:3 107:22
110:5,5,17 119:5
119:6 123:3
127:23 137:8,19
151:21 159:19
164:9 166:1,3
168:13,14,15,16
171:8 173:2
175:25 185:2
189:11 198:14
206:13 215:4
224:21 225:1
226:3 227:23
229:6 230:14,16
230:17,18 233:6,9
233:18 243:23
244:12 246:15
250:11,13 260:9,9
263:24 265:18
267:6 278:1
289:16,18 292:24
292:25 298:3
**arguments** 38:25
39:3 116:6 120:20
146:15 147:3,3,4
149:7 211:11
223:9
**arisen** 100:19
**arising** 255:11
**arose** 116:5 156:9
298:4

**arrangement**
56:22 116:16
**arrival** 49:2
**arrive** 172:11
**arrives** 85:1
**article** 158:15
159:1 248:1 249:3
**articles** 225:5
**ashtabula** 279:22
280:14
**aside** 41:12
103:17
**asked** 19:11,20
21:22 38:12 48:13
66:12 78:21 79:10
79:13 81:15 98:5
98:8,10,12 102:25
105:13,16 116:13
140:11 150:12,14
151:1 157:19,20
234:13,17
**asking** 18:25
19:23 20:17 34:15
60:9 61:14 63:9
69:1 123:1 186:5
190:16 214:11
261:17
**aspect** 269:15,17
291:11
**aspects** 114:24
297:17
**asserted** 17:19,19
264:25
**asserting** 173:7
**asserts** 224:22
**assess** 63:1
**assessing** 64:13
**assessment** 64:15
77:3,5,11
**asset** 4:1,10 31:11
31:14 44:5 53:7
58:18 59:10,16
61:11 104:19

**asset** 129:24 253:21,24
265:21
**assets** 46:13 63:7
86:21,23 87:2,18
87:22 88:19 130:1
131:1 132:18
133:10 158:20
192:25 226:20
228:4 234:24,25
235:1,3 236:24
255:12
**assign** 117:6
123:12,17,18
**assigned** 12:14
124:14 125:17
126:13 203:15
**assignee** 241:4
**assigning** 117:5
124:12
**assignment** 3:4,19
10:13 12:7 16:18
63:25 64:3,4
66:17
**assigns** 125:14
**assist** 39:14 59:8
65:18,20,24
**associate** 227:22
**associated** 20:24
36:9 48:24 55:20
55:24,25 56:2
121:13 123:9
130:12 225:9
226:1 227:21
**association** 6:10
55:22
**assume** 11:7 73:8
93:3 117:6 153:11
160:11 181:12
184:3 191:25
204:25 206:25
210:2 220:15
223:20 224:4,20
226:12,15 227:15

**assume** 227:19,24 228:4,9
234:14 236:20
238:10 241:4,5,5
242:16 245:4,7
247:23 250:19,23
253:18 268:3
272:14 286:6
**assumed** 12:14
23:5 98:25 99:4,6
99:11 158:20
183:20 184:2,21
192:1,5,6,14,17
192:17 193:1,2
210:24 224:16
226:21 227:1
241:14,22 242:24
243:10,12 244:24
248:10 249:18
251:12 256:11
257:6 259:1,9,25
265:22 266:17,19
266:22,23,25
267:8,11,15,19,23
**assumes** 123:4
191:24 245:3
268:20
**assuming** 38:24
68:5 99:12,15
104:13 107:2
123:7,8 151:1,9
184:9,11,22
243:13 245:2
258:24 264:6
281:20
**assumption** 3:4
3:19 10:13 27:16
234:19 238:10
249:8
**assumptions** 91:9
221:5
**assurance** 36:20
108:5,6,17 222:6
297:6,16

assure  45:2
astor  12:20
attachments
  112:14
attempt  124:18
attention  46:6
  114:19 234:11
  239:7 240:15
  247:12 255:6
attorneys  5:4,18
  6:2,10,18 7:2,9,17
  8:2
attributable
  177:10
audit  71:20,23
  95:1,3,4,6,7 140:1
  214:3
audited  134:3
  138:18 146:9
auditors  71:11
august  11:2,3
  23:22 24:5,6
authorities
  132:22 185:4
authority  193:23
  194:12
automatic  26:11
  179:20 185:18
  186:15 189:12,15
availability  280:3
available  27:4
  36:8 44:17 47:20
  48:6 90:14,15,18
  93:6 97:5 105:9
  112:1 126:25
  140:13 202:9
  206:2 222:7,22
  229:4,11,12
  254:17 269:17
  272:4,8,15,20,22
  273:19,23 274:22
  277:12,14,17,21
  277:22,24 278:10

278:20 280:11,12
  281:2,13 283:4,15
  284:4 285:9,12,13
  286:3,3,8,13,16
  287:11,12 288:9
  288:12,17,24
  289:11,18 290:4
  293:11,12,13,24
  294:15 295:5
  296:23 298:7
avenue  6:3,12 7:3
  7:10
average  64:7 92:7
avoid  134:7,10
  171:9,10 244:4,20
  270:16
avoidance  244:11
  244:21
avoids  244:13
aware  54:14 79:7
  79:10 80:15,16
  100:4,7 104:18,22
  104:24 105:18
  118:17,21 119:8
  180:16 181:7
  185:8 283:12
awfully  29:22

b

b  2:12 29:22
  43:25 44:2 51:4
  101:18 109:11
  134:15 139:11
  143:10 159:3
  192:23 210:2
  248:10 257:6
  275:18,19 298:18
b.r.  29:7,8 132:21
back  16:3,3,5,5
  46:2 57:18 71:25
  78:4 81:10,14
  84:10,21 89:16
  95:15 110:9,14
  116:20 143:21

160:4 171:21
  177:14 178:1,24
  181:13,25 182:14
  182:15,17 186:9
  192:15 193:4,7
  198:16 214:16
  222:4 223:5 242:7
  249:15,18 259:17
  271:1 276:8 277:3
  280:24 298:12,13
background
  139:20
backup  216:21
bad  139:7 149:1
  287:7
balance  63:8,14
  65:3 66:21 68:2
  75:24 93:14 99:9
  150:21 186:6
  282:20
balanced  253:20
balances  170:2
  277:18,18
balancing  27:5
ball  271:3
ballpark  74:19
  83:14
bank  88:16,20
  151:7 278:17
  279:8 280:25
  282:14,19 287:16
  287:18 296:24
bankr  29:7,8
  132:21
bankruptcy  1:1
  2:1,14 3:23 18:12
  20:12 24:25 25:4
  25:9,10 52:9
  92:12 196:12
  211:19 265:5
banks  212:21
  278:8,9 279:21
  281:15 282:19

293:12
bar  141:13
barefoot  5:15
  10:14 12:4,5 13:2
  13:11,15,23
  123:20
bargained  116:7,8
  148:4 208:1,20
  210:25 235:15,16
  235:20
barnes  105:4
base  210:18
  213:24
baseball  55:1
  120:8 130:21
based  17:2 29:20
  61:23 68:15,21
  81:21 91:11 93:9
  99:2,16 106:12
  113:25 120:23
  130:23 131:14
  132:23 136:5
  144:9 151:9
  152:20 153:20
  156:23 161:10
  163:1 164:2
  173:13,15 179:21
  199:14 201:23
  210:17,18,20
  213:25 214:4
  215:8 219:14,16
  219:16 220:22,23
  221:11 250:13
  265:8 267:25
  285:3
bases  29:24
basic  191:8
  225:12
basically  16:18
  24:22 74:14 75:21
  101:8 107:22
  128:1 164:1
  165:24 185:25

210:17 270:2,9
271:8 277:20
**basis**   14:14 16:24
18:21 24:8,16
55:8 74:17 79:23
79:25 89:6,10,17
89:21,25 90:3
96:24 98:22 119:6
119:11 120:22
121:2 136:3
161:23 179:20
180:25 183:9
219:17 220:1
271:12,13 285:22
**basket**   64:22,23
**basketball**   55:1
130:21
**baskets**   64:24
65:5
**bates**   144:9
**bear**   261:15
**bearing**   150:8
191:17 260:24
**began**   9:17 52:6
60:5 74:7
**beginning**   64:5,6
102:4 187:5 196:4
**begins**   159:14
**begs**   119:14
**begun**   9:16 10:22
**behalf**   10:9,17,20
14:6 24:16 31:9
34:6 43:18 44:21
52:19 53:1,4
110:20 117:24
158:17,21 159:12
181:13 189:10
**belied**   131:10
**belief**   116:2 135:6
**believe**   24:4,10
33:8 37:15 43:4
52:12 55:2 56:17
56:24 63:17 71:18

73:8,22 76:11
77:20 83:12,13
84:6 85:19 86:17
87:15 91:21 99:14
101:15 103:5,18
105:11 107:8
112:18 113:7
115:15 121:18
122:4,8,12 131:12
132:12 144:6,8
162:2 164:19
176:25 177:8
185:4 189:6 193:6
193:17 218:8
219:12 229:1
231:24 240:2
254:7 267:2,24
268:3 272:16
297:21 298:3
**believed**   112:23
114:23 145:7
**believes**   223:14
**belknap**   7:1
**bell**   105:6
**belong**   76:14,15
77:9 78:2,2 80:10
86:18 145:8
185:16 297:21
**belonged**   75:13
76:20 79:9,12
80:7 83:9,10,21
**belonging**   180:2
**belongs**   155:10
**ben**   99:8
**bench**   42:16
**beneficial**   22:25
**benefit**   20:6 56:9
82:13 110:21
111:11 116:15
134:12 147:13,20
154:17 157:15,16
157:20 173:2,19
177:5 189:23

190:2 205:22
212:4 233:25
273:15,15
**benefits**   117:2
168:18 171:13,15
211:22
**benefitted**   188:8
**bernstein**   29:11
**bernstein's**   29:6
**bespoke**   13:7
**best**   64:14 85:4,7
85:10 140:13
202:19 206:2
277:16
**bet**   214:12
**better**   73:8 86:18
97:21 138:4 141:9
143:20 144:15
145:16 148:11
153:3,24 237:18
251:24 259:22
**beverly**   54:19
55:11
**beware**   146:14
**beyond**   73:23
79:15,19 112:1,12
118:12 125:18
223:17 263:6
**bibi**   5:10 79:13
81:5,6,9 85:11
86:13,16 88:5
93:24
**big**   40:16
**biggest**   103:21
**bill**   105:4 281:25
**billed**   169:9
**billion**   258:10
274:20 275:5
276:7,11,14,22,22
285:24 288:16
**bind**   176:13
220:12

**binder**   37:8 38:1
44:6 50:11,14
51:21
**binders**   37:13,14
37:25 38:2 128:24
**bit**   13:4 56:12
75:6 121:12 139:3
178:19 197:13
200:9 218:2 237:4
260:11
**bits**   240:14
**bizarre**   273:1
**black**   223:16
**bleed**   40:22
**blended**   135:14
**blew**   254:10
**blind**   247:11
**block**   259:2
**blow**   259:25
**blown**   255:2
**board**   247:6
**bonus**   259:10
**book**   51:10 59:22
60:1 62:10,13,22
63:1,3,6 70:2
89:17 133:23
134:1,9,24 136:7
136:12 145:25
146:3,5 149:20
**booked**   225:17
**bookkeeping**
225:12 232:18
233:20
**books**   135:18
147:9 148:12
154:11 156:4,24
182:18 184:1,5,8
184:19 193:18
194:3 196:9
197:24 199:15
200:15 201:23
205:17 209:2
213:21

**borden** 8:11 41:10
  43:16,20,24,25
  44:2,3,10 45:9,10
  45:12,22 46:10
  47:3,9 48:11,13
  49:11 113:4
  123:24 126:9
  127:10 131:9,15
**borden's** 44:15
  123:11 132:8
**bore** 88:17
**borne** 166:12
**borrowing** 213:24
**bottom** 67:25
  135:15 182:11
  225:5,6 240:16
**bought** 127:6
  131:6 159:20
  167:11
**bounced** 273:3
**bound** 172:6,12
  244:18,19,19
**boxes** 286:10
**brainer** 193:16
**brand** 148:5
**brauner** 5:22
**breach** 36:9
**break** 110:4
  116:16 132:10
  221:23 222:2
  229:10 235:4
  298:19
**brief** 4:7,11,13
  10:19 13:22 44:4
  58:16 81:6 85:12
  185:2 228:2
  269:22 277:20
  278:2
**briefed** 10:21
**briefing** 11:19
  13:8 132:13
  146:24 159:4

**briefly** 48:10 65:9
  168:25
**bring** 15:13 16:15
  39:19 194:17
  202:6 270:18
  281:19
**broad** 26:25
**broader** 19:12
**broadway** 6:19
**brooklyn** 12:18
  33:6,11 35:1,6
**brooks** 44:22
**brought** 14:16
  255:5 279:4
**brush** 19:12
**bryant** 5:19
**buckets** 60:7 62:7
  62:14
**budget** 218:16
**build** 87:1 212:22
**building** 54:15,17
  55:3 116:17
  132:12
**buildings** 54:13
  54:14,20,22
**built** 91:9 213:6
  258:8
**bullet** 162:6
**burden** 27:6,8
  29:3,18 115:9
  180:21 194:6
**burdensome**
  29:22 79:24 96:23
**burdensomeness**
  22:16 29:21
**bureaucratic**
  194:4
**business** 54:6,9,25
  66:3 68:22 85:3
  86:22 88:12,22
  113:13,14,21,22
  114:15,22,25
  115:2,7 131:7

  158:19 165:17
  181:22 192:21
  193:1 232:13
  235:3,5 240:19
  241:10 242:13
  258:21
**businesses** 89:5
**busy** 20:23
**button** 22:12
**butz** 67:9 74:6
  102:3 105:4 107:8
  108:7 109:1,2,3,3
  109:3,4,10,12,25
  110:2 166:5
  204:23 215:11
  216:9
**butz's** 170:13
  171:17,21
**buy** 82:3 148:22
  160:14,15 167:10
**buyer** 86:22 96:20
  129:15,23 135:21
  135:24 136:17
  139:22 145:1
  146:13 149:8
  158:22 163:21,22
  174:15,17 176:8
  177:5 179:1,9,14
  179:19 181:11,12
  181:16,19 182:14
  183:20 223:12,19
  224:13,19,22
  226:7,10,14,16
  227:5,11,19 228:2
  228:9 229:6
  233:16 241:3,4
  242:25 245:2,3,4
  250:17,18,23
  252:25 265:21
  267:4,23 268:4,20
  272:13 280:20
  297:16

**buyer's** 133:8
**buyers** 115:9
  134:16 179:1
  180:19 184:22
  226:21 227:8
  242:16 253:2
  277:19
**buyer's** 176:8
  179:3 185:2 223:8
  225:6,16 226:3,5
  226:18,24 227:3
  227:14,23 228:8
  228:12 243:18
  244:15 247:22
  262:7 263:10
  266:12 268:24
**buying** 129:16
  130:25 199:10,13
  206:7 259:16

**c**

**c** 5:1 9:1 30:21
  113:18 114:1,3
  301:1,1
**cake** 228:3 296:7
**calculate** 59:12
  81:16 82:19 134:1
  196:17 201:13
  218:24 219:20
**calculated** 99:2,3
  133:12 136:24
  187:5 196:24
  201:5,24 208:13
  210:24 236:16
**calculating** 65:4
  187:2
**calculation** 93:14
  101:9 102:21
  154:10 157:6
  173:7 177:6
  196:22 200:16
  201:22 205:1
  220:20 221:22
  239:11 269:16

**calculations** 73:24
100:3 101:15
136:22 212:25
213:12
**calculator** 83:13
**calculus** 214:2
219:3
**calendar** 57:10
177:24
**california** 12:18
**call** 43:16 60:25
69:18 77:25 94:1
105:11 123:23
181:25
**callable** 265:17
**called** 46:15
137:12 138:5
170:15 181:9
183:7 211:14
279:22
**calling** 138:22
139:23 141:19
159:16
**calls** 60:14 101:25
106:10 140:4
221:2
**campus** 111:10
**cancel** 181:24
**canceled** 181:10
181:10,16,19
182:21 191:3
227:20
**cancellation** 84:6
**cancellations**
103:7
**cancelled** 191:4
**cancels** 91:2
**canons** 269:6,9
**can't** 178:11
185:23 188:20
194:20 253:9
256:20 260:20
269:12

**cap** 224:8 226:11
236:1 243:4
251:22 252:10
257:15 260:21
**capacity** 45:15
46:5 52:23
**capital** 197:20
247:16
**capitalized**
265:23
**capped** 249:14,14
249:19,21 251:2,7
251:8,11,12 257:8
260:16 261:5
262:20 266:23
**caps** 266:12
**caption** 24:24
**captured** 34:11
**car** 148:1,6
**card** 95:24 100:2
100:4,8,10 103:6
138:8 179:8 281:5
283:17
**cards** 103:1,23
188:17
**careful** 25:23
**carefully** 253:20
267:2
**carve** 198:6 262:3
267:7
**carved** 177:12
297:18
**carveout** 132:3
146:22
**case** 1:3,4 11:13
17:20,23 18:5,22
24:25 25:9,10
27:6 28:15 29:7
52:2 72:2 87:11
87:14 111:3 130:9
132:5 140:15
170:13 172:6
190:8 215:9

220:22 249:13,13
254:10 268:6
272:10 277:22
283:22 286:5,12
290:5,5 292:11
294:7,11 296:8
**cases** 67:21 68:5
132:22 286:7
**cash** 33:3,16
34:14 36:8 66:22
68:3 88:9,11,16
88:23 147:8,9
158:11 169:6
179:1,7 185:17
212:22,22 213:1
222:7,22 229:4,11
254:18 258:1
269:17 272:4,8,15
272:20 273:8,24
274:22 277:12,14
277:17,18,21,25
278:2,2,7,8,8,9,11
278:20 279:1,4,7
280:24,25 281:1,2
281:5,5,8,12,13
281:15,16 282:23
283:3,5,10,10
284:2,5,16,18,19
284:20 285:3,9,12
285:13 286:3,3,8
286:9,13,13,16,24
287:5,11,12,19,22
287:24 288:2,5,5
288:11,13,17,21
289:4,6,9,11,11
289:14,18,19
290:4,10 291:2,3
291:7,8 293:3,4,6
293:16 294:15,22
294:23 295:4,8,10
295:12,19,20,21
296:5,22,23 298:8

**cashed** 99:8
183:11,14 193:8
194:11
**cashes** 277:21
**cashier** 292:20
**cashing** 32:14
**categories** 102:19
103:15 105:20,21
105:22 133:19
134:23 136:12
164:24 166:6
167:13 170:25
171:14,22 174:23
176:12 185:12
223:22 224:6,14
**categorized**
102:10 118:9
**category** 32:17
68:11 137:9 171:5
171:7,9,13 175:13
175:25 176:11
237:22 279:6
**caught** 52:1
**cause** 27:6 233:4
**caused** 166:9
**caveat** 38:3,19
41:2
**center** 7:18
123:18 151:7
**centers** 122:20
123:19 125:15
**ceo** 71:17 74:3
139:25 294:8
**certain** 14:10
18:25 22:8 46:7
47:1 59:17 69:1
82:4 85:23 93:9
95:5 96:15 115:6
118:17 134:6
136:18 139:2
142:9 160:11
171:25 174:8,9
180:17 247:23

249:2 250:12,16
250:17 284:11
**certainly** 112:25
117:15 132:2,8
145:5 175:22
176:22 188:15
197:25 198:2
201:9 202:20
203:14 204:19
269:1
**certification**
152:22 177:3
**certified** 152:6
175:8 301:3
**cetera** 84:17 87:6
88:18 159:6
297:25
**cfo** 140:16 225:16
225:16 272:21
277:16 294:8
**challenge** 84:18
274:14
**chambers** 10:25
12:24,25 30:14
**chance** 61:1 69:5
210:20 297:10,12
**change** 42:7 43:7
44:8 50:2 51:6
58:22 70:17 94:13
108:19 109:17,24
136:24 152:23
194:5 246:20
281:25
**changed** 95:22
100:18,21 148:13
149:10 211:18
**changes** 9:19,24
89:2 109:25
**chapter** 14:19
**characterization**
72:24
**characterize**
67:13 75:17

**characterized**
122:18
**charged** 137:22
**charles** 7:22 14:5
**chart** 31:18 32:5,6
35:17,19 70:13
**chase** 161:16
208:11
**check** 75:21 79:25
84:19 85:1,4,7,9
86:8 91:7 97:13
101:9,12,17,22
103:13,17 180:17
181:6 183:14
184:3 193:18
194:3,9,11 273:4
**checks** 32:13,16
75:1,4,7,12,12,16
75:20,23 76:13,14
77:3 78:1,12,13
78:16,18,19,21,23
79:3,8,12,23 80:5
80:9,22,23 83:8
83:10,16,21,23
84:12,13,15,21
86:18 94:22 95:1
95:2,4,6,8 97:4,6
97:10,13 98:4,5,6
98:8,10,11,11,15
98:21 99:7,11,15
103:20 104:5
178:21 179:9,23
179:25 180:3,6,10
180:13,13 181:1,2
181:6 183:8,10,18
184:12 185:3,7,22
188:14,22,25
191:10,17,18
192:19 193:4,25
195:4
**chesley** 7:14 10:16
10:16,19 11:8,20
11:24 12:1,3

**chief** 87:17
**china** 205:25
**choose** 92:5
143:13 170:14
**chose** 220:14
**chosen** 91:23
**chris** 94:1
**christopher** 8:15
94:1,8,18 100:15
104:16 106:6
**chunks** 137:11
**cia** 66:22 67:3
137:23 146:25
**cie** 169:6
**cinch** 268:12
**circumstance**
286:17
**circumstances**
202:10 267:5
**cite** 15:20 208:15
**cited** 132:22
**cites** 165:7 198:16
**claim** 16:3,5,6
17:20 18:2 21:7
24:8,24 25:3,9,10
25:11,15,17,21,25
28:3 75:12 162:22
162:22 181:17
**claiming** 33:22
96:22 159:20
**claims** 9:25 14:9
14:12,16 15:1,23
16:2,7,15,16,16
16:20 17:11,18,18
17:21 18:4,11
28:9 29:14 34:24
36:9 65:19,20
111:6 134:15
151:7 158:9
179:21 181:11
182:14 226:7

233:1 248:10
249:19 251:12
267:19
**clarification** 30:9
39:11 50:20 62:24
110:21
**clarified** 27:7
79:18 113:17
**clarify** 19:7 73:9
76:2 106:13 111:3
119:24 163:10
209:11
**clarifying** 9:19,24
**classified** 72:5
101:19 102:6
**classifies** 102:8
**classify** 76:1
**clause** 230:11
235:11 241:16
242:1,14 247:14
248:4,6,12,14,15
248:16,17 249:1,4
250:7,10,12,17,18
250:24 252:1
253:25 255:9
256:3,4,25 269:3
269:8 289:21
**clauses** 255:16
**cleaning** 182:17
**clear** 38:22 40:3
45:22 60:6 61:22
69:6 100:23
107:15 113:9,19
116:9 119:9 124:6
124:7 125:13
126:16 131:21
151:24 158:13
159:20 167:10
178:2 181:4,14
182:16 183:10
192:6,17 195:1
206:24 213:19
223:14 252:11

263:8 264:7,23,25
266:1 267:3
268:18 273:19
287:7 289:16
297:25
**cleared**  142:7,10
178:22 183:8
191:10
**clearer**  201:7
**clearly**  29:11
114:24 117:24
125:19 128:17
141:16 159:3
173:19 177:15
178:3 180:6 188:4
210:10 238:21
267:11,12,21
277:21
**cleary**  5:3 10:14
12:5 43:18 65:12
81:6 111:18
189:10
**clerk**  182:1
**clicking**  9:21
**client**  151:3
235:18 236:9
263:16 285:17
294:3 295:12
**client's**  294:4
**clients**  28:8
**close**  60:12 63:5
72:4,6,14,19
73:21 79:8 90:11
93:3,17 99:5
100:1,23 127:22
133:11,13 145:16
145:21 147:16,24
148:16 153:21
154:5 157:16
163:21,22 181:2,9
181:10 182:21
183:10,12,14,15
184:13,14 185:10

191:4,5 192:18,20
196:2,3 199:18
201:24 202:7,16
203:14,19,21
210:5 239:2,19,20
261:19 282:24
**closed**  103:19
107:21 145:10
185:13 209:7
217:16 271:1
279:14
**closely**  215:14
229:3
**closer**  104:5 151:4
**closing**  52:16
59:14 60:1 61:5
62:5,12 63:3 64:9
67:6,6,15 74:12
75:2,5,8,22 80:4
82:16 88:8,10,13
89:24 90:2,10
91:4,6 92:14
95:25 135:8
136:10,25 137:15
141:10 152:6,22
152:24 154:1,12
154:15,21,24
155:1,7,18 157:5
161:15 164:3,6,12
164:14 166:9
167:8 168:3,11
169:6,7 171:25
173:8,9,19 174:15
174:17 175:7,10
176:22 177:4
179:25 180:12
181:14 183:25
184:3 191:3,19,20
193:9 195:4
196:20,22 197:18
197:19 201:4
203:17,18 207:9
208:19,23 211:2,4

219:3 226:20
227:13 231:20
238:18 240:20
241:10 242:9
252:13 272:16,20
281:2,17 287:13
288:15,19,20
290:8 291:14
295:5 296:20,25
298:5
**clue**  277:10
**cocktail**  269:10
**cogency**  242:24
**coincidence**
261:14
**cold**  294:3
**collar**  292:17
**collateral**  6:11
281:8
**colleague**  50:9
**collect**  16:15,21
25:3,17 61:1,1
135:17 138:12
160:15,20 280:21
280:22
**collectability**
163:5
**collectable**  138:8
163:2 171:15
176:12
**collected**  67:15
137:15 141:24
142:2,3,3 150:2
152:1 214:7
**collectible**  161:1
**collecting**  25:20
150:3,19 280:17
**collection**  25:25
26:4 28:11 59:9
60:6 65:21,25
66:4
**collectively**  99:18
99:19

**colorful**  223:9
**combination**
190:21
**combined**  132:2
224:18
**come**  36:12 40:8
41:7,16 42:15
49:14 55:14 90:2
91:1 93:18 108:8
109:23 124:19
135:9 152:12
155:7 165:18
176:3 177:24
184:8 190:11
201:25,25 202:13
202:23 203:11
204:3 207:15
208:3 210:14
221:20 271:10
**comes**  21:3 89:19
90:16 127:22
131:12 152:15
208:6 263:13
274:18 277:3
281:24 291:11
**comfort**  294:3
**comfortable**
146:13
**coming**  85:5,7
102:16 127:5
179:5 187:2 244:8
244:8,9
**comma**  267:19,20
267:20
**commas**  225:4
**commenced**  14:11
**comment**  213:17
**comments**  20:4
144:25
**commercial**
239:21
**committed**  96:12

**committee** 4:9
5:18 71:20,23
140:1
**common** 168:6,18
232:3 241:17
286:15 288:12
**communication**
270:9
**communications**
67:8,23
**companies** 206:3
**company** 14:7,22
25:19 49:2 73:2,6
74:16 79:22 85:2
99:3 101:22 102:7
137:17 138:2,19
139:18,19,24
141:8 142:6
145:13 149:5
158:1,9 162:20
169:5 182:13
184:5,19 197:24
199:9,10,14,14
201:17,18,19
202:6,13 204:9
205:17,19 206:7
207:2,24 209:15
209:16,17 211:16
211:18 216:8
225:21 277:15,17
278:7 279:2,13,25
280:18,25 281:4
282:8
**company's** 133:11
139:10
**company's** 196:9
199:14 200:15
208:13 225:14,18
**compare** 187:4
**compared** 121:16
**comparing** 156:16
**comparisons**
119:25

**compelling** 231:8
**compels** 177:19
**compensate**
258:13,22
**compensated**
66:14
**compile** 215:16
**complaining** 97:1
**complaint** 31:15
33:8,10 35:2
58:17
**complaints** 96:5
**complete** 47:17,24
48:4 77:4,11,17
104:12,14 121:1
126:24 185:22
186:13
**completed** 185:15
186:9
**completely** 60:21
101:17 119:2
141:12 218:9
**complexity** 66:1
**comply** 11:9
269:6
**complying** 158:5
**compressed**
217:23
**comprise** 225:25
**comprising**
130:18
**computer** 22:20
**concede** 95:16
181:7
**conceivable** 11:12
180:11
**conceivably**
298:13
**conceive** 187:14
**conceived** 196:18
**concept** 183:13
206:14 266:9
278:10 286:13

**concepts** 206:16
266:8
**concern** 113:13
113:14 114:21
185:12 188:10
204:19 231:20
**concerned** 17:14
22:17 28:19 29:21
102:8 110:6 172:4
212:13 222:6
234:25 298:2,9
**concerning** 102:3
**concerns** 227:14
227:16
**concert** 98:19
**conclude** 221:7
254:12 266:20
270:22
**concluded** 230:15
299:13
**conclusion** 60:15
180:4 228:1
263:13
**condition** 32:11
175:8
**conduct** 214:17
**conducted** 61:24
79:19
**conference** 4:6
10:12,20 31:20
39:18 223:13
**confess** 212:12
**confidentiality**
23:8 29:24
**confirm** 36:6
37:18 43:4 103:14
103:25 150:15
**confirmation**
15:10 18:1,15,19
20:24 21:13 23:3
**confirmed** 68:2
84:2,9 100:1
150:22 166:4

