Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 18-23538-rdd

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   SEARS HOLDINGS CORPORATION,

8

9           Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                   United States Bankruptcy Court

13                   300 Quarropas Street, Room 248

14                   White Plains, NY 10601

15

16                   November 15, 2018

17                   11:08 AM

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  NAROTAM RAI

Page 2

1   HEARING Notice of Agenda of Matters Scheduled for Hearing on

2   November 15, 2018 at 10:00 a.m.

3

4   Motion to Approve : Debtors Motion for Approval of Global

5   Bidding Procedures (document #429)

6

7   Motion of Debtors Pursuant to Fed. R. Bankr. P. 9006(c) for

8   Order Shortening Notice with Respect to Motion of Debtors

9   for Entry of Order (I)(A) Approving Bidding Procedures for

10   Sale of Sears Home Improvement Business, (B) Approving

11   Stalking Horse Bid Protections, (C) Scheduling Auction for

12   and Hearing to Approve Sale of Sears Home Improvement

13   Business, (D) Approving Form and Manner of Notice of Sale,

14   Auction, and Sale Hearing, (E) Approving Assumption and

15   Assignment Procedures, (II) Approving the Sale of Sears Home

16   Improvement Business in Accordance with the Stalking Horse

17   Agreement and (III) Granting Related Relief (related

18   document(s)450) filed by Ray C Schrock on behalf of Sears

19   Holdings Corporation (document #451)

20

21   Motion to Approve : Motion of Debtors for Entry of Order

22   (I)(A) Approving Bidding Procedures for Sale of Sears Home

23   Improvement Business, (B) Approving Stalking Horse Bid

24   Protections, (C) Scheduling Auction for and Hearing to

25   Approve Sale of Sears Home Improvement Business, (D)

Page 3

1    Approving Form and Manner of Notice of Sale, Auction, and

2    Sale Hearing, (E) Approving Assumption and Assignment

3    Procedures, (II) Approving the Sale of Sears Home

4    Improvement Business in Accordance with the Stalking Horse

5    Agreement and (III) Granting Related Relief (document #450)

6    11/15/2018, 9:06 AM.

7

8    Motion to Shorten Time : Motion of Debtors for Order

9    Shortening Notice with Respect to Emergency Motion of

10   Debtors for Order Approving Sale of Medium Term Notes

11   (related document(s)642)(document #643)

12

13   Motion to Approve : Emergency Motion of Debtors for Order

14   Approving Sale of Medium Term Notes (document #642)

15

16   Motion to Extend Time / Motion of Debtors for Authority to

17   Extend the Time to Assume or Reject Unexpired Leases and

18   Subleases of Nonresidential Real Property (document #426)

19

20   Motion of Debtors for Approval of (I) Procedures for Store

21   Closing Sales and (II) Assumption of The Liquidation

22   Consulting Agreement filed by Ray C Schrock on behalf of

23   Sears Holdings Corporation (document #23).

24

25

1    Motion of Debtors for Entry of an Order Establishing

2    Procedures for Rejection of Unexpired Leases of

3    Nonresidential Real Property and Abandonment of Property in

4    Connection Therewith filed by Ray C Schrock on behalf of

5    Sears Holdings Corporation (document #24)

6    Motion to Reject Lease or Executory Contract / Omnibus

7    Motion of Debtors to

8    Reject Certain Unexpired Leases and Related Subleases of

9    Nonresidential Real

10   Property and Abandonment of Property in Connection Therewith

11   filed by Ray C

12   Schrock on behalf of Sears Holdings Corporation (document

13   #25)

14   Motion of Debtors for Entry of an Order Authorizing and

15   Establishing Procedures

16   for De Minimis Asset Sales and De Minimis Asset Abandonments

17   (document

18   #427)

19   Motion of Debtors for Entry of Order (I) Authorizing but Not

20   Directing the Debtors to (A) Pay Certain Prepetition Wages

21   and Reimbursable Employee Expenses, (B) Pay and Honor

22   Employee Medical and Other Benefits, and (C) Continue

23   Employee Benefits Programs, and (II) Granting Related Relief

24   (document #31)

25

Page 5

1    Motion of Debtors for Interim and Final Authority to (1) Pay

2    Prepetition Claims of (A) Shippers, Warehousemen, and Other

3    Non-Merchandise Lien Claimants, and (B) Holders of PACA/PASA

4    Claims, and (11) Confirm Administrative Expense Priority for

5    Prepetition Order Delivered to the Debtors Post-petition and

6    Satisfy Such Obligations in the Ordinary Course of Business

7    filed by Ray C Schrock on behalf of Sears Holdings

8    Corporation (document #14)

9

10   Application to Employ Evercore Croup L.L.C. as Investment

11   Banker for the Debtors Nunc Pro Tune to the Petition Date

12   filed by Paul M. Basta on behalf of Sears Holdings

13   Corporation (document #424)

14

15   Motion of the Official Committee of Unsecured Creditors of

16   Sears Holdings Corporation, at al. for Leave to Redact and

17   File under Seal Certain Portions of the Committee's

18   Supplemental Objection to Debtors Motion for Approval of

19   Global Bidding Procedures and Related Declaration (related

20   document(s)429) (document #699)

21

22   Motion of the Official Committee of Unsecured Creditors For

23   the Entry of an Order Pursuant to Bankruptcy Code Section

24   105 and Federal Rules of Bankruptcy Procedure 2004, 9006,

25   and 9016 Authorizing Expedited Discovery of the Debtors and

Page 6

1    Third Parties (document #484)

2

3    Motion of the Official Committee of Unsecured Creditors of

4    Sears Holdings Corporation, et al, for Entry of an Order

5    Pursuant to Federal Rule of Evidence 502(d) (related

6    document(s)484) (document #485)

7

8    Motion Pursuant to Fed. R. Bankr. P. 9006(c) and 9007 and

9    Local Bank. R. 9006-1 for Order Shortening Notice with

10   Respect to the Motion for Leave to Conduct Discovery

11   Pursuant to Bankruptcy Rule 2004 (related

12   document(s)609)(document #614)

13

14   Motion for Leave to Conduct Discovery Pursuant to Bankruptcy

15   Rule 2004 filed by Paul M. Basta on behalf of Sears Holdings

16   Corporation (document #609)

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

```
1    A P P E A R A N C E S :

2

3    WEIL, GOTSHAL & MANGES LLP

4         Attorneys for the Debtor

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:  RAY SCHROCK

9         SUNNY SINGH

10         GARRETT FAIL

11         CANDACE M. ARTHUR

12         PALOMA VAN GROLL

13         JESSICA LIOU

14         JARED R. FRIEDMANN

15         JACQUELINE MARCUS

16         GREG A. DANILOW

17

18    MO MEGHJI - Debtors' Chief Restructuring Officer

19    BRANDON AEBERSOLD - Debtors' Lead Investment Banker

20    ROB RIECKER - Debtors' Chief Financial Officer

21

22

23

24

25
```

Page 8

1    UNITED STATES DEPARTMENT OF JUSTICE

2         Attorney for the U.S. Trustee

3         201 Varick Street, Suite 1006

4         New York, NY 10014

5

6    BY:  PAUL K. SCHWARTZBERG

7         RICHARD C. MORRISSEY

8

9    LATHAM & WATKINS

10        Attorneys of Simon Property Group

11        885 3rd Avenue

12        New York, NY 10022

13

14   BY:  TED DILLMAN

15        MARK A. ZELINA

16

17   FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

18        Attorney for Seritage KMT Finance LLC, Seritage SRL

19        Finance LLC, Seritage Growth Properties

20        One New York Plaza

21        New York, NY 10004

22

23   BY:  SCOTT LUFTGLASS

24        PETER B. SIROKA

25

Page 9

1   ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP

2        Attorneys for LBA Realty and Weingarten Realty

3        Landlords

4        Three Embarcadero Center, 12th Floor

5        San Francisco, CA 94111

6

7   BY:  ALLEN MATKINS

8

9   SIDLEY AUSTIN LLP

10        Attorney to Service.com

11        1501 K Street, N.W.

12        Washington, DC 20005

13

14   BY:  DAVID E. KRONENBERG

15

16   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

17        Attorney for DIP ABL Agent

18        4 Times Square

19        New York, NY 10036

20

21   BY:  GEORGE R. HOWARD

22        SHANA A. ELBERG

23

24

25

Page 10

1    HALPERIN BATTAGLIA BENZIJA, LLP

2          Attorneys for NW Properties and Taubman

3          40 Wall Street, 37th Floor

4          New York, NY 10005

5

6   BY:  DONNA H. LIEBERMAN

7

8   FROST BROWN TODD LLC

9          Attorneys for Washington Group, Inc.

10          3300 Great American Tower

11          Cincinnati, OH 45202

12

13   BY:  A.J. WEBB

14

15   KELLEY DRYE & WARREN LLP

16          101 Park Avenue

17          New York, NY 10178

18

19   BY:  SCOTT L. FLEISCHER

20

21

22

23

24

25

Page 11

1    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

2         Attorney for Restructuring Subcommittee of the Board

3         1285 Avenue of the Americas

4         New York, NY 10019-6064

5

6    BY:  PAUL M. BASTA

7         JONATHAN H. HURWITZ

8         LEWIS R. CLAYTON

9

10        SUSANNA M. BUERGEL

11

12   BILL TRANSIER - Restructuring Committee Member

13   ALAN CARR - Restructuring Committee Member

14

15   BARCLAY DAMON LLP

16        Attorneys for Landlords included in

17        Docket Number 628

18        125 East Jefferson Street

19        Syracuse, NY 13202

20

21   BY:  KEVIN M. NEWMAN

22

23

24

25

```
 1   CHOATE

 2         Attorneys for Wells Fargo

 3         Two International Place

 4         Boston, MA 02110

 5

 6   BY:  KEVIN J. SIMARD

 7

 8   LAW OFFICES OF DOUGLAS T. TABACHNIK

 9         Attorney for Certain Taxing Authorities

10         Woodhull House

11         63 West Main Street, Suite C

12         Freehold, New Jersey 07728

13

14   BY:  DOUGLAS TABACHNIK

15

16   HOLLAND & KNIGHT LLP

17         Attorneys for Cushman & Wakefield, Inc.

18         31 West 52nd Street

19         New York, NY 10019

20

21   BY:  ARTHUR E. ROSENBERG

22

23

24

25
```

Page 13

1    AKIN GUMP STRAUSS HAUER & FELD LLP

2         Proposed Counsel to the Official Committee

3         Unsecured Creditors

4         One Bryant Park

5         Bank of America Tower

6         New York, NY 10036

7

8    BY:  IRA S. DIZENGOFF

9         ABID QURESHI

10        JOSEPH L. SORKIN

11        SARA L. BRAUNER

12

13   GADSDEN, CARTER LEDYARD & MILBURN LLP

14        Attorneys for Bank of New York Mellon Trust Company,

15        N.A. as indenture trustee

16        2 Wall Street

17        New York, NY 10005

18

19   BY:  JAMES GADSDEN

20

21

22

23

24

25

```
 1   ROPES & GRAY LLP

 2         Attorney for Apex

 3         920 N King St # 700

 4         Wilmington, DE 19801

 5

 6   BY:  GREGG GALARDI

 7

 8   HUSCH BLACKWELL in Austin, Texas

 9         Attorney for Wc Independence Center

10         600 Travis Street, Suite 2350

11         Houston, TX 77002

12

13   BY:  LYNN BUTLER

14

15   LAW OFFICE OF WILLIAM P. FENNELL

16         Attorney for Dart Warehouse

17         1 Columbia Place

18         401 West A St., Suite 1800

19         San Diego, CA 92101

20

21   BY:  WILLIAM FENNELL (TELEPHONICALLY)

22

23

24

25
```

Page 15

1   GOULSTON & STORRS, P.C.

2        Attorneys for Cape Town Plaza LLC, New Westgate Mall,

3        LLC, OND Property, LLC

4        885 Third Avenue

5        18th Floor

6        New York, NY 10022

7

8   BY:  TREVOR R. HOFFMAN

9

10   SEWARD & KISSEL LLP

11        Attorneys for Wilmington Trust Savings Fund Society,

12        Trustee

13        One Battery Park Plaza

14        New York, NY 10004

15

16   BY:  JOHN R. ASHMEAD

17

18   CLEARY GOTTLIEB STEEN & HAMILTON LLP

19        Attorney for ESL

20        One Liberty Plaza

21        New York, NY 10006

22

23   BY:  JAMES L. BROMLEY

24        SEAN O'NEAL

25

Page 16

1    SEYFARTH SHAW LLP

2         Attorneys for Wilmington Trust as Indenture

3         Trustee and Collateral Agent

4         620 Eighth Avenue

5         New York, NY 10018-1405

6

7    BY:  EDWARD M. FOX

8

9    MILBANK, TWEED, HADLEY & MCCLOY LLP

10        Attorney for Cyrus Capital Partners, LP.

11        28 Liberty Street

12        New York, NY US 10005-1413

13

14   BY:  THOMAS KRELLER

15

16   APPEARING TELEPHONICALLY:

17   VERA KANOVA

18   MARC HANKIN

19   LYNN BUTLER

20   CATHERINE LOTEMPIO

21   SAWNIE MCENTIRE

22   KATHERINE MASSEY

23   EMILY RUCKER

24   NEGISA BALLUKU

25   TERESA LII

Page 17

1    JOSEPH SARACHEK

2    COURTNEY SCHAEL

3    PAUL SINGER

4    SCOTT ZUBER

5    MICHAEL BAIRD

6    CLEMENT YEE

7    RYAN BARTLEY

8    ROBERT FITZGERALD

9    NICK KRISLOV

10   MICHAEL HERZ

11   JULIAN BULAON

12   JASON DIBATTISTA

13   ANDREW SCURRIA

14   WENDY SIMKULAK

15   PATRICK HEALY

16   STEPHANIE GLEASON

17   ARLENE ALVES

18   RONALD GOLD

19   CATHERINE HEITZENRATER

20   BRIAN LENNON

21   SHLOMO MAZA

22   STEPHEN MILLER

23   JASON PIERCE

24   LILLIAN RIZZO

25   DANIEL SWETNAM

1    ANDREW TENZER

2    GWENDOLYN GODFREY

3    FOTEINI TELONI

4    VLADIMIR JELISAVCIC

5    SARA BRAUNER

6    SARA CHENTZ

7    LAUREN BESLOW

8    JEFFREY KRAUSE

9    BERNICE LEE

10    JOSH SAUL

11    CHRIS ISIDORE

12    MARIA CHUTCHIAN

13    JONATHAN MARSHALL

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2              THE COURT:  Okay, good morning.

 3              MR. SCHROCK:  Good morning, Your Honor.

 4              THE COURT:  It is still morning.  In re Sears

 5     Holding Corporation.

 6              MR. SCHROCK:  It is.

 7              THE COURT:  Before I begin, I apologize for all of

 8     you who waited in line at security.  Apparently, they were

 9     doing a jury selection today, as well as this case, which

10     doubled the number of people they're used to, and of course,

11     there are real criminals who go through this building, so

12     they're careful with the security. Go ahead.

13              MR. SCHROCK:  Okay, good morning, Your Honor.  Ray

14     Schrock, Weil, Gotshal & Manges, counsel for the Debtors.

15     I'm here with my partners and colleagues from Weil.  We're

16     going to be handling various pieces of the hearing today.

17     Also present, here in the courtroom with me today, are the

18     Debtors' Chief Restructuring Officer, Mo Meghji, the

19     Debtors' Lead Investment Banker, Brandon Aebersold, as well

20     as the Debtors' Chief Financial Officer, Rob Riecker.

21              THE COURT:  Good morning.

22              MR. SCHROCK:  Your Honor, I know it's been a -- I

23     feel like I've almost accomplished something already,

24     getting through security, so we're going to dive right into

25     it, if it's all right with you.  We've got an agenda that we
```

Page 20

1    filed with the Court --

2              THE COURT:  Sure.

3              MR. SCHROCK:  -- and the first item up is the

4    Debtors' global bidding procedures motion.  I wanted to give

5    the Court an update, just in the course of presenting a few

6    points on that motion to address the objections that have

7    been raised.  Your Honor, I can hold onto this for now, or I

8    do have a -- I have a red line.  I think your Deputy asked

9    that we hand red lines up as we're talking about the

10   motions.

11             THE COURT:  Is this in addition to the red line

12   that was in the binder that I got yesterday?

13             MR. SCHROCK:  Yes.  Yes, Your Honor.

14             THE COURT:  And is it red lined off that document?

15             MR. SCHROCK:  Yes.

16             THE COURT:  Okay.

17             MR. SCHROCK:  There's just a few changed pages.

18             THE COURT:  Okay, that's fine.  You can hand it

19   up.  Thank you.

20             MR. SCHROCK:  Your Honor, first of all, thank you

21   to the Court and your staff for working with us and with all

22   the parties in interest as we prepare for the second day

23   hearing before the Court.

24             Your Honor, for the core parties in interest, I'd

25   just like to highlight a few items here.  The Debtors have

1    been extremely busy since we filed for Chapter 11.  It seems

2    like it's been longer, but it's just been a month.

3            For the management team, the Debtors, the

4    Restructuring Committee, the Board, it's been a trying

5    month, but it's been a month of a lot of progress.  There's

6    been a lot of pleadings filed in this case that have been,

7    I'd say, less than positive about the Debtors' prospects,

8    but I wanted to take a moment to highlight some of the

9    things that we are doing, and we think are doing well for

10   the company right now.

11           THE COURT:  Okay.

12           MR. SCHROCK:  The Debtors sought protection of

13   this Court, Chapter 11, just a month ago, for a breathing

14   spell to take advantage of the tools available in bankruptcy

15   to attempt to maximize value, and reorganize the Debtors'

16   businesses, if possible.  And I do think that point is

17   important on maximizing value.  There's so much emphasis on

18   near-term liquidity, that I want you to know that the

19   Debtors and the Restructuring Committee in particular,

20   focused on maximizing value.

21           As to liquidity, the Debtors have been at all

22   times focused and maintained due care on being

23   administratively solvent.  They have performed much work in

24   this regard since the last hearing and we are confident that

25   we are, and will at all times, remain administratively

Page 22

1    solvent.

2           The Debtors are in their most profitable time of

3    the year here in the holiday season, and I think it's

4    important to take a step back and just think about that for

5    a second.  Like many retailers, Sears has losses during the

6    first three quarters of the year.  The fourth quarter is the

7    exception.  It is break-even.  The holiday season, and

8    particularly the weeks that are coming up, they are really

9    critical for the company and its ability to reorganize.

10   This is when we have the best sales, the highest margin, the

11   most value is brought into the company during the next

12   several weeks.

13          We focused in many areas over the last month, but

14   we've had a few principal purposes.  First, stabilization of

15   the business, the employee base and vendor base; raising

16   incremental Debtor-in-Posession financing; preparing the

17   company for its sale process, with a particular focus on

18   those assets whose value depends on Sears continuing as a

19   going concern; putting two key assets up for sale, the SHIP

20   business, as it's known by the acronym, the home improvement

21   business, as well as the sale of the S-Rack MTN notes.

22          These two assets are unencumbered.  We think that

23   we've got good prospects for value on them, and they would

24   be used to fund the Debtors' $200 million wind-down reserve,

25   which they fought so very hard to obtain at the beginning of

Page 23

1    these cases, and I think, you know, that carve out is

2    something that's going to be very important as the Court

3    looks at the Debtors and their next steps over the coming

4    weeks.

5           We've also spent a fair amount of time

6    strategizing with the Restructuring Committee around paths

7    to maximize value, not just focusing on near-term liquidity,

8    but focusing on what's the right path for a Debtor with

9    complex, intertwined operations to make sure that we're not

10   taking a step too fast and inadvertently destroying very

11   significant value.  And finally, we've been educating our

12   constituents on the opportunities and challenges the

13   business faces.

14          On the stabilization efforts front, we've been

15   very successful.  We have ensured a steady flow of goods, we

16   have stabilized the Debtors' vendor base of nearly 12,000

17   vendors.  It was a massive task for any company.  We have

18   re-established terms with certain vendors, we've worked with

19   the Debtors' employees and management to educate them on the

20   realities of Chapter 11, and the company's views on what

21   it'll take to save the business.

22          It's become clear, I think, to the Debtors'

23   professionals and everybody involved in the case, this is a

24   very proud workforce, they love this company, this is their

25   home, they've raised their families here, and we're here to

Page 24

1    give them every opportunity to try and save this company.

2              The Debtors have performed above budget and their

3    DIP financing.  Through the first four weeks of the case,

4    the Debtors beat the DIP financing budget by about $289

5    million dollars.  The Debtors -- this performance has

6    allowed the Debtors additional flexibility to run a robust

7    marketing process for the junior DIP.  The Debtors are about

8    $27 million ahead of the DIP budget for this week as well.

9              Sales last week are down.  The Debtors have

10   solidified their supply base, particularly in the hardline

11   space, which was a challenge bringing that up to speed,

12   where there had been a stop in production with some of the

13   highest-margin sales.  That is now flowing again, and we're

14   hopeful that, after the 19th, that that week, we can get a

15   pickup back in sales.

16             We've performed in compliance with our DIP

17   financing order, we're not in default.  We enjoy the support

18   of our secured lenders.  There's a very substantial secured

19   lender base, as Your Honor knows.  It's a very substantial

20   constituent that holds billions of dollars in debt, and

21   again, to read some of the papers in the case, you wouldn't

22   understand that, you know, heading into this hearing.

23             We've worked with a third-party provider of

24   purchase protection insurance for -- after running a

25   competitive process.  That's the -- when you buy an

Page 25

1    appliance at Sears, having the ability to get that purchase

2    protection, it really drives a lot of sales.  We think, and

3    we've been talking to all of our constituencies and the

4    committee about it, but we think being able to, basically,

5    allow that through a third-party provider and have that

6    purchase protection coverage is a key profitability driver.

7          We think that it'll also allow the Debtors to

8    minimize administrative claim risk that they would otherwise

9    have by underwriting policies within the estate, on a post-

10   petition basis.

11         We've formed and vetted, with our key

12   constituencies, a key employee retention program and a key

13   employee incentive program.  This is an important step to

14   stabilizing the employee base and maintaining key talent.

15   I'd like to thank the unsecured creditors committee for

16   working with the Debtors on that.  I don't think that we

17   have formalized support, but I think we're very close.  We

18   want to get that motion on with the Court today, so we can

19   at least get it set for hearing.

20         On raising incremental DIP financing efforts,

21   we've run a robust junior DIP financing process that has

22   allowed us to raise another $350 million dollars of

23   committed junior DIP financing.  That hearing is set to be

24   heard before the Court on November 27th.  That was a very

25   substantial effort, and yesterday, we filed that

Page 26

1    comprehensive term sheet, which is led by Great American

2    Capital Partners.

3            The incremental financing substantially is in the

4    form that the ESL financing was in terms of its structure.

5    That is there's a junior lien on unencumbered assets, except

6    for four key assets where there's a 50/50 sharing.  The

7    pricing was very competitive, the terms are flexible.  It's

8    a little more expensive than the SL financing.  We think it

9    was important to get third-party financing.

10           The loan structured as a multi-draw term loan

11   credit facility, so that we're only pulling it down as we

12   would need it, when availability under the other facility

13   gets below $50 million dollars, which is less expensive.

14   We've also completed the documentation underlying the senior

15   DIP credit facility.  We filed it with the Court yesterday

16   at Docket No. 744.

17           We've been preparing the Debtors on their sale

18   processes, and we've also been preparing for if the Debtors'

19   efforts are unsuccessful.  We have a very short window,

20   here, through December 15th to try and secure a going

21   concern bid, but we are planning for, and you have to, you

22   know, it's the responsible thing to do, to make plans and do

23   things in the event that things don't go your way, and I

24   wanted to ensure the Court, creditors, everyone, that that

25   is something that's a key focus for the company.

Page 27

```
 1              We have something that I just want the Court and
 2     people to understand about the business.  When people think
 3     of Sears, they really think about the two retail banners, K-
 4     mart and Sears.  But there's also a very profitable division
 5     called Sears Home Services.  This business is a market
 6     leader in providing in-home services and warranty
 7     protection.
 8              It's extremely profitable. It a trailing LTM
 9     EBITDA of about $200 million dollars.  That business is
10     highly dependent on Sears continuing as a going concern.
11     We're keenly focused on the fact that if the Debtors were to
12     pivot to an immediate liquidation, this business would very
13     likely suffer immediate, and we think, irreparable damage.
14              We also have other systems, like Parts Direct,
15     which they believe is a good business, also dependent upon
16     the company -- it's entwined with Sears Home Services.  We
17     have a delivery company, Innovel, which is substantial.  We
18     also -- the company is just so, frankly, very large, that
19     you've missed that sometimes, it's the third largest
20     appliance seller in the United States and we're the number
21     one home service provider.
22              We have filed a motion with a stalking horse bid
23     for the home improvement business, SHIP.  The bid is put
24     together with a healthy 15 times EBITDA multiple.  That
25     multiple would not have been obtainable without the Debtors'
```

Page 28

1      businesses continuing as a going concern.

2             We're also performing analyses and Chapter 11

3      planning surrounding the NOL asset, which is in excess of $5

4      billion.  We're hopeful that when we complete these

5      analyses, can serve as a substantial asset and method to

6      enhance recoveries and build a Chapter 11 plan around.

7      Going into immediate liquidation, we think, would destroy a

8      lot of that value.

9             We're evaluating our substantial real estate

10     portfolio, as there's nearly 1000 leases, Judge.  We have

11     very substantial owned properties as well.  We're working

12     with A&G and JLL, as real estate advisors on this case, and

13     that's a very substantial work stream.

14            We've made decisions around our store footprint of

15     505 stores.  That decision was informed by the EBITDA of

16     those stores, which is either positive or very close to

17     break-even where -- and there's very substantial lease

18     value, we believe, in stores where there was just marginal

19     EBITDA, and we felt it was important to keep those stores

20     open.  If we're going to be negotiating with landlords, it's

21     a much different negotiation if you have a store closed

22     versus open and being able to generate that value.

23            We finished an initial review of a go-forward

24     business plan.  We've shared it with the creditors'

25     committee.  That business plan projects a modest

1    improvement, same-store sales of .6 percent in 2019, and I

2    think it's really important that you understand that the

3    company was almost at breakeven shortly before the petition

4    date on same-store sales.  So, we're not shooting for the

5    moon.  We think it's a straight-up plan.

6              The committee -- but I think that overall, we've

7    fielded numerous offers for their assets, assembling data

8    rooms and processes related to the sale efforts, but we're

9    mindful of the complex operations of the cases.

10             ESL has also been busy during this time.  They've

11   been sending inquiries, diligence inquiries, they've been

12   talking to other parties.  We've produced, I think, well

13   over 150,000 pages, the Debtors have, in the course of the

14   restructuring subcommittee's investigation.  But there's a

15   tremendous amount of activity on the ESL front.

16             I know that it's easy to cast aspersions,

17   sometimes, and you see that in the paper around the

18   company's major shareholder, but whether people like it or

19   not, ESL, they're the single largest creditor in these

20   cases.  They've loaned the company billions of dollars, and

21   they continue to support the company's operations, and the

22   Restructuring Committee's view is that, listen, if there's a

23   buyer and they can save tens of thousands of jobs, we have

24   an obligation to look at this and look at it very seriously

25   and that's what we're doing.

1         And then, finally, we've been strategizing with

2    the Restructuring Committee around value maximizing paths.

3    The Restructuring Committee meets at least three times a

4    week.  It's really a full-time job.  One of our

5    Restructuring Committee members, Bill Transier, is here in

6    the Court today.

7         But we finished an all-day session this past

8    Sunday where we reviewed a number of items, including the

9    management team's go-forward business plan, a preliminary

10   wind-down analysis, and planning surrounding the potential

11   to satisfy themselves that they're going to remain

12   administratively solvent.  The fiduciaries are the

13   stakeholders for everyone in this case, or we're the

14   fiduciaries for (indiscernible) stakeholders in these cases.

15   We're the only party that serves that role.  We take it

16   seriously.

17        But we're not here to say, of course, that we're

18   perfect.  I mean, that's why we're here.  We're here because

19   we need the Court's protection and the Court's help.  We

20   need a breathing spell.  We needed plan exclusivity.  We

21   need the opportunity to form a Chapter 11 plan that

22   satisfies the requirements of 1129, and that's better than

23   liquidation.

24        That's a lot of work that is going on with the

25   Restructuring Committee right now.  It's a very serious

Page 31

1   workstream, and we're intending to work on Chapter 11 plan

2   issues very shortly.  We recognize that we have a tough task

3   ahead of us to save the company.  We're not blind to that

4   fact.  We understand that we're going to give it our all,

5   and it's possible that -- we hope it doesn't happen, but we

6   could not -- that we may not be successful.  We have our

7   eyes wide open on this, but there's a lot of planning on

8   both sides of this to drive value.

9           And contrary to what I think the committee has

10  noted in their papers, we really do appreciate everyone's

11  views, and we understand what we're doing.  Get consensual

12  cash collateral use, DIP financing, and we have the ability

13  to educate all parties in this cases since the three weeks

14  that the committee has been formed, and that really brings

15  me to the first motion that's in front of the Court today.

16          The level of dialogue between the committee, I

17  think everyone would agree, has been extreme.  It's

18  substantial.  We talk every day.  It's been three weeks,

19  it's been extensive by any measure.  It's a lot for anyone

20  to get up to speed on, and we really appreciate that,

21  frankly, more than anyone.  I think they're doing their very

22  best to do so.

23          Your Honor, they did file an affidavit.  What I'd

24  like to do is just talk a little bit about at least our view

25  on why we don't think evidence is required, but if Your

Page 32

1    Honor is inclined to take evidence, my suggestion is that we

2    have the global bidding procedures heard on the 27th as an

3    evidentiary hearing, in accordance with the Court's case

4    management procedures.

5            THE COURT:  Before you get into that, and I

6    appreciate that the committee objection is significantly

7    different than the other objections to the global bidding

8    procedures motion.  But, in reading the Debtors' response to

9    all of the objections, just glancing through this most

10   recent black line of the proposed procedures and order, I

11   just -- bring me up to speed on where the parties are on the

12   objections by other parties.  Are there remaining objections

13   by other parties to the global bidding procedures?

14           MR. SCHROCK:  Yeah, I'll turn it over to Mr.

15   Singh.  He was handling that.

16           THE COURT:  Okay.

17           MR. SINGH:  Good morning, Your Honor.  Sunny

18   Singh, Weil, Gotshal.  We think we're generally done with

19   all of the other parties.  We haven't received an email, a

20   phone call confirmation, just having heard back, but the

21   most recent changes that we just handed up, Mr. Schrock did,

22   reflect a few additional comments that we got late yesterday

23   after the filing by landlords.  It looks like everybody's

24   here, if anybody wants to be heard on those issues.

25           We think we've addressed everyone's issues as to

Page 33

1    notice and timing and the most recent changes, giving even

2    more time on adequate assurance and cure objections for a

3    go-forward store bid.

4              So, I think we're done, but not every single

5    person has said I'm done.  We just haven't heard back from

6    everybody.

7              THE COURT:  Okay.  All right, so, then, why don't

8    you -- unless anyone really wants to press an objection -- I

9    don't need to hear statements that we agree or I'm reserving

10   my rights or anything like that.  I just want to hear

11   whether there are any other objections, besides the

12   committee objection, that we need to deal with at this

13   hearing as well, on the global bidding procedures, that is.

14             MR. DILLMAN:  Your Honor, I apologize for that,

15   but we --

16             THE COURT:  Why don't you come up by the

17   microphone?

18             MR. DILLMAN:  Good morning, Your Honor.  Ted

19   Dillman of Latham & Watkins on behalf of Simon Property

20   Group.

21             I think I'm happy to, obviously, let the committee

22   go first, but we would like to be heard on that and not just

23   to reserve our rights.

24             THE COURT:  It's a similar type of objection,

25   though?

```
 1              MR. DILLMAN:  It's a similar type of objection,

 2      Your Honor.

 3              THE COURT:  All right, fine, and I've read that

 4      pleading.  Wait, there's --

 5              MR. SCHROCK:  Oh.

 6              MR. SCHWARTZBERG:  Your Honor, Paul Schwartzberg

 7      for the U.S. Trustee's office.  The Debtors were going to

 8      make a statement regarding an agreement that we made on the

 9      record because we'll be submitting a supplement --

10              THE COURT:  On that privacy ombudsman solution?

11              MR. SCHWARTZBERG:  Yes, Your Honor.

12              THE COURT:  Okay.

13              MR. SCHWARTZBERG:  They've agreed they were going

14      to work with us on an order that we would submit to the

15      Court.

16              THE COURT:  Okay.

17              MR. SINGH:  Your Honor, I can confirm what Mr.

18      Schwartzberg just said, so we're working with them.  I think

19      we're going to get an order down as soon as possible.

