UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: <br><br> SEARS HOLDINGS CORPORATION, *et al.*, <br><br> Debtors.[1] | Chapter 11 <br><br> Case No. 18-23538 (RDD) <br><br> (Jointly Administered) |

**EVIDENTIARY HEARING DECLARATION OF MICHAEL JERBICH IN SUPPORT OF TRANSFORM HOLDCO LLC'S REPLY TO MOAC MALL HOLDINGS LLC'S (I) OBJECTION TO SUPPLEMENTAL NOTICE OF CURE COSTS AND POTENTIAL ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH GLOBAL SALE TRANSACTION; (II) SECOND SUPPLEMENTAL AND AMENDED: (A) OBJECTIONS TO DEBTOR'S NOTICE OF ASSUMPTION AND ASSIGNMENT OF ADDITIONAL DESIGNATABLE LEASES, AND (B) OBJECTION TO DEBTOR'S STATED CURE AMOUNT; AND (III) THIRD SUPPLEMENTAL AND AMENDED OBJECTIONS TO DEBTOR'S NOTICE OF ASSUMPTION AND ASSIGNMENT OF ADDITIONAL DESIGNATABLE LEASES**

1. I, Michael Jerbich, declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

2. I am a principal at A&G Realty Partners, LLC ("**A&G**"), in the Chicago, Illinois office. A&G is one of the largest commercial real estate firms in the United States dedicated to asset disposition, lease negotiation, and optimization of retail real estate. A&G has extensive experience and knowledge of the real estate market and in providing services including the review,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); u Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

EAST\168777264.1

analysis, and negotiation of lease and real property agreements, both in and out of chapter 11 cases. A&G evaluates, restructures, facilitates the acquisition of, and disposes of all types of real estate. The principals of A&G have over 80 years combined of commercial real estate experience, and have extensive expertise and knowledge in the retail industry.

3. I have been one of the senior principals from A&G responsible for working with Transform Holdco LLC ("**Transform Holdco**") and its related and affiliated entities in these chapter 11 cases (collectively, "**Transform**"). By way of further background, I have 20 years of experience in commercial real estate, and have specialized in turnarounds over the past 19 years. The retail turnarounds I specialize in are the ones in which real estate and renegotiating leases are crucial to the company's success. Some of the well-known retailers I have worked for are Bon-Ton, Borders, Golfsmith, Linens-n-Things, Shopko, Pamida, Sports Authority, Shaper Image, Blockbuster, Toys R Us, and Loehmann's.

4. A&G is very familiar with the real estate assets that are the subject of this hearing, as it was originally retained by the Debtors to provide real estate consulting and advisory services in connection with certain of the Debtors' unexpired leases and fee-owned real property (ECF Nos. 1079, 1438). Following the Debtors' sale of substantially all of its assets, A&G was engaged by Transform to assist in the potential assumption, assignment, and renegotiation of hundreds of leases for Sears and Kmart locations throughout the United States.

5. On April 19, 2019, the Debtors filed the *Notice of Assumption and Assignment of Additional Designatable Leases* (ECF No. 3298; "**Designation Notice**"), which sought to assume and assign approximately 660 retail and non-retail leases to Transform. To date, hundreds of leases have been assumed and assigned to Transform, over 40 of which are in shopping centers, and over $20 million in cure costs have been paid by Transform.

6.     I am also aware that in support of efforts to effectuate the assumption and assignment of these leases, on May 6, 2019, Transform Holdco filed under seal the *Declaration of Robert A. Riecker in Support of Transform Holdco LLC's Omnibus Reply in Support of Assumption and Assignment of Designated Leases* (ECF No. 3654-2; the "**Riecker Declaration**").  In addition to providing substantial financial information regarding the ability of Transform Holdco to meet the financial obligations for all proposed assumed and assigned leases, the Riecker Declaration provided confidential financial information and also set out Buyer's business plan, which is to essentially operate the Sears and Kmart stores on a reduced footprint and utilize excess retail inventory to further support Buyer's balance sheet.  The Riecker Declaration confirmed that Transform has a net worth of at least $50,000,000.  The Riecker Declaration also confirmed that, in addition to the substantial evidence of adequate assurance, landlords, such as MOAC Holdings LLC ("**MOAC**"), who have raised an objection, shall receive a guarantee from Transform MidCo LLC "in substantial form to Exhibit B of Transform's reply brief within fifteen (15) days of entry of an order approving the assignment and assumption of those leases."  (*See* Riecker Decl. ¶ 32).

