**DLA Piper LLP (US)**
Richard A. Chesley
R. Craig Martin
Rachel Ehrlich Albanese
Alana M. Friedberg
1251 Avenue of the Americas, 27th Floor
New York, NY 10020-1104
Phone: (212) 335-4500
Fax: (212) 335-4501

**Hearing Date and Time:**
**August 22, 2019 at 10:00 A.M.**

*Attorneys for Transform Holdco LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x

In re:

SEARS HOLDINGS CORPORATION, *et al.*,[1]

Debtors.

:    Chapter 11
:
:    Case No. 18-23538 (RDD)
:
:    (Jointly Administered)
:

---------------------------------------------------------------- x

**TRANSFORM HOLDCO LLC'S REPLY TO GRAZIADIO INVESTMENT COMPANY AND WEINGARTEN REALTY INVESTORS' OBJECTIONS TO (I) CURE OBJECTION RELATING TO THE DEBTORS' NOTICES OF ASSUMPTION AND ASSIGNMENT OF ADDITIONAL DESIGNATABLE LEASES IN CONNECTION WITH GLOBAL SALE TRANSACTION AND (II) NOTICES OF ASSUMPTION AND ASSIGNMENT OF ADDITIONAL DESIGNATABLE LEASES**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); u Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ......................................................................................1

   A.    Temple City, California K Mart (Store No. 3127)..........................................6

   B.    Raleigh, North Carolina K Mart (Store No. 3667) ........................................8

ARGUMENT IN REPLY .............................................................................................10

   A.    Applicable Legal Standards .........................................................................10

   B.    The Buyer Has Satisfied the Objectors' Adequate Assurance Requirements. ..............12

   C.    Section 365(b)(3)(A) Does Not Prohibit Assignment of the Lease ..............................13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Ames Dep't Stores, Inc.*,
 348 B.R. 91 (Bankr. S.D.N.Y. 2006) ...................................................................................15

*Androse Assocs. of Allaire, LLC v. The Great Atl. & Pac. Tea Co., Inc (In re
 Great Atl. & Pac. Tea Co., Inc.)*,
 472 B.R. 666 (S.D.N.Y. 2012) ..................................................................................13, 17

*Ramco-Gershenson Props., L.P. v. Serv. Merch. Co.*,
 293 B.R. 169 (M.D. Tenn. 2003) ........................................................................................13

*In re Rickel Home Ctrs., Inc.*,
 240 B.R. 826 (Bankr. D. Del. 1998) ...................................................................................10

*In re Patriot Place Ltd.*, 486 B.R. 773, 805 (Bankr. W.D. Tex. 2013) ........................................16

*In re Serv. Merch. Co., Inc.*, 297 B.R. 675 (Bankr. M.D. Tenn. 2002), *aff'd sub
 nom. Ramco-Gershenson Props., L.P. v. Serv. Merch. Co.*,
 293 B.R. 169 (M.D. Tenn. 2003) ........................................................................................15

**Statutes**

11 U.S.C. § 365(b) ...................................................................................................................9, 13

11 U.S.C. § 365(b)(3) ............................................................................................................ passim

11 U.S.C. § 365(b)(3)(A) ....................................................................................................... passim

11 U.S.C. § 365(b)(3)(B) ...............................................................................................................11

11 U.S.C. § 365(b)(3)(C) ...............................................................................................................11

11 U.S.C. § 365(b)(3)(D) ...............................................................................................................11

11 U.S.C. § 365(f)(1) .....................................................................................................................10

11 U.S.C. § 365(f)(2) .....................................................................................................................10

11 U.S.C. § 365(f)(3) .....................................................................................................................10

**Other Authorities**

S. Rep. No. 98-70 (1983) .........................................................................................................14, 15

Schmitt, *The Bankruptcy Code Requirement of Compliance with Lease
Obligations - Does "'All'" Mean Everything?*, 10 N. Ill. U. L. Rev. 225, 257
n.13 (1990) .......................................................................................................................... 14

**Exhibit**

Exhibit A, Excerpts of the Leases and Related Documents ............................................................ 2

Transform Holdco, LLC ("**Buyer**"), for itself and on behalf of its affiliate Transform Operating Stores LLC ("**Transform**"), as buyer of substantially all of the Debtors' assets under the *Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith and (IV) Granting Related Relief*, dated Feb. 8, 2019 (ECF No. 2507; "**Sale Order**"), submits this reply ("**Reply**") to objections made by Graziadio Investment Company ("**Graziadio**") and Weingarten Realty Investors ("**Weingarten**" and with Graziadio, the "**Objectors**"). The Objectors were two of several landlords that filed: (1) cure objections ("**Cure Objection**") at ECF No. 3553 relating to the Debtors' *Notice of Assumption and Assignment of Additional Designatable Leases* (ECF No. 3298; the "**Designation Notice**"); and (2) an adequate assurance objection at ECF No. 3558 relating to the Designation Notice (the "**Adequate Assurance Objection**" and with the Cure Objection, the "**Objections**"). Buyer respectfully submits that the Court should deny the Objections for the reasons set forth in this Reply, which supplements *Transform Holdco LLC's Omnibus Reply in Support of Assumption and Assignment of Designated Leases* (ECF No. 3654; "**Omnibus Reply**").

