David W. Dykhouse (dwdykhouse@pbwt.com)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036-6710
Tel:  (212) 336-2000
Fax:  9212) 336-2222

Thomas J. Flynn (tflynn@larkinhoffman.com)
LARKIN HOFFMAN DALY & LINDGREN, LTD.
8300 Norman Center Drive, Suite 1000
Minneapolis, Minnesota 55437-1060
Tel:  (952) 835-3800
Fax:  (952) 896-3333

*Attorneys for MOAC Mall Holdings LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | Chapter 11 |
| In re: | ) | Case No. 18-23538 (RDD) |
| | ) | |
| SEARS HOLDINGS CORPORATION, *et al.*, | ) | (Jointly Administered) |
| | ) | |
| Debtors.[1] | ) | |

**MOAC MALL HOLDINGS LLC'S**
**PRE-EVIDENTIARY HEARING BRIEF**
**REGARDING THE PROPOSED**
**ASSUMPTION AND ASSIGNMENT OF THE MOAC LEASE**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows:  Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**INTRODUCTION**

For over twenty-five years, a three-floor Sears department store operated as one of the original anchor tenants in Mall of America®. This arrangement, governed by a lease between MOAC Mall Holdings LLC ("MOAC" or the "Landlord") and the debtor (the "MOAC Lease" or the "Lease")—along with MOAC's meticulous management of Mall of America and its tenant mix—enabled Mall of America to establish itself as the nation's premier shopping center. Mall of America now provides jobs to over 13,000 employees and brings $3 billion to Minnesota's economy every year. This is now threatened by the proposed assignment of the MOAC Lease to Transform Leaseco LLC ("Leaseco" or the "Assignee"), an affiliate and subsidiary of Transform Holdco LLC ("Holdco," collectively with Leaseco "Transform" or the "Buyer").

Transform's financial condition and operating performance are not remotely similar to the financial condition and operating performance of the debtors' predecessor-in-interest Sears, Roebuck and Co. ("Sears Co.") when it entered into the Lease in 1991. Without any proposed tenant, there is no assurance that a hypothetical tenant's financial condition and operating performance would be adequate to support assignment. The debtors and Transform fail to provide any assurance that the three-floor leased premises (the "Premises") *will have any tenants* within a reasonable time—much less tenant(s) which would utilize the entirety of the Premises, comply with the terms of the Lease, and not disturb the tenant mix or balance of Mall of America. In fact, Transform takes the position that it can do anything it wants with the Premises.

Fortunately, the Bankruptcy Code protects Mall of America and its tenants from being saddled with unstable, inappropriate, or non-existent tenants in one of the most critical spaces of the shopping center. In exchange for preempting contractual limitations on assignment, Congress granted shopping-center landlords and tenants special protections in the Code, including the requirements:

- that any proposed assignee have similar financial condition and operating performance of the debtor at the time it became the lessee under the lease;

-  that any assignment will not breach any provision contained in the lease itself, or any other lease, financing agreement, or master agreement related to the shopping center; and

- That the assignment will not disrupt any tenant mix or balance in the shopping center.

The debtors and Transform cannot meet their burden to prove compliance with these requirements, and, as a result, the assignment of the MOAC Lease to Transform must be denied.

## FACTS

### I.    Mall of America succeeds by meticulously curating the quality and mix of its tenants.

1.    Mall of America is the premier shopping center in the United States. (Declaration of Richard Hoge ("Hoge Decl.") (ECF No. 4876), ¶ 1; Declaration of Raphael Ghermezian ("Ghermezian Decl.") (ECF No. 4875), ¶ 2.) By insisting on the highest of standards and leading the shopping-center industry, Mall of America has achieved unprecedented success, including:

- 99 percent brand recognition (Hoge Decl., ¶ 4.);

- Welcoming 40 million annual visitors (*Id.*; Ghermezian Decl., ¶ 3);

- Generating $3 billion in annual economic impact to its region (Hoge Decl., ¶ 4.);

- Creating, directly and indirectly, over 13,000 jobs (*Id.*; Ghermezian Decl., ¶ 3);

- Paying over $30 million in property taxes (Ghermezian Decl., ¶ 3);

- Managing 5.6 million square feet of high-quality space (*Id.*; Hoge Decl., ¶ 3); and

- Leasing to over 500 retail tenants (Hoge Decl., ¶ 3).

2.      Mall of America is regularly featured in trade publications, and it continues to generate high levels of foot traffic, occupancy, and sales in an industry where others struggle from highly competitive market changes, such as internet sales. (Hoge Decl., ¶ ¶ 8, 10.)

**A.      High-quality operating performance is critical to first-class shopping centers, like Mall of America.**

3.      Mall of America's brand depends upon the highest-quality operating performance throughout the mall, including from its tenants. (Ghermezian Decl., ¶ ¶ 4, 5; Hoge Decl., ¶ 14.) MOAC carefully screens prospective tenants to ensure that their operating performance harmonizes with the experience and quality that patrons expect from Mall of America. (Ghermezian Decl., ¶ 5; Hoge Decl., ¶ 15.) MOAC supports its existing tenants and provides tools to help Mall of America's tenants continue to succeed and maintain first-class operating performance. (Hoge Decl., ¶ 12.) Operational performance is even more essential for Mall of America's anchor tenants. (*Id.*, ¶ 15; Ghermezian Decl., ¶ 6.) The operating performance of Sears in 1991 is a prime example of what is expected of anchor tenants.

4.      Anchor tenants receive extremely favorable leases. (Ghermezian Decl., ¶ 6; Hoge Decl., ¶ 16.) The financial consideration paid under the lease provides virtually no profit to MOAC. (*See* 1-MOAC at 28, Article 21.1 (defining rent under the Lease).) Instead, the valuable consideration provided by an anchor tenant is found in its ability to bring customers to the mall through brand and operational appeal, name recognition, advertising and marketing expenditures, and its customer service experience, to name only a few key characteristics. (Ghermezian Decl., ¶ ¶ 6–7; Hoge Decl., ¶ 16.) Control of the Premises by MOAC is critical to Mall of America, including its tenants, because without an active Sears department store, Mall of America's continued success requires the operational performance of a first-class anchor tenant that complements Mall of America's tenant mix. (Ghermezian Decl., ¶ ¶ 8, 9; Hoge Decl., ¶ 35.) The

4.

tenant willing to pay the most for the space is almost certainly not the same tenant that would generate the operational performance benefits critical to the success of Mall of America and the other tenants. (Ghermezian Decl., ¶ ¶ 8, 9.)

5.      In addition to a prospective tenant's financial condition, other factors are at least as important in assessing operational performance for shopping centers. (Ghermezian Decl., ¶ ¶ 5–8; Hoge Decl., ¶ ¶ 14, 15.) These factors include, but are not limited to, the quality of the store's finish, maintenance, operations, and staff. (Hoge Decl., ¶ 15.) Brand recognition and reputation are also key factors in assessing operational performance. (*Id.*) MOAC does not fill a space with the first available tenant that offers to pay the rent. (*Id.*, ¶ ¶ 14, 23; Ghermezian Decl., ¶ 4.) MOAC will turn away tenants that do not meet the operational performance requirements expected by Mall of America customers and, thus, do not harmonize with the operation of a first-class shopping center. (Ghermezian Decl., ¶ 5; Hoge Decl., ¶ ¶ 20, 22.) In support of these high standards, MOAC meets regularly with tenants to keep them updated on mall and industry-relevant information, provide operational training and support, and help address tenant needs. (Hoge Decl., ¶ 12.) For example, MOAC recently partnered with a staffing agency to help its tenants ensure optimal staffing. (*Id.*) MOAC has a direct landlord-tenant relationship with Mall of America's tenants—without separate, third-party, absentee sub-landlords—which enables this direct support of tenant operational performance. (*Id.*) Transform's demand to receive assignment of the Premises and sublet it to others is unprecedented at the Mall of America, and would cause MOAC to lose control of one of its most critical spaces during an economic environment that is increasingly competitive and unforgiving for shopping centers. (Ghermezian Decl., ¶ ¶ 9, 13; Hoge Decl., ¶ ¶ 35–36.)

