

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 18-23538-rdd

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    SEARS HOLDINGS CORPORATION,

8

9         Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                   United States Bankruptcy Court

13                   300 Quarropas Street, Room 248

14                   White Plains, NY 10601

15

16                   July 23, 2019

17                   10:24 AM

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO: NAROTAM RAI

1   HEARING re Debtors' Motion to Strike Second-Lien Holders'

2   Experts in Connection with July 23, 2019, Hearing on Rule

3   507(b) Determination (related document(s)4565)

4

5   HEARING re Motion of Cyrus Capital Partners, L.P. , ESL

6   Investments, Inc. and Wilmington Trust, National

7   Associations in Limine to Exclude Certain Testimony and

8   Strike Certain Portions of the Declarations by the Debtors'

9   Fact Witness Brian Griffith (related document(s)4439, 4272)

10   filed by Thomas J. Moloney on behalf of Cyrus Capital

11   Partners, L.P., ESL Investments, Inc., Wilmington Trust,

12   National Association (document #4564)

13

14   HEARING re Debtors Motion to Estimate Certain 507(B) Claims

15   for Reserve Purposes filed by Ray C Schrock on behalf of

16   Sears Holdings Corporation (document #4034)

17

18   HEARING re Debtors' (I) Opposition to Second-Lien Holders'

19   Requests to Determine Amount of Second-Lien Secured Claims

20   Under Section 506(a) and Section 507(b) Administrative

21   Claims and (II) Reply in Support of Debtors' Rule 3012

22   Motion to Determine the Amount, if any, of 507(b) Claims and

23   to Surcharge Second-Lien Collateral Pursuant to Section

24   506(c) (related document(s)4034) (document #4381)

25

1    HEARING re The Debtors' Supplemental Brief on Expert

2    Discovery and in Further Support of (I) Opposition to

3    Second-Lien Holders' Requests to Determine Amount of Second-

4    Lien Secured Claims Under Section 506(a) and Section 507(b)

5    Administrative Claims and (II) Reply in Support of the

6    Debtors' Rule 3012 Motion to Determine the Amount, if any,

7    of 507(b) Claims and to Surcharge Second-Lien Collateral

8    Pursuant to Section 506(c) (related document(s)4034)

9    (document #4565)

10

11   HEARING re The Creditors1 Committee's (I) Qualified Joinder

12   to the Debtors' Objection to the Second Lien Parties'

13   Requests to Determine Claims Under Section 506(A) and

14   Section 507(B) and Reply in Support of the Debtors' Rule

15   3012 Motion and (II) Supplemental Objection to the Second

16   Lien Parties' Request to Determine Claims Under Section

17   506(A) and Section 507(B) (REDACTED) (related

18   document(s)4034, 4381) (document #4385)

19

20   HEARING re The Creditors' Committee's (I) Qualified Joinder

21   to the Debtors' Objection to the Second Lien Parties'

22   Requests to Determine Claims Under Section 506(A) and

23   Section 507(B) and Reply in Support of Debtors' Rule 3012

24   Motion and (II) Supplemental Objection to the Second Lien

25   Parties' Request to Determine the Claims Under Section

1   506(A) and Section 507(B) (related document(s)4034, 4381)

2   (document #4538)

3

4   HEARING re Common Memorandum of Law on Behalf of the Second

5   Lien Parties: (A) In Support of Their Requests to Determine

6   the Amount of Their Second Lien Secured Claims Under Section

7   506(a) and Their Section 507(b) Administrative Claims

8   Pursuant to Bankruptcy Rule 3012; and (B) In Opposition to

9   Debtors Motion to Surcharge Their Collateral Pursuant to

10  Section 506( c) ( document #4,272)

11

12  HEARING re Supplemental Memorandum of Law on Behalf of ESL

13  Investments, Inc. In Support of Its Requests to Determine

14  the Amount of Its Second Lien Secured Claims Under Section

15  506(a) and Its Section 507(b) Administrative Claims Pursuant

16  to Bankruptcy Rule 3012; and In Opposition to the Debtors'

17  Motion to Surcharge Its Collateral Pursuant to Section

18  506(c) (document #4273)

19

20  HEARING re Motion of Cyrus Capital Partners, L.P. for Leave

21  to File Under Seal (1) Memorandum of Law In Support of Cyrus

22  Capital Partners, L.P. to Determine the Amount of Secured

23  Claims Under Section 506(a) and Section 507(b)

24  Administrative Claims Pursuant to Bankruptcy Rule 3012 and

25  In Opposition to Debtors' Request to Surcharge Collateral

1    Pursuant to Section 506(c) and (2) Expert Report of Marti P.

2    Murray filed by Thomas R. Kreller on behalf of Cyrus Capital

3    Partners, L.P. (document #4274)

4

5    HEARING re ESL's Demand For Payment (document #4276)

6

7    HEARING re Request For Payment filed by Thomas R. Kreller on

8    behalf of Cyrus Capital Partners, L.P. (document #4278)

9

10   HEARING re Memorandum of Law in Support of Request of Cyrus

11   Capital Partners, L.P. to Determine the Amount of Secured

12   Claims under Section 506(a) and Section 507(b)

13   Administrative Claims Pursuant to Bankruptcy Rule 3012 and

14   in Opposition to Debtors' Request to Surcharge Collateral

15   Pursuant to Section 506(c) (document #4313)

16

17   HEARING re Common Reply Memorandum of Law on Behalf of the

18   Second Lien Parties: (a) in Further Support of Their

19   Requests to Determine the Amount of Their Second Lien

20   Secured Claims Under Section 506(a) and Their Section 507(b)

21   Administrative Claims Pursuant to Bankruptcy Rule 3012; and

22   (b) in Opposition to Debtors' Motion to Surcharge Their

23   Collateral Pursuant to Section 506(c) (document #4439)

24

25   HEARING re Supplemental Reply Memorandum of Law on Behalf of

Page 6

1    ESL Investments, Inc. in Further Support of Its Request to

2    Determine the Amount of Its Second Lien Secured Claims Under

3    Section 506(a) and Its Section 507(b) Administrative Claims

4    Pursuant to Bankruptcy Rule 3012; and in Opposition to the

5    Debtors' Motion to Surcharge Its Collateral Pursuant to

6    Section 506( c) ( document #4440)

7

8    HEARING re Supplemental Reply Memorandum of Law in Further

9    Support of the Request of Wilmington Trust, National

10   Association, as Indenture Trustee and Collateral Agent for

11   Payment of an Administrative Expense Pursuant to 11 U.S.C. §

12   503(a) With Priority Over All Other Administrative Expenses

13   Pursuant to 11 U.S.C. § 507(a) and For Allowing of A Secured

14   Claim to the Extent of Remaining Collateral Pursuant to 11

15   U.S.C. § 506(a) (Corrected) (related document(s)4279)

16   (document #4445)

17

18   HEARING re Common Supplemental Brief of the Second Lien

19   Parties Addressing Discovery: (A) In Connection with Their

20   Requests to Determine the Amount of Their Second Lien

21   Secured Claims Under Section 506(a) and Their Section 507(b)

22   Administrative Claims Pursuant to Bankruptcy Rule 3012; and

23   (B) In Opposition to Debtors' Motion to Surcharge Their

24   Collateral Pursuant to Section 506( c) (related document( s

25   )4 272) ( document #4570)

1   HEARING re Motion for Payment of Administrative Expenses

2   Request of Wilmington Trust, National Association, as

3   Indenture Trustee and Collateral Agent for Payment of an

4   Administrative Expense Pursuant to 11 U.S.C. § 503(a) With

5   Priority Over All Other Administrative Expenses Pursuant to

6   11 U.S.C. § 507(b) and For Allowance of a Secured Claim to

7   the Extent of Remaining Collateral Pursuant to 11 U.S.C. §

8   506(a) (unredacted version of Dkt. No. 4279) (document

9   #4586)

10

11   HEARING re Memorandum of Law Supplemental Memorandum of Law

12   of Wilmington Trust, National Association, as Indenture

13   Trustee and Collateral Agent, (I) In Support of Motion

14   Pursuant to Bankruptcy Rule 3012 for Determination of Amount

15   of Secured Claim Pursuant to 11 U.S.C. § 506(a) and Amount

16   of Claim Entitled to Priority Pursuant to 11 U.S.C. § 507(b)

17   and (II) In Opposition to the Debtors Motion Pursuant to 11

18   U.S.C. § 506(c) (unredacted version of Dkt. No. 4280)

19   (document #4587)

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 8

1   A P P E A R A N C E S :

2

3   CLEARY GOTTLIEB STEEN & HAMILTON LLP

4        Attorneys for ESL

5        One Liberty Plaza

6        New York, NY 10006

7

8   BY:  THOMAS J. MOLONEY

9        ANDREW WEAVER

10       SEAN A. O'NEAL

11

12  WEIL, GOTSHAL & MANGES LLP

13       Attorneys for the Debtors

14       767 Fifth Avenue

15       New York, NY 10153

16

17  BY:  NATASHA S. HWANGPO

18       JARED R. FRIEDMANN

19

20  WEIL, GOTSHAL & MANGES LLP

21       Attorneys for the Debtors

22       200 Crescent Court, Suite 300

23       Dallas, TX 75201

24

25  BY:  PAUL R. GENENDER

Page 9

1    SEYFARTH SHAW LLP

2         Attorneys for Wilmington Trust, National Association as

3         Indenture Trustee and Collateral Agent

4         620 Eighth Avenue

5         New York, NY 10018

6

7    BY:  EDWARD M. FOX

8         STEVEN PARADISE

9

10   MILBANK, TWEED, HADLEY & MCCLOY LLP

11        Attorneys for Cyrus Capital

12        28 Liberty Street

13        New York, NY 10005

14

15   BY:  THOMAS R. KRELLER

16        ROBERT J. LIUBICIC

17

18   AKIN GUMP STRAUSS HAUER & FELD LLP

19        Attorneys for the Unsecured Creditors Committee

20        One Bryant Park

21        New York, NY 10036

22

23   BY:  SARA L. BRAUNER

24        JOSEPH L. SORKIN

25        PHILIP C. DUBLIN

Page 10

1    GETZLER HENRICH

2          295 Madison Avenue, 20th Floor

3          New York, NY 10017

4

5    BY:  WILLIAM H. HENRICH

6

7    ALSO PRESENT TELEPHONICALLY:

8    ALIX BROZMAN

9    MARIA CHUTCHIAN

10   SONIA E. COLON

11   JASON DIBATTISTA

12   ROBERT J. GAYDA

13   WILLIAM S. HOLSTE

14   HOO RI KIM

15   MATTHEW KOCH

16   ZACHARY D. LANIER

17   TERESA LII

18   SHIRIN MAHKAMOVA

19   MICHAEL MITTELMAN

20   COURTNEY D. MORPHET

21   BRYAN OBERG

22   RITA MARIE RITROVATO

23   CHRIS STAUBLE

24   ANDREW M. THAU

25   DAVID H. WANDER

```
 1                    P R O C E E D I N G S

 2              [SEE EXAMPLES]

 3

 4

 5              CLERK:  All rise.

 6              THE COURT:  Please be seated.  Good morning.  In

 7    re Sears Holdings Corporation, et al.

 8              MR. GENENDER:  Good morning, Your Honor, Paul

 9    Genender, Weil, Gotshal & Manges for the debtors.  And when

10    the Court's ready, we'd like to proceed with our motion on

11    the 2L's experts.

12              THE COURT:  The motion in limine.

13              MR. GENENDER:  Yes, yes, Your Honor.

14              THE COURT:  Okay.

15              MR. MOLONEY:  Good morning, Your Honor.  Tom

16    Moloney and Andrew Weaver of Cleary Gottlieb Steen &

17    Hamilton LLP on behalf of ESL.

18              THE COURT:  Good morning.  And I suppose you want

19    to proceed with your motion in limine too?

20              MR. MOLONEY:  Yeah.  Well, yes.  But when it's

21    time for me to talk or now I would suggest that I think that

22    they are two different qualitative motions and that the

23    motion that we've advanced dealing with the parol evidence

24    questions are ones that I think you should hear as a

25    threshold level.
```

1          The other motion -- and frankly we've raised

2    similar issues in our briefs about the competence and some

3    of the assumptions, the correction of some of -- the

4    correctness of some of the opinions, the basis for the

5    evidence.  I think that might be better dealt with, frankly,

6    in the course of the cross-examinations with people

7    reserving their rights after the declaration is entered to

8    move at the end of those declarations to strike testimony.

9    But Your Honor obviously will proceed however you think is

10   best.

11          THE COURT:  Okay.

12          MR. LIUBICIC:  Good morning, Your Honor.  Robert

13   Liubicic with Milbank on behalf of Cyrus Capital Partners

14   LP.  And with me today, Your Honor, is Tom Kreller, also

15   with Milbank.

16          MR. FOX:  Good morning, Your Honor.  Edward Fox

17   with Seyfarth Shaw on behalf of Wilmington Trust National

18   Association as collateral agent and indentured trustee.  And

19   with me also is my partner, Steven Paradise.

20          THE COURT:  Okay, good morning.  All right.  I

21   think I probably should take both motions in limine now.  As

22   I think I've told all of you, I'm not a big fan of motions

23   in limine.  And normally these issues can come up when

24   there's objections to specific testimony.  But here

25   testimony is -- I think there -- I think the testimony would

Page 13

1    benefit from some guidance on both motions.

2              I don't know if we have the experts here and

3    whether the parties are content to have them stay here since

4    people will be commenting on their testimony before they

5    testify.

6              MR. MOLONEY:  Our expert's here, but we have no

7    problem with their experts staying for this part of the

8    testimony.

9              THE COURT:  Okay.

10             MR. GENENDER:  Mr. Griffith is here

11   (indiscernible) on call.  But we don't have an issue as

12   well, Your Honor.

13             THE COURT:  All right.  So I don't care who goes

14   first.

15             MR. GENENDER:  Your Honor, I stood up first, so

16   that's got to count for something.  Your Honor, Paul

17   Genender, Weil, Gotshal and Manges on behalf of the debtors.

18   I didn't introduce -- I'm obviously here with my partners,

19   Ray Schrock and Sunny Singh.  May I approach, Your Honor?  I

20   have a demonstrative and some excerpts that we'll be using

21   throughout the course of the day.  I've given them to

22   Counsel.

23             THE COURT:  Okay.

24             MR. GENENDER:  Thank you.

25             THE COURT:  All right.  But these don't really go

1   to the motions in limine, do they?  Or only to a minor

2   extent.

3           MR. GENENDER:  Somewhat.  Somewhat.

4           THE COURT:  Okay.

5           MR. GENENDER:  Your Honor, our -- I'm going to --

6   knowing how the Court feels about these sorts of motions,

7   I'm going to be brief and I'm going to -- and I know the

8   Court's read the materials.

9           We certainly understand that striking experts is

10  not a routine matter.  In this case I submit it warrants

11  consideration.  This is not a motion about the

12  qualifications of Mr. Schulte, of Mr. Henrich, or Ms.

13  Murray, rather it's a motion to strike what we think is

14  unreliable and flawed opinions that lack the credibility

15  required to be presented to this court.

16          At the outset, the Debtors submit that the 507(b)

17  matter is not nearly as complicated as the second

18  lienholders would have this court believe.  In fact, it's an

19  entirely fact-based exercise, as shown by the Debtor's

20  submission and reliance upon the factual testimony of Brian

21  Griffith and Brandon Abersold.  Compared with ResCap, this

22  507(b) determination is far more straightforward.

23          As this court has noted, we have an actual outcome

24  of the sale and related GOB sales.  So this should be a much

25  easier process.  As expressed in this Court's own words in

Page 15

1    April, on April 18th, we actually have the facts so it's a

2    lot easier --

3              MR. MOLONEY:   This is more like a closing argument

4    than a motion in limine.

5              THE COURT:   Well, let me try to cut through this.

6    I don't get the impression that you are looking to strike

7    these expert declarations on the basis of Daubert and Kumho

8    Tire, right?   It really goes to two separate different

9    grounds.   The first is that they're in essence not expert

10   declarations at all, they're basically just comments on the

11   factual record before me, which is in essence the same basis

12   as the second lienholder's objection.   Although they also

13   point out the flip side, which is that Mr. Griffith isn't

14   testifying as an expert in the first place, but in essence

15   he's just commenting on facts, and to the extent he's not

16   commenting on facts, I shouldn't hear his testimony because

17   he's not an expert.

18              The flip side of that is it seems to me that these

19   experts who, as you say, are perfectly qualified to present

20   expert testimony are in essence commenting on the facts and

21   not providing expert testimony except in very limited

22   portions of their declarations.   On top of that, I think you

23   also suggest that they rely on expert reports without having

24   vetted them in an expert way, primarily the Tiger appraisal,

25   but also appraisals underlying the equity bids.   Is that

Page 16

1    fair?

2         MR. GENENDER:  Yes, Your Honor.

3         THE COURT:  Okay.

4         MR. GENENDER:  And so it's not -- the basis of the

5    motion relates to the fact that they're relying upon faulty

6    assumptions so their testimony isn't helpful to you.  Now, I

7    --

8         THE COURT:  Well, you could point out the faulty

9    assumptions.  I think that the bigger issue is whether the

10   testimony should be given the (indiscernible) of expert

11   testimony when it's basically just fact testimony or

12   commenting on facts that appear in the record without really

13   an expert analysis behind it.

14        MR. GENENDER:  And there's a significant

15   difference, as this court knows well, between these three

16   proffered experts by the second lienholders on the one hand

17   and Mr. Griffith on the other.

18        THE COURT:  Well, that's the nature of the expert

19   testimony.

20        MR. GENENDER:  Well, but Mr. Griffith is offering

21   fact testimony, but he has firsthand factual knowledge

22   because he's been working on this at Sears for three-and-a-

23   half years.  And that's the basis from which -- that's the

24   vantagepoint from which he's offering his either

25   observations or --

Page 17

1          THE COURT:  Well, he is just a fact witness.  So

2     it's really -- these motions are actually flip sides of each

3     other.  They're objecting to Mr. Griffith's motion to the

4     extent it purports to be expert testimony -- I'm sorry, to

5     the extent it purports to be fact testimony when in fact

6     it's expert testimony.  You're objecting to the three

7     experts on the basis that what purports to be expert

8     testimony is really fact testimony.

9          MR. GENENDER:  Yes.  And I stand before you well

10    aware that Your Honor can take the position that it goes to

11    the weight and not the admissibility.  However, I do think

12    in this situation it rises to the level of when they have

13    three different opinions that are widely divergent based on

14    widely different sets of flaws, and we submit that Mr.

15    Griffith just did math and took into -- and followed this

16    court's instructions in April, which were you have the facts

17    of the sale, keep this simple.  I wouldn't -- you've said to

18    the effect don't spend a lot of time and money on this.

19          THE COURT:  It's not -- it may -- it's quite

20    possible that three sets of professionals can make three

21    different legal arguments based upon their assessments of

22    the facts.  So I don't have a problem with the fact that

23    they each take a different assessment of the facts.  But my

24    problem is, with some very minor exceptions, it doesn't

25    really strike me as an expert assessment because there's no

Page 18

1    real expert analysis here that helps me.

2              MR. GENENDER:  Your Honor --

3              THE COURT:  And on top of that, while experts are

4    certainly entitled to rely on facts, where experts rely on

5    other experts' testimony without vetting it, I have a

6    problem, too.  And that's where they rely on the Tiger

7    reports and other appraisals.

8              MR. GENENDER:  So, Your Honor, I think that the

9    point that you're making is really the point we were making

10   in our June 27th response and reply papers, that we think

11   this motion, these motions could actually be decided on the

12   papers themselves.  Because as it relates to the actual

13   source documents necessary to make this determination, we

14   submit they're actually in this small demonstrative before

15   you in that you have -- for petition date, borrowing base,

16   work from there.  We had the sale.  And so what are the

17   tensions, Your Honor?  There's really three tensions in this

18   whole dispute.  And one is how do you value the inventory

19   and should a fair market analysis be applied to it.

20             THE COURT:  Okay.  I'm going to interrupt you

21   because we not getting -- but I think -- cutting to the

22   chase, although I'll hear counsel for the second

23   lienholders.  My preliminary take on this motion, which may

24   well be my final take on it, is that I am giving very little

25   weight, notwithstanding my respect for all three of the

Page 19

1    experts, to their testimony as expert testimony.  In other

2    words, this is not a case where I would say in a complicated

3    matter that requires expert financial analysis.  I find the

4    experts credible and their analysis persuades me that this

5    is the value, because it's not that type of analysis.  It's

6    primarily a legal analysis based on facts that they have

7    been given and other expert analysis they've been given that

8    they didn't, as far as I can see, vet in any way.

9              So I'm not going to grant the motion, but if

10   there's any doubt about it, either for the parties appearing

11   in front of me today on appeal, I'm really not granting

12   these reports the type of weight that I would give a

13   valuation testimony where I would listen to cross-

14   examination on the margins but obviously accept a lot of

15   what the expert is telling me as true expert analysis.

16             MR. GENENDER:  So then Your Honor I can ask so

17   that we're most efficient with your -- our time here when

18   evidence is put on, we do submit that some of these issues

19   that they're opining on are legal assumptions that the court

20   can make from documents to wit are letters of credit 1L debt

21   or not?  And --

22             THE COURT:  I think that's true.

23             MR. GENENDER:  And we'll just handle it in cross-

24   examination, and I'll be as efficient as I can be.

25             THE COURT:  Okay.  In other words, it crosses your

Page 20

1    opportunity and Mr. Moloney's and Mr. Fox's and everyone

2    else's opportunity in essence to have oral argument with the

3    expert or through the expert.

4            MR. GENENDER:  And if I hit a -- and I would ask

5    as an indulgence from the Court, if I hit an area that you

6    think is -- you don't need testimony on because you think

7    it's a legal matter, I would ask you just to let me know.

8            THE COURT:  Okay.

9            MR. GENENDER:  Thank you, Judge.

10           THE COURT:  Well, and that includes -- I mean,

11   this -- it starts with the goose, it starts with the gander.

12   Interpretation of the reach of the second lien, for example,

13   is a pure legal issue.  It's not a factual issue.  You know,

14   does it apply to cash, does it apply to pharmacy scripts, et

15   cetera.  I think the experts are generally -- the three

16   experts for the second lienholders are generally consistent

17   in saying that that was just an assumption that they were

18   given by Counsel.  But, you know, those obviously are not

19   worth cross-examining on.  That's a legal point.

20           MR. MOLONEY:  Thank you, Your Honor.  And, Your

21   Honor, I have a handout too for -- if I may approach the

22   bench?

23           THE COURT:  Yes.

24           MR. MOLONEY:  With copies for (indiscernible).  I

25   think there's a qualitatively different motion which I think

1    Your Honor just granted (indiscernible), which is, Your

2    Honor, I understand I'm not going to reargue the first part

3    which you ruled.  I would make a few observations.

4              One is that in all the cases that we looked at,

5    and I might have read a million cases involving 507(b) and

6    also cases where you value property for 506.  Courts

7    invariably have relied on expert testimony for valuation

8    questions.  And I think that there are really two pivotal

9    valuation questions, and almost everything else is legal.

10   The two pivotal valuation questions are what was the value

11   of our collateral as a petition date.  I think that is an

12   appropriate topic for expert testimony in terms of valuing

13   the inventory.  I think everything else is just legal

14   questions, what's included and what's not.  And I think this

15   is --

16             THE COURT:  That's fair, but these reports

17   basically rely on the company's books and records and don't

18   provide any expert analysis of them as far as I can see or

19   rely on a separate appraisal that was done shortly before

20   the petition date, or proposals that were made without

21   actually evaluating the inventory and receivables.  Which is

22   understandable, because receivables and inventory are -- I

23   mean, they could question the assumptions, whether it's at a

24   discount or not and how you do them, but they pretty much

25   just accept the books and records or critique them as a

Page 22

1    lawyer would do.

2            MR. MOLONEY:  Well, that's not actually true, Your

3    Honor.

4            THE COURT:  Okay.

5            MR. MOLONEY:  And I think that's why I thought it

6    would be better to do this later.  Because for example, my

7    witness, Mr. Schulte, provides almost no reliance, if any,

8    on Tiger and is relying on the actual performance of the

9    company by looking at what they did when they actually sold

10   the inventory.

11           THE COURT:  But that's the facts.  And I can rely

12   on that, too.  You could show me that fact.

13           MR. MOLONEY:  And also applying the issue which

14   was really the defining question in Sabine, which I know

15   Your Honor is familiar with because you're involved in

16   mediating as to what is the proper 4 wall EBITDA analysis

17   and what that entails and what expenses are picked up by

18   that.  And that's normally the province of an expert.

19           THE COURT:  That's fair.  There were tiny pieces

20   of these declarations that have some expert element to them.

21           MR. MOLONEY:  They were tiny, but they were

22   actually important in terms of I think the tableau, Your

23   Honor.  But that's for -- but anyways, I'm not going to

24   reargue any of that because essentially --

25           THE COURT:  I'm not excluding these declarations,

Page 23

1    I'm just telling you that I think I can navigate through

2    what is real expert testimony that's helpful and testimony

3    that really isn't expert testimony.

4             MR. MOLONEY:  So let's now move to the second.

5    And it's I think a categorically different in limine motion.

6    And as I said, I think Your Honor already granted half of

7    it, which is that we don't think it's appropriate for any

8    lay witness to be telling you as to what's included or not

9    included as a legal matter in our collateral package.  I

10   think Your Honor was going to make that determination about

11   the legal argument.  But none of the witnesses are qualified

12   to help you with that.

13            THE COURT:  Right.

14            MR. MOLONEY:  The second question is -- and this

15   is whether they have a basis for their alternative theory of

16   value, which is that when this case started, you recall what

17   they filed.  And (indiscernible) motion which then got

18   converted to a 3012 motion.  And now we have the burden of

19   proving what our secure claim was.  But they've continued

20   with a basic assumption that you look at what the inventory

21   supposedly was sold at under the APA, which they claim was

22   85 cents.  And that's the value for the inventory.  And that

23   is a key driver of value in this case that involves maybe

24   $300 million.  So it's -- of our potential deficiency, $300

25   million was picked up on this item, this 15 percent discount

Page 24

1    from book value for the inventory.  And that's all

2    predicated, as the slide deck I had showed you, it's all

3    predicated on Mr. Griffith's reading of the APA or

4    alternatively his reading of negotiations -- confidential

5    negotiations.  Communications went back and forth between

6    the parties basically two or three weeks before the final

7    bid was made.  And that -- all said they were not bids, that

8    they were not intents to bid, and they were basically

9    designed to -- I'm not going to get into the commentary, but

10   none of them related to the actual bid that was actually

11   accepted by the (indiscernible), and none of them relate to

12   the APA.

13          So the question is can they rely on that evidence

14   at all and that they properly interpreted the APA at all.

15   And that's a purely legal question I think for Your Honor.

16   And we've teed it up in the slide deck, which is basically -

17   - if you look at --

18          THE COURT:  Okay, so I understand that point.  And

19   I think that first of all, are all the documents that -- I

20   think I know the answer to this.  But are all the documents

21   that Mr. Griffith refers to in his declarations in the

22   record as admitted exhibit?

23          MR. MOLONEY:  Subject to this motion.

24          THE COURT:  Well --

25          MR. GENENDER:  No, that's not true.

1          THE COURT:  I mean, I have a bunch of agreed

2     exhibit books.

3          MR. GENENDER:  Many of them are, Your Honor.  Some

4     of the backup, some of the actual underlying records are

5     attached to his most recent declaration but are not yet --

6          THE COURT:  Okay.  Is that the parol evidence?

7          MR. GENENDER:  No, no.

8          THE COURT:  No?

9          MR. GENENDER:  Those are company records -- those

10    are -- those are company records that he used to rely upon

11    for some of his calculations of expenses.

12          MR. MOLONEY:  Your Honor, in specifically

13    paragraph 5 of his most recent declaration -- paragraphs 15

14    to 16 of his most recent declaration, and from the exhibit

15    list, the exhibits would be Exhibits -- well, the ones

16    (indiscernible) -- the exhibits with the --

17          THE COURT:  So we're dealing with his second

18    supplemental declaration.

19          MR. MOLONEY:  Right --

20          THE COURT:  And what paragraphs?  I'm sorry.

21          MR. MOLONEY:  Paragraphs five to ten and 15 and

22    16.  I think you already ruled on 15 to 16, so we're going

23    to talk about five to ten.

24          THE COURT:  So eight refers to an ESL

25    presentation.

1          MR. MOLONEY:  Right.  And then these are joint

2     exhibit.

3          THE COURT:  And nine is also.

4          MR. MOLONEY:  Right.

5          THE COURT:  The rest -- the other paragraphs just

6     refer to the outside purchase agreement.

7          MR. MOLONEY:  Correct, which we had no issue with.

8          THE COURT:  Okay, so --

9          MR. MOLONEY:  It's Exhibit 8 and Exhibit 9.

10          THE COURT:  But those two ESL presentations are

11     not yet in the record.

12          MR. MOLONEY:  Correct.  Or they're in the record

13     subject to this motion, Your Honor.

14          THE COURT:  Subject to objection.

15          MR. GENENDER:  Actually, my understanding is they

16     were a part -- they were admitted as jointly admitted.

17          THE COURT:  Well, that was my question.

18          MR. GENENDER:  They were.  And that's what I was

19     confirming.  They absolutely are.  (indiscernible).

20          MR. MOLONEY:  Your Honor, we agreed and put a

21     footnote at the beginning of this thing of what we submitted

22     as joint exhibits which says -- and this was discussed.

23     "The parties reserve the right to argue the relevance of any

24     joint exhibit and to argue the joint exhibit is improper

25     parol evidence."  What could be more clear than -- and this

Page 27

1   (indiscernible) was negotiated and agreed for exactly this

2   purpose, so this would not happen.

3            THE COURT:  Right.  So that I'll deal with when

4   he's on the stand.  I don't think I need to deal with this

5   on this point on motion in limine.

6            MR. GENENDER:  Your Honor, I don't --

7            THE COURT:  I want to understand the Debtor's

8   argument and how it ties into the APA.  If it completely is

9   based on the APA, then I will grant your motion because the

10   APA speaks for itself.

11            MR. MOLONEY:  Right.  But the APA also has --

12            THE COURT:  If it's basically more of like a

13   context argument, then I might, depending on the basis for

14   your objection at that point, hear your objection as to

15   relevance and the like.  But --

16            MR. MOLONEY:  Well, the APA does have a complete

17   agreement which prohibits exactly --

18            THE COURT:  Well, no, but --

19            MR. MOLONEY:  -- going into making assumptions.

20            THE COURT:  This isn't -- that's why I say if

21   they're relying on just saying that the APA speaks for

22   itself, then I don't need -- then I can't hear the parol

23   evidence.

24            MR. MOLONEY:  But their argument is, Your Honor,

25   at bottom is this was sold under the APA to us for 85 cents,

1    the inventory.  And the APA says --

2            THE COURT:  But if that's -- that may well be the

3    case when they get them on the stand.  And I've heard their

4    overall argument.  To me it's a little opaque at this point.

5    You may be right, in which case I won't admit it, those two

6    exhibit.

7            MR. MOLONEY:  Thank you, Your Honor.

8            THE COURT:  Okay.  Okay.  So I'm assuming we're

9    going to go ahead with the 507(b) issue first where the

10   second lien creditors have the burden of proof.  So I think

11   it's their time to start.

12           MR. MOLONEY:  Yes, Your Honor.  And we would call

13   Mr. Schulte to the stand.

14           THE COURT:  Okay.  Come up here, sir.  Just have a

15   seat over there.

16           MR. SCHULTE:  Morning.

17           THE COURT:  Morning.  Would you raise your right

18   hand, please?  Do you swear or affirm to tell the truth, the

19   whole truth, and nothing but the truth, so help you God?

20           MR. SCHULTE:  Yes, sir.

21           THE COURT:  Okay.  And it's S-c-h-u-l-t-e?

22           MR. SCHULTE:  Correct.

23           THE COURT:  Okay.  So Mr. Schulte, you have

24   provided an expert report in this case.  It actually appears

25   twice in the exhibit book as it pertains to both of the

1   motions before me on a consolidated basis.  But it's dated -

2   - maybe it's not dated.  In any event, you're familiar with

3   that expert report, correct?

4            MR. SCHULTE:  Yes, sir.

5            THE COURT:  And sitting here today, you understand

6   that this would be your direct testimony in these matters.

7   Is there anything in --

8            MR. MOLONEY:  Your Honor, do you have the

9   declaration which is Tab 5 -- which is -- that should be --

10  that should be what you have in front of you, declaration of

11  Mr. Schulte.

12           THE COURT:  It's his report, right?

13           MR. MOLONEY:  It's broader than the report.

14           THE COURT:  Okay.  I'll get to that in a second.

15           MR. MOLONEY:  It's attached to the report.  But

16  you should have the entire I think declaration --

17           THE COURT:  As far as the expert report is

18  concerned which is referred to in your declaration, sitting

19  here today, would continue to be your expert testimony in

20  this case?

21           MR. SCHULTE:  Yes.  I filed an amended report

22  which cleared up some really insignificant factual changes.

23           THE COURT:  So except for those changes.

24           MR. SCHULTE:  Yes.

25           THE COURT:  And you would stand by that.  And then

1    as far as your declaration is concerned, that would also

2    continue to be your testimony on direct in this case?  Is

3    there anything you wish to change in that?

4                MR. SCHULTE:  Yes, sir.

5                THE COURT:  I'm just getting that in front of me.

6    All right.  So --

7                MR. MOLONEY:  Can I ask one housekeeping question?

8    Just for ease of Your Honor, it may make sense for them to

9    cross him on all issues including 506(c).  Rather than have

10   him come back again, I would think -- but we'll do whatever

11   Your Honor thinks makes sense.

12               THE COURT:  That's right.  So you can go ahead

13   with cross.

14               MR. GENENDER:  Absolutely, Your Honor.  That's how

15   we were planning to proceed.

16               Your Honor, I have a notebook for the Court and

17   for the witness, for this witness.

18               THE COURT:  Okay.

19               MR. GENENDER:  (indiscernible)?

20               THE COURT:  Sure.

21                   DIRECT EXAMINATION OF DAVID SCHULTE

22   BY MR. GENENDER:

23   Q    Good morning, Mr. Schulte.

24   A    Good morning.

25   Q    You have in front of you a notebook that has some

1    documents in it.  And you should also have a very skinny

2    document that has -- it's entitled Debtor's 507(b), July 23

3    Hearing Demonstratives and Excerpts.  Do you have that as

4    well?

5    A    I have both.

6    Q    Okay, thank you very much.  Mr. Schulte, this is your

7    first engagement that has involved an analysis of 507(b)

8    claims, correct?

9    A    That is correct.

10   Q    This is your first engagement that has involved an

11   analysis of 506(c) surcharges, correct?

12   A    That is correct.

13   Q    You issued a report on behalf of ESL on June 18th,

14   2019, correct?

15   A    I don't have the date in front of me, but I will take

16   your word for it.

17   Q    Thank you very much.  You were deposed on June 19th,

18   early Saturday morning.  Do you recall that?

19   A    I remember.

20   Q    Okay.  And you amended your report on July 18th, 2019,

21   last Thursday, correct?

22   A    That's correct.

23   Q    Your analysis in both reports applies two

24   methodologies, one to go-forward inventory and a second

25   different methodology to the GOB stores, correct?

Page 32

1   A     That is correct.

2   Q     And looking at -- if you look in the notebook,

3   Paragraph 30 of your declaration, if you can get there,

4   please.  I'm sorry, Page 30 I should say.  I'm looking at an

5   ECF number at the top.

6   A     Are we talking 30 of 71?

7   Q     Yes.  Yes, 30 of 71.  Thank you.  Do you have that in

8   front of you?

9   A     I do.

10  Q     And that's what's reflected there, is that right?  You

11  have a book value for -- you show a book value -- actually,

12  turn to Page 31 of your report.  You show a book value for

13  go-forward stores of 2.073 billion.  Do you see that?

14  A     I'm not sure exactly what you're directing me to.

15  Q     Upper-right-hand corner, Page 31 of 71, in a box.  The

16  page numbers are in the middle top center of each page, Mr.

17  Schulte.  31 of 71.

18  A     Thank you.

19  Q     You bet.  Let me know when you're there.

20  A     Yes, sir.

21  Q     You use book value for go-forward stores and net retail

22  value for the GOB stores, is that right?

23  A     That is correct.

24  Q     Your original report in June miscalculated the starting

25  values for these values for these numbers, which you

1    corrected last week.  Is that right?

2    A    Well, Excel did it.  I didn't do it.

3    Q    So it was Excel's fault?

4    A    Yes.

5    Q    Okay.  In other words, it was corrected by you last

6    week?

7    A    That is correct.

8    Q    Okay.  I don't get to examine Excel.  You're the best

9    I've got.  Okay?

10   A    Yeah, I'm happy to fill in.

11   Q    Okay.  For go-forward inventory, the number you use,

12   2.074 billion rounded, is the book value of all inventory

13   less the GOB inventory, is that right?

14   A    Yes, sir.

15   Q    And while you considered various approaches, you

16   applied the book value to the go-forward stores rather than

17   the net retail value because, as you put it, the book value

18   was the most conservative approach.  Is that right?

19   A    That was one reason.

20   Q    Okay.  But you report on Page 30 actually says -- the

21   page before, the second paragraph on the bottom, "Because it

22   is the most conservative approach."  Do you see that?

23   A    Yes, I do.

24   Q    Those are your words, right?

25   A    Yes.  You're ignoring the rest of what I wrote, but

Page 34

1    yes.

2    Q     Okay.  To calculate net retail value, you applied a 0.7

3    percent 4 wall EBITDA margin.  Is that right?

4    A     Yes, sir.

5    Q     And that resulted in a net value of inventory of 2.088

6    billion?

7    A     That is correct.

8    Q     Which is $14 million higher than your book value,

9    correct?

10   A     In round numbers, yes.

11   Q     And is it fair to say that the 4 wall EBITDA margin

12   does not include corporate overhead?

13   A     That is correct.

14   Q     Is it also fair to say that if corporate overhead were

15   included, the $14 million difference between the net retail

16   value and the book value would be erased?

17   A     I don't know exactly how you're doing that.

18   Q     Well, you'd agree that corporate overhead would be more

19   than $14 million, wouldn't it?

20   A     You're conflating a number of things in getting there.

21   Q     Well, is your conclusion that the book value is the

22   most conservative approach relies on your assumption that

23   it's appropriate to exclude corporate overhead from your

24   calculation of net retail proceeds.  Is that right?

25   A     Not really.

1    Q    Your figure that you're relying upon --

2    A    What I'm saying is corporate overhead has been

3    contributed to by the retail value of the inventory.

4    Q    Mr. Schulte, I'm going to ask you to look at, in your

5    notebook, Paragraph 10 of the common brief that the parties

6    filed last week.  And that is going to be -- bear with me.

7    It's going to be the tab that says 4570 in the book, which

8    is the docket number.

9    A    It's the one where you have highlighted some things in

10   yellow?

11   Q    Yes, it is.  It absolutely is.  You're in Paragraph 10

12   on Page -- Paragraph 10 on Page 10 of that brief.  Do you

13   see the highlighted language where it says, "Because the

14   gross profits generally from inventory sales, which the

15   Debtor's analysis ignores, funded the cost of achieving a

16   return slightly higher than the inventory book value, the

17   Debtor's book value already takes into consideration all of

18   the direct costs necessary to sell and maintain the

19   inventory during these cases."  Do you see that statement by

20   the second lienholders?

21   A    It takes into account, yes.  Because these goods are

22   sold at a profit.

23   Q    And if you look, sir, at Paragraph 35 of your

24   declaration, which is Page 16 of 71 in the document we were

25   just in a moment ago.

Page 36

```
 1   A     My declaration, got it.  Hold on.

 2   Q     In Paragraph 35 on Page 16 of 71 you state, "As

 3   indicated above, my calculations already take into

 4   consideration all of the direct costs necessary to sell and

 5   maintain the inventory during the bankruptcy cases,

 6   including store-level employee payroll, rent, utility, and

 7   telephone expenses, advertising, and security services."  Do

 8   you see that?

 9   A     Which paragraph?  In 16 of 71 --

10   Q     The second sentence of Paragraph 35.

11   A     Yes.

12   Q     And you previously testified that the book value does

13   not include any of the 4 wall costs of the go-forward

14   stores, correct?

15   A     No.

16   Q     You have your deposition in front of you and the -- the

17   notebook in front of you.  If you can turn to your

18   deposition to Page 100.  Do you have Page 100 in the

19   deposition in front of you?  Line 6?

20   A     Yes.

21   Q     Okay.  My question, "That book value does not include

22   any 4 wall costs of those stores, correct?"  What's your

23   answer?

24   A     Well my answer is it effectively does.  It isn't

25   arrived at that way when it's reported.
```

Page 37

1   Q    Well, Mr. Schulte, respectfully, I'm just asking you to

2   read the answer in the deposition.

3   A    All right.  My answer says, "That is correct."

4   Q    And then I say, question, "It does not include

5   corporate overhead, correct?" And your answer is?

6   A    "Correct."

7   Q    Question.  "And using book value does not account for

8   the costs associated with selling the inventory, correct?"

9   Could you read your answer, please?

10  A    Again --

11  Q    Can you read your answer, please?

12  A    I will read to you the answer here, but it's a very

13  incomplete question.  The answer says, "Correct."

14          MR. MOLONEY:  But continue to read the whole

15  answer.

16          MR. SCHULTE:  I'm sorry?

17          MR. MOLONEY:  Read the whole answer.

18  Q    Mr. Schulte, I'm happy for you to read the whole

19  answer.  I'm not hiding a thing.

20  A    I've got it.  This is replying to --

21  Q    Mr. Schulte, I'm just asking you to read the answer to

22  the question on Line 16.

23  A    "Correct.  The accounting convention is the inventory

24  as recorded as the lower of costs for realizable value."

25  Q    Mr. Schulte, rent and utilities -- are you saying rent

1    and utilities aren't 4 wall costs?

2    A    They are.

3    Q    You previously testified that book value does not

4    account for the costs associated with selling the inventory,

5    correct?

6    A    Not explicitly unless there's a profit.

7    Q    And it doesn't include corporate overhead.  We've

8    established that, right?

9    A    Yes.

10   Q    You also testified that you did not know if book value

11   accounts for the costs associated with storing the

12   inventory, correct?

13   A    I definitely answer that way.

14   Q    That you don't know.

15   A    That is correct.

16   Q    The book value includes $300 million of ineligible

17   inventory that's not included in the borrowing base

18   certificate, correct?

19   A    I didn't spent much time on the borrowing base.

20   Q    That was my next question.  If you can turn to the

21   smaller notebook, Mr. Schulte, the tab that says Borrowing

22   Base Certificate.

23   A    Yes.

24   Q    All right.  This is part of -- I believe it's Exhibit

25   5, Joint Exhibit 3 that's in evidence.  It's just Page 3 of

1    that document.  It says -- do you see in the lower-right-

2    hand corner it says 3 of 35?

3    A    Three of 35?

4    Q    Yes.  And you see there's a total stock price ledger of

5    $2.69 billion and a net eligible inventory number of $2.391

6    billion.  Do you see that?

7    A    Your excitement is exceeding my ability to turn pages.

8    Q    I'll try and contain myself.

9    A    Borrowing base certificate starts for me on Page 4 of

10   36.

11   Q    Yes, at the top.  That's right, on the top.  Yes.

12   A    So when you said Page 3 you were just kidding.

13   Q    I was looking in the lower-right-hand corner.

14   A    Ah, yes, sir.

15   Q    Do you see the total stock ledger inventory figure and

16   the net eligible inventory figure and the fact that the

17   latter is about $300 million less?

18   A    Yes.

19   Q    You testified in your June 29th deposition, 11 days

20   after issuing your opinion in this case, that that was the

21   first time you'd seen this borrowing base certificate,

22   correct?

23   A    If that's what I said.  I've seen it since.

24   Q    And that was the first time you saw it, correct?

25   A    I think so.

Page 40

1    Q    You didn't consider the fair market value paid for the

2    second lien collateral as part of the February sale in this

3    case, did you?

4    A    Would you ask that again?

5    Q    Sure.  You didn't consider the fair market value paid

6    by the buyers for the second lien collateral as part of the

7    February 2019 sale, correct?

8    A    Well, there was nothing in the asset purchase agreement

9    that delineated the value of the inventory.

10   Q    Did you perform an analysis of the fair market value of

11   the sale of the -- excuse me.  Did you perform any analysis

12   of the fair market value of the second lien collateral sold

13   as part of the going concern sale in February 2019?

14   A    Yes, of course.  That's the whole of my opinion, or a

15   good part of it.

16   Q    What analysis did you perform of the value of the

17   second lien collateral as a -- that was sold in the February

18   2019 sale?

19   A    Can I go back to the source materials?

20   Q    Well, I'm just asking if you performed an analysis of

21   the value --

22   A    Yes.  We actually -- yes, sir.

23   Q    -- of that collateral on -- as of the sale date,

24   February, 2019?

25   A    As of the sale date?

Page 41

1   Q    Yes.

2   A    Of the petition date, yes.  Of the sale date, I don't

3   know that it was specifically done.

4   Q    Well, we're dealing with two dates. There's the

5   petition date, October 15, 2018, and the sale date, which I

6   believe is February 11, 2019.  Did you perform a fair market

7   analysis of the value of the 2L collateral as of February

8   11, 2019?  Because if you have, I haven't seen it.

9   A    I don't know that I did.

10  Q    You didn't did you?

11  A    I don't know that I did.

12  Q    You can't recall one, can you?

13  A    That's correct.

14  Q    Did you perform a fair market value analysis of the

15  value of the second lien collateral as of the petition date,

16  October 15, 2018?

17  A    Yes.

18  Q    And using fair market value?

19  A    Yes.  That's what the report is about.  It's imprecise

20  because there were no -- well, the backup material was dated

21  a few days different from the petition date.  We have on the

22  petition date the Debtor's declaration of what its higher

23  inventory was using the book value.

24  Q    In valuing -- I want to now talk about the GOB store

25  inventory valuation, which is also on Page 30 of your

1    declaration.  Page 30 of 71, if we can get there.  Here you

2    applied the net retail value approach, correct?  Mr.

3    Schulte, you've got to go to the other notebook, the larger

4    notebook.  It's in your declaration.  It's the tab before

5    that, sir.

6    A     Thirty of 71.

7    Q     Yes, sir.

8    A     I have it.

9    Q     And before I ask you about that, Mr. Schulte, let me

10   take one step back and ask you a different question.  Mr.

11   Schulte, did you do any independent analysis to vet any of

12   the appraisals upon which you relied in offering any

13   opinions as to the value of the second lien collateral as of

14   the petition date?

15   A     By vetting do you mean did we go out and take a full

16   physical inventory?  No.

17   Q     That would be -- yeah.  What did you do to verify the

18   accuracy or independently confirm that the appraisals upon

19   which you replied were accurate?

20   A     The -- first of all, we didn't really rely much if at

21   all on other people's reports on Tiger or Abacus or

22   whatever.  We relied on the Debtor's general ledger more

23   than anything else.

24   Q     You're on Page 30 or 71 of your declaration.  For the

25   GOB stores, you took a book value of the GOB inventory and

1    applied a 95.6 percent net recovery percentage to it.  Is

2    that right?

3    A     Yes.

4    Q     And that 95.6 percent does not include any corporate

5    overhead, only store level costs.  Correct?

6    A     Yes.

7    Q     And if I go to Page 31 where you have those two -- did

8    you make any adjustment to the book value of the go-forward

9    store inventory in coming up with your valuation of the

10   collateral?

11   A     Well, we explored several ways to adjust it.  In the

12   end we started with Mr. Griffith's number.

13   Q     Okay.  Mr. Griffith you understand applied a fair

14   market value, the 85 percent number, to the --

15   A     No, that's different.  That's a different point.

16   Q     Let me finish my question.  Okay?

17   A     Okay.

18   Q     You understand Mr. Griffith took -- may have started

19   with a similar number to you, but he applied a fair market

20   value percentage of 85 percent to that number.  Correct?

21   A     He used the number of 85 percent as a proxy for fair

22   market value.

23   Q     Okay.  And you understand that -- but you did not use

24   any proxy for fair market value in terms of a discount of

25   the percentage of the book value of go-forward stores,

Page 44

1    correct?

2    A    Well, that's not quite right.

3    Q    What discount did you take?

4    A    Well, we used the resulting profitability of the

5    stores.  If you notice, there are three different approaches

6    we took, if I may, to the value of the inventory.  We used a

7    gross retail approach, a net retail approach, and book

8    value.  In book value for the going-forward stores, we made

9    no adjustment.

10   Q    Thank you.  Mr. Griffith adjusted 85 -- took a 15

11   percent reduction.  You took a zero percent reduction.

12   Correct?

13   A    That's correct.

14   Q    And on that amount of inventory, that creates a

15   disparity just on that, between what you did and what Mr.

16   Griffith did, of about $375 million, doesn't it?

17   A    It's a substantial number.

18   Q    $375 million approximately, right?

19   A    I never quantified it that tight, but yes, I think

20   that's about right.

21   Q    All right, thank you.  You included in your -- let me

22   just step ahead.  Mr. Schulte, you come up with a total

23   collateral value for the second liens of $2.928 billion.  Is

24   that right?

25   A    Yes, sir.

Page 45

```
 1   Q    And that includes not just what we went through with
 2   GOB inventory and go-forward stores adjusted only for the
 3   95.6 percent to the GOB sales -- GOB stores.  That portion
 4   was approximately 2.664 billion, correct?
 5   A    The inventory number within that is 2.664.
 6   Q    Yes.  And your -- and then you added to that credit
 7   card receivables, cash, scripts, and pharmacy receivables,
 8   is that correct?
 9   A    And cash.
10   Q    Yes, I said cash.  Yes.
11   A    Yes, sir.
12   Q    Okay.  And your -- what is your basis to include cash,
13   scripts, and pharmacy receivables as 2L collateral?
14   A    Well, I was instructed by counsel about the status of
15   those asset accounts in the security agreement, and I read
16   the security agreement.  And I know that cash is not
17   explicitly included in the second lien collateral at all.
18   It is in the first lien collateral.  And the other items are
19   either proceeds of second lien collateral or are
20   specifically included.
21   Q    Mr. Schulte, you testified in your deposition that it
22   was not your task to go through and either enumerate or
23   include or exclude items that were in the second
24   lienholder's collateral package, correct?
25   A    Well, the work necessarily includes -- that's a
```

Page 46

1    judgement about what counts.  And the judgement was informed

2    by the advice of counsel.

3    Q    Did you do anything independent to determine, other

4    than take counsel's word, whether -- to determine whether

5    scripts, pharmacy receivables, and cash should be part of

6    the 2L collateral package?

7    A    No.

8    Q    Thank you.  And you have not -- you testified you have

9    not studied the underlying security or credit agreements,

10   correct?

11   A    I've read the security agreement.

12   Q    Yes.  But you said you certainly had not studied it,

13   correct?

14   A    I don't know what difference the word read and studied

15   makes, but if it makes you happy.

16   Q    I'm just looking at your testimony.  I asked you, "Have

17   you studied them?"  And you answered no.

18   A    At that point --

19   Q    Do you recall that?

20   A    At that point I had not read or studied the security

21   agreement.  I have since.

22   Q    Okay.  The number you add for credit card receivables

23   was not the number that is contained in the borrowing base

24   certificate, correct?

25   A    That might well be.

1   Q      Well, the number on the borrowing base certificate, if

2   you can turn to it, it's $54.8 million.

3   A      Yeah, well, there are -- yes.  As with any borrowing

4   basis, there are exclusions.

5   Q      The number on the borrowing base certificate, which

6   also includes the total stock ledger book value amount that

7   you started with --

8   A      Yes.

9   Q      -- the number is 54.8 million.  And you use 64.2

10  million, a difference of 9.4 million, correct?

11  A      Yes.  The documents have different purposes, but yes.

12  Q      Thank you.  So just to address this, Mr. Schulte, if

13  you add it up, that took $9.4 million, the difference

14  between the number you used for credit card receivables and

15  the number on the borrowing base certificate, and then added

16  up the figures you used for cash, scripts, and pharmacy

17  receivables, that adds up to a number in excess of $200

18  million, correct?

19  A      Okay.

20  Q      If I represented to you that it's $209.6 million, do

21  you have any basis to disagree with me?

22  A      I would trust you.

23  Q      Thank you.  If you will look in the skinny little

24  notebook at the very first demonstrative, it says 507(b)

25  Diminution Calculations.  Do you have that page in front of

Page 48

1    you?

2    A    No.  I have the demonstratives.

3    Q    Okay.  If you will turn to the very first tab that says

4    507(b) Chart.

5    A    Yes, sir.

6    Q    Okay?  And there's a line in there for you.  The second

7    one in.  Do you see that?

8    A    Yes.

9    Q    And do you see your total collateral number in the

10   middle of the page, the 2.928 billion?

11   A    Yes, sir.

12   Q    And you see that it's approximately $595 million more

13   than Mr. Griffith's calculation, correct?

14   A    Yes, I do.

15   Q    And would you agree with me that we just went through

16   the bases for those differences, meaning the $209.6 million

17   of items you included in 2L collateral that he did not and

18   the fact you didn't make an adjustment to the value of the

19   inventory along the lines of what Mr. Griffith did.  Would

20   you agree with those, the two bases for that $595 million

21   difference?

22   A    Almost.  We did make a one percent adjustment.

23   Q    A one percent adjustment.  I agree.  You're right, sir.

24   You made a 95.6 -- you made a 4.4 percent adjustment on the

25   $617 million number and a zero percent adjustment on the --

1   A    Yes, I certainly agree with you that the 85 percent

2   number has no status in our work.

3   Q    Thank you.  Mr. Schulte, are you offering an opinion as

4   to whether the first lien debt includes approximately $395

5   million of letters of credit?

6   A    Well, you said first lien debt?

7   Q    Let me ask you, are you offering an opinion as to

8   whether the approximately $395 million of the two letters of

9   credit would count as senior debt?

10  A    If it was funded, I would agree.

11  Q    You're offering that opinion that since they weren't

12  funded, they shouldn't count as part of the 1L debt.

13  A    Except for $9 million that was funded.

14  Q    Okay.  And what is your basis for drawing a distinction

15  as to whether -- based on whether it's funded or not?

16  A    If the company went with a wheelbarrow full of cash to

17  Citibank or whoever had written the letter of credit and

18  said here is money to pay you back, they might have gotten a

19  toaster, but they would have not gotten any other kind of

20  response.  The bank would have said you don't owe me this.

21  Q    Mr. Schulte, are you aware that the $271 million letter

22  of credit was cash collateralized by ESL?

23  A    Yes.

24  Q    Are you aware --

25          MR. MOLONEY:  Your Honor, that's not true.  In

Page 50

1   part we were.  (indiscernible).

2           THE COURT:  You could --

3   Q    The second lienholders I should -- ESL and Cyrus.

4   A    I know that there was cash collateral posted, and I

5   think it was by ESL and Cyrus, I think.

6   Q    And are you aware that as to the 1L letter of credit

7   facility for $123.8 million that there was a block on

8   borrowing available under the ABL for that amount?

9   A    I don't know specifically about that.  My analysis of

10  the LLCs went only as far as the amount that was actually

11  owed.  Contingent amounts and (indiscernible) amounts were

12  not counted.

13  Q    Did you consider any -- the treatment of those two

14  letters of credit under the sale transaction under the APA?

15  A    Not particularly because they didn't count.

16  Q    Did you consider the fact that they were -- that they

17  formed $395 million of the $5.2 billion purchase price?

18  A    Yes.

19  Q    Okay.  And yet you don't consider them to be 1L debt?

20  A    It was not live debt.  It was the relief of a

21  contingent obligation.

22  Q    Mr. Schulte, do you have in the notebook in front of

23  you Joint Exhibits 8 and 9?  At the very back.

24  A    I'm not sure.  What tab is it?  What is the tab?  Oh,

25  am I in the wrong notebook?  Oh, sorry.

Page 51

1    Q    It's actually in the big notebook.  It's in the big

2    notebook at the very end.  It should say -- the document

3    should say JX-8 in the lower-right-hand corner.

4    (indiscernible).  Mr. Schulte --

5    A    Are you talking about -- excuse me.  Let me just get it

6    straight that we're on the same document.

7                 THE COURT:  It's in the spiral one.

8                 MR. GENENDER:  It's in the spiral one.

9                 MR. MOLONEY:  Your Honor, we object to reference

10   to these documents on the grounds of it's parol evidence, it

11   should not be considered.

12                THE COURT:  Okay.  What is your response on that?

13                MR. GENENDER:  Your Honor, I'm -- my question is

14   just to ask if he relied on the documents.  That's all I

15   want to find out.

16                THE COURT:  All right, that's fair.

17   Q    Let's use the --

18   A    Are you on the ESL bid presentation?  Is that your

19   document?

20   Q    Yes.  Have you --

21   A    I know about this, yes.

22   Q    Does it form any basis for your opinions in this case?

23   A    No.

24   Q    Okay.  What about the next document, Joint Exhibit 9,

25   does it form any basis for your opinion in this case?

1   A    No.

2   Q    Did you consider any aspect of these documents,

3   including the references to the two letters of credit that I

4   just asked you about?

5   A    No.  Well, excuse me, did I consider?  Yes, I

6   considered, and yes, I rejected all of that stuff for the

7   reason that I said, namely these were not live obligations

8   in the ESL bid.  It's an illustration that's a talking

9   point.  And the asset purchase agreement is in fact the

10   deal.

11   Q    Did you refer to the treatment to see how either of

12   those lines of credit were treated in the actual APA?

13   A    Yes, I looked at the sections of the APA, yes.

14   Q    And if you will take a look at the small notebook, the

15   little bound notebook in front of you.

16   A    You've given me three, so let's not do it by size.

17   Q    If you can turn to the last tab.  It says JX-34.

18   There's an excerpt from the APA.  Sir, it's in the small

19   notebook in front of you, the bound notebook.  Last tab, it

20   says JX-34.  Do you have that?

21   A    JX-034.

22   Q    Yes, sir.  And it's an excerpt --

23   A    Page 42 of 1120?

24   Q    Yeah, this is a three-page excerpt from the APA.  You

25   have that in front of you?

1    A    I do.

2    Q    All right.  Do you see that on page 42 of 120 JX-34-

3    125, there's a definition for LC facility consideration?

4    A    Yes.

5    Q    And it -- and that includes a definition that

6    references the Citi LC facility of two -- and it says, "but

7    in no event with respect to a principal amount of greater

8    than $271 million."  Do you see that, in the parenthetical?

9    A    Yes.

10   Q    You'll turn to the next page which in the document

11   skips from -- we were just on Page 21 of the APA; now we're

12   going to Page 51 of the APA.  Do you have that page in front

13   of you?

14   A    I do.

15   Q    You see the cash component of $1.408 billion

16   highlighted?

17   A    Yes, sir.

18   Q    You understand that includes the ABL?

19          MR. FOX:  Objection, Your Honor.  The document

20   speaks for itself.

21          THE COURT:  Well, he did testify he considered

22   this as part of his analysis, so I think it's fair game.

23   A    Well, the ABL was discharged as part of this, so yes.

24   Q    Okay.  Do you know, Mr. Schulte, that the $123.8

25   million credit facility was rolled into any aspect of

1    Section 3.1 of the APA?

2    A    Yes, it was an assumed liability.

3    Q    Thank you.  And if you turn to Page 52, the next page,

4    under Section 3.1(c) -- I'm sorry, under 3.1(f), you'll see

5    there's a specific demarcation item for the LC facility

6    consideration.  Do you see that?

7    A    I do.

8    Q    Thank you.  You didn't do a calculation for any post-

9    petition interest that would be a 1L obligation, did you?

10   A    Not explicitly, no.

11   Q    Did you do one implicitly?

12   A    I don't (indiscernible).  We did not specifically take

13   into account post-petition interest.

14   Q    And you're not disputing that there was post-petition

15   interest associated with 1L debt --

16   A    No.  I'm saying it was irrelevant to the work we did.

17   Q    Can I finish my question?

18   A    Sure.

19   Q    You're not disputing that there was 1L -- that there

20   was post-petition interest on 1L debt from October --

21   A    I do not dispute that.

22   Q    And you didn't calculate it, did you?

23   A    No.

24   Q    And you don't have a basis to refute the $34 million

25   calculation that Mr. Griffith did, do you?

1    A    I'm sorry; give me that one again.

2    Q    You don't have any basis to dispute or refute the $34

3    million calculation that Mr. Griffith did for post-petition

4    interest?

5    A    Post-petition interest?

6    Q    That's correct.

7    A    Only to say that it's irrelevant to the work we did.

8    Q    But you can't dispute the figure, can you?

9    A    No.

10   Q    Mr. Schulte, if you'll look back at the 507(b) chart,

11   that's the first page of the spiral notebook.  You see that

12   you don't include in 1L the 2Letters of credit and the $34

13   million of first lien interest.  Is that right?

14   A    I see that.

15   Q    And those add up to $429 million.  Would you accept

16   that representation?

17   A    I would accept that representation.

18   Q    Thank you.  I want to talk for a minute about 506(c)

19   surcharges.  Are you -- do you agree, Mr. Schulte, that at

20   all times ESL favored a going concern sale in this case?

21   Correct?

22   A    I'm informed that that was the case.

23   Q    You testified that ESL very much wanted to see a going

24   concern sale, correct?

25   A    Yes.

Page 56

1   Q     You'd also agree that ESL tried very hard not to have a

2   full-scale liquidation, correct?

3   A     Yes.

4   Q     And you previously testified that you have not done an

5   analysis of any of the expenses that the Debtors incurred

6   between December 28th, which is when ESL submitted its first

7   bid and February 11th, 2019, which is the day that the sale

8   closed, correct?

9   A     Which expenses are you talking about?

10  Q     Any expenses that the Debtors incurred in furtherance

11  of the going concern sale.

12  A     We did not.  We did not do that.

13  Q     And you didn't do -- you understand Mr. Griffith did do

14  a calculation of those expenses?

15  A     I've seen that.

16  Q     And you didn't -- you don't have a basis to disagree

17  with his calculations of expenses incurred between January

18  17th, the day the APA was signed, and February 11th, the day

19  the transaction closed, correct?

20  A     As I did, we did not evaluate that.

21  Q     Or any other period of time relevant to this case,

22  correct?

23  A     Oh, no, that's not right.

24  Q     Okay, so December 28th to February 11th, you didn't do

25  a calculation of that period of time?

1    A    Not during that -- no, not on that specific period of

2    time.

3    Q    And you didn't do one for the corresponding time Mr.

4    Griffith did from January 17th to February 11th, correct?

5    A    That's correct.

6    Q    Want to go back.  Mr. Schulte, is it your position that

7    there were no expenses incurred by the Debtors that were

8    reasonable and necessary and for the primary benefit of ESL

9    in connection with the going concern sale?  Is that your

10   testimony?

11   A    I don't -- no, I would not say that.

12   Q    Okay.  Good.  You'd agree there are expenses incurred

13   by the Debtors in furtherance of the going concern sale that

14   were the primary benefit of ESL and were reasonable and

15   necessary.  Is that right?

16   A    I don't think it's possible to know exactly what

17   everyone at the corporate level or with counsel did in

18   pursuit of the sale or in pursuit of recovery from second

19   lien lenders.

20   Q    You don't know that number, do you?

21   A    No.

22   Q    Would you defer to someone who was involved in the

23   operation of the company?

24   A    No.  I wouldn't defer to anyone on the company side on

25   this whole question of the charging lien.

Page 58

```
 1   Q    Your client is ESL?

 2   A    My client is Cleary Gottlieb.

 3   Q    And you offered a report on behalf of ESL?

 4   A    Yes.

 5   Q    Have you asked anyone -- and you haven't asked anyone

 6   at ESL about any expenses incurred in furtherance of the

 7   sale by the Debtor --

 8   A    I didn't talk to anyone at ESL about anything.

 9   Q    Thank you.  I want to go back -- so you still have the

10   507(b) charge in front of you?

11   A    I do.

12   Q    All right.  So your total 507(b) claim number that

13   you're proffering is $962.7 million.  Do you see that?

14   A    Yes.

15   Q    And that is -- you understand the Debtors have a no --

16   submitting there's no 507(b) charge, correct?

17   A    Yes.

18   Q    Okay.  And they're actual -- the total that Mr.

19   Griffith computes is negative $60 million.  Do you see that?

20   A    Yes, I do.

21   Q    So there's about a $1,200,000,000 difference between

22   your number and Mr. Griffith's number, correct?

23   A    Yes.

24   Q    And are the components of that that we've gone through

25   in your testimony, Mr. Schulte, the fact you didn't make a
```

Page 59

1   fair market value adjustment to the inventory?

2   A    No.

3   Q    Well --

4   A    I didn't accept 85 cents.

5   Q    Okay.  You made a 1 percent adjustment; he made a 15

6   percent adjustment.

7   A    Yes.

8   Q    Is that right?

9   A    Yes.

10  Q    That makes up about $375 million of the difference,

11  right?

12  A    Yes.  And the treatment of letters of credit, is the

13  other big piece.

14  Q    Well, let me go in my order, okay?

15  A    Sure.

16  Q    We're almost done.  Thank you.

17  A    Okay.

18  Q    $375 million for the fact you made a 1 percent -- only

19  a 1 percent adjustment, correct?

20  A    Yes.

21  Q    $210 million -- 209.6, because you included the items

22  you did as 2L collateral that we talked about, right?

23  A    Yes.

24  Q    Cash, scripts, pharmacy receivables, and use the higher

25  credit card receivable number, correct?

Page 60

1    A     That's a dispute between us, yes.

2    Q     Yes.  Plus $395 million of letters of credit that you

3    didn't include as 1L debt, correct?

4    A     Yes.

5    Q     Plus $34 million of 1L interest that you didn't

6    include, correct?

7    A     Correct.

8    Q     That adds up to the difference between your number of

9    $962.7 million and Mr. Griffith's number of negative $60

10   million?

11   A     Yes.

12          MR. GENENDER:  Thank you.  Pass the witness.

13   Thank you, Your Honor.

14          THE COURT:  Okay.  Let me just ask one question.

15   It's probably better to ask it now.  Mr. Schulte on -- you

16   saw that chart there in front of you, the 507 calculation,

17   and you see there's a item there of $115.5 million for cash?

18          MR. SCHULTE:  Yes.

19          THE COURT:  You're familiar with the concept of

20   tracing, where you trace cash to a particular asset that's

21   sold?

22          MR. SCHULTE:  I'm roughly familiar with it, Your

23   Honor.

24          THE COURT:  Did you do any tracing analysis?

25          MR. SCHULTE:  No.  We actually assumed that away.

Page 61

1             THE COURT:  Okay.

2             MR. SCHULTE:  The -- may I continue?

3             THE COURT:  Sure.

4             MR. SCHULTE:  Our analysis by assumption said that

5     the first thing creditors -- it's a much more global kind of

6     a subtraction.  We have value, we had first lien obligations

7     --

8             THE COURT:  I -- maybe my question was not clear

9     enough.  Did you trace the cash or do analysis to trace the

10    cash to the second lien collateral that you were told by

11    constituted the second lien collateral?

12            MR. SCHULTE:  Not explicitly, no.  We looked at

13    the aggregate of the first lien obligations, deducted from

14    the -- what we concluded was the value of the collateral and

15    built into that is the assumption the first lien creditors

16    would use the quickest assets first, which cash is the

17    quickest.  And in the -- so there's adding and subtraction.

18    There's a lot of delineation of that 115.

19            THE COURT:  Okay.

20            MR. SCHULTE:  Or tracing, in your parlance.

21            THE COURT:  Okay.  All right.  Go ahead with

22    redirect.

23            MR. MOLONEY:  You asked one question I was going

24    to ask, Your Honor.  Thank you.

25            THE COURT:  Okay.

1          RE-DIRECT EXAMINATION OF DAVID SCHULTE

2     BY MR. MOLONEY:

3     Q    Could you look at -- you still have that book in front

4     of you of exhibits, Mr. Schulte --

5     A    Sure.

6     Q    If you go to page -- to Exhibit Number, looks like,

7     4569 or ECF Number 4569 and to that Page 30 of 71 and 31 of

8     71 which we were looking at before?  It's in your report.

9     So it's the -- it's really the first tab in the book here.

10    A    ECF 4570?

11    Q    Yeah, and it's Page 30 of 71 and 31 of 71.  See that?

12              MAN 1:  What page?

13              MR. MOLONEY:  It's going to be Page 30 of 71 and

14    31 of 71, which he was asked about on direct.

15    Q    Do you have that in front of you, Mr. Schulte?

16    A    I'm on a different tab.  Hold on.

17    Q    It's right in the book of -- the big black book.

18    A    In ECG 4570, I don't --

19    Q    Yeah --

20    A    -- have any pages as high as 71.

21    Q    4569 --

22    A    Aha.  I'm sorry --

23    Q    Page 30 of 71 -- 30 of 71.

24    A    Okay.  Yes.

25    Q    And you recall being asked by Mr. Genender questions

Page 63

1    about the paragraph that appears on Page 30 of 71 which is

2    the last full paragraph on Page 30 of 71 which begins for

3    the go-forward stores.  You recall being asked questions

4    about that paragraph?

5    A    Under number four, summary of inventory --

6    Q    Yes.

7    A    -- evaluation?

8    Q    The paragraph -- the second paragraph under number

9    four?

10   A    Yes.

11   Q    You were asked a question about your testimony --

12   A    Yes.

13   Q    -- in your report about that you chose the most

14   conservative approach.  Can you tell us why you view that as

15   most conservative approach for the going concern inventory?

16   A    Yes.  Conceptually, I would prefer the net retail

17   value.  But in doing it, it came out so close to the book

18   value, number one.  Number two, the number's much more

19   discernible in terms of the book value, fewer assumptions

20   you have to make.  And number three, it was lower.  For

21   those reasons, we adopted the book value.

22   Q    Was another reason related to replacement value?

23   A    Yes.

24   Q    And what was that?

25   A    The book value derives from inventory purchases and the

Page 64

1   prices that have to be paid for inventory.  So, yes, it does

2   speak to replacement value.

3   Q    Okay.  And can you explain why you chose a different

4   number than book value for the going-out-of-business stores?

5   A    Well, going-out-of-business stores have merchandise

6   that is sold at a discount and relying on the book value to

7   get at some notion of what that inventory was worth would be

8   wildly wrong.  And it also happened where the company has

9   closed many hundreds of stores and has considerable

10  experience on the realizations against inventory book value

11  in those going-out-of-business sales.  So we relied on their

12  actual experience.

13  Q    So that number, is that based on post-filing experience

14  of the Debtor?  Both the gross retail value and the net

15  retail value?

16  A    Principally, pre-bankruptcy experience.

17  Q    Right.  And did you verify that based on the post-

18  bankruptcy filing experience?

19  A    It's a consistent pattern.

20  Q    So they basically have the same returns pre- and post-

21  bankruptcy?

22  A    The company has earned roughly 95 percent of book value

23  in the liquidations of inventory in their closed stores.

24  Q    Now, before they filed for bankruptcy, had the company

25  contracted substantially?

Page 65

1    A    Oh, yes.

2    Q    Approximately how many stores had they closed out even

3    before they filed for bankruptcy?

4    A    Well, once upon a time, they had 4,000 and at the time

5    of the bankruptcy, it was down to 700-something.  There were

6    several hundred closed in the last few years before the

7    Chapter 11 filing.

8    Q    So this number reflects the experience over several

9    years involving hundreds of stores, correct?

10   A    That is correct.

11   Q    Thank you.  Now, why did you value the receivables at

12   face?

13   A    The -- this is not a business with a great many

14   receivables.  The receivables are mainly from credit card

15   companies and the credit risk has been accepted by the

16   credit card company.  The accountants in ordering the

17   company statements have accepted the company's accounting

18   which treats credit card receivables as cash.  They're very

19   short term and they don't have credit exposure on them.

20   Q    And can you explain to us, why did you include

21   collateral that was considered excluded under the borrowing

22   base certificate within your calculation of $300 million

23   difference that was alluded to by Mr. Genender?

24   A    Well, they measure different things.  The borrowing

25   base calculation is something negotiated with the lender and

Page 66

1    it has to do with the extent to which the lender is prepared

2    to lend against inventory.  It doesn't mean that excluded

3    inventory is worthless.

4    Q    Okay.  And how, if at all, did you account for expenses

5    that directly and primarily benefitted the 2L collateral

6    during the case?

7    A    There are two categories of expenses.  The ones that we

8    definitely count are the four wall costs, the costs of

9    operating the stores.  What's fuzzier is the costs at the

10   corporate level, Weil Gotshal, for example.  Sorry.  Or

11   other professionals or other things the company did.  We

12   don't have, with any precision, an accounting of those

13   expenditures.  We took into account the aggregate of

14   expenditures that the company had but for direct -- primary

15   and direct benefit to the second liens, we paid close

16   attention to the expenses in the stores.

17   Q    Now, for purposes of your analysis of net retail value,

18   did you use the same accounting methodology that the company

19   itself used in deciding whether to the stores were EBITDA

20   positive?

21   A    Yes.

22   Q    And is that -- is there a common name for that form of

23   accounting?  Is that so-called four wall accounting?

24   A    Oh, okay.  I was going to say, it's called accounting.

25   Q    Can you explain to me what is meant by four wall

Page 67

1  accounting?

2  A     Well -- and this is common among retailers.  The

3  measure -- the easiest thing to measure is what are stores

4  spending, right, because each store is separately accounted

5  for.  Its revenues are separately accounted for.  Its

6  purchases of inventory are allocated to it as it takes them

7  into the store, et cetera.  So what is mean by four wall

8  accounting is the profitability of a particular store and

9  retailers use this by way of deciding which stores should be

10  kept, which stores should be closed, et cetera.

11  Q     So looking at, for example, at the chart on Page 31 of

12  71, we're showing basically -- I did a math roughly, but

13  it's over a $700 million differential between the gross

14  retail value and net retail value of the go-forward sales.

15  You see that number?

16  A     Yes.

17  Q     What was that $700 million used for?

18  A     That's expense in effect of realizations on second lien

19  collateral.  Those are in-store expenses.

20  Q     So, for example, what expenses are included within that

21  category?  Would payroll be picked up?

22  A     Yes.  Payroll and utilities.

23  Q     Rent?

24  A     Rent.

25  Q     Security?

Page 68

1    A    Yes.

2    Q    Advertising?

3    A    All the normal expenses of running a store.

4    Q    And they're picked up by that differential, right?

5    A    Yes.

6    Q    And similarly, for the going-out-of-business store, the

7    delta between 734 and 590, that $150 million approximately,

8    that, too, would go to those types of expenses, correct?

9    A    Yes.  The company -- it shows that as going-out-of-

10   business store expenses.

11   Q    Now, in Mr. Griffith's analysis of -- to get to his

12   $1.4 billion, did he deduct any of this money?

13   A    I didn't really spend a lot of time on what Mr.

14   Griffith did.  I looked at it.  I didn't try and duplicate

15   it.

16   Q    Okay.  Okay, I'll ask -- we'll have a chance to ask

17   him, so don't worry about it.  And I think -- by the way,

18   one more question.  Are there other contributors to overhead

19   besides the small delta in profit that is the differential

20   between the net retail value for go-forward stores and the

21   book value?  Were there other financial contributors within

22   the financial statements of the company?

23   A    Well, the company doesn't report -- I'm not sure I

24   understand the question.  What accounts for the 15 --

25   Q    No, my question is --

Page 69

1   A    -- million dollars --

2   Q    -- what else was available to satisfy overhead?  Were

3   there other resources generated at a store level

4   (indiscernible) --

5   A    Well there's a -- yeah, I'm sorry.  There's a large

6   category that's not picked up there.  Vendor discounts,

7   rebates, and allowances.  There's a multi-hundred million

8   dollar category which the company books at the corporate

9   level rather than at the store level.

10  Q    And that money is not included in your net retail

11  value.  Is that correct?

12  A    No.  That's exactly right.

13  Q    So that money would be available for corporate

14  overhead?

15  A    Yes, sir.

16  Q    And are other business that Sears had besides the store

17  business that is reflected on this -- in this report?

18  A    Yes.

19  Q    And what are they?

20  A    Well, they had a variety of store -- of businesses that

21  they were in and none of them were counted in this analysis.

22  Q    And presumably, they contributed to overhead as well?

23  A    Unless they were losers, in which case (indiscernible)

24  drain, but yes.

25       MR. MOLONEY:  Thank you.  No more questions, Your

Page 70

1    Honor.

2            THE COURT:  Okay.  Any re-cross?

3            MR. GENENDER:  Very briefly, Your Honor.

4                RE-CROSS EXAMINATION OF DAVID SCHULTE

5    BY MR. GENENDER:

6    Q    Mr. Schulte, you have your report in front of you, your

7    declaration.  You're on Page 30 of 71.  Do you have that?

8    A    Yes, sir.

9    Q    And on Page 31 of 71, the numbers that Mr. Moloney just

10   went through with you, those are the delta between gross

11   retail and book value or net retail, that's as of the

12   petition date, right?

13   A    Yes.

14   Q    Does that take into account expenses that were being

15   incurred in furtherance of a going concern sale post-

16   petition?

17   A    This was done on the petition date.

18   Q    Thank you.  So the answer is no to my question, right?

19   A    Yes.  Yes, sir.

20   Q    Thank you.  If you can turn to the previous page, Page

21   10 -- 29 of 71, Page 10 at the bottom of your report and can

22   -- I want to direct your attention.  I apologize for the

23   small print, but you're the one that used it.  Footnote 20.

24   You're citing to -- Footnote 20 goes to your inventory

25   valuation, right?

Page 71

1    A    Yes.

2    Q    And your footnote says, "Based on information contained

3    in Sears Holding Corporation inventory appraisal by Tiger

4    Capital Group dated September 28th, 2018 for inventory as of

5    October 6."  Correct?  You see that?

6    A    I do.

7    Q    And then you say you note the historical margin of 27.4

8    percent that implies the 37.7 percent markup is not

9    materially different from the 26.5 percent margin achieved

10   by the go-forward stores during the bankruptcy as shown in

11   Appendix F.  Do you see that?

12   A    I do.

13   Q    Did you do those calculations independently or did you

14   rely on the Tiger report?

15   A    We relied on the Tiger report for what Tiger said.

16   Q    Thank you.

17   A    But only for what Tiger said.  Relied on the company's

18   financials for the historical margins.

19          MR. GENENDER:  Those are all the questions I have,

20   Your Honor.

21          THE COURT:  Okay.

22          MR. MOLONEY:  Just very, very briefly, Your Honor.

23            RE-DIRECT EXAMINATION OF DAVID SCHULTE

24   BY MR. MOLONEY:

25   Q    On first petition, they did sell -- continued to sell

Page 72

1    the inventory, correct?

2    A    Yes.

3    Q    And they actually realized the same values, 95.6

4    percent value on the going-out-of-business sale and the same

5    profit margin as they earned --

6            MR. GENENDER:  Your Honor, at this point -- I

7    haven't, but at this point I'm going to object to counsel

8    testifying through leading questions.

9            MR. MOLONEY:  Okay.

10   Q    Did they continue to sell the same inventory that they

11   had sold pre-petition, post-petition?

12   A    Yes.  And Footnote 20 says that they -- their

13   historical experience of 27 percent continued.

14   Q    And did they achieve the same historical experience on

15   the going-out-of-business sales that they had pre-petition?

16   A    Yes.

17   Q    And did that -- did those revenues, was there

18   significant revenues generated by those sales?

19   A    I'm sorry --

20   Q    Post-petition sales.  Were there significant revenues

21   generated by the --

22   A    Yes.  I believe the correct number for revenue generate

23   between the petition date and the sale date was over $3

24   billion.

25   Q    Over $3 billion?

1    A    Of gross revenue.

2              MR. MOLONEY:  Thank you.

3              THE COURT:  You may step down.  So who's next?

4    Ms. Murray or Mr. Henrich?

5              MR. FOX:  Your Honor, Edward Fox, for the record.

6    Call William Henrich.

7              THE COURT:  Okay.  Okay, would you raise your

8    right hand, please?  Do you swear or affirm to tell the

9    truth, the whole truth, and nothing but the truth, so help

10   you God?

11             MR. HENRICH:  I do.

12             THE COURT:  Okay.  And could you just spell your

13   last name for the record, please?

14             MR. HENRICH:  Henrich, H-E-N-R-I-C-H.

15             THE COURT:  Okay.  And Mr. Henrich, you've

16   submitted an expert report in connection with these

17   disputes.  Sitting here today, is there anything that you

18   would want to change in that or your declaration in support

19   of it that attaches?

20             MR. HENRICH:  No.  The expert report stands as it

21   is, as also the declaration.  There are just four minor

22   edits that didn't make it into the last draft --

23             THE COURT:  Okay.

24             MR. HENRICH:  -- transcription errors that -- if

25   the Court allows --

Page 74

```
 1              THE COURT:  In the declaration?

 2              MR. HENRICH:  -- I'm happy to clear up.

 3              THE COURT:  In the declaration?

 4              MR. HENRICH:  In the declaration.

 5              THE COURT:  Okay.

 6              MR. HENRICH:  In Paragraph 8, Bucyrus Erie should

 7    be EaglePicher.  It's a prior testimony.  Paragraph 83,

 8    there was a transcription error.  The go-forward stores'

 9    inventory -- it reads, "The go-forward stores' inventory was

10    approximately $2.497 billion at cost on the petition date."

11    That should've read $2.074 billion.  In Paragraph 94, it

12    says, "reflected in Exhibit 3 to my report."  That should've

13    been Exhibit D of the declaration.

14              And in Declaration Exhibit D, Exhibit 2A and 2B,

15    the column heading says, "10/15/2019."  It should've been

16    10/15/2018.  None of these change the analysis or the

17    conclusions of the report or as cited in the declaration.

18    They're just minor edits that didn't make it into the final

19    draft.

20              THE COURT:  Okay.  Okay.  So you want to go ahead

21    with cross?

22              MR. GENENDER:  Thank you, Your Honor.  May I

23    approach, Your Honor?

24              THE COURT:  Yes.

25                CROSS EXAMINATION OF WILLIAM HENRICH
```

Page 75

1    BY MR. GENENDER:

2    Q    Good morning, Mr. Henrich.

3    A    Good morning.

4    Q    How are you?

5    A    Good, thank you.

6    Q    Okay.  You've got a book in front of you that we'll

7    navigate through, a skinny book, and I'll -- we'll be

8    referring back and forth to them.  If there's method to how

9    we're going back and forth at the end, let me know how I

10   did, okay?

11   A    Sure thing.

12   Q    Looking at the first page of the skinny book, the

13   (indiscernible) book that says the 507(b) chart, can you

14   turn to that?

15   A    I have that in front of me.

16   Q    Great.  Let me stop for a second before I even go

17   there.  Did you rely in any way on any third-party

18   appraisals in arriving any of your opinions?  Tiger, for

19   example?

20   A    We did not rely on the appraisal.  We used it as a data

21   point but did not utilize it in the calculation of our

22   value.

23   Q    Did you do anything to vet the accuracy of anything in

24   the Tiger appraisal?

25   A    No.

1    Q    Or any other appraisal?

2    A    No.

3    Q    Thank you.  Okay.  You have the 507(b) chart in front

4    of you and you see there's a column -- the farthest column

5    on the right is dedicated to you?

6    A    I see the last column has my last name --

7    Q    Yes.

8    A    -- on top.

9    Q    And then you see the figures below it, correct?

10   A    I do.

11   Q    And there is a total inventory value that you're --

12   depicted there that you arrived at of $3 billion -- $3.011

13   billion.  Do you see that?

14   A    I do.

15   Q    And that's your number, correct?

16   A    Yes.

17   Q    And that's reflected in Exhibit D of your declaration,

18   whether it's 2018 or 2019, right?

19   A    Yes.

20   Q    Okay.  And you get that number by applying a 29 percent

21   gross margin to the go-forward book value inventory,

22   correct?

23   A    That was one component of the calculation.

24   Q    Okay.

25   A    Right.

1   Q    And would you agree with me that the $3.011 billion

2   inventory value reflects a 12.4 percent margin on inventory?

3   A    I am not aware how you calculated that --

4   Q    Okay.

5   A    -- percentage.

6   Q    Would you agree with me -- let me try a different way.

7   Would you agree with me that your inventory value of $3.011

8   billion is 112 percent of the total stock ledger inventory

9   in the October 13th borrowing base certificate, the $2.69

10  billion number?

11  A    If you're suggesting by math, if you're dividing the

12  three-oh -- the $3.011 billion divided by $2.691 billion, if

13  that comes to the calculation that you suggested, by math, I

14  concur.

15  Q    Thank you.  In other words, maybe a simpler way to put

16  it, there's a 320-some-odd million dollar difference between

17  your inventory -- your gross inventory calculation and the

18  book value inventory from the borrowing base certificate of

19  $2.69 billion, correct?

20  A    Again, $3.011 billion less $2.691 billion, if your math

21  is correct, I'll take your word for it.

22  Q    Thank you.  In your inventory number, if you look at

23  your $3.011 billion number and go to the left, it's $816

24  million more than Marti Murray's inventory value, correct?

25  A    Yes.

Page 78

1   Q    And it's approximately $725 million more than Mr.

2   Griffith's calculation, correct?

3   A    It is -- would you repeat the question, please?

4   Q    It's about $725 million more than Mr. Griffith's

5   calculation, correct, for total inventory?

6   A    No.

7   Q    You see his number of total -- I'm sorry, inventory

8   value of $2,287,000,000 and yours is $3,011,000,000?

9   A    I apologize.  I was on the wrong line.  Sorry.

10  Q    Fair enough.

11  A    Okay.

12  Q    About $725 million more than Mr. Griffith's, correct?

13  A    Correct.

14  Q    And about 350 more than Mr. Schulte's, correct?

15  A    Correct.

16  Q    And you added in -- you included non-inventory

17  collateral sources to your petition date valuation of

18  collateral, correct?

19  A    Would you repeat the question, please?

20  Q    You included non-inventory collateral sources to you

21  collateral calculation --

22  A    To the total collateral value --

23  Q    Yes, sir.

24  A    -- Yes.

25  Q    And those were cash, pharmacy receivables, pharmacy

Page 79

1   prescription lists, and a figure for credit card

2   receivables, right?

3   A     Correct.

4   Q     All right.  The credit card receivable number you used

5   is different than the one contained in the borrowing base

6   certificate, right?

7   A     The credit card receivable amount that we used was that

8   listed in the Debtors' schedules.  I believe it is slightly

9   different than what was identified in the borrowing base.

10  Q     I'll represent to you the borrowing base certificate

11  says $54.8 million.  Does that sound right?

12  A     Thank you, yes.

13  Q     And you see actually just to the left of you that Ms.

14  Murray actually uses the borrowing base certificate number.

15  You see that?

16  A     Yes.

17  Q     So your number's $9.5 million more than the borrowing

18  base certificate, correct?

19  A     Yes.

20  Q     And you use $116.2 million for cash, correct?

21  A     Yes.

22  Q     Different than the number for cash used by Mr. Schulte

23  and Ms. Murray, correct?

24  A     Yes.

25  Q     And you use $14.5 million for pharmacy receivables and

Page 80

1    72.8 million for pharmacy prescription lists, correct?

2    A    Correct.

3    Q    That's based on your belief that those -- that cash,

4    scripts, and pharmacy receivables are 2L collateral,

5    correct?

6    A    Can you repeat the question, please?

7    Q    Are you expressing an opinion as to whether cash,

8    scripts, and pharmacy receivables are 2L collateral?

9    A    I express an opinion that pharmacy receivables and

10   scripts are 2L collateral cash to the extent that it was out

11   of proceeds of the second lien's collateral, but cash and

12   cash equivalents is the exclusive -- except to the extent it

13   comes out of second lien collateral -- is the exclusive

14   collateral of the first lien.

15   Q    Did you perform any calculation of how much of the

16   $116.2 million of cash you believe came from 2L collateral?

17   A    No, but it wasn't necessary --

18   Q    The answer's no?

19   A    -- to our analysis.

20   Q    The answer is, you didn't do that calculation?

21   A    We did not.

22   Q    Thank you.  Now, you're not offering -- are you

23   offering an interpretation as to what the 1L and 2L security

24   agreements state as to what's included as 1L collateral and

25   what's included at 2L collateral?

1    A    We made certain judgments about that based on the

2    agreements, yes.

3    Q    Okay.

4    A    But again, it was -- but the distinction between what

5    was first and second lien collateral was irrelevant to our

6    approach to the calculation of aggregate value.

7    Q    Well, you -- your total collateral value is

8    $3,279,000,000, correct?

9    A    Correct.

10   Q    And that includes cash, scripts, and pharmacy

11   receivables as reflected on this demonstrative, correct?

12   A    Yes.

13   Q    If you're turn to the pad that says JX-006 and 007,

14   demonstrative -- if you'll turn that so you can read it, do

15   you see there's a juxtaposition there of Section 3.1 from

16   the 1L security agreement which is JX Exhibit 7 on Pages 13

17   and 14 and Section 2.1 of the 2L security agreement which is

18   JX Exhibit 6, Page 12?  Do you see those?

19   A    Yes, I do.

20   Q    And you see that in the 1L security agreement pharmacy

21   receivables, prescription lists, and all cash and cash

22   equivalents are specifically listed as highlighted, correct?

23   A    Yes.

24   Q    And those three items are not so listed in the 2L

25   security agreement, correct?

Page 82

1    A     They're not specifically listed --

2    Q     Thank you.

3    A     -- correct.

4    Q     As a matter of math, going back to the 507(b) chart,

5    Mr. Henrich, would you agree with me that if you added

6    $116.2 million of cash --

7    A     I'm sorry, did we move back to the first page?

8    Q     The charts.  Yes, sir.

9    A     Thank you.

10   Q     You bet.  As a matter of math, if you added the $116

11   million of cash that you include, the -- as 2L collateral,

12   the $9.5 million of credit card receivable difference

13   between your figure and the borrowing base figure of $14.5

14   million pharmacy receivable figure you used and the $72.8

15   million pharmacy prescription lists that you use, that that

16   adds up to approximately $213 million?

17   A     I beg your pardon?  You added the 14.5, the 72.8, the

18   116.2 --

19   Q     And 9.5.

20   A     -- and 9.5.

21   Q     As a delta between the 64.3 and 54.8 from the borrowing

22   base.

23   A     Okay.

24   Q     Do you accept my math on that?

25   A     I'll accept your math.

Page 83

1    Q    $213 million.  Thank you.  Your original report that

2    was, I think we established in your deposition was finalized

3    moments before midnight on June 18th, 2019?

4    A    Yes, we had a chuckle about that.

5    Q    Yes.

6    A    Yes.

7    Q    And we just did now.

8    A    Yeah.

9    Q    That included as 1L the $128 million standby letters of

10   credit, correct?

11   A    I believe you meant 123.8.

12   Q    Yes.  You included that as 1L debt in your original

13   report, correct?

14   A    We did, out of -- to be conservative, because at the

15   time we were uncertain whether the first lien letters of

16   credit were funded, drawn, or not.

17   Q    Okay.  You amended your report last Thursday and

18   changed that -- your opinion in that regard to exclude both

19   letters of credit as opposed to just one of the 2Letters of

20   credit as 1L debt, correct?

21   A    Like, the initial exclude the standby --

22   Q    Yes.

23   A    -- letter of credit, 271, and the second -- and the

24   amended report excluded both the 271 and the 123.

25   Q    Okay.  And you're basing that solely on the fact --

Page 84

1   your belief that the letters of credit weren't drawn,

2   correct?

3   A     Well, based on -- the answer is yes, based on listening

4   to Mr. Griffith's testimony based on inquiry that we made at

5   the time that we asked for discovery as it related to the

6   271 and addition and going back to Mr. Riecker's declaration

7   from November 2018 where he indicated that 15 -- $1.531

8   billion was drawn against the first lien facility and the

9   only way you get to -- was outstanding on the first lien

10  facility and the only way you get to that number is if the

11  395, the aggregate of the 123 and the 271, was not

12  outstanding.

13  Q     Did you -- you agree that those 2Letters of credit, the

14  combined amount of $395 million, formed a portion of the

15  $5.2 billion purchase price under the APA?

16  A     I don't have an opinion of that.

17  Q     Okay.  You're not aware of that.  Are you aware that

18  the 2Letters of credit that you excluded as 1L debt were

19  rolled into, assumed as part of the purchase price of the

20  APA?

21  A     Again, that was irrelevant to our analysis --

22  Q     Can you just answer my question?

23  A     -- as to what the debt was as of the petition date.

24  Q     Can you just answer my question?

25  A     Sure.

Page 85

```
 1    Q    So you're not aware that the 2Letters of credit were

 2    rolled into the APA?  Is that correct?

 3    A    I have not studied the APA.  Only to the extent that

 4    you have discussion with Mr. Schulte and indicated that it

 5    was.  Only to that extent.

 6    Q    Can you turn in the larger book in front of you to the

 7    tabs that says Joint Exhibit 8?  Do you have that in front

 8    of you?

 9    A    I do.

10    Q    Have you ever seen Joint Exhibit 8 before?

11    A    I don't recall.

12    Q    Can you turn to Page 4 of it, please?  You see on Page

13    4 of it, the third bullet down underneath the heading.  The

14    heading is, "ESL is pleased to offer its $4.4 billion bid

15    for Newco as a going concern which is composed of the

16    following."  Do you see that?

17             MR. FOX:  Your Honor, this is the exhibit we

18    (indiscernible).

19             THE COURT:  Well, we'll see what he's going to ask

20    first, all right --

21             MR. FOX:  Thank you.

22             THE COURT:  Then I'll consider it.

23    Q    Do you see that heading?

24    A    Would you (indiscernible) the question again?

25    Q    Absolutely.  You see the heading on Page 4?  It says,
```

1    "ESL bid summary."  Do you see that?

2           THE COURT:  That's Page 3, right?

3    A    Yeah, I don't -- on Page 4, I do not.

4           THE COURT:  I think it's Page 3.

5    Q    You're both right.  It's Bates number 4 but it's Page 3

6    of the presentation.  I apologize, Your Honor.  See it says,

7    "ESL bid summary" at the top?

8    A    Yes, thank you.

9    Q    And then the heading says, "ESL is pleased to offer its

10   $4.4 billion bid for Newco as a going concern which is

11   composed of the following."  Do you see that?

12   A    I do.

13   Q    And then if you go third bullet point down, it says,

14   $501 million in rollover debt and it says, $230 million of

15   junior DIP and $271 million of Citi LC facility.  Do you see

16   that?

17   A    I do.

18   Q    Is that the same $271 million Citi LC facility that you

19   did not include as 1L debt?

20          MR. FOX:  Objection, Your Honor.  He's never even

21   seen this.  He doesn't know what it is.

22          THE COURT:  He's never seen it before.

23          MR. GENENDER:  I'll withdraw it.

24          THE COURT:  Okay.

25   Q    Mr. Henrich, did you consider Exhibit 8 in any way

1   forming any of your opinions in this case?

2   A    No.

3   Q    And can I -- let me ask you the same question on

4   Exhibit 9, which is the next document in the book.  Did you

5   consider -- have you seen Exhibit 9 before entitled,

6   "Project transform sources and uses, December 2018"?

7   A    I do not recall seeing it.

8   Q    Thank you.  If you could turn in the small book to the

9   very last tab that has three pages from the APA.  It's under

10  -- the heading is JX-34.

11  A    Thank you.

12  Q    You bet.  See there's a definition of LC facility

13  consideration?

14  A    I see that highlighted.

15  Q    And on next page, the $1.4 billion cash component is

16  highlighted?

17  A    Yes.

18  Q    And Page 52 of the document, the LC facility

19  consideration is listed specifically.  You see that?

20  A    Yes.

21  Q    Did you rely in any way on these items in the APA in

22  forming your decision to not include the 1L debt -- not

23  include the letters of credit as 1L debt?

24  A    No.  Our consideration of debt was as of the petition

25  date.

1   Q    Did you do any independent analysis of the fair market

2   value of the 2L debt -- sorry, the 2L collateral as of the

3   sale date?

4   A    As of the sale date?

5   Q    Yes, sir.

6   A    No.  We deemed that irrelevant.

7   Q    Thank you.

8   A    To the analysis.

9   Q    You didn't do a calculation for post-petition interest,

10  did you -- 1L post-petition interest?

11  A    No --

12          MR. FOX:  Objection, Your Honor.

13          THE COURT:  First of all, it's any calculation.

14  Q    Did you answer, sir?

15  A    My prior answer was based on having not done one at any

16  point in time.

17  Q    So you don't have any basis to refute the calculation

18  performed by Mr. Griffith that there was 34 -- that there

19  would be $34 million in 1L post-petition interest?

20  A    Other than it seemed odd that the unfunded LCs, that an

21  interest rate of seven -- I think 7.1 percent, if I'm not

22  mistaken, was applied to total first lien debt of 1927 which

23  would assume that the LCs were fully drawn for the 395, the

24  123, and the 271, were fully drawn and that would be unusual

25  for a full interest rate to be applied against undrawn LCs.

Page 89

1    Q    You didn't perform a calculation, did you?

2    A    No, we didn't perform a calculation.

3    Q    Thank you.  Mr. Henrich, you're critical of the

4    Debtors' application of an 85 percent value on the petition

5    date to the book value of inventory because, as you say, the

6    Debtors' actual experience at the GOB stores yielded 96.4

7    percent of book value.  Is that correct?

8    A    Yes.

9    Q    Okay.  Do you understand Mr. Griffith applied 85 -- an

10   85 percent figure to the total inventory, rather than just

11   the GOB inventory?

12   A    Yes.  That's what -- that was his methodology.

13   Q    And if you'll look sir, at the second tab in the spiral

14   book that says, "Borrowing base certificate."

15   A    I have that in front of me.

16   Q    Mr. Griffith applies an 85 percent fair market value

17   figure to the total stock ledger inventory of $2.69 billion.

18   You see that?

19   A    Would you repeat the question?  I apologize.

20   Q    Sure.  Mister -- you see the total stock ledger

21   inventory number of $2.69 billion?

22   A    Yes.

23   Q    Okay.  And if you go back now to the 507(b) chart; you

24   have that in front of you?

25   A    Yes.

1    Q    That's -- and that's the figure to which Mr. Griffith

2    applies an 85 percent fair market value number, correct?

3    A    That's to which he applies 85 percent.

4    Q    Yes.  Well -- yes, which he calls a fair market value

5    figure, right?

6    A    Which he calls a fair market value.

7    Q    He does not apply that 85 percent figure to the net

8    eligible inventory reflected on the borrowing base, does he,

9    if you go back to the next page?

10   A    He does not.

11   Q    And the delta between those two numbers of the total

12   stock ledger inventory and the net eligible inventory is

13   about $300 million, correct?

14   A    The 269.1 less the 239.1.

15   Q    Yes.

16   A    Correct.

17   Q    Have you done the math to see how his inventory value

18   of $2.287 billion compares as a percentage to the net

19   eligible inventory number on the borrowing base certificate

20   of $2.391 billion?

21   A    No.  Again, that was irrelevant --

22   Q    Is the answer no?

23   A    -- to the analysis.

24   Q    Answer's no?

25   A    The answer is no.

1    Q     Okay.  If that number, would you be surprised if that

2    number came out to approximately 96 percent?

3    A     Shall I take your word on the math again?

4    Q     Up to you.  $2.287 billion over $3.91 billion is over

5    95 percent, isn't it?

6    A     That would be about correct.

7    Q     Thank you.  And we can agree that it is what it is,

8    right?

9    A     Correct.

10   Q     Thank you.  You'd agree, sir, as a general proposition

11   the inventory that is in a store to be sold is eligible

12   inventory, correct?

13   A     Inventory that is in a store --

14   Q     To be sold.

15   A     -- can be sold.

16   Q     To be sold, is eligible inventory.

17   A     It is inventory and -- but whether something's eligible

18   or ineligible is a lender's definition to determine

19   ultimately what they're going to lend against.

20   Q     And you didn't give that any weight, did you?

21   A     No.

22   Q     And I want to talk -- let me talk about 506(c)

23   surcharges in this -- Mr. Henrich, you agree that there

24   should be 506(c) surcharges in this case, correct?

25   A     Correct.

Page 92

1    Q    Of the three experts, you're the one that feels that

2    way, right?

3    A    Correct.

4    Q    And you'd agree that a certain allocation of

5    professional fees went to the primary and direct benefit of

6    the second lienholders and the Debtors are entitled to a

7    506(c) surcharge on that basis, correct?

8    A    I believe that some portion of professional fees would

9    be properly allocable to 506(c).

10   Q    You testified that because we do believe that a certain

11   allocation of professional fees are -- in the pendency of

12   the bankruptcy case are applicable to providing primary and

13   direct benefit to the preservation of the collateral for the

14   secured lender, correct?

15   A    I concur.

16   Q    That's your testimony?

17   A    Then I certainly concur.

18   Q    And you previously testified on 506(c) surcharges in

19   this very Court, right?

20   A    I did.

21   Q    In the In RE:  Flat Out Crazy, LLC bankruptcy, right?

22   A    Correct.

23   Q    And you were -- and that was before Judge Drain,

24   correct?

25   A    It was.

Page 93

1   Q    And you were successful in that matter in obtaining --

2   well, the Debtor in that case was successful in obtaining a

3   506(c) surcharge over the objection of a secured creditor

4   and successful bidder at an auction in that case, correct?

5   A    Subject to His Honor's allocation of expense, yes.

6   Q    Okay.  And you said that was -- there was a secured

7   lender in that case that, in your words, "essentially wanted

8   the sale process for free."  Do you recall telling me that

9   in a deposition?

10  A    I do.

11  Q    And you testified in that case that among other things,

12  you took the pre-petition and post-petition steps to

13  stabilize and improve profitability across the entire

14  business, USCRO in that case, right?

15  A    Correct.

16  Q    And you're aware that M3 was engaged as early as 2016

17  to act as the Debtors' financial advisors in this case?

18  A    I don't recall when they were retained, but I know they

19  were there pre-petition.

20  Q    Okay.  And they are serving as the chief restructuring

21  officer in this case?

22  A    Correct.

23  Q    You testified that to the extent Mr. Schulte or Ms.

24  Murray opined that there should be no 506(c) surcharge

25  against the collateral, you disagree with that analysis,

1    correct?

2    A    Yes, consistent with what I indicated previously.

3    Q    Your analysis deducts or includes as 506(c) surcharges

4    corporate overhead expenses which help preserve the

5    collateral as a component of the 506(c) expenses, correct?

6    A    Well, we included professional fees as 506(c) costs and

7    we thought that there should be an allocation of corporate

8    expenses as well.

9    Q    $51 million of professional feels, $138 million of

10   corporate overhead expense, and $19.1 million of expenses

11   associated with the GOB source, correct?

12   A    Correct.  Those are the numbers we ascribe -- we had no

13   basis to -- we utilized the Debtors' number on the 506(c)

14   professional fees.

15   Q    But the other numbers you calculated, correct?

16   A    Correct.

17   Q    And the total is reflected on the 507(b) chart

18   demonstrative of $208.1 million, correct?

19   A    Correct.

20   Q    So I want to go -- finishing on the 507(b) chart and

21   try and figure out and go through with you, you see you have

22   a total 507(b) claim of $1.314 billion.  Do you see that?

23   A    Yes.

24   Q    Which is $350 million more than Mr. Schulte's, correct?

25   A    Correct.

1    Q      And $820 million more than Ms. Murray's, correct?

2    A      Correct.

3    Q      And $1.375 billion different than the total arrived at

4    by the Debtors, correct?

5    A      Correct.

6    Q      That delta between your figure and the Debtors' figure

7    is comprised of $395 million of letters of credit that you

8    didn't include, correct?

9    A      Yes, that's one component.

10   Q      Plus the $34 million of 1L post-petition interest,

11   correct -- first lien interest?

12   A      Yes.

13   Q      Those together are $429 million, right?

14   A      Yes.

15   Q      And then the total difference in collateral between

16   your figure and the Debtors' figure is about $945 million,

17   is that right?  Total collateral.

18   A      The difference between the $3,279,000,000 and the

19   $2,334,000,000.

20   Q      Yes.

21   A      Yes.

22   Q      And those two figures together arrive at a delta

23   between your figure and the Debtors' figure of about $1.375

24   billion, correct?

25   A      $1.375?

1    Q    Billion, yes.

2    A    Okay --

3    Q    Because you're positive 1.314 --

4    A    And you're negative --

5    Q    And the Debtors are negative $60 million.

6    A    Yes.

7    Q    To be fair, you would -- unlike the experts, would

8    apply a $208.1 million 506(c) surcharge, right?

9    A    I couldn't hear you.

10   Q    You would apply a 506(c) surcharge, correct?

11   A    Yes.

12   Q    And you haven't done any independent calculations

13   regarding Mr. Griffith's calculations on expenses incurred

14   in furtherance of the sale for the direct and primary

15   benefit of the preservation of collateral for the time

16   periods December 28 to February 11th, correct?

17   A    Between December 28th and February 11th?

18   Q    Yes.

19   A    No.

20   Q    And you didn't do any sort of analysis of his

21   calculations of those saving -- expenses for time period

22   January 17th, 2019 to February 11th, 2019, correct?

23   A    Correct.

24          MR. GENENDER:  Pass the witness.  Thank you, Your

25   Honor.

```
 1              THE COURT:  Redirect?  (Indiscernible).

 2              MR. LIUBICIC:  For the record, Robert Liubicic on

 3      behalf of Cyrus Capital.

 4              RE-DIRECT EXAMINATION OF WILLIAM HENRICH

 5      BY MR. LIUBICIC:

 6      Q    Good afternoon, Mr. Henrich.

 7      A    Mr. Henrich, just a couple of questions about the

 8      testimony that you gave about 506(b) surcharges, if that's

 9      okay.

10      Q    Sure.  Do you --

11              THE COURT:  Can I interrupt you?  Are you going to

12      do direct?  I thought he was your witness, Mr. Fox.

13              MR. FOX:  He is.  Mr. Liubicic wanted to ask about

14      -- a couple questions Mr. Genender asked and --

15              MR. LIUBICIC:  Your Honor, I just have about three

16      questions that relate to Ms. Murray.

17              THE COURT:  Okay.

18      Q    Mr. Henrich, are you aware that Ms. Murray used an 88.7

19      percent NOLV to value eligible inventory?

20      A    I am.

21      Q    Okay.  Do you know whether Ms. Murray's NOLV includes

22      the direct selling costs of disposal of that inventory?

23      A    Well, by definition, if you're using the net orderly

24      liquidation value it would already consider direct selling

25      expenses.
```

Page 98

1   Q    And do you know whether Ms. Murray's NOLV includes the

2   non-direct selling costs of disposing of that inventory?

3   A    With respect to corporate expenses, for example?

4   Q    For example.

5   A    Well, to the extent that it relied on the Tiger

6   valuation report, the Tiger valuation report did consider

7   some level of corporate overhead royalty expense and there

8   was one other line item, as well.

9         MR. LIUBICIC:  No further questions.

10        THE COURT:  Okay.

11        RE-DIRECT EXAMINATION OF WILLIAM HENRICH

12   BY MR. FOX:

13   Q    Good afternoon, I think it is, Mr. Henrich.  My name's

14   Edward Fox, as you know.  I represent Wilmington Trust.  Mr.

15   Genender asked you a few questions about the difference

16   between the total inventory number that you used and the

17   total inventory number that Mr. Griffith used.  Do you

18   recall that?

19   A    Yes.

20   Q    Okay.  Can you explain why there's a difference between

21   your total inventory number and Mr. Griffith's total

22   inventory number?

23   A    Yes.

24   Q    There's different methodologies.  So we used -- we've

25   looked at valuing the collateral by its intended use as of

Page 99

1    the petition date.  So we recognized that there were 262

2    stores, albeit that was in three waves, that were GOB stores

3    that were going to be liquidated and there were 425 stores

4    that were going to be going concern, going forward stores.

5            So we valued the inventory for the GOB stores at

6    its, essentially, actual results as reported by the company,

7    which exceeded approximate 96 percent, well exceeded the 85

8    percent multiplier that Mr. Griffith used and then with

9    respect to the going forward stores, the assumption there is

10   that inventory was going to be sold at retail and being sold

11   at retail, it would generate a gross margin.  That gross

12   margin dollars would pay for both direct selling expense as

13   well as corporate expense and leave a margin so that

14   inventory would actually generate incremental value for the

15   benefit of the company.

16           And so that distinction, you know, of looking at

17   inventory actually being sold at retail as opposed to a

18   contrived or assumed 85 percent is -- yields a difference of

19   a magnitude as depicted.  I wouldn't call 85 percent of fair

20   market value of inventory at the petition date, nor would I

21   consider it a value of inventory sold at retail.  You

22   couldn't -- an entity, if that was the fair market value at

23   retail, they would be never making money.

24           And here, the assumption was that this inventory

25   was going to be sold as -- in going concern stores and an

Page 100

1    ongoing business.

2    Q    Now, when you applied a gross margin, I believe you

3    testified you used a 29 percent gross margin on book value?

4    A    Yes.

5    Q    And how'd you pick that number?

6    A    Well, that was the number that the Debtor actually

7    identified and assumed through most of its business plans

8    and forecasts for the going forward stores in presentations

9    to the Unsecured Creditors' Committee and there were various

10   presentations that incorporated that.

11   Q    And then after you applied the gross margin to the book

12   value of inventory to get the gross value, what did you do

13   next in order to reach your net value?

14   A    So, we applied direct selling expenses and we used

15   direct selling expenses and a comparable basis as what the

16   experience had been as a percentage of inventory in the GOB

17   stores as we saw.  In fact, the 20 percent that we utilized

18   is slightly -- is actually slightly higher than that.  And

19   then we applied a 5 percent corporate overhead number for

20   the going forward stores.  We actually used the 3.1 percent

21   of inventory for the GOB stores.  And that 5 percent, we

22   thought, was reasonable.

23        It made -- it was not necessarily all that the

24   company incurred because it was a bloated corporate

25   structure that was on the decline as they were looking -- as

Page 101

1   they were shedding stores over time.  But if you looked at

2   their forecasts of corporate overhead expenses, they

3   incurred in 2017 about a $1.71 billion which is about 10

4   percent, 10 percent plus, of revenue.

5          In 2018, they incurred about $600 million which

6   was about 5.5 percent and their forecast for 2019 was, if

7   memory serves me right, $365 million which was about 4.4

8   percent.  So we opted -- we thought from a normalized

9   operations based on experience in retail operations, 5

10  percent was a reasonable going concern, go-forward number

11  and it was relative -- it was consistent with the blend

12  between 2018 and 2019 that they were experiencing.

13  Q    Do you recall the amount of direct selling expense you

14  deducted in your report from the gross margin inventory

15  number?

16  A    Do I remember the direct selling expense?

17  Q    The total direct selling cost that you deducted from

18  the gross margin.

19  A    I have to look it up.

20  Q    You can take a look if you don't remember.  You have

21  your report there, or your declaration.

22  A    Is that total for the -- the total between the GOB and

23  the going forward, are you asking, or just one or the other?

24  Q    Just the go forward.

25  A    Just the go forward.

Page 102

1    Q    If you can.

2    A    I believe -- well, can someone please --

3    Q    Do you have your report?

4    A    -- direct me -- well, just -- I have the report.  Here,

5    is just my -- what is this, Exhibit D?  That's that.  A

6    total of approximately $470 million.

7           THE COURT:  And that -- I'm sorry, you testified

8    that's 20 percent of what?

9           MR. HENRICH:  For the going forward stores, it's

10    20 percent of revenue.

11           THE COURT:  Of gross sales?

12           MR. HENRICH:  Of gross revenue, gross sales.

13    Q    And would those direct selling expenses include some of

14    the things that Mr. Griffith calls 506(c) surcharges, things

15    like rent and employee expense and things of that nature?

16    A    Yes.

17    Q    Now, you also talked about -- you also deducted

18    overhead expense?  How much overhead expense did you deduct?

19    A    Approximately $158 million.

20    Q    Okay.  And that was over a period of about four months?

21    A    Correct.

22    Q    So on an annualized basis, what would have been the

23    total overhead cost you'd be using?  Corporate overhead

24    cost.

25    A    450.

1    Q    About $450 million?

2    A    Right.

3    Q    And does that compare favorably, in your view, to the

4    assumptions that the Debtors made in the report you're

5    referring to?

6    A    It's consistent.  I mean, as I said, it's consistent

7    with a blend between 2018, 2019.

8    Q    Okay.  And the report you looked at was -- had M3's

9    name on it, right?

10   A    It was a report to the Unsecured Creditors' Committee.

11   Yes, it did.

12   Q    Okay.  Now, the -- I think you mentioned the 3.1

13   percent number that you used, that you referenced Tiger?  Is

14   that correct?

15   A    Yes.

16   Q    And just tell me again what that was?

17   A    So in -- and this is the one place that we did look at

18   the Tiger appraisal, correct slightly my earlier statement,

19   but the Tiger appraisal report incorporated an allocation of

20   cost of corporate overhead as well as royalty expense and

21   there was one other line item that I can't recall right now.

22   The aggregate of the three was 3.1 percent of inventory

23   value.

24   Q    Did you rely on the Tiger 3.1 percent number in your

25   analysis?

Page 104

1    A    Well, in fact, for the GOB stores, we didn't rely on

2    it.  I take that -- because, in fact, we looked at actual

3    results.

4    Q    So you looked at -- so is it fair to say you looked at

5    the Tiger number but you did not rely on that number?

6    A    That's correct.

7    Q    Okay.  Now --

8    A    No, I beg your pardon.  Let me -- I beg your pardon.

9    Let me take a step back.  We did not rely in terms of direct

10   selling expenses.  We did not rely on the Tiger report.

11   With respect to an allocation of corporate overhead, we did

12   rely on the Tiger report only for the 3.1 -- we utilized the

13   3.1 percent and applied that to the GOB inventory to derive

14   the $18, $19 million of corporate expenses.  So I apologize

15   to what I said before.

16   Q    Okay.  And to the extent that the Debtor had going-out-

17   of-business sales and go-forward store sales going on at the

18   same time, isn't there just one -- is it fair to say there's

19   one overall corporate overhead number that the company

20   incurs?

21   A    Yes.

22   Q    Okay.

23   A    It's the same people.

24   Q    Right.  So if you were a little lower on, say, going-

25   out-of-business stores, you'd be a little bit higher on the

Page 105

1    other stores to get the overall total, correct?

2    A    Well, again, we thought that the aggregate allocation

3    that we made for corporate overhead was a fair allocation

4    and in our estimation, reasonable.

5    Q    Okay.  Now, you were -- it was pointed out during your

6    testimony with respect to this -- the Debtors' 507(b)

7    calculation chart that there was a difference of -- between

8    your total inventory number and both the Murray -- wait, I'm

9    sorry.  Strike that.  Move on.  You were asked about your

10   use of cash in connection with your evaluation.  So did you

11   include the cash in your collateral numbers?

12   A    Yes.

13   Q    Okay.  And -- but was it your view that that's 2L,

14   second lien cash or is it your view that it's first lien

15   cash?

16   A    Our view was that it was first lien cash, but we were

17   looking at the aggregate collateral value as compared to the

18   aggregate debt stack.

19   Q    So are you saying you -- that it doesn't matter to you,

20   then, whose -- whether it's first lien or second lien

21   collateral when you applied it here?

22   A    For our analysis, it did not.  It did not matter.  We

23   did assume that the first liens would look to cash to

24   satisfy their debt first.  We did make that assumption.

25   Q    Was it your understanding that the second lien -- part

Page 106

1    of the second lien collateral included proceeds from the

2    sales of inventory?

3    A    Yes.

4    Q    And are you aware that the Debtor had a cash management

5    system into which the proceeds of inventory would flow?

6    A    Yes.

7    Q    Okay.  Now, you were asked about, I believe, it's a $34

8    million post-petition interest accrual that Mr. Griffith

9    applied.  Do you recall that?

10   A    Yes.

11   Q    Okay.  Now, is it your understanding that that was

12   interest that was outstanding at the petition date or is --

13   was it an assumption about what interest would accrue after

14   the petition date?

15   A    The latter.  By definition, it's post-petition interest

16   that was calculated to some degree and therefore it was

17   subsequent to the petition date.

18   Q    So in your understanding, it was not an amount of

19   interest which was outstanding at the petition date,

20   correct?

21   A    Correct, and such is why we did not include it as part

22   of the debt at the petition date.

23   Q    Okay.  Now, I think you may have answered this when you

24   used the word contrived, but I just want to be clear.  Is

25   your -- Mr. Griffith applies this 85 percent number to the

Page 107

1    total inventory of $2,690,000,000.  Is that your

2    understanding?

3    A    Yes.

4    Q    Okay.  And as of the petition date, in your view, is it

5    a fair view of fair market value to assume that the

6    inventory value is only 85 percent of its book value at the

7    petition date?

8    A    No.

9    Q    And why not?

10   A    For the reasons that I stated before, which are a

11   couple.  One is even in liquidation, the liquidation value

12   is approximately 96 percent, not 85 percent.  Second, it

13   ignores the fact that inventory was sold at retail in the

14   going-forward stores that yields a much higher valuation

15   than, by definition, than liquidation value.  And as 85

16   percent, the stores would never be in business, if that was

17   the fair market value of the inventory at retail in a go-

18   forward operation.

19   Q    Now, you were asked about Mr. Griffith's assumption

20   about 506(c) expenses and whether you had analyzed his

21   assumptions.  Do you recall that?

22   A    Yes.

23   Q    Did you look at the amounts that he asserted should be

24   surcharged against the second lien collateral under 506(c),

25   laying aside the legal expense?

Page 108

1    A    We did look at it.

2    Q    And what was your view when you looked at it?

3    A    Well, we thought it was, A, duplicative.  I mean -- but

4    again, even at 85 percent, if you assumed that was a

5    liquidation value, that would be net of direct selling

6    expenses and in the stack of 506(c) charges that were

7    identified by Mr. Griffith, he incorporated direct selling

8    expenses, a considerable degree of direct selling expenses.

9    So to us, that was even on the surface, duplicative and

10   there was no way to discern how those numbers were derived.

11   Q    When you say there was no way to discern how those

12   numbers were derived, can you explain what you mean by that?

13   A    Well, there was no (indiscernible).  It was just -- it

14   was merely stated that these are the 506(c) charges that we

15   believe exist and there was no -- there was no provision of

16   any backup or how those -- or description as to how those

17   numbers were derived.

18   Q    Okay.  And you were at Mr. Griffith's deposition,

19   weren't you?

20   A    I was.

21   Q    And did he -- was he able to explain then about how he

22   derived the 506(c) numbers?

23        MR. GENENDER:  I'm going to object, Your Honor.

24   His testimony is what it is.

25        THE COURT:  His what?

Page 109

```
1                MR. GENENDER:  His testimony is what it is.

2                THE COURT:  Well --

3                MR. GENENDER:  He's asking to comment.

4                THE COURT:  I think you're setting up the next

5     question, right?  Is this a foundation question?

6                MR. FOX:  Yes.

7                THE COURT:  Maybe you should rephrase it.

8     Q    Do you recall, Mr. --

9     A    Henrich.

10    Q    -- Henrich -- see what happens?  Do you recall Mr.

11    Griffith's testimony at his deposition about his schedule of

12    506(c) charges?

13    A    Yes.

14    Q    Okay.  And do you recall whether there was any analysis

15    -- or, I'm sorry, that there was any -- did he say whether

16    he had any backup to the numbers that he was asserting?

17               THE COURT:  All right, I will sustain the

18    objection.

19               MR. FOX:  That's fine, Your Honor.  I'm almost

20    finished.

21               THE COURT:  Okay.

22               MR. FOX:  Thank you, Your Honor.  That's all.

23               THE COURT:  Okay.  Any re-cross?

24               MR. GENENDER:  Very briefly, Your Honor.

25               THE COURT:  Okay.
```

Page 110

1                  RE-CROSS EXAMINATION OF WILLIAM HENRICH

2    BY MR. GENENDER:

3    Q    Mr. Henrich, did you do anything to independently test

4    the 29 percent gross margin you used other than rely on the

5    records you referred to?

6    A    No.

7    Q    You referred to a presentation to the UCC by M3.  Do

8    you recall being asked about that?

9    A    Yes.  I mean, that wasn't the only place that the 29

10   percent appeared, but yes.

11   Q    What was the date of the presentation?

12   A    Sincerely don't recall.  I don't recall the exact date.

13               MR. GENENDER:  Thank you.

14               THE COURT:  Do you have any questions on that?

15               MR. FOX:  No, Your Honor.

16               THE COURT:  So, Mr. Henrich, you said that

17   evaluation of the inventory for the going-forward stores is

18   less than 100 percent, specifically 85 percent, those stores

19   wouldn't be in business.  They wouldn't be profitable

20   stores?  You remember that testimony?

21               MR. HENRICH:  Yes.

22               THE COURT:  So are you assuming, then, that all

23   the profit in the stores is in the inventory?  Is that a

24   necessary assumption for that statement?

25               MR. HENRICH:  As opposed to the other parts of the

1    Sears --

2            THE COURT:  As opposed to the people, the real

3    estate, the location.

4            MR. HENRICH:  Oh, no, I wasn't -- but as an

5    ongoing -- but I said as a going concern business, it

6    wouldn't be a going concern business.  Would there be other

7    value in property?  Sure.  But I mean as a going concern

8    business.

9            THE COURT:  So in other words, you're attributing

10   the profit in those going concern stores and sending it to

11   the inventory line?

12           MR. HENRICH:  Well, the stores are there to

13   merchandise and sell inventory and gain -- and generate a

14   contribution to be able to pay, to contribute to overhead

15   and other costs of the business.  If you're generating

16   materially less than what the inventory cost you to begin

17   with, then you're not generating any contribution to

18   overhead.

19           THE COURT:  But -- okay, but your allocation of

20   costs is largely after the fact, right, for corporate

21   overhead and four-wall costs, et cetera?

22           MR. HENRICH:  Well, we tried --

23           THE COURT:  For going forward.

24           MR. HENRICH:  Well --

25           THE COURT:  I understand your analysis on the GOB

1    sales.

2           MR. HENRICH:  Right.  Well, we -- what we did was

3    try to look at normalized operations and for -- and we

4    needed to attribute to this volume of collateral, right, so

5    we looked at applying percentages that seemed to be

6    appropriate for normalized operations.  But I would add to

7    Your Honor -- and I know that, somewhat ancillary, but we

8    had generated approximately $400 million of -- close to $400

9    million of cushion in the comparison of the value of the

10   collateral to the debt.

11          Even if you eliminated the entire net margin on

12   the go-forward stores that we incorporated which was about 4

13   percent on $2.7 billion, so it's about $110 million, you'd

14   still be well over collateralized.

15          THE COURT:  Making the other assumptions about the

16   first lien debt and the rest?

17          MR. HENRICH:  Correct.

18          THE COURT:  Right.

19          MR. HENRICH:  Correct.

20          THE COURT:  Okay.  All right.  Anything on that?

21          MR. FOX:  Nothing further.

22          THE COURT:  Okay.  You can step down.

23          MR. HENRICH:  Thank you.

24          THE COURT:  Okay.  How long do you think your

25   cross will be of Ms. Murray?

```
 1              MR. GENENDER:  Shorter.

 2              THE COURT:  Okay.  All right.  So unless people

 3   are dying to take a break, should we just go ahead with Ms.

 4   Murray, then?

 5              MR. FOX:  That'd be great.

 6              THE COURT:  Okay.

 7              MR. FOX:  Your Honor, at this time, we'll call

 8   Marti Murray.

 9              THE COURT:  Okay.  Okay, would you raise your

10   right hand, please?  Do you swear or affirm to tell the

11   truth, the whole truth, and nothing but the truth, so help

12   you God?

13              MS. MURRAY:  I do.

14              THE COURT:  Could you spell your last name,

15   please?

16              MS. MURRAY:  M-U-R-R-A-Y.

17              THE COURT:  Okay.  All right, and Ms. Murray, you

18   also submitted an expert report in connection with these

19   contested matters in a declaration.  Sitting here today,

20   knowing that those would be your direct testimony, is there

21   anything you want to change in it?

22              MS. MURRAY:  I have one clarification, Your Honor.

23              THE COURT:  Okay.

24              MS. MURRAY:  Paragraph 15 in my declaration

25   contains a correction to Paragraph 104 in my report.  In
```

1    Paragraphs 104 of my report, I say that the proposed

2    surcharge would equal 62 percent of the $2.457 billion of

3    non-cash collateral.  That $2.457 billion number actually

4    included a cash balance of 123.2, so the correct value of

5    the non-cash collateral is $2.334 billion which is stated in

6    the declaration.

7                    THE COURT:  Okay.  And that affects the percentage

8    number, too?

9                    MS. MURRAY:  I'm sorry?

10                   THE COURT:  Did that affect -- would that affect

11   the percent, too --

12                   MS. MURRAY:  It did not.

13                   THE COURT:  -- or just the number?

14                   MS. MURRAY:  The percent is correct.

15                   THE COURT:  Percent was correct.  Okay.  All

16   right.  Okay.  You can go ahead with cross.

17                   MR. GENENDER:  Thank you, Your Honor.

18                     CROSS EXAMINATION OF MARTI MURRAY

19   BY MR. GENENDER:

20   Q    Good afternoon, Ms. Murray.

21   A    Good afternoon.

22                   MR. GENENDER:  Your Honor, may I approach the book

23   for her?

24                   THE COURT:  Yes.

25                   MR. GENENDER:  (Indiscernible).

Page 115

1              THE COURT:  Thanks.

2     Q    Ms. Murray, you performed a liquidation analysis as of

3     the petition date, correct?

4     A    I performed evaluation analysis as of the petition

5     date, correct.

6     Q    And you did it by taking the net inventory value from

7     the borrowing base certificate and applying -- adding an

8     amount for inventory in transit and then applying an 88.7

9     percent NOLV percentage, correct?

10    A    I applied 88.7 percent net orderly liquidation value to

11    the eligible inventory and then I assessed a certain value

12    for in-transit inventory.

13    Q    Yes.  Do you have the small spiral-bound book in front

14    of you?  Can you turn -- do you have the first page that

15    says 507(b) diminution calculation in front of you?

16    A    Yes.

17    Q    And there's a column with your name above it.  You see

18    that?

19    A    Yes.

20    Q    And what you just said is -- you started with the

21    eligible inventory of $2.391 billion, correct?

22    A    I don't have the source documents in front of me.  I'm

23    only looking at your analysis.

24    Q    Well, if you turn to the next page, it's the borrowing

25    base certificate.  You see where it has net eligible

1     inventory at 2.391 billion?  The next tab, Ms. Murray, next

2     tab.

3     A     Yes.

4     Q     Okay.  And you said you applied 88.7 percent, which is

5     the NO- -- same NOLV percentage on the borrowing base

6     certificate, right?

7     A     Correct.

8     Q     You applied that to 2.319, the net eligible inventory,

9     and then added an amount for in-transit; is that correct?

10    A     I did.

11    Q     And you came up with an inventory value of $2.196

12    billion; is that right?

13    A     That is the minimum inventory value.

14    Q     I understand you have an alternative.  I'm operating

15    under your lower number.

16    A     Okay.

17    Q     Is that correct?

18    A     Yes.

19    Q     Okay.  And you relied -- and did you rely upon the

20    Tiger report, which is in your notebook as Exhibit 4, in the

21    larger notebook as Exhibit 4; did you rely upon that for the

22    88.7 percent NOLV figure?

23    A     Yes.

24    Q     And the Tiger report is an inventory appraisal prepared

25    by Tiger Valuation Services, right?

Page 117

1    A    Correct.

2    Q    Tiger and its affiliated companies provide an appraisal

3    and liquidation services to retail, wholesale and industrial

4    companies; that's what they do, right?

5    A    Yes.

6    Q    Did you perform any independent analysis or

7    verification of any of the information in the Tiger report?

8    A    I prepared an analysis verifying the appropriateness of

9    the net orderly liquidation value percentage that they

10   concluded.

11   Q    Did you do any independent verification of actually the

12   assets that they appraised, or did you simply rely upon the

13   Tiger appraisal?

14   A    The assets they appraised were assets that were -- or

15   that don't -- aren't -- don't exist anymore, so it wouldn't

16   be possible for me to do an independent evaluation of the

17   actual assets that they appraised.

18   Q    So you just relied on the Tiger report.

19   A    I relied on the Tiger report, which incorporates

20   information that Tiger received from management.

21   Q    Thank you.  You didn't conduct your own appraisal of

22   the inventory to determine its value at petition date, did

23   you?

24   A    I think I did.  I applied --

25   Q    By using the Tiger report?

```
 1    A    I applied what I viewed as reasonable and conservative

 2    assumptions about a net orderly liquidation value to the

 3    borrowing base certificate that reflected the state of the

 4    inventory as of October 13, 2018.

 5    Q    And your figure for the inventory value for your first

 6    case is approximately $92 million less than the inventory

 7    value calculated by Mr. Griffith, correct?

 8    A    I can't do that calculation sitting here.

 9    Q    But yours is 2.196 and his is 2.287.  Do you see that?

10    A    Yes.

11    Q    Okay.

12    A    That's not an apples-to-apples comparison.

13    Q    I'm just asking if your net inventory number -- if your

14    inventory number is 2.196; is that right?

15    A    Yes.

16    Q    Thank you.

17    A    On a net orderly liquidation value basis.

18    Q    I understand that; that's your testimony.  And you

19    included credit cards rec- -- then you added to that figure

20    credit card receivables, cash, scripts and pharmacy

21    receivables; is that right?

22    A    Correct.

23    Q    And you got the credit card receivable figure from the

24    borrowing base certificate, right?

25    A    Yes.
```

Page 119

1   Q    And then the -- you have a different number from case -

2   - for cash than Mr. Schulte and Mr. Henrich; is that right?

3   A    Yes.

4   Q    All right.  Where did you get that number from?

5   A    It's from the statement of financial affairs that was

6   filed by the debtors.

7   Q    And are you offering an opinion that cash, scripts and

8   pharmacy receivables are 2L -- are 2L collateral?

9   A    What I stated is that I -- my analysis is based on the

10  assumption that the cash represents proceeds from inventory

11  and receivables.

12  Q    You didn't perform any sort of analysis to determine

13  what percentage or what amount, if any, of that cash arise

14  from inventory proceeds, correct?

15  A    I did not.  I relied on the assumption that it was

16  proceeds from inventory and receivables.

17  Q    You did not do analysis, correct?

18  A    Correct.

19  Q    Thank you.  If you can turn to the tab in the small

20  bound book that says JX-6 and 7.  It has excerpts from

21  Exhibits -- Joint Exhibits 6 and 7, the 1L and 2L security

22  agreements.  Do you have that in front of you?

23  A    I do.

24  Q    And you'll agree -- did you review these documents as

25  part of your work in this case?

Page 120

1    A    I did.

2    Q    And you'll agree that the 1L, the excerpt on collateral

3    for the 1L security agreement specifically enumerates

4    pharmacy receivables -- all pharmacy receivables, all

5    prescription lists, and all cash and cash equivalents,

6    correct?

7    A    Yes.

8    Q    And those corresponding items are not specifically

9    enumerated in the 2L security agreement definition of

10   collateral in Section 2.1, correct?

11   A    They're not specifically enumerated.

12   Q    Thank you.

13        MR. GENENDER:  Your Honor, bear with me.  I'm just

14   skipping some things that we've already covered.

15   Q    Ms. Murray, are you aware if the company generates cash

16   from things besides selling inventory?

17   A    The company is a retailer, so I would assume that most

18   of the cash that it generates is from the sell of inventory.

19   It could, from time to time, generate cash from the sale of

20   assets.

21   Q    Okay.  Ms. Murray, that's not my question, though.  Are

22   you aware that Sears generates cash from things besides

23   selling inventory?

24   A    I'm sorry.  Could you --

25   Q    Sure.

Page 121

1   A   I have hearing loss.

2   Q   No, I know.

3   A   So I sometimes can't catch.

4   Q   If I don't keep my voice up, please let me know.  Okay?

5   A   Thank you.

6   Q   You bet.  Are you aware that Sears generates revenue --

7   cash -- from things other than selling inventory in stores?

8   A   Yes.

9   Q   That would include Home Services, right?

10  A   Yes.

11  Q   That would include warranties, right?

12  A   Yes.

13  Q   Did you perform any tracing analysis in connection with

14  your figure of $123 million of cash that's in your report?

15  A   No.

16  Q   Thank you.  Ms. Murray, if you look at the 507(b)

17  demonstrative, that first page we were looking at.  You'd

18  agree that by including cash, scripts and pharmacy

19  receivables, that that's approximately $206 million of your

20  total collateral figure of 2.457 billion; is that right?

21  A   I'm sorry.  What was the question?

22  Q   Sure.  You see -- if you -- would you agree that your

23  inclusion of cash, scripts and pharmacy receivables total

24  about $206.5 million?

25  A   It sounds about right.

Page 122

1    Q    Okay, thank you.

2    A    I don't know have my calculator here.

3    Q    Thank you.  And you did not include the two letters of

4    credit as part of 1L debt, did you?

5    A    I did not.

6    Q    And you did that -- you excluded them because they were

7    not fully drawn, right?

8    A    I excluded them because they represent contingent

9    obligation.  They weren't funded as of the filing date;

10   therefore, including them was not consistent with what was

11   known as the filing date.  And I also excluded them because

12   only 9.1 million of them were drawn between the filing date

13   and May 2019; and, therefore, it wouldn't have been knowable

14   as the filing date that the amount would have been drawn.

15   Q    You included a chart as part of your declaration and

16   report that reflected their 89.1 percent of the debtors' LCs

17   related to workers' compensation insurance and surety bonds,

18   correct?

19   A    If you represent that's the percent in the report, I

20   don't have the report in front of me.

21   Q    You do have it in front of you, but I'm going to save

22   time and --

23   A    Okay.

24   Q    -- I will represent that your chart says 89.1 percent.

25   Will you accept that representation?

Page 123

1   A     Sure.

2   Q     Thank you.  Workers' compensation, those sorts of

3   obligations can arise 20 to 30 years into the future, can't

4   they?

5   A     I don't know that.

6   Q     Okay, thank you.  Are you aware that the two letters of

7   credit formed $395 million of the $5.2 billion purchase

8   price under the asset purchase agreement?

9   A     I'm aware that those facilities were assumed under the

10  asset purchase agreement.

11  Q     In other words, they had to be dealt with under the

12  APA, correct?

13  A     The facilities had to be dealt with, but the --

14  certainly that amount was not drawn.

15  Q     Are you -- you're aware that there are ongoing annual

16  insurance payment obligations associated with the letters of

17  credit, aren't you?

18  A     I am aware that there are insurance premiums that are

19  paid in the normal course of business for the company.

20  Q     You did not include -- I want to switch to 506(c).  You

21  didn't include a 506(c) surcharge in your analysis, correct?

22  A     I think that, while I don't call it a 506(c) surcharge,

23  my understanding of what a 506(c) surcharge is is included

24  in my analysis, which is the cost necessary to maintain and

25  preserve the collateral.  And I believe that that's already

Page 124

1    incorporated into the net orderly liquidation value

2    percentages that I posed.

3    Q    And you believe that by taking 88.7 percent of the net

4    inventory figure that that takes into account what would

5    otherwise be 506(c) type expenses; is that fair?

6    A    I think it takes into account what my understanding is

7    of what a 506(c) surcharge is supposed to represent, which

8    is the necessary cost of maintaining and preserving a

9    collateral.  And based on my review of the Tiger appraisals,

10   that -- those costs are already included; both direct and

11   indirect expenses are deducted from the gross recovery on

12   the inventory to get to the net orderly liquidation value.

13   Q    And you contend that the Tiger report that you relied

14   on for your NOLV figure includes those expenses, correct?

15   A    I do.

16   Q    And you testified to that fact at your deposition,

17   correct?

18   A    Yes.

19   Q    And you didn't do any sort of independent verification

20   of those -- of that figure, correct?

21   A    I did in the sense that I verified that the information

22   that the Tiger appraisal reports is based on came from the

23   management of the company.

24   Q    How did you do that?

25   A    It's mentioned throughout in the Tiger appraisal report

1    that they're relying on information from the company.

2    Q    But you didn't do anything independent of reviewing and

3    relying upon the Tiger report itself, correct?

4    A    Well, I did because there were other data points in

5    terms of net orderly liquidation value that ran through the

6    case.  And so, I could compare and see that the 88.7 percent

7    net orderly liquidation value that I was using was lower

8    than what other parties were using to calculate net orderly

9    liquidation value, because what the evidence indicates that

10   other parties used values ranging from 90 percent up to 93

11   percent, including direct and indirect costs in getting to

12   that 90 to 93 percent.

13   Q    The Tiger report does not include all expenses that

14   will be incurred in a going concern sales scenario, does it?

15   A    No.  Because the premise -- well, the premise of value

16   that I used in my report was net -- company-wide going-out-

17   of-business sales orderly liquidation.

18   Q    And that leads me to my next question.  You did a

19   valuation as of petition date that assumed an orderly

20   liquidation of Sears, correct?

21   A    I did.

22   Q    An orderly liquidation of Sears is not what happened in

23   February of 2019, correct?

24   A    Fortunately, Sears was able to not have an orderly

25   liquidation.  However, as a valuator, I have to deal with

Page 126

1    what's known or knowable as of the measurement date.

2    Q    So I just want to be clear because the rest of left for

3    the Court.  You did a valuation as of the petition date that

4    is different than what actually happened in this case,

5    correct?

6    A    At the end, yes.

7    Q    Thank you.  The types of expenses that the Tiger report

8    doesn't capture but that would occur in a going concern

9    scenario, such as we have here, will be professional fees,

10   financing fees, or perhaps post-petition interest, correct?

11   A    I -- there are some professional fees that are included

12   in an orderly liquidation valuation analysis.  There may be

13   other professional fees that aren't included.  I don't have

14   enough visibility into that.  And interest is not included.

15   Q    Ms. Murray, you didn't do any calculation for 506(c)

16   surcharges in a going concern scenario, correct?

17   A    Correct.

18   Q    Thank you.  So I want to go back to the 507(b) chart.

19   Ms. Murray, to wrap this up, your collateral number under

20   this scenario is about 125 -- your total collateral figure

21   of 2.457 billion is about $125 million more than Mr.

22   Griffith's calculation, correct?

23   A    I don't believe that's correct because I don't think

24   it's an apples-to-apples comparison.

25   Q    Okay.  Well, would you agree that $2.457 billion is

Page 127

1    about $125 million more than 2.334 billion?

2    A    I would agree mathematically --

3    Q    Thank you.

4    A    -- that's correct.

5    Q    And your 1L deck number is $429 million less than Mr.

6    Griffiths because of -- because you don't include the two

7    letters of credit to the tune of 395 million and you don't

8    include post-petition interest, correct?

9    A    I don't include the letters of credit and I don't

10   include post-petition interest, correct.

11   Q    And that makes your number $429 million less than Mr.

12   Griffiths, correct?

13   A    If you represent that's the math.

14   Q    Thank you.  And 429 million plus 125 million difference

15   in collateral value is about 550 million, correct?  Rough

16   math?

17   A    I don't have my calculator here.

18   Q    Okay.

19   A    And it's not calc- -- if it's not -- it's not

20   calculated on the page.

21   Q    Okay.  Then will you accept my -- the numbers are what

22   they are, right?  If you took those numbers, if you

23   subtracted those numbers from your total 507(b) calculation

24   of 492 million, you end up with about negative 60, wouldn't

25   you?

Page 128

```
 1   A     In the minimum case.

 2   Q     Thank you very much.

 3   A     And assuming that all of those hypothetical

 4   calculations are appropriate.

 5   Q     Thank you.

 6           MR. GENENDER:  Pass the witness.

 7           THE COURT:  Okay.  Redirect?

 8           MR. LIUBICIC:  Yes, Your Honor.

 9              REDIRECT EXAMINATION OF MARTI MURRAY

10   BY MR. LIUBICIC:

11   Q     So Ms. Murray, you were asked some questions about your

12   reliance on the Tiger appraisal.  Do you recall that?

13   A     Yes.

14   Q     Okay.  And Ms. Murray, are you a certified valuation

15   analyst?

16   A     I am.

17   Q     And are you familiar with the National Association of

18   Certified Valuation Analysts?

19   A     I am.

20   Q     Can we call that NACVA?

21   A     Yes.

22   Q     Does NACVA have professional standards that guide

23   valuation practice?

24   A     It does.

25   Q     And do those standards speak to reliance on third-party
```

Page 129

1    specialists?

2    A    Yes.

3    Q    And what do those standards say about reliance on

4    third-party specialists?

5    A    That as evaluator, it's appropriate in some cases to

6    rely on third-party specialists to value specific types of

7    assets.

8    Q    Do you consider Tiger a third-party specialist?

9    A    I do.  I consider both Tiger and Abacus specialists in

10   the valuation of inventory.

11   Q    And why did you consider it appropriate to rely on

12   Tiger for aspects of your analysis?

13   A    Because the work of Tiger is a specialist in evaluation

14   of inventory.  Tiger had been retained by the collateral

15   agent for the banks.  And the banks had an interest in

16   having the collateral appropriately valued so that they knew

17   what they were lending against and, therefore, I viewed the

18   Tiger appraisals as being conservative.  And I felt that

19   they also did not include in their inventory that they were

20   applying the NOLV to certain categories of inventory that I

21   felt likely had value.  And so, they were done

22   contemporaneously right around the time of the filing, and

23   they were not done in a context of litigation.

24   Q    Do you know whether Sears' management relied on Tiger?

25   A    Sears' management relied on Tiger in determining the

Page 130

1    borrowing base percentages.

2    Q    And now a minute ago, you mentioned Abacus; what's

3    Abacus?

4    A    Abacus is a professional firm that specializes in

5    helping retailers liquidate inventory.  Prior to the filing,

6    they had assisted the debtor liquidate between 700 and 800

7    stores.  And they were retained as part of the bankruptcy to

8    assist with the going-out-of-business store sale process

9    during the bankruptcy, and they also provided a bid to

10   liquidate the remaining stores if the company decided to go

11   down the route of a company-wide going-out-of-business sale.

12   Q    And in addition to Tiger, does the work of Abacus

13   inform your expert analysis?

14   A    I'm sorry?

15   Q    In addition to Tiger, does the work of Abacus inform

16   your expert analysis?

17   A    It does.

18   Q    How so?

19   A    Because it's another firm that specializes in valuing

20   and liquidating inventory, working with the debtors'

21   management to determine what the debtor would realize if the

22   debtor were to pursue a company-wide going-out-of-business

23   sale.

24   Q    And did Abacus put forth any values that you rely on in

25   your report?

Page 131

1    A    Yes, they did.

2    Q    And what were those?

3    A    Those values were in a range of approximately 90 to 93

4    percent, NOLV percentage.

5    Q    Those were NOLVs.

6    A    Yes.

7    Q    Okay.  Did your work evaluate data put forth by anyone

8    other than Tiger or Abacus?

9    A    Yes.

10   Q    How so?

11   A    The debtors' chief restructuring officer, Mr. Meghji,

12   had put together a winddown plan for the company in which he

13   had assumed a 90 percent NOLV.  The unsecured creditors'

14   committee had also put forward an analysis of a winddown, in

15   which they as well had assumed a 90 percent NOLV.

16   Q    And did you rely on statements by Sears' CFO, Mr.

17   Riecker in your analysis?

18   A    Yes.

19   Q    Can you describe that please?

20   A    Yes.  Mr. Riecker had a declaration in November of

21   2015, in which he stated that the net orderly liquidation

22   value of the inventory was 2.74 billion.

23   Q    And I think you just said November of 2015.  Is that

24   what you meant to say?

25   A    I meant -- no, I'm sorry -- November of 2018.

1    Q    Now, Ms. Murray, could you look at the very thin volume

2    that Mr. Genender asked you about, and specifically at the

3    first tab, the 507(b) diminution chart.  Now, do you recall

4    that when Mr. Genender asked you about the inventory value

5    row and the comparison of your inventory valued and Mr.

6    Griffith, you said that that was not apples-to-apples?

7    A    Yes.

8    Q    Okay.  I think later, you also said that comparison

9    would not be apples-to-apples when it came to the total

10   collateral row.  Do you recall that?

11   A    Yes.

12   Q    What did you mean when you said the comparison to

13   Griffith -- Mr. Griffith was not apples-to-apples?

14   A    My inventory valuation is after the costs to maintain

15   and preserve the value of the collateral; whereas, Mr.

16   Griffith's inventory valuation is before costs to preserve

17   and maintain the collateral.  And if you subtract what he is

18   saying are the necessary costs, which is the 1.451 billion,

19   you get a very low value for the inventory.

20            MR. LIUBICIC:  I'll pass the witness.

21            THE COURT:  Okay.

22                RECROSS-EXAMINATION OF MARTI MURRAY

23   BY MR. GENENDER:

24   Q    Ms. Murray, did you -- you didn't undertake to do any

25   sort of valuation of the 2L collateral as of the sale date,

Page 133

1    February 11th, 2019, correct?

2            MR. LIUBICIC:  Objection, Your Honor.  Beyond the

3    scope of the redirect.

4            THE COURT:  It is, I think.

5    Q    Did you perform any analysis of any assets sold pre- or

6    post-petition other than inventory?

7    A    No.

8    Q    Did you perform any analysis of the actual costs

9    incurred in these cases, the actual costs?

10   A    No.

11           MR. GENENDER:  Thank you, Your Honor.

12           THE COURT:  Ms. Murray, you testified about

13   relying in part on the Tiger appraisal.  And your

14   assumption, I think, was that the liquidation would take

15   place over -- was it 11 weeks?

16           MS. MURRAY:  Yes.

17           THE COURT:  And that is a sale period that Tiger

18   puts in its appraisal.  Are you aware that it also has a

19   six-month sale appraisal, a six-month liquidation analysis?

20           MS. MURRAY:  Can you direct me to it?

21           THE COURT:  It was on Page 10 of their report.

22           MS. MURRAY:  The Tiger appraisal?

23           THE COURT:  Yeah, of the Tiger report.

24           MS. MURRAY:  Yeah.  I'm familiar with that.  I

25   think what that is is if the sale is started in that month,

Page 134

1    what they expected the percentage recovery to be.

2                  THE COURT:  So this isn't -- I was trying to

3    figure out what this meant.  You read this to mean that it's

4    still an 11-week process?

5                  MS. MURRAY:  Correct.

6                  THE COURT:  But that the money would come in over

7    a period of six months?

8                  MS. MURRAY:  That if they --

9                  THE COURT:  I'm just trying to figure out what it

10   means.  You tell me what you think this is.

11                 MS. MURRAY:  So if you read the first paragraph

12   there, it says, "Based upon company provided monthly

13   inventory projections, blended net recovery values for GOB

14   retail inventory and wholesale inventory were forecast for

15   sales commencing at the beginning of each of the six months

16   from October 2018 through March 2019."

17                 So what I interpreted that to mean is if you

18   started the sales, the company-wide GOB in October 2018,

19   this is what you would get.

20                 THE COURT:  Over that six-month period.

21                 MS. MURRAY:  Over the -- no, over the 11-week,

22   over the period.

23                 THE COURT:  And then if you started it in

24   November/December, it'd be different each time.

25                 MS. MURRAY:  Correct.

1           THE COURT:  I see.  Okay, thanks.  Anything on

2    that?

3           MR. GENENDER:  Nothing further, Your Honor.

4           THE COURT:  Okay.  You can step down.  Okay.

5           MR. GENENDER:  Your Honor, does that conclude the

6    second lienholders evidentiary portion?

7           THE COURT:  Well, that's a good point.  Does it,

8    other than on rebuttal, I guess?

9           MR. MOLONEY:  Your Honor --

10           THE COURT:  You got to cross-examine obviously on

11    the 506 and 507.

12           MR. MOLONEY:  Correct.  We're going to cross-

13    examine on 506(c).  And I assume that all of the

14    designations are in evidence, that we all both designated

15    deposition testimony.

16           THE COURT:  I think that's what's agreed, right?

17           MR. MOLONEY:  Right.

18           THE COURT:  Except for the footnote that you

19    referred me to earlier.

20           MR. MOLONEY:  Then I think we've rested on this

21    section of the case.

22           THE COURT:  Okay.

23           MR. GENENDER:  Your Honor, if I may.  In light of

24    the fact that the second lienholders have rested, the

25    debtors will respectfully move on our 3012 motion under the

Page 136

1    grounds that the second lienholders have not met their

2    burden to establish, under 507(b), a diminution of value and

3    would submit that if you take into account under any of the

4    evidence they put forward -- the letters of credit, the

5    items included which shouldn't have been included, they

6    didn't do tracing, and the fact that one witness did an

7    analysis, the last witness did an analysis that's the wrong

8    analysis for when you have a going concern and the other

9    witnesses --

10            THE COURT:  Well, I get the point.  I'm not going

11   to -- I'm going to take a break though for lunch --

12            MR. GENENDER:  Fair enough.

13            THE COURT:  -- before I hear that --

14            MR. GENENDER:  Thank you.

15            THE COURT:  -- that motion.

16            MR. GENENDER:  I just want to make for the record.

17            THE COURT:  That's fine.

18            MR. GENENDER:  Thank you.

19            THE COURT:  While you're at lunch, I'd like the

20   parties to consider the effect, if anything, on the 507(b)

21   analysis of the carveout under the DIP order and cash

22   collateral order.  It appears on Page 61, Paragraph 21 of

23   the final order.

24            And there are also references to it in connection

25   with the 507(b) claim that's in subparagraph (d) that starts

Page 137

1    53 and carries over to Page 54, which says that such

2    adequate protection claims shall be junior to, among other

3    things, the carveout.  And the carveout until

4    (indiscernible) includes all the -- well, you can read it,

5    but it includes all the professional fees, with a limited

6    exception for success fees, although there's an exception to

7    that on Page 66.

8            No one's really addressed this in their papers,

9    and I'd like you to tell me how it affects the 506 -- I'm

10   sorry, the 507(b) analysis, since the 507(b) claim is

11   subject to those amounts.  And I think it probably also

12   affects the 506(c) analysis.

13           I'd also like you to address where in the record

14   there's anything as to the status of the winddown account.

15   And, obviously, there's a stipulation that was entered into

16   that is part of the record that puts the winddown account in

17   play for a certain period.  But I'm just curious as to how

18   that affects the analysis of the 507(b) claim since I don't

19   see a deduct for it anywhere for the carveout and, of

20   course, I don't know what that number is either.

21           THE COURT:  Okay.  So it's 1:30. Why don't we come

22   back at 2:30.

23           MR. MOLONEY:  Your Honor, we did address that last

24   question in the Schulte declaration.

25           THE COURT:  The winddown.

1           MR. MOLONEY:  The winddown.

2           THE COURT:  Yeah.  I just want to know where in

3    the record -- I want to make sure I'm clear in where the

4    record those numbers are.

5           MR. MOLONEY:  I have it in my handout, the next

6    handout.  I took it up because you said you weren't going to

7    talk about the cash collateral order.  I thought we weren't

8    going to get into it, but it is a deduct.

9           THE COURT:  When did I say that?

10          MR. MOLONEY:  We heard it with those.  The debtor

11   suggested that the cash collateral was not for today.

12          THE COURT:  No, no.  I'm talking about how it

13   relates to 507.

14          MR. MOLONEY:  Thank you, Judge.

15          THE COURT:  It may not relate at all.  But if

16   people are counting that.

17          MR. MOLONEY:  It does.  It does, Your Honor.

18          THE COURT:  Okay.  So I would not leave anything

19   valuable here, but you can leave everything else.

20       [RECESS]

21          THE COURT:  Okay.  We're back on the record in In

22   Re. Sears Holdings Corporation, et al.

23          MR. SCHROCK:  Good afternoon, Your Honor.  Ray

24   Schrock, Weil Gotshal, for the debtors.  Just very quickly,

25   at least we can give you our view as to the two questions

1   that you asked before we took a break.

2          THE COURT:  Okay.

3          MR. SCHROCK:  The first question was the effect,

4   if any, of the carveout on the DIP order on the 507(b)

5   analysis.

6          THE COURT:  Right.

7          MR. SCHROCK:  And, Your Honor, in being fair about

8   that, we do note, as Your Honor correctly noted, that under

9   the terms of the DIP order, all adequate protection

10  obligations are junior to the entire winddown account.  The

11  carveout that -- I'm sorry, the carveouts rather.  The

12  carveout funding to date is $213.4 million; that's something

13  that Mr. Griffith has personal knowledge of, and he could so

14  inform the court.

15         We think it affects the analysis is that when you

16  look at the assets available for 507(b), I think you just

17  take that number off of the top of what's available for

18  507(b) claim.  So, Your Honor, they could still argue for an

19  adequate protection, but those assets are simply not there

20  from the starting delta.  When you make those adjustments,

21  and then we, I think appropriately, would take out some of

22  the profession- -- you know, we had $51 million of

23  professional fees that were in our 506(c) analysis, and we

24  can have Mr. Griffith walk through some of this when he --

25  if the Court [AUDIO DISTORTION].

1           THE COURT:  (indiscernible) is here.

2           MR. SCHROCK:  I don't know how we do it with that

3     mic?  But it's pretty amazing.  So that must have said

4     something to have gotten some --

5           THE COURT:  Well, you're saying you take it off

6     the top.

7           MR. SCHROCK:  Yeah, you take it off the top.  I

8     think that's the fair way.  Those assets just aren't --

9     simply aren't available for purposes of the -- I'm not

10    saying that -- listen, they could still argue, right, for a

11    507(b) claim that is junior.  But I think those assets are -

12    - they're out of the equation when you look at what's the

13    starting point from which you start arguing for a 507(b)

14    claim.

15          On the winddown account itself, Judge, I -- those

16    assets under the terms of the DIP order were specifically,

17    you know, they're unencumbered collateral, they weren't

18    coming out, and they weren't available to the second liens.

19    Now, we did enter into a stipulation that noted, for any --

20    if there's -- you know, from April 15th through, you know, I

21    think it's August 1, if there's something that had to be

22    reallocated, that's a remedy that's available.

23          If Your Honor found a 507(b) claim, he could

24    certainly take it out of the account, but I don't see how it

25    would be really relevant to the 507(b) analysis, per se.

Page 141

1    But we will have Mr. Griffith available to --

2              THE COURT:  Is there anything in that account?

3              MR. SCHROCK:  Yes, there's roughly, I think it's

4    $53 million is in there, Your Honor.

5              THE COURT:  But obviously was nothing there on the

6    petition date.  It's all post-petition.

7              MR. SCHROCK:  Correct.  It's generated from asset

8    sales, unencumbered asset sales post-petition.  So that's

9    our view, at least the debtors' view on the questions you

10   asked.

11             THE COURT:  Okay.

12             MR. MOLONEY:  Your Honor, may not be a huge

13   surprise, but it was somewhat (indiscernible).  I just get

14   the documents in front of me and we can kind of walk through

15   the provisions together.  And looking at the DIP order, I

16   think the first paragraph Your Honor properly directed us to

17   look at was on Page 49 of the DIP order, Paragraph D.  And

18   you start with the liens, Your Honor, because I think this

19   exercise, why I wanted to move this to a motion under 3012,

20   rather than a 507(b) is because that's kind of like the cart

21   before the horse.

22             The first exercise is to find out, do we have a

23   claim after the sale order and after all those orders.

24   Second, if we do have a claim, was it fully secured or

25   partially secured as to the filing date.  And I think that's

Page 142

1    the second question you have to answer for yourself is find

2    out what are secured claims at the filing date; then you

3    have to look at the question of what's left to satisfy the

4    claim, which in part relates to your question about what

5    happens to a replacement lien on a winddown account.

6            And only if our adequate protection liens are

7    inadequate, do we get to 507(b), and we've shown the

8    diminution in property.  So I think, to my mind, that's the

9    logical way to attack this problem, and I think that's the

10   way to look at these two provisions.  And I think in a big

11   picture, there's a bargain that was done at the beginning of

12   this case.

13           The bargain was, we're going to get a junior DIP

14   in place, we're going to get a senior DIP in place, we're

15   going to create a separate winddown account.  And second

16   lien creditors, you're not -- you're going to come behind

17   all those things and you're going to come behind -- and

18   you're also going to come behind the carveout account in the

19   sense that you're not going to be able to invade that

20   account to satisfy your second lien obligations.

21           And the quid pro quo on day one of this case in

22   the order the Court entered was that we got, under Paragraph

23   D, an adequate protection lien, and that included for any

24   diminution in value as a result of this bargain, as a result

25   of the creation of these accounts.  And so since it's a

1   result -- and diminution value is a result of the creation

2   of the carveout account basically is something which

3   enhances our ability to have -- ultimately have a 507(b)

4   claim in this case.

5          So it's not a number that doesn't count.  The fact

6   that they put money into the winddown account means that

7   that was while we got -- rather, the carveout account,

8   that's why we got the adequate protection lien because the

9   property was not going to be our property; and, in fact, was

10  going to be our collateral.  Point of fact, that's what

11  happened was our collateral, in fact, that funded that

12  account, including as recently as last week when out of the

13  $6 million -- $8 million ESL turned over right before the

14  APA hearing, they put $6 million in the carveout account.

15  So we funded that account, and the quid pro quo for that was

16  to the extend that diminished our collateral position, we

17  got a lien that says.

18         Now, if we go to the second section, Paragraph 18,

19  dealing with the administrative claims and the two priority

20  claims of our -- of the second lien creditors, which is on

21  Page 53, Paragraph D.  What this says is that, look, you

22  have a super-priority claim, but that claim is not going to

23  trump what assets have been put into the carveout account.

24  So whatever claim you have, it should never limitation on

25  your recovery rights with respect to that claim.  You can't

Page 144

1    invade property that's properly in the carveout account.

2            THE COURT:  Well, the winddown account isn't

3    collateral anyway.

4            MR. MOLONEY:  We have, but for the stipulation we

5    entered into at the beginning of the case part of the grand

6    bargain, which gave us these adequate protection rights, was

7    that the winddown account was going to be sacrosanct and

8    we'd have no right to invade it whatsoever.  For super-

9    priority claims, (indiscernible) -- I don't know if you just

10   gave us a right we don't have under the agreements.  We

11   don't have a 507(b) claim against the winddown account.

12           The only claim we have against the winddown

13   account is a replacement lien, based on the stipulation Your

14   Honor entered; otherwise, we have no other claim.  That was

15   part of why that money was set aside because the source

16   through that --

17           THE COURT:  I think you actually agree with the

18   debtors on that point.

19           MR. MOLONEY:  Yeah.  Because the source through

20   that account, remember, was supposed to be from the sale of

21   unencumbered assets.

22           THE COURT:  Right.

23           MR. MOLONEY:  And we were not -- and normally, in

24   a -- there's nothing particularly normal about this case.

25   With all due respect, I'm coming in late to the normal, you

Page 145

1    know, from your run of the mill DIP financing, all of the

2    assets that were unsecured before suddenly become available

3    for the DIP lenders (indiscernible) as a secured claim or a

4    507(b) claim.  We carved out a $250 million tranche and said

5    we don't have that.

6           But, Your Honor, I think the quid pro quo for that

7    is that we got these 507(b) rights and we got these adequate

8    protection rights.  And, you know, I think what they're

9    doing -- and this was -- I was going to save this for my

10   argument, Your Honor, but what they're doing is that they're

11   kind of reneging on the deal.

12          Fundamentally, this motion is a renege, a renege

13   on a bargain because they're saying that even though we've

14   got this right because of our putting money in the carveout

15   account, we now want to charge you again for the money we

16   put in the carveout account to reduce your claim, and that

17   doesn't make any sense.

18          It's also their argument that even though you got

19   this money specifically because you were going to put in --

20   we're putting prior debt ahead of you and we're going to use

21   your collateral to pay the interest on that debt, that's why

22   we got these rights.  Now, we're going to make you pay that

23   again.  I mean, that effectively --

24          CLERK:  The microphone.

25          MR. MOLONEY:  Sorry.  That meant effectively they

Page 146

1    gave us nothing; effectively.  This order was worthless from

2    the outset because the rights that they were giving to us,

3    they said effectively we can take back.

4         THE COURT:  Well, except there was an agreement to

5    have the carveout be senior.

6         MR. MOLONEY:  We're not quarreling on that.  But

7    what they're saying now is they want to reallocate the

8    expenses that have been paid.

9         THE COURT:  No, I understand that point.  I'm just

10   focusing on the --

11        MR. MOLONEY:  I agree with Your Honor; we have no

12   problem with that.  But this reallocation is a renege in

13   terms of the basic agreement because --

14        THE COURT:  What reallocation are you talking

15   about; the 506(c)?

16        MR. MOLONEY:  The 506(c) chart.

17        THE COURT:  No, I'm just focusing on the --

18        MR. MOLONEY:  Okay.

19        THE COURT:  -- on the carveout.

20        MR. MOLONEY:  Right.  And then, Your Honor, if I

21   can answer the second question.  I have a handout -- if I

22   can approach the bench -- on the winddown -- on what happens

23   with your replacement lien.  It's the impact for that on our

24   507(b) claims, and the source from the Schulte report.  Your

25   Honor, may I approach the bench?

Page 147

```
 1              THE COURT:  Sure.

 2              MR. SCHROCK:  We had a handout too, Judge, but I

 3   decided (indiscernible).

 4              THE COURT:  Thanks.

 5              MR. MOLONEY:  This is just saying that -- I know

 6   you have a lot of pieces of paper we dumped on you, and I'm

 7   sorry, Your Honor.  But this is from the Schulte

 8   Declaration, which was when you asked for the declaration

 9   (indiscernible) report, it was a little bit different

10   because it dealt exclusively with the subject.

11              And just to tell you what this tells you, is that

12   the first column, 4/27 to 7/20, 2019; that brings us to

13   today.  And it just tells you that this is the cash, which

14   is our cash collateral as replacement liens, that they have

15   spent in the time we filed our motion saying stop, and they

16   mull over how --

17              THE COURT:  Right.  Didn't this all -- this goes

18   to the winddown issue.

19              MR. MOLONEY:  Exactly.  And so, that gets us as of

20   today a $39 million claim, which we would claim if Your

21   Honor finds that we were -- that we have a diminution of our

22   -- if finds, depending on what amount Your Honor finds to be

23   our secure claim at the beginning, this $39 million will be

24   a deduct from that claim before we ever go to 507(b).

25   Because that would -- because we have our adequate
```

Page 148

1    protection liens still are in place, and those adequate

2    protection liens still have a prior claim on the asset under

3    the stipulation.

4              Our adequate protection liens also have a prior

5    claim on the $71 million that the debtor is projecting to

6    come in from here on in, which is the second column.

7              THE COURT:  Okay.

8              MR. MOLONEY:  And that's ahead in the day.  I just

9    wanted you to claim that -- I think that's the way --

10             THE COURT:  And there may be a factual -- I don't

11   know if there's a factual about these numbers as opposed to

12   how, where there isn't a factual dispute is how the parties

13   are looking at the winddown account.

14             MR. SCHROCK:  Yes, Judge.  I mean, our point was

15   simply that the money -- no one dispute the money in the

16   carveout account is not -- is senior; and, therefore, we

17   thought that the appropriate way to deal with it was just to

18   take it out from the starting point for the 507(b) claim.

19   They don't have a claim to it.  That doesn't meant that they

20   still don't -- they still can't argue for a diminution in

21   value claim, but I think the starting point, it's not assets

22   from which they could --

23             THE COURT:  Recover.

24             MR. SCHROCK:  -- recover.

25             THE COURT:  So you, you -- okay.  You don't

Page 149

1    contend then that this is part and parcel of the adequate

2    protection bargain; in other words, that they gave up on

3    recovering on this.

4            MR. SCHROCK:  I don't contend that they don't have

5    an adequate protection claim at all for a bite or two at the

6    -- you know, a bite or two of the carveout account.  I just

7    think that it's appropriate that the assets from which they

8    can recover don't include the -- don't include those funds.

9    They haven't put any proof in as to whether or not that was

10   even their collateral, of course.

11           THE COURT:  Okay.

12           MR. MOLONEY:  Your Honor, can I just make one

13   footnote, just a footnote observation, in essence, for a

14   future date, but I want to make sure I didn't waive this; is

15   that when I said that we don't have any claim to the money

16   in the carveout account.  That's two caveats: one, the money

17   is properly put in the carveout account, and if Your Honor

18   finds this money was improperly put into the carveout

19   account that's obviously -- I mean, we reserve on; and

20   second is it's only for allowed claims, by definition, the

21   carveout account only allows.

22           THE COURT:  Sure, of course.  That's right.

23           MR. MOLONEY:  Thank you, Your Honor.

24           THE COURT:  All right.  And to the extent provided

25   for in the carveout provisions.

Page 150

1          MR. MOLONEY:  Right.  Yes, Your Honor.

2          MR. SCHROCK:  And, Your Honor, I mean, just -- I'm

3    not sure if I'm making the point, you know, articulately.

4    We do have a -- we have a chart that kind of -- we really

5    view that carveout account; effectively, it makes it senior

6    debt, you know, and puts it, you know, appropriately in that

7    category.  There's another, you know, $213.4 million of

8    senior debt that it's effectively gotten, you know, ahead of

9    the second lien.

10         THE COURT:  Well, that was my -- that's really my

11   ultimate question, which is the briefing and the

12   demonstrative of the 507(b) diminution calculations.  When

13   it refers to senior debt; it doesn't refer to that.  It

14   refers to the bank debt.

15         MR. MOLONEY:  That's not senior debt, Your Honor.

16   If that, that clearly under the agreement, that's clearly

17   not senior debt.  It's senior only in the sense that by us

18   permitting it to be senior, we're given a right -- so

19   basically, to be reimbursed under our adequate protection

20   liens and under our 507(b) for money put into that account.

21   So it's senior -- our agreement --

22         MR. SCHROCK:  So you're saying it was their

23   collateral claim.

24         MR. MOLONEY:  Yes.  It's not (indiscernible).  The

25   language cannot be clearer in the agreement, Your Honor,

Page 151

1    when it says that because of any loss -- any loss of value

2    because of money put into the winddown account will go back

3    -- I can go back and look at it again under 50- -- but it --

4              THE COURT:  I'm not focusing on the winddown.  I'm

5    focusing on the carveout.

6              MR. MOLONEY:  Rather, on the carveout account.

7    Let me just stay with it for a second.  On the carveout

8    account, getting back to originally, because he did not

9    argue his first time up that it was senior debt put up in

10   the carveout account.  But it says, for adequate protection

11   liens -- and this is Page 51 -- now where is it -- 49, Page

12   49.  Page 49 says --

13             THE COURT:  You'd have a lien against aggregate

14   net diminution in value of your collateral.

15             MR. MOLONEY:  Right, resulting from any

16   diminution, and diminution includes as a result of the

17   priming by the second lien facilities and the subordination

18   to the carveout.  So that -- I think that's clear that to

19   the extent that we become diminished as a result of the

20   carveout and our new collateral is not adequate, that's our

21   claim today.

22             MR. FOX:  And, Your Honor, with respect to --

23   Edward Fox.  With respect to the first lien point.  I don't

24   have my finger on the section, but the first lien provided

25   that to the extent that the carveout was funded, the first

Page 152

1   lien amount was diminished by that same amount, so that they

2   weren't lending more than the total amount by virtue of the

3   addition of the carveout funds.  So there's not some

4   additional amount that was funding the carveout that was

5   added onto the first lien debt that somehow pushed us deeper

6   into subordination, you know, subordinate us more deeply.

7              But to Mr. Moloney's point is right.  Although we

8   may not be able to invade the professional fee carveout

9   account itself, the order clearly provides that we're

10  entitled to adequate protection, both a lien and a super-

11  priority claim, to the extent that we are subordinated to

12  the carveout.  So the extent that they take money off the

13  top, put it in the carveout account, we should get a dollar-

14  for-dollar adequate protection lien or super-priority claim

15  if they don't have funds available.

16             THE COURT:  If it's there.

17             MR. FOX:  I'm sorry?

18             THE COURT:  If it's there.

19             MR. FOX:  Well, we can't --

20             MAN 1:  If it's there that (indiscernible)

21  collateral.

22             MR. FOX:  We can't get a lien if it's not there --

23             THE COURT:  Right.

24             MR. FOX:  -- or if there's no funds available.  We

25  can certainly get a super-priority claim, which will have to

Page 153

1    be dealt with in some way, shape or form.

2              THE COURT:  Okay.

3              MR. FOX:  And we have -- one of the joint exhibits

4    has the very recent status of the cash flow and has at least

5    some of the current numbers.  What's that joint exhibit

6    number?

7              THE COURT:  But then again goes to the stipulation

8    and the like.

9              MR. FOX:  No -- well, it goes to the total number.

10   If you're interested in seeing what the finances look like--

11             THE COURT:  Fine.

12             MR. FOX:  -- that's the most recent.

13             THE COURT:  Okay.  All right.

14             MR. FOX:  Judge, just --

15             THE COURT:  All right, that's fine.  I just wanted

16   to make sure we were on the same page.  And, despite a brief

17   detour about two minutes ago, I think we are.

18             MR. GENENDER:  Okay, fair enough.  Are you ready

19   for us to proceed with our case, Your Honor?

20             THE COURT:  Well, you had a motion pending.

21             MR. GENENDER:  We did.

22             THE COURT:  I thought about it over lunch, and I'm

23   going to hear from Mr. Griffith anyway on 506(c).  I think I

24   ought to hear him on both issues.  And then I'll rule after

25   hearing oral argument, as opposed to just ruling on the 507

1    case by the 2L creditors.

2              MR. GENENDER:  Understood.  Your Honor, with that,

3    we can call -- we're going to call Brendan Aebersold.  We've

4    been told that the other side does not have cross-

5    examination of him, but we'll call him now and allow you to-

6    -

7              THE COURT:  Okay.

8              MR. GENENDER:  -- take his evidence.

9              THE COURT:  That's fine.

10             MR. GENENDER:  Your Honor, I have a copy of his

11   declarations for you.

12             THE COURT:  Okay, that's fine.  Yeah, that would

13   help.  Would you raise your right hand, pleas?  Do you swear

14   or affirm to tell the truth, the whole truth, and nothing

15   but the truth, so help you God?

16        [WITNESS BRANDON AEBERSOLD SWORN IN]

17             MR. AEBERSOLD:  I do.

18             THE COURT:  And could you spell your last name,

19   please, for the record.

20             MR. AEBERSOLD:  A-E-B-E-R-S-O-L-D.

21             THE COURT:  Okay.  And, Mr. Aebersold, you

22   submitted three declarations in this case -- with respect to

23   these contested matters.  One dated October 15th, 2018 on a

24   petition date, and then that's really more, I believe, just

25   standing on its own.  But the two that I'm going to ask you

Page 155

1   about are one dated February 1, 2019 and one dated January

2   27, 2019.  It's the 27 one that would be his direct

3   testimony, right?

4          MR. GENENDER:  That's correct, Your Honor.

5          THE COURT:  Okay.

6          MR. GENENDER:  It references the other one.

7          THE COURT:  All right.  The other two are

8   incorporated in it.  So sitting there today, knowing that

9   the June 27th declaration would be your direct testimony, is

10  there anything you'd like to change in it?

11         MR. AEBERSOLD:  No, Your Honor.

12         THE COURT:  Okay, all right.  And no cross-

13  examination; is that correct?  Okay.  So you can step down

14  now.

15         MR. AEBERSOLD:  Thank you, Your Honor.

16         MR. GENENDER:  And then next, Your Honor, the

17  debtors would call Brian Griffith.

18         THE COURT:  Okay.

19         MR. GENENDER:  May I approach, Your Honor?

20         THE COURT:  Sure.  Okay.  Would you raise your

21  right hand, please?

22         MR. GRIFFITH:  Yes.

23         THE COURT:  Do you swear or affirm to tell the

24  truth, the whole truth, and nothing but the truth, so help

25  you God?

Page 156

```
 1              MR. GRIFFITH:  I do.

 2         [WITNESS BRIAN GRIFFITH SWORN IN]

 3              THE COURT:  And it's G-R-I-F-F-I-T-H?

 4              MR. GRIFFITH:  That's correct, yes.

 5              THE COURT:  So, Mr. Griffith, you submitted three

 6    declarations in connection with these contested matters: one

 7    dated May 26th, 2019, one dated June 27th, 2019, and one

 8    dated July 18, 2019 that, subject to my earlier ruling at

 9    the start of this hearing, would constitute your direct

10    testimony in this set of contested matters.  Sitting here

11    today, is there anything you'd like to change in them?

12              MR. GRIFFITH:  No, Your Honor.

13              THE COURT:  Okay.  All right.  So you can go ahead

14    with cross.

15              MR. MOLONEY:  Your Honor, may we approach the

16    bench with a cross-examination binder for the witness as

17    well?

18              THE COURT:  Yeah, that's fine.

19                 CROSS-EXAMINATION OF BRIAN GRIFFITH

20    BY MR. MOLONEY:

21    Q    Good afternoon, Mr. Griffith.  Are you ready?

22    A    I am.

23    Q    Okay, good.  And you're testifying today as a fact

24    witness and not as an expert, correct?

25    A    That's correct.
```

Page 157

1    Q    And you did not submit an expert report, correct?

2    A    I have not.

3    Q    And were you aware that there was an agreement among

4    the parties to provide any document relied upon by the

5    expert in his report for his or her conclusion one business

6    date following delivery of the expert report?

7    A    I wasn't aware of that, but I'm not an expert witness.

8    I'm a fact witness.

9    Q    Would you look at the -- at Exhibit 2 in your binder?

10   And if you look at that email, I take it that you were not

11   aware of this agreement, that the parties agreed to exchange

12   backup material for expert reports one day after reports

13   were filed, correct?

14           MR. GENENDER:  Your Honor, I'm going to object.

15   This is an (indiscernible).

16           THE COURT:  Well, he can -- are you aware of it?

17           MR. GRIFFITH:  I'm not aware of it.

18           THE COURT:  Okay.

19   Q    And you didn't deliver any documents to the second lien

20   parties that were backed up to your declaration one day

21   after you filed -- one day after they were filed before your

22   deposition, correct?

23   A    I'm not sure I follow the question.

24   Q    Your second declaration was filed a few days before

25   your deposition, correct?

Page 158

```
1    A    That sounds correct, yes.

2    Q    And you did not deliver any documents to the second

3    lien party one day following your declaration as backup for

4    the information in your declaration, either your first or

5    second declaration, correct?

6    A    I believe we produced the documents.  I don't --

7    Q    Did you deliver any documents that were backup?  Did

8    you deliver Exhibit I -- or excuse me -- G to your current

9    report one day after your --

10             THE COURT:  Well, it's not a report.

11   Q    -- current declaration.  Did you deliver G or I to us

12   one day after your declaration?

13             MR. GENENDER:  Your Honor, I'm going to object.

14             THE COURT:  Well, are you contending, Mr. Moloney,

15   that somehow there's a breach of this agreement dealing with

16   expert reports?

17             MR. MOLONEY:  I think Your Honor has expressed the

18   view that there's no difference between him being a fact

19   witness and an expert.  But I actually think --

20             THE COURT:  No, no.  I said he's not an expert.

21   He's not testifying as an expert.

22             MR. MOLONEY:  Correct.  Okay, so then those

23   documents, if they come in at all, are going to be only

24   summary exhibits, which we had to be given reasonable data

25   in advance under reasonable circumstances.  And I believe,
```

Page 159

1    as we continue this examination, I may have a basis to

2    object to those documents to summary exhibits.

3              MR. GENENDER:  May I respond briefly?

4              MR. MOLONEY:  Well, I haven't made the motion yet,

5    Your Honor.  I'm just telling you why I'm asking these

6    questions.

7              THE COURT:  Okay.

8              MR. GENENDER:  Your Honor, Mr. Griffith's second

9    declaration was on June 27th.  His deposition was actually

10   on July 10th.  Those are matters of fact.

11             THE COURT:  Okay.

12             MR. GENENDER:  His most recent declaration was

13   last Thursday, the deadline agreed to for direct testimony.

14   Everything -- which is when his second supplemental

15   declaration was presented, all of that backup -- all of the

16   backup associated with it was produced contemporaneously

17   with it, including all the backup.  I'm just representing

18   that to the Court because that's --

19             THE COURT:  Well, is the backup part of the agreed

20   exhibits?

21             MR. GENENDER:  The backup --

22             THE COURT:  Except for the two ESL presentations?

23             MR. GENENDER:  The backup -- certain of the backup

24   is not on the exhibit list; they're exhibits to the second

25   declaration, just because they're raw data.

Page 160

```
 1              THE COURT:  Okay.

 2              MR. GENENDER:  Thank you.

 3              MR. MOLONEY:  I'll come back to those exhibits

 4     later, Your Honor.  I'm going to go somewhere else.

 5     Q    In both your first and second declarations, you used

 6     the same starting book value for inventory, as my expert

 7     David Schulte did in his report, correct?

 8     A    I believe in the first.  I don't believe that's correct

 9     in the second.

10     Q    Well, let's take a look at the second declaration.  Do

11     you have it in front of you?

12     A    I do.

13     Q    And in your second declaration -- in your supplemental

14     declaration, right, it's your second declaration, right?  In

15     your second, you have a chart, and that chart is on Page 6

16     of your second supplemental declaration, correct?

17     A    Yes.

18     Q    And the $2.76 billion number, which you say total gross

19     collateral.  What do you have as -- what component of that

20     is inventory?

21     A    I don't think that was the number on the page.

22     Q    Okay.  But I'm asking you, what component of it is

23     inventory?

24     A    Of the 2.746?

25     Q    Yes.
```

Page 161

1    A    I believe it's the 2 billion 690.8.

2    Q    And that's the same number that Mr. Schulte used,

3    right?

4    A    I would need a copy of his declaration.

5    Q    Okay.

6    A    But from whatever I'm looking at here, it's not.

7    Q    You have it in front of you in your book.  If you go to

8    Exhibit No. 3 and you look at page -- it's a report that's

9    an exhibit to that, and you look to the Page 7 of that

10   report, you'll see in the chart at the top, it shows 2.691;

11   that's the same number you used, right?

12   A    That's right.

13   Q    And that's the same number you applied your 85 percent

14   number against, right?

15   A    That's correct.

16   Q    So if he used the same number as you used, what is the

17   basis for your criticizing his choice of a number?

18   A    Well, he's using full book value.

19   Q    I understand.

20   A    Not the fair market value.

21   Q    I understand you disagree with the 85 percent versus

22   100 percent discount.  Putting that aside, for the starting

23   number, he's using the same number as you.  So why do you

24   criticize him for that choice?

25   A    I think I criticize him for the value, not the starting

1   point.

2   Q    Okay.  To the extent your clients -- you were here when

3   Mr. Genender said there should be a $300 million adjustment

4   in Mr. Schulte's analysis based on his starting number.  You

5   don't agree with that, right?

6            MR. FOX:  Misstates the evidence.

7   Q    I thought he said -- I thought the -- but the amount of

8   ineligible collateral under the borrowing base is $300

9   million, right, Mr. Griffith?

10  A    It's approximately.

11  Q    And the $300 million deduct that was in -- you can take

12  look at this slender volume again or I can hand it up --

13  that the $300 million deduct that they -- that was

14  complained about from Mr. Schulte was because he didn't use

15  the same number in the borrowing base, right?

16  A    It's because he's using the full book value.

17  Q    Okay.  So in any event, you have no problem with him

18  starting with his number and not starting with the borrowing

19  base number; is that right?

20           MR. GENENDER:  Objection, misstates the evidence.

21  The number is from the borrowing base, his totals ledger

22  number.

23           MR. MOLONEY:  Let me rephrase, Your Honor.

24  Q    You have no problem when Mr. Schulte started with

25  2.691, rather than a lesser number for his starting

Page 163

1    analysis, putting aside what he used by way of a discount,

2    correct?

3    A    That's correct.

4    Q    Okay.  Now -- so the only real quarrel with Mr.

5    Schulte's valuation of the inventory is that he used his

6    number, rather than 85 percent, correct?

7    A    That's correct.

8    Q    And the only reason why you used 85 percent was based

9    primarily on your interpretation of the APA and,

10   secondarily, on what you implied from the negotiations prior

11   to that, correct?

12   A    It's what I learned from the negotiations, as I took

13   part in those and had the documentation from -- and

14   ultimately, the numbers wound up in the APA.

15   Q    So other than the APA and the negotiations, you have no

16   view whatsoever as to what the correct value of the

17   inventory was at the petition date, right?

18   A    We're using 85 percent as the proxy based on that --

19   what was realized in a sale between a willing buyer and

20   willing seller.

21            MR. FOX:  Your Honor --

22   Q    But assuming that --

23            MR. FOX:  I'm going to object to that, because if

24   he's here as a fact witness, (indiscernible) judgments about

25   what the value should be on the petition date, and a fact

Page 164

1   witness isn't qualified to do that.  If he has to testify as

2   to what the property sold for in February, so be it if he

3   has personal knowledge.

4           THE COURT:  I thought that's what he did.  He said

5   this was a proxy for --

6           MR. FOX:  But that's where he has to stop, because

7   he doesn't get involved with.

8           THE COURT:  But that's when you objected.

9           MR. FOX:  Well, that's right.

10          THE COURT:  I think the question was going to go

11  in a different direction.

12          MR. MOLONEY:  I would like to go in a different

13  direction, Your Honor.

14          THE COURT:  I don't think -- there's nothing you

15  can object to at this point.

16          MR. FOX:  I agree, Your Honor.

17  Q    I just want to -- I want to just be clear that if the

18  Court were to agree with us that you're not allowed to rely

19  on your interpretation of the APA and you're not allowed to

20  rely on what you think the negotiation show as a value, you

21  have no other basis for your 85 percent number, correct?

22  A    That is the basis for my 85 percent, so that would be

23  yes.

24          MR. MOLONEY:  Okay, Your Honor.  At this point,

25  Your Honor, I would renew my motion to exclude those two

Page 165

1    exhibits and to preclude testimony on the subject.  I'm

2    prepared to walk Your Honor through the APA.

3              THE COURT:  Is there anything based on your

4    interpretation -- leave aside the negotiations that led up

5    to it, just focusing on the actual language of the APA.  Is

6    there anything in that interpretation that the debtors'

7    counsel can't tell me?

8              MR. GENENDER:  I think they understand the

9    agreement the same way as I do.

10             THE COURT:  All right.  So I'll sustain the --

11             MR. MOLONEY:  Thank you, Your Honor.

12             THE COURT:  -- the objection to the declaration.

13             MR. MOLONEY:  Okay.  And both of those exhibits,

14   Your Honor.  I would move to exclude them.

15             THE COURT:  Well, that's a separate issue because

16   I haven't decided yet whether it's plainly clear.

17             MR. GENENDER:  Judge, the objection, just so I'm

18   clear, was sustained as to any testimony about --

19             THE COURT:  The meeting of the APA.

20             MR. GENENDER:  Understood.

21             THE COURT:  Right.

22             MR. GENENDER:  Yes.

23             THE COURT:  But I don't know yet.  I mean, I

24   haven't heard the parties as to whether it's ambiguous or

25   not.

 1             MR. MOLONEY:  I know.  And, Your Honor, I will

 2     cross-examine him on his understanding if I thought that

 3     those exhibits were coming in.  But if they're excluded, I

 4     will not go into it.  So that's why I thought that was a

 5     threshold issue, with all due respect, Your Honor.  So I'm

 6     prepared to argue that motion now.

 7             THE COURT:  About the plain meeting of the ADA --

 8             MR. MOLONEY:  Yes, Your Honor.

 9             THE COURT:  -- APA, excuse me.  Well, I think we

10     should probably do that.

11             MR. MOLONEY:  Okay.  Thank you, Your Honor.

12             MR. GENENDER:  Judge, can I address this?  This is

13     not parol evidence issue.  This is a context of his

14     understanding of the valuation, number one, and that's the

15     context -- these are admissible documents; they're party

16     admissions.  Number two, they go to facts upon which he made

17     computations.  They can cross-examine him on that.  They're

18     their own representations, number one.  And two, and I'm

19     happy to let the ECC speak to this, Your Honor.

20             We had oral arguments as well, and they certainly

21     go to equitable issues, certainly as to estoppel as to this

22     -- as to Mr. Moloney's own client now taking contrary

23     positions in this hearing than were taken in its

24     presentations leading up to the APA.  This is not a parol

25     evidence to determine the meaning of the APA because we're

Page 167

1    not trying to determine the meaning of it.  Mr. Griffith has

2    offered testimony, factual testimony, as to the value, fair

3    market value of the assets in February of 2019.  It's not a

4    parol evidence issue; it's not an ambiguity.

5              THE COURT:  Okay.

6              MR. MOLONEY:  I think that's an argument, Your

7    Honor.  And I can respond to it after I make my argument, or

8    I can make my argument.

9              THE COURT:  Well, he did interrupt you, but you

10   should make your argument.

11             MR. MOLONEY:  Okay.  Let me make my argument first

12   if it means that it answers -- responds to his argument.

13   Your Honor, can I get indulged to look at the PowerPoint I

14   gave you this morning.

15             THE COURT:  I have it.

16             MR. MOLONEY:  Okay, thank you.  And this is -- it

17   has two key definitions up front.  One is required assets,

18   which has the meaning set forth in Section 2.1; and second

19   is purchase price, which has the meaning set forth in

20   Section 3.1.  And then if you turn the page, you see the

21   definition of purchase price in Section 3.1.

22             We highlighted, I think, the language you really

23   need to focus on, which is that it's an aggregate purchase

24   price for purchase and sale of everything and shall consist

25   of the following, and that's collectively the purchase

Page 168

1   price.  There are then nine levels of consideration.  And

2   so, you have an aggregate purchase price; you don't have a

3   broken out purchase price for one aggregate purchase price

4   for all of the assets.

5            Now, we go to 2.1 to see what did we get for

6   aggregate purchase price.  In 2.1, we get the purchase and

7   sale of the acquired assets, which are defined, if you go to

8   2.1, as collectively the acquired assets.  And we have 29

9   categories of acquired assets; inventory is not even a

10  separate category.  The separate category is that includes

11  in inventory of one of the 29 categories is all acquired

12  inventory, all acquired receivables, all acquired equipment,

13  and all acquired improvements.

14           So we did not spend 85 cents to buy the inventory.

15  It couldn't be clearer.  But let's look at the one section

16  they would like you to rely on, which is Section 10.9.  It's

17  the only section they've ever referred to.  And looking at

18  that section, which we also have here at Page 11, and it

19  says, basically, it's just -- it's not a purchase price,

20  it's not an allocation of value.  It says that there's a

21  minimum amount of assets that have to be delivered.  The

22  assets include three categories of documents -- of assets:

23  inventory, credit card receivables and pharmacy receivables,

24  which include pharmacy script.  Those are the categories of

25  assets that have to be delivered in an aggregate amount.

1              And to the extent this is any relevance, and I

2       think that it's very little relevance, this provision, to

3       anything, but if it has any relevance, to the extent that

4       they over delivered, they have more assets on hand.  Let's

5       say they have extra pharmacy script on hand.  Do they deduct

6       it at 85 percent level?  No.  They deduct it at book value.

7       They deduct the receivables at book level.  They deduct the

8       inventory at book value.  They deduct the pharmacy

9       receivables at a price of $10 per receivable.  That's the

10      way this provision works.

11             So, there's nothing in this provision that, from

12      which you can imply a value of inventory, and then get to

13      the entire agreement provision.  This agreement says you

14      can't recreate how the sausage was made, in plain Brooklyn

15      language.  Basically, it says that this is the entire

16      agreement, it supersedes all prior communications.  And

17      that, on to of New York's pro-evidence rule, means that he

18      testimony they want to give, or the exhibits they want to

19      rely on, are not permissible for purposes of enforcing or

20      interpreting this agreement.  To make it clear, Your Honor -

21      -

22             THE COURT:  They're not enforcing or interpreting

23      the agreement though, so I think they concede that point.

24      It wasn't entirely clear in the briefing leading up to this.

25             MR. MOLONEY:  But they are interpreting the

Page 170

1   agreement.  If they're not interpreting the agreement, how

2   are they getting it 85 percent price?

3            THE COURT:  This is not a matter of contract, in

4   other words.  They're not relying on the party's contract.

5   They're relying on their party's discussions about value.

6            MR. MOLONEY:  Your Honor, that's what I

7   (indiscernible).  The legal point was, I thought their point

8   was -- but maybe I missed their point completely -- was that

9   if you sold an asset for $X, that was a fair value.  That

10  implies that was the sales price.

11           THE COURT:  I agree with you that that was a point

12  that you could certainly read their briefing to state.  But

13  I think what they're stating is something different than

14  that, because I agree with you and I think they agree with

15  you, that the agreement itself does not allocate a purchase

16  price.  But there's a separate point that I think you need

17  to address, which is that it -- I believe it's relevant

18  evidence if in discussions, the parties put a value -- not

19  for purposes of the agreement, not for purposes of enforcing

20  the agreement in a particular way -- but just put a value on

21  these assets, this collateral.

22           Now, for example, the Debtor has, as the three --

23  at least two of the experts -- relied on, provided, in

24  various contexts in this case, either directly through Mr.

25  Meghji, or through its agents, valuation analyses --

Page 171

1    evidence of -- fact evidence of value.  I think what Mr.

2    Griffith wants to get to, and the Debtors want to get to, is

3    similar evidence.  Not evidence interpreting the APA, so

4    that the APA could be enforced against your client, but just

5    evidence that at some point during this process, maybe

6    fairly early in the process, when people were thinking about

7    the value of the collateral -- I mean, this is -- I haven't

8    heard it yet, so don't know -- you know, here may be all

9    sorts of ways to cross-examine him on that.  Will -- the

10   collateral or just pieces of the collateral, for example,

11   that ESL, like the Debtors, discussed the value of the

12   inventory.

13           MR. MOLONEY:  Let me continue going through this,

14   just for a moment, Your Honor, and I'll come back to it.

15   The bid letter, which we gave, our formal bid letter, which

16   is attached here, also allocates all of the consideration,

17   al the value.  That as the December 28 bid letter.  The

18   January 9 bid letter --

19           THE COURT:  That's great for cross-examination.

20   You can ask him that.

21           MR. MOLONEY:  And the global bidding procedures

22   order provided for (indiscernible) allocations, and you had

23   a hearing where they waived and there (indiscernible).

24           THE COURT:  This is not to enforce or interpret

25   the APA.

Page 172

1          MR. MOLONEY:  Then I don't understand -- this is a

2    road to nowhere, Your Honor, because --

3          THE COURT:  Not necessarily.  If Mr. Griffith is

4    going to testify that ESL's representative said in a

5    meeting, "I totally agree this is the way we need to value

6    the inventory," it's relevant and admissible, I think.

7          MR. MOLONEY:  It would be hearsay.  It could be an

8    admission but --

9          THE COURT:  But it would be an exception, yeah.

10          MR. MOLONEY:  But that's not anything he'd put in

11    any declaration so far.

12          THE COURT:  The exhibit, actually --

13          MR. MOLONEY:  The true exhibits do not purport to

14    be our opinion as to the value of the inventory.

15          THE COURT:  Well, I don't know.  I don't know.  I

16    think you can cross-examine him on that.  I don't think it's

17    -- put it differently:  I don't think he would exclude it

18    without him trying to say what it is.

19          MR. MOLONEY:  If the only relevant fact is, for

20    their argument, is that for fair value accounting, you look

21    at what an asset was sold at, if that's the reason why we're

22    getting the evidence --

23          THE COURT:  But that's not the reason.

24          MR. MOLONEY:  If they're saying that this --

25          THE COURT:  I'm excluding it on that basis because

Page 173

1    the purchase price doesn't say that.  The purchase agreement

2    doesn't that.

3              MR. MOLONEY:  Okay.  If it's excluded for that

4    purpose, Your Honor, then I have no problem trying to

5    understand -- though I must say I don't understand what

6    purpose it could have as an analytical matter.  But I'll

7    continue my examination.

8              MR. SCHROCK:  Can I just respond, Your Honor,

9    please, for the record.

10             THE COURT:  Okay.

11             MR. SCHROCK:  So, again, Ray Schrock for the

12   Debtors.  We looked at this and we said that Mr. Griffith,

13   when he's looking at what facts, you know, determine value,

14   there's the APA, there's the presentations that ESL gave,

15   there's discussions in which Mr. Griffith participated.  I

16   think that all those things are relevant facts for purposes

17   of determining how the Debtors assessed the value of the

18   second lien collateral, and also what was actually paid for.

19   And I would also note that as to the actual APA, we concede,

20   the Court, it does not have an allocation.  As we've said on

21   the record there's nothing there.

22             As to whether or not, given there is no

23   allocation, this would be relevant evidence.  We've had an

24   APA enforcement hearing where other parties have said,

25   listen, and in fact, ESL said we need other evidence to

Page 174

1   actually interpret what people meant by these purchases.

2   And we're not here to concede the point that, you know, you

3   shouldn't hear some of that evidence, actually, for what the

4   actual purchase price was paid under the terms of the

5   documents.

6           MR. MOLONEY:  That was not an argument

7   (indiscernible), Your Honor.

8           THE COURT:  The APA doesn't allocate this purchase

9   price.  This is not a -- it would not be proper for me to

10  take parole evidence to interpret the APA.  I don't think

11  the APA is ambiguous on this issue as to how the APA treats

12  the purchase price.  But as far as how the parties to the

13  APA may have valued the inventory, that's another story.

14          MR. SCHROCK:  Fair enough, Judge, just wanted to

15  be ...

16          THE COURT:  Okay.

17          MR. MOLONEY:  Your Honor, may I resume the

18  examination?

19          THE COURT:  Sure.

20  Q   Okay, paragraph six of your declaration, do you have

21  that in front of you, Mr. Griffith?

22  A   Which one?

23  Q   Your trial testimony declaration.

24  A   That's the supplemental?

25  Q   Yes, the supplemental.

Page 175

1    A     Okay.

2    Q     This is where you build up your analysis based on the

3    APA, that there was a 85 percent value associated with the

4    inventory, correct?

5    A     That's right.

6    Q     And basically, if I understand your argument, your

7    argument is that if you look at the, all the prior debt,

8    secured debt, that came ahead of the second lien position,

9    and you figure out how much money we paid off to satisfy

10   that debt, and you add $433 million you get 85 cents, and

11   that's why you believe, that the APA supports your position.

12   Right?

13   A     Not exactly.  I mean, we also had the other senior LC

14   facility that was ahead of the second liens, that's not in

15   this part of the APA definition.

16   Q     Okay, that's what I was going to ask you, because if

17   you actually add the other senior LC facility, right, if you

18   add the $271 million and the $135 million to your paragraph

19   six numbers, then we paid well over 100 percent of the

20   inventory value, right?

21   A     The 271 stand-alone LC facility is accounted for in a

22   separate part of the APA so would not be considered as this

23   part of the definition.

24   Q     I know you didn't put it in as part of your

25   declaration, but your logic is that it basically, if you

Page 176

1   look at us paying off the prior, the debt that had prior

2   call on the assets, and you add on 433 you get 85 percent,

3   right, that was your logic?

4   A    Well the ABL facility, which had the 124 million or

5   approximately thereof, of LCs under it, which is in the 850,

6   plus the (indiscernible) facility, plus the second lien

7   credit bid, yes, that gets us to the billion 408 which is

8   also in those ESL documents.

9   Q    And if you add in the 271 number you get over 100

10  percent, right?

11  A    It's not part of the same collateral.  It was cash

12  collateralized and not part of the borrowing base on ABL

13  first lien facility.

14  Q    So, you're saying the 271 is not debt that comes ahead

15  of us?

16  A    It does.  It's just accounted for in a separate part of

17  the APA.

18  Q    What do you mean, accounted for in a separate part of

19  the APA?

20  A    If I had the APA I could look at the sections, but they

21  have a separate section related to that facility, as part of

22  the sources and uses.

23  Q    Are you saying the $271 million, it has a prior claim

24  on the same inventory collateral, to our second lien debt,

25  or not?

Page 177

1    A    I'm saying it's senior to the second lien.

2    Q    So, if you counted it, along with the other senior

3    debt, which you put in that paragraph six, you get to a

4    number of 100 percent for the inventory, correct?

5              MR. GENENDER:  Objection, asked and answered, Your

6    Honor.  He's already explained that it relates to a

7    different set of assets.

8              THE COURT:  No, but I ... you're counting it

9    dollar for dollar, separately?

10             MR. GRIFFITH:  It is, yes.

11             THE COURT:  As opposed to 85 percent.

12             MR. GRIFFITH:  The 271 million LC facility was

13   assumed 100 percent as part of this transaction, yes.

14   Q    What asset does it relate to in your mind?

15   A    I don't know which asset it's actually secured against.

16   I believe it's the same collateral but it's cash

17   collateralized by ESL and Cyrus.

18             THE COURT:  Well, was the original facility cash

19   collateralized, 271?

20             MR. GRIFFITH:  It was, Your Honor, yes.

21   Q    And that's why you assumed it would not be drawn,

22   right?

23   A    It's still a material obligation that's real.  It would

24   not be drawn, necessarily, but it would be an obligation, a

25   first lien obligation.

Page 178

```
 1    Q     Now, you agree that both the ABL LC and the $271

 2    million Citibank LC we talked about -- they're standby LC's

 3    right?

 4    A     That's correct.

 5    Q     And in a going concern context, those type of LCs are

 6    not drawn if the company meets their obligation in a going

 7    concern context, right?

 8    A     If they continue to make the payments that are due,

 9    that would be correct.

10    Q     And you didn't opine in either of your two declarations

11    that in a going concern context these contingent obligations

12    would actualize because you assumed that they would be

13    assumed in any going concern sale by the buyer, right?

14    A     We assume that they are assumed as part of the

15    transaction, which they were, under the ESL transaction.

16    Q     And I'd like you to look at paragraph -- at the Reicker

17    declaration, which is in your book as exhibit number four.

18    And I'd like you to look at paragraph eight.  I'll represent

19    to you, this is a declaration in support of the priming

20    liens, the adequate protection we received that the junior

21    and senior DIPs -- in that context, Mr. Reicker says that

22    there's basically 1.3 billion borrowed against it under the

23    ABL facility, meaning all of the Debtors, right?  And that's

24    in paragraph eight.

25    A     That's what it says, yes.
```

Page 179

1  Q    And that $1.3 million, which he represented to the

2  Court as a condition to basically priming our lien, does not

3  include either of the LCs -- doesn't include either the ABL

4  LCs or the LCs that are cash collateralized at Citibank,

5  right?

6  A    I believe that's correct, yes.

7  Q    Now, were you involved in the preparation of the wind-

8  down analysis that is Joint Exhibit 14 and is in your book

9  at five?

10  A    I was not.

11  Q    This was an M-III production, right?

12  A    Yes.  I'm sure we had a part in preparing this, yes.

13  Q    And if you look at the second page, the bullet point

14  under substantial funding through wind down is provided by,

15  it says, "The imposition of a four percent charge on

16  incumbent assets sold throughout the case, pursuant to

17  506(c) of the Bankruptcy Code, with the exception of first

18  lien and prepetition ABL collateral (including non-insider

19  portions of the FILO and Citi LC), and junior DIP collateral

20  due to the 506 waivers granted to these lenders solely in

21  their capacity as DIP lenders."  See that?

22  A    I do.

23  Q    And if that four percent number was used as the

24  appropriate 506 surcharge in this case, you would get a

25  number of about $66 million, right, ballpark?

Page 180

1   A    I'm not sure I get that from just looking at this page.

2   Q    I'm just saying the inventory had a ballpark value of

3   $1.7 million, times four percent, I'm getting at $66

4   million, I did the math.  But that's about right, right?

5   A    Sounds right, yes.

6   Q    And why isn't that the right 506(c) charge, assuming

7   any is appropriate in this case?

8   A    It's a different scenario.  We had an actual sale of

9   the company with a fair market value that we discussed that

10  had took us a certain amount of expenditures to get us to

11  that point to allow for the credit bids and the deal to

12  close.  It's just a different analysis.  I can't really

13  compare that, apples to apples, to this.

14  Q    You're not claiming that if you pivoted at this point

15  in time -- which this was prepared January 12 -- that you

16  have had (indiscernible) decrease in overall expenses, are

17  you?

18  A    I'm not sure I understand the question.

19  Q    I'm saying if on January 12 you adopted the wind-down

20  proposal, or wind-down option, rather than the sale option,

21  you're not claiming that would have resulted in more

22  expenses than you incurred up to that point in time.

23  A    I guess I'm still not following.  What ...?

24  Q    Wouldn't you have incurred a lot more of expenses if

25  you did this wind-down proposal, than you actually incurred

Page 181

1   by doing the proposal with my client, ESL, and Transform?

2   A    I mean, it's possible.  I mean, if you're starting to

3   pivot in January, and we've been operating in bankruptcy for

4   several months, it's still going to take you minimum three

5   to four months for a wind-down.  So, it's possible you would

6   have more expenses.

7   Q    And he also assumes that you're going to, that there's

8   going to be a 90 percent recovery of the inventory of the

9   liquidation, right, at that point in time.

10           MR. GENENDER:  Your Honor, I'm going to object to

11   this.  There's a lack of foundation.  By his own testimony,

12   Mr. Griffith didn't prepare this document.  It doesn't have

13   any foundation upon which to testify to the accuracy of the

14   information, and they haven't established it.

15           MR. MOLONEY:  This was prepared by M-III.  We

16   could call Mr. Meghji, the CRO, whose affidavit this was

17   attached to, and they made it a joint exhibit.

18   THE COURT:  I think he can answer questions on this.  I

19   mean, if there's something that you don't understand in it

20   you should say so.  But otherwise, if you understand it and

21   can knowledgably talk about it, then you can answer the

22   question.

23           MR. GENENDER:  Okay.

24           MR. MOLONEY:  Your Honor, I'm going to leave this

25   exhibit, make it easier.

Page 182

1    Q    Now, I'd like you to look at Exhibit I to your report.

2              THE COURT:  What tab does that ...?

3              MR. MOLONEY:  That's, it's to supplemental report

4    and it may not ... is it in there?  I have a ...

5              THE COURT:  Is it number six?  That's also labeled

6    five.

7              MR. GENENDER:  Your Honor, in the declaration book

8    it's the third declaration, page ... it's toward the back,

9    unfortunately it's not one (indiscernible) page number.

10             MR. MOLONEY:  Okay, it's in the book at Exhibit

11   Six.

12             THE COURT:  Yeah, six.

13             MR. MOLONEY:  In Exhibit Six.

14             THE COURT:  The thin book.  It's the chart that

15   adds up to $1.451 billion.

16             MR. MOLONEY:  Yes, exactly, Your Honor.  That's

17   the chart that adds up to that number.

18   Q    And this was a chart that was given to us on Thursday

19   evening of last week.  Is that correct?

20   A    That's correct.

21   Q    And a more legible version, it says the searchable,

22   legible (indiscernible).

23   A    I'm sorry?

24   Q    Maybe you weren't involved in the details.  Forget

25   that.  And is it fair to say that you included on this

Page 183

1    exhibit all of the money, all the money the Debtors spent in

2    these cases, except for approximately $100 million of legal

3    fees, $31 million of license fees to vendors, $10 million

4    for utility deposits and $295 million of what Exhibit I

5    calls, quote, "GOB stores on non-sale related expenses."  Is

6    that correct?

7    A    That's correct.

8    Q    And looking at that last item, GOB sales on non-related

9    expenses, which I think is the last part of this Exhibit I,

10   should that be 'or'?  Should that be "GOB store or non-sale

11   related"?

12   A    It's the GOB-related expenses of the stores that were

13   closed during the process, the oppose process.

14   Q    It's only the GOB stores.

15   A    That's right.

16   Q    There's no other expenses there, other than the stores

17   that are related to the GOB sales or are there other

18   expenses included there as well?

19   A    I believe it's just the GOB.  It is.

20   Q    And how do you know that?

21   A    It's the analysis that my team has pulled together on

22   the GOB expenses as we ran the GOB reporting over the course

23   of the case.

24   Q    Okay.  Now, if you look at the Schulte report, amended

25   report, which is Exhibit Three, and you look at Exhibit --

Page 184

1    after that report, which is page 42 -- page 42, Exhibit F,

2    to the Schulte report.

3    A    Okay.

4    Q    And you see that there's a gross margin of $414.5

5    million that was actually earned by the stores post chapter

6    11 filing, correct?

7    A    Yes.

8    Q    And you see that $414.5 million was used to pay $403

9    million of actual operating expenses.  Do you see that?

10   A    I see that.

11   Q    To the extent expenses were paid from that source, they

12   were not deducted from your chart, right?

13   A    I'm sorry, can you say that part again?

14   Q    To the extent expenses were paid from the $403 million

15   margin, from the sale of our collateral, your chart wants to

16   double charge us for those same expenses, correct?

17   A    I don't think that's how it works.

18   Q    In what way did I get it wrong?

19   A    The 506(c) surcharge that we're showing here does show

20   store-level expenses as well as the corporate overhead, but

21   we don't account for that anywhere else.  So, it is the true

22   and actual operating expenses that were incurred post-

23   petition to get us to a sale.

24   Q    I'm sorry, did you deduct from -- we talked, we saw

25   what the deduct for your total, I didn't see any deduct for

Page 185

1    earnings at the store level.  Are you saying that you

2    deducted from your total, the $414.5 million?

3    A    No, I did not.

4    Q    Okay.  If you did not deduct from your total -- these

5    expenses, went to pay store-level employees, right?

6    A    It's one of the components, yes.

7    Q    And it went to pay rent, right?

8    A    Yes.

9    Q    It went to pay utility and telephones, right?

10   A    It did.

11   Q    It went to pay advertising, right?

12   A    A portion of it.

13   Q    It went to pay security services, right?

14   A    Yes.

15   Q    And so, you're double counting to the extent you're

16   charging us for that money, right?

17   A    Where else am I charging it for that?

18   Q    In your Exhibit I.

19   A    I'm saying that the 403 is a component of the billion

20   451.  This is not my schedule, this Appendix F.  It's Mr.

21   Schulte's.

22   Q    So the 403 is a component of the 451.  That's all I

23   need, I think, on that.  Let me go onto Exhibit B which is,

24   ironically, on page ... four pages in -- you have that?

25           THE COURT:  I'm sorry, Exhibit B to what?

Page 186

1          MR. MOLONEY:  It's the same thing.  It's called

2     Exhibit B.  It follows Appendix D.

3          THE COURT:  As to Mr. Schulte's --

4          MR. MOLONEY:  In the same document we're looking

5     at, you just go forward a few pages, and it's 65 and 71 on

6     the top, in terms of numbering.  And it's showing GOB

7     results.

8     Q    If you look that $144 million number, which is the end

9     of total GOB expenses, that was additional money generated

10    by the margin on the GOB stores, right, that was available

11    to pay expenses and, in fact, did pay the same store level

12    expenses we just discussed, right, for the GOB stores.

13    A    I'm confused.  It says, "Total GOB expenses."

14         THE COURT:  Are you asking whether this 144

15    million is part of the 403, or on top of it?

16         MR. MOLONEY:  No, this is on top of it.

17         THE COURT:  On top of the 403.

18    Q    First I just want to establish the 144 is, in

19    qualitatively, the same; this represents the money that was

20    spent at a store level to pay payroll, to pay security, to

21    pay advertising in connection with the going-out-of-business

22    sales, right?

23    A    That's what it appears to show here.  I can't verify

24    the document though.  But yes, it would appear to be the GOB

25    expenses...

1   Q    And that number would be on top of the $403 million,

2   right?

3   A    It's part of what we excluded from our billion 451.  We

4   excluded GOB store-level expenses.

5   Q    I know, but I couldn't -- that's why I asked the

6   question I asked earlier about Exhibit I, because your

7   number for Exhibit I for excluded GOB on-store sale expenses

8   is higher than this $144 billion number.  Right?

9   A    You're saying what I have excluded was higher than

10   this?

11   Q    Yes.  I'm looking at your Exhibit I and I'm looking at

12   the exclusions that you have under, at the -- for on-store -

13   - and you have a number of 295.3, and I'm trying to

14   understand how I can reconcile that with the 144.

15   A    We excluded more expense.  I don't know the source of

16   this Exhibit B in the Schulte.  I don't know if he's not

17   taking any allocations.  But to the extent we were taking

18   GOB-related expenses plus any overhead allocation, plus any

19   Abacus Advisor fees.  It's quite possible we have a much

20   higher number that's being excluded.

21   Q    But you don't know what you excluded on top of $144

22   million, right?

23   A    I don't know the --

24         MR. GENENDER:  Objection, misstate the testimony.

25   That's --

1          THE COURT:  I think he didn't -- I think what he

2     testified is he didn't know what was in the 144.

3     Q    Okay.  You don't know what's in the 144?  And you don't

4     really know what's in the 295.3 either, do you?

5     A    We show the detail here.

6     Q    I know you show this level of detail, but what else you

7     might have excluded you don't know.

8     A    This breaks down what we exclude.  I just can't speak

9     to the 144.

10    Q    Okay.  Now, would you look back at Schulte report, at

11    the appendix, which is ... page 25, the appendix?  Did you

12    include all of the employee payroll expense for Sears Auto

13    Center in your expenses?

14    A    I'm sorry, what page are you on?

15    Q    I'm on page 25, on the list of various businesses.  I'm

16    asking, did you include -- it's page 44 of 71, at the top,

17    page 25 at the bottom, Appendix A of the Schulte report.

18    Did you exclude all of the payroll expenses of the Sears

19    Auto Center, or include it?

20    A    No, I think the Sears Auto Center are included.

21    Q    And how about the e-commerce -- are they included or

22    excluded?

23    A    They'd be included.

24    Q    And the ShopYourWay, is that included or included?

25    A    It would be included.

Page 189

```
 1    Q     How about service contract -- how about Service Home

 2    Services -- Sears Home Services?  Did you include all of

 3    their employees?

 4    A     Yes.

 5    Q     How about Service Contract segment, did you include all

 6    of their employees?

 7    A     We did.

 8    Q     And In-home Repair segment, did you include all of

 9    their employees?

10    A     We did.

11    Q     And Parts Direct segment, do you include all of their

12    employees?

13    A     Yes.

14    Q     And franchise segment, did you include all of their

15    employees?

16    A     I don't know if they have employees if they're a

17    franchise, but the expenses would likely be included, yes.

18    Q     And Home Improvement?

19    A     Yes.

20    Q     Did you include -- and Financial Services, did you

21    include all of their employees?

22    A     Yes.

23    Q     And Innovel, did you include all of their employees?

24    A     Yes.

25    Q     And Monarch, did you include all of their employees?
```

Page 190

1    A     We did.

2    Q     And Kenmore, did you include all of their employees?

3    A     Yes.

4    Q     And Die Hard?

5    A     Yes.

6    Q     And if I went through every category, would you give

7    the same answers, that you included, for every category, all

8    the expenses for all these businesses, to be surcharged

9    against our collateral?

10   A     I would, because in most of these scenarios we're using

11   the collateral that's on the borrowing base.  The inventory

12   and accounts receivable that are generated are done so

13   through using, for Home Services, we have the service

14   inventory on the books.  The same would be true with any of

15   the parts kind of direct businesses.  And Innovel, Monarch,

16   sell the inventory that we have on hand as well.  It's all

17   part of the retail network.

18   Q     And if the Judge were to disagree with you and say,

19   okay, some of these expenses I don't think make sense,

20   there's no way you could figure it out from your Exhibit I,

21   what the detail is in terms of how much of the expenses

22   relate to any of these businesses, right?

23   A     We have it in the supporting detail, but this is the

24   summary level of the detail, what we think is appropriate to

25   include.  But that is up to the Court to decide what they

Page 191

1    want to include.

2    Q    With all due respect, it was up to you to include what

3    you thought was necessary to get your document into

4    evidence, but that's an issue --

5              THE COURT:  Well, let me ask it a different way.

6    Is the detail in evidence?  Is it in any of the exhibits?

7              MR. GENENDER:  We turned over the support files,

8    the affidavit.

9              THE COURT:  But it's not in the exhibits?

10             MR. GENENDER:  Attached to the declaration, with

11   respect to the backup, Your Honor, obviously, we intend to

12   move the declaration into evidence, so the answer is yes.

13   Q    What detail is it, besides Exhibit I, that supports

14   this analysis?

15   A    We provided the raw data files that include all of the

16   underling expenses for the periods covered.

17   Q    For what periods?

18   A    From petition date through close, as well as the --

19   also as subsets of the other periods we discussed, in terms

20   of from the first --

21   Q    But when and how were they produced to anyone?

22             THE COURT:  I'm sorry, we're moving away.  I was

23   just asking what's in the record as opposed to what was

24   provided in discovery.

25   Q.   I think in the record, all there is, is Exhibit I,

1    right?

2    A    I think that's correct.

3    Q    You included $34 million in assumed post-petition

4    interest to first lien DIP lenders in your declaration as

5    part of the first lien debt, is that correct?

6    A    Yes.

7    Q    And you also included, in your build up to the $14.51

8    million, $91 million ... or actually $94 million of actually

9    DIP interest in financing fees.  Is that correct?

10   A    That's correct.

11   Q    Isn't that double counting?

12   A    They're used for separate purposes.  In our calculation

13   of a 507(b), there is no diminution in value so we don't

14   apply any 506(c) surcharge to the extent.  Another valuation

15   method was used to determine the 507(b).  We'd be using the

16   506(c) surcharge we've attached her.  If, to the extent

17   there was some amount that was already included per our

18   analysis, we would reduce the 94 million in Exhibit I by the

19   similar amount, but they're not being calculated in any

20   fashion here.

21   Q    The $94 million includes all the interest you actually

22   paid to any of the first lien lenders or DIP lenders joining

23   the chapter 11 case, right?

24   A    Interest and fees, yes.

25   Q    And the $34 million number is just a projected number,

Page 193

1    not a number you actually paid.

2    A    It was the hypothetical minimum, yes.

3    Q    A hypothetical number, okay.  And you want to charge

4    this for both the hypothetical number and the real number,

5    right?

6    A    No, that's not what I said.

7    Q    Well, your calculation starts with a deduct based on

8    the hypothetical number being ahead of us, and then you want

9    to subtract from us the real debt, real amount you spent.

10   Why is that not double counting?

11   A    Because we never get to a 506(c) surcharge in our

12   analysis.  We show no diminution in value, so we never

13   actually have to apply this.  To the extent there was

14   another way it was being employed, do you actually calculate

15   the 507(b); this is the 506(c) in Exhibit I that we would

16   put forward.

17   Q    If you look at the Reicker declaration again, which is

18   Exhibit Four, (indiscernible) the sentence I asked you about

19   before, where we talked about the LCs, the next sentence is,

20   "Accordingly, absent some unforeseen circumstances, the

21   Debtor should be able to satisfy the DIP ABL facility from

22   the proceeds of the original pre-petition ABL collateral

23   without resorting to the proceeds of previously unencumbered

24   collateral, as long as the Debtors have the time and

25   liquidity to run an orderly and valued maximizing process."

Page 194

1    Did I read that properly?

2    A    Yes.

3    Q    And that was the plan, right?

4    A    The plan was always to maximize value.  The sentence

5    seems reasonable.

6    Q    So, there was always ... when we obtained the adequate

7    protection, it was understood that the $94 million was going

8    to be spent out, which is why we got the adequate

9    protection.  And now you're saying, now that it was actually

10   spent we don't have it anymore.  Is that what you're saying?

11   A    I'm not sure I follow the question.

12   Q    Well, when we got the adequate protection liens, the

13   replacement liens, everyone anticipated that our collateral

14   was going to be used to pay out the first lien debt.  That's

15   what this says, right?

16   A    That's what it says here, I don't --

17   Q    And, therefore, we were given adequate protection liens

18   and 507(b) claims to compensate us for that use, correct?

19           MR. GENENDER:  Objection.  He's asking for legal

20   conclusions.

21           THE COURT:  I think you are.

22           MR. MOLONEY:  I think I can make this argument to

23   Your Honor.  I have a few more questions.

24           THE COURT:  Can I just ask -- it's related to what

25   you've just been going though.  You said the $34 million in

Page 195

1    your 507(b) calculation was a hypothetical number.  Why did

2    you choose that number instead of the actual interest

3    number?

4              MR. GRIFFITH:  We were just assuming bare minimum,

5    three-month period with, actually, with no DIP being put in

6    place, with some type of an orderly liquidation.  So, it's

7    really just the interest on a first lien debt that would

8    approve that period.  It was just to be on a conservative

9    basis.

10   Q    All of the decisions were made, whether to do one thing

11   or the other in this case, whether for value maximization,

12   whether to do liquidation, or to do a going concern sale,

13   were made by parties other than the second lien parties,

14   right?

15   A    I mean, the decisions were made by the Restructuring

16   Committee and the company with buy-in from various

17   creditors, including, I believe, the second liens.

18   Q    Well, all of the buy-in from the second lien creditors

19   was premised on their -- the original deal you had where

20   they had where they had adequate protection liens and 507(d)

21   claims, right?  Did they ever say, "We're happy to do this

22   transaction, we're happy to have you go forward in this

23   case, but we don't want these protections," -- did they ever

24   tell you that?

25   A    I can't answer that question. I don't know.

Page 196

```
 1              MR. MOLONEY:  I have no more questions, Your Honor

 2              MR. LIUBICIC:  Your Honor, if we may approach, we

 3    have a cross-exam binder for the Court.

 4              THE COURT:  Before you do that, I had one question

 5    and I probably will forget it if I don't ask it now.  If you

 6    turn to Exhibit B of Mr. Schulte's report, at the top it

 7    says Page 65 of 71 ... GOB results.

 8              MR. GRIFFITH:  Yes, I see it, Your Honor.

 9              THE COURT:  If you look at the far right, Net

10    Recovery Percentage column.

11              MR. GRIFFITH:  Yes.

12              THE COURT:  The aggregate number is 95.6 percent.

13    You see that?

14              MR. GRIFFITH:  I do.

15    THE COURT: Are you aware that Mr. Heinrich had a different

16    number for the aggregate recovery?  A different percentage

17    number, I think it was 96.4 percent.

18    MR. GRIFFITH:  Yes, I think we did realize that, that he has

19    a slightly different calculation.

20    THE COURT:  Do you know who's right?  I mean, I appreciate

21    it's a difference of 1.4 percent that -- do you have a view

22    as to who is correct based on your knowledge of your

23    company's books and records?

24    MR. GRIFFITH:  I don't.  I haven't done any calculation, but

25    my understanding if I recall is that I believe the Schulte
```

Page 197

1    one is correct.  It's really just a matter of what you're

2    using in your numerator versus in your denominator.  I

3    believe that Heinrich is subtracting certain expenses from

4    the numerator as opposed to the denominator and it's

5    changing the fraction slightly.

6    But overall I think the Schulte methodology is more

7    accurate.  But it maybe should also be mentioned that I

8    don't believe this takes into account any type of corporate

9    allocation.

10   THE COURT:  I understand that point, that this was, in

11   essence, the store allocation GLB1.

12   MR. GRIFFITH:  Correct.

13   THE COURT:  Just the 95.6, do the Debtors have a number like

14   this anywhere?

15   MR. GRIFFITH:  We did not rely on an OOB or any type of

16   liquidation methodology in our analysis.

17   THE COURT:  So this is a calculation that's made by both Mr.

18   Schulte and Mr. Heinrich, not taken off of the Debtors --

19   MR. GRIFFITH:  The basis for this may be from ours.  I don't

20   think I know the source of this.

21   THE COURT:  Okay.  Thank you

22   MR. LUBICIC:  Your Honor, the source on it is the Debtors'

23   four month actuals since we gave them, and this is a summary

24   exhibit based on documents they have, the corrected summary

25   exhibit.

Page 198

1    THE COURT:  Okay.  All right.

2    MR. LUBICIC:  Your Honor, may we approach?

3    Q    Good afternoon, Mr. Griffith.

4    A    Good afternoon.

5    Q    Mr. Griffith, we've handed you a binder with some of

6    the joint exhibits that are behind tabs and in the left

7    pocket there's a copy of your deposition in case we need to

8    look at that, okay?

9         And Mr. Griffith, do you have the binder of your

10   declarations that Mr. Genender handed you when you took the

11   stand?

12   A    I do.

13   Q    Okay.  Mr. Griffith, you'd agree with me that

14   collateral values expressed as a percentage of book value

15   can vary over time?

16   A    Yes.

17   Q    And you can't point us to any authority suggesting it's

18   appropriate to value collateral as of the petition date

19   based on what someone might have paid for that collateral

20   about four months later, correct?

21   A    Most reasonably.  That methodology I can think of based

22   on that's -- what was achieved in a transaction between a

23   willing buyer and a willing seller.  I don't know of a

24   better way to do it.

25   Q    That wasn't my question.  My question was, can you

Page 199

1   point us to any authority supporting that notion?

2   A     I cannot.

3   Q     Let me ask you a few questions about the letters of

4   credit.  Your view was that in a liquidation, letters of

5   credit may be fully drawn, correct?

6   A     Yes, that's possible.

7   Q     Okay.  And one of the bases of your view is that in a

8   liquidation -- withdrawn.  One of the bases of your view

9   that in a liquidation, letters of credit may be fully drawn.

10  Is your understanding of litigation over letters of credit

11  in the Circuit City bankruptcy, correct?

12  A     It was just the data point that was used.

13  Q     That was one of the bases that you told me about in

14  your deposition, right?

15  A     It was something I mentioned, yes.

16  Q     Okay.  You're not personally involved in the Circuit

17  City case, correct?

18  A     I am not.

19  Q     Okay.  And the other basis of your view is from

20  discussions you've had with your colleagues at M3, right?

21  A     That's correct.

22  Q     And you're not aware of any instance in an orderly

23  Chapter 11 liquidation of a retailer, where letters of

24  credit were fully drawn, correct?

25  A     I do not know that, no.

Page 200

1    Q     And you'd agree that in the three years prior to the

2    petition date, hundreds of Sears stores were liquidated?

3    A     Yes.

4    Q     And as of the filing date, Sears had approximately at

5    687 stores?

6    A     Approximately sounds correct.

7    Q     And you'd agree that during the course of this case,

8    there have been approximately 262 GOB sales at Sears stores?

9    A     Yes.

10   Q     And you'd also agree that it was public knowledge at

11   certain points in this Chapter 11 case that the Debtors were

12   taking the position that they might have to pivot to a

13   liquidation, right?

14   A     Yes.

15   Q     And from the petition date to the date of the closing

16   of the sale to ESL, only $9.1 million was drawn under the

17   letters of credit, correct?

18   A     That's correct.

19   Q     And if the letter of credit is drawn to cover a

20   contingent liability, but the liability doesn't ultimately

21   occur, you'd expect that at the end of the period where --

22   during which the liability was contingent, the proceeds of

23   the letters of credit would be returned, correct?

24   A     Yes.

25   Q     Okay.  Let's talk for a few minutes about Ms. Murray's

1    analysis, okay?

2    A    Okay.

3    Q    With regard to Ms. Murray's minimum case made out in

4    her report, you don't believe she used an incorrect

5    methodology, correct?

6    A    Can you repeat the question?

7    Q    Yeah.  With regard to Ms. Murray's minimum case laid

8    out in her report, you don't believe she used an incorrect

9    methodology, correct?

10   A    No, I wouldn't say that.

11   Q    Okay.  Could you turn to your deposition, which should

12   be in the left pocket of the exhibit binder you did?  And

13   could you turn to Page 171, please?  Are you there?

14   A    I am.

15   Q    Okay.  So do you see on Line 23 of Page 171 I asked you

16   the question, "And what about in Ms. Murray's minimum case,

17   do you believe she used an incorrect methodology?  Do you

18   see that?"

19   A    That's in response to the inventory --

20   Q    Sir, do you see my question?

21   A    It's --

22   Q    Do you see the question that I asked you?  I'm looking

23   at Page 171, Line 23.

24   A    You're asking if there's a problem with her

25   methodology, but the question is --

Page 202

1   Q    All I'm asking you, Mr. Griffith, is if you see the

2   question that I asked you in your deposition.

3   A    I see a few questions, yes.

4   Q    Okay.  And could you read your answer on Page 172, Line

5   2?  Could you read that answer, please?

6   A    Starting on which line?

7   Q    Two.

8   A    Line 2?

9   Q    Yes sir, the answer to the question that I asked you.

10  Can you read that, please?

11  A    Line 2 on Page 171 --

12          THE COURT:  No, no, on Page 172.

13  Q    172.

14  A    Oh 172.  "I don't believe so."

15  Q    Now you understand that Ms. Murray's analysis relies on

16  part on NOLV's set out in appraisals that were performed by

17  Tiger, right?

18  A    I do.

19  Q    And Tiger is knowledgeable about the values of Sears'

20  inventory, correct?

21  A    It is.

22  Q    And in fact, Debtors have relied on Tiger data during

23  this Chapter 11 case, haven't they?

24  A    They have.

25  Q    For example, Debtors have relied on Tiger data in

Page 203

1   connection with the borrowing base advance rates, right?

2   A    Yes.

3   Q    And you'd agree that Tiger's inventory analyses rely in

4   large part on information supplied by the company to Tiger?

5   A    Yes.

6   Q    Tiger was hired by the first lien ABL lenders to

7   prepare appraisals of the inventory that was the ABL

8   lenders' collateral, correct?

9   A    Yes.

10  Q    And both before and after the petition date, you had

11  discussions with the ABL lenders and their advisors, right?

12  A    We did.

13  Q    And prior to the petition date leading up to the

14  filing, you told the ABL lenders that Tiger's NOLV's were

15  conservative, correct?

16  A    About a year prior to it, yes.

17  Q    Well, you tell me in your deposition it was leading up

18  to the filing, you told them it was conservative, right?

19  A    We were leading up to it at that point, yes.  That the

20  (indiscernible) was around November the year before.

21  Q    And you understand that the source of Ms. Murray's 88.7

22  percent NOLV is the Tiger appraisal dated September 28th,

23  2018, right?

24  A    Yes.

25  Q    And if you look in your exhibit binder at Tab 1, you

1    see what is Joint Exhibit 4, the Tiger appraisal dated

2    September 28th, 2018.  Do you see that?

3    A    I do.

4    Q    And you'd agree with me that this September 28th

5    appraisal, if you look at the cover page, it has an

6    inventory date of October 6, 2018?

7    A    Yes.

8    Q    Okay.  Let's turn to Page 6 of the appraisal, please.

9    And the JX Bates Number is JX004-8.  Do you see that?

10   A    I see it.

11   Q    Okay.  Do you see that on Page 6, under the heading

12   "Sale Expenses", Tiger said, "Expenses for the retail JOB

13   inventory sale included in this analysis, consists of two

14   categories"?

15   A    I do.

16   Q    And you see those two categories are direct sale

17   expenses and non-direct sale expenses, right?

18   A    Yes.

19   Q    And do you see that Tiger said non-direct sale expenses

20   include royalty payments, (indiscernible) liquidation fees

21   and corporate overhead required to support the retail store

22   JOB sales?

23   A    That's what it says, yes.

24   Q    And you don't know whether during the time period you

25   were telling the ABL lenders and their advisors that Tiger's

Page 205

1    NOLVs were conservative.  Whether those NOLVs included any

2    more corporate overhead than what's described here on Page

3    6, right?

4    A    It was about a year earlier.  I assume they were using

5    a similar methodology.

6    Q    And post-petition, you've never told the ABL lenders or

7    their advisors that you disagreed with any of Tiger's NOLVs,

8    right?

9    A    We have not.

10   Q    Mr. Griffith, do you recall in your second supplemental

11   declaration you discussed Ms. Murray's inclusion of in

12   transit inventory as part of her inventory valuation?

13   A    Yes.

14   Q    Okay.  And do you recall you included that discussion

15   in a section of your second supplemental declaration titled

16   "Problems with 2L Expert's Inventory Valuations"?

17   A    It sounds correct, yes.

18   Q    Okay.  In fact, your 507(b) analysis includes in

19   transit inventory, right?

20   A    Well, the fair market on a book basis, yes, not in an

21   NOLV.

22   Q    And your analysis values the in transit inventory at 85

23   percent, just like you value the rest of the inventory,

24   right?

25   A    When you take 85 percent of the book value of all

Page 206

1    inventory, yes.

2    Q    Do you know what Ms. Murray valued the inventory at,

3    the in transit inventory at?

4    A    Is it in this Tiger report?

5    Q    It is not.  But do you recall what she valued the in

6    transit inventory at?

7    A    I don't recall.

8    Q    Okay.  Does 51.6 percent sound correct?

9    A    It could be.

10   Q    Okay.  And I'll represent to you that she valued it at

11   a 51.6 percent NOLV.  So Ms. Murray valued the in transit

12   inventory at a lower percentage than you did, correct?

13   A    It sounds like it, yes.

14   Q    Let's talk about Abacus for a minute.  Abacus is a

15   liquidator, correct?

16   A    They are.

17   Q    And Abacus was the company's liquidation advisor, is

18   that right?

19   A    Yes.

20   Q    And you'd agree that Abacus was highly experience in

21   running JOB sales for Sears?

22   A    They were.

23   Q    And prior to the petition date, Abacus has liquidated

24   hundreds of Sears and K-Mart locations, right?

25   A    Yes.

Page 207

1    Q    It was Abacus that handled the liquidation of 200 plus

2    JOB stores during this case?

3    A    Yes.

4    Q    And you'd agree that in December of 2018, Abacus

5    projected NOLVs of 90.2 percent to 93.7 percent in the event

6    Debtors pivoted to a liquidation?

7    A    I'd have to see the document and (indiscernible).

8    Q    We could look in your exhibit binder at Tab 4.  And for

9    the record, this is Joint Exhibit 17.  It's a deck titled

10   "Project Blue Liquidation Bits Review".  And Mr. Griffith,

11   you could turn to Page 3, the JX Bates Number is 017-3.  Do

12   you see it?

13   A    Okay.

14   Q    Are you with me?

15   A    I am.

16   Q    And do you see this slide is titled "Abacus Net

17   Recovery Projection"?

18   A    Yes.

19   Q    And do you see the first bullet says "Abacus and the

20   company project a final net orderly liquidation value

21   (indiscernible) merchandise of 90.2 and 93.7 percent?"

22   A    Before liquidation fees?

23   Q    I thought you might say that.  If you look down at the

24   chart at the bottom, do you see there's a bolded line near

25   the bottom of the chart that says "Net recovery before

1     liquidator fee"?

2     A     Yes.

3     Q     Okay.  And do you see the figures before liquidator fee

4     are 90.3 percent and 93.8 percent?

5     A     Yes.

6     Q     And then do you see two rows down, there's net recovery

7     after liquidator fee?

8     A     I see it.

9     Q     And do you see those values are 90.2 percent and 90

10    point -- 93.7 percent?

11    A     I do.

12    Q     Okay.  So that 90.2 percent and 93.7 percent, they

13    match the figures up at the top in the first

14    (indiscernible), correct?

15    A     Yes.

16    Q     Okay.  So I read the before liquidation fees in that

17    first bullet as a typo and rather, it should say after.

18    Would you agree with that?

19    A     Yes.

20    Q     Okay.  And do you see here on this slide it says Abacus

21    on the company projected those NOLVs?

22    A     I do.

23    Q     Okay.  So this was not just Abacus' projection, but the

24    projection of the company, correct?

25    A     That's what it says, yes.

1    Q    All right.  And then, if you look at the bullets that

2    have dashes in front of them, do you see the third one that

3    begins "Expense categories are taken from Tiger's

4    appraisal"?

5    A    I see it.

6    Q    Okay.  And do you see it goes on to say, "With expense

7    amounts estimated here in (indiscernible)."  And it gives a

8    number of bases, including Tiger's estimates for certain

9    expenses.  Do you see that?

10   A    I do.

11   Q    So this is another example of the company relying on

12   Tiger, right?

13            MR. GENENDER:  Your Honor, I'm going to object.

14   That totally conflates the exercise what -- exactly for

15   what.  I mean, he's talking about liquidation, which didn't

16   happen.  It's a leading question.

17            THE COURT:  He's relying on Tiger for the purposes

18   of this particular analysis.

19            MR. LIUBICIC:  Yes.

20            THE COURT:  That's what it is.

21            MR. LIUBICIC:  Exactly.

22            MR. GENENDER:  It's irrelevant to -- I object to

23   its relevance.

24            THE COURT:  It's (indiscernible) relevant.

25            MR. LIUBICIC:  It does say we're (indiscernible)

Page 210

1    on Tiger on this one.

2    Q    And Mr. Griffith, at a January 5th meeting of the

3    Restructuring Committee that you attended, Weil recommended

4    in the event of a wind down the company proceed with a

5    liquidation advisory team consisting of Abacus and SB360,

6    right?

7    A    That sounds correct, yes.

8    Q    And you stated in your supplemental declaration, your

9    June 27th declaration that it's possible that Debtors

10   would've accepted an equity bid for their liquidation of the

11   company, correct?

12   A    It's possible.

13   Q    Okay.  Abacus and SB360 didn't submit equity bids for

14   the liquidation of the company, correct?

15   A    I mean, it never happened.  It's possible they could

16   have, if we switched directions and abandoned going in a

17   certain sale.

18   Q    At the time Weil was recommending that the company use

19   a team of Abacus and SB360, they had not submitted equity

20   bids, correct?

21   A    Not that I'm aware of.

22   Q    And in fact, the equity bids that were submitted by

23   other liquidators, those were deemed nonconforming by the

24   company, correct?

25   A    The last versions I saw, I think that's correct.

1    Q    Mr. Griffith, you recall in Paragraphs 9 and 10 of your

2    supplemental declaration, you point to a number of risks of

3    a liquidation that you argue would reduce overall

4    recoveries?

5    A    Yes.

6    Q    And I'm happy to show you those paragraphs, I'm just

7    trying -- doing this in the interest of time.  But if you

8    want to look at them, that's totally fine.

9    A    Okay.

10   Q    Your views about the costs and the margins that would

11   be realized in a wind down or a liquidation, those are based

12   on your general understanding of how liquidations of

13   retailers work, correct?

14   A    That's right.

15   Q    You've never personally been engaged in a Chapter 11

16   orderly liquidation of a retailer, right?

17   A    I have not.

18   Q    And you've never been engaged in a Chapter 7

19   liquidation of a retailer, right?

20   A    I have not.

21   Q    And you've never been engaged in a Chapter 7

22   liquidation of a retailer, right?

23   A    No.

24   Q    And you're not aware of any retailers who have

25   converted their cases to a Chapter 7, correct?

1    A    Not that I've been involved with, no.

2    Q    I'm sorry?

3    A    Not that I've been involved with, no.

4    Q    You've never been engaged in what you call a fire sale

5    liquidation of a retailer, correct?

6    A    I'm not a liquidation expert, no.

7    Q    And you haven't attempted to quantify by how much a

8    wind down would reduce overall recoveries, right?

9    A    It didn't happen here, so we focused on the actual

10   transaction that occurred.

11   Q    Okay.  So the answer to my question is no, you haven't

12   attempted that, right?

13   A    I have not done that (indiscernible), no.

14   Q    And you haven't quantified what you refer to in your

15   supplemental declarations as the margins in a fire sale,

16   right?

17   A    We have not or I have not.

18   Q    No.

19        MR. LIUBICIC:  Okay.  So Your Honor, I would move

20   to strike Paragraphs 9 and 10 of Mr. Griffith's supplemental

21   declaration?  He's a lay witness.  He just said he's not an

22   expert in liquidations.  He's attempting to offer opinions

23   about an area of specialized knowledge.  What happens in the

24   liquidation of a retailer.  And in addition, to the extent

25   he's offering those opinions as a lay witness, they're not

1    based on his perception.  He's never been involved in a

2    liquidation of a retailer in bankruptcy.  He's not able to

3    quantify any of these risks, and we submit that violates

4    Rule 7 or (indiscernible), and those paragraphs that are

5    supplemental should be struck.

6            MR. GENENDER:  Your Honor, he's just responding to

7    different aspects of their own reports.  And clearly Ms.

8    Murray is making a liquidation analysis in a case that was

9    always -- that turned out to be (indiscernible).  So I don't

10   know that it's the most important part of this testimony,

11   Your Honor, but I do think that they're fair and they should

12   be allowed.

13           THE COURT:  Well, I'd strike the second sentence

14   of Paragraph 9, and the equity bids aren't there in the

15   record elsewhere, right?  Or is this how these equity bids

16   come in?  Are they in the record?  The Gordon brothers

17   proposed Tiger (indiscernible) America bids are they --

18           MR. LIUBICIC:  There are some data points on the

19   record about what the equity bids were.

20           THE COURT:  Okay.  So I think that's fine, but the

21   standard about the market's view of (indiscernible) is -- I

22   mean, the bids just speak for themselves.  And as far as 10

23   is concerned, I think it's irrelevant.  So I'm not paying

24   any attention to 10.  This isn't about Chapter 7 in any

25   case.

Page 214

1          MR. LIUBICIC:  Thank you, Your Honor.

2     Q    Ms. Murray notes that there are other indicators of

3     inventory value, including a January 2019 wind down analysis

4     that the company prepared that includes an NOLV of 90

5     percent.  Do you recall that?

6     A    I recall her mentioning that, yes.

7     Q    In your view is that the 90 percent NOLV from the wind

8     down analysis isn't an appropriate metric because you're not

9     sure it takes all of the costs associated with the full

10    liquidation and bankruptcy into account, correct?

11    A    That's right.

12    Q    But you're not sure you did a very diligenced review of

13    whether the wind down analysis does or does not take all of

14    the costs into account, correct?

15    A    I was not a part of that analysis, so I can't comment

16    on it.

17    Q    Then it's not -- if I understand you correctly, you're

18    saying you didn't do any analysis of whether the wind down

19    analysis took all of the costs (indiscernible)?

20    A    If the NOLV in the Tiger report is lower than that, I

21    would assume it is not taking into account everything.  I

22    think that's at a store level without much overhead

23    allocation.

24    Q    But you didn't do that analysis, right?

25    A    I didn't.

1   Q    In Paragraph 17 of your supplemental declaration, Mr.

2   Griffith, you set out what you call an adjusted

3   (indiscernible) valuation.  Do you recall that?

4   A    Yes.

5   Q    Your adjustments that you make in Paragraph 17 to Ms.

6   Murray's minimum case analysis, those total about $600

7   million in Debtor's favor.  Is that about right?

8   A    Yes, I think that's right.

9   Q    But you're still calling that an adjusted Cyrus

10  analysis, right?

11  A    Based off of the analysis provided by Mrs. Murray.

12  Q    Just a few questions on 506(c), the $1.45 billion in

13  costs you allege is a portion of the amount that was

14  incurred to conduct the going sale -- the going concern sale

15  process, correct?

16  A    Yes.

17  Q    And we'd agree that in the going concern sale, what was

18  sold to ESL was not just the 2L collateral, but in fact the

19  majority of the company's remaining assets, right?

20  A    That's right.

21  Q    And could we look in your supplemental declaration at

22  Page 11, Paragraph 18 for a moment?

23  A    I'm sorry, which declaration?

24  Q    It's your supplemental, the June 27th, and it's

25  Paragraph 18.

Page 216

1   A    Okay.

2   Q    And I'm at the top of Page 11.  Are you with me?

3   A    I am.

4   Q    Okay.  Do you see that you stated here that if an NOLV

5   valuation approach is used, certain reductions to your

6   506(c) surcharges, and you state certain store level

7   expenses and corporate overhead allocations would need to be

8   made to account for the costs included in the NOLV values in

9   the Tiger appraisal?

10  A    Yes.

11  Q    You haven't done an analysis of what those store level

12  expenses and corporate overhead allocations amount to,

13  correct?

14  A    We have not done an NOLV valuation approach.  We

15  focused on the fair market value approach.

16  Q    Okay.  So the answer to my question is no.

17  A    That's right.

18  Q    I'll pass the witness.

19          CROSS-EXAMINATION OF MR. BRIAN GRIFFITH

20  BY MR. FOX:

21          MR. FOX:  And for the record, Edward Fox from

22  (indiscernible).

23  Q    Good afternoon, Mr. Griffith.  In your response to Mr.

24  Moloney's testimony, I believe you indicated that you

25  included employee costs in your 506(c) charge for Innovel,

Page 217

```
 1    Monark, Kenmore, DieHard, Home Services, and perhaps other

 2    entities that I can't even recall, because they were all

 3    part of the retail network.  Is that correct?

 4    A    Yes.

 5    Q    Okay.  So that would mean that all the proceeds from

 6    those entities was the proceeds of inventory as well,

 7    correct?

 8    A    The costs associated with those were to help move the

 9    inventory one way or another.  So it's part of the necessary

10    costs to actually sell a refrigerator or to move the goods

11    in and out of a store to sell them online.  It's all related

12    to the inventory collateral, and eventually, the accounts

13    receivable.

14    Q    I'm sorry, what -- I couldn't -- the last part?

15    A    And the credit card receivables.

16    Q    So my question though, was, are all the proceeds from

17    those entities, proceeds from the sale of inventory?

18    A    A good portion of them are, yes.

19    Q    A good portion, but not all?

20    A    There may be portions that are not, yes.

21    Q    Okay.  So you included all the costs of the employees,

22    even though we don't get all the proceeds are not all

23    proceeds for inventory.  Is that right?

24    A    It was part of the going concern sale, yes.

25    Q    I didn't ask you if it was part of the going concern
```

Page 218

1    sale.  I asked you whether you included all of the costs,

2    even though not all of the proceeds from the sales of

3    inventory by those entities constituted or -- not all of the

4    revenues constituted proceeds from the sale of inventory

5    from those entities.

6    A    Yes, I think that's right.

7    Q    Okay.  Now in your May 26th, 2019 declaration, you

8    included a list in Paragraph 20 of the 506(c) chart,

9    surcharge items and the amounts.  Do you recall that?  Do

10   you have that?

11   A    Yes, I do recall that.

12   Q    Okay.  So look at Paragraph 20, then, on Page 7.

13   A    Okay.

14   Q    Have you looked at that?

15   A    Yes, I have.

16   Q    Okay.  And that was your entire written analysis of the

17   amounts that you assume from the total that should be the

18   506(c) charges, and they're all listed right there.  That's

19   your entire analysis, correct?

20   A    It's the summary for the declaration, yes.

21   Q    But there is no underlying data beyond that summary,

22   correct?

23   A    No, there's underlying data.

24   Q    There's underlying data that comes to these numbers or

25   is there underlying data that covers the entire universe of

1    costs from which you selected these numbers?

2    A    That is correct.

3    Q    Okay.  Which is correct?

4    A    It's the entire universe that we've selected these

5    amounts.

6    Q    So there's underlying data that shows the entire

7    universe of the costs, correct?

8    A    Yes.

9    Q    Okay.  And then, from that underlying data, you

10   selected these particular amounts for these particular line

11   items, correct?

12   A    Yes.

13   Q    And there's no further support for these line items or

14   amounts other than the entire data for which you selected

15   these amounts, right?

16   A    I believe we provided the detailed file that has

17   everything in it, which would include these pieces, but I

18   don't know.

19   Q    Well, but it had everything, not just this, correct?

20   A    I think that's correct, yes.

21   Q    Okay.  So there's no subset of that overarching data

22   that was produced from which one could see how you extracted

23   these amounts in these categories in Paragraph 20 of your

24   May 26th declaration, correct?

25   A    I'm not 100 percent positive.  I don't know.

Page 220

1  Q    You're not 100 percent positive?

2  A    No.

3  Q    But didn't you testify -- don't you recall testifying

4  on July 10th that this was all you had, was this Paragraph

5  20?  That was your entire analysis?

6  A    I think we said we had the detail behind it.  I believe

7  we provided the most detailed schedules.  I'm not 100

8  percent sure.  We actually provided the breakdown of these

9  amounts.

10 Q    You're not sure if you provided it.

11 A    I don't believe we did.

12 Q    Okay.  Thank you.  Now in your declaration dated July

13 18th, in Paragraph 32, do you have that?

14 A    I do.

15 Q    Okay.  You say there, similarly the Debtors have

16 removed any professional fees related to the GOB store

17 process, the calculation of applicable professional fees was

18 narrowly tailored.  My team and I calculated professional

19 fees for purposes of the 506(c) charge with assistance from

20 Counsel.  And then you say, with them three's guidance,

21 while reviewing all the applications for compensation for

22 fees incurred by the Debtors, and isolated only those

23 expenses that dealt directly with the going concern sale

24 process by using the task codes included in those filings.

25 Do you see that?

Page 221

1    A    Yes.

2    Q    In fact, didn't you previously testify at your

3    deposition that Counsel did that entirely?

4    A    They did a lot of the work in terms of actually pulling

5    the data together.  That's a lot of data, but yes, they did.

6    Q    But in fact, you didn't personally do it at all, did

7    you?

8    A    We discussed what was supposed to be done and be

9    included.  They actually did a lot of the work in terms of

10   pulling the data.

11   Q    I'm not asking you about we, whoever that is, I'm

12   asking you about you.  You didn't do it, did you?

13   A    I did not pull the data myself, no.

14   Q    Okay.  Counsel did that for you, correct?

15   A    Counsel did it, yes.

16   Q    Okay.  And you didn't know on July 10th at your

17   deposition whether the professionals who are included in the

18   $51 million included Akin Gump or Houlihan Lokey, did you?

19   A    I didn't know that off the top of my head, no.

20   Q    Okay.  And looking at Paragraph 32 of your declaration,

21   aside from the reference of $14,927,627 related to Weil

22   Gotshal's fees, there's no fees listed for any other

23   professional listed there, right?

24   A    That's right.

25   Q    Okay.  And in the next paragraph, Paragraph 33, you

1    talk about professionals on a fixed fee basis, such as

2    Evercore, and you say, for Evercore, you came to a ratio

3    that resulted in including $400,000 of a million dollar

4    fixed fee, correct?

5    A    Yes.

6    Q    Now you say you did the same thing for Lazard and

7    Houlihan and Lokey, but you don't list how much you -- that

8    resulted in here, do you?

9    A    Yeah, we listed one as an example.

10   Q    Okay.  And you didn't list the other two, did you?

11   A    We did not.

12   Q    Okay.  So between Paragraphs 32 and 33, there's no way

13   to determine how you got the $51 million, is there?

14   A    No, there is not.

15   Q    Okay.  Now one other thing.  Excuse me one second.  Mr.

16   Griffith, you also swore a declaration on April 15th, 2019,

17   which was entitled "The Declaration of Brian Griffith in

18   Support of Debtor's Objection to the Motion of Wilmington

19   Trust National Association as Indentured Trustee and

20   Collateral Agent to Prohibit or Condition Debtor's Continued

21   Use of Collateral, Including Cash Collateral."  That was

22   filed on the docket at Docket 3198.  And in Paragraph 4 of

23   that declaration, you stated --

24            MR. GENENDER:  (indiscernible) was supposed to be

25   taken up today.

1              MR. FOX:  No, no, no.  It's relevant to his

2    testimony today, not for the purposes of (indiscernible)

3    motion.

4              MR. GENENDER:  If he's using it to impeach him,

5    he's got to show an inconsistent (indiscernible) --

6              THE COURT:  Well, he's setting up the question.

7              MR. FOX:  Yeah.

8    Q    So in Paragraph 4 of that declaration, you've stated,

9    "The Debtors had no more than approximately $2.88 billion of

10   collateral available to secure the first and second lien

11   debt senior to the second lien 2,000 notes."  Do you

12   remember making that statement, Mr. Griffith?

13   A    I don't have a copy of that, but I'd need a copy.

14   Q    It doesn't --

15             THE COURT:  Mr. Fox has said he's using this for

16   impeachment purposes, so he can show it to him now.

17             MR. FOX:  Thank you.

18             THE COURT:  And if it's not for impeachment, you

19   could stand up again and say he's expanding on the direct.

20             MR. FOX:  May I approach, Your Honor?

21             THE COURT:  Yes.

22   Q    So Mr. Griffith, turn if you would to -- I've handed

23   you the -- your April 15, 2019 declaration.  Turn, if you

24   would, to Paragraph 4.  And read the third line to yourself,

25   please, the third sentence.  I'm sorry.  In Paragraph 4 to

Page 224

1    yourself.

2    A    Okay.

3    Q    All right.  So again, let me just ask you again, now

4    that you had a chance to refresh your recollection.  You can

5    put the document down.  Did you state in your April 15th,

6    2019 declaration that the Debtors had no more than

7    approximately $2.88 billion of collateral available to

8    secure the first and second lien debts senior to the second

9    lien 2010 notes?

10   A    That's what it appears to say, yes.

11   Q    And that was your sworn statement, correct?

12   A    Yes.

13   Q    Thank you.

14        MR. FOX:  Your Honor, based on this, I have no

15   further questions.  But based on Mr. Griffith's testimony, I

16   would ask that Paragraph 32 of his second supplemental

17   declaration -- I'm sorry, Paragraphs 32 and 33 of his second

18   supplemental declaration be stricken.  And those relate to

19   the 506(c) costs for the professions.

20        THE COURT:  This has nothing to do with his

21   declaration, right?  That's -- you're going back to his

22   earlier testimony before his last question?

23        MR. FOX:  Yes.  Yes, I'm going back now.  I have

24   no further questions.

25        THE COURT:  Okay, all right.

1          MR. FOX:  So going back to his --

2          THE COURT:  All right, so do you have a response

3     to that?

4          MR. GENENDER:  Yeah, no.  Thank you, Judge. I'll

5     make a segue to it.  Judge, he's -- it is exactly what he

6     did and the fact that --

7          THE COURT:  I'll take it for what it's worth, you

8     cross-examined him on it.  I think there's -- I get -- I

9     understand your cross-examination.  I'm not going to strike

10    it.

11         MR. FOX:  Okay, fine.  We've also designated that

12    testimony, as some additional testimony, but I -- but the

13    point is, we think it's clear that he has no personal

14    knowledge of this at all and other people did it for him.

15    And now, he's testifying that he knows what happened.  Thank

16    you, Your Honor.

17         THE COURT:  Okay.  Well, he refers to my team, so

18    --

19         MR. FOX:  Well, in his deposition testimony, Your

20    Honor, he just said his Counsel did it and he didn't know.

21    And when he was asked what -- about certain specific

22    professionals, he knew nothing about whether they were

23    included or not.  And that's the problem.  And even with

24    respect to his testimony here, he (indiscernible) --

25         THE COURT:  I --

1          MR. FOX:  $51 million can't be determined.

2          THE COURT:  I view the Counsel as part of the

3     team.

4          MR. FOX:  Thank you, Your Honor.

5          THE COURT:  Okay.  And they're probably most

6     knowledgeable in terms of evaluating (indiscernible) amount.

7          MR. GENENDER:  So look, I was hitting the big

8     trifecta, Judge.  I'm just going to try and get organized

9     with these notes here, okay?

10          THE COURT:  Okay.

11          RE-DIRECT EXAMINATION OF MR. BRIAN GRIFFITH

12     BY MR. GENENDER:

13     Q    Mr. Griffith, do you have your second supplemental

14     declaration in front of you?

15     A    I do.

16     Q    Can you turn to Exhibit H in your second supplemental

17     declaration?

18     A    Okay.

19     Q    That chart is entitled "506(c) Expenses".  Do you see

20     that?

21     A    I do.

22     Q    And it breaks expenses that you totaled according to

23     the time period that's reflected there.  Do you see that?

24     A    I do.

25     Q    Does that roughly correspond to the date of the ESL bid

1  through the APA being signed, and then the date of the APA

2  being signed through the APA closing?

3  A    It does, yes.

4  Q    First, you totaled the first number to be $273 million

5  of expenses, and the second number to be $254 million of

6  expenses?

7  A    That's right, yes.

8  Q    And the pages following, is that the backup for those

9  figures?

10 A    It is.

11 Q    Okay.  Exhibit I, while we're there, please?  You had

12 just asked your original declaration before we had anything

13 on 507(b) or 506(c) from the two L's on May 26th had a chart

14 of the total (indiscernible) $451 billion of expenses,

15 correct?

16 A    That's right, yes.

17 Q    Is that the same number that's reflected on Exhibit I

18 in your direct testimony declaration that was submitted last

19 week?

20 A    It is, yes.

21 Q    Now the pages that follow, the backup?

22 A    Yes.

23 Q    And the last page, the JOB store on non-sale related,

24 are those the items on the backup that were excluded?

25 A    As we excluded, yes, for the (indiscernible).

Page 228

1   Q    So just to be clear, notwithstanding the fact that this

2   particular copy that I'm looking at is hard to read, if you

3   took that backup less what is on the last page, the $295.3,

4   would you end up with the $1.45 billion?

5   A    Yes.

6   Q    Thank you, sir.  Can you find Mr. Riecker's declaration

7   in one of the -- in the notebook that was provided to you --

8   it feels like a long time ago, by Mr. Norman.  Do you have

9   that?

10  A    I do.

11  Q    You asked about, I believe it was Paragraph 8, is that

12  right?

13  A    Yes.

14  Q    You were also asked about this in your deposition, is

15  that correct?

16  A    I was, yes.

17  Q    Do you believe Mr. Riecker made a mistake in this

18  paragraph?

19  A    I believe the $2.74 is not accurate, yes.

20  Q    All right.  Did you testify that in your deposition?

21  A    I did.

22  Q    How do you believe it's inaccurate?

23  A    I believe they've taken the closed book value as

24  opposed to the NOLV, which they -- I would assume meant to

25  take it from the borrowing base.

1   Q   Okay.  While we're on that, I'd like to ask you about

2   the April 15th declaration that Mr. Fox just handed you.

3   You should have it loose copied.

4   A   Yes.

5   Q   He asks you about the $2.88 billion that you're on

6   Paragraph 4.  Do you see that?

7   A   I do.

8   Q   Your sentence in your declaration says, "As provided in

9   the borrowing base certificate attached as Exhibit 1."  Do

10   you see that?

11   A   I do.

12   Q   If you turn to Exhibit 1, the borrowing base

13   certificate, do you see anywhere on that the borrowing base

14   certificate, that $2.88 billion figure?

15   A   I do not.

16   Q   Okay.  Might that $2.88 billion figure in Paragraph 4

17   of your April 15th declaration, might that be a mistake?

18          MR. FOX:  Objection, Your Honor.  That's a leading

19   question.

20          THE COURT:  You can ask it.

21   A   It appears it can be possible, yes.

22   Q   Okay.  Would you defer, sir, instead, to what the

23   referenced exhibit in this sentence says for the value of

24   the inventory?

25   A   I'm sorry, could you repeat that?

1    Q    Would you instead -- your sentence that you were asked

2    about referred, as provided in the borrowing base

3    certificate attached is Exhibit 1 --

4    A    Yes.

5    Q    What does that say as to the value of the inventory?

6    A    Yeah, I mean, here we have the stock lender and the net

7    eligible inventory as of that October 13th date in the

8    exhibit.

9    Q    I said inventory to be fair, that your text says

10   collateral, correct?

11   A    Correct.

12   Q    Okay.  Thank you.  Have you ever seen a liquidation of

13   a company -- a full-on liquidation of the company the size

14   of Sears, a full-on liquidation?

15   A    I have not been part of it, no.

16   Q    You were asked questions about the letters of credit.

17   In fact, that they secured obligations under -- the

18   obligations as secured, right?

19   A    Yes.

20   Q    And do you have an understanding as to what then the

21   vast majority -- you heard Ms. Murray's testimony that 89.1

22   percent related to worker's comp?

23   A    Yes.

24   Q    Claims?  Do you have a view, based on your knowledge,

25   personal knowledge, as to how long out into the future those

Page 231

1    obligations can go?

2    A    I do.

3    Q    What is that view?

4    A    They can be outstanding for up to 20 to 30 years based

5    on potential claims filed by ex-employees for slip and fall,

6    for auto accidents, et cetera.  They have in the past year,

7    paid out over $26 million in claims under the various

8    policies that are in place.  They can (indiscernible)

9    outstanding for quite some time.  We would expect those LCs

10   to be either the liability will eventually be paid off as

11   time goes on through the monthly and weekly and daily kind

12   of payments or to the extent the company will just stop

13   performing, they would be (indiscernible).

14   Q    Did you rely -- are you relying for any of your

15   calculations on the Tiger appraisals?

16   A    I am not.

17   Q    Are you relying on any of the Abacus liquidation

18   appraisals from later in December or January?

19   A    I am not.

20   Q    All right.  Did you do a liquidation analysis?

21   A    Not associated with this, no.

22   Q    You were asked questions about risks in liquidation.

23   Do you recall those questions?

24   A    I do.

25   Q    I want -- at this point, I want to direct you to what

Page 232

1   have become rather noteworthy exhibits, Exhibits 8 and 9,

2   which are also attached to your declaration, to your second

3   supplemental declaration, okay?  Can you get to those,

4   please?

5           MR. GENENDER:  And actually, it might be easier,

6   Your Honor, the excerpts I'm going to ask questions about

7   are in the (indiscernible) that's still underneath the piles

8   we've given you today.

9           MR. MOLONEY:  Your Honor, may I be heard on this,

10  please?

11          THE COURT:  Okay.

12          MR. MOLONEY:  I have two objections.  One, it's

13  beyond the scope.  I asked no questions about these exhibits

14  at all.  And second, I want to continue my objection to

15  (indiscernible) evidence.

16          MR. GENENDER:  Judge, he absolutely referred

17  directly to offer.  I mean, I'm just trying to move them

18  into evidence at this point.  I mean, the issue of the fair

19  market value of the collateral as of the sale date is what

20  he's testified about is (indiscernible) --

21          THE COURT:  You can move to offer them into

22  evidence, but I don't think you can ask any questions about

23  them --

24          MR. GENENDER:  All right.

25          THE COURT:  -- because it wasn't the subject of

Page 233

1    cross.

2              MR. GENENDER:  Okay.

3    Q    Mr. Griffith, Exhibits 8, what are marked as Joint

4    Exhibit 8 and 9 are attached to your declaration, is that

5    correct?

6    A    Yes.

7    Q    And they're attached to your second supplemental

8    declaration as Exhibits A and B, is that correct?

9    A    I believe so, yes.

10   Q    Can you describe -- do you have personal knowledge of

11   the documents?

12   A    I do.  These were documents that were provided during

13   the course of negotiations to get the going concern and

14   transaction completed.

15   Q    Do you know who prepared each of the documents?

16   A    I believe ESL and their advisors.

17   Q    Were you present when these were presented?

18   A    I was.

19   Q    Did you review either and rely on either of these

20   documents when you were collecting facts from which you went

21   about determining factually what the fair market value of

22   the second lien collateral was that was sold as part of the

23   sale transaction?

24   A    Yes, we did.

25              MR. MOLONEY:  (indiscernible) --

1          THE COURT:  May I have (indiscernible) on this?

2     (indiscernible) --

3               RE-CROSS EXAMINATION OF BRIAN GRIFFITH

4     BY MR. MOLONEY:

5     Q    Were either of these documents contained in your

6     initial declaration?

7     A    They were not in the initial declaration, no.

8     Q    And then you filed another declaration.  Were either of

9     these documents contained in your second declaration?

10    A    We were looking to make the point stronger by

11    (indiscernible) --

12    Q    Can you answer my question?  Were either of these

13    documents referred to in your second declaration?

14    A    I don't recall if we talked about the fact that we had

15    additional documents.

16    Q    You may look at it.

17    A    I don't believe we referenced them in the second -- or

18    in the first supplemental.

19    Q    Okay.  And had you concluded your factual investigation

20    before your first declaration under oath as to the value of

21    the collateral?  Yes or no?

22    A    Can you repeat the question?

23    Q    Had you concluded your factual declaration as of -- as

24    to -- your first declaration under oath, as to the value of

25    collateral?

1              MR. GENENDER:  This is not appropriate

2      (indiscernible) --

3              MR. MOLONEY:  Well he said that -- the question

4      was it was part of his factual investigation.  I'm finding

5      out whether in fact it was part of his factual, "factual"

6      investigation, because if that's the predicate for admitting

7      it, that was -- it apparently is not true.

8              THE COURT:  Continue.

9      A    It was the basis all along for how we understood the 85

10     cents.  We pointed to the APA initially, I think to support

11     that, we also wanted to offer up additional documents that

12     we had.

13     Q    You did not -- but did not refer it in either of your

14     two declarations?

15     A    They're in my third declaration, yes.

16             MR. MOLONEY:  Thank you.  We object, Your Honor,

17     to the use of these documents.

18             THE COURT:  Okay, on what basis?

19             MR. MOLONEY:  We object to them on the grounds

20     that they're parole evidence, on the grounds that the

21     (indiscernible) before he was deposed in this case, he had

22     to produce them.  And that -- those are the two grounds.

23             THE COURT:  Well, I've already ruled on the parole

24     evidence (indiscernible).  As far as the (indiscernible) --

25     he should've produced them before his deposition.  I don't

Page 236

1    know what the parties agreements or understanding were as

2    far as document production.

3              MR. GENENDER:  I think I've answered that

4    question, (indiscernible).

5              THE COURT:  That's not an expert, so the ESL

6    wouldn't cover it, as referred to earlier.

7              MR. GENENDER:  Well, I believe these were produced

8    by ESL, but Judge, I'm also going to say this and under the

9    theory of no good deed goes unpunished, he's not an expert,

10   but we kept getting declarations according to the expert

11   schedule, and now it's like, it's not fair that it

12   (indiscernible) --

13             THE COURT:  Well, this is an ESL Bates stamped --

14             MR. GENENDER:  Correct.

15             THE COURT:  At least 8 is.  Let me look at 9.

16             MR. GENENDER:  Correct.  So in terms of

17   (indiscernible) --

18             THE COURT:  9 doesn't have a Bates stamp,

19   actually, but 8 does.

20             MR. GENENDER:  They were produced, Your Honor, by

21   ESL.  That was a nonsensical comment by Counsel.

22             MR. MOLONEY:  This is also, for the

23   (indiscernible) draft, confidential, not for distribution --

24             THE COURT:  They stopped being admitted for the

25   truth, because this is part of the settlement discussions,

Page 237

1   but it's being admitted for what the parties were talking to

2   each other about.

3            MR. MOLONEY:  What are we objecting to being used

4   -- it violates your settlement discussions --

5            THE COURT:  No, it's not being offered as the

6   truth.  It's being offered as what they discussed.

7            MR. MOLONEY:  And understanding what the relevance

8   is, if it's not for the proof of the documents, I don't

9   understand what the relevance would be.  We object on the

10  grounds of relevance, too, Your Honor.

11           THE COURT:  It's reasonably relevant.

12           MR. GENENDER:  I was actually in the process of

13  trying to lay the (indiscernible) offering.

14           THE COURT:  Okay, all right.

15            RE-DIRECT EXAMINATION OF BRIAN GRIFFITH

16  BY MR. GENENDER:

17  Q    Mr. Griffith, do you have the ESL bid summary in front

18  of you?

19  A    I do.

20  Q    Okay.  Is this a document that -- let me ask you a

21  question.  Were you aware of the contents of these two

22  documents prior to preparing your second supplemental

23  declaration?

24  A    Yes, I was.

25  Q    Okay.  Do these documents confirm your memory of those

Page 238

1   two presentations?

2   A    They do.

3   Q    Do they provide context that factored into your factual

4   understanding of the value of the collateral in connection

5   with the sale?

6   A    Yes, they do.

7   Q    Do they reflect -- does it inform your factual

8   understanding to know how ESL, Counsel's own client referred

9   to the value of the very collateral at issue?

10  A    It does, yes.

11  Q    Without reading the contents, because the documents are

12  not yet into evidence?  If you can turn to the pages that

13  says JX or it doesn't say it there, it's the fourth page of

14  the ESL bid presentation?

15  A    Yes.

16  Q    It says, "Transaction overview sources and uses."  Do

17  you see that?

18  A    I do.

19  Q    I do not want you to read this out loud.  In Footnotes

20  7 and 8, did you recall Footnotes 7 and 8 before attaching

21  this document to your declaration?

22  A    Yes, I do.

23  Q    Okay.  Did you recall the references to the LC

24  facilities above, on that same page in connection with your

25  declarations?

Page 239

1    A    I do, yes.

2    Q    Could these confirm those recollections?

3    A    It does.

4    Q    If you can turn to the page of the presentation, it

5    says Page 12.  Do you see the line that says "At

6    Illustrative Purchase Price"?  That's a yes or no.

7    A    I see it.  Yes.

8    Q    And there's a number under going concern.  Do you see

9    that?

10   A    I do.

11   Q    Above that it says, "Remaining ABL Collateral."  Do you

12   see that?

13   A    Yes.

14   Q    How could those numbers for remaining ABL collateral

15   and at Illustrative purchase price, how do they compare with

16   numbers that aren't in Sections 3.1 and 10.9 of the APA?

17   A    They're identical.

18   Q    Do you see next, this is -- and this is again a

19   document prepared by ESL, right?

20   A    It is.

21   Q    Do you see there, next to going concerns, it says,

22   "Liquidation"?

23            MR. MOLONEY:  Your Honor, he can't read from the

24   exhibit.  It's not in evidence and he can't ask him about

25   the numbers.  This is -- either we're going to get a foot in

Page 240

1    evidence and we'll have an objection, including under Rule

2    408 and parole evidence and relevance, because the date's

3    way off in terms of when our offer bids were made, or it's

4    not going into evidence.  But we can't -- they shouldn't be

5    able to (indiscernible) --

6            THE COURT:  You've already set up the context for

7    the first one.  You should just -- you should do this

8    (indiscernible).  So --

9            MR. GENENDER:  Thank you.

10            THE COURT:  Are you offering it into evidence?

11            MR. GENENDER:  I am offering it.  Yes, Your Honor.

12            THE COURT:  Okay.

13            MR. GENENDER:  I think I heard three objections.

14    I am offering (indiscernible), and Your Honor, that's --

15            MR. MOLONEY:  And Your Honor, we would object on

16    three grounds.  We object on the grounds of parole evidence,

17    understanding and respecting Your Honor (indiscernible)

18    ruling.  We object under Rule 408, because we don't believe

19    that these -- that they're not being -- we don't think that

20    Rule 408 permits the use of these documents in trial context

21    for what we said during the discussions.  That's what this

22    witness -- that's the only purpose of doing that.

23            And we object on relevance for multiple reasons.

24    One is it's -- and we object to it on the grounds that it's

25    an incomplete document.  Four, because there's a preamble to

1    it that says that if we have the full document, it would say

2    that this is not an offer.  This is not something you can

3    rely on.  This is not an indication.  So we object on all

4    four grounds.

5            MR. GENENDER:  Your Honor, the joint exhibit list

6    only reserves a right to argue relevance of any joint

7    exhibit and to argue that a joint exhibit is in proper

8    parole evidence, supported rule on parole evidence, and this

9    is -- I think the Court's also ruled on relevance.

10           And Judge, the last point I'd say is, and the

11   UCC's Counsel can chime in as they deem appropriate, but we

12   have a --

13           MR. MOLONEY:  (indiscernible) --

14           MR. GENENDER:  Excuse me.

15           MR. MOLONEY:  Sorry.

16           MR. GENENDER:  That we have equitable arguments,

17   and I know the UCC does as well.  And they certainly go to

18   that, to the extent that the ESL is taking directly contrary

19   positions now than those that were taken at the operative

20   times, regarding the very facts and trying to -- and argue

21   inequitably benefit from that at the expense of other

22   stakeholders.

23           MR. MOLONEY:  Just for the benefit of the Court,

24   I'd like to read to Rule 408, Your Honor, prohibited use.

25   Evidence of the following is not admissible on behalf of any

1    party, either to prove or disprove the validity or amount of

2    the disputed claim.  This 408 could not be clear, I think

3    it's appropriate on three independent grounds, but under

4    408, it's clearly inappropriate.

5            MR. GENENDER:  Judge, it's not a settlement

6    communication.  They're trying to get us -- ESL is trying to

7    get us to accept a bid.  They're trying to get us to --

8            MR. MOLONEY:  We're trying to get a release.

9            MR. GENENDER:  And it's a very complicated deal.

10           MR. WEAVER:  Your Honor, just for the record, I

11   want to (indiscernible) all (indiscernible).  Your Honor,

12   (indiscernible).

13           MR. GENENDER:  You're a Judge, I provoked the UCC

14   to come to my rescue.

15           MR. SORKIN:  Your Honor, Joseph Sorkin, of Akin

16   Gump on behalf of the UCC.  I don't know that I'm adding

17   anything new other than to simply point out when you

18   understand the context of the (indiscernible) log units

19   we've made to judicial estoppel on 19 hands.  This is

20   exactly the sort of information that we are highlighting,

21   because on the one-hand, you had ESL as the potential

22   purchaser saying the inventory should be valued at a certain

23   amount, 85 percent -- excuse me, 85 cents as a going

24   concern, 82 and a half cents as a liquidation.

25           And then here, ESL as a second lien, saying

Page 243

1    something completely different, that you have a 99 cent

2    value.  This goes to the equitable arguments, setting aside

3    whether or not it could be admitted as evidence of -- parole

4    evidence, which I think has already been ruled on, that's

5    not what it's being used for.

6              But it is simply going to -- the statements they

7    have made at the time about the value in connection with the

8    sale that they were pursuing and advocating from the

9    beginning of these cases.  So I think separate and apart

10   from everything else that has been raised, it is certainly

11   admissible with respect to the equitable arguments that have

12   been raised.

13             MR. MOLONEY:  Your Honor, from a legal point of

14   view, the fact that they want to raise it for an equitable

15   argument or a legal argument is totally relevant.  So that

16   argument's irrelevant other than that they're just trying

17   not to poison the well by actually informing Your Honor a

18   part of the story.

19             It's a more complicated document.  Part of it

20   required that (indiscernible) a release.  Part of it was an

21   indication of (indiscernible) value.  Part of it was an

22   effort on our part to compare apples and oranges, apples to

23   apples and oranges to oranges at an earlier point in time,

24   well before actually any of the bids occurred in this case,

25   any of the contracts were drafted, well before additional

Page 244

1       billion dollars in value was put in play.

2              THE COURT:  I understand that point.  That goes to

3       the weight I gave it and how relevant I think it is.

4              MR. MOLONEY:  Right.  408 just says you just can't

5       use it, and we shouldn't have even started down this road.

6              THE COURT:  Well --

7              MR. MOLONEY:  And I think that 411 of this rule

8       does as well, with all due respect.

9              THE COURT:  It's hard for me to see that all of

10      this is covered by 408.

11             MR. MOLONEY:  I don't think you can

12      (indiscernible) --

13             THE COURT:  Well --

14             MR. MOLONEY:  If it's relevant to a

15      (indiscernible) claim regardless, Rule 408, that's exactly

16      the prohibitive real use of the Rule 408.  That's what 408

17      says.

18             THE COURT:  But this isn't -- this isn't the claim

19      that you were negotiating.  The only claim you were

20      negotiating here was the release.

21             MR. MOLONEY:  It does really -- that's not what

22      408 says.  408 says if it's being used for a claim and the

23      prohibitive use, if it falls not in this (indiscernible),

24      but even to approve or disprove the validity of the matter

25      of the disputed claim or to impeach by a prior existing

Page 245

1    statement or a contradiction.  And there are exceptions, and

2    they're not falling under any of the exceptions.  I think in

3    a bankruptcy context, Your Honor, there are all types of

4    negotiations that go on for people saying at the very

5    beginning, this is a 408 discussion and expect that the

6    confidence shows -- the value of those discussions and what

7    they say back and forth are not going to appear in a Court

8    hearing later on.

9              I think this is a broader issue than just this

10   particular argument in this case, and I think as a policy

11   matter, this is not appropriate.

12             MR. GENENDER:  The document's not marked 408, it's

13   --

14             THE COURT:  One of them is.  The second one is,

15   but you're not just dealing with the first one.

16             MR. GENENDER:  Yeah.  And one of the Joint Exhibit

17   8 is actually produced with an ESL Bates number on it.

18             MR. MOLONEY:  408 does not protect us from the

19   discovery, Your Honor.  I'm not arguing it does.  It does

20   protect us against this use of information in Court.

21             THE COURT:  I (indiscernible) have the statute in

22   front of me and the rule on this just appeared.

23             MR. MOLONEY:  I could approach the bench.  I can

24   hand it off, the rules.

25             THE COURT:  So again, the context here is

Page 246

1    compromising or attempting to compromise a claim or to a

2    compromised negotiations about the claim, not just general

3    negotiations.

4              MR. MOLONEY:  I think no one's going to say that

5    our 507(b) claims are -- or (indiscernible) claims are not

6    part of this whole picture.

7              THE COURT:  But that's not what people are

8    negotiating here.  This is a sale negotiation.

9              MR. MOLONEY:  Well, actually, it's a negotiation

10   over a complete resolution, as I said, it's an incomplete

11   document, so we don't have to get any release.

12             THE COURT:  Well, is there any mention of 507(b)

13   here?  I understand there are discussions about the release

14   might be confidential, but I --

15             MR. MOLONEY:  But they may -- Your Honor, the

16   complete document, I don't even know whether that 507(b)

17   gets mentioned.  But that certainly was the fact that there

18   would be administrative claims asserted as part of the

19   ongoing negotiations, (indiscernible) of all of these

20   discussions.

21             MR. GENENDER:  Judge, I'm looking at 8, Your

22   Honor, produced by ESL.  ESL bid details, why ESL's bid

23   should prevail to the party to whom they're making the bid.

24   That's not settlement.  And then, the litigation

25   considerations.  We're not focused on the litigation

1    consideration portion anyway.

2          And Your Honor, this -- their arguments might make

3    sense.  Are we litigating the release that became part of

4    the APA.  We're not.  It's already in the APA.  So the

5    argument -- there's nothing being compromised here, and

6    frankly, what they're trying to do is use this, this --

7    before this Court of equity, taking an equitable position by

8    shielding the very evidence that shows how disingenuous the

9    positions are that they're taking now, and questioning and

10   suggesting to this fact witness that 85 cents has no bearing

11   anywhere, except in their own documents.

12         And by the way, January 2nd was after they'd

13   already submitted their initial bid.  And they were inducing

14   us -- the inducement was to get us to accept their bid, as

15   this Court knows far better than me.

16         MR. MOLONEY:  The next page, Your Honor, this is

17   why we -- if I can approach the bench?  If you look at JX08-

18   14, you'll see that in the very next page, it's not in this

19   binder, the shortened binder of the exhibit.  It says, "As a

20   result of the decrease of value, the 2L inter-collateral,

21   ESL is a valid super priority claim of previously uncovered

22   assets."  It was quite -- this is the -- this is what we're

23   looking over.  It's right here in the next page of this

24   presentation.

25         THE COURT:  Let me see that.  These are just

Page 248

1    questions, though.  This is not part of the negotiation.

2    It's like a separate (indiscernible) --

3              MR. MOLONEY:  (indiscernible) --

4              THE COURT:  You are right that it's a -- this is a

5    separate issue.

6              MR. MOLONEY:  Your Honor --

7              THE COURT:  Consisting with how the parties have

8    dealt with this.  (indiscernible) --

9              MR. MOLONEY:  (indiscernible) is that this is not

10   relevant, Your Honor.

11             THE COURT:  Well --

12             MR. MOLONEY:  And it's --

13             THE COURT:  I think it's -- I'm not going to

14   exclude it on relevance.  I believe it's --

15             MR. MOLONEY:  And not parole evidence, it's

16   improper parole evidence and --

17             THE COURT:  Well, I've already ruled on this.

18   This is not to enforce an agreement.

19             MR. GENENDER:  The only things they've reserved,

20   Your Honor, under the joint exhibit list were relevance and

21   parole evidence, and I believe they've ruled on this.

22             THE COURT:  Well, 408, if 408 would apply, it

23   would go to relevance, because if I had to exclude it, then

24   it wouldn't be relevant.  But to me, people slap 408 on

25   almost everything that they exchange, and this does not seem

Page 249

1    to be a settlement discussion on a claim for the purposes of

2    the rule.

3              And it doesn't have to be about 507(b).  That's

4    not -- it doesn't have to be the claim at issue, as to why

5    it would be excluded or not --

6              MR. MOLONEY:  I just think people have -- I think

7    people have a reasonable expectation, when they attend these

8    type of meetings, an early stage of the negotiation that

9    they can make good faith proposals back and forth that are

10   not going to be part of a hearing like this.  I think that

11   was the intention of putting on -- but I respect Your

12   Honor's ruling --

13             THE COURT:  Okay.

14             MR. MOLONEY:  But I think that is the expectation

15   of people in that circumstance, which I know Your Honor was

16   in once not too long ago, that they're not going to see

17   these type of folks show up in a hearing like this.  Your

18   Honor, having said that, Your Honor, I think that this has

19   very little, if any relevance because that offer was not

20   accepted.  That bid never went forward.  That ship sailed

21   many years later.

22             THE COURT:  Well, that's a separate -- that's a

23   separate issue, all right?  So I appreciate that.

24             MR. MOLONEY:  I think there is very little

25   relevance preventing it.

Page 250

1          THE COURT:  Okay, all right.  But I actually -- I

2     think what you're alluding to Mr. Moloney is the types of

3     confidentiality stipulations and confidentiality orders that

4     are added in mediations when people are actually mediating a

5     claim.  That wasn't done here.  I don't think you have to do

6     it to protect true negotiations over claims.  But to me,

7     this is a sale proposal, and I don't -- you know, just like

8     the Tiger and other proposals that are in the record,

9     they're not excluded because they're settlement

10    negotiations, I don't think this one is, either.

11         You're right.  Part of the proposal was demanding

12    a release, but I think that stands on its own.  I don't

13    think this ties into that.  So I would admit it.

14         MR. GENENDER:  That's as to 8, Your Honor?  Would

15    the same apply to 9?

16         THE COURT:  Well, let me see.  I was actually

17    looking.  In my book, 9 comes first for some reason.  And I

18    was focusing on 9.  8 is the one that actually refers to

19    408?

20         MR. GENENDER:  Yes, that's correct.

21         MR. MOLONEY:  Your Honor, I will (indiscernible),

22    Your Honor, but can I have just for the record, all my other

23    objections preserved as to (indiscernible) --

24         THE COURT:  Sure, absolutely.

25         MR. MOLONEY:  Thank you, Your Honor.

 1                 THE COURT:  Yeah.

 2                 MR. GENENDER:  I'd like to offer --

 3                 THE COURT:  As the letter to all parties.

 4                 MR. GENENDER:  I'd like to offer 8 and 9 together.

 5      I'm happy to lay predicate for the sources of the uses

 6      document.

 7                 THE COURT:  Okay.  Well, I think you already did -

 8      - no, you didn't do it as to 8 yet.

 9                    (Exhibit 9 is Admitted Into Evidence)

10                 MR. GENENDER:  Okay.  So 9 is in.  Let me do that

11      as to 8.

12                 RE-DIRECT EXAMINATION OF MR. BRIAN GRIFFITH

13      BY MR. GENENDER:

14      Q    Do you have the document that's attached to your

15      declaration, Project Transform ESL Bid Presentation, January

16      2, 2019?  I believe it's -- is it Exhibit A or B to your

17      second supplemental declaration?

18      A    I do.

19      Q    Okay.  Also represent that is marked for identification

20      as Joint Exhibit 8.  Mr. Griffith, is this a document that

21      you were thinking up in connection with coming up with the

22      facts that you used to evaluate the collateral on -- in

23      February?

24      A    It is, yes.

25      Q    Were you present when this presentation was made?

1    A    That's right.

2    Q    Do you see on the fourth page of the presentation,

3    which is also JX8-5, Footnotes 7 and 8?

4    A    I do.

5    Q    Do you see the references to 85 cents?

6    A    Yes.

7    Q    Do you see the numbers associated with projected book

8    value of inventory in Footnote 7?

9              MAN:   Judge, what Exhibit are we now in?

10             MR. GENENDER:   8.

11   A    I do.

12   Q    Do you see the number associated with projected book

13   value of credit card and pharmacy receivables?

14   A    I do.

15   Q    If you add those two numbers up, do you see any

16   correlation to what actually ended up in the APA?

17   A    Yes, that's the $1,657,000,000.  It's in the section I

18   believe that (indiscernible).

19   Q    Okay.  Did any -- to your knowledge, did those -- did

20   that number change between January 2nd, 2019, the day that

21   Exhibit 8 and when the APA was executed on January 17th?

22   A    I believe we delivered slightly more inventory, but

23   (indiscernible) --

24   Q    The number that's --

25             MR. MOLONEY:  Your Honor, I can't (indiscernible)

Page 253

1    the answers.

2    Q    Did the total number change as was referenced in

3    Section 10.9?

4    A    No, it did not.  No.

5    Q    If you'll turn to Page 12 of the -- if you will turn to

6    Page 12 of the document?  Do you see the reference "To going

7    concern and liquidation scenarios"?

8    A    I do.

9    Q    We talked about the going concern scenario.  And there

10   is a Footnote 2 next to the liquidation scenario.  Do you

11   see that?

12   A    Yes.

13   Q    Footnote 2 says, "Assumes 85 percent purchase price and

14   going concern scenario, of a liquidation scenario assumes 82

15   and a half percent purchase price."  Do you see that?

16   A    I do see that.  Yes.

17   Q    Who prepared this document?

18   A    ESL and their advisors, I believe.

19   Q    On January 2nd, 2018, it was -- 2019, it was presented?

20   A    Yes.

21   Q    And you were there?

22   A    I was.

23        MR. GENENDER:  Now I'll offer Exhibit 8 into

24   evidence.

25        THE COURT:  Okay.

1          MR. MOLONEY:  The same objections.

2          THE COURT:  The same objections, the same ruling.

3          MR. GENENDER:  Thank you.

4          THE COURT:  So I'll admit it.

5              (Exhibit 8 Admitted Into Evidence)

6    Q    Mr. Griffith, are you aware of any analysis, of any of

7    the potential 506(c) expenses that any of the 2L experts

8    undertook?

9    A    No, I'm not.

10   Q    In connection with the different analyses that you

11   performed, totaling $1.451 billion and the alternative

12   numbers for the different dates we talked about, did you

13   ever take any efforts to ensure that there was no double

14   counting?

15   A    Yes, we did.

16   Q    Okay.  Is it your testimony that there is no double

17   counting?

18   A    There is no double counting.

19   Q    You understand Ms. Murray did, according to her

20   testimony and NOLV analysis?

21   A    Yes.

22   Q    In which she took the net eligible inventory and

23   applied 88.7 to that?

24   A    Yes.

25   Q    If you have the 507(b) chart, do you see your inventory

Page 255

1   number is $2.287 billion, correct?

2   A    I do.  I see that.

3   Q    Could you do a (indiscernible) check, even though you

4   didn't do an eligibility, a liquidation analysis, could you

5   do a (indiscernible) check comparison, taking your number of

6   $2.287 and dividing it by the same $2.391 net eligible

7   inventory number that she did, when she applied 88.7 percent

8   to that number?  If you took as a numerator your $2.287 and

9   divided it by $2.391, did you -- do you know what that math

10  is?

11  A    It would be more than 95 percent or 95 plus.

12  Q    Where she had 88.7, you'd have 95 plus?

13  A    Yes.

14  Q    Mr. Griffith, were the letters of credit, the two

15  letters of credit part of the sale?

16  A    Yes, they were.

17  Q    Were the three -- were they part of the purchase price?

18  A    Yes.

19  Q    Were they $395 million of the purchase price?

20  A    Yes, they were.

21  Q    As it relates to the post-petition interest, Judge

22  Drain asked you a question, what was your purpose in

23  calculating and including $34 million of post-petition 1L

24  interest?

25  A    It was just the bare minimum interest we would expect

1    to incur regardless of the path chosen.  Again, it's just

2    related to the first lien debt and not DIP, and only for a

3    three-month period.

4    Q    Mr. Griffith, if that number were not included in the

5    507(b) analysis, that $34 million, would it be a 506(c)

6    potential expense?

7    A    It would, yes.

8    Q    Did you double count there?

9    A    We did not.  Like I said, in our analysis we came up

10   with, there is no diminution in value.  There is no 507

11   date, when we applied for the post-petition first lien

12   interest.  To the extent that that was not going to be the

13   case where there was a 507(b), we would then have the full

14   amount for the 506(c) to be calculated.

15   Q    As it relates to 506(c), Mr. Griffith, do you have your

16   second supplemental declaration in front of you?

17   A    I do.

18   Q    You see Paragraphs 29 and 30 on Pages 15 and 16.

19   A    Yes.

20   Q    Those are your -- are those your descriptions of what

21   you included and what you excluded?

22   A    Yes, it is.

23   Q    Did Counsel for the second lien holders ask you about

24   those descriptions when they were cross-examining?

25   A    No, they did not.

Page 257

1          MR. GENENDER:  I'll pass the witness.  Thank you,

2     Your Honor.

3          MR. MOLONEY:  Your Honor, I didn't expect to be

4     asking about Exhibits 8 and 9, so if you -- I just want to

5     make sure you know (indiscernible) save full copies, and you

6     can just make sure we have it?

7          THE COURT:  Sure, that's fine.

8          MR. GENENDER:  I think they're in your book, Your

9     Honor.

10          THE COURT:  They're attached to his declaration,

11     right?

12          MR. GENENDER:  I don't know if the entire --

13          THE COURT:  Is the full copy attached to his

14     declaration?  I'm not sure.

15          MR. GENENDER:  Yes.  Yes.

16          THE COURT:  Okay.

17          RE-CROSS-EXAMINATION OF MR. BRIAN GRIFFITH

18     BY MR. MOLONEY:

19     Q   .  Well, we'll find out (indiscernible).  Let's start

20     with Exhibit Number 9.  Do you have that in front of you?

21     A    Which one is that, (indiscernible)?

22     Q    It's the first (indiscernible), Exhibit Number 9, it's

23     dated December 2018.

24     A    Okay, yes.

25     Q    Okay?  And looking at the second page of this exhibit,

Page 258

1    you see this claimant?

2    A    Yes.

3    Q    It says, "This presentation is solely for informational

4    purposes.  The presentation is not intended to provide the

5    basis for a decision on any transaction.  The recipient

6    should make its own independent business and legal decisions

7    based on all (indiscernible) information.  Advice and

8    recipient's own judgment."  And it says in bolded language,

9    "This presentation is not an offer to sell or a solicitation

10   or an indication of interest to purchase any security

11   option, commodity, future loan or currency.  It is not a

12   commitment to underwrite any security to (indiscernible)

13   funds or to make any investments."  Did I read that right?

14   A    I do see that, yes.

15   Q    And looking to the second page, the footnote you were

16   looking at begins with the word "Footnote 7 should assume

17   purchase (indiscernible)," right, on Footnote 7?  It's a

18   number on the top based on the assumption, correct?

19   A    That's what it says, yes.

20   Q    Right?  And the number -- Number 8 is simply an

21   assumption, right?  It says, "Assumed purchase" -- it's an

22   assumption, right?

23   A    That's what it says, yes.

24   Q    There's no statement here with an opinion of that,

25   right?

1   A    Just the assumptions they're using here with the

2   sources and (indiscernible), yeah.

3   Q    Thank you.  I have no more questions about this

4   exhibit.  I wanted to note, it says in the right hand

5   corner, "Preliminary draft, confidential, not for

6   distribution," right?

7   A    Yes.

8   Q    And was there any discussion in the meeting that people

9   would not use this information for any purpose, that

10  (indiscernible) speech as to how to use the information?

11  A    I don't recall.  I don't believe so.

12  Q    Were you at the meeting?

13  A    I was.

14  Q    Okay.  Looking at Exhibit JX08-1, the first page it

15  should say, Your Honor, "Logic transform ESL bid

16  presentation."  And it should have a stamp, "Highly

17  confidential, not for distribution subject to Rule 408."  Do

18  you see that?

19  A    Yes.

20  Q    Mr. Griffith?  And it says, in (indiscernible), "Any

21  information regarding valuation forecasts, projections,

22  recoveries or treatment of this presentation is for

23  illustrative and discussion purposes only, and assumes that

24  all transactions contemplated here are executed in a timely

25  manner, and that no transaction will be executed unless all

Page 260

1    transactions are executed as contemplated herein, right?

2    A    I see it, yes.

3    Q    And the date is January 2, 2019?  Is that correct?

4    A    Yes.

5    Q    And this exhibit has the same disclaimer that we just

6    looked at at the -- before and the second page, correct?

7    A    Yes.

8    Q    And including that was not a commitment to make any

9    investment, right?

10   A    Yes.

11   Q    And there's -- in the next page, there's one that's

12   (indiscernible) it says, "Litigation consideration."  Is

13   that right?

14   A    Yes, that's one of them.

15   Q    And the meeting was in part to discuss litigation

16   considerations?

17   A    Yes, it was one of the topics.

18   Q    And was there any discussions beginning this meeting as

19   to whether the parties would -- how the parties would use

20   the information that was conveyed during the meeting or

21   whether they would be under any undertaking to keep it

22   confidential?

23   A    It's a long time, but I don't recall if there was or

24   was not.

25   Q    Were you at the meeting?

Page 261

1    A    Yes, I believe I was.

2    Q    Okay.  Now if you look at the next page, it's -- it

3    says beginning, "ESL's pleased to offer its $4.4 billion bid

4    for Newco as a going concern."  Do you see that?

5    A    Yes.

6    Q    What's the ultimate bid in this case, the $4.4 billion

7    bid?

8    A    No, there was -- it was $5.2.

9    Q    So the bid being discussed here is not the bid that was

10   actually made in this case, right?

11   A    I think additional liabilities were assumed.

12   Q    And there's a reference here in a rollover debt, they

13   included both the $232 (indiscernible) DIP, and the $271

14   million of the (indiscernible) facility, correct?

15   A    Yes.

16   Q    And then your build-up to say that 100 percent wasn't

17   paid from the collateral on -- under $3.1 in the ultimate

18   purchase agreement, you didn't cap the $271 million,

19   otherwise you would've gone over 100 percent, right?

20   A    To (indiscernible) a separate part of the APA

21   consideration.

22   Q    Okay.  And looking at the next page, again, Footnote 7

23   and 8 did the same as the other footnotes before, and

24   they're just assumptions.  They're no opinions, right?

25   A    It says assumed purchase price, yes.

Page 262

1   Q    And turning the page again, it -- go to page date X08-

2   12.  And as a reference to how the two (indiscernible) is

3   going to be covered by the proposal, right?

4   A    What page are you on?

5   Q    JX08-12.  Page 12 of the presentation.  Actually, 11 of

6   the presentation, but it bears Bates stamp number JX008-12.

7   A    Okay.

8   Q    You see that?  And you see where it says two

9   (indiscernible)?  And it says, "To be used to bid for

10  inventory and ABL collateral," and you see that bullet

11  point?  And it indicates that the residual claim, I mean,

12  the portion of the claim that was not bid for inventory or

13  collateral was to include adequate protection super priority

14  liens and claims, right?

15  A    I see that.

16  Q    So basically, did they indicate that they expected that

17  part of this package that they would obtain adequate

18  protection and super priority liens and claims for the

19  remainder of their claim, correct?

20  A    That's what they believed, yes, they did.

21  Q    And what was discussed about that?

22  A    I don't recall the exact conversations.  It was a while

23  ago.

24  Q    I have no more questions, Your Honor.

25          THE COURT:  Okay.

1              MR. GENENDER:  No questions, Your Honor.

2              THE COURT:  Okay.

3                  CROSS-EXAMINATION OF MR. BRIAN GRIFFITH

4    BY MR. FOX:

5    Q    Mr. Griffith, Edward Fox.  You asked whether it was

6    double counting in the 506(c) charges or (indiscernible).

7    And you said there was no double count.  Now you're aware

8    that there is a professional fee carve-out account in this

9    case, correct?

10   A    Yes.

11   Q    Okay.  And findings are taken off the top of the first

12   and second lien collateral and put into the professional fee

13   carve-out account to pay for the fees and expenses with any

14   professionals, the hand-off of the second lien holders,

15   correct?

16   A    Yes.

17   Q    Okay.  And so, that's taken place on a weekly basis,

18   and as those fees have been approved, they have been paid,

19   correct?

20   A    We fund the account.  And then, as with the

21   applications are approved, we will disperse what we can from

22   the account.  Yes.

23   Q    Right.  So now once of the surcharges you want includes

24   $51 million for professional fees, correct?

25   A    As part of the 506(c), yes.

Page 264

1    Q    Okay.  And in fact, though, all of those fees are

2    funded out of the carve-out account in order to pay it out

3    of the carve-out account ahead of the second lien

4    collateral, correct?

5    A    I mean, we're viewing them as expenses incurred post-

6    petition for the benefit of the sale, so yes.

7    Q    I didn't ask you that.  I asked you if those -- that

8    $51 million is part of the professional fees that get funded

9    out of the professional fee carve-out account ahead of the

10   second liens collateral and paid when those -- as those fee

11   applications are approved?

12   A    Yes, they'd be funded from the (indiscernible) account.

13   Q    Thank you.  I also wanted to ask you about the letter

14   of credit facility that came up again.  The total is $395

15   million of the two letter of credit facilities, correct?

16   A    Yes.

17   Q    Okay.  And one of those is the $271 million facility,

18   and I believe that's cash collateralized by ESL and the

19   Cyrus, correct?

20   A    Yes.

21   Q    Okay.  But nevertheless, you believed that that $271

22   million of undrawn LCs should come ahead of the second lien

23   in the inventory collateral stack, correct?

24   A    Yes.

25   Q    Okay.  And you also said there's $123.8 million, I

Page 265

1  think, of letters of credit, which are part of the ABL DIP

2  loan, correct?

3  A    Yes.

4  Q    Okay.  And so, of the $850 million that was owing on

5  the ABL DIP loan at the closing of the sale, part of that

6  $850, $123 was the undrawn letters of credit, correct?

7  A    Yes.

8  Q    Okay.  The $271 million, though, was not part of that

9  $850, correct?

10  A    That's correct.

11  Q    Okay.  So the $271 million that you're saying encumbers

12  our collateral ahead of the second lien was not included in

13  the $850, correct?

14  A    That's a separate facility, yes.

15  Q    But it's not included in the $850, correct?

16  A    It's not part of that facility, no.

17  Q    Okay.  And it's not included in the $433 million credit

18  bid, correct?

19  A    That's correct.

20  Q    Okay.  And it's not included in the $125 million

21  (indiscernible) loan payoff either, right?

22  A    That's correct.

23  Q    Okay.  So it's an additional $271 million relating to

24  the inventory, which has to be paid off at the closing on

25  top of those amounts that I just referred to, the first lien

Page 266

1    loan, $850, the credit bid of $433 and the $125

2    (indiscernible) loan, correct?

3    A    Yes.  It's a different piece, yes.

4    Q    Fine.  And so, in addition to the $850 to $433 and the

5    $125, which totals a billion 408, they also had to pay off

6    an additional $271 million of letters of credit relating to

7    the credit bid, which would then total $1,679,000,000,

8    correct?

9    A    I believe it's the same (indiscernible) structure they

10   have today, the 271 is still outstanding.  It never came

11   against the borrowing base, but it is not a part of the APL

12   facility, so it's the same.  It might as well --

13   Q    But you're counting it against our collateral, correct?

14   A    I don't believe I am.

15   Q    Well, when you say the $271 million comes ahead of the

16   second lien and it adds to the total amount that was

17   outstanding on top of the first lien ABL, you're adding it

18   ahead of us, correct?

19   A    Well, it is first lien down.

20   Q    Okay.  So let's go back to my question again.  Is the

21   $850 million a first lien ABL debt that had to be paid off

22   that was a lien in on a collateral, $433 million credit bid

23   for the second lien, $125 million five loan, which was a

24   first lien application.  According to you, there's $271

25   million additional, which is a lien on the inventory ahead

Page 267

1   of the second lien.  Those four things together total

2   $1,679,000,000, don't they?

3   A    It's a separate part of the APA, but yes.

4   Q    But your answer is yes, correct?  They total

5   $1,679,000,000, don't they?

6   A    I'd have to do the calculation (indiscernible)?

7   Q    Well, go ahead.  Would you like me to calculate it?

8   A    (indiscernible) --

9   Q    Would you like one?

10  A    No, I think we're good.

11  Q    Okay.  So what's the -- do you want to do the

12  calculation and tell me the answer?

13  A    It sounds correct.

14  Q    Okay.  Now what was the amount of inventory in Section

15  10.9 that had to be turned -- collateral that had to be

16  turned over in connection with a closing in the sale?

17  A    It's a billion 657.

18  Q    Okay.  Now if you divide the before, to get to your 85

19  percent, you divided what, what was that formula?

20  A    It's the $850 from the ABL facility, it's the $433 on

21  the credit bid, and it's the $100 and -- I believe it's the

22  $150 term loan, (indiscernible) term loan.

23  Q    So you divided the $1,408,000,000 by -- what was the

24  amount of $10.9?

25  A    $1,657,000,000.

Page 268

```
 1    Q    By -- and you've got 84.9 percent, correct?

 2    A    85 percent, yes.

 3    Q    Okay.  So if you divide $1,679,000,000 divided by

 4    $1,657,000,000, you get 101 percent, correct?  Is that the

 5    math?

 6    A    The math is correct.

 7    Q    Thank you.  Thank you.

 8              THE COURT:  Okay, thanks.

 9              DIRECT EXAMINATION OF MR. PAUL GRIFFITH

10    BY MR. GENENDER:

11    Q    Mr. Griffith, was the $271 million line of credit --

12    letter of credit facility outstanding on the petition date?

13    A    Yes.

14    Q    Was it paid as part of -- is it paid off as part of the

15    sale transaction?

16    A    It was, yes.

17    Q    Is the last bit of math that you did relevant to the

18    value of the collateral based on your factual observations?

19    A    I don't think so.  No.

20    Q    Did you calculate -- we talked about this in the

21    response -- there was a discussion at the morning break.

22    Did you -- during the break, did you calculate the carve-out

23    funding to date?

24    A    Yes, we did.

25    Q    Do you recall what that number is?
```

Page 269

1   A    I believe it was approximately $213 million.

2   Q    Okay.  And if that number were included in -- as a

3   senior debt, would that matter, the $1.45 billion of 501(c)

4   potential surcharges expenses that you testified to?

5   A    We would remove I think the $51 million that we've

6   referenced as a part of the 506(c).

7   Q    Okay.

8            MR. GENENDER:  May I approach the witness, Your

9   Honor?.

10           THE COURT:  Okay.

11           MR. GENENDER:  I have an updated demonstrative,

12  but (indiscernible) --

13           THE COURT:  (indiscernible).

14           MR. GENENDER:  I (indiscernible) asked him before

15  (indiscernible).

16  Q    Mr. Griffith, is -- did I just -- is what I handed you,

17  is that a demonstrative that would -- that was prepared by

18  you and your team at the lunch hour?

19  A    Yes, it is.

20  Q    Is the left-hand column Griffith with CO, is that

21  carve-out?  Is that what's (indiscernible)?

22  A    Yes, that's the carve-out.

23  Q    Okay.  Does that fairly and accurately reflect what you

24  just testified to?

25  A    It does.

1          MR. GENENDER:  Your Honor, may I pass the

2    (indiscernible).

3          THE COURT:  Okay.

4    Q    Do you -- at the meetings you were at in December 2018

5    and January 2nd, 2019 that would reflect -- that are

6    reflected in Joint Exhibits 8 and 9, do you have any memory

7    of anyone talking about confidential settlement of disputed

8    claims?

9    A    I honestly don't recall.

10   Q    You have no memory of that?

11   A    I do not.

12   Q    What, if anything, do you recall anyone on behalf of

13   ESL at either of those meetings talking about in terms of

14   the 85 cent references in the documents in connection with

15   the 2L collateral?

16         MR. MOLONEY:  We object, Your Honor.

17   (indiscernible).

18         THE COURT:  I'm sorry, on what basis?

19         MR. MOLONEY:  On the basis of the -- of all the

20   objections I've raised before about it, but (indiscernible)

21   repeating them.

22         THE COURT:  All right, okay.  So you can answer

23   the question.

24   A    I can't recall specific conversations, but I know that

25   this is what was discussed in terms of the (indiscernible) -

Page 271

```
 1   -
 2   Q    Do you recall references to the --
 3            MR. MOLONEY:  I object to that.  If he wants to
 4   just --
 5            MR. GENENDER:  I'm going to ask a different
 6   question --
 7            MR. MOLONEY:  All right, so I'm not going to --
 8            MR. GENENDER:  Move to strike that answer.
 9            THE COURT:  Go ahead.
10   Q    Do you recall references to 85 cents during the
11   meetings?
12   A    Yes.
13   Q    All right, by who?
14   A    By Moelis and ESL, I believe.
15   Q    Okay.
16            MR. GENENDER:  Thank you, Your Honor.
17            THE COURT:  Okay.  Anything on that?  Okay, you
18   can step down.
19            MR. GENENDER:  Your Honor, the Debtors rest on
20   this.
21            THE COURT:  Okay.  All right.  Do you have any
22   rebuttal on the 506(c)?
23            MR. FOX:  No.
24            THE COURT:  No?  All right.  Well, I think
25   notwithstanding, all the work the parties did, they were
```

Page 272

1    overly optimistic that I'd be in a position to hear oral

2    argument and rule today.  We should get a date as soon as --

3    a date for Ms. Lee that is as close to today as possible to

4    have oral argument and a ruling, I think it'd be half a day

5    for both -- you know, total half a day for oral argument and

6    a ruling.

7            MR. FOX:  Thanks very much.

8            MR. GENENDER:  Thank you, Your Honor.

9            MR. MOLONEY:  Thank you, Your Honor.  I'm going to

10   be out of the country next week, Your Honor.

11           MAN:  Oh don't even start with me, Tom.

12           MR. MOLONEY:  Well, no, I'm just saying.

13           MAN:  I tried to get out of here --

14           MR. GENENDER:  You were so accommodating --

15           MAN:  Your Honor, is it possible tomorrow --

16           THE COURT:  Well, talk to Ms. Lee.  She runs

17   (indiscernible).  I know (indiscernible), but I

18   (indiscernible) have -- Thursday afternoon.

19           MAN:  Your Honor, in all fairness, I mean, we've

20   had trouble scheduling with Mr. Schrock until literally last

21   week, when we had a call before we spoke.  He's on a plane

22   tonight in California.  He's doing the closing

23   (indiscernible), so --

24           THE COURT:  So --

25           MAN:  I'm assuming that was an oversight.

Page 273

1          THE COURT:  Well, I don't know who's doing the

2     final arbiting.

3          MAN:  He is.  We told him that.

4          THE COURT:  Well, I think you should talk now

5     between yourselves, unless you have to go out to the airport

6     right now, Mr. Schrock, and figure out what days you'd be

7     available, and then --

8          MR. SCHROCK:  Okay.  We'll do that, Judge.

9          MAN:  Thank you.

10          THE COURT:  (indiscernible) is probably not here

11     at this point, so you could talk to her tomorrow morning.

12          MAN:  Okay, thank you, Your Honor.

13          THE COURT:  Okay.

14          MAN:  Thank you, Judge.

15          MAN:  Thank you, Your Honor.

16          (Whereupon these proceedings were concluded at

17     5:42 PM)

18

19

20

21

22

23

24

25

Page 274

1                        C E R T I F I C A T I O N

2

3          I, Sonya Ledanski Hyde, certified that the foregoing

4      transcript is a true and accurate record of the proceedings.

5

6      Sonya

7      Ledanski Hyde

Digitally signed by Sonya Ledanski
Hyde
DN: cn=Sonya Ledanski Hyde, o, ou,
email=digital@veritext.com, c=US
Date: 2019.08.07 15:31:45 -04'00'

8      Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20      Veritext Legal Solutions

21      330 Old Country Road

22      Suite 300

23      Mineola, NY 11501

24

25      Date:  July 25, 2019

[& - 2,690,000,000]                                                                    Page 1

| & |
| --- |

**&**   8:3,12,20 9:10
9:18 11:9,16

| 0 |
| --- |

**0.7**   34:2
**006**   81:13
**007**   81:13
**017-3**   207:11
**034**   52:21

| 1 |
| --- |

**1**   4:21 59:5,18,19
62:12 140:21
152:20 155:1
203:25 229:9,12
230:3
**1,200,000,000**
58:21
**1,408,000,000**
267:23
**1,657,000,000**
252:17 267:25
268:4
**1,679,000,000**
266:7 267:2,5
268:3
**1.3**   178:22 179:1
**1.314**   94:22 96:3
**1.375**   95:3,23,25
**1.4**   68:12 87:15
196:21
**1.408**   53:15
**1.45**   215:12 228:4
269:3
**1.451**   132:18
182:15 254:11
**1.531**   84:7
**1.7**   180:3
**1.71**   101:3
**10**   35:5,11,12,12
70:21,21 101:3,4
133:21 169:9
183:3 211:1

**212:20 213:22,24**
**10.9**   239:16 253:3
267:15,24
**10.9.**   168:16
**10/15/2018**   74:16
**10/15/2019**   74:15
**100**   36:18,18
110:18 161:22
175:19 176:9
177:4,13 183:2
219:25 220:1,7
261:16,19 267:21
**10005**   9:13
**10006**   8:6
**10017**   10:3
**10018**   9:5
**10036**   9:21
**101**   268:4
**10153**   8:15
**104**   113:25 114:1
**10601**   1:14
**10:24**   1:17
**10th**   159:10 220:4
221:16
**11**   6:11,13,14 7:4
7:6,7,15,16,17
39:19 41:6,8 65:7
133:15 134:4,21
168:18 184:6
192:23 199:23
200:11 202:23
211:15 215:22
216:2 262:5
**110**   112:13
**112**   77:8
**1120**   52:23
**115**   61:18
**115.5**   60:17
**11501**   274:23
**116**   82:10
**116.2**   79:20 80:16
82:6,18

**11th**   56:7,18,24
57:4 96:16,17,22
133:1
**12**   81:18 180:15
180:19 239:5
253:5,6 262:2,5
**12.4**   77:2
**120**   53:2
**123**   83:24 84:11
88:24 121:14
265:6
**123.2**   114:4
**123.8**   50:7 53:24
264:25
**123.8.**   83:11
**124**   176:4
**125**   53:3 126:20
126:21 127:1,14
265:20 266:1,5,23
**128**   83:9
**13**   81:16 118:4
**135**   175:18
**138**   94:9
**13th**   77:9 230:7
**14**   34:8,15,19
81:17 179:8
247:18
**14,927,627**   221:21
**14.5**   79:25 82:13
82:17
**14.51**   192:7
**144**   186:8,14,18
187:8,14,21 188:2
188:3,9
**15**   23:25 25:13,21
25:22 41:5,16
44:10 59:5 68:24
84:7 113:24
223:23 256:18
**150**   68:7 267:22
**158**   102:19
**15th**   140:20
154:23 222:16

**224:5 229:2,17**
**16**   25:14,22,22
35:24 36:2,9
37:22 256:18
**17**   207:9 215:1,5
**171**   201:13,15,23
202:11
**172**   202:4,12,13
202:14
**17th**   56:18 57:4
96:22 252:21
**18**   104:14 143:18
156:8 215:22,25
**18-23538**   1:3
**18th**   15:1 31:13
31:20 83:3 220:13
**19**   104:14 242:19
**19.1**   94:10
**1927**   88:22
**19th**   31:17
**1:30**   137:21
**1l**   19:20 49:12
50:6,19 54:9,15
54:19,20 55:12
60:3,5 80:23,24
81:16,20 83:9,12
83:20 84:18 86:19
87:22,23 88:10,19
95:10 119:21
120:2,3 122:4
127:5 255:23

| 2 |
| --- |

**2**   5:1 157:9 161:1
202:5,8,11 251:16
253:10,13 260:3
**2,000**   223:11
**2,287,000,000**
78:8
**2,334,000,000**
95:19
**2,690,000,000**
107:1

**2.073**   32:13
**2.074**   33:12 74:11
**2.088**   34:5
**2.1**   81:17 120:10
   167:18 168:5,6,8
**2.196**   116:11
   118:9,14
**2.287**   90:18 91:4
   255:1,6,8
**2.287.**   118:9
**2.319**   116:8
**2.334**   114:5 127:1
**2.391**   39:5 90:20
   115:21 116:1
   255:6,9
**2.457**   114:2,3
   121:20 126:21,25
**2.497**   74:10
**2.664**   45:4
**2.664.**   45:5
**2.69**   39:5 77:9,19
   89:17,21
**2.691**   77:12,20
   161:10 162:25
**2.7**   112:13
**2.74**   131:22
   228:19
**2.746**   160:24
**2.76**   160:18
**2.88**   223:9 224:7
   229:5,14,16
**2.928**   44:23 48:10
**20**   70:23,24 72:12
   100:17 102:8,10
   123:3 218:8,12
   219:23 220:5
   231:4
**200**   8:22 47:17
   207:1
**2010**   224:9
**2015**   131:21,23
**2016**   93:16

**2017**   101:3
**2018**   41:5,16 71:4
   76:18 84:7 87:6
   101:5,12 103:7
   118:4 131:25
   134:16,18 154:23
   203:23 204:2,6
   207:4 253:19
   257:23 270:4
**2019**   1:16 2:2
   31:14,20 40:7,13
   40:18,24 41:6,8
   56:7 76:18 83:3
   96:22,22 101:6,12
   103:7 122:13
   125:23 133:1
   134:16 147:12
   155:1,2 156:7,7,8
   167:3 214:3 218:7
   222:16 223:23
   224:6 251:16
   252:20 253:19
   260:3 270:5
   274:25
**206**   121:19
**206.5**   121:24
**208.1**   94:18 96:8
**209.6**   47:20 48:16
   59:21
**20th**   10:2
**21**   53:11 136:22
**210**   59:21
**213**   82:16 83:1
   269:1
**213.4**   139:12
   150:7
**23**   1:16 2:2 31:2
   201:15,23
**230**   86:14
**232**   261:13
**239.1.**   90:14
**248**   1:13

**25**   188:11,15,17
   274:25
**250**   145:4
**254**   227:5
**26**   231:7
**26.5**   71:9
**262**   99:1 200:8
**269.1**   90:14
**26th**   156:7 218:7
   219:24 227:13
**27**   72:13 155:2,2
**27.4**   71:7
**271**   49:21 53:8
   83:23,24 84:6,11
   86:15,18 88:24
   175:18,21 176:9
   176:14,23 177:12
   177:19 178:1
   261:13,18 264:17
   264:21 265:8,11
   265:23 266:6,10
   266:15,24 268:11
**272**   6:25
**273**   227:4
**27th**   18:10 155:9
   156:7 159:9 210:9
   215:24
**28**   9:12 96:16
   171:17
**28th**   56:6,24 71:4
   96:17 203:22
   204:2,4
**29**   70:21 76:20
   100:3 110:4,9
   168:8,11 256:18
**295**   10:2 183:4
**295.3**   187:13
   188:4 228:3
**29th**   39:19
**2:30**   137:22
**2a**   74:14
**2b**   74:14

**2l**   41:7 45:13 46:6
   48:17 59:22 66:5
   80:4,8,10,16,23
   80:25 81:17,24
   82:11 88:2,2
   105:13 119:8,8,21
   120:9 132:25
   154:1 205:16
   215:18 247:20
   254:7 270:15
**2l's**   11:11
**2letters**   55:12
   83:19 84:13,18
   85:1
**2nd**   247:12
   252:20 253:19
   270:5

**3**

**3**   38:25,25 39:2,12
   72:23,25 74:12
   76:12 86:2,4,5
   161:8 207:11
**3,011,000,000**
   78:8
**3,279,000,000**
   81:8 95:18
**3.011**   76:12 77:1,7
   77:12,20,23
**3.1**   54:1,4,4 81:15
   100:20 103:12,22
   103:24 104:12,13
   239:16 261:17
**3.1.**   167:20,21
**3.91**   91:4
**30**   32:3,4,6,7
   33:20 41:25 42:1
   42:24 62:7,11,13
   62:23,23 63:1,2
   70:7 123:3 231:4
   256:18
**300**   1:13 8:22
   23:24,24 38:16
   39:17 65:22 90:13

162:3,8,11,13
274:22
**3012** 2:21 3:6,15
3:23 4:8,16,24
5:13,21 6:4,22
7:14 23:18 135:25
141:19
**31** 32:12,15,17
43:7 62:7,11,14
67:11 70:9 183:3
**3198** 222:22
**32** 220:13 221:20
222:12 224:16,17
**320** 77:16
**33** 221:25 222:12
224:17
**330** 274:21
**34** 52:17,20 53:2
54:24 55:2,12
60:5 87:10 88:18
88:19 95:10 106:7
192:3,25 194:25
255:23 256:5
**35** 35:23 36:2,10
39:2,3
**350** 78:14 94:24
**36** 39:10
**365** 101:7
**37.7** 71:8
**375** 44:16,18
59:10,18
**39** 147:20,23
**395** 49:4,8 50:17
60:2 84:11,14
88:23 95:7 123:7
127:7 255:19
264:14

**4**

**4** 6:25 22:16 34:3
34:11 36:13,22
38:1 39:9 85:12
85:13,25 86:3,5
112:12 116:20,21

204:1 207:8
222:22 223:8,24
223:25 229:6,16
**4,000** 65:4
**4,272** 4:10
**4.4** 48:24 85:14
86:10 101:7 261:3
261:6
**4/27** 147:12
**400** 112:8,8
**400,000** 222:3
**403** 184:8,14
185:19,22 186:15
186:17 187:1
**4034** 2:16,24 3:8
3:18 4:1
**408** 176:7 240:2
240:18,20 241:24
242:2,4 244:4,10
244:15,16,16,22
244:22 245:5,12
245:18 248:22,22
248:24 250:19
259:17 266:5
**411** 244:7
**414.5** 184:4,8
185:2
**42** 52:23 53:2
184:1,1
**425** 99:3
**4272** 2:9
**4273** 4:18
**4274** 5:3
**4276** 5:5
**4278** 5:8
**4279** 6:15 7:8
**4280** 7:18
**429** 55:15 95:13
127:5,11,14
**4313** 5:15
**433** 175:10 176:2
265:17 266:1,4,22
267:20

**4381** 2:24 3:18 4:1
**4385** 3:18
**44** 188:16
**4439** 2:9 5:23
**4440** 6:6
**4445** 6:16
**450** 102:25 103:1
**451** 185:20,22
187:3 227:14
**4538** 4:2
**4564** 2:12
**4565** 2:3 3:9
**4569** 62:7,7,21
**4570** 6:25 35:7
62:10,18
**4586** 7:9
**4587** 7:19
**470** 102:6
**49** 141:17 151:11
151:12,12
**492** 127:24

**5**

**5** 25:13 29:9 38:25
100:19,21 101:9
**5.2** 50:17 84:15
123:7
**5.2.** 261:8
**5.5** 101:6
**50** 151:3
**501** 86:14 269:3
**503** 6:12 7:4
**506** 2:20,24 3:4,8
3:13,17,22 4:1,7
4:10,15,18,23 5:1
5:12,15,20,23 6:3
6:6,15,21,24 7:8
7:15,18 21:6 30:9
31:11 55:18 91:22
91:24 92:7,9,18
93:3,24 94:3,5,6
94:13 96:8,10
97:8 102:14
107:20,24 108:6

108:14,22 109:12
123:20,21,22,23
124:5,7 126:15
135:11,13 137:9
137:12 139:23
146:15,16 153:23
179:17,20,24
180:6 184:19
192:14,16 193:11
193:15 215:12
216:6,25 218:8,18
220:19 224:19
226:19 227:13
254:7 256:5,14,15
263:6,25 269:6
271:22
**507** 2:3,14,20,22
3:4,7,14,17,23 4:1
4:7,15,23 5:12,20
6:3,13,21 7:6,16
14:16,22 21:5
28:9 31:2,7 47:24
48:4 55:10 58:10
58:12,16 60:16
75:13 76:3 82:4
89:23 94:17,20,22
105:6 115:15
121:16 126:18
127:23 132:3
135:11 136:2,20
136:25 137:10,10
137:18 138:13
139:4,16,18
140:11,13,23,25
141:20 142:7
143:3 144:11
145:4,7 146:24
147:24 148:18
150:12,20 153:25
192:13,15 193:15
194:18 195:1,20
205:18 227:13
246:5,12,16 249:3

254:25 256:5,10
256:13
**51** 53:12 94:9
139:22 151:11
221:18 222:13
226:1 263:24
264:8 269:5
**51.6** 206:8,11
**52** 54:3 87:18
**53** 137:1 141:4
143:21
**54** 137:1
**54.8** 47:2,9 79:11
82:21
**550** 127:15
**590** 68:7
**595** 48:12,20
**5:42** 273:17
**5th** 210:2

**6**

**6** 36:19 71:5 81:18
119:20,21 143:13
143:14 160:15
204:6,8,11 205:3
**60** 58:19 60:9 96:5
127:24
**600** 101:5 215:6
**61** 136:22
**617** 48:25
**62** 114:2
**620** 9:4
**64.2** 47:9
**64.3** 82:21
**65** 186:5 196:7
**657** 267:17
**66** 137:7 179:25
180:3
**687** 200:5
**690.8.** 161:1

**7**

**7** 81:16 119:20,21
161:9 211:18,21
211:25 213:4,24

218:12 238:20,20
252:3,8 258:16,17
261:22
**7.1** 88:21
**7/20** 147:12
**700** 65:5 67:13,17
130:6
**71** 32:6,7,15,17
35:24 36:2,9 42:1
42:6,24 62:7,8,11
62:11,13,14,20,23
62:23 63:1,2
67:12 70:7,9,21
148:5 186:5
188:16 196:7
**72.8** 80:1 82:14,17
**725** 78:1,4,12
**734** 68:7
**75201** 8:23
**767** 8:14

**8**

**8** 26:9 50:23 51:3
74:6 85:7,10
86:25 143:13
228:11 232:1
233:3,4 236:15,19
238:20,20 245:17
246:21 250:14,18
251:4,8,11,20
252:3,10,21
253:23 254:5
257:4 258:20
261:23 270:6
**800** 130:6
**816** 77:23
**82** 242:24 253:14
**820** 95:1
**83** 74:7
**84.9** 268:1
**85** 23:22 27:25
43:14,20,21 44:10
49:1 59:4 89:4,9
89:10,16 90:2,3,7

99:7,18,19 106:25
107:6,12,15 108:4
110:18 161:13,21
163:6,8,18 164:21
164:22 168:14
169:6 170:2 175:3
175:10 176:2
177:11 205:22,25
235:9 242:23,23
247:10 252:5
253:13 267:18
268:2 270:14
271:10
**850** 176:5 265:4,6
265:9,13,15 266:1
266:4,21 267:20
**88.7** 97:18 115:8
115:10 116:4,22
124:3 125:6
203:21 254:23
255:7,12
**89.1** 122:16,24
230:21

**9**

**9** 26:9 49:13 50:23
51:24 87:4,5
171:18 211:1
212:20 213:14
232:1 233:4
236:15,18 250:15
250:17,18 251:4,9
251:10 257:4,20
257:22 270:6
**9.1** 122:12 200:16
**9.4** 47:10,13
**9.5** 79:17 82:12
**9.5.** 82:19,20
**90** 125:10,12
131:3,13,15 181:8
208:9 214:4,7
**90.2** 207:5,21
208:9,12

**90.3** 208:4
**91** 192:8
**92** 118:6
**93** 125:10,12
131:3
**93.7** 207:5,21
208:10,12
**93.8** 208:4
**94** 74:11 192:8,18
192:21 194:7
**945** 95:16
**95** 64:22 91:5
255:11,11,12
**95.6** 43:1,4 45:3
48:24 72:3 196:12
197:13
**96** 91:2 99:7
107:12
**96.4** 89:6 196:17
**962.7** 58:13 60:9
**99** 243:1

**a**

**abacus** 42:21
129:9 130:2,3,4
130:12,15,24
131:8 187:19
206:14,14,17,20
206:23 207:1,4,16
207:19 208:20
210:5,13,19
231:17
**abacus'** 208:23
**abandoned**
210:16
**abersold** 14:21
**ability** 39:7 143:3
**abl** 50:8 53:18,23
176:4,12 178:1,23
179:3,18 193:21
193:22 203:6,7,11
203:14 204:25
205:6 239:11,14
262:10 265:1,5

[abl - affirm]                                                                          Page 5

| | | | |
|---|---|---|---|
| 266:17,21 267:20 | accounted 67:4,5 | 116:9 118:19 | 143:19 246:18 |
| **able** 108:21 | 175:21 176:16,18 | 152:5 250:4 | **admissibility** |
| 111:14 125:24 | **accounting** 37:23 | **adding** 61:17 | 17:11 |
| 142:19 152:8 | 65:17 66:12,18,23 | 115:7 242:16 | **admissible** 166:15 |
| 193:21 213:2 | 66:23,24 67:1,8 | 266:17 | 172:6 241:25 |
| 240:5 | 172:20 | **addition** 84:6 | 243:11 |
| **absent** 193:20 | **accounts** 38:11 | 130:12,15 152:3 | **admission** 172:8 |
| **absolutely** 26:19 | 45:15 68:24 | 212:24 266:4 | **admissions** |
| 30:14 35:11 85:25 | 142:25 190:12 | **additional** 152:4 | 166:16 |
| 232:16 250:24 | 217:12 | 186:9 225:12 | **admit** 28:5 250:13 |
| **accept** 19:14 | **accrual** 106:8 | 234:15 235:11 | 254:4 |
| 21:25 55:15,17 | **accrue** 106:13 | 243:25 261:11 | **admitted** 24:22 |
| 59:4 82:24,25 | **accuracy** 42:18 | 265:23 266:6,25 | 26:16,16 236:24 |
| 122:25 127:21 | 75:23 181:13 | **address** 47:12 | 237:1 243:3 251:9 |
| 242:7 247:14 | **accurate** 42:19 | 137:13,23 166:12 | 254:5 |
| **accepted** 24:11 | 197:7 228:19 | 170:17 | **admitting** 235:6 |
| 65:15,17 210:10 | 274:4 | **addressed** 137:8 | **adopted** 63:21 |
| 249:20 | **accurately** 269:23 | **addressing** 6:19 | 180:19 |
| **accidents** 231:6 | **achieve** 72:14 | **adds** 47:17 60:8 | **advance** 158:25 |
| **accommodating** | **achieved** 71:9 | 82:16 182:15,17 | 203:1 |
| 272:14 | 198:22 | 266:16 | **advanced** 11:23 |
| **account** 35:21 | **achieving** 35:15 | **adequate** 137:2 | **advertising** 36:7 |
| 37:7 38:4 54:13 | **acquired** 168:7,8 | 139:9,19 142:6,23 | 68:2 185:11 |
| 66:4,13 70:14 | 168:9,11,12,12,13 | 143:8 144:6 145:7 | 186:21 |
| 124:4,6 136:3 | **act** 93:17 | 147:25 148:1,4 | **advice** 46:2 258:7 |
| 137:14,16 139:10 | **actual** 14:23 | 149:1,5 150:19 | **advisor** 187:19 |
| 140:15,24 141:2 | 18:12 22:8 24:10 | 151:10,20 152:10 | 206:17 |
| 142:5,15,18,20 | 25:4 52:12 58:18 | 152:14 178:20 | **advisors** 93:17 |
| 143:2,6,7,12,14 | 64:12 89:6 99:6 | 194:6,8,12,17 | 203:11 204:25 |
| 143:15,23 144:1,2 | 104:2 117:17 | 195:20 262:13,17 | 205:7 233:16 |
| 144:7,11,13,20 | 133:8,9 165:5 | **adjust** 43:11 | 253:18 |
| 145:15,16 148:13 | 173:19 174:4 | **adjusted** 44:10 | **advisory** 210:5 |
| 148:16 149:6,16 | 180:8 184:9,22 | 45:2 215:2,9 | **advocating** 243:8 |
| 149:17,19,21 | 195:2 212:9 | **adjustment** 43:8 | **aebersold** 154:3 |
| 150:5,20 151:2,6 | **actualize** 178:12 | 44:9 48:18,22,23 | 154:16,17,20,21 |
| 151:8,10 152:9,13 | **actuals** 197:23 | 48:24,25 59:1,5,6 | 155:11,15 |
| 184:21 197:8 | **ada** 166:7 | 59:19 162:3 | **affairs** 119:5 |
| 214:10,14,21 | **add** 46:22 47:13 | **adjustments** | **affect** 114:10,10 |
| 216:8 263:8,13,20 | 55:15 112:6 | 139:20 215:5 | **affidavit** 181:16 |
| 263:22 264:2,3,9 | 175:10,17,18 | **administrative** | 191:8 |
| 264:12 | 176:2,9 252:15 | 2:20 3:5 4:7,15,24 | **affiliated** 117:2 |
| **accountants** | **added** 45:6 47:15 | 5:13,21 6:3,11,12 | **affirm** 28:18 73:8 |
| 65:16 | 78:16 82:5,10,17 | 6:22 7:1,4,5 | 113:10 154:14 |

155:23
**afternoon** 97:6
98:13 114:20,21
138:23 156:21
198:3,4 216:23
272:18
**agent** 6:10 7:3,13
9:3 12:18 129:15
222:20
**agents** 170:25
**aggregate** 61:13
66:13 81:6 84:11
103:22 105:2,17
105:18 151:13
167:23 168:2,3,6
168:25 196:12,16
**ago** 35:25 130:2
153:17 228:8
249:16 262:23
**agree** 34:18 48:15
48:20,23 49:1,10
55:19 56:1 57:12
77:1,6,7 82:5
84:13 91:7,10,23
92:4 119:24 120:2
121:18,22 126:25
127:2 144:17
146:11 162:5
164:16,18 170:11
170:14,14 172:5
178:1 198:13
200:1,7,10 203:3
204:4 206:20
207:4 208:18
215:17
**agreed** 25:1 26:20
27:1 135:16
157:11 159:13,19
**agreement** 26:6
27:17 40:8 45:15
45:16 46:11,21
52:9 81:16,17,20
81:25 120:3,9

123:8,10 146:4,13
150:16,21,25
157:3,11 158:15
165:9 169:13,13
169:16,20,23
170:1,1,15,19,20
173:1 248:18
261:18
**agreements** 46:9
80:24 81:2 119:22
144:10 236:1
**ah** 39:14
**aha** 62:22
**ahead** 28:9 30:12
44:22 61:21 74:20
113:3 114:16
145:20 148:8
150:8 156:13
175:8,14 176:14
193:8 264:3,9,22
265:12 266:15,18
266:25 267:7
271:9
**airport** 273:5
**akin** 9:18 221:18
242:15
**al** 11:7 138:22
171:17
**albeit** 99:2
**alix** 10:8
**allege** 215:13
**allocable** 92:9
**allocate** 170:15
174:8
**allocated** 67:6
**allocates** 171:16
**allocation** 92:4,11
93:5 94:7 103:19
104:11 105:2,3
111:19 168:20
173:20,23 187:18
197:9,11 214:23

**allocations** 171:22
187:17 216:7,12
**allow** 154:5
180:11
**allowance** 7:6
**allowances** 69:7
**allowed** 149:20
164:18,19 213:12
**allowing** 6:13
**allows** 73:25
149:21
**alluded** 65:23
**alluding** 250:2
**alternative** 23:15
116:14 254:11
**alternatively** 24:4
**amazing** 140:3
**ambiguity** 167:4
**ambiguous**
165:24 174:11
**amended** 29:21
31:20 83:17,24
183:24
**america** 213:17
**amount** 2:19,22
3:3,6 4:6,14,22
5:11,19 6:2,20
7:14,15 44:14
47:6 50:8,10 53:7
79:7 84:14 101:13
106:18 115:8
116:9 119:13
122:14 123:14
147:22 152:1,1,2
152:4 162:7
168:21,25 180:10
192:17,19 193:9
215:13 216:12
226:6 242:1,23
256:14 266:16
267:14,24
**amounts** 50:11,11
107:23 137:11

209:7 218:9,17
219:5,10,14,15,23
220:9 265:25
**analyses** 170:25
203:3 254:10
**analysis** 16:13
18:1,19 19:3,4,5,6
19:7,15 21:18
22:16 31:7,11,23
35:15 40:10,11,16
40:20 41:7,14
42:11 50:9 53:22
56:5 60:24 61:4,9
66:17 68:11 69:21
74:16 80:19 84:21
88:1,8 90:23
93:25 94:3 96:20
103:25 105:22
109:14 111:25
115:2,4,23 117:6
117:8 119:9,12,17
121:13 123:21,24
126:12 129:12
130:13,16 131:14
131:17 133:5,8,19
136:7,7,8,21
137:10,12,18
139:5,15,23
140:25 162:4
163:1 175:2 179:8
180:12 183:21
191:14 192:18
193:12 197:16
201:1 202:15
204:13 205:18,22
209:18 213:8
214:3,8,13,15,18
214:19,24 215:6
215:10,11 216:11
218:16,19 220:5
231:20 254:6,20
255:4 256:5,9

analyst 128:15
analysts 128:18
analytical 173:6
analyzed 107:20
ancillary 112:7
andrew 8:9 10:24
  11:16
annual 123:15
annualized
  102:22
answer 24:20
  36:23,24 37:2,3,5
  37:9,11,12,13,15
  37:17,19,21 38:13
  70:18 80:20 84:3
  84:22,24 88:14,15
  90:22,25 142:1
  146:21 181:18,21
  191:12 195:25
  202:4,5,9 212:11
  216:16 234:12
  267:4,12 270:22
  271:8
answered 46:17
  106:23 177:5
  236:3
answers 167:12
  190:7 253:1
answer's 80:18
  90:24
anticipated
  194:13
anymore 117:15
  194:10
anyway 144:3
  153:23 247:1
anyways 22:23
apa 23:21 24:3,12
  24:14 27:8,9,10
  27:11,16,21,25
  28:1 50:14 52:12
  52:13,18,24 53:11
  53:12 54:1 56:18

84:15,20 85:2,3
87:9,21 123:12
143:14 163:9,14
163:15 164:19
165:2,5,19 166:9
166:24,25 171:3,4
171:25 173:14,19
173:24 174:8,10
174:11,11,13
175:3,11,15,22
176:17,19,20
227:1,1,2 235:10
239:16 247:4,4
252:16,21 261:20
267:3
apart 243:9
apl 266:11
apologize 70:22
  78:9 86:6 89:19
  104:14
apparently 235:7
appeal 19:11
appear 16:12
  186:24 245:7
appeared 110:10
  245:22
appearing 19:10
appears 28:24
  63:1 136:22
  186:23 224:10
  229:21
appendix 71:11
  185:20 186:2
  188:11,11,17
apples 118:12,12
  126:24,24 132:6,6
  132:9,9,13,13
  180:13,13 243:22
  243:22,23
applicable 92:12
  220:17
application 89:4
  266:24

applications
  220:21 263:21
  264:11
applied 18:19
  33:16 34:2 42:2
  43:1,13,19 88:22
  88:25 89:9 100:2
  100:11,14,19
  104:13 105:21
  106:9 115:10
  116:4,8 117:24
  118:1 161:13
  254:23 255:7
  256:11
applies 31:23
  89:16 90:2,3
  106:25
apply 20:14,14
  90:7 96:8,10
  192:14 193:13
  248:22 250:15
applying 22:13
  76:20 112:5 115:7
  115:8 129:20
appraisal 15:24
  21:19 71:3 75:20
  75:24 76:1 103:18
  103:19 116:24
  117:2,13,21
  124:22,25 128:12
  133:13,18,19,22
  203:22 204:1,5,8
  209:4 216:9
appraisals 15:25
  18:7 42:12,18
  75:18 124:9
  129:18 202:16
  203:7 231:15,18
appraised 117:12
  117:14,17
appreciate 196:20
  249:23

approach 13:19
  20:21 33:18,22
  34:22 42:2 44:7,7
  63:14,15 74:23
  81:6 114:22
  146:22,25 155:19
  156:15 196:2
  198:2 216:5,14,15
  223:20 245:23
  247:17 269:8
approaches 33:15
  44:5
appropriate
  21:12 23:7 34:23
  112:6 128:4 129:5
  129:11 148:17
  149:7 179:24
  180:7 190:24
  198:18 214:8
  235:1 241:11
  242:3 245:11
appropriately
  129:16 139:21
  150:6
appropriateness
  117:8
approve 195:8
  244:24
approved 263:18
  263:21 264:11
approximate 99:7
approximately
  44:18 45:4 48:12
  49:4,8 65:2 68:7
  74:10 78:1 82:16
  91:2 102:6,19
  107:12 112:8
  118:6 121:19
  131:3 162:10
  176:5 183:2 200:4
  200:6,8 223:9
  224:7 269:1

**april** 15:1,1 17:16
140:20 222:16
223:23 224:5
229:2,17
**arbiting** 273:2
**area** 20:5 212:23
**aren't** 213:14
239:16
**argue** 26:23,24
139:18 140:10
148:20 151:9
166:6 211:3 241:6
241:7,20
**arguing** 140:13
245:19
**argument** 15:3
20:2 23:11 27:8
27:13,24 28:4
145:10,18 153:25
167:6,7,8,10,11
167:12 172:20
174:6 175:6,7
194:22 243:15,15
245:10 247:5
272:2,4,5
**arguments** 17:21
166:20 241:16
243:2,11 247:2
**argument's**
243:16
**arrive** 95:22
**arrived** 36:25
76:12 95:3
**arriving** 75:18
**articulately** 150:3
**ascribe** 94:12
**aside** 107:25
144:15 161:22
163:1 165:4
221:21 243:2
**asked** 46:16 52:4
58:5,5 61:23
62:14,25 63:3,11

84:5 97:14 98:15
105:9 106:7
107:19 110:8
128:11 132:2,4
139:1 141:10
147:8 177:5 187:5
187:6 193:18
201:15,22 202:2,9
218:1 225:21
227:12 228:11,14
230:1,16 231:22
232:13 255:22
263:5 264:7
269:14
**asking** 37:1,21
40:20 101:23
109:3 118:13
159:5 160:22
186:14 188:16
191:23 194:19
201:24 202:1
221:11,12 257:4
**asks** 229:5
**aspect** 52:2 53:25
**aspects** 129:12
213:7
**asserted** 107:23
246:18
**asserting** 109:16
**assessed** 115:11
173:17
**assessment** 17:23
17:25
**assessments** 17:21
**asset** 40:8 45:15
52:9 60:20 123:8
123:10 141:7,8
148:2 170:9
172:21 177:14,15
**assets** 61:16
117:12,14,14,17
120:20 129:7
133:5 139:16,19

140:8,11,16
143:23 144:21
145:2 148:21
149:7 167:3,17
168:4,7,8,9,21,22
168:22,25 169:4
170:21 176:2
177:7 179:16
215:19 247:22
**assist** 130:8
**assistance** 220:19
**assisted** 130:6
**associated** 37:8
38:4,11 54:15
94:11 123:16
159:16 175:3
214:9 217:8
231:21 252:7,12
**association** 2:12
6:10 7:2,12 9:2
12:18 128:17
222:19
**associations** 2:7
**assume** 88:23
105:23 107:5
120:17 135:13
178:14 205:4
214:21 218:17
228:24 258:16
**assumed** 54:2
60:25 84:19 99:18
100:7 108:4 123:9
125:19 131:13,15
177:13,21 178:12
178:13,14 192:3
258:21 261:11,25
**assumes** 181:7
253:13,14 259:23
**assuming** 28:8
110:22 128:3
163:22 180:6
195:4 272:25

**assumption** 20:17
23:20 34:22 61:4
61:15 99:9,24
105:24 106:13
107:19 110:24
119:10,15 133:14
258:18,21,22
**assumptions** 12:3
16:6,9 19:19
21:23 27:19 63:19
103:4 107:21
112:15 118:2
259:1 261:24
**attached** 25:5
29:15 171:16
181:17 191:10
192:16 229:9
230:3 232:2 233:4
233:7 251:14
257:10,13
**attaches** 73:19
**attaching** 238:20
**attack** 142:9
**attempted** 212:7
212:12
**attempting**
212:22 246:1
**attend** 249:7
**attended** 210:3
**attention** 66:16
70:22 213:24
**attorneys** 8:4,13
8:21 9:2,11,19
**attribute** 112:4
**attributing** 111:9
**auction** 93:4
**audio** 139:25
**august** 140:21
**authority** 198:17
199:1
**auto** 188:12,19,20
231:6

**available**  50:8
69:2,13 139:16,17
140:9,18,22 141:1
145:2 152:15,24
186:10 223:10
224:7 273:7
**avenue**  8:14 9:4
10:2
**aware**  17:10
49:21,24 50:6
77:3 84:17,17
85:1 93:16 97:18
106:4 120:15,22
121:6 123:6,9,15
123:18 133:18
157:3,7,11,16,17
196:15 199:22
210:21 211:24
237:21 254:6
263:7

**b**

**b**  1:21 2:3,14,20
2:22 3:4,7,14,17
3:23 4:1,7,8,15,23
5:12,20,22 6:3,21
6:23 7:6,16 14:16
14:22 21:5 28:9
31:2,7 47:24 48:4
55:10 58:10,12,16
75:13 76:3 82:4
89:23 94:17,20,22
97:8 105:6 115:15
121:16 126:18
127:23 132:3
136:2,20,25
137:10,10,18
139:4,16,18
140:11,13,23,25
141:20 142:7
143:3 144:11
145:4,7 146:24
147:24 148:18
150:12,20 154:20

185:23,25 186:2
187:16 192:13,15
193:15 194:18
195:1 196:6
205:18 227:13
233:8 246:5,12,16
249:3 251:16
254:25 256:5,13
**back**  24:5 30:10
40:19 42:10 49:18
50:23 55:10 57:6
58:9 75:8,9 82:4,7
84:6 89:23 90:9
104:9 126:18
137:22 138:21
146:3 151:2,3,8
160:3 171:14
182:8 188:10
224:21,23 225:1
245:7 249:9
266:20
**backed**  157:20
**backup**  25:4
41:20 108:16
109:16 157:12
158:3,7 159:15,16
159:17,19,21,23
159:23 191:11
227:8,21,24 228:3
**balance**  114:4
**ballpark**  179:25
180:2
**bank**  49:20
150:14
**bankruptcy**  1:1
1:12,23 4:8,16,24
5:13,21 6:4,22
7:14 36:5 64:16
64:18,21,24 65:3
65:5 71:10 92:12
92:21 130:7,9
179:17 181:3
199:11 213:2

214:10 245:3
**banks**  129:15,15
**bare**  195:4 255:25
**bargain**  142:11,13
142:24 144:6
145:13 149:2
**base**  18:15 38:17
38:19,22 39:9,21
46:23 47:1,5,15
65:22,25 77:9,18
79:5,9,10,14,18
82:13,22 89:14
90:8,19 115:7,25
116:5 118:3,24
130:1 162:8,15,19
162:21 176:12
190:11 203:1
228:25 229:9,12
229:13 230:2
266:11
**based**  14:19 17:13
17:21 19:6 27:9
49:15 64:13,17
71:2 80:3 81:1
84:3,3,4 88:15
101:9 119:9 124:9
124:22 134:12
144:13 162:4
163:8,18 165:3
175:2 193:7
196:22 197:24
198:19,21 211:11
213:1 215:11
224:14,15 230:24
231:4 258:7,18
268:18
**bases**  48:16,20
199:7,8,13 209:8
**basic**  23:20
146:13
**basically**  15:10
16:11 21:17 24:6
24:8,16 27:12

64:20 67:12 143:2
150:19 168:19
169:15 175:6,25
178:22 179:2
262:16
**basing**  83:25
**basis**  12:4 15:7,11
16:4,23 17:7
23:15 27:13 29:1
45:12 47:4,21
49:14 51:22,25
54:24 55:2 56:16
88:17 92:7 94:13
100:15 102:22
118:17 159:1
161:17 164:21,22
172:25 195:9
197:19 199:19
205:20 222:1
235:9,18 258:5
263:17 270:18,19
**bates**  86:5 204:9
207:11 236:13,18
245:17 262:6
**bear**  35:6 120:13
**bearing**  247:10
**bears**  262:6
**beg**  82:17 104:8,8
**beginning**  26:21
134:15 142:11
144:5 147:23
243:9 245:5
260:18 261:3
**begins**  63:2 209:3
258:16
**behalf**  2:10,15 4:4
4:12 5:2,8,17,25
11:17 12:13,17
13:17 31:13 58:3
97:3 241:25
242:16 270:12
**belief**  80:3 84:1

**believe** 14:18
38:24 41:6 72:22
79:8 80:16 83:11
92:8,10 100:2
102:2 106:7
108:15 123:25
124:3 126:23
154:24 158:6,25
160:8,8 161:1
170:17 175:11
177:16 179:6
183:19 195:17
196:25 197:3,8
201:4,8,17 202:14
216:24 219:16
220:6,11 228:11
228:17,19,22,23
233:9,16 234:17
236:7 240:18
248:14,21 251:16
252:18,22 253:18
259:11 261:1
264:18 266:9,14
267:21 269:1
271:14
**believed** 262:20
264:21
**bench** 20:22
146:22,25 156:16
245:23 247:17
**benefit** 13:1 57:8
57:14 66:15 92:5
92:13 96:15 99:15
241:21,23 264:6
**benefitted** 66:5
**best** 12:10 33:8
**bet** 32:19 82:10
87:12 121:6
**better** 12:5 22:6
60:15 198:24
247:15
**beyond** 133:2
218:21 232:13

**bid** 24:7,8,10
51:18 52:8 56:7
85:14 86:1,7,10
130:9 171:15,15
171:17,18 176:7
210:10 226:25
237:17 238:14
242:7 246:22,22
246:23 247:13,14
249:20 251:15
259:15 261:3,6,7
261:9,9 262:9,12
265:18 266:1,7,22
267:21
**bidder** 93:4
**bidding** 171:21
**bids** 15:25 24:7
180:11 210:13,20
210:22 213:14,15
213:17,19,22
240:3 243:24
**big** 12:22 51:1,1
59:13 62:17
142:10 226:7
**bigger** 16:9
**billion** 32:13
33:12 34:6 39:5,6
44:23 45:4 48:10
50:17 53:15 68:12
72:24,25 74:10,11
76:12,13 77:1,8
77:10,12,12,19,20
77:20,23 84:8,15
85:14 86:10 87:15
89:17,21 90:18,20
91:4,4 94:22 95:3
95:24 96:1 101:3
112:13 114:2,3,5
115:21 116:1,12
121:20 123:7
126:21,25 127:1
131:22 132:18
160:18 161:1

176:7 178:22
182:15 185:19
187:3,8 215:12
223:9 224:7
227:14 228:4
229:5,14,16 244:1
254:11 255:1
261:3,6 266:5
267:17 269:3
**binder** 156:16
157:9 196:3 198:5
198:9 201:12
203:25 207:8
247:19,19
**bit** 104:25 147:9
268:17
**bite** 149:5,6
**bits** 207:10
**black** 62:17
**blend** 101:11
103:7
**blended** 134:13
**bloated** 100:24
**block** 50:7
**blue** 207:10
**bolded** 207:24
258:8
**bonds** 122:17
**book** 24:1 28:25
32:11,11,12,21
33:12,16,17 34:8
34:16,21 35:7,16
35:17 36:12,21
37:7 38:3,10,16
41:23 42:25 43:8
43:25 44:7,8 47:6
62:3,9,17,17
63:17,19,21,25
64:4,6,10,22
68:21 70:11 75:6
75:7,12,13 76:21
77:18 85:6 87:4,8
89:5,7,14 100:3

100:11 107:6
114:22 115:13
119:20 160:6
161:7,18 162:16
169:6,7,8 178:17
179:8 182:7,10,14
198:14 205:20,25
228:23 250:17
252:7,12 257:8
**books** 21:17,25
25:2 69:8 190:14
196:23
**borrowed** 178:22
**borrowing** 18:15
38:17,19,21 39:9
39:21 46:23 47:1
47:3,5,15 50:8
65:21,24 77:9,18
79:5,9,10,14,17
82:13,21 89:14
90:8,19 115:7,24
116:5 118:3,24
130:1 162:8,15,18
162:21 176:12
190:11 203:1
228:25 229:9,12
229:13 230:2
266:11
**bottom** 27:25
33:21 70:21
188:17 207:24,25
**bound** 52:15,19
115:13 119:20
**box** 32:15
**brandon** 14:21
154:16
**brauner** 9:23
**breach** 158:15
**break** 113:3
136:11 139:1
268:21,22
**breakdown** 220:8

**breaks** 188:8
226:22
**brendan** 154:3
**brian** 2:9 14:20
155:17 156:2,19
216:19 222:17
226:11 234:3
237:15 251:12
257:17 263:3
**brief** 3:1 6:18
14:7 35:5,12
153:16
**briefing** 150:11
169:24 170:12
**briefly** 70:3 71:22
109:24 159:3
**briefs** 12:2
**brings** 147:12
**broader** 29:13
245:9
**broken** 168:3
**brooklyn** 169:14
**brothers** 213:16
**brozman** 10:8
**bryan** 10:21
**bryant** 9:20
**bucyrus** 74:6
**build** 175:2 192:7
261:16
**built** 61:15
**bullet** 85:13 86:13
179:13 207:19
208:17 262:10
**bullets** 209:1
**bunch** 25:1
**burden** 23:18
28:10 136:2
**business** 64:4,5,11
65:13 68:6,10
69:16,17 72:4,15
93:14 100:1,7
104:17,25 107:16
110:19 111:5,6,8

111:15 123:19
125:17 130:8,11
130:22 157:5
186:21 258:6
**businesses** 69:20
188:15 190:8,15
190:22
**buy** 168:14
195:16,18
**buyer** 163:19
178:13 198:23
**buyers** 40:6

## c

**c** 2:15,24 3:8 4:10
4:18 5:1,15,23 6:6
6:24 7:18 8:1 9:25
11:1 28:21 30:9
31:11 54:4 55:18
73:14 91:22,24
92:7,9,18 93:3,24
94:3,5,6,13 96:8
96:10 102:14
107:20,24 108:6
108:14,22 109:12
123:20,21,22,23
124:5,7 126:15
135:13 137:12
139:23 146:15,16
153:23 179:17
180:6 184:19
192:14,16 193:11
193:15 215:12
216:6,25 218:8,18
220:19 224:19
226:19 227:13
254:7 256:5,14,15
263:6,25 269:3,6
271:22 274:1,1
**calc** 127:19
**calculate** 34:2
54:22 125:8
193:14 267:7
268:20,22

**calculated** 77:3
94:15 106:16
118:7 127:20
192:19 220:18
256:14
**calculating**
255:23
**calculation** 34:24
48:13 54:8,25
55:3 56:14,25
60:16 65:22,25
75:21 76:23 77:13
77:17 78:2,5,21
80:15,20 81:6
88:9,13,17 89:1,2
105:7 115:15
118:8 126:15,22
127:23 192:12
193:7 195:1
196:19,24 197:17
220:17 267:6,12
**calculations** 25:11
36:3 47:25 56:17
71:13 96:12,13,21
128:4 150:12
231:15
**calculator** 122:2
127:17
**california** 272:22
**call** 13:11 28:12
73:6 99:19 113:7
123:22 128:20
154:3,3,5 155:17
176:2 181:16
212:4 215:2
272:21
**called** 66:23,24
186:1
**calling** 215:9
**calls** 90:4,6
102:14 183:5
**can't** 55:8 103:21
198:17 214:15

217:2 226:1
239:23,24 240:4
244:4 252:25
270:24
**cap** 261:18
**capacity** 179:21
**capital** 2:5,10
4:20,22 5:2,8,11
9:11 12:13 71:4
97:3
**capture** 126:8
**card** 45:7 46:22
47:14 59:25 65:14
65:16,18 79:1,4,7
82:12 118:20,23
168:23 217:15
252:13
**cards** 118:19
**care** 13:13
**carries** 137:1
**cart** 141:20
**carve** 263:8,13
264:2,3,9 268:22
269:21,22
**carved** 145:4
**carveout** 136:21
137:3,3,19 139:4
139:11,12 142:18
143:2,7,14,23
144:1 145:14,16
146:5,19 148:16
149:6,16,17,18,21
149:25 150:5
151:5,6,7,10,18
151:20,25 152:3,4
152:8,12,13
**carveouts** 139:11
**case** 1:3 14:10
19:2 23:16,23
28:3,5,24 29:20
30:2 39:20 40:3
51:22,25 55:20,22
56:21 66:6 69:23

87:1 91:24 92:12
93:2,4,7,11,14,17
93:21 118:6 119:1
119:25 125:6
126:4 128:1
135:21 142:12,21
143:4 144:5,24
153:19 154:1,22
170:24 179:16,24
180:7 183:23
192:23 195:11,23
198:7 199:17
200:7,11 201:3,7
201:16 202:23
207:2 213:8,25
215:6 235:21
243:24 245:10
256:13 261:6,10
263:9
**cases** 21:4,5,6
35:19 36:5 129:5
133:9 183:2
211:25 243:9
**cash** 20:14 45:7,9
45:10,12,16 46:5
47:16 49:16,22
50:4 53:15 59:24
60:17,20 61:9,10
61:16 65:18 78:25
79:20,22 80:3,7
80:10,11,12,16
81:10,21,21 82:6
82:11 87:15
105:10,11,14,15
105:16,23 106:4
114:3,4,5 118:20
119:2,7,10,13
120:5,5,15,18,19
120:22 121:7,14
121:18,23 136:21
138:7,11 147:13
147:14 153:4
176:11 177:16,18

179:4 222:21
264:18
**catch** 121:3
**categorically** 23:5
**categories** 66:7
129:20 168:9,11
168:22,24 204:14
204:16 209:3
219:23
**category** 67:21
69:6,8 150:7
168:10,10 190:6,7
**caveats** 149:16
**cent** 243:1 270:14
**center** 32:16
188:13,19,20
**cents** 23:22 27:25
59:4 168:14
175:10 235:10
242:23,24 247:10
252:5 271:10
**certain** 2:7,8,14
81:1 92:4,10
115:11 129:20
137:17 159:23
180:10 197:3
200:11 209:8
210:17 216:5,6
225:21 242:22
**certainly** 14:9
18:4 46:12 49:1
92:17 123:14
140:24 152:25
166:20,21 170:12
241:17 243:10
246:17
**certificate** 38:18
38:22 39:9,21
46:24 47:1,5,15
65:22 77:9,18
79:6,10,14,18
89:14 90:19 115:7
115:25 116:6

118:3,24 229:9,13
229:14 230:3
**certified** 128:14
128:18 274:3
**cetera** 20:15 67:7
67:10 111:21
231:6
**cfo** 131:16
**chance** 68:16
224:4
**change** 30:3 73:18
74:16 113:21
155:10 156:11
252:20 253:2
**changed** 83:18
**changes** 29:22,23
**changing** 197:5
**chapter** 65:7
184:5 192:23
199:23 200:11
202:23 211:15,18
211:21,25 213:24
**charge** 58:10,16
145:15 179:15
180:6 184:16
193:3 216:25
220:19
**charges** 108:6,14
109:12 218:18
263:6
**charging** 57:25
185:16,17
**chart** 48:4 55:10
60:16 67:11 75:13
76:3 82:4 89:23
94:17,20 105:7
122:15,24 126:18
132:3 146:16
150:4 160:15,15
161:10 182:14,17
182:18 184:12,15
207:24,25 218:8
226:19 227:13

254:25
**charts** 82:8
**chase** 18:22
**check** 255:3,5
**chief** 93:20 131:11
**chime** 241:11
**choice** 161:17,24
**choose** 195:2
**chose** 63:13 64:3
**chosen** 256:1
**chris** 10:23
**chuckle** 83:4
**chutchian** 10:9
**circuit** 199:11,16
**circumstance**
249:15
**circumstances**
158:25 193:20
**cited** 74:17
**citi** 53:6 86:15,18
179:19
**citibank** 49:17
178:2 179:4
**citing** 70:24
**city** 199:11,17
**claim** 6:14 7:6,15
7:16 23:19,21
58:12 94:22
136:25 137:10,18
139:18 140:11,14
140:23 141:23,24
142:4 143:4,22,22
143:24,25 144:11
144:12,14 145:3,4
145:16 147:20,20
147:23,24 148:2,5
148:9,18,19,21
149:5,15 150:23
151:21 152:11,14
152:25 176:23
242:2 244:15,18
244:19,22,25
246:1,2 247:21

249:1,4 250:5
262:11,12,19
**claimant** 258:1
**claiming** 180:14
180:21
**claims** 2:14,19,21
2:22 3:4,5,7,13,16
3:22,25 4:6,7,14
4:15,23,24 5:12
5:13,20,21 6:2,3
6:21,22 31:8
137:2 142:2
143:19,20 144:9
146:24 149:20
194:18 195:21
230:24 231:5,7
246:5,5,18 250:6
262:14,18 270:8
**clarification**
113:22
**clear** 26:25 61:8
74:2 106:24 126:2
138:3 151:18
164:17 165:16,18
169:20,24 225:13
228:1 242:2
**cleared** 29:22
**clearer** 150:25
168:15
**clearly** 150:16,16
152:9 213:7 242:4
**cleary** 8:3 11:16
58:2
**clerk** 11:5 145:24
**client** 58:1,2
166:22 171:4
181:1 238:8
**clients** 162:2
**close** 63:17 66:15
112:8 180:12
191:18 272:3
**closed** 56:8,19
64:9,23 65:2,6

67:10 183:13
228:23
**closing** 15:3
200:15 227:2
265:5,24 267:16
272:22
**code** 179:17
**codes** 220:24
**collateral** 2:23 3:7
4:9,17,25 5:14,23
6:5,10,14,24 7:3,7
7:13 9:3 12:18
21:11 23:9 40:2,6
40:12,17,23 41:7
41:15 42:13 43:10
44:23 45:13,17,18
45:19,24 46:6
48:9,17 50:4
59:22 61:10,11,14
65:21 66:5 67:19
78:17,18,20,21,22
80:4,8,10,11,13
80:14,16,24,25
81:5,7 82:11 88:2
92:13 93:25 94:5
95:15,17 96:15
98:25 105:11,17
105:21 106:1
107:24 112:4,10
114:3,5 119:8
120:2,10 121:20
123:25 124:9
126:19,20 127:15
129:14,16 132:10
132:15,17,25
136:22 138:7,11
140:17 143:10,11
143:16 144:3
145:21 147:14
149:10 150:23
151:14,20 152:21
160:19 162:8
170:21 171:7,10

171:10 173:18
176:11,24 177:16
179:18,19 184:15
190:9,11 193:22
193:24 194:13
198:14,18,19
203:8 215:18
217:12 222:20,21
222:21 223:10
224:7 230:10
232:19 233:22
234:21,25 238:4,9
239:11,14 247:20
251:22 261:17
262:10,13 263:12
264:4,10,23
265:12 266:13,22
267:15 268:18
270:15
**collateralized**
49:22 112:14
176:12 177:17,19
179:4 264:18
**colleagues** 199:20
**collecting** 233:20
**collectively**
167:25 168:8
**colon** 10:10
**column** 74:15
76:4,4,6 115:17
147:12 148:6
196:10 269:20
**combined** 84:14
**come** 12:23 28:14
30:10 44:22 134:6
137:21 142:16,17
142:18 148:6
158:23 160:3
171:14 213:16
242:14 264:22
**comes** 77:13
80:13 176:14
218:24 250:17

266:15
**coming** 43:9
140:18 144:25
166:3 251:21
**commencing**
134:15
**comment** 109:3
214:15 236:21
**commentary** 24:9
**commenting** 13:4
15:15,16,20 16:12
**comments** 15:10
**commerce** 188:21
**commitment**
258:12 260:8
**committee** 9:19
100:9 103:10
131:14 195:16
210:3
**committee's** 3:11
3:20
**commodity**
258:11
**common** 4:4 5:17
6:18 35:5 66:22
67:2
**communication**
242:6
**communications**
24:5 169:16
**comp** 230:22
**companies** 65:15
117:2,4
**company** 22:9
25:9,10 49:16
57:23,24 64:8,22
64:24 65:16,17
66:11,14,18 68:9
68:22,23 69:8
99:6,15 100:24
104:19 120:15,17
123:19 124:23
125:1,16 130:10

130:11,22 131:12
134:12,18 178:6
180:9 195:16
203:4 207:20
208:21,24 209:11
210:4,11,14,18,24
214:4 230:13,13
231:12
**company's**  21:17
196:23
**company's**  65:17
71:17 206:17
215:19
**comparable**
100:15
**compare**  103:3
125:6 180:13
239:15 243:22
**compared**  14:21
105:17
**compares**  90:18
**comparison**  112:9
118:12 126:24
132:5,8,12 255:5
**compensate**
194:18
**compensation**
122:17 123:2
220:21
**competence**  12:2
**complained**
162:14
**complete**  27:16
246:10,16
**completed**  233:14
**completely**  27:8
170:8 243:1
**complicated**
14:17 19:2 242:9
243:19
**component**  53:15
76:23 87:15 94:5
95:9 160:19,22

185:19,22
**components**  58:24
185:6
**composed**  85:15
86:11
**comprised**  95:7
**compromise**
246:1
**compromised**
246:2 247:5
**compromising**
246:1
**computations**
166:17
**computes**  58:19
**concede**  169:23
173:19 174:2
**concept**  60:19
**conceptually**
63:16
**concern**  40:13
55:20,24 56:11
57:9,13 63:15
70:15 85:15 86:10
99:4,25 101:10
111:5,6,7,10
125:14 126:8,16
136:8 178:5,7,11
178:13 195:12
215:14,17 217:24
217:25 220:23
233:13 239:8
242:24 253:7,9,14
261:4
**concerned**  29:18
30:1 213:23
**concerns**  239:21
**conclude**  135:5
**concluded**  61:14
117:10 234:19,23
273:16
**conclusion**  34:21
157:5

**conclusions**  74:17
194:20
**concur**  77:14
92:15,17
**condition**  179:2
222:20
**conduct**  117:21
215:14
**confidence**  245:6
**confidential**  24:4
236:23 246:14
259:5,17 260:22
270:7
**confidentiality**
250:3,3
**confirm**  42:18
237:25 239:2
**confirming**  26:19
**conflates**  209:14
**conflating**  34:20
**confused**  186:13
**connection**  2:2
6:19 57:9 73:16
105:10 113:18
121:13 136:24
156:6 186:21
203:1 238:4,24
243:7 251:21
254:10 267:16
270:14
**conservative**
33:18,22 34:22
63:14,15 83:14
118:1 129:18
195:8 203:15,18
205:1
**consider**  40:1,5
50:13,16,19 52:2
52:5 85:22 86:25
87:5 97:24 98:6
99:21 129:8,9,11
136:20

**considerable**  64:9
108:8
**consideration**
14:11 35:17 36:4
53:3 54:6 87:13
87:19,24 168:1
171:16 247:1
260:12 261:21
**considerations**
246:25 260:16
**considered**  33:15
51:11 52:6 53:21
65:21 175:22
**consist**  167:24
**consistent**  20:16
64:19 94:2 101:11
103:6,6 122:10
**consisting**  210:5
248:7
**consists**  204:13
**consolidated**  29:1
**constitute**  156:9
**constituted**  61:11
218:3,4
**contain**  39:8
**contained**  46:23
71:2 79:5 234:5,9
**contains**  113:25
**contemplated**
259:24 260:1
**contemporaneo...**
129:22 159:16
**contend**  124:13
149:1,4
**contending**
158:14
**content**  13:3
**contents**  237:21
238:11
**contested**  113:19
154:23 156:6,10
**context**  27:13
129:23 166:13,15

178:5,7,11,21
238:3 240:6,20
242:18 245:3,25
**contexts** 170:24
**contingent** 50:11
50:21 122:8
178:11 200:20,22
**continue** 29:19
30:2 37:14 61:2
72:10 159:1
171:13 173:7
178:8 232:14
235:8
**continued** 23:19
71:25 72:13
222:20
**contract** 170:3,4
189:1,5
**contracted** 64:25
**contracts** 243:25
**contradiction**
245:1
**contrary** 166:22
241:18
**contribute** 111:14
**contributed** 35:3
69:22
**contribution**
111:14,17
**contributors**
68:18,21
**contrived** 99:18
106:24
**convention** 37:23
**conversations**
262:22 270:24
**converted** 23:18
211:25
**conveyed** 260:20
**copied** 229:3
**copies** 20:24
257:5

**copy** 154:10 161:4
198:7 223:13,13
228:2 257:13
**corner** 32:15 39:2
39:13 51:3 259:5
**corporate** 34:12
34:14,18,23 35:2
37:5 38:7 43:4
57:17 66:10 69:8
69:13 94:4,7,10
98:3,7 99:13
100:19,24 101:2
102:23 103:20
104:11,14,19
105:3 111:20
184:20 197:8
204:21 205:2
216:7,12
**corporation** 1:7
2:16 11:7 71:3
138:22
**correct** 26:7,12
28:22 29:3 31:8,9
31:11,12,14,21,22
31:25 32:1,23
33:7 34:7,9,13
36:14,22 37:3,5,6
37:8,13,23 38:5
38:12,15,18 39:22
39:24 40:7 41:13
42:2 43:5,20 44:1
44:12,13 45:4,8
45:24 46:10,13,24
47:10,18 48:13
55:6,21,24 56:2,8
56:19,22 57:4,5
58:16,22 59:19,25
60:3,6,7 65:9,10
68:8 69:11 71:5
72:1,22 76:9,15
76:22 77:19,21,24
78:2,5,12,13,14
78:15,18 79:3,18

79:20,23 80:1,2,5
81:8,9,11,22,25
82:3 83:10,13,20
84:2 85:2 89:7
90:2,13,16 91:6,9
91:12,24,25 92:3
92:7,14,22,24
93:4,15,22 94:1,5
94:11,12,15,16,18
94:19,24,25 95:1
95:2,4,5,8,11,24
96:10,16,22,23
102:21 103:14,18
104:6 105:1
106:20,21 112:17
112:19 114:4,14
114:15 115:3,5,9
115:21 116:7,9,17
117:1 118:7,22
119:14,17,18
120:6,10 122:18
123:12,21 124:14
124:17,20 125:3
125:20,23 126:5
126:10,16,17,22
126:23 127:4,8,10
127:12,15 133:1
134:5,25 135:12
141:7 155:4,13
156:4,24,25 157:1
157:13,22,25
158:1,5,22 160:7
160:8,16 161:15
163:2,3,6,7,11,16
164:21 175:4
177:4 178:4,9
179:6 182:19,20
183:6,7 184:6,16
192:2,5,9,10
194:18 196:22
197:1,12 198:20
199:5,11,17,21,24
200:6,17,18,23

201:5,9 202:20
203:8,15 205:17
206:8,12,15
208:14,24 210:7
210:11,14,20,24
210:25 211:13,25
212:5 214:10,14
215:15 216:13
217:3,7 218:19,22
219:2,3,7,11,19
219:20,24 221:14
222:4 224:11
227:15 228:15
230:10,11 233:5,8
236:14,16 250:20
255:1 258:18
260:3,6 261:14
262:19 263:9,15
263:19,24 264:4
264:15,19,23
265:2,6,9,10,13
265:15,18,19,22
266:2,8,13,18
267:4,13 268:1,4
268:6
**corrected** 6:15
33:1,5 197:24
**correction** 12:3
113:25
**correctly** 139:8
214:17
**correctness** 12:4
**correlation**
252:16
**correspond**
226:25
**corresponding**
57:3 120:8
**cost** 35:15 74:10
101:17 102:23,24
103:20 111:16
123:24 124:8

**costs** 35:18 36:4
36:13,22 37:8,24
38:1,4,11 43:5
66:8,8,9 94:6
97:22 98:2 111:15
111:20,21 124:10
125:11 132:14,16
132:18 133:8,9
211:10 214:9,14
214:19 215:13
216:8,25 217:8,10
217:21 218:1
219:1,7 224:19
**couldn't** 96:9
99:22 217:14
**counsel** 13:22
18:22 20:18 45:14
46:2 57:17 72:7
165:7 220:20
221:3,14,15
225:20 226:2
236:21 241:11
256:23
**counsel's** 46:4
**counsel's** 238:8
**count** 13:16 49:9
49:12 50:15 66:8
143:5 256:8 263:7
**counted** 50:12
69:21 177:2
**counting** 138:16
177:8 185:15
192:11 193:10
254:14,17,18
263:6 266:13
**country** 272:10
274:21
**counts** 46:1
**couple** 97:7,14
107:11
**course** 12:6 13:21
40:14 123:19
137:20 149:10,22

183:22 200:7
233:13
**court** 1:1,12 8:22
11:6,12,14,18
12:11,20 13:9,13
13:23,25 14:4,6
14:15,18,23 15:5
16:3,8,15,18 17:1
17:19 18:3,20
19:19,22,25 20:5
20:8,10,23 21:16
22:4,11,19,25
23:13 24:18,24
25:1,6,8,17,20,24
26:3,5,8,10,14,17
27:3,7,12,18,20
28:2,8,14,17,21
28:23 29:5,12,14
29:17,23,25 30:5
30:12,16,18,20
50:2 51:7,12,16
53:21 60:14,19,24
61:1,3,8,19,21,25
70:2 71:21 73:3,7
73:12,15,23,25
74:1,3,5,20,24
85:19,22 86:2,4
86:22,24 88:13
92:19 97:1,11,17
98:10 102:7,11
108:25 109:2,4,7
109:17,21,23,25
110:14,16,22
111:2,9,19,23,25
112:15,18,20,22
112:24 113:2,6,9
113:14,17,23
114:7,10,13,15,24
115:1 126:3 128:7
132:21 133:4,12
133:17,21,23
134:2,6,9,20,23
135:1,4,7,10,16

135:18,22 136:10
136:13,15,17,19
137:21,25 138:2,9
138:12,15,18,21
139:2,6,14,25
140:1,5 141:2,5
141:11 142:22
144:2,17,22 146:4
146:9,14,17,19
147:1,4,17 148:7
148:10,23,25
149:11,22,24
150:10 151:4,13
152:16,18,23
153:2,7,11,13,15
153:20,22 154:7,9
154:12,18,21
155:5,7,12,18,20
155:23 156:3,5,13
156:18 157:16,18
158:10,14,20
159:7,11,18,19,22
160:1 164:4,8,10
164:14,18 165:3
165:10,12,15,19
165:21,23 166:7,9
167:5,9,15 169:22
170:3,11 171:19
171:24 172:3,9,12
172:15,23,25
173:10,20 174:8
174:16,19 177:8
177:11,18 179:2
181:18 182:2,5,12
182:14 185:25
186:3,14,17 188:1
190:25 191:5,9,22
194:21,24 196:3,4
196:9,12,15,20
197:10,13,17,21
198:1 202:12
209:17,20,24
213:13,20 223:6

223:15,18,21
224:20,25 225:2,7
225:17,25 226:2,5
226:10 229:20
232:11,21,25
234:1 235:8,18,23
236:5,13,15,18,24
237:5,11,14 240:6
240:10,12 241:23
244:2,6,9,13,18
245:7,14,20,21,25
246:7,12 247:7,15
247:25 248:4,7,11
248:13,17,22
249:13,22 250:7
250:16,24 251:1,3
251:7 253:25
254:2,4 257:7,10
257:13,16 262:25
263:2 268:8
269:10,13 270:3
270:18,22 271:9
271:17,21,24
272:16,24 273:1,4
273:10,13
**court's** 11:10 14:8
14:25 17:16
**courtney** 10:20
**courts** 21:6
**court's** 241:9
**cover** 200:19
204:5 236:6
**covered** 120:14
191:16 244:10
262:3
**covers** 218:25
**crazy** 92:21
**create** 142:15
**creates** 44:14
**creation** 142:25
143:1
**credibility** 14:14

**credible** 19:4
**credit** 19:20 45:6
  46:9,22 47:14
  49:5,9,17,22 50:6
  50:14 52:3,12
  53:25 55:12 59:12
  59:25 60:2 65:14
  65:15,16,18,19
  79:1,4,7 82:12
  83:10,16,19,20,23
  84:1,13,18 85:1
  87:23 95:7 118:19
  118:20,23 122:4
  123:7,17 127:7,9
  136:4 168:23
  176:7 180:11
  199:4,5,9,10,24
  200:17,19,23
  217:15 230:16
  252:13 255:14,15
  264:14,15 265:1,6
  265:17 266:1,6,7
  266:22 267:21
  268:11,12
**creditor** 93:3
**creditors** 3:20
  9:19 28:10 61:5
  61:15 131:13
  142:16 143:20
  154:1 195:17,18
**creditors1** 3:11
**creditors'** 100:9
  103:10
**crescent** 8:22
**critical** 89:3
**criticize** 161:24
  161:25
**criticizing** 161:17
**critique** 21:25
**cro** 181:16
**cross** 12:6 19:13
  19:23 20:19 30:9
  30:13 70:2,4

74:21,25 109:23
  110:1 112:25
  114:16,18 135:10
  135:12 154:4
  155:12 156:14,16
  156:19 166:2,17
  171:9,19 172:16
  196:3 216:19
  225:8,9 233:1
  234:3 256:24
  257:17 263:3
**crosses** 19:25
**curious** 137:17
**currency** 258:11
**current** 153:5
  158:8,11
**cushion** 112:9
**cut** 15:5
**cutting** 18:21
**cyrus** 2:5,10 4:20
  4:21 5:2,8,10 9:11
  12:13 50:3,5 97:3
  177:17 215:9
  264:19

---

**d**

**d** 1:22 10:16,20
  11:1 74:13,14
  76:17 102:5
  136:25 141:17
  142:23 143:21
  154:20 186:2
  195:20
**daily** 231:11
**dallas** 8:23
**dashes** 209:2
**data** 75:20 125:4
  131:7 158:24
  159:25 191:15
  199:12 202:22,25
  213:18 218:21,23
  218:24,25 219:6,9
  219:14,21 221:5,5
  221:10,13

**date** 18:15 21:11
  21:20 31:15 40:23
  40:25 41:2,2,5,5
  41:15,21,22 42:14
  70:12,17 72:23,23
  74:10 78:17 84:23
  87:25 88:3,4 89:5
  99:1,20 106:12,14
  106:17,19,22
  107:4,7 110:11,12
  115:3,5 117:22
  122:9,11,12,14
  125:19 126:1,3
  132:25 139:12
  141:6,25 142:2
  149:14 154:24
  157:6 163:17,25
  191:18 198:18
  200:2,4,15,15
  203:10,13 204:6
  206:23 226:25
  227:1 230:7
  232:19 256:24
  260:3 262:1
  268:12,23 272:2,3
  274:25
**dated** 29:1,2
  41:20 71:4 154:23
  155:1,1 156:7,7,8
  203:22 204:1
  220:12 257:23
**dates** 41:4 254:12
**date's** 240:2
**daubert** 15:7
**david** 10:25 30:21
  62:1 70:4 71:23
  160:7
**day** 13:21 56:7,18
  56:18 142:21
  148:8 157:12,20
  157:21 158:3,9,12
  252:20 272:4,5

**days** 39:19 41:21
  157:24 273:6
**deadline** 159:13
**deal** 27:3,4 52:10
  125:25 145:11
  148:17 180:11
  195:19 242:9
**dealing** 11:23
  25:17 41:4 143:19
  158:15 245:15
**dealt** 12:5 123:11
  123:13 147:10
  153:1 220:23
  248:8
**debt** 19:20 49:4,6
  49:9,12 50:19,20
  54:15,20 60:3
  83:12,20 84:18,23
  86:14,19 87:22,23
  87:24 88:2,22
  105:18,24 106:22
  112:10,16 122:4
  145:20,21 150:6,8
  150:13,14,15,17
  151:9 152:5 175:7
  175:8,10 176:1,14
  176:24 177:3
  192:5 193:9
  194:14 195:7
  223:11 256:2
  261:12 266:21
  269:3
**debtor** 1:9 58:17
  64:14 93:2 100:6
  104:16 106:4
  130:6,21,22
  138:10 148:5
  170:22 193:21
**debtor's** 14:19
  27:7 31:2 35:15
  35:17 41:22 42:22
**debtors** 2:1,8,14
  2:18,21 3:1,6,12

3:14,21,23 4:9,16
4:25 5:14,22 6:5
6:23 7:17 8:13,21
11:9 13:17 14:16
56:5,10 57:7,13
58:15 92:6 95:4
96:5 103:4 119:6
122:16 130:20
131:11 135:25
138:24 141:9
144:18 155:17
165:6 171:2,11
173:12,17 178:23
183:1 193:24
197:13,18,22
200:11 202:22,25
207:6 210:9
220:15,22 223:9
224:6 271:19
**debtors'** 79:8 89:4
89:6 93:17 94:13
95:6,16,23 105:6
**debtor's** 215:7
222:18,20
**debts** 224:8
**december** 56:6,24
87:6 96:16,17
134:24 171:17
207:4 231:18
257:23 270:4
**decide** 190:25
**decided** 18:11
130:10 147:3
165:16
**deciding** 66:19
67:9
**decision** 87:22
258:5
**decisions** 195:10
195:15 258:6
**deck** 24:2,16
127:5 207:9

**declaration** 12:7
25:5,13,14,18
29:9,10,16,18
30:1 32:3 35:24
36:1 41:22 42:1,4
42:24 70:7 73:18
73:21 74:1,3,4,13
74:14,17 76:17
84:6 101:21
113:19,24 114:6
122:15 131:20
137:24 147:8,8
155:9 157:20,24
158:3,4,5,11,12
159:9,12,15,25
160:10,13,14,14
160:16 161:4
165:12 172:11
174:20,23 175:25
178:17,19 182:7,8
191:10,12 192:4
193:17 205:11,15
210:8,9 211:2
212:21 215:1,21
215:23 218:7,20
219:24 220:12
221:20 222:16,17
222:23 223:8,23
224:6,17,18,21
226:14,17 227:12
227:18 228:6
229:2,8,17 232:2
232:3 233:4,8
234:6,7,8,9,13,20
234:23,24 235:15
237:23 238:21
251:15,17 256:16
257:10,14
**declarations** 2:8
12:8 15:7,10,22
22:20,25 24:21
154:11,22 156:6
160:5 178:10

198:10 212:15
235:14 236:10
238:25
**decline** 100:25
**decrease** 180:16
247:20
**dedicated** 76:5
**deduct** 68:12
102:18 137:19
138:8 147:24
162:11,13 169:5,6
169:7,7,8 184:24
184:25,25 185:4
193:7
**deducted** 61:13
101:14,17 102:17
124:11 184:12
185:2
**deducts** 94:3
**deed** 236:9
**deem** 241:11
**deemed** 88:6
210:23
**deeper** 152:5
**deeply** 152:6
**defer** 57:22,24
229:22
**deficiency** 23:24
**defined** 168:7
**defining** 22:14
**definitely** 38:13
66:8
**definition** 53:3,5
87:12 91:18 97:23
106:15 107:15
120:9 149:20
167:21 175:15,23
**definitions** 167:17
**degree** 106:16
108:8
**delineated** 40:9
**delineation** 61:18

**deliver** 157:19
158:2,7,8,11
**delivered** 168:21
168:25 169:4
252:22
**delivery** 157:6
**delta** 68:7,19
70:10 82:21 90:11
95:6,22 139:20
**demand** 5:5
**demanding**
250:11
**demarcation** 54:5
**demonstrative**
13:20 18:14 47:24
81:11,14 94:18
121:17 150:12
269:11,17
**demonstratives**
31:3 48:2
**denominator**
197:2,4
**depending** 27:13
147:22
**depicted** 76:12
99:19
**deposed** 31:17
235:21
**deposition** 36:16
36:18,19 37:2
39:19 45:21 83:2
93:9 108:18
109:11 124:16
135:15 157:22,25
159:9 198:7
199:14 201:11
202:2 203:17
221:3,17 225:19
228:14,20 235:25
**deposits** 183:4
**derive** 104:13
**derived** 108:10,12
108:17,22

derives  63:25
describe  131:19
  233:10
described  205:2
description
  108:16
descriptions
  256:20,24
designated  135:14
  225:11
designations
  135:14
designed  24:9
despite  153:16
detail  188:5,6
  190:21,23,24
  191:6,13 220:6
detailed  219:16
  220:7
details  182:24
  246:22
determination  2:3
  7:14 14:22 18:13
  23:10
determine  2:19,22
  3:3,6,13,16,22,25
  4:5,13,22 5:11,19
  6:2,20 46:3,4
  91:18 117:22
  119:12 130:21
  166:25 167:1
  173:13 192:15
  222:13
determined  226:1
determining
  129:25 173:17
  233:21
detour  153:17
dibattista  10:11
didn't  54:8,22
  56:13,16,24 57:3
  58:8,25 59:4 60:3
  60:5 68:13,14

73:22 74:18 80:20
  88:9 89:1,2 91:20
  95:8 96:20 104:1
  209:15 210:13
  212:9 214:18,24
  214:25 217:25
  220:3 221:2,6,12
  221:16,19 222:10
  225:20 251:8
  255:4 257:3
  261:18 264:7
die  190:4
diehard  217:1
difference  16:15
  34:15 46:14 47:10
  47:13 48:21 58:21
  59:10 60:8 65:23
  77:16 82:12 95:15
  95:18 98:15,20
  99:18 105:7
  127:14 158:18
  196:21
differences  48:16
different  11:22
  15:8 17:13,14,21
  17:23 20:25 23:5
  31:25 41:21 42:10
  43:15,15 44:5
  47:11 62:16 64:3
  65:24 71:9 77:6
  79:5,9,22 95:3
  98:24 119:1 126:4
  134:24 147:9
  164:11,12 170:13
  177:7 180:8,12
  191:5 196:15,16
  196:19 213:7
  243:1 254:10,12
  266:3 271:5
differential  67:13
  68:4,19
differently  172:17

diligenced  214:12
diminished
  143:16 151:19
  152:1
diminution  47:25
  115:15 132:3
  136:2 142:8,24
  143:1 147:21
  148:20 150:12
  151:14,16,16
  192:13 193:12
  256:10
dip  86:15 136:21
  139:4,9 140:16
  141:15,17 142:13
  142:14 145:1,3
  179:19,21 192:4,9
  192:22 193:21
  195:5 256:2
  261:13 265:1,5
dips  178:21
direct  29:6 30:2
  30:21 35:18 36:4
  62:1,14 66:14,15
  70:22 71:23 92:5
  92:13 96:14 97:4
  97:12,22,24 98:2
  98:11 99:12
  100:14,15 101:13
  101:16,17 102:4
  102:13 104:9
  108:5,7,8 113:20
  124:10 125:11
  133:20 155:2,9
  156:9 159:13
  189:11 190:15
  204:16,17,19
  223:19 226:11
  227:18 231:25
  237:15 251:12
  268:9
directed  141:16

directing  32:14
direction  164:11
  164:13
directions  210:16
directly  66:5
  170:24 220:23
  232:17 241:18
disagree  47:21
  56:16 93:25
  161:21 190:18
disagreed  205:7
discern  108:10,11
discernible  63:19
discharged  53:23
disclaimer  260:5
discount  21:24
  23:25 43:24 44:3
  64:6 161:22 163:1
discounts  69:6
discovery  3:2 6:19
  84:5 191:24
  245:19
discuss  260:15
discussed  26:22
  171:11 180:9
  186:12 191:19
  205:11 221:8
  237:6 261:9
  262:21 270:25
discussion  85:4
  205:14 245:5
  249:1 259:8,23
  268:21
discussions  170:5
  170:18 173:15
  199:20 203:11
  236:25 237:4
  240:21 245:6
  246:13,20 260:18
disingenuous
  247:8
disparity  44:15

disperse 263:21
disposal 97:22
disposing 98:2
disprove 242:1
244:24
dispute 18:18
54:21 55:2,8 60:1
148:12,15
disputed 242:2
244:25 270:7
disputes 73:17
disputing 54:14
54:19
distinction 49:14
81:4 99:16
distortion 139:25
distribution
236:23 259:6,17
district 1:2
divergent 17:13
divide 267:18
268:3
divided 77:12
255:9 267:19,23
268:3
dividing 77:11
255:6
dkt 7:8,18
docket 35:8
222:22,22
document 2:3,9
2:12,16,24,24 3:8
3:9,18,18 4:1,2,10
4:18 5:3,5,8,15,23
6:6,15,16,24,25
7:8,19 31:2 35:24
39:1 51:2,6,19,24
53:10,19 87:4,18
157:4 181:12
186:4,24 191:3
207:7 224:5 236:2
237:20 238:21
239:19 240:25

241:1 243:19
246:11,16 251:6
251:14,20 253:6
253:17
documentation
163:13
documents 18:13
19:20 24:19,20
31:1 47:11 51:10
51:14 52:2 115:22
119:24 141:14
157:19 158:2,6,7
158:23 159:2
166:15 168:22
174:5 176:8
197:24 233:11,12
233:15,20 234:5,9
234:13,15 235:11
235:17 237:8,22
237:25 238:11
240:20 247:11
270:14
document's
245:12
doesn't 66:2
68:23 86:21
105:19 200:20
223:14 236:18
238:13 249:3,4
doing 34:17 63:17
145:9,10 181:1
211:7 240:22
272:22 273:1
dollar 69:8 77:16
152:13,14 177:9,9
222:3
dollars 69:1 99:12
244:1
don't 54:12,24
55:2,12 56:16
57:11,16,20 62:18
65:19 66:12 68:17
84:16 85:11 86:3

88:17 93:18
101:20 110:12,12
115:22 198:23
201:4,8 202:14
204:24 206:7
213:9 217:22
219:18,25 220:3
220:11 222:7
223:13 232:22
234:14,17 235:25
237:8 240:18,19
242:16 244:11
246:11,16 250:5,7
250:10,12 257:12
259:11,11 260:23
262:22 266:14
267:2,5 268:19
270:9 272:11
273:1
double 184:16
185:15 192:11
193:10 254:13,16
254:18 256:8
263:6,7
doubt 19:10
draft 73:22 74:19
236:23 259:5
drafted 243:25
drain 1:22 69:24
92:23 255:22
drawing 49:14
drawn 83:16 84:1
84:8 88:23,24
122:7,12,14
123:14 177:21,24
178:6 199:5,9,24
200:16,19
driver 23:23
dublin 9:25
due 144:25 166:5
178:8 179:20
191:2 244:8

dumped 147:6
duplicate 68:14
duplicative 108:3
108:9
dying 113:3

e

e 1:21,21 8:1,1
10:10 11:1,1
28:21 73:14
154:20,20 188:21
274:1
eaglepicher 74:7
earlier 103:18
135:19 156:8
187:6 205:4
224:22 236:6
243:23
early 31:18 93:16
171:6 249:8
earned 64:22 72:5
184:5
earnings 185:1
ease 30:8
easier 14:25 15:2
181:25 232:5
easiest 67:3
ebitda 22:16 34:3
34:11 66:19
ecc 166:19
ecf 32:5 62:7,10
ecg 62:18
ecro 1:25
edits 73:22 74:18
edward 9:7 12:16
73:5 98:14 151:23
216:21 263:5
effect 17:18 67:18
136:20 139:3
effectively 36:24
145:23,25 146:1,3
150:5,8
efficient 19:17,24

effort 243:22
efforts 254:13
eight 25:24
178:18,24
eighth 9:4
either 16:24 19:10
45:19,22 52:11
137:20 158:4
170:24 178:10
179:3,3 188:4
231:10 233:19,19
234:5,8,12 235:13
239:25 242:1
250:10 265:21
270:13
element 22:20
eligibility 255:4
eligible 39:5,16
90:8,12,19 91:11
91:16,17 97:19
115:11,21,25
116:8 230:7
254:22 255:6
eliminated 112:11
else's 20:2
email 157:10
employed 193:14
employee 36:6
102:15 188:12
216:25
employees 185:5
189:3,6,9,12,15
189:16,21,23,25
190:2 217:21
231:5
encumbers
265:11
ended 252:16
enforce 171:24
248:18
enforced 171:4
enforcement
173:24

enforcing 169:19
169:22 170:19
engaged 93:16
211:15,18,21
212:4
engagement 31:7
31:10
enhances 143:3
ensure 254:13
entails 22:17
enter 140:19
entered 12:7
137:15 142:22
144:5,14
entire 29:16 93:13
112:11 139:10
169:13,15 218:16
218:19,25 219:4,6
219:14 220:5
257:12
entirely 14:19
169:24 221:3
entities 217:2,6,17
218:3,5
entitled 7:16 18:4
31:2 87:5 92:6
152:10 222:17
226:19
entity 99:22
enumerate 45:22
enumerated 120:9
120:11
enumerates 120:3
equal 114:2
equation 140:12
equipment 168:12
equitable 166:21
241:16 243:2,11
243:14 247:7
equity 15:25
210:10,13,19,22
213:14,15,19
247:7

equivalents 80:12
81:22 120:5
erased 34:16
erie 74:6
error 74:8
errors 73:24
esl 2:5,11 4:12 6:1
8:4 11:17 25:24
26:10 31:13 49:22
50:3,5 51:18 52:8
55:20,23 56:1,6
57:8,14 58:1,3,6,8
85:14 86:1,7,9
143:13 159:22
171:11 173:14,25
176:8 177:17
178:15 181:1
200:16 215:18
226:25 233:16
236:5,8,13,21
237:17 238:8,14
239:19 241:18
242:6,21,25
245:17 246:22,22
247:21 251:15
253:18 259:15
264:18 270:13
271:14
esl's 5:5 172:4
esl's 246:22 261:3
essence 15:9,11
15:14,20 20:2
149:13 197:11
essentially 22:24
93:7 99:6
establish 136:2
186:18
established 38:8
83:2 181:14
estate 111:3
estimate 2:14
estimated 209:7

estimates 209:8
estimation 105:4
estoppel 166:21
242:19
et 11:7 20:14 67:7
67:10 111:21
138:22 231:6
evaluate 56:20
131:7 251:22
evaluating 21:21
226:6
evaluation 63:7
105:10 110:17
115:4 117:16
129:13
evaluator 129:5
evening 182:19
event 29:2 53:7
162:17 207:5
210:4
eventually 217:12
231:10
evercore 222:2,2
evidence 11:23
12:5 19:18 24:13
25:6 26:25 27:23
38:25 51:10 125:9
135:14 136:4
154:8 162:6,20
166:13,25 167:4
169:17 170:18
171:1,1,3,3,5
172:22 173:23,25
174:3,10 191:4,6
191:12 232:15,18
232:22 235:20,24
238:12 239:24
240:1,2,4,10,16
241:8,8,25 243:3
243:4 247:8
248:15,16,21
251:9 253:24
254:5

evidentiary 135:6
ex 231:5
exact 110:12
  262:22
exactly 27:1,17
  32:14 34:17 57:16
  69:12 147:19
  175:13 182:16
  209:14,21 225:5
  242:20 244:15
exam 196:3
examination
  19:14,24 30:21
  62:1 70:4 71:23
  74:25 97:4 98:11
  110:1 114:18
  128:9 132:22
  154:5 155:13
  156:16,19 159:1
  171:19 173:7
  174:18 216:19
  225:9 226:11
  234:3 237:15
  251:12 257:17
  263:3 268:9
examinations
  12:6
examine 33:8
  135:10,13 166:2
  166:17 171:9
  172:16
examined 225:8
examining 20:19
  256:24
example 20:12
  22:6 66:10 67:11
  67:20 75:19 98:3
  98:4 170:22
  171:10 202:25
  209:11 222:9
examples 11:2
exceeded 99:7,7

exceeding 39:7
excel 33:2,8
excel's 33:3
exception 137:6,6
  172:9 179:17
exceptions 17:24
  245:1,2
excerpt 52:18,22
  52:24 120:2
excerpts 13:20
  31:3 119:20 232:6
excess 47:17
exchange 157:11
  248:25
excitement 39:7
exclude 2:7 34:23
  45:23 83:18,21
  164:25 165:14
  172:17 188:8,18
  248:14,23
excluded 65:21
  66:2 83:24 84:18
  122:6,8,11 166:3
  173:3 187:3,4,7,9
  187:15,20,21
  188:7,22 227:24
  227:25 249:5
  250:9 256:21
excluding 22:25
  172:25
exclusions 47:4
  187:12
exclusive 80:12,13
exclusively
  147:10
excuse 40:11 51:5
  52:5 158:8 166:9
  222:15 241:14
  242:23
executed 252:21
  259:24,25 260:1
exercise 14:19
  141:19,22 209:14

exhibit 24:22 25:2
  25:14 26:2,9,9,24
  26:24 28:6,25
  38:24,25 51:24
  62:6 74:12,13,14
  74:14 76:17 81:16
  81:18 85:7,10,17
  86:25 87:4,5
  102:5 116:20,21
  153:5 157:9 158:8
  159:24 161:8,9
  172:12 178:17
  179:8 181:17,25
  182:1,10,13 183:1
  183:4,9,25,25
  184:1 185:18,23
  185:25 186:2
  187:6,7,11,16
  190:20 191:13,25
  192:18 193:15,18
  196:6 197:24,25
  201:12 203:25
  204:1 207:8,9
  226:16 227:11,17
  229:9,12,23 230:3
  230:8 233:4
  239:24 241:5,7,7
  245:16 247:19
  248:20 251:9,16
  251:20 252:9,21
  253:23 254:5
  257:20,22,25
  259:4,14 260:5
exhibits 25:15,15
  25:16 26:22 50:23
  62:4 119:21,21
  153:3 158:24
  159:2,20,24 160:3
  165:1,13 166:3
  169:18 172:13
  191:6,9 198:6
  232:1,1,13 233:3
  233:8 257:4 270:6

exist 108:15
  117:15
existing 244:25
expanding 223:19
expect 200:21
  231:9 245:5
  255:25 257:3
expectation 249:7
  249:14
expected 134:1
  262:16
expenditures
  66:13,14 180:10
expense 6:11 7:4
  67:18 93:5 94:10
  98:7 99:12,13
  101:13,16 102:15
  102:18,18 103:20
  107:25 187:15
  188:12 209:3,6
  241:21 256:6
expenses 6:12 7:1
  7:5 22:17 25:11
  36:7 56:5,9,10,14
  56:17 57:7,12
  58:6 66:4,7,16
  67:19,20 68:3,8
  68:10 70:14 94:4
  94:5,8,10 96:13
  96:21 97:25 98:3
  100:14,15 101:2
  102:13 104:10,14
  107:20 108:6,8,8
  124:5,11,14
  125:13 126:7
  146:8 180:16,22
  180:24 181:6
  183:5,9,12,16,18
  183:22 184:9,11
  184:14,16,20,22
  185:5 186:9,11,12
  186:13,25 187:4,7
  187:18 188:13,18

189:17 190:8,19
190:21 191:16
197:3 204:12,12
204:17,17,19
209:9 216:7,12
220:23 226:19,22
227:5,6,14 254:7
263:13 264:5
269:4
**experience** 64:10
64:12,13,16,18
65:8 72:13,14
89:6 100:16 101:9
206:20
**experiencing**
101:12
**expert** 3:1 5:1
15:7,9,14,17,20
15:21,23,24 16:10
16:13,18 17:4,6,7
17:25 18:1 19:1,3
19:7,15,15 20:3,3
21:7,12,18 22:18
22:20 23:2,3
28:24 29:3,17,19
73:16,20 113:18
130:13,16 156:24
157:1,5,6,7,12
158:16,19,20,21
160:6 212:6,22
236:5,9,10
**expert's** 13:6
**experts** 2:2 11:11
13:2,7 14:9 15:19
16:16 17:7 18:3,4
18:5 19:1,4 20:15
20:16 92:1 96:7
170:23 254:7
**expert's** 205:16
**explain** 64:3
65:20 66:25 98:20
108:12,21

**explained** 177:6
**explicitly** 38:6
45:17 54:10 61:12
**explored** 43:11
**exposure** 65:19
**express** 80:9
**expressed** 14:25
158:17 198:14
**expressing** 80:7
**extend** 143:16
**extent** 6:14 7:7
14:2 15:15 17:4,5
66:1 80:10,12
85:3,5 93:23 98:5
104:16 149:24
151:19,25 152:11
152:12 162:2
169:1,3 184:11,14
185:15 187:17
192:14,16 193:13
212:24 231:12
241:18 256:12
**extra** 169:5
**extracted** 219:22

## f

**f** 1:21 54:4 71:11
156:3,3 184:1
185:20 274:1
**face** 65:12
**facilities** 123:9,13
151:17 238:24
264:15
**facility** 50:7 53:3
53:6,25 54:5 84:8
84:10 86:15,18
87:12,18 175:14
175:17,21 176:4,6
176:13,21 177:12
177:18 178:23
193:21 261:14
264:14,17 265:14
265:16 266:12
267:20 268:12

**fact** 2:9 14:18,19
16:5,11,21 17:1,5
17:5,8,22 22:12
39:16 48:18 50:16
52:9 58:25 59:18
83:25 100:17
104:1,2 107:13
111:20 124:16
135:24 136:6
143:5,9,10,11
156:23 157:8
158:18 159:10
163:24,25 171:1
172:19 173:25
186:11 202:22
205:18 210:22
215:18 221:2,6
225:6 228:1
230:17 234:14
235:5 243:14
246:17 247:10
264:1
**factored** 238:3
**facts** 15:1,15,16
15:20 16:12 17:16
17:22,23 18:4
19:6 22:11 166:16
173:13,16 233:20
241:20 251:22
**factual** 14:20
15:11 16:21 20:13
29:22 148:10,11
148:12 167:2
234:19,23 235:4,5
235:5 238:3,7
268:18
**factually** 233:21
**fair** 16:1 18:19
21:16 22:19 34:11
34:14 40:1,5,10
40:12 41:6,14,18
43:13,19,21,24
51:16 53:22 59:1

78:10 88:1 89:16
90:2,4,6 96:7
99:19,22 104:4,18
105:3 107:5,5,17
124:5 136:12
139:7 140:8
153:18 161:20
167:2 170:9
172:20 174:14
180:9 182:25
205:20 213:11
216:15 230:9
232:18 233:21
236:11
**fairly** 171:6
269:23
**fairness** 272:19
**faith** 249:9
**fall** 231:5
**falling** 245:2
**falls** 244:23
**familiar** 22:15
29:2 60:19,22
128:17 133:24
**fan** 12:22
**far** 14:22 19:8
21:18 29:17 30:1
50:10 172:11
174:12 196:9
213:22 235:24
236:2 247:15
**farthest** 76:4
**fashion** 192:20
**fault** 33:3
**faulty** 16:5,8
**favor** 215:7
**favorably** 103:3
**favored** 55:20
**february** 40:2,7
40:13,17,24 41:6
41:7 56:7,18,24
57:4 96:16,17,22
125:23 133:1

155:1 164:2 167:3
251:23
**fee** 152:8 208:1,3
208:7 222:1,4
263:8,12 264:9,10
**feels** 14:6 92:1
94:9 228:8
**fees** 92:5,8,11
94:6,14 126:9,10
126:11,13 137:5,6
139:23 183:3,3
187:19 192:9,24
204:20 207:22
208:16 220:16,17
220:19,22 221:22
221:22 263:13,18
263:24 264:1,8
**feld** 9:18
**felt** 129:18,21
**fewer** 63:19
**fifth** 8:14
**figure** 35:1 39:15
39:16 55:8 79:1
82:13,13,14 89:10
89:17 90:1,5,7
94:21 95:6,6,16
95:16,23,23
116:22 118:5,19
118:23 121:14,20
124:4,14,20
126:20 134:3,9
175:9 190:20
229:14,16 273:6
**figures** 47:16 76:9
95:22 208:3,13
227:9
**file** 4:21 219:16
**filed** 2:10,15 5:2,7
23:17 29:21 35:6
64:24 65:3 119:6
147:15 157:13,21
157:21,24 222:22
231:5 234:8

**files** 191:7,15
**filing** 64:13,18
65:7 122:9,11,12
122:14 129:22
130:5 141:25
142:2 184:6 200:4
203:14,18
**filings** 220:24
**fill** 33:10
**filo** 179:19
**final** 18:24 24:6
74:18 136:23
207:20 273:2
**finalized** 83:2
**finances** 153:10
**financial** 19:3
68:21,22 93:17
119:5 189:20
**financials** 71:18
**financing** 126:10
145:1 192:9
**find** 19:3 51:15
141:22 142:1
228:6 257:19
**finding** 235:4
**findings** 263:11
**finds** 147:21,22
147:22 149:18
**fine** 109:19
136:17 153:11,15
154:9,12 156:18
211:8 213:20
225:11 257:7
266:4
**finger** 151:24
**finish** 43:16 54:17
**finished** 109:20
**finishing** 94:20
**fire** 212:4,15
**firm** 130:4,19
**first** 13:14,15 15:9
15:14 21:2 24:19
28:9 31:7,10

39:21,24 42:20
45:18 47:24 48:3
49:4,6 55:11,13
56:6 61:5,6,13,15
61:16 62:9 71:25
75:12 80:14 81:5
82:7 83:15 84:8,9
85:20 88:13,22
95:11 105:14,16
105:20,23,24
112:16 115:14
118:5 121:17
132:3 134:11
139:3 141:16,22
147:12 151:9,23
151:24,25 152:5
158:4 160:5,8
167:11 176:13
177:25 179:17
186:18 191:20
192:4,5,22 194:14
195:7 203:6
207:19 208:13,17
223:10 224:8
227:4,4 234:18,20
234:24 240:7
245:15 250:17
256:2,11 257:22
259:14 263:11
265:25 266:17,19
266:21,24
**firsthand** 16:21
**five** 25:21,23
179:9 182:6
266:23
**fixed** 222:1,4
**flat** 92:21
**flawed** 14:14
**flaws** 17:14
**flip** 15:13,18 17:2
**floor** 10:2
**flow** 106:5 153:4

**focus** 167:23
**focused** 212:9
216:15 246:25
**focusing** 146:10
146:17 151:4,5
165:5 250:18
**folks** 249:17
**follow** 157:23
194:11 227:21
**followed** 17:15
**following** 85:16
86:11 157:6 158:3
167:25 180:23
227:8 241:25
**follows** 186:2
**foot** 239:25
**footnote** 26:21
70:23,24 71:2
72:12 135:18
149:13,13 252:8
253:10,13 258:15
258:16,17 261:22
**footnotes** 238:19
238:20 252:3
261:23
**forecast** 101:6
134:14
**forecasts** 100:8
101:2 259:21
**foregoing** 274:3
**forget** 182:24
196:5
**form** 51:22,25
66:22 153:1
**formal** 171:15
**formed** 50:17
84:14 123:7
**forming** 87:1,22
**formula** 267:19
**forth** 24:5 75:8,9
130:24 131:7
167:18,19 245:7
249:9

**fortunately**
  125:24
**forward**   31:24
  32:13,21 33:11,16
  36:13 43:8,25
  44:8 45:2 63:3
  67:14 68:20 71:10
  74:8,9 76:21 99:4
  99:9 100:8,20
  101:10,23,24,25
  102:9 104:17
  107:14,18 110:17
  111:23 112:12
  131:14 136:4
  186:5 193:16
  195:22 249:20
**found**   140:23
**foundation**   109:5
  181:11,13
**four**   63:5,9 66:8
  66:23,25 67:7
  73:21 102:20
  111:21 178:17
  179:15,23 180:3
  181:5 185:24
  193:18 197:23
  198:20 240:25
  241:4 267:1
**fourth**   238:13
  252:2
**fox**   9:7 12:16,16
  53:19 73:5,5
  85:17,21 86:20
  88:12 97:12,13
  98:12,14 109:6,19
  109:22 110:15
  112:21 113:5,7
  151:22,23 152:17
  152:19,22,24
  153:3,9,12,14
  162:6 163:21,23
  164:6,9,16 216:20
  216:21,21 223:1,7

223:15,17,20
  224:14,23 225:1
  225:11,19 226:1,4
  229:2,18 263:4,5
  271:23 272:7
**fox's**   20:1
**fraction**   197:5
**franchise**   189:14
  189:17
**frankly**   12:1,5
  247:6
**free**   93:8
**friedmann**   8:18
**front**   19:11 29:10
  30:5,25 31:15
  32:8 36:16,17,19
  47:25 50:22 52:15
  52:19,25 53:12
  58:10 60:16 62:3
  62:15 70:6 75:6
  75:15 76:3 85:6,7
  89:15,24 115:13
  115:15,22 119:22
  122:20,21 141:14
  160:11 161:7
  167:17 174:21
  209:2 226:14
  237:17 245:22
  256:16 257:20
**full**   42:15 49:16
  56:2 63:2 88:25
  161:18 162:16
  214:9 230:13,14
  241:1 256:13
  257:5,13
**fully**   88:23,24
  122:7 141:24
  199:5,9,24
**fund**   263:20
**fundamentally**
  145:12
**funded**   35:15
  49:10,12,13,15

83:16 122:9
  143:11,15 151:25
  264:2,8,12
**funding**   139:12
  152:4 179:14
  268:23
**funds**   149:8 152:3
  152:15,24 258:13
**further**   3:2 5:18
  6:1,8 98:9 112:21
  135:3 219:13
  224:15,24
**furtherance**   56:10
  57:13 58:6 70:15
  96:14
**future**   123:3
  149:14 230:25
  258:11
**fuzzier**   66:9

## g

**g**   11:1 156:3 158:8
  158:11
**gain**   111:13
**game**   53:22
**gander**   20:11
**gayda**   10:12
**genender**   8:25
  11:8,9,13 13:10
  13:15,17,24 14:3
  14:5 16:2,4,14,20
  17:9 18:2,8 19:16
  19:23 20:4,9
  24:25 25:3,7,9
  26:15,18 27:6
  30:14,19,22 51:8
  51:13 60:12 62:25
  65:23 70:3,5
  71:19 72:6 74:22
  75:1 86:23 96:24
  97:14 98:15
  108:23 109:1,3,24
  110:2,13 113:1
  114:17,19,22,25

120:13 128:6
  132:2,4,23 133:11
  135:3,5,23 136:12
  136:14,16,18
  153:18,21 154:2,8
  154:10 155:4,6,16
  155:19 157:14
  158:13 159:3,8,12
  159:21,23 160:2
  162:3,20 165:8,17
  165:20,22 166:12
  177:5 181:10,23
  182:7 187:24
  191:7,10 194:19
  198:10 209:13,22
  213:6 222:24
  223:4 225:4 226:7
  226:12 232:5,16
  232:24 233:2
  235:1 236:3,7,14
  236:16,20 237:12
  237:16 240:9,11
  240:13 241:5,14
  241:16 242:5,9,13
  245:12,16 246:21
  248:19 250:14,20
  251:2,4,10,13
  252:10 253:23
  254:3 257:1,8,12
  257:15 263:1
  268:10 269:8,11
  269:14 270:1
  271:5,8,16,19
  272:8,14
**general**   42:22
  91:10 211:12
  246:2
**generally**   20:15
  20:16 35:14
**generate**   72:22
  99:11,14 111:13
  120:19

**generated** 69:3
72:18,21 112:8
141:7 186:9
190:12
**generates** 120:15
120:18,22 121:6
**generating** 111:15
111:17
**getting** 18:21 30:5
34:20 125:11
151:8 170:2
172:22 180:3
236:10
**getzler** 10:1
**give** 19:12 55:1
91:20 138:25
169:18 190:6
**given** 13:21 16:10
19:7,7 20:18
52:16 150:18
158:24 173:22
182:18 194:17
232:8
**gives** 209:7
**giving** 18:24
146:2
**glb1** 197:11
**global** 61:5
171:21
**go** 13:25 28:9
30:12 31:24 32:13
32:21 33:11,16
36:13 40:19 42:3
42:15 43:7,8,25
45:2,22 57:6 58:9
59:14 61:21 62:6
63:3 67:14 68:8
68:20 71:10 74:8
74:9,20 75:16
76:21 77:23 86:13
89:23 90:9 94:20
94:21 101:10,24
101:25 104:17

107:17 112:12
113:3 114:16
126:18 130:10
143:18 147:24
151:2,3 156:13
160:4 161:7
164:10,12 166:4
166:16,21 168:5,7
185:23 186:5
195:22 231:1
241:17 245:4
248:23 262:1
266:20 267:7
271:9 273:5
**gob** 14:24 31:25
32:22 33:13 41:24
42:25,25 45:2,3,3
89:6,11 94:11
99:2,5 100:16,21
101:22 104:1,13
111:25 134:13,18
183:5,8,10,12,14
183:17,19,22,22
186:6,9,10,12,13
186:24 187:4,7,18
196:7 200:8
220:16
**god** 28:19 73:10
113:12 154:15
155:25
**goes** 13:13 15:8
17:10 70:24
147:17 153:7,9
209:6 231:11
236:9 243:2 244:2
**going** 14:5,7,7
18:20 19:9 21:2
22:23 23:10 24:9
25:22 27:19 28:9
35:4,6,7 40:13
44:8 53:12 55:20
55:23 56:11 57:9
57:13 61:23 62:13

63:15 64:4,5,11
66:24 68:6,9
70:15 72:4,7,15
75:9 82:4 84:6
85:15,19 86:10
91:19 97:11 99:3
99:4,4,4,9,10,25
99:25 100:8,20
101:10,23 102:9
104:16,17,24
107:14 108:23
110:17 111:5,6,7
111:10,23 122:21
125:14,16 126:8
126:16 130:8,11
130:22 135:12
136:8,10,11 138:6
138:8 142:13,14
142:15,16,17,18
142:19 143:9,10
143:22 144:7
145:9,19,20,22
153:23 154:3,25
157:14 158:13,23
160:4 163:23
164:10 171:13
172:4 175:16
178:5,6,11,13
181:4,7,8,10,24
186:21 194:7,14
194:25 195:12
209:13 210:16
215:14,14,17
217:24,25 220:23
224:21,23 225:1,9
226:8 232:6
233:13 236:8
239:8,21,25 240:4
242:23 243:6
245:7 246:4
248:13 249:10,16
253:6,9,14 256:12
261:4 262:3 271:5

271:7 272:9
**good** 11:6,8,15,18
12:12,16,20 30:23
30:24 40:15 57:12
75:2,3,5 97:6
98:13 114:20,21
135:7 138:23
156:21,23 198:3,4
216:23 217:18,19
236:9 249:9
267:10
**goods** 35:21
217:10
**goose** 20:11
**gordon** 213:16
**gotshal** 8:12,20
11:9 13:17 66:10
138:24
**gotshal's** 221:22
**gotten** 49:18,19
140:4 150:8
**gottlieb** 8:3 11:16
58:2
**grand** 144:5
**grant** 19:9 27:9
**granted** 21:1 23:6
179:20
**granting** 19:11
**great** 65:13 75:16
113:5 171:19
**greater** 53:7
**griffith** 2:9 13:10
14:21 15:13 16:17
16:20 17:15 24:21
43:13,18 44:10,16
48:19 54:25 55:3
56:13 57:4 58:19
68:14 88:18 89:9
89:16 90:1 98:17
99:8 102:14 106:8
106:25 108:7
118:7 132:6,13,13
139:13,24 141:1

153:23 155:17,22
156:1,2,4,5,12,19
156:21 157:17
162:9 167:1 171:2
172:3 173:12,15
174:21 177:10,12
177:20 181:12
195:4 196:8,11,14
196:18,24 197:12
197:15,19 198:3,5
198:9,13 202:1
205:10 207:10
210:2 211:1 215:2
216:19,23 222:16
222:17 223:12,22
226:11,13 233:3
234:3 237:15,17
251:12,20 254:6
255:14 256:4,15
257:17 259:20
263:3,5 268:9,11
269:16,20

**griffith's** 17:3
24:3 43:12 48:13
126:22 132:16
159:8

**griffiths** 127:6,12

**griffith's** 58:22
60:9 68:11 78:2,4
78:12 84:4 96:13
98:21 107:19
108:18 109:11
212:20 224:15

**gross** 35:14 44:7
64:14 67:13 70:10
73:1 76:21 77:17
99:11,11 100:2,3
100:11,12 101:14
101:18 102:11,12
102:12 110:4
124:11 160:18
184:4

**grounds** 15:9
51:10 136:1
235:19,20,22
237:10 240:16,16
240:24 241:4
242:3

**group** 71:4

**guess** 135:8
180:23

**guidance** 13:1
220:20

**guide** 128:22

**gump** 9:18 221:18
242:16

**h**

**h** 10:5,25 28:21
73:14,14 156:3
226:16

**hadley** 9:10

**half** 16:23 23:6
242:24 253:15
272:4,5

**hamilton** 8:3
11:17

**hand** 16:16 28:18
32:15 39:2,13
51:3 73:8 113:10
154:13 155:21
162:12 169:4,5
190:16 242:21
245:24 259:4
263:14 269:20

**handed** 198:5,10
223:22 229:2
269:16

**handle** 19:23

**handled** 207:1

**handout** 20:21
138:5,6 146:21
147:2

**hands** 242:19

**happen** 27:2
209:16 212:9

**happened** 64:8
125:22 126:4
143:11 210:15
225:15

**happens** 109:10
142:5 146:22
212:23

**happy** 33:10
37:18 46:15 74:2
166:19 195:21,22
211:6 251:5

**hard** 56:1 190:4
228:2 244:9

**hauer** 9:18

**haven't** 58:5 72:7
96:12 202:23
212:7,11,14
216:11

**head** 221:19

**heading** 74:15
85:13,14,23,25
86:9 87:10 204:11

**hear** 11:24 15:16
18:22 27:14,22
96:9 136:13
153:23,24 174:3
272:1

**heard** 28:3 138:10
165:24 171:8
230:21 232:9
240:13

**hearing** 2:1,2,5,14
2:18 3:1,11,20 4:4
4:12,20 5:5,7,10
5:17,25 6:8,18 7:1
7:11 31:3 121:1
143:14 153:25
156:9 166:23
171:23 173:24
245:8 249:10,17

**hearsay** 172:7

**heinrich** 196:15
197:3,18

**help** 23:12 28:19
73:9 94:4 113:11
154:13,15 155:24
217:8

**helpful** 16:6 23:2

**helping** 130:5

**helps** 18:1

**henrich** 10:1,5
14:12 73:4,6,11
73:14,14,15,20,24
74:2,4,6,25 75:2
82:5 86:25 89:3
91:23 97:4,6,7,18
98:11,13 102:9,12
109:9,10 110:1,3
110:16,21,25
111:4,12,22,24
112:2,17,19,23
119:2

**he's** 85:19 86:20
86:22 109:3
209:15,17 212:21
212:21,22,25
213:1,2,6 223:4,5
223:6,15,19 225:5
225:15 232:20
236:9 272:21,22

**hiding** 37:19

**high** 62:20

**higher** 34:8 35:16
41:22 59:24
100:18 104:25
107:14 187:8,9,20

**highlighted** 35:9
35:13 53:16 81:22
87:14,16 167:22

**highlighting**
242:20

**highly** 206:20
259:16

**hired** 203:6

**historical** 71:7,18
72:13,14

**hit**  20:4,5
**hitting**  226:7
**hold**  36:1 62:16
**holders**  2:1,18 3:3
  256:23 263:14
**holding**  71:3
**holdings**  1:7 2:16
  11:7 138:22
**holste**  10:13
**home**  121:9 189:1
  189:2,8,18 190:13
  217:1
**hon**  1:22
**honestly**  270:9
**honor**  11:8,13,15
  12:9,12,14,16
  13:12,15,16,19
  14:5 16:2 17:10
  18:2,8,17 19:16
  20:20,21 21:1,2
  22:3,15,23 23:6
  23:10 24:15 25:3
  25:12 26:13,20
  27:6,24 28:7,12
  29:8 30:8,11,14
  30:16 49:25 51:9
  51:13 53:19 60:13
  60:23 61:24 70:1
  70:3 71:20,22
  72:6 73:5 74:22
  74:23 85:17 86:6
  86:20 88:12 96:25
  97:15 108:23
  109:19,22,24
  110:15 112:7
  113:7,22 114:17
  114:22 120:13
  128:8 133:2,11
  135:3,5,9,23
  137:23 138:17,23
  139:7,8,18 140:23
  141:4,12,16,18
  144:14 145:6,10

146:11,20,25
147:7,21,22
149:12,17,23
150:1,2,15,25
151:22 153:19
154:2,10 155:4,11
155:15,16,19
156:12,15 157:14
158:13,17 159:5,8
160:4 162:23
163:21 164:13,16
164:24,25 165:2
165:11,14 166:1,5
166:8,11,19 167:7
167:13 169:20
170:6 171:14
172:2 173:4,8
174:7,17 177:6,20
181:10,24 182:7
182:16 191:11
194:23 196:1,2,8
197:22 198:2
209:13 212:19
213:6,11 214:1
223:20 224:14
225:16,20 226:4
229:18 232:6,9
235:16 236:20
237:10 239:23
240:11,14,15,17
241:5,24 242:10
242:11,15 243:13
243:17 245:3,19
246:15,22 247:2
247:16 248:6,10
248:20 249:15,18
249:18 250:14,21
250:22,25 252:25
257:2,3,9 259:15
262:24 263:1
269:9 270:1,16
271:16,19 272:8,9
272:10,15,19

273:12,15
**honor's**  93:5
  249:12
**hoo**  10:14
**horse**  141:21
**houlihan**  221:18
  222:7
**hour**  269:18
**housekeeping**
  30:7
**how'd**  100:5
**huge**  141:12
**hundred**  65:6
  69:7
**hundreds**  64:9
  65:9 200:2 206:24
**hwangpo**  8:17
**hyde**  7:25 274:3,8
**hypothetical**
  128:3 193:2,3,4,8
  195:1

**i**

**identical**  239:17
**identification**
  251:19
**identified**  79:9
  100:7 108:7
**ignores**  35:15
  107:13
**ignoring**  33:25
**ii**  2:21 3:5,15,24
  7:17
**iii**  179:11 181:15
**illustration**  52:8
**illustrative**  239:6
  239:15 259:23
**impact**  146:23
**impeach**  223:4
  244:25
**impeachment**
  223:16,18
**implicitly**  54:11

**implied**  163:10
**implies**  71:8
  170:10
**imply**  169:12
**important**  22:22
  213:10
**imposition**  179:15
**imprecise**  41:19
**impression**  15:6
**improper**  26:24
  248:16
**improperly**
  149:18
**improve**  93:13
**improvement**
  189:18
**improvements**
  168:13
**inaccurate**  228:22
**inadequate**  142:7
**inappropriate**
  242:4
**include**  34:12
  36:13,21 37:4
  38:7 43:4 45:12
  45:23 55:12 60:3
  60:6 65:20 82:11
  86:19 87:22,23
  95:8 102:13
  105:11 106:21
  121:9,11 122:3
  123:20,21 125:13
  127:6,8,9,10
  129:19 149:8,8
  168:22,24 179:3,3
  188:12,16,19
  189:2,5,8,11,14
  189:20,21,23,25
  190:2,25 191:1,2
  191:15 204:20
  219:17 262:13
**included**  21:14
  23:8,9 34:15

38:17 44:21 45:17
45:20 48:17 59:21
67:20 69:10 78:16
78:20 80:24,25
83:9,12 94:6
106:1 114:4
118:19 122:15
123:23 124:10
126:11,13,14
136:5,5 142:23
182:25 183:18
188:20,21,23,24
188:24,25 189:17
190:7 192:3,7,17
204:13 205:1,14
216:8,25 217:21
218:1,8 220:24
221:9,17,18
225:23 256:4,21
261:13 265:12,15
265:17,20 269:2
**includes**  20:10
38:16 45:1,25
47:6 49:4 53:5,18
81:10 94:3 97:21
98:1 124:14 137:4
137:5 151:16
168:10 192:21
205:18 214:4
263:23
**including**  30:9
36:6 52:3 121:18
122:10 125:11
143:12 159:17
179:18 195:17
209:8 214:3 222:3
222:21 240:1
255:23 260:8
**inclusion**  121:23
205:11
**incomplete**  37:13
240:25 246:10

**inconsistent**  223:5
**incorporated**
100:10 103:19
108:7 112:12
124:1 155:8
**incorporates**
117:19
**incorrect**  201:4,8
201:17
**incremental**  99:14
**incumbent**  179:16
**incur**  256:1
**incurred**  56:5,10
56:17 57:7,12
58:6 70:15 96:13
100:24 101:3,5
125:14 133:9
180:22,24,25
184:22 215:14
220:22 264:5
**incurs**  104:20
**indenture**  6:10
7:3,12 9:3
**indentured**  12:18
222:19
**independent**
42:11 46:3 88:1
96:12 117:6,11,16
124:19 125:2
242:3 258:6
**independently**
42:18 71:13 110:3
**indicate**  262:16
**indicated**  36:3
84:7 85:4 94:2
216:24
**indicates**  125:9
262:11
**indication**  241:3
243:21 258:10
**indicators**  214:2
**indirect**  124:11
125:11

**indiscernible**
13:11 16:10 20:24
21:1 23:17 24:11
25:16 26:19 27:1
30:19 50:1,11
51:4 54:12 69:4
69:23 75:13 85:18
85:24 97:1 108:13
114:25 137:4
140:1 141:13
144:9 145:3 147:3
147:9 150:24
152:20 157:15
163:24 170:7
171:22,23 174:7
176:6 180:16
182:9,22 193:18
203:20 204:20
207:7,21 208:14
209:7,24,25
212:13 213:4,9,17
213:21 214:19
215:3 216:22
222:24 223:2,5
225:24 226:6
227:14,25 231:8
231:13 232:7,15
232:20 233:25
234:1,2,11 235:2
235:21,24,24
236:4,12,17,23
237:13 240:5,8,14
240:17 241:13
242:11,11,12,18
243:20,21 244:12
244:15,23 245:21
246:5,19 248:2,3
248:8,9 250:21,23
252:18,23,25
255:3,5 257:5,19
257:21,22 258:7
258:12,17 259:2
259:10,20 260:12

261:13,14,20
262:2,9 263:6
264:12 265:21
266:2,9 267:6,8
267:22 269:12,13
269:14,15,21
270:2,17,20,25
272:17,17,18,23
273:10
**inducement**
247:14
**inducing**  247:13
**indulged**  167:13
**indulgence**  20:5
**industrial**  117:3
**ineligible**  38:16
91:18 162:8
**inequitably**
241:21
**inform**  130:13,15
139:14 238:7
**information**  71:2
117:7,20 124:21
125:1 158:4
181:14 203:4
242:20 245:20
258:7 259:9,10,21
260:20
**informational**
258:3
**informed**  46:1
55:22
**informing**  243:17
**initial**  83:21 234:6
234:7 247:13
**initially**  235:10
**innovel**  189:23
190:15 216:25
**inquiry**  84:4
**insider**  179:18
**insignificant**
29:22

instance 199:22
instructed 45:14
instructions 17:16
insurance 122:17
  123:16,18
intend 191:11
intended 98:25
  258:4
intention 249:11
intents 24:8
inter 247:20
interest 54:9,13
  54:15,20 55:4,5
  55:13 60:5 88:9
  88:10,19,21,25
  95:10,11 106:8,12
  106:13,15,19
  126:10,14 127:8
  127:10 129:15
  145:21 192:4,9,21
  192:24 195:2,7
  211:7 255:21,24
  255:25 256:12
  258:10
interested 153:10
interpret 171:24
  174:1,10
interpretation
  20:12 80:23 163:9
  164:19 165:4,6
interpreted 24:14
  134:17
interpreting
  169:20,22,25
  170:1 171:3
interrupt 18:20
  97:11 167:9
introduce 13:18
invade 142:19
  144:1,8 152:8
invariably 21:7
inventory 18:18
  21:13,21,22 22:10

23:20,22 24:1
28:1 31:24 33:11
33:12,13 34:5
35:3,14,16,19
36:5 37:8,23 38:4
38:12,17 39:5,15
39:16 40:9 41:23
41:25 42:16,25
43:9 44:6,14 45:2
45:5 48:19 59:1
63:5,15,25 64:1,7
64:10,23 66:2,3
67:6 70:24 71:3,4
72:1,10 74:9,9
76:11,21 77:2,2,7
77:8,17,17,18,22
77:24 78:5,7,16
78:20 89:5,10,11
89:17,21 90:8,12
90:12,17,19 91:11
91:12,13,16,17
97:19,22 98:2,16
98:17,21,22 99:5
99:10,14,17,20,21
99:24 100:12,16
100:21 101:14
103:22 104:13
105:8 106:2,5
107:1,6,13,17
110:17,23 111:11
111:13,16 115:6,8
115:11,12,21
116:1,8,11,13,24
117:22 118:4,5,6
118:13,14 119:10
119:14,16 120:16
120:18,23 121:7
124:4,12 129:10
129:14,19,20
130:5,20 131:22
132:4,5,14,16,19
133:6 134:13,14
134:14 160:6,20

160:23 163:5,17
168:9,11,12,14,23
169:8,12 171:12
172:6,14 174:13
175:4,20 176:24
177:4 180:2 181:8
190:11,14,16
201:19 202:20
203:3,7 204:6,13
205:12,12,16,19
205:22,23 206:1,2
206:3,6,12 214:3
217:6,9,12,17,23
218:3,4 229:24
230:5,7,9 242:22
252:8,22 254:22
254:25 255:7
262:10,12 264:23
265:24 266:25
267:14
investigation
234:19 235:4,6
investment 260:9
investments 2:6
2:11 4:13 6:1
258:13
involved 22:15
31:7,10 57:22
164:7 179:7
182:24 199:16
212:1,3 213:1
involves 23:23
involving 21:5
65:9
ironically 185:24
irrelevant 54:16
55:7 81:5 84:21
88:6 90:21 209:22
213:23 243:16
isn't 91:5 104:18
213:24 214:8
244:18,18

isolated 220:22
issue 13:11 16:9
20:13,13 22:13
26:7 28:9 147:18
165:15 166:5,13
167:4 174:11
191:4 232:18
238:9 245:9 248:5
249:4,23
issued 31:13
issues 12:2,23
19:18 30:9 153:24
166:21
issuing 39:20
it'd 134:24
item 23:25 54:5
60:17 98:8 103:21
183:8
items 45:18,23
48:17 59:21 81:24
87:21 120:8 136:5
218:9 219:11,13
227:24
it'd 272:4
it's 52:22 53:22
55:7 57:16 60:15
61:5 62:8,9,9,11
62:13,17 64:19
66:24 67:13 74:7
76:18 77:23 78:1
78:4 86:4,5,5 87:9
88:13 102:9 103:6
103:6 104:23
105:14,20 106:7
106:15 112:13
198:17 201:21
207:9 209:16,22
209:24 210:9,12
210:15 213:10,23
214:17 215:24,24
217:9,11 218:20
219:4 223:1,18
225:7,13 228:22

232:12 236:11,11
237:1,5,6,8,11
238:13 239:24
240:3,24,24 242:3
242:4,5,9 243:5
243:19 244:9,14
244:22 245:12
246:9,10 247:4,18
247:23 248:2,4,12
248:13,14,15
251:16 252:17
256:1 257:22,22
258:17,21 260:23
261:2 265:15,16
265:17,20,23
266:3,9,12 267:3
267:17,20,20,21
267:21
**i'd** 207:7 213:13
223:13 229:1
241:10,24 251:2,4
267:6 272:1
**i'll** 68:16 75:7
77:21 79:10 82:25
85:22 86:23
206:10 216:18
225:4,7 253:23
254:4 257:1
**i'm** 54:4,16 55:1
55:22 60:22 62:16
62:22 68:23 69:5
72:7,19 74:2 78:7
82:7 88:21 102:7
105:8 108:23
109:15,19 114:9
115:22 201:22
202:1 209:13
210:21 211:6,6
212:2,6 213:23
215:23 216:2
217:14 219:25
220:7 221:11,11
223:25 224:17,23

225:9 226:8 228:2
229:25 232:6,17
235:4 236:8
242:16 245:19
246:21 248:13
251:5 254:9
257:14 270:18
271:5,7 272:9,12
272:25
**i've** 56:15 212:1,3
223:22 235:23
236:3 248:17
270:20

## j

**j** 2:10 8:8 9:16
10:12
**january** 56:17
57:4 96:22 155:1
171:18 180:15,19
181:3 210:2 214:3
231:18 247:12
251:15 252:20,21
253:19 260:3
270:5
**jared** 8:18
**jason** 10:11
**job** 204:12,22
206:21 207:2
227:23
**joinder** 3:11,20
**joining** 192:22
**joint** 26:1,22,24
26:24 38:25 50:23
51:24 85:7,10
119:21 153:3,5
179:8 181:17
198:6 204:1 207:9
233:3 241:5,6,7
245:16 248:20
251:20 270:6
**jointly** 26:16
**joseph** 9:24
242:15

**judge** 1:23 20:9
92:23 138:14
140:15 147:2
148:14 153:14
165:17 166:12
174:14 190:18
225:4,5 226:8
232:16 236:8
241:10 242:5,13
246:21 252:9
255:21 273:8,14
**judgement** 46:1,1
**judgment** 258:8
**judgments** 81:1
163:24
**judicial** 242:19
**july** 1:16 2:2 31:2
31:20 156:8
159:10 220:4,12
221:16 274:25
**june** 18:10 31:13
31:17 32:24 39:19
83:3 155:9 156:7
159:9 210:9
215:24
**junior** 86:15
137:2 139:10
140:11 142:13
178:20 179:19
**juxtaposition**
81:15
**jx** 51:3 52:17,20
52:21 53:2 81:13
81:16,18 87:10
119:20 204:9
207:11 238:13
**jx004-8** 204:9
**jx008-12** 262:6
**jx08** 247:17
**jx08-1** 259:14
**jx08-12** 262:5
**jx8-5** 252:3

## k

**k** 206:24
**keep** 17:17 121:4
260:21
**kenmore** 190:2
217:1
**kept** 67:10 236:10
**key** 23:23 167:17
**kidding** 39:12
**kim** 10:14
**kind** 49:19 61:5
141:14,20 145:11
150:4 190:15
231:11
**knew** 129:16
225:22
**know** 13:2 14:7
20:7,13,18 22:14
24:20 32:19 34:17
38:10,14 41:3,9
41:11 45:16 46:14
50:4,9 51:21
53:24 57:16,20
75:9 86:21 93:18
97:21 98:1,14
99:16 112:7 121:2
121:4 122:2 123:5
129:24 137:20
138:2 139:22
140:2,17,20,20
144:9 145:1,8
147:5 148:11
149:6 150:3,6,6,7
150:8 152:6
165:23 166:1
171:8,8 172:15,15
173:13 174:2
175:24 177:15
183:20 187:5,15
187:16,21,23
188:2,3,4,6,7
189:16 195:25
196:20 197:20

198:23 199:25
204:24 206:2
213:10 219:18,25
221:16,19 225:20
233:15 236:1
238:8 241:17
242:16 246:16
249:15 250:7
255:9 257:5,12
270:24 272:5,17
273:1
**knowable**  122:13
126:1
**knowing**  14:6
113:20 155:8
**knowledgably**
181:21
**knowledge**  16:21
139:13 164:3
196:22 200:10
212:23 225:14
230:24,25 233:10
252:19
**knowledgeable**
202:19 226:6
**known**  122:11
126:1
**knows**  16:15
225:15 247:15
**koch**  10:15
**kreller**  5:2,7 9:15
12:14
**kumho**  15:7

**l**

**l**  9:23,24 28:21
154:20
**l.p.**  2:5,11 4:20,22
5:3,8,11
**labeled**  182:5
**lack**  14:14 181:11
**laid**  201:7
**language**  35:13
150:25 165:5

167:22 169:15
258:8
**lanier**  10:16
**large**  69:5 203:4
**largely**  111:20
**larger**  42:3 85:6
116:21
**late**  144:25
**law**  4:4,12,21 5:10
5:17,25 6:8 7:11
7:11
**lawyer**  22:1
**lay**  23:8 212:21,25
237:13 251:5
**laying**  107:25
**lazard**  222:6
**lc**  53:3,6 54:5
86:15,18 87:12,18
175:13,17,21
177:12 178:1,2
179:19 238:23
**lc's**  178:2
**lcs**  88:20,23,25
122:16 176:5
178:5 179:3,4,4
193:19 231:9
264:22
**leading**  72:8
166:24 169:24
203:13,17,19
209:16 229:18
**leads**  125:18
**learned**  163:12
**leave**  4:20 99:13
138:18,19 165:4
181:24
**led**  165:4
**ledanski**  7:25
274:3,8
**ledger**  39:4,15
42:22 47:6 77:8
89:17,20 90:12
162:21

**lee**  272:3,16
**left**  77:23 79:13
126:2 142:3 198:6
201:12 269:20
**legal**  17:21 19:6
19:19 20:7,13,19
21:9,13 23:9,11
24:15 107:25
170:7 183:2
194:19 243:13,15
258:6 274:20
**legible**  182:21,22
**lend**  66:2 91:19
**lender**  65:25 66:1
92:14 93:7 230:6
**lenders**  57:19
145:3 179:20,21
192:4,22,22 203:6
203:11,14 204:25
205:6
**lenders'**  203:8
**lender's**  91:18
**lending**  129:17
152:2
**lesser**  162:25
**letter**  49:17,21
50:6 83:23 171:15
171:15,17,18
200:19 251:3
264:13,15 268:12
**letters**  19:20 49:5
49:8 50:14 52:3
59:12 60:2 83:9
83:15,19 84:1
87:23 95:7 122:3
123:6,16 127:7,9
136:4 199:3,4,9
199:10,23 200:17
200:23 230:16
255:14,15 265:1,6
266:6
**let's**  200:25 204:8
206:14 257:19

266:20
**level**  11:25 17:12
36:6 43:5 57:17
66:10 69:3,9,9
98:7 169:6,7
184:20 185:1,5
186:11,20 187:4
188:6 190:24
214:22 216:6,11
**levels**  168:1
**liabilities**  261:11
**liability**  54:2
200:20,20,22
231:10
**liberty**  8:5 9:12
**license**  183:3
**lien**  2:1,18,19,23
3:3,4,7,12,16,21
3:24 4:5,6,14 5:18
5:19 6:2,18,20
20:12 28:10 40:2
40:6,12,17 41:15
42:13 45:17,18,19
49:4,6 55:13
57:19,25 61:6,10
61:11,13,15 67:18
80:13,14 81:5
83:15 84:8,9
88:22 95:11
105:14,14,16,20
105:20,25 106:1
107:24 112:16
142:5,16,20,23
143:8,17,20
144:13 146:23
150:9 151:13,17
151:23,24 152:1,5
152:10,14,22
157:19 158:3
173:18 175:8
176:6,13,24 177:1
177:25 179:2,18
192:4,5,22 194:14

195:7,13,18 203:6
223:10,11 224:8,9
233:22 242:25
256:2,11,23
263:12,14 264:3
264:22 265:12,25
266:16,17,19,21
266:22,23,24,25
267:1
**lienholder's**  15:12
45:24
**lienholders**  14:18
16:16 18:23 20:16
35:20 50:3 92:6
135:6,24 136:1
**liens**  44:23 66:15
105:23 140:18
141:18 142:6
147:14 148:1,2,4
150:20 151:11
175:14 178:20
194:12,13,17
195:17,20 262:14
262:18 264:10
**lien's**  80:11
**light**  135:23
**lii**  10:17
**limine**  2:7 11:12
11:19 12:21,23
14:1 15:4 23:5
27:5
**limitation**  143:24
**limited**  15:21
137:5
**line**  36:19 37:22
48:6 78:9 98:8
103:21 111:11
201:15,23 202:4,6
202:8,11 207:24
219:10,13 223:24
239:5 268:11
**lines**  48:19 52:12

**liquidate**  130:5,6
130:10
**liquidated**  99:3
200:2 206:23
**liquidating**
130:20
**liquidation**  56:2
97:24 107:11,11
107:15 108:5
115:2,10 117:3,9
118:2,17 124:1,12
125:5,7,9,17,20
125:22,25 126:12
131:21 133:14,19
181:9 195:6,12
197:16 199:4,8,9
199:23 200:13
204:20 206:17
207:1,6,10,20,22
208:16 209:15
210:5,10,14 211:3
211:11,16,19,22
212:5,6,24 213:2
213:8 214:10
230:12,13,14
231:17,20,22
239:22 242:24
253:7,10,14 255:4
**liquidations**  64:23
211:12 212:22
**liquidator**  206:15
208:1,3,7
**liquidators**
210:23
**liquidity**  193:25
**list**  25:15 159:24
188:15 218:8
222:7,10 241:5
248:20
**listed**  79:8 81:22
81:24 82:1 87:19
218:18 221:22,23
222:9

**listen**  19:13
140:10 173:25
**listening**  84:3
**lists**  79:1 80:1
81:21 82:15 120:5
**literally**  272:20
**litigating**  247:3
**litigation**  129:23
199:10 246:24,25
260:12,15
**little**  18:24 28:4
47:23 52:15
104:24,25 147:9
169:2 249:19,24
**liubicic**  9:16
12:12,13 97:2,2,5
97:13,15 98:9
128:8,10 132:20
133:2 196:2
209:19,21,25
212:19 213:18
214:1
**live**  50:20 52:7
**llc**  92:21
**llcs**  50:10
**llp**  8:3,12,20 9:1
9:10,18 11:17
**loan**  258:11 265:2
265:5,21 266:1,2
266:23 267:22,22
**location**  111:3
**locations**  206:24
**log**  242:18
**logic**  175:25 176:3
259:15
**logical**  142:9
**lokey**  221:18
222:7
**long**  112:24
193:24 228:8
230:25 249:16
260:23

**look**  23:20 24:17
32:2 35:4,23
47:23 52:14 55:10
62:3 77:22 89:13
101:19,20 103:17
105:23 107:23
108:1 112:3
121:16 132:1
139:16 140:12
141:17 142:3,10
143:21 151:3
153:10 157:9,10
160:10 161:8,9
162:12 167:13
168:15 172:20
175:7 176:1,20
178:16,18 179:13
182:1 183:24,25
186:8 188:10
193:17 196:9
198:8 203:25
204:5 207:8,23
209:1 211:8
215:21 218:12
226:7 234:16
236:15 247:17
261:2
**looked**  21:4 52:13
61:12 68:14 98:25
101:1 103:8 104:2
104:4,4 108:2
112:5 173:12
218:14 260:6
**looking**  15:6 22:9
32:2,4 39:13
46:16 62:8 67:11
75:12 99:16
100:25 105:17
115:23 121:17
141:15 148:13
161:6 168:17
173:13 180:1
183:8 186:4

187:11,11 201:22
221:20 228:2
234:10 246:21
247:23 250:17
257:25 258:15,16
259:14 261:22
**looks** 62:6
**loose** 229:3
**losers** 69:23
**loss** 121:1 151:1,1
**lot** 15:2 17:18
19:14 61:18 68:13
147:6 180:24
221:4,5,9
**loud** 238:19
**low** 132:19
**lower** 37:24 39:1
39:13 51:3 63:20
104:24 116:15
125:7 206:12
214:20
**lp** 12:14
**lubicic** 197:22
198:2
**lunch** 136:11,19
153:22 269:18
**l's** 227:13

**m**

**m** 9:7 10:24
113:16 179:11
181:15
**m3** 93:16 110:7
199:20
**m3's** 103:8
**madison** 10:2
**magnitude** 99:19
**mahkamova**
10:18
**maintain** 35:18
36:5 123:24
132:14,17
**maintaining**
124:8

**majority** 215:19
230:21
**making** 18:9,9
27:19 99:23
112:15 150:3
213:8 223:12
246:23
**man** 62:12 152:20
252:9 272:11,13
272:15,19,25
273:3,9,12,14,15
**management**
106:4 117:20
124:23 129:24,25
130:21
**manges** 8:12,20
11:9 13:17
**manner** 259:25
**march** 134:16
**margin** 34:3,11
71:7,9 72:5 76:21
77:2 99:11,12,13
100:2,3,11 101:14
101:18 110:4
112:11 184:4,15
186:10
**margins** 19:14
71:18 211:10
212:15
**maria** 10:9
**marie** 10:22
**marked** 233:3
245:12 251:19
**market** 18:19
40:1,5,10,12 41:6
41:14,18 43:14,19
43:22,24 59:1
88:1 89:16 90:2,4
90:6 99:20,22
107:5,17 161:20
167:3 180:9
205:20 216:15
232:19 233:21

**market's** 213:21
**markup** 71:8
**mart** 206:24
**marti** 5:1 77:24
113:8 114:18
128:9 132:22
**match** 208:13
**material** 41:20
157:12 177:23
**materially** 71:9
111:16
**materials** 14:8
40:19
**math** 17:15 67:12
77:11,13,20 82:4
82:10,24,25 90:17
91:3 127:13,16
180:4 255:9 268:5
268:6,17
**mathematically**
127:2
**matter** 1:5 14:10
14:17 19:3 20:7
23:9 82:4,10 93:1
105:19,22 170:3
173:6 197:1
244:24 245:11
269:3
**matters** 29:6
113:19 154:23
156:6,10 159:10
**matthew** 10:15
**maximization**
195:11
**maximize** 194:4
**maximizing**
193:25
**mccloy** 9:10
**mean** 20:10 21:23
25:1 42:15 66:2
67:7 103:6 108:3
108:12 110:9
111:7 132:12

134:3,17 145:23
148:14 149:19
150:2 165:23
171:7 175:13
176:18 181:2,2,19
195:15 196:20
209:15 210:15
213:22 217:5
230:6 232:17,18
262:11 264:5
272:19
**meaning** 48:16
166:25 167:1,18
167:19 178:23
**means** 134:10
143:6 167:12
169:17
**meant** 66:25
83:11 131:24,25
134:3 145:25
148:19 174:1
228:24
**measure** 65:24
67:3,3
**measurement**
126:1
**mediating** 22:16
250:4
**mediations** 250:4
**meeting** 165:19
166:7 172:5 210:2
259:8,12 260:15
260:18,20,25
**meetings** 249:8
270:4,13 271:11
**meets** 178:6
**meghji** 131:11
170:25 181:16
**memorandum** 4:4
4:12,21 5:10,17
5:25 6:8 7:11,11
**memory** 101:7
237:25 270:6,10

mention  246:12
mentioned  103:12
  124:25 130:2
  197:7 199:15
  246:17
mentioning  214:6
merchandise  64:5
  111:13 207:21
merely  108:14
met  136:1
method  75:8
  192:15
methodologies
  31:24 98:24
methodology
  31:25 66:18 89:12
  197:6,16 198:21
  201:5,9,17,25
  205:5
metric  214:8
mic  140:3
michael  10:19
microphone
  145:24
middle  32:16
  48:10
midnight  83:3
milbank  9:10
  12:13,15
mill  145:1
million  21:5 23:24
  23:25 34:8,15,19
  38:16 39:17 44:16
  44:18 47:2,9,10
  47:10,13,18,20
  48:12,16,20,25
  49:5,8,13,21 50:7
  50:17 53:8,25
  54:24 55:3,13,15
  58:13,19 59:10,18
  59:21 60:2,5,9,10
  60:17 65:22 67:13
  67:17 68:7 69:1,7

77:16,24 78:1,4
78:12 79:11,17,20
79:25 80:1,16
82:6,11,12,14,15
82:16 83:1,9
84:14 86:14,14,15
86:18 88:19 90:13
94:9,9,10,18,24
95:1,7,10,13,16
96:5,8 101:5,7
102:6,19 103:1
104:14 106:8
112:8,9,13 118:6
121:14,19,24
122:12 123:7
126:21 127:1,5,7
127:11,14,14,15
127:24 139:12,22
141:4 143:13,13
143:14 145:4
147:20,23 148:5
150:7 162:3,9,11
162:13 175:10,18
175:18 176:4,23
177:12 178:2
179:1,25 180:3,4
183:2,3,3,4 184:5
184:8,9,14 185:2
186:8,15 187:1,22
192:3,8,8,8,18,21
192:25 194:7,25
200:16 215:7
221:18 222:3,13
226:1 227:4,5
231:7 255:19,23
256:5 261:14,18
263:24 264:8,15
264:17,22,25
265:4,8,11,17,20
265:23 266:6,15
266:21,22,23,25
268:11 269:1,5

mind  142:8
  177:14
mineola  274:23
minimum  116:13
  128:1 168:21
  181:4 193:2 195:4
  201:3,7,16 215:6
  255:25
minor  14:1 17:24
  73:21 74:18
minute  55:18
  130:2 206:14
minutes  153:17
  200:25
miscalculated
  32:24
missed  170:8
misstate  187:24
misstates  162:6
  162:20
mistake  228:17
  229:17
mistaken  88:22
mister  89:20
mittelman  10:19
moelis  271:14
moloney  2:10 8:8
  11:15,16,20 13:6
  15:3 20:20,24
  22:2,5,13,21 23:4
  23:14 24:23 25:12
  25:19,21 26:1,4,7
  26:9,12,20 27:11
  27:16,19,24 28:7
  28:12 29:8,13,15
  30:7 37:14,17
  49:25 51:9 61:23
  62:2,13 69:25
  70:9 71:22,24
  72:9 73:2 135:9
  135:12,17,20
  137:23 138:1,5,10
  138:14,17 141:12

144:4,19,23
145:25 146:6,11
146:16,18,20
147:5,19 148:8
149:12,23 150:1
150:15,24 151:6
151:15 156:15,20
158:14,17,22
159:4 160:3
162:23 164:12,24
165:11,13 166:1,8
166:11 167:6,11
167:16 169:25
170:6 171:13,21
172:1,7,10,13,19
172:24 173:3
174:6,17 181:15
181:24 182:3,10
182:13,16 186:1,4
186:16 194:22
196:1 232:9,12
233:25 234:4
235:3,16,19
236:22 237:3,7
239:23 240:15
241:13,15,23
242:8 243:13
244:4,7,11,14,21
245:18,23 246:4,9
246:15 247:16
248:3,6,9,12,15
249:6,14,24 250:2
250:21,25 252:25
254:1 257:3,18
270:16,19 271:3,7
272:9,12
moloney's  20:1
  152:7 166:22
moloney's  216:24
moment  35:25
  171:14 215:22
moments  83:3

**monarch** 189:25
190:15
**monark** 217:1
**money** 17:18
49:18 68:12 69:10
69:13 99:23 134:6
143:6 144:15
145:14,15,19
148:15,15 149:15
149:16,18 150:20
151:2 152:12
175:9 183:1,1
185:16 186:9,19
**month** 133:19,19
133:25 134:20
195:5 197:23
256:3
**monthly** 134:12
231:11
**months** 102:20
134:7,15 181:4,5
198:20
**morning** 11:6,8
11:15,18 12:12,16
12:20 28:16,17
30:23,24 31:18
75:2,3 167:14
268:21 273:11
**morphet** 10:20
**motion** 2:1,5,14
2:22 3:6,15,24 4:9
4:17,20 5:22 6:5
6:23 7:1,13,17
11:10,12,19,23
12:1 14:11,13
15:4 16:5 17:3
18:11,23 19:9
20:25 23:5,17,18
24:23 26:13 27:5
27:9 135:25
136:15 141:19
145:12 147:15
153:20 159:4

164:25 166:6
222:18 223:3
**motions** 11:22
12:21,22 13:1
14:1,6 17:2 18:11
29:1
**move** 12:8 23:4
82:7 105:9 135:25
141:19 165:14
191:12 212:19
217:8,10 232:17
232:21 271:8
**moving** 191:22
**mull** 147:16
**multi** 69:7
**multiple** 240:23
**multiplier** 99:8
**murray** 5:2 14:13
73:4 79:14,23
93:24 97:16,18
105:8 112:25
113:4,8,13,16,17
113:22,24 114:9
114:12,14,18,20
115:2 116:1
120:15,21 121:16
126:15,19 128:9
128:11,14 132:1
132:22,24 133:12
133:16,20,22,24
134:5,8,11,21,25
206:2,11 213:8
214:2 215:11
254:19
**murray's** 77:24
95:1 97:21 98:1
200:25 201:3,7,16
202:15 203:21
205:11 215:6
230:21

## n

**n** 8:1 11:1 73:14
274:1
**nacva** 128:20,22
**name** 66:22 73:13
76:6 103:9 113:14
115:17 154:18
**name's** 98:13
**narotam** 1:25
**narrowly** 220:18
**natasha** 8:17
**national** 2:6,12
6:9 7:2,12 9:2
12:17 128:17
222:19
**nature** 16:18
102:15
**navigate** 23:1
75:7
**near** 207:24
**nearly** 14:17
**necessarily** 45:25
100:23 172:3
177:24
**necessary** 18:13
35:18 36:4 57:8
57:15 80:17
110:24 123:24
124:8 132:18
191:3 217:9
**need** 20:6 27:4,22
161:4 167:23
170:16 172:5
173:25 185:23
198:7 216:7
223:13
**needed** 112:4
**negative** 58:19
60:9 96:4,5
127:24
**negotiated** 27:1
65:25

**negotiating**
244:19,20 246:8
**negotiation**
164:20 246:8,9
248:1 249:8
**negotiations** 24:4
24:5 163:10,12,15
165:4 233:13
245:4 246:2,3,19
250:6,10
**net** 32:21 33:17
34:2,5,15,24 39:5
39:16 42:2 43:1
44:7 63:16 64:14
66:17 67:14 68:20
69:10 70:11 90:7
90:12,18 97:23
100:13 108:5
112:11 115:6,10
115:25 116:8
117:9 118:2,13,17
124:1,3,12 125:5
125:7,8,16 131:21
134:13 151:14
196:9 207:16,20
207:25 208:6
230:6 254:22
255:6
**network** 190:17
217:3
**never** 44:19 86:20
86:22 99:23
107:16 143:24
193:11,12 205:6
210:15 211:15,18
211:21 212:4
213:1 249:20
266:10
**nevertheless**
264:21
**new** 1:2 8:6,15 9:5
9:13,21 10:3
151:20 169:17

242:17
newco 85:15
86:10 261:4
nine 26:3 168:1
nolv 97:19,21
98:1 115:9 116:5
116:22 124:14
129:20 131:4,13
131:15 203:22
205:21 206:11
214:4,7,20 216:4
216:8,14 228:24
254:20
nolvs 131:5 205:1
205:1,7 207:5
208:21
nolv's 202:16
203:14
non 78:16,20 98:2
114:3,5 179:18
183:5,8,10 204:17
204:19 227:23
nonconforming
210:23
nonsensical
236:21
normal 68:3
123:19 144:24,25
normalized 101:8
112:3,6
normally 12:23
22:18 144:23
norman 228:8
note 71:7 139:8
173:19 259:4
notebook 30:16
30:25 32:2 35:5
36:17 38:21 42:3
42:4 47:24 50:22
50:25 51:1,2
52:14,15,19,19
55:11 116:20,21
228:7

noted 14:23 139:8
140:19
notes 214:2
223:11 224:9
226:9
noteworthy 232:1
notice 44:5
notion 64:7 199:1
notwithstanding
18:25 228:1
271:25
november 84:7
131:20,23,25
134:24 203:20
number 32:5
33:11 34:20 35:8
39:5 43:12,14,19
43:20,21 44:17
45:5 46:22,23
47:1,5,9,14,15,17
48:9,25 49:2
57:20 58:12,22,22
59:25 60:8,9 62:6
62:7 63:5,8,18,18
63:20 64:4,13
65:8 67:15 72:22
76:15,20 77:10,22
77:23 78:7 79:4
79:14,22 84:10
86:5 89:21 90:2
90:19 91:1,2
94:13 98:16,17,21
98:22 100:5,6,19
101:10,15 103:13
103:24 104:5,5,19
105:8 106:25
114:3,8,13 116:15
118:13,14 119:1,4
126:19 127:5,11
137:20 139:17
143:5 153:6,9
160:18,21 161:2
161:11,13,14,16

161:17,23,23
162:4,15,18,19,21
162:22,25 163:6
164:21 166:14,16
166:18 176:9
177:4 178:17
179:23,25 182:5,9
182:17 186:8
187:1,7,8,13,20
192:25,25 193:1,3
193:4,4,8 195:1,2
195:3 196:12,16
196:17 197:13
204:9 207:11
209:8 211:2 227:4
227:5,17 239:8
245:17 252:12,20
252:24 253:2
255:1,5,7,8 256:4
257:20,22 258:18
258:20,20 262:6
268:25 269:2
numbering 186:6
numbers 32:16,25
34:10 70:9 90:11
94:12,15 105:11
108:10,12,17,22
109:16 127:21,22
127:23 138:4
148:11 153:5
163:14 175:19
218:24 219:1
239:14,16,25
252:7,15 254:12
number's 63:18
79:17
numerator 197:2
197:4 255:8
ny 1:14 8:6,15 9:5
9:13,21 10:3
274:23

o

o 1:21 11:1 154:20
274:1
oath 234:20,24
oberg 10:21
object 51:9 72:7
108:23 157:14
158:13 159:2
163:23 164:15
181:10 209:13,22
235:16,19 237:9
240:15,16,18,23
240:24 241:3
270:16 271:3
objected 164:8
objecting 17:3,6
237:3
objection 3:12,15
3:21,24 15:12
26:14 27:14,14
53:19 86:20 88:12
93:3 109:18 133:2
162:20 165:12,17
177:5 187:24
194:19 222:18
229:18 232:14
240:1
objections 12:24
232:12 240:13
250:23 254:1,2
270:20
obligation 50:21
54:9 122:9 177:23
177:24,25 178:6
obligations 52:7
61:6,13 123:3,16
139:10 142:20
178:11 230:17,18
231:1
observation
149:13
observations
16:25 21:3 268:18

obtain  262:17
obtained  194:6
obtaining  93:1,2
obviously  12:9
  13:18 19:14 20:18
  135:10 137:15
  141:5 149:19
  191:11
occur  126:8
  200:21
occurred  212:10
  243:24
october  41:5,16
  54:20 71:5 77:9
  118:4 134:16,18
  154:23 204:6
  230:7
odd  77:16 88:20
offer  85:14 86:9
  212:22 232:17,21
  235:11 240:3
  241:2 249:19
  251:2,4 253:23
  258:9 261:3
offered  58:3 167:2
  237:5,6
offering  16:20,24
  42:12 49:3,7,11
  80:22,23 119:7
  212:25 237:13
  240:10,11,14
officer  93:21
  131:11
oh  50:24,25 56:23
  65:1 66:24 77:12
  111:4 202:14
  272:11
okay  11:14 12:11
  12:20 13:9,23
  14:4 16:3 18:20
  19:25 20:8 22:4
  24:18 25:6 26:8
  28:8,8,14,21,23

29:14 30:18 31:6
  31:20 33:5,8,9,11
  33:20 34:2 36:21
  43:13,16,17,23
  45:12 46:22 47:19
  48:3,6 49:14
  50:19 51:12,24
  53:24 56:24 57:12
  58:18 59:5,14,17
  60:14 61:1,19,21
  61:25 62:24 64:3
  66:4,24 68:16,16
  70:2 71:21 72:9
  73:7,7,12,15,23
  74:5,20,20 75:6
  75:10 76:3,20,24
  77:4 78:11 81:3
  82:23 83:17,25
  84:17 86:24 89:9
  89:23 91:1 93:6
  93:20 96:2 97:9
  97:17,21 98:10,20
  102:20 103:8,12
  104:7,16,22 105:5
  105:13 106:7,11
  106:23 107:4
  108:18 109:14,21
  109:23,25 111:19
  112:20,22,24
  113:2,6,9,9,17,23
  114:7,15,16 116:4
  116:16,19 118:11
  120:21 121:4
  122:1,23 123:6
  126:25 127:18,21
  128:7,14 131:7
  132:8,21 135:1,4
  135:4,22 137:21
  138:18,21 139:2
  141:11 146:18
  148:7,25 149:11
  153:2,13,18 154:7
  154:12,21 155:5

155:12,13,18,20
  156:13,23 157:18
  158:22 159:7,11
  160:1,22 161:5
  162:2,17 163:4
  164:24 165:13
  166:11 167:5,11
  167:16 173:3,10
  174:16,20 175:1
  175:16 181:23
  182:10 183:24
  184:3 185:4 188:3
  188:10 190:19
  193:3 197:21
  198:1,8,13 199:7
  199:16,19 200:25
  201:1,2,11,15
  202:4 204:8,11
  205:14,18 206:8
  206:10 207:13
  208:3,12,16,20,23
  209:6 210:13
  211:9 212:11,19
  213:20 216:1,4,16
  217:5,21 218:7,12
  218:13,16 219:3,9
  219:21 220:12,15
  221:14,16,20,25
  222:10,12,15
  224:2,25 225:11
  225:17 226:5,9,10
  226:18 227:11
  229:1,16,22
  230:12 232:3,11
  233:2 234:19
  235:18 237:14,20
  237:25 238:23
  240:12 249:13
  250:1 251:7,10,19
  252:19 253:25
  254:16 257:16,24
  257:25 259:14
  261:2,22 262:7,25

263:2,11,17 264:1
  264:17,21,25
  265:4,8,11,17,20
  265:23 266:20
  267:11,14,18
  268:3,8 269:2,7
  269:10,23 270:3
  270:22 271:15,17
  271:17,21 273:8
  273:12,13
old  274:21
once  65:4 249:16
  263:23
one's  137:8
ones  11:24 25:15
  66:7
one's  246:4
ongoing  100:1
  111:5 123:15
  246:19
online  217:11
oob  197:15
opaque  28:4
operating  66:9
  116:14 181:3
  184:9,22
operation  57:23
  107:18
operations  101:9
  101:9 112:3,6
operative  241:19
opine  178:10
opined  93:24
opining  19:19
opinion  39:20
  40:14 49:3,7,11
  51:25 80:7,9
  83:18 84:16 119:7
  172:14 258:24
opinions  12:4
  14:14 17:13 42:13
  51:22 75:18 87:1
  212:22,25 261:24

[opportunity - pardon]                                                          Page 39

**opportunity**  20:1
20:2
**oppose**  183:13
**opposed**  83:19
99:17 110:25
111:2 148:11
153:25 177:11
191:23 197:4
228:24
**opposition**  2:18
3:2 4:8,16,25 5:14
5:22 6:4,23 7:17
**opted**  101:8
**optimistic**  272:1
**option**  180:20,20
258:11
**oral**  20:2 153:25
166:20 272:1,4,5
**oranges**  243:22,23
243:23
**order**  59:14
100:13 136:21,22
136:23 138:7
139:4,9 140:16
141:15,17,23
142:22 146:1
152:9 171:22
264:2
**ordering**  65:16
**orderly**  97:23
115:10 117:9
118:2,17 124:1,12
125:5,7,8,17,19
125:22,24 126:12
131:21 193:25
195:6 199:22
207:20 211:16
**orders**  141:23
250:3
**organized**  226:8
**original**  32:24
83:1,12 177:18
193:22 195:19

227:12
**originally**  151:8
**ought**  153:24
**outcome**  14:23
**outset**  14:16 146:2
**outside**  26:6
**outstanding**  84:9
84:12 106:12,19
231:4,9 266:10,17
268:12
**overall**  28:4
104:19 105:1
180:16 197:6
211:3 212:8
**overarching**
219:21
**overhead**  34:12
34:14,18,23 35:2
37:5 38:7 43:5
68:18 69:2,14,22
94:4,10 98:7
100:19 101:2
102:18,18,23,23
103:20 104:11,19
105:3 111:14,18
111:21 184:20
187:18 204:21
205:2 214:22
216:7,12
**overly**  272:1
**oversight**  272:25
**overview**  238:16
**owe**  49:20
**owed**  50:11
**owing**  265:4
**o'neal**  8:10

**p**

**p**  5:1 8:1,1 11:1
**package**  23:9
45:24 46:6 262:17
**pad**  81:13
**page**  32:4,12,15
32:16,16 33:20,21

35:12,12,24 36:2
36:18,18 38:25
39:9,12 41:25
42:1,24 43:7
47:25 48:10 52:23
52:24 53:2,10,11
53:12,12 54:3,3
55:11 62:6,7,11
62:12,13,23 63:1
63:2 67:11 70:7,9
70:20,20,21 75:12
81:18 82:7 85:12
85:12,25 86:2,3,4
86:5 87:15,18
90:9 115:14,24
121:17 127:20
133:21 136:22
137:1,7 141:17
143:21 151:11,11
151:12 153:16
160:15,21 161:8,9
167:20 168:18
179:13 180:1
182:8,9 184:1,1
185:24 188:11,14
188:15,16,17
196:7 201:13,15
201:23 202:4,11
202:12 204:5,8,11
205:2 207:11
215:22 216:2
218:12 227:23
228:3 238:13,24
239:4,5 247:16,18
247:23 252:2
253:5,6 257:25
258:15 259:14
260:6,11 261:2,22
262:1,1,4,5
**pages**  39:7 62:20
81:16 87:9 185:24
186:5 227:8,21
238:12 256:18

**paid**  40:1,5 64:1
66:15 123:19
146:8 173:18
174:4 175:9,19
184:11,14 192:22
193:1 198:19
231:7,10 261:17
263:18 264:10
265:24 266:21
268:14,14
**paper**  147:6
**papers**  18:10,12
137:8
**paradise**  9:8
12:19
**paragraph**  25:13
32:3 33:21 35:5
35:11,12,23 36:2
36:9,10 63:1,2,4,8
63:8 74:6,7,11
113:24,25 134:11
136:22 141:16,17
142:22 143:18,21
174:20 175:18
177:3 178:16,18
178:24 213:14
215:1,5,22,25
218:8,12 219:23
220:4,13 221:20
221:25,25 222:22
223:8,24,25
224:16 228:11,18
229:6,16
**paragraphs**  25:13
25:20,21 26:5
114:1 211:1,6
212:20 213:4
222:12 224:17
256:18
**parcel**  149:1
**pardon**  82:17
104:8,8

**parenthetical**
53:8
**park** 9:20
**parlance** 61:20
**parol** 11:23 25:6
26:25 27:22 51:10
166:13,24 167:4
**parole** 174:10
235:20,23 240:2
240:16 241:8,8
243:3 248:15,16
248:21
**part** 13:7 21:2
26:16 38:24 40:2
40:6,13,15 46:5
49:12 50:1 53:22
53:23 84:19
105:25 106:21
119:25 122:4,15
130:7 133:13
137:16 142:4
144:5,15 149:1
159:19 163:13
175:15,22,23,24
176:11,12,16,18
176:21 177:13
178:14 179:12
183:9 184:13
186:15 187:3
190:17 192:5
202:16 203:4
205:12 213:10
214:15 217:3,9,14
217:24,25 226:2
230:15 233:22
235:4,5 236:25
243:18,19,20,21
243:22 246:6,18
247:3 248:1
249:10 250:11
255:15,17 260:15
261:20 262:17
263:25 264:8

265:1,5,8,16
266:11 267:3
268:14,14 269:6
**partially** 141:25
**participated**
173:15
**particular** 60:20
67:8 170:20
209:18 219:10,10
228:2 245:10
**particularly**
50:15 144:24
**parties** 3:12,16,21
3:25 4:5 5:18 6:19
13:3 19:10 24:6
26:23 35:5 125:8
125:10 136:20
148:12 157:4,11
157:20 165:24
170:18 173:24
174:12 195:13,13
236:1 237:1 248:7
251:3 260:19,19
271:25
**partner** 12:19
**partners** 2:5,11
4:20,22 5:3,8,11
12:13 13:18
**parts** 110:25
189:11 190:15
**party** 75:17
128:25 129:4,6,8
158:3 166:15
242:1 246:23
**party's** 170:4,5
**pass** 60:12 96:24
128:6 132:20
216:18 257:1
270:1
**path** 256:1
**pattern** 64:19
**paul** 8:25 11:8
13:16 268:9

**pay** 49:18 99:12
111:14 145:21,22
184:8 185:5,7,9
185:11,13 186:11
186:11,20,20,21
194:14 263:13
264:2 266:5
**paying** 176:1
213:23
**payment** 5:5,7
6:11 7:1,3 123:16
**payments** 178:8
204:20 231:12
**payoff** 265:21
**payroll** 36:6 67:21
67:22 186:20
188:12,18
**pendency** 92:11
**pending** 153:20
**people** 12:6 13:4
104:23 111:2
113:2 138:16
171:6 174:1
225:14 245:4
246:7 248:24
249:6,7,15 250:4
259:8
**people's** 42:21
**percent** 23:25
34:3 43:1,4,14,20
43:21 44:11,11
45:3 48:22,23,24
48:25 49:1 59:5,6
59:18,19 64:22
71:8,8,9 72:4,13
76:20 77:2,8
88:21 89:4,7,10
89:16 90:2,3,7
91:2,5 97:19 99:7
99:8,18,19 100:3
100:17,19,20,21
101:4,4,6,8,10
102:8,10 103:13

103:22,24 104:13
106:25 107:6,12
107:12,16 108:4
110:4,10,18,18
112:13 114:2,11
114:14,15 115:9
115:10 116:4,22
122:16,19,24
124:3 125:6,10,11
125:12 131:4,13
131:15 161:13,21
161:22 163:6,8,18
164:21,22 169:6
170:2 175:3,19
176:2,10 177:4,11
177:13 179:15,23
180:3 181:8
196:12,17,21
203:22 205:23,25
206:8,11 207:5,5
207:21 208:4,4,9
208:10,12,12
214:5,7 219:25
220:1,8 230:22
242:23 253:13,15
255:7,11 261:16
261:19 267:19
268:1,2,4
**percentage** 43:1
43:20,25 77:5
90:18 100:16
114:7 115:9 116:5
117:9 119:13
131:4 134:1
196:10,16 198:14
206:12
**percentages** 112:5
124:2 130:1
**perception** 213:1
**perfectly** 15:19
**perform** 40:10,11
40:16 41:6,14
80:15 89:1,2

117:6 119:12
121:13 133:5,8
**performance**  22:8
**performed**  40:20
88:18 115:2,4
202:16 254:11
**performing**
231:13
**period**  56:21,25
57:1 96:21 102:20
133:17 134:7,20
134:22 137:17
195:5,8 200:21
204:24 226:23
256:3
**periods**  96:16
191:16,17,19
**permissible**
169:19
**permits**  240:20
**permitting**  150:18
**personal**  139:13
164:3 225:13
230:25 233:10
**personally**  199:16
211:15 221:6
**persuades**  19:4
**pertains**  28:25
**petition**  18:15
21:11,20 41:2,5
41:15,21,22 42:14
54:9,13,14,20
55:3,5 70:12,16
70:17 71:25 72:11
72:11,15,20,23
74:10 78:17 84:23
87:24 88:9,10,19
89:4 93:12,12,19
95:10 99:1,20
106:8,12,14,15,17
106:19,22 107:4,7
115:3,4 117:22
125:19 126:3,10

127:8,10 133:6
141:6,6,8 154:24
163:17,25 184:23
191:18 192:3
193:22 198:18
200:2,15 203:10
203:13 205:6
206:23 255:21,23
256:11 264:6
268:12
**pharmacy**  20:14
45:7,13 46:5
47:16 59:24 78:25
78:25 79:25 80:1
80:4,8,9 81:10,20
82:14,15 118:20
119:8 120:4,4
121:18,23 168:23
168:24 169:5,8
252:13
**philip**  9:25
**physical**  42:16
**pick**  100:5
**picked**  22:17
23:25 67:21 68:4
69:6
**picture**  142:11
246:6
**piece**  59:13 266:3
**pieces**  22:19 147:6
171:10 219:17
**piles**  232:7
**pivot**  181:3
200:12
**pivotal**  21:8,10
**pivoted**  180:14
207:6
**place**  15:14
103:17 110:9
133:15 142:14,14
148:1 195:6 231:8
263:17

**plain**  166:7
169:14
**plainly**  165:16
**plains**  1:14
**plan**  131:12 194:3
194:4
**plane**  272:21
**planning**  30:15
**plans**  100:7
**play**  137:17 244:1
**plaza**  8:5
**pleas**  154:13
**please**  11:6 28:18
32:4 37:9,11 73:8
73:13 78:3,19
80:6 85:12 102:2
113:10,15 121:4
131:19 154:19
155:21 173:9
201:13 202:5,10
204:8 223:25
227:11 232:4,10
**pleased**  85:14
86:9 261:3
**plus**  60:2,5 95:10
101:4 127:14
176:6,6 187:18,18
207:1 255:11,12
**pm**  273:17
**pocket**  198:7
201:12
**point**  15:13 16:8
18:9,9 20:19
24:18 27:5,14
28:4 43:15 46:18
46:20 52:9 72:6,7
75:21 86:13 88:16
135:7 136:10
140:13 143:10
144:18 146:9
148:14,18,21
150:3 151:23
152:7 162:1

164:15,24 169:23
170:7,7,8,11,16
171:5 174:2
179:13 180:11,14
180:22 181:9
197:10 198:17
199:1,12 203:19
208:10 211:2
225:13 231:25
232:18 234:10
241:10 242:17
243:13,23 244:2
262:11 273:11
**pointed**  105:5
235:10
**points**  125:4
200:11 213:18
**poison**  243:17
**policies**  231:8
**policy**  245:10
**portion**  45:3
84:14 92:8 135:6
185:12 215:13
217:18,19 247:1
262:12
**portions**  2:8 15:22
179:19 217:20
**posed**  124:2
**position**  17:10
57:6 143:16 175:8
175:11 200:12
247:7 272:1
**positions**  166:23
241:19 247:9
**positive**  66:20
96:3 219:25 220:1
**possible**  17:20
57:16 117:16
181:2,5 187:19
199:6 210:9,12,15
229:21 272:3,15
**post**  54:8,13,14,20
55:3,5 64:13,17

64:20 70:15 72:11
72:20 88:9,10,19
93:12 95:10 106:8
106:15 126:10
127:8,10 133:6
141:6,8 184:5,22
192:3 205:6
255:21,23 256:11
264:5
**posted** 50:4
**potential** 23:24
231:5 242:21
254:7 256:6 269:4
**powerpoint**
167:13
**practice** 128:23
**pre** 64:16,20
72:11,15 93:12,19
133:5 193:22
**preamble** 240:25
**precision** 66:12
**preclude** 165:1
**predicate** 235:6
251:5
**predicated** 24:2,3
**prefer** 63:16
**preliminary**
18:23 259:5
**premise** 125:15
125:15
**premised** 195:19
**premiums** 123:18
**preparation**
179:7
**prepare** 181:12
203:7
**prepared** 66:1
116:24 117:8
165:2 166:6
180:15 181:15
214:4 233:15
239:19 253:17
269:17

**preparing** 179:12
237:22
**prepetition**
179:18
**prescription** 79:1
80:1 81:21 82:15
120:5
**present** 10:7
15:19 233:17
251:25
**presentation**
25:25 51:18 86:6
110:7,11 238:14
239:4 247:24
251:15,25 252:2
258:3,4,9 259:16
259:22 262:5,6
**presentations**
26:10 100:8,10
159:22 166:24
173:14 238:1
**presented** 14:15
159:15 233:17
253:19
**preservation**
92:13 96:15
**preserve** 94:4
123:25 132:15,16
**preserved** 250:23
**preserving** 124:8
**presumably** 69:22
**pretty** 21:24
140:3
**prevail** 246:23
**preventing**
249:25
**previous** 70:20
**previously** 36:12
38:3 56:4 92:18
94:2 193:23 221:2
247:21
**price** 39:4 50:17
84:15,19 123:8

167:19,21,24
168:1,2,3,3,6,19
169:9 170:2,10,16
173:1 174:4,9,12
239:6,15 253:13
253:15 255:17,19
261:25
**prices** 64:1
**primarily** 15:24
19:6 66:5 163:9
**primary** 57:8,14
66:14 92:5,12
96:14
**priming** 151:17
178:19 179:2
**principal** 53:7
**principally** 64:16
**print** 70:23
**prior** 74:7 88:15
130:5 145:20
148:2,4 163:10
169:16 175:7
176:1,1,23 200:1
203:13,16 206:23
237:22 244:25
**priority** 6:12 7:5
7:16 143:19,22
144:9 152:11,14
152:25 247:21
262:13,18
**pro** 142:21 143:15
145:6 169:17
**probably** 12:21
60:15 137:11
166:10 196:5
226:5 273:10
**problem** 13:7
17:22,24 18:6
142:9 146:12
162:17,24 173:4
201:24 225:23
**problems** 205:16

**procedures**
171:21
**proceed** 11:10,19
12:9 30:15 153:19
210:4
**proceedings**
273:16 274:4
**proceeds** 34:24
45:19 80:11 106:1
106:5 119:10,14
119:16 193:22,23
200:22 217:5,6,16
217:17,22,23
218:2,4
**process** 14:25
93:8 130:8 134:4
171:5,6 183:13,13
193:25 215:15
220:17,24 237:12
**produce** 235:22
**produced** 158:6
159:16 191:21
219:22 235:25
236:7,20 245:17
246:22
**production**
179:11 236:2
**profession** 139:22
**professional** 92:5
92:8,11 94:6,9,14
126:9,11,13
128:22 130:4
137:5 139:23
152:8 220:16,17
220:18 221:23
263:8,12,24 264:8
264:9
**professionals**
17:20 66:11
221:17 222:1
225:22 263:14
**professions**
224:19

proffered 16:16
proffering 58:13
profit 35:22 38:6
68:19 72:5 110:23
111:10
profitability 44:4
67:8 93:13
profitable 110:19
profits 35:14
prohibit 222:20
prohibited 241:24
prohibitive
244:16,23
prohibits 27:17
project 87:6
207:10,20 251:15
projected 192:25
207:5 208:21
252:7,12
projecting 148:5
projection 207:17
208:23,24
projections
134:13 259:21
proof 28:10 149:9
237:8
proper 22:16
174:9 241:7
properly 24:14
92:9 141:16 144:1
149:17 194:1
property 21:6
111:7 142:8 143:9
143:9 144:1 164:2
proposal 180:20
180:25 181:1
250:7,11 262:3
proposals 21:20
249:9 250:8
proposed 114:1
213:17
proposition 91:10

protect 245:18,20
250:6
protection 137:2
139:9,19 142:6,23
143:8 144:6 145:8
148:1,2,4 149:2,5
150:19 151:10
152:10,14 178:20
194:7,9,12,17
195:20 262:13,18
protections
195:23
prove 242:1
provide 21:18
117:2 157:4 238:3
258:4
provided 28:24
130:9 134:12
149:24 151:24
170:23 171:22
179:14 191:15,24
215:11 219:16
220:7,8,10 228:7
229:8 230:2
233:12
provides 22:7
152:9
providing 15:21
92:12
province 22:18
proving 23:19
provision 108:15
169:2,10,11,13
provisions 141:15
142:10 149:25
provoked 242:13
proxy 43:21,24
163:18 164:5
public 200:10
pull 221:13
pulled 183:21
pulling 221:4,10

purchase 26:6
40:8 50:17 52:9
84:15,19 123:7,8
123:10 167:19,21
167:23,24,25
168:2,3,3,6,6,19
170:15 173:1,1
174:4,8,12 239:6
239:15 253:13,15
255:17,19 258:10
258:17,21 261:18
261:25
purchaser 242:22
purchases 63:25
67:6 174:1
pure 20:13
purely 24:15
purport 172:13
purports 17:4,5,7
purpose 27:2
173:4,6 240:22
255:22 259:9
purposes 2:15
47:11 66:17 140:9
169:19 170:19,19
173:16 192:12
209:17 220:19
223:2,16 249:1
258:4 259:23
pursuant 2:23 3:8
4:8,9,15,17,24 5:1
5:13,15,21,23 6:4
6:5,11,13,14,22
6:24 7:4,5,7,14,15
7:16,17 179:16
pursue 130:22
pursuing 243:8
pursuit 57:18,18
pushed 152:5
put 19:18 26:20
33:17 77:15
130:24 131:7,12
131:14 136:4

143:6,14,23
145:16,19 149:9
149:17,18 150:20
151:2,9 152:13
170:18,20 172:10
172:17 175:24
177:3 193:16
195:5 224:5 244:1
263:12
puts 133:18
137:16 150:6
putting 145:14,20
161:22 163:1
249:11

q

qualifications
14:12
qualified 3:11,20
15:19 23:11 164:1
qualitative 11:22
qualitatively
20:25 186:19
quantified 44:19
212:14
quantify 212:7
213:3
quarrel 163:4
quarreling 146:6
quarropas 1:13
question 21:23
22:14 23:14 24:13
24:15 26:17 30:7
36:21 37:4,7,13
37:22 38:20 42:10
43:16 51:13 54:17
57:25 60:14 61:8
61:23 63:11 68:18
68:24,25 70:18
78:3,19 80:6
84:22,24 85:24
87:3 89:19 109:5
109:5 120:21
121:21 125:18

137:24 139:3
142:1,3,4 146:21
150:11 157:23
164:10 180:18
181:22 187:6
194:11 195:25
196:4 198:25,25
201:6,16,20,22,25
202:2,9 209:16
212:11 216:16
217:16 223:6
224:22 229:19
234:12,22 235:3
236:4 237:21
255:22 266:20
270:23 271:6
**questioning** 247:9
**questions** 11:24
21:8,9,10,14
62:25 63:3 69:25
71:19 72:8 97:7
97:14,16 98:9,15
110:14 128:11
138:25 141:9
159:6 181:18
194:23 196:1
199:3 202:3
215:12 224:15,24
230:16 231:22,23
232:6,13,22 248:1
259:3 262:24
263:1
**quickest** 61:16,17
**quickly** 138:24
**quid** 142:21
143:15 145:6
**quite** 17:19 44:2
187:19 231:9
247:22
**quo** 142:21
143:15 145:6
**quote** 183:5

**r**

**r** 1:21 5:2,7 8:1,18
8:25 9:15 11:1
73:14 113:16,16
154:20 156:3
274:1
**rai** 1:25
**raise** 28:17 73:7
113:9 154:13
155:20 243:14
**raised** 12:1
243:10,12 270:20
**ran** 125:5 183:22
**range** 131:3
**ranging** 125:10
**rate** 88:21,25
**rates** 203:1
**ratio** 222:2
**raw** 159:25
191:15
**ray** 2:15 13:19
138:23 173:11
**rdd** 1:3
**reach** 20:12
100:13
**read** 14:8 21:5
37:2,9,11,12,14
37:17,18,21 45:15
46:11,14,20 74:11
81:14 134:3,11
137:4 170:12
194:1 202:4,5,10
208:16 223:24
228:2 238:19
239:23 241:24
258:13
**reading** 24:3,4
238:11
**reads** 74:9
**ready** 11:10
153:18 156:21
**real** 18:1 23:2
111:2 163:4

177:23 193:4,9,9
244:16
**realizable** 37:24
**realizations** 64:10
67:18
**realize** 130:21
196:18
**realized** 72:3
163:19 211:11
**reallocate** 146:7
**reallocated**
140:22
**reallocation**
146:12,14
**really** 13:25 15:8
16:12 17:2,8,25
18:9,17 19:11
21:8 22:14 23:3
29:22 34:25 42:20
62:9 68:13 137:8
140:25 150:4,10
154:24 167:22
180:12 188:4
195:7 197:1
244:21
**reargue** 21:2
22:24
**reason** 33:19 52:7
63:22 163:8
172:21,23 250:17
**reasonable** 57:8
57:14 100:22
101:10 105:4
118:1 158:24,25
194:5 249:7
**reasonably**
198:21 237:11
**reasons** 63:21
107:10 240:23
**rebates** 69:7
**rebuttal** 135:8
271:22

**rec** 118:19
**recall** 23:16 31:18
41:12 46:19 62:25
63:3 85:11 87:7
93:8,18 98:18
101:13 103:21
106:9 107:21
109:8,10,14 110:8
110:12,12 128:12
132:3,10 196:25
205:10,14 206:5,7
211:1 214:5,6
215:3 217:2 218:9
218:11 220:3
231:23 234:14
238:20,23 259:11
260:23 262:22
268:25 270:9,12
270:24 271:2,10
**receivable** 59:25
79:4,7 82:12,14
118:23 169:9
190:12 217:13
**receivables** 21:21
21:22 45:7,7,13
46:5,22 47:14,17
59:24 65:11,14,14
65:18 78:25 79:2
79:25 80:4,8,9
81:11,21 118:20
118:21 119:8,11
119:16 120:4,4
121:19,23 168:12
168:23,23 169:7,9
217:15 252:13
**received** 117:20
178:20
**recess** 138:20
**recipient** 258:5
**recipient's** 258:8
**recognized** 99:1
**recollection** 224:4

recollections
239:2
recommended
210:3
recommending
210:18
reconcile 187:14
record 15:11
16:12 24:22 26:11
26:12 73:5,13
97:2 136:16
137:13,16 138:3,4
138:21 154:19
173:9,21 191:23
191:25 207:9
213:15,16,19
216:21 242:10
250:8,22 274:4
recorded 37:24
records 21:17,25
25:4,9,10 110:5
196:23
recover 148:23,24
149:8
recoveries 211:4
212:8 259:22
recovering 149:3
recovery 43:1
57:18 124:11
134:1,13 143:25
181:8 196:10,16
207:17,25 208:6
recreate 169:14
recross 132:22
redacted 3:17
redirect 61:22
97:1 128:7,9
133:3
reduce 145:16
192:18 211:3
212:8
reduction 44:11
44:11

reductions 216:5
refer 26:6 52:11
150:13 212:14
235:13
reference 51:9
221:21 253:6
261:12 262:2
referenced 103:13
229:23 234:17
253:2 269:6
references 52:3
53:6 136:24 155:6
238:23 252:5
270:14 271:2,10
referred 29:18
110:5,7 135:19
168:17 230:2
232:16 234:13
236:6 238:8
265:25
referring 75:8
103:5
refers 24:21 25:24
150:13,14 225:17
250:18
reflect 238:7
269:23 270:5
reflected 32:10
69:17 74:12 76:17
81:11 90:8 94:17
118:3 122:16
226:23 227:17
270:6
reflects 65:8 77:2
refresh 224:4
refrigerator
217:10
refute 54:24 55:2
88:17
regard 83:18
201:3,7
regarding 96:13
241:20 259:21

regardless 244:15
256:1
reicker 178:16,21
193:17
reimbursed
150:19
rejected 52:6
relate 24:11 97:16
138:15 177:14
190:22 224:18
related 2:3,9,24
3:8,17 4:1 6:15,24
14:24 24:10 63:22
84:5 122:17
176:21 183:5,8,11
183:12,17 187:18
194:24 217:11
220:16 221:21
227:23 230:22
256:2
relates 16:5 18:12
138:13 142:4
177:6 255:21
256:15
relating 265:23
266:6
relative 101:11
release 242:8
243:20 244:20
246:11,13 247:3
250:12
relevance 26:23
27:15 169:1,2,3
209:23 237:7,9,10
240:2,23 241:6,9
248:14,20,23
249:19,25
relevant 56:21
140:25 170:17
172:6,19 173:16
173:23 209:24
223:1 237:11
243:15 244:3,14

248:10,24 268:17
reliance 14:20
22:7 128:12,25
129:3
relied 21:7 42:12
42:22 51:14 64:11
71:15,17 98:5
116:19 117:18,19
119:15 124:13
129:24,25 157:4
170:23 202:22,25
relief 50:20
relies 34:22
202:15
rely 15:23 18:4,4
18:6 21:17,19
22:11 24:13 25:10
42:20 71:14 75:17
75:20 87:21
103:24 104:1,5,9
104:10,12 110:4
116:19,21 117:12
129:6,11 130:24
131:16 164:18,20
168:16 169:19
197:15 203:3
231:14 233:19
241:3
relying 16:5 22:8
27:21 35:1 64:6
125:1,3 133:13
170:4,5 209:11,17
231:14,17
remainder 262:19
remaining 6:14
7:7 130:10 215:19
239:11,14
remedy 140:22
remember 31:19
101:16,20 110:20
144:20 223:12
remove 269:5

**removed** 220:16
**renege** 145:12,12
  146:12
**reneging** 145:11
**renew** 164:25
**rent** 36:6 37:25,25
  67:23,24 102:15
  185:7
**repair** 189:8
**repeat** 78:3,19
  80:6 89:19 201:6
  229:25 234:22
**repeating** 270:21
**rephrase** 109:7
  162:23
**replacement**
  63:22 64:2 142:5
  144:13 146:23
  147:14 194:13
**replied** 42:19
**reply** 2:21 3:5,14
  3:23 5:17,25 6:8
  18:10
**replying** 37:20
**report** 5:1 28:24
  29:3,12,13,15,17
  29:21 31:13,20
  32:12,24 33:20
  41:19 58:3 62:8
  63:13 68:23 69:17
  70:6,21 71:14,15
  73:16,20 74:12,17
  83:1,13,17,24
  98:6,6 101:14,21
  102:3,4 103:4,8
  103:10,19 104:10
  104:12 113:18,25
  114:1 116:20,24
  117:7,18,19,25
  121:14 122:16,19
  122:20 124:13,25
  125:3,13,16 126:7
  130:25 133:21,23

146:24 147:9
  157:1,5,6 158:9
  158:10 160:7
  161:8,10 182:1,3
  183:24,25 184:1,2
  188:10,17 196:6
  201:4,8 206:4
  214:20
**reported** 36:25
  99:6
**reporting** 183:22
**reports** 15:23
  18:7 19:12 21:16
  31:23 42:21
  124:22 157:12,12
  158:16 213:7
**represent** 79:10
  98:14 122:8,19,24
  124:7 127:13
  178:18 206:10
  251:19
**representation**
  55:16,17 122:25
**representations**
  166:18
**representative**
  172:4
**represented** 47:20
  179:1
**representing**
  159:17
**represents** 119:10
  186:19
**request** 3:16,25
  4:25 5:7,10,14 6:1
  6:9 7:2
**requests** 2:19 3:3
  3:13,22 4:5,13
  5:19 6:20
**required** 14:15
  167:17 204:21
  243:20

**requires** 19:3
**rescap** 14:21
**rescue** 242:14
**reserve** 2:15
  26:23 149:19
**reserved** 248:19
**reserves** 241:6
**reserving** 12:7
**residual** 262:11
**resolution** 246:10
**resorting** 193:23
**resources** 69:3
**respect** 18:25 53:7
  98:3 99:9 104:11
  105:6 143:25
  144:25 151:22,23
  154:22 166:5
  191:2,11 225:24
  243:11 244:8
  249:11
**respectfully** 37:1
  135:25
**respecting** 240:17
**respond** 159:3
  167:7 173:8
**responding** 213:6
**responds** 167:12
**response** 18:10
  49:20 51:12
  201:19 216:23
  225:2 268:21
**rest** 26:5 33:25
  112:16 126:2
  205:23 271:19
**rested** 135:20,24
**restructuring**
  93:20 131:11
  195:15 210:3
**result** 142:24,24
  143:1,1 151:16,19
  247:20
**resulted** 34:5
  180:21 222:3,8

**resulting** 44:4
  151:15
**results** 99:6 104:3
  186:7 196:7
**resume** 174:17
**retail** 32:21 33:17
  34:2,15,24 35:3
  42:2 44:7,7 63:16
  64:14,15 66:17
  67:14,14 68:20
  69:10 70:11,11
  99:10,11,17,21,23
  101:9 107:13,17
  117:3 134:14
  190:17 204:12,21
  217:3
**retailer** 120:17
  199:23 211:16,19
  211:22 212:5,24
  213:2
**retailers** 67:2,9
  130:5 211:13,24
**retained** 93:18
  129:14 130:7
**return** 35:16
**returned** 200:23
**returns** 64:20
**revenue** 72:22
  73:1 101:4 102:10
  102:12 121:6
**revenues** 67:5
  72:17,18,20 218:4
**review** 119:24
  124:9 207:10
  214:12 233:19
**reviewing** 125:2
  220:21
**ri** 10:14
**riecker** 131:17,20
  228:17
**riecker's** 84:6
  228:6

**right** 12:20 13:13
13:25 15:8 23:13
25:19 26:1,4,23
27:3,11 28:5,17
29:12 30:6,12
32:10,15,22 33:1
33:13,18,24 34:3
34:24 37:3 38:8
38:24 39:1,11,13
43:2 44:2,18,20
44:21,24 48:23
51:3,16 53:2
55:13 56:23 57:15
58:12 59:8,11,22
61:21 62:17 64:17
67:4 68:4 69:12
70:12,18,25 73:8
76:5,18,25 79:2,4
79:6,11 85:20
86:2,5 90:5 91:8
92:2,19,21 93:14
95:13,17 96:8
101:7 103:2,9,21
104:24 109:5,17
111:20 112:2,4,18
112:20 113:2,10
113:17 114:16
116:6,12,25 117:4
118:14,21,24
119:2,4 121:9,11
121:20,25 122:7
127:22 129:22
135:16,17 139:6
140:10 143:13
144:8,10,22
145:14 146:20
147:17 149:22,24
150:1,18 151:15
152:7,23 153:13
153:15 154:13
155:3,7,12,21
156:13 160:14,14
161:3,11,12,14

162:5,9,15,19
163:17 164:9
165:10,21 175:5
175:12,17,20
176:3,10 177:22
178:3,7,13,23
179:5,11,25 180:4
180:4,5,6 181:9
183:15 184:12
185:5,7,9,11,13
185:16 186:10,12
186:22 187:2,8,22
190:22 192:1,23
193:5 194:3,15
195:14,21 196:9
196:20 198:1
199:14,20 200:13
202:17 203:1,11
203:18,23 204:17
205:3,8,19,24
206:18,24 209:1
209:12 210:6
211:14,16,19,22
212:8,12,16
213:15 214:11,24
215:7,8,10,19,20
216:17 217:23
218:6,18 219:15
221:23,24 224:3
224:21,25 225:2
227:7,16 228:12
228:20 230:18
231:20 232:24
237:14 239:19
241:6 244:4
247:23 248:4
249:23 250:1,11
252:1 257:11
258:13,17,20,21
258:22,25 259:4,6
260:1,9,13 261:10
261:19,24 262:3
262:14 263:23

265:21 270:22
271:7,13,21,24
273:6
**rights** 12:7 143:25
144:6 145:7,8,22
146:2
**rise** 11:5
**rises** 17:12
**risk** 65:15
**risks** 211:2 213:3
231:22
**rita** 10:22
**ritrovato** 10:22
**road** 172:2 244:5
274:21
**robert** 1:22 9:16
10:12 12:12 97:2
**rolled** 53:25 84:19
85:2
**rollover** 86:14
261:12
**room** 1:13
**rough** 127:15
**roughly** 60:22
64:22 67:12 141:3
226:25
**round** 34:10
**rounded** 33:12
**route** 130:11
**routine** 14:10
**row** 132:5,10
**rows** 208:6
**royalty** 98:7
103:20 204:20
**rule** 2:2,21 3:6,14
3:23 4:8,16,24
5:13,21 6:4,22
7:14 153:24
169:17 213:4
240:1,18,20 241:8
241:24 244:7,15
244:16 245:22
249:2 259:17

272:2
**ruled** 21:3 25:22
235:23 241:9
243:4 248:17,21
**rules** 245:24
**ruling** 153:25
156:8 240:18
249:12 254:2
272:4,6
**run** 145:1 193:25
**running** 68:3
206:21
**runs** 272:16

**s**

**s** 2:3,9,24 3:8,18
4:1 6:15,24 8:1,17
10:13 11:1 28:21
154:20
**sabine** 22:14
**sacrosanct** 144:7
**sailed** 249:20
**sale** 14:24 17:17
18:16 40:2,7,11
40:13,18,23,25
41:2,5 50:14
55:20,24 56:7,11
57:9,13,18 58:7
70:15 72:4,23
88:3,4 93:8 96:14
120:19 130:8,11
130:23 132:25
133:17,19,25
141:23 144:20
163:19 167:24
168:7 178:13
180:8,20 183:5,10
184:15,23 187:2
195:12 200:16
204:12,13,16,17
204:19 210:17
212:4,15 215:14
215:14,17 217:17
217:24 218:1,4

220:23 227:23
232:19 233:23
238:5 243:8 246:8
250:7 255:15
264:6 265:5
267:16 268:15
**sales** 14:24 35:14
45:3 64:11 67:14
72:15,18,20
102:11,12 104:17
104:17 106:2
112:1 125:14,17
134:15,18 141:8,8
170:10 183:8,17
186:22 200:8
204:22 206:21
218:2
**sara** 9:23
**satisfy** 69:2
105:24 142:3,20
175:9 193:21
**saturday** 31:18
**sausage** 169:14
**save** 122:21 145:9
257:5
**saving** 96:21
**saw** 39:24 60:16
100:17 184:24
210:25
**saying** 20:17
27:21 35:2 37:25
54:16 105:19
132:18 140:5,10
145:13 146:7
147:5,15 150:22
172:24 176:14,23
177:1 180:2,19
185:1,19 187:9
194:9,10 214:18
242:22,25 245:4
265:11 272:12
**says** 26:22 28:1
33:20 35:7,13

37:3,13 38:21
39:1,2 47:24 48:3
52:17,20 53:6
71:2 72:12 74:12
74:15 75:13 79:11
81:13 85:7,25
86:6,9,13,14
89:14 115:15
119:20 122:24
134:12 137:1
143:17,21 151:1
151:10,12 168:19
168:20 169:13,15
178:21,25 179:15
182:21 186:13
194:15,16 196:7
204:23 207:19,25
208:20,25 229:8
229:23 230:9
238:13,16 239:5,5
239:11,21 241:1
244:4,17,22,22
247:19 253:13
258:3,8,19,21,23
259:4,20 260:12
261:3,25 262:8,9
**sb360** 210:5,13,19
**scale** 56:2
**scenario** 125:14
126:9,16,20 180:8
253:9,10,14,14
**scenarios** 190:10
253:7
**schedule** 109:11
185:20 236:11
**schedules** 79:8
220:7
**scheduling** 272:20
**schrock** 2:15
13:19 138:23,24
139:3,7 140:2,7
141:3,7 147:2
148:14,24 149:4

150:2,22 173:8,11
173:11 174:14
272:20 273:6,8
**schulte** 14:12 22:7
28:13,16,20,22,23
29:4,11,21,24
30:4,21,23 31:6
32:17 35:4 37:1
37:16,18,21,25
38:21 42:3,9,11
44:22 45:21 47:12
49:3,21 50:22
51:4 53:24 55:10
55:19 57:6 58:25
60:15,18,22,25
61:2,4,12,20 62:1
62:4,15 70:4,6
71:23 79:22 85:4
93:23 119:2
137:24 146:24
147:7 160:7 161:2
162:14,24 183:24
184:2 187:16
188:10,17 196:25
197:6,18
**schulte's** 162:4
163:5 185:21
186:3 196:6
**schulte's** 78:14
94:24
**scope** 133:3
232:13
**script** 168:24
169:5
**scripts** 20:14 45:7
45:13 46:5 47:16
59:24 80:4,8,10
81:10 118:20
119:7 121:18,23
**se** 140:25
**seal** 4:21
**sean** 8:10

**searchable** 182:21
**sears** 1:7 2:16
11:7 16:22 69:16
71:3 111:1 120:22
121:6 125:20,22
125:24 129:24,25
131:16 138:22
188:12,18,20
189:2 200:2,4,8
206:21,24 230:14
**sears'** 202:19
**seat** 28:15
**seated** 11:6
**second** 2:1,18,19
2:23 3:3,3,7,12,15
3:21,24 4:4,6,14
5:18,19 6:2,18,20
14:17 15:12 16:16
18:22 20:12,16
23:4,14 25:17
28:10 29:14 31:24
33:21 35:20 36:10
40:2,6,12,17
41:15 42:13 44:23
45:17,19,23 48:6
50:3 57:18 61:10
61:11 63:8 66:15
67:18 75:16 80:11
80:13 81:5 83:23
89:13 92:6 105:14
105:20,25 106:1
107:12,24 135:6
135:24 136:1
140:18 141:24
142:1,15,20
143:18,20 146:21
148:6 149:20
150:9 151:7,17
157:19,24 158:2,5
159:8,14,24 160:5
160:9,10,13,14,15
160:16 167:18
173:18 175:8,14

176:6,24 177:1
179:13 195:13,17
195:18 205:10,15
213:13 222:15
223:10,11 224:8,8
224:16,17 226:13
226:16 227:5
232:2,14 233:7,22
234:9,13,17
237:22 242:25
245:14 251:17
256:16,23 257:25
258:15 260:6
263:12,14 264:3
264:10,22 265:12
266:16,23 267:1
**secondarily**
163:10
**section**   2:20,20,23
3:4,4,8,13,14,16
3:17,22,23,25 4:1
4:6,7,10,14,15,17
4:23,23 5:1,12,12
5:15,20,20,23 6:3
6:3,6,21,21,24
54:1,4 81:15,17
120:10 135:21
143:18 151:24
167:18,20,21
168:15,16,17,18
176:21 205:15
252:17 253:3
267:14
**sections**   52:13
176:20 239:16
**secure**   23:19
147:23 223:10
224:8
**secured**   2:19 3:4
4:6,14,22 5:11,20
6:2,13,21 7:6,15
92:14 93:3,6
141:24,25 142:2

145:3 175:8
177:15 230:17,18
**security**   36:7
45:15,16 46:9,11
46:20 67:25 80:23
81:16,17,20,25
119:21 120:3,9
185:13 186:20
258:10,12
**see**   11:2 19:8
21:18 32:13 33:22
35:13,19 36:8
39:1,4,6,15 48:7,9
48:12 52:11 53:2
53:8,15 54:4,6
55:11,14,23 58:13
58:19 60:17 62:11
67:15 71:5,11
76:4,6,9,13 78:7
79:13,15 81:15,18
81:20 85:12,16,19
85:23,25 86:1,6
86:11,15 87:12,14
87:19 89:18,20
90:17 94:21,22
109:10 115:17,25
118:9 121:22
125:6 135:1
137:19 140:24
161:10 167:20
168:5 179:21
184:4,8,9,10,25
196:8,13 201:15
201:18,20,22
202:1,3 204:1,2,9
204:10,11,16,19
207:7,12,16,19,24
208:3,6,8,9,20
209:2,5,6,9 216:4
219:22 220:25
226:19,23 229:6
229:10,13 238:17
239:5,7,8,12,18

239:21 244:9
247:18,25 249:16
250:16 252:2,5,7
252:12,15 253:6
253:11,15,16
254:25 255:2
256:18 258:1,14
259:18 260:2
261:4 262:8,8,10
262:15
**seeing**   87:7
153:10
**seen**   39:21,23
41:8 56:15 85:10
86:21,22 87:5
230:12
**segment**   189:5,8
189:11,14
**segue**   225:5
**selected**   219:1,4
219:10,14
**sell**   35:18 36:4
71:25,25 72:10
111:13 120:18
190:16 217:10,11
258:9
**seller**   163:20
198:23
**selling**   37:8 38:4
97:22,24 98:2
99:12 100:14,15
101:13,16,17
102:13 104:10
108:5,7,8 120:16
120:23 121:7
**sending**   111:10
**senior**   49:9
142:14 146:5
148:16 150:5,8,13
150:15,17,17,18
150:21 151:9
175:13,17 177:1,2
178:21 223:11

224:8 269:3
**sense**   30:8,11
124:21 142:19
145:17 150:17
190:19 247:3
**sentence**   36:10
193:18,19 194:4
213:13 223:25
229:8,23 230:1
**separate**   15:8
21:19 142:15
165:15 168:10,10
170:16 175:22
176:16,18,21
192:12 243:9
248:2,5 249:22,23
261:20 265:14
267:3
**separately**   67:4,5
177:9
**september**   71:4
203:22 204:2,4
**serves**   101:7
**service**   189:1,1,5
190:13
**services**   36:7
116:25 117:3
121:9 185:13
189:2,2,20 190:13
217:1
**serving**   93:20
**set**   144:15 156:10
167:18,19 177:7
202:16 215:2
240:6
**sets**   17:14,20
**setting**   109:4
223:6 243:2
**settlement**   236:25
237:4 242:5
246:24 249:1
250:9 270:7

seven 88:21
seyfarth 9:1 12:17
shape 153:1
shaw 9:1 12:17
shedding 101:1
shielding 247:8
ship 249:20
shirin 10:18
shopyourway
188:24
short 65:19
shortened 247:19
shorter 113:1
shortly 21:19
shouldn't 240:4
244:5
should've 74:11
74:12,15 235:25
show 22:12 32:11
32:12 164:20
184:19 186:23
188:5,6 193:12
211:6 223:5,16
249:17
showed 24:2
showing 67:12
184:19 186:6
shown 14:19
71:10 142:7
shows 68:9 161:10
219:6 245:6 247:8
side 15:13,18
57:24 154:4
sides 17:2
signed 56:18
227:1,2
significant 16:14
72:18,20
similar 12:2 43:19
171:3 192:19
205:5
similarly 68:6
220:15

simple 17:17
simpler 77:15
simply 117:12
139:19 140:9
148:15 242:17
243:6 258:20
sincerely 110:12
singh 13:19
sir 28:14,20 29:4
30:4 32:20 33:14
34:4 35:23 39:14
40:22 42:5,7
44:25 45:11 48:5
48:11,23 52:18,22
53:17 69:15 70:8
70:19 78:23 82:8
88:5,14 89:13
91:10 201:20
202:9 228:6
229:22
sitting 29:5,18
73:17 113:19
118:8 155:8
156:10
situation 17:12
six 133:19,19
134:7,15,20
174:20 175:19
177:3 182:5,11,12
182:13
size 52:16 230:13
skinny 31:1 47:23
75:7,12
skipping 120:14
skips 53:11
slap 248:24
slender 162:12
slide 24:2,16
207:16 208:20
slightly 35:16
79:8 100:18,18
103:18 196:19
197:5 252:22

slip 231:5
small 18:14 52:14
52:18 68:19 70:23
87:8 115:13
119:19
smaller 38:21
sold 22:9 23:21
27:25 35:22 40:12
40:17 60:21 64:6
72:11 91:11,14,15
91:16 99:10,10,17
99:21,25 107:13
133:5 164:2 170:9
172:21 179:16
215:18 233:22
solely 83:25
179:20 258:3
solicitation 258:9
solutions 274:20
something's 91:17
somewhat 14:3,3
112:7 141:13
sonia 10:10
sonya 7:25 274:3
274:8
soon 272:2
sorkin 9:24
242:15,15
sorry 17:4 25:20
32:4 37:16 50:25
54:4 55:1 62:22
66:10 69:5 72:19
78:7,9 82:7 88:2
102:7 105:9
109:15 114:9
120:24 121:21
130:14 131:25
137:10 139:11
145:25 147:7
152:17 182:23
184:13,24 185:25
188:14 191:22
212:2 215:23

217:14 223:25
224:17 229:25
241:15 270:18
sort 96:20 119:12
124:19 132:25
242:20
sorts 14:6 123:2
171:9
sound 79:11 206:8
sounds 121:25
158:1 180:5 200:6
205:17 206:13
210:7 267:13
source 18:13
40:19 94:11
115:22 144:15,19
146:24 184:11
187:15 197:20,22
203:21
sources 78:17,20
87:6 176:22
238:16 251:5
259:2
southern 1:2
speak 64:2 128:25
166:19 188:8
213:22
speaks 27:10,21
53:20
specialist 129:8
129:13
specialists 129:1,4
129:6,9
specialized
212:23
specializes 130:4
130:19
specific 12:24
54:5 57:1 129:6
225:21 270:24
specifically 25:12
41:3 45:20 50:9
54:12 81:22 82:1

87:19 110:18
120:3,8,11 132:2
140:16 145:19
**speech** 259:10
**spell** 73:12 113:14
154:18
**spend** 17:18 68:13
168:14
**spending** 67:4
**spent** 38:19
147:15 183:1
186:20 193:9
194:8,10
**spiral** 51:7,8
55:11 89:13
115:13
**spoke** 272:21
**stabilize** 93:13
**stack** 105:18
108:6 264:23
**stage** 249:8
**stakeholders**
241:22
**stamp** 236:18
259:16 262:6
**stamped** 236:13
**stand** 17:9 27:4
28:3,13 29:25
175:21 198:11
223:19
**standard** 213:21
**standards** 128:22
128:25 129:3
**standby** 83:9,21
178:2
**standing** 154:25
**stands** 73:20
250:12
**start** 28:11 140:13
141:18 156:9
257:19 272:11
**started** 23:16
43:12,18 47:7

115:20 133:25
134:18,23 162:24
244:5
**starting** 32:24
139:20 140:13
148:18,21 160:6
161:22,25 162:4
162:18,18,25
181:2 202:6
**starts** 20:11,11
39:9 136:25 193:7
**state** 36:2 80:24
118:3 170:12
216:6 224:5
**stated** 107:10
108:14 114:5
119:9 131:21
210:8 216:4
222:23 223:8
**statement** 35:19
103:18 110:24
119:5 223:12
224:11 245:1
258:24
**statements** 65:17
68:22 131:16
243:6
**states** 1:1,12
**stating** 170:13
**status** 45:14 49:2
137:14 153:4
**statute** 245:21
**stauble** 10:23
**stay** 13:3 151:7
**staying** 13:7
**steen** 8:3 11:16
**step** 42:10 44:22
73:3 104:9 112:22
135:4 155:13
271:18
**steps** 93:12
**steven** 9:8 12:19

**stipulation** 137:15
140:19 144:4,13
148:3 153:7
**stipulations** 250:3
**stock** 39:4,15 47:6
77:8 89:17,20
90:12 230:6
**stood** 13:15
**stop** 75:16 147:15
164:6 231:12
**stopped** 236:24
**store** 36:6 41:24
43:5,9 67:4,7,8,19
68:3,6,10 69:3,9
69:16,20 91:11,13
104:17 130:8
183:10 184:20
185:1,5 186:11,20
187:4,7,12 197:11
204:21 214:22
216:6,11 217:11
220:16 227:23
**stores** 31:25 32:13
32:21,22 33:16
36:14,22 42:25
43:25 44:5,8 45:2
45:3 63:3 64:4,5,9
64:23 65:2,9 66:9
66:16,19 67:3,9
67:10 68:20 71:10
89:6 99:2,2,3,4,5
99:9,25 100:8,17
100:20,21 101:1
102:9 104:1,25
105:1 107:14,16
110:17,18,20,23
111:10,12 112:12
121:7 130:7,10
183:5,12,14,16
184:5 186:10,12
200:2,5,8 207:2
**stores'** 74:8,9

**storing** 38:11
**story** 174:13
243:18
**straight** 51:6
**straightforward**
14:22
**strauss** 9:18
**street** 1:13 9:12
**stricken** 224:18
**strike** 2:1,8 12:8
14:13 15:6 17:25
105:9 212:20
213:13 225:9
271:8
**striking** 14:9
**stronger** 234:10
**struck** 213:5
**structure** 100:25
266:9
**studied** 46:9,12
46:14,17,20 85:3
**stuff** 52:6
**subject** 24:23
26:13,14 93:5
137:11 147:10
156:8 165:1
232:25 259:17
**submission** 14:20
**submit** 14:10,16
17:14 18:14 19:18
136:3 157:1
210:13 213:3
**submitted** 26:21
56:6 73:16 113:18
154:22 156:5
210:19,22 227:18
247:13
**submitting** 58:16
**subordinate**
152:6
**subordinated**
152:11

**subordination**
151:17 152:6
**subparagraph**
136:25
**subsequent**
106:17
**subset** 219:21
**subsets** 191:19
**substantial** 44:17
179:14
**substantially**
64:25
**subtract** 132:17
193:9
**subtracted** 127:23
**subtracting** 197:3
**subtraction** 61:6
61:17
**success** 137:6
**successful** 93:1,2
93:4
**suddenly** 145:2
**suggest** 11:21
15:23
**suggested** 77:13
138:11
**suggesting** 77:11
198:17 247:10
**suite** 8:22 274:22
**summary** 63:5
86:1,7 158:24
159:2 190:24
197:23,24 218:20
218:21 237:17
**sunny** 13:19
**super** 143:22
144:8 152:10,14
152:25 247:21
262:13,18
**supersedes**
169:16
**supplemental** 3:1
3:15,24 4:12 5:25

6:8,18 7:11 25:18
159:14 160:13,16
174:24,25 182:3
205:10,15 210:8
211:2 212:15,20
213:5 215:1,21,24
224:16,18 226:13
226:16 232:3
233:7 234:18
237:22 251:17
256:16
**supplied** 203:4
**support** 2:21 3:2
3:5,14,23 4:5,13
4:21 5:10,18 6:1,9
7:13 73:18 178:19
191:7 204:21
219:13 222:18
235:10
**supported** 241:8
**supporting**
190:23 199:1
**supports** 175:11
191:13
**suppose** 11:18
**supposed** 124:7
144:20 221:8
222:24
**supposedly** 23:21
**surcharge** 2:23
3:7 4:9,17,25 5:14
5:22 6:5,23 92:7
93:3,24 96:8,10
114:2 123:21,22
123:23 124:7
179:24 184:19
192:14,16 193:11
218:9
**surcharged**
107:24 190:8
**surcharges** 31:11
55:19 91:23,24
92:18 94:3 97:8

102:14 126:16
216:6 263:23
269:4
**sure** 30:20 32:14
40:5 50:24 54:18
59:15 61:3 62:5
68:23 75:11 84:25
89:20 97:10 111:7
120:25 121:22
123:1 138:3 147:1
149:14,22 150:3
153:16 155:20
157:23 174:19
179:12 180:1,18
194:11 214:9,12
220:8,10 250:24
257:5,6,7,14
**surety** 122:17
**surface** 108:9
**surprise** 141:13
**surprised** 91:1
**sustain** 109:17
165:10
**sustained** 165:18
**swear** 28:18 73:8
113:10 154:13
155:23
**switch** 123:20
**switched** 210:16
**swore** 222:16
**sworn** 154:16
156:2 224:11
**system** 106:5

---

**t**

**t** 28:21 156:3
274:1,1
**tab** 29:9 35:7
38:21 42:4 48:3
50:24,24 52:17,19
62:9,16 87:9
89:13 116:1,2
119:19 132:3
182:2 203:25

207:8
**tableau** 22:22
**tabs** 85:7 198:6
**tailored** 220:18
**take** 12:21 17:10
17:23 18:23,24
31:15 36:3 42:10
42:15 44:3 46:4
52:14 54:12 70:14
77:21 91:3 101:20
104:2,9 113:3
133:14 136:3,11
139:17,21 140:5,7
140:24 146:3
148:18 152:12
154:8 157:10
160:10 162:11
174:10 181:4
205:25 214:13
225:7 228:25
254:13
**taken** 166:23
197:18 209:3
222:25 228:23
241:19 263:11,17
**takes** 35:17,21
67:6 124:4,6
197:8 214:9
**talk** 11:21 25:23
41:24 55:18 58:8
91:22,22 138:7
181:21 200:25
206:14 222:1
272:16 273:4,11
**talked** 59:22
102:17 178:2
184:24 193:19
234:14 253:9
254:12 268:20
**talking** 32:6 51:5
52:8 56:9 138:12
146:14 209:15
237:1 270:7,13

**task** 45:22 220:24
**team** 183:21
  210:5,19 220:18
  225:17 226:3
  269:18
**teed** 24:16
**telephone** 36:7
**telephones** 185:9
**telephonically**
  10:7
**tell** 28:18 63:14
  73:8 103:16
  113:10 134:10
  137:9 147:11
  154:14 155:23
  165:7 195:24
  203:17 267:12
**telling** 19:15 23:1
  23:8 93:8 159:5
  204:25
**tells** 147:11,13
**ten** 25:21,23
**tensions** 18:17,17
**teresa** 10:17
**term** 65:19 267:22
  267:22
**terms** 21:12 22:22
  43:24 63:19 104:9
  125:5 139:9
  140:16 146:13
  174:4 186:6
  190:21 191:19
  221:4,9 226:6
  236:16 240:3
  270:13,25
**test** 110:3
**testified** 36:12
  38:3,10 39:19
  45:21 46:8 55:23
  56:4 92:10,18
  93:11,23 100:3
  102:7 124:16
  133:12 188:2

232:20 269:4,24
**testify** 13:5 53:21
  164:1 172:4
  181:13 220:3
  221:2 228:20
**testifying** 15:14
  72:8 156:23
  158:21 220:3
  225:15
**testimony** 2:7
  12:8,24,25,25
  13:4,8 14:20
  15:16,20,21 16:6
  16:10,11,11,19,21
  17:4,5,6,8,8 18:5
  19:1,1,13 20:6
  21:7,12 23:2,2,3
  29:6,19 30:2
  46:16 57:10 58:25
  63:11 74:7 84:4
  92:16 97:8 105:6
  108:24 109:1,11
  110:20 113:20
  118:18 135:15
  155:3,9 156:10
  159:13 165:1,18
  167:2,2 169:18
  174:23 181:11
  187:24 213:10
  216:24 223:2
  224:15,22 225:12
  225:12,19,24
  227:18 230:21
  254:16,20
**text** 230:9
**thank** 13:24 20:9
  20:20 28:7 31:6
  31:17 32:7,18
  44:10,21 46:8
  47:12,23 49:3
  54:3,8 55:18 58:9
  59:16 60:12,13
  61:24 65:11 69:25

70:18,20 71:16
73:2 74:22 75:5
76:3 77:15,22
79:12 80:22 82:2
82:9 83:1 85:21
86:8 87:8,11 88:7
89:3 91:7,10
96:24 109:22
110:13 112:23
114:17 117:21
118:16 119:19
120:12 121:5,16
122:1,3 123:2,6
126:7,18 127:3,14
128:2,5 133:11
136:14,18 138:14
149:23 155:15
160:2 165:11
166:11 167:16
197:21 214:1
220:12 223:17
224:13 225:4,15
226:4 228:6
230:12 235:16
240:9 250:25
254:3 257:1 259:3
264:13 268:7,7
271:16 272:8,9
273:9,12,14,15
**thanks** 115:1
  135:1 147:4 268:8
  272:7
**that'd** 113:5
**that's** 55:6,11
  56:23 57:5 60:1
  60:20 67:18 69:6
  69:12 70:11 76:15
  76:17 80:3 86:2
  89:12 90:1,1,3
  92:16 95:9 97:8
  102:5,8 104:6
  105:13 109:19,22
  198:22 199:6,21

200:18 201:19
204:23 208:25
209:20 210:25
211:8,14 213:20
214:11,22 215:8
215:20 216:17
218:6,18 219:20
221:5,24 224:10
224:21 225:23
226:23 227:7,16
227:17 229:18
232:7 235:6 236:5
239:6 240:14,21
240:22 243:4
244:15,16,21
246:7,24 249:3,22
249:22 250:14,20
251:14 252:1,17
252:24 257:7
258:19,23 260:11
260:14 262:20
263:17 264:18
265:10,14,19,22
269:22
**thau** 10:24
**theory** 23:15
  236:9
**thereof** 176:5
**there's** 53:3 54:5
  58:16,21 60:17
  61:17,18 69:5,5,7
  75:8 76:4 77:16
  81:15 87:12 98:20
  98:24 104:18
  115:17 201:24
  207:24 208:6
  218:23,24 219:6
  219:13,21 221:22
  222:12 225:8
  239:8 240:25
  247:5 258:24
  260:11,11 261:12
  264:25 266:24

**they'd** 247:12
264:12
**they're** 58:18
65:18 68:4 74:18
82:1 91:19 212:25
213:11 218:18
226:5 233:7
235:15,20 239:17
240:19 242:6,7
243:16 245:2
246:23 247:6,9
249:16 250:9,9
257:8,10 259:1
261:24,24
**they've** 228:23
248:19,21
**thin** 132:1 182:14
**thing** 26:21 37:19
61:5 67:3 75:11
186:1 195:10
222:6,15
**things** 34:20 35:9
65:24 66:11 93:11
102:14,14,15
120:14,16,22
121:7 137:3
142:17 173:16
248:19 267:1
**think** 11:21,24
12:5,9,21,22,25
12:25 14:13 15:22
16:9 17:11 18:8
18:10,21 19:22
20:6,6,15,25,25
21:8,11,13,14
22:5,22 23:1,5,6,7
23:10 24:15,19,20
25:22 27:4 28:10
29:16 30:10 39:25
44:19 50:5,5
53:22 57:16 68:17
83:2 86:4 88:21
98:13 103:12

106:23 109:4
112:24 117:24
123:22 124:6
126:23 131:23
132:8 133:4,14,25
134:10 135:16,20
137:11 139:15,16
139:21 140:8,11
140:21 141:3,16
141:18,25 142:8,9
142:10 144:17
145:6,8 148:9,21
149:7 151:18
153:17,23 158:17
158:19 160:21
161:25 164:10,14
164:20 165:8
166:9 167:6,22
169:2,23 170:13
170:14,16 171:1
172:6,16,16,17
173:16 174:10
181:18 183:9
184:17 185:23
188:1,1,20 190:19
190:24 191:25
192:2 194:21,22
196:17,18 197:6
197:20 198:21
210:25 213:11,20
213:23 214:22
215:8 218:6
219:20 220:6
225:8,13 232:22
235:10 236:3
240:13,19 241:9
242:2 243:4,9
244:3,7,11 245:2
245:9,10 246:4
248:13 249:6,6,10
249:14,18,24
250:2,5,10,12,13
251:7 257:8

261:11 265:1
267:10 268:19
269:5 271:24
272:4 273:4
**thinking** 171:6
251:21
**thinks** 30:11
**third** 75:17 85:13
86:13 128:25
129:4,6,8 182:8
209:2 223:24,25
235:15
**thirty** 42:6
**thomas** 2:10 5:2,7
8:8 9:15
**thought** 22:5 94:7
97:12 100:22
101:8 105:2 108:3
138:7 148:17
153:22 162:7,7
164:4 166:2,4
170:7 191:3
207:23
**three** 16:15,22
17:6,13,20,20
18:17,25 20:15
24:6 39:3 44:5
52:16,24 63:20
77:12 81:24 87:9
92:1 97:15 99:2
103:22 154:22
156:5 168:22
170:22 181:4
183:25 195:5
200:1 240:13,16
242:3 255:17
256:3
**three's** 220:20
**threshold** 11:25
166:5
**thursday** 31:21
83:17 159:13
182:18 272:18

**ties** 27:8 250:13
**tiger** 15:24 18:6
22:8 42:21 71:3
71:14,15,15,17
75:18,24 98:5,6
103:13,18,19,24
104:5,10,12
116:20,24,25
117:2,7,13,18,19
117:20,25 124:9
124:13,22,25
125:3,13 126:7
128:12 129:8,9,12
129:13,14,18,24
129:25 130:12,15
131:8 133:13,17
133:22,23 202:17
202:19,22,25
203:4,6,22 204:1
204:12,19 206:4
209:12,17 210:1
213:17 214:20
216:9 231:15
250:8
**tiger's** 203:3,14
204:25 205:7
209:3,8
**tight** 44:19
**time** 11:21 17:18
19:17 28:11 38:19
39:21,24 56:21,25
57:2,3 65:4,4
68:13 83:15 84:5
88:16 96:15,21
101:1 104:18
113:7 120:19,19
122:22 129:22
134:24 147:15
151:9 180:15,22
181:9 193:24
198:15 204:24
210:18 211:7
226:23 228:8

231:9,11 243:7,23
260:23
**timely** 259:24
**times** 55:20 180:3
241:20
**tiny** 22:19,21
**tire** 15:8
**titled** 205:15
207:9,16
**toaster** 49:19
**today** 12:14 19:11
29:5,19 73:17
113:19 138:11
147:13,20 151:21
155:8 156:11,23
222:25 223:2
232:8 266:10
272:2,3
**told** 12:22 61:10
154:4 199:13
203:14,18 205:6
273:3
**tom** 11:15 12:14
272:11
**tomorrow** 272:15
273:11
**tonight** 272:22
**top** 15:22 18:3
32:5,16 39:11,11
76:8 86:7 139:17
140:6,7 152:13
161:10 186:6,15
186:16,17 187:1
187:21 188:16
196:6 208:13
216:2 221:19
258:18 263:11
265:25 266:17
**topic** 21:12
**topics** 260:17
**total** 39:4,15
44:22 47:6 48:9
58:12,18 76:11

77:8 78:5,7,22
81:7 88:22 89:10
89:17,20 90:11
94:17,22 95:3,15
95:17 98:16,17,21
98:21 101:17,22
101:22 102:6,23
105:1,8 107:1
121:20,23 126:20
127:23 132:9
152:2 153:9
160:18 184:25
185:2,4 186:9,13
215:6 218:17
227:14 253:2
264:14 266:7,16
267:1,4 272:5
**totaled** 226:22
227:4
**totaling** 254:11
**totally** 172:5
209:14 211:8
243:15
**totals** 162:21
266:5
**trace** 60:20 61:9,9
**tracing** 60:20,24
61:20 121:13
136:6
**tranche** 145:4
**transaction** 50:14
56:19 177:13
178:15,15 195:22
198:22 212:10
233:14,23 238:16
258:5 259:25
268:15
**transactions**
259:24 260:1
**transcribed** 7:25
**transcript** 274:4
**transcription**
73:24 74:8

**transform** 87:6
181:1 251:15
259:15
**transit** 115:8,12
116:9 205:12,19
205:22 206:3,6,11
**treated** 52:12
**treatment** 50:13
52:11 59:12
259:22
**treats** 65:18
174:11
**trial** 174:23
240:20
**tried** 56:1 111:22
272:13
**trifecta** 226:8
**trouble** 272:20
**true** 19:15,22 22:2
24:25 49:25
172:13 184:21
190:14 235:7
250:6 274:4
**trump** 143:23
**trust** 2:6,11 6:9
7:2,12 9:2 12:17
47:22 98:14
222:19
**trustee** 6:10 7:3
7:13 9:3 12:18
222:19
**truth** 28:18,19,19
73:9,9,9 113:11
113:11,11 154:14
154:14,15 155:24
155:24,24 236:25
237:6
**try** 15:5 39:8
68:14 77:6 94:21
112:3 226:8
**trying** 134:2,9
167:1 172:18
173:4 187:13

211:7 232:17
237:13 241:20
242:6,6,7,8
243:16 247:6
**tune** 127:7
**turn** 32:12 36:17
38:20 39:7 47:2
48:3 52:17 53:10
54:3 70:20 75:14
81:13,14 85:6,12
87:8 115:14,24
119:19 167:20
196:6 201:11,13
204:8 207:11
223:22,23 226:16
229:12 238:12
239:4 253:5,5
**turned** 143:13
191:7 213:9
267:15,16
**turning** 262:1
**tweed** 9:10
**twice** 28:25
**two** 11:22 15:8
21:8,10 24:6
26:10 28:5 31:23
41:4 43:7 48:20
49:8 50:13 52:3
53:6 63:18 66:7
90:11 95:22 122:3
123:6 127:6
138:25 142:10
143:19 149:5,6,16
153:17 154:25
155:7 159:22
164:25 166:16,18
167:17 170:23
178:10 202:7
204:13,16 208:6
222:10 227:13
232:12 235:14,22
237:21 238:1
252:15 255:14

262:2,8 264:15
**tx**  8:23
**type**  19:5,12
 124:5 178:5 195:6
 197:8,15 249:8,17
**types**  68:8 126:7
 129:6 245:3 250:2
**typo**  208:17

**u**

**u**  28:21 113:16
**u.s.**  1:23
**u.s.c.**  6:11,13,15
 7:4,6,7,15,16,18
**ucc**  110:7 241:17
 242:13,16
**ucc's**  241:11
**ultimate**  150:11
 261:6,17
**ultimately**  91:19
 143:3 163:14
 200:20
**uncertain**  83:15
**uncovered**  247:21
**underling**  191:16
**underlying**  15:25
 25:4 46:9 218:21
 218:23,24,25
 219:6,9
**underneath**  85:13
 232:7
**understand**  14:9
 21:2 24:18 27:7
 29:5 43:13,18,23
 53:18 56:13 58:15
 68:24 89:9 111:25
 116:14 118:18
 146:9 161:19,21
 165:8 172:1 173:5
 173:5 175:6
 180:18 181:19,20
 187:14 197:10
 202:15 203:21
 214:17 225:9

237:9 242:18
244:2 246:13
254:19
**understandable**
 21:22
**understanding**
 26:15 105:25
 106:11,18 107:2
 123:23 124:6
 166:2,14 196:25
 199:10 211:12
 230:20 236:1
 237:7 238:4,8
 240:17
**understood**  154:2
 165:20 194:7
 235:9
**undertake**  132:24
**undertaking**
 260:21
**undertook**  254:8
**underwrite**
 258:12
**undrawn**  88:25
 264:22 265:6
**unencumbered**
 140:17 141:8
 144:21 193:23
**unforeseen**
 193:20
**unfortunately**
 182:9
**unfunded**  88:20
**united**  1:1,12
**units**  242:18
**universe**  218:25
 219:4,7
**unpunished**  236:9
**unredacted**  7:8,18
**unreliable**  14:14
**unsecured**  9:19
 100:9 103:10
 131:13 145:2

**unusual**  88:24
**updated**  269:11
**upper**  32:15
**uscro**  93:14
**use**  32:21 33:11
 43:23 47:9 51:17
 59:24 61:16 66:18
 67:9 79:20,25
 82:15 98:25
 105:10 145:20
 162:14 194:18
 210:18 222:21
 235:17 240:20
 241:24 244:5,16
 244:23 245:20
 247:6 259:9,10
 260:19
**uses**  79:14 87:6
 176:22 238:16
 251:5
**utilities**  37:25
 38:1 67:22
**utility**  36:6 183:4
 185:9
**utilize**  75:21
**utilized**  94:13
 100:17 104:12

**v**

**valid**  247:21
**validity**  242:1
 244:24
**valuable**  138:19
**valuation**  19:13
 21:7,9,10 41:25
 43:9 70:25 78:17
 98:6,6 107:14
 116:25 125:19
 126:3,12 128:14
 128:18,23 129:10
 132:14,16,25
 163:5 166:14
 170:25 192:14
 205:12 215:3

216:5,14 259:21
**valuations**  205:16
**valuator**  125:25
**value**  18:18 19:5
 21:6,10 23:16,22
 23:23 24:1 32:11
 32:11,12,21,22
 33:12,16,17,17
 34:2,5,8,16,16,21
 35:3,16,17 36:12
 36:21 37:7,24
 38:3,10,16 40:1,5
 40:9,10,12,16,21
 41:7,14,15,18,23
 42:2,13,25 43:8
 43:14,20,22,24,25
 44:6,8,8,23 47:6
 48:18 59:1 61:6
 61:14 63:17,18,19
 63:21,22,25 64:2
 64:4,6,10,14,15
 64:22 65:11 66:17
 67:14,14 68:20,21
 69:11 70:11 72:4
 75:22 76:11,21
 77:2,7,18,24 78:8
 78:22 81:6,7 88:2
 89:4,5,7,16 90:2,4
 90:6,17 97:19,24
 99:14,20,21,22
 100:3,12,12,13
 103:23 105:17
 107:5,6,6,11,15
 107:17 108:5
 111:7 112:9 114:4
 115:6,10,11
 116:11,13 117:9
 117:22 118:2,5,7
 118:17 124:1,12
 125:5,7,9,15
 127:15 129:6,21
 131:22 132:4,15
 132:19 136:2

| | | w | 250:5 261:16 |
|---|---|---|---|

142:24 143:1
148:21 151:1,14
160:6 161:18,20
161:25 162:16
163:16,25 164:20
167:2,3 168:20
169:6,8,12 170:5
170:9,18,20 171:1
171:7,11,17 172:5
172:14,20 173:13
173:17 175:3,20
180:2,9 192:13
193:12 194:4
195:11 198:14,18
205:23,25 207:20
214:3 216:15
228:23 229:23
230:5 232:19
233:21 234:20,24
238:4,9 243:2,7
243:21 244:1
245:6 247:20
252:8,13 256:10
268:18
**valued** 99:5
129:16 132:5
174:13 193:25
206:2,5,10,11
242:22
**values** 32:25,25
72:3 125:10
130:24 131:3
134:13 198:14
202:19 205:22
208:9 216:8
**valuing** 21:12
41:24 98:25
130:19
**vantagepoint**
16:24
**variety** 69:20
**various** 33:15
100:9 170:24

188:15 195:16
231:7
**vary** 198:15
**vast** 230:21
**vendor** 69:6
**vendors** 183:3
**verification** 117:7
117:11 124:19
**verified** 124:21
**verify** 42:17 64:17
186:23
**verifying** 117:8
**veritext** 274:20
**version** 7:8,18
182:21
**versions** 210:25
**versus** 161:21
197:2
**vet** 19:8 42:11
75:23
**vetted** 15:24
**vetting** 18:5 42:15
**view** 63:14 103:3
105:13,14,16
107:4,5 108:2
138:25 141:9,9
150:5 158:18
163:16 196:21
199:4,7,8,19
213:21 214:7
226:2 230:24
231:3 243:14
**viewed** 118:1
129:17
**viewing** 264:5
**views** 211:10
**violates** 213:3
237:4
**virtue** 152:2
**visibility** 126:14
**voice** 121:4
**volume** 112:4
132:1 162:12

**wait** 105:8
**waive** 149:14
**waived** 171:23
**waivers** 179:20
**walk** 139:24
141:14 165:2
**wall** 22:16 34:3,11
36:13,22 38:1
66:8,23,25 67:7
111:21
**wander** 10:25
**want** 11:18 27:7
41:24 51:15 55:18
57:6 58:9 70:22
73:18 74:20 91:22
94:20 106:24
113:21 123:20
126:2,18 136:16
138:2,3 145:15
146:7 149:14
164:17,17 169:18
169:18 171:2
186:18 191:1
193:3,8 195:23
211:8 231:25,25
232:14 238:19
242:11 243:14
257:4 263:23
267:11
**wanted** 55:23
93:7 97:13 141:19
148:9 153:15
174:14 235:11
259:4 264:13
**wants** 171:2
184:15 271:3
**warranties**
121:11
**warrants** 14:10
**wasn't** 80:17
110:9 111:4
198:25 232:25

**waves** 99:2
**way** 15:24 19:8
36:25 38:13 67:9
68:17 75:17 77:6
77:15 84:9,10
86:25 87:21 92:2
108:10,11 140:8
142:9,10 148:9,17
153:1 163:1 165:9
169:10 170:20
172:5 184:18
190:20 191:5
193:14 198:24
217:9 222:12
240:3 247:12
**ways** 43:11 171:9
**we've** 11:23 12:1
24:16 38:7 120:14
135:20 142:7
145:13 154:3
173:20,23 181:3
192:16 198:5
**weaver** 8:9 11:16
242:10
**week** 33:1,6 35:6
134:4,21 143:12
182:19 227:19
272:10,21
**weekly** 231:11
263:17
**weeks** 24:6 133:15
**weight** 17:11
18:25 19:12 91:20
244:3
**weil** 8:12,20 11:9
13:17 66:10
138:24 210:3,18
221:21
**went** 24:5 45:1
48:15 49:16 50:10
70:10 92:5 185:5
185:7,9,11,13

190:6 233:20
249:20
**weren't** 84:1
108:19
**we'd** 215:17
**we'll** 68:16 75:6,7
85:19 113:7 240:1
257:19 273:8
**we're** 53:11 59:16
67:12 75:9 209:25
227:11 229:1
239:25 242:8
246:25 247:4,22
264:5 267:10
**we've** 58:24 98:24
219:4 225:11
232:8 242:19
269:5 272:19
**whatsoever** 144:8
163:16
**what's** 66:9 80:24
80:25 205:2 261:6
267:11 269:21
**wheelbarrow**
49:16
**white** 1:14
**wholesale** 117:3
134:14
**who's** 73:3 273:1
**wide** 125:16
130:11,22 134:18
**widely** 17:13,14
**wildly** 64:8
**william** 10:5,13
73:6 74:25 97:4
98:11 110:1
**willing** 163:19,20
198:23,23
**wilmington** 2:6,11
6:9 7:2,12 9:2
12:17 98:14
222:18

**wind** 179:7,14
180:19,20,25
181:5 210:4
211:11 212:8
214:3,7,13,18
**winddown** 131:12
131:14 137:14,16
137:25 138:1
139:10 140:15
142:5,15 143:6
144:2,7,11,12
146:22 147:18
148:13 151:2,4
**wish** 30:3
**wit** 19:20
**withdraw** 86:23
**withdrawn** 199:8
**witness** 2:9 17:1
22:7 23:8 30:17
30:17 60:12 96:24
97:12 128:6
132:20 136:6,7
154:16 156:2,16
156:24 157:7,8
158:19 163:24
164:1 212:21,25
216:18 240:22
247:10 257:1
269:8
**witnesses** 23:11
136:9
**word** 31:16 46:4
46:14 77:21 91:3
106:24 258:16
**words** 14:25 19:2
19:25 33:5,24
77:15 93:7 111:9
123:11 149:2
170:4
**work** 18:16 45:25
49:2 54:16 55:7
119:25 129:13
130:12,15 131:7

211:13 221:4,9
271:25
**workers** 122:17
123:2
**worker's** 230:22
**working** 16:22
130:20
**works** 169:10
184:17
**worry** 68:17
**worth** 20:19 64:7
225:7
**worthless** 66:3
146:1
**wouldn't** 57:24
99:19 110:19,19
111:6 201:10
236:6 248:24
**would've** 210:10
261:19
**wound** 163:14
**wrap** 126:19
**written** 49:17
218:16
**wrong** 50:25 64:8
78:9 136:7 184:18
**wrote** 33:25

| x |
| --- |

**x** 1:4,10 170:9
**x08** 262:1

| y |
| --- |

**y** 113:16
**yeah** 11:20 33:10
42:17 47:3 52:24
62:11,19 69:5
83:8 86:3 133:23
133:24 138:2
140:7 144:19
154:12 156:18
172:9 182:12
201:7 222:9 223:7
225:4 230:6
245:16 251:1

259:2
**year** 203:16,20
205:4 231:6
**years** 16:23 65:6,9
123:3 200:1 231:4
249:21
**yellow** 35:10
**yielded** 89:6
**yields** 99:18
107:14
**york** 1:2 8:6,15
9:5,13,21 10:3
**york's** 169:17
**you'd** 56:1 57:12
91:10 92:4 102:23
104:25 112:13
200:1,7,10,21
203:3 204:4
206:20 207:4
255:12 273:6
**you'll** 53:10 54:4
55:10 81:14 89:13
247:18 253:5
**you're** 54:14,19
58:13 60:19 70:7
70:23,24 76:11
77:11,11 80:22
81:13 83:25 84:17
85:1 86:5 89:3
92:1 93:16 96:3,4
97:23 103:4 109:4
111:9,15,17
199:16,22 201:24
211:24 214:8,12
214:17 215:9
220:1,10 224:21
229:5 242:13
245:15 250:2,11
263:7 265:11
266:13,17
**you've** 73:15 75:6
199:20 205:6
211:15,18,21

| |
|---|
| 212:4 223:8 240:6 268:1 |
| **z** |
| **zachary**   10:16 |
| **zero**   44:11 48:25 |