**Hearing Date: October 23, 2019 at 10:00 a.m.**
**Objection Deadline: October 11, 2019 at 12:00 noon**

**HALPERIN BATTAGLIA BENZIJA, LLP**
Alan D. Halperin, Esq.
Donna H. Lieberman, Esq.
Julie D. Goldberg, Esq.
40 Wall Street, 37th Floor
New York, NY 10005
Telephone: (212) 765-9100
Email: ahalperin@halperinlaw.net
Email: dlieberman@halperinlaw.net
Email: jgoldberg@halperinlaw.net

*Counsel to Relator Carl Ireland,*
*Administrator of the Estate of James Garbe*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x

In re                                                      :

                                                           :          **Chapter 11**

**SEARS HOLDINGS CORPORATION,** *et al.*,                  :

                                                           :          **Case No. 18-23538 (RDD)**

        Debtors.[1]                                        :

                                                           :          **(Jointly Administered)**

---------------------------------------------------------- x

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); Max Serv, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (19870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC ,Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None): SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**MOTION OF RELATOR CARL IRELAND, ADMINISTRATOR OF THE ESTATE OF JAMES GARBE, FOR AN ORDER (I) DETERMINING THE VALUE OF RELATOR'S COLLATERAL AS OF THE SALE OF SUCH COLLATERAL; (II) DETERMINING THE AMOUNT OF ANY DIMINUTION IN THE AMOUNT OF THE SALES PROCEEDS ALLOCABLE TO SUCH COLLATERAL AFTER THE SALE; (III) DIRECTING PAYMENT OF RELATOR'S SECURED AND SUPERPRIORITY <u>ADMINISTRATIVE CLAIMS; AND (IV) GRANTING RELATED RELIEF</u>**

Relator Carl Ireland, Administrator of the Estate of James Garbe ("Relator") by and

through his undersigned counsel, makes this motion (the "Motion") pursuant to sections 105(a),

361, 363(e), 506(a) and 507(b) of Title 11 of the United States Code (the "Bankruptcy Code"),

Rule 3012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and certain

Orders of this Court in these cases, including the:

(a) Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Leases in Connection Therewith and (IV) Granting Related Relief [D.N. 2507] (the "Sale Order");

(b) Final Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Claims and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief [D.N. 955] (the "Senior DIP Order"); and

(c) Final Junior DIP Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing and (B) Grant Senior Secured Priming Liens and Superpriority Administrative Claims; (II) Modifying the Automatic Stay; and (III) Granting Related Relief [D.N. 1436](the "Junior DIP Order" and together with the Senior DIP Order, the "DIP Orders").

Relator seeks the entry of an order: (i) determining the value of Relator's collateral, and hence,

the value of Relator's secured claim, as of the sale of such collateral pursuant to the Sale Order;

(ii) determining the amount of any diminution in the amount of the sales proceeds allocable to

such collateral after the closing of the sale; (iii) directing payment of Relator's secured and

superpriority administrative claims;[2] and (iv) granting related relief.  In support of the Motion,

Relator respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      Relator, together with the United States of America, is party to the settlement of a

litigation against certain of the above-captioned debtors (together with their affiliated debtors,

the "Debtors") that was brought under the False Claims Act and similar State statutes. As of the

commencement of the Debtors' bankruptcy cases, more than $26 million remained due under

that settlement, and a portion of the Debtors' payment obligation was secured by a perfected first

mortgage lien on real property known as Sears Distribution Center #8975 (defined below as the

"Puerto Rico Property") and the proceeds of the same. Relator's proof of claim reflects that the

secured portion of the claim is calculated to be at least $18,190,144.82.  The mortgage note is

dated January 12, 2018 (the "Mortgage Note"), is in the face amount of $17.4 million, and, by its

terms, also secures payment of 1.5% interest per year and attorneys' fees.

2.      Relator objected to the priming or dilution of the mortgage lien under the DIP

Orders, and, as a result of that objection, protections were added to both DIP Orders, stating in

pertinent part that: "[n]othing herein, including the Carve-Out, shall be deemed to prime or be

otherwise made senior or *pari passu* to any valid, perfected and non-avoidable security interests

or liens" of Relator or the United States in the Puerto Rico Property.  Relator similarly sought to

protect his rights in connection with the proposed sale of the Debtors' assets, including the

Puerto Rico Property, and filed an objection stating that he did not consent to the sale of his

collateral absent payment in full of the mortgage obligations at the closing of the sale.

---

[2] Relator's co-mortgagee with respect to the collateral is the United States of America, as more fully discussed in the Statement of Facts, which would be the relevant payee in an Order directing payment.

3.      The Sale Order authorized the sale of the Debtors' assets, including the Puerto

Rico Property, but recognized that Relator and his co-mortgagee, the United States (together, the

"Mortgagees") were entitled to protection of the value of their secured claim.  The proposed sale

order was thus modified to address the rights of the Mortgagees, and to grant them a "lien against

the sale proceeds of the Property in the same order of priority as existing on the date of entry of

this Sale Order and a superpriority administrative expense claim against the Debtors as adequate

protection pursuant to sections 361, 363(e), and 507(b) of the Bankruptcy Code arising from the

sale of such Property to satisfy any diminution of the value of such replacement lien post-

Closing."  The Sale Order also specifically authorized the Mortgagees to bring the issues of the

value of the Puerto Rico Property, the allocation of sales proceeds with respect to that property,

and other, related disputes before this Court by motion.

4.      According to the Debtors' public statements and filings with this Court, the sale

transaction closed on February 11, 2019 and the consideration for the Debtors' assets was in

excess of $5.2 billion.

