MORTGAGE NOTE PLEDGE AND SECURITY AGREEMENT

This **MORTGAGE NOTE PLEDGE AND SECURITY AGREEMENT** (this "Agreement") dated January 12, 2017, made by **SEARS ROEBUCK DE PUERTO RICO, INC.**, a corporation organized and existing under the laws of the State of Delaware, and duly authorized to engage in trade or business in the Commonwealth of Puerto Rico as pledgor (the "Pledgor"), in favor of the **UNITED STATES OF AMERICA** acting through the United States Department of Justice, Civil Division, Commercial Litigation Branch in turn represented by the Assistant U.S. Attorney, Chief Civil Division, Héctor E. Ramírez Carbó, who is of legal age, married, attorney-at-law and resident of Guayama, Puerto Rico (the "United States") and Carl Ireland Curtiss, of legal age, married, attorney-at-law and resident of the State of Ohio as guardian for James Garbe and his estate in his role as Relator under a *qui tam* action filed by James Garbe against Kmart Corporation ("Kmart") in the United States District Court for the Central District of California captioned *U.S., et al., ex rel. Garbe v. Kmart Corporation*, Case No. CV08-04669 (C.D.Cal.) and subsequently transferred to the United States District Court for the Southern District of Illinois, Case Number 3:12-cv-00881-MJR-PM (S.D. Ill.), who in turn is herein represented by his true and lawful attorney-in-fact, Alexandra L. Pérez Pérez, of legal age, married, attorney-at-law and resident of San Juan, Puerto Rico (the "Relator" and together with the United States hereinafter collectively referred to as the "Pledgees" and individually a "Pledgee").

**WITNESSETH:**

**WHEREAS**, James Garbe, a former Kmart pharmacist, filed a *qui tam* action against Kmart in the United States District Court for the Central District of California captioned *U.S., et al., ex rel. Garbe v. Kmart Corporation*, Case No. CV08-04669 (C.D. Cal.), pursuant to the *qui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. §3730(b); state FCA statutes; and the California Insurance Fraud Prevention Act, Cal. Ins. Code § 1871, *et seq.*, and the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS § 92 (the "Civil Action");



**WHEREAS**, the parties to the Civil Action, through their authorized representatives have entered into a Settlement Agreement effective on the 22nd day of December, 2017 (the "Settlement Agreement");

**WHEREAS**, in the Settlement Agreement, Kmart and Sears Holding Corporation agreed to pledge real estate as collateral to secure the Settlement Payments (as such term is defined in the Settlement Agreement) as set forth in the Settlement Agreement.

**NOW, THEREFORE**, in consideration of the premises and the agreements herein contained and in order to induce the Pledgees to enter into the Settlement Agreement, the Pledgor hereby agrees with the Pledgees as follows:

**1. Definitions.** Reference is hereby made to the Settlement Agreement for a statement of the terms thereof. All capitalized terms used herein that are not otherwise defined shall have the meanings set forth in the Settlement Agreement.

**2. Pledge and Grant of Security Interest.** As collateral security for all of the Obligations (as defined below), the Pledgor hereby delivers, pledges and assigns to the Pledgees, and grants to the Pledgees, a continuing lien on and security interest in all of the following collateral (hereinafter the "Pledged Collateral"):

(a) Mortgage Note in the stated principal amount of SEVENTEEN MILLION FOUR HUNDRED THOUSAND DOLLARS ($17,400,000.00) bearing affidavit number 2888 of Notary Public

1

Miguel Agustín Blanco Fuertes, secured by a mortgage constituted pursuant to Deed Number Two (2) executed on even date herewith before the same Notary Public; and

(b) All proceeds of the foregoing including, without limitation, cash proceeds.

The Pledgor agrees that the mortgage described above (the "Mortgage") shall secure, through the pledge of the mortgage note identified above (the "Mortgage Note"), any and all of the Obligations (as hereinafter defined). The Mortgage constitutes a mortgage lien on those certain properties of Pledgor with an aggregate surface area of 14.9929 *cuerdas* located in the Municipality of San Juan, Puerto Rico, one of which is recorded in the Registry of Property, Third Section of San Juan, at page 221 of volume 466 of Monacillos, property number 17,328, property tax identification number 087-061-851-37-001 and the other recorded in the Registry of Property, Fourth Section of San Juan at page 181 of volume 302 of Rio Piedras Sur, property number 9,717, property tax identification number 087-061-058-07-001 (collectively the "Realty").

3. **Security for Obligations.** This Agreement secures the payment of all obligations of every kind and character now or hereafter existing (whether matured or unmatured, contingent or liquidated) of Kmart due to the Pledgees under the Settlement Agreement, as such agreement may hereafter be amended or otherwise modified from time to time, whether for principal, interest, fees, expenses, reimbursement, indemnification or otherwise (all such obligations being the "Obligations"). Without limiting the generality of the foregoing, this Agreement secures the payment of all amounts that constitute part of the Obligations, including without limitation the Settlement Payments due to the Pledgees or any other amount that would be owed to the Pledgees under the Settlement Agreement.



