WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Paul R. Genender
Jared R. Friedmann
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x

|  |  |  |
|---|---|---|
| **In re** | : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION,** *et al.,* | : | **Case No. 18-23538 (RDD)** |
| **Debtors.** [1] | : | **(Jointly Administered)** |

----------------------------------------------------------------x

**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF**
**DEBTORS' BRIEF IN OPPOSITION TO TRANSFORM HOLDCO LLC'S ADVERSARY**
**COMPLAINT AND IN FURTHER SUPPORT OF DEBTORS' SUPPLEMENTAL MOTION**
<u>**TO ENFORCE THE ASSET PURCHASE AGREEMENT**</u>

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC  (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT ..............................................................................................................................2

I.    The Debtors Did Not Have "Available Cash" at the Moment of Closing ..........................2

II.   Buyer's Ordinary Course Arguments Have No Merit .....................................................13

      A.    Buyer's Novel and Myopic Contractual Interpretation Fails................................15

      B.    Buyer Has Not Established Any Facts to Support its Arguments ........................19

      C.    Buyer Should Be Precluded From Arguing Breach of the Ordinary Course
            Provision .........................................................................................................21

III.  Buyer Is Responsible For Paying, Discharging Or Bonding Over Mechanics'
      Liens Related to Lease Premises and Sparrow Properties ................................................24

CONCLUSION..........................................................................................................................26

RESERVATION OF RIGHTS ...................................................................................................27

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.W. Fin. Servs., S.A. v. Empire Res., Inc.*,
   981 A.2d 1114 (Del. 2009) ...............................................................................17, 18

*Aspen Advisors LLC v. United Artists Theatre Co.*,
   861 A.2d 1251 (Del. 2004) ...................................................................................18

*Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*,
   702 A.2d 1228 (Del. 1997) .....................................................................................3

*Huatuco v. Satellite Healthcare*,
   No. CV 8465-VCG, 2013 WL 6460898 (Del. Ch. Dec. 9, 2013), *aff'd*, 93
   A.3d 654 (Del. 2014) .............................................................................................18

*Klaassen v. Allegro Dev. Corp.*,
   106 A.3d 1035 (Del. 2014) ....................................................................................21

*Lehman Bros. Holdings Inc. v. Spanish Broad. Sys. Inc.*,
   No. 8321-VCG, 2014 WL 718430 (Del. Ch. Feb. 25, 2014).............................21, 22

**Statutes**

Ill. Comp. Stat. 120/2a ...............................................................................................18

Ill. Comp. Stat. 120/5..................................................................................................18

**Other Authorities**

Black's Law Dictionary (11th ed. 2019)......................................................................16

Oxford English Dictionary,
   https://www.oed.com/view/Entry/133247?redirectedFrom=otherwise#eidhttps
   ://www.oed.com/view/Entry/133247?redirectedFrom=otherwise#eid....................16

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Sears Holdings Corporation and certain of its affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), the sellers under that certain Asset Purchase Agreement, dated January 17, 2019 (as amended on February 11, 2019, and as amended or modified from time to time, the "**APA**"),[1] by and among Transform Holdco LLC (the "**Buyer**"), the Debtors and certain of its subsidiaries (collectively, the "**Sellers**", and together with the Buyer, the "**Parties**"), respectfully submit this Supplemental Memorandum of Law in Support of *Debtors' Brief in Opposition to Transform Holdco LLC's Adversary Complaint and in Further Support of Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* ("**Brief**") [ECF No. 4430] and in further support of the *Debtors' Supplemental Motion To Enforce The Asset Purchase Agreement* (collectively, "**Supplemental Motion to Enforce**") [ECF No. 4029] and in response to Buyer's *Supplemental Memorandum of Law in Support of Transform Holdco LLC's Adversary Complaint* ("**Buyer's Brief**") [ECF No. 4767].

## PRELIMINARY STATEMENT

1.      At the July 11, 2019 hearing (the "**Hearing**"), the Court left several items open for further consideration.  This Brief addresses three of those items: (1) the parol evidence relevant to determine the meaning "available cash" as that term is used in the definition of "Aggregate DIP Shortfall Amount" in the APA; (2) whether the Debtors violated the APA's Ordinary Course of Business ("**Ordinary Course**") provisions; and (3) whether Buyer is

---

[1] Capitalized terms used in this Brief but not otherwise defined herein will have the meanings set forth in the Supplemental Motion to Enforce or the *Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith and (IV) Granting Related Relief* [ECF No. 2507] as applicable.

1

responsible for paying, discharging or bonding over mechanics' liens related to Lease Premises and Sparrow Properties.

## ARGUMENT

### I.    The Debtors Did Not Have "Available Cash" at the Moment of Closing

2.        Section 10.10 of the APA required the Debtors to pay down the DIP Credit Agreement ("**Senior DIP**") to an amount no greater than $850 million as a closing condition. Failing to pay the Senior DIP down to that amount would have given Buyer the right to back out of (or renegotiate) the deal.[2]  And, overpaying the Senior DIP resulted in a dollar-for-dollar reduction of liabilities that Buyer was required to assume since it would result in the Debtors receiving a cash infusion at close equal to the amount of the overpayment (i.e., the difference between the $850 million received from Buyer to pay off the Senior DIP and the amount actually remaining to be paid off).  Specifically, the APA defined the "Aggregate DIP Shortfall Amount" to mean "as of the Closing Date, an amount equal to $1,200,000,000 less aggregate amounts required to be paid (net of any ***available cash***) to fully satisfy the existing indebtedness of Seller under both (i) the DIP Credit Agreement and (ii) the Junior DIP Term Loan Agreement."  APA § 1.1 (emphasis added).  Section 2.3(k)(vi) in turn provides that, to the extent there is an Aggregate DIP Shortfall Amount, Buyer receives a dollar-for-dollar reduction of, first, the Severance Reimbursement Obligations, second, the Other Payables, and third, the Assumed 503(b)(9) Claims.  *Id.* § 2.3(k)(vi).

---

[2] *See* Declaration of Jessie B. Mishkin ("**Mishkin Decl.**"), Ex. A (Deposition of Kunal Kamlani, dated Aug. 15, 2019 ("**Kamlani Dep.**") at 101:20-102:23 (testifying that had the Debtors not paid the DIPs balance down to $1.2 billion at Closing, Buyer would have had the choice not to close, and that Buyer had structured its financing based on that closing condition).

