WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Paul R. Genender
Jared R. Friedmann
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | **:** | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | **:** | **Case No. 18-23538 (RDD)** |
| Debtors. [1] | **:** | **(Jointly Administered)** |

-------------------------------------------------------------x

## DECLARATION OF JESSIE B. MISHKIN IN SUPPORT

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**OF DEBTORS' SUPPLEMENTAL BRIEF IN OPPOSITION TO TRANSFORM
HOLDCO LLC'S ADVERSARY COMPLAINT AND IN FURTHER SUPPORT OF
DEBTORS' SUPPLEMENTAL MOTION TO ENFORCE THE ASSET PURCHASE
AGREEMENT**

Pursuant to 28 U.S.C. § 1746, I, Jessie B. Mishkin, hereby declare as follows:

I am a counsel with the law firm of Weil, Gotshal & Manges LLP, representing the Debtors

in the above-captioned proceeding.   I submit this Declaration in Support of the Debtors'

Supplemental Memorandum of Law in Support of Debtors' Brief in Opposition to Transform

Holdco LLC's Adversary Complaint and in Further Support of Debtors' Supplemental Motion to

Enforce the Asset Purchase Agreement [ECF No. 4973].[2]

1.   Attached as **Exhibit A** is a true and correct copy of excerpts from the deposition
transcript of Kunal Kamlani taken on August 15, 2019 (portions cited in Debtors'
brief are highlighted for the convenience of the Court);

2.   Attached as **Exhibit B** is a true and correct copy of excerpts from the deposition
transcript of Robert Riecker taken on August 20, 2019 (portions cited in Debtors'
brief are highlighted for the convenience of the Court);

3.   Attached as **Exhibit C** is a true and correct copy of excerpts from the transcript of
the hearing held before this Court on July 11, 2019 (portions cited in Debtors' brief
are highlighted for the convenience of the Court);

4.   Attached as **Exhibit D** is a true and correct copy of an e-mail between Kunal
Kamlani and Rajat Prakash on November 2, 2018;

5.   Attached as **Exhibit E** is a true and correct copy of a June 14, 2019 E&Y
Presentation;

6.   Attached as **Exhibit F** is a true and correct copy of excerpts from the deposition
transcript of Rajat Prakash taken on August 20, 2019 (portions cited in Debtors'
brief are highlighted for the convenience of the Court).

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms
in the Debtors' Brief in Opposition to Transform Holdco LLC's Adversary Complaint and in Further Support of
Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement or the *Order (I) Approving the Asset
Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and
Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain
Executory Contracts, and Leases in Connection Therewith and (IV) Granting Related Relief* [ECF No. 2507] as
applicable.

7.      Attached as **Exhibit G** is a true and correct copy of an e-mail between Kunal Kamlani and M-III Oct. 22, 2018;

8.      Attached as **Exhibit H** is a true and correct copy is a true and correct copy of excerpts from the deposition transcript of Robert Riecker taken on June 19, 2019 (portions cited in Debtors' brief are highlighted for the convenience of the Court);

9.      Attached as **Exhibit I** is a true and correct copy of an e-mail between Kunal Kamlani and M-III on January 3, 2019;

10.     Attached as **Exhibit J** is a true and correct copy of Email correspondence, dated February 7, 2019, from counsel for the Debtors to counsel for Transform, attaching a revised draft of the APA Amendment No. 1 and redline against a prior draft provided by counsel for Transform.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated: August 23, 2019                    By:   _/s/ Jessie B. Mishkin_____
      New York, New York                    Jessie B. Mishkin

# *EXHIBIT A*

**In The Matter Of:**

*IN RE Sears*
*Holdings*

---

*Kunal Kamlani*
*August 15, 2019*
*HIGHLY CONFIDENTIAL*

---



Page 1

```
 1            UNITED STATES BANKRUPTCY COURT
 2            SOUTHERN DISTRICT OF NEW YORK
 3            Chapter 11 - Case No. 18-23538 (RDD)
 4
 5
 6    ---------------------------------x
 7    In Re:
 8    SEARS HOLDINGS CORPORATION, et al.,
 9                     Debtor.
10    ---------------------------------x
11
12
13            HIGHLY CONFIDENTIAL
14            DEPOSITION OF KUNAL KAMLANI
15            NEW YORK, NEW YORK
16            THURSDAY, AUGUST 15, 2019
17
18
19
20
21
22
23    Reported by:
24    S. ARIELLE SANTOS, CCR, CLR
25    JOB NO:  2019-75105
```

Page 2

```
 1
 2               New York, New York
 3               AUGUST 15, 2019
 4               8:30 A.M.
 5
 6          DEPOSITION of KUNAL KAMLANI, held at the
 7    offices of WEIL, GOTSHAL & MANGES LLP, 767 Fifth
 8    Avenue, New York, New York, before S. ARIELLE
 9    SANTOS, a Certified Court Reporter, Certified
10    Livenote Reporter and Notary Public.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2                  APPEARANCES:
 3
 4    Attorneys for Unsecured Creditors:
 5         AKIN GUMP STRAUSS HAUER & FELD LLP
 6         One Bryant Park
 7         Bank of America Tower
 8         New York, New York 10036
 9         212-872-1000
10    BY - JOHN P. KANE, ESQ.
11         Jkane@akingump
12
13    Attorneys for Debtors and Debtors-in-Possession:
14    Sears Holdings Corporation, et al.
15         WEIL, GOTSHAL & MANGES LLP
16         767 Fifth Avenue
17         New York, New York 10153
18    BY - JESSIE B. MISHKIN, ESQ.
19         Jessie.mishkin@weil.com
20    BY - JARED FRIEDMAN, ESQ.
21         Jared.friedman@weil.com
22
23
24
25
```

Page 4

```
 1    APPEARANCES (Cont.)
 2
 3    WEIL, GOTSHAL & MANGES LLP
 4    200 Crescent Court, Suite 300
 5    Dallas, Texas  75201-6950
 6    BY - JAKE RUTHERFORD, ESQ.
 7    Jake.rutherford@weil.com
 8
 9    Attorneys for ESL Investments, Inc.:
10    CLEARY GOTTLIEB STEEN & HAMILTON LLP
11    One Liberty Plaza
12    New York, New York 10006
13    212-225-2094
14    BY - LEWIS J. LIMAN, ESQ.
15    Lliman@cgsh.com
16    BY - BRIAN P. GIUNTA, ESQ.
17    Bgiunta@cgsh.com
18
19    ATTORNEYS FOR WITNESS:
20    HOLWELL SHUSTER & GOLDBERG LLP
21    425 Lexington Avenue
22    New York, New York  10017
23    BY - MATTHEW GURGEL, ESQ.
24    Mgurgel@hsgllp.com
25
```

Page 17

KUNAL KAMLANI - HIGHLY CONFIDENTIAL
1 the forecast that was being presented
2 to us, was either right or either
3 wrong.
4     And so the purposes of
5 this provision in effect was an
6 elegant solution to allow Transform to
7 solve the estate's concern with
8 respect to liabilities such that we
9 could agree to assume them. However,
10 when all was said and done, on the
11 closing day, to the extent that there
12 was available cash, that the estate
13 could have used to pay off those
14 liabilities, then Transform would get
15 the benefit of that because we
16 wouldn't know that -- I will call it a
17 month in advance.
18     On the flip side, to the
19 extent that the forecast was correct
20 and there was no additional available
21 cash for the estate to satisfy the
22 liabilities, the forecast -- in fact,
23 if it was right, then we wouldn't get
24 a dollar-for-dollar offset and we were

Page 18

KUNAL KAMLANI - HIGHLY CONFIDENTIAL
1 amenable to assuming the liabilities.
2     So it was a
3 self-correcting mechanism that allowed
4 both parties in effect to be
5 indifferent and not rely on whether a
6 specific forecast was right or wrong.
7 Q.  Mr. Kamlani, you stated in
8 that answer that -- let me see if I
9 can get the exact words -- that the
10 discussion was with respect to the
11 estate's desire that we assume --
12 Transform, the buyer, assume
13 additional liabilities so that the
14 estate would be administratively
15 solvent.
16     Did Transform ultimately
17 assume liabilities so that the estate
18 would be administratively solvent?
19 A.  We assumed additional
20 liabilities because we were advised by
21 the seller's advisors that if we did
22 not, they would not qualify our bid.
23 And we knew that if our bid was not
24 qualified, that there was no way we

Page 19

KUNAL KAMLANI - HIGHLY CONFIDENTIAL
1 would prevail over a liquidation,
2 which was the alternative option.
3     The context that was
4 provided for why we were told that our
5 bid was not qualified, was that it was
6 important to the estate for us to
7 assume additional liabilities because
8 the directors were very focused on
9 making sure that the estate would be
10 administratively solvent.
11     We ultimately assumed the
12 liabilities to qualify our bid.
13 Q.  Could I have you turn to
14 paragraph 16 of your declaration.
15 It's on page 8 of 46.
16 A.  The top says January 9th
17 bid?
18 Q.  Yes.
19 A.  Yes.
20 Q.  See in paragraph 16, you
21 wrote, "Through these negotiations
22 with the debtors, Transform ultimately
23 agreed to increase the value of its
24 offer by assuming additional

Page 20

KUNAL KAMLANI - HIGHLY CONFIDENTIAL
1 liabilities in exchange for acquiring
2 additional assets."
3     Do you see that?
4 A.  I do.
5 Q.  And that was accurate,
6 correct?
7 A.  It is accurate.
8 Q.  Going back to my question
9 about paragraph 5, I asked you what
10 were your bases for your statement
11 about what in plain terms Transform
12 was entitled to, and you gave me three
13 bases.
14     Do you remember that?
15 A.  Yes.
16 Q.  Any other bases you can
17 remember other than what you testified
18 to?
19 A.  I think your question was
20 what was the basis for -- let me ask
21 you, can you repeat the original
22 question?
23 Q.  I am not sure I can do it
24 exactly, but let me ask it again and

Page 29

1  KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2  familiarize -- that is a good
3  idea.
4  (Reviewing.)  Okay.  I am
5  familiar with the document.
6  BY MS. MISHKIN:
7  Q.  Okay.  Let's start at the
8  top, the most recent e-mail.
9  That is an e-mail from you
10  dated November 2, 2018, to Rajat
11  Prakash?
12  A.  Yes.
13  Q.  Who is Rajat Prakash?
14  A.  Rajat, at this time, I
15  believe, is the deputy treasurer or
16  assistant treasurer of the company.
17  Q.  And the subject is "Re:
18  Prelim daily cash forecast for
19  November 1, 2018"?
20  A.  Yes.
21  Q.  Let's go back in the chain
22  a little for some context.
23  If you turn to page 2 of
24  the exhibit, middle of the page, you
25  see there's an e-mail from you earlier

Page 30

1  KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2  that day to various folks.
3  And if you go down a
4  little bit further, you see the
5  subject or the substance of your
6  e-mail you say, "The question I have
7  is with respect to what we are
8  assuming our free cash is today that
9  is baked into the liquidity forecast?"
10  Do you see that?
11  A.  I do.
12  Q.  And then turning back to
13  the first page, Mr. Prakash wrote back
14  and responded to your e-mail.
15  Do you see that?
16  A.  Yes.
17  Q.  And Mr. Prakash listed for
18  you specific components of unavailable
19  cash.
20  Do you see that?
21  A.  Yes.
22  Q.  Okay.
23  And among the categories
24  that he listed for you as unavailable
25  cash were cash in escrow; is that

Page 31

1  KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2  right?
3  A.  Yes.
4  Q.  He also listed credit card
5  receivables.
6  Do you see that?
7  A.  I do.
8  Q.  Just going a little
9  further down, cash in regional banks
10  was listed as a component of
11  unavailable cash.
12  Do you see that?
13  A.  I do.
14  Q.  And in response, you asked
15  him -- if you go up a couple of lines,
16  it's your response at 7:42.
17  Do you see that?  And you
18  ask, "What is the cash in regional
19  banks for?"
20  A.  Yes.
21  Q.  And why were you asking
22  that?
23  A.  I was asking that question
24  to have an understanding of why it is
25  we would have $59 million, which, in

Page 32

1  KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2  my mind, was a large number for a
3  company of our size, spread throughout
4  a series of regional banks across the
5  country.
6  So trying to understand
7  why we have $59 million spread around
8  the country.
9  Q.  And Mr. Prakash's response
10  to you was, if you look up a couple of
11  lines, "Example: Cash in Oklahoma
12  store was picked up by armored car and
13  deposited in the local bank.  That
14  cash has not yet reached company's
15  concentration account to be able to
16  use it."
17  Do you see that?
18  A.  I do.
19  Q.  Did you have an
20  understanding about what he meant when
21  he said, "The cash has not yet reached
22  the company's concentration account
23  for us to be able to use it"?
24  A.  Yes, I do.
25  Q.  What was your

Page 33

KUNAL KAMLANI - HIGHLY CONFIDENTIAL
1
2    understanding?
3    A.   That -- so the context
4    behind this e-mail, if you look at the
5    subject line, is preliminary daily
6    cash forecast, November 1, 2018.  The
7    company, for as long as I can
8    remember, put out a daily cash flow --
9    put out this exact form of e-mail
10   every day between the hours of 6:30
11   p.m. and midnight every night.  So the
12   company had an understanding of what
13   its liquidity position is and cash
14   position is, its various debt
15   balances, including the ABL.
16       Rajat's response with
17   respect to the money has not yet
18   reached the company's cash
19   concentration account for us to be
20   able to use it, specifically refers to
21   our daily management of the revolving
22   credit facility, and so to the extent
23   that there's cash in a regional bank
24   account that's available to the
25   company, but from a mechanical

Page 34

1    KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2    perspective, it has not reached the
3    concentration account yet, there's a
4    timing issue that would prohibit the
5    company from using that account to be
6    swept to pay down the revolver.
7        The distinction being the
8    cash is available to the company, but
9    purely due to mechanics, it cannot be
10   in the concentration account yet and
11   therefore cannot be used to pay down
12   the revolver.
13       Once money is in the
14   concentration account, it all gets
15   swept.  If you don't want money swept,
16   you don't put it in the concentration
17   account.  That is the context behind
18   this.
19   Q.  Okay.
20       And you mentioned part of
21   that context related to the
22   preliminary cash forecast.
23       Did that forecast
24   separately report on available and
25   unavailable cash?

Page 35

1    KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2    A.  (Reviewing.)  From memory,
3    historically, these reports certainly
4    had a column called available cash.  I
5    don't recall off the top of my head if
6    it also had a column called
7    unavailable cash.  It may have.  It
8    may have.
9        But certainly, it's
10   something we tracked because managing
11   the company's revolving credit
12   facility was extremely important to
13   the company.
14   Q.  Why was that extremely
15   important?
16   A.  For lots of reasons.  One,
17   to the extent you can keep your
18   revolver balance low, you incur less
19   interest expense.  Knowing how much
20   availability we had on the revolver at
21   any point in time was important to
22   decisions that management would make
23   with respect to buying inventory,
24   procuring services.  It's -- it's --
25   cash and available liquidity is the

Page 36

1    KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2    lifeline of the company.  It's
3    important.
4    Q.  Turning back to this
5    Exhibit 3, at the top of the page you
6    responded, "I suspect there is a way
7    to get to that 59."
8        What did that mean?
9    A.  (Reviewing.)
10       What that meant was --
11   again, I don't have the ABL balances
12   in front of me.  But the context
13   behind this sentence is, we always
14   have an interest -- had an interest of
15   making sure that the revolver was paid
16   down as low as it possibly could be
17   paid down.
18       The reason for that is,
19   there's no point in having cash
20   sitting in the ecosystem of the
21   company and not paying down the
22   revolver because then we are incurring
23   interest expense on a high revolver
24   balance.
25       So the intent of my

Page 37

KUNAL KAMLANI - HIGHLY CONFIDENTIAL

1  sentence here was let's drive higher
2  efficiencies, figure out how to get
3  this $59 million in the concentration
4  account so we can pay down the
5  revolver to a lower balance because
6  interest expense would be lower, and
7  also the ability to use that cash by
8  drawing on the revolver gives us far
9  more flexibility than if it's sitting
10  in 20 or 30 states around the country
11  and, you know, trying to get it if you
12  need it.
13  Q.  And you wrote, "We should
14  definitely figure that out"?
15  A.  Correct.
16  Q.  Do you know if anybody did
17  figure a way to get to that?
18     Do you know?
19  A.  I do.  So I can't tell you
20  whether it was on November 2nd or not,
21  but there were, you know,
22  conversations -- multiple
23  conversations with M-III, including
24  Mo -- and M-III is here -- where we

Page 38

KUNAL KAMLANI - HIGHLY CONFIDENTIAL

1  were collaborating in thinking
2  through, how do we take cash that is
3  within the system in ways that we may
4  not have thought of before in order to
5  pay down the ABL.
6     I can't tell you whether
7  or not those initial conversations
8  with M-III around this issue -- if
9  they originated because they called me
10  or because I called them or it was
11  because of this e-mail, but the spirit
12  of it was there is cash here in the
13  system and if we are managing cash,
14  here is one idea that we may not have
15  thought of to pay down the ABL.
16  Q.  And do you know if those
17  ideas were ever successful in making
18  that cash available?
19  A.  I believe they were.  My
20  understanding is that M-III increased
21  the expenditures toward armored -- the
22  armored car vendors in order to
23  accelerate moving cash around the
24  country to ultimately get it to the

Page 39

KUNAL KAMLANI - HIGHLY CONFIDENTIAL

1  concentration account, in order to pay
2  down more of the ABL.
3     And so, I believe, this
4  idea was ultimately acted on to some
5  extent.  I can't calibrate the level
6  of success, but I believe this idea
7  got some traction.
8  Q.  If you turn back to page
9  2, if you look at the top of the page,
10  part of Mr. Prakash's e-mail to you.
11     Do you see the last bullet
12  in his e-mail says, "Cash in regional
13  banks and stores could potentially be
14  freed up by working with armored cars,
15  banks, et cetera, but it might require
16  additional expense"?
17     Do you see that?
18  A.  I do.
19  Q.  And is that what you were
20  referring to in your answer just now?
21  A.  It wasn't what I was
22  referring to.  I was referring to two,
23  if not three, possibly more conference
24  calls with M-III with respect to

Page 40

KUNAL KAMLANI - HIGHLY CONFIDENTIAL

1  brainstorming how we can take cash we
2  already have and be more efficient
3  with it by paying down the ABL.
4     I wasn't referring to this
5  sentence, but this sentence is
6  perfectly consistent with the line of
7  thinking at the time.
8  Q.  If money was moved from an
9  unavailable category, like the cash in
10  regional banks, to be in the
11  concentration account, could that
12  money then also be used to pay
13  accounts payable?
14     MR. LIMAN: Objection to
15  form.
16     THE WITNESS: The answer is
17  yes, but practically -- the
18  answer is yes.  The answer is
19  yes.
20  BY MS. MISHKIN:
21  Q.  Okay.
22     And what, practically
23  speaking, might change that answer
24  from a "yes"?

18-23538-shl    Doc 4975    Filed 08/23/19    Entered 08/23/19 16:49:48    Main Document
Pg 11 of 205

IN RE Sears
Holdings

HIGHLY CONFIDENTIAL

Kunal Kamlani
August 15, 2019

Page 41

KUNAL KAMLANI - HIGHLY CONFIDENTIAL
1 KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2 A.  So I think it's important
3 to understand what the purpose of the
4 concentration account was and is.
5 When you put money in the
6 concentration account, the underlying
7 assumption is that's what the banks
8 are sweeping down to zero that day to
9 pay down the revolver.
10     You would not put money in
11 the concentration account if you do
12 not want the banks to sweep it down.
13 That's why you put money in the
14 concentration account.
15     So to answer your specific
16 question in that context, you put
17 money in the concentration account.
18 The bank sweeps it down.  And then --
19 then you borrow on the revolver in
20 order to pay the accounts payable
21 that's due.
22     So the reason the answer
23 is yes, but understanding the
24 mechanics is important, is that
25 putting cash in the concentration

Page 43

1 KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2 were listed as available cash in those
3 daily forecasts?
4     MR. LIMAN: Objection to
5     form.
6     THE WITNESS: Available
7 cash, to the extent that it
8 showed up in that column and in
9 that cell on the Excel
10 worksheet, typically was cash
11 that would come in after the
12 cutoff time for which it could
13 be put in the concentration
14 account and -- let me restate
15 that.  Let's strike that.
16 I don't know the exact time
17 the revolver sweeps, but for
18 this conversation, let's assume
19 it's 2:00 p.m.  Let's assume we
20 sell a piece of real estate, and
21 it closes at 3:00 p.m.  So
22 $30 million comes in.
23 $30 million comes in.  The
24 cash is available to the
25 company.  But we missed the

Page 42

1 KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2 account in its first instance doesn't
3 pay accounts payable.  Putting cash in
4 the concentration account gets swept
5 by the banks; then you can borrow on
6 the revolver in order to pay your
7 accounts payable.
8 Q.  Before I forget, we talked
9 about the preliminary daily cash
10 forecast that kind of led to this
11 e-mail chain.
12     And I think you testified
13 before that you remembered there was
14 at least a column that talked about
15 available cash?
16 A.  Yes.
17 Q.  What were -- what was
18 available cash in those forecasts?
19     MR. LIMAN: Objection to
20     form.
21     BY MS. MISHKIN:
22 Q.  Let me ask it better
23 because I am not asking for a number,
24 especially back in November.
25     I'm asking what categories

Page 44

1 KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2 cutoff to put it into the
3 concentration account, so the
4 next day, the 30 million would
5 go from available cash into the
6 concentration account.  It would
7 get swept, and it would pay down
8 the revolver.
9 I do think it is critically
10 important, though, to make the
11 distinction that available cash
12 in the context of the daily cash
13 flow report specifically meant
14 cash that was available to the
15 company most likely within a
16 24-hour time period, such that
17 it could be moved to the
18 concentration account to pay
19 down the revolver.
20 "Available cash," as it's
21 used in the bid letter and the
22 APA, is a completely different
23 context and it's not the context
24 that the way the term was used
25 in the daily cash flow report.

Page 53

KUNAL KAMLANI - HIGHLY CONFIDENTIAL

1   KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2     So, again, the key
3   distinction is, available cash in the
4   context of the daily report was
5   specifically with respect to what
6   could get into the concentration
7   account to pay down the revolver,
8   which is entirely in the estate's
9   control.
10     The context of available
11   cash in the bid letter and in the
12   purchase agreement is on the day of
13   closing, what cash was legally
14   available to the estate to pay down
15   liabilities that we had assumed.
16   Q.  No surprise here. I am
17   sure I have a couple of follow-up
18   questions.
19     Can we go back to that bid
20   letter?
21   A.  Sure.
22   Q.  Once again, it's Exhibit C
23   in the declaration.
24     So you just testified, Mr.
25   Kamlani, the context of available cash

Page 54

1   KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2   in the bid letter and the purchase
3   agreement is on the day of closing
4   what cash was legally available to the
5   estate to pay down liabilities that we
6   assumed.
7     Do you remember that was
8   your testimony?
9   A.  I do.
10   Q.  And in the bid letter --
11   directing you back to the same
12   paragraph we have been looking at, the
13   bid letter states, "In the event that
14   the sum of the amounts outstanding
15   under debtor's first lien ABL DIP
16   facility and debtor's junior DIP
17   facility, net of any cash available to
18   pay down such amounts."
19     I think we discussed
20   earlier that the phrase "pay down such
21   amounts" refers to the debtor's DIP
22   facilities; is that right?
23   A.  It does.
24   Q.  So how could the estate
25   use cash that was, for example, in an

Page 55

1   KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2   armored truck to pay down the DIP
3   facility?
4     MR. LIMAN: Objection to
5   form.
6     THE WITNESS: It is up to
7   the estate to either accelerate
8   cash from wherever it is, in an
9   armored truck, in a store, in a
10   regional bank account, to get to
11   the concentration account or
12   not.
13   If they chose to leave
14   $800 million in an armored
15   truck, you would be correct.
16   They could not pay down the ABL
17   of the DIP facility.
18   If they chose to accelerate
19   their cash movement operations
20   and get that money into a
21   concentration account, then, in
22   fact, they could pay down the
23   DIP facility.
24   Now, having said that,
25   because of the mechanics of the

Page 56

1   KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2   way the concentration account
3   works, it would make no sense
4   for the estate to put one penny
5   more than $1.2 billion in the
6   concentration account because
7   the banks would have swept it
8   all, which wouldn't have made
9   any sense.
10   What we bargained for was
11   an aggregate DIP amount between
12   the ABL and the junior DIP of no
13   more than 1.2 billion
14   outstanding on the day of close
15   and to the extent that there was
16   available cash above and beyond
17   that, if we received an offset
18   for liabilities.
19   What we did not ask for is
20   if you have available cash above
21   $1.2 billion, you must put it
22   all in the concentration
23   account. And on top of that, if
24   there was available cash above
25   the $1.2 billion, we also get a

Page 61

1  KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2  that were within the ecosystem of
3  Sears:  the amount in transit in
4  armored trucks, the amount in regional
5  bank accounts, et cetera.
6      We relied on the financing
7  treasury function to manage cash in
8  the most efficient -- efficient
9  manner.  So in the months of January
10  to, you know, October 14th of 2018,
11  other than what we went through on
12  that e-mail where it showed the
13  breakdown of unavailable cash in the
14  context of what could be used to pay
15  down the revolver, it was only then
16  that I was aware of the cash in the
17  different regions.
18  Q.  In a minute, I am going to
19  ask for that promised break, but
20  before I forget --
21  A.  Sure.
22  Q.  -- and this morning a
23  couple of times you mentioned during
24  your testimony, the concept of legally
25  available cash?

Page 62

1  KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2  A.  Yes.
3  Q.  I just want to understand
4  what you meant by that.
5  A.  By legally available cash,
6  cash that the company has the right to
7  access and use.  The example I can
8  give you is, if the company had, you
9  know, cash in a regional bank account
10  in Wisconsin, it was the company's
11  cash.  They could pick up the phone;
12  ask them to wire the cash; it's their
13  cash.
14      We could not pick up the
15  phone and call First Data and ask them
16  to wire the cash they were holding for
17  different purposes because First Data
18  had a contractual right to hold that
19  cash.  That was not legally available
20  cash to the company, absent a long
21  fought court battle.
22      It's cash that's available
23  to the company by, you know, picking
24  up the phone, directing an armored car
25  to go in one direction or the other,

Page 63

1  KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2  being able to move cash around the
3  system.  It's available to them,
4  legally available.
5  Q.  And where are you getting
6  the term "legally available cash"?
7  Is that in the APA?
8      MR. LIMAN: Objection to
9  form.
10      THE WITNESS: No, I -- I
11  don't believe it is.
12      BY MS. MISHKIN:
13  Q.  And we took a quick look
14  at the January 9th bid letter and the
15  term "legally available cash" was not
16  in there, right?
17  A.  It is not.  There's also
18  not language in there that says
19  available cash as the cash designated
20  in the operating account.
21  Q.  In the daily forecast we
22  have been talking about that the
23  debtor provided, is the term "legally
24  available cash" used there?
25  A.  No.

Page 64

1  KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2  Q.  Is that a -- it's a Mr.
3  Kamlani term; is that right?
4      MR. LIMAN: Objection to
5  form.
6      THE WITNESS: I am sure
7  other people have used it as
8  well.  I am doing my best to
9  describe what available cash
10  meant certainly to me and in my
11  conversations with M-III, and
12  likely Lazard, as to what the
13  spirit of available cash was in
14  this context.
15  The spirit of what
16  available cash meant in this
17  context would be cash available
18  to pay down liabilities.  If
19  cash was available to pay down
20  liabilities, it was available.
21  If cash was not available to pay
22  down liabilities, then it wasn't
23  available to anybody, and we
24  shouldn't be entitled to a
25  dollar-for-dollar offset.

Page 73

KUNAL KAMLANI - HIGHLY CONFIDENTIAL
1  KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2  chart, put together presumably by
3  Lazard and M-III and Weil, shows
4  the -- on the first column, it's a
5  representation of the administrative
6  liabilities that the estate has in
7  addition to the debt position.
8      It then shows -- the
9  second column is the value provided by
10  ESL in its bid.
11     The third column is taking
12  the first column, subtracting the
13  value of the ESL to show what
14  remaining claims are left over after
15  our bid at this point in time.
16     And the last column is
17  titled "The additional value required
18  after application of other sources of
19  value."
20  Q.  I want to ask you about
21  that "additional value required"
22  column.
23     Is it fair to say that the
24  items listed in that column represent
25  potential sources of value --

Page 74

1  KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2  A.  (Reviewing.)
3  Q.  -- at that time?
4  A.  The only reason I am
5  hesitating is I don't understand all
6  the mechanics of the professional fee
7  carve-out account.
8     Other than that line, each
9  of these lines were certainly
10  sources -- potential sources of value
11  at that time.
12  Q.  For example, the column
13  lists "ship sale proceeds," right?
14  A.  Correct.
15  Q.  Ultimately, a ship sale
16  did not happen?
17  A.  That ship did not sale.
18  Q.  I see that.
19     And you see in that same
20  column, it lists "company cash, 89
21  million."
22     Do you see that?
23  A.  I do.
24  Q.  Flipping back to paragraph
25  14 of your declaration, which is on

Page 75

1  KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2  page 7 of 46.
3  A.  (Reviewing.)  Okay.
4  Q.  Instead of me driving the
5  court reporter crazy again, do you
6  just want to take a minute and read
7  paragraph 14?
8      MR. LIMAN: Read it to
9  himself?
10     MS. MISHKIN: Yes, unless
11  you're dying to read it out
12  loud.
13     THE WITNESS: No.  I will
14  read it to myself.  Thank you.
15  (Reviewing.)  I have read
16  it.
17     BY MS. MISHKIN:
18  Q.  And you mention in that
19  paragraph an 89 million in company
20  cash.
21     Do you see that?
22  A.  I do.
23  Q.  Okay.
24     At the end of that
25  paragraph, you said it was your

Page 76

1  KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2  understanding that this referred to
3  cash that could be used to satisfy the
4  administrative claims and was not
5  limited to cash in the operating
6  accounts or that could be used to
7  satisfy the DIP.
8     Do you see that?
9  A.  Yes.
10  Q.  What was your basis of
11  that understanding?
12  A.  The presentation that we
13  were just looking at, it was put
14  together by the debtor's advisors.
15     On page 1 of that
16  presentation, in the documents we are
17  looking at, page 23 of 46, references
18  in the last column, less company cash
19  of 89 million.  That, as it's
20  presented here, shows -- the top of
21  the column says $680 million.
22     That $680 million is the
23  same number at the bottom of the third
24  column that shows what the advisors
25  represent to be the remaining claims

Page 81

1  KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2  15 of your declaration. And, again,
3  feel free to read to yourself the
4  entire paragraph.
5      I am going to ask you
6  about where you discuss the
7  opportunities and action slide in the
8  closing tracker.
9      Let me know when you're
10  done.
11  A.  Sure.
12      (Reviewing.) Okay. I
13  have read it.
14  Q.   And in this paragraph, you
15  were referring to a closing tracker
16  slide labeled "opportunity and
17  actions"; is that right?
18  A.  Yes.
19  Q.   And that is a slide that's
20  part of -- attached to Exhibit B to
21  your declaration.
22  A.  I am just going to turn to
23  it.
24      (Reviewing.)
25  Q.   It's at page 25 of 46.

Page 82

1  KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2  A.  (Reviewing.) Okay.
3  Q.   Is it fair to say the word
4  "opportunities" represents future
5  potential occurrences?
6  A.  (Reviewing.)
7      MR. LIMAN: Objection to
8  form. Foundation.
9      THE WITNESS: Could you
10  tell me specifically which page
11  you're on in the closing
12  tracker?
13      BY MS. MISHKIN:
14  Q.   It is the last page of
15  that slide, page 32 of 46.
16  A.  Okay.
17  Q.   Do you see that slide is
18  titled "opportunity and actions"?
19  A.  Yes, I do.
20  Q.   So is an opportunity a
21  certainty?
22      MR. LIMAN: Objection to
23  form.
24      THE WITNESS: Did you ask
25  is an opportunity a certainty?

Page 83

1  KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2      BY MS. MISHKIN:
3  Q.  Yes.
4  A.  No, an opportunity is not
5  a certainty. An opportunity is
6  something that is possible that may or
7  may not come to fruition.
8      THE REPORTER: 4.
9      (Exhibit 4 is Marked.)
10      BY MS. MISHKIN:
11  Q.  If you want to, you could
12  put away your declaration, Mr.
13  Kamlani. I am not going to ask about
14  it right this second.
15  A.  Do I need the opportunity
16  slide for this next question?
17  Q.  I don't think so, no.
18  A.  Okay.
19  Q.  Have you seen Exhibit 4
20  before?
21  A.  Let me just read it.
22      (Reviewing.) I am
23  familiar with this discussion.
24  Q.  The top e-mail in that
25  chain is an e-mail from you on

Page 84

1  KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2  January 3, 2019, to Chris Good of
3  M-III; is that right?
4  A.  Yes.
5  Q.  And the subject is, "Re:
6  A hundred million of restricted cash";
7  is that true?
8  A.  Yes.
9  Q.  So in your e-mail to
10  Mr. Good, you said, "We have assumed
11  that there is approximately a hundred
12  million of cash in the unavailable
13  cash bucket, which as of yesterday
14  shows 357 million for February 1st,
15  that is ABL collateral."
16      Do you see that?
17  A.  Yes.
18  Q.  And then the next sentence
19  you said, "Upon the closing of a
20  transaction, we understand that that
21  cash would be used to pay down the
22  ABL."
23      Do you see that?
24  A.  Yes.
25  Q.  I am going to ask you

Page 85

KUNAL KAMLANI - HIGHLY CONFIDENTIAL
1  about the next couple of sentences
2  just to make sure I understand them.
3  A.  Okay.
4  Q.  The next sentence in your
5  e-mail you wrote, "Depending on where
6  exactly that cash comes from" -- when
7  you said "that cash," does that mean
8  the hundred million of cash in the
9  unavailable cash bucket that you
10 reference in your first sentence of
11 that e-mail?
12 A.  Yes.
13 Q.  And then that third
14 sentence goes on to read, "Depending
15 on where exactly that cash comes from,
16 we understand that we would need to
17 build it up."
18    What is "it" referred to
19 at the end of that sentence?
20 A.  The hundred million of
21 cash.
22 Q.  And then the next sentence
23 in that paragraph, you wrote, "As an
24 example, if it comes out of cash

Page 86

KUNAL KAMLANI - HIGHLY CONFIDENTIAL
1  registers, we would need to
2  replenish."
3     What does the "it" refer
4  to in that sentence?
5  A.  The same hundred million
6  of cash.
7  Q.  And why would you need to
8  replenish that cash if it came out of
9  cash registers?
10 A.  Because the stores need
11 cash in their registers to conduct
12 business with customers on a
13 day-to-day basis.
14 Q.  And then your next
15 sentence you wrote, "It is not clear
16 to me that if it comes out of regional
17 banks that we would need to
18 replenish."
19    In that sentence, does the
20 "it" in "if it comes out of regional
21 bank accounts" also mean the hundred
22 million dollars of cash in the
23 unavailable cash bucket?
24 A.  Yes.

