# Exhibit 24

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

One Liberty Plaza
New York, NY 10006-1470
T: +1 212 225 2000
F: +1 212 225 3999

clearygottlieb.com

WASHINGTON, D.C. · PARIS · BRUSSELS · LONDON · MOSCOW
FRANKFURT · COLOGNE · ROME · MILAN · HONG KONG
BEIJING · BUENOS AIRES · SÃO PAULO · ABU DHABI · SEOUL

VICTOR I. LEWKOW
LEE C. BUCHHEIT
THOMAS J. MOLONEY
DAVID G. SABEL
JONATHAN I. BLACKMAN
YARON Z. REICH
RICHARD S. LINCER
JAMES A. DUNCAN
STEVEN M. LOEB
CRAIG B. BROD
NICOLAS GRABAR
CHRISTOPHER E. AUSTIN
HOWARD S. ZELBO
DAVID E. BRODSKY
ARTHUR H. KOHN
RICHARD J. COOPER
JEFFREY S. LEWIS
PAUL J. SHIM
STEVEN L. WILNER
ERIKA W. NIJENHUIS
ANDRES DE LA CRUZ
DAVID C. LOPEZ
JAMES L. BROMLEY
MICHAEL A. GERSTENZANG
LEWIS J. LIMAN
LEV L. DASSIN
NEIL Q. WHORISKEY
JORGE U. JUANTORENA
MICHAEL D. WEINBERGER
DAVID LEINWAND
DIANA L. WOLLMAN
JEFFREY A. ROSENTHAL
ETHAN A. KLINGSBERG
MICHAEL D. DAYAN
CARMINE D. BOCCUZZI, JR.
JEFFREY D. KARPF
KIMBERLY BROWN BLACKLOW
ROBERT J. RAYMOND
SUNG K. KANG
LEONARD C. JACOBY

SANDRA L. FLOW
FRANCISCO L. CESTERO
FRANCESCA L. ODELL
WILLIAM L. MORAE
JASON FACTOR
JOON H. KIM
MARGARET S. PEPONIS
LISA M. SCHWEITZER
JUAN G. GIRÁLDEZ
DUANE MCLAUGHLIN
BREON S. PEACE
MEREDITH E. KOTLER
CHANTAL E. KORDULA
BENET J. O'REILLY
ADAM E. FLEISHER
SEAN A. O'NEAL
GLENN P. MCGRORY
MATTHEW P. SALERNO
MICHAEL J. ALBANO
VICTOR L. HOU
ROGER A. COOPER
AMY R. SHAPIRO
JENNIFER KENNEDY PARK
ELIZABETH LENAS
LUKE A. BAREFOOT
PAMELA L. MARCOGLIESE
PAUL M. TIGER
JONATHAN S. KOLODNER
DANIEL ILAN
MEYER H. FEDIDA
ADRIAN R. LEIPSIC
ELIZABETH VICENS
ADAM J. BRENNEMAN
ARI D. MACKINNON
JAMES E. LANGSTON
JARED GERBER
COLIN D. LLOYD
COREY M. GOODMAN
RISHI ZUTSHI
JANE VANLARE

DAVID H. HERRINGTON
KIMBERLY R. SPOERRI
AARON J. MEYERS
DANIEL C. REYNOLDS
ABENA A. MAINOO
HUGH C. CONROY, JR.
JOSEPH LANZKRON
MAURICE R. GINDI
KATHERINE R. REAVES
RAHUL MUKHI
    RESIDENT PARTNERS

SANDRA M. ROCKS
S. DOUGLAS BORISKY
JUDITH KASSEL
DAVID E. WEBB
PENELOPE L. CHRISTOPHOROU
BOAZ S. MORAG
MARY E. ALCOCK
HEIDE H. ILGENFRITZ
KATHLEEN M. EMBERGER
WALLACE L. LARSON, JR.
AVRAM E. LUFT
ANDREW WEAVER
HELENA K. GRANNIS
JOHN V. HARRISON
CAROLINE F. HAYDAY
NEIL R. MARKEL
HUMAYUN KHALID
KENNETH S. BLAZEJEWSKI
ANDREA M. BASHAM
LAURA BAGARELLA
SHIRLEY M. LO
JONATHAN D.W. GIFFORD
SUSANNA E. PARKER
    RESIDENT COUNSEL

