# Exhibit 32

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION**, *et al.*, | : | |
| | : | **Case No. 18-23538 (RDD)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

-----------------------------------------------------------------x

## <u>DECLARATION OF WILLIAM L. TRANSIER</u>

I, William L. Transier, make this declaration under 28 U.S.C. § 1746:

1. I submit this declaration ("**Declaration**") in support of entry of the *Revised Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Leases in Connection Therewith, and (IV) Granting Related Relief* ("**Revised Proposed Sale Order**").[1]

2. Except as otherwise indicated, all statements in this Declaration are based on my personal experience and knowledge, my opinions based on my experience, my discussion with the Debtors' management and professionals, and my review of the relevant documents. If called to testify, I could and would testify competently to each of the facts set forth in this

---

[1] Capitalized terms used in this Declaration but not otherwise defined have the meanings given to them in the Revised Proposed Sale Order.

**JX 040-1**

Declaration.  I am authorized to submit this Declaration on behalf of the Restructuring

Committee (defined below) for the Debtors.[2]

## I.    **Background and Qualifications**[3]

3.    I am the founder and CEO of Transier Advisors LLC, an independent

financial restructuring and advisory firm providing operational improvement, turnaround,

restructuring, and executive leadership services to distressed companies.  I have extensive

management and board leadership experience, including serving as an independent director in

roles such as non-executive chairman, lead director, and audit and compensation committee's

chairman, as well as on special committees.

4.    I have held these management and leadership roles for a variety of

corporations, including debtors in large, complex chapter 11 cases.  These roles include, by way

of example, serving as an independent director of:  (a) Gastar Exploration Inc. from August 2018

to January 2019;  (b) Waypoint Leasing Holdings Ltd. since June 2018;  (c) Helix Energy

Solutions Group, Inc. since September 2000;  (d) Westinghouse Electric Company, LLC since

---

[2] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[3] Additional information regarding my background and qualifications can be found in my resume, attached to this Declaration as "**Exhibit A**."

JX 040-2

March 2017; (e) Stonegate Production LLC since May 2016; (f) Brock Group Inc. from July 2017 to November 2017; (g) Cal Dive International Corporation from 2008 to December 2012; (h) Paragon Offshore PLC from 2014 to 2017; (i) Reliant Energy Inc. from 2002 to 2007; (j) CHC Group Ltd. from May 2016 to May 2017; and (k) Country Fresh Acquisition Corp. from January 2019 to the present.

## II.     The Restructuring Committee

### A.     Committee Appointments and Responsibilities

5.      On or about October 7, 2018, without disclosing the name of the company, Ray Schrock of Weil, Gotshal & Manges LLP ("**Weil**") asked whether I was interested in joining the board as an independent director of a retail company.  Soon after expressing my interest and sending him my updated background information, I was interviewed by Tom Tisch, the chairman of the nominating and governance committee for the board of directors (the "**Board**") of Sears Holdings Corporation ("**Sears**" or the "**Company**") and subsequently invited to join the Board and a Restructuring Committee comprised solely of independent directors ("**Restructuring Committee**") by one of its members, Alan Carr.

6.      On October 10, 2018, in anticipation of the need to file the Chapter 11 Cases, the Sears Board formed the Restructuring Committee.  I was appointed and formally joined the Board and the Restructuring Committee as an independent director on October 11, 2018, to help guide the Debtors' restructuring process.

7.      Prior to joining the Restructuring Committee, I did not have any association or interactions with Eddie Lampert ("**Lampert**"), Kunal Kamlani ("**Kamlani**"), President of ESL Investments, Inc. ("**ESL**"), or any other ESL management or leadership.

