# Exhibit 34

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | |
|---|---|
| In re | : |
| | :     **Chapter 11** |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | : |
| | :     **Case No. 18-23538 (RDD)** |
| | : |
| Debtors. | :     **(Jointly Administered)** |

---------------------------------------------------------------x

### DECLARATION OF BRANDON AEBERSOLD

I, Brandon Aebersold, make this declaration under 28 U.S.C. § 1746:

      1.    I am a Managing Director at Lazard Frères & Co. LLC ("**Lazard**"), the investment banker to Sears Holdings Corporation ("**SHC**") and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and, together with their non-debtor affiliates, the "**Company**" or "**Sears**").[1]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations

2.  I submit this declaration ("**Declaration**") in support of entry of the *Revised Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Leases in Connection Therewith, and (IV) Granting Related Relief* (the "**Revised Proposed Sale Order**").[2]

3.  Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge of the Debtors' operations and finances gleaned during the course of my engagement with the Debtors; my discussions with the Debtors' senior management, other members of the Lazard team, and the Debtors' other advisors; my review of relevant documents; and my views based upon my experience. If called to testify, I would testify competently to each of the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of Lazard for the Debtors.

---

LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Global Bidding Procedures Order (as defined herein), Revised Proposed Sale Order, or Asset Purchase Agreements, as applicable.

**DECLARATION OF BRANDON AEBERSOLD** – Page 2

## I. Background and Qualifications[3]

4. I am a Managing Director with Lazard, a financial advisory and investment banking firm. I joined Lazard in 2007 and have approximately fifteen years of investment banking and restructuring experience. Prior to joining Lazard, I practiced law at the firm of Simpson Thatcher & Bartlett LLP, where I focused on mergers and acquisitions and leveraged finance transactions. I have advised corporate clients and creditor groups in a broad range of restructuring, reorganization, and capital raising transactions in traditional and distressed situations across a diverse variety of industries.

5. Together with its predecessors and affiliates, Lazard has been advising clients around the world for over 165 years. Lazard has dedicated professionals who provide restructuring services to its clients. The current managing directors, directors, vice presidents, associates, and analysts of Lazard (including myself) have extensive experience working with financially troubled companies and creditors thereof in complex financial restructurings out-of-court and in chapter 11 proceedings. Lazard and its professionals have been involved as advisors to debtors, creditors, equity constituencies, and government agencies in numerous reorganization cases. Since 1990, Lazard's professionals have been involved in over 250 restructurings, representing well over $1 trillion in debtor liabilities.

## II. Lazard's Retention

6. Pursuant to the terms and conditions of its engagement letter dated October 11, 2018 (the "**Engagement Letter**"), Lazard agreed to serve as the Debtors'

---

[3] Additional information regarding Mr. Aebersold's background and qualifications can be found in the *Declaration of Brandon Aebersold in Support of Debtors' Motion for Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections to Prepetition Secured Parties, and (D) Schedule Second Interim Hearing and Final Hearing*, filed with the Bankruptcy Court on October 15, 2018 [ECF No. 9] ("**DIP Declaration**").

**DECLARATION OF BRANDON AEBERSOLD – Page 3**

**JX 042-3**

investment banker to provide general restructuring advice and advise in connection with any Restructuring, Financing, and, if mutually agreed by the Debtors and Lazard, any Sale Transaction (as such terms are defined under the Engagement Letter), which would result from the Debtors' review of strategic alternatives to address their capital structure. In connection with its engagement, Lazard is working with the Debtors' outside counsel, Weil, Gotshal & Manges LLP ("**Weil**") and M-III Advisory Partners, LP ("**M-III**"), in analyzing, structuring, negotiating, and effecting a Restructuring or Sale Transaction pursuant to the terms and conditions of the Engagement Letter. By order dated November 9, 2018 [ECF Nos. 606, 607], the Bankruptcy Court authorized Lazard's retention by the Debtors as investment banker in accordance with the terms of the Engagement Letter. Lazard and the Debtors subsequently agreed that Lazard would advise with respect to certain potential Sale Transactions. On January 18, 2019, the Bankruptcy Court authorized an amendment to the Engagement Letter in light of additional services provided by Lazard in connection with potential Sale Transactions. [ECF. No. 1775].

