# Exhibit 35

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 18-23538-rdd

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    SEARS HOLDINGS CORPORATION,

8

9            Debtor.

10    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    300 Quarropas Street, Room 248

14                    White Plains, NY 10601

15

16                    April 18, 2019

17                    10:46 AM

18

19

20

21    B E F O R E :

22    HON ROBERT D. DRAIN

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO:   UNKNOWN

Page 2

1   HEARING re Debtors Motion to (A) Enforce Asset Purchase

2   Agreement and Automatic Stay Against Transform Holdco LLC

3   and (B) Compel Turnover of Estate Property, and (II)

4   Response to Transform Holdco LLCs Motion to Assign Matter to

5   Mediation (related document(s)2766) (document #2796)

6

7   HEARING re Motion to Compel Payment of Post-Petition Rent

8   and Related Lease Obligations Pursuant to 11 U.S.C. §§

9   105(a), 363(e), 365(d)(3) and 503(b)(l)(A) and to Pay All

10  Subsequent Amounts Owed On a Timely Basis filed by Robert L.

11  LeHane on behalf of Trustees of the Estate of Bernice Pauahi

12  Bishop (document #2414)

13

14  HEARING re Initial Supplemental Brief in Response to

15  Debtors' Motion to (A) Enforce Asset Purchase Agreement and

16  Automatic Stay Against Transform Holdco LLC and (B) Compel

17  Turnover of Estate Property, dated April 2, 2019 (REDACTED)

18  (related document(s)2796) filed by Abena Mainoo on behalf of

19  Transform Holdco LLC (document #3011)

20

21  HEARING re Debtors' Supplemental Memorandum of Law in

22  Further Support of Their Motion to Enforce the Automatic

23  Stay (related document(s)2796, 2864) (document #3079)

24

25

JX 053-2

Page 3

1    HEARING re Transform Holdco LLC's Supplemental Reply Brief

2    in Response to Debtors' Motion (A) Enforce Asset Purchase

3    Agreement and Automatic Stay Against Transform Holdco LLC

4    and (B) Compel Turnover of Estate Property

5    [REDACTED] (related document(s)3079, 2796) filed by Abena

6    Mainoo on behalf of Transform Holdco LLC. (document #3156)

7

8    HEARING re Transform Holdco LLC's Response to Debtors' (I)

9    Motion to (A) Enforce Asset Purchase Agreement and Automatic

10   Stay Against Transform Holdco LLC and (B) Compel Turnover of

11   Estate Property and Reply in Further Support of Its Motion

12   to Assign Matter to Mediation (related document(s)2766,

13   2796) filed by Abena Mainoo on behalf of Transform Holdco

14   LLC. (document #2864)

15

16   HEARING re Joinder of the Official Committee of Unsecured

17   Creditors to Debtors (I) Motion to (A) Enforce Asset

18   Purchase Agreement and Automatic Stay Against Transform

19   Holdco LLC and (B) Compel Turnover of Estate Property, and

20   (II) Response to Transform Holdco LLC's Motion to Assign

21   Matter to Mediation (related document(s)2796) filed by Ira

22   S. Dizengoff on behalf of Official Committee of Unsecured

23   Creditors of Sears Holdings Corporation, et al. (document

24   #2808)

25

JX 053-3

Page 4

1  HEARING re Motion of Wilmington Trust, National Association,

2  as Indenture Trustee and Collateral Agent to Prohibit or

3  Condition Debtors' Continued Use of Collateral, Including

4  Cash Collateral filed by Edward M. Fox on behalf of

5  Wilmington Trust, National Association (document #3050)

6

7  HEARING re Objection / Joinder of the Official Committee of

8  Unsecured Creditors to Debtors' Objection to Motion of

9  Wilmington Trust, National Association, as Indenture Trustee

10 and Collateral Agent, to Prohibit or Condition Debtors'

11 Continued Use of Collateral, Including Cash Collateral

12 (related document(s)3198)(document #3210)

13

14 HEARING re Motion of Debtors to Compel Turnover of Estate

15 Property filed by Sunny Singh on behalf of Sears Holdings

16 Corporation (document #2715)

17

18 HEARING re Community Unit School District 300's (I)

19 Objection to Debtors' Motion to Compel Turnover of Estate

20 Property  and (II) Reply to Debtors' Objection to Motion of

21 Community Unit School District 300 for Relief From the

22 Automatic Stay or, in the Alternative, Abstention (Related

23 Documents 652, 1280, 2715 and 2717) (related

24 document(s)2715, 652) filed by Allen G. Kadish on behalf of

25 Community Unit School District 300 (document #2996)

JX 053-4

Page 5

1    HEARING re Supplemental Objection to Debtors' Motion to

2    Compel Turnover of Estate Property (related document(s)2996,

3    2715) filed by Allen G. Kadish on behalf of Community Unit

4    School District 300 (document #3247)

5

6    HEARING re Motion of Community Unit School District 300 for

7    Relief from the Automatic Stay (document #652)

8

9    HEARING re Debtors' Objection (document #1280)

10

11   HEARING re Motion of Community Unit School District 300 for

12   Relief From the Automatic Stay or, in the Alternative, for

13   Abstention filed by Allen G. Kadish on behalf of Community

14   Unit School District 300 (document #652)

15

16   HEARING re Motion to Compel Payment of Post-Petition Rent

17   and Related Lease Obligations Pursuant to 11 U.S.C. §§

18   105(a), 363(e), 365(d)(3) and 503(b)(l)(A) and to Pay All

19   Subsequent Amounts Owed On a Timely Basis filed by Robert L.

20   LeHane on behalf of Trustees of the Estate of Bernice Pauahi

21   Bishop (document #2414)

22

23   HEARING re Objection of Transform Holdco (document #2832)

24

25

JX 053-5

Page 6

1   HEARING re Debtors' Response and Reservation of Rights (

2   document #3169)

3

4   HEARING re Response of Trustees of the Estate of Bernice

5   Pauahi Bishop ( document #2922)

6

7   HEARING re Motion to Compel Debtor in Possession to Assume

8   and Assign, Or, Alternatively, to Reject, Unexpired Lease on

9   Real Property (Sears Contract No. S8729-73-A) by Dedeaux

10  Inland Empire Properties filed by William P Fennell on

11  behalf of Dart Warehouse Corporation ( document #2980)

12

13  HEARING re Debtors' Objection ( document #3168)

14

15  HEARING re Motion for Payment of Administrative Expenses

16  Pursuant To 11 U.S.C. §503(a), 503 (b)(l)(A), and 507(a)(2)

17  for Mauldin At Butler LLC, Other Professional, period:

18  1/1/2018 to 12/31/2018, fee:$, expenses: $88,660.08. filed

19  by Mauldin At Butler LLC ( document #2690)

20

21  HEARING re Debtors' Objection (document #3163)

22

23  HEARING re Reply of Mauldin at Butler, LLC ( document #3225)

24

25

JX 053-6

Page 7

1   HEARING re Motion of Debtors for Entry of an Order

2   Authorizing and Approving Procedures for Settling De Minimis

3   Affirmative Claims and Causes of Action of the Debtors (

4   document #3031)

5

6   HEARING re Limited Objection of Wilmington Trust, National

7   Association (document #3144)

8

9   HEARING re Motion for Payment of Administrative Expenses

10  Motion of Winners Industry Co., Ltd. for Allowance and

11  Payment of Administrative Expense Claims. filed by Winners

12  Industry Co., Ltd. (document #1386)

13

14  HEARING re Notice of Agenda of Matters Scheduled for Hearing

15  on April 18, 2019 at 10:00 a.m.

16

17  HEARING re Debtors' Objection (document #2839)

18

19

20

21

22

23

24

25  Transcribed by:  Sonya Ledanski Hyde

**JX 053-7**

Page 8

1   A P P E A R A N C E S :

2

3   WEIL, GOTSHAL & MANGES LLP

4        Attorneys for the Debtor

5        767 Fifth Avenue

6        New York, NY 10153

7

8   BY:  JARED FRIEDMANN

9        JACQUELINE MARCUS

10       OLGA F. PESHKO

11

12  CLEARY GOTTLIEB STEEN & HAMILTON LLP

13       Attorneys for Transform Holdco LLC

14       One Liberty Plaza

15       New York, NY 10006

16

17  BY:  LEWIS J. LIMAN

18

19  SEYFARTH SHAW LLP

20       Attorneys for Wilmington Trust, National Association.

21       599 Lexington Avenue

22       New York, NY 10022

23

24  BY:  EDWARD M. FOX

25

Page 9

1

2   CLEARY GOTTLIEB STEEN & HAMILTON LLP

3        Attorneys for ESL Investments

4        One Liberty Plaza

5        New York, NY 10006

6

7   BY:  SEAN A. O'NEAL

8

9   MILBANK, TWEED, HADLEY & MCCLOY LLP

10        Attorneys for Attorneys for Cyrus Capital Partners

11        28 Liberty Street

12        New York, NY 10005

13

14   BY:  THOMAS R. KRELLER

15

16   GENSBURG CALANDRIELLO & KANTER, P.C.

17        Attorneys for Community Unit School District 300

18        200 West Adams Street, Suite 2425

19        Chicago, IL 60606

20

21   BY:  MATTHEW T. GENSBURG

22

23

24

25

**JX 053-9**

Page 10

1   ROBBINS SCHWARTZ

2        Attorneys for Community Unit School District 300

3        631 East Boughton Road, Suite 200

4        Bolingbrook, IL 60440

5

6   BY:  KENNETH M. FLOREY

7

8   VEDDER PRICE P.C.

9        Attorneys for NorthStar Group Services, Inc.

10       1633 Broadway, 31st Floor

11       New York, NY 10019

12

13  BY:  MICHAEL SCHEIN

14

15  ALSO PRESENT TELEPHONICALLY:

16

17  COLLEEN MAKER

18  ARLENE R. ALVES

19  JENNIFER A. ASHER

20  ERIC C. DAUCHER

21  RANIERO D'AVERSA

22  PATRICK FITZGERALD

23  ROBERT E. FITZGERALD

24  DAVID J. GALLAGHER

25  KIMBERLY B. GIANIS

JX 053-10

Page 11

1    IVAN M. GOLD

2    EVAN HOLLANDER

3    PATRICK J. HOLOHAN

4    WILLIAM S. HOLSTE

5    VLADIMIR JELISAVCIC

6    KELLY E. KLEIST

7    MATTHEW KOCH

8    STEVEN KOSSON

9    ZACHARY D. LANIER

10   TERESA LII

11   CATHERINE LOTEMPIO

12   SCOTT LUFTGLASS

13   KATHERINE E. MASSEY

14   MICHAEL MITTELMAN

15   BRYANT OBERG

16   BRIAN A. RAYNOR

17   RYAN REINERT

18   COURTNEY A. SCHAEL

19   PAUL SCHWARTZBERG

20   MICHELLE E. SHRIRO

21   CHRIS STAUBLE

22   AUSTIN H. VINY

23   DAVID WANDER

24

25

JX 053-11

1                    P R O C E E D I N G S

2              THE COURT:  Okay, good morning.  In re Sears

3      Holdings Corporation et al?

4              MR. SCHROCK:  Good morning, Your Honor.  Ray

5      Schrock, Weil Gotshal on behalf of the Debtors.  Your Honor,

6      before we get started and move into the main agenda, I just

7      had a quick update for the Court and parties in interest and

8      some recent case developments.

9              THE COURT:  Okay.

10             MR. SCHROCK:  First, Your Honor, I want to report

11     that the Debtors have selected two firms in consultation

12     with the Creditors' Committee to pursue preference

13     recoveries.  This is following a competitive process, you

14     know, working with the parties.  And we think what we have

15     are market leading recovery -- or market leading pricing for

16     contingency fees on those, so the ASK firm and

17     Acumen/(indiscernible) that have been selected by the estate

18     to pursue those recoveries.  And I believe, you know, the

19     Committee and the Debtors are both supportive of those.

20             THE COURT:  And these are basically preference

21     claims?

22             MR. SCHROCK:  These are just preference claims,

23     Your Honor.

24             THE COURT:  Okay.

25             MR. SCHROCK:  And you know, there's -- there were

Page 13

1   roughly $3.8 billion of transfers in the 90 days before the

2   cases were commenced.  When you take out some of the low-

3   hanging fruit, the exclusions, you know, it's roughly $1.9

4   billion.  And you know, we do have some estimates that you

5   know, we believe will be recoverable, but we do think that

6   those firms getting started, getting demand letters out soon

7   and starting to get that process moving is crucial to, you

8   know, the plan process and driving the estate's recoveries.

9        THE COURT:  Okay.  Hopefully that process won't be

10  finished by the time our plan is confirmed in the case, so

11  obviously, I would hope you -- I would consider how to

12  integrate that into a plan --

13       MR. SCHROCK:  Yeah.

14       THE COURT:  -- a post-effective date plan

15  structure.

16       MR. SCHROCK:  We are, Your Honor, we would

17  contemplate that those firms would ultimately be retained by

18  a post-consummation trust born under the Chapter 11 plan.

19  And you know, those would continue also to work of course

20  with chambers so that we don't necessarily cause too much

21  trauma to your docket as well as we would put that protocol

22  together.

23       THE COURT:  Okay.  Well, and that's the other

24  point I just wanted to raise.  I don't know how many

25  potential defendants there are, but clearly, in other cases,

JX 053-13

Page 14

1    the adoption of sort of the overall procedures for dealing

2    with these types of claims has been successful, sort of

3    along the lines of what you've done with personal injury

4    claims in other contexts, so hopefully -- I hope they will

5    be considering that as a possibility, at least.

6         MR. SCHROCK:  We are, Your Honor, and we'll work

7    on the protocol and hope to get it through with the

8    Committee and get it in front of Your Honor, the

9    (indiscernible) Committee that is, and get it in front of

10   Your Honor here in short order.

11        THE COURT:  Right.  It's obviously something you

12   want to discuss with the Committee.

13        MR. SCHROCK:  Of course, very much.

14        THE COURT:  Okay, all right.

15        MR. SCHROCK:  Your Honor, a quick Chapter 11 plan

16   update.  Following several weeks of discussions with the --

17   with certain Creditors and the Unsecured Creditor's

18   Committee, we have filed the Chapter 11 plan and a company

19   disclosure statement to wind up the affairs of these Chapter

20   11 cases.

21        A few notes on this point.  As everybody I'm sure

22   is very aware that the cases are -- they're expensive.  The

23   administrative costs are significant.  There's only one way,

24   we believe, to finish these cases, and that's to start the

25   clock.  We've set a -- asked for a disclosure statement

Page 15

1   hearing for May 16th.  We think that by starting the clock

2   and working with the stakeholders and really driving the

3   process leading from the front and getting people to focus

4   on what's really necessary in order to wind up the estates,

5   that's the only way it's going to happen.

6          But this is after, you know, roughly serving out

7   60 days ago the first draft of a plan.  You know, I think

8   some claimants would say let's please wait.  And you know,

9   our view, our strong view here is that if you don't have

10  deadlines associated with the plan process, gravity will

11  take over.  And it's very difficult to get the estates

12  efficiently wound up.

13         There's still a significant amount of work.  Even

14  though the assets are largely gone associated with the

15  ongoing operations, there's very significant services that

16  are still being provided by the estate, including transition

17  services, issues related to executory contracts, cure

18  reconciliation.

19         And I wish I could tell Your Honor that it's just,

20  you know, it's a one-person job at Weil and Akin to, you

21  know, go through all of those claims, but it's not.  It's

22  literally, you know, hundreds of inquiries every day and

23  trying to work through the employee issues, the regulatory

24  issues, the bank issues.  There's still quite a bit that's

25  going on, so those transition services are ongoing, and you

JX 053-15

Page 16

1    know, we know that we have to wrap things up.

2            The plan overall, it's a non-consolidated plan.

3    It's a straight, what I call waterfall plan, with only one

4    settlement at this time incorporated, which is with the

5    PGBC.  The plan has a mechanic that's under discussion for

6    resolving inter-company claims, which remains open.  So like

7    any company, Sears did not have cash at every legal entity

8    within the structure.

9            Some entities have cash, some entities don't, some

10   have -- we know more assets, some have less, and that's very

11   common in our experience in any complex structure.  So to

12   deal with this issue, we have a non-consolidated plan and an

13   ability for one Debtor to make loans to another Debtor, if

14   they believe there are sufficient recoveries to deal with

15   it.

16           We're also in discussions with certain Creditors

17   around, is there a compromise around inter-company claims

18   that everybody can get behind.  As you might imagine, that's

19   a very -- it's a very complex negotiation, but we do think

20   we have at least one mechanic to preserve the integrity of a

21   non-consolidated plan.

22           The 503(b)(9) claims bar date has passed.  We

23   expect to complete the initial reconciliation of claims in

24   the next few days and we'll sit down with the Unsecured

25   Creditor's Committee and professionals to review them.  I

JX 053-16

1    think the good news is that based upon our preliminary

2    review, that we think valid claims are coming in right

3    around the range that we have previously disclosed to

4    parties in interest in the Court and in line with the

5    Debtor's expectations.

6           We do have, of course, the Transform Co

7    assumption, or not assumption, reimbursement of

8    approximately $140 million of those claims, which Mr.

9    O'Neill likes to remind me would be subject to offset, if

10   there are any costs that would be going the other direction.

11          507(b) claims, which parties in, you know, some

12   parties that are surveyed are very significant numbers are

13   just treated as a straight waterfall under the plan.  We do

14   not have a global settlement with 507(b) claimants at this

15   time.  We've had initial discussions with Cyrus, which I

16   would characterize as hopeful and somewhat productive.

17          I wouldn't say that they were vigorous at this

18   point.  But our focus was to sit down with the UCC, get to a

19   deal -- try and get to a deal.  We didn't reach a deal yet.

20   But at least file it and use the filing of the plan as a

21   mechanic to sit down with the large 507(b) claimants in

22   these cases, in the very near future.

23          So in that vein, our plan is to sit down in the

24   next week with the key stakeholders, including Cyrus,

25   Wilmington, ESL, so that we can address how some of those

Page 18

1   507(b) claims can be teed up with the Court.  I've had some

2   initial discussions with ESL's counsel just around, you

3   know, if it's an estimation proceeding or the right, at

4   least procedural mechanic to get those in front of the Court

5   in conjunction with a plan process as well as a reserve

6   mechanic.

7        But we believe firmly that the structure in place

8   and the tension of a disclosure statement here and a

9   confirmation hearing, that we're going to be able to lead

10  parties to get to something that's workable to wind up the

11  affairs of the estate.  We have to wind this up some way,

12  and we believe this is the best way to do it.

13       There's a litigation or a post-consummation trust

14  that I referred to earlier that's in the plan.  That was

15  after a great deal of coordination among the tax

16  professionals at Akin and Weil that we believe that that's

17  the right structure for claim holders and beneficial

18  interest holders in the trust.

19       We've left the governance of the trust open as

20  TBD.  That's subject to ongoing negotiations with

21  stakeholders, including the 507(b) claimants in the UCC.

22  We've left the position of the litigation trustee open at

23  this time.  It's still being subject to negotiation.  You

24  know, we just also wanted to mention the administrative

25  claims bar date.

JX 053-18

Page 19

1          We do have that concept in the plan.  When the

2    particular date is is still subject to discussion.  We've

3    dealt with this issue in two ways in prior cases, including

4    cases in front of this Court, where we've had the admin

5    claims bar date, you know, at confirmation or even sometimes

6    in advance of confirmation.  We've heard from stakeholders

7    arguing each way, but we'll certainly resolve that over the

8    next couple of weeks.

9          And then, finally, on releases.  There's a

10   mechanic in the plan that provides that if a party's named

11   in a plan supplement document or otherwise in a complaint,

12   they will not be released.  The releases under -- are under

13   the exclusive authority within the Debtors of the

14   restructuring subcommittee, consistent with their mandate.

15   Those issues are still being under discussion, but that's

16   the mechanic that's in there right now.

17          THE COURT:  And you're referring to releases by

18   the Debtor's estate?

19          MR. SCHROCK:  Yes, thank you, Judge.  Yes, just

20   Debtor releases.  There is not non-consensual -- there are

21   no non-consensual third party releases in the plan.

22          THE COURT:  Okay.

23          MR. SCHROCK:  And then finally, Your Honor, just

24   as I referred to earlier, there's, you know, related to the

25   other work that's ongoing at the estate, there's quite a few

Page 20

1    disputes that we're still working through with Transform Co.

2    Some of those are up today.

3            We are providing, you know, pretty extensive

4    transition services at this point, and we still have all of

5    the employees that are still employed effectively by the

6    Debtors and are being leased to Transform Co.  So we have

7    numerous deals that have to be worked out with Creditors and

8    Transform Co to allow those parties to have a fresh start

9    with new Sears, and as well, still balance the estate

10   interests that we're not compromising the claims that have

11   been reserved for the benefit of the estate, namely the

12   preferences and the other litigation issues.

13           But the work is time intensive.  We are very

14   mindful of the costs in this case, and we are going to do

15   our level best to try and get these estates through a

16   confirmed plan process by July.  And we have, you know,

17   tentatively talked with parties about, you know, a date for

18   confirmation around the third week in July.

19           So we don't have broad support for the plan at

20   this time, but we believe the getting in on file and driving

21   the process is the right answer for these estates.  And

22   then, finally Your Honor, I know that the parties made

23   notice we did -- the restructuring subcommittee did file a

24   complaint last -- late last evening against a number of

25   parties.  I'm sure there'll be plenty of time for discussion

Page 21

1    on those issues at another point.  But you know, that action

2    is in fact under way.

3         THE COURT:  Okay.  Does anyone have anything to

4    say on that report?  Okay.  Well, obviously, the Debtors and

5    their professionals have the task of moving the case along

6    as promptly and efficiently as possible.  I appreciate there

7    are a number of steps that need to be taken before you're

8    nearly at the point to confirm a plan, but it clearly to me

9    makes sense to be moving forward as you are within active

10   consultation with the key parties in interest.

11         It's in their interest, too, except perhaps,

12   although I think it's in their interest also, parties that

13   may view themselves more as litigation targets than

14   Creditors.  But frankly, I think resolving the cases

15   promptly is in everyone's interest.

16         And in that regard, I only have a couple of

17   observations.  The first is that if the cost of doing your

18   company analysis or the difficulty of it exceeds the

19   benefit, you know, there is an alternative, which is

20   substantive consolidation, so that's something to be aware

21   of.

22         MR. SCHROCK:  Yes, Your Honor.  We're

23   (indiscernible) aware of that and --

24         THE COURT:  Okay.

25         MR. SCHROCK:  -- I think we're hopeful that

Page 22

1   reasonable minds will agree on something.

2          THE COURT:  Well, and it's a factual

3   (indiscernible), if you can actually make the analysis, then

4   ignore what I just said.  Secondly, as far as the necessary

5   reconciliation of claims is concerned necessary for

6   confirming a plan that is, you're absolutely right.  They're

7   under the authority to estimate claims.

8          And given the actual outcome of the sale and the

9   related GOB sales, that should be a much easier process.  So

10  again, it's not something that I think parties should spend

11  a lot of time and money on trying to negotiate, if there's

12  just an impasse.  I think you may just want to tee up an

13  estimation on that (indiscernible) --

14         MR. SCHROCK:  That's -- that was our thinking

15  exactly, Your Honor.

16         THE COURT:  Okay.  I mean, unlike when it was

17  being discussed during the sale hearing, when I was asked to

18  compare alternatives as far as 507(b) claims are concerned,

19  we don't have an alternative scenario here.  We actually

20  have the facts, so I think it's a lot easier to decide at

21  this point.

22         MR. SCHROCK:  Thanks very much.

23         THE COURT:  Okay.  So why don't we proceed then

24  with the agenda?

25         MR. SCHROCK:  Yes, Your Honor.  The first item on

JX 053-22

Page 23

1   the agenda is the Debtor's motion to enforce the asset

2   purchase agreement automatic stay against Transform Holdco,

3   and I'll cede the podium to my partner, Mr. Friedmann.

4           THE COURT:  Okay.

5           MR. FRIEDMANN:  Good morning, Your Honor, Jared

6   Friedmann from Weil, Gotshal on behalf of the Debtors.

7   Before I get into the credit card accounts receivable issue

8   we were discussing at the last hearing, I wanted to put on

9   the record where we are with respect to the interim

10  agreement we advised you of at the last hearing regarding

11  the two other categories of assets that we've moved on in

12  our motion to enforce the automatic stay.

13          THE COURT:  Okay.

14          MR. FRIEDMANN:  As we advised you then, the basis

15  of that agreement was that there were initial payments that

16  were to be made to Debtors on March 26th.  And then, we gave

17  Transform until April 3rd to complete the reconciliation

18  process and pay us whatever the remainder was of the

19  undisputed amounts.

20          So with respect to the cash in transit, and those

21  are the pre-closing proceeds that ended up in Transform,

22  because we had transferred the cash management system over

23  to Transform at closing, so these were pre-closing proceeds

24  that ended up in the bank accounts they were intended for,

25  but those bank accounts were no longer in our possession so

JX 053-23

Page 24

1    they went over to Transform and we were moving to get them

2    back.

3            So on March 26th, consistent with our agreement,

4    the Debtors were paid $3 million and they were produced

5    documentation regarding the reconciliation at that point.

6    On April 3rd, pursuant to the agreement, Transform was

7    supposed to pay Debtors any amount above and beyond that $3

8    million initial payment and to also provide us with

9    additional reconciliation.

10           On April 4th, Transform confirmed that the total

11   amount of cash in transit in the cash management system was

12   $22.5 million, so $19 and a half million more than they had

13   paid us on March 26th.  There is no dispute regarding that

14   $22.5 million number.  To date, however, Transform has

15   refused to turn over that $19 and a half million delta in

16   cash in transit proceeds.  And again, these are dollars that

17   we would have had in our bank accounts, had we not given

18   them our bank accounts.

19           THE COURT:  And what's the standard rationale for

20   not paying it?

21           MR. FRIEDMANN:  The standard rationale, as we

22   understand it, and this is for both the cash in transit as

23   well as the (indiscernible), which I'll discuss in a moment,

24   is, as we understand it, that there are other set-offs.  And

25   in our discussions, we've reminded Transform of Your Honor's

JX 053-24

Page 25

1    admission at the last hearing that set off our -- an excuse

2    and they still violate the automatic stay.  It hasn't worked

3    yet so far.

4           So as -- we're willing to give Transform until

5    next Thursday to turn over these funds to us, otherwise, we

6    anticipate moving on an expedited basis to have another

7    hearing because we need these dollars now.

8           THE COURT:  And has Transform identified to you

9    what the basis for the claims over are?

10          MR. FRIEDMANN:  There are a series of various

11   setoffs and reconciliations that necessarily are happening

12   between the companies and we're happy to work through those.

13   Our point with respect to both the cash in transit and the

14   rent (indiscernible), these are announced at our estate

15   property and were supposed to be turned over to us

16   immediately.

17          No doubt there would be later reconciliations on a

18   number of other issues, which we're happy to work through

19   with them, but these are -- this is estate property that

20   they're holding onto and not turning over on the rent

21   (indiscernible) and the APA --

22          THE COURT:  Can I interrupt you?

23          MR. FRIEDMANN:  Please.

24          THE COURT:  I understand reconciliations.  That

25   presumes that departure's still trying to work out what is

Page 26

1    owing.  But I'm trying to understand whether Trans Co has

2    asserted that there are actually separate and apart from

3    just trying to figure out the ultimate purchase price,

4    whether there amounts owing by the Debtors to it, that would

5    be the set off.  The rest is a reconciliation of amounts

6    that are to be paid and still to be decided to be paid, in

7    other words.

8              MR. FRIEDMANN:  Yeah, so it's a series of other

9    set offs, and there are other buckets where monies are owed

10   from Debtors to Transform Co.

11             THE COURT:  Okay.

12             MR. FRIEDMANN:  And so, they're using those other

13   buckets to offset the cash in transit and the real estate

14   (indiscernible), as we understand it at this point.

15             THE COURT:  Are those owed under the purchase

16   agreement?  It's asserted as being owed under the purchase

17   agreement?  I don't understand.  They're the buyer.  Why

18   would the Debtor be owing them money except as part of

19   reconciling the ultimate purchase price?

20             MR. FRIEDMANN:  Yeah, so that's exactly what --

21   it's reconciling (indiscernible) --

22             THE COURT:  Well, but that's reconciling amounts

23   that were made to be paid as opposed to amounts that are

24   already owing.

25             MR. FRIEDMANN:  Correct.

Page 27

1          THE COURT:  I think that's the important

2    distinction.  So I just reiterated what I said last time.  I

3    don't see any basis not to pay this money, unless you know,

4    they disagree and say that the Debtors independently owe

5    Trans Co something, as opposed to Trans Co has the right

6    under the purchase agreement to adjust remaining amounts,

7    not these amounts, but other amounts that are still to be

8    fixed.

9          MR. FRIEDMANN:  The -- just to be on the record

10   also, respectfully, the rent -- the February rent

11   (indiscernible), they are too consistent with the agreement

12   on March 26th, Transform paid Debtors $5 million and

13   produced documentation at that time, calculating where --

14   how they've gotten there so far.

15          On April 3rd, they were supposed to pay any

16   amounts over that $5 million owed in rent (indiscernible),

17   and provided Debtors with backup.  On April 4th, Transform

18   advised and it confirmed that $14.9 million in rent

19   (indiscernible) was due.  They were still reconciling

20   apparently another $1.3 million of that.

21          Now while we believe that the $1.3 million is also

22   due and owing to the Debtors, the $9.9 million delta between

23   the $5 million they gave us on March 26th and what they had

24   already determined was owed by April 4th has also not been

25   paid.  So in total, there is the $19.5 million in cash in

JX 053-27

Page 28

1   transit, plus the $9.9 million in rent (indiscernible).

2          So $29.4 million in total that we believe is

3   estate property that should be turned over immediately, and

4   as I said, it is -- we've -- you know, we're happy to wait

5   until next Thursday for them to do what needs to be done to

6   get that money to us, but if we do not receive that money by

7   next Thursday, we do anticipate moving the Court on an

8   expedited basis.

9          THE COURT:  Okay.

10         MR. FRIEDMANN:  And the turn now to the credit

11   card receivables account issue.  So as I -- a preliminary

12   matter, I just wanted to move into evidence the second

13   supplemental declaration of (indiscernible) in support of

14   the motion to enforce, which is Document 3080.

15         THE COURT:  Okay.  As I understood it, the parties

16   were not going to be treating this as a hearing with live

17   testimony.  Is that correct?

18         MR. FRIEDMANN:  I believe from my discussions with

19   my colleagues at Cleary that neither of us intend to call

20   any witnesses today.

21         THE COURT:  Okay, all right, so if there's no

22   objection to the admission of that declaration, subject to

23   sometime in the future if need be, you have the right to

24   examine the witness on anything other than just the

25   documents that were provided.  Okay, I'll admit it, then.

Page 29

1        (Document 3080 Admitted Into Evidence)

2            MR. FRIEDMANN:  So Your Honor, the Court asked the

3    party to submit a supplemental briefing addressing whether

4    the credit card processing agreements filed by the buyer on

5    the eve of the March 21st hearing helped clarify in any way

6    whether or not the reserve accounts at issue fall within the

7    APA's definition of credit card accounts receivable.

8            THE COURT:  Right.  And I also wanted to make sure

9    I had all of those agreements, which I believe I do now, I

10   have.

11           MR. FRIEDMANN:  They would know better than we do,

12   and we're assuming that they've pre-solved them.

13           THE COURT:  Okay.

14           MR. FRIEDMANN:  And frankly, I'm not sure it

15   matters that much because from the agreements that we've

16   seen, those agreements demonstrate or at least do nothing to

17   refute that the reserve accounts do in fact fall within the

18   definition of credit card accounts receivable.

19           The buyer's initial brief and then their

20   subsequent reply brief repeat the same argument over and

21   over again, and because the reserve accounts describe their

22   treated something and as they -- a security in the

23   processing agreements, that therefore, those reserve

24   accounts must also be a security deposit and cannot be

25   credit card accounts receivable within the meaning of the

Page 30

1   APA.

2          And that argument, we submit, is fundamentally

3   flawed.  The fact that the reserve accounts are described or

4   treated as security under the processing agreements does not

5   mean that they'd be -- necessarily become security deposits

6   within the meaning of the APA.  All that matters here is how

7   the Debtor and the buyer define credit card accounts

8   receivable in the APA, and whether the reserve accounts fall

9   within that definition, which they plainly do.  Likewise --

10          THE COURT:  That's because the operative paragraph

11  is Paragraph 10?

12          MR. FRIEDMANN:  I think the operative paragraph is

13  the definition of credit card accounts receivable, which is

14  --

15          THE COURT:  Well, I understand, but --

16          MR. FRIEDMANN:  Right.  And then 10.9.

17          THE COURT:  It flows through Paragraph 10 because

18  that's the mechanism where credit cards accounts receivable

19  comes into play.

20          MR. FRIEDMANN:  That's correct, Your Honor.  But -

21  -

22          THE COURT:  Okay.

23          MR. FRIEDMANN:  -- and credit card -- it includes

24  the defined term credit card accounts receivable, which

25  requires you to go back to the definition.

Page 31

1          THE COURT:  Right.

2          MR. FRIEDMANN:  Like, the fact that the reserve

3    account serve a security under a collateral to protect the

4    processors from default doesn't change the fact that the

5    reserve accounts are ultimately due and payable to Sears, a

6    fact that the buyer does not and cannot really dispute.  In

7    fact, in their initial moving brief, they cite the American

8    Express amended agreement in Section 2, which explains that

9    although American Express was not currently obligated to pay

10   Sears anything in their reserve accounts, it ultimately is

11   obligated to return an amount equal to the amount in the

12   reserve, not of any current obligations.  So at all times,

13   that money is due and owing to Sears, there just may not be

14   a payment obligation right away.

15          The buyer also argues in their reply brief that

16   the terms in the (indiscernible) related agreement should be

17   given the same meaning.  But of course, the APA and the

18   processing agreements are not in the same, nor are they even

19   related agreements.  In all the cases the buyer sites for

20   that proposition are at opposite because they concern

21   provisions that are in the same agreement or transactions

22   that were intertwined or multiple contracts in a single

23   transaction, so none of that case law is applicable here.

24          Similarly, the buyer's argument in their reply

25   that the processing agreements are integrated into the APA,

Page 32

1    (indiscernible) by the integration clause at 13.4 in the

2    APA.   The buyer also argues that the processing agreements

3    were the backdrop against which the APA was drafted.

4            Accepting that premise as true for a moment, Your

5    Honor, it's notable that not only are the reserve accounts

6    not carved out from the APA's definition of credit card

7    accounts receivable, but Section 2.10, which lists almost

8    every conceivable type of security from restricted cash to

9    letters of credit to utility deposits and everything in

10   between, what doesn't it include, are reserve accounts held

11   by the credit card companies.

12           Why is that?   It's because they're already covered

13   and included within the broad definition of credit card

14   accounts receivable.   And Your Honor, as we discussed in the

15   last hearing, even if the reserve accounts are a type of

16   restricted cash or other security or whatever buyer is

17   arguing today about where it falls under 2.1, the APA's

18   specific definition of credit card accounts receivable

19   controls over that broad catch-all provision in 2.10 or even

20   2.1 (indiscernible).

21           And as I mentioned early -- earlier, what really

22   matters is how the APA defines credit card accounts

23   receivable and whether the reserve accounts are in fact

24   credit card accounts receivable within the meaning of the

25   APA.   And we submit that they are.

Page 33

1          The APA defines credit card accounts receivable as

2   each account together with its proceed is owed by the credit

3   card payment processor to a seller, resulting from charges

4   by a customer of a seller on credit cards that are processed

5   by such a processor in connection with the sale of goods by

6   a seller or services performed by a seller, in each case in

7   ordinary course of that seller's business.

8          And unless you twist the words of the definition

9   of credit card accounts receivable, these reserve accounts

10  satisfy every element of that definition.  The fact that as

11  we've (indiscernible) recently First Data has agreed to

12  release $15 million of the $28 million that its holding in

13  reserve accounts underscores our point that the reserve

14  accounts are in fact owed, and that they're far more liquid

15  than the buyer tried to portray.

16         Mr. Kamlani's latest declaration submitted with

17  the reply brief candidly admits in Paragraph 5 that the

18  reason First Data did not release the reserve accounts pre-

19  closing to Sears is that ESL refused to provide the

20  information that was requested.  He then goes on to explain

21  in the next paragraph that after the closing, when Transform

22  did provide that information, First Data is not prepared to

23  release $15 million.

24         So I want to stop there for a moment, because what

25  it demonstrates is that that money, at the time of closing,

Page 34

1    was available to be released.  It was owed, it was ready to

2    be released.  All that had to happen was for ESL to provide

3    the information that First Data was requesting, and then $15

4    million at that moment would have gone straight to debtors

5    and be in their pockets right now.  We wouldn't be having

6    this issue.

7            But what ESL did was to say, "We refuse to give

8    you the information right now."  As Mr. Kamlani says in his

9    declaration, they waited until after the closing and then

10   they went and gave that information, and now the $15 million

11   is available.

12           There also can be no dispute that had, following

13   the sale hearing, the deal for some reason fallen apart and

14   that there was no deal with ESL, and Sears had to go through

15   a liquidation, the amount in those reserve accounts would

16   have gone right to the debtors.

17           The agreements would have been done and saved for

18   any chargebacks, but you go into a going out of business

19   deal, there are no returns.  There aren't even any

20   chargebacks.  There's a lot of money flowing in.  The

21   reserves clearly would have gone to debtors because that

22   money was always owed to debtors.

23           THE COURT:  Well, can I -- I want to make sure I

24   understand what you all are really fighting over,

25   practically.  10.9 of the APA is the provision that sets

JX 053-34

Page 35

1    forth an aggregate amount of inventory value, amounts due to

2    seller with respect to credit card accounts receivable, and

3    pharmacy receivables, and says that it should be at least

4    $1,657,000,000.

5            And then it says that to the extent that that

6    amount -- the amount of those three items exceeds,

7    $1,657,000,000, sellers may reduce such amount to be equal

8    to that number by first transferring inventory and second

9    retaining as an excluded asset, the oldest of any credit

10   cards account receivable.

11           So that's a mechanism that comes into place that

12   refers just to credit card accounts receivable, right?  It

13   doesn't have anything to deal with security deposits.

14           MR. FRIEDMANN:  That's correct.

15           THE COURT:  One can conclude, therefore I think,

16   that if something is both a credit card account receivable

17   and a security deposit, that paragraph would operate just

18   fine.  It doesn't matter whether a security deposit, you

19   just use the paragraph because it all refers to accounts

20   receivable.

21           MR. FRIEDMANN:  That's correct, Your Honor.

22           THE COURT:  Okay.  Is there some other provision

23   of the agreement that applies to require the security

24   deposits to be held?  In other words, are you saying that

25   you're entitled, the debtors are entitled to other money

Page 36

1   constituting credit card accounts receivable because it's

2   not a security deposit?  Or are we just arguing about the

3   operation of 10.9?

4           MR. FRIEDMANN:  What we're arguing about is the

5   operation of 10.9, and I think the key factor here is

6   whether or not those reserve accounts were considered part

7   of the credit card receivables to get to the threshold.

8           THE COURT:  I understand that.  But in your

9   explanation about they should pay us the $15 million now, I

10  wanted to make sure I understood your basis for saying that.

11          MR. FRIEDMANN:  Let me reclarify also that point,

12  is that we do not dispute that what 10.9 entitles us to is

13  the oldest of any credit card accounts receivable.

14          THE COURT:  Okay.

15          MR. FRIEDMANN:  So if Your Honor was to order than

16  what we're entitled to is $14.6 million of the oldest credit

17  card receivables, and that First Data should release $14.6

18  million of only the oldest credit card receivables to us, we

19  have no issue with that.

20          THE COURT:  Okay.  So you're not arguing then that

21  Transform is obligated to release all of the reserve amounts

22  because they're credit card accounts receivable.  You're not

23  arguing that.

24          MR. FRIEDMANN:  No, and there's a suggestion in

25  their brief that we're suggesting that the reserve accounts

Page 37

1    were not transferred or we were arguing they should not have

2    been transferred.  All of the security deposits, all of the

3    accounts receivable, all of that went to Transform.

4         The point is that that in that happening, and in

5    light of the fact that there also were pre-closing

6    transactions that had not yet cleared, they ended up in

7    excess of the $1.657 -- not only by the $7 million that was

8    recognized at the closing which is why there was property,

9    inventory transfer, but it ended up being an additional

10   $14.6 million, as they learned about a week a later when all

11   those credit card transactions had cleared.

12        THE COURT:  Okay, all right.  That's fine.  I just

13   wanted to make sure I understood the extent of your claim or

14   your demand.

15        MR. FRIEDMANN:  And the last point I wanted to

16   make, Your Honor, was on this point exactly, which was that

17   at the closing, Transform admitted that the debtors had met

18   and exceeded this $1.657 billion threshold -- and that's

19   demonstrated in the emails between counsel for debtors and

20   ESL, which are attached to Mr. (indiscernible) declaration

21   that we just put into evidence.  It was only hours before

22   closing the parties had agreed that debtors would be

23   delivering in excess of $7 million above the aggregate

24   threshold in 10.9.

25        And the email shows that the parties agreed at

Page 38

1    that point that at ESL's request, the debtors would take $7

2    million in prepaid inventory that was still at the vendor's

3    facility instead of taking inventory that was already in

4    transit.  And my understanding is the reason for that swap

5    was that the inventory already in transit could go towards

6    the borrowing base, whereas the prepaid inventory that was

7    still at the vendor could not.

8           So we agreed to accommodate them in order to get

9    this deal to close at that point, but -- and first of all,

10   the characterization by the way in the briefing that there

11   was some threat made that they had to do this, that's just

12   ridiculous.  But it's also not the point.

13          The point is that there would be no $7 million in

14   excess of inventory to be transferred unless the $1.657

15   threshold was met.  And that threshold is met only if the

16   reserve accounts were treated as part of the credit card

17   accounts receivable in 10.9 by both parties.

18          Your Honor, in the end, you have before you an

19   agreement whose terms are unambiguous.  The definition of

20   "credit card account receivable" is enough to clearly

21   embrace the reserve accounts, even in the context of what we

22   see in the proxy agreements.  At the end of the day, this is

23   about what the agreement says, not what ESL made, not which

24   they had negotiated.

25          For that reason, we ask the court to enforce the

Page 39

1   automatic stay and order First Data to release, $14.6

2   million currently held in reserves to the buyer.  I'm sorry,

3   to the debtors.  Thank you.

4              THE COURT:  Okay.

5              MR. LIMAN:  Your Honor, Lewis Liman.  My

6   colleague, (indiscernible), is prepared to answer briefly

7   the questions with respect to cash in transit, if Your Honor

8   has questions about that.  The bottom line is we didn't know

9   that that was on the agenda for today.

10             THE COURT:  No, I just wanted to makes sure I

11  understood it, because again, the issue about the automatic

12  stay is a serious one, and I wanted to make sure Transform

13  appreciates the difference between setting off a claim

14  against another claim or withholding cash based on a claim

15  setoff right, which would violate the automatic stay.

16             The difference of that concept from the concept of

17  adjusting accounts through a reconciliation process, which

18  is recoupment, which is not subject to the automatic stay.

19  And if it's the former, we should stop it.

20             MR. LIMAN:  Okay.  We have serious quarrels with

21  Mr. Friemdann's representations.

22             THE COURT:  Okay, that's fine.  We don't need to

23  get into that today.  I just wanted to give everyone a

24  head's up on how I think that issue should be viewed as far

25  as the automatic stay is concerned.

Page 40

1          MR. LIMAN:  Your Honor, with respect to the credit

2   card accounts receivable security deposit issue, we've got

3   several points that we wanted to highlight.  The first is

4   that, you're quite correct, that the operative language to

5   focus on is 10.9, which has two components as applicable

6   here.  One is that it has to be credit card accounts

7   receivable, and second it has to be due.

8          Now from the beginning of this case -- and I mean

9   from the beginning of this case -- there has been a

10  distinction drawn between the notion of credit card

11  receivables payer to debtors and reserve accounts.  And when

12  I say, "from the beginning of this case," I'm referring to

13  the first stay order that was entered in this case.

14         It's Docket 1394, which refers separately to the

15  credit card receivables payable to debtors, that's Paragraph

16  19, and to the reserve accounts maintained by the payment

17  processors, and that's Paragraph 15.  And that is obviously

18  a backdrop against which this was drafted.

19         THE COURT:  Why is that?

20         MR. LIMAN:  Why is that?  Because I think, Your

21  Honor, the parties recognized from the very beginning -- and

22  I'll get into the detail with respect to this -- that

23  there's a difference between the amounts that were in the

24  reserve accounts and the credit payables.  Different rights

25  that the credit card processors had with respect to those

Page 41

1    funds.

2                THE COURT:  Well the processes, I understand that

3    issue.

4                MR. LIMAN:  And that, I think, ultimately

5    underlies a lot of the issues and a lot of the dispute

6    between us.  What I'd like to do -- should I ignore that?

7                THE COURT:  Well, let's see if anyone answers

8    that.  I think that was just a glitch with the call.

9                MR. LIMAN:  I'd like to focus on three or four

10   elements of the contract.  The first is the definition of

11   "credit card accounts receivable."  The second is the

12   definition of "due," the third is the notion of payment.  In

13   order for something to be a credit card accounts receivable,

14   there has to be at least two elements.

15               First of all, it has to be a payment intangible,

16   and second, the payment intangible has to be owed as a

17   result of card charges in the ordinary course.  Now we've

18   cited a case in our papers -- I noticed Mr. Friedmann did

19   not respond to it -- that a reserve account, payments that

20   are held in a reserve account, that were withheld from

21   payments otherwise due, do not constitute a payment

22   intangible.

23               The monies in essence of Sears of debtors that are

24   held by the card companies as security.  That's the

25   Morristown Lincoln case, it's not answered.  The second

JX 053-41

Page 42

1    element is these need to be a payment intangible --

2          THE COURT:  Well, it says "account or payment

3    intangible."

4          MR. LIMAN:  That's correct, Your Honor.  And the

5    definition of "account," these would be an account under the

6    UCC as between the card processing companies and the

7    ultimate customers.  So I think under the UCC, these would

8    not fall within the definition of account.  They -- the

9    argument would be that they fall within the definition of

10   payment intangibles, but monies that have been held back on

11   behalf as security on behalf of another party are not

12   payment intangibles.

13         THE COURT:  Why isn't it an account?  It's owed.

14   They're holding it back because they have a right of set

15   off, which means there's another obligation which they owe,

16   which they're holding back to set off against.

17         MR. LIMAN:  It's because it's cash that is held by

18   the card processing companies in the form of cash.  So that,

19   I believe, under the UCC, would make it fall within the

20   definition of payment intangible, if anything.  I do want to

21   focus though on the language about owed as a result of card

22   charges in the ordinary course.  And I also want to focus on

23   the language of the card agreements.

24         Now Mr. Friedmann told you, and his briefs say,

25   that you should not look at the card agreements for their

JX 053-42

Page 43

1    definitions.  I'd like to cite a couple of cases to you and

2    propositions that demonstrate that that's wrong.  It's the

3    restatement of contracts 214 says that when you have related

4    contracts and you're trying to interpret a term, you look to

5    those related contracts.  And after all, what we're trying

6    to figure out here is whether these monies that are, that

7    are held by First Data, AmEx and Discover, in each instance

8    fall within credit card accounts receivable.

9           The other case I'd like to cite to you is the

10   Shiftan case, Delaware 57.935, Note 15.  If you look, just

11   for example, and parse carefully the language of the First

12   Data agreement, that tells you what is payable from card

13   transactions in the ordinary course.  The language almost

14   tracks the language that is in the APA.  It refers to sales

15   data that come from card transactions in the ordinary

16   course.

17          And remember, ordinary course in the APA in this

18   instance is used in the lower case, not the formal upper

19   case, so it's got to be referring to something.  Our view is

20   that it best refers to that language in First Data and in

21   the other agreements.

22          And then it tells you what is payable out of those

23   card transactions in the ordinary course.  And what it tells

24   you is payable is a net amount.  It's not just monies that

25   were furnished as a result of card transactions at the Sears

Page 44

1    stores.  The amount that is payable is an amount that is net

2    of reserve account amounts.

3            Now, the debtors would say, well the title, you

4    should disregard the title of credit card accounts

5    receivable because receivable and payable are not referred

6    to within the definition.  But they also within the papers

7    say that the word "owed" equals payable.  That's their

8    Paragraph 18.

9            And we would respectfully submit that in order to

10   determine what is payable, or what was receivable out of

11   card transactions in the ordinary course, you don't need to

12   go beyond the First Data agreement at Paragraph 4.3 and the

13   other related provisions.

14           Now, Mr. Friedmann also told you that reserve is

15   not mentioned within the APA, but he has no answer to the

16   fact that security is referenced within the APA.  The

17   reserve is simply the account in which the asset is being

18   held.  There's no -- it shouldn't be a surprise that reserve

19   is not being mentioned.  The issue before Your Honor is

20   what's due and how to characterize that cash in the moment

21   of closing in the hands of the debtor.

22           And when the agreements before you refer in the

23   instance of First Data to an amount that is held for

24   protection against the risk of default, when they refer to

25   in the AmEx agreement as an amount that is collateral, when

Page 45

1   they refer to in the Discover agreement as security, and in

2   the Discover agreement -- and I do have a correction I need

3   to make from my argument last time -- the Discover agreement

4   makes it quite clear that there is a security interest that

5   Discover has in these funds.

6           The correction that I have to make is that I fear

7   that I may have been misunderstood to suggest that the card

8   processing companies don't have a security interest in these

9   funds.  I think they do, and I think what you need to do is

10  look at the UCC paragraphs or sections 3.12 to 3.14.  It

11  says that when the funds are in the possession of the card

12  companies, that gives them a security interest without the

13  need for perfecting.  I've got two more points I'd like to

14  make --

15          THE COURT:  But they weren't granted a lien.  They

16  have a right of setoff.

17          MR. LIMAN:  They have a right of setoff.  Under

18  the UCC, they've got -- they don't need to -- and right of

19  setoff actually is quite important, and I want to get back

20  to that in a moment.  They don't need to have perfected

21  their filing --

22          THE COURT:  No, but that's a different point.

23  That's perfection as opposed to a lien.  And I think what

24  they have is a right of setoff, i.e., they owe Sears money,

25  which they have a right to offset against.

Page 46

1          MR. LIMAN:  That's correct, Your Honor.  Now there

2     are two additional points that I want to make with respect

3     to just the definition of credit card accounts receivable.

4     The first is that when you look at the argument in the

5     definition that the debtors urge you to apply, which is to

6     say that the funds that were used to satisfy the reserve

7     obligation were generated from credit card receipts.  As

8     we've pointed out, there is no limiting principle with

9     respect to that argument.

10         THE COURT:  I don't understand.

11         MR. LIMAN:  Well the point, Your Honor, is that in

12    each instance, Sears had an option when the card companies

13    said in order to continue to do business with us, we need

14    you to post security.  Until First Data -- what First Data

15    said is you need to post a letter of credit.  You've got an

16    option if you don't want to post a letter of credit to post

17    cash or to permit us to withhold.  Similar mechanisms under

18    the AmEx agreement and under the Discover agreement.  I

19    don't think there would be any dispute if the debtors here,

20    Sears chose pre-petition to deposit cash with the card

21    companies.  That money would not constitute a credit card

22    account receivable.  That money would be derived from credit

23    card transactions, and that's where Sears's money came from.

24    It's a retail business.  Its revenues are all derived from

25    there.

```
                                                              Page 47
 1              THE COURT:  But the parties actually use the term
 2       "credit card accounts receivable."  They didn't use the term
 3       "cash."  And that's the term that's used in 10.9.
 4              MR. LIMAN:  They did not --
 5              THE COURT:  I mean, I guess this is my ultimate
 6       point.  Why can't something be both a credit card account
 7       receivable and a security.
 8              MR. LIMAN:  Your Honor, if you look at -- because
 9       under 2.1D, we got the right to all of the acquired
10       receivables.  And under 2.1P2, all of the security deposits,
11       free and clear.
12              THE COURT:  Subject to 10.9.  10.9 doesn't take
13       those asway, it just says if the aggregate amount of the
14       three items listed in 10.9, including Item 2 of those 3, the
15       credit card accounts receivables exceeds $1 billion, $600
16       and some thousand, million dollars, then the debtors can
17       take from the bottom, from the oldest credit card accounts
18       receivable.  It doesn't take away what the debtors sold.  It
19       just says that the debtors actually sell more than the
20       billion six, they get this adjustment.
21              MR. LIMAN:  There are two reasons, two other
22       reasons why they can't on these facts be both.  One reason
23       is that what these funds on the facts of these agreements,
24       what these funds were doing was securing obligations of
25       Sears.  And so they were not, in fact, payable to Sears.
```

Page 48

1   There was no obligation to pay these --

2              THE COURT:  It doesn't say "payable," it says

3   "owed."  It says "owed by."  And that's what a setoff is.

4   That's the underlying right to the -- that's the applicable

5   language in 2.10, setoff.

6              MR. LIMAN:  Your Honor, I don't think there's any

7   dispute that "owed" also is a synonym for "is payable."

8              THE COURT:  Then they would have used the word

9   "payable" instead of "owed."  One is present, and one is

10  both present and future.

11             MR. LIMAN:  But one of them is also has to be

12  derived, and this is the key language, that debt that is

13  owed has to be from the credit card transactions.  It can't

14  -- in these instances, that debt is not owed as a result of

15  the credit card transactions.

16             THE COURT:  Well how did -- I'm sorry, can we just

17  go through 1.1.  Each account, or credit card receivable,

18  each account or payment intangible, each is defined in the

19  UCC, together with all income, payments, and proceeds

20  thereof owed, right, credit card payment processor, or an

21  issuer of credit cards to a seller, resulting from charges

22  by a customer of the seller on credit cards processed by

23  such processor or issued by such issuer in connection with

24  the sale of goods by a seller or service performed by a

25  seller in each case in the ordinary course of business.

JX 053-48

Page 49

1           So as I read the agreements, the credit card

2     processor agreements, they get the payments by the

3     purchasers, based on the processor or issuer being paid in

4     the ordinary course.  And they owe that money to the debtor,

5     but they have the right to hold as a basis of setoff

6     (indiscernible).

7           So I mean, again, this agreement -- and we

8     clarified this when I was here for the debtor's counsel --

9     does not require the buyer to pay over the amount that's

10    being held, but it does, I think, require the buyer to pay

11    over effectively or not buy anything above the billion 657

12    in the form of the oldest credit card accounts receivable.

13          So it's just a business deal, that that was the

14    receivable.  And it seems to me that these are credit card

15    accounts receivable -- I can't imagine that they aren't.

16    It's not -- that's the basis for the relationship.  There's

17    no separate lien, it's just an offset.

18          MR. LIMAN:  Your Honor, let me put it this way.

19    Let's imagine a different world in which First Data had

20    filed for bankruptcy.  And First Data -- and the question

21    was what is the character of those funds that were held by

22    First Data.  Remember, they're held in a separate account.

23    Only First Data gets access to those accounts.  It's a

24    separate account that is funded.

25          Now in that alternative world, there will be two

Page 50

1    questions.  If it's an accounts receivable, then my

2    understanding is that that -- that Sears would be a general

3    unsecured creditor, just entitled to be paid on those

4    accounts receivable.  I don't think that that is the

5    argument that Sears would be making in that instance.

6           What Sears would be saying -- and they would be

7    correct -- is that the money in the reserve changed

8    character once it was withheld from the accounts payable and

9    used to satisfy their obligation under the agreement.  What

10   they would be saying in that instance is that they've got an

11   interest in those funds.

12          THE COURT:  Who does?

13          MR. LIMAN:  Sears would be saying that.  And

14   there's a case that I would cite, Your Honor, with respect

15   to that very proposition.  It's the Ionosphere case, 177

16   Bankruptcy 198.  That's what Sears would be saying.  And

17   what First Data would be saying is that by virtue of their

18   possession of those monies that belong to Sears, they've got

19   a security interest.  Now, if you look at the --

20          THE COURT:  No, there's no grant of a lien.  They

21   would say they have a -- they would say they have a secured

22   claim because of a right of setoff, a contractual right of

23   setoff.

24          MR. LIMAN:  And that would distinguish this from a

25   accounts receivable.

Page 51

1          THE COURT:  But the basis for the setoff is that

2    one party owes another party, and that party owes the other

3    party.  They both owe each other, so it is an account.

4          MR. LIMAN:  But let's take the American Express

5    Reserve for an example.  American Express Reserve, those

6    funds are held --

7          THE COURT:  Can I interrupt you for a second, sir?

8    The UCC definition of account means "a right to payment of a

9    monetary obligation, whether or not earned by performance."

10   And it includes, among other things, "arising out of the use

11   of a credit or charge card."  So why isn't this a monetary

12   obligation arising out of the use of a charge card owed by

13   the processor, which however, the parties have agreed can be

14   held based on a right to setoff.

15         MR. LIMAN:  Your Honor --

16         THE COURT:  So it's an account obligation.  It's

17   two mutual obligations.

18         MR. LIMAN:  Your Honor, there's commentary onto

19   the UCC, and I can provide you cases.  I don't have them

20   right here at the (indiscernible), but I'd be happy to

21   provide them this afternoon, that says that that language

22   from card transactions refers to the obligation between the

23   card company and the ultimate customer.

24         THE COURT:  Fine, but it's a right to payment, and

25   that's what Sears has.  It has a right to payment.  It's not

1   earned yet.  I'm sorry -- it's not payable yet, but it has a

2   right to payment.

3           MR. LIMAN:  Your Honor, but let's just pass for

4   the moment the question of whether these are payment

5   intangibles or accounts.

6           THE COURT:  Okay.

7           MR. LIMAN:  They do need to result -- whether

8   they're accounts or payment intangibles, they're an

9   obligation.  That's what unites payment intangibles and

10  accounts.  They're obligations.  The question that the rest

11  of the definition addresses is what is that obligation

12  derived from.  It's not how is that obligation satisfied, it

13  is what is that obligation derived from.

14          THE COURT:  Well, it's --

15          MR. LIMAN:  That I think is the best --

16          THE COURT:  All right, but I think you're arguing

17  that it is not an obligation owed by a credit card payment

18  processor resulting from charges by a customer of the seller

19  on credit cards processed by such processor.

20          MR. LIMAN:  In the ordinary course.

21          THE COURT:  In each course, the ordinary course.

22  But these were credit cards.  The customers use them in the

23  ordinary course.  The obligation was charged in the ordinary

24  course.  And this agreement in each case lays out the

25  obligation of the credit card processor to pay the amounts

Page 53

1   over, except there's a reserve based on a right of setoff.

2   But if it's --

3           MR. LIMAN:  Your Honor --

4           THE COURT:  To me, it sounds like a credit card

5   account receivable.

6           MR. LIMAN:  I do want to make sure I address my

7   other two arguments.  I just want to make one more point

8   with respect to this.  When you look at the nature of the

9   obligation, I think it is important to look at what triggers

10  the obligation to pay.  In the case of credit card accounts

11  receivable, in the ordinary course there's a period of days

12  that come, and after those periods of days, you have to pay.

13          THE COURT:  Right.  I think our difference here

14  really stems ultimately from your view that the word "owed"

15  means payable.

16          MR. LIMAN:  I don't think so, Your Honor.

17          THE COURT:  Well, I mean to say that it's an

18  obligation to pay.  Clearly the credit card processor has an

19  obligation to pay eventually if it turns out that the

20  reserve is not required.

21          MR. LIMAN:  That's not our position.  That's not

22  our position.  Our position is not that these have to be

23  immediately payable.  Our position with respect to the

24  definition of credit card accounts receivable is that the

25  obligation that was triggered that gave rise to the need to

Page 54

1    put those monies with the card companies has to have been

2    triggered from card transactions in the ordinary course.

3            It can't be that it was triggered by the fact that

4    in the past there were card transactions.  There was a

5    lingering liability.  That's the facts here.  There's a

6    lingering liability.  The company is in financial strain,

7    financial distress that reserve accounts --

8            THE COURT:  But there's nothing in the credit card

9    agreements dealing with the company being in financial

10   distress.  This is an ordinary course arrangement.  They

11   always have the reserve.

12           MR. LIMAN:  That's not true, Your Honor.  That's

13   not true.

14           THE COURT:  Well the agreements don't speak about

15   financial distress.

16           MR. LIMAN:  They do.  If you look at 4.7 of the

17   First Data agreement.  I want to be careful about using the

18   precise language because it's confidential.  But you will

19   see that there's a trigger there that refers to the

20   revolving credit facility.

21           THE COURT:  But is there anything in the record to

22   suggest that this money was withheld on that basis as

23   opposed to on the basis of all the other language that lets

24   them create a reserve because of a concern about --

25           MR. LIMAN:  Yes, Your Honor.  I'm glad you asked

JX 053-54

Page 55

1   that question.  If you were to look at the Rolacheck

2   affidavit, Exhibit B, it tells you why that reserve account

3   was triggered.

4           THE COURT:  Well, I'm sorry -- when you say

5   triggered --

6           MR. LIMAN:  Why the obligation was created to put

7   funds in that reserve.  It's not the point within 4.4, which

8   is what the debtors had cited to you.  The provision that

9   First Data invokes, Section 4.7.  And the only triggering

10  condition under 4.7 is the provision with respect to the

11  revolving credit facility.

12          THE COURT:  Okay.

13          MR. LIMAN:  And Your Honor, I would understand

14  your argument if the card companies invoked separate

15  provisions that exist under each of the agreements for

16  delayed accounts payable.  They did not trigger to invoke

17  those here.  Let me just address briefly two other, we

18  think, dispositive points that I don't think are answered.

19  And that I think there's been some confusion about.

20          THE COURT:  Okay.

21          MR. LIMAN:  The first is with respect to whether

22  these counts against the 10.9 (indiscernible).  And if you

23  read that provision carefully as it was written, it has two

24  elements.  One is that it has to be credit card accounts

25  receivable, and the second is due to sellers.  That's the

Page 56

1   language of 10.9.

2          Now my colleague would have you either say that

3   due to seller means immediately payable and would caricature

4   our argument.  And again, that is not our argument.  Or they

5   would say that that language is just surplusage and means

6   the same thing as owed, and that's contrary to principles of

7   contract interpretation.  It's also contrary to the purpose

8   of the provision and contrary to the APA itself.

9          And I'd like to cite a couple of things to Your

10  Honor.  The first in terms of how that language of due is

11  used in the APA, the drafters were quite careful to draw

12  distinctions between things that would be due or would

13  become due.  You can look at the definition of "liability"

14  under the APA.

15         You can also look at 2.3K little 1, which talks

16  about obligations that transforms obligation to pay

17  liabilities as they become due in the ordinary course.  If

18  there was an intent here to pick up things that would become

19  due in the ordinary course, that could be -- it could be

20  drafted that way.

21         So there could be an obligation that can become

22  payable in the future that is not currently due.  And for

23  that -- and the definition that the case law gives to that

24  is to say that you have an amount is due when there is a

25  fixed, settled obligation.  It's in re: Hamilton Krieg, 143

Page 57

1    F3rd, 1381; in re: Rubina Metro, 522 Bankruptcy 656; and

2    Black's Law Dictionary of "due."

3         And Your Honor, I think that language is

4    critically important.  First, it corresponds to what is inf

5    act payable under the card agreements.  In each of the

6    instances of card agreements, it refers to two separate

7    potential sums of money.  One is the sums of money that are

8    payable on the regular schedule three days, four days, five

9    days after the sales data is submitted.  There's no question

10   here that those would be credit card accounts receivable,

11   that even if they were not immediately payable, would count

12   against the 10.9 cap.

13        There is the separate provision -- and here Mr.

14   Friedmann, I think, made some critical concessions that are

15   the sums that are held in the reserve accounts.  Those

16   numbers first of all, you heard him say, we don't know what

17   they are.  They're going to be the amount that's in the

18   reserve less what the obligations are from chargebacks.

19        And if you look at the agreements themselves, in

20   terms of when if ever they would become payable or there

21   would be an immediately enforceable right, is entirely

22   unclear.  What is clear is that there was no immediately

23   enforceable right at the time of the closing to the return

24   of those monies.

25        In each instance, it had to be that there was

JX 053-57

Page 58

1  trigger conditions that were satisfied that had not been

2  satisfied, and as to which there was no date certain.  Now,

3  they misquoted Mr. Kamlani from his declaration.  We've got

4  the declaration in front of you.  I'm not going to just

5  repeat that.  I do want to address --

6            THE COURT:  Well how did they misquote him?

7            MR. LIMAN:  They misquote him by saying that those

8  monies would have been -- if we had only delivered

9  Transform's financial condition and information about what

10 Transform's condition would look like post closing, then

11 First Data would have released all of the reserves,

12 including the oldest of the reserves.

13           If you look at the letter from First Data and the

14 email that they quote, that's not what First Data says.  And

15 if you look at Mr. Kamlani's declaration, even today after

16 we've provided that information, it's not the position that

17 First Data and the others have taken.  Their position is

18 that they still have the right to a reserve, and we have no

19 entitlement to get any of that money back.

20           They're willing to put some, not released to us,

21 in reserve.  But they're not resisting the notion that we

22 have a current entitlement to it.  That's -- now, I don't

23 think that that is particularly here or there with respect

24 to what the communications were.  We plainly didn't have an

25 obligation to turn over business information to First Data.

Page 59

1    First Data still has not agreed to the turnover.  I do think

2    that there's one other -- two other critical points.

3             THE COURT:  Did they assign the First Data

4    agreements to transform?

5             MR. LIMAN:  The debtors did assign the First Data

6    agreements to Transform, pursuant to the APA, the moment

7    that the transaction closed, those agreements were assigned

8    to us and we've exercised the right to assume those.  And

9    those agreements have been assumed (indiscernible), with all

10   of the duties and rights that go with them.

11            And they were at the time the transaction closed,

12   we were delivered a schedule.  That schedule had listed on

13   them the reserves.  We believe that the reserves were being

14   delivered to us.  There was no effort made to hold back on

15   any of the reserves.  And that's what happened at the moment

16   of closing.  There was a dispute over the $7 million.

17            You've seen the different parties' views with

18   respect to that.  Our view that we were threatened.  They

19   say that they've got a different view.  We think our facts

20   would be right.  The point is that the moment that an

21   agreement was reached with respect to that $7 million, we

22   thought they had every expectation to believe that those

23   contracts with each of the card companies were our contracts

24   that were assigned to us.  And when we assume them, we had

25   the right to assume them.

Page 60

1            From the card companies' perspective, which I

2    think is also recorded, to look at from this perspective,

3    the card companies also had the right to assume that when

4    they decided not to object to the APA because there were

5    reserves there, that those reserves would be kept in place.

6            Mr. Friedmann has said that all you have to do is

7    order First Data to release the reserves.  I don't think

8    that that is what First Data had in mind at the time of the

9    sale hearing, and I don't think that that's what the APA has

10   in mind.

11           THE COURT:  Well, First Data hasn't taken a

12   position here though, right?

13           MR. LIMAN:  I think this is the first time that

14   we've heard the debtors say that Your Honor should enter an

15   order requiring them to turn over the reserves.  They've

16   been very unclear about exactly the type of relief that

17   they're seeking.  In our mind, the only relief --

18           THE COURT:  Well they -- okay, there's this

19   dispute as to whether they're prepared to turn them over.

20           MR. LIMAN:  I don't think there's even a dispute

21   as to whether they're prepared to release them.

22           THE COURT:  Well ultimately, the purpose of the

23   reserve is to protect them against returns and chargebacks.

24   Once they figure out that there aren't any returns or

25   chargebacks, there's no reason to hold it.

1            MR. LIMAN:  Well Your Honor, imagine the

2    hypothetical that you would have to engage in to figure out

3    what the true amount of that -- those receivables looked

4    like at the time of closing.

5            THE COURT:  I'm sure they have records to show

6    that.  They processed the cards.

7            MR. LIMAN:  I don't think so, Your Honor, because

8    you'd have to figure out which chargebacks are associated

9    with which transactions, going back in time to figure out --

10           THE COURT:  But that's what you do.

11           MR. LIMAN:  No, no, Your Honor.  You don't always

12   link it to a particular transaction in order to figure it --

13   to do the tracing exercise.  This money exists to satisfy

14   the chargebacks, whether those chargebacks are pre-closing

15   chargebacks, which are their liabilities, or chargebacks as

16   a result of post-transactions, which --

17           THE COURT:  Right, but you can tell which is

18   which.  You could tell what's pre and what's post.

19           MR. LIMAN:  I don't know that you can in order to

20   figure out what the --

21           THE COURT:  Well then, they're not really doing

22   their job, because they have to keep records and they have

23   to know what they're doing.  I guess it's conceivable they

24   don't know, but then I don't know how they file proofs of

25   claim and assert rights to collect.

Page 62

1          MR. LIMAN:  They've got that reserved, but in any

2    event, the number's not going to be the $14 million or

3    whatever.  It's going to be a number net of the chargebacks

4    that would be associated with card transactions up until the

5    moment of sale.  And that I think is a reason why this is

6    fairly considered to be a contingent claim and not a sum

7    that is due knowing.

8          I do want to mention the notion that these have to

9    be -- that they have to have taken an action to retain the

10   cards, to come back to us of February 22nd and say the

11   reserves belong to us.  I think it's just not the notion

12   that is contemplated by the APA.  They say, well it's estate

13   property, so it will --

14          THE COURT:  But this is not, again, I think we

15   clarified this -- the debtors are not saying that the

16   reserve account needs to be turned over.  This is a

17   crediting mechanism under 10.9 of the APA.  The reserve

18   stays where it is.  It gets out as it gets worked out.  But

19   the crediting mechanism is the only thing that this relates

20   to, under 10.9.

21          MR. LIMAN:  Your Honor, if I understand the point

22   correctly, we would agree that the most that the creditors -

23   - sorry, the debtors would get is that if First Data, which

24   has the oldest of the reserves, agrees to release those

25   oldest of the reserves to us, then we have an obligation to

Page 63

1    turn them over.

2              THE COURT:  No, that's not what that -- I don't

3    think -- I mean, that's what I spent a few minutes with the

4    debtor's counsel on.  10.9 says that the amount over $1.657

5    billion goes to the debtor in the form of the two abilities

6    of the debtor to use the assets.  And one of them is the

7    oldest credit card accounts receivables.  Not reserve, but

8    the receivables, the oldest ones.

9              MR. LIMAN:  They get the right to retain --

10             THE COURT:  So you all pay it over, because you've

11   gotten them.

12             MR. LIMAN:  No, we haven't gotten them.  We don't

13   have them.

14             THE COURT:  But it's over -- it doesn't matter

15   whether you've gotten them or not.  If the defined term is

16   over $1.657 billion, then there's this purchase price

17   adjustment.

18             MR. LIMAN:  But no, that's not the -- the most

19   that they would get -- assume that these were 360-day-old

20   receivables, right?  They're 360-day-old receivables.  When

21   we -- a year after the closing, we get paid those -- some

22   portion of those receivables.

23             THE COURT:  Right.

24             MR. LIMAN:  Maybe we don't get paid any of them.

25             THE COURT:  I agree with that.  That's what

Page 64

1    they're entitled to, which explains why this isn't such a

2    big deal as far as transforms credit and everything else,

3    because the reserve is still there.  They negotiated a

4    pretty good deal in 10.9 for themselves, which is that the

5    amount above $1.657 billion, the debtor is entitled to, but

6    it gets it in the two limited ways that that section

7    provides, which are first, transferring inventory that would

8    otherwise be acquired inventory, to a GLB-leased store or a

9    GLB-owned story.

10            And second, retaining as an excluded asset the

11   oldest of any credit card accounts receivable, which you can

12   do as a book adjustment as part of the reconciliation

13   process of the purchase price.  So it's not depriving

14   Transform of some sort of its benefit of this security

15   deposit.  It's a purchase price adjustment where the

16   purchase price adjustment comes in those two forms in that

17   order.

18            MR. LIMAN:  If I understand Your Honor correctly,

19   the inventory's all resolved, and that with respect to the

20   security deposit, it would be an obligation running from us

21   to them once that security deposit is -- those funds are

22   released.

23            THE COURT:  No, it's just -- you just credit back

24   to them the amount on the oldest credit card accounts

25   receivable.

Page 65

1          MR. LIMAN:  Once we receive it.

2          THE COURT:  No, as part of the purchase price.

3          MR. LIMAN:  But it's not -- that's cash out to us.

4    And that's exactly what this was designed not to do.

5          THE COURT:  Well, then --

6          MR. LIMAN:  I mean, they get the --

7          THE COURT:  No one has briefed that issue.  But

8    that seems to be the only right that they have is to get

9    that provision enforced.  I agree with you, it's not to turn

10   over the money in the reserve account.

11         MR. LIMAN:  It's not to turn it over, and I think

12   we have briefed, and I don't think there's any dispute with

13   it, that the most that they would get is the contingent

14   right that if we recover, they recover.

15         THE COURT:  Well, I think it's a purchase price

16   adjustment.  I don't know how that's made, but that's a

17   separate issue.

18         MR. LIMAN:  But it's not designed as a purchase

19   price adjustment.  It's not designed as a purchase price

20   adjustment.  And I think -- and I may be overstaying my

21   welcome here, and I apologize if I am, but I think in order

22   to give -- the three points I want to leave you with --

23         THE COURT:  Well, it's just transferring.  You're

24   right.  Well it says "retaining," "retaining as an excluded

25   asset."  I guess colloquially, that to me would be a

JX 053-65

Page 66

1   purchase price adjustment.  They're not selling you those

2   old receivables.  They retain it.

3          MR. LIMAN:  What they would have had to have done

4   is at the time of closing and before we exercised assumption

5   rights, they would have had to have said something to

6   indicate that they were holding back on it.  Just like, Your

7   Honor, if you read the provision with respect to the

8   inventory, what that says is at the time of closing, they

9   need to do something with respect to inventory.

10         We're going -- we're an operating business.  To

11  say to us a week and a half after closing, we're retaining

12  something, then we already have a right to assume --

13         THE COURT:  Well, but you don't know all the

14  credit card accounts receivables at the closing.  You just

15  told me they can't figure it out as of today, what's pre and

16  post.

17         MR. LIMAN:  They could make the claim as to --

18         THE COURT:  Why do they have to?  It's right in

19  the APA.

20         MR. LIMAN:  Because what it says in the APA is

21  they have to retain it.  They have to retain it.  They

22  didn't do anything --

23         THE COURT:  They don't have to.  It's in the APA.

24  It's (indiscernible).  I think this one you're not going to

25  convince me on.  I mean, it's not something you know at the

Page 67

1  closing.

2          MR. LIMAN:  Your Honor, I would urge you to look

3  closely at the language of the card agreement.  I do think

4  under the restatement and under the integration clause,

5  they're part of the agreement, I think they define what is

6  payable in the ordinary course and what's receivable in the

7  ordinary course.

8          I do think you have to give independent meaning to

9  the notion of "due."  I think that does have the meaning of

10  law that says that it is immediately enforceable, it has to

11  be a fixed obligation.  It doesn't have to be payable

12  immediately.  It can be payable in 20 days, 30 days.  It has

13  to be a fixed obligation.  And I think their argument fails

14  on those grounds.

15          THE COURT:  Okay, thanks.

16          MR. LIMAN:  Thank you, Your Honor.

17          MR. FRIEDMANN:  Your Honor, if I may just quickly

18  respond and clarify to a couple of the points.  First of

19  all, Mr. Liman pointed to the Morrison Lincoln Mercury and

20  said we had no answer and, as we all know, lawyers hate to

21  be told they have no answer so we have an answer which I

22  have to give now.

23          They're pointing to this Eastern District

24  Tennessee case from 1983, which applied completely different

25  facts, a totally different law in determining whether or not

Page 68

1   a reserve account fell under the definition of account under

2   the UCC.

3          The Delaware UCC applicable here, as you pointed

4   out, defines account as a right to payment of a monetary

5   obligation arising out of the use of credit or charge card.

6   The reserve accounts here clearly represent a right to

7   payment of monetary obligations and, under the definition of

8   the credit card accounts receivable, the key is that these

9   are accounts and the proceeds thereof resulting from those

10  charges.  I don't really see how that's a disputable point.

11         The second point I wanted to make is that the

12  withholding of these credit card receivables in reserve

13  accounts does not change the fundamental character of those

14  proceeds.  They continue to be credit card transaction

15  proceeds that were now withheld.  They were not converted

16  and they ultimately and at all times were owed to Sears.

17         The third point is Mr. Liman was making much of

18  the term "due" in 10.9, but kept inserting the word

19  "immediately".  It doesn't say immediately due, it just says

20  due.  Due and owed are synonyms.  If it said immediately due

21  that might be a different story.  That would tie closer to

22  their notion of it being payable, but it just says due.

23         The final thing I just want to clarify in terms of

24  the relief we're seeking here, Your Honor is exactly right

25  and what the mechanisms are after the fact are different,

Page 69

1    but we're looking to demonstrate that credit card accounts

2    receivable includes the reserve accounts and that therefore

3    there's a credit due to the debtors of $4.6 million.

4            THE COURT:  What is your response to Mr. Liman's

5    argument that because -- well first of all, let me ask you

6    this question.  Is the money at issue here held exclusively

7    by First Data or are there other ones too that are holding

8    it?

9            MR. FRIEDMANN:  So there are reserves that are

10   held by the other credit card processors as well.  My

11   understanding is that First Data is holding approximately

12   $28 million and change and then the other credit card

13   processors have some smaller amounts.

14            In terms of determining what the oldest are, my

15   understanding is the oldest $13.3 million, if my number is

16   right, are with First Data.  You would then need to go one

17   of the other credit card processors if you're looking for

18   the oldest to get the next whatever that is --

19            THE COURT:  All right.

20            MR. FRIEDMANN:  One point whatever million.

21            THE COURT:  So, Mr. Liman's argument is that the

22   definition of credit card account receivable ends with the

23   clause in each case in the ordinary course of business and

24   his argument is that the reserve established by First Data

25   was not in the ordinary course of business because it was

Page 70

1  premised upon a more recent fact, which was the lack of

2  availability of the revolving credit facility in this

3  specific amount or higher.

4          So, what is your response to that argument?  This

5  isn't in the ordinary course, this deposit.

6          MR. FRIEDMANN:  This is something that we

7  addressed in our brief and I think the key here is the term

8  in each case in the ordinary course of its business, what is

9  that modifying?  And what it's modifying is the clause that

10 directly precedes it, which is in connection with the sale

11 of goods by a seller or services performed by a seller in

12 each case in the ordinary course.

13         It's describing how these charges came to be that

14 the credit card processor had.  So, they're owed --

15         THE COURT:  So you're applying the last antecedent

16 rule.

17         MR. FRIEDMANN:  Correct.

18         THE COURT:  Okay.  It doesn't have to be owed by

19 the credit card processor in the ordinary course.

20         MR. FRIEDMANN:  It's not owed in the ordinary

21 course.  It's owed from proceeds resulting from credit card

22 charges and then the key is that those credit card charges

23 were from the sale of goods or the services performed by the

24 seller in the ordinary course of seller's business.

25         THE COURT:  Okay.

JX 053-70

Page 71

1              MR. FRIEDMANN:  Thank you, Your Honor.

2              THE COURT:  How do you envision this working in

3      practice?  You're saying you're above the $1.657 billion cap

4      right now or amount right now, right?

5              MR. FRIEDMANN:  That's correct.  My $14.6 million.

6              THE COURT:  Right.  Is that it or will there be

7      additional amounts beyond that or is this just based on the

8      reserves that you have now?  We know what the reserves are.

9              MR. FRIEDMANN:  Based on our understanding, based

10     on the aggregate threshold in 10.9, the $14.6 is the total

11     amount that we were above.

12             THE COURT:  Okay.  So then what happens?  Because

13     we clarified it's not necessarily to have the reserve

14     released, it's just that you're entitled to the excluded

15     assets or the other assets.

16             MR. FRIEDMANN:  To be honest, I think the debtors

17     at this point are flexible in terms of how we get the $14.6

18     million.  If they want to write a check for $14.6 million,

19     that works.  If it's --

20             THE COURT:  Or it's between you and the --

21             MR. FRIEDMANN:  -- us and First Data and whoever

22     other credit card processors --

23             THE COURT:  Or whoever has the oldest one.

24             MR. FRIEDMANN:  Correct.

25             THE COURT:  And if they still have a right to hold

Page 72

1    it because of their right, you can contest that.

2          MR. FRIEDMANN:  That's something we'd have to work

3    out between us and the credit card processor.

4          THE COURT:  All right.

5          MR. FRIEDMANN:  I'm sorry, I stand corrected.  The

6    $7 million that we've been referring to where at the time of

7    closing there was this identified $7 million overage, that

8    was before we knew about the additional credit card

9    proceeds.

10         THE COURT:  Right.

11         MR. FRIEDMANN:  As I mentioned, the $7 million,

12   the deal that was agreed to was rather than taking the

13   inventory in transit, we instead agreed to take inventory

14   that was still with the vendor and that was supposed to be

15   shipped to the going out of business stores.

16         That truck has not arrived yet, Your Honor.  I

17   don't know how much traffic there was between the vendors

18   and the going out of business stores, but we have not gotten

19   that $7 million worth of inventory either.  So, it's really

20   $14.6 million of credit card (indiscernible) plus that $7

21   million in inventory.

22         THE COURT:  Okay.

23         MR. LIMAN:  Your Honor, if I could just respond to

24   that last point.  My understanding is that the debtors have

25   never given any instruction to the vendors with respect to

Page 73

1    it.

2         THE COURT:  On where that's supposed to go?

3         MR. LIMAN:  As to where it's supposed to go.  The

4    first we heard of a complaint with respect to that was in

5    their papers and I think they, frankly, have -- I understand

6    we've got a lot of balls in the air.  This one looks to me

7    that they've dropped.

8         I think, Your Honor, has the point with the $15

9    million that First Data has agreed to put in escrow.  It's

10   not the older stuff of the reserves.

11        THE COURT:  Right.  Okay.  All right.  I have

12   before me the motion by the debtors in this case to compel

13   turnover of estate property under Section 542 of the

14   Bankruptcy Code.  At issue in the motion is the

15   interpretation and application of the asset purchase

16   agreement between the debtors and Transform Hold Co.  More

17   specifically, for purposes of this hearing, this ruling

18   without ignoring the rest of the motion which the parties

19   seem to be working through, whether certain reserves held by

20   credit card processing companies constitute credit card

21   accounts receivable, or CCAR, as defined in the asset

22   purchase agreement, of APA, and, in addition, whether if

23   they do in fact constitute credit card accounts receivable,

24   whether Section 10.9 of the APA has been triggered or not,

25   which involves I believe as a contested basis only the issue

JX 053-73

Page 74

1   of whether such credit card accounts receivable and "due" to

2   the seller, i.e., the debtors.

3           I believe that this issue can and should be

4   decided based on the plain meaning of the asset purchase

5   agreement pursuant to APA Section 13.8, the laws of the

6   State of Delaware govern the agreement and construction of

7   contract language under Delaware law is a question of law.

8   Rhone-Poulenc company v. American Motorist Insurance

9   Company, 616 A.2d 1192, 1195, (Del. 1992).  The primary

10  consideration in interpreting contract is "to attempt to

11  fulfill to the extent possible the reasonable shared

12  expectations of the parties at the time they contracted."

13          Comrie v. Enterasys Networks Inc., 837 A.2d 1, 13

14  (Del. Ch. 2013) where contract language is clear and

15  unambiguous, under Delaware law the ordinary and usual

16  meaning of the chosen words will generally establish the

17  parties' intent, Matthew v. Laudamiel, 2012 WL 2508572 at

18  page 5 (Del. Ch. June 29, 2012).

19          Courts must be circumspect when considering a

20  contract's language, especially when the contract is between

21  sophisticated commercial entities.  Creating ambiguity and

22  ambiguity where none exists could in effect create a new

23  contract with rights, liabilities and duties to which the

24  parties have not assented.  Cypress Semiconductor Corp. v

25  SVTC Technologies., LLC, 2012 WL 2989169 at page 4,

JX 053-74

Page 75

1   Del.Super., 2012 June 29, 2012, O'Brien v. Progressive

2   Northern Insurance Company, 785 A.2d 281-288 (Del. 2001).

3           An ambiguity exists when the provisions in

4   controversy are fairly susceptible of different

5   interpretations or may have two or more different meanings,

6   GMG Capital Investments, LLC v. Athenian Venture Partners I,

7   L.P. 36 A.3d 776, (Del.Supr., January 03, 2012).

8           Contract language is not ambiguous merely because

9   the parties dispute what it means, Alta Berkeley VI C.V. v.

10  Omneon, Inc., 41 A.3d 381 (Del.Supr., 2012, March 05, 2012).

11          Delaware adheres to the objective theory of

12  contracts under which a contract is construed as it would be

13  understood by an objective reasonable party.

14          The Court, of course, should not interpret a

15  contract provision to yield an asserted result or a result

16  that would render other provisions null, Martin Marietta

17  Materials Inc., v. Vulcan Materials Company 2012 WL 2819464

18  (Del.Supr., May 14, 2012).  See also GMG Capital

19  Investments, 36 A.3d 779.

20          But again, based on my review of the parties'

21  agreement, I do not believe that I need to look at parol

22  evidence and that the clear and unambiguous ordinary usual

23  meaning of the words chosen by the parties in their context

24  should govern.

25          APA Section 1.1 defines credit card accounts

Page 76

1   receivables, "Each Account or Payment Intangible each as

2   defined in the UCC together with all income payments and

3   proceeds that are owed by a credit card payment processor or

4   an issuer of credit cards to a seller", the seller meaning

5   the debtors, "resulting from charges by a customer of the

6   seller on credit cards processed by such processor or issued

7   by such issuer in connection with the sale of goods by a

8   seller of services performed by a seller in each case in the

9   ordinary course of its business."

10          This term becomes relevant for purposes of this

11  dispute because Section 10.9 of the APA entitled Inventory

12  and Receivables provides the following; "The aggregate

13  amount of 1) the inventory value of the acquired inventory,

14  excluding any pending inventories, 2) the amount due to

15  seller in respect to a) the credit card accounts receivable

16  and 3) pharmacy receivables shall be at least $1.657

17  billion.  To the extent that the aggregate amount of items 1

18  through 3 in the foregoing sentence exceeds $1.657 billion

19  on the closing date, the sellers may reduce such amount to

20  be equal to $1.657 billion by first, transferring at

21  sellers' expense and in consultation with buyer inventory

22  that would otherwise be acquired inventory to a GOB leased

23  store or a GOB owned store or any other location designated

24  by sellers that is not a property, until the inventory value

25  of the acquired inventory is equal to $1.553 billion and

Page 77

1    second, retaining as an excluded asset, that is an asset not

2    purchased by the buyer, the oldest of any credit card

3    accounts receivable or pharmacy receivables."

4         I believe it is undisputed that the $1.657 billion

5    threshold in Section 10.9 has been met and that there are

6    disputed assets, disputed in the sense that there are credit

7    card accounts receivable were not in excess of that number,

8    the debtors therefore contend that the excess oldest coming

9    first should be treated as an excluded asset and not part of

10   the assets purchased by Transform Hold Co.

11        Transform Hold Co disputes this provision or this

12   interpretation on two grounds.  First, it contends that the

13   disputed credit card accounts receivable are not credit card

14   accounts receivable, but are instead covered by a different

15   definition in the APA, namely the definition of a security

16   deposit, which is found in APA Section 2.1(o).

17        That section defines a security deposit as, "Any

18   and all rights to sellers in and to any restricted cash,

19   security deposits, letters of credit, escrow deposits and

20   cash collateral, including cash collateral given to obtain

21   or maintain letters of credit and cash drawn or paid on

22   letters of credit (indiscernible) deposits, performance,

23   payment of surety bonds, credits, allowance, prepaid rent or

24   other assets, charges, setoffs, prepaid expenses, other

25   prepaid items and other security, collectively security

JX 053-77

Page 78

1    deposits, together with all contracts, agreements or

2    documents evidencing or related to the same in each case to

3    the extent related to any acquired asset."

4            There is another potential definition that would

5    apply to the disputed credit card accounts receivable here,

6    which is the APA's definition of claim as all rights to

7    payment, which then tracks the Bankruptcy Code definition in

8    1015.

9            I have now had the chance to review all of the

10   credit card servicing agreements under which the disputed

11   credit card accounts receivable are governed and pursuant to

12   which those amounts are being held by the credit card

13   servicers.

14           Those agreements are filed under seal and I will

15   resist quoting extensively from them. Instead I will note

16   merely that based on my review of each of them, including

17   the First Data, AmEx and Discover agreements, there is a

18   common thread whereby each processor or servicer owes or has

19   an obligation to pay the Debtor and in one case aptly is

20   described as a provisional credit for all of the proceeds of

21   the credit card transactions at the Debtors' stores or

22   otherwise with the Debtor.

23           But has the right to setup a reserve account for

24   chargebacks, credits or adjustments, current or anticipated

25   card organization fees or fines in the amount of any fees or

Page 79

1    discounts due.  There is no formal security agreement

2    language in these contracts, but they each recognize that

3    the basis for such reserve amounts ultimately relies upon

4    the right of setoff and/or recoupment.

5              As I previously quoted, a right of setoff is one

6    of the rights that falls within the definition of security

7    deposit and I conclude that accordingly the funds being held

8    legitimately and there's been no dispute that they have been

9    illegitimately held by the credit card processors under

10   their respective reserve right agreements, would constitute

11   security deposits as a defined term under Section 2.1(o) of

12   the APA.

13             Again, the fundamental point being that they're

14   being held pursuant to a right of setoff recognizing that,

15   to the extent that there are no amounts owed over by Sears

16   in the nature of chargebacks, adjustments, fees and the

17   like, they would be owed by the credit card processors to

18   the debtors.

19             My conclusion that the money at issue here

20   constitutes a security deposit does not however lead me to

21   conclude that it is not also a credit card accounts

22   receivable.  There is no carveout in the definition of

23   credit card accounts receivable for security deposits and

24   the fact that it would be covered by the defined term

25   security deposit, does not also mean that it wouldn't be

JX 053-79

Page 80

1    covered by the term credit card accounts receivable.

2         That is particularly the case given that the only

3    operative provision we're focusing on here as far as the

4    underlying dispute is 10.9, which itself does not make the

5    distinction or any distinction between credit card accounts

6    receivable and security deposits.

7         So, I believe that having now read all of the

8    relevant provisions of the credit card processing agreement,

9    the argument by Transform Hold Co that the money at issue is

10   a security deposit is a red herring.

11        That still leaves the issue of whether the money

12   does fall within the definition of credit card accounts

13   receivable.  Having carefully considered the parties'

14   arguments and reviewed the applicable provisions in the

15   context of the entire agreement, I conclude that the funds

16   at issue are credit card accounts receivable within the

17   meaning of APA Section 1.1.

18        I believe that under the parties' own definition,

19   this money does in fact constitute an account for purposes

20   of the UCC as well as a payment intangible.  Delaware's

21   version of the UCC provides in Section 9.1022 that an

22   account means a right to payment of a monetary obligation,

23   whether or not earned by performance.

24        It includes, among other things, in (g) arising

25   out of the use of a credit or charge card or information

Page 81

1    contained (indiscernible) within the card.

2         Payment intangible in Section 61 of that section

3    of the Delaware UCC means a general intangible under which

4    the account debtors' principal obligation is a monetary

5    obligation.

6         As noted, the credit card processors have a

7    monetary obligation and owe money to the Debtors arising out

8    of their processing of credit cards used by customers of the

9    Debtors.

10        It's clear to me that they owe this money based on

11   my review of the processing agreements themselves which base

12   their right to hold the money on the mutual obligation that

13   the Debtor owes them for chargebacks and future other

14   amounts that would be owed either by nature of setoff or

15   recoupment under the processing agreements, i.e., these

16   reserves are being held on account of amounts owed mutually

17   by both parties to the transaction even though neither party

18   has an immediate payment obligation, hence the use of the

19   term "reserve."

20        Transform Holdco contends that those obligations,

21   and more specifically the mutual obligation owed by the

22   respective processors to the Debtors, is neither one in

23   connection with the sale -- I'm sorry, is not -- is neither

24   resulting from charges by a customer of a seller on credit

25   card processed by such processor or in the ordinary course

Page 82

1    of the -- of business.  On the latter point, it appears that

2    one of the processors, First Data, exercised its right to a

3    reserve based upon a specific triggering fact under Section

4    4.7 of its agreement pertaining to the availability of

5    revolving credit facility in the specified amount.

6         Transform Holdco also argues that the obligation

7    owed by the credit card processor to the Debtor is different

8    from the definition of account that I previously read and

9    does not result from charges by a customer of the Debtors

10   for the use of the credit cards processed by the processor.

11   As to that latter point, I disagree.  I believe that the

12   language is more than broad enough in the definition of

13   Section 1.1(a) both in its incorporation of the term

14   "account" and in its use of the phrase "resulting from" to

15   encompass the obligation, albeit not yet -- not necessarily

16   realized on the -- closing it as a due obligation that is

17   due in the sense of immediately due to make payment to the

18   Debtor, but nevertheless, (indiscernible) owed obligation to

19   give rise to a right of setoff.

20        And it would ultimately be owed once the customer

21   chargeback and related grounds for setoff were determined,

22   resulting from language obviously on its face is quite broad

23   as is the definition of account in the Delaware UCC that I

24   have previously quoted, namely a right to payment whether or

25   not earned by performance which can rise among other things

Page 83

1   out of the use of the credit or charged card.  That's the

2   entire basis for the relationship between the processors and

3   the Debtor and I believe what was contemplated by this

4   provision.

5            That leaves the issue of the meaning of the phrase

6   at the end of the definition "in each case in the ordinary

7   course of its business."  It appears clear to me and as is

8   consistent with the last antecedent rule of interpretation

9   that this phrase refers to the ordinary course of incurrence

10  of the credit card charges in the first place and not any

11  unusual relationship separate and apart from that between

12  the processor and Sears.

13           That leaves the remaining defense raised by

14  Transform Holdco that notwithstanding the inclusion of the

15  reserved security -- the reserved amounts by the credit card

16  processors in the term "security deposit," such amounts are

17  also included within the term "credit card accounts

18  receivable."  The operation of Section 10.9 restricts the

19  particular credit cards receivable amounts that go to the

20  $1.657 billion cap to amounts due to the seller as

21  pertaining to amounts immediately due or actually and

22  presently due and payable to be paid to the seller

23  immediately.  Of course, those extra words are not in the

24  phrase.  The phrase merely uses the word "due to seller."

25           The plain meaning of this term I believe is on all

JX 053-83

Page 84

1    fours with the term "owed" as opposed to immediately due.

2    And I believe that interpretation is consistent with the

3    definition of credit card accounts receivable and the

4    operation of this provision which I believe requires the

5    parties to look at the credit card accounts receivable with

6    a snapshot which however takes into account information they

7    learn post-closing as to whether they are in fact owed as of

8    the closing date.  You would not know that calculus until

9    after the closing date, and I believe that requires one to

10   take into account that they need not be immediately payable

11   but rather simply owing to the seller as of the closing

12   date.  I say that in part based on the nature of the

13   adjustment that's laid out in Section 10.9.

14          So in light of that conclusion, I will grant the

15   Debtors' motion insofar as it seeks to implement Section

16   10.9 by including within it all amounts in the respective

17   reserve accounts to the extent that they are not actually

18   applied by the credit card processors appropriately to

19   amounts that Sears owes the processors, again, as of the

20   closing date.

21          So the Debtors can email an order to that effect

22   to chambers.  You don't need to formally settle the order on

23   counsel for Transform Holdco, but you should run it by them

24   before you email it to chambers so that they can make sure

25   it's consistent with my ruling.

1        There is a separate aspect of the relief sought by

2    the Debtors for a declaration that Transform Holdco had

3    violated the automatic stay by not causing such funds to be

4    paid over.  It appears to me that this issue was complex

5    enough and that the funds in fact were being held by a third

6    party that to the extent there was any violation of the

7    automatic stay, given the prompt resolution of the matter,

8    there should be no damages flowing from it.  So I will deny

9    that aspect of the motion on that basis that to the extent

10   there's any violation of the stay, it would not give rise to

11   any independent or separate obligation by Transform Holdco

12   to the Debtors.

13        MR. SCHROCK:  Your Honor, Ray Schrock for the

14   Debtors.  Just to clarify, there were two other issues

15   raised in the motion to enforce the February rent proration

16   and the cash in transit.

17        THE COURT:  Right.  But as I understand, the

18   parties are still leaving those open at least for a few

19   days.

20        MR. SCHROCK:  Exactly, Your Honor.

21        THE COURT:  Okay.

22        MR. SCHROCK:  And my --

23        THE COURT:  So this is just a partial resolution

24   of the motion, this ruling.

25        MR. SCHROCK:  Understood.  Just as a matter of

Page 86

1    procedure to make sure that, you know, we keep these issues

2    open, there were some other issues that were raised by

3    Transform Holdco related to amounts that the Debtors believe

4    are due to them and they believe their ongoing disputes were

5    working through them.

6            And just so that we can be efficient, Your Honor,

7    and make sure that these issues remain in front of the

8    Court, you know, we can always file I know a declaratory

9    judgment action to bring it in front of the Court, but we've

10   got a current motion, you know, to enforce.  If the parties

11   can't work these other open issues out that were raised by

12   Transform Holdco and the Debtors, you know, we'd like to

13   have an efficient vehicle to frankly put them up for a

14   hearing under the current motion.

15           THE COURT:  I mean you would have to give me

16   papers on them one way or the other because --

17           MR. SCHROCK:  Exactly.

18           THE COURT:  -- they're new issues.  So I leave it

19   up to the parties whether -- I mean you probably ought to

20   just file something new on it --

21           MR. SCHROCK:  Okay.  Fair enough, Judge.  That's

22   what --

23           THE COURT:  -- unless it's really an outgrowth of

24   the issues that are covered by this current motion.

25           MR. SCHROCK:  No, that's fine, Your Honor.  We'll

Page 87

1   just file something new.  And I do want to raise them just

2   because they're -- you know, some of them like for instance,

3   you know, the payment of the $166 million other payables,

4   they're relevant to -- you know, there's a number of parties

5   that are requesting administrative payments.  And so they're

6   fresh so we're going to have to move on them, you know,

7   relatively quickly.

8               THE COURT:  Right.  Okay.

9               MR. SCHROCK:  Thanks very much, Your Honor.  I

10  believe the next item on the agenda is Wilmington Trust's

11  motion for related to cash collateral.

12              THE COURT:  Okay.  Now I've been going for a while

13  now.  I'm fine to keep going, but if anyone wants to take a

14  break, they can do it.  No?  Okay, let's go ahead with that

15  motion then.

16              MR. FOX:  Good afternoon, Your Honor.  Edward Fox

17  with Seyfarth Shaw on behalf of Wilmington Trust, National

18  Association as Indenture Trustee and Collateral Agent.  Your

19  Honor, this is a motion by Wilmington Trust to prohibit or

20  condition the Debtors' continued use of cash collateral.

21              At the outset, I just want to clear up one issue

22  the Debtors have raised in their objection a question about

23  Wilmington Trust's standing.  Mr. Schrock contacted me last

24  evening to advise that they were not going to pursue that

25  objection and that they recognize that we are the collateral

Page 88

1   agent and have standing to make the motion.

2             THE COURT:  Okay.

3             MR. SCHROCK:  That's correct, Your Honor.

4             THE COURT:  But you're not waiving your rights

5   that they may be unsecured or undersecured?

6             MR. SCHROCK:  That's correct, Your Honor.  But I

7   believe that given that they're collateral agent for the

8   entire cap stack over there, we weren't going to frankly

9   waste a lot of time arguing about standing.

10            THE COURT:  Okay.  That's fine.

11            MR. FOX:  Your Honor, the Court entered an order

12   in November of 2018.  It's a final order authorizing the

13   Debtors to obtain and get financing in the roll-up DIP of

14   the first lien and also to use cash collateral.  And that

15   cash collateral is cash collateral in which the holders of

16   the pre-petition second lien obligations have an interest as

17   it secures their outstanding obligations as well.

18            Under the terms of the order, the Debtors were

19   authorized to use cash collateral subject to and consistent

20   with the terms of the approved budget which was a defined

21   term.  And the approved budget was annexed as Exhibit C to

22   the order that was entered.  And we included a copy at the

23   end of my declaration as well.  That budget, that approved

24   budget carried the Debtors through February 16, 2019 which

25   as it turned out was five days after the closing of the sale

Page 89

1    substantially but not all of the Debtors' assets.

2            There as far as we know and have been advised

3    there was no extension of that budget, although I'll get to

4    the Debtors have a view about that.  But to the extent there

5    was any extension by the DIP ABL lenders, the Debtors would

6    concede that that did not take them beyond March 16th of

7    2019.

8            THE COURT:  Well, what the DIP ABL lenders paid

9    out?

10           MR. FOX:  Yes, they were.

11           THE COURT:  So why would they agree to -- why

12   would they bother to deal with an extension?

13           MR. FOX:  Well, we don't believe they ever did.

14   In fact, they told us to the contrary.

15           THE COURT:  So why -- because they're paid.

16           MR. FOX:  Yes.

17           THE COURT:  They shouldn't be spending any more

18   time on the file.

19           MR. FOX:  I agree, Your Honor.

20           THE COURT:  So why is that extension even

21   relevant?

22           MR. FOX:  Well, it's only relevant because the

23   Debtors have raised that as a defense.

24           THE COURT:  No.  But what I'm saying is you're

25   relying on their not consenting to an extension of the

Page 90

1   budget, but there's a pretty good reason why they're not

2   consenting, which is they're not paid.  That doesn't mean

3   that you somehow have a right to consent.

4          MR. FOX:  And we're not suggesting that we do,

5   Your Honor.

6          THE COURT:  So but the whole right is theirs.  And

7   it's a pretty good reason why they haven't consented.

8          MR. FOX:  I understand that, Your Honor, but the

9   order is conditioned -- it limits the Debtors to making

10  expenditures in accordance with that budget.  If there's no

11  budget anymore, then there's no right under the order for

12  the Debtors to continue to use cash collateral going

13  forward.

14         THE COURT:  So --

15         MR. FOX:  Otherwise what we end up with is an

16  order that as the Debtors read it would allow them to do

17  whatever they wish with respect to cash collateral with no

18  limitations whatsoever.  And according to them, the second

19  lien which is now the only remaining lien has no ability to

20  have anything to say about what they can or cannot do with

21  that cash collateral.  And according to them, it even

22  seemingly prevents us from coming back to the Court to ask

23  the Court to address that issue either by enforcing the

24  order or alternatively under 363(e).

25         So we're in a situation now where as I said, we

1   believe --

2          THE COURT:  So I'm sorry.  So you're saying that

3   the authority to use cash collateral ended on the payout of

4   the DIP lenders and ABL lenders?

5          MR. FOX:  Well, that's effectively what happened

6   because the Debtors' ability to comply with the terms of the

7   order that was entered no longer exists.

8          THE COURT:  Is there any disagreement about the

9   use of the cash collateral?

10          MR. FOX:  You mean going forward between us?

11          THE COURT:  Yes.

12          MR. FOX:  We've not had that discussion.  The

13   Debtors -- I mean we're open to having that.

14          THE COURT:  Well, don't you think you should do

15   that before precipitating a totally unnecessary crisis of

16   this case where the Debtors can't use any cash?

17          MR. FOX:  Your Honor, we wrote to the Debtors and

18   asked before filing the motion and asked them to explain the

19   basis on which they continue to believe that they're

20   entitled to spend cash collateral.  They responded and said

21   they were entitled to.  I spoke with Mr. Schrock before we

22   filed the motion, and we've had conversations since then and

23   there's --

24          THE COURT:  All right.  Well, maybe the question's

25   addressed to the both of you.

Page 92

1          MR. FOX:  I'm happy to have that --

2          THE COURT:  Well, I think you should.

3          MR. FOX:  Okay.

4          THE COURT:  I could go through this and I will if

5    you want, and I think pretty much come up with the argument

6    that as drafted, neither your argument nor the Debtors'

7    argument makes a whole lot of sense.  Normally there's a

8    provision in these that says that, you know, under

9    materially changed circumstances, lenders can come back and

10   dispute the use of cash collateral.  Well, that's not in

11   here as far as I can see.

12          On the other hand, to argue that you gave your

13   cash collateral rights up to the DIP and ABL lenders but

14   somehow got them back when they were paid in full, it's a

15   bit of a stretch to just throw the bomb into the case.  So I

16   think you all should meet, work through a process, and if

17   you can't do it, I'll decide it because that's really what

18   we're talking about here.

19          MR. FOX:  We're happy to do that.

20          THE COURT:  Okay.

21          MR. FOX:  It takes two to tango.

22          THE COURT:  Well, that's true.  So you all should

23   start tangoing.  Actually, it's three because the Committee

24   would be involved, too.  So that'll be an interesting dance,

25   but that's how it works.

Page 93

1          MR. SCHROCK:  Judge, I --

2          THE COURT:  And by the way, there's no limitations

3     under 506(c) and 105 either or 552 as far as the -- 506(c),

4     excuse me, on I think on certain parties here.  So, you

5     know, we should just get to what's real here which is if you

6     really believe the Debtors are wasting your cash collateral,

7     I understand.  If they aren't, then we should just move on

8     to get the case over with.

9          MR. FOX:  Our concern is, Your Honor, that there's

10    a limited amount of cash available and but for the previous

11    motion, there's nothing else coming into the estate.  So

12    what we're left with is seeing the cash continue to be spent

13    with nothing to replace it but for --

14          THE COURT:  Well -- but honestly, what's the

15    alternative?  I mean if they can't spend the cash at all,

16    then you're going to be dealing with the Trustee who you're

17    going to be paying.  And I guess I could understand why

18    targets of litigation might somehow think that's right,

19    although I imagine the Trustee would hire the same people

20    that analyzed those causes of action over the last few

21    months so that they can file a, you know, 110-page

22    complaint.

23          So I just think the parties should get real here

24    and see where they are as far as a timeline to get out of

25    the case.  And I'm not suggesting you're not being real.  I

Page 94

1    understand your point.  You see this glitch in the

2    agreement.  It's the type of glitch that would drive an

3    indenture trustee crazy.  I understand that.  Let's just be

4    realistic about it.

5              MR. SCHROCK:  And, Your Honor, we're happy to sit

6    down with them.  I think the fundamental issue just that is

7    going to before the parties.  So we have been using cash

8    collateral because we believe we're authorized to do so.  I

9    think they've raised this issue.  We looked at the order as

10   we did, you know, with the closing and we said, listen,

11   we're going to have to sit down obviously at some point to

12   deal with this.  I think they want us, some of the second

13   lien parties who don't have rights against the winddown

14   account are looking at the Debtor saying, hey, why don't you

15   use the winddown account proceeds at this point and start to

16   get --

17             THE COURT:  Well, I don't know.  I mean that --

18             MR. SCHROCK:  And so we have to work that out.

19             THE COURT:  That comes through very remotely in

20   the papers, but --

21             MR. SCHROCK:  Yes.

22             THE COURT:  -- those rights are defined.

23             MR. SCHROCK:  Yes.

24             THE COURT:  And the carveout is defined.

25             MR. SCHROCK:  Right.

Page 95

1              THE COURT:  And frankly, the APA which lays out

2      the mechanism for what I think isn't covered by the carveout

3      and the winddown is something that clearly the movant and

4      the parties joining in this motion and the DIP lenders and

5      the ABL lenders were all perfectly fine with.  So, you know,

6      I don't know what we're talking about here except maybe

7      trying to get some leverage in the plan negotiation process

8      which isn't going to work.

9              MR. SCHROCK:  And, Your Honor, if I could just

10     make a suggestion then.  We'll sit down.  We'll try and work

11     it out.  If we can't we'll contact the Court and --

12             THE COURT:  Okay.

13             MR. SCHROCK:  -- just have a quick status

14     conference to discuss how to proceed.

15             THE COURT:  That's fine.

16             MR. SCHROCK:  (Indiscernible).

17             MR. FOX:  Sure.

18             THE COURT:  Okay.

19             MR. FOX:  Thank you, Your Honor.

20             THE COURT:  Okay.

21             MR. O'NEAL:  Sean O'Neal with Cleary Gottlieb on

22     behalf of the ESL.  I only stand up just to confirm that

23     we'll be part of those discussions as second lienholders.

24             THE COURT:  Well, I don't know.  I mean there are

25     specific provisions of the DIP order that deal with ESL.

Page 96

1    And your colleague behind you for --

2              MAN:  Cyrus.

3              MR. O'NEAL:  Yes.

4              THE COURT:  So --

5              MR. O'NEAL:  Understood, Your Honor.  Though --

6              THE COURT:  I mean the indenture trustee is the

7    one with the lien.

8              MR. O'NEAL:  Well, also, let's be clear we're

9    talking about the collateral agent which is Bloomington

10   Trust.  He's also the indenture trustee for one of the

11   tranches.

12             THE COURT:  Look, if they try to --

13             MR. O'NEAL:  But ESL does --

14             THE COURT:  If they're trying to take something

15   away from your clients, you and Cyrus, yes, absolutely.

16             MR. O'NEAL:  Yes.

17             THE COURT:  If you want to be involved.

18             MR. O'NEAL:  Just to be clear that ESL as a second

19   lienholder does have adequate protection liens and claims.

20   We do have those.

21             THE COURT:  Well, there are lots of reserved

22   right.

23             MR. O'NEAL:  Yes.

24             THE COURT:  That's all I can say.

25             MR. O'NEAL:  But we actually have those liens.

Page 97

1           THE COURT:  Right.

2           MR. O'NEAL:  And they're in the order and actually

3     discussed in the settlement.

4           THE COURT:  You do.  And it's to protect for

5     diminution of collateral in the process where ESL became the

6     buyer of the company.  So --

7           MR. O'NEAL:  Correct, Your Honor.

8           THE COURT:  -- you know, let's --

9           MR. O'NEAL:  Okay.  And I just wanted to --

10          THE COURT:  I think that also had -- let's get

11    real here.

12          MR. O'NEAL:  Thank you, Your Honor.

13          THE COURT:  Okay.  I.e, it goes what it wanted.

14    So it's hard to argue with diminished.

15          MR. KRELLER:  Your Honor, Thomas Kreller with

16    Milbank, LLP, on behalf of Cyrus Capital.  I'll be brief,

17    Your Honor.  Just to be clear and for the record, the notion

18    was not that the consent to the use of cash collateral was

19    being withdrawn, thereby leaving the Debtors with no ability

20    to use cash.

21          THE COURT:  Right.

22          MR. KRELLER:  We're exactly in the scenario, and

23    this is the adequate protection was negotiated this way.  We

24    negotiated for adequate protection.  We gave consent to cash

25    collateral.  The Debtors negotiated for a winddown reserve.

Page 98

1    If you were to shut off the use of cash collateral, they

2    would turn to their winddown reserve which is if the

3    winddown reserve is not to cover the cost of the case post-

4    closing to plan confirmation, I don't know what else it is

5    for.

6            And if you look at the budget that the Debtors --

7            THE COURT:  Well, there's a carveout.

8            MR. KRELLER:  There's a --

9            THE COURT:  And there are certain -- let me just

10   see.

11           (Pause)

12           MR. KRELLER:  Your Honor, there's actually --

13           THE COURT:  There's a -- the waiver of 506(c) I

14   don't think covers your clients.  So, again --

15           MR. KRELLER:  Your Honor?

16           THE COURT:  -- it's not that simple.

17           MR. KRELLER:  Your Honor, I'm trying to make a

18   different point.  The Debtors attached a budget to their

19   reply where they show a winddown account with $93 million in

20   it.  So I don't think that it's a fair characterization to

21   say the lenders are stepping up, the second lien creditors

22   are stepping up trying to shut the Debtors off of the use of

23   cash collateral.  The Debtors have a $90 million --

24           THE COURT:  I'm not --

25           MR. KRELLER:  -- winddown budget.

1              THE COURT:  I mean I said to Mr. Fox I understand

2      why the collateral agent and indenture trustee brought this

3      motion.  But I think that who should be funding this case is

4      not nearly as simple as you posit.  The winddown account

5      among other things was meant to take into account and

6      protect against the risk of administrative insolvency, to

7      protect administrative expense creditors, to protect

8      503(b)(9) creditors who have administrative expense claims.

9      It wasn't just to wind down from now going forward.  That's

10     a nice name for it, but I believe it was meant to cover more

11     than that.  And instead, it wasn't -- we have the 506(c)

12     issues.

13             MR. KRELLER:  Understood, Your Honor.  I think

14     there's a burden on the 506(c), particularly with respect to

15     my client Cyrus who is not the buyer.  But that'll be for

16     another day.

17             THE COURT:  Well, it will because I think they're

18     fairly close to each other.

19             MR. KRELLER:  Your Honor, we'll make the record

20     clear on that.

21             THE COURT:  Okay.

22             MR. KRELLER:  We're not an insider.  We are not

23     the buyer.

24             THE COURT:  Okay.

25             MR. KRELLER:  The point is this, Your Honor.  The

Page 100

1    winddown budget, you're right, is there to protect

2    administrative creditors.  It's not at the moment protecting

3    super priority administrative creditors.  The debtors are

4    marshaling their cash and using cash collateral without

5    consent in a manner designed to allow them to pay

6    administrative expenses, regular way administrative expenses

7    during the case in a case where there may not be cash as

8    when we stand at the confirmation to pay the 507(b) claims.

9           THE COURT:  To the extent there are any, but

10   again, you have to look at -- again, that's where 506(c)

11   comes into place.  You know, I don't know what the snapshot

12   on the start of the case and the snapshot at the end of the

13   case will look like and whether as was argued to me the sale

14   which the ongoing administrative expenses clearly

15   contributed to the value of actually enhanced the value of

16   your client's collateral.  So those are all open issues.

17          MR. KRELLER:  Your Honor --

18          THE COURT:  It's not that easy to decide in

19   advance and it's probably something that the parties should

20   try to resolve not in terms of doing a budget that specifies

21   exactly where the money is going to come from, or at least

22   leaves open -- let's put it that way.  It should leave open

23   reallocation of it.  It's fungible in other words.

24          MR. KRELLER:  It is fungible, Your Honor, and

25   that's actually a good point.  Number one, we've begun that

Page 101

1    dialogue.  In fact, we made a proposal to the Debtors in the

2    beginning of March.  We are still awaiting a

3    counterproposal.

4             THE COURT:  Okay.

5             MR. KRELLER:  And just so to size this for you a

6    bit, we believe Cyrus' position is that our 507(b) claim is

7    in the neighborhood of $60 million to the point of closing

8    plus then whatever collateral of ours has been dissipated

9    since then in our position without our consent.

10            And, Your Honor, to the extent it's fungible, the

11   other problem that I want to alert you to because I think

12   what you would hear from Mr. Schrock is the DIP order says

13   we don't have a lien on the winddown budget and we can't

14   access that, what that means -- what that doesn't mean is

15   that doesn't override the requirement under 1129(a)(9) that

16   if we have an allowed 507(b) claim, it has to be paid in

17   full.

18            THE COURT:  That's true.

19            MR. KRELLER:  And so --

20            THE COURT:  But the key word there is "if."

21            MR. KRELLER:  Absolutely, Your Honor.

22            THE COURT:  Okay.

23            MR. KRELLER:  But my point is this.  What -- the

24   risk that we have is that come plan time, Mr. Schrock stands

25   up and says you don't have any rights to that winddown

Page 102

1    reserve and there's no other cash to pay our 507(b) claim.

2    I don't think they can override 1129(a)(9) in that fashion,

3    and I expect that's probably something we'll confront if

4    we're unable to resolve this consensually.

5            THE COURT:  Well, clearly, I can't confirm a plan

6    unless parties consent.  But that's not today's issue, which

7    is why I suggest that when you work out a budget, you leave

8    the issue of allocation to another day which is not that far

9    off.  It's like 30 days from now --

10           MR. KRELLER:  Your Honor --

11           THE COURT:  -- or 60 days from now.

12           MR. KRELLER:  -- we'll be happy to do that, to

13   work out a budget.  We would have to see a budget and this

14   is the first we've --

15           THE COURT:  Sure.

16           MR. KRELLER:  And our concern, Your Honor, is Mr.

17   Schrock stands here and says it's a simple waterfall plan.

18   The problem with that is you need water.  And it's not clear

19   there's a whole lot of water here.

20           THE COURT:  Well, okay.

21           MR. KRELLER:  So, Your Honor, we'll work -- and

22   the super priority claims to the extent they exist and are

23   ultimately allowed, are being made to bear that risk.

24           THE COURT:  Okay.

25           MR. KRELLER:  Thank you, Your Honor.

JX 053-102

Page 103

1          MR. SCHROCK:  We'll be happy to sit down, Judge.

2          THE COURT:  Okay.

3          MR. SCHROCK:  They took all the water, but we're

4     trying to deal with that.  Thank you, and we'll be back in

5     touch with the Court if we can't work that out.

6          (Pause)

7          MR. FRIEDMAN:  Your Honor, Jared Friedman, Weil

8     Gotshal, on behalf of the Debtors.  The next two agenda

9     items, Number 3 is supposed to be the motion of Debtors to

10    compel turnover of estate property.

11         THE COURT:  Yes.

12         MR. FRIEDMAN:  And Number 4 is dealing with

13    related issues.  It's the motion of the Community Unit

14    School District 300 for relief from the automatic stay or in

15    the alternative for abstention.  I spoke to the school

16    district's counsel prior to the hearing today.  They

17    requested if it's amenable, the Court is amenable to it to

18    flip the order of those because the motion for stay also

19    includes a request for an abstention, they asked to have

20    that heard first because in the event that they're

21    successful on that, that might moot our motion for turnover.

22         We have no objection if they want to proceed in

23    that order, but we'd leave it to Your Honor to make that

24    determination.

25         THE COURT:  Okay.  That's fine.

JX 053-103

Page 104

1          MR. FRIEDMAN:  It's their motion.  I'll turn it

2     over to them.

3          THE COURT:  Okay.

4          MR. GENSBURG:  Good afternoon, Your Honor.  Matt

5     Gensburg on behalf of Community Unit School District 300.

6     Your Honor, I have a number of colleagues.  We sort of split

7     the tasks here, so I'd like to introduce a couple of folks

8     to you if I may.  I have Alan (indiscernible) is my co-

9     counsel in bankruptcy.  I got Ken Florey is municipal law

10    and tax counsel.  And Cory (indiscernible) who's also a

11    municipal law tax counsel.

12         Your Honor, there's really four matters in front

13    of you that all revolve around the same thing or related to

14    the same thing.  There's our motion to modify the stay, and

15    in that motion, we also included a request for abstention

16    under 1334(c)(2) and 1334(c)(1).  There's a motion of the

17    Debtor to compel turnover under 542.  And then there's a

18    related motion to strike the declaration of Mr. Meghji.

19         When you think about the flow of the analysis,

20    Your Honor, we thought it made sense for the Court to

21    consider the 1334(c)(2) matter first, mandatory abstention,

22    because we believe that all those elements are met and if

23    the Court agrees with us, that none of the other issues need

24    to be dealt with today.  And so with the Court's indulgence,

25    I'd like to go through our analysis of 1334(c)(2), answer

JX 053-104

Page 105

1    any questions Your Honor may have with respect to that.

2              THE COURT:   Okay.   Before we start on that, what

3    would the school district get back under the EDA Act if the

4    funds are not distributed to the Debtor?

5              MR. GENSBURG:   So the school district, Your Honor,

6    is the largest taxing district involved.   We would get 60

7    percent of that.

8              THE COURT:   Okay.   All right.

9              MR. GENSBURG:   So, Your Honor, I'm going to start

10   with 1334(c)(2) which states basically that the Court must

11   abstain from the proceeding if six prerequisites are

12   satisfied.   Those prerequisites are timely motion has been

13   made, the proceeding is based on state law claim or state

14   law cause of action, the proceeding is related to a case

15   under Title 11, the proceeding does not arise under or arise

16   in a case under Title 11.   But absent jurisdiction under

17   1334, there would be no federal jurisdiction here at all

18   over this matter entitling adjudication of the Court

19   original jurisdiction.

20             Every one of those elements are met.   So let's

21   take each one.   First, timely motion.   We filed our motion

22   to modify the stay and our request for abstention on

23   November 12th of 2018.   You might recall, Your Honor, I'm

24   sure you read all the pleadings --

25             THE COURT:   No, I don't have an issue on your

Page 106

1      client's timeliness.

2                MR. GENSBURG:  I'm sorry, sir.

3                THE COURT:  I don't have an issue on that point.

4                MR. GENSBURG:  Okay.  We'll go on.  State law, I

5      don't think anyone's disputing that the matters at issue

6      right now between Sears and the school district involves

7      exclusively issues of state law and state law claims causes

8      of action.  This involves the Illinois EDA Act.  It's a

9      unique Illinois legislation, also involves an economic

10     development agreement entered into by Sears in 1990 which

11     implemented the Illinois EDA Act.

12               When you look at the briefs, a large portion of

13     the briefs are just voided to try and interpret this

14     legislation.  And, you know, we filed our action, the

15     Illinois action pre-petition.  If this case were to go away

16     and were to be dismissed for some reason or had never been

17     filed, this would still be out here as an issue.  It would

18     be resolved in the state court where the matter was

19     originally filed.  I don't think anyone's disputing the fact

20     that this is a state law issue.

21               THE COURT:  Well, the Debtors contend -- and if

22     they're right on the facts, I think they're right on the

23     law, that to get there, you have to make it -- I'll have to

24     conclude that it is a real issue, a difficult issue of state

25     law.  There has to be a limit, in other words, to the

1   argument that a non-debtor third party doesn't have to turn

2   over property, doesn't have to perform an agreement or

3   otherwise exercise control over property of the estate and

4   force a debtor to go pursue its rights in some other forum.

5           MR. GENSBURG:  Actually, Your Honor, I think in

6   the way you framed it, you jumped a couple of steps forward

7   because that's not what it is.  The question here is whether

8   Sears complied with the terms of the Illinois EDA Act.

9           THE COURT:  I know, but if the -- I'm not -- I

10  don't have a view on this yet.  But if the answer to that is

11  yes, clearly, this is a no-brainer, then it really isn't an

12  issue guided by state law because it's not an issue.

13          MR. GENSBURG:  Well, right.  And it's sort of --

14  it gets a little circular here.

15          THE COURT:  Well, it doesn't because Congress

16  clearly did not mean that any party to which a debtor has

17  some dispute with can force the debtor to pursue it

18  notwithstanding the automatic stay, notwithstanding 542 in a

19  state court where it's perfectly clear that there really

20  isn't a dispute.  There's no real dispute.

21          MR. GENSBURG:  Your Honor, on that point, I guess

22  you and I are not going to disagree.

23          THE COURT:  Okay.

24          MR. GENSBURG:  Because clearly what you're talking

25  about is 542.  And we all know the case law under 542.  542

Page 108

```
1    is meant to bring into property that's already undisputed

2    property of the estate.

3              THE COURT:  Well, you can't just raise your hand

4    and say I dispute.  It has to be a real dispute.

5              MR. GENSBURG:  Oh, absolutely.

6              THE COURT:  Okay.

7              MR. GENSBURG:  Absolutely.  And that's what the

8    cases say.  You know, they use -- you know, and you look at

9    the verbiage in the cases and you see some cases say

10   frivolous.  It refers to frivolous dispute and not

11   legitimate dispute, not bona fide, not substantial.  And I

12   understand that.  And what the Debtors can convince Your

13   Honor is that this matter is not a bona fide dispute so that

14   it is under 542, then I think it's correct and falls within

15   the confines and it is in fact a core proceeding.

16             But, you know, the Supreme Court talked about this

17   a long time ago in Northern Pipeline.  In Northern Pipeline,

18   you'll recall is a breach of contract action, and the

19   contract would have augmented the estate.  And what the

20   Court did is it made a clear distinction between public

21   rights which govern Article I courts and private rights.

22   And what we have here, we have a contract and we have a

23   question.  You know, did Sears comply with the terms of the

24   contract or did not comply with the terms of the contract?

25             And it gets a little more complicated because
```

Page 109

1   within that question, there's a question of, all right, what

2   year's relevant.  Sears says 2017.  We think it's 2018.  And

3   then it gets even more complicated by saying, well, do you

4   count tenants and contractor employees or do you limit it

5   just to Sears employees.  And then you add on top of that

6   the third issue is even if they're right about 2017-2018

7   issue and even if you determine that they're entitled to

8   count tenants and contractors, when you count those tenants

9   and contractors, do they meet the limit.  Well, those are

10  all the issues --

11          THE COURT:  I'm sorry.  When you say there's a

12  factual issue, even if you count the tenants and the

13  contractors?

14          MR. GENSBURG:  There is.

15          THE COURT:  Okay.

16          MR. GENSBURG:  There is and which drove our motion

17  to strike to a certain extent.  And so I guess, Your Honor,

18  I'm not debating the fact that if you -- and that's why I

19  have Mr. Florey here.  If Your Honor's going to tell me

20  that, counsel, this is as clear as day.  This legislation

21  that's not the epitome of clarity is clear as day.  You're a

22  loser.  I can see it.  That's sort of a 12(b)(6) argument.

23          In CIL, that's exactly how the court dealt with

24  it.  The court dealt with this turnover issue by treating it

25  almost like a 12(b)(6) issue had they stated a plausible

Page 110

1    claim.

2              THE COURT:  Right.

3              MR. GENSBURG:  I tried to figure out because when

4    you look at the decisions, the courts really don't explain,

5    well, how do you know --

6              THE COURT:  That's a fair analogy.

7              MR. GENSBURG:  And but there's other analogies

8    that even may be closer.  You know, under 303 of the

9    Bankruptcy Code involuntary, if you're a petitioning

10   creditor, you have to have a (indiscernible) subject to bona

11   fide dispute.  And so when Your Honor is dealing with are

12   there appropriate creditors here and one of the questions

13   you're asking I assume depending on the facts that arise, is

14   this a bona fide dispute.  This is the same issue to a

15   certain extent.

16             THE COURT:  No, that case law is very different

17   because of the policy against involuntaries.  But go ahead.

18             MR. GENSBURG:  Okay.

19             THE COURT:  It's okay.

20             MR. GENSBURG:  But where it gets a little -- in my

21   mind, a little unclear is -- and I get the impression Sears

22   is suggesting that you should actually resolve the dispute

23   to determine whether it's a bona fide dispute.  And that I

24   think would be inappropriate.  I don't think that's -- that

25   would just basically say, well, Northern Pipeline is

Page 111

1   irrelevant.  You need to determine, look at the facts and

2   determine whether there's really a dispute here.  And if

3   there is really a dispute here and this is the only basis

4   for them having jurisdiction, then the Court must abstain,

5   assuming that we've --

6              THE COURT:  Well --

7              MR. GENSBURG:  -- convinced you with respect to

8   the other elements of 1334(c)(2).

9              THE COURT:  Right.  Okay.

10             MR. GENSBURG:  So if that's where we're going and

11  whether there's a bona fide dispute and all the other

12  elements of 1334(c)(2) have been conceded, then --

13             THE COURT:  Well, I'm not sure they are.  Will the

14  pending Illinois action result in a timely adjudication?

15             MR. GENSBURG:  I believe it will, Your Honor.

16  And so let me address that.  So first of all, there's a --

17  you know, AOG Entertainment from this district dealt with

18  that issue.  And basically what that court says is it stated

19  that out of deference for -- to the paramount interest of

20  another sovereign and out of respect for principles of

21  comity and federalism, "Absent contrary evidence, a federal

22  court must presume that the state court will operate

23  efficiently and effectively in adjudicating the matters

24  before it."

25             And then another case from this district,

Page 112

1    (indiscernible) Capital basically says that the burden

2    should be on the Debtor to prove that the state cannot

3    adjudicate claims in a timely manner.  And, Your Honor, they

4    simply have not met their burden.  What the Debtors say in

5    their briefs is they say, well, Your Honor, can do it

6    faster.  Well, when I go on, I'll explain why --

7            THE COURT:  Just tell me what your projected

8    timeline is on this.

9            MR. GENSBURG:  Right now, Your Honor -- well, I

10   guess this should be if it's a straightforward as their

11   counsel suggests and it can be sided as a matter of law and

12   not as a -- I think this could be resolved in 30 to 60 days.

13   It's already pending before the Court.  They got stayed and

14   motion for injunctive relief.

15           THE COURT:  By?

16           MR. GENSBURG:  I'm sorry, Your Honor.

17           THE COURT:  That motion by whom for injunctive

18   relief?

19           MR. GENSBURG:  By the school district.  And it was

20   going to be -- it was set for argument and the bankruptcy

21   got filed and they stopped it.  If in fact this issue --

22           THE COURT:  And I'm sorry, that's to enjoin the

23   town from paying the money over?

24           MR. GENSBURG:  Yes, sir.

25           THE COURT:  Okay.

Page 113

1          MR. GENSBURG:  And issues -- and that's basically

2     the issue, right.  The issue is don't pay it if they don't

3     meet the prerequisites.  The Debtors stated that this is a

4     straightforward issue.  I get the impression they believe

5     that this Court can decide or any court can decide as a

6     matter of law.  There's no reason to believe if that's true

7     that that's can't be decided in 30 to 60 days in Illinois.

8     They certainly know how to do it.

9          And the statistics that I attached to our response

10    say, you know, 81 percent of the cases, civil motions filed

11    in Cook County now are resolved in 30 days.  So --

12          THE COURT:  Well, I would really like something

13    more specific on this case.  You know, a lot of the motions

14    filed in Cook Count involve cars.  So can you or one of your

15    colleagues tell me their projection of the timeline of this

16    case?  I mean obviously an injunction would not -- it would

17    give the parties a good idea what the Court believes the

18    merits -- where the merits go, but it wouldn't decide the

19    issues.

20          So I'm trying to -- I'm really trying to -- look,

21    the reason I'm saying this is this is not a two- or three-

22    year case.  This is a case where the Debtors have reduced

23    their hard assets to cash.  Their obligations and that cash

24    -- I'm sorry, their administrative expense obligations and

25    that cash are very close to each other, so time is really

JX 053-113

Page 114

1    important.  And any extra cash is really important.

2         Now they may have all sorts of litigations claims,

3    but those won't be realized for a long time and you can't

4    use those to fund the payment of administrative expenses

5    under a plan unless the administrative expense creditors

6    consent.  So resolving this case promptly is really

7    important.  And I think what Congress drafted or -- yes,

8    when Congress or the Supreme Court drafted these provisions,

9    when they used the word "timely," they wanted to take --

10   they wanted the bankruptcy court to take into account the

11   effect of the state court litigation on the bankruptcy case.

12        So what is your best --

13        MR. GENSBURG:  And what I'll do, Your Honor --

14        THE COURT:  Just what is your best estimate and

15   why of the likely -- I understand if there's going to be a

16   trial, that's a different issue.  You know, if there's going

17   to be a trial on whether even counting the third parties who

18   work at the site or worked at the site, that will take

19   months longer.  But just on a motion to dismiss type of

20   standard on either the 2017 versus 2018 and/or it has to be

21   Sears as opposed to Sears past people who worked there,

22   what's your best estimate of --

23        MR. GENSBURG:  Let me allow Mr. Florey --

24        THE COURT:  Okay.

25        MR. FLOREY:  Good morning, Judge.  Ken Florey from

Page 115

1   Robin Schwartz on behalf of the School District 300.  Judge,

2   the state court case is still active pending the ruling from

3   this Court on the automatic stay.  And Cook County is used

4   to dealing with expedited cases.  There are election cases

5   that when there's a need for a quicker briefing schedule for

6   rulings and issues of the law, the courts are cooperative in

7   doing that.  That's exactly what we would be doing.

8          If you give us the relief, if you abstain and

9   we're back in the state court, we'll be filing motions next

10  week.  We'll get a hearing on the temporary restraining

11  order to be followed by a motion for summary judgment on the

12  issues of law.  And if counsel's right, there are not many

13  disputed fact issues, we could get a ruling very quickly.

14  We would be going under expedited briefing schedule.  We

15  would have it briefed.  You can expect the ruling within 30

16  to 60 days.

17          THE COURT:  Of the abstention or of the filing the

18  motion?

19          MR. FLOREY:  From tomorrow.

20          THE COURT:  Okay.  And it would seem to me that

21  your client would really want the money, right?  You

22  wouldn't be delaying the process knowing that there would be

23  some leverage on the Debtor if you did that?

24          MR. FLOREY:  Judge, this money will be going

25  towards -- first of all, the school district is 21

Page 116

1   buildings.  There's --

2           THE COURT:  No, I'm sorry.  I didn't -- it wasn't

3   clear.  Would you undertake not to delay the process?

4           MR. FLOREY:  We want the money tomorrow.  We need

5   the money for --

6           THE COURT:  All right.

7           MR. FLOREY:  -- security measures to secure our

8   schools.

9           THE COURT:  So the answer to my question is yes,

10  you won't delay the process?

11          MR. FLOREY:  Yes, absolutely.

12          THE COURT:  Okay.

13          MR. FLOREY:  The money is -- the time of this

14  money is critical.

15          THE COURT:  Okay.  So why don't I hear from your

16  colleague then.

17          MR. GENSBURG:  On that point, Your Honor, I just

18  want to make one other point with respect to this Court.  If

19  I'm right, I think I am, that this matter is related to --

20  it's clearly related to -- but it's not (indiscernible),

21  then what we ought to keep in mind is what's going to have

22  to happen.  Your Honor's going to make findings of fact and

23  conclusions of law and that's got to be sent up to the

24  district court to consider.

25          The only way we avoid that is if Your Honor

Page 117

1   determines that this is in fact court and I don't know how

2   --

3           THE COURT:  Well, we're back to the 12(b)(6) type

4   of point.

5           MR. GENSBURG:  Yes, we are.

6           THE COURT:  Okay.

7           MR. GENSBURG:  And so I think in summary, Your

8   Honor, with respect to 1334(c)(2), it sounds like those are

9   the only two issues.  You got us into the time frame.  The

10  school district, we filed this motion in November because we

11  needed the money.  We still need the money even more.  So we

12  have every incentive to get this done promptly.

13          And then the real question, Your Honor, is whether

14  this is -- the dispute is functionally frivolous or not bona

15  fide or -- and I wish I could find a case that actually

16  defined what does it mean not to be bona fide.  And that's

17  why I went to 303 because 303 actually uses the word "bona

18  fide."  And I was trying to find something similar to that

19  and you just don't find in the case law.  What you find is

20  cases that say, you know, for example, one decision in which

21  they argue that they didn't owe the money and there was a

22  dispute but the Court looked at the defense, I forget what

23  it was, and it said there's no possibility under this

24  agreement that that defense has any validity at all.  And

25  that's I think the Court that said it was frivolous.  That's

Page 118

1    not where we are.

2            And so, I guess in trying to figure out what the

3    appropriate step is at this point, if Your Honor wants, I

4    can give it back to Mr. Florey.  Mr. Florey can explain to

5    you his analysis with respect to the statute, both the

6    years, you know, which year's applicable.  He could explain

7    to Your Honor the school district's analysis with respect to

8    can you count tenants and contractors or not because the

9    statute's not really clear on this point.  And then we can

10   deal with the issue of even if you can do all of that,

11   whether Sears up to this point has actually proven the

12   elements of the number of tenants that worked, full-time

13   equivalent tenants and number of contractors that were full-

14   time equivalent contractors because we have problems with

15   that.  And that's the motion to strike.

16           So, Your Honor, you know, I guess I ask the Court

17   to suggest how you'd like us to proceed.

18           THE COURT:  What is your proof on the latter

19   point?  What is your evidence on the -- that the third

20   parties don't add up to the number of -- the number in the

21   EDA along with Sears?

22           MR. GENSBURG:  Well, so our problem with that

23   point which led to our motion to strike is that we don't

24   know how and Mr. Meghji doesn't know how it was calculated.

25   So --

Page 119

1          THE COURT:  Okay.  So let's say you don't need to

2     present evidence on that because you just would cross-

3     examine him.

4          MR. GENSBURG:  Well --

5          THE COURT:  And depose him, of course.  We take

6     discovery on that.

7          MR. GENSBURG:  We sent him a notice of deposition

8     and we sent Sears a 30(b)(6) notice.

9          THE COURT:  Right.

10         MR. GENSBURG:  And he came and we asked that

11    question and he refers to a methodology, but he didn't what

12    it was.  And think about this.

13         THE COURT:  So, no, I'm sorry.  I understand your

14    point which is this isn't an evidentiary hearing and you

15    want to develop the record on that point.

16         MR. GENSBURG:  And some of the tenants, Your

17    Honor, (indiscernible).

18         THE COURT:  I'm sorry.

19         MR. GENSBURG:  (Indiscernible), you know, the

20    authentic Italian --

21         THE COURT:  Pizza?

22         MR. GENSBURG:  Yeah.

23         THE COURT:  Right.

24         MR. GENSBURG:  And I would suggest it would be

25    like, you know, Walmart that very few of their employees are

Page 120

1   full-time equivalent employees in that everyone's part-time

2   so you don't have to give them benefits.  But I don't -- I

3   have no idea how they calculated their numbers.  And I don't

4   think Mr. Meghji knows.  I can guarantee you he doesn't know

5   because he didn't tell us.  We asked him the question.  And

6   that's an important fact assuming we even get to that point.

7            THE COURT:  Right.  Okay.

8            MR. GANSBURG:  So, Your Honor, I guess -- would

9   you like Mr. Florey to walk you through --

10           THE COURT:  Yes.

11           MR. GANSBURG:  Yes.

12           MR. FLOREY:  Judge, a little background on Civil

13  District 300.  The school district has 21,000 students with

14  27,000 school buildings, and it is heavily reliant on

15  commercial property taxes.

16           THE COURT:  But can I just interrupt you for a

17  second?

18           MR. FLOREY:  Sure, Judge.

19           THE COURT:  This subsidy has been going on for a

20  while, right?  I mean, they had to have budgeted, I would

21  think, on the assumption that it would be paid again, right?

22           MR. FLOREY:  Every year this subsidy exists, the

23  costs grow.  With Illinois, there's a --

24           THE COURT:  Well, of course, that's a given with

25  schools.  But what I'm saying is it's not as if they built

Page 121

1      into their budget getting this money.  It's a windfall,

2      right?

3                  MR. FLOREY:  It is not a windfall, Judge.

4                  THE COURT:  Well, all right.

5                  MR. FLOREY:  It's not a windfall.  They've been

6      disputing this.  They've been demanding proof of compliance

7      since Sears realized it breached the agreement with the

8      state.  There are two subsidy agreements in place for the

9      facility, state subsidy-based income taxes, and the local

10     subsidy based on property taxes.

11                 In Illinois, school districts are heavily

12     dependent for operations on commercial property taxes.  The

13     resident come in, they build houses, they create kids.  Each

14     kid is roughly $12,000.  You have two kids, that's $24,000.

15     You're going to get maybe four, five, six thousand dollars

16     on that house.  You're running a deficit for every single

17     house that is built.

18                 Well, since Sears came in and built their facility

19     and homes grew, our burden just kept building and building

20     for funding the education of these students.  We're below

21     the state average.  We're at over 40 percent property --

22                 THE COURT:  All right.  My only point is that's

23     arguing that the statute was a mistake in the first place.

24     I don't think...  It doesn't do any good with me to argue

25     that it would be nice for the school district to have the

Page 122

1    money because it's a tautology.  I don't think there's

2    anything as far as beyond that.

3            MR. FLOREY:  But the statute does have recapture

4    provisions.

5            THE COURT:  Right.

6            MR. FLOREY:  And it was amended in --

7            THE COURT:  That's fair.  I understand that.

8            MR. FLOREY:  -- in 2012.

9            THE COURT:  I understand that.

10           MR. FLOREY:  Remanded in 2012.  There was a

11   question and a doubt about whether Sears would comply with

12   the 4,250-employee requirement.

13           THE COURT:  Right.

14           MR. FLOREY:  So, the recapture provision was

15   specifically -- went into both statutes, the state statute

16   and the local statute, to recover the funds.  And we're at

17   that point.  We're at the point that the school district has

18   been carefully monitoring since 2016.  They were dropping

19   employees like flies and were at that point where they

20   dropped below the 4,250 for the state statute, and similarly

21   they dropped below the 4,250 in the local statute.

22           Now the recapture provision has kicked in.  We're

23   in the position to be able to assert the recover of those

24   dollars.  It's been -- it's desperately needed in the school

25   district.  You're talking about employees.  You've asked if

Page 123

1    we budgeted for it.  They're running at a deficit as far as

2    education funding for their district.  This is necessary

3    money, Judge.

4            All right.  If you look to the statute, you're

5    talking about what we've talked about repeatedly.  What are

6    the relevant numbers, Judge?  What are the relevant -- what

7    do we look to for the account for the employees?

8            Clearly, when you only count Sears employees,

9    there's -- it's undisputed, they fail on that regard.  They

10   dropped below the 4,250 at least in early 2017, if not

11   earlier.  So, then Sears came up with the novel argument

12   that we're going to change the year of how we're accounting.

13           The Village, in 2017, asked for a certification

14   from Sears.  Are you in compliance with the jobs requirement

15   for 2017 data?  They provided that answer with 2017 data.

16           In 2018, the Village submitted a similar

17   (indiscernible).  Are you in compliance with the jobs count

18   for 2018, using 2018 data?  Sears response was, we're going

19   to use 2017 data.  We're going to count the data we want to

20   use twice, even though in that year there were all

21   indications that failed to comply with that, based on only

22   counting their own employees.

23           THE COURT:  So, the first issue is the year issue?

24           MR. FLOREY:  The year.  Which year's data are we

25   using?

Page 124

1              THE COURT:  Okay.

2              MR. FLOREY:  The statute talks about that.  And

3     Cook County taxation, I could put you to sleep with an

4     explanation of how that works.  But the critical terms are

5     levy taxes, levy new taxes paid.  The statute -- the EDA Act

6     talks about using the -- to satisfy the subsidy requirement

7     of 4,250 employees, you use the data from the year the taxes

8     are paid.  They didn't use the year the taxes are levied.

9              Sears' argument requires you to go back to a prior

10    year for the levy.  There's no term of levy in the EDA Act,

11    only paid, and it's used multiple times, as recited in our

12    brief.  So, based on that, just --

13             THE COURT:  Although they say that in practice

14    that's what the parties did.

15             MR. FLOREY:  No, just the opposite.

16             THE COURT:  You disagree with that?

17             MR. FLOREY:  Look at the documentation from the

18    Village.  The Village asks for 2017, provide us 2017.  For

19    2018, provide us 2018 data.  Sears did it in 2017, as

20    requested.  Sears started playing games and 2018 when they

21    realized they can't hit numbers.  Then they decided, we'll

22    just change the year, despite the practice, despite the

23    clear language in the statute.

24             And then when that didn't work, they said, we're

25    going to change the count.  We're going to now start --

Page 125

1    we've never counted contractor employees; we've never

2    counted tenants.  We'll even count employers that are miles

3    away from the campus.  But in theory, have some economic

4    development of Sears.

5            It continues to be a stretch for Sears to try to

6    demonstrate that they complied with the statute and then the

7    recapture provisions do not kick in.

8            THE COURT:  Okay.

9            MR. FLOREY:  So, the 2018, in our view, the

10   statute is clear, the past practice is clear; you need to be

11   using the 2018 data, not the 2017 data.  And then we get

12   into the employee count.

13           The statute talks about the developer.  And the

14   developer is not tied into Sears, but it has characteristics

15   that Sears is the only company that does comply.  It does

16   not talk about the developer and its contractors and its

17   third-party employers, or any other employers.  None of

18   which these employers receive any tax subsidies.

19           So, to claim that you can -- the burden of them

20   and those other entities employing people without any

21   benefit of a subsidy is a ridiculous interpretation of the

22   statute.

23           The statute talks about the development agreement.

24   It's much more specific and talks specifically about Sears

25   as the developer and having to create, retain and maintain

Page 126

1    4,250 jobs.

2            Let's talk about the state statute, because it's

3    important, and these words that are in both the EDA Act, the

4    local statute and the state statute.  They use create,

5    retain and maintain.  Maintain is a critical word, Judge.

6            Maintain is the word used in the recapture

7    provision.  If Sears doesn't maintain 4,250 jobs, it loses

8    the subsidy.  Under the state statute, that's the exact term

9    that's used.  And if you're going to go outside the

10   statutory language, as Sears wants you to do, and look to

11   other statutes, cardinal rule of statutory construction, you

12   look to similar statutes with similar terms to get your

13   answer.  Maintain under the state statute, meant Sears

14   maintained the employees.

15           THE COURT:  And what is your authority for that?

16           MR. FLOREY:  The authority for just counting the

17   Sears employees?

18           THE COURT:  Yeah, that maintain means employ.

19           MR. FLOREY:  Because that's how Sears settled with

20   the state, saying, we did not -- Sears, as an entity alone,

21   did not maintain 4,250 employees.  So, under the state

22   statute, which is the same target of employee count, similar

23   subject, the maintain is, was, and been interpreted by both

24   parties to mean Sears employees.  So, that same word is used

25   --

Page 127

1                THE COURT:  In --

2                MR. FLOREY:  -- in the (indiscernible) provision.

3                THE COURT:  In what context, though?

4                MR. FLOREY:  The same context.

5                THE COURT:  No.

6                MR. FLOREY:  The context of providing the

7      employees for the economic development.

8                THE COURT:  But -- I'm not being clear.  It's not

9      a judicial decision.

10               MR. FLOREY:  It is not a judicial decision;

11     correct.

12               THE COURT:  It is reflected in what?

13               MR. FLOREY:  It's reflected in the statute, how

14     it's been interpreted by the agency that -- the Department

15     of Economic Development is a state agency created to process

16     that statute.  That was the party that Sears (indiscernible)

17     was saying we did not reply with the jobs requirement.  The

18     state agency's interpretation of the statute are given a

19     high amount of deference in Illinois, as in most

20     jurisdictions.  The conduct of the parties using the Sears

21     employees only for the two --

22               THE COURT:  As part of the settlement, though.

23               MR. FLOREY:  It was a point of --

24               THE COURT:  As part of the settlement?

25               MR. FLOREY:  Correct.

Page 128

1                THE COURT:  Okay.

2                MR. FLOREY:  So, when you take the word maintain

3     that's used in both statutes, clearly, you're talking about

4     Sears employees only.  If the General Assembly of the

5     Illinois Legislature sought to expand Sears ability to count

6     other employers, you would have had language, express

7     language to do that.  In Illinois, as within most municipal

8     jurisdictions, you must have express statutory language to

9     authorize any type of conduct you're going to engage in.

10               THE COURT:  I'm sorry.  The statute you're relying

11    on was enacted before or after that settlement?

12               MR. FLOREY:  Prior to the settlement.  They were

13    both amended in 2012 --

14               THE COURT:  Okay.

15               MR. FLOREY:  -- to extend Sears' state and local

16    subsidies for another 15 years.

17               THE COURT:  Okay.

18               MR. FLOREY:  So, you get past the 2018, 2017

19    issue.  If we're correct, Sears is -- they lose.  They lose.

20    They don't come in compliance.  If you get to the employee

21    count issue, based on the statutory language, based on the

22    interpretation of how the state is interpreted, and most

23    importantly based on the legislative history, which we have

24    included in our documents.

25               Interesting, very critical debate of the sponsor

Page 129

1    of the bill, the legislative history for our statute, before

2    the EDA Act, the question was raised.  What if Sears drops

3    out its employees -- and they had the presence of mind to

4    ask this question in 2012 -- what if Sears has rough times,

5    drops out its employees, goes to a lower count, couple

6    hundred employees below the 4,250 number, and they have a

7    skeletal crew operating there?  Do they still receive the

8    subsidy?

9           The sponsor of the bill said the intention of this

10   statute is no.  If they drop to that level, they lose the

11   subsidy.  That's a clear indication of the legislative

12   intent, do you count other employees?  The sponsor could

13   have said, well, representative, you can also -- Sears is

14   going -- there's going to be other employers still.  There's

15   going to be -- because it's not just a Sears campus.

16          There could be another company that comes in here

17   and starts to lease the space with thousands of employees.

18   They didn't say because its Sears as original economic

19   development, they were going to continue to proceed with the

20   subsidy, even though they're still there, still in

21   existence, still operating on the campus.

22          That's critical that the General Assembly did not

23   intend Sears to count anyone but its own employees.  You

24   have the burden of the employees.  That's the only way you

25   can receive the benefit of the subsidy.

Page 130

1          So, based on the clear language of the EDA Act,

2     the development agreement which talks about Sears

3     maintaining the 4,250 jobs, the practice of the parties, the

4     legislative history, it's clear that only Sears employees

5     are counted, for the same reasons it's clear that the year

6     taxes are paid is the applicable year.

7          And if you get through all those levels, if you

8     still disagree with us, as counsel said, they have no idea

9     whether the numbers that they've presented, the documents

10    they've presented as contractor employees, tenant employees,

11    are liable numbers.  They haven't even provided a list of

12    the names of the tenants, the names of the contractors.

13    It's just a term on their spreadsheet.  They didn't -- it'd

14    be very simple to say these are our tenants, Sbarro, dry

15    cleaners, Dunkin' Donuts --

16          THE COURT:  Right.  And --

17          MR. FLOREY:  -- whoever they are.

18          THE COURT:  And the argument being made is that

19    Mr. Meghji wasn't fully informed so he couldn't

20    (indiscernible) there would be a sixth witness on that

21    issue.

22          MR. FLOREY:  He didn't even need to -- they just

23    need to produce documentation, give us a -- I'm assuming

24    they have leases.  Give us copies of the lease, give us a

25    list of the leases and the parties.  Who are your

Page 131

1    contractors?  Who are you counting?  Who are the businesses?

2            If you can't even provide the names of the

3    tenants, the names of the contractors, the names of these

4    other entities, how can you count for employees?

5            If you can't explain why we've -- and the term,

6    the second (indiscernible) Misty Redman, she said -- she

7    testified that the document they were relying on, Exhibit

8    13, hasn't been scrubbed.  She called it scrubbed.  No one

9    has gone through and removed part-time employees.

10           So, they're relying on an unscrubbed -- using

11   their terminology -- document to attempt to demonstrate to

12   this Court that you get through all others hoops about can

13   we count these obscure employees that we have no identity --

14   we don't identify the employers, we don't identify the

15   employees, where they're only verifying whether they're

16   full-time or part-time or anytime.

17           Any way you look at this, Judge, there is no basis

18   in fact or law to grant their motion to compel.  To the

19   contrary, the arguments that we raise in opposition to that,

20   as well as the demonstration of the bona fide dispute, it's

21   pretty clear that exists, as counsel has argued.  And I'll

22   leave the rest to the abstention argument.

23           THE COURT:  Okay.  Thanks.

24           MR. GANSBURG:  Your Honor, at this stage, I think

25   it's probably appropriate, unless you have more questions

JX 053-131

Page 132

1    for me, to hand it over to Mr. Friedmann.

2            THE COURT:  Okay.  That's fine.

3            MR. FRIEDMANN:  Your Honor, Jared Friedmann, Weil

4    Gotscal & Manges, on behalf of the Debtors.  All right.  I'm

5    not even sure where to start.

6            Okay.  So, beginning with the fact that for a

7    mandatory abstention, all of our requirements need to be

8    addressed and they need to be met by the movant seeking

9    abstention here.

10           The issues here are clearly fundamental core

11   issues.  We're talking about property of the estate.  Now,

12   there --

13           THE COURT:  Well, no, it hasn't been decided yet -

14   -

15           MR. FRIEDMANN:  Well --

16           THE COURT:  -- that they can't be released.

17           MR. FRIEDMANN:  -- the Illinois action that they

18   want to pursue -- so this is a motion for -- it was a motion

19   for stay and also a motion for abstention, so the issues are

20   a little bit conflated.

21           But the -- when he's talking about the injunction

22   that's been filed and the complaint that's been filed, it

23   doesn't just involve the amounts in our motion for turnover,

24   which are the 2017 funds.  It also seeks to recoup funds

25   that were paid in 2016 and 2015, and I don't know how many

Page 133

1    years back.

2              So, it's both the funds that have not yet been

3    paid by the EDA, because they're sitting there right now,

4    and the EDA is waiting to pay them to us.  It includes funds

5    that we already were paid, which they'd really, even if they

6    were successful, not have -- just an unsecured claim, I

7    guess.  And it also seeks to seek a declaration going

8    forward for claims that aren't yet ripe in 2018, 2019 and so

9    on.

10             THE COURT:  Well, that --

11             MR. FRIEDMANN:  It's a lot broader than --

12             THE COURT:  You're not going to be covering 2019,

13   are you?

14             MR. FRIEDMANN:  Are we covering 2019 --

15             THE COURT:  I mean --

16             MR. FRIEDMANN:  Well, that's why we've moved on a

17   very narrow issue, Your Honor.

18             THE COURT:  Right.

19             MR. FRIEDMANN:  Which is that right now, there are

20   funds being held by the EDA for 2017, which we want to be

21   turned over.  That's the only thing we're moving on right

22   now (indiscernible) has the right.

23             THE COURT:  But the abstention is only as to the

24   turnover motion, right?  It's not -- the rest of it would be

25   stayed, right?

Page 134

1          MR. FRIEDMANN:  I don't that's accurate.  I think

2     that the abstention motion was filed before we even moved

3     for turnover.  The --

4          THE COURT:  Well --

5          MR. FRIEDMANN:  The first filing here was a --

6          THE COURT:  Well, let's clarify that.  I mean, I

7     understand the point about the money that's sitting with the

8     Town, but I mean, there's...  What's the action requesting?

9          MR. GANSBURG:  Well, Your Honor -- and you

10    probably saw it in our brief.  We offered a compromise on

11    this point.  All we need to know is determine whether Sears

12    has complied with the terms of the EDA Act.  Has it the

13    4,250 employees, which --

14         THE COURT:  Well --

15         MR. GANSBURG:  -- picks up the other two issues?

16    And then, which would make sense, when did -- if it didn't

17    comply or fell out of compliance, when did it fall out of

18    compliance?  That's it.

19         THE COURT:  Well, that's a --

20         MR. GANSBURG:  That --

21         THE COURT:  That's not...

22         MR. GANSBURG:  It seems...  The only reason why I

23    added that second part, Your Honor, because it seems

24    efficient.

25         THE COURT:  Well --

JX 053-134

Page 135

1          MR. GANSBURG:  But if the Court --

2          THE COURT:  That's not mandatory of the statute.

3          MR. GANSBURG:  Right.  Well, it would still fall

4    under the mandatory of the statute, but not withstanding

5    that --

6          THE COURT:  It's not efficient because you've been

7    litigating issues that might -- your client might get, you

8    know, five cents on the dollar on -- six years from now.

9    So, it's not efficient.

10         MR. GANSBURG:  Well --

11         THE COURT:  It would be efficient to decide the

12   core legal issues, which would then be a matter of

13   collateral estoppel on the claim.  And of course, then you

14   have the mandatory abstention issue for money that's being

15   held.

16         MR. GANSBURG:  And we'll go and look at that, Your

17   Honor.

18         THE COURT:  Okay.

19         MR. GANSBURG:  And so, just have these matters

20   resolved and then we'll come back to the Court and we can

21   discuss through other pleadings what's the consequences of

22   all that.

23         THE COURT:  Okay.

24         MR. FRIEDMANN:  All right.  So, the second issue

25   that we had discussed was timing, and you asked what, I

Page 136

1    guess, what they guess is how long it would take?  I don't

2    know if anybody knows the answer to that.  I started hearing

3    about injunctions and summary judgment motions, and I'm sure

4    that discovery would be taken in advance of all of that.

5             And based on the way in which it's been litigated

6    in this court, I have absolutely no doubt that if we prevail

7    in Illinois, there would then be appeals.  So, the notion of

8    30 to 60 days --

9             THE COURT:  Well, there'd be appeals --

10            MR. FRIEDMANN:  There would be --

11            THE COURT:  -- by me too.

12            MR. FRIEDMANN:  -- appeals here as well.  That's

13   fine.  But the notion that Illinois is a place for this can

14   be timely adjudicated, I don't know that there's any basis

15   for that at all, especially --

16            THE COURT:  Well, is there a -- do you have anyone

17   to represent to me how long you think it would take in

18   Illinois, including the appellate process?

19            MR. FRIEDMANN:  I don't.  But the burden is on

20   them to prove to you that in fact it would be timely

21   adjudicated there.  What I can --

22            THE COURT:  Well, I have an Illinois lawyer

23   telling me, so, you know, I need some response, I think.

24   That's generally how I deal with this is like the lawyers,

25   since it's their area of expertise, they know their court,

Page 137

1    you know?  How long does it take?

2            MR. FRIEDMANN:  I know from one colleague who

3    advised me with a matter she had an Cook County that in two

4    years they have not even gotten to summary judgment.  So, my

5    guess is that it depends on the type of case, and the nature

6    of the case, and all of that.

7            THE COURT:  Okay.

8            MR. FRIEDMANN:  But I don't know that I'd be

9    asking this Court to put a lot of weight on either of those

10   predictions in terms of what this will take.  I'm just

11   certain that -- whereas what I can predict is that because

12   the motion for turnover is up for an evidentiary hearing

13   today, we can hopefully have that resolved in the next

14   couple of hours, which will be much more efficient and much

15   more quick for the estate, than starting to go in Illinois.

16           THE COURT:  It's not teed for an evidentiary

17   hearing today.  I have not budgeted time with another 10

18   more items that are contested on the agenda to have an

19   evidentiary hearing today.

20           MR. FRIEDMANN:  Okay.

21           THE COURT:  Particularly with a motion to strike

22   Mr. Meghji's declaration because he wasn't sufficiently

23   prepared under 30(b)(6).

24           MR. FRIEDMANN:  We're happy to address that as

25   well.

Page 138

1          THE COURT:  Okay.

2          MR. FRIEDMANN:  The other factor is that I believe

3   Mr. Gansburg said that there's no dispute that this is an

4   issue of state law.  And there is a dispute regarding that

5   because it's actually not a state-specific law.  It's

6   actually a debtor-specific law.

7          The EDA act -- not the Edge Act, which they kept

8   referring to -- the EDA Act is an act drafted by Sears for

9   Sears.  That's it.  It only affects Sears.  There is no

10  other company who's affected by it.  It's not an issue that

11  the Illinois state courts have issued many opinions on over

12  the years.  It's never been heard by any court anywhere.

13  And it only affects one party, which is the one that's

14  before your court here as the Debtor.

15         THE COURT:  I guess I didn't really understand

16  that argument because even if it were, as you say, a Sears-

17  specific statute, it's still governed by Illinois law.

18         MR. FRIEDMANN:  That's correct.

19         THE COURT:  And it's not like Sears is not a

20  department of the U.S. that's governed by federal law.

21  We're not in the Court of Claims.  But in any event, if we

22  were, it wouldn't be a bankruptcy.  It wouldn't be

23  bankruptcy jurisdiction.  It would be federal jurisdiction.

24         MR. FRIEDMANN:  That's correct, Your Honor.

25         THE COURT:  Okay.

Page 139

1          MR. FRIEDMANN:  The point really being that there

2     is no -- there's nothing specific about this act --

3          THE COURT:  But that's a point for discretionary

4     abstention, not mandatory abstention, I think.

5          MR. FRIEDMANN:  That's correct.

6          THE COURT:  Okay.

7          MR. FRIEDMANN:  So, also getting back to where we

8     are in the relative cases in terms of timing, so the -- a

9     case was in fact filed on the eve of bankruptcy by the

10    school district, just a couple days later.  As of this date,

11    nothing's happened.  It hasn't even been -- hasn't been a

12    responsive pleading filed in that case.

13         So, in terms of where the efficiency is and where

14    things are going to happen most quickly, under mandatory

15    abstention, I don't how there is evidence before this Court

16    that it's going to be timely adjudicated in Illinois,

17    certainly compared to -- even if there's no evidentiary

18    hearing today, if there's an evidentiary hearing at the next

19    omnibus hearing, or sometime before then, we've already had

20    documents produced here.  We've already responded to

21    interrogatories.  There's been depositions of two witnesses

22    in their individual capacity.  There's been a 30(b)(6)

23    deposition.  There have been discovery disputes.

24         All this stuff would have to happen all over again

25    in Illinois.

Page 140

```
 1              THE COURT:  Why would it?  Wouldn't the parties

 2    use the same discovery?

 3              MR. FRIEDMANN:  My understanding is that my --

 4              THE COURT:  They're nodding yes over there.

 5              MR. FRIEDMANN:  Well, my understanding is that my

 6    friends here have not been very happy with any of the

 7    discovery so far here and --

 8              THE COURT:  Well, that's different issue.

 9              MR. FRIEDMANN:  -- would start all over again.

10              THE COURT:  I mean, they would raise that issue

11    with me too.  But --

12              MR. FRIEDMANN:  They can, but --

13              THE COURT:  -- in terms of the discovery that's

14    actually been had, you would start all over again, right?

15    No.  And you should say that louder so the record reflects

16    it.

17              MR. FRIEDMANN:  We're not going to waste legal

18    fees repeating ourselves and our school district --

19              THE COURT:  Okay.  All right.

20              MR. FRIEDMANN:  That -- well --

21              THE COURT:  And I'm seeing you're raising your

22    rights as to whether it was responsive discovery, but you're

23    not going to start it all over again.

24              MR. FRIEDMANN:  We (indiscernible).  Your Honor,

25    we'll move to permissive abstention as well.  And I don't
```

1    know if I'm addressing --

2            THE COURT:  No, I just want to focus on mandatory

3    --

4            MR. FRIEDMANN:  Okay, sure.

5            THE COURT:  -- at this point.

6            MR. FRIEDMANN:  Yeah, I think from our perspective

7    is there's nothing there we've required -- unless they have

8    put in front of you evidence that this is going to proceed

9    more efficiently in Illinois, which they have not, other

10   than --

11           THE COURT:  I don't think that's the standard.  It

12   says timely adjudicated.  Now, I do take into account the

13   pressures in the particular bankruptcy case.  But -- and I

14   can always revisit it.  I mean, I can estimate the -- there

15   are things I could do in this case if it turns out that the

16   Illinois court, for whatever reason, just sits on this.

17           MR. FRIEDMANN:  The issue we have --

18           THE COURT:  But it's --

19           MR. FRIEDMANN:  -- is that right now there are

20   about $9.6 million sitting in an account with the Village

21   that should have been paid out to us --

22           THE COURT:  Well, can I --

23           MR. FRIEDMANN:  -- by the end of 2018.

24           THE COURT:  Could I stop you on that point?

25           MR. FRIEDMANN:  Yeah.

Page 142

1              THE COURT:  Is that $9.6, is that -- would that

2     all go to this school district?

3              MR. FRIEDMANN:  Not -- no, absolutely not.  It's -

4     -

5              THE COURT:  Well, why doesn't -- they're the only

6     ones who raised this issue.  Why doesn't the rest of it go

7     out?

8              MR. FRIEDMANN:  I don't think anybody else wants

9     to raise the arguments that they raised because there is no

10    merit to them.

11             THE COURT:  Then I don't understand why the rest

12    of it doesn't go out.

13             MR. FRIEDMANN:  Oh, no, it's -- let me back up.

14    We were before Your Honor back in February, I believe, when

15    there was 100 percent of the EDA fund was there.  Sixty-five

16    percent of it goes to Sears -- I'm messing the numbers up --

17    55 percent goes to Sears, 45 percent goes to a bunch of

18    other municipalities, including the school district.

19             THE COURT:  Right.

20             MR. FRIEDMANN:  At Your Honor's -- I don't want to

21    say insistence, but suggestion, we went back afterwards and

22    reached a stipulation so that the children that we heard

23    about who need security and the budget that (indiscernible)

24    would not be held up by this dispute, and we stipulated to

25    the distribution of that 45 percent to the municipality,

Page 143

1   including the school.  They've had that money since, I

2   believe, January.

3          The only portion of the EDA funds we're talking

4   about right now are the 55 percent that are earmarked for

5   Sears.

6          THE COURT:  Okay.  I don't think my question was

7   clear.  That money you say should go to Sears, as I read the

8   statute there is more than one -- if it doesn't go to Sears,

9   there's more than one recipient of it.  My question is -- I

10  gathered from the answer I got that 65 percent of that would

11  go to this school district, or approximately that amount.

12  The rest should go to Sears.  No one else is asking for

13  that, right?

14         MR. FRIEDMANN:  I think that's probably right,

15  Your Honor.

16         THE COURT:  So, that should happen.  I don't see

17  why it shouldn't.  I don't understand why that doesn't

18  happen.  The school district.  It's not fighting for anyone

19  else.  It's just the school district.

20         MR. FRIEDMANN:  We made that offer

21  (indiscernible).

22         THE COURT:  So, that should definitely happen.

23         MR. FRIEDMANN:  And Your Honor, I'm reminded by my

24  colleague that the Village actually does have an attorney

25  here today, the Village, on behalf of the Village.  So, in

Page 144

1    terms of why things have or not have happened by the

2    Village, I probably should not be responding on their

3    behalf.  And if you have questions --

4              THE COURT:  Okay.  Well --

5              MR. FRIEDMANN:  -- it would probably make sense

6    for them to respond to those.

7              THE COURT:  All right.  Well, maybe they want to

8    just see who else got involved.  But at this point, no one

9    else has gotten involved.  So, it seems to me the rest of

10   the money, the money that's not...  I mean, before I deal

11   with anything else, the rest of the money that's not,

12   depending on your point of view, going to go to the Village

13   -- I'm sorry -- going to go the school district, should be

14   paid by the Village or the Town to Sears.  Which is --

15             MR. FRIEDMANN:  Agreed.

16             THE COURT:  -- I think, 35 percent, or roughly.

17             MR. SCHEIN:  Your Honor, Michael Schein, Vedder

18   Price, on behalf of the Village of Hoffman Estates.  One

19   clarification there.  The way the statute works, if any

20   portion of the 55 percent is recaptured, that money -- the

21   money that doesn't go (indiscernible) -- of that 55 percent,

22   the way the recapture works is the Village would share in

23   some of the money that didn't otherwise go on that 55

24   percent, whereas the Village gets none of the 45 percent

25   under the statute.

Page 145

1          So, the question becomes, assuming the parties can

2     all agree on what that number is, as long as we get an order

3     that's clear as to where that money goes, the Village will--

4          THE COURT:  So, the Village is --

5          MR. SCHEIN:  -- take the Court's direction.

6          THE COURT:  -- reserving its rights to share

7     something?

8          MR. SCHEIN:  Well, we would have -- that's the way

9     the statute's written.  So, we have to follow the statutes.

10         THE COURT:  I didn't really see that, but okay.

11         MR. SCHEIN:  That's how it works, because the

12    statute, if you look at 4(g)4(a) --

13         THE COURT:  How do you determine that?  The

14    Village has some sort of percentage of the --

15         MR. SCHEIN:  Yeah --

16         THE COURT:  school district

17         MR. SCHEIN:  Well, if you look at 4(g)4(a),

18    besides the 55 and 45 percent, there's another $5 million

19    that goes off the top and it comes to the Village.  And then

20    there's a bucket for costs.  So, the 40 --

21         THE COURT:  Is that we're talking about   bucket?

22         MR. SCHEIN:  No, we're not.  But what happens is

23    the way the statute's written, if any of the Sears money is

24    recaptured, as the district's arguing, then Sears at that --

25    I'm sorry -- then the Village at that point shares.  I don't

Page 146

1   know offhand what that calculation is.  I just want the

2   Court to be clear about that.

3          THE COURT:  Okay.  Well, you could make that

4   calculation, though, right?

5          MR. SCHEIN:  Yes.  We could do it all, as long as

6   we get a direction from this Court to do so, we will do it.

7          THE COURT:  All right.  Well, I think you should

8   do that.

9          MR. SCHEIN:  We will, Your Honor.

10          THE COURT:  Obviously, if there's a dispute about

11   it, I'll hear it.  But I mean, no one else is interested in

12   this except you two, the school district and the Village.

13          MR. SCHEIN:  Correct, Your Honor.  Actually, this

14   dispute is with them.  We at the Village are just waiting

15   for your Judge to direct this.

16          THE COURT:  Well, no, you just told me that you

17   want some of it.

18          MR. SCHEIN:  Well, all we're saying is at some

19   point, some of it may come back.  It's not a question of

20   want.  It's what the statute says.

21          THE COURT:  Well, but no one else has asked for

22   it.

23          MR. SCHEIN:  Correct.

24          THE COURT:  You're asking for it.

25          MR. SCHEIN:  I'm just reserving -- I'm just

Page 147

1    clarifying on the record that to the extent --

2              THE COURT:  Okay.

3              MR. SCHEIN:  -- we are entitled to a piece of it,

4    I want the Court aware of that.  That's all.

5              THE COURT:  All right.  So your rights are

6    preserved.  You're reserving your rights.  But I really

7    believe that the remaining money should go to Sears.

8              MR. SCHEIN:  And Your Honor...

9              THE COURT:  So can we pre-- I don't want to focus

10   on permissive extension for the moment -- abstention for the

11   moment. I want to focus on mandatory.  What -- I didn't, as

12   you can tell, I didn't accept the argument that this is a

13   Sears specific statute and therefore it's somehow core,

14   right?  I don't really accept the notion that turnover is

15   core unless, again, it's a no brainer.

16             MR. FRIEDMANN:  Well, that adds, I think -- that's

17   our other point, though, Your Honor, is I think it is a no-

18   brainer.  I think that you've got a lot of very -- they've

19   got a wonderful team here who've come up with some really

20   creative arguments, none of it is really supported, though,

21   by the statute.  So the Recapture Provision 4.5 it just

22   simply says that if we don't have the 4,250 employees during

23   the relevant year that -- it doesn't say that -- what that

24   relevant year is.  It doesn't say that it's the year in

25   which the taxes were levied versus the year in which the

Page 148

1    taxes were paid.  That's something that they have read into

2    it, because it would be better for them if it was the year

3    in which the taxes were paid because then it -- we wouldn't

4    be eligible for it quite yet.

5            THE COURT:  Well, why aren't you also reading into

6    it?

7            MR. FRIEDMANN:  What we're doing is we are

8    treating it the same way it's been treated year, after year,

9    after year by the Village and Sears with nobody ever raising

10   an issue.  So every year, what happens is the taxes are

11   levied and, you know, so in this instance they were levied

12   in 2017, those taxes -- and they're paid in arrears.  So in

13   the early part and middle part of 2018 they're paid for 2017

14   and typically by December.  And in the record we've got --

15   showing both in the last two years this has happened, so by

16   December of 2018 there would have been a board meeting and

17   resolution of the Village to make that payment and

18   distribute that payment.

19           So what does that tell us about what year is

20   relevant?  Well, if the Recapture Provision allows you to

21   withhold payments in any month in which we were not in

22   compliance, if they're meeting in December 2018 regarding

23   2017, they can make a decision about every month in 2017.

24   What they can't do in December of 2018 is make a decision

25   about every month in 2018, and that's the way it's worked

Page 149

1   every single year going back as far as we've seen records

2   for.  Is that it's that following year after collecting the

3   funds, they go back and say, was Sears in compliance?  They

4   were, then the Village authorizes the payment to be made,

5   often enough in that same year, in that same year which the

6   taxes were collected, the taxes are reimbursement is paid,

7   so the course of dealing between the parties.

8           We also, again, we have Mr. Schein here from the

9   Village who can confirm our understanding and the

10  understanding between the only two parties to this

11  agreement, which are Sears and the Village.  And the Village

12  does not disagree with any -- I mean, the Village, as you

13  saw, did not file any kind of objection to our motion to

14  turn over funds that they're holding, even though, frankly

15  if we're wrong it's to the Village's benefit because that

16  money goes, amongst all the municipalities, they're one of

17  them.  But they didn't file any response because they would

18  have been saying something that's not accurate.

19          They don't challenge our compliance in 2017.  They

20  don't challenge that 2017 is the right year to be looking at

21  for these funds, the year in which the taxes were levied.

22  They don't challenge that the way in which the employees

23  were counted was appropriate, which employees in terms of

24  what --

25          THE COURT:  Well, you say "they" you're referring

Page 150

1    to the Village?

2              MR. FRIEDMANN:  The Villages.

3              THE COURT:  Right.

4              MR. FRIEDMANN:  Excuse me.  Sorry.  To be more

5    specific.

6              So I don't think there really is a genuine dispute

7    here at all.  You have an opportunistic school district who,

8    in addition to getting the 45 percent we already agreed to

9    make sure that that was distributed to them and was not held

10   up by their own litigation, they have that money, now

11   they're looking for, as Your Honor put it, a windfall.  This

12   is above and beyond what they could have reasonable have

13   expected to get when they put their budget together, and

14   they're taking a shot at it.  And, you know they're lawyers

15   and that's the way lawyers make money, so I get it.  But

16   there really is no legitimate basis in the case law, other

17   than their creative lawyering.

18             Let me address one final thing on that is, you

19   know, they suggest that the record is not clear and Mr.

20   Meghji's deposition, he wasn't prepared for.  This is the

21   reality of being in bankruptcy, Your Honor, is that all the

22   employees who worked there in 2017 unfortunately are no

23   longer all employed by Sears.  So the two women who were

24   responsible for contemporaneously keeping track, on a

25   monthly basis, of our compliance with the EDA Act are not

Page 151

1   there anymore.  Luckily all of their documents and records

2   are, so Mr. Meghji, as CFO -- CRO of the company, excuse me,

3   gathered all those documents, went through them and was able

4   to see that consistent with what Sears confirmed to the

5   Village, in real-time, it was in compliance in every month

6   in 2017.

7              So what has been produced and what Mr. Meghji was

8   able to testify is the best available evidence and it's

9   unrebutted.  There's not -- it's not as those there's some

10  email that says, oh no, we're really not in compliance, what

11  are we going to do.  There, by the way, certain are email

12  that say, we better we careful, we're learning -- we're

13  losing a lot of employees, we've got to track this carefully

14  because in the future we may not be in compliance.  But

15  there is no evidence whatsoever suggesting that at any point

16  in 2017 they were not in compliance.

17             And really, at the end of the day, it's a counting

18  exercise.  This is not a complicated issue.  You count from

19  1 to 4,250 and when you hit that number you can stop because

20  you're in compliance.  You certify that to the Village and

21  the Village turns over the money.

22             THE COURT:  And that's with actual Sears

23  employees, not third parties?

24             MR. FRIEDMANN:  So, it depends on the timing.  So

25  in 2017, certainly the beginning of 2017, they were relying

Page 152

1   solely on Sears employees at the Hoffman Estates campus.

2   And the numbers were significantly above 4,250 so as long as

3   they knew -- and then the actual number didn't matter, they

4   didn't have to certify that to the Village, they had to

5   certify that we are above the number.  So there were enough

6   employees, full-time employees at Sears at the time, they

7   were fine.  As the year went on and as they started getting

8   closer to that number, they started including, and there's

9   nothing in the EDA Act that prevents them from doing so,

10   they included other full-time employees that were also at

11   the Hoffman Estates campus, and that includes the --

12         THE COURT:  Employees of Sears?

13         MR. FRIEDMANN:  They're not employees of Sears,

14   they're employees who work at the EDA.

15         THE COURT:  All right.

16         MR. FRIEDMANN:  Which again, the -- there was

17   discussion about the Edge Act and the EDA Act --

18         THE COURT:  And this was in 2017?

19         MR. FRIEDMANN:  This was for 2017.  So in 2012 it

20   wasn't just -- the EDA Act and the Edge Act were both

21   amended.  Same piece of legislation, amended them both.  In

22   the Edge Act the language was they required Sears to "employ

23   a minimum of 4,250 full-time employees at its corporate

24   headquarters in Illinois at the time of the application."

25   Employ.  In the EDA Act, amended at the same time, same

Page 153

1    legislation, uses very different language it says, "Sears is

2    required to maintain 4,250 jobs," they don't have that same

3    language "employed" because there never was an understanding

4    or a requirement that Sears employ all those people.  The

5    idea was Sears came out of the Hoffman Estates, which at the

6    time was Prairieland, put $100 million or so into that area

7    and now they're being reimbursed for that.  Not just because

8    it created Sears jobs, but it created jobs for probably a

9    lot of the parents of the kids that lived in -- live in the

10   Hoffman Estates area, whether or not they work for Sears or

11   work for some other company that, you know, was spurned by

12   the fact that Sears had moved there.

13           So there is not that requirement.  And once again,

14   as the Village can confirm, there's no dispute, as between

15   Sears and the Village, that it's not limited to just Sears

16   employees.  In fact, it's not only limited to Hoffman

17   Estates.  You could count employees in the entire EDA, and

18   Sears never did that, because it wasn't necessary.  Once

19   they got to 4,250 they stopped counting.  If it was

20   necessary to count through the entire EDA, they could have

21   done that they would have been even that much more over the

22   threshold.

23           But our view, Your Honor, is that there's no real

24   bona fide dispute here because neither the statute has the

25   language that the school district wishes it had, and in

Page 154

1   terms of the numbers, they're there, they are what they are.

2   And it was counted contemporaneously, they're in business

3   records and it -- and Sears --

4           THE COURT:  Well, the numbers for the Sears

5   employees.

6           MR. FRIEDMANN:  Well, the numbers are in there for

7   both Sears employees and they also kept track of the non-

8   Sears employees.  They're all working at the Hoffman Estate

9   campus, so all these employees had to get registered badges

10  through the, what was it, real estate office, at Hoffman

11  Estates.  So Sears actually was able to easily keep track of

12  every -- all of the employees at the building, not just

13  Sears.

14          THE COURT:  What about the school district's

15  argument that it shouldn't count part-time employees?

16          MR. FRIEDMANN:  They did not count part-time

17  employees.  That's actually -- the documents that were

18  produced reflect they were only counting full-time

19  employees.  Now, by the way, I know the Village takes the

20  position that part-time employees could have been counted,

21  there's nothing that restricts Sears from doing so under the

22  EDA.  Because they were using information from the Edge Act

23  that they had already collected, which had more restrictions

24  on it, they limited themselves to only counting full-time

25  employees.  And the materials, the term "scrub" that was

Page 155

1    used before, that was one of the things that was done, is

2    they would scrub it to make sure that they were only

3    including full-time employees.

4              THE COURT:  Okay.

5              MR. FRIEDMANN:  Thank you, Your Honor.

6              MR. GENSBURG:  Your Honor, may I address just a

7    couple matter?  I think this dialogue that I -- we've had

8    sort of establishes that this is simply not a statute that's

9    going to need clarity, as I said earlier.

10             But I want to point out a couple things.  First of

11   all, Mr. Friedmann mentions past practices.  You might

12   recall we had sent a letter to the Court about our ability

13   to get documentation from prior years and they objected

14   saying that 2017 was the only year that's relevant.  And now

15   he's arguing about years' prior past practices.  We've never

16   been given those documents, we've asked for that stuff,

17   haven't been given it and so I don't think it's appropriate

18   that he makes that argument right now.

19             He makes a point about how the Village's silence

20   is somehow acquiescence.  I'm not sure how you read that

21   into it.  You know, we've been active on this, and the

22   Village has been watching us and they know what's going on.

23   So their silence may be, you know, guys go for it, we're

24   supporting you.  I don't know what it is.  Or it could be

25   the fact that the Village gets -- as long as the EDA Act

Page 156

1    remains in effect gets $5 million.  And then once the Act

2    disappears, because it's noncompliant, that $5 million goes

3    away.  So it could be one of those two things, or maybe it's

4    a third, I don't know.

5              THE COURT:  Where does it go?

6              MR. GENSBURG:  It goes to the other taxing

7    districts.  The $5 million is their take under the EDA Act

8    while its in place.  And that's -- you know, if you were a

9    cynic you would say, well, that's why the Village is not

10   doing anything about this.  Or maybe they're looking at me

11   and saying, go for it, Gensburg.  I don't know.  But I think

12   the mere fact that they're silent is not necessarily

13   acquiescence and agreement.

14             Mr. Friedmann says that there's a -- that there

15   was -- there's no --

16             THE COURT:  Well, there's no -- isn't there -- I

17   mean, Sears had to certify compliance, there's no document

18   where they accept certification?

19             MR. GENSBURG:  Sears -- when you -- in actually

20   attaching some of the documents Sears sends a certification

21   letter that basically says, we've complied.

22             THE COURT:  Okay.

23             MR. GENSBURG:  And the Village says, great.  The

24   Village doesn't say, well, give the detail about how you

25   complied.

JX 053-156

Page 157

1          THE COURT:  But is -- I guess my point is, isn't

2     saying, great, enough to mean that they've agreed?

3          MR. GENSBURG:  I don't -- yeah, I don't think --

4     you know, the problem with those letters is the years.  So

5     Sears -- the Village was saying, give us data in 2017 for

6     2017, 2018 for 2018 and so there's that discrepancy.  But I

7     think, quite frankly, Your Honor, that the Village would be

8     thrilled to allow the EDA Act to remain in place because

9     they make money off of it.  And that's the $5 million.  I

10    don't know if that's what Michael Schein was talking about,

11    but that's the $5 million.  Once the Act disappears, that $5

12    million goes to all the taxing districts, it's not funds

13    that are just to the Village, which is a product of the

14    statute that Mr. Florey or Mr. Atkinson can walk the Court

15    through, if you want a little more detail on that.

16          And the problem with the 30(b)(6), you know, he

17    says, Mr. Meghji, all the employees are gone.  Well, you

18    know, 30(b)(6) is hard, it requires you to inform yourself.

19    And when you look at the case law that deals with 30(b)(6),

20    you can call them employees or nonemployees, you just have

21    to inform yourself.  And most of these employees are at

22    least employees under the agreement.  I'm not sure why this

23    is so difficult.  But the bottom line is, just saying there

24    was a methodology, and I can't tell you what it is, doesn't

25    inform me.  I have no idea how you determine that the people

Page 158

1   at Sbarro's who make the pizza for lunch are full-time

2   employees.

3           The other problem is, is that when you look at the

4   documentation that was provided in his declaration, Your

5   Honor, they refer to active badges for the Sears employees.

6   But there's also a column that says "daily swipes of

7   associates," which is employees.  It's half that number.  So

8   there's active badges of 4,300 and the daily swipes are

9   2,100.  And we asked him about that and he says, I don't

10  know, I didn't look at that.

11          The fact that there's a lot of active badges and

12  the company is shrinking dramatically doesn't necessarily

13  mean there's 4,300 full-time equivalent employees, the point

14  being there's a lot at issue here that needs to be resolved.

15  This is not a frivolous dispute, by any stretch of the

16  imagination.

17          THE COURT:  Let me ask your colleague, we talked

18  about, at the trial level -- at the appellate level, what is

19  your sense of getting -- let's assume there is contested, up

20  to at least the intermediate appellate court, what would

21  that time take?

22          MAN:  Well, there's also an expedited proceeding

23  in the appellate court as well.

24          THE COURT:  Right.  But can you just give me a

25  ball park sense?

1              MAN:  Again, an election case is probably the best

2      example where there's a critical need to get the answer

3      quickly, and it can be done in less than four months. You

4      have an expedited briefing schedule, you have an expedited

5      hearing schedule.  Most appellate courts don't take oral

6      argument, they just render the decision.  And if the

7      direction was clear from this Court to be on -- you simply

8      have to request to be on the expedited calendar.

9              THE COURT:  And that applies to matters like this?

10             MAN:  If --

11             THE COURT:  If the parties --

12             MAN:  -- we will inform --

13             THE COURT:  -- request it?

14             MAN:  Not just the parties but this Court.

15     They're going to understand that this -- there's a need for

16     expedited action so that we don't hold up any element of the

17     bankruptcy case.  That alone is enough to get the trial

18     court to expedite this to get the appellate court to

19     expedite it.

20             THE COURT:  Okay.

21             MAN:  Thank you.

22             THE COURT:  All right.

23             MR. FLOREY:  Your Honor, I just want to clarify a

24     few statements made on the record that the district raised.

25             First and foremost, the Village's responsibility

Page 160

1    is to comply with the statute, and what's most important is

2    the district noted in its papers, the statute does not give

3    the Village any audit or certification rights.  So the

4    Village is not with the power to go ahead and verify.  It

5    has no authority to go ahead and verify.  Prior to 2018 no

6    one disputed Sears' letters, Sears' statements, all the

7    Village did, in good faith, was, are you in compliance and

8    Sears said yes and we distributed the monies as the statute

9    directs us to do.  It is only just before this case and in

10   2018 that the district, or any party, let alone this

11   district, any district has disputed.

12            As a result, the bankruptcy happened, we are

13   stayed.  We came to this Court with the parties to

14   distribute the 45 percent that no one had an issue, and

15   we're here today asking this Court to make a determination,

16   or if it's going to be the state court, whoever it is, just

17   to tell us what to do with the money.  It is not for us to

18   make that interpretation.  You, or another judge, are

19   wearing the robes, its not for the Village.

20            As for a conflict of interest, which we take

21   personally, if any of this 55 percent comes back, it

22   actually goes to the Village.  So the Village would get a

23   piece of that, but right now we don't, so saying that we're

24   in favor of the Debtors or not in favor of the Debtors, it

25   would show that we, the Village, would not -- supporting the

Page 161

1    Debtors, which we're not taking a position one way or

2    another, that's why our silence is here, Your Honor.

3              And finally, the EDA Act, as we understand it,

4    just doesn't go away.  What they're fighting over now is

5    4.5(b) which is the statute within a section of the EDA Act

6    dealing with Recapture.  The EDA Act is still in effect,

7    we're still required to comply.  There is also an EDA

8    agreement, Your Honor, and really what that agreement was is

9    when this project was developed that was the basis to fund

10   the project, with -- most of it was funded by Sears.  And

11   what is being paid now is not really a subsidy, it's a

12   reimbursement of the advancement of the costs to Sears, that

13   is what the statute and the agreement is.

14             We also, probably, Your Honor, to give you a

15   heads-up, may very well be back before you at some point for

16   this year, depending how this Court or any other court

17   rules, because we have the issue of the EDA agreement is up

18   for assignment to the buyer, Transform Holdco.  So we're

19   only dealing with 2017 levy and the money we're holding.  We

20   are collecting and will be collecting from the Cook County

21   Treasurer this coming year's tax revenues from 2018 taxy

22   levy.  So we may eventually face this issue again.  I just

23   want to let the Court know that.

24             THE COURT:  Okay.  All right.  Okay.  I have

25   before me a motion of Community Unit School District 300 for

Page 162

1   a relief from the automatic stay, or in the alternative, for

2   abstention.

3           The motion was actually filed before there was

4   anything really, I think, to abstain from, although since

5   then the Debtors have filed, and this is on for today's

6   calendar as well, a motion for turnover of property that the

7   Debtors contend is its property that's currently being held

8   by the Village party to the EDA Agreement, the Village of

9   Hoffman Estates.  And I'm applying the abstention piece of

10  the motion to that turnover motion, i.e. that it is the

11  turnover motion that I am being asked to abstain from.

12          The motion seeks abstention on both a permissive

13  and a mandatory basis.  28 USC Section 1334(c)(2) provides

14  for a mandatory abstention.  "Upon timely motion of a party

15  in a proceeding based upon a state law claim or state law

16  cause of action, related to a case under Title 11, but not

17  arising under Title 11 or arising in a case under Title 11,

18  with respect to which an action could not have been

19  commenced in a court of the United States absent

20  jurisdiction under this section."  The section referring,

21  generally, to Section 1334, which pertains to jurisdiction

22  of bankruptcy cases and proceedings.

23          Under those circumstances, continuing on with the

24  statute, "The district court shall abstain from hearing such

25  proceeding if an action is commenced and can be timely

JX 053-162

Page 163

1    adjudicated in a state forum of appropriate jurisdiction."

2    Under the general order of reference the issues before me is

3    to the district court.

4           Accordingly, Section 1334(c)(2) requires, requires

5    that is, abstention where the motion to abstain is timely

6    filed, the underlying is proceeding is based on a state law

7    claim or cause of action, there's a lack of a federal

8    jurisdictional basis, absent bankruptcy, the action is

9    commenced in a state forum of appropriate jurisdiction, the

10   abstention will result in a timely adjudication and the

11   proceeding is noncore for purposes of 28 USC 157(b), in that

12   it would not arise under, or arise in -- arise under Title

13   11, or arise in a Title 11 bankruptcy case.  See In Re:

14   WorldCom, Inc. Securities Litigation, 293 B.R. 308, 331

15   (S.D.N.Y. 2003).

16          Regarding the timely adjudication -- or subject to

17   timely adjudication requirement, there appears to be no

18   definitive standard for judging whether an action is capable

19   of timely adjudication.  However, it is reasonably clear

20   that the cases that address the issue focus on the needs of

21   the Chapter 11 case and not an absolute time frame.  See

22   Paragraph 3.05, Collier, 16th Edition, 2019, i.e., the Court

23   should not simply look at an objective argument as to

24   whether courts in the nonbankruptcy forum adjudicate their

25   cases within a certain time frame, but rather how the time

Page 164

1    frame in which they adjudicate those cases relates to any

2    urgent needs of their particular Chapter 11 case where the

3    bankruptcy court -- over which the bankruptcy court is

4    presiding.

5            The only basis for bankruptcy jurisdiction here

6    that is not related to jurisdiction, but rather core

7    jurisdiction, is the the Debtor's argument that the money at

8    issue, which is being held by the Village of Hoffman

9    Estates, is clearly property of the Debtor's estate and

10   therefore must be turned over, under Section 542 of the

11   Bankruptcy Code, and that the movant school districts

12   attempt to prevent that turnover is a violation of the

13   automatic stay under Section 362(a).

14           That would clearly serve as a basis for defeating

15   the mandatory requirement under Section 1334(c)(2) if the

16   issue, indeed, were clear.  I conclude, however, based on

17   the record before me, that the issues underlying the dispute

18   as to the reallocation of the funds at issue under Section 4

19   of the EDA, is not clear and would require adjudication on

20   issues that cannot be decided on a clear basis.

21           The Debtor relies heavily on the fact that the

22   recipient of the funds and the entity to whom the Debtor's

23   compliance with the EDA and its requirement that a certain

24   level of jobs be maintained for the year at issue has

25   accepted that certification.  However, it is not clear to me

Page 165

1    that that acceptance, which in fact is not an agreement, but

2    merely a lack of, at this point objection, qualifies as a

3    binding determination or waiver that would control here over

4    the interests of the school district, which is a residual

5    beneficiary, if in fact Sears failed to maintain 4,250 jobs

6    at the EDA for the year in question, 2017.

7          The school district argues, to the contrary, that

8    the Debtor is using figures from the wrong year, which is

9    not specified in the actual statute.  And secondly, to the

10   extent its relying upon figures that include jobs that are

11   not jobs of direct Sears employees, the statute is not clear

12   on its face that that is the right method for calculation.

13          I believe that under the case law, considering 542

14   as a basis for core jurisdiction in the mandatory abstention

15   context, a Debtor needs to show more than that it has a good

16   shot at winning, or is likely to win.  Rather, it needs to

17   show whether there's a bona fide basis or it is clear that

18   the Debtor will prevail.  And I did not believe that the

19   Debtor's pleadings to date rise to that level of assurance

20   or lead me to rise to that level of assurance.

21          That leaves the issue, which I believe the Movant,

22   as with all of the factors in Section 1334(c)(2) as to carry

23   the burden of proof that the right to the funds being held

24   by the Village can be adjudicated on a timely basis by the

25   State Court.  When I consider timeliness here, I'm very much

Page 166

1    motivated by the concern that the Sears Debtors are on a

2    fairly thin margin as to the ability to pay administrative

3    expenses and, therefore, also, on a fine margin in their

4    ability without the consent of administrative expense

5    creditors to confirm with chapter 11 plan.  It's important

6    for the debtors to proceed promptly to confirm a plan which

7    requires them to determine their sources and uses of cash as

8    a condition precedent to that.  The Debtors have targeted an

9    outside date to do that, of July of this year, which to me

10   does not reflect wishful thinking, but rather is important

11   to do.  And I believe that the money at stake here, several

12   million dollars, is an important component of that analysis.

13          So, timely adjudication, I review in that context.

14   I have been told by an active member of the Illinois Bar who

15   practices in this area, that with proper guidance from the

16   parties as well as this Court, the Illinois Trial Court, as

17   well as the Appellate Courts, would likely treat this matter

18   on an expedited basis.  Counsel for the movants has

19   represented to me that under those circumstances he believes

20   there would be a final ruling on the merits of the issues

21   before me, which I briefly summarized, and which are well

22   set forth on the record within approximately 60 days of my

23   ruling on abstention, and that there is an expedited

24   procedure for appeal as well.

25          The Movants have also represented to me that they

1    would act to expedite the process and not to delay it,

2    including, for example, using discovery that has already

3    been produced in seeking expedited treatment.  Based on

4    those representations I conclude that the matter can be

5    timely adjudicated, although I reserve my right to

6    reconsider my decision if it turns out to the contrary, that

7    the timeline for adjudication is not a matter of several

8    weeks, but rather several months or longer.  But based upon

9    the record before me, I will abstain under Section

10   1334(c)(2).  I believe there are at least colorable issues

11   going to the merits here, based on, A, the choice of year

12   for the certification and, B -- although this may never be

13   relevant, depending on the answer to issue number A, or

14   issue A, whether the statute permits the developer to

15   include in its calculations of jobs maintained, jobs of

16   workers who are not direct employees of Sears, and the

17   evidence to support that.  But I believe that given those

18   colorable issues I'm required to have the State Court decide

19   those issues, again, on the conditions that the Movants have

20   agreed to on an expedited basis.

21        So, I'll ask the Movants to submit an order to

22   that effect and you don't need to formally settle that

23   order, but you should provide a copy in advance to counsel

24   for the Debtors so they can be sure it's consistent with my

25   ruling.

Page 168

1          I'm not deciding today whether the stay was

2     violated.  That's really an issue that will come up at the

3     end of the day.  But I'm obviously permitting the underlying

4     facts to be decided by the State Court.

5          MR. FRIEDMANN:  Your Honor, just a point of

6     clarification.  With respect to the 40 percent that is not

7     issue, should that same order be addressing that?  Do you

8     want a separate -- I know it's important to the Village to

9     have something?

10         THE COURT:  No, I think there should be a separate

11    order.  It's really a separate issue.  I don't want to have

12    that hold up this.  I just think it should proceed promptly.

13    And I also want to make it clear that what I'm abstaining on

14    is the turnover motion.  The litigation should not delve

15    into the State Court litigation and decide the merits of the

16    claims that have been filed in this case for reallocation

17    for prior years, or for the future.  I'm hopeful that there

18    may be clarification, based on the State Court's decision,

19    that will inform those issues on a collateral estoppel

20    basis, but the only thing that's going to the State Court is

21    the particular issue of the right to the money that's being

22    held, that would otherwise go to the school district itself,

23    by the Village.

24         MR. FRIEDMANN:  And Judge, you asked earlier about

25    how do we figure out how much goes back to the other taxing

Page 169

1    districts, all of a certain percent.

2              THE COURT:  Right.

3              MR. FRIEDMANN:  It's very easy mathematics if you

4    figure out what goes.

5              THE COURT:  So, the only issue is what part the

6    Village keeps on account of your piece.

7              MR. FRIEDMANN:  Whether they keep it or their

8    silence gives it to Sears.

9              MR. FLOREY:  Yes, Your Honor, just for

10   clarification, we'll work with both of them.  They'll do the

11   calculation the Village technically has to go through a

12   finance committee and a board committee process which we'll

13   expedite to get that completed and submit an order.

14             THE COURT:  And if Sears disputes what should be

15   retained by the Village at all, I just suggest that you guys

16   leave that issue open.

17             MR. FLOREY:  Thank you, Your Honor.

18             MR. FRIEDMANN:  Your Honor, on the motion to

19   strike, I guess that --

20             THE COURT:  It's irrelevant.  It's moot.

21             MR. FRIEDMANN:  Withdraw without prejudice.

22             THE COURT:  Because it's not my issues.

23             MR. FRIEDMANN:  Right.  Thank you, Judge.

24             THE COURT:  In other words, I decided this issue

25   without my consideration of Mr. (indiscernible) declaration

Page 170

1    one way or the other.  Okay.

2           MS. MARCUS:  Good afternoon, Your Honor,

3    Jacqueline Marcus, Weil Gotshal & Manges on behalf of Sears

4    Holding Corporation, its affiliates.  The next item on the

5    agenda, I believe is number five.  It's the motion of the

6    Trustees of the Estate of Bernice Pauahi Bishop to compel

7    payment.  As indicated on the agenda, that matter has been

8    adjourned, but Mr. LeHane would like to address the Court.

9           THE COURT:  Okay.  This is the Hawaiian store.

10          MR. LEHANE:  That's correct, Your Honor.  Robert

11   LeHane, Kelley Drye and Warren, on behalf of the Trustees of

12   the Estate of Bernice Pauahi Bishop, which does business as

13   the Kamehameha Schools.  As Your Honor may recall, this

14   estate really is a school system.  Ms. Bishop left all of

15   her estate to the children of Hawaii.  There is a

16   significant shortfall in the rent.  The rent increased in

17   July of 2018 by fourfold.  And the Debtor has been paying

18   approximately 26 percent.  As of April 1st, the total

19   shortfall is $1.646 million.  We agreed, at the last

20   hearing, at the request of Transform and the Debtor to

21   adjourn the matter.  The Debtor did agree, in connection

22   with that adjournment, to put $500,000 into escrow as

23   adequate protection for the rent shortfall, and we very much

24   appreciate that.

25          They, again, asked for an adjournment of this

Page 171

1    hearing because, at the time they made the requests, they

2    still were not sure the treatment of the lease.

3    Subsequently, we were informed by Transform, as was the

4    Debtor that they were going to reject the lease, that the

5    store will be closing.

6            We're in the process of negotiating with Transform

7    what we believe may be a short-term lease that will allow

8    for that to be a more orderly process than closing the store

9    by the deadline to assume or reject on May 15.  The Debtor

10   has agreed to add another $250,000 to the escrow and we

11   appreciate that.  That is a percentage of what would be

12   allocated to the Debtor's share of the time during which

13   they've been in the premise.  From and after the closing,

14   really is the obligation of Transform and we would reserve

15   the right depending on how discussions go during the next

16   several weeks, to seek further adequate assurance from

17   Transform, which would be related to the time that they've

18   been in the premises, and base rent and tax obligations that

19   have come due since then.

20          THE COURT:  Under the APA, in essence.

21          MR. LEHANE:  Yeah, under the APA, that's correct,

22   Your Honor.  And what we've also discussed is we're

23   adjourning this to June 20, but with the understanding that

24   we really will try to resolve this.  If the parties are

25   unable to make significant progress in the next several

Page 172

1    weeks, we will be submitting a scheduling order for the May

2    21, and use that as a status conference.

3              THE COURT:  Okay.

4              MR. LEHANE:  So, that if we have to come back here

5    before Your Honor, we would like that to be an evidentiary

6    hearing.  In fact, we have folks from Hawaii ready to come

7    out for today.  I obviously don't want to make that trip,

8    frankly, if we don't have to, or more than once, Your Honor.

9    So, that's essentially the update.  Sorry to hear that this

10   store is going to be closing much sooner than we thought it

11   would, but we hope we can resolve this.  To date, we've

12   heard no real substantive response to the issues that I

13   think were raised in our original motion.  So, we thank you

14   for that, Your Honor.

15             THE COURT:  Okay.  Very well.  Thanks.

16             MS. MARCUS:  I'm glad we've picked up the pace a

17   little bit.  The next item, Your Honor, is the motion of

18   Dedeaux Inland Empire Properties to compel the debtor in

19   possession to assume and assign or alternatively to reject.

20   It's Item Number Six on the agenda.

21             MR. FENNELL:  Good afternoon, Your Honor, William

22   Fennell on behalf of Dedeaux and on the Empire's.  Your

23   Honor, I believe that we have accomplished what they sought

24   to accomplish, which is communication with both Transform

25   Co. and the Debtor.  Literally at the 11th hour last night,

Page 173

1   we had a conference call and I was informed that the Debtor

2   had been informed formally that Transform Co. will seek to

3   assume its contract and, therefore, I understand that one of

4   the parties for the Debtor or for Transform Co. is willing

5   to put that on the record today.  It doesn't resolve the

6   cure issue items and we're hopeful that those could be done

7   promptly and in conjunction with the master services

8   agreement for the facility, but that would be left for

9   another day.

10          THE COURT:  All right.  So, it is on the, it's now

11   on the assigned list.

12          MS. MARCUS:  Your Honor, I believe it was on

13   Friday but it may have been on Thursday of last week, before

14   the designation rights period, and with respect to this

15   lease.  We did get the notice from Transform that they are

16   designating this lease for assumption.  We have not yet

17   formally -- we've kind of shared the work between transform

18   and the Debtors in terms of filing the notices with the

19   Court.  And I believe that Transform's counsel is going to

20   actually file the formal notice.

21          THE COURT:  So, this motion is really moot then.

22          MS. MARCUS:  From our perspective it is, Your

23   Honor.

24          THE COURT:  I mean, I'm not sure I would have

25   granted it, given the statute, but it's moot.

Page 174

1            MS. MARCUS:  I was going to make the argument, but

2      given the time, I'm not going there, Your Honor.  Thank you.

3            THE COURT:  Okay, very well.

4            MR. FENNELL:  Is there somebody from Transform who

5      can confirm.

6            THE COURT:  The counsel is here.  They're not

7      disputing what you say.

8            MR. FENNELL:  Your Honor, I will have to confirm

9      with their office.  I'm sure, I mean we're working very

10     closely with Weil on this one but --

11            THE COURT:  I accept the Debtor's representation.

12            MR. FENNELL:  I do too.

13            THE COURT:  They're aware of the whole process

14     here.

15            MR. FENNELL:  Understood, Your Honor, but that

16     wasn't completely transparent to us, but we understand from

17     last evening and today's representations.  Thank you.

18            THE COURT:  Okay, very well.

19            MS. MARCUS:  The next one, Your Honor, number

20     seven, is the motion of Maudlin At Butler LLC for payment of

21     administrative expenses, and their counsel will handle that.

22            THE COURT:  Right.

23            MR. GOODHOUSE:  Good afternoon, Your Honor.

24     Brendan Goodhouse, Cutty & Feder for Maudlin At Butler, the

25     landlord.  This motion is for the payment of property taxes

Page 175

1    that came due in November of 2018.

2            THE COURT:  Well --

3            MR. GOODHOUSE:  When --

4            THE COURT:  I'm sorry, go ahead.

5            MR. GOODHOUSE:  Sure.  I just wanted -- some

6    housekeeping -- it's in the papers, but just so we're all on

7    the same page.  When we first made a motion, the claim was

8    for $88,660.08.  Subsequently, we learned that the Debtor

9    had made a partial payment of those taxes in the amount of

10   roughly $19,000.  So, the amount outstanding is $69,713.54.

11           THE COURT:  And the Debtor contends that that

12   payment is in respect of the pro-rated post-petition

13   portion?

14           MR. GOODHOUSE:  Yeah.  Essentially, so, what the

15   dispute comes down to is, the Debtor's position, and

16   obviously they can state it better than I will, but that the

17   roughly $70,000 that's unpaid is not properly categorized as

18   administrative expense.  It should be considered a

19   prepetition claim because it's applicable to the earlier

20   part of 2018.

21           THE COURT:  The taxes themselves accrued pre-

22   petition?

23           MR. GOODHOUSE:  The taxes -- yes, that's right.

24   So, what we really come down to is just, I think, it's a

25   statutory interpretation argument.  And the key provision is

Page 176

1   section 635(d)(3) of the code.

2           THE COURT:  Three sixty-five.

3           MR. GOODHOUSE:  What did I say?  Sorry about that.

4           THE COURT:  You transposed a couple of numbers, no

5   problem, 365(d)(3).

6           MR. GOODHOUSE:  My temporary dyslexia; apologies.

7   It requires timely performance of obligations of the Debtor

8   arising from and after the order for relief under any

9   unexpired lease of nonresidential real property until such

10  lease is assumed or rejected.  Not many courts have actually

11  directly addressed this question here, where what you have

12  is property taxes that aren't billed until the end of the

13  year, which is what the case is in South Carolina, at least

14  in Greenville County, South Carolina, where what you have a

15  lease obligation that comes up following the petition.  But

16  the tax period covers both prepetition and post-petition

17  periods.  The question really boils down to, do you read

18  Section 365(d)(3) and give a plain meaning to those words,

19  or do you find that there's ambiguity in there, and starts

20  taking to account certain policy considerations that may

21  adjust how you're going to read this.  And you have

22  different -- different Courts have come to different

23  conclusions on this issue.

24          Now, the Debtor's notes the In re Child World

25  case, which found, as they would like Your Honor to hold

Page 177

1    here, that the portion of the taxes applicable to the

2    prepetition period would not fall under 365(d)(3).  But then

3    about three months after that case came down, the In re RH

4    Macy case came down where Judge Sotomayor looked directly at

5    the Child World case, considered it and, I think in sum and

6    substance, that ruling came out to be -- I understand the

7    policy considerations being discussed in the Child World

8    matter.  I'm not going to read ambiguity into words of the

9    statute where I see none.  And it's really, you know, it's

10   the same thing, and I took note of it when you were issuing

11   the decision on the first motion here, in discussing the

12   rules and interpretation of contracts.  And it's really no

13   different with statutory language.  Yes, you have to

14   consider overall policy objectives, and you have to consider

15   the totality of the statute.  But that doesn't override the

16   actual words.  And just because two parties had different

17   understandings of their meanings, doesn't mean there's

18   ambiguity there.

19           Now, I think, frankly, what seems to me at least

20   to be the critical decision here is the term 'arise.'  Does

21   the obligation arise prepetition as the taxes are accruing

22   or does the obligation arise post-petition when the county

23   says the taxes are due, and then when they're do under the

24   lease?  And I think the plain English meaning of that is, it

25   doesn't arise until the county says it's due, and it doesn't

Page 178

1    arise under the lease until the payment is due.  So, here,

2    the contrary example, or the example is, if Mauldin had,

3    some time in 2018, gone to K-Mart and said, "We want you --

4    ," for whatever reason, because they knew the bankruptcy was

5    brewing but that's really irrelevant; if they said, "We want

6    you to make a payment on your 2018 taxes," K-Mart would have

7    properly said, "No, we have no obligation to do that."  That

8    obligation doesn't arise under the lease until the county

9    bills them.  So, it's -- and the other --

10             THE COURT:  Of course, that's what Judge Posner

11   had a real problem with.  He said it didn't make any sense,

12   that very fact (indiscernible), and that's why he said in

13   Handy Andy that this can't be what --

14             MR. GOODHOUSE:  In Handy Andy, yes, I understand -

15   -

16             THE COURT:  -- this can't be what Congress meant.

17             MR. GOODHOUSE:  And the Third Circuit has gone

18   other way on it.  So, both parties in their briefing,

19   obviously, focused on this jurisdiction.

20             THE COURT:  So, you have some real heavyweights

21   talking here, right?

22             MR. GOODHOUSE:  So, you do --

23             THE COURT:  Posner, Sotomayor.

24             MR. GOODHOUSE:  -- certainly above my pay grade.

25   And the last thing --

Page 179

1          THE COURT:  Right.  But actually, she recognized

2     too that it was kind of the logical ...  But I don't think

3     anyone argued to her that the statute may have been just a

4     timing issue; not the timing of accrual versus arise, but

5     the fact that you actually have to pay.

6          MR. GOODHOUSE:  I think, in that case, Judge,

7     actually, the parties' argument seemed to focus more on the

8     term 'obligation' than 'arise.'  I found that in looking at

9     some of the subsequent cases 'arise' struck me as being the

10    key issue here.  But one thing I would note about the policy

11    --

12         THE COURT:  But I think that the point is -- and

13    actually, I think Judge -- I think it was Judge Sweet,

14    another heavyweight, in the Loews case, talks about -- yeah,

15    it was Judge Sweet -- talks about the focus of the statute

16    being on immediate payment, not so much on the world

17    'arising' and he distinguished the situation in Lowe's from

18    the situation where taxes would be accruing over time, even

19    if they're payable as of one date.  So, I'm going to cut

20    this short.  You want to brief this very well.  This is an

21    issue that is clearly not decided in the Second Circuit yet,

22    and I believe it can go either way.  And my view is that

23    this should be pro-rated here, that the full tax bill isn't

24    required to be paid under 365(d)(3).  And I think that's the

25    majority view of the cases, generally.  I wouldn't limit it

JX 053-179

Page 180

1    just to tax bills.  I think you have to look at things that

2    accrue over time.  And you're absolutely right, there are

3    circuits that go the other way.  In fact, even though the

4    majority of courts apply the accrual analysis, the majority

5    of the circuit courts go the other way.  But I think Judge

6    Posner actually does a really good job of analyzing it in

7    Handy Andy Improvement Centers 144 F.3rd, 1125 Seventh

8    Circuit 1998.  And I do think it depends a lot on the

9    particular obligation, but I think with accruing taxes,

10   which is what Handy Andy covers, and of course with Child

11   World and Macy's did too, on contrary District Court

12   opinions, the better view would that Congress was trying to

13   do a lot of things in 365(d)(3), but the main ... but I

14   don't think it was intended, and I don't think the language

15   requires that tax bills that accrue over the length of the

16   prepetition period, as well as carrying over the post-

17   petition period have to be paid under 365(d)(3).  And I

18   think the Urban Realtek Properties versus Loews Cineplex

19   Entertainment Corp case 2002 US District LEXUS 6186, April

20   9, 2002, goes into this in some detail at pages 18 -- I'm

21   sorry, 17 through 24, where Judge Sweet recognizes it's

22   appropriate to pro-rate in some cases, particularly taxes,

23   but not in that case where there was one overall payment.

24           I recognize that CenterPoint Properties, In re

25   Montgomery Ward, goes the other way; 268 F.3rd 205 Third

Page 181

1    Circuit 2001, as well as, of course, the Macy's case.  But I

2    think the majority of the cases doesn't, as discussed, for

3    example, in In re Rothman 2007 Bankruptcy LEXUS 2651,

4    Bankruptcy EDNY August 2, 2007.  And also note that, for

5    what it's worth, the ABI Commission on reforming the

6    Bankruptcy Code sided with the pro-rating courts as to how

7    the landlord's claim against the estate should be treated.

8    See First Glance: Legislative Update ABI Commission,

9    Creating More Certainty in Chapter 11 for All Parties, 34-4

10   ABI Journal 12, April 2015.  The recommendation is actually

11   at the very end of that article.  So, I just think that the

12   statute is sufficiently ambiguous to look at the overall

13   bankruptcy policy.  This is a lease that was rejected

14   ultimately, right?

15          MR. GOODHOUSE:  Yes.

16          THE COURT:  So, we look at 502(g) and 365(g), and

17   I'm going to deny your motion.

18          MS. MARCUS:  Number Eight on the agenda is

19   actually one of the Debtor's motions.  It's the motion of

20   the Debtors for entry of an order authorizing and approving

21   procedures for settling de minimis affirmative claims and

22   causes of action of the Debtors.

23          Basically, Your Honor, what we've proposed is a

24   procedure that would expedite the Debtor's ability to enter

25   into those kinds of settlements.  We have discussed it and

Page 182

1    actually run the procedures by the Creditors Committee.  The

2    Creditors Committee made comments.  We responded to the

3    comments and those comments are reflected in the proposed

4    procedures.  Essentially, we're seeking authority to settle

5    claims that have a settlement amount of less than $5

6    million.

7            We received only one objection to the motion.

8    That was the objection of Wilmington Trust, the successor

9    indentured trustee, with respect to the 2010 notes.

10    Wilmington asserts two objections.  First, that the Debtors

11    have not provided any evidence of how many de minimis claims

12    may exist and may be resolved before plan confirmation.

13    Given the size of the Debtors' estates and the compressed

14    period in which these cases have taken place, I don't

15    believe there's anyone who can guess as to how many claims

16    there would be.  Frankly, I don't know that I have one that

17    I can think of today, but we do think it would be in the

18    Debtor's estates and it would also assist the Court if we

19    were to approve these procedures.  There's no downside to

20    doing it, so if there were five or if they were 100, I don't

21    think that would make a difference.

22            The second objection asserted by Wilmington is

23    that given the replacement liens that they were granted

24    under the final DIP order, they should not be excluded from

25    the opportunity to review and object to the proposed

JX 053-182

Page 183

1   settlements.  Again, we're talking about the settlements

2   that are under $5 million.  On this, Your Honor --

3            THE COURT:  I'm sorry, say that again, a

4   settlement ...?

5            MS. MARCUS:  Settlements that are less than $5

6   million, because settlements that have an amount more than

7   $5 million would be subject to the normal noticing

8   procedures.  I think in the last line of their objection,

9   Wilmington says, "Include us as a noticed party on those de

10  minimis settlements."  The Debtors' perspective is that we

11  leave it to Your Honor.  I think every time we add another

12  notice party on these kinds of matters, we're increasing the

13  cost and the delay and the hassle, frankly, of getting this

14  stuff done.

15           THE COURT:  Although I think they're right -- I

16  mean, they're the fulcrum security, arguably, so I would

17  include them in indentured trustee.  You don't have to give

18  it to every bond holder, it's just the indentured -- the

19  collateral agent and indentured trustee.

20           MS. MARCUS:  Okay.

21           THE COURT:  On the first point, these are -- it

22  doesn't say what you settled them for, right, it just says

23  settlement?

24           MS. MARCUS:  It says settlement amount.

25           THE COURT:  The settlement amount.

Page 184

1          MS. MARCUS:  So, if the claim is one where the

2     other party -- and we didn't seek authority to actually make

3     payments on any claims because these are affirmative claims

4     that belong to the estate.  So, if the amount that the

5     estate is going to get is less than $5 million, then we

6     don't need to -- we only notice the US Trustee, the

7     Creditors Committee and Wilmington Trust.

8          THE COURT:  Okay.  All right, Mr. Fox, you have

9     anything to say on this one?

10         MR. FOX:  No, Your Honor.

11         THE COURT:  Since you were on the second part.

12         MR. FOX:  Yes.  So, I don't have any -- we made a

13    motion as the collateral agent as well, which was for the

14    entire --

15         THE COURT:  That's right.  I keep saying -- it's

16    in both capacities.

17         MR. FOX:  Yes, thank you, Your Honor.

18         THE COURT:  Five million dollars is a lot of

19    money, obviously.  There needs to be some review as this

20    motion provided for.  And I think that the motion itself was

21    properly noticed under the case management order.  The only

22    party that objected was the second lien trustee and

23    collateral agent.  I take that very clearly to mean that

24    other parties of interest are comfortable with this

25    procedure.  But I believe given the position of the second

Page 185

1   lien debt in the capital structure that it should be also a

2   notice party.  And with that change I'll grant the motion.

3          MS. MARCUS:  Okay, Your Honor, we'll revise the

4   order and submit it to chambers with a copy to Mr. Fox in

5   advance.

6          THE COURT:  Okay.

7          MS. MARCUS:  The next item on the agenda is the

8   motion of Winners Industry.

9          MR. SMITH:  Good afternoon, Your Honor, James

10  Smith from McKool Smith on behalf of Industry Co.  Winners

11  originally moved for motion to grant administrative expense

12  priority for the goods that Winners sold to Debtors that

13  were received by the Debtors post-petition.  Debtors oppose

14  this motion, arguing that the relevant date with which to

15  assess when the transaction occurred isn't the date the

16  goods were received, but is rather the date the goods were

17  shipped, which is pre-petition.  So, Debtors are arguing

18  that because the goods were shipped pre-petition, the whole

19  transaction is a pre-petition transaction and doesn't fall

20  within the ambit of 503 --

21         THE COURT:  But since then, they've argued that

22  you should just follow the order that covers all of these

23  types of claims, procedurally.

24         MR. SMITH:  Our position is, we are urging Court

25  to adopt a reasoning of the Third Circuit in the In re World

Page 186

1    Import case.

2            THE COURT:  There's a ... maybe I'm confusing

3    this.  Isn't there now a procedural order for dealing with

4    all of these types of claims?

5            MR. SMITH:  There's a procedural order for

6    503(b)(9) claims which are not at issue today, and we agree

7    with them that those are subject to that order and those

8    will be raised at the appropriate time.  With regard to the

9    503(b)(1) claims, there is an order on those procedures,

10   this specific motion, and this specific circumstance, in

11   which we're asking for a ruling on a very discreet legal

12   issue, was carved out of that order.  And we informed

13   Debtors of this last Tuesday.

14           THE COURT:  I'm not prepared to rule on this.

15   It's now 3:30.  I've been in court, basically, 12 hours a

16   day since Monday.  You're going to have to come back.

17           MR. SMITH:  Thank you, Your Honor.

18           THE COURT:  I'm sorry.  You had to wait several

19   hours but this is just not acceptable to me.

20           MR. SMITH:  Thank you, Your Honor.

21           MS. MARCUS:  The next matters, Your Honor, we

22   categorized as automatic stay matters.

23           MS. PESHKO:  Your Honor, the first of these

24   matters is the motion of Mario Aliano for relief from a

25   stay.  I'm no sure whether counsel is in the courtroom.

Page 187

1           MS. HARRIS:  Good afternoon, Your Honor.  This is

2   Sharon Harris.  I'm on telephonically from Chicago.

3           THE COURT:  Good afternoon.

4           MS. HARRIS:  Good afternoon.  I represent Movant

5   Mario Aliano.  And this is motion to lift the stay in the

6   civil litigation.  All that's remaining in his case is on

7   appeal.  Just real briefly, the Circuit Court of Cook County

8   Illinois entered a judgment against Sears for violation of

9   the Illinois Consumer Fraud Act, and that was affirmed on

10  appeal by the Illinois Appellate Court in 2015.  And the

11  matter was remanded on issue of attorneys' fees.  There was

12  a three-day evidentiary hearing and the Court awarded

13  $267,470 in attorneys fees.  Sears appealed the Circuit

14  Court's award of the fees and Sears also (indiscernible) and

15  obtained an approval of an appeal bond.  The appeal bond

16  covers the award plus one year of statutory interest.

17          THE COURT:  But does it --

18          MS. HARRIS:  So, the only thing --

19          THE COURT:  I'm sorry.  Does it actually cover the

20  fees?  I thought that was the issue.

21          MS. HARRIS:  Debtors have raised the issue of the

22  defense cost.  The appeal has been fully briefed for several

23  months, and all that's awaiting is the decisions by the

24  Illinois Appellate Court.  Debtors raise that there could be

25  some cost involved in arguing the matter on appeal, but

Page 188

1    there's no guarantee that the Appellate Court would set the

2    matter for oral argument.  It's within the Court's

3    discretion as to whether to set it for oral arguments.  And

4    we're willing to waive our request for oral argument on the

5    appeal in order for the matter to go forward.  And even if

6    here is oral argument, I think the cost to Debtors of

7    defending that would really be minimal because, as I said,

8    the matter has been fully briefed and it's just a matter of

9    whether the Court, Illinois Appellate Court orders there to

10   be oral argument in matter.

11           THE COURT:  Okay.

12           MS. HARRIS:  We've cited some cases in our brief

13   that the causative defending litigation by itself is not

14   necessarily enough to preclude relief from an automatic

15   stay.

16           THE COURT:  Okay.  Let me hear from the Debtor's

17   counsel.

18           MS. PESHKO:  Your Honor, for the record, Olga

19   Peshko, Weil Gotshal for the Debtors.  This particular

20   appeals bond is fully collateralized by Sears prepetition,

21   Your Honor, in the amount of over $290,000.  The Debtors

22   have an interest in this money and they're not willing to

23   waive their right to argue oral argument or to prepare for

24   that.  And there's a cost associated with that.  If the

25   Debtors do succeed at the appeal, then the matter may be

Page 189

1    remanded, there may be other further proceedings.  And so,

2    our view is that there's cause to keep the automatic stay in

3    place.  Furthermore, Your Honor, there is no insurance

4    available for the incident date related to this action to

5    cover the Debtors' defense costs.

6              THE COURT:  So, the appeal bond is collateralized,

7    it's not paid for, it's collateralized.

8              MS. PESHKO:  That's right.

9              THE COURT:  So, it's not like insurance.

10             MS. HARRIS:  Your Honor, if it makes a difference,

11   we are willing -- the appeal ban covers the award plus one-

12   year statutory interest.  We're willing to waive recovery

13   for attorneys' fees of any amount above and beyond the

14   appeal bond amount.

15             MS. PESHKO:  With respect, that does not account

16   for the Debtors having to expend defense defend costs now.

17             THE COURT:  Okay, but that does take care of the -

18   - I mean, the only issue that's on appeal is he defense

19   cost, right?  So, they're not going against the appeal bond

20   for that?

21             MS. PESHKO:  The issue on appeal are attorney fees

22   for the --

23             THE COURT:  The attorneys' fees.

24             MS. PESHKO:  Exactly.

25             THE COURT:  So, maybe I misunderstood counsel.  I

JX 053-189

Page 190

1    thought she was saying that they were not going to look to

2    the appeal bond for the attorneys' fees.

3              MS. PESHKO:  I think == I don't want to put words

4    in her mouth but -=

5              MS. HARRIS:  No, that's not what I meant, Your

6    Honor.  What I'm trying to say is the only issue that's on

7    appeal is the amount of attorneys' fees and the appeal bond

8    covers the amount that the Circuit Court awarded plus one

9    year's statutory interest.

10             THE COURT:  So, that would include --

11             MS. HARRIS:  So, it's been beyond --

12             THE COURT:  So, that would include the attorneys'

13   fees.  The appeal bond includes the attorneys' fees.

14             MS. HARRIS:  Yes.

15             THE COURT:  So, what were you saying, that you

16   would waive?  I thought I heard you say you would waive some

17   --

18             MS. HARRIS:  The statutory interest beyond one

19   year.

20             MS. PESHKO:  The appeals bond doesn't cover that.

21             THE COURT:  Okay.  So, we're not relating

22   anything.  All right.  Well ...  How would the Debtors

23   propose this get resolved otherwise, if I didn't lift the

24   stay?

25             MR. FAIL:  Your Honor, Garrett Fail, Weil Gotshal

Page 191

1   & Manges for the Debtors as well.  Your Honor, this is one

2   of a large number of pending litigations that will have to

3   be resolved post confirmation pursuant to a plan, whether

4   part of a liquidated trust or whatever structure is proposed

5   in that plan with the moneys available in judgments about

6   what's worth pursuing at that point.  At this point, though,

7   with cash limited and a desire to protect the assets, the

8   Debtors chose to oppose the motion to preserve the stay and

9   status quo for an additional period which, for the cases to

10  continue.

11          THE COURT:  So then, on the phone, do you have a

12  slot that you would lose with the Illinois Appellate Court

13  if I denied your motion for a stay of relief?  In other

14  words, let's say I adjourned it until a date that I believe

15  would be a reasonable date for a plan to be confirmed, so

16  that will be post-confirmation, some time in August or

17  September.  There will be a determination whether to go and

18  liquidate the claim at that point.  Other than the delay, do

19  you lose anything else, the delay between now and September?

20          MS. HARRIS:  Well, I would say that the Appellate

21  Court had the brief, fully-briefed, last August, I believe.

22  So, in that respect they didn't get the suggestion of

23  bankruptcy until October, and so we kind of lost our place

24  in line with the Appellate Court deciding that, because they

25  stayed the matter rather than ruling on the brief or

Page 192

1   ordering oral arguments.

2           THE COURT:  So, it's still locked in place based

3   on the automatic stay.

4           MS. HARRIS:  Right.  I would just say we got the

5   judgment against Sears and December 2015 it was affirmed, so

6   we've been waiting all this time for the attorneys' fee.

7           THE COURT:  Well, you're going to be waiting

8   longer because it's -- the fees aren't covered anyway.  So,

9   this is a fairly close call under (indiscernible) but I will

10  determine to adjourn the motion.  I'm not going to require

11  you to refile it, but I'm going to adjourn it because I

12  believe the Debtors have a reasonable basis to win the

13  motion, but that's only for a relatively brief period until

14  the Debtors confirm a plan or something else dramatic

15  happens in the case.  So, you'll have to refile it.  But you

16  should get an adjourn date for the omnibus hearing in

17  August.

18          MS. HARRIS:  Thank you, Your Honor.  Okay.

19          THE COURT:  Okay.  It's just I don't think that

20  the result -- this is just liquidating a claim, except to

21  the extent that you would get paid by the bond, but that

22  hits the Debtor.  It's not the equivalent of having an

23  insurance policy that's already been paid for.  So, the

24  impact is significant and the reason to do it now as opposed

25  to a few months from now is not dramatic enough to warrant

JX 053-192

Page 193

1   lifting the stay, because it's a prepetition claim.  So,

2   I'll ask the Debtors to submit an order that adjourns the

3   motion, making the finding that I need to make under 362(e).

4           MS. PESHKO:  Thank you, Your Honor, we will.  The

5   next item on the agenda is the motion of Steven Tuttle for

6   relief from the stay.  Your Honor, I wanted to note that the

7   counsel that filed this motion has withdrawn as attorney for

8   this party, so we don't know whether anyone is appearing on

9   behalf of Mr. Tuttle.

10          THE COURT:  Okay.  Is anyone here or on the phone

11  appearing on behalf of Steven Tuttle on this lift stay

12  motion to pursue litigation in respect of a prepetition

13  claim?

14          MS. PESHKO:  Your Honor, I wanted to also note

15  that while we file this objection to reserve our rights,

16  because we don't have any insurance available of our own, we

17  did confirm that a third-party insurer for the employer of

18  Mr. Tuttle at the time of the incident is paying defense

19  costs for Innovel, the debtor in this instance.  However,

20  after counsel withdrew we reached out to get contact

21  information for his former client and he has not agreed to

22  provide us with a phone number or email.  So, we've been

23  trying to reach out to reach a stipulation and we'd like to

24  just adjourn without a date, to be able to get in touch with

25  this party.

Page 194

1          THE COURT:  Okay, that's fine.  We should provide

2     the same type of order that I just directed in the last

3     matter.  Have you communicated to former counsel that you've

4     discovered this insurance at Innovel?

5          MS. PESHKO:  That's what they've argued in their

6     motion.

7          THE COURT:  No, I thought you said -- no, I'm not

8     talking about Sears.  I thought you said there's a third

9     party that as insurance, the actual employer of this

10    individual.

11         MS. PESHKO:  We haven't reached out to the

12    employer, Your Honor.

13         THE COURT:  No, no, I said, have you reached out

14    to Mr. Tuttle's former counsel to let former counsel know

15    that you've located this third-party insurance?

16         MS. PESHKO:  That's right.  That's who we reached

17    out to try to negotiate a stipulation.

18         THE COURT:  All right, so you told her that?

19         MS. PESHKO:  Right.

20         THE COURT:  All right.  Because I was going to

21    direct you to do that if you haven't, but you've already

22    done it.

23         MS. PESHKO:  We did it.  We did that too, and

24    tried to get the contact information afterwards.

25         THE COURT:  Okay.  All right, that's fine.  So,

JX 053-194

Page 195

1    you can just submit he adjournment order on that one.

2           MS. PESHKO:  Will do.

3           THE COURT:  It's likely that I would have denied

4    the motion subject to a step dealing with going against the

5    third-party insurance.

6           MS. PESHKO:  Thank you, Your Honor.  The next item

7    is the motion of Jeffrey Pfeiffer to lift the stay.  I'm not

8    sure whether someone is here --

9           THE COURT:  This is Mr. Pfeiffer's motion?

10          MR. GALLAGHER:  Yes.  Good afternoon, Your Honor,

11   Dave Gallagher on behalf of Mr. Pfeiffer.

12          THE COURT:  Right, good afternoon.

13          MR. GALLAGHER:  Your Honor, if you'd like brief

14   argument I would just state this is a motion to lift the

15   stay with regards to a pre-suit action in Illinois that we

16   filed in the Circuit Court of Cook County against K-Marts as

17   well as a co-defendant, Monsanto, with regards to cancer

18   that my client developed after use of Roundup.  As the

19   Court's aware of the (indiscernible) factors, the big issue

20   with regards to the Defendant's objection -- the Debtor's

21   objection -- is that of insurance coverage.  The period of

22   time with which Mr. Pfeiffer claims he purchased this

23   Roundup spans from 1988 until 2014.  The Debtor's counsel,

24   their objection notes that their records with regards to

25   coverage only go back to 2005.  They do provide exhibits to

Page 196

1   their spots, which indicate that coverage is exhausted for

2   multiple years.  However, they did not provide any

3   explanation for coverage for the period of 2008 to 2009,

4   which leaves me to believe that there was, in fact, coverage

5   available for that time period.  Their coverage does provide

6   (indiscernible) defense for the case.  The Claimant here

7   simply seeks to move forward their claim.  We believe

8   there's available insurance coverage which would include the

9   cost of defense and, in exchange, the Debtors would get

10  complete relief from the claim other than whatever is

11  available, and insurance proceeds.  We believe it to be in

12  the benefit of the Debtors and it would expedite the

13  resolution of this claim.

14          THE COURT:  I'm sorry, I missed the last sentence.

15  I couldn't follow what you were saying.  Can you --?

16          MR. GALLAGHER:  Sure.  It would be to the benefit

17  of the Debtors, it would expedite the resolution of this

18  claim.

19          THE COURT:  It's a prepetition unsecured claim to

20  the extent it's not been discharged in K-Mart's bankruptcy.

21  If there is available insurance, I'm sure the Debtors would

22  lift the, agree to lift the stay to let you go against the

23  insurance.  They're saying there isn't available insurance.

24  You're saying that they haven't shown you that fact for 2008

25  through 2009?  Okay.

Page 197

1             MR. GALLAGHER:  That's correct.

2             MS. PESHKO:  Your Honor, that's correct.  We have

3     not provided a certificate of exhaustion for that period.

4     The Debtors believe there is no -- the insurance has been

5     exhausted for that period.  However, we are trying to obtain

6     a copy from the insurer.  We informed counsel that we would

7     like an adjournment to be able to get information, also to

8     confirm the discharge issue and counsel has not agreed to

9     adjourn.

10            THE COURT:  Do you have any problem lifting the

11    stay solely as to 2008 and '09, to the extent that there is

12    insurance and that the Claimant waives any other claim

13    against K-Mart?

14            MS. PESHKO:  If we can confirm that there is

15    insurance we'll do that --

16            THE COURT:  If part of the stip stays this waives

17    a claim against the Debtors, except to the extent of any

18    available insurance policy and we make no representation

19    that there is one, is there any issue there?

20            MS. PESHKO:  We would be willing to do that

21    except, Your Honor, that Sears would be required to defend

22    itself.  I mean, K-Mart would be required to defend itself

23    in this action.  Or we could try to provide first a

24    statement from the insurer that it's not there so that we

25    don't have to proceed with the stipulation?

Page 198

1          THE COURT:  Well, what efforts are you making to

2     determine that?

3          MS. PESHKO:  We have reached out to the Debtors

4     and we're trying to work with them to get this letter of

5     exhaustion.  It's just, we're just looking for additional

6     time to do that, Your Honor.

7          MR. GALLAGHER:  Your Honor, if I may, the issue

8     for me is one of statute of limitations on my claims.  These

9     claims are going to be going forward on a discovery basis.

10    I'm not sure of your familiarity with the Roundup

11    litigation, but this has really started to be a public --

12         THE COURT:  Well, it can certainly wait a month or

13    two, I'm assuming, right?

14         MR. GALLAGHER:  In theory, maybe.  It's going to

15    depend on what the parties respond as far as their response

16    to the pleading filed in the State Court.  But my client

17    could suffer prejudice in the loss of his ability to bring

18    these claims if we delay this inadvertently.

19         THE COURT:  Well, there's nothing in the motion

20    about whether he learned about Roundup, right?  And

21    apparently, he was buying it until 2014.

22         MR. GALLAGHER:  That's correct.  That's when he

23    was diagnosed.

24         THE COURT:  He was diagnosed in 2014?

25         MR. GALLAGHER:  That's correct.

JX 053-198

Page 199

1          THE COURT:  Okay.  So, what is the statute of

2     limitations for this type of claim in Illinois?

3          MR. GALLAGHER:  It is two years from when you knew

4     or should have known of the harm and the potential cause.

5     So, the literature regarding the AML, my client's form of

6     leukemia, and his exposure to Roundup really started coming

7     out in 2017.  There's a critical article that was published

8     on November 9, 2017 that I would argue would be the point at

9     which he knew or should have known of the association

10    between AML and Roundup.

11         THE COURT:  Okay.  Adjourning this to the June

12    omnibus day doesn't seem to affect the statute of

13    limitations.  And I thought you already commenced this

14    lawsuit.  You didn't?  You haven't yet?  All right.

15         MR. GALLAGHER:  I have not yet.  I was aware of

16    the stay once I got --

17         THE COURT:  All right.  Have you filed a claim in

18    this case?

19         MR. GALLAGHER:  I did.

20         THE COURT:  All right, so that's enough.  You've

21    asserted the claim.  So, I'm going to adjourn this for two

22    months so the Debtors can see whether it's worthwhile to

23    enter into the type of stipulation that I mentioned for

24    2008, 2009.

25         MS. PESHKO:  Thank you, Your Honor.

Page 200

1          MR. GALLAGHER:  Thank you, Your Honor.

2          MS. PESHKO:  That was the last matter on the

3    agenda today.

4          THE COURT:  Okay, very well.

5          MAN 1:  Thank you very much for your

6    (indiscernible) today --

7          THE COURT:  I'm really impressed by those who

8    stayed for the whole thing.

9          (Whereupon these proceedings were concluded at

10   0:00 PM)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 201

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  April 22, 2019

[& - 2017]                                                                    Page 1

**&**

**&** 8:3,12 9:2,9,16
132:4 170:3
174:24 191:1

**0**

**03** 75:7
**05** 75:10
**09** 197:11
**0:00** 200:10

**1**

**1** 47:15 56:15
74:13 76:13,17
104:16 151:19
186:9 200:5
**1,657,000,000**
35:4,7
**1.1** 75:25 82:13
**1.1.** 48:17 80:17
**1.3** 27:20,21
**1.553** 76:25
**1.646** 170:19
**1.657** 37:7,18
38:14 63:4,16
64:5 71:3 76:16
76:18,20 77:4
83:20
**1.9** 13:3
**1/1/2018** 6:18
**10** 30:11,17
137:17
**10.9** 34:25 36:3,5
36:12 38:17 40:5
47:12,14 55:22
57:12 62:17 63:4
64:4 68:18 71:10
73:24 76:11 77:5
80:4 83:18 84:16
**10.9.** 30:16 37:24
47:3,12 56:1
62:20 84:13
**100** 142:15 153:6
182:20

**10005** 9:12
**10006** 8:15 9:5
**10019** 10:11
**10022** 8:22
**1015** 78:8
**10153** 8:6
**105** 2:9 5:18 93:3
**10601** 1:14
**10:00** 7:15
**10:46** 1:17
**11** 2:8 5:17 6:16
13:18 14:15,18,20
105:15,16 162:16
162:17,17 163:13
163:13,21 164:2
166:5 181:9
**110** 93:21
**1125** 180:7
**1129** 101:15 102:2
**11501** 201:23
**1192** 74:9
**1195** 74:9
**11th** 172:25
**12** 109:22,25
117:3 181:10
186:15
**12,000** 121:14
**12/31/2018** 6:18
**1280** 4:23 5:9
**12th** 105:23
**13** 74:13 131:8
**13.3** 69:15
**13.4** 32:1
**13.8** 74:5
**1334** 104:16,16,21
104:25 105:10,17
111:8,12 117:8
162:13,21 163:4
164:15 165:22
167:10
**1381** 57:1
**1386** 7:12

**1394** 40:14
**14** 62:2 75:18
**14.6** 36:16,17
37:10 39:1 71:5
71:10,17,18 72:20
**14.9** 27:18
**140** 17:8
**143** 56:25
**144** 180:7
**15** 33:12,23 34:3
34:10 36:9 40:17
43:10 73:8 128:16
171:9
**157** 163:11
**16** 88:24
**1633** 10:10
**166** 87:3
**16th** 15:1 89:6
163:22
**17** 180:21
**177** 50:15
**18** 1:16 7:15 44:8
180:20
**18-23538** 1:3
**19** 24:12,15 40:16
**19,000** 175:10
**19.5** 27:25
**198** 50:16
**1983** 67:24
**1988** 195:23
**1990** 106:10
**1992** 74:9
**1998** 180:8
**1st** 170:18

**2**

**2** 2:17 6:16 31:8
47:14 76:14
104:16,21,25
105:10 111:8,12
117:8 162:13
163:4 164:15
165:22 167:10
181:4

**2,100** 158:9
**2.1** 32:17,20 77:16
79:11
**2.10** 32:7,19 48:5
**2.1d** 47:9
**2.1p2** 47:10
**2.3k** 56:15
**20** 67:12 171:23
**200** 9:18 10:3
**2001** 75:2 181:1
**2002** 180:19,20
**2003** 163:15
**2005** 195:25
**2007** 181:3,4
**2008** 196:3,24
197:11 199:24
**2009** 196:3,25
199:24
**2010** 182:9
**2012** 74:17,18,25
75:1,1,7,10,10,17
75:18 122:8,10
128:13 129:4
152:19
**2013** 74:14
**2014** 195:23
198:21,24
**2015** 132:25
181:10 187:10
192:5
**2016** 122:18
132:25
**2017** 109:2 114:20
123:10,13,15,15
123:19 124:18,18
124:19 125:11
128:18 132:24
133:20 148:12,13
148:23,23 149:19
149:20 150:22
151:6,16,25,25
152:18,19 155:14
157:5,6 161:19

165:6 199:7,8
**2017-2018**   109:6
**2018**   88:12 105:23
  109:2 114:20
  123:16,18,18
  124:19,19,20
  125:9,11 128:18
  133:8 141:23
  148:13,16,22,24
  148:25 157:6,6
  160:5,10 161:21
  170:17 175:1,20
  178:3,6
**2019**   1:16 2:17
  7:15 88:24 89:7
  133:8,12,14
  163:22 201:25
**205**   180:25
**21**   115:25 172:2
**21,000**   120:13
**214**   43:3
**21st**   29:5
**22**   201:25
**22.5**   24:12,14
**22nd**   62:10
**24**   180:21
**24,000**   121:14
**2414**   2:12 5:21
**2425**   9:18
**248**   1:13
**250,000**   171:10
**2508572**   74:17
**26**   170:18
**2651**   181:3
**267,470**   187:13
**268**   180:25
**2690**   6:19
**26th**   23:16 24:3
  24:13 27:12,23
**27,000**   120:14
**2715**   4:16,23,24
  5:3

**2717**   4:23
**2766**   2:5 3:12
**2796**   2:5,18,23 3:5
  3:13,21
**28**   9:11 33:12
  69:12 162:13
  163:11
**2808**   3:24
**281-288**   75:2
**2819464**   75:17
**2832**   5:23
**2839**   7:17
**2864**   2:23 3:14
**29**   74:18 75:1
**29.4**   28:2
**290,000**   188:21
**2922**   6:5
**293**   163:14
**2980**   6:11
**2989169**   74:25
**2996**   4:25 5:2

## 3

**3**   2:9 5:18 24:4,7
  47:14 76:16,18
  103:9 176:1,5,18
  177:2 179:24
  180:13,17
**3.05**   163:22
**3.12**   45:10
**3.14.**   45:10
**3.8**   13:1
**30**   67:12 102:9
  112:12 113:7,11
  115:15 119:8
  136:8 137:23
  139:22 157:16,18
  157:19
**300**   1:13 4:21,25
  5:4,6,11,14 9:17
  10:2 103:14 104:5
  115:1 120:13
  161:25 201:22

**300's**   4:18
**3011**   2:19
**303**   110:8 117:17
  117:17
**3031**   7:4
**3050**   4:5
**3079**   2:23 3:5
**308**   163:14
**3080**   28:14 29:1
**3144**   7:7
**3156**   3:6
**3163**   6:21
**3168**   6:13
**3169**   6:2
**3198**   4:12
**31st**   10:10
**3210**   4:12
**3225**   6:23
**3247**   5:4
**330**   201:21
**331**   163:14
**34-4**   181:9
**35**   144:16
**36**   75:7,19
**360**   63:19,20
**362**   164:13 193:3
**363**   2:9 5:18 90:24
**365**   2:9 5:18 176:5
  176:18 177:2
  179:24 180:13,17
  181:16
**381**   75:10
**3:30**   186:15
**3rd**   23:17 24:6
  27:15

## 4

**4**   74:25 103:12
  145:12,12,17,17
  164:18
**4,250**   122:12,20
  122:21 123:10
  124:7 126:1,7,21
  129:6 130:3

134:13 147:22
  151:19 152:2,23
  153:2,19 165:5
**4,300**   158:8,13
**4.3**   44:12
**4.4**   55:7
**4.5**   147:21 161:5
**4.6**   69:3
**4.7**   54:16 55:10
  82:4
**4.7.**   55:9
**40**   121:21 145:20
  168:6
**41**   75:10
**45**   142:17,25
  144:24 145:18
  150:8 160:14
**4th**   24:10 27:17
  27:24

## 5

**5**   27:12,16,23
  33:17 74:18
  145:18 156:1,2,7
  157:9,11,11 182:5
  183:2,5,7 184:5
**500,000**   170:22
**502**   181:16
**503**   2:9 5:18 6:16
  6:16 16:22 99:8
  185:20 186:6,9
**506**   93:3,3 98:13
  99:11,14 100:10
**507**   6:16 17:11,14
  17:21 18:1,21
  22:18 100:8 101:6
  101:16 102:1
**522**   57:1
**542**   73:13 104:17
  107:18,25,25,25
  108:14 164:10
  165:13
**55**   142:17 143:4
  144:20,21,23

**[55 - act]**                                                                  Page 3

145:18 160:21
**552**  93:3
**57.935**  43:10
**599**  8:21

### 6

**6**  109:22,25 117:3
119:8 137:23
139:22 157:16,18
157:19
**60**  15:7 101:7
102:11 105:6
112:12 113:7
115:16 136:8
166:22
**600**  47:15
**60440**  10:4
**60606**  9:19
**61**  81:2
**616**  74:9
**6186**  180:19
**631**  10:3
**635**  176:1
**65**  143:10
**652**  4:23,24 5:7,14
**656**  57:1
**657**  49:11
**69,713.54.**  175:10

### 7

**7**  37:7,23 38:1,13
59:16,21 72:6,7
72:11,19,20
**70,000**  175:17
**767**  8:5
**776**  75:7
**779**  75:19
**785**  75:2

### 8

**81**  113:10
**837**  74:13
**88,660.08.**  6:18
175:8

### 9

**9**  16:22 99:8
101:15 102:2
180:20 186:6
199:8
**9.1022**  80:21
**9.6**  141:20 142:1
**9.9**  27:22 28:1
**90**  13:1 98:23
**93**  98:19

### a

**a.2d**  74:9,13 75:2
**a.3d**  75:7,10,19
**a.m.**  7:15
**abena**  2:18 3:5,13
**abi**  181:5,8,10
**abilities**  63:5
**ability**  16:13
90:19 91:6 97:19
128:5 155:12
166:2,4 181:24
198:17
**abl**  89:5,8 91:4
92:13 95:5
**able**  18:9 122:23
151:3,8 154:11
193:24 197:7
**absent**  105:16
111:21 162:19
163:8
**absolute**  163:21
**absolutely**  22:6
96:15 101:21
108:5,7 116:11
136:6 142:3 180:2
**abstain**  105:11
111:4 115:8 162:4
162:11,24 163:5
167:9
**abstaining**  168:13
**abstention**  4:22
5:13 103:15,19
104:15,21 105:22

115:17 131:22
132:7,9,19 133:23
134:2 135:14
139:4,4,15 140:25
147:10 162:2,9,12
162:14 163:5,10
165:14 166:23
**accept**  147:12,14
156:18 174:11
**acceptable**  186:19
**acceptance**  165:1
**accepted**  164:25
**accepting**  32:4
**access**  49:23
101:14
**accommodate**
38:8
**accomplish**
172:24
**accomplished**
172:23
**account**  28:11
31:3 33:2 35:10
35:16 38:20 41:19
41:20 42:2,5,5,8
42:13 44:2,17
46:22 47:6 48:17
48:18 49:22,24
51:3,8,16 53:5
55:2 62:16 65:10
68:1,1,4 69:22
76:1 78:23 80:19
80:22 81:4,16
82:8,14,23 84:6
84:10 94:14,15
98:19 99:4,5
114:10 123:7
141:12,20 169:6
176:20 189:15
**accounting**
123:12
**accounts**  23:7,24
23:25 24:17,18

29:6,7,17,18,21
29:24,25 30:3,7,8
30:13,18,24 31:5
31:10 32:5,7,10
32:14,15,18,22,23
32:24 33:1,9,9,13
33:14,18 34:15
35:2,12,19 36:1,6
36:13,22,25 37:3
38:16,17,21 39:17
40:2,6,11,16,24
41:11,13 43:8
44:4 46:3 47:2,15
47:17 49:12,15,23
50:1,4,8,25 52:5,8
52:10 53:10,24
54:7 55:16,24
57:10,15 63:7
64:11,24 66:14
68:6,8,9,13 69:1,2
73:21,23 74:1
75:25 76:15 77:3
77:7,13,14 78:5
78:11 79:21,23
80:1,5,12,16
83:17 84:3,5,17
**accrual**  179:4
180:4
**accrue**  180:2,15
**accrued**  175:21
**accruing**  177:21
179:18 180:9
**accurate**  134:1
149:18 201:4
**acquiescence**
155:20 156:13
**acquired**  47:9
64:8 76:13,22,25
78:3
**act**  57:5 105:3
106:8,11 107:8
124:5,10 126:3
129:2 130:1

134:12 138:7,7,8
138:8 139:2
150:25 152:9,17
152:17,20,20,22
152:25 154:22
155:25 156:1,7
157:8,11 161:3,5
161:6 167:1 187:9
**action**  7:3 21:1
62:9 86:9 93:20
105:14 106:8,14
106:15 108:18
111:14 132:17
134:8 159:16
162:16,18,25
163:7,8,18 181:22
189:4 195:15
197:23
**active**  21:9 115:2
155:21 158:5,8,11
166:14
**actual**  22:8
151:22 152:3
165:9 177:16
194:9
**acumen**  12:17
**adams**  9:18
**add**  109:5 118:20
171:10 183:11
**added**  134:23
**addition**  73:22
150:8
**additional**  24:9
37:9 46:2 71:7
72:8 191:9 198:5
**address**  17:25
53:6 55:17 58:5
90:23 111:16
137:24 150:18
155:6 163:20
170:8
**addressed**  70:7
91:25 132:8

176:11
**addresses**  52:11
**addressing**  29:3
141:1 168:7
**adds**  147:16
**adequate**  96:19
97:23,24 170:23
171:16
**adheres**  75:11
**adjourn**  170:21
192:10,11,16
193:24 197:9
199:21
**adjourned**  170:8
191:14
**adjourning**
171:23 199:11
**adjournment**
170:22,25 195:1
197:7
**adjourns**  193:2
**adjudicate**  112:3
163:24 164:1
**adjudicated**
136:14,21 139:16
141:12 163:1
165:24 167:5
**adjudicating**
111:23
**adjudication**
105:18 111:14
163:10,16,17,19
164:19 166:13
167:7
**adjust**  27:6
176:21
**adjusting**  39:17
**adjustment**  47:20
63:17 64:12,15,16
65:16,19,20 66:1
84:13
**adjustments**
78:24 79:16

**admin**  19:4
**administrative**
6:15 7:9,11 14:23
18:24 87:5 99:6,7
99:8 100:2,3,6,6
100:14 113:24
114:4,5 166:2,4
174:21 175:18
185:11
**admission**  25:1
28:22
**admit**  28:25
**admits**  33:17
**admitted**  29:1
37:17
**adopt**  185:25
**adoption**  14:1
**advance**  19:6
100:19 136:4
167:23 185:5
**advancement**
161:12
**advise**  87:24
**advised**  23:10,14
27:18 89:2 137:3
**affairs**  14:19
18:11
**affect**  199:12
**affidavit**  55:2
**affiliates**  170:4
**affirmative**  7:3
181:21 184:3
**affirmed**  187:9
192:5
**afternoon**  51:21
87:16 104:4 170:2
172:21 174:23
185:9 187:1,3,4
195:10,12
**agency**  127:14,15
**agency's**  127:18
**agenda**  7:14 12:6
22:24 23:1 39:9

87:10 103:8
137:18 170:5,7
172:20 181:18
185:7 193:5 200:3
**agent**  4:2,10
87:18 88:1,7 96:9
99:2 183:19
184:13,23
**aggregate**  35:1
37:23 47:13 71:10
76:12,17
**ago**  15:7 108:17
**agree**  22:1 62:22
63:25 65:9 89:11
89:19 145:2
170:21 186:6
196:22
**agreed**  33:11
37:22,25 38:8
51:13 59:1 72:12
72:13 73:9 144:15
150:8 157:2
167:20 170:19
171:10 193:21
197:8
**agreement**  2:2,15
3:3,9,18 23:2,10
23:15 24:3,6
26:16,17 27:6,11
31:8,16,21 35:23
38:19,23 43:12
44:12,25 45:1,2,3
46:18,18 49:7
50:9 52:24 54:17
59:21 67:3,5
73:16,22 74:5,6
75:21 79:1 80:8
80:15 82:4 94:2
106:10 107:2
117:24 121:7
125:23 130:2
149:11 156:13
157:22 161:8,8,13

[agreement - applies]                                                    Page 5

161:17 162:8
165:1 173:8
**agreements** 29:4
29:9,15,16,23
30:4 31:18,19,25
32:2 34:17 38:22
42:23,25 43:21
44:22 47:23 49:1
49:2 54:9,14
55:15 57:5,6,19
59:4,6,7,9 78:1,10
78:14,17 79:10
81:11,15 121:8
**agrees** 62:24
104:23
**ahead** 87:14
110:17 160:4,5
175:4
**air** 73:6
**akin** 15:20 18:16
**al** 3:23 12:3
**alan** 104:8
**albeit** 82:15
**alert** 101:11
**aliano** 186:24
187:5
**allen** 4:24 5:3,13
**allocated** 171:12
**allocation** 102:8
**allow** 20:8 90:16
100:5 114:23
157:8 171:7
**allowance** 7:10
77:23
**allowed** 101:16
102:23
**allows** 148:20
**alta** 75:9
**alternative** 4:22
5:12 21:19 22:19
49:25 93:15
103:15 162:1

**alternatively** 6:8
90:24 172:19
**alternatives** 22:18
**alves** 10:18
**ambiguity** 74:21
74:22 75:3 176:19
177:8,18
**ambiguous** 75:8
181:12
**ambit** 185:20
**amenable** 103:17
103:17
**amended** 31:8
122:6 128:13
152:21,21,25
**american** 31:7,9
51:4,5 74:8
**amex** 43:7 44:25
46:18 78:17
**aml** 199:5,10
**amount** 15:13
24:7,11 31:11,11
34:15 35:1,6,6,7
43:24 44:1,1,23
44:25 47:13 49:9
56:24 57:17 61:3
63:4 64:5,24 70:3
71:4,11 76:13,14
76:17,19 78:25
82:5 93:10 127:19
143:11 175:9,10
182:5 183:6,24,25
184:4 188:21
189:13,14 190:7,8
**amounts** 2:10
5:19 23:19 26:4,5
26:22,23 27:6,7,7
27:16 35:1 36:21
40:23 44:2 52:25
69:13 71:7 78:12
79:3,15 81:14,16
83:15,16,19,20,21
84:16,19 86:3

132:23
**analogies** 110:7
**analogy** 110:6
**analysis** 21:18
22:3 104:19,25
118:5,7 166:12
180:4
**analyzed** 93:20
**analyzing** 180:6
**andy** 178:13,14
180:7,10
**annexed** 88:21
**announced** 25:14
**answer** 20:21 39:6
44:15 67:20,21,21
104:25 107:10
116:9 123:15
126:13 136:2
143:10 159:2
167:13
**answered** 41:25
55:18
**answers** 41:7
**antecedent** 70:15
83:8
**anticipate** 25:6
28:7
**anticipated** 78:24
**anybody** 136:2
142:8
**anymore** 90:11
151:1
**anyone's** 106:5,19
**anytime** 131:16
**anyway** 192:8
**aog** 111:17
**apa** 25:21 30:1,6,8
31:17,25 32:2,3
32:22,25 33:1
34:25 43:14,17
44:15,16 56:8,11
56:14 59:6 60:4,9
62:12,17 66:19,20

66:23 73:22,24
74:5 75:25 76:11
77:15,16 79:12
80:17 95:1 171:20
171:21
**apa's** 78:6
**apart** 26:2 34:13
83:11
**apa's** 29:7 32:6,17
**apologies** 176:6
**apologize** 65:21
**apparently** 27:20
198:21
**appeal** 166:24
187:7,10,15,15,22
187:25 188:5,25
189:6,11,14,18,19
189:21 190:2,7,7
190:13
**appealed** 187:13
**appeals** 136:7,9
136:12 188:20
190:20
**appearing** 193:8
193:11
**appears** 82:1 83:7
85:4 163:17
**appellate** 136:18
158:18,20,23
159:5,18 166:17
187:10,24 188:1,9
191:12,20,24
**applicable** 31:23
40:5 48:4 68:3
80:14 118:6 130:6
175:19 177:1
**application** 73:15
152:24
**applied** 67:24
84:18
**applies** 35:23
159:9

[apply - authority]                                                                                    Page 6

**apply** 46:5 78:5
  180:4
**applying** 70:15
  162:9
**appreciate** 21:6
  170:24 171:11
**appreciates** 39:13
**appropriate**
  110:12 118:3
  131:25 149:23
  155:17 163:1,9
  180:22 186:8
**appropriately**
  84:18
**approval** 187:15
**approve** 182:19
**approved** 88:20
  88:21,23
**approving** 7:2
  181:20
**approximately**
  17:8 69:11 143:11
  166:22 170:18
**april** 1:16 2:17
  7:15 23:17 24:6
  24:10 27:15,17,24
  170:18 180:19
  181:10 201:25
**aptly** 78:19
**area** 136:25 153:6
  153:10 166:15
**aren't** 34:19
  49:15 60:24
**arguably** 183:16
**argue** 92:12 97:14
  117:21 121:24
  188:23 199:8
**argued** 100:13
  131:21 179:3
  185:21 194:5
**argues** 31:15 32:2
  82:6 165:7

**arguing** 19:7
  32:17 36:2,4,20
  36:23 37:1 52:16
  88:9 121:23
  145:24 155:15
  185:14,17 187:25
**argument** 29:20
  30:2 31:24 42:9
  45:3 46:4,9 50:5
  55:14 56:4,4
  67:13 69:5,21,24
  70:4 80:9 92:5,6,7
  107:1 109:22
  112:20 123:11
  124:9 130:18
  131:22 138:16
  147:12 154:15
  155:18 159:6
  163:23 164:7
  174:1 175:25
  179:7 188:2,4,6
  188:10,23 195:14
**arguments** 53:7
  80:14 131:19
  142:9 147:20
  188:3 192:1
**arising** 51:10,12
  68:5 80:24 81:7
  162:17,17 176:8
  179:17
**arlene** 10:18
**arrangement**
  54:10
**arrears** 148:12
**arrived** 72:16
**article** 108:21
  181:11 199:7
**asher** 10:19
**asked** 14:25 22:17
  29:2 54:25 91:18
  91:18 103:19
  119:10 120:5
  122:25 123:13

**135:25 146:21
  155:16 158:9
  162:11 168:24
  170:25
**asking** 110:13
  137:9 143:12
  146:24 160:15
  186:11
**asks** 124:18
**aspect** 85:1,9
**assembly** 128:4
  129:22
**assented** 74:24
**assert** 61:25
  122:23
**asserted** 26:2,16
  75:15 182:22
  199:21
**asserts** 182:10
**assess** 185:15
**asset** 2:1,15 3:2,9
  3:17 23:1 35:9
  44:17 64:10 65:25
  73:15,21 74:4
  77:1,1,9 78:3
**assets** 15:14 16:10
  23:11 63:6 71:15
  71:15 77:6,10,24
  89:1 113:23 191:7
**assign** 2:4 3:12,20
  6:8 59:3,5 172:19
**assigned** 59:7,24
  173:11
**assignment**
  161:18
**assist** 182:18
**associated** 15:10
  15:14 61:8 62:4
  188:24
**associates** 158:7
**association** 4:1,5
  4:9 7:7 8:20 87:18
  199:9

**assume** 6:7 59:8
  59:24,25 60:3
  63:19 66:12
  110:13 158:19
  171:9 172:19
  173:3
**assumed** 59:9
  176:10
**assuming** 29:12
  111:5 120:6
  130:23 145:1
  198:13
**assumption** 17:7
  17:7 66:4 120:21
  173:16
**assurance** 165:19
  165:20 171:16
**asway** 47:13
**athenian** 75:6
**atkinson** 157:14
**attached** 37:20
  98:18 113:9
**attaching** 156:20
**attempt** 74:10
  131:11 164:12
**attorney** 143:24
  189:21 193:7
**attorneys** 8:4,13
  8:20 9:3,10,10,17
  10:2,9 187:11,13
  189:13,23 190:2,7
  190:12,13 192:6
**audit** 160:3
**augmented**
  108:19
**august** 181:4
  191:16,21 192:17
**austin** 11:22
**authentic** 119:20
**authority** 19:13
  22:7 91:3 126:15
  126:16 160:5
  182:4 184:2

**authorize** 128:9
**authorized** 88:19
  94:8
**authorizes** 149:4
**authorizing** 7:2
  88:12 181:20
**automatic** 2:2,16
  2:22 3:3,9,18 4:22
  5:7,12 23:2,12
  25:2 39:1,11,15
  39:18,25 85:3,7
  103:14 107:18
  115:3 162:1
  164:13 186:22
  188:14 189:2
  192:3
**availability** 70:2
  82:4
**available** 34:1,11
  93:10 151:8 189:4
  191:5 193:16
  196:5,8,11,21,23
  197:18
**avenue** 8:5,21
**average** 121:21
**avoid** 116:25
**awaiting** 101:2
  187:23
**award** 187:14,16
  189:11
**awarded** 187:12
  190:8
**aware** 14:22
  21:20,23 147:4
  174:13 195:19
  199:15

**b**

**b** 1:21 2:3,9,16
  3:4,10,19 5:18
  6:16 10:25 16:22
  17:11,14,21 18:1
  18:21 22:18 55:2
  99:8 100:8 101:6

101:16 102:1
109:22,25 117:3
119:8 137:23
139:22 157:16,18
157:19 161:5
163:11 167:12
186:6,9
**b.r.** 163:14
**back** 24:2 30:25
  42:10,14,16 45:19
  58:19 59:14 61:9
  62:10 64:23 66:6
  90:22 92:9,14
  103:4 105:3 115:9
  117:3 118:4 124:9
  133:1 135:20
  139:7 142:13,14
  142:21 146:19
  149:1,3 160:21
  161:15 168:25
  172:4 186:16
  195:25
**backdrop** 32:3
  40:18
**background**
  120:12
**backup** 27:17
**badges** 154:9
  158:5,8,11
**balance** 20:9
**ball** 158:25
**balls** 73:6
**ban** 189:11
**bank** 15:24 23:24
  23:25 24:17,18
**bankruptcy** 1:1
  1:12,23 49:20
  50:16 57:1 73:14
  78:7 104:9 110:9
  112:20 114:10,11
  138:22,23 139:9
  141:13 150:21
  159:17 160:12

162:22 163:8,13
164:3,3,5,11
178:4 181:3,4,6
181:13 191:23
196:20
**bar** 16:22 18:25
  19:5 166:14
**base** 38:6 81:11
  171:18
**based** 17:1 39:14
  49:3 51:14 53:1
  71:7,9,9 74:4
  75:20 78:16 81:10
  82:3 84:12 105:13
  121:9,10 123:21
  124:12 128:21,21
  128:23 130:1
  136:5 162:15
  163:6 164:16
  167:3,8,11 168:18
  192:2
**basically** 12:20
  105:10 110:25
  111:18 112:1
  113:1 156:21
  181:23 186:15
**basis** 2:10 5:19
  23:14 25:6,9 27:3
  28:8 36:10 49:5
  49:16 51:1 54:22
  54:23 73:25 79:3
  83:2 85:9 91:19
  111:3 131:17
  136:14 150:16,25
  161:9 162:13
  163:8 164:5,14,20
  165:14,17,24
  166:18 167:20
  168:20 192:12
  198:9
**bear** 102:23
**beginning** 40:8,9
  40:12,21 101:2

132:6 151:25
**begun** 100:25
**behalf** 2:11,18 3:6
  3:13,22 4:4,15,24
  5:3,13,20 6:11
  12:5 23:6 42:11
  42:11 87:17 95:22
  97:16 103:8 104:5
  115:1 132:4
  143:25 144:3,18
  170:3,11 172:22
  185:10 193:9,11
  195:11
**believe** 12:18 13:5
  14:24 16:14 18:7
  18:12,16 20:20
  27:21 28:2,18
  29:9 42:19 59:13
  59:22 73:25 74:3
  75:21 77:4 80:7
  80:18 82:11 83:3
  83:25 84:2,4,9
  86:3,4 87:10 88:7
  89:13 91:1,19
  93:6 94:8 99:10
  101:6 104:22
  111:15 113:4,6
  138:2 142:14
  143:2 147:7
  165:13,18,21
  166:11 167:10,17
  170:5 171:7
  172:23 173:12,19
  179:22 182:15
  184:25 191:14,21
  192:12 196:4,7,11
  197:4
**believes** 113:17
  166:19
**belong** 50:18
  62:11 184:4
**beneficial** 18:17

**beneficiary** 165:5
**benefit** 20:11
  21:19 64:14
  125:21 129:25
  149:15 196:12,16
**benefits** 120:2
**berkeley** 75:9
**bernice** 2:11 5:20
  6:4 170:6,12
**best** 18:12 20:15
  43:20 52:15
  114:12,14,22
  151:8 159:1
**better** 29:11 148:2
  151:12 175:16
  180:12
**beyond** 24:7
  44:12 71:7 89:6
  122:2 150:12
  189:13 190:11,18
**big** 64:2 195:19
**bill** 129:1,9
  179:23
**billed** 176:12
**billion** 13:1,4
  37:18 47:15,20
  49:11 63:5,16
  64:5 71:3 76:17
  76:18,20,25 77:4
  83:20
**bills** 178:9 180:1
  180:15
**binding** 165:3
**bishop** 2:12 5:21
  6:5 170:6,12,14
**bit** 15:24 92:15
  101:6 132:20
  172:17
**black's** 57:2
**bloomington** 96:9
**board** 148:16
  169:12

**boils** 176:17
**bolingbrook** 10:4
**bomb** 92:15
**bona** 108:11,13
  110:10,14,23
  111:11 117:14,16
  117:17 131:20
  153:24 165:17
**bond** 183:18
  187:15,15 188:20
  189:6,14,19 190:2
  190:7,13,20
  192:21
**bonds** 77:23
**book** 64:12
**born** 13:18
**borrowing** 38:6
**bother** 89:12
**bottom** 39:8 47:17
  157:23
**boughton** 10:3
**brainer** 107:11
  147:15,18
**breach** 108:18
**breached** 121:7
**break** 87:14
**brendan** 174:24
**brewing** 178:5
**brian** 11:16
**brief** 2:14 3:1
  29:19,20 31:7,15
  33:17 36:25 70:7
  97:16 124:12
  134:10 179:20
  188:12 191:21,25
  192:13 195:13
**briefed** 65:7,12
  115:15 187:22
  188:8 191:21
**briefing** 29:3
  38:10 115:5,14
  159:4 178:18

**briefly** 39:6 55:17
  166:21 187:7
**briefs** 42:24
  106:12,13 112:5
**bring** 86:9 108:1
  198:17
**broad** 20:19 32:13
  32:19 82:12,22
**broader** 133:11
**broadway** 10:10
**brought** 99:2
**bryant** 11:15
**bucket** 145:20,21
**buckets** 26:9,13
**budget** 88:20,21
  88:23,24 89:3
  90:1,10,11 98:6
  98:18,25 100:1,20
  101:13 102:7,13
  102:13 121:1
  142:23 150:13
**budgeted** 120:20
  123:1 137:17
**build** 121:13
**building** 121:19
  121:19 154:12
**buildings** 116:1
  120:14
**built** 120:25
  121:17,18
**bunch** 142:17
**burden** 99:14
  112:1,4 121:19
  125:19 129:24
  136:19 165:23
**business** 33:7
  34:18 46:13,24
  48:25 49:13 58:25
  66:10 69:23,25
  70:8,24 72:15,18
  76:9 82:1 83:7
  154:2 170:12

**businesses** 131:1
**butler** 6:17,19,23
  174:20,24
**buy** 49:11
**buyer** 26:17 29:4
  30:7 31:6,15,19
  32:2,16 33:15
  39:2 49:9,10
  76:21 77:2 97:6
  99:15,23 161:18
**buyer's** 29:19
  31:24
**buying** 198:21

**c**

**c** 8:1 10:20 12:1
  88:21 93:3,3
  98:13 99:11,14
  100:10 104:16,16
  104:21,25 105:10
  111:8,12 117:8
  162:13 163:4
  164:15 165:22
  167:10 201:1,1
**c.v.** 75:9
**calandriello** 9:16
**calculated** 118:24
  120:3
**calculating** 27:13
**calculation** 146:1
  146:4 165:12
  169:11
**calculations**
  167:15
**calculus** 84:8
**calendar** 159:8
  162:6
**call** 16:3 28:19
  41:8 157:20 173:1
  192:9
**called** 131:8
**campus** 125:3
  129:15,21 152:1
  152:11 154:9

cancer  195:17
candidly  33:17
can't  47:6,22
  48:13 49:15 54:3
  66:15
cap  57:12 71:3
  83:20 88:8
capable  163:18
capacities  184:16
capacity  139:22
capital  9:10 75:6
  75:18 97:16 112:1
  185:1
card  23:7 28:11
  29:4,7,18,25 30:7
  30:13,23,24 32:6
  32:11,13,18,22,24
  33:1,3,9 35:2,12
  35:16 36:1,7,13
  36:17,18,22 37:11
  38:16,20 40:2,6
  40:10,15,25 41:11
  41:13,17,24 42:6
  42:18,21,23,25
  43:8,12,15,23,25
  44:4,11 45:7,11
  46:3,7,12,20,21
  46:23 47:2,6,15
  47:17 48:13,15,17
  48:20 49:1,12,14
  51:11,12,22,23
  52:17,25 53:4,10
  53:18,24 54:1,2,4
  54:8 55:14,24
  57:5,6,10 59:23
  60:1,3 62:4 63:7
  64:11,24 66:14
  67:3 68:5,8,12,14
  69:1,10,12,17,22
  70:14,19,21,22
  71:22 72:3,8,20
  73:20,20,23 74:1
  75:25 76:3,15

77:2,7,13,13 78:5
78:10,11,12,21,25
79:9,17,21,23
80:1,5,8,12,16,25
81:1,6,25 82:7
83:1,10,15,17
84:3,5,18
cardinal  126:11
cards  30:18 33:4
  35:10 48:21,22
  52:19,22 61:6
  62:10 76:4,6 81:8
  82:10 83:19
care  189:17
careful  54:17
  56:11 151:12
carefully  43:11
  55:23 80:13
  122:18 151:13
caricature  56:3
carolina  176:13
  176:14
carried  88:24
carry  165:22
carrying  180:16
cars  113:14
carved  32:6
  186:12
carveout  79:22
  94:24 95:2 98:7
case  1:3 12:8
  13:10 20:14 21:5
  31:23 33:6 40:8,9
  40:12,13 41:18,25
  43:9,10,18,19
  48:25 50:14,15
  52:24 53:10 56:23
  67:24 69:23 70:8
  70:12 73:12 76:8
  78:2,19 80:2 83:6
  91:16 92:15 93:8
  93:25 98:3 99:3
  100:7,7,12,13

105:14,16 106:15
107:25 110:16
111:25 113:13,16
113:22,22 114:6
114:11 115:2
117:15,19 137:5,6
139:9,12 141:13
141:15 150:16
157:19 159:1,17
160:9 162:16,17
163:13,21 164:2
165:13 168:16
176:13,25 177:3,4
177:5 179:6,14
180:19,23 181:1
184:21 186:1
187:6 192:15
196:6 199:18
cases  13:2,25
  14:20,22,24 17:22
  19:3,4 21:14
  31:19 43:1 51:19
  108:8,9,9 113:10
  115:4,4 117:20
  139:8 162:22
  163:20,25 164:1
  179:9,25 180:22
  181:2 182:14
  188:12 191:9
cash  4:4,11 16:7,9
  23:20,22 24:11,11
  24:16,22 25:13
  26:13 27:25 32:8
  32:16 39:7,14
  42:17,18 44:20
  46:17,20 47:3
  65:3 77:18,20,20
  77:21 85:16 87:11
  87:20 88:14,15,15
  88:19 90:12,17,21
  91:3,9,16,20
  92:10,13 93:6,10
  93:12,15 94:7

97:18,20,24 98:1
98:23 100:4,4,7
102:1 113:23,23
113:25 114:1
166:7 191:7
catch  32:19
categories  23:11
categorized
  175:17 186:22
catherine  11:11
causative  188:13
cause  13:20
  105:14 162:16
  163:7 189:2 199:4
causes  7:3 93:20
  106:7 181:22
causing  85:3
ccar  73:21
cede  23:3
centerpoint
  180:24
centers  180:7
cents  135:8
certain  14:17
  16:16 58:2 73:19
  93:4 98:9 109:17
  110:15 137:11
  151:11 163:25
  164:23 169:1
  176:20
certainly  19:7
  113:8 139:17
  151:25 178:24
  198:12
certainty  181:9
certificate  197:3
certification
  123:13 156:18,20
  160:3 164:25
  167:12
certified  201:3
certify  151:20
  152:4,5 156:17

cfo 151:2
ch 74:14,18
challenge 149:19
  149:20,22
chambers 13:20
  84:22,24 185:4
chance 78:9
change 31:4 68:13
  69:12 123:12
  124:22,25 185:2
changed 50:7 92:9
chapter 13:18
  14:15,18,19
  163:21 164:2
  166:5 181:9
character 49:21
  50:8 68:13
characteristics
  125:14
characterization
  38:10 98:20
characterize
  17:16 44:20
charge 51:11,12
  68:5 80:25
chargeback 82:21
chargebacks
  34:18,20 57:18
  60:23,25 61:8,14
  61:14,15,15 62:3
  78:24 79:16 81:13
charged 52:23
  83:1
charges 33:3
  41:17 42:22 48:21
  52:18 68:10 70:13
  70:22,22 76:5
  77:24 81:24 82:9
  83:10
check 71:18
chicago 9:19
  187:2

child 176:24
  177:5,7 180:10
children 142:22
  170:15
choice 167:11
chose 46:20 191:8
chosen 74:16
  75:23
chris 11:21
cil 109:23
cineplex 180:18
circuit 178:17
  179:21 180:5,8
  181:1 185:25
  187:7,13 190:8
  195:16
circuits 180:3
circular 107:14
circumspect
  74:19
circumstance
  186:10
circumstances
  92:9 162:23
  166:19
cite 31:7 43:1,9
  50:14 56:9
cited 41:18 55:8
  188:12
civil 113:10
  120:12 187:6
claim 18:17 37:13
  39:13,14,14 50:22
  61:25 62:6 66:17
  78:6 101:6,16
  102:1 105:13
  110:1 125:19
  133:6 135:13
  162:15 163:7
  175:7,19 181:7
  184:1 191:18
  192:20 193:1,13
  196:7,10,13,18,19

197:12,17 199:2
  199:17,21
claimant 196:6
  197:12
claimants 15:8
  17:14,21 18:21
claims 7:3,11
  12:21,22 14:2,4
  15:21 16:6,17,22
  16:23 17:2,8,11
  18:1,25 19:5
  20:10 22:5,7,18
  25:9 96:19 99:8
  100:8 102:22
  106:7 112:3 114:2
  133:8 138:21
  168:16 181:21
  182:5,11,15 184:3
  184:3 185:23
  186:4,6,9 195:22
  198:8,9,18
clarification
  144:19 168:6,18
  169:10
clarified 49:8
  62:15 71:13
clarify 29:5 67:18
  68:23 85:14 134:6
  159:23
clarifying 147:1
clarity 109:21
  155:9
clause 32:1 67:4
  69:23 70:9
cleaners 130:15
clear 45:4 47:11
  57:22 74:14 75:22
  81:10 83:7 87:21
  96:8,18 97:17
  99:20 102:18
  107:19 108:20
  109:20,21 116:3
  118:9 124:23

125:10,10 127:8
  129:11 130:1,4,5
  131:21 143:7
  145:3 146:2
  150:19 159:7
  163:19 164:16,19
  164:20,25 165:11
  165:17 168:13
cleared 37:6,11
clearly 13:25 21:8
  34:21 38:20 53:18
  68:6 95:3 100:14
  102:5 107:11,16
  107:24 116:20
  123:8 128:3
  132:10 164:9,14
  179:21 184:23
cleary 8:12 9:2
  28:19 95:21
client 99:15
  115:21 135:7
  193:21 195:18
  198:16
client's 100:16
  106:1 199:5
clients 96:15
  98:14
clock 14:25 15:1
close 38:9 99:18
  113:25 192:9
closed 59:7,11
closely 67:3
  174:10
closer 68:21 110:8
  152:8
closing 23:21,23
  23:23 33:19,21,25
  34:9 37:5,8,17,22
  44:21 57:23 58:10
  59:16 61:4,14
  63:21 66:4,8,11
  66:14 67:1 72:7
  76:19 82:16 84:7

84:8,9,11,20
88:25 94:10 98:4
101:7 171:5,8,13
172:10
**code**  73:14 78:7
110:9 164:11
176:1 181:6
**collateral**  4:2,3,4
4:10,11,11 31:3
44:25 77:20,20
87:11,18,20,25
88:7,14,15,15,19
90:12,17,21 91:3
91:9,20 92:10,13
93:6 94:8 96:9
97:5,18,25 98:1
98:23 99:2 100:4
100:16 101:8
135:13 168:19
183:19 184:13,23
**collateralized**
188:20 189:6,7
**colleague**  39:6
56:2 96:1 116:16
137:2 143:24
158:17
**colleagues**  28:19
104:6 113:15
**collect**  61:25
**collected**  149:6
154:23
**collecting**  149:2
161:20,20
**collectively**  77:25
**colleen**  10:17
**collier**  163:22
**colloquially**  65:25
**colorable**  167:10
167:18
**column**  158:6
**come**  43:15 53:12
62:10 92:5,9
100:21 101:24

121:13 128:20
135:20 146:19
147:19 168:2
171:19 172:4,6
175:24 176:22
186:16
**comes**  30:19
35:11 64:16 94:19
100:11 129:16
145:19 160:21
175:15 176:15
**comfortable**
184:24
**coming**  17:2 77:8
90:22 93:11
161:21 199:6
**comity**  111:21
**commenced**  13:2
162:19,25 163:9
199:13
**commentary**
51:18
**comments**  182:2,3
182:3
**commercial**  74:21
120:15 121:12
**commission**  181:5
181:8
**committee**  3:16
3:22 4:7 12:12,19
14:8,9,12,18
16:25 92:23
169:12,12 182:1,2
184:7
**common**  16:11
78:18
**communicated**
194:3
**communication**
172:24
**communications**
58:24

**community**  4:18
4:21,25 5:3,6,11
5:13 9:17 10:2
103:13 104:5
161:25
**companies**  25:12
32:11 41:24 42:6
42:18 45:8,12
46:12,21 54:1
55:14 59:23 60:3
73:20
**companies'**  60:1
**company**  14:18
16:6,7,17 21:18
51:23 54:6,9 74:8
74:9 75:2,17 97:6
125:15 129:16
138:10 151:2
153:11 158:12
**compare**  22:18
**compared**  139:17
**compel**  2:3,7,16
3:4,10,19 4:14,19
5:2,16 6:7 73:12
103:10 104:17
131:18 170:6
172:18
**competitive**  12:13
**complaint**  19:11
20:24 73:4 93:22
132:22
**complete**  16:23
23:17 196:10
**completed**  169:13
**completely**  67:24
174:16
**complex**  16:11,19
85:4
**compliance**  121:6
123:14,17 128:20
134:17,18 148:22
149:3,19 150:25
151:5,10,14,16,20

156:17 160:7
164:23
**complicated**
108:25 109:3
151:18
**complied**  107:8
125:6 134:12
156:21,25
**comply**  91:6
108:23,24 122:11
123:21 125:15
134:17 160:1
161:7
**component**
166:12
**components**  40:5
**compressed**
182:13
**compromise**
16:17 134:10
**compromising**
20:10
**comrie**  74:13
**concede**  89:6
**conceded**  111:12
**conceivable**  32:8
61:23
**concept**  19:1
39:16,16
**concern**  31:20
54:24 93:9 102:16
166:1
**concerned**  22:5
22:18 39:25
**concessions**  57:14
**conclude**  35:15
79:7,21 80:15
106:24 164:16
167:4
**concluded**  200:9
**conclusion**  79:19
84:14

[conclusions - core]                                                                Page 12

conclusions
  116:23 176:23
condition  4:3,10
  55:10 58:9,10
  87:20 166:8
conditioned  90:9
conditions  58:1
  167:19
conduct  127:20
  128:9
conference  95:14
  172:2 173:1
confidential  54:18
confines  108:15
confirm  21:8
  95:22 102:5 149:9
  153:14 166:5,6
  174:5,8 192:14
  193:17 197:8,14
confirmation  18:9
  19:5,6 20:18 98:4
  100:8 182:12
  191:3,16
confirmed  13:10
  20:16 24:10 27:18
  151:4 191:15
confirming  22:6
conflated  132:20
conflict  160:20
confront  102:3
confusing  186:2
confusion  55:19
congress  107:15
  114:7,8 178:16
  180:12
conjunction  18:5
  173:7
connection  33:5
  48:23 70:10 76:7
  81:23 170:21
consensual  19:20
  19:21

consensually
  102:4
consent  90:3
  97:18,24 100:5
  101:9 102:6 114:6
  166:4
consented  90:7
consenting  89:25
  90:2
consequences
  135:21
consider  13:11
  104:21 116:24
  165:25 177:14,14
consideration
  74:10 169:25
considerations
  176:20 177:7
considered  36:6
  62:6 80:13 175:18
  177:5
considering  14:5
  74:19 165:13
consistent  19:14
  24:3 27:11 83:8
  84:2,25 88:19
  151:4 167:24
consolidated  16:2
  16:12,21
consolidation
  21:20
constitute  41:21
  46:21 73:20,23
  79:10 80:19
constitutes  79:20
constituting  36:1
construction  74:6
  126:11
construed  75:12
consultation
  12:11 21:10 76:21
consumer  187:9

consummation
  13:18 18:13
contact  95:11
  193:20 194:24
contacted  87:23
contained  81:1
contemplate
  13:17
contemplated
  62:12 83:3
contemporaneo...
  150:24 154:2
contend  77:8
  106:21 162:7
contends  77:12
  81:20 175:11
contest  72:1
contested  73:25
  137:18 158:19
context  38:21
  75:23 80:15 127:3
  127:4,6 165:15
  166:13
contexts  14:4
contingency
  12:16
contingent  62:6
  65:13
continue  13:19
  46:13 68:14 90:12
  91:19 93:12
  129:19 191:10
continued  4:3,11
  87:20
continues  125:5
continuing  162:23
contract  6:9 41:10
  56:7 74:7,10,14
  74:20,23 75:8,12
  75:15 108:18,19
  108:22,24,24
  173:3

contract's  74:20
contracted  74:12
contractor  109:4
  125:1 130:10
contractors  109:8
  109:9,13 118:8,13
  118:14 125:16
  130:12 131:1,3
contracts  15:17
  31:22 43:3,4,5
  59:23,23 75:12
  78:1 79:2 177:12
contractual  50:22
contrary  56:6,7,8
  89:14 111:21
  131:19 165:7
  167:6 178:2
  180:11
contributed
  100:15
control  107:3
  165:3
controls  32:19
controversy  75:4
conversations
  91:22
converted  68:15
convince  66:25
  108:12
convinced  111:7
cook  113:11,14
  115:3 124:3 137:3
  161:20 187:7
  195:16
cooperative  115:6
coordination
  18:15
copies  130:24
copy  88:22 167:23
  185:4 197:6
core  108:15
  132:10 135:12
  147:13,15 164:6

165:14
corp 74:24 180:19
corporate 152:23
corporation 1:7
3:23 4:16 6:11
12:3 170:4
correct 26:25
28:17 30:20 35:14
35:21 40:4 42:4
46:1 50:7 70:17
71:5,24 88:3,6
97:7 108:14
127:11,25 128:19
138:18,24 139:5
146:13,23 170:10
171:21 197:1,2
198:22,25
corrected 72:5
correction 45:2,6
correctly 62:22
64:18
corresponds 57:4
cory 104:10
cost 21:17 98:3
183:13 187:22,25
188:6,24 189:19
196:9
costs 14:23 17:10
20:14 120:23
145:20 161:12
189:5,16 193:19
counsel 18:2
37:19 49:8 63:4
84:23 103:16
104:9,10,11
109:20 112:11
130:8 131:21
166:18 167:23
173:19 174:6,21
186:25 188:17
189:25 193:7,20
194:3,14,14
195:23 197:6,8

counsel's 115:12
count 57:11 109:4
109:8,8,12 113:14
118:8 123:8,17,19
124:25 125:2,12
126:22 128:5,21
129:5,12,23 131:4
131:13 151:18
153:17,20 154:15
154:16
counted 125:1,2
130:5 149:23
154:2,20
counterproposal
101:3
counting 114:17
123:22 126:16
131:1 151:17
153:19 154:18,24
country 201:21
counts 55:22
county 113:11
115:3 124:3 137:3
161:20 176:14
177:22,25 178:8
187:7 195:16
couple 19:8 21:16
43:1 56:9 67:18
104:7 107:6 129:5
137:14 139:10
155:7,10 176:4
course 13:19
14:13 17:6 31:17
33:7 41:17 42:22
43:13,16,17,23
44:11 48:25 49:4
52:20,21,21,23,24
53:11 54:2,10
56:17,19 67:6,7
69:23,25 70:5,8
70:12,19,21,24
75:14 76:9 81:25
83:7,9,23 119:5

120:24 135:13
149:7 178:10
180:10 181:1
court 1:1,12 12:2
12:7,9,20,24 13:9
13:14,23 14:11,14
17:4 18:1,4 19:4
19:17,22 21:3,24
22:2,16,23 23:4
23:13 24:19 25:8
25:22,24 26:11,15
26:22 27:1 28:7,9
28:15,21 29:2,8
29:13 30:10,15,17
30:22 31:1 34:23
35:15,22 36:8,14
36:20 37:12 38:25
39:4,10,22 40:19
41:2,7 42:2,13
45:15,22 46:10
47:1,5,12 48:2,8
48:16 50:12,20
51:1,7,16,24 52:6
52:14,16,21 53:4
53:13,17 54:8,14
54:21 55:4,12,20
58:6 59:3 60:11
60:18,22 61:5,10
61:17,21 62:14
63:2,10,14,23,25
64:23 65:2,5,7,15
65:23 66:13,18,23
67:15 69:4,19,21
70:15,18,25 71:2
71:6,12,20,23,25
72:4,10,22 73:2
73:11 75:14 85:17
85:21,23 86:8,9
86:15,18,23 87:8
87:12 88:2,4,10
88:11 89:8,11,15
89:17,20,24 90:6
90:14,22,23 91:2

91:8,11,14,24
92:2,4,20,22 93:2
93:14 94:17,19,22
94:24 95:1,11,12
95:15,18,20,24
96:4,6,12,14,17
96:21,24 97:1,4,8
97:10,13,21 98:7
98:9,13,16,24
99:1,17,21,24
100:9,18 101:4,18
101:20,22 102:5
102:11,15,20,24
103:2,5,11,17,25
104:3,20,23 105:2
105:8,10,18,25
106:3,18,21 107:9
107:15,19,23
108:3,6,16,20
109:11,15,23,24
110:2,6,16,19
111:4,6,9,13,18
111:22,22 112:7
112:13,15,17,22
112:25 113:5,5,12
113:17 114:8,10
114:11,14,24
115:2,3,9,17,20
116:2,6,9,12,15
116:18,24 117:1,3
117:6,22,25
118:16,18 119:1,5
119:9,13,18,21,23
120:7,10,16,19,24
121:4,22 122:5,7
122:9,13 123:23
124:1,13,16 125:8
126:15,18 127:1,3
127:5,8,12,22,24
128:1,10,14,17
130:16,18 131:12
131:23 132:2,13
132:16 133:10,12

JX 053-214

133:15,18,23
134:4,6,14,19,21
134:25 135:1,2,6
135:11,18,20,23
136:6,9,11,16,22
136:25 137:7,9,16
137:21 138:1,12
138:14,15,19,21
138:25 139:3,6,15
140:1,4,8,10,13
140:19,21 141:2,5
141:11,16,18,22
141:24 142:1,5,11
142:19 143:6,16
143:22 144:4,7,16
145:4,6,10,13,16
145:21 146:2,3,6
146:7,10,16,21,24
147:2,4,5,9 148:5
149:25 150:3
151:22 152:12,15
152:18 154:4,14
155:4,12 156:5,16
156:22 157:1,14
158:17,20,23,24
159:7,9,11,13,14
159:18,18,20,22
160:13,15,16
161:16,16,23,24
162:19,24 163:3
163:22 164:3,3
165:25 166:16,16
167:18 168:4,10
168:15,20 169:2,5
169:14,20,22,24
170:8,9 171:20
172:3,15 173:10
173:19,21,24
174:3,6,11,13,18
174:22 175:2,4,11
175:21 176:2,4
178:10,16,20,23
179:1,12 180:11

181:16 182:18
183:3,15,21,25
184:8,11,15,18
185:6,21,24 186:2
186:14,15,18
187:3,7,10,12,17
187:19,24 188:1,9
188:9,11,16 189:6
189:9,17,23,25
190:8,10,12,15,21
191:11,12,21,24
192:2,7,19 193:10
194:1,7,13,18,20
194:25 195:3,9,12
195:16 196:14,19
197:10,16 198:1
198:12,16,19,24
199:1,11,17,20
200:4,7
**court's** 104:24
145:5 168:18
187:14 188:2
195:19
**courtney** 11:18
**courtroom** 186:25
**courts** 74:19
108:21 110:4
115:6 138:11
159:5 163:24
166:17 176:10,22
180:4,5 181:6
**cover** 98:3 99:10
187:19 189:5
190:20
**coverage** 195:21
195:25 196:1,3,4
196:5,8
**covered** 32:12
77:14 79:24 80:1
86:24 95:2 192:8
**covering** 133:12
133:14

**covers** 98:14
176:16 180:10
185:22 187:16
189:11 190:8
**crazy** 94:3
**create** 54:24
74:22 121:13
125:25 126:4
**created** 55:6
127:15 153:8,8
**creating** 74:21
181:9
**creative** 147:20
150:17
**credit** 23:7 28:10
29:4,7,18,25 30:7
30:13,18,23,24
32:6,9,11,13,18
32:22,24 33:1,2,4
33:9 35:2,9,12,16
36:1,7,13,16,18
36:22 37:11 38:16
38:20 40:1,6,10
40:15,24,25 41:11
41:13 43:8 44:4
46:3,7,15,16,21
46:22 47:2,6,15
47:17 48:13,15,17
48:20,21,22 49:1
49:12,14 51:11
52:17,19,22,25
53:4,10,18,24
54:8,20 55:11,24
57:10 63:7 64:2
64:11,23,24 66:14
68:5,8,12,14 69:1
69:3,10,12,17,22
70:2,14,19,21,22
71:22 72:3,8,20
73:20,20,23 74:1
75:25 76:3,4,6,15
77:2,6,13,13,19
77:21,22 78:5,10

78:11,12,20,21
79:9,17,21,23
80:1,5,8,12,16,25
81:6,8,24 82:5,7
82:10 83:1,10,15
83:17,19 84:3,5
84:18
**crediting** 62:17,19
**creditor** 50:3
110:10
**creditors** 3:17,23
4:8 14:17 16:16
20:7 21:14 62:22
98:21 99:7,8
100:2,3 110:12
114:5 166:5 182:1
182:2 184:7
**creditors'** 12:12
**creditor's** 14:17
16:25
**credits** 77:23
78:24
**crew** 129:7
**crisis** 91:15
**critical** 57:14 59:2
116:14 124:4
126:5 128:25
129:22 159:2
177:20 199:7
**critically** 57:4
**cro** 151:2
**cross** 119:2
**crucial** 13:7
**cure** 15:17 173:6
**current** 31:12
58:22 78:24 86:10
86:14,24
**currently** 31:9
39:2 56:22 162:7
**customer** 33:4
48:22 51:23 52:18
76:5 81:24 82:9
82:20

**customers** 42:7
52:22 81:8
**cut** 179:19
**cutty** 174:24
**cynic** 156:9
**cypress** 74:24
**cyrus** 9:10 17:15
17:24 96:2,15
97:16 99:15 101:6

**d**

**d** 1:22 2:9 5:18
11:9 12:1 176:1,5
176:18 177:2
179:24 180:13,17
**daily** 158:6,8
**damages** 85:8
**dance** 92:24
**dart** 6:11
**data** 33:11,18,22
34:3 36:17 39:1
43:7,12,15,20
44:12,23 46:14,14
49:19,20,22,23
50:17 54:17 55:9
57:9 58:11,13,14
58:17,25 59:1,3,5
60:7,8,11 62:23
69:7,11,16,24
71:21 73:9 78:17
82:2 123:15,18,18
123:19,19,24
124:7,19 125:11
125:11 157:5
**date** 13:14 16:22
18:25 19:2,5
20:17 24:14 58:2
76:19 84:8,9,12
84:20 139:10
165:19 166:9
172:11 179:19
185:14,15,16
189:4 191:14,15
192:16 193:24

201:25
**dated** 2:17
**daucher** 10:20
**dave** 195:11
**david** 10:24 11:23
**day** 15:22 38:22
63:19,20 99:16
102:8 109:20,21
151:17 168:3
173:9 186:16
187:12 199:12
**days** 13:1 15:7
16:24 53:11,12
57:8,8,9 67:12,12
85:19 88:25 102:9
102:11 112:12
113:7,11 115:16
136:8 139:10
166:22
**de** 7:2 181:21
182:11 183:9
**deadline** 171:9
**deadlines** 15:10
**deal** 16:12,14
17:19,19,19 18:15
34:13,14,19 35:13
38:9 49:13 64:2,4
72:12 89:12 94:12
95:25 103:4
118:10 136:24
144:10
**dealing** 14:1 54:9
93:16 103:12
110:11 115:4
149:7 161:6,19
186:3 195:4
**deals** 20:7 157:19
**dealt** 19:3 104:24
109:23,24 111:17
**debate** 128:25
**debating** 109:18
**debt** 48:12,14
185:1

**debtor** 1:9 6:7 8:4
16:13,13 19:20
26:18 30:7 44:21
49:4 63:5,6 64:5
78:19,22 81:13
82:7,18 83:3
94:14 104:17
105:4 107:1,4,16
107:17 112:2
115:23 138:6,14
164:21 165:8,15
165:18 170:17,20
170:21 171:4,9
172:18,25 173:1,4
175:8,11 176:7
192:22 193:19
**debtor's** 164:7,9
164:22 165:19
171:12 174:11
175:15 176:24
181:19,24 182:18
188:16 195:20,23
**debtors** 2:1,15,21
3:2,8,17 4:3,8,10
4:14,19,20 5:1,9
6:1,13,21 7:1,3,17
12:5,11,19 19:13
20:6 21:4 23:6,16
24:4,7 26:4,10
27:4,12,17,22
34:4,16,21,22
35:25 37:17,19,22
38:1 39:3 40:11
40:15 41:23 44:3
46:5,19 47:16,18
47:19 55:8 59:5
60:14 62:15,23
69:3 71:16 72:24
73:12,16 74:2
76:5 77:8 78:21
79:18 81:4,7,9,22
82:9 84:15,21
85:2,12,14 86:3

86:12 87:20,22
88:13,18,24 89:1
89:4,5,23 90:9,12
90:16 91:6,13,16
91:17 92:6 93:6
97:19,25 98:6,18
98:22,23 100:3
101:1 103:8,9
106:21 108:12
112:4 113:3,22
132:4 160:24,24
161:1 162:5,7
166:1,6,8 167:24
173:18 181:20,22
182:10,13 183:10
185:12,13,13,17
186:13 187:21,24
188:6,19,21,25
189:5,16 190:22
191:1,8 192:12,14
193:2 196:9,12,17
196:21 197:4,17
198:3 199:22
**debtor's** 17:5
19:18 23:1 49:8
63:4
**december** 148:14
148:16,22,24
192:5
**decide** 22:20
92:17 100:18
113:5,5,18 135:11
167:18 168:15
**decided** 26:6 60:4
74:4 113:7 124:21
132:13 164:20
168:4 169:24
179:21
**deciding** 168:1
191:24
**decision** 117:20
127:9,10 148:23
148:24 159:6

167:6 168:18
177:11,20
**decisions** 110:4
187:23
**declaration** 28:13
28:22 33:16 34:9
37:20 58:3,4,15
85:2 88:23 104:18
133:7 137:22
158:4 169:25
**declaratory** 86:8
**dedeaux** 6:9
172:18,22
**default** 31:4 44:24
**defeating** 164:14
**defend** 189:16
197:21,22
**defendant** 195:17
**defendant's**
195:20
**defendants** 13:25
**defending** 188:7
188:13
**defense** 83:13
89:23 117:22,24
187:22 189:5,16
189:18 193:18
196:6,9
**deference** 111:19
127:19
**deficit** 121:16
123:1
**define** 30:7 67:5
**defined** 30:24
48:18 63:15 73:21
76:2 79:11,24
88:20 94:22,24
117:16
**defines** 32:22 33:1
68:4 75:25 77:17
**definitely** 143:22
**definition** 29:7,18
30:9,13,25 32:6

32:13,18 33:8,10
38:19 41:10,12
42:5,8,9,20 44:6
46:3,5 51:8 52:11
53:24 56:13,23
68:1,7 69:22
77:15,15 78:4,6,7
79:6,22 80:12,18
82:8,12,23 83:6
84:3
**definitions** 43:1
**definitive** 163:18
**del** 74:9,14,18
75:2
**del.super.** 75:1
**del.supr.** 75:7,10
75:18
**delaware** 43:10
68:3 74:6,7,15
75:11 81:3 82:23
**delaware's** 80:20
**delay** 116:3,10
167:1 183:13
191:18,19 198:18
**delayed** 55:16
**delaying** 115:22
**delivered** 58:8
59:12,14
**delivering** 37:23
**delta** 24:15 27:22
**delve** 168:14
**demand** 13:6
37:14
**demanding** 121:6
**demonstrate**
29:16 43:2 69:1
125:6 131:11
**demonstrated**
37:19
**demonstrates**
33:25
**demonstration**
131:20

**denied** 191:13
195:3
**deny** 85:8 181:17
**department**
127:14 138:20
**departure's** 25:25
**depend** 198:15
**dependent** 121:12
**depending** 110:13
144:12 161:16
167:13 171:15
**depends** 137:5
151:24 180:8
**depose** 119:5
**deposit** 29:24
35:17,18 36:2
40:2 46:20 64:15
64:20,21 70:5
77:16,17 79:7,20
79:25 80:10 83:16
**deposition** 119:7
139:23 150:20
**depositions**
139:21
**deposits** 30:5 32:9
35:13,24 37:2
47:10 77:19,19,22
78:1 79:11,23
80:6
**depriving** 64:13
**derived** 46:22,24
48:12 52:12,13
**describe** 29:21
**described** 30:3
78:20
**describing** 70:13
**designated** 76:23
**designating**
173:16
**designation**
173:14
**designed** 65:4,18
65:19 100:5

**desire** 191:7
**desperately**
122:24
**despite** 124:22,22
**detail** 40:22
156:24 157:15
180:20
**determination**
103:24 160:15
165:3 191:17
**determine** 44:10
109:7 110:23
111:1,2 134:11
145:13 157:25
166:7 192:10
198:2
**determined** 27:24
82:21
**determines** 117:1
**determining**
67:25 69:14
**develop** 119:15
**developed** 161:9
195:18
**developer** 125:13
125:14,16,25
167:14
**development**
106:10 125:4,23
127:7,15 129:19
130:2
**developments**
12:8
**diagnosed** 198:23
198:24
**dialogue** 101:1
155:7
**dictionary** 57:2
**didn't** 17:19 39:8
47:2 58:24 66:22
147:11,12
**difference** 39:13
39:16 40:23 53:13

182:21 189:10

**different** 40:24
45:22 49:19 59:17
59:19 67:24,25
68:21,25 75:4,5
77:14 82:7 98:18
110:16 114:16
140:8 153:1
176:22,22,22
177:13,16

**difficult** 15:11
106:24 157:23

**difficulty** 21:18

**diminished** 97:14

**diminution** 97:5

**dip** 88:13 89:5,8
91:4 92:13 95:4
95:25 101:12
182:24

**direct** 146:15
165:11 167:16
194:21

**directed** 194:2

**direction** 17:10
145:5 146:6 159:7

**directly** 70:10
176:11 177:4

**directs** 160:9

**disagree** 27:4
82:11 107:22
124:16 130:8
149:12

**disagreement**
91:8

**disappears** 156:2
157:11

**discharge** 197:8

**discharged**
196:20

**disclosed** 17:3

**disclosure** 14:19
14:25 18:8

**discounts** 79:1

**discover** 43:7 45:1
45:2,3,5 46:18
78:17

**discovered** 194:4

**discovery** 119:6
136:4 139:23
140:2,7,13,22
167:2 198:9

**discreet** 186:11

**discrepancy**
157:6

**discretion** 188:3

**discretionary**
139:3

**discuss** 14:12
24:23 95:14
135:21

**discussed** 22:17
32:14 97:3 135:25
171:22 177:7
181:2,25

**discussing** 23:8
177:11

**discussion** 16:5
19:2,15 20:25
91:12 152:17

**discussions** 14:16
16:16 17:15 18:2
24:25 28:18 95:23
171:15

**dismiss** 114:19

**dismissed** 106:16

**dispositive** 55:18

**disputable** 68:10

**dispute** 24:13
31:6 34:12 36:12
41:5 46:19 48:7
59:16 60:19,20
65:12 75:9 76:11
79:8 80:4 92:10
107:17,20,20
108:4,4,10,11,13

110:11,14,22,23
111:2,3,11 117:14
117:22 131:20
138:3,4 142:24
146:10,14 150:6
153:14,24 158:15
164:17 175:15

**disputed** 77:6,6
77:13 78:5,10
115:13 160:6,11

**disputes** 20:1
77:11 86:4 139:23
169:14

**disputing** 106:5
106:19 121:6
174:7

**disregard** 44:4

**dissipated** 101:8

**distinction** 27:2
40:10 80:5,5
108:20

**distinctions** 56:12

**distinguish** 50:24

**distinguished**
179:17

**distress** 54:7,10
54:15

**distribute** 148:18
160:14

**distributed** 105:4
150:9 160:8

**distribution**
142:25

**district** 1:2 4:18
4:21,25 5:4,6,11
5:14 9:17 10:2
67:23 103:14
104:5 105:3,5,6
106:6 111:17,25
112:19 115:1,25
116:24 117:10
120:13,13 121:25
122:17,25 123:2

139:10 140:18
142:2,18 143:11
143:18,19 144:13
145:16 146:12
150:7 153:25
159:24 160:2,10
160:11,11 161:25
162:24 163:3
165:4,7 168:22
180:11,19

**district's** 103:16
118:7 145:24
154:14

**districts** 121:11
156:7 157:12
164:11 169:1

**dizengoff** 3:22

**docket** 13:21
40:14

**document** 2:5,5
2:12,18,19,23,23
3:5,6,12,14,21,23
4:5,12,12,16,24
4:25 5:2,4,7,9,14
5:21,23 6:2,5,11
6:13,19,21,23 7:4
7:7,12,17 19:11
28:14 29:1 131:7
131:11 156:17

**documentation**
24:5 27:13 124:17
130:23 155:13
158:4

**documents** 4:23
28:25 78:2 128:24
130:9 139:20
151:1,3 154:17
155:16 156:20

**doesn't** 31:4
32:10 35:13,18
47:12,18 48:2
63:14 67:11

**doing** 21:17 47:24
  61:21,23 100:20
  115:7,7 148:7
  152:9 154:21
  156:10 182:20
**dollar** 135:8
**dollars** 24:16 25:7
  47:16 121:15
  122:24 166:12
  184:18
**donuts** 130:15
**don't** 13:20,24
  15:9 16:9 20:19
  22:19,23 26:17
  27:3 39:22 44:11
  45:8,18,20 46:10
  46:16,19 48:6
  50:4 51:19 53:16
  54:14 55:18 57:16
  58:22 60:7,9,20
  61:7,11,19,24,24
  63:2,12,24 65:12
  65:16 66:13,23
  147:9,14
**doubt** 25:17
  122:11 136:6
**downside** 182:19
**draft** 15:7
**drafted** 32:3
  40:18 56:20 92:6
  114:7,8 138:8
**drafters** 56:11
**drain** 1:22
**dramatic** 192:14
  192:25
**dramatically**
  158:12
**draw** 56:11
**drawn** 40:10
  77:21
**drive** 94:2
**driving** 13:8 15:2
  20:20

**drop** 129:10
**dropped** 73:7
  122:20,21 123:10
**dropping** 122:18
**drops** 129:2,5
**drove** 109:16
**dry** 130:14
**drye** 170:11
**due** 27:19,22 31:5
  31:13 35:1 40:7
  41:12,21 44:20
  55:25 56:3,10,12
  56:13,17,19,22,24
  57:2 62:7 67:9
  68:18,19,20,20,20
  68:22 69:3 74:1
  76:14 79:1 82:16
  82:17,17 83:20,21
  83:22,24 84:1
  86:4 171:19 175:1
  177:23,25 178:1
**dunkin** 130:15
**duties** 59:10 74:23
**dyslexia** 176:6
**d'aversa** 10:21

**e**

**e** 1:21,21 2:9 5:18
  8:1,1 10:23 11:6
  11:13,20 12:1,1
  90:24 193:3 201:1
**earlier** 18:14
  19:24 32:21
  123:11 155:9
  168:24 175:19
**early** 32:21
  123:10 148:13
**earmarked** 143:4
**earned** 51:9 52:1
  80:23 82:25
**easier** 22:9,20
**easily** 154:11
**east** 10:3

**eastern** 67:23
**easy** 100:18 169:3
**economic** 106:9
  125:3 127:7,15
  129:18
**ecro** 1:25
**eda** 105:3 106:8
  106:11 107:8
  118:21 124:5,10
  126:3 129:2 130:1
  133:3,4,20 134:12
  138:7,8 142:15
  143:3 150:25
  152:9,14,17,20,25
  153:17,20 154:22
  155:25 156:7
  157:8 161:3,5,6,7
  161:17 162:8
  164:19,23 165:6
**edge** 138:7 152:17
  152:20,22 154:22
**edition** 163:22
**edny** 181:4
**education** 121:20
  123:2
**edward** 4:4 8:24
  87:16
**effect** 74:22 84:21
  114:11 156:1
  161:6 167:22
**effective** 13:14
**effectively** 20:5
  49:11 91:5 111:23
**efficiency** 139:13
**efficient** 86:6,13
  134:24 135:6,9,11
  137:14
**efficiently** 15:12
  21:6 111:23 141:9
**effort** 59:14
**efforts** 198:1
**eight** 181:18

**either** 56:2 72:19
  81:14 90:23 93:3
  114:20 137:9
  179:22
**election** 115:4
  159:1
**element** 33:10
  42:1 159:16
**elements** 41:10,14
  55:24 104:22
  105:20 111:8,12
  118:12
**eligible** 148:4
**email** 37:25 58:14
  84:21,24 151:10
  151:11 193:22
**emails** 37:19
**embrace** 38:21
**empire** 6:10
  172:18
**empire's** 172:22
**employ** 126:18
  152:22,25 153:4
**employed** 20:5
  150:23 153:3
**employee** 15:23
  122:12 125:12
  126:22 128:20
**employees** 20:5
  109:4,5 119:25
  120:1 122:19,25
  123:7,8,22 124:7
  125:1 126:14,17
  126:21,24 127:7
  127:21 128:4
  129:3,5,6,12,17
  129:23,24 130:4
  130:10,10 131:4,9
  131:13,15 134:13
  147:22 149:22,23
  150:22 151:13,23
  152:1,6,6,10,12
  152:13,14,23

153:16,17 154:5,7
154:8,9,12,15,17
154:19,20,25
155:3 157:17,20
157:21,22 158:2,5
158:7,13 165:11
167:16
**employer** 193:17
194:9,12
**employers** 125:2
125:17,17,18
128:6 129:14
131:14
**employing** 125:20
**enacted** 128:11
**encompass** 82:15
**ended** 23:21,24
37:6,9 91:3
**ends** 69:22
**enforce** 2:1,15,22
3:2,9,17 23:1,12
28:14 38:25 85:15
86:10
**enforceable** 57:21
57:23 67:10
**enforced** 65:9
**enforcing** 90:23
**engage** 61:2 128:9
**english** 177:24
**enhanced** 100:15
**enjoin** 112:22
**enter** 60:14
181:24 199:23
**enterasys** 74:13
**entered** 40:13
88:11,22 91:7
106:10 187:8
**entertainment**
111:17 180:19
**entire** 80:15 83:2
88:8 153:17,20
184:14

**entirely** 57:21
**entities** 16:9,9
74:21 125:20
131:4
**entitled** 35:25,25
36:16 50:3 64:1,5
71:14 76:11 91:20
91:21 109:7 147:3
**entitlement** 58:19
58:22
**entitles** 36:12
**entitling** 105:18
**entity** 16:7 126:20
164:22
**entry** 7:1 181:20
**envision** 71:2
**epitome** 109:21
**equal** 31:11 35:7
76:20,25
**equals** 44:7
**equivalent** 118:13
118:14 120:1
158:13 192:22
**eric** 10:20
**escrow** 73:9 77:19
170:22 171:10
**esl** 9:3 17:25
33:19 34:2,7,14
37:20 38:23 95:22
95:25 96:13,18
97:5
**esl's** 18:2 38:1
**especially** 74:20
136:15
**essence** 41:23
171:20
**essentially** 172:9
175:14 182:4
**establish** 74:16
**established** 69:24
**establishes** 155:8
**estate** 2:3,11,17
3:4,11,19 4:14,19

5:2,20 6:4 12:17
15:16 18:11 19:18
19:25 20:9,11
25:14,19 26:13
28:3 62:12 73:13
93:11 103:10
107:3 108:2,19
132:11 137:15
154:8,10 164:9
170:6,12,14,15
181:7 184:4,5
**estates** 15:4,11
20:15,21 144:18
152:1,11 153:5,10
153:17 154:11
162:9 164:9
182:13,18
**estate's** 13:8
**estimate** 22:7
114:14,22 141:14
**estimates** 13:4
**estimation** 18:3
22:13
**estoppel** 135:13
168:19
**et** 3:23 12:3
**evan** 11:2
**eve** 29:5 139:9
**evening** 20:24
87:24 174:17
**event** 62:2 103:20
138:21
**eventually** 53:19
161:22
**everybody** 14:21
16:18
**everyone's** 120:1
**everyone's** 21:15
**evidence** 28:12
29:1 37:21 75:22
111:21 118:19
119:2 139:15
141:8 151:8,15

167:17 182:11
**evidencing** 78:2
**evidentiary**
119:14 137:12,16
137:19 139:17,18
172:5 187:12
**exact** 126:8
**exactly** 22:15
26:20 37:16 60:16
65:4 68:24 85:20
86:17 97:22
100:21 109:23
115:7 189:24
**examine** 28:24
119:3
**example** 43:11
51:5 117:20 159:2
167:2 178:2,2
181:3
**exceeded** 37:18
**exceeds** 21:18
35:6 47:15 76:18
**excess** 37:7,23
38:14 77:7,8
**exchange** 196:9
**excluded** 35:9
64:10 65:24 71:14
77:1,9 182:24
**excluding** 76:14
**exclusions** 13:3
**exclusive** 19:13
**exclusively** 69:6
106:7
**excuse** 25:1 93:4
150:4 151:2
**executory** 15:17
**exercise** 61:13
107:3 151:18
**exercised** 59:8
66:4 82:2
**exhausted** 196:1
197:5

exhaustion 197:3
198:5
exhibit 55:2 88:21
131:7
exhibits 195:25
exist 55:15 102:22
182:12
existence 129:21
exists 61:13 74:22
75:3 91:7 120:22
131:21
expand 128:5
expect 16:23
102:3 115:15
expectation 59:22
expectations 17:5
74:12
expected 150:13
expediate 196:12
196:17
expedite 159:18
159:19 167:1
169:13 181:24
expedited 25:6
28:8 115:4,14
158:22 159:4,4,8
159:16 166:18,23
167:3,20
expend 189:16
expenditures
90:10
expense 7:11
76:21 99:7,8
113:24 114:5
166:4 175:18
185:11
expenses 6:15,18
7:9 77:24 100:6,6
100:14 114:4
166:3 174:21
expensive 14:22
experience 16:11

expertise 136:25
explain 33:20
91:18 110:4 112:6
118:4,6 131:5
explains 31:8 64:1
explanation 36:9
124:4 196:3
exposure 199:6
express 31:8,9
51:4,5 128:6,8
extend 128:15
extension 89:3,5
89:12,20,25
147:10
extensive 20:3
extensively 78:15
extent 35:5 37:13
74:11 76:17 78:3
79:15 84:17 85:6
85:9 89:4 100:9
101:10 102:22
109:17 110:15
147:1 165:10
192:21 196:20
197:11,17
extra 83:23 114:1

f

f 1:21 8:10 201:1
f.3rd 180:7,25
f3rd 57:1
face 82:22 161:22
165:12
facility 38:3 54:20
55:11 70:2 82:5
121:9,18 173:8
fact 21:2 29:17
30:3 31:2,4,6,7
32:23 33:10,14
37:5 44:16 47:25
54:3 68:25 70:1
73:23 79:24 80:19
82:3 84:7 85:5
89:14 101:1

106:19 108:15
109:18 112:21
115:13 116:22
117:1 120:6
131:18 132:6
136:20 139:9
153:12,16 155:25
156:12 158:11
164:21 165:1,5
172:6 178:12
179:5 180:3 196:4
196:24
factor 36:5 138:2
factors 165:22
195:19
facts 22:20 47:22
47:23 54:5 59:19
67:25 106:22
110:13 111:1
168:4
factual 22:2
109:12
fail 123:9 190:25
190:25
failed 123:21
165:5
fails 67:13
fair 86:21 98:20
110:6 122:7
fairly 62:6 75:4
99:18 166:2 192:9
faith 160:7
fall 29:6,17 30:8
42:8,9,19 43:8
80:12 134:17
135:3 177:2
185:19
fallen 34:13
falls 32:17 79:6
108:14
familiarity 198:10
far 22:4,18 25:3
27:14 33:14 39:24

64:2 80:3 89:2
92:11 93:3,24
102:8 122:2 123:1
140:7 149:1
198:15
fashion 102:2
faster 112:6
favor 160:24,24
fear 45:6
february 27:10
62:10 85:15 88:24
142:14
feder 174:24
federal 105:17
111:21 138:20,23
163:7
federalism 111:21
fee 6:18 192:6
fees 12:16 78:25
78:25 79:16
140:18 187:11,13
187:14,20 189:13
189:21,23 190:2,7
190:13,13 192:8
fell 68:1 134:17
fennell 6:10
172:21,22 174:4,8
174:12,15
fide 108:11,13
110:11,14,23
111:11 117:15,16
117:18 131:20
153:24 165:17
fifth 8:5
fighting 34:24
143:18 161:4
figure 26:3 43:6
60:24 61:2,8,9,12
61:20 66:15 110:3
118:2 168:25
169:4
figures 165:8,10

**file** 17:20 20:20
20:23 61:24 86:8
86:20 87:1 89:18
93:21 149:13,17
173:20 193:15
**filed** 2:10,18 3:5
3:13,21 4:4,15,24
5:3,13,19 6:10,18
7:11 14:18 29:4
49:20 78:14 91:22
105:21 106:14,17
106:19 112:21
113:10,14 117:10
132:22,22 134:2
139:9,12 162:3,5
163:6 168:16
193:7 195:16
198:16 199:17
**filing** 17:20 45:21
91:18 115:9,17
134:5 173:18
**final** 68:23 88:12
150:18 166:20
182:24
**finally** 19:9,23
20:22 161:3
**finance** 169:12
**financial** 54:6,7,9
54:15 58:9
**financing** 88:13
**find** 117:15,18,19
117:19 176:19
**finding** 193:3
**findings** 116:22
**fine** 35:18 37:12
39:22 51:24 86:25
87:13 88:10 95:5
95:15 103:25
132:2 136:13
152:7 166:3 194:1
194:25
**fines** 78:25

**finish** 14:24
**finished** 13:10
**firm** 12:16
**firmly** 18:7
**firms** 12:11 13:6
13:17
**first** 12:10 15:7
21:17 22:25 33:11
33:18,22 34:3
35:8 36:17 38:9
39:1 40:3,13
41:10,15 43:7,11
43:20 44:12,23
46:4,14,14 49:19
49:20,22,23 50:17
54:17 55:9,21
56:10 57:4,16
58:11,13,14,17,25
59:1,3,5 60:7,8,11
60:13 62:23 64:7
67:18 69:5,7,11
69:16,24 71:21
73:4,9 76:20 77:9
77:12 78:17 82:2
83:10 88:14
102:14 103:20
104:21 105:21
111:16 115:25
121:23 123:23
134:5 155:10
159:25 175:7
177:11 181:8
182:10 183:21
186:23 197:23
**fitzgerald** 10:22
10:23
**five** 57:8 88:25
121:15 135:8
142:15 170:5
176:2 182:20
184:18
**fixed** 27:8 56:25
67:11,13

**flawed** 30:3
**flexible** 71:17
**flies** 122:19
**flip** 103:18
**floor** 10:10
**florey** 10:6 104:9
109:19 114:23,25
114:25 115:19,24
116:4,7,11,13
118:4,4 120:9,12
120:18,22 121:3,5
122:3,6,8,10,14
123:24 124:2,15
124:17 125:9
126:16,19 127:2,4
127:6,10,13,23,25
128:2,12,15,18
130:17,22 157:14
159:23 169:9,17
**flow** 104:19
**flowing** 34:20
85:8
**flows** 30:17
**focus** 15:3 17:18
40:5 41:9 42:21
42:22 141:2 147:9
147:11 163:20
179:7,15
**focused** 178:19
**focusing** 80:3
**folks** 104:7 172:6
**follow** 145:9
185:22 196:15
**followed** 115:11
**following** 12:13
14:16 34:12 76:12
149:2 176:15
**force** 107:4,17
**foregoing** 76:18
201:3
**foremost** 159:25
**forget** 117:22

**form** 42:18 49:12
63:5 199:5
**formal** 43:18 79:1
173:20
**formally** 84:22
167:22 173:2,17
**former** 39:19
193:21 194:3,14
194:14
**forms** 64:16
**forth** 35:1 166:22
**forum** 107:4
163:1,9,24
**forward** 21:9
90:13 91:10 99:9
107:6 133:8 188:5
196:7 198:9
**found** 77:16
176:25 179:8
**four** 41:9 57:8
104:12 121:15
159:3
**fourfold** 170:17
**fours** 84:1
**fox** 4:4 8:24 87:16
87:16 88:11 89:10
89:13,16,19,22
90:4,8,15 91:5,10
91:12,17 92:1,3
92:19,21 93:9
95:17,19 99:1
184:8,10,12,17
185:4
**frame** 117:9
163:21,25 164:1
**framed** 107:6
**frankly** 21:14
29:14 73:5 86:13
88:8 95:1 149:14
157:7 172:8
177:19 182:16
183:13

fraud 187:9
free 47:11
fresh 20:8 87:6
friday 173:13
friedman 103:7,7
103:12 104:1
friedmann 8:8
23:3,5,6,14 24:21
25:10,23 26:8,12
26:20,25 27:9
28:10,18 29:2,11
29:14 30:12,16,20
30:23 31:2 35:14
35:21 36:4,11,15
36:24 37:15 41:18
42:24 44:14 57:14
60:6 67:17 69:9
69:20 70:6,17,20
71:1,5,9,16,21,24
72:2,5,11 132:1,3
132:3,15,17
133:11,14,16,19
134:1,5 135:24
136:10,12,19
137:2,8,20,24
138:2,18,24 139:1
139:5,7 140:3,5,9
140:12,17,20,24
141:4,6,17,19,23
141:25 142:3,8,13
142:20 143:14,20
143:23 144:5,15
147:16 148:7
150:2,4 151:24
152:13,16,19
154:6,16 155:5,11
156:14 168:5,24
169:3,7,18,21,23
friemdann's
39:21
friends 140:6
frivolous 108:10
108:10 117:14,25

158:15
front 14:8,9 15:3
18:4 19:4 58:4
86:7,9 104:12
141:8
fruit 13:3
fulcrum 183:16
fulfill 74:11
full 92:14 101:17
118:12,13 120:1
131:16 152:6,10
152:23 154:18,24
155:3 158:1,13
179:23
fully 130:19
187:22 188:8,20
191:21
functionally
117:14
fund 114:4 142:15
161:9
fundamental
68:13 79:13 94:6
132:10
fundamentally
30:2
funded 49:24
161:10
funding 99:3
121:20 123:2
funds 25:5 41:1
45:5,9,11 46:6
47:23,24 49:21
50:11 51:6 55:7
64:21 79:7 80:15
85:3,5 105:4
122:16 132:24,24
133:2,4,20 143:3
149:3,14,21
157:12 164:18,22
165:23
fungible 100:23
100:24 101:10

furnished 43:25
further 2:22 3:11
171:16 189:1
furthermore
189:3
future 17:22
28:23 48:10 56:22
81:13 151:14
168:17

**g**

g 4:24 5:3,13 12:1
80:24 145:12,17
181:16,16
gallagher 10:24
195:10,11,13
196:16 197:1
198:7,14,22,25
199:3,15,19 200:1
games 124:20
gansburg 120:8
120:11 131:24
134:9,15,20,22
135:1,3,10,16,19
138:3
garrett 190:25
gathered 143:10
151:3
general 50:2 81:3
128:4 129:22
163:2
generally 74:16
136:24 162:21
179:25
generated 46:7
gensburg 9:16,21
104:4,5 105:5,9
106:2,4 107:5,13
107:21,24 108:5,7
109:14,16 110:3,7
110:18,20 111:7
111:10,15 112:9
112:16,19,24
113:1 114:13,23

116:17 117:5,7
118:22 119:4,7,10
119:16,19,22,24
155:6 156:6,11,19
156:23 157:3
genuine 150:6
getting 13:6,6
15:3 20:20 121:1
139:7 150:8 152:7
158:19 183:13
gianis 10:25
give 25:4 34:7
39:23 65:22 67:8
67:22 82:19 85:10
86:15 113:17
115:8 118:4 120:2
130:23,24,24
156:24 157:5
158:24 160:2
161:14 176:18
183:17
given 22:8 24:17
31:17 72:25 77:20
80:2 85:7 88:7
120:24 127:18
155:16,17 167:17
173:25 174:2
182:13,23 184:25
gives 45:12 56:23
169:8
glad 54:25 172:16
glance 181:8
glb 64:8,9
glitch 41:8 94:1,2
global 17:14
gmg 75:6,18
go 15:21 30:25
34:14,18 38:5
44:12 48:17 59:10
69:16 73:2,3
83:19 87:14 92:4
104:25 106:4,15
107:4 110:17

112:6 113:18
124:9 126:9
135:16 137:15
142:2,6,12 143:7
143:8,11,12
144:12,13,21,23
147:7 149:3
155:23 156:5,11
160:4,5 161:4
168:22 169:11
171:15 175:4
179:22 180:3,5
188:5 191:17
195:25 196:22
**gob** 22:9 76:22,23
**goes** 33:20 63:5
97:13 129:5
142:16,17,17
145:3,19 149:16
156:2,6 157:12
160:22 168:25
169:4 180:20,25
**going** 15:5,25
17:10 18:9 20:14
28:16 34:18 57:17
58:4 61:9 62:2,3
66:10,24 72:15,18
87:6,12,13,24
88:8 90:12 91:10
93:16,17 94:7,11
95:8 99:9 100:21
105:9 107:22
109:19 111:10
112:20 114:15,16
115:14,24 116:21
116:22 120:19
121:15 123:12,18
123:19 124:25,25
126:9 128:9
129:14,14,15,19
133:7,12 139:14
139:16 140:17,23
141:8 144:12,13

149:1 151:11
155:9,22 159:15
160:16 167:11
168:20 171:4
172:10 173:19
174:1,2 176:21
177:8 179:19
181:17 184:5
186:16 189:19
190:1 192:7,10,11
194:20 195:4
198:9,9,14 199:21
**gold** 11:1
**good** 12:2,4 17:1
23:5 64:4 87:16
90:1,7 100:25
104:4 113:17
114:25 121:24
160:7 165:15
170:2 172:21
174:23 180:6
185:9 187:1,3,4
195:10,12
**goodhouse** 174:23
174:24 175:3,5,14
175:23 176:3,6
178:14,17,22,24
179:6 181:15
**goods** 33:5 48:24
70:11,23 76:7
185:12,16,16,18
**gotscal** 132:4
**gotshal** 8:3 12:5
23:6 103:8 170:3
188:19 190:25
**gotten** 27:14
63:11,12,15 72:18
137:4 144:9
**gottlieb** 8:12 9:2
95:21
**govern** 74:6 75:24
108:21

**governance** 18:19
**governed** 78:11
138:17,20
**grade** 178:24
**grant** 50:20 84:14
131:18 185:2,11
**granted** 45:15
173:25 182:23
**gravity** 15:10
**great** 18:15
156:23 157:2
**greenville** 176:14
**grew** 121:19
**grounds** 67:14
77:12 82:21
**group** 10:9
**grow** 120:23
**guarantee** 120:4
188:1
**guess** 47:5 61:23
65:25 93:17
107:21 109:17
112:10 118:2,16
120:8 133:7 136:1
136:1 137:5
138:15 157:1
169:19 182:15
**guidance** 166:15
**guided** 107:12
**guys** 155:23
169:15

**h**

**h** 11:22
**hadley** 9:9
**half** 24:12,15
66:11 158:7
**hamilton** 8:12 9:2
56:25
**hand** 92:12 108:3
132:1
**handle** 174:21
**hands** 44:21

**handy** 178:13,14
180:7,10
**hanging** 13:3
**happen** 15:5 34:2
116:22 139:14,24
143:16,18,22
**happened** 59:15
91:5 139:11 144:1
148:15 160:12
**happening** 25:11
37:4
**happens** 71:12
145:22 148:10
192:15
**happy** 25:12,18
28:4 51:20 92:1
92:19 94:5 102:12
103:1 137:24
140:6
**hard** 97:14 113:23
157:18
**harm** 199:4
**harris** 187:1,2,4
187:18,21 188:12
189:10 190:5,11
190:14,18 191:20
192:4,18
**hasn't** 25:2 60:11
**hassle** 183:13
**hate** 67:20
**haven't** 63:12
**hawaii** 170:15
172:6
**hawaiian** 170:9
**headquarters**
152:24
**heads** 161:15
**head's** 39:24
**hear** 101:12
116:15 146:11
172:9 188:16
**heard** 19:6 57:16
60:14 73:4 103:20

138:12 142:22
172:12 190:16
**hearing** 2:1,7,14
2:21 3:1,8,16 4:1
4:7,14,18 5:1,6,9
5:11,16,23 6:1,4,7
6:13,15,21,23 7:1
7:6,9,14,14,17
15:1 18:9 22:17
23:8,10 25:1,7
28:16 29:5 32:15
34:13 60:9 73:17
86:14 103:16
115:10 119:14
136:2 137:12,17
137:19 139:18,18
139:19 159:5
162:24 170:20
171:1 172:6
187:12 192:16
**heavily** 120:14
121:11 164:21
**heavyweight**
179:14
**heavyweights**
178:20
**held** 32:10 35:24
39:2 41:20,24
42:10,17 43:7
44:18,23 49:10,21
49:22 51:6,14
57:15 69:6,10
73:19 78:12 79:7
79:9,14 81:16
85:5 133:20
135:15 142:24
150:9 162:7 164:8
165:23 168:22
**helped** 29:5
**herring** 80:10
**hey** 94:14
**high** 127:19

**higher** 70:3
**highlight** 40:3
**hire** 93:19
**history** 128:23
129:1 130:4
**hit** 124:21 151:19
**hits** 192:22
**hoffman** 144:18
152:1,11 153:5,10
153:16 154:8,10
162:9 164:8
**hold** 49:5 59:14
60:25 71:25 73:16
77:10,11 80:9
81:12 159:16
168:12 176:25
**holdco** 2:2,4,16,19
3:1,3,6,8,10,13,19
3:20 5:23 8:13
23:2 81:20 82:6
83:14 84:23 85:2
85:11 86:3,12
161:18
**holder** 183:18
**holders** 18:17,18
88:15
**holding** 25:20
33:12 42:14,16
66:6 69:7,11
149:14 161:19
170:4
**holdings** 1:7 3:23
4:15 12:3
**hollander** 11:2
**holohan** 11:3
**holste** 11:4
**homes** 121:19
**hon** 1:22
**honest** 71:16
**honestly** 93:14
**honor** 12:4,5,10
12:23 13:16 14:6
14:8,10,15 15:19

19:23 20:22 21:22
22:15,25 23:5
29:2 30:20 32:5
32:14 35:21 36:15
37:16 38:18 39:5
39:7 40:1,21 42:4
44:19 46:1,11
47:8 48:6 49:18
50:14 51:15,18
52:3 53:3,16
54:12,25 55:13
56:10 57:3 60:14
61:1,7,11 62:21
64:18 66:7 67:2
67:16,17 68:24
71:1 72:16,23
73:8 85:13,20
86:6,25 87:9,16
87:19 88:3,6,11
89:19 90:5,8
91:17 93:9 94:5
95:9,19 96:5 97:7
97:12,15,17 98:12
98:15,17 99:13,19
99:25 100:17,24
101:10,21 102:10
102:16,21,25
103:7,23 104:4,6
104:12,20 105:1,5
105:9,23 107:5,21
108:13 109:17
110:11 111:15
112:3,5,9,16
114:13 116:17,25
117:8,13 118:3,7
118:16 119:17
120:8 131:24
132:3 133:17
134:9,23 135:17
138:24 140:24
142:14 143:15,23
144:17 146:9,13
147:8,17 150:11

150:21 153:23
155:5,6 157:7
158:5 159:23
161:2,8,14 168:5
169:9,17,18 170:2
170:10,13 171:22
172:5,8,14,17,21
172:23 173:12,23
174:2,8,15,19,23
176:25 181:23
183:2,11 184:10
184:17 185:3,9
186:17,20,21,23
187:1 188:18,21
189:3,10 190:6,25
191:1 192:18
193:4,6,14 194:12
195:6,10,13 197:2
197:21 198:6,7
199:25 200:1
**honor's** 109:19
116:22 142:20
**honor's** 24:25
**hoops** 131:12
**hope** 13:11 14:4,7
172:11
**hopeful** 17:16
21:25 168:17
173:6
**hopefully** 13:9
14:4 137:13
**hour** 172:25
**hours** 37:21
137:14 186:15,19
**house** 121:16,17
**housekeeping**
175:6
**houses** 121:13
**hundred** 129:6
**hundreds** 15:22
**hyde** 7:25 201:3,8
**hypothetical** 61:2

**i**

**i.e** 97:13
**i.e.** 45:24 74:2
  81:15 162:10
  163:22
**idea** 113:17 120:3
  130:8 153:5
  157:25
**identified** 25:8
  72:7
**identify** 131:14,14
**identity** 131:13
**ignore** 22:4 41:6
**ignoring** 73:18
**ii** 2:3 3:20 4:20
**il** 9:19 10:4
**illegitimately** 79:9
**illinois** 106:8,9,11
  106:15 107:8
  111:14 113:7
  120:23 121:11
  127:19 128:5,7
  132:17 136:7,13
  136:18,22 137:15
  138:11,17 139:16
  139:25 141:9,16
  152:24 166:14,16
  187:8,9,10,24
  188:9 191:12
  195:15 199:2
**imagination**
  158:16
**imagine** 16:18
  49:15,19 61:1
  93:19
**immediate** 81:18
  179:16
**immediately**
  25:16 28:3 53:23
  56:3 57:11,21,22
  67:10,12 68:19,19
  68:20 82:17 83:21
  83:23 84:1,10

**impact** 192:24
**impasse** 22:12
**implement** 84:15
**implemented**
  106:11
**import** 186:1
**important** 27:1
  45:19 53:9 57:4
  114:1,1,7 120:6
  126:3 160:1 166:5
  166:10,12 168:8
**importantly**
  128:23
**impressed** 200:7
**impression**
  110:21 113:4
**improvement**
  180:7
**inadvertently**
  198:18
**inappropriate**
  110:24
**incentive** 117:12
**incident** 189:4
  193:18
**include** 32:10
  165:10 167:15
  183:9,17 190:10
  190:12 196:8
**included** 32:13
  83:17 88:22
  104:15 128:24
  152:10
**includes** 30:23
  51:10 69:2 80:24
  103:19 133:4
  152:11 190:13
**including** 4:3,11
  15:16 17:24 18:21
  19:3 47:14 58:12
  77:20 78:16 84:16
  136:18 142:18
  143:1 152:8 155:3

167:2
**inclusion** 83:14
**income** 48:19 76:2
  121:9
**incorporated** 16:4
**incorporation**
  82:13
**increased** 170:16
**increasing** 183:12
**incurrence** 83:9
**indenture** 4:2,9
  87:18 94:3 96:6
  96:10 99:2
**indentured** 182:9
  183:17,18,19
**independent** 67:8
  85:11
**independently**
  27:4
**indicate** 66:6
  196:1
**indicated** 170:7
**indication** 129:11
**indications**
  123:21
**indiscernible**
  12:17 14:9 21:23
  22:3,13 24:23
  25:14,21 26:14,21
  27:11,16,19 28:1
  28:13 31:16 32:1
  32:20 33:11 37:20
  39:6 49:6 51:20
  55:22 59:9 66:24
  72:20 77:22 81:1
  82:18 95:16 104:8
  104:10 110:10
  112:1 116:20
  119:17,19 123:17
  127:2,16 130:20
  131:6 133:22
  140:24 142:23
  143:21 144:21

169:25 178:12
  187:14 192:9
  195:19 196:6
  200:6
**individual** 139:22
  194:10
**indulgence**
  104:24
**industry** 7:10,12
  185:8,10
**inf** 57:4
**inform** 157:18,21
  157:25 159:12
  168:19
**information** 33:20
  33:22 34:3,8,10
  58:9,16,25 80:25
  84:6 154:22
  193:21 194:24
  197:7
**informed** 130:19
  171:3 173:1,2
  186:12 197:6
**initial** 2:14 16:23
  17:15 18:2 23:15
  24:8 29:19 31:7
**injunction** 113:16
  132:21
**injunctions** 136:3
**injunctive** 112:14
  112:17
**injury** 14:3
**inland** 6:10
  172:18
**innovel** 193:19
  194:4
**inquiries** 15:22
**inserting** 68:18
**insider** 99:22
**insistence** 142:21
**insofar** 84:15
**insolvency** 99:6

instance  43:7,18
  44:23 46:12 50:5
  50:10 57:25 87:2
  148:11 193:19
instances  48:14
  57:6
instruction  72:25
insurance  74:8
  75:2 189:3,9
  192:23 193:16
  194:4,9,15 195:5
  195:21 196:8,11
  196:21,23,23
  197:4,12,15,18
insurer  193:17
  197:6,24
intangible  41:15
  41:16,22 42:1,3
  42:20 48:18 76:1
  80:20 81:2,3
intangibles  42:10
  42:12 52:5,8,9
integrate  13:12
integrated  31:25
integration  32:1
  67:4
integrity  16:20
intend  28:19
  129:23
intended  23:24
  180:14
intensive  20:13
intent  56:18 74:17
  129:12
intention  129:9
inter  16:6,17
interest  12:7 17:4
  18:18 21:10,11,12
  21:15 45:4,8,12
  50:11,19 88:16
  111:19 160:20
  184:24 187:16
  188:22 189:12

190:9,18
interested  146:11
interesting  92:24
  128:25
interests  20:10
  165:4
interim  23:9
intermediate
  158:20
interpret  43:4
  75:14 106:13
interpretation
  56:7 73:15 77:12
  83:8 84:2 125:21
  127:18 128:22
  160:18 175:25
  177:12
interpretations
  75:5
interpreted
  126:23 127:14
  128:22
interpreting
  74:10
interrogatories
  139:21
interrupt  25:22
  51:7 120:16
intertwined  31:22
introduce  104:7
inventories  76:14
inventory  35:1,8
  37:9 38:2,3,5,6,14
  64:7,8 66:8,9
  72:13,13,19,21
  76:11,13,13,21,22
  76:24,25
inventory's  64:19
investments  9:3
  75:6,19
invoke  55:16
invoked  55:14

invokes  55:9
involuntaries
  110:17
involuntary  110:9
involve  113:14
  132:23
involved  92:24
  96:17 105:6 144:8
  144:9 187:25
involves  73:25
  106:6,8,9
ionosphere  50:15
ira  3:21
irrelevant  111:1
  169:20 178:5
isn't  42:13 51:11
  64:1
issue  16:12 19:3
  23:7 28:11 29:6
  34:6 36:19 39:11
  39:24 40:2 41:3
  44:19 65:7,17
  69:6 73:14,25
  74:3 79:19 80:9
  80:11,16 83:5
  85:4 87:21 90:23
  94:6,9 102:6,8
  105:25 106:3,5,17
  106:20,24,24
  107:12,12 109:6,7
  109:12,24,25
  110:14 111:18
  112:21 113:2,2,4
  114:16 118:10
  123:23,23 128:19
  128:21 130:21
  133:17 135:14,24
  138:4,10 140:8,10
  141:17 142:6
  148:10 151:18
  158:14 160:14
  161:17,22 163:20
  164:8,16,18,24

165:21 167:13,14
  168:2,7,11,21
  169:5,16,24 173:6
  176:23 179:4,10
  179:21 186:6,12
  187:11,20,21
  189:18,21 190:6
  195:19 197:8,19
  198:7
issued  48:23 76:6
  138:11
issuer  48:21,23
  49:3 76:4,7
issues  15:17,23,24
  15:24 19:15 20:12
  21:1 25:18 41:5
  85:14 86:1,2,7,11
  86:18,24 99:12
  100:16 103:13
  104:23 106:7
  109:10 113:1,19
  115:6,12,13 117:9
  132:10,11,19
  134:15 135:7,12
  163:2 164:17,20
  166:20 167:10,18
  167:19 168:19
  169:22 172:12
issuing  177:10
it'd  130:13
italian  119:20
item  22:25 47:14
  87:10 170:4
  172:17,20 185:7
  193:5 195:6
items  35:6 47:14
  76:17 77:25 103:9
  137:18 173:6
it's  13:3 14:11
  15:5,11,19,20,21
  15:21 16:2,3,19
  18:3,23 21:11,12
  22:2,10,20 26:8

26:16,21 32:5,12
36:1 38:12 39:19
40:14 41:25 42:13
42:17,17 43:2,19
43:24 46:24 49:13
49:16,17,23 50:1
50:15 51:16,16,24
51:25 52:1,12,14
53:2,17 54:18
55:7 56:7,25
58:16 61:23 62:3
62:11,12 63:14
64:13,15,23 65:3
65:9,11,15,18,19
65:23 66:18,23,24
66:25 147:13,15

**ivan** 11:1

**i'd** 41:6,9 43:1,9
45:13 51:20 56:9

**i'll** 23:3 24:23
28:25 40:22

**i'm** 14:21 20:25
26:1 29:14 39:2
40:12 48:16 52:1
54:25 55:4 58:4
61:5

**i've** 18:1 45:13

**j**

**j** 8:17 10:24 11:3
**jacqueline** 8:9
170:3
**james** 185:9
**january** 75:7
143:2
**jared** 8:8 23:5
103:7 132:3
**jeffrey** 195:7
**jelisavcic** 11:5
**jennifer** 10:19
**job** 15:20 61:22
180:6
**jobs** 123:14,17
126:1,7 127:17

130:3 153:2,8,8
164:24 165:5,10
165:11 167:15,15
**joinder** 3:16 4:7
**joining** 95:4
**journal** 181:10
**judge** 1:23 19:19
86:21 93:1 103:1
114:25 115:1,24
120:12,18 121:3
123:3,6 126:5
131:17 146:15
160:18 168:24
169:23 177:4
178:10 179:6,13
179:13,15 180:5
180:21
**judging** 163:18
**judgment** 86:9
115:11 136:3
137:4 187:8 192:5
**judgments** 191:5
**judicial** 127:9,10
**july** 20:16,18
166:9 170:17
**jumped** 107:6
**june** 74:18 75:1
171:23 199:11
**jurisdiction**
105:16,17,19
111:4 138:23,23
162:20,21 163:1,9
164:5,6,7 165:14
178:19
**jurisdictional**
163:8
**jurisdictions**
127:20 128:8

**k**

**k** 178:3,6 195:16
196:20 197:13,22
**kadish** 4:24 5:3
5:13

**kamehameha**
170:13
**kamlani** 34:8 58:3
**kamlani's** 33:16
58:15
**kanter** 9:16
**katherine** 11:13
**keep** 61:22 86:1
87:13 116:21
154:11 169:7
184:15 189:2
**keeping** 150:24
**keeps** 169:6
**kelley** 170:11
**kelly** 11:6
**ken** 104:9 114:25
**kenneth** 10:6
**kept** 60:5 68:18
121:19 138:7
154:7
**key** 17:24 21:10
36:5 48:12 68:8
70:7,22 101:20
175:25 179:10
**kick** 125:7
**kicked** 122:22
**kid** 121:14
**kids** 121:13,14
153:9
**kimberly** 10:25
**kind** 149:13
173:17 179:2
191:23
**kinds** 181:25
183:12
**kleist** 11:6
**knew** 72:8 152:3
178:4 199:3,9
**know** 12:14,18,25
13:3,4,5,8,19,24
15:6,7,8,20,21,22
16:1,1,10 17:11
18:3,24 19:5,24

20:3,16,17,22
21:1,19 27:3 28:4
29:11 39:8 57:16
61:19,23,24,24
65:16 66:13,25
67:20 71:8 72:17
84:8 86:1,8,8,10
86:12 87:2,3,4,6
89:2 92:8 93:5,21
94:10,17 95:5,6
95:24 97:8 98:4
100:11,11 106:14
107:9,25 108:8,8
108:16,23 110:5,8
111:17 113:8,10
113:13 114:16
117:1,20 118:6,16
118:24,24 119:19
119:25 120:4
132:25 134:11
135:8 136:2,14,23
136:25 137:1,2,8
141:1 146:1
148:11 150:14,19
153:11 154:19
155:21,22,23,24
156:4,8,11 157:4
157:10,16,18
158:10 161:23
168:8 177:9
182:16 193:8
194:14

**knowing** 62:7
115:22
**known** 199:4,9
**knows** 120:4
136:2
**koch** 11:7
**kosson** 11:8
**kreller** 9:14 97:15
97:15,22 98:8,12
98:15,17,25 99:13
99:19,22,25

100:17,24 101:5
101:19,21,23
102:10,12,16,21
102:25
**krieg** 56:25

**l**

**l** 2:9,10 5:18,19
6:16
**l.p.** 75:7
**lack** 70:1 163:7
165:2
**laid** 84:13
**landlord** 174:25
**landlord's** 181:7
**language** 40:4
42:21,23 43:11,13
43:14,20 48:5,12
51:21 54:18,23
56:1,5,10 57:3
67:3 74:7,14,20
75:8 79:2 82:12
82:22 124:23
126:10 128:6,7,8
128:21 130:1
152:22 153:1,3,25
177:13 180:14
**lanier** 11:9
**large** 17:21
106:12 191:2
**largely** 15:14
**largest** 105:6
**late** 20:24
**latest** 33:16
**laudamiel** 74:17
**law** 2:21 31:23
56:23 57:2 67:10
67:25 74:7,7,15
104:9,11 105:13
105:14 106:4,7,7
106:20,23,25
107:12,25 110:16
112:11 113:6
115:6,12 116:23

117:19 131:18
138:4,5,6,17,20
150:16 157:19
162:15,15 163:6
165:13
**laws** 74:5
**lawsuit** 199:14
**lawyer** 136:22
**lawyering** 150:17
**lawyers** 67:20
136:24 150:14,15
**lays** 52:24 95:1
**lead** 18:9 79:20
165:20
**leading** 12:15,15
15:3
**learn** 84:7
**learned** 37:10
175:8 198:20
**learning** 151:12
**lease** 2:8 5:17 6:8
129:17 130:24
171:2,4,7 173:15
173:16 176:9,10
176:15 177:24
178:1,8 181:13
**leased** 20:6 64:8
76:22
**leases** 130:24,25
**leave** 65:22 86:18
100:22 102:7
103:23 131:22
169:16 183:11
**leaves** 80:11 83:5
83:13 100:22
165:21 196:4
**leaving** 85:18
97:19
**led** 118:23
**ledanski** 7:25
201:3,8
**left** 18:19,22
93:12 170:14

173:8
**legal** 16:7 135:12
140:17 186:11
201:20
**legislation** 106:9
106:14 109:20
152:21 153:1
**legislative** 128:23
129:1,11 130:4
181:8
**legislature** 128:5
**legitimate** 108:11
150:16
**legitimately** 79:8
**lehane** 2:11 5:20
170:8,10,11
171:21 172:4
**lenders** 89:5,8
91:4,4 92:9,13
95:4,5 98:21
**length** 180:15
**letter** 46:15,16
58:13 155:12
156:21 198:4
**letters** 13:6 32:9
77:19,21,22 157:4
160:6
**let's** 15:8 41:7
49:19 51:4 52:3
**leukemia** 199:6
**level** 20:15 129:10
158:18,18 164:24
165:19,20
**levels** 130:7
**leverage** 95:7
115:23
**levied** 124:8
147:25 148:11,11
149:21
**levy** 124:5,5,10,10
161:19,22
**lewis** 8:17 39:5

**lexington** 8:21
**lexus** 180:19
181:3
**liabilities** 56:17
61:15 74:23
**liability** 54:5,6
56:13
**liable** 130:11
**liberty** 8:14 9:4
9:11
**lien** 45:15,23
49:17 50:20 88:14
88:16 90:19,19
94:13 96:7 98:21
101:13 184:22
185:1
**lienholder** 96:19
**lienholders** 95:23
**liens** 96:19,25
182:23
**lift** 187:5 190:23
193:11 195:7,14
196:22,22
**lifting** 193:1
197:10
**light** 37:5 84:14
**lii** 11:10
**likes** 17:9
**likewise** 30:9
**liman** 8:17 39:5,5
39:20 40:1,20
41:4,9 42:4,17
45:17 46:1,11
47:4,8,21 48:6,11
49:19 50:13,24
51:4,15,18 52:3,7
52:15,20 53:3,6
53:16,21 54:12,16
54:25 55:6,13,21
58:7 59:5 60:13
60:20 61:1,7,11
61:19 62:1,21
63:9,12,18,24

JX 053-229

64:18 65:1,3,6,11
65:18 66:3,17,20
67:2,16,19 68:17
72:23 73:3
**liman's** 69:4,21
**limit** 106:25 109:4
109:9 179:25
**limitations** 90:18
93:2 198:8 199:2
199:13
**limited** 7:6 64:6
93:10 153:15,16
154:24 191:7
**limiting** 46:8
**limits** 90:9
**lincoln** 41:25
67:19
**line** 17:4 39:8
157:23 183:8
191:24
**lines** 14:3
**lingering** 54:5,6
**link** 61:12
**liquid** 33:14
**liquidate** 191:18
**liquidated** 191:4
**liquidating**
192:20
**liquidation** 34:15
**list** 130:11,25
173:11
**listed** 47:14 59:12
**listen** 94:10
**lists** 32:7
**literally** 15:22
172:25
**literature** 199:5
**litigated** 136:5
**litigating** 135:7
**litigation** 18:13,22
20:12 21:13 93:18
114:11 150:10
163:14 168:14,15

187:6 188:13
193:12 198:11
**litigations** 114:2
191:2
**little** 56:15 107:14
108:25 110:20,21
120:12 132:20
157:15 172:17
**live** 28:16 153:9
**lived** 153:9
**llc** 2:2,16,19 3:3,6
3:10,14,19 6:17
6:19,23 8:13
74:25 75:6 174:20
**llc's** 3:1,8,20
**llcs** 2:4
**llp** 8:3,12,19 9:2,9
97:16
**loans** 16:13
**local** 121:9 122:16
122:21 126:4
128:15
**located** 194:15
**location** 76:23
**locked** 192:2
**loews** 179:14
180:18
**logical** 179:2
**long** 108:17 114:3
136:1,17 137:1
145:2 146:5 152:2
155:25
**longer** 23:25 91:7
114:19 150:23
167:8 192:8
**look** 42:25 43:4
43:10 45:10 46:4
47:8 50:19 53:8,9
54:16 55:1 56:13
56:15 57:19 58:10
58:13,15 60:2
67:2 75:21 84:5
96:12 98:6 100:10

100:13 106:12
108:8 110:4 111:1
113:20 123:4,7
124:17 126:10,12
131:17 135:16
145:12,17 157:19
158:3,10 163:23
180:1 181:12,16
190:1
**looked** 61:3 94:9
117:22 177:4
**looking** 69:1,17
94:14 149:20
150:11 156:10
179:8 198:5
**looks** 73:6
**lose** 128:19,19
129:10 191:12,19
**loser** 109:22
**loses** 126:7
**losing** 151:13
**loss** 198:17
**lost** 191:23
**lot** 22:11,20 34:20
41:5,5 73:6 88:9
92:7 102:19
113:13 133:11
137:9 147:18
151:13 153:9
158:11,14 180:8
180:13 184:18
**lotempio** 11:11
**lots** 96:21
**louder** 140:15
**low** 13:2
**lowe's** 179:17
**lower** 43:18 129:5
**luckily** 151:1
**luftglass** 11:12
**lunch** 158:1

**m**

**m** 4:4 8:24 10:6
11:1
**macy** 177:4
**macy's** 180:11
181:1
**main** 12:6 180:13
**mainoo** 2:18 3:6
3:13
**maintain** 77:21
125:25 126:5,5,6
126:7,13,18,21,23
128:2 153:2 165:5
**maintained** 40:16
126:14 164:24
167:15
**maintaining**
130:3
**majority** 179:25
180:4,4 181:2
**maker** 10:17
**making** 50:5
68:17 90:9 193:3
198:1
**man** 96:2 158:22
159:1,10,12,14,21
200:5
**management**
23:22 24:11
184:21
**mandate** 19:14
**mandatory**
104:21 132:7
135:2,4,14 139:4
139:14 141:2
147:11 162:13,14
164:15 165:14
**manges** 8:3 132:4
170:3 191:1
**manner** 100:5
112:3
**march** 23:16 24:3
24:13 27:12,23

29:5 75:10 89:6
101:2
marcus 8:9 170:2
170:3 172:16
173:12,22 174:1
174:19 181:18
183:5,20,24 184:1
185:3,7 186:21
margin 166:2,3
marietta 75:16
mario 186:24
187:5
market 12:15,15
marshaling 100:4
mart 178:3,6
197:13,22
mart's 196:20
martin 75:16
marts 195:16
massey 11:13
master 173:7
materially 92:9
materials 75:17
75:17 154:25
mathematics
169:3
matt 104:4
matter 1:5 2:4
3:12,21 28:12
35:18 63:14 85:7
85:25 104:21
105:18 106:18
108:13 112:11
113:6 116:19
135:12 137:3
152:3 155:7
166:17 167:4,7
170:7,21 177:8
187:11,25 188:2,5
188:8,8,10,25
191:25 194:3
200:2

matters 7:14
29:15 30:6 32:22
104:12 106:5
111:23 135:19
159:9 183:12
186:21,22,24
matthew 9:21
11:7 74:17
maudlin 174:20
174:24
mauldin 6:17,19
6:23 178:2
mccloy 9:9
mckool 185:10
mean 22:16 30:5
40:8 47:5 49:7
53:17 63:3 65:6
66:25 79:25 86:15
86:19 90:2 91:10
91:13 93:15 94:17
95:24 96:6 99:1
101:14 107:16
113:16 117:16
120:20 126:24
133:15 134:6,8
140:10 141:14
144:10 146:11
149:12 156:17
157:2 158:13
173:24 174:9
177:17 183:16
184:23 189:18
197:22
meaning 29:25
30:6 31:17 32:24
67:8,9 74:4,16
75:23 76:4 80:17
83:5,25 176:18
177:24
meanings 75:5
177:17
means 42:15 51:8
53:15 56:3,5 75:9

80:22 81:3 101:14
126:18
meant 99:5,10
108:1 126:13
178:16 190:5
measures 116:7
mechanic 16:5,20
17:21 18:4,6
19:10,16
mechanism 30:18
35:11 62:17,19
95:2
mechanisms
46:17 68:25
mediation 2:5
3:12,21
meet 92:16 109:9
113:3
meeting 148:16
148:22
meghji 104:18
118:24 120:4
130:19 151:2,7
157:17
meghji's 137:22
150:20
member 166:14
memorandum
2:21
mention 18:24
62:8
mentioned 32:21
44:15,19 72:11
199:23
mentions 155:11
mercury 67:19
mere 156:12
merely 75:8 78:16
83:24 165:2
merit 142:10
merits 113:18,18
166:20 167:11
168:15

messing 142:16
met 37:17 38:15
38:15 77:5 104:22
105:20 112:4
132:8
method 165:12
methodology
119:11 157:24
metro 57:1
michael 10:13
11:14 144:17
157:10
michelle 11:20
middle 148:13
milbank 9:9 97:16
miles 125:2
million 17:8 24:4
24:8,12,12,14,15
27:12,16,18,20,21
27:22,23,25 28:1
28:2 33:12,12,23
34:4,10 36:9,16
36:18 37:7,10,23
38:2,13 39:2
47:16 59:16,21
62:2 69:3,12,15
69:20 71:5,18,18
72:6,7,11,19,20
72:21 73:9 87:3
98:19,23 101:7
141:20 145:18
153:6 156:1,2,7
157:9,11,12
166:12 170:19
182:6 183:2,6,7
184:5,18
mind 60:8,10,17
110:21 116:21
129:3
mindful 20:14
minds 22:1
mineola 201:23

[minimal - need]    Page 31

**minimal**  188:7
**minimis**   7:2
  181:21 182:11
  183:10
**minimum**  152:23
**minutes**  63:3
**misquote**  58:6,7
**misquoted**  58:3
**missed**  196:14
**mistake**  121:23
**misty**  131:6
**misunderstood**
  45:7 189:25
**mittelman**  11:14
**modify**  104:14
  105:22
**modifying**  70:9,9
**moment**  24:23
  32:4 33:24 34:4
  44:20 45:20 52:4
  59:6,15,20 62:5
  100:2 147:10,11
**monday**  186:16
**monetary**  51:9,11
  68:4,7 80:22 81:4
  81:7
**money**  22:11
  26:18 27:3 28:6,6
  31:13 33:25 34:20
  34:22 35:25 45:24
  46:21,22,23 49:4
  50:7 54:22 57:7,7
  58:19 61:13 65:10
  69:6 79:19 80:9
  80:11,19 81:7,10
  81:12 100:21
  112:23 115:21,24
  116:4,5,13,14
  117:11,11,21
  121:1 122:1 123:3
  134:7 135:14
  143:1,7 144:10,10
  144:11,20,21,23

145:3,23 147:7
149:16 150:10,15
151:21 157:9
160:17 161:19
164:7 166:11
168:21 184:19
188:22
**moneys**  191:5
**monies**  26:9 41:23
  42:10 43:6,24
  50:18 54:1 57:24
  58:8 160:8
**monitoring**
  122:18
**monsanto**  195:17
**montgomery**
  180:25
**month**  148:21,23
  148:25 151:5
  198:12
**monthly**  150:25
**months**  93:21
  114:19 159:3
  167:8 177:3
  187:23 192:25
  199:22
**moot**  103:21
  169:20 173:21,25
**morning**  12:2,4
  23:5 114:25
**morrison**  67:19
**morristown**  41:25
**motion**   2:1,4,7,15
  2:22 3:2,9,11,17
  3:20 4:1,8,14,19
  4:20 5:1,6,11,16
  6:7,15 7:1,9,10
  23:1,12 28:14
  73:12,14,18 84:15
  85:9,15,24 86:10
  86:14,24 87:11,15
  87:19 88:1 91:18
  91:22 93:11 95:4

99:3 103:9,13,18
103:21 104:1,14
104:15,16,18
105:12,21,21
109:16 112:14,17
114:19 115:11,18
117:10 118:15,23
131:18 132:18,18
132:19,23 133:24
134:2 137:12,21
149:13 161:25
162:3,6,10,10,11
162:12,14 163:5
168:14 169:18
170:5 172:13,17
173:21 174:20,25
175:7 177:11
181:17,19 182:7
184:13,20,20
185:2,8,11,14
186:10,24 187:5
191:8,13 192:10
192:13 193:3,5,7
193:12 194:6
195:4,7,9,14
198:19
**motions**  113:10
  113:13 115:9
  136:3 181:19
**motivated**  166:1
**motorist**  74:8
**mouth**  190:4
**movant**  95:3
  132:8 164:11
  165:21 187:4
**movants**  166:18
  166:25 167:19,21
**move**  12:6 28:12
  87:6 93:7 140:25
  196:7
**moved**  23:11
  133:16 134:2
  153:12 185:11

**moving**  13:7 21:5
  21:9 24:1 25:6
  28:7 31:7 133:21
**multiple**  31:22
  124:11 196:2
**municipal**  104:9
  104:11 128:7
**municipalities**
  142:18 149:16
**municipality**
  142:25
**mutual**  51:17
  81:12,21
**mutually**  81:16

**n**

**n**  8:1 12:1 201:1
**name**  99:10
**named**  19:10
**names**  130:12,12
  131:2,3,3
**narrow**  133:17
**national**  4:1,5,9
  7:6 8:20 87:17
**nature**  53:8 79:16
  81:14 84:12 137:5
**near**  17:22
**nearly**  21:8 99:4
**necessarily**  13:20
  25:11 30:5 71:13
  82:15 156:12
  158:12 188:14
**necessary**  15:4
  22:4,5 123:2
  153:18,20
**need**  21:7 25:7
  28:23 39:22 42:1
  44:11 45:2,9,13
  45:18,20 46:13,15
  52:7 53:25 66:9
  69:16 75:21 84:10
  84:22 102:18
  104:23 111:1
  115:5 116:4

JX 053-232

117:11 119:1
125:10 130:22,23
132:7,8 134:11
136:23 142:23
155:9 159:2,15
167:22 184:6
193:3
**needed** 117:11
122:24
**needs** 28:5 62:16
158:14 163:20
164:2 165:15,16
184:19
**negotiate** 22:11
194:17
**negotiated** 38:24
64:3 97:23,24,25
**negotiating** 171:6
**negotiation** 16:19
18:23 95:7
**negotiations**
18:20
**neighborhood**
101:7
**neither** 28:19
81:17,22,23 92:6
153:24
**net** 43:24 44:1
62:3
**networks** 74:13
**never** 72:25
106:16 125:1,1
138:12 153:3,18
155:15 167:12
**nevertheless**
82:18
**new** 1:2 8:6,15,22
9:5,12 10:11 20:9
74:22 86:18,20
87:1 124:5
**news** 17:1
**nice** 99:10 121:25

**night** 172:25
**nodding** 140:4
**non** 16:2,12,21
19:20,21 107:1
154:7
**nonbankruptcy**
163:24
**noncompliant**
156:2
**noncore** 163:11
**nonemployees**
157:20
**nonresidential**
176:9
**normal** 183:7
**normally** 92:7
**northern** 75:2
108:17,17 110:25
**northstar** 10:9
**notable** 32:5
**note** 43:10 78:15
177:10 179:10
181:4 193:6,14
**noted** 81:6 160:2
**notes** 14:21
176:24 182:9
195:24
**nothing's** 139:11
**notice** 7:14 20:23
119:7,8 173:15,20
183:12 184:6
185:2
**noticed** 41:18
183:9 184:21
**notices** 173:18
**noticing** 183:7
**notion** 40:10
41:12 58:21 62:8
62:11 67:9 68:22
97:17 136:7,13
147:14
**notwithstanding**
83:14 107:18,18

**novel** 123:11
**november** 88:12
105:23 117:10
175:1 199:8
**null** 75:16
**number** 20:24
21:7 24:14 25:18
35:8 62:3 69:15
77:7 87:4 100:25
103:9,12 104:6
118:12,13,20,20
129:6 145:2
151:19 152:3,5,8
158:7 167:13
170:5 172:20
174:19 181:18
191:2 193:22
**numbers** 17:12
57:16 120:3 123:6
124:21 130:9,11
142:16 152:2
154:1,4,6 176:4
**number's** 62:2
**numerous** 20:7
**ny** 1:14 8:6,15,22
9:5,12 10:11
201:23

___

**o**

**o** 1:21 12:1 77:16
79:11 201:1
**o'brien** 75:1
**o'neal** 95:21,21
96:3,5,8,13,16,18
96:23,25 97:2,7,9
97:12
**oberg** 11:15
**object** 60:4
182:25
**objected** 155:13
184:22
**objection** 4:7,8,19
4:20 5:1,9,23 6:13
6:21 7:6,17 28:22

87:22,25 103:22
149:13 165:2
182:7,8,22 183:8
193:15 195:20,21
195:24
**objections** 182:10
**objective** 75:11,13
163:23
**objectives** 177:14
**obligated** 31:9,11
36:21
**obligation** 31:14
42:15 46:7 48:1
50:9 51:9,12,16
51:22 52:9,11,12
52:13,17,23,25
53:9,10,18,19,25
55:6 56:16,21,25
58:25 62:25 64:20
67:11,13 68:5
78:19 80:22 81:4
81:5,7,12,18,21
82:6,15,16,18
85:11 171:14
176:15 177:21,22
178:7,8 179:8
180:9
**obligations** 2:8
5:17 31:12 47:24
51:17 52:10 56:16
57:18 68:7 81:20
88:16,17 113:23
113:24 171:18
176:7
**obscure** 131:13
**observations**
21:17
**obtain** 77:20
88:13 197:5
**obtained** 187:15
**obviously** 13:11
14:11 21:4 40:17
82:22 94:11

113:16 146:10
168:3 172:7
175:16 178:19
184:19
**occurred** 185:15
**october** 191:23
**offer** 143:20
**offered** 134:10
**offhand** 146:1
**office** 154:10
174:9
**official** 3:16,22
4:7
**offs** 24:24 26:9
**offset** 17:9 26:13
45:25 49:17
**oh** 108:5 142:13
151:10
**okay** 12:2,9,24
13:9,23 14:14
19:22 21:3,4,24
22:16,23 23:4,13
26:11 28:9,15,21
28:25 29:13 30:22
35:22 36:14,20
37:12 39:4,20,22
52:6 55:12,20
60:18 67:15 70:18
70:25 71:12 72:22
73:11 85:21 86:21
87:8,12,14 88:2
88:10 92:3,20
95:12,18,20 97:9
97:13 99:21,24
101:4,22 102:20
102:24 103:2,25
104:3 105:2,8
106:4 107:23
108:6 109:15
110:18,19 111:9
112:25 114:24
115:20 116:12,15
117:6 119:1 120:7

124:1 125:8 128:1
128:14,17 131:23
132:2,6 135:18,23
137:7,20 138:1,25
139:6 140:19
141:4 143:6 144:4
145:10 146:3
147:2 155:4
156:22 159:20
161:24,24 170:1,9
172:3,15 174:3,18
183:20 184:8
185:3,6 188:11,16
189:17 190:21
192:18,19 193:10
194:1,25 196:25
199:1,11 200:4
**old** 63:19,20 66:2
201:21
**older** 73:10
**oldest** 35:9 36:13
36:16,18 47:17
49:12 58:12 62:24
62:25 63:7,8
64:11,24 69:14,15
69:18 71:23 77:2
77:8
**olga** 8:10 188:18
**omneon** 75:10
**omnibus** 139:19
192:16 199:12
**once** 50:8 60:24
64:21 65:1 82:20
153:13,18 156:1
157:11 172:8
199:16
**ones** 63:8 69:7
142:6
**ongoing** 15:15,25
18:20 19:25 86:4
100:14
**open** 16:6 18:19
18:22 85:18 86:2

86:11 91:13
100:16,22,22
169:16
**operate** 35:17
111:22
**operating** 66:10
129:7,21
**operation** 36:3,5
83:18 84:4
**operations** 15:15
121:12
**operative** 30:10
30:12 40:4 80:3
**opinions** 138:11
180:12
**opportunistic**
150:7
**opportunity**
182:25
**oppose** 185:13
191:8
**opposed** 26:23
27:5 45:23 54:23
84:1 114:21
192:24
**opposite** 31:20
124:15
**opposition** 131:19
**option** 46:12,16
**oral** 159:5 188:2,3
188:4,6,10,23
192:1
**order** 7:1 14:10
15:4 36:15 38:8
39:1 40:13 41:13
44:9 46:13 60:7
60:15 61:12,19
64:17 65:21 84:21
84:22 88:11,12,18
88:22 90:9,11,16
90:24 91:7 94:9
95:25 97:2 101:12
103:18,23 115:11

145:2 163:2
167:21,23 168:7
168:11 169:13
172:1 176:8
181:20 182:24
184:21 185:4,22
186:3,5,7,9,12
188:5 193:2 194:2
195:1
**ordering** 192:1
**orderly** 171:8
**orders** 188:9
**ordinary** 33:7
41:17 42:22 43:13
43:15,17,23 44:11
48:25 49:4 52:20
52:21,23,23 53:11
54:2,10 56:17,19
67:6,7 69:23,25
70:5,8,12,19,20
70:24 74:15 75:22
76:9 81:25 83:6,9
**organization**
78:25
**original** 105:19
129:18 172:13
**originally** 106:19
185:11
**ought** 86:19
116:21
**outcome** 22:8
**outgrowth** 86:23
**outset** 87:21
**outside** 126:9
166:9
**outstanding** 88:17
175:10
**overage** 72:7
**overall** 14:1 16:2
177:14 180:23
181:12
**override** 101:15
102:2 177:15

overstaying  65:20
owe  27:4 42:15
  45:24 49:4 51:3
  81:7,10 117:21
owed  2:10 5:19
  26:9,15,16 27:16
  27:24 33:2,14
  34:1,22 41:16
  42:13,21 44:7
  48:3,3,7,9,13,14
  48:20 51:12 52:17
  53:14 56:6 68:16
  68:20 70:14,18,20
  70:21 76:3 79:15
  79:17 81:14,16,21
  82:7,18,20 84:1,7
owes  51:2,2 78:18
  81:13 84:19
owing  26:1,4,18
  26:24 27:22 31:13
  84:11
owned  64:9 76:23
o'neal  9:7
o'neill  17:9

**p**

p  6:10 8:1,1 12:1
p.c.  9:16 10:8
pace  172:16
page  74:18,25
  93:21 175:7
pages  180:20
paid  24:4,13 26:6
  26:6,23 27:12,25
  49:3 50:3 63:21
  63:24 77:21 83:22
  85:4 89:8,15 90:2
  92:14 101:16
  120:21 124:5,8,11
  130:6 132:25
  133:3,5 141:21
  144:14 148:1,3,12
  148:13 149:6
  161:11 179:24

180:17 189:7
  192:21,23
papers  41:18 44:6
  73:5 86:16 94:20
  160:2 175:6
paragraph  30:10
  30:11,12,17 33:17
  33:21 35:17,19
  40:15,17 44:8,12
  163:22
paragraphs  45:10
paramount
  111:19
parents  153:9
park  158:25
parol  75:21
parse  43:11
part  26:18 36:6
  38:16 64:12 65:2
  67:5 77:9 84:12
  95:23 120:1
  127:22,24 131:9
  131:16 134:23
  148:13,13 154:15
  154:16,20 169:5
  175:20 184:11
  191:4 197:16
partial  85:23
  175:9
particular  19:2
  61:12 83:19
  141:13 164:2
  168:21 180:9
  188:19
particularly
  58:23 80:2 99:14
  137:21 180:22
parties  12:7,14
  17:4,11,12 18:10
  20:8,17,22,25
  21:10,12 22:10
  28:15 37:22,25
  38:17 40:21 47:1

51:13 73:18 74:12
  74:17,24 75:9,20
  75:23 80:13,18
  81:17 84:5 85:18
  86:10,19 87:4
  93:4,23 94:7,13
  95:4 100:19 102:6
  113:17 114:17
  118:20 124:14
  126:24 127:20
  130:3,25 140:1
  145:1 149:7,10
  151:23 159:11,14
  160:13 166:16
  171:24 173:4
  177:16 178:18
  179:7 181:9
  184:24 198:15
parties'  59:17
partner  23:3
partners  9:10
  75:6
party  19:21 29:3
  42:11 51:2,2,2,3
  75:13 81:17 85:6
  107:1,16 125:17
  127:16 138:13
  160:10 162:8,14
  183:9,12 184:2,22
  185:2 193:8,17,25
  194:9,15 195:5
party's  19:10
pass  52:3
passed  16:22
patrick  10:22
  11:3
pauahi  2:11 5:20
  6:5 170:6,12
paul  11:19
pause  98:11 103:6
pay  2:9 5:18
  23:18 24:7 27:3
  27:15 31:9 36:9

48:1 49:9,10
  52:25 53:10,12,18
  53:19 56:16 63:10
  78:19 100:5,8
  102:1 113:2 133:4
  166:2 178:24
  179:5
payable  31:5
  40:15 43:12,22,24
  44:1,5,7,10 47:25
  48:2,7,9 50:8 52:1
  53:15,23 55:16
  56:3,22 57:5,8,11
  57:20 67:6,11,12
  68:22 83:22 84:10
  179:19
payables  40:24
  87:3
payer  40:11
paying  24:20
  93:17 112:23
  170:17 193:18
payment  2:7 5:16
  6:15 7:9,11 24:8
  31:14 33:3 40:16
  41:12,15,16,21
  42:1,2,10,12,20
  48:18,20 51:8,24
  51:25 52:2,4,8,9
  52:17 68:4,7 76:1
  76:3 77:23 78:7
  80:20,22 81:2,18
  82:17,24 87:3
  114:4 148:17,18
  149:4 170:7
  174:20,25 175:9
  175:12 178:1,6
  179:16 180:23
payments  23:15
  41:19,21 48:19
  49:2 76:2 87:5
  148:21 184:3

payout  91:3
pending  76:14
   111:14 112:13
   115:2 191:2
people  15:3 93:19
   114:21 125:20
   153:4 157:25
percent  105:7
   113:10 121:21
   142:15,16,17,17
   142:25 143:4,10
   144:16,20,21,24
   144:24 145:18
   150:8 160:14,21
   168:6 169:1
   170:18
percentage
   145:14 171:11
perfected  45:20
perfecting  45:13
perfection  45:23
perfectly  95:5
   107:19
perform  107:2
performance  51:9
   77:22 80:23 82:25
   176:7
performed  33:6
   48:24 70:11,23
   76:8
period  6:17 53:11
   173:14 176:16
   177:2 180:16,17
   182:14 191:9
   192:13 195:21
   196:3,5 197:3,5
periods  53:12
   176:17
permissive  140:25
   147:10 162:12
permit  46:17
permits  167:14

permitting  168:3
person  15:20
personal  14:3
personally  160:21
perspective  60:1,2
   141:6 173:22
   183:10
pertaining  82:4
   83:21
pertains  162:21
peshko  8:10
   186:23 188:18,19
   189:8,15,21,24
   190:3,20 193:4,14
   194:5,11,16,19,23
   195:2,6 197:2,14
   197:20 198:3
   199:25 200:2
petition  2:7 5:16
   46:20 88:16
   106:15 175:12,22
   176:15,16 177:22
   180:17 185:13,17
   185:18,19
petitioning  110:9
pfeiffer  195:7,11
   195:22
pfeiffer's  195:9
pgbc  16:5
pharmacy  35:3
   76:16 77:3
phone  191:11
   193:10,22
phrase  82:14 83:5
   83:9,24,24
pick  56:18
picked  172:16
picks  134:15
piece  147:3
   152:21 160:23
   162:9 169:6
pipeline  108:17
   108:17 110:25

pizza  119:21
   158:1
place  18:7 35:11
   60:5 83:10 100:11
   121:8,23 136:13
   156:8 157:8
   182:14 189:3
   191:23 192:2
plain  74:4 83:25
   176:18 177:24
plainly  30:9 58:24
plains  1:14
plan  13:8,10,12
   13:14,18 14:15,18
   15:7,10 16:2,2,3,5
   16:12,21 17:13,20
   17:23 18:5,14
   19:1,10,11,21
   20:16,19 21:8
   22:6 95:7 98:4
   101:24 102:5,17
   114:5 166:5,6
   182:12 191:3,5,15
   192:14
plausible  109:25
play  30:19
playing  124:20
plaza  8:14 9:4
pleading  139:12
   198:16
pleadings  105:24
   135:21 165:19
please  15:8 25:23
plenty  20:25
plus  28:1 72:20
   101:8 187:16
   189:11 190:8
pm  200:10
pockets  34:5
podium  23:3
point  13:24 14:21
   17:18 20:4 21:1,8
   22:21 24:5 25:13

26:14 33:13 36:11
   37:4,15,16 38:1,9
   38:12,13 45:22
   46:11 47:6 53:7
   55:7 59:20 62:21
   68:10,11,17 69:20
   71:17 72:24 73:8
   79:13 82:1,11
   94:1,11,15 98:18
   99:25 100:25
   101:7,23 106:3
   107:21 116:17,18
   117:4 118:3,9,11
   118:19,23 119:14
   119:15 120:6
   121:22 122:17,17
   122:19 127:23
   134:7,11 139:1,3
   141:5,24 144:8,12
   145:25 146:19
   147:17 151:15
   155:10,19 157:1
   158:13 161:15
   165:2 168:5
   179:12 183:21
   191:6,6,18 199:8
pointed  46:8
   67:19 68:3
pointing  67:23
points  40:3 45:13
   46:2 55:18 59:2
   65:22 67:18
policy  110:17
   176:20 177:7,14
   179:10 181:13
   192:23 197:18
portion  63:22
   106:12 143:3
   144:20 175:13
   177:1
portray  33:15
posit  99:4

position  18:22
  53:21,22,22,23
  58:16,17 60:12
  101:6,9 122:23
  154:20 161:1
  175:15 184:25
  185:24
posner  178:10,23
  180:6
possession  6:7
  23:25 45:11 50:18
  172:19
possibility  14:5
  117:23
possible  21:6
  74:11
post  2:7 5:16
  13:14,18 18:13
  46:14,15,16,16
  58:10 61:16,18
  66:16 84:7 98:3
  175:12 176:16
  177:22 180:16
  185:13 191:3,16
potential  13:25
  57:7 78:4 199:4
poulenc  74:8
power  160:4
practically  34:25
practice  71:3
  124:13,22 125:10
  130:3
practices  155:11
  155:15 166:15
prairieland  153:6
pre  23:21,23
  29:12 33:18 37:5
  46:20 61:14,18
  66:15 88:16
  106:15 147:9
  175:21 185:17,18
  185:19 195:15

precedent  166:8
precedes  70:10
precipitating
  91:15
precise  54:18
preclude  188:14
predict  137:11
predictions
  137:10
preference  12:12
  12:20,22
preferences  20:12
prejudice  169:21
  198:17
preliminary  17:1
  28:11
premise  32:4
  171:13
premised  70:1
premises  171:18
prepaid  38:2,6
  77:23,24,25
prepare  188:23
prepared  33:22
  39:6 60:19,21
  137:23 150:20
  186:14
prepetition
  175:19 176:16
  177:2,21 180:16
  188:20 193:1,12
  196:19
prerequisites
  105:11,12 113:3
presence  129:3
present  10:15
  48:9,10 119:2
presented  130:9
  130:10
presently  83:22
preserve  16:20
  191:8

preserved  147:6
presiding  164:4
pressures  141:13
presume  111:22
presumes  25:25
pretty  20:3 64:4
  90:1,7 92:5
  131:21
prevail  136:6
  165:18
prevent  164:12
prevents  90:22
  152:9
previous  93:10
previously  17:3
  79:5 82:8,24
price  10:8 26:3,19
  63:16 64:13,15,16
  65:2,15,19,19
  66:1 144:18
pricing  12:15
primary  74:9
principal  81:4
principle  46:8
principles  56:6
  111:20
prior  19:3 103:16
  124:9 128:12
  155:13,15 160:5
  168:17
priority  100:3
  102:22 185:12
private  108:21
pro  175:12 179:23
  180:22 181:6
probably  86:19
  100:19 102:3
  131:25 134:10
  143:14 144:2,5
  153:8 159:1
  161:14
problem  101:11
  102:18 118:22

157:4,16 158:3
  176:5 178:11
  197:10
problems  118:14
procedural  18:4
  186:3,5
procedurally
  185:23
procedure  86:1
  166:24 181:24
  184:25
procedures  7:2
  14:1 181:21 182:1
  182:4,19 183:8
  186:9
proceed  22:23
  33:2 95:14 103:22
  118:17 129:19
  141:8 166:6
  168:12 197:25
proceeding  18:3
  105:11,13,14,15
  108:15 158:22
  162:15,25 163:6
  163:11
proceedings
  162:22 189:1
  200:9 201:4
proceeds  23:21,23
  24:16 48:19 68:9
  68:14,15 70:21
  72:9 76:3 78:20
  94:15 196:11
process  12:13
  13:7,8,9 15:3,10
  18:5 20:16,21
  22:9 23:18 39:17
  64:13 92:16 95:7
  97:5 115:22 116:3
  116:10 127:15
  136:18 167:1
  169:12 171:6,8
  174:13

processed 33:4
48:22 52:19 61:6
76:6 81:25 82:10
processes 41:2
processing 29:4
29:23 30:4 31:18
31:25 32:2 42:6
42:18 45:8 73:20
80:8 81:8,11,15
processor 33:3,5
48:20,23 49:2,3
51:13 52:18,19,25
53:18 70:14,19
72:3 76:3,6 78:18
81:25 82:7,10
83:12
processors 31:4
40:17,25 69:10,13
69:17 71:22 79:9
79:17 81:6,22
82:2 83:2,16
84:18,19
produce 130:23
produced 24:4
27:13 139:20
151:7 154:18
167:3
product 157:13
productive 17:16
professional 6:17
professionals
16:25 18:16 21:5
progress 171:25
progressive 75:1
prohibit 4:2,10
87:19
project 161:9,10
projected 112:7
projection 113:15
prompt 85:7
promptly 21:6,15
114:6 117:12
166:6 168:12

173:7
proof 118:18
121:6 165:23
proofs 61:24
proper 166:15
properly 175:17
178:7 184:21
properties 6:10
172:18 180:18,24
property 2:3,17
3:4,11,19 4:15,20
5:2 6:9 25:15,19
28:3 37:8 62:13
73:13 76:24
103:10 107:2,3
108:1,2 120:15
121:10,12,21
132:11 162:6,7
164:9 174:25
176:9,12
proposal 101:1
propose 190:23
proposed 181:23
182:3,25 191:4
proposition 31:20
50:15
propositions 43:2
proration 85:15
protect 31:3 60:23
97:4 99:6,7,7
100:1 191:7
protecting 100:2
protection 44:24
96:19 97:23,24
170:23
protocol 13:21
14:7
prove 112:2
136:20
proven 118:11
provide 24:8
33:19,22 34:2
51:19,21 124:18

124:19 131:2
167:23 193:22
194:1 195:25
196:2,5 197:23
provided 15:16
27:17 28:25 58:16
123:15 130:11
158:4 182:11
184:20 197:3
provides 19:10
64:7 76:12 80:21
162:13
providing 20:3
127:6
provision 32:19
34:25 35:22 55:8
55:10,23 56:8
57:13 65:9 66:7
75:15 77:11 80:3
83:4 84:4 92:8
122:14,22 126:7
127:2 147:21
148:20 175:25
provisional 78:20
provisions 31:21
44:13 55:15 75:3
75:16 80:8,14
95:25 114:8 122:4
125:7
proxy 38:22
public 108:20
198:11
published 199:7
purchase 2:1,15
3:2,9,18 23:2 26:3
26:15,16,19 27:6
63:16 64:13,15,16
65:2,15,18,19
66:1 73:15,22
74:4
purchased 77:2
77:10 195:22

purchasers 49:3
purpose 56:7
60:22
purposes 73:17
76:10 80:19
163:11
pursuant 2:8 5:17
6:16 24:6 59:6
74:5 78:11 79:14
191:3
pursue 12:12,18
87:24 107:4,17
132:18 193:12
pursuing 191:6
put 13:21 23:8
37:21 49:18 54:1
55:6 58:20 73:9
86:13 100:22
124:3 137:9 141:8
150:11,13 153:6
170:22 173:5
190:3

**q**

qualifies 165:2
quarrels 39:20
quarropas 1:13
question 49:20
52:4,10 55:1 57:9
69:6 74:7 87:22
107:7 108:23
109:1,1 116:9
117:13 119:11
120:5 122:11
129:2,4 143:6,9
145:1 146:19
165:6 176:11,17
question's 91:24
questions 39:7,8
50:1 105:1 110:12
131:25 144:3
quick 12:7 14:15
95:13 137:15

quicker  115:5
quickly  67:17
  87:7 115:13
  139:14 159:3
quite  15:24 19:25
  40:4 45:4,19
  56:11 82:22 148:4
  157:7
quo  191:9
quote  58:14
quoted  79:5 82:24
quoting  78:15

**r**

r  1:21 8:1 9:14
  10:18 12:1 201:1
raise  13:24 87:1
  108:3 131:19
  140:10 142:9
  187:24
raised  83:13
  85:15 86:2,11
  87:22 89:23 94:9
  129:2 142:6,9
  159:24 172:13
  186:8 187:21
raising  140:21
  148:9
range  17:3
raniero  10:21
rate  180:22
rated  175:12
  179:23
rating  181:6
rationale  24:19,21
ray  12:4 85:13
raynor  11:16
rdd  1:3
reach  17:19
  193:23,23
reached  59:21
  142:22 193:20
  194:11,13,16
  198:3

read  49:1 55:23
  66:7 80:7 82:8
  90:16 105:24
  143:7 148:1
  155:20 176:17,21
  177:8
reading  148:5
ready  34:1 172:6
real  6:9 26:13
  93:5,23,25 97:11
  106:24 107:20
  108:4 117:13
  151:5 153:23
  154:10 172:12
  176:9 178:11,20
  187:7
realistic  94:4
reality  150:21
realized  82:16
  114:3 121:7
  124:21
reallocation
  100:23 164:18
  168:16
really  15:2,4 31:6
  32:21 34:24 53:14
  61:21 68:10 72:19
  86:23 92:17 93:6
  104:12 107:11,19
  110:4 111:2,3
  113:12,20,25
  114:1,6 115:21
  118:9 133:5
  138:15 139:1
  145:10 147:6,14
  147:19,20 150:6
  150:16 151:10,17
  161:8,11 162:4
  168:2,11 170:14
  171:14,24 173:21
  175:24 176:17
  177:9,12 178:5
  180:6 188:7

198:11 199:6
  200:7
realtek  180:18
reason  33:18
  34:13 38:4,25
  47:22 60:25 62:5
  90:1,7 106:16
  113:6,21 134:22
  141:16 178:4
  192:24
reasonable  22:1
  74:11 75:13
  150:12 191:15
  192:12
reasonably
  163:19
reasoning  185:25
reasons  47:21,22
  130:5
recall  105:23
  108:18 155:12
  170:13
recapture  122:3
  122:14,22 125:7
  126:6 144:22
  147:21 148:20
  161:6
recaptured
  144:20 145:24
receipts  46:7
receivable  23:7
  29:7,18,25 30:8
  30:13,18,24 32:7
  32:14,18,23,24
  33:1,9 35:2,10,12
  35:16,20 36:1,13
  36:22 37:3 38:17
  38:20 40:2,7
  41:11,13 43:8
  44:5,5,10 46:3,22
  47:2,7,18 48:17
  49:12,14,15 50:1
  50:4,25 53:5,11

53:24 55:25 57:10
  64:11,25 67:6
  68:8 69:2,22
  73:21,23 74:1
  76:15 77:3,7,13
  77:14 78:5,11
  79:22,23 80:1,6
  80:13,16 83:18,19
  84:3,5
receivables  28:11
  35:3 36:7,17,18
  40:11,15 47:10,15
  61:3 63:7,8,20,20
  63:22 66:2,14
  68:12 76:1,12,16
  77:3
receive  28:6 65:1
  125:18 129:7,25
received  182:7
  185:13,16
recipient  143:9
  164:22
recited  124:11
reclarify  36:11
recognize  79:2
  87:25 180:24
recognized  37:8
  40:21 179:1
recognizes  180:21
recognizing  79:14
recommendation
  181:10
reconciliation
  15:18 16:23 22:5
  23:17 24:5,9 26:5
  39:17 64:12
reconciliations
  25:11,17,24
reconciling  26:19
  26:21,22 27:19
reconsider  167:6
record  23:9 27:9
  54:21 97:17 99:19

119:15 140:15
147:1 148:14
150:19 159:24
164:17 166:22
167:9 173:5
188:18 201:4
**recorded** 60:2
**records** 61:5,22
149:1 151:1 154:3
195:24
**recoup** 132:24
**recoupment** 39:18
79:4 81:15
**recover** 65:14,14
122:16,23
**recoverable** 13:5
**recoveries** 12:13
12:18 13:8 16:14
**recovery** 12:15
189:12
**red** 80:10
**redacted** 2:17 3:5
**redman** 131:6
**reduce** 35:7 76:19
**reduced** 113:22
**refer** 44:22,24
45:1 158:5
**reference** 163:2
**referenced** 44:16
**referred** 18:14
19:24 44:5
**referring** 19:17
40:12 43:19 72:6
138:8 149:25
162:20
**refers** 35:12,19
40:14 43:14,20
51:22 54:19 57:6
83:9 108:10
119:11
**refile** 192:11,15
**reflect** 154:18
166:10

**reflected** 127:12
127:13 182:3
**reflects** 140:15
**reforming** 181:5
**refuse** 34:7
**refused** 24:15
33:19
**refute** 29:17
**regard** 21:16
123:9 186:8
**regarding** 23:10
24:5,13 138:4
148:22 163:16
199:5
**regards** 195:15,17
195:20,24
**registered** 154:9
**regular** 57:8
100:6
**regulatory** 15:23
**reimbursed** 153:7
**reimbursement**
17:7 149:6 161:12
**reinert** 11:17
**reiterated** 27:2
**reject** 6:8 171:4,9
172:19
**rejected** 176:10
181:13
**related** 2:5,8,18
2:23 3:5,12,21
4:12,22,23 5:2,17
15:17 19:24 22:9
31:16,19 43:3,5
44:13 78:2,3
82:21 86:3 87:11
103:13 104:13,18
105:14 116:19,20
162:16 164:6
171:17 189:4
**relates** 62:19
164:1

**relating** 190:21
**relationship**
49:16 83:2,11
**relative** 139:8
**relatively** 87:7
192:13
**release** 33:12,18
33:23 36:17,21
39:1 60:7,21
62:24
**released** 19:12
34:1,2 58:11,20
64:22 71:14
132:16
**releases** 19:9,12
19:17,20,21
**relevant** 76:10
80:8 87:4 89:21
89:22 109:2 123:6
123:6 147:23,24
148:20 155:14
167:13 185:14
**reliant** 120:14
**relief** 4:21 5:7,12
60:16,17 68:24
85:1 103:14
112:14,18 115:8
162:1 176:8
186:24 188:14
191:13 193:6
196:10
**relies** 79:3 164:21
**relying** 89:25
128:10 131:7,10
151:25 165:10
**remain** 86:7 157:8
**remainder** 23:18
**remaining** 27:6
83:13 90:19 147:7
187:6
**remains** 16:6
156:1

**remanded** 122:10
187:11 189:1
**remember** 43:17
49:22
**remind** 17:9
**reminded** 24:25
143:23
**remotely** 94:19
**removed** 131:9
**render** 75:16
159:6
**rent** 2:7 5:16
25:14,20 27:10,10
27:16,18 28:1
77:23 85:15
170:16,16,23
171:18
**repeat** 29:20 58:5
**repeatedly** 123:5
**repeating** 140:18
**replace** 93:13
**replacement**
182:23
**reply** 3:1,11 4:20
6:23 29:20 31:15
31:24 33:17 98:19
127:17
**report** 12:10 21:4
**represent** 68:6
136:17 187:4
**representation**
174:11 197:18
**representations**
39:21 167:4
174:17
**representative**
129:13
**represented**
166:19,25
**request** 38:1
103:19 104:15
105:22 159:8,13
170:20 188:4

requested  33:20
103:17 124:20
requesting  34:3
87:5 134:8
requests  171:1
require  35:23
49:9,10 164:19
192:10
required  53:20
141:7 152:22
153:2 161:7
167:18 179:24
197:21,22
requirement
101:15 122:12
123:14 124:6
127:17 153:4,13
163:17 164:15,23
requirements
132:7
requires  30:25
84:4,9 124:9
157:18 163:4,4
166:7 176:7
180:15
requiring  60:15
reservation  6:1
reserve  18:5 29:6
29:17,21,23 30:3
30:8 31:2,5,10,12
32:5,10,15,23
33:9,13,13,18
34:15 36:6,21,25
38:16,21 40:11,16
40:24 41:19,20
44:2,14,17,18
46:6 50:7 51:5,5
53:1,20 54:7,11
54:24 55:2,7
57:15,18 58:18,21
60:23 62:16,17
63:7 64:3 65:10
68:1,6,12 69:2,24

71:13 78:23 79:3
79:10 81:19 82:3
84:17 97:25 98:2
98:3 102:1 167:5
171:14 193:15
reserved  20:11
62:1 83:15,15
96:21
reserves  34:21
39:2 58:11,12
59:13,13,15 60:5
60:5,7,15 62:11
62:24,25 69:9
71:8,8 73:10,19
81:16
reserving  145:6
146:25 147:6
resident  121:13
residual  165:4
resist  78:15
resisting  58:21
resolution  85:7,23
148:17 196:13,17
resolve  19:7
100:20 102:4
110:22 171:24
172:11 173:5
resolved  64:19
106:18 112:12
113:11 135:20
137:13 158:14
182:12 190:23
191:3
resolving  16:6
21:14 114:6
respect  23:9,20
25:13 35:2 39:7
40:1,22,25 46:2,9
50:14 53:8,23
55:10,21 58:23
59:18,21 64:19
66:7,9 72:25 73:4
76:15 90:17 99:14

105:1 111:7,20
116:18 117:8
118:5,7 162:18
168:6 173:14
175:12 182:9
189:15 191:22
193:12
respectfully  27:10
44:9
respective  79:10
81:22 84:16
respond  41:19
67:18 72:23 144:6
198:15
responded  91:20
139:20 182:2
responding  144:2
response  2:4,14
3:2,8,20 6:1,4
69:4 70:4 113:9
123:18 136:23
149:17 172:12
198:15
responsibility
159:25
responsible
150:24
responsive  139:12
140:22
rest  26:5 52:10
73:18 131:22
133:24 142:6,11
143:12 144:9,11
restatement  43:3
67:4
restraining
115:10
restricted  32:8,16
77:18
restrictions
154:23
restricts  83:18
154:21

restructuring
19:14 20:23
result  41:17 42:21
43:25 48:14 52:7
61:16 75:15,15
82:9 111:14
160:12 163:10
192:20
resulting  33:3
48:21 52:18 68:9
70:21 76:5 81:24
82:14,22
retail  46:24
retain  62:9 63:9
66:2,21,21 125:25
126:5
retained  13:17
169:15
retaining  35:9
64:10 65:24,24
66:11 77:1
return  31:11
57:23
returns  34:19
60:23,24
revenues  46:24
161:21
review  16:25 17:2
75:20 78:9,16
81:11 166:13
182:25 184:19
reviewed  80:14
revise  185:3
revisit  141:14
revolve  104:13
revolving  54:20
55:11 70:2 82:5
rh  177:3
rhone  74:8
ridiculous  38:12
125:21
right  14:11,14
17:2 18:3,17

19:16 20:21 22:6
27:5 28:21,23
29:8 30:16 31:1
31:14 34:5,8,16
35:12 37:12 39:15
42:14 45:16,17,18
45:24,25 47:9
48:4,20 49:5
50:22,22 51:8,14
51:20,24,25 52:2
52:16 53:1,13
57:21,23 58:18
59:8,20,25 60:3
60:12 61:17 63:9
63:20,23 65:8,14
65:24 66:12,18
68:4,6,24 69:16
69:19 71:4,4,4,6
71:25 72:1,4,10
73:11,11 78:23
79:4,5,10,14
80:22 81:12 82:2
82:19,24 85:17
87:8 90:3,6,11
91:24 93:18 94:25
96:22 97:1,21
100:1 105:8 106:6
106:22,22 107:13
109:1,6 110:2
111:9 112:9 113:2
115:12,21 116:6
116:19 119:9,23
120:7,20,21 121:2
121:4,22 122:5,13
123:4 130:16
132:4 133:3,18,19
133:21,22,24,25
135:3,24 140:14
140:19 141:19
142:19 143:4,13
143:14 144:7
146:4,7 147:5,14
149:20 150:3

152:15 155:18
158:24 159:22
160:23 161:24
165:12,23 167:5
168:21 169:2,23
171:15 173:10
174:22 175:23
178:21 179:1
180:2 181:14
183:15,22 184:8
184:15 188:23
189:8,19 190:22
192:4 194:16,18
194:19,20,25
195:12 198:13,20
199:14,17,20
**rights** 6:1 40:24
59:10 61:25 66:5
74:23 77:18 78:6
79:6 88:4 92:13
94:13,22 101:25
107:4 108:21,21
140:22 145:6
147:5,6 160:3
173:14 193:15
**ripe** 133:8
**rise** 53:25 82:19
82:25 85:10
165:19,20
**risk** 44:24 99:6
101:24 102:23
**road** 10:3 201:21
**robbins** 10:1
**robert** 1:22 2:10
5:19 10:23 170:10
**robes** 160:19
**robin** 115:1
**rolacheck** 55:1
**roll** 88:13
**room** 1:13
**rothman** 181:3
**rough** 129:4

**roughly** 13:1,3
15:6 121:14
144:16 175:10,17
**roundup** 195:18
195:23 198:10,20
199:6,10
**rubina** 57:1
**rule** 70:16 83:8
126:11 186:14
**rules** 161:17
177:12
**ruling** 73:17
84:25 85:24 115:2
115:13,15 166:20
166:23 167:25
177:6 186:11
191:25
**rulings** 115:6
**run** 84:23 182:1
**running** 64:20
121:16 123:1
**ryan** 11:17

**s**

**s** 2:5,18,23 3:5,12
3:21,22 4:12,24
5:2 8:1 11:4 12:1
**s.d.n.y.** 163:15
**s8729-73** 6:9
**sale** 22:8,17 33:5
34:13 48:24 60:9
62:5 70:10,23
76:7 81:23 88:25
100:13
**sales** 22:9 43:14
57:9
**satisfied** 52:12
58:1,2 105:12
**satisfy** 33:10 46:6
50:9 61:13 124:6
**saved** 34:17
**saw** 134:10
149:13

**saying** 35:24
36:10 50:6,10,13
50:16,17 58:7
62:15 71:3 89:24
91:2 94:14 109:3
113:21 120:25
126:20 127:17
146:18 149:18
155:14 156:11
157:2,5,23 160:23
184:15 190:1,15
196:15,23,24
**says** 34:8 35:3,5
38:23 42:2 43:3
45:11 47:13,19
48:2,3 51:21
58:14 63:4 65:24
66:8,20 67:10
68:19,22 92:8
101:12,25 102:17
109:2 111:18
112:1 141:12
146:20 147:22
151:10 153:1
156:14,21,23
157:17 158:6,9
177:23,25 183:9
183:22,24
**sbarro** 130:14
**sbarro's** 158:1
**scenario** 22:19
97:22
**schael** 11:18
**schedule** 57:8
59:12,12 115:5,14
159:4,5
**scheduled** 7:14
**scheduling** 172:1
**schein** 10:13
144:17,17 145:5,8
145:11,15,17,22
146:5,9,13,18,23
146:25 147:3,8

149:8 157:10
**school** 4:18,21,25
5:4,6,11,14 9:17
10:2 103:14,15
104:5 105:3,5
106:6 112:19
115:1,25 117:10
118:7 120:13,14
121:11,25 122:17
122:24 139:10
140:18 142:2,18
143:1,11,18,19
144:13 145:16
146:12 150:7
153:25 154:14
161:25 164:11
165:4,7 168:22
170:14
**schools** 116:8
120:25 170:13
**schrock** 12:4,5,10
12:22,25 13:13,16
14:6,13,15 19:19
19:23 21:22,25
22:14,22,25 85:13
85:13,20,22,25
86:17,21,25 87:9
87:23 88:3,6
91:21 93:1 94:5
94:18,21,23,25
95:9,13,16 101:12
101:24 102:17
103:1,3
**schwartz** 10:1
115:1
**schwartzberg**
11:19
**scott** 11:12
**scrub** 154:25
155:2
**scrubbed** 131:8,8
**seal** 78:14

**sean** 9:7 95:21
**sears** 1:7 3:23
4:15 6:9 12:2 16:7
20:9 31:5,10,13
33:19 34:14 41:23
43:25 45:24 46:12
46:20 47:25,25
50:2,5,6,13,16,18
51:25 68:16 79:15
83:12 84:19 106:6
106:10 107:8
108:23 109:2,5
110:21 114:21,21
118:11,21 119:8
121:7,18 122:11
123:8,11,14,18
124:9,19,20 125:4
125:5,14,15,24
126:7,10,13,17,19
126:20,24 127:16
127:20 128:4,5,15
128:19 129:2,4,13
129:15,18,23
130:2,4 134:11
138:8,9,9,16,19
142:16,17 143:5,7
143:8,12 144:14
145:23,24 147:7
147:13 148:9
149:3,11 150:23
151:4,22 152:1,6
152:12,13,22
153:1,4,5,8,10,12
153:15,15,18
154:3,4,7,8,11,13
154:21 156:17,19
156:20 157:5
158:5 160:6,6,8
161:10,12 165:5
165:11 166:1
167:16 169:8,14
170:3 187:8,13,14
188:20 192:5

194:8 197:21
**sears's** 46:23
**second** 28:12 35:8
40:7 41:11,16,25
51:7 55:25 64:10
68:11 77:1 88:16
90:18 94:12 95:23
96:18 98:21
120:17 131:6
134:23 135:24
179:21 182:22
184:11,22,25
**secondly** 22:4
165:9
**section** 31:8 32:7
55:9 64:6 73:13
73:24 74:5 75:25
76:11 77:5,16,17
79:11 80:17,21
81:2,2 82:3,13
83:18 84:13,15
161:5 162:13,20
162:20,21 163:4
164:10,13,15,18
165:22 167:9
176:1,18
**sections** 45:10
**secure** 116:7
**secured** 50:21
**secures** 88:17
**securing** 47:24
**securities** 163:14
**security** 29:22,24
30:4,5 31:3 32:8
32:16 35:13,17,18
35:23 36:2 37:2
40:2 41:24 42:11
44:16 45:1,4,8,12
46:14 47:7,10
50:19 64:14,20,21
77:15,17,19,25,25
79:1,6,11,20,23
79:25 80:6,10

83:15,16 116:7
142:23 183:16
**see** 27:3 38:22
41:7 54:19 68:10
75:18 92:11 93:24
94:1 98:10 102:13
108:9 109:22
143:16 144:8
145:10 151:4
163:13,21 177:9
181:8 199:22
**seeing** 93:12
140:21
**seek** 133:7 171:16
173:2 184:2
**seeking** 60:17
68:24 132:8 167:3
182:4
**seeks** 84:15
132:24 133:7
162:12 196:7
**seemingly** 90:22
**seen** 29:16 59:17
149:1
**selected** 12:11,17
**sell** 47:19
**seller** 33:3,4,6,6
35:2 48:21,22,24
48:25 52:18 56:3
70:11,11,24 74:2
76:4,4,6,8,8,15
81:24 83:20,22,24
84:11
**seller's** 70:24
**sellers** 35:7 55:25
76:19,21,24 77:18
**seller's** 33:7
**selling** 66:1
**semiconductor**
74:24
**sends** 156:20
**sense** 21:9 77:6
82:17 92:7 104:20

134:16 144:5
158:19,25 178:11
**sent** 116:23 119:7
119:8 155:12
**sentence** 76:18
196:14
**separate** 26:2
49:17,22,24 55:14
57:6,13 65:17
83:11 85:1,11
168:8,10,11
**separately** 40:14
**september** 191:17
191:19
**series** 25:10 26:8
**serious** 39:12,20
**serve** 31:3 164:14
**service** 48:24
**servicer** 78:18
**servicers** 78:13
**services** 10:9
15:15,17,25 20:4
33:6 70:11,23
76:8 173:7
**servicing** 78:10
**serving** 15:6
**set** 14:25 24:24
25:1 26:5,9 42:14
42:16 112:20
166:22 188:1,3
**setoff** 39:15 45:16
45:17,19,24 48:3
48:5 49:5 50:22
50:23 51:1,14
53:1 79:4,5,14
81:14 82:19,21
**setoffs** 25:11
77:24
**sets** 34:25
**setting** 39:13
**settle** 84:22
167:22 182:4

**settled** 56:25
126:19 183:22
**settlement** 16:4
17:14 97:3 127:22
127:24 128:11,12
182:5 183:4,23,24
183:25
**settlements** 
181:25 183:1,1,5
183:6,10
**settling** 7:2
181:21
**setup** 78:23
**seven** 174:20
**seventh** 180:7
**seyfarth** 8:19
87:17
**share** 144:22
145:6 171:12
**shared** 74:11
173:17
**shares** 145:25
**sharon** 187:2
**shaw** 8:19 87:17
**shiftan** 43:10
**shipped** 72:15
185:17,18
**short** 14:10 171:7
179:20
**shortfall** 170:16
170:19,23
**shot** 150:14
165:16
**shouldn't** 44:18
**show** 61:5 98:19
160:25 165:15,17
**showing** 148:15
**shown** 196:24
**shows** 37:25
**shrinking** 158:12
**shriro** 11:20
**shut** 98:1,22

**sided** 112:11
181:6
**significant** 14:23
15:13,15 17:12
170:16 171:25
192:24
**significantly**
152:2
**silence** 155:19,23
161:2 169:8
**silent** 156:12
**similar** 46:17
117:18 123:16
126:12,12,22
**similarly** 31:24
122:20
**simple** 98:16 99:4
102:17 130:14
**simply** 44:17
84:11 112:4
147:22 155:8
159:7 163:23
196:7
**singh** 4:15
**single** 31:22
121:16 149:1
**sir** 51:7 106:2
112:24
**sit** 16:24 17:18,21
17:23 94:5,11
95:10 103:1
**site** 114:18,18
**sites** 31:19
**sits** 141:16
**sitting** 133:3
134:7 141:20
**situation** 90:25
179:17,18
**six** 47:20 105:11
121:15 135:8
172:20
**sixth** 130:20

**sixty** 142:15 176:2
**size** 101:5 182:13
**skeletal** 129:7
**sleep** 124:3
**slot** 191:12
**smaller** 69:13
**smith** 185:9,10,10
185:24 186:5,17
186:20
**snapshot** 84:6
100:11,12
**sold** 47:18 185:12
**solely** 152:1
197:11
**solutions** 201:20
**solved** 29:12
**somebody** 174:4
**somewhat** 17:16
**sonya** 7:25 201:3
201:8
**soon** 13:6
**sooner** 172:10
**sophisticated**
74:21
**sorry** 39:2 48:16
52:1 55:4 62:23
72:5 81:23 91:2
106:2 109:11
112:16,22 113:24
116:2 119:13,18
128:10 144:13
145:25 150:4
172:9 175:4 176:3
180:21 183:3
186:18 187:19
196:14
**sort** 14:1,2 64:14
104:6 107:13
109:22 145:14
155:8
**sorts** 114:2
**sotomayor** 177:4
178:23

**sought** 85:1 128:5
  172:23
**sounds** 53:4 117:8
**sources** 166:7
**south** 176:13,14
**southern** 1:2
**sovereign** 111:20
**space** 129:17
**spans** 195:23
**speak** 54:14
**specific** 32:18
  70:3 82:3 95:25
  113:13 125:24
  138:5,6,17 139:2
  147:13 150:5
  186:10,10
**specifically** 73:17
  81:21 122:15
  125:24
**specified** 82:5
  165:9
**specifies** 100:20
**spend** 22:10 91:20
  93:15
**spending** 89:17
**spent** 63:3 93:12
**split** 104:6
**spoke** 91:21
  103:15
**sponsor** 128:25
  129:9,12
**spots** 196:1
**spreadsheet**
  130:13
**spurned** 153:11
**stack** 88:8
**stage** 131:24
**stake** 166:11
**stakeholders** 15:2
  17:24 18:21 19:6
**stand** 72:5 95:22
  100:8

**standard** 24:19,21
  114:20 141:11
  163:18
**standing** 87:23
  88:1,9
**stands** 101:24
  102:17
**start** 14:24 20:8
  92:23 94:15
  100:12 105:2,9
  124:25 132:5
  140:9,14,23
**started** 12:6 13:6
  124:20 136:2
  152:7,8 198:11
  199:6
**starting** 13:7 15:1
  137:15
**starts** 129:17
  176:19
**state** 74:6 105:13
  105:13 106:4,7,7
  106:18,20,24
  107:12,19 111:22
  112:2 114:11
  115:2,9 121:8,9
  121:21 122:15,20
  126:2,4,8,13,20
  126:21 127:15,18
  128:15,22 138:4,5
  138:11 160:16
  162:15,15 163:1,6
  163:9 165:25
  167:18 168:4,15
  168:18,20 175:16
  195:14 198:16
**stated** 109:25
  111:18 113:3
**statement** 14:19
  14:25 18:8 197:24
**statements** 159:24
  160:6

**states** 1:1,12
  105:10 162:19
**statistics** 113:9
**status** 95:13 172:2
  191:9
**statute** 118:5
  121:23 122:3,15
  122:16,20,21
  123:4 124:2,5,23
  125:6,10,13,22,23
  126:2,4,4,8,13,22
  127:13,16,18
  128:10 129:1,10
  135:2,4 138:17
  143:8 144:19,25
  145:12 146:20
  147:13,21 153:24
  155:8 157:14
  160:1,2,8 161:5
  161:13 162:24
  165:9,11 167:14
  173:25 177:9,15
  179:3,15 181:12
  198:8 199:1,12
**statute's** 118:9
  145:9,23
**statutes** 122:15
  126:11,12 128:3
  145:9
**statutory** 126:10
  126:11 128:8,21
  175:25 177:13
  187:16 189:12
  190:9,18
**stauble** 11:21
**stay** 2:2,16,23 3:3
  3:10,18 4:22 5:7
  5:12 23:2,12 25:2
  39:1,12,15,18,25
  40:13 85:3,7,10
  103:14,18 104:14
  105:22 107:18
  115:3 132:19

162:1 164:13
  168:1 186:22,25
  187:5 188:15
  189:2 190:24
  191:8,13 192:3
  193:1,6,11 195:7
  195:15 196:22
  197:11 199:16
**stayed** 112:13
  133:25 160:13
  191:25 200:8
**stays** 62:18
  197:16
**steen** 8:12 9:2
**stems** 53:14
**step** 118:3 195:4
**stepping** 98:21,22
**steps** 21:7 107:6
**steven** 11:8 193:5
  193:11
**stip** 197:16
**stipulated** 142:24
**stipulation** 142:22
  193:23 194:17
  197:25 199:23
**stop** 33:24 39:19
  141:24 151:19
**stopped** 112:21
  153:19
**store** 64:8 76:23
  76:23 170:9 171:5
  171:8 172:10
**stores** 44:1 72:15
  72:18 78:21
**story** 64:9 68:21
**straight** 16:3
  17:13 34:4
**straightforward**
  112:10 113:4
**strain** 54:6
**street** 1:13 9:11
  9:18

**stretch** 92:15
125:5 158:15
**strike** 104:18
109:17 118:15,23
137:21 169:19
**strong** 15:9
**struck** 179:9
**structure** 13:15
16:8,11 18:7,17
185:1 191:4
**students** 120:13
121:20
**stuff** 73:10 139:24
155:16 183:14
**subcommittee**
19:14 20:23
**subject** 17:9 18:20
18:23 19:2 28:22
39:18 47:12 88:19
110:10 126:23
163:16 183:7
186:7 195:4
**submit** 29:3 30:2
32:25 44:9 167:21
169:13 185:4
193:2 195:1
**submitted** 33:16
57:9 123:16
**submitting** 172:1
**subsequent** 2:10
5:19 29:20 179:9
**subsequently**
171:3 175:8
**subsidies** 125:18
128:16
**subsidy** 120:19,22
121:8,9,10 124:6
125:21 126:8
129:8,11,20,25
161:11
**substance** 177:6
**substantial**
108:11

**substantially** 89:1
**substantive** 21:20
172:12
**succeed** 188:25
**successful** 14:2
103:21 133:6
**successor** 182:8
**suffer** 198:17
**sufficient** 16:14
**sufficiently**
137:22 181:12
**suggest** 45:7
54:22 102:7
118:17 119:24
150:19 169:15
**suggesting** 36:25
90:4 93:25 110:22
151:15
**suggestion** 36:24
95:10 142:21
191:22
**suggests** 112:11
**suit** 195:15
**suite** 9:18 10:3
201:22
**sum** 62:6 177:5
**summarized**
166:21
**summary** 115:11
117:7 136:3 137:4
**sums** 57:7,7,15
**sunny** 4:15
**super** 100:3
102:22
**supplement** 19:11
**supplemental**
2:14,21 3:1 5:1
28:13 29:3
**support** 2:22 3:11
20:19 28:13
167:17
**supported** 147:20

**supporting**
155:24 160:25
**supportive** 12:19
**supposed** 24:7
25:15 27:15 72:14
73:2,3 103:9
**supreme** 108:16
114:8
**sure** 14:21 20:25
29:8,14 34:23
36:10 37:13 39:10
39:12 53:6 61:5
84:24 86:1,7
95:17 102:15
105:24 111:13
120:18 132:5
136:3 141:4 150:9
155:2,20 157:22
167:24 171:2
173:24 174:9
175:5 186:25
195:8 196:16,21
198:10
**surety** 77:23
**surplusage** 56:5
**surprise** 44:18
**surveyed** 17:12
**susceptible** 75:4
**svtc** 74:25
**swap** 38:4
**sweet** 179:13,15
180:21
**swipes** 158:6,8
**synonym** 48:7
**synonyms** 68:20
**system** 23:22
24:11 170:14

**t**

**t** 9:21 201:1,1
**take** 13:2 15:11
38:1 47:12,17,18
51:4 72:13 84:10
87:13 89:6 96:14

99:5 105:21 114:9
114:10,18 119:5
128:2 136:1,17
137:1,10 141:12
145:5 156:7
158:21 159:5
160:20 184:23
189:17
**taken** 21:7 58:17
60:11 62:9 136:4
182:14
**takes** 84:6 92:21
154:19
**talk** 125:16 126:2
**talked** 20:17
108:16 123:5
158:17
**talking** 92:18 95:6
96:9 107:24
122:25 123:5
128:3 132:11,21
143:3 145:21
157:10 178:21
183:1 194:8
**talks** 56:15 124:2
124:6 125:13,23
125:24 130:2
179:14,15
**tango** 92:21
**tangoing** 92:23
**target** 126:22
**targeted** 166:8
**targets** 21:13
93:18
**task** 21:5
**tasks** 104:7
**tautology** 122:1
**tax** 18:15 104:10
104:11 125:18
161:21 171:18
176:16 179:23
180:1,15

JX 053-246

taxation  124:3
taxes  120:15
  121:9,10,12 124:5
  124:5,7,8 130:6
  147:25 148:1,3,10
  148:12 149:6,6,21
  174:25 175:9,21
  175:23 176:12
  177:1,21,23 178:6
  179:18 180:9,22
taxing  105:6
  156:6 157:12
  168:25
taxy  161:21
tbd  18:20
team  147:19
technically
  169:11
technologies
  74:25
tee  22:12
teed  18:1 137:16
telephonically
  10:15 187:2
tell  15:19 61:17
  61:18 109:19
  112:7 113:15
  120:5 147:12
  148:19 157:24
  160:17
telling  136:23
tells  43:12,22,23
  55:2
temporary  115:10
  176:6
tenant  130:10
tenants  109:4,8,8
  109:12 118:8,12
  118:13 119:16
  125:2 130:12,14
  131:3
tennessee  67:24

tension  18:8
tentatively  20:17
teresa  11:10
term  30:24 43:4
  47:1,2,3 63:15
  68:18 70:7 76:10
  79:11,24 80:1
  81:19 82:13 83:16
  83:17,25 84:1
  88:21 124:10
  126:8 130:13
  131:5 154:25
  171:7 177:20
  179:8
terminology
  131:11
terms  31:16 38:19
  56:10 57:20 68:23
  69:14 71:17 88:18
  88:20 91:6 100:20
  107:8 108:23,24
  124:4 126:12
  134:12 137:10
  139:8,13 140:13
  144:1 149:23
  154:1 173:18
testified  131:7
testify  151:8
testimony  28:17
thank  19:19 39:3
  67:16 71:1 95:19
  97:12 102:25
  103:4 155:5
  159:21 169:17,23
  172:13 174:2,17
  184:17 186:17,20
  192:18 193:4
  195:6 199:25
  200:1,5
thanks  22:22
  67:15 87:9 131:23
  172:15

that's  13:23 14:24
  15:5,24 16:5,10
  16:18 18:10,14,16
  18:20 19:15,16,25
  21:20 22:14 26:20
  26:22 27:1 30:10
  30:18,20 35:11,14
  35:21 37:12,18
  38:11 39:22 40:15
  40:17 41:24 42:4
  43:2 44:7 45:22
  45:23 46:1,23
  47:3,3 48:3,4,4
  49:9,16 50:16
  51:25 52:9 53:21
  53:21 54:5,12,12
  55:25 56:6 57:17
  58:14,22 59:15
  60:9 61:10 63:2,3
  63:18,25 65:3,4
  65:16,16
theirs  90:6
theory  75:11
  125:3 198:14
thereof  48:20 68:9
there'll  20:25
there's  12:25
  14:23 15:13,15,24
  18:13 19:9,24,25
  22:11 28:21 34:20
  36:24 40:23 42:15
  44:18 48:6 49:16
  50:14,20 51:18
  53:1,11 54:5,8,19
  55:19 57:9 59:2
  60:18,20,25 63:16
  65:12
they'd  30:5
they're  14:22 22:6
  25:20 26:12,17
  32:12 33:14 36:22
  42:14,16 49:22
  52:8,8,10 57:17

58:20,21 60:17,19
  60:21 61:21,23
  63:20 64:1 66:1
  67:5
they've  27:14
  29:12 45:18 50:10
  50:18 59:19 60:15
  62:1
thin  166:2
thing  56:6 62:19
  68:23 104:13,14
  133:21 150:18
  168:20 177:10
  178:25 179:10
  187:18 200:8
things  16:1 51:10
  56:9,12,18 80:24
  82:25 99:5 139:14
  141:15 144:1
  155:1,10 156:3
  180:1,13
think  12:14 13:5
  15:1,7 16:19 17:1
  17:2 21:12,14,25
  22:10,12,20 27:1
  30:12 35:15 36:5
  39:24 40:20 41:4
  41:8 42:7 45:9,9
  45:23 46:19 48:6
  49:10 50:4 52:15
  52:16 53:9,13,16
  55:18,18,19 57:3
  57:14 58:23 59:1
  59:19 60:2,7,9,13
  60:20 61:7 62:5
  62:11,14 63:3
  65:11,12,15,20,21
  66:24 67:3,5,8,9
  67:13 70:7 71:16
  73:5,8 91:14 92:2
  92:5,16 93:4,18
  93:23 94:6,9,12
  95:2 97:10 98:14

98:20 99:3,13,17
101:11 102:2
104:19 106:5,19
106:22 107:5
108:14 109:2
110:24,24 112:12
114:7 116:19
117:7,25 119:12
120:4,21 121:24
122:1 131:24
134:1 136:17,23
139:4 141:6,11
142:8 143:6,14
144:16 146:7
147:16,17,18
150:6 155:7,17
156:11 157:3,7
162:4 168:10,12
172:13 175:24
177:5,19,24 179:2
179:6,12,13,13,24
180:1,5,8,9,14,14
180:18 181:2,11
182:17,17,21
183:8,11,15
184:20 188:6
190:3 192:19
**thinking** 22:14
166:10
**third** 19:21 20:18
41:12 68:17 85:5
107:1 109:6
114:17 118:19
125:17 151:23
156:4 178:17
180:25 185:25
193:17 194:8,15
195:5
**thomas** 9:14
97:15
**thought** 59:22
104:20 172:10
187:20 190:1,16

194:7,8 199:13
**thousand** 47:16
121:15
**thousands** 129:17
**thread** 78:18
**threat** 38:11
**threatened** 59:18
**three** 35:6 41:9
47:14 57:8 65:22
92:23 113:21
176:2 177:3
187:12
**threshold** 36:7
37:18,24 38:15,15
71:10 77:5 153:22
**thrilled** 157:8
**throw** 92:15
**thursday** 25:5
28:5,7 173:13
**tie** 68:21
**tied** 125:14
**time** 13:10 16:4
17:15 18:23 20:13
20:20,25 22:11
27:2,13 33:25
45:3 57:23 59:11
60:8,13 61:4,9
66:4,8 72:6 74:12
88:9 89:18 101:24
108:17 113:25
114:3 116:13
117:9 118:12,14
120:1,1 131:9,16
131:16 137:17
151:5 152:6,6,10
152:23,24,25
153:6 154:15,16
154:18,20,24
155:3 158:1,13,21
163:21,25,25
171:1,12,17 174:2
178:3 179:18
180:2 183:11

186:8 191:16
192:6 193:18
195:22 196:5
198:6
**timeline** 93:24
112:8 113:15
167:7
**timeliness** 106:1
165:25
**timely** 2:10 5:19
105:12,21 111:14
112:3 114:9
136:14,20 139:16
141:12 162:14,25
163:5,10,16,17,19
165:24 166:13
167:5 176:7
**times** 31:12 68:16
124:11 129:4
**timing** 135:25
139:8 151:24
179:4,4
**title** 44:3,4 105:15
105:16 162:16,17
162:17 163:12,13
**today** 20:2 28:20
32:17 39:9,23
58:15 66:15
103:16 104:24
137:13,17,19
139:18 143:25
160:15 168:1
172:7 173:5
182:17 186:6
200:3,6
**today's** 102:6
162:5 174:17
**told** 42:24 44:14
66:15 67:21 89:14
146:16 166:14
194:18
**tomorrow** 115:19
116:4

**top** 109:5 145:19
**total** 24:10 27:25
28:2 71:10 170:18
**totality** 177:15
**totally** 67:25
91:15
**touch** 103:5
193:24
**town** 112:23
134:8 144:14
**tracing** 61:13
**track** 150:24
151:13 154:7,11
**tracks** 43:14 78:7
**traffic** 72:17
**tranches** 96:11
**trans** 26:1 27:5,5
**transaction** 31:23
59:7,11 61:12
68:14 81:17
185:15,19,19
**transactions**
31:21 37:6,11
43:13,15,23,25
44:11 46:23 48:13
48:15 51:22 54:2
54:4 61:9,16 62:4
78:21
**transcribed** 7:25
**transcript** 201:4
**transfer** 37:9
**transferred** 23:22
37:1,2 38:14
**transferring** 35:8
64:7 65:23 76:20
**transfers** 13:1
**transform** 2:2,4
2:16,19 3:1,3,6,8
3:10,13,18,20
5:23 8:13 17:6
20:1,6,8 23:2,17
23:21,23 24:1,6
24:10,14,25 25:4

25:8 26:10 27:12
27:17 33:21 36:21
37:3,17 39:12
59:4,6 64:14
73:16 77:10,11
80:9 81:20 82:6
83:14 84:23 85:2
85:11 86:3,12
161:18 170:20
171:3,6,14,17
172:24 173:2,4,15
173:17 174:4
**transform's**
173:19
**transforms** 56:16
64:2
**transform's** 58:9
58:10
**transit** 23:20
24:11,16,22 25:13
26:13 28:1 38:4,5
39:7 72:13 85:16
**transition** 15:16
15:25 20:4
**transparent**
174:16
**transposed** 176:4
**trauma** 13:21
**treasurer** 161:21
**treat** 166:17
**treated** 17:13
29:22 30:4 38:16
77:9 148:8 181:7
**treating** 28:16
109:24 148:8
**treatment** 167:3
171:2
**trial** 114:16,17
158:18 159:17
166:16
**tried** 33:15 110:3
194:24

**trigger** 54:19
55:16 58:1
**triggered** 53:25
54:2,3 55:3,5
73:24
**triggering** 55:9
82:3
**triggers** 53:9
**trip** 172:7
**truck** 72:16
**true** 32:4 54:12,13
61:3 92:22 101:18
113:6 201:4
**trust** 4:1,5,9 7:6
8:20 13:18 18:13
18:18,19 87:17,19
96:10 182:8 184:7
191:4
**trust's** 87:10,23
**trustee** 4:2,9
18:22 87:18 93:16
93:19 94:3 96:6
96:10 99:2 182:9
183:17,19 184:6
184:22
**trustees** 2:11 5:20
6:4 170:6,11
**try** 17:19 20:15
95:10 96:12
100:20 106:13
125:5 171:24
194:17 197:23
**trying** 15:23
22:11 25:25 26:1
26:3 43:4,5 95:7
96:14 98:17,22
103:4 113:20,20
117:18 118:2
180:12 190:6
193:23 197:5
198:4
**tuesday** 186:13

**turn** 24:15 25:5
28:10 58:25 60:15
60:19 63:1 65:9
65:11 98:2 104:1
107:1 149:14
**turned** 25:15 28:3
62:16 88:25
133:21 164:10
**turning** 25:20
**turnover** 2:3,17
3:4,10,19 4:14,19
5:2 59:1 73:13
103:10,21 104:17
109:24 132:23
133:24 134:3
137:12 147:14
162:6,10,11
164:12 168:14
**turns** 53:19
141:15 151:21
167:6
**tuttle** 193:5,9,11
193:18
**tuttle's** 194:14
**tweed** 9:9
**twice** 123:20
**twist** 33:8
**two** 12:11 19:3
23:11 40:5 41:14
45:13 46:2 47:21
47:21 49:25 51:17
53:7 55:17,23
57:6 59:2 63:5
64:6,16 75:5
77:12 85:14 92:21
103:8 113:21
117:9 121:8,14
127:21 134:15
137:3 139:21
146:12 148:15
149:10 150:23
156:3 177:16
182:10 198:13

199:3,21
**type** 32:8,15
60:16 94:2 114:19
117:3 128:9 137:5
194:2 199:2,23
**types** 14:2 185:23
186:4
**typically** 148:14

**u**

**u.s.** 1:23 138:20
**u.s.c.** 2:8 5:17
6:16
**ucc** 17:18 18:21
42:6,7,19 45:10
45:18 48:19 51:8
51:19 68:2,3 76:2
80:20,21 81:3
82:23
**ultimate** 26:3,19
42:7 47:5 51:23
**ultimately** 13:17
31:5,10 41:4
53:14 60:22 68:16
79:3 82:20 102:23
181:14
**unable** 102:4
171:25
**unambiguous**
38:19 74:15 75:22
**unclear** 57:22
60:16 110:21
**underlies** 41:5
**underlying** 48:4
80:4 163:6 164:17
168:3
**underscores**
33:13
**undersecured**
88:5
**understand** 24:22
24:24 25:24 26:1
26:14,17 30:15
34:24 36:8 41:2

46:10 55:13 62:21
64:18 73:5 85:17
90:8 93:7,17 94:1
94:3 99:1 108:12
114:15 119:13
122:7,9 134:7
138:15 142:11
143:17 159:15
161:3 173:3
174:16 177:6
178:14
**understanding**
38:4 50:2 69:11
69:15 71:9 72:24
140:3,5 149:9,10
153:3 171:23
**understandings**
177:17
**understood**  28:15
36:10 37:13 39:11
75:13 85:25 96:5
99:13 174:15
**undertake**  116:3
**undisputed**  23:19
77:4 108:1 123:9
**unexpired**  6:8
176:9
**unfortunately**
150:22
**unique**  106:9
**unit**  4:18,21,25
5:3,6,11,14 9:17
10:2 103:13 104:5
161:25
**united**  1:1,12
162:19
**unites**  52:9
**unknown**  1:25
**unnecessary**
91:15
**unpaid**  175:17
**unrebutted**  151:9

**unscrubbed**
131:10
**unsecured**  3:16
3:22 4:8 14:17
16:24 50:3 88:5
133:6 196:19
**unusual**  83:11
**update**  12:7 14:16
172:9 181:8
**upper**  43:18
**urban**  180:18
**urge**  46:5 67:2
**urgent**  164:2
**urging**  185:24
**usc**  162:13 163:11
**use**  4:3,11 17:20
35:19 47:1,2
51:10,12 52:22
63:6 68:5 80:25
81:18 82:10,14
83:1 87:20 88:14
88:19 90:12 91:3
91:9,16 92:10
94:15 97:18,20
98:1,22 108:8
114:4 123:19,20
124:7,8 126:4
140:2 172:2
195:18
**uses**  83:24 117:17
153:1 166:7
**usual**  74:15 75:22
**utility**  32:9

|  v  |
| --- |

**v**  74:8,13,17,24
75:1,6,9,17
**valid**  17:2
**validity**  117:24
**value**  35:1 76:13
76:24 100:15,15
**various**  25:10
**vedder**  10:8
144:17

**vehicle**  86:13
**vein**  17:23
**vendor**  38:7 72:14
**vendors**  72:17,25
**vendor's**  38:2
**venture**  75:6
**verbiage**  108:9
**verify**  160:4,5
**verifying**  131:15
**veritext**  201:20
**version**  80:21
**versus**  114:20
147:25 179:4
180:18
**vi**  75:9
**view**  15:9,9 21:13
43:19 53:14 59:18
59:19 89:4 107:10
125:9 144:12
153:23 179:22,25
180:12 189:2
**viewed**  39:24
**views**  59:17
**vigorous**  17:17
**village**  123:13,16
124:18,18 141:20
143:24,25,25
144:2,12,14,18,22
144:24 145:3,4,14
145:19,25 146:12
146:14 148:9,17
149:4,9,11,11,12
150:1 151:5,20,21
152:4 153:14,15
154:19 155:22,25
156:9,23,24 157:5
157:7,13 160:3,4
160:7,19,22,22,25
162:8,8 164:8
165:24 168:8,23
169:6,11,15
**village's**  149:15
155:19 159:25

**villages**  150:2
**viny**  11:22
**violate**  25:2 39:15
**violated**  85:3
168:2
**violation**  85:6,10
164:12 187:8
**virtue**  50:17
**vladimir**  11:5
**voided**  106:13
**vulcan**  75:17

|  w  |
| --- |

**wait**  15:8 28:4
186:18 198:12
**waited**  34:9
**waiting**  133:4
146:14 192:6,7
**waive**  188:4,23
189:12 190:16,16
**waiver**  98:13
165:3
**waives**  197:12,16
**waiving**  88:4
**walk**  120:9 157:14
**walmart**  119:25
**wander**  11:23
**want**  12:10 14:12
22:12 33:24 34:23
42:20,22 45:19
46:2,16 53:6,7
54:17 58:5 62:8
65:22 68:23 71:18
87:1,21 92:5
94:12 96:17
101:11 103:22
115:21 116:4,18
119:15 123:19
132:18 133:20
141:2 142:20
144:7 146:1,17,20
147:4,9,11 155:10
157:15 159:23
161:23 168:8,11

168:13 172:7
178:3,5 179:20
190:3
**wanted** 13:24
18:24 23:8 28:12
29:8 36:10 37:13
37:15 39:10,12,23
40:3 68:11 97:9
97:13 114:9,10
175:5 193:6,14
**wants** 87:13 118:3
126:10 142:8
**ward** 180:25
**warehouse** 6:11
**warrant** 192:25
**warren** 170:11
**waste** 88:9 140:17
**wasting** 93:6
**watching** 155:22
**water** 102:18,19
103:3
**waterfall** 16:3
17:13 102:17
**way** 14:23 15:5
18:11,12 19:7
21:2 29:5 38:10
49:18 56:20 86:16
93:2 97:23 100:6
100:22 107:6
116:25 129:24
131:17 136:5
144:19,22 145:8
145:23 148:8,25
149:22 150:15
151:11 154:19
161:1 170:1
178:18 179:22
180:3,5,25
**ways** 19:3 64:6
**we've** 72:6 73:6
86:9 91:12,22
100:25 102:14
111:5 123:5 125:1

125:1 131:5
133:16 139:19,20
141:7 148:14
149:1 151:13
155:7,15,16,21
156:21 171:22
172:11,16 173:17
181:23 188:12
192:6 193:22
**wearing** 160:19
**week** 17:24 20:18
37:10 66:11
115:10 173:13
**weeks** 14:16 19:8
167:8 171:16
172:1
**weight** 137:9
**weil** 8:3 12:5
15:20 18:16 23:6
103:7 132:3 170:3
174:10 188:19
190:25
**welcome** 65:21
**went** 24:1 34:10
37:3 117:17
122:15 142:21
151:3 152:7
**weren't** 45:15
**west** 9:18
**we'll** 14:6 16:24
19:7
**we're** 16:16 18:9
20:1,10 21:22,25
25:4,12,18 28:4
29:12 36:4,16,25
43:5 66:10,10,11
**we've** 14:25 17:15
18:19,22 19:2,4,6
23:11 24:25 28:4
29:15 33:11 40:2
41:17 46:8 58:3
58:16 59:8 60:14

**whatsoever** 90:18
151:15
**what's** 15:4 24:19
44:20 61:18,18
66:15 67:6
**white** 1:14
**who've** 147:19
**william** 6:10 11:4
172:21
**willing** 25:4 58:20
173:4 188:4,22
189:11,12 197:20
**wilmington** 4:1,5
4:9 7:6 8:20 17:25
87:10,17,19,23
182:8,10,22 183:9
184:7
**win** 165:16 192:12
**wind** 14:19 15:4
18:10,11 99:9
**winddown** 94:13
94:15 95:3 97:25
98:2,3,19,25 99:4
100:1 101:13,25
**windfall** 121:1,3,5
150:11
**winners** 7:10,11
185:8,10,12
**winning** 165:16
**wish** 15:19 90:17
117:15
**wishes** 153:25
**wishful** 166:10
**withdraw** 169:21
**withdrawn** 97:19
193:7
**withdrew** 193:20
**withheld** 41:20
50:8 54:22 68:15
**withhold** 46:17
148:21
**withholding**
39:14 68:12

**withstanding**
135:4
**witness** 28:24
130:20
**witnesses** 28:20
139:21
**wl** 74:17,25 75:17
**women** 150:23
**wonderful** 147:19
**won't** 13:9
**word** 44:7 48:8
53:14 68:18 83:24
101:20 114:9
117:17 126:5,6,24
128:2
**words** 26:7 33:8
35:24 74:16 75:23
83:23 100:23
106:25 126:3
169:24 176:18
177:8,16 190:3
191:14
**work** 13:19 14:6
15:13,23 19:25
20:13 25:12,18,25
72:2 86:11 92:16
94:18 95:8,10
102:7,13,21 103:5
114:18 124:24
152:14 153:10,11
169:10 173:17
198:4
**workable** 18:10
**worked** 20:7 25:2
62:18 114:18,21
118:12 148:25
150:22
**workers** 167:16
**working** 12:14
15:2 20:1 71:2
73:19 86:5 154:8
174:9

[works - zachary]                                                    Page 51

**works** 71:19
  92:25 124:4
  144:19,22 145:11
**world** 49:19,25
  176:24 177:5,7
  179:16 180:11
  185:25
**worldcom** 163:14
**worth** 72:19 181:5
  191:6
**worthwhile**
  199:22
**wouldn't** 17:17
  34:5
**wound** 15:12
**wrap** 16:1
**write** 71:18
**written** 55:23
  145:9,23
**wrong** 43:2
  149:15 165:8
**wrote** 91:17

190:19
**year's** 109:2 118:6
  123:24 161:21
  190:9
**years** 118:6
  128:16 133:1
  135:8 137:4
  138:12 148:15
  155:13,15 157:4
  168:17 196:2
  199:3
**yield** 75:15
**york** 1:2 8:6,15,22
  9:5,12 10:11
**you'd** 61:8
**you're** 19:17 21:7
  22:6 35:25 36:20
  36:22 40:4 43:4
  52:16 65:23 66:24
  147:6
**you've** 14:3 46:15
  59:17 63:10,15

| x | z |
|---|---|
| **x** 1:4,10 | **zachary** 11:9 |

| y |
|---|

**yeah** 13:13 26:8
  26:20 119:22
  126:18 141:6,25
  145:15 157:3
  171:21 175:14
  179:14
**year** 63:21 113:22
  120:22 123:12,20
  123:23,24 124:7,8
  124:10,22 130:5,6
  147:23,24,24,25
  148:2,8,8,9,10,19
  149:1,2,5,5,20,21
  152:7 155:14
  161:16 164:24
  165:6,8 166:9
  167:11 176:13
  187:16 189:12

**JX 053-252**