# Exhibit 39

**EXECUTION VERSION**



CASH COLLATERAL AGREEMENT

**CASH COLLATERAL AGREEMENT** (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "**Agreement**"), dated as of December 28, 2016, among JPP LLC, a Delaware limited liability company, and JPP II, LLC, a Delaware limited liability company (each a "**Pledgor**" and collectively, the "**Pledgors**"), CITIBANK, N.A., a national banking association organized and existing under the laws of the United States of America ("**Citibank**"), acting in its capacity as secured party (the "**Secured Party**"), and Citibank acting through its Agency and Trust Division and solely in its capacity as collateral agent, and any successors appointed pursuant to the terms hereof (Citibank in such capacity, the "**Collateral Agent**").

## W I T N E S S E T H

**WHEREAS**, Sears Holdings Corporation, a Delaware corporation, Sears Roebuck Acceptance Corp., a Delaware corporation ("**SRAC**"), Kmart Corporation, a Michigan corporation ("**Kmart Corp.**", together with SRAC, the "**Borrowers**"), the Secured Party, as Issuing Bank (in such capacity, the "**Issuing Bank**") and as administrative agent (in such capacity, the "**Agent**"), JPP, LLC and JPP II, LLC, collectively, as the initial letter of credit lender, and other banks, financial institutions and institutional lenders or other entities from time to time party thereto are party to that certain Letter of Credit and Reimbursement Agreement, dated as of the date hereof (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**L/C Agreement**").

**WHEREAS**, the Secured Party may issue Letters of Credit from time to time for the account of the Borrowers and their Subsidiaries pursuant to the terms of the L/C Agreement.

**WHEREAS**, pursuant to the terms of the L/C Agreement, the other Loan Documents or this Agreement, each Pledgor may from time to time owe various obligations to the Secured Party, including in its capacities as Issuing Bank and as Agent.

**WHEREAS**, JPP LLC shall deposit cash into Account Number 11727800 entitled JPP Pledge Account maintained by the Collateral Agent for the benefit of the Secured Party (the "**JPP Account**") and JPP II LLC shall deposit cash into Account Number 11728200 entitled JPP II Pledge Account maintained by the Collateral Agent for the benefit of the Secured Party (the "**JPP II Account**", and together with the JPP Account, each an "**Account**", and collectively, the "**Accounts**").

**WHEREAS**, it is a condition precedent to the effectiveness of the L/C Agreement that each Pledgor shall have executed and delivered this Agreement and a condition precedent to the issuance of any Letter of Credit by the Secured Party that the Accounts shall have been established and funded as provided in Section 4 of this Agreement.

**JX 064-1**

**NOW THEREFORE**, in consideration of the premises and in order to induce the Secured Party to issue the Letters of Credit, each Pledgor hereby agrees as follows:

1. <u>Certain Defined Terms</u>.  As used in this Agreement (including the preamble and the recitals), (i) capitalized terms used and not defined herein shall have the meanings assigned to them in the L/C Agreement as in effect on the date hereof or as amended, amended and restated, supplemented or otherwise modified from time to time with the consent of the Secured Party; *provided, however*, that the Collateral Agent shall not be deemed to have any knowledge of or duty to ascertain the meaning of any capitalized term not otherwise defined in this Agreement and (ii) the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"**Account**" and "**Accounts**" have the meanings set forth in the recitals to this Agreement.

"**Agent**" has the meaning set forth in the recitals to this Agreement.

"**Agreement**" has the meaning set forth in the preamble to this Agreement.

"**Applicable Account**" means, with respect to JPP LLC, the JPP Account, and with respect to JPP II LLC, the JPP II Account.

"**Borrowers**"  has the meaning set forth in the recitals to this Agreement.

"**Collateral**" has the meaning set forth in Section 2(a) of this Agreement.

"**Discharge of Obligations**" means the date upon which each of the following has occurred: (i) all of the Pledgors' L/C Commitments shall have been terminated or shall have expired and the obligation of the Issuing Bank to issue Letters of Credit pursuant to Section 3.01(a) of the L/C Agreement has been terminated, (ii) all Obligations and "Obligations" (as defined in the L/C Agreement) owing to the Secured Party have been paid in full in accordance with the terms of the Loan Documents (other than contingent indemnification and reimbursement obligations for which no claim has been asserted) and (iii) all outstanding Letters of Credit shall have been (x) returned to the Secured Party for cancellation, or (y) backstopped by a Satisfactory Letter of Credit.

"**FCPA**" has the meaning set forth in Section 9(n) of this Agreement.

"**Indemnified Party**" has the meaning set forth in Section 16(c) of this Agreement.

"**Issuing Bank**" has the meaning set forth in the recitals of this Agreement.

"**JPP Account**" has the meaning set forth in the recitals to this Agreement.

"**JPP II Account**" has the meaning set forth in the recitals to this Agreement.

citi

**JX 064-2**

"**Kmart Corp.**" has the meaning set forth in the recitals to this Agreement.

"**L/C Agreement**" has the meaning set forth in the recitals to this Agreement.

"**L/C Commitment Percentage**" means, with respect to any Pledgor, the percentage set forth next to such Pledgor's name on Schedule A, which Schedule A may be updated from time to time upon written notice from the Pledgor Representative and the Secured Party to the Collateral Agent.

"**Material Adverse Effect**" means, with respect to any Pledgor, a material adverse effect on (a) the business, condition (financial or otherwise), operations or assets of such Pledgor, or (b) the ability of such Pledgor to perform its obligations under this Agreement, the L/C Agreement or the other Loan Documents or (c) the validity or enforceability of this Agreement, the L/C Agreement or the other Loan Documents or the rights and remedies of the Secured Party, the Agent, the Collateral Agent or the Issuing Bank thereunder (including, but not limited to, the enforceability or priority of any Liens granted to the Secured Party).

"**Obligations**" shall mean all obligations and liabilities of each Pledgor, to the Secured Party or any of its Affiliates (whether as Issuing Bank, Agent or otherwise) or to any other bank or financial institution which may from time to time act as Issuing Bank under the L/C Agreement, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under or in connection with this Agreement, the L/C Agreement or any other Loan Document, in each case whether on account of Letter of Credit participations purchased or deemed purchased pursuant to Section 3.04 of the L/C Agreement, funding or reimbursement obligations on account of such participations and interest on amounts due with respect to such participations (including, without limitation, any interest accruing (and interest that would have accrued but for the filing or commencement of such proceeding) at the then applicable rate provided in the L/C Agreement after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding with respect to such Pledgor or any Loan Party, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), fees, indemnities, costs, expenses or amounts otherwise (including, without limitation, all fees and disbursements of counsel to the Secured Party and all reimbursement obligations, fees, indemnities, costs, expenses or other amounts accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding with respect to such Pledgor or any Loan Party, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) that in each case are required to be paid by such Pledgor to the Secured Party or any of its Affiliates (whether as Issuing Bank, Agent or otherwise) or to any other bank or financial institution which may from time to time act as Issuing Bank under the L/C Agreement, pursuant to the terms of this Agreement, the L/C Agreement or any other Loan Document to which such Pledgor is a party.

"**Person**"  has the meaning set forth in Section 9(o) of this Agreement.

"**Pledgor**" has the meaning set forth in the preamble to this Agreement.

citi

-3-

**JX 064-3**

"**Pledgor Representative**" means ESL Investments, Inc. or such other entity as is designated in writing to the Secured Party and the Collateral Agent by Pledgors holding more than 50% of the L/C Commitments.

"**Pro Rata Share of Issuer Exposure**" means, with respect to any Pledgor, an amount equal to (i) the L/C Commitment Percentage of such Pledgor multiplied by (ii) the Issuer Exposure.

