# Exhibit 47

Page 578

1   UNITED STATES BANKRUPTCY COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------x
3   In re:
4   SEARS HOLDINGS CORPORATION, et al.,
                    Debtor.
5
6                   Chapter 11
                    Case No. 18-23538 (RDD)
7
8   ------------------------------------x
    HEARING DAY 3
9                   February 7, 2019
10
11  B E F O R E:
12       HON. ROBERT D. DRAIN,
         UNITED STATES BANKRUPTCY JUDGE
13
14
15
16  Reported by:
    MARK RICHMAN, CSR, RPR, CM
17  JOB NO:  155335
18
19
20
21
22
23
24
25

JX 072-1

1    APPEARANCES:

2

     AKIN GUMP STRAUSS HAUER & FELD
3    Attorneys for Unsecured Creditors
            One Bryant Park
4            Bank of America Tower
            New York, New York 10036
5    BY:    ABID QURESHI, ESQ.
            DEAN CHAPMAN, JR., ESQ.
6            PHILIP DUBLIN, ESQ.
            JOHN KANE, ESQ.
7            JOSEPH SORKIN, ESQ.
            CHRISTOPHER CARTY, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**JX 072-2**

Page 580

1    A P P E A R A N C E S (Continued):

2    WEIL, GOTSHAL & MANGES

     Attorneys for Debtors

3    and Debtors-in-Posession: Sears Holdings

     Corporation, et al.

4    200 Crescent Court

     Dallas, Texas 75201

5    BY:    JAKE RUTHERFORD, ESQ.

            PAUL GENENDER, ESQ.

6            JENNIFER CROZIER, ESQ.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**JX 072-3**

Page 581

1    A P P E A R A N C E S (Continued):

2    WEIL, GOTSHAL & MANGES

     Attorneys for Debtors

3    and Debtors-in-Posession: Sears Holdings

     Corporation, et al.

4         767 Fifth Avenue

          New York, New York 10153

5    BY:   JARED FRIEDMANN, ESQ.

          GARRETT FAIL, ESQ.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**JX 072-4**

1

A P P E A R A N C E S  (Continued):

2   PAUL, WEISS, RIFKIND, WHARTON & GARRISON

Attorneys for the Restructuring Committee

3          1285 Avenue of the Americas

New York, New York 10019

4   BY:    JONATHAN HURWITZ, ESQ.

DAVID GILLER, ESQ.

5          KAREN KING, ESQ.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JX 072-5

Page 583

1

A P P E A R A N C E S (Continued):

2

CLEARY GOTTLIEB STEEN & HAMILTON

3    Attorneys for ESL Investments Inc.
     and the Witness

4         One Liberty Plaza
          New York, New York 10006

5    BY:  ANDREW WEAVER, ESQ.
          JACK WHITELEY, ESQ.

6         JAMES BROMLEY, ESQ.
          LEWIS LIMAN, ESQ.

7         ILYA GLINCHENKO, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JX 072-6

Page 584

1          PROCEEDINGS

2      THE COURT:  Okay, good morning.

3  In re Sears Holdings Corporation.

4  Before we begin, I just want to make

5  double sure that the court call is

6  hooked in, that the people are on it.

7      AUDIENCE MEMBER VIA PHONE:  Yes,

8  your Honor, we are all set.

9      THE COURT:  Okay.  Because I got

10  an earlier email.  Maybe that wasn't

11  the case.

12      Okay, you can go ahead, Mr.

13  Schrock.

14      MR. SCHROCK:  Good morning, your

15  Honor, for the record, Ray Schrock,

16  Weil Gotshal Manges on behalf of the

17  debtors.

18      Your Honor, we are here for

19  closing arguments to finish up the

20  summary proceeding for approval of

21  substantially all of the debtors' --

22  sale of substantially all of the

23  debtors' assets to ESL and then the

24  Transformco.

25      Your Honor, I do have a few slides

**JX 072-7**

Page 585

1                    PROCEEDINGS

2    that I'd like to walk through to

3    organize my points and my thoughts.

4    May I approach?

5         THE COURT:  Sure.

6         MR. SCHROCK:  Your Honor, today

7    is obviously a very important day for

8    Sears and there have been many of

9    those in the short course of this

10   case, but this is in fact may be the

11   most important day.  Everything

12   depends on it.

13        The fate of Sears is going to be

14   in the court's hands.  We've done

15   everything that we can to save this

16   company over the last several months.

17   And as your Honor may remember when

18   we first started this case, we put it

19   on a very fast timeline and we knew

20   that it was going to be a tremendous

21   amount of work to even get to this

22   position.  But I think even by, and I

23   think I speak on behalf of all the

24   professionals and stakeholders

25   involved, I think everybody would

JX 072-8

Page 586

1                    PROCEEDINGS

2   acknowledge it's frankly been even

3   more than that, it's been

4   extraordinary.

5       We very much are in support of

6   approving the sale to ESL.  And the

7   primary objections that have been

8   lodged against the sale revolve

9   around whether the sale transaction

10  has been the product of an adequate

11  sale process, you know, whether or

12  not it's the highest or best

13  alternative.  And we believe that the

14  evidence submitted during the summary

15  proceeding overwhelmingly

16  demonstrates that the debtors have

17  carried their burden.

18      Now, your Honor, on slide 2 we

19  also note that we have addressed a

20  few other key issues at the request

21  of the court that I'll be covering

22  this morning.

23      ESL's assuming of $166 million of

24  accounts payable.

25      The potential overhang of warranty

**JX 072-9**

Page 587

1           PROCEEDINGS

2    liabilities.

3           The transition services agreement.

4           Cyrus's allowance of claims.

5           The, quote, unquote, noncredit bid

6    value for unencumbered assets.

7           Clarifying the scope of release

8    for ESL.

9           And the KCD administrative claim.

10          I'll be turning the podium over to

11   Mr. Basta following my comments to

12   cover issues related to the

13   subcommittee and the credit bid and

14   release issues.

15          Last night and this morning, we

16   filed a few documents with the court.

17   We did file a form of transition

18   services agreement.  It's in

19   substantially final form.  Parties

20   are still working out a few issues

21   but we believe it's very close.

22          We filed the schedules to the

23   asset purchase agreement.

24   Importantly, these schedules were

25   done at the time of signing the asset

JX 072-10

Page 588

1                    PROCEEDINGS

2    purchase agreement and that schedule

3    contains, among other things, a

4    schedule 1 G that demonstrates that

5    the $166 million of accounts payable

6    was in fact agreed to be assumed by

7    ESL.

8         Just to put it out there, judge,

9    this is an important issue.  We have

10   not come to terms with ESL on that

11   particular point.  The debtors are

12   prepared to close on the contract as

13   written.  But we will be asking the

14   court for the court's guidance.

15   We're not going to engage in

16   litigation post closing.  If ESL is

17   prepared to close on the agreement as

18   written, take the 166, we have a

19   deal.  If they're not, then we don't

20   have a deal.  And I think that's

21   where the parties are at the moment.

22   But I do have copies of the schedules

23   if you'd like.

24        THE COURT:  I was going to ask

25   you for that schedule in particular.

JX 072-11

Page 589

1              PROCEEDINGS

2        MR. SCHROCK:  Certainly.

3        THE COURT:  1.1 G or 1 G?

4        MR. SCHROCK:  Yes, your Honor.

5        THE COURT:  Other payables.

6        MR. SCHROCK:  So, your Honor, as

7     it does demonstrate on schedule 1 G,

8     1.1 G, which is defined as other

9     payables --

10        THE COURT:  It just says 166

11     million.  I assume accounts payable.

12        MR. SCHROCK:  Yes.

13        THE COURT:  Okay.  You put it

14     about as broad as you can get.

15        MR. SCHROCK:  That's about as far

16     as we could get, your Honor.  And

17     taking it a little bit out of order,

18     but on the KCD administrative claim,

19     I do have an important announcement

20     for the court and parties in

21     interest.

22        I am very pleased to report that

23     last evening the debtors

24     restructuring committee agreed to a

25     settlement term sheet with the PBGC.

JX 072-12

Page 590

1                    PROCEEDINGS

2     That settlement results in a number

3     of things and a number of benefits

4     for these estates, but it doesn't

5     just resolve their objection to the

6     sale.  It also resolves their claims

7     in these cases.

8          Your Honor, I do have a copy of

9     the settlement term sheet that I'll

10    be prepared to walk through and hand

11    it up to you and we have copies for

12    parties in interest.

13         THE COURT:  Okay.

14         MR. SCHROCK:  So, your Honor,

15    this settlement proposal which really

16    is phenomenal, we have come to an

17    arrangement where the PBGC will

18    withdraw their objection to the ESL

19    sale.  This agreement is not

20    contingent upon closing of the ESL

21    transaction.  But we have agreed and

22    the debtors have agreed importantly

23    that, to the consensual termination

24    of the Sears pension plan and K-Mart

25    pension plan effective as of January

JX 072-13

Page 591

1         PROCEEDINGS

2    31, 2019.

3         Now importantly this is just an

4    agreement to the debtors.  This does

5    not affect the obligations or the

6    rights and cannot be used as a sword

7    against nondebtors.

8         There's going to be an agreement

9    on a claim that, a general unsecured

10   claim that will be held against all

11   debtors because there is a joint and

12   several claim.  It's been lowered

13   from the asserted amount of roughly

14   $1.7 billion to $800 million.

15        The termination premium is not

16   going to -- the debtor is not going

17   to be liable for that.  And

18   importantly, the PBGC would be

19   willing to support a Chapter, it will

20   support a Chapter 11 plan, subject to

21   approval of disclosure statement,

22   both the claims in favor of a plan.

23        The PBGC which holds -- which has

24   a director at KCD will also take

25   steps with the debtors to ensure that

**JX 072-14**

Page 592

1              PROCEEDINGS

2    any claims of KCD against the debtors

3    are waived in total.

4        So importantly, the $111 million

5    claim that's been talked about and

6    that I think the committee's

7    witnesses, the debtors and myself

8    have said, listen, this is an

9    administrative claim, that claim --

10       THE COURT:  Potentially one.

11       MR. SCHROCK:  Potentially one, is

12   in fact resolved.

13       Because of the steps that the PBGC

14   has taken in conjunction with the

15   sale, because of the steps they've

16   taken to assist us with the, all of

17   the issues with the administrative,

18   purported administrative claim, the

19   substantial reduction in their

20   allowed claim as a general unsecured

21   claim for 1.7 down to roughly $800

22   million, we are agreeing that under

23   the terms of a plan that they would

24   have a priority right to $80 million

25   of net proceeds in litigation

JX 072-15

Page 593

1              PROCEEDINGS

2    actions.  There's also a release.

3    And this is subject to us documenting

4    this and moving forward for approval

5    on settlement.

6         Now importantly that settlement is

7    not up for approval today.  But I

8    think for purposes of this hearing,

9    your Honor, what matters is the PBGC

10   is withdrawing its objection and the

11   debtors we believe -- we have a path

12   forward to resolve the KCD

13   administrative claim.  Nothing's

14   guaranteed, and nothing's guaranteed

15   in this case on administrative

16   solvency in an ESL sale, nor is it

17   guaranteed certainly in a winddown.

18   There's heavy risk, in our view,

19   around the winddown.  And we will

20   talk more about this.

21        THE COURT:  So you'll be seeking

22   approval of this settlement, the

23   aspects that aren't that go into

24   effect immediately?

25        MR. SCHROCK:  That's correct.

**JX 072-16**

Page 594

1             PROCEEDINGS

2        THE COURT:  I'm assuming

3    reasonably promptly or maybe it will

4    be in the context of approval of the

5    plan, maybe it will be separate.

6        MR. SCHROCK:  I expect, your

7    Honor, we're going to document a plan

8    and likely a restructuring and

9    support agreement promptly with court

10   approval.  We are also going to sit

11   down with the committee on the terms

12   of a plan.  So we haven't worked out

13   precisely what's going to be in the

14   context of the plan or separate, but

15   we will be moving forward promptly.

16       THE COURT:  I know counsel for

17   the PBGC has participated.  Is that a

18   fair summary of the settlement?  I

19   mean I have the signed term sheet.

20       MR. RADER:  Good afternoon, your

21   Honor.  For the record, Brian Rader

22   on behalf of PBGC.  Everything that

23   Mr. Schrock says is consistent with

24   the term sheet.  And one obligation

25   under the term sheet is to formally

JX 072-17

Page 595

1              PROCEEDINGS

2    withdraw our objection to the sale,

3    and I'd like to do that on the record

4    right now.

5         THE COURT:  Okay, very well.

6    Thank you.

7         MR. RADER:  Thank you, your

8    Honor.

9         MR. SCHROCK:  Your Honor, moving

10   on from the PBGC settlement.  We

11   think the evidence in this matter is

12   very much largely uncontroverted.

13        THE COURT:  I'm sorry.  Can I go

14   back to your slide.

15        MR. SCHROCK:  Yes, which one?

16        THE COURT:  You mentioned the

17   transition services agreement and I

18   haven't had a chance to review that

19   yet.  Is it essentially neutral to

20   the debtors?  Are the debtors

21   performing obligations under it that

22   they can't perform because they don't

23   have the money to do so, or

24   alternatively are they relying on ESL

25   to perform obligations that they

JX 072-18

Page 596

1              PROCEEDINGS

2    don't have the money to do so?

3        MR. SCHROCK:  Your Honor, I think

4    it's fair to say, like most

5    transition services agreement, it's a

6    framework for the parties to work

7    together over the near term.  And

8    given the pace at which this is

9    closing, there are some things that

10   ESL needs from the debtor, such as,

11   you know, transform Postco license to

12   conduct business and they're going to

13   need to use the debtors' licenses.

14   They're leasing the debtors'

15   employees.  We're getting access to

16   books and records to finish the

17   conduct of the case.  There is

18   agreement from the debtors for some

19   cash payments over the next 60 days

20   for the use of -- for the use of

21   basically facilities, conducting

22   GOBs, liquidating inventory.

23       THE COURT:  By the debtors.

24       MR. SCHROCK:  By the debtors.

25       THE COURT:  In respect to

**JX 072-19**

Page 597

1                    PROCEEDINGS

2      pursuing assets.

3          MR. SCHROCK:  Yes, over the next

4      60 days.  Now we can agree to extend

5      that 60 day time frame.  We can come

6      to an agreement, as is common.

7          I don't -- one thing is for

8      certain, your Honor.  Like every

9      other transition services agreement,

10     I'm very confident that the parties

11     are going to have to supplement it

12     because as you know, if we can, are

13     fortunate enough to close the

14     transaction tomorrow, parties are

15     going to need to be able to work

16     together.

17         THE COURT:  I understand that.  I

18     just want to make sure that it's

19     essentially neutral that the benefits

20     the debtor is getting -- the debtors

21     are getting out of it are no less

22     than what they're paying for it and

23     vice-versa.

24         MR. SCHROCK:  That is very

25     much --

**JX 072-20**

1              PROCEEDINGS

2          THE COURT:  And what ESL is

3     getting out of it are going to be

4     paid by ESL.

5          MR. SCHROCK:  That is very much

6     the intent, your Honor.  There are

7     modest cash payments from the company

8     coming out of that.  But when you go

9     through all of the back and forth --

10         THE COURT:  Is the company

11    providing services to ESL?

12         MR. SCHROCK:  Yes.

13         THE COURT:  Is it being

14    compensated for that?

15         MR. SCHROCK:  It's all being

16    taken into account in terms of the

17    back and forth in terms of who is

18    providing what services.  At the end

19    of the day, there's a net payment

20    coming from the debtors.  But we

21    believe that it's a fair compromise

22    in light of what's being required

23    from all the parties on each side.

24    But primarily we're going to need

25    access to Transformco assets.

Page 599

1                    PROCEEDINGS

2        THE COURT:  As far as the

3    services the debtors are providing,

4    will they have the resources to

5    provide those services?

6        MR. SCHROCK:  Yes, your Honor.

7        THE COURT:  Will they pay for it

8    if they don't?

9        MR. SCHROCK:  Yes, your Honor.

10       THE COURT:  Is that ESL's

11   understanding too?

12       MR. BROMLEY:  Your Honor, James

13   Bromley, Cleary Gottlieb on behalf of

14   ESL.  The answer is yes.  The TSA is

15   structured in a way that the debtors

16   would be paying $1.25 million a month

17   during this period of time subject to

18   extension to ESL for a vast host of

19   services, the cost of which is much

20   in excess of 1.25.

21       For the services that the debtors

22   are providing back to ESL, there will

23   be a payment from ESL of 250,000 a

24   month.  So the net is a million

25   dollars a month during that period of

**JX 072-22**

Page 600

1              PROCEEDINGS

2    time, 60 days subject to extension.

3         THE COURT:  And the primary

4    services are, in essence, being able

5    to do GOB sales?  I mean is that

6    keeping the access to the properties?

7         MR. BROMLEY:  There's a variety

8    of things.  That's one of them, your

9    Honor.  But upon closing, assuming

10   that the sale closes, nearly all of

11   the debtors' operations will be

12   transferred to the buyer and the

13   debtor needs some of those services

14   back in order to continue its

15   operations in winddown.  So in that

16   sense ESL, or the Newco will be

17   providing those services back to the

18   estate.

19        And in terms of the cost neutral

20   element of it, the cost of providing

21   those services by Newco is far in

22   excess of the net million dollars

23   that's going to be paid by the

24   debtor.

25        THE COURT:  Okay.

JX 072-23

Page 601

1              PROCEEDINGS

2          MR. SCHROCK:  And I mean from the

3     estate's perspective, judge, the

4     primary thing that we believe we're

5     getting, access to books and records,

6     we don't think that's something --

7          THE COURT:  I mean that's in the

8     contract.

9          MR. SCHROCK:  That's in the

10    contract.  It's not really a big

11    deal.  We need access to finish GOBs,

12    to bring those assets into the

13    estates.  They need from us

14    licensing.  That's the real trade

15    here over the next 60 days.  But when

16    we did the math --

17         THE COURT:  And then taking some

18    of your, or all of your people

19    primarily or almost all of them.

20         MR. SCHROCK:  Almost all the

21    people.

22         THE COURT:  So some of them will

23    continue to provide the services you

24    need related to the winddown for the

25    rest of the case.

**JX 072-24**

Page 602

1              PROCEEDINGS

2        MR. SCHROCK:  Yes, your Honor.

3    Importantly, we are agreeing to,

4    we're leasing employees in fact to,

5    under the transition services

6    agreement, to Transformco over the

7    near term.  So those employees are

8    still going to be technically the

9    debtors' employees for a period of

10   time until they get their systems up

11   and running.

12       THE COURT:  Okay.  We have some

13   other things on here.  Are you going

14   to get to those later or do you want

15   to cover them now?  The warranties,

16   the Cyrus release.

17       MR. SCHROCK:  Your Honor, we can

18   take those now.  The potential

19   overhang on warranties, if your Honor

20   were to turn to slide 27.  There's a

21   provision in the agreement that

22   pending the transfer of the KCD notes

23   --

24       THE COURT:  I'm sorry, so this

25   isn't anything new?

**JX 072-25**

1             PROCEEDINGS

2        MR. SCHROCK:  No.

3        THE COURT:  I just want you to

4    summarize anything new.  I'm sorry.

5        MR. SCHROCK:  If that's a

6    clarification under the agreement

7    that's already handled.

8        Going through this list --

9        THE COURT:  If there's anything

10   new on here as opposed to explaining

11   as part of your organize argument,

12   you should let me know.

13       MR. SCHROCK:  The scope of the

14   release is the only other thing that

15   I think Mr. Basta will address.

16       THE COURT:  And related to that

17   is Cyrus, I guess.

18       MR. SCHROCK:  That's right, but

19   Cyrus I will handle in argument as

20   will Mr. Basta but it's literally

21   nothing changed.

22       THE COURT:  Okay.

23       MR. SCHROCK:  Your Honor, moving

24   forward on slide 3, the evidence in

25   this matter is largely uncontroverted

**JX 072-26**

Page 604

1              PROCEEDINGS

2    in favor of a number of solutions,

3    including that the sale transaction

4    is subject to business judgment

5    standard and that we meet the

6    standard as a valid exercise of the

7    debtors' business judgment.

8        The sale process is thorough,

9    competitive, and a highly public

10   process carried out in compliance

11   with the court's approved global

12   bidding procedures.

13       The sale transaction is superior

14   to the winddown alternative and

15   Transformco has provided adequate

16   assurance of future performance.

17       Your Honor, the legal standard is

18   set out in 363 (B) (1) that the

19   trustee, after notice and a hearing,

20   may use, sell, or lease, other than

21   in the ordinary course of business,

22   property of the estate.

23       Courts in this circuit and others,

24   in applying this section, have

25   required that the sale of the

JX 072-27

Page 605

1          PROCEEDINGS

2    debtor's assets must be based on the

3    sound business judgment of the

4    debtor.

5       Now where the transaction is

6    negotiated or supervised by an

7    independent fiduciary, such as a

8    restructuring committee, the business

9    judgment standard we believe

10   undoubtedly continues to apply.

11      This is an unusual auction, judge,

12   in that in every other auction

13   certainly that I've been involved in,

14   you are comparing two live bidders,

15   one bid being, you know, could be a

16   going concern bid and another bid, at

17   least if there's a liquidation

18   alternative, there is at least, you

19   know, a liquidator that's really

20   putting up cash, that's providing

21   real value.

22      Here the company only had one

23   qualified bid, okay, for the auction,

24   for going concern sale.  We were

25   comparing it to a winddown

**JX 072-28**

Page 606

```
 1              PROCEEDINGS
 2    alternative run by the debtors, okay.
 3    And we took that obligation very
 4    seriously nevertheless.  But I do
 5    think it's worth noting that the only
 6    qualified bid was for -- was from ESL
 7    and Transformco.
 8         THE COURT:  Can I explore that a
 9    little bit.
10         MR. SCHROCK:  Sure.
11         THE COURT:  There really was not
12    a whole lot in the record on this.
13    But the prior hearings leading up to
14    the auction referenced the debtors
15    soliciting I guess it's bulk bids
16    from liquidators.
17         MR. SCHROCK:  Yes.
18         THE COURT:  And the debtors
19    announced their conclusion that their
20    retained liquidator, Abicus, actually
21    had the best of that lot of that
22    group.  Abicus, when you refer to
23    Abicus being the best of that group,
24    is that just based on the terms of
25    Abicus's retention?
```

JX 072-29

Page 607

1                    PROCEEDINGS

2         MR. SCHROCK:  It is, your Honor,

3    based on the terms of Abicus's

4    retention.  And when we were looking

5    at so-called equity bids from

6    liquidators where they were actually

7    going to be purchasing the assets,

8    the recoveries that could be had on

9    the company's assets was simply

10   superior under a company run GOB.

11   And I don't really think that issue

12   is in controversy by any of the

13   stakeholders in this case.

14        THE COURT:  Well certainly no one

15   has raised the argument that any of

16   the liquidators made a higher or

17   better bid.

18        Were those proposals including the

19   Abicus one, did they include Abicus

20   running anything more than GOB sales,

21   i.e., did they assume that the

22   company would be -- the debtors would

23   be marketing the real estate assets

24   separately from the liquidators?

25        MR. SCHROCK:  Your Honor, there

JX 072-30

Page 608

1              PROCEEDINGS

2    are various permutations of those

3    bids.  And the debtors actually ran

4    an informal auction during the first

5    week of January among the liquidators

6    in the event that we were going to go

7    the GOB route.

8          The results of that auction --

9          THE COURT:  We announced that.

10          MR. SCHROCK:  The result of that

11    was that Abicus was a higher or

12    better bid.  But we don't have, you

13    know, deposits, qualified bids from

14    liquidators.  And I think that how

15    the parties and the committee and the

16    debtors certainly agreed that the

17    recovery under it was an Abicus and

18    we also supplemented with SB 360,

19    Schottenstein, a Schottenstein run

20    venture, to provide additional

21    capacity, that those two parties

22    running the GOBs with the debtors

23    would provide the highest or

24    recoveries and that's what we were

25    comparing in the context of the

JX 072-31

Page 609

```
 1              PROCEEDINGS
 2    auction and the winddown.
 3         THE COURT:  I guess my question
 4    is, the Abicus terms, were those set
 5    forth in the retention?  You didn't
 6    change those?
 7         MR. SCHROCK:  Yes, your Honor.
 8         THE COURT:  Except they added
 9    SB360 which sounds like a product
10    that Sears would be selling as
11    opposed to buying.
12         MR. SCHROCK:  Yes, your Honor.
13    The answer is yes.  It's very modest.
14         THE COURT:  So can I interrupt
15    you.  As I remember that retention,
16    they didn't take on the
17    responsibility to market real estate.
18    It was really straight GOB.
19         MR. SCHROCK:  That's correct.
20         THE COURT:  So --
21         MR. SCHROCK:  That's right.
22         THE COURT:  So when you compared
23    the various ESL proposals including
24    the one that was ultimately accepted
25    to a liquidation alternative, it was
```

JX 072-32

Page 610

1                    PROCEEDINGS

2      a combination of Abicus GOB sales and

3      the debtors marketing real estate.

4          MR. SCHROCK:  That's correct,

5      your Honor.  So we used a combination

6      of, as provided in the testimony from

7      Mr. Meghji as well as Mr. Welch, a

8      combination of appraisals that we had

9      conducted for assets as well as

10     indications of interest received and

11     comparing how we received them.

12         THE COURT:  There's some

13     miscellaneous assets in potential

14     litigation claims, but it was

15     primarily GOB and real estate.  And

16     you're still doing the GOB.

17         MR. SCHROCK:  We are still doing

18     the GOB.

19         THE COURT:  So it comes down to

20     the real estate.

21         MR. SCHROCK:  That is it.  I

22     think when you really looked at the

23     differences between the committee's

24     assumptions and the debtors'

25     assumptions around the winddown, it

JX 072-33

1          PROCEEDINGS

2    really did in our view come down to

3    the real estate.  You had, you know,

4    from the one perspective the debtors,

5    the debtors' valuations that are in

6    the record.  They are uncontested.

7    And during Mr. Greenspan's live

8    testimony, he retracted his two

9    important criticisms of the Welch

10   declaration and lessened his

11   valuation by 50 to $90 million.

12       I note that Mr. Greenspan also was

13   assuming what I can only say is just

14   a process that's not bound in reality

15   or 365 (B) (4) bankruptcy code that

16   you can liquidate leases over the

17   course of 20 to 24 months and saying

18   you're going to assume those leases

19   and put them in a trust.

20       I think this does not recognize

21   what the legal restrictions are and

22   the assumption and assignment under

23   the bankruptcy code.

24       And as Mr. Welch further

25   explained, the discounts applied by

Page 612

1                    PROCEEDINGS

2    M-III related to the real estate were

3    reasonable because they accounted for

4    an unprecedented expedited bulk sale

5    of big box properties from a

6    distressed seller.

7         In fact, Mr. Greenspan himself

8    testified that sale of the properties

9    of the magnitude contemplated by the

10   debtors was unprecedented.

11        The liquidation winddown analysis

12   reasonably values the real estate.

13   We think the Toys experience does

14   support our valuation.  But I do

15   believe that overall when you look at

16   the appraisals and the rigor through

17   which the debtors put all of these

18   properties through that test,

19   demonstrates that the ESL value, and

20   we'll talk more about it, was in fact

21   much greater for all of the creditors

22   at large.

23        Your Honor, slide 5 we talk a

24   little bit about the marketing

25   process and I think it's really worth

JX 072-35

Page 613

1                    PROCEEDINGS

2    noting that Mr. Aebersold's testimony

3    in this matter is largely

4    uncontroverted.

5        Their initial phase was designed

6    to provide a large number of

7    potential purchasers with

8    information.  We engaged with over

9    250 potential investors, 125 under

10   NDA.

11       It was extraordinary.  The debtors

12   and their advisors responded to

13   several hundred diligence questions,

14   held over 40 formal diligence calls

15   and in-person meetings.

16       In multiple formal meetings and

17   numerous other informal discussions

18   with the UCC, the debtors outlined

19   their marketing strategy, shared the

20   identity of prospective bidders,

21   facilitated in-person meetings with

22   management and gave the opportunity

23   to review and comment on proposed

24   purchase agreements for prospective

25   bidders.

JX 072-36

Page 614

1              PROCEEDINGS

2        Now the UCC had the opportunity to

3    ask Mr. Aebersold about the sales

4    process but they really didn't ask a

5    single question, I believe, about

6    that process.  And they cannot now

7    challenge that process with the

8    evidence closed.

9        THE COURT:  I think you're about

10   to go to a different point.  Turning

11   back to the real estate, the debtors'

12   committee asserts that the debtors

13   did not run a real estate auction per

14   se.  They instead ran an auction

15   where they posited their assumed

16   values for the real estate as a

17   counter to the one going concern

18   proposal that was qualified which was

19   the ESL proposal.  And they suggest

20   that if you run a parallel real

21   estate auction, that instead of the

22   relatively modest number of

23   expressions of interest, or

24   indications of interest, you would

25   have gotten a much bigger number.

JX 072-37

Page 615

1          PROCEEDINGS

2       And I guess my question is why

3    wasn't that done and could it have

4    been done?

5       MR. SCHROCK:  Yes, your Honor, I

6    think with due respect to my friends

7    on the committee, I think that they

8    have a selective memory on this

9    issue.  Because when we first

10   undertook the global sale process and

11   had it approved, we were very open

12   with the committee, we were very open

13   with all parties we have to do what's

14   within the realm of the possible.  So

15   we set up the case so we had a chance

16   to run a process, an expedited

17   process on a going concern sale.

18       We told parties during December

19   that if they wanted to put in

20   indications of interest for the

21   debtors to consider, that we would

22   certainly -- that we would consider

23   them.  But as we told the committee,

24   we were going to be relying, you

25   know, also on nonbinding indications

JX 072-38

Page 616

1                PROCEEDINGS

2      of interest which were due by the

3      28th and the debtors' appraisals in

4      comparing the market value.

5          We have plan exclusivity.  We

6      think that the record -- you don't

7      have to run a full real estate

8      process.  And I think frankly

9      marketing, you know, 500 properties

10     in this amount of time, when you talk

11     about what's within the realm of the

12     possible, your Honor, in our

13     judgment, and we have a lot of people

14     working on this matter, that was not

15     possible to run a full real estate

16     process simultaneously with running

17     the going concern process.

18         But we did test the market.  The

19     evidence is uncontroverted on exactly

20     what the debtors did do.  I think

21     that if we were in contact with the

22     committee during this time, we had

23     global asset sale procedure process

24     that we followed to the letter with

25     the court.

JX 072-39

Page 617

1              PROCEEDINGS

2        And, your Honor, during that

3    process we found that there was one,

4    effectively one qualified bid.  But

5    those nonbinding indications of

6    interest, we didn't have a lot of

7    deposits, we didn't have a lot of

8    serious offers.  It was our

9    contemplation that if we weren't able

10   to have a going concern sale, because

11   we looked at the values and we made

12   we thought generous assumptions

13   around the real estate that if we

14   couldn't really substantially reduce

15   claims, have a going concern

16   opportunity, either in whole or in

17   part by selling divisions or selling

18   the whole business, that then in fact

19   we would have to pivot during the

20   winddown process to a full real

21   estate liquidation process.

22        THE COURT:  Okay.  So I want to

23   make sure I understand this.  To

24   summarize, and I guess this is

25   consistent with both Mr. Welch and

**JX 072-40**

1                   PROCEEDINGS

2    Mr. Greenspan's testimony, you're

3    saying you could not run an actual

4    real estate sale process in the

5    roughly month and a half, two months

6    that you had.  In fact, the minimum

7    time for such a process would be four

8    months and according to Mr. Greenspan

9    it would have to be over a year.

10       MR. SCHROCK:  That's right, your

11   Honor.

12       THE COURT:  So you did instead,

13   recognizing that time was valuable

14   here and recognizing the risks of

15   going with just a going concern

16   process without a some reality check

17   beyond appraisals, which is, real

18   estate is not like valuing tech

19   assets, real estate's real estate,

20   you can do a pretty good valuation of

21   real estate.

22       You did indicate strongly to those

23   who might believe that a liquidation

24   process with the sale of the real

25   estate would be better, to actually

**JX 072-41**

Page 619

1              PROCEEDINGS

2      put their best foot forward and make

3      at least indications of interest.

4      Which is frankly what I said too

5      during the hearing on the approval of

6      the sale procedures looking right at

7      counsel for various potential buyers

8      of real estate and the creditors'

9      committee, i.e., if you really

10     believe this, put your best foot

11     forward and make a proposal.

12         Okay.

13         MR. SCHROCK:  And, your Honor,

14     building on that, on slide 6 we do

15     note that, and it's really worth

16     emphasizing, this is a process that

17     was conducted pursuant to the court

18     approved global bidding procedures.

19     We have followed those procedures

20     throughout the case.  The report is

21     uncontroverted on that piece.

22         We have determined what is the

23     successful bid consistent with the

24     global bidding procedures, which

25     qualified bids constitute the highest

JX 072-42

Page 620

1              PROCEEDINGS

2    or best qualified bids.  And pursuant

3    to the auction rules, that was

4    determined in the business judgment

5    of the debtors.

6         We also had an independent chief

7    restructuring officer that the court

8    heard from, Mr. Meghji, an

9    independent restructuring committee.

10   You heard from both of the

11   subcommittee members.  They were all

12   very active during this process.

13        And, your Honor, on slide 7 we do

14   note that I think the record is fully

15   uncontroverted that restructuring

16   committee here is independent.  And

17   having certainly lived through this,

18   your Honor, I can vouch that it very

19   much is, that there's a couple of

20   anecdotes here just in regard to

21   that, that the testimony of Mr. Carr

22   as well as Mr. Transier is that they

23   did not have any association or

24   interactions with Mr. Lampert prior

25   to joining the board.  We put

**JX 072-43**

1              PROCEEDINGS

2    together an independent restructuring

3    committee.  I think ESL knew that if

4    they, given their position within the

5    capital structure, that this is going

6    to be necessary.  But there's no

7    personal or business relationship

8    either prior to or since that time

9    with either of the subcommittee

10   members.

11       This independent restructuring

12   committee negotiated, reviewed, they

13   approved the sale transaction.  They

14   were specifically delegated with the

15   authority to negotiate and approve

16   the ESL transaction.

17       And the record in these

18   proceedings is that the restructuring

19   committee was actively involved.  No

20   less than 58 times prior to the

21   proposed ESL transaction being

22   approved did the restructuring

23   committee meet since being formed in

24   October 2018.  And these were not

25   short meetings.  These were lengthy,

Page 622

1                   PROCEEDINGS

2    involved meetings, numerous in-person

3    meetings.  The directors, the

4    professionals, everyone took their

5    job extremely seriously and their

6    responsibilities to these estates.

7         Mr. Aebersold further testified

8    that consistent with his experience,

9    that the sale process was extensive.

10   We gave you some anecdotes to that

11   earlier, and that to his knowledge

12   and based upon his observations and

13   experience the auction was conducted

14   in good faith and the sale process

15   provided a fair and reasonable

16   opportunity to purchase components of

17   substantially all the debtors' assets

18   and operations.

19        That evidence is uncontroverted.

20        And further, your Honor, in

21   talking about how independent this

22   committee was, the committee formally

23   voted to reject separate bids by ESL

24   on at least two occasions.  This was

25   in my experience very unusual.  I

**JX 072-45**

Page 623

1              PROCEEDINGS

2    mean it's a very tight transaction I

3    think for ESL as well as the estate.

4    But this is not something where

5    anyone was pandering to anyone at ESL

6    and there's certainly no record to

7    support that.

8        We think the sound business

9    justifications here are consistent

10   with case law in the Second Circuit.

11       We point to Chrysler, among

12   others.  But there's in announcing

13   and looking at what types of

14   consideration that the court can

15   consider, I think it's worth

16   reiterating just looking at what ESL

17   and Transformco are providing.

18   They're committing approximately $5.2

19   billion in the form of cash and

20   noncash consideration, including a

21   cash payment of approximately $885

22   million.  There's a credit bid

23   pursuant to 363 (K) of the bankruptcy

24   code of secured debt facilities

25   totalling approximately 1.3 billion.

JX 072-46

Page 624

1                    PROCEEDINGS

2        There's the assumption of $621

3    million of senior debt, including

4    $350 million of the amounts owed

5    under the Junior DIP facility and

6    $271 million of the standalone LC

7    facility.

8        Those are all senior claims to

9    senior unsecured creditors.

