# Exhibit 53

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | |
| | : | **CHAPTER 11** |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | : | |
| | : | **Case No. 18-23538 (RDD)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

---------------------------------------------------------------x

## DECLARATION OF MOHSIN Y. MEGHJI

I, Mohsin Meghji, make this declaration under 28 U.S.C. § 1746:

1.      I submit this declaration ("**Declaration**") in support of the Debtors' *Motion for Entry of an Order (I) Approving the Asset Purchase Agreement among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Leases in Connection therewith and (IV) Granting Related Relief*, filed with the Bankruptcy Court on February 1, 2019 (ECF No. [●]) ("**Revised Proposed Sale Order**").[1]

---
[1] Capitalized terms used in this Declaration but not otherwise defined have the meanings given to them in the Proposed Sale Order.

2.       I am the Chief Restructuring Officer ("**CRO**") of Sears Holdings Corporation and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and, together with their non-debtor affiliates, the "**Company**" or "**Sears**").[2] I am also the Managing Partner of M-III Advisory Partners, LP ("**M-III**").  In October 2018, Sears retained M-III to provide the Debtors with a CRO and to provide the Debtors and their other professionals with financial advisory services in connection with the Company's evaluation and development of strategic alternatives to wind-down and liquidation.

3.       In or around November 2018, the Debtors, with the assistance of Lazard Frères & Co. ("**Lazard**"), Weil, Gotshal & Manges LLP ("**Weil**"), and M-III, commenced a multi-staged process whose purpose was to effectuate a going-concern transaction for all or substantially all of the Debtors' assets and operations (the "**Sale Process**").  At an auction of the Debtors' assets held at Weil's New York offices on January 14 through January 17, 2019 (the "**Auction**"), ESL Investments, Inc. ("**ESL**") submitted a bid to purchase substantially all of the Debtors' assets, including the go-forward retail footprint and other assets and component businesses of the

---

[2] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

---

**JX 079-2**

Company, as a going concern pursuant to Section 363 of the Bankruptcy Code (the "**ESL Bid**").

After extensive negotiations, the Debtors, in consultation with their advisors, determined that the

ESL Bid was the highest or otherwise best bid.  Subsequently, the Debtors entered into an Asset

Purchase Agreement with ESL, memorializing the terms of its successful bid (the "**APA**").  The

APA sets forth the key terms of the sale transaction between ESL and the Debtors.  That transaction

is scheduled to close on February 8, 2019 (the "**Closing Date**").

4.    Except as otherwise indicated, all statements in this Declaration are based upon my

personal knowledge of the Debtors' operations and finances gleaned during the course of my

engagement with the Debtors; my discussions with the Debtors' senior management, other

members of the M-III team, and the Debtors' other advisors; my review of relevant documents;

and my views based upon my experience.  If called to testify, I would testify competently to each

of the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of

M-III for the Debtors.

## I.    <u>Qualifications and Background</u>

5.    As CRO, I provide strategic business advice to the Restructuring Committee of the

Company's Board of Directors in connection with the Debtors' chapter 11 cases.  Further, I am

responsible for carrying out the Debtors' chapter 11 strategy and objectives.  I am knowledgeable

about and familiar with the Debtors' day-to-day operations, business and financial affairs, books

and records, and the circumstances leading to the commencement of these chapter 11 cases.  I have

more than 25 years of financial restructuring, interim management, turnaround, and management

consulting experience across a wide variety of industries, including but not limited to the retail and

real-estate industries.

## II.     The Company and ESL Business Plans

### A.     The Company Business Plan

6.      In connection with my engagement as the Debtors' CRO, I worked with members of the Company's Office of the CEO—Greg Ladley, Leena Munjal, and Robert Riecker—and others to build a bottoms-up business plan (the "**Company Business Plan**"), starting with store-by-store projections and business-by-business projections.[3]  Mr. Ladley joined the Company sometime in October or November 2017 after spending twenty-seven years at Ralph Lauren in a senior capacity, and Ms. Munjal, who had been at the Company in different roles for some time, stepped into her role as the Company's Chief Digital Officer in January 2018.  Mr. Riecker is the Company's Chief Financial Officer.  We developed the Company Business Plan in order to better understand the viability of the Company's business on a going-forward basis and also to provide prospective purchasers of the Company's assets and operations with an understanding of the Company's potential to operate as a going concern.  In preparing the plan, I worked diligently and collaboratively with management to, among other things, derive reasonable assumptions upon which projections of various aspects of the Company's going forward business—liquidity and profit margin, for example—would be based.  Those assumptions were based upon knowledge of and experience in the retail industry held by management, myself, and other members of my team at M-III as well as a thorough review and analysis of Company-related data, including but not limited to same-store sales growth comparisons.

7.      The Company Business Plan demonstrates that the Company does, indeed, have a reasonable probability of operating as a going concern upon emerging from chapter 11 bankruptcy. M-III generated, for example, a projection of the new company's financial performance in the

---

[3] *See generally* Sears Holdings Corporation Preliminary Business Plan dated December 2018 (UCC_SEARS0000010), attached to this declaration as **Exhibit A** ("**Ex. A**").

twelve months following emergence from chapter 11 (the "**Company Financial Performance Projection**").[4]   The Company Financial Performance Projection assumes (a) same-store sales growth for 2019 of -2.4% and (b) gross margin improvement for 2019 of 220 bps.  In my opinion and based upon my experience, these assumptions were reasonable, as were the conclusions that followed from them—namely, that the new company would be liquid for at least the twelve months after emergence from chapter 11, and likely longer.