**confirming** 11:4
**conjunction** 78:7
**conjunctions**
225:5
**connection** 20:7
35:9 42:25 46:7
46:11 126:18
159:8 197:23
**connotes** 241:19
246:17
**consensual** 21:11
**consensually** 13:7
**conservative**
92:19 212:4
**conserve** 240:4
**consider** 124:2
231:5
**considered** 39:7
45:24 138:16,21
140:1 165:3
279:25
**considering** 38:23
43:15
**considers** 279:2
281:4
**consistent** 26:23
164:21 168:9
176:22 199:22
220:2 264:21
269:7 284:10
**consistently**
132:24 158:3
165:16
**consists** 63:20
**consolidated**
158:1,9,11
**constant** 166:2,12
**constitute** 44:11
70:19
**constituted** 60:24
62:8
**constituting** 63:10

construct 175:2
consult 216:10
consultation
  270:11
consulted 86:7
  135:24 216:8
consulting 182:19
consumed 223:6
consuming 84:20
contacted 14:20
  14:25
contained 46:12
  138:4 158:15
  159:1
contains 54:25
contemplate
  210:22,23
contemplates
  125:11
contend 220:7
contended 38:22
  268:4
contends 130:23
  175:11 220:19
contention 15:21
contested 14:1
  18:22 24:1 26:10
  43:1 49:25 58:21
  94:10 108:17
  110:15
context 61:11
  230:6 240:11
  246:24 253:12,14
  265:3
contingency
  66:14,16
contingent 213:15
  233:1
continue 28:3
  79:24 88:12 97:11
  117:8 186:11
  231:21 297:13

continued 56:21
continues 185:20
continuing 13:6
contract 15:3 17:4
  36:9 124:24
  125:11 230:20
  231:6,19 232:21
  232:22 237:16
  238:2,10,20 240:2
  242:18 243:22
  244:18 246:24
  249:5 259:20,20
  260:22 269:11
  284:9 294:12
contracted 82:3
contracts 15:4
  17:6 19:5,15,21
  22:6 23:4 27:4
  262:5 285:9 292:7
contractual 232:6
  232:7,9 240:6
contrary 115:15
  175:11 220:10
  254:2 260:7,8
  267:6
contrived 231:14
control 22:1,2,3
  30:4 176:5 182:12
  182:18 183:15
  209:16 239:22
controverted
  125:1
conversations
  67:8 270:14
conveyed 115:20
convince 245:12
  245:19
convincing
  245:13
convoluted 223:9
cooperation 97:25
  221:1

coordinating
  225:5
copies 14:20 15:8
  18:25 50:14 70:3
copy 30:19,21
  51:12,13
corners 223:17
corp 6:2 222:5
corporation 1:8
  1:15 3:21 4:5 7:17
  9:3 10:10 26:22
  110:15 142:16
  146:20 162:13
correct 26:5 33:12
  35:7 38:3 39:8
  40:14 45:13,14,16
  45:20,21 46:2,8,9
  46:14,20,25 47:6
  47:12 50:18 52:5
  52:17,18,20,21
  53:14,16,22 54:7
  54:10,21 59:10
  60:13 64:12,20
  65:4 71:6,7,11,14
  71:21,25 72:10,11
  72:15,16,23 73:9
  73:15,21,22 74:3
  74:4,7,9 75:2,3,8
  75:9,16 76:7,8,16
  76:17,21,22,24
  77:15 78:16,20,24
  78:25 79:12,21
  80:17,25 81:1
  85:18 89:11 93:8
  94:7,23,24 97:19
  99:23 109:12
  114:17 117:1,13
  141:2 164:8
  177:10 209:23
  218:19,19 229:16
  229:16,21 230:25
  233:2,21 235:17
  237:24 244:25

247:10 250:20,20
  251:3 253:23
  272:9 279:24
  281:14
correction 109:18
correctly 29:11
  117:21 275:9
correspond 46:24
  126:11 133:20
corresponded
  46:19 47:10
corresponds
  123:5
cost 15:5 91:13
  177:17 178:7
  220:1
couched 25:1
could've 280:4
couldn't 202:8,17
  209:9 210:10
counsel 30:18,24
  47:14 50:15 51:12
  57:20 78:8,9,10
  78:11 100:25
  127:25 170:11
  214:13 223:13
counsel's 99:18
counsel's 263:24
count 81:17,25
  82:9,15 99:10
  131:5 175:22
  205:24 212:20
  214:16 215:1
counted 83:8
counter 146:16
countervailing
  254:1
counting 73:12,13
  82:1 83:1,5
  143:11 147:1
  152:11 195:2
country 120:5
  301:21

[couple - court]                                                                    Page 17

**couple**   9:19,24
20:10 37:24 42:5
42:25 67:16 74:23
74:24 79:11
104:12 156:19
178:24 181:5
215:21 256:22
260:3 298:25
**course**   9:13 22:9
36:8 72:21,22
73:4 99:13 112:13
128:19 149:4
179:19 184:10,12
184:15,17 192:21
192:22 193:5
199:12 200:17
201:18 208:12
209:9,18,20,22
210:18 213:8
219:15 222:7,22
223:15 228:15
229:4,11 231:22
231:23 236:18
240:19,23 241:9
241:13 242:6,11
242:13 243:2,3
262:23,25 263:24
263:25 264:19
266:6 269:18,20
270:3,4 279:12,12
282:8 284:9 287:9
291:11,16,19,21
292:8,25 293:10
294:1,6 297:19,20
**court**   1:1 2:1 9:2,5
9:11,14,16 10:1,5
10:11,15,18,22
11:4,6,9,21,23,25
12:2,25 13:10,14
13:16,21,24 14:4
15:13,19 16:8,23
17:5,8,13,23
18:17,21 19:4,22

20:1 21:4,15,19
21:21,25 22:4,10
22:16,24 23:7,11
23:15,17,19,23
24:3,6,8,11,18,20
25:6,11,12,14,21
26:1,3,6,8,12,14
27:11,20,23 28:5
28:10,18 30:12,17
31:4,6,24 32:3,7
32:16,20,25 33:11
33:13,19 34:2,7
34:15,19,22,24
35:3,11,14,18
36:23 37:7,11,16
37:19,21,25 38:5
38:11,18 39:4,9
39:14,20,23,25
40:11,15,25 41:5
41:9,18,22,24
42:1,14,20,24
43:9,14,21,25
44:3,11,15,19,25
45:5 48:9,17
49:10,12,14,19,23
50:4,7,16,19,24
51:4,9,12,16,19
51:22 55:1,1 56:1
56:6,8,14,19 57:1
57:5,12,14,16,22
57:25 58:5,11,15
58:24 59:3 60:16
65:8 66:7,9,18
67:7,10,25 68:8
68:11,13,19,24
69:4,8,11,14,18
69:24 70:2,8,12
70:19,22 77:21
79:14,17 81:4,12
85:14 86:14 87:12
88:6,23 89:4,12
90:13,22 91:7,9
91:15,21 92:3,21

93:23,25 94:6,8
94:15 100:14
101:4,7,12,24
102:12,18,22,25
103:11,15,22
104:7,15 106:5,17
106:23 107:2,11
107:15,20 108:5,8
108:13,15,22,25
109:3,5,11,13,20
109:22 110:1,3,10
110:13 111:1,20
111:23 112:3,14
113:23 114:2,4,10
114:13,18 115:3
116:11,13,24
117:11,18,22
118:1 119:18
120:4,6,10,13,15
121:11,21,25
122:6,9,14,22,24
123:3 124:6,22
125:2,24 126:3,6
126:8,13,21
127:13,25 128:4,6
128:12 129:3,8,12
129:20,22 137:2,4
138:7,23 139:8
140:8,19,25 141:3
141:12,22 142:11
143:1,4,6,21
144:7,13 146:3,15
147:18 150:12,20
151:5,13,15,21
152:4,9,21 153:1
153:4,7,10,15,18
154:8,14,19,21,25
155:5,9,12,14,16
155:23,25 156:5
157:3,9,13,20
159:7,10 161:12
161:16,19 162:4,6
162:11,14,18

163:4,8,13,18,24
164:5,9,19 165:4
165:11 166:13,19
166:25 167:5,12
167:20,22,25
168:6,9,15,24
169:2,10,13,16,19
169:21 170:5,8,17
171:3,11 172:3,10
172:14,20 173:5
173:15,25 174:5
182:6,8,10,24
183:4,6 184:9
186:17,21,24
187:11 189:3,22
190:2,7,17,20
191:1,6,12,14,23
192:3,8,10,12,14
193:3,11,13,20,23
194:8 195:1,16,20
197:2,6 198:5,11
198:13,19 199:1
199:21 200:3,12
200:18 201:1,10
201:15 202:17
203:2,12,22,25
204:6,8 205:9
206:12,25 208:7,9
209:8,13 210:9
211:5,21 212:1,6
212:11,19 213:3,9
213:16,23 214:5,8
214:11,21 215:2
215:18,23,25
216:3,11,14,20,24
217:2,5,7,11,17
217:19,22 218:1
218:17,21,23
222:1,4,11,13,16
222:19 223:1,11
223:17 228:12,18
229:3,14,17,19,22
230:1,5,23 231:1

233:4,11,14,24
234:5 235:7,14,18
235:25 236:3,6,9
236:12,24 237:2,6
237:12,14,20
238:1,6,14,22
239:3,7 240:24
241:1 242:21,23
243:6,17 244:13
244:23 245:1,10
245:18,24 246:2,7
246:12,20 247:4,8
247:18 248:15,24
249:6,12,17,22,24
250:3,15,21 251:4
251:7,10,18
252:15,21,24
253:6,8,12 254:14
254:20 257:18
259:4,12 261:1,20
262:1,9,12,14,22
264:3,5,14,17
265:13 270:1,8,15
270:17,19 271:5
271:10,15,18,21
271:25 272:3,6,10
273:3,6,10,13,17
273:20 274:1,4,7
274:11,19 275:3
275:10 276:2,5,13
276:21,25 277:5,8
277:11 278:9,13
278:16,23,25
279:6,15,20 280:1
280:3,7,9,13,24
281:7,10,12,16,20
282:1,3,6,10,13
282:16,18,25
283:3,9,13,20,23
284:1,22,24 285:1
285:6 286:2,14,22
287:2,4,8,15,22
288:1,4,9,14,23

289:1,6,9,11,17
289:25 290:10,15
290:18,21,23
291:2,5,10,18,23
291:25 292:3,6,10
292:18,20 293:6,9
293:17,22 294:2,7
294:13,17,19,24
295:12,16,19,23
295:25 296:2,6,10
296:13,16 297:5
297:12 298:17,21
298:24 299:3,7,11
**court's** 10:25
39:20 44:22 45:3
106:9
**courtroom** 170:1
286:7
**courts** 29:17
120:9 248:2,3
**covenant** 213:24
291:16 292:8
**covenants** 291:19
294:1
**cover** 69:23,24
106:14
**coverage** 25:18
**covered** 17:9
26:24
**create** 144:22
146:7 187:4
231:24 232:19
293:24
**created** 49:6 93:7
144:19 147:8
153:12 155:6
168:3 173:17,18
232:6,11 260:12
260:14
**creates** 89:18
231:17,17,18,18
232:24 242:2
272:25

**creating** 232:15
295:11
**creation** 117:15
**credit** 78:4 138:8
138:9 153:16
156:6 164:13
172:15,18 174:8
174:10,18 177:1
179:8 207:10
266:15 274:23
275:7,17 281:5
283:17 295:3
**credited** 76:19
95:7 96:3 97:9
98:22
**crediting** 205:13
219:4 249:8 253:1
253:2,3 266:14
**creditor** 3:22
**creditors** 4:10
**creditors'** 5:18
**credits** 166:1
173:2 189:16
**critical** 15:16
88:21 240:14,15
**critically** 212:8
**cross** 35:24 36:13
36:13,19 38:14
40:3,9,23 44:18
44:19,23 45:4,10
50:8 51:23 59:1,4
68:13 70:23 85:12
85:15 92:21,23
94:18 101:8
104:16 107:9,24
127:14 210:20
263:19 275:9
**crozier** 44:22 45:7
45:8,11 48:8
**cure** 65:19
**current** 15:17
134:20 152:25
199:23 220:2

**currently** 52:3
54:8
**custody** 30:4
**cut** 161:16 184:3
208:10 249:15,18
**cutoff** 183:24
217:9
**cutting** 18:7

| d |
| --- |

**d** 2:13 9:1 11:5
12:10 43:25 44:2
58:13 70:10,11
94:6 206:8 300:1
**daily** 63:23 79:23
**data** 46:12,15,20
46:22,25 47:10,13
47:19,24 48:21,21
90:13,18 91:3
120:22 121:6
215:16
**database** 121:1
**date** 11:7 52:11
52:12 70:14 79:15
80:21 88:9 113:6
154:22,24 155:1,7
155:18 156:9,13
156:19 173:19
190:21 197:18,19
201:4 211:2 217:7
219:3 220:3
240:20 241:10
242:9,10 261:11
261:11 281:2,17
287:13 288:15,19
288:20 290:8
295:5 296:20
301:25
**dated** 43:2 44:6
49:8,25 58:19
94:9,11 109:14
**dates** 11:5 158:4
158:10

**dating**  46:2
**david**  7:6
**dawn**  68:1
**day**  18:25 40:10
  52:13 112:21
  115:21 126:15
  135:9 136:2 142:3
  142:3,8 153:2
  164:14 182:20
  184:13 188:11
  199:15 207:12
  223:8 227:2 230:2
  230:17 240:3
  265:16 270:12
  285:15 291:12
  298:19 299:8
**daycare**  122:23
  123:18
**days**  10:24 29:21
  30:2 31:21 104:13
  109:23 135:7
  136:9 142:9
  145:23,23 146:1
  147:15,25 148:3
  148:13,21 149:4
  153:24 154:4
  156:19 178:7
  180:12,12 194:17
  194:20 199:11,18
  206:8 207:23
  221:13 229:1
  259:21
**deadline**  11:5
  12:11 15:10
  218:10
**deal**  27:14,18
  28:20 67:12 96:20
  116:7 118:19
  126:22 145:9
  159:18 169:10
  185:13 186:21
  202:7,11 207:25
  213:17 229:19,25

  252:25 253:15,18
  253:19 254:11,25
  258:7,8 263:2,13
  263:17,25 285:22
  292:16
**dealing**  11:17
**dealt**  68:25
  132:24
**debate**  118:25
**debt**  138:9 176:9
  194:13 213:15
**debtor**  1:10 15:7
  17:13,20 26:23
  27:3 29:9,12,14
  30:23 60:12 63:2
  64:9 67:5,19 84:2
  85:25 110:20
  129:18 130:23
  154:5 156:6
  161:20 162:23
  164:13,15 168:17
  168:18 173:9
  176:25 181:20
  185:17 187:13
  196:20 199:17
  216:21 233:25
  242:23 279:13
  297:21
**debtors**  3:24,25
  4:1,7,10,11 8:2
  9:7 10:10 14:10
  14:19,20 15:9,12
  16:17 17:2,7,15
  17:22,24 18:12
  19:2,20 20:3,20
  21:1,4,15,16,22
  22:1,5,25 23:1
  27:1,8,18 29:5,15
  30:4,5 31:10,10
  31:13 32:10,11,22
  33:4,22 35:3 36:1
  39:5 44:5,21 45:8
  46:6,11 51:12

  52:20 58:18 59:14
  59:17,25 61:6
  62:4,11 63:4,8,13
  71:4,9 72:4,9,14
  72:18,20 73:18,24
  74:12 75:12,19
  76:16 77:13 78:2
  78:21 79:1,5,7,10
  79:14 80:1 81:15
  81:17,21 82:14,17
  83:4,8,15,20,22
  84:3,8,11 85:5,8,9
  85:17 86:5,17
  87:8 88:15 89:9
  91:8,21,24 93:6,9
  93:16 95:8,11,18
  95:25 96:3,24
  98:23 100:4,5,8
  100:11 101:7
  102:12 104:21
  105:9 111:17,20
  113:12 119:1
  120:16,24 129:23
  132:1,10,19
  133:21 134:2,5,19
  135:2,25 136:4,10
  136:22 138:17
  140:8 143:13
  151:12 153:15
  159:15,19,22,23
  159:24 160:1,17
  160:22 161:4
  162:21 164:19
  165:10,15 166:3,5
  166:10,16 167:18
  168:25 169:3,22
  170:10,11,14
  171:24 172:13
  173:1,12,18,20
  174:10 175:3
  176:4,10,17
  179:14 180:10,19
  183:11 184:2,21

  186:1 189:2,6,15
  189:19 190:1,3,5
  190:15 191:10,18
  192:18 193:10
  196:11 208:3,6,23
  209:5,5,23 210:6
  210:20 211:13
  212:5 215:10
  216:7,18 217:3,24
  219:14,21 220:7
  221:3,11 226:20
  227:20 228:7,11
  228:13 230:7
  232:7 234:2,23
  238:5 239:10
  244:8,9 247:21
  263:22 266:7,19
  269:23 270:10,23
  271:7 272:15
  276:16 277:3
  285:22 298:5
**debtors'**  87:3
  88:11 95:15,24
  132:5 137:1
  167:10 168:3,13
  168:15 176:2
  177:16 178:25
  181:13 189:11
  208:25 210:1,12
  211:10 214:13
  217:24 221:19
  223:7 224:4
  225:15 227:14,16
  228:4 231:11,13
  231:20 234:16,21
  241:14 242:3
  243:15,16 249:13
  250:11 269:14
**debts**  140:9
  166:13,16
**december**  68:2
**decide**  165:14
  230:8 263:15,16

297:12
**decided** 15:12
76:18 77:11,21
91:25 182:2 234:9
259:24
**decision** 78:3,9,10
181:21,22 182:14
258:21
**decisions** 182:19
**declarants** 41:24
42:9,12
**declaration** 40:8
41:14,16 42:3,7
43:6 44:3 45:23
46:4 49:24 50:17
51:2,6 58:16 60:4
61:3,8,20 63:24
66:18 70:4,16
71:2 75:10 88:7
94:9,11 95:14
96:15,19 98:20
99:25 103:1,3,5
103:19 107:8,10
107:13 108:2,16
108:24 109:13,19
109:24 110:2
112:15 113:3
121:16 123:11,17
131:16 137:11
146:16 150:1,14
155:2 161:22
166:5 168:10
169:15 170:4
171:18,21 179:6
208:16 215:13,13
**declarations**
39:17 41:18,25
42:5,25 43:13
50:12,16,21 70:13
70:17 94:15,17
217:13
**dedicated** 286:10

**deduct** 188:20
**deducted** 175:23
183:16 293:20
**deducting** 182:22
**deduction** 183:8
**deductions**
166:21 177:8,13
**deducts** 163:25
**deed** 33:6 35:6
**deeds** 33:5 35:1
115:21 126:17,19
**deemed** 241:5
284:12
**default** 292:8
**defendant** 24:9,12
24:14
**defendants** 1:16
**defense** 15:5
**defenses** 33:4
**deferred** 57:19
**deficient** 168:8
**defies** 225:2
**define** 95:12
124:18 284:18
**defined** 62:3
130:2,5,7 133:14
133:17 140:23,23
140:24 174:11,12
174:21 197:16,20
198:17 199:22,24
201:2 211:1
218:25 219:1,25
223:23 224:7,25
265:22,25,25
268:6,9 272:6,8
277:14 294:23
296:17
**defines** 170:23
244:2
**defining** 294:15
**definite** 225:4
**definitely** 76:10
76:20 80:7,12,15

80:16,20 82:10
97:5 104:5
**definition** 21:12
60:21,23 61:15,18
114:1,5 137:5
138:15 140:19
159:13 160:4,7
163:1 165:5
176:16 192:1,15
193:13 200:19
219:11,24 220:5
229:23 232:22,25
237:8 252:17
269:18 272:11
274:20 275:11
288:12 295:5
**definitions** 130:4
162:19,24 163:14
266:6,9 267:1
269:12
**definitive** 248:1
249:3
**definitively** 121:8
**delaware** 223:16
**delay** 168:5
177:17 291:13
292:13
**deliver** 59:25
134:6 137:9
156:22 160:1,1
165:10 166:8
169:7 171:24
172:13 196:2,21
199:17 202:15
206:8,9 207:13,19
208:24 210:6
226:20 258:14
261:18
**delivered** 59:13
60:12 61:6,15
62:3,4 63:2 64:9
72:3,14,18 73:21
74:11 134:11,13

136:10,20,25
148:3 154:1
159:22,24,25
163:21,22 166:10
168:25 169:3,4
170:10,12,14
171:2,9 172:16
173:8 174:15,16
175:5,10,13
187:13 199:19
210:7 221:4 232:9
258:14,15,16
**delivering** 156:22
171:6
**delivery** 35:6
197:19 211:3
225:11
**deloitte** 138:18
146:9
**delve** 265:1
**demonstrates**
150:4 184:14
**denied** 105:14,15
105:17
**denominated**
131:17 132:25
**denomination**
132:7
**denying** 190:19
**department** 53:1
140:17
**depending** 38:21
39:6
**depose** 38:13,14
**deposed** 217:2
**deposit** 36:20
108:18 181:15
222:7 297:18,20
**deposited** 75:1,5
75:13,21 78:14
80:6,10,24 84:10
94:23 97:4,6
151:6 179:9 180:1

180:14 189:1
depositing   179:2
deposition   30:10
  38:4 43:3 107:12
  136:17 212:12
  217:4,21 225:16
  225:23,24 227:18
  234:12
depositions   217:8
deposits   297:16
derive   119:4
deriving   114:19
derogating
  268:18
describe   93:5
described   33:7
  63:17 92:25 114:8
  114:16 130:8,15
  144:24 237:21
  247:13,24 248:4,6
  248:8,14 249:1,4
  250:7,10,12
  251:24,25
description
  144:25
designatable   3:5
designated   43:15
  115:3 127:15
  178:2
designating
  131:22
designed   186:16
designs   14:7
desire   133:9
desired   88:8
desk   128:24
detail   90:16
  102:24
detailed   66:20
details   88:17
  135:25 140:5
determination
  39:20 75:23 77:16

77:19 224:12
determine   15:1
  59:24 62:2,8,10
  63:3 64:18 72:2
  76:20 77:6 78:13
  80:23 82:5 119:12
  124:20 161:10
  166:4 223:18
determined   75:6
  76:5,13 83:9
  139:9 181:3
  187:16 199:13
  219:6
determines   18:21
determining   23:4
  72:13,17 74:10
detriment   276:15
develop   82:22
  164:15 215:15
developed   72:12
  72:17 117:14
developer   117:3,5
  117:7
developing   74:2
development   47:6
  56:12 113:20
  115:19
devoted   46:5 64:6
diamond   7:16
diamonds   120:9
didn't   128:2,2
  162:18 163:9
  164:11,19 172:21
  177:3 181:23
  182:25 184:3
  187:20 192:8
  200:15,16 202:19
  204:3,12,14
  214:12 217:20
  218:5 230:8,8
  238:15 248:16
  263:22

difference   122:1
  163:5 207:10
  208:1 249:25
differences   218:6
different   11:16
  36:16 42:2 64:17
  64:18,23 65:2
  68:11 72:20 73:7
  73:19 79:17 123:5
  123:5 126:23
  128:12 133:11
  154:8 156:10,15
  170:18 173:12
  179:22 187:4
  197:13 201:24
  205:18 208:4
  210:14 226:15
  240:1,6,11 246:1
  255:15,17 258:25
  263:9 270:6
  294:13
differently   75:17
  101:19 138:20
  191:20 194:9
  207:22 221:16
difficult   101:16
  205:24 240:12
  248:23
diligence   46:10
  102:13 112:10,16
  112:20 115:16
  120:17,21,24
  127:3 131:25
  134:16 135:6,22
  136:5 139:10,16
  139:17 140:4,11
  145:2 161:5,8
  165:14 204:11
  206:8 221:3,12,22
  293:15
diligenced   145:13
  220:25

diligent   96:12
dip   229:20 250:21
  250:22,25 257:23
  257:24 258:2,4,10
  266:16 269:16
  272:19,23,24,24
  272:25 273:9,11
  273:16,21,22
  274:13,16,20,23
  274:24 275:7,8,14
  275:17,19 276:6
  276:10 278:22
  279:17,23 280:15
  280:18 283:5,16
  283:19 285:12,24
  286:25 288:15
  289:1,15 291:9
  295:3
direct   16:2 22:5
  42:2,8 43:2,7,14
  44:8,12,16 49:24
  50:4 51:6 58:20
  58:24 61:4,4
  68:18 70:20 71:3
  71:3 75:11 86:13
  86:15 94:12,16
  100:14,15 106:6
  108:19,23 109:15
  109:17 123:11
  234:10 240:15
directed   107:18
directly   16:9,12
  26:23 67:20 97:18
  117:16 136:25
director   52:3
directors   158:25
disagree   219:13
  250:16 263:8,9
  284:13
discharge   15:18
  15:22,25 16:1,4,6
discharging   18:2
  18:4

**disclaims** 158:22
159:4
**disclosure** 51:18
141:23
**discovered** 125:7
**discoveries**
217:10
**discovery** 15:12
16:25 17:1 18:17
19:8 25:7 26:14
28:13 29:9,10,13
29:18 217:16,24
218:10 271:1,6
**discreet** 40:17
**discrete** 264:17,20
**discuss** 178:5
298:6
**discussed** 31:19
103:1,4,23 124:11
129:6 135:5 160:6
178:22 197:22
**discusses** 157:23
157:24
**discussing** 111:4
128:21 228:23
**discussion** 112:12
128:8 129:1,17
**discussions** 15:9
78:8,25 216:3
228:25 269:23
287:10
**dismiss** 35:1
**dispense** 108:3
**dispute** 9:9 34:8
77:2 100:24
110:23 111:4
125:22 130:15
150:17 174:6
179:5 190:24
218:24 219:7
223:3 228:19
229:23 247:17,20
283:21 285:20

**disputed** 54:8
99:21 269:15
**disputes** 33:15
100:19 110:16,18
110:22 116:5
129:23
**disputing** 281:1
**distinct** 266:22
**distinguish** 259:9
**distinguished**
286:7
**distribution**
122:20 123:19
125:15
**district** 1:2 24:7
25:11
**divide** 293:2,2,3,4
**divided** 111:24
**dividing** 293:19
**division** 45:13
**divvied** 143:18
**dizengoff** 5:24
**dla** 7:8 10:16
**docket** 106:25
**document** 30:20
39:7,12,14 51:18
128:20 201:11,12
201:13 218:15
221:9 240:12
297:15
**documentary**
231:8
**documented**
126:23
**documents** 3:24
9:22 15:11,15
26:16,17 29:23
30:1 46:12,19,21
46:24 47:1,4,7,9
47:13,17,19,24
48:3,5,6,14,16,18
48:21,23 49:4,6,7
51:15,21 93:9

112:10 113:8
121:6,7 158:16
159:2 212:21
213:14 240:12
276:15
**doesn't** 167:1,17
168:21 170:20
171:3,5,7,7 172:7
172:10 178:6
184:7 193:23
197:2 200:1 201:5
201:12 206:24
219:10 220:4
225:7 229:15,22
232:19 236:7
238:6,6 243:6
245:4,4,5 246:20
247:25 249:20
251:13 261:16
262:5 264:9,24
265:19 267:16
**doing** 13:1 17:1
28:23 89:14 98:18
103:11 138:20
173:13,15 195:12
195:13,16 201:21
201:22 205:12,17
207:22 213:22
270:23 290:6,11
290:23 293:15
**dollar** 68:25 91:12
91:12 104:1
148:23,23 172:7
179:13,15,16
188:12 202:2,2,18
207:21,21 226:18
226:18,23,24
227:5,8,8 243:2
250:24,24 272:22
272:23 281:23
283:15
**dollars** 56:16
138:10,13 166:11

170:15 183:21
186:7 187:12,25
188:9 189:5
194:24 195:24
196:1,3,5,8,13,15
196:23,25 199:9
199:16 200:23
201:14,16 207:6
232:14 275:5
283:7
**dollars'** 196:21
**dollar's** 227:5
**don't** 76:25
127:17 168:19
178:1 188:18
197:6,11 213:11
213:12 215:2
221:3,15 222:1,9
229:1,19,24 230:2
230:3 232:2,15
233:9 235:12
236:11,14,19
237:24 238:12,15
238:17,17 247:16
247:19 248:22
249:6 251:21
256:14 260:18,23
262:5,16,23 263:8
263:14 264:3
267:24 269:3
**double** 91:25
92:19 99:10
143:11 147:1
225:12 232:18
233:19
**doubled** 92:2
**doubt** 113:15
151:18 184:7
203:4 244:11,13
244:21 245:12
263:2
**draft** 268:1,12
292:7

**drafted** 256:7
259:22 268:24
**drafting** 268:5
291:17
**drafts** 265:11
**dragged** 190:9
**drain** 2:13
**draw** 250:2,5
252:2,4 253:5
**drawer** 194:4
**drawn** 180:8
191:19 194:1,3
**driving** 114:20
**drop** 180:14
**dropped** 221:6
**dual** 65:18
**dublin** 5:23
**due** 34:1 88:7
102:13 112:16,20
120:17,21,24
131:25 139:10
161:5 165:13
186:10 204:11
220:25 221:2,12
221:22 242:10
264:5 293:15
**dykhouse** 7:6
**déjà** 197:3

**e**

**e** 2:12,12 5:1,1 9:1
9:1 44:1,2 49:22
58:13 70:10,11,11
300:1 301:1
**e&y** 86:3 104:10
106:10 140:14
204:24 205:1,4,12
205:20 238:15
**e&y's** 101:9
**e&y's** 204:15
221:10
**e.g.** 185:6
**earlier** 35:17
83:22 85:19