20              THE COURT:  That's fine.

21              MR. SINGH:  Yeah.

22              MR. SCHWARTZBERG:  Thank you, Your Honor.

23              THE COURT:  Okay, so, why don't we address the --

24              MR. SCHROCK:  Committee's objection?

25              THE COURT:  -- Committee objection and the points
```

Page 35

1    raised in support, I guess, by the Simon pleading which --

2    Simon is a member of the committee, as I understand it, too.

3           MR. SCHROCK:  Yes.  So, Your Honor, I think,

4    bottom line, I think that if the Court were to take

5    evidence, we would obviously, not surprisingly -- not

6    obviously, not surprisingly, we disagree with many of the

7    statements in Mr. Sims' affidavit.  I know they have some

8    very large numbers in there.  We think it's more like $11

9    million to get to the end of the year.

10          But, I think that's even before considering the

11   significant degradation in value the Debtors would suffer by

12   turning to an immediate liquidation.  But I think it's

13   important, as we said in our response, that's not what we're

14   -- we're not asking for it to continue as a going concern

15   today.  There's rights that the committee has to seek relief

16   from this Court if it disagrees with our use of cash

17   collateral or our plan exclusivity or even, frankly, moving

18   to convert.

19          But here, we're just seeking procedures that we

20   think everybody should support, whether you're supportive of

21   the company as a going concern or in a pivot to a GOB sales,

22   it just allows -- they're just procedures to allow the

23   company, frankly, to, among other things, meet the December

24   15th date that's set forth in the Debtors' DIP financing

25   documents to maintain -- to get a fully financed bid by that

1    date.

2            And so, we look at it as, it's really just

3    procedural assistance to allow us to meet those deadlines

4    and frankly, that everybody should be supportive.

5            Now, I can't say that what the committee had at

6    the end of their objection that every single one of these

7    suggestions was unreasonable.  Our issue as the Debtors is,

8    listen, that -- we understand that.  We're going to continue

9    to work with the committee.  That's our job.  But, giving

10   them covenants, we have a very complex capital structure.

11   If I start giving the committee covenants around pivoting

12   into a GOB, I think that I'm going to -- I have other people

13   that are standing right behind them, frankly, asking for the

14   very same thing.

15           And what we're really looking at is, just

16   shortened procedures to get a stalking horse bid, to get

17   auctions moving, and just to facilitate, frankly, the

18   company's ability to reorganize and otherwise pivot to a

19   sale.

20           We have been, and we continue to be, in compliance

21   with our DIP financing.  There's no notice of default on the

22   docket.  We have consensual use of cash collateral.

23           But having these procedures, we believe, approved

24   today will allow us to start the marketing process for some

25   key assets, including with the go-forward stores.  If we did

Page 37

1    delay it to the 27th because the Court thought that were

2    necessary, we could still start.  But ironically, that very

3    act would be something that slows the cases down, which I

4    don't think the creditors' committee, if it ultimately,

5    according to their papers, would really like to do.  They

6    don't want to see things go slower.  They'd like to see

7    things go faster.  We're not asking for approval of sales.

8    We're merely asking for approval to act quickly.

9            It's fair to say that, as again, that we disagree

10   with what's in Mr. Sims' affidavit, and if we're put to the

11   test, and we will file an affidavit, I just felt it was odd

12   in response to a procedural motion to get into a debate, and

13   I chose not to take the bait for today on the ability of the

14   Debtors to reorganize as a going concern.  That's certainly

15   not our task here today.

16           As for the requests around credit bidding, Judge,

17   I think that, if Your Honor orders that credit bidding is

18   allowed, it has to -- I'm not sure what the large

19   controversy would be around that.  We have to have the

20   ability to maximize value and extend deadlines if we need to

21   and consult with the committee.

22           We thought that, from the Debtors' professionals'

23   perspective, we thought that having a case where you're

24   giving a mere 60 days - 60 days - to save the company, we

25   thought that, listen, we're approaching this straight up,

Page 38

1   right down the middle of the fairway.  You can't really do

2   it any faster than that.  Even if we were to try to pivot,

3   we really can't do it any earlier than December 15th.  And I

4   think there's this concern underlying a lot of the

5   statements in the papers that we're just, you know, going to

6   keep running headlong into something that's not feasible.

7           But that is just not the way the committee, the

8   company, anyone, has really been approaching any aspect of

9   these cases and everybody knows the challenge that's in

10  front of them.  We just want the chance to do it as Chapter

11  11 really allows and affords us the ability to do.

12          There's parties asking for groupings of assets.

13  We're marketing -- we're going to work with parties on the

14  right groupings of assets and being able to form a

15  competitive process.  But again, I don't think you need in

16  the procedures to specifically lay out how the Debtors need

17  to group assets and what they're going to be able to group.

18          You can't put the whole company up for sale and

19  every single asset and division at the same time.  It's not

20  responsible, it's not the right way to maximize value.

21  We've chosen to focus on the go-forward stores and those

22  assets that are specifically, we think, at risk if the

23  company doesn't have a go-forward store footprint.  We think

24  that's the right way to maximize value.  These procedures

25  merely allow us the ability to have a chance to do that.

1            But if we're not allowed to move forward, and we

2     want to do it on the 27th, we can definitely do that.  I

3     just think, Your Honor, that when everybody just takes a

4     step back and looks at a retailer that's in the most

5     profitable quarter of the year and the fact we're working

6     with everyone that we can find a way for the parties just to

7     grant the relief that's requested today.  But I'm happy to

8     answer any specific questions you have, Judge.

9            THE COURT:  Okay.  Well, I did have a couple of

10    questions related to the process.  You said that the focus

11    is on the global group of stores.

12            MR. SCHROCK:  It is.

13            THE COURT:  But this is a question, it does not --

14    I don't know the answer to it, but I'm assuming that, if

15    someone wants to make a proposal by the 15th for some

16    portion of them or some other major asset, they are free to

17    do that?

18            MR. SCHROCK:  Yes, Your Honor.  In fact, people

19    have put in proposals for assets, even since we've filed.

20    But I think we're going to focus on the go-forward stores

21    and the group --

22            THE COURT:  Well, let me just interrupt you on

23    that.

24            MR. SCHROCK:  Sure.

25            THE COURT:  I mean, there's an auction process.

Page 40

1    The auction assumes, if you have appropriate bids by the

2    15th, or a bid by the 15th, that you would move ahead to the

3    auction process.  Generally speaking, such a process would

4    permit parties to bid on less than the full group, and then

5    you'd consider those bids in the aggregate, as opposed to

6    aggregate bids.

7               MR. SCHROCK:  Absolutely.  Yes.

8               THE COURT:  That's part of the -- this auction

9    process.

10              MR. SCHROCK:  Absolutely -- yes.  Yes.

11              THE COURT:  And, I'm assuming that, facilitating

12   due diligence in that regard is easy, because it's the same

13   group of stores.

14              MR. SCHROCK:  That's correct, Your Honor.  It's

15   the same 505 stores that are going to be operating.

16              THE COURT:  So, what is less clear is the

17   following: there are, clearly, more than one set of

18   potential buyers out there, or funders out there, whose

19   business is not going concern-buying business, but GOB

20   business.

21              MR. SCHROCK:  Yes.

22              THE COURT:  There are at least three that I'm --

23   you know, that you see all the time.

24              MR. SCHROCK:  Yes.

25              THE COURT:  And they have friends.

Page 41

1           MR. SCHROCK:  Yes, they do.

2           THE COURT:  So, my question is, assume, for the

3    moment, that one or more of them wants to make a proposal

4    along those lines, GOB lines, by the 15th.

5           MR. SCHROCK:  Yes.

6           THE COURT:  They're certainly free to make a

7    proposal.  It's a free country, the Debtors are fiduciaries,

8    et cetera.  I guess my real question is two-fold.  First is,

9    under these procedures, how would that type of proposal be

10   considered, and then second, maybe it's a subset of that, do

11   the Debtors have the resources to consider such a proposal,

12   or to facilitate such a proposal?

13          I mean, in my experience, GOB proposals are much

14   less uniform than people might think.  They have all sorts

15   of variations, depending on risk and reward, and the like,

16   and they're often heavily negotiated.  It would seem to me

17   that, given all of the things that the Debtors need to do

18   over this very short period, it may be worthwhile to bake in

19   a type of auction that, in essence, would force anyone who

20   wants to make a GOB proposal to put their best foot forward,

21   i.e., perhaps -- I'll leave this up to the investment banker

22   whizzes, an auction where you say, we'll take the second

23   best one, so everyone has to, you know, make their best

24   proposal.

25          That might, at least, you know, we'll take the

1    second best one to compare with the going concern proposal.

2            MR. SCHROCK:  Yes.

3            THE COURT:  That might, at least, take some of the

4    administrative burden off all the parties.  My impression is

5    that the people who do this for a living act fast, they're

6    sophisticated, they've probably done a lot of wandering

7    through Sears already and run it --

8            MR. SCHROCK:  Yes.

9            THE COURT:  -- in various scenarios, and that

10   they're capable of doing that.  So, really, the time delay

11   is more the negotiation part.  So, maybe the company could

12   consider something like that?  I'm just getting the reaction

13   of both you and the committee on that.  I don't, frankly,

14   feel that a decision one way or the other can be made today,

15   or frankly, even on the 27th.  You really need to see where

16   the process goes.  On the other hand, I'm clearly guided by

17   case law that says that the whole point of a sales process

18   is to maximize value, and I'm reluctant to cut out a

19   potential source of the highest and best value.

20           MR. SCHROCK:  Your Honor, I can say definitively,

21   it was never our intent to not have those types of

22   proposals, and I think we're happy to consider it.

23           THE COURT:  I don't think it was.  I just want to

24   make sure that --

25           MR. SCHROCK:  That it's explicit that we will be

1    considering them?  I think it's a good idea.

2              THE COURT:  Well, not only that, but that the

3    Debtors have sufficient resources to do it.  I mean,

4    notwithstanding that you have a lot of talent focusing on

5    this, negotiating a reorganization, in essence, is a real

6    task, and it involves multiple parties.

7              MR. SCHROCK:  I can so personally attest.

8              THE COURT:  To do that with simultaneously

9    negotiating a separate path of a potential GOB approach is a

10   lot to take.  And what I'm suggesting is, maybe a way to

11   shorten that by putting more of the burden on those who are

12   in the GOB business to, again, put their best foot forward.

13             MR. SCHROCK:  Yeah, I think so, Judge, and I think

14   we'd actually have to compare that against what the Debtors

15   are already doing, which is, if they were to run a GOB

16   process, what do they believe the proceeds --

17             THE COURT:  Yeah, that's fair.

18             MR. SCHROCK:  -- which we are -- yeah, I think we

19   are doing.

20             THE COURT:  I'm assuming you'll be doing that

21   anyway.

22             MR. SCHROCK:  Yeah, we're doing that anyway, so, I

23   think that -- but, having that type of bid --

24             THE COURT:  And you have your own person, who's --

25             MR. SCHROCK:  We do, yes.

1           THE COURT:  -- quite experienced with that.

2           MR. SCHROCK:  Yeah, Mr. Cohen is in the courtroom

3      today.

4           THE COURT:  Right.  Right.

5           (Cellphone sounds)

6           THE COURT:  Okay.

7           MR. SCHROCK:  That wasn't me.

8           (LAUGHTER IN THE COURTROOM)

9           THE COURT:  No, it was no one in the courtroom.  I

10     don't know what that was.  So, anyway, I don't know, maybe

11     it JC Penney or someone doing, I don't know.  So, I wanted

12     to lay that out, both -- that suggestion out to both you and

13     the committee and Simon to see if we can, maybe, truncate

14     some of the discussion on this.

15           My belief, frankly, is that there are serious

16     missing links in what I've been given by the committee, and

17     I don't have anything from you all, which is fair, and even

18     a 12-day delay is potentially -- costs a lot of money in a

19     lot of different ways, not just the running costs of the

20     company, but other factors.  So, my inclination in reading

21     these papers is that we should ensure that the best

22     environment exists to consider all reasonable alternatives

23     without turning everything upside down.

24           MR. SCHROCK:  It's certainly a sensible approach.

25     We -- I'll --

1          THE COURT:  I think if we can -- I'm sorry, Mr.

2     Schrock.  If we can resolve that issue, I think the other

3     issues raised by the committee can probably be dealt with

4     fairly quickly and without evidence.  So, I interrupted.

5     You were about to say your reaction to that.

6          MR. SCHROCK:  We agree, Judge.

7          THE COURT:  Okay.

8          (LAUGHTER IN THE COURTROOM)

9          MR. SCHROCK:  That's all I wanted to get out.

10          THE COURT:  So, I don't know which one of you all

11     are going to be speaking on this motion, but let me pose the

12     question to you.

13          MR. DIZENGOFF:  Yeah, so, Your Honor, Ira

14     Dizengoff, Akin Gump Strauss Hauer & Feld, I don't need the

15     podium, I just needed a second.  Your Honor, what we started

16     with was an operating premise that the committee was

17     concerned that the company was hell-bent on a path that we

18     thought just didn't make sense, based on the numbers and the

19     information that we digested.

20          THE COURT:  Right.

21          MR. DIZENGOFF:  And we laid out for you in the

22     (indiscernible) declaration, this is a decision that costs

23     hundreds of millions of dollars to execute.  So, we went to

24     the company and said, I understand you can't just pivot to

25     GOB sales instantaneously, but if you're going to go down

1    this path, and by December 15th, you don't have something

2    that's actionable, what the committee wants, and the

3    committee, I think, rightly deserves, is an alternative

4    that's set forth so that we don't lose time and money.

5    Because, as you said, every day actually does matter.  The

6    administrative expense burn associated with this company,

7    whether it's the financings that we have to pay for, the

8    professional fees, just the time, whatever is losing money

9    in this company, costs an enormous amount of money.

10            So, we said, in our pleading on Page 6, we

11   actually said, here's the deliverables, which we should

12   embed in the order, and that would obfuscate the need,

13   actually, to have --

14            THE COURT:  Not obfuscate.

15            MR. DIZENGOFF:  I'm sorry.  Obviate.

16            THE COURT:  Eliminate.

17            MR. DIZENGOFF:  Eliminate, yes.  Not obfuscate.

18   Sorry, I misspoke.  If we can get those deliverables, and

19   that's what we ask for, I take Mr. Schrock at his word, and

20   I know this is a mountain of stuff that has to be done, as

21   we in the committee are largely doing a lot of the same work

22   streams to get to a conclusion that we actually think makes

23   sense.  We asked for deliverables about a plan that says,

24   here's what the GOB looks like.  And, the GOB sales process

25   is very detailed.  We asked for a Gant chart, basically

1     giving responsibilities, who's doing what, the timeframe,

2     how everything happens.

3              THE COURT:  Well, that's the -- that's from the

4     Debtors' end.

5              MR. DIZENGOFF:  Yes.

6              THE COURT:  There are third parties who live this,

7     you know, and have probably been thinking about it for the

8     last ten years, and I would like to have it clear that they

9     should feel free to make a proposal.

10             MR. DIZENGOFF:  Yeah, I actually think, Your Honor

11     --

12             THE COURT:  And not only just a proposal, but that

13     they should appreciate the need to do it in a way that,

14     really, probably skips -- well, you could do it in terms of

15     hours or you could do it in terms of days, but the weeks

16     probably compressed into 24-hour stretches that people

17     negotiate these things, and just go to their bottom line or

18     their -- next to their bottom line.  But the Debtor,

19     clearly, and you have your professionals, they should be

20     working together on, sort of, if we run it, how does it

21     look?  But, that's not really part of bidding procedures,

22     that's just what people do, and I just want to make it clear

23     that all options are being considered, and that there should

24     be a mechanism to get in best foot forward, third-party GOB

25     proposal.  Not that that's the direction that this company

1    will go, but just to have it, and see whether it makes

2    sense.

3              MR. DIZENGOFF:  So, I agree with that, Your Honor.

4              THE COURT:  Okay.

5              MR. DIZENGOFF:  It does make sense to actually

6    have that and require those that are in the GOB business to

7    actually provide bids in that timeframe.

8              THE COURT:  With timing and how long will this

9    take --

10             MR. DIZENGOFF:  Yes.

11             THE COURT:  -- all of that.

12             MR. DIZENGOFF:  And we do have, in the data room,

13   that we're going to be opening up.  I think there's really

14   going to be information so that parties can place such a

15   bid, you know, for a real response.

16             THE COURT:  I just don't want people focusing on

17   going concern falling over the other people.

18             MR. DIZENGOFF:  Of course.

19             THE COURT:  So, it needs to be worked out, how to

20   handle that process.

21             MR. DIZENGOFF:  Your Honor, that would alleviate

22   concerns.  We asked for this to be embedded, actually, in

23   this bid procedure's order because although Mr. Schrock says

24   to the contrary, this is not just about procedures, and what

25   the committee's concern was, we can't go down a path that is

1    predestined and predetermined for an outcome that says we're

2    wedded to a 505 store sale path without actually

3    understanding what the alternatives look like.

4              THE COURT:  Yeah, I don't think that's what this

5    is.

6              MR. DIZENGOFF:  Okay.

7              THE COURT:  I think that it's -- it's an approach

8    that, if it works, it would be great, and the company is

9    under understandable time pressure to pursue it, and should

10   pursue it, because it may well work.  But you don't want to

11   -- I guess my point, I think this is ultimately your point,

12   is that, if it doesn't work, you want to have laid some

13   groundwork for an alternative without having to, then, lose

14   maybe another month or so before you'd start laying that

15   groundwork.

16             MR. DIZENGOFF:  There's no dispute on that.

17             THE COURT:  Okay.

18             MR. DIZENGOFF:  Your Honor, we asked that it be

19   embedded, actually, in the order, if that's where we go,

20   which would make it a deliverable, if you will, to the

21   creditors committee.  I understand Mr. Schrock's part about

22   everybody raising their hand, but like him, we act as

23   fiduciaries for the unsecured creditors, so having that as a

24   deliverable to the committee, we think, makes sense.

25             THE COURT:  Well, when you say -- you mean the

Page 50

1    third -- not the third-party proposals, the company's work

2    plan?

3              MR. DIZENGOFF:  Not the third-party, a commitment

4    on the company's part that says, we have a GOB plan, this is

5    what it looks like, here's the dotting the I's, crossing the

6    T's --

7              THE COURT:  Is that -- I mean, again, I'm

8    concerned about resources.  Is that deliverable?  That type

9    of analysis?

10             MR. SCHROCK:  Your Honor, we're working on the GOB

11   analysis, but delivering a Gant chart, you know, a full

12   company GOB plan by November 30th, and all of the specifics

13   here, I mean, I'll say it on the record, we're committing to

14   work with the committee on this plan.

15             THE COURT:  I mean, to me, to me, I think the

16   relevant date is December 15th, and that's the company's

17   internal analysis of that will be relevant when you get in

18   the other --

19             MR. SCHROCK:  Right.

20             THE COURT:  -- if there are any other third-party

21   GOB proposals.

22             MR. DIZENGOFF:  Yeah, but, what I don't want to

23   happen, Your Honor --

24             THE COURT:  You want to see the work happening up

25   to that point.  That's fine.

Page 51

1          MR. DIZENGOFF:  Correct.  We want to know -- what

2   we don't want to do is show up --

3          MR. SCHROCK:  He doesn't want to get it delivered

4   on --

5          THE COURT:  I'm not sure what a Gant chart is.  I

6   thought that was a shirt, but, you know.

7          (LAUGHTER IN THE COURTROOM)

8          MR. DIZENGOFF:  I'm sure they went out of business

9   a long time ago.  We can let the professionals work out

10  whether the Gant chart is deliverable or not.

11         THE COURT:  Okay.  You want serious work done --

12         MR. DIZENGOFF:  We want serious work done --

13         THE COURT:  -- on an alternative GOB approach.

14         MR. DIZENGOFF:  Right, and what we don't want to

15  happen is --

16         THE COURT:  That's company-generated --

17         MR. DIZENGOFF:  Right, company-generated.

18         THE COURT:  -- as opposed to third-party proposal.

19         MR. DIZENGOFF:  And what we don't want to happen

20  is, December 15th come around and they say, well, we're not

21  quite ready and we're going to march forward with the 505

22  store sales path, and that's another month before we

23  actually see what a GOB plan actually looks like.

24         THE COURT:  Well, I think it's --

25         MR. DIZENGOFF:  Because that's burning $100

1    million dollars.  So, we need to have this in real time, we

2    need to -- as Ray knows, we're pressuring them to get us a

3    lot of information and digesting it, and I know they're

4    working full steam ahead, but this is a critically important

5    decision that commits the company to a path that will cost

6    hundreds of millions of dollars with every delay.  So, I'll

7    give you a for example.

8              THE COURT:  Well, yes and no.  I mean, it -- you

9    can't do a GOB process for a company this big by snapping

10   your fingers.

11             MR. DIZENGOFF:  I agree.  I agree, we couldn't it

12   instantaneously, but every month delay will cost our

13   clients, out of unencumbered assets --

14             THE COURT:  Unless you're kind of working on

15   parallel paths.

16             MR. DIZENGOFF:  That's right.

17             THE COURT:  Right, okay.

18             MR. DIZENGOFF:  And that's what we're looking for,

19   is that commitment embedded in the order.  Your Honor, one

20   of the --

21             MR. SCHROCK:  I can commit it on the record.

22             MR. DIZENGOFF:  Just a procedural thing, why this

23   kind of bubbles up.  The deadlines for those things are

24   embedded in the order, but the company has the right to move

25   those deadlines.  We ask for committee consent to do that

Page 53

 1    for precisely this reason.

 2              THE COURT:  I think that's --

 3              MR. DIZENGOFF:  Every time you go past it --

 4              THE COURT:  -- it's too -- I have to keep on top

 5    of this, so I think -- I'm not going to defer that right or

 6    veto right to anyone in the case.  It should be aired with

 7    me.

 8              MR. DIZENGOFF:  Agreed with that.

 9              THE COURT:  Okay.

10              MR. DIZENGOFF:  So, can I suggest one other thing?

11    Perhaps this will actually help alleviate some of our

12    concerns as well.  We ask for a check-in date with you, Your

13    Honor, call it December 17th, if those bids are due on the

14    15th.  Let's just come back to Court and tell you where the

15    lay of the land is.

16              THE COURT:  Yeah, that's fine.

17              MR. DIZENGOFF:  Yeah, I think that's useful.

18              THE COURT:  If you can get a --

19              MR. DIZENGOFF:  Well, we'll talk to your --

20              MR. SCHROCK:  We have the hearing on the 20th.

21              THE COURT:  Yeah, there's a hearing on the --

22    there's an omnibus hearing on the 20th.  I think -- I talked

23    to Ms. Lee this morning.  I think there's actually a date

24    between the 17th and the 20th.

25              MR. DIZENGOFF:  Okay.

1          THE COURT:  I think you all -- that's fine to have

2     that type of check-in date.

3          MR. DIZENGOFF:  Okay.  That's --

4          MR. SCHROCK:  I think that we also have a hearing

5     on the 18th, so.

6          THE COURT:  Yeah, I think that was the -- yeah, I

7     think that was the date, so.  Maybe it'll be the 18th.

8          MR. DIZENGOFF:  I'm sure we can find time to check

9     in, Your Honor.

10         THE COURT:  Okay.  I think on the baked into the

11    order point, I guess I would rather do it a little more

12    generically than is laid out in the committee motion.  I

13    think, basically, it should say something along the lines

14    of, the Debtors will prepare a Debtor-run going concern --

15    an analysis for a Debtor-run GOB sale, and will frequently

16    and periodically update the committee on that process.

17         MR. DIZENGOFF:  Your Honor, if you say it, it

18    doesn't need to be in the order, so I'm --

19         THE COURT:  Well, okay.  All right.

20         MR. DIZENGOFF:  -- that's good enough for me.

21         MR. SCHROCK:  All right, fine.

22         THE COURT:  Well, Mr. Schrock is committed to it,

23    too.

24         MR. DIZENGOFF:  He's committed to it.

25         MR. SCHROCK:  Again.

1          THE COURT:  Okay.  So, on the other -- why don't

2    we -- so, I think that means we don't need to have an

3    evidentiary hearing, at this point.  On the other points

4    that the committee has raised, you all have -- the order has

5    been moving since -- even since the committee objection with

6    the proposed committee comments on the order was filed.  So,

7    what, if anything, is open, at this point on those -- on the

8    other aspects of the committee objection?

9          MR. DIZENGOFF:  Your Honor, I'm not sure I've kept

10   up with all of them, because they're fast and furious in

11   terms of the changes that have happened.  We had three kind

12   of global issues, and then we can talk about the micro

13   wordsmithing stuff.  Issue one was what is actually being

14   sold and when, which I think you addressed a little bit,

15   which is how to bucket assets, and then looking at

16   alternatives and having a GOB bid as well.  So, the order is

17   going to have to be significantly changed to embed that into

18   the order.

19         THE COURT:  Well, I think what we need to say -- I

20   mean, you've identified 505 stores.

21         MR. SCHROCK:  We have, Your Honor.

22         THE COURT:  I think that the order should make it

23   clear that the Debtors will entertain offers for less than

24   those --

25         MR. SCHROCK:  Yes.

1          THE COURT:  -- and will so structure the auction

2     so that those can be made and then you could consider them

3     as a group, compared to any offers for the -- a bigger

4     number, a larger number, or the total number.

5          MR. SCHROCK:  We'll do that.

6          THE COURT:  And Mr. Schrock's gone on record that

7     the company will entertain offers for other assets too, but

8     I don't think that's really part of this auction process.  I

9     think it has to be tied to those 505 stores, although,

10    again, industry buyer X can say, I want 250 of them, and

11    industry buyer Y can say, I want 150 of them, and then the

12    two of them are paying more than whoever bids for the 505.

13         MR. SCHROCK:  Yeah, and your risks are, I think,

14    you know, related, but somewhat separate, you know, the

15    Sears Home Services, we expect, also will be an asset that

16    will be looking to market -

17         THE COURT:  Part of this process or?

18         MR. SCHROCK:  Separate.  They could bid for Sears

19    Home Services as part of this or separate.

20         THE COURT:  Well, I think we should make that

21    clear, then, too.

22         MR. SCHROCK:  We are -- we do.  We have a process

23    letter, Your Honor, that outlines that.

24         THE COURT:  Okay.

25         MR. DIZENGOFF:  Okay, I'm not sure we've seen the

1   process letter.  The normal parlance would be there'd be

2   some kind of confidential information memorandum that would

3   kind of spell this all out, that is how the process -- and

4   then we can understand exactly what you're selling and what

5   the timeline is and what people are bidding on them.  So, if

6   we can get the bankers together on that and agree to that, I

7   think that resolves --

8           THE COURT:  Well, I think the timeline is clear.

9   I think it's just what's in the package, and --

10          MR. DIZENGOFF:  Yeah, I understand what the

11  deadlines are.

12          THE COURT:  It's just, what's in the package and -

13  -

14          MR. DIZENGOFF:  Which, there's no clarity on it.

15          THE COURT:  Well, I --

16          MR. DIZENGOFF:  Other than just saying it's 505,

17  right?

18          MR. SCHROCK:  We have a process letter.  We're

19  happy to share it with you.  We'll work with you on what the

20  package looks like.

21          THE COURT:  I just -- I guess that maybe the

22  missing link, then, is those who are interested in making

23  bids should know what the process is.

24          MR. SCHROCK:  Yes.  Of course.

25          THE COURT:  So, you should --

Page 58

1              MR. SCHROCK:  These are just the procedures, so we

2    didn't -- you know, the procedures contemplate there'll be a

3    notice for each specific type of sale that we're going to

4    run under the global procedures, and so, there'll be a

5    process letter and, for appropriate ASIM that'll be going

6    out, explaining for a relevant asset sale procedure.

7              THE COURT:  All right, but your investment bankers

8    are quite capable, and they've probably been beating the

9    bushes.

10             MR. SCHROCK:  Yes.

11             THE COURT:  But there are always people who just

12   are interested, particularly with a name like Sears.  And I

13   want to make sure that, assuming I approve these procedures

14   today, they understand that they can lob in bids for -- it

15   sounds like almost anything there, is what you're saying.

16             MR. SCHROCK:  Your Honor, so, for each specific

17   sale that were to take place under the procedures, yes, we

18   will send out -- we'll file a notice that will explain,

19   here's what's for sale, here's the timeframe for considering

20   -- for the 505 store sale, we're going to have a process

21   letter, and we can file it, frankly, with the Court, that it

22   will just explain exactly what's for sale and when we're --

23   you know, how we're considering the bids, considering how

24   much time it's --

25             THE COURT:  All right.  So, I think that should be

1    put in the procedures --

2              MR. SCHROCK:  Okay.

3              THE COURT:  -- so that they'll understand that, so

4    they'll know that's the thing to look for.

5              MR. SCHROCK:  We'll make that clear, Judge.

6              THE COURT:  Okay.

7              MR. SCHROCK:  That was definitely the intent.

8              THE COURT:  Okay.

9              MR. DIZENGOFF:  Okay, Your Honor.  Two other

10   points to raise.  One as it relates to the ESL potential

11   credit bid.  I think the procedures, the way they're set up,

12   and again, I'm trying to keep up with the flow of the

13   changes to it, is if they do anoint ESL as a stalking horse,

14   they have to come back to Court as an insider.

15             THE COURT:  Right.  Correct.

16             MR. DIZENGOFF:  So, there's no prejudgment on

17   whether they're entitled to breakup fees or expense

18   reimbursement, or even the ability to credit bid.

19             THE COURT:  That's how I read it.

20             MR. DIZENGOFF:  Okay.

21             THE COURT:  Including the last point.  And you

22   well know that I have more than -- many times held that, if

23   there's some legitimate issue, either about what the

24   collateral is that's in the package that's being bid on, or

25   about the claim or the lien, I require people who want to

Page 60

1    credit bid to show that they have the cash to back it up, if

2    it turns out that's a real issue.  So, I mean, I don't think

3    that's any secret to ESL, or anyone else that wants to

4    credit bid.

5            MR. DIZENGOFF:  It's not a secret to us.

6            THE COURT:  Okay.

7            MR. DIZENGOFF:  So, we've articulated those

8    concerns as well.

9            THE COURT:  Okay.

10           MR. DIZENGOFF:  Okay, so that's --

11           THE COURT:  On the other hand, you can't just say,

12   I don't like the way they look, and so, therefore, they have

13   to have the cash available.

14           MR. DIZENGOFF:  Yeah, of course, understood.  As

15   you know, Your Honor, there are -- there were, I think, five

16   asset dispositions, 15 financings that were done in the

17   years leading up to it.

18           THE COURT:  We've said enough on this topic.  I'm

19   just --

20           MR. DIZENGOFF:  Yeah, fine.

21           THE COURT:  -- I want to be clear that there

22   should be a little bit more than just that in an objection

23   to unfettered credit bidding.

24           MR. DIZENGOFF:  And of course there will be.

25           THE COURT:  Okay.

1          MR. DIZENGOFF:  Of course.  The last point to

2     raise with you, Your Honor, which I think you've already

3     highlighted is not going to be an issue, is the extension of

4     the bid deadline.  So, we'll have a check-in with the Court

5     sometime during the week of December 17th --

6          THE COURT:  Right.

7          MR. DIZENGOFF:  -- but our concern is the bid

8     procedures, as drafted, allow the Debtor to extend that

9     deadline without committee consent.  If you want to embed

10    the committee consent, that's fine.  If we all agree that it

11    makes sense, fine.  If not, they should have to come back to

12    you.

13         THE COURT:  I think it's the latter.

14         MR. DIZENGOFF:  Okay and that would address our

15    concerns.

16         THE COURT:  That extension should come back to the

17    Court, unless -- maybe there's -- maybe you could build in a

18    mechanism that if no one disagrees --

19         MR. DIZENGOFF:  Right, if we could agree, fine.

20         THE COURT:  -- we don't have to go back to Court,

21    you know.

22         MR. SCHROCK:  I think we said consultation.

23         MR. SINGH:  And Your Honor, we have consultation

24    rights, and I think we said that anybody can be heard on an

25    expedited basis.

1          THE COURT:  No, but what I'm saying is --

2          MR. SINGH:  You're saying if it's --

3          THE COURT:  -- particularly if you're having more

4   than one sale, I don't need to have a hearing on it if

5   everyone is on board with saying that, you know, fine, a

6   week's extension because someone has to close one loop with

7   their financing or something is -- that's fine.  But that's

8   not giving anyone a veto, that just says you don't have to

9   come to Court.

10          MR. DIZENGOFF:  Understood.  Okay.

11          THE COURT:  Okay.

12          MR. DIZENGOFF:  That's the highlights.  We'll have

13   to look at the rest of the language to make sure it's --

14          THE COURT:  Well, on the rest of the -- I don't

15   want to -- I mean, again, timing's important here.

16          MR. DIZENGOFF:  Yeah.

17          THE COURT:  I -- I'm looking at -- so I think

18   those changes will have to be made, and before you submit

19   the order, you need to run it by counsel to make sure that

20   they're consistent with what's been said on the record

21   today.  I'm just looking at the rest of the comments, here.

22   I think most of them do go to that -- those points.  I think

23   you worked out when it is that people get these bids, right?

24          MR. SINGH:  Yes, Your Honor.  Your Honor, just to

25   help bridge the gap, just for -- I know the Akin team is

Page 63

1    looking, the order that we filed with our reply, which I

2    believe they have, two days ago, that's -- with all the

3    changes.  The only incremental changes that have been made

4    were a few changes around timing of adequate insurance,

5    which we filed last night.  We've got change pages only.

6    I'm sure if I hand them a copy, it'll take them about ten

7    minutes to go through it and confirm that those are just

8    additional changes.

9              THE COURT:  Right.

10             MR. SINGH:  So, everybody's seen it.  It's all

11   been filed publicly and there's not a ton else -- much else

12   there at all, and then it's just the couple of changes Your

13   Honor outlined this morning regarding filing the process

14   letter on the docket after we confer with them regarding the

15   assets to be sold --

16             THE COURT:  Right.

17             MR. SINGH:  -- as well as that the extension

18   beyond just the particular December 15th deadline requires -

19   -

20             THE COURT:  Come back to Court.

21             MR. SINGH:  Yeah, unless the parties all agree it

22   makes sense.

23             THE COURT:  Unless the consulting parties are in

24   agreement.

25             MR. SINGH:  Right, the consultation parties are on

Page 64

1    board with that, and we'll obviously add a clarification

2    language that, in the bid process notice that Mr. Schrock

3    mentioned, that not just going concern bids are being

4    considered by the Debtors.

5              THE COURT:  Yes.

6              MR. SINGH:  So, I think that's really it, Judge.

7    There's not --

8              THE COURT:  Okay.

9              MR. SINGH:  -- there's not much else.  Or anything

10   else, excuse me.

11             THE COURT:  I think there was a suggestion that

12   the auction be videotaped.  There should be some record of

13   it.

14             MR. SINGH:  Yes, of course, Your Honor.  It's

15   going to be transcribed.

16             THE COURT:  Right, okay.

17             MR. SINGH:  Of course.  And/or videotaped, just,

18   you know.

19             THE COURT:  Whatever's more efficient.

20             MR. SINGH:  One way or the other, there will be an

21   accurate record --

22             THE COURT:  That's fine.

23             MR. SINGH:  -- that's going to be submitted, of

24   course.

25             THE COURT:  Okay.  All right, I had one question

1     on -- for the parties to be thinking about on the stalking

2     horse point, that the $200 million-dollar carve out, if you

3     will, is obviously really important here.

4              MR. SINGH:  It is.

5              THE COURT:  From what you said earlier, it's

6     possible that a big chunk of that will already be obtained.

7     But, I'm assuming, if there's a credit bid, the Debtors

8     don't really benefit from that, so that's an issue in terms

9     of evaluating bids.

10             MR. SINGH:  Yes.

11             THE COURT:  Okay.  All right.

12             MR. SINGH:  But we're focused on it, Judge.

13             THE COURT:  Okay, very well.  All right, so, does

14    anyone else have anything further to say on the order -- the

15    request for an order approving global bidding procedures?

16    Okay.

17             MR. TABACHNIK:  Thank you, Your Honor.  Thank you.

18    Douglas Tabachnik for certain of the taxing authorities

19    entities is, I think, the way we called it on the docket.

20             THE COURT:  Okay.

21             MR. TABACHNIK:  We're working through issues here,

22    and we want to make sure that it's not quite -- it doesn't

23    get left between the cracks, but there are a number of ad

24    valorem taxes that are secured by liens imposed by statute.

25             Texas is kind of unique that way, and so we've got

Page 66

1    a bunch of language that we're still parsing through that

2    needs to make sure that -- and this doesn't get left behind.

3              THE COURT:  This is just a procedural order.

4              MR. TABACHNIK:  Yes, but --

5              THE COURT:  Any order I enter approving a sale is

6    going to say that all valid and enforceable liens shall

7    attach to the sale proceeds in the order of their priority.

8              MR. TABACHNIK:  And certainly -- and the order

9    that we looked at also says it's subject to the DIP loan,

10   you know, order that's going to be entered at some point.

11             THE COURT:  Okay.

12             MR. TABACHNIK:  But to the extent that there is

13   language that needs to be put in here that reserves those

14   rights and doesn't leave them behind, I just raise it.

15             THE COURT:  Anyone who has a lien has a lien.  I

16   don't want to -- I read the objection.  It seemed to me that

17   it was really going to be covered by whatever sale orders

18   get entered.

19             MR. TABACHNIK:  All right.

20             THE COURT:  And nothing is being taken away from

21   any lienholder in these procedures as far as I can see.

22   They're supposed to give anyone with an interest in the

23   property notice and --

24             MR. TABACHNIK:  To the extent that they're

25   advertising that sale is free and clear of all liens,

Page 67

1     encumbrances --

2             THE COURT:  Right.

3             MR. TABACHNIK:  -- you know, which is a little bit

4     in anticipation of an order to be entered later on --

5             THE COURT:  Right.

6             MR. TABACHNIK:  -- we want to make sure that issue

7     is accounted for.  That's all.

8             THE COURT:  What -- why -- that's the whole point

9     of 363(f).

10             MR. TABACHNIK:  Yes, but we're not doing that

11     here.  We're saying that upfront in the sale procedures

12     order that this is going to happen before it's happened, and

13     that's the only thing.

14             THE COURT:  But are you saying that 363(f) doesn't

15     apply to your clients?

16             MR. TABACHNIK:  No, no, no.

17             THE COURT:  So what's the -- I don't get it.  I'm

18     not following.  I'm sorry.

19             MR. TABACHNIK:  No.  There are -- I'm not saying

20     anything of the kind.

21             THE COURT:  Right.

22             MR. TABACHNIK:  I'm simply saying that there are

23     liens here that don't go away, and --

24             THE COURT:  But they could be shifted to the

25     proceeds.

Page 68

1          MR. TABACHNIK:  Well, I guess they could as long

2     as the proceeds are segregated.  That's correct.

3          THE COURT:  Right.

4          MR. TABACHNIK:  Yes.

5          THE COURT:  Okay.  Okay.  Well, look, the Debtors

6     are well on notice that that's what you'll want in a sale

7     order where your collateral's affected.  So if there's

8     collateral in Texas, you know.

9          MR. TABACHNIK:  It's a unique state because the --

10          THE COURT:  Well, in many ways.

11          MR. TABACHNIK:  -- lien's attached to personal --

12     yes, in many ways.  I've never seen, you know, a state that

13     has tax laws quite like this.  But it's unique in that way.

14          THE COURT:  Okay.  All right.

15          MR. TABACHNIK:  So it attaches to personalty as

16     well as realty, and that's the distinction between --

17          THE COURT:  Right.  No, but the Debtors are on

18     notice of that, so they -- you know, when they're

19     structuring the sale of stuff in Texas, they have to be

20     careful to preserve your lien.

21          MR. TABACHNIK:  Yes, Your Honor.

22          THE COURT:  Okay.

23          MR. TABACHNIK:  Yes.

24          THE COURT:  In the proceeds, which means that

25     there needs to be some way to trace the collateral.

1           MR. TABACHNIK:  Yeah, but there's some -- yeah.

2    To some extent, though, the real property and the assets may

3    not necessarily -- it -- I don't know that 363 supplants the

4    local state statute in this regard.

5           THE COURT:  I have a feeling it does.

6           MR. TABACHNIK:  Okay.  I will take your word for

7    that.

8           THE COURT:  Texas has not yet seceded.

9           MR. TABACHNIK:  Yeah.  That's an issue.

10          THE COURT:  Well, they did once, but they

11   regretted it.

12          MR. TABACHNIK:  Yes, Your Honor.

13          THE COURT:  Okay.  All right.

14          MR. TABACHNIK:  Thank you, Your Honor.

15          MR. SINGH:  Your Honor, I'm only rising just

16   because when we do have two sale motions, the de minimums

17   asset procedures and the GOBs.

18          THE COURT:  Right.

19          MR. SINGH:  We do have the appropriate taxing

20   language.

21          THE COURT:  Okay.

22          MR. SINGH:  This is just procedure, so, you know,

23   that's why we don't have it.

24          THE COURT:  Okay.  All right.

25          MR. DILLMAN:  Your Honor, again, Ted Dillman of

Page 70

1    Latham & Watkins on behalf of Simon Property Group.  I'll be

2    very brief.  I think you went to the heart of our concern,

3    which was really about knowing what's up for sale when.

4                THE COURT:  Okay.

5                MR. DILLMAN:  So just one very minor point that I

6    would like to ask.  We take certainly the, you know, Mr.

7    Shock and the Weil team at their word that they're going to

8    be transparent in the process, but as we stand here today,

9    we actually don't know which stores are in the 505 stores.

10   And, you know, Simon and a number of other landlords -- we

11   put this in our papers -- are, of course, interested and

12   natural purchases -- potential purchase of properties that

13   are associated with their malls.

14               THE COURT:  Right.

15               MR. DILLMAN:  And so as we stand here today, we

16   actually don't know whether or not our -- the stores we are

17   interested in are part of the 505 or not.  And so we'd just

18   ask that that process letter include which stores they are

19   selling.

20               MR. SHROCK:  That would be a good idea.  We have

21   to tell people what we're selling.

22               MR. DILLMAN:  Okay.

23               MR. SHROCK:  We agree.

24               THE COURT:  Okay.  Very well.

25               MR. DILLMAN:  I'll sit down.  Thank you, Your

Page 71

1    Honor.

2          THE COURT:  I mean, actually, before you sit down,

3    I do want to say this.  Simon's one of them.  There are

4    players in this case that are wearing more than one hat, so

5    they and the Debtors need to be careful in what they share

6    with each other.

7          You know, you mentioned transparency, and that's

8    all well and good, but if the Debtors are dealing with Simon

9    as a prospective bidder, they're obviously not going to be

10   sharing other things with Simon, or they're going to want to

11   make sure that the people from Simon that are getting

12   reports sort of overall strategy or GOB alternatives are

13   walled off.

14         MR. DILLMAN:  Your Honor, that's clearly

15   understood.  And actually, I'm standing here for Simon.

16   Simon is a committee member, but the committee discussions

17   are really not being had with our involvement.

18         THE COURT:  Okay.

19         MR. DILLMAN:  We're very mindful of the various

20   roles that we have here in not crossing those lines.  We've

21   discussed this with Akin, and I know Ron Tucker, who is the

22   (indiscernible) committee member is here, has been on many

23   committees, and is very mindful of the need to step off and

24   recuse himself whenever --

25         THE COURT:  I'm sure Simon has been through this

1     drill before.

2              MR. DILLMAN:  -- whenever that becomes appropriate

3     or necessary.

4              THE COURT:  Okay.

5              MR. DILLMAN:  Thank you.

6              THE COURT:  Okay.

7              MR. SHROCK:  Your Honor, just to add to that, I

8     mean, we -- you know, Simon has already submitted, frankly,

9     an unsolicited JV offer for some properties.  They're not

10    completely overlapping, but we've talked with the committee,

11    and we are being very mindful of -- you know, on the real

12    estate front in particular -- that, you know, we're really

13    dealing with that primarily on a professional-eyes-only

14    basis.

15             THE COURT:  Okay.  Okay.  So I -- having reviewed

16    all the pleadings on this, and based on the record of

17    today's hearing -- will grant the Debtors' motion for

18    approval of global bidding procedures as well as the -- I'm

19    sorry -- enter those procedures with the proposed order

20    provided that it's revised to reflect the movements that

21    I've made today that have been laid out on the record.

22             MR. SHROCK:  Thank you very much, Your Honor.

23    We'll revise it accordingly.

24             THE COURT:  Okay.

25             MR. SHROCK:  Share it with relevant parties and

Page 73

1    then submit it.

2              The next item on the agenda is related to the

3    bidding procedures for the Sears Home Improvement business,

4    and I'll cede the podium to Ms. Marcus.

5              THE COURT:  Okay.

6              MS. MARCUS:  Good afternoon, Your Honor.

7    Jacqueline Marcus, Weil, Gotshal & Manges on behalf of Sears

8    Holdings Corporation and its affiliated Debtors.

9              As Mr. Shrock noted, number 2 on the agenda --

10   while number 2 on the agenda is related to number 3, which

11   is the substantive motion, number 2 is the Debtors' motion

12   for shortened notice with respect to their motion for

13   approval of bidding procedures --

14             THE COURT:  Right.

15             MS. MARCUS:  -- and related relief.

16             Under the amended case management order, Your

17   Honor, our calculation is that the SHIP motion was required

18   to be filed on Thursday, November 1st. Due to some final

19   negotiations with our stalking horse Service.com and delay

20   in finalizing a final form of asset purchase agreement, we

21   were unable to get the motion filed on that day and instead

22   filed it on the morning of Saturday, November 3rd, a little

23   after 9 a.m.

24             The Debtors submit that in light of the fact that

25   the instant motion seeks approval of procedures rather than

Page 74

1    the approval of any particular sale at this time, and due to

2    the urgency of proceeding with the SHIP sale before there is

3    further diminution in the value of the asset, the Court

4    should grant the order shortening time and allow u to move

5    forward with the SHIP motion.

6              THE COURT:  OKAY.  We might -- my -- some judges

7    do it differently.  They'll grant the order shortening time

8    when it's submitted ex parte.  My practice is to schedule

9    the hearing on it because things can happen in between then

10   and the hearing, and I think they did hear, including a

11   revision to the agreement, which was negotiated.  It seems

12   to me -- and no one has said to the contrary -- that there's

13   been sufficient notice for this motion.

14             MS. MARCUS:  Thank you, Your Honor.

15             THE COURT:  So I'll grant that motion to shorten.

16             MS. MARCUS:  Thank you.  Number (indiscernible) on

17   the agenda is the actual motion itself.  As noted in the

18   motion, the SHIP business is being treated separate and

19   apart from the global bidding procedures that Your Honor

20   just approved because the Debtors and their advisors

21   concluded that the SHIP -- the sale of the SHIP business --

22             THE COURT:  It's S-H-I-B?

23             MS. MARCUS:  S-H-I-P.

24             THE COURT:  P. S-H-I-P. Okay.  All right.

25             MS. MARCUS:  Hopefully that's what I've been

Page 75

1    saying.

2            They concluded that the sale had to occur on a

3    more expeditious basis due to the nature of the business and

4    the fact that the commencement of the Chapter 11 case was

5    already having a profound effect on the value of the

6    business.

7            In addition, the SHIP business was extensively

8    marketed over the past year, and the Debtors were confident

9    that most interested parties had already had a head start on

10   considering the acquisition of the business and doing

11   diligence in connection with it.

12           As noted on the agenda, the only remaining

13   objection to the motion is the objection filed by the United

14   States Trustee, and we believe that we have resolved that,

15   as Mr. Schwartzberg referenced earlier.

16           THE COURT:  That's on the privacy --

17           MS. MARCUS:  On the ombudsman.  Yes, Your Honor.

18           THE COURT:  Okay.

19           MS. MARCUS:  But for the record, I thought I'd

20   give a very brief summary of the terms of the stalking horse

21   agreement --

22           THE COURT:  Okay.

23           MS. MARCUS:  -- as well as run through some of the

24   changes to the proposed order.

25           Your Honor, under the stalk -- under the asset

1    purchase agreement, the stalking horse is Service.com.  The

2    cash purchase price is $60 million.  There will be an

3    assumption of liabilities, including the purchaser's payment

4    of cure costs on executory contracts and unexpired leases

5    that they identify for assumption up to a maximum $5

6    million.

7           The purchaser will also assume certain obligations

8    related to SHIP's employees up to a maximum of $2 million.

9           In the event that Service.com is not the

10   successful bidder after the auction and alternative

11   transaction closes, Service.com is entitled to be paid a

12   breakup fee equal to 1.5 percent of the cash purchase price,

13   or approximately $900,000.

14          The proposed timetable laid out in the bidding

15   procedures, Your Honor was large developed in light of the

16   purchaser's desire to close on the acquisition as soon as

17   possible to minimize damage to the value of the franchise,

18   and so that we could conduct the auction and have the sale

19   hearing before the holiday weeks of December 24th and

20   December 31, which we believe would be inconvenient for

21   potential bidders as well as the Court.

22          So if the Court grants the relief requested in the

23   motion today, competing bids would be due on December 11th

24   or approximately three and a half weeks after entry of the

25   order.  An auction, if required, would take place on

Page 77

1    December 13th, and the sale hearing to consider the approval

2    of the sale, whether to the stalking horse bidder or to

3    another bidder, would take place on December 18th, 2018.

4              There were other responses filed with respect to

5    the motion.  There were several reservations of rights.  I

6    don't believe I need to address those here.  I know your

7    views on reservations of rights, so we can just move on.

8              After we filed the motion, the Debtor received

9    comments to the asset purchase agreement, the bidding

10   procedures, and the bidding procedures order from counsel to

11   the creditor's committee, and counsel to the DIP ABL agents

12   and the pre-petition ABL agents.  As a result of discussions

13   and negotiation among those parties and the purchase,

14   attached to Exhibits A and B respectively to the Debtors'

15   response are clean and blacklined copies of the revised

16   bidding procedures order, including the bidding procedures

17   that are attached there too.

18             There are a lot of people here, and there are no

19   objections.  I'm happy to walk through the changes if you'd

20   like me to, but I'm also happy to skip it in the interest of

21   time.

22             THE COURT:  Okay.  Well, I -- I -- there's one --

23   the one point I wanted to raise -- it seemed to me that at

24   one part of the revised documents, it was recognized that

25   there should be a different deadline for contract parties on

Page 78

1    adequate assurance and for cure if they weren't previously

2    designated as being assumed and assigned in the event that

3    someone else won the auction.  I don't think that comes

4    thorium in the schedule of important dates and deadlines

5    that's in the order.

6                    MS. MARCUS:  We can clarify that.

7                    THE COURT:  Yeah.  I think it should be -- in each

8    place where there's the deadline, you should maybe at least

9    have a footnote that says that, you know, it's the later

10   deadline if either a -- I'm sorry.  It's the later deadline

11   for adequate assurance if someone other than stalking horse

12   wins the auction, and it's the later deadline for cure and

13   adequate assurance if a contract is designated that had not

14   previously been designated.

15                   MS. MARCUS:  Thanks, Your Honor.  We will -- we

16   will definitely take care of that.

17                   THE COURT:  Okay.

18                   MS. MARCUS:  I can't imagine anybody would object

19   to that.

20                   THE COURT:  Okay.

21                   MS. MARCUS:  And that was to take into account the

22   fact that there is time to, as you said, additional

23   contracts, and a successful bidder might choose a different

24   --

25                   THE COURT:  Right.

1          MS. MARCUS:  -- group of contracts.

2          THE COURT:  Right.  So does anyone have anything

3     further to say on this motion?

4          MR. DEGROFF:  Your Honor, just for the record, Ira

5     Dizengoff, Akin Gump Strauss Hauer & Feld LLP, post-counsel

6     with the committee.  we are okay with this motion.

7          THE COURT:  Okay.

8          MR. DIZENGOFF:  Just wanted you to know.

9          THE COURT:  As somewhat modifying it --

10         MR. DIZENGOFF:  Correct.

11         THE COURT:  -- in light of the discussions.  So I

12    will grant the motion like the last one.  It lays out

13    procedures that, in light of the Debtors' particular

14    circumstances are designed to maximize the value of this

15    asset in a reasonable sale process.  And also provide for

16    sufficient notice to parties of interest who are directly

17    affected by the process, including lienholders and contract

18    parties.

19         MS. MARCUS:  Thank you, Your Honor.

20         THE COURT:  Okay.

21         MS. MARCUS:  The next item, Your Honor, on the

22    agenda, again you have number 4 and number 5.  Number 4 is a

23    motion to shorten notice with respect to the Debtors'

24    emergency motion for an order approving the sale of

25    medium-term notes, also known as MTNs, and that's ECF number

Page 80

1    643.

2              There's no question, Your Honor, that this motion

3    requested unusual relief.  At the time it was filed, we were

4    asking the Court to schedule a hearing on four calendar

5    days' notice due to an incoming ISDA action of the debt of

6    Sears Roebuck Acceptance Corporation, which we refer to as

7    SRAC, that had been scheduled for November 14th.

8              Shortly after we filed the motion to shorten time,

9    we learned that the ISDA auction had actually been postponed

10   to a date, and I'll put it in quotes "no earlier than

11   November 26th." As a result, and in light of the fact that

12   we already had an omnibus hearing scheduled for today, we

13   notified the Court and filed a notice of adjournment,

14   postponing our requested hearing today.

15             One objection has been filed to the motion for an

16   order shortening time, and that is the objection of Cyrus

17   Capital Partners as ECF number 722, which is to both the

18   order shortening notice and the substantive motion.

19             Cyrus contends that the order shortening notice

20   should be denied because there's no longer any urgency to

21   proceeding apace given that the CDS auction has been posted.

22             But Cyrus ignores the following important facts.

23   As of now, no one knows exactly when the ISDA auction will

24   take place, and if the Debtors are going to maximize the

25   value of the MTNs, they have to run a sale process and close

Page 81

1    a sale transaction before the ISDA auction, all of which

2    takes time, especially given the upcoming holiday week.

3            Cyrus claims, and I quote, "The sale motion does

4    not provide sufficient information to property evaluate the

5    relief of the Debtors seek." That's in their objection on

6    page 3.  If Cyrus had sufficient time to file an 11-page

7    objection to the emotion and the 6.5-page single-spaced

8    submission to the ISDA determinations committee, setting

9    forth a litany of reasons why they contend the MTN should

10   not be included on the final list of oblations eligible to

11   participate in the ISDA auction.

12           Moreover, in its challenge to the ISDA

13   determinations committee's inclusion of the MTNs on the

14   supplemental list of eligible securities, Cyrus alluded to

15   the absence of court approval of the sale as a reason that

16   ISDA should reverse its decision regarding the MTNs.

17           Notably, both the creditor's committee and the DIP

18   ABL agents and the pre-petition ABL agents support the

19   relief requested in the substantive motion and in the motion

20   for the order shortening time.  Given the forgoing, the

21   Debtors request that the Court grant the order shortening

22   time and consider the motion today.

23           THE COURT:  Okay.  Is the counsel for Cyrus here?

24           MR. KRELLER:  I am, Your Honor.

25           THE COURT:  Okay.

1          MR. KRELLER:  Good afternoon, Your Honor.  Thomas

2    Keller of Milbank, Tweed, Hadley & McCloy appearing on

3    behalf of Cyrus Capital Partners, LP.

4          THE COURT:  Afternoon.

5          MR. KRELLER:  Your Honor, just for context, Cyrus

6    Capital is a significant creditor holding claims across the

7    capital structure of Sears against many -- against a large

8    number of the Debtors, several hundreds of millions of

9    dollars' worth of claims in terms of both direct secured and

10   unsecured claims and guaranteed claims as well.

11         THE COURT:  Okay.

12         MR. KRELLER:  And, Your Honor, it is also -- in

13   the nature of full disclosure, Cyrus Capital is also a

14   participant in the CDS market on the Sears CDS agreements.

15         THE COURT:  Okay.

16         MR. KRELLER:  Your Honor, on the -- on shortening

17   time, and I'm happy to -- I'm happy to talk about both

18   motions, but I'll start with the shortened time motion.

19         Your Honor, as counsel for the Debtor has

20   indicated, the auction has now been pushed to no earlier

21   than November 26th.  I would still submit, Your Honor, that

22   the notice that was given, a motion that was filed on a

23   Friday night ahead of a Monday holiday weekend, we're really

24   standing here with two business days' notice of that -- of

25   that motion.  And frankly, the notion that we could file a

Page 83

1    brief in the time that we did is just function of people

2    working around the clock, not the adequacy of the notice.

3              I think, Your Honor, I think there's also

4    questions here about whether --

5              THE COURT:  Well, but on the timing point -- hold

6    on.  They could have the auction on the 26th, and I think my

7    next day in this case is the 27th, so that wouldn't work

8    unless they're able to have the auction subject to court

9    approval, which I don't know if that's been explored.  I

10   would assume -- I would assume not because people want to

11   know what they're buying.

12             MS. MARCUS:  That's exactly right, Your Honor.

13   We've been told that that wouldn't work.

14             MR. KRELLER:  Your Honor, my response to that is I

15   understand the -- I understand how the calendar works on

16   that.

17             THE COURT:  Right.

18             MR. KRELLER:  What I would say is there are

19   complexities to this transaction, which we set forth in our

20   objection.

21             THE COURT:  Well, let's go into those.  I just --

22   I think it's -- the real issue, to me, is whether I should

23   authorize it today or not at all because I just -- it seems

24   to me that we won't know a whole lot more about -- even if I

25   were able to schedule a hearing, you know, next Monday or

Page 84

1   Tuesday, you know, two or three business days from now, it's

2   probably the same issues that you raised. And it wouldn't

3   make sense to schedule a hearing after that because it could

4   be preempted by the auction.

5           And as I read the papers, the Debtors basically

6   have to have their own auction before the auction.  I mean,

7   they have to have their proposed broker decide who they're

8   -- who they're going to sell it to.

9           MR. KRELLER:  Your Honor, I think in terms of -- I

10  think you've accurately articulated the sequence of events,

11  and so I'm happy to jump into the heart of the transaction.

12          THE COURT:  Okay.

13          MR. KRELLER:  Frankly, to the extent I can

14  because, Your Honor, if you look at the motion -- well,

15  actually, let me step back, Your Honor.  I'm going to gather

16  from your comments that you -- you've had an opportunity to

17  read our objection.

18          THE COURT:  Yes.

19          MR. KRELLER:  So, Your Honor, the concerns about

20  the underlying transaction really don't come through in the

21  motion because the motion contains so little information

22  about the basics of this transaction.  And I think that the

23  way to attack this is not to look to the motion because the

24  muton doesn't really say much of anything, and ask ourselves

25  some fundamental questions about what's going on here, about

1    the magnitude and the complexity of these inter-company

2    claims, about who are the sellers?  We don't even know who

3    the sellers of the MTNs, Your Honor, are.

4            There's a -- there's a motion that's filed with --

5    by the collective Debtors, but it doesn't say who the

6    Debtors are who are seeking to sell these, and it also

7    doesn't say anything about the position of SRAC, which

8    itself is a Debtor, which is the obligor under the MTNs.

9            And, Your Honor, that estate is keenly -- or ought

10   to be keenly -- interested in what happens here because when

11   you think about these claims, Your Honor, we don't know what

12   they are.  There are no schedules on file.  It's very early

13   in the case.  They're simply intercompany notes that were

14   issued.  That's what the motion tells us.  They were issued

15   by SRAC, to whom we don't know.  Some Debtors, unidentified,

16   and Sears Re, which is a non-Debtor entity which apparently

17   hold about a billion four face amounts of the MTNs.

18           We don't know -- so we don't know which Debtors

19   hold these notes.  We don't know what they were issued for.

20   We don't know what SRAC received in exchange.  We don't know

21   anything about the validity, the priority, the magnitude of

22   these claims, and we don't know anything about what SRAC --

23           THE COURT:  Well, it -- when you say -- I don't --

24   they're unsecured notes, right?

25           MR. KRELLER:  They're unsecured intercompany

1    notes, Your Honor.

2              THE COURT:  Right.

3              MR. KRELLER:  And in --

4              THE COURT:  So, I mean, doesn't that say what the

5    priority is?  They're unsecured notes.  Let me ask it

6    differently.  What other debt does SRAC have?  I'm not --

7    I'm looking over your shoulder at the Debtors.  I mean, it

8    -- does it -- is it obligated on all the secured debt?

9              MS. MARCUS:  Yes, Your Honor.  Yes, it is.

10             THE COURT:  And what -- what type of business does

11   it have?  I mean, is it -- is it a -- is it a business with

12   material assets?

13             MS. MARCUS:  Your Honor, it was a financing arm of

14   the Sears -- the broader Sears company.

15             THE COURT:  Right.  Is it owed money then by other

16   Sears entities?

17             MS. MARCUS:  It may actually be owed money, but I

18   think --

19             THE COURT:  But that would be unsecured too,

20   right?

21             MS. MARCUS:  Yes.  Your Honor, I think that these

22   issues are all real obfuscating, and I'm --

23             THE COURT:  Well, I'm just -- I'm just trying to

24   -- I mean, I just want to make sure I understand the facts.

25   I mean, if SRAC had -- you know, if SRAC owned the 505

Page 87

1    stores, for example, I would -- I guess I would understand

2    why there might be hesitancy to sell off claims that other

3    Debtor entities might have against it under these notes

4    because maybe they would be recovering a meaningful amount

5    from SRAC.

6          On the other hand, if SRAC really doesn't have

7    assets other than unsecured claims against the other Debtors

8    that are behind the secured debt, and the Unsecured

9    Creditor's Committee is in favor of this, it would seem to

10   me that, you know, that's a different way to analyze it,

11   which is maybe it's not that big a deal.

12         MS. MARCUS:  I think that's right, Your Honor.

13   The Debtors believe that the value to be received as a

14   result of the sale of the medium-term notes before the

15   auction is in excess of what their place in the capital

16   structure would otherwise warrant.  And the creditor's

17   committee, as you noted, is on board with the proposed

18   transaction.

19         THE COURT:  Okay.  And the notes are -- I mean,

20   the notes are -- there are -- they're on paper, right?

21   They're not claims.  It's a note that says --

22         MS. MARCUS:  They're --

23         THE COURT:  -- X million is owed to Sears Company

24   X for -- by SRAC.

25         MS. MARCUS:  They are notes issued pursuant to an

Page 88

1    indenture, and I think Mr. Gadsden is standing up because he

2    represents the indenture (indiscernible).

3            THE COURT:  Right, and I read that pleading also.

4    We've got to turn to that before we finish with this motion,

5    but I guess I'm not -- I mean, it's an overused phrase, but,

6    I mean, these notes are what they are, and that's what

7    people who buy them know.  You'd better come over to the

8    microphone, though, Mr. Gadsden.

9            MR. GADSDEN:  James Gadsden, Carter Ledyard &

10   Milburn LLP of the attorneys for the Bank of New York Mellon

11   Trust Company, N.A. as indenture trustee.

12           THE COURT:  Right.

13           MR. GADSDEN:  So the Bank of New York Mellon is

14   the trustee for the SRAC indenture.

15           THE COURT:  Right.

16           MR. GADSDEN:  One unique feature about this

17   indenture is Section 6.8, which is quoted in our papers,

18   which says that so long as these notes are held by an

19   affiliate, they're entitled to no distribution under the

20   remedies article of the indenture.

21           THE COURT:  Right.

22           MR. GADSDEN:  So I just -- because we're talking

23   about what are they.  I think that's an important feature to

24   --

25           THE COURT:  No, that was clear from your pleading,

1    and then there was the other point about the alleged typo.

2            MR. GADSDEN:  Yes, Your Honor.

3            THE COURT:  So I do want to turn to that before

4    we're done, but -- although that point may be worth raising

5    now.  I think the analysis that the Debtors and the

6    committee have made is that the sale of these notes now is

7    going to result in a higher recovery than if they're just

8    left where they are.  And that may, though, adversely affect

9    SRAC, including -- based on the point that Mr. Gadsden for

10   the indenture trustee just raised.  On the other hand, you

11   know, as King Lear said, nothing from nothing is nothing.

12   And if you don't -- you know, if there's so much debt ahead

13   of them at SRAC, it doesn't really matter whether they

14   become obligations that SRAC actually has to pay out on or

15   not.

16           MR. KRELLER:  Your Honor, I guess a couple of

17   responses to that.  One, there's absolutely no evidence to

18   suggest that there is no recovery to the unsecured claimants

19   at SRAC, including those that would sit pari with the

20   intercompany MTN notes.  You have thong to base that

21   conclusion on, Your Honor.

22           THE COURT:  Well, I mean --

23           MR. KRELLER:  There's not -- there's nothing in

24   the record.

25           THE COURT:  I just asked.  I just asked.  I'm told

Page 90

1    that SRAC is just a financing arm that finances unsecured

2    debt to the other -- to the other Debtors.

3             MR. KRELLER:  Your Honor, no.  There is out --

4    there are third parties like Cyrus who own other SRAC notes.

5    There's about $75 million of --

6             THE COURT:  No --

7             MR. KRELLER:  -- retail holders of SRAC notes.

8             THE COURT:  No, but those are the creditors.  I'm

9    talking about the asset side of the balance sheet of SRAC.

10            MR. KRELLER:  I understand, Your Honor, but I

11   think you actually have to -- I think you have to think

12   about the claims side of it because what happens here --

13            THE COURT:  Or you're going to be diluted.  I get

14   that.

15            MR. KRELLER:  We're going to be -- we're going to

16   be diluted by $2.4 billion worth of --

17            THE COURT:  But again, if it's -- if --

18            MR. KRELLER:  -- SRAC note claims, Your Honor.

19            THE COURT:  If you're not going to get anything

20   anyway, then what -- does it matter?

21            MR. KRELLER:  If that is true, yes, but that's a

22   supposition that there is no value of SRAC.

23            THE COURT:  Well, do you have anything -- well,

24   you've lent -- or your clients have lent hundreds of

25   millions of dollars to this company.  Do you have anything

Page 91

1    to tell me about what it has besides intercompany claims on

2    an unsecured basis?

3            MR. KRELLER:  Your Honor, I don't know the answer

4    to that.  That's why --

5            THE COURT:  They didn't do their due diligence

6    when they were making their investment in SRAC notes?

7            MR. KRELLER:  Your Honor -- Your Honor, I'm

8    standing here as the lawyer for the client who received this

9    motion a few days ago.

10           THE COURT:  Well, I'm sure the client instructed

11    you to object for a reason.  If there's a reason -- if they

12    have an asset, I understand the point.  If they have a real

13    asset that's not collateral -- are the notes themselves

14    collateral, by the way?  I mean, does the lender -- secured

15    lender group have a lien on these notes?

16           MS. MARCUS:  Only pursuant to the DIP financing,

17    Your Honor.  So they were what we call previously

18    unencumbered assets under the DIP facility, which is why the

19    proceeds of these notes will be used to fund the wind down

20    account.

21           THE COURT:  All right.

22           MS. MARCUS:  Your Honor, perhaps a better way to

23    proceed -- I have a proffer that I can offer that may answer

24    some of the questions, and if I may offer the proffer --

25           THE COURT:  Okay.

1           MS. MARCUS:  -- that might help.

2           THE COURT:  Is it someone's proffer who's here?

3           MS. MARCUS:  Yes, it is, Your Honor.

4           THE COURT:  Okay.  All right.

5           MR. KRELLER:  Your Honor -- Your Honor, this is --

6    this is precisely why, actually, the -- having the hearing

7    on this timing doesn't make sense.  If we're going to do

8    this as an evidentiary matter --

9           THE COURT:  If it's --

10          MR. KRELLER:  -- it really ought to happen next

11   week.

12          THE COURT:  I --

13          MR. KRELLER:  This is --

14          THE COURT:  All right.  We will, and your client

15   will have to come here and tell me why it thinks that it's

16   going to be diluted.  I want to know.  I don't want you to

17   just to lob something at and tell me sort of sotto voce, and

18   we're participants in the CDS market, which I think may be

19   the reason they're objecting.

20          MR. KRELLER:  Your Honor --

21          THE COURT:  By the way, they should no longer

22   interfere with the Debtor's right to sell these notes

23   without running risk of violating the automatic stay.

24          MR. KRELLER:  Your Honor --

25          THE COURT:  Enough.  I'm going to have the hearing

1   the day before Thanksgiving.  Mark it off.  It'll be in the

2   afternoon.  You're done.

3            MR. KRELLER:  Thank you.  Thank you, Your Honor.

4            THE COURT:  You're done.  But I'm going to take it

5   quite seriously at that point.

6            MR. KRELLER:  Thank you, Your Honor.

7            THE COURT:  There can be inquiry into your

8   client's motives on this too.

9            MR. KRELLER:  Your Honor, I'm -- I will be -- I'm

10  certainly prepared to deal with that now.

11           THE COURT:  Good.

12           MR. KRELLER:  I'll be prepared to deal with it

13  then.

14           THE COURT:  Good.

15           take:  I would like to know who's speaking on

16  behalf of the SRAC estate --

17           THE COURT:  Yeah, that's fair.

18           MR. KRELLER:  -- when we do that.

19           THE COURT:  Who's proffer was you going to be

20  making, Ms. Marcus?

21           MS. MARCUS:  Your Honor, it was the proffer of

22  Colin Adams from M-III --

23           THE COURT:  Okay.

24           MS. MARCUS:  -- which is the company's financial

25  advisor.

Page 94