7.     Notwithstanding the evidence provided to establish Transform's adequate assurance of future performance, I am familiar with *MOAC Mall Holdings LLC's (I) Objection to Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection With Global Sale Transaction; (II) Second Supplemental And Amended: (A) Objections to Debtor's Notice of Assumption and Assignment of Additional Designatable Leases, and (B) Objection to Debtor's Stated Cure Amount; and (III) Third Supplemental and Amended Objections to Debtor's Notice of Assumption and Assignment of Additional Designatable Leases* (the "**Objections**").

8. This Declaration is provided based upon my personal knowledge, information, and belief, or client matter records kept in the ordinary course of business that were reviewed by me or other A&G employees under my supervision and direction. If called upon to testify, I could and would competently testify to the facts set forth herein.

**Background**

9. Sears Roebuck & Co., as one of the Debtors, was party to a number of agreements relating to its construction of, and lease regarding a store in the Mall of America, located in Bloomington, Minnesota (the "**Mall**"). The agreements included the: (1) Lease, Construction and Operation Agreement between Sears, Roebuck and Co. and Mall of America Company dated May 30, 1991 (the "**Lease**"); (2) Agreement to Grant Option to Lease between Sears, Roebuck and Co. and Minntertainment Company dated May 30, 1991 ("**Option Agreement**"); (3) Amended and Restated Reciprocal Easement and Operating Agreement, Mall of America, Bloomington, Minnesota among Sears, Roebuck and Co., Mall of America Company, Nordstrom, Inc., and Macy's California, Inc. dated May 30, 1991 (as amended by the First Amendment to Amended and Restated Reciprocal Easement and Operating Agreement dated December 16, 2010 and by the Second Amendment to Amended and Restated Reciprocal Easement and Operating Agreement dated December 31, 2013) (as amended and/or modified, the "**REA**"); (4) Supplemental Agreement between Sears, Roebuck and Co. and Mall of America Company dated May 30, 1991; and (5) Second Supplemental Agreement between Sears, Roebuck and Co. and MOAC Mall Holdings LLC dated October 22, 2013.

10. The Debtors are seeking authority to assume and assign the Lease, Option Agreement, and REA to Transform Leaseco, LLC ("**Transform Leaseco**"), a wholly owned affiliate of Transform Holdco.

EAST\168777264.1

11. The Lease is part of a suite of documents under which Sears built a part of the Mall. The initial term of the Lease is for 30 years or until 2022. (*See* Lease at Art. 3.1(A).) Rent of $10 per Lease year, or $300, has been pre-paid. (*Id.* at Art. 21.1.) Since the Lease has seven, 10-year extension options, it is effectively a 100-year lease term. (*Id.* at Art. 3.2(A).) In addition to fixed rent (that would only be $1,000 for the full 100-year term), Sears must pay specified property taxes and a defined pro rata share of common area property taxes. (*Id.* at Art. 23.) Sears also must pay for the utilities it uses. (*Id.* at Art. 25.1(A).) Finally, Sears must contribute towards common area maintenance expenses in an initial amount of $1.10 per square foot of leased space, with the contribution increasing by $.20 per square foot every five Lease years.[2] (*Id.* at Art. 22.1(A).) Effectively, Sears makes an aggregate annual payment, based on property taxes, utilities, common area maintenance, and insurance of approximately $1,100,000 per year.

12. The Lease contains a unique set of "Use" provisions. Specifically, Article 4 of the Lease, titled "Uses," incorporates the provisions of Article XXII-A and XXII-C of the REA. (*Id.* at Art. 4.3.) These provisions state an intent that the Mall "contain a combination of Occupants which represent a sound and balanced diversification of merchandise." (REA at Art. XXII-A.) Sears was only required to operate as a retail Department Store under the name "Sears" *for the first 15 years* ("**Initial Period**"). (*See id.* at Art. XXII-C.) After the expiration of the Initial Period, Sears is permitted to use the space for any "retail purposes customarily found in an enclosed mall shopping center and non-retail activities customarily incidental thereto or such other uses and purposes that are compatible and consistent with (and are not detrimental, injurious or inimical to) the operation of a first-class regional shopping center." (*Id.* at Art. XXII-C.)

---

[2] Article 24 of the Lease makes Sears' participation in (and financial contributions to) the Shopping Center Merchants Association or Promotional Fund strictly optional after the first two years in business.