## PRELIMINARY STATEMENT

Transform is the contemplated assignee for the two leases identified on the Designation Notice as Store #3127 at 5665 N. Rosemead Blvd., Temple City, California (as amended and/or modified, the "**Temple City Lease**" or "**TCL**") and Store #3667 at 8701 Six Forks Road, Raleigh, North Carolina (as amended and/or modified, the "**Raleigh Lease**" or "**RL**" and with

the Temple City Lease, the "**Leases**")[2].   The Temple City Lease is between Graziadio's

predecessor, EGS of California, as Lessor, and K Mart Enterprises of California, Inc., as Lessee,

and is dated December 15, 1977.[3]   The Raleigh Lease is between Weingarten's predecessor,

Leadmine Associates I, Ltd., as Landlord, and K Mart Corporation, as Tenant, and is dated July

31, 1987.[4]   At both Lease locations, Transform is operating the very same K Mart retails stores

that the Debtors had operated for many years.

In the Designation Notice, the Debtors identified over 660 leases that they would be

assigning to Buyer or one of its affiliated entities, including the Leases.   (Designation Notice at

Ex. 1.)   During these chapter 11 cases, the Debtors filed a total of seven notices setting out

agreements for potential assumption and assignment and stating proposed cure costs.   As is

typical of cases of this size and nature, those notices led to a number of objections, including

those filed by a group of landlords that included Graziadio and Weingarten.[5]

---

[2]      Excerpts of the Leases and related documents are attached as Exhibit A.

[3]      The documents that complement the Temple City Lease are: (1) First Amendment to Lease between K
Mart Enterprises of California, Inc. and EGS of California dated May 29, 1978; and (2) Construction, Operation and
Reciprocal Easement Agreement between Eltinge, Graziadio & Sampson Development Co. ("**EG&S**") and A.D.
Clark, Inc. ("**AD**") dated August 1, 1974 as amended by: (a) First Modification to Construction, Operation and
Reciprocal Easement Agreement between EG&S and AD dated October 8, 1975; and (b) Second Modification to
Construction, Operation and Reciprocal Easement Agreement between EG&S, AD, Colonial Properties Company,
Albertson's Inc., T.C. Associates, Temple City Holding Corporation, and Vornado, Inc. dated February 25, 1977 (as
amended and/or modified, the "**REA**").

[4]      The documents that complement the Raleigh Lease are: (1) First Amendment to Lease between Leadmine
Associates I Limited Partnership and K Mart Corporation dated April 23, 1999; and (2) renewal notice letters dated
September 19, 2012 and September 20, 2017 extending the Term of the Lease to March 31, 2018 and March 31,
2023, respectively.

[5]      In addition to the Adequate Assurance Objection, the following pleadings are relevant to the Objections
and this Reply: (1) *Objection of . . . Graziadio Investment Company . . . and Weingarten Realty Investors to
Debtors' Notices of Cure Costs and Potential Assumption and Assignment of Executory Contracts* [ECF No. 2063]
("**Initial Objection**"); (2) *Graziadio Investment Company . . . and Weingarten Realty Investors' Objection to
Global Asset Sale Transaction, Sale Order, and Asset Purchase Agreement* [ECF No. 2069] ("**Sale Objection**"); (3)
*Supplemental Objection of Weingarten Realty Investors to Global Asset Sale Transaction, Sale Order, and Asset
Purchase Agreement* [ECF No. 2093] ("**Weingarten Supplemental Sale Objection**" and with the Initial Objection
and Sale Objection, the "**Original Objections**"); (4) the declaration of Lee Brody [ECF No. 2218] ("**Brody
Declaration**") in support of the Weingarten Supplemental Sale Objection; (5) the Cure Objection; and (6) the

In the Initial Objections, the Objectors focus on the proposed cure amounts and assert Debtors' proposal for adequate assurance was deficient.  The Adequate Assurance Objection focused on Buyer's alleged failure to provide adequate assurance of future performance with respect to the Leases and makes a demand for adequate assurance of future performance.