6.      Sears of 1991 exemplifies the financial condition and operating performance Mall of America demands of its tenants and necessary for a first-class regional shopping center. (Hoge

Decl., ¶ 16.) Raphael Ghermezian, Chief Executive Officer of MOAC, who was involved with the development of Mall of America confirms that Sears's operating performance and ability to drive traffic was key to the Lease. (Ghermezian Decl., ¶ ¶ 6, 7.) In 1991, Sears was a household name and had universal brand recognition. (*Id.*, ¶ 7; Hoge Decl., ¶ 16.) This brand represented quality and shoppers' destination for almost anything a shopper might need, from clothing to home furnishings, hardware to lawn equipment, or school shopping to appliances. (Hoge Decl., ¶ 16.) Sears aggressively advertised its stores and first-class operations. (Ghermezian Decl., ¶ 7.) As explained by Louis Frillman, an expert in evaluating retail financial condition and operating performance, "Sears was a diversified and dominant going concern" that had over 1,800 retail stores and "a diversified business base" with a "100 year successful history of maintaining and growing operations." (Declaration of Louis W. Frillman ("Frillman Decl.") (ECF No. 4874), ¶ 15.) In today's dollars, Sears had over $70 billion in diversified assets—$37 billion in *net* assets—which, in addition to inventory and accounts receivable, included property such as the tallest skyscraper at the time in Chicago, among other assets. (*Id.*, ¶ ¶ 23–24.) Adjusted for inflation, Sears had a $10 billion stock market cap, predictable sales of nearly $60 billion, or over $32 million per store, and predictable net income of $2.4 billion. (*Id.*, ¶ 24.) In short, Sears was then essentially what Amazon.com is today. (Ghermezian Decl., ¶ 7; Frillman Decl., ¶ 16.)

## B.    Tenant mix at Mall of America is meticulously curated at multiple levels.

7.    Proactive, detailed, and strategic curation of tenant mix is another critical contributing factor to Mall of America's success. (Ghermezian Decl., ¶ 8; Hoge Decl., ¶ 11.) MOAC's tenant-mix assessment looks at the issue on multiple levels. From a marketplace perspective, Mall of America leads the industry in identifying new ventures that can improve the position and brand of Mall of America. (Hoge Decl., ¶ 11.) MOAC also actively pursues key tenants that do not yet exist in the region, but share Mall of America's commitment to success.

(*Id.*, ¶ 23.) At the mall level, MOAC seeks out tenants who meet its stringent operational

performance requirements and will drive new traffic to Mall of America. (Ghermezian Decl.,

¶ ¶ 4, 8; Hoge Decl., ¶ 20.) MOAC also ensures that new tenants will enhance Mall of America's

brand and complement existing tenants—this can mean turning away a potential tenant, such as

if its adult-oriented products do not fit the family-friendly atmosphere of Mall of America.

(Ghermezian Decl., ¶ 5; Hoge Decl., ¶ 22.) At a more granular level, MOAC carefully manages

the location of tenants within Mall of America, and will move tenants around for optimal

placement. (Hoge, Decl., ¶ 20.) MOAC also plans ahead to fill vacancies to minimize the

disruption caused by spaces that go dark. (*See* Hoge Decl., ¶ 21 (describing a circumstance in

which MOAC implemented such a plan).) For an anchor space, MOAC would expect to have the

space operational within 12 months of its prior tenant's departure. (Hoge Decl., ¶ 26.)

## II.    The Lease provides Mall of America important protections.

8.    Because of the strong performance and stellar reputation of Sears in 1991, it was

considered a key anchor tenant to help ensure the success of Mall of America. (Ghermezian

Decl., ¶ ¶ 6–7.) Accordingly, the May 30, 1991 Lease provides favorable financial terms to the

debtors while including key protections to the Landlord regarding the use or transfer of Interests

in the Premises, including through a contemporaneously executed Reciprocal Easement and

Operating Agreement ("REA") (3-MOAC).[2] (Ghermezian Decl., ¶ 6; Hoge Decl., ¶ 31; 1-

MOAC; 2-MOAC; 3-MOAC.) Under these documents, the debtors and their predecessors-in-

interest operated a Sears department store in all three floors of the Premises until the store closed

in March of 2019 due to the debtors' bankruptcy. (Stipulation of Facts ("Stip.") (ECF No. 4865),

¶ 15.)

---

[2] The Lease controls in the event of a conflict between the agreements. (3-MOAC at 148 Article
  XXVII-A.)

## A.    The Lease incorporates use restrictions from the REA.

9.    The Lease incorporates key protections regarding how the Premises may be used. Article 4 of the Lease explicitly incorporates provisions of the REA, including Articles XXII-A and XXII-C. (1-MOAC at 10.) Violation of these incorporated provisions is a default and breach of the Lease for which the Lease may be terminated by the Landlord. (1-MOAC at Article 28.1(A).) Incorporated Article XXII-A provides for the anchor spaces, including the Premises, to be operated as department stores as an integral part of the planned tenant mix in the shopping center:

> The Parties agree that it is in their mutual best interests that the Stores of the Majors [Sears, Macy's, and Nordstrom][3] to be developed and maintained as Department Stores as an integral part of the Shopping Center, to permit the Shopping Center to contain a combination of occupants which represent a sound and balanced diversification of merchandise.

(*Id.* at 115.)

10.    The REA defines Department Stores as "a series of integrated departments for the sale of goods and merchandise of various kinds (including such non-retail activities as may customarily be incidental thereto)." (3-MOAC at Article II-F.) Article XXII-C further defines the permissible uses of the Premises to exclude uses detrimental to the operation of a first-class regional shopping center:

> . . . any use or purpose other than retail purposes customarily found in an enclosed mall shopping center and non-retail activities customarily incidental thereto or such other uses and purposes that are compatible and consistent with (and are not detrimental, injurious or inimical to) the operation of a *first-class regional shopping center*. . .

(*Id.* at 126 (emphasis added).)

---

[3] The REA defines "Majors" as "Nordstrom and/or Macy's and/or Sears," except with regard to Article XXII-B, where it "refers only to Nordstrom and/or Macy's." (3-MOAC at 11.)

11.      This provision goes on to confirm that these restrictions apply to all three levels of

the Premises, except that this provision does not restrict the third floor from going dark. (*Id.*)

**B.      The Lease provides MOAC the first right to the Premises if the space goes dark.**

12.      In the event the third floor does go dark, the Lease gives MOAC the immediate

first right and option to lease the third floor without limitation. (1-MOAC at 11, Article 4.4.) A

contemporaneous agreement between MOAC and Sears Co. requires Sears Co. or its successors

to provide one-year's notice prior to the third floor "going dark" and permits MOAC two years

to exercise its first right and option to lease the third floor. (2-MOAC ("Third-Floor

Addendum").)

13.      The Lease also provides MOAC first option to purchase the lessee's interest in the

Premises if the Premises goes dark and the lessee "determines to sell, exchange or otherwise

transfer its interest in the Leased Premises" (1-MOAC at 15, Article 6.3(A)), except as stated in

Article 6.3(C):

> (C) None of the foregoing provisions [regarding first option to purchase] of this Paragraph 6.3 shall be applicable to:
>
>> (1) a transfer to an Affiliate of Tenant;
>>
>> (2) a transfer pursuant to a reorganization, consolidation, merger or liquidation or the transfer of all or substantially all of the assets of Tenant; *and*
>>
>> (3) a transfer pursuant to a bona fide financing arrangement with any lender.

(*Id.* at 16–17, Article 6.3(C) (emphasis added).) Applying the conjunction "and" to require

satisfaction of all conditions in Article 6.3(C) (in contrast to the use of "or" in Article 6.3(C)(2))

would only except MOAC's first option in the limited circumstance of a reorganization, pursuant

to a lender financial arrangement, in which the lessee's assets are transferred to an affiliate. Thus

this provision is not applicable here.

14.     The Lease also limits permissible subleasing to an excess portion beyond a minimum floor area and other subleases typical of a tenant's usual business in the Premises without MOAC's consent. (*Id.* at 12, Article 6.1.)