5.      As evidenced by the Current Appraisal (defined below) the appraiser valued  the

Puerto Rico Property as of the sale closing at approximately $22.1 million, meaning that the

replacement lien granted to the Mortgagees in the Sale Order attached to sales proceeds that

exceeded the amount of their mortgage by almost $4 million. The appraised amount is somewhat

higher than the purchase price of $20,770,000 disclosed in the deeds of transfer which the

Debtors and the Buyer (defined below) filed with the Puerto Rico Property Registry in May

2019, but both the value in the Current Appraisal and the purchase price disclosed by the Debtors

and the Buyer are well in excess of the amount of the secured claim.

6.      There has undoubtedly been diminution in the value of the replacement lien as a result of the Debtors' use of the sale proceeds to satisfy other liens, and to pay the administrative costs of these Chapter 11 cases.  Pursuant to the Sale Order, the Mortgagees have a superpriority administrative expense claim against the Debtors for the amount of such diminution.  In any event, Relator and the United States are entitled to a payment of at least $18,190,144.82.[3]

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§157 and 1334.  Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. §157(b)(2), and venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The statutory predicates for the relief requested herein are sections 105(a), 361, 363(e), 506(a) and 507(b) of the Bankruptcy Code, as supplemented by Bankruptcy Rule 3012, the DIP Orders and the Sale Order.

## STATEMENT OF FACTS

(A)    **The Basis of Relator's Claim**

9.      In July of 2008, a Kmart pharmacist named James Garbe filed an action under the False Claims Act ("FCA") and analogous State statutes in the United States District Court, Central District of California, alleging that, since at least 2004, Kmart Corporation and its affiliates had been knowingly submitting false reimbursement claims for prescription drugs to government healthcare programs like Medicare Part D, Medicaid, and Tricare.[4]  The case was subsequently transferred to the United States District Court, Southern District of Illinois, and

---

[3] The amount of the secured obligation continues to increase, as the mortgage documents secure payment of attorneys' fees and expenses in connection with the enforcement of the Mortgagees' rights (specifically including the enforcement of rights in a bankruptcy proceeding). Relator thus reserves his right to amend or supplement this Motion to reflect such additional amounts as may be accruing.

[4] The *qui tam* action commenced by Mr. Garbe under the FCA is colloquially know as a "whistleblower" action.

docketed as *United States ex rel. Garbe v. Kmart Corp.*, Case No. 12-cv-881, (the "District Court Action").

10.    In addition to Mr. Garbe, the plaintiffs in the District Court Action included the United States of America and numerous States.[5]  The calculation of damages in this FCA case was in the range of $375 million in actual damages (before trebling) and $110 billion in statutory penalties.  There was a significant amount of litigation, including motions for partial summary judgment by the Defendant, the denial of those motions, and an unsuccessful appeal by the defendant to the Seventh Circuit.  After losing before the Seventh Circuit, (*See United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 627 (2017)), Sears, Kmart and their affiliates engaged in settlement negotiations with the Plaintiffs, and a settlement was reached between Relator, the United States, and numerous States, on the one hand, and Kmart Corporation and Sears Holding Corporation, on the other.  The parties subsequently executed a settlement agreement, which was approved by the District Court on January 19, 2018 (the "Settlement Agreement").[6]  (Court approval of FCA settlements is required by statute.) A copy of the Settlement Agreement is **Exhibit 1** to the Declaration of Robert L. King (the "King Declaration"), which is attached to this Motion as **Exhibit A**.

11.    Pursuant to the terms of the Settlement Agreement, Kmart and Sears were obligated to pay a total of $59 million in three installments. A payment of $20 million was due within 14 days of the Settlement Agreement effective date of December 22, 2017, another payment of $20 million was due on the one year anniversary of the effective date, and a final payment of $19 million was due on the second anniversary of the effective date.

---

[5] On August 21, 2018, the District Court granted Relator's motion to substitute Carl Ireland, the Administrator of the Estate of James Garbe as the Relator in the District Court Action.
[6] The docket of the District Court Action is available on PACER, as noted in the King Declaration, and the Order approving the Settlement Agreement appears at ECF D.N. 497.

(B)    **The Granting of Mortgages and Liens**

12.    The Settlement Agreement required Kmart and Sears to secure the second and third payments by executing mortgages that would create first priority mortgage liens in favor of Relator and the United States on two pieces of commercial real estate owned by the Debtors. *See* Settlement Agreement, ¶2. The Settlement Agreement identified the two properties, a distribution center in Florida, and a distribution center and warehouse (with an accompanying outlet store) in Puerto Rico, and established a procedure for determining the face amounts of the mortgages. Specifically, appraisals of the "as dark" values of the properties would be provided by one of three appraisal firms (or another firm, if agreed to by the parties), and those appraised, "as dark" values would be the face amounts of the mortgages.

13.    Sears provided an appraisal report that it had obtained from one of the approved appraisers in 2017 for the property known as Sears Distribution Center #8975, Cupey Bajo, San Juan, Puerto Rico (the "Puerto Rico Property") to both Relator and the United States. The appraiser, Cushman & Wakefield, had worked with Pons & Lamadrid Appraisers in Puerto Rico, and they jointly provided a report (the "Initial Appraisal") that set the "as dark" value of the Puerto Rico Property at $17.4 million and the "as leased" operating value of the property at $22.1 million, as of February 2017.[7]    The report was signed by Stephen E. Saunders of Cushman & Wakefield Regional, Inc., and Pedro A. Pons and Esteban Lamadrid of Pons & Lamadrid Appraisers. *See* King Declaration, ¶¶ 7-8.

---

[7] Because Sears identified the Initial Appraisal as "confidential," it has not been attached to the King Declaration. Relator is not aware of any reason for continuing to treat the report as confidential (or for treating it as confidential in the first instance) and has no objection to the release of the document.  Alternatively, if the Debtors continue to believe that there is a reason for the original appraisal report to be treated as confidential, Relator is prepared to stipulate to it being filed under seal, provided there are no restrictions on giving the report to this Court or any appellate court, magistrate judge or mediator and using the report in any related hearings.