4. **Representations and Warranties.** Pledgor represents and warrants as follows:

(a) This Agreement, the Mortgage Note and the Mortgage have been duly authorized, executed and delivered by the Pledgor, and such instruments are the legal, valid and binding obligations of the Pledgor, enforceable against the Pledgor in accordance with their respective terms.

(b) No authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required either (i) for the constitution of the Mortgage (except for the filing of a certified copy of the Deed of Mortgage described in Section 2(a) hereof at the Registry of Property of Puerto Rico, Fifth Section of San Juan) or the pledge of the Pledged Collateral pursuant to this Agreement or for the due execution, delivery or performance of this Agreement, the Mortgage Note or the Mortgage by the Pledgor, or (ii) for the exercise by each of the Pledgees of any of their respective rights and remedies hereunder or under the Settlement Agreement, the Mortgage Note or the Mortgage.

(c) The Pledgor is and will be at all times the owner of the Pledged Collateral, free and clear of any lien or other charge or encumbrance or rights of third parties, except for the lien created by this Agreement and those other encumbrances set forth on Schedule B of the title insurance policy obtained by the Pledgees in connection with the execution of this Agreement (collectively the "Permitted Encumbrances"). Except for this Agreement no other instrument similar in effect covering the Pledged Collateral is in effect.

(d) The Pledgor is the owner of record, with valid, good and marketable fee simple *(pleno dominio)* title to the Realty, free and clear of all liens, charges, encumbrances and rights of third parties except for the Permitted Encumbrances.

2

(e) The Mortgage constitutes a mortgage lien on the property identified therein, and is not subject or subordinated to any prior liens, charges, encumbrances or rights of third parties.

(f) This Agreement creates a valid lien in favor of the Pledgees on the Pledged Collateral as security for the Obligations. The Pledgees possession of the Mortgage Note pursuant to the terms of this Agreement results in the perfection of such lien. Such lien constitutes a perfected first priority lien. All actions necessary or desirable to perfect and protect such lien have been duly taken.

(g) The exercise by each of the Pledgees of any of their respective rights and remedies under the Settlement Agreement, hereunder or under the Mortgage will not contravene any law or any contractual restriction binding on or affecting the Pledgor or any of its properties.

5. **Covenants.** Pertaining to the Pledge Collateral for so long as any of the Obligations shall remain outstanding:

(a) The Pledgor will, at its expense, at any time and from time to time, promptly execute and deliver all further instruments and documents and take all further action that any of the Pledgees may reasonably determine are necessary (i) to perfect and protect the lien purported to be created hereby and by the Mortgage; (ii) to enable any of the Pledgees to exercise and enforce its rights and remedies under the Settlement Agreement or hereunder in respect of the Pledged Collateral and under the Mortgage in respect of the Realty and the Mortgaged Property; and (iii) to otherwise effect the purposes of this Agreement and the Mortgage, including, without limitation, executing and filing such other documents, or amendments hereto or thereto, as may be necessary to perfect and preserve the lien purported to be created hereby and by the Mortgage.

(b) The Pledgor shall not (i) sell, assign (by operation of law or otherwise) or otherwise dispose of or transfer, or grant an option with respect to, or permit any such disposition to occur with respect to, the Pledged Collateral or the Realty, or any part thereof or (ii) create, incur, assume or permit to exist any lien, security interest, or other charge or encumbrance or any other type of preferential arrangement upon or with respect to the Pledged Collateral or the Realty, or any part thereof, except for the liens created under this Agreement with respect to the Pledged Collateral and the liens created pursuant to and described in the Mortgage with respect to the Realty and the Mortgaged Property (as such term is defined in the Mortgage).

(c) The Pledgor will not take or fail to take any action that would in any manner impair the value or enforceability of the lien of the Pledgees on the Pledged Collateral.

(d) The Pledgor will pay promptly when due all property and other taxes, assessments and governmental charges or levies imposed upon, and all claims (including claims for labor, materials and supplies) against the Realty or the Mortgaged Property, except to the extent that the validity thereof is being contested in good faith by proper proceedings which stay the imposition of any penalty, fine or lien resulting from the non-payment thereof and with respect to which adequate reserves have been made and set aside for the payment thereof.

(e) The Pledgor shall, promptly on written demand therefor by any Pledgee, deliver to such Pledgee evidence of the Pledgor's ownership of any of the Pledged Collateral, the Realty and the Mortgaged Property.

(f) The Pledgor will, at its expense, maintain the Realty insured at all times as required under Section 6 of this Agreement.

3

(g) The Pledgor will comply in all material respects with all laws, ordinances, and regulations affecting the Realty and the Mortgaged Property.

(h) The Pledgor hereby irrevocably appoints the Pledgees as the Pledgor's attorney-in-fact and proxy, with full authority in the place and stead of the Pledgor and in the name of the Pledgor or otherwise, from time to time in the Pledgees' discretion, if an Event of Default (as such term is defined in Section 8 herof) shall have occurred and be continuing, to take any action and to execute any instrument that the Pledgees may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation, (i) to obtain and adjust insurance required to be paid to the Pledgees with respect to the Realty or the Mortgaged Property, (ii) to pay taxes, assessments or other charges or claims that the Pledgees in good faith believe to be then due with respect to the Pledged Collateral, the Realty or the Mortgaged Property, (iii) to ask, demand, collect, sue for, recover, compound, receive and give acquittance and receipt for moneys due and to become due under or in respect of the Pledged Collateral, the Realty or the Mortgaged Property, (iv) to receive, indorse and collect any drafts or other instruments, documents and chattel paper, and (v) to file any claims or take any action or institute any proceedings which either of the Pledgees may deem necessary to enforce the rights of the Pledgees with respect to the Pledged Collateral, the Realty and the Mortgaged Property. Pledgor hereby ratifies and approves all acts of the attorney-in-fact.