3.      The Senior DIP was paid down through daily sweeps of the Debtors'
concentration accounts (the "**Concentration Accounts**")—the last of which took place at 3:00
p.m. each business day.  After that final sweep, a sum of cash would sometimes accrue that was
available to pay down the Senior DIP, but that would not be swept until the earliest sweep the
following business day.  *See* Mishkin Decl. Ex. B (Deposition of Robert Riecker, dated August
20, 2019 ("**Riecker Dep. II**") at 25:23-27:5); Kamlani Dep. at 42:25-44:8.  For that reason, the
Aggregate DIP Shortfall Amount is calculated as "net of any available cash," meaning that at the
time of Closing, *i.e*., February 11, 2019 at 12:01am, any cash in the Debtors' Concentration
Accounts, which was available to pay down the Senior DIP, but simply had not yet been swept,
also would count toward the Aggregate DIP Shortfall Amount.  As it turned out, at the time of
close, there was no "available cash" in the Concentration Accounts, so the only amounts to be
applied to the Aggregate DIP Shortfall Amount was the $243,249 by which the Debtors overpaid
the Senior DIP.[3]

4.      At the Hearing, the Court held that because the term "available cash" was
not defined in the APA, there was ambiguity regarding what it meant in APA Section 1.1.  More
specifically, the Court held that it needed parol evidence to determine whether the Parties intended
for any Cash-in-Transit at the time of closing to fall within "available cash" as of the Closing Date.
*See* Mishkin Decl. Ex. C (July 11 Hr'g Tr. at 297:12-298:4).

---

[3] Even though daily sweeps caused the Concentration Accounts to be swept down to zero, "available cash" as used in the APA is not mere surplusage.  The "available cash" clause of the Aggregate DIP Shortfall Amount provision protected Buyer in the event of one of two possibilities that could have arisen if the Debtors had outperformed their DIP projections: (i) the Debtors had paid down the DIP below $850 million before the date of Closing, and Bank of America Merrill Lynch ("**BAML**") agreed to stop the automatic sweeps (as it did) and additional cash was subsequently swept into the Concentration Accounts from the regional banks; or (ii) cash ended up being swept and/or deposited into the Concentration Accounts between the last sweep on the last business day immediately prior to the close and 12:01 am on the day of Closing.  Good Second Suppl. Decl. ¶ 6.

3

5.    In construing an ambiguous contractual provision, a court "should consider any admissible extrinsic evidence that may shed light on the expectations of the parties at the time they entered into the [a]greement." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del. 1997).  Specifically, the court "may consider evidence of prior agreements and ***communications*** of the parties as well as trade usage or ***course of dealing***." *Id.* (emphases added).  As demonstrated below, all of the relevant parol evidence submitted by the parties demonstrates that "available cash" at the time of the Closing did not include "Cash-in-Transit" as those two terms were used by the Debtors and Buyer alike.

6.    As reflected in the Debtors' business records, numerous email correspondence between the Debtors and Buyer (including emails authored by Mr. Kamlani), and the daily cash forecasts (the "**Daily Cash Forecasts**") sent by the Debtors to Buyer, the term "available cash" was consistently used prior to the execution of the APA to identify the amount of cash that was available *at a particular time* to be used to pay down the Debtors' pre-petition Revolving Credit Facility and, later, their post-petition Senior DIP.

7.    Significantly, "available cash" was distinguished from other cash in the company that was not *at that time* available to be used to pay down the Senior DIP.  Such "unavailable cash" included cash in escrow or security accounts, credit card receivables, cash in stores, cash in regional banks, and what the company referred to as "Cash-in-Transit," meaning cash that was in the process of moving by armored carrier or otherwise from stores to bank accounts or from regional accounts to Concentration Accounts.  *See, e.g.*, Mishkin Decl. Ex. D (Email from R. Prakash to K. Kamlani, dated Nov. 2, 2018); *id.*, Ex. E (June 14, 2019 E&Y Presentation) at 19-20 (describing unavailability of "Cash-in-Transit" in light of the 4-6 business

4

day lag between stores reporting cash and cash being deposited in corresponding store bank accounts).

8.    Except for a brief period between the Petition Date and the Final DIP Order, at all times from May 2017 through the Closing, the Debtors operated under a cash dominion policy (the "**Cash Dominion Policy**").  *See Second Supplemental Declaration of Christopher A. Good in Support of the Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* ¶ 3 ("**Good Second Suppl. Decl.**").  Under the Cash Dominion Policy, all available cash—i.e., any positive balance—in the Debtors' two Concentration Accounts was swept twice each day to pay down the Debtors' Revolving Credit Facility or Senior DIP balance.  *Id.*; *see also* Mishkin Decl., Ex. F (Deposition of Rajat Prakash, dated Aug. 20, 2019 ("**Prakash Dep.**") at 13:24-14:3 ("[B]ecause we were in cash dominion, cash from Concentration Accounts is swept to pay down the revolver.  Then companies – the company borrows on the revolver to make disbursements is generally how it happens."))[4]

9.    Once the Debtors began operating under the Cash Dominion Policy— whether pre- or post-petition—managing availability of cash to pay down the credit facilities under the applicable borrowing base to avoid a default became crucial.  Good Second Suppl. Decl. ¶ 4; *see also* Kamlani Dep. at 35:10-36:3 ("[M]anaging the company's revolving credit facility was extremely important to the company . . . .  [C]ash and available liquidity is the lifeline of the company.  It's important.").  Managing that availability required, *inter alia*, closely tracking the

---

[4] *See also Final Order (I) Authorizing The Debtors To (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens And Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection To The Prepetition Secured Parties; (III) Modifying The Automatic Stay; and (IV) Granting Related Relief* [ECF No. 955] ("**DIP Order**") at Ex. A, p. 99 (DIP ABL Credit Agreement § 6.01(m) (describing daily sweep of DDAs (i.e., Regional Bank Accounts) to Blocked Accounts to Agent's Account (i.e., Concentration Accounts))).

cash that was actually available each day to (1) determine the Debtors' net availability under the applicable borrowing base ("**Net Availability**"), and (2), if there were remaining Net Availability, borrow money to make disbursements to meet the Debtors' obligations.  Good Second Suppl. Decl. ¶ 4.  This meant forecasting available cash that was *actually* in the Concentration Accounts and *available* to be swept to pay down the Revolving Credit Facility or the Senior DIP.  *Id.*

10.    Each of Buyer's witnesses confirmed that "available cash" was the term used by the Debtors and Buyer prior to the execution of the APA to refer to cash that was currently in the Debtors' Concentration Accounts and therefore available to pay down the Senior DIP. Robert Riecker, who was the Debtors' CFO pre-Closing and now serves as Buyer's CFO testified as follows:

> Q.  Do you recall the company also using the term "available cash"?
>
> A.   Loosely—my loose definition of that would be sometimes overnight we would have cash that's available, but it did not get in time—did not get put into an account in time **in order to be— pay down the revolving credit facility**.  So I may have borrowed—all deposits—any day all deposits went in to pay down the revolving credit facility. They got swept and they paid down.  Then I was allowed to borrow.  **I may have borrowed more money than the disbursements I was going to make that day and if I did that, I parked it in an account and that became available cash**.
>
> Q.  What account would you park that money in?
>
> A.  **I believe it went into an account that then got automatic—into an account that was automatically swept back to the—to pay down the revolver**.
>
> Q.   So back into **the concentration account that was otherwise being swept**?
>
> A.  **Correct**.

Riecker Dep. II at 25:23-27:5 (objections to form omitted) (emphasis added).  On redirect, Mr. Riecker further testified that:

> Q.  And in what context did you use the term "available cash" before the closing of the APA?

6

> A.  In the context that it was ***available to pay down the revolver*** at some point in time.