Page 87

1  KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2  Q.  And why was it not clear
3  to you if you would need to replenish
4  that -- the cash if it came out of
5  regional bank accounts?
6  A.  Because at the time I
7  didn't have a good understanding of
8  why it was we needed -- or the estate,
9  ultimately we, would need to keep cash
10 in all these regional bank accounts.
11    So depending on,
12 ultimately, what their rationale was
13 for keeping that cash there -- there
14 may have been good operating reasons
15 to keep it there.  There may not have
16 been, which is why it wasn't clear to
17 me at the time.
18 Q.  Turning back to the
19 beginning of your e-mail, you said,
20 "We have assumed that there's
21 approximately a hundred million of
22 cash in that unavailable cash bucket."
23    What was your assumption
24 of that number based on?
25 A.  So this e-mail is dated

Page 88

1  KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2  January 3rd.  I don't have the
3  chronology of when the unavailable
4  cash was -- the attribution of that
5  unavailable cash was shared with us.
6  But I suspect it was before this
7  e-mail -- suspect it was before this
8  e-mail.
9     And that allowed us to
10 make the assumption that a hundred
11 million dollars of that 357 million
12 would become available.
13 Q.  And based on -- your
14 assumption was that a hundred million
15 dollars would become available at some
16 point to pay down the DIP facility,
17 correct?
18 A.  Yeah.  I believe at this
19 time, to put this e-mail in context,
20 there was a discussion between myself
21 and M-III where they maintained that
22 they would not be able to get the DIP
23 balance below $1.3 billion.
24    As we know sitting here
25 today, we were of the view, based on

18-23538-shl    Doc 4975    Filed 08/23/19    Entered 08/23/19 16:49:48    Main Document
Pg 17 of 205
HIGHLY CONFIDENTIAL
IN RE Sears
Holdings
Kunal Kamlani
August 15, 2019

Page 93

KUNAL KAMLANI - HIGHLY CONFIDENTIAL
1  KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2  was page 23 of 46, but I am just going
3  to ask you the same question.
4      What would have to happen
5  in order for that 89 million to be
6  able to be used to reduce
7  administrative claims in that case?
8      MR. LIMAN: Objection to
9  the form.
10     THE WITNESS: So for that
11  89 million to be used, to reduce
12  administrative claims --
13  presumably you're talking about
14  reducing administrative claims
15  starting the day after the close
16  of the transaction?
17     BY MS. MISHKIN:
18  Q.  Why don't we start before
19  closing, and tell me if that changes
20  your answer.
21     Why don't you tell me what
22  the answer -- bad question.  Let me
23  try it over.
24     So, yes, let me take your
25  premise that for the $89 million in

Page 94

1  KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2  company cash listed in that Exhibit A,
3  for that to be used to pay down
4  administrative claims post-closing,
5  say, starting day 1, what would have
6  to happen?
7      MR. LIMAN: Objection to
8  the form.
9  Do you mean as they became
10  due?
11  MS. MISHKIN: Sure.  As
12  they became due.
13  THE WITNESS: I think of it
14  very simply in layman's terms.
15  There's $89 million after
16  the closing that's available to
17  pay down administrative claims.
18  Someone needs to open a bank
19  account or use one they have.
20  Cash needs to ultimately get
21  into a bank account.  Someone
22  presumably needs to authorize a
23  payment.  Someone sends a check
24  or releases a wire to the
25  counterparty, and that's how you

Page 95

1  KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2      pay somebody.
3      BY MS. MISHKIN:
4  Q.  At the time of the
5  January 3rd e-mail that we were just
6  looking at, which was Exhibit 4, where
7  you assumed a hundred million of cash
8  in the unavailable cash bucket, did
9  you know what portion of that hundred
10  million dollars was cash-in-transit?
11  A.  I may have known at the
12  time.  Sitting here today, again, I --
13  I don't have the attribution of the
14  cash in front of me that I may have
15  had at the time, but I am fairly
16  certain I did not pull a hundred
17  million out of thin air.  I had
18  something in front of me.
19  Q.  Sure.
20     THE REPORTER: 5.
21     (Exhibit 5 is Marked.)
22     BY MS. MISHKIN:
23  Q.  Mr. Kamlani, can you take
24  a couple of minutes to look at what's
25  been marked as Exhibit 5, and tell me

Page 96

1  KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2  if you recognize this document?
3  A.  (Reviewing.)  I have read
4  the document.
5  Q.  And the first e-mail in
6  that chain, which is at the bottom of
7  the page, is an e-mail from you to
8  some folks at M-III and Sears on
9  October 22, 2018.
10     Do you see that?
11  A.  I do.
12  Q.  And the subject is "cash"?
13  A.  Yes.
14  Q.  And you wrote, "The
15  unavailable cash (in transit) as of
16  10/19 was 412 million."
17     Do you see that?
18  A.  Yes.
19  Q.  When you said "in transit"
20  in that parenthetical, does that mean
21  cash-in-transit?
22  A.  Yes, cash-in-transit.
23  Q.  Cash-in-transit includes
24  cash in regional banks?
25  A.  I didn't think of it that

18-23538-shl   Doc 4975   Filed 08/23/19   Entered 08/23/19 16:49:48   Main Document
Pg 18 of 205

IN RE Sears
Holdings

HIGHLY CONFIDENTIAL

Kunal Kamlani
August 15, 2019

Page 97

1  KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2  way at the time.  I couldn't even try
3  to think of it that way now.
4     Cash-in-transit -- so
5  there are -- let me start again.
6     There are -- the company
7  used the terms "in transit" in this
8  period of time, I believe, two ways.
9  One way was credit card
10  cash-in-transit.  And the context for
11  that is the credit card companies paid
12  us two to three days after a customer
13  bought something and charged the
14  credit card.
15     So that was
16  cash-in-transit on its way over to the
17  company on a two- to three-day lag.
18  There's cash-in-transit, in the
19  literal sense, in armored cars on the
20  road.
21     I thought about cash in
22  regional banks, not in transit,
23  because it wasn't moving.  It's
24  sitting in regional banks, whereas
25  credit card cash is literally moving

Page 98

1  in transit to the company.
2     Armored car cash is
3  actually in transit somewhere.  Maybe
4  going to regional bank account.  Maybe
5  going to the concentration account.
6  It's in transit.  But I suspect if you
7  were to ask other people at the
8  company -- because these terms were
9  used very loosely, it's very possible
10  someone would tell you they thought of
11  regional bank account cash as
12  cash-in-transit, but in my own mind, I
13  do not.
14  Q.  And cash-in-transit falls
15  into the unavailable cash bucket?
16     MR. LIMAN: Objection to
17  the form.
18  THE WITNESS:
19  Cash-in-transit as used in the
20  daily report, because it is cash
21  that is not in the concentration
22  account, and therefore is
23  unavailable on that day to pay
24  down the revolver, is considered

Page 99

1  KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2  on that report unavailable cash
3  because it is unavailable to pay
4  down the revolver.
5  MS. MISHKIN: With
6  apologies, because I know with
7  we haven't been going that long,
8  but I need to take another quick
9  break.
10  Is five minutes okay?
11  THE WITNESS: Sure.
12  (Whereupon a Recess
13  Commenced at 10:42 and Testimony
14  Recommenced at 10:49.)
15  BY MS. MISHKIN:
16  Q.  Mr. Kamlani, in the APA,
17  there are various targets that debtors
18  were supposed to hit, and if they
19  didn't hit them, Transform would get
20  offsets to the liabilities they had
21  assumed; is that right?
22  A.  There were closing
23  conditions that were required in order
24  to close the transaction and then
25  there were, separate and apart from

Page 100

1  KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2  the closing conditions -- so the
3  $1.2 billion aggregate ABL outstanding
4  amount, that was a closing condition.
5     Separate and apart from
6  that, there were other mechanisms
7  within the asset purchase agreement
8  that provided for a reduction in
9  liabilities if they were not met.
10  Q.  An example would be
11  pre-paid inventory; if there was a
12  pre-paid inventory shortfall, that
13  would result in a dollar-for-dollar
14  reduction of liabilities for
15  Transform?
16  A.  Yes.
17  Q.  And if there was a
18  warranty receivable shortfall amount,
19  that would also result in a
20  dollar-for-dollar reduction of
21  liabilities for Transform?
22  A.  Any specified receivable
23  shortfall.
24  Q.  And we have discussed
25  there was the aggregate DIP shortfall

Page 101

1 KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2 amounts, meaning the debtors paid over
3 the DIP facility amounts, there would
4 be a dollar-for-dollar reduction of
5 liabilities for Transform?
6     MR. LIMAN: Objection to
7 the form.
8     THE WITNESS: I want to
9 make sure we don't talk past
10 each other in this point.
11 To the extent that there
12 was available cash after -- over
13 and above the DIP balance being
14 no higher than $1.2 billion at
15 closing, then Transform was
16 entitled to a dollar-for-dollar
17 offset equal to the amount of
18 that available cash.
19     BY MS. MISHKIN:
20 Q.  And I think you said this,
21 but if the debtors had not paid the
22 DIP balance down to 1.2 billion, the
23 remedy was not an offset in
24 liabilities; it was a closing
25 condition, right?

Page 102

1 KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2     MR. LIMAN: Objection to
3 the form.
4     THE WITNESS: So it was a
5 condition to close.  I don't
6 want to speak to remedies.  It
7 was a condition to closing.
8     BY MS. MISHKIN:
9 Q.  So if that closing
10 condition had not been met, Transform
11 could walk away from the APA deal?
12 A.  My understanding was we
13 would have had to make -- we would
14 have had a choice to make, whether or
15 not to close or not, yes.
16 Q.  And the reason that was a
17 closing condition is because new
18 financing was tied to the debtor's
19 ability to pay down the DIP balance?
20 A.  Yes, we had structured our
21 financing to close on the acquisition
22 based on funding/taking out
23 $1.2 billion of debt.
24 Q.  Can you please take out
25 your declaration again?

Page 103

1 KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2 A.  Sure.
3 Q.  I am going to ask you to
4 turn to your paragraph 8, which is on
5 page 3 of 46.
6 A.  Let me take a moment to
7 read it.
8     (Reviewing.) Okay.
9 Q.  In that first sentence of
10 paragraph 8, I am going to read it,
11 but I will do it slowly this time.
12     "The notion of the
13 aggregate DIP shortfall amount and
14 that Transform's obligations to assume
15 liabilities would be reduced in the
16 event that the aggregate DIP shortfall
17 amount was a positive number, as well
18 as the notion that the aggregate DIP
19 shortfall amount would be increased by
20 'available cash' was critical to those
21 discussions."
22     Critical to whom?
23 A.  It was critical to the
24 negotiations, which ultimately allowed
25 both sides to enter into this

Page 104

1 KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2 transaction knowing that we had a fair
3 and symmetrical mechanism by which
4 regardless of how the forecasts
5 ultimately actualized, that these
6 liabilities would either be wholly
7 assumed by Transform as contemplated
8 or in part assumed by the estate
9 because of the scenario where there
10 was available cash above and beyond
11 the $1.2 billion.
12     This was a fundamental and
13 critical part of the transaction.
14 There would -- I don't believe there
15 would have been a transaction without
16 this construct had it not come to
17 bear.  So it's critical to those
18 discussions.
19 Q.  And further down in that
20 paragraph, on the part that goes over
21 to page 4 -- it's kind of in the
22 middle.
23     I am looking at the
24 sentence that starts, "That provision
25 was designed to protect Transform

Page 105

1  KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2  against the risk that debtors
3  underestimated how much cash they
4  would have to satisfy the
5  administrative expenses or
6  overestimated the amount of
7  liabilities that they represented they
8  needed Transform to assume."
9      Do you see that?
10  A.  I do.
11  Q.   Among the liabilities that
12  Transform was going to assume was up
13  to a $166 million of other payables?
14  A.   That was one of the
15  several hundreds of millions of
16  dollars of liabilities we assumed.
17  That was one of them.
18  Q.   And just to be clear, of
19  the other payables, there was a cap of
20  a 166 million that Transform would
21  assume?
22  A.   Correct.  It was up to
23  $166 million.
24  Q.   Another category of
25  liabilities that Transform was going

Page 106

1  KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2  to assume was up to 139 million of
3  503(b)(9) claims; is that right?
4  A.   That's right.
5  Q.   But Transform is not going
6  to assume over $139 million of
7  503(b)(9) claims?
8  A.   That's correct.
9  Q.   And another category of
10  liabilities that Transform was going
11  to assume was up to 43 million of
12  severance reimbursement obligations;
13  is that right?
14  A.   That's right.
15  Q.   But not over 43 million?
16  A.   That's correct.
17  Q.  So the extent -- to the
18  extent that any of those categories of
19  liabilities we just discussed were in
20  excess of what was assumed, the
21  debtors bore that risk?
22  A.   The debtors bore the risk
23  of their forecast with respect to the
24  liabilities that they presented to us
25  were incorrect.  So rather than engage

Page 107

1  KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2  in a discussion where we provided them
3  with our view of how much cash was
4  going to be available, what the
5  aggregate ABL DIP would be, and what
6  we thought the liabilities were and
7  ask them to take our word for it, we
8  said, okay; we will take your word for
9  it.
10      Presumably they were much
11  closer to the liability estimates than
12  we were, as they were managing the
13  estate.  And so in this instance, they
14  bore the risk that if the liabilities
15  came in in an excess of what they
16  represented to us, yes, they bore that
17  risk.
18  Q.   And Transform's risk with
19  respect to those categories was
20  limited to the numbers that we just
21  discussed with respect to each of
22  those categories -- to those caps?
23  A.   Our risk was that if we
24  assumed those liabilities, along with
25  those caps, and the estate ultimately

Page 108

1  KUNAL KAMLANI - HIGHLY CONFIDENTIAL
2  had more cash available when all was
3  said and done, that they could have
4  satisfied those liabilities, then we
5  would have been in a position where we
6  should have never accepted them in the
7  first place.
8      So the point of this
9  provision was to be able to say yes to
10  the estate; we will assume all the
11  liabilities you're asking us to
12  assume, but we are also asking you to
13  assume that your cash number is right.
14  And to the extent -- to the extent
15  there's available cash that you would
16  have used to pay down these
17  liabilities in the event we had not
18  assumed them, then we should receive a
19  dollar-for-dollar offset, which
20  ultimately was agreed to.
21  Q.   So essentially, the risk
22  to Transform was that the debtors, if
23  they had underestimated the available
24  cash, would be getting a better deal
25  than they otherwise would have?

HIGHLY CONFIDENTIAL

Page 129

1    A C K N O W L E D G E M E N T
2   STATE OF _____
3   COUNTY OF _____
4
5      I, the undersigned,
6   hereby certify that I have read the
7   transcript of my testimony taken under
8   oath in my deposition; that the
9   transcript is a true and complete and
10  correct record of my testimony, and
11  that the answers on the record as
12  given by me are true and correct.
13
14  _____
15   KUNAL KAMLANI
16
17   Signed and subscribed to
18  before me
19   This _____ day of
20  _____,
21   20__.
22
23  _____
24  Notary Public
25

Page 130

1           I, S. Arielle Santos,
2    Certified Shorthand Reporter,
3    Certified LiveNote Reporter do hereby
4    certify:
5     That prior to being examined, the
6    witness named in the forgoing
7    deposition, was by me duly sworn to
8    testify the truth, the whole truth,
9    and nothing but the truth.
10    That said deposition was taken before
11   me at the time and place set forth and
12   was taken down by me in shorthand and
13   thereafter reduced to computerized
14   transcription under my direction and
15   supervision, and I hereby certify the
16   foregoing deposition is a full, true
17   and correct transcript of my shorthand
18   notes so taken.
19    I further certify that I am neither
20   counsel for nor related to any party
21   to said action nor in anywise
22   interested in the outcome thereof.
23
24  _____
25    S. Arielle Santos, CCR, CLR

# *EXHIBIT B*

**In The Matter Of:**

*IN RE Sears*
*Holdings*

---

*Robert Riecker*
*August 20, 2019*

---



*Min-U-Script® with Word Index*

18-23538-shl    Doc 4975    Filed 08/23/19    Entered 08/23/19 16:49:48    Main Document
IN RE Sears
Holdings
Pg 24 of 205
Robert Riecker
August 20, 2019

---

**Page 1**

```
 1              IN THE UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF NEW YORK
 2
                 Chapter 11 - Case No. 18-23538 (RDD)
 3

 4   _____x

 5   IN RE: SEARS HOLDINGS

 6   CORPORATION, et al.,

 7

 8           Debtor.

 9   _____x

10

11

12           The deposition of ROBERT RIECKER, called by

13   the Debtors and Debtors-In-Possession for

14   examination, pursuant to the Rules of Civil

15   Procedure for the United States District Courts,

16   taken stenographically by Sandra L. Rocca, CSR, CRR,

17   at 3333 Beverly Road, Hoffman Estates, Illinois, on

18   the 20th of August, 2019, at the hour of 1:00 p.m.

19

20

21

22

23

24   Job No. 2019-75180

25   Certification No. 084-003435
```

---

**Page 2**

```
 1   APPEARANCES:

 2       WEIL GOTSHAL & MANGES LLP
         By:  MR. JAKE RUTHERFORD
 3       200 Crescent Court, Suite 300
         Dallas, Texas  75201
 4       214.746.8119
         jake.rutherford@weil.com
 5
              -and-
 6
         WEIL GOTSHAL & MANGES LLP
 7       By:  MR. JARED R. FRIEDMANN
         767 Fifth Avenue
 8       New York, New York  10153
         212.310.8000
 9       jared.friedmann@weil.com

10       appeared on behalf of the
         Debtors and Debtors-in-Possession,
11       Sears Holdings Corporation;

12
         AKIN GUMP STRAUSS HAUER & FELD, LLP
13       By:  MR. JOHN KANE
         One Bryant Park
14       New York, New York  10036
         212.872.1000
15       jkane@akingump.com

16       appeared via telephone on behalf of the
         Unsecured Creditors;
17

18       CLEARY GOTTLIEB STEEN & HAMILTON LLP
         By:  MS. ABENA MAINOO
19            MR. BRIAN P. GIUNTA
         One Liberty Plaza
20       New York, New York  10006
         212.225.2785
21       amainoo@cgsh.com
         bgiunta@cgsh.com
22
         appeared on behalf of Transform Holdco.
23

24   Also Present:

25       Mr. Nick Webber, M-III
```

---

**Page 3**

```
 1                    I N D E X

 2   WITNESS                                    PAGE

 3   ROBERT RIECKER

 4   EXAMINED BY

 5       Mr. Friedmann                            5
         Ms. Mainoo                              76
 6       Mr. Friedmann                           81

 7

 8                    EXHIBITS

 9   NUMBER                          MARKED FOR ID

10   Riecker

11   Exhibit 1   SEARS_ENFORCE0001160 to 1161
                 with spreadsheet                 5
12
     Exhibit 2   8/14/18 K. Kamlani email        11
13
     Exhibit 3   SEARS_ENFORCE0001175 to 1176
14               with spreadsheet, 3 pages       15

15   Exhibit 4   email string 2/6/19 from
                 B. Griffith                      16
16
     Exhibit 5   email string 11/2/18 from
17               K. Kamlani
                 SEARS_ENFORCE0000771 to 786      23
18
     Exhibit 6   R. Riecker Rule 1007-2
19               Declaration                      28

20   Exhibit 7   R. Riecker Declaration in
                 Support of Transform's
21               Adversary Complaint              31

22   Exhibit 8   Supplemental Memorandum of Law
                 in Support of Transform's
23               Adversary Complaint              68

24   Exhibit 9   J. Joye email 2/12/19           71

25   Exhibit 10  R. Prakash 10/19/18 eamil       81
```

---

**Page 4**

```
 1      ROBERT A. RIECKER,
 2   having been first duly sworn, was examined and
 3   testified as follows:
 4      CROSS EXAMINATION
 5      BY MR. FRIEDMANN:
 6   Q.  Good afternoon, Mr. Riecker.
 7   A.  Hello.
 8   Q.  So this is your second deposition in
 9   connection with APA-related disputes, correct?
10   A.  Correct.
11   Q.  You were deposed back in June, if you
12   recall?
13   A.  Yes.
14   Q.  So the same deal, you understand that you're
15   under oath and it's the same oath as if you were in
16   the court before a judge and jury, correct?
17   A.  Yes, correct.
18   Q.  And we need to be careful not to speak over
19   each other, even though you'll likely know where I'm
20   going with questions and I'll get excited to ask the
21   next one.  So we'll just be careful to take turns so
22   that the court reporter is able to get everything
23   down.
24   A.  Okay.
25   Q.  Also, the same deal, if you need a break at
```

Page 5

1  any point, it's not an endurance test, just let
2  me -- I'm happy to take a break whenever you'd like.
3  If you don't ask for a break, we'll probably take
4  one every hour or so and the only request is that
5  you not take one while a question is pending.  Okay?
6  A.  Got it.
7  Q.  Any reason why you cannot provide truthful
8  testimony today?
9  A.  No reason.
10  (Riecker Exhibit 1 marked for
11  identification.)
12  Q.  Mr. Riecker, I've just handed you what's
13  been marked as Exhibit 1.  This is an email from
14  Mr. Prakash dated Monday, August 6, 2018, to a
15  number of recipients, including Eddie Lampert, Kunal
16  Kamlani --
17  A.  Yes.
18  Q.  -- thank you -- at ESL.  I believe you also
19  are a recipient.  Though I'm --
20  A.  Correct.
21  Q.  There you are.  Second one on there.
22  Attaching a cash report from August 6, 2018.  Do you
23  see that?
24  A.  Yes.
25  Q.  And obviously take as much time as you need

Page 6

1  to look at the documents, attachments.  I'm only
2  going to be asking you right now about the very
3  first page of the email.
4  A.  Okay.
5  Q.  In particular, the email starts -- it's
6  addressed Eddie.  I assume that's Eddie Lampert?
7  A.  Yes.
8  Q.  It says, "Key assumptions.  The combined
9  cash position attachment includes August through
10  September 2018 cash flow forecast."  It then reports
11  that availability is forecasted at $82 million on
12  August 7th.  That's 2018, I believe, is that
13  correct?
14  A.  Yes.
15  Q.  And it then shows net availability for the
16  next several days, correct?
17  A.  Yes.
18  Q.  On August 7th, is it fair to say that there
19  was positive net availability in the revolver?
20  MS. MAINOO: Objection to form.
21  A.  Yes, that is correct.
22  Q.  Okay.  And then the second bullet point down
23  says, "For most vendors, domestic and import
24  payments have been shifted to an eight-day delay."
25  Do you see that?

Page 7

1  A.  Yes, I do.
2  Q.  And is that consistent with your
3  recollection that in this time period of August
4  2018, the company had shifted to an eight-day delay
5  on payments?
6  MS. MAINOO: Objection to form and lack of
7  foundation.
8  A.  On this day, correct, the report states how
9  many days delayed we are.
10  Q.  So Mr. Prakash in this email is -- at least
11  in the first two bullet points is first reporting on
12  the extent that there is net availability over the
13  next several days, and then in the second bullet
14  point is reporting that on this day, there's been a
15  shift to an eight-day delay in paying vendors, is
16  that correct?
17  A.  That's correct.
18  Q.  Is it fair to say, Mr. Riecker, that every
19  day in 2018 pre-petition, there was at least some
20  delay in paying vendors?
21  MS. MAINOO: Objection to form.
22  A.  I can't say as to every day that's -- if
23  that's a valid statement or not without looking at
24  the data from every day.
25  Q.  And to be clear, I'm referring to fiscal

Page 8

1  year 2018 when I'm asking that question, that
2  throughout fiscal year 2018, the company shifted
3  payments so that there was a delay of payments
4  throughout all of fiscal year 2018?
5  MS. MAINOO: Objection to form.
6  A.  Fiscal year 2018 would have started sometime
7  around the beginning of February.  To state that
8  every day there was a delay is -- I can't make that
9  statement.
10  Q.  Would you be able to say that a majority of
11  the days in fiscal year 2018 leading up to the
12  petition date there were delays of vendor payments?
13  MS. MAINOO: Objection to form.
14  A.  I don't know if majority would be either
15  without looking at it.  I don't know that I could
16  say that as well.
17  Q.  Okay.  It's fair to say that net
18  availability during that fiscal year 2018 period
19  pre-petition would fluctuate, it would go up and it
20  would go down depending on -- depending on the day?
21  A.  Correct.  It would go up and down depending
22  on day, depending on when some short-term debt may
23  or may not have become due and when that short-term
24  debt was then financed.
25  Q.  And was it generally the practice that when

18-23538-shl   Doc 4975   Filed 08/23/19   Entered 08/23/19 16:49:48   Main Document
Pg 26 of 205

IN RE Sears
Holdings

Robert Riecker
August 20, 2019

Page 9

1 net availability was going down, that is when you
2 would increase the number of days that you would
3 delay payments?
4 A.   That is correct.
5 Q.   When net availability increased during that
6 period, you didn't reduce the number of days in
7 which vendors were delayed, did you?
8      MS. MAINOO: Objection to form.
9 A.   I guess could you say what period?
10 Q.   So this is still -- I'm talking about the
11 period from the beginning of fiscal year 2018, so
12 February 2018 up until the petition date on
13 October 15th, 2018.
14 A.   There may have been some movement up and
15 down, but generally -- generally that was -- would
16 be a few times, if that were the case.
17 Q.   Let me try to give you a smaller window to
18 answer because I recognize it's a large period.
19 If we focus just on, say, August of 2018 --
20 and there were vendor delays in August 2018,
21 correct?
22 A.   Correct.
23 Q.   I think we went over a bunch of examples of
24 that back in your June deposition.  In August
25 of 2018 when there were days where net availability

Page 10

1 increased, was there a shift in the number of days
2 -- to reduce the number of days of the delays?
3      MS. MAINOO: Objection to form.
4 A.   In the August time frame, once we started
5 delaying vendors, it typically -- I don't recall
6 reducing -- if we delayed one day, went to two, went
7 to three, don't recall going from three to two to
8 one.
9 Q.   Regardless of net availability?
10 A.   Regardless of net availability, during
11 the -- during that time frame.
12 Q.   Okay.  Now, at all periods of time going
13 back to the larger fiscal year 2018 period, you
14 always had what were called exception vendors,
15 correct?
16 A.   Correct.
17 Q.   And those were key vendors who were, I
18 guess, important that you wanted to maintain
19 relationships with them and therefore, you didn't
20 delay their payments, is that correct?
21      MS. MAINOO: Objection to form.
22 A.   That is correct.
23 Q.   So when you would go to, say in the example
24 we said before, an eight-day payment delay, that
25 would be an eight-day payment delay for all vendors

Page 11

1 other than the exception vendors, correct?
2 A.   Generally yes, correct.
3 (Riecker Exhibit 2 marked for
4   identification.)
5 Q.   Mr. Riecker, I've just handed you what we've
6 marked as Riecker Exhibit 2.  It's an email from
7 Mr. Kamlani dated August 14th, 2018, the same period
8 we were just talking about.  And it's to you and
9 Mr. Phelan and Mr. Prakash and Mr. Brace?
10 A.   Yeah.
11 Q.   The subject is "Monday disbursements."  Why
12 don't you take a moment and look at the document.
13 I'll ask you a couple questions.
14 A.   Okay.
15 Q.   So in the first sentence, Mr. Kamlani says,
16 "Can you have someone send me a list of the vendors
17 and amounts that we would pay this Friday and Monday
18 who are not on the ten-day delay and we believe
19 there would not be severe consequences if we paid
20 them Tuesday."  Do you see that?
21 A.   Yes.
22 Q.   Did this suggest to you that during this
23 period, there was a -- at least a general ten-day
24 delay in making vendor payments?
25      MS. MAINOO: Objection to form, lack of

Page 12

1 foundation.
2 A.   It looks like that as of that date, we had
3 gone to a ten-day delay.
4 Q.   Okay.  But Mr. Kamlani is asking about a
5 list of vendors who are not on the ten-day delay.
6 Would that be what we were just talking about, these
7 exception vendors?
8 A.   Most likely, yes.
9 Q.   And he's asking about, "Therefore, if there
10 were some of these exception vendors where there
11 would not be severe consequences if we paid them on
12 Tuesday."  Do you see that?
13 A.   Yes.
14 Q.   And so the idea there is are there some of
15 these vendors who are important to us that we have
16 them as exception vendors, but we think if we push
17 them off another couple of days, there won't be
18 severe consequences.  Was that your understanding of
19 what Mr. Kamlani was referring to?
20 A.   Yes.
21 Q.   What type of consequences did you understand
22 Mr. Kamlani being concerned about when he wrote you
23 this email?
24      MS. MAINOO: Objection, lack of foundation.
25 A.   Typically would be, you know, vendor decides

18-23538-shl    Doc 4975    Filed 08/23/19    Entered 08/23/19 16:49:48    Main Document
IN RE Sears
Holdings
Pg 27 of 205
Robert Riecker
August 20, 2019

---

Page 13

1  to completely stop shipping at some point in time.
2  Vendor may have been on terms and wants to go to
3  CIA.  Those would be the consequences that we
4  would -- or potentially they were customer orders
5  and we needed the product because the customer had
6  already potentially paid us for the product.
7  Q.  And if those consequences were a
8  possibility, why would you consider delaying the
9  vendor payment?
10      MS. MAINOO: Objection, lack of foundation.
11  A.  There may have been vendors on that list
12  where that would not have been the consequences.
13  Q.  Were you concerned at the time about
14  consequences with the non-exception vendors who were
15  on the ten-day delay already?
16      MS. MAINOO: Objection to form.
17  A.  In general, the vendors who were delayed --
18  we had never not paid anyone, even up to this point.
19  And so people who were on delay, they can go use
20  online and look at a system that we have that lets
21  them know when their payment is going to be coming.
22  There were a number of vendors, specifically
23  I can't recall which, that would say to me, We know
24  you're paying, we know you're paying late, but we
25  know we're getting paid.  And so as long as they had

Page 14

1  access to that information, they seemed to be, you
2  know -- were they all generally okay with that?  I
3  can't say that.  But there were some that understood
4  our pattern and they were okay with the pattern that
5  we had created.
6  Q.  And I assume you were being thoughtful in
7  terms of which vendors were on the ten-day delay and
8  which ones were the exception vendors, correct?
9      MS. MAINOO: Objection to form.
10  A.  That is correct.
11  Q.  And I assume you also were doing your best
12  to manage the vendors who you knew may need an extra
13  phone call just to assure them that they were on a
14  delay but don't worry, we're going to get you paid,
15  is that fair?
16      MS. MAINOO: Objection, form.
17  A.  That's fair, yes.
18  Q.  But notwithstanding that, there remained
19  some possibility that vendors you were putting on a
20  ten-day delay might, for example -- it might affect
21  the terms of service that those vendors might offer
22  you in the future, right?
23  A.  That's correct.
24  Q.  And some of those vendors on a ten-day
25  delay, that ten-day delay could result in a delay in

Page 15

1  their supplying Sears with merchandise, correct?
2  A.  Yes.
3  (Riecker Exhibit 3 marked for
4      identification.)
5  Q.  I've now handed you what we've marked as
6  Riecker Exhibit 3.  This is another email from
7  Mr. Prakash, again Mr. Lampert and Mr. Kamlani from
8  ESL are recipients as well as yourself and a number
9  of others.  This one is dated February 4th, 2019
10  and it attaches a daily cash flow forecast dated
11  also February 4th, 2019.  You can take a look at
12  those documents.  I'm just going to be asking
13  questions about what's on the very first page
14  though.
15  A.  Okay.
16  Q.  So is this -- by the way, this is a similar
17  document to the one from back in August.  This is
18  just now advancing several months to February now in
19  the post-petition period, correct?
20  A.  Yes.
21  Q.  And if you go under the section that says
22  "Key Callouts," the first bullet point says, "In
23  order to manage 1L outstanding on February 8th, we
24  are delaying certain payments contractually due on
25  February 5th, February 6th, February 7th, by three

Page 16

1  business days."  Do you see that?
2  A.  Yes.
3  Q.  So that's a shorter delay than what we saw
4  in Exhibit 2 when there was a ten business day
5  delay, correct?
6  A.  That's correct.
7  Q.  And do you recall whether or not -- when
8  this three business day delay was put in place or
9  suggested on February 4th, whether or not there were
10  exception vendors at that time as well?
11  A.  I don't recall.
12  (Riecker Exhibit 4 marked for
13      identification.)
14  Q.  Mr. Riecker, I've just handed you what we've
15  marked as Riecker Exhibit 4.  It's an email chain.
16  The most recent in time is one from Brian Griffith
17  to Mr. Prakash and you're on that as well, as well
18  as a number of other people --
19  A.  Yep.
20  Q.  -- dated February 6, 2019.  So that's two
21  days after Exhibit 3, the February 4th email we were
22  looking at.  And if you turn to the third page of
23  Exhibit 4, there's an email from Natalie Valentine
24  also from February 6, 2019.  Do you see that?
25  A.  Yes.

18-23538-shl    Doc 4975    Filed 08/23/19    Entered 08/23/19 16:49:48    Main Document
IN RE Sears
Holdings
Pg 28 of 205
Robert Riecker
August 20, 2019

Page 17

1 Q.   Who is Natalie Valentine?
2 A.   She works in the treasury department in our
3 SRAC group in Delaware.
4 Q.   And the email here says, "Please approve the
5 following for payment today with the assumption of
6 the SHO $7 million payment.  It was received today
7 after the second sweep.  It will be shown as
8 available cash tonight.  Projected AVL balance is
9 $240 million.  Thank you."
10 And then there's a list below of accounts
11 payable payments and other disbursements.  Do you
12 see that?
13 A.   Yes.
14 Q.   And looking at this list, does it refresh
15 your recollection as to whether or not there were
16 any exception vendors who were paid in that
17 February 4th week of February, notwithstanding the
18 three-day delay that was being suggested on
19 February 4th by Mr. Prakash?
20     MS. MAINOO: Objection to form and lack of
21 foundation.
22 A.   It does not.  It does not help me with the
23 exception or non-exception vendors.  I don't know if
24 that was something because of the way in which the
25 ACH changed, whether we still had exception versus

Page 18

1 non-exception vendors once we went into bankruptcy.
2 Q.   How about the CIA cash in advance payment to
3 Whirlpool of a little over $3 million on February 6,
4 would that suggest that there were at least certain
5 vendors that were being paid that week of
6 February 4th, notwithstanding Mr. Prakash's email
7 suggesting that there would be a three-day delay?
8     MS. MAINOO: Objection to form and asked and
9 answered.
10 A.   Correct.  So cash-in-advance vendors weren't
11 going to ship inventory unless we had paid them in
12 advance.
13 Q.   So there was some decision made that we
14 should continue paying cash-in-advance vendors or at
15 least some cash-in-advance vendors that week of
16 February 4th?
17     MS. MAINOO: Objection, lack of foundation.
18 A.   This schedule would suggest that these were
19 the ones presented for payment.  Whether they were
20 paid on that day or not, I don't know.
21 Q.   Okay.  Do you recall -- let's go back to
22 what we marked as Exhibit 3.
23 Do you recall any discussions prior to
24 Mr. Prakash sending out this February 4th daily cash
25 flow forecast in which he advises that certain

Page 19

1 payments otherwise contractually due on the 5th, 6th
2 and 7th would be delayed by three business days, any
3 discussion about whether or not certain vendors
4 should be paid in order to maintain relationships
5 with them or anything else of that nature?
6     MS. MAINOO: Objection to form.
7 A.   I think as of that time, other than required
8 payments, so payroll, sales tax, real estate taxes,
9 rent, other types of things, that -- you know,
10 regulatory types of payments, that I think at that
11 point in time, everything was available for
12 discussion of either one, delaying the payment to
13 the vendor; or two, not ordering or paying cash in
14 advance for product.
15 Q.   And again, you guys, I assume, were
16 thoughtful in terms of anything that was being paid
17 out.  That was the subject of some discussion before
18 you were adding --
19 A.   That's correct, which is the purpose of the
20 Exhibit 4, the emails that I think occurred almost
21 on a daily basis.
22 Q.   Of going through potential accounts to pay
23 and deciding should we make this payment or do we
24 think that we can balance whatever consequences
25 there are for not paying it for a couple days,

Page 20

1 right?
2 A.   That is correct.
3 Q.   In your experience, Mr. Riecker, do there
4 tend to be fewer negative consequences from a three
5 business day delay as compared to a ten business day
6 delay in making payments?
7     MS. MAINOO: Objection to form.
8 A.   Did I notice any in that short time period?
9 Any difference between the two?  No.  Is a shorter
10 delay generally better than a longer delay, yes.
11 Q.   And again, not just during that time period,
12 but in general, I think you told me at your last
13 deposition that since you became CFO, there have
14 been delays of some type to vendor payments
15 throughout that time dating back to -- I think it
16 was March of 2017, is that right?
17     MS. MAINOO: Objection and mischaracterizes
18 prior testimony.
19 A.   I can't remember the exact date, but it
20 was -- of what I said in my testimony, but I would
21 agree that whatever date I provided at that time
22 is -- would still be relevant.
23 Q.   So throughout that period, there were vendor
24 delays of some type?
25 A.   Yes.

18-23538-shl  Doc 4975  Filed 08/23/19  Entered 08/23/19 16:49:48  Main Document
IN RE Sears
Holdings
Pg 29 of 205
Robert Riecker
August 20, 2019

Page 21

1  Q.   And over that period of experience, did you
2  find that vendors generally were more concerned
3  about a ten-day delay in payment than they would be
4  a three-day delay in payment?
5       MS. MAINOO: Objection to form and
6  foundation.
7  A.   We didn't experience the multiple days, ten
8  days, the -- a ten-day delay until I think of August
9  of 2017 -- or 2018.  Excuse me.
10  Q.   How about a seven-day delay versus a
11  three-day delay?
12       MS. MAINOO: Objection to form.
13  A.   I think most vendors understood that they
14  were getting paid.  And was there a difference
15  between three, five and seven?  I don't know that
16  generally a vendor -- we had more vendor exceptions
17  versus not at three, five or seven.
18  Q.   I'm sure they'd rather get paid on time than
19  have a delay at all, correct?
20       MS. MAINOO: Objection to form.
21  A.   That's correct.
22  Q.   After this February 4th, 2019 email that we
23  marked as Exhibit 3 was sent out by Mr. Prakash, do
24  you recall any pushback later that day -- and it was
25  already 9:00 at night or the next day -- any time

Page 22

1  that week from Mr. Lampert regarding the decision to
2  institute this three business day delay in payments
3  that were otherwise contractually due?
4       MS. MAINOO: Objection to form.
5  A.   I do not.
6  Q.   How about from Mr. Kamlani, do you recall
7  him pushing back on this decision that you were
8  going to be delaying certain payments by three
9  business days that week of February 4th?
10       MS. MAINOO: Objection to form.
11  A.   I do not.
12  Q.   Did anyone from either ESL or ESL's advisors
13  reach out to you to tell you that they had a concern
14  about delaying these vendor payments by three days?
15  A.   Not to me, no.
16  Q.   Are you aware of anyone from ESL or ESL's
17  advisors reaching out to anyone at the debtor saying
18  that there were concerns about this three-day delay
19  in making these payments?
20  A.   I am not.
21  Q.   Are you aware of anybody at ESL advising
22  debtors in that period that they thought that this
23  three-day delay made sense?
24  A.   I am not aware of any discussions with ESL
25  about any delay.