LOUISE M. PARENT
    OF COUNSEL

D: +1 212 225 2264
jbromley@cgsh.com

January 7, 2019

BY EMAIL

Board of Directors
Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, Illinois  60179

Re:  Going Concern Sale/Liquidation

Dear Sir/Madam:

This firm represents ESL Investments, Inc. and its affiliates (including JPP, LLC and JPP II, LLC) and Mr. Edward S. Lampert (together, "ESL"), which submitted a series of proposals to purchase on a going concern basis substantially all of the operating assets of Sears Holdings Corporation ("SHC") and certain of its debtor affiliates, all of which are debtors and debtors-in-possession (collectively, the "Debtors").

As set forth in detail below, ESL hereby demands that the Board of Directors of SHC (the "Board") immediately override the decision of the Subcommittee of the Restructuring Committee of the Board (the "Subcommittee") to reject ESL's improved going concern bid referred to below to prevent an imminent breach of fiduciary duties, work to formalize and qualify that proposal and move forward with the auction contemplated by the Bidding Procedures Order.  In the event that the Board does not override the Subcommittee's decision, ESL will have no choice but to commence litigation on an expedited basis to hold the relevant members of the Board and the Subcommittee responsible for their breaches of fiduciary duties.

As the Board is aware, ESL is the Debtors' largest creditor, having lent the Debtors more than $2.6 billion, of which more than $2.4 billion is secured by valid and enforceable security interests over much of the Debtors' assets.  On January 4, 2019, ESL filed 236 proofs of claim memorializing its claims against the Debtors.  In addition, Cascade, as agent, filed 12 proofs of

Cleary Gottlieb Steen & Hamilton LLP or an affiliated entity has an office in each of the cities listed above.

JX 025-1

Board of Directors, p. 2

claim memorializing additional claims against the Debtors in which ESL holds approximately 87% of the economic exposure.

As the Board is further aware, ESL has expended substantial resources in its efforts to submit a going concern bid. ESL structured and offered to provide a junior debtor-in-possession financing facility (a "Junior DIP"), which served as the (uncompensated) stalking horse for Great American and for the eventual Junior DIP provided by Cyrus. ESL has conducted substantial due diligence, engaged in extensive good faith negotiations with the Debtors, the Subcommittee and their respective advisors, and expended millions of dollars attempting to reach agreement on the terms of a going concern bid.

In addition, ESL has produced hundreds of thousands of pages of documents to the Subcommittee on a voluntary basis and made Mr. Lampert and Mr. Kamlani, its two most senior executives, available for full day interviews in connection with the Subcommittee's investigation. ESL refutes the allegations made by the Subcommittee's advisors that there are colorable claims against ESL and is confident that there will never be a finding of liability against ESL. In any event, the theories underlying the purported claims alleged against ESL actually concern the appropriateness of the conduct of the Board generally (not limited to ESL), the committees of independent directors that approved the relevant transactions, and the advisors to the Board and such committees.

Throughout this process, ESL has stated consistently its belief in Sears, its belief in the future of Sears and in its steadfast dedication to saving this iconic American retailer and the nearly 50,000 jobs that it provides to Americans across the country. In pursuit of its goal of consummating a going concern bid, ESL assembled and submitted a compelling and actionable bid by the December 28, 2018 deadline set forth in the Bidding Procedures Order (as set forth in more detail in the letter from ESL to Lazard Frères & Co. LLC dated December 28, 2018, the "December 28 Bid"). Among other things, the December 28 Bid included a commitment from three leading financial institutions for up to $1.3 billion of asset backed financing for "new" Sears, provided a basis to resolve virtually all secured claims against the Debtors, and would have preserved a substantial store footprint for Sears and continued employment opportunities for tens of thousands employees.