**JX 040-3**

8.      The Restructuring Committee was charged with, among other things: (a) considering, evaluating and, if it deemed it to be in the best interests of Sears, recommending to the Board that Sears enter into a transaction not involving ESL, or authorizing and approving a transaction involving ESL; (b) overseeing the provision of confidential information by or on behalf of Sears and its subsidiaries to third parties under cover of an appropriate confidentiality arrangement; (c) overseeing discussions and negotiations with Sears' stakeholders with respect to a restructuring transaction and the implementation and execution of such a transaction; (d) overseeing the work of the Chief Restructuring Officer[4] who reports to the Restructuring Committee; and (e) such other actions considered by the Restructuring Committee to be necessary or desirable to carry out its mandate, subject, as appropriate (where not exclusively delegated to the Restructuring Subcommittee), to the approval of the Board.  The three other members of the Restructuring Committee are Alan J. Carr, Paul G. DePodesta, and Ann N. Reese.

9.      In addition to my appointment to serve as an independent director of the Board and the Restructuring Committee, I also was appointed to serve as a member of the Subcommittee of the Restructuring Committee ("**Restructuring Subcommittee**").   The Restructuring Subcommittee, comprised exclusively of Alan Carr and myself, was formed and specifically authorized to, among other things, investigate potential claims of the Debtors against ESL and, with respect to a restructuring transaction, determine any bidder's (including ESL's) ability to credit bid and the Debtors' ability to provide releases in any such transaction.  For

---

[4] On October 10, 2018, the Board authorized the retention of M-III Advisory Partners, LP and, specifically, Mohsin Y. Meghji, as Chief Restructuring Officer ("**CRO**") to assist the Debtors with their reorganization efforts as authorized by the Bankruptcy Court.  *See Order Authorizing Debtors to Retain M-III Advisory Partners, LP to Provide a Chief Restructuring Officer and Certain Additional Personnel for Debtors Nunc Pro Tunc to Commencement Date*, entered on November 19, 2018 [ECF No. 814].

JX 040-4

further information regarding the Restructuring Subcommittee's role related to the Revised Proposed Sale Order, *see Declaration of Alan Carr*, filed with the Bankruptcy Court on February 1, 2019 ("**Carr Declaration**").

### B.        Restructuring Committee Diligence

10.        At all times since its formation, the Restructuring Committee has been and remains actively engaged with the Debtors' advisors to preserve and maximize the value of the Debtors' estates for the benefit of all creditors.  Since the Restructuring Committee was officially formed in October 2018, it formally met no less than fifty-eight (58) times prior to accepting a proposed ESL transaction at a meeting on January 16 held at 11:30 p.m. ET.  The Restructuring Committee met fifteen (15) times during the month of October, eleven (11) times in November, thirteen (13) times in December, and twenty (20) times between January 1 and January 16, 2019—often multiple times on the same day and late into the night and early mornings.  In addition, there were numerous informal meetings and countless hours spent on conference calls and in-person meetings discussing issues related to the Chapter 11 Cases.  The members of the Restructuring Committee regularly participated in calls and discussions regarding the bids received throughout the Sale and Restructuring Process (as defined below) and our reactions to those bids.

11.        In my role as a member of the Restructuring Committee, I regularly received Company financials, cash forecasts, and business plans,[5] as well as presentations concerning proposed processes for the sale of substantially all of the Debtors' assets (including the retail store footprint) as a going concern, analyses regarding an orderly wind-down, and related analyses regarding liquidity, go-forward business plans, analyses of bid proposals, related

---

[5] Examples of business plans provided to and analyzed by the Restructuring Committee are attached to this Declaration as "**Composite Exhibit B**."

feedback and other detailed information.  My practice was to read the materials carefully, listen and make inquiries to the financial advisors, legal advisors, and CRO regarding the information provided to the Restructuring Committee.  These presentations and discussions occurred in various contexts, including the Restructuring Committee's consideration of DIP financing, a potential go-forward sale of the business, and an ongoing consideration of an orderly wind-down, as we analyzed what would be in the best interest of the Debtors' estates and its creditors.