7. Under my supervision, the Lazard team has worked closely with the Debtors' management and their other professionals and has become knowledgeable of and familiar with the Debtors' capital structure, liquidity needs, and business operations.

### III. The Sale and Restructuring Process

8. The Company owns and operates hundreds of stores under the *Sears* and *Kmart* brands across the United States and its territories.[4] Despite Sears' long history and iconic status, the Debtors have a highly-levered capital structure and faced liquidity challenges that necessitated these chapter 11 cases.

---

[4] *See Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for the Southern District of New York*, filed with the Bankruptcy Court on October 15, 2018 [ECF No. 3] (providing a full description of the Debtors' businesses and operations).

9.      My understanding is that on October 10, 2018, in anticipation of the need to file the chapter 11 cases, the board of directors of Sears (the "**Board**") formed the Restructuring Committee comprised solely of independent directors. *See* Exhibit A hereto (October 10, 2018 Board Resolution (SEARS_UCC00413859)). The four members of the Restructuring Committee are Alan J. Carr, Paul G. DePodesta, Ann N. Reese and William L. Transier. *Id.* I have been informed that the Restructuring Committee was charged with, among other things, considering, evaluating, and, if it deemed it to be in the best interests of Sears, recommending to the Board that Sears enter into a transaction not involving ESL, or authorizing and approving a transaction involving ESL; the oversight of the provision of confidential information by or on behalf of Sears and its subsidiaries to third parties under cover of an appropriate confidentiality arrangement; the oversight of discussions and negotiations with Sears' stakeholders in respect of a restructuring transaction and the implementation and execution of such a transaction; the oversight of the Chief Restructuring Officer[5]; and such other actions considered by the Restructuring Committee to be necessary or desirable to carry out its mandate, subject, as appropriate (where not exclusively delegated to the Restructuring Committee), to the approval of the Board. *Id.*[6] The Restructuring Committee was involved throughout the Process (as defined below), during which Lazard participated in over 60 calls or meetings with them.

---

[5] On October 10, 2018, the Board also authorized the retention of M-III and, specifically, Mohsin Y. Meghji, as Chief Restructuring Officer ("**CRO**") to assist the Debtors with their reorganization efforts as authorized by the Bankruptcy Court. *See Order Authorizing Debtors to Retain M-III Advisory Partners, LP to Provide a Chief Restructuring Officer and Certain Additional Personnel for Debtors Nunc Pro Tunc to Commencement Date*, entered on November 19, 2018 [ECF No. 814].

[6] I am also informed that a subcommittee of the Restructuring Committee (the "**Subcommittee**") comprised of Alan Carr and William Transier was specifically authorized to, among other things, investigate potential claims of the Debtors against ESL, and, with respect to a restructuring transaction, determine any bidder's (including ESL) ability to credit bid and the Debtors' ability to provide releases in any such transaction.

10. Since filing the chapter 11 cases, the Debtors have explored a broad array of strategic alternatives and options, including a possible sale, recapitalization, reorganization, or orderly wind-down of all or substantially all of the Debtors' businesses (the "**Sale and Restructuring Process**" or "**Process**").

11. The Restructuring Committee, Lazard, and Weil assessed and discussed these potential transactions, including sale transactions whereby all or substantially all of the Debtors' assets would be sold to an investor or buyer who would continue to operate the Debtors' businesses as a going concern, or an alternative whereby individual businesses within Sears would be sold separately to multiple purchasers. Ultimately, the Restructuring Committee, in consultation with Lazard and its other advisors, determined that a single, going-concern transaction for all or substantially all of the Debtors' businesses provided the best opportunity to maximize value for the Debtors, preserve jobs, and mitigate the creation of additional claims against the Debtors. Other alternatives, including a potential orderly wind-down of the business, were considered throughout the Process.

### A.    The Sale Process

12. As part of the broader Process, and after obtaining approval from the Restructuring Committee, the Debtors, with the assistance of Lazard, Weil, and M-III, commenced a sale process for the Debtors (the "**Sale Process**"). Lazard, with the support of the Debtors' other advisors, led the Sale Process for the non-real estate assets or businesses. The initial phase of the Sale Process was designed to provide a large number of potential purchasers with information concerning the Debtors' businesses and other assets to allow such parties to submit bids and request further diligence, and was to be followed with efforts aimed at providing potential purchasers with a more thorough understanding of the Debtors' businesses prior to an

auction of the Debtors' assets, which was to be held at Weil's New York offices on January 14, 2019, at 10:00 a.m. EST (the "**Auction**").