"**Rescinded Amount**" has the meaning set forth in Section 10(b) of this Agreement.

"**Sanctions**" has the meaning set forth in Section 9(o) of this Agreement.

"**Secured Party**" has the meaning set forth in the preamble to this Agreement.

"**SRAC**" has the meaning set forth in the recitals to this Agreement.

2. Pledge and Assignment.

(a)    As security for the payment and performance of all present and future Obligations, each Pledgor hereby irrevocably pledges, assigns and transfers to the Secured Party, and hereby grants to the Secured Party, a first priority lien on and security interest in, and express right of setoff against, all of the right, title and interest of such Pledgor in, to and under the following property, whether now owned or existing or hereafter from time to time acquired or coming into existence (collectively, the "**Collateral**"):

(i) each of the Accounts and all moneys and funds held therein or credited thereto, all rights to renew or withdraw the same, and all certificates and instruments, if any, from time to time representing or evidencing such Account;

(ii) any interest, cash, or other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Collateral; and

(iii) to the extent not covered by the clauses listed above, all proceeds of any and all of the foregoing.

(b)    The Pledgors and the Secured Party agree that the Secured Party will have sole control and dominion over each of the Accounts and the Collateral. Except as expressly provided herein, no Pledgor shall have any right to issue instructions to the Collateral Agent regarding the disposition of funds from any Account.

citi

-4-

**JX 064-4**

3.  <u>The Accounts</u>.

(a)     The Collateral Agent represents and warrants to the Secured Party that the Collateral Agent has established and will maintain each of the Accounts.  The Collateral Agent represents and warrants that except for the claim and interest of the Pledgors and the Secured Party, the Collateral Agent does not know of any claim to or interest in either of the Accounts or any assets credited thereto.

(b)     The Collateral Agent agrees that each Account is a "deposit account" (as such term is defined in Section 9-102(29) of the UCC).

(c)     The Collateral Agent agrees that it is and shall continue to act as a "bank" (as defined in Section 9-102(8) of the UCC) with respect to each Account and all funds on deposit therein.  The parties hereto agree that the jurisdiction of the "bank" is and shall at all times be the State of New York.

(d)     The Collateral Agent will comply with all written notifications it receives directing the disposition of any funds in any Account, substantially in the form set forth in <u>Exhibit A</u> attached hereto, originated by an Authorized Person (as defined in Section 19) of the Secured Party without further consent by any Pledgor.  Except as expressly set forth herein, no Pledgor may give any instructions relating to any Account.

4.  <u>Maintaining the Accounts.</u>  Each Pledgor hereby severally agrees that so long as any Letters of Credit or Obligations are outstanding, it will maintain at all times, in the Applicable Account of such Pledgor, an amount equal to or greater than one hundred two percent (102%) of the L/C Commitment of such Pledgor.  No amounts shall be released by the Collateral Agent to the Pledgors from any Account except as provided in Section 6 of this Agreement or upon the termination of this Agreement pursuant to Section 20 of this Agreement.

5.  <u>Reimbursements to Secured Party from Accounts</u>.  If any Borrower or any Pledgor (x) fails to timely pay any amounts owed to the Secured Party or (y) chooses to direct the Secured Party to satisfy any demands pursuant to the terms under the L/C Agreement by withdrawing funds from the Accounts, or (z) in lieu of making any demands pursuant to the terms under the L/C Agreement, the Secured Party wishes to withdraw funds from the Accounts, in each case, whether in the Secured Party's capacity as Issuing Bank, Agent, or otherwise, in accordance with the terms of this Agreement, the L/C Agreement, or any other Loan Document, the Secured Party may instruct the Collateral Agent in writing to release to the Secured Party funds on deposit in the Accounts, and the Collateral Agent shall promptly release such funds from the Accounts to the Secured Party pursuant to such instructions, via wire transfer to the account of the Secured Party set forth on <u>Schedule D</u> hereto (as the same may be updated by notice to the Collateral Agent executed by the Secured Party and each Pledgor (or, in the case of any Pledgor, the Pledgor Representative on its behalf)). The Secured Party shall provide a copy of such notice or instructions to the Collateral Agent to release funds from the Accounts pursuant to this Section 5

citi

**JX 064-5**

promptly (and in any event, within one Business Day) to the Pledgor Representative (which may be by email).

6. <u>Release of Cash from the Accounts</u>.  All funds held in each Applicable Account shall be released back to the applicable Pledgor, via wire transfer to the accounts of such Pledgor set forth on <u>Schedule D</u> hereto (as the same may be updated by notice to the Collateral Agent from such Pledgor), upon receipt by the Collateral Agent of a joint written notice from the Pledgor Representative and the Secured Party of the occurrence of the Discharge of Obligations.

Notwithstanding the foregoing, if the Pro Rata Share of Issuer Exposure of such Pledgor is less than 102% of the amount on deposit in the Applicable Account of such Pledgor, upon written request of the Pledgor Representative to the Secured Party, accompanied by a certificate setting forth a reasonably detailed calculation of such excess, the Secured Party shall, subject to its reasonable agreement with the Pledgor Representative's calculation, instruct the Collateral Agent to return such excess to the applicable Pledgor, via wire transfer to the account of the applicable Pledgor set forth on <u>Schedule D</u> hereto (as the same may be updated by notice to the Collateral Agent executed by the Secured Party and such Pledgor (or, in the case of any Pledgor, the Pledgor Representative on its behalf)).  The Collateral Agent shall have no duty or responsibility to calculate, monitor or determine the Pro Rata Share of Issuer Exposure, or to monitor or determine whether amounts on deposit in the Accounts satisfy, or are in excess of, the amounts required to be on deposit in the Accounts pursuant to the L/C Agreement.

7. <u>Priority of Secured Party's Security Interest</u>.  The Collateral Agent subordinates in favor of the Secured Party any interest, lien or right of setoff it may have, now or in the future, against any Account or assets in any Account; provided, however, that, subject to the foregoing, the Collateral Agent may set off all amounts due to it in respect of its fees and expenses (including without limitation the payment of any legal fees or expenses).

8. <u>Investment; Tax Matters</u>.

(a)    Funds held in cash in each of the Accounts will be posted to the Collateral Agent's dollars on deposit in custody account ("**DDCA**") and will initially yield a rate of 20 bps.  The Collateral Agent will exercise reasonable efforts to notify the Pledgor Representative (on behalf of the Pledgors) and the Secured Party no less than 30 days prior upon any change in this rate.  Interest will be credited to each of the Accounts monthly, on the second Business Day of the following month, and will be reported on a Form 1099 INT, if applicable.  The DDCA will be insured up to the limits permitted by the Federal Deposit Insurance Corporation.  The Collateral Agent shall invest funds received into any Account on the date of deposit, provided such funds are received on or before 11:00 a.m. New York City time.  Any funds received by the Collateral Agent after 11:00 a.m. New York City time shall be treated as if received on the following Business Day.  For purposes of this Agreement "*Business Day*" shall mean any day that the Collateral Agent is open for business.

citi

**JX 064-6**

(b)     The Collateral Agent is hereby authorized and directed to sell or redeem any such investments as it deems necessary to make any payments or distributions required under this Agreement. The Collateral Agent shall have no responsibility or liability for any loss in the value of any investment made pursuant to this Agreement, or for any loss, cost or penalty resulting from any sale or liquidation of the Collateral.   The Collateral Agent is hereby authorized to execute purchases and sales of investments through the facilities of its own trading or capital markets operations or those of any affiliated entity.   The Collateral Agent does not have a duty nor will it undertake any duty to provide investment advice.

(c)     Unless the Collateral Agent receives instructions in writing to the contrary from the Secured Party, the Collateral Agent shall on a quarterly basis release all earnings in each Applicable Account to the applicable Pledgor.