10        There's further the assumption of

11    certain of the other debtors

12    liabilities in the total amount of

13    approximately $1.3 billion, including

14    liabilities for warranties and

15    protection agreements or other

16    service contracts, certain customer

17    credits to existing customer loyalty

18    programs, the Shop Your Way program,

19    all cure costs are being assumed by

20    ESL.

21        There's up to $43 million of

22    certain severance reimbursement

23    obligations.  There's up to $139

24    million of 503(b)(9) claims.  And

25    just to hit that for your Honor,

JX 072-47

Page 625

1                      PROCEEDINGS

2       you've asked what's the mechanism to

3       do that.

4            The debtors are obligated to

5       reconcile those claims and there's

6       not an independent right of claimants

7       to go after ESL.  But ELS is

8       obligated to the estate to pay those

9       503(b)(9) claims upon the earlier of

10      120 days and confirmation of a plan.

11           Our experience, and we do have an

12      $80 million winddown budget that's

13      built into how we intend to finish

14      these cases, it's our expectation

15      that we will do the reconciliation,

16      finish the reconciliation around the

17      503(b)(9) claims.

18           We don't expect a lot of costly

19      litigation certainly around the

20      503(b)(9) claims, but those claims

21      are going to be paid by ESL at

22      confirmation of the plan.

23           THE COURT:  The 89 million

24      winddown budget, is that included in

25      the projections that Mr. Meghji went

JX 072-48

Page 626

1               PROCEEDINGS

2     through?

3          MR. SCHROCK:  Yes.

4          THE COURT:  On this insolvency

5     analysis?

6          MR. SCHROCK:  It is, your Honor.

7          THE COURT:  So the debtors will

8     be reconciling those claims,

9     potentially objecting to them.  Many

10    of those claimants I would assume

11    would have an ongoing relationship

12    with, if I approve the sale, the

13    buyer.

14         MR. SCHROCK:  That's right.

15         THE COURT:  Is it contemplated

16    there will be some interactions since

17    the buyer is liable for them, how to

18    resolve those claims?

19         MR. SCHROCK:  There's going to be

20    a lot of interactions, your Honor.  I

21    think one thing that ELS and the

22    debtors do recognize, if the sale is

23    approved and we close tomorrow, it's

24    still all the same people that are

25    really doing this work at the

JX 072-49

Page 627

1                      PROCEEDINGS

2    company.  And we're going to be

3    working together.  And the TSA, the

4    transition services agreement

5    certainly contemplates that we're

6    going to be cooperating, working in

7    good faith to finish the

8    administration of the cases.

9        ESL is heavily incentivized.

10   They're still a very large claimant,

11   as is Cyrus, in these estates to have

12   these cases administered efficiently.

13       And I don't want that to be lost

14   on the court.  They still have claims

15   in these cases.  They still have

16   every incentive to cooperate.  They

17   still have every incentive to work

18   with the company to minimize the

19   costs associated with the

20   administration of the estate.

21       But when I look at what are the

22   noncredit bid items that are really

23   being provided for unencumbered

24   assets and I'm looking at slide 13

25   and 14, all of these liabilities,

JX 072-50

1                    PROCEEDINGS

2      it's just the one credit bid item but

3      paying off senior debt before

4      unsecureds are going to be paid, the

5      assumption of all of these

6      liabilities, the cure costs, these

7      are all things that we negotiated for

8      in order to ensure that -- you know

9      these are unsecured claims that are

10     getting paid.  Property taxes,

11     environmental liabilities, the

12     mechanic's liens are senior secured

13     claims.

14         So they are all either senior or

15     parity with general unsecured

16     creditors, but there's a lot of -- we

17     focused on the exit facility but

18     there's cash being paid for these

19     senior claims.

20         And when we look at Cyrus, your

21     Honor, Cyrus is rolling the entire

22     Junior DIP facility.  It went out and

23     purchased the rest of it, repurchased

24     that claim.  They put it and its part

25     of the asset financing for this

Page 629

1                    PROCEEDINGS

2    company upon emergence.

3         And I think that if you didn't

4    give them something in terms of an

5    allowance of claim, we would be

6    defeating the very purpose of doing

7    this transaction because the

8    committee could simply, or any party

9    could frankly just go challenge

10   Cyrus's claims for

11   recharacterization.

12        So although ESL can technically

13   drag other parties within their

14   facility along for a credit bid, if

15   you think about it, if they didn't

16   have the ability to credit bid, if

17   that wasn't part of the release for

18   Cyrus, you could move to

19   recharacterize, go after those Cyrus

20   claims and undo the very transaction

21   we're trying to accomplish here.

22        So we have to have certainty of

23   closing.  And we thought that, your

24   Honor, they're still liable.  The

25   scope of the release is just related

**JX 072-52**

Page 630

1                    PROCEEDINGS

2    to the credit bid, okay.  It's not --

3    and the allowance of their claims.

4        It's not any broader than that.

5    And for the transaction even to work,

6    for the transaction to close we had

7    to provide that.  But we did take

8    that into account in looking at, you

9    know, Cyrus is a very substantial

10   claim holder.  They've come into this

11   process.  Nothing is going to affect

12   the investigation and the ongoing

13   claims that the estate has, other

14   than just related to that credit bid.

15   And we think at the end of the day

16   that was a very fair compromise as

17   part of this transaction.

18       THE COURT:  So it would pertain,

19   for example, if it turned out, I have

20   no view on whether it will turn out

21   this way, but if it turned out that

22   the sale of the MTN notes --

23       MR. SCHROCK:  Right, nothing --

24       THE COURT:  -- was somehow

25   collusive, that that's not being

JX 072-53

Page 631

1          PROCEEDINGS

2    released.

3        MR. SCHROCK:  That is not being

4    released, avoidance action is not

5    being released.  Only thing, it's

6    consistent with the scope of the ESL

7    release and I think Mr. Basta will be

8    hitting some of those points.

9        Your Honor, on slide 15, just to

10   point it out, when you look at the

11   benefits of the -- the risks of the

12   winddown --

13       THE COURT:  I'm sorry, before you

14   get to that slide.  So you were

15   talking about the amount and

16   consideration in addition to the

17   credit bid.

18       MR. SCHROCK:  Yes.

19       THE COURT:  When you look at a --

20   this is a question for both sides.

21   When you look at the presumed value

22   or assumed value of the unencumbered

23   assets, the assets that, in other

24   words, that ESL/Cyrus don't have a

25   lien on, how do they match up?

JX 072-54

Page 632

1             PROCEEDINGS

2       Because you can't credit bid on

3       something you don't have a lien on,

4       so that means you have to pay

5       something else for it.

6            MR. SCHROCK:  Yes.  Of course,

7       your Honor.  So a couple of things

8       here.  I mean of course when we're

9       comparing it to the alternative in

10      the winddown we don't have the luxury

11      of just assuming you just get all of

12      those amounts of course.  We have to

13      look at them in the context of the

14      winddown analysis and the continued

15      burn that would occur and costs that

16      would be incurred that are senior to

17      those unsecured claims.

18           But, you know, to answer your

19      question directly, I think it's fair,

20      your Honor.  The credit bid is $1.3

21      billion.  Everything else here, your

22      Honor, payment of claims that are

23      senior to unsecured creditors, okay,

24      those all have to be paid regardless

25      of whether or not we're here, we're

JX 072-55

Page 633

1               PROCEEDINGS

2     at a winddown.

3         THE COURT:  Just to cut through

4     it to do the math, you're saying

5     basically if the total value of the

6     ESL deal is $5.2 billion, if you

7     subtract a billion-three from that.

8         MR. SCHROCK:  That's right.

9         THE COURT:  There's 3.9 billion

10    of value provided for the

11    unencumbered assets.

12        MR. SCHROCK:  That's right.

13        THE COURT:  Has anyone placed a

14    value on unencumbered assets anywhere

15    close to 3.9 billion?

16        MR. SCHROCK:  No, your Honor.

17        THE COURT:  Okay.

18        MR. SCHROCK:  Your Honor, we

19    think it's unquestionable that the

20    benefits of a sale transaction

21    outweigh --

22        THE COURT:  I'm sorry.  You were

23    going through the sale process at

24    what people refer to as the auction.

25    One of the provisions of the sale

**JX 072-56**

Page 634

1                    PROCEEDINGS

2    procedures order, all of which are

3    waivable in the exercise of judicial

4    duties, is to require qualified

5    bidders to provide an allocation of

6    what -- what assets they're paying

7    what for.  It's uncontroverted that

8    ESL did not do that.

9         I have traditionally viewed --

10        MR. SCHROCK:  We waived it, your

11   Honor.

12        THE COURT:  You waived that

13   condition.

14        MR. SCHROCK:  We did.

15        THE COURT:  I have viewed that

16   condition, which appears in sale

17   orders, generally as serving the

18   purpose of letting a seller, the

19   debtor and its constituents, value a

20   global proposal as against piecemeal

21   proposals so that you can slice and

22   dice the auction to see whether some

23   combination of bids will equal a

24   global bid or a reduced global bid.

25        It also though does have the

JX 072-57

Page 635

1            PROCEEDINGS

2    benefit of giving you the debtors --

3    giving you the buyers' viewpoint of

4    what the -- the buyers credit bid of

5    what the unencumbered assets are.

6         But maybe you can just tell me,

7    why did you waive it here?

8         MR. SCHROCK:  Your Honor, at the

9    end of the day we didn't have

10   qualified bids for even sections of

11   the business.  And when we looked at

12   this in total and given that the

13   structure of the auction was going to

14   be a comparison of the debtors

15   looking at a going concern versus a

16   winddown, while we did have some

17   indications from ESL around

18   allocations and a view we had to

19   take, and I think it's fair to take

20   -- we took a global view as to what

21   consideration was being provided to

22   the company.  And we understood that

23   the entire business would have to be

24   valued as a whole.

25        But given that we didn't have any

JX 072-58

Page 636

```
 1              PROCEEDINGS
 2   particular bids or qualified bids for
 3   particular divisions, that wasn't as
 4   much of a concern for the company.
 5        THE COURT:  Okay.
 6        MR. SCHROCK:  So the benefits of
 7   the sale transaction really do
 8   significantly outweigh an orderly
 9   winddown.
10        Your Honor, I know there's been
11   press around the debtors' severance
12   obligations and what we were doing.
13   I do want to make clear for the
14   record that under either scenario the
15   debtors were honoring severance
16   obligations.  Those claims are
17   administrative claims in these cases
18   under governing Second Circuit
19   precedent.
20        We deliberately made sure that and
21   it was one of the primary purposes
22   around having the winddown, to make
23   sure we could pay severance claims.
24        But we are entitled to take into
25   account in turning the highest or
```

JX 072-59

1           PROCEEDINGS

2    best offer not just the economic

3    point.  And people make light of it.

4    But there's 45,000 people out there

5    that are working for this company.

6    And it matters.  These people will

7    have jobs.  As a going concern we've

8    got uncontroverted testimony from Mr.

9    Kamlani about the steps that they're

10   taking with this business plan.  This

11   business plan is being financed by

12   major commercial banks.

13       They and we are true believers in

14   a going concern for sales -- for

15   Sears, rather.

16       In a winddown we're going to lose

17   all those jobs.  With the exception

18   of probably a few stores and perhaps

19   in Guam, Puerto Rico where there are

20   some highly profitable operations, we

21   would have to GOB them.  And we see

22   certain businesses could be possibly

23   sold in divisions in parts.  But,

24   your Honor, this truly is like many

25   retailers, it's a melting ice cube

Page 638

PROCEEDINGS

1
2   and the timing is so urgent.  We saw
3   that even with the Services.Com
4   purchase of Parts Direct which ended
5   up with them not closing.  We're now
6   going to end up having to argue with
7   them around the return of the
8   deposit.
9        But we saw and we believe the
10  evidence is uncontroverted that there
11  was significant risk around the
12  winddown.
13       The protection agreement
14  liabilities are going to be honored
15  in a sale transaction.  In a
16  winddown, they would very likely be
17  rejected unless we could find
18  somebody to take those liabilities
19  and basically sell that part of the
20  business for zero or negative value.
21       THE COURT:  While we're on this
22  subject of the potential warranty,
23  the protection agreements, there was
24  some discussion yesterday about the
25  risk that there would be a delay in

**JX 072-61**

Page 639

```
 1              PROCEEDINGS
 2    the approval of the KCD transfer.
 3         MR. SCHROCK:  Yes.
 4         THE COURT:  You have the PBGC
 5    resolution somewhat ameliorates that
 6    or more than somewhat, but you still
 7    have to go to a third-party to get
 8    approval.  How is the risk allocated
 9    in that approval?
10         MR. SCHROCK:  Your Honor, we
11    handled that.  If you take a look at
12    slide 27.  Section -- this is section
13    2.8 E of the asset purchase agreement
14    which states that from the closing
15    date until such time as the transfer
16    of the KCD notes and assumption of
17    purchase agreement liability occurs,
18    the buyer provides services to the
19    applicable seller to sufficient to
20    enable the sellers to perform the
21    purchase agreement liabilities and in
22    consideration for such services the
23    sellers are paying to the buyer
24    amount equal to the aggregate amounts
25    paid by buyers and sellers with
```

JX 072-62

Page 640

1              PROCEEDINGS

2    respect to any licenses which buyers

3    licenses to KCD IP.

4         So effectively, instead of making

5    payments under the new KCD exclusive

6    license, the buyer is going to get to

7    keep it but that results in the buyer

8    paying for, during the interim

9    period, they're paying for and

10   bearing the economic risk associated

11   with the purchase agreement

12   liabilities.  I'm sure ESL can stand

13   up and confirm that.  And that amount

14   is in excess of the royalties that

15   would ever be paid during that

16   interim period.

17        So ESL, in short, ESL is bearing

18   the risk associated with the

19   administration, the purchase

20   agreement liabilities pending --

21        THE COURT:  During that interim

22   period.

23        MR. SCHROCK:  During that interim

24   period.  The avoidance action, no

25   claims are being released in a

JX 072-63

1             PROCEEDINGS

2    winddown, but of course there's a

3    very limited release here.  And we

4    thought that was very meaningful to

5    the estates, that the litigation is

6    very largely preserved for the

7    benefit of the estates.  That was a

8    key compromise that we came to in

9    accepting the bid.

10       Mr. Basta will hit on the 507(B)

11   claims and some of the nuances around

12   the release.  But the vendors of this

13   company -- the company has in excess

14   of 10,000 vendors.  So when we talk

15   about there's a couple of people, I

16   think Mr. Burian mentioned that might

17   be affected by this, by Sears

18   closing, we big to differ.  The

19   company's schedules are on file.

20   There's hundreds of millions of

21   dollars in vendor claims.  All of

22   these parties have relationships with

23   Sears.  They will continue to have

24   those relationships moving forward in

25   very large part as a result of the

Page 642

1              PROCEEDINGS

2    benefits of this deal.

3        The claims pool is very

4    substantially reduced.  And if you

5    take a look at the next slide on

6    slide 16, we put this chart in our

7    reply but it bears emphasizing.  When

8    you look at the recoveries to

9    creditors overall, there is a very

10   significant benefit in terms of the

11   reduction of the claims pool in

12   conjunction with this transaction,

13   even compared to a winddown, as well

14   as some creditors getting enhanced or

15   better treatment.

16       Now the committee --

17       THE COURT:  This is before

18   litigation, any litigation with them?

19       MR. SCHROCK:  That's right,

20   litigation is not included in these

21   recoveries, in either the committee's

22   or the company's charts.

23       But the winddown of this company

24   is uncontroverted.  For the

25   committee, it's never been done.

JX 072-65

1                    PROCEEDINGS

2      From the company, you have witnesses

3      saying it's never been done.  But we

4      would do our best to manage it.

5          We have a 465 (D) (4) deadline

6      that's on May 3rd.  I think everybody

7      would try their best in the context

8      of a winddown.  But when you have a

9      transaction like this that's on the

10     table that actually gives the company

11     a chance, and nothing is for certain,

12     but substantially reduces the claim

13     pool, treats creditors better, saves

14     45,000 jobs, judge, it's not close.

15         Now the sale transaction does not

16     guarantee administrative solvency.

17     It is certainly a very important

18     point for the company since the start

19     of these cases.  It's not required to

20     sell assets.  You don't have to have

21     administrative solvency.  But we

22     believe we're administratively

23     solvent.  I think under the debtors'

24     analysis the shortfall is $42

25     million.  We do not take into account

Page 644

1               PROCEEDINGS

2    any litigation claims in considering

3    that.  We have opportunities in

4    excess of $100 million.

5        But in the context of a winddown,

6    you know, there's certainly,

7    according to Mr. Meghji, there's also

8    no guarantee that the company will be

9    administratively solvent.

10       But importantly, the sale

11   transaction we think gives us the

12   highest or best opportunity.

13       Mr. Transier talked about in

14   accepting the successful bid all of

15   the things that they looked at.  The

16   nature and amount, the ability of

17   both parties to close, the recovery

18   of the successful bid would provide

19   to nonESL creditors liquidity, the

20   alternative to the successful bid

21   which is the winddown and the loss of

22   tens of thousands of jobs.

23       That alternative of liquidation,

24   in our judgment, after consultation

25   with numerous parties, was not in the

JX 072-67

Page 645

1            PROCEEDINGS

2    best interests of stakeholders.

3        Now Mr. Kamlani gave testimony

4    around adequate assurance of future

5    performance.  It's worth noting that

6    adequate assurance does not mean

7    absolute assurance or guaranteed

8    performance.

9        They have a business plan.  They

10   have financing.  They have excess

11   availability at closing in excess of

12   $400 million.  They have a means and

13   a business plan to move this company

14   forward with a very substantially

15   reduced balance sheet, with much less

16   debt.  They have a smaller footprint.

17   But they kept open the profitable

18   stores.  And giving Sears a chance,

19   your Honor, we think it's more than

20   warranted under the facts that are

21   before the court.

22       We go through on the next couple

23   of slides, which I won't belabor,

24   just all of the uncontroverted

25   evidence that's in favor of adequate

**JX 072-68**

Page 646

1               PROCEEDINGS

2    assurance of future performance.

3    There's nothing out there that has

4    been put forth by the committee

5    that's really put this evidence into

6    serious question.  And we do think

7    that the company's witnesses when

8    considered overall and the court were

9    to make a ruling, that the company's

10   witnesses have been interested,

11   dedicated.  They are very credible.

12   And they were in the details compared

13   to the high level views that we

14   received from the unsecured

15   creditors' committee witnesses in

16   these cases.

17       Your Honor, overall I'm going to

18   cede my time and allow Mr. Basta to

19   come up here and say a few words

20   about the release.  But we are very

21   much in favor of approval of this

22   sale.

23       We do need some guidance and

24   clarity from the court around the

25   $166 million issue in the event that

JX 072-69

1              PROCEEDINGS

2    we don't resolve it.  We think the

3    issue is clear under the terms of the

4    document.  But we're prepared to move

5    to closing providing that the debtors

6    are not liable.  We provided the

7    agreements and $166 million is

8    actually taken on by ESL.  But I'm

9    happy to answer any further

10   questions.  Otherwise I can cede the

11   podium and respond to any objections.

12         THE COURT:  Okay.  Thank you.

13         MR. BASTA:  Good morning, your

14   Honor, Paul Basta from Paul, Weiss on

15   behalf of the restructuring

16   subcommittee.

17         Mr. Britton, my partner, will hand

18   up the clarifications to the ESL

19   release that were discussed on the

20   record in the beginning of the

21   hearing.

22         I think there's one or two issues

23   that the committee still has with the

24   language, and once that's done I'll

25   provide a closing statement on behalf

**JX 072-70**

Page 648

1              PROCEEDINGS

2    of the restructuring subcommittee if

3    that's okay with the court.

4         THE COURT:  Okay.

5         MR. BRITTON:  Good morning, your

6    Honor, Bob Britton of Paul, Weiss on

7    behalf of the restructuring

8    subcommittee.  I have an amendment to

9    the asset purchase agreement that was

10   filed by the debtors this morning.

11   Revisions to the release provisions

12   of the APA are embodied in that

13   document.  I have a copy here that I

14   can hand up to your Honor.

15        THE COURT:  Okay.

16        MR. BRITTON:  Your Honor, there's

17   a lot of changes in the amendment to

18   the APA capped for you at the back of

19   that document, a red line that just

20   goes to the release provisions that

21   fall within the mandate of the

22   restructuring subcommittee.

23        THE COURT:  Okay.

24        MR. BRITTON:  So the first thing

25   we're focused on, your Honor,

JX 072-71

1                PROCEEDINGS

2    following the filing of the original

3    asset purchase agreement was ensuring

4    that the actual purchase of assets

5    didn't somehow cause ESL to purchase

6    claims and therefore get a back door

7    release, otherwise were carved out of

8    our release.  So we started in the

9    acquired asset section of the APA and

10   that's in section 2.1 B.  What we

11   provided here is that ESL, as part of

12   its commercial negotiation with the

13   larger restructuring committee,

14   negotiated the purchase ordinary

15   commercial claims with counterparties

16   it's continued to do business with

17   and we carved section 2.1 P that

18   required asset purchase of claims

19   back to essentially those claims and

20   then added clarifying language that

21   none of the excluded assets or

22   excluded liabilities are included in

23   those purchase of assets.

24       We also deleted section 2.1 T

25   which was largely duplicative of

Page 650

1           PROCEEDINGS

2    section 2.1 P and also said that ESL

3    was buying claims and actions.

4         Then in section 2.2 I, your Honor,

5    which is the excluded assets we

6    provided that all claims, proceedings

7    and causes of action are excluded

8    assets other than those claims and

9    causes of action that are

10   specifically called out as an

11   acquired asset in section 2.1.  We

12   also added clarifying language here

13   that nothing in this provision

14   affects the scope of the releases as

15   set forth in section 913.

16        That brings us to section 913,

17   your Honor.  And so in section 913,

18   section B is the actual allowance of

19   the ESL funded debt claims per our

20   negotiation.  We've added to that in

21   response to comments from your Honor

22   language that clarifies that the

23   allowance of any ESL claims, and ESL

24   claim is defined as the claims that

25   are -- the funded debt claims that

Page 651

1                    PROCEEDINGS

2    are allowed by the limited release,

3    the allowance of any ESL claim shall

4    not limit or preclude any claim under

5    any applicable law or doctrine of

6    collateral estoppel, res judicata,

7    claim or issue, preclusion or

8    otherwise.

9         Then you go to the actual release

10   which is really you have to go to the

11   definition of release of estate

12   claims in subsection E 2.  And what

13   we've done here, your Honor, is

14   clarified again that the only claims

15   that are being released are claims

16   that could be brought to challenge

17   the allowance of the ESL claims.  So

18   there are claims against ESL under

19   equitable principles of subordination

20   and recharacterization, under section

21   263 (K), 502 (A) or 510 (C) of the

22   bankruptcy code.

23        We've also provided your Honor

24   that any claims against buyer as a

25   momentary holder of the ESL claims

**JX 072-74**

Page 652

1                    PROCEEDINGS

2     before the credit bid are being

3     released so that the only causes of

4     action that we will retain are

5     against ESL and ESL related parties.

6         The rest of this, that's really

7     the first five lines of the

8     definition.

9         The rest of this is for the

10    avoidance of doubt clarifying things

11    that are not included in the release

12    estate claims.

13        Among things that are not included

14    in the release estate claims are, and

15    I won't list them all but I'll call

16    out any claims for causes of action

17    constructive or fraudulent transfer

18    under 11 USC 544 B, 568 or 550 and

19    new clarifying language in the

20    parenthetical that says including,

21    but not limited to, any claims for

22    damages or equitable relief other

23    than disallowance of ESL claims.

24        What we've meant to clarify with

25    that language, your Honor, is that we

**JX 072-75**

Page 653

1                    PROCEEDINGS

2    can bring fraudulent conveyance

3    claims related to ESL claims on the

4    debt claims that have been allowed.

5    The remedy just can't be avoidance of

6    those claims.

7         THE COURT:  But this is all for

8    the avoidance of doubt.

9         MR. BRITTON:  That's all for the

10   avoidance of doubt.

11        THE COURT:  The first sentence is

12   the key sentence.

13        MR. BRITTON:  Correct, your

14   Honor.  NoW, the UCC, creditors'

15   committee and the Akin law firm sent

16   across comments as to these release

17   provisions last night.  And we

18   incorporated certain of those

19   comments.  I think we still have a

20   disagreement on at least one

21   substantive point which is that Akin

22   had asked us to include in this

23   release estate claim definition

24   language to the effect that the

25   debtors, the estates continue to

**JX 072-76**

Page 654

1                    PROCEEDINGS

2    pursue claims for equitable

3    subordination and recharacterization,

4    provided that the only remedy on

5    account of those claims could be --

6    it wouldn't be disallowance of the

7    ESL claims, it would be presumably

8    damages against ESL.

9         Our view, your Honor, is two-fold.

10   One, at the subordination and

11   recharacterization our remedy is for

12   equitable conduct that will give rise

13   to money damages.  But separately and

14   apart from that the inequitable

15   conduct that the committee is focused

16   on, we have preserved claims that

17   inequitable conduct -- in fact there

18   is inequitable conduct there.  That's

19   included in the avoidance of doubt

20   language and that would include, your

21   Honor, claims for fraudulent transfer

22   and actual fraud.

23        And we intend to continue to

24   investigate and pursue those claims

25   on behalf of the estate.

JX 072-77

Page 655

1                    PROCEEDINGS

2        But allowing the ability to

3    continue to pursue equitable

4    subordination and recharacterization

5    claims against ESL goes directly

6    contrary to the scope of the limited

7    release that we had negotiated with

8    them in order to allow the credit

9    bid.  Thank you, your Honor.

10       THE COURT:  Do you want to

11   address this now or later?

12       MR. QURESHI:  Happy to address it

13   now, your Honor.  For the record,

14   Abid Qureshi of Akin Gump on behalf

15   of the committee.

16       It is our view, your Honor, that

17   what is by design supposed to happen

18   with this release is no claims

19   against Newco, no claims against

20   their allowed claims, but in every

21   other respect we should be permitted

22   to pursue those claims against ESL.

23       So really the language that we

24   built into the release, your Honor,

25   was aimed at ensuring that the very

JX 072-78

Page 656

1                   PROCEEDINGS

2    same remedy that one could get

3    against their claims for equitable

4    subordination or recharacterization,

5    should be a remedy that is available

6    to be pursued only as against ESL.

7        And that is what we tried to do

8    with the language that we suggested

9    and that is --

10       THE COURT:  I'm sorry, is that

11   remedy -- that remedy is either a

12   subordination of the claim or

13   recharacterization of the claim.

14   It's not a damages remedy, right?

15       MR. QURESHI:  Well, it's the

16   economic equivalent, your Honor.

17   That's the point.

18       THE COURT:  But that's -- if it's

19   damages I understand it.  But if it's

20   equitable subordination then by

21   definition it's a claim related

22   remedy.

23       MR. QURESHI:  It's the measure of

24   damages on account of either

25   equitable subordination,

JX 072-79

Page 657

1            PROCEEDINGS

2    recharacterization.  So as your Honor

3    is well aware, those are remedies or

4    causes of action I should say where

5    the court has great latitude in terms

6    of what the remedy is, how much of

7    the claim to subordinate, how much of

8    the claim to recharacterize.

9        What we are saying is we should be

10   able to pursue ESL for the dollar

11   equivalent, economic equivalent of

12   whatever that amount might be.

13       THE COURT:  But I've never seen

14   -- by definition, that's not what

15   they are.  Those remedies are claim

16   related remedies.  I mean they affect

17   the defendant's claim as opposed to

18   -- affirmative claim.  This preserves

19   equitable claims.

20       I mean it just doesn't preserve

21   equitable subordination which means a

22   claim is subordinated or

23   recharacterization which means the

24   claim is recharacterized either as an

25   equity interest or maybe as an

JX 072-80

Page 658

1              PROCEEDINGS

2    unsecured claim.

3        I mean I think the preservation of

4    equitable damages does what you want.

5        MR. QURESHI:  Again, your Honor

6    --

7        THE COURT:  Except to say it's

8    not -- it wouldn't be under the

9    rubric of equitable subordination.

10       I've never seen an equitable

11   subordination opinion that says that

12   you have to pay damages and

13   recharacterization that says you have

14   to pay damages.  It just doesn't.

15       MR. QURESHI:  Agreed.  Again, the

16   purpose of the language we were

17   looking for was to preserve the

18   economic equivalent if you will of

19   whatever that remedy might be.

20   That's all that it was designed to

21   do.

22       THE COURT:  But that's creating a

23   new -- the language that's in here

24   preserves equitable remedies other

25   than disallowing the claim or

JX 072-81

Page 659

1                    PROCEEDINGS

2    subordinating the claim.

3        That to me is the economic

4    equivalent.

5        But to say that you're creating a

6    new form of equitable subordination,

7    I'm not prepared to do that.  It's a

8    different -- that's like you're

9    asking me in a contract to say that a

10   remedy that is well defined is no

11   longer well defined and it's an

12   informative claim as opposed to a

13   reduction of a claim or

14   recharacterization of a claim.

15       MR. QURESHI:  Your Honor, the

16   important point I think here is if

17   this court's reading of the language

18   that's been presented is that all of

19   the equitable claims as against ESL

20   and Mr. Lampert are preserved.

21       THE COURT:  Well I said

22   resubordination or

23   recharacterization.  Okay.

24       MR. BRITTON:  Thank you, your

25   Honor.  Unless your Honor has any

JX 072-82

Page 660

1                    PROCEEDINGS

2     other questions about the scope of

3     the releases, I'm happy to cede the

4     podium.

5          THE COURT:  I read them quickly

6     but I think they did the trick.

7          MR. BRITTON:  Thank you, your

8     Honor.

9          THE COURT:  I appreciate the

10    parties working on it to clarify.

11         MR. BASTA:  Good morning, your

12    Honor, Paul Basta from Paul, Weiss on

13    behalf of --

14         THE COURT:  I'm sorry to

15    interrupt you.  So this language will

16    also be the language in the order as

17    far as Cyrus is concerned?  When

18    people say it's the same thing,

19    that's what they mean?

20         MR. BASTA:  Yes.

21         THE COURT:  But it will be in the

22    order instead of this agreement.

23         MR. BASTA:  The scope of the

24    Cyrus lease, although outside the

25    scope of the restructuring

JX 072-83

Page 661

1              PROCEEDINGS

2     subcommittee, will be and should be

3     the same as the scope of the ESL.

4          THE COURT:  You may want to add

5     the MTN note language.  It was MTN,

6     right?  Okay.

7          MR. SINGH:  Your Honor, Sunny

8     Singh for Weil.  It's more general.

9     There's just a general reservation of

10    rights.  We didn't go into all the

11    detail because it was a little less

12    prominent than the ESL piece but

13    there is a reservation.

14         THE COURT:  The release is no

15    broader than as set forth in the

16    section.

17         MR. SINGH:  Right.  We can add.

18         MR. BRITTON:  I think you can put

19    it in the MTN too.

20         THE COURT:  Yes, you should put

21    it in the MTN too.

22         MR. BRITTON:  And I'll just

23    confer with counsel.

24         MR. BASTA:  Your Honor, Paul

25    Basta from Paul, Weiss on behalf of

JX 072-84

Page 662

1              PROCEEDINGS

2    the restructuring subcommittee.  I

3    will try to avoid any overlap with

4    Mr. Schrock.  This subcommittee

5    statement, your Honor, Mr. Schrock

6    walks through the execution risks

7    associated with this deal.  Our

8    subcommittee statement is predicated

9    on ESL not reneging on the $166

10   million assumption.  That was a

11   critical component of the

12   subcommittee's decision to provide

13   the credit bid release.  And so this

14   statement is on the assumption that

15   ESL is going to honor the agreement

16   in that respect.

17        The decision before the

18   restructuring subcommittee in this

19   case was whether to provide a release

20   to ESL in order to facilitate a going

21   concern transaction that would

22   maximize --

23        THE COURT:  I'm sorry.  Can I

24   interrupt you.  Let's assume -- I

25   hope this doesn't happen.  I assume

**JX 072-85**

Page 663

1                    PROCEEDINGS

2      it won't happen but just

3      hypothetically assume that the deal

4      closes, ESL doesn't reimburse for the

5      debts listed on schedule 1.1 G, it's

6      ultimately determined that the deal

7      is breached.

8           MR. BASTA:  By ESL.

9           THE COURT:  Is there the release

10     -- release isn't effective at that

11     point?

12          MR. BASTA:  It is not effected.

13     We wanted to effect the -- when we

14     looked at the release, for a long

15     time the release was on the back

16     burner.  Because the concept here was

17     we needed a deal.  We needed a viable

18     deal.  It only makes sense to talk

19     about a release in connection with

20     the viable deal.  So the 166 from the

21     subcommittee's perspective was

22     critical to get to a deal that was

23     viable and the release was predicated

24     on that assumption.

25          THE COURT:  Okay.

**JX 072-86**

Page 664

1              PROCEEDINGS

2         MR. BASTA:  So the decision

3    before the subcommittee was whether

4    to provide a release to ESL in

5    whatever form we could negotiate in

6    order to facilitate a going concern

7    transaction or alternatively to

8    choose liquidation.  That was it.

9         Release, deal, or liquidation.

10        And ultimately the restructuring

11   subcommittee determined in good faith

12   to approve a limited credit bid

13   release to facilitate a

14   reorganization and came to the view

15   that that was better for the estates

16   than proceeding to a winddown.

17        THE COURT:  I think I have the

18   chronology here.  But all of the ESL

19   proposals that the restructuring

20   committee, the subcommittee rejected

21   contained a general release, right?

22        MR. BASTA:  Yes, and let me walk

23   through that.

24        THE COURT:  The one that was

25   accepted had this limited release.

**JX 072-87**

Page 665

1              PROCEEDINGS

2          MR. BASTA:  Right.  Your Honor,

3      if I can walk you through that for

4      one second.  On December 5th, 2018

5      was the first indicative bid by ESL

6      and it contained a broad ESL release.

7      And on December 9th and 12th it was

8      rejected in writing by both the

9      restructuring committee and the

10     subcommittee.

11         On December 28th bid by ESL, it

12     contained a broad release and it was

13     rejected on January 4th.

14         On January 6th bid there was also

15     a -- there was also a broad release

16     and it was rejected on January 6th.

17         On January 7th Cleary sent a

18     letter threatening the restructuring

19     subcommittee with breach of fiduciary

20     duty if they did not accept the ESL

21     bid.

22         On January 9th ESL put a bid on

23     the auction record and we rejected it

24     because it contained a broad release

25     among other things.

JX 072-88

Page 666

1            PROCEEDINGS

2        It wasn't until January 15th, late

3    in the evening -- I'm sorry, on

4    January 15th there was yet another

5    bid that also contained a broad

6    release that was rejected by the

7    subcommittee.

8        It wasn't until the limited

9    release was accepted by ESL and other

10   components of the deal were improved,

11   that the subcommittee agreed to

12   provide the limited release.

13       And we believe that the limited

14   release is the solution to this case.

15       If your Honor remembers, in the

16   early bidding procedures there was a

17   requirement that in order to credit

18   bid, ESL was going to have to cash

19   backstop any credit bid.  And that

20   was where we were for a long time.

21   And ESL indicated there would be no

22   going concern with a cash bid.

23       So we had to figure out a way to

24   facilitate a credit bid if we wanted

25   to achieve the benefits of the going

JX 072-89

Page 667

1                    PROCEEDINGS

2    concern, and so we came up with the

3    bifurcated structure.  And the

4    bifurcated structure is one where we

5    retained the valuable causes of

6    action while allowing the company to

7    receive the benefits of a

8    reorganization.  We think that's the

9    lynchpin of the case and the obvious

10   benefit of moving forward.

11        There were a number of, your

12   Honor, of less obvious benefits that

13   came out of the subcommittee's

14   negotiations around the credit bid.

15   The credit bid was the key, and there

16   were substantial improvements to the

17   deal in addition to the limited

18   release that stemmed from that credit

19   bid negotiation.

20        They closed the administrative

21   insolvency gap by hundreds of

22   millions of dollars.  The deal

23   provides in our view, when we looked

24   at this we always look at is the

25   going concern better than the

JX 072-90

Page 668

1                    PROCEEDINGS

2      winddown, not is the going concern

3      good.  Is it, does it provide

4      proportionally an incrementally

5      better alternative?

6          Our analysis showed that in the

7      final bid that third party secured

8      creditors are benefited compared to a

9      winddown and that's not including

10     obviously ESL to the tune of $152

11     million.

12         It's our analysis that general

13     unsecured creditors that are getting

14     assumed under the deal which include

15     protection agreement and other

16     consumer related claims of $524

17     million, are getting paid under this

18     deal and they would not get paid in a

19     winddown.  I'm going to get into some

20     more detail about that later.