8.      As CRO, I was very focused on establishing that the Company had a credible path forward out of bankruptcy.  I spent a substantial amount of time poring over the Company's sales and other related data, including the Company's history of same-store sales comps.  I observed that, in August and September 2018, the Company's same-store sales numbers were healthier than they had been in the preceding months, and I sought to understand why.  As the Company's Chief Digital Officer, Ms. Munjal has worked to improve online and overall sales.  Her efforts have been centered on driving sales and marketing, among other things.   Ms. Munjal and Mr. Ladley implemented some changes concerning how the Shop Your Way program operated and took a new approach to the soft-line business for apparel.  The two began to apply a combination of points offerings along with pricing adjustments and began conducting experiments, so to speak, to determine which of their initiatives would positively impact performance.

9.      Ms. Munjal and Mr. Ladley initiated these new strategies in January or February 2018.  They expanded them to the brick-and-mortar apparel business over the course of time.  They then applied them to the hard-line businesses and got additional contribution from Citi, the Company's credit-card partner, to fund some of these changes.  From there, Ms. Munjal and Mr. Ladley implemented some changes around supply and logistics issues.  Finally, in July and August

---

[4] *Id.* at 8.

2018, they layered in some traditional television and other modes of advertising, and the combination of these efforts really started to improve the outlook for same-store sales comps.

10.     I spent a good deal of time with Ms. Munjal, Mr. Ladley, and others discussing the changes the two had implemented. Their efforts bore a lot of fruit—more than anything I had seen in the prior couple of years of my involvement with the Company. In August and September 2018, for example, the Company's same-store sales results were -2.0% and 0.0%, respectively.[5] The Company Business Plan's projection that it would achieve -2.4% same-store sales growth for 2019 was based, in part, on these recent results reflecting the Company's implementation of Mr. Ladley's and Ms. Munjal's Shop Your Way and other sales and marketing initiatives. That projection was also based—quite reasonably, in my view—upon the fact that a Sears emerging from bankruptcy would not be a Sears descending into bankruptcy. For many years, the Company had been cloaked in a shroud of negative media attention. Emerging from bankruptcy, the new company would enjoy increased consumer confidence, a healthier capital structure, and myriad opportunities to both continue and expand upon the good work that Ms. Munjal and Mr. Ladley had begun in the pre-petition period. Accordingly, I was more than satisfied that the Company could continue to improve the outlook for same-store sales comps and other measures of corporate success.

### B.     The ESL Business Plan

11.     I have also become familiar with the proposed business plan for NewCo prepared by ESL (the "**ESL Business Plan**").[6] I reviewed and analyzed the ESL Business Plan—which, as I understand it, is based upon the Company Business Plan—in my capacity as CRO and financial

---

[5] *Id.* at 11.

[6] *See generally* Project Transform – Business Plan dated January 2019 (SEARS_UCC00280135), attached to this declaration as **Exhibit B** ("**Ex. B**").

**JX 079-6**

advisor to the Debtors in order to better understand NewCo's liquidity picture and viability as a going concern. Like the Company Business Plan, the ESL Business Plan demonstrates that the Company has a reasonable probability of operating as a going concern upon emerging from chapter 11 bankruptcy. ESL generated a projection of NewCo's financial performance in the twelve months following emergence from chapter 11 (the "**ESL Liquidity Analysis**").[7] The ESL Liquidity Analysis assumes (a) same-store sales growth for 2019 of -1.0%; (b) gross margin improvement for 2019 of 125 bps; and (c) days payable outstanding ("**DPO**") of 32 days by July 2019, remaining constant for the rest of 2019.[8] In my opinion and based upon my experience and discussions with Sears management, these assumptions and the conclusions that flow from them are reasonable for the same reasons as those discussed at length above: new and effective sales and marketing initiatives, increased consumer confidence, healthier capital structure, and others. ESL's DPO assumption, specifically, is reasonable given that, according to data provided by the Company's inventory team, in 2018 the Company's mean and median vendor terms were 42 and 34 days, respectively.

### III.    M-III's Financial and Solvency Analyses

12.    In late November/early December, in connection with its role as financial advisor to the Debtors and in consultation with Lazard, Weil, and the Company's other professionals, M-III developed a wind-down and liquidation analysis (the "**Wind-Down Analysis**") that assessed the potential value of the Debtors' assets and any amounts the Debtors' creditors would recover on their claims in the context of an assumed orderly wind-down and liquidation.[9] M-III also

---

[7]    *See generally See* Project Transform Liquidity Analysis dated January 23, 2019 (UCC Ex. 7), attached to this declaration as **Exhibit C**, ("**Ex. C**").

[8]    *Id.* at 2-3.