105:21 123:19
145:23 147:25
170:9 173:1 188:1
211:17
**early** 64:3 134:21
187:24
**easement** 119:21
**easements** 116:17
130:11
**easier** 41:23
252:16
**easily** 119:18
201:2 219:6
268:23
**easy** 22:11 167:6
195:6 240:12
255:23 268:1
285:14,16
**eat** 228:3
**eating** 296:7
**ecf** 3:5,8,11,14,15
3:19,25,25 4:2,7
4:12,13,14
**economic** 56:12
82:13,13 252:25
253:17 263:13
**economics** 258:7
**ecro** 2:16
**eda** 36:21 56:12
116:16,20 117:6,8
117:10,12,14,16
297:7,21
**edison** 29:7
**edward** 6:15
**effect** 123:11
220:3
**effectively** 16:6
18:2,7 89:7,13
112:21
**effort** 47:16 48:3
48:5 80:22 171:9
187:7 204:24

**efforts** 35:12
47:23 64:11 96:12
280:20
**ehrlich** 7:13
**either** 27:24 29:14
40:11 41:1 57:7
63:23 88:20 92:5
95:16 96:22
127:17 128:7
133:1 139:9
162:20 173:11
194:19,22 206:15
246:21 252:16
261:23 268:5
286:3
**electronic** 46:12
46:15
**eliminates** 35:15
**email** 12:25 30:13
67:23 278:5
284:20,23,25
**employed** 46:3
52:22
**employee** 74:6,8
105:15 127:10
**employees** 20:21
20:22 21:23 55:6
85:17,20,22,23
86:1,4,10 97:18
97:21 100:17
105:14,16 111:11
130:20 158:25
271:7
**empty** 279:14,18
**enable** 98:3
**enclosed** 116:17
**encompass** 45:25
248:5 250:9
**encompassed**
122:11 248:12
**encompasses**
250:11

**encourage** 189:7
**encumbered**
161:24
**ended** 75:7 79:9
158:12 179:2
180:1 185:16
196:24 272:23
**ends** 152:8 232:15
**enforce** 4:1,10
31:11,14 44:5
58:18 228:13
**enforcement**
129:24
**engaged** 59:8
63:16
**engagement** 59:24
62:25 74:7
**english** 225:2
241:18 250:13,14
**ensure** 47:16,23
48:3,5 100:2
153:25 210:5
276:19
**ensuring** 228:6
**entail** 59:12
287:11
**enter** 225:13
**entered** 113:12
**entertained**
196:16
**entire** 119:6
128:22 131:23
133:2 157:24
**entirely** 32:19
189:19 197:25
**entirety** 250:9
**entities** 22:14 23:1
142:16 146:19
161:20 162:10,12
**entitled** 20:13
114:12 157:4,7
180:20 221:12
227:8 239:9

entitlement
  117:16
entity  56:21
  162:23
entrance  55:3,10
  55:12
entrances  111:10
  130:20
entries  22:12
  62:17,23 66:21,24
  71:8 72:8 159:20
  171:23 173:13
entry  3:22 24:1
  71:5,13 81:22
  153:13 211:9
  225:12 232:18
  233:20
enunciated  284:6
equal  163:20
  174:13 200:3,22
  201:3 219:2 275:5
  288:16
equally  164:10
  166:16
equals  90:11
equating  219:13
equivalent  283:5
  283:10 289:7
equivalents  283:3
  283:11 289:12,14
ernst  71:24 72:1
  74:10 75:14 77:13
  92:25 189:25
  201:25 202:6,23
  203:16 213:21
  216:7,9 220:19
escrow  32:12,13
  178:22 179:16
  281:5 297:2
esl  93:6 135:12
esl's  111:18
esl's  225:22

especially  97:12
  116:20 222:20
  265:3 268:6
essence  65:18
  205:11
essential  64:21
  65:1
essentially  81:22
  92:7 224:19 258:9
  288:8
establish  68:22
  209:24 291:20
established
  247:14
establishes  221:16
  263:5
establishing  88:9
  290:6
estate  18:10 25:4
  27:1 29:15 45:12
  45:19,24 46:5
  47:12,15,16,23
  48:2 53:1 67:15
  69:15 75:1,4,7,14
  75:16,24 76:1,3,5
  76:7,15,19,19,20
  77:6,14 78:5,13
  79:9,12 80:7,11
  80:25 83:9,11,21
  84:15 85:9,24
  86:19,23 87:3,5
  87:14,15,18,22
  88:1,3,22 95:8
  96:6,7,10,13
  97:10,14 98:12
  107:5 115:14
  123:25 178:14,21
  179:2,3,9,17,23
  180:2,13,23,24
  181:1,3,17 182:5
  183:8 184:23,24
  186:8,8 189:21
  190:6 191:10

243:11,12,13
  254:6 260:2 277:4
estate's  87:19
estates  6:18 16:22
  17:15,16,17,22
  18:12 33:18 36:16
  36:19 40:20 41:11
  41:21 46:1,1 47:5
  53:13,15,20 55:15
  56:3,10 107:4
  111:5 113:20
  115:18 116:17
  117:4 118:4,15,17
  118:22 119:17
  120:2 121:4,10
  124:15 130:17,18
  131:14,23 132:11
  133:3 141:15
estimate  81:15,17
  81:21 82:19
  208:21 211:15,15
  261:6
estimated  136:4
  144:12 149:24
  261:8
estimating  276:18
estoppel  132:13
  132:16
et  1:15 4:5 9:3
  84:17 87:6 88:18
  110:15 159:6
  297:25
ether  295:23
evens  165:24
event  19:17,22
  21:12 26:21 54:20
  174:11 266:16
eventually  134:23
  152:3 233:16
  280:19
evermore  223:8
everybody  22:21
  41:7 140:16

141:21 145:22
  187:5 277:10
everyone's  57:7
evidence  18:15
  38:11,24 39:21
  43:13 57:18 76:1
  76:6,9 94:17
  107:3,15,17
  108:24 113:1
  115:11,13 116:10
  124:3,10,24,25
  127:20 128:23,25
  129:8 168:5,22
  173:23 181:4
  231:5,6,8,8 247:9
  254:24 256:6,24
  259:23 260:6,7
  263:5,11,12,23,23
  264:12 265:2
  291:22 294:14
  296:18 298:7
evident  101:1
exact  33:21 82:5
  105:7 134:23
  136:11 145:16
  149:13 153:23
  196:24 205:23
exactly  48:20
  109:21 133:14,20
  134:2 136:20
  145:14,22 146:7
  148:4,22 149:18
  150:6,7 161:14
  167:21 186:16
  196:9 206:6
  207:25 211:7
  215:3 224:2
  243:10 267:6
  274:13
examination  3:24
  35:24 36:13,19
  40:3,9 44:23 45:4
  45:10 48:11 50:8

51:23 59:4 65:10
66:10 70:23 71:3
81:8 85:15 86:15
92:23 94:18
100:15 104:16
106:6 107:9,24
**examinations**
36:13 40:24
**examine** 38:14
59:1 127:14
210:20
**examined** 263:19
**examiner** 178:7
194:21 195:10,10
195:13
**examiner's**
221:14
**examining** 75:1,4
**example** 39:4
67:25 82:6 84:1,5
90:4 91:14 97:4
101:24 102:2
103:25 146:17,23
150:20 153:3
181:14 185:5,6,23
283:16
**exceed** 3:17
183:21 243:19
262:8 268:14,22
269:1
**excel** 101:21
102:18,22,24
204:10 215:19,24
217:11
**exception** 42:11
73:22 240:18
241:16 297:19,20
**exceptions** 241:11
281:13
**excerpts** 107:12
212:12
**excess** 134:25
174:17 176:10

244:14 258:9
259:8 267:12
289:22
**excessively** 199:7
**exchange** 260:22
**exciting** 228:25
**exclude** 191:11
199:1 245:7 257:4
**excluded** 118:18
162:24 171:20,23
181:11,18 199:2,2
199:3 240:9,17,17
240:23 241:6,19
243:14,23,25
245:5 267:14,16
267:17
**excluding** 198:21
**exclusive** 275:20
**exclusively** 25:5
**excuse** 78:15
111:7 112:6 135:4
145:23 191:2
198:11 210:4
214:6 233:13
**excused** 12:1 31:5
**executed** 199:15
199:20
**executing** 227:12
**execution** 133:24
134:17 135:8,23
136:7,9 147:15
148:15,20 149:3,6
149:18 153:21,25
156:9,13,19
157:15 196:1
202:4,16 203:21
206:3 207:9,12
**executory** 15:3
23:4
**exercise** 164:14
**exh** 38:6
**exhaustive** 121:2

**exhibit** 131:19
135:1 144:5,5,9
213:11 218:15
278:4
**exhibits** 37:2,2,3,4
37:5,14 38:19
50:12,13 67:22
**exigencies** 88:8
**exist** 20:17 27:17
27:18,23,23 96:16
96:23 97:2 178:19
**existed** 48:25 49:5
185:9 196:13
**existence** 177:4
**existing** 88:11
240:19 241:10
274:22 275:6,16
288:18
**exists** 96:17 97:3
178:15
**expanded** 212:3
**expect** 29:22
77:21 78:7 79:4,6
87:22 104:8
187:20
**expectation** 34:25
84:25 87:3,24
148:10 149:14
206:4,6 263:1
**expectations**
61:18 196:19
201:9 203:7
206:13,18 208:5
215:5,6 230:19,22
246:25
**expected** 125:11
135:2,15 148:22
149:22 208:11,15
**expecting** 84:22
149:13
**expeditiously**
31:17

**expense** 17:18
103:25 185:25
**expenses** 95:24
188:17
**experience** 63:21
80:4 86:17,25
102:6 106:12,13
240:13
**expert** 271:2
**explain** 19:18
65:16 84:4 100:21
197:17 256:20
257:18 277:17
**explained** 135:4
**explaining** 278:6
**explains** 162:8
171:18,22 209:22
**explanation**
231:15
**explication** 297:8
**express** 158:18
187:22
**extend** 11:7 97:17
218:10
**extending** 11:5
**extensive** 83:2
265:10
**extensively** 86:9
**extent** 11:20 26:3
27:23 30:6 35:23
36:12 47:1 118:6
181:10 184:21
206:22 210:7
269:5
**external** 146:21
162:16,19
**extinguished**
147:10
**extra** 112:24
**extraneous** 265:1
**extraordinary**
223:7

**extremely** 82:12
**ey** 95:23 97:15,20
　98:16 103:24
　215:11,12,12,14
**ey's** 89:6,12
**eyes** 247:11

**f**

**f** 2:12 238:25
　301:1
**face** 38:23 116:9
　204:15 219:6
　264:24 265:1
**facie** 180:20 181:4
**facilitate** 19:1
　66:4
**facilities** 111:11
**facility** 295:3
**fact** 21:13 22:12
　22:23 35:9 59:25
　78:13 80:13 95:21
　97:12 115:16,17
　118:9,13 119:13
　121:15,23 124:13
　125:20 129:16
　131:21 132:10
　135:22,24 141:19
　145:4 149:8
　150:13 157:25
　161:7,8,9 162:22
　165:21 170:13
　171:13 175:5
　177:4 180:8 181:2
　181:3 184:12
　185:6 191:16,18
　191:21,21 198:4
　204:21 205:24
　209:17 210:6
　211:18 214:16
　215:11 220:21
　226:10 229:7
　231:14,18 232:18
　243:3 247:20
　252:2,4 257:8

265:7 267:7
269:13 273:1,15
275:25 276:25
277:9,10 280:19
**factor** 85:3
**facts** 131:11
　270:20 271:12
**failed** 188:23
　203:4,5
**fails** 226:3
**fair** 41:9 47:15
　60:10 127:9 141:6
　197:25 208:2
　270:1,5 290:9
**fairly** 79:5 84:20
　137:19 263:15
**fairness** 253:4
**faith** 287:7
**fall** 67:13 142:15
　235:2
**falls** 239:16
**falsehood** 231:25
**familiar** 51:1 53:6
　56:9 105:10
**fannin** 7:19
**far** 20:4 22:16
　27:5 28:18 29:12
　29:20 37:19,20
　78:9 91:10 103:16
　110:5 172:4
　183:22 212:13
　222:5 236:6 249:7
　249:8 250:19
　287:19 298:2,8
**fargo** 279:22
　280:14 287:18
**favor** 223:15
　230:12 257:2
　293:10
**favorite** 36:21
**favors** 242:2
　284:6

**february** 32:10
　52:17 145:19
　150:24,24 154:23
　154:25 155:8,20
　155:21 156:3
　184:6,18 185:13
　187:18 223:5,12
　224:3 229:12
　278:19 291:13
**federal** 3:23
**fee** 66:14,16,17
　169:13,16
**feedback** 83:5
**feeling** 195:21
**fees** 45:2
**feld** 5:17
**fell** 228:7
**felt** 79:23
**fewer** 226:20
**fields** 55:1
**fifo** 91:10,14
**fifth** 6:3
**fight** 190:20
**figure** 74:19 77:8
　77:13 78:1 83:16
　83:21 187:9,11,17
　199:18 202:5
　205:22 213:7
　294:5
**file** 10:6 25:15
　115:16 127:3
　181:25
**filed** 9:18 14:19
　15:7 19:12 20:10
　23:21 31:15 33:8
　35:2 52:9
**files** 29:1 120:21
　217:15
**filing** 92:12
**final** 230:4
**finalize** 189:7
**finalized** 45:3

**finally** 36:21
　145:20 227:11
**finance** 63:6
　104:21 138:17
　216:10 254:11
**financial** 71:4,9
　71:10,14 72:9
　73:10 102:16
　133:9 157:23
　158:1 175:4
　176:18 212:15
　219:16 220:14
　221:8 225:17,18
**financials** 134:3
　138:18 146:9
**financing** 48:25
　49:1 121:5 212:10
　212:13 213:15,18
　254:10 255:2
**find** 21:24 22:5
　29:1 35:18 83:10
　84:21 123:13
　147:14,21 156:17
　206:15,19 261:16
　263:7 280:17
**finding** 96:7
　156:13 181:6
　275:13
**finds** 271:6
**fine** 10:5 13:14
　19:16 37:11 43:14
　45:5 51:9 58:3
　106:25 108:4
　120:6 168:24
　182:2 186:24
　188:1 220:13
　223:1 288:22
　293:17
**finger** 294:10
**finish** 154:19
　187:24 271:11
**firm** 205:4

**first** 9:8 10:3,12
12:16 29:4 30:15
30:18 40:18 41:11
69:19 75:19 79:8
111:3 118:16,20
128:13 129:22
131:5 141:25
142:14 159:24
160:5 162:6 163:9
169:9 175:12,25
179:13 180:11
195:23 197:1
211:13 228:18
240:7,8,16 242:3
249:15,18 251:1
251:20 255:14
262:15 266:2
277:19,20 283:14
**fit** 29:5,18 162:23
164:23 206:14,14
297:17
**fitness** 45:19
**fits** 200:18 218:4
**five** 12:15 90:12
185:14,24
**fix** 28:23
**fixed** 171:12
262:10,11
**floor** 6:19 7:19
8:3
**flow** 213:1
**flows** 158:11
212:22,22
**fluctuate** 149:15
**fluctuating**
142:22 236:18
**fluctuation**
166:12
**fluctuations** 166:2
**flynn** 10:20
**focus** 96:9,11
201:8

**focused** 74:25
96:7 264:7
**focuses** 96:8 184:4
**focusing** 138:13
138:14
**folder** 47:4
**folders** 46:20,24
48:24
**follow** 19:13,19
202:20 249:7
**followed** 36:15
250:8,9 255:16
265:10,15
**following** 36:14
67:2 80:8 144:25
179:4 241:6
250:25 265:16
**follows** 32:9
266:15
**footnote** 38:9
269:21
**forced** 181:12
201:8 203:6
**foregoing** 301:3
**foremost** 227:14
266:2
**forever** 185:24
**forget** 191:25
**forgotten** 222:15
**form** 18:24 30:19
158:5 252:11,12
**formalize** 15:12
**formalized** 15:14
**former** 85:17,25
86:4 294:8,8
**forms** 12:22
**formula** 229:20
**formulas** 297:17
**formulate** 213:25
**formulation**
177:16
**forth** 131:8,8,18
133:18 140:20

160:8 163:15
174:22 175:13
203:5 206:24
223:24,25 224:1
224:14 225:1
226:16 228:2
**fortuity** 20:12
**forward** 61:2
64:15 166:3
**found** 78:11 228:5
266:9
**four** 52:16 147:20
202:7 221:24
223:17 224:14
226:17
**fourth** 3:13
251:14
**fox** 6:15
**frankly** 36:5
137:18 143:4
147:15 149:13
181:22 189:11
195:8 230:16
231:14,25 233:10
239:6 244:19
251:21 252:14
260:10 263:15
290:5 291:20
297:22 298:15
**fraud** 159:21
**free** 127:6 185:25
298:14
**fresh** 57:6
**friday** 9:18 156:3
184:13
**fridge** 211:8
**friedman** 123:16
**friedman's** 69:7
82:6
**friedmann** 31:8,9
31:25 32:4,8,18
32:21 33:1,12,14
33:25 34:9,10

35:7,12,15 39:12
40:14,23 41:2,6
41:23 44:20,20
45:1,6 49:13
50:20 56:7 57:3
57:11,15,19,23
58:3 59:2,5 65:7
66:8 68:14 69:17
69:20 70:1,21,24
81:2 85:12,16
86:12 92:24 93:22
100:16 101:3
106:7 110:19,19
111:2,22,25 112:4
112:18 113:25
114:3,8,11,17,20
115:5 116:12,19
117:1,13,19 119:4
123:15,23 125:13
125:25 126:15,24
127:18 128:3,5,8
128:15 129:4
133:7 137:3,25
138:16,24 139:14
140:10,22 141:2,6
141:15,25 142:19
143:3,5,12 144:4
144:8,14 146:5
147:5,19 150:18
151:3,11,14,16,23
152:7,10,19,24
153:2,5,9,11,17
153:19 154:13,17
154:20,23 155:3,6
155:10,13,15,19
155:24 156:1,8
157:7,11,14
160:17 173:11
178:18 182:7,9,11
183:2,5,7 184:11
186:19,23 187:1
187:20 189:4
195:18,21 197:4

197:12 198:14,24
199:5 200:2,9,17
200:21 201:6,12
201:16 202:22
203:4,13,17,19,21
203:23 204:2,7,17
205:16 206:21
207:4 208:8,11
213:14,19 214:4
214:10 217:14,18
217:20 222:9,12
222:15,17,20
223:2 228:22
229:5,16,18,21
230:15 231:23
232:17 237:16
247:25 270:25
271:9,14,16 272:5
272:9,12 273:5,7
273:12,14,18,23
274:3,6,8,12
275:1,4,12 276:4
276:12,17,24
277:2,6,9,13
278:12,15,18,24
279:2,10,16,24
280:2,5,8,10,16
281:3,8,11,14,18
281:22 282:2,4,7
282:11,22 283:1,6
283:12

**friendman** 66:11
**friends** 269:10
274:14
**front** 38:14 39:13
54:15,19 83:13
116:21 246:6,12
246:13
**frontier** 132:20
**full** 35:25 102:23
140:14,16 261:13
**fuller** 157:19

**fully** 10:21 33:15
274:22 275:6,16
288:17
**fun** 247:25
**function** 67:2
132:17 210:16
245:3,6 257:5,24
258:11 293:19
**funds** 36:21 79:5
83:1 84:3,10
88:22 95:17
187:13 189:20
190:18 222:7
279:25
**further** 48:8 49:9
56:4 65:7 66:6,8
66:20 81:2 88:5
89:15 93:24
100:13 106:4
122:8 145:2
177:18,22 186:15
218:12 220:5
228:2
**furthering** 10:24
**future** 225:20

**g**

**g** 5:12 9:1 14:21
19:3 22:13 49:22
49:22 94:6 108:13
255:13
**gaap** 81:23 82:8
165:18,20,23
167:3 168:3 175:4
175:16 176:17
178:1 191:7
205:11 212:22,24
212:25,25 214:1,4
214:10 215:9
219:16 220:13
221:7,19 232:20
**gallagher** 8:6,12
41:10 49:12,18,21
49:21,23 50:3,6

51:1,3,8,23,25
52:3 53:6 56:2,9
56:11,15,24 111:9
116:13 118:8,20
121:9 123:4 128:2
132:6
**gallagher's** 50:15
111:12 112:15
**game** 227:3
**games** 148:21
194:18 209:9
**gander** 168:1
**gate** 55:5
**gates** 111:14
112:1
**gee** 292:15
**genender** 6:7
**general** 16:16
17:18 49:5 225:14
240:22 241:13
242:25 270:12
278:10 279:5,7
286:8,11 296:13
298:1
**generally** 53:9
66:21 71:15 84:14
84:24 132:20
292:11
**generate** 56:17
**generated** 154:9
165:22 167:7
168:11 177:2
**generic** 130:18
**getting** 9:22 104:3
127:1 141:10
145:14 146:13
148:14,19,21,22
149:22 154:17
156:14 171:14
173:19 177:1
181:24 198:5
207:5,7,24,25
213:21 233:7,12

233:15,18 261:13
263:4
**give** 23:12 62:25
69:4 74:19 83:4
83:15,18,20
101:24 104:10
132:18 144:21
146:3 148:8
151:16 159:7
181:25 188:2,4
205:7,7 230:10
244:2,3,20 248:13
251:23 254:9
256:17 258:9
260:20 288:8
289:4,20 292:25
297:7
**given** 31:15,16
37:2 63:10 64:15
65:25 71:10 73:2
73:6 117:17
131:21 132:7
135:21 136:2
142:8 146:10
152:17,18 187:1
205:24 209:4
212:21 213:6
219:8 221:4
222:20 228:20
252:25 263:9
269:20 284:11
**gives** 150:23
290:6
**giving** 139:2,15
147:2,3 177:22
263:16 285:9
**glad** 33:19
**go** 9:14 17:25
21:16 22:20 35:18
40:7 57:7,18 58:2
58:5 61:2 77:13
81:10,14 84:20
85:18 89:14

101:22 102:19
103:11 108:3
114:5 118:12
119:21 129:18
133:6 142:11,11
143:13,21 149:16
149:16 153:7
154:12,13 156:25
157:5 167:2,15
168:20 172:24
178:1 180:15
181:20 182:15
185:23 188:14,22
194:19,20 199:25
201:10 204:8
214:3,16 215:1
237:8 242:7
246:22 283:7
297:16 298:8
**goal**  57:20
**gob**  88:21 104:2
130:5 179:8
**god**  42:18 43:23
49:17 58:9 70:6
94:4 108:11 109:9
**goes**  9:23 116:16
158:4 177:22
197:17 208:22
210:21 236:7
285:2
**going**  10:14 19:13
23:3,5 25:12,15
25:17,24 27:12
30:10,23 38:11
40:3 41:12 42:8
47:18 57:23 64:14
69:24 70:3 72:1
73:13 77:20 78:4
78:5,19 81:10,12
81:14 84:25
104:10 113:12,14
114:21 115:4
117:22 131:7

138:11 143:7,15
143:17,18,21
144:20 147:14,16
148:8 149:16,16
156:17,18 157:24
160:4 161:16
167:2 169:22
172:22 173:16,20
177:24 178:22
179:4,16 180:22
181:5 186:16
188:11 191:1,2
195:12,13,22
202:5,14,20
204:22 206:1,6,8
206:9,10,11
210:13 211:21
212:1 233:15
235:5 239:15,19
239:22 241:10
245:10 252:19
260:5 262:20,20
264:14,17 270:22
282:11 290:6
296:5
**good**  8:15 9:2,4,5
10:8,11,18 12:4
14:5 22:4 27:6
31:8,22 33:10
43:17 45:8 51:25
51:25 59:6,7
65:12,13,15 69:15
69:17,21 70:25
71:1 79:5,18 81:5
81:10 82:19 94:1
94:1,5,7,8,8,14,17
94:18,20,20,21
96:20 100:4,15,17
101:4,6,11,15
102:2,14,21,23
103:8,13,20,24
104:12,16,18
106:6,8,18 110:13

117:23 118:1
139:7 148:25
159:11 181:22
185:20 189:9
197:8 204:9,20
216:22 292:16
**goods**  105:25
200:7 205:25
225:25
**good's**  218:2
220:24
**goose**  167:25
**gotshal**  6:1 9:6
10:9 31:9 44:21
45:2,8 110:20
169:16,22 181:25
**gotten**  29:19
103:4 172:18
173:21 183:23
188:6 262:23
**gottlieb**  5:3 12:5
43:18 65:13 81:6
117:24 189:10
**governing**  264:22
**grab**  116:5
**graciously**  11:1
**grammar**  252:1
**grant**  29:25
228:13 243:15
269:14
**granted**  300:7
**great**  134:12
223:2 277:3
**greater**  238:24
275:17,20 276:3
**greatly**  142:24
**ground**  264:15
**group**  45:13 47:12
47:16,23 48:2
87:16 112:5
115:14 132:21
137:18 150:22
218:18 250:23

**groups**  82:25
255:17,18
**grow**  152:6
**guaranty**  9:24
**guard**  52:1
**guess**  11:11 15:23
21:6 31:20 117:11
162:20 172:21
177:23 178:21
188:12 190:7
198:22 199:21
210:16 259:13
279:10 283:4
294:13 298:9
**gump**  5:17
**guys**  139:23
291:14

## h

**h**  49:22 70:11
**hac**  44:23
**hadn't**  194:11
196:15
**half**  178:13
190:10 194:21
195:14
**halfway**  168:16
**hamilton**  5:3 12:5
43:18 81:6 117:24
189:10
**hand**  12:23 38:20
42:16 43:22 49:15
50:11 51:9 58:7
70:4 94:2 108:9
109:7 116:18
176:15,24 277:5,6
**handed**  282:24
**handle**  31:13
297:3
**handled**  10:14
**happen**  142:9
145:11 147:16
149:15 168:7
178:6 180:6,18

187:21 188:5
**happened** 84:4
93:20 125:5 139:5
146:2 165:15
264:1 273:7,9
276:14
**happening** 125:6
254:25 272:23
**happens** 28:16
274:6
**happy** 12:23 57:7
57:17 79:4 80:2
229:18
**hard** 16:10 81:13
137:19 141:13
167:17 180:9
216:23
**hasn't** 172:20,20
173:17,25 185:15
185:23 204:10,14
**hat** 196:6
**hauer** 5:17
**haven't** 186:17
188:6 212:12
230:5,23 262:23
264:19
**hazard** 241:18
**head** 20:4 58:1
194:18
**heading** 113:23
119:5,6 130:13
**headings** 114:19
119:9 130:23
131:5
**headquarters**
54:11,18 111:8,15
113:15 114:24
119:20,21 124:13
125:18,19 127:2
128:9,18,19,21
130:19
**hear** 40:20,25
57:17,18 60:17

83:19 192:8
228:17 254:24
263:11,20 264:3
**heard** 11:2 42:13
56:11 111:16
116:10 123:19
179:22,23 190:23
205:18 216:15
231:14 232:17
263:17,23 277:22
**hearing** 3:1,1,4,7
3:10,13,17,21 4:1
4:4,9 9:10 12:8
15:11 18:15,19
24:5 39:15 81:13
178:17 202:11
204:4 223:12
224:3,13 230:22
253:5,10 255:7
298:3,16,20
**hears** 263:12
**hearsay** 68:15
**heavy** 73:17
**hede** 8:14 69:14
69:18,21 70:7,10
70:10,12,18,23,25
74:25 79:16 80:4
81:8,10 85:15
86:15 88:6,15
89:1,11,15 90:15
90:24 91:8,11,17
91:24 92:6,23,25
93:25 179:24
180:3,16 181:7
189:25 196:14
203:11 207:15,19
211:7,17 212:3
215:13 216:16,20
216:22 217:2
**hede's** 101:5
102:21 103:19
**hede's** 179:6
217:3 220:24

221:16
**held** 150:16
156:21 171:4
179:17 181:1
185:18 193:4
272:15
**help** 42:18 43:23
49:17 58:8 66:4
70:6 83:16,20
86:7 94:4 108:11
109:9 205:6 233:4
234:16
**helped** 234:21
245:19
**helpful** 35:18
**hereof** 220:3
**here's** 183:18
**herring** 260:11
**hey** 18:1 201:25
**he's** 172:21
**high** 79:22
**highlight** 34:20
132:14
**highlighted** 77:1
**highlights** 275:13
**hinges** 269:17
**hint** 118:6
**hire** 203:16
**hired** 65:17
201:25 202:23
203:12,15
**historic** 147:6
**historical** 92:10
199:23 220:2
**historically** 72:9
113:7 127:12
**history** 260:19
**hit** 20:3 104:3
154:10 274:13
**hoffman** 6:18
33:18 36:16,19
40:19 41:11,21
46:1,1 47:5 53:13

53:15,19 55:15
56:3,10 107:4
111:5 113:20
115:18 116:16
117:4 118:4,15,17
118:22 119:17
120:2 121:4,9
122:2 124:15
130:16,18 131:14
131:23 132:11
133:2 141:15
**hold** 186:3
**holdco** 1:12 3:15
3:17 4:5,13,14 5:4
7:9 12:6 27:13
34:6 37:3,8 41:13
52:2
**holdco's** 27:2 44:4
58:16
**holding** 117:9
142:16 146:20
158:1,9 162:13
180:23 182:5,22
186:1 193:7 222:5
**holdings** 1:8,15
3:7,10,13,18 4:5
6:2 7:2 9:3 10:9
14:22 110:14
**holter** 68:2
**home** 40:7 261:16
261:20,22,25
264:9
**hon** 2:13
**honest** 104:22
200:9
**honestly** 60:23
104:25 142:20
**honor** 9:4 10:2,8
10:16,17 11:8,20
11:24 12:1,4,6,7
13:2,9,15,17,23
14:2,5 19:7 20:2,3
20:20,25 21:18