```
 1                  THE COURT:  Okay.

 2                  MR. KRELLER:  And --

 3                  THE COURT:  Very well.

 4                  MR. KRELLER:  Is there any -- Your Honor, I'm --

 5                  THE COURT:  Monday.  We'll have the hearing

 6      Monday.

 7                  MR. KRELLER:  I'm sorry.  Monday, not Wednesday.

 8                  THE COURT:  Monday afternoon.

 9                  MR. KRELLER:  Thank you, Your Honor.  And will

10      there be someone -- a representative of the SRAC estate who

11      would actually be taking a position on this?

12                  THE COURT:  He's the financial advisor for all the

13      Debtors.  He's going to talk about SRAC and what's in it.

14                  MR. KRELLER:  Your Honor, but there's -- the

15      fundamental issue is that these -- different Debtor estates

16      are --

17                  THE COURT:  He's talking about --

18                  MR. KRELLER:  -- diametrically opposed to each

19      other.

20                  THE COURT:  He's talking about -- he's going to

21      have to talk about what's in the SRAC estate.  He's going to

22      have to tell me that, what's in the SRAC estate.

23                  MR. KRELLER:  But --

24                  THE COURT:  I'm not going to put an examiner for

25      the SRAC estate --
```

1          MR. KRELLER:  I'm -- Your Honor --

2          THE COURT:  -- based on what I've heard.  And he's

3     the financial advisor for it.  He cannot favor --

4          MR. KRELLER:  He is, Your Honor.

5          THE COURT:  -- one Debtor over another.  We spent

6     too much time on this already given the fact that we're

7     going to have a trial on it on Monday.  All right?

8          MR. KRELLER:  Yes, Your Honor.

9          THE COURT:  You do not have to -- you do not have

10    the power to dictate what witness they put forward.

11         MR. KRELLER:  I'm not trying to do that, Your

12    Honor.  I --

13         THE COURT:  Well, you were in fact doing that.

14         MR. KRELLER:  I apologize.

15         THE COURT:  Yeah, absolutely you were trying to do

16    that.  You said, I want another witness.  And I'm not going

17    to let -- to require the Debtor to do that.  It's their

18    risk.

19         MR. KRELLER:  Thank you, Your Honor.

20         THE COURT:  All right.

21         MS. MARCUS:  Your Honor, if I --

22         THE COURT:  Confirm the date with Ms. -- the time

23    with Ms. Lee.

24         MS. MARCUS:  If I just may clarify two points for

25    everybody's benefit going forward.  The Debtors are not

Page 96

```
1    seeking authority to sell 2.3 billion of medium-term notes.

2    The 1.4 billion owned by Sears Re is not part of this.

3                 THE COURT:  Okay.

4                 MS. MARCUS:  They haven't been proffered to the --

5    to ISDA for sale, so that's off the table.

6                 And the second is the primary owners of the MTNs

7    are Sears Protection Company and Sears Protection Company

8    Florida, and we'll be prepared on Monday to talk about how

9    much each one of those entities owns, but they are both

10   Debtor entities.

11                THE COURT:  Okay.

12                MS. MARCUS:  Thank you.

13                THE COURT:  All right.  The indenture trustee also

14   asked me for some sort of ruling on the typo.  I don't think

15   -- I don't think it's necessary.  And even if it were

16   necessary, I wouldn't do it.  I'm just not -- it's too much

17   -- too much involved here to do that.

18                MS. MARCUS:  We agree, Your Honor.  That's not

19   necessary --

20                THE COURT:  Right.

21                MS. MARCUS:  -- from our point of view.

22                THE COURT:  Okay.  All right.

23                So we're dealing with the lease rejection

24   otherwise?

25                MR. SINGH:  Yes, Your Honor.  We're going to get
```

1   to the real estate motions, and our colleague Paloma Van

2   Groll is going to present the GOB motion.

3              THE COURT:  Okay.

4              MS. VAN GROLL:  Good afternoon, your -- good

5   afternoon, Your Honor.  Paloma Van Groll, Weil, Gotshal &

6   Manges for the Debtors.

7              THE COURT:  Good afternoon.

8              MS. VAN GROLL:  The next item on the agenda is the

9   GOB motion.  The order of approving the GOB motion on the

10  interim basis was entered on October 26th at ECF number 337.

11  We have a redline of proposed changes from the interim order

12  here if Your Honor would like a copy.

13             THE COURT:  Yeah, if you could hand it --

14             MS. VAN GROLL:  May I approach?

15             THE COURT:  Please.  Thank you.

16             MS. VAN GROLL:  Since the entry of the interim

17  order, we've received only four objections to the motion,

18  three from certain taxing authorities and one from the

19  landlord, Simon Properties, along with informal comments

20  from the UCC.

21             We believe all the objections are resolved.  We

22  cleaned up the master lease language in Paragraph 26 to

23  address Simon's objection, which is not a substantive

24  change.  To address the three objections from the taxing

25  authorities, we added a new paragraph, 23, which provides

1    that the Debtors will either pay tax claims directly from

2    the proceeds of store closing sales or fund a segregated

3    account from the proceeds as adequate protection for their

4    liens.

5              THE COURT:  Okay.  Is --

6              MS. VAN GROLL:  The DIP --

7              THE COURT:  Mr. Tabachnik, is this -- I mean, this

8    language is okay with you, right?

9              MR. TABACHNIK:  Yeah.  We actually, you know, the

10   one good thing that came -- should I come to the mic?

11             THE COURT:  I think you can be heard.  It's fine.

12             MR. TABACHNIK:  The one good thing that came from

13   the security delay this morning was that my staff had a

14   chance to look at the list.  We actually had language we

15   agreed upon, and then somebody decided that they wanted to

16   list all the taxing entities separately in a lengthy

17   footnote.  So that's the thing we've been going over.  Some

18   of them are missing, and we'll get them included.  And

19   subject to getting all of them properly included and listed

20   in that footnote, I think that the language is going to

21   work.

22             THE COURT:  But the language itself -- not the

23   footnote but the text of Paragraph 23 is okay.

24             MR. TABACHNIK:  Yes, Your Honor.

25             THE COURT:  Okay.  All right.

1          MS. VAN GROLL:  So subject to adding those other

2     entities in the footnote, we have confirmed signoff from all

3     of the taxing authorities that that language is sufficient,

4     and the DIP ABL and (indiscernible) also signed off on this

5     language.

6          THE COURT:  Okay.

7          MS. VAN GROLL:  So the only other changes are,

8     one, conforming changes to make the interim order a final

9     order and, two, upon the request of the UCC, we added

10    certain notice and information requirements for, one,

11    information about stores that the Debtors intend to close in

12    the future and, two, if the Debtors ever intend to give a

13    performance-based fee to a liquidation consultant.

14         THE COURT:  I'm sorry.  Say that again, that last

15    part.

16         MS. VAN GROLL:  The last part.  So the second --

17    we added in a notice requirement if the Debtors ever intend

18    --

19         THE COURT:  Oh, a notice requirement.

20         MS. VAN GROLL:  A notice requirement --

21         THE COURT:  Yes.

22         MS. VAN GROLL:  -- if we ever want to give a

23    performance-based fee to a liquidation consultant.

24         THE COURT:  Right, which was implicit anyway.

25         MS. VAN GROLL:  Exactly.

Page 100

```
1                THE COURT:  Okay.

2                MS. VAN GROLL:  So subject to any questions that

3      Your Honor may have, the Debtors respectful request entry of

4      the final order.

5                THE COURT:  Did you figure out what sundries was?

6                MAN 1:  Yes, Mr. (indiscernible).

7                THE COURT:  Maybe that was strategic.  I don't

8      know.

9                MAN 1:  It's basically -- it's basically his way

10     of saying anything else that's appropriately and reasonably

11     --

12               THE COURT:  All right.  but you have brakes on

13     that.

14               MAN 1:  Yes, absolutely.

15               THE COURT:  Okay.

16               MAN 1:  It has to be --

17               THE COURT:  All right.

18               MAN 1:  -- reasonable.  He has to preapprove them

19     with us.

20               THE COURT:  Okay.

21               MAN 1:  You know, and, you know, parties which

22     will get notice of it.