EAST\168777264.1

13. It is important to view the "Use" provisions from the Lease in the context of the Mall, which is a truly unique shopping experience. As opposed to the majority of shopping centers, based upon my review of information relating to the Mall, it is as much an entertainment complex as it is a retailing destination. While the Mall has over 500 stores, it has numerous tourist-based attractions, including the Nickelodeon Universe, which is an amusement park located on seven full acres and consists of roller coasters, a zip line over 55 feet tall and 405 feet long, and other rides and attractions. There is also an aquarium, a Crayola Experience that is "larger than an NFL football field" with 25 hands-on attractions with an average length of stay of three and one-half hours, and Flyover America, which is the longest ride of its kind in the world lasting about 10 minutes, and virtually brings riders on a tour of different parts of the United States. In addition to all of the amusement parks and tourist attractions, the Mall has two hotels, over 50 restaurants, a gaming and entertainment center called Smaaash, billed as "American's Adrenaline Arena," a flight simulation ride, an Amazing Mirror Maze consisting of 2,500 square feet of "endless hallways," an 18-hole miniature golf course, and a comedy club.

14. Given that the Mall contains not only traditional retail and restaurants, but also an extensive entertainment complex (including a roller coaster and water park), hotels, movie theaters, restaurants, tourist attractions, commercial office space and a transit center, there are any number of leasing options that would be compatible or consistent with the Mall's non-retail and incidental activity, dining, and entertainment venues.

15. The "Use" provision of the Lease also incorporates by reference Article XXI-D of the REA, which is a covenant from MOAC to Sears that MOAC will use reasonable efforts to select a diversified mix of tenants near Sear's entrance court from an approved list of categories of occupants attached to the REA. (Lease at Art. 4.2.) Thus, not only does the Lease *not* contain the

kinds of restrictions on change in use by tenant that a shorter term, non-major lease would typically include, but the REA actually flips the obligations of tenant and landlord so that *MOAC* is required to defer to the requirements of Sears as to what other types of businesses the tenant wants in proximity to its store. With this tenant-favorable provision, it is inconsistent for MOAC to suggest that Sears has this right to, but its assignee cannot, sub-lease the property, including the third floor, to others.

16.    Article 4.4(1) of the Lease incorporates the terms of the Option Agreement, which MOAC heavily relies upon. The Option Agreement provides that if after the Initial Period Sears wants to cease operating 20,000 square feet or more on the third floor "for purposes then permitted by the REA," then Minntertainment Company, an affiliate of MOAC, or its affiliate (collectively, "**Minntertainment**") shall have the exclusive and irrevocable first right and option to sublease said third floor from Sears (presumably so Minntertainment can further sub-lease it to another retail tenant) for the remainder of the Term, in accordance with the Option Agreement. (*Id.* at Art. 4.1(1); Option Agreement ¶ 1.) Sears is required to give notice of such cessation of operations at least one year prior thereto and Minntertainment then has two years to exercise its option. (Option Agreement ¶ 1.) If Minntertainment exercises its option, such sublease shall be on "substantially similar" terms and conditions as the Sears Lease but rent paid by Minntertainment shall be equal to (i) Minntertainment's proportionate share of all real estate taxes, utilities, Common Area Payments and Merchant's Association/Promotional Fund charges which Sears is obligated to pay under its Lease plus (ii) 50% of any minimum and percentage rent which Minntertainment receives from the subtenant after Minntertainment has been fully reimbursed for all costs incurred in obtaining such subtenant. (*Id.* ¶¶ 1-2.)

17. An integral part of the "Use" restrictions under the Lease is the right of Sears, or another tenant by assignment, to remain "dark" following the initial 15-year term (which has long since passed). Section 6.1 of the Lease incorporates Article XXV of the REA, which provides that Sears shall have the right, following the Initial Period, "without Developer's consent . . . to vacate all or any part of the Sears Building or to lease or sublease all or any portion of the Sears Building or to assign this REA." (Lease at Art. 6.1; REA at XXV-D-4-a.)

18. In summary therefore, the Lease is a long-term lease that is essentially a classic ground lease, granting Sears unique rights in the property that allows it to conduct almost any retail or other activity consistent with the myriad ancillary related services provided in the Mall. Sears may also sub-lease the property or cease operating in certain areas of its Lease.