Buyer's Omnibus Reply specifically detailed the steps that it had taken to meet the cure and adequate assurance standards necessary for the assumption and assignment of the Debtors' leases.  Buyer stated that it had provided instructions for obtaining its adequate assurance package and then referenced the extensive proof of adequate assurance of financial and operating performance in the Omnibus Reply.  (*See generally* Omnibus Reply.)  Buyer further stated that it would pay the undisputed cure amounts and escrow any disputed amounts pending consensual resolution or a Court order.  (*See id.* at 3-4.)  Finally, Buyer noted that it has agreed not to seek relief with respect to any restrictive covenants related to the Lease.  (*See id.* at ¶¶ 62-64.)

Buyer has been in discussions with Graziadio and Weingarten regarding potential resolution of the assumption and assignment of the Leases, and as of the date of the Omnibus Reply the only outstanding issue was the proper cure amount.  (Omnibus Reply, Annex at 42). Objectors now appear prepared to press the Adequate Assurance Objection based on section 365(b)(3) of the Bankruptcy Code.  In the Adequate Assurance Objection, the Objectors argued that they had not received an adequate information package, however, as acknowledged, they did receive this information and will have had it for many weeks in advance of the hearing. (Adequate Assurance Obj. ¶ 15.)   Additionally, Transform has responded to the Objectors Discovery, agreeing to provide information regarding their business plans and current financial status upon the entry of a form of protective order used previously in these proceedings.

---

declaration of William R. Lang [ECF No. 3580] ("**Lang Declaration**" and with the Brody Declaration, "**Declarations**") in support of the Adequate Assurance Objection.

And, as made clear to the Landlords, intends to continue to operate Sears/Kmart with a smaller footprint of stores, with a goal of leveraging a synergistic network and interdependent ecosystems across numerous business segments. And, in addition to the operating store footprint, Transform owns related real estate interests and significant lines of businesses including the iconic Kenmore and DieHard brands, the Sears Home Services business, the Innovel delivery and installation business and the online "Shop Your Way" platform.

Since the closing on the sale transaction. Transform continues to take steps to rationalize the business, increase liquidity and improve operating performance. As part of this process, Transform recently announced the closing of 26 retail stores that were not core to Transform's operating business. In fact, Transform will continue to explore opportunities to maximize the value of its real estate holdings, consistent with it overall business strategy. An important aspect of this business strategy is the announced acquisition of over 400 small footprint stores throughout the country. Each of these steps enhance the value of Transform for the benefit of its creditors, including the Landlords, and provide further evidence of adequate assurance of future performance.

Of greater significance is that both Objectors have made clear what would satisfy their demand for adequate assurance of future performance; namely credit enhancements in the form of a cash deposit or letter of credit for three month's (Graziadio) or six months (Weingarten) rent and charges, or both would require a continuing parent guaranty for all Lease obligations instead of a deposit. (Brody Decl. ¶¶ 9, 12; Lang Decl. ¶¶ 9, 11.). Transform has confirmed to the Objectors that it is willing to provide even *greater financial security;* thus eliminating any economic risk from the assumption and assignment of the Leases.

-4-

Having already addressed the Objectors seminal concern, Transform's ability to provide demanded credit enhancements, the inquiry on assumption and assignment should be at an end; however, the Objectors press on and Transform thus addresses the Objectors' remaining points.

Transform respectfully submits that the Objectors points have either been addressed or are of no moment under the section 365 of the Bankruptcy Code.  For example, Mr. Brody posits that Weingarten would be hesitant to sign a new lease with Buyer because it "is not proposing to invest significant sums in the Premises through remodeling, restoration and other capital improvements that would demonstrate a long-term commitment to the Premises and potentially ameliorate credit risk."  (Brody Decl. ¶ 11.)  Of course, not only is such a standard found nowhere within the four corners of the Lease, but it is also absent from section 365(b)(3), which looks to protecting landlords from the risk of contracting with a less than solvent tenant not enabling landlords to enhance their lease terms.  Additionally, the Objectors make arguments regarding assumption being subject to all restrictive covenants and provisions of insurance, calculation of defined adjustment amounts, and related run of the mill lease issues.  *See* Adequate Assurance Obj. ¶¶ 21-33; Initial Obj. ¶¶14-15; Sale Obj. ¶¶ 15-17; Weingarten Suppl. Sale Obj., ¶¶ 12-16.  As Transform has made clear, it intends to assume and assign the Leases according to their terms.  Finally, the Objectors argue that they are entitled to know what brand name will be operating in the space and what, if any, alterations will be made to the store.  (*Id*. ¶¶ 35-38.)  Presently, that store will be K Mart, and any future changes or sub-leasing will be done under and in compliance with the Leases.  Thus, as Transform has not only met, but exceeded, the Objectors' request for adequate assurance, these remaining issues are addressed by terms of the Leases, which Transform has confirmed it will comply with.