**C.     Other Lease provisions also restrict use of the Premises.**

15.     The REA explicitly prohibits certain uses anywhere on the Premises, including any use that does not satisfy the exacting standards and fit required for a first-class regional shopping center:

> No use or operation will be made, conducted or permitted on or with respect to all or any part of the Total Development Tract, which use or operation is obnoxious to or *out of harmony with* the development or operation of a first-class regional shopping center.
> . . .

(3-MOAC at 55, Article IX(D) (emphasis added).) The REA identifies a number of specifically prohibited uses including, but not limited to, an office building (*id.* at 55, Article IX-C)[4], a warehouse, a dry cleaner or laundromat, or a pet shop, to name only a few. (*Id.* at 55–57, Article IX-D.)

16.     The REA requires approval from MOAC and otherwise restricts redecoration and renovation changes to the "Sears Court,"[5] including, but not limited to restrictions on low-quality design or materials and changes that adversely affect other tenants or customer traffic. (3-MOAC at 32, Article V-D.) The REA requires approval from MOAC *and* the other anchor tenants for any changes to the exterior of the Premises building. (*Id.* at 34, Article V-E.) The REA also strictly regulates signage, requiring MOAC approval for some signs and approval from MOAC

---

[4] While an office building is now attached to Mall of America, this building required approvals and agreements between MOAC, the anchor tenants, and the City of Bloomington. (Hoge Decl., ¶ 33.)

[5] The "Sears Court" constitutes the area in front of the entrance to the Premises from the interior of Mall of America, identified by a honeycomb pattern in Exhibit B to the REA. (3-MOAC at MOAC000322.)

*and* the other anchor tenants for any exceptions to the REA's sign criteria. (*Id.* at 109, Article

XIX, with reference to *id.* at MOAC000376, Exhibit K.)

17.     These provisions of the REA require approval from MOAC and the other anchor

tenants for any use of the Premises that materially differs from that of the debtors because

differing uses require changes which require approval. (*See* Hoge Decl., ¶ ¶ 31–33 (explaining

the process of developing the former Bloomingdale's space and the hotels and office building,

which are adjacent to Mall of America).) Changing the use of the Premises would also likely

require MOAC's assistance in obtaining variances of city ordinances to allow changes to the

exterior of the building, signage, or parking. (*Id.*)

**III.   Assignment to Transform will harm Mall of America and the other tenants of the
shopping center.**

18.     The debtors seek to assign the Lease to a leasing company: Transform's

subsidiary Leaseco. However, Transform's financial condition and operating performance are

dismal, and in no way similar to that of Sears in 1991. (Frillman Decl., ¶ 27.) Neither the debtors

nor Transform provide evidence suggesting otherwise. (*Id.*, ¶ 26.) Transform also claims that it

can do whatever it wants with the Premises—in spite of the Lease and REA restrictions or Mall

of America's tenant mix. (*E.g.*, ECF No. 4454 at 7, 9.)

**A.     Transform's financial condition is poor.**

19.     The limited information provided by Transform demonstrates that its financial

condition is poor. To purportedly demonstrate adequate assurance of Transform's financial

condition, the debtors rely on Transform (ECF No. 3651, ¶ ¶ 12, 13), and Transform points to a

confidential letter, dated April 26, 2019 (the "Transform Financials") (12-MOAC) and the

Buyer's omnibus reply to various landlords' objections (the "Buyer's Reply") (16-MOAC).[6]
(Stip., ¶ 10.) As explained by Mr. Frillman, an expert in assessing the financial condition of
retailers, Transform has provided "[n]o evidence whatsoever" that the financial condition of
Transform is similar to or better than that of Sears in 1991. (Frillman Decl., ¶ 19.) Mr. Frillman
points out that the limited financials provided by Transform include "no underlying values or
valuations" and include explicit disclaimers that undermine the reliability of these explicitly
estimated values. (Frillman Decl., ¶ 19.) Even if the information provided by Transform was
reliable, it would demonstrate that Transform's financial condition is not anywhere near similar
to, much less better than that of Sears in 1991. (Frillman Decl., ¶ 22.) Looking at sales, income,
assets, debt, stock market cap, and other comparative factors, Mr. Frillman opines that
"Transform's financial condition is significantly worse when compared to that of Sears of 1991
adjusted to today." (*Id.*, ¶ 24.)

**B.    Transform's operating performance is poor.**

20.     Transform intends to operate with a smaller footprint than the Debtors prior to
bankruptcy of approximately 425 "go-forward" retail stores, but Transform is clear that it will
not operate any of these stores in the Premises. (16-MOAC, ¶ 24; Stip., ¶¶ 11–14.) As a new
company, Transform does not yet have any measurable operating performance. Transform does
not provide any historical financial or operating performance information about Transform's
principals. (*See* Stip., ¶ 10 (referring to 16-MOAC and 12-MOAC).) Instead, as with regard to
financial condition, Transform relies on the Transform Financials and Buyer's Reply which

---

[6] The debtors and Transform contend that the financial condition and operating performance of
Sears Co. and its guarantors at the time Sears Co. became lessee under the Lease can be
derived from the 10-K for Sears Co. for the fiscal year ending December 31, 1991 (the "Sears
1991 10-K") (Exhibit 7-MOAC), and the 10-Q for Sears Co. the fiscal quarter ending June 30,
1991 (the "Sears 10-Q 2Q1991") (Exhibit 8-MOAC). (Stip., ¶ 9.)

focus on Transform's performance projections. (*Id.*) Even when looking at the financial or operating performance of Transform's leadership, this leadership is substantially the same as the debtors' leadership prior to bankruptcy. (16-MOAC, ¶ 39; Frillman Decl., ¶ 25.) The top executives of Transform all worked for the debtors in its decent into bankruptcy—all but one of these worked with the debtors for at least 10 years. (16-MOAC, ¶ 38, *see also* 14-MOAC at 20 (identifying the debtor's executive officers in early 2018).)

21.     As with Transform's financial condition, Mr. Frillman's expert assessment explains that Transform has provided no evidence that its operating performance is similar to or better than that of Sears in 1991. (Frillman, ¶ 12.) The very "evidence" offered by Transform to provide adequate assurance, explicitly states that this evidence cannot be relied on or provide any assurance of future performance:

> Transform and its representatives make **no representation or warranty as to the accuracy, completeness or reasonableness** of the information herein. This letter includes projections, forecasts or other forward-looking statements with respect to Transform and **there can be no assurance as to Transform's or the Company's future performance**. . . . This letter **is not intended to provide the basis for any decision** on any transaction.

(12-MOAC at MOAC000007.) Mr. Frillman points out that Transform provides no business plan, other that vague conclusory statements, to suggest that its business plan might be viable. (Frillman Decl., ¶ ¶ 17–18.) The evidence provided by Transform demonstrates that, in contrast to Sears in 1991, among other things, it is not a publicly traded going concern, plans to operate less than one-quarter the number of stores which each generate significantly less sales, and is supported by significantly less business diversity. (*See id*, ¶ 17.) Assessing these and other factors, including, but not limited to, the fact that Transform's brand, business, and leadership team all have a poor performance record, Mr. Frillman opines,

> Based on virtually any method of analysis, the two cannot be considered "similar." Transform's predicted *operating performance is significantly worse* when compared to that of Sears in 1991 adjusted to today.

(*Id.*, ¶ 25 (emphasis added).)

22.    The operating performance of Transform's leadership, as evidence through their performance with the debtors, is equally poor. MOAC's experience further demonstrates that, leading up to its bankruptcy, the operational performance of the debtors had diminished dramatically from Sears Co. in 1991. (Hoge Decl., ¶ 17.) The debtors' quality of management was poor, and resulted in poorly maintained stores, poor customer service, and a lack of product availability. (*Id.*) Where other stores found success at Mall of America, the debtors' store did not, and it is not one of Transform's go-forward stores. (*Id.*; Stip., ¶ 12.) The debtors' operational performance was so poor that, even before the bankruptcy, MOAC was problem solving to try to address the impact of the debtors' operational performance on Mall of America and to prepare for the debtors' future demise. (Ghermezian Decl., ¶ 10; Hoge Decl., ¶ 17.)