14.     The face amount of the mortgage for the Puerto Rico Property was thus fixed at the õas darkö value of $17.4 million, as required by the Settlement Agreement. The parties had their professionals prepare the additional documents needed to implement the Settlement Agreement, including the Mortgage Note, a mortgage note pledge and security agreement, and a certified deed of constitution of mortgage, the last being the document required to attach a mortgage lien to realty in Puerto Rico. *See* Article 57 of the Real Property Registry Act of the Commonwealth of Puerto Rico of 2015, Act Number 210 of December 8, 2015.[8] Copies of these documents (the õMortgage Documentsö) are attached to Relatorøs proof of claim [claim number 15292], and are **Exhibits 2 through 4** to the King Declaration.

15.     The Puerto Rico Property is comprised of two parcels, and certified copies of the deed of constitution of mortgage were filed at the Puerto Rico Real Property Registry on January 16, 2018 in connection with both of the parcels.  *See* King Declaration, ¶ 9.  Relator received confirmation of the recordation of the notices -- generally referred to as õrecording slipsö -- via email from the Real Property Registry in July 2018.  Pursuant to Article 229 of the Real Property Registry Act of the Commonwealth of Puerto Rico of 2015, Act Number 210 of December 8, 2015, the recording slips are issued only after the Registrar of Property has scrutinized the filed documents and determined that all legal requirements have been satisfied and that the deed of constitution of mortgage is a legal, valid and enforceable lien under the laws of the Commonwealth of Puerto Rico.  A Notarial Act that, among other things, translates the recording slips (the originals of which are in Spanish), is attached to the King Declaration as **Exhibit 5,** together with copies of the original recording slips.  *See also* King Declaration, ¶¶ 9-11. The

---

[8] Relator is advised by Puerto Rico-based counsel that the statutes referenced in paragraphs 14 through 16 hereof are not currently available in English online.

Notarial Act is executed pursuant to Article 30, Act Number 75 of July 2, 1987, as amended, and Rules 37 and 38 of the Notarial Rules and Regulations adopted on August 1, 1995.

16.    Upon the issuance of the recording slips, the date of the filing of the deed of constitution of mortgage, January 16, 2018, became the effective date of recordation.[9]  The Mortgage is therefore perfected under the laws of the Commonwealth of Puerto Rico, Article 19 of the Real Property Registry Act of the Commonwealth of Puerto Rico of 2015, Act Number 210 of December 8, 2015.  Consistent therewith, title abstracts issued on August 1, 2019 for the two parcels (the "Title Abstracts") evidence that the Mortgagees' mortgage lien was recorded on January 16, 2018 and that there are no other recorded monetary liens or mortgages on the Puerto Rico Property.  The Title Abstracts are attached to the King Declaration as **Exhibit 6**.  *See* King Declaration, ¶12.

17.    The Mortgage Documents, including the Mortgage Note and the deed of constitution of mortgage, evidence a first mortgage and liens on the Puerto Rico Property and all proceeds of the property, (including, without limitation, any cash proceeds), and partially secure the Debtors' payment obligations under the Settlement Agreement. The Mortgage Documents also authorize mortgage interest at the rate of 1.5% per annum and the payment of attorneys' fees and expenses in connection with the enforcement of Mortgagees' rights, including in a bankruptcy proceeding, and secure those obligations as well.

18.    The liens on the Puerto Rico Property were timely and properly recorded in the appropriate municipality (San Juan), and as of the Commencement Date (defined below), the Mortgagees held a perfected first mortgage lien on the Puerto Rico Property.

(C)    **The Amendment of the Settlement Agreement and the Debtors'**

---

[9] As set forth in the King Declaration, Mr. King worked closely with Puerto Rico-based real estate counsel to make certain that everything was done in compliance with the laws of Puerto Rico.  *See* King Declaration, ¶ 8.

**Breach of the Same**

19.      Sears and Kmart initiated discussions about the possible amendment of the

Settlement Agreement in April 2018, and the Settlement Agreement was amended by the parties

in August 2018.  (Kmart and Sears wished to sell the second mortgaged property, the Sears

distribution center in Florida.)  *See* King Declaration, ¶¶14-15. The letter agreement amending

the Settlement Agreement (the õAmendmentö) was approved by the District Court on August 24,

2018, and, pursuant to its terms, Kmart and Sears were required to make a payment of $12.8

million upon the closing of the sale transaction, and pay the balance of the second installment

payment ó $7.2 million ó by December 2018. The Amendment further required  Kmart and Sears

to escrow an additional $1.6 million by December 2018 so that, after the balance of the second

installment payment was made, the escrowed amount and the remaining mortgage upon the

Puerto Rico Property would fully secure the third (and final) installment payment of $19 million.

A copy of the Amendment is attached as **Exhibit 7** to the King Declaration.

20.      Kmart and Sears defaulted in the performance of their obligations under the

Settlement Agreement. They did not pay the $7.2 million that was due in December of 2018, and

to Relatorøs knowledge, they never escrowed the additional $1.6 million or made any provision

for the final installment payment of $19 million.  *See* King Declaration, ¶ 16.

**(D)      Events During the Bankruptcy Cases**

21.      Beginning on October 15, 2018 (the õCommencement Dateö), less than two

months after the District Courtøs approval of the Amendment, each of the above-captioned

Debtors commenced a voluntary case with this Court under chapter 11 of title 11 of the

Bankruptcy Code.  The Debtorsøchapter 11 cases have been consolidated for procedural

purposes only and are being jointly administered under Chapter 11 Case No. 18-23538 (RDD).

The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

     **(i)   The DIP Financing Orders**

    22.     As of the Commencement Date, Relator and the United States had a first priority, perfected mortgage lien on the Puerto Rico Property and the proceeds thereof (the ōMortgage Lienö). For that reason, Relator filed a *Limited Objection to the Debtors' Motion for Authority to (a) Obtain Post-Petition Financing, (b) Use Cash Collateral, (c) Grant Certain Protections to Prepetition Secured Parties, and (d) Schedule Second Interim Hearing and Final Hearing* [D.N. 550], objecting to the proposed priming of the Mortgageesø liens or the granting of liens that were *pari passu* therewith.