(i) If the Pledgor fails to perform any agreement contained herein or in Mortgage, upon written notice to Pledgor either one of the Pledgees may itself perform, or cause performance of, such agreement or obligation, and the expenses of the Pledgee taking such action incurred in connection therewith shall be payable by the Pledgor pursuant to the terms hereof.

(j) The powers conferred on the Pledgees under this Agreement are solely to protect the interests of the Pledgees in the Pledged Collateral, the Realty and the Mortgaged Property, and shall not impose any duty on either one of the Pledgees to exercise any such powers. Except for the safe custody of any Pledged Collateral in their possession and the accounting for monies actually received by them hereunder, the Pledgees shall not have any liability or duty as to any Pledged Collateral, the Realty or the Mortgaged Property or as to the taking of any necessary steps to preserve any rights pertaining to the Pledged Collateral, the Realty or the Mortgaged Property.

### 6. Insurance; Casualty and Condemnation

6.1 Insurance Policies; Flood Insurance.

(a) The Pledgor shall obtain and maintain, or cause to be maintained, insurance for the Pledgor and the Mortgaged Property providing at least the following coverages:

(i) so called "All Risk" or "Special Perils" property insurance on the Mortgaged Property;

(A) in an amount equal to one hundred percent (100%) of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) without depreciation;

(B) with no co-insurance requirement, or otherwise waiving all co-insurance provisions;

4

(C)   providing for no deductible in excess of Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) (the "<u>Required Deductible</u>") for all such "All Risk" or "Special Perils" property insurance coverage or such higher deductible if the Pledgor provides the Pledgees with cash or a letter of credit in an amount equal to the difference between the actual deductible and the Required Deductible; and

(D)   containing "Ordinance or Law Coverage" covering "Demolition Expense" of and the replacement value for the "Undamaged Portion" as well as the increased cost to reconstruct following a loss due to enforcement of laws and building regulations or ordinances regulating construction following a loss.

In addition, the Pledgor shall obtain (x) Earthquake insurance in form and substance reasonably satisfactory to Pledgor in the event the Mortgaged Property is located in an area with a high degree of seismic activity in an amount equal to the lesser (1) or 100% of the total insured value of the Mortgaged Property or (2) $30,000,000.00 prior to the second Settlement Payment and $19,000,000 prior to the third Settlement Payment and (y) Named Windstorm insurance, in form and substance reasonably satisfactory to the Pledgees in the event Windstorm coverage is excluded from the "All Risk" or "Special Perils" coverage, in an amount equal to the lesser of (1) 100% of the total insured value of the Mortgaged Property or (2) $30,000,000.00 prior to the second Settlement Payment and $19,000,000 prior to the third Settlement Payment, provided that deductibles for the insurance required pursuant to clause (x) or (y) shall not be greater than five percent (5%) of the total insured value at the Mortgaged Property.

In addition, if the Mortgaged Property is at any time a Flood Hazard Property (as such term is defined in Section 12 hereof), then the Pledgor shall provide to the Pledgees the Flood Insurance Documents (as such term is defined in Section 12 hereof) with respect thereto. Unless the Pledgor provides the Pledgees with the Flood Insurance Documents, the Pledgees may purchase Flood Insurance (as such term is defined in Section 12 hereof) meeting the requirements of clause (iii) of the definition of "Flood Insurance Documents" at the Pledgor's expense to protect the interests of the Pledgees. The Pledgor shall cooperate with the Pledgees in connection with compliance with the Flood Laws (as such term is defined in Section 12 hereof), including by providing any information reasonably required by the Pledgees in order to confirm compliance with the Flood Laws. If a Flood Redesignation (as such term is defined in Section 12 hereof) shall occur with respect to the Mortgaged Property, the Pledgees shall obtain a completed Flood Hazard Determination (as such term is defined in Section 12 hereof) with respect to the Mortgaged Property, and the Pledgor shall provide to the Pledgees the Flood Insurance Documents with respect thereto by not later forty-five (45) days after the date of the Flood Redesignation or any earlier date required by the Flood Laws. The Pledgor shall give to the Pledgees written notice of any Flood Compliance Event (as such term is defined in Section 12 hereof) (other than a Flood Redesignation) not less than forty-five (45) days prior to such Flood Compliance Event. For avoidance of doubt, the Pledgor shall provide, or re-provide, as the case may be, to the Pledgees the Flood Insurance Documents by not later than the date of the Flood Compliance Event and as a condition precedent to the occurrence of such Flood Compliance Event.