*Id.* at 80:11-15 (emphasis added).  Rajat Prakash, who served as the Assistant Treasurer for the Debtors and now is in that same capacity for Transform, testified as follows with respect to the Daily Cash Forecasts that he was responsible for circulating to the Debtors and Buyer, and which tracked the Debtor's "available cash":

> Q.  What comprises the available cash balance?
>
> A.  I mean, in the context of cash flow forecasting, available cash balance, when we write here, is ***essentially cash that's sitting in our concentration accounts that has not yet paid down the revolver***. It's mainly that.

Prakash Dep. at 17:1-8 (objections to form omitted) (emphasis added).  Kunal Kamlani, President of ESL Investments, testified to the same:

> Q.  [W]hat categories were listed as available cash in those daily forecasts?
>
> A.  ***Available cash*** [as reported in Debtor's Daily Cash Forecast] typically was cash that would come in after the cutoff time for which it could be put in the concentration account and—let me restate that. Let's strike that.  I don't know the exact time the revolver sweeps, but for this conversation, let's assume it's 2:00 p.m. Let's assume we sell a piece of real estate, and it closes at 3:00 p.m.  So $30 million comes in.   $30 million comes in.  The cash is available to the company.   But we missed the cutoff to put it into the concentration account, so the next day, ***the 30 million would go from available cash into the concentration account. It would get swept, and it would pay down the revolver***.

Kamlani Dep. at 42:25-44:8 (objection to form omitted) (emphasis added).

> 11.    Any doubt that this is exactly what the Parties were referring to as "available cash" when they inserted that term in the definition of Aggregate DIP Shortfall Amount is eliminated by Buyer's January 9, 2019 Bid Letter that Buyer submitted as an attachment to Mr. Kamlani's declaration.  In that letter, Buyer proposed the mechanism that would become the Aggregate DIP Shortfall Amount:

> In the event that the sum of the amounts outstanding under Debtors' first lien ABL DIP facility and Debtors' junior DIP facility (***net of any cash available to pay down such amounts***) is less than $1.2 billion at the time of closing the proposed transactions, Buyer's obligation to assume the foregoing liabilities shall be reduced dollar-for-dollar to the extent of such shortfall.

*Supplemental Declaration of Kunal S. Kamlani in Support of Transform Holdco LLC's Adversary Complaint* [ECF No. 4770] ("**Suppl. Kamlani Decl.**") Ex. C (emphasis added).  As Mr. Kamlani confirmed, in ESL's bid letter, the phrase "cash available to pay down such amounts" referred to the amounts outstanding under the Senior DIP.  *See* Kamlani Dep. at 54:10-23.

12.    Cash-in-Transit on the other hand was not, and could not be, "available cash" because it was not available to be used to pay down the Debtors' Senior DIP.  The parol evidence and testimony on this issue is undisputed.  Communications between the Debtors' advisors and the Buyer in advance of the execution of the APA made clear that the Parties and their advisors understood that Cash-in-Transit was considered "unavailable cash" for purposes of paying down the Senior DIP.  For example, on October 19, 2018, Mr. Prakash wrote to Mr. Lampert that "unavailable cash" includes "cash in stores, cash in transit, etc."  Meghji Declaration Ex. A.  Similarly, on October 22, 2018, Mr. Kamlani wrote to M-III that "The unavailable cash (in transit) as of 10/19 was 412 [million]."  Mishkin Decl. Ex. G; *see also* Kamlani Dep. at 96:5-99:4 (testifying that he was referring to "Cash-in-Transit," which was "cash that is not in the concentration account, and therefore is unavailable on that day to pay down the revolver," and was considered by the Debtors in the daily cash forecasts as "unavailable cash because it us unavailable to pay down the revolver").

13.    Mr. Riecker testified that Cash-in-Transit is cash "between a store and a regional bank, a regional bank to an operating account," and is therefore not available to pay down the Senior DIP.  *See* Riecker Dep. II at 49:3-50:10.  Likewise, Mr. Prakash testified that cash in an

8

armored truck or regional bank accounts could not be used to pay down the revolver or make other disbursements until it reached the Concentration Accounts. *See* Prakash Dep. at 21:16-22:17.

14.    The same is true with respect to other categories of "unavailable cash," including cash in regional banks. As Mr. Prakash explained to Mr. Kamlani in email correspondence in November 2018: "Please see the specific components of ***Unavailable Cash***," which included "***Cash in regional banks***." Mishkin Decl. Ex. D (emphasis added). When Mr. Kamlani asked what the cash in the regional banks was for, Mr. Prakash explained that it was, for example, cash that had been picked up by armored car and deposited in a local bank, and had "***not yet reached the company's concentration account for [the Company] to be able to use it.***" *Id.* (emphasis added); *see also* Kamlani Dep. at 29:7-20, 30:17-21, 31:8-34:18. Buyer's CFO, Mr. Riecker, also confirmed that post-petition, the Debtors considered "unavailable cash" to refer to "***cash that was not available to the company to pay down its revolving credit facility***, whether that be because it was held in an account that does not get swept or it was just cash within the system, ***meaning from the store to a regional bank to our sweep accounts***." Mishkin Decl. Ex. H (Deposition of Robert Riecker, dated June 19, 2019 ("**Riecker Dep.**") at 59:18-25) (emphasis added).

15.    Likewise, Mr. Kamlani wrote in an e-mail on January 3, 2019:

> We have assumed that there is approx. $100M of ***cash in the "Unavailable Cash" bucket***, which as of yesterday shows $357M for 2/1, that is ABL collateral. ***Upon the closing of a transaction we understand that that cash would be used to pay down the ABL***. Depending on where that cash comes from we understand we would need to build it up . . . . ***It is not clear to me that if it comes out of regional bank accounts that we would need to replenish***.

Mishkin Decl. Ex. I (emphasis added); *see also* Kamlani Dep. at 83:24-86:25 (confirming that the second "it" in his final sentence referred to cash in the "unavailable cash" bucket).

9

16.     In advance of the Closing, the Debtors swept *all* of the available cash from their Concentration Accounts in order to meet the closing condition in APA Section 10.10 and reduced the outstanding DIP indebtedness to $1,199,756,675, causing an Aggregate DIP Shortfall Amount (*i.e.*, an overpayment) of $243,249.  *Declaration of Christopher A. Good in Support of the Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* [ECF No. 4031] ¶ 5. As Buyer's own CFO testified:

> Q.  To the best of your knowledge, was ***every available dollar*** that the debtors had at the closing ***used to pay down the outstanding DIP*** indebtedness?
>
> A.  Based upon the automatic sweeps that happened, based on the rules for giving DIP financing, ***yes***.