Page 23

1  Q.   Either positive or negative?
2  A.   Positive or negative or not only with me or
3  anyone else that I know of.
4  (Riecker Exhibit 5 marked for
5   identification.)
6  Q.   Mr. Riecker, I've just handed you a document
7  that's marked as Exhibit 5.  I think we may have
8  actually looked at this at your prior deposition as
9  well because it's one of my favorite documents, so I
10  try to make sure it comes out at least once in every
11  deposition.
12  It is, at the top, an email from Mr. Kamlani
13  to Mr. Prakash and cc'ing a bunch of other folks
14  including Mr. Meghji and Mr. Lampert and yourself
15  and others.  It's dated November 2nd, 2018.  What
16  I'd like to do, though, is ask you about an email
17  that starts towards the middle of the page.  It's
18  dated November 2nd, 2018 at 8:33 p.m. from
19  Mr. Prakash.  Do you see that?
20  A.   Yes.
21  Q.   And in that email, Mr. Prakash writes to
22  Mr. Kamlani and says, "Please see the specific
23  components of unavailable cash followed by some
24  callouts."  Do you see that?
25  A.   Yes.

Page 24

1  Q.   What is your understanding as to what at
2  Sears, the debtors, now Transform, what "unavailable
3  cash" refers to?
4       MS. MAINOO: Objection to form.
5  Q.   In fact, let me strike that.  Bad question.
6  As of November 2nd, 2018, so post-petition,
7  Sears as the debtors, what was your understanding of
8  what "unavailable cash" referred to?
9       MS. MAINOO: Objection to form.
10  A.   Unavailable cash was cash that was not
11  available to the company to pay down its revolving
12  credit facility, whether that be because it was held
13  in an account that does not get swept or it was just
14  cash within the system, meaning from the store to a
15  regional bank to our sweep accounts, the main
16  depository accounts.
17  Q.   Do you recall when you first heard the term
18  "unavailable cash" used as a -- working here at
19  Sears?
20       MS. MAINOO: Objection to form.
21  A.   I don't recall.
22  Q.   Was that something you recall being a term
23  that you heard when you first became CFO in 2017?
24  A.   I don't know when it became a term of use by
25  the company.

---

**Page 25**

1 Q.   Do you recall if it was a term that was used
2 before October 15th, 2018 when Sears filed its
3 bankruptcy petition?
4 A.   I don't recall.
5 Q.   You don't know if that terms predates the
6 bankruptcy?
7 A.   I do not.
8 Q.   Amongst at least the finance and treasury
9 group, was "unavailable cash" a commonly used term
10 to describe the type of accounts you just described?
11      MS. MAINOO: Objection to form.
12 A.   No.  I mean, the -- whenever I would discuss
13 it with someone in treasury, it was always cash in
14 the system.
15 Q.   And did that have a similar meaning, cash in
16 the system, and it wasn't in one of the accounts
17 that was currently being swept to be able to pay off
18 whether it be the revolver or the DIP depending on
19 the time period?
20      MS. MAINOO: Objection.
21 A.   That's correct.
22 Q.   Now, Mr. Prakash here is referring to what
23 he's calling "unavailable cash."  Do you recall the
24 company also using the term "available cash"?
25      MS. MAINOO: Objection to form.

---

**Page 26**

1 A.   I remember the term of "available cash,"
2 yes.
3 Q.   What do you recall that meaning?
4      MS. MAINOO: Objection to form.
5 A.   Loosely -- my loose definition of that would
6 be sometimes overnight we would have cash that's
7 available, but it did not get in time -- did not get
8 put into an account in time in order to be -- pay
9 down the revolving credit facility.
10 So I may have borrowed -- all deposits --
11 any day all deposits went in to pay down the
12 revolving credit facility.  They got swept and they
13 paid down.  Then I was allowed to borrow.  I may
14 have borrowed more money than the disbursements I
15 was going to make that day and if I did that, I
16 parked it in an account and that became available
17 cash.
18 Q.   What account would you park that money in?
19 A.   I believe it went into an account that then
20 got automatic -- into an account that was
21 automatically swept back to the -- to pay down the
22 revolver.
23 Q.   So back into the concentration account that
24 was otherwise being swept?
25 A.   Correct.

---

**Page 27**

1 Q.   So that money would be in there only so long
2 as you had overborrowed, put it into the
3 concentration account and then the next sweep?
4      MS. MAINOO: Objection to form.
5 A.   Correct.
6 Q.   Okay.  So it may be in there for less than a
7 day?
8 A.   Typically, yes.
9 Q.   It would be whatever the last sweep was for
10 that day, you would make a deposit after that, the
11 money would sit there and by the following day's
12 sweep, that money would be gone, is that correct?
13 A.   Correct.  I think the last sweep is like at
14 1 p.m. Eastern.  And so maybe we sold something or
15 we got a check or something else, maybe that came in
16 after the last sweep as well.
17 Q.   Okay.  And do you know how early in the day
18 the first sweep was?
19 A.   I do not, but we typically had a meeting
20 around 10:30 everyday Central time.  So at 11:30
21 Eastern, we'd know what had been swept.
22 Q.   So sometime between whatever time the banks
23 opened and 11:30 Central?
24 A.   Yes, correct.
25 Q.   These were U.S. banks?

---

**Page 28**

1 A.   U.S. banks, yes.
2 Q.   So earliest sweep would be at what, 8:30,
3 9:00 Eastern time?
4 A.   I think so.  I don't know.
5 Q.   It wasn't something that happened at like
6 midnight or something like that, was it?
7 A.   Don't believe so, no.
8 (Riecker Exhibit 6 marked for
9     identification.)
10 Q.   Mr. Riecker, I've just handed you what we've
11 marked as Riecker Exhibit 6.  Don't worry.  I'm not
12 going to ask you to review that whole document.
13 A.   Thank you.
14 Q.   You can if you want to.  This is a -- the
15 stamped "Filed copy of Declaration of Robert A.
16 Riecker pursuant to Rule 1007-2 of local bankruptcy
17 rules for the Southern District of New York."
18 A.   Yep.
19 Q.   Dated the 15th of October 2018, and more
20 commonly referred to as your first day declaration.
21 Do you recall this document, Mr. Riecker?
22 A.   I do.
23 Q.   And my tree-hugging friends are going to be
24 upset at me because I'm going to ask you about one
25 line in this 68-page document, but it's on page 50.

---

Page 41

1  down to the 850, was that the deal might not close,
2  correct?
3  A.   My understanding, yes.
4  Q.   Did you have an understanding of what the
5  consequences would be if you overpaid the debt?  So
6  instead of getting it down to 850, you got it down
7  to 825, for example?
8  A.   I don't know what the mechanism in the APA
9  was if that happened.
10  Q.   Did you know if there was some kind of a
11  setoff or consequence of that nature?
12      MS. MAINOO: Objection, asked and answered.
13  A.   I don't recall.
14  Q.   Paragraph 5, you reference Exhibit A to your
15  declaration.
16  A.   Uh-huh.
17  Q.   Can you turn to that?  It should be right
18  behind the signature page.
19  A.   Got it.
20  Q.   And this is a transaction tracking document?
21  A.   Correct.
22  Q.   Okay.  This one is dated January 1st,
23  2019 -- January 18, 2019, I guess.
24  A.   Yes.
25  Q.   Depending on whether you look at the name of

Page 42

1  the document or the date on the document itself?
2  A.   Correct.
3  Q.   I guess the best way to tell you what page
4  I'm looking at is the very top, where it's got the
5  stamp from the court, you'll see it says page 14 of
6  108.  It's a page that says "Opportunities and
7  actions."
8  A.   Okay.
9  Q.   These are -- well, say it differently.  What
10  is this chart showing at a high level?
11      MS. MAINOO: Objection to form.
12  A.   The chart is showing just a number of
13  actions that could be taken to meet the 850
14  requirement of the DIP balance.
15  Q.   These are all potential opportunities?
16  A.   Potential opportunities.
17  Q.   Ones that as of January 18th or 19th,
18  whatever date you happen to be looking at this, you
19  were hoping might be avenues that you could identify
20  monies that could be used to pay down the DIP, is
21  that fair?
22      MS. MAINOO: Objection.
23  A.   Monies that could be used or collateral,
24  additional collateral that could be obtained.
25  Q.   And were these -- this list of

Page 43

1  opportunities, was this something that the M-III
2  team and the finance team put together collectively?
3      MS. MAINOO: Objection, lack of foundation.
4  A.   Yes.
5  Q.   What was your role in that?
6  A.   So M-III would generally work with people in
7  my department to understand the different line items
8  on here and the different opportunities.  And then
9  we would gather -- they would then gather the data
10  from the individuals and then we would review the
11  data.
12  Q.   At the time, did you consider any of these
13  opportunities or actions that you were considering
14  to be a breach of the APA that you had just signed?
15      MS. MAINOO: Objection to form.  Calls for a
16  legal conclusion.
17  A.   No.
18  Q.   Sitting here today, do you believe that any
19  of these opportunities or actions, if carried out,
20  would be a breach of the APA?
21      MS. MAINOO: Objection to form and calls for
22  a legal conclusion.
23  A.   No.
24  Q.   Do you know if these -- now, these trackers
25  were created on a fairly regular basis, correct,

Page 44

1  over the period of time between the signing of the
2  APA and the closing, is that correct?
3  A.   That's correct.
4  Q.   It says weekly tracking, but sometimes they
5  were created more often than that?
6  A.   I believe so, yes.
7  Q.   Do you know whether or not any of these
8  trackers were ever shared with Transform or ESL at
9  the time?
10  A.   I don't recall them being shared with
11  Transform.
12  Q.   Do you remember if any of them were produced
13  in connection with discovery in regard to the sale
14  hearing?
15  A.   I don't recall.
16  Q.   Do you remember testifying about the tracker
17  during the sale hearing?
18  A.   I don't remember.
19  Q.   Going back to the declaration, paragraph 6
20  of Riecker Exhibit 7, paragraph 6, says, "Shortly
21  after signing the APA, those action items..."
22  And "those action items" referring to steps
23  you could take to reduce the expected shortfall on
24  the DIP, is that what you're referring to?
25  A.   Yes.

Page 45

1  Q.  "...included accelerating the movement of
2  cash in stores and cash in regional banks to the
3  company's operating accounts."
4  How would that help, accelerating the
5  movement of cash in stores and cash in regional
6  banks to the company's operating accounts?
7  A.  It would be -- it would be cash that would
8  flow into an automatic sweep, basically a
9  concentration account that would then pay down the
10  DIP.  So if I could -- instead of picking up at a
11  store, armored car pickup two times a week, if I did
12  it three times a week, I may be able to move it
13  through the system in a faster -- at a faster pace.
14  Q.  So you were essentially expediting the pace
15  at which monies that were essentially in the
16  unavailable cash buckets were moved into the
17  available cash concentration accounts?
18      MS. MAINOO: Objection, it mischaracterizes
19  testimony.
20  A.  Yes.
21  Q.  This expediting the movement of cash in
22  stores and cash in regional banks into the company's
23  operating accounts, is that something the company
24  had done pre-petition ever, as far as you know?
25  A.  Not to my knowledge.

Page 46

1  Q.  While this process was going on, were you
2  aware of any effort by the debtor to stash certain
3  funds or keep certain funds in those regional
4  accounts and prevent them from moving into the
5  concentration account where they could pay down the
6  DIP?
7      MS. MAINOO: Objection.
8  A.  I'm not aware -- I'm not aware of any.
9  Q.  Had you learned of such efforts, would you
10  have been okay with it as the CFO?
11      MS. MAINOO: Objection, calls for
12  speculation.
13  A.  No.
14  Q.  Do you know whether any of the actions that
15  were used to accelerate the cash from the stores or
16  from the regional banks may have resulted in some
17  additional expense to the debtors?
18  A.  It did result in additional expense, yes.
19  Q.  That was because of the additional pickups
20  and things of that nature?
21  A.  Yes.
22  Q.  You also mention in paragraph 6 as another
23  action item to try to reduce the DIP, accelerating
24  payments of accounts receivable.  What was that?
25  A.  It should be accelerating collections of

Page 47

1  accounts receivable most likely.  Grammar error.
2  Q.  Okay.  Do you know whether or not
3  accelerating the collection of accounts receivable
4  had the consequence of reducing the amount of
5  specified receivables that would be available to be
6  delivered to the buyer at close?
7      MS. MAINOO: Objection to form.
8  A.  It's a possibility, yes.
9  Q.  So in the event that -- strike that.
10  The last thing you say is in paragraph 6,
11  another last action item to reduce the DIP is
12  transferring excess inventory to GOB stores.  Do you
13  see that?
14  A.  Yes.
15  Q.  Do you know whether or not transferring
16  excess inventory -- first of all, how did
17  transferring excess inventory to GOB stores help in
18  the effort to pay down the DIP?
19  A.  Converting inventory to cash.
20  Q.  Do you know whether or not converting that
21  inventory to cash may have impacted the debtor's
22  obligations to provide a certain amount of inventory
23  to the buyer at close?
24      MS. MAINOO: Objection to form.
25  A.  All of these -- the conditions to close and

Page 48

1  the amounts that were supposed to be achieved,
2  whether there was offsets or not, offsets all -- one
3  goes up, one goes down.  There were many inverse
4  relationships between all of the groups.  To the
5  extent that inventory was transferred, yes, that may
6  lower the inventory balance of the inventory that
7  was required to be delivered.
8      MR. FRIEDMANN: Okay.  Got it.  Why don't we
9  take that break now.
10      MS. MAINOO: All right.
11  (Short recess.)
12      BY MR. FRIEDMANN:
13  Q.  Mr. Riecker, as the CFO of Sears and debtors
14  and now of Transform, have you ever heard the term
15  used in the finance department of "legally available
16  cash"?
17      MS. MAINOO: Objection to form.
18  A.  I have not.
19  Q.  That's not something that the company
20  tracks, something called "legally available cash"?
21      MS. MAINOO: Objection, asked and answered.
22  A.  Not to my knowledge.
23  Q.  Mr. Riecker, do you know whether or not cash
24  that's -- what does cash-in-transit refer to?
25      MS. MAINOO: Objection to form.

Page 49

1  Q.   At the company?
2       MS. MAINOO: Same objection.
3  A.   Cash-in-transit is just cash between a store
4  and a regional bank, a regional bank to an operating
5  account.
6  Q.   So for example, cash and checks that might
7  be bagged by a store and then picked up by armored
8  car carriers, that would be cash-in-transit until
9  they're deposited into the regional bank?
10 A.   I think generally, yes.
11 Q.   And that cash-in-transit money, whether it's
12 in the process of being bagged in a store or on the
13 truck, that's not available at that time for the
14 company to be able to make any payments, correct?
15      MS. MAINOO: Objection to form.
16 A.   That would be correct, except for payments
17 in a store that may be made.
18 Q.   I'm even talking about after it's in the
19 store.  It's been bagged, picked up by an armored
20 truck.  At that point you can't use that money to
21 make any payments, correct?
22      MS. MAINOO: Objection to form.
23 A.   Correct.
24 Q.   And let's be more specific.  So if we're
25 looking at the post-petition but presale period when

Page 50

1  you were the CFO of the debtors, in-store cash that
2  was bagged and picked up by an armored car carrier,
3  at that point that cash is not available to pay any
4  liabilities of the company, correct?
5       MS. MAINOO: Objection to form.
6  A.   That's correct.
7  Q.   You can't pay down the DIP with that money
8  while it's on the truck, correct?
9       MS. MAINOO: Objection, asked and answered.
10 A.   Correct.
11 Q.   Mr. Riecker, turning back to your
12 declaration, Riecker Exhibit 7, I'm now looking at
13 paragraph 7 and you say, "As reflected in the
14 closing tracker dated January 18th, 2019, M-III also
15 proposed as a potential action item that in order to
16 reduce accounts payable at the close, the company
17 should 'manage down disputed payables and reduce
18 nonessential spend' and decrease operating
19 expenses."
20 Do you see that?
21 A.   Uh-huh.  Yes.
22 Q.   What did you mean by "manage down disputed
23 payables"?
24      MS. MAINOO: Objection.
25 A.   To the extent that there were amounts that

Page 51

1  we did not owe, for example, we received an invoice
2  for inventory that we never received, so managing
3  through those.
4  Q.   So things that might be listed as an
5  accounts payable but which the company believed
6  there was a reason why it shouldn't have to make
7  that payment?
8  A.   Correct.
9  Q.   And is that the kind of activity that the
10 company had never done in the pre-petition period?
11 A.   That is a normal process in the company,
12 yes.
13 Q.   And what did you mean by "reduce
14 nonessential spend"?
15 A.   So essentially not create the payable, not
16 create a payable by managing essentially if there
17 was a -- whatever it might be, a marketing spend,
18 capital project.  So if it's not essential, we don't
19 need to incur the expense.
20 Q.   And is that the type of thing that the
21 company had ever done in the pre-petition period?
22 A.   I think the company always tried to be
23 thoughtful and managed what expenses that they would
24 incur, but yes, it was done pre-petition.
25 Q.   And how about "decrease operating expenses,"

Page 52

1  what do you mean by that?
2       MS. MAINOO: Objection.  Just to clarify,
3  the declaration is referring to M-III's proposal.
4  You keep saying "What do you mean by that?"
5  Q.   We'll get to that in a moment.
6  What's your understanding of what decrease
7  operating expenses is, as you say, as proposed by
8  M-III as a potential action item?
9  A.   To just reduce expenses in general.
10 Q.   Is that something the company had done
11 pre-petition?
12 A.   Yes.
13 Q.   Getting to the point your attorney just
14 raised, when you talked about the other action items
15 in paragraphs 5 and 6, you said that these were
16 things that the finance team and M-III came up with,
17 but in paragraph 7, you're only giving M-III credit
18 for these.  Why is that?
19      MS. MAINOO: Objection, mischaracterizes the
20 declaration.
21 A.   Can't define specifically why it's M-III.
22 It's their tracker, but it's -- it was a team that
23 put this information together.
24 Q.   So the idea to include on the tracker
25 managing down disputed payables and reduce

Page 53

1  nonessential spend and decrease operating expenses,
2  those were ideas that collectively were come up with
3  by M-III and the finance team together?
4  A.  I think generally those are just normal
5  things that companies would do in order to reduce
6  spend, yes.
7  Q.  It wasn't something where M-III said, we
8  should decrease operating expenses and the finance
9  team said, no, no, we think that's a terrible idea,
10 so when you drafted this, you only gave M-III credit
11 for this one, is it?
12 A.  Correct.
13 Q.  You next note that one of the lines in the
14 weekly dashboard reflected that debtors had
15 $177 million in accounts payable as of January 18th,
16 2019.  That its DIP budget as of February 9, 2019
17 and then anticipated closing date projected it would
18 have 196 million in accounts payable and that its
19 target was accounts payable of 166 million, an
20 amount debtors claim Transform would be assuming.
21 Do you see that?
22 A.  Yes.
23 Q.  First of all, how do you get accounts
24 payable that are currently at 177 million and
25 projected to increase up to $196 million down to a

Page 54

1  target of 166 million?
2      MS. MAINOO: Objection to form.
3  A.  You manage the -- you manage not entering
4  into transactions that would create those additional
5  payables.
6  Q.  Is that something the company had also done
7  pre-petition at times?
8  A.  Yes.
9  Q.  When you say at the end of that sentence,
10 "Debtors claim Transform would be assuming the
11 $166 million of payable," when you're referring to
12 debtors there, you were the CFO of debtors at that
13 time, correct?
14 A.  Correct.
15 Q.  So are you referring to yourself here?
16     MS. MAINOO: Objection.  Objection to form.
17 A.  Yes.
18 Q.  Now, you said -- in the last sentence here,
19 you say, "Initially in the period following the
20 signing, M-III and the debtors plan to do this
21 through a reduction in new spending, not in delaying
22 payments as they became due."
23 Do you see that?
24 A.  Yes.
25 Q.  Did you consider an effort to reduce new

Page 55

1  spending to be a breach of the APA that you had just
2  signed?
3      MS. MAINOO: Objection to form and calls for
4  a legal conclusion.
5  A.  Did not.
6  Q.  If you had to pivot to delaying payments as
7  they became due, did you consider that would be a
8  breach of the APA you had just signed?
9      MS. MAINOO: Objection to form and calls for
10 a legal conclusion.
11 A.  I did not.
12 Q.  Going to paragraph 9, and there you're
13 referencing Exhibit B here, so if you need to flip
14 back and forth, feel free to.  And I'm looking at
15 after the reference to Exhibit B, so about halfway
16 through that paragraph where it begins, "The closing
17 tracker reflected."  Do you see that?
18 A.  Uh-huh.
19 Q.  It says, "The closing tracker reflected in
20 the section on opportunities and actions that as a
21 potential action, debtors could 'manage AP'" that
22 debtors would -- I'm sorry -- "'manage AP balance
23 based on deliverable under the APA.'"  And you go on
24 to say, "One of the comments in that document
25 reflected that debtors would 'increase payables to

Page 56

1  offset the DIP.'"  You say, "This increase would
2  result from delaying until after the close
3  disbursements on accounts payable as they became
4  due."
5  And then you say, "M-III identified a
6  $15 million opportunity in this strategy to reduce
7  what it estimated to be a $104 million gap in
8  meeting its senior DIP target."
9  Again, there's a reference here just to
10 M-III identifying this opportunity.  Was that
11 $15 million opportunity actually identified M-III
12 and the finance team together?
13 A.  On this one, they most likely utilized
14 people from my team to come up with the number.
15 Q.  Do you know why you specifically gave M-III
16 credit here?
17     MS. MAINOO: Objection.
18 A.  It's their tracker.
19 Q.  But the tracker was put together in a
20 collaborative effort between M-III and the finance
21 team?
22 A.  For the most part, yes.
23 Q.  In paragraph 10, you say, "The daily
24 touch-base meetings, the finance team and M-III
25 discussed potential consequences of delaying and not

18-23538-shl    Doc 4975    Filed 08/23/19    Entered 08/23/19 16:49:48    Main Document
IN RE Sears
Holdings
Pg 35 of 205
Robert Riecker
August 20, 2019

Page 57

1  paying until after close disbursements of accounts
2  payable. Delaying payments could negatively affect
3  the terms of service that vendors will offer the
4  company in the future and could result in delays in
5  supply of merchandise." Do you see that?
6  A.  Yes.
7  Q.  Those are the exact same consequences we
8  discussed would have been a concern back in August
9  as well pre-petition, correct?
10  A.  Yes.
11  Q.  Okay. And that's why, as you said, you
12  thoughtfully considered which specific vendors were
13  being delayed to try to minimize those consequences,
14  correct?
15  A.  Correct.
16  Q.  And is that what the finance team and M-III
17  team did together?
18  A.  Yes.
19  Q.  Again you say, "Delaying payments could
20  negatively affect the terms of service that vendors
21  would offer." By "could," you meant it might, but
22  it also might not, correct?
23       MS. MAINOO: Object.
24  A.  Yes.
25  Q.  In these daily touch-base meetings, did you

Page 58

1  personally provide any advice as to whether or not
2  payments should be delayed in that last week of --
3  sorry -- I guess the first week of February?
4       MS. MAINOO: Objection to form.
5  A.  I believe it was a discussion amongst a
6  group of people and I was part of that discussion.
7  Q.  Do you recall if in that discussion, you
8  were one of the people in favor of delaying three
9  days until after the closing?
10  A.  I don't know if I was one of the people in
11  favor, but I was not objecting either.
12  Q.  Were you or your team talking to any of the
13  vendors at that time in order to ensure them that,
14  you know, even though we're in bankruptcy, there's a
15  plan for the company to be sold and if your payments
16  are delayed a little bit, this is at the end of the
17  day, best for you?
18       MS. MAINOO: Objection, lack of foundation.
19  A.  There was a letter that went out early on in
20  the bankruptcy that kind of explained some of that.
21  But during this specific time period, I don't
22  recall. I don't recall having any discussions with
23  vendors. Vendors may have called our offices,
24  though.
25  Q.  Did you have a sense from discussions with

Page 59

1  vendors that either you had personally or others on
2  your team had, that they preferred that payments be
3  delayed rather than see Sears liquidate?
4       MS. MAINOO: Objection to form, lack of
5  foundation.
6  A.  I don't recall any conversations along those
7  lines.
8  Q.  In paragraph 13, which is on page 5, the
9  first sentence you say, "On Monday, February 4th,
10  2019, debtors, in consultation with M-III, directed
11  that payments should not be made on accounts payable
12  that would become due the following day with certain
13  excepted accounts which were specifically approved
14  by myself or M-III." Do you see that?
15  A.  Yes.
16  Q.  Again, when you're referring to debtors
17  here, you are at the time the CFO of debtors,
18  correct?
19  A.  Correct.
20  Q.  So you're referring to yourself?
21  A.  Yes.
22  Q.  And any of the excepted accounts, that's the
23  same thing as we were talking about before,
24  exception vendors?
25  A.  Exception vendors.

Page 60

1  Q.  They're the same thing?
2  A.  Yes, I don't think in the same concept,
3  though. It was more of a concept of almost
4  approving on a daily basis every payable that would
5  go out.
6  Q.  And every payable that would go out had to
7  be approved either by you or M-III at that point, is
8  that correct?
9  A.  Typically they were approved by all of us,
10  yes.
11  Q.  And you were making sure that that same
12  assessment you were talking about before, this is
13  one where the consequence of not paying this vendor
14  outweigh not having that cash on hand or available
15  to pay down the DIP, is that correct?
16  A.  Yes.
17  Q.  You have this discussion in paragraph 13
18  about Mr. Prakash telling you about a discussion
19  between Mr. Prakash and Mr. Meghji that takes place
20  I guess sometime in the first week of February 2019.
21  Do you see that?
22       MS. MAINOO: Objection.
23  A.  Yes.
24  Q.  But then at the end of it all, you attach
25  Exhibit E to your declaration, which is the same

Page 61

1  February 4th email I think we were looking at before
2  where Mr. Prakash advised everyone that in order to
3  manage the 1L outstanding on February 8th, we are
4  delaying certain payments contractually due on
5  February 5th, 6th -- February 5th, February 6th,
6  February 7th by three business days, right?
7  A.  Yes.
8  Q.  So notwithstanding whatever conversation
9  Mr. Prakash and Mr. Meghji had, ESL was advised of
10  the plan to delay these payments, correct?
11      MS. MAINOO: Objection, argumentative.
12  A.  It was in an email that went to them, yes.
13  Q.  So what's the point of the story?  Why --
14  what's the relevance of that discussion that
15  Mr. Prakash had with Mr. Meghji if at the end of the
16  day the conclusion was that this should go out?
17      MS. MAINOO: Objection, to the form,
18  argumentative.  Calls for privileged information.
19  A.  It's privileged discussion between --
20  Q.  So you don't have a view as to why that's a
21  relevant set of facts outside of talking to counsel?
22      MS. MAINOO: Same objection.
23  A.  I do not.
24  Q.  Did you ask Mr. Meghji about this
25  conversation after Mr. Prakash told you about it?

Page 62

1  A.  I did not.
2  Q.  In paragraph 14 of your declaration,
3  Exhibit 7, I wanted to ask you about the sentence
4  which is about halfway through beginning, "While
5  debtors had in the past delayed disbursements."  Do
6  you see that?
7  A.  Uh-huh.
8  Q.  It says, "While debtors had in the past
9  delayed disbursements for accounts payable that were
10  due, this was typically done where the company
11  lacked availability under its ABL revolver to make
12  such disbursements."  Do you see that?
13  A.  Yes.
14  Q.  The word "typically" suggests that that was
15  not always the case, right?
16      MS. MAINOO: Objection to form.
17  A.  Yes, correct.
18  Q.  Sometimes -- and when you say "in the past,"
19  you're talking about pre-petition, by the way?
20  A.  Yes.
21  Q.  So sometimes pre-petition -- it's not really
22  debtors, so sometimes pre-petition Sears would delay
23  disbursements for accounts payable that were due
24  when the company did, in fact, lack the availability
25  under its ABL revolver to make those disbursements,

Page 63

1  correct?
2  A.  Trying to parse --
3  Q.  Sorry.  Let me start that over.
4  A.  I'm trying to parse through the double
5  negative.  Sorry.
6  Q.  It was a terrible question.  Nothing to
7  apologize about.
8  Sometimes pre-petition, when Sears would
9  delay disbursements for accounts payable that were
10  due, at that time the company lacked availability
11  under its ABL revolver to make those disbursements,
12  correct?
13  A.  Correct.
14  Q.  But other times, Sears pre-petition would
15  delay disbursements for accounts payable that were
16  due when there remained availability under its ABL
17  revolver to make those disbursements, correct?
18      MS. MAINOO: Objection to form and lack of
19  foundation.
20  A.  Correct.
21  Q.  And we looked at one of those documents at
22  the very beginning of the deposition today, right?
23  Riecker Exhibit 1 was an example of a situation
24  where on that day, there was availability under the
25  revolver, yet there was an eight-day payment delay

Page 64

1  in place, correct?
2  A.  Correct.
3  Q.  Oftentimes it was -- had not only to do with
4  what the revolver had on that day, but what the
5  revolver was projected to look like in the coming
6  days, correct?
7  A.  That's correct.
8  Q.  So the fact that you happened to have
9  availability on a particular day doesn't mean --
10  strike that.
11  Do you recall what the net availability
12  projection was for the debtors in the event that the
13  sale failed to close on February 11th?
14      MS. MAINOO: Objection to form.
15  A.  I don't recall if we failed, but I thought
16  the availability on that day was in the plus
17  $20 million range.
18  Q.  And do you know what it was projected to do
19  in the following days?
20  A.  It would have gone negative sometime in the
21  following days, I believe.
22  Q.  So within a few days after the closing, the
23  specifics are -- strike that.
24  So within a few days of the closing, net
25  availability would have gone negative had the deal

Page 65

1 not closed?
2 A.   Without looking at the specific forecasts on
3 those days, but I believe that generally to be
4 accurate.
5 Q.   Mr. Riecker, if I could have you turn --
6 this is Attachment G again to your declaration.
7 This is that -- this is a February 8th email from --
8 well, I think the one from Mr. Kamlani is just to
9 his counsel for the purpose of -- whatever purpose.
10 But if we go below that, there's Mr. Prakash's daily
11 cash flow forecast from February 8th, 2019.  Do you
12 see that?
13 A.   Yes.
14 Q.   And February 8th, 2019, recall was the
15 Friday that the deal was initially supposed to
16 close?
17 A.   Yes.
18 Q.   And then it got pushed off until Monday?
19 A.   Correct.
20 Q.   Do you remember why it got pushed off until
21 Monday?
22 A.   I believe the banks couldn't -- just the
23 timing when the banks could pull everything together
24 to complete the deal.
25 Q.   If you turn to -- it's -- easiest way of

Page 66

1 finding it, it's at the top.  It's one of the
2 attachments, but it's page 87 of 108 of your
3 declaration.
4 A.   Yes.
5 Q.   And if you take a look at the projected
6 excess availability that was being shown in this
7 February 8th projection, does this help refresh your
8 recollection in terms of what type of excess
9 availability was being projected in the event the
10 deal did not close on February 11th?
11     MS. MAINOO: Objection to form.
12 A.   Yes.
13 Q.   What was that?
14 A.   So it looks like -- I mean, I can't --
15 somebody have a ruler or -- so on February 11th, was
16 this 43 the number of excess availability, going to
17 39, going to negative 9.
18 Q.   What date do you see it going to negative 9?
19 A.   February 13th.
20 Q.   So two days after the -- after February
21 11th -- or?
22 A.   The 12th.  I can't --
23 Q.   It's either -- this is not supposed to be a
24 seeing test.  Within a day or two, if -- strike
25 that.

Page 67

1 If the sale did not close on February 11th,
2 within a day or two, debtors were projecting
3 negative availability, correct?
4 A.   Correct.
5 Q.   Okay.  What's the consequence of -- strike
6 What would be the consequence to debtors of
7 falling into negative availability?
8 
9 A.   I mean, it would be a default under the
10 debtor-in-possession financing.
11 Q.   So the risk if you didn't close on
12 February 11th was that within a day or two, you
13 could default on your DIP?
14 A.   Correct.
15 Q.   Do you recall whether the reason that the
16 sale wasn't able to close on February 8th, 2019 was
17 because Transform was not prepared to request
18 funding under the new ABL?
19     MS. MAINOO: Objection, asked and answered.
20 A.   I don't.  Whether the banks could react that
21 quickly or not, I don't know, or it wasn't available
22 to draw, I don't know the answer.
23 Q.   Do you recall if there was concerns about if
24 the sale didn't close on February 11th, the company
25 being able to close at a later date?

Page 68

1     MS. MAINOO: Objection to form.
2 A.   There was concern by the debtor and its
3 advisors that the closing moving out could
4 potentially result in not -- of going negative on
5 the excess availability.
6 Q.   And of possibly having to liquidate,
7 correct?
8 A.   If that would -- if that would be the
9 consequences of that, yes.
10     MR. FRIEDMANN: Why don't we take a break.
11 (Short recess.)
12 (Riecker Exhibit 8 marked for
13     identification.)
14     BY MR. FRIEDMANN:
15 Q.   Mr. Riecker, I've just handed you Exhibit 8,
16 which is the Supplemental Memorandum of Law in
17 Support of Transform Holdco LLC's Adversary
18 complaint as filed on August 6, 2019.  First of all,
19 did you have any role in preparing this document?
20     MS. MAINOO: Objection, calls for privileged
21 information.
22     MR. FRIEDMANN: Whether he had a role in
23 preparing the document is privileged?
24 A.   No.
25 Q.   Did you review this document before it was

Page 77

1  about reference to action items in paragraph 6.  And
2  I just wanted to clarify what those action items
3  concerned.
4  So going back to paragraph 5, there's a
5  statement in your declaration that each of these
6  closing trackers also contained a slide labeled
7  "Opportunity and Actions" which described potential
8  actions that the company could take to reach its
9  closing targets.  It goes on to say, "It was these
10  action items within the closing tracker that formed
11  the principal basis of discussion at the daily
12  touch-base meetings."
13  My question is the action items that are
14  referred to in the next paragraph in paragraph 6,
15  are those action items relating generally to actions
16  the company could take to reach its closing targets,
17  or are they specifically relating to managing the
18  debt balance?
19      MR. FRIEDMANN: Objection to form, leading.
20  A.   These were actions to meet a significant
21  number of the financial metrics set forth in the
22  Asset Purchase Agreement.
23  Q.   Mr. Friedmann also asked you about the term
24  "unavailable cash."  And I believe your response
25  was -- I'll just go back to his question and your

Page 78

1  answers.
2      MR. FRIEDMANN: Can you tell us where you
3  are?
4      MS. MAINOO: Will do.
5  Q.   So I'm at 23:07 on the transcript.
6  Mr. Friedmann's question was, "As of November 2nd of
7  2018, so post-petition, Sears as the debtors, what
8  is your understanding of what 'unavailable cash'
9  referred to?"
10  And you responded.
11  And my question is, in what context did you
12  use the term "unavailable cash" as of November 2nd,
13  2018?
14      MR. FRIEDMANN: Objection to form.
15  A.   Generally unavailable cash, I think as I
16  said earlier in my -- in the deposition, generally
17  defined "unavailable cash" is, you know, cash that
18  was in the system or in transit.  We never used the
19  terms "unavailable cash."  We used the terms "cash
20  in the system," you know, as opposed to "unavailable
21  cash."
22  Q.   And for what purpose did you use the term
23  "cash in the system"?
24  A.   It was cash that was either in a store, in
25  transit or at a regional depository account.

Page 79

1  Q.   And what was the context in which the -- in
2  what context did you talk about cash that was either
3  in a store or in transit or at a regional depository
4  account in terms of the processes of the finance and
5  treasury teams?
6      MR. FRIEDMANN: Objection to form.
7  A.   So the processes of the finance teams is
8  there was just a general flow of cash from stores
9  into the depository accounts that took place.
10  Q.   Did you use the term "unavailable cash" in
11  the context of forecasting?
12  A.   No.
13  Q.   Was the term "cash in the system" used in
14  the context of cash flow forecasting?
15  A.   I think in some ways, yes, it was.
16  Q.   What do you mean when you say "in some
17  ways"?
18  A.   You had to know what cash was -- or have a
19  general perspective of the amounts of
20  cash-in-transit and in the system to understand what
21  your end close would be that day which would include
22  this cash that's in the system.
23  Q.   Outside of this context of -- outside of the
24  context of understanding what your end -- what your
25  cash in the system was, as part of the inflow

Page 80

1  process -- sorry.  Strike that.
2  Outside of the context of the cash flow
3  forecasting, did you use the concept of cash in the
4  system?
5  A.   In discussions with certain investors and
6  banks, we would use the term "cash in the system."
7  Q.   Before the closing of the APA, did you use
8  the term "available cash"?
9      MR. FRIEDMANN: Objection to form.
10  A.   I believe so, yes.
11  Q.   And in what context did you use the term
12  "available cash" before the closing of the APA?
13      MR. FRIEDMANN: Objection to form.
14  A.   In the context that it was available to pay
15  down the revolver at some point in time.
16  Q.   And when we previously looked at a -- the
17  first day declaration, Exhibit 6, correct, and
18  Mr. Friedmann had asked you about the use of the
19  term "available cash" in that context?
20  A.   Correct.
21  Q.   What did you mean by the term "available
22  cash" -- strike that.
23  Did you use "available cash" consistently to
24  mean a particular thing in the period before the
25  closing of the APA?