ESL strongly believes that the December 28 Bid, as submitted, should have been designated a "Qualified Bid" as defined in the Bidding Procedures. Representatives of ESL, including its Chief Executive Officer (Mr. Lampert), met with three of the four members of the Special Committee, including both members of the Subcommittee, and their respective advisors for three hours in the early evening of January 2, 2019 at the offices of Weil Gotshal & Manges LLP to discuss ESL's going concern proposal. A few hours after that meeting concluded, ESL was informed by representatives of the Debtors and the Subcommittee that the December 28 Bid would not be designated a qualified bid and advised that ESL would need to improve its proposal in at least four "threshold" respects. ESL was also advised that a chambers conference was scheduled with the Bankruptcy Court for the afternoon of January 4, 2019.

After further discussions on January 3, 2019, ESL worked to respond to those four issues. The first issue, which related to the availability of the ABL financing, was resolved after several discussions among ESL, the Debtors and their respective advisors. The second issue involved a

Board of Directors, p. 3

$30 million difference in the deposit, seemed capable of prompt resolution in the event that the other issues were resolved. After further discussions with the Debtors, ESL proposed on January 4, 2019 to resolve the remaining two issues, the responsibility for paying what was described as $450 million in administrative claims and the release requested by ESL as part of its proposal, by agreeing to assume approximately $225 million of administrative liabilities.

Despite these very material improvements, counsel for the Debtors informed counsel for ESL that the improved going concern proposal had also been rejected. ESL's counsel then attended the January 4 chambers conference, at which the Debtors' counsel stated in the presence of the Bankruptcy Court that despite the rejection of its most recent proposal, ESL should remain engaged in the process.

Again, notwithstanding ESL's even stronger belief that both the December 28 Bid and the substantially improved proposal should be qualified, ESL made a further improved proposal on the evening of January 5, 2019. The January 5 proposal included the assumption by ESL of "cure costs" in respect of contracts and leases that would be assumed as part of the going concern proposal. Although such cure costs were estimated to be as much as $180 million, ESL's January 5 proposal did not set any cap on such obligations. Repeating the now disheartening pattern, late in the afternoon of January 6, 2019, ESL was told that its further improved going concern proposal would not be qualified under the Bidding Procedures.

In rejecting the January 6 proposal, the primary rationale given by the Subcommittee and its representatives was that ESL's improved bid, if accepted, would not provide "complete assurance" that the Debtors would remain administratively solvent because there was some risk that the remaining assets of the estates would not be sufficient to satisfy the remaining administrative liabilities. As a result, ESL was advised that its bid could be qualified only if ESL assumed this risk and "backstopped" the payment of all administrative claims, estimated to be approximately $335 million. In a final attempt to bridge the gap, ESL proposed today to acquire certain assets and assume $257 million of additional administrative liabilities, including severance obligations and section 503(b)(9) obligations. With these additional modifications, ESL improved its December 28 Bid by taking responsibility for an additional $482 million in administrative claims, plus cure costs relating to assumed contracts in an uncapped amount. By this proposal, ESL clearly satisfied the Subcommittee's previously stated "threshold" issue of providing for payment of $450 million in administrative liabilities. Nevertheless, the Subcommittee rejected this still further improved proposal, again citing a concern about administrative solvency.

This oft-stated concern is unfounded for several reasons.