12.    In connection with reviewing the various presentations provided by the Debtors' advisors related to, among other things, the Company's financials and the DIP budgets from October 12, 2018, into December of 2018, I learned a great deal about the Company's operations and history.  In addition, shortly after joining the Restructuring Committee, I traveled to Hoffman Estates, Illinois to meet with the members of the office of the CEO on October 22, 2018, to better understand the Company and get to know in person the key executives of the Company.  As a result, and through my general involvement as an independent director, I am knowledgeable and familiar with the Debtors' business and financial affairs, the circumstances leading to the commencement of these Chapter 11 Cases, the Sale and Restructuring Process (as defined below), and the analyses that the Restructuring Committee has undertaken to determine the best path forward for the estates and their creditors.

13.    Throughout the process, the Restructuring Committee has relied on the advice of the Debtors' advisors, including Lazard Frères & Co. LLC ("**Lazard**"), the  investment banker  to the Debtors, the Debtors' outside counsel, Weil, and M-III Advisory Partners, LP ("**M-III**").  The Restructuring Committee also engaged and relied upon information provided by a real estate advisor, Jones Lang Lasalle ("**JLL**"), to assist with the potential sales of real estate beginning as early as October 29, 2018.  Further, in light of my dual role as a member of both the

**JX 040-6**

Restructuring Committee and the Restructuring Subcommittee, I also received and relied upon advice from the Restructuring Subcommittee's advisors, including Paul, Weiss, Rifkind, Wharton & Garrison LLP ("**Paul, Weiss**"), Young Conaway Stargatt & Taylor, LLP ("**Young Conaway**"), Alvarez & Marsal ("**A&M**"), Stout, and Evercore Partners, LP ("**Evercore**").

14.    During our meetings, the Restructuring Committee actively engaged in the discussions, provided instruction and direction to the Debtors' advisors and professionals, and asked and received answers to questions posed to the Debtors' advisors.  The Restructuring Committee was provided with a variety of material and presentations—often at its request—including, but not limited to, Board decks and related presentation materials.  Neither Mr. Lampert nor Mr. Kamlani—or any other ESL representative—attended meetings or deliberations held by the Restructuring Committee or the Restructuring Subcommittee at any time.  The Restructuring Committee participated in a videoconference with Mr. Lampert in early January 2019, but it was not part of any Restructuring Committee meeting.

### III.    Sale and Restructuring Process

15.    Since filing the Chapter 11 Cases, the Debtors and the Restructuring Committee have explored a broad array of strategic alternatives and options, including a possible sale, recapitalization, reorganization, or orderly wind-down of all or substantially all of the Debtors' businesses (the "**Sale and Restructuring Process**").[6]

16.    The Restructuring Committee, along with Lazard, Weil, and M-III, assessed and discussed potential transactions, including sale transactions whereby all or substantially all of the Debtors' assets would be sold to an investor or buyer who would continue

---

[6] For additional information related to the Sale and Restructuring Process, selection of ESL as the Successful Bidder at the Auction, and terms of the ESL APA (as those terms are defined below), *see Declaration of Brandon Aebersold*, filed with the Bankruptcy Court on February 1, 2019.

to operate the Debtors' businesses as a going concern, or an alternative whereby individual businesses within Sears would be sold separately to multiple purchasers and the remaining Company assets would be liquidated ("**Sale Process**").  Initial discussions with our advisors regarding the proposed sale transactions, including the key elements of the process such as the assets covered, process for submitting bids, requirements for qualified bids, stalking horse process and protections, process for review of bids, proposed timeline, and proposed next steps, began as early as October 25, 2018.

17.     The deadlines and requirements for the Sale Process were outlined and approved by the Bankruptcy Court on November 19, 2018, in the *Order Approving Global Bidding Procedures and Granting Related Relief* [ECF No. 816] (the "**Bidding Procedures**") and the November 22, 2018 *Notice of Filing of Global Bidding Procedures Process Letter* [ECF No. 862] ("**Process Letter**"), both of which were reviewed and analyzed by the Restructuring Committee prior to filing.  Throughout the Sale and Restructuring Process, all parties, including the Debtors and the Consultation Parties (as defined below), recognized the process had to be completed on an expedited time frame given the ongoing cash burn, and they were in agreement that the decision to go forward with a liquidation or going-concern sale had to be made quickly.