13. The deadlines and requirements for the Sale Process were outlined and approved by the Bankruptcy Court on November 19, 2018, in the *Order Approving Global Bidding Procedures and Granting Related Relief* [ECF No. 816] (the "**Bidding Procedures**") and further outlined in the November 22, 2018 *Notice of Filing of Global Bidding Procedures Process Letter* [ECF No. 862] (the "**Process Letter**").

14. Although Lazard had been preparing virtual data rooms and having discussions with interested parties on or prior to the Commencement Date, the formal Sale Process began on November 22, 2018, with the distribution of the Process Letter.

15. Based on my experience and participation, the Sale Process led by Lazard with the support of the Debtors' other advisors was extensive, involving solicitations of interest from a diverse set of potential strategic and financial parties, and the diligence was inclusive and thorough. Diligence included, among other information, (i) electronic data rooms containing over 17,000 documents concerning retail operations, associated intellectual property, inventory, the Sears Home Services business (including the repair and warranty business, the Sears Home Improvement Products ("**SHIP**") business, and the Parts Direct business ("**Parts Direct**"), Monark, Sears Auto Center, the Kenmore® and DieHard® brands, taxes, labor, employment, real estate, and the Debtors' tort claims against certain credit card processors (the "**Credit Card Tort Claims**"); (ii) confidential information memoranda ("**CIM**"), which contained non-public information concerning certain of the Debtors' businesses; (iii) discussions with the Debtors' management; (iv) site visits; and (v) analysis and discussion of requested legal due diligence topics. During the overall Process, Lazard, in conjunction with the Debtors and their other

advisors, engaged with over 250 potential third-party investors, approximately 128 of which executed a confidentiality agreement ("**NDA**").

16.     The Process Letter instructed bidders to submit non-binding indications of interest by December 5, 2018 ("**Indications of Interest**"), which were required to include, among other things, descriptions of the contemplated transaction, the total purchase price to be paid, other consideration to be paid, the prospective bidder's financial wherewithal to consummate the transaction, and allocation of value.

17.     By the December 5 deadline, the Debtors received 19 Indications of Interest, including bids on one or more operating businesses, advisory and agency proposals from liquidators, and bids for the Credit Card Tort Claims. Only ESL submitted a going-concern bid that included substantially all of the Debtors' assets, including the retail store footprint.

18.     Between December 5 and December 28, 2018, the Debtors and their advisors continued to work to determine the most effective plan for maximizing the value of the Debtors' assets and reducing creditors' exposure, including by developing analyses that compared ESL's going-concern proposal to a potential wind-down of the business (which would potentially have involved both going out of business sales at retail stores and separate sales of certain assets and businesses). During this period, the Debtors and their advisors responded to several hundred diligence questions, held over 40 formal diligence calls and in-person meetings with prospective bidders and their advisors (approximately half of which included relevant members of the Debtors' management), and held management presentations (that were preceded by numerous preparatory sessions and in-person rehearsals).

19.     Throughout this period, the advisors for the Debtors and the Restructuring Committee regularly consulted with key constituencies, including advisors to Bank of America,

N.A.,[7] Wells Fargo Bank, N.A.[8] (together, the Debtor-in-Possession ("**DIP**") Lenders), and the advisors to the Unsecured Creditors' Committee[9] (the "**UCC,**" collectively with the DIP Lenders, the "**Consultation Parties**"). In multiple formal meetings and numerous other informal discussions with UCC representatives, the Debtors outlined their marketing strategy, shared the identity of prospective bidders, facilitated in-person meetings with management, and gave the opportunity to review and comment on proposed purchase agreements for Prospective Bidders. Professionals for the Consultation Parties were provided with full access to the data room, and were permitted to perform extensive due diligence and to review and provide comments on sale documents.

20.     On December 20, 2018, the Debtors and their advisors emailed form purchase agreements to Prospective Bidders ("**Form Purchase Agreements**"), which included form agency agreements with potential liquidators. Throughout the Sale Process, Lazard, Weil, M-III, and the Debtors' management worked closely to coordinate diligence such that Prospective Bidders could receive adequate information to formulate their bids.