(d)     Each Pledgor and the Secured Party agree that any earnings or proceeds received on or distributions of earnings or proceeds from the Applicable Account of such Pledgor, during a calendar year period shall be treated as the income of the applicable Pledgor and shall be reported on an annual basis by the Collateral Agent on the appropriate United States Internal Revenue Service ("**IRS**") Form 1099 (or IRS Form 1042-S), as required pursuant to the Internal Revenue Code of 1986, as amended (the "**Code**") and the regulations thereunder.

(e)     Each of the Pledgors and the Secured Party shall upon the execution of this Agreement provide the Collateral Agent with a duly completed and properly executed IRS Form W-9 or applicable Form W-8, in case of a non-U.S. person, for each payee, together with any other documentation and information reasonably requested by the Collateral Agent in connection with the Collateral Agent's tax reporting obligations under the Code and the regulations thereunder. With respect to the Collateral Agent's tax reporting obligations under the Code, the Foreign Account Tax Compliance Act and the Foreign Investment in Real Property Tax Act and any other applicable law or regulation, the Pledgors and the Secured Party understand that, in the event valid U.S. tax forms or other required supporting documentation are not provided to the Collateral Agent, the Collateral Agent may be required to withhold tax from the Collateral and report account information on any earnings, proceeds or distributions from the Collateral.

(f)     Should the Collateral Agent become liable for the payment of taxes, including withholding taxes relating to any funds, including interest and penalties thereon, held by it pursuant to this Agreement or any payment made hereunder, the Collateral Agent shall satisfy such liability to the extent possible from the Collateral.  Each of the Pledgors and Secured Party agree, jointly and severally, to indemnify and hold the Collateral Agent harmless pursuant to Section 16(c) hereof from any liability or obligation on account of taxes, assessments, interest, penalties, expenses and other governmental charges that may be assessed or asserted against the Collateral Agent.

(g)     The Collateral Agent's rights under this Section shall survive the termination of this Agreement or the resignation or removal of the Collateral Agent.

citi

1069403.06B-CHISR02A - MSW

**JX 064-7**

9.  <u>Representations and Warranties</u>.  Each Pledgor individually represents and warrants to the Secured Party and the Collateral Agent as follows (and each Pledgor shall be deemed to make these representations and warranties on the date hereof, on the date of issuance of any Letter of Credit, and on any other date on which Pledgors make representations and warranties to the Secured Party under any Loan Document):

(a)    Such Pledgor owns or has rights in the Collateral in which it purports to grant a security interest to the Secured Party free and clear of any lien, security interest, option or other charge or encumbrance except for the security interest created by this Agreement.

(b)    The pledge and assignment of the Collateral by such Pledgor pursuant to this Agreement creates a valid and perfected first priority security interest in the Collateral granted by such Pledgor, in favor of the Secured Party, securing the payment of the Obligations.

(c)    No consent of any other Person (including, without limitation, stockholders or creditors of such Pledgor or any of its Subsidiaries or of any parent company of such Pledgor) or entity and no authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body, except such as have been obtained or made and are in full force and effect, is required (i) for the pledge and assignment by such Pledgor of the Collateral pursuant to this Agreement or for the execution, delivery or performance of this Agreement by such Pledgor, (ii) for the perfection or maintenance of the security interest created hereby (including the first priority nature of such security interest), (iii) for the exercise by the Collateral Agent of its rights hereunder, or (iv) for the exercise by the Secured Party of its rights and remedies hereunder.

(d)    [Reserved]

(e)    Such Pledgor is (i) duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and (ii) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(f)    The execution, delivery and performance by such Pledgor of this Agreement, the L/C Agreement and each other Loan Document to which it is a party, and the consummation of the transactions contemplated hereby or thereby, are within such Pledgor's powers, have been duly authorized by all necessary organizational action, and do not contravene (i) the charter or by-laws or other organizational or governing documents of such Pledgor or (ii) law applicable to or any material contractual restriction binding on or affecting such Pledgor.

(g)    This Agreement has been duly executed and delivered by such Pledgor. This Agreement constitutes, and the L/C Agreement and each other Loan Document to which such Pledgor is a party will constitute upon execution, the legal, valid and binding obligation of such Pledgor party thereto enforceable against such Pledgor in accordance with its respective terms subject to the effect of any applicable bankruptcy, insolvency, reorganization or moratorium or

citi

-8-

**JX 064-8**

similar laws affecting the rights of creditors generally and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

(h)     [Reserved]

(i)     The execution, delivery and performance of this Agreement by such Pledgor will not result in the creation or imposition of any Lien (other than the Liens in favor of the Secured Party or the Collateral Agent under this Agreement) on any of its properties or assets pursuant to the provisions of any contractual obligation.

(j)     There is no action, suit, investigation, litigation or proceeding which is pending or, to such Pledgor's knowledge, threatened affecting such Pledgor before any court, Governmental Authority or arbitrator relating to this Agreement or any other Loan Document to which such Pledgor is a party.

(k)     Such Pledgor is and after giving effect to the incurrence of all obligations incurred in connection herewith will be, Solvent.

(l)     No L/C Lender Insolvency Event has occurred and is continuing with respect to such Pledgor.

(m)     None of the Pledgors is required to register as an "investment company" under the Investment Company Act of 1940, as amended.

(n)     To the extent applicable, such Pledgor is in compliance, in all material respects, with (i) the United States Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, (ii) the PATRIOT Act, (iii) the United States Foreign Corrupt Practices Act of 1977, and (iv) the Corruption of Foreign Public Officials Act, as amended (the "**FCPA**").

(o)     Neither such Pledgor nor any of its Subsidiaries, nor, to the knowledge of such Pledgor, any director, officer, or employee of such Pledgor is an individual or entity (for purposes of this clause (x), a "**Person**") that is, or is owned or controlled by Persons that are the subject of any sanctions (A) administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control, the United Nations Security Council, the European Union, Her Majesty's Treasury or other applicable sanctions authority or (B) pursuant to the U.S. Iran Sanctions Act, as amended, or Executive Order 13590 (collectively, "**Sanctions**") or (C) located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions (including, without limitation, Iran, North Korea, Sudan, Crimea, Cuba and Syria).

(p)     Such Pledgor is not an EEA Financial Institution.

citi

-9-

**JX 064-9**

10.  <u>Reinstatement</u>.  (a) If at any time any amount paid by any Pledgor or by any other Person in respect of any Obligations is rescinded or must otherwise be restored or returned for any reason, including upon the insolvency, bankruptcy, or reorganization of any Person or otherwise, each Pledgor's obligations under this Agreement with respect to that payment shall be reinstated at such time and this Agreement, if terminated, shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto.  All rights, interests, agreements, and obligations of each Pledgor under this Agreement shall remain in full force and effect and shall continue irrespective of the commencement of, or any discharge, confirmation, conversion, or dismissal of, any insolvency proceeding by or against any Pledgor or any other circumstance which otherwise might constitute a defense available to, or a discharge of any Pledgor in respect of the obligations.

(b)  If at any time any amount paid by any Loan Party or by any other Person in respect of any "Obligations" (as defined in the L/C Agreement) is rescinded or must otherwise be restored or returned for any reason, including upon the insolvency, bankruptcy, or reorganization of any Person or otherwise (such amount, the "**Rescinded Amount**"), each Pledgor's obligations under the L/C Agreement and this Agreement with respect to such Rescinded Amount and the obligations that gave rise to payment of such Rescinded Amount, including, without limitation, pursuant to Article III of the L/C Agreement, shall be reinstated at such time and this Agreement, if terminated, shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto. In addition, if, at any time, any Rescinded Amount has been paid or transferred by the Collateral Agent (at the written direction of the Secured Party) to any Pledgor, such Pledgor shall immediately deposit with the Collateral Agent the amount of such Rescinded Amount received by such Pledgor.