21         But earlier iterations of the

22     contract from ESL added a condition

23     to the assumption of the protection

24     agreement liabilities that they be

25     reaffirmed by the consumer.  And we

JX 072-91

Page 669

1                    PROCEEDINGS

2      were able to get that out of the

3      contract to make that an absolute

4      requirement to assume those

5      liabilities.  And that allowed us to

6      value that as a contribution to the

7      estates.

8          There's a $621 million avoidance

9      of additional administrative claims

10     in a reorg versus a winddown which we

11     think is very significant and there

12     are jobs that are being preserved.

13         There's also a substantial

14     limitation on ESL's ability to

15     recover from litigation proceeds with

16     respect to its deficiency claims.  We

17     negotiated so there would be no right

18     of ESL to share on any Land's End or

19     Seritage litigation, no right of ESL

20     to share on any litigation relating

21     to any ESL misconduct and we were

22     able to cap ESL's 507(B) claim at $50

23     million which so if there's other

24     nonESL litigation recovery, their

25     507(B) claim is capped.

JX 072-92

1          PROCEEDINGS

2        The decision to provide the

3     limited release is coming from a

4     process where Mr. Carr and Mr.

5     Transier faithfully discharged their

6     fiduciary duties.  There is some

7     allegation in the committee's papers

8     that Mr. Carr and Mr. Transier were

9     handpicked by Mr. Lampert.  There's

10    no evidence in the record to support

11    that.  In fact, the evidence in the

12    record is that they were introduced

13    to the board by Mr. Schrock and that

14    they had -- the evidence is clear

15    that they have no prior relationships

16    with ESL.

17       Your Honor observed the demeanor

18    of Mr. Transier and Mr. Carr in

19    person and I think anyone who watched

20    that testimony would see that they

21    were not pulling any punches

22    whatsoever and were faithfully trying

23    to do what was best for the estate.

24       And of course Mr. Carr and Mr.

25    Transier have found that there's

JX 072-93

Page 671

1                    PROCEEDINGS

2     hundreds of millions of dollars of

3     valuable claims against ESL and

4     repeatedly rejected ESL's bids that

5     contained a release, even in the face

6     of litigation threats from ESL.

7         It's also unmistakable that Mr.

8     Carr and Mr. Transier satisfied the

9     duty of care.  The debtor set up a

10    purely independent subcommittee

11    because it could see what was coming

12    down the pike and if there was any

13    way to get this through given the

14    conflicts involved you needed a truly

15    independent committee.

16        And Mr. Carr and Mr. Transier

17    directed all of the professionals for

18    the subcommittee, including A&M and

19    Evercore to do a massive amount of

20    work investigating the claims up

21    front so that we would be in a

22    position at the auction to assess the

23    value of those claims, and all of

24    that work led to the bifurcation

25    approach that was an informed

**JX 072-94**

Page 672

1                    PROCEEDINGS

2     approach so we could present to this

3     court a solution that would allow a

4     reorganization instead of making a

5     liquidation a fait accompli.

6          Mr. Schrock talked about the 58

7     restructuring committee meetings,

8     many of which the subcommittees'

9     professionals attended.  There were

10    also three times a week calls of the

11    subcommittee and a myriad of other

12    one-off conversations on the process.

13         Mr. Carr and Mr. Transier, as you

14    could see, were not passive

15    recipients of professional advice.

16    They were deep in the weeds on what

17    the numbers are.

18         The committee presented the court

19    with -- the committee presented the

20    court with texts of Mr. Carr.  What

21    those texts showed is that Mr. Carr

22    wanted to get to the right answer and

23    was not satisfied with the numbers

24    that were coming out of the

25    professionals upon which to make a

JX 072-95

Page 673

1                    PROCEEDINGS

2    decision so he didn't make a decision

3    until those numbers settled down.

4    That is the embodiment of satisfying

5    the duty of care.

6        Your Honor, I have two slides I'd

7    like to hand up.

8        Mr. Carr and Mr. Transier had a

9    deep understanding of what fiduciary

10   duty means in an insolvency

11   situation.

12       If you look I've given your Honor

13   a quote from the Gewala.  This is of

14   course the seminal decision where

15   this is arising in the context where

16   the Delaware Supreme Court is

17   concluding that there's no separate

18   duty, fiduciary duty of afforded to

19   creditors.  If your Honor reads the

20   sentence it says, to recognize a new

21   right for creditors to bring direct

22   fiduciary duty claims against those

23   directors, would create a conflict

24   between those directors' duties to

25   maximize the value of the insolvent

JX 072-96

1          PROCEEDINGS

2    corporation for the benefit of all

3    those having an interest in it, in

4    the newly directed fiduciary duty to

5    individual creditors.

6        This is a sophisticated sentence

7    that understands the difficult job

8    that directors have to undertake

9    because there are numerous

10   constituents that have an interest in

11   the corporation.  So by saying you

12   have a duty to the corporation, you

13   have to take into account the impact

14   on all of the constituents.  And this

15   is different than a creditors'

16   committee who has duty to its

17   unsecured creditor constituent.

18       And so if you look at it through

19   that lens where the restructuring

20   subcommittee had a broader

21   constituency group to consider than

22   the unsecured creditors' committee,

23   I've given the court a slide that

24   talks about the release consideration

25   that we considered separate for the

Page 675

1                   PROCEEDINGS

2     reason to provide the limited

3     release.

4          And if you go through this, your

5     Honor, I think it's very compelling.

6     We're getting $35 million of cash.

7     We're getting $152 million of third

8     party secured creditors.  We're

9     getting $453 million of assumption

10    for protection agreement liabilities.

11    We're getting gift card liability

12    assumption of $13 million.  We're

13    getting $68 million of assumption of

14    Shop Your Way liabilities.  We're

15    avoiding $621 million of

16    administrative expense claims.

17         We are preserving the litigation

18    against ESL and other defendants.

19    We're getting a cap on ESL recoveries

20    and we're preserving tens of

21    thousands of jobs.

22         THE COURT:  Other than the cap

23    this is part of the sale

24    consideration, your point is that the

25    sale wouldn't have happened without

**JX 072-98**

Page 676

```
1              PROCEEDINGS
2     the credit bid?
3         MR. BASTA:  To get a release
4     under Drexel, there needs to be
5     consideration.  There needs to be
6     consideration it needs to be more
7     than the winddown.
8         THE COURT:  Well --
9         MR. BASTA:  So in other words, if
10    they showed up with a deal --
11        THE COURT:  The winddown includes
12    what you carved out of the release.
13    I guess I'm looking at this a little
14    differently, which is that there's
15    value that ESL is paying for the
16    debtors in addition to the credit
17    bid.
18        But I view that as value that I
19    would measure against a winddown.
20    The alternative.
21        I wouldn't also measure it as
22    consideration for the limited
23    release.  But I understand your point
24    which is that value wouldn't be there
25    without the limited release.  Which
```

JX 072-99

Page 677

1              PROCEEDINGS

2    is a little bit of a different thing.

3         MR. BASTA:  Your Honor I

4    respectfully disagree.  If they

5    showed up with $35 million for the

6    credit bid release, we would not have

7    provided it.

8         THE COURT:  Because the whole

9    deal wouldn't have made sense.

10        MR. BASTA:  The whole deal

11   wouldn't have made sense and the

12   whole deal wouldn't have been better

13   than a liquidation.

14        THE COURT:  Right.

15        MR. BASTA:  You had to measure

16   whether to give the release on

17   whether there were benefits to the

18   company above a liquidation.

19        THE COURT:  And it's a limited

20   release.

21        MR. BASTA:  And it's a limited

22   release.  And so I think the question

23   that I'd like to focus in conclusion,

24   your Honor, is why does the

25   subcommittee value these things as

**JX 072-100**

Page 678

1                    PROCEEDINGS

2    important but the creditors'

3    committee does not value them as

4    important?  Because I think that's

5    the key as to what's really going on

6    in this case.

7        If your Honor looks at whatever

8    the committee, creditors' committee

9    describes this deal, they say it's

10   $35 million for the release.  They

11   never acknowledged that there are

12   very significant unsecured creditor

13   constituencies that are doing better

14   in this deal than what they would do

15   in a winddown.  In a winddown the

16   protection agreement liabilities

17   would not get paid.  Gift card,

18   consumer, jobs.  In fact, Mr. Burian

19   said that the creditors' committee is

20   not supposed to look at jobs.  I

21   guess he views employees, I think he

22   said they're not prepetition

23   creditors or that in our vibrant

24   economy they can go and find another

25   job.  So he didn't even view them as

JX 072-101

Page 679

1                    PROCEEDINGS

2    a constituency that the unsecured

3    creditors' committee in its lens

4    needs to, needs to consider.

5        And I think this is the key, is

6    why doesn't the committee view these

7    benefits as being important enough to

8    support this deal?

9        And I want to suggest to the court

10   that there are four reasons and that

11   none of those reasons warrant denial

12   of this transaction.

13       The first is that none of the

14   unsecured creditors that are on this

15   list as receiving a benefit are on

16   the committee.

17       The committee is not dominated by

18   trade.  It is not -- it does not have

19   employee representatives.  It does

20   not have consumer representatives.

21       The committee constituency is not

22   actually getting these benefits.

23       The second reason I think is that

24   I think the creditors' committee is

25   focused on equitable subordination as

**JX 072-102**

Page 680

1                    PROCEEDINGS

2    an important remedy for them because

3    they can hold that debt essentially

4    in the case and recover from the

5    liquidation proceeds and subvert the

6    priority scheme.

7         And I understand that as an

8    important consideration for the

9    committee.  But from our perspective,

10   when we've preserved our remedies by

11   preserving the litigation, we don't

12   think that preserving equitable

13   subordination as an independent

14   remedy is a reason to thwart

15   reorganization.

16        The third argument they made and

17   your Honor asked Mr. Schrock about it

18   relates to the unencumbered real

19   estate value.  And in a liquidation

20   if you believe that the unencumbered

21   real estate value could get a lot of

22   value, then your whole analysis as to

23   whether reorg versus winddown would

24   change.  But the way the subcommittee

25   looked at that is that in the

JX 072-103

Page 681

1                    PROCEEDINGS

2    winddown analysis the unencumbered

3    real estate was consumed by the newly

4    created administrative claims.

5        So the way we looked at it is when

6    you compared the two transactions,

7    the unencumbered property wouldn't

8    flow down to unsecured creditors to

9    give them a recovery.

10       Now I understand that there's a

11   debate about what the value of that

12   is.  But the restructuring

13   committee's professionals reported on

14   what their view of the valuation of

15   those assets was and that that value

16   would not result in -- would not

17   result in a recovery to the

18   unsecureds.

19       THE COURT:  Unless you hit a home

20   run.

21       MR. BASTA:  Unless you hit a home

22   run.

23       THE COURT:  Well not on the real

24   estate, on the litigation against ESL

25   including under section 507 (D) and

JX 072-104

Page 682

```
 1              PROCEEDINGS
 2    506 (C).
 3         MR. BASTA:  Yes.
 4         THE COURT:  They basically assume
 5    out a claim.  There would be a super
 6    priority claim under 507 (D).
 7         MR. BASTA:  Right.
 8         And then the last thing that I
 9    think they're focused on is they say
10    they don't believe in Newco.  And if
11    you don't believe in Newco then maybe
12    the benefits that we are considering
13    that would be assumed by the new
14    company shouldn't be valued because
15    the company is not going to survive.
16         I would say while they have
17    questioned it, at no point in the
18    process has the unsecured committee
19    ever said this deal gives valuable
20    consideration to some of our
21    constituencies.  Let us work the
22    contract to make the contract better,
23    to preserve these, better to preserve
24    these benefits.  The entire time
25    their focus has really been on just
```

JX 072-105

Page 683

1              PROCEEDINGS

2    causing a liquidation.  They

3    announced that in the very beginning

4    of the case.

5        Irrespective of that --

6        THE COURT:  Maybe here that's the

7    best negotiating strategy but we can

8    leave that for business schools.

9        MR. BASTA:  We can leave that for

10   another day.  I would say, your

11   Honor, that the subcommittee's

12   professionals and the restructuring

13   committee professionals believe that

14   there's a reasonable prospect that

15   Newco can succeed and that in light

16   of all the benefits that are -- that

17   can be achieved and the retention of

18   the litigation that it should be

19   approved.

20       Three legal points and then I'll

21   sit down.

22       We're going to defer to the

23   restructuring committee on standard

24   of review.  We would point out, your

25   Honor, that even if the court applied

JX 072-106

Page 684

1                PROCEEDINGS

2    the entire fairness test to this

3    transaction, we think that this is

4    entirely fair.  There's been

5    tremendous court oversight through

6    the entire process.  We have a truly

7    independent subcommittee and we

8    believe that entire fairness test is

9    about a fair process and fair price

10   and given the auction process as well

11   as the transparency with all parties,

12   that even if entire fairness test

13   applies it has been satisfied.

14       Two cases I want to refer the

15   court to as your Honor considers

16   this.  The first of the cases that

17   says that the estate has the right to

18   settle 502 (D) or release 502 (D)

19   claims, it is -- there was some

20   reference in the committee objection,

21   it is in re Foundation of New Era

22   Philanthropy 1996 Bankruptcy, Lexis

23   1829, 1996.

24       And the second is the Applied

25   Theory case from the Second Circuit

JX 072-107

1                    PROCEEDINGS

2     which holds that equitable

3     subordination claims are derivative,

4     especially in the context of where

5     the complaint that is the grounds for

6     equitable subordination harmed all of

7     the creditors equally.

8         And therefore our view is that we

9     have an ability, as because they are

10    derivative, they belong to the estate

11    to release them or settle them as

12    part of this transaction.

13        THE COURT:  Okay.

14        AUDIENCE MEMBER VIA PHONE:  Your

15    Honor, for the benefit of the sellers

16    that have objections in the agenda

17    that have not been disposed of, will

18    we have an opportunity to address the

19    court regarding those objections?

20        THE COURT:  Yes, you will.

21        AUDIENCE MEMBER VIA PHONE:  Thank

22    you, your Honor.

23        MR. BROMLEY:  Good morning, your

24    Honor, Jim Bromley from Cleary

25    Gottlieb on behalf of ELS.  I stand

JX 072-108

Page 686

1                    PROCEEDINGS

2    here before you today, your Honor, as

3    an advocate to ask you to approve the

4    transaction that's before you.

5        I can't help, however, but feeling

6    a little bit like a character from

7    that Monte Python skit where somebody

8    walks in looking for an argument and

9    he finds himself getting hit on the

10   head lessons.

11       This is a difficult exercise, your

12   Honor.  We are being criticized both

13   by the creditors' committee and to a

14   certain extent on the $166 million

15   issue by both the debtors and the

16   subcommittee.

17       It is true that what happened in

18   this case from the very beginning was

19   that ESL has indicated very clearly

20   that it was interested in a going

21   concern transaction.  It is also very

22   true that from the very beginning ESL

23   indicated that it wanted releases in

24   connection with pursuing that and the

25   ability to credit bid.

JX 072-109

1          PROCEEDINGS

2          ESL lent the company over $2.6

3     billion in the prepetition period, of

4     which about $2.4 billion was secured.

5          The vast majority of that effort

6     was -- well the entire majority of

7     that effort was made to keep this

8     company in business and to allow it

9     to avoid the very fee frenzy that we

10    are facing here today in the

11    bankruptcy court.

12         But while it might have been on a

13    back burner for Mr. Basta, it is

14    important for everyone to realize it

15    was on the front burner for ESL.  ESL

16    has been criticized substantially and

17    consistently throughout the case by

18    creditors' committee and it is

19    important for us to state on the

20    record that we uncategorically deny

21    any of the allegations that were

22    made.  We believe that the releases

23    that are being provided are

24    appropriate under the circumstances

25    and we also believe that the claims

JX 072-110

Page 688

```
1              PROCEEDINGS
2    being retained are worthless.
3        So from an administrative solvency
4    perspective, your Honor, we don't
5    believe that the claims retained have
6    any value.  We understand that
7    there's a difference of opinion
8    there.
9        But it is important that before we
10   go any further that that claim
11   position be made clear.
12       I'd like to turn to the $166 --
13   yes, you have something to say, your
14   Honor?
15       THE COURT:  No, go ahead.
16       MR. BROMLEY:  I thought you had a
17   question.  With respect to the $166
18   million, both Mr. Basta and Mr.
19   Schrock made comments that were
20   somewhat inconsistent.
21       First they said they believe the
22   contract is in their favor and they
23   are ready to close.  And then they
24   said they're ready to close so long
25   as your Honor gives some guidance or
```

**JX 072-111**

Page 689

1              PROCEEDINGS

2    makes some kind of decision that

3    indicates that they are right and we

4    are wrong.

5        We are ready to close based on the

6    contract as written, regardless of

7    the ultimate interpretation.  But we

8    believe that the ultimate

9    interpretation is not for here today.

10       THE COURT:  I don't have the

11   authority to decide that issue

12   although I do have to evaluate as in

13   essence whether it's reasonable to

14   assume the debtors' interpretation

15   because it's clear to me that the

16   debtors don't believe that the deal

17   is worth pursuing lest their

18   interpretation is right.  So I'm not

19   able to make a decision today because

20   as the Second Circuit held in Orion

21   Pictures, but on the other hand it

22   needs to be evaluated as

23   Judge Chapman recently did in one of

24   her cases.

25       MR. BROMLEY:  It's in that

JX 072-112

1                    PROCEEDINGS

2     context that I feel I need to address

3     it, your Honor, to a certain extent.

4     There are lots of information that is

5     not before the court.  But what is

6     before the court is the contract and

7     the schedules.  With great fanfare

8     the debtors today told you what is on

9     schedule 1.1 G which is the number

10    $166 million.

11         That I think is fair to say not

12    particularly enlightening guidance as

13    to the specific accounts payable that

14    are supposed to go forward.  And that

15    is exactly the issue.

16         The way the contract is written,

17    your Honor, and the way our bid

18    letter went in, the way Mr. Kamlani

19    testified, consistently from our

20    perspective, is that with respect to

21    the $166 million, it's about accounts

22    payable with respect to product that

23    is ordered before the closing and

24    delivered after the closing.

25         THE COURT:  Well it just doesn't

**JX 072-113**

Page 691

1                    PROCEEDINGS
2      say that.
3          MR. BROMLEY:  Well, your Honor,
4      actually we believe it does.
5          THE COURT:  Okay, the schedule
6      doesn't.
7          MR. BROMLEY:  The schedule has to
8      be read together with 1.1 F and 1.1 G
9      and they both say 166 million.
10         THE COURT:  And other payables.
11         MR. BROMLEY:  And other payables.
12         THE COURT:  The definition refers
13     you to the schedule.
14         MR. BROMLEY:  And ordered
15     inventory the way the line is
16     written, ordered inventory in our
17     view is clearly included in other
18     payables.
19         So with that, your Honor,
20     regardless of the ultimate outcome
21     ESL stands before you today ready to
22     close on the basis of the contracts
23     assigned.
24         With respect to the arguments that
25     have been made and will be made, I

JX 072-114

Page 692

1                   PROCEEDINGS

2       think that there's a couple of points

3       that we want to add to those that

4       have been made by Mr. Schrock and Mr.

5       Basta.

6           When viewed through the

7       appropriate lens, your Honor, there's

8       really no question that all the

9       standards for approval have been met

10      and exceeded in this case.

11          For a buyer, one of the most

12      important aspects of the sale order

13      is defined in good faith.  And with

14      respect to a finding of and with

15      respect to a participant in these

16      proceedings like ESL it is important,

17      critically important because of all

18      the allegations that have been made

19      against it.

20          THE COURT:  What is it?

21          MR. BROMLEY:  Good faith.

22          THE COURT:  I just didn't hear

23      you.

24          MR. BROMLEY:  Sorry, your Honor.

25      And the evidence is replete with

JX 072-115

1                     PROCEEDINGS

2      evidence -- the record is replete

3      with evidence of good faith, that

4      from the very beginning, prior to the

5      petition date, Mr. Lampert had been

6      the CEO resigned.  The restructuring

7      committee was appointed.  The

8      restructuring committee and the

9      subcommittee in particular was vested

10     with dual roles to both investigate

11     potential claims that may exist as

12     well as to evaluate any transactions

13     that would involve ESL.

14         And there's no evidence at all in

15     the record that anything happened

16     where either Mr. Lampert, Mr. Kamlani

17     or anyone else representing ESL had

18     any influence over the debtors'

19     process, any influence over the

20     debtors' business plan, any influence

21     over the debtors at all.

22         Indeed, your Honor, if anything,

23     the evidence is overwhelming with

24     respect to the intensity of these

25     negotiations.

1            PROCEEDINGS

2        This is a deal that has fallen

3    apart and come together on numerous

4    occasions.  The intensity and frankly

5    contentiousness of the negotiations

6    that have taken place are marked.

7    They are, when at least two of the

8    witnesses, Mr. Transier, Mr. Kamlani

9    referred to the auction as a

10   four-day/night, that clearly is a

11   perfect encapsulation of the exercise

12   that went on during that week at Weil

13   Gotshal's offices.

14       Our offers were rejected

15   repeatedly.  They were rejected

16   formally and informally.  And at

17   every moment in time we came back to

18   the table and put more consideration

19   on the table.

20       With respect to the releases we

21   did start off looking for a global

22   release.  That was our intention from

23   the beginning and that was our

24   desire.

25       As the transaction continued to

Page 695

1                    PROCEEDINGS

2     move forward, we understood that in

3     order to make this get over the

4     finish line that we needed to

5     identify an opportunity to negotiate

6     a more limited release and it was in

7     that context that on the night of the

8     15th and into the early morning of

9     the 16th that we sat down and were

10    able to cut that deal.

11        It is what is reflected in the

12    document.  It's reflected in the

13    comments of Mr. Britton and certainly

14    with respect to the attempt by the

15    creditors' committee to recapture

16    certain of the release elements

17    particularly with respect to

18    equitable subordination and

19    recharacterization of this allowance,

20    we reject that entirely.  That's not

21    the deal.  And we have to have the

22    ability to credit bid or the

23    transaction cannot go forward.

24        And that includes frankly the

25    release -- the allowance of the

JX 072-118

1              PROCEEDINGS

2    claims in their entirety.

3        The cabining of the opportunities

4    for those claims to recover that Mr.

5    Basta described were hard fought

6    negotiations and provide we believe

7    both protection for the estates as

8    well as protection for ESL.

9        But it was protection that was

10   hard fought in the context of a

11   global transaction.

12       Your Honor, you've heard from Mr.

13   Kamlani who is the president of ESL

14   with respect to the business plan and

15   there's been a lot made by the

16   creditors' committee about the

17   going-forward business plan of Newco.

18       The criticisms of the business

19   plan I think are important to take

20   for a moment.

21       One of the -- the creditors'

22   committee frankly rely almost

23   entirely on their purported expert

24   Mr. Kniffen.  He did not appear in

25   court.  He was not cross examined.

JX 072-119

Page 697

1                     PROCEEDINGS

2      The parties have relied on the

3      designations of his testimony.

4          But I think it is important to

5      look at those designations because

6      Mr. Kniffen is by no, in no way,

7      shape or form an expert on anything.

8      Mr. Kniffen is a pundit on cable TV.

9      He has worked in the retail industry

10     but hasn't been involved in any way,

11     shape or form for about 15 years.

12     And he hasn't even set foot in a

13     Sears store in a year and a half at

14     least.

15         His expert opinion is no more

16     worthwhile than if we brought in a

17     parade of Sears customers who said

18     they like Sears, they like Kenmore

19     products and they enjoy shopping at

20     Sears.

21         And when you take Mr. Kniffen off

22     the table we believe he wouldn't

23     survive a Daubert challenge in any

24     circumstance so we did not bore the

25     court with it.  You have simply

Page 698

1              PROCEEDINGS

2    nothing on the side to criticize the

3    going-forward business plan.

4         Mr. Diaz as well relies almost

5    entirely on Mr. Kniffen's

6    assumptions.  He does the math for

7    Mr. Kniffen.  But if it wasn't for

8    Mr. Kniffen there would be no math

9    for Mr. Diaz to do.

10        And so if you take both Kniffen

11   and Diaz off the table which we

12   believe is appropriate in light of

13   Mr. Kniffen's obvious incapacity to

14   be qualified as an expert, there's

15   simply no evidence whatsoever that

16   the business plan for Newco going

17   forward is anything other than

18   appropriate.

19        Notwithstanding that, your Honor,

20   Mr. Kamlani was very clear as to the

21   opportunities that are being provided

22   with respect to the go-forward

23   business plan.  The go-forward

24   business plan is not a plan to close

25   stores and fire employees.  The

JX 072-121

Page 699

<pre>
 1                PROCEEDINGS

 2    go-forward business plan is a plan to

 3    maximize the opportunities provided

 4    by the Sears ecosystem.  That

 5    includes the Innovel and SHS, Sears

 6    Home Services network, to transition

 7    from larger footprint stores to

 8    smaller footprint stores, and to

 9    transform this company, to transform

10    this company which is exactly what

11    ESL has been trying to do for the

12    past 13 or 14 years.

13        Now the fact that the company has

14    not succeeded is obvious because

15    we're here in bankruptcy court.

16        But when we're looking at

17    commitment of ESL to Sears, it's

18    important to contrast the commitment

19    of ESL to Sears and the commitment of

20    others in other situations.  There

21    was testimony yesterday about Toys 'R

22    Us.  The private equity sponsors in

23    Toys 'R Us did a leveraged buyout of

24    the company and abandoned it.  Mr.

25    Lampert and ESL have been with Sears
</pre>

JX 072-122

1                    PROCEEDINGS

2      and believers in Sears long term,

3      contrarian investors and they are

4      continuing to put money and resources

5      behind this business model and this

6      plan.

7           Now we can sit here and criticize

8      that business decision.  But we

9      should not misinterpret that business

10     decision for some kind of evil

11     intent.

12          Mr. Lampert's dedication and ELS's

13     dedication to Sears really is without

14     question.

15          And the idea that we're doing

16     anything other than to try and make

17     this company succeed and succeed

18     going forward is completely belied by

19     the other options on the table.

20          If this was an exercise in trying

21     to obtain real estate and liquidate

22     that real estate, we would simply be

23     credit bidding the liens that we have

24     with respect to the real estate.

25          If this was an exercise to keep

JX 072-123

Page 701

1                    PROCEEDINGS

2      Sears alive to protect our investment

3      in Seritage, there would have been no

4      reason to have put $2.5 or 6 billion

5      into Sears instead of into Seritage,

6      the rest of which was only about $750

7      million.

8          We are dealing with a universe of

9      incompatible positions, right.  The

10     creditors' committee right now says

11     we are getting too much value and

12     we're not paying enough for it.

13         And at the same time they're

14     saying that that very Newco that's

15     getting too much value and not paying

16     enough for it is going to fail

17     because it's inadequately capitalized

18     and incapable of providing adequate

19     assurance of future performance.

20         Quite simply, the creditors'

21     committee can't have it both ways.

22     We can't be stealing assets and

23     unable to pay our creditors when

24     those debts come due going forward.

25         We're doing nothing with respect

**JX 072-124**

Page 702

1                    PROCEEDINGS

2    to taking the assets other than to

3    incorporate them into a valid and

4    viable going forward business.

5         And every time the creditors'

6    committee stands up and talks out of

7    both sides of its mouth we have to

8    recognize it for what it is, right.

9    Creditors' committee is dominated by

10   Simon Properties, the largest real

11   estate mall owner in the country.

12   And what are we doing?  We're sitting

13   here criticizing the real estate sale

14   process?

15        I submit, your Honor, that Simon

16   knows more and better about every one

17   of the properties in their malls than

18   anyone else including Sears.

19        So if they wanted to be here and

20   be bidding against this transaction,

21   they had every opportunity.  And that

22   goes for every other large real

23   estate developer.

24        The idea that this Sears process

25   has been going on under some sort of

**JX 072-125**

Page 703

1              PROCEEDINGS

2    cover of darkness is just ridiculous.

3        Sears has been under a microscope

4    for years.  Mr. Lampert has been

5    under a microscope for years.  This

6    entire bankruptcy has been under a

7    microscope with live vlogging the

8    moment anything is said including

9    instantaneous reports of anything

10   going on in chambers conferences we

11   find outrageous.

12       There's nothing hidden in this

13   case.  Any time something is said it

14   is broadcast almost immediately.  And

15   the idea that we are doing something

16   undercover of darkness is frankly

17   outrageous.

18       Now, your Honor, I want to talk a

19   little bit about the reasonableness

20   of the settlement and the 9019

21   standards.

22       I know Mr. Basta covered it and

23   Mr. Britton described the release.

24       But it is very important that when

25   we're taking a look at this that

JX 072-126

1                    PROCEEDINGS

2    we're not conflating things, right.

3    The 9019 standard for approval of a

4    settlement, which we understand is

5    part and parcel of 363 standard for

6    the sale, is such that you have to

7    take into account the strength of

8    these claims, but not have a mini

9    trial with respect to the claims.

10        You have heard from Mr. Carr, from

11   Mr. Transier, you've seen what was

12   submitted by the restructuring

13   subcommittee, that they have

14   conducted an extensive investigation.

15   They have taken a look at these

16   equitable subordination, disallowance

17   and recharacterization claims and

18   they have come to a reasoned

19   conclusion that the consideration

20   being provided both in the form of

21   the $35 million as well as all of the

22   other assumptions of liabilities is

23   more than enough to justify this

24   release.

25        I think it's important for a

Page 705

1                    PROCEEDINGS

2      moment to stop and go back to Mr.

3      Basta's timeline.  It is true,

4      absolutely, we wanted a complete

5      release all through the process.  We

6      did not get to the point where we

7      were willing to engage on a more

8      limited release until the time of the

9      auction.

10         And it was in that same period of

11     time, in conversations with the

12     debtors and the subcommittee, that

13     ESL did two things.  One, decided

14     that it would be willing to put a

15     proposal on the table or consider a

16     proposal, depending on which point of

17     view you have, with respect to a more

18     limited release.  But at the same

19     time also assuming substantial

20     amounts of liability, substantial

21     amounts of liability and increasing

22     the overall value.

23         Mr. Kamlani testified yesterday,

24     uncontradicted, that the bid that

25     went in on the 28th of December, the

JX 072-128

Page 706

1                PROCEEDINGS

2    bid deadline, compared to the bid

3    that was accepted, had a difference,

4    a positive increase in value of $800

5    million.

6        So between the time that our bid

7    went in on the 28th and the winning

8    bid was selected in the early morning

9    hours of the 16th, subject to

10   documentation, we did two things.  We

11   increased the amount of consideration

12   by approximately $800 million and we

13   also agreed to the more limited

14   release.

15       Now with respect to those -- and

16   this -- a lot of this ties into all

17   different pieces.  But another piece

18   of this is that at the same time we

19   were assuming liabilities we were

20   addressing issues that dealt with the

21   so called allocation with respect to

22   unencumbered assets.

23       I think your Honor's math is

24   exactly right.  We've got $5.2

25   billion of consideration, $1.3

JX 072-129

Page 707

1               PROCEEDINGS

2     billion of credit bidding, so that

3     consists of 3.9 of other

4     consideration.

5          But just to put a finer point on

6     that to give you a couple of other

7     datapoints.  The protection

8     agreements that have been discussed,

9     what are the protection agreements

10    and what is the value with respect to

11    that?

12         It was in the context of that

13    December 28th to January 17th period

14    that we increased our bid to take on

15    responsibility for the entirety of

16    the protection agreements.

17         The protection agreements are if

18    you go and buy a washing machine at

19    Sears and they ask if you want an

20    extended warranty and you say yes and

21    you pay $300 for it, something along

22    those lines, that is an obligation of

23    Sears to continue to provide service

24    and to come out to your home, fix

25    these appliances to the extent they

JX 072-130

Page 708

1                    PROCEEDINGS

2      break.

3          Like any insurance, it's a bet,

4      it's a bet that the quality of the

5      product is going to be such that

6      you're not going to have to spend

7      nearly as much repairing the

8      appliance as you did to buy it -- to

9      buy the protection.

10         And so the accounting for these is

11     obvious when they describe it but a

12     little tricky from a distance.

13         There's about a billion dollars

14     worth of liabilities right now for

15     protection agreements.  It's a little

16     less than a billion but it's close

17     enough to a billion.

18         And so the question becomes well

19     we took on the responsibility for

20     that in this transaction.  The

21     present value of discharging the

22     obligations is somewhere in the

23     neighborhood of 400 to $430 million.

24         However you view it, we are taking

25     on a substantial obligation.  If

**JX 072-131**

Page 709

1                    PROCEEDINGS

2    Sears liquidates, that's a billion

3    dollar claim.  It's a billion dollar

4    claim because everybody who brought

5    those protection agreements will no

6    longer have protection and have a

7    billion dollars worth of claims

8    against Sears.  The fact they can be

9    serviced for $430 million is

10   irrelevant because no one is there to

11   services it.  So we are taking on the

12   obligation of a billion.  Yes, it

13   will cost us 430 to service it.  But

14   we are taking off the liquidation

15   balance sheet of the debtors

16   approximately a billion dollars of

17   liabilities.

18        There are several other instances

19   where the bid was improved

20   substantially during that period of

21   time, all of which accrues to the

22   benefit of the -- for credit with

23   respect to the nonencumbered assets.

24        Also with respect to the

25   nonencumbered assets, your Honor,

JX 072-132

1               PROCEEDINGS

2     there's an issue that goes into

3     liquidation, the liquidation analysis

4     I think as your Honor has said, what

5     we're doing is comparing this

6     transaction to the opportunity

7     presented, the less desirable

8     opportunity hopefully of liquidation.

9          And when you look at the

10    liquidation analysis, including the

11    one that was just presented to your

12    Honor by the debtors in their debt,

13    what you're looking at there is the

14    question of the liability with

15    respect to the priority scheme on how

16    obligations flow through.

17         In this circumstance, this

18    transaction that is being proposed to

19    be approved is substantially better

20    than the liquidation alternative and

21    substantially better than the one the

22    debtors have shown you.

23         In your deck, your Honor, I direct

24    you to, this is page 16 of their

25    deck.  This is the benefits of the

Page 711

1                  PROCEEDINGS

2   sale transaction in an orderly

3   winddown.  And it's got two columns,

4   the winddown column and the sale

5   transaction would assume creditor

6   recoveries under each column.

7        The first column under winddown is

8   the liquidation alternative.  So

9   looking at that first category,

10  administrative and other priority

11  claims and assumes recovery under

12  that liquidation scenario of hundred

13  percent, that's simply incorrect,

14  your Honor.  Because if you go one,

15  two, three, four, five lines down

16  there is a line for second lien

17  507(B) claims and it says 41 percent.

18       Now the 507(B) claims your Honor

19  will recall relate to the second lien

20  facility that has second lien

21  positions with respect to all of the

22  collateral securing the first lien

23  ABL.

24       There's been a diminution in value

25  since the filing of the case.  The

JX 072-134

Page 712

1                    PROCEEDINGS

2    amount of the collateral, value of

3    the collateral as of the petition

4    date versus the amount of the

5    collateral today is substantially

6    diminished.  And that diminution was

7    used to fund the estates and the

8    operations.

9        The 41 percent number is incorrect

10   because the 507(B) claims are senior

11   both by statute and by the order that

12   your Honor ordered to the

13   administrative and other priority

14   claims.

15       So whatever those amounts are, and

16   we understand the debtors made this

17   agreement our point of view which we

18   think is in the neighborhood of 700

19   to 900 million, those 507(B) claims

20   are entitled to recovery before and

21   above the administrative and other

22   priority claims.

23       So what we're talking about here

24   when you flow that through is that

25   the administrative insolvency in a

**JX 072-135**

Page 713

1                    PROCEEDINGS

2    winddown scenario is enormous.  And

3    the only way it's not is if you

4    ignore the law and if you ignore the

5    orders that this Court has entered

6    with respect to the 507(B) claims and

7    the diminution of value since the

8    petition date.

9         THE COURT:  At least you'd have a

10   fight over it.

11        MR. BROMLEY:  We would certainly

12   have a fight about it.  And there's a

13   lot of fights we've had, hopefully

14   that's not one of them.  But on that

15   one we feel good the statute tells us

16   very clearly and so does the order

17   that your Honor issued.

18        So, your Honor, with respect to

19   the -- going back into the analysis

20   of the release, you know, the

21   subcommittee and Paul, Weiss in the

22   brief made very clear, I won't

23   belabor the point, both equitable

24   subordination and recharacterization

25   are extraordinary remedies.  We don't

JX 072-136

1                    PROCEEDINGS

2    believe that there are facts or

3    circumstances that would give rise to

4    any valid claim.