[9]    *See generally* Sears Holdings Corporation Wind-Down Recoveries dated January 14, 2019 (UCC_SEARS0002236), attached to this declaration as **Exhibit D** ("**Ex. D**").

compared that value and those recoveries to the value and creditor recoveries implied in the context of the sale transaction contemplated by the ESL Bid (the "**Variance Analysis**").[10]  Finally, M-III evaluated the Debtors' ability to satisfy any and all administrative and other priority claims up to and until the Closing Date (the "**Administrative Solvency Analysis**") (collectively, the "**Analyses**").

13.    In preparing these detailed Analyses, M-III drew upon my decades-long restructuring experience across a wide variety of industries, including but not limited to the retail and real-estate industries and, specifically, with retailers like Toys 'R Us, Shopko, and Full Beauty Brands, whose Boards I have served or currently serve on.  M-III also reviewed and analyzed vast quantities of relevant data, including but not limited to data derived from (1) the going-out-of-business ("**GOB**") sales of approximately 750 Sears stores and their inventory in the past three years; (2) the recent wind-down and full-chain liquidation of Toys 'R Us; (3) bids to purchase components of the Debtors' assets and operations received in connection with the Sale Process; (4) bids to liquidate the Debtors' assets and operations received in connection with the Sale Process; (5) the Company's detailed payroll, benefits, merchandise, tax, and other business records; and (6) guidance and input from Lazard and Weil.  Finally, M-III reviewed and analyzed appraisals of approximately 400 of the Debtors' real-estate assets, commissioned by the Debtors in an effort to quantify the liquidity those assets would generate in the context of an orderly wind-down and liquidation.  In my opinion and based upon my experience, M-III's Analyses are reasonable and reliable projections.

---

[10] *See* Sears Holdings Corporation Discussion Materials: Wind-Down/ESL Bid dated January 12, 2019 (SEARS_UCC00365984) at 7, attached to this declaration as **Exhibit E** ("**Ex. E**").

IV.    **The Wind-Down Analysis**

A.    **Assumptions**

14.    M-III calculated wind-down recoveries based upon a twelve-month orderly wind-down and liquidation beginning January 14, 2019, the date of the Auction.  The preliminary wind-down budget assumed that all assets, including general merchandise inventory and real estate, would be liquidated in place.  The budget further assumed that self-supporting business units, such as Parts Direct, Sears Auto Centers, and Sears Home Services, would be sold as going concerns pursuant to Section 363 of the Bankruptcy Code.

15.    M-III assumed that, as of January 14, 2019, the Debtors would (1) commence liquidation of all remaining inventory in the Debtors' stores and distribution centers (with final GOB sales beginning on January 21, 2019); (2) reject all remaining store and distribution-center leases, other than valuable leases, which would be monetized; (3) reject all remaining non-essential contracts; (4) reduce management and staff to the minimum necessary to liquidate the collateral and perform transition services; and (5) sell or monetize all remaining encumbered and unencumbered assets.

16.    Substantial funding for the wind-down would be provided by (1) the gross proceeds from GOB sales of merchandise inventory; (2) proceeds from the sale of previously unencumbered assets, applied in the following order: (a) $240 million to fund the wind-down reserve, (b) repayment of the Junior DIP in full, and (c) to pay remaining claims in the order of their priority; (3) the imposition of a 4% charge on encumbered assets sold throughout the case, with the exception of the first lien and prepetition ABL collateral and Junior DIP collateral due to Section 506(c) waivers granted to these lenders in their capacity as DIP lenders; and (4) any proceeds above lien value realized from sales of encumbered collateral.

**JX 079-9**

### B.    Repayment Priority Waterfall for Wind-Down Recoveries

17.    Based upon its discussions with Weil, M-III deducted costs related to the liquidation of merchandise inventory—for example, store operating expenses during liquidation, severance claims, merchandise accounts payable, logistics expenses, and home-office support expenses—from gross inventory values.  The payment of these administrative claims, necessary and related to the orderly wind-down process, would provide them with a recovery that was, in effect, senior to other claims, including but not limited to those claims arising under the First Lien Asset-Based Loan ("**ABL**"), the Junior Debtor-in-Possession ("**DIP**") loan, and Section 507(b) of the Bankruptcy Code.

18.    M-III then applied the net proceeds of the liquidation of merchandise inventory to repay claims arising under the Senior DIP loan, First Lien ABL, FILO Facility, and Citi LC Facility.  The net proceeds of sales of previously unencumbered assets, other non-merchandise assets, and charges collected under Section 506(c) of the Bankruptcy Code were applied in the following order of priority: (1) the carve-out for professional fees as provided in the DIP loans and related orders; (2) the wind-down reserve (up to $240 million); (3) the Senior DIP (to the extent the merchandise collateral would be insufficient to provide a repayment in full); (4) the Junior DIP; (5) super-priority administrative claims arising under Section 507(b); (6) administrative claims not otherwise paid from the operating budget related to the liquidation or the wind-down reserve; (7) unsecured claims on a priority basis; and (8) general unsecured claims.