23:14,20 24:14
26:5,9 28:12
30:10 31:2,3,5,8
31:12,18 33:7
34:5 35:15 36:24
37:2,6,10 38:15
39:2,8,13,19 40:1
40:14 41:12,23
42:10 43:12,17
44:13,20 45:7
48:8,10 49:9,13
50:8,10,10,14,20
51:11,15 56:7,18
57:3,11,15,19
58:3,23 59:2
60:14,20 65:7,9
67:22 68:7,14,20
69:3,13,17 70:21
81:2,5 85:13
86:13 89:15 93:24
104:18 106:21
107:1,7,19 108:1
108:21 109:18
110:19 111:3
112:21 115:9
116:10 117:23
118:2,24 119:3,8
119:14,25 120:9
120:16,18 121:3
122:4,13 123:11
123:14 124:3,9,16
124:20,25 125:5,5
125:10,12,13
126:9,16 129:4,5
129:11,21 133:7,7
138:1 141:7,25
142:20 143:13
147:5 149:23
150:10 151:4,18
152:19 157:18
159:11,12,13
162:2,8 164:25
165:1,25 166:18

167:9 168:4 169:1
169:25 170:10
171:18 172:25
174:4 178:18,23
183:19 185:13
186:5,20 189:4,9
189:11 194:25
195:15,18 198:9
201:6 202:10
206:21 208:8,10
209:12 211:25
212:17 213:5
214:4,14 215:10
215:22 216:16
217:14 218:12,14
218:22 221:25
222:10,18 223:2,4
223:4 224:2 225:6
226:14 227:11
228:1,15,17 230:2
230:11,25 231:4,6
232:3 233:22
234:8 235:23
236:2,8,15 237:13
237:15,17,23
238:9 239:5,12,17
240:7 241:18
242:18 243:21
244:7,12,19 245:8
246:6,11,23,24
247:1 248:2,11
250:1,5 251:8
252:14 253:4,7,23
254:12 255:23
256:23 257:8,21
259:15,19 260:5,6
260:8,25 261:23
263:7,11,12,13,15
263:21 264:4
269:19 270:18
271:1 272:12
283:14 284:6
285:5 286:5

289:24 290:13
291:15,20 292:1
292:14,17,23
293:24 295:7,17
299:10
**honor's** 32:1
108:3 110:23
269:21
**honoring** 218:4
**honor's** 210:21
224:12
**hope** 247:15 295:4
**hopeful** 10:23
**hopefully** 11:19
35:18 57:24
104:13 195:11,14
270:16
**hoping** 13:11 97:8
97:10,15,16
**hour** 45:19 66:14
153:2 217:16
269:20 294:21
**hourly** 66:16
**hours** 58:2 63:25
64:2,7 74:14,20
74:22 147:14,21
161:12,14,15
165:13 168:19
172:22 221:24
**housekeeping**
36:24 37:1,24
39:10 69:21
**houston** 7:18,20
**huge** 128:24 254:3
**hundred** 64:7
104:2,22 217:15
**hundreds** 74:21
74:22
**huron** 105:5
**hyde** 4:25 301:3,8
**hypothetical** 90:5

**i**

**i.e.** 165:19 169:5
175:25 266:22
296:25
**iau** 21:4
**idea** 20:25 21:9
127:22 128:11
138:24 139:1
141:9 163:1 166:1
187:22,23 188:1
206:2 273:23
276:17 282:4
**identified** 59:9
69:21 75:11 88:18
95:24 96:2 100:10
103:3 125:22
171:19 173:9
196:25
**identifies** 55:12
**identify** 19:2
63:18 75:25 86:18
92:19 132:17
147:21 155:21
**ignore** 263:7
269:12
**ignores** 184:25
**iii** 8:1 52:4,6
82:17 87:8,13
93:13 94:22 97:2
100:7,10 104:21
105:9,16 140:18
216:2 274:15
**iii's** 94:25
**illinois** 130:17
131:14
**imagine** 286:18
**immediately**
11:22 33:5 125:8
186:6 291:8
**impact** 9:20 82:13
**implication**
197:11

**implicit** 130:25
**implied** 158:18
  174:10
**important** 82:2
  99:20 122:1
  133:16 211:4
  212:8,10 213:18
  215:7 240:21
  248:7 265:3 268:4
  285:18
**importantly**
  134:4 268:11
**impression**
  102:15 204:14
**impressive** 299:9
**improper** 18:21
  184:25 204:15
**improvements**
  130:10
**inaccurate** 204:16
**inadequate**
  103:16
**incentive** 186:2
  187:9 188:7
  190:14 286:24
  290:7,15,19 291:1
  291:7 295:1,11
**incentives** 286:18
  293:25
**incentivize** 186:13
**include** 15:5
  17:16 71:16,19
  111:9 127:19,21
  132:3 137:14
  140:8 143:17
  144:2 168:2
  180:25 264:24
  267:18 287:15
  289:14
**included** 15:6
  46:11 100:2
  105:19,20,23
  115:19 118:3,4

120:23 122:25
127:8 128:16,17
131:1 141:13,23
143:24,25 171:1
171:25 173:17
193:2 210:3 226:8
242:25 243:24
255:20 256:8
**includes** 38:1
  67:14 114:5
  127:23 130:5
  169:6 170:2 178:3
  232:25 241:21
  266:3 289:11
**including** 14:7
  33:3,16 34:13
  61:7 130:8 131:8
  131:16,18 170:15
  170:25 174:23
  183:17
**inclusion** 256:19
**inconsistent** 20:14
  278:3,4
**incorporate**
  197:10
**incorporated**
  18:18 197:15
**incorporates**
  120:21 174:22
**incorrectly**
  102:10
**increased** 92:13
**incremental**
  208:17
**incumbent** 199:17
**incurred** 240:19
  241:9 242:5
**incurring** 177:17
**indebtedness**
  274:23 275:7,15
  275:16 288:18
**indefinitely**
  186:12

**indemn** 18:16
**indemnifica** 21:1
**indemnification**
  15:1,4,17 16:4,14
  16:19 17:16,21
  18:3,7,11 20:18
  21:1,5 24:17 26:4
  27:3,17 28:3,4,11
  28:14,24
**indemnify** 14:15
  25:19
**indemnifying**
  16:7 18:8
**indemnity** 25:22
**indenture** 6:11
**india** 142:16
  146:19 161:25
  162:11,12
**indian** 161:24
**indicated** 67:21
**indicates** 129:17
  269:22
**indication** 172:17
**indiscernible**
  11:16 32:15 67:9
  77:7 85:20 105:5
  107:14 123:15
  126:5,7,10 135:22
  139:6 142:24,25
  148:17 151:17
  153:22 158:3,8
  161:13 162:3
  167:11 173:21
  174:11,20 175:21
  176:5 177:20
  187:6 188:13
  190:14 191:22
  192:4 194:13
  198:16,20 199:24
  201:1 204:1,2,16
  205:14,21 209:16
  209:19 210:11,15
  212:2 213:22

214:8,10,20,25
215:4,17,18
216:19 217:1,15
217:16,25 218:12
219:21 222:21
229:8 246:9 247:8
255:10 259:16
262:6 271:17
275:2,4 284:20
294:12 295:1,18
**indisputably**
  179:17
**individual** 15:3
  89:6,7,10,13,21
  89:24 90:3 119:11
  139:17 143:25
  149:10,12,19
**individually**
  125:22
**individuals**
  139:18 182:2
**indulge** 208:15
**industry** 89:18
**inference** 61:13
  250:2,4,6 252:2,3
  253:5,10
**inflatable** 14:8
**information** 16:9
  16:11 17:10 18:13
  19:10,11,18,19
  20:5,13 22:1
  28:22 59:23 68:17
  68:21 73:20,23,25
  75:15 76:13 77:6
  77:25 83:3,15,18
  83:20 96:16,17,20
  96:21,22,24 97:2
  97:3,5,23 98:2,3
  100:22 103:4
  104:11 121:1
  126:25 132:1
  140:13,17 141:17
  141:18,18 142:6

144:17 151:18
152:20 158:21
182:15 205:3
206:3 220:21
**infringement** 14:9
14:16 24:7
**infringing** 16:12
**ing** 165:14
**inherited** 144:22
144:23 145:12
146:7
**initial** 19:10 21:24
135:11 187:25
225:8
**initially** 19:19
144:18 178:24
**input** 135:6
**inquiries** 103:19
**inquiry** 80:3
**insisted** 268:5
**insolvency** 234:17
234:22
**instance** 95:15,20
98:4 167:23
263:14 294:4
**instances** 67:18
150:13
**instructed** 292:13
**instruction**
280:14
**insurance** 25:19
25:19 84:16,22
132:21
**integrity** 217:1
**intend** 167:15
**intended** 39:14
43:1 66:19,24
67:2 68:25 94:11
127:19 167:14
220:17 221:9
248:5 258:22
265:18 266:20

**intending** 24:18
28:7,8 250:9
**intent** 68:24 69:9
69:10 198:1 205:1
223:18
**intention** 67:4
194:1,2 240:22
**intentionally**
275:25
**intentions** 113:9
**interact** 228:23
**intercompany**
68:10 142:14,18
146:19 161:19
162:9 163:2,11
177:11
**interest** 9:16
130:9,11 132:18
185:25 187:15,15
190:10,13 194:22
194:24 231:22
239:15 265:14
275:21
**interesting** 261:7
261:9
**interim** 179:14
187:21
**interlink** 131:25
**interlinks** 120:17
120:22,24 121:6
**interlocutory**
298:11
**interpret** 119:10
120:22 219:12
285:19 294:11
**interpretation**
60:15 99:16,18,20
99:21 176:9
177:25 224:4
225:7 242:4,4
243:5,15,16
244:18 251:24
256:12,12,13

257:2,5 258:17
261:23,24,24,25
263:11 264:10
267:25 269:6,9
284:4,11 286:16
286:18 289:20
290:3 293:1
**interpretations**
218:7 244:21
**interpreted** 165:8
268:2 284:12
**interpreting**
247:1
**interrupt** 9:11
137:2 242:21
292:10
**interrupted** 218:6
**intervened** 14:13
24:16
**intralinks** 46:15
46:20,22,25 47:4
47:7,10,13,17,18
47:24 48:3,6,14
48:19,22,23 49:5
**introduce** 107:17
**introduction**
266:3
**introductory**
269:8
**inure** 117:2
134:12
**inures** 273:14
**invalid** 67:14
**inventories**
102:20 201:19
246:9
**inventory** 36:4,14
40:22 66:22,23,25
67:3 69:15,22
71:5,8 72:2,3,5,8
72:13,18,22,25
73:1,6,12,21
74:11,15,18 81:11

81:15,16,18,23,25
82:1,4,9,16,20,24
89:5,7,9,13,16,19
89:19,22 90:1,8
90:11,20,24,25
91:4,16,19 92:8,9
93:2,11,16 101:10
105:25 106:12
107:6 137:23
146:25 169:6
186:18 187:3
195:19,23,25
196:3,17,21
197:12,15,16,16
197:19,20,20,22
198:7,17,17,19,20
198:21,22,23
199:2,4,16,22,24
199:25 200:1,4,5
200:6,6,7,7,10,11
200:19,22 201:2,4
201:5,14 202:25
203:10 207:7
208:12,18,18,21
208:21,25 209:2,6
209:24 210:5,6,7
210:12,17,20,23
210:25 211:1,1,5
211:6,15 212:8,9
212:16,23 213:1,3
213:4,20,20 214:2
214:16 215:1,15
215:17 216:12
218:20 219:1,3,10
219:12,15,24
220:1,5,17,21
221:20 223:21,25
224:10,18,21,23
225:9,10,10,13,17
225:19,21,23,25
226:2,7,19,25
227:2,6,6,10,15
227:20,21,25

228:11,19,24
229:23 231:16,21
231:22 232:14,24
233:9,12,15,24
234:10,15,20
235:6,8,10,12,19
235:21,23 236:20
236:22 237:4,6,7
237:7,9,21 238:3
238:7,11,12,18,23
239:1,14,16,21,23
239:24 241:24
244:6 246:4 247:3
247:6,16 249:11
249:21 251:14,19
252:5,7,8,10,18
253:1 256:1,14
257:13,16 258:16
259:13,17,18
260:5,13 261:8,17
262:19,21 265:24
266:14,18,24
267:9,21 268:7,14
268:20,25 269:4

**investigate** 132:19
**invoice** 104:1
**invoiced** 243:1
**invoices** 175:21
**invoke** 18:6
**involve** 36:11
**involved** 57:9
106:15 118:14
158:4 195:7 221:2
286:6,12
**involves** 111:4
**involving** 29:14
110:16
**ira** 5:24
**irony** 230:16
**irrelevant** 119:19
218:9,11
**isn't** 168:17
173:16 176:7

177:12 198:5,6
200:11 210:9
211:5 238:1
**isolated** 11:21
204:24
**israel** 280:22
**issue** 11:14 15:25
16:24 18:1,10
21:13,14 32:19,22
32:23,24,24 35:5
35:22,24 36:4,5
36:10,15,16,19,20
36:22 38:16,21
39:6 40:6,13,16
40:16,16,20 41:4
58:6 61:17 84:1
90:6 103:17
108:18 109:15
123:6,6 124:9,10
131:12 133:5,8
146:17 147:6
151:19 156:9
159:21 168:20
174:5 177:21,24
178:15,18,23
183:7,9,13,19
186:18 188:19
191:6,14,15
194:15,15 195:2
205:9 218:23
219:9 222:8 223:5
223:6,10 229:25
230:5,9,21 231:4
263:15,16 264:18
264:20 265:20
270:12 271:6,6
272:4 277:5,6
283:2 288:5
292:11 297:5
298:4
**issued** 89:23 90:1
90:19

**issuers** 138:8
**issues** 11:21 13:8
31:16,16,19,21,23
32:5 33:16,17
34:21,22,22 35:16
35:19,20 36:11,17
40:18 42:13 50:22
56:9 60:7 77:22
95:11,12,13,18
107:6,21 116:21
142:5 144:24
145:21 146:12
147:21 148:6,7
154:3 156:13
160:22 161:9
178:4 190:23
191:7 195:3
209:21 222:5
234:22 264:18,19
265:17 269:15
271:2 297:4 298:7
298:9,11,18
**it'll** 271:10
**item** 10:4,12
16:16 31:10 33:7
37:1 38:10 175:17
181:8,15,16,16
255:6
**itemized** 176:2
**items** 9:7 37:24
63:2 67:13 84:13
84:24 87:5 91:15
92:16 95:22
138:14 141:23
147:7 149:12
159:25 160:20
161:2,6 168:25
169:3,4,7 170:10
170:25 171:19,20
171:23,23 172:1
251:22 254:7
255:7 256:4,16
257:8

**iterate** 104:14
**iteration** 178:6
**iterative** 104:7
**it'd** 207:21
**it'll** 165:17 190:11
221:13
**it's** 101:17 109:2
161:25,25 162:1,1
162:11,25 163:25
164:1,6 165:21
166:13,15,15
167:16,25 168:6,9
169:24 170:19,21
171:16 174:18
176:12,16,20
177:1,24 178:25
180:11,17,19
181:17 182:16
187:16 188:11,11
188:12 190:9
191:25,25 192:1,6
193:15,18,20,20
193:21 194:8,15
195:8 196:6
197:13,17 198:5
198:19,24,24
199:2,3,6 200:9
206:21,24 207:4,7
207:17,17 208:2
211:6 212:1,24,24
212:25 213:7
214:14,24 216:23
218:11,15,16
222:15 224:3,7
225:23 226:14
227:4,22 230:2
232:4 233:11
234:2 235:6 236:2
236:4,5 239:13
240:3,25 245:11
248:5,22 249:14
250:7,9 251:4,7,8
253:2,12,15,15

254:23 255:9,11
255:18 259:2,4,5
260:12,14,23,24
262:1,4,10,11
264:11,21 268:3
268:18
**ix** 192:23 219:5
257:3,14 275:11
**i'd** 181:8 206:18
230:13 231:10
237:23 240:15
255:3 256:22
**i'll** 161:11 171:17
171:21 175:6
176:6 178:7,11
194:20 195:19
208:10 218:23
221:15 228:15
235:4 240:4,18
**i'm** 161:16,25,25
162:21 167:8
168:12 169:14
172:4 177:22
178:8 179:4
180:17 182:7
187:11,17 191:7,8
192:8,9 195:6,9
197:24 199:21
200:18 202:24
204:8,22 205:10
206:18,19 213:16
214:11,25 215:1
216:6 223:4
228:21,22 229:18
238:22 239:3,5,13
240:24 241:10
243:16 244:7
245:8 246:7,10
247:12,18 248:2
248:16 250:15
251:20,23 254:22
254:23 255:10
257:18 259:19

261:3,3 264:17
266:4
**i've** 235:24 263:23
265:15

## j

**j** 5:11
**jacqueline** 6:6
10:8 20:2
**jane** 8:11 43:16
43:20 113:4
127:10
**january** 134:21
135:11 144:4
160:25 166:7
236:17 247:7
254:8,8 261:6,7,8
261:11,11
**jared** 31:8 44:20
110:19
**jason** 105:4
**jeff** 67:9 102:3
105:4 109:13
110:2 166:5 216:9
**jennifer** 44:22
45:7 105:4 150:22
**jeopardized** 21:2
**job** 117:12 202:12
221:14
**jobs** 117:15,16
**joinder** 4:9
**joint** 37:2 50:13
134:25 144:5
218:15 278:4
**joseph** 5:25
**joye** 105:5 150:22
**judge** 2:14 29:6
29:11 110:9 115:5
170:7 294:21
299:5
**judgment** 101:25
106:10 187:15,15
221:2

**judgments** 204:19
205:2,6
**july** 2:5 3:2 24:3
32:9 43:5 44:7
49:25 50:1 51:5
58:21 70:15 88:6
94:9,12 103:4
108:18 109:16,20
188:5 195:6
215:23 298:14
301:25
**jump** 116:24
166:9
**june** 42:6 43:2
44:7 45:15 46:2
58:19 64:13 68:1
70:14,15 108:16
109:14,22 149:23
179:6 188:5 195:6
217:9 271:1
**junior** 274:24
275:18
**justice** 240:10
**justifies** 235:25

## k

**k** 42:22,23 58:14
108:13 133:18,19
133:22,22 134:5
134:24 136:6
137:7,8,9 139:15
140:21,24 141:7
141:23 142:12,14
142:17 143:10,14
143:15,24 160:2,9
160:10 163:16
165:6 170:12,24
174:22,22 247:12
247:13,13,14,21
248:5,6,14,22
249:1,4 250:7,10
250:12,17,18,24
252:1 257:3,14
266:2,3 275:11

284:6
**k1** 256:7 266:4
**kagan** 240:10
**kamlani** 39:17
40:10 41:13 42:15
42:19,22,22,24
43:8,11 71:20,22
134:18 135:21
140:12 208:14,22
209:3,14,22
210:19 213:1,4
220:11 225:22
227:18 278:6
**kamlani's** 43:14
**kamlani's** 208:16
225:24 234:11
**keep** 58:1 139:17
173:21 233:25
275:13 282:19
286:25 290:7
**keeping** 180:5
296:4
**keith** 108:13
**ken** 105:5
**kept** 73:5 76:23
133:21 136:18
138:2 141:8
234:25 283:23
**kerp** 188:18
**key** 32:2,8 113:13
147:23 148:9
149:21 176:4
207:5,8,8
**kind** 22:14 36:8
53:3 84:12 98:18
99:9 156:17
188:18 197:3
290:13
**kinds** 293:25
**klug** 107:23 108:6
108:8,12,13,14,14
108:15,15,21,24

**kmart**  9:24 64:22
**knew**  40:13
  141:21 143:23
  144:24 145:14
  148:5 160:22
  219:22 220:12
  227:11
**know**  9:22 11:13
  11:14,15 13:24
  15:2,4,6 19:13
  20:16,17 21:3,8
  21:17 22:22,25
  23:11,24 28:13,15
  35:21 37:12,19,20
  42:1 48:15 49:4
  56:15,18,20,25
  61:17 63:13 64:4
  65:6 67:7 71:23
  72:20 75:25 76:1
  78:3,9,25 79:5,22
  79:23,24 80:13,15
  80:20 81:24,24
  82:4,17 83:2,14
  83:24,25 84:22
  85:4,7 96:17 97:3
  97:12 100:12
  105:19,19 109:6
  111:17,21,24,25
  116:14 123:17,18
  124:3 127:9 128:6
  128:23 133:16
  139:12 142:19
  143:16,25 145:3,4
  147:7 148:1,21
  151:8,9 152:13
  156:18 165:2,14
  167:12,18 168:1
  170:12 173:25
  178:8,10 183:22
  187:19 188:10,17
  190:12 194:24,24
  195:3,6,21 197:6
  203:14 204:17,25

  205:15,23 206:23
  209:21 213:12
  214:5,9,16 215:2
  216:3 218:9
  219:21 225:3
  228:23 232:3
  238:7,12,15,17,22
  239:6 242:6,6
  248:1 249:5,22,24
  254:4,12 259:21
  260:18,18 262:16
  262:19,23 263:22
  264:1 269:1 270:2
  270:22,22 271:23
  273:20 275:13
  279:15,21 280:13
  281:9,25 282:18
  282:20 284:3,3
  285:15 287:8,9,13
  287:18,19 289:5,8
  289:13,14 292:14
  292:18,21 294:9
  295:1,3 296:4,10
  296:25 298:9,12
  298:18,25
**knowing**  42:8
  56:19
**knowledge**  56:21
  68:18 86:23 100:7
  100:9
**knowledgeable**
  178:2 205:3
**known**  135:18
  145:5 157:22
  161:5
**knows**  20:20
  31:12 129:15,15
  184:7
**kudos**  274:17
**kumlani's**  134:22
**kunal**  8:10 42:22
**kundani**  8:10

**l**
**l**  5:22 6:22 42:22
  42:23 44:6 49:21
  49:21,22,22 58:14
  108:13 183:21
  192:11,12 247:16
**la**  230:9
**laboring**  20:20
**lack**  112:22
  120:18 126:16,24
**lag**  142:4,7 151:23
  152:12,14
**lags**  154:2
**laid**  27:25 28:20
  28:21 29:20
  143:24
**lampert**  71:17
**land**  111:5,13
  115:17 118:3,9,11
  118:15,17 130:17
  130:20 131:1,19
  132:12
**landlord**  13:5
**landlords**  12:22
**lands**  111:9
**language**  15:20
  20:18 26:25
  118:12 119:2
  129:19 132:25
  167:16 170:23
  197:22 219:8
  225:3 230:20,21
  231:3 241:12,12
  241:18 243:25
  247:1 248:21,23
  251:23 263:7
  266:1,21 268:2
  269:11 284:11,12
  297:15,22 298:1
**lansing**  12:17
**large**  85:2 88:15
  103:10,21 166:15
  233:25

**largely**  66:2 89:1
  89:3
**larger**  84:24 87:5
**largest**  36:5
**late**  93:12 106:15
  198:6 230:2 240:3
  273:20 294:22
  299:6
**lately**  228:23
**lateness**  269:20
**laughs**  170:7
**laughter**  170:1
**law**  27:6 38:22
  223:16 225:2
  230:3 264:22
  284:8,9
**laws**  249:4
**lawsuit**  14:11
**lawyer**  116:22
  248:2
**lawyers**  41:13
  57:11 69:4 110:21
  299:12
**lay**  28:19 175:22
**laying**  276:9
**layman's**  176:19
**lead**  176:9 177:15
  192:19
**leading**  135:23
**leads**  36:3
**learn**  82:8
**learned**  82:11
  118:18
**lease**  12:7,9,13
  13:5 123:20
**leased**  100:17
**leases**  3:5 12:9,15
  115:4
**leave**  40:9 57:16
  133:15
**leaves**  269:16
**leaving**  103:17

**led**  140:12 141:19
**ledanski**  4:25
  301:3,8
**ledger**  76:24,25
  135:25 197:21
  200:8,11 208:19
  208:20 220:4
  225:14
**lee**  298:13
**left**  12:9 20:21
  35:16 85:21 88:22
  110:16 124:23
  143:18,19,24
  144:19 177:6
  221:19 222:24
  277:7,12 285:23
**legal**  60:15 191:6
  191:14,15 194:15
  206:14 218:6
  221:7 301:20
**lender**  214:17
  218:17,18 220:4
**lenders**  212:14
  213:7,19 214:15
  214:25
**lender's**  213:24
**lending**  213:20
  215:8
**lengthy**  51:18
  223:9
**letter**  55:17
  106:22 111:18
  118:24 145:20
  223:16
**letters**  135:3
**letting**  156:5
  209:15
**let's**  165:23
  178:14 202:5,6
  244:23 258:15
**levander**  5:9 50:9
  50:10,18 51:11,14
  51:17,20,24 52:2

56:4
**level**  132:13,16
**levels**  135:4
**lewis**  5:11 34:6
  230:1 244:8
**liabilities**  98:25
  134:14 158:20
  160:12 174:20
  179:22 181:12
  183:20 184:5,20
  192:2,6,7,14,17
  192:18 193:1,2,9
  193:14,14 210:2
  224:16 226:22
  227:2 228:5,7
  234:14,24,25
  240:10,17 241:7
  241:22 243:23
  244:24 245:2,3
  247:13,23,24,24
  248:4,6,8,14
  249:1,2,2,3,8
  250:7,8,8,10,12
  250:23 251:24,25
  255:11,20 256:7,8
  256:11 257:7
  258:23 259:1
  260:1,1 264:6
  265:22 267:7,11
  267:18,18 273:25
  285:25
**liability**  159:4
  181:11,18 183:23
  184:1,7 185:1,9
  193:15,20 194:6,6
  194:8,12 212:25
  231:17 232:9,19
  232:23,24,25
  233:20 234:19
  240:17,23 241:20
  243:11,12,13,14
  245:4 247:16,18
  247:19 252:10

255:9,13 256:17
  256:21 260:2
  263:3 267:15,15
  267:16 268:20
**liable**  244:15
**liberty**  5:5
**licenses**  84:7
**lien**  36:20
**liens**  222:10,12,13
  222:14,16 297:7
  298:2,4
**lies**  211:19
**life**  221:21
**lifo**  91:10,14
**lift**  25:7
**light**  15:10 97:12
  107:16 178:20
  186:10 204:21
**likelihood**  28:15
**likes**  128:23
**likewise**  156:4,8
  278:1
**liman**  5:11 34:5,6
  34:9,18,20,23,25
  36:24 37:9,15,17
  37:20,23 38:3,6
  39:2,8,10,24 40:1
  41:12,20 42:10
  43:12 57:13 107:7
  107:14,19,23
  108:6 109:2,4
  212:17,20 213:4
  213:11 214:6
  218:14,19,22
  223:13 228:17
  230:1,1,10,25
  231:2 233:5,13,17
  234:2,7 235:9,16
  235:20 236:2,4,8
  236:11,14 237:1,3
  237:8,13,15,23
  238:2,9,17 239:8
  239:12 240:25

241:2 242:22
  243:5,8,21 244:8
  244:16,25 245:8
  245:14,20,25
  246:5,10,15,22
  247:5,10,19
  248:17,25 249:9
  249:16,20,23
  250:1,4,20 251:3
  251:6,8,17,20
  252:20,22 253:4,7
  253:9,14 254:16
  254:22 257:21
  259:6,15 261:3,22
  262:4,11,13,16,24
  264:1,8 269:19
  270:5,13,16,18
  271:20,23 272:1
  272:16 277:22
  283:14,21,25
  284:3,23,25 285:2
  285:7 286:5,15,23
  287:3,6,14,21,24
  288:2,7,10,20,25
  289:3,8,10,13,18
  290:1,13,17,20,22
  290:25 291:3,6,15
  291:19,24 292:1,5
  292:7,14,19,23
  293:8,13,18,23
  294:3,10,16,18,20
  295:7,9,14,17
  297:3,10
**limit**  3:17 13:20
  19:24 39:24 238:6
  256:17
**limitation**  237:20
  242:20 243:2
**limited**  21:6,17
  167:12 173:6
  223:7 236:4,5
  254:2 262:21

**limiting** 224:22
296:22
**limon** 239:1
**line** 62:17 63:1
95:22 135:15
144:11 149:12,19
153:14 180:9
182:11 284:16
293:2,19 300:4
**lines** 138:3 225:24
**linked** 90:17
**liquidate** 25:11
**liquidated** 24:25
**liquidating** 15:24
202:12
**liquidation** 9:17
25:8,10 29:14
**liquor** 84:7
**list** 19:1 37:2,3,5
37:13,14 39:16
50:25 75:20 87:1
94:22 134:19
136:6 145:8
154:16 191:2
215:6 222:6 252:4
257:4
**listed** 13:18 14:23
19:3 22:19 35:19
39:13 53:20
103:19 119:12
133:22,22 170:25
223:22 224:6
243:14
**listen** 253:7 264:8
295:2
**listing** 37:6
**lists** 31:21 130:1
130:16 133:19
161:21 174:23
241:6
**litigate** 228:6
**litigating** 223:6

**litigation** 14:13,17
20:7,9 24:7,11,15
224:5
**little** 13:4 56:12
75:6,17 81:12
121:12 174:7
178:19 188:2
192:23 197:13
219:5 224:8 237:4
260:11 261:9
266:5 271:3
**live** 35:23 36:19
40:17 203:6 259:9
**llc** 1:12 4:5 5:4
52:2
**llc's** 3:7,10,13,15
3:18 4:13,14
**llc's** 3:18
**llp** 5:3,17 6:1 7:8
7:16
**loan** 185:25
213:10 275:8,18
275:19
**locate** 75:15
**located** 130:10
**location** 12:17
55:13
**locations** 12:10,13
12:16,19,22 13:3
**locked** 286:9
**logic** 176:2,23
225:2 257:22
258:21 259:3,4,7
259:10 260:20
268:18
**logical** 176:13,24
252:24 253:13
267:24
**logically** 210:11
268:17
**long** 27:17 43:5
63:19 74:8 99:13
107:25 153:18