23               THE COURT:  Okay.  All right.

24               MAN 1:  Right.  Mr. Shock said it cannot be bought

25     at a bodega.
```

Page 101

1                    THE COURT:  Okay.

2                    MAN 1:  It's appropriate expenses, and we have

3     advanced mechanics to make sure.

4                    THE COURT:  Okay.  All right.

5                    Does anyone have anything further to say on this

6     motion?  This -- we obviously had an interim hearing on this

7     motion, but now's your chance if you want to say anything

8     further.

9                    Okay.  I will grant the motion on a final basis as

10    modified as laid out in the proposed order.

11                   MS. VAN GROLL:  Thank you, Your Honor.  I will now

12    cede the podium to my colleague, Candace Arthur.

13                   MS. ARTHUR:  Good afternoon, Your Honor.  For the

14    recode, Candace Arthur of Weil, Gotshal & Manges on behalf

15    of Sears Holdings Corporation and its affiliated Debtors.

16                   THE COURT:  Good afternoon.

17                   MS. ARTHUR:  The next item on the agenda is the

18    Debtors' motion seeking approval of lease rejection

19    procedures and abandonment procedures as well.  It was filed

20    October 15th and is reflected in the docket as ECF number

21    24.

22                   As the Court is aware, the Debtors commenced these

23    cases with approximately 1,800 leases in the real estate

24    portfolio.  The Debtors have already sought rejection of 234

25    unexpired leases.  And the procedures, which are nearly

Page 102

1    identical to those approved by this Court in recent retail

2    cases of Tops Market and A&P provide a streamlined approach

3    to efficiently allow the Debtors to shed some burden, some

4    leases, without having to file multiple -- on individual

5    motions.

6            The motion before the Court is uncontested.  The

7    two objections filed by landlords have been resolved as

8    reflected in the language included in the revised proposed

9    order.

10           Your Honor, we filed a reside proposed order

11    yesterday evening.  And to the extent you'd like a copy of

12    the redline, I'm happy to bring it up.

13           THE COURT:  Can you give that to me?  Thanks.

14    Thanks.

15           MS. ARTHUR:  The revised order is reflected on the

16    docket at ECF number 736.  With the Court's indulgence, I

17    can either go through the changes that are substantive or

18    just wait for any questions Your Honor may have in

19    connection with them.

20           THE COURT:  Now, these changes are consistent with

21    what I thought should be made, just to make it clear that

22    you were abandoning the property and the claims based on

23    rejection and non-lease-related post-rejection claims were

24    -- survived, which is consistent with the case law in this

25    district, including going back to In Re Ames Department

Page 103

1    Stores Inc., 306 B.R. 43 Bankruptcy S.D.N.Y 2004.  So does

2    anyone have anything further to say on this motion?

3           All right.  I will grant the motion given the size

4    of the Debtors' lease portfolio and the protections for both

5    the non-Debtor parties to those leases as well as other

6    constituents in the case.  This relief is in the best

7    interests of the Debtors, estates, and creditors.

8           MS. ARTHUR:  Thank you, Your Honor.

9           THE COURT:  Thanks.

10          MS. ARTHUR:  Your Honor, the next item on the

11   agenda is the Debtors' omniums motion to reject certain

12   unexpired leases and related sub-leases and abandoned

13   property in connection therewith.

14          THE COURT:  All right.

15          MS. ARTHUR:  The motion was filed on the petition

16   date and is reflected not eh docket at ECF number 25.  On

17   October 24th, the Debtors did file an amended schedule of

18   rejected leases where they removed five leases and added 22.

19   The amended schedule is on the docket at ECF number 290.

20          I think it's pertinent to provide some relevant

21   background in connection with the 234 stores that the

22   Debtors have designated for rejection.  The 234 stores are

23   not necessary for or beneficial to the Debtors' business.

24   As of petition date, nearly all of the stores were dark

25   stores, and others were in the process of being wound down

Page 104

1    to close.

2           The monthly lease costs, inclusive of rent, CAM,

3    and taxes for the 234 stores is $12.5 million a month.  So

4    it's -- you know, you know, the Debtors determine that there

5    are no current opportunities to assume and assign the

6    leases, and there's no meaningful value that would be

7    realized by any such transactions, so rejecting the leases

8    is a sound exercise of the Debtors' business judgment.

9           The only party that has filed a response in

10   connection with the Debtors' business judgment in rejecting

11   these leases is the recently appointed creditor's committee.

12   The committee's reservation of rights statement is reflected

13   on the docket at ECF number 662.

14          And as an update -- and I'm sure that counsel for

15   the committee can also speak to this as well -- the Debtors

16   have worked with the committee in connection with responding

17   to their information request that they received on Sunday,

18   and we've been informed that they've been satisfied with

19   respect to 227 of the leases, and there's about seven that

20   they're still reviewing and looking into.

21          So to that extent, we would -- we would move to

22   adjourn the motion with respect to the seven leases, and

23   give the committee an additional seven days so that they can

24   also get as comfortable with them as they received -- as

25   they were with the other ones.

Page 105

1                    THE COURT:  Okay.  Is that --

2                    MAN 2:  That's fine.

3                    THE COURT:  Okay.  Very well.

4                    MAN 2:  Thank you.

5                    THE COURT:  Let me ask you though, the 20 or so

6      that were recently designated, are you looking for approval

7      today on those, or are you going to give the landlords

8      notice but ask for retroactive relief too, the date that you

9      designated them.

10                    MS. ARTHUR:  We would ask for retroactive relief.

11     We gave -- we provided them notice on October 24th, and we

12     do think that they --

13                    THE COURT:  Oh, it was -- it was that long ago.

14                    MS. ARTHUR:  It was, Your Honor.

15                    THE COURT:  For some reason, I thought you just

16     did it the other day.

17                    MS. ARTHUR:  No, we didn't.

18                    THE COURT:  Oh, okay.  All right.

19                    MS. ARTHUR:  So, Your Honor in connection with the

20     motion, there were five objections that were filed by

21     landlords.  None of them were with respect to the Debtors'

22     ability to reject the leases.  It was only solely as to the

23     rejection date.  The Debtors have been able to resolve three

24     of the objections, so we're only going to move forward with

25     two today.

1              As to the resolutions between the Debtors and

2      Maserich Company, Heidenberg Properties, Centennial Real

3      Estate Management LLC, Woodbury Corporation, Rockaway Realty

4      Associates LP, and NW Duluth.

5              The parties have agreed to the rejection date of

6      October 15th.  The Debtors will execute a memorandum of

7      lease termination as it relates to the Rockaway Realty

8      lease.  The Debtors will turn over any subtenant payments

9      that they may have received and have not yet furnished from

10     November 1st forward to the extent that it's applicable.

11     And the -- also recent agreement with respect to October

12     rent for those parties.

13             The parties intend to enter into a signed letter

14     agreement memorializing the terms.  The Debtors have

15     discussed with the creditor's committee as well the terms,

16     and once the -- once the -- once the arrangement has been

17     memorialized, we'll share the letters with the creditors'

18     committee in connection with this as well

19             So, Your Honor, this brings me to the pending

20     objections.  The Debtors filed a reply yesterday, and I

21     apologize for its tardiness.  It's ECF number 715 on the

22     docket.  Each objection, as I noted, contests the proposed

23     the rejection date, and so I'll take the objections in turn.

24             Your Honor, U.S. Realty 86 Associates filed an

25     objection, and their objection is reflected on the docket at

Page 107

1        ECF number 556.  The landlord contends that the rejection

2        date cannot be before the Debtor surrenders possession, and

3        we agree.

4               The Debtors commenced all closing procedures at

5        this location and estimate that the rejection date will be

6        November 30th, as we indicated in the amended schedule.

7               The proposed order -- Your Honor, you will note --

8        provides that rejection is only effective as of the date the

9        Debtors surrounded possession.  The landlord also objected

10       to the Debtors' ability to abandon any property, and their

11       position is that the Debtor's rejection cannot be before any

12       personal property is removed.  The Debtors have a statutory

13       right of abandonment.  This Court and others in this

14       district have granted such relief.  And the landlord has not

15       presented any facts as to why the Debtor should be precluded

16       in this instance.

17              So for those reasons, as well as those stated in

18       the reply in the motion, the Debtors believe that the

19       objection should be overruled.  I'm not sure if Counsel is

20       present today in the courtroom, but I'm happy to cede the

21       podium to him at this time.

22              THE COURT:  Okay.  On the first point then, the

23       Debtors -- I'm sorry.  Is the -- is the sale still going

24       forth in -- it's ongoing at this property?

25              MS. ARTHUR:  Yes, Your Honor.

1          THE COURT:  So the award will simply say the date

2     the Debtors deliver possession.

3          MS. ARTHUR:  Yes, Your Honor.

4          THE COURT:  And at that point, obviously the

5     landlord is free to say, "Well, you didn't really deliver it

6     on that date," and in all likelihood, you'll work out an

7     agreement on the date like you did with the other four.  But

8     if not, you'll -- the parties can come in front of me, and

9     I'll decide under the case law that's applicable whether --

10    which party's right on which date.

11         MS. ARTHUR:  Yes, Your Honor.

12         THE COURT:  Okay.

13         MS. ARTHUR:  We've articulated the same to the --

14    to Counsel, and that's exactly how we plan to proceed.

15         THE COURT:  Okay.  So I have -- I've reviewed U.S.

16    Realty 86 Associates objection, but time happy to hear from

17    its counsel.

18         All right.  Well, it seems to me that the first

19    issue raised by U.S. Realty has been clarified on the record

20    as well as in the proposed order.

21         As to the second issue, it really hasn't given any

22    authority for the proposition.  The Debtors' right to

23    abandon property is somehow constrained or somehow limits

24    the ability to reject a lease under Section 365 of the

25    Bankruptcy Code, and the case law in this district is to the

Page 109

1    contrary against the In Re Ames Department Stores Inc. 306

2    BR 43, starting at page 50 and going through page 53,

3    Bankruptcy S.D.N.Y. 2004 in a typically comprehensive

4    opinion by Judge Gerber.  He's really covered the issue.  I

5    don't think I need to supplement that.

6              As he notes, there is an exception.  If the -- if

7    the property is toxic or somehow is, you know, creating a

8    tort or some sort of injury, there may be a limitation on

9    that.  But none of that is alleged, and it's hard to believe

10   that this would be the only Sears store in the country that

11   has those -- it has those facts that would pertain to it.

12   So I'm going to overrule the objection.

13             MS. ARTHUR:  Thank you, Your Honor.

14             The only remaining objection is that of Wc

15   Independence Center LLC.  Their objection is reflected in

16   the docket at ECF number 525.  Your Honor, the landlord is

17   seeking to tie the rejection date not to when the Debtors

18   have vacated and surrendered the premises but when a

19   third-party licensee, Spirit Halloween, vacates.

20             So by way of background, Your Honor, with this

21   particular lease and the situation before the Court, the

22   Debtors publicly announced it was ceasing operations and

23   shuttering this location on May 14th, 2017.  The Debtors

24   commenced a three-month door-closing process and the store

25   went dark on July 30th, 2017.  So for about a year and a

Page 110

1   half, the Debtors had been paying their rent and performing

2   under the lease as they're required to.

3          So on the petition date, the Debtor served the

4   landlord a surrender letter, which included key access codes

5   and noted for the landlord that they may enter and re-let

6   the premises.  The landlord was also served notice of the

7   motion on the 15th.  The Debtors timely paid October rent

8   for the full month, even though they are seeking to reject

9   as of October 15th, and the landlord received such amounts.

10         The landlord is now asking for an additional nine

11  days of November on account of the sub-tenant remaining in

12  the premises for an -- for those -- for that additional

13  period.  The Debtors don't believe that Section 365 nor

14  Section 503 supports the landlord's position.  Your Honor,

15  the landlord made no attempts to remove the tenant between

16  the 15th and the 9th.  And the Debtors believe that the

17  objection is an attempt to extract post-potion,

18  post-rejection amounts that should not be permitted.

19         This Court has held numerous times that the

20  appropriate rejection date is a date in which the Debtors

21  surrender passion and tell the landlord it can come in and

22  re-let the premises, and that's what happened here in this

23  instance.

24         The Court has also noted that post -- that

25  post-rejection it is the landlord's burden to evict a

Page 111

1    sub-tenant that may be remaining on the premises.  The

2    Debtors believe that that Court should hold, as it has

3    previously, that the rejection date should be the date of

4    surrender, which is October 15th.

5            THE COURT:  Okay.  Is anyone here on behalf of Wc

6    Independence?

7            MR. BUTLER:  Your Honor, this is Lynn Butler.  I'm

8    not the line.  I apologize.  Travel difficulties have

9    prevented me from being there live.

10           THE COURT:  No problem.  That's fine.

11           MR. BUTLER:  I represent -- I'm sorry?

12           THE COURT:  I said no problem.  That's fine.

13   You're -- I hear you loud and clear.

14           MR. BUTLER:  Thank you, Your Honor.  I represent

15   Wc Independence Center.  Again, Lynn Butler with Husch

16   Blackwell in Austin, Texas.

17           Our position -- actually, the resolution that was

18   put on the record with the prior objection, the way I see

19   this is we have a dispute as to when the premises were

20   surrendered, which with the new -- the new version of the

21   order in which the administrative claim restriction has been

22   stricken from the order -- my suggestion would be we will at

23   the appropriate time file a request for administrative

24   expense in which we may choose to add that nine days of

25   November in which the premises were not available to us. And

Page 112

1    at that point in time, if the landlord and the Debtors can't

2    reach a resolution, we can have an evidentiary hearing on

3    it.

4            Our position is the Halloween store that existed

5    in the location was there through an agreement with the

6    Debtors, an agreement that was permitted under the lease.

7    And I have a funny feeling if we evicted the Halloween store

8    on October 16th, the Debtors may have had us in front of you

9    for stay violations at that point.

10           But I think the procedure that I'm recommending is

11   probably the most efficient way to get this resolved.

12           THE COURT:  Okay.  I think that's right.  I don't

13   -- I'm certainly not able to resolve it all -- I don't know

14   all the facts.  I mean, it's odd to be asking for rent from

15   a Halloween store for November, but -- it -- you're -- are

16   you turning over the sub-tenant's rent from the 15th?

17           MS. ARTHUR:  We were only paid rent as of October

18   1st, to the extent that anything came in subsequently, we

19   would be happy to do so.

20           THE COURT:  Okay.

21           MS. ARTHUR:  We're not -- obviously not intending

22   to keep it.

23           THE COURT:  All right.  So I'll grant the motion

24   insofar as it seeks rejection and under the current

25   language, the landlord's free to dispute the date and the --

Page 113

1    and is also free to assert a claim, you know, administrative

2    claim.

3              MS. ARTHUR:  Okay.

4              MR. BUTLER:  I appreciate it, Your Honor.

5              THE COURT:  Of course, the Debtors are free to

6    object to that, and I expect it'll probably be worked out.

7              MS. ARTHUR:  All right.  Thank you.

8              MR. BUTLER:  Yes, sir.

9              THE COURT:  Okay.  Thank you.

10             MS. ARTHUR:  I think the next item on the agenda

11   is the de minimums asset sale procedures motion.

12             Your Honor, a revised form of order was also filed

13   in connection with this motion.  The revised order is on the

14   docket at 739.  I'd be happy to provide Your Honor with a

15   redline.

16             THE COURT:  Is that different than the one that's

17   in the binder?

18             MS. ARTHUR:  I believe so, only because it was

19   filed late last night, so --

20             THE COURT:  Okay.  Why don't you -- why don't you

21   hand that up then?  Thanks.

22             MS. ARTHUR:  Your Honor, this motion is also

23   moving forward on an uncontested basis.  The language as

24   reflected in the order has been heavily negotiated with

25   various parties.  We believe it addresses all concerns,

Page 114

1    whether formally made or informally made.  I'm happy to walk

2    Your Honor through the changes and -- or, if you prefer, to

3    the extent you have any questions, I can await those

4    questions and answer them in turn.

5              THE COURT:  Let me just take a quick look at it.

6              Okay.  So you've gotten rid of the no-look number.

7              MS. ARTHUR:  Yes.

8              THE COURT:  So there will -- there are a group of

9    parties that will get notice of any of these.

10             MS. ARTHUR:  Of any.  Yes, Your Honor.  Any sale

11   that's below --

12             THE COURT:  All right.

13             MS. ARTHUR:  -- $15 million.

14             THE COURT:  And I guess the question I had on this

15   -- and I'm not sure this answer it, this blackline answers

16   it.  A couple of parties had said, well, does this include

17   sale of our lease or sale of our contract?  And there's

18   language in here that says that it doesn't include sale of

19   restricted covenants and -- I mean, you know, easements

20   running with the land and such, or master leases.  So there

21   could be an implication that does include sale of leases.

22             MS. ARTHUR:  So, Your Honor, we did end up

23   addressing that issue.  It's Paragraph 10 on page 9.

24             THE COURT:  Oh, okay.

25             MS. ARTHUR:  And we specifically noted that the

Page 115

1    procedures will not be used in connection with the

2    assumption or the assumption assignment of executory --

3              THE COURT:  Okay.

4              MS. ARTHUR:  -- contracts, unexpired leases of

5    personal property, and unexpired leases of non-residential

6    real property for which the Debtor is not a landlord.

7              THE COURT:  All right.  So the other language

8    about restrictive covenants is --

9              MS. ARTHUR:  That's still there as well, Your

10   Honor.

11             THE COURT:  Is that -- that's just -- okay.  So

12   people were concert that you were going to sneak that

13   through this one instead of the lease motion, and they

14   wanted out of here.

15             MS. ARTHUR:  They were concerned on every single

16   motion we were going to sneak it.

17             THE COURT:  All right.

18             MS. ARTHUR:  So that language is in a lot of

19   places.

20             THE COURT:  Okay.  Well, I overlooked that

21   paragraph.  Let me just make sure -- and you're still

22   noticing anyone that has an interest?

23             MS. ARTHUR:  Yes, Your Honor.

24             THE COURT:  I had one at -- this -- these

25   procedures do not apply to insiders, to sales, to insiders?

1              MS. ARTHUR:  You're correct, Your Honor.

2              THE COURT:  Okay.  All right.  all right.  does

3      anyone have anything further to say on this motion?

4              MR. FROELICH:  Your Honor, could I just be heard

5      quickly?

6              THE COURT:  Yes.

7              MR. FROELICH:  Good afternoon, Your Honor.  Joseph

8      Froelich from Locke Lord on behalf of Cardtronics.

9      Cardtronics is an entity that provides the ATMs --

10             THE COURT:  Oh, right.

11             MR. FROELICH:  -- and, more importantly, the cash

12     inside the ATMs.

13             THE COURT:  Right.

14             MR. FROELICH:  As I've learned, the cash inside

15     the ATMs I think is actually more valuable than the ATMs

16     themselves, if you can believe.  But the issue we had raised

17     was the 2.5 million, and that got taken out, and we're very

18     fine with that.

19             The one question we had raised informally was it's

20     unclear whether we are a noticed party, but they did put in

21     a line that said they were going to file it.  I assume that

22     means file it on the docket in this case.  And if that's the

23     case, then we are fine, and we're good to go.

24             THE COURT:  Okay.

25             MR. FROELICH:  All right.

1           THE COURT:  And you will be filing the notice?

2           MS. ARTHUR:  Yes, Your Honor, we're going to file

3      it on the docket.

4           THE COURT:  Okay.  All right.

5           MR. FROELICH:  Thank you, Your Honor.

6           THE COURT:  Okay.  I'm assuming you're not selling

7      their cash.

8           MS. ARTHUR:  No, we're not.

9           MR. FROELICH:  We hope not, Your Honor.

10          THE COURT:  Okay.  All right.  All right.  I will

11     grant this motion.  I think the revised order properly sets

12     the threshold for these procedures and gives appropriate

13     review rights to parties as well as deals with certain types

14     of assets that are more sensitive than others in a way that

15     is fair and reasonable.  So I'll grant this relief.

16          MS. ARTHUR:  Thank you, Your Honor.

17          At this time, I'll cede the podium to my college,

18     Garrett Fail.

19          THE COURT:  Okay.  We skipped over the time to --

20     the motion for an extension of time to assume or reject

21     leases.

22          MS. ARTHUR:  Oh, yes, Your Honor.  So we had one

23     objection to that motion.  It was later withdrawn.

24          THE COURT:  Oh, okay.

25          MS. ARTHUR:  And the language that we provided in

Page 118

1   the revised order addressed their concern, which was really

2   just clarifying that to the extent that the landlord took a

3   position that the lease was not unexpired, or was

4   terminated, that it was not going to be affected by the

5   relief requested.

6              THE COURT:  Okay.

7              MS. ARTHUR:  A CNO was submitted as well yesterday

8   for it.

9              THE COURT:  Okay.  Very well.

10             MR. FAIL:  Good afternoon, Your Honor.  Garrett

11  Fail, Weil, Gotschal & Manges, for the Debtors.

12             THE COURT:  Yes.

13             MR. FAIL:  The next item on the agenda is final

14  hearing on one of the Debtors' first day motions for

15  shippers, warehousemen, other non-merchant lien claimants,

16  PACA/PASA claims, and related relief.

17             Your Honor, no one has objected to the payments or

18  the authority to pay shippers, warehousemen, or other liens,

19  or PACA/PASA.  There were two statements that were filed.

20  One was from a warehousemen shipper who had questions about

21  -- which had questions about its own situation.  The Debtors

22  are in discussions, and from the Debtors' perspective,

23  nothing in that filing precludes entry of a final order

24  today.

25             THE COURT:  All right, that's --

1              MR. FAIL:  That's the objection by Dart --

2              THE COURT:  That's the Dart one?

3              MR. FAIL:  -- or the statement and position that

4      was filed.

5              THE COURT:  That was my view in looking at that.

6      But I'm happy to hear from them if they have any --

7              MR. FAIL:  Counsel for Dart is here.  I'll give

8      them an opportunity, if there's anything that we're missing.

9              THE COURT:  Okay.

10             MR. FAIL:  Or was here.

11             MR. FENNELL:  I am here.

12             MR. FAIL:  Okay.

13             THE COURT:  So, anything to add to that?

14             MR. FENNELL:  No, Your Honor.

15             THE COURT:  Okay.

16             WILLIAM FENNELL:  Just for the record, William

17     Fennell, on behalf of Dart Warehouse.  At this point, Mr.

18     Fail's comment that we're in discussions is appropriate and

19     accurate.

20             THE COURT:  Okay.  Thank you.

21             MR. FAIL:  The other response and limited

22     objection that was filed was by Apex Tool Group.  Your

23     Honor, the Debtors' position is that there is also nothing

24     here that would preclude entry of a final order.  The

25     interim order contains standard comfort order language to

Page 120

1    provide for those parties that would -- may be entitled to

2    501(b) -- 503(b)(1) priority.

3                THE COURT:  (b)(9).

4                MR. FAIL:  No.  Post-petition.

5                THE COURT:  Oh.

6                MR. FAIL:  Parties that -- there were parties that

7    held doing anything, providing goods or services, until

8    after the bankruptcy.  Once the bankruptcy came, parties

9    were prepared to deliver, ship and pick up.

10               Also, we had orders that were in place that were

11   not paid for and weren't due to be paid, and weren't

12   provided, delivered, received in any respect.  And for those

13   parties, rather than ripping up old POs or requiring new POs

14   or requiring purchase orders with new tax identification

15   numbers which don't exist, or a new purchase order with the

16   word "Debtor in possession", this provided comfort to

17   parties that they would be entitled to administrative

18   priority, as they normally would be.

19               THE COURT:  Okay.  But I thought the issue was --

20   they just wanted to make sure that nothing in this order

21   restricted their rights under (b)(9)?

22               MR. FAIL:  Your Honor, if that's the case, there

23   was language in the order that said nothing enhanced or

24   inhibited or hurt parties' priority.  What we read this

25   language to be was a determination as to what would be

Page 121

1    503(b)(9).  Your Honor is aware, and they cited in their

2    brief the case law on what "delivered" means.  We --

3                THE COURT:  Right.  I'm not going to decide that

4    today.

5                MR. FAIL:  We're not asking you to, Your Honor.

6                THE COURT:  Okay.  All right.

7                MR. GALARDI:  Your Honor, very briefly, Gregg

8    Galardi, of Ropes & Gray, on behalf of Apex.

9                THE COURT:  Okay.

10               MR. GALARDI:  We filed the objection.

11               THE COURT:  Right.

12               MR. GALARDI:  We also are a member of the

13   Creditors' Committee.  Your Honor, just -- all we really

14   asked for was a clarification of the word "delivered",

15   because as we put forth in our paper --

16               THE COURT:  That would take me about two months.

17               MR. GALARDI:  I understand that, Your Honor.  And

18   we're not saying you have to do that.

19               THE COURT:  Okay.  Good.

20               MR. FAIL:  We're letting you know, though, the

21   word 503(b)(9), which they did rely on for the relief, uses

22   the word "received", which is different.

23               THE COURT:  But as long as it's clear that anyone

24   who believes they have a 503(b)(9) claim is not affected

25   adversely by this order, then it should matter, right?

Page 122

1              MR. GALARDI:  No, but it does matter on 503(b)(1),

2     Your Honor, for the following reason.  Your Honor, they

3     asked for 160 -- they say they have $162 million of

4     prepetition orders.  Those orders were going to be delivered

5     post-petition, without clarity on what the word "delivered"

6     means.  And Your Honor, I understand if you want to defer

7     that to a future date, then we'll have a 503(b)(1) fight

8     about what's payment in the ordinary course.  That was the

9     point, because the word 503(b)(9) is received, (b)(1) says

10    actual and necessary, and what constitutes a delivery, we're

11    concerned that vendors such as ourselves and others were

12    being given "a comfort order" saying it's an administrative

13    expense, when purchase orders could change title, FOB, and

14    that doesn't give anybody any sort of administrative

15    expense.

16             THE COURT:  Well, but, I mean, you're asking me

17    for an advisory opinion.  I mean, I just don't see a reason

18    to, certainly not on today's record to have a declaratory

19    judgment on that issue.

20             MR. GALARDI:  Again, Your Honor, it's your order

21    with your word "delivered".  If the order is ambiguous, we

22    wanted to have the opportunity to clarify it.  If you're

23    comfortable with that word and how it's been used in the

24    orders, we'll have a litigation, if we have to, about the

25    administrative expense claim.

Page 123

1          THE COURT:  Well, I mean, I think there's two

2    levels to it, right?  There's the colloquial word "deliver",

3    and it's just an order.  And then there's the statute.  As I

4    read it, this order doesn't change anyone's rights under the

5    statute.

6          MR. GALARDI:  Under 503(b)(9), correct.

7          THE COURT:  But I think just in terms of the

8    colloquial meaning of the word "deliver", anyone who

9    actually did deliver should be pretty comfortable.  And the

10   people who transferred title but kept it in their warehouse,

11   they're going to have to talk to their lawyer.  But they

12   also have their rights under 503 preserved.

13         MR. GALARDI:  That's fine, Your Honor.

14         THE COURT:  Okay.

15         MR. GALARDI:  Thank you.

16         MR. FAIL:  Thank you, Your Honor.  Just to note,

17   we would dispute any assertions that folks were misled.

18   We'll leave that for another day.  And it sounds like there

19   might be a -- might've been a question about who's being

20   paid and the concern that we were paying people.  I would

21   suggest that parties -- the party that hasn't been paid

22   would say that we aren't paying.  So, the money isn't just

23   going out the door --

24         THE COURT:  Okay.

25         MR. FAIL:  -- without careful consideration as to

Page 124

1    who's entitled to be paid.

2              THE COURT:  Okay.