19. For these reasons, the Lease is a substantially valuable asset of Transform Holdco. Not only do the economics of the Lease arrangements allow Transform Holdco to realize a return on their investment, but the terms of the Lease also afford substantial latitude in locating appropriate replacement tenants.

### Adequate Assurance of Future Performance

20. I am aware that in order to assume and assign the Lease to Transform Leaseco, it is necessary to demonstrate adequate assurance of future performance as provided in section 365(b)(3) and (f) of the Bankruptcy Code. In this regard, I am familiar with the cure, financial, and operational issues that MOAC raised in the Objections.

21. I am aware that Transform Holdco has provided extensive proof of adequate assurance of financial and operating performance in the Omnibus Reply. Further, Transform Holdco has already paid nearly $600,000 in cure amounts to MOAC and confirmed that it would escrow any disputed amounts pending further resolution such that any cure objection would be

resolved in such a way that all cure amounts required to be paid would be paid by agreement or in accordance with any Court order. Finally, Transform agreed to provide a guarantee by Transform Midco LLC, an intermediate holding company that sits below Transform Holdco.

22. In reviewing the adequate assurance information provided by Transform Holdco, it is significant to note that the REA specifically delineates the financial condition that MOAC determined to be adequate. Specifically, Article XXV-D-4-a of the REA provides that Sears is released from all future liability under the REA if its assignee: (1) has a net worth or shareholder equity of at least $50 million; and (2) executes a written undertaking in recordable form in which such assignee expressly assumes and covenants to perform and be bound by all the terms and provisions of the REA. (REA at Art. XXV-D-4-a.) Thus, at the inception of the Lease, MOAC agreed to the actual financial wherewithal of a potential assignee of the Lease, a figure well below that already confirmed by Transform Leaseco.

23. In the end, in addition to the wealth of information provided, including the guarantee, Transform Leaseco has sought to remove any economic risk to MOAC pursuant to section 365(b)(3)(A) of the Bankruptcy Code. Specifically, upon the assumption and assignment of the Lease, Transform Leaseco will put in an escrow account the *full amount* of the Lease charges for one year, which is approximately $1.1 million. The escrow would remain available during the term of each Lease in the event that Transform Leaseco fails to pay a scheduled payment owing under its respective Lease. In the event that either Lease is subsequently assigned, the escrow for the respective Lease will be released on a pro rata basis according to amount of space assigned to a tenant. Thus, MOAC has no economic risk from the assumption and assignment of the Lease.

24. In fact, MOAC has not expressed a concern about the ability of Transform to meet its future obligations under the Lease, which as noted above is minimal, and is substantially below market. Rather, MOAC has made clear that it wants to extract the value of the Lease and control the Sears space within the Mall. This is, however, value that Sears negotiated for at the inception of the Lease, and which Transform is entitled to realize.

### Tenant Mix and Replacement Tenants

25. On behalf of A&G, I have been actively engaged in negotiations with a variety of high-quality, national retailers to occupy the Sears location provided that the Lease is assumed and assigned to Transform Leaseco. As part of these negotiations, we have made clear that any replacement tenant must fully comply with the provisions of the Lease that are protected under the "shopping center" provisions of section 365(b)(3) of the Bankruptcy Code.

26. While ordinarily I would expect that I could complete the further assumption and assignment of the Sears space in the Mall in 12 to 18 months, MOAC has clearly expressed that they will create impediments to our ability to properly market this space, including offering prospective tenants space in other areas of the Mall, or by using their leverage at other shopping centers as a financial disincentive to assume the Sears location. Owing to the likely difficulty these distractions will cause, it may require two years, if not longer, to fully re-lease the Sears space in the Mall.

27. Nonetheless, in the event that MOAC allows us to freely market the Lease without interference, I believe that we will have replacement tenants prepared to occupy the Sears location in the Mall in the next 12 to 24 months. Sears has control of the space for an additional 73 years, and while brick and mortar retail is continuing to suffer from economic headwinds, not only can this trend begin to change, but the unusual circumstances relating to the Mall affords Sears with

real and significant value in the Lease.  Consistent with this view, I understand that Bloomington, Minnesota's South Loop District, which is in close proximity to the Mall, has plans to be redeveloped into a regional headquarters for a technology company.  All of these factors make clear the value of the Sears' space in the Mall.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

    Executed this 18th day of August 2019, in Chicago, Illinois.

Dated: August 18, 2019  
       Chicago, Illinois

Michael Jerbich  
Principal  
A&G Realty Partners, LLC

EAST\168777264.1