For the reasons set forth in the Omnibus Reply and this Reply, the Court should deny Objections to the assignment of the Leases to Transform.

## FACTUAL BACKGROUND

### A.    Temple City, California K Mart (Store No. 3127)

1.    The Temple City Lease is located in Temple City Plaza (the "**Plaza**"), which is an open-air retail location with 225,000 rentable retail square feet.  (Lang Decl. ¶ 6.)  As part of the initial transaction, which included K Mart Corporation arranging for the financing of the development of its parcel, and the sale of the Landlord's interests in the Lease to a corporate trustee, Tenant and K Mart Corporation entered into a "Consent and Agreement" dated December 15, 1977, consenting to such transfer and making additional commitments to such transferees (including, without limitation, to pay all rent and additional rent to such transferees without deduction or offset).  The underlying indebtedness was paid off in January 2003, and only the rent and additional rent guarantees remain subject to the Consent and Agreement.

2.    The initial Fixed Term of the Temple City Lease was for 25 years commencing (after an interim term from December 15, 1977 to January 1, 1978) on January 2, 1978 and expiring on January 1, 2003.  (TCL at Art. 1.)  The Temple City Lease also grants Tenant the right to renew the Term for 7 extension periods of 5-years each.  (*Id.* at Art. 22; TC First Am.)  After the exercise of its most recent option (the fourth), the term of the Temple City Lease is scheduled to expire on January 1, 2023, leaving three more options with the possibility to extend the Temple City Lease to January 1, 2038.

3.    K Mart continues to operate a store under the Temple City Lease in 94,500 square feet of the retail space on the far north end of the Plaza.  (Lang Decl. at Ex. 3.)  The Plaza also has a Super A Foods, a CVS, an Office Depot, and several smaller shops.  (*Id.*)  These stores are in a contiguous building with a sidewalk along the various store fronts allowing shoppers to walk

from store to store.  (*See id.*)  The parking lot has 991 shared parking spaces.  (Lang Decl. ¶ 6.)

In the parking lot area there is a stand-alone bank, a Denny's, and two other restaurants that have

the appearance of being part of the Plaza but are not as the lots on which those restaurants sit

were carved out of the Plaza property lines.  (*See id.* at Ex. 3.)

4.      Under the terms of the Lease, there are no restrictions on specific uses for the

property subject to the Temple City Lease, and the Tenant may use the property for a full-line

department store with office space and related facilities ***or for any other lawful purpose*** so long

as the property is not used for an illegal purpose or contrary to insurance requirements.  (TCL at

Art. 7.2.)  Similarly, the REA provides that the property may be used for any purpose in similar

locations in California, including, a food market, retail, offices, and service establishments

including financial institutions, brokerage houses, restaurants, automotive service stations, travel,

and other agencies.  (REA § 2.1.)  As to prohibited uses, the REA is sparse, providing that  the

property may not be used for automotive sales, bowling alleys, skating rinks, motion picture

theatres, a mortuary, a commercial laundry plant, or a transportation depot unless specifically

approved in writing by the landlord.  (*Id.*)

5.      The Temple City Lease permits the Tenant to sublet the Leased Property or any

part thereof or assign or transfer the Lease so long as any assignee assumes in writing and agrees

to keep and perform all of the terms of the Temple City Lease and is jointly and severally liable

with original Tenant for the performance thereof.  (TCL at Art. 26.1.)  The REA does not contain

any restrictions on assignment.  (REA § 11.1, 11.7.)  Notwithstanding these broad rights, upon

the Debtors' assumption and assignment of the Temple City Lease to Transform, Transform

intends to continue to operate the K Mart at the Plaza in compliance with the Temple City Lease

terms and if it decides to close that store to find a replacement tenant to which it can sub-lease the space in compliance with the terms of the Temple City Lease.

**B.    Raleigh, North Carolina K Mart (Store No. 3667)**

6.    The Raleigh Lease is located in Six Forks Station in an open-air retail location with 468,414 rentable retail square feet.  (Brody Decl. ¶¶ 1, 5.)  The initial term of the Lease was for 25 years.  (RL at Art. 2.)  The Raleigh Lease also grants Tenant the right to renew the term for 10 extension periods of 5 years each.  (RL at Arts. 2, 13(a).)  After the exercise of its most recent option (the second), the term of the Raleigh Lease is scheduled to expire on March 31, 2023, leaving eight more options with the possibility to extend the Raleigh Lease to March 31, 2063.   Outside of bankruptcy, the Raleigh Lease may be assigned or subleased with the Landlord's consent, which shall not be unreasonably withheld.  (RL at Art. 22.)