### C.    Transform argues that it can use the Premises for practically any purpose.

23.    Despite the significant use restrictions in the Lease and the REA, Transform inexplicably argues that it can use the Premises for practically any purpose:

> [U]nder the Lease and the REA, the available uses of the location by Sears and its assignee are almost unlimited.

(ECF No. 4454 at 7, *see also id.* at 9 (arguing further that Transform can use the Premises for any purpose, including any use already existing at or adjacent to Mall of America).) Transform's belief that it can simply fill the Premises with any use already existing in Mall of America's complex further demonstrates Transform's inadequacy when it comes to the operational performance required of a first-class shopping center. (Ghermezian Decl., ¶ 8; *see generally*

Ghermezian Decl.; Hoge Decl. (explaining the considerations necessary for a first-class shopping center).)

24.    Transform does not intend to operate any go-forward stores in the Premises or otherwise use the Premises for its own purposes. (Stip., ¶¶ 12, 13.) Instead, after being assigned the Lease, Transform, an entity asserted to be stable and, thus, not in reorganization, intends to market the currently dark Premises for transfer, by subsequent sublease or assignment, to an as-yet identified tenant or tenants. (Stip., ¶¶ 13–16.) Again, opposite of acknowledging the limitations on this transfer in the Lease, REA, and Third Floor Addendum, or providing any assurance of complying with these provisions, Transform insists that it intends to transfer interest in the Premises based on its belief that it has an unfettered ability to so do.

## IV.    The cure amount is $122,063.52.

25.    Currently, $122,063.52 of the cure amount remains unpaid, plus attorneys' fees and expenses accrued after July 31, 2019. (Hoge Decl., ¶ 34 (with reference to 5-MOAC).) In addition to any other obligations it may have under the Asset Purchase Agreement, dated as of January 17, 2019, as amended, Transform has agreed to bear all occupancy costs relating to the Lease during the period from May 13, 2019 through August 31, 2019 (the "Section 365(d)(4) Period"), as extended by stipulation and Court order. (Stip., ¶ 5.)

26.    The total estimated cure amount as of August 22, 2019 was $699,570.11, plus attorneys' fees and expenses accrued after July 31, 2019. (5-MOAC) Transform sent MOAC a check for $578,736.39 of this amount, and the debtors, MOAC, and Transform have stipulated that MOAC can deposit and apply this amount towards the cure amount without prejudice to MOAC's objection to the assumption and assignment of the Lease. (Stip., ¶ 17.) The remaining $122,063.52 consists of $50,000 for the July quarterly electrical charge and $72,063.52 in attorneys' fees and expenses accrued through July 31, 2019. (5-MOAC.) Neither the debtors nor

Transform have put forward any argument or evidence to contradict the July quarterly electrical charge or accrued attorneys' fees and expenses. (*See generally*, ECF Nos. 3651, 3654, 4454.)

## V.    Transform failed to timely answer MOAC's discovery requests.

27.    MOAC served the Debtors and Transform with interrogatories and requests for admissions on May 17, 2019. (*See* 10-MOAC (Requests for Admissions from Transform (with service email)) ("Transform RFA") at MOAC000067 (acknowledging service of the requests by counsel for Transform, as identified in Transform's initial substantive filing in support of assumption and assignment (16-MOAC).) The Debtors, the Buyer, and the Landlord agreed that all responses to the requested discovery were due on or before July 2, 2019. (ECF No. 4354, ¶ 8.) While the debtors served their discovery objections and responses on July 2, 2019 (6-MOAC at 11; 9-MOAC at 15), the Buyer failed to respond by the deadline—instead serving delinquent responses on July 26, 2019. (11-MOAC ("Transform's Discovery Responses").).[7]

28.    All notices, objections, and responses have been timely filed, and the contested issues are properly before the Court and scheduled for an evidentiary hearing on August 22, 2019. (Stip., ¶ 3.) Among other objections, MOAC's May 2, 2019 objection specifically objects (a) on the basis that the debtors and Transform fail to provide adequate assurance required under Section 365(b)(3)(A), (C), and (D) and (b) to Transform's cure amount. (ECF No. 3501.) MOAC continues these objections, which are now scheduled for the requested evidentiary hearing on August 22, 2019.

## DISCUSSION

29.    The debtors fail to provide the heightened adequate assurance of future performance required for shopping center leases like the MOAC Lease. By failing to timely

---

[7] On August 16, 2019, Transform filed a motion to permit its late responses to MOAC's discovery requests. (ECF No. 4867.) MOAC will separately respond directly to that motion.

answer MOAC's requests for admissions, Transform is deemed to have admitted that it does not

satisfy the Code's requirements for assignment. The financial condition and operating

performance of any potential tenant cannot provide any assurance, and the financial condition

and operating performance of Transform pales in comparison to that of Sears Co. when it entered

into the Lease in 1991. The debtors and Transform fail to provide assurance that the terms of the

Lease and other contracts will not be breached—instead insisting that they can use the Premises

in ways that *would* breach the Lease. The debtors and Transform fail to provide assurance that

Mall of America's tenant mix and balance will not be disturbed—again insisting that Transform

can do whatever it wants with the Premises. Finally, the debtors and Transform fail to provide

any support for their claimed cure amount. Each of these issues is addressed in turn.

I.    **Debtor bears the burden for adequate assurance of future performance—**

    A.    **Specially defined, heightened standard for shopping centers**

    30.    The debtors are required to meet a heightened burden of assurance to assume and

assign the Lease to Transform. Under Section 365(f)(2) of the Bankruptcy Code, a lease may

only be assigned if (i) the lease is assumed in accordance of the requirements Section 365(b)(1)

of the Code and (ii) the moving party provides adequate assurance of future performance by the

proposed assignee of the lease and its terms. 11 U.S.C. § 365(f)(2). Section 365(b)(1) provides

that if there has been a default in the unexpired lease, the trustee may not assume the lease

unless, at the time of assumption, the trustee cures the default and provides adequate assurance

of future performance under the lease. Moreover, Section 365(f)(2) provides that in order to

assign a lease under Section 365, adequate assurance of future performance by the assignee must

be provided whether or not there has been a default under the lease. The debtor, along with the

proposed assignee, bears the burden on of providing this adequate assurance. *See, e.g.*, *In re

Bygraph, Inc,*. 56 B.R. 596, 605 (Bankr. S.D.N.Y. 1986). *See also In re Lafayette Radio*

*Electronics Corp.*, 12 B.R. 302, 312 (Bankr. E.D.N.Y. 1991). Absent such a showing, the

Bankruptcy Code requires denial of the proposed assumption and assignment.

31.    Transform focuses its adequate-assurance arguments on its ability to pay the rent

and financial obligations under the Lease. (*See generally* Buyer's Reply; ECF No. 4454.)[8]

However, Section 365(b)(3) specifically defines the adequate assurance required in the case of

shopping center leases to include heightened assurances *in addition to* assurance that the rent and

other financial obligations will be satisfied. This provision explicitly requires adequate assurance

"of the source of rent and other consideration due under such lease" (11 U.S.C. § 365(b)(3)(A))

*before going on* to list several *additional requirements*, including, but not limited to:

    a.  Adequate assurance of the assignee's financial condition and operating
        performance (*id.*);

    b.  Adequate assurance that neither the lease nor other agreements relating to the
        shopping center will be breached (11 U.S.C. § 365(b)(3)(C)); and

    c.  Adequate assurance that the shopping center's tenant mix and balance will not be
        disrupted (11 U.S.C. § 365(b)(3)(D)).