    23.     Relator and the Debtors were able to agree upon language for the final orders approving both the senior and the junior DIP financing facilities. The DIP Orders state:

> Notwithstanding anything to the contrary contained herein (including, but not limited to, paragraphs iv, 13, and 14 hereof), nothing herein, including the Carve-Out, shall be deemed to prime or be otherwise made senior or pari passu to any valid, perfected and non-avoidable security interests or liens held by (i) SHLD Lendco, LLC or Cyrus Capital Partners, L.P. under the IP/Ground Lease Term Loan or (ii) Relator Carl Ireland, Administrator of the Estate of James Garbe, and the other parties to the Garbe settlement agreement sharing in that security interest with Garbe (such security interests and liens the ōSpecified Security Interestsö). All partiesø rights to object to the priority, validity, amount, and extent of the Specified Security Interests and the claims secured thereby (and all objections and defenses of the holders of the Specified Security Interests) are hereby fully preserved. All rights and remedies of the Debtors in respect of the Specified Security Interests, including, but not limited to, the right to seek to surcharge and to seek to impose the remedy of marshaling (and, in each case, all objections and defenses of the holders of the Specified Security Interests) are hereby fully preserved. All rights of the holders of the Specified Security Interests to seek relief from the automatic stay of section 362 of the Bankruptcy Code, to seek adequate protection of the Specified Security Interests, and/or other permissible secured creditor rights, including the right to object to any relief sought pursuant to the Debtorsø reserved rights, are hereby fully reserved.

Senior DIP Order, D.N. 955, ¶ 65 and Junior DIP Order, D.N. 1436, ¶ 64. The first priority liens and security interests of the Mortgagees in the Puerto Rico Property were thereby preserved, and not diluted or subordinated in any manner.

**(ii)    The Proposed Sale and Relator's Objection**

24.    The Debtors also embarked upon a marketing and sale process early on in these cases, during which they negotiated an asset purchase agreement with ESL Investments, Inc. (the "Buyer")[10], which directly or indirectly owned 48.4% of the common stock of Debtor Sears Holdings as of the Commencement Date.

25.    The Buyer proposed to purchase substantially all of the Debtors' assets, including approximately 425 of the Debtors' retail stores, as well as other owned and leased real estate, including the Mortgagees' collateral, the Puerto Rico Property.  The proposed transaction also contemplated the sale of inventory, receivables, intellectual property, data, certain claims, security deposits and insurance proceeds, cash held in the retail stores and foreign assets, and the release of certain claims against the Buyer and its principal.

26.    After some negotiations between the Buyer and the Debtors, the value of the bid, as disclosed to the Court and announced in the press, was approximately $5.2 billion.  The proposed sale proceeds included cash, credit bids, assumption of certain liabilities and obligations, the satisfaction and release of  amounts due under the junior DIP financing facility, the satisfaction and release of amounts due and commitments under the Citibank letter of credit facility, cure costs, and certain employment and severance obligations.[11]

---

[10] ESL ultimately created new entities, Transform Holdco LLC and other "Transform" entities, to serve (collectively) as the Buyer.

[11] The Debtors' summary of the consideration payable under the asset purchase agreement appears at pages 42- 44 of the Debtors' second amended disclosure statement.  [D.N. 4390]

27.    Relator timely filed a *Limited Objection and Reservation of Rights to the Debtors'
Proposed Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II)
Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests
and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory
Contracts and Leases in Connection Therewith and (IV) Granting Related Relief* [D.N. 1931 (the
"Sale Objection"), stating that he did not consent to the sale of the Puerto Rico Property free and
clear of the Mortgage Lien absent payment in full of the amount of the Mortgage Lien. Relator
calculated the amount of the Mortgage Lien to be in excess of $18 million as of the date of the
Sale Objection.

28.    The Sale Objection cited section 363(f) of the Bankruptcy Code and the relevant
provisions of the DIP Orders, and noted that Relator would consider consenting to the sale of the
Puerto Rico Property free and clear of the Mortgage Lien "provided that safeguards of his rights
as to valuation are included in the Order that the Relator determines are sufficient to ensure a fair
and proper valuation and allocation of sale proceeds, as well as the prompt turnover of such
proceeds upon resolution of allocation." Sale Objection, ¶ 10.[12]

29.    A hearing to consider the proposed sale began on February 4, 2019 and concluded
on February 7, 2019. Most of the hearing was evidentiary in nature and devoted to challenges to
the sale raised by the committee of unsecured creditors, but other objections were heard on

---

[12] Relator was concerned about the allocation of sale proceeds because the proposed asset purchase agreement
provided in section 9.3(d) that the Buyer would deliver a schedule allocating the purchase price to the Debtors after
the closing of the sale, giving Relator no voice in the determination of the collateral's value.  However, at the sale
hearing, counsel to the Debtors advised the Court that the Debtors had waived the provision of the Sale Procedures
Order that required an allocation from the Buyer in part because the Debtors "understood that the entire business
would have to be valued as a whole." Tr.47-48.

However, as noted in this Motion and the King Declaration, the Debtors and the Buyer have filed Deeds of Transfer
with the Puerto Rico Real Property Registry which state the purchase prices for the two parcels that constitute the
Puerto Rico Property.

February 7th.  Hearing Transcript, day 3 [D.N. 2886] ("Tr."), pages 167-171.  A copy of the

pages of the hearing transcript related to this matter is attached hereto as **Exhibit B**. On the third

day of the sale hearing, Relator's counsel reiterated that: (i) Relator did not consent to the sale of

his collateral; and (ii) Relator wanted assurance that if the Mortgage Lien on the Puerto Rico

Property was not going to be paid in full upon the sale closing, that cash in the amount of the

Mortgage Lien was segregated and reserved, particularly given concerns about the Debtors'

administrative solvency. *See* Tr.168, 170.  The Debtors opposed Relator's request that cash in the

amount of the Mortgage Lien be escrowed.  Tr. 169-170.