(ii)   Commercial General Liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Mortgaged Property, such insurance:

(A)   to be on the so called "occurrence" form with a limit of not less than One Million and No/100 Dollars ($1,000,000) per occurrence and Two Million and No/100 Dollars ($2,000,000) in the aggregate; and

5

(B)    to continue at not less than the aforesaid limit until required to be changed by the Pledgees in writing by reason of changed economic conditions making such protection inadequate; and

(iii)    at all times during which structural construction, repairs or alterations are being made, and only if the Mortgaged Property coverage form does not otherwise apply, the insurance provided for in subsection (i) shall be written on a Builder's Risk Completed Value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to subsection (i) above, (3) including permission to occupy the Mortgaged Property or no exclusion thereof, (4) in an amount equal to one hundred percent (100%) of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) without depreciation, and (5) written on a no-coinsurance form, or otherwise waiving all co-insurance provisions;

(iv)    if applicable, Comprehensive Boiler and Machinery insurance covering all pressure vessels and steam boilers (if any), mechanical equipment and electrical systems at the Mortgaged Property in amounts as shall be reasonably required by the Pledgees on terms consistent with the commercial property insurance policy required under subsection (i) above;

(v)    Umbrella Liability insurance in an amount not less than One Million and No/100 Dollars ($1,000,000) per occurrence;

(vi)    commercial auto liability coverage for all owned and non-owned vehicles, including rented and leased vehicles in the amount of $1,000,000 per occurrence;

(vii)    the Policies (as such term is defined hereinafter) will not contain an exclusion for acts of terrorism or if the Terrorism Risk Insurance Program Reauthorization Act of 2015 (as the same may be amended, restated, supplemented or otherwise modified from time to time) is not in effect and such Policies contain an exclusion for acts of terrorism, then provided that terrorism insurance is commercially available, the Pledgor shall obtain, to the extent available, a stand-alone policy that provides the same coverage as the Policies would have if such exclusion did not exist; provided, however, (x) that such stand-alone policy may have a deductible that is reasonable for such stand-alone policies with respect to properties similar to the Mortgaged Property and reasonable for the geographic region where the Mortgaged Property is located, so long as in no event shall such deductible exceed $50,000.00, and (y) Pledgor shall not be required to spend on terrorism insurance coverage more than two times the amount of the insurance premium that is payable at such time in respect of the property and business interruption/rental loss insurance required hereunder on a standalone-basis (without giving effect to the cost of terrorism and earthquake components of such casualty and business interruption/rental loss insurance), and if the cost of terrorism insurance exceeds such amount, Pledgor shall purchase the maximum amount of terrorism insurance available with funds equal to such amount; and

(viii)    upon sixty (60) days' notice, such other insurance and in such reasonable amounts as the Pledgees from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Mortgaged Property located in or around the region in which the Mortgaged Property is located if such other insurance is recommended by an independent, third party insurance consultant commissioned by any of the Pledgees and agreeable to the Pledgor, whose agreement will not be unreasonably withheld. The Pledgees agrees that it shall be responsible for all fees and expenses incurred in connection with the aforementioned insurance consultant.

All insurance provided for in this Section 6.1 shall be obtained under valid and enforceable policies (collectively, the "Policies" or, in the singular, the "Policy"), and shall be subject to the confirmation by

6

the Pledgees that the insurance companies, amounts, deductibles, loss payees and insureds satisfy the requirements expressly set forth herein. The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in Puerto Rico and having a claims paying ability rating of "A-" by Standard & Poor's Financial Services, LLC ("S&P). Not less than ten (10) days prior to the expiration dates of the Policies furnished to the Pledgees, certificates of insurance, including all applicable mortgagee clauses and additional insured policy language, accompanied by evidence satisfactory to the Pledgees of payment of the premiums due (the "Insurance Premiums"), shall be delivered by the Pledgor to the Pledgees.

(b) All Policies provided for or contemplated by Section 6.1(a), shall name the Pledgor as the insured and the Pledgees as the additional insured, as its interests may appear, and in the case of all risk property coverage, including but not limited to boiler and machinery, flood and earthquake insurance, shall contain a so called New York standard non-contributing mortgagee clause in favor of the Pledgees providing that the loss thereunder shall be payable to the Pledgees as a Loss Payee.

(c) As respects the Mortgaged Property coverage required herein;

(i) no act or negligence of the Pledgor, or anyone acting for the Pledgor, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as the Pledgees are concerned;

(ii) to the extent statutorily permitted, the Policies shall not be canceled without at least thirty (30) days' notice to the Pledgees; and

(iii) the Pledgees shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder.

(d) If at any time the Pledgees are not in receipt of written evidence that all Policies are in full force and effect, the Pledgees shall have the right, with written notice to Pledgor (of at least fifteen (15) Business Days unless either one of the Pledgees has a reasonable good faith belief that one or more of the Policies is not in full force and effect), to take such action as either one of the Pledgees reasonably deems necessary to protect the Pledgees' interests in the Mortgaged Property, including, without limitation, obtaining such insurance coverage as either one of the Pledgees in its sole discretion deems appropriate. The insurance may, but need not, protect the Pledgor's interest. The coverages that either one of the Pledgees purchases may not pay any claim that the Pledgor makes or any claim that is made against the Pledgor in connection with the Mortgaged Property. The Pledgor may later cancel any insurance purchased by either of the Pledgees, but only after providing the Pledgees with evidence that the Pledgor has obtained insurance as required by this Agreement. All premiums incurred by either of the Pledgees in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by the Pledgor to the corresponding Pledgee upon demand and, until paid, shall be secured by the Mortgage and shall bear interest at the interest rate sets forth in the Mortgage Note. The costs of the insurance may be added to the Obligations. The cost of the insurance may be more than the cost of insurance the Pledgor may be able to obtain on its own.