Riecker Dep. at 59:18-25 (emphasis added).[5]

17.     Buyer's post-hoc interpretation of "available cash" as used in the APA to mean cash that was "available" according to GAAP accounting methods (as opposed to the company's historical and current use of that term) is without merit.  To the extent Buyer is using GAAP accounting to support its interpretation of what was "available cash" at Closing, the Court has already applied the layman's meaning, rather than GAAP methods, to a particular undefined term where, as here, the APA does not state that GAAP methods apply.  *See* July 11 Hr'g Tr. at 177:17-24 (COURT: "[A]ccounts receivable in the definition is not in quotes, it's not stated

---

[5] At his deposition, Mr. Kamlani suggested that Buyer could have easily moved cash in regional banks into the Concentration Accounts as of Closing, and that all the Debtors had to do to have operational control of cash in regional banks was to pick up a phone and call in a wire transfer (*see* Kamlani Dep. at 62:5-63:4).  This claim is divorced from reality.  As testimony from both Mr. Kamlani (contradicting himself) and Mr. Prakash confirmed, the Debtors did everything they could to accelerate the movement of Cash-in-Transit into the Concentration Accounts by Closing in order to meet the closing condition of paying down the DIP facility.  *See id.* at 38:17-39:8 (testifying that the Debtors attempted to accelerate moving cash into the Concentration Accounts); Prakash Dep. at 34:3-35:9 (the Debtors made efforts to cut down on the time it took cash sitting in remote locations like armored cars to reach Concentration Accounts).

'accounts receivable for GA[A]P purposes,' or as reported by the Debtors in their financial reporting, and I take it to mean, therefore, that the natural layman's reading of it, accounts receivable, applies, which means that it's an account receivable meaning the account where there's not yet been paid, as of the closing.").[6]

18.     Buyer's now claims that the purpose of the Aggregate DIP Shortfall Amount provision was to ensure that if the Debtors ended up having excess cash that at some point in the future could be available to satisfy the *administrative expenses* that Buyer agreed to assume under the APA, then Buyer's obligations would be reduced dollar-for-dollar, to protect it against the "risk" that the Debtors underestimated how much cash they would have to satisfy future administrative expenses. *See* Suppl. Kamlani Decl. ¶ 8. But, this purported purpose (and Buyer's resulting interpretation that "available cash" must therefore include Cash-in-Transit that was indisputably not "available" as of the Closing Date) makes no sense.

19.     First, this assertion is contradicted by Buyer's own admission in the same declaration that Buyer actually agreed to assume additional liabilities "in exchange for acquiring additional assets" (*id.* ¶ 16; *see also* Kamlani Dep. at 19:21-20:8), not that Buyer agreed to take on more liabilities merely to assist Debtors in staying administratively solvent.[7] Second, it also is contradicted by the APA itself, which capped the "risk" that Buyer purportedly was concerned

---

[6] At his deposition, Mr. Kamlani offered yet another interpretation of the term "available cash" to be what he coined, "legally available cash." But, that phraseology is not found anywhere in the APA, in the Buyer's January 9 Bid Letter, or in any other documentary evidence or other parol evidence in this case, outside Mr. Kamlani's own head. *See* Kamlani Dep. at 63:5-64:25 (admitting that the term "legally available cash," was not found in any document, and was merely Mr. Kamlani's attempt to "describe what available cash meant certainly to me" and what he called the "spirit" of available cash in his conversations with the Debtors' advisors); *see also* Riecker Dep. II at 48:13-22 (testifying that as CFO of Sears, the Debtors, and Transform, he had never heard the finance department use the term "legally available cash" or track something called "legally available cash").

[7] Of course just weeks ago, Buyer joined ESL in a brief asserting that the Debtors' solvency is "based on dubious assumptions," which "[o]nce corrected, . . . could render the Debtors administratively insolvent." *See Limited Objection and Reservation of Rights of ESL Investments, Inc. and Transform Holdco LLC to Joint Chapter 11 Plan of Sears Holding Corp. and its Affiliated Debtors* ¶¶ 5, 7 [ECF No. 4759].

about at $166 million with respect to Accounts Payable, $139 million of 503(b)(9) claims, and $43 million of Severance Reimbursement Obligations.[8]   The only theoretical "risk" to Buyer if the Debtors had underestimated the cash it eventually would have available to satisfy administrative expenses was that perhaps it would reveal that in retrospect Buyer could have further squeezed the Debtors in negotiating the APA.   Third, Buyer's asserted intent and purpose behind the Aggregate DIP Shortfall Amount provision is contradicted by the definition of Aggregate DIP Shortfall Amount, which uses the term "available cash" rather than the term total value of Excluded Assets, the latter which could be used by the Debtors to pay down liabilities at some point after Closing. Cash-in-Transit, on the other hand, was not available at the time of Closing to make payments on the Senior DIP or any other liabilities for that matter.   *See* Good Second Suppl. Decl. ¶ 4; *Declaration of Moshin Y. Meghji in Support of the Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* ¶ 7 ("**Meghji Decl.**")

20.    Tellingly, the documents Buyer points to as purported "parol evidence" regarding the meaning of "Available Cash" do nothing of the sort.   Mr. Kamlani's email to his own advisor memorializing his own understanding of the Aggregate DIP Shortfall Amount provision (Suppl. Kamlani Decl. ¶ 20, Ex. D) is irrelevant to any *mutual* understanding of the parties.   Buyer also points to a January 6, 2019 presentation that estimated "other sources of value" to pay down administrative claims, including $89 million in "company cash."   Suppl. Kamlani Decl. ¶¶ 13-14, Ex. A.   But, as Mr. Kamlani testified, various items listed as additional sources of value were only *potential* sources of value that could potentially be converted from unavailable to available cash—for example, the chart included estimated proceeds from the sale of SHIP, which

---

[8] *See* APA § 2.3(k); *see also* Kamlani Dep. at 105:11-106:16.

never materialized.  *Id.* at Ex. A; Kamlani Dep. at 73:20-74:17.  Similarly, Buyer points to a Closing Tracker that contained a slide labeled "Opportunities and Actions" which described potential actions including a line-item for "company cash" and "Cash-in-transit, in regional banks and stores."  Suppl. Kamlani Decl. ¶ 15, Ex. B.  Of course, as Mr. Kamlani conceded, "Opportunities" are not certainties, just things that "may or may not come to fruition."  Kamlani Dep. at 82:17-83:7.  In short, none of these documents provides evidence that the term "available cash" was ever used by the Debtors or as between the parties to refer to anything other than cash available in the Debtors' Concentration Accounts to pay down the Senior DIP.  Likewise, Buyer points to no documentary evidence, nor could it, supporting its position that the parties mutually understood the term "available cash," as used in the APA, to include Cash-in-Transit as of the Closing date.

21.    For the foregoing reasons, the Debtors respectfully request that the Court issue an order finding that the term "available cash" as used in the definition of Aggregate DIP Shortfall Amount means cash in the Debtors' Concentration Accounts available to pay down the Senior DIP as of the Closing, and does not include the Cash-in-Transit.  Accordingly, the Court should further find that the Debtors had no available cash at the moment of Closing that would cause an Aggregate DIP Shortfall Amount in excess of the $243,249 caused by the Debtors' overpayment of their Senior DIP obligation.