18-23538-shl    Doc 4975    Filed 08/23/19    Entered 08/23/19 16:49:48    Main Document
IN RE Sears
Holdings
Pg 39 of 205
Robert Riecker
August 20, 2019

Page 85

```
 1                   C E R T I F I C A T E

 2

 3          I, Sandra L. Rocca, CSR, RPR, RMR, CRR, a

 4   Certified Court Reporter within and for the State of

 5   Illinois, do hereby certify:

 6          That ROBERT A. RIECKER, the witness whose

 7   deposition is hereinbefore set forth, was duly sworn

 8   by me and that such deposition is a true record of

 9   the testimony given by such witness.

10          I further certify that I am not related to

11   any of the parties to this action by blood or

12   marriage; and that I am in no way interested in the

13   outcome of this matter.

14          IN WITNESS WHEREOF, I have hereunto set my

15   hand this 20th day of August, 2019.

16

17

18

19          -------------------------

20          Sandra L. Rocca, CSR, RPR, RMR, CRR

21

22

23

24

25
```

# *EXHIBIT C*

Page 1

```
 1    UNITED STATES BANKRUPTCY COURT

 2    SOUTHERN DISTRICT OF NEW YORK

 3    Case No. 18-23538-rdd

 4    Adv. Case No. 19-08262-rdd

 5    - - - - - - - - - - - - - - - - - - - - - - - - - - x

 6    In the Matter of:

 7

 8    SEARS HOLDINGS CORPORATION,

 9

10            Debtor.

11    - - - - - - - - - - - - - - - - - - - - - - - - - - x

12    TRANSFORM HOLDCO LLC,

13                   Plaintiff,

14            v.

15    SEARS HOLDINGS CORPORATION et al.,

16                   Defendants.

17    - - - - - - - - - - - - - - - - - - - - - - - - - - x

18

19

20

21

22

23

24

25
```

1          **United States Bankruptcy Court**

2          **300 Quarropas Street, Room 248**

3          **White Plains, NY 10601**

4

5          **July 11, 2019**

6          **10:11 AM**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21    **B E F O R E :**

22    **HON ROBERT D. DRAIN**

23    **U.S. BANKRUPTCY JUDGE**

24

25    **ECRO:   NAROTAM RAI**

Page 271

1     the reconciliation and --

2              THE COURT:  Okay.  But is it fair to say that, you

3     know, basically non-payment over a week isn't that in the

4     ordinary course?  You have to do something on top of that to

5     make it out of the ordinary course?

6              MR. LIMAN:  I think it's fair to say that -- yeah,

7     it has to be something on top of that, something different

8     from that.

9              THE COURT:  All right.  And again, there's the

10    communication part.  So basically, what you're looking at

11    now is whether there's something the Debtors did secretly or

12    not in consultation with Transform, and outside of the

13    general six-day, one-week issue?

14             MR. LIMAN:  And I think we have the parameters of

15    that, and we can have conversations and --

16             THE COURT:  All right.

17             MR. LIMAN:  -- hopefully, avoid the need --

18             THE COURT:  Well, look, I --

19             MR. LIMAN:  -- to bring it to Your Honor.

20             THE COURT:  It is 6:20.  I don't have any more

21    facts than just that, what we just agreed upon.  So, I'm not

22    sure there's anything more for me to agree to here.  I don't

23    know when you're going to conclude.  I don't even know if

24    the Debtors thought you were doing more analysis on that

25    point.

1             MR. SCHROCK:  Right.

2             THE COURT:  This is in transit?

3             MR. SCHROCK:  Right.

4             THE COURT:  So, who gets that?

5             MR. SCHROCK:  My point was when we were talking

6    about, you know, parties keeping things in the store.

7    They're going to be purchasing the cash --

8             THE COURT:  Right.  But it's not like -- I thought

9    you were saying that Transform has its cake and is eating it

10   too.  That's not really the case.

11            MR. SCHROCK:  I mean, what's --

12            THE COURT:  You know what?  I actually think this

13   is an ambiguous term.

14            MR. SCHROCK:  Okay.

15            THE COURT:  It's a term that does have a general

16   meaning.

17            MR. SCHROCK:  Right.

18            THE COURT:  But the parties may well have meant

19   something specific here.  Normally, it's a defined term.

20   So, I think I should have (indiscernible) evidence on this,

21   what they meant by this parenthetical.  I think we

22   understand that it's as of the closing date.  I think we

23   understand it's not restricted.

24            I think we're really limiting this to cash in

25   transit, and everything else is not available cash, other

Page 298

1   than money that's in a bank account that could be used to

2   make the payment on the closing, you know, i.e. not a

3   payroll account, not a special purpose tax account, or an

4   escrow account, or anything like that.  Okay.

5          MR. LIMAN:  How would you like to handle the

6   remaining -- they're small issues --

7          THE COURT:  Well, I mean, we have that issue and

8   we have -- I think the only -- oh, the adequate assurance,

9   the EDA, and the mechanics liens.  I will give you my

10  preliminary ruling without any explication of it on each of

11  these.

12         MR. LIMAN:  Do we each get a chance to argue the -

13  -

14         THE COURT:  You'll get a chance to then decide

15  what you want to do, whether you want to continue to argue

16  these.

17         I think under the plain language of the document,

18  the adequate assurance deposits go to the buyer.  There may

19  be aspects related to that that fit into other formulas.

20  But they're a deposit.  And they're not specifically carved

21  out, and there's no ordinary course exception, or out of the

22  ordinary course exception for the deposit.

23         I believe the EDA rights belong to the Debtor

24  under the specific language, which I frankly don't see how

25  you could really write it any more specific than the

Page 299

1    applicable provisions that has the refund rebate, refers to

2    the taxes, et cetera.  I think that's clear and I think it

3    supersedes the general language of the claim.

4         As far as mechanics liens are concerned, I'm more

5    open to hearing argument on this, but I believe that that

6    issue, if we're talking about mechanics liens that arose

7    pre-closing, I think those are the Debtors' responsibility.

8         Again, you all should discuss what you want to do

9    with those three issues and the (indiscernible) evidence on

10   available cash and see where you want to go.  But as far as

11   all the other issues are concerned, you know, I guess I'll

12   look for an order.  Unless you want to have it all wrapped

13   up so that there's no issues about an interlocutory order.

14        I think you're back here -- I know, you should

15   talk to Ms. Lee.  You could conceivably be back here in a

16   week or so.  I think she had like July 20th free for

17   something.  I'm not sure, frankly.

18        MR. SCHROCK:  We have a hearing on the 23rd --

19        THE COURT:  23rd, that's it.

20        MR. SCHROCK:  -- for the 507(b) issues, but I know

21   we were talking about having another day if we had to break

22   apart this hearing.

23        THE COURT:  So, talk with her about timing on

24   that.

25        MR. SCHROCK:  Okay.

Page 302

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5

6

7

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  July 15, 2019

# *EXHIBIT D*

| | |
|---|---|
| **From:** | kunal@eslinvest.com |
| **Sent:** | Friday, November 2, 2018 7:56 PM |
| **To:** | Prakash, Rajat |
| **Cc:** | mmeghji@miiipartners.com; Eddie; rob.riecker; Naren.Sinha@searshc.com; Robert.Phelan@searshc.com; William.Linnane@searshc.com; Thomas.Koreis@searshc.com; bgriffith@miiipartners.com; cgood@miiipartners.com; Nicholas Weber; jfrantz@miiipartners.com |
| **Subject:** | Re: Prelim Daily Cash Forecast 11.1.2018 |

I suspect there is a way to get to that 59...we should definitely figure that out.

> On Nov 2, 2018, at 8:45 PM, Prakash, Rajat <Rajat.Prakash@searshc.com> wrote:
>
> Example, Cash in an oklahoma store was picked up by armored car and deposited in the local bank.
>
> That cash has not yet reached company's concentration account for us to be able to use it.
>
>> On Nov 2, 2018, at 7:42 PM, Kunal Kamlani <kunal@eslinvest.com> wrote:
>>
>> What is the cash in regional banks for?
>>
>> On Nov 2, 2018, at 8:33 PM, Prakash, Rajat <Rajat.Prakash@searshc.com<mailto:Rajat.Prakash@searshc.com>> wrote:
>>
>> Kunal,
>>
>> Please see the specific components of Unavailable Cash followed by some callouts:
>>

| | | |
|---|---|---|
| >> · | Cash in escrow | $281 M |
| >> · | Credit card receivables | 60 |
| >> · | Cash posted as collateral | 5 |
| >> · | Invested Cash | 12 |
| >> · | Cash in regional banks | 59 |
| >> · | Cash in stores | 20 |
| >> · | Total Unavailable Cash (11/2) | $437 M |



>> Key Callouts:
>>
>> o  Total cash on the balance sheet is a GAAP metric and therefore credit card receivables are included here
>>
>> o  We can only have exact visibility into this as frequently as company's books close, which is once a month
>>

KAMLANI -3
Kunal Kamlani
8/15/2019
S. Arielle Santos
CCR-NJ, CLR
Lexitas Legal

EXHIBIT
4

>> o  Fiscal October closed today, and the preliminary balance sheet should be available around Nov 9th, which is when we will have exact balances of all these components as of Nov 2nd

>>

>> o  All intra month components (excl. Cash in escrow) are estimates, however Cash posted as Collateral, Invested Cash, and Cash in Stores, generally tend to remain stable at the levels shown above

>>

>> o  We will look into freeing up cash in the collateral & investment buckets

>>

>> o  Cash in regional banks and stores could potentially be freed up by working with armored cars, banks, etc. but it might require additional expense

>>

>> Thanks,

>>

>> Rajat Prakash

>> Sears Holdings Corporation

>> Treasury

>> 847.286.2288

>>

>> From: Kunal Kamlani [mailto:kunal@eslinvest.com]

>> Sent: Friday, November 02, 2018 4:18 PM

>> To: mmeghji@miiipartners.com<mailto:mmeghji@miiipartners.com>;

>> Prakash, Rajat

>> <Rajat.Prakash@searshc.com<mailto:Rajat.Prakash@searshc.com>>

>> Cc: eddie@eslinvest.com<mailto:eddie@eslinvest.com>; Riecker, Rob

>> <Rob.Riecker@searshc.com<mailto:Rob.Riecker@searshc.com>>; Sinha,

>> Naren <Naren.Sinha@searshc.com<mailto:Naren.Sinha@searshc.com>>;

>> Phelan, Robert

>> <Robert.Phelan@searshc.com<mailto:Robert.Phelan@searshc.com>>;

>> Linnane, William

>> <William.Linnane@searshc.com<mailto:William.Linnane@searshc.com>>;

>> Koreis, Thomas

>> <Thomas.Koreis@searshc.com<mailto:Thomas.Koreis@searshc.com>>;

>> bgriffith@miiipartners.com<mailto:bgriffith@miiipartners.com>;

>> cgood@miiipartners.com<mailto:cgood@miiipartners.com>;

>> nweber@miiipartners.com<mailto:nweber@miiipartners.com>; Joseph

>> Frantz <jfrantz@miiipartners.com<mailto:jfrantz@miiipartners.com>>

>> Subject: RE: Prelim Daily Cash Forecast 11.1.2018

>>

>> The question I have is with respect to what we are assuming our free cash is today that is baked into the Liquidity forecast. As of yesterday we had:

>>

>> Avail Cash 333

>> Unavail 437

>> In the Unavail is Pension Escrow of 280, so that leaves 157 of remaining unavailable.

>>

>> As we close stores some of that 157 will shake loose. There may be components of the 157 that we do have access to. Trying to figure out what the real starting cash number is....its 333 + ??

>>

>> KSK

>>

>> From: Mohsin Meghji

>> <mmeghji@miiipartners.com<mailto:mmeghji@miiipartners.com>>

>> Sent: Friday, November 2, 2018 4:56 PM

HIGHLY CONFIDENTIAL

SEARS_ENFORCE0000772

>> To: Prakash, Rajat
>> <Rajat.Prakash@searshc.com<mailto:Rajat.Prakash@searshc.com>>
>> Cc: Kunal Kamlani <kunal@eslinvest.com<mailto:kunal@eslinvest.com>>;
>> Eddie <Eddie@eslinvest.com<mailto:Eddie@eslinvest.com>>; rob.riecker
>> <rob.riecker@searshc.com<mailto:rob.riecker@searshc.com>>;
>> naren.sinha
>> <naren.sinha@searshc.com<mailto:naren.sinha@searshc.com>>; Phelan,
>> Robert <Robert.Phelan@searshc.com<mailto:Robert.Phelan@searshc.com>>;
>> Linnane, William
>> <William.Linnane@searshc.com<mailto:William.Linnane@searshc.com>>;
>> Koreis, Thomas
>> <Thomas.Koreis@searshc.com<mailto:Thomas.Koreis@searshc.com>>; Brian
>> Griffith
>> <bgriffith@miiipartners.com<mailto:bgriffith@miiipartners.com>>;
>> Chris Good <cgood@miiipartners.com<mailto:cgood@miiipartners.com>>;
>> Nicholas Weber
>> <nweber@miiipartners.com<mailto:nweber@miiipartners.com>>; Joseph
>> Frantz <jfrantz@miiipartners.com<mailto:jfrantz@miiipartners.com>>
>> Subject: Re: Prelim Daily Cash Forecast 11.1.2018
>>
>> Brian,
>> Can you and Rajat and Joseph pls get Kunal everything he needs on
>> liquidity scenarios we ran and showed this pm?
>>
>> Critical we have flushed any data discrepancies out before early next
>> week. Thx Mo Meghji M-III Partners, L.P.
>> 130 West 42nd Street, 17th Floor
>> New York, NY 10036
>>
>> 212 716 1492 (o)
>> 516 851 8266 (c)
>>
>> On Nov 2, 2018, at 4:22 PM, Prakash, Rajat <Rajat.Prakash@searshc.com<mailto:Rajat.Prakash@searshc.com>>
wrote:
>> Kunal,
>>
>> Following up on the email exchange this morning.
>>
>> Attached is the Feb 1 Dip Availability reconciliation between 10/31 & 11/1 daily cash forecasts. Merchandise
disbursements forecast in the 11/1 daily cash forecast caught up with the inventory assumptions driving the sales
forecast.
>>
>> Naren & MIII are working on the by-day change in sales going from (15)% to flat comp sales, per your highlighted
request below.
>>
>> Let us know of any questions.
>>
>> Thanks,
>>
>> Rajat Prakash
>> Sears Holdings Corporation
>> Treasury
>> 847.286.2288

HIGHLY CONFIDENTIAL

\>>
\>> From: Kunal Kamlani [mailto:kunal@eslinvest.com]
\>> Sent: Friday, November 02, 2018 7:15 AM
\>> To: Prakash, Rajat
\>> <Rajat.Prakash@searshc.com<mailto:Rajat.Prakash@searshc.com>>;
\>> eddie@eslinvest.com<mailto:eddie@eslinvest.com>; Riecker, Rob
\>> <Rob.Riecker@searshc.com<mailto:Rob.Riecker@searshc.com>>; Sinha,
\>> Naren <Naren.Sinha@searshc.com<mailto:Naren.Sinha@searshc.com>>;
\>> Phelan, Robert
\>> <Robert.Phelan@searshc.com<mailto:Robert.Phelan@searshc.com>>;
\>> Linnane, William
\>> <William.Linnane@searshc.com<mailto:William.Linnane@searshc.com>>;
\>> Koreis, Thomas
\>> <Thomas.Koreis@searshc.com<mailto:Thomas.Koreis@searshc.com>>;
\>> mmeghji@miiipartners.com<mailto:mmeghji@miiipartners.com>;
\>> bgriffith@miiipartners.com<mailto:bgriffith@miiipartners.com>;
\>> cgood@miiipartners.com<mailto:cgood@miiipartners.com>
\>> Subject: RE: Prelim Daily Cash Forecast 11.1.2018
\>>
\>> When we cover liquidity during today's board meeting it would be very helpful to understand the change from the 10/31 to the 11/1 report. This is critically important as the board assesses the cash needs for the company in the current environment.
\>>
\>> -        What were the sales assumptions by day (inflows) in the 10/31 report which reflected lower receipts
\>> -        What are the sales assumptions by day (inflows) in the 11/1 report that now reflect $150M higher of receipts/disbursements
\>> o  There is a notation regarding -15% SSS and now we are assuming that to be flat. Would like to see that change by day in dollars.
\>> -        Please provide a bridge that shows the change in the DIP Availability from -33 to -165 for Feb 1st. Trying to understand the math behind  adding $150M in receipts/disbursements based on a more favorable sales trend assumption and how that leads to less availability. DIP BB only increases by $1M and BS Inventory only increases by $18M comparing Feb 1 b/w the two reports. Assume that means that we procure the inventory and sell through it fairly quickly which should be liquidity positive but the report suggests otherwise.
\>> -        Please confirm that the "142 unannounced store closures" in the commentary is a typo and should be "142 previously announced store closures".
\>>
\>> Thank You.
\>>
\>> From: Prakash, Rajat
\>> <Rajat.Prakash@searshc.com<mailto:Rajat.Prakash@searshc.com>>
\>> Sent: Thursday, November 1, 2018 11:06 PM
\>> To: Eddie <Eddie@eslinvest.com<mailto:Eddie@eslinvest.com>>; Riecker,
\>> Rob <Rob.Riecker@searshc.com<mailto:Rob.Riecker@searshc.com>>; Sinha,
\>> Naren <Naren.Sinha@searshc.com<mailto:Naren.Sinha@searshc.com>>;
\>> Phelan, Robert
\>> <Robert.Phelan@searshc.com<mailto:Robert.Phelan@searshc.com>>;
\>> Linnane, William
\>> <William.Linnane@searshc.com<mailto:William.Linnane@searshc.com>>;
\>> Koreis, Thomas
\>> <Thomas.Koreis@searshc.com<mailto:Thomas.Koreis@searshc.com>>; Kunal
\>> Kamlani <kunal@eslinvest.com<mailto:kunal@eslinvest.com>>;
\>> mmeghji@miiipartners.com<mailto:mmeghji@miiipartners.com>;
\>> bgriffith@miiipartners.com<mailto:bgriffith@miiipartners.com>;

HIGHLY CONFIDENTIAL

SEARS_ENFORCE0000774

>> cgood@miiipartners.com<mailto:cgood@miiipartners.com>;
>> nweber@miiipartners.com<mailto:nweber@miiipartners.com>; Joseph
>> Frantz <jfrantz@miiipartners.com<mailto:jfrantz@miiipartners.com>;
>> miiipartners.com<https://na01.safelinks.protection.outlook.com/?url=h
>> ttp%3A%2F%2Fmiiipartners.com&amp;data=02%7C01%7CRajat.Prakash%40sears
>> hc.com%7Cc03ba6c38f1143c2826508d641252d83%7C27e4c16803234463acad7e124
>> b566726%7C0%7C0%7C636768025291473438&amp;sdata=BwZ8yzxRZQU83b%2FKDvlt
>> VdeXubFsSDm8JqCOO5g9Ri4%3D&amp;reserved=0>,sima
>> <wsima@miiipartners.com<mailto:wsima@miiipartners.com>>; Daniel Allan
>> <dallan@miiipartners.com<mailto:dallan@miiipartners.com>>
>> Cc: Wells, Paris
>> <Paris.Wells@searshc.com<mailto:Paris.Wells@searshc.com>>;
>> Avitia-Guzman, Jaqueline
>> <Jaqueline.Avitia-Guzman@sears.com<mailto:Jaqueline.Avitia-Guzman@s
>> earshc.com>>; Joye, Jennifer
>> <Jenny.Joye@searshc.com<mailto:Jenny.Joye@searshc.com>>; Hutka,
>> Jeffrey
>> <Jeffrey.Hutka@searshc.com<mailto:Jeffrey.Hutka@searshc.com>>;
>> Espinosa, Daniel
>> <Daniel.Espinosa@searshc.com<mailto:Daniel.Espinosa@searshc.com>>;
>> Wehby, Andrew
>> <Andrew.Wehby@searshc.com<mailto:Andrew.Wehby@searshc.com>>; Khan,
>> Aziz <Aziz.Khan@searshc.com<mailto:Aziz.Khan@searshc.com>>; Liu, Lu
>> <Lu.Liu@searshc.com<mailto:Lu.Liu@searshc.com>>; Prakash, Rajat
>> <Rajat.Prakash@searshc.com<mailto:Rajat.Prakash@searshc.com>>
>> Subject: Prelim Daily Cash Forecast 11.1.2018
>>
>> All,
>>
>> Attached is the preliminary daily cash forecast.
>>
>> Key Callouts:
>>
>> *   We are now tracking variances to budget on a daily, weekly, and monthly basis
>> *   Attached incorporates $(150) M higher merchandise disbursements in Q4 compared to yesterday's cash forecast
>>
>>    *   This is primarily driven by aligning with the flat comp store sales assumption to be consistent with the sales forecast. Until yesterday, merchandise disbursements were based on a (15)% comp store sales assumptions per the DIP budget
>>    *   Additionally, the merchandise disbursements here assumes no inventory replenishment for 142 unannounced store closures
>>    *   While the DIP revolver is capped at $188 M, DIP revolver balance reflects total cash need
>>
>> *   The total AP Balance beginning 11-1-2018 is:
>>
>>    *  Merch: 29.2
>>    *  Non-merch: 11.4
>>
>> Key Assumptions:
>>
>> *   Available cash is used to pay down the revolver Nov 15th onward after the second order approval
>> *   Forecast assumes interest payments on prepetition ABL debt, FILO, and UBS loan
>> ================================================================

HIGHLY CONFIDENTIAL

```
>> ==================================================
>> I. October
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>> Total Cash
>>
>> Prepetition 1L Debt
>>
>> DIP Term Loan
>>
>> DIP Revolver
>>
>> Net Debt
>>
>> As of: October 31, 2018
>>
>> 749
>>
>> 1,530
>>
>> 112
>>
>> 0
>>
>> 893
>>
>>
>>
>> Change to Month End Estimate
>>
>> +21
>>
>> 0
>>
>> 0
>>
>> 0
>>
>> -21
>>
>> As of: November 1, 2018
>>
```

HIGHLY CONFIDENTIAL

SEARS_ENFORCE0000776

>> 770
>>
>> 1,530
>>
>> 112
>>
>> 0
>>
>> 872
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>> Daily Variances (and treatment through rest of month):
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>> Today

HIGHLY CONFIDENTIAL

SEARS_ENFORCE0000777

```
>>
>> Timing
>>
>> Forecast
>>
>> Permanent
>>
>>
>>
>>
>>
>> Prior Day  Available Cash Estimate
>>
>> +317
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>> Cash Inflows
>>
>> +1
>>
>> -1
>>
>> -1
>>
>> -1
>>
>> Merch/Non-Merch Disbursements
>>
>> +21
>>
>> -21
>>
>> +20
>>
>> +20
>>
```

HIGHLY CONFIDENTIAL

SEARS_ENFORCE0000778

>> Logistics
>>
>> +.3
>>
>> -.3
>>
>> 0
>>
>> 0
>>
>> Western Union
>>
>> 0
>>
>> 0
>>
>> +1
>>
>> +1
>>
>> Logistics
>>
>> 0
>>
>> 0
>>
>> +3
>>
>> +3
>>
>> Lands' End
>>
>> +3
>>
>> -3
>>
>> -1
>>
>> -1
>>
>> Cardinal Rebate
>>
>> 0
>>
>> 0
>>
>> -2
>>
>> -2
>>
>> Sales taxes/State taxes
>>
>> -1

HIGHLY CONFIDENTIAL

SEARS_ENFORCE0000779

>>
>> +1
>>
>> -1
>>
>> -1
>>
>> Payroll/ Taxes/ Benefits
>>
>> -.2
>>
>> +.2
>>
>> +2
>>
>> +2
>>
>> Total Operating
>>
>> +25
>>
>> -25
>>
>> +21
>>
>> +21
>>
>>
>>
>>
>>
>>
>>
>>
>>
>> Misc Cash
>>
>> 0
>>
>> 0
>>
>> 0
>>
>> 0
>>
>> Revolver
>>
>> 0
>>
>> 0
>>
>> 0
>>

HIGHLY CONFIDENTIAL

SEARS_ENFORCE0000780

>> 0
>>
>> Total Financing
>>
>> 0
>>
>> 0
>>
>> 0
>>
>> 0
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>> Available Cash Change
>>
>> +25
>>
>> -25
>>
>> +21
>>
>> +21
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>

HIGHLY CONFIDENTIAL                                    SEARS_ENFORCE0000781

```
>>
>> Available Cash Balance
>>
>> 342
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>> Operating Comments:
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>   - Today's cash inflows +1.2 to forecast
>>
>>   - Merch/Non Merch Disbursements +21.4 treated as timing
>>
>>   - Logistics +0.3 treated as timing
>>
>>   - Payroll/ Taxes/ Benefits -0.2 treated as timing
>>
>>   - Lands' End +3.4 treated as timing
>>
```

HIGHLY CONFIDENTIAL

```
>>   - Sales taxes/State taxes -1 treated as timing
>>
>>
>> Financing Comments:
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>   - Commercial Paper flat to forecast
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>   - Revolver flat to forecast
>>
>> =====================================================================
>> =====================
>>
>>
>>
>> II. November
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>> Total Cash
```

HIGHLY CONFIDENTIAL

>>
>> Prepetition 1L Debt
>>
>> DIP Term Loan
>>
>> DIP Revolver
>>
>> Net Debt
>>
>>
>>
>> As of: October 31, 2018
>>
>> 476
>>
>> 991
>>
>> 112
>>
>> 0
>>
>> 626
>>
>>
>>
>> Change to November's Month End Estimate
>>
>> 0
>>
>> +32
>>
>> 0
>>
>> +7
>>
>> +39
>>
>>
>>
>> As of: November 1, 2018
>>
>> 476
>>
>> 1,023
>>
>> 112
>>
>> 7
>>
>> 666
>>
>>
>>

HIGHLY CONFIDENTIAL

SEARS_ENFORCE0000784

>>
>> Daily Variances (and treatment through rest of month):
>>
>>
>>
>> Permanent
>>
>>
>> October Operating Changes
>>
>> +21
>>
>> November Operating Changes
>>
>> -60
>>
>> Total Operating
>>
>> -39
>>
>>
>> October Financing Changes
>>
>> 0
>>
>>
>>
>> November Financing Changes
>>
>> +7
>>
>>
>>
>> Total Financing
>>
>> +7
>>
>>
>>
>>
>>
>> Total Cash Flow Changes Thru November Month End
>>
>> -32
>>
>>
>>
>> Rajat Prakash
>> Sears Holdings Corporation
>> Treasury
>> 847.286.2288
>>

HIGHLY CONFIDENTIAL

SEARS_ENFORCE0000785

>> This message, including any attachments, is the property of Sears Holdings Corporation and/or one of its subsidiaries. It is confidential and may contain proprietary or legally privileged information. If you are not the intended recipient, please delete it without reading the contents. Thank you.

>> This message, including any attachments, is the property of Sears Holdings Corporation and/or one of its subsidiaries. It is confidential and may contain proprietary or legally privileged information. If you are not the intended recipient, please delete it without reading the contents. Thank you.

>> This message contains information which may be confidential and privileged. Unless you are the intended addressee (or authorized to receive for the intended addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply email or by calling 212-716-1491 and delete the message.

>>

>> <DIP Availability Recon.xlsx>

>>

>> This message contains information which may be confidential and privileged. Unless you are the intended addressee (or authorized to receive for the intended addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply email or by calling 212-716-1491 and delete the message.

>>

>> This message, including any attachments, is the property of Sears Holdings Corporation and/or one of its subsidiaries. It is confidential and may contain proprietary or legally privileged information. If you are not the intended recipient, please delete it without reading the contents. Thank you.

> This message, including any attachments, is the property of Sears Holdings Corporation and/or one of its subsidiaries. It is confidential and may contain proprietary or legally privileged information. If you are not the intended recipient, please delete it without reading the contents. Thank you.


This message contains information which may be confidential and privileged. Unless you are the intended addressee (or authorized to receive for the intended addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply email or by calling 212-716-1491 and delete the message.

HIGHLY CONFIDENTIAL

SEARS_ENFORCE0000786

# *EXHIBIT E*

# Post-close Reconciliation Items

June 14, 2019

DRAFT – subject to material change
Rule 408 – for settlement purposes



DRAFT – June 14, 2019
Rule 408 – for settlement purposes

# Table of contents

1. Executive summary                                    3

2. Cash in transit                                      4

3. Estate checks                                        5

4. P-Card (Pre-close transactions)                      6

5. Taxes                                                7

6. Telecom expenses                                     8

7. Pre-close orders cancelled post-close                9

8. February real estate expense pro-rations            10

9. March GOB store rent payments                        11

10. Citi LC facility draws                              12

11. TSA fees                                            13

12. KERP Payment                                        14

13. GOB CC Proceeds                                     15

14. Estate checks deposited into Transform account      16

15. Subtenant Proceeds                                  17

16. Appendix                                            18

sears    kmart    SHOP YOUR WAY

DRAFT – June 14, 2019
Rule 408 – for settlement purposes

# Executive summary

- Detailed below is a summary of the post-close reconciliations performed to date (and their current status) quantifying funds owed to the Estate and Transform.

- The following slides provide a description of the analysis performed and preliminary conclusions. Please note that for certain items the analysis herein is not yet complete and is subject to material change.

| Description | Status | Owed to Estate ($) | Owed to Transform ($) |
|---|---|---|---|
| Cash in transit | Complete | $22,452,428 | $- |
| Estate checks cleared | Complete | - | 11,444,233 |
| Estate checks not-cleared | Complete | - | 2,355,197 |
| P-Cards (Pre-close transactions) | Ongoing | - | 3,155,380 |
| Taxes | Complete | - | 2,774,750 |
| Telecom expenses | Complete | - | 1,922,800 |
| Pre-close orders cancelled post-close | Complete | - | 9,578,762 |
| February real estate expense pro-rations | Complete | 11,174,959 | - |
| March GOB store rent payments | Complete | - | 1,598,931 |
| Citi LC facility draw | Complete | - | 1,587,658 |
| Net TSA fees | Ongoing | - | 1,015,377 |
| April 2019 KERP Payment | Complete | - | 1,131,870 |
| Estate checks deposited into Transform account | Complete | 5,945,069 | - |
| GOB CC Proceeds | Ongoing | 4,368,957 | - |
| Subtenant Proceeds | Complete | 657,243 | - |
| **Total** | | **$44,598,656** | **$36,564,958** |
| **Amounts already paid** | | (8,000,000) | - |
| **Net amount owed** | | **$33,698** | **$-** |

sears    kmart    🛒 SHOP YOUR WAY°

DRAFT – June 14, 2019
Rule 408 – for settlement purposes

# Reconciliation of cash in-transit

*Amounts shown in $MM*

- The cash in-transit reconciliation was performed using a combination of point of sale information provided by stores, and bank statement data provided by the corresponding financial institution.

- This reconciliation was completed in two stages and has identified $22.5MM of cash related to pre-close transactions that was received post-close:

  i. Store cash reported prior to and including February 10, 2019 (the Pre-Close amount) ~ $14.3MM.

  ii. Store cash reported after and including February 11, 2019 (the Post-Close amount) ~ $8.2MM.

- Despite the detailed nature of this reconciliation, there are certain limitations, including:

  i. Sears Treasury team cannot connect specific point of sale cash and check receipt information to bank wires sent from the regional banks to the main concentration account at Bank of America (BAML).

  ii. It remains unclear what portion of money deposited at a regional level on February 11th was actually applied against the Estate revolver (DIP) due to lack of detail included within the bank statement data provided by Sears Accounting Team.

- The scope of this analysis is discussed in greater detail in the appendix.




$22.5

Post-Close    8.2

Pre-Close    14.3

Sears    kmart    ⓢ SHOP YOUR WAY®

DRAFT – June 14, 2019
Rule 408 – for settlement purposes

# Estate checks

- A reconciliation was performed to identify Estate checks issued pre-close which cleared post close and were funded by Transform. To date, there are approximately $11.4MM of pre-close checks that have cleared (net of February 2019 rent payments). Additionally, there are approximately $2.4MM of pre-close checks that have not yet cleared.

## Transform Methodology & Analysis

1. Identified all check numbers related to Estate check stock.

2. Reviewed all registers to identify checks cashed on or after 2/11.

3. Totaled all checks identified as Estate checks that were cashed on or after 2/11.

4. Removed checks related to February occupancy costs as they were already included within the February rent pro-rations.

5. Removed checks identified as paid by the Estate on 2/11.

(1) Data as of April 15, 2019
(2) Accounted for in February 2019 real estate expense pro-ration (see page 10)

| Summary [1] | Amount | # of Checks |
|---|---|---|
| Checks cleared | | |
| K-Mart | $9,566,307 | 8,876 |
| Sears | 5,163,377 | 187 |
| Monark – FL Builder | 58,537 | 57 |
| Monark – McPhails | 72,211 | 76 |
| Monark – Westar | 18,784 | 24 |
| SHIP | 347,940 | 188 |
| K-Mart rent [2] | (1,230,858) | (41) |
| Sears rent [2] | (1,494,446) | (81) |
| Checks funded by Estate on 2/11 | (1,057,619) | |
| **Total** | **$11,444,233** | **9,286** |

| Checks outstanding | Amount | # of Checks |
|---|---|---|
| K-Mart | $2,098,825 | 13,951 |
| Sears | 199,487 | 110 |
| Monark – FL Builder | 4,424 | 4 |
| Monark – McPhails | 15,495 | 10 |
| Monark – Westar | 2,906 | 3 |
| SHIP | 36,417 | 125 |
| K-Mart rent | (2,292) | (1) |
| Sears rent | (64) | (4) |
| **Total** | **$2,355,197** | **14,201** |

sears    kmart    SHOP YOUR WAY

DRAFT – June 14, 2019
Rule 408 – for settlement purposes

# P–Cards (Pre-close transactions)

An analysis was performed to reconcile corporate credit card charges paid by Transform on behalf of the Estate.

- The time period used to perform this reconciliation included transactions prior to February 10, 2019 that were paid post-close.

- Based upon this analysis, approximately $3.2MM of corporate credit card expenses were paid by Transform in relation to Estate charges.

| GL Indicator | Amount |
|---|---|
| SHC Sears P-Card | $476,899 |
| SHC Travel | 354,790 |
| Home Improvement Card | 363,874 |
| SHC Service P-Card | 834,601 |
| SHC Auto P-Card | 869,169 |
| Home Improvement Travel | 40,894 |
| SHC Service Fleet | 582,729 |
| Amount paid by Transform[1] | $3,522,955 |
| Less: Reconciling Amount[2] | (367,575) |
| Net Amount paid by Transform | $3,155,380 |

- Transform is reviewing P-card charges to determine if there were any Estate charges incurred post-close.

1. Estate portion for payments made on 2/22 and 3/7/19.
2. Represents transactions posted on 2/1/19, paid by Debtor on 2/7/19; removed from this analysis.



DRAFT – June 14, 2019
Rule 408 – for settlement purposes

# Taxes

An analysis was performed to reconcile tax disbursements to determine payments made by Transform in relation to Estate charges.

• Based upon this analysis we identified approximately $2.7MM in taxes were paid by Transform on behalf of the Estate.

• This analysis does not include real estate taxes.

| GL Indicator | Amount |
|---|---|
| Sales Tax | $2,833,358 |
| Federal Tax | - |
| Foreign Tax | - |
| State Income & Franchise Tax | (148,145) |
| Annual Report Tax | 17,093 |
| Business License Tax | 72,445 |
| Total | $2,774,750 |

sears    kmart    🛒 SHOP YOUR WAY®

DRAFT – June 14, 2019
Rule 408 – for settlement purposes

# Telecom expenses

An analysis was performed to reconcile telecom disbursements to determine payments made by Transform in relation to Estate charges.

- The reconciliation includes services provided pre-close that were paid post-close.
- Based upon this analysis, approximately $1.9MM of Estate telecom expenses were paid by Transform.
- We have identified and removed ~$305k of telephone expenses that were accounted for within the February rent pro-rations.

| Timing | Amount |
|---|---|
| Paid | $2,297,944 |
| Telephone expenses included in February rent pro-ration | (305,144) |
| Total | $1,992,800 |

sears    kmart    SHOP YOUR WAY

DRAFT – June 14, 2019
Rule 408 – for settlement purposes

# Pre-close orders cancelled post-close

- This analysis relates to all pre-close orders that were subsequently canceled on or after February 11th and a refund was issued to the customer.

| Business Unit | Amount Refunded Post-Close |
|---|---|
| Innovel | $ 3,726,830 |
| RRC Shipments | 199,846 |
| Kmart | 6,852 |
| Monark | 5,110,777 |
| SHIP | 534,457 |
| **TOTAL:** | **$ 9,578,762** |

- The canceled orders include (i) canceled order data related to all Innovel orders, (ii) Retail Replenishment Center (RRC) shipments, (iii) Kmart orders, (iv) Monark orders and (v) SHIP contracts for the defined timeframe.