First, the January 7 proposal should not leave the Debtors administratively insolvent. When these cases were filed, the Debtors, with the consent of senior secured lenders, including ESL, agreed to establish a wind-down reserve of $240 million to avoid the risk of administrative insolvency. This wind-down reserve, managed prudently, particularly if the estates provide appropriate oversight of professionals' fees, should be more than enough to assure administrative solvency. Furthermore, we are confident that that the evidence will demonstrate that even in a going concern sale predicated on ESL's January 7 proposal, the Debtors should have reasonable assurance that the estates will remain administratively solvent. Quite simply, it would be a

**JX 025-3**

Board of Directors, p. 4

terrible tragedy if Sears were to liquidate, with the attendant loss of tens of thousands of jobs and enormous value, as a result of a poorly managed wind-down or reckless reliance on inaccurate projections. In addition, the determination as to the possibility of administrative solvency should be made by management and the team from M-III Partners, who are most familiar with the numbers, and not the Subcommittee, which on this issue faces an insurmountable conflict described below.

This situation stands in stark contrast with the situation in Toys R Us. In Toys, the company plunged headlong into the holiday season with grand plans of a prompt emergence backed by billions in DIP loans and billions in new trade credit, only to find itself commencing a complete liquidation in the US by early March, with the main US operating entity administratively insolvent (administrative creditors at Toys R Us Delaware, Inc. are estimated to recover approximately 42 cents on the dollar). Here, the process from the beginning has focused on the narrow window available for a going concern transaction and the need for a wind-down reserve. Unlike Toys, where there was no going concern bid, the Debtors have a viable and fully funded going concern bid.

<u>Second</u>, even if there were a possibility that ESL's going concern proposal would leave the Debtors administratively insolvent, there is no alternative available to the Debtors that would lead to a better result for the Debtors or their creditors. Strikingly, the Subcommittee and its advisors have never advised that a piecemeal liquidation, the only real alternative to ESL's going concern proposal, would yield anywhere near the value that would be obtained by the January 7 proposal. Rather, every other alternative will yield a result that is materially worse for the Debtors' creditors and, in such circumstances, courts have recognized that administrative insolvency, while not favored, does not prevent approval of a going concern sale under section 363 of the Bankruptcy Code. The best overall result should be pursued, even if administrative insolvency may result.[1] In fact, given that a chapter 7 trustee is empowered to sell assets under section 363,[2] there is simply no argument that administrative solvency is a *sine qua non* for approval of a going concern bid.

To this end, the Debtors and, in particular, the Subcommittee, which is in control of the decision given its mandate, must focus on achieving the resolution of these cases that will maximize the value of the Debtors' assets. The proposition is quite simple – the Debtors have a duty to pursue the transaction that maximizes value. Period.

Under this standard, the January 7 proposal is far and away the best alternative for the Debtors. There is simply no comparison between ESL's going concern proposal and any other option. The going concern proposal is the only one that will satisfy, in full, nearly all of the Debtors' senior secured debt – the DIP Loan (the rolled-up $1.2 billion pre-petition ABL loan as well as the $300 million of post-petition incremental financing), the Junior DIP Loan, the FILO

---

[1] *See In re ICL Holding Co.*, 802 F.3d 547 (3d Cir. 2015); *In re Real Mex Rests., Inc.*, No. 11-13122-BLS, Hr'g Tr., Dkt. No. 93 at 192 (Bankr. D. Del. Feb. 10, 2012) ("[W]hile I recognize that there is an administrative insolvency at present in this case, and I have noted my hope and expectation with respect to the, frankly, improvement via a sale in the prospects for all creditors in this case, I believe that it would be much worse, and the administrative insolvency and the circumstances for all creditors would be much worse without this sale."); *In re Allen Family Foods, Inc.*, No. 11-11764-KJC, Hr'g Tr., Dkt. No. 225 at 44 (Bankr. D. Del. July 27, 2011).

[2] 11 U.S.C. § 363(b), (c)1; *see also In re Mejia*, 576 B.R. 464, 468-69 and 471 (Bankr. S.D.N.Y. 2017) (Glenn, J.).

**JX 025-4**

Board of Directors, p. 5

Facility, the IP/GL Facility, the Dove and Sparrow real estate facilities, and the Second Lien Loans. To fund the bid, ESL has raised $1.3 billion from three leading banks, ESL and Cyrus are adding an additional $175 million in incremental real estate loans, and ESL has committed to invest more than $200 million to buy out the senior lenders in several separate loan facilities, including Cascade, Kawa, Cyrus and Great American.