18.     The Debtors regularly consulted with key constituencies throughout this process, including advisors to Bank of America, N.A.,[7] Wells Fargo Bank, N.A.[8] (together, the Debtor-in-Possession ("**DIP**") Lenders), and the advisors to the Unsecured Creditors'

---

[7]  Administrative agent under the First Lien Credit Facility and DIP ABL Agent and its advisors, including Skadden, Arps, Slate, Meagher & Flom LLP; and Berkeley Research Group, LLC ("**BOA**").

[8]  Co-Collateral Agent under the First Lien Credit Facility and Co-Collateral Agent under the DIP ABL Facility (as defined in the DIP ABL Orders) (together with Bank of America, N.A., the "**DIP ABL Agents**") and its advisors, including Choate, Hall & Stewart LLP.

Committee[9] (the "**UCC**", collectively with the DIP Lenders, the "**Consultation Parties**").  The Restructuring Committee was regularly updated by the Debtors' advisors and professionals regarding those meetings and discussions, including, by way of example, concerns raised by the UCC.

19.    Throughout the Sale and Restructuring Process, the Restructuring Committee was informed of all bids for component parts of the business, including, by way of example, certain real estate, MTN notes, PartsDirect, and Sears Home Services ("**SHIP**"), as well as all liquidation agent bids in connection with the going-out-of-business ("**GOB**") sales. The Restructuring Committee remained informed of the steps taken by JLL and Lazard to sell some or all of the business and to solicit and receive various indicative bids for components or pieces of the real estate, including through regular updates given by the advisors at Restructuring Committee meetings.  In consultation with the Debtors' advisors, the Restructuring Committee gave due consideration to all bids and diligently analyzed and compared the value of bids received.

20.    At all relevant times, the Restructuring Committee discussed and reviewed with the Debtors' advisors the initiatives and number of call-outs they had during the Sale and Restructuring Process, including a log of outreaches from Lazard that were substantive in nature. Reviewing the materials provided by the Debtors' advisors, including the Bidding Procedures, Process Letter, analyses of potential qualified bids, and proposed sale processes and timelines, and relying on the advisors' regular updates and recommendations, I believe that the Sale Process led by Lazard with the support of the Debtors' other advisors was fair, extensive, robust, and thorough.

---

[9] Official committee of unsecured creditors appointed in the Debtors' chapter 11 cases and its advisors, including Akin Gump Strauss Hauer & Feld LLP.

## IV.   The Restructuring Committee Unanimously Rejects ESL's December 28 Bid

21.     As part of the Sale Process, the Bidding Procedures required that binding proposals for target businesses and the going concern be submitted by December 28, 2018. Among the bids received by the Restructuring Committee was a bid submitted by ESL to purchase substantially all of the Debtors' assets, including the go-forward retail store footprint and other assets and component businesses of the Company, as a going concern (the "**ESL Bid**").  The ESL Bid—the only going-concern bid submitted that included substantially all of the Debtors' assets, including the retail store footprint—was carefully considered by the Restructuring Committee.

22.     The Restructuring Committee convened no less than six (6) meetings after receiving the ESL Bid before ultimately determining, on January 4, 2019, that the ESL Bid was not a qualified bid.   In doing so, the Restructuring Committee relied upon advice from its advisors at Weil, Lazard, and M-III, who previously had engaged in extensive negotiations with ESL and its advisors in an effort to improve the ESL Bid.   Specifically, the Restructuring Committee met on:  December 28, 2018; December 30, 2018; January 2, 2019 (2:00 p.m. ET); January 2, 2019 (7:30 p.m. ET): January 3, 2019; and January 4, 2019.[10]  Prior to reaching its January 4 decision and after extensive discussions among the Restructuring Committee and the Debtors' advisors regarding the key deficiencies in the ESL Bid, the Debtors notified ESL of the deficiencies in the ESL Bid which needed to be addressed, including that: (i) ESL must remove the conditionality for closing of the transaction; (ii) ESL must provide sufficient liquidity to maintain administrative solvency; and (iii) the Restructuring Subcommittee and ESL must reach agreement  regarding the scope of any release to enable ESL to credit bid.  During this time and