21.     The Bidding Procedures required that all binding proposals – for target businesses and the going concern – be submitted by December 28, 2018. By that date, setting aside bids to purchase certain of the Debtors' real estate, the Debtors received approximately seven (7) bids for inventory or going-concern businesses that the Debtors believed were potentially executable and informed by substantial purchaser due diligence. Of those bids, five

---

[7] Administrative agent under the First Lien Credit Facility and DIP ABL Agent and its advisors, including Skadden, Arps, Slate, Meagher & Flom LLP and Berkeley Research Group, LLC.

[8] Co-Collateral Agent under the First Lien Credit Facility and Co-Collateral Agent under the DIP ABL Facility (as defined in the DIP ABL Orders) (together with Bank of America, N.A., the "DIP ABL Agents") and its advisors, including Choate, Hall & Stewart LLP.

[9] Official committee of unsecured creditors appointed in the Debtors' chapter 11 cases and its advisors, including Akin Gump Strauss Hauer & Feld LLP.

(5) proposed to purchase a business line or lines, including the non-retail businesses (the "**Other Assets**"), and two (2) proposed to serve as liquidation agent (*i.e.*, an equity bid) to the Debtors. Separately, the Debtors received four (4) advisory proposals to assist the Debtors in the liquidation of inventory in their retail stores.

22.    One of the bids the Debtors received was a bid from ESL to purchase substantially all of the Debtors' assets, including the go-forward retail store footprint and other assets and component businesses of the Company, as a going concern pursuant to Section 363 (the "**ESL Bid**"). The Restructuring Committee—after seeking advice from Weil, Lazard, M-III, and the Debtors' other advisors, who had engaged in extensive negotiations with ESL and its advisors to improve the ESL Bid—determined, however, that the ESL Bid was not a "Qualified Bid" under the terms of the Bidding Procedures.

23.    Following discussions with ESL and the Consultation Parties at the Bankruptcy Court on January 8, 2019 and subsequent consultation with members of the Restructuring Committee, however, the Debtors reached an agreement that if ESL met certain requirements, the ESL Bid would be permitted to proceed to the Auction with the understanding that ESL ultimately would need to improve the ESL Bid. Specifically, ESL was to submit a revised written bid and increase its deposit to $120 million by 4 p.m. the following day, of which $17.9 million was to be non-refundable if ESL was not determined to the successful bidder at the Auction.

24.    On January 9, 2019, ESL funded the deposit and submitted a revised formal offer (the "**January 9 ESL Bid**") and was, therefore, permitted to participate in the Auction.

### B.  The Auction

25.     In the interim between the January 9 ESL Bid and the Auction, the Debtors and their advisors engaged in continued arm's-length discussions with advisors to ESL. The Debtors conferred with advisors to the Consultation Parties throughout this period.

26.     The Auction began at Weil's New York offices on January 14, 2019, at approximately 10:00 a.m., and concluded on January 17, 2019, at 3:10 a.m.  Each potential bidder was required to confirm in writing and on the record that: (i) it had not engaged in any collusion with respect to the submission of any bid; and (ii) its bid represented a binding, good faith, and bona fide offer to purchase the Debtors' assets if selected as the successful bidder. Each attendee also affirmed the confidentiality of the Auction.  At the suggestion of and in arrangement with the UCC's investment banker, Houlihan Lokey, Inc. ("**Houlihan**"), the attendees included potential bidders for Other Assets.

27.     The January 9 ESL Bid was the only bid put on the record during the first day of the Auction.  The alternative of a wind-down was also read into the record.[10]  The Auction was conducted openly, and the Consultation Parties, and/or their advisors, attended.  The Subcommittee's advisors were also present in-person for all three days of the Auction. Throughout the Auction and Sale Process generally, the Debtors kept the Consultation Parties apprised of the key negotiations and any changes in the terms of the ESL Bid.