11.  <u>Covenants</u>.  Each Pledgor individually covenants and agrees with the Secured Party that:

(a)    Such Pledgor will not (1) sell, assign, transfer, exchange, or otherwise dispose of, or grant any option with respect to, the Collateral, or (2) create, incur or permit to exist any Lien or option in favor of, or any claim of any person with respect to, any of the Collateral, or any interest therein, except for the security interest created by this Agreement.

(b)    Such Pledgor will maintain the security interest created by this Agreement as a first priority, perfected security interest and defend the right, title and interest of the Secured Party in and to the Collateral against the claims and demands of all persons whomsoever.  At any time and from time to time, upon the written request of the Secured Party, and at the sole expense of such Pledgor, such Pledgor will promptly and duly execute and deliver such further instruments and documents and take such further actions as the Secured Party reasonably may request for the purposes of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted.

<span style="text-align:center;">citi</span>

JX 064-10

(c)      Such Pledgor agrees that at any time and from time to time, at the expense of such Pledgor, such Pledgor will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that the Secured Party may reasonably request in writing, in order to perfect and protect any security interest granted or purported to be granted hereby or to enable the Secured Party (or the Collateral Agent, at the direction of the Secured Party) to exercise and enforce its rights and remedies hereunder with respect to any Collateral.

(d)      Each of the Pledgors shall, and shall cause the Pledgor Representative to, deliver to the Collateral Agent and the Secured Party completed Schedules B-2, B-3 and B-4, it being understood and agreed that the Collateral Agent shall not be required to follow any notice or instruction delivered by any Pledgor or Pledgor Representative until such Schedules have been completed and accepted by the Collateral Agent.

12.    Secured Party Appointed Attorney-in-Fact.  Each Pledgor hereby appoints the Secured Party such Pledgor's attorney-in-fact, with full authority, but without any obligation whatsoever, in the place and stead of such Pledgor and in the name of such Pledgor or otherwise, from time to time to take any action and to execute any instrument which may be necessary or advisable to accomplish the purposes of this Agreement, including, without limitation, to receive, indorse and collect all instruments made payable to such Pledgor representing any interest payment, or other distribution in respect of the Collateral or any part thereof.  This appointment shall not be deemed to create any liability on the part of the Secured Party.

13.    Secured Party May Perform.  If any Pledgor fails to perform any agreement contained herein, the Secured Party may itself perform, or cause performance of, such agreement, and the expenses of the Secured Party incurred in connection therewith will be payable by such Pledgor under Section 16 hereof.

14.    Concerning the Collateral Agent.

(a)      Collateral Agent Duties.  Each of each Pledgor and the Secured Party acknowledges and agrees that (i) the duties, responsibilities and obligations of the Collateral Agent shall be limited to those expressly set forth in this Agreement, each of which is administrative or ministerial (and shall not be construed to be fiduciary) in nature, and no duties, responsibilities or obligations shall be inferred or implied, (ii) the Collateral Agent shall not be responsible for any of the agreements referred to or described herein, or for determining or compelling compliance therewith, and shall not otherwise be bound thereby, and (iii) the Collateral Agent shall not be required to expend or risk any of its own funds to satisfy payments from the Collateral.

(b)      Liability of Collateral Agent.  The Collateral Agent shall not be liable for any damage, loss or injury resulting from any action taken or omitted in the absence of gross negligence or willful misconduct (as finally adjudicated by a court of competent jurisdiction).   In no event shall the Collateral Agent be liable for indirect, incidental, consequential, punitive or special losses or damages (including but not limited to lost profits), regardless of the form of action

citi

-11-

**JX 064-11**

and whether or not any such losses or damages were foreseeable or contemplated. The Collateral Agent shall be entitled to rely upon any instruction, notice, request or other instrument delivered to it without being required to determine the authenticity or validity thereof, or the truth or accuracy of any information stated therein. The Collateral Agent may act in reliance upon any signature believed by it to be genuine and may assume that any person purporting to make any statement, execute any document, or send any instruction in connection with the provisions hereof has been duly authorized to do so. The Collateral Agent may consult with counsel satisfactory to it, and the opinion or advice of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it in good faith and in accordance with the opinion and advice of such counsel. The Collateral Agent may perform any and all of its duties through its agents, representatives, attorneys, custodians and/or nominees. The Collateral Agent shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, without limitation, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility). The Collateral Agent shall have no responsibility or liability for the form, content, validity, value or genuineness of the Collateral. The Collateral Agent does not, and shall not be deemed to, assume any responsibility to monitor any corporate actions affecting the Collateral. The Collateral Agent shall have no responsibility and shall not be liable for ascertaining or acting upon any calls, conversions, exchange offers, tenders, or similar matters relating to the Collateral. The Collateral Agent does not, and shall not be deemed to, assume any responsibility or incur any liability for any act or omission to act with respect to any corporate action affecting the Collateral or the rights of the parties hereto.

(c)    <u>Reliance on Orders</u>. The Collateral Agent is authorized to comply with final orders issued or process entered by any court with respect to the Collateral, without determination by the Collateral Agent of such court's jurisdiction in the matter. If any portion of the Collateral is at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such Collateral shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such Collateral or any part thereof, then and in any such event, the Collateral Agent is authorized to rely upon and comply with any such order, writ, judgment or decree which it is advised is binding upon it without the need for appeal or other action; and if the Collateral Agent complies with any such order, writ, judgment or decree, it shall not be liable to any Pledgor or the Secured Party or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

15.    <u>Remedies Upon Default</u>. Each Pledgor hereby agrees that if any Obligations are not paid when due, in addition to other rights and remedies provided for herein or otherwise available to it, the Secured Party shall have all the rights and remedies of a secured party on default under the UCC, including the right to, without notice or demand, and at any time or from time to time, charge, set-off and otherwise apply all or any part of the Collateral against the Obligations or any part thereof.

citi

-12-

JX 064-12

16.  Compensation, Expense Reimbursement and Indemnification.

(a)     Compensation.  Each of the Pledgors covenants and agrees, jointly and severally, to pay the Collateral Agent's compensation specified in Schedule C.  Each Pledgor covenants and agrees, jointly and severally, to pay to the Collateral Agent all reasonable, documented out-of-pocket expenses incurred by the Collateral Agent in the performance of its role under this Agreement (including, but not limited to, any reasonable attorney's fees incurred in connection with the preparation and negotiation of this Agreement, which shall be due and payable upon the execution of this Agreement).

(b)     Security and Offset.  Each Pledgor and the Secured Party hereby grant to the Collateral Agent a first lien upon, and right of offset against, the Collateral with respect to any fees or expenses due to the Collateral Agent hereunder (including any claim for indemnification hereunder).  In the event that any fees or expenses or any other obligations owed to the Collateral Agent (or its counsel) are not paid to the Collateral Agent within 30 calendar days following the presentment of any invoice for the payment of such fees and expenses or the demand for such payment, then the Collateral Agent may, without further action or notice, pay such fees and expenses from the Collateral and may sell, convey or otherwise dispose of any Collateral for such purpose.  The Collateral Agent may in its sole discretion withhold from any distribution of the Collateral an amount of such distribution it reasonably believes would, upon sale or liquidation, produce proceeds equal to any unpaid amounts to which the Collateral Agent is entitled hereunder. Any offset from the Accounts shall be made pro rata between the Accounts.