5        But in the context of trying to

6    make a commercial transaction work

7    here, because of the huge desire that

8    ESL has to try to go forward and this

9    company succeed in the future, we

10   were willing to put the settlement

11   proposal on the table.  But it

12   doesn't mean that you shouldn't take

13   into account the fact that the case

14   law is very clear.  Those are

15   extraordinary remedies.  They do not

16   come -- they do not come across any

17   of our desks in a fully litigated

18   fashion very often and the reason for

19   that is they are incredibly factually

20   intensive and the standards are very

21   high.

22       Your Honor, there's been some

23   criticism made about the conduct of

24   the auction.  And we -- and whether

25   it was open and fair and transparent.

Page 715

1              PROCEEDINGS

2        We were a mere participant and to

3     an extent there was nothing we did to

4     have any role in trying to keep

5     anyone out or anyone in when we

6     showed up at Weil's offices for the

7     auction.  We had no idea who would be

8     there or who wouldn't be there or

9     what we were bidding against.

10       We weren't provided with any

11    advance notice of any competing bid.

12    And frankly, as we stand here today

13    have no idea who bid what for

14    anything, notwithstanding demands

15    that we had made for that

16    information.

17       THE COURT:  You're going to have

18    to let other people who are objecting

19    have a chance.  I don't have how much

20    longer you're going.

21       MR. BROMLEY:  I'll be wrapping

22    up, your Honor, sorry.  One thing I

23    do want to say, I'm not going to go

24    into any detail refuting the

25    allegations that have been made in

**JX 072-138**

1          PROCEEDINGS

2     the creditors' committees bids.  30

3     or 40 pages of their pleadings were

4     filled with accusations about my

5     client, about actions that may or may

6     not have taken in the prepetition

7     period.

8        We don't view this to be the time

9     or place to be dealing with any of

10    those and we hope that your Honor

11    would be of the same view.

12       To the extent Mr. Qureshi or his

13    colleagues feel a need to get into

14    that and your Honor allows, I want to

15    reserve time to respond to that.

16       Let me see if I have anything

17    else.  So I am in light of the issues

18    that have been covered by my

19    colleagues from Weil Gotshal and

20    Paul, Weiss that's all I have for

21    your Honor today.  Again, reserving

22    my rights to the extent there's a

23    need.  Thank you.

24       THE COURT:  Okay.  Very well.

25    I'm sorry.

JX 072-139

1              PROCEEDINGS

2        MR. SELTZER:  Your Honor, I'll

3   only be about two minutes.

4        THE COURT:  Okay.

5        MR. SELTZER:  Richard Seltzer of

6   Cohen Weiss & Simon for the United

7   Auto Workers, United Steel Workers,

8   Workers United SEIU, DC unions, we're

9   also creditors that represent

10  employees of five distribution soft

11  good centers of the debtors,

12  Pennsylvania, New York and

13  California.

14      One thing I'd say I think it's

15  important listening to this morning

16  that the debtor and the buyer if the

17  sale is approved be in excellent

18  communication with the employees

19  about their status.  It sounds like

20  they're going to continue being

21  employees of the debtors for some

22  period of time.  Whatever the story

23  is, I think it's important that be

24  communicated to the employees.

25        THE COURT:  I agree with you.

**JX 072-140**

1              PROCEEDINGS

2        MR. SELTZER:  We've been in

3    communication with the debtors and

4    it's our understanding that five

5    locations that we represent people at

6    will be sold and probably three of

7    them will continue operations.

8        We represent -- the unions I

9    represent, represent hundreds of

10   workers whose jobs are important to

11   them, their families and their

12   communities, and we hope that the

13   debtors and the buyers will have the

14   sense to assume the respective

15   collective bargaining agreements, on

16   the list of agreements that may be

17   assumed because we think that makes

18   sense for labor stability, business

19   stability and equitable agreement.

20       One of the main goals of Chapter

21   11 is to preserve jobs.  The one case

22   that the creditors' committee cited

23   for sort of the opposite proposition

24   was the in re After 6 case of Dr. --

25   of Judge Schoal in Philadelphia and

```
 1            PROCEEDINGS
 2    the case actually stands for exactly
 3    the opposite.
 4        It may be limited in its analysis,
 5    but it certainly held that the debtor
 6    exercising its business judgment can
 7    take into consideration the
 8    preservation of jobs in a sale.
 9        The point I ultimately rise to
10    make is simple but telling.  While
11    the unions we represent do not
12    condone some of the kinds of
13    activities that at least are alleged
14    in the creditors' committees papers
15    and while we do not look at life
16    through rose colored glasses either
17    in the past or the future, at the end
18    of the day the union's members and
19    other employees will either have the
20    opportunity to continue their jobs
21    working for Sears or K-Mart or they
22    will be out of work.
23        In the real world of real working
24    people and real jobs, not the world
25    of armchair experts who sounded to me
```

JX 072-142

1                    PROCEEDINGS

2     like were thinking about this

3     alternate universe, these jobs are

4     vital, they're important, they're not

5     easily replaced.  There was no other

6     offer to even suggest it, the

7     possibility of maintaining jobs.  And

8     so the UAW, USW and Workers United

9     SEIU, while supportive of any efforts

10    to improve the offer, improve the lot

11    of the employees, improve the estate,

12    support the sale.  Thank you.

13        THE COURT:  Okay.  I will hear

14    from your firm, the committee and the

15    other objectors.

16        MR. QURESHI:  Thank you, your

17    Honor, Abid Qureshi, Akin Gump, for

18    the committee.  May I approach with a

19    short presentation?

20        THE COURT:  Sure.

21        MR. QURESHI:  Your Honor, before

22    I get into the presentation, there's

23    just a couple of things I'd like to

24    respond to from Mr. Basta's remarks

25    initially.  And the first is, and I

Page 721

1                    PROCEEDINGS

2       will say I'm going to approach this a

3       little bit differently, unlike Mr.

4       Basta and Mr. Schrock and Mr.

5       Bromley, I'm not going to testify

6       from the podium which I think your

7       Honor heard a lot of.  I'm going to

8       focus instead on the evidence that's

9       in the record.

10          But I do want to respond to the

11      allegation concerning the committee

12      and the committee's decisionmaking

13      process.  The suggestion has been

14      made that somehow this committee is

15      dominated by landlords.  It's not,

16      your Honor.  The committee's

17      membership is two landlords, two

18      trade creditors, one indenture

19      trustee as well as the PBGC.

20          Your Honor, every member of the

21      committee and all of the committee's

22      professionals take their fiduciary

23      duties very seriously and every

24      action the committee has taken in

25      this case has been with the unanimous

JX 072-144

Page 722

1                    PROCEEDINGS

2    support of the committee members.

3         Secondly, your Honor, Mr. Basta

4    suggested that the committee has

5    never said let us work the contract I

6    think was the phrase he uses.  And

7    frankly, your Honor, given what

8    transpired here, I find that comment

9    really hard to take.  Your Honor,

10   there's record evidence that at this

11   auction the committee was not

12   consulted.  Yes, it is true --

13        THE COURT:  I took what Mr. Basta

14   said with a grain of salt and frankly

15   I don't need to get into

16   deliberations.  I'm just evaluating

17   what's in front of me.  Motivations

18   are not particularly relevant to me.

19        MR. QURESHI:  I agree

20   wholeheartedly with that, your Honor.

21        THE COURT:  And I also take -- I

22   mean it sounded facetious but I also

23   take seriously the point that the

24   committee being a total pain in the

25   neck may be the best negotiating

JX 072-145

1              PROCEEDINGS

2    strategy.  I don't want to get into

3    that.

4         MR. QURESHI:  I raise it only,

5    your Honor, because the consultation

6    provision is there so that the

7    committee can be used to improve the

8    deal.  And we'd love nothing more

9    than a better deal which we don't

10   have, we have the deal that we have

11   and it's one that we object to.

12        And with that, your Honor, if I

13   could ask the court to turn to the

14   second page of the presentation I

15   handed out.  And I want to start with

16   what I think is the fundamental

17   defect in this bid and it relates to

18   the allocation point.

19        As your Honor observed already,

20   the testimony is unanimous from all

21   the witnesses that there was no

22   allocation.

23        Now Mr. Carr in his cross

24   examination made clear why that's an

25   issue.  Because he could not explain

Page 724

1                    PROCEEDINGS
2    how the credit bid was being
3    allocated --
4         THE COURT:  Let's just go to my
5    question.  Is there value here in the
6    unencumbered assets on a reasonable
7    basis in excess of either 3.9 billion
8    or 3.5 billion depending on how you
9    count the rollover of the DIP, the
10   Junior DIP?
11        MR. QURESHI:  I think there is,
12   your Honor.  If your Honor turns to
13   slide 3.  And what I'll try to do
14   here is walk through the numbers.
15   But before I do that, your Honor, we
16   don't accept that the right way to do
17   this is to simply globally take 5.2,
18   deduct 1.3, get 3.9 and it's that
19   simple.
20        The DIP order requires that the
21   ABL only be satisfied by the ABL
22   collateral.  This is not an estate
23   that's been substantively
24   consolidated.  And so I don't think
25   it's necessarily appropriate to look

JX 072-147

```
 1              PROCEEDINGS
 2    at it globally on that basis.
 3         But, your Honor, let me, if I
 4    could, walk through a few of the
 5    numbers.
 6         So on this --
 7         THE COURT:  I'm sorry, ABL -- I
 8    didn't follow that point.  I mean
 9    what is happening to the ABL under
10    this deal?
11         MR. QURESHI:  So it's being
12    repaid.
13         THE COURT:  In cash, not a credit
14    bid.
15         MR. QURESHI:  Correct.
16         THE COURT:  All right.  So let's
17    move on from that point.
18         MR. QURESHI:  So, your Honor, if
19    your Honor looks at this chart, and
20    this is a chart that appeared in a
21    slightly different form in our
22    objection, there have been some
23    changes to it based on the testimony
24    and the evidence that's come in, if
25    your Honor looks at the consideration
```

JX 072-148

1              PROCEEDINGS

2     paid column here and what I'd like to

3     focus on first of all is the assumed

4     administrative claim, so the fine

5     numbers, the severance, all those

6     numbers --

7          THE COURT:  So this is page what?

8          MR. QURESHI:  Page 3 of the

9     presentation.

10         THE COURT:  Page 3.

11         MR. QURESHI:  And there is a

12    chart there.  I'm beginning --

13         THE COURT:  I just want to make

14    sure I'm on the right page.

15         MR. QURESHI:  I'm on the right

16    side, the consideration paid side of

17    this page.  And what's set forth here

18    is a number to be assumed by.  And on

19    the top, the Junior DIP we have about

20    $175 million.  Gift card liabilities

21    at $32 million.  That totals 789.

22         Now if your Honor looks a little

23    further down we've included two

24    additional items that we don't think

25    are appropriately in the

Page 727

1                    PROCEEDINGS

2     consideration paid column and I'll

3     explain why.  But even if your Honor

4     disagrees with that, we think there's

5     still a shortfall of consideration

6     for the unencumbered assets.

7          Those two items that we disagree

8     with are the PA liabilities,

9     protection agreement liabilities at

10    $465 million and the additional

11    Junior DIP at $175 million.  And just

12    briefly on those two, your Honor, the

13    assumptions of the Junior DIP, why we

14    in our analysis think that it's only

15    fair to look at half of that as being

16    an assumption, that's because, and

17    this is detailed on the next slide,

18    but, your Honor, the company's own

19    numbers show that the second draw of

20    $175 million, the online purpose that

21    served was to get these estates from

22    the auction to the closing date

23    essentially.

24         But again --

25          THE COURT:  So you're saying

JX 072-150

Page 728

```
 1              PROCEEDINGS
 2   that's a 506 (C) claim instead?
 3        MR. QURESHI:  Your Honor --
 4        THE COURT:  Understanding
 5   Flagstar?  Come on, let's be
 6   realistic here.  I'm at great law now
 7   that every DIP loan is subject to 506
 8   (C)?  Give me a break.
 9        MR. QURESHI:  So, your Honor --
10        THE COURT:  Let's go to the PA
11   liabilities.  Have you ever
12   liquidated an insurance company?  So
13   how are those claims treated?
14        MR. QURESHI:  So, your Honor, the
15   reason that we suggest that the PA
16   liabilities are not appropriate here
17   is because in the winddown scenario
18   there were expressions of interest
19   for the Sears Home Services business
20   and those expressions of interest
21   included --
22        THE COURT:  Well get to that
23   point.
24        MR. QURESHI:  -- assumption of
25   the liabilities.
```

JX 072-151

1               PROCEEDINGS

2        So, your Honor, let's not take

3    those items out.  So consideration

4    paid.

5        THE COURT:  No, you're treating

6    them at 465 instead of a billion.

7        MR. QURESHI:  That is correct,

8    your Honor.  And the reason we do

9    that is again because of the record

10   evidence and the testimony as cited

11   on page 5.

12       THE COURT:  That's what they're

13   booked at but as a claim it's a

14   billion dollars.  I go back, have you

15   ever liquidated an insurance company?

16       MR. QURESHI:  No, your Honor,

17   I've not.

18       THE COURT:  All right.

19       MR. QURESHI:  And then over on

20   the asset purchase side, your Honor,

21   I want to focus in particular, so

22   there's a low and a high, and the

23   differences are driven, number one,

24   by the real estate valuation.  And

25   I'll get to that talking only about

Page 730

1                        PROCEEDINGS

2    the low end numbers.  And beyond

3    that, your Honor, it's what we

4    believe to be equity value in

5    Sparrow, in the Sparrow assets and

6    equity value in the assets securing

7    the IGPL loan which are set forth at

8    the bottom of the page and if you

9    total those two up and add it to the

10   other assets that are being

11   purchased, that, your Honor, is where

12   we think we get to the shortfall.

13       And if I can ask the court to turn

14   first next to slide 6.  What I want

15   to talk about very briefly is the

16   real estate value to make sure that

17   the court is clear as to in our low

18   end number what constitutes the

19   difference.

20       So there are 555 properties in the

21   debtors unencumbered real estate

22   valuation that the debtors did not

23   value.

24       What Mr. Greenspan did with those

25   properties is he said well let's take

JX 072-153

Page 731

1                    PROCEEDINGS
2      a look at them and see if there's any
3      basis to value them.  80 percent of
4      them he agreed he gave zero.  The
5      balance he valued at $126 million.
6           Now two important things with
7      respect to Mr. Greenspan's valuation.
8      One, he did the valuation on a dark
9      basis.  So there was no assumption
10     that there would be an operating
11     company that would keep these
12     properties lit with all of the
13     expenses associated with that.
14          Secondly, he deducted from his
15     valuation an estimate of carrying
16     costs for those dark properties to
17     carry them through the length end
18     sale process that this analysis was
19     based on.
20          The second bucket of properties
21     with 402 in it, his valuation 800
22     million as against the debtors at
23     634.
24          So there's that difference is made
25     up of two things.  One is, your

JX 072-154

1              PROCEEDINGS

2    Honor, the debtors took a 75 percent

3    discount to liquidation value.  Mr.

4    Greenspan took a 60 percent discount

5    to liquidation value.  For reasons

6    explained in his report which we

7    think are well founded.

8         So in addition, on the debtors'

9    side of that analysis, what the

10   debtors did is their expert gave

11   equal weight in that analysis to

12   nonbinding indications of interest,

13   including those that came in at zero

14   or as your Honor asked Mr. Meghji did

15   that apply equal to a $500 express of

16   interest and the answer is that it

17   did.

18        THE COURT:  Do you dispute that

19   he said the delta there if you didn't

20   include any of that was $70 million?

21        MR. QURESHI:  I believe that's

22   right, your Honor.

23        THE COURT:  Do you dispute Mr.

24   Greenspan's testimony that 70 million

25   was just a rounding error so he

JX 072-155

1              PROCEEDINGS

2    didn't even include it in his

3    adjustment?

4         MR. QURESHI:  I think

5    mathematically the way he expressed

6    his overall range for all of the

7    properties, that's correct.

8         THE COURT:  Okay.

9         MR. QURESHI:  Now, your Honor, if

10   I could move on.

11        THE COURT:  Do you dispute that

12   he ascribed value to leases where the

13   secured interest in the lease

14   exceeded the value of the lease?

15        MR. QURESHI:  Your Honor, I don't

16   know the answer to that question.

17   I'll try to get that.

18        Your Honor, if I could ask the

19   court to then turn to slide 8.  And

20   this gets to the collateral that

21   secures the Dove and the Sparrow

22   properties.

23        Your Honor will recall I took Mr.

24   Kamlani through this document.  There

25   is an appraised value and schedule

1                    PROCEEDINGS

2       prepared by Mr. Kamlani of those

3       properties of $1.65 billion.  The

4       term sheet which is also in evidence

5       quite clearly identifies the Dove and

6       the Sparrow collateral as the

7       collateral that secures that loan.

8           If your Honor turns to the next

9       page, we know from the asset purchase

10      agreement that $544 million of the

11      Dove debt is part of the credit bid

12      here.  Mr. Kamlani acknowledged that

13      with that credit bid what ESL was

14      acquiring is the collateral that

15      secured that.

16          So by simple math of subtracting

17      that 54 from the overall 165, the

18      remainder of that value is

19      attributable to the Sparrow

20      properties as acknowledged by Mr.

21      Kamlani.

22          The Sparrow properties have some

23      debt on them that's been credit bid.

24      So you back out that debt and, your

25      Honor, you're left with $560 million

**JX 072-157**

Page 735

1              PROCEEDINGS

2    of equity value in Sparrow.

3         And there's no evidence as to how

4    that's being paid for other than by

5    credit bid.  Your Honor, similarly,

6    the IPGL loan.  If your Honor turns

7    to slide 10.  How the IGPL loan is

8    being credit bid as set forth in the

9    asset purchase agreement in the

10   amount of $231 million.

11        Now, the value of the collateral

12   pledged under that loan exceeds that

13   debt.  The debtors, there's two

14   components to that debt, your Honor,

15   one is the IP and the second is the

16   leases.  So looking first at the

17   intellectual property, we've

18   excerpted on the page, your Honor, of

19   the winddown recovery from the

20   debtors that shows that the IP in the

21   IGPL loan was valued by Ocean Tomo at

22   $345 million and with respect to the

23   ground leases that are part of that

24   loan, those were valued by the

25   debtors at $119 million.  That's also

JX 072-158

Page 736

1                   PROCEEDINGS

2    excerpted.  And that by the way

3    represents a 50 percent discount to

4    the appraised value.  So those are

5    conservative values.

6         And Mr. Kamlani, in response to

7    questioning not by me but by Mr.

8    Bromley, confirmed that at the time

9    of that loan, the collateral value

10   exceeded, exceeded the amount being

11   lent and he confirmed, as he did with

12   respect to Sparrow same questions,

13   that he's not aware of any change in

14   those values as of the time that he

15   testified.

16        Your Honor, one more difference

17   between the committees' numbers and

18   the debtors' numbers with respect to

19   the unencumbered value, and that

20   relates to unencumbered collateral

21   where we had, your Honor, back on

22   slide 3 for the other unencumbered

23   accounts receivable a value of 60 to

24   $80 million, we now have record

25   testimony from Mr. Kamlani that the

JX 072-159

Page 737

1              PROCEEDINGS

2     value of that is significantly

3     higher, $255 million according to Mr.

4     Kamlani.

5          So, your Honor, the bottom line

6     here is we don't think that there is

7     value being received by these estates

8     for all of the unencumbered assets,

9     and we don't think there's evidence

10    in the record that supports that

11    there is.  And on that basis we don't

12    think that the credit bid can be

13    approved.

14         Now, your Honor, if I can move on

15    to the accounts payable chart.  And

16    this is addressed on slide 12.

17         If I understand correctly what

18    I've heard from both the debtors and

19    from ESL, we don't have a deal.  We

20    don't have a deal because there's a

21    disagreement over what the debtors

22    consider to be, and we agree, a very

23    material term.

24         And, your Honor, an estate that is

25    indisputably being left insolvent

JX 072-160

1              PROCEEDINGS

2     today if this transaction closes

3     tomorrow, this estate is simply not

4     in a position to close this

5     transaction and then immediately

6     litigate with Mr. Lampert.

7         And so we do think that this is an

8     issue to the extent your Honor is

9     otherwise prepared to approve this

10    transaction that needs to be resolved

11    and resolved in the debtors' favor

12    before there is a closing.  It just

13    makes no sense to close a transaction

14    and begin to litigate.

15        I also think, your Honor --

16        THE COURT:  That's exactly what

17    the Second Circuit says I'm supposed

18    to do.

19        MR. QURESHI:  We think, your

20    Honor, that certainly in a context

21    here where the estate is

22    administratively insolvent, the

23    company's evidence, not the

24    committee's argument, $42 million was

25    the amount of the insolvency.

Page 739

1                    PROCEEDINGS

2        And if as I understand the bid and

3    the ask in terms of what ESL is

4    prepared to pay, the amount of

5    administrative insolvency goes up

6    another $43 million.

7        So while I don't disagree that in

8    other circumstances it might be

9    appropriate to close the transaction

10   and allow that mitigation to happen

11   here, respectfully, your Honor, I

12   don't think that the debtors in the

13   exercise of their sound business

14   judgment can or should do that.  Not

15   when there is an alternative in the

16   form of what we have called the

17   alternative sale transaction, the

18   liquidation option, which we think

19   yields a better result to begin with,

20   and not when the estate is simply not

21   going to have the resources to

22   litigate.

23        In addition, your Honor, I think

24   that when one adds what's happening

25   in court today on this provision to

**JX 072-162**

Page 740

1                    PROCEEDINGS

2      all of the other conduct of ESL and

3      of Mr. Lampert that is part of the

4      record, it rises to the level of

5      whether this is a good faith offer

6      under 363.

7           THE COURT:  What other comment is

8      part of the record other than

9      litigation claims that you and the

10     special committee are asserting?

11          MR. QURESHI:  Your Honor, I'm

12     about to get to it.

13          THE COURT:  Okay.

14          MR. QURESHI:  So for all of those

15     reasons, your Honor, we don't think

16     it's appropriate, in these

17     circumstances, with an

18     administratively insolvent estate to

19     close on a dispute like this.

20          And unless I misheard the debtors,

21     I don't believe the debtors are

22     prepared to close so long as this is

23     an open issue either.

24          That's how thin the line is in

25     this case between whether this

JX 072-163

Page 741

1                PROCEEDINGS

2     transaction makes economic sense or

3     does not.

4         Now, your Honor, I think there are

5     a number of other issues that remain

6     unresolved.  And I will add that we

7     received overnight more than 600

8     pages of deal documents, revised sale

9     order, revised asset purchase

10    agreement, a transition services

11    agreement, new releases.  Your Honor,

12    we're simply not in a position,

13    despite literally having the entire

14    team up all night, to respond in a

15    detailed way to very dense documents

16    that have very material terms in

17    them.

18        And yet despite that flood of

19    overnight documents, as I understand

20    it, there is still material things

21    that frankly I'm not sure are

22    resolved.

23        503(b)(9) claims, for example.

24        THE COURT:  Have you read the

25    order?  Has anyone on your team read

**JX 072-164**

Page 742

1                  PROCEEDINGS

2      the order?

3          MR. QURESHI:  We have, yes, your

4      Honor.

5          THE COURT:  What about the

6      representations about the transition

7      services agreement?

8          MR. QURESHI:  Your Honor, we are

9      concerned about the mechanics that

10     are going to be in place to deal post

11     closing with 503(b)(9) to ensure that

12     to the extent there's risk there,

13     that is risk that is borne by ESL as

14     the buyer.

15         THE COURT:  How concerned are

16     you?  Did you raise the issue ever

17     until I raised it yesterday in light

18     of your cross examination that killed

19     the deal?

20         MR. QURESHI:  Your Honor, we have

21     had numerous conversations with the

22     debtors.

23         THE COURT:  No, no.  Did you

24     propose a specific change?

25         MR. QURESHI:  Not prior to last

JX 072-165

1          PROCEEDINGS

2    night, your Honor.

3        THE COURT:  Okay.  Why don't you

4    propose one now so I can hear it.

5        MR. QURESHI:  Again, your Honor,

6    not having had the time to go through

7    all --

8        THE COURT:  You haven't thought

9    about it.  It was enough to cross

10   examine someone about it, to raise

11   the issue in my mind.  So I raised it

12   immediately.  But you're so concerned

13   about these people that you haven't

14   made one proposal.

15       MR. QURESHI:  Your Honor --

16       THE COURT:  Maybe the two vendors

17   on your committee might think about

18   that.

19       MR. QURESHI:  Your Honor --

20       THE COURT:  I wasn't going to

21   speculate, but I do now have a record

22   on one big issue as far as your

23   committee's operation.

24       MR. QURESHI:  Your Honor, we have

25   --

JX 072-166

1              PROCEEDINGS

2         THE COURT:  So make the proposal

3    that you say should fix it.

4         MR. QURESHI:  We have made clear,

5    your Honor, that the 503(b)(9)

6    provisions, the reconciliation of

7    those claims needs to happen in a way

8    so that the debtor is able to

9    reconcile those liabilities without

10   bearing the risk.  That the risk of

11   that should be borne by ESL.

12        THE COURT:  But ESL is picking it

13   up.  The debtor is liquidating it and

14   it's within the budget that's part of

15   the calculation of the going forward

16   costs.  Unless you dispute that.

17        MR. QURESHI:  Your Honor, it's

18   not that we dispute it.  It's that we

19   haven't been shown the details.

20        THE COURT:  It's a claim

21   objection process.

22        MR. QURESHI:  Your Honor, also

23   with respect to to the Cyrus release,

24   we just don't understand why a Cyrus

25   release should be approved.

Page 745

1              PROCEEDINGS

2        First of all, Cyrus does not need

3    a release in order to credit bid.

4    Cyrus consent to a credit bid isn't

5    even required.  ESL can and has

6    directed the indenture trustee to

7    credit bid those claims.

8        And secondly, our understanding of

9    the reason I think that the asset

10   purchase agreement as originally

11   filed did not have a release for

12   Cyrus, is that ESL had obtained the

13   financing commitments to satisfy the

14   Junior DIP and that he did that

15   without the need for any release from

16   Cyrus.

17       And so the auction record was

18   clear on that point.  And then all of

19   a sudden Cyrus shows up and says we

20   want a release and by the way we're

21   not prepared to pay for it.

22       THE COURT:  Well, they rollover

23   the DIP.

24       MR. QURESHI:  Again, your Honor,

25   the estate isn't getting anything for

**JX 072-168**

Page 746

1               PROCEEDINGS

2    that.

3         THE COURT:  The DIP is rolled

4    over, it paid for in cash.  How much

5    is that Junior DIP?

6         MR. QURESHI:  $300 million.

7         THE COURT:  And what would happen

8    if it wasn't rolled over to your

9    administrative claims analysis and

10   your professed concern about

11   administrative insolvency?

12        MR. QURESHI:  The concern is not

13   professed, your Honor.

14        THE COURT:  Well what would

15   happen to that amount?  What would

16   happen to that amount?  Would it get

17   paid or not?  Would it have to get

18   paid as a priority administrative

19   expense?

20        MR. QURESHI:  My understanding,

21   your Honor, is it would have been

22   paid by the financing commitments

23   that ESL had in place.

24        THE COURT:  Today, today, the

25   Second Circuit in FNN says that the

JX 072-169

Page 747

1            PROCEEDINGS

2   bankruptcy court has a difficult

3   balancing act in dealing with these

4   decisions in real time.  So today,

5   what would happen to that $335

6   million if you go into a winddown?

7        MR. QURESHI:  Today it would be

8   an administrative claim, of course.

9        THE COURT:  And instead it's

10  being rolled over and you don't think

11  there's any value to the debtor in

12  that.

13       MR. QURESHI:  Your Honor, we are

14  looking at it from the perspective of

15  if the transaction closes.

16       THE COURT:  Past tense, because

17  that's what litigators do.  They like

18  to litigate things that happen in the

19  past but that's not what bankruptcy

20  lawyers and bankruptcy judges do.

21  They have to look at transactions

22  that are supposed to happen in the

23  future.

24       MR. QURESHI:  And when the ESL

25  bid was selected as the highest bid

**JX 072-170**

Page 748

1                   PROCEEDINGS

2      at the auction, ESL had committed

3      financing in place to satisfy the

4      Junior DIP.  And they had that

5      financing in place without the need

6      for a release from Cyrus.

7           THE COURT:  And now they don't.

8           MR. QURESHI:  And now they don't.

9      They changed the deal.

10          THE COURT:  So we should just

11     pull the plug.

12          MR. QURESHI:  No, we shouldn't

13     pull the plug.  We should say to

14     Cyrus go forward but without a

15     release or we should say --

16          THE COURT:  I said that last

17     night.  I don't know if you did or

18     your partner did.  I did and they

19     carved out what seemed to be the real

20     concern which is something beyond the

21     release that ESL was getting.  So

22     let's move on.

23          MR. QURESHI:  Very well, your

24     Honor.

25          THE COURT:  Basically so far I'm

JX 072-171

Page 749

1                    PROCEEDINGS

2       finding all of this highly

3       pretextual.

4            MR. QURESHI:  I will nonetheless

5       continue to make the record if I may,

6       your Honor.

7            THE COURT:  Yes, I know it's hard

8       for you but I know you should go

9       ahead and do that.

10           MR. QURESHI:  Your Honor, the

11      transition services agreement, again,

12      one of the documents that we received

13      overnight, and your Honor these are

14      not documents about which we are

15      consulted before we get them, these

16      are not documents about which our

17      input is sought before we receive

18      them.

19           THE COURT:  Let me tell you the

20      way I look at the transition services

21      agreement.  I agree with you

22      completely on that point.  But I have

23      a record here which is that this

24      agreement is more than neutral for

25      the debtor.  That the debtor actually

JX 072-172

Page 750

```
 1                  PROCEEDINGS
 2    does better under this agreement than
 3    if they were just compensating each
 4    other for their fair value of the
 5    services.  If that's not true, that's
 6    not what I approved.  That's what I'm
 7    approving, what I just said and what
 8    the record says.
 9         MR. QURESHI:  Your Honor, I
10    didn't think there was any evidence
11    about the TSA.
12         THE COURT:  There were
13    representations by both sides as to
14    what it contains and it's bottom
15    line.
16         MR. QURESHI:  Your Honor, let me
17    move on to another area that I have
18    no doubt the court will disagree
19    with.
20         THE COURT:  Okay.
21         MR. QURESHI:  But I will again
22    make the argument nonetheless.
23         We do think that ESL in a number
24    of ways acted inappropriately in the
25    auction process and acted in a way
```

**JX 072-173**

Page 751

1               PROCEEDINGS

2    that we think influenced the outcome.

3         Let me go through a number of the

4    ways in which we think that happened.

5         First of all, we introduced into

6    evidence an email from Mr. Transier

7    which we found somewhat odd that an

8    independent director put in place in

9    a role designed to investigate Mr.

10   Lampert would, at the very outset of

11   that process, send him an email with

12   the subject line very impressed,

13   followed by a request from Mr.

14   Lampert that they meet in person.

15        And then we get into the auction

16   process itself when these independent

17   directors, Mr. Transier and Mr. Carr,

18   are supposed to be assessing ESL's

19   bids and what happens?  Threats from

20   Mr. Lampert.  You're going to get

21   sued immediately.  You should be

22   removed from your role as an

23   independent director.  You should be

24   bypassed completely because you

25   didn't approve my bid.

**JX 072-174**

Page 752

1            PROCEEDINGS

2        THE COURT:  The threat you're

3    referring to is the letter, right?

4        MR. QURESHI:  Yes, it's on slide

5    21.  We've excerpted it there.

6        THE COURT:  Were you a party to

7    the chambers conference we've all had

8    on that that was called immediately

9    after that letter?

10        MR. QURESHI:  I was, your Honor.

11        THE COURT:  So since I ran it, I

12    will for the sake of the record state

13    that I said that letter should be put

14    in a drawer and forgotten about

15    because it had no effect and was

16    half-baked because, among other

17    things, it did not deal with the fact

18    that ESL's bids at that point

19    insisted on a complete release.  And

20    there's no doubt in my mind that

21    everyone in that conference

22    understood that that letter was a bad

23    letter.  And I believe the record

24    reflects, in terms of the

25    negotiations thereafter, that

Page 753

1              PROCEEDINGS

2    understanding.

3        And if anyone believed to the

4    contrary, including you and your

5    partners, you could have come to me

6    and said, no, they're still leaning

7    on it and I didn't get that.  And you

8    know that I would have reacted

9    immediately if I'd been apprised of

10   that.

11       MR. QURESHI:  Neither I nor my

12   partners had a different

13   understanding, your Honor.  But that

14   is not what's relevant here.  What's

15   relevant here is did it have an

16   impact on the decisionmakers?  And

17   for that, your Honor, look at the

18   next slide, slide 22.  We have

19   minutes where Mr. Schrock explains

20   that it was describing what the

21   advisors and the management had been

22   doing to get to a deal.  It was hard

23   to do amid threats of court action

24   from the primary counterparty, where

25   Mr. Schrock describes in the auction

JX 072-176

Page 754

1                    PROCEEDINGS

2      transcript a situation that was very

3      difficult for his subcommittee where

4      an insider and a chairman is

5      threatening litigation with the very

6      party whose bid they're supposed to

7      be evaluating.

8          So from that perspective, your

9      Honor, while we certainly as counsel

10     to the committee view the threats to

11     be empty, that's not what's relevant.

12     What's relevant is the decisionmakers

13     and how did the decisionmakers view

14     it?

15         And that is why we referred to it

16     here.

17         Next, your Honor, the letter from

18     the office of the CEO.  And this one,

19     your Honor, is the one that I find

20     most troubling.  So subsequent to Mr.

21     Lampert's resignation as the CEO, the

22     office of the CEO was created that

23     consists of three people whose names

24     are here on slide 23.

25         Now, your Honor, this is the

JX 072-177

1                    PROCEEDINGS

2    senior management team of the company

3    whose job it is to provide guidance

4    and make recommendations to the board

5    of directors on numerous important

6    operational issues and most of all

7    during this time frame, the ESL bid.

8        And yet the very people that are

9    supposed to be doing that were

10   requested by Mr. Lampert to write a

11   letter to the board.  They then

12   apparently wrote that letter, sent a

13   draft of it to Mr. Lampert's counsel.

14   And then that letter was sent to the

15   board.  And the letter says Mr.

16   Lampert, we support you, and we

17   support your bid.  And that's the

18   management team that the board is

19   supposed to take advice from, all

20   engineered by Mr. Lampert.  So do we

21   think that had an impact on the

22   decisionmaking process?  Yes, we do.

23   Do we think that was inappropriate

24   conduct by Mr. Lampert?  Yes, we do.

25       Now, your Honor, moving on to the

JX 072-178

Page 756

1          PROCEEDINGS

2    release.  And I am not going to get

3    into the merits of the claims.  It's

4    never our intention to do that.  I

5    will state simply that we

6    incorporated by reference into our

7    pleading our standing motion in the

8    complaint that was attached thereto.

9    We think the claims are very well

10   founded.  We think that that

11   complaint in every respect easily

12   passes a motion to dismiss.  We think

13   the claims are more than colored.

14       Why do we think the release and

15   the consideration for the release are

16   woefully insufficient here?  Two

17   principal reasons, your Honor.

18   Number one, the claim allowance that

19   was allowed here to allow ESL to

20   credit bid, it's more than was needed

21   to allow them to credit bid.

22       We think that if the claims

23   allowance was limited to the $1.3

24   billion that is credit bid and the

25   balance of the claims were subject to

JX 072-179

Page 757

1                    PROCEEDINGS

2    recharacterization and equitable

3    subordination, that would have been a

4    more appropriate balance.

5         Secondly, your Honor, in light of

6    all of ESL' claims being allowed,

7    what is fundamentally problematic

8    from our perspective with the

9    release, the credit bid and the

10   consideration for those two things,

11   is that with the 502 (D) remedy begin

12   up, the estate is now in the position

13   of having to look to ESL and Mr.

14   Lampert to recover on what the

15   restructuring subcommittee agrees are

16   very valuable claims.

17        There is no record evidence at all

18   that the subcommittee conducted any

19   diligence to inquire into is it going

20   to be easy or difficult to recover

21   against ESL.  Where are ESL's assets?

22   Are they offshore?  Are they in

23   trusts?  How are Mr. Lampert's assets

24   held?

25        Those are all potentially

JX 072-180

1              PROCEEDINGS

2    significant collection issues that

3    the estate is now being put at risk

4    of because the 502 (D) remedy has

5    been given up and has been given up

6    to a greater degree than necessary to

7    allow the credit bid.  And that's

8    problematic, particularly on a record

9    where no such diligence was

10   performed.