### C.    Key Assumptions in Wind-Down Recoveries: Generally

19.    M-III made a number of key assumptions in connection with its preparation of the wind-down recoveries.  By way of example only:

- with respect to operating receipts, M-III assumed that GOB sales would run at a net negative margin resulting in a 90% net orderly liquidation value ("**NOLV**");

**DECLARATION OF MOHSIN Y. MEGHJI – Page 10**

**JX 079-10**

- with respect to operating disbursements, M-III assumed merchandise vendors to supply cash-in-advance terms with a four-day average shipping time in the period leading up to the wind-down and further assumed that outstanding merchandise would be paid down during the post-petition period;

- with respect to selling, general, and administrative ("**SG&A**") disbursements, M-III assumed an immediate reduction-in-force ("**RIF**") of non-core, non-key personnel beginning January 15, 2019, with sixty days of WARN Act liability to follow;

- with respect to the Junior DIP, M-III assumed a starting balance of $175 million to reflect a $75 million balance as of January 5, 2019 plus a $100 million draw on January 10, 2019; and

- M-III assumed, in consultation with Lazard, the following unencumbered asset values in a wind-down or liquidation scenario based upon the highest indications of interest ("**IOIs**") received during the Sale Process:

    o    credit-card tort claims - $35 million,

    o    unencumbered receivables - $63 million,

    o    Sears Home Improvement - $45 million,

    o    Sears Parts Direct - $60 million, and

    o    Sears Service Contracts - $80 million.

20.    These and M-III's other key assumptions were reasonable given the Company's history and present circumstances as well as the fact that the Company was anticipating a full-chain liquidation, which necessarily impacts what a company can expect to recover (or spend) in connection with a wind-down.  And, as discussed above, the assumptions were developed in the course of a thorough review and analysis of large quantities of relevant data.

### D.    Key Assumptions in Wind-Down Recoveries: Unencumbered Real-Estate Values

21.    One of M-III's roles as financial advisors to the Debtors was to advise the Restructuring Committee concerning the liquidation proceeds the Debtors' estates could expect to recover from the sale of the Debtors' unencumbered real-estate assets in connection with an orderly wind-down and liquidation.  M-III did not purport to provide the Restructuring Committee with a

valuation of those unencumbered real-estate assets; rather, it provided what it believed was a reasonable estimate of the amount of liquidation proceeds—specifically, $561 million, net of $35 million transaction costs—that the Debtors' estates could expect to recover from the sale of the Debtors' unencumbered real-estate assets of which a material portion (approximately 64%) would be recovered from the sale or assignment of the Debtor's lease portfolio by May 13, 2019, the Debtors' deadline to accept or reject leases (the "**Outside Lease Rejection Date**").  The balance would be from the sale of fee-owned real estate over the course of 2019.

22.     In arriving at that amount, M-III considered (1) buyer IOIs received in the course of the Debtors' real-estate marketing and sales process (the "**Real-Estate Sales Process**"), undertaken in connection with and parallel to the Sales Process; (2) twenty-four property appraisals performed by Jones Lang LaSalle IP, Inc. ("**JLL**") in November 2018; (3) twenty-five broker opinions of value performed by A&G Realty Partners, LLC ("**A&G**") in October 2018; (4) approximately 400 appraisals performed by JLL in December 2018 and January 2019; and (5) the results of the 2018 lease auction and sale in the Toys 'R Us wind-down and liquidation.

### i.     The Real-Estate Sales Process

23.     The Real-Estate Sales Process was launched in the last week of November 2018 pursuant to the Global Bidding Procedures Process Letter filed with the Bankruptcy Court on November 21, 2018 (the "**Lazard Process Letter**").  The Lazard Process Letter referenced a list of 505 "go-forward" stores; the Debtors, in consultation with the Restructuring Committee, had decided to market the stores that would comprise the primary real-estate assets of the business that was being offered for sale (the "**Go-Forward Stores**").  The Debtors made a list of the Go-Forward Stores publicly available and posted the list to Prime Clerk.

24.     The Lazard Process Letter identified JLL as the Company's real-estate advisor and indicated that JLL would distribute a separate correspondence in the near future further describing

the Real-Estate Sales Process (the "**JLL Process Letter**"). JLL distributed the JLL Process Letter on or about December 3, 2018. The letter further described the Real-Estate Sales Process, the due date for IOIs (December 28, 2018), who to contact at JLL, and where and how to get additional information concerning the process. JLL included an expanded list of the real-estate assets being offered—all of the Company's real estate rather than just the Go-Forward Stores—in a separate filing at Prime Clerk. The Debtors and their advisors, including JLL, had decided to expand the list of real-estate assets offered by the Company in order to make the Real-Estate Sales Process more complete. JLL advised any interested party who inquired that all of the Debtors' real estate and leases were being offered for sale, not just the 505 Go-Forward Stores.

25. On December 6, 2018, M-III sent JLL an updated list of real estate to provide to interested parties who executed non-disclosure agreements ("**NDAs**"). The additional information included square footage, lease termination dates, and information on the status of each store or property listed (open, closed, or GOB). Interested parties could obtain additional information in the Intralinks data room.