175:3 187:8
**longer** 13:21
92:10,18 164:6
186:3,3 187:10
**look** 19:20 22:20
28:25 71:24 77:22
77:24 79:4,11,15
80:22 87:22 89:16
90:1 114:6,12,13
116:20 127:11
139:1 141:15
146:11,12 164:23
172:21 181:5
184:19 188:15
189:24 195:4,4
199:5 201:17
202:1,5,13 204:13
204:17 205:4
212:21 215:21
223:17 232:21,22
240:7,8,9 255:4,5
255:8,11,12 256:6
256:24,25 257:3
270:17 271:7
276:23 278:19
284:15 288:14
298:9
**looked** 61:19
78:16,18,19,23
132:14 145:22
148:2 168:20,23
214:19 282:14
**looking** 23:3 30:2
30:13 61:21 87:24
88:2 99:4 151:3
168:19 169:14
172:22 176:14
195:8 206:7
212:14 228:21,22
270:9 275:1
**looks** 198:18
**looting** 207:24

**lost** 15:17 133:5
**lot** 15:5 21:20
26:16 41:18 54:11
54:18 55:9 74:24
83:8 84:12 101:17
101:18,19 111:7,7
111:7,7 113:11
120:16 128:15,17
140:11 148:6
149:7 179:3
180:17 218:10
225:3 228:23
239:16,22,23
252:15,16 263:23
271:24 272:1
282:23 299:7
**lots** 47:5 48:25
53:15,21,24 54:1
54:1,5,8,9,13,15
54:19,21,23,24
55:2,5,7,8,13,14
55:19,21,24 56:22
111:7,17,24 112:4
112:7,8,12,15,24
113:21,22 114:25
115:8,10,22,24
116:9 117:9
118:22 119:15,17
120:1 121:4,7,8,9
121:17,20,24
124:1 125:4,7,21
125:22 126:1
128:22 129:2
**loud** 284:7
**louder** 81:13
**lower** 174:19
220:1 257:9
272:10
**lp** 7:1 8:1
**luke** 5:15 12:4
**lunch** 110:4

# m

**m** 6:15 7:22 8:1
42:23 49:21 52:3
52:6 82:17 87:8
87:13 93:13 94:22
94:25 97:2 100:7
100:10 104:21
105:9,16 140:18
216:2 274:15
**machine** 73:14
**machines** 73:14
73:16 82:7 91:1
**magic** 207:6,7
**mail** 85:2 194:5
**main** 96:9,10
111:10,13 185:11
220:10 269:11
**mainoo** 5:13
60:14 65:9,11,12
66:6 68:20 69:2,6
69:10 94:19
100:13 104:17
106:4,20 107:1
109:18,21 152:19
159:11,12 161:14
161:18 162:2,5,7
162:12,15,25
163:7,10,17,23
164:4,8,17,25
165:5,25 166:18
166:21 167:4,9,19
167:21,23 168:4,8
168:12,22,25
169:3,12,14,18,20
169:24 170:2,9,22
171:8,17 172:9,12
172:17,25 173:14
173:23 174:4
198:9,12,16
208:10 209:11,19
210:19 211:7,24
212:3,7 215:10,21
215:24 216:1,6,12

216:15,22,25
217:3,6,9,13,23
218:12
**maintain** 57:24
117:4
**maintained** 74:16
82:15 91:24 146:8
277:17
**maintaining**
93:10
**maintains** 90:19
224:13
**majority** 9:10
85:19 88:10,13
95:21
**making** 18:14
30:8 33:6 77:19
96:12 119:25
147:4 159:15
170:18 182:13,19
215:4,4,5 216:6
244:7
**malinowski**
189:21
**mall** 3:7,10,13,18
7:2 10:21 11:11
**man** 110:9 169:25
170:6 203:16,18
221:25
**management**
18:23 82:25 88:9
88:11,16,23
142:16 146:20
162:13 179:1
185:17 215:15
216:13 282:23
287:10
**managing** 52:3
**mandate** 65:16,18
65:22 66:12,13
**manges** 6:1 10:9
31:9 45:8 110:20

**manhattan** 12:19
**manipulate**
289:24
**manipulated**
287:4 289:23
**manipulation**
289:23
**manner** 29:23
67:3 133:11 151:8
**manpower** 187:1
**manual** 63:17
84:20
**manufacturer**
17:7 19:20
**manufacturers**
14:13,23 16:12
17:7,10 18:9 19:1
19:16 20:8 24:15
**manufactures**
14:7
**march** 49:8 55:18
64:3,5,6 78:19,24
79:15,19 80:5,8
80:22 83:8 94:23
94:24 95:2 97:4,7
97:11,13 98:5
118:19,24 179:23
179:25 180:9
181:3 185:22
187:19,23 188:25
195:5
**marcus** 6:6 10:3,8
10:9,12 13:17
14:1 20:2,2 21:8
21:18,20,22 22:3
22:7,11,21 23:2
23:10,20,24 24:4
24:9 26:9,13 27:9
30:9,14 31:2
**margot** 5:12
189:9
**mark** 13:24

**marked** 104:12
**market** 214:3
220:1
**marks** 175:6
**master** 13:5
**match** 89:25 90:8
90:24 147:12
236:10,13,15,16
**matched** 91:1
152:13 253:21,24
**matching** 90:20
90:22,23 91:10
216:17
**material** 158:5,8
**materially** 192:24
**materials** 131:25
139:11
**matter** 1:6 13:17
13:18 14:2 24:1
26:10,25 28:19
39:10 43:1,2
49:25 51:2 58:21
69:20 94:10
108:17 110:16
111:16 170:20
175:19 198:20
221:7 225:8
231:18,18 232:19
232:21,22 239:21
240:22 241:13
250:14 254:16
298:25
**matters** 3:1 12:7
14:1 36:25 57:9
170:23
**mattresses** 14:8
**max** 258:17,18
**maximize** 87:19
96:13
**maximizing** 96:10
**maximum** 226:13
**mccarthy** 7:16

**mean** 16:25 18:24
21:16 22:13 23:2
24:22 25:7 27:17
60:3 62:7,13 63:7
68:4,6 73:16
88:13 98:18
105:23 106:2
107:12 111:20
114:16 121:8
122:20 125:5
131:13 133:17
137:4,8 138:10
140:20 151:11
152:22 159:14
164:5 166:14
167:2,6 168:9
169:21 170:19
171:6,7,12 172:23
176:18 182:25
187:12 192:6
193:13,15 194:8
194:10 197:3,6,16
200:5,6,7 201:3
205:10 207:1
210:9,14 238:7,14
239:8,8,14 242:5
243:22 245:11
246:12 247:2
249:6,17,24
252:21 256:15
262:2 272:7 273:3
281:10 284:9
286:19 288:13,15
289:9 290:15
292:1,3,16 293:10
296:9 297:5
**meaning** 61:16
129:24 134:11
176:21 220:15
221:9 223:18
244:2,3,20 245:21
246:21 248:10,13
251:23 256:8

277:24,24 284:23
286:4 296:14
**meaningful** 29:16
246:19 268:8
269:6
**meanings** 285:10
**means** 13:3 35:16
37:25 61:11
120:18 122:2
124:25 125:18
130:14,17 138:12
160:6 165:12
171:6 176:20,25
193:15 237:6
251:14 264:11
267:12 273:4
276:6 289:19
**meant** 106:13
113:7 131:2,23
296:16,19
**measure** 156:23
156:23 199:20
210:13 284:14
**measured** 206:11
283:7
**measuring** 208:3
210:14
**mechanically**
48:15
**mechanics** 36:20
222:9,12,13,14,16
297:7 298:2,4
**mechanism**
125:10 160:10
210:1,8,10 219:4
253:3
**mediated** 206:19
**meet** 204:12 219:1
**meeting** 105:9
112:22 126:16,24
141:16 194:18
**meetings** 140:5

**meghji** 38:13,14
118:16 128:1
**meghji's** 38:8
87:16
**member** 71:23
**members** 104:20
181:23
**memo** 84:19
**mention** 256:23
257:10 260:3
**mentioned** 35:17
84:5 87:8 106:8
115:8,13 131:2
136:8,14 160:17
226:4 237:17
**merch** 102:9,10
105:20,20,24
106:2 204:13,13
204:20,21
**merchandise**
102:5,5,6,7
105:25 232:10
**merely** 165:21
**merit** 40:17
**message** 292:4
**messrs** 69:14
**method** 101:13
201:1
**methodologies**
64:18,21 65:1,2
156:11,16 173:12
**methodology**
64:24,25 72:12,17
72:19 73:7,19
74:2,5 82:23 83:5
89:6,12 92:25
93:5,18 101:9,14
106:11 134:1,2,4
153:23 156:11
157:1,4,10,11
175:5 187:4,14
196:10,11,16
197:10 198:2,4,7

199:3 200:24,24
203:5 204:3,15
205:11,12,18,19
206:22,24 207:1,2
207:3,19 209:15
211:11,14,16
212:15 215:12,16
216:17 219:15,23
220:6,12,16,20,25
221:3,10
**methods** 202:9
225:12
**metrics** 102:16
**michael** 6:22
116:22 117:20
**michigan** 12:17
84:7
**mid** 93:12 94:23
**mike** 99:3
**million** 32:9,13,21
32:23,24 33:1,20
34:12 35:5,10
36:4,10 39:5
40:16,16 59:22
60:2 61:6 67:14
67:14 75:6,24
90:5,9,12 93:15
95:8,9 99:1,6,12
104:1 134:10,25
135:16,17 136:8
136:23,24 137:13
137:14,16 142:13
146:18,25 148:12
148:14,15,17,20
149:8,9,20 150:2
150:24,25 151:6
152:5 154:7
161:21,22 164:11
166:11 167:8
170:15 174:24
175:9,24 177:3,7
179:13,15,16
183:21 186:7

187:12,25 188:9
188:12 189:5,18
191:24 195:24
196:1,3,5,8,13,15
196:21,23,25
199:9,16 200:4,14
200:23 201:3,13
201:16 202:18
203:24 207:6,17
207:19 208:24
210:15 212:8,25
213:7 215:7
218:20 219:2,18
222:8 223:3,20
224:8,20 226:12
228:10 229:13
234:14,16,19,21
235:2 236:4,5
238:4 239:13
242:17,17,24
243:14,20 244:15
251:5,9,10,11
253:19 254:1,5,5
254:6,9,18 256:17
258:20 259:3,7,25
260:15,17,21
261:6,9,13,14,16
262:8 266:14,24
267:12 268:15,22
269:1 272:14,17
275:19,20,22
283:17
**millions** 194:24
232:13
**mind** 57:7 139:17
221:17 234:18
**minds** 112:22
126:17,25 141:16
**mineola** 301:23
**minimal** 282:20
**minimum** 242:2
**minor** 105:5

**minute** 164:25
216:15 222:2
254:11
**minutes** 215:21
245:19 247:6
**mirrors** 150:5
**misleading** 13:4
**misnomer** 139:3
200:10
**mispronounce**
204:22
**mispronounced**
109:2
**missed** 34:11
147:18 207:20
222:14
**missing** 88:3
126:20 143:6
246:13
**mistake** 125:4
126:19,21 204:1
206:16
**mistakes** 206:17
**misunderstood**
39:22
**mitigates** 209:20
**mixed** 31:21
**moac** 3:7,10,13,18
7:2
**model** 87:1 213:6
**models** 212:23
254:10
**modification**
16:13
**modifications**
27:22 265:12
**modified** 9:18
21:9 29:25 244:6
255:21 256:1,5
257:12
**modifier** 224:22
**modifies** 224:23

**modify** 226:2
**molly** 105:5
**moment** 123:14
151:16 193:8
240:18 241:11
**moments** 157:12
**monday** 32:9
52:12 156:4
**monetary** 26:22
**monetize** 87:2
**monetizing** 87:18
**money** 32:11
67:17,18 151:10
156:6 169:5 180:5
181:15,25 182:17
182:23 186:1,4,11
189:23 190:1,2,4
190:5 218:10
258:6 276:8,18
279:3,23 280:8,10
280:21,22 282:2
285:23 287:16
289:22 290:7
296:24
**monies** 34:23
179:20 180:21
185:15 188:6
**month** 64:7 79:8
116:4 127:22
142:8,10 179:24
**monthly** 218:16
**months** 13:9
20:10 52:16 74:23
74:24 79:11 113:6
147:20 161:10,15
161:15 178:25
181:6 185:14,24
188:5 190:10
202:7 203:11
205:22,22,22
207:15,16 228:5
**mooney** 5:12
189:9,10,24 190:4

190:15,18,22
191:4,9,13,15
192:1,5,9,11,13
192:16 193:6,12
193:17,22,24
194:25 195:15
**moot** 27:25 33:9
**morning** 9:2,4,5
10:8,11,18 12:4
14:5 31:8,18
43:17 45:9 51:25
59:6,7 65:12,13
65:15 70:25 71:1
81:5,10 94:20,21
118:7,20 123:20
156:4 178:20
179:15 280:11
**morphed** 64:4
**morrie** 99:3
**mortgaged** 121:4
**motion** 3:17 4:1
4:10 10:21 15:20
23:13,21 25:1
31:11,13 44:5
58:18 228:13
269:14
**move** 43:12 44:14
68:14 71:25
106:21 110:24
178:14 228:15
237:25 245:10,13
245:14,23
**moved** 178:24
**moves** 176:2
**moving** 103:2
**multiple** 79:1
90:16 140:4
**murphy** 39:17
42:11
**mutual** 126:21
204:1 206:16

**n**

**n**   5:1 9:1 42:22,23
44:1,2 58:13
70:10 300:1 301:1
**nader**   8:13 58:13
**nail**   20:3
**name**   24:9,12,13
24:23 42:20,22
49:19 52:1 58:11
65:12 70:8,10
194:2 204:22
**named**   24:15
**narotam**   2:16
**narrow**   83:22,24
**narrowing**   11:18
**national**   151:7
**natural**   55:3
166:13,16 176:19
**nature**   83:23
84:21 124:12
142:1 157:23
**near**   141:11
183:23 185:21
**nearly**   131:19
**necessarily**   15:6
220:13 261:13
**necessary**   29:22
88:19 96:21
113:14 264:13
**need**   13:19 19:8
19:18,18 23:4
27:13 31:16 83:25
101:22 103:5,18
118:12 126:15
157:12 188:2
195:16 209:25
226:8 231:5 232:2
260:23 265:15
270:16 273:24
276:18 282:18
**needed**   103:6
174:1 276:20
285:25

**needs**   21:9 38:16
178:1 179:12
180:6 194:19
195:7 240:7
**negotiate**   149:17
149:19
**negotiated**   93:7
127:1 129:10
132:3 149:19
196:13,14 203:1
203:10 209:3
234:6 285:22
**negotiating**
128:10 203:9
**negotiation**   65:19
93:20 112:9 115:5
128:19 203:23
**negotiations**
10:23 60:22
124:10,11 129:9
134:18 208:12
264:1 265:11
**neighborhood**
214:1
**neither**   36:18
80:21 107:3
158:17 225:11
**net**   194:23,23
274:21 286:3
288:17 294:15
**netted**   179:12
**neutral**   293:5,19
**never**   76:2,3
112:7,9 128:3,5,8
128:20 209:3,14
255:1
**nevertheless**
220:7
**new**   1:2 5:6,20 6:4
6:13,20 7:4,11 8:4
12:18 88:9 89:2
106:11 135:9
148:5 153:11

156:25 187:2
**newly**   165:22
173:17,17
**news**   31:22 33:10
**nice**   33:21
**nigh**   202:16
**night**   273:8
**nine**   20:10
**noise**   284:7
**nomenclature**
138:10
**nominal**   24:12,13
**non**   102:5,7,10
105:20 106:2
115:25 146:23
161:20 162:23
204:13,21 270:2
**normally**   42:2
84:25 141:3 294:7
294:11 296:17
**note**   14:21 18:20
20:9,25 23:20
38:16 267:17
**notebook**   51:4
**noted**   14:16 20:14
**notes**   35:19
121:13
**nothing's**   148:13
**notice**   3:1,4 10:13
13:12 23:12 41:3
217:3 265:13
**noticed**   98:11
183:19 265:5
**notified**   125:8
**notion**   197:23
212:23,24 233:6
290:4
**notwithstanding**
130:13 224:11
**november**   284:20
**nuances**   101:17
216:23

**number**   9:7 11:16
33:21,22 55:20,24
56:3 62:24 64:17
74:14,20 79:22
82:19 86:25 88:16
90:7 95:5 99:2,4
104:25 118:10
121:20,22,24
122:6,10,12 123:5
123:9,21 124:14
125:24 126:14
130:16 131:4,13
137:16 144:10
150:23 160:13
171:16 174:25
175:1 176:3,4,13
179:21 188:21,22
196:6 200:14
202:1,18,19
213:13,25 214:2
236:19 238:24
239:9 241:6 244:2
249:14,19 250:22
251:2,7,8,11,13
262:10,11 263:9
**numbers**   46:18,23
47:11 63:9,13
68:25 83:13 90:4
103:21 123:1,13
123:17,18,19
124:12 125:15,25
126:10,11,11
136:2 137:9
149:15 153:3
166:15 176:2
178:19 179:4
195:2 205:14
213:20 221:21
257:9 259:12
261:15
**ny**   2:3 5:6,20 6:4
6:13,20 7:4,11 8:4
301:23

**o**

**o** 2:12 9:1 43:25
  44:2 58:14 94:6,6
  266:4 301:1
**oath** 118:8
**object** 29:23
  265:7
**objecting** 55:17
**objection** 3:25
  17:12 18:14 27:15
  27:21,25 28:23
  38:7,8,17 41:25
  60:14 69:7 79:13
  152:19
**objections** 3:8,11
  3:14,18 11:17
  12:15,16,21 265:7
**objective** 178:12
**objectively**
  264:25
**obligated** 224:20
  241:5 242:16
  272:13
**obligates** 223:19
  227:23 228:9
**obligation** 56:16
  142:18 154:5
  180:20 182:3
  184:25 209:9
  218:3 224:15
  226:24 231:17,21
  232:6,7 236:1
  240:11 242:10
  244:14 247:15
  252:13 253:20,23
  258:18,19 262:7
  266:17 273:25
  282:9 287:9
**obligations**
  160:11 174:8
  194:22 210:2
  213:15 223:21,22
  223:23 224:6,6,10

224:14,17 226:5,6
226:13,17,19
227:1,9,15,19,22
227:24 228:10
231:24 232:23
233:8 234:15,20
235:10,22 241:22
241:23 242:10
243:19 245:16
246:3,8,18 247:23
248:9,18,19
249:10,21 250:17
250:18 251:1
252:5,7,11,18
255:25 256:9,11
256:13 257:12
259:1 265:24
266:12,18,24
267:9,20,22
268:13,21,24
269:3 286:9
288:10
**obliged** 196:2
**obtain** 14:20,25
  15:8 77:5
**obtained** 83:2
**obvious** 267:3
  269:14
**obviously** 11:16
  23:11 34:10 35:8
  43:4 57:6 82:3,5
  83:2 84:17,24
  85:1,2,10 86:2,20
  86:21,23 87:5,15
  87:16,18 88:15
  89:2,17,18 90:20
  90:25 91:11 99:8
  103:20 117:14
  121:12 132:1
  140:18 149:9
  168:23 186:2
  205:4 221:19
  227:13 236:18

239:15 261:4
264:22 295:2
**occasions** 79:1
  87:1
**occurred** 52:17
  173:7
**october** 52:6,14
  52:20,22,25 53:3
**odd** 176:9
**offer** 294:18
**offered** 109:14
**offhand** 213:13
**office** 217:1
**officer** 87:17
**officers** 158:24
**offices** 125:16
**official** 4:9 52:12
**offs** 179:21 188:16
**offset** 17:17
  134:14 210:8
  229:13,15
**oh** 9:13 25:8,12
  79:17 120:4
  121:21 148:16
  207:17 222:13
  275:14 297:6
**okay** 9:2,11 10:1,7
  10:15 11:6,23
  13:10,14 16:8
  20:1 22:10 23:7
  23:17 24:6 25:13
  26:2,2 31:4,24
  32:3,7,25 33:13
  33:19 34:2,7,19
  35:3,14,14 36:23
  37:11,16 38:5,18
  39:9,23,25 40:11
  40:25 42:14,24
  43:9,21,25 44:11
  44:25 46:23 47:3
  47:22 48:2,9
  49:10,11,12,14,19
  49:23 50:7,19

51:9,16,19,22
56:6,8 57:1,2,14
58:11,15 59:3
61:10,21 62:19
63:16 65:2,8 66:7
67:10,25 68:8,13
68:19 69:2,10,11
69:14,18 70:4,12
71:16,24 73:4
74:1 75:4 76:12
76:18 77:11 78:18
78:23 79:17 80:19
81:4 85:14 86:14
88:23 89:4 91:9
91:21 92:21 93:15
93:25 94:1,2,6,8
94:15 102:18,22
102:25 103:15
104:7,15 105:2
106:5,17 107:2,20
108:15 109:13
110:1,3,11,13,25
111:2 112:3 114:2
116:11 117:18
120:10,10 122:9
125:2 126:13,15
129:3,20 143:21
144:7,13 146:15
151:14 154:14,25
155:12 159:10
162:5 163:4,23
164:9 170:8
172:23 174:2
183:6 186:21,22
189:3 195:1,17,20
199:21 201:15
204:6,8 207:18
208:7,9 212:6,19
214:24 216:14
217:5,19,22
218:21,23 221:23
222:1,4,14,19
223:1 229:3,3,17

231:1 236:3 237:6
238:1 246:2 247:9
253:8 264:4,16
270:1 271:21,25
272:10 274:11
279:6 282:6,10,25
283:3,13,13
284:24 285:6
289:17 291:18
296:12 297:2
298:23
**old**   301:21
**omnibus**   24:5
**once**   34:25 36:12
40:8 66:23 91:2
186:8 187:16
193:17 268:8
**one's**   61:21
283:10
**ones**   23:4 36:18
76:19 104:5 110:8
142:14 180:23,24
182:13 185:9
248:8
**one's**   161:24
**ongoing**   64:11
218:3 269:22
**ontario**   12:18
**open**   11:14 171:23
282:19 298:3
**operate**   113:14
117:8 199:11
282:8
**operated**   124:12
149:3 184:9,11
**operating**   53:7
99:13 102:15
114:5,6,12,14,23
115:24,25 119:7
119:13 121:14
129:7 130:6,7,14
131:1,7 184:14
278:20,25 279:5

279:11,13 285:13
287:11,12,17
291:7 293:2
295:15
**operation**   54:9,25
55:22 113:20
114:15 174:7
**operations**   46:13
54:5 114:25
119:16,23 125:17
158:11 235:5
**operative**   133:1
164:13 192:3
**opine**   61:14
**opinions**   29:6
**opportunity**
38:13 127:14
132:19 134:16
135:21 145:1,5
160:15 209:6
216:18 217:6,20
221:4 263:17
**opposed**   26:13
56:22 67:20 70:15
73:11 81:24 151:2
167:3 173:10
176:14 177:17
210:13 215:9
**opposite**   121:16
250:6
**opposition**   4:7,11
44:4 58:17
**oral**   57:17 107:22
110:5,5,17 168:16
267:5
**oranges**   221:17
**order**   3:22 13:22
14:3,25 15:8,14
18:23 24:2 27:10
30:14,20,21 35:25
36:1,2 39:11 40:1
51:17 52:1 90:17
90:18,19 91:2,2

91:12 110:7 134:7
134:10 146:10
156:21 181:10,17
181:24 193:22,24
224:10,18,23
225:17 231:21
232:5 247:21
250:25 251:23
286:25 298:10,11
299:3
**ordered**   36:4
152:13 223:21,25
224:21 225:9,9,10
225:19,23,25
226:2,7,19,25
227:2,9,15,20,24
228:11 229:23
231:16 232:14,23
232:24 233:9,24
234:10,15,20
236:20,22 237:7,9
238:3,18 239:1,13
241:23 244:6
246:4 247:3,5,15
249:11,21 251:14
251:18 252:5,7,8
252:10,18 253:1
256:1,14 257:12
257:16 259:13,18
260:5,13 261:8
262:19,21 265:24
266:13,18,24
267:9,21 268:7,14
268:20,25 269:4
**ordering**   231:22
232:13 239:15,22
239:23
**orderlies**   174:10
**orders**   12:23 15:2
22:13,18 89:25
90:7 91:18 92:20
181:9 182:21
191:3,4 227:21

231:16,24 299:1
**ordinary**   36:7
72:21 73:4 99:13
149:3 184:9,12,15
184:17 192:21,22
193:5 199:12
201:18 209:8,18
209:20,21 210:18
213:8 219:14
222:7,22 228:15
229:4,10 231:21
231:23 236:18
240:19,23 241:9
241:13 242:6,11
242:13 243:1,3
262:22,25 264:19
269:18,20 270:3,4
282:8 287:8
291:10,16,19,21
292:8,25 293:9
294:1,5 297:19,20
**origin**   92:6,15
**original**   91:13
93:1 95:22
**originally**   256:7
**orion**   230:9
**ought**   177:16
**outbuildings**
130:22
**outcome**   215:25
**outside**   47:14
104:4 115:19
270:11 292:24
294:5
**outstanding**
103:21 136:11
184:1,20 185:1
186:7 275:14
**overall**   130:25
131:10 135:14
**overestimate**
276:19

**overlapping**
31:16 203:20
**overnight** 187:21
**overpaid** 272:24
273:10,12 274:7
276:8 277:7,9
**overpaying** 274:8
277:1
**overreach** 17:5
**overseeing** 63:22
**owe** 182:23
184:24 187:16
188:14 190:11
**owed** 76:18 95:17
143:11 153:9
166:16 169:5,11
186:8 189:19
190:1,5,18 193:15
193:15,20,20,21
**owes** 187:14 190:3
**owing** 153:7
**owned** 45:25 53:7
113:11 114:4,6,6
114:12,14 118:15
119:7,13 123:8,13
128:16 130:2,5,6
130:6,7,13,14
139:24
**owners** 66:3 67:23
**ownership** 56:21
255:12
**owns** 14:8 53:15
**oxford** 225:4
**o'neal** 5:14

**p**

**p** 5:1,1 9:1 46:19
46:24 47:11 53:10
53:12,20 95:24
100:2,4,7,10
103:1,6,23 113:18
114:9,11,16 118:4
119:5,16,23 120:2
122:4 125:21

126:6,12 130:8,15
130:16 131:3,8,14
131:19 188:17
**pace** 57:24
**packed** 299:7
**page** 3:17 13:20
32:6 67:11 68:1
107:16 128:25
133:5 144:6,8
151:5 162:3,6
163:25 169:14
170:3 177:14,14
218:16,25 219:25
225:24 241:3
246:1 250:19
252:3 255:10
266:10 284:16
300:4
**pages** 67:12 223:6
234:12
**paid** 33:21 35:10
45:2 66:16 84:2
100:3,5,8,11
140:9 141:5 143:9
143:10 144:3
146:4 147:9 164:6
165:20 166:13
170:2,19 175:18
176:22 181:15
182:17 184:16
197:17 200:5
211:2 225:11,21
273:5,10,22 274:2
274:4,21 275:6,15
275:25 276:14
286:19,20 288:17
**paper** 9:23 63:10
75:21
**papers** 244:9
**paragraph** 61:5
66:19,20 67:1,11
88:7 89:4 96:19
123:15,16 125:14

126:10 131:16
171:20,21 208:16
**paragraphs** 43:16
68:15,21 107:13
**parameters**
270:13
**parcels** 33:6 47:8
113:19 116:18
118:17 123:6
130:17,19 131:2
131:24
**parenthetical**
296:19
**park** 5:19
**parking** 126:1
130:12
**parol** 38:11,23
39:21 113:1
127:20 128:23,25
129:8 231:5 256:5
256:24 263:23,23
264:12 265:1
294:14 296:18
298:7
**part** 9:8 17:15
18:18,18 21:7
23:2 25:16 28:22
32:17,20 48:14
59:12,16,24 61:2
62:25 63:22 64:19
68:24 71:2 87:22
112:9,10 114:24
115:7 116:14
117:10 121:5
123:3,7 131:7
138:15 147:18
160:7,25 163:19
169:10 178:16
186:20 208:18,20
209:13 221:14,22
233:7 234:11
259:4,5 264:11
270:9 273:22

274:12 287:7
293:13
**partial** 178:20
**participants**
29:13
**particular** 20:6
112:19,20 135:6
142:8 145:4,6
153:13 176:11
220:6 263:24
265:4 286:11
**particularly** 29:2
204:21 244:22
269:6
**parties** 9:16 10:22
11:6,17 16:6
21:12 22:19 31:12
33:15,22 35:17,20
35:21,24 38:21
47:18 77:2 113:10
114:23 116:1
130:15 131:13
132:18,18,24
135:5 148:10
149:17 164:15
167:14 168:20,23
172:6,9,12,24
174:6,25 175:1
176:13 177:16,25
178:8,9 194:16,17
195:10 196:2
197:9 198:1 199:6
200:14 201:9
203:7 206:4,13,18
211:12 215:5,6
219:18,22 220:8
220:12,17 221:1
221:13 226:8,23
227:7 228:20
230:19,22 235:14
235:16,20 239:21
243:8 246:25
247:2 248:13

249:24 252:9
253:15,16 259:9
260:22 263:3
264:21,23,25
265:5,6,8,14,18
266:20 269:1
276:9,23 284:11
290:4,7 292:7
295:4 296:4,16
**parties'** 177:12
218:24 223:18
263:1 268:19
**partner** 157:18
**partners** 8:1
82:17 87:9,13
**parts** 82:14 120:5
160:5
**party** 17:2,3
21:10,11 29:10,13
29:14 30:22,25
36:18 117:8
126:22 139:21,22
146:22,23 162:16
162:19 196:19
269:10
**party's** 116:5
**party's** 240:21
**pascale** 5:10 81:6
**pass** 37:5
**patent** 14:9,15
16:12 24:7
**patents** 14:8
**path** 129:17
**patterson** 7:1
**paul** 6:7
**pause** 205:7
241:11 242:19
**pay** 18:4 22:9
169:22 174:9
178:12 181:13
182:2,14 186:6,9
192:20 194:13,21
195:10 226:11