3              MR. FAIL:  Unless Your Honor has any questions...?

4              THE COURT:  No, I mean, I think that was pretty

5    clear.  I mean, frankly, to me, the word "delivered", as

6    used in this order, is not tied to any particular statutes.

7    It's the word in the order.  But --

8              MR. FAIL:  We agree, Your Honor.

9              THE COURT:  -- again, the order doesn't change

10   anyone's rights under the statute.  So, I'll grant the

11   motion.  I think both objections have been resolved.  And

12   the record set at the interim hearing justifies the motion,

13   which is now unopposed, except to the limited extent that

14   the objections still survive, which is minimal.

15             MR. FAIL:  Thank you, Your Honor.  I'll turn the

16   podium over to Mr. Basta, counsel -- or proposed counsel, or

17   counsel for the Special Committee, the Restructuring

18   Committee of the Board.

19             THE COURT:  Okay.

20             MR. BASTA:  Good afternoon, Your Honor.  Paul

21   Basta from Paul, Weiss.  We represent the Restructuring

22   Subcommittee of the Board.  The Restructuring Subcommittee

23   has two members on it, Mr. Bill Transier, who is here in the

24   courtroom, as well as Mr. Alan Carr.

25             THE COURT:  Okay.

Page 125

1            MR. BASTA:  And they're both independent

2    directors.  The Subcommittee sought to retain Evercore, and

3    the Committee has objected.  The retention is supported by

4    two declarations, one from Mr. Dan Aronson, who is in the

5    court, who would be leading the engagement, as well as Mr.

6    Transier.  We'd like to move those declarations into

7    evidence.

8            THE COURT:  Okay.  Does anyone want to cross-

9    examine them on their declarations?  Okay.  I've reviewed

10   both of them and at least as of now, I don't have any

11   questions.  But I'll admit them into the evidentiary record.

12            (Declarations of William Transier and Daniel

13   Aronson Entered into Evidence)

14            MR. BASTA:  Thank you, Your Honor.  The mandate of

15   the restructuring committee is attached as an annex to Mr.

16   Transier's declaration.  And if Your Honor looks at that

17   mandate, that mandate looks backwards, and it looks

18   forwards.  It looks backwards because our job is to

19   investigate the 19 affiliate transactions.  There may be

20   more that occurred here that involve billions of dollars of

21   value.

22            It looks forward because to the extent there needs

23   to be a disposition of those litigation assets, whether it

24   be commencing litigation, or settling litigation, or looking

25   at a contribution from and defendants as part of any

Page 126

1    settlement or transaction involving potential defendants,

2    the approval of those transactions requires the approval of

3    our subcommittee, and therefore, the amount of contribution

4    that may be involved in any of those transactions also

5    requires analysis as we go forward.

6              This function of the restructuring committee, we

7    believe, is extremely important in this case.  And your

8    honor has already seen the positions of the parties start to

9    develop.  ESL has filed a number of pleadings, making it

10   clear that they think all the affiliate transactions were

11   proper.  And the Creditors' Committee has expressed very

12   significant concern regarding these transactions.

13             And ESL, who is a target of the investigation, is

14   the largest secured creditor, with $2.6 billion of secured

15   claims.  And so, to the extent those secured claims could be

16   the subject of avoidance or subordination, there would

17   obviously be an enormous transfer value from one

18   constituency to another.

19             And so, we're taking our job very, very seriously,

20   and we're going to get to the bottom of what happened here,

21   but we need Evercore to do it.  Evercore has significant

22   expertise in the areas in which we need help.  Valuation

23   including DCF comparable company transaction values,

24   evaluating the terms of the debt and any marketing process

25   that went to third parties to determine if they got the best

Page 127

1     terms on the debt that was provided, critique of sale or

2     marketing processes.  And as I mentioned, perhaps most

3     importantly, they will provide -- help us evaluate value

4     coming into the estate in various contexts that go forward.

5          There are three main objections.  The first

6     objection is duplication with A&M, who is also helping the

7     Restructuring Committee.  Our pleadings highlight the

8     different roles that Evercore will play and that A&M will

9     play.

10          And I'm not going to repeat how we divide up the

11    responsibilities, but I think that from my very simple

12    perspective, Your Honor -- and Your Honor knows this from

13    every case we ever have -- if you're going to do solvency

14    work, you've got to get into the projections, and you've got

15    to determine whether the projections were reasonable and

16    whether the process that led to the projections are

17    reasonable.

18          And A&M is going to be taking the lead on looking

19    at the projection elements.  They're also helping with the

20    solvency.  But Evercore has a particular expertise as an

21    investment banker to help evaluate the value of the

22    transactions and the fairness of the transactions.

23          On duplication, Your Honor, this subcommittee is

24    extremely active.  We have calls twice a week formally, and

25    we speak to the Restructuring Committee every day.  And

1    they're in our offices often and they require updates from

2    each professional as to what they're doing.  And they're

3    going to make significant effort to make sure there's not

4    duplication.

5            The second objection is that this work could be

6    performed by Lazard.  Lazard has a different client.  Lazard

7    reports to the full Board, and last I could tell, they had

8    their hands full on other subjects.

9            Finally, they requested that we put evidence to

10   support the reasonableness of the fee.  There's two

11   components, I think, to the fee here.  We did not want the

12   fee to be a transaction fee.  We do not want to create any

13   incentive from Evercore to feel that there has to be a

14   transaction or no transaction.

15           So, the way the fee is structured is with a

16   $200,000 monthly, with a minimum of $3 million.  We think

17   that's an appropriate structure as to the quantum of the

18   fee.  Attached to Mr. Transier's declaration is support from

19   other independent committees.  I would note that in those

20   other independent committees, there wasn't nearly as

21   extensive an investigation as there's going to be here.

22           THE COURT:  Okay.  On the overlapping issue, the

23   description in the declaration says that one of the things

24   A&M will be doing is "contemporaneous solvency analysis",

25   and just wasn't clear to me what that -- does that mean,

1    basically -- well, I don't know what that means.  I mean, is

2    it -- how does that not overlap with valuation analysis of

3    the transferred businesses, which is what Evercore is doing?

4    Are they --

5              MR. BASTA:  I think --

6              THE COURT:  I think, what I was about to say, but

7    then I wasn't sure what it meant, is are they looking at

8    what other people did at the time, like if there was a

9    solvency opinion that --

10             MR. BASTA:  Well, the --

11             THE COURT:  -- I don't know, Houlihan Lokey gave,

12   or someone like that?

13             MR. FAIL:  Your Honor, there's a Duff & Phelps

14   solvency opinions that support two of the transactions that

15   we're looking at.  Those solvency opinions have DCS net

16   asset value components to them.  A&M is really looking at

17   those opinions and helping us critique those opinions.

18   Evercore is looking more at like the transaction multiples

19   upon which those transactions were based.

20             THE COURT:  So, in doing contemporary solvency

21   analysis, they're not doing the same valuation work?

22             MR. FAIL:  Well --

23             THE COURT:  They're basically looking at the bona

24   fides of those types of opinions that were given to people

25   at the time of the transaction?

Page 130

1          MR. BASTA:  Yes, Your Honor.  And if there's a

2   matter that's being handled by A&M, there's a work plan in

3   place that's being directed by the committee to make sure

4   that that's not being duplicated by Evercore.

5          THE COURT:  Okay.  Well -- and that's my next

6   question.  Obviously, the committee is looking at these

7   types of issues too, and they have their financial advisor,

8   who also has their hands full, but they're also doing this

9   type of work.  And neither the company nor the committee

10  have objected to your process or their process going on,

11  except with regard to Evercore.

12         And I guess the question I have on Evercore is do

13  you each need of financial advisor on this --

14         MR. BASTA:  Well, Your Honor --

15         THE COURT:  -- on these sets of issues?  Can't you

16  share Evercore or share the other one?  I mean, they're both

17  great.  I mean, I don't understand --

18         MR. BASTA:  Your Honor, I don't really believe

19  that works --

20         THE COURT:  No?

21         MR. BASTA:  -- in this context for the following

22  reason.  You know, what's unique about this case is that the

23  target of the investigation, one of the targets of the

24  investigation, is a secured creditor, which is -- so the

25  interests of the Restructuring Committee are different than

Page 131

1   the interests of the unsecureds.  Obviously, the unsecureds,

2   to the extent that that debt is subordinated or avoided,

3   gets a transfer of value.

4           So, the way we view it is we're independent and

5   we're looking at it neutrally.  We understand that the

6   Creditor's Committee -- and we've been facilitating their

7   investigation -- they need to see what we're looking at,

8   where the financial advisors are coordinated, so that the

9   information is being shared.  But I think the purposes of

10  the investigation are really different.

11          THE COURT:  Well, I guess I understand that with

12  the lawyers, and I think also probably with A&M.  I just --

13  you know, Evercore, if they testify, are going to be an

14  expert.  I appreciate experts, generally speaking, somehow

15  find a way to take a position that's consistent with their

16  client's position.

17          MR. BASTA:  Well, Your Honor, let's take this --

18          THE COURT:  Have there been any discussions about

19  splitting up the work, maybe for less -- I don't know.

20          MR. BASTA:  Your Honor --

21          THE COURT:  I'm just curious.

22          MR. BASTA:  Let's pose the following context.

23  Let's say that there is a transaction that's going forward -

24  -

25          THE COURT:  No, you have to know the past to

1    valuate the future.  I get that.

2             MR. BASTA:  Well, let's just there's a -- let's

3    say we are faced in a month with a transaction that's going

4    forward --

5             THE COURT:  Right.

6             MR. BASTA:  -- that the Creditors' Committee says,

7    you know, we don't like that deal.

8             THE COURT:  Right.

9             MR. BASTA:  And let's say that deal asks for a

10   release.  And there needs to be testimony that says, well,

11   what's the contribution being given for the release, what's

12   the value for the release, and we need to present that to

13   the Court?  Our job is to give the Court what our view is as

14   independent.  The Creditors' Committee has other factors

15   that they're considering.  So, I just don't think the two

16   sit in the same position.

17            Evercore might look at the transaction and say

18   that the contribution is X dollars, and Houlihan might look

19   at it and say that the difference between this transaction

20   and another liquidation bid, or another going concern bid is

21   different.  I think that has to come out in the adversary

22   process.

23            THE COURT:  Okay.  Do you have the same view?  I'm

24   not sure which one of you guys is speaking on this one.

25            MR. DIZENGOFF:  I'll take it.

1          THE COURT:  Okay.

2          MR. DIZENGOFF:  Do you want me to address the

3   Evercore issues first, or your latter points?

4          THE COURT:  The latter ones.

5          MR. DIZENGOFF:  Yeah, I largely share that view.

6   I think Evercore will do whatever Evercore does.  But the

7   role of the Creditors' Committee is, as the fiduciary for

8   unsecured creditors, to maximize the value.

9          And if it turns out that the only bid that

10  actually does materialize is the ESL bid, and it's

11  functioned with a release, which is what we've been told by

12  their counsel, that's going to be a problem for us if we

13  actually think that there are viable causes of action.

14         THE COURT:  Right.

15         MR. DIZENGOFF:  So, I don't think we could rely on

16  what the Restructuring Committee advisors say in that

17  regard.  We have to do our homework on our own and draw our

18  own conclusions.

19         THE COURT:  Okay.

20         MR. DIZENGOFF:  And for that, we need our own

21  advisers to do so.

22         THE COURT:  Okay.

23         MR. DIZENGOFF:  And I'll get -- do you want me to

24  address the Evercore issues?

25         THE COURT:  Well, I think -- yeah, that was my

Page 134

1    only question --

2             MR. DIZENGOFF:  Okay.

3             THE COURT:  -- for both.  So, why don't I hear

4    from you on the other points?

5             MR. DIZENGOFF:  Okay, so four quick points, all of

6    which Mr. Basta has touched on.

7             First is the need for actually two financial

8    types.  So, this is a subcommittee of a restructuring

9    committee of the Board of Directors.  We asked for a

10   precedent for these kinds of engagements, and we've never

11   seen anything.  And we were not supplied with --and maybe it

12   exists, but I just haven't -- we haven't been able to find

13   it -- where multiple financial types were retained by a

14   subcommittee of a restructuring committee.

15            I understand the case is large and complex and

16   unusual, but this is an unprecedented transaction.  That's

17   issue one.    Issue two --

18            THE COURT:  But isn't it ultimately the

19   Restructuring Committee?  I mean, there's a smaller group

20   working on this, but that's because --

21            MR. DIZENGOFF:  And that's fine.  I still haven't

22   found a circumstance in which a restructuring committee

23   hired two financial advisors.

24            THE COURT:  Okay.

25            MR. DIZENGOFF:  I would say financial types.

Page 135

1          THE COURT:  All right.  All right.

2          MR. DIZENGOFF:  So, I understand they have two

3    firms that they think are both qualified.  Just a quick

4    review of the A&M website, the Alvarez website, says that

5    they can do all the suite of services that Mr. Basta

6    articulates that Evercore would do.  You look at it, it says

7    they can value businesses, they do solvency, they do

8    fairness opinions, all those things.

9          So, I don't understand what it is that the estate

10   is being burdened by.  The cost of this is $3 million.

11         THE COURT:  They would --

12         MR. DIZENGOFF:  Because it's a guaranteed minimum.

13         THE COURT:  They would probably charge more than

14   they're charging now, though, for that.

15         MR. DIZENGOFF:  Yeah, I understand that, but it's

16   hourly.  So, at least I know exactly what they're doing,

17   what A&M is doing.  I know exactly what they're doing, and I

18   know what the work product is.

19         Here, it's largely like a check on A&M is doing

20   and saying, hey, it's $3 million, no matter what.  Why don't

21   you just do a whole bunch of things and we'll get two

22   opinions and see if they actually line up?  But I think

23   that's just redundant, Judge.

24         THE COURT:  But it -- well, I understand your

25   concern about duplication, but it appears, at least from the

1    declarations, that the opinions are really quite different.

2            MR. DIZENGOFF:  Yeah, I understand that that's

3    what they articulated, that they're going to say there's two

4    different roles.  But I have an advisor in A&M that can do

5    everything, or I have an advisor in Evercore that can do

6    only one subset.

7            So, why shouldn't I take the advisor that can do

8    everything?  Whatever the cost is of that, it is.  I don't

9    need Evercore to be redundant of what A&M is fully capable

10   of doing and can do.  And that suite of services is readily

11   available to them.

12           THE COURT:  Well, if it's essentially -- I don't

13   know the answer to this, but if it's essentially the same,

14   why not let the Debtors' committee have its choice?

15           MR. DIZENGOFF:  Yeah.

16           THE COURT:  I mean, you're positing that it --

17           MR. DIZENGOFF:  That would be okay with me.

18           THE COURT:  You're positing that it would be

19   different.

20           MR. DIZENGOFF:  Yeah.

21           THE COURT:  But I don't know whether it would be

22   different, if just A&M did it.

23           MR. DIZENGOFF:  From our perspective, if just A&M

24   was their advisor, I don't think we actually have an issue.

25           THE COURT:  it might end up costing more, though.

Page 137

1              MR. DIZENGOFF:  And it might, actually.  I don't

2      know the answer to that.  You know what?  You're right.  In

3      fairness, it might.  If Evercore could do the entire suite

4      of services that was required -- we're not quibbling with

5      their retention of an advisor, or quibbling with their

6      retention of two advisors that are both financial types,

7      where one we know can do the entire universe of what's

8      required, as Mr. Basta articulates and as their declaration

9      sets forth, and then one that is just a subset of it that

10     has a fixed fee for $3 million that I can't revisit under

11     328, which is how the retention is proposed.

12             So, I'm troubled by that.  Your Honor, I don't

13     think they need that.  Or we should have the ability to

14     review that down the road to see if there was duplication

15     and unnecessary costs.

16             MR. BASTA:  Your Honor, I reviewed the FTI website

17     and FTI actually can provide the same services as Houlihan.

18     Just because someone has on their website the expertise,

19     that would mean that the client doesn't have the business

20     judgment range to be able to decide who they want to do

21     what.

22             THE COURT:  Okay.  You do have two.

23             (Laughter)

24             MR. DIZENGOFF:  I do have two, except our tasks,

25     Your Honor, our tasks are dramatically more, dramatically

Page 138

1    more, sir.  He has one microcosm as a subset.

2         THE COURT:  He actually has three.

3         MR. DIZENGOFF:  Yeah, but he has --

4         THE COURT:  Actually, four.  Okay, I got it.  But

5    still --

6         MR. BASTA:  And Your Honor, I did want to make

7    point, Your Honor -- sorry to interrupt -- about the broader

8    four of the restructuring --

9         THE COURT:  No, can I -- I'm going to interrupt

10   you.  I mean, when I have had valuation testimony, the

11   investment bankers almost uniformly do not get into the

12   projections.  I mean, they rely on the company or they rely

13   on the equivalent of FTI that, you know, or A&M to vet the

14   projections.

15        So, I really don't think that it's necessarily odd

16   to have it structured this way.  But anyway, I interrupted

17   you, because you were will still -- you were --

18        MR. DIZENGOFF:  No, no --

19        THE COURT:  There's more aspects to your objection

20   than that.

21        MR. DIZENGOFF:  Those are the four points of our

22   objection, which is two financial advisors.  One is -- can

23   provide this whole suite of services, so why do you actually

24   need two?

25        THE COURT:  Right.

1          MR. DIZENGOFF:  The cost, which is guaranteed, for

2     $3 million and unprotected under 328.

3          THE COURT:  Well, I guess that's -- this case may

4     be a lot shorter than $200,000 per month, adding up to $3

5     million.  So, the guarantee bothered me, and my thought was

6     that we should either do Section 330 on this or take out the

7     guarantee.  I just -- you know, $200,000 is a lot for this

8     limited -- it's a lot of work, but it's not totally open-

9     ended, except for the future valuation of a release.

10          But to guarantee the $3 million, I just -- I was

11    troubled by that.

12          MR. BASTA:  Well, let me address that, and I did

13    want to come back to one other point, Your Honor.

14          THE COURT:  Okay.

15          MR. BASTA:  Which is, we don't know how long this

16    project is going to last --

17          THE COURT:  I know, but it's --

18          MR. BASTA:  We don't know if it's going to --

19          THE COURT:  -- $200,000 until it -- forever, until

20    it's over.

21          MR. BASTA:  It does.  And the $3 million is the

22    minimum.  I believe that was the opportunity cost of

23    securing, you know, Evercore for this --

24          THE COURT:  Well --

25          MR. BASTA:  -- for this engagement.  I can ask

Page 140

1    them about --

2              THE COURT:  I mean, I --

3              MR. BASTA:  -- the 330 versus the guarantee, but

4    it was a material part of the negotiation of this fee.

5              THE COURT:  All right.  I mean, to me --

6              MR. BASTA:  Your Honor, if you look --

7              THE COURT:  I can -- put it this way.  I can

8    imagine scenarios where this all gets resolved in January.

9    You know, it's conceivable that you and Mr. Dizengoff and

10   your friends at Weil Gotschal will actually have a meeting

11   of the minds and figure out how to get out of the case and

12   the burn.  And then to pay another, you know, $2.4 million

13   is -- it's asking a lot, I think.

14             So, to me, the guarantee should be subject to 330

15   review, is what I'm saying.

16             MR. BASTA:  I will raise that with Evercore, Your

17   Honor.

18             THE COURT:  Okay.  All right.

19             MR. BASTA:  The other point I wanted to make is

20   Your Honor made the point that there is a Restructuring

21   Committee of four, but it was delegated to the two.

22             THE COURT:  Right.

23             MR. BASTA:  The reason why it was --

24             THE COURT:  The other guys are doing some things

25   too, I'm assuming?

Page 141

1          MR. BASTA:  Well, no, it's -- Your Honor, what it

2     is is that the other two were part of the independent

3     committee that approved all of the transactions --

4          THE COURT:  Okay.  All right.

5          MR. BASTA:  -- that are being questioned.  So,

6     it's being --

7          THE COURT:  But they're working on other aspects

8     of the case.

9          MR. BASTA:  And they're working very hard on other

10    aspects of the case.

11         THE COURT:  Right.

12         MR. BASTA:  But I believe the purpose of the

13    subcommittee is to have a conflict-free party during the

14    investigation.

15         THE COURT:  Okay.  All right.  So, I'm prepared to

16    grant this motion, on the condition that the guarantee

17    aspect of it be subject to 330 review, beyond the normal

18    U.S. Trustee right to do a 330 review -- by everybody.

19         MR. BASTA:  Your Honor, let me --

20         THE COURT:  I mean, I just -- I would be very

21    reluctant to have an imputed hourly rate that just -- that

22    could just skyrocket.  I mean, it just in these facts --

23         MR. BASTA:  Your Honor, Evercore doesn't go by an

24    hourly rate, so we were --

25         THE COURT:  I know, but I --

Page 142

1           MR. BASTA:  -- so we were struggling to try to

2     find --

3           THE COURT:  Yeah.

4           MR. BASTA:  -- a way to get them to provide the

5     value here.

6           THE COURT:  Right.  Okay.

7           MR. BASTA:  But I will consult with them and come

8     back to the Court.

9           THE COURT:  Okay.

10          MR. BASTA:  The next item on the agenda, Your

11    Honor, was our 2004 motion, but that has not been objected

12    to.

13          THE COURT:  Right.  And the Committee has a 2004

14    motion --

15          MR. BASTA:  And then the next one is the --

16          THE COURT:  -- and a --

17          MR. BASTA:  Committee's 2004.

18          THE COURT:  -- a rule 502(d) motion.

19          MR. BASTA:  Right.

20          THE COURT:  Which I don't think was objected to

21    either, although people made comments on it.  So --

22          MR. BASTA:  Do you want to address that?

23          MR. CLAYTON:  That is --

24          THE COURT:  I'm prepared to grant both of those

25    motions.

Page 143

1              MR. CLAYTON:  Your Honor, Lew Clayton from Paul,

2    Weiss.  We did make comments.  They speak for themselves.

3              THE COURT:  Right.

4              MR. CLAYTON:  I see no need to take the time to

5    repeat them, and we don't object to the motion.

6              THE COURT:  Is there any way to do -- it's not

7    really a joint defense agreement, because you're both

8    analyzing facts.  But is there any way to proceed on the

9    privilege that way too, through an agreement?  Are people

10   exploring that at all

11             MR. BASTA:  They problem we have, Your Honor,

12   where -- we're trying to approach this as practically as we

13   can.  And the problem we have is that because of the mandate

14   and the job of our subcommittee, we have been given the

15   authority to raise claims, prosecute claims, and control the

16   privilege and waive the privilege, which we thought was

17   necessary for us to do our job in a vigorous way.

18             THE COURT:  Right.

19             MR. BASTA:  Right now, we have lots of work to do.

20   We're investigating.  We don't know where these claims will

21   shake out.  And we, therefore, don't know who will be on

22   which side of which issue.  If we knew that, we could make

23   judgments now, who could be in a joint defense agreement,

24   with whom could we share material, which waivers do we care

25   about?  We don't know the answers to those questions and we

Page 144

1    feel, as fiduciaries, we've got to protect the ability of

2    the estate to maximize the value of its asset, and that at

3    that includes its privilege claim.

4         But we are working to get out these -- review

5    these documents for privilege and get them out as quickly as

6    we can.  We don't -- as we sit here today, we don't know yet

7    that there are key, huge, hugely important documents that

8    are privileged.  There may be.  What we are getting out are

9    documents concerning the facts, and there are -- we've

10   processed over 100,000 of them and turned about 150,000 over

11   to the UCC.

12        THE COURT:  So, am I right in summarizing the

13   502(d) motion that the parties have no opposition to it, but

14   they're not entirely comfortable that it works to save the

15   privilege, and so they're still going to go through the

16   privilege analysis?

17        MR. BASTA:  That is our view, Your Honor.

18        THE COURT:  All right.  If the Second Circuit of

19   the Supreme Court rules otherwise, then it's easy.

20        MR. BASTA:  Yes, and --

21        THE COURT:  But until then, it isn't.

22        MR. BASTA:  People have gone through just this

23   analysis in lots of different cases --

24        THE COURT:  Right.

25        MR. BASTA:  -- and it comes up from time to time.

Page 145

1   Eventually, someone will push it to the point where we get

2   some clear consensus in the case law.

3               THE COURT:  Okay.

4               MR. BASTA:  Thank you.

5               MR. SORKIN:  Your Honor, Joseph Sorkin, from Akin

6   Gump, very briefly.  One, on the 2004 issue, it was not

7   objected to.  There were discussions that we had in

8   connection with Paul, Weiss and the various parties that

9   we've identified in the 2004 motion.  There were some

10  changes to the proposed order that we have all agreed to.

11  We have a copy and a redline that we'll submit to the Court

12  later today.

13              THE COURT:  That's fine.

14              MR. BASTA:  And Your Honor, if I may just add, the

15  same changes apply to our order, and we will do exactly

16  that, submit the redline --

17              THE COURT:  Okay.

18              MR. BASTA:  -- and the final.

19              THE COURT:  Okay.  And then the last point I want

20  to make, which I think is consistent with how you've been

21  approaching this, you're not at that point yet, but I would

22  like you to make sure that where you can you coordinate any

23  depositions that you're taking so we don't multiply those.

24              MR. SORKIN:  We intend to do that, Your Honor.

25              THE COURT:  Okay.

Page 146

1          MR. BASTA:  We have been working closely, Your

2    Honor.

3          THE COURT:  All right.  Okay.  Thanks.  So, you

4    can submit those orders to chambers, the two from the

5    Committee and the one from the independent director for...

6          MR. BASTA:  Your Honor, this is a policy issue,

7    and of course, I can't address it right here.

8          THE COURT:  Okay.

9          MR. BASTA:  So, we need to go back and have a

10   broader discussion as to what --

11         THE COURT:  Okay.

12         MR. BASTA:  -- they're prepared to do.

13         THE COURT:  That's fine.

14         MR. BASTA:  And what we'd propose to do is to

15   advise the Committee after that occurs and we'll let the

16   Court know.  And if there needs to be something else, we'll

17   let the Court know.

18         THE COURT:  Oh, I understand that.  The only point

19   I'd make is that, while I didn't buy everything that Mr.

20   Dizengoff was telling me, I do believe that this is a pretty

21   -- it's close to a unique engagement.

22         MR. BASTA:  I think this is a unique engagement.

23         THE COURT:  Yeah.

24         MR. BASTA:  Mr. Dizengoff called me, and he said,

25   Paul, send me, when this has been done before.

1           THE COURT:  Right.  So, I think --

2           MR. BASTA:  Okay.  But you know --

3           THE COURT:  So --

4           MR. BASTA:  I don't believe, Your Honor, that you

5   normally see a case which requires an investigation of this

6   of this magnitude in this timeframe, with the likelihood of

7   expert valuation testimony, and being able to secure the

8   people who can provide that with conflicting interests.  I

9   think it's --

10          THE COURT:  Right.

11          MR. BASTA:  -- unique and that the structure we

12  did come up with, which does not make it transaction-

13  related, really goes to making sure that there's no adverse

14  incentives.

15          THE COURT:  I understand that.  On the other hand,

16  I don't think this would be thrown back in Evercore's face

17  in 95-99 percent of their engagements, so...

18          Okay, so I have a number of orders for people to

19  send me.  I think there's really only one that you need to

20  socialize with various counsel, which is the first one we

21  dealt with.  But that should be -- I think that the company

22  and its professionals can be working, based on the record

23  today, on the assumption that that order will eventually be

24  entered.

25          And then I know I also have a number of orders

Page 148

1      where there were no objections.

2              MR. BASTA:  Yes, Your Honor.