7.    K Mart continues to operate a store under the Raleigh Lease in 113,849 square feet of the retail space in a stand-alone building on the southeastern part of the Plaza.  (Brody Decl. at Ex. 1.)  Six Forks Station also has a Home Depot, a movie theater, and other well-known tenants such as Bed Bath & Beyond, Chick-Fil-A, Food Lion Grocer, Hardee's, Papa John's, PetSmart, PNC Bank, Rite Aid Pharmacy, Starbucks, and Taco Bell operating in different parts of about five different buildings.  (*See id.*; *id.* ¶ 5.)  Six Forks Station has 1,928 shared parking spaces that are spread around separate parts of the property.  (*See id.*)

8.    Again, the Objectors overlook the expansive use restrictions in the Raleigh Lease. Specifically, the premises may be used by Tenant for "any lawful purpose."  (RL at Art. 22.) Notwithstanding the foregoing, the premises may not be used for: "Bingo parlor, Bowling alley, Movie theatre, Disco, Bar/Lounge, Auto sales or service, Flea market, Manufacturing facility, Skating rink, Residential use(s), Truck terminal, Lodging facility, Hospital, Nursing home, Distribution center or Warehouse" (except that any stock or storage area for a retail

establishment on the Premises is not a warehouse).  (*Id.*)  Tenant may not operate a supermarket on the premises as long as the "present food tenant" (a Food Lion) continues to operate a supermarket in its premises.  (*Id.*)

9.    At the time Six Forks Station was built, the Landlord promised that at the commencement of the Raleigh Lease term, an "Existing Phase I portion of the shopping center," consisting of approximately 70,000 square feet containing a 25,000 square foot Food Lion Market, a 9,000 square foot Eckerd drug store, a 36,000 square feet of retail shops, and a 20,000 square foot 6-Plex theatre, would be in place.  (*Id.* at Art. 12.)  Furthermore, Landlord committed to using its best efforts to aggressively pursue development of 160,000 square feet of additional retail shops and services, including one additional anchor fashion store of approximately 60,000 square feet with the intention of such additional spaces being complete within approximately one year from Tenant's store opening.  (*Id.*)  The concept apparent in the Raleigh Lease is that when fully developed Six Forks Station would contain 113,500 square feet of additional retail space (including a third anchor) for a total of 405,000 square feet.[6]  (*Id.*)

10.    Upon the Debtors' assumption and assignment of the Raleigh Lease to Transform, Transform intends to continue to operate the store at Six Forks Station in compliance with the Raleigh Lease terms and should that change to sublease the space in accordance with the terms of the Raleigh Lease.

---

[6]    With the exception of the list of "undesirable" uses listed in Article 22 of the Raleigh Lease, and the exclusive in favor of Food Lion (who appears, to still be operating at the center), Tenant is free to use the premises for any lawful purpose.  The obligations with respect to the tenant mix at the shopping center are all placed on Landlord with very strong remedies provided to Tenant in the event of Landlord's failure.

## ARGUMENT IN REPLY

### A.    Applicable Legal Standards

11.    The singular issue before the Court is whether the assignee under the Lease, Buyer and its designee, Transform, has met the standards for adequate assurance of future performance as set forth in section 365(b) and (f) of the Bankruptcy Code.

12.    In general, section 365(b) of the Bankruptcy Code requires a debtor seeking to assume an unexpired lease to cure any existing defaults under the contract or lease and to provide adequate assurance of future performance.    11 U.S.C. § 365(b).    Section 365(f) of the Bankruptcy Code establishes the time-honored standards that a debtor must meet in order to assume and assign a lease in three separate sub-sections.    Subsection (f)(1) provides that except as provided in subsection (b) and (c) of section 365, a debtor may assign a lease notwithstanding a provision that prohibits, restricts, or conditions the assignment of such lease.    11 U.S.C. § 365(f)(1).    Subsection (f)(2) provides that a lease may be assigned if there is adequate assurance of future performance regardless of whether the lease is in default.    11 U.S.C. § 365(f)(2). Subsection (f)(3) provides that a lease may not be terminated or modified by an anti-assignment provision. 11 U.S.C. § 365(f)(3).    Section 365(b)(3) of the Bankruptcy Code adds to subsection (f)(2)(B) adequate assurance provisions applicable to a "shopping center" lease.    *See* 11 U.S.C. § 365(b)(3).    There is nothing in section 365(b)(3) that eliminates subsection (f)(1) or (f)(3) from the analysis to be applied to a "shopping center" lease.    *See generally In re Rickel Home Ctrs., Inc.*, 240 B.R. 826, 831 (D. Del. 1998 ("Section 356(b)(3) [sic] is not meant to be read in isolation.    Rather, Section 365(b)(3) must be read in conjunction with the section that it cross-references, Section 365(f).").    And, when it comes to shopping center leases, a bankruptcy court has latitude to ensure a balance between the parties with respect to the assignment of a shopping center lease.