32.    As explained by the Third Circuit, "the mall *is* the archetypal 'shopping center.'"

*In re Joshua Slocum, Ltd.*, 922 F.2d 1081, 1086 (3d Cir. 1990) (emphasis in original). Mall of

America *is* the nation's premier mall. Because Mall of America indisputably constitutes a

shopping center, as stipulated by the parties (Doc. No. 4354, ¶4; Stip., ¶ 6), the Debtor must meet

specific requirements of adequate assurance under Section 365(b)(3) of the Bankruptcy Code,

---

[8] Transform repeatedly refers to Article XXV-D-4-a for the proposition that $50 million in
shareholder equity and a written assumption is all that is required under the Lease and REA
for assignment. (*E.g.*, ECF No. 4454 at 21, ¶ 20.) However, the context of this provision
makes it clear that it does not obviate other requirements, but assumes all requirements have
otherwise been met, before also requiring financial reassurance of rent. (*See generally* 3-
MOAC at 143, Article XXV-D-4-a (providing for the assignor to "remain liable for all sums
due" and other obligations, unless the identified conditions are met).)

which are intended to "protect the rights of lessors *and* the centers other tenants." *See, e.g.*, *In re Joshua Slocum,* 922 F.2d 1081, 1086 (3rd Cir. 1990) (emphasis added).

    **B.**    **Legislative history: protect rights of lessors and tenants by creating statutory protections, since Code takes away bargained for protections, like blanket restrictions on assignment**

33.    Congress recognized the unique nature of shopping center leases and the symbiotic relationship between landlords and tenants and added specifically defined adequate assurance of future performance to include heightened assurances to protect both landlords and other tenants, as explained by the Third Circuit:

> Congress in 1978 and again in 1984 placed additional restrictions on assignment of shopping center leases *in order to protect* the rights of the lessors *and the center's other tenants*. *See* S.Rep. Nos. 98–70, 98th Cong. 1st Sess. (1983). Congress recognized that unlike the usual situation where a lease assignment affects only the lessor, an assignment of a shopping center lease to an outside party can have a significant detrimental impact on others, *in particular, the center's other tenants*. *Id.*

*In re Joshua Slocum,* 922 F.2d 1081, 1086 (3rd Cir. 1990) (emphasis added).

34.    The Third Circuit explained Congress's recognition of the need to protect from the unique effects a change in one tenant can have on other tenants and the shopping center as a whole:

> Congress recognized that unlike the usual situation where a lease assignment affects only the lessor, an assignment of a shopping center lease to an outside party can have a significant detrimental impact on others, in particular, the center's other tenants.

*Id.* (citing S. Rep. Nos. 98–70, 98th Cong. 1st Sess. (1983)).

35.    The nature of the proposed tenant's business and its affect on tenant mix is an important consideration and "may be as important to the lessor as the actual promised rental payments." *Id.* at 1091 (quoting H.R. Rep. No. 595, 95th Cong., 1st Session 348–49). In other

words, in exchange for taking away a landlord's contractual ability to regulate and ensure a

stable tenant mix through prohibitions on assignment, the Code builds in its own protections.

36.    The MOAC Lease, with the REA and Third Floor Addendum include important

provisions that normally would protect Mall of America and its tenants from the assignment and

use proposed by the debtors and Transform. As demonstrated above, these documents include

interacting use restrictions that require approvals from MOAC, other anchor tenants, and

sometimes even the City of Bloomington for uses that materially differ from the debtors' use of

the space. MOAC could normally use the first-option provisions of Article 6.3 and the Third

Floor Addendum to regulate the transfer of interests in the Premises and, therefore, use of the

premises. To the degree that these or other provisions are voided by the Bankruptcy Code as

prohibitions on assignment, they would be the kind of protections that Congress intended to

replace with its own protections drafted into the Code.

37.    Mall of America is a destination for 40 million visitors per year, provides over

13,000 jobs, has over 500 tenants, and brings in billions to the local and state economy, among

many other benefits. The Premises is a critical space for Mall of America's continued success.

Assignment of the Lease to an assignee or tenant that does not meet the Code's requirements and

does not harmonize with the operations of this first-class shopping center could be disastrous for

Mall of America, its tenants and employees, and the local and state economy. (Ghermezian

Decl., ¶ 13.) These are the exact kind of circumstances contemplated by Congress in creating its

Section 365(b)(3) protections.

38.    In contrast, an assignment to Transform is contrary to Congress's intent behind

permitting assumption and assignment to add value to a bankruptcy estate and aiding

rehabilitation of the going concern are not supported by an assignment to Transform. As pointed

out by Transform, "Congress intended to favor assumption and assignment of leases as a means

of realizing value for the estate and aiding in its progress toward rehabilitation." (16-MOAC, ¶ 20 (quoting *In re Bygaph, Inc.*, 56 B.R. 596, 605 (Bankr. S.D.N.Y. 1986).) The estate will realize no further benefit from an assignment to Transform. (*See generally*, ECF No. 2507 (approving the sale of assets to Transform without identification of the MOAC Lease as a lease that would be assigned or any reassurance that the MOAC Lease could be assigned).) Transform is not using the Premises for go-forward stores. If Transform's financial position is so precarious that it cannot continue the debtor's going concern without assignment of the Lease, then it cannot provide the adequate assurance of financial condition required by Section 365(b)(3)(A). (*See also* 16-MOAC, ¶ 36 (explaining why transform believes the go-forward stores will be independently successful).) Assignment of the Lease does not advance Congressional intent.

## II.    Transform is deemed to admit failure to provide adequate assurance.

39.    By failing to respond to MOAC's requests for admissions within the statutory deadline, Transform is deemed to have admitted that it cannot meet the adequate assurance requirements of Section 365(b)(3).[9] Federal Rule of Civil Procedure 36(3) explicitly provides that a request for admission is deemed admitted unless responded to within the specified time:

> A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney. A shorter or longer time for responding may be stipulated to under Rule 29 or be ordered by the court.

Bankruptcy Rule 7036 incorporates this rule into adversary proceedings. *See also* Local Rule 7036-1. Bankruptcy Rule 9014(c) incorporates this rule into contested matters. *See also* Local Rule 9014-1. The Amended Case Management Order does not amend or obviate this rule. (*See*

---

[9] On August 16, 2019, Transform filed a motion to permit its late responses to MOAC's discovery requests. (ECF No. 4867.) MOAC will separately respond directly to that motion.

ECF No. 405.) This rule does not require the requesting party to do anything to do anything other than serve the requests before they are deemed admitted—the matter is simply admitted unless a timely response is provided. Fed. R. Civ. P. 36. The Amended Case Management Order does permit expedited discovery without further Court order. (ECF No. 405 at 16, ¶ 41.) Document requests by e-mail are also authorized. (*Id.*) "Service by e-mail shall be effective as of the date the Document is sent to the e-mail address provided by a party." (*Id.* at 6, ¶ 11.)

40.     MOAC served counsel for Transform, as identified in the Buyer's Reply directly speaking to these proceedings, on May 17, 2019. (10-MOAC at MOAC000067.) Counsel for Transform acknowledged and thanked MOAC's counsel for the service. (*Id.*) Instead of requesting expedited responses, as permitted by the Amended Scheduling Order, MOAC requested responses from Transform thirty days after service of the requests. (*Id.* at MOAC000123.) MOAC, the debtors, and Transform then agreed to extend the time for responses to these discovery requests to July 2, 2019—46 days after service of the requests. (ECF No. 4354.) While the debtors responded within the deadline (6-MOAC at 11; 9-MOAC at 15), Transform did not respond until July 26, 2019 (11-MOAC at MOAC000069)—24 days after the deadline to respond and 18 days after it claims to have learned about missing the deadline. (*Id.* (with reference to ECF No. 4450, filed July 8, 2019).) Accordingly, these requests are deemed admitted.

41.     These admissions include, but are not limited to admitting that the financial condition and operating performance of Transform are not similar to or better than that of Sears in 1991. (10-MOAC at Request No. 5, Request No. 6.)

42.     Even if the Court were inclined to consider Transform's untimely responses, Transform fails to actually answer or fairly respond to these requests—instead merely insisting that the information can be readily obtained from Sears's 1991 SEC filings and the limited

financial information served by Transform. (11-MOAC at MOAC000085–86.) But the Federal

Rules of Civil Procedure require Transform to directly admit or deny each request, or state in

detail why the responding party cannot admit or deny the request. Fed. R. Civ. P. 36(a)(4).