30.    The Court responded to the arguments by stating:

"I think you need to give them that protection lien on assets then.  I don't know
how they are protected otherwise."  Tr. 169:15-17.

"They have superpriority where they are actually covered, then I think that's –
you can litigate what the actual value was and what you're entitled to be paid."
Tr. 169:21-22.

"[T]his is a first lien on this property. It's worth what it's worth and it can't be
paid just by a, you know, just saying we're going to pay you some day. They need
to have a – indubitable equivalent in something."  Tr. 170: 19-23.

31.    Following the conclusion of the sale hearing, the parties attempted to draft

language for the proposed sale order that would reflect the Court's comments and

determinations.  However, there were differences of opinion about appropriate language, and

ultimately, the Debtors' counsel submitted a proposed order to the Court via email, Relator 's

counsel commented on it, and the Court made revisions to the proposed language that it

determined were appropriate.

32.    The Sale Order, as entered, provides in pertinent part:

**Mortgage Adequate Protection**. Notwithstanding anything to the contrary contained
herein or in the Asset Purchase Agreement or related documents, upon the closing of the
Sale Transaction, Relator Carl Ireland, as Administrator of the Estate of James Garbe,

and the United States (the "Mortgagees") as holders of liens on the real property known as Location #8975, Cupey Bajo, San Juan, Puerto Rico (the "Property") shall be entitled to a lien against the sale proceeds of the Property in the same order of priority as existing on the date of entry of this Sale Order and a superpriority administrative expense claim against the Debtors as adequate protection pursuant to sections 361, 363(e), and 507(b) of the Bankruptcy Code arising from the sale of such Property to satisfy any diminution of the value of such replacement lien post-Closing. All parties' rights to object to the priority, validity, amount, and extent of such asserted liens and superpriority claim or the obligations relating thereto are preserved. The Debtors' and Mortgagees' rights as to the amount of the allocation of proceeds from the Sale Transaction to the Property and any valuation of the Property are preserved and any disputes shall be determined by the Bankruptcy Court, upon motion by any of the Debtors or the Mortgagees.

Sale Order, D.N. 2507, ¶ 71.  The Sale Order placed no restrictions on the sources of recovery from the Debtors with respect to the superpriority claim, thereby making the funds in the Wind-down Account, among other things, available to satisfy such a claim.

33.    Unfortunately, Relator's concern about the dissipation of funds by the Debtors absent an escrow requirement proved warranted.  The Debtors' monthly operating reports for the months after the sale indicated that the Debtors had: (i) unrestricted cash and cash equivalents of $24 million and restricted cash of $211 million as of March 2, 2019; (ii) unrestricted cash and cash equivalents of $9 million and restricted cash of $195 million as of April 6, 2019; (iii) unrestricted cash and cash equivalents of $14 million and restricted cash of $150 million as of May 4, 2019; and (iv) unrestricted cash and cash equivalents of $7 million and restricted cash of $139 million as of June 1, 2019.  Further, unpaid post-petition vendor payables were $45,700,351 as of June 1st. (The Debtors note in their operating reports that there is a dispute between them and their Buyer about who is liable for such payables.) D.N. 3199, 3596, 4241, 4590.

### (iii)    Relator's Proof of Claim

34.    Relator timely filed a proof of claim in the bankruptcy cases, asserting a total claim of $26,200,000.00 against all the Debtors as of the Commencement Date.[13] The proof of claim (the "Claim") was recorded as Claim No. 15292 and a copy of the Claim (without exhibits) is attached hereto as **Exhibit C**.

35.    As set forth in the Claim, the secured portion of the Claim totals $18,190,144.82. That amount is based upon the terms of (i) the Settlement Agreement, which provided the procedures for determining the face amount of the mortgage ($17.4 million), and (ii) the Mortgage Note, which reflects that face amount and provides for interest of 1.5% per year and attorneys' fees and expenses in connection with the enforcement of the Mortgagees' rights under the Mortgage Note (including in a bankruptcy proceeding).[14]

### (E)    The New Appraisal and Relator's Efforts to Consensually Resolve This Matter

36.    The Sale Order was entered on February 8, 2019 and the Debtors have represented in filings with the Court that the sale transaction closed on February 11, 2019. Recognizing that the value of the Puerto Rico Property on or about the time of the sale closing would be critical to any discussion of the property's value, Relator very promptly made arrangements to obtain a current appraisal of the Puerto Rico Property.

37.    Relator, through the counsel that represented him in the underlying lawsuit, engaged Pons & Lamadrid Appraisers (the "Appraisers"), the same Puerto Rico-based appraisal firm that had been engaged for the Initial Appraisal of the Sears property.  The Declaration of Esteban Lamadrid of Pons & Lamadrid Appraisers is attached to this Motion as **Exhibit D** (the

---

[13] Pursuant to a stipulation that was approved by the Court, Relator was authorized to file a single claim against all of the Debtors. [D.N. 3081]

[14] This amount is subject to increase for additional interest, and fees incurred since the proof of claim was filed.

õLamadrid Declarationö) and the appraisal report is attached to the Lamadrid Declaration as

**Exhibit 1**.  As set forth in the appraisal report, , appraisers from Pons & Lamadrid were

permitted access to the Puerto Rico Property in March of 2019, and a new appraisal report was

provided to Relator on April 5, 2019 (the õCurrent Appraisalö).