(e) Such Policies may be "blanket policies" covering multiple locations so long as the coverages for the Mortgaged Property provide the protections listed above.

6.2 Casualty; Application of Proceeds.

(a) Right to Adjust.

(i) If the Mortgaged Property or any part thereof is damaged or destroyed, in whole or in part, by fire or other casualty (a "Casualty"), the Pledgor shall give prompt written notice thereof to the Pledgees, generally describing the nature and extent of such Casualty. Unless otherwise expressly provided in this Agreement, following the occurrence of a Casualty, the Pledgor, regardless of whether proceeds are available, shall promptly proceed to restore, repair, replace or rebuild the portion(s) of the Mortgaged Property to the extent practicable to be of at least equal value and of substantially the same character as prior to the Casualty, all in accordance with the terms hereof.



(ii) In the event of a Casualty that involves a loss that does not exceed $1,000,000.00, and provided that no Event of Default has occurred and be continuing, the Pledgor may settle and adjust such claim, as long as such adjustment is carried out in a competent and timely manner. In such case, the Pledgor shall collect and receive any proceeds from the Pledgees and apply such proceeds to Restoration (as such term is defined hereinafter) in the Pledgor's discretion.

(iii) In the event of a Casualty that involves a loss that exceeds $1,000,000.00, Pledgor may settle and adjust such claim only with the written consent of both Pledgees and the Pledgees shall have the opportunity to participate, at the Pledgor's cost in any such adjustments.

(iv) Subject to Section 6.2(a)(ii), the proceeds of any Policy shall be due and payable solely to the Pledgees for their ratable benefit, and held and applied in accordance with the terms hereof.

(b) Borrower's Right to Apply to Restoration.

(i) In the event of a Casualty or a Condemnation (as such term is defined hereinafter), the Pledgees shall apply the proceeds (after reimbursement of any reasonable expenses incurred by the Pledgees) to reimburse the Pledgor for the cost of restoring, repairing, replacing or rebuilding the Mortgaged Property (the "Restoration") in the manner required hereby, provided and on the condition that:

(A) no Event of Default shall have occurred and be then continuing;

(B) the Restoration can be completed by the earliest to occur of:

(1) the 365th day following receipt of the proceeds; and

(2) the day scheduled for the third and last Settlement Payment.

(C) The Pledgor shall (1) commence settlement of the insurance claim within thirty (30) days after the date of the Casualty, (2) diligently pursue the preparation of plans and specifications, the issuance of all necessary permits and approvals, the execution of construction contracts, and all other actions necessary to commence Restoration, (3) commence Restoration as soon as

8

reasonably practicable (but in no event later than sixty (60) days after completion of the matters referred to in <u>clause (2)</u> above, and (4) diligently pursue each of the same to satisfactory completion;

(D)    Pledgor has delivered to the Pledgees an appraisal conducted by Cushman & Wakefield, CBRE or JLL of the Mortgaged Property stating a "as dark" appraised value for the Mortgaged Property of at least $17,400,000.00;

(E)    the Mortgaged Property and the use thereof after the Restoration will be in compliance with and permitted under all legal requirements, including, without limitation, all applicable zoning laws, ordinances, rules and regulations; and

(F)    the Restoration shall be done and completed by the Pledgor in an expeditious and diligent fashion and in compliance with all legal requirements and insurance requirements.

If any of the conditions set forth in the proviso in this <u>subsection (b)(i)</u> is not satisfied, then, notwithstanding anything herein to the contrary, or in the Settlement Agreement, the proceeds shall be applied to the prepayment of the Settlement Payments.

(ii)    Subject to <u>Section 6.2.(a)(ii)</u>, the proceeds shall be held by the Pledgees for their ratable benefit, and, until disbursed in accordance with the provisions hereof, shall constitute additional security for the Obligations under the Mortgage. The proceeds shall be disbursed by the Pledgees to, or as directed by, the Pledgor from time to time during the course of the Restoration, upon receipt of evidence reasonably satisfactory to the Pledgees that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full (less the Restoration Retainage as such term is hereinafter defined), and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other liens or encumbrances of any nature whatsoever on the Mortgaged Property which have not either been fully bonded to the reasonable satisfaction of the Pledgees and discharged of record or in the alternative fully insured to the reasonable satisfaction of the Pledgees by a title company.

(iii)    Subject to <u>Section 6.2(a)(iii)</u>, if the cost of the Restoration exceeds $1,000,000.00 and the proceeds are provided to the Pledgor to rebuild in accordance with <u>Section 6.2(b)(i)</u>, then the following shall apply: (a) all plans and specifications required in connection with the Restoration shall be subject to prior reasonable review and acceptance in all respects by the Pledgees and by an independent consulting engineer or other person selected by the Pledgees after consultation with the Pledgor (the "<u>Restoration Consultant</u>"), (b) no approval of the plans and specifications or working drawings for any Restoration or other alterations of the Mortgaged Property shall create any responsibility or liability on behalf of either Pledgee, or the Restoration Consultant for their completeness, design, sufficiency or their compliance with legal requirements or insurance requirements and (c) all out-of-pocket costs and expenses incurred by the Pledgees in connection with making the proceeds available for the Restoration including, without limitation, reasonable legal fees and disbursements and the Restoration Consultant's fees, shall be paid by Pledgor.