## II.    Buyer's Ordinary Course Arguments Have No Merit

22.    Buyer asserts that the Debtors violated the Ordinary Course provisions in Sections 8.1 and 8.6 of the APA, while ignoring the clear qualifications found in those provisions that authorize the Debtors' actions.  Buyer's arguments that the Debtors breached the APA by failing to operate in the Ordinary Course fail for several reasons.  First, Buyer's new contractual interpretation arguments defy common sense and the plain language of the APA.  Second, Buyer

13

offers no evidence that the Debtors' operations were in any way inconsistent with pre-petition cash management policies or done outside of the plain view of Buyer.  Third, with full knowledge of the Debtors' intention of delaying payments, Buyer did not object and has acquiesced to the Debtors' conduct of which it now complains.

23.     At the Hearing, the Court previewed the showing that Buyer would have to make in support of its allegations:

> THE COURT: Okay. But is it fair to say that, you know, basically ***non-payment over a week isn't that in the ordinary course***? You have to do something on top of that to make it out of the ordinary course?
>
> MR. LIMAN: ***I think it's fair to say that—yeah, it has to be something on top of that, something different from that.***
>
> THE COURT: All right. And again, there's the communication part. ***So basically, what you're looking at now is whether there's something the Debtors did secretly or not in consultation with Transform, and outside of the general six-day, one-week issue***?
>
> MR. LIMAN: And I think we have the parameters of that, and we can have conversations and . . . hopefully, avoid the need . . . to bring it to Your Honor.

July 11 Hr'g Tr. at 271:2-19 (emphases added).

24.     Buyer now again attempts to resurrect its claim that the Debtors breached the APA by acting outside the Ordinary Course.  Because the evidence simply does not support any such breach, Buyer improperly attempts to rely on an isolated sliver of a single ordinary course provision in order to manufacture an alleged breach.  But its new interpretation arguments fail.

25.     Further, Buyer does not offer any new evidence of something the Debtors have done "secretly" or beyond the "one-week issue" discussed at the July 11 Hearing.  Instead, Buyer's new theory simply points to the same February 4, 2019 Daily Cash Flow forecast which advised ESL that the Debtors were delaying payments by three business days in order to manage

net availability and meet the closing condition to pay the Senior DIP down to $850 million.  *See* Buyer's Br. ¶ 10.[9]  Buyer now suggests that this delay was somehow inconsistent with the Debtors' pre-petition cash management policies.  *See id.* ¶¶ 10, 14.  But, the uncontroverted testimony of Robert Riecker, previously the Debtors' CFO and now Buyer's CFO, establishes that, consistent with the delays instituted by the Debtors just prior to the Closing, (i) during the pre-petition period, the Debtors also delayed payables when they currently had net availability but were projecting a default under the Revolving Credit Facility, and (ii) the Debtors projected a default under the DIP Facility within a day or two of the planned closing date.  Riecker Dep. II at 63:14-20, 67:11-14. The Debtors' decision to delay certain vendor payments in order to pay down the Senior DIP was consistent with how the Debtors ran the business pre-petition in the ordinary course, as Buyer knew and understood.  Meghji Decl. ¶¶ 14-15.

### A.    Buyer's Latest Contractual Interpretation Fails

26.    Buyer argues that Section 8.6 of the APA imposes two conditions upon the Debtors: "(1) to pay payables arising from the date of the Agreement until the Closing Date in all material respects on a timely basis, and (2) to otherwise manage the accounts payable of the business in accordance with the Sellers' cash management policies and practices (as in effect prior to the Petition Date) in the Ordinary Course of Business."  Buyer's Br. ¶ 11.  It further argues that the Debtors' "obligation to satisfy payables on a timely basis was unmodified by the 'ordinary course' clause of the second obligation."  *Id.* (citing *Barnhart v. Thomas*, 540 U.S. 20 (2003)).

---

[9] Buyer has relied on the February 4, 2019 Daily Cash Flow forecast, along with Daily Cash Flow forecasts sent the following three days and containing the same information, since it first asserted its breach of the APA on February 25, 2019.  *See, e.g.*, *Declaration of Katherine R. Lynch in Support of Transform Holdco LLC's Motion to Assign Matter to Mediation* [ECF No. 2767], Ex. A (Letter from Cleary Gottlieb to Weil, dated Feb. 25, 2019).

27.     Once again, Buyer misconstrues the plain language of the APA, which states in relevant part:

> The Sellers shall make all payments in respect of payables of the Business (including rent payments and sales taxes) arising from the date of this Agreement until the Closing Date in all material respects on a timely basis and shall otherwise manage the accounts payable of the business in accordance with the Sellers' cash management policies and practices (as in effect prior to the Petition Date) in the Ordinary Course of Business[.]

APA § 8.6.

28.     First, Section 8.6 makes clear that the Debtors must "make all payments in respect of payables of the Business (including rent payments and sales taxes)  arising from the date of this Agreement until the Closing Date *in all material respects* on a timely basis . . . ." *Id.* (emphasis added).  In other words, the Debtors' obligation to pay payables in the period between execution and Closing was *qualified by materiality*.  *See* Black's Law Dictionary (11th ed. 2019) (defining "material" as "[o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential").  Here, the general term "payables" that should be paid "on a timely basis" is qualified and therefore modified by the examples "rent payments" and "sales taxes."  APA § 8.6.  It makes complete sense that rent and sales taxes should be paid on time because failure to do so can result in eviction or stiff penalties, respectively, rather than—as Mr. Riecker put it—"the possibility" that a vendor who "understood the pattern [of delayed payments the Debtors] created" may become disgruntled.  Riecker Dep. II at 13:7-10; 13:13-14:5.  Such qualification permitted the Debtors to pay payables between execution and Closing in a manner that took into account the Debtors' status as debtors-in-possession and the recognition that the Debtors would need to determine which payments were most critical to pay on time (and which could be delayed).  *See* Riecker Dep. II at 18:23-19:21.

16

29.    Second, the use of the word "otherwise" in the second clause of the first

sentence of Section 8.6 indicates that the obligation set forth in the first clause is merely ***an***

***example of*** the obligation set forth in the second.  Otherwise means "[i]n another way or ways; in

a different manner."[10]   The Oxford English Dictionary gives a number of examples of the word

"otherwise" used in context, including:

- "We would so frequently <u>exchange suits</u> and ***otherwise*** <u>circumvent
  the enemy</u> that they abandoned all such ineffectual attempts."

- "Rye, vetches, winter-oats or some other rapidly-growing crop may
  be sown in the autumn and <u>fed off</u> or ***otherwise*** <u>disposed of</u> prior to
  the root-sowing."[11]

These examples illustrate that the word "otherwise," when used as the Parties used it in Section

8.6 of the APA, effects a transition from a specific example of an activity to a general category of

activity.  "Exchanging suits" is an example of "circumventing the enemy."  "Feeding off" crops is

an example of "disposing of" crops.  The first sentence of Section 8.6 of the APA—albeit more

complicated—works the same way:

> The Sellers shall <u>make all payments in respect of payables of the
> Business . . . arising from the date of this Agreement until the
> Closing Date in all material respects on a timely basis</u> and shall
> ***otherwise*** <u>manage the accounts payable of the business in
> accordance with the Sellers' cash management policies and
> practices . . . in the Ordinary Course of Business</u>[.]