- These five categories total $9.6MM of pre-close orders that were canceled on or after February 11th, 2019.

- It is assumed that for any order canceled on or after February 11th, 2019, the sale value was refunded by Transform.

sears    kmart    SHOP YOUR WAY

DRAFT – June 14, 2019
Rule 408 – for settlement purposes

# February real estate expense pro-rations

- Sears Real Estate Team, in conjunction with M-III, provided a proration schedule of occupancy costs for the month of February 2019. The proration allocates occupancy costs as follows:

  – There is a total of 28 days in February 2019;

  – Occupancy costs from February 1st thru February 10th are the responsibility of the Estate (10 days).

  – Occupancy costs from February 11th thru February 28th is the responsibility of Transform (18 days).

  – Utility costs paid in arrears post-close by Transform for service periods prior to February 2019 ($4.2MM) were allocated to the Estate.

- Allocations are based on whether expenses were paid in advance or in arrears and a net payment was calculated of $11.2MM due from Transform to the Estate.

  – EY and the Sears Real Estate Team are in agreement regarding the methodology employed in the calculation

|  | Advance Payments (Seller) | Arrear Payments (Transform) | Total Payments |
|---|---|---|---|
| Rent | $    28,116,174 | $    409,754 | $    28,525,927 |
| CAM/Maintenance | 3,855,140 | 2,597,730 | 6,452,870 |
| Insurance | 334,747 | - | 334,747 |
| Utilities | 164,886 | 11,198,458 | 11,363,343 |
| Pre-February utilities [1] | - | 4,245,757 | 4,245,757 |
| RE taxes made on behalf of Estate [2] | - | 766,420 | 766,420 |
| **Total** | **32,470,946** | **19,218,119** | **51,689,065** |
| **Seller Portion** | 11,192,072 | 10,103,915 | 21,295,987 |
| **Buyer Portion** | 21,278,874 | 9,114,204 | 30,393,078 |

(1) Utility bills received and paid post closing relating to pre 2019 service periods
(2) Real Estate taxes paid by Transform relating to rejected leases

|  | Seller | | |
|---|---|---|---|
|  | Actually Paid | Should Have Paid | Net Due |
|  | 32,470,946 | 21,295,987 | 11,174,959 |

|  | Buyer | | |
|---|---|---|---|
|  | Will Actually Pay | Should Have Paid | Net Payable |
|  | 19,218,119 | 30,393,078 | 11,174,959 |

DRAFT – June 14, 2019
Rule 408 – for settlement purposes

# March GOB store rent payments

- Transform paid approximately $1.6MM of March rent payments related to Going Out of Business (GOB) stores.

| Store | Amount |
|-------|--------|
| K-Mart | $814,726 |
| Sears | $784,205 |
| Total | $1,598,931 |

sears    kmart    SHOP YOUR WAY

DRAFT – June 14, 2019
Rule 408 – for settlement purposes

# Citi letter of credit facility draw

Per APA Amendment No. 1, Section 9.11 (c): "With respect to the Citi L/C Facility, all letter of credit commitment fees shall be prorated on a daily basis for the month in which the Closing Date occurs based on the amounts paid. All amounts unreimbursed as of the Closing Date under the Citi L/C Facility with respect to drawn letters of credit, along with any accrued interest thereon, will be allocated to the Sellers[1]."

The following chart details the total pre-close draw amounts against Letters of Credit, which totaled approximately $1.6MM.

| Summary | Amounts Drawn |
|---|---|
| Applicant<br>Beneficiary<br>Value of Drawing | Sears Roebuck Acceptance Group<br>Direct Energy Business LLC<br>USD $277,483 |
| Applicant<br>Beneficiary<br>Value of Drawing | Sears Roebuck Acceptance Group<br>Southern California Edison<br>USD $1,048,828 |
| Applicant<br>Beneficiary<br>Value of Drawing | Sears Roebuck Acceptance Group<br>Argonaut Insurance Company<br>USD $261,347 |

1 APA Amendment No. 1, Section 9.11 bullet (c)

sears        kmart        SHOP YOUR WAY

DRAFT – June 14, 2019
Rule 408 – for settlement purposes

# TSA fees

- The net of Buyer and Seller fees for both February and March calculates a payment of $1.0MM due from the Estate to Transform.

| TSA Services | February [1] | March | April | May | Total |
|---|---|---|---|---|---|
| Seller Services: | | | | | |
| Administrative Fee | $ (250,000) | $ (250,000) | TBD | TBD | $ (500,000) |
| EE Medical Benefit Flat Fee [2] | (154,291) | (240,008) | (240,008) | - | (634,307) |
| EE Medical Benefit Variable Fees [3] | NA | NA | NA | NA | - |
| Custom, Surety, and Medical Bond Fees [4] | (60,380) | (103,263) | (96,589) | (90,085) | (350,316) |
| Total TSA services owed to Seller from Buyer | $ (464,671) | $ (593,271) | $ (336,597) | $ (90,085) | $(1,484,623) |
| Buyer Services: | | | | | |
| Fixed Fee for TSA Services owed from Seller to Buyer | $1,250,000 | $1,250,000 | TBD | TBD | 2,500,000 |
| KCD IP License Backstop Reimbursement [5] | NA | NA | NA | NA | - |
| Net amount (Due to Seller)/ Due to Buyer | $ 785,329 | $ 656,729 | $ (336,597) | $ (90,085) | $ 1,015,377 |

(1) Pro-rated based on closing date of February 11, 2019

(2) EE Medical Benefits Flat Fee amount in accordance with TSA Schedule A-1 "Human Resouces / Payroll Services" (1); Transform EE Medical Benefit Plan initiated in May.

(3) EE Medical Benefits have been prefunded with payroll since the closing

(4) Prorated portion of annual bond premiums paid by Estate pre-close

(5) Estate has previously reimbursed Transform

sears    kmart    ◼ SHOP YOUR WAY®

DRAFT – June 14, 2019
Rule 408 – for settlement purposes

# Estate portion of KERP payment

- On 4/30/19, a KERP payment in the amount of $3.9MM was funded by Transform.
- The below chart calculates that approximately $1.1MM of the total amount funded should be paid by the Estate.

| Timing | Amount | Begin | End | Days | % |
|--------|--------|-------|-----|------|---|
| Total | $3,902,999 | 1/16/19 | 4/15/19 | 90 | 100% |
| Estate | 1,131,870 | 1/16/19 | 2/10/19 | 26 | 29% |
| Transform | 2,771,129 | 2/11/19 | 4/15/19 | 64 | 71% |

sears    kmart    SHOP YOUR WAY™

DRAFT – June 14, 2019
Rule 408 – for settlement purposes

# GOB store credit card proceeds

- The table below summarizes $4.4MM in GOB store credit card proceeds that the Estate claims were funded into Transform accounts.

- Transform has a high level of confidence that $4.4MM of GOB store transactions were deposited into Transform bank accounts. This is primarily based on the timing for when credit card providers began complying with instructions provided to deposit GOB store proceeds into Estate bank accounts. However, Transform cannot validate that proceeds were deposited into Transform accounts due to reporting limitations by the credit card processors.

| Card | Amounts Owed To Estate | Percentage of Total |
|------|------------------------|---------------------|
| Amex | $291,487.52 | 7% |
| Discover | 1,362,183.22 | 31% |
| FDMS | 53,921.50 | 1% |
| Telecheck | 2,661,364.53 | 61% |
| **Total** | **$4,368,956.77** | |

sears    kmart    SHOP YOUR WAY

DRAFT – June 14, 2019
Rule 408 – for settlement purposes

# Estate checks deposited into Transform account

- The Estate has questioned whether $6.8MM of checks that were deposited into Transform bank accounts after February 11th are Estate property. The breakdown of the initial analysis is as follows:

| Deposit Date | Service Dates | No. of Checks | Amount | % of Total: |
|---|---|---|---|---|
| Post-Close | Pre-Close | 635 | 4,910,013 | 72% |
| Post-Close | Post-Close | 12 | 56,154 | 1% |
| Post-Close | Partial | 4 | 14,219 | 0% |
| Post-Close | Unclear | 1,031 | 1,822,788 | 27% |
| **Total:** | | **1,682** | **6,803,174** | **100%** |

- Of the $6.8MM of checks that were deposited into Transform bank accounts after February 11th, Transform has a high level of confidence that $5.9MM of checks are related to Estate operations.

- For the remaining $0.8MM, no information has been discovered to support that this is Estate property, as noted in the table below:

| Category: | # of Checks: | Additional Information | Owed to Estate | Property of Transform | Total |
|---|---|---|---|---|---|
| Insurance | 1 | Hurricane Maria settlement, check signed and finalized on 1/31/19. Insurance policy not assumed by Transform | $ 1,311,155 | $ - | $ 1,311,155 |
| Legal | 487 | Proceeds received from restitution payments and subpoenas | 76,375 | - | 76,375 |
| Store Closing | 854 | Closed store fixture sales | 472,272 | - | 472,272 |
| Vendor Allowances | 6 | No Vendor Contract or Contract Not Assumed by Transform | 18,333 | - | 18,333 |
| Vendor Allowances | 16 | Duke Energy cash deposit refunds | 1,094,320 | - | 1,094,320 |
| Vendor Allowances - Unconfirmed | 11 | No Vendor Contract or Contract Not Assumed by Transform | 101,838 | - | 101,838 |
| Vendor Allowances - Unconfirmed | 6 | Tax appeal refund | 100,064 | - | 100,064 |
| Vendor Allowances - Estate Confirmed | 24 | Tax Refunds | 2,770,712 | - | 2,770,712 |
| **Total:** | **1405** | | $ 5,945,069 | $ - | $ 5,945,069 |
| Other checks | 277 | No information discovered to support checks are Estate property | | | 858,105 |
| **Grand total (All checks)** | **1682** | | | $ | $ 6,803,174 |

sears    kmart    SHOP YOUR WAY®

DRAFT – June 14, 2019
Rule 408 – for settlement purposes

# Sub-tenant Proceeds

- The below table provides data for Estate properties in which subtenant proceeds were deposited into Transform bank accounts.

| Properties | Amount |
|---|---|
| Vernon (36853) | $592,536 |
| Riverside (3106) | 41,484 |
| Lansing (30901) | 10,104 |
| Chicago (26985) | 2,500 |
| El Centro (30958) | 10,618 |
| Total | $657,243 |

sears    kmart    SHOP YOUR WAY

# Appendix

SHOP YOUR WAY®

kmart

sears

DRAFT – June 14, 2019
Rule 408 – for settlement purposes

# Summary of pre-close cash bagged & reconciled

- An analysis was performed to quantify the amount of in-store cash and checks that were bagged and picked up by armored car carriers prior to February 11th and deposited into Transform's bank accounts on or after February 11th.

- In the normal course, there can be a 4-6 business day lag between stores reporting cash in the ReconNet[1] system and cash being deposited into corresponding store bank accounts.

- This time lag can be exacerbated by (i) missed pick ups by armored car carriers, and (ii) non-daily pick up schedules maintained by armored car carriers.

- Due to the 4-6 business day lag, bagged in-store cash and checks related to transactions which occurred between February 1 – February 10 were potentially deposited into store bank accounts after February 11th.

- **Based upon this analysis, store cash and checks reported by the store prior to February 11th relating to pre-close collections deposited into bank accounts after February 11th are estimated to total approximately $14.3MM.**

1. The ReconNet system is the software used by store managers to record bagged in-store cash and checks which is then automatically reconciled against bank account deposits.

sears    kmart    SHOP YOUR WAY

DRAFT – June 14, 2019
Rule 408 – for settlement purposes

# Summary of post-close cash bagged & reconciled

- An analysis was also performed leveraging point of sale data related to in-store cash and checks that were bagged by the store manager for the period of February 11th – February 25th.

- This analysis quantified the following:

  – **Deposits from Going Out of Business ("GOB") stores** – Receipts and deposits received from any of the 80 GOB stores.

  – **Pre-close deposits from Go Forward ("GF") stores** – Receipts and deposits received from any of the 425 GF stores or Sears Auto Centers for the sales period prior to February 11th.

- The report was then further filtered to reflect in-store cash and checks reported, which were reconciled with deposits in the corresponding store's bank account.

- When the armored car carrier deposits bagged cash at the store's corresponding bank, the ReconNet system reconciles what was recorded by the store manager versus what was deposited by the armored car carrier.

- If the reconciliation results in a variance greater than or equal to $10, the amount that was deposited is subject to a further reconciliation and marked as outstanding.

- This outstanding reconciliation lasts until the amount recorded at the store matches what was deposited at the bank – this process is ongoing.

sears   kmart   SHOP YOUR WAY

# *EXHIBIT F*

**In The Matter Of:**

*IN RE Sears*
*Holdings*

*Rajat Prakash*
*August 20, 2019*



*Min-U-Script® with Word Index*

18-23538-shl   Doc 4975   Filed 08/23/19   Entered 08/23/19 16:49:48   Main Document
IN RE Sears
Holdings
Pg 88 of 205

Rajat Prakash
August 20, 2019

## Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF NEW YORK
 2
             Chapter 11 - Case No. 18-23538 (RDD)
 3

 4   _____x

 5   IN RE: SEARS HOLDINGS

 6   CORPORATION, et al.,

 7

 8           Debtor.

 9   _____x

10

11

12        The deposition of RAJAT PRAKASH, called by
13   the Debtors and Debtors-In-Possession for
14   examination, pursuant to the Rules of Civil
15   Procedure for the United States District Courts,
16   taken stenographically by Sandra L. Rocca, CSR, CRR,
17   at 3333 Beverly Road, Hoffman Estates, Illinois, on
18   the 20th of August, 2019, at the hour of 10:00 a.m.

19

20

21

22

23

24   Job No. 2019-75180

25   Certification No. 084-003435
```

## Page 2

```
 1   APPEARANCES:

 2        WEIL GOTSHAL & MANGES LLP
          By:  MR. JAKE RUTHERFORD
 3        200 Crescent Court, Suite 300
          Dallas, Texas  75201
 4        214.746.8119
          jake.rutherford@weil.com
 5
              -and-
 6
          WEIL GOTSHAL & MANGES LLP
 7        By:  MR. JARED R. FRIEDMANN
          767 Fifth Avenue
 8        New York, New York  10153
          212.310.8000
 9        jared.friedmann@weil.com

10            appeared on behalf of the
              Debtors and Debtors-in-Possession,
11            Sears Holdings Corporation;

12
          AKIN GUMP STRAUSS HAUER & FELD, LLP
13        By:  MR. JOHN KANE
          One Bryant Park
14        New York, New York  10036
          212.872.1000
15        jkane@akingump.com

16            appeared via telephone on behalf of the
              Unsecured Creditors;
17

18        CLEARY GOTTLIEB STEEN & HAMILTON LLP
          By:  MS. ABENA MAINOO
19             MR. BRIAN P. GIUNTA
          One Liberty Plaza
20        New York, New York  10006
          212.225.2785
21        amainoo@cgsh.com
          bgiunta@cgsh.com
22
              appeared on behalf of Transform Holdco.
23

24   Also Present:

25        Mr. Nick Webber, M-III
```

## Page 3

```
                    I N D E X

 WITNESS                                     PAGE

 RAJAT PRAKASH

 EXAMINED BY

      Mr. Rutherford                            5
      Ms. Mainoo                               48
      Mr. Rutherford                           53


                    EXHIBITS

 NUMBER                          MARKED FOR ID

 Prakash

 Exhibit 1    2/8/19 email string with
              daily cash flow                  14

 Exhibit 2    SEARS_ENFORCE0000771 to 786      22

 Exhibit 3    email string 1/15/19 from
              R. Prakash                       27

 Exhibit 4    email string 11/2/18 from
              M. Meghji                        29

 Exhibit 5    email string 10/19/18 from
              R. Prakash                       30

 Exhibit 6    email string 2/11/19 from
              R. Riecker                       38

 Exhibit 7    email string 2/12/19 from
              J. Joye                          42
```

## Page 4

```
 1   RAJAT PRAKASH,
 2   having been first duly sworn, was examined and
 3   testified as follows:
 4       CROSS EXAMINATION
 5       BY MR. RUTHERFORD:
 6   Q.  Good morning.
 7   A.  Morning.
 8   Q.  Could you please state your full name for
 9   the record?
10   A.  Rajat Prakash.
11   Q.  That was mostly so I knew how to pronounce
12   your last name correctly.
13   A.  Yeah.
14   Q.  Have you ever been deposed before?
15   A.  No.
16   Q.  Okay.  So we'll go through kind of some of
17   the ground rules.  First, you are under oath, so you
18   do need to tell the truth.  If you give an answer
19   and you later realize something triggers your memory
20   and you want to go back and clarify or correct the
21   previous answer, just let me know, I'm happy to let
22   you do that.  We want accurate answers on the
23   record.
24   If I ever interject and you're not -- you
25   know, if you give a pause as you're giving an answer
```

18-23538-shl    Doc 4975    Filed 08/23/19    Entered 08/23/19 16:49:48    Main Document
Pg 89 of 205

IN RE Sears
Holdings

Rajat Prakash
August 20, 2019

**Page 13**

1  A.   Payment processing does not report under
2  treasury, so I'm not exactly sure.  Wires are made
3  out of treasury and these are manual wires.
4  Q.   Which accounts do they come from?
5  A.   I do not know.
6  Q.   Do you know when AP is paid?
7       MS. MAINOO: Objection to form.
8  A.   I mean, whenever payments are due, the
9  company generally tries to pay them.  We have some
10  payment due almost every day.
11  Q.   Do you make all the disbursements at once or
12  are they staggered throughout the day?
13       MS. MAINOO: Objection to form.
14  A.   They all -- they don't all go at once,
15  generally speaking, because there are different
16  kinds of payment mechanisms.  There's automated
17  payments.  There's manual wires.  We mail checks
18  also.  So they don't always get cleared at the same
19  time.
20  Q.   So you don't know if cash from the
21  concentration account can be wired to make
22  disbursements on accounts payable?
23       MS. MAINOO: Objection.
24  A.   So cash, because we were in cash dominion,
25  cash from concentration accounts is swept to pay

**Page 14**

1  down the revolver.  Then companies -- the company
2  borrows on the revolver to make disbursements is
3  generally how it happens.
4  Q.   I apologize if I wasn't clear on the time.
5  The questions I was asking you about how AP
6  disbursements are made in the cash dominion policy,
7  is that uniform between the post-petition cash
8  dominion policy and the pre-petition policy?
9       MS. MAINOO: Objection to form.
10  A.   Again, I mean, I can't totally ascertain
11  that because payment -- payments don't fall under
12  treasury, most of the payments.
13  Q.   Okay.  I'm going to hand you an exhibit that
14  I'm marking as Exhibit 1.
15  (Prakash Exhibit 1 marked for
16    identification.)
17  Q.   I'll give you a moment to look that over.
18  A.   Okay.
19  Q.   What is this document you're looking at?
20  A.   This is our daily cash flow forecast.
21  Q.   And this specific one was sent from you on
22  February 18, 2019 at 5:42 p.m. to Eddie Lampert, Rob
23  Riecker, et cetera -- excuse me, Riecker.
24  Did I read all that correctly?
25       MS. MAINOO: Objection to form.

**Page 15**

1  A.   It was sent to all the people who are marked
2  here.
3  Q.   Okay.  What is the purpose of a daily cash
4  flow forecast?
5  A.   Mainly to show projected cash and debt and
6  government compliance levels for the foreseeable
7  future by day.
8  Q.   And I think you had said earlier that
9  this -- is it your responsibility to send these
10  daily cash flow forecasts?
11  A.   Our team sends it out, yeah, and I spend
12  most of my time on this.
13  Q.   Is a daily cash flow forecast important?
14       MS. MAINOO: Objection to form.
15  A.   It depends how you define "important," but
16  we do it every day, so I think it's a safe
17  presumption.
18  Q.   Do you have an understanding of whether
19  Eddie Lampert found the daily cash flow forecast
20  important?
21       MS. MAINOO: Objection.
22  A.   I can't speak for Eddie.
23  Q.   And these are -- as the name would imply,
24  are these sent daily?
25  A.   Yes.

**Page 16**

1  Q.   Business days?
2  A.   Business days, yes.
3  Q.   You don't have to work on Saturday and
4  Sunday?
5  A.   No.  Still have to work, but just not --
6  Q.   Just don't hit send.
7  So if we're looking at the first page of
8  this document, underneath there's a -- where you get
9  down into this table underneath February, there's a
10  column that says "Total Cash."
11  A.   Uh-huh.
12  Q.   What does total cash represent?
13       MS. MAINOO: Objection to form.
14  A.   It's the company's estimate of total cash on
15  the balance sheet.
16  Q.   What comprises total cash on the balance
17  sheet?
18  A.   It has a few elements.  It could -- that
19  could be -- these are all estimates with
20  forecasting, but cash sitting in stores, cash
21  sitting in regional banks, any cash that's escrowed,
22  any cash that's in concentration accounts to pay
23  down the revolver and some other things, but those
24  are the main components.
25  Q.   If you turn to the second page, there's a

18-23538-shl    Doc 4975    Filed 08/23/19    Entered 08/23/19 16:49:48    Main Document

IN RE Sears
Holdings
Pg 90 of 205

Rajat Prakash
August 20, 2019

Page 17

1  line that says "available cash balance." What
2  comprises the available cash balance?
3      MS. MAINOO: Objection to form.
4  A.  I mean, in the context of cash flow
5  forecasting, available cash balance, when we write
6  here, is essentially cash that's sitting in our
7  concentration accounts that has not yet paid down
8  the revolver.  It's mainly that.
9  Q.  So you'd agree that the majority of days
10  while the debtors were under a cash dominion policy,
11  the available cash was zero?
12     MS. MAINOO: Objection to form.
13  A.  Please rephrase that.
14  Q.  Yes.  You would agree that on most days
15  while the debtors were under a cash dominion policy,
16  the available cash balance was zero?
17     MS. MAINOO: Objection to form and lack of
18  foundation.
19  A.  It's hard to determine that and the reason
20  for that is if cash comes in late in the day, cash
21  could sit in the concentration account and pay down
22  the revolver on the next business day.  So although
23  the cash dominion and cash concentration accounts
24  was being swept, it is possible that there were days
25  when cash from different sources arrived late in the

Page 18

1  day.  So it's hard to say majority or minority.  I
2  don't know just sitting here.
3  Q.  Are there any other reasons besides that
4  cash would come in later in the day?
5      MS. MAINOO: Objection to form and
6  foundation.
7  A.  Can you give me some example if -- can you
8  specify when you say other example?
9  Q.  So I'm trying to find out -- you said most
10  of the time it's -- I don't want to mischaracterize
11  your testimony, but what I understood was that a lot
12  of times money would come into the account after the
13  swepts happen.  And that's one reason why cash could
14  be in the account.
15  Can you think of any other reasons why there
16  would be an available cash balance?
17     MS. MAINOO: Mischaracterizes testimony,
18  objection to form and lack of foundation.
19  A.  I didn't say a lot of times.  I said there
20  were occasions when money came in after the cash was
21  swept.  It could be because some real estate deal
22  closed and we got the money late in the day.  It
23  could be because the money from SHO reimbursed us
24  for payments to vendors.  We get the money typically
25  once a week.  That happens in late afternoon.

Page 19

1  That's another reason.  So the two examples.
2  Q.  SHO is Sears -- what is SHO?
3  A.  Let me try.  Sears Hometown and Outlet.
4  Q.  Why does the company break out available
5  cash from total cash in the daily cash flow
6  forecast?
7      MS. MAINOO: Objection to form.
8  A.  This is how we were I think asked to do it
9  at one point in time by someone in the senior
10  management, which has changed considerably, but I
11  think it's largely to show how much revolver can be
12  paid down on top of what already has been paid down
13  on that day because of cash that's sitting there.
14  Q.  Do you currently send daily cash flow
15  forecasts?
16  A.  Our team does, yeah.  It could be me, could
17  be someone else, but our team does.
18  Q.  Do you still break out available cash in
19  this manner from total cash?
20     MS. MAINOO: Objection to form.
21  A.  I'm pretty sure we do.
22  Q.  And you also still projected available cash
23  based on what was in the debtor's concentration
24  accounts for the period from the petition date, so
25  October 15th, until you were under a cash dominion

Page 20

1  policy under the DIP, correct?
2      MS. MAINOO: Objection to form and lack of
3  foundation.
4  A.  Can you restate that?
5  Q.  Did you -- did you project available cash
6  that would be available to pay down the
7  concentration accounts -- or excuse me.
8  Did you project available cash that would be
9  in the concentration accounts to pay down the DIP
10  even for the period from October 15th to late
11  November when the debtors were not under a cash
12  dominion policy?
13     MS. MAINOO: Objection to form and lack of
14  foundation.
15  A.  Your dates were October 15, 2018 to November
16  of 2018?
17  Q.  Yeah, yeah, November 2018.  So basically
18  from the petition date till when the final DIP order
19  placed the debtors under another cash dominion
20  policy.
21     MS. MAINOO: Same objections.
22  A.  Yeah, I mean, to my recollection, we were
23  showing a cash balance and cash in our concentration
24  accounts, the best of my recollection.
25  Q.  So was all total cash available to pay down

18-23538-shl   Doc 4975   Filed 08/23/19   Entered 08/23/19 16:49:48   Main Document
IN RE Sears
Holdings
Pg 91 of 205
Rajat Prakash
August 20, 2019

Page 21

1  the revolver?
2      MS. MAINOO: Objection to form and lack of
3  foundation.
4  A.   So the total cash as shown in this table
5  that you were talking about earlier was the total
6  cash on the balance sheet and I had given some
7  examples of some main elements in that.  So it had
8  cash sitting in concentration accounts, plus cash
9  stuck in pipeline, as we call it.  So cash sitting
10  in store, cash sitting in regional banks.  That were
11  the elements, main elements.
12  Q.   Is -- as you put it, "cash stuck in
13  pipeline," is that cash available to pay down the
14  revolver?
15      MS. MAINOO: Objection to form.
16  A.   Not on that day.  If there's a cash sitting
17  in a store, we cannot pay the revolver using that
18  cash the same day.  That cash has to first reach our
19  concentration accounts.
20  Q.   What about cash that's in an armored truck,
21  is that --
22      MS. MAINOO: Objection to form.
23  A.   Like I said, so the cash can be -- cash --
24  we can only pay down revolver from the cash that is
25  in concentration accounts.

Page 22

1  Q.   You can't pay down the revolver with cash
2  from the regional bank accounts?
3      MS. MAINOO: Objection to form and asked and
4  answered.
5  A.   To the best of my knowledge, we cannot.
6  That's -- it has to first reach the concentration
7  accounts.
8  Q.   Can you use the cash to make other
9  disbursements from the regional bank accounts?
10      MS. MAINOO: Objection to form.
11  A.   To the best of my knowledge, in the last few
12  years we have operated under the cash dominion
13  mechanic.  So all the cash has to first reach our
14  concentration accounts, that pays on the revolver.
15  Generally speaking then, we bought on the revolver
16  and then make disbursements.  That's the general
17  practice, to the best of my recollection.
18  (Prakash Exhibit 2 marked for
19      identification.)
20  Q.   I'm going to hand you what we're marking as
21  Exhibit 2.  I'll give you a moment to look that
22  over.
23  A.   Okay.
24  Q.   Do you -- I'd like to direct your attention
25  to the email, it's about halfway down the page, on

Page 23

1  November 2nd, 2018 at 8:33 p.m., which you sent
2  to -- it appears to be Kunal because that's who you
3  addressed the email to.
4  A.   I'm looking at that email.
5  Q.   You say, "Please see the specific components
6  of unavailable cash followed by some callouts."  And
7  then you set the specific components.
8  Are these specific components all the assets
9  that are not available cash?
10      MS. MAINOO: Objection to form and lack of
11  foundation.
12  A.   No, they're not all the assets.  Inventory
13  is an asset.
14  Q.   You're right.  Let me clarify that.  Is this
15  all cash that isn't available cash?
16      MS. MAINOO: Objection to form and lack of
17  foundation.
18  A.   To the best of our estimates, this was the
19  cash that was not available to pay down the revolver
20  on that day.  These are our estimates.
21  Q.   So if we go back to Exhibit 1, which is that
22  daily cash flow forecast, on any given day you could
23  determine how much unavailable cash there was by
24  subtracting available cash from the total cash, is
25  that correct?

Page 24

1      MS. MAINOO: Objection to form and lack of
2  foundation.
3  A.   These are all estimates.  So yeah, you will
4  see in one of the callouts in our Exhibit 2, total
5  cash is a GAAP metric, and it's based on whatever
6  the total cash balance is based on the accounting.
7  And our books close once a month.  So we have no way
8  to know what the company's -- in treasury, we have
9  no way to know what the company's unavailable cash
10  is.  So these are all estimates.  But what we do
11  know is we have the ability to look at the company's
12  concentration amounts.
13  So we have visibility into how much money is
14  sitting in the concentration accounts on any given
15  day.  So if we have an estimate of total cash,
16  that's all forward from the prior closing of the
17  books, and we have visibility into the cash sitting
18  in concentration accounts, the difference.
19  Q.   Okay.  You said total cash from the balance
20  sheet is a GAAP metric.  Is unavailable cash a GAAP
21  metric?
22  A.   Not to my knowledge.
23  Q.   Is available cash a GAAP metric?
24      MS. MAINOO: Objection to form.
25  A.   Not to my knowledge.  Again, I can only

18-23538-shl   Doc 4975   Filed 08/23/19   Entered 08/23/19 16:49:48   Main Document
IN RE Sears
Holdings
Pg 92 of 205
Rajat Prakash
August 20, 2019

Page 33

1  A.  I believe so, yeah.  Again, it was a long
2  time ago, but I think that's what I was referring
3  to.
4  Q.  Did anyone ever reach out to you and say,
5  Hey, we should track cash differently?
6      MS. MAINOO: Objection to form.
7  A.  Not to my recollection.
8  Q.  No one reached out with problems with
9  tracking available cash, accounts -- in the
10 concentration accounts?
11     MS. MAINOO: Objection to form.
12 A.  Not to my recollection.
13 Q.  If we refer back to Exhibit 4, and in your
14 email at the bottom of the page, you said, "Cash in
15 regional banks and stores could potentially be freed
16 up by working with armored cars, banks, et cetera,
17 but it might require additional expense."
18 Why would it require additional expense?
19     MS. MAINOO: Objection.
20 A.  I don't exactly recall, but I think if you
21 want armored cars to change their pickup frequency,
22 they might charge you more.
23     MR. RUTHERFORD: If it's all right, can we
24 take a break?
25     MS. MAINOO: Sure.

Page 34

1  (Short recess.)
2      BY MR. RUTHERFORD:
3  Q.  We were speaking a moment ago about
4  Exhibit 4.  If you want to pull that out.  Talking
5  about potentially freeing up cash in regional banks
6  and stores by working with armored cars.  Do you
7  know if the debtors attempted to work with the
8  armored cars to free up cash?
9  A.  To my recollection, yes.
10 Q.  Do you know if that was successful?
11 A.  I don't exactly recall.  There were a number
12 of armored cars and we had a lot of stores, so I
13 think it really depended on their -- on their
14 ability -- on the abilities of an armored car
15 carrier to service a store at a location.
16 I know we weren't successful with all the
17 stores.  We were not successful with all the armored
18 car carriers.  I don't exactly recall if it was an
19 item that some armored cars had accelerated the
20 frequency of pickups for some stores.  I don't
21 exactly recall.
22 Q.  But the short answer is efforts were made to
23 speed up the pickup of cash?
24 A.  If I recall correctly, yes.
25 Q.  So speeding up the pickup of cash, basically

Page 35

1  turned -- accelerates the process by which
2  unavailable cash turns into available cash?
3      MS. MAINOO: Objection to form and lack of
4  foundation.
5  A.  Yeah, I'll put it literal on that because I
6  don't know what you mean.  What I mean is I think
7  efforts were made to cut down the time it takes for
8  cash sitting in a remote location to reach our
9  concentration accounts.
10 Q.  So we're going to switch gears a little bit
11 here.  The transaction between the debtors and ESL
12 or Transform was originally scheduled to close on
13 February 8th, correct?
14 A.  Yeah, I don't exactly recall.  I know it was
15 pushed by a day or two.  Was it February 8th?  Was
16 it 7th?  Was it 6th?  I don't exactly recall.
17 Q.  Do you remember it being pushed from a
18 Friday to a Monday?
19     MS. MAINOO: Objection, asked and answered.
20 A.  I think February 8 was one of the dates of
21 the close and it was pushed to February 11, Monday.
22 Q.  Do you recall that the debtors had to pay
23 down their senior DIP to 850 million by the closing?
24     MS. MAINOO: Objection.
25 A.  If I recall it correct, that was the goal

Page 36

1  around that timeline.
2  Q.  And do you recall if the debtors had met
3  that 850 prior to February 8th?
4      MS. MAINOO: Objection to form.
5  A.  I don't recall if we had met it prior to
6  February 8th.  I don't recall that.
7  Q.  If you turn back to Exhibit 1, if you look
8  on page 3, about halfway -- look at the columns
9  about halfway across that table, total extensions of
10 credit.  Does that represent the senior DIP balance?
11 A.  I'm looking at it.  I'm trying to see that
12 allocation here.  There's some mental gymnastics.
13 Yeah, I mean, I'll have to go back and look through
14 the document and emails how the senior DIP was
15 defined, but it seems to be the combination of total
16 revolver, Letters of Credit and total term loan.
17 Seems to be the combination of those three numbers,
18 I think.
19 Q.  And if you look at the fifth number down, it
20 says 850, correct?
21 A.  Fifth number down.  Fifth number in the
22 total extension of credits does say 850.
23 Q.  Just because there's no lines, if you look
24 five down in the date column, that's February 8,
25 2019?

Page 37

1  A.  Uh-huh.
2  Q.   Does that refresh your recollection of
3  whether the debtors had to pay down the DIP balance
4  to 850 as of February 8th?
5      MS. MAINOO: Objection, asked and answered.
6  A.  Looking at just these numbers, it is
7  possible, yes.
8  Q.   We talked about -- I think you called it
9  cash in the pipeline.  Is that -- cash-in-transit?
10  A.   That's a general term we use sometimes.
11  Q.   Since the closing was delayed from
12  February 8th to February 11th, you agree that
13  additional cash would come through the pipeline into
14  the debtor's concentration accounts?
15      MS. MAINOO: Objection, lack of foundation.
16  A.   Additional cash would come in from what
17  dates into the concentration accounts on what dates.
18  Q.   So in between February 8th --
19  A.   February 8th was a Friday.  February 11 was
20  a Monday.
21  Q.   Yes.  So additional cash had come in over
22  the weekend?
23      MS. MAINOO: Objection, lack of foundation.
24  A.  I don't exactly know what happens in these
25  commercial concentration accounts at banks.  On the

Page 38

1  morning of February 11, because that was a business
2  day, cash -- we would expect some cash in our
3  concentration accounts.  I don't know whether it
4  happened on Saturday or Sunday.  I don't know.
5  Q.   Do you have an understanding of whether the
6  debtors made disbursements on February 11th?  And
7  it's not a memory test.
8      MS. MAINOO: Objection to form.
9  A.  I don't recall.  I don't recall.
10  (Prakash Exhibit 6 marked for
11      identification.)
12  Q.   Are these the disbursements for February 11,
13  2019?
14  A.   This, I think, was what was discussed in one
15  of the morning meetings, and then Jennifer Joye in
16  treasury sent out this list for approval and Rob
17  Riecker approved it.  Did we end up making it?  Were
18  we able to make it?  Actually, I don't recall that.
19  Q.   If you look back at Exhibit 1 --
20  A.   Okay.
21  Q.   -- there's also -- if you look at the very
22  last line on page 1, there's an $11 million
23  disbursement for reserve funding, correct, projected
24  at least?
25      MS. MAINOO: Objection.

Page 39

1  A.  I see that number.
2  Q.   The letter -- excuse me.
3  The debtors delayed disbursements
4  pre-petition to manage availability under the first
5  lien credit facility, correct?
6      MS. MAINOO: Objection to form.
7  A.   On what day?
8  Q.   I mean, there were occurrences pre-petition
9  at which point the debtors delayed payments?
10      MS. MAINOO: Objection to form.
11  A.   Yeah, I mean, generally speaking, Sears
12  Holdings did delay payments.
13  Q.   And the debtors -- sorry.  Were you
14  finished?
15  A.   No.  That's pretty much it.
16  Q.   The debtors also delayed payments during the
17  week of the closing of the sale transaction to
18  Transform?
19  A.   So closing happened on February 11, which
20  was a Monday.  When you say "week of closing," can
21  you specify the dates?
22  Q.   Good point.  So the prior week, from the 8th
23  to -- it would be the 3rd --
24      MS. MAINOO: Objection.
25  Q.   -- 2nd to the 8th.  The week that ended on

Page 40

1  Friday, the 8th.
2  A.  Right.  To my recollection, yes.
3  Q.   Just to clarify, it's the 4th through the
4  8th.
5  So would you agree that all other things
6  equal, that paying down the DIP facility creates
7  additional availability?
8      MS. MAINOO: Objection to form.
9  A.  Availability on DIP facility?  Availability
10  of what?  Availability -- if you pay down the DIP
11  revolver, then generally speaking, that should
12  theoretically create availability on the DIP
13  facility, but it depends on -- availability depends
14  on multiple things.  You could also have Letters of
15  Credit.  It is also impacted by borrowing base.  So
16  it depends.
17  Q.   But if all other things are equal and you
18  just pay down the DIP, all the other numbers stay
19  the same, it increases availability --
20  A.   It should.
21  Q.   -- in a vacuum?
22      MS. MAINOO: Objection to form.
23  Q.   And when I say -- or when you talk about
24  availability, are you referring to -- if you look on
25  Exhibit 1, on page 3, is that the excess

18-23538-shl   Doc 4975   Filed 08/23/19   Entered 08/23/19 16:49:48   Main Document

IN RE Sears
Holdings

Pg 94 of 205

Rajat Prakash
August 20, 2019

Page 53

1  A.  Yes.
2  Q.  Was there anyone else on the line?
3  A.  No one else announced.  No one was in my
4  office and I was not on speaker.
5     MS. MAINOO: No further questions.  Thank
6  you, Mr. Prakash.
7     RECROSS EXAMINATION
8     BY MR. RUTHERFORD:
9  Q.  I have just a couple follow-up questions.
10  So you just testified that Mr. Meghji called you and
11  "expressed some concern about including the vendor
12  payment delay to meet the first lien requirement,
13  the first bullet."
14  Is the bullet that he called to express
15  concern about the first bullet on Exhibit 1?
16  A.  The first key callout.
17  Q.  Yeah, in this --
18  A.  Yeah, that's what I meant.
19  Q.  Okay.  So you ultimately included the
20  information he was concerned about?
21  A.  Yes, yes.
22  Q.  And Mr. Meghji was the CRO, correct?
23  A.  My understanding, he's Chief Restructuring
24  Officer.
25  Q.  You reported to him?

Page 54

1  A.  No.
2  Q.  You did not report to him?
3  A.  I did not.
4  Q.  Is he your superior?
5  A.  Sorry.
6  Q.  Was he your superior?
7  A.  Way superior.
8  Q.  So if he -- could he have told you not to
9  include that information on the daily cash flow
10  forecast?
11     MS. MAINOO: Objection.
12  A.  Could he have told me?
13  Q.  Yes.
14  A.  He could have told me.  I mean, I don't know
15  what he could have done.
16  Q.  But he did not stop you from putting the
17  information on the cash flow forecast?
18  A.  I don't exactly recall whether he asked me
19  to not include it or to be -- I think he was more
20  concerned about the language and he was more about
21  you have to be careful, you're putting this out
22  in -- at the end they might walk away.  It was
23  something along those lines.
24  Q.  But he did not stop you from including it?
25     MS. MAINOO: Objection, asked and answered.

Page 55

1  A.  I don't recall that.
2  Q.  But it ended up on the February 8th daily
3  cash flow forecast?
4  A.  Correct, yes.  I told him -- I don't recall
5  the exact words -- that we have to be transparent
6  for that.
7     MR. RUTHERFORD: That's all we have.  Thank
8  you.
9     (Whereupon, the deposition concluded
10  at 11:38 a.m.)
11
12
13
14
15  ---------------------
16     RAJAT PRAKASH
17
18
19  Subscribed and sworn to before me
20  this       day of           2019.
21
22  --------------------------------------
23
24
25

Page 56

1           C E R T I F I C A T E
2
3       I, Sandra L. Rocca, CSR, RPR, RMR, CRR, a
4  Certified Court Reporter within and for the State of
5  Illinois, do hereby certify:
6       That RAJAT PRAKASH, the witness whose
7  deposition is hereinbefore set forth, was duly sworn
8  by me and that such deposition is a true record of
9  the testimony given by such witness.
10       I further certify that I am not related to
11  any of the parties to this action by blood or
12  marriage; and that I am in no way interested in the
13  outcome of this matter.
14       IN WITNESS WHEREOF, I have hereunto set my
15  hand this 20th day of August, 2019.
16
17
18       Sandra Rocca
19  -------------------------
20       Sandra L. Rocca, CSR, RPR, RMR, CRR
21
22
23
24
25

# *EXHIBIT G*

| | |
|---|---|
| **From:** | Kunal Kamlani <kunal@eslinvest.com> |
| **Sent:** | Monday, October 22, 2018 3:31 PM |
| **To:** | Prakash, Rajat; Chris Good; rob.riecker; Mohsin Meghji |
| **Subject:** | RE: Cash |

There should be some pieces that we know as actuals. Escrow, CC Cash in transit....right? Can understand if we don't know Cash in Stores to the dollar...

**From:** Prakash, Rajat <Rajat.Prakash@searshc.com>
**Sent:** Monday, October 22, 2018 4:27 PM
**To:** Kunal Kamlani <kunal@eslinvest.com>; cgood@miiipartners.com; Riecker, Rob <Rob.Riecker@searshc.com>; mmeghji@miiipartners.com
**Subject:** RE: Cash

It was an estimated roll forward of Sep month end actual cash, since we have no precise visibility into day to day changes for most of these categories.

Will get back with the estimate details.

Thanks,

Rajat Prakash
Sears Holdings Corporation
Treasury
847.286.2288

**From:** Kunal Kamlani [mailto:kunal@eslinvest.com]
**Sent:** Monday, October 22, 2018 3:23 PM
**To:** cgood@miiipartners.com; Riecker, Rob <Rob.Riecker@searshc.com>; Prakash, Rajat <Rajat.Prakash@searshc.com>; mmeghji@miiipartners.com
**Subject:** Cash

The Unavailable Cash (In Transit) as of 10/19 was 412M. Can we break that number out into various buckets:

Pension Plan Escrow – I think 280
Cash in Stores - ?
Credit Card Cash in Transit – I think about $55
??
??

**KSK**

**KAMLANI -5**

Kunal Kamlani

8/15/2019
S. Arielle Santos
CCR-NJ, CLR
Lexitas Legal

This message is intended only for the designated recipient(s). It may contain confidential, privileged or proprietary information. If you are not the designated recipient, you may not review, copy or distribute this message. If you receive this message in error, please notify the sender by reply e-mail and delete this message. Thank you.
This message, including any attachments, is the property of Sears Holdings Corporation and/or one of its subsidiaries. It is confidential and may contain proprietary or legally privileged information. If you are not the intended recipient, please delete it without reading the contents. Thank you.

# *EXHIBIT H*

**In The Matter Of:**

*In Re Sears
Holdings*

---

*Rob Riecker
June 19, 2019*

---



Page 1