Third, the January 7 going concern proposal also is the best result for *all* of the Debtors' creditors, not just for the administrative creditors, which include retained professionals and the members of the Subcommittee themselves. It will eliminate the burden of billions of dollars of claims on the Debtors' estates, it will employ nearly 50,000 people and avoid the severance and similar claims that would arise if those employees were needlessly terminated, it would prevent claims from the rejection of real estate leases, and it would assume substantial claims of trade creditors.

Fourth, a rejection of the ESL proposal violates the very real duties that the Board and the Subcommittee owe to ESL and to Cyrus, which is participating in the bid, both of which are the Debtors' largest senior secured creditors. Based on extensive conversations with the advisors to the Debtors and the Subcommittee, all senior creditors – other than ESL and Cyrus – will be treated virtually the same (and are thus indifferent to the form of a resolution) under a liquidation or a going concern proposal. Moreover, the liquidation scenarios shared with ESL are hopelessly wrong, ignoring the hundreds of millions of dollars owed to ESL and Cyrus in respect of adequate protection replacement liens and superpriority claims under 507(b), which must be paid before general administrative claims. The Board and the Subcommittee cannot simply ignore the very real interests of their largest senior secured creditors, particularly on the basis of made up numbers.

While administrative solvency is important, it cannot be a myopic goal, particularly one that obscures logic and prevents the acceptance of the clearly superior going concern proposal. It is quite clear that the mere possibility of an administrative solvency on which the Subcommittee is focused is predicated on successful litigation against ESL on multiple fronts. There is not any question that ESL lent the Debtors over $2.6 billion, that each loan was approved by independent directors supported by their selected independent financial and legal advisors, and that all of the liens supporting ESL's secured debt are valid and perfected. Success in litigation therefore lies in what would be a lengthy, expensive and highly speculative attack on multiple transactions against the Debtors' largest creditor. The only thing that is certain from that approach is the feeding frenzy of professional fees that will result. That is not a prudent basis on which to predicate administrative solvency. That is casino gambling at its worst, particularly when ESL's proposal contains a very rich settlement offer made in the hope of facilitating a commercial resolution proffered only in the context of saving Sears.

The decision to reject the going concern proposal is simply not a decision that is consistent with the fiduciary duties that the members of the Subcommittee owe to the Debtors' creditors, including the Debtors' largest creditors, ESL and Cyrus. First, the rejection of the going concern proposal violates the duty of care, because it guarantees that the Debtors' largest creditor, ESL, will receive a materially lower recovery on its claims than if the January 7 proposal were accepted. Second, and more importantly, the rejection of the going concern proposal violates the duty of loyalty because the Subcommittee's focus on administrative

Board of Directors, p. 6

solvency is a thinly disguised requirement that the members of the Subcommittee receive releases from the ramifications of their reckless decision to reject the going concern proposal, releases that would be provided through a confirmed chapter 11 plan of reorganization. Because a confirmed plan would not be possible without the administrative solvency required by 11 U.S.C. §1129(a)(9)(A), the Subcommittee is requiring unreasonable assurances of administrative solvency. Its members are hopelessly conflicted.

      In light of the foregoing, ESL hereby demands that the Board immediately override the decision of the Subcommittee to reject the January 7 going concern proposal to prevent an imminent breach of fiduciary duties, work to formalize and qualify that proposal and conduct the auction on the basis of the qualified bids received by December 28, 2018 bid deadline. In the event that the Board does not immediately override the Subcommittee's decision, ESL will have no choice but to commence litigation on an expedited basis to hold the Board and the Subcommittee responsible for their breaches of fiduciary duties.

                                Very truly yours,

                                */s/ James L. Bromley*

                                James L. Bromley

cc:   Ray C. Schrock, P.C.
       Paul M. Basta
       Scott K. Charles

**JX 025-6**