---

[10] *See generally, Global Sale Process: Bid Qualification Overview*, provided to the Restructuring Committee during the December 30, 2018 meeting; a copy of which is attached to this Declaration as "**Exhibit C**."

throughout the Sale Process, the Restructuring Committee pushed back on ESL multiple times regarding its bid, attempting to get ESL to narrow the gap and explaining that if ESL could not get the Debtors close to administrative solvency, then it was likely not a bid the Restructuring Committee could accept. The Restructuring Committee contemplated an immediate pivot to a liquidation—a scenario that Weil and M-III had simultaneously analyzed and discussed with the Restructuring Committee—if ESL could not or would not improve its bid.

23.     After conveying to ESL and its advisors the deficiencies in the ESL Bid, Alan Carr and I had discussions with Mr. Kamlani on January 5, and I spoke with Mr. Kamlani again on January 6, 2019, re-emphasizing the importance of the issues previously conveyed and making suggestions as to how ESL might bridge the gaps. On January 7, 2019, in anticipation of the upcoming Bankruptcy Court hearing, on January 8, the Restructuring Committee again considered the ESL Bid and unanimously agreed—and instructed counsel to inform the Bankruptcy Court—that the current ESL proposal was not a qualified bid. The Debtors' advisors recommended on January 8, 2019, that the Debtors pivot to a liquidation.

24.     Following discussions with ESL and the Consultation Parties at the Bankruptcy Court on January 8, 2019, and subsequent consultation with members of the Restructuring Committee, the Debtors reached an agreement with ESL, that if ESL met certain requirements, the ESL Bid would be permitted to proceed to the scheduled auction with the understanding that ESL ultimately would need to improve the ESL Bid if it was to be accepted. Specifically, as discussed during Restructuring Committee meetings held on January 6, 7, and 8, the requirements were that ESL was required by 4:00 p.m. the following day to submit a revised written bid and to increase its deposit to $120 million, of which $17.9 million would be non-

refundable if ESL was not determined to be the successful bidder at the auction of the Debtors' assets, which was to be held the following week.

25.     On January 9, 2019, ESL funded the deposit and submitted a revised formal offer and was, therefore, permitted to participate in the Auction (the "**January 9 ESL Bid**").

## V.     The Restructuring Committee Unanimously Rejects ESL's January 15 Bid

26.     The Auction began at Weil's New York offices on January 14, 2019, at approximately 10:00 a.m. and concluded on January 17, 2019, at 3:10 a.m. (the "**Auction**").  The Auction was conducted openly and was attended by the Consultation Parties (as defined below) and their advisors.  Certain members of the Restructuring Committee, including myself and Mr. Carr, attended the Auction in person.  At all relevant times, the Restructuring Committee was kept informed concerning the negotiations with ESL and its advisors and the Debtors' advisors in connection with those negotiations.

27.     The January 9 ESL Bid was the only going concern bid put on the record during the first day of the Auction.  The Debtors' wind-down scenario also was put into the record.