28.     During the morning of the first day of the Auction, ESL made certain proposed revisions to the January 9 ESL Bid, including, among other things, agreeing to delete

---

[10] *See* 1/14/19 Auction Tr. at 10:15-11:2 ("We will start with a recitation of events from the status conference on January 8th to today's auction, that ESL Investments will be permitted to put their on the record. ESL is a qualifying bidder. Next, we will allow any other competing bidders to put their bids on the record. If there are any, and they've been qualified for this auction, I don't expect that to be the case at this initial session, and then we'll summarize in brief fashion the Debtors' wind down recoveries of the company, which are among the company's alternatives and against which ESL will be competing today.").

**DECLARATION OF BRANDON AEBERSOLD – Page 11**

**JX 042-11**

ESL's debt financing conditions, accept the forfeiture of the $120 million deposit for financing failure, assume certain environmental liabilities, and provide certain protections for employees (as so revised, the "**January 14 ESL Bid**"). The Debtors, the Restructuring Committee, and their advisors worked together and reviewed the outstanding material issues that prevented their acceptance of the January 14 ESL Bid. Key concerns included (but were not limited to) whether certain proposed conditions to closing the transaction contemplated by the January 14 ESL Bid could be met, and whether the Debtors would be administratively solvent following the transaction. The Debtors informed ESL of the deficiencies in the January 14 ESL Bid and, at the request of ESL's advisors, the Debtors presented potential alternatives for a revision to the January 14 ESL Bid. ESL advised it would consider these issues and respond early the next morning. At the same time, the Debtors and their advisors continued to consider an orderly wind-down as an alternative if ESL failed to provide a higher or otherwise better alternative.

29. On the morning of January 15, 2019, ESL further revised the January 14 ESL Bid on the Auction record (as so revised, the "**January 15 ESL Bid**"). The January 15 ESL Bid included a number of revisions, including, among other things, modification of certain conditions precedent, acceleration of the timing of payment of certain assumed obligations, removal of the requirement that holders of protection agreements reaffirm their agreements, and elimination of a $30 million expense reimbursement requirement.

30. The Debtors, the Restructuring Committee, and their advisors met to discuss the revisions. After extensive discussions, that afternoon, the Restructuring Committee unanimously agreed that the January 15 ESL Bid was still not a higher or otherwise better alternative to a wind-down due to, among other things, risks that the transaction would not be executable and that the Debtors' estates could face administrative insolvency. These

**DECLARATION OF BRANDON AEBERSOLD – Page 12**

**JX 042-12**

considerations were weighed against the heavy consideration that a wind-down scenario would mean the loss of tens of thousands of jobs.

31.    Following the meeting with the Restructuring Committee, I understand that at approximately 2:00 p.m. EST on January 15, the Debtors held a status conference with the Bankruptcy Court. As the Auction was still open, following that status conference, the parties agreed that they would continue negotiating.

32.    After additional hours of negotiations with the Debtors and their advisors, ESL submitted another revised ESL Bid (the "**Revised January 15 ESL Bid**"). The Revised January 15 ESL Bid included substantial improvements, most notably providing that NewCo would assume the entirety of the $350 million Junior DIP, which represented a $120 million increase in "cash equivalent" consideration. The Revised January 15 ESL Bid also provided that NewCo would assume an additional $23 million of liabilities and allowed the Debtors to keep $19 million of sale and insurance proceeds, which was partially offset by including SHIP (or the proceeds of a sale of SHIP) as an acquired asset. These modifications are set forth more fully in the Proposed Sale Order.[11]

33.    After several further rounds of debate among the Restructuring Committee, the Subcommittee, and the Debtors' advisors stretching into the early hours of January 16, the Debtors, in consultation with their advisors, and consistent with the Bidding Procedures, determined that the Revised January 15 ESL Bid to purchase substantially all of the Debtors' assets, including the "go-forward" retail stores and other assets and component

---

[11] I understand that during the Auction, the Subcommittee also negotiated with ESL with respect to their ability to credit bid and a release of ESL by the Debtors.

**DECLARATION OF BRANDON AEBERSOLD – Page 13**

**JX 042-13**

businesses as a going concern, constituted the highest or otherwise best alternatives (the "**Successful Bid**").

34.  In making this determination, the Debtors, in consultation with their advisors, considered, among other things: (i) the nature and amount of the consideration provided; (ii) the ability of both parties to close on the proposed transaction and the timing of the same; (iii) the recovery the Successful Bid would provide to creditors and the net benefit to the Debtors' estates; and (iv) the alternative to the Successful Bid—a wind-down—and its expected impact on creditor recoveries, on tens of thousands of jobs, and on potential additional claims.