(c)     Indemnification.  Each of the Pledgors covenants and agrees, jointly and severally, to indemnify the Collateral Agent and its employees, officers, directors, and agents (each, an "**Indemnified Party**") for, hold each Indemnified Party harmless from, and defend each Indemnified Party against any and all claims, losses, actions, liabilities, costs, damages and expenses of any nature incurred by any Indemnified Party, arising out of or in connection with this Agreement or with the administration of its duties hereunder, including but not limited to attorney's fees, costs and expenses, except to the extent such loss, liability, damage, cost or expense shall have been finally adjudicated by a court of competent jurisdiction to have resulted from the Indemnified Party's own gross negligence or willful misconduct.  The foregoing indemnification and agreement to hold harmless shall survive the termination of this Agreement and the resignation or removal of the Collateral Agent.

17.  Security Interest Absolute; Waivers.

(a)     The obligations of each Pledgor under this Agreement are independent of the Obligations, and a separate action or actions may be brought and prosecuted against any Pledgor to enforce this Agreement, irrespective of whether any action is brought against such Pledgor or whether such Pledgor is joined in any such action or actions.  All rights of the Secured Party and security interests hereunder, and all obligations of each Pledgor hereunder, will be absolute and unconditional irrespective of:

citi

-13-

JX 064-13

(i)  any lack of validity or enforceability of any (a) Obligation, (b) "Obligations" (as defined in the L/C Agreement), (c) obligations under the Existing Credit Agreement or any "Loan Document" (as defined in the Existing Credit Agreement), (d) Loan Documents, (e) Letter of Credit, or (f) any other agreement or instrument relating thereto;

(ii)  any change in the time, manner or place of payment of, or in any other term of, all or any (a) Obligations, (b) "Obligations" (as defined in the L/C Agreement), or (c) obligations under the Existing Credit Agreement or any "Loan Document" (as defined in the Existing Credit Agreement);

(iii)  any other amendment or waiver of or consent to departure from any (a) Obligations, (b) "Obligations" (as defined in the L/C Agreement), (c) obligations under the Existing Credit Agreement or any "Loan Document" (as defined in the Existing Credit Agreement), (d) Loan Documents, (e) Letter of Credit, or (f) any other agreement or instrument relating thereto, including without limitation, any increase in the (a) Obligations, (b) "Obligations" (as defined in the L/C Agreement), (c) obligations under the Existing Credit Agreement or any "Loan Document" (as defined in the Existing Credit Agreement), (d) Loan Documents, (e) Letter of Credit, or (f) any other agreement or instrument relating thereto, resulting from the extension of additional credit to the Borrowers or any of their Subsidiaries or Affiliates or otherwise;

(iv)  any taking, exchange, release or non-perfection of any other collateral, or any taking, release or amendment or waiver of or consent to departure from any guaranty, for all or any of the (a) Obligations, (b) "Obligations" as defined in the L/C Agreement, (c) obligations under the Existing Credit Agreement or any "Loan Document" (as defined in the Existing Credit Agreement), (d) Loan Documents, (e) Letter of Credit, or (f) any other agreement or instrument relating thereto;

(v)  any manner of application of collateral (whether provided by a Loan Party, a Pledgor, or otherwise), or proceeds thereof, to all or any of the (a) Obligations, (b) "Obligations" (as defined in the L/C Agreement), (c) obligations under the Existing Credit Agreement or any "Loan Document" (as defined in the Existing Credit Agreement), (d) Loan Documents, (e) Letter of Credit, or (f) any other agreement or instrument relating thereto, or any manner of sale or other disposition of any collateral for all or any of the Obligations or any "Obligations" (as defined in the L/C Agreement), any obligations under the Existing Credit Agreement or any "Loan Document" (as defined in the Existing Credit Agreement), or any other assets of any Pledgor or its Subsidiaries or Affiliates;

(vi)  any change, restructuring or termination of the corporate structure of any Pledgor or any of its Subsidiaries or Affiliates or of any Loan Party or its Subsidiaries or Affiliates or any change in the ownership or the corporate existence of any Pledgor;

(vii)  any set-off, counterclaim, recoupment, defense or other right whatsoever (in any case, whether based on contract, tort or any other theory) that any Pledgor may have

citi

-14-

JX 064-14

against the Secured Party, the Borrowers, any Loan Party or any other Person for any reason whatsoever;

(viii) the occurrence or continuance of (a) a Default or an Event of Default or the failure to satisfy any of the other conditions specified in Article IV of the L/C Agreement or (b) a "Default" or an "Event of Default" (each as defined in the Existing Credit Agreement);

(ix) any adverse change in the condition (financial or otherwise) of any Pledgor or any Borrower or Loan Party;

(x) any breach of this Agreement or any other Loan Document by any Pledgor or of any Loan Document by any Borrower;

(xi) any breach of the Existing Credit Agreement or any "Loan Document" (as defined in the Existing Credit Agreement) by any Loan Party;

(xii) any present or future law, regulation or order of any jurisdiction (whether of right or in fact) or of any agency thereof purporting to reduce, amend, restructure or otherwise affect any term of (a) any Obligations, (b) any "Obligations" (as defined in the L/C Agreement), (c) any obligations under the Existing Credit Agreement or any "Loan Document" (as defined in the Existing Credit Agreement), (d) the L/C Agreement or any Loan Documents, (e) any Letter of Credit, (f) the Existing Credit Agreement or any "Loan Document" (as defined in the Existing Credit Agreement), or (g) any other agreement or instrument relating thereto; or

(xiii) any other circumstance, happening or other event whatsoever, which might otherwise constitute a defense available to, or a discharge of, any Pledgor, whether or not similar to the foregoing.

(b)    Each Pledgor hereby waives any and all notice of the creation, renewal, extension, or accrual of any Obligations or any "Obligations" (as defined in the L/C Agreement). Each Pledgor waives diligence, presentment, protest, demand for payment and notice of default or nonpayment with respect to any Obligations or any "Obligations" (as defined in the L/C Agreement). The obligations of each Pledgor hereunder shall not be discharged or impaired or otherwise affected by the failure of Secured Party to assert any claim or demand or to enforce any remedy under this Agreement, the L/C Agreement or any other Loan Document, or any other agreement, by any default, failure or delay, willful or otherwise, in the performance of any of the Obligations or any "Obligations" (as defined in the L/C Agreement), or by any other act or omission that may or might in any manner or to any extent vary the risk of any Pledgor or that would otherwise operate as a discharge of any Pledgor as a matter of law or equity (other than a Discharge of Obligations).

citi

-15-

JX 064-15

(c)      It shall not be necessary for the Secured Party, in order to exercise its rights to any Account, whether pursuant to Section 5 of this Agreement, Section 15 of this Agreement, or otherwise, first to institute suit or pursue or exhaust any rights or remedies against any Borrower, any Loan Party or any other Person, or to enforce any rights against any collateral given to secure any Obligations or any "Obligations" (as defined in the L/C Agreement), or to join any Borrower, any Loan Party or any other Person in any action to enforce this Agreement, the L/C Agreement, or any other Loan Document, or to resort to any other means of obtaining payment of the Obligations or any "Obligations" (as defined in the L/C Agreement).

(d)      Each Pledgor hereby agrees that until the Discharge of Obligations has occurred it will not exercise any right or remedy arising by reason of the application of any Collateral to the payment of the Obligations or the performance of such Pledgor of any of its obligations hereunder, whether by subrogation or otherwise, against any Pledgor or any Loan Party or any guarantor of any of the Obligations or any  "Obligations" (as defined in the L/C Agreement) or any other security for any of the Obligations  or "Obligations" (as defined in the L/C Agreement).

18.  Amendments.  Any amendment of this Agreement shall be binding only if evidenced by a writing signed by each of the parties to this Agreement.  No waiver of any provision hereof shall be effective unless expressed in writing and signed by the party to be charged.