11        In addition to that, we know from

12   the testimony of Mr. Kamlani that a

13   very substantial portion of the value

14   of ESL is tied up in Sears.  And

15   another significant chunk of the

16   value of ESL is tied up in Seritage.

17   Seritage will be a defendant for a

18   very substantial claim.

19        And we know that a substantial

20   amount of the value of ESL is Mr.

21   Lampert's personal capital, all tied

22   up in Sears and in Seritage.

23        Your Honor is aware from the

24   evidence we've presented --

25        THE COURT:  I thought the

**JX 072-181**

1          PROCEEDINGS

2    personal capital was separate from

3    Sears and Seritage.

4        MR. QURESHI:  I think the

5    evidence is that of the assets under

6    management by ESL, some very

7    substantial portion of that, I think

8    maybe 70 percent, is Mr. Lampert's

9    personal money.

10       So, your Honor, there is --

11       THE COURT:  I understand the

12   remedies point.  In terms of the

13   showing that you would have to make,

14   it's basically the same, very close.

15   I mean there's some more discretion

16   that a judge would have under

17   equitable subordination, but it's

18   actually quite close particularly

19   given the other -- the language we

20   walked through earlier.

21       But as far as the remedies issue

22   is concerned, the valuations, either

23   on a liquidation basis -- I mean --

24   the valuations on a windown basis or

25   the valuations of the deal, show that

1                    PROCEEDINGS

2     there's substantial value not subject

3     to liens in the purchased assets.

4     And frankly even 30 percent of the

5     remaining 30 percent of ESL would

6     seem to me to be still a very large

7     amount of money you're talking here.

8          So I understand the issue, that

9     you have to go and collect.  But

10    given that it's a public company and

11    given that they are certainly on

12    notice of these claims and that any

13    transfers of assets out after that

14    notice would be, per se, a fraudulent

15    transfer under New York law at least,

16    to me I'm not sure why it is such a

17    big deal to equate a release for

18    credit bidding and claim allowance

19    purposes as a general release, in

20    essence.

21         MR. QURESHI:  Your Honor, I think

22    it all comes down to the collection

23    risk on the estate and whether it

24    makes sense to take that collection

25    risk when a much more certain remedy

JX 072-183

1              PROCEEDINGS

2    is at hand in the form of 502 (B) and

3    while that could have been achieved

4    while still allowing a credit bid.

5        THE COURT:  Well except at that

6    point you're collecting from the

7    proceeds of a liquidation of the real

8    estate assets and GOB sales for a

9    relatively short time and fighting

10   with ESL and Cyrus over 507(B), which

11   is a super priority, and 506 (C).

12       So, you know, it's not like you

13   can snap your fingers and bring in

14   the money.

15       MR. QURESHI:  Your Honor, let me

16   move on to --

17       THE COURT:  I mean, no, I'm not

18   -- that's not rhetorical statement.

19   Am I missing something on that?

20   Because that's how I've been looking

21   at it.

22       MR. QURESHI:  No.  Look, your

23   Honor, I think that when we assess

24   the reasonableness of the deal that

25   was struck and we weigh the value of

Page 762

1                    PROCEEDINGS

2      the claims on the one hand with the

3      consideration that was received on

4      the other hand, and there was

5      testimony from Mr. Basta about what

6      that consideration was, it doesn't

7      line up at all with what the

8      witnesses said, but that's a

9      different story.

10          THE COURT:  But again, it's a

11     consideration for a limited release

12     on remedies.

13          MR. QURESHI:  Yes.

14          THE COURT:  And, you know, 35

15     million in cash plus a cap on

16     recoveries from certain -- which are

17     effectively going to be the only

18     remaining assets, in return for a

19     limitation on remedies as opposed to

20     bring claims and to go after at least

21     what appear to be substantial access,

22     seems to me to be a pretty fair deal.

23          MR. QURESHI:  Your Honor, the

24     other concern that we have and it

25     continues relating to collection risk

**JX 072-185**

Page 763

1                PROCEEDINGS

2    is very strong doubts about what's

3    going to happen with the new Sears

4    after this transaction should close.

5    And in particular, your Honor, I'm

6    referring to $930 million of budgeted

7    for asset sales in three years.  That

8    is a very substantial chunk of the

9    value here that's going to get sold.

10   And where those proceeds are going to

11   go we obviously don't know.  Whether

12   those assets are going to as they

13   have been in the past get spun off to

14   some other entity that ESL and Mr.

15   Lampert has an interest in, whether

16   that pattern is going to continue we

17   don't know.

18       What we do know is there's a plan

19   in place for very material ongoing

20   selling of assets.  And that's a

21   point I'm going to come back to when

22   I talk about jobs.

23       THE COURT:  That's fair.  On the

24   other hand, I would hope you would be

25   able to progress your litigation

**JX 072-186**

Page 764

1              PROCEEDINGS

2    faster than three years.  I know you

3    would.

4        MR. QURESHI:  We certainly intend

5    to try to progress it as fast as

6    possible but we also know, your

7    Honor, because it happened last week

8    we got a liquidity forecast that said

9    $200 million of real estate sales in

10   2019 and then it was changed, now

11   it's 250.

12       THE COURT:  I understand.  I

13   understand.

14       MR. QURESHI:  How fast that's

15   going to change particularly once

16   ESL's decisions in that respect are

17   no longer subject to bankruptcy court

18   review, we shall see.

19       Your Honor, if I can turn to slide

20   27 and I want to talk briefly about

21   from the committee's perspective why

22   we view the alternative to a sale to

23   ESL to be superior.  And I will come

24   back to the employee point, your

25   Honor, after I walk through the

JX 072-187

Page 765

1                    PROCEEDINGS

2    numbers.

3        So on this chart, your Honor, what

4    shows first of all is the

5    administrative insolvency.

6        But I also want to make the point

7    here, and it was a point made by Mr.

8    Meghji.  Who is the principal

9    beneficiary of the going concern

10   transaction?  And I'm going to come

11   back to the employees and the vendors

12   and all of that.  The principal

13   beneficiary of the going concern

14   transaction is ESL.

15       THE COURT:  I guess that has some

16   appeal to people who don't understand

17   bankruptcy law.  But anyone who has

18   read the RadLax decision and 363 (K)

19   knows how much is left unstated in

20   that statement.  Right?  I mean the

21   reason they are the principal

22   beneficiary is because they are being

23   allowed to credit bid.  And we just

24   talked about I think a pretty nuanced

25   evaluation of that settlement which

JX 072-188

Page 766

1              PROCEEDINGS

2    preserved claims against them.

3         So, you know, it's true they're

4    the beneficiary in the sense that

5    they're being allowed to exercise a

6    right that the Supreme Court said

7    they have unless the bankruptcy court

8    says they don't for cause and that's

9    what the settlement is about.

10        MR. QURESHI:  Part and parcel,

11   your Honor, of what we think is going

12   to happen postclose and whether

13   postclose this enterprise is likely

14   to survive as a going concern and

15   whether as a result of that all of

16   the creditors that would benefit are

17   in fact ever going to realize that

18   benefit and whether in fact all of

19   those creditors might actually be

20   better off if we look at an

21   alternative scenario.

22        THE COURT:  Okay, that's a point

23   but go ahead.

24        MR. QURESHI:  On the alternative

25   scenario, your Honor, if your Honor

JX 072-189

Page 767

```
1              PROCEEDINGS
2    turns to slide 28.  And what slide 28
3    is is an excerpt from Mr. Burian's
4    declaration.  And I just want to
5    highlight to your Honor what -- how
6    few things he's moved in order to
7    demonstrate that credit recoveries
8    are actually better in the
9    alternative, in the alternative
10   scenario.
11       So for unsecured creditors first
12   of all, there is an issue and it's
13   described in Mr. Burian's declaration
14   in some detail but around the
15   allocation of administrative claims
16   and the extent to which those
17   administrative claims for
18   unencumbered assets versus the ABL
19   collateral, we don't think that the
20   way the debtors have proposed in
21   their analysis of the winddown
22   scenario to burden the unsecured
23   claims is appropriate.
24       THE COURT:  Is that a 506 (C)
25   point?
```

**JX 072-190**

Page 768

```
 1                    PROCEEDINGS
 2        MR. QURESHI:  Yes.  And --
 3        THE COURT:  So how are you going
 4   to get around the Second Circuit law
 5   on that point and the law in the
 6   other circuits including Domistyle,
 7   that you would have to show primary
 8   and direct benefit?
 9        MR. QURESHI:  Well, I mean, your
10   Honor, we think when the ABL
11   collateral --
12        THE COURT:  Including when you
13   have a 506 (C) waiver and a DIP
14   agreement.
15        MR. QURESHI:  There is no waiver
16   for the second lien, your Honor.
17        THE COURT:  I'm talking about the
18   first lien.  So you're not really
19   talking about the ABL, you're talking
20   about the second lien.
21        MR. QURESHI:  I'm sorry, that is
22   correct.  The number here that is
23   moved that is boxed in Mr. Burian's
24   analysis, it's the second lien.
25        THE COURT:  Okay.  And so you
```

JX 072-191

Page 769

1              PROCEEDINGS

2    would have to establish,

3    notwithstanding Flagstar and

4    Domistyle and all the other cases

5    dealing with 506 (C), that this is as

6    simple a case as selling a piece of

7    real estate for anything that has a

8    mortgage on the property.

9         MR. QURESHI:  Your Honor, I have

10   no doubt there would be litigation

11   around the issue.  But we do think

12   there is an argument that a

13   reallocation --

14        THE COURT:  It's an argument.  I

15   understand the argument.  I also went

16   through that experience with a very

17   inexperienced secured lender group in

18   a case last year where they didn't

19   agree to carveouts and the like or to

20   fund the case even though they wanted

21   the case funded.  It was -- you may

22   well be better lawyers than their

23   lawyers, although their lawyers were

24   pretty good for the debtors' side.

25   It's not an easy case to win.  And it

JX 072-192

1                  PROCEEDINGS

2    was settled with major haircuts to

3    the professionals and the other

4    administrative expense because the

5    standard is a high one to meet.  The

6    Second Circuit has set a high

7    standard and that's been followed by

8    the other courts.

9          MR. QURESHI:  Your Honor, the

10   other significant driver --

11         THE COURT:  I didn't see anything

12   on that issue, by the way.  It's

13   assumed by Mr. Burian who I know is a

14   lawyer but he hasn't been a lawyer

15   for a long time.

16         MR. QURESHI:  Your Honor, the

17   other issue and we do address it in

18   our brief is the second lien 507(B)

19   claim Mr. Bromley mentioned briefly

20   so I won't spend any more time there.

21         THE COURT:  You're giving no

22   value to that, right?

23         MR. QURESHI:  In this analysis we

24   are not.

25         THE COURT:  No, okay.

1              PROCEEDINGS

2        MR. QURESHI:  Your Honor, if I

3    could then move on --

4        THE COURT:  Is that because the

5    value of the collateral declined or

6    didn't decline?  I mean didn't

7    decline during the case?  Is there

8    evidence in the record to show that

9    the value of the collateral didn't

10   decline?

11       MR. QURESHI:  Your Honor, again

12   --

13       THE COURT:  I don't think there's

14   evidence to show it did decline.  To

15   say it didn't is kind of a stretch

16   here given the amounts that at least

17   the debtors have said that they are

18   operating at a deficit at times.

19       MR. QURESHI:  Your Honor, if I

20   could turn to very briefly the

21   business plan.

22       And this starts on slide 30.  And,

23   your Honor, our point with the

24   business plan is simply this.  That

25   history has to be a guide here and it

Page 772

1                    PROCEEDINGS

2    has to be a guide in circumstances

3    where you have the same management

4    team in place that put together the

5    ESL business plan.  That's what the

6    evidence shows.  Obviously the same

7    ownership structure in terms of Mr.

8    Lampert being at the helm of the

9    go-forward business.

10       And when your Honor looks at the

11   historical results, frankly, your

12   Honor, I've never seen anything like

13   it.  Magnitudes of misses so huge,

14   and yet year after year those misses

15   having no impact on the projections

16   for the next year, as though history

17   didn't occur.

18       And when we look at the go-forward

19   plan, and yes, Mr. Kniffen did not

20   testify here and it's curious that

21   Mr. Bromley expresses so much

22   confidence in his ability to have him

23   excluded by way of a Daubert

24   challenge and yet nobody wanted to

25   cross examine him.

JX 072-195

Page 773

1              PROCEEDINGS

2        THE COURT:  I did read the

3    deposition.  I mean it's true there's

4    no challenge.  I guess he's been

5    accepted as an expert, right?

6        MR. QURESHI:  He has.

7        THE COURT:  But he also is clear

8    that he's never written anything on

9    this issue, there's no peer review of

10   his analysis or methodology of his

11   analysis.  So I took it for what it

12   was worth.  And I understand your

13   point about his projections.  The

14   debtors are asking me to accept the

15   projections for basically 2018.  I

16   mean the performance, the real

17   performance in 2018 to counteract all

18   of the years of missed projections.

19   And I understand that point.

20       MR. QURESHI:  Your Honor, what

21   Mr. Kniffen does have is 30 years of

22   experience as a senior executive.

23       THE COURT:  Although he also says

24   retail has changed a lot since the

25   last time he actually worked for

JX 072-196

Page 774

1            PROCEEDINGS

2    retail.

3         MR. QURESHI:  Yes, but since --

4         THE COURT:  I think 2005, right.

5         MR. QURESHI:  2005 I believe

6    since he left the May department

7    stores, that's right, which is where

8    he was, but he's obviously remained

9    in the business since then.

10        THE COURT:  I was trying to think

11   back what sort of computer I had in

12   2005.  It's totally different world

13   today.

14        MR. QURESHI:  And it's a world

15   he's still involved in, your Honor.

16        THE COURT:  Sort of.

17        MR. QURESHI:  On a day-to-day

18   basis.  Your Honor says sort of.  I

19   think his deposition is clear he's a

20   full time consultant in the retail

21   industry.

22        THE COURT:  I know, he walks

23   through malls, I understand.  I read

24   his deposition.  I didn't -- look,

25   this is an inexact exercise to begin

JX 072-197

Page 775

1                   PROCEEDINGS

2      with.  And frankly there was one

3      element of the exercise that just was

4      flat out wrong, I think, and you

5      should respond to that, which is the

6      occupancy point.

7           MR. QURESHI:  Your Honor, on the

8      occupancy point, he is, as I

9      understand it, pulling numbers from

10     the debtors' filings.  And I don't

11     think that has a material impact on

12     his observations.  I think the key

13     observations that he makes, your

14     Honor, are that if you look at the

15     excerpt from his report that we have

16     on page 30, the type of growth that

17     is projected.  At the same time that

18     SG&A is going to get slashed by $600

19     million a year, something this

20     company has been trying to

21     unsuccessfully do for years, that

22     EBITDA growth is going to continue.

23     That margin growth is going to

24     continue.  It's something that he

25     says it's just unprecedented to see

**JX 072-198**

```
 1              PROCEEDINGS
 2    that kind of turnaround.
 3         And when you peel the onion back
 4    the next layer, your Honor, you look
 5    at the business plan and you ask
 6    yourself well what's driving it?
 7    Well the key is apparently Shop Your
 8    Way.  That's what we heard from Mr.
 9    Kamlani.  He went on at length in his
10    deposition about it.  Mr. Lampert
11    went on even longer in his interview
12    about it.
13         And yet the initiatives that are
14    going to be the source of all this
15    revenue are the same initiatives that
16    are in the business plans from years
17    past.  Nothing's changed.
18         And in addition to that, your
19    Honor, we have some contradictory
20    testimony and Mr. Kamlani says well
21    the ecosystem is how he referred to
22    it is important.  And the bigger the
23    ecosystem the better for Shop Your
24    Way.
25         And Mr. Riecker says smaller
```

**JX 072-199**

```
 1              PROCEEDINGS
 2    footprint is better because we're
 3    getting rid of all the EBITDA
 4    negative stores and we can shrink our
 5    SG&A.
 6         THE COURT:  How do the parties --
 7    I want to make sure I understand the
 8    defined term ecosystem.  I understood
 9    it to mean the fact that Sears has
10    warranties, service people, that sort
11    of stuff, the inner realm.  That's
12    how I interpreted it.  But I don't
13    know.  Is that how the parties are --
14    like I said how he's using it?
15         MR. QURESHI:  I believe that that
16    is how Mr. Kamlani is using it and
17    when he uses it --
18         THE COURT:  Those aren't going
19    away.
20         MR. QURESHI:  No, but when he
21    uses it in the context of Shop Your
22    Way, I believe, and there's a long
23    back and forth between Mr. Kamlani
24    and I in his deposition about this,
25    that what he is also talking about is
```

**JX 072-200**

1              PROCEEDINGS

2     that the value of Shop Your Way is

3     dependent on attracting partners,

4     outside partners.

5          THE COURT:  I understand.

6          MR. QURESHI:  And that's easier

7     to do when you have a bigger

8     footprint.

9          THE COURT:  Or maybe more, more

10    profitable stores where people like

11    to shop more.  I don't know.  I agree

12    with you.  Unfortunately in today's

13    world where there is a company that

14    used to print textbooks or a company

15    that sells plus sized clothes, that's

16    changed everything.  And frankly any

17    projection is more in doubt than a

18    normal projection that you would have

19    had fifteen years ago or ten years

20    ago because of that.  It's very hard

21    to predict.  I agree with all of

22    that, definitely.

23         MR. QURESHI:  And in an industry

24    when it's very hard to predict hockey

25    stick like projections which is what

JX 072-201

1              PROCEEDINGS

2    these look like are even more

3    unreasonable than in an industry

4    where that's not the case, where the

5    history of the company is wild misses

6    year after year, and it's the same

7    company going forward with the same

8    management team.

9         THE COURT:  That's the part I'm

10   not so sure about, the same company

11   going forward.  I understand the

12   management team does seem to me that

13   they had a huge drag with the size of

14   the company and the debt load,

15   whether that's enough or not.

16        MR. QURESHI:  So, your Honor, let

17   me go on.  As I said I would to

18   address the issue of jobs.  And the

19   first thing I'm going to do is defend

20   the committee and defend the

21   committee's advisors because, your

22   Honor, it's just not the case that we

23   have ignored the interests of

24   employees, that we don't care about

25   the interests of employees, that Mr.

Page 780

1                    PROCEEDINGS

2    Burian doesn't care about the

3    interests of employees or that that

4    wasn't something that wasn't

5    considered in connection with all the

6    analysis we did.  This committee and

7    every member on it owe fiduciary

8    duties and those duties have been

9    taken very seriously.  Everybody has

10   acted faithful to those duties.  And,

11   your Honor, the bottom line is there

12   are situations in bankruptcy where

13   liquidation can be the better option.

14   It's never pleasant.  It's not

15   something anybody involved in a

16   bankruptcy case wishes for.  But

17   sometimes it's the better result.

18   And here we believe that it is the

19   better result for all of the reasons

20   we've been talking about.

21       But what I want to make clear is

22   that this has been presented, your

23   Honor, as a decision between 45,000

24   jobs on the one hand and zero on the

25   other.  And that's also not right.

JX 072-203

Page 781

1               PROCEEDINGS

2    Because in the alternative scenario

3    there are standalone pieces of this

4    business, like Sears Home Services,

5    like Innovel, like Parts Direct, that

6    in the aggregate employ over 10,000

7    people.  And those are jobs that

8    would be preserved.

9          THE COURT:  What sort of

10   decisions were made on those?

11         MR. QURESHI:  So, your Honor,

12   it's detailed in Mr. Burian's report.

13   And if your Honor goes back to slide

14   3 of the deck, the values that are on

15   the asset purchase side there for

16   Sears Home Services and the repair

17   business and SHIP business, that

18   reflects indications of interest or

19   bids that were put in as part of the

20   sale process.

21         Because of how that process went,

22   your Honor, those never were

23   progressed to definitive bids.  But

24   those were all as I understand it

25   indications of interest where the

JX 072-204

Page 782

1                    PROCEEDINGS

2    intent was that the business would

3    continue.

4         THE COURT:  Would those

5    indications of interest assume that

6    Sears would continue?

7         MR. QURESHI:  Your Honor, I don't

8    think so.  With respect to I believe

9    it was the Sears Home Services

10   business, I think there was one bid

11   that originally did contemplate and

12   had some contingency in it about

13   Sears stores and then there was a

14   revision of that or at least

15   discussions concerning that where

16   that was then no longer the case at

17   least with respect to one of those

18   parties.

19        So it's not a case of 45,000

20   versus zero.

21        And the other thing that I think

22   is significant, your Honor, and it's

23   part of the record, look at slide 31.

24   Slide 31 is a history of jobs.

25        THE COURT:  I don't doubt it's

JX 072-205

1              PROCEEDINGS

2      gone down.  There's no doubt about

3      that.

4          MR. QURESHI:  And more to the

5      point, your Honor, so it's the

6      trajectory under Mr. Lampert's

7      leadership.  Not that I'm suggesting

8      that the Internet didn't happen.  But

9      with all the substantial asset

10     spinoffs that obviously had a very

11     significant impact on employment.

12         In addition, your Honor, I'll come

13     back to what we've excerpted on slide

14     32, which is the asset sales.

15         I mean, your Honor, when Mr.

16     Burian talks about the process and

17     the process as far as the sale

18     process and how rushed it was, let's

19     be clear Mr. Burian is not

20     criticizing Lazard, the debtors'

21     investment bankers.  It's really a

22     criticism of Mr. Lampert.  Lazard was

23     brought in basically at the filing.

24     There was no time to prepare a proper

25     sale process.  And frankly we think

1                    PROCEEDINGS

2      it's because that's exactly how Mr.

3      Lampert wanted it.

4          He set up a process where there

5      was no alternative but for ESL to be

6      standing alone as the only party that

7      could possibly put forward a going

8      concern bid in the very limited time

9      that was left.  It was a chaotic

10     filing at the most important time of

11     year for a retailer.

12         And looking at that from the

13     outside it made no sense.

14         And that was preceded by a long

15     period of time where in effect --

16         THE COURT:  Is there anything in

17     the record to indicate that any other

18     going concern party said, for

19     example, give me a little more time,

20     I'm happy to make a bid, etc.?

21         MR. QURESHI:  Your Honor, there

22     are a number of statements in Mr.

23     Burian's declaration that go to

24     conversations that he had with

25     bidders where, as your Honor just put

Page 785

```
 1                  PROCEEDINGS
 2    it, those statements were not
 3    expressly made.
 4         THE COURT:  I'm talking about a
 5    going concern bidder.
 6         MR. QURESHI:  For the entirety of
 7    the business, no, your Honor.
 8         THE COURT:  So we're really
 9    talking about the segments.
10         MR. QURESHI:  We're really
11    talking about the segments.  But
12    again this entire process was in our
13    view set up to fail.  Not Lazard's
14    fault.  They did the best they could
15    in the very limited amount of time
16    they had.
17         THE COURT:  Did anyone ask to
18    extend the process in any way or
19    raise those concerns?  I don't
20    remember hearing from Mr. Burian
21    about those concerns.  And you know
22    how active I am when anyone does
23    raise a concern, for example, when I
24    got a call from one of the real
25    estate's counsel, I think I responded
```

**JX 072-208**

1             PROCEEDINGS

2    to the debtors and him within five

3    minutes of getting the email.  Was

4    that concern ever raised to me during

5    the sale process?

6         MR. QURESHI:  Your Honor, the

7    concern was raised by this committee

8    from day one.

9         THE COURT:  To me.

10        MR. QURESHI:  Which concern

11   specifically, your Honor.

12        THE COURT:  Articulated in Mr.

13   Burian's declaration about

14   information not being available,

15   people wanting to bid and not

16   knowing, the requests being denied,

17   etc., etc., etc.

18        MR. QURESHI:  Your Honor, we

19   raised those concerns with the

20   debtors.  We did not file a motion.

21   We did not seek relief from the

22   court.

23        THE COURT:  Or even request a

24   chambers conference to discuss it.

25        MR. QURESHI:  We did not, your

1          PROCEEDINGS

2    Honor.

3        THE COURT:  Might it be because

4    you didn't want a going concern sale

5    in the first place?

6        MR. QURESHI:  Your Honor, we made

7    clear from the very early days of

8    this case that we were very concerned

9    by the administrative burn, millions

10   of dollars a day.

11       THE COURT:  So it would have to

12   be a fast process anyway.

13       MR. QURESHI:  Given the way it

14   was set up by Mr. Lampert it

15   absolutely would have to be a fast

16   process.  And unfortunately that's

17   one of the reasons and one of the

18   dynamics why we think in this

19   circumstance the alternative would be

20   better.  It's just the reality of the

21   situation, your Honor.

22       Now, had -- and certainly in the

23   claims that will be brought against

24   Mr. Lampert and that will be brought

25   against ESL, these facts will all

JX 072-210

Page 788

1                    PROCEEDINGS

2      come to light.  And I'm not here to

3      litigate those now.  But we do think

4      and we think there's evidence to

5      support that Mr. Lampert knew exactly

6      what he was doing when he elected not

7      to commence a reorganization for

8      Sears years earlier than he did, with

9      advice from investment bankers he

10     retained at the time telling him of

11     exactly the risk of what would happen

12     if he didn't do it, which is what

13     would happen here.  Telling him

14     specifically that with retailers

15     there's a high risk of liquidation.

16          THE COURT:  I'm sorry.  I guess

17     -- you know I usually don't pay a

18     whole lot of attention to the buyer

19     when they stand up in support of a

20     sale.  But there was to me some

21     cogency to Mr. Bromley's argument

22     that if ESL really wanted to take the

23     assets, it would -- it would actually

24     cause a liquidation.  And it could

25     cherrypick the assets it wanted.

JX 072-211

1                    PROCEEDINGS

2          MR. QURESHI:  I think, your

3    Honor, that that for ESL is a far

4    inferior result than being able to

5    credit bid all of their claims.

6          And by the way, Mr. Bromley --

7          THE COURT:  You could credit bid

8    on just the assets you want.

9          MR. QURESHI:  And Mr. Bromley

10   also --

11         THE COURT:  That you have leads

12   on.

13         MR. QURESHI:  And Mr. Bromley

14   also says the claims against his

15   client have no merit.

16         THE COURT:  That's a separate

17   issue.  I'm accepting that they have

18   merit because I have two independent

19   parties with well staffed law firms

20   telling me so.  That will have to be

21   sorted out in the future.

22         MR. QURESHI:  What we see, your

23   Honor, in the business plan and in

24   particular in the plans for asset

25   sales under that business plan, is a

```
 1                PROCEEDINGS
 2    continuation postclose of what
 3    happened prepetition which is a
 4    continuing selling of assets.  And,
 5    your Honor, Mr. Kamlani and ESL I
 6    think are very careful in saying,
 7    look, we're making offers of
 8    employment to these 45,000 people.
 9         There is no obligation to employ
10    them for more than a day.  He's clear
11    that he doesn't know or at least
12    hasn't yet decided exactly what's
13    going to be sold and what the
14    employee reductions are going to be
15    as a result of that.
16         But it doesn't take much, your
17    Honor, to figure out that at $930
18    million worth of asset sales there's
19    going to be a lot of lit stores in
20    that number that end up getting sold
21    and likely a lot of job losses as a
22    result.
23         So, your Honor, to sum up, the
24    very party that was accused by the
25    restructuring committee, and, your
```

Page 791

1                    PROCEEDINGS

2        Honor, on slide 3 there's an excerpt

3        from the auction transcript, and this

4        is Mr. Basta speaking, he talks about

5        ESL's abuse of its control and about

6        the transfers of hundreds of millions

7        of dollars of assets and those

8        transfers hurting Sears and its

9        employees, it's rather ironic that

10       that very individual is now presented

11       as a savior for all of these jobs.

12           Your Honor, I had shown Mr. Carr a

13       series of text messages that he was

14       exchanging with his advisors.  And he

15       was doing so right around the time

16       ESL bids were being considered.  And

17       the one in particular that I focus

18       on, the reason I focus on it is where

19       Mr. Carr says it's close enough.

20           Respectfully, your Honor, a proper

21       analysis here where we have

22       everything that we have going on, an

23       insider, an insider who is not just a

24       regular insider, he's the chairman

25       and the CEO of the company, an

JX 072-214

Page 792

1               PROCEEDINGS

2    insider against whom valuable claims

3    have been alleged, when that same

4    insider who has taken the steps that

5    I've described in terms of his

6    involvement in the auction process,

7    when that's what's going on and a bid

8    by that insider is tabled, close

9    enough doesn't cut it.  Whatever the

10   standard is, and we've briefed the

11   issue of whether it should be

12   heightened scrutiny or business

13   judgment, under either standard,

14   under any standard close enough?  And

15   we've got cover?  Shouldn't cover.

16        THE COURT:  Show me that.  I'm

17   not sure I understand the close

18   enough.  I think you're quoting it

19   out of context.

20        MR. QURESHI:  It's the second to

21   last page, your Honor.  Page 34.  So

22   this is the text message exchange on

23   January the 8th.

24        THE COURT:  January 8th?

25        MR. QURESHI:  Yes.

JX 072-215

Page 793

1                    PROCEEDINGS

2           THE COURT:  All right.  I will

3      tell you what that is, all right.

4      That's when everyone came into my

5      office and said we don't think we can

6      go any farther.  I heard the parties

7      and made the assessment no, you can

8      go farther.  And that's what he's

9      referring to when he says close

10     enough for government work.  I think

11     he's saying he's not so sure I'm

12     right, but he did then testify that

13     $800 million was added to the

14     transaction thereafter and the

15     release was limited as we've already

16     discussed.  And I think as you have

17     conceded is reasonable.  So I think

18     you misquoted that.

19          MR. QURESHI:  Well, your Honor,

20     the text right above it where Mr.

21     Carr writes to Mr. Stogsdill says

22     this is good and gives us cover.

23          THE COURT:  January 8th, exactly.

24     Blame it on the judge.  That's fine.

25     That's what the judge does sometimes.

JX 072-216

1            PROCEEDINGS

2        Look, I appreciate, I remember

3    Eastern, Eastern, you know, the judge

4    said this airline should survive, it

5    didn't and it didn't because the

6    person who ran the airline messed it

7    up.  I understand those things.  I've

8    been around for a while.

9        So but don't misquote someone

10   about their decision based on

11   something that happened seven days

12   before the decision was made and

13   after several rejections of interim

14   offers.

15       MR. QURESHI:  Your Honor, I'm

16   certainly not blaming the judge as

17   the court put it by any stretch.

18       THE COURT:  That's not the point.

19   I'm saying don't misquote Mr. Carr.

20       MR. QURESHI:  I don't think I

21   did.

22       THE COURT:  It's totally out of

23   context.

24       MR. QURESHI:  I don't believe we

25   are misquoting Mr. Carr.

1              PROCEEDINGS

2         THE COURT:  Well I do, I do.

3    He's talking about a specific point

4    when I said keep talking to each

5    other, period.  That's all he's

6    talking about.  And he was pretty

7    much fed up with Mr. Lampert at that

8    point, as people got fed up with Mr.

9    De Lorenzo 30 years ago.

10         And I believed, and he certainly

11   was certainly within his rights

12   because the judge only sees about

13   five percent of what's going on in a

14   case, but I believe based on the

15   conference that I had with the

16   parties, that there was a basis for a

17   limited period with protection for

18   the estate to keep talking.  That's

19   what he's talking about.  That's the

20   cover.

21         So I don't fault him for the

22   email.  But I do fault you for

23   misquoting it in the context.  It's

24   not the approval of the overall deal.

25   It's the approval of an interim step

1                    PROCEEDINGS

2      in the deal.

3          MR. QURESHI:  Your Honor, I will

4      end with this.  I don't think there's

5      a deal to be done today.

6          THE COURT:  Okay.  So I know

7      there may be other -- I know there's

8      at least one other party that wanted

9      to speak because she was on the

10     phone.  Are there other parties that

11     want to address their objections?

12         I'm sorry, my courtroom deputy

13     tells me this oral argument has gone

14     a lot longer than the court

15     originally thought and she tells me

16     that we don't have this room beyond 1

17     o'clock.  We have to go into my

18     courtroom.

19         So I think it may make sense,

20     since it's only ten minutes to one

21     and there are about 150 people in

22     this room, that we should break now,

23     set up the call again and then hear

24     the other objectors.

25         Someone has like a two minute

1            PROCEEDINGS

2    update.  One minute update.  That's

3    fine.

4        MR. HAYNES:  Thank you very much,

5    your Honor, for the report, Robert

6    Lee Haynes, Kelly Drye & Warren on

7    behalf of Brookfield Property Site

8    Centers and numerous other landlords.

9        Your Honor, as Mr. Schrock

10   indicated on the first day of the

11   case we have been working a group of

12   landlord counsel on behalf of a

13   significant portion of the landlords

14   to try to work and make sure that the

15   form of order incorporated the

16   concept that all landlord rights

17   would be adjourned and preserved,

18   that designation rights process would

19   fully do that.  It's obviously been a

20   moving process.

21       I believe we are there and have

22   been able to work closely with

23   counsel for the debtor and ESL

24   throughout the four or five days now.

25   There were some curve balls thrown at

1                    PROCEEDINGS

2    us including a lien on leases and new

3    financing package.  I think we've

4    resolved those consistent with your

5    prior decisions in that.  We are

6    waiting to hear from counsel for the

7    secured lenders on the exit facility

8    to confirm that.  But as far as that

9    goes, your Honor, I believe we're in

10   a place we believe all our rights

11   have been reserved.

12       THE COURT:  I did see the

13   blackline of the order that I think

14   did that.  I appreciate the

15   confirmation of that.

16       MR. HAYNES:  Thank you, your

17   Honor.

18       THE COURT:  I'm serious, unless

19   it's like 30 seconds I really need to

20   get the people out of this room

21   because they're going to be having a

22   jury assembly here or something for

23   the district court.

24       I'm going to adjourn for about 10

25   minutes and we'll get you back on the

JX 072-221

1            PROCEEDINGS

2    phone, all of you who are on the

3    phone and resume at about five after

4    one.

5        (A recess was taken.)

6        THE COURT:  We're back on the

7    record in re Sears Holdings

8    Corporation.  Just want to make sure

9    we have court call on, correct?  I

10   mean the people on the phone, put it

11   that way.

12       AUDIENCE MEMBER VIA PHONE:  Yes,

13   your Honor, we are connected.

14       THE COURT:  All right.  When we

15   left off I was about to hear the

16   other remaining objections or

17   statements or reservations.

18       MR. ZUMBRO:  Good afternoon, your

19   Honor, Paul Zumbro from Cravath

20   Swaine & Moore on behalf of Stanley

21   Black+Decker.  Your Honor, we have no

22   objection to the sale itself as Mr.

23   Sharp just reminded we have a

24   discrete issue in the overall context

25   of this hearing but's important to my

JX 072-222

Page 800

PROCEEDINGS

1

2   client.  Our objection is that docket

3   number 2072.  We have an assumption

4   and assignment objection and a cure

5   objection.  The cure objection is

6   relatively straightforward.  I will

7   address that briefly at the end of my

8   presentation.  The assumption

9   assignment objection however is a bit

10  more complex.

11      That objection concerns the

12  proposal to assume and assign a

13  valuable trademark license without

14  our consent.  By way of background,

15  your Honor, my client Stanley

16  Black+Decker purchased the Craftsman

17  brand and the related trademark from

18  Sears in early 2017 for approximately

19  $900 million.  In connection with

20  that transaction SBD licensed back to

21  Sears a license to allow Sears to use

22  the Craftsman mark in the sale of

23  Craftsman branded tools and other

24  Craftsman branded products in Sears

25  retail stores.  That trademark

JX 072-223

Page 801

PROCEEDINGS

1  license agreement was included in the

2  list of initial assigned agreements

3  that the debtors recently filed in

4  connection with the proposed sales.

5      Your Honor, as I mentioned, we

6  have not consented to that

7  consignment.  And unlike a garden

8  variety contract where the bankruptcy

9  code overrides anti-assignment

10  provisions, applicable law here gives

11  a trademark owner clear consent

12  rights.

13      The starting point, your Honor, in

14  section 365 (C) (1) of the --

15      THE COURT:  Can I just interrupt

16  you.  I think I understand the basis

17  for the debtors' objection in

18  response to this.  I'm not sure you

19  need to get into all of that because

20  I think the debtor has a more limited

21  objection.

22      MR. ZUMBRO:  More limited

23  response, sir.

24      THE COURT:  Yes.

JX 072-224

Page 802

1                    PROCEEDINGS

2        MR. ZUMBRO:  I'll hop right to

3    that.  It basically comes down to

4    just quickly trademark law is very

5    clear that the trademark owners'

6    consent is required unless there's an

7    express assignment provision in the

8    contract.  There is an express

9    assignment provision in the contract,

10   but in our case it's limited to a

11   sale of all or substantially all of

12   the assets.