26. JLL and the Company utilized Intralinks as its virtual data-room site for the Real-Estate Sales Process. The Debtors and their advisors, including JLL, populated the Intralinks site with relevant information on the properties being offered, and the site was then made available to interested parties on or about December 7, 2018. Information uploaded to Intralinks included leases, title documentation where available, site plans where available, and property tax and common-area maintenance ("**CAM**") data. Parties who requested data room access were required to execute an NDA and provide a list of individuals seeking access. JLL and M-III administered the Intralinks data room and provided access to interested parties once approved.

27.     JLL contacted 842 entities ("**Prospective Bidder Contacts**") for both core and non-core properties.  In connection with this effort, JLL distributed a master list of the properties being offered for sale to these 842 Prospective Bidder Contacts.  495 of the 842 Prospective Bidder Contacts executed NDAs; JLL and M-III provided them with access to the data room.

28.     Three of the primary groups of parties that gained access to the data room were landlords, retailers, and consolidators of retail properties.  In my opinion based upon my knowledge and experience, JLL targeted the appropriate groups.  Many Prospective Bidder Contacts accessed the data room and the materials therein concerning the Company's real estate assets.  Furthermore, a substantial percentage of the real estate offered for sale was in the form of leases.  As a general matter, in my opinion, leases are primarily of interest to landlords, end users (retailers for most of the Debtors' properties), and consolidators.  Accordingly, the list of people and firms who were interested in purchasing the Company's real estate would be more limited than in a typical real-estate offering.

29.     The advisory team engaged by the Debtors manages JLL's Disposition Services Group.  This unit focuses exclusively on the sale of retail properties, including but not limited to big-box stores for national retailers.  The unit's past assignments include the sale of approximately 200 stores for Walmart.  The unit's marketing strategies included direct outreach to potential buyers, as well as working with and through JLL's nationwide brokerage network.  JLL utilized both of these approaches in their marketing of the Company's real estate and was successful in bringing in a number of parties to the Company's data room.

30.     In connection with the Real-Estate Sales Process, JLL undertook among the following internal and external outreach measures:

- JLL implemented an email campaign to national and regional retail companies, particularly users of big-box real estate, as well as to JLL brokers who covered this sector.  In all, JLL

JX 079-14

sent 464 separate emails, including to at least eighty large retail companies who regularly occupy big-box stores.

- On November 30, 2018, Naveen Jaggi, head of JLL's Retail Property Brokerage, sent an internal email to JLL senior leadership, industrial brokers (273 in this group), capital markets brokers (900 brokers and analysts), and retail property brokers (159) describing the assignment and the properties being offered.

- On December 6 and 11, 2018, Craig Meyer, head of JLL's Industrial Property brokerage group, sent emails to his team of 273 brokers discussing the properties being offered. This group would have focused on the Company's distribution centers and warehouses.

- On December 12, 2018, Jay Koster and Blake Lacher, the co-heads of Capital Markets, sent an email to the 900 brokers and analysts in their division discussing the properties being offered.

- On December 16, 2018, JLL enabled a "Real Capital Markets Property Marketing" website for approximately 129 non-core properties. This website covered properties which were separately chosen for sale in mid-November 2018.

- Individual JLL brokers conducted their own outreach and email campaigns in an effort to find buyers for the Debtors' properties.

- JLL representatives, including Naveen Jaggi, attended the December International Council of Shopping Centers conference in New York in early December 2018. JLL representatives discussed the Real-Estate Sales Process with potential investors/buyers at this conference.

- As mentioned above, the Disposition Services team also reached out to interested parties on multiple occasions to inform them of the Real-Estate Sales Process. This included the email blast sent to approximately 80 national retailing companies on or about December 19, 2018. As part of this email blast, JLL's retail brokerage team contacted and discussed the Company's real-estate offering with a number of representatives at these national retailing companies. My understanding is that the retailers contacted included Walmart, Target, Lowes, Home Depot, TJX, Kohl's, Dick's Sporting Goods, Raymour & Flanigan, and At Home Stores.

31.    These efforts, taken together, represented a reasonable and robust marketing effort

targeted at the parties who would have the greatest possible need for and interest in the types of

stores and properties owned by Sears. A number of these parties signed NDAs and gained access

to the data room. A number of them also submitted IOIs for various leases and real-estate assets.

32.    JLL maintained a marketing report to log the calls and contacts with interested parties.  JLL and M-III provided this report to the UCC's advisors in mid-December.   The JLL call report was ultimately supplanted by an Excel "offer tracker" report prepared by JLL in late December.  The offer tracker was provided to the UCC advisors so that they would have regular access to the offers submitted.

33.    In terms of bids received, the Real-Estate Sales Process was successful by any reasonable measure.  In aggregate, Prospective Bidder Contacts submitted 440 separate IOIs.  The total value of these offers exceeded $1 billion when only the highest offer for assets were considered.  Approximately $360 million of the IOIs were for unencumbered properties, many of which were for leases, and $640 million for encumbered properties, most of which are fee simple or ground leased assets.  While the bids on some assets were low, some were reasonable and potentially actionable.  To characterize all of the bids as low ball is misleading.

34.    It is also misleading to consider all of the Company's real-estate assets (approximately 900 leases and 300 fee-owned properties as of December 2018) when measuring the number of offers received.  M-III believes that approximately 500 of the Company's leases offered for sale had no value; accordingly, it should not be surprising that most of these did not receive an IOI.  This is not a reflection on the adequacy or reasonableness of the Real-Estate Sales Process.