236:13 239:7
258:10 272:22,24
273:8 275:24
276:21,22 278:21
279:17 280:18
283:5,8,16,18
285:12 286:8,25
288:24 293:12
295:3
**payable** 36:4,10
193:14 223:3
224:25 225:9
226:1 229:2,9
234:20 240:19,22
241:9,13 242:5,16
243:1,9 244:14
252:13 254:1
258:20,25 259:9
260:14 261:21,22
263:4 267:10,12
291:12
**payables** 63:21
205:10 223:20
224:1,9,17,20,24
224:25 226:2,6,10
226:25 228:10
229:24 233:8
234:15,19 235:22
241:22 242:4,5,9
242:13,17,24
243:3,4,19 244:5
245:16 246:3,8,13
246:14,18 247:2
248:10,11,17,19
249:14 251:11,18
252:8,17 253:19
256:8,13,16 257:4
257:5,9,10,11,14
257:16 258:6,25
260:5,15,16,21
261:5 262:8,13,17
262:20 264:11
265:22,23 266:13

266:17,23 267:8
267:19 268:13,21
268:25 272:14
291:11
**paying** 21:7
190:10,12 194:23
195:13 227:3,4
275:24 285:24
291:13
**payment** 33:6
89:18 95:25 96:2
148:24 150:14,15
154:11,15 155:7
179:13 181:19,21
187:25 188:18
223:21 224:9,17
226:13 227:15,19
227:22,24 228:10
233:8 234:15,20
235:22 241:23
245:16 246:3,8,18
247:15 248:18,19
249:10,20 252:5,6
252:7,13,17
255:25 256:9,13
257:12 265:23
266:18,24 267:8
268:13,20 269:3
270:2 271:19
292:13 296:25
**payments** 66:22
100:2,2,5,8,11
103:9,14 150:13
150:18 155:1,17
155:21 168:10
182:25 183:1,3,4
242:8
**payor** 83:24
**payout** 147:8
**payroll** 279:8
297:1
**pays** 227:5 281:24

**peanut** 272:18
**peanuts** 254:21
272:18
**peculiar** 163:14
**peg** 93:15 134:5,9
136:23 195:25
199:6,8 202:5
203:24 207:21
**pegged** 144:1
207:11,11
**pegging** 149:2
**penalized** 171:6
275:23
**pending** 23:24
24:21 26:9 39:20
198:21 199:1
237:4,6 259:17
**penn** 12:19
**penny** 280:17
286:19,20
**people** 9:21 16:9
29:22 41:19 57:8
63:20 110:11
129:6 139:24
141:3 145:13
165:13 178:2
194:18 202:12
204:12 205:2,5
221:1 259:20
281:1 291:22,25
**peradventure**
263:6
**percent** 78:16
79:8,9 80:5 83:10
91:18 97:9 104:22
104:24 135:13,14
135:15 149:24
150:3,8 179:25
180:12,16 181:2
187:15 194:21
231:25 291:9
**percentage** 80:9
180:16

**perfect** 141:17,18
141:18 243:6
**perfectly** 220:13
252:24 259:20
268:3
**performed** 95:4,6
**period** 27:9,11
32:15 46:2,3 49:4
49:5 64:1 71:16
71:19 74:22 80:8
88:17 90:6 91:18
91:25 92:17
106:13 147:22
166:19 172:1
201:20,21 202:15
205:20
**periods** 158:3,12
**permissible** 15:25
**permission** 32:1
44:22 45:3 50:11
194:10 195:19
**permits** 84:17
**permitted** 292:24
**person** 42:9 63:6
63:23 84:18
115:14 158:17
203:8
**personal** 99:19
**perspective** 32:23
73:3,11 74:10
142:21 206:5
231:11,12,13
232:16 233:23
234:13 235:13
238:19,20 239:14
240:1,5
**pertaining** 146:17
**pertains** 108:17
129:25 265:20
**petition** 72:21
92:13 113:6 138:3
138:20,22 194:11
194:12,13 196:11

201:20,21 205:20
**phil** 5:23
**phone** 63:23
140:4
**phrase** 88:13
118:4 140:25
163:22 224:22
226:1 251:15
268:12
**physically** 73:11
**pick** 142:9,12
143:13 170:14
195:5
**picked** 196:5,7,15
**picking** 252:6
269:10
**picks** 251:25
**picture** 177:23
**pictures** 230:9
**piece** 41:17 63:9
102:2 113:16
**piecemeal** 19:9,15
57:17
**piper** 7:8
**pitfalls** 101:20
**place** 12:20 197:1
207:20 240:7,8
262:15 290:7
**placed** 32:12 67:3
85:4,7,10
**plain** 118:12
129:19 132:25
167:16 220:15
221:9 230:20,20
231:3 243:25
250:13,14 265:9
265:15 269:11
297:15
**plainly** 184:24
228:9 232:11,24
**plains** 2:3 182:1
292:21

**plaintiff** 1:13
**plan** 9:17,19,23
11:2 14:20 15:8
15:17,23,24 16:1
16:14 20:24 21:2
21:8,9 23:6 27:15
27:21 36:6 225:20
**planned** 40:10
**plate** 269:21
**play** 209:9
**playing** 130:21
**plaza** 5:5
**please** 9:2 42:15
42:17,21 43:22
49:15,20 58:7,12
70:5 75:18 94:2
108:9,10 109:7
110:13 116:12
137:3 221:25
230:1
**pleased** 37:3
**pleasure** 110:22
**plenty** 40:6
**plot** 112:14,20
**plots** 111:5,13
115:17 118:3,9,11
118:15
**plural** 50:16
**plus** 37:3 180:12
**pm** 299:14
**point** 19:23,25
23:16 28:16,19
30:6 35:13 37:8
38:19 42:2 43:19
57:4 77:12,17,23
91:22 97:21 103:2
103:17 108:5
110:20 112:2
113:3 116:2
119:24 120:19,24
124:22 125:3
126:2 133:6
134:24 136:6,10

136:12 137:21
141:6 143:1,12
144:1 148:7,18
149:21 151:20
152:17,18 159:7
164:10 165:13,25
169:13,17 170:18
170:22 171:17,21
172:25 173:1
174:3 182:13,18
185:12,23 186:22
187:23 188:21,21
190:9 195:3 197:8
198:22 199:6
200:13 206:18,23
207:12,18 210:16
211:10,16 214:22
216:7,9 220:18,19
225:20 228:1
229:14 244:2,12
245:11 246:10
249:11 257:7
262:23 263:25,25
268:4 269:11
270:24 271:4,11
271:13 278:18
279:11,18,24
280:16 289:22
290:14,17,17
294:14 295:1,10
296:3
**pointed** 113:2
128:20
**pointing** 140:8
**points** 112:11
125:14,20 137:24
157:18 190:24
214:18 241:25
245:14 257:17
260:4 283:14
**pole** 156:25
**poles** 156:24

policed  293:25
policy  25:19
popular  163:24
portion  38:7
  41:14 60:24
  157:24
portions  39:4
position  33:25
  36:1 111:19,19,23
  113:8 156:21
  165:15 166:22
  173:3 180:19
  184:2 208:23
  228:13 242:12
  294:4
positions  158:9
positive  66:21
  160:13 164:1
  250:22
possession  30:4
  151:10 179:3
  185:16 279:13
possible  87:25
possibly  203:8
post  67:6 72:21
  75:21 90:2,11
  92:13,14 93:3
  97:11,13,25 98:5
  138:3 154:11,15
  181:10 182:21
  183:12,14 191:3,4
  191:19 195:5
  201:20 203:21
  205:19 227:13
posted  281:8
postpones  190:20
potential  87:25
  91:13 101:20
  190:13 192:25
potentially  22:24
  77:1 80:20 83:23
  83:23 92:17 102:9

practical  177:20
practice  167:18
  199:23 211:18
  220:3 291:12
  292:16
prakash  278:5,6
pre  4:5 72:21 90:2
  95:25 98:1 100:1
  100:23 138:22
  157:5 169:6,7
  170:2 181:9,14
  183:10,14 184:3
  187:15 191:4
  194:11,12,13
  195:4 196:11,21
  201:20 203:18,19
  203:21 231:20
  298:5
preceded  140:25
  185:5 255:16
precise  205:24
precisely  207:14
  260:7,8
preclosing  154:9
preclude  24:1
precluded  38:23
predict  230:8
predicting  197:5
preference  110:23
prehearing  31:20
preliminary
  134:19 144:11
  178:4 230:3 297:8
premise  117:11
premised  214:1
prepaid  36:14
  40:21 67:17,19
  68:6 69:15,22
  71:5,8 72:2,3,5,8
  72:13,18,22,25
  73:1,6,21 74:11
  74:15,17 81:11,14
  81:16,17,23,25

82:1,4,9,16,20
  89:5,7,9,13,16,19
  89:21 90:10,11
  91:5 93:1,11,16
  98:24 101:10
  102:20 106:11
  107:5 172:1
  175:18,20 186:17
  187:3 195:19,23
  195:24 196:3,17
  197:12,15,20
  198:7,17 199:16
  199:25 200:4,10
  200:10,19,21
  201:4,14,19
  202:25 203:10
  207:7 208:12,25
  209:1,24 210:23
  210:25 211:1,15
  212:9,23 218:25
  219:3,10,11 220:5
  220:17 221:20
  228:19,24 237:7
  258:12,15 274:7
prepared  35:17
  40:8,11 108:3
  115:22,22 134:3
  158:2
preparing  11:15
  20:23
prepayment
  89:20
prepetition  71:10
  134:2 138:2,18
  139:19 144:20,23
presence  246:17
present  13:7
  158:8
presentation
  95:23 144:5,10
  145:1 149:23
  161:1 166:7
  218:17

presented  135:12
  135:13
presentment
  13:13
preserved  16:15
  16:21 35:4,8 39:3
president  45:12
  45:19,23 46:5
  123:25 225:22
presume  214:15
pretty  9:8 15:23
  29:6 113:9 124:7
  165:17 181:4
  222:25 286:4
prevail  223:10
  224:5
prevent  16:5
  186:16 210:12
preventing
  186:15
prevention
  209:20
previous  48:21
previously  14:11
  199:8
price  6:17 259:5
  264:12
prima  180:20
  181:4
primary  55:10,12
  87:16
principle  293:5,20
prior  49:2 67:6,15
  89:24 90:9 143:22
  159:8 167:18
  177:4 191:18
  197:18 203:15
  211:2 224:12
privilege  29:24
pro  27:2 44:23
probably  30:17
  56:19 74:7 100:25
  117:20 119:19

153:3 162:22
190:9 196:7 203:8
218:3
**problem** 143:2
156:15 183:17
187:8 188:20
208:5 260:12
285:5,7
**problems** 131:4
147:23,25 148:5
**procedure** 3:23
**procedures** 18:22
18:23
**proceed** 23:25
35:25 36:2 70:21
230:7
**proceeding** 4:4
23:25 24:21 26:9
43:1 49:25 58:20
94:10 108:16
110:15
**proceedings**
299:13 301:4
**proceeds** 84:15,16
84:23 179:2,8,10
**process** 15:14
23:3 44:24 46:11
48:14,19 60:4,6
61:2 63:16,17,22
64:14 65:25 66:5
83:24 84:20 93:2
96:6 103:2,10
104:8 112:9
123:12 128:22
139:16 152:11,12
178:2 189:14
216:18 265:11
**processes** 142:6
**produce** 30:2
**produced** 182:15
**producing** 30:3
**product** 91:14

**production** 3:24
**products** 14:7,13
**professional**
47:14
**professor** 269:9
**proffered** 263:5
**progress** 185:21
**prohibited** 192:24
**project** 74:20
**projections** 159:6
**projects** 74:25
86:8
**promise** 45:1
227:14
**promised** 153:25
156:22
**promises** 228:6
**promising** 228:4
**proof** 182:25
183:2 291:21
292:11
**proper** 132:19
175:16 178:10
182:4 186:10
220:25 224:5
**properly** 39:7
137:22 143:9
207:24 220:16
**properties** 46:7
46:22 53:12
113:11,13 114:6,7
114:12 115:20,25
119:7,12,13 120:3
120:4,12 123:6
124:13,19 127:4
127:15,15,20,21
128:7,10,14,16
130:6,7,14 131:17
131:18,19 132:2,4
132:7,11 133:3
181:1 193:1
**property** 18:10,11
33:13 45:25 47:2

53:7 55:4,4,10
69:15 75:16,24
76:2,3,5,7,10 77:7
77:14,15 80:24
84:2 88:2 96:7
97:10,14 98:12,21
98:22 99:1,2,5,7,9
99:12,15,22 107:5
112:5 113:16
114:4,8,14,14,16
115:18 122:2,16
122:17,18 123:8
123:13 124:14,21
130:3,5,8,14
131:6,6,22,24
132:14,24 178:15
179:3,17 180:23
180:24 181:4
182:5 183:18,20
183:22 184:1,16
184:23 185:1,9
188:24 189:21
190:6 191:11,16
191:17,21 192:2
192:14,17,18,21
193:2,14
**proposal** 26:7
222:17
**propose** 36:10
222:21
**proposed** 27:9,18
**proposing** 16:13
25:2
**proposition**
284:13 288:7
**prorated** 32:6,10
**proration** 32:17
32:19 33:17,20
34:1,3,8,17 35:5
**prorations** 33:23
**prosecution** 28:22
**protect** 289:21

**protecting** 257:25
**prove** 115:10
**proves** 249:12
**provide** 16:14
29:23 30:19 51:12
93:16 96:21
100:22 105:3
124:3 145:18
167:1 181:18
200:22 217:11
226:18 239:12
293:15
**provided** 14:15
16:17 19:1 23:18
31:18 47:11,13,19
59:21 91:8 94:22
96:20,24 101:7,11
101:16 112:5
113:17 126:18,19
127:3 134:19
144:18 145:1,15
145:24 158:21
160:17 210:8
215:19,20 216:4
223:4 226:23
**provides** 16:18
30:7,20 125:9
160:10 174:8
192:23 266:15
267:17 268:19
**providing** 30:22
69:22 104:20
128:24 141:13
176:10
**provision** 33:9
82:7,9 125:9
148:18 159:8
206:20 210:3,4
219:8 220:9 231:9
234:3,6 238:19
239:6 240:1,5
243:1 244:24
252:23 254:20,22

255:8 256:19
257:24,25 258:3,5
268:10 285:20,21
290:2 292:8
293:14
**provisions** 15:4,5
24:17 133:1
210:22 215:2
230:18 238:11
240:6 244:3,4
256:10,25 257:23
263:10 267:1
297:24
**proviso** 255:19,21
256:2
**provisos** 236:5
256:5
**proximity** 55:10
**proxy** 81:22
293:15,18
**published** 158:6
**pull** 185:8 188:23
282:4
**pulled** 48:16,18
48:22 188:23
274:17
**pundit** 12:11
**punished** 176:10
**purchase** 4:2,11
15:2 22:13,18
31:11,14 44:5
53:7 58:18 59:10
59:16 61:12 89:25
90:7,17,18,19
91:1,2,12,17
92:20 104:19
129:24 227:21
231:16,24 232:5
259:5 264:12
265:21
**purchased** 86:21
91:5 124:15
236:25

**purchasing**
294:23 295:2
296:5
**purely** 81:21
91:11 194:6
**purport** 61:6
165:10
**purported** 166:6
166:8,10 169:7
171:24 180:25
**purporting**
112:23
**purpose** 17:8
20:14 28:13 92:11
114:21 130:25
131:10 139:14
141:7 154:1 258:2
258:22 285:9,19
285:21 287:16
289:21 293:14
297:1
**purposes** 39:15
71:4,9,14 72:10
81:24 87:2 92:1
165:2,20,23
175:16 176:17
220:14 268:9
279:9 286:11,11
289:19 293:21
**pursuant** 3:22
39:18 105:2,8
160:2 210:24
238:10
**pursue** 16:20
17:11,24 18:5
20:8 24:7,11,24
25:3,6,9
**pursuing** 20:7
26:22 28:24
**pushed** 95:15
**pushing** 22:12
**put** 11:4 18:13
48:22 67:11,24

73:16 76:25 104:1
109:5 129:14
131:13 143:15
166:3 175:6 187:2
187:7 189:25
194:9 206:18
217:13 221:15
232:2 245:21
255:24,25 256:3,3
257:13 263:22
265:13 269:2
283:25 294:10
**putting** 285:9
286:23 290:11
**puzzled** 228:21

## q

**qualify** 165:1
**quality** 142:23
143:1 157:22
299:11
**quarropas** 2:2
**question** 37:12
40:21 41:15 53:17
56:8,20 57:2,6
59:15 60:8,17,20
61:13,24 62:25
63:8 77:23 83:4
83:19 96:25 98:15
106:8,9,19 118:2
118:5,21 119:14
121:18,19 124:2
124:24 142:21
143:22 145:3
154:8 157:19
159:9 167:14
199:9 200:23,25
209:11 210:21
211:24 212:11,18
213:23 216:17,25
228:18 234:18
235:6 237:18
239:18 244:10
245:15 247:10

248:18 250:5
252:22 260:24
262:17 280:11
284:18,21 285:18
287:14 293:1
294:14
**questioning** 93:13
104:15
**questions** 10:3
19:14 41:7 48:8
48:13 49:9 50:13
56:5 65:7 66:6
88:5 100:13 106:4
106:20 119:4
140:11 146:12
150:10 169:1
213:5 218:13
228:16 234:17
285:8
**quibble** 61:16,21
**quick** 9:8,15
100:22 222:25
263:22
**quicker** 92:9
**quickly** 57:24
125:3 186:14
189:7 202:11
**quid** 27:2
**quite** 51:18 60:22
121:16 216:4
**quo** 27:2
**quotation** 175:6
**quote** 45:24
111:15
**quotes** 175:15
176:16

## r

**r** 2:12 5:1 6:7 9:1
43:25 44:2 49:22
58:13 70:10 301:1
**rachel** 7:13
**radar** 111:22

rai 2:16
raise 18:1 42:16
  43:21 49:15 58:6
  70:4 94:2 108:9
  109:7
raised 95:11,18
  149:7 167:13
raises 38:18 191:6
rajat 278:5
ran 102:3 139:18
  145:13
random 196:6
ranging 135:13
rate 135:14
rates 135:13
  160:18,25
rationale 156:5
ray 9:6 214:14
  239:5 263:21
rdd 1:3,4 4:4
reach 29:12 38:16
  104:13
reached 15:7
  33:19 84:8 187:21
react 213:17
reaction 82:11
  272:17
read 29:4 32:1
  56:11,17 123:21
  131:10 157:24
  162:7 209:13
  212:12 220:9
  237:24 240:11
  241:8 242:14,15
  242:18 244:5
  247:21,22 248:20
  248:22,25 251:15
  253:22,25 291:7
readily 90:13,15
reading 176:19
  267:3 269:14
readings 114:22

reads 230:12
ready 263:20
real 33:13 45:12
  45:19,24 46:5
  47:12,15,16,23
  48:2 53:1 87:5
  114:4,8,16 115:14
  123:25 130:2,5,7
  132:24 138:25
  139:21 143:14,16
  149:1,1 170:21
  195:2 211:6 215:3
  221:21 239:18
  243:11,12,13
  254:5 260:1
reality 118:13
  164:2 167:2 215:8
realize 128:13
realized 53:16
really 17:1,10
  18:10,23 20:13
  26:15 27:20 28:19
  28:23 36:8 57:19
  60:24 65:24
  109:20 116:14
  124:7 138:5 139:4
  141:20 143:2,9
  145:7 147:1
  159:17 165:15
  167:14 169:21
  171:3 172:7 176:5
  178:25 180:22
  185:11 188:10,18
  195:6 202:6,15
  204:10 207:17,17
  210:16 211:22
  215:6 216:23
  222:23 225:1
  228:2 246:20
  254:20 262:4
  263:19,19,19,22
  264:14 265:18
  266:7,8 267:4

272:19,19 283:5
  288:23 293:11
  296:8,22 297:23
reason 15:16 92:1
  101:1 121:11
  129:5 140:15
  168:16 189:4
  194:4 195:9
  197:13 204:4,25
  205:6 209:14
  210:3 211:4 212:7
  216:16 218:8
  227:23 242:3
  253:18 255:20,22
  256:4,4,19 257:11
  257:13 258:4,24
  261:5 262:6,6
  266:25 267:10
  278:11 285:18
  289:20 290:3
  291:15 298:25
reasonable 105:3
  195:5 196:19
  201:8 203:1,6
  206:4,5,13,17
  207:1 208:5 221:5
  224:4 230:19,22
  246:25
reasonableness
  195:7
reasonably
  132:17 220:23
reasons 124:16
  142:5 230:11,14
  240:2 242:1
  246:22 266:11
rebate 297:24
recalculate 133:9
recall 12:8 61:7
  105:7
recalled 234:17
recalls 239:18

receipt 90:8
receivable 59:18
  61:1 64:25 66:1
  133:18 134:10
  135:7 137:6,10,12
  137:13,16,20
  138:2,5,15,17,22
  139:12,13,23
  140:2,20,22 141:1
  141:4,9,14,20,20
  142:14 143:8,15
  143:16 144:2,3,16
  145:8 146:18,21
  147:2,8,9 150:21
  151:15 154:9,16
  155:6,15 156:7,18
  159:15,16,17
  160:6,8 161:7
  162:9,15 163:1,6
  163:15,18 164:7
  164:12 165:2,9,19
  165:22,22 166:8
  166:10 167:1,7,10
  167:16,17 168:2
  169:5,22 170:20
  171:10 172:2,5,13
  172:15,19 173:4,8
  174:12,18,21
  175:6,7,9,12,15
  175:15,17,19,22
  176:6,7,10,15,17
  176:20,21 177:2,9
  177:12 187:3
  202:24 205:11
  219:8 221:18
receivable's 139:3
receivables 36:15
  40:19,22 41:15
  58:6 59:9,13,21
  59:25 60:5,11,22
  60:25 61:7,11,14
  61:18,19 62:3,8,9
  62:11 63:4,11,18

63:21 64:8,16,19
64:20 65:4,21,23
66:1 67:14 87:6
98:24 107:5,8
108:7 109:15
133:6,8,10,13,14
133:17,20,20
134:6,8,13,21
135:3,9,9,12,16
135:23 136:11,18
136:23 137:5
138:25 139:2,4
140:20 142:15
144:11,14 145:12
146:22,23 148:6
149:1,2,6 150:2,9
150:19 152:15
153:11 154:18
155:17,18 156:12
157:5 159:14,14
159:22,24,25
160:4,5,7,12,14
160:16,21 161:2,6
161:19,20,23,24
162:17,19 163:2
163:11,12,15,21
165:6,8 166:2,6
166:23 167:11
169:4 170:16,16
170:24 173:6
174:14,16,21,23
174:24 198:20
228:24 257:19,20
257:22,23 258:11
258:12,17 261:10
274:15 281:6
**receive**  38:11
84:13,25 90:25
98:13 117:16
134:12 210:25
212:9 225:20
237:3,3 260:6,6
265:7

**received**  15:11
66:24,25 67:17,19
67:19 68:2,6 72:6
75:19 79:6 83:2
90:1,2,5,9,10 91:2
91:4,6,19,20 92:8
92:9,10,16,17
95:23 133:10
135:16 137:23
139:11 147:7
150:23,24,25
169:6,7 180:1
208:18 217:15
235:1
**receives**  79:22
227:5
**receiving**  171:19
**recess**  110:12
222:3
**recognized**  166:7
189:13 224:2
**recognizing**  92:8
92:16
**reconcile**  180:10
186:2 188:13,22
**reconciled**  66:24
100:1 185:8
**reconciliation**
32:22,24 36:15
41:4 63:17 64:8
64:17 65:19,21
66:2,5 83:7 86:8
93:10 96:6 98:4
180:6,18,22 181:8
185:14 186:9
187:21,24 188:4
189:8,14,25
269:25
**reconciliations**
32:20 69:16 96:22
107:5 178:15
180:25 186:11,22
186:25

**record**  27:14 28:1
30:1 32:1 42:21
49:20 58:12 66:21
70:9 106:24
110:14 112:19
116:15,20 117:20
120:3 122:15
123:22 141:22
143:23 152:20
157:25 160:23,24
164:17 172:18
212:14,21 213:12
214:9,15 218:14
220:23 222:4
233:3,21 234:11
301:4
**record's**  107:20
**recorded**  127:16
151:8 153:12
**recording**  167:18
**records**  31:1
68:22 73:17 74:15
152:25 156:24
184:5,19 196:9
197:24 199:15
201:23 205:17
208:14 209:1,24
**recoupment**  33:2
34:13 189:14,20
190:6,19
**recover**  18:3,8
135:19
**recoveries**  136:4
**recovery**  21:7
26:22 27:3 135:3
135:3,13,14
144:12 149:24
150:8,9 160:18,25
**recreate**  93:1
**recreated**  89:7,13
**recreation**  74:15
**recross**  66:10

**recut**  258:8
**red**  260:11
**redirect**  48:9,11
56:6,7 65:8,10
81:4,8 93:23
**redrafted**  256:9
**redrafts**  265:11
**reduce**  155:18
173:3 210:1
**reduced**  92:13
248:9 250:24
272:15
**reduces**  89:20
155:16
**reducing**  160:11
**reduction**  226:18
226:24 227:9
256:18
**redundancy**
260:11,12,14
**refer**  73:9,10
105:23 248:9
266:17 274:24
**reference**  69:10
112:7 119:23
123:13 131:3
137:6 170:24
218:15 258:5
267:10 269:18
275:9 285:4
**referenced**  32:6
38:8,9 49:7 115:6
188:1 198:25
281:3 286:1
**references**  21:10
69:9
**referred**  106:2
114:11 155:1
204:20 256:7,16
**referring**  26:10
50:17 62:14 67:4
155:4 162:2
254:22,23 284:19

**refers** 46:1 134:7
238:4 241:20
247:13 255:9
259:17,17 267:11
267:15 275:12
297:24
**reflect** 155:20
163:3,12 209:1
**reflected** 134:22
134:23 136:6
152:2,18,25
153:13 156:2,20
169:8 197:21
200:7
**reflecting** 218:19
226:9,9
**reflects** 39:13
166:14 213:12
220:16 240:21
241:12 299:11
**refund** 84:23
297:24
**refunds** 84:16,16
84:17 87:6
**refused** 179:19
180:10
**refusing** 180:24
**regard** 27:14
47:21 174:7
265:16
**regarding** 10:13
38:10 68:16 88:17
135:25 157:21
178:21
**regards** 95:21
**regional** 278:8,9
279:3,21,21
281:14 282:19
293:2,3
**regularly** 210:18
**regulations** 158:7
**rehearse** 230:3

**reimburse** 182:3
**reimbursed**
181:20
**reimbursement**
210:1 224:15
227:1 241:21
248:9 251:1
256:10 257:6
258:18 259:1
260:1 267:20
**reinforcing**
257:15
**reiterate** 172:25
**reject** 11:7 228:12
263:18
**rejected** 23:5
**rejections** 265:11
**relate** 47:8 54:9
84:15 113:20
146:21 162:16
189:1 222:23
228:19 261:4,4
**related** 12:7 13:20
33:11 42:12 46:12
47:4 48:24 50:22
54:5,24 55:2
56:10 79:2 88:20
99:7 117:12
119:16 125:3
297:17
**relates** 84:19
121:7 162:9
**relating** 26:17
146:18,25
**relation** 82:12
84:6,9 87:4,15,17
89:2 90:20
**relationship**
26:16 215:8
261:15,17
**relationships** 17:2
26:17

**relatively** 167:6
**released** 21:12
32:13,14
**releases** 21:10,11
**relevant** 39:18
42:13 55:23
121:14 266:1,11
272:13
**relied** 93:13
**relief** 23:21
271:21
**rely** 72:7 202:9
209:23 292:8
**remain** 190:24
**remained** 85:24
**remaining** 13:3
33:16 35:20 87:18
90:12 110:8
190:23 222:5
227:12,12 297:4
**remains** 33:2
34:12
**remarkably** 268:1
268:23
**remember** 60:18
105:11 202:10
204:4 240:16
255:6 259:2
274:12 275:9
**remembers** 223:4
**remind** 191:23
**reminded** 276:17
**removed** 98:21
99:8,11,16 102:10
118:7
**rent** 32:6,10,17,19
33:20,23 34:1,3,7
34:16 35:4
**rent's** 195:6
**rephrase** 85:6
**reply** 3:15,18 4:14
294:12

**report** 31:22 37:4
138:9 146:9,10
165:18 166:14
167:15 175:17
**reported** 71:5
73:2 134:3 165:20
165:23 176:17
280:19
**reporting** 65:3
71:4,10,14 72:9
73:11 138:9,17,19
139:10 166:20
175:4 176:6,18
201:19 212:15
219:16 220:14
221:8
**reports** 112:6
271:2
**represent** 52:2
65:13 81:7 185:11
217:14
**representation**
26:21 120:25
158:18 261:12
285:23 293:16
**representations**
47:20 158:14,15
158:23 159:1,5
**representative**
220:11
**representatives**
158:25
**represented** 30:5
78:15
**representing**
180:3 258:1
**reputable** 205:4
**request** 15:13
19:24 20:4,5
21:20 22:17,22,23
28:25 30:8 40:2
40:12 57:20 75:19
79:7,14,21 94:25