3              THE COURT:  And those will be entered shortly, too

4      --

5              MR. BASTA:  Thank you very much, Your Honor.

6              THE COURT:  -- on the -- you know, the final

7      hearings for the -- that I granted interim relief on and

8      then there were no objections.

9              MR. BASTA:  Thanks, Your Honor.

10             THE COURT:  Okay.

11             MR. BASTA:  We'll see you Monday.

12             THE COURT:  Thank you.

13

14             (Whereupon these proceedings were concluded at

15     1:45 PM)

16

17

18

19

20

21

22

23

24

25

Page 149

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5    Sonya Ledanski       Digitally signed by Sonya Ledanski
                          Hyde
6    Hyde                 DN: cn=Sonya Ledanski Hyde, o, ou,
                          email=digital@veritext.com, c=US
7                         Date: 2019.08.09 14:32:01 -04'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  November 16, 2018

| **&** |
| --- |

**&**   7:3 8:9,17 9:1
  9:16 10:15 11:1
  12:16,17 13:1,13
  14:1 15:1,10,18
  16:9 19:14 33:19
  45:14 70:1 73:7
  79:5 82:2 88:9
  97:5 101:14
  118:11 121:8
  129:13

| **0** |
| --- |

**02110**   12:4
**07728**   12:12

| **1** |
| --- |

**1**   5:1 14:17 100:6
  100:9,14,16,18,21
  100:24 101:2
  120:2 122:1,7,9
**1,800**   101:23
**1.4**   96:2
**1.5**   76:12
**10**   114:23
**100**   51:25
**100,000**   144:10
**1000**   28:10
**10004**   8:21 15:14
**10005**   10:4 13:17
**10005-1413**   16:12
**10006**   15:21
**10014**   8:4
**10018-1405**   16:5
**10019**   12:19
**10019-6064**   11:4
**10022**   8:12 15:6
**10036**   9:19 13:6
**1006**   8:3
**101**   10:16
**10153**   7:6
**10178**   10:17
**105**   5:24

**10601**   1:14
**10:00**   2:2
**11**   5:4 21:1,13
  23:20 28:2,6
  30:21 31:1 35:8
  38:11 75:4 81:6
**11/15/2018**   3:6
**1129**   30:22
**11501**   149:23
**11:08**   1:17
**11th**   76:23
**12**   44:18
**12,000**   23:16
**12.5**   104:3
**125**   11:18
**1285**   11:3
**12th**   9:4
**13202**   11:19
**13th**   77:1
**14**   5:8
**14th**   80:7 109:23
**15**   1:16 2:2 27:24
  60:16 114:13
**150**   56:11
**150,000**   29:13
  144:10
**1501**   9:11
**15th**   26:20 35:24
  38:3 39:15 40:2,2
  41:4 46:1 50:16
  51:20 53:14 63:18
  101:20 106:6
  110:7,9,16 111:4
  112:16
**16**   149:25
**160**   122:3
**162**   122:3
**16th**   112:8
**17th**   53:13,24
  61:5
**18-23538**   1:3
**1800**   14:18

**18th**   15:5 54:5,7
  77:3
**19**   125:19
**19801**   14:4
**19th**   24:14
**1:45**   148:15
**1st**   73:18 106:10
  112:18

| **2** |
| --- |

**2**   13:16 73:9,10,11
  76:8 105:2,4
**2.3**   96:1
**2.4**   90:16 140:12
**2.5**   116:17
**2.6**   126:14
**20**   105:5
**200**   22:24 27:9
  65:2
**200,000**   128:16
  139:4,7,19
**20005**   9:12
**2004**   5:24 6:11,15
  103:1 109:3
  142:11,13,17
  145:6,9
**201**   8:3
**2017**   109:23,25
**2018**   1:16 2:2 77:3
  149:25
**2019**   29:1
**20th**   53:20,22,24
**22**   103:18
**227**   104:19
**23**   3:23 97:25
  98:23
**234**   101:24 103:21
  103:22 104:3
**2350**   14:10
**24**   4:5 47:16
  101:21
**248**   1:13
**24th**   76:19 103:17
  105:11

**25**   4:13 103:16
**250**   56:10
**26**   97:22
**26th**   80:11 82:21
  83:6 97:10
**27**   24:8
**27th**   25:24 32:2
  37:1 39:2 42:15
  83:7
**28**   16:11
**289**   24:4
**290**   103:19

| **3** |
| --- |

**3**   73:10 81:6
  128:16 135:10,20
  137:10 139:2,4,10
  139:21
**300**   1:13 149:22
**306**   103:1 109:1
**30th**   50:12 107:6
  109:25
**31**   4:24 12:18
  76:20
**328**   137:11 139:2
**330**   139:6 140:3
  140:14 141:17,18
  149:21
**3300**   10:10
**337**   97:10
**350**   25:22
**363**   67:9,14 69:3
**365**   108:24 110:13
**37th**   10:3
**3rd**   8:11 73:22

| **4** |
| --- |

**4**   9:18 79:22,22
**40**   10:3
**401**   14:18
**424**   5:13
**426**   3:18
**427**   4:18
**429**   2:5 5:20

**43**   103:1 109:2
**450**   2:18 3:5
**451**   2:19
**45202**   10:11
**484**   6:1,6
**485**   6:6

**5**

**5**   28:3 76:5 79:22
**50**   26:13 109:2
**50/50**   26:6
**501**   120:2
**502**   6:5 142:18
   144:13
**503**   110:14 120:2
   121:1,21,24 122:1
   122:7,9 123:6,12
**505**   28:15 40:15
   49:2 51:21 55:20
   56:9,12 57:16
   58:20 70:9,17
   86:25
**525**   109:16
**52nd**   12:18
**53**   109:2
**556**   107:1

**6**

**6**   29:1 46:10
**6.5**   81:7
**6.8**   88:17
**60**   37:24,24 76:2
**600**   14:10
**609**   6:12,16
**614**   6:12
**620**   16:4
**628**   11:17
**63**   12:11
**642**   3:11,14
**643**   3:11 80:1
**662**   104:13
**699**   5:20

**7**

**700**   14:3
**715**   106:21
**722**   80:17
**736**   102:16
**739**   113:14
**744**   26:16
**75**   90:5
**767**   7:5
**77002**   14:11

**8**

**86**   106:24 108:16
**885**   8:11 15:4

**9**

**9**   73:23 114:23
   120:3,21 121:1,21
   121:24 122:9
   123:6
**900,000**   76:13
**9006**   2:7 5:24 6:8
**9006-1**   6:9
**9007**   6:8
**9016**   5:25
**920**   14:3
**92101**   14:19
**94111**   9:5
**95-99**   147:17
**9:06**   3:6
**9th**   110:16

**a**

**a&g**   28:12
**a&m**   127:6,8,18
   128:24 129:16
   130:2 131:12
   135:4,17,19 136:4
   136:9,22,23
   138:13
**a&p**   102:2
**a.j.**   10:13
**a.m.**   2:2 73:23
**abandon**   107:10
   108:23

**abandoned**
   103:12
**abandoning**
   102:22
**abandonment**   4:3
   4:10 101:19
   107:13
**abandonments**
   4:16
**abid**   13:9
**ability**   22:9 25:1
   31:12 36:18 37:13
   37:20 38:11,25
   59:18 105:22
   107:10 108:24
   137:13 144:1
**abl**   9:17 77:11,12
   81:18,18 99:4
**able**   25:4 28:22
   38:14,17 83:8,25
   105:23 112:13
   134:12 137:20
   147:7
**absence**   81:15
**absolutely**   40:7,10
   89:17 95:15
   100:14
**acceptance**   80:6
**access**   110:4
**accomplished**
   19:23
**account**   78:21
   91:20 98:3 110:11
**accounted**   67:7
**accurate**   64:21
   119:19 149:4
**accurately**   84:10
**acquisition**   75:10
   76:16
**acronym**   22:20
**act**   37:3,8 42:5
   49:22

**action**   80:5
   133:13
**actionable**   46:2
**active**   127:24
**activity**   29:15
**actual**   74:17
   122:10
**ad**   65:23
**adams**   93:22
**add**   64:1 72:7
   111:24 119:13
   145:14
**added**   97:25 99:9
   99:17 103:18
**adding**   99:1 139:4
**addition**   20:11
   75:7
**additional**   24:6
   32:22 63:8 78:22
   104:23 110:10,12
**address**   20:6
   34:23 61:14 77:6
   97:23,24 133:2,24
   139:12 142:22
   146:7
**addressed**   32:25
   55:14 118:1
**addresses**   113:25
**addressing**
   114:23
**adequacy**   83:2
**adequate**   33:2
   63:4 78:1,11,13
   98:3
**adjourn**   104:22
**adjournment**
   80:13
**administrative**
   5:4 25:8 42:4 46:6
   111:21,23 113:1
   120:17 122:12,14
   122:25

**administratively** 21:23,25 30:12
**admit** 125:11
**advanced** 101:3
**advantage** 21:14
**adversary** 132:21
**adverse** 147:13
**adversely** 89:8 121:25
**advertising** 66:25
**advise** 146:15
**advisers** 133:21
**advisor** 93:25 94:12 95:3 130:7 130:13 136:4,5,7 136:24 137:5
**advisors** 28:12 74:20 131:8 133:16 134:23 137:6 138:22
**advisory** 122:17
**aebersold** 7:19 19:19
**affect** 89:8
**affidavit** 31:23 35:7 37:10,11
**affiliate** 88:19 125:19 126:10
**affiliated** 73:8 101:15
**affords** 38:11
**afternoon** 73:6 82:1,4 93:2 94:8 97:4,5,7 101:13 101:16 116:7 118:10 124:20
**agenda** 2:1 19:25 73:2,9,10 74:17 75:12 79:22 97:8 101:17 103:11 113:10 118:13 142:10

**agent** 9:17 16:3
**agents** 77:11,12 81:18,18
**aggregate** 40:5,6
**ago** 21:13 51:9 63:2 91:9 105:13
**agree** 31:17 33:9 45:6 48:3 52:11 52:11 57:6 61:10 61:19 63:21 70:23 96:18 107:3 124:8
**agreed** 34:13 53:8 98:15 106:5 145:10
**agreement** 2:17 3:5,22 34:8 63:24 73:20 74:11 75:21 76:1 77:9 106:11 106:14 108:7 112:5,6 143:7,9 143:23
**agreements** 82:14
**ahead** 19:12 24:8 31:3 40:2 52:4 82:23 89:12
**aired** 53:6
**akin** 13:1 45:14 62:25 71:21 79:5 145:5
**al** 5:16 6:4
**alan** 11:13 124:24
**alleged** 89:1 109:9
**allen** 9:1,7
**alleviate** 48:21 53:11
**allow** 25:5,7 35:22 36:3,24 38:25 61:8 74:4 102:3
**allowed** 24:6 25:22 37:18 39:1
**allows** 35:22 38:11

**alluded** 81:14
**alternative** 46:3 49:13 51:13 76:10
**alternatives** 44:22 49:3 55:16 71:12
**alvarez** 135:4
**alves** 17:17
**ambiguous** 122:21
**amended** 73:16 103:17,19 107:6
**america** 13:5
**american** 10:10 26:1
**americas** 11:3
**ames** 102:25 109:1
**amount** 23:5 29:15 46:9 87:4 126:3
**amounts** 85:17 110:9,18
**analyses** 28:2,5
**analysis** 30:10 50:9,11,17 54:15 89:5 126:5 128:24 129:2,21 144:16 144:23
**analyze** 87:10
**analyzing** 143:8
**andrew** 17:13 18:1
**annex** 125:15
**announced** 109:22
**anoint** 59:13
**answer** 39:8,14 91:3,23 114:4,15 136:13 137:2
**answers** 114:15 143:25
**anticipation** 67:4

**anybody** 32:24 61:24 78:18 122:14
**anyone's** 123:4 124:10
**anyway** 43:21,22 44:10 90:20 99:24 138:16
**apace** 80:21
**apart** 74:19
**apex** 14:2 119:22 121:8
**apologize** 19:7 33:14 95:14 106:21 111:8
**apparently** 19:8 85:16
**appearing** 16:16 82:2
**appears** 135:25
**appliance** 25:1 27:20
**applicable** 106:10 108:9
**application** 5:10
**apply** 67:15 115:25 145:15
**appointed** 104:11
**appreciate** 31:10 31:20 32:6 47:13 113:4 131:14
**approach** 43:9 44:24 49:7 51:13 97:14 102:2 143:12
**approaching** 37:25 38:8 145:21
**appropriate** 40:1 58:5 69:19 72:2 101:2 110:20 111:23 117:12 119:18 128:17

**appropriately**
100:10
**approval**  2:4 3:20
5:18 37:7,8 72:18
73:13,25 74:1
77:1 81:15 83:9
101:18 105:6
126:2,2
**approve**  2:4,12,21
2:25 3:13 58:13
**approved**  36:23
74:20 102:1 141:3
**approving**  2:9,10
2:13,14,15,22,23
3:1,2,3,10,14
65:15 66:5 79:24
97:9
**approximately**
76:13,24 101:23
**areas**  22:13
126:22
**arlene**  17:17
**arm**  86:13 90:1
**aronson**  125:4,13
**arps**  9:16
**arrangement**
106:16
**arthur**  7:11 12:21
101:12,13,14,17
102:15 103:8,10
103:15 105:10,14
105:17,19 107:25
108:3,11,13
109:13 112:17,21
113:3,7,10,18,22
114:7,10,13,22,25
115:4,9,15,18,23
116:1 117:2,8,16
117:22,25 118:7
**article**  88:20
**articulated**  60:7
84:10 108:13
136:3

**articulates**  135:6
137:8
**ashmead**  15:16
**asim**  58:5
**asked**  20:8 46:23
46:25 48:22 49:18
89:25,25 96:14
121:14 122:3
134:9
**asking**  35:14
36:13 37:7,8
38:12 80:4 110:10
112:14 121:5
122:16 140:13
**asks**  132:9
**aspect**  38:8
141:17
**aspects**  55:8
138:19 141:7,10
**aspersions**  29:16
**assembling**  29:7
**assert**  113:1
**assertions**  123:17
**asset**  4:16,16 28:3
28:5 38:19 39:16
56:15 58:6 60:16
69:17 73:20 74:3
75:25 77:9 79:15
90:9 91:12,13
113:11 129:16
144:2
**assets**  22:18,19,22
26:5,6 29:7 36:25
38:12,14,17,22
39:19 52:13 55:15
56:7 63:15 69:2
86:12 87:7 91:18
117:14 125:23
**assign**  104:5
**assigned**  78:2
**assignment**  2:15
3:2 115:2

**assistance**  36:3
**associated**  46:6
70:13
**associates**  106:4
106:24 108:16
**assume**  3:17 41:2
76:7 83:10,10
104:5 116:21
117:20
**assumed**  78:2
**assumes**  40:1
**assuming**  39:14
40:11 43:20 58:13
65:7 117:6 140:25
**assumption**  2:14
3:2,21 76:3,5
115:2,2 147:23
**assurance**  33:2
78:1,11,13
**atms**  116:9,12,15
116:15
**attach**  66:7
**attached**  68:11
77:14,17 125:15
128:18
**attaches**  68:15
**attack**  84:23
**attempt**  21:15
110:17
**attempts**  110:15
**attest**  43:7
**attorney**  8:2,18
9:10,17 11:2 12:9
14:2,9,16 15:19
16:10
**attorneys**  7:4 8:10
9:2 10:2,9 11:16
12:2,17 13:14
15:2,11 16:2
88:10
**auction**  2:11,14
2:24 3:1 39:25
40:1,3,8 41:19,22

56:1,8 64:12
76:10,18,25 78:3
78:12 80:9,21,23
81:1,11 82:20
83:6,8 84:4,6,6
87:15
**auctions**  36:17
**austin**  9:9 14:8
111:16
**authorities**  12:9
65:18 97:18,25
99:3
**authority**  3:16 5:1
96:1 108:22
118:18 143:15
**authorize**  83:23
**authorizing**  4:14
4:19 5:25
**automatic**  92:23
**availability**  26:12
**available**  21:14
60:13 111:25
136:11
**avenue**  7:5 8:11
10:16 11:3 15:4
16:4
**avoidance**  126:16
**avoided**  131:2
**await**  114:3
**award**  108:1
**aware**  101:22
121:1

**b**

**b**  1:21 2:10,23
4:21 5:3 8:24
74:22 77:14 120:2
120:2,3,21 121:1
121:21,24 122:1,7
122:9,9 123:6
**b.r.**  103:1
**back**  22:4 24:15
32:20 33:5 39:4
53:14 59:14 60:1

61:11,16,20 63:20
84:15 102:25
139:13 142:8
146:9 147:16
**background**
103:21 109:20
**backwards**
125:17,18
**baird** 17:5
**bait** 37:13
**bake** 41:18
**baked** 54:10
**balance** 90:9
**balluku** 16:24
**bank** 6:9 13:5,14
88:10,13
**banker** 5:11 7:19
19:19 41:21
127:21
**bankers** 57:6 58:7
138:11
**bankr** 2:7 6:8
**bankruptcy** 1:1
1:12,23 5:23,24
6:11,14 21:14
103:1 108:25
109:3 120:8,8
**banners** 27:3
**barclay** 11:15
**bartley** 17:7
**base** 22:15,15
23:16 24:10,19
25:14 89:20
**based** 45:18 72:16
89:9 95:2 99:13
99:23 102:22
129:19 147:22
**basically** 25:4
46:25 54:13 84:5
100:9,9 129:1,23
**basics** 84:22
**basis** 25:10 61:25
72:14 75:3 91:2

97:10 101:9
113:23
**basta** 5:12 6:15
11:6 124:16,20,21
125:1,14 129:5,10
130:1,14,18,21
131:17,20,22
132:2,6,9 134:6
135:5 137:8,16
138:6 139:12,15
139:18,21,25
140:3,6,16,19,23
141:1,5,9,12,19
141:23 142:1,4,7
142:10,15,17,19
142:22 143:11,19
144:17,20,22,25
145:4,14,18 146:1
146:6,9,12,14,22
146:24 147:2,4,11
148:2,5,9,11
**battaglia** 10:1
**battery** 15:13
**beat** 24:4
**beating** 58:8
**beginning** 22:25
**behalf** 2:18 3:22
4:4,12 5:7,12 6:15
33:19 70:1 73:7
82:3 93:16 101:14
111:5 116:8
119:17 121:8
**belief** 44:15
**believe** 27:15
28:18 36:23 43:16
63:2 75:14 76:20
77:6 87:13 97:21
107:18 109:9
110:13,16 111:2
113:18,25 116:16
126:7 130:18
139:22 141:12
146:20 147:4

**believes** 121:24
**beneficial** 103:23
**benefit** 65:8 95:25
**benefits** 4:22,23
**bent** 45:17
**benzija** 10:1
**bernice** 18:9
**beslow** 18:7
**best** 22:10 31:22
41:20,23,23 42:1
42:19 43:12 44:21
47:24 103:6
126:25
**better** 30:22 88:7
91:22
**beyond** 63:18
141:17
**bid** 2:11,23 26:21
27:22,23 33:3
35:25 36:16 40:2
40:4 43:23 48:15
48:23 55:16 56:18
59:11,18,24 60:1
60:4 61:4,7 64:2
65:7 132:20,20
133:9,10
**bidder** 71:9 76:10
77:2,3 78:23
**bidders** 76:21
**bidding** 2:5,9,22
5:19 20:4 32:2,7
32:13 33:13 37:16
37:17 47:21 57:5
60:23 65:15 72:18
73:3,13 74:19
76:14 77:9,10,16
77:16
**bids** 40:1,5,6 48:7
53:13 56:12 57:23
58:14,23 62:23
64:3 65:9 76:23
**big** 52:9 65:6
87:11

**bigger** 56:3
**bill** 11:12 30:5
124:23
**billion** 28:4 85:17
90:16 96:1,2
126:14
**billions** 24:20
29:20 125:20
**binder** 20:12
113:17
**bit** 31:24 55:14
60:22 67:3
**black** 32:10
**blackline** 114:15
**blacklined** 77:15
**blackwell** 14:8
111:16
**blind** 31:3
**board** 11:2 21:4
62:5 64:1 87:17
124:18,22 128:7
134:9
**bodega** 100:25
**bona** 129:23
**boston** 12:4
**bothered** 139:5
**bottom** 35:4 47:17
47:18 126:20
**bought** 100:24
**br** 109:2
**brakes** 100:12
**brandon** 7:19
19:19
**brauner** 13:11
18:5
**break** 22:7 28:17
**breakeven** 29:3
**breakup** 59:17
76:12
**breathing** 21:13
30:20
**brian** 17:20

**bridge** 62:25
**brief** 70:2 75:20
83:1 121:2
**briefly** 121:7
145:6
**bring** 32:11
102:12
**bringing** 24:11
**brings** 31:14
106:19
**broader** 86:14
138:7 146:10
**broker** 84:7
**bromley** 15:23
**brought** 22:11
**brown** 10:8
**bryant** 13:4
**bubbles** 52:23
**bucket** 55:15
**budget** 24:2,4,8
**buergel** 11:10
**build** 28:6 61:17
**building** 19:11
**bulaon** 17:11
**bunch** 66:1
135:21
**burden** 42:4
43:11 102:3
110:25
**burdened** 135:10
**burn** 46:6 140:12
**burning** 51:25
**bushes** 58:9
**business** 2:10,13
2:16,23,25 3:4 5:6
22:15,20,21 23:13
23:21 27:2,5,9,12
27:15,23 28:24,25
30:9 40:19,19,20
43:12 48:6 51:8
73:3 74:18,21
75:3,6,7,10 82:24
84:1 86:10,11

103:23 104:8,10
137:19
**businesses** 21:16
28:1 129:3 135:7
**busy** 21:1 29:10
**butler** 14:13
16:19 111:7,7,11
111:14,15 113:4,8
**buy** 24:25 88:7
146:19
**buyer** 29:23 56:10
56:11
**buyers** 40:18
**buying** 40:19
83:11

**c**

**c** 2:7,11,18,24
3:22 4:4,11,22 5:7
6:8 7:1 8:7 12:11
19:1 149:1,1
**ca** 9:5 14:19
**calculation** 73:17
**calendar** 80:4
83:15
**call** 32:20 53:13
91:17
**called** 27:5 65:19
146:24
**calls** 127:24
**cam** 104:2
**candace** 7:11
101:12,14
**capable** 42:10
58:8 136:9
**cape** 15:2
**capital** 16:10 26:2
36:10 80:17 82:3
82:6,7,13 87:15
**cardtronics** 116:8
116:9
**care** 21:22 78:16
143:24

**careful** 19:12
68:20 71:5 123:25
**carr** 11:13 124:24
**carter** 13:13 88:9
**carve** 23:1 65:2
**case** 1:3 19:9 21:6
23:23 24:3,21
28:12 30:13 32:3
37:23 42:17 53:6
71:4 73:16 75:4
83:7 85:13 102:24
103:6 108:9,25
116:22,23 120:22
121:2 126:7
127:13 130:22
134:15 139:3
140:11 141:8,10
145:2 147:5
**cases** 23:1 29:9,20
30:14 31:13 37:3
38:9 101:23 102:2
144:23
**cash** 31:12 35:16
36:22 60:1,13
76:2,12 116:11,14
117:7
**cast** 29:16
**catherine** 16:20
17:19
**causes** 133:13
**cds** 80:21 82:14
82:14 92:18
**ceasing** 109:22
**cede** 73:4 101:12
107:20 117:17
**cellphone** 44:5
**centennial** 106:2
**center** 9:4 14:9
109:15 111:15
**certain** 4:8,20
5:17 12:9 23:18
65:18 76:7 97:18
99:10 103:11

117:13
**certainly** 37:14
41:6 44:24 66:8
70:6 93:10 112:13
122:18
**certified** 149:3
**cetera** 41:8
**challenge** 24:11
38:9 81:12
**challenges** 23:12
**chambers** 146:4
**chance** 38:10,25
98:14 101:7
**change** 63:5 97:24
122:13 123:4
124:9
**changed** 20:17
55:17
**changes** 32:21
33:1 55:11 59:13
62:18 63:3,3,4,8
63:12 75:24 77:19
97:11 99:7,8
102:17,20 114:2
145:10,15
**chapter** 21:1,13
23:20 28:2,6
30:21 31:1 38:10
75:4
**charge** 135:13
**charging** 135:14
**chart** 46:25 50:11
51:5,10
**check** 53:12 54:2
54:8 61:4 135:19
**chentz** 18:6
**chief** 7:18,20
19:18,20
**choate** 12:1
**choice** 136:14
**choose** 78:23
111:24

chose  37:13
chosen  38:21
chris  18:11
chunk  65:6
chutchian  18:12
cincinnati  10:11
circuit  144:18
circumstance
  134:22
circumstances
  79:14
cited  121:1
claim  25:8 59:25
  111:21 113:1,2
  121:24 122:25
  144:3
claimants  5:3
  89:18 118:15
claims  5:2,4 81:3
  82:6,9,10,10 85:2
  85:11,22 87:2,7
  87:21 90:12,18
  91:1 98:1 102:22
  102:23 118:16
  126:15,15 143:15
  143:15,20
clarification  64:1
  121:14
clarified  108:19
clarify  78:6 95:24
  122:22
clarifying  118:2
clarity  57:14
  122:5
clayton  11:8
  142:23 143:1,1,4
clean  77:15
cleaned  97:22
clear  23:22 40:16
  47:8,22 55:23
  56:21 57:8 59:5
  60:21 66:25 88:25
  102:21 111:13

121:23 124:5
  126:10 128:25
  145:2
clearly  40:17
  42:16 47:19 71:14
cleary  15:18
clement  17:6
client  91:8,10
  92:14 128:6
  137:19
client's  93:8
  131:16
clients  52:13
  67:15 90:24
clock  83:2
close  25:17 28:16
  62:6 76:16 80:25
  99:11 104:1
  146:21
closed  28:21
closely  146:1
closes  76:11
closing  3:21 98:2
  107:4 109:24
cno  118:7
code  5:23 108:25
codes  110:4
cohen  44:2
colin  93:22
collateral  16:3
  31:12 35:17 36:22
  59:24 68:8,25
  91:13,14
collateral's  68:7
colleague  97:1
  101:12
colleagues  19:15
collective  85:5
college  117:17
colloquial  123:2,8
columbia  14:17
come  33:16 51:20
  53:14 59:14 61:11

61:16 62:9 63:20
  84:20 88:7 92:15
  98:10 108:8
  110:21 132:21
  139:13 142:7
  147:12
comes  78:3
  144:25
comfort  119:25
  120:16 122:12
comfortable
  104:24 122:23
  123:9 144:14
coming  22:8 23:3
  127:4
commenced
  101:22 107:4
  109:24
commencement
  75:4
commencing
  125:24
comment  119:18
comments  32:22
  55:6 62:21 77:9
  84:16 97:19
  142:21 143:2
commit  52:21
commitment  50:3
  52:19
commits  52:5
committed  25:23
  54:22,24
committee  5:15
  5:22 6:3 11:12,13
  13:2 21:4,19 23:6
  25:4,15 28:25
  29:6 30:2,3,5,25
  31:9,14,16 32:6
  33:12,21 34:25
  35:2,15 36:5,9,11
  37:4,21 38:7
  42:13 44:13,16

45:3,16 46:2,3,21
  49:21,24 50:14
  52:25 54:12,16
  55:4,5,6,8 61:9,10
  71:16,16,22 72:10
  77:11 79:6 81:8
  81:17 87:9,17
  89:6 104:11,15,16
  104:23 106:15,18
  121:13 124:17,18
  125:3,15 126:6,11
  127:7,25 130:3,6
  130:9,25 131:6
  132:6,14 133:7,16
  134:9,14,19,22
  136:14 140:21
  141:3 142:13
  146:5,15
committee's  5:17
  29:22 34:24 48:25
  81:13 104:12
  142:17
committees  71:23
  128:19,20
committing  50:13
company  13:14
  21:10 22:9,11,17
  23:17,24 24:1
  26:25 27:16,17,18
  29:3,20 31:3
  35:21,23 37:24
  38:8,18,23 42:11
  44:20 45:17,24
  46:6,9 47:25 49:8
  50:12 51:16,17
  52:5,9,24 56:7
  85:1 86:14 87:23
  88:11 90:25 96:7
  96:7 106:2 126:23
  130:9 138:12
  147:21
company's  23:20
  29:18,21 36:18

50:1,4,16 93:24
**comparable**
126:23
**compare** 42:1
43:14
**compared** 56:3
**competing** 76:23
**competitive** 24:25
26:7 38:15
**complete** 28:4
**completed** 26:14
**completely** 72:10
**complex** 23:9 29:9
36:10 134:15
**complexities**
83:19
**complexity** 85:1
**compliance** 24:16
36:20
**components**
128:11 129:16
**comprehensive**
26:1 109:3
**compressed** 47:16
**conceivable** 140:9
**concern** 22:19
26:21 27:10 28:1
35:14,21 37:14
38:4 40:19 42:1
48:17,25 54:14
61:7 64:3 70:2
118:1 123:20
126:12 132:20
135:25
**concerned** 45:17
50:8 115:15
122:11
**concerning** 144:9
**concerns** 48:22
53:12 60:8 61:15
84:19 113:25
**concert** 115:12

**concluded** 74:21
75:2 148:14
**conclusion** 46:22
89:21
**conclusions**
133:18
**condition** 141:16
**conduct** 6:10,14
76:18
**confer** 63:14
**confident** 21:24
75:8
**confidential** 57:2
**confirm** 5:4 34:17
63:7 95:22
**confirmation**
32:20
**confirmed** 99:2
**conflict** 141:13
**conflicting** 147:8
**conforming** 99:8
**connection** 4:4,10
75:11 102:19
103:13,21 104:10
104:16 105:19
106:18 113:13
115:1 145:8
**consensual** 31:11
36:22
**consensus** 145:2
**consent** 52:25
61:9,10
**consider** 40:5
41:11 42:12,22
44:22 56:2 77:1
81:22
**consideration**
123:25
**considered** 41:10
47:23 64:4
**considering** 35:10
43:1 58:19,23,23
75:10 132:15

**consistent** 62:20
102:20,24 131:15
145:20
**constituencies**
25:3,12
**constituency**
126:18
**constituent** 24:20
**constituents**
23:12 103:6
**constitutes** 122:10
**constrained**
108:23
**consult** 37:21
142:7
**consultant** 99:13
99:23
**consultation**
61:22,23 63:25
**consulting** 3:22
63:23
**contains** 84:21
119:25
**contemplate** 58:2
**contemporaneous**
128:24
**contemporary**
129:20
**contend** 81:9
**contends** 80:19
107:1
**contests** 106:22
**context** 82:5
130:21 131:22
**contexts** 127:4
**continue** 4:22
29:21 35:14 36:8
36:20
**continuing** 22:18
27:10 28:1
**contract** 4:6 77:25
78:13 79:17
114:17

**contracts** 76:4
78:23 79:1 115:4
**contrary** 31:9
48:24 74:12 109:1
**contribution**
125:25 126:3
132:11,18
**control** 143:15
**controversy** 37:19
**convert** 35:18
**coordinate** 145:22
**coordinated**
131:8
**copies** 77:15
**copy** 63:6 97:12
102:11 145:11
**core** 20:24
**corporation** 1:7
2:19 3:23 4:5,12
5:8,13,16 6:4,16
19:5 73:8 80:6
101:15 106:3
**correct** 40:14 51:1
59:15 68:2 79:10
116:1 123:6
**cost** 52:5,12
135:10 136:8
139:1,22
**costing** 136:25
**costs** 44:18,19
45:22 46:9 76:4
104:2 137:15
**counsel** 13:2
19:14 62:19 77:10
77:11 79:5 81:23
82:19 104:14
107:19 108:14,17
119:7 124:16,16
124:17 133:12
147:20
**country** 41:7
109:10 149:21

**couple**  39:9 63:12
89:16 114:16
**course**  5:6 19:10
20:5 29:13 30:17
48:18 57:24 60:14
60:24 61:1 64:14
64:17,24 70:11
113:5 122:8 146:7
**court**  1:1,12 19:2
19:4,7,21 20:1,2,5
20:11,14,16,18,21
20:23 21:11,13
23:2 25:18,24
26:15,24 27:1
30:6 31:15 32:5
32:16 33:7,16,24
34:3,10,12,15,16
34:20,23,25 35:4
35:16 37:1 39:9
39:13,22,25 40:8
40:11,16,22,25
41:2,6 42:3,9,23
43:2,8,17,20,24
44:1,4,6,9 45:1,7
45:10,20 46:14,16
47:3,6,12 48:4,8
48:11,16,19 49:4
49:7,17,25 50:7
50:15,20,24 51:5
51:11,13,16,18,24
52:8,14,17 53:2,4
53:9,14,16,18,21
54:1,6,10,19,22
55:1,19,22 56:1,6
56:17,20,24 57:8
57:12,15,21,25
58:7,11,21,25
59:3,6,8,14,15,19
59:21 60:6,9,11
60:18,21,25 61:4
61:6,13,16,17,20
61:20 62:1,3,9,11
62:14,17 63:9,16

63:20,20,23 64:5
64:8,11,16,19,22
64:25 65:5,11,13
65:20 66:3,5,11
66:15,20 67:2,5,8
67:14,17,21,24
68:3,5,10,14,17
68:22,24 69:5,8
69:10,13,18,21,24
70:4,14,24 71:2
71:18,25 72:4,6
72:15,24 73:5,14
74:3,6,15,22,24
75:16,18,22 76:21
76:22 77:22 78:7
78:17,20,25 79:2
79:7,9,11,20 80:4
80:13 81:15,21,23
81:25 82:4,11,15
83:5,8,17,21
84:12,18 85:23
86:2,4,10,15,19
86:23 87:19,23
88:3,12,15,21,25
89:3,22,25 90:6,8
90:13,17,19,23
91:5,10,21,25
92:2,4,9,12,14,21
92:25 93:4,7,11
93:14,17,19,23
94:1,3,5,8,12,17
94:20,24 95:2,5,9
95:13,15,20,22
96:3,11,13,20,22
97:3,7,13,15 98:5
98:7,11,22,25
99:6,14,19,21,24
100:1,5,7,12,15
100:17,20,23
101:1,4,16,22
102:1,6,13,20
103:9,14 105:1,3
105:5,13,15,18

107:13,22 108:1,4
108:12,15 109:21
110:19,24 111:2,5
111:10,12 112:12
112:20,23 113:5,9
113:16,20 114:5,8
114:12,14,24
115:3,7,11,17,20
115:24 116:2,6,10
116:13,24 117:1,4
117:6,10,19,24
118:6,9,12,25
119:2,5,9,13,15
119:20 120:3,5,19
121:3,6,9,11,16
121:19,23 122:16
123:1,7,14,24
124:2,4,9,19,25
125:5,8 128:22
129:6,11,20,23
130:5,15,20
131:11,18,21,25
132:5,8,13,13,23
133:1,4,14,19,22
133:25 134:3,18
134:24 135:1,11
135:13,24 136:12
136:16,18,21,25
137:22 138:2,4,9
138:19,25 139:3
139:14,17,19,24
140:2,5,7,18,22
140:24 141:4,7,11
141:15,20,25
142:3,6,8,9,13,16
142:18,20,24
143:3,6,18 144:12
144:18,19,21,24
145:3,11,13,17,19
145:25 146:3,8,11
146:13,16,17,18
146:23 147:1,3,10
147:15 148:3,6,10

148:12
**court's**  30:19,19
32:3 102:16
**courtney**  17:2
**courtroom**  19:17
44:2,8,9 45:8 51:7
107:20 124:24
**covenants**  36:10
36:11 114:19
115:8
**coverage**  25:6
**covered**  66:17
109:4
**cracks**  65:23
**create**  128:12
**creating**  109:7
**credit**  26:11,15
37:16,17 59:11,18
60:1,4,23 65:7
**creditor**  29:19
82:6 126:14
130:24
**creditor's**  77:11
81:17 87:9,16
104:11 106:15
131:6
**creditors**  5:15,22
6:3 13:3 25:15
26:24 28:24 37:4
49:21,23 90:8
103:7 106:17
121:13 126:11
132:6,14 133:7,8
**criminals**  19:11
**critical**  22:9
**critically**  52:4
**critique**  127:1
129:17
**cross**  125:8
**crossing**  50:5
71:20
**croup**  5:10

**cure** 33:2 76:4
78:1,12
**curious** 131:21
**current** 104:5
112:24
**cushman** 12:17
**cut** 42:18
**cyrus** 16:10 80:16
80:19,22 81:3,6
81:14,23 82:3,5
82:13 90:4

**d**

**d** 1:22 2:13,25 6:5
19:1 142:18
144:13
**damage** 27:13
76:17
**damon** 11:15
**dan** 125:4
**daniel** 17:25
125:12
**danilow** 7:16
**dark** 103:24
109:25
**dart** 14:16 119:1
119:2,7,17
**data** 29:7 48:12
**date** 5:11 29:4
35:24 36:1 50:16
53:12,23 54:2,7
80:10 95:22
103:16,24 105:8
105:23 106:5,23
107:2,5,8 108:1,6
108:7,10 109:17
110:3,20,20 111:3
111:3 112:25
122:7 149:25
**dates** 78:4
**david** 9:14
**day** 20:22 30:7
31:18 44:18 46:5
73:21 83:7 93:1

105:16 118:14
123:18 127:25
**days** 37:24,24
47:15 63:2 80:5
82:24 84:1 91:9
104:23 110:11
111:24
**dc** 9:12
**dcf** 126:23
**dcs** 129:15
**de** 4:16,16 14:4
69:16 113:11
**deadline** 61:4,9
63:18 77:25 78:8
78:10,10,12
**deadlines** 36:3
37:20 52:23,25
57:11 78:4
**deal** 33:12 87:11
93:10,12 132:7,9
**dealing** 71:8
72:13 96:23
**deals** 117:13
**dealt** 45:3 147:21
**debate** 37:12
**debt** 24:20 80:5
86:6,8 87:8 89:12
90:2 126:24 127:1
131:2
**debtor** 1:9 7:4
22:16 23:8 47:18
54:14,15 61:8
77:8 82:19 85:8
85:16 87:3 94:15
95:5,17 96:10
103:5 107:2,15
110:3 115:6
120:16
**debtor's** 92:22
107:11
**debtors** 2:4,7,8,21
3:8,10,13,16,20
4:1,7,14,19,20 5:1

5:5,11,18,25 7:19
7:20 19:14,18,19
19:20 20:4,25
21:3,7,12,15,19
21:21 22:2,24
23:3,16,19,22
24:2,4,5,6,7,9
25:7,16 26:17,18
27:11,25 29:13
32:8 34:7 35:11
35:24 36:7 37:14
37:22 38:16 41:7
41:11,17 43:3,14
47:4 54:14 55:23
64:4 65:7 68:5,17
71:5,8 72:17 73:8
73:11,24 74:20
75:8 77:14 79:13
79:23 80:24 81:5
81:21 82:8 84:5
85:5,6,15,18 86:7
87:7,13 89:5 90:2
94:13 95:25 97:6
98:1 99:11,12,17
100:3 101:15,18
101:22,24 102:3
103:4,7,11,17,22
103:23 104:4,8,10
104:15 105:21,23
106:1,6,8,14,20
107:4,9,10,12,18
107:23 108:2,22
109:17,22,23
110:1,7,13,16,20
111:2 112:1,6,8
113:5 118:11,14
118:21,22 119:23
136:14
**debtors'** 7:18
**december** 26:20
35:23 38:3 46:1
50:16 51:20 53:13
61:5 63:18 76:19

76:20,23 77:1,3
**decide** 84:7 108:9
121:3 137:20
**decided** 98:15
**decision** 28:15
42:14 45:22 52:5
81:16
**decisions** 28:14
**declaration** 5:19
45:22 125:16
128:18,23 137:8
**declarations**
125:4,6,9,12
136:1
**declaratory**
122:18
**default** 24:17
36:21
**defendants**
125:25 126:1
**defense** 143:7,23
**defer** 53:5 122:6
**definitely** 39:2
59:7 78:16
**definitively** 42:20
**degradation**
35:11
**degroff** 79:4
**delay** 37:1 42:10
44:18 52:6,12
73:19 98:13
**delegated** 140:21
**deliver** 108:2,5
120:9 123:2,8,9
**deliverable** 49:20
49:24 50:8 51:10
**deliverables**
46:11,18,23
**delivered** 5:5 51:3
120:12 121:2,14
122:4,5,21 124:5
**delivering** 50:11

**delivery** 27:17
122:10
**denied** 80:20
**department** 8:1
102:25 109:1
**dependent** 27:10
27:15
**depending** 41:15
**depends** 22:18
**depositions**
145:23
**deputy** 20:8
**description**
128:23
**deserves** 46:3
**designated** 78:2
78:13,14 103:22
105:6,9
**designed** 79:14
**desire** 76:16
**destroy** 28:7
**destroying** 23:10
**detailed** 46:25
**determination**
120:25
**determinations**
81:8,13
**determine** 104:4
126:25 127:15
**develop** 126:9
**developed** 76:15
**dialogue** 31:16
**diametrically**
94:18
**dibattista** 17:12
**dictate** 95:10
**didn't** 45:18 58:2
146:19
**diego** 14:19
**difference** 132:19
**different** 28:21
32:7 44:19 77:25
78:23 87:10 94:15

113:16 121:22
127:8 128:6
130:25 131:10
132:21 136:1,4,19
136:22 144:23
**differently** 74:7
86:6
**difficulties** 111:8
**digested** 45:19
**digesting** 52:3
**diligence** 29:11
40:12 75:11 91:5
**dillman** 8:14
33:14,18,19 34:1
69:25,25 70:5,15
70:22,25 71:14,19
72:2,5
**diluted** 90:13,16
92:16
**diminution** 74:3
**dip** 9:17 24:3,4,7
24:8,16 25:20,21
25:23 26:15 31:12
35:24 36:21 66:9
77:11 81:17 91:16
91:18 98:6 99:4
**direct** 27:14 82:9
**directed** 130:3
**directing** 4:20
**direction** 47:25
**directly** 79:16
98:1
**director** 146:5
**directors** 125:2
134:9
**disagree** 35:6 37:9
**disagrees** 35:16
61:18
**disclosure** 82:13
**discovery** 5:25
6:10,14
**discussed** 71:21
106:15

**discussion** 44:14
146:10
**discussions** 71:16
77:12 79:11
118:22 119:18
131:18 145:7
**disposition**
125:23
**dispositions** 60:16
**dispute** 49:16
111:19 112:25
123:17
**distinction** 68:16
**distribution** 88:19
**district** 1:2 102:25
107:14 108:25
**dive** 19:24
**divide** 127:10
**division** 27:4
38:19
**dizengoff** 13:8
45:13,14,21 46:15
46:17 47:5,10
48:3,5,10,12,18
48:21 49:6,16,18
50:3,22 51:1,8,12
51:14,17,19,25
52:11,16,18,22
53:3,8,10,17,19
53:25 54:3,8,17
54:20,24 55:9
56:25 57:10,14,16
59:9,16,20 60:5,7
60:10,14,20,24
61:1,7,14,19
62:10,12,16 79:5
79:8,10 132:25
133:2,5,15,20,23
134:2,5,21,25
135:2,12,15 136:2
136:15,17,20,23
137:1,24 138:3,18
138:21 139:1

140:9 146:20,24
**docket** 11:17
26:16 36:22 63:14
65:19 101:20
102:16 103:16,19
104:13 106:22,25
109:16 113:14
116:22 117:3
**document** 2:5,18
2:19 3:5,11,11,14
3:18,23 4:5,12,17
4:24 5:8,13,20,20
6:1,6,6,12,12,16
20:14
**documentation**
26:14
**documents** 35:25
77:24 144:5,7,9
**doesn't** 31:5
38:23 49:12 51:3
54:18 65:22 123:4
**doing** 19:9 21:9,9
29:25 31:11,21
42:10 43:15,19,20
43:22 44:11 46:21
47:1 67:10 75:10
95:13 120:7 128:2
128:24 129:3,20
129:21 130:8
135:16,17,17,19
136:10 140:24
**dollar** 65:2
**dollars** 24:5,20
25:22 26:13 27:9
29:20 45:23 52:1
52:6 90:25 125:20
132:18
**dollars'** 82:9
**donna** 10:6
**don't** 26:23 33:7,9
33:16 37:6 42:13
45:14 46:4 48:16
49:10 51:2,14

55:1,2 60:12 62:4
62:8 65:8 132:15
**door** 109:24
123:23
**dotting** 50:5
**doubled** 19:10
**douglas** 12:8,14
65:18
**drafted** 61:8
**drain** 1:22
**dramatically**
137:25,25
**draw** 26:10
133:17
**drill** 72:1
**drive** 31:8
**driver** 25:6
**drives** 25:2
**drye** 10:15
**due** 21:22 40:12
53:13 73:18 74:1
75:3 76:23 80:5
91:5 120:11
**duff** 129:13
**duluth** 106:4
**duplicated** 130:4
**duplication** 127:6
127:23 128:4
135:25 137:14

**e**

**e** 1:21,21 2:14 3:2
7:1,1 9:14 12:21
19:1,1 149:1
**earlier** 38:3 65:5
75:15 80:10 82:20
**early** 85:12
**easements** 114:19
**east** 11:18
**easy** 29:16 40:12
144:19
**ebitda** 27:9,24
28:15,19

**ecf** 79:25 80:17
97:10 101:20
102:16 103:16,19
104:13 106:21
107:1 109:16
**ecro** 1:25
**educate** 23:19
31:13
**educating** 23:11
**edward** 16:7
**effect** 75:5
**effective** 107:8
**efficient** 64:19
112:11
**efficiently** 102:3
**effort** 25:25 128:3
**efforts** 23:14
25:20 26:19 29:8
**eh** 103:16
**eighth** 16:4
**either** 28:16 59:23
78:10 98:1 102:17
139:6 142:21
**elberg** 9:22
**elements** 127:19
**eligible** 81:10,14
**eliminate** 46:16
46:17
**email** 32:19
**embarcadero** 9:4
**embed** 46:12
55:17 61:9
**embedded** 48:22
49:19 52:19,24
**emergency** 3:9,13
79:24
**emily** 16:23
**emotion** 81:7
**emphasis** 21:17
**employ** 5:10
**employee** 4:21,22
4:23 22:15 25:12
25:13,14

**employees** 23:19
76:8
**encumbrances**
67:1
**ended** 139:9
**enforceable** 66:6
**engagement** 125:5
139:25 146:21,22
**engagements**
134:10 147:17
**enhance** 28:6
**enhanced** 120:23
**enjoy** 24:17
**enormous** 46:9
126:17
**ensure** 26:24
44:21
**ensured** 23:15
**enter** 66:5 72:19
106:13 110:5
**entered** 66:10,18
67:4 97:10 125:13
147:24 148:3
**entertain** 55:23
56:7
**entire** 137:3,7
**entirely** 144:14
**entities** 65:19
86:16 87:3 96:9
96:10 98:16 99:2
**entitled** 59:17
76:11 88:19 120:1
120:17 124:1
**entity** 85:16 116:9
**entry** 2:9,21 4:1
4:14,19 5:23 6:4