13.    As noted above, under section 365(b)(3), there are additional adequate assurance provisions generally required for assumption and assignment of a shopping center lease, and Buyer assumes for the purposes of this litigation that both the Plaza and Six Forks Station are shopping centers.  The adequate assurance provisions for shopping centers include adequate assurance:

> (A) of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;
> (B) that any percentage rent due under such lease will not decline substantially;
> (C) that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; and
> (D) that the assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

11 U.S.C. § 365(b)(3)(A)-(D).  As discussed below, these provisions were intended by Congress to provide an environment in which a bankruptcy court could balance the interests of the debtor with those of the landlord and other tenants in a shopping center.  These provisions were not intended to provide landlords with special rights or to let them veto an assumption and assignment that otherwise fully complies with the lease to be assigned.

14.    Here, the Objectors do not object based on section 365(b)(3)(B), (C), or (D); rather, the Objectors only, as an almost throw away concept, argue that they have been provided no finances of Buyer to compare to K Mart's in 1977 and 1987 when the leases were signed. Again, this is an issue under section 365(b)(3)(A), and since Transform intends to continue operating a K Mart at both the Plaza and Six Forks Station locations, no other subsection of section 365(b)(3) is relevant.

15.    Thus, the two issues before the Court are: (1) whether the fact that the Objectors made an adequate assurance demand that Transform has met and exceeded renders the Objections moot; and (2) whether there would be economic risk to the Objectors as a result of assumption and assignment of the Leases to Transform under section 365(b)(3)(A).  The answer to the first question is that Buyer's willingness to exceed the adequate assurance demand should end the inquiry.  If not, then the answer to the second question is that the proposal eliminates the Objectors' economic risk and thus complies with 365(b)(3)(A), but as the Objectors conceded, Buyer has also already provided the financial information.

### B.    The Buyer Has Satisfied the Objectors' Adequate Assurance Requirements.

16.    As noted above, the Objectors, in both the Objections and Declarations, acknowledged that they would be willing to lease the property to a newly-formed entity so long as that newly-formed entity provided credit enhancements.  (Brody Decl. ¶ 12; Lang Decl. ¶ 11.). In the Declarations, the Objectors asked for a cash deposit or letter of credit for 3 and 6 months of rent and charges.  (Brody Decl. ¶¶ 9, 12; Lang Decl. ¶¶ 9, 11.).  In the alternative, the Declarations stated that if a guaranty was provided, that would also be a sufficient credit enhancement.  (*See id.*)  As noted in the Riecker Declaration, for the Temple City Lease, a guaranty will be provided from Buyer's affiliate, Transform MidCo LLC.  (*See* Riecker Decl. ¶ 32.)[7]  As noted in the Omnibus Reply, for the Raleigh Lease, an affiliate of Buyer will provide a guaranty.

17.    While the Objectors sought credit enhancement in the form of *either* a guarantee or a cash deposit or letter of credit, here, Buyer is willing to provide not only the guarantee, but a

---

[7]    The Riecker Declaration states, "In order to address adequate assurance objections raised by landlords on the basis that Transform only has consolidated financials at what is effectively the MidCo level, for those landlords who timely raised such an objection, as reflected in Schedule 2 to the Draft Proposed Order, MidCo shall provide a guarantee in substantial form to Exhibit B of Transform's reply brief within fifteen (15) days of entry of an order approving the assignment and assumption of those leases."  (Riecker Decl. ¶ 32.).

cash deposit that exceeds that even sought by the Objectors.  This should effectively end the inquiry, and the Objectors should not now be permitted to seek more than they have already confirmed will give them the protections they feel necessary to avoid financial risk.  *See Androse Assocs. of Allaire, LLC v. The Great Atl. & Pac. Tea. Co., Inc. (In re Great Atl. & Pac. Tea Co., Inc.)*, 472 B.R. 666, 676 (S.D.N.Y. 2012) (affirming Judge Drain and noting that section 365(b)(3) was enacted to remedy "the uncertainty of whether the landlord will continue to receive rent payments," among other things) (quoting *In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1088 (3d Cir. 1990)).