Transform's untimely and incomplete responses fail to do so, and are no better than a failure to

respond. Fed. R. Civ. P. 37(a)(4) (evasive or incomplete response must be treated as a failure to

respond). Accordingly, Transform has admitted that it does not meet the requirements of Section

365(b)(3)(A) to provide adequate assurance that its financial condition and operating

performance are similar to or better than that of Sears in 1991.

### III. Transform fails to provide adequate assurance of financial condition or operating performance.

43.     Recognizing that shopping-center landlords enter into leases based on the

financial condition and operating performance of the tenant-to-be, the Code requires that the new

tenant's financial condition and operating performance be similar to the debtor *as of the time it

became the lessee*. Section 365(b)(3)(A). Transform fails to provide evidence suggesting that it

meets these requirements, and the facts demonstrate Transform does not meet these

requirements. Accordingly, assignment of the Lease to Transform should be denied.

44.     A Massachusetts bankruptcy court, in *In re Casual Male Corp.*, noted that

congress's 1984 amendments to Section 365(b)(3)(A) were intended to provide assurance to the

landlord and tenants that the assignee would not go bankrupt as well, but would continue to

provide the critical non-monetary benefits important to shopping centers and their tenants:

> The legislative history indicates that the purpose of this language
> was "to insure that the assignee itself will not soon go into
> bankruptcy and *will provide operating and advertising benefits to
> the other tenants similar to those provided by the original tenant*
> when its lease was executed."

120 B.R. 256, 264 n.8 (Bankr. D. Mass. 1990) (emphasis added) (quoting 130 Cong.Rec. S8889

*reprinted in* App. 3 *Collier on Bankruptcy* XX–71 (15th ed.1989)).[10]

A.    **Transform's financial condition is substantially inferior to that of Sears in 1991.**

*45.*    Recognizing that financial condition of a tenant speaks to its staying power,

ability to weather storms, and invest in store operation, Congress requires that Transform's

financial condition be similar to that of the debtor when it entered into the Lease. *Accord In re*

*Ames Dept. Stores, Inc.*, 2003 WL 749172, at *2 (S.D.N.Y. March 5, 2003) (approving of per-

store sales and profit and current ratio as relevant factors in comparing the prospective assignee

tenant's financial condition with that of the debtor at the time the lease was established).

46.    However, Transform takes the position that it only needs sufficient financial

condition to ensure rent and financial obligations of the Lease are satisfied (*see, e.g.* ECF No.

4454 at 19–22, ¶¶ 17–20 (focusing on pure economic risk and rent requirements).) This conflicts

with both the text of Section 365(b)(3)(A) and its legislative history. The limited information

provided by Transform, if anything, shows that "Transform's financial condition is significantly

worse when compared to that of Sears of 1991 adjusted to today." (Frillman Decl., ¶ 24.)

Transform provides even this limited information with no substantiation and with statements that

acknowledge that the estimates are based on speculation, and expressly warn that "there can be

no assurance as to Transform's . . . future performance. (Frillman Decl., ¶ 19.) Comparison of

the information found in the Sears 1991 10-K (7-MOAC), Transform Financials (12-MOAC),

---

[10] Despite the text of Section 365(b)(3)(A) *adding* the financial condition and operating performance requirements to the financial obligation assurance and noting this explicit Congressional intent in its amendments to Section 365(b)(3)(A), the non-binding *Casual Male* court inexplicitly cites pre-amendment cases in considering the assignee's ability to pay rent its "prime" purpose. 120 B.R. at 264. However, *Casual Male* does not conclude that payment of future rent is that Section 365(b)(3)(A)'s only purpose. *Id.*

and Buyer's Reply (16-MOAC), similarly shows that Transform's financial condition is much

worse than that of Sears in 1991—including the factors discussed in *In re Ames Dept. Stores,*

*Inc.*, 2003 WL 749172, at *2. The pending disputes, in the docket of this bankruptcy case,

between Transform and others regarding alleged breaches of the asset purchase agreement could

further undermine Transform's financial condition.

47.     The evidence presented and relied upon by Transform and the debtors fails to

provide adequate assurance that Transform's financial condition will be similar to that of Sears

in 1991.  In fact, it demonstrates just the opposite, preventing Transform from taking assignment

of the Lease under 11 U.S.C. § 365(b)(3)(A).

**B.      Assignment must also assure that operating performance of assignee (and
         guarantors) is similar to Sears 1991**

**1.      Transform's financial performance pales in comparison to the
         financial performance of Sears in 1991.**

48.     Section 365(b)(3)(A) explicitly requires comparing a proposed assignee's

operating performance in addition to its financial condition. There are relatively few decisions

applying 11 U.S.C. § 365(b)(3)(A), and those that have applied the law have been inconsistent

with their analysis of financial condition and operating performance.  However, the text of the

statute and legislative history clearly indicate that financial condition and operating performance

are distinct factors which can and should be considered separately.

49.     In comparing the operating performance of the proposed assignee to that of the

debtor, at the time the lease commenced, the *Casual Male* court limited its review to the

historical operating losses or profits. *Id.* at 265. Where the assignee is a new company, that

company has no operating performance. Instead, the few courts considering this situation looked

at the operating performance of the assignee's principal or parent company. *See In re Ames Dept.*

*Stores, Inc.*, 2003 WL 749172 at *2 (S.D.N.Y. Mar. 5, 2003) (citing *Casual Male*).

50.    Transform provides no historical operating performance for itself or its principals. Instead, Transform relies on its projected operating performance to purportedly provide the adequate assurance with which to compare to the operating performance of Sears in 1991. However, the very document upon which Transform relies to purportedly provide assurance of its financial condition explicitly states that Transform makes "no representation or warranty as to the accuracy, completeness, or reasonableness of the information herein" and can provide "no assurance as to Transform's . . . future performance." (12-MOAC at MOAC000007.) This disclaimer alone should preclude its use in this proceeding as admissible evidence of financial condition and operating performance.  But even if the information is considered,  Mr. Frillman's expert assessment shows that "Transform's predicted *operating performance is significantly worse* when compared to that of Sears in 1991 adjusted to today." (Frillman Decl., ¶ 25 (emphasis added).)

2.    **Transform's overall operating performance pales in comparison to the overall operating performance of Sears in 1991.**

51.    While risk of bankruptcy may be evident in an entity's financial performance, the shopping center context requires a more complete review of operating performance. Again, the legislative history of Section 365(b)(3)(A) shows that its operating performance requirements are intended to ensure that other tenants would continue to receive similar "operating and advertising benefits" as they received from the original tenant at the beginning of the lease. *Casual Male*, 120 B.R. at 264 n.8. This legislative history of 356(b)(3)(A) specifically states that courts should consider of both operating and financial performance:

> [T]he assignee should have a similar operating and financial performance when all factors, including advertising aggressiveness, profit margins, growth potential, and other financial indicia, are weighed.

(*See* ECF No. 4454 at 16 (*quoting* S. Rep. No. 98-70 (1983)).) Limiting the comparison to financial performance does nothing to ensure that other tenants receive similar operating and advertising benefits and can miss key indicators that a proposed assignee is on the verge of collapse.

52.     Mall of America carefully vets the operating performance of its potential tenants. In addition to financial performance, this assessment of operating performance focuses on other key indicators of the operating and advertising benefits and potential longevity of the potential tenant. (Hoge Decl., ¶ 14.) Operational performance includes factors, such as how the business is run, its performance in regard to public and employee reputation, the quality of its operations and product, etc. This assessment is not only qualitative but also takes into account how the tenant will fit in Mall of America and drive traffic and interest to the mall and its brand.

In 1991, Sears was a household name—it was *the* retailer to whom families turned for a broad range of shopping needs. In this time of catalogs and bricks and mortar before internet sales, Sears was the Amazon.com of retail. This is exactly the kind of key anchor that could and did drive traffic to Mall of America and supported its brand as a premier, family-friendly shopping experience.