38.    The Current Appraisal evaluates the Puerto Rico Property ó which is on a 632,072

square foot site and includes a 302,928 square foot distribution center and a 36,472 square foot

outlet store ó as of March 15, 2019. *See* Current Appraisal, pages v-vi.  The Current Appraisal

discusses both Puerto Ricoøs economic situation and the impact of the two hurricanes that struck

the island in September of 2017. It also notes the property is in good working condition and

appropriately zoned (as light industrial) for its current uses.[15]

39.    The Appraisers employed several different means of analyzing value, including

the highest and best use analysis, the income capitalization approach and the sales comparison

approach, with the last being viewed as the most relevant. The Current Appraisal assigned the

Puerto Rico Property an õas darkö value of $16.6 million, an õas leasedö value of $22.3 million

and an õas isö market value of $22.1 million.

40.    Relator provided a copy of the Current Appraisal to the Debtorsø counsel on April

29, 2019, along with the Mortgage Note, and a letter providing the history of Relatorøs claim and

details about the calculation of the claim, particularly the secured portion of the claim. Given the

values provided in the Current Appraisal, particularly the $22.1 million õas isö valuation,[16]

---

[15] The Appraisers were not asked to do a title search, and perhaps because all the signage at the Puerto Rico Property continues to say õSears,ö (as evidenced by the photographs in the Current Appraisal), the Appraisers refer to the Puerto Rico Property as a õSearsö property, with the distribution center being owner-occupied and the outlet store being leased to an affiliate. In fact, upon the sale closing, the Puerto Rico Property became the Buyerøs property.

[16] The Settlement Agreement provided that the propertyøs õas darkö value would be used to determine the face amount of the mortgage.  But for purposes of determining the propertyøs value as of its sale to Transform Holdco, LLC, Relator submits that the õas isö value is the appropriate reference point, since this is an operating property.

Relator is confident that the value of the Puerto Rico Property as of the sale closing was well in excess of the amount due under the Mortgage Note, and that the replacement liens granted to the Mortgagees in the Sale Order are properly for the full amount of the Mortgage Note ($17.4 million) plus the interest and attorneys' fees provided for therein. That amount was $18,190,144.82 as of the date Relator's Claim was filed, and given Relator's right to attorneys' fees and interest, continues to increase.

41.     More recently, in connection with the preparation of this Motion, Relator obtained the Title Abstracts for the two parcels of real estate that comprise the Puerto Rico Property. *See* King Declaration, **Exhibit 6**. Those Title Abstracts evidence that the Mortgagees' mortgage lien is the only monetary lien on either parcel, and that the mortgage lien was duly recorded on January 16, 2018. In addition, one Title Abstract lists Transform Distribution Center Holdco, LLC as the owner of the property, and references a deed of transfer executed on May 8, 2019 concerning a sale by Sears to Transform for the price of $17,792,950, while the second Title Abstract shows Sears as the owner of record, but references a deed executed on May 8, 2019 that states that the second parcel has also been sold to Transform Distribution, for a purchase price of $2,977,050. (The Title Abstract identifies the May 2019 deed as a "document pending.") The sale price ascribed to the Puerto Rico Property by the Debtors in their filings with the Puerto Rico Real Property Registry is therefore $20,770,000.

42.     As set forth in the King Declaration, after reviewing the Title Abstracts, Mr. King directed Puerto Rico counsel to obtain copies of the deeds of transfer themselves. See King Declaration, ¶ 24. Copies of the deeds of transfer, both of which are dated May 8, 2019 (the "Deeds of Transfer") are attached to the King Declaration as **Exhibit 8.** The Deeds of Transfer acknowledge the Mortgagees' mortgage and its January 16, 2018 recording date, and show no

other mortgage liens or other monetary liens on the Puerto Rico Property. And perhaps even more significantly, the Deeds of Transfer, which state that they are submitted by both Sears and Transform Distribution Holdco, disclose the purchase price for the two parcels and acknowledge receipt of the purchase price. The Deeds of Transfer state as follows:

> Two: <u>Purchase Price</u>. The Property is sold for a purchase price equal to the amount of SEVENTEEN MILLION SEVEN HUNDRED NINETY-TWO THOUSAND NINE HUNDRED FIFTY DOLLARS ($17,792,950.00), the receipt of which is hereby acknowledged.

*See* Deed of Transfer, Distribution Center, page 4.

> Two: <u>Purchase Price</u>. The Property is sold for a purchase price equal to the amount of TWO MILLION NINE HUNDRED SEVENTY-SEVEN THOUSAND FIFTY DOLLARS ($2,977.050.00), the receipt of which is hereby acknowledged.

*See* Deed of Transfer, Outlet Store, page 4.

43.     While the consideration paid for the Debtors' assets was reported by the Debtors to be in excess of $5.2 billion and the sale price for the Puerto Rico Property as disclosed by the Debtors and the Buyer in the Deeds of Transfer totals $20,770,000, it is uncertain what amount the Debtors hold as of the date of this Motion. To the extent that there has been a diminution in the value of the replacement lien since the sale closing, the amount of the diminution is entitled to payment as a superpriority administrative claim, in accordance with the Sale Order.

## **STATUTORY BASES FOR RELIEF**

44.     Section 506(a)(1) of the Bankruptcy Code provides as follows:

An allowed claim of a creditor secured by a lien on property in which the estate has an interest' is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property' and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506(a)(1).  As Relator's claim was secured by the mortgage as of the

Commencement Date, Relator's claim is indisputably a secured claim pursuant to Section

506(a)(1) of the Bankruptcy Code.  As stated above, Relator's proof of claim reflects that the

secured portion of the claim is calculated to be at least $18,190,144.82, *i.e.* the face amount of

the mortgage plus interest and attorneys' fees (both as specifically provided for in the Mortgage

Note).