(iv)    In the context of a Restoration that exceeds $1,000,000.00, the Pledgees in no event shall be obligated to make disbursements of the proceeds in excess of an amount equal

9

to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Restoration Consultant, minus the Restoration Retainage; provided that, upon completion of each identifiable design element of the Restoration, and subject to the provisions of the last sentence of this paragraph (iv), the Pledgees shall release the related portion of the Restoration Retainage for the purpose of paying the contractors and other obligees with respect to such design element. The term "Restoration Retainage" means an amount equal to ten percent (10%) of the costs actually incurred for work in place as part of the Restoration, as certified by the Restoration Consultant. The Restoration Retainage shall in no event, and notwithstanding anything to the contrary set forth herein, be less than the amount actually held back by the Pledgor from contractors, subcontractors and materialmen engaged in the Restoration. The Restoration Retainage shall not be released until the Restoration Consultant certifies to the Pledgees that the Restoration has been completed in accordance with the provisions of this Section 6.2(b) and that all approvals necessary for the re-occupancy and use of the Mortgaged Property have been obtained from all appropriate governmental authorities, and the Pledgees receives evidence reasonably satisfactory to the Pledgees that the costs of the Restoration have been paid in full or will be paid in full out of the Restoration Retainage; provided, however, that the Pledgees will release the portion of the Restoration Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Restoration Consultant certifies to the Pledgees that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, and the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by the Pledgees. If required by the Pledgees, the release of any such portion of the Restoration Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(v)    The Pledger shall not be obligated to make disbursements of proceeds more frequently than once every calendar month.

(vi)    If at any time the proceeds or the undisbursed balance thereof shall not, in the reasonable opinion of the Pledgees, be sufficient to pay in full the balance of the costs which are estimated by the Restoration Consultant to be incurred in connection with the completion of the Restoration, the Pledgor shall deposit the deficiency (the "Net Proceeds Deficiency") in immediately available funds with the Pledgees before any further disbursement of proceeds shall be made. The Net Proceeds Deficiency deposited with the Pledgees shall be held by the Pledgees and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the proceeds, and until so disbursed pursuant to this Section 6.2(b) shall constitute additional security for the Obligations under the Mortgage.

(vii)    The excess, if any, of the proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with the Pledgees after the Restoration Consultant certifies to the Pledgees that the Restoration has been completed in accordance with the provisions of this Section 6.2(b), and the receipt by the Pledgees of evidence reasonably satisfactory to them that all costs incurred in connection with the Restoration have been paid in full, shall be remitted by the Pledgees to the Pledgor, provided no Event of Default shall have occurred and be continuing.

6.3 Condemnation.    The Pledgor shall promptly give the Pledgees written notice of the actual or threatened commencement of any condemnation or eminent domain proceeding affecting the Mortgaged Property (a "Condemnation") and shall deliver to the Pledgees copies of any and all papers served in connection with such Condemnation. Following the occurrence of a Condemnation, Pledgor, regardless of whether Proceeds are available, shall promptly proceed to the Restoration the same to the extent practicable to be of at least equal value and of substantially the same character as prior to such Condemnation, all to

10

be effected in accordance with the terms of this Agreement applicable to Restorations. If the loss is less than $1,000,000.00 and no Restoration is required hereunder, the Pledgor may retain the award if no Event of Default has occurred and be continuing.

Provided no Event of Default has occurred and is continuing, (x) in the event of a Condemnation where the loss does not exceed $1,000,000.00, the Pledgor may settle and compromise such Proceeds, provided that the same is effected in a competent and timely manner, and (y) in the event of a Condemnation where the loss exceeds $1,000,000.00, the Pledgor may settle and compromise the award only with the consent of Pledgees and the Pledgees shall have the opportunity to participate, at the Pledgor's cost, in any litigation and settlement discussions in respect thereof. Notwithstanding any Condemnation by any public or quasi-public authority (including any transfer made in lieu of or in anticipation of such a Condemnation), the Pledgor shall continue to pay the Obligations under the Settlement Agreement at the time and in the manner provided for therein. The Pledgor shall cause any award that is payable to the Pledgor to be paid directly to the Pledgees, to be held and applied in accordance with the terms hereof.

6.4 Payment of Obligations. No Casualty or Condemnation shall affect the Pledgor's continuing obligation to pay the Settlement Payments.

7. **Remedies Upon Default.** If any default or event of default on the part of Kmart under the Settlement Agreement shall have occurred and be continuing (each an "Event of Default"):

    (a) Either one of the Pledgees, acting singly may exercise in respect of the Pledged Collateral, in addition to other rights and remedies provided for herein or otherwise available to it at law or in equity, all of the rights and remedies of a secured party under the applicable laws of the Commonwealth of Puerto Rico. Without limiting the generality of the foregoing, each Pledgee, acting singly may foreclose the Mortgage without first exercising any rights to foreclose on the Pledged Collateral.