APA § 8.6 (emphasis added). "Making all payments in respect of payables of the Business arising

from the date of the Agreement until the Closing Date in all material respects on a timely basis" is

an example of—***and thus limited by***—"managing the accounts payable of the business in

---

[10]   "Otherwise," OXFORD ENGLISH DICTIONARY,   https://www.oed.com/view/Entry/133247?redirectedFrom
=otherwise#eidhttps://www.oed.com/view/Entry/133247?redirectedFrom=otherwise#eid.

[11] *Id.*

accordance with the Sellers' cash management policies and practices in the Ordinary Course of

Business."  Accordingly, and contrary to Buyer's argument, the Debtors' obligation to satisfy

payables on a timely basis *is* modified by the "ordinary course" clause of the second obligation.

Buyer simply ignores the significance of "in all material respects" and "otherwise" to the meaning

of Section 8.6.  Buyer would strike those terms from that provision and read Section 8.6 as follows:

> The Sellers shall make all payments in respect of payables of the
> Business (including rent payments and sales taxes) arising from the
> date of this Agreement until the Closing Date ~~in all material
> respects~~ on a timely basis and shall ~~otherwise~~ manage the accounts
> payable of the business in accordance with the Sellers' cash
> management policies and practices (as in effect prior to the Petition
> Date) in the Ordinary Course of Business.

30.    Finally, the first clause in Section 8.6 refers generally to "all payments in

respect of payables," while the second clause specifically refers to "accounts payables."  APA

§ 8.6.  It is a cardinal rule of contract interpretation that the specific governs over the general.  *See*

*A.W. Fin. Servs., S.A. v. Empire Res., Inc.*, 981 A.2d 1114, 1131 (Del. 2009).  Further, when a

general word or phrase is qualified by a list of specific examples, the general will be interpreted to

include only items of the same type as those listed.  *See Aspen Advisors LLC v. United Artists*

*Theatre Co.*, 861 A.2d 1251, 1265 (Del. 2004).

31.    Buyer cannot simply strike or ignore language in the APA that it now

believes disadvantages it.  *See Huatuco v. Satellite Healthcare*, No. CV 8465-VCG, 2013 WL

6460898, at *5 & n.29 (Del. Ch. Dec. 9, 2013), *aff'd*, 93 A.3d 654 (Del. 2014) ("Sophisticated

parties entering unambiguous . . . agreements are presumed to understand the consequences of the

language they have chosen, and are bound thereby, lest contract rights be subject to endless second-

guessing and opportunistic revision.").  Accordingly, Buyer's argument fails.

18

### B.    Buyer Has Not Established Any Facts to Support its Arguments

32.    Buyer also argues that the Debtors failed to manage payables "in accordance with the Sellers' cash management policies and practices . . . in the Ordinary Course of Business." *See* Buyer's Br. ¶ 14.    However, the evidence establishes that the Debtors' management of accounts payable was wholly consistent with the company's cash management policies and practices pre-petition.

33.    Mr. Riecker testified that the Debtors often delayed payments pre-petition when "there remained availability under its ABL revolver."  Riecker Dep. II at 63:14-20; 6:2-7:17. The point is intuitive: companies ***must*** manage while there is still availability to manage.  Once availability is negative, default occurs and it is too late.  *See id.* at 67:7-10.    Accordingly, the Debtors' pre-petition delays were based not on "what the revolver had on that day, ***but what the revolver was projected to look like in the coming days***."  *Id.* at 64:3-7 (emphasis added); *see also* Prakash Dep. at 39:3-12.    Indeed, Mr. Riecker testified that, beginning in August 2018, once the Debtors began delaying payments to manage availability, they never reduced delays, "[r]egardless of net availability."  Riecker Dep. II at 10:4-11.

34.    The Debtors' conduct in the week before Closing was plainly consistent with pre-petition cash management policies.[12]  In that week, the Debtors projected a default under the DIP Facility within a day or two of Closing.  *See id.* at 67:11-14.  Further, "[t]here was concern by the Debtor[s] and [their] advisors that the closing moving out could result in [a default under

---

[12] Buyer implies that the Debtors' managing of the DIP obligations down to meet the closing conditions, while also taking advantage of the $166 million of accounts payable Buyer assumed, was somehow improper.  As an initial matter, Mr. Riecker testified that he did not view those actions as a breach at the time, nor does he now.  *Id.* at 43:12-23; 54:25-55:11.  Moreover, the Buyer's risk with respect to the $166 million of Other Payables it assumed was capped at $166 million.  *See* APA § 2.3(k)(iii).  In any event, the Debtors had $189 million of accounts payable at Closing (Buyer's Br. n.4), meaning the Debtors' decision to delay payments to vendors, however necessary, ultimately caused the Debtors' themselves to incur approximately $23 million of post-Closing liabilities.

the Senior DIP] . . . [a]nd of possibly having to liquidate." *Id.* at 67:23-68:9; *see also* Good Second Suppl. Decl. Ex. D.  As such, and consistent with pre-petition practices, the Debtors began managing cash flow in respect of accounts payable to provide additional availability and avoid the risk of a default on the Senior DIP.  *See* Riecker Dep. II. at 67:11-14.

35.    Buyer's suggestion that the Debtors "simply stop[ped] making payments" (*see, e.g.*, Buyer's Br. ¶ 15), also is a mischaracterization.  Rather, Mr. Riecker, along with the Debtors' financial advisors, "thoughtfully considered which specific vendors were being delayed. to try to minimize th[e] consequences."  Riecker Dep. II at 56:23-57:15.  As Mr. Riecker stated in his Declaration, "[d]elaying payments could negatively affect the terms of service that vendors will offer the company in the future and could result in delays in the supply of merchandise." Riecker Decl. ¶ 10 [ECF No. 4772].    But he also testified that those "exact same consequences . . . would have been a concern back in August" 2018, when the Debtors were delaying payments.  Riecker Dep. II at 57:7-10.  During the pre-petition period, the Debtors decided which vendors to delay after analyzing whether they could "balance whatever consequences there are for not paying [that vendor] for a couple of days." *Id.* at 19:22-20:2. Likewise, in the week prior to Closing, the same assessment was made to determine if the "consequence of not paying [a] vendor outweigh[s] not having that cash on hand or available to pay down the Senior DIP. *Id.* at 60:11-16.

36.    While Buyer has abandoned its argument that the Debtors violated Section 8.1(a), to the extent that provision applies, it specifically authorizes the Debtors to "reasonably manage the amount of Inventory in consultation with the Buyer in order to satisfy" the Outstanding DIP Indebtedness condition precedent.  APA §§ 8.1(a), 10.10.  As outlined in the Debtors' Opposition Brief, in the period between the Effective Date of the APA and Closing, the Debtors

consulted with Buyer—on a daily basis—regarding any of the Debtors' delays in the payment of payables, including those affecting inventory.  *Debtors' Br. in Opp'n to Transform Holdco LLC's Adversary Compl. and in Further Support of Debtors' Suppl. Mot. to Enforce the Asset Purchase Agreement* ¶¶ 39-40 [ECF No. 4430].