```
1
2   UNITED STATES BANKRUPTCY COURT
3   SOUTHERN DISTRICT OF NEW YORK
4   Chapter 11 - Case No. 18-23538 (RDD)
5   ----------------------------------------
6   In Re:
7   SEARS HOLDINGS CORPORATION, et al.,
8           Debtor.
9   ----------------------------------------
10
11
12          DEPOSITION OF ROB RIECKER
13
14          Wednesday, June 19, 2019
15               9:00 a.m.
16
17
18
19
20
21
22  Reported by:
23  Joan Ferrara, RMR, FCRR
24  Job No. 2019-72623
25
```

Page 2

```
1
2
3               June 19, 2019
4               9:00 a.m.
5               New York, New York
6
7
8           Deposition of ROB RIECKER,
9   held at the offices of Weil Gotshal
10  & Manges, LLP, 767 Fifth Avenue,
11  New York, New York, before Joan Ferrara,
12  a Registered Merit Reporter, Federal
13  Certified Realtime Reporter and Notary
14  Public of the State of New York.
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2   A P P E A R A N C E S:
3
4   Attorneys for Unsecured Creditors:
5   AKIN GUMP STRAUSS HAUER & FELD, LLP
6           One Bryant Park
7           Bank of America Tower
8           New York, New York 10036.
9   BY:     JOHN P. KANE, ESQ.
10          jkane@akingump.com
11
12
13  Attorneys for Debtors and
14  Debtors-in-Possession:  Sears Holdings
15  Corporation, et al.:
16  WEIL GOTSHAL & MANGES, LLP
17          767 Fifth Avenue
18          New York, New York 10153
19  BY:     JARED R. FRIEDMANN, ESQ.
20          jared.friedmann@weil.com
21  JAKE RUTHERFORD, ESQ.
22          jake.rutherford@weil.com
23  JENNIFER CROZIER, ESQ.
24
25                      (Continued)
```

Page 4