28.     During the morning of the first day of the Auction, ESL made certain proposed revisions to the January 9 ESL Bid that addressed some of the Restructuring Committee's concerns, including, among other things: (i) removing ESL's debt financing conditions; (ii) accepting the forfeiture of the $120 million deposit for financing failure; (iii) agreeing to assume certain environmental liabilities; and (iv) agreeing to certain protections for employees, including accepting the construct of continuing employee benefits until the end of 2019 and the intent to employ tens of thousands of employees (the "**January 14 ESL Bid**"). The Restructuring Committee and its advisors discussed and analyzed the January 14 ESL Bid,

**JX 040-12**

and the Restructuring Committee concluded that the Debtors would not accept the revised bid. Key concerns included, but were not limited to, whether certain proposed conditions to closing the transaction contemplated by the January 14 ESL Bid could be met and whether the Debtors would be administratively solvent following the transaction.  There was also no resolution of ESL's right to credit bid.  ESL made an offer of $35 million for a full release of all potential claims.  Based on the discussions and instructions of the Restructuring Committee, the Debtors informed ESL of the deficiencies in the January 14 ESL Bid.  At the request of ESL's advisors, the Debtors prepared and presented several proposed options by which ESL could improve upon the January 14 ESL Bid.[11]  ESL advised it would consider these issues and respond early the next morning.  At the same time, the Debtors and their advisors continued to prepare for a potential orderly wind-down, including further considering the liquidators' bids so that they could quickly pivot in the event that ESL failed to provide a higher or otherwise better alternative.

29.    On the morning of January 15, 2019, ESL further revised the January 14 ESL Bid on the Auction record (the "**January 15 ESL Bid**").  The January 15 ESL Bid included a number of revisions, including, among other things: (i) removing a condition precedent related to the Seritage master lease; (ii) modifying the closing condition related to the delivery of inventory and receivables and allowing the estates to have the benefit of any inventory and receivables in excess of the amounts required to be delivered at closing; (iii) accelerating the timing of payment of certain assumed obligations; (iv) removing the requirement that holders of protection agreements reaffirm their agreements before assuming those obligations; and (v) eliminating a $30 million expense reimbursement requirement.

---

[11] A true and correct copy of the January 14 Proposed Final Ask from the Restructuring Committee/Subcommittee to ESL is attached to this Declaration as "**Exhibit D**."

30.     The Restructuring Committee and its advisors met to discuss the revisions. After thoroughly analyzing the January 15 ESL Bid, early that afternoon, the Restructuring Committee unanimously agreed that the January 15 ESL Bid was still not a higher or otherwise better alternative to a wind-down due to, among other things, risks that the transaction would not be executable and that the Debtors' estates could face administrative insolvency.  ESL's ability to credit bid also had not been resolved.  These considerations were weighed against the heavy consideration that a wind-down scenario would mean the immediate loss of tens of thousands of jobs in communities across the country.

31.     Following the meeting with the Restructuring Committee, on January 15, the Debtors announced on the Auction record their decision to reject the January 15 ESL Bid, but left the Auction open.  Shortly thereafter, counsel for the Debtors, ESL, and the Consultation Parties held a telephonic status conference with the Bankruptcy Court.  Following that status conference, the parties agreed that they would continue negotiating to see if ESL was able to sufficiently improve its bid.

## VI.     ESL Further Improves Its January 15 Bid and the Restructuring Committee Unanimously Votes to Accept It

32.     After additional hours of negotiations with the Restructuring Committee and its advisors, ESL submitted a new revised bid (the "**Revised January 15 ESL Bid**"), which included substantial improvements from the initial ESL Bid, most notably providing that:

- ESL took on more liabilities to substantially narrow the gap on the administrative solvency risk;

- ESL demonstrated that it had financing in place;

- ESL agreed to allow the Debtors to keep $19 million of sale deposit and hurricane insurance proceeds, which was partially offset by including SHIP (or proceeds of the sale of SHIP) as an acquired asset;

JX 040-14

- ESL increased its assumption of liabilities to a total of $2.2 billion, including, among other things: (i) additional cure costs with no cap; (ii) approximately $4 million in mechanics liens; (iii) all consumer protection agreements without any affirmation requirements; (iv) property taxes for acquired properties not to exceed $135 million; and (v) certain severance costs and section 503(b)(9) claims;

- To obtain the right to credit bid a portion of its debt, ESL agreed to a release that was substantially more limited and narrow, releasing only equitable subordination, recharacterization, and disallowance claims, yet preserving for the benefit of the estates all remaining litigation claims against ESL and its affiliates, which the Restructuring Subcommittee, in reliance on its advisors, determined to have substantial value;

- ESL retained certain deficiency and section 507(b) claims subject to limitations, including, among other things, a $50 million cap;

- ESL agreed to purchase up to $17 million of store cash to assist the Debtors in meeting the maximum Senior DIP condition; and

- ESL agreed to provide employees with comparable benefits and prepetition severance plan protection through the end of fiscal year 2019.