35.  To my knowledge and based on my observations and experience, I believe that the Auction was conducted in good faith and the Sale Process provided a fair and reasonable opportunity to purchase components of or substantially all of the Debtors' assets and operations. Throughout the Auction, the Debtors kept the Consultation Parties apprised of the key negotiations.

### C.  The Successful Bid

36.  With the approval of the Restructuring Committee, the Debtors entered into an Asset Purchase Agreement with ESL, memorializing the terms of the Successful Bid, on January 17, 2019 (the "**APA**"). The APA sets forth the key terms of the Sale Transaction.

37.  Pursuant to the Successful Bid, ESL has agreed to commit the following as consideration in order to purchase the Debtors' assets and operations: (i) a cash payment of $885 million; (ii) a credit bid of secured debt facilities totaling $1.3 billion; (iii) an assumption of secured debt totaling $621 million; and (iv) an assumption of administrative liabilities, including for severance obligations and other employee claims, Section 503(b)(9) claims, and post-petition accounts payable and property taxes, of up to $482 million. In addition, the Successful Bid

provides the additional benefits to the Debtors of (i) including offers of employment to tens of thousands of employees, (ii) assuming an additional $1 billion of "protection agreement" liabilities related to consumer warranties sold by Sears Home Services, (iii) taking on cure cost obligations associated with assumed contracts, (iv) honoring approximately $81 million of "Shop Your Way" points, gift cards and other customer liabilities, and (v) purchasing up to $17 million of in-store cash.

38. The Sale and Restructuring Process required a significant amount of time and resources focused on maximizing the Debtors' value for the benefit of all stakeholders. In conducting that Process and negotiating with a number of interested parties, while simultaneously considering an orderly wind-down as an alternative throughout, I believe, based on my professional experience and on the input from the Debtors' management and other advisors, that the terms of the Successful Bid represent the highest or otherwise best offer currently available for the Debtors' businesses for several reasons.

39. **First**, the terms of the Successful Bid, including the consideration for the Debtors' assets, constitute the best terms presently available under these trying circumstances.

40. **Second**, I understand that the Successful Bid will provide greater recoveries for the Debtors' estates and creditors than would be provided by any other practically available alternative, including, specifically, a wind-down or liquidation of the business.

41. **Third,** the Successful Bid gives the Company the opportunity to preserve tens of thousands of jobs. While the terms of the Successful Bid do not constitute a guarantee that those jobs will persist in perpetuity, a wind-down or liquidation would have resulted in their near-term elimination.

### D.  Other Assets

42. Throughout the Sale Process, Lazard has had a continual and collaborative dialogue with Houlihan. In fact, Houlihan provided a number of suggestions and had direct input into timing and tactics with respect to potential bidders. Specifically, Houlihan visited the Debtors' headquarters for direct diligence sessions with senior management, attended telephonic and in-person diligence sessions with bidders for Other Assets, joined Lazard in contacting bidders for Other Assets in advance of the Auction to discuss timing and expectations, and attended and participated alongside Lazard and the Debtors' management in the in-person meetings with each of the bidders for Other Assets at the Auction.

43. The Other Assets, components of which I understand are unencumbered, are not simple to market. Key reasons are, for the most part, because they are not fully-functioning stand-alone businesses and require time to carve-out, and because these businesses depend in large part on the Sears corporate infrastructure and retail platform (examples of the reasons include they primarily service the Sears retail platform rather than third-party customers, depend on sales in the retail stores to generate business, do not have stand-alone supply agreements, rely on platform-wide intellectual property, have no segregated, stand-alone financials, do not exist as distinct legal entities, or in some cases, are physically connected to Sears retail stores). Accordingly, significant time and resources were dedicated to market those assets.

44. One such Other Asset is Sears Home Services ("**SHS**"), which is an umbrella business that encompasses several other subsidiary businesses: a home warranty business (the "**Warranty Business**"), a product repair business (the "**Repair Business**"), Parts Direct, and SHIP, among others.