19.  Notices; Instructions.

(a)      Any notice permitted or required hereunder shall be in writing in English, and may be sent by (i) secure file transfer or (ii) electronic mail with a scanned attachment thereto of an executed notice or instruction, and shall be effective upon actual receipt by the Collateral Agent in accordance with the terms hereof.  Each of the applicable persons designated on Schedule B-1, Schedule B-2, Schedule B-3, and Schedule B-4 attached hereto have been duly appointed to act as Authorized Persons hereunder and individually have full power and authority to execute any notices or instructions, to amend, modify or waive any provisions of this Agreement, and to take any and all other actions permitted under this Agreement, all without further consent or direction from, or notice to, it or any other party.  The Pledgors hereby, to the fullest extent permitted by law, irrevocably constitutes and appoint the Pledgor Representative as their true and lawful attorney-in-fact with full power and authority in the name of the Pledgors or the name of such attorney-in-fact, from time to time in the Pledgor Representative's discretion, for the purposes of giving any instructions to the Collateral Agent under this Agreement, and to take any other actions on behalf of the Pledgors that may be necessary or required under the terms of this Agreement; *provided, however*, that this appointment shall not be interpreted to relieve the Pledgors of their duties under this Agreement.    Any notice or instruction must be originated from a corporate domain.  Any change in designation of Authorized Persons shall be provided by written notice, signed by an Authorized Person, and actually received and acknowledged by the Collateral Agent.  Any communication from the Collateral Agent that the Collateral Agent deems to contain confidential, proprietary, and/or sensitive information shall be encrypted in accordance with the Collateral Agent's internal procedures.  Each Pledgor and the Secured Party agree that the above security procedures are commercially reasonable.

citi

-16-

**JX 064-16**

If to the Pledgors:

JPP LLC
JPP II, LLC
c/o Harold Talisman
1170 Kane Concourse, Suite 200
Bay Harbor Islands, FL 33154

Telephone: (305) 702-2100
E-mail: eslaccounting@eslinvest.com

If to the Pledgor Representative:

ESL Investments, Inc.
1170 Kane Concourse, Suite 200
Bay Harbor Islands, FL 33154

Telephone: (305) 702-2100
E-mail: eslaccounting@eslinvest.com

If to the Secured Party:

 Citibank, N.A.
390 Greenwich Street, 1st Floor, New York, NY 10013
Attention: David L. Smith

Telephone:  (212) 723-3759
E-mail: david.l2.smith@citi.com


If to the Collateral Agent:

Citibank, N.A.
Agency & Trust
388 Greenwich Street, 14th Floor
New York, NY  10013
Attention: Paolo Ippolito
Telephone:  (212) 816-8831
E-mail: cts.spag@citi.com
       paolo.ippolito@citi.com

(b)     Any funds to be paid by the Collateral Agent hereunder shall be sent by wire transfer pursuant to the instructions set forth on Schedule D, or as otherwise may be instructed by the



-17-

**JX 064-17**

Pledgors (or the Pledgor Representative on their behalf), or the Secured Party, as to their respective payment instructions.

(c)      Payments to the Collateral Agent shall be sent by wire transfer pursuant to the following instructions: **CITIBANK, N.A.**, ABA: 0210-0008-9; Account Name: Escrow Concentration Account; A/C#.: 36855852; Ref: 11727800- JPP LLC Pledge Account; Ref: 11728200 JPP II, LLC Pledge Account.

20.    <u>Continuing Security Interest; Assignments</u>.  This Agreement will create a continuing security interest in the Collateral and will (a) remain in full force and effect until the Discharge of Obligations has occurred, (b) be binding upon each Pledgor, its successors and assigns, and (c) inure to the benefit of, and be enforceable by, the Secured Party and its successors, transferees and assigns.  Upon the Discharge of Obligations, the security interest granted hereby will terminate and all rights to the Collateral will revert to the applicable Pledgors.  Upon any such termination, the Collateral Agent will, upon receipt of joint written direction of the Secured Party and the Pledgor Representative, and at the Pledgors' expense, return to the applicable Pledgors, via wire transfer to the account of such Pledgor set forth on <u>Schedule D</u> hereto (as the same may be updated by notice to the Collateral Agent executed by such Pledgor), such of the Collateral as will not have been applied pursuant to the terms hereof, close the Accounts, and execute and deliver to the Pledgor Representative and/or each Pledgor such documents as reasonably requested by the Pledgor Representative to evidence such termination.

21.    <u>Governing Law; Jurisdiction; Waivers</u>.  This Agreement is governed by and shall be construed and interpreted in accordance with the laws of the State of New York without giving effect to the conflict of laws principles thereof.  The parties irrevocably and unconditionally submit to the exclusive jurisdiction of the federal and state courts located in the Borough of Manhattan, City, County and State of New York, for any proceedings commenced regarding this Agreement.  The parties irrevocably submit to the jurisdiction of such courts for the determination of all issues in such proceedings and irrevocably waive any objection to venue or inconvenient forum for any proceeding brought in any such court. The parties irrevocably and unconditionally waive any right to trial by jury with respect to any proceeding relating to this Agreement.

22.    <u>Ambiguity</u>.  In the event of any ambiguity or uncertainty hereunder or in any notice, instruction or other communication received by the Collateral Agent hereunder, the Collateral Agent may, in its sole discretion, refrain from taking any action other than retain possession of the Collateral, unless the Collateral Agent receives written instructions, signed by an Authorized Person of the Secured Party, which eliminates such ambiguity or uncertainty, provided that nothing in this Section 22 shall in any way limit the Secured Party's right to issue, or the Collateral Agent's obligation to follow, instructions referred to in Section 3(d) and Section 5.

23. <u>Resignation</u>.

(a)      The Secured Party may remove the Collateral Agent at any time by giving to the Collateral Agent thirty (30) calendar days' prior written notice of removal signed by an

citi

-18-

**JX 064-18**

Authorized Person of the Secured Party.  The Collateral Agent may resign at any time by giving the Pledgor Representative and the Secured Party thirty (30) calendar days' prior written notice of resignation.

(b)    Within thirty (30) calendar days after receiving the foregoing notice of removal to the Collateral Agent or within thirty (30) calendar days after receiving the foregoing notice of resignation from the Collateral Agent, the Pledgors and the Secured Party shall appoint a successor collateral agent and the Secured Party shall give notice of such successor collateral agent to the Collateral Agent.  If a successor collateral agent has not accepted such appointment by the end of such 30-day period, the Collateral Agent may either (A) safe keep the Collateral until a successor collateral agent is appointed, without any obligation to invest the same or continue to perform under this Agreement or (B) apply to a court of competent jurisdiction for the appointment of a successor collateral agent or for other appropriate relief.

(c)    Upon receipt of notice of the identity of the successor collateral agent, the Collateral Agent shall either deliver the Collateral then held hereunder to the successor collateral agent, less the Collateral Agent's fees, costs and expenses, or hold such Collateral (or any portion thereof), pending distribution, until all such fees, costs and expenses are paid to it.  Upon delivery of the Collateral to the Secured Party or to the successor collateral agent, the Collateral Agent shall have no further duties, responsibilities or obligations hereunder.

24.    <u>Entire Agreement, No Third Party Beneficiaries</u>.  This Agreement constitutes the entire agreement between the parties and sets forth in its entirety the obligations and duties of the Collateral Agent with respect to the Collateral.  This Agreement is for the exclusive benefit of the parties to this Agreement and their respective permitted successors, and shall not be deemed to give, either expressly or implicitly, any legal or equitable right, remedy, or claim to any other entity or person whatsoever.  No party may assign any of its rights or obligations under this Agreement without the prior written consent of the other parties.

25.    <u>Mergers and Conversions</u>.  Any corporation or entity into which the Collateral Agent may be merged or converted or with which it may be consolidated, or any corporation or entity resulting from any merger, conversion or consolidation to which the Collateral Agent will be a party, or any corporation or entity succeeding to the business of the Collateral Agent will be the successor of the Collateral Agent hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding.