13       Those are the only circumstances

14   in which the licensee can assign the

15   license.  And we understand, your

16   Honor, that the debtors' position is

17   that because all that's left over is

18   being sold to ESL, that satisfies the

19   all or substantially all test.  But

20   that's not a correct recitation of

21   New York law.  The debtors cite

22   solely an unpublished Chancery Court

23   opinion from Delaware.  The actual

24   law in the Second Circuit on this

25   topic is Sharon Steel on the one hand

JX 072-225

1              PROCEEDINGS

2    and Sharon Steel teaches that if

3    there's been a plan of liquidation or

4    a plan of sales you have to look back

5    to the beginning of the plan and then

6    you compare what the assets were at

7    the beginning of the plan versus

8    what's now proposed to be sold to

9    test whether it's all or

10   substantially all.  And then there's

11   another case that's also recent where

12   the Delaware Supreme Court was

13   interpreting New York law and it said

14   very clearly that a sale of all

15   that's left over does not constitute

16   a sale of all or substantially all.

17   So we think it's very clear, your

18   Honor --

19        THE COURT:  I'm sorry.  So you're

20   saying those cases stand for the

21   proposition that you look at what

22   point in time to determine whether

23   it's all or substantially all?

24        MR. ZUMBRO:  Your Honor, it's not

25   crystal clear under the law.  The

JX 072-226

Page 804

1                    PROCEEDINGS

2     debtor will say it's not the time of

3     the contract and even if I concede

4     that, if it's at the time of the

5     contract there was 1430 stores at the

6     time, but if I point your Honor to

7     mid 2017 where Sears publicly

8     announced an intention, a plan to

9     liquidate all of its unprofitable

10    stores in a sort of planned event, I

11    think that's an appropriate time to

12    look back to which is mid 2017 when

13    they publicly said they were going to

14    start liquidating their stores.

15         So there was about 1150 stores at

16    that time versus the 425 that are

17    being proposed to be sold today.

18    It's like 30 percent.  It's nowhere

19    near all or substantially all.  If we

20    even looked at the petition date,

21    your Honor, just looked at what's

22    happened during the course of this

23    case we've gone from 687 stores down

24    to 425 stores which are now being

25    proposed to be sold.  That's about 60

JX 072-227

Page 805

1                    PROCEEDINGS

2    percent, your Honor.  That is not all

3    or substantially all under either a

4    common use of the term or what the

5    courts have said all or substantially

6    all means.  It's a very high

7    threshold, your Honor.

8         So what we're saying --

9         THE COURT:  Well except frankly

10   as I remember it the case law was

11   pretty sparse on this either way.  I

12   don't think -- the whole issue is the

13   timing issue when you -- how you

14   define the process of selling all the

15   assets or substantially all the

16   assets.

17        MR. ZUMBRO:  I understood --

18        THE COURT:  Right now it's just

19   two lawyers talking to me.  I don't

20   really have a factual record.  I know

21   what happened in this case.  I will

22   say that this is a sale of all or

23   substantially all of the assets

24   because it is substantially all of

25   the assets.  But I don't know what

JX 072-228

Page 806

1                    PROCEEDINGS

2    was done prepetition as far as some

3    sort of formal plan to sell assets.

4         MR. ZUMBRO:  I understand, your

5    Honor.  But if even if I could just

6    focus the court on what's happened

7    while this case has been under your

8    supervision.  Like I said the Liberty

9    Media case which we cited to in our

10   response to the debtors' response

11   says it very clear that purchasing

12   whatever assets are left at the time

13   of the sale, which is exactly what

14   we're doing here, doesn't constitute

15   all or substantially all.

16        THE COURT:  Were those

17   substantially all of the assets on

18   the start of the petition date on

19   Liberty Media?

20        MR. ZUMBRO:  It wasn't a

21   bankruptcy case.  There was a plan in

22   that case where there was a plan over

23   a series of time.

24        THE COURT:  This is a different

25   context we are in at this point.

**JX 072-229**

Page 807

1              PROCEEDINGS

2    They were certainly heading toward a

3    sale.

4         MR. ZUMBRO:  Look, your Honor,

5    cutting through it, we think we have

6    a right to determine who our licensee

7    is here, and that's fundamentally

8    what trademark law provides.

9         THE COURT:  I know but the

10   parties can vary that by their

11   agreement.

12        MR. ZUMBRO:  I understand that.

13   But here their agreement was if

14   someone is purchasing Sears, all of

15   Sears, they can continue the license.

16   But this is not Sears.  I just heard

17   your Honor during Mr. Qureshi's

18   presentation say it's not clear to

19   the court that this is the same

20   company going forward as it was as

21   Sears.  And we agree with that.  We

22   have that same concern.  It's not

23   clear to us either.

24        THE COURT:  As far as this case

25   is concerned, these are the assets

JX 072-230

Page 808

1                    PROCEEDINGS

2      that matter.  The rest was GOB sales.

3      I mean that's just selling stuff on

4      the shelves.

5           MR. ZUMBRO:  I understand.  But

6      our license was very specifically

7      crafted to Sears and to very

8      specifically identify channels of

9      retail trade which were defined as

10     Sears retail stores of a certain

11     type, of a certain size.  I think

12     you've heard lots of testimony over

13     the last couple of days.  We don't

14     know what Newco is going to be going

15     forward.  We don't know what their

16     footprint is going to be.

17          THE COURT:  We know it's going to

18     be sold which is substantially all of

19     the assets.

20          MR. ZUMBRO:  It's substantially

21     all of the remaining assets.

22          THE COURT:  Substantially all of

23     the assets as of the petition date.

24          MR. ZUMBRO:  I disagree with

25     that, sir.  60 percent is not

JX 072-231

Page 809

1                    PROCEEDINGS

2      substantially all.  425 over 687 --

3          THE COURT:  Those are closing

4      stores.  In terms of your client's

5      brand, I mean seems to me -- well you

6      tell me, you were about to tell me, I

7      interrupted you.  What was it that

8      you think the client wanted to have

9      this mark associated with?  Do they

10     want it to be associated with the

11     operating assets of Sears or the sale

12     of the inventory and closed

13     nonoperating stores?

14         MR. ZUMBRO:  It's a bigger issue

15     than just going out of business.

16     It's not the going out of business

17     sale.  We think in order for this

18     Newco or new Sears to have the

19     ability to sell Craftsman branded

20     marks, branded products, they need to

21     enter into a new license agreement

22     with Stanley.

23         THE COURT:  I know what you're

24     trying to say.  What is it you're

25     protecting here?  I guess if you're

JX 072-232

Page 810

1                  PROCEEDINGS

2    -- I could understand why you want to

3    have consent in connection with the

4    sale of part of the brand, in

5    essence, to someone and part to

6    someone else and part to someone

7    else.  But I could also understand

8    why the parties would agree that if

9    it's basically going to one entity,

10   then it's the same thing.  And what

11   you're saying is that the sales that

12   are not to anybody who is using the

13   mark but just liquidation sales, I'm

14   not sure why that affects the mark

15   and why that wouldn't be consistent

16   with the parties bargain to say that

17   substantially all the assets are sold

18   then the mark can be assigned.

19        MR. ZUMBRO:  Well, your Honor, I

20   think fundamentally we're trying to

21   protect the quality of the mark and

22   the brand.  Your Honor, there's been

23   a lot of testimony over the last

24   couple of days about whether or not

25   Newco is or isn't a viable entity.

JX 072-233

1              PROCEEDINGS

2        THE COURT:  That's a separate

3    issue.

4        MR. ZUMBRO:  But it's not, your

5    Honor, because the ability, the

6    viability of Newco to continue to use

7    our mark and potentially degrade our

8    mark is very important to us and the

9    law doesn't impose that risk on the

10   owner of a trademark license.

11       THE COURT:  Unless the parties

12   agree.  And I'm trying to understand

13   the basis for the agreement, I guess.

14   Again I understand your point which

15   is that there have been sales of

16   assets of the company during the

17   first couple of months of the

18   bankruptcy case.  But they certainly

19   weren't operating or going concern

20   sales or sales that involved your

21   mark at all.  So it's not like --

22   anyway, I understand your point.  I

23   don't think you need to tell me more.

24   You succinctly stated it and clearly.

25   I'll just hear the debtor on it.

JX 072-234

Page 812

1             PROCEEDINGS

2        MR. SCHROCK:  Your Honor, Ray

3   Schrock, Weil Gotshal, for the

4   debtors.  Your Honor, I think you

5   have it.  If you look at the record

6   in this proceeding, first of all

7   there was no cross taken, even though

8   the opportunity was there, if they

9   wanted to build a record around

10  whether or not there was some kind of

11  plan for an extended liquidation

12  either prepetition or postpetition.

13  But the agreement says that if

14  there's a transfer of all or

15  substantially all of the assets it's

16  a permitted assignment.  Clearly

17  that's exactly what's happening here.

18  I don't think the testimony can be

19  read any other way from, you know, as

20  supported by any party.

21      When we enter bankruptcy we had

22  687 stores including those stores

23  that were going out of -- had GOBs

24  that were being conducted.  We had to

25  shut down some stores that were

JX 072-235

1              PROCEEDINGS

2    unprofitable.  But this has been one

3    plan to try and save Sears.  And

4    although we're conducting this under

5    an asset sale under 363, there's

6    nothing in this agreement first of

7    all that says substantially all of

8    the assets as were held at the time

9    of this agreement.  That is not in

10   the license agreement.

11        THE COURT:  That's kind of a

12   strawman.  The point is that there

13   may be some creeping sale process.

14        MR. SCHROCK:  And I understand

15   Mr. Zumbro pointing to cases where

16   there's several different sales and

17   it's the last step in a protracted

18   liquidation process.  That's not what

19   we have here.  There's been one sale.

20   And clearly the parties were

21   bargaining for this mark staying with

22   Sears.  I mean that's what's

23   happening.  These are the Sears

24   stores.  I mean these are the Sears

25   marks.  And, you know, to try and

Page 814

1                    PROCEEDINGS

2     take Craftsman away from the buyer

3     takes away the fundamental right that

4     we really bargained for as the

5     licensee of the mark.

6          So, your Honor, we don't think

7     there's any support under the law.

8     We think that there's no support in

9     the record and we don't think that

10    Mr. Zumbro has even built an

11    evidentiary record to support his

12    position around an extended

13    liquidation or a multipart

14    liquidation which this would be the

15    last step, and we'd ask you to

16    overrule the objection.

17         THE COURT:  Okay.

18         MR. ZUMBRO:  Just to respond,

19    your Honor, I think it's quite clear

20    that this company has been in sort of

21    effectively a slow moving liquidation

22    for quite some time.

23         THE COURT:  Well I don't know how

24    that's quite clear.  I don't really

25    have a record on that.  I do have a

JX 072-237

Page 815

1                      PROCEEDINGS

2      record of what's happened in the

3      bankruptcy case.  But they have

4      consistently said they're pursuing a

5      going concern sale of the whole

6      business.

7            MR. ZUMBRO:  I understand but --

8            THE COURT:  Isn't it the same

9      headquarters, the same people running

10     it?

11           MR. ZUMBRO:  A going concern sale

12     -- to be clear, we are not objecting

13     to the sale.  But a going concern

14     sale --

15           THE COURT:  I know you're not.

16     What I'm saying is when you look at a

17     sale of all or substantially all,

18     it's --

19           MR. ZUMBRO:  I guess I wish I had

20     this in the record but Sears made

21     public statements, Eddie Lampert on

22     July 7, 2017 said going forward we

23     have a plan to start selling stores

24     and selling our unprofitable stores

25     and then only maintaining the

JX 072-238

Page 816

1               PROCEEDINGS

2    profitable stores.  I think that's a

3    plan.  And that is what has happened

4    since then.

5         THE COURT:  It is.  He's got to

6    get to -- he's got to sell it to

7    himself, right?

8         MR. ZUMBRO:  He is selling it to

9    himself.  We understand that and

10   that's why it's a little awkward.  We

11   are using, we have the right to

12   consent to hold and bargained for the

13   right and we have a right to who

14   holds and exploit our mark.

15        THE COURT:  I'm going to disagree

16   on that.  I'm going to deny the

17   objection.  The cure I think is just

18   reserved; is that right?  I thought

19   the all cure objections were

20   reserved.

21        MR. SINGH:  That's correct, your

22   Honor.

23        MR. ZUMBRO:  That's fine I didn't

24   object.  Just to be clear for the

25   record, they have designated the cure

JX 072-239

1                    PROCEEDINGS

2     as relating to this IP agreement and

3     it doesn't, it relates to a different

4     agreement.  I just want to make sure

5     the debtors and I are on the same

6     page.  I suspect you're going to deny

7     this too, I'm not asking for a stay

8     of the sale closing but I am asking

9     you orally to move for a stay of the

10    court's order that this license can

11    be assigned at tomorrow's closing.

12    I'd like a stay of that pending

13    appeal so we can pursue our appellate

14    rights.

15         THE COURT:  Well --

16         MR. ZUMBRO:  Because otherwise

17    it's part of the transferred assets

18    as I understand it which will be

19    assigned to the Newco tomorrow and I

20    don't want to get caught up in 363

21    (M) and statutory mootness.  I'd like

22    to move for a stay pending appeal of

23    the assignment of this particular

24    agreement and their ability to use

25    the Craftsman mark pending our

JX 072-240

Page 818

1                   PROCEEDINGS

2     appeal.

3         MR. SCHROCK:  Not surprisingly,

4     your Honor, we object.

5         THE COURT:  I mean it's in all

6     the stores, right.

7         MR. SCHROCK:  It's used in all

8     the stores, there's no bond being

9     posted.  I frankly don't think that

10    ESL can speak to this.  I doubt the

11    sale is going to be going through if

12    we're not able to use the Craftsman

13    mark.

14        THE COURT:  That means putting a

15    sign on every Craftsman and Black &

16    Decker.  I think your prejudice is

17    outweighed here.

18        MR. ZUMBRO:  Understood.  Thank

19    you for your consideration, your

20    Honor.

21        THE COURT:  Is that the line

22    going out the door there?

23        MS. LIEBERMAN:  Hopefully not

24    going out the door, your Honor.  Good

25    afternoon, your Honor, Donna

JX 072-241

1          PROCEEDINGS

2    Lieberman from Halperin Battaglia

3    Benzija.  Your Honor, we represent

4    relator Carl Ireland, administrator

5    of the estate of James Garb.  The

6    objection that we filed is at docket

7    number 1931 and it's a fairly

8    discreet objection, your Honor.

9    Although as you can imagine it's one

10   that's very important to our client.

11       Your Honor, the objector as well

12   as the United States of America hold

13   a mortgage against one piece of Sears

14   real estate.  That piece of real

15   estate is identified by the debtors

16   as 8975.  It is listed on APA

17   schedule 1.1 P.  The operating owned

18   property.  So it is presumably a

19   piece of real estate that the debtors

20   wish to convey to the buyer.

21       The objection is very simple, your

22   Honor.  The mortgagees have a

23   performed first lien mortgage on this

24   property.  The court may recall that

25   we actually filed a limited objection

JX 072-242

1              PROCEEDINGS

2    to the DIP motions in connection with

3    this.  My colleague Mr. Halperin

4    argued that, and both the final

5    orders have specific language about

6    the fact that this mortgage is not

7    primed, nobody is pari passu with

8    this mortgage lien.

9         Your Honor, the face amount of the

10   mortgage note is $17.4 million.

11   There is a provision in the mortgage

12   note and related documents for a

13   small amount of annual interest as

14   well as a provision for professional

15   fees.  I'm sure the court will not be

16   surprised as we state in our

17   objection we do not consent to the

18   sale of our collateral.  We want to

19   know that if this mortgage is not

20   going to be paid at closing, that the

21   amount of the mortgage which we

22   calculated and we've given the debtor

23   the precise number, that that amount

24   is segregated and reserved.

25        And obviously the second piece is

Page 821

1              PROCEEDINGS

2      if we cannot reach agreement with the

3      debtor about the value of the

4      collateral that either party can

5      bring that issue to this court on

6      motion.

7          THE COURT:  So what is the

8      debtors' proposed treatment of this?

9      I mean obviously there is protection

10     of interest in the property.

11         MR. SINGH:  Sunny Singh, Weil

12     Gotshal on behalf of the debtors,

13     your Honor.  I think we've got a very

14     narrow issue here.  The valuation

15     reservation of rights I think we have

16     no problem with that.  I think if we

17     have to come back later to deal with

18     that we can.  Our position simply is

19     that under 363 (F) their liens get to

20     attach to the proceeds of sale which

21     right here as your Honor knows the

22     transaction is primarily assumptions

23     of liabilities which are the proceeds

24     that are coming in.  There's no other

25     liens on this asset.  So whatever

JX 072-244

1                    PROCEEDINGS

2     those proceeds may be we'll have to

3     fight about another day with the

4     objecting party but there's no basis

5     to -- they haven't traced.  There's

6     no basis to say we set aside 19.8

7     million of cash that's sitting aside

8     in the company's --

9          THE COURT:  I think you need to

10    give them that protection lien on

11    assets then.  I don't know how they

12    are protected otherwise.

13         MR. SINGH:  I believe under the

14    DIP order -- your Honor, so long as

15    it's not against a particular asset.

16         THE COURT:  They have super

17    priority where they are actually

18    covered, then I think that's -- you

19    can litigate what the actual value

20    was and what you're entitled to be

21    paid.

22         MR. SINGH:  Your Honor, I think

23    we would be fine with that because

24    that doesn't require any segregation

25    of whatever funds are asserted.  We

Page 823

1                    PROCEEDINGS

2    have no problem with that.

3        MR. LIEBERMAN:  Your Honor, as

4    you can imagine our only concern once

5    the value is set we know the money is

6    there and available to our client.

7    We have been hearing a great deal

8    about competing claims and whether

9    there is an administratively solvent

10   estate.

11       THE COURT:  I vaguely remember

12   the carveout in the DIP order.  This

13   is a first lien on this property.

14   It's worth what it's worth and it

15   can't be paid just by just saying

16   we're going to pay you some day.  We

17   need to have the equivalent.

18       MR. SINGH:  Your Honor, I think

19   we can add a short paragraph that

20   gives the adequate protection lien

21   that your Honor outlined with

22   everybody's rights reserved as to the

23   underlying claim.

24       THE COURT:  As to the value and

25   the right to bring that issue to the

JX 072-246

Page 824

1                 PROCEEDINGS

2     court.

3         MR. SINGH:  Exactly.  Thank you,

4     your Honor.

5         MR. FONG:  Good afternoon, Chris

6     Fong from Nixon Peabody on behalf of

7     U.S. Bank in its capacity as the KCD

8     indenture trustee.  We don't have any

9     objection to the sale.  I just rise

10    with respect to a discrete issue that

11    we have with the sale documents with

12    which we would like to reserve our

13    rights.  I think as you know U.S.

14    Bank is the indenture trustee under

15    indenture with KCD IP, a nondebtor

16    subsidiary.  We've negotiated with

17    the debtor for the inclusion of what

18    is now paragraph 10 of the order

19    which number one reserves our rights

20    as indenture trustee and requires

21    that all the closing transactions

22    that are relevant to KCD be

23    consistent with the indenture.

24        Paragraph B of the order requires

25    that as part of closing, KCD enter

JX 072-247

Page 825

1                    PROCEEDINGS

2      into exclusive licensing permit with

3      the buyer.  We have not seen that

4      agreement yet.  So I rise just to

5      reserve our rights to ensure that

6      that transaction complies with the

7      indenture and that nothing in the

8      order, if it is further modified --

9          THE COURT:  Changes what's

10     already there.  Sounds reasonable to

11     me.  Any issue the debtors have with

12     that?

13         MR. SINGH:  No, your Honor.

14         THE COURT:  Very well.

15         MR. CICERO:  Gerard Cicero from

16     Brown Rudnick on behalf of Primark.

17     Primark leases two properties from

18     the debtors.  Primark is a clothing

19     retailer.

20         THE COURT:  Is a tenant?

21         MR. FONG:  It's a tenant in the

22     property.  One of the properties it

23     leases is in Pennsylvania where the

24     debtors own that property in fee and

25     Primark just leases it.  And one

**JX 072-248**

Page 826

1              PROCEEDINGS

2    property is in Braintree,

3    Massachusetts.  The debtors actually

4    lease that from a ground lessor and

5    sublease it to Primark where Primark

6    operates its stores.

7        I rise to let you know we have

8    reached a temporary resolution of our

9    objection with the buyers.  But I

10   wanted to give you a little insight

11   into what's going on.  The first

12   version and the initial versions of

13   the sale orders would have sold the

14   debtors' interests in their fee

15   property and arguably in their

16   interest in property in the property

17   of the ground lease, they have a

18   ground lease to, free and clear of

19   our tenancy, of our leases, and we

20   had raised an objection under a

21   number of grounds, 365 (H) that the

22   debtors can meet 363 (F) and in the

23   alternative that under 363 (E) we

24   would request adequate protection of

25   tenancy.

JX 072-249

Page 827

1              PROCEEDINGS

2        I would say that the buyers

3    counsel and the debtors have been

4    very helpful and our issue has been

5    punted to another day should they

6    continue to want to try and sell the

7    property free and clear of our leases

8    because there has been an inclusion

9    as far as I understand it in

10   paragraph 19 of the sale order that

11   carves out tenants who have objected

12   on these bases to the free and clear

13   sale of their interest in property.

14        THE COURT:  Okay.  And your

15   client is one of those that's listed

16   -- not listed, anyone who has

17   objected on that basis.

18        MR. FONG:  Yes.  Unless your

19   Honor has any --

20        THE COURT:  No, I think that's

21   reasonable resolution.  I mean it may

22   be that the two leases are dealt with

23   differently under the law.  I don't

24   know.  It may depend.  But I

25   understand your objection.  I also

JX 072-250

Page 828

1              PROCEEDINGS

2      understand that you're reserving your

3      rights and therefore 363 (F)

4      objection has actually been waived --

5      not been waived, excuse me, whereas

6      those who might well beyond you was

7      waived.

8          MR. ROSENZWEIG:  Your Honor, good

9      afternoon, David Rosenzweig, Norton

10     Rose Fulbright.  I'm jumping in now

11     because we have the same issue.

12         THE COURT:  Same issue.  Did you

13     file objection?

14         MR. ROSENZWEIG:  We did.  We

15     represent Living Spaces Furniture

16     which is a furniture retailer that

17     has three stores, two in Arizona, one

18     in California.  They sublease from

19     Sears or K-Mart the entirety of the

20     store.  And we filed our objection as

21     well, raising all of those issues,

22     365 (H), 363 (F), adequate

23     protection, (E), and so we have

24     worked with ESL's counsel to include

25     in paragraph 19 the reservations for

**JX 072-251**

Page 829

```
 1              PROCEEDINGS
 2    those parties that filed objection.
 3         THE COURT:  Okay.
 4         MR. SARACHEK:  Good afternoon,
 5    your Honor.  Joe Sarachek.  We filed
 6    on behalf of Mein and six other
 7    vendors.  First of all, I want to say
 8    thank you to Mr. Lampert for stepping
 9    up and to the court, to Weil Gotshal
10    and the professionals who have worked
11    on this.  I represent trade vendors
12    who really need Sears to stay in
13    business.  They want Sears to stay in
14    business.  These, you know, you
15    talked about 45,000 employees.  But
16    with 10,000 vendors, there are
17    thousands, there are probably
18    hundreds of thousands of families of
19    vendors who are dependent on Sears to
20    stay in business.  That said, we're
21    totally supportive of the sale.  The
22    issue is timing of payment.  And I've
23    been before you before to talk about
24    the 503.  You asked the creditors'
25    committee attorney had he thought of
```

JX 072-252

Page 830

1                    PROCEEDINGS

2    any ideas.  Quite frankly this is an

3    unusual situation and we are

4    suggesting that the court appoint a

5    503(b)(9) ombudsman, an independent

6    party to make sure that there is 120

7    day period by which ESL is supposed

8    to pay.

9         THE COURT:  They have a lot of

10   incentive here to get a plan done

11   very fast.  They just want to set up

12   a litigation trust basically.  But I

13   understand.  I'm sorry to interrupt

14   you.

15        MR. SARACHEK:  No, your Honor.

16   So it's a suggestion just so you

17   know.  I'd like to take credit for

18   it, but there are a lot of far more

19   brilliant bankruptcy lawyers out

20   there.

21        THE COURT:  Can I interrupt you.

22   First of all, it's M-E-M-E?

23        MR. SARACHEK:  M-I-E-N.  And by

24   the way, they are the nicest people.

25        THE COURT:  My reaction to that

JX 072-253

Page 831

1                    PROCEEDINGS

2    is the following:  It seems to me

3    that with -- if I were to approve the

4    sale, the likelihood of these claims

5    getting resolved promptly goes way up

6    because there's actually someone to

7    negotiate with then who is a customer

8    of the vendor.  I think that if the

9    debtors and ESL don't work out a

10   process promptly to deal with

11   503(b)(9) claims then someone should

12   ask for a case conference to just

13   literally deal with that issue.  But

14   before doing that, before adding

15   another layer of administrative

16   expense to the estate through another

17   professional, I would like to see the

18   -- now that -- well if in fact I

19   approve the transaction, now that

20   there will be a customer on the other

21   side to deal with the vendor, I think

22   those things move a lot faster in

23   that context.  If it doesn't, and by

24   that I mean like in another few

25   weeks, two or three weeks, you know,

JX 072-254

1                    PROCEEDINGS

2    that sort of thing, then I think I

3    might have to actually direct a

4    process, which may involve an

5    administrative layer expense or may

6    just say look you've got to do this

7    now, you've got to have a process to

8    deal with these claims now that will

9    involve the vendor and the buyer as

10   well as the debtors.

11        MR. SARACHEK:  Thank you, your

12   Honor.

13        THE COURT:  A lot of these are

14   small businesses.

15        MR. SARACHEK:  They are.

16        THE COURT:  And they're facing

17   their own financial troubles, I get

18   that.

19        MR. SARACHEK:  And the issue of

20   course is that definition of receipt.

21        THE COURT:  So there are two

22   things.  There's a legal process

23   issue, there's a business process

24   issue.  What's been lacking so far, I

25   think, is the business process

JX 072-255

1                    PROCEEDINGS

2      because you didn't know whether this

3      was going to go to liquidation or

4      sale.  If it goes for liquidation

5      then that should happen right away, I

6      understand the process of liquidating

7      this claim should happen right away.

8           If it goes to the sale, then I

9      would like to give the debtors and

10     the buyer two or three weeks to come

11     up with a process that will work so

12     that they can be communicating with

13     the vendors directly in resolving

14     those issues.  If that doesn't happen

15     then someone like yourself could put

16     it on the calendar so we can go over

17     it.

18          MR. SARACHEK:  Thank you.  One

19     other point I want to make about the

20     160 million and I'm not sure I fully

21     appreciate the issue, but if the

22     issue is what I think it is which is

23     current accounts payable, I want to

24     say to everyone, these vendors need

25     to be paid and they need to be paid

JX 072-256

Page 834

1                    PROCEEDINGS

2     timely because they are out of a lot

3     of money.  They're recognizing or

4     realizing their unsecured claims are

5     likely worthless and other than their

6     503(b)(9) and they need to be paid

7     and this is a big, big issue.  I mean

8     this is an issue that China will hear

9     about in minutes after this hearing.

10    Thank you, your Honor.

11         MR. HONEYWELL:  Good afternoon,

12    your Honor, Robert Honeywell, K&L

13    Gates for Amazon.Com Services.  Very

14    briefly we are one of the parties

15    that cares about the language in

16    paragraph 19.  There are some

17    procedures for reserving recoupment

18    and sell off rights.  We've worked on

19    new language to the 4 a.m. order that

20    will fix that.  We are reserving our

21    rights.  It's a minor glitch.  We've

22    worked it out with the debtors

23    attorneys and ESL.

24         THE COURT:  It is not in the red

25    line I got.

JX 072-257

Page 835

1                    PROCEEDINGS

2        MR. HONEYWELL:  It is not in the

3    red line.  It is a two word glitch.

4    We've worked it out and are

5    preserving our rights.

6        THE COURT:  Is that right from

7    the debtors' point of view?

8        MR. SINGH:  Yes, your Honor.

9        THE COURT:  Okay.

10       MR. CHAFETZ:  Eric Chafetz of

11   Lowenstein Sandler on behalf of 2, LG

12   Electronics and Valvoline LLC.  I

13   rise for the same reason as Mr.

14   Gates.  We've been negotiating that

15   paragraph 19 language as well and we

16   saw what we think is the final

17   version.  Thank you, your Honor.

18       MR. SINGH:  Your Honor, before

19   anybody else gets up I promise we

20   will fix that language.

21       THE COURT:  Very well.  For those

22   of you on the phone that want to be

23   heard, no one is coming up to the

24   podium so this is your time.

25       MS. COLON:  Sonia Colon on behalf

JX 072-258

Page 836

1              PROCEEDINGS

2     of Santa Rosa Mall LLC.  Since the

3     objections under docket --

4          THE COURT:  I'm sorry, can I get

5     the name?  The name of your client

6     again, it went by very quickly.

7          MS. COLON:  Sonia Colon on behalf

8     of Santa Rosa Mall LLC.

9          THE COURT:  Santa Rosa Mall LLC.

10    Very well, yes, ma'am.

11         MS. COLON:  We have objections

12    under docket 2013 and docket 2425

13    that were filed to protect and to

14    preserve its rights to insurance

15    process for a store that was

16    destroyed as a result of hurricane

17    Irma and Maria in 2017.  It was --

18    although Santa Rosa does not object

19    to the proposed after sale principal,

20    it does object and reserve its right

21    with regards to the proposed

22    retention of $13 million inheriting

23    related insurance related process

24    when Santa Rosa is a loss payee under

25    the insurance policy for store 1915,

JX 072-259

Page 837

1                    PROCEEDINGS

2    and still its motion to compel debtor

3    to the insurance process under docket

4    1240 its result in February '14.

5         Further, Santa Rosa reserves its

6    right to the transfer of any

7    hurricane insurance proceeds that may

8    have been disbursed under the

9    proposed agreement.

10        Note that under the APA, acquired

11   assets include any and all insurance

12   assets with respect to a loss or

13   damage to any acquired assets of

14   hearing prior to the asset purchase

15   agreement.

16        Despite debtors' objection last

17   Friday under docket 2013 at pages 96

18   and 97, that the $13 million were

19   unrelated to any insurance coverage

20   under a lease agreement, the sworn

21   statements filed that day by Sunny

22   Singh under docket 2344 and

23   transferred under 2341 shows that $13

24   million were in fact hurricane

25   insurance proceeds.

JX 072-260

Page 838

1              PROCEEDINGS

2        THE COURT:  So if I can

3   understand, I'm sorry, ma'am, so let

4   me make sure I understand.  You're

5   reserving your rights, there's a

6   hearing scheduled for Valentine's Day

7   I guess on the merits of this issue.

8   Or at least partly.  And I guess the

9   debtors are reserving their rights.

10  You can't sell what isn't yours.

11       MR. SINGH:  Your Honor --

12       THE COURT:  If it is yours, the

13  debtors can sell.

14       MS. COLON:  Your Honor, they

15  agree to we reserve our rights with

16  respect to the insurance process

17  that were received by the debtors or

18  any third party for the damages by

19  Hurricane Irma and Maria, but also

20  that may be received by purchasers

21  because under the acquired assets

22  that can be insurance process.

23       THE COURT:  But again --

24       MS. COLON:  So we need to

25  preserve the rights.  We proposed

JX 072-261

1              PROCEEDINGS

2    language that should be included in

3    the proposed order to the debtors but

4    they did not include the same in the

5    proposed orders, the redlines that

6    have been submitted to this court.

7    So we need, your Honor, that

8    reservations be included in sections

9    3 regarding the objections, and also

10   free and clear of any claims because

11   claims should be limited, that any

12   claims shall be limited to loss or

13   damages for those caused by Hurricane

14   Irma and Maria.

15        THE COURT:  I think it's a

16   different concept.  The free and

17   clear point goes to claims or

18   interests in assets the debtors own.

19   But the debtors don't own the asset.

20   If it's not property of the estate,

21   if it's actually someone else's, then

22   they can't sell it.  I'm fine with a

23   reservation like that.

24        MR. SINGH:  That's right, your

25   Honor.

JX 072-262

Page 840

1                    PROCEEDINGS

2        MS. COLON:  We request, your

3    Honor, in the reservation language be

4    specifically included in the order.

5    But the debtors have refused to

6    include it in the red line.

7        MR. SINGH:  Your Honor, Sunny

8    Singh.  If I can just respond very

9    quick.  There's a reference to $13

10   million of insurance proceeds that

11   are not being sold to which the

12   claimant -- that is coming back to

13   the estate to which the claimant is

14   asserting claims.  Their rights are

15   reserved.  Our rights are reserved.

16   We can be heard on the 14th.  There

17   was a lot of back and forth on the

18   language to the order and frankly,

19   your Honor, what counsel laid out I'm

20   happy that their rights are reserved

21   and would stipulate that that is all

22   fine and we will deal with it on the

23   14th.  These are not proceeds that

24   are actually being transferred.  The

25   $13 million reference in the APA is

**JX 072-263**

1              PROCEEDINGS

2    actually a reference to being

3    retained by the estate.  So it's not

4    going anywhere.

5        THE COURT:  I think counsel is

6    worried -- let me finish, ma'am,

7    please.  I think you were worried

8    about in the future proceeds might be

9    transferred, future proceeds that

10   might come in.  And I don't know

11   whether those are proceeds the debtor

12   can sell or not, but to the extent

13   the debtor can't sell them.

14       MR. SINGH:  Then they are not

15   subject to 363 (F) and we can't

16   transfer.

17       THE COURT:  I don't think we need

18   to put in the order because it's a

19   given that you can't sell assets that

20   you don't own.

21       You're not making a representation

22   to ESL that you can sell assets that

23   you don't own, right?

24       MR. SINGH:  No, of course not,

25   your Honor.

Page 842

1                PROCEEDINGS

2          THE COURT:  I think your point is

3     noted on the record, ma'am, and I

4     think it's clear.

5          MS. SONGONUGA:  Good afternoon,

6     your Honor, Natasha Songonuga of

7     Gibbons, PC on behalf of the American

8     Lebanese Syrian Association, Inc.

9     This is not-the-profit section

10    501(c)(3) corporation founded

11    exclusively to raise funds for St.

12    Jude's Children Research Hospital,

13    your Honor.  St. Jude's does not have

14    and does not object to the sale

15    motion as a matter of fact, your

16    Honor, I want it to be clear that St.

17    Jude's consider K-Mart which is the

18    debtor that the relationship exists

19    with to be part of the St. Jude's

20    family and together both St. Jude's

21    and K-Mart have made a tremendous

22    impact on the mission of St. Jude's

23    which is finding cures and saving

24    children.

25          I filed a limited objection on

JX 072-265

Page 843

1                   PROCEEDINGS

2    behalf of St. Jude's at docket number

3    1947, your Honor, and without going

4    into the specific of that objection I

5    was advised yesterday by email that

6    either debtors' counsel or ESL's

7    counsel would be making a

8    representation to the court regarding

9    that limited objection.  So far I

10   have not heard that representation

11   made to the court.  I'm waiting for

12   the representation.

13        THE COURT:  Now is the time.

14        MR. SINGH:  Your Honor, Sunny

15   Singh, Weil, on behalf of the

16   debtors.  The debtors and the buyer

17   will work with St. Jude to review and

18   work toward reconciliation of the

19   amount of funds to be turned over to

20   St. Jude on March 1 pursuant to the

21   applicable contract and the parties'

22   rights are preserved and will not be

23   prejudiced by the sale transaction.

24        THE COURT:  Is that what you're

25   looking for?

JX 072-266

Page 844

1                PROCEEDINGS

2          MS. SONGONUGA:  Your Honor, that

3     addresses one part.  To be clear, the

4     debtors continue to collect

5     donations.  There's actually

6     currently a Valentine's donation

7     campaign ongoing in the stores and

8     the debtors continue to collect

9     donation on behalf of St. Jude's.

10    Those donations are not due on March

11    1st, they're not part of the proceeds

12    that are due on March 1st.

13         THE COURT:  They're not being

14    sold.  Again, it's the same point.

15    It's even worse here.  You can't sell

16    what you don't own.  You certainly

17    can't sell what people have decided

18    to give to St. Jude's.