35.    Finally, it is worth reiterating that leases, by their nature, are not as liquid as fee-owned real estate. The existence of a large number of lease contracts would have limited the number and the types of potential buyers and goes some way to explain why there may not have been as many IOIs for the Company's real-estate assets as one might see under typical circumstances.

**JX 079-16**

36.     These, however, were not typical circumstances.  It is unprecedented for 400 big-box properties to be offered for sale in the real-estate market all at once.  The odds of selling all such properties at high prices by the Outside Lease Rejection Date were low.  The closest parallel in recent years was the wind-down and liquidation of Toys 'R Us.  In my deposition I testified that it was my understanding that, when Toys 'R Us offered its leases for sale in the context of its full-chain liquidation, only 40% of the those leases were sold, and that they were sold for somewhere approaching 50% of the appraised values.  Since my deposition, I have learned that only 35% of the company's leases sold at auction in 2018 and that the recovery rate on those leases was 44% (sales price to appraised dark value).  And, in my opinion, the Toys 'R Us properties were generally more desirable and thus more marketable than those being offered by the Company because they were smaller than the Sears/K-mart big boxes.

### ii.     The Appraisals

37.     In connection with the process to obtain DIP and Junior DIP financing, in late October 2018, M-III asked A&G to prepare broker opinions of the value of twenty-five of the Company's high-value leased properties (the "**A&G BOVs**").  These A&G BOVs formed the initial basis for prospective DIP lenders' collateral valuations.

38.     A&G conducted its work in connection with the A&G BOVs in the last week of October and into the first ten days of November and ultimately presented the Company and M-III with a spreadsheet containing valuation data as well as a summary memorandum concerning the ten largest properties valued.  In conducting the A&G BOVs, A&G made a determination of what each lease might be worth were it to be terminated or assigned to the landlord.  The property owner could then re-lease the space at market rents and create value via the rent increase.  The Company and M-III shared this data with prospective DIP and Junior DIP lenders and the UCC (through an electronic data room maintained by Lazard).

**JX 079-17**

39.     To provide prospective Junior lenders with a more robust, appraised collateral pool, in the first week of November, the Company and M-III determined that the Company should augment the A&G BOVs with additional appraisals of some of its real-estate assets. This was done because the Debtors were interested in obtaining appraisals from a nationally recognized group to assess the value of some of their more valuable leases and fee-owned properties. The Debtors, with assistance from M-III, prepared a list of twenty-five predominantly, but not exclusively, leased properties and provided that list to JLL so that it could begin the appraisal process. JLL performed appraisals on twenty-four properties (the "**JLL 2018 Appraisals**").[11] In conducting the JLL 2018 Appraisals, JLL made a determination of what each fee-owned property would be worth were it to be sold as a standalone property outside the context of a wind-down or liquidation or what each lease would be worth if subleased at market rental rates.

40.     During the week of November 19, 2018, the Debtors and their advisors had a number of calls concerning the Sales Process. The Debtors and their advisors determined that obtaining appraisals on the Go-Forward Stores would help inform the Sales Process, including by allowing the Debtors to compare the value of one bid or IOI to another and to compare the value of the Company's individual primary assets to a proposal to acquire substantially all of the Company's assets as a going concern. The Debtors and their advisors decided that they did not need to commission appraisals of the twenty-four already appraised stores, and they did not need to commission an appraisal of the Seritage properties. The Debtors ultimately requested, in December, that JLL provide appraisals for approximately 400 of the Go-Forward Stores. JLL provided those appraisals to the Debtors and to M-III in January 2019 (the "**JLL 2019**

---

[11] One of the twenty-five properties (located in Puerto Rico) was determined to be encumbered; accordingly, JLL did not ultimately complete the appraisal and did not assign a value to that property. The Debtors' objective was to value unencumbered properties.

**DECLARATION OF MOHSIN Y. MEGHJI – Page 18**

**Appraisals**"). In conducting the JLL 2019 Appraisals, JLL's central focus was to determine the value of the unencumbered properties and leases on an unoccupied or "dark" basis in the context of a wind-down and liquidation.

41.    M-III reviewed and analyzed (1) the IOIs received in the course of the Real-Estate Sales Process; (2) the twenty-five A&G BOVs; (3) the twenty-four JLL 2018 Appraisals; (4) the approximately 400 JLL 2019 Appraisals; and (5) the results of the 2018 auction and sale of leases in the Toys 'R Us wind-down and liquidation in order to estimate the amount of cash the Debtor could raise from the liquidation of its unencumbered real-estate assets including its leases by the Outside Lease Rejection Date.

### iii.    M-III's Calculation of Likely Liquidation Proceeds

42.    M-III estimated that the Debtors would recover $561 million, net of transaction costs, from the liquidation of the Debtors' unencumbered real-estate assets in context of a wind-down and liquidation. M-III arrived at an estimate of the liquidation proceeds for the Debtors' leases by discounting and averaging (1) IOIs, (2) A&G BOVs, and (3) the JLL 2018 Appraisals. M-III also included the undiscounted liquidation value contained in the JLL 2019 Appraisals in the averages it calculated to estimate liquidation proceeds for each asset. The discount rate applied to IOIs, A&G BOVs, and JLL 2018 Appraisals was 50%.