97:6 189:5 217:24
228:12
**requested** 9:20
96:16,22 97:1,3
98:2,2 102:12
107:9,24
**requests** 22:8
95:19 96:15 97:20
180:10
**require** 117:3
118:23 195:12
268:9
**required** 59:17
74:15 93:16
136:21 145:18
164:2 192:20
208:24 229:8
242:8 263:6
274:21 275:6,15
276:5,6 288:17
**requirement**
119:22 192:22
**requirements**
158:6 282:13,16
**requires** 27:7
200:22 209:19
213:17 229:8
291:20,21,21
**requiring** 3:23
**reserve** 19:17
283:18,24,25
**reserved** 33:15,23
34:4
**residual** 87:1
**resolution** 12:12
186:14 190:16
**resolve** 11:12,19
13:12 298:24
**resolved** 11:1,3
12:15,16,21 27:25
31:17,23 123:20
176:9 178:16
187:8

**resolves** 32:18,21
34:7
**resolving** 104:5
**resort** 285:8
288:12
**resources** 147:20
223:8
**respect** 13:19
25:22 31:25 32:4
33:15,16 34:16,21
35:4,7,8 36:25
37:1,23 38:4,7,15
39:11,12,20 40:1
40:4,23 41:14,20
64:22,23 65:23
67:3 77:25 78:11
107:7,25 137:22
148:19 158:7,19
158:21 188:17
191:9 197:12
200:10 209:21
211:13 223:3,18
223:21 224:10,17
224:20,23 226:1,5
226:6,19,24 227:9
227:15,19,24
228:11,14 231:7,9
232:12,13,23
233:2,6,8 235:22
241:23 242:1,8
243:9,10,12,19
244:14 245:21
246:3,8,23 247:3
247:4,5,15 249:21
251:22 252:5,7,8
252:10,18 253:17
256:1,14,15,21
257:15 258:4,15
258:16 259:16
261:7 262:7,17,18
262:21 263:1,17
264:5 265:24
266:12,18 267:8,9

268:13,15,24
269:4,8,19 284:6
284:8
**respected** 249:10
**respectfully** 122:5
189:5 228:12
**respective** 158:24
**respects** 158:5,8
225:2
**respond** 100:22
190:24 197:7
260:3 285:21
**responded** 95:19
140:12
**responding** 106:9
**response** 29:5
68:19,20 79:21,25
96:15 103:16
118:21 211:10
**responsibilities**
87:14
**responsibility**
87:19,23 116:14
159:5 298:5
**responsible**
194:18
**responsive** 95:10
95:12,17 101:2
**rest** 43:3 107:21
122:7 150:10
188:4,14 189:7
**restricted** 278:2
278:11,13 281:12
284:2 286:9,13
287:17 288:21
289:19 296:21
**restrictions** 23:8
**restructuring**
87:17
**result** 95:7 117:14
177:19,20 178:25
**resulted** 255:2

**results** 158:11
**retailers** 14:18
20:11
**retained** 117:17
**retrospect** 201:7
**return** 263:4
**revealed** 161:8
**revenues** 56:17
**review** 19:2 78:22
79:3,24 80:2
98:14 179:4 265:6
265:8
**reviewed** 75:22
**reviewing** 101:21
101:23
**revised** 12:22
**revolves** 60:24
**richard** 7:14
10:16
**rid** 275:15
**riecker** 74:3 86:10
105:4,9 135:4,20
135:24 136:16
140:15 149:14
204:22 215:11
216:9 225:15,19
272:21 273:18
277:16 284:15
285:5
**riecker's** 278:3
284:7
**right** 13:25 14:4
16:23 17:23 20:1
21:5,8,25 22:10
22:16,24 23:9,19
23:23 24:8 25:14
26:1,6,8,12 27:20
28:2,18 30:10,12
30:17 34:18,19,24
35:11,14 36:5
37:11,21 40:12,15
40:25 41:5,22
42:14,16 43:21

44:1,24 46:16
49:15 50:24 51:19
52:4,7 53:6,11,13
53:15,21 54:11
55:11,11 56:14
57:1,16,22,25
58:7,24 59:11
62:15 67:11 68:11
69:11,11,12 70:4
70:19 73:14 76:14
80:14 81:17 91:15
92:21 93:7,17,19
94:2 95:1,3,8,11
95:18 96:1,9
97:24 99:21
100:11 101:5
103:22 107:1,20
107:22 108:8,9,22
109:7,20 110:4
113:23 114:10
117:5,12 126:21
128:1,7 129:9,22
130:9 140:22
142:20 143:14
145:19 147:10,12
148:10 150:20
151:6 155:5,9,23
155:25 157:13
162:7,14,18 163:7
163:17,19 164:2
164:24 167:4
169:16,20,23,24
170:5,19 172:23
173:14 174:5,19
180:15 182:10
188:13,19 190:15
191:6,9,12 192:3
192:10,16 193:3
193:11,24 197:4
199:10 200:12
201:1,15 202:6,14
203:22 206:7,9
209:5,14 210:25

212:2,3,6 213:10
213:21 214:3
216:7,24 221:1
230:23 235:11
236:9,14,15,19,20
236:21,22 237:3
237:12,14,21
239:17 244:24
245:1 249:12
250:3,19,21 251:2
251:10 256:18
259:6 262:2,9,12
262:12 264:9
265:6 270:8,15
271:9,14,15,20
272:3,5,7 273:6
273:13 274:16,16
274:19 275:3
276:4,12,24 277:8
277:13 280:1
281:7,16,22,23
282:3,10 283:24
285:1 286:14
287:23 288:1,4,19
289:25 291:23
292:2,5 293:11
294:2,25 295:23
295:24 296:1,6,15
**rights** 15:15,17
16:19 17:16,17,21
18:3,7,11 19:17
21:2 23:1 27:17
28:3,4,14,24 33:3
33:4,14,23 34:4
34:13,16 35:4,8,9
130:11,12 297:21
**ring** 105:6
**ripe** 34:21
**ripped** 255:9
**rise** 132:16
**rises** 132:12
**risk** 160:16,20
163:8 221:17

232:11,11,12,15
233:22 239:22
258:1
**road** 54:19 55:4
55:12 301:21
**roads** 54:23
**rob** 105:3 216:8
277:16
**robert** 2:13
**rock** 87:25
**roebuck** 14:22,22
151:7
**role** 45:23 87:11
87:13 117:7
**roman** 163:24
174:7 219:5 266:5
266:12
**romanette** 192:23
**room** 2:2 46:12,15
112:16,20
**roughly** 78:17
110:10 234:16
**round** 33:21
**rounder** 196:7
**route** 16:14
**rubio** 7:22 14:5,6
15:22 16:13 17:4
17:6,12,15,25
18:20 19:6,24
23:14,16,18 24:13
24:19 25:2,8,13
25:16,23 26:2,5,7
27:16,22 28:2,7
28:12 30:16 31:3
31:5,7
**rule** 3:22 14:3
17:9 20:4,14
23:25 24:21 29:19
29:19 30:19 225:4
264:17 269:7
290:6 300:7
**ruled** 230:5

**rules** 3:23 18:18
158:6 244:18
248:2,3 252:1
284:5 285:14
**ruling** 132:9,9
223:5 230:6 297:8
**rulings** 230:4,4
269:5 300:3
**run** 30:14,17 74:9
88:12 90:17 129:7
194:22 277:1
282:19
**running** 74:2,5,16
81:24 82:15 88:21
207:23 279:12
**runs** 55:5,11

**s**

**s** 5:1 8:10,11 9:1
**s.d.n.y.** 29:7,8
132:22
**sale** 46:8,11 48:15
75:22 84:7 88:8
97:25 98:1 149:18
202:11 223:12
224:3,13 255:7
265:5
**sales** 46:6
**sam** 52:1
**samuel** 5:9
**sand** 180:9
**sara** 5:22
**sat** 194:4 203:9
**satisfactory**
260:23
**satisfied** 19:10
34:5 95:25 135:10
220:22,23
**satisfies** 34:1
**satisfy** 34:3 175:7
272:2 274:22
275:6,16 288:18
291:8

sauce   167:25
168:1
save   110:6
saw   117:22
saying   17:25
25:17,24,24 113:6
114:13 115:14
120:6 121:13
122:3 127:6
145:20 151:11
152:5 153:15,20
154:14 155:16,17
155:19 157:3,9
164:1,4,5 171:12
173:20 182:20,24
195:9 199:21
202:13 216:1
239:8 243:16
251:13,16,20,23
259:19 261:1,3,3
266:13 281:21
286:24 289:6
290:18 294:10
296:7
says   38:1 66:20,23
67:1,17 96:15
102:4 114:15
121:15 122:2
137:10,11 139:8
144:11 146:17
150:14 163:19
167:20 168:10,20
187:14 193:13
200:3 201:11,13
208:16 209:3,14
210:11 219:11
232:4 237:12
242:7 243:18
244:1,24 254:24
260:15,16 262:7
266:8 274:20
276:2 284:9,16
285:2 286:3 290:4

293:20
scale   125:6
schedule   11:9
13:8 14:21 19:3
22:13 36:25 39:21
46:19,22,24 47:11
53:7,10,12,20
113:18,24 114:9
114:16 118:4
119:5,6,15 120:1
122:4 125:21
129:12,13 130:8
130:15,16 131:3
131:14 133:18,19
134:22,24 137:7
139:15,16 140:21
142:12,17 143:20
143:24 144:11
160:2,9,18,19,24
161:6 165:6
170:24 172:7
173:9,18 174:22
217:24 236:17
237:10,10 238:3
238:25 239:4
260:13,13,15,20
261:10,10,21,23
262:10,14,17,18
264:8
scheduled   3:1
132:11
schedules   14:22
51:18 129:14
132:10,17,19
223:25 226:5,9
260:10,19,22
261:4
schein   6:22
116:22 117:20
schrock   9:4,6,6,13
9:15 10:2,7
157:18 214:14,14
214:24 239:5,5

263:21,21 264:4
264:16 294:21,25
295:8,9,21,24
296:1,3,9,12,15
298:16,18,23
299:2,5,9
scope   65:22
scrambling
121:11
sean   5:14
search   79:3 80:2
83:25
searching   21:15
21:17
sears   1:8,15 4:5
6:2 9:3,17 10:9
14:10,21,22 16:2
16:3,5,7,20 20:12
24:9,23,25 25:4
32:14 33:5 45:12
45:18,23,25 46:5
46:13 47:12,14,16
47:23 48:2 52:9
52:19,23 53:1,4
53:15 54:5,9,11
54:25 55:6,13
64:23 65:3 67:9
68:4,6 71:17,20
74:6 82:22 84:13
84:22 85:2 89:8
90:19 106:1,14,15
110:14 111:8,15
112:1 113:21,22
114:24 115:2
118:15 119:16
122:16,16 123:8
123:12,22,25
124:2,4,12 125:14
128:16,18,18,21
129:7,7,23 130:19
130:25 131:17,23
132:14 142:16
144:19,23 146:19

146:20 150:15,16
151:1,7,10,11
153:9 154:9 158:1
158:9 161:24
162:10,12,13
193:17 215:14
216:9 222:5
225:12,13,17
278:6 292:21
sears's   85:22
sears'   218:10
sears's   216:10
seated   9:2 110:13
sec   71:14 134:4
138:19 146:10
158:7
second   3:7 9:12
33:5 38:12 70:3
115:23 131:6
137:21 145:20
160:1,7 163:9
235:4 241:2
242:19 244:12
249:17 251:10,22
253:7
secondly   175:14
176:7 221:10
secretly   270:10
section   113:18
119:8 129:25
130:4 157:23
159:3 160:10
163:24 191:24
192:3,8 197:9
198:11,15 218:25
219:4,20 223:19
223:23 224:7,11
224:13 226:16
227:23 228:9,14
228:16 229:24
237:1 240:10
265:20 266:2,3,5
266:9,12,14

267:13,13 274:24
**sections** 167:20
266:4 276:23
**security** 55:4
**see** 11:3 21:2,9
41:19 79:11 82:18
89:20 91:4 98:10
101:13 103:13
119:22 121:11
122:14 132:20,20
137:20 146:22
162:18 184:20
202:1 250:15
272:7 276:7,25
293:22 297:22
298:8
**seeing** 25:18
141:13 157:1
**seek** 27:3 87:2
191:10
**seeking** 16:11
19:4 24:2 216:21
271:22
**seen** 23:10 59:23
93:9 102:6 160:24
286:7
**segregated** 286:10
**self** 113:4 123:23
257:15
**sell** 82:6,7 113:12
114:21 211:8,8
227:6
**seller** 129:15
130:9 154:5
158:17,22,23,24
197:17,18 200:8
225:10 267:18
**seller's** 114:15
**sellers** 158:17,19
158:22 211:2,3
274:23 275:7,16
**seller's** 199:23
220:2

**selling** 113:13
129:15 235:3
**send** 75:20 279:23
280:15
**sending** 184:12
**senior** 45:18
**sense** 26:23 27:11
36:3 110:11 168:6
168:19 171:4,5
172:8 207:2 225:7
227:7,25 230:7,15
230:19 231:4,4,6
231:9,10,11 232:4
233:6 236:6,7
238:19 239:25
240:4 243:7
246:21 248:21,23
252:14 286:17
**sensible** 231:16
285:10 293:1
**sent** 55:17 193:7
280:14 291:8
292:3
**sentence** 66:23
240:14
**sentences** 240:16
**separate** 15:2
98:15 186:19
216:6 223:22,24
224:6 226:4,8
241:25 242:1
246:2 248:20
255:9 265:25
266:7,8,22 267:22
267:22 269:12,13
279:7
**separately** 90:18
125:23 166:22
223:24 224:7
268:7,9,16,21
277:18
**separates** 102:4
137:13 246:1

**separating** 267:21
**series** 250:8
**serve** 30:20,23
43:1 50:4 58:19
245:6 293:18
**served** 45:15
71:23
**services** 22:7 30:7
30:25 97:24 106:3
175:20
**serving** 87:16
113:4 123:24
**set** 12:7 76:12
93:15 131:8,8,18
133:3,18 134:5,9
136:9,16,24
140:20 160:8
163:15 174:22
175:13 179:21
182:4,10 187:6
188:16 195:24,25
202:2,5 203:5,23
203:24 206:24
207:20 209:5
223:24 225:1
228:2 250:16
274:9
**setoff** 33:2 34:12
34:22,23 264:18
271:12,13
**sets** 223:25 224:1
224:13 226:16
**settlement** 10:23
32:2,8 178:20
179:15 283:17
**seven** 29:21
230:11,14 240:1
**severance** 134:15
224:15 227:1
241:21 248:9
251:1 254:4,4
256:10 257:6
258:18,25 260:1

267:20
**seyfarth** 6:9
**shared** 211:12
216:1
**shaw** 6:9
**she'd** 124:6
**sheet** 63:8,14 65:3
93:14 101:21
109:22
**shelf** 73:16
**shells** 272:18
**shelves** 73:13
**shift** 186:6
**shifted** 153:3,5,6
178:19
**shipped** 181:16
**ships** 205:25
**shirks** 184:25
**shoes** 16:20 88:10
**shooting** 236:10
236:12,15,16
**shop** 181:23
**short** 41:14 88:17
147:22 174:18
196:23 202:15
210:8 221:23
235:2
**shortchanged**
159:23 177:1
**shorter** 13:25
92:16
**shortfall** 134:8,10
136:8 148:23
159:21 160:12
163:18 165:2,9
166:23 167:1
171:10 173:4,6
174:12 175:8
186:18 195:23
199:25 200:19,21
208:2,4,13 210:17
210:23 219:1
220:5 229:20

250:22,25 254:15
257:20,24,25
258:2,5,12,13,22
258:23 266:16
269:17 272:19,25
273:16,22 274:16
274:20 275:2
**shortfalls** 207:8
**shot** 178:9
**should've** 157:21
**shouldn't** 168:17
180:21 194:5
231:2 253:3
**show** 112:15
126:3 142:17
143:23 256:6
**showed** 127:3
**showing** 27:6
112:6 128:25
144:17 149:23
180:20 280:20
**shown** 98:21
134:25
**shows** 115:18
122:16 134:1,18
256:23
**side** 35:22 76:24
76:25 101:1 107:3
113:9 133:2
187:14 190:12
194:19,23 195:11
197:8 230:21
253:21,24
**sided** 38:12
190:16
**sides** 151:23 167:5
178:3 187:16
190:9 194:21
195:16 212:1
219:12
**sign** 162:22
**signage** 55:11

**signed** 115:21
145:9 162:22
207:25
**significance**
251:21
**significant** 60:7
74:14 126:4
**significantly**
185:5
**signing** 148:11
194:2
**siloed** 205:5
**similar** 14:12,17
25:18 87:4 98:24
151:5 194:16
282:13,16
**similarly** 35:3
**simple** 40:2 118:2
226:14
**simply** 22:11 63:9
72:7 93:13 131:12
134:11 140:24
154:15 175:18
223:10 264:25
**single** 13:5,5 56:3
79:24 128:20,25
203:8 245:17
248:12,20,21,22
255:13 256:21
284:23,25
**sir** 49:15 57:2
64:10 110:3
**sit** 43:9 100:6
108:1 116:11
124:20 186:12
194:19 204:9
**site** 46:20,22,25
47:4,10,13,17,19
47:21,24 48:14,19
48:21,21,23 56:13
120:17,22,24
121:6,16 131:25

**sits** 111:8
**sitting** 42:4 43:5
44:7 47:22 50:1
51:4 58:21 70:16
94:12 108:18
109:16 188:8
260:18
**situated** 86:18
**situation** 18:14
86:22 125:12
136:17
**six** 40:2,5 89:24
91:22,23,25 92:4
92:20 205:21
211:21 212:2,4
270:12 291:12
**size** 51:14,21
86:20 125:6
**sleep** 259:21
**slightly** 9:18
**small** 297:4
**smaller** 259:12
**smoke** 150:5
**snapshot** 153:21
153:21 154:3,4
164:2
**snapshots** 153:20
153:23
**sold** 106:1 112:2
112:25 149:5
199:19 235:1
**sole** 210:2
**solely** 20:6
**solicitation** 9:20
**soliciting** 9:17,21
**solution** 16:24
**solutions** 301:20
**solve** 285:7
**solvency** 227:16
232:12
**solvent** 227:13
**solves** 285:5

**somebody** 292:15
292:15
**somewhat** 91:22
132:9 163:14
**sonya** 4:25 301:3
301:8
**soon** 11:13 15:7
117:6
**sophisticated**
264:23
**sorkin** 5:25
**sorry** 9:14 25:8
30:19 32:16 40:21
48:17 56:1 73:5
76:23 77:22 83:19
85:6 87:12 90:23
106:18 114:3
130:14 147:18
152:4 154:20
161:25,25 162:7
167:8 182:7
184:21 192:8,9
202:24 204:8
205:10 222:11
238:22 239:3
240:24 246:7
247:12,18 248:16
250:15 255:10
257:18 266:4
273:17 275:1,12
276:2 282:17
284:22 292:10
**sort** 74:17 82:15
82:25 83:1,24
**sorts** 131:18
204:13
**sought** 26:16,18
29:9,10 160:15
**sound** 24:21 26:14
26:19 27:7 101:13
101:13
**sounds** 52:18
53:11,14 74:24

168:5
**source**  68:16,20
  87:25 277:16
  279:1
**sources**  73:23
  74:1 90:16 91:3
**southern**  1:2
**speak**  81:12,14
  86:4
**speaks**  161:1
**special**  279:8
  287:16 297:1
**specific**  54:14
  59:25 60:8 79:2
  80:1 84:1,4 91:15
  96:18 133:8,19
  137:9 138:3 161:1
  170:25 172:6
  198:6 203:5
  219:22 249:7
  257:24 274:10
  296:17 297:22,23
**specifically**  60:3
  65:22 68:5 71:22
  82:21 84:8 115:6
  123:2 175:12
  197:10 198:24
  215:24 297:18
**specifics**  56:15,18
  56:25
**specified**  36:14
  40:19,22 41:15
  58:6 59:9,13,18
  59:21 60:11,21
  61:6,11,14,18,19
  62:2,8,11 63:4,10
  63:18 64:8,20
  65:4,21,23 98:24
  107:4,7 108:7
  109:15 133:6,10
  133:12,14,16
  134:6,7,10,13
  135:2,11,16,22

136:23 137:5
139:3,4,5,12
140:19 149:5
150:18 155:17,18
156:12 159:13,14
159:22,23,25
160:3,4,7,12,14
160:18 161:6,20
161:23 163:14,18
163:21 165:1,5,7
165:9 166:2,6,23
167:1,11 169:4
170:23 171:10
173:3,5 174:12,14
174:16,18,21
187:3 202:24
219:7 221:18
228:24 257:19,22
258:11,16 261:10
**specifies**  267:14
**specify**  219:23
  220:6
**speculating**
  100:25 168:12
**speed**  293:23
**spell**  42:20 49:19
  58:11 70:8
**spend**  74:13
  101:22 103:24
  165:13 168:19
  172:22 218:9
**spending**  147:13
**spent**  63:19,25
  64:1 74:13,20
  196:17
**spirit**  129:19
**split**  178:8
**spoke**  211:17
**spoken**  10:25
**spreadsheet**
  204:10 215:19,24
**spreadsheets**
  102:19,22,24

**spring**  49:2
**stage**  12:8
**stale**  152:17
**stamina**  299:9
**stand**  42:4,15
  43:20 49:14 108:9
  118:8 228:8
**standard**  30:19
  284:14
**standing**  142:19
**start**  52:12 161:11
  187:18,18,19
  230:13
**started**  19:6 52:19
  64:3 65:24 138:20
  138:22 169:9
  178:16 185:23
**starting**  165:13
  170:9 188:21,21
  205:13
**starts**  218:4 241:2
  241:17
**state**  84:7 88:7
  165:17 200:24
  266:7
**stated**  34:10 45:22
  117:20 130:24
  159:13 176:1,16
  223:14 224:3
  225:22 227:18
**statement**  61:4,7
  89:8 95:20 101:10
  214:12 233:21
**statements**  113:4
  157:23 158:1
  159:6 213:1
  225:18
**states**  1:1 2:1
  278:4
**stating**  55:17
**station**  12:20
**status**  10:12,20
  117:4

**stay**  23:21 25:7
  26:11 33:17 40:10
  77:12 78:5 135:7
  179:20 185:19
  186:15 189:12,15
  281:24
**staying**  299:6
**steady**  165:17
**steen**  5:3 12:5
  43:18 81:6 117:24
  189:10
**stems**  133:8
**step**  41:12 49:10
  57:2 69:12 89:15
  93:25 106:17
  108:25 110:3
  122:8
**stepped**  88:10
**stick**  177:25
  206:11 208:4
  255:1 259:24
**stipulate**  215:1
  295:4
**stipulation**  11:4
**stock**  197:21
  200:8,11 208:19
  220:4
**stop**  21:25
**stopped**  64:13
**storage**  279:4
**store**  12:10,17,18
  12:19 45:25 46:18
  46:23 47:10 49:5
  53:12,19 55:20,24
  88:21 104:2
  118:10 121:19,20
  121:22,24 122:6
  122:11,17,19
  123:1,5,9,12,17
  123:18,21 124:1
  124:12,13 125:15
  125:24,25 126:10
  126:11,11,13

127:15 130:16
131:13,20,23
132:3,6 281:23
294:22,23 295:15
295:20 296:4
**stores**   12:20 104:2
113:15 125:15
126:2,18 130:6
131:17 179:8
206:1 278:8
281:15,16 282:20
287:19 288:5
291:3,5,13 292:13
293:4 295:21
**straight**   179:5
**strauss**   5:17
**stream**   218:8,9,11
**street**   2:2 7:19 8:3
292:21
**strike**   68:15 71:25
255:15
**strong**   28:14
**struck**   230:16,16
253:15,16,18
263:2,18
**structure**   66:15
**structured**   238:21
**stuck**   234:3,10
235:12 239:17,20
242:11,12 258:19
**studied**   60:23
156:10
**stuff**   147:14
232:18 271:3
286:21
**subdivided**
121:17
**subject**   33:2 34:12
34:15 40:9 189:15
189:20 190:5
255:19 265:5
**subjugated**   182:6
182:8

**submit**   12:23
13:12,21,22 36:2
107:4 115:9
**submitted**   35:22
42:5,6,24 44:3
49:24 61:4 70:12
71:2 75:10 94:9
107:8 174:25
175:21 215:13
**submitting**   50:21
**subpoena**   30:20
**subsequent**   12:11
180:10
**subsequently**
37:22
**subset**   226:6
241:19,20,21
**subsidiaries**
130:10 158:2,10
158:19
**substance**   18:24
**substantial**   46:6
**substantially**
20:22 86:21 228:3
**substantiate**
63:18 75:15 76:6
76:9 80:7 96:21
**subtenants**
179:11
**subtracted**   37:22
**successfully**   12:14
**sudden**   127:5
138:21 139:22
254:8 259:23
**suddenly**   180:14
207:23
**sue**   16:9,11
**sufficient**   208:25
209:23 220:25
**suggest**   41:6
69:23 116:15
150:6 211:13
229:7 277:19

**suggested**   127:7
150:7 185:21
202:4 216:23
223:11 272:16
**suggesting**   76:4
102:1 111:18
119:3 164:18
185:6 204:18
**suggestion**   23:7
40:18 166:11
211:20 269:24
**suggests**   112:11
113:1,2 127:19,20
128:20 149:12
150:1 159:19
172:5 177:15
185:2 198:3
**suite**   301:22
**sum**   227:3
**summary**   223:4
**sun**   29:7
**supersedes**   298:1
**supplement**   4:10
228:13
**supplemental**   3:7
3:10,13 4:1 11:18
31:11,13 37:5
44:5 58:18 70:15
94:9 278:1
**supply**   20:16
22:14
**support**   15:20
44:4 58:16,17
113:8 206:22
224:21
**supported**   132:9
**supporting**
160:23
**supports**   132:9
**supposed**   59:21
127:21 212:9
277:11

**sure**   23:2 24:19
35:11 37:13 48:20
50:22 59:15 60:8
60:21 61:10,20
62:13 66:9 67:16
77:22 99:24
100:24 104:3
116:24 119:8
121:15,17 133:14
148:10,13 149:3
152:4 154:6 156:1
156:2 161:18
162:21 180:4
182:19 197:25
198:14 199:11
200:6,18 206:18
206:19 207:22
214:25 215:1
223:4 235:24
239:5 270:21
290:20,22 293:22
298:15
**surplusage**   244:4
267:5,13
**surprised**   40:12
82:12
**surrounded**
111:13
**surrounding**
111:9
**survey**   115:18
**surveys**   112:6
**sustained**   69:12
**swear**   42:17 43:22
49:15 58:7 70:5
94:2 108:10 109:7
**swept**   273:8
278:21
**switched**   52:1
**sympathetic**
137:19
**system**   22:20 88:9
88:11,12,16,24,25

90:20,22,23 146:6
179:1 185:18
282:23 284:17,17
**systems** 66:2
73:18,19 101:18
133:12,21 134:20
137:1 138:4
144:22 147:7
225:17

**t**

**t** 58:13 109:11
301:1,1
**tab** 44:6 51:4
**table** 108:1
128:10
**tail** 124:11
**take** 9:9 17:1
18:17 19:14 29:13
29:18 40:18 41:10
42:2 43:20 45:4
70:3 71:24 73:20
79:10 85:22 89:8
89:15,23 110:4
117:7 140:3
146:12 157:16
160:19 170:6
176:18 177:9
180:19 184:25
194:16 202:1
221:23 222:1
229:9 230:3
232:10,15 233:8
234:9 235:10,18
235:21,21 236:9
236:14,16 252:14
253:25 259:24
261:18 269:21
273:24 274:1
275:21 281:22
285:25 288:11,14
291:22,22
**taken** 165:15
166:23 174:8

183:25 186:1
197:18 208:23
211:3 218:7
225:11 274:5
280:5 283:16
**takes** 102:4
124:16 147:11
186:3 192:15
237:9,10 285:18
**talk** 81:11 83:7
96:5 140:14 158:4
181:9 197:21
225:3 240:4,5
254:4 269:10
298:13,21
**talked** 83:8 84:12
**talking** 62:22,22
68:17 100:25
109:6 120:8
123:20 191:7,8
205:2,5 232:20
247:9 248:1
291:21 296:3
298:4,19
**talks** 157:25
163:25 241:3
**tally** 215:3
**tandem** 165:8
**tangible** 105:25
**tappable** 281:17
281:18
**targeted** 226:20
**targets** 274:10
**task** 60:3
**tasks** 20:24
**tavakoli** 8:13 58:5
58:10,13,13,15,23
59:4,6 60:19 61:3
61:21 65:10,14,16
66:10,12,18 67:5
67:8,21 68:7,9,12
68:22 69:3,13
133:13 142:13

146:16,17 147:13
150:12 151:2,19
156:12 161:21
162:8 166:14
172:21 178:3
**tavakoli's** 137:11
150:1 155:2 157:4
**tavakoli's** 164:21
168:10 169:15
170:3 177:10
**tax** 56:9,16 84:16
84:23 99:5,9
184:20 185:9
192:2,14,17,18
193:2 243:11,12
243:13 297:1
**taxable** 192:2
**taxes** 98:21,22
99:1,3,7,13,15,22
183:18,20,22
184:1,16 185:1
188:24 191:11,16
191:17,21 192:21
193:14 194:13
243:11 297:25
**taxing** 185:4
193:23
**team** 3:21 7:17
14:2,6,6,8,9,11
16:19,19 20:6,16
21:7 22:15 23:21
26:21 27:2 63:20
64:1,6 67:9,9,23
74:13,25 94:22,25
95:3 99:19 102:8
102:17 103:13
104:21 178:4
216:10 225:13,13
278:5 300:6
**teams** 215:15
216:13
**technical** 61:17
63:7