76:24 97:16 100:3
118:23 119:24
**entwined** 27:16
**environment**
44:22
**equal** 76:12

**equivalent** 138:13
**esl** 15:19 26:4
29:10,15,19 59:10
59:13 60:3 126:9
126:13 133:10
**especially** 81:2
**essence** 41:19
43:5
**essentially** 136:12
136:13
**established** 23:18
**establishing** 4:1
4:15
**estate** 25:9 28:9
28:12 72:12 85:9
93:16 94:10,21,22
94:25 97:1 101:23
106:3 127:4 135:9
144:2
**estates** 94:15
103:7
**estimate** 107:5
**et** 6:4 41:8
**evaluate** 81:4
127:3,21
**evaluating** 28:9
65:9 126:24
**evening** 102:11
**event** 26:23 76:9
78:2
**events** 84:10
**eventually** 145:1
147:23
**evercore** 5:10
125:2 126:21,21
127:8,20 128:13
129:3,18 130:4,11
130:12,16 131:13
132:17 133:3,6,6
133:24 135:6
136:5,9 137:3
139:23 140:16
141:23

evercore's 147:16
everybody 23:23
33:6 35:20 36:4
38:9 39:3 49:22
141:18
everybody's
32:23 63:10 95:25
everyone's 31:10
32:25
evict 110:25
evicted 112:7
evidence 6:5
31:25 32:1 35:5
45:4 89:17 125:7
125:13 128:9
evidentiary 32:3
55:3 92:8 112:2
125:11
ex 74:8
exactly 57:4 58:22
80:23 83:12 99:25
108:14 135:16,17
145:15
examine 125:9
examiner 94:24
example 52:7 87:1
exception 22:7
109:6
excess 28:3 87:15
exchange 85:20
exclusivity 30:20
35:17
excuse 64:10
execute 45:23
106:6
executory 4:6
76:4 115:2
exercise 104:8
exhibits 77:14
exist 120:15
existed 112:4
exists 44:22
134:12

expect 56:15
113:6
expedited 5:25
61:25
expeditious 75:3
expense 5:4 46:6
59:17 111:24
122:13,15,25
expenses 4:21
101:2
expensive 26:8,13
experience 41:13
experienced 44:1
expert 131:14
147:7
expertise 126:22
127:20 137:18
experts 131:14
explain 58:18,22
explaining 58:6
explicit 42:25
explored 83:9
exploring 143:10
expressed 126:11
extend 3:16,17
37:20 61:8
extension 61:3,16
62:6 63:17 117:20
extensive 31:19
128:21
extensively 75:7
extent 66:12,24
69:2 84:13 102:11
104:21 106:10
112:18 114:3
118:2 124:13
125:22 126:15
131:2
extract 110:17
extreme 31:17
extremely 21:1
27:8 126:7 127:24

eyes 31:7 72:13

f

f 1:21 67:9,14
149:1
face 85:17 147:16
faced 132:3
faces 23:13
facilitate 36:17
41:12
facilitating 40:11
131:6
facility 26:11,12
26:15 91:18
fact 27:11 31:4
39:5,18 73:24
75:4 78:22 80:11
95:6,13
factors 44:20
132:14
facts 80:22 86:24
107:15 109:11
112:14 141:22
143:8 144:9
fail 7:10 117:18
118:10,11,13
119:1,3,7,10,12
119:21 120:4,6,22
121:5,20 123:16
123:25 124:3,8,15
129:13,22
fail's 119:18
fair 23:5 37:9
43:17 44:17 93:17
117:15
fairly 45:4
fairness 127:22
135:8 137:3
fairway 38:1
falling 48:17
families 23:25
far 66:21
fargo 12:2

fast 23:10 42:5
55:10
faster 37:7 38:2
favor 87:9 95:3
feasible 38:6
feature 88:16,23
fed 2:7 6:8
federal 5:24 6:5
fee 76:12 99:13,23
128:10,11,12,12
128:15,18 137:10
140:4
feel 19:23 42:14
47:9 128:13 144:1
feeling 69:5 112:7
fees 46:8 59:17
feld 13:1 45:14
79:5
felt 28:19 37:11
fennell 14:15,21
119:11,14,16,17
fides 129:24
fiduciaries 30:12
30:14 41:7 49:23
144:1
fiduciary 133:7
fielded 29:7
fifth 7:5
fight 122:7
figure 100:5
140:11
file 5:17 31:23
37:11 58:18,21
81:6 82:25 85:12
102:4 103:17
111:23 116:21,22
117:2
filed 2:18 3:22 4:4
4:11 5:7,12 6:15
20:1 21:1,6 25:25
26:15 27:22 39:19
55:6 63:1,5,11
73:18,21,22 75:13

77:4,8 80:3,8,13
80:15 82:22 85:4
101:19 102:7,10
103:15 104:9
105:20 106:20,24
113:12,19 118:19
119:4,22 121:10
126:9
**filing** 32:23 63:13
117:1 118:23
**final** 5:1 73:18,20
81:10 99:8 100:4
101:9 118:13,23
119:24 145:18
148:6
**finalizing** 73:20
**finally** 23:11 30:1
128:9
**finance** 8:18,19
**financed** 35:25
**finances** 90:1
**financial** 7:20
19:20 93:24 94:12
95:3 130:7,13
131:8 134:7,13,23
134:25 137:6
138:22
**financing** 22:16
24:3,4,17 25:20
25:21,23 26:3,4,8
26:9 31:12 35:24
36:21 62:7 86:13
90:1 91:16
**financings** 46:7
60:16
**find** 39:6 54:8
131:15 134:12
142:2
**fine** 20:18 34:3,20
50:25 53:16 54:1
54:21 60:20 61:10
61:11,19 62:5,7
64:22 98:11 105:2

111:10,12 116:18
116:23 123:13
134:21 145:13
146:13
**fingers** 52:10
**finish** 88:4
**finished** 28:23
30:7
**firms** 135:3
**first** 20:3,20 22:6
22:14 24:3 31:15
33:22 41:8 107:22
108:18 118:14
127:5 133:3 134:7
147:20
**fitzgerald** 17:8
**five** 60:15 103:18
105:20
**fixed** 137:10
**fleischer** 10:19
**flexibility** 24:6
**flexible** 26:7
**flom** 9:16
**floor** 9:4 10:3
15:5
**florida** 96:8
**flow** 23:15 59:12
**flowing** 24:13
**fob** 122:13
**focus** 22:17 26:25
38:21 39:10,20
**focused** 21:20,22
22:13 27:11 65:12
**focusing** 23:7,8
43:4 48:16
**fold** 41:8
**folks** 123:17
**following** 40:17
67:18 80:22 122:2
130:21 131:22
**foot** 41:20 43:12
47:24

**footnote** 78:9
98:17,20,23 99:2
**footprint** 28:14
38:23
**force** 41:19
**foregoing** 149:3
**forever** 139:19
**forgoing** 81:20
**form** 2:13 3:1
26:4 30:21 38:14
73:20 113:12
**formalized** 25:17
**formally** 114:1
127:24
**formed** 25:11
31:14
**forth** 35:24 46:4
81:9 83:19 107:24
121:15 137:9
**forward** 28:23
30:9 33:3 36:25
38:21,23 39:1,20
41:20 43:12 47:24
51:21 74:5 95:10
95:25 105:24
106:10 113:23
125:22 126:5
127:4 131:23
132:4
**forwards** 125:18
**foteini** 18:3
**fought** 22:25
**found** 134:22
**four** 24:3 26:6
80:4 85:17 97:17
108:7 134:5 138:4
138:8,21 140:21
**fourth** 22:6
**fox** 16:7
**franchise** 76:17
**francisco** 9:5
**frank** 8:17

**frankly** 27:18
31:21 35:17,23
36:4,13,17 42:13
42:15 44:15 58:21
72:8 82:25 84:13
124:5
**free** 39:16 41:6,7
47:9 66:25 108:5
112:25 113:1,5
141:13
**freehold** 12:12
**frequently** 54:15
**friday** 82:23
**fried** 8:17
**friedmann** 7:14
**friends** 40:25
140:10
**froelich** 116:4,7,8
116:11,14,25
117:5,9
**front** 23:14 29:15
31:15 38:10 72:12
108:8 112:8
**frost** 10:8
**fti** 137:16,17
138:13
**full** 30:4 40:4
50:11 52:4 82:13
110:8 128:7,8
130:8
**fully** 35:25 136:9
**function** 83:1
126:6
**functioned** 133:11
**fund** 15:11 22:24
91:19 98:2
**fundamental**
84:25 94:15
**funders** 40:18
**funny** 112:7
**furious** 55:10
**furnished** 106:9

**further** 65:14
74:3 79:3 101:5,8
103:2 116:3
**future** 99:12
122:7 132:1 139:9

**g**

**g** 19:1
**gadsden** 13:13,19
88:1,8,9,9,13,16
88:22 89:2,9
**galardi** 14:6 121:7
121:8,10,12,17
122:1,20 123:6,13
123:15
**gamble** 9:1
**gant** 46:25 50:11
51:5,10
**gap** 62:25
**garrett** 7:10
117:18 118:10
**garrison** 11:1
**gather** 84:15
**generally** 32:18
40:3 131:14
**generate** 28:22
**generated** 51:16
51:17
**generically** 54:12
**george** 9:21
**gerber** 109:4
**getting** 19:24
42:12 71:11 98:19
144:8
**give** 20:4 24:1
31:4 52:7 66:22
75:20 99:12,22
102:13 104:23
105:7 119:7
122:14 132:13
**given** 41:17 44:16
80:21 81:2,20
82:22 95:6 103:3
108:21 122:12

129:24 132:11
143:14
**gives** 117:12
**giving** 33:1 36:9
36:11 37:24 47:1
62:8
**glancing** 32:9
**gleason** 17:16
**global** 2:4 5:19
20:4 32:2,7,13
33:13 39:11 55:12
58:4 65:15 72:18
74:19
**go** 19:11,12 26:23
28:23 30:9 33:3
33:22 36:25 37:6
37:7 38:21,23
39:20 45:25 47:17
48:1,25 49:19
53:3 61:20 62:22
63:7 67:23 83:21
102:17 116:23
126:5 127:4
141:23 144:15
146:9
**gob** 35:21 36:12
40:19 41:4,13,20
43:9,12,15 45:25
46:24,24 47:24
48:6 50:4,10,12
50:21 51:13,23
52:9 54:15 55:16
71:12 97:2,9,9
**gobs** 69:17
**godfrey** 18:2
**goes** 42:16 147:13
**going** 19:16,24
22:19 23:2 26:20
27:10 28:1,7,20
30:11,24 31:4
34:7,13,19 35:14
35:21 36:8,12
37:14 38:5,13,17

39:20 40:15,19
42:1 45:11,25
48:13,14,17 51:21
53:5 54:14 55:17
58:3,5,20 61:3
64:3,15,23 66:6
66:10,17 67:12
70:7 71:9,10
80:24 84:8,15,25
89:7 90:13,15,15
90:19 92:7,16,25
93:4,19 94:13,20
94:21,24 95:7,16
95:25 96:25 97:2
98:17,20 102:25
105:7,24 107:23
109:2,12 115:12
115:16 116:21
117:2 118:4 121:3
122:4 123:11,23
126:20 127:10,13
127:18 128:3,21
130:10 131:13,23
132:3,20 133:12
136:3 138:9
139:16,18 144:15
**gold** 17:18
**good** 19:2,3,13,21
22:23 27:15 32:17
33:18 43:1 54:20
70:20 71:8 73:6
82:1 93:11,14
97:4,4,7 98:10,12
101:13,16 116:7
116:23 118:10
121:19 124:20
**goods** 23:15 120:7
**gotschal** 118:11
140:10
**gotshal** 7:3 19:14
32:18 73:7 97:5
101:14

**gotten** 114:6
**gottlieb** 15:18
**goulston** 15:1
**grant** 39:7 72:17
74:4,7,15 79:12
81:21 101:9 103:3
112:23 117:11,15
124:10 141:16
142:24
**granted** 107:14
148:7
**granting** 2:17 3:5
4:23
**grants** 76:22
**gray** 14:1 121:8
**great** 10:10 26:1
49:8 130:17
**greg** 7:16
**gregg** 14:6 121:7
**groll** 7:12 97:2,4,5
97:8,14,16 98:6
99:1,7,16,20,22
99:25 100:2
101:11
**groundwork**
49:13,15
**group** 8:10 10:9
33:20 38:17,17
39:11,21 40:4,13
56:3 70:1 79:1
91:15 114:8
119:22 134:19
**groupings** 38:12
38:14
**growth** 8:19
**guarantee** 139:5,7
139:10 140:3,14
141:16
**guaranteed** 82:10
135:12 139:1
**guess** 35:1 41:8
49:11 54:11 57:21
68:1 87:1 88:5

89:16 114:14
130:12 131:11
139:3
**guided** 42:16
**gump** 13:1 45:14
79:5 145:6
**guys** 132:24
140:24
**gwendolyn** 18:2

**h**

**h** 10:6 11:7 74:22
74:23,24
**hadley** 16:9 82:2
**half** 76:24 110:1
**halloween** 109:19
112:4,7,15
**halperin** 10:1
**hamilton** 15:18
**hand** 20:9,18
42:16 49:22 60:11
63:6 87:6 89:10
97:13 113:21
147:15
**handed** 32:21
**handle** 48:20
**handled** 130:2
**handling** 19:16
32:15
**hands** 128:8 130:8
**hankin** 16:18
**happen** 31:5
50:23 51:15,19
67:12 74:9 92:10
**happened** 55:11
67:12 110:22
126:20
**happening** 50:24
**happens** 47:2
85:10 90:12
**happy** 33:21 39:7
42:22 57:19 77:19
77:20 82:17,17
84:11 102:12

107:20 108:16
112:19 113:14
114:1 119:6
**hard** 22:25 109:9
141:9
**hardline** 24:10
**harris** 8:17
**hat** 71:4
**hauer** 13:1 45:14
79:5
**head** 75:9
**heading** 24:22
**headlong** 38:6
**healthy** 27:24
**healy** 17:15
**hear** 33:9,10
74:10 108:16
111:13 119:6
134:3
**heard** 25:24 32:2
32:20,24 33:5,22
61:24 95:2 98:11
116:4
**hearing** 2:1,1,12
2:14,24 3:2 19:16
20:23 21:24 24:22
25:19,23 32:3
33:13 53:20,21,22
54:4 55:3 62:4
72:17 74:9,10
76:19 77:1 80:4
80:12,14 83:25
84:3 92:6,25 94:5
101:6 112:2
118:14 124:12
**hearings** 148:7
**heart** 70:2 84:11
**heavily** 41:16
113:24
**heidenberg** 106:2
**heitzenrater**
17:19

**held** 59:22 88:18
110:19 120:7
**hell** 45:17
**help** 30:19 53:11
62:25 92:1 126:22
127:3,21
**helping** 127:6,19
129:17
**herz** 17:10
**hesitancy** 87:2
**hey** 135:20
**higher** 89:7
**highest** 22:10
24:13 42:19
**highlight** 20:25
21:8 127:7
**highlighted** 61:3
**highlights** 62:12
**highly** 27:10
**hired** 134:23
**hoffman** 15:8
**hold** 20:7 83:5
85:17,19 111:2
**holders** 5:3 90:7
**holding** 19:5 82:6
**holdings** 1:7 2:19
3:23 4:5,12 5:7,12
5:16 6:4,15 73:8
101:15
**holds** 24:20
**holiday** 22:3,7
76:19 81:2 82:23
**holland** 12:16
**home** 2:10,12,15
2:22,25 3:3 22:20
23:25 27:5,6,16
27:21,23 56:15,19
73:3
**homework** 133:17
**hon** 1:22
**honor** 4:21 19:3
19:13,22 20:7,13
20:20,24 24:19

31:23 32:1,17
33:14,18 34:2,6
34:11,17,22 35:3
37:17 39:3,18
40:14 42:20 45:13
45:15 47:10 48:3
48:21 49:18 50:10
50:23 52:19 53:13
54:9,17 55:9,21
56:23 58:16 59:9
60:15 61:2,23
62:24,24 63:13
64:14 65:17 68:21
69:12,14,15,25
71:1,14 72:7,22
73:6,17 74:14,19
75:17,25 76:15
78:15 79:4,19,21
80:2 81:24 82:1,5
82:12,16,19,21
83:3,12,14 84:9
84:14,15,19 85:3
85:9,11 86:1,9,13
86:21 87:12 89:2
89:16,21 90:3,10
90:18 91:3,7,7,17
91:22 92:3,5,5,20
92:24 93:3,6,9,21
94:4,9,14 95:1,4,8
95:12,19,21 96:18
96:25 97:5,12
98:24 100:3
101:11,13 102:10
102:18 103:8,10
105:14,19 106:19
106:24 107:7,25
108:3,11 109:13
109:16,20 110:14
111:7,14 113:4,12
113:14,22 114:2
114:10,22 115:10
115:23 116:1,4,7
117:2,5,9,16,22

118:10,17 119:14
119:23 120:22
121:1,5,7,13,17
122:2,2,6,20
123:13,16 124:3,8
124:15,20 125:14
125:16 126:8
127:12,12,23
129:13 130:1,14
130:18 131:17,20
137:12,16,25
138:6,7 139:13
140:6,17,20 141:1
141:19,23 142:11
143:1,11 144:17
145:5,14,24 146:2
146:6 147:4 148:2
148:5,9
**hope** 31:5 117:9
**hopeful** 24:14
28:4
**hopefully** 74:25
**horse** 2:11,16,23
3:4 27:22 36:16
59:13 65:2 73:19
75:20 76:1 77:2
78:11
**houlihan** 129:11
132:18 137:17
**hour** 47:16
**hourly** 135:16
141:21,24
**hours** 47:15
**house** 12:10
**houston** 14:11
**howard** 9:21
**huge** 144:7
**hugely** 144:7
**hundreds** 45:23
52:6 82:8 90:24
**hurt** 120:24
**hurwitz** 11:7

**husch** 14:8 111:15
**hyde** 6:25 149:3,8

**i**

**i.e.** 41:21
**idea** 43:1 70:20
**identical** 102:1
**identification**
120:14
**identified** 55:20
145:9
**identify** 76:5
**ignores** 80:22
**ii** 2:15 3:3,21 4:23
**iii** 2:17 3:5 93:22
**imagine** 78:18
140:8
**immediate** 27:12
27:13 28:7 35:12
**implication**
114:21
**implicit** 99:24
**important** 21:17
22:4 23:2 25:13
26:9 28:19 29:2
35:13 52:4 62:15
65:3 78:4 80:22
88:23 126:7 144:7
**importantly**
116:11 127:3
**imposed** 65:24
**impression** 42:4
**improvement**
2:10,12,16,23,25
3:4 22:20 27:23
29:1 73:3
**imputed** 141:21
**inadvertently**
23:10
**incentive** 25:13
128:13
**incentives** 147:14
**inclination** 44:20

**inclined** 32:1
**include** 70:18
114:16,18,21
**included** 11:16
81:10 98:18,19
102:8 110:4
**includes** 144:3
**including** 30:8
36:25 59:21 74:10
76:3 77:16 79:17
89:9,19 102:25
126:23
**inclusion** 81:13
**inclusive** 104:2
**incoming** 80:5
**inconvenient**
76:20
**incremental** 22:16
25:20 26:3 63:3
**indenture** 13:15
16:2 88:1,2,11,14
88:17,20 89:10
96:13
**independence**
14:9 109:15 111:6
111:15
**independent**
125:1 128:19,20
131:4 132:14
141:2 146:5
**indicated** 82:20
107:6
**indiscernible**
30:14 45:22 71:22
74:16 88:2 99:4
100:6
**individual** 102:4
**indulgence**
102:16
**industry** 56:10,11
**informal** 97:19
**informally** 114:1
116:19

**information** 45:19
48:14 52:3 57:2
81:4 84:21 99:10
99:11 104:17
131:9
**informed** 28:15
104:18
**inhibited** 120:24
**initial** 28:23
**injury** 109:8
**innovel** 27:17
**inquiries** 29:11,11
**inquiry** 93:7
**inside** 116:12,14
**insider** 59:14
**insiders** 115:25,25
**insofar** 112:24
**instance** 107:16
110:23
**instant** 73:25
**instantaneously**
45:25 52:12
**instructed** 91:10
**insurance** 24:24
63:4
**intend** 99:11,12
99:17 106:13
145:24
**intending** 31:1
112:21
**intent** 42:21 59:7
**inter** 85:1
**intercompany**
85:13,25 89:20
91:1
**interest** 20:22,24
66:22 77:20 79:16
115:22
**interested** 57:22
58:12 70:11,17
75:9 85:10
**interests** 103:7
130:25 131:1

147:8
**interfere**  92:22
**interim**  5:1 97:10
  97:11,16 99:8
  101:6 119:25
  124:12 148:7
**internal**  50:17
**international**  12:3
**interrupt**  39:22
  138:7,9
**interrupted**  45:4
  138:16
**intertwined**  23:9
**investigate**  125:19
**investigating**
  143:20
**investigation**
  29:14 126:13
  128:21 130:23,24
  131:7,10 141:14
  147:5
**investment**  5:10
  7:19 19:19 41:21
  58:7 91:6 127:21
  138:11
**involve**  125:20
**involved**  23:23
  96:17 126:4
**involvement**
  71:17
**involves**  43:6
**involving**  126:1
**ira**  13:8 45:13
  79:4
**ironically**  37:2
**irreparable**  27:13
**isda**  80:5,9,23
  81:1,8,11,12,16
  96:5
**isidore**  18:11
**issue**  36:7 45:2
  55:13 59:23 60:2
  61:3 65:8 67:6

69:9 83:22 94:15
  108:19,21 109:4
  114:23 116:16
  120:19 122:19
  128:22 134:17,17
  136:24 143:22
  145:6 146:6
**issued**  85:14,14
  85:19 87:25
**issues**  31:2 32:24
  32:25 45:3 55:12
  65:21 84:2 86:22
  130:7,15 133:3,24
**it'll**  23:21 25:7
  54:7 63:6 93:1
  113:6
**item**  20:3 73:2
  79:21 97:8 101:17
  103:10 113:10
  118:13 142:10
**items**  20:25 30:8
**it's**  57:12 62:13
**i'll**  52:6
**i'm**  33:21 54:8
**i've**  34:3

**j**

**j**  12:6
**jacobson**  8:17
**jacqueline**  7:15
  73:7
**james**  13:19 15:23
  88:9
**january**  140:8
**jared**  7:14
**jason**  17:12,23
**jc**  44:11
**jefferson**  11:18
**jeffrey**  18:8
**jelisavcic**  18:4
**jersey**  12:12
**jessica**  7:13
**jll**  28:12

**job**  30:4 36:9
  125:18 126:19
  132:13 143:14,17
**jobs**  29:23
**john**  15:16
**joint**  143:7,23
**jonathan**  11:7
  18:13
**joseph**  13:10 17:1
  116:7 145:5
**josh**  18:10
**judge**  1:23 28:10
  37:16 39:8 43:13
  45:6 59:5 64:6
  65:12 109:4
  135:23
**judges**  74:6
**judgment**  104:8
  104:10 122:19
  137:20
**judgments**  143:23
**julian**  17:11
**july**  109:25
**jump**  84:11
**junior**  24:7 25:21
  25:23 26:5
**jury**  19:9
**justice**  8:1
**justifies**  124:12
**jv**  72:9

**k**

**k**  8:6 9:11 27:3
**kanova**  16:17
**katherine**  16:22
**keenly**  27:11 85:9
  85:10
**keep**  28:19 38:6
  53:4 59:12 112:22
**keller**  82:2
**kelley**  10:15
**kept**  55:9 123:10
**kevin**  11:21 12:6

**key**  22:19 25:6,11
  25:12,12,14 26:6
  26:25 36:25 110:4
  144:7
**kind**  52:14,23
  55:11 57:2,3
  65:25 67:20
**kinds**  134:10
**king**  14:3 89:11
**kissel**  15:10
**kmt**  8:18
**knew**  143:22
**knight**  12:16
**know**  19:22 21:18
  23:1 24:22 26:22
  29:16 35:7 38:5
  39:14 40:23 41:23
  41:25 44:10,10,11
  45:10 46:20 47:7
  48:15 50:11 51:1
  51:6 52:3 56:14
  56:14 57:23 58:2
  58:23 59:4,22
  60:15 61:21 62:5
  62:25 64:18 66:10
  67:3 68:8,12,18
  69:3,22 70:6,9,10
  70:16 71:7,21
  72:8,11,12 77:6
  78:9 79:8 83:9,11
  83:24,25 84:1
  85:2,11,15,18,18
  85:19,20,20,22
  86:25 87:10 88:7
  89:11,12 91:3
  92:16 93:15 98:9
  100:8,21,21 104:4
  104:4 109:7
  112:13 113:1
  114:19 121:20
  129:1,11 130:22
  131:13,19,25
  132:7 135:16,17

135:18 136:13,21
137:2,2,7 138:13
139:7,15,17,18,23
140:9,12 141:25
143:20,21,25
144:6 146:16,17
147:2,25 148:6
**knowing** 70:3
**known** 22:20
79:25
**knows** 24:19 38:9
52:2 80:23 127:12
**krause** 18:8
**kreller** 16:14
81:24 82:1,5,12
82:16 83:14,18
84:9,13,19 85:25
86:3 89:16,23
90:3,7,10,15,18
90:21 91:3,7 92:5
92:10,13,20,24
93:3,6,9,12,18
94:2,4,7,9,14,18
94:23 95:1,4,8,11
95:14,19
**krislov** 17:9
**kronenberg** 9:14

**l**

**l** 10:19 13:10,11
15:23
**l.l.c.** 5:10
**laid** 45:21 49:12
54:12 72:21 76:14
101:10
**land** 53:15 114:20
**landlord** 97:19
107:1,9,14 108:5
109:16 110:4,5,6
110:9,10,15,21
112:1 115:6 118:2
**landlord's** 110:14
110:25 112:25

**landlords** 9:3
11:16 28:20 32:23
70:10 102:7 105:7
105:21
**language** 62:13
64:2 66:1,13
69:20 97:22 98:8
98:14,20,22 99:3
99:5 102:8 112:25
113:23 114:18
115:7,18 117:25
119:25 120:23,25
**large** 27:18 35:8
37:18 76:15 82:7
134:15
**largely** 46:21
133:5 135:19
**larger** 56:4
**largest** 27:19
29:19 126:14
**late** 32:22 113:19
**latham** 8:9 33:19
70:1
**laughter** 44:8
45:8 51:7 137:23
**lauren** 18:7
**law** 12:8 14:15
42:17 102:24
108:9,25 121:2
145:2
**laws** 68:13
**lawyer** 91:8
123:11
**lawyers** 131:12
**lay** 38:16 44:12
53:15
**laying** 49:14
**lays** 79:12
**lazard** 128:6,6,6
**lba** 9:2
**lead** 7:19 19:19
127:18

**leader** 27:6
**leading** 60:17
125:5
**lear** 89:11
**learned** 80:9
116:14
**lease** 4:6 28:17
96:23 97:22
101:18 102:23
103:4 104:2 106:7
106:8 108:24
109:21 110:2
112:6 114:17
115:13 118:3
**leases** 3:17 4:2,8
28:10 76:4 101:23
101:25 102:4
103:5,12,12,18,18
104:6,7,11,19,22
105:22 114:20,21
115:4,5 117:21
**leave** 5:16 6:10,14
41:21 66:14
123:18
**leck** 9:1
**led** 26:1 127:16
**ledanski** 6:25
149:3,8
**ledyard** 13:13
88:9
**lee** 18:9 53:23
95:23
**left** 65:23 66:2
89:8
**legal** 149:20
**legitimate** 59:23
**lender** 24:19
91:14,15
**lenders** 24:18
**lengthy** 98:16
**lennon** 17:20
**lent** 90:24,24

**letter** 56:23 57:1
57:18 58:5,21
63:14 70:18
106:13 110:4
**letters** 106:17
**letting** 121:20
**level** 31:16
**levels** 123:2
**lew** 143:1
**lewis** 11:8
**liabilities** 76:3
**liberty** 15:20
16:11
**licensee** 109:19
**lieberman** 10:6
**lien** 5:3 26:5
59:25 66:15,15
68:20 91:15
118:15
**lien's** 68:11
**lienholder** 66:21
**lienholders** 79:17
**liens** 65:24 66:6
66:25 67:23 98:4
118:18
**light** 73:24 76:15
79:11,13 80:11
**lii** 16:25
**likelihood** 108:6
147:6
**lillian** 17:24
**limitation** 109:8
**limited** 119:21
124:13 139:8
**limits** 108:23
**line** 19:8 20:8,11
32:10 35:4 47:17
47:18 111:8
116:21 135:22
**lined** 20:14
**lines** 20:9 41:4,4
54:13 71:20

link 57:22
links 44:16
liou 7:13
liquidation 3:21
  27:12 28:7 30:23
  35:12 99:13,23
  132:20
liquidity 21:18,21
  23:7
list 81:10,14 98:14
  98:16
listed 98:19
listen 29:22 36:8
  37:25
litany 81:9
litigation 122:24
  125:23,24,24
little 26:8 31:24
  54:11 55:14 60:22
  67:3 73:22 84:21
live 47:6 111:9
living 42:5
llc 8:18,19 10:8
  15:2,3,3 106:3
  109:15
llp 7:3 8:17 9:1,9
  9:16 10:1,15 11:1
  11:15 12:16 13:1
  13:13 14:1 15:10
  15:18 16:1,9 79:5
  88:10
loan 26:10,10
  66:9
loaned 29:20
lob 58:14 92:17
local 6:9 69:4
location 107:5
  109:23 112:5
locke 116:8
lokey 129:11
long 48:8 51:9
  68:1 88:18 105:13
  121:23 139:15

longer 21:2 80:20
  92:21
look 29:24,24
  36:2 47:21 49:3
  59:4 60:12 62:13
  68:5 84:14,23
  98:14 114:5,6
  132:17,18 135:6
  140:6
looked 66:9
looking 36:15
  52:18 55:15 56:16
  62:17,21 63:1
  86:7 104:20 105:6
  119:5 125:24
  127:18 129:7,15
  129:16,18,23
  130:6 131:5,7
looks 23:3 32:23
  39:4 46:24 50:5
  51:23 57:20
  125:16,17,17,18
  125:22
loop 62:6
lord 116:8
lose 46:4 49:13
losing 46:8
losses 22:5
lot 21:5,6 25:2
  28:8 30:24 31:7
  31:19 38:4 42:6
  43:4,10 44:18,19
  46:21 52:3 77:18
  83:24 115:18
  139:4,7,8 140:13
lotempio 16:20
lots 143:19 144:23
loud 111:13
love 23:24
lp 16:10 82:3
  106:4
ltm 27:8

luftglass 8:23
lynn 14:13 16:19
  111:7,15

**m**

m 5:12 6:15 7:11
  11:6,10,21 16:7
  93:22
ma 12:4
magnitude 85:1
  85:21 147:6
main 12:11 127:5
maintain 35:25
maintained 21:22
maintaining
  25:14
major 29:18
  39:16
making 57:22
  91:6 93:20 126:9
  147:13
mall 15:2
mallory 9:1
malls 70:13
man 100:6,9,14
  100:16,18,21,24
  101:2 105:2,4
management 21:3
  23:19 30:9 32:4
  73:16 106:3
mandate 125:14
  125:17,17 143:13
manges 7:3 19:14
  73:7 97:6 101:14
  118:11
manner 2:13 3:1
marc 16:18
march 51:21
marcus 7:15 73:4
  73:6,7,15 74:14
  74:16,23,25 75:17
  75:19,23 78:6,15
  78:18,21 79:1,19
  79:21 83:12 86:9

86:13,17,21 87:12
  87:22,25 91:16,22
  92:1,3 93:20,21
  93:24 95:21,24
  96:4,12,18,21
margin 22:10
  24:13
marginal 28:18
maria 18:12
mark 8:15 93:1
market 27:5
  56:16 82:14 92:18
  102:2
marketed 75:8
marketing 24:7
  36:24 38:13
  126:24 127:2
marshall 18:13
mart 27:4
maserich 106:2
massey 16:22
massive 23:17
master 97:22
  114:20
material 86:12
  140:4 143:24
materialize
  133:10
matkins 9:1,7
matter 1:5 46:5
  89:13 90:20 92:8
  121:25 122:1
  130:2 135:20
matters 2:1
maximize 21:15
  23:7 37:20 38:20
  38:24 42:18 79:14
  80:24 133:8 144:2
maximizing 21:17
  21:20 30:2
maximum 76:5,8
maza 17:21

mccloy 16:9 82:2
mcentire 16:21
meagher 9:16
mean 30:18 39:25
  41:13 43:3 49:25
  50:7,13,15 52:8
  55:20 60:2 62:15
  71:2 72:8 84:6
  86:4,7,11,24,25
  87:19 88:5,6
  89:22 91:14 98:7
  112:14 114:19
  122:16,17 123:1
  124:4,5 128:25
  129:1 130:16,17
  134:19 136:16
  137:19 138:10,12
  140:2,5 141:20,22
meaning 123:8
meaningful 87:4
  104:6
means 55:2 68:24
  116:22 121:2
  122:6 129:1
meant 129:7
measure 31:19
mechanics 101:3
mechanism 47:24
  61:18
medical 4:22
medium 3:10,14
  79:25 87:14 96:1
meet 35:23 36:3
meeting 140:10
meets 30:3
meghji 7:18 19:18
mellon 13:14
  88:10,13
member 11:12,13
  35:2 71:16,22
  121:12
members 30:5
  124:23

memorandum
  57:2 106:6
memorialized
  106:17
memorializing
  106:14
mentioned 64:3
  71:7 127:2
merchandise 5:3
merchant 118:15
mere 37:24
merely 37:8 38:25
method 28:5
mic 98:10
michael 17:5,10
micro 55:12
microcosm 138:1
microphone 33:17
  88:8
middle 38:1
might've 123:19
milbank 16:9 82:2
milburn 13:13
  88:10
miller 17:22
million 22:24 24:5
  24:8 25:22 26:13
  27:9 35:9 52:1
  65:2 76:2,6,8
  87:23 90:5 104:3
  114:13 116:17
  122:3 128:16
  135:10,20 137:10
  139:2,5,10,21
  140:12
millions 45:23
  52:6 82:8 90:25
mindful 29:9
  71:19,23 72:11
minds 140:11
mineola 149:23
minimal 124:14

minimis 4:16,16
minimize 25:8
  76:17
minimum 128:16
  135:12 139:22
minimums 69:16
  113:11
minor 70:5
minutes 63:7
misled 123:17
missed 27:19
missing 44:16
  57:22 98:18 119:8
misspoke 46:18
mo 7:18 19:18
modest 28:25
modified 101:10
modifying 79:9
moment 21:8 41:3
monday 82:23
  83:25 94:5,6,7,8
  95:7 96:8 148:11
money 44:18 46:4
  46:8,9 86:15,17
  123:22
month 21:2,5,5,13
  22:13 49:14 51:22
  52:12 104:3
  109:24 110:8
  132:3 139:4
monthly 104:2
  128:16
months 121:16
moon 29:5
morning 19:2,3,4
  19:13,21 32:17
  33:18 53:23 63:13
  73:22 98:13
morrissey 8:7
motion 2:4,4,7,8
  2:21,21 3:8,8,9,13
  3:13,16,16,20 4:1
  4:6,7,14,19 5:1,15

5:18,22 6:3,8,10
  6:14 20:4,6 25:18
  27:22 31:15 32:8
  37:12 45:11 54:12
  72:17 73:11,11,12
  73:17,21,25 74:5
  74:13,15,17,18
  75:13 76:23 77:5
  77:8 79:3,6,12,23
  79:24 80:2,8,15
  80:18 81:3,19,19
  81:22 82:18,22,25
  84:14,21,21,23
  85:4,14 88:4 91:9
  97:2,9,9,17 101:6
  101:7,9,18 102:2
  103:2,3,11,15
  104:22 105:20
  107:18 110:7
  112:23 113:11,13
  113:22 115:13,16
  116:3 117:11,20
  117:23 124:11,12
  141:16 142:11,14
  142:18 143:5
  144:13 145:9
motions 20:10
  69:16 82:18 97:1
  102:5 118:14
  142:25
motives 93:8
mountain 46:20
move 39:1 40:2
  52:24 74:4 77:7
  104:21 105:24
  125:6
movements 72:20
moving 35:17
  36:17 55:5 113:23
mtn 22:21 81:9
  89:20
mtns 79:25 80:25
  81:13,16 85:3,8

85:17 96:6
**multi** 26:10
**multiple** 27:24,25
43:6 102:4 134:13
**multiples** 129:18
**multiply** 145:23
**muton** 84:24

**n**

**n** 7:1 14:3 19:1
149:1
**n.a.** 13:15 88:11
**n.w.** 9:11
**name** 58:12
**narotam** 1:25
**natsis** 9:1
**natural** 70:12
**nature** 75:3 82:13
**near** 21:18 23:7
**nearly** 23:16
28:10 101:25
103:24 128:20
**necessarily** 69:3
138:15
**necessary** 37:2
72:3 96:15,16,19
103:23 122:10
143:17
**need** 26:12 30:19
30:20,21 33:9,12
37:20 38:15,16
41:17 42:15 45:14
46:12 47:13 52:1
52:2 54:18 55:2
55:19 62:4,19
71:5,23 77:6
109:5 126:21,22
130:13 131:7
132:12 133:20
134:7 136:9
137:13 138:24
143:4 146:9
147:19

**needed** 30:20
45:15
**needs** 48:19 66:2
66:13 68:25
125:22 132:10
146:16
**negisa** 16:24
**negotiate** 47:17
**negotiated** 41:16
74:11 113:24
**negotiating** 28:20
43:5,9
**negotiation** 28:21
42:11 77:13 140:4
**negotiations**
73:19
**neither** 130:9
**net** 129:15
**neutrally** 131:5
**never** 42:21 68:12
134:10
**new** 1:2 7:6 8:4,12
8:20,21 9:19 10:4
10:17 11:4 12:12
12:19 13:6,14,17
15:2,6,14,21 16:5
16:12 88:10,13
97:25 111:20,20
120:13,14,15
**newman** 11:21
**nick** 17:9
**night** 63:5 82:23
113:19
**nine** 110:10
111:24
**nol** 28:3
**non** 5:3 85:16
102:23 103:5
115:5 118:15
**nonresidential**
3:18 4:3,9
**normal** 57:1
141:17

**normally** 120:18
147:5
**notably** 81:17
**note** 87:21 90:18
107:7 123:16
128:19
**noted** 31:10 73:9
74:17 75:12 87:17
106:22 110:5,24
114:25
**notes** 3:10,14
22:21 79:25 85:13
85:19,24 86:1,5
87:3,14,19,20,25
88:6,18 89:6,20
90:4,7 91:6,13,15
91:19 92:22 96:1
109:6
**notice** 2:1,8,13 3:1
3:9 6:9 33:1 36:21
58:3,18 64:2
66:23 68:6,18
73:12 74:13 79:16
79:23 80:5,13,18
80:19 82:22,24
83:2 99:10,17,19
99:20 100:22
105:8,11 110:6
114:9 117:1
**noticed** 116:20
**noticing** 115:22
**notified** 80:13
**notion** 82:25
**notwithstanding**
43:4
**november** 1:16
2:2 25:24 50:12
73:18,22 80:7,11
82:21 106:10
107:6 110:11
111:25 112:15
149:25

**now's** 101:7
**number** 11:17
19:10 27:20 30:8
56:4,4,4 65:23
70:10 73:9,10,10
73:11 74:16 79:22
79:22,22,25 80:17
82:8 97:10 101:20
102:16 103:16,19
104:13 106:21
107:1 109:16
114:6 126:9
147:18,25
**numbers** 35:8
45:18 120:15
**numerous** 29:7
110:19
**nunc** 5:11
**nw** 10:2 106:4
**ny** 1:14 7:6 8:4,12
8:21 9:19 10:4,17
11:4,19 12:19
13:6,17 15:6,14
15:21 16:5,12
149:23

**o**

**o** 1:21 19:1 149:1
**obfuscate** 46:12
46:14,17
**obfuscating** 86:22
**object** 78:18
91:11 113:6 143:5
**objected** 107:9
118:17 125:3
130:10 142:11,20
145:7
**objecting** 92:19
**objection** 5:18
32:6 33:8,12,24
34:1,24,25 36:6
55:5,8 60:22
66:16 75:13,13
80:15,16 81:5,7

83:20 84:17 97:23
106:22,25,25
107:19 108:16
109:12,14,15
110:17 111:18
117:23 119:1,22
121:10 127:6
128:5 138:19,22
**objections** 20:6
32:7,9,12,12 33:2
33:11 77:19 97:17
97:21,24 102:7
105:20,24 106:20
106:23 124:11,14
127:5 148:1,8
**oblations** 81:10
**obligated** 86:8
**obligation** 29:24
**obligations** 5:6
76:7 89:14
**obligor** 85:8
**obtain** 22:25
**obtainable** 27:25
**obtained** 65:6
**obviate** 46:15
**obviously** 33:21
35:5,6 64:1 65:3
71:9 101:6 108:4
112:21 126:17
130:6 131:1
**occur** 75:2
**occurred** 125:20
**occurs** 146:15
**october** 97:10
101:20 103:17
105:11 106:6,11
110:7,9 111:4
112:8,17
**odd** 37:11 112:14
138:15
**offer** 72:9 91:23
91:24

**offers** 29:7 55:23
56:3,7
**office** 14:15 34:7
**officer** 7:18,20
19:18,20
**offices** 12:8 128:1
**official** 5:15,22
6:3 13:2
**oh** 10:11 34:5
99:19 105:13,18
114:24 116:10
117:22,24 120:5
146:18
**okay** 19:2,13
20:16,18 21:11
32:16 33:7 34:12
34:16,23 39:9
44:6 45:7 48:4
49:6,17 51:11
52:17 53:9,25
54:3,10,19 55:1
56:24,25 59:2,6,8
59:9,20 60:6,9,10
60:25 61:14 62:10
62:11 64:8,16,25
65:11,13,16,20
66:11 68:5,5,14
68:22 69:6,13,21
69:24 70:4,22,24
71:18 72:4,6,15
72:15,24 73:5
74:6,24 75:18,22
77:22 78:17,20
79:6,7,20 81:23
81:25 82:11,15
84:12 87:19 91:25
92:4 93:23 94:1
96:3,11,22 97:3
98:5,8,23,25 99:6
100:1,15,20,23
101:1,4,9 105:1,3
105:18 107:22
108:12,15 111:5

112:12,20 113:3,9
113:20 114:6,24
115:3,11,20 116:2
116:24 117:4,6,10
117:19,24 118:6,9
119:9,12,15,20
120:19 121:6,9,19
123:14,24 124:2
124:19,25 125:8,9
128:22 130:5
132:23 133:1,19
133:22 134:2,5,24
136:17 137:22
138:4 139:14
140:18 141:4,15
142:6,9 145:3,17
145:19,25 146:3,8
146:11 147:2,18
148:10
**old** 120:13 149:21
**ombudsman**
34:10 75:17
**omnibus** 4:6
53:22 80:12
**omniums** 103:11
**once** 69:10 106:16
106:16,16 120:8
**ond** 15:3
**ones** 104:25 133:4
**ongoing** 107:24
**open** 28:20,22
31:7 55:7 139:8
**opening** 48:13
**operating** 40:15
45:16
**operations** 23:9
29:9,21 109:22
**opinion** 109:4
122:17 129:9
**opinions** 129:14
129:15,17,17,24
135:8,22 136:1

**opportunities**
23:12 104:5
**opportunity** 24:1
30:21 84:16 119:8
122:22 139:22
**opposed** 40:5
51:18 94:18
**opposition** 144:13
**options** 47:23
**order** 2:8,9,21 3:8
3:10,13 4:1,14,19
5:5,23 6:4,9 24:17
32:10 34:14,19
46:12 48:23 49:19
52:19,24 54:11,18
55:4,6,16,18,22
62:19 63:1 65:14
65:15 66:3,5,7,8
66:10 67:4,12
68:7 72:19 73:16
74:4,7 75:24
76:25 77:10,16
78:5 79:24 80:16
80:18,19 81:20,21
97:9,11,17 99:8,9
100:4 101:10
102:9,10,15 107:7
108:20 111:21,22
113:12,13,24
117:11 118:1,23
119:24,25,25
120:15,20,23
121:25 122:12,20
122:21 123:3,4
124:6,7,9 145:10
145:15 147:23
**orders** 37:17
66:17 120:10,14
122:4,4,13,24
146:4 147:18,25
**ordinary** 5:6
122:8

**ought** 85:9 92:10
**outcome** 49:1
**outlined** 63:13
**outlines** 56:23
**overall** 29:6 71:12
**overlap** 129:2
**overlapping** 72:10 128:22
**overlooked** 115:20
**overrule** 109:12
**overruled** 107:19
**overused** 88:5
**owed** 86:15,17 87:23
**owned** 28:11 86:25 96:2
**owners** 96:6
**owns** 96:9
**o'neal** 15:24

**p**

**p** 2:7 6:8 7:1,1 14:15 19:1 74:23 74:24,24
**p.c.** 15:1
**paca** 5:3 118:16 118:19
**package** 57:9,12 57:20 59:24
**page** 46:10 81:6,6 81:7 109:2,2 114:23
**pages** 20:17 29:13 63:5
**paid** 76:11 110:7 112:17 120:11,11 123:20,21 124:1
**paloma** 7:12 97:1 97:5
**paper** 29:17 87:20 121:15
**papers** 24:21 31:10 37:5 38:5

44:21 70:11 84:5 88:17
**paragraph** 97:22 97:25 98:23 114:23 115:21
**parallel** 52:15
**pari** 89:19
**park** 10:16 13:4 15:13
**parlance** 57:1
**parsing** 66:1
**part** 40:8 42:11 47:21 49:21 50:4 56:8,17,19 70:17 77:24 96:2 99:15 99:16 125:25 140:4 141:2
**parte** 74:8
**participant** 82:14
**participants** 92:18
**participate** 81:11
**particular** 21:19 22:17 63:18 72:12 74:1 79:13 109:21 124:6 127:20
**particularly** 22:8 24:10 58:12 62:3
**parties** 6:1 20:22 20:24 29:12 31:13 32:11,12,13,19 38:12,13 39:6 40:4 42:4 43:6 47:6 48:14 63:21 63:23,25 65:1 72:25 75:9 77:13 77:25 79:16,18 90:4 100:21 103:5 106:5,12,13 108:8 113:25 114:9,16 117:13 120:1,6,6 120:8,13,17,24 123:21 126:8,25

144:13 145:8
**partners** 16:10 19:15 26:2 80:17 82:3
**parts** 27:14
**party** 24:23 25:5 26:9 30:15 47:24 50:1,3,20 51:18 104:9 109:19 116:20 123:21 141:13
**party's** 108:10
**pasa** 5:3 118:16 118:19
**passion** 110:21
**path** 23:8 43:9 45:17 46:1 48:25 49:2 51:22 52:5
**paths** 23:6 30:2 52:15
**patrick** 17:15
**paul** 5:12 6:15 8:6 11:1,6 17:3 34:6 124:20,21 143:1 145:8 146:25
**pay** 4:20,21 5:1 46:7 89:14 98:1 118:18 140:12
**paying** 56:12 110:1 123:20,22
**payment** 76:3 122:8
**payments** 106:8 118:17
**pending** 106:19
**penney** 44:11
**people** 19:10 27:2 27:2 29:18 36:12 39:18 41:14 42:5 47:16,22 48:16,17 57:5 58:11 59:25 62:23 70:21 71:11 77:18 83:1,10

88:7 115:12 123:10,20 129:8 129:24 142:21 143:9 144:22 147:8,18
**percent** 29:1 76:12 147:17
**perfect** 30:18
**performance** 24:5 99:13,23
**performed** 21:23 24:2,16 128:6
**performing** 28:2 110:1
**period** 41:18 110:13
**periodically** 54:16
**permit** 40:4
**permitted** 110:18 112:6
**person** 33:5 43:24
**personal** 68:11 107:12 115:5
**personally** 43:7
**personalty** 68:15
**perspective** 37:23 118:22 127:12 136:23
**pertain** 109:11
**pertinent** 103:20
**peter** 8:24
**petition** 5:5,11 25:10 29:3 77:12 81:18 103:15,24 110:3 120:4 122:5
**phelps** 129:13
**phone** 32:20
**phrase** 88:5
**pick** 120:9
**pickup** 24:15
**pieces** 19:16
**pierce** 17:23

**pivot**  27:12 35:21
36:18 38:2 45:24
**pivoting**  36:11
**place**  12:3 14:17
48:14 58:17 76:25
77:3 78:8 80:24
87:15 120:10
130:3
**places**  115:19
**plains**  1:14
**plan**  28:6,24,25
29:5 30:9,20,21
31:1 35:17 46:23