### C.    Section 365(b)(3)(A) Does Not Prohibit Assignment of the Lease

18.    The Objectors arguably are seeking to impose requirements upon Transform under section 365(b)(3)(A) that simply do not exist within the statute or applicable case law. While the Objectors argue they are entitled to a comparison of Buyer's financial condition to that of the relevant debtors as of the date of the Lease, this argument simply misses the mark, both legally and based upon the factual record.  First, as noted above, since Buyer has met the Objectors adequate assurance requirements, the Objectors will likely have *no economic risk* from the assumption and assignment for the term of the deposit.  To this end, the Objectors effectively seek a *per se* bar on the assumption and assignment of shopping center leases to newly created entities.  This position conflicts with their own Declarations in which they acknowledge accepting newly formed entities as long as credit enhancements are, as here, provided.  In addition, the Objectors' position ignores the realities of 21st century retailing.  The case law is clear that newly formed entities have every right to assume and assign a shopping center lease if they meet the standards imposed by section 365(b)(3).  *Ramco-Gershenson Props., L.P. v. Serv. Merch. Co.*, 293 B.R. 169, 176-77 (M.D. Tenn. 2003).  In *Ramco-Gershenson*, the district court affirmed the bankruptcy court's ruling that:

Ramco had adequate assurance of JLPK's financial strength and operating performance and, therefore, could not refuse consent to the proposed assignment and sublease on that basis. Adequate assurance is to be evaluated on a commercially reasonable standard based on information available at the time of the parties['] decision. It has also been interpreted to mean adequate assurance for payment of future rent. Commercial reasonableness factors include the proposed subtenant's financial responsibility, the type of business to be conducted on the premises, and whether the proposed business competes with that of the lessor or the lessee.

*Id.* (internal citations omitted).

19.     The legislative history underlying the shopping center amendments to section 365(b) confirms that the focus of inquiry under section 365(b)(3)(A) is on the financial dependability of the assignee.[8]  The following two excerpts from a Senate Report provide guidance on this issue:

*4- Operating and financial performance of assignee*

*a. Problem.*—If shopping center space is assigned to a business in poor financial condition, the shopping center and its solvent tenants may soon find themselves dealing with another store in bankruptcy, with all of the attendant problems. As discussed above, when the trustee assigns space to a store in unsound financial condition, the harm to the landlord and the other tenants is compounded.

*b. Solution.*—Under the code, adequate assurances of the source of rent and other consideration due under the lease must be given. The bill makes clear that this includes assurances that the assignee has an operating and financial performance similar to that of the debtor when the lease was first executed. This provision was amended by the full Judiciary Committee in 1982 to insure that it would not be interpreted to mean that the assignee must have exactly the same financial posture as the assignor. Instead, the assignee should have a similar operating and financial performance when all factors, including advertising aggressiveness, profit margins, growth potential, and other financial indicia, are weighed.

---

[8]     The Senate Judiciary Committee proposed the Shopping Center Protections Improvements Act of 1983 (the "**SCPIA**"), S. Rep. No. 98-70 (1983), "to remedy several substantive and technical problems relating to the operation and assignment of shopping center" leases that arose under the Bankruptcy Reform Act of 1978. While SCPIA passed in the Senate, it did not pass in the House. *See* Schmitt, *The Bankruptcy Code Requirement of Compliance with Lease Obligations -- Does "'All'" Mean Everything?*, 10 N. ILL. U. L. REV. 225, 257 n.13 (1990).

> 3. Section 365(b)(3)(A) is amended to require an adequate assurance that any assignee of the lease will have an operating and financial performance, including guarantors, similar to that of the original tenant when the lease was executed. This provision is intended to prevent a shopping center lease from being assigned to another business in poor financial condition. Such a business might itself soon fail, resulting in a repetition of the problems caused by the bankruptcy of the assignor.

SCPIA, S. Rep. No. 98-70 (1983).

20.    As noted in the Omnibus Reply, Buyer, of which Transform is an affiliate, is sufficiently capitalized, is relying on the operational expertise of the Debtors' employees, and has provided the appropriate guarantees as an affiliate of Transform.  It is also worth noting that to date, hundreds of leases have been assumed and assigned to a Buyer entity, over 40 of which are in shopping centers.  While not judicially determined, this is strong circumstantial support that the adequate assurance package is objectively reasonable, especially where the assignee has met or exceeded the demand made by the landlord.  As a result, the value of the Leases should accrue to Sears' creditors, which is what has occurred under the Court-approved Sale Order.[9] This is precisely what section 365(b)(3)(A) and Congress intended.