53.     In contrast, the operating performance of Transform's principals—i.e. the recent operational performance of the debtor—is dismal. The Sears store at Mall of America suffered from poor management and maintenance. (Hoge Decl., ¶ 17.) Because this store should have been a flagship store, the debtors' operating performance at Mall of America is indicative of the debtors' overall operating performance. The fact that the debtors ended up in bankruptcy and Transform only proposes to move forward with less than half of the debtors' stores demonstrates that the operational performance evident at Mall of America was not isolated, but systemic and indicative of the operating performance of the principals of Transform. Even if Transform was

proposing to operate a go-forward store in Mall of America, it would fail the operating

performance requirement of 365(b)(3)(A).

###### C.    Congress intended to provide assurance of the stability and performance of the actual occupants of leased space.

54.    Not only does Transform's financial condition and operating performance pale in

comparison to that of Sears in 1991, but these factors are irrelevant under the circumstances for

congress's intent behind Section 365(b)(3)(A) of ensuring that landlords and other tenants would

receive the same intangible benefits that they received at the start of the lease:

> If shopping center space is assigned to a business in poor financial
> condition, the shopping center and its solvent tenants may soon
> find themselves dealing with another *store* in bankruptcy, with all
> of the attendant problems.

(ECF No. 4454 at 16 (quoting S. Rep. No. 98-70 (1983).) Accordingly, Congress contemplated

that leases would be assigned to new tenants—not to a third-party, absentee sub-landlord.

55.    Transform is not the tenant going into the Premises. There is no proposed tenant.

Right now, it is guaranteed that Mall of America, including its tenants, will not receive any of

these intangible benefits until a new tenant begins operations—much less similar benefits to

those received from Sears in 1991. Even if Transform did have one or more tenants to fill the

Premises, it is the financial condition and operating performance *of the proposed tenant or

tenants* that would speak to Congress's intent.

#### IV.    The assignment must comply with the Lease and Transform must subsequently comply with all terms of the Lease.

56.    Transform insists that it intends sub-lease the space without regard to Lease

requirements restricting how the Premises can be used and limiting how interests in the Premises

may be subsequently transferred. This is the opposite of providing assurance that Transform will

comply with the Lease and other related agreements. Accordingly, assumption and assignment of the Lease to Transform should be denied.

57.     Section 365(b)(3)(C) requires the Debtor and assignee to prove adequate assurance:

> that the assumption or assignment of such lease is subject to all provisions thereof, including, but not limited to, provisions such as radius, location, use, or exclusivity provisions, and will not breach any such provision contained in any other lease, financing agreements or master agreement relating to such shopping center.

In other words, while the Code permits some limited, temporary suspension of some lease requirements which might otherwise prevent assignment, a lease must be assumed in its entirety—along with all other related agreements. *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 531 (1984); *In re Rickel Home Centers, Inc.*, 209 F.3d 291, 298 (3d Cir. 2000); *In re MF Glop. Holdings Ltd.*, 466 B.R. 239, 241 (Bankr. S.D. N.Y. 2012). As explained by the Fourth Circuit, Congress intended to preserve bargained-for protections through 365(b)(3)(C):

> [W]hen a shopping center lease is assigned in bankruptcy, Congress's purpose in § 365(b)(3)(C) is to preserve the landlord's bargained-for protections with respect to premises use and other matters that are spelled out in the lease with the debtor-tenant.

*In re Trak Auto* Corp, 367 F.3d 237, 244 (4th Cir. 2004). Therefore, the debtors and Transform must prove adequate assurance that, once the Lease is assigned, the assignee will comply with *all provisions* of the Lease, REA, Third Floor Addendum, and any other related documents.

### A.     Transform's proposed plan ignores MOAC's contractual first options to purchase or lease.

58.     Transform's proposed plan of subleasing the Premises to theoretical tenants ignores key contractual requirements that provide MOAC first option to purchase the interests that Transform seeks to transfer.

59.     Even if the Lease was assigned to Transform, the Lease limits Transform's ability to subsequently assign or sublet the entire Premises to one or more third parties. The Lease explicitly provides MOAC the first right to purchase any property interests a lessee seeks to transfer after the space goes dark. (1-MOAC at 15, Article 6.3(A)) Even if the exception in Article 6.3(C) is read to apply with regard to the assignment to Transform, none of the circumstances identified in the exception would continue to apply after the Lease was assigned to Transform. Accordingly, since the Premises will still be dark, Article 6.3(A) will apply without exception and permit MOAC to purchase any interest Transform seeks to transfer. Similarly, the Lease also permits MOAC the first right and option to lease the third floor, and not subject to the exception just discussed. (1-MOAC at 11, Article 4.4.) Again, even if this provision is suspended for the assignment to Transform, Transform would have to comply with this Lease requirement and give MOAC first right and option to lease the third floor. The Lease, which prevails over any broader provisions in the REA, also limits the amount of space in the Premises that Transform could sublease without MOAC's consent. (1-MOAC at 12, Article 6.1.)

60.     Transform argues that it can sublet or assign the entire Premises without providing MOAC the first right to the Premises. This insistence directly contradicts the option and sublease limitation provisions of the Lease with which Transform must comply. Indeed, Transform's entire plan for its use of the Lease is likely precluded by these Lease provisions.

61.     Transform's planned use of the Premises is further limited by the Third Floor Addendum. This agreement requires the lessee to provide one year's notice before going dark, then gives MOAC two years to exercise its right and option to lease the third floor. (2-MOAC.) Because the Premises is *already dark*, Transform cannot comply with the notice requirement, unless the Premises is operational within a reasonable time after assignment. MOAC would have the space operational within a year of going dark (Hoge Decl., ¶ 26), but Transform has already

had months to start this process. By immediately exercising MOAC's right upon receiving

notice, if it had received such notice, MOAC could have cut this time down even further. There

is no indication that Transform plans to have the Premises operational within a reasonable

time— instead taking the position that it could take years to find a new tenant to occupy the

space. Because Transform would be required to comply with the notice provision, it would have

to provide immediate notice upon assignment if the space would not be occupied within a year.

This, in turn, would also trigger MOAC's right and option to lease the third floor. Again,

Transform's position indicates that it does not intend to comply with the third-floor notice or

lease option requirements.

      **B.**     **Transform flouts restrictions on use of the Premises in the Lease and REA.**

     62.     The Lease and REA contain overlapping use restrictions which effectively require

the Premises to be used as a three-floor department store, similar to the store operated by the

debtors, unless special exception is approved by MOAC and other parties. These provisions

include restrictions on any use that is "out of harmony with the development or operation of a

first-class regional shopping center" (3-MOAC at 55, Article IX(D)) which would prohibit use

by any tenant whose operational performance does not meet the standards required for a first-

class shopping center or whose offerings conflicted with Mall of America's tenant mix or

balance. Among other  use regulations, the REA contains provisions that:

- note the intent that the Premises be used as a department store (REA Article
  XXII-A);

-  require use "consistent with (and . . . not detrimental, injurious or inimical to) the
  operation of a first-class regional shopping center" (REA Article XXII-C);

- define specifically identified prohibited uses (REA Article IX-C, D); and

- provide restrictions on changes to design, materials, or signage (REA Articles V-D, V-E, XIX).

63.    As Mr. Hoge, who has direct experience placing tenants and implementing projects at Mall of America, these provisions effectively require the approval and involvement of MOAC, other anchor tenants, and, sometimes, the City of Bloomington for any changes from the debtors' prior use of the Premises. (Hoge Decl., ¶ ¶ 31–33.)

64.    In claiming that it can do whatever it wants with the Premises, Transform demonstrates that it has no intent to ensure that it or any tenant complies with these contractual use restrictions.

**V.    In addition to any contractual use restrictions, assumption and assignment must not disrupt a shopping center's tenant mix or balance.**

65.    By insisting that Transform can fill the Premises with whatever tenant or use it wishes, Transform fails to provide adequate assurance that tenant mix or balance will not be disrupted.

66.    Section 365(b)(3)(D) requires the Debtor and assignee to prove adequate assurance "that assumption or assignment of such lease will not disrupt any tenant mix or balance in the shopping center."

67.    This requirement is in addition to and independent of any such requirements found in the lease and implicated by Section § 365(b)(3)(C) (requiring adequate assurance of compliance with the lease). In other words, regardless of any lease provisions regarding tenant mix, tenant mix or balance may not be disrupted by assignment.