45.     With respect to Relator's superpriority administrative claim for adequate

protection of the replacement liens granted with respect to the prepetition secured claim, Section

507(b) provides as follows:

> If the trustee, under section 362, 363, or 364 of this title, provides adequate protection of
> the interest of a holder of a claim secured by a lien on property of the debtor and if,
> notwithstanding such protection, such creditor has a claim allowable under subsection
> (a)(2) of this section arising from the stay of action against such property under section
> 362 of this title, from the use, sale, or lease of such property under section 363 of this
> title, or from the granting of a lien under section 364(d) of this title, *then such creditor's
> claim under such subsection shall have priority over every other claim allowable under
> such subsection.*

11 U.S.C. § 507(b) (emphasis added).  Section 507(a)(2), in turn, provides that "[t]he following

expenses and claims have priority in the following order:  Second, administrative expenses

allowed under section 503(b) of this title."  Thus, adequate protection claims on account of

secured claims are entitled to superpriority treatment, above all other administrative claims.

46.     The Court confirmed Relator's superpriority administrative claim treatment in the

Sale Order when it afforded Relator a post-petition replacement lien on the sale proceeds of the

Puerto Rico Property.  As cited above, the Sale Order provides, in relevant part, that upon the

closing of the sale transaction "Relator Carl Ireland, as Administrator of the Estate of James

Garbe, and the United States (the "Mortgagees") as holders of liens on the real property known

as Location #8975, Cupey Bajo, San Juan, Puerto Rico (the "Property") shall be entitled to a lien

against the sale proceeds of the Property in the same order of priority as existing on the date of entry of this Sale Order and a superpriority administrative expense claim against the Debtors as adequate protection pursuant to sections 361, 363(e), and 507(b) of the Bankruptcy Code arising from the sale of such Property to satisfy any diminution of the value of such replacement lien post-Closing õí [Sale Order, D.N. 2507, paragraph 71] . Thus, by Order and by statute, the Mortgagees have a superpriority claim for diminution of the value of its replacement lien in the amount that is determined to be the value of the Puerto Rico Property on February 11, 2019 (the date of the sale closing) minus the sale proceeds that remain with the Debtors, if any, when the replacement lien is ultimately satisfied.

**ARGUMENT**

47.     From before the Commencement Date and continuously through the date of the sale closing, Relator and the United States have held a perfected first mortgage lien on the Puerto Rico Property and the proceeds of that property.  Pursuant to the clear terms of the DIP Orders, the Mortgage Lien was not primed during these cases, nor was anyone granted *pari passu* rights with respect to the Mortgagees' collateral.  Relator objected to the sale of the Puerto Rico Property, and, as a result, the Mortgagees were granted replacement liens, and (to the extent of diminution in the value of those liens,) superpriority administrative claims to protect their rights as secured creditors.

48.     The Puerto Rico Property was historically used by Sears as a warehouse and distribution center, with an outlet store also located on the site.  As noted in the Current Appraisal, that continues to be the present use of the site. Applying the Appraiser's sales comparison approach, the "as is" value of the Puerto Rico Property is in excess of $22 million, almost $4 million more than the amount due under the Mortgage Note.  Given that the consideration provided in connection with the sale, according to numerous filings and other public statements by the Debtors, totaled more than $5.2 billion, the Mortgagees therefore had a replacement lien for the full amount of their secured claim.[17]

---

[17] As noted in the Statement of Facts, the allowed claim under the Settlement Agreement was not fully secured. After payment of the secured portion of their claim, the Mortgagees will still have an unsecured claim of more than $8 million.

49.     At the hearing to consider Relator's objection to the sale of the Puerto Rico

Property, Relator requested that the amount due under the Mortgage Note be escrowed, since the

Debtors had no plans to satisfy the Mortgage Note at the sale closing.  The Debtors strongly

opposed Relator's request, because they did not want to be restricted in their use of the proceeds

from the sale of the property.  The stated purpose of the replacement liens and the superpriority

administrative claim was to protect the Mortgagees' rights and to insure that when the value of

the collateral was determined, funds in that amount would be available to pay the Mortgagees.

**(i)     The Value of the Secured Claim as of the Sale Closing**

50.     It is well-established that the value of collateral under section 506(a) of the

Bankruptcy Code should be determined "in light of the purpose of the valuation and the

proposed disposition or use of such property." *Assocs. Commercial Corp. v. Rush*, 520 U.S. 953,

961-62 (1997); *Menorah Congregation & Religious Ctr. v. Feldman (In re Menorah*

*Congregation & Religious Center),* 554 B.R. 675, 689-90 (Bankr. S.D.N.Y. 2016) ("*Menorah*");

*In re Residential Capital, LLC*, 501 B.R. 549, 592 (Bankr. S.D.N.Y. 2013). The purpose of the

Puerto Rico Property's valuation is to determine its value as of the date of the closing of the

Debtors' asset sale, so as to ascertain the value of the first priority lien on the property and the

amount of sales proceeds properly allocable to the Mortgagees.

51.     This Court articulated the methods for valuing real property in *Menorah*, noting

that "valuations of real property are not mathematical exercises. They involve reasoned

judgments about the market, comparable properties and the specific property at issue." *Menorah*,

554 B.R. at 690.

52.     The three most widely recognized valuation methods for real property are: (i) the

income capitalization approach, for a property that is income-producing; (ii) the comparable

sales approach, for a property in an active commercial market; and (iii) the cost or land development approach, minus depreciation, for a property that is a rarely traded specialty. *See United States v. Certain Prop. in Manhattan*, 403 F.2d 800, 802 (2d Cir. 1968); *see also In re Chait Props.,* 2013 Bankr. LEXIS 3746, at \*10-11; *In re Fortune Smooth (U.S.) Ltd., 1993 Bankr. LEXIS 2377, at \*5-6 (Bankr. S.D.N.Y. July 8, 1993). Menorah* discusses all three of these methods of valuing real property. *See* 554 B.R. at 690-696.

53.      Relator made arrangements for an updated appraisal of the Puerto Rico Property promptly after the Court's approval of the collateral's sale, contacting and engaging the respected Puerto Rico-based appraisal firm that had been used in connection with Sears' 2017 appraisal of the property. The Appraisers were able to gain access to the Puerto Rico Property and conduct a physical inspection of the facilities in March 2019. The Current Appraisal values the property as of March 15, 2019, just weeks after the sale closing.