    (b) All cash proceeds in respect of any sale of, collection from, or other realization upon the Pledged Collateral and/or received by the Pledgee that filed the mortgage foreclosure action shall be applied in whole against the Obligations which shall be distributed between the Pledgees on a pro rata basis as provided in Section 1 of the Settlement Agreement. Any surplus of such cash or cash proceeds held by the Pledgees and remaining after payment in full of all of the Obligations shall be paid over to the Pledgor or to such person as may be lawfully entitled to receive such surplus in accordance with the Settlement Agreement.

8. **Foreclosure of Mortgage.** If the Mortgage is foreclosed upon the occurrence of an Event of Default, the Mortgaged Property covered thereunder, or any interest therein, may, at the discretion of the Pledgee assenting the foreclosure action, be sold in one or more parcels or in several interests or portions and in any order or manner. Pledgor waives and releases any right to have any of the Realty or the Mortgaged Property marshaled.

9. **Indemnity and Expenses.** The Pledgor agrees to indemnify each Pledgee from and against any and all claims, losses and liabilities growing out of or resulting from this Agreement and the Mortgage (including, without limitation, enforcement of this Agreement and the Mortgage). The Pledgor will upon demand of the Pledgees pay to the Pledgees the amount of any and all costs and expenses, including the fees and expenses of their respective real estate counsel and of any experts and agents, which any of the Pledgees may incur in connection with (i) the administration of this Agreement and of the Mortgage, (ii) the custody, preservation or the sale of, collection from, or other realization upon, the Pledged Collateral, the Realty and the Mortgaged Property, (iii) the exercise or enforcement of any

of the rights of any of the Pledgees hereunder or under the Mortgage, or (iv) the failure by the Pledgor to perform or observe any of the provisions hereof or of the Mortgage. Such costs, expenses and fees shall be secured by the lien of the pledge made hereunder.

10. **Lien Interest Absolute.** Except as otherwise expressly provided herein and in the Settlement Agreement, all rights of the Pledgees hereunder and the lien created hereunder, and all obligations of the Pledgor hereunder, shall be absolute and unconditional, and shall not be affected or released in any way, irrespective of:

(a) Any lack of validity or enforceability of the Settlement Agreement, the Mortgage Note, the Mortgage, or any other agreement or instrument relating thereto, so long as indefeasible payment in full in cash has not been received by the Pledgees with respect to any outstanding Obligations; or

(b) Any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of, or any consent to departure from, this Agreement, the Mortgage, the Mortgage Note, the Settlement Agreement or any other related document, including, but not limited to, (i) any increase or decrease in any such Obligations and (ii) any amendment of the Settlement Agreement or any other related document; or

(c) Any taking and holding of collateral (which term for purposes of this Agreement includes, but is not limited to, the Pledged Collateral) or additional guaranties for all or any of the Obligations; any amendment, alteration, exchange, substitution, transfer, enforcement, waiver or subordination of any collateral or guaranty; or the termination, release or non-perfection of any collateral (other than with respect to the Pledged Collateral, the Realty and/or the Mortgaged Property) or guaranty or any consent to departure from any security agreement or guaranty with respect thereto; or

(d) Any manner of application of collateral, or proceeds thereof, to all or any of the Obligations or the manner of sale of any collateral; or

(e) Any consent by any Pledgee to (i) a change, restructuring or termination of the corporate or partnership structure or existence, as the case may be, of the Pledgor or any of its affiliates and (ii) any corresponding restructuring of, or any other restructuring of the Obligations or any portion thereof; or

(f) Any modification, compromise, settlement or release by the any of the Pledgees, or, by operation of law or otherwise, collection or other liquidation of the Obligations or the liability of the Pledgor or any guarantor, or of any collateral, in whole or in part, and any refusal of payment by the any of the Pledgees, in whole or in part, from any obligor or guarantor in connection with any of the Obligations, whether or not with notice to, or further assent by, or any reservation of rights against, the Pledgor.

Without limiting the generality of the foregoing, the Pledgor hereby consents to, and hereby agrees, that the rights of the Pledgees hereunder, and the liability of the Pledgor hereunder, shall not be affected by any and all releases of any collateral (other than any Pledged Collateral specifically released by the Pledgees) from the liens created by the Settlement Agreement or any other agreement or instrument. This Agreement shall continue to be so long as any of the Obligations shall remain outstanding.

12

11. **Notices.** All notices and other communications provided for hereunder shall be in writing and shall be mailed, faxed, e-mailed or delivered, to the address set forth in the Settlement Agreement, all in the manner and to be effective as provided in the Settlement Agreement.

12. **Defined Terms.**

As used in this Agreement, the following terms shall have the meanings specified below (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Business Day" means any day of the year that is not a Saturday, Sunday or other day on which commercial banks in New York City or Puerto Rico are authorized or required by law to remain closed.

"Flood Compliance Event" means the occurrence a Flood Redesignation with respect to the Mortgaged Property.

"Flood Hazard Determination" means a "Life-of-Loan" FEMA Standard Flood Hazard Determination obtained by the Pledgees.