### C.    Buyer Should Be Precluded From Arguing Breach of the Ordinary Course Provision

37.    Even if the short delays at issue could constitute a breach of the agreement—which they do not—Buyer should be precluded from making this argument because Buyer was well aware that the Debtors intended to delay vendor payments before they did so, and why, yet remained silent.  Under Delaware law, inaction or silence by a party may preclude that party from obtaining legal or equitable relief in certain circumstances based on acquiescence.  *See Lehman Bros. Holdings Inc. v. Spanish Broad. Sys. Inc.*, No. 8321-VCG, 2014 WL 718430, at *9 (Del. Ch. Feb. 25, 2014);  *see also Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1047 (Del. 2014) (plaintiff acquiesced in his removal as CEO when, after his removal, he helped new CEO transition into his role—without protest—and engaged in other conduct that led the company to believe he approved of his removal as CEO).

38.    This defense—which is a type of estoppel—provides that where, as here, "a plaintiff has remained silent with knowledge of her rights, and the defendant has knowledge of the plaintiff's silence and relies on that silence to the defendant's detriment, the plaintiff will be estopped from seeking protection of those rights."  *Lehman Bros. Holdings*, 2014 WL 718430, at *9.  As the court explained in *Lehman Bros. Holdings*, "[a]cquiescence, . . . like estoppel, focuses on the defendant's knowledge of and reliance on the plaintiff's behavior (or lack thereof), and why the plaintiff must be adjudged complicit in the very breach for which she seeks damages."  *Id.*  To succeed on this defense, the defendant must show that:  "(1) the plaintiff remained silent (2) with

21

knowledge of her rights (3) and with the knowledge or expectation that the defendant would likely

rely on her silence, (4) the defendant knew of the plaintiff's silence, and (5) the defendant in fact

relied to her detriment on the plaintiff's silence." *Id.* at *10.

39.     Here, all of these elements are met, and Buyer should be estopped from

asserting its "ordinary course" breach of contract claim as a result.  There is no dispute that on

February 4, 2019, Buyer received an email from Mr. Prakash stating that, "In order to manage 1L

outstanding on Feb 8th, we are delaying certain payments contractually due on Feb 5th, Feb 6th,

Feb 7th, by 3 business days."  Riecker Decl., Ex. E.  This email was sent to Eddie Lampert and

Kunal Kamlani of ESL, who routinely received these types of daily cash forecasts. *Id.*  In other

words, this notice email was sent to Buyer on February 4, 2019—***before*** any of the vendor

payments in question were delayed—and Buyer had ample opportunity to speak up about the

decision to delay vendor payments, but chose not to.[13]

40.     Despite receiving clear notice that the Debtors intended to delay certain

vendor payments by three business days and why, Buyer said nothing to the Debtors about this

being an issue.  As Mr. Riecker testified at his deposition, he did not recall there being any

pushback later in the day or any time that week from Messrs. Lampert or Kamlani regarding the

decision to institute this three business day delay in payments that were otherwise contractually

due.  Riecker Dep. II at 21:22-22:5; 22:6-11.  In fact, Mr. Riecker testified that ***no one*** from either

ESL or ESL's advisors reached out to tell him or anyone else from the Debtors that there were

---

[13] And, contrary to Buyer's contention that they raised this issue as soon as they knew about it (Buyer's Br. ¶ 18), Buyer not only knew about these delayed payments before they occurred, but also for months after the fact, yet Buyer remained silent until deciding to raise this issue months after filing its Adversary Complaint in yet another attempt to shirk responsibility for the liabilities it agreed to assume under the APA.

concerns about this three-day delay in making these vendor payments, and he was not aware of *any* discussions with ESL about any delay. *Id.* at 22:12-25; *see also* Meghji Decl. ¶ 15.

41.    Buyer was in regular communication with the Debtors during the time period preceding the Debtors' delay of vendor payments, as the Parties were jointly litigating for approval of the proposed sale, and simultaneously coordinating for a potential February 8 closing in the event that the sale was approved. Meghji Decl. ¶ 13. However, Buyer remained silent and failed to raise any issue in connection with the Debtors' intention to delay vendor payments. *Id.* ¶ 15. Relying on Buyer's silence, the Debtors proceeded to delay certain vendor payments as they had told Buyer they intended to do. *Id.* ¶ 16. The Debtors relied on this silence and delayed vendor payments in order to maintain the Senior DIP, but did so to their detriment as they had no expectation whatsoever that Buyer would later sue them for doing so. *Id.*

42.    Indeed, the whole reason this delay was even necessary—as the February 4 email made clear—was to manage the outstanding Senior DIP obligation and not default on the Senior DIP agreement. *Id.* ¶ 12. This was something that Buyer reiterated to the Debtors from the outset as being the paramount goal in advance of Closing, and Buyer's representatives repeatedly told the Debtors to focus on paying down the Senior DIP, and do whatever was necessary to achieve that goal. *Id.* ¶ 15. Against this backdrop, the Debtors relied on Buyer's repeated statements and undertook an extraordinary effort to manage cash flow in a way that allowed them to meet the conditions necessary to close. *Id.* ¶ 12. All of this was done in full view of Buyer, who never once suggested that delaying vendor payments in an effort to maintain that availability—something the Debtors routinely did pre-petition (*see, e.g.*, Riecker Dep. II at 6:22-7:9, 11:15-12:3)—would somehow later be alleged to be a breach of the agreement. Meghji Decl. ¶ 15. Buyer should not now be heard to argue otherwise.

43.     For all of the foregoing reasons, the Debtors respectfully request that the Court issue an order finding that the Debtors did not violate the Ordinary Course provisions in the APA.

### III.    Buyer Is Responsible For Paying, Discharging Or Bonding Over Mechanics' Liens Related to Lease Premises and Sparrow Properties

44.     At the July 11, 2019 Hearing, the Court gave a preliminary ruling on the issue of which party is responsible under the APA for certain disputed mechanics' liens: "As far as mechanics liens are concerned, I'm more open to hearing argument on this, but I believe that that issue, if we're talking about mechanics liens that arose pre-closing, I think those are the Debtors' responsibility." July 11 Hr'g Tr. at 299:4-7.  In response to the Court's willingness to hear additional argument on this issue, the Debtors respectfully submit that, for all the reasons set forth in their prior briefing, and as further detailed below, that the Buyer is in fact responsible under the APA for the payment or discharge of pre-Closing mechanics liens on the Lease Premises and Sparrow properties transferred to Buyer.  *See* First Amendment to APA § 9.11(a)(vi).

45.     Buyer asserts that it is only responsible for the 36 mechanics' liens specifically identified in § 2 of Schedule 6.5 to the APA.  The Debtors do not dispute that Buyer expressly assumed liability for the claims underlying these specific mechanics' liens.  But, the Parties later agreed to the First Amendment to the APA, in part to address apportionment of certain costs, including with respect to mechanics' liens, that had not been set forth in the initial agreement.  In the amendment, the Parties specifically agreed to prorate "***all items of revenue and expense*** with respect to the Owned Real Property, the Lease Premises . . . and the Sparrow Properties . . . ."  APA § 9.11(a).  Section 9.11(a) provides in subsection (vi), that with respect to underlying mechanics' liens, the Debtors would be charged with those liens on Owned Real

24

Property (other than those identified in Schedule 6.5), if not paid, discharged, or bonded over in a manner reasonably acceptable to Buyer. *Id*.