```
1
2   A P P E A R A N C E S: (Continued)
3
4   Attorneys for ESL Investments, Inc.:
5   CLEARY GOTTLIEB STEEN & HAMILTON, LLP
6   One Liberty Plaza
7   New York, New York 10006
8   BY: ABENA A. MAINOO, ESQ.
9   amainoo@cgsh.com
10
11  ALSO PRESENT:
12  Stephen Szrom, Cleary Summer
13  Associate
14  Kimberly Mannausa, Weil Summer
15  Associate
16  Chris Good, M-III
17  Nick Weber, M-III
18  Brian Griffith, M-III
19
20
21
22
23
24
25
```

In Re Sears
Holdings

Rob Riecker
June 19, 2019

Page 57

1  R.  Riecker
2    accounts.
3  Q.  Again --
4  A.  What's a concentration versus
5  not, I don't -- without seeing it, the
6  delineation of which specific account, I
7  can't define that.
8  Q.  Okay.
9      Again, this is not meant to be as
10  confusing as the question apparently has
11  become.
12      Are you aware of the extent to
13  which available cash of the debtors was
14  swept on a daily basis and applied towards
15  outstanding DIP indebtedness?
16      MS. MAINOO: Objection.
17  A.  Available cash balances are
18  applied to the DIP balance the next day to
19  reduce the DIP balance.
20  Q.  And was that done on a daily
21  basis, where daily again means whenever the
22  banks are open?
23      MS. MAINOO: Objection.
24      BY MR. FRIEDMANN:
25  Q.  This is between, by the way, the

Page 58

1  R.  Riecker
2  signing of the APA and the closing.
3  A.  If the available cash sat in an
4  account that was automatically swept by the
5  bank, it would go to pay down the revolver,
6  yes, or the DIP balance, excuse me.
7  Q.  And do you know whether that
8  daily sweep of the available cash balances
9  occurred on the night before the closing to
10  pay down the outstanding DIP indebtedness?
11      MS. MAINOO: Objection.
12  A.  Sweeps typically occur before 1
13  p.m. Eastern Time.  So the night of, I
14  don't -- I would say no, at the night there
15  was no sweep.
16  Q.  Okay.
17      Change that up a little bit for
18  you.
19      Do you know whether the daily
20  sweep of the available cash balances
21  occurred on the day immediately prior to
22  the closing to pay down the outstanding DIP
23  indebtedness?
24  A.  Most likely.  They're automatic
25  sweeps.

Page 59

1  R.  Riecker
2  Q.  And that would mean that at 12:01
3  a.m. on the day of the closing, the
4  debtors' accounts would have a zero
5  balance, because if they were swept the
6  prior day and applied to the DIP
7  indebtedness, there would be nothing in
8  that account until new monies were
9  deposited in that account during the course
10  of the following day, correct?
11      MS. MAINOO: Objection.  Lack of
12  personal knowledge.
13  A.  Not necessarily.
14  Q.  To the best of your knowledge,
15  was every available dollar as of the
16  closing that the debtor had, every
17  available -- sorry, strike that.
18      To the best of your knowledge,
19  was every available dollar that the debtors
20  had at the closing used to pay down the
21  outstanding DIP indebtedness?
22      MS. MAINOO: Objection.
23  A.  Based upon the automatic sweeps
24  that happened, based on the rules for
25  giving DIP financing, yes.

Page 60

1  R.  Riecker
2  Q.  And to the best of your
3  knowledge, did that result in a slight
4  overpayment of about $243,000 beyond that
5  $850 million target of trying to get the
6  outstanding DIP indebtedness to that
7  specific number?
8      MS. MAINOO: Objection.
9  A.  I don't -- without seeing that
10  specific schedule or number, I can't -- I
11  can't -- I can't determine that granularity
12  of detail.
13  Q.  Let's do it at a higher level.
14      Do you remember whether at the
15  closing -- strike that.
16      To the best of your knowledge,
17  did the sweep in the day immediately prior
18  to the closing result in an overpayment of
19  some amount beyond the $850 million target
20  of trying to get that outstanding DIP
21  indebtedness to that $850 million number?
22      MS. MAINOO: Objection.
23  A.  Once again, without -- I don't
24  know whatever number was on every day that
25  occurred.

18-23538-shl    Doc 4975    Filed 08/23/19    Entered 08/23/19 16:49:48    Main Document
In Re Sears
Holdings
Pg 101 of 205
Rob Riecker
June 19, 2019

Page 113

1  R.   Riecker
2  well, let me strike that.
3      Yes, I'm just asking about
4  non-privilege issues.
5  A.   Yeah, so I have not seen any of
6  their work product.  I may get an
7  occasional question about who can I go to
8  see to find this or that.  That's generally
9  the interaction with Ernst & Young.
10      MR. FRIEDMANN: Thank you,
11  Mr. Riecker.  It's a pleasure to see
12  you.  Thank you very much for coming
13  in and thank you.
14      MS. MAINOO: Thanks.  I just have
15  one question.
16  EXAMINATION BY
17      MS. MAINOO:
18  Q.   Jared asked earlier,
19  Mr. Friedmann asked earlier about your
20  knowledge of any role Mr. Jeff Butz played
21  with respect to the specified receivables.
22      To your knowledge, what role, if
23  any, did Mr. Butz play with respect to the
24  specified receivables schedule?
25  A.   I think just in general of

Page 114

1  R.   Riecker
2  working with the accounting individual that
3  works in that area for those balance sheet
4  accounts, meaning accounts receivable.
5      MS. MAINOO: All right.  No
6  further questions from me.
7      MR. FRIEDMANN: Okay.
8      MS. MAINOO: Just for the record,
9  I want to note that we'll need to get
10  the witness an opportunity to review
11  the transcript.
12      MR. FRIEDMANN: Of course.
13      MS. MAINOO: And I also see that
14  you agree to treat the transcript as
15  confidential?
16      MR. FRIEDMANN: Once you've had a
17  chance to review it, if you can let us
18  know what about it is confidential we
19  can agree to keep those portions
20  confidential.
21      MS. MAINOO: Okay.  Thank you.
22      (Continued on next page to
23  include signature and jurat.)
24
25

Page 115

1  R.  Riecker
2      MR. FRIEDMANN: Thank you.  We
3  can go off the record.
4      (Time noted:  11:51 a.m.)
5
6
7  _____
8      ROB RIECKER
9
10  Subscribed and sworn to before me
11  this ___ day of _____, 2019.
12
13  _____
14
15
16
17
18
19
20
21
22
23
24
25

Page 116

1
2          C E R T I F I C A T E
3  STATE OF NEW YORK    )
4                       : ss.
5  COUNTY OF NEW YORK   )
6
7      I, Joan Ferrara, a Notary Public
8  within and for the State of New York,
9  do hereby certify:
10      That ROB RIECKER, the witness
11  whose deposition is hereinbefore set
12  forth, was duly sworn by me and that
13  such deposition is a true record of the
14  testimony given by the witness.
15      I further certify that I am not
16  related to any of the parties to this
17  action by blood or marriage, and that I
18  am in no way interested in the outcome
19  of this matter.
20      IN WITNESS WHEREOF, I have
21  hereunto set my hand this 19th day of
22  June, 2019  Joan Ferrara
23
24  _____
25          Joan Ferrara

# *EXHIBIT I*

| | |
|---|---|
| **From:** | kunal@eslinvest.com |
| **Sent:** | Thursday, January 3, 2019 11:56 AM |
| **To:** | Chris Good |
| **Cc:** | Mohsin Meghji; Josh Gruenbaum; Cullen Murphy |
| **Subject:** | RE: $100mm of Restricted Cash |

We have assumed that there is approx. $100M of cash in the "Unavailable Cash" bucket, which as of yesterday shows $357M for 2/1, that is ABL collateral. Upon the closing of a transaction we understand that that cash would be used to pay down the ABL. Depending on where exactly that cash comes from we understand we would need to build it up. As an example if it comes out of cash registers we would need to replenish. It is not clear to me that if it comes out of regional bank accounts that we would need to replenish.

KSK

**From:** Chris Good <cgood@miiipartners.com>
**Sent:** Thursday, January 3, 2019 12:47 PM
**To:** Kunal Kamlani <kunal@eslinvest.com>
**Cc:** Mohsin Meghji <mmeghji@miiipartners.com>; Josh Gruenbaum <Josh.Gruenbaum@moelis.com>; Cullen Murphy <Cullen.Murphy@moelis.com>
**Subject:** $100mm of Restricted Cash

Kunal –

Could you please confirm that the $100mm of restricted cash you're assuming can be used to pay down the ABL? Know we've been assuming that but we wanted to make sure it's understood in your modeling that you will have to build that cash back up in NewCo.

Thanks,
Chris

_____
Christopher A. Good
M-III Partners
130 West 42nd Street, 17th Floor
New York, New York 10036
O:  212.716.1497
M: 252.714.2092
cgood@miiipartners.com

This message contains information which may be confidential and privileged. Unless you are the intended addressee (or authorized to receive for the intended addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply email or by calling 212-716-1491 and delete the message.

This message contains information which may be confidential and privileged. Unless you are the intended addressee (or authorized to receive for the intended addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply email or by calling 212-716-1491 and delete the message.

# *EXHIBIT J*

| | |
|---|---|
| **From:** | Guthrie, Hayden |
| **Sent:** | Thursday, February 7, 2019 5:51 PM |
| **To:** | Arn, Kristen; Allen, Charles W.; O'Reilly, Benet J.; Gray, Paul |
| **Cc:** | Project Blue Sasset M&A |
| **Subject:** | RE: Sears - APA Amendment |
| **Attachments:** | Project Blue - APA Amendment No. 1 (Weil Comments 02.07.19)_WEIL_96909476_2.DOCX; Redline - Against Cleary Draft.pdf; Redline - Changed Pages Only.pdf |

Hi Kristen

Please see attached for a further revised draft of the APA Amendment and a redline against the draft provided below. Please note that this draft remains subject to our client's continued review and comment.

Kind regards

Hayden



**Hayden Guthrie**

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Hayden.Guthrie@weil.com
+1 212 310 8196 Direct
+1 212 729 3480 Mobile
+1 212 310 8007 Fax

---

**From:** Arn, Kristen <karn@cgsh.com>
**Sent:** Thursday, February 7, 2019 3:37 AM
**To:** Guthrie, Hayden <Hayden.Guthrie@weil.com>; Allen, Charles W. <callen@cgsh.com>; O'Reilly, Benet J. <boreilly@cgsh.com>; Gray, Paul <pgray@cgsh.com>
**Cc:** Project Blue Sasset M&A <ProjectBlueSassetM&A@weil.com>
**Subject:** RE: Sears - APA Amendment

Hi Hayden,

Please see attached for a revised draft of the APA amendment, clean and marked against the draft sent below.

This draft remains subject to the ongoing review and comment of our client and its advisors.

Best,
Kristen

⎯⎯

**Kristen Arn**

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006
T: +1 212 225 2137 | F: +1 212 225 3999
karn@cgsh.com | clearygottlieb.com

---

**From:** Guthrie, Hayden [mailto:Hayden.Guthrie@weil.com]
**Sent:** Wednesday, February 6, 2019 9:35 PM
**To:** Allen, Charles W. <callen@cgsh.com>; O'Reilly, Benet J. <boreilly@cgsh.com>; Arn, Kristen <karn@cgsh.com>; Gray, Paul <pgray@cgsh.com>
**Cc:** Project Blue Sasset M&A <ProjectBlueSassetM&A@weil.com>
**Subject:** RE: Sears - APA Amendment

Hi Charlie

Please see attached for an updated draft of the APA Amendment. Please note that this draft remains subject to our client's continued comment and review.

Kind regards

Hayden



Hayden Guthrie

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Hayden.Guthrie@weil.com
+1 212 310 8196 Direct
+1 212 729 3480 Mobile
+1 212 310 8007 Fax

---

**From:** Guthrie, Hayden <Hayden.Guthrie@weil.com>
**Sent:** Wednesday, February 6, 2019 9:09 PM
**To:** Allen, Charles W. <callen@cgsh.com>; O'Reilly, Benet J. <boreilly@cgsh.com>; Arn, Kristen <karn@cgsh.com>; Gray, Paul <pgray@cgsh.com>
**Cc:** Project Blue Sasset M&A <ProjectBlueSassetM&A@weil.com>
**Subject:** Sears - APA Amendment Exhibits

Hi Charlie

Is the replacement Exhibit G in agreed form? I understand we need to file all schedules with the amendment.

I have the real estate schedules and the Securities Consideration schedule which I understand are both in agreed form (see attached – our draft makes all the real estate schedules "Schedule A").  Can you please confirm these are in agreed form?

Kind regards

Hayden



**Hayden Guthrie**

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Hayden.Guthrie@weil.com
+1 212 310 8196 Direct
+1 212 729 3480 Mobile
+1 212 310 8007 Fax

---

**From:** Allen, Charles W. <callen@cgsh.com>
**Sent:** Wednesday, February 6, 2019 4:18 PM
**To:** Lii, Teresa <tlii@paulweiss.com>; O'Reilly, Benet J. <boreilly@cgsh.com>; Schrock, Ray <Ray.Schrock@weil.com>; Austin, Christopher E. <caustin@cgsh.com>; O'Neal, Sean A. <soneal@cgsh.com>; Arn, Kristen <karn@cgsh.com>; Marcus, Jacqueline <jacqueline.marcus@weil.com>; Singh, Sunny <sunny.singh@weil.com>; Gray, Paul <pgray@cgsh.com>; Rosenbloom, Chelsey <crosenbloom@cgsh.com>; Odoner, Ellen <ellen.odoner@weil.com>; Reich, Yaron Z. <yreich@cgsh.com>; Lanzkron, Joseph <jlanzkron@cgsh.com>; Bachand-Parente, Christopher J. <cbachandparente@cgsh.com>; Danilow, Greg <greg.danilow@weil.com>; Munz, Naomi <Naomi.Munz@weil.com>; Guthrie, Hayden <Hayden.Guthrie@weil.com>; Black, Kimberly <kblack@cgsh.com>; Bromley, James L. <jbromley@cgsh.com>
**Cc:** GRP-Sears-Senior <GRP-Sears-Senior@paulweiss.com>
**Subject:** RE: Sears - Revised Exhibit G

Hi Teresa,

We've confirmed the numbers with ESL. Please see attached for a clean version of the full Exhibit G (including the explanatory notes), along with blacklines against (1) the execution date version and (2) the Excel you sent (showing no change from that).

Best,
Charlie

---

**Charles W. Allen**
Cleary Gottlieb Steen & Hamilton LLP
Assistant: brevell@cgsh.com
One Liberty Plaza, New York NY 10006
T: +1 212 225 2004 | F: +1 212 225 3999
callen@cgsh.com | clearygottlieb.com

---

**From:** Lii, Teresa [mailto:tlii@paulweiss.com]
**Sent:** Tuesday, February 5, 2019 1:45 PM
**To:** Allen, Charles W. <callen@cgsh.com>; O'Reilly, Benet J. <boreilly@cgsh.com>; Schrock, Ray <Ray.Schrock@weil.com>; Austin, Christopher E. <caustin@cgsh.com>; O'Neal, Sean A. <soneal@cgsh.com>; Arn, Kristen <karn@cgsh.com>; Marcus, Jacqueline <jacqueline.marcus@weil.com>; Singh, Sunny <sunny.singh@weil.com>; Gray, Paul <pgray@cgsh.com>; Rosenbloom, Chelsey <crosenbloom@cgsh.com>; Odoner, Ellen <ellen.odoner@weil.com>; Reich, Yaron Z. <yreich@cgsh.com>; Lanzkron, Joseph <jlanzkron@cgsh.com>; Bachand-Parente, Christopher J. <cbachandparente@cgsh.com>; Danilow, Greg <greg.danilow@weil.com>
**Cc:** GRP-Sears-Senior <GRP-Sears-Senior@paulweiss.com>
**Subject:** RE: Sears - Revised Exhibit G

I've attached a redline to the original Exhibit G, as well as the revised numbers in Excel format. Note that we have slightly revised the IP/Ground Lease numbers from the version circulated yesterday. Please let us know of any questions.

Thanks,
Teresa

**Teresa Lii** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 (212) 373-3862 (Direct Phone) | +1 646 219 2634 (Direct Fax)
tlii@paulweiss.com | www.paulweiss.com

---

**From:** Allen, Charles W. <callen@cgsh.com>
**Sent:** Tuesday, February 5, 2019 12:00 AM
**To:** Lii, Teresa <tlii@paulweiss.com>; O'Reilly, Benet J. <boreilly@cgsh.com>; Schrock, Ray <Ray.Schrock@weil.com>; Austin, Christopher E. <caustin@cgsh.com>; O'Neal, Sean A. <soneal@cgsh.com>; Arn, Kristen <karn@cgsh.com>; Marcus, Jacqueline <jacqueline.marcus@weil.com>; Singh, Sunny <sunny.singh@weil.com>; Gray, Paul <pgray@cgsh.com>; Rosenbloom, Chelsey <crosenbloom@cgsh.com>; Odoner, Ellen <ellen.odoner@weil.com>; Reich, Yaron Z. <yreich@cgsh.com>; Lanzkron, Joseph <jlanzkron@cgsh.com>; Bachand-Parente, Christopher J. <cbachandparente@cgsh.com>; Danilow, Greg <greg.danilow@weil.com>
**Cc:** GRP-Sears-Senior <GRP-Sears-Senior@paulweiss.com>
**Subject:** RE: Sears - Revised Exhibit G

Thanks Teresa. We'll confirm the numbers with ESL—do you have anything showing what changed or the context for any updates?

Once the numbers are signed off we will drop the chart into the existing Schedule G form, as any revised numbers should remain subject to the explanatory footnotes already in the schedule.

———

**Charles W. Allen**
Cleary Gottlieb Steen & Hamilton LLP
Assistant: brevell@cgsh.com
One Liberty Plaza, New York NY 10006
T: +1 212 225 2004 | F: +1 212 225 3999
callen@cgsh.com  |  clearygottlieb.com

---

**From:** Lii, Teresa [mailto:tlii@paulweiss.com]
**Sent:** Monday, February 4, 2019 8:35 PM
**To:** O'Reilly, Benet J. <boreilly@cgsh.com>; Allen, Charles W. <callen@cgsh.com>; Schrock, Ray <Ray.Schrock@weil.com>; Austin, Christopher E. <caustin@cgsh.com>; O'Neal, Sean A. <soneal@cgsh.com>; Arn, Kristen <karn@cgsh.com>; Marcus, Jacqueline <jacqueline.marcus@weil.com>; Singh, Sunny <sunny.singh@weil.com>; Gray, Paul <pgray@cgsh.com>; Rosenbloom, Chelsey <crosenbloom@cgsh.com>; Odoner, Ellen <ellen.odoner@weil.com>; Reich, Yaron Z. <yreich@cgsh.com>; Lanzkron, Joseph <jlanzkron@cgsh.com>; Bachand-Parente, Christopher J. <cbachandparente@cgsh.com>; Danilow, Greg <greg.danilow@weil.com>
**Cc:** GRP-Sears-Senior <GRP-Sears-Senior@paulweiss.com>
**Subject:** Sears - Revised Exhibit G

All,

Please see attached for the revised Exhibit G. Please let us know of any questions.

Thanks,
Teresa

Teresa Lii | Associate
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas | New York, NY 10019-6064
+1 (212) 373-3862 (Direct Phone) | +1 646 219 2634 (Direct Fax)
tlii@paulweiss.com | www.paulweiss.
com

This message is intended only for the use of the Addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately.

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the "firm" refer to Cleary Gottlieb Steen & Hamilton LLP and its affiliated entities in certain jurisdictions, and the term "offices" includes offices of those affiliated entities.

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the "firm" refer to Cleary Gottlieb Steen & Hamilton LLP and its affiliated entities in certain jurisdictions, and the term "offices" includes offices of those affiliated entities.

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the "firm" refer to Cleary Gottlieb Steen & Hamilton LLP and its affiliated entities in certain jurisdictions, and the term "offices" includes offices of those affiliated entities.

*CGSHWeil Comments of February 7, 2019*

# AMENDMENT NO. 1 TO

# ASSET PURCHASE AGREEMENT

This Amendment No. 1, dated as of February [●], 2019 (this "Amendment"), to the Asset Purchase Agreement (the "Purchase Agreement"), dated as of January 17, 2019, by and among Transform Holdco LLC, a Delaware limited liability company (together with any applicable Affiliated Designee, "Buyer"), Sears Holdings Corporation ("SHC" or the "Seller" and together with each of its Subsidiaries party to the Purchase Agreement, the "Sellers") is entered into by and among Buyer and each Seller.  Terms capitalized but not defined herein shall have the meanings given to such terms in the Purchase Agreement.

WHEREAS, Buyer and the Sellers have previously entered into the Purchase Agreement pursuant to which, among other things, Buyer will acquire the Acquired Assets and assume the Assumed Liabilities on the terms and subject to the conditions set forth in the Purchase Agreement; and

WHEREAS, Buyer and the Sellers desire to amend the Purchase Agreement in accordance with Section 13.3 of the Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing, the representations, warranties, covenants and agreements set forth in the Purchase Agreement and this Amendment, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE I    AMENDMENTS

SECTION 1.01.    Section 1.1 of the Purchase Agreement is amended as follows:

(a) The definition of "Acquired Inventory" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Acquired Inventory" shall mean (i) with respect to any Operating Leased Property, all Inventory which is located at, on or in transit to the applicable Operating Lease Property as of the Closing Date, (ii) with respect to any Operating Owned Property, all Inventory which is located at, on or in transit to the Operating Owned Property as of the Closing Date, (iii) with respect to any IP/Ground Lease Property, all Inventory which is located at, on or in transit to the IP/Ground Lease Property as of the Closing Date, (iv) with respect to any Operating Sparrow Properties, all Inventory located at, on or in transit to the Operating Sparrow Properties, and (v) all other Inventory Related to the Business other than Inventory included in clause (ii) of the definition of Excluded Inventory.

(b) The definition of "Buyer Party Release" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety.

(c) The definition of "Designatable Lease" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Designatable Lease" shall mean each of (i) the GOB Leases, the Operating Leases, the Landlord Leases and the Sparrow Subleases and (ii) to the extent applicable to such leases and lease agreements, all non-disturbance agreements with fee owners or senior landlords, subordination, non-disturbance and attornment agreements, waivers and consents in favor of any Seller,  estoppel certificates from landlords under any of the Leases (to the extent assignable), and landlord waivers or other collateral access agreements in favor of any Seller or any asset-based lenders.

(d) The following is added as a new defined term:

"Employee Lease Agreement" shall mean the agreement substantially in the form of Exhibit H.

(e) The definition of "Expenses" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Expenses" shall mean (i) the Buyer Occupancy Costs, if applicable, and (ii) the reasonable and documented out-of-pocket fees, costs and expenses or other disbursements borne by any Seller or its Affiliates incurred or accruing (a) during the Designation Rights Period, to the extent Related to the Operating Leases, Operating Leased Stores, Landlord Leases or Sparrow Leases, (b) to the extent Related to the GOB Leases or GOB Leased Stores following the GOB Period for each such GOB Lease or GOB Leased Store, (c) to the extent Related to the GOB Owned Stores following the GOB Period for such GOB Owned Store, (d) after the Closing, to the extent related to an Additional Contract or any Operating Lease, Operating Leased Store, Landlord Lease or Sparrow Lease or (e) as a result of the Sellers being the tenant or landlord under the Designatable Lease or Additional Contract during, with respect to the GOB Leased Stores, the period commencing after the GOB Period for each such GOB Leased Store and ending at the expiration of the Designation Rights Period, and with respect to any Operating Leased Property, Landlord Lease or Sparrow Lease, during the Designation Rights Period, and any reasonable and documented fees, costs and expenses incurred by any Seller or its Affiliates in connection with any transfer of a Designatable Lease to Purchaser following the Designation Rights Period, but in each case shall not, for the avoidance of doubt, include rejection damages or Cure Costs.

(f) The definition of "GOB Period" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"GOB Period" shall mean with respect to each GOB Store, the period commencing on the Closing Date and ending on the date that the Seller delivers written notice to Buyer that the "going-out-of-business" sale with respect to such GOB Store, as applicable, has been completed and all inventory of the Sellers has been removed from

2

such GOB Store, as applicable. For the avoidance of doubt, the Sellers may deliver any such notice on or prior to the Closing Date.

(g) The definition of "GOB Stores" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"GOB Stores" shall mean, individually or collectively as the context may require, the GOB Leased Stores, the GOB Sparrow Properties and the GOB Owned Stores.

(g) The following is hereby added as a new defined term:

"Landlord Leases" shall mean each of (i) those leases or lease agreements (including ground leases) related to the Owned Real Property under which any Seller is the lessor (together with all amendments, modifications, supplements and renewals thereof), and (ii) to the extent applicable to such leases and lease agreements, all non disturbance agreements with fee owners or senior landlords, subordination, non disturbance and attornment agreements, waivers and consents in favor of any Seller, estoppel certificates from landlords under any such leases and lease agreements (to the extent assignable), and landlord waivers or other collateral access agreements in favor of any Seller or any asset based lenders.

(h) The definition of "Occupancy Expenses" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Occupancy Expenses" shall mean, with respect to any Lease Premises, Owned Real Property or Sparrow Property, all liquidated costs, expenses, obligations and liabilities under or in connection with the applicable Lease payable or paid by any Seller, including any and all mortgage payments, base rent, percentage rent, additional rent, CAM, utilities, Property Taxes and assessments, costs of continuing the level of maintenance and security required by this Agreement, a pro rata portion of insurance (including public liability and casualty insurance) attributable to such Lease or Lease Premises, Owned Real Property or Sparrow Property and all other categories of expenses, obligations and liabilities arising or accruing under or in connection with such Lease (whether or not billed by the applicable counterparty to such Lease), Owned Real Property or Sparrow Property.  For the avoidance of doubt, Occupancy Expenses shall not include any Seller's costs and expenses of (a) any professionals retained in connection with the Bankruptcy Cases or (b) counsel of any kind except to the extent counsel is retained with respect to a Lease, Owned Real Property or Sparrow Property and not the Sellers' other operations.

(i) The definition of "PA Liabilities Services Agreement" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety.

(j) The following is hereby added as a new defined term:

"Proration Date" shall have the meaning given in Section 9.11(a).

(k) The definition of "Securities Consideration" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Securities Consideration" shall mean the securities described in Schedule 9.2.

(l) The following is hereby added as a new defined term:

"Services Agreement" shall mean the agreement substantially in the form attached hereto as Exhibit I.

(m) The following are hereby added as new defined terms:

"Sparrow Leases" shall mean the Sparrow Subleases together with the lease listed in Schedule 1.1(r).

"Sparrow Subleases" shall mean each of (i) those leases or lease agreements (including ground leases) related to the Sparrow Properties under which any Seller is the lessor (including the leases listed on Schedule 1.1(s)) (together with all amendments, modifications, supplements and renewals thereof), and (ii) to the extent applicable to such leases and lease agreements, all non disturbance agreements with fee owners or senior landlords, subordination, non disturbance and attornment agreements, waivers and consents in favor of any Seller,  estoppel certificates from landlords under any such leases and lease agreements (to the extent assignable), and landlord waivers or other collateral access agreements in favor of any Seller or any asset based lenders.

(n) The definition of "Store Cash" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Store Cash" shall mean any cash of the Sellers in the registers or otherwise held at any Operating Lease Property, any Operating Owned Property or any Sparrow Property, in an amount not to exceed $17,000,000.

(o) The definition of "Second Lien Line of Credit Facility" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Second Lien Line of Credit Facility" shall mean each line of credit facility granted pursuant to an amendment to the Second Lien Credit Agreement.

SECTION 1.02.    Section 2.1(p) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(p)        any and all Actions or Claims (other than returns of merchandise for warranty claims (except, for the avoidance of doubt, to the extent Related to Acquired Inventory or comprising Assumed Liabilities)) of Sellers as of the Closing that (i) constitute Acquired Assets under any other subsection of this Section 2.1, or (ii) are against vendors, counterparties to leases, licenses or other contracts, customers, Transferred Employees or parties to other

4

commercial relationships of the Business, in each case as of immediately prior to the Closing, that arose in connection with the ownership of the Acquired Assets or the operation of the Business or the Acquired Assets, excluding (in each case) any Actions or Claims that are, or are Related to, an Excluded Asset or Excluded Liability;"

SECTION 1.03.    Section 2.1(r) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(r)    the KCD Notes;"

SECTION 1.04.    Section 2.1(t) of the Purchase Agreement is hereby deleted in its entirety on the basis that its subject matter is addressed by Section 2.1(p) of the Purchase Agreement.

SECTION 1.05.    Section 2.1(v) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(v)    the release of the Released Estate Claims in accordance with Section 9.13;"

SECTION 1.06.    Section 2.1(bb) of the Purchase Agreement is hereby amended to remove the word "and" at the conclusion of such Section, Section 2.1(cc) of the Purchase Agreement is hereby amended to replace the period at the conclusion of such Section with a semicolon and the following is hereby added as Section 2.1(dd) of the Purchase Agreement:

"(dd)    subject to Section 2.13, any Acquired Foreign Assets; and"

SECTION 1.07.    The following is hereby added as Section 2.1(ee) of the Purchase Agreement:

"(ee)    any bank accounts of the Sellers as may be agreed by Buyer and the Sellers prior to the Closing Date (but, for the avoidance of doubt, not including any cash in any such bank accounts)."

SECTION 1.08.    Section 2.2(i) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(i)    all Claims, Proceedings, and causes of action of Sellers other than Claims described in any subsection of Section 2.1.  Notwithstanding anything to the contrary in Section 2.1(p) or elsewhere, the Excluded Assets shall include (A) all Claims, Proceedings and causes of action of Sellers against vendors, counterparties to leases, licenses or other contracts, customers, Transferred Employees or parties to other commercial relationships of the Business, in each case as of immediately prior to the Closing, that that did not arise in connection with the ownership of the Acquired Assets or the operation of the Business or the Acquired Assets; (B) all Avoidance Actions; (C) all Released Estate Claims; and (D) all Claims, Proceedings, and causes of action

described in the second sentence of Section 9.13(e)(ii) (other than in clause (a) thereof), including any Claims against the Sellers or their directors, officers, insiders or shareholders under any applicable Law arising from any pre-petition transaction including for breach of fiduciary duty, fraudulent conveyance, or illegal dividend.  Nothing in this Section 2.2(i) or in any subsection of Section 2.1 shall affect the scope of the Released Estate Claims or Section 9.13, and in the event of any conflict between Section 2.2(i) and any subsection of Section 2.1, on the one hand, and Section 9.13, on the other hand, Section 9.13 shall govern;"

SECTION 1.09.    Section 2.2(n) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(n)    all bank accounts (except as otherwise provided in Section 2.1(ee);"

SECTION 1.10.    Section 2.2(p) of the Purchase Agreement is hereby amended to remove the word "and" at the conclusion of such Section and Section 2.2(q) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(q)    the SHIP Purchase Agreement Assets (if the SHIP Closing shall have occurred prior to the Closing Date); and"

SECTION 1.11.    In Section 2.3(i) of the Purchase Agreement, the reference to "Section 9.2" is revised to refer to "Section 9.2(a)".

SECTION 1.12.    Section 2.3(j) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(j)    all Liabilities with respect to the Transferred Employees (i) to the extent arising as a result of an event, action or omission that occurs on or following the Closing Date or (ii) expressly assumed by Buyer and its Subsidiaries pursuant to Section 9.7 (including under the Employee Lease Agreement);"

SECTION 1.13.    Section 2.3(n) of the Purchase Agreement is hereby amended to remove the word "and" at the conclusion of such Section, Section 2.3(o) of the Purchase Agreement is hereby amended to replace the period at the conclusion of such Section with a semicolon and the following is hereby added as Section 2.3(p) of the Purchase Agreement:

"(p)    the claims underlying the mechanics' liens identified in Section 2 of Schedule 6.5; and"

SECTION 1.14.    The following is hereby added as Section 2.3(q) of the Purchase Agreement:

"(q)    all fee and reimbursement obligations in connection with any Backstopped Letter of Credit."

SECTION 1.15.      Section 2.3(k)(x) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(x)      Notwithstanding anything to the contrary herein or in the Approval Order, and for the avoidance of doubt, the Buyer's agreement to pay Assumed 503(b)(9) Claims, Other Payables, or any other administrative or priority claim of the Sellers pursuant to the terms hereof is a general unsecured contractual obligation of the Buyer owed solely to the Sellers;"

SECTION 1.16.      Section 2.4(p) of the Purchase Agreement is hereby amended to add the word "and" at the conclusion of such Section, Section 2.4(q) of the Purchase Agreement is hereby amended to replace "; and" at the conclusion of such Section with a period and Section 2.4(r) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(r)      [Reserved]."

SECTION 1.17.      The final paragraph of Section 2.4 is revised to read as follows:

"For the avoidance of doubt, (i) all Taxes of any Seller shall be Assumed Liabilities, regardless of the time and circumstances giving rise to any such Taxes, except for any Tax expressly excluded under Section 2.4(h) or Section 2.4(i) and (ii) the Liabilities of any entity that is an Acquired Foreign Asset shall not be Excluded Liabilities."

SECTION 1.18.      Section 2.6 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 2.6      Purchase and Sale of Designation Rights.  Upon the terms and subject to the conditions of this Agreement and the Approval Order, on the Closing Date, Sellers shall sell, transfer, assign and convey, or cause to be sold, transferred, assigned and conveyed, to Buyer, and Buyer shall purchase from Sellers, the Designation Rights. For the avoidance of doubt, the sale, transfer, assignment and conveyance of the Designation Rights provided for herein on the Closing Date shall not effectuate a sale, transfer, assignment or conveyance of any Designatable Lease to Buyer or any other Assignee, which shall only be effectuated on a Designation Assignment Date; provided, that, notwithstanding the foregoing, Buyer shall be responsible for all Expenses arising under or related to any Designatable Lease from and after the Closing Date until, if applicable, the rejection of such Designatable Lease in accordance with this Agreement. Subject to the terms and conditions of this Agreement, the Approval Order and the requirements of section 365(b) of the Bankruptcy Code, Buyer shall have the right to designate itself or any other Person as the Assignee to which a Designatable Lease is to be assumed and assigned.  The Designation Rights shall terminate upon the expiration of the Designation Rights Period."

SECTION 1.19.    Section 2.8(e) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(e)    Notwithstanding anything to the contrary contained in this Agreement, the Sellers shall not transfer the KCD Notes to Buyer, and Buyer shall not assume the PA Liabilities from the Sellers, unless and until the Sellers have received the requisite consent of the Bermuda Monetary Authority or any other applicable Bermuda regulatory authority to the transfer of the KCD Notes (the "BMA Consent").  The Sellers shall cooperate with Buyer in determining the manner in which such transfer pursuant to Section 2.1(r) shall take place as soon as practicable after the Closing.  The Sellers shall use reasonable best efforts to obtain the BMA Consent and Buyer shall cooperate in such efforts.  Immediately following receipt of the BMA Consent, the transfer of the KCD Notes and the assumption of the PA Liabilities shall take place simultaneously.  From the Closing Date until such time as the transfer of the KCD Notes and the assumption of the PA Liabilities occurs, pursuant to the Services Agreement, (i) Buyer shall provide services to the applicable Sellers sufficient to enable Sellers to perform the PA Liabilities and (ii) in consideration for such services, Sellers shall pay to Buyer an amount equal to the aggregate of all amounts paid by Buyer to Sellers with respect to any licenses under which Buyer licenses the KCD IP."

SECTION 1.20.    Section 2.9 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 2.9        If, at any time prior to the date that is sixty (60) days after the Closing Date, but in no event later than May 3, 2019 (the "Designation Deadline"), Buyer so determines as to any Contract that is Related to the Acquired Assets or is an IP License, in each case but is not an Initial Assigned Contract (other than (i) any lease of non residential real property and (ii) any Excluded Asset set forth in Section 2.2) (each, an "Additional Contract"), Buyer may elect, after consultation with the Sellers, by written notice delivered to the Sellers, to designate for assignment or assumption and assignment any Additional Contract for no additional consideration.  Upon the designation of any such Additional Contract as an Assigned Agreement pursuant to this Section 2.9, the Sellers will use their reasonable best efforts to assume and assign to the applicable Assignee such Additional Contract so long as the Buyer pays all Expenses accrued post-Closing and all Cure Costs associated with such Additional Contract; provided, however, that nothing herein shall be deemed or construed to obligate the Sellers to retain, or refrain from rejecting or terminating any Lease or Contract after the Designation Deadline that does not constitute an Assigned Agreement.  Notwithstanding anything to the contrary herein, the Sellers shall not be obligated to assume and assign any Contract pursuant to this Section 2.9 with respect to which Buyer fails to satisfy the Bankruptcy Court as to adequate assurance of future performance or for which Consent is required to assume and assign such Additional Contract and such Consent has not been obtained, provide that the Parties shall use their reasonable best efforts to obtain all such Consents.  Without duplication of any amounts payable under the Services Agreement, Buyer shall pay all Expenses accrued after the Closing with respect to any Additional Contract that is not ultimately designated as an Assigned Agreement if and to the extent Buyer receives a

benefit under such Additional Contract.  If the Sellers also receive a benefit under such Additional Contract after the Closing, Buyer and the Sellers shall allocate a proportionate amount of the Expenses with respect to such Additional Contract to the Sellers (including by netting against amounts owed by Buyer)."

SECTION 1.21.    Section 2.11 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 2.11        Rejection of Outbound IP Licenses.  Within seven (7) Business Days after the Closing Date, subject to section 365(n) of the Bankruptcy Code, the Sellers shall file a motion to reject, and take all actions (including actions required under section 365 of the Bankruptcy Code) reasonably necessary to reject any Outbound IP Licenses that (i) are executory Contracts and (ii) are designated by Buyer for rejection at any time prior to the second (2nd) Business Day prior to the Closing Date (such Contracts, "Closing Date Rejected Licenses"). Without limiting the foregoing, promptly following the Designation Deadline, the Sellers shall file a motion to reject, and take all actions (including actions required under section 365 of the Bankruptcy Code) reasonably necessary to reject, any Outbound IP Licenses that (x) are not Closing Date Rejected Licenses, (y) are executory Contracts and (z) are not designated by Buyer for assignment or assumption and assignment as an Assigned Agreement in accordance with the terms of this Agreement or for solely assumption pursuant to Section 9.14(d)."

SECTION 1.22.    Section 2.13(a) and Section 2.13(b) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(a)    On the Closing Date, (i) the Sellers shall use reasonable best efforts to cause each of the Foreign Subsidiaries to sell, transfer, assign, convey and deliver, or cause to be sold, transferred assigned, conveyed and delivered to Buyer or the applicable Assignee, and Buyer or such applicable Assignee shall use reasonable best efforts to purchase, all right, title and interest of each of the Foreign Subsidiaries, in, to or under all assets, properties and rights Related to the Business (other than the Excluded Assets) and any other assets of the type that would have been Acquired Assets had they had been owned by the Sellers as of the Closing Date or minority equity interests in non-U.S. Persons held by Subsidiaries of the Seller (other than any Subsidiary who is a Seller (including, if agreed between Buyer and the Sellers, through transferring the equity of any such Subsidiaries holding such minority equity interests)) (collectively, the "Acquired Foreign Assets"), in each case free and clear of any and all Encumbrances of any kind, nature or description and any Claims, other than Permitted Post-Closing Encumbrances and (ii) subject to and to the extent of the transfer of the Acquired Foreign Assets, Buyer shall assume, effective as of the Closing, and shall timely perform and discharge in accordance with their respective terms all Liabilities (other than Excluded Liabilities) of the type that would have been Assumed Liabilities had the applicable Foreign Subsidiary been a Seller as of the Closing Date.  If the transfer of any Acquired Foreign Assets does not occur at the Closing Date, Seller and Buyer shall use reasonable best efforts to complete such transfer as promptly as practicable and shall enter into such agreements as may be reasonably required to provide Buyer or the applicable Assignee the benefit of such assets until such transfer is consummated.  If, at any time prior to the date that is

sixty (60) days after the Closing Date, Buyer determines (in its sole discretion) and notifies the Seller that it is necessary or desirable to acquire all of the equity interests in any Foreign Subsidiary in lieu of the acquisition of assets and assumption of liabilities contemplated by the first sentence of this Section 2.13(a), then the Sellers shall use reasonable best efforts to transfer such equity interests, which equity interests shall be deemed to be Acquired Foreign Assets.  If (i) the proposed transfer of any Acquired Foreign Assets triggers any right of first offer, right of first refusal or other preemptive right by a third party and (ii) such third party exercises such right of first offer, right of first refusal or other preemptive right, then the Sellers shall pay or cause to be paid to Buyer any consideration received by the Sellers or their Subsidiaries resulting from such exercise (and such transfer shall be deemed to satisfy the Sellers' obligation to sell, transfer, assign, convey or deliver the applicable Acquired Foreign Asset).

(b)    If, at any time prior to the date that is sixty (60) days after the Closing Date, Buyer determines (in its sole discretion) and notifies the Seller that it is necessary or desirable to acquire other minority equity interests in non-U.S. Persons held by Subsidiaries of the Seller (other than any Subsidiary who is a Seller (including, if agreed between Buyer and Sellers, through transferring the equity of any such Subsidiaries holding such minority equity interests)) so as to ensure that Buyer or the applicable Assignee shall be able to secure the benefit of the applicable Acquired Foreign Assets, Buyer may elect, by written notice delivered to the Sellers, to acquire such other minority equity interests directly from the Seller it being agreed by the Parties that such equity interests will be deemed to be Acquired Foreign Assets for the purposes of this Agreement.  Following any such election, Buyer and the Seller shall promptly execute all documentation required to effectuate the purchase and sale of such other minority equity interests under applicable Law.  If (i) the proposed transfer of any such other minority equity interests triggers any right of first offer, right of first refusal or other preemptive right by a third party and (ii) such third party exercises such right of first offer, right of first refusal or other preemptive right, then the Sellers shall pay or cause to be paid to Buyer any consideration received by the Sellers or their Subsidiaries resulting from such exercise (and such transfer shall be deemed to satisfy the Sellers' obligation to sell, transfer, assign, convey or deliver the applicable other minority equity interests)."

SECTION 1.23.    Section 3.1(a)(ii) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(ii)    an amount in cash equal to the Store Cash as of 12:01 a.m. New York City time on the Closing Date; *plus*;"

SECTION 1.24.    The following proviso is hereby added at the end of Section 3.1(a):

"provided, that to the extent any portion of the Closing Payment Amount will be used by Sellers to satisfy the existing indebtedness of Sellers under the DIP Credit Agreement with respect to outstanding letters of credit, Buyer shall assume, cash collateralize or backstop any such letters of credit (any such assumed, cash collateralized or backstopped letters of credit, the "Backstopped Letters of

Credit"). The obligation of Buyer to pay the cash portion of the Closing Payment Amount shall be reduced on a dollar for dollar basis by the face amount of the Backstopped Letters of Credit. Sellers shall notify Buyer on the Business Day prior to the Closing Date as to any amounts outstanding under the DIP Credit Agreement as to which Buyer shall be required to assume or backstop letters of credit."

SECTION 1.25.    Section 3.1(b)(iv) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(iv)    obligations held by, or credit bid at the direction of, Buyer and its Affiliates as of the Closing Date in an aggregate amount equal to $433,450,000 under (x) the Second Lien Term Loan; (y) the Second Lien Line of Credit Facility; and (z) the Second Lien PIK Notes,"

SECTION 1.26.    Section 4.1 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 4.1    Closing Date. The closing of the sale, transfer, assignment, conveyance and delivery of the Designation Rights and the Sellers' right, title and interest in, to and under the Acquired Assets by the Sellers to Buyer contemplated hereby (the "Closing") shall take place at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153, or at such other place or time as Buyer and the Sellers may mutually agree, on the third (3rd) Business Day following satisfaction or waiver of the conditions set forth in Article X and Article XI (other than those conditions that by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing). Notwithstanding the immediately preceding sentence, if the Marketing Period has not ended at the time of the satisfaction or waiver of the conditions set forth in Article X and Article XI (other than those conditions that by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing), then the Closing shall occur instead on the date that is the earlier to occur of (x) any Business Day as may be specified by Buyer on no less than two (2) Business Days' prior written notice to the Sellers and (y) two (2) Business Days following the final day of the Marketing Period. The date on which the Closing actually occurs is referred to as the "Closing Date", and for all purposes under this Agreement and any Transaction Document (including the Occupancy Agreement and the Seller Retained Occupancy Agreement), the Closing Date shall be deemed to be 12:01 a.m., New York City time on the date on which Closing actually occurs."

SECTION 1.27.    Section 4.2(e) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(e)    the Employee Lease Agreement and the Services Agreement, each duly executed by Buyer; and"

SECTION 1.28.    Section 4.3(e) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(e)    a quit claim deed to be recorded with respect to the Owned Real Property, or if a quit claim deed is not acceptable to the title insurer to receive insurable title in a particular jurisdiction, a no-warranty deed;"

SECTION 1.29.    Section 4.3(h) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(h)    all tangible embodiments of the Acquired Intellectual Property, including all (i) Software object code and source code related thereto, (ii) all materials and documentation (in electronic and editable form, to the extent existing in such form) necessary for the use, modification, manufacture, sale and other exploitation of the Acquired Intellectual Property, to the extent not included in Intellectual Property Related Documentation, (iii) all content made available on or through any websites and webpages accessed through any Domain Names or Media Accounts included in the Acquired Intellectual Property and all other audio-visual or written materials (including such archival materials) produced by or on behalf of the Sellers, (iv) all Labeling and Marketing Materials and (v) all Product Catalogs and Manuals;"

SECTION 1.30.    Section 4.3(k) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(k)    a counterpart of each Short Form Assignment provided by Buyer to Seller as of February 5, 2019, duly executed by each applicable Seller (it being understood that post-Closing, the Parties will, in good faith, continue to prepare and execute all other jurisdiction-specific Short Form Assignments provided by Buyer to Seller unless otherwise agreed in writing by the Parties);"

SECTION 1.31.    Section 4.3(l) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(l)    a counterpart of each IP Power of Attorney provided by Buyer to Seller as of February 5, 2019, duly executed by each applicable Seller (it being understood that post-Closing, the Parties will, in good faith, continue to prepare and execute all other jurisdiction-specific IP Powers of Attorney provided by Buyer to Seller unless otherwise agreed in writing by the Parties);"

SECTION 1.32.    Section 4.3(n) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(n)    the Employee Lease Agreement and the Services Agreement, each duly executed by the Sellers;"

SECTION 1.33.    Section 4.4 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 4.4    Local Sale Agreements.  Subject to the terms and conditions hereof, to the extent necessary or desirable to effect the Closing on the terms hereof, Buyer or applicable Assignee and relevant Sellers shall, enter into such agreements or instruments, including a sale agreement and no-warranty deed for the Owned Real Property and bills of sale and/or assignment and assumption agreements, providing for the sale, transfer, assignment or other conveyance to Buyer or applicable Assignee, in accordance with the requirements of applicable local Law.  The Sellers and Buyer acknowledge and agree that to the extent applicable law imposes requirements for transferring assets of record, the Parties will reasonably cooperate to satisfy such requirements as to transfer such assets as promptly as reasonably practical after Closing."

SECTION 1.34.    Section 5.1(c)(ii) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(ii)    The operation of the GOB Owned Stores during the GOB Period and the Sparrow Properties set forth on Schedule 5.1(c)(ii) (collectively, the "GOB Sparrow Properties" and the Sparrow Properties other than the GOB Sparrow Properties, the "Operating Sparrow Properties") during the period commencing on the Closing Date and ending on the date that the Seller delivers written notice to Buyer that the "going-out-of-business" sale with respect to such Sparrow Properties has been completed and all inventory of the Sellers has been removed from such Sparrow Properties shall be governed by the Seller Retained Occupancy Agreement and the Seller shall conduct such operation pursuant to such Seller Retained Occupancy Agreement as the Seller determines in its sole discretion."

SECTION 1.35.    Section 5.2(b) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(b)    Within five (5) Business Days following the date upon which Buyer delivers a Buyer Assumption Notice to the Sellers with respect to any Designatable Lease, together with a related assignment agreement substantially in the form attached hereto as Exhibit E (the "Assignment and Assumption of Lease") executed by the applicable Assignee, the Sellers shall (1) deliver to Buyer and such Assignee a fully executed Assignment and Assumption of Lease and (2) file with the Bankruptcy Court and serve on the applicable lessor(s) and other appropriate notice parties (as applicable) a notice, and shall seek entry by the Bankruptcy Court of the Approval Order in respect of the Designatable Leases subject to such Buyer Assumption Notice.  As of the applicable Designation Assignment Date, except for such obligations and liabilities with respect to such Designatable Leases and the related Lease Premises arising during the Designation Rights Period and except for Buyer's obligations specifically set forth in this Agreement, as between Buyer and the Assignee, Buyer shall have no further obligation or Liability with respect to such Designatable Lease or the related Lease Premises (including any obligation to continue to pay Expenses with respect thereto) and Assignee shall thereafter be solely responsible for all amounts payable or other obligations or liabilities that may be owed in connection with such Designatable Lease or the related Lease Premises; provided, however, that nothing in this sentence shall affect the Sellers' rights against

13

Buyer with respect to such Designatable Lease or the Lease Premises as set forth in this Agreement.;"

SECTION 1.36.    Section 6.6(a) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(a)    Except as would not, individually or in the aggregate, reasonably be expected to  have a Material Adverse Effect, the Sellers have good and marketable fee title to the Owned Real Property, free and clear of all liens (except for Permitted Encumbrances).  None of the Owned Real Property is subject to any leases or tenancies or other rights of occupancy other than the Landlord Leases;"

SECTION 1.37.    Section 8.8(a) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(a)    [Reserved]."

SECTION 1.38.    Section 8.8(b) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(b)    To the extent permitted by applicable Law, during the Management Services Period, the applicable the Sellers shall remain the manager, controller or operator of each Acquired Property, Occupancy Leased Premise and Sparrow Property solely to the limited extent required for any Permit applicable to such Acquired Property, Occupancy Leased Premise or Sparrow Property (in the case of the Sparrow Properties, solely to the extent of any Sellers' rights related to the Sparrow Properties) to remain effective  (the "Management Services").  Notwithstanding the foregoing, to the fullest extent permitted by applicable Law, each of the Sellers hereby appoints Buyer and its Affiliated Designees as agent of such Seller to manage, control and operate each of (i) the Acquired Properties, (ii) Occupancy Leased Premises and (iii) the Sparrow Properties (in the case of the Sparrow Properties, solely to the extent of any Sellers' rights related to the Sparrow Properties) at which Management Services are being provided (collectively, the "Managed Properties").  Pursuant to their appointment as the Sellers' agent, Buyer and its Affiliated Designees shall be entitled to manage, control and operate each of the Managed Properties as they see fit in their sole discretion and collect and retain all revenues generated by each Managed Property.  In furtherance thereof, the Parties acknowledge and agree that the Sellers shall have no economic interest in the Managed Properties other than the right to receive the Management Services Reimbursements.  As consideration for the provision of the Management Services, Buyer shall reimburse the Sellers, or cause the Sellers to be reimbursed, for any reasonable and documented out-of-pocket costs, fees and expenses incurred at any time in providing the Management Services, including any income and other taxes incurred by the Seller and its Subsidiaries in respect of the payment and receipt of such reimbursement (the "Management Services Reimbursements") and indemnify the Sellers from any Liability arising from the provision of the Management Services, except for any such Liability arising from gross negligence or willful misconduct of the Sellers. For the avoidance of doubt, all employees of the Managed Properties shall be employed by Buyer or its Affiliated Designee and no Seller

14

shall have any authority to take action as an employer with respect to any such employee or to enter into any Contract on behalf of Buyer or any Affiliated Designee except to the extent otherwise provided for pursuant to any arrangement entered into in accordance with Section 9.7(a);"

SECTION 1.39.    The following is hereby added as Section 8.10 of the Purchase Agreement:

"Section 8.10    Sparrow Master Lease.  The Parties hereby agree that the lease set forth on Schedule 1.1(r) shall be assumed by the Sellers and assigned to the Buyer on the Closing Date."

SECTION 1.40.    Section 9.2(a) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(a)    Unless Buyer makes the election under Section 2.12(b) to treat all the transactions described in Article II as Designated Sale Transactions (resulting in no transfer of the Sellers' Tax attributes to Buyer): (1) Buyer shall provide to the Sellers detailed instructions as to steps to take (or not take) in order to secure and preserve the qualification of any of the transactions set forth in this Agreement as a Tax Reorganization (except if and to the extent Buyer determines otherwise, in accordance with Section 2.12(b), in respect of a given transaction or a particular Seller) and to achieve the Tax Result, including with respect to (i) repayment, cancellation or settlement of, or other actions with respect to, intercompany accounts after the approval of the Bankruptcy Plan and on or before the Closing Date, (ii) the merger of any of the Sellers' Subsidiaries with another Sellers' Subsidiaries after the approval of the Bankruptcy Plan and on or before the Closing Date or conversion of any of the Sellers' Subsidiaries into limited liability companies, (iii) the filing of any Tax elections to treat any such Subsidiaries as disregarded entities for U.S. federal income tax purposes, or otherwise taking an action to establish that such Subsidiaries have liquidated for tax purposes, (iv) implementation of the Distribution Requirement in a manner that is consistent with section 507 of the Bankruptcy Code, (v) satisfaction of the ownership requirements set forth in section 382(l)(5)(A)(ii) of the Code, (vi) the manner in which the transfer of the KCD Notes shall take place, and (vii) any other instructions that in the reasonable opinion of tax counsel for Buyer are necessary or desirable to ensure the qualification of the Tax Reorganization and the achievement of the Tax Result, and the Sellers shall follow such instructions; provided that (A) such instructions shall not limit the Sellers' discretion or actions in respect of (x) operating the Business and its other Assets in the Ordinary Course of Business and in compliance with the other provisions of this Agreement for all periods through the Closing Date, (y) disposing of any of its Assets if and to the extent permitted under the other provisions of this Agreement (z) taking or refraining from taking any action required by this Agreement or by Law, including if such actions would be inconsistent with its obligations under the Bankruptcy Code or other applicable Law, (B) if requested by the Sellers, Buyer's tax counsel shall deliver to the Sellers a Tax Opinion that each and any such transaction (other than any Designated Sale Transactions) qualifies as a Tax Reorganization, and (C) nothing herein shall affect Buyer's  liability for Taxes that are Assumed Liabilities; (2) subject to the preceding clause (1), the Sellers

15

agree to cooperate with Buyer in order that, for federal income Tax purposes, the transactions effected pursuant to this Agreement, together with the distributions made by, and liquidation of, the Sellers pursuant to the Bankruptcy Plan, are treated as one or more plans of reorganization under section 368 of the Code and as qualifying as one or more reorganizations under section 368(a)(1)(G) of the Code (except if and to the extent Buyer determines otherwise, in accordance with Section 2.12(b), in respect of a given transaction or a particular Seller); (3) any Tax Return in respect of a Tax imposed on any Seller for which Buyer is liable hereunder shall be prepared by Buyer, a copy of such Tax Return shall be provided to SHC at least thirty (30) days prior to the due date thereof, Buyer shall consider in good faith any reasonable comments provided by the Sellers, the Sellers shall, if necessary for filing, properly execute any such Tax Return, and Buyer shall timely and properly file any such Tax Return and pay the amount of any Taxes shown due on any such Tax Return; and (4) immediately following the Closing, the Sellers shall take the steps with respect to the Securities Consideration described in Schedule 9.2. Consistent with and subject to the foregoing, the Seller shall convert any of the Sellers' Subsidiaries as shall be designated by Buyer to a limited liability company pursuant to instructions provided by Buyer."

SECTION 1.41.    Section 9.3(d) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(d)    As soon as practicable (and in any event within ninety (90) days) after the Closing Date, Buyer shall deliver to the Sellers a schedule allocating the Purchase Price (including any Assumed Liabilities treated as consideration for the Acquired Assets for Tax purposes) (the "Allocation Schedule"). The Allocation Schedule shall allocate the Purchase Price among the Sellers and among the Acquired Assets acquired from each Seller, and shall be prepared in accordance with Section 1060 of the Code if Buyer makes the election under Section 2.12(b) to treat all the transactions described in Article II as Designated Sale Transactions (resulting in no transfer of the Sellers' Tax attributes to Buyer), and in any case shall be prepared in accordance with applicable law to the extent necessary to comply with reporting in respect of applicable Transfer Taxes. The Allocation Schedule shall be deemed final unless the Sellers notify Buyer in writing that the Sellers object to one or more items reflected in the Allocation Schedule within forty-five (45) days after delivery of the Allocation Schedule.  In the event of any such objection, Buyer and the Sellers shall negotiate in good faith to resolve such dispute; provided, however, that if Buyer and the Sellers are unable to resolve any dispute with respect to the Allocation Schedule within sixty (60) days after the delivery of the Allocation Schedule, such dispute shall be resolved by the CPA Firm.  The fees and expenses of the CPA Firm in connection therewith shall be borne equally by Buyer and the Sellers.  Each of Buyer and the Sellers agrees to file its respective federal, state and local Tax returns in accordance with the Allocation Schedule, and any adjustments to the Purchase Price pursuant to this Section 9.3 shall be allocated in a manner consistent with the Allocation Schedule. For the avoidance of doubt, the Parties shall cooperate in determining the portion of the Purchase Price allocable to the Acquired Assets that are subject to a Transfer Tax prior to the due date of the Tax Return required to be filed in connection with such Transfer Taxes; provided, that if the parties do not agree with

respect to such determination, such matter shall be resolved in accordance with the determination of the CPA Firm; provided further, that such Tax Return will be adjusted, as applicable, consistent with the procedures described above, to reflect any adjustments to the allocated Purchase Price. Notwithstanding the foregoing, in the case of any asset for which an allocation of Purchase Price is required earlier than contemplated by the foregoing, the time frame for determination of the allocation of Purchase Price to those assets shall be fixed by the Parties to accommodate such requirement, provided that any such allocation may thereafter be revised for other purposes as appropriate and necessary to reflect the overall final allocation of Purchase Price in the Allocation Schedule."

SECTION 1.42.    Section 9.7 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 9.7          Employment Offers.

(a)    Buyer shall make an offer of employment to any Business Employee represented by a labor union and whose terms and conditions of employment are covered by a collective bargaining agreement ("Represented Employees") using reasonable best efforts to comply with the requirements of any such collective bargaining agreement. For any Business Employee not represented by a labor union ("Non-Represented Employees"), Buyer shall, or shall cause any of its Subsidiaries to, (i) no later than five (5) days prior to the date determined under the Employee Lease Agreement (the "Offer Effective Date"), use reasonable best efforts to provide a written offer of employment in a comparable position to, effective as of 11:59 p.m., local time, on the Offer Effective Date, each of such Business Employees, or (ii) to the extent required by and in accordance with applicable Law, enter into employment agreements with each of such Business Employees. Those Business Employees, including both Represented Employees and Non-Represented Employees, who accept such offer of employment on or before the Offer Effective Date in accordance with the provisions of such offer and continue employment with Buyer or any of its Subsidiaries, shall be referred to as "Transferred Employees." At the Closing, Buyer and the Seller shall enter into the Employee Lease Agreement pursuant to which Buyer shall, at Buyer's cost, have the benefit of the Business Employees' (the "Leased Employees") services during the period from the Closing Date through the Offer Effective Date (the "Lease Period") such that Buyer may carry on the operation of the Business from and after the Closing Date. In accordance with the Employee Lease Agreement, and for the avoidance of doubt, Buyer shall timely advance to the Seller the actual, out-of-pocket expenses to be paid or provided by the Seller and its Subsidiaries for wages and benefits associated with the Leased Employees during the Lease Period and any other liabilities attributable to Leased Employees that are incurred by the Seller and its Subsidiaries in connection with the Employee Services (as defined in the Employee Lease Agreement) during the Lease Period such that the Seller is in the same economic position as if the Leased Employees had been hired by Buyer as of the Closing. For the avoidance of doubt, during the Lease Period, the Seller and its Subsidiaries shall continue to provide to each of the Leased Employees compensation and benefits on the same basis as they were provided to such Leased Employee immediately prior to the Closing Date.

(b)    Subject to the last sentence of this Section 9.7(b) and except as otherwise expressly provided in this Section 9.7(b), with respect to each Transferred Employee who remains employed by Buyer or any of its Subsidiaries, Buyer shall, or shall cause any of its Subsidiaries to, provide for the period commencing on the Offer Effective Date and ending on the last day of the Sellers' fiscal year ending in 2020, subject to such Transferred Employee's continued employment with Buyer or any of its Subsidiaries (as applicable) (i) (A) base salary or hourly wage rate and (B) a target short-term cash incentive opportunity, in each of (A) and (B), that is at least equal to the base salary or wages and target short-term cash incentive opportunity, respectively, provided to such Transferred Employee immediately prior to the Closing Date and (ii) a group health and welfare plan and, subject to and in accordance with Section 9.7(k), a 401(k) plan, qualified under Sections 401(a) and 401(k) of the Code ("401(k) Plan"), that are substantially comparable in the aggregate to the group health and welfare plan and 401(k) Plan under which such Transferred Employee participates as of the date hereof. For the avoidance of doubt, (x) the terms of this Section 9.7(b) shall apply notwithstanding anything to the contrary in any non-solicitation or similar agreement currently entered into by Buyer or any of its Affiliates and the Sellers and (y) from and after the date hereof, no such non-solicitation or similar agreement by Buyer and any Seller or any Affiliate thereof entered into prior to the date hereof shall prevent Buyer from hiring (or seeking to hire) any employee of the Sellers. The Parties agree to cooperate in good faith to coordinate the establishment of benefit plans and arrangements so as to satisfy the obligations set forth in this Section 9.7(b)(ii).

(c)    Except as otherwise provided under the terms of the applicable Employee Plan, each Transferred Employee shall be given credit for all service with the Sellers under all employee benefit plans, programs and policies and fringe benefits of the Business or Buyer or any of its Subsidiaries in which they become participants (i) for purposes of eligibility, participation, and vesting (but not benefit accruals), and (ii) with respect to any vacation and severance plans, programs or arrangements of Buyer or its Subsidiaries, for purposes of determining the level of benefits except to the extent such crediting would result in duplication of benefits with respect to the same period of service.

(d)    If a Transferred Employee becomes eligible to participate in a medical, dental or health plan of Buyer (or its Subsidiaries), Buyer shall, or shall cause its Subsidiaries to, to the extent permitted by (x) applicable Law and (y) the terms of the applicable medical, dental or health plan of Buyer or any of its Subsidiaries in which the Transferred Employee participates following the Closing, cause the plan provider of such plan to (i) waive any preexisting condition limitations to the extent such pre-existing condition limitations would not have been applicable under the applicable medical, dental or health plans of the Sellers as of immediately prior to the Closing Date and (ii) credit any complete or partial satisfaction of any deductible and out-of-pocket expenses incurred by the Transferred Employee and his or her dependents under the applicable Seller's or its Subsidiaries' medical, dental or health plans during the portion of the calendar year in which the Closing Date occurs. Buyer agrees to use commercially reasonable efforts to cause a medical, dental and health plan provider to provide such

waivers and credits contemplated by the first (1st) sentence of this Section 9.7(d).  If a Transferred Employee becomes eligible to participate in a group term life insurance plan maintained by Buyer or its Subsidiaries, Buyer shall use commercially reasonable efforts to cause such plan to waive any medical certification for such Transferred Employee up to the amount of coverage the Transferred Employee had under the life insurance plan of the Sellers (but subject to any limits on the maximum amount of coverage under Buyer's life insurance plan).

(e)      Except as required by Law or an applicable bargaining agreement or as otherwise agreed in writing by the Parties, Buyer or any of its Subsidiaries shall provide severance and other separation benefits to each Leased Employee and Transferred Employee terminated by Buyer or any of its Subsidiaries within the period commencing on the Closing Date and ending on the last day of the Sellers' fiscal year ending in 2020 that are at least equal to the severance and other separation benefits provided by the Seller and its Subsidiaries to such Leased Employee and Transferred Employee as in effect immediately prior to the Petition Date, it being understood that such severance and other separation benefits do not include any long-term incentive, equity incentive, defined benefit pension or retiree welfare or life insurance benefits.

(f)      Except as prohibited by applicable Law, each offer letter shall provide that by accepting employment with Buyer the Business Employee is acknowledging that Buyer is assuming, and Buyer shall assume all vacation days and other paid time off accrued but not yet taken by each Transferred Employee through the Offer Effective Date, in accordance with their terms as of the date hereof.  To the extent that applicable Law prohibits a Transferred Employee's vacation from being assumed by Buyer and requires that a Transferred Employee to be paid for any vacation days and other paid time off accrued but not yet taken by such Transferred Employee as of the Offer Effective Date without regard to any acknowledgement by such Transferred Employee to the contrary, the Sellers shall pay each Transferred Employee for such vacation days.

(g)      The Sellers agree to pay to the Transferred Employees any bonus (including any related payroll Taxes) that such Transferred Employees would have been paid had they remained employees of the Sellers through the date the bonus in respect of the fiscal year ending February 2, 2019.

(h)      Buyer and the Seller agree to cooperate in good faith to ensure that Transferred Employees do not experience a break in health coverage from and after the Closing Date. Buyer shall take commercially reasonable efforts to provide or make available the health coverage required by Section 4980B of the Code available with respect to any individual who is an "M&A Qualified Beneficiary" (as defined in Treasury Regulation Section 54.49806-9 (Q&A 4) of the Code) as the result of the consummation of the Transactions. Notwithstanding the foregoing, Buyer shall take all actions reasonably necessary to ensure that all Leased Employees shall transfer to Buyer's health and welfare plans effective as of the Offer Effective Date, provided, that if any such employee continues coverage under COBRA under the health and welfare benefit plans maintained by the Seller or its Subsidiaries, Buyer shall reimburse the Seller for the positive difference, if any, between (x) the claims incurred and paid under such plan

attributable to such employee and any eligible dependents, and (y) the COBRA coverage premiums paid by such employee, with such amount to be determined on a monthly basis. The Seller and Buyer shall negotiate in good faith to agree upon the timing for and the mechanics of reimbursement of all fees, costs and expenses incurred by the Seller pursuant to the immediately foregoing sentence.

(i)    From and after the Closing Date, subject in all respects to the limitations set forth in Section 2.3(k), Buyer shall, within thirty (30) days following written demand by the Seller, with such supporting documentation as Buyer shall reasonably request, reimburse the Sellers for the payment of any cash severance or other cash separation pay, and the Sellers' or their Subsidiaries' portion of any related employment and payroll Taxes, made by any Seller or any Subsidiary of a Seller to any employee of any Seller or their Subsidiaries whose employment with any of the Sellers or their Subsidiaries terminated following the Petition Date or terminates on, or following the Closing Date (it being understood that this does not include any Transferred Employees who shall have become the employees of Buyer and its Subsidiaries and shall be covered by Buyer's obligations as set forth in Section 9.7(b)), to the extent of the cash severance or other cash separation pay that has been paid on or following the Petition Date and prior to the Closing Date or would have been due and payable had such employee's employment been terminated by any of the Sellers or their Subsidiaries immediately prior to the date hereof (the reimbursement Liabilities of Buyer set forth in this Section 9.7(i), including with respect to any related employment and payroll Taxes, the "Severance Reimbursement Obligations").

(j)    The Sellers shall retain liability for all medical, dental and health claims incurred by Transferred Employees (and their dependents) under the employee welfare benefit plans of the Sellers prior to the Closing.  Buyer shall be liable for all medical, dental and health claims incurred by Transferred Employees (and their dependents) under the employee welfare benefit plans of Buyer or any of its Subsidiaries on or after the Employee Effective Date.  For purposes of this Section 9.7(j), a claim shall be deemed to have been incurred on the date on which the medical or other treatment or service was rendered and not the date of the inception of the related illness or injury or the date of submission of a claim related thereto; provided, that claims relating to a hospital confinement that begins on or before the Closing but continues thereafter shall be treated as incurred before the Closing.

(k)    U.S. Savings Plan.

(i)    As soon as practicable following the Closing Date, Buyer shall, or shall cause its Subsidiaries to, establish a new savings plan or designate an existing savings plan qualified under Section 401(a) of the Code and including a cash or deferred feature under Section 401(k) of the Code and a related trust thereunder which shall be exempt under Section 501(a) of the Code ("Buyer's Savings Plan") that will permit participation by all Transferred Employees who are participating in the Seller's or its Subsidiaries' 401(k) Plan ("Seller's Savings Plan") as of the Closing Date.

(ii)    No assets or liabilities of Seller's Savings Plan shall be transferred to Buyer's Savings Plan, other than in connection with a rollover of a Transferred Employee's account balance under Seller's Savings Plan.   Except as could reasonably be expected to cause the Buyer's Savings Plan to cease to qualify under Section 401(a) and 401(k) of the Code or cause the trust to cease to be qualified under Section 501(a) of the Code or otherwise result in the Buyer or its Affiliates incurring any penalties thereunder, Buyer shall permit the Transferred Employees to roll over into Buyer's Savings Plan any rollover distribution (in cash or loan notes of any "eligible rollover distribution" (within the meaning of Section 402(c)(4) of the Code)).   Effective as of the Closing, the Seller shall and shall cause it Subsidiaries to take any action necessary to ensure that the accounts of each Transferred Employee in Seller's Savings Plan shall be fully vested and nonforfeitable.

(l)    The Parties acknowledge and agree that all provisions contained in this Section 9.7 are included for the sole benefit of the respective Parties and shall not create any right (i) in any other person, including any Business Employees, Transferred Employees, current or former employees of the Seller, any participant in any Employee Plan or any compensation or benefit plan, program, agreement or arrangement of Buyer or its Subsidiaries or any beneficiary thereof or (ii) in any other person, to continued employment with Buyer or its Subsidiaries or particular compensation or benefits coverage in any compensation or benefit plan, program, agreement or arrangement of Buyer or its Subsidiaries.   The provisions of this Section 9.7 shall not constitute an amendment to any Employee Plan or any plan, program, agreement or arrangement maintained by Buyer or any of its Subsidiaries.

(m)    The Sellers and Buyer hereby agree to follow the "alternate procedure" for employment tax reporting as provided in Section 5 of Rev. Proc. 2004-53, 2004-34 I.R.B. 320 for each Transferred Employee and to cooperate with each other in furtherance thereof. Provided that the Sellers provide Buyer with all necessary payroll records for the calendar year which includes the date on which the Transferred Employee commences employment with Buyer, Buyer, and not the Sellers, shall furnish a Form W-2 to each Transferred Employee, disclosing all wages and other compensation paid for such calendar year, and taxes withheld therefrom.

(n)    Effective as of the Offer Effective Date, Buyer shall assume the collective bargaining agreements listed on Schedule 6.9(a)."

SECTION 1.43.    Section 9.11 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 9.11 Apportionments.

(a) The Sellers and Buyer shall prorate all items of revenue and expense with respect to the Owned Real Property, the Lease Premises, the lease identified in Schedule 1.1(r) and the Sparrow Properties as of the Closing Date with the Sellers being entitled to all revenues and responsible for all fees, costs and expenses accrued or apportioned up to but not

including the Closing Date and Buyer being entitled to all revenues and responsible for all fees, costs and expenses from the Closing Date forward; provided, however, that with respect to the GOB Stores the proration date for each GOB Store will be the date that is the first day after the end of the GOB Period for each such GOB Store.  As used herein, the "Proration Date" shall mean the Closing Date with respect to any Owned Real Property, Lease Premises or Sparrow Property that is not a GOB Store and for any GOB Store shall mean the date that is the first day after the end of the GOB Period for such GOB Store.  In order to effectuate the foregoing the following shall apply:

(i) Wwith respect to Owned Real Properties and any Sparrow Properties that are owned in fee, all rental income will be prorated on a daily basis for the month in which the proration date occurs based on the amounts of rent due for the month in which the Proration Date occurs;

(ii) Wwith respect to all Lease Premises, all Sparrow Properties that are leased, the lease described in Schedule 1.1(r) and all Sparrow Subleases, all rental payments will be prorated on a daily basis for the month in which the proration date occurs based on the amount of rent paid and all rental income will be prorated on a daily basis based on the rental amounts due for the month in which the Proration Date occurs; provided, however, that there shall be no proration of rent with respect to each of SRC O.P. LLC, SRC Facilities LLC and SRC Real Estate (TX), LLC that are "dark" stores as all parties reserve their rights with respect thereto as described in Section 8.9;

(iii) Ffor all Properties and the Sparrow Properties (1) all utilities (including telephone service, water, sewer rents, heat, steam, electric power, gas and CAM payments with respect thereto) will be prorated on a daily basis for the month in which the Proration Date occurs based on the budgeted amounts for each such item set forth in the Sellers' utility plan for each such Property delivered to Buyer prior to the Closing Date (which budgeted amounts shall be based on prior actual use for such Property), (2) payments due under all third party Contracts will be prorated on a daily basis for the month in which the Proration Date occurs based on the amounts due under each such Contract for such month. With respect to all maintenance performed with respect to the Properties and Sparrow Properties in the ordinary course and common area maintenance performed by the Sellers required to be performed by the Sellers under any third-party Contract, to the extent performed by the Sellers the actual third-party costs and expenses incurred by the Sellers with respect to such maintenance will be prorated based on the average amounts thereof for the same calendar month in the past three years for each such respective Property;

(iv) Ffor all Owned Properties, Lease Premises, Sparrow Properties, Sparrow Subleases and the lease described in Schedule 1.1(r) all payments and premiums with respect to property, casualty and liability insurance will be prorated on a daily basis for the month in which the Proration Date occurs based on the amounts paid by the Sellers;

(v) Buyer and Seller shall prorate Property Taxes pursuant to Section 9.2(d), with Seller responsible for the period up to the Closing Date and Buyer

responsible for the Closing Date forward, except; provided, however, that: If if the net amount that would otherwise be paid by Sellers and/or credited to Buyer is in the aggregate $135,000,000 or less, then such amount shall be borne by Buyer as an Assumed Property Tax Liability and no further charge shall be taken into account in the proration schedules with respect to any Property Taxes.  If such amount exceeds $135,000,000 in the aggregate, then Sellers shall be charged for such excess in the prorations, and Buyer shall assume and be responsible for pay directly all unpaid Property Taxes (taking into account the fact that Sellers will have been charged in the prorations for the amount in excess of $135,000,000 of Assumed Property Taxes); and

(vi)  Sellers shall be charged for any the amount of any underlying mechanics' liens with respect to any Potential Acquired Assets (other than Owned Real Property (other those identified in Section 2 of Schedule 6.5). that are not paid, discharged by order of the Bankruptcy Court or bonded over in a manner reasonably acceptable to Buyer; provided, however, that the amount to be prorated pursuant to this subparagraph (vi) shall not be reflected or taken into account in the Initial Proration Schedule or the initial proration but shall be reflected in the Final Proration Schedule.

(b) Nothing contained in this Section 9.11 shall limit or affect any Party's rights or obligations under the Occupancy Agreement or the Seller Retained Occupancy Agreement.

(c) With respect to the Citi L/C Facility, all letter of credit commitment fees shall be prorated on a daily basis for the month in which the Proration Closing Date occurs based on the amounts paid. All amounts unreimbursed as of the Closing Date under the Citi L/C Facility with respect to drawn letters of credit, along with any accrued interest thereon, will be allocated to the Sellers.

(d) The prorations set forth in this Section 9.11 shall be settled as follows:

(i)     the Seller shall provide Buyer, prior to the Closing Date, a schedule setting forth each item to be prorated pursuant to this Section 9.11, including the total amount and a calculation of such proration to be on account or credit to Buyer and the Seller (the "Initial Prorations Schedule");

(ii)    following the Closing, to the extent the Seller receives any additional invoices with respect to items set forth in this Section 9.11, the Seller shall promptly (but in no event more than five (5) Business Days after receipt) deliver all such invoices to Buyer;

(iii)   during the seven (7) Business Day period following the Closing Date, Buyer and Seller shall work in good faith to account for each of the items set forth in the Initial Prorations Schedule (taking into account any additional invoices, payments and requests for payment received during such period) and shall reasonably cooperate to agree to agree on an updated calculation of such prorations to be on account or credit to Buyer and Seller (the "Post-Closing Prorations Schedule");

(iv)      if the net amount of prorations set forth in the Post-Closing Prorations Schedule results in a payment due from Buyer to Seller then Buyer shall make such payment to Seller within one (1-) Business Day after the end of such seven (7) Business Day period following Closing.  If the net amount of prorations set forth in the Updated Prorations Schedule results in a payment due from Seller to Buyer then Seller shall make such payment to Buyer within one (1-) Business Day after the end of such fifteen (15) day period following Closing;

(v)      seventy-five (75) days following the Closing Date, Buyer shall deliver to Seller an updated calculation of the Post-Closing Prorations Schedule setting forth all updated proration items reflecting all invoices and payments received within the period following Closing and accounting for all amounts owed by Buyer and Seller pursuant to the Occupancy Agreement and the Seller Occupancy Agreement (the  "Final Prorations Schedule"); and

(vi)      if the net amount of prorations set forth in the Final Prorations Schedule results in a payment due from Buyer to Seller (taking into account any credit or payment made following the Post-Closing Prorations Schedule) then Buyer shall make such payment to Seller within 1 Business Day after delivery of the Post-Closing Prorations Schedule.  If the net amount of prorations set forth in the Final Prorations Schedule results in a payment due from Seller to Buyer (taking into account any credit or payment made following the Final Prorations Schedule) then Seller shall make such payment to Buyer within 1 Business Day after delivery of the Final Prorations Schedule.

(e) For the avoidance of doubt, (A) to the extent the Seller is obligated to make a payment prior to Closing (including with respect to a Leased Premises) or receives an invoice prior to Closing with respect to any item to be prorated that is due prior to Closing, the Seller shall make such payment and (B) the extent Buyer receives an invoice following Closing, an amount becomes due with respect to an Acquired Asset following Closing, or the Seller receives an invoice prior to Closing that is due and payable following Closing, Buyer shall make all such required payments.  All such payments will be taken into account in the forgoing prorations.  The prorations effected pursuant to this Section 9.11 shall be final and not subject to further adjustment."

SECTION 1.44.      Section 9.13 of the Purchase Agreement is hereby amended as follows:

(a) Section 9.13(b) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(b)      Effective upon the Closing, ESL's Claims against the Debtors arising under (i) the IP/Ground Lease Term Loan Facility; (ii) the FILO Facility; (iii) the Real Estate Loan 2020; (iv) the Second Lien Term Loan; (v) the Second Lien Line of Credit Facility; (vi) the Second Lien PIK Notes and (vii) the Citi L/C Facility (together with the any security interests securing any of the Claims described in the preceding sub-clauses (b)(i)-(vii), collectively, the "ESL Claims") shall each be deemed allowed for all purposes in the Bankruptcy Cases and under the Bankruptcy Code in the amounts set forth on

24

Exhibit G, as reduced by the credit bid set forth in <u>Section 3.1(b)</u>.  The allowance of any ESL Claims shall not limit or preclude any claim under any applicable Law or doctrine of collateral estoppel, res judicata, claim or issue preclusion, or otherwise."

(b) Section 9.13(e) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(e)  For the purposes of this <u>Section 9.13</u>, the terms set out below shall be defined as follows:

(i)     "<u>Debtors</u>" means each of the debtors and debtors in possession in the Bankruptcy Cases, including the Sellers.

(ii)     "<u>Released Estate Claims</u>" means any and all Claims and causes of action of the Debtors and their estates (i) against ESL arising under sections 363(k), 502(a) or 510(c) of the Bankruptcy Code, (ii) against ESL arising under equitable principles of subordination or recharacterization, (iii) against ESL challenging the allowance of the ESL Claims pursuant to Section 9.13(c); or (iv) against Buyer as a subsequent holder of any Claims in respect of the debt described on Exhibit G.  For the avoidance of doubt the Released Estate Claims do not include (a) any Claims or causes of action that are Acquired Assets under any subsection of <u>Section 2.1</u>; or (b) any Claims or causes of action of the Debtors or their estates against ESL or any other Person not specifically described in the preceding sentence, including any Claims or causes of action (i) for constructive or actual fraudulent transfer under 11 U.S.C. 544(b), 548 or 550(a) or any applicable state or federal Law, for breach of fiduciary duty, or for illegal dividend under 8 Del. C. 170-174 or any other state Law (including, but not limited to, any Claims for damages or equitable relief (other than disallowance of the ESL Claims) in connection with the incurrence of any debt described on Exhibit G); (ii) that are related to Lands' End, Inc., the "spin-off" (as such term is defined in the Information Statement of Lands' End, Inc. dated March 18, 2014), Seritage Growth Properties, Inc., Seritage Growth Properties, L.P, or the "Transaction" (as that term is defined in the registration statement on Form S-11 filed by Seritage Growth Properties, which registration statement became effective on June 9, 2015), or (iii) that have been asserted (or may be asserted in connection with these Claims and causes of action) by or on behalf of any party in interest in the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 cases captioned In the Matter of a Plan of Compromise or Arrangement of Sears Canada Inc., 9370-2751 Quebec Inc., 191020 Canada Inc., The Cut Inc., Sears Contact Services Inc., Initium Logistics Services Inc., Initium Commerce Labs Inc., Initium Trading and Sourcing Corp., Sears Floor Covering Centers Inc., 173470 Canada Inc., 2497089 Ontario Inc., 6988741 Canada Inc., 10011711 Canada Inc., 1592580 Ontario Limited, 955041 Alberta Ltd., 4201531 Canada Inc., 168886 Canada Inc., and 3339611 Canada Inc., Ontario Superior Court of Justice

Court File No.: CV-17-11846-00CL; and in the cases captioned Sears Canada Inc., by its Court-appointed Litigation Trustee, J. Douglas Cunningham, Q.C. v. ESL Invs. Inc., *et al.*, Ont. Sup. Ct. J. (Commercial List) No.: CV-18-00611214-00CL; Morneau Shepell Ltd. in its capacity as administrator of the Sears Canada Inc. Registered Pension Plan v. ESL Invs. Inc., *et al.*, Ont. Sup. Ct. J. (Commercial List) No.: CV-18-00611217-00CL; FTI Consulting Canada Inc., in its capacity as Court-appointed monitor in proceedings pursuant to the *Companies' Creditors Arrangement Act*, RSC 1985, c. c-36 v. ESL Invs. Inc., *et al.*, Ont. Sup. Ct. J. (Commercial List) No.: CV-18-00611219-00CL; and 1291079 Ontario Ltd. v. Sears Canada Inc., *et al.*, Ont. Sup. Ct. J. No.: 4114/15CP."

SECTION 1.45.    The following is hereby added as Section 10.11 of the Purchase Agreement:

"Section 10.11    Pay-Down of Real Estate 2020 Loan.  To the extent not previously provided, ~~at least~~ one ~~(1) Business Day prior to~~ the Closing Date, the Sellers shall provide to the agent under the Real Estate 2020 Loan all proceeds from the sale or other disposition of collateral pledged to secure the Real Estate 2020 Loan that were closed prior to the Closing Date, including the proceeds held in a segregated account pursuant to paragraph 27 of the *Order (I) Approving the Sale of Certain Real Property, (II) Authorizing the Assumption and Assignment of Certain Unexpired Leases in Connection therewith, and (III) Granting Related Relief* [Docket No. 1393]."

SECTION 1.46.    Section 11.8 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 11.8    [Reserved]."

SECTION 1.47.    The following Exhibits and Schedules are hereby added to the Purchase Agreement or amended as follows:

(a)    Schedule 1.1(n) of the Purchase Agreement is hereby deleted in its entirety and replaced with Schedule 1.1(n) of Exhibit A of this Amendment;

(b)    Schedule 1.1(m) of the Purchase Agreement is hereby deleted in its entirety and replaced with Schedule 1.1(m) of Exhibit A of this Amendment;

(c)    Schedule 1.1(o) of the Purchase Agreement is hereby deleted in its entirety and replaced with Schedule 1.1(o) of Exhibit A of this Amendment;

(d)    Schedule 1.1(p) of the Purchase Agreement is hereby deleted in its entirety and replaced with Schedule 1.1(p) of Exhibit A of this Amendment;

(e)    "Schedule 1.1(r): Sparrow Master Leases" shall be added as a new Schedule to the Purchase Agreement as set forth on Schedule 1.1(r) of Exhibit A of this Amendment;

(f)    "Schedule 1.1(s): Sparrow Subleases" shall be added as a new Schedule to the Purchase Agreement as set forth on Schedule 1.1(s) of Exhibit A of this Amendment;

(g)    "Schedule 5.1(c)(ii): GOB Sparrow Properties" shall be added as a new Schedule to the Purchase Agreement as set forth on Schedule 5.1(c)(ii) of Exhibit A of this Amendment;

(h)    Schedule 6.6(a)(2) of the Purchase Agreement is hereby deleted in its entirety and replaced with Schedule 6.6(a)(2) of Exhibit A of this Amendment;

(i)    Schedule 6.6(c)(2) of the Purchase Agreement is hereby deleted in its entirety and replaced with Schedule 6.6(c)(2) of Exhibit A of this Amendment;

(j)    "Schedule 9.2: Securities Consideration" shall be added as a new Schedule to the Purchase Agreement as set forth on Exhibit B of this Amendment; and

(k)    Exhibit G of the Purchase Agreement is hereby deleted in its entirety and replaced with Exhibit C of this Amendment.

## ARTICLE II   MISCELLANEOUS

SECTION 2.01.    This Agreement (including the Exhibits), the Confidentiality Agreement and the other Transaction Documents contain all of the terms, conditions and representations and warranties agreed to by the parties hereto relating to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings, negotiations, correspondence, undertakings and communications of the parties hereto or their representatives, oral or written, respecting such subject matter.  The terms of this Amendment shall constitute a waiver of the Purchase Agreement only with respect to the specific amendments herein and shall in no way impair the rights of any Party in any other respect.

SECTION 2.02.    This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered to the other parties hereto.  Delivery of an executed counterpart of a signature page to this Amendment by facsimile, email in "portable document format" (".pdf") form, or by other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing the original signature.

SECTION 2.03.    The signature page of each party to this Amendment who was not a Party to the Purchase Agreement on the date of the Purchase Agreement shall indicate such party's agreement to be bound by all of the terms of the Purchase Agreement as a Seller

thereunder as if such party were a Party on the date of the Purchase Agreement.  In the case of KMart Stores of Illinois LLC, the signature of such party to this Amendment shall also be deemed to replace the signature page for "KMart of Illinois LLC" to the Asset Purchase Agreement.

SECTION 2.04.    Except as otherwise provided herein, the Purchase Agreement shall remain unchanged and in full force and effect.  On and after the date hereof, each reference in the Purchase Agreement to "this Agreement", "herein", "hereof", "hereunder" or words of similar import shall mean and be a reference to the Purchase Agreement as amended hereby, although it shall not alter the dates as of which any provision of the Purchase Agreement speaks.  For example, phrases such as "as of the date hereof" and "as of the date of this Agreement" shall continue to refer to January 17, 2019, the date that the Purchase Agreement was originally executed.

SECTION 2.05.    Article XIII of the Purchase Agreement shall, to the extent not already set forth in this Amendment, apply *mutatis mutandis* to this Amendment.

**[SIGNATURE PAGE FOLLOWS]**

28

IN WITNESS WHEREOF, each of the parties hereto has caused this Amendment to be executed and delivered on its behalf by its duly authorized officer as of the date and year first written above.

**Transform Holdco LLC**

By: _____
Name:
Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Sears Holdings Corporation**


By:  _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Kmart Holding Corporation**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Kmart Operations LLC**

By: _____

Name:

Title:

**Sears Operations LLC**

By: _____

Name:

Title:

**Sears, Roebuck and Co.**


By: _____

Name:

Title:

**ServiceLive, Inc.**


By:                  _____

Name:

Title:

**SHC Licensed Business LLC**


By: _____

Name:

Title:

**A&E Factory Service, LLC**


By: _____

Name:

Title:

**A&E Home Delivery, LLC**

By: _____

Name:

Title:

**A&E Lawn & Garden, LLC**

By: _____

Name:

Title:

**A&E Signature Service, LLC**

By: _____

Name:

Title:

**FBA Holdings Inc.**

By: _____

Name:

Title:

**Innovel Solutions, Inc.**


By: _____

Name:

Title:

**Kmart Corporation**


By: _____

Name:

Title:

**MaxServ, Inc.**

By: _____

Name:

Title:

**Private Brands, Ltd.**


By: _____

Name:

Title:

**Sears Development Co.**

By: _____

Name:

Title:

**Sears Holdings Management Corporation**

By: _____

Name:

Title:

**Sears Home & Business Franchises, Inc.**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Sears Home Improvement Products, Inc.**

By: _____

Name:

Title:

**Sears Insurance Services, L.L.C.**

By: _____

Name:

Title:

**Sears Procurement Services, Inc.**


By: _____

Name:

Title:

**Sears Protection Company**

By: _____

Name:

Title:

**Sears Protection Company (PR), Inc.**

By: _____

Name:

Title:

**Sears Roebuck Acceptance Corp.**


By: _____

Name:

Title:

**Sears, Roebuck de Puerto Rico, Inc.**

By: _____

Name:

Title:

**SYW Relay LLC**

By: _____

Name:

Title:

**Wally Labs LLC**

By: _____

Name:

Title:

**SHC Promotions LLC**


By: _____

Name:

Title:

**Big Beaver of Florida Development, LLC**

By: _____

Name:

Title:

**California Builder Appliances, Inc.**

By: _____

Name:

Title:

**Florida Builder Appliances, Inc.**

By: _____

Name:

Title:

**KBL Holding Inc.**

By: _____

Name:

Title:

**Kmart of Michigan, Inc.**

By: _____

Name:

Title:

**Kmart of Washington LLC**

By: _____

Name:

Title:

**Kmart Stores of Illinois LLC**


By: _____

Name:

Title:

**Kmart Stores of Texas LLC**


By: _____

Name:

Title:

**MyGofer LLC**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Sears Brands Business Unit Corporation**


By: _____

Name:

Title:

**Sears Holdings Publishing Company, LLC**

By: _____

Name:

Title:

**Sears Protection Company (Florida), L.L.C.**

By: _____

Name:

Title:

**SHC Desert Springs, LLC**

By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**SOE, Inc.**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**StarWest, LLC**


By: _____

Name:

Title:

**STI Merchandising, Inc.**


By: _____

Name:

Title:

**Troy Coolidge No. 13, LLC**

By: _____

Name:

Title:

**BlueLight.com, Inc. .**

By: _____

Name:

Title:

**Sears Brands, L.L.C.**


By: _____

Name:

Title:

**Sears Buying Services, Inc.**

By: _____

Name:

Title:

**Kmart.com LLC**


By: _____

Name:

Title:

**Sears Brands Management Corporation**

By: _____

Name:

Title:

**KLC, Inc.**


By: _____

Name:

Title:

**SRe Holding Corporation**

By: _____

Name:

Title:

**SRC Sparrow 2 LLC**


By: _____

Name:

Title:

**Sears Reinsurance Company Ltd.**

By: _____

Name:

Title:

      Its duly authorized officer

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Troy Coolidge No. 30, LLC**

By: _____

Name:

Title:

Its duly authorized officer

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Troy Coolidge No. 42, LLC**


By: _____

Name:

Title:

                    Its duly authorized officer


*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

## EXHIBIT A

**REAL ESTATE SCHEDULES**

*Attached.*

## EXHIBIT B

**SCHEDULE 9.2: SECURITIES CONSIDERATION**

*Attached.*

## EXHIBIT C

**EXHIBIT G: CREDIT BID RELEASE EXHIBIT**

*Attached.*

| Summary report: Litéra® Change-Pro TDC 10.1.0.800 Document comparison done on 2/7/2019 5:48:57 PM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Transform - Amendment No. 1 to Asset Purchase Agreement (CGSH Draft 2.7.2019).DOCX | |
| **Modified filename:** Project Blue - APA Amendment No. 1 (Weil Comments 02.07.19)_WEIL_96909476_2.DOCX | |
| **Changes:** | |
| Add | 25 |
| Delete | 24 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 2 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 51 |

# AMENDMENT NO. 1 TO

# ASSET PURCHASE AGREEMENT

This Amendment No. 1, dated as of February [●], 2019 (this "Amendment"), to the Asset Purchase Agreement (the "Purchase Agreement"), dated as of January 17, 2019, by and among Transform Holdco LLC, a Delaware limited liability company (together with any applicable Affiliated Designee, "Buyer"), Sears Holdings Corporation ("SHC" or the "Seller" and together with each of its Subsidiaries party to the Purchase Agreement, the "Sellers") is entered into by and among Buyer and each Seller.  Terms capitalized but not defined herein shall have the meanings given to such terms in the Purchase Agreement.

WHEREAS, Buyer and the Sellers have previously entered into the Purchase Agreement pursuant to which, among other things, Buyer will acquire the Acquired Assets and assume the Assumed Liabilities on the terms and subject to the conditions set forth in the Purchase Agreement; and

WHEREAS, Buyer and the Sellers desire to amend the Purchase Agreement in accordance with Section 13.3 of the Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing, the representations, warranties, covenants and agreements set forth in the Purchase Agreement and this Amendment, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE I    AMENDMENTS

SECTION 1.01.        Section 1.1 of the Purchase Agreement is amended as follows:

(a) The definition of "Acquired Inventory" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Acquired Inventory" shall mean (i) with respect to any Operating Leased Property, all Inventory which is located at, on or in transit to the applicable Operating Lease Property as of the Closing Date, (ii) with respect to any Operating Owned Property, all Inventory which is located at, on or in transit to the Operating Owned Property as of the Closing Date, (iii) with respect to any IP/Ground Lease Property, all Inventory which is located at, on or in transit to the IP/Ground Lease Property as of the Closing Date, (iv) with respect to any Operating Sparrow Properties, all Inventory located at, on or in transit to the Operating Sparrow Properties, and (v) all other Inventory Related to the Business other than Inventory included in clause (ii) of the definition of Excluded Inventory.

(b) The definition of "Buyer Party Release" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety.

the first day after the end of the GOB Period for such GOB Store.  In order to effectuate the foregoing the following shall apply:

(i) ~~W~~with respect to Owned Real Properties and any Sparrow Properties that are owned in fee, all rental income will be prorated on a daily basis for the month in which the proration date occurs based on the amounts of rent due for the month in which the Proration Date occurs;

(ii) ~~W~~with respect to all Lease Premises, all Sparrow Properties that are leased, the lease described in <u>Schedule 1.1(r)</u> and all Sparrow Subleases, all rental payments will be prorated on a daily basis for the month in which the proration date occurs based on the amount of rent paid and all rental income will be prorated on a daily basis based on the rental amounts due for the month in which the Proration Date occurs; <u>provided</u>, <u>however</u>, that there shall be no proration of rent with respect to each of SRC O.P. LLC, SRC Facilities LLC and SRC Real Estate (TX), LLC that are "dark" stores as all parties reserve their rights with respect thereto as described in <u>Section 8.9</u>;

(iii) ~~F~~for all Properties and the Sparrow Properties (1) all utilities (including telephone service, water, sewer rents, heat, steam, electric power, gas and CAM payments with respect thereto) will be prorated on a daily basis for the month in which the Proration Date occurs based on the budgeted amounts for each such item set forth in the Sellers' utility plan for each such Property delivered to Buyer prior to the Closing Date (which budgeted amounts shall be based on prior actual use for such Property), (2) payments due under all third party Contracts will be prorated on a daily basis for the month in which the Proration Date occurs based on the amounts due under each such Contract for such month. With respect to all maintenance performed with respect to the Properties and Sparrow Properties in the ordinary course and common area maintenance performed by the Sellers required to be performed by the Sellers under any third-party Contract, to the extent performed by the Sellers the actual third-party costs and expenses incurred by the Sellers with respect to such maintenance will be prorated based on the average amounts thereof for the same calendar month in the past three years for each such respective Property;

(iv) ~~F~~for all Owned Properties, Lease Premises, Sparrow Properties, Sparrow Subleases and the lease described in <u>Schedule 1.1(r)</u> all payments and premiums with respect to property, casualty and liability insurance will be prorated on a daily basis for the month in which the Proration Date occurs based on the amounts paid by the Sellers;

(v) Buyer and Seller shall prorate Property Taxes pursuant to <u>Section 9.2(d)</u>, with Seller responsible for the period up to the Closing Date and Buyer responsible for the Closing Date forward~~, except~~; provided, however, that~~: If~~ if the net amount that would otherwise be paid by Sellers <u>and</u>/or credited to Buyer is <u>in the aggregate</u> $135,000,000 or less, then such amount shall be borne by Buyer as an Assumed Property Tax Liability and no further charge shall be taken into account in the proration schedules <u>with respect to any Property Taxes</u>. If such amount exceeds $135,000,000 <u>in the aggregate</u>, then Sellers shall be charged for such excess in the

prorations, and Buyer shall assume and ~~be responsible for~~pay directly all unpaid Property Taxes (taking into account the fact that Sellers will have been charged in the prorations for the amount in excess of $135,000,000 of Assumed Property Taxes); and

(vi)  Sellers shall be charged for ~~any~~the amount of any underlying mechanics' liens with respect to any ~~Potential Acquired Assets (other than~~Owned Real Property (other those identified in Section 2 of Schedule 6.5)~~.~~ that are not paid, discharged by order of the Bankruptcy Court or bonded over in a manner reasonably acceptable to Buyer; provided, however, that the amount to be prorated pursuant to this subparagraph (vi) shall not be reflected or taken into account in the Initial Proration Schedule or the initial proration but shall be reflected in the Final Proration Schedule.

(b) Nothing contained in this Section 9.11 shall limit or affect any Party's rights or obligations under the Occupancy Agreement or the Seller Retained Occupancy Agreement.

(c) With respect to the Citi L/C Facility, all letter of credit commitment fees shall be prorated on a daily basis for the month in which the ~~Proration~~Closing Date occurs based on the amounts paid. ~~All amounts unreimbursed as of the Closing Date under the Citi L/C Facility with respect to drawn letters of credit, along with any accrued interest thereon, will be allocated to the Sellers.~~

(d) The prorations set forth in this Section 9.11 shall be settled as follows:

(i)    the Seller shall provide Buyer, prior to the Closing Date, a schedule setting forth each item to be prorated pursuant to this Section 9.11, including the total amount and a calculation of such proration to be on account or credit to Buyer and the Seller (the "Initial Prorations Schedule");

(ii)    following the Closing, to the extent the Seller receives any additional invoices with respect to items set forth in this Section 9.11, the Seller shall promptly (but in no event more than five (5) Business Days after receipt) deliver all such invoices to Buyer;

(iii)    during the seven (7) Business Day period following the Closing Date, Buyer and Seller shall work in good faith to account for each of the items set forth in the Initial Prorations Schedule (taking into account any additional invoices, payments and requests for payment received during such period) and shall reasonably cooperate to agree to agree on an updated calculation of such prorations to be on account or credit to Buyer and Seller (the "Post-Closing Prorations Schedule");

(iv)    if the net amount of prorations set forth in the Post-Closing Prorations Schedule results in a payment due from Buyer to Seller then Buyer shall make such payment to Seller within one (1~~-~~) Business Day after the end of such seven (7) Business Day period following Closing.  If the net amount of prorations set forth in the Updated Prorations Schedule results in a payment due from Seller to Buyer then Seller shall make such payment to Buyer within one (1~~-~~) Business Day after the end of such fifteen (15) day period following Closing;

23

Inc., in its capacity as Court-appointed monitor in proceedings pursuant to the *Companies' Creditors Arrangement Act*, RSC 1985, c. c-36 v. ESL Invs. Inc., *et al.*, Ont. Sup. Ct. J. (Commercial List) No.: CV-18-00611219-00CL; and 1291079 Ontario Ltd. v. Sears Canada Inc., *et al.*, Ont. Sup. Ct. J. No.: 4114/15CP."

SECTION 1.45.    The following is hereby added as Section 10.11 of the Purchase Agreement:

"Section 10.11    Pay-Down of Real Estate 2020 Loan.  To the extent not previously provided, at least one (1) Business Day prior to the Closing Date, the Sellers shall provide to the agent under the Real Estate 2020 Loan all proceeds from the sale or other disposition of collateral pledged to secure the Real Estate 2020 Loan that were closed prior to the Closing Date, including the proceeds held in a segregated account pursuant to paragraph 27 of the *Order (I) Approving the Sale of Certain Real Property, (II) Authorizing the Assumption and Assignment of Certain Unexpired Leases in Connection therewith, and (III) Granting Related Relief* [Docket No. 1393]."

SECTION 1.46.    Section 11.8 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 11.8    [Reserved]."

SECTION 1.47.    The following Exhibits and Schedules are hereby added to the Purchase Agreement or amended as follows:

(a)    Schedule 1.1(n) of the Purchase Agreement is hereby deleted in its entirety and replaced with Schedule 1.1(n) of Exhibit A of this Amendment;

(b)    Schedule 1.1(m) of the Purchase Agreement is hereby deleted in its entirety and replaced with Schedule 1.1(m) of Exhibit A of this Amendment;

(c)    Schedule 1.1(o) of the Purchase Agreement is hereby deleted in its entirety and replaced with Schedule 1.1(o) of Exhibit A of this Amendment;

(d)    Schedule 1.1(p) of the Purchase Agreement is hereby deleted in its entirety and replaced with Schedule 1.1(p) of Exhibit A of this Amendment;

(e)    "Schedule 1.1(r): Sparrow Master Leases" shall be added as a new Schedule to the Purchase Agreement as set forth on Schedule 1.1(r) of Exhibit A of this Amendment;

(f)    "Schedule 1.1(s): Sparrow Subleases" shall be added as a new Schedule to the Purchase Agreement as set forth on Schedule 1.1(s) of Exhibit A of this Amendment;

**Troy Coolidge No. 30, LLC**

By:                                    _____

Name:

Title:

　　　　　　　Its duly authorized officer

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Troy Coolidge No. 42, LLC**


By: _____

Name:

Title:

          Its duly authorized officer

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*