33.     The Revised January 15 ESL Bid, all together, increased the total consideration to the estates by roughly $800 million compared with the initial ESL Bid. It also was significant to the Restructuring Committee that Cyrus agreed to rollover the remainder of the Junior DIP from $230 to $350 million. Over the course of the negotiations, ESL continued to assume more liabilities, provide additional liquidity, and provide greater recovery to the Debtors' estates.

34.     In further reliance on information provided by the Debtors' advisors, the Restructuring Committee considered that, compared to a wind-down, a going-concern sale contemplated by the Revised January 15 ESL Bid would: (i) present the opportunity to preserve tens of thousands of jobs; (ii) preserve the ongoing business relationship with a multitude of vendors; (iii) provide greater recovery for unsecured creditors due to the assumption of certain cure amounts, 503(b)(9) claims, and protection agreements; and (iv) provide significant,

JX 040-15

additional value in excess of a wind-down to secured creditors, plus potentially substantial recoveries from litigation claims against ESL identified by the Restructuring Subcommittee's investigation. As a result, the Restructuring Committee, in consultation with Lazard, Weil, M-III, and its other advisors and based on marketing feedback, determined that a single, going-concern transaction for all or substantially all of the Debtors' businesses provided, among other things, the best opportunity to maximize value for the Debtors and to mitigate the creation of substantial additional claims against the Debtors.

35.     As part of its consideration of the Revised January 15 ESL Bid, the Restructuring Committee also carefully considered and discussed potential administrative solvency concerns, which it persistently addressed through the negotiations and which were significantly narrowed by the Revised January 15 ESL Bid. The Restructuring Committee carefully considered how to close the remaining gap with its advisors. The Restructuring Committee also received presentations comparing, side-by-side, the Revised January 15 ESL Bid to a wind-down scenario to help it compare the impact on creditor recoveries in the waterfall.

36.     During these discussions, I inquired whether the CRO could manage the Company's operations to close the estimated outstanding administrative solvency gap, recognizing the substantial amount of inflows and outflows of the Company, and he confirmed that he was confident this could be accomplished. I then also asked each of the advisors to give the Restructuring Committee their judgment and recommendation as to whether the Restructuring Committee should accept the bid, notwithstanding the potential administrative solvency gap. Mr. Meghji, the CRO, and Robert Riecker, the Company's CFO, agreed that the Company's liquidity could be managed to mitigate this small potential gap. Based on the advice and recommendations received from our advisors, the Restructuring Committee determined the

JX 040-16

potential risk of administrative insolvency was within the realm of reasonableness in terms of being able to manage the business accordingly to keep the estates administratively solvent.

37.   In evaluating the Revised January 15 ESL Bid, the Restructuring Committee, in consultation with the Debtors' advisors, also considered ESL's proposed go-forward business plan and the initiatives and assumptions included therein.  The Restructuring Committee believed it was important to consider the go-forward business plan to ensure that ESL would be able to run the Company as a going concern business.   Among other things, the Restructuring Committee compared ESL's go-forward business plan with the Company business plans previously reviewed by the Restructuring Committee in November and December of 2018. In reviewing ESL's business plan, the Restructuring Committee, in reliance on and consultation with the Debtors' advisors, as well as advice that Mr. Carr and I received from advisors to the Restructuring Subcommittee, understood that ESL's business plan was based on the Company's business plans but contemplated a smaller footprint of promising stores, which provided more control and the ability to concentrate the go-forward efforts in addition to ESL initiatives related to leveraged marketing strategies and identified expense reductions.   The Restructuring Committee also analyzed and discussed the differences between the ESL business plan and the Company's historical business plans, including, by way of example, the absence of "go-gets" or top-down target goals used to create the go-forward plan.   After carefully considering, discussing, and analyzing the same with the Debtors' advisors, and after considering the fact that reputable, sophisticated third-party financial institutions provided new financing to the go-forward business, the Restructuring Committee determined in its business judgment that the go-forward ESL business plan provided a sufficiently adequate assurance of future performance and a viable go-forward business.

38.     After several further rounds of discussion among the Restructuring Committee, the Restructuring Subcommittee, and the Debtors' advisors stretching into the early hours of January 16, the Restructuring Committee, upon my motion, in consultation with the Debtors' advisors—who unanimously recommended accepting the Revised January 15 ESL Bid—determined that the Revised January 15 ESL Bid to purchase substantially all of the Debtors' assets, including the "go-forward" retail stores and other assets and component businesses as a going concern, constituted the highest or otherwise best alternative (the "**Successful Bid**").

39.     In accepting the Successful Bid, the Restructuring Committee, in consultation with the Debtors' advisors, considered, among other things: (i) the nature and amount of the consideration provided; (ii) the ability of both parties to close on the proposed transaction and the timing of the same; (iii) the recovery the Successful Bid would provide to non-ESL creditors and the net benefit to the Debtors' estates; (iv) the liquidity for the new Sears post-acquisition; and (v) the alternative to the Successful Bid—a wind-down—and its expected impact on creditor recoveries, on tens of thousands of jobs, and on the magnitude of potential additional claims.

## VI.     Asset Purchase Agreement

40.     With the approval of the Restructuring Committee, the Debtors completed their negotiations with ESL, memorializing the terms of the Successful Bid (the "**APA**"). At a Restructuring Committee meeting held on January 16, 2019, at 11:30 p.m. ET, I made a motion to approve accepting the Successful Bid, agreeing on finalizing the transaction documentation, and to close the Auction based on the recommendations of the advisors to the Restructuring Committee and the Restructuring Subcommittee. The motion was seconded by Ms. Reese and approved by Mr. DePodesta and Mr. Carr. Following the Restructuring Committee's meeting in

**JX 040-18**

the early hours of January 17, 2019, the parties executed the APA, our acceptance of the Successful Bid was put on the Auction record, and the Auction was closed at 3:10 a.m. ET.

41.    In total, the Restructuring Committee formally met no less than twenty-two times between when we received the initial ESL Bid on December 28, 2018, and when the Auction was closed on January 17, 2019.  During that period, we twice concluded that the ESL bid on the table at the time was not the "highest or otherwise better bid" and therefore were prepared to pivot to a liquidation.  It was only after intense negotiations at the Auction that we succeeded in getting ESL to significantly improve its bid, at which point we approved the Successful Bid because in our business judgment, it would maximize value for the estates and their creditors.[12]

42.    Based on my experience and observations, the Restructuring Committee operated diligently and in good faith when considering and ultimately accepting the Successful Bid, which it determined preserves and maximizes the value of the Debtors' estates for the benefit of all creditors and represents the highest or otherwise best offer for the Debtors' businesses.

43.    I firmly believe—and it is the view of the entire Restructuring Committee—that the ESL sale transaction described in the Revised Proposed Sale Order represents a higher and better offer than any alternative scenario presented, and that approval of the transaction is the best means to preserve and maximize the value of the Debtors' estates for the benefit of all creditors and interested parties.

---

[12] It is also worth noting that the Restructuring Subcommittee also approved the Successful Bid, as discussed in more detail in the Carr Declaration.

JX 040-19

Dated:          February 1, 2019

                Dallas, Texas


                                          _/s/ William L. Transier_____
                                          William L. Transier
                                          Independent Director and Member of
                                          Restructuring Committee of
                                          Sears Holdings Corporation

**JX 040-20**