45. SHS has been marketed extensively. As noted by the UCC, SHS was the subject of a marketing process conducted by Citibank in 2016. Over 30 companies (strategic and financial sponsors) were contacted, of which only three asked for management presentations. In 2017, another strategic was approached and discussions were held with the management team. However, I understand the process did not yield a bid that Sears wanted to pursue. In the summer of 2018, according to the Debtors' management, Sears launched an informal process with three interested parties for the Repair Business and the Warranty Business; again, I understand this process did not yield viable bids. Contemporaneously with the process for the Repair Business and Warranty Business, Sears launched a formal marketing process for Parts Direct that was conducted by Centerview Partners. Of the 48 interested parties that were contacted in this Parts Direct process, I understand that only one potentially viable, third-party bid was received.

46. Since the filing of the chapter 11 cases and in conjunction with the Sale Process, Lazard continued and built upon those prior processes. Specifically, Lazard engaged with over 60 parties that had expressed interest in SHS or any of the component businesses, updated CIMs with respect to SHS and each of its main component businesses, and worked with SHS management to develop and regularly update stand-alone business plans in the event of an orderly wind-down and the cessation of the Sears retail platform.

47. The UCC alleges two instances of insufficient engagement or available information in the SHS process. The first alleged instance by the UCC was a lack of engagement with a party interested in the Parts Direct business ("**Prospective Bidder A**"). Soon after the formation of the UCC on October 30, 2018, the Debtors hosted a meeting at Lazard's New York offices with the advisors to the UCC; a main purpose of the meeting was to discuss the Sale

Process and review indications of interest that had been received. The Debtors' recommendation at the meeting was to not move forward with a preemptive bid from Prospective Bidder A on an expedited and stand-alone basis, but rather to include Parts Direct as part of a broader auction of SHS and encourage Prospective Bidder A to participate in the broader auction. The provided rationale included, among other factors, (i) that, at that time, the potential bidders for all of SHS or for all of Sears as a going-concern required that Parts Direct be included in their purchase; therefore, selling the smaller Parts Direct early in the case would jeopardize a potentially more valuable path, (ii) Prospective Bidder A's October 28, 2018 bid was conditioned on being able to directly negotiate new supply agreements with key Parts Direct vendors ("**OEMs**"), and (iii) the bid required the use of the "Sears Parts Direct" trademark. In subsequent conversations with Houlihan, they agreed with the recommended approach.

48. Notwithstanding the decision to not advance Prospective Bidder A's bid on an expedited basis, the Debtors continued to have significant engagement with them. Specifically, between receiving Prospective Bidder A's October 28, 2018 bid and the Auction, the Debtors and their advisors conducted in excess of ten (10) calls with Prospective Bidder A, the majority of which included members of the Debtors' management. Topics covered in those discussions included process updates, summaries of recent performance, transition services, and intellectual property concerns, among others. Prospective Bidder A submitted a revised bid on December 28, 2018 and stated the reason for the decline in their contemplated purchase price: "we have seen continued erosion in the value since submitting our indication of interest on December 5, 2018." Prospective Bidder A attached a bridge showing a 79.5% decline in *pro forma* EBITDA compared to 2018 expected EBITDA due to changes in underlying vendor pricing and the addition of stand-alone costs and other adjustments.

49. The second alleged instance of a lack of information is based on a January 8, 2019 email from a prospective SHS purchaser ("**Prospective Bidder B**"). With respect to information provided to Prospective Bidder B during the Process, the Debtors provided over 900 documents, conducted twelve (12) meetings and calls with management and hosted a four-hour, in-person meeting at the Debtors' headquarters. On December 26, 2018, during the holidays, [Prospective Bidder B] provided a 14-item, "high priority" diligence request list to the Debtors. In response, over the next two (2) days, the Debtors uploaded 17 documents, addressing nine (9) of the 14 requests. VDR data indicates that Prospective Bidder B accessed 13 of those 17 documents. The Debtors subsequently uploaded additional responsive documents. On January 9, the Debtors contacted Prospective Bidder B to review outstanding diligence items. On January 11, Prospective Bidder B responded with an updated diligence list, marking eight (8) items "complete", three (3) "partially complete" and only three (3) items as "outstanding."

50. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and after reasonable inquiry.

Dated: February 1, 2019
   New York, New York

                                     */s/ Brandon Aebersold*
                                     Brandon Aebersold
                                     Managing Director
                                     Lazard Frères & Co. LLC