26. <u>No Implied Duties</u>.  As between the Pledgors and the Secured Party, notwithstanding any provision to the contrary elsewhere in this Agreement, the L/C Agreement or any other Loan Document, the Secured Party shall not have any duties or responsibilities, except those expressly set forth in this Agreement and the other Loan Documents to which it is a party, or any fiduciary relationship with any Pledgor, and no implied covenants, functions, responsibilities, duties,

citi

-19-

**JX 064-19**

obligations or liabilities shall be read into this Agreement, the L/C Agreement or any other Loan Document or otherwise exist against the Secured Party.

27. <u>No Advisory or Fiduciary Capacity</u>. As between the Pledgors and the Secured Party, in connection with all aspects of each transaction contemplated hereby, the Pledgors each acknowledge and agree for the benefit of the Secured Party that: (i) the transaction contemplated by the Loan Documents (including in connection with any amendment, restatement, consent, supplement, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Pledgors, on the one hand, and the Secured Party (including, without limitation, in its capacities as Agent and Issuing Bank), on the other hand, and each of the Pledgors is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, restatement, consent, supplement, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, the Secured Party is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Pledgors or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) the Secured Party (including, without limitation, in its capacities as Agent and Issuing Bank) has not assumed or will not assume an advisory, agency or fiduciary responsibility in favor of the Pledgors with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, restatement, consent, supplement, waiver or other modification hereof or of any other Loan Document (irrespective of whether the Secured Party has advised or is currently advising any Pledgor or any of its Affiliates on other matters) and the Secured Party has no obligation to any Pledgor or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Secured Party and its Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Pledgors and their respective Affiliates, and the Secured Party has no obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the Secured Party has not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, restatement, consent, supplement, waiver or other modification hereof or of any other Loan Document) and each of the Pledgors has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate. Each of the Pledgors hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against the Secured Party (including, without limitation, in its capacities as Agent and Issuing Bank) with respect to any breach or alleged breach of agency or fiduciary duty.

28. <u>PATRIOT Act Notice</u>. Each of the Secured Party and the Collateral Agent hereby notifies each Pledgor that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies each Pledgor, which information includes the name and address of such Pledgor and other information that will allow the Collateral Agent and/or the Secured Party to identify such Pledgor in accordance with the PATRIOT Act. Each Pledgor hereby agrees to provide such information promptly upon the request of the Secured Party and/or the Collateral Agent, as applicable.

citi

-20-

**JX 064-20**

29.  <u>Counterparts</u>.  This Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same agreement.  Scanned signatures on counterparts of this Agreement shall be deemed original signatures with all rights accruing thereto.

30.  <u>Joinders</u>.  In the event that after the date hereof, any Person becomes an L/C Lender under the L/C Agreement, such Person shall execute a joinder in form and substance acceptable the Collateral Agent and the Secured Party and provide information with regards to wire transfer instructions, authorized signers and other matters requested by the Collateral Agent or the Secured Party.  Upon execution and delivery of such joinder, <u>Schedule A</u> shall be updated to reflect the then current L/C Commitment Percentages.

**[Remainder of Page Left Intentionally Blank]**

citi

1069403.06B-CHISR02A - MSW

**JX 064-21**

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the date first written above.

**JX 064-22**

**JPP, LLC**

By: _____
Name:  Edward S. Lampert
Title:    Member

*[Signature Page to Cash Collateral Agreement – JPP, LLC]*

**JX 064-23**

**JPP II, LLC**

By: RBS Partners, L.P., as Manager

By: ESL Investments, Inc., as General Partner

By: _____
Name:  Edward S. Lampert
Title:    Chairman and Chief Executive Officer

**JX 064-24**

**CITIBANK, N.A., in its capacity
the Secured Party**

By_____
Name: David Smith
Title: Vice President

**CITIBANK, N.A , solely in its
 capacity as Collateral Agent**

By_____
Name:
Title:

*[Signature Page to Cash Collateral Agreement – JPP II, LLC]*

**JX 064-25**

**CITIBANK, N.A., in its capacity
the Secured Party**

By_____
   Name:
   Title:

**CITIBANK, N.A , solely in its
capacity as Collateral Agent**

By_____
   Name:
   Title:   **CAMILLE** TOMAO
         **Director**

**JX 064-26**

**EXHIBIT A**

**FORM OF INSTRUCTION**

**VIA EMAIL: cts.spag@citi.com and paolo.ippolito@citi.com**

Citibank, N.A.
Agency & Trust
388 Greenwich Street, 14th Floor
New York, New York 10013
Attn: Paolo Ippolito

Pursuant to the Cash Collateral Agreement dated as of [_____], 201[ ], among JPP LLC, a Delaware limited liability company, and JPP II, LLC, a Delaware limited liability company (each a "**Pledgor**" and collectively, the "**Pledgors**"),  CITIBANK, N.A., a national banking association organized and existing under the laws of the United States of America ("**Citibank**"), acting in its capacity as secured party (the "**Secured Party**"), and Citibank acting through its Agency and Trust Division and solely in its capacity as collateral agent, and any successors appointed pursuant to the terms hereof (Citibank in such capacity, the "**Collateral Agent**"), we hereby instruct you of the following:

The Secured Party hereby notifies you [that you are hereby directed to retain and hold all funds in each Account (as defined in the Cash Collateral Agreement referred to above) and not to invest or disburse the same to any party whatsoever, other than as instructed by the Secured Party] [disburse funds in each Account as follows:]

[Insert instructions].

CITIBANK, N.A.,
as Secured Party


By: _____
  Name:
  Title

Exhibit A

**JX 064-27**

## SCHEDULE A

### PLEDGORS L/C COMMITMENT PERCENTAGE

| **Pledgor** | **Percentage** |
|---|---|
| **JPP LLC** | **63.68%** |
| **JPP II, LLC** | **36.32%** |

Schedule A

**JX 064-28**

## SCHEDULE B-1

## AUTHORIZED LIST OF SIGNERS

Each of the following person(s) is authorized to execute documents and to direct funds transfers on the Secured Party's behalf.

**CITIBANK, N.A.**

Specimen Signature

Please check[(1)]:

Upload  Maker  Checker

| | | |
|---|---|---|
| Name | David Smith | |
| Title | Vice President | |
| Phone | (212) 723-3759 | |
| E-mail Address* | david.L2.smith@citi.com | |

| | |
|---|---|
| Name | Thomas Halsch |
| Title | Vice President |
| Phone | (212) 723-3749 |
| E-mail Address* | thomas.halsch@citi.com |

| | |
|---|---|
| Name | William Washburn |
| Title | Vice President |
| Phone | (212) 816-2496 |
| E-mail Address* | william.washburn@citi.com |

The Collateral Agent may confirm the instructions received by return call to one of the telephone numbers listed below.

| Telephone Number (including Country code) | Name |
|---|---|
| (212) 723-3755 | Katy Noel |
| (212) 723-3744 | Denise Perry |
| | |
| | |

*must be a corporate domain

[(1)]Secure File Transfer Designation Descriptions:
UPLOAD ONLY: The individual is authorized to upload such notices or instructions to the SFTP site. (NO CHECKER REQUIRED)
MAKER: The individual is authorized to create and upload such notices or instructions to the SFTP site.
CHECKER: The individual is authorized to authenticate and approve such notices or instructions to the SFTP site

JX 064-29

## SCHEDULE B-2

## AUTHORIZED LIST OF SIGNERS

Each of the following person(s) is authorized to execute documents and to direct funds transfers on behalf of JPP, LLC.

**JPP LLC**

|  |  | Specimen Signature | Please check[1]: |
|--|--|--|--|

| | | | Upload | Maker | Checker |
|--|--|--|--|--|--|
| Name | Edward S. Lampert | | x | x | x |
| Title | Sole Member and | | | | |
| | Authorized Signatory | | | | |
| Phone | (305) 702-2100 | | | | |
| E-mail Address* | eslaccounting@eslinvest.com | | | | |

The Collateral Agent may confirm the instructions received by return call to one of the telephone numbers listed below.

| *Telephone Number (including Country code)* | *Name* |
|--|--|
| (305) 702-2100 | Edward S. Lampert |
| (305) 702-2100 | Harold R. Talisman |
| | |
| | |

**\*must be a corporate domain**

[1]Secure File Transfer Designation Descriptions:
UPLOAD ONLY: The individual is authorized to upload such notices or instructions to the SFTP site. (NO CHECKER REQUIRED)
MAKER: The individual is authorized to create and upload such notices or instructions to the SFTP site.
CHECKER: The individual is authorized to authenticate and approve such notices or instructions to the SFTP site

**JX 064-30**

## SCHEDULE B-3

## AUTHORIZED LIST OF SIGNERS

Each of the following person(s) is authorized to execute documents and to direct funds transfers on behalf of JPP II, LLC.

**JPP II, LLC**

| | | Specimen Signature | **Please check**[1]: |
|---|---|---|---|

|  |  |
|---|---|
| Name | Edward S. Lampert |
| Title | Authorized Signatory and Chairman and Chief Executive Officer of ESL Investments, Inc. (as general partner of RBS Partners, L.P., manager of JPP II, LLC) |
| Phone | (305) 702-2100 |
| E-mail Address* | eslaccounting@eslinvest.com |

Please check[1]:

| Upload | Maker | Checker |
|--------|-------|---------|
| x | x | x |

The Collateral Agent may confirm the instructions received by return call to one of the telephone numbers listed below.

| Telephone Number (including Country code) | Name |
|---|---|
| (305) 702-2100 | Edward S. Lampert |
| (305) 702-2100 | Harold R. Talisman |
|  |  |
|  |  |

**\*must be a corporate domain**

[1]Secure File Transfer Designation Descriptions:

UPLOAD ONLY: The individual is authorized to upload such notices or instructions to the SFTP site. (NO CHECKER REQUIRED)

MAKER: The individual is authorized to create and upload such notices or instructions to the SFTP site.

CHECKER: The individual is authorized to authenticate and approve such notices or instructions to the SFTP site

Schedule B-3

**JX 064-31**

## SCHEDULE B-4

## AUTHORIZED LIST OF SIGNERS

Each of the following person(s) is authorized to execute documents and to direct funds transfers on the Pledgor Representative's behalf.

### ESL INVESTMENTS, INC.

Specimen Signature

Please check[1]:

Upload   Maker   Checker

| x | x | x |

| | |
|---|---|
| Name | Edward S. Lampert |
| Title | Chairman and Chief Executive Officer |
| Phone | (305) 702-2100 |
| E-mail Address* | eslaccounting@eslinvest.com |

The Collateral Agent may confirm the instructions received by return call to one of the telephone numbers listed below.

| Telephone Number (including Country code) | Name |
|---|---|
| (305) 702-2100 | Edward S. Lampert |
| (305) 702-2100 | Harold R. Talisman |
| | |
| | |

**must be a corporate domain*

[1]Secure File Transfer Designation Descriptions:

UPLOAD ONLY: The individual is authorized to upload such notices or instructions to the SFTP site. (NO CHECKER REQUIRED)
MAKER: The individual is authorized to create and upload such notices or instructions to the SFTP site.
CHECKER: The individual is authorized to authenticate and approve such notices or instructions to the SFTP site

**JX 064-32**

**SCHEDULE C**

**SCHEDULE OF FEES FOR SERVICES
AS
COLLATERAL AGENT FOR
JPP, LLC AND JPP II, LLC**

**<u>Acceptance Fee</u>**

To cover the acceptance of the Collateral Agent role, the study of the Pledge Agreement and all supporting documents submitted in connection with the execution and delivery of this transaction, communication with other members of the working group. To be paid in advance.

**Waived**

**<u>Annual Collateral Agent Fee:</u>**

To cover the administrative functions of the Collateral Agent under the agreement, including the establishment and maintenance of the Pledge account, safekeeping of assets, maintenance of the records, follow-up of the agreement provisions, and other duties required of the agent under the terms of the Pledge agreement.

**Waived**

**<u>Legal Fee:</u>**

To cover fees and expenses of external legal counsel, on behalf of Citibank, N.A. in connection with the review and negotiation of governing documents:

**AT COST (IF APPLICABLE)**

Schedule C

JX 064-33

**Schedule Assumptions**

- Opening of collateral account with initial funding of US$100,000,000 with potential to increase pledge to $500,000,000 in conjunction with collateralization of Citi Letter of Credit
- Distributions will be made in accordance with Pledge agreement
- Documentation to be subject to internal approval and satisfactory review by Citibank, N.A. including all applicable AML and KYC requirements
- Agreement will be governed by New York law
- Funds held in the collateral account will be deposited in Citi's Dollars on Deposit in Custody Account ("DDCA") and earn a return of 20bps (please note that this return is subject to change upon 30 days' notice by Citibank)

This proposal shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to the conflicts of laws principles thereof.   The above schedule of fees does not include charges for out-of-pocket expenses or for any services of an extraordinary nature that Citibank, N.A. or its legal counsel may be called upon from time to time to perform in either an agency or fiduciary capacity, nor does it include the fees of Citibank, N.A.'s legal counsel.  Fees are also subject to satisfactory review of the documentation, and we reserve the right to modify them should the characteristics of the transaction change from what is described herein.  The Acceptance Fee is payable upon execution of the relevant documentation.  The fees are payable annually in advance. Should this schedule of fees be accepted and agreed upon and work commenced on this transaction but subsequently halted and the transaction is not consummated, the Acceptance Fee and legal fees incurred, if any, will still be payable by you in full.  This Fee Schedule is offered for, and applicable to the transaction described on page one only, and is guaranteed for sixty (60) days from the date on this proposal.  After sixty (60) days, this offer can be extended only in a writing signed by Citibank, N.A.

In accordance with US regulations regarding anti-money laundering and terrorist financing, Federal law requires us to obtain, verify and record information that identifies each business or entity that opens an account or establishes a relationship with Citibank, N.A. What this means for you: when you open an account or establish a relationship, we will ask for and independently verify your business name, a street address and a tax identification number, all of which Federal law requires us to obtain.  In accordance with the Unlawful Internet Gambling Act (the "Act"), Citibank, N.A. accounts or other Citibank, N.A. facilities in the United States may not be used to process "restricted transactions" as such term is defined in U.S. 31 CFR Section 132.2(y).

Citi may wish to refer to this transaction for marketing purposes, both internally and externally, without disclosing any confidential or sensitive non-publicly available information.

*[Signature Page to Cash Collateral Agreement – JPP, LLC]*

**JX 064-34**

## SCHEDULE D

## WIRE INSTRUCTIONS

If to JPP LLC:

Bank of America, NA
100 West 33rd Street
New York, NY 10001
ABA: 026009593
Account Name: Merrill Lynch
Account #: 6550113516
FFC: JPP LLC
Account #: 850-02805

If to JPP II, LLC

Bank of America, NA
100 West 33rd Street
ABA: 026009593
Account Name: Merrill Lynch
Account #: 6550113516
FFC: JPP II LLC
Account #: 850-02806

If to the Secured Party:

Bank: Citibank N.A.
ABA#: 021- 000-089
Account Name: Agency/Medium Term Finance
A/C#: 3685-2248
Ref:

**JX 064-35**