19         MS. SONGONUGA:  Exactly.  We

20    agree with that, your Honor.  It was

21    not a matter of selling those

22    donations.  It was just simply a

23    matter of ensuring that the purchaser

24    would be continuing to collect those

25    donation on behalf of St. Jude's.

JX 072-267

Page 845

1               PROCEEDINGS

2       MR. SINGH:  Your Honor, we will

3   work with St. Jude's to deal with the

4   reconciliation and the buyers agree

5   to do that as well.

6       THE COURT:  Not just --

7       MR. SINGH:  Not limited to March

8   1.  Whatever the amounts are.

9       THE COURT:  Okay.  Okay.  I

10  think that I can assume then that the

11  other objections are either as was

12  previously stated being adjourned,

13  and that's largely the cure

14  objection, or been resolved or the

15  parties are reserving as to a

16  mechanism to resolve it.

17      MR. SINGH:  Yes, your Honor,

18  that's exactly right.  And we've got,

19  we built in most of that language,

20  I'd say 99 percent of it in the order

21  that was filed last night.  We've

22  gotten some cleanup changes

23  throughout the day today that we can

24  build in.  I don't think it's even

25  worth reviewing on the record some of

JX 072-268

1           PROCEEDINGS

2    the stuff counsel have already

3    notified your Honor about.  We've

4    also worked out the clarification on

5    the Cyrus release language that your

6    Honor mentioned earlier in the

7    hearing.

8         THE COURT:  Okay.  It's late in

9    the day, much longer than I thought

10   you have on this.  But I'm happy to

11   hear very brief response by those who

12   are seeking approval of the

13   transaction.

14        MR. BASTA:  Your Honor, Paul

15   Basta from Paul, Weiss from the

16   subcommittee.  I literally have one

17   minute.  Mr. Qureshi pointed out my

18   testimony from the podium, all the

19   numbers in my argument tie to Mr.

20   Carr's declaration.  Your Honor --

21        THE COURT:  Well in bankruptcy

22   cases there are times when the

23   lawyers who are speaking to you who

24   are intimately involved in the very

25   things that they're being asked

1                    PROCEEDINGS

2      about, such as a meeting takes place,

3      etc., so I take those representations

4      by people who are subject to

5      discipline from me as close to

6      evidence.

7           MR. BASTA:  Understand, your

8      Honor.  Your Honor had a discussion

9      with Mr. Qureshi about what it meant

10     to give up equitable subordination

11     because as a remedy it would mean

12     that the debtors would then have to

13     go and chase a recovery.  A primary

14     defendant in the debtors' litigation

15     claims that is not included in the

16     complaint that's attached to the

17     standing motion that the committee

18     filed is of course Seritage.  And if

19     your Honor looks on Yahoo, you'll see

20     that Seritage has a market cap of

21     $2.27 billion and ESL's interest --

22          THE COURT:  That actually is

23     evidence.  But I understand the

24     point.

25          MR. BASTA:  I'm just saying I

Page 848

1                  PROCEEDINGS

2    know that is evidence.  I'm just

3    saying ESL owns 45 percent of

4    Seritage.  So when we looked at it

5    from the collection issue, ESL had a

6    significant interest in Seritage

7    which has a large market cap and

8    Seritage itself is a significant

9    defendant.  The third point, your

10   Honor, Mr. Qureshi pointed out the

11   letter from ESL attacking the

12   subcommittee somehow tainted the

13   process.  I think the record is

14   uncontroverted that Mr. Carr and Mr.

15   Transier made their decisions without

16   any fear and without any bias and in

17   fact rejected the ESL bids after the

18   receipt of that letter.

19       MR. SCHROCK:  Your Honor, Ray

20   Schrock, Weil Gotshal, for the

21   debtors.  Subject to any questions

22   you have actually, I'm willing to

23   stand on the record before you.

24       THE COURT:  Actually I did have a

25   couple of questions I forgot to ask

JX 072-271

Page 849

PROCEEDINGS

1

2   you when you were speaking this

3   morning.  I have the statement by the

4   consumer privacy ombudsman in which

5   she makes a number of

6   recommendations.  She says as long as

7   the debtors and ESL abide by those

8   recommendations she supports the

9   sale.  She thinks it's proper as far

10  as the bankruptcy code and the

11  applicable law with regard to

12  consumer identifying information and

13  other related topics.

14      So I have the debtors and ESL

15  agreed to those recommendations?

16      MR. SCHROCK:  Yes we have, your

17  Honor.

18      THE COURT:  And ELS to?

19      MR. SCHROCK:  Yes, your Honor.

20      THE COURT:  All right.  And then

21  my other issue here is what is your

22  response on the argument that Mr.

23  Qureshi made that certain of the

24  assets being purchased here aren't

25  being purchased with the noncredit

Page 850

1              PROCEEDINGS

2     bid portion of the sale?

3         MR. SCHROCK:  Your Honor, I just

4     don't think that's frankly consistent

5     with the asset purchase agreement,

6     that assertion, as well as the record

7     in this case.

8         They are -- ESL is purchasing,

9     with the credit bid and then they are

10    paying off senior secured claims.

11    And by the way, we keep calling them

12    the unencumbered assets.  The DIP

13    loans have leans on those assets as

14    course.  The DIP loans have to be

15    repaid.

16        THE COURT:  The DIP loans have

17    liens on Dove and Sparrow?

18        MR. SCHROCK:  Certainly I believe

19    on the equity, the underlying equity

20    that the debtors hold, that's

21    correct, your Honor.

22        THE COURT:  And anything else?

23        MR. SCHROCK:  Yes.  And so

24    there's, you know, as your Honor

25    noted there's 3.9 billion.

JX 072-273

Page 851

1                    PROCEEDINGS

2          THE COURT:  It's like 850 million

3     of DIP loan?

4          MR. SCHROCK:  That's correct,

5     there's 850 million of DIP loan,

6     there's $350 million Junior DIP

7     that's there.

8          THE COURT:  I'm sorry to

9     interrupt you.  The committee's

10    argument is that there's 560 million

11    of equity value in Dove and Sparrow

12    and 233 in IPGL so that's less than

13    the DIP loan.

14         MR. SCHROCK:  Your Honor, we will

15    rely on the record as to the value of

16    the collateral but we didn't get

17    there on the map.  It was a

18    presentation.

19         THE COURT:  Assuming that value.

20         MR. SCHROCK:  Yes.

21         THE COURT:  Okay.  Mr. Qureshi,

22    any response on that?

23         MR. QURESHI:  Your Honor, I'm not

24    sure that that's consistent with how

25    the DIP order is supposed to work and

**JX 072-274**

Page 852

1            PROCEEDINGS

2    in particular the mash lane

3    provisions under the DIP order.

4         THE COURT:  I thought they waived

5    marshalling.  I mean they normally

6    do.

7         MR. QURESHI:  Your Honor, again,

8    I don't think that's how --

9         THE COURT:  Can I interrupt you.

10   I know there were reservations of

11   rights with respect to the Junior

12   DIP.  But on the senior DIP I thought

13   there was a waiver of 506 (C) and

14   marshalling.

15        MR. QURESHI:  Your Honor, let Mr.

16   Dublin handle that question.

17        THE COURT:  Okay, he's the

18   financing guy.

19        MR. DUBLIN:  Phil Dublin, Akin

20   Gump.  I don't have the DIP order

21   handy, your Honor.  But when we

22   negotiated the DIP, the final DIP

23   order with the ABL lenders we

24   actually had a whole construct of

25   marshaling built in where there was

JX 072-275

Page 853

1          PROCEEDINGS

2     marshaling waiver except there's a

3     provision in the back of the order

4     which I don't remember the paragraph

5     number that provides that even in

6     connection with a sale process, the

7     proceeds of the sale are supposed to

8     be used, that are applicable to what

9     was prepetition ABL collateral, I

10    think that might be the defined term,

11    are used in a specific order

12    distribution, such that, for example,

13    here, since the new ABL loan is being

14    funded and the collateral for the new

15    ABL loan is are the ABL assets that

16    exist at the company, the proceeds

17    from that new ABL loan that come into

18    the estate should be used to repay

19    the existing ABL DIP, thereafter

20    whatever prepetition ABL obligations

21    have not been repaid which I think

22    what's left is the FILO and the LC

23    facility which have liens on the ABL

24    assets and then after that there's a

25    whole litany of order of marshaling.

JX 072-276

Page 854

```
 1                  PROCEEDINGS
 2    That's also included in the Junior
 3    DIP order.  I apologize, I don't have
 4    the document with me.  But I believe
 5    that that's the way the marshaling
 6    provisions work, notwithstanding the
 7    fact that technically there's a
 8    marshaling waiver.
 9         MR. SCHROCK:  But again, your
10    Honor, we don't have the luxury of
11    evaluating this bid in a vacuum.
12    Indisputably, there's billions of
13    dollars of assumed liabilities that
14    are general unsecured claims,
15    administrative claims that are being
16    put into and are being paid off.
17         THE COURT:  I understand that
18    point.  If you look at it in the
19    aggregate, I understand.
20         MR. SCHROCK:  Right.
21         THE COURT:  Dove and Sparrow are
22    separate debtors?  Or are they --
23         MR. SCHROCK:  The Sparrow
24    entities are in a REMIC structure,
25    where we hold the equity.  They're
```

JX 072-277

Page 855

1                    PROCEEDINGS

2    not debtors.

3         The court:  Right. So I mean --

4         MR. SCHROCK:  But that equity is

5    held by the debtors.

6         THE COURT:  I'm assuming, because

7    I thought they were like special

8    purpose real estate entities, that

9    they don't have a lot of the types of

10   debts that ESL is taking on.

11        So you have to look at other value

12   that's going to them which would be

13   the DIP and there's some carveout.

14        MR. SCHROCK:  Right, your Honor.

15   But I think when I just look at the

16   -- when you think about the -- in a

17   winddown, right, there's going to be

18   a number --

19        THE COURT:  All I'm saying is I

20   just want to make sure that the sale

21   is fair to those particular debtors.

22   Now the easiest way to make sure of

23   that is to see whether they are

24   obligated in respect of debts that

25   are being repaid one way or the other

**JX 072-278**

```
1              PROCEEDINGS
2    including with cash taking out the
3    DIP.
4        MR. SCHROCK:  But we've been
5    servicing their collateral with money
6    that's being generated from sales.
7    It's an integrated operation.
8        THE COURT:  The other way to
9    ensure that it's fair is to recognize
10   some sort of intercompany claim
11   against the people who get the
12   benefit.
13       MR. SCHROCK:  And those are all
14   reserved.
15       THE COURT:  I would like to look
16   at the DIP order which I had printed
17   out actually last night.  So I think
18   I can find it pretty quickly.  All
19   right.  Anyone else?  Okay.  I'm
20   sorry, Mr. Bromley, I have a question
21   of you.
22       MR. BROMLEY:  That's why I sat
23   over here, your Honor.
24       THE COURT:  This issue about the
25   $166 million, your favorite issue.  I
```

Page 857

1                    PROCEEDINGS

2    have the schedule now.  There's no

3    dispute that that was the schedule

4    that was attached to the agreement,

5    correct?

6         MR. BROMLEY:  Correct.

7         THE COURT:  And I have the

8    provisions in the agreement that

9    relate to this issue.  There are

10   assumption provision and the cross

11   reference to the definitional

12   provision of other payables.

13        So I understand the debtors'

14   argument completely on this one.

15   What is the -- in terms of the plain

16   language of the agreement, what is

17   ESL arguing?

18        MR. BROMLEY:  Can I get the

19   document, your Honor?

20        THE COURT:  Sure.

21        MR. BROMLEY:  So, your Honor, do

22   you have the document in front of

23   you?

24        THE COURT:  Do the debtors have

25   the most recent version of the APA?

JX 072-280

1                    PROCEEDINGS

2          MR. SINGH:  Your Honor, there's

3     been no change to the original

4     version.  But we do have copies.

5          THE COURT:  So the amendments

6     don't cover this.

7          MR. SINGH:  The amendment does

8     not relate to this issue.  But we

9     have extra copies.

10         THE COURT:  Can you give me an

11    extra copy.

12         MR. SINGH:  Yes.  Just a moment,

13    your Honor.

14         MR. SCHROCK:  We have to find the

15    box.

16         MR. SINGH:  Yes, just the

17    transition over.

18         THE COURT:  You can just read it.

19         MR. SINGH:  Your Honor, it is

20    quoted in the presentation.

21         MR. BROMLEY:  Do you have the

22    debtors' presentation from earlier?

23         THE COURT:  Yes, the slides from

24    today?

25         MR. SCHROCK:  It's slide 24, your

JX 072-281

Page 859

1                    PROCEEDINGS

2    Honor.  That's the relevant language

3    that's quoted here.

4          THE COURT:  Right.  Okay.

5          MR. BROMLEY:  Your Honor, the way

6    that the document works is section 2

7    of the asset purchase agreement,

8    article 2, deals with purchase and

9    sale, with section 2.1 being the

10   purchase and sale of the acquired

11   assets.  And section 2.2 dealing with

12   the excluded assets.

13         Section 2.3 deals with the

14   assumption of liabilities.  So this

15   is the way a standard asset purchase

16   agreement is structured.  So what

17   you're buying, what you're not buying

18   and then what you're assuming.

19         So section 2.3 is the assumption

20   of liabilities and the header for

21   that says on the closing date the

22   buyer shall assume effective as the

23   closing and timely perform and

24   discharge in accordance with their

25   respective terms the following

JX 072-282

Page 860

1              PROCEEDINGS

2    liabilities.

3         If you go to 2.3 K, there are

4    several things that are going on in

5    2.3 K and it has a total of 10

6    subsections.

7         So what 2.3 K says that the

8    assumed liabilities include the

9    severance reimbursement obligations,

10   which is a defined term.  The assumed

11   503(b)(9) liabilities, other

12   payables, defined term, and all

13   payment obligations with respect to

14   the ordered inventory.

15        And then there's the 10

16   subsections which a couple of them

17   reference these terms.

18        But then when you go back to the

19   definitions, so you have other

20   payables as a defined term and

21   ordered inventory is a defined term.

22        MR. SCHROCK:  Your Honor, those

23   are on the next page, the next slide,

24   ordered inventory as well as the

25   other schedule.

JX 072-283

1               PROCEEDINGS

2          MR. BROMLEY:  So when you look at

3     other payables, and that is on page

4     24, other payables shall mean the

5     accounts payable set forth on

6     schedule 1.1 G.  Ordered inventory,

7     another defined term, shall mean

8     inventory, which itself is a defined

9     term, other than prepaid inventory.

10    Again, a defined term.  Of the type

11    set forth on schedule 1.1 F that has

12    been ordered by the sellers prior to

13    the closing date but as to which the

14    sellers have not taken title or

15    delivery prior to the closing date.

16         So if you go back to 2.3 K and

17    look at the -- and each of those have

18    a schedule.  So if you go to schedule

19    1.1 F which is ordered inventory, and

20    I'm not sure if that's in your chart.

21         MR. SCHROCK:  It is.

22         MR. BROMLEY:  That's on page 23

23    of the slide deck you got this

24    morning, your Honor.

25              THE COURT:  25.

JX 072-284

Page 862

1          PROCEEDINGS

2          MR. BROMLEY:  I'm sorry, 25, yes.

3     And that box at the bottom is exactly

4     how it appears and how I've cut it

5     out and put it in the back of my

6     binder.  And so what does it say?  It

7     says ordered inventory.  Ordered

8     inventory, and then it says as of

9     January 7, 2019.  And it has two

10    categories, domestic and imports.  It

11    has a total line.  Total on order,

12    less paid in transit, less on the

13    order, total amount of ordered

14    inventory.  And you go all the way

15    over to the far right-hand side, 278

16    million total on order, deducting

17    what has been paid in transit and is

18    on the order which is also in effect

19    title is transferred, you get total

20    of 166,557,000.  But there are two

21    things that are important to keep in

22    mind about the way schedule 1.1 F is

23    written and how ordered inventory is

24    defined.  Ordered inventory on

25    schedule 1.1 F is ordered inventory

**JX 072-285**

Page 863

1                    PROCEEDINGS

2       as of January 7, 2019.  So this is an

3       example, your Honor, this is not a

4       definition, this is going to be the

5       ordered inventory as of the moment of

6       closing.

7            Because if you go back to what the

8       definition of closing is it says

9       goods of the type set forth on

10      schedule 1.1.  So it's not saying

11      it's exactly on 1.1, meaning 1.1 F as

12      an example.  That has been ordered by

13      the sellers prior to the closing

14      date, as to which the sellers have

15      not taken title or delivery prior to

16      the closing date.

17           So what we have is anything as to

18      which there are orders out but it

19      hasn't been delivered, title hasn't

20      been taken.

21           That's what ordered inventory

22      means.

23           It just so happens that as of

24      January 7, 2019 schedule 1.1 had a

25      number of $166.6 million.

JX 072-286

Page 864

1                PROCEEDINGS

2      That is what from ESL's

3   perspective in terms of the

4   negotiations it was having with

5   respect to the bid letter that it put

6   in dated January 5th, because that's

7   when this was added in, the

8   expectation for ESL was that what we

9   were doing with respect to the

10  accounts payable was that we were

11  taking accounts payable that relate

12  to ordered inventory, that is

13  accounts that are -- amounts that are

14  going to be due for inventory that

15  was paid that has not yet been

16  received but will be delivered after

17  the closing date.  And so that number

18  is $166 --  as of January 7th was

19  $166.6 million.

20      And it was that number that we

21  were operating in respect of.

22      Now other payables is defined term

23  as well.  And if you go to 2.3 K it

24  says other payables is the accounts

25  payable set forth on schedule 1.1 G.

JX 072-287

Page 865

1                    PROCEEDINGS

2     And that schedule was made public

3     today.  And that schedule simply is

4     an amount that says $166 million.

5     That is on page 24 of the deck from

6     this morning.

7          So there's no -- schedule 1.1 G is

8     not a schedule of particular

9     payables, it's a dollar amount,

10    right.

11         And so if you go further down in

12    2.3 K, and there's sub numbers,

13    romanettes i through l, there is

14    romanette v, buyers' obligation with

15    respect to the other payables shall

16    not exceed $166 million in the

17    aggregate.

18         It's not a coincidence that the

19    number $166 million is with respect

20    to both the schedule relating to

21    ordered inventory or other payables

22    because it was indeed the parties'

23    intention, at least is ESL's point of

24    view, that what other payables meant

25    in 2.3 K is that it's other payables

**JX 072-288**

Page 866

1            PROCEEDINGS

2   and payment obligations with respect

3   to the ordered inventory.

4        So that total amount is $166

5   million.  The schedule 1.1 F makes it

6   clear that the ordered inventory

7   expectation was $166 million.

8        THE COURT:  But if it was other

9   payables and all payment obligations

10  and you define other payables in 5,

11  little roman v you say buyers'

12  obligation with respect to the other

13  payables and all payment obligations

14  shall not exceed $166 million.  This

15  just refers to the other payables,

16  not the clause that follows it and

17  all payment obligations with respect

18  to ordered inventory.

19       MR. BROMLEY:  I hear what you're

20  saying, your Honor.  But there's no

21  other use of the word ordered

22  inventory.  What we're talking about

23  here it may be that ordered inventory

24  is an additional defined term that's

25  not necessary.  The but what we're

Page 867

1                    PROCEEDINGS

2     talking about --

3          THE COURT:  The parties defined

4     it.

5          MR. BROMLEY:  But it's the exact

6     same definition.  It's $166 million.

7     It's the same number, your Honor.

8          MR. SCHROCK:  But that's why we

9     had two schedules.

10         THE COURT:  Why are you fighting

11    over it?  If it's the same thing then

12    it's 166 either way.

13         MR. BROMLEY:  The point is

14    whether there's two 166s or one, the

15    schedule that Mr. Schrock refers to

16    is not a schedule, it's just a number

17    on a page.  That's not a schedule.

18         THE COURT:  But it is because

19    that's what the schedule says.

20         MR. SCHROCK:  Right.  But, your

21    Honor, the other payables are

22    payables that exist, right, that we

23    specifically negotiated as a bridge

24    out of insolvency.

25         THE COURT:  I don't care what

JX 072-290

Page 868

1                    PROCEEDINGS

2    people negotiated.  It looks to me

3    the parties used two different terms,

4    they define them differently and put

5    a cap on one and assumed the other

6    one.  Now it may be that

7    definitionally they overlap in which

8    case there's no reason to pay more

9    than once but if they don't overlap

10   --

11       MR. BROMLEY:  Your Honor I think

12   at a minimum there's an ambiguity

13   here and there are no documents in

14   the record because it's not the time

15   to do it.

16       THE COURT:  I'm not deciding this

17   issue today because I can't but I

18   don't see ambiguity.  You can't make

19   one under New York law by saying the

20   parties disagree about what they

21   meant unless the document itself is

22   ambiguous.

23       MR. BROMLEY:  I understand, your

24   Honor.

25       THE COURT:  Hang on just for a

JX 072-291

Page 869

```
 1                    PROCEEDINGS

 2    second.  Is Mr. Dublin here still?

 3         MR. DUBLIN:  Yes.

 4         THE COURT:  Can you just look and

 5    see where this provision is.

 6         MR. SINGH:  Your Honor, I think

 7    it's paragraph 13.

 8         MR. SCHROCK:  Paragraph 13 for

 9    the senior DIP.

10         THE COURT:  What page is that, do

11    you know?

12         MR. SINGH:  It starts on page 37

13    if you have the senior DIP order,

14    your Honor.

15         THE COURT:  Yes, I do.

16         MR. SINGH:  It's a very, very

17    longer paragraph.

18         THE COURT:  Sorry.

19         MR. BROMLEY:  That's okay.

20         THE COURT:  I don't really need

21    -- I now understand the rationale.

22         MR. BROMLEY:  But I have some

23    more.

24         THE COURT:  Okay.  Go ahead.  No,

25    go ahead.
```

JX 072-292

Page 870

1              PROCEEDINGS

2          MR. BROMLEY:  I'm sorry, your

3     Honor.  The fact is that that's not

4     the only point.  There's two -- that

5     these two definitions are sitting

6     here together is not happenstance.

7     But what we are talking about as well

8     is that there is an ongoing

9     obligation of the debtors with

10    respect to these numbers to be

11    performing the base, to operate the

12    business in the ordinary course.  To

13    order things and pay for them as they

14    come due, right.  And what we know --

15         THE COURT:  That's a separate

16    issue.  Debtors haven't looked for a

17    different interpretation of that.

18         MR. BROMLEY:  It is and it isn't,

19    your Honor.  To the extent what has

20    happened is to the extent there's two

21    buckets which we don't agree with and

22    this one bucket is being filled up

23    because what is happening is the

24    debtors are not paying their

25    obligations as they come due, they

JX 072-293

Page 871

1              PROCEEDINGS

2      are violating another portion of the

3      agreement.  This is an

4      extraordinarily complex document.

5      But it cannot be on the one hand the

6      debtors can choose voluntarily not to

7      pay things.

8          THE COURT:  The debtors are

9      willing to live with the ordinary

10     course provision, right?

11         MR. SCHROCK:  We are, your Honor.

12         MR. BROMLEY:  Your Honor to the

13     extent there's a dispute going

14     forward I want to let you know the

15     issues are to whether or not the

16     debtors are performing --

17         THE COURT:  I understand that

18     point.  Correct me if I'm wrong, but

19     I think the concern that the special

20     committee and the debtors had was

21     that, was not over that issue, but

22     rather over the first argument you

23     made.

24         MR. SCHROCK:  That's correct,

25     your Honor.

JX 072-294

Page 872

```
 1                    PROCEEDINGS

 2          MR. BROMLEY:  I know because

 3    they're not concerned about the first

 4    issue because it helps them because

 5    what they've been doing is not

 6    performing in the ordinary course.

 7          THE COURT:  The ordinary course

 8    is a separate provision.

 9          MR. BROMLEY:  They relate to each

10    other, your Honor.

11          THE COURT:  Well, I don't know.

12    Okay.  Thank you.

13          MR. BROMLEY:  Thank you, your

14    Honor.

15          THE COURT:  Page 37 you said, Mr.

16    Singh?

17          MR. SINGH:  One second, your

18    Honor.

19          THE COURT:  This is a five-page

20    paragraph.  I have what's called the

21    final order.

22          MR. SINGH:  It's paragraph 13,

23    page 37 where we start talking about

24    reverse marshaling provisions.  As

25    you say, your Honor, it's a very long
```

**JX 072-295**

Page 873

1               PROCEEDINGS

2    paragraph.  If you go to page 40,

3    right after the definition of reverse

4    marshaling provisions, your Honor.  I

5    think the relevant provision we were

6    talking about before is that the DIP

7    ABL agent shall not apply proceeds of

8    prepetition unencumbered.

9         THE COURT:  Received in

10   connection with any exercise of

11   secured credit or remedies or any

12   sale, transfer, such asset.

13        MR. SINGH:  That's right, your

14   Honor.  So the point of the provision

15   being that the senior DIP ABL agents

16   agree to personal space on the

17   inventory and then if they came up

18   short they would look to the other

19   unencumbered collateral.  But it

20   wasn't that they didn't have a lien

21   on the other unencumbered collateral,

22   your Honor.

23        THE COURT:  I don't think Mr.

24   Dublin was saying they don't have a

25   lien, it's just a marshaling

JX 072-296

Page 874

1                    PROCEEDINGS

2    provision.  I think he summarized

3    that correctly.  Amazing he

4    remembered all of that.  All right.

5        So I have before me a motion by

6    the debtors in these cases for

7    approval of an asset purchase

8    agreement as modified, and related

9    exhibits and documents, between them,

10   to create an entity that is going to

11   be owned by the debtors controlling

12   shareholder ESL and other parties who

13   will be in a minority position in

14   that Newco.

15       The Second Circuit has been

16   addressing motions for the approval

17   of the sale of all or substantially

18   all of the business of a debtor in

19   possession which this sale in essence

20   is.  For decades, starting with in re

21   Lionel Corp, 722 Fed 2nd 1063, Second

22   Circuit, 1983, in which the Second

23   Circuit held that a debtor in

24   possession can sell all or

25   substantially all of its assets

JX 072-297

Page 875

1                PROCEEDINGS

2    outside of a Chapter 11 plan,

3    provided that the judge finds a good

4    business reason based on the evidence

5    before him or her.  That's at page

6    1071.

7         And the sale is not outside of a

8    plan is not the result of undue

9    pressure separate and apart from

10   there being a good business reason.

11        The sale here at this point is

12   essentially unopposed, with the

13   exception of an objection by the

14   debtors official creditors'

15   committee.

16        I have dealt with the other

17   objections which are primarily

18   reservations of rights with the

19   exception of the Craftsman, Black &

20   Decker objection which I dealt with

21   on the merits, but that involved the

22   assignment of one particular asset, a

23   trademark license.

24        The creditors' committee does not

25   oppose the sale of substantially all

JX 072-298

Page 876

1                    PROCEEDINGS

2    of the assets outside of a Chapter 11

3    plan.  Indeed, the basis, the primary

4    basis for its objection is that it

5    would rather have all the assets sold

6    on a liquidation basis outside of the

7    -- outside of the Chapter 11 plan.

8        So the standard by which I should

9    review the sale here is the essential

10   standard laid out by Lionel which

11   again is the court needs to find a

12   good business reason based on the

13   evidence before it as that standard

14   has evolved over the years.

15       It's important to note at the

16   outset the Second Circuit has made it

17   clear that these types of motion,

18   even though they are of extreme

19   importance in a bankruptcy case, are

20   summary proceedings.  That is, the

21   court, unless the proceeding is

22   combined with an adversary

23   proceeding, is not to determine

24   interest in property or other issues

25   that might affect the sale on a final

JX 072-299

Page 877

1              PROCEEDINGS

2     basis, but rather, needs to determine

3     the merits of the proposed sale

4     itself.

5         See, for example, in re Orion

6     Pictures 4 F3 1095 Second Circuit

7     1993 and in re Genco Shipping and

8     Trading Limited, 509, 445, Bankruptcy

9     SDNY 2014.

10        The general inquiry that the court

11    should make when considering the

12    proprietary of a sale motion under

13    section 363 (B) of the bankruptcy

14    code is well laid out by Judge Lane

15    in re Advanced Contracting Solutions

16    LLC, 582 B.R. 285 through 10,

17    bankruptcy SDNY 2011, quote, section

18    363 (B) of the bankruptcy code

19    governs the proposed sale or use of

20    estate property outside the ordinary

21    course of business.  The standard for

22    approval under section 363 (B) of

23    whether the debtor exercised sound

24    business judgment.

25        The case law concerning section

JX 072-300

Page 878

1              PROCEEDINGS

2    363 provides that the court needs to

3    review the business decision and

4    whether it was made on a

5    disinterested basis with due care and

6    good faith and according to some

7    courts,truncated, there's no abuse of

8    discretion and waste of corporate

9    assets.

10       See also in re GMC 407 B.R. 463,

11   294 bankruptcy SDNY 2009 where the

12   court held to approve a section 363

13   (B) sale the court must be satisfied

14   that notice had been given to all

15   creditors and interested parties,

16   sale contemplates a fair and

17   reasonable price that the purchaser

18   is proceeding in good faith.

19       A number of courts in this

20   district, with the seminal case being

21   in re Resources Inc. 47 B.R. 650 at

22   656 SDNY 1992, and including the

23   Advanced Contracting case that I

24   quoted, go further and say that in

25   analyzing whether the proposed sale

JX 072-301

Page 879

1                    PROCEEDINGS

2     is a proper exercise of good or sound

3     business judgment, the court may

4     apply the business judgment rule

5     which essentially as determined by

6     courts is a rule applying to

7     transactions in nonbankruptcy context

8     that presumes that court and

9     decisionmakers and the decisions,

10    presumes, excuse me, the corporate

11    decisionmakers and the decisions will

12    be protected from judicial second

13    guessing.  And that courts are loath

14    to interfere with corporate decisions

15    absent issuing a case of bad faith,

16    self interest or gross negligence and

17    will uphold the board decisions as

18    long as they are attributable to any

19    rational business purpose, with the

20    burden being on parties opposed to

21    the exercise of such a decision.

22         And I appreciate the analysis that

23    the courts in this district have done

24    to apply that standard.  But I have

25    consistently held and believe that

JX 072-302

Page 880

1                    PROCEEDINGS

2     Lionel and Orion and the plain

3     language of the statute require more

4     inquiry at least where the

5     substantive objections to the

6     proposed sale which is the case here.

7          Ultimately as laid out by the

8     Second Circuit in the Orion Pictures

9     case, albeit that case involved a

10    business decision to assume or reject

11    contracts, but that decision was

12    still done in the ordinary course.

13    And I think the logic therefore

14    applies to section 363 (B),

15    ultimately the decision as laid out

16    by the Second Circuit in Orion

17    Pictures is one where the bankruptcy

18    court has to exercise its business

19    judgment to determine in light of all

20    of the facts laid out on the record

21    in a summary proceeding whether in

22    fact the decision does make business

23    sense to sell the assets as proposed

24    by the debtor.

25          And that's the standard that I've

JX 072-303

Page 881

1                    PROCEEDINGS

2    applied here.  The Second Circuit in

3    putting that burden on the bankruptcy

4    court also made it clear that the

5    bankruptcy judge is looking into the

6    future and therefore cannot assure

7    the benefits of the proposed

8    transaction, but nevertheless needs

9    to evaluate it based on what it knows

10   in the present day to decide whether

11   in fact the transaction makes good

12   business sense.

13        In doing so, the courts are guided

14   by not only the underlying

15   consideration being provided for the

16   assets but also the process by which

17   the assets were sold and whether it

18   was generally fair and within the

19   constraints under which the selling

20   party was operating in some

21   circumstances and the like designed

22   to maximize the value.

23        The case law is clear that section

24   363 (B) sales does not require a

25   formal auction process as is

JX 072-304

Page 882

1                  PROCEEDINGS

2    confirmed by the SDNY guidelines on

3    asset sales developed by the judges

4    in the bankruptcy court in the

5    Southern District, and that with the

6    right process, sales to insiders may

7    be approved.

8         However, an inquiry into the

9    process is clearly warranted,

10   especially where the sale is to an

11   insider as is the case here.

12        Again, though, the Second Circuit

13   has given the bankruptcy courts

14   guidance in dealing with sale

15   processes.  As stated by the Second

16   Circuit in re Financial News Network

17   Inc., 980 if 2nd 165 and 166, Second

18   Circuit 1992, bankruptcy court must

19   perform a difficult balancing act

20   when it conducts an auction of the

21   debtors' assets.  It walks a

22   tightrope between on the one hand

23   providing for an orderly bidding

24   process recognizing the danger of the

25   absence such a fixed bidding process,

JX 072-305

Page 883

1                    PROCEEDINGS

2     bidders may decline to participate in

3     the auction, while on the other hand,

4     retaining the liberty to respond to

5     different circumstances so as to

6     obtain greatest return for the

7     bankrupt estate.

8         What one takes away from that

9     opinion and subsequent opinions is

10    that as reflected in the sale

11    procedures order entered by the court

12    to govern the process for selling the

13    debtors' assets, regular procedures

14    are important so that parties can

15    rely on them, but overall supervision

16    by the court with the input from key

17    parties in interest including the

18    debtors in the exercise of their

19    fiduciary duties, the creditors'

20    committee and other interested

21    parties, is necessary to deal with

22    issues that come up during the sale

23    process and that need to be addressed

24    if in fact addressing them will lead

25    to increased value in a fair manner.

JX 072-306

Page 884

1          PROCEEDINGS

2       The last couple of points I will

3    make generally on court's standard

4    for reviewing this motion is that

5    typically courts will consider

6    whether the sale price was fair and

7    the transaction in which its being

8    paid is one that makes good business

9    sense, by looking to the sale price

10   for all of the assets together,

11   without discussion of the constituent

12   parts.

13       And as a subset of that

14   proposition, the courts recognize

15   that provided that one keeps within

16   the priorities in the bankruptcy

17   code, there may be individual

18   constituencies in a case who benefit

19   more from a sale than others.  For

20   example, those who are parties to

21   executory contracts or unexpired

22   leases whose contracts are being

23   assumed by the buyer will have their

24   prepetition claims cured or there

25   will be adequate assurance of a cure.

JX 072-307

Page 885

1              PROCEEDINGS

2        Whereas other unsecured creditors,

3   after the payment of the sale

4   proceeds to senior creditors may get

5   far less in respect of their

6   unsecured claims.

7        Nevertheless, such a sale, as long

8   as the overall price is fair, and

9   again it doesn't violate other

10  provisions of the bankruptcy code,

11  will be approved.

12       See, for example, in re TWA, 2001

13  Bankruptcy, Lexis 980, Delaware,

14  April 2, 2001 in re 100 US, 674, 677,

15  Bankruptcy SDNY 1989.  See also

16  Mission Iowa Wind Company V Enron

17  Corp 291 B.R. 39, 43 SDNY 2003.

18       That case, that is the Enron

19  Mission Wind case however also stands

20  for another proposition which is

21  that, as I said before, its sale

22  cannot violate substantive rights

23  except as permitted by the bankruptcy

24  code, for example, under section 363

25  (F) of the court -- of the code or

JX 072-308

Page 886

1                     PROCEEDINGS

2      violate the general priority scheme

3      of the bankruptcy code.

4           So, for example, in the Mission

5      Wind case the debtor sought approval

6      of a sale of assets that included not

7      only its own assets but assets of

8      nondebtor entities.

9           Obviously the proceeds of that

10     sale need to be allocated among the

11     two sellers which the district court

12     required to be done on a thorough

13     basis.

14          It is also important if assets are

15     being sold by more than one debtor to

16     ensure that no particular debtor is

17     shortchanged for the assets that it

18     is selling in respect of the sale

19     proceeds or consideration received

20     from the sale so that to the extent

21     that it has separate creditors, those

22     creditors are not prejudiced.

23          There has been a fair amount of

24     talk during the trial in the summary

25     proceeding as to whether or not the

JX 072-309

Page 887

1                      PROCEEDINGS

2      proposed sale would leave the debtors

3      after the sale administratively

4      insolvent, that is, unable to pay

5      their postpetition and 503(b)(9)

6      prepetition administrative expenses

7      in full as is required under a

8      Chapter 11 plan for that plan to be

9      confirmed, unless the administrative

10     expense creditors waive that right.

11         There is no requirement under the

12     bankruptcy code to ensure that a

13     proposed sale of substantially all of

14     the assets that have been operating

15     the business result in administrative

16     solvency.

17         Indeed, the opinions a number of

18     opinions recited in the debtors'

19     memorandum of law to the contrary but

20     even more so there are hundreds of

21     cases that are resolved in going

22     concern sales with the subsequent

23     dismissal of the case, with unpaid

24     administrative expenses.

25         The court's concern about

JX 072-310

Page 888

1                    PROCEEDINGS

2       administrative solvency nevertheless

3       is real because the debtor needs to

4       be left with resources to ensure that

5       the transaction's benefits will be

6       received and generally speaking one

7       wants to get as many claims paid as

8       possible.  But it is in that context

9       that I reviewed the testimony

10      regarding the fact of the proposed

11      sale on the administrative solvency

12      of these debtors.

13          This sale motion has resulted in a

14      far longer evidentiary hearing than

15      most sale motions.  I heard the

16      testimony of ten witnesses live as

17      well as reviewed deposition

18      designations of one other witness,

19      Mr. Kniffen, and deposition

20      designations from Mr. Diaz, one of

21      the committee's experts.

22          There are also several binders of

23      agreed exhibits which have been

24      admitted into evidence.

25          But it appears clear to me, having

**JX 072-311**

1           PROCEEDINGS

2    heard all of that testimony and

3    reviewed the evidence as deemed to be

4    significant by the parties that

5    essentially there are three

6    underlying grounds for the creditors'

7    committees objection to the proposed

8    sale.

9        The first is that the sale process

10   under which the debtors proceeded

11   with the marketing of their assets

12   that resulted in the sale that's

13   sought to be approved today was

14   flawed to such an extent that the

15   sale should not be approved, or if it

16   were to be approved, I should not

17   provide a finding under section 363

18   (M) of the bankruptcy code that the

19   purchaser engaged in transaction in

20   good faith, which is essentially the

21   same thing as saying that I would not

22   approve the sale because no purchaser

23   would enter into an agreement without

24   that.

25       The second argument that the

Page 890

1                    PROCEEDINGS

2    committee has made is that in light

3    of the only reasonable alternative

4    here, which is a prompt liquidation

5    of the debtors' assets, the proposed

6    going concern sale is deficient,

7    i.e., the hypothetical liquidation of

8    the debtors' assets would result in a

9    higher or better transaction.

10        Finally, the committee has argued

11   that there is insufficient value

12   being provided by purchaser here over

13   and above its credit bid in relation

14   to assets that it is purchasing that

15   are not encumbered by a lien that

16   would support the credit bid.

17        I'll address each of those

18   objections in order.

19        But before doing so, I will note

20   that currently there are no

21   objections to the proposed sale by

22   any party to executory contract or

23   lease that is sought to be assumed in

24   today's order L, other than cure

25   objections which the parties have

JX 072-313

Page 891

1                    PROCEEDINGS

2      agreed to resolve in the future.

3         In other words, no party today

4      whose contract is being assumed or

5      whose lease is being governed by this

6      order, has objected today on the

7      grounds of a lack of adequate

8      assurance and future performance.

9         The parties have been careful to

10     reserve all rights in respect of that

11     issue, in respect of any lease that

12     is not specifically being assumed at

13     the closing or executory contract,

14     except where there's not been an

15     objection and no express reservation

16     of rights.

17        As I noted, I entered an order

18     approving a sale process here that

19     contemplated taking bids for all or

20     substantially all of the debtors'

21     assets as well as bids for

22     substantial portions of the debtors'

23     assets which could then be aggregated

24     if they were submitted in a

25     qualifying way to compete as a group

JX 072-314

Page 892

1                  PROCEEDINGS

2    to any bid that were made for all or

3    substantially all of the assets.

4        I also made it clear that any

5    party seeking to make a proposal for

6    real estate assets should do so and

7    the debtor should take such proposals

8    seriously.

9        The record here is clear that to

10   thoroughly market the debtors' real

11   estate assets one would need a

12   minimum of four months.

13       The committee's expert has opined

14   that it would be a disaster to market

15   the real estate assets for anything

16   less than over a year and as much as

17   20 months.

18       Obviously the debtors here could

19   not therefore run a full real estate

20   marketing process along with a going

21   concern sale process that also would

22   have contemplated bids for

23   substantial portions of the debtors'

24   business to be aggregated as I stated

25   earlier.

JX 072-315

Page 893

1                    PROCEEDINGS

2          Nevertheless, as I said, those

3     wishing to make material bids for

4     real estate were encouraged strongly

5     to put their best foot forward by me

6     to do so in the bidding procedures

7     order contemplated.

8          The bidding procedures order also

9     contemplated that the creditors'

10    committee, and other parties in

11    interest, would have the right to

12    come back to this court and to

13    complain about how the process was

14    being conducted in real time and to

15    seek a prompt pivot if the process

16    was not being conducted in a way that

17    would maximize value to a liquidation

18    process that would start the active

19    marketing of the debtors' real estate

20    assets in a manner that I previously

21    described.

22         I have reviewed the testimony here

23    on the process issues, including from

24    the debtors's side the testimony by

25    Brandon Aebersold and the two

JX 072-316

Page 894

1                   PROCEEDINGS

2      independent directors, William

3      Transier and Alan Carr.  I've also

4      considered the testimony of the

5      committee's investment banker Saul

6      Burian, and I conclude that as far as

7      a going concern sale process is

8      concerned, the debtors engaged in a

9      thorough and fair process given the

10     constraints under which they were

11     operating, namely, the need that all

12     parties recognize, including the

13     creditors' committee, that they could

14     not sustain continuing operations for

15     any meaningful length of time.

16         The committee through Mr. Burian

17     has complained that certain potential

18     buyers of segments of the debtors

19     business were confused or given short

20     shrift during the sale process and

21     that that is a reason there were only

22     indicative, or insufficient, rather,

23     expressions for bids for parts of the

24     debtors that might be hiked off on a

25     standalone basis.

JX 072-317

Page 895

1              PROCEEDINGS

2        I have considered that allegation

3    carefully and conclude that given the

4    nature of this process as supervised

5    by me on a hands-on basis, that all

6    parties in interest, including Mr.

7    Burian, knew if indeed these problems

8    were truly troublesome, they would

9    have been raised to me so that I

10   could have stepped in to have ensured

11   either a little more time or a little

12   more focus to maximize potential

13   competing offers.  None of that

14   happened.

15       It is also reasonably clear to me

16   based on the testimony not only by

17   the debtors's directors that I

18   previously mentioned but certainly

19   other witnesses that the so-called

20   potentially standalone businesses are

21   closely integrated with the rest of

22   Sears and that there are meaningful

23   issues related to separating them

24   that would potentially adversely

25   affect a potential buyer's

JX 072-318

1           PROCEEDINGS

2    willingness to bid for such assets.

3         That's I believe simply a fact

4    that may well go to explain why the

5    bidding for those assets was not more

6    robust.

7         The committee has also complained

8    as a process matter that the insider

9    purchaser tainted the sale process to

10   its advantage.  As a set of facts to

11   support that conclusion, committee

12   has pointed to three or four things.

13        Before addressing them, I should

14   note that the debtors then controlled

15   by ESL and before the commencement of

16   these cases, and with ESL's consent,

17   replaced ESL as the controlling party

18   for purposes of a transaction of this

19   kind as well as review of any claims

20   against ESL independently and as how

21   that may relate to a transaction of

22   this kind, to third parties, the

23   restructuring committee and then a

24   subset of that restructuring

25   subcommittee.  Those independent

Page 897

1                    PROCEEDINGS

2    third parties were represented by

3    independent counsel and financial

4    advisors.

5        The two members of the

6    restructuring subcommittee testified

7    in the hearing before me on the sale

8    motion, Mr. Transier and Mr. Carr.

9        I believe the record is crystal

10   clear that the restructuring

11   committee and restructuring

12   subcommittee, A, actually had control

13   of the debtors with respect to the

14   sale process and the debtors'

15   decision throughout that process as

16   to whether to accept or reject any

17   offers and how to conduct the

18   process, B, that they were in fact

19   truly independent as evidenced by,

20   among other things, their rejection

21   of numerous proposals by ESL and

22   heated and lengthy negotiations with

23   ESL, C, that they were well and

24   thoroughly advised by independent

25   professionals, and D, that their

JX 072-320

Page 898

1            PROCEEDINGS

2  focus was a proper one, which

3  essentially is the same standard that

4  I've already outlined.  Does the

5  proposed transaction represent the

6  highest or best transaction available

7  to these debtors?

8      I believe that they exercised

9  their responsibilities in an active

10  and informed way and that they

11  themselves were experienced in this

12  area and brought their experience to

13  bear, as opposed to being passive

14  receptacles for their profession's

15  advice. There are numerous incidences

16  in the record to reflect that.

17      Under the circumstances,

18  therefore, I believe that the

19  involvement of the proposed buyer

20  here as a bidder for the assets was

21  effectively neutralized in respect of

22  the debtors' review of that bid and

23  the process that led to the bid and

24  the bid's acceptance.

25      The committee, that is the

JX 072-321

Page 899

1                    PROCEEDINGS

2    creditors' committee has attacked

3    that process I believe only by

4    pointing to the fact that after Mr.

5    Transier first met Mr. Lampert, the

6    controlling party of ESL, that

7    meeting having been by phone, to lay

8    out the -- at a board meeting that

9    laid out the duties of the new board

10   members of the restructuring

11   subcommittee and the fact that a

12   joint office of the CEO would be

13   formed, including Mr. Meghji and Mr.

14   Riecker and Mr. Transier, and

15   therefore Mr. Lampert stepped down

16   from making any decisions over the

17   fate of Sears.

18       Mr. Transier sent an email to Mr.

19   Lampert in which he stated to Mr.

20   Lampert that he admired how Mr.

21   Lampert had handled those sensitive

22   issues.  Given the sensitivity of

23   that transfer, I believe the email

24   was appropriate.  I don't believe it

25   indicated that Mr. Transier took any

JX 072-322

1               PROCEEDINGS

2    less seriously his role as an

3    independent director, co-CEO and

4    member of the restructuring

5    subcommittee.  Rather, it was simple

6    diplomacy dealing with someone who

7    potentially would regret and

8    therefore cause problems later the

9    decision that he had made to turn

10   over power over the fate of what had

11   been his company to people he had

12   never met before.

13       There was no suggestion of any

14   subsequent communications between Mr.

15   Transier and Mr. Lampert that would

16   indicate Mr. Transier was anything

17   other than an independent director

18   who recognized that the company's

19   interests separate and apart from Mr.

20   Lampert and ESL needed to be

21   protected and that it was his job to

22   do so.

23       The committee also points to a

24   letter sent by, among others, Mr.

25   Riecker, one of three of Sears senior

JX 072-323

1               PROCEEDINGS

2    managers, to the board stating that

3    they strongly hoped that the board

4    would seriously consider a going

5    concern exit for Sears as opposed to

6    a liquidation.

7         There is evidence in the record

8    that Mr. Riecker and the other

9    authors of that letter were

10   approached by Mr. Lampert before they

11   sent the letter and that they ran the

12   letter by Mr. Lampert's counsel.

13        But having assessed Mr. Riecker's

14   credibility on the witness stand, it

15   is clear to me that that letter and

16   the sentiment behind it came from him

17   personally and that he would have

18   sent it whether Mr. Lampert told him

19   to or not.

20        Finally, the committee challenges

21   the process not based on how the

22   parties who were charge of the

23   process conducted it or evaluated it,

24   but to the contrary, on the actions

25   of ESL in the process.

JX 072-324

Page 902

1              PROCEEDINGS

2        It points to two things.  First, a

3    letter sent on behalf of ELS to the

4    debtors' board during the course of

5    negotiations leading up to the

6    January 15th sliding into the end of

7    January 16th period auction.

8        The letter was sent at a time when

9    the restructuring committee and

10   restructuring subcommittee quite

11   firmly indicated to ESL that it was

12   not going to accept the current

13   proposal by ESL that was then on the

14   table and was instead prepared to

15   pivot to a liquidation.

16       The letter threatened the board

17   with legal action for abuse of

18   fiduciary -- brief of fiduciary duty

19   if it so took -- if it took such an

20   action.

21       The debtors' counsel, the

22   restructuring committee and

23   restructuring subcommittee's counsel,

24   committee's counsel and other parties

25   raised this issue immediately with

JX 072-325

1          PROCEEDINGS

2    the court which held a chambers

3    conference on the issue and which

4    those parties as well as ESL's

5    counsel participated.

6          I made it clear in no uncertain

7    terms that that letter was a mistake

8    and should be ignored by all parties,

9    including those who were handling the

10   sale on behalf of the debtor,

11   including the independent board

12   members.

13         It is clear both from the letter

14   and I made it clear at the chambers

15   conference that the letter did not

16   recognize that one of the major

17   reasons, if not the only reason that

18   ESL's proposals had been rejected is

19   that ESL was still insisting on a

20   global release of all claims against

21   it.  In other words, the letter was

22   half-baked.

23         I believe that it had literally no

24   effect on the subsequent negotiations

25   other than perhaps giving the

1             PROCEEDINGS

2    negotiators on behalf of the company

3    a little more negotiating leverage

4    against ESL, because obviously I

5    wasn't happy with the letter had been

6    sent and had so characterized it. But

7    clearly it did not give ESL any more

8    negotiating leverage or affect the

9    sale price.

10       When I weigh that one mistake

11   against the actions that ESL took to

12   enable this sale process to be

13   conducted in an independent way, it

14   is clear to me that all told, ESL

15   conducted itself in this case with

16   respect to the sale process in good

17   faith for the purposes of 363 (M) of

18   the bankruptcy code.

19       The committee has also pointed to

20   prepetition actions by ESL that it

21   contends means that it did not engage

22   in good faith in the sale process

23   that has led to the sale today.

24       The evidence supporting that

25   contention is frankly rather vague in

JX 072-327

Page 905

1                    PROCEEDINGS

2      the record, but I gather the argument

3      is that some time in the past ESL

4      started to cause the sale of Sears

5      but resisted until shortly before the

6      bankruptcy petition date actually

7      setting up a structure to enable the

8      sale in a meaningful way.

9          Besides the evidentiary issue that

10     I already addressed, my focus is

11     primarily if not exclusively on the

12     postpetition period in section 363

13     (M).

14         Moreover, I don't really

15     understand the argument in the first

16     place to have a true sale process

17     here of a store that relies on trade

18     credit and the like, one needs to act

19     fast and generally in a bankruptcy

20     environment because the sale would

21     not have happened except in a

22     bankruptcy environment.

23         So conducting the type of sale

24     process that apparently the committee

25     thinks Mr. Lampert and ESL should

**JX 072-328**

Page 906

1                     PROCEEDINGS

2     have conducted or Sears should have

3     conducted some time before the

4     petition date, truly is not

5     realistic.

6          Certain of the groundwork could be

7     laid, but the actually process it

8     would have to go through for a

9     business of this kind, a court

10    supervised process, under the

11    bankruptcy code, because no buyer

12    really would take these assets at

13    this point, I believe without a court

14    order protecting them.

15         I believe the properties -- I'm

16    sorry.  Let me back up.

17         I believe that the law is further

18    clear that my focus should be on the

19    postpetition period, not actions that

20    the buyer may have taken prepetition.

21    See in re Wingspread Corp. 92 B.R.

22    87, Bankruptcy, SDNY 88.

23         But more importantly, I don't see

24    the rationale behind the arguments

25    under the facts before me which

JX 072-329

1              PROCEEDINGS

2    reflect again I think a more

3    important reality which is that there

4    really were no other going concern

5    buyers here and the parties

6    reasonably understood the liquidation

7    alternative and used the value that

8    could have been derived in the

9    alternative effectively in

10   negotiating with ESL.

11        So I conclude that the process

12   here was proper and appropriate.  If

13   anyone wanted to, they could have

14   complained.  Mr. Mahane, counsel for

15   a group of landlords, did complain at

16   one point, the day of the auction,

17   and as I said during the trial I

18   responded to him I believe within

19   five minutes as well as to debtors'

20   counsel to make it clear that the

21   landlords could attend -- continue to

22   make proposals if they wanted to.

23        But notwithstanding the various

24   protestations of an improper sale

25   process, I did not receive other

JX 072-330

Page 908

1                   PROCEEDINGS

2   complaints until after the fact.

3       The second basis for the objection

4   is that the proposed transaction is

5   inferior to a liquidation sale of the

6   debtors.  To be clear, this appears

7   to me to be primarily a dispute over

8   the value of the debtors' real estate

9   assets.  And secondly, the likelihood

10  that ESL will perform the noncash

11  payment aspects of its proposed

12  purchase agreement.

13      It is true that the debtors have

14  -- would have in a liquidation

15  scenario the ability to sell certain

16  business segments, although I believe

17  the parties agree and frankly if they

18  didn't I believe it to be the case

19  that the value of those business

20  segments is substantially tied to an

21  ongoing Sears and would be greatly

22  reduced if Sears were liquidated.

23      I believe there's little

24  disagreement with the value of those

25  segments or frankly about the other

JX 072-331

Page 909

1                    PROCEEDINGS

2    assets besides real estate that is in

3    any way meaningful.

4        The parties do disagree over the

5    realizable value of the debtors' real

6    estate.  I carefully considered the

7    testimony offered on that subject by

8    Michael Welch, the debtors' expert

9    from Jones Lang LaSalle and to some

10   extent Mr. Meghji, the debtors' CRO,

11   and from the company's side -- I'm

12   sorry, from the committee side Mr.

13   Greenspan of FTI Consulting.

14       I found that the assumed value of

15   the debtors real estate to the debtor

16   as opposed to those that might have a

17   lien on that real estate, ie., those

18   who would be entitled to the proceeds

19   before they received them, to be

20   credibly set forth by Mr. Welch and

21   supported by Mr. Meghji.

22       Mr. Welch's valuation assumed the

23   reality here which is that the pivot

24   to a real estate sale would be

25   extremely difficult given a number of

1          PROCEEDINGS

2    the debtors' properties and the big

3    box size of so many of them, as well

4    as the fact that, with respect to the

5    debtors's leased assets, which

6    comprise most of the real estate

7    assets, the debtors' ability to keep

8    landlords at bay under section 365

9    would end at the beginning of May of

10   this year by which point any landlord

11   who believes that there in fact is

12   value in the lease would have a

13   strong incentive not to consent to a

14   further extension of the time to

15   assume or retract.

16       Any buyer would know that too and

17   therefore would prefer to deal with

18   the landlord directly as opposed to

19   the debtor.

20       So the debtors' window for real

21   estate sale process was constrained

22   as Mr. Welch properly opined.

23       Committee has criticized the

24   debtors' valuation of the real estate

25   other than focusing on the timing

JX 072-333

Page 911

1                    PROCEEDINGS

2     point by noting that where there were

3     indicative bids for the real estate.

4     Even if those bids were substantially

5     smaller than the professional

6     estimations by Jones Lang LaSalle,

7     the debtors included them as a

8     datapoint equally with the other

9     appraisal information.

10         There is something to be said for

11    the committee's point, particularly

12    if an indicative bid was a clear

13    outlier as was the case with many of

14    the bids for certain leases or other

15    real estate assets.

16         On the other hand, given the I

17    believe relatively small number of

18    large potential bidders, the response

19    by potential bidders for the real

20    estate to the court's invitation to

21    put their best foot forward at least

22    an indicative bid was certainly

23    underwhelming.

24         I believe it's consistent, at a

25    minimum, with Mr. Welch's view that

JX 072-334

Page 912

1                    PROCEEDINGS

2    given the number and size of the

3    debtors' real estate assets, the

4    parties wanted to keep their options

5    open to see how the case shook out.

6         That works both ways.  They then

7    put their best bid forward but they

8    also were reserving their right to

9    make a much lower bid in the future

10   if the debtors negotiating leverage,

11   as was inevitable with the ticking of

12   the clock under section 365, would

13   decrease.

14        In any event, Mr. Meghji testified

15   that the delta if it were included as

16   the debtors did, those indicative

17   bids in the valuation and if the

18   debtors didn't include it, was

19   roughly $70 million which no one on

20   the committee side is contradicting.

21        Mr. Greenspan in dealing with

22   another $70 million error which he

23   recognized did not actually reflect

24   it in one of his valuations because

25   he said it was just a mere rounding

JX 072-335

Page 913

1              PROCEEDINGS

2     error.

3         Turning to Mr. Greenspan, I don't

4     think I have ever seen an appraisal

5     of a real estate portfolio that was

6     more divorced from reality than his

7     determination that you should value

8     these assets based on an 18 to 22

9     month marketing period.  That is

10    simply not what the debtors had

11    available to them.

12        When you take that out of his

13    calculation, and when you recognize,

14    as one must, that the period really

15    would be approximately four months,

16    the valuations are substantially the

17    same.

18        The other minor number of assets

19    that FTI evaluated that the debtors

20    didn't evaluate could be potentially

21    available to the debtors, was limited

22    to about 20 percent according to Mr.

23    Greenspan's testimony of the assets

24    the debtor didn't evaluate at all.

25        Of that 20 percent, he appears to

JX 072-336

Page 914

1          PROCEEDINGS

2    have not recognized that in a number

3    of cases there were prior lien

4    holders that would have a right to

5    all of the proceeds, that they would

6    in fact not be paid in full for the

7    proceeds before the debtor estate

8    would.  And at least in one case

9    that, by his own analysis, comprised

10   approximately 10 percent of that

11   extra value.  He clearly just got

12   wrong whether the debtor was paying

13   any current rent under the lease.

14       His explanation for that omission

15   frankly didn't make sense to me.  He

16   said that the market rent number of

17   $8.50 must actually reflect the

18   arbitrage number, ignoring the fact

19   that the very next column was headed

20   arbitrage and also had the 8.50

21   number.  So clearly the arbitrage was

22   the whole market rent that he stated.

23       Obviously that was just 1/10 of

24   the unencumbered asset valuation that

25   the debtors didn't undertake but it

JX 072-337

Page 915

1                    PROCEEDINGS

2    certainly cast more doubt on his

3    testimony which frankly I completely

4    discounted anyway given his view on

5    the ability of the debtors to conduct

6    a real estate sales that he posits

7    within the time frame that he posits.

8    It's simply not a viable basis for

9    comparison to the deal presently

10   before the court.

11        That leaves the committee's

12   argument that the value in the ESL

13   transaction, which I find, I found it

14   to be on its face 5.2 billion clearly

15   exceeds the value to the estate of a

16   liquidation approach based on the

17   foregoing analysis.

18        The committee, as I said, contends

19   that that value isn't really there,

20   that it's illusory.  I conclude to

21   the contrary, that there's a

22   reasonable basis to believe that in

23   fact the value will be received by

24   the debtors.

25        There are several different issues

JX 072-338

Page 916

1                    PROCEEDINGS

2       that this raises, or this analysis

3       raised.  First, the debtors contend

4       that the limited release that ESL

5       will receive as part of this

6       transaction leaves the debtors with

7       substantial valuable litigation

8       claims against ESL, that the release

9       is carefully confined to equitable

10      subordination and recharacterization

11      claims for which ESL is paying not

12      only $35 million but also the

13      entirety which is premised on a

14      portion of the deal, $1.3 billion

15      being the credit bid and settlement

16      of ESL's recovery in respect of its

17      allowed claims from other assets of

18      the estate.

19          It appears to me based on oral

20      argument at least that the committee

21      when pushed does actually recognize

22      that the release is in fact limited

23      and that the remaining causes of

24      action are appropriately preserved.

25          The committee contends, and this

**JX 072-339**

Page 917

1                   PROCEEDINGS

2    is a tautology, that in granting the

3    release that would be granted to ESL,

4    the estate is giving up a potential

5    revenue which is to limit the

6    recovery that ESL in the bankruptcy

7    case through equitable subordination

8    or recharacterization and that come

9    constant with that the proceeds that

10   would otherwise go to ESL from

11   liquidation would go to other

12   creditors.

13       I have two responses to that

14   argument.  The first is that it

15   appears to me that there are

16   substantial sources of recovery at

17   ESL and assets that it owns including

18   Seritage that remain available to the

19   estate on its litigation claims.

20       Secondly, I want to reiterate that

21   the underlying causes of action that

22   are preserved have essentially the

23   same quantum of proof as equitable

24   and subordination claims have.

25       Unfortunately for her,

JX 072-340

Page 918

1              PROCEEDINGS

2   Judge Chapman has had to deal with

3   these issues more than her fair share

4   in the recent past, including in re

5   Light Square Inc. 511 B.R. 253

6   Bankruptcy SDNY 2014 and in re Sabine

7   Oil and Gas Corp 547 B.R. 503, SDNY

8   2016.

9       In those cases she goes through

10  the elements of equitable

11  subordination and I think accurately

12  summarizes them.

13      In addition to building that it is

14  a remedial equitable power and that

15  the remedy is limited to

16  subordinating the claim to the extent

17  of being actual damages and damages

18  would need to be shown for equitable

19  claims outside of bankruptcy as well,

20  although fraudulent transfer, the

21  transfer is what would be avoided.

22      She states that courts in this

23  district have held that there is no

24  different or heightened standard by

25  which to judge a noninsider's conduct

**JX 072-341**

Page 919

1                    PROCEEDINGS

2       for purposes of equitable

3       subordination, though there may be

4       fewer traditional grounds available

5       because neither under capitalization

6       or breach of fiduciary duty applies

7       to conduct of a noninsider, that's at

8       page 340.

9          Here the debtors are preserving

10      breach of fiduciary duty claims and

11      other equitable claims.  It's a

12      complete overlap.

13         So in other words, Sears gets to

14      reorganize but these claims are

15      preserved nevertheless.  To me, that

16      is a completely fair and reasonable

17      settlement considering all of the

18      issues including collection issues.

19         Secondly, the committee contends

20      that certain of the obligations that

21      ESL is undertaking to pay don't have

22      to be paid immediately upon closing,

23      but will be paid over time, albeit

24      over a relatively short period of

25      approximately three to four months at

JX 072-342

Page 920

1               PROCEEDINGS

2    most.  In that context, it challenges

3    the ESL business plan that was

4    introduced into evidence and

5    supported by the testimony of not

6    only ESL's witness, Mr. Kamlani but

7    also Mr. Meghji, Mr. Riecker and to

8    some extent Mr. Transier and Mr.

9    Carr, although to a much more limited

10   extent.

11       That business plan in itself is

12   premised upon a standalone business

13   plan that Sears developed shortly

14   after the start of these bankruptcy

15   cases for a somewhat larger footprint

16   of stores, 505 instead of 425.

17       The committee points out that in

18   the past Sears has dramatically

19   underperformed as against

20   projections.  The debtors have

21   pointed out that in the more recent

22   past, the remaining months before the

23   bankruptcy filing which I acknowledge

24   is a brief period, the debtors have

25   actually or did actually perform well

**JX 072-343**

Page 921

1              PROCEEDINGS

2    consistent with their projection and

3    consistent with the projections in

4    the Sears and ESL business plans, or

5    at least reasonably consistent with

6    those projections, given that under

7    the ESL business plan one is talking

8    about 80 fewer stores and a far lower

9    debt load and dealing with stores

10   that truly have value.

11       I have carefully reviewed Mr.

12   Kniffen's deposition excerpts that

13   were introduced to go along with his

14   declaration which I've also carefully

15   reviewed.  I do not view his

16   concededly expert testimony with any

17   greater degree of deference than the

18   testimony I received from Mr.

19   Kamlani, Mr. Riecker or the other

20   debtor witnesses. Clearly the latter

21   group are far closer to the actual

22   facts of Sears.  Mr. Kniffen has not

23   actually worked in retail since 2005.

24   He's been a consultant to people who

25   are interested in retail since then.

JX 072-344

Page 922

```
 1                PROCEEDINGS
 2   But he's not actually had the
 3   pleasure of dealing with the
 4   admittedly, he admits this, changed
 5   environment over the last decade for
 6   big box retailers.
 7        For the period that really is at
 8   issue here, which is the next several
 9   months, I believe, based on the
10   evidence before me, that ESL, or the
11   buyer will in effect -- will, in
12   fact, rather, perform its obligation
13   under the agreement.
14        If it breaches the agreement, it
15   will be the subject of every lawsuit
16   including equitable subordination and
17   it will have lost a substantial new
18   investment that it will be making in
19   this business.
20        Accordingly, I conclude that the
21   execution risk for this transaction,
22   when one considers the alternative
23   which has its own execution risk, is
24   reasonable to take.
25        One aspect of the transaction
```

JX 072-345

1               PROCEEDINGS

2    creates additional execution risk

3    with respect some time on oral

4    argument.  It is the proper

5    interpretation of section 2.3 (K) of

6    the asset purchase agreement as set

7    forth in the Orion Pictures case that

8    I previously cited.  Given the

9    procedural context of this matter, I

10   cannot conclude that issue, those two

11   different interpretations,

12   dispositively.  See also in re Sabine

13   Oil and Gas Corp 550 B.R. 59,

14   Bankruptcy SDNY 2016.

15       I do, however, have an obligation

16   to review the issue, make sure I

17   understand it and determine how I

18   believe it would turn out with a

19   proper record and a proper procedural

20   context, just as Judge Chapman did in

21   the Sabine case that I just cited

22   when she interpreted a similar

23   contract issue.

24       Based on my review of section 2.3

25   including subsection K, subsection

JX 072-346

Page 924

1                   PROCEEDINGS

2    roman V of that subsection K and the

3    schedule, that is incorporated into

4    the definition of the defined term

5    other payables which appears in the

6    definitional section of the

7    agreement, as well as my evaluation

8    of the analysis given to me by ESL's

9    counsel that includes a review of the

10   defined term other inventory that

11   appears in the APA and schedule 1.1 F

12   that deals with other inventory, I

13   believe it's reasonable to assume

14   that the debtors' interpretation of

15   2.3 would prevail in a proper

16   litigation, namely, that the parties

17   defined separately the concept of

18   other payables from all payment

19   obligations with respect to ordered

20   inventory, which is the clause that

21   precedes the words other payables in

22   section 2.3 K.

23        And further that the parties

24   clearly set forth in little roman v

25   of subsection K that the cap of 166

JX 072-347

Page 925

1                PROCEEDINGS

2    million would apply only to other

3    payables, not to the phrase that

4    follows those two words in subsection

5    K, namely, quote, and all payment

6    obligations with respect to ordered

7    inventory.

8        I'm more than reasonably confident

9    that would be the result in a

10   contested matter brought before the

11   court under the part 7 rules.

12       That leaves of course the debtors

13   with their obligation to make a

14   supplement agreement, the agreement

15   will control obviously, conduct their

16   operations in the ordinary course for

17   closing and any other rights under

18   the agreement that either party has.

19       For the debtors it seems to me

20   they are willing to live with that,

21   those terms in the agreement.

22       There are certain other conditions

23   to the agreement, closing conditions

24   that need to be satisfied.  I am

25   reasonably confident, based on Mr.

JX 072-348

Page 926

1                    PROCEEDINGS

2     Meghji's testimony, Mr. Riecker's

3     testimony, particularly that they

4     will be, and further, that the

5     parties will deal with each other in

6     good faith to enable those conditions

7     to happen, particularly given the

8     identification of ESL with this

9     business of the consequences that

10    would happen to it, that is, the

11    Sears business with which its

12    identified, if they do not deal with

13    each other in good faith to resolve

14    those conditions to closing.

15        The last point I will make,

16    although I believe only the asset

17    side really needs to be addressed and

18    I've already done so when comparing

19    the ESL transaction to the

20    liquidation alternative, but I will

21    nevertheless mention that in each of

22    the committee's calculations it has

23    made assumptions regarding the

24    treatment of ESL's claims in these

25    cases that I believe are not

JX 072-349

Page 927

1                    PROCEEDINGS

2    warranted and that would at a minimum

3    lead to substantial litigation and

4    litigation risk for the estates,

5    namely the committee has assumed that

6    notwithstanding a pivot to a

7    liquidation sale and its request, the

8    estate would be able to prevail on

9    making substantial charges to the

10   underlying collateral that secures

11   the ESL secured debt and the DIP

12   loans.

13        The ability to surcharge

14   collateral under section 506 (C) of

15   the bankruptcy code is constrained by

16   the language of the statute itself

17   and the case law, including the

18   leading case of in re Flagstaff Food

19   Service Corporation, 739 F2d 73,

20   1984.

21        See also in re Domistyle Inc. 811

22   F 3rd 691, Fifth Circuit 2015, cert

23   denied 2017, US Lexis 2509, May 30,

24   2017.

25        Those cases make it clear that the

JX 072-350

Page 928

1                    PROCEEDINGS

2    determination of surcharge and

3    collateral is a difficult one for a

4    court that requires the courts to

5    make judgments as to whether the

6    expenses incurred by a debtor were

7    for the primary and direct benefit of

8    the secured creditor as opposed to

9    other parties in interest in the

10   case.  This issue is usually dealt

11   with by stipulations between the

12   parties because they know how

13   difficult it is to litigate.

14       Properly here the committee

15   insisted on certain carveouts from

16   506 (C) waivers, but that didn't

17   eliminate the difficulty of

18   litigating such an issue.

19       The word primary does not appear

20   in the statute, but the courts have

21   applied it because otherwise as the

22   Domistyle court notes, the statute

23   could in essence eat up the narrow --

24   the interpretation could eat up the

25   narrow nature of the statute which is

JX 072-351

Page 929

```
1              PROCEEDINGS
2    a direct benefit.
3         Secondly, the committee has
4    completely discounted any right that
5    ESL would have under section 507(B)
6    to a super priority administrative
7    expense based on the decline of its
8    collateral value since the start of
9    the bankruptcy cases.
10        Until disallowed, ESL's secured
11   claim is entitled to adequate
12   protection including under 361.3, the
13   super priority claim under sections
14   503 B and 507(B).
15        Determining the decline in value
16   of the collateral during the course
17   of the bankruptcy case is again an
18   extremely difficult issue.  It was
19   dealt with by Judge Glenn in re
20   Residential Capital LLC 501 B.R. 549
21   bankruptcy SDNY 2013.  It's fact
22   based, dependent upon the value of
23   the collateral at time one and time
24   two.  To give absolutely no
25   consideration to that claim I believe
```

JX 072-352

1               PROCEEDINGS

2     in terms of comparing creditor

3     recoveries under a liquidation

4     process to the ESL going concern

5     transaction I believe is quite

6     inappropriate.

7          So for all of those reasons, I

8     will grant the motion.  I believe the

9     proposed order needs some work along

10    the lines of the remarks that were

11    stated on the record and oral

12    argument today.  But that that work

13    is relatively modest and would appear

14    to me that I should be in a position

15    to enter it tomorrow morning if it's

16    provided to me in black letter form.

17         That will conclude, for the

18    reasons that I stated on the record,

19    a finding that the transaction

20    entitled under section 363 (M) of the

21    bankruptcy code.

22         I would like to say one other

23    thing which is simply to echo the

24    remarks that Mr. Seltzer made not

25    only on behalf of the prospective

JX 072-353

Page 931

1                    PROCEEDINGS

2   union employees but all employees for

3   this company.

4        During the course of this case Mr.

5   Lampert in particular and ESL

6   generally has been subject to

7   substantial verbal abuse.  He is a

8   wealthy individual and a big boy and

9   I guess he can take it.  Some of it

10  based on past years may be justified

11  or may not be justified.  That will

12  be part of the record in the

13  litigation that's fully preserved

14  here.

15       I can say that that abuse has led

16  to, as Mr. Bromley kind of probably

17  more eloquently than I'm about to

18  say, summarized two conflicting views

19  of him that he's somehow Jay Gould

20  and Barney Fife at one and the same

21  time.  He has the opportunity now not

22  to be a cartoon character and to take

23  actions that I believe Mr. Kamlani

24  mentioned would in fact be of great

25  meaning to the debtors constituents.

**JX 072-354**

Page 932

1              PROCEEDINGS

2    He should do that.  A clear

3    communication process, both with

4    vendors but important with employees

5    is really warranted.  Okay.  Thank

6    you.

7        MR. SCHROCK:  Thank you, your

8    Honor.

9        (Matter concluded at 3:53 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JX 072-355

Page 933

1

2                           C E R T I F I C A T E

3

4     STATE OF NEW YORK    )

                                      : ss.

5     COUNTY OF NEW YORK   )

6                    I, MARK RICHMAN, a Certified

7        Shorthand Reporter, Registered Professional

8        Reporter and Notary Public within and for

9        the State of New York, do hereby certify

10       that the foregoing proceedings were taken

11       before me on February 7, 2019;

12                   That the within transcript is a

13       true record of said proceedings;

14                   That I am not connected by blood

15       or marriage with any of the parties herein

16       nor interested directly or indirectly in the

17       matter in controversy, nor am I in the

18       employ of the counsel.

19                   IN WITNESS WHEREOF, I have

20       hereunto set my hand this 7th day of

21       February, 2019

22

23

24       _____

25            MARK RICHMAN, C.S.R., RPR

**JX 072-356**