43.    M-III applied a 50% discount to the A&G BOVs and JLL 2018 Appraisals because those BOVs and Appraisals assessed market value, not liquidation value. As discussed above, they sought to determine what each lease would be worth were it terminated or assigned to the property owner or re-leased at market rental rates or what each fee-owned property would be worth were it sold as a standalone property outside the context of a wind-down or liquidation. The JLL 2018 Appraisals also assumed the leases would be sold in a normal market and in a normal manner, not on an accelerated basis in a full-chain liquidation scenario.

**DECLARATION OF MOHSIN Y. MEGHJI – Page 19**

# JX 079-19

44.      M-III used discounted IOIs in its calculation to estimate liquidation proceeds because M-III viewed these prices as relevant data points. In general, there is limited information on lease sale prices and values, particularly in a large-scale liquidation scenario; M-III therefore included the discounted IOIs as one of a limited number of actual data points. M-III applied a 50% discount to the IOIs, as it had to the A&G BOVs and JLL 2018 Appraisals, because the IOIs were uncommitted and subject to further due diligence by prospective buyers.

45.      M-III did not apply a discount to the JLL 2019 Appraisals but, rather, used the liquidation value determined by JLL. It is my understanding that, in connection with the JLL 2019 Appraisals, JLL discounted its determined market values to account for the distressed nature of the contemplated sale, as well as a lack of purchasers for hundreds of big-box stores flooding the market at one time. Because the JLL 2019 Appraisals were already discounted to determine the liquidation value, M-III did not further discount these amounts in its liquidation estimate modeling.

46.      Finally, M-III employed the above described discounting methodology because it reasonably concluded that the Debtors would likely sell most of their leases at liquidation rather than market value because hundreds of leases would be offered for sale at the same time and sales would need to be completed on an accelerated basis by the Outside Lease Rejection Date. The view that high discounts to market values were appropriate is further informed by the results of the 2018 auction of Toys 'R Us leases. Based upon my understanding of those auctions, Toys 'R Us only sold 35% of the leases it offered for sale at three separate auctions in 2018 and the average recovery rate of the leases that did sell was 44% of the appraised dark value.

47.      M-III arrived at the estimate of liquidation proceeds for the Debtors' leases as follows:

- Where there was a JLL 2018 Appraisal, an A&G BOV, and an IOI received in the course of the Real-Estate Sales Process for a subject property, M-III averaged the JLL 2018

**JX 079-20**

Appraisal and the A&G BOV with the current high IOI and then applied 50% discount to that average. If there were two values, they were discounted and averaged. If there was one, it was discounted and utilized.

- Where there was a JLL 2019 Appraisal and an IOI received in the course of the Real-Estate Sales Process for a subject property, M-III averaged the JLL 2019 Appraisal with 50% of the current high IOI and 50% of the A&G BOV, to the extent it existed.

- Where there was only a JLL 2019 Appraisal for a subject property, M-III used that number as the liquidation proceeds for the property.

- For owned and non-core properties, M-III calculated the average of (1) the JLL 2018 Appraised Value, (2) the A&G BOV, and (3) the IOI. In many instances for owned and non-core properties, only one of these values existed. In such cases, the liquidation proceeds amount was based upon the one data point. The liquidation proceeds for owned and non-core properties was discounted by 17%, rather than 50%. This group was primarily owned rather than leased properties; accordingly, the sales would not be under pressure to be completed by the Outside Lease Rejection Date.

48.    M-III then summed the estimated liquidation proceeds calculated for each of the subject properties; applied a 6% discount to account for transaction costs; and arrived at the total of $561 million in estimated liquidation proceeds. This estimate was ultimately incorporated into M-III's Wind-Down Analysis.[12]

49.    In summary, M-III applied a discounting methodology that it concluded was reasonable based upon (a) its knowledge; (b) its experience; (c) its review and analysis of the data available to it, including but not limited to the IOIs received in connection with the Real-Estate Sales Process; and (d) the results of the 2018 auction and sale of leases in the Toys 'R Us bankruptcy. For these reasons, among others, it is my opinion that the method employed by M-III to estimate liquidation proceeds from the sale of the Debtors' real-estate assets was reasonable and that its resulting conclusion ($561 million estimated liquidation proceeds) was a reasonable estimate of the liquidation proceeds the Debtors could expect to recover from the sale of their unencumbered real-estate assets in context of a wind-down and liquidation

---

[12] **Ex. D** at 5.

### E.    Creditor Recoveries Under the Wind-Down Analysis

50.    In consultation with Weil and Lazard, M-III prepared a creditor recovery matrix that illustrates how the Debtors would apply the liquidity generated in an orderly wind-down and liquidation, including that generated by the sale of the Debtors' real-estate assets, to the claims of the Debtors' creditors (the "**Wind-Down Recovery Matrix**").[13]  The current iteration of the Wind-Down Recovery Matrix projects that, after repayment in a manner consistent with the priority waterfall described above, six of the Debtors' categories of secured creditors would recover 100% of their claims.  Two other categories of secured creditors would recover substantially less than that (69% and 44%, respectively), and the remaining four categories of secured creditors would recover nothing.  Holders of second-lien 507(b) claims would recover 41% of their claims, and the Debtors' general unsecured and other creditors would recover nothing.

51.    The Debtors and their advisors shared the Wind-Down Analysis with the UCC on December 3, 2018, and continually shared updated versions of the analysis all the way up to and throughout the Auction.  In addition, M-III had multiple "advisor-to-advisor" conversations and multiple in-person meetings with the UCC's financial advisors, walking them through the Debtors' Wind-Down Analysis step by step.  In stark contrast, the UCC did not share its wind-down analysis until days before the Auction.

## V.    The Variance Analysis

52.    M-III undertook, at the request of the Debtors and the Restructuring Committee, to develop a creditor recovery matrix that illustrated creditor recoveries in the context of a sale of substantially all of the Debtors' assets to ESL as a going concern (the "**ESL Recovery Matrix**").  The current iteration of the ESL Recovery Matrix illustrates that, in an ESL/going-concern

---

[13] *Id.* at 7.

scenario, seven of the Debtors' categories of secured creditors will recover 100% of their claims.

Four other categories of secured creditors will recover less than that (60%, 41%, 41%, and 41%,

respectively), and only one secured creditor will recover nothing. Notably, the ESL Recovery

Matrix shows that general unsecured creditors will recover 1% of their claims.[14]

53.     M-III's Variance Analysis sets these two recovery matrices side by side and shows,

quite clearly, that the Debtors' secured and unsecured creditors will recover significantly more in

the context of an ESL/going-concern scenario than in a wind-down/liquidation scenario.

## VI.     The Administrative Solvency Analysis

54.     In addition to preparing the Wind-Down and Variance Analyses, M-III prepared an

administrative and other priority claims schedule that estimated the Debtors' outstanding

administrative claims, excluding budgeted GOB expenses, reflected in the net proceeds from GOB

sales. That claims schedule, among other inputs, provided the basis for M-III's Administrative

Solvency Analysis, which was reflected in discussion materials prepared by Lazard for the

Restructuring Committee. [15]  Administrative claims included but were not limited to Section

503(b)(9) claims, accounts payable, severance claims, employee claims, franchise taxes, and

property taxes. As of January 16, 2019, those claims totaled $615 million. Other priority claims

included, but were not limited to, the ABL DIP, the Junior DIP, professional fees, cure costs,

transfer taxes, and mechanics' liens. As of January 16, 2019, those claims totaled $1.67 billion.

In total, the Debtors' administrative and other priority claims totaled $2.281 billion.

---

[14] The sale transaction, at its baseline, provides for 96% recovery on account of administrative claims. However, the Debtors reasonably believe that under the sale transaction all administrative claims will be paid in full and that the remaining 4% (or approximately $62 million) gap can be bridged with mitigating items such as outperformance of the DIP Budget, maintained inventory levels, and the like. Assuming such measures can bridge the gap, the Debtors believe the $35 million received as consideration for the credit-bid release will flow to general unsecured creditors. If the gap remains unfilled, the Debtors will utilize the $35 million to fill that gap rather than flowing through the waterfall to general unsecured creditors.

[15] *See generally* Project Blue Discussion Materials dated January 16, 2019 (RS_UCC_00002953), attached to this declaration as **Exhibit F** ("**Ex. F**").

# JX 079-23

55.        According to the Administrative Solvency Analysis, ESL would satisfy $1.925 billion of that amount under the terms of the ESL APA.  Less company cash available at close, a professional-fee carve out, various sale proceeds, insurance proceeds, and the SHIP security deposit, $62 million additional value would be required to close.  The Debtors, in consultation with M-III, have identified a number of opportunities to recover that additional value.[16] Committed to the success of the ESL transaction—which, among other advantages, preserves a century-old department-store icon as well as tens of thousands of jobs—the Debtors are now diligently pursuing those opportunities.  For example, the Debtors are (1) using critical vendor payments and accounts receivable credits to reduce Section 503(b)(9) liability; (2) managing down disputed payables and reducing non-essential spend; (3) actively managing operating disbursements and potential conservatism in the SG&A forecast, as well as receipt outperformance; (4) recovering cash in transit and in regional banks and stores; and (5) working to recover credit-card proceeds held back by credit-card processing company First Data on or shortly after the Debtors' petition date.  In my opinion, based upon my long experience in the restructuring arena and my experience with the Debtors and their professionals, these efforts will succeed and the Debtors will be administratively solvent at closing.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and after reasonable inquiry.

---

[16] *See* Sears Holdings Corporation Transform Transaction – Weekly Tracking dated January 25, 2019 (Diaz Ex. 3) at 4, attached to this declaration as **Ex. G** ("**Ex. G**").

**DECLARATION OF MOHSIN Y. MEGHJI – Page 24**

JX 079-24

Dated: February 1, 2019          By:  /s/ Mohsin Y. Meghji
       New York, New York              Mohsin Y. Meghji
                                        Chief Restructuring Officer
                                        Debtors and Debtors in Possession