**telecom** 103:25
188:17
**tell** 11:18 20:5
25:14 42:17 43:22
49:16 58:7 70:5
94:3 108:10 109:8
148:14 241:18
248:3,3 249:5
260:19 262:6
264:5 274:14
281:4
**tempered** 209:17
287:9
**temporary** 68:3
**ten** 90:25 134:20
178:6 221:13
222:1 229:1
245:18 266:4
**tend** 119:22
**tension** 263:10
**tenure** 45:18
**term** 63:7 66:19
130:2,18 140:23
144:15 167:16
175:6 199:22,25
200:1 201:2
218:24 219:10,25
224:23 262:2
265:23,23,25,25
268:6 269:3 272:6
272:8,10 273:1
275:8,18,19
277:15 284:10
294:23 296:11,13
296:17
**termed** 281:2
**terminated** 32:15
**terms** 32:2,8
35:21 41:9 64:25
73:24 88:16 90:18
91:19 149:22
152:14 175:22
195:8 224:11

228:8 232:8
238:11 246:25
254:17,18,23
265:9,15 266:6,7
266:21,22 267:21
268:15,16 269:13
280:3 291:11
292:11
**terribly**  199:7
**test**  124:19
**testified**  54:24
55:2 61:10 71:4
99:25 105:21
111:10 118:8,10
118:16,20 123:4
128:2 132:6
133:13 135:21,24
136:16 149:14
180:3 196:14
203:13 204:4,9,23
208:14 210:19
211:8,17 216:16
216:22
**testifies**  123:12
126:9 215:14
**testify**  36:17 46:4
60:11 61:23 74:8
123:24 203:8
213:2
**testifying**  60:17
151:19
**testimonial**  231:7
**testimony**  35:21
36:11 38:4,8,9,15
39:5,13,24 40:17
40:19,21 41:17
42:3,9,13 43:2,7
43:15 44:9,12,16
47:22 48:1 49:24
50:5 51:7 53:19
54:4 55:16,19,21
57:6 58:1,20,25
60:23 61:5 67:18

69:22,23 70:20
75:11 85:19 94:12
94:16 101:5
107:16 108:20,23
109:15,17 111:12
111:16 112:16,19
120:2 122:12
123:10,23 127:8
127:10 128:12
131:9,15 132:8
133:25 134:18
151:10 179:24
218:3 220:9,24
221:16 234:12,12
235:4 253:10,16
272:21 273:18
278:3 284:8,8,14
284:15 291:22
**thank**  11:24 12:3
13:15,23 31:2,7
43:11 44:13,17
45:6,7 48:7 50:10
51:11 58:3 69:13
70:1 81:3 83:7
85:11 86:12 93:22
100:13 101:3
106:4,18 107:1
116:10 117:19
123:16 125:12
129:4,21 174:4
189:8 194:25
195:15 204:7
208:8 275:19
299:5,6
**thanks**  11:25
13:16 195:1 299:6
**that's**  164:20
165:20,20 167:19
167:23 168:16
169:16,21 170:13
170:17 172:23
174:12 177:18,20
178:16 179:7,8

180:18 183:20
184:4,18,20
186:24 187:6
189:21 190:7
192:16,22 194:13
194:14 195:9
196:8 197:4 198:1
198:18 199:23
202:3,14,18
205:24 206:10,23
207:13 208:4,6
209:17 213:7
214:6,6,21 220:8
220:9,18,22 223:1
225:1 229:14,16
229:16,21 230:25
231:25,25 232:3
232:21 235:13,14
236:17 237:24
238:4 240:6,21
242:11,12 243:2,5
243:15,17 244:7,8
244:9,11 245:2,6
246:15 247:3,6,6
247:20 248:7
249:4,9,11,14,23
250:20 251:3
252:1 253:2,4,12
254:13,16 255:13
257:10 258:4
259:10 260:11,12
260:14 262:2,9,20
262:24 264:12
265:3 267:3,13
268:6,16 269:13
**theoretically**
22:22 279:10
**theory**  183:12
**thereof**  158:10
**thereon**  130:10
275:21
**thereto**  130:11
158:7

**thereunder**
242:10
**there's**  163:4,13
164:10,17 165:19
165:22 166:11
168:4,22 172:17
173:23 174:18
175:8 176:11,21
179:16 182:2
183:8 184:15
185:2,4 187:9
188:15 197:8
203:4 204:24
205:25 207:6
218:2,8 220:9
221:17 225:3
230:6,17 236:1
237:19,20,22
239:15 243:2,4
244:13 246:23
248:13 249:6
250:16 252:22
253:1,1 255:22
257:11 258:21,24
259:3,22 261:7,12
261:14 263:2
266:25 267:24
**they'd**  172:15
196:4 204:23
208:2
**they'll**  171:4
178:12 234:5
**they're**  161:23
172:3,4 173:20
179:5 180:23,24
182:5,6,8,20
184:2 192:20,23
205:13,13,16,17
207:24 223:23,24
232:13 233:11,18
234:7,10 239:9,17
239:22 242:25
243:24 244:19

245:19 254:25
255:21 257:9
261:1

**they've**   170:19
180:8,22 185:24
188:8,23,23 205:4
205:21 242:11
259:11

**thing**   11:10,15,19
113:3 116:5,8
138:7 142:1 149:4
151:6 156:8,17
157:1 160:24
164:14 165:16
199:12 201:21
211:6 245:17,20
248:12 249:15,18
251:22 252:9
253:13 255:14,23
261:2 264:6 283:6

**things**   15:2 59:8
72:1 80:1 84:15
87:5 101:18 103:3
104:8 115:6
122:23 137:17
138:21 139:9
140:6 141:19
147:14,21 149:21
151:4,25 152:1,12
152:16,17 156:2
157:22 159:16
175:11 179:13
188:18 190:24
204:13 226:15
228:23 233:2
246:1 249:9
255:19 256:22
259:22 271:24
278:7,7 282:21
296:4

**think**   9:8,9 11:10
13:19 20:3,21
27:12 28:14 29:11

29:19 30:18 34:9
34:10 37:9,12
38:15,18 40:10,15
49:7 56:17 58:1
60:3,16,19 61:13
62:6 63:6,11,24
64:14,21 67:22
68:9 70:13,14
76:5,25 77:16
79:17 80:8 81:16
95:4,12,19 98:18
98:24 101:25
103:3,8,9,10
104:12 106:23,23
107:12,23,24
110:16 114:18
116:6 117:20
119:3,18,19
121:25 122:1,2
123:3,6 124:16,25
125:19 127:17,25
128:4,12 129:10
129:11 133:5
137:25 138:12
141:3,6,10 143:12
144:4,6 146:11
147:16,23 149:21
151:19 156:3
163:8,13 164:10
164:21,22 165:1,7
166:1 167:6,25
170:18 172:5
173:10,11,17
174:2 177:13,18
177:19 178:10,14
184:14,15 186:12
186:24 188:3
189:17 190:4,5
191:9,13 194:14
194:14,15 197:6,7
197:25 198:15
199:7,13 202:17
203:13 204:18

205:24 206:6,23
207:25 210:21
213:23 214:21,24
215:8,23 216:4
218:2,11 221:3,15
221:15,16 222:6
231:4 233:5,11,17
233:17 237:15,24
238:2 239:8,12,13
239:23 240:6
242:1,23 243:22
245:10,15,18
246:23 247:14,17
247:19,20 251:4,5
254:18 256:22,23
257:7 260:6,10
262:5,24,24,25
263:6,14,19,19
264:7,12,14,20
265:3 269:5 270:5
270:13,25 271:14
271:16,20 272:17
275:8,11 276:17
277:20 284:5
285:3,4,8,20
287:15,22 288:2,4
288:5,19,25 289:3
289:24 290:1,3
291:3 293:9 294:8
295:9,17 296:10
296:18,19,20,22
297:6,15,25,25
298:5,12,14

**thinking**   177:23
178:5 195:6,9
203:10

**thinks**   292:15

**third**   3:10 17:2,3
21:10,11 29:10,13
29:13 32:6 33:14
42:6 139:20,22
146:21,23 162:16
162:19 251:12

**thought**   92:18
111:2 120:6 124:7
124:8 126:22
133:2 143:7
222:21 228:20
233:14 270:23
273:21 292:22
295:16,19 296:6

**thousands**   265:5,6

**three**   47:8 54:4,21
82:18 91:3,24
92:4,6,7,7,9,13,15
109:6 111:6,13
112:4,7,8,12,24
113:6 115:17,22
115:24 117:9
119:14 120:1,3,11
121:16 125:4
126:17 127:4,6
128:10,22 129:2
131:2,24 148:1,2
148:3 185:11
188:5 203:11
205:20 207:15,16
211:19,21 222:25
224:14,16 226:17
251:22 298:7

**threshold**   136:9
136:15 145:17
219:19

**throw**   253:9

**thumb**   290:11

**thumb's**   117:19

**thursday**   156:3

**tidbit**   261:7,9

**tie**   91:15,17,18
229:4,5,15,22
238:15 257:19
262:9

**tied**   117:16 165:6
220:20

**ties**   219:4 229:20
238:3 257:21

262:22,25

**tilted** 293:6,10

**time** 12:13 13:25
16:10 27:9,11
31:13 40:6 43:19
46:2,3,6 49:4,6
59:14 64:1,5
71:16,19 73:2,6
74:7,12,22 81:13
81:23 84:20 85:1
85:1 88:18 90:6
91:18 92:8,11,17
93:6,11 95:22
101:22 103:24
106:14 110:9,23
124:4,15 133:23
135:12 136:7
141:13 142:4
145:8 146:6
147:22 149:6,15
151:20 152:17,18
157:12 164:12
165:16 172:1
174:25 185:10
186:2 188:2,2
195:5 196:1,2,17
201:23 202:3,4,8
202:15,16,19,22
206:3 207:9,9
208:19 222:20
223:5,7 225:15
226:11 231:15
234:9 240:4
246:16 252:13
255:5 272:7,21
273:9 277:23,23
278:19 279:1,14
280:6 283:4 285:4

**timely** 151:8

**times** 109:6 142:7
178:24 223:9

**timing** 27:21
28:18 41:10

203:14 298:21

**title** 130:9 197:19
211:3 225:11,20

**today** 9:7 12:15
21:14 24:23 27:14
34:21 35:10,19,24
36:1 38:16 39:20
42:4,9,13 43:5
44:7 47:22 50:1
50:13,22 51:5
55:19 57:10 58:21
70:16 94:12
108:18 109:16
110:7 111:4 121:9
154:3 179:22
185:20 186:5
230:17 231:14
232:20 260:18
277:23

**today's** 39:15

**today's** 177:24

**told** 11:1 24:23
28:5,10 47:18
93:13 104:9 107:9
148:7 150:4,7
181:25 194:17
214:11 231:15
239:13 260:7,8
291:12

**tomorrow** 289:2

**top** 29:17 65:20
119:2 144:10
270:3,6 292:12,15

**topic** 186:19

**topics** 69:25

**total** 62:20 63:24
183:8 189:17

**totaled** 148:15

**totaling** 62:23

**totally** 208:4

**totals** 179:11

**touch** 63:23
211:10

**track** 73:5 89:5,9
151:4 167:6

**tracked** 168:2
284:17,19,21

**tracking** 72:22,24

**trade** 254:25

**traditional** 175:4

**transaction** 46:8
48:15 82:14 86:20
88:8 99:1,6 112:9
112:13 118:18
121:5 125:7
128:17,18 129:14
146:19 158:16,20
159:2 162:9 209:2
209:4,7 230:7
234:1 239:16,19
239:19 253:16
265:4 293:11,14

**transactions**
177:11

**transcribed** 4:25

**transcript** 109:5
121:12 134:22
301:4

**transfer** 33:1,5
34:11 55:18 59:17
125:4 185:17

**transfer's** 96:5

**transferred** 20:22
35:1 62:11 63:4
64:19 78:14 84:10
115:7 116:3 117:9
118:16 119:15
120:1 125:8 128:9
130:1 179:1
183:12 238:23

**transform** 1:12
3:15,17 4:4,13,14
5:4 7:9 10:17 12:5
13:21 20:23 21:23
22:5,9,17 28:25
30:8 31:15 32:9

32:14 33:9 34:2,3
34:6 37:3,7 38:1
39:5 41:13 43:19
44:4 46:7 52:2
53:23 55:15,16
58:16 59:14,18
60:1,12 61:2 62:4
62:12 63:2,5 64:9
64:14 65:13,17
66:13 67:20 72:4
72:15,19 74:12
75:16 76:10,24
77:12,14 78:2,6
78:14 80:21 81:7
82:3 85:5,8,18,22
85:25 86:1,5 87:7
88:10,24 91:5
93:17 94:22,23,25
95:3,7,10,17,25
96:3,16 97:1,18
97:23 98:3,20
99:12,25 100:10
100:18 105:3,8,14
111:6 112:11,23
113:5,13,19
115:20,23 117:6
117:25 118:23
125:8,8 127:5,10
128:23 129:23
130:2,25 131:6
132:2,13 133:2
134:12 136:5,15
143:19,23 150:16
151:2 154:13
155:11 157:16,21
159:12,18,19,23
160:3,14,15,16,17
160:19,22 161:4
161:10 163:8
166:9 170:12,15
171:13,18 173:19
174:9,19 175:11
179:18 180:5,14

181:19 183:12
184:6 185:16
186:9,12,13
187:22 188:7
189:1,7,11,16,22
190:19 191:24
197:7 206:5
208:17,20 209:3
210:4,24 212:9
219:21,22 220:19
223:14 230:13
234:24 238:23
265:21 266:8
268:2 270:11
271:6,8 273:15
282:24 296:7
**transform's** 22:2
22:3 30:18,24,25
33:2 34:12,16
57:20 67:6 73:18
74:3 75:2,5,7,13
78:15 79:10 80:6
80:10,24 86:3
97:21 111:19,23
127:25 137:8
160:11
**transform's**
173:21 180:1
182:15 191:19
194:3 212:10
220:10 223:15
231:12 234:14,18
238:19,20
**transit** 33:17
179:7 279:4
280:25 286:21,25
287:23,25 288:3,6
288:23 289:4
290:10,12 293:4,4
295:4,25 296:23
**transition** 22:7
30:7 97:24

**transitions** 55:13
**transmit** 290:24
293:7
**transport** 104:20
**treasurer** 292:20
**treasury** 82:24
90:16 103:13
150:22 215:15
216:12
**treat** 258:24
269:24
**treated** 147:1
172:2 191:20
**treating** 269:24
**treatment** 178:1
**trial** 4:5 119:12
**tried** 173:1
**trigger** 174:11
219:18
**troubling** 180:8
**trucks** 206:1
**true** 47:9 121:21
232:3,4,19 283:15
301:4
**trust** 6:10 42:18
**trustee** 6:11
**truth** 42:17,18
43:22,23,23 49:16
49:16,17 58:8,8,8
70:5,6,6 94:3,3,4
108:10,11,11
109:8,8,9 111:16
**try** 11:2 13:6 19:9
20:12 37:17 77:8
186:2 205:22
208:10 227:6
280:18,20 292:25
**trying** 27:4 28:23
59:12 60:5 61:22
62:1 65:24 116:5
116:6 124:19
157:16 187:11,17
228:6 234:23

239:21 243:9
245:8,15 246:10
252:9,11 254:25
255:24 274:15
280:21,22 285:11
**tuesday** 31:20
223:13
**turn** 10:3 40:6
67:10 119:2
135:17 165:7
179:19 180:24
247:12 255:3
283:21
**turned** 149:5
175:18 189:6
207:14 275:25
**turning** 14:1
198:15
**turnover** 92:3
**turns** 229:7 233:6
277:2
**twain** 13:24
**twelve** 162:4
**two** 7:18 11:14
12:19 13:9 14:23
19:2 22:12 29:6
36:24 38:2,12
39:19 41:3,4
54:15,20,24 55:13
57:8 63:20 64:21
65:1 68:9 70:12
73:14 90:17 92:12
92:14 109:23
130:6,19 137:11
137:24 139:9
141:17 150:22
153:20,22 156:10
156:15,24 159:8
159:24 160:5
166:5 170:18
171:22 173:11
175:11 179:12
185:3,5 190:9

203:11 205:2
211:18 217:13
220:19 223:22
224:5,15 225:20
226:4,8,15 229:11
231:10 233:2
240:16 241:25
242:1 246:1
248:20 257:17
260:10 261:4,15
266:6,7,7,11,21
267:1 299:1
**twofold** 38:10
251:20
**tx** 7:20
**tyler** 7:1
**type** 102:12,13
142:18 197:10
212:15 219:23
237:12,13,21,22
**types** 34:24
279:25
**typical** 15:23 89:5
281:12
**typically** 84:17
86:22 89:16

**u**

**u** 42:22 108:13
109:11
**u.s.** 2:14 14:8,18
**ucc** 280:19
**ultimate** 221:22
230:8,8 265:12
**ultimately** 18:8
77:20 145:15
190:8
**unable** 75:25
**unaccrued** 233:1
**unambiguous**
131:22 224:11
253:17 263:8
264:24

**unambiguously**
223:19 267:22
**unapplied** 68:3
**unavailable**
277:18,19 278:2,7
280:2 281:4
284:16,18,19,20
285:3
**uncapped** 266:25
**uncashed** 32:13
32:16
**unclear** 139:7
**uncontested**
13:18
**uncontroverted**
131:9,15,21
220:10
**undefined** 284:10
**underlying** 101:8
117:11
**undermines**
215:12
**underneath**
163:19
**underscored**
118:13
**understand** 16:10
16:24 17:8 21:19
21:21 24:20 41:5
46:10,18,23 48:20
55:14 59:15,16,20
60:19 62:1 68:25
82:25 118:14,22
121:18 124:22
127:11,13 137:7
139:21 140:5
147:5 151:21
152:5 162:20
164:9 168:13,13
169:19 172:3
183:15 190:17
198:14 200:13
206:15,16,17

213:16 214:21,22
218:1,7 233:9,18
251:21 262:10
276:10 278:10
279:7 280:9 282:1
294:19 296:19,20
**understanding**
16:10 47:7 49:1
54:12 71:12,15
79:5 85:23 87:11
87:12,13 92:11
93:8,12 116:21
117:1 140:10
155:3 162:25
163:11 211:13
280:16 282:22
286:15 290:2
**understands**
208:22
**understating**
152:7
**understood** 25:16
116:2 118:23
124:1 129:6 135:5
138:25 140:6
145:11,22 160:16
163:10 210:13
211:12 214:24
220:8 247:1 286:4
**undeterminable**
95:5
**undisputed**
111:12 121:3
123:24 133:25
247:2
**undisputedly**
119:15
**undoubtedly**
250:4
**unencumbered**
134:21
**unfortunately**
84:18 217:21

**unidentified**
171:23
**unilateral** 206:17
**unit** 248:20,21,22
**united** 1:1 2:1
**units** 66:3 85:3
248:20
**unlimited** 147:20
236:1,2
**unnecessary**
195:12
**unpaid** 275:21
**unquote** 45:24
111:15
**unrelated** 121:5
**unresolved** 77:1
**unrestricted**
187:13
**unsecured** 4:9
5:18 16:16 17:18
**unstated** 130:24
**untrue** 232:1
233:22
**unvarying** 284:10
**upcoming** 15:10
**update** 13:16
**upset** 181:23
**upsets** 208:5
**upside** 180:23
**upwards** 185:7
**urge** 276:23
**use** 32:11 55:6
82:6,19 130:20
142:13,13 200:1
206:11,12 209:15
245:21,25 248:2,3
248:4 249:3
269:13 278:11,16
279:7 283:18
288:11
**uses** 167:16
**usually** 245:25

**v**

**v** 1:14 4:5 58:13
256:17 266:12
**vacant** 119:15
120:1 125:21
126:10 131:1,19
131:19
**vagaries** 65:25
**valid** 16:23 60:25
146:20 162:15
164:10 168:17
177:9
**validate** 60:5
**valuable** 17:17,21
167:24
**valuation** 199:2
200:13 219:15,23
221:11
**value** 59:22 60:1
62:10,13,22 63:3
63:6 87:20,25
96:10,13 133:10
133:12,23 134:1,9
134:24 136:7,12
136:22 138:6
144:12 145:25
146:3,5 149:20
154:6 171:19
198:21,22 199:22
199:24 200:1,7
201:2,5 208:17
219:9,13,14,14,24
219:25 220:1,17
238:23 254:1,3,6
**valued** 199:4
**values** 63:1 64:18
135:18 146:10
**varied** 142:24
**various** 63:18
100:18 102:19
110:22 179:21
230:18 265:8

varying 135:3
vast 95:21
vedder 6:17
vendor 22:18,19
  26:16,19 29:2
  30:3,12,13,25
  66:20 67:1 89:6,7
  89:10,13,17,21,21
  89:25 90:3 93:1
  93:10,10 220:21
  232:2,4
vendors 19:5
  21:11,17 23:9,12
  24:10,10 26:17
  29:1 30:3,24
  65:20 232:9
verify 67:24 103:6
  103:18
verifying 103:8
veritext 301:20
version 9:19
  265:13
versions 9:23
versus 36:4
  204:20 230:4
  286:13 293:2,3,4
vet 204:10 218:10
vi 247:12,13,13,21
  248:22
vice 44:23 45:18
view 38:10 39:2,6
  40:4 61:16 98:22
  141:3 144:20
  177:9 199:5 238:4
  254:18 259:2
viewing 18:23
vii 18:18 163:25
  174:7 257:3,14
viii 257:3,14
village 6:18
  116:22
violating 189:12

violation 33:17
  179:20 185:18
virtual 48:21
virtually 95:14,20
voices 203:20
volleyball 55:1
  120:9
voluminous 58:1
votes 9:17
vu 197:3
v's 224:8

w

w 7:6 49:21 70:10
wai 28:7
wait 115:23
  145:20 187:10
  241:2 289:2
waive 15:15 25:21
  25:24 28:8 38:25
waiving 26:4
  28:10
walk 15:19 190:22
walmart 14:12,12
  14:14,15 20:19
  24:14,15
want 16:8 19:14
  19:16 20:7 24:20
  24:23 25:23 28:16
  37:13 39:21 42:15
  43:16 57:1,8
  60:17 61:24 67:16
  103:24 104:3
  106:12 109:17,24
  115:1 119:24
  146:12 148:9,12
  148:14,21 151:24
  172:24 181:23
  186:20 195:10
  198:13 200:5,16
  204:25 221:23
  229:18 230:2
  233:2,3 235:12
  241:11,25 242:18

247:11 260:3
  264:3 276:10
  297:13,13 298:6,8
  298:10
wanted 34:20
  42:1,7 82:5 98:7
  111:3 132:4 159:7
  190:22 214:22
  233:20 255:24
  276:19 279:17,18
  294:22
wants 11:11 13:21
  107:4,17 108:1
  116:24 129:18
  228:3,17
warehouse 12:17
  123:21
warehouses
  113:15
warranted 176:25
warranties
  158:14,15,23
  159:1,5
warrants 181:5
warranty 158:18
  210:15 257:20,22
  258:12
wash 165:18
  190:11
washing 73:14,14
  73:16 82:6 91:1
wasn't 165:3
  180:4 199:7 207:5
  207:5,5 210:15
  216:5 255:5 264:1
waste 165:16
water 260:2
waterfall 249:7,10
  256:18
way 9:21 27:24
  29:16 40:5,12
  54:16 56:23 57:7
  64:11 67:12 69:1

73:8 78:12 81:17
  83:1 109:6 122:15
  127:16 133:11
  142:6 144:15
  145:19 146:7
  149:2 153:25
  156:23 157:15
  164:20 165:19,24
  172:8,10 181:23
  184:4 187:5 190:1
  194:23 195:8
  196:8,24,25
  198:23 199:4,20
  201:17,24 203:9
  206:15 210:14
  216:4 228:8,20
  229:5 241:8 244:5
  247:21 248:13
  254:23 255:16
  257:1,13,21 267:1
  268:8,12 273:1,7
  274:9 276:20
  286:23
ways 56:16
  159:24 170:18
  187:2 231:10
we've 9:18 12:13
  27:18 35:12 37:4
  38:12 40:2 77:5
  79:1 84:12 98:10
  107:9 160:5,23
  269:23 271:2,23
  272:1 277:22
  285:15
weaver 5:8 43:17
  43:18 44:13,17
  48:10,12,18 49:9
  50:8 117:23,24
  118:2 119:24
  120:5,8,11,14,16
  121:18,23 122:3,8
  122:10,20,23,25
  123:10,16 124:9

124:23 125:3,14
125:20 126:5,7,9
129:5,10,13,21
**webb**   7:1
**week**   10:24 42:6
91:25 205:20,21
270:2,12 298:14
**weeks**   82:18 89:24
91:22,23,25 92:4
92:6,7,7,9,12,15
92:20 135:23
211:19 212:4
298:25
**weighed**   29:17
**weight**   51:15
**weil**   6:1 9:6 10:9
31:9 44:21 45:1,8
110:19 169:16,22
181:25
**wells**   279:21
280:14 287:18
**went**   60:4 61:17
75:22 85:17 98:11
111:14 122:8
128:10 136:14
138:20 143:19,20
164:15,15 181:24
213:23 272:23
277:15
**weren't**   182:19
193:11 233:15
234:6
**west**   8:3
**we'd**   207:9
**we'll**   188:2 195:22
202:7 222:24
**we're**   164:1,4
171:12 180:20
182:21,22 185:7
185:21 186:5
188:5 189:12
195:22 199:10,13
201:8 202:5 203:6

204:18 206:6,7,7
206:9,11 207:22
207:23 215:3
221:20 222:4
242:8,12 243:13
244:18 245:10,15
247:9 248:18
250:19 259:16
263:1 264:14
**we've**   165:24
166:4 178:23
179:2 206:7
207:19 221:24
228:22 230:20,22
232:20 236:21,21
247:14 263:5
**whatever's**
140:24 280:15
**whatsoever**   53:4
115:11 120:25
127:18 149:11
226:13 259:23
**what's**   186:16
195:12 200:23
202:5 206:2
210:16 212:24
221:4 246:13
254:24 259:10
261:20,22
**wheels**   148:1,2,3
**when's**   24:3
**whirlpool**   90:5,9
**white**   2:3 182:1
292:17,21
**who's**   178:12
**william**   8:6,12
49:21
**wilmington**   6:10
**win**   231:3 291:14
**windfall**   288:8
**winding**   87:17
**wire**   32:9 82:25
89:18 90:16 91:12

92:10 280:14
**wires**   89:23 90:6
92:19 102:4,5,5,6
102:7,9 150:23
**wish**   43:6 50:2
58:22,25 94:13
**withheld**   166:5
**witness**   36:11
41:20 42:3 50:11
68:16 132:5
**witnesses**   8:8
36:12,16 40:2,5
41:3,4 57:21
107:22 253:10
263:20
**won**   230:23
**wonder**   238:14
**wondering**   107:16
**won't**   195:14
**word**   116:1 140:3
219:13 244:20
245:22,22 246:5
248:4,14 250:6
277:23
**wording**   267:25
**words**   27:2
114:19 165:9
241:17 285:14,16
290:16
**work**   13:6 16:1
21:24 25:12,15
27:12 52:25 53:3
56:16 61:23,25
62:1,7,9 74:24
82:18,22 85:18
91:7 96:6 101:8
157:2 161:15
170:13 172:10
173:12 177:15
178:4,11 188:16
215:11 216:23
218:4,8,8,11
237:4 254:11

269:22
**workable**   124:20
129:18
**worked**   27:14
82:24 215:14
273:8
**working**   21:23
52:6,19 63:21
64:7 66:3 77:8
86:1,3,5 100:18
106:14 124:4
205:16 245:11
271:8,24 272:1
**works**   15:18
113:5 184:4
229:24 273:2
299:5
**world**   145:6
202:23
**worldwide**   3:21
7:17 14:3,6,6,8,9
14:11 16:19,20
20:6,17 21:7
22:15 23:21 26:22
300:6
**worried**   234:7
**worries**   9:15
**worse**   96:23 138:5
141:9 143:20
145:16 148:11
153:24 207:24
**worth**   26:20 28:24
75:6,12 76:12
78:1 90:5 93:15
138:13 140:6
141:11 148:12
149:20 196:21
227:5 235:6
**would've**   280:5,10
**wouldn't**   168:2
187:18 252:15,15
**would've**   226:7
240:10

**wrapped** 298:10
**write** 84:19
193:18 264:9
297:23
**writing** 192:19
193:25
**written** 172:1
183:10 185:4
191:18 193:7
194:9,11 237:18
252:23 257:1
259:20
**wrong** 70:14
117:2 258:8
**wrote** 183:13
240:10 259:21

**x**

**x** 1:5,11,17 210:24
218:8,9,11 237:3
266:4,5 300:1

**y**

**yeah** 15:22 17:8
23:15 32:18 52:15
53:18 69:24
101:12 102:2,24
111:1 120:13,13
122:22,24 137:25
151:13,15 152:21
153:10 162:4
178:18 184:11
186:23,23 198:13
198:19 216:3
217:18 243:5
262:24 270:5
280:7 281:10,10
287:21 291:6
299:2
**year** 49:3 72:22
117:17
**years** 63:21 74:6
182:15
**yesterday** 33:8
35:2 42:5

**york** 1:2 5:6,20
6:4,13,20 7:4,11
8:4 12:18
**young** 71:24 72:1
75:14 77:13 93:1
189:25 201:25
202:7,23 203:16
213:22 216:8,10
**young's** 74:10
**young's** 220:20
**you'd** 164:22,22
242:15 249:18
**you'll** 208:15
**you're** 164:5
166:19 167:2
170:18 173:15
195:13 202:14
206:8,19 208:3
215:4 216:1
245:12 249:7
251:16 261:1
**you've** 162:7
189:12,13 195:3,4
199:20 231:13
**yup** 62:16 68:12

**z**

**z** 109:11
**zagged** 64:4
**zero** 135:13 138:9
138:13 180:15
227:3 258:15,16
272:20
**zigged** 64:4
**zoning** 112:6