50:2,4,12,14
51:23 108:14
130:2
**planning**  26:21
28:3 30:10 31:7
**plans**  26:22
**play**  127:8,9
**players**  71:4
**plaza**  8:20 15:2,13
15:20
**pleading**  34:4
35:1 46:10 88:3
88:25
**pleadings**  21:6
72:16 126:9 127:7
**please**  97:15
**pm**  148:15
**podium**  45:15
73:4 101:12
107:21 117:17
124:16
**point**  21:16 42:17
49:11,11 50:25
54:11 55:3,7
59:21 61:1 65:2
66:10 67:8 70:5
77:23 83:5 89:1,4
89:9 91:12 93:5
96:21 107:22
108:4 112:1,9

119:17 122:9
138:7 139:13
140:19,20 145:1
145:19,21 146:18
**points**  20:6 34:25
55:3 59:10 62:22
95:24 133:3 134:4
134:5 138:21
**policies**  25:9
**policy**  146:6
**portfolio**  28:10
101:24 103:4
**portion**  39:16
**portions**  5:17
**pos**  120:13,13
**pose**  45:11 131:22
**posession**  22:16
**positing**  136:16
136:18
**position**  85:7
94:11 107:11
110:14 111:17
112:4 118:3 119:3
119:23 131:15,16
132:16
**positions**  126:8
**positive**  21:7
28:16
**possession**  107:2
107:9 108:2
120:16
**possible**  21:16
31:5 34:19 65:6
76:17
**post**  5:5 25:9 79:5
102:23 110:17,18
110:24,25 120:4
122:5
**posted**  80:21
**postponed**  80:9
**postponing**  80:14
**potential**  30:10
40:18 42:19 43:9

59:10 70:12 76:21
126:1
**potentially**  44:18
**potion**  110:17
**power**  95:10
**practically**  143:12
**practice**  74:8
**pre**  77:12 81:18
**preapprove**
100:18
**precedent**  134:10
**precisely**  53:1
92:6
**preclude**  119:24
**precluded**  107:15
**precludes**  118:23
**predestined**  49:1
**predetermined**
49:1
**preempted**  84:4
**prefer**  114:2
**prejudgment**
59:16
**preliminary**  30:9
**premise**  45:16
**premises**  109:18
110:6,12,22 111:1
111:19,25
**prepare**  20:22
54:14
**prepared**  93:10
93:12 96:8 120:9
141:15 142:24
146:12
**preparing**  22:16
26:17,18
**prepetition**  4:20
5:2,5 122:4
**present**  19:17
97:2 107:20
132:12
**presented**  107:15

**presenting**  20:5
**preserve**  68:20
**preserved**  123:12
**press**  33:8
**pressure**  49:9
**pressuring**  52:2
**pretty**  123:9
124:4 146:20
**prevented**  111:9
**previously**  78:1
78:14 91:17 111:3
**price**  76:2,12
**pricing**  26:7
**primarily**  72:13
**primary**  96:6
**principal**  22:14
**prior**  111:18
**priority**  5:4 66:7
85:21 86:5 120:2
120:18,24
**privacy**  34:10
75:16
**privilege**  143:9,16
143:16 144:3,5,15
144:16
**privileged**  144:8
**pro**  5:11
**probably**  42:6
45:3 47:7,14,16
58:8 84:2 112:11
113:6 131:12
135:13
**problem**  111:10
111:12 133:12
143:11,13
**procedural**  36:3
37:12 52:22 66:3
**procedure**  5:24
58:6 69:22 112:10
**procedure's**  48:23
**procedures**  2:5,9
2:15,22 3:3,20 4:2
4:15 5:19 20:4

[procedures - questions]                                                                            Page 26

32:2,4,8,10,13
33:13 35:19,22
36:16,23 38:16,24
41:9 47:21 48:24
58:1,2,4,13,17
59:1,11 61:8
65:15 66:21 67:11
69:17 72:18,19
73:3,13,25 74:19
76:15 77:10,10,16
77:16 79:13
101:19,19,25
107:4 113:11
115:1,25 117:12
**proceed**  91:23
108:14 143:8
**proceeding**  74:2
80:21
**proceedings**
148:14 149:4
**proceeds**  43:16
66:7 67:25 68:2
68:24 91:19 98:2
98:3
**process**  22:17
24:7,25 25:21
36:24 38:15 39:10
39:25 40:3,3,9
42:16,17 43:16
46:24 48:20 52:9
54:16 56:8,17,22
57:1,3,18,23 58:5
58:20 63:13 64:2
70:8,18 79:15,17
80:25 103:25
109:24 126:24
127:16 130:10,10
132:22
**processed**  144:10
**processes**  26:18
29:8 127:2
**produced**  29:12

**product**  135:18
**production**  24:12
**professional**  46:8
72:13 128:2
**professionals**
23:23 47:19 51:9
147:22
**professionals'**
37:22
**proffer**  91:23,24
92:2 93:19,21
**proffered**  96:4
**profitability**  25:6
**profitable**  22:2
27:4,8 39:5
**profound**  75:5
**program**  25:12,13
**programs**  4:23
**progress**  21:5
**project**  139:16
**projection**  127:19
**projections**
127:14,15,16
138:12,14
**projects**  28:25
**proper**  126:11
**properly**  98:19
117:11
**properties**  8:19
10:2 28:11 70:12
72:9 97:19 106:2
**property**  3:18 4:3
4:3,10,10 8:10
15:3 33:19 66:23
69:2 70:1 81:4
102:22 103:13
107:10,12,24
108:23 109:7
115:5,6
**proposal**  39:15
41:3,7,9,11,12,20
41:24 42:1 47:9
47:12,25 51:18

**proposals**  39:19
41:13 42:22 50:1
50:21
**propose**  146:14
**proposed**  13:2
32:10 55:6 72:19
75:24 76:14 84:7
87:17 97:11
101:10 102:8,10
106:22 107:7
108:20 124:16
137:11 145:10
**proposition**
108:22
**prosecute**  143:15
**prospective**  71:9
**prospects**  21:7
22:23
**protect**  144:1
**protection**  21:12
24:24 25:2,6 27:7
30:19 96:7,7 98:3
**protections**  2:11
2:24 103:4
**proud**  23:24
**provide**  48:7
79:15 81:4 102:2
103:20 113:14
120:1 127:3
137:17 138:23
142:4 147:8
**provided**  72:20
105:11 117:25
120:12,16 127:1
**provider**  24:23
25:5 27:21
**provides**  97:25
107:8 116:9
**providing**  27:6
120:7
**publicly**  63:11
109:22

**pulling**  26:11
**purchase**  24:24
25:1,6 70:12
73:20 76:1,2,12
77:9,13 120:14,15
122:13
**purchaser**  76:7
**purchaser's**  76:3
76:16
**purchases**  70:12
**purpose**  141:12
**purposes**  22:14
131:9
**pursuant**  2:7 5:23
6:5,8,11,14 87:25
91:16
**pursue**  49:9,10
**push**  145:1
**pushed**  82:20
**put**  27:23 37:10
38:18 39:19 41:20
43:12 59:1 66:13
70:11 80:10 94:24
95:10 111:18
116:20 121:15
128:9 140:7
**putting**  22:19
43:11

**q**

**qualified**  135:3
**quantum**  128:17
**quarropas**  1:13
**quarter**  22:6 39:5
**quarters**  22:6
**question**  39:13
41:2,8 45:12
64:25 80:2 114:14
116:19 123:19
130:6,12 134:1
**questioned**  141:5
**questions**  39:8,10
83:4 84:25 91:24
100:2 102:18

114:3,4 118:20,21
124:3 125:11
143:25
**quibbling** 137:4,5
**quick** 114:5 134:5
135:3
**quickly** 37:8 45:4
116:5 144:5
**quite** 44:1 51:21
58:8 65:22 68:13
93:5 136:1
**quote** 81:3
**quoted** 88:17
**quotes** 80:10
**qureshi** 13:9

**r**

**r** 1:21 2:7 6:8,9
7:1,14 9:21 11:8
15:8,16 19:1
149:1
**rack** 22:21
**rai** 1:25
**raise** 25:22 59:10
61:2 66:14 77:23
140:16 143:15
**raised** 20:7 23:25
35:1 45:3 55:4
84:2 89:10 108:19
116:16,19
**raising** 22:15
25:20 49:22 89:4
**range** 137:20
**rate** 141:21,24
**ray** 2:18 3:22 4:4
4:11 5:7 7:8 19:13
52:2
**rdd** 1:3
**reach** 112:2
**reaction** 42:12
45:5
**read** 24:21 34:3
59:19 66:16 84:5
84:17 88:3 120:24

123:4
**readily** 136:10
**reading** 32:8
44:20
**ready** 51:21
**real** 3:18 4:3,9
19:11 28:9,12
41:8 43:5 48:15
52:1 60:2 69:2
72:11 83:22 86:22
91:12 97:1 101:23
106:2 115:6
**realities** 23:20
**realized** 104:7
**really** 22:8 25:2
27:3 29:2 30:4
31:10,14,20 33:8
36:2,15 37:5 38:1
38:3,8,11 42:10
42:15 47:14,21
48:13 56:8 64:6
65:3,8 66:17 70:3
71:17 72:12 82:23
84:20,24 87:6
89:13 92:10 108:5
108:21 109:4
118:1 121:13
129:16 130:18
131:10 136:1
138:15 143:7
147:13,19
**realty** 9:2,2 68:16
106:3,7,24 108:16
108:19
**reason** 53:1 81:15
91:11,11 92:19
105:15 122:2,17
130:22 140:23
**reasonable** 44:22
79:15 100:18
117:15 127:15,17
**reasonableness**
128:10

**reasonably**
100:10
**reasons** 81:9
107:17
**received** 32:19
77:8 85:20 87:13
91:8 97:17 104:17
104:24 106:9
110:9 120:12
121:22 122:9
**recode** 101:14
**recognize** 31:2
**recognized** 77:24
**recommending**
112:10
**record** 34:9 50:13
52:21 56:6 62:20
64:12,21 72:16,21
75:19 79:4 89:24
108:19 111:18
119:16 122:18
124:12 125:11
147:22 149:4
**recoveries** 28:6
**recovering** 87:4
**recovery** 89:7,18
**recuse** 71:24
**red** 20:8,9,11,14
**redact** 5:16
**redline** 97:11
102:12 113:15
145:11,16
**redundant** 135:23
136:9
**refer** 80:6
**referenced** 75:15
**reflect** 32:22
72:20
**reflected** 101:20
102:8,15 103:16
104:12 106:25
109:15 113:24

**regard** 21:24
40:12 69:4 130:11
133:17
**regarding** 34:8
63:13,14 81:16
126:12
**regretted** 69:11
**reimbursable**
4:21
**reimbursement**
59:18
**reject** 3:17 4:6,8
103:11 105:22
108:24 110:8
117:20
**rejected** 103:18
**rejecting** 104:7,10
**rejection** 4:2
96:23 101:18,24
102:23,23 103:22
105:23 106:5,23
107:1,5,8,11
109:17 110:18,20
110:25 111:3
112:24
**related** 2:17,17
3:5,11 4:8,23 5:19
5:19 6:5,11 29:8
39:10 56:14 73:2
73:10,15 76:8
102:23 103:12
118:16 147:13
**relates** 59:10
106:7
**release** 132:10,11
132:12 133:11
139:9
**relevant** 50:16,17
58:6 72:25 103:20
**relief** 2:17 3:5
4:23 35:15 39:7
73:15 76:22 80:3
81:5,19 103:6

105:8,10 107:14
117:15 118:5,16
121:21 148:7
**reluctant**  42:18
141:21
**rely**  121:21
133:15 138:12,12
**remain**  21:25
30:11
**remaining**  32:12
75:12 109:14
110:11 111:1
**remedies**  88:20
**remove**  110:15
**removed**  103:18
107:12
**rent**  104:2 106:12
110:1,7 112:14,16
112:17
**reorganization**
43:5
**reorganize**  21:15
22:9 36:18 37:14
**repeat**  127:10
143:5
**reply**  63:1 106:20
107:18
**reports**  71:12
128:7
**represent**  111:11
111:14 124:21
**representative**
94:10
**represents**  88:2
**request**  65:15
81:21 99:9 100:3
104:17 111:23
**requested**  39:7
76:22 80:3,14
81:19 118:5 128:9
**requests**  37:16
**require**  48:6
59:25 95:17 128:1

**required**  31:25
73:17 76:25 110:2
137:4,8
**requirement**
99:17,19,20
**requirements**
30:22 99:10
**requires**  63:18
126:2,5 147:5
**requiring**  120:13
120:14
**reservation**
104:12
**reservations**  77:5
77:7
**reserve**  22:24
33:23
**reserves**  66:13
**reserving**  33:9
**reside**  102:10
**residential**  115:5
**resolution**  111:17
112:2
**resolutions**  106:1
**resolve**  45:2
105:23 112:13
**resolved**  75:14
97:21 102:7
112:11 124:11
140:8
**resolves**  57:7
**resources**  41:11
43:3 50:8
**respect**  2:8 3:9
6:10 73:12 77:4
79:23 104:19,22
105:21 106:11
120:12
**respectful**  100:3
**respectively**  77:14
**responding**
104:16

**response**  32:8
35:13 37:12 48:15
77:15 83:14 104:9
119:21
**responses**  77:4
89:17
**responsibilities**
47:1 127:11
**responsible**  26:22
38:20
**rest**  62:13,14,21
**restricted**  114:19
120:21
**restriction**  111:21
**restrictive**  115:8
**restructuring**
7:18 11:2,12,13
19:18 21:4,19
23:6 29:14,22
30:2,3,5,25
124:17,21,22
125:15 126:6
127:7,25 130:25
133:16 134:8,14
134:19,22 138:8
140:20
**result**  77:12 80:11
87:14 89:7
**retail**  27:3 90:7
102:1
**retailer**  39:4
**retailers**  22:5
**retain**  125:2
**retained**  134:13
**retention**  25:12
125:3 137:5,6,11
**retroactive**  105:8
105:10
**reverse**  81:16
**review**  28:23
117:13 135:4
137:14 140:15
141:17,18 144:4

**reviewed**  30:8
72:15 108:15
125:9 137:16
**reviewing**  104:20
**revise**  72:23
**revised**  72:20
77:15,24 102:8,15
113:12,13 117:11
118:1
**revision**  74:11
**revisit**  137:10
**reward**  41:15
**richard**  8:7
**rid**  114:6
**riecker**  7:20 19:20
**rifkind**  11:1
**right**  19:24,25
21:10 23:8 30:25
33:7 34:3 36:13
38:1,14,20,24
44:4,4 45:20
50:19 51:14,17
52:16,17,24 53:5
53:6 54:19,21
57:17 58:7,25
59:15 61:6,19
62:23 63:9,16,25
64:16,25 65:11,13
66:19 67:2,5,21
68:3,14,17 69:13
69:18,24 70:14
73:14 74:24 78:25
79:2 83:12,17
85:24 86:2,15,20
87:12,20 88:3,12
88:15,21 91:21
92:4,14,22 95:7
95:20 96:13,20,22
98:8,25 99:24
100:12,17,23,24
101:4 103:3,14
105:18 107:13
108:10,18,22

112:12,23 113:7
114:12 115:7,17
116:2,2,10,13,25
117:4,10,10
118:25 121:3,6,11
121:25 123:2
132:5,8 133:14
135:1,1 137:2
138:25 140:5,18
140:22 141:4,11
141:15,18 142:6
142:13,19 143:3
143:18,19 144:12
144:18,24 146:3,7
147:1,10
**rightly**  46:3
**rights**  33:10,23
35:15 61:24 66:14
77:5,7 104:12
117:13 120:21
123:4,12 124:10
**ripping**  120:13
**rising**  69:15
**risk**  25:8 38:22
41:15 92:23 95:18
**risks**  56:13
**rizzo**  17:24
**road**  137:14
149:21
**rob**  7:20 19:20
**robert**  1:22 17:8
**robust**  24:6 25:21
**rockaway**  106:3,7
**roebuck**  80:6
**role**  30:15 133:7
**roles**  71:20 127:8
136:4
**ron**  71:21
**ronald**  17:18
**room**  1:13 48:12
**rooms**  29:8
**ropes**  14:1 121:8

**rosenberg**  12:21
**rucker**  16:23
**rule**  6:5,11,15
142:18
**rules**  5:24 144:19
**ruling**  96:14
**run**  24:6 25:21
42:7 43:15 47:20
54:14,15 58:4
62:19 75:23 80:25
**running**  24:24
38:6 44:19 92:23
114:20
**ryan**  17:7

**s**

**s**  2:18 3:11 5:20
6:6,12 7:1 13:8
19:1 22:21 74:22
74:23,24
**s.d.n.y**  103:1
**s.d.n.y.**  109:3
**sale**  2:10,12,13,14
2:15,22,25 3:1,2,3
3:10,14 22:17,19
22:21 26:17 29:8
36:19 38:18 49:2
54:15 58:3,6,17
58:19,20,22 62:4
66:5,7,17,25
67:11 68:6,19
69:16 70:3 74:1,2
74:21 75:2 76:18
77:1,2 79:15,24
80:25 81:1,3,15
87:14 89:6 96:5
107:23 113:11
114:10,17,17,18
114:21 127:1
**sales**  3:21 4:16
22:10 24:9,13,15
25:2 29:1,4 35:21
37:7 42:17 45:25
46:24 51:22 98:2

115:25
**san**  9:5 14:19
**sara**  13:11 18:5,6
**sarachek**  17:1
**satisfied**  104:18
**satisfies**  30:22
**satisfy**  5:6 30:11
**saturday**  73:22
**saul**  18:10
**save**  23:21 24:1
29:23 31:3 37:24
144:14
**savings**  15:11
**sawnie**  16:21
**saying**  57:16
58:15 62:1,2,5
67:11,14,19,22
75:1 100:10
121:18 122:12
135:20 140:15
**says**  42:17 46:23
48:23 49:1 50:4
62:8 66:9 78:9
87:21 88:18
114:18 122:9
128:23 132:6,10
135:4,6
**scenarios**  42:9
140:8
**schael**  17:2
**schedule**  74:8
78:4 80:4 83:25
84:3 103:17,19
107:6
**scheduled**  2:1
80:7,12
**schedules**  85:12
**scheduling**  2:11
2:24
**schrock**  2:18 3:22
4:4,12 5:7 7:8
19:3,6,13,14,22
20:3,13,15,17,20

21:12 32:14,21
34:5,24 35:3
39:12,18,24 40:7
40:10,14,21,24
41:1,5 42:2,8,20
42:25 43:7,13,18
43:22,25 44:2,7
44:24 45:2,6,9
46:19 48:23 50:10
50:19 51:3 52:21
53:20 54:4,21,22
54:25 55:21,25
56:5,13,18,22
57:18,24 58:1,10
58:16 59:2,5,7
61:22 64:2
**schrock's**  49:21
56:6
**schwartzberg**  8:6
34:6,6,11,13,18
34:22 75:15
**scott**  8:23 10:19
17:4
**scurria**  17:13
**seal**  5:17
**sean**  15:24
**sears**  1:7 2:10,12
2:15,18,22,25 3:3
3:23 4:5,12 5:7,12
5:16 6:4,15 19:4
22:5,18 25:1 27:3
27:4,5,10,16 42:7
56:15,18 58:12
73:3,7 80:6 82:7
82:14 85:16 86:14
86:14,16 87:23
96:2,7,7 101:15
109:10
**season**  22:3,7
**seceded**  69:8
**second**  20:22 22:5
41:10,22 42:1
45:15 96:6 99:16

108:21 128:5
144:18
**secret** 60:3,5
**section** 5:23 88:17
108:24 110:13,14
139:6
**secure** 26:20
147:7
**secured** 24:18,18
65:24 82:9 86:8
87:8 91:14 126:14
126:14,15 130:24
**securing** 139:23
**securities** 81:14
**security** 19:8,12
19:24 98:13
**see** 29:17 37:6,6
40:23 42:15 44:13
48:1 50:24 51:23
66:21 111:18
122:17 131:7
135:22 137:14
143:4 147:5
148:11
**seek** 35:15 81:5
**seeking** 35:19
85:6 96:1 101:18
109:17 110:8
**seeks** 73:25
112:24
**seen** 56:25 63:10
68:12 126:8
134:11
**segregated** 68:2
98:2
**selection** 19:9
**sell** 84:8 85:6 87:2
92:22 96:1
**seller** 27:20
**sellers** 85:2,3
**selling** 57:4 70:19
70:21 117:6

**send** 58:18 146:25
147:19
**sending** 29:11
**senior** 26:14
**sense** 45:18 46:23
48:2,5 49:24
61:11 63:22 84:3
92:7
**sensible** 44:24
**sensitive** 117:14
**separate** 43:9
56:14,18,19 74:18
**separately** 98:16
**sequence** 84:10
**serious** 30:25
44:15 51:11,12
**seriously** 29:24
30:16 93:5 126:19
**seritage** 8:18,18
8:19
**serve** 28:5
**served** 110:3,6
**serves** 30:15
**service** 27:21
**service.com** 9:10
73:19 76:9,11
**service.com.** 76:1
**services** 27:5,6,16
56:15,19 120:7
135:5 136:10
137:4,17 138:23
**session** 30:7
**set** 25:19,23 35:24
40:17 46:4 59:11
83:19 124:12
**sets** 117:11 130:15
137:9
**setting** 81:8
**settlement** 126:1
**settling** 125:24
**seven** 104:19,22
104:23

**seward** 15:10
**seyfarth** 16:1
**shake** 143:21
**shana** 9:22
**share** 57:19 71:5
72:25 106:17
130:16,16 133:5
143:24
**shared** 28:24
131:9
**shareholder**
29:18
**sharing** 26:6
71:10
**shaw** 16:1
**shed** 102:3
**sheet** 26:1 90:9
**shifted** 67:24
**ship** 22:19 27:23
73:17 74:2,5,18
74:21,21 75:7
120:9
**ship's** 76:8
**shipper** 118:20
**shippers** 5:2
118:15,18
**shirt** 51:6
**shlomo** 17:21
**shock** 70:7 100:24
**shooting** 29:4
**short** 26:19 41:18
**shorten** 3:8 43:11
74:15 79:23 80:8
**shortened** 36:16
73:12 82:18
**shortening** 2:8 3:9
6:9 74:4,7 80:16
80:18,19 81:20,21
82:16
**shorter** 139:4
**shortly** 29:3 31:2
80:8 148:3

**shoulder** 86:7
**show** 51:2 60:1
**shriver** 8:17
**shrock** 70:20,23
72:7,22,25 73:9
**shuttering** 109:23
**side** 90:9,12
143:22
**sides** 31:8
**sidley** 9:9
**signed** 99:4
106:13
**significant** 23:11
35:11 82:6 126:12
126:21 128:3
**significantly** 32:6
55:17
**signoff** 99:2
**simard** 12:6
**similar** 33:24 34:1
**simkulak** 17:14
**simon** 8:10 33:19
35:1,2 44:13 70:1
70:10 71:8,10,11
71:15,16,25 72:8
97:19
**simon's** 71:3
97:23
**simple** 127:11
**simply** 67:22
85:13 108:1
**sims** 35:7 37:10
**simultaneously**
43:8
**singer** 17:3
**singh** 7:9 32:15,17
32:18 34:17,21
61:23 62:2,24
63:10,17,21,25
64:6,9,14,17,20
64:23 65:4,10,12
69:15,19,22 96:25

**single**  29:19 33:4
  36:6 38:19 81:7
  115:15
**sir**  113:8 138:1
**siroka**  8:24
**sit**  70:25 71:2
  89:19 132:16
  144:6
**situation**  109:21
  118:21
**size**  103:3
**skadden**  9:16
**skip**  77:20
**skipped**  117:19
**skips**  47:14
**skyrocket**  141:22
**sl**  26:8
**slate**  9:16
**slower**  37:6
**slows**  37:3
**smaller**  134:19
**snapping**  52:9
**sneak**  115:12,16
**socialize**  147:20
**society**  15:11
**sold**  55:14 63:15
**solely**  105:22
**solidified**  24:10
**solution**  34:10
**solutions**  149:20
**solvency**  127:13
  127:20 128:24
  129:9,14,15,20
  135:7
**solvent**  21:23 22:1
  30:12
**somebody**  98:15
**someone's**  92:2
**somewhat**  56:14
  79:9
**sonya**  6:25 149:3
  149:8

**soon**  34:19 76:16
**sophisticated**  42:6
**sorkin**  13:10
  145:5,5,24
**sorry**  45:1 46:15
  46:18 67:18 72:19
  78:10 94:7 99:14
  107:23 111:11
  138:7
**sort**  47:20 71:12
  92:17 96:14 109:8
  122:14
**sorts**  41:14
**sotto**  92:17
**sought**  21:12
  101:24 125:2
**sound**  104:8
**sounds**  44:5 58:15
  123:18
**source**  42:19
**southern**  1:2
**space**  24:11
**spaced**  81:7
**speak**  104:15
  127:25 143:2
**speaking**  40:3
  45:11 93:15
  131:14 132:24
**special**  124:17
**specific**  39:8 58:3
  58:16
**specifically**  38:16
  38:22 114:25
**specifics**  50:12
**speed**  24:11 31:20
  32:11
**spell**  21:14 30:20
  57:3
**spent**  23:5 95:5
**spirit**  109:19
**splitting**  131:19
**square**  9:18

**srac**  80:7 85:7,15
  85:20,22 86:6,25
  86:25 87:5,6,24
  88:14 89:9,13,14
  89:19 90:1,4,7,9
  90:18,22 91:6
  93:16 94:10,13,21
  94:22,25
**srl**  8:18
**st**  14:3,18
**stabilization**
  22:14 23:14
**stabilized**  23:16
**stabilizing**  25:14
**staff**  20:21 98:13
**stakeholders**
  30:13,14
**stalk**  75:25
**stalking**  2:11,16
  2:23 3:4 27:22
  36:16 59:13 65:1
  73:19 75:20 76:1
  77:2 78:11
**stand**  70:8,15
**standard**  119:25
**standing**  36:13
  71:15 82:24 88:1
  91:8
**start**  36:11,24
  37:2 49:14 75:9
  82:18 126:8
**started**  45:15
**starting**  109:2
**state**  68:9,12 69:4
**stated**  107:17
**statement**  34:8
  104:12 119:3
**statements**  33:9
  35:7 38:5 118:19
**states**  1:1,12 8:1
  27:20 75:14
**statute**  65:24 69:4
  123:3,5 124:10

**statutes**  124:6
**statutory**  107:12
**stay**  92:23 112:9
**steady**  23:15
**steam**  52:4
**steen**  15:18
**step**  22:4 23:10
  25:13 39:4 71:23
  84:15
**stephanie**  17:16
**stephen**  17:22
**steps**  23:3
**stop**  24:12
**store**  3:20 28:14
  28:21 29:1,4 33:3
  38:23 49:2 51:22
  58:20 98:2 109:10
  109:24 112:4,7,15
**stores**  28:15,16,18
  28:19 36:25 38:21
  39:11,20 40:13,15
  55:20 56:9 70:9,9
  70:16,18 87:1
  99:11 103:1,21,22
  103:24,25 104:3
  109:1
**storrs**  15:1
**straight**  29:5
  37:25
**strategic**  100:7
**strategizing**  23:6
  30:1
**strategy**  71:12
**strauss**  13:1 45:14
  79:5
**stream**  28:13
**streamlined**  102:2
**streams**  46:22
**street**  1:13 8:3
  9:11 10:3 11:18
  12:11,18 13:16
  14:10 16:11

**stretches** 47:16
**stricken** 111:22
**structure** 26:4
  36:10 56:1 82:7
  87:16 128:17
  147:11
**structured** 26:10
  128:15 138:16
**structuring** 68:19
**struggling** 142:1
**stuff** 46:20 55:13
  68:19
**sub** 103:12 110:11
  111:1 112:16
**subcommittee**
  11:2 124:22,22
  125:2 126:3
  127:23 134:8,14
  141:13 143:14
**subcommittee's**
  29:14
**subject** 66:9 83:8
  98:19 99:1 100:2
  126:16 140:14
  141:17
**subjects** 128:8
**subleases** 3:18 4:8
**submission** 81:8
**submit** 34:14
  62:18 73:1,24
  82:21 145:11,16
  146:4
**submitted** 64:23
  72:8 74:8 118:7
**submitting** 34:9
**subordinated**
  131:2
**subordination**
  126:16
**subsequently**
  112:18
**subset** 41:10
  136:6 137:9 138:1

**substantial** 24:18
  24:19 25:25 27:17
  28:5,9,11,13,17
  31:18
**substantially** 26:3
**substantive** 73:11
  80:18 81:19 97:23
  102:17
**subtenant** 106:8
**successful** 23:15
  31:6 76:10 78:23
**suffer** 27:13 35:11
**sufficient** 43:3
  74:13 79:16 81:4
  81:6 99:3
**suggest** 53:10
  89:18 123:21
**suggesting** 43:10
**suggestion** 32:1
  44:12 64:11
  111:22
**suggestions** 36:7
**suite** 8:3 12:11
  14:10,18 135:5
  136:10 137:3
  138:23 149:22
**summarizing**
  144:12
**summary** 75:20
**sunday** 30:8
  104:17
**sundries** 100:5
**sunny** 7:9 32:17
**supplants** 69:3
**supplement** 34:9
  109:5
**supplemental**
  5:18 81:14
**supplied** 134:11
**supply** 24:10
**support** 24:17
  25:17 29:21 35:1
  35:20 81:18

**128:10,18 129:14**
**supported** 125:3
**supportive** 35:20
  36:4
**supports** 110:14
**supposed** 66:22
**supposition** 90:22
**supreme** 144:19
**sure** 20:2 23:9
  37:18 39:24 42:24
  51:5,8 54:8 55:9
  56:25 58:13 62:13
  62:19 63:6 65:22
  66:2 67:6 71:11
  71:25 86:24 91:10
  101:3 104:14
  107:19 114:15
  115:21 120:20
  128:3 129:7 130:3
  132:24 145:22
  147:13
**surprisingly** 35:5
  35:6
**surrender** 110:4
  110:21 111:4
**surrendered**
  109:18 111:20
**surrenders** 107:2
**surrounded** 107:9
**surrounding** 28:3
  30:10
**survive** 124:14
**survived** 102:24
**susanna** 11:10
**swetnam** 17:25
**syracuse** 11:19
**systems** 27:14

**t**

**t** 12:8 149:1,1
**t's** 50:6
**tabachnik** 12:8,14
  65:17,18,21 66:4
  66:8,12,19,24

**67:3,6,10,16,19**
  67:22 68:1,4,9,11
  68:15,21,23 69:1
  69:6,9,12,14 98:7
  98:9,12,24
**table** 96:5
**take** 21:8,14 22:4
  23:21 30:15 32:1
  35:4 37:13 41:22
  41:25 42:3 43:10
  46:19 48:9 58:17
  63:6 69:6 70:6
  76:25 77:3 78:16
  78:21 80:24 93:4
  93:15 106:23
  114:5 121:16
  131:15,17 132:25
  136:7 139:6 143:4
**taken** 66:20
  116:17
**takes** 39:3 81:2
**talent** 25:14 43:4
**talk** 31:18,24
  53:19 55:12 82:17
  94:13,21 96:8
  123:11
**talked** 53:22
  72:10
**talking** 20:9 25:3
  29:12 88:22 90:9
  94:17,20
**tardiness** 106:21
**target** 126:13
  130:23
**targets** 130:23
**task** 23:17 31:2
  37:15 43:6
**tasks** 137:24,25
**taubman** 10:2
**tax** 68:13 98:1
  120:14
**taxes** 65:24 104:3

**taxing**  12:9 65:18
  69:19 97:18,24
  98:16 99:3
**team**  21:3 62:25
  70:7
**team's**  30:9
**ted**  8:14 33:18
  69:25
**telephonically**
  14:21 16:16
**tell**  53:14 70:21
  91:1 92:15,17
  94:22 110:21
  128:7
**telling**  146:20
**tells**  85:14
**teloni**  18:3
**ten**  47:8 63:6
**tenant**  110:11,15
  111:1
**tenant's**  112:16
**tens**  29:23
**tenzer**  18:1
**teresa**  16:25
**term**  3:10,14
  21:18 23:7 26:1
  26:10 79:25 87:14
  96:1
**terminated**  118:4
**termination**  106:7
**terms**  23:18 26:4
  26:7 47:14,15
  55:11 65:8 75:20
  82:9 84:9 106:14
  106:15 123:7
  126:24 127:1
**test**  37:11
**testify**  131:13
**testimony**  132:10
  138:10 147:7
**texas**  14:8 65:25
  68:8,19 69:8
  111:16

**text**  98:23
**thank**  20:19,20
  25:15 34:22 65:17
  65:17 69:14 70:25
  72:5,22 74:14,16
  79:19 93:3,3,6
  94:9 95:19 96:12
  97:15 101:11
  103:8 105:4
  109:13 111:14
  113:7,9 117:5,16
  119:20 123:15,16
  124:15 125:14
  145:4 148:5,12
**thanks**  78:15
  102:13,14 103:9
  113:21 146:3
  148:9
**thanksgiving**  93:1
**therewith**  4:4,10
  103:13
**there's**  57:14
**they're**  59:17
**thing**  26:22 36:14
  52:22 53:10 59:4
  67:13 98:10,12,17
**things**  21:9 26:23
  26:23 35:23 37:6
  37:7 41:17 47:17
  52:23 71:10 74:9
  128:23 135:8,21
  140:24
**think**  20:8 21:9,16
  22:3,4,22 23:1,22
  25:2,4,7,16,17
  26:8 27:2,3,13
  28:7 29:2,5,6,12
  31:9,17,21,25
  32:18,25 33:4,21
  34:18 35:3,4,8,10
  35:12,20 36:12
  37:4,17 38:4,15
  38:22,23 39:3,20

41:14 42:22,23
  43:1,13,13,18,23
  45:1,2 46:3,22
  47:10 48:13 49:4
  49:7,11,24 50:15
  51:24 53:2,5,17
  53:22,23 54:1,4,6
  54:7,10,13 55:2
  55:14,19,22 56:8
  56:9,13,20 57:7,8
  57:9 58:25 59:11
  60:2,15 61:2,13
  61:22,24 62:17,22
  62:22 64:6,11
  65:19 70:2 74:10
  78:3,7 83:3,3,6,22
  84:9,10,22 85:11
  86:18,21 87:12
  88:1,23 89:5
  90:11,11,11 92:18
  96:14,15 98:11,20
  103:20 105:12
  109:5 112:10,12
  113:10 116:15
  117:11 123:1,7
  124:4,11 126:10
  127:11 128:11,16
  129:5,6 131:9,12
  132:15,21 133:6
  133:13,15,25
  135:3,22 136:24
  137:13 138:15
  140:13 142:20
  145:20 146:22
  147:1,9,16,19,21
**thinking**  47:7
  65:1
**thinks**  92:15
**third**  6:1 15:4
  24:23 25:5 26:9
  27:19 47:6,24
  50:1,1,3,20 51:18
  90:4 109:19

126:25
**thomas**  16:14
  82:1
**thong**  89:20
**thorium**  78:4
**thought**  37:1,22
  37:23,25 45:18
  51:6 75:19 102:21
  105:15 120:19
  139:5 143:16
**thousands**  29:23
**three**  9:4 22:6
  30:3 31:13,18
  40:22 55:11 76:24
  84:1 97:18,24
  105:23 109:24
  127:5 138:2
**threshold**  117:12
**thrown**  147:16
**thursday**  73:18
**tie**  109:17
**tied**  56:9 124:6
**time**  3:8,16,17
  22:2 23:5 29:10
  30:4 33:2 38:19
  40:23 42:10 46:4
  46:8 49:9 51:9
  52:1 53:3 54:8
  58:24 74:1,4,7
  77:21 78:22 80:3
  80:8,16 81:2,6,20
  81:22 82:17,18
  83:1 95:6,22
  107:21 108:16
  111:23 112:1
  117:17,19,20
  129:8,25 143:4
  144:25,25
**timeframe**  47:1
  48:7 58:19 147:6
**timeline**  57:5,8
**timely**  110:7

times   9:18 21:22
  21:25 27:24 30:3
  59:22 110:19
timetable   76:14
timing   33:1 48:8
  63:4 83:5 92:7
timing's   62:15
title   122:13
  123:10
today   19:9,16,17
  25:18 30:6 31:15
  35:15 36:24 37:13
  37:15 39:7 42:14
  44:3 58:14 62:21
  70:8,15 72:21
  76:23 80:12,14
  81:22 83:23 105:7
  105:25 107:20
  118:24 121:4
  144:6 145:12
  147:23
today's   72:17
  122:18
todd   10:8
told   83:13 89:25
  133:11
ton   63:11
tool   119:22
tools   21:14
top   53:4
topic   60:18
tops   102:2
tort   109:8
total   56:4
totally   139:8
touched   134:6
tough   31:2
tower   10:10 13:5
town   15:2
toxic   109:7
trace   68:25
trailing   27:8

transaction   76:11
  81:1 83:19 84:11
  84:20,22 87:18
  126:1,23 128:12
  128:14,14 129:18
  129:25 131:23
  132:3,17,19
  134:16 147:12
transactions
  104:7 125:19
  126:2,4,10,12
  127:22,22 129:14
  129:19 141:3
transcribed   6:25
  64:15
transcript   149:4
transfer   126:17
  131:3
transferred
  123:10 129:3
transier   11:12
  30:5 124:23 125:6
  125:12
transier's   125:16
  128:18
transparency
  71:7
transparent   70:8
travel   111:8
travis   14:10
treated   74:18
tremendous   29:15
trevor   15:8
trial   95:7
troubled   137:12
  139:11
true   90:21 149:4
truncate   44:13
trust   13:14 15:11
  16:2 88:11
trustee   8:2 13:15
  15:12 16:3 75:14
  88:11,14 89:10

96:13 141:18
trustee's   34:7
try   24:1 26:20
  38:2 142:1
trying   21:4 59:12
  86:23 95:11,15
  143:12
tucker   71:21
tuesday   84:1
tune   5:11
turn   32:14 88:4
  89:3 106:8,23
  114:4 124:15
turned   144:10
turning   35:12
  44:23 112:16
turns   60:2 133:9
tweed   16:9 82:2
twice   127:24
two   12:3 22:19,22
  27:3 41:8 56:12
  59:9 63:2 69:16
  82:24 84:1 95:24
  99:9,12 102:7
  105:25 118:19
  121:16 123:1
  124:23 125:4
  128:10 129:14
  132:15 134:7,17
  134:23 135:2,21
  136:3 137:6,22,24
  138:22,24 140:21
  141:2 146:4
tx   14:11
type   33:24 34:1
  41:9,19 43:23
  50:8 54:2 58:3
  86:10 130:9
types   42:21
  117:13 129:24
  130:7 134:8,13,25
  137:6

typically   109:3
typo   89:1 96:14

**u**

u   74:4
u.s.   1:23 8:2 34:7
  106:24 108:15,19
  141:18
ucc   97:20 99:9
  144:11
ultimately   37:4
  49:11 134:18
unable   73:21
unclear   116:20
uncontested
  102:6 113:23
underlying   26:14
  38:4 84:20
understand   24:22
  27:2 29:2 31:4,11
  35:2 36:8 45:24
  49:21 57:4,10
  58:14 59:3 83:15
  83:15 86:24 87:1
  90:10 91:12
  121:17 122:6
  130:17 131:5,11
  134:15 135:2,9,15
  135:24 136:2
  146:18 147:15
understandable
  49:9
understanding
  49:3
understood   60:14
  62:10 71:15
underwriting
  25:9
unencumbered
  22:22 26:5 52:13
  91:18
unexpired   3:17
  4:2,8 76:4 101:25
  103:12 115:4,5

118:3
unfettered  60:23
unidentified
  85:15
uniform  41:14
uniformly  138:11
unique  65:25 68:9
  68:13 88:16
  130:22 146:21,22
  147:11
united  1:1,12 8:1
  27:20 75:13
universe  137:7
unnecessary
  137:15
unopposed
  124:13
unprecedented
  134:16
unprotected
  139:2
unreasonable
  36:7
unsecured  5:15
  5:22 6:3 13:3
  25:15 49:23 82:10
  85:24,25 86:5,19
  87:7,8 89:18 90:1
  91:2 133:8
unsecureds  131:1
  131:1
unsolicited  72:9
unsuccessful
  26:19
unusual  80:3
  134:16
upcoming  81:2
update  20:5 54:16
  104:14
updates  128:1
upfront  67:11
upside  44:23

urgency  74:2
  80:20
use  31:12 35:16
  36:22
useful  53:17
uses  121:21

          v

vacated  109:18
vacates  109:19
valid  66:6
validity  85:21
valorem  65:24
valuable  116:15
valuate  132:1
valuation  126:22
  129:2,21 138:10
  139:9 147:7
value  21:15,17,20
  22:11,18,23 23:7
  23:11 28:8,18,22
  30:2 31:8 35:11
  37:20 38:20,24
  42:18,19 74:3
  75:5 76:17 79:14
  80:25 87:13 90:22
  104:6 125:21
  126:17 127:3,21
  129:16 131:3
  132:12 133:8
  135:7 142:5 144:2
values  126:23
van  7:12 97:1,4,5
  97:8,14,16 98:6
  99:1,7,16,20,22
  99:25 100:2
  101:11
variations  41:15
varick  8:3
various  19:16
  42:9 71:19 113:25
  127:4 145:8
  147:20

vendor  22:15
  23:16
vendors  23:17,18
  122:11
vera  16:17
veritext  149:20
version  111:20
versus  28:22
  140:3
vet  138:13
veto  53:6 62:8
vetted  25:11
viable  133:13
videotaped  64:12
  64:17
view  29:22 31:24
  96:21 119:5 131:4
  132:13,23 133:5
  144:17
views  23:20 31:11
  77:7
vigorous  143:17
violating  92:23
violations  112:9
vladimir  18:4
voce  92:17

          w

wages  4:20
wait  34:4 102:18
waited  19:8
waive  143:16
waivers  143:24
wakefield  12:17
walk  77:19 114:1
wall  10:3 13:16
walled  71:13
wandering  42:6
want  21:18 25:18
  27:1 33:10 37:6
  38:10 39:2 42:23
  47:22 48:16 49:10
  49:12 50:22,24
  51:1,2,3,11,12,14

51:19 56:10,11
  58:13 59:25 60:21
  61:9 62:15 65:22
  66:16 67:6 68:6
  71:3,10 83:10
  86:24 89:3 92:16
  92:16 95:16 99:22
  101:7 122:6 125:8
  128:11,12 133:2
  133:23 137:20
  138:6 139:13
  142:22 145:19
wanted  20:4 21:8
  26:24 44:11 45:9
  77:23 79:8 98:15
  115:14 120:20
  122:22 140:19
wants  32:24 33:8
  39:15 41:3,20
  46:2 60:3
warehouse  14:16
  119:17 123:10
warehousemen
  5:2 118:15,18,20
warrant  87:16
warranty  27:6
warren  10:15
washington  9:12
  10:9
watkins  8:9 33:19
  70:1
way  26:23 38:7,20
  38:24 39:6 42:14
  43:10 47:13 59:11
  60:12 64:20 65:19
  65:25 68:13,25
  84:23 87:10 91:14
  91:22 92:21 100:9
  109:20 111:18
  112:11 117:14
  128:15 131:4,15
  138:16 140:7
  142:4 143:6,8,9

143:17
**ways**  44:19 68:10
  68:12
**wc**  14:9 109:14
  111:5,15
**we've**  19:25 22:14
  22:23 23:5,11,14
  23:18 24:16,23
  25:3,11,21 26:14
  26:17,18 28:14,24
  29:6,12 30:1
  32:25 38:21 39:19
  56:25 60:7,18
  63:5 65:25 71:20
  72:10 83:13 88:4
  97:17 98:17
  104:18 108:13
  131:6 133:11
  134:10 144:1,9
  145:9
**wearing**  71:4
**webb**  10:13
**website**  135:4,4
  137:16,18
**wedded**  49:2
**wednesday**  94:7
**week**  24:8,9,14
  30:4 61:5 81:2
  92:11 127:24
**week's**  62:6
**weekend**  82:23
**weeks**  22:8,12
  23:4 24:3 31:13
  31:18 47:15 76:19
  76:24
**weil**  7:3 19:14,15
  32:18 70:7 73:7
  97:5 101:14
  118:11 140:10
**weingarten**  9:2
**weiss**  11:1 124:21
  143:2 145:8

**wells**  12:2
**wendy**  17:14
**went**  45:23 51:8
  70:2 109:25
  126:25
**west**  12:11,18
  14:18
**westgate**  15:2
**wharton**  11:1
**whatever's**  64:19
**what's**  57:12
**white**  1:14
**whizzes**  41:22
**wide**  31:7
**william**  14:15,21
  119:16,16 125:12
**wilmington**  14:4
  15:11 16:2
**wind**  22:24 30:10
  91:19
**window**  26:19
**wins**  78:12
**withdrawn**
  117:23
**witness**  95:10,16
**won**  78:3
**woodbury**  106:3
**woodhull**  12:10
**word**  46:19 69:6
  70:7 120:16
  121:14,21,22
  122:5,9,21,23
  123:2,8 124:5,7
**wordsmithing**
  55:13
**work**  21:23 28:13
  30:24 31:1 34:14
  36:9 38:13 46:21
  49:10,12 50:1,14
  50:24 51:9,11,12
  57:19 83:7,13
  98:21 108:6
  127:14 128:5

129:21 130:2,9
  131:19 135:18
  139:8 143:19
**worked**  23:18
  24:23 48:19 62:23
  104:16 113:6
**workforce**  23:24
**working**  20:21
  25:16 28:11 34:18
  39:5 47:20 50:10
  52:4,14 65:21
  83:2 134:20 141:7
  141:9 144:4 146:1
  147:22
**works**  49:8 83:15
  130:19 144:14
**workstream**  31:1
**worth**  82:9 89:4
  90:16
**worthwhile**  41:18
**wound**  103:25

**x**

**x**  1:4,10 56:10
  87:23,24 132:18

**y**

**y**  56:11
**yeah**  32:14 34:21
  43:13,17,18,22
  44:2 45:13 47:10
  49:4 50:22 53:16
  53:17,21 54:6,6
  56:13 57:10 60:14
  60:20 62:16 63:21
  69:1,1,9 78:7
  93:17 95:15 97:13
  98:9 133:5,25
  135:15 136:2,15
  136:20 138:3
  142:3 146:23
**year**  22:3,6 35:9
  39:5 75:8 109:25
**years**  47:8 60:17

**yee**  17:6
**yesterday**  20:12
  25:25 26:15 32:22
  102:11 106:20
  118:7
**york**  1:2 7:6 8:4
  8:12,20,21 9:19
  10:4,17 11:4
  12:19 13:6,14,17
  15:6,14,21 16:5
  16:12 88:10,13
**you'd**  88:7

**z**

**zelina**  8:15
**zuber**  17:4