21.    Indeed, it is plain from the history and structure of this transaction that an existing former chief executive officer of the Debtors, having served in that position from May 2013 to February 14, 2019, was the principal backing Buyer.  *In re Serv. Merch. Co., Inc.*, 297 B.R. 675, 682 (Bankr. M.D. Tenn. 2002), *aff'd sub nom. Ramco-Gershenson Props., L.P.*, 293 B.R. 169 (noting that newly formed "assignee's future performance is to be judged, *inter alia*, by the

---

[9]      "In a legislative judgment built into the Code, Congress has determined that, subject only to certain statutory safeguards, the value of a debtor's leases should go to the debtor's creditors, and that leases can be sold to achieve that end—with or without landlord consent. Here, [the over-landlord] has shown no legally cognizable basis for interfering with the assumption and assignment of this lease—which is, after all, the norm in bankruptcy, to implement Congressional policy in order to benefit the general body of the debtor's creditors, and not the single creditor landlord that would like to get a lease back. I fully understand why a landlord would like to terminate a 1973 lease under which it gets a below market rate, but Congress has determined that the economic value in below market leases is to go to creditor bodies generally, and not to a windfall for a single creditor." *In re Ames Dep't Stores, Inc.*, 348 B.R. 91, 98 (Bankr. S.D.N.Y. 2006).

financial strength of its backers, and its operating performance is to be judged by its principal's operating performance") (citing *In re Casual Male Corp.*, 120 B.R. 256 (Bankr. D. Mass. 1990)). And as noted in the adequate protection materials provided, Buyer's main management principals previously worked for the Debtors.  As disclosed in the adequate protection package, the Debtors' business plan is to continue to operate the selected stores and to use cost reduction to reduce expenses, and thus strengthen the balance sheet, enabling the provision of security deposits and guaranties to the Objectors.  Additionally, as further disclosed in the adequate protection package, Transform owns related real estate interests and significant lines of businesses including the iconic Kenmore and DieHard brands, the A&E repair, maintenance and warranty protection business, and the Innovel delivery and installation business.  Transform thus has sufficient operational expertise to justify serving as an assignee of the Leases.  Thus, while the technical requirements of assumption and assignment have been used to enable this transformation, the operating performance of Buyer as a NewCo is similar to the Debtors' because it is based on many of the same individuals with the same experience.  And as to the comparative nature of Buyer's finances to the original lessees under the Leases, Buyer has produced relevant financial information in discovery to enable an appropriate comparison. While the financial information also reflects similar asset values and cash availability sufficient to satisfy section 365(b)(3)(A), the fact that the Objectors' tenant after assignment will be an entity similar to its pre-bankruptcy tenant also independently satisfies section 365(b)(3)(A), as cases involving assumption only are more analogous to this situation than those cases involving assignment to entities new to the situation.  *See, e.g.*, *In re Patriot Place Ltd.*, 486 B.R. 773, 805 (Bankr. W.D. Tex. 2013) ("As for § 365(b)(3)(A)'s requirements that the debtor (3LM) provide adequate assurance of the source of rent and other consideration due under the lease, 3LM has

met this requirement by consistently paying its rent and CAM charges to PPL over the past ten

years, seven years of which was under the Shopping Center lease."); *see also In re Great Atlantic*

*& Pacific Tea Co. Inc.*, 472 B.R. 667 (finding that bankruptcy court did not err when it found

compliance with section 365(b)(1) in an assumption situation as such determination regarding

deposits and guarantees is to be made on a case-by-case basis).

## CONCLUSION

22.     Buyer and Transform respectfully submit that having met, and in fact exceeding

the Objectors demands for adequate assurance of future performance, the Court can and should

find that 365(b)(3)(A) of the Bankruptcy Code is satisfied.  Even if the Court goes beyond that

inquiry, however, it should nonetheless find that the provision is satisfied because adequate

assurance package provided by the Buyer makes clear that Objectors have little, if any financial

risk from assumption and assignment, which the statutory goal of section 365(b)(3).  Moreover,

the fact that Buyer is essentially the same business that operated these two stores for decades,

should provide the Court with an adequate showing that financial and operating condition of

Buyer are similar enough to the lessees under the Leases to justify a finding of compliance with

section 365(b)(3)(A).

23.     Buyer and Transform therefore request that this Court deny the Objections,

approve the Debtors' assumption and assignment of the Leases to Transform, and grant Buyer

and Transform such other and further relief as is just and appropriate.

Dated: New York, New York
       August 20, 2019

Respectfully submitted,

**DLA Piper LLP (US)**
1251 Avenue of the Americas, 27th Floor
New York, NY 10020-1104
Phone: (212) 335-4500
Fax: (212) 335-4501

By: */s/ R. Craig Martin*
    Richard A. Chesley
    R. Craig Martin
    Rachel Ehrlich Albanese
    Alana M. Friedberg

    *Attorneys for Transform Holdco LLC*