68.    A bankruptcy court in *In re Rickel Home Centers, Inc.* considered whether the adequate assurance requirement of Section 365(b)(3)(D) was met regarding a shopping center lease that contained no go-dark prohibition, in addition to other considerations. 240 B.R. 826

(Bankr. D. Del. 1998), *appeal dismissed*, 209 F.3d 291 (2000), *cert. denied*, 531 U.S. 873 (2000). Acknowledging that the location was temporarily vacant due to the bankruptcy, the court found that adequate assurance was provided due to several factors not present here. *Id.* at 834–35. The assignee, in that case, *was* a retail distributor and provided evidence that *it* would occupy and operate in much of the space within six months. *Id.* at 835. The assignee also provided evidence that it had strong incentive and would, in fact, seek to sublet the smaller remaining space within a reasonable period of time. *Id.* The court also noted that the assignee represented to the court that it intended to seek tenants which would complement the shopping center's tenant mix and meet with the landlord's approval. *Id.* at 834 n.5. Accordingly, the court concluded that it "has no reason to believe that [the assignee] would allow the portion of the [space] not used by [the assignee] to remain dark for an unreasonable period of time." *Id.* at 835 (noting that the landlord would be preserved recourse should the sublet efforts become unreasonable).

69.    *In addition to* the other, separate adequate assurance requirements of Section 365(b)(3), Section 365(b)(3)(D) requires adequate assurance that assumption and assignment "will not disrupt any tenant mix or balance in the shopping center." Even a portion of the leased space remaining dark for an unreasonable period of time violates this provision. *See In re Rickel Home Centers, Inc.*, 240 B.R. 826 (Bankr. D. Del. 1998), *appeal dismissed*, 209 F.3d 291 (2000), *cert. denied*, 531 U.S. 873 (2000).

70.    The plain text of the Section 365(b)(3)(D) requires that tenant mix provision be considered separately from, and in addition to, Section (b)(3)(C)'s consideration of contractual tenant mix, and other, requirements. This court has analyzed Section 365(b)(3)(D) separately from Section 365(b)(3)'s other requirements. *See, e.g.*, *In re Ames Dept. Stores, Inc.*, 348 B.R. 91 (Bankr. S.D.N.Y. 2006); *In re TSW Stores of Nanuet, Inc.*, 34 B.R. 299 (Bankr. S.D.N.Y. 1983); *In re Ames Dep't Stores, Inc.*, 121 B.R. 160, 165 (Bankr. S.D.N.Y. 1990) (same); *accord In re*

*Rickel Home Centers, Inc.*, 240 B.R. 826 (Bankr. D. Del. 1998), *appeal dismissed*, 209 F.3d 291

(2000), *cert. denied*, 531 U.S. 873 (2000) (analyzing tenant mix requirement for shopping center,

even with a provision allowing the space to go dark). The Third Circuit, in *In re Joshua Slocum,*

*Ltd.*, discussed Congress's intent in protecting both landlords *and* tenants from vacancy, partial

operation, and other disruptions to tenant mix—*in addition to* financial and operation assurances:

> Congress wished to alleviate the hardship caused landlord and
> tenant resulting from vacancy or partial operation of the debtor's
> space in the shopping center. Section 365 also insures that the
> landlord will continue to receive payments due under the lease.
> Finally, the statute guarantees to the landlord *and remaining*
> *tenants* that the tenant mix will not be substantially disrupted.
> (emphasis added)

922 F.2d 1081 (3d Cir. 1990) (citing 130 Cong. Rec. S8891); *see also In re Trak Auto Corp.*, 367

F.3d 267, 241–44 (4th Cir. 2004) (discussing Congress's intent in preventing tenant mix issues

by removing flexibility from § 365(b)(3)(C) and (D)). Whereas the first version of Section

365(b)(3)(C) and (D)  prohibited "substantial" deviations, Congress removed the "substantially"

qualifier from both of these paragraphs in 1983 to clarify its intent. *Compare* 11 U.S.C.

§365(b)(3) (1982) *with* Pub.L. 98-353, Title III, §§ 362, 402-404, July 10, 1984, 98 Stat. 361,

367; 11 U.S.C. § 65(b)(3) (2019). Accordingly, Section 365(b)(3)(D) must be considered without

regard for contractual tenant-mix requirements, as intentional, distinct protection for both

landlords and other tenants in light of other contracted-for protections taken away through the

Bankruptcy Code's assignment process. *See, e.g.*, *In re Rickel, supra* (holding that a shopping

center had to be entirely rented out to new tenants within six months of assumption, even though

original lease allowed the debtor to go dark).

71.    As explained by Mr. Ghermezian and Mr. Hoge, Tenant mix and balance at first-

class shopping centers like Mall of America is meticulously curated at multiple levels. As a

completely independent, absentee third party from MOAC and its existing tenants, assignment of

the Lease to Transform would be an unprecedented change to tenant mix. Transform further insists that it is subject to no use restrictions in filling the space with one or more tenants. This alone demonstrates Transform's inadequate understanding of tenant mix and balance at first-class shopping centers. There is no indication that Transform has the experience necessary or even intends to take anywhere near the same care as MOAC which is essential to maintain the tenant mix and balance critical to Mall of America and its tenants—especially for one of only three anchor-tenant spaces. Combined with Transform's sole incentive of maximizing rent, these factors will result in inevitable disruption to tenant mix and balance at Mall of America by Transform. Transform also provides no assurance that the Premises will be operational in a reasonable period after assignment even claiming that it can leave the Premises dark indefinitely. However, both Mr. Ghermezian and Mr. Hoge confirm the obvious—a vacant space is disruptive to tenant mix and balance at a shopping center, and a vacant anchor space at the nation's premier shopping center is potentially catastrophic.

## VI.    The cure amount of $122,063.52 is effectively uncontested.

72.    Between the stipulated amounts and a lack of counter evidence from Transform, the cure amount is effectively uncontested. Under Section 365(f)(2) of the Bankruptcy Code, a lease may only be assigned if (i) the lease is assumed in accordance of the requirements Section 365(b)(1) of the Code and (ii) the moving party provides adequate assurance of future performance by the proposed assignee of the lease and its terms. (*See* 11 U.S.C. § 365(f)(2).) Section 365(b)(1) provides that if there has been a default in the unexpired lease, the trustee may not assume the lease unless, at the time of assumption, the trustee cures the default and provides adequate assurance of future performance under the lease.

73.    After applying the May 17, 2019 check to the cure amount claimed by MOAC, only $122,063.52, plus attorneys' fees and expenses accrued after July 31, 2019, remain unpaid.

This amount represents a quarterly electrical charge and attorneys' fees and expenses accrued through July 31, 2019. (5-MOAC.) Because neither the debtors nor Transform provide any evidence to contradict this remaining amount, the cure amount is effectively uncontested.

## CONCLUSION

74.     The debtors and Transform do not satisfy the code's requirements for the assumption and assignment of a shopping center lease. Assignment of the Lease to Transform could be catastrophic to Mall of America, its tenants, its employees, and its community—not to mention the 40 million people who visit Mall of America every year. Accordingly, the debtors' proposed assumption and assignment to Transform should be denied.

Dated:  August 19, 2019            Respectfully submitted,
            Minneapolis, Minnesota

                                                /e/Thomas J. Flynn
                                                Thomas J. Flynn
                                                Admitted *pro hac vice* on December 26, 2018
                                                Alexander J. Beeby
                                                *Pro hac vice* pending
                                                Larkin Hoffman Daly & Lindgren, Ltd.
                                                8300 Norman Center Drive
                                                Suite 1000
                                                Minneapolis, Minnesota  55437-1060
                                                (952) 835-3800
                                                tflynn@larkinhoffman.com

Dated:  August 19, 2019            /e/David W. Dykhouse
                                                David W. Dykhouse
                                                Patterson Belknap Webb & Tyler LLP
                                                1133 Avenue of the Americas
                                                New York, New York  10036-6710
                                                (212) 336-2000
                                                dwdykhouse@pbwt.com

                                                *Attorneys for MOAC Mall Holdings LLC*

4833-8833-5265, v. 1