54.      The Current Appraisal discusses all three of the valuation methods for real property noted above, and applies both the income capitalization approach and the comparable sales approach to determine the value of the Puerto Rico Property.[18] Because the Puerto Rico Property derives its income from its operations as a warehouse and distribution facility, and not from the leasing of the real estate to third parties, the Appraisers correctly based the income capitalization analysis on commercial rent prices and terms for comparable properties in the same market, as well as the customary costs and expenses related to the ownership and maintenance of such properties. After evaluating these factors, the Current Appraisal values the Puerto Rico Property at $22.3 million under the income capitalization approach.

---

[18] The Current Appraisal notes that the third approach, the cost approach (which estimates the current cost of reproducing or replacing the current property), is "adequate when the structures are relatively new, with minimal obsolescence." The Appraisers note that because of market conditions and difficulty in estimating obsolescence, the cost approach is not commonly used by buyers. Current Appraisal, page 51.

55.     The Appraisers also applied the comparable sales approach.  They evaluated three recent transactions in the local real estate market involving comparable properties, detailed the similarities and differences between the Puerto Rico Property and the other properties, and made appropriate adjustments for differences.  Based upon their analysis of warehouse/distribution center sales, the Appraisers determined the Puerto Rico Property had an appraised value of approximately $22.1 million under the comparable sales approach.  They noted their belief that the comparable sales approach was the best approach for valuing the Puerto Rico Property, and opined that the value of the property was $22.1 million.

56.     The Debtors have repeatedly and consistently stated that the consideration they received in connection with the sale of their assets is in excess of $5.2 billion, and they summarized the nature of that consideration in their disclosure statement. Perhaps more significantly the Title Abstracts and the Deeds of Transfer evidence that after the closing of the sale transaction, the Debtors and the Buyer filed Deeds of Transfer with the Puerto Rico Real Property Registry stating that the property was sold to Transform Distribution for a purchase price totaling  $20,770,000.  The Deeds of Transfer also acknowledge receipt of the sale proceeds.

57.     While the purchase price disclosed by the Debtors and the Buyer is somewhat lower than the appraised value of the Puerto Rico Property, it nonetheless exceeds the amount due under the Mortgage Note by more than two million dollars. Therefore, Relator respectfully submits that the amount due under the Mortgage Note -- $18,190,144.82 -- was fully secured by the Mortgagees' replacement lien on the sales proceeds.

### (ii)    Diminution in the Value of the Sales Proceeds

58.    The Sale Order grants Relator and the United States a superpriority administrative

claim against the Debtors for any diminution in the value of their replacement liens. It places no

restrictions on which of the Debtors' assets the Mortgagees can look to for satisfaction of that

claim. Relator is unsure of precisely how much of the sale proceeds realized by the Debtors have

been dissipated since the February 11, 2019 closing of the sale transaction, but as noted above,

the Debtors' most recent monthly operating reports, for the periods ending on March 2nd, April

6th, May 4th and June 1, 2019 evidence that the amount of cash in the Debtors' possession has

been steadily declining.  The operating reports show that the amount of unrestricted cash has

decreased from $24 million to $7 million and the amount of restricted cash has decreased from

$211 million to $139 million between March 2nd and June 1st of this year.  The most recent

operating report also notes post-petition amounts due to vendors in excess of $45 million. D.N.

3199, 3596, 4241, 4590.

59.    Unfortunately, the Debtors have not escrowed or segregated any funds for either

the satisfaction of the Mortgagees' replacement lien or the payment of their superpriority

administrative claim.  Instead, the Debtors continue to spend their funds to pay certain of their

ongoing operating and restructuring expenses.  The Debtors are not entitled to do so on the backs

of secured creditors such as Relator, whose collateral has been liquidated for a sale that

unquestionably benefitted the Debtors.[19]

60.    The Mortgagees' rights as to the Puerto Rico Property and the proceeds thereof

are senior to those of administrative creditors.  And while Relator, like any holder of a

---

[19] To the extent the Debtors seek to surcharge the Relator's collateral for preservation of value under section 506(c) of the Bankruptcy Code, such relief should be denied because it was the Debtors that benefitted from the sale process, not the Relator, whose collateral has remained consistent in value at all relevant times.  The Relator reserves the right to brief the surcharge issue, if raised by the Debtors.

substantial claim, wishes to be paid promptly, Relator has an additional and significant concern in these cases.  He does not want the Debtors to continue using his sale proceeds for payment of their general administrative expenses and fees, and then advise him that they don¢ have any cash with which to pay his secured claim.

## RESERVATION OF RIGHTS

61.    Relator expressly reserves any and all rights to supplement or amend this Motion, including to seek discovery with respect to the Debtorsø filings with the Puerto Rico Real Property Registry and dissipation of the sale proceeds, as well as any other issues that may be relevant to this dispute.

## CONCLUSION

WHEREFORE, Relator respectfully requests that this Court grant this Motion, allowing Relator's secured claim and superpriority administrative claim in an amount totaling no less than $18,190,144.82, directing the Debtors to promptly pay such amount, and granting Relator such other and further relief as this Court deems just and proper.

Dated: New York, New York
      August 21 2019

Respectfully submitted,

HALPERIN BATTAGLIA BENZIJA, LLP

*/s/ Alan D. Halperin*
Alan D. Halperin, Esq.
Donna H. Lieberman, Esq.
Julie D. Goldberg, Esq.
40 Wall Street, 37th Floor
New York, NY 10005
Telephone: (212) 765-9100
ahalperin@halperinlaw.net
dlieberman@halperinlaw.net
jgoldberg@halperinlaw.net

*Counsel to Relator Carl Ireland,*
*Administrator for the Estate of James Garbe*