"Flood Hazard Property" means the Mortgaged Property to the extent that, on the relevant date of determination, the Mortgaged Property includes a building and, as shown on a Flood Hazard Determination, such building is located in a Special Flood Hazard Area.

"Flood Insurance" means (a) federally-backed flood insurance available under the National Flood Insurance Program to owners of real property improvements located in Special Flood Hazard Areas in a community participating in the National Flood Insurance Program or (b) to the extent permitted by the Flood Laws, a private flood insurance policy from a financially sound and reputable insurance company that is not an affiliate of the Pledgor.

"Flood Insurance Documents" means (a) evidence as to whether the Mortgaged Property is a Flood Hazard Property pursuant to a Flood Hazard Determination, and (b) if the Mortgaged Property is a Flood Hazard Property, (i) evidence as to whether the community in which the Mortgaged Property is located is participating in the National Flood Insurance Program, (ii) the Pledgor's written acknowledgment of receipt of written notification from the Pledgees as to the fact that the Mortgaged Property is a Flood Hazard Property and as to whether the community in which such Flood Hazard Property is located is participating in the National Flood Insurance Program and (iii) copies of the Pledgor's application for a Flood Insurance policy plus proof of premium payment, a declaration page confirming that Flood Insurance has been issued, or such other evidence of Flood Insurance, in an amount equal to at least the amount required by the Flood Laws and naming the Pledgees as sole loss payee and mortgagee, and otherwise including terms satisfactory to the Pledgees.

"Flood Laws" means the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973, as revised by the National Flood Insurance Reform Act of 1994, and as the same may be further amended, modified or supplemented, and including the regulations issued thereunder.

"Flood Redesignation" means the designation of the Mortgaged Property as a Flood Hazard Property where such property was not a Flood Hazard Property previous to such designation.

13. **Miscellaneous**.

(a) No amendment of any provision of this Agreement shall be effective unless it is in writing and signed by the Pledgor and each of the Pledgees and no waiver of any provision of this Agreement, and no consent to any departure by the Pledgor therefrom, shall be effective unless it is in writing and signed by the either of the Pledgees, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No failure on the part of the any of the Pledgees to exercise, and no delay in exercising, any right hereunder, under the Mortgage, the Settlement Agreement or any other related document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.

(b) The rights and remedies of the Pledgees provided herein, in the Mortgage, in the Settlement Agreement and in any of the other related documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law. The rights of the Pledgees hereunder, under the Mortgage, the Settlement Agreement or under any other related document against any party thereto are not conditional or contingent on any attempt by the Pledgees to exercise any of their respective rights under any document related to the Settlement Agreement against such party or against any other person.

(c) Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

(d) This Agreement creates a continuing security interest in the Pledged Collateral and shall (i) remain in full force and effect until the payment in full of the Obligations, (ii) be binding upon the Pledgor, its successors and assigns, and (iii) inure, together with the rights and remedies of the Pledgees hereunder, to the benefit of each of the Pledgees and their respective successors, transferees and assigns. None of the rights and obligations of the Pledgor hereunder may be assigned or otherwise transferred without the prior written acceptance of each of the Pledgees.

(e) Upon payment in full of the Obligations, the Pledgees shall, upon the Pledgor's request and at the Pledgor's expense, surrender the Pledged Collateral, with any necessary endorsement, to the Pledgor.

(f) This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico.

(g) In the event of any inconsistency between this Agreement and the Settlement Agreement relating to collateral security provisions, the terms hereof shall be controlling as necessary to create, preserve and/or maintain a valid, enforceable and perfected lien upon the Pledged Collateral and in all matters related to insurance requirements, the application of insurance proceeds to a Restoration in the context of a Casualty or of an award in the context of a Condemnation, but otherwise, the provisions of the Settlement Agreement shall be controlling.

(h) THE PLEDGOR AND EACH OF THE PLEDGEES HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

IN WITNESS WHEREOF, the Pledgor has caused this Agreement to be executed and delivered by its duly Authorized Representative as of the date first above written.

**SEARS ROEBUCK DE PUERTO RICO, INC.**

By: _____
Name:  Dilia María Peña Fontanes
Title:   Controller

Affidavit No. -2889-

Acknowledged and subscribed before me in San Juan, Puerto Rico, on this 12th day of January, 2018 by the following person who is personally known to me: Dilia María Peña Fontanes, of legal age, married, executive and resident of San Juan, Puerto Rico, in her capacity as Controller of **SEARS ROEBUCK DE PUERTO RICO, INC.**

_____
Notary Public

**ACCEPTED AND AGREED TO
AND POSSESSION OF THE PLEDGED COLLATERAL ACKNOWLEDGED,**
as of the day above indicated:

**JAMES GARBE – RELATOR,**
by Carl Ireland, as guardian for
James Garbe and his estate

By: _____
Name:  Alexandra L. Pérez Pérez
Title:   Attorney-in-Fact



15

**THE UNITED STATES OF AMERICA,**
through the United States Department of Justice, Civil Division, Commercial Litigation Branch

By: _____/s/_____
Name: Héctor E. Ramírez Carbó
Title: Assistant U.S. Attorney, Chief Civil Division

16