46.    Read together, Section 9.11(a) and Section 9.11(a)(vi) are not, as Buyer asserts, "silent" on the apportionment of mechanics' liens related to the Lease Premises and Sparrow Properties, which would, at best, create an ambiguity as to which party is responsible for mechanics' liens related to those two types of property.  Rather, Section 9.11(a) makes clear that the Parties intended to apportion "***all*** . . . expenses" related to all three types of transferred property, including Lease Premises and Sparrow Properties (emphasis added). Subsection (vi) then identifies only one type of transferred property, Owned Real Property, for which certain expenses related to mechanics' liens are apportioned to the Debtors.  The only logical reading of this provision is that it leaves the expenses related to mechanics' liens on the other two types of transferred property referenced in Section 9.11(a)—Lease Premises and the Sparrow Properties—for the Buyer.  Had the Parties intended to apportion to the Debtors the expenses related to mechanics' liens on all three types of transferred property, the APA would have either listed them all out or just used the inclusive term "any Potential Acquired Assets," which is defined in the APA as "all assets of Seller of any kind that either (i) constitute an Acquired Asset (other than Leases or Contracts) or (ii) constitute Potential Transferred Agreements" (APA §1.1), and therefore would include each of Owned Real Property, Lease Premises, and Sparrow Properties.  Instead, the apportionment to the Debtors expressly identified mechanics' liens only on Owned Real Property.

47.    To the extent the Court finds some ambiguity with respect to which party the expenses related to mechanics' liens on Lease Premises and Sparrow Properties were apportioned to, the drafting history of the Amended APA Section 9.11(a) makes clear that responsibility for those costs was intended to be apportioned to the Buyer, not the Debtors.

25

48.     As set forth in the Debtors' Supplemental Motion at ¶ 142, an initial draft of the Amended APA Section 9.11(a)(vi) provided that the Debtors would be charged for any amount of underlying mechanics' liens with respect to "any Potential Acquired Assets." *See* Mishkin Decl. Ex. J (Feb. 7, 2019, Redline to Amendment No. 1 to Asset Purchase Agreement). As noted above, the defined term "Potential Acquired Assets" would have broadly included all three types of transferred property: Owned Real Property, Lease Premises, and Sparrow Properties. But, on February 7, 2019, counsel for the Debtors proposed a revision to that provision limiting the Debtors' apportionment to only costs associated with underlying mechanics' liens on Owned Real Property. *See id.* That limitation and narrowing of the Debtors' obligations from all three types of transferred property to only the Owned Real Property was accepted by Buyer and reflects the Parties' intent that the Buyer, and not the Debtors, be charged with pre-Closing underlying mechanics' liens on the other two types of property, Lease Premises and Sparrow Properties.

49.     For the foregoing reasons, the Debtors respectfully request that the Court issue an order finding that Buyer is responsible for paying, discharging or bonding over pre-Closing mechanics' liens related to Lease Premises and Sparrow Properties.

## CONCLUSION

50.     For the foregoing reasons, the Debtors respectfully request that the Court issue an order (i) finding that the Aggregate DIP Shortfall Amount is $243,249; (ii) determining the Debtors did not violate the Ordinary Course provisions in the APA; (iii) finding that Buyer is responsible for paying, discharging or bonding over mechanics' liens related to Lease Premises and Sparrow Properties; (iv) dismissing Buyer's Adversary Complaint; and (v) granting the Debtors such other and further relief, at law or in equity, to which they are entitled.

## RESERVATION OF RIGHTS

51.    The Debtors reserve all of their rights, claims, defenses, and remedies, including, without limitation, their rights to amend, modify, or supplement this Motion, to seek discovery, and introduce any evidence in any hearing with respect to this Motion.  Further, the Debtors reserve all claims, causes of action, damages, rights, remedies, and/or defenses in connection with Buyer's violation of the automatic stay.

WHEREFORE, the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as is just.

Dated: August 23, 2019
      New York, New York

                        **/s/ Sunny Singh**

                        WEIL, GOTSHAL & MANGES LLP
                        767 Fifth Avenue
                        New York, New York  10153
                        Telephone:  (212) 310-8000
                        Facsimile:  (212) 310-8007
                        Ray C. Schrock, P.C.
                        David J. Lender
                        Paul R. Genender
                        Jared R. Friedmann
                        Sunny Singh

                        *Attorneys for Debtors*
                        *and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
                                           :

In re                            :          Chapter 11

                                           :

SEARS HOLDINGS CORPORATION, *et al.*,  :          Case No. 18-23538 (RDD)

                                         :

Debtors.[1]                       :          (Jointly Administered)

                                         :

-------------------------------------------------------------------x

## ORDER (I) ENFORCING ASSET PURCHASE AGREEMENT AGAINST BUYER AND COMPELLING TURNOVER OF ESTATE PROPERTY AND (II) DISMISSING ADVERSARY COMPLAINT

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

Upon the motion, dated May 24, 2019 [ECF No. 4029] (the "**Motion**")[2] of Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), for entry of an order (the "**Order**") enforcing the Asset Purchase Agreement and in opposition to Transform Holdco LLC's *Adversary Complaint* [ECF No. 4033], pursuant to sections 105, 362, 541, and 542 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"); and Debtors' Brief in Opposition to Transform Holdco LLC's Adversary Complaint and in Further Support of Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement [ECF No. 4430] and in further support of the Debtors' Supplemental Motion To Enforce The Asset Purchase Agreement [ECF No. 4029] and Buyer's Supplemental Memorandum of Law in Support of Transform Holdco LLC's Adversary Complaint [ECF No. 4767], and Buyer's Supplemental Memorandum of Law in Support of Debtors' Brief in Opposition to Transform Holdco LLC's Adversary Complaint and in Further Support of Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement; along with all supporting declarations; and the Court having jurisdiction to decide the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the relief sought in the Motion and the opportunity for a hearing thereon having been provided in accordance with the Amended Case Management Order; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

having held a hearing to consider the relief requested in the Motion on July 11, 2019 (the "Hearing"); and upon the record of the Hearing, and upon all of the proceedings had before the Court; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein and that such relief is in the best interests of the Debtors, their estates, their creditors, and all parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Aggregate DIP Shortfall Amount is $243,249;

2.      The Debtors did not breach the ordinary course of business provisions of the APA;

3.      Pursuant to the unambiguous terms of the APA, Transform is responsible for paying, discharging, or bonding over mechanics' liens related to Lease Premises and Sparrow Properties;

4.      The Adversary Complaint is dismissed with prejudice;

5.      The Debtors are entitled to recover damages under 11 U.S.C. § 362(k)(1), including costs and attorneys' fees; and

6.      The Court shall retain jurisdiction to hear and determine all matters arising

from or related to the implementation, interpretation, and/or enforcement of this Order.

Dated: _____, 2019
          White Plains, New York

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE