# Exhibit 55

# EXHIBIT D

**JOINT EX. 011**

**JX 082-1**



Subject to Material Change

# Wind Down Recoveries

January 14th 2019

## Wind Down Executive Summary

- With assistance from its professionals, the Company has prepared wind-down recoveries showing a twelve-month orderly liquidation commencing 1/14/19

  - The preliminary wind-down budget assumes that all assets are orderly liquidated in-place, including general merchandise inventory and real estate. Self-supporting business units are assumed to be sold as going concerns pursuant to section 363 of the bankruptcy code

  - The analysis is on a consolidated basis for the Company

  - At 1/14/19, we assume the Company will:

    - Commence liquidation of all remaining inventory in the stores and distribution centers (with final GOB sales beginning on 1/21/19)
    - Reject all remaining store and DC leases, other than valuable leases, which will be monetized
    - Reject all remaining non-essential contracts
    - Reduce management and staff to the minimum necessary to liquidate the collateral and perform transition services
    - Sell or monetize all remaining encumbered and unencumbered assets on a non-going concern basis

  - Substantial funding for the wind-down is provided by:

    - The gross proceeds from GOB sales of merchandise inventory. As this inventory is sold, expenses related to the inventory liquidation are deducted from proceeds, resulting in an assumed net orderly liquidation inventory value to the estate of ~90%
    - The first $240mm of previously unencumbered asset sale proceeds realized (which are segregated into a separate account), after which previously unencumbered asset sale proceeds are used to repay the $350mm Junior DIP in full; after the Junior DIP has been repaid in full, additional asset proceeds are used to pay administrative expenses and unsecured creditors
    - The imposition of a 4% charge on encumbered assets sold throughout the case pursuant to 506(c) of the Bankruptcy code, with the exception of the first lien and prepetition ABL collateral (including non-insider portions of the FILO and Citi L/C), and Junior DIP collateral, due to the 506(c) waivers granted to these lenders solely in their capacity as DIP lenders
    - Excess proceeds (proceeds above lien value) from sales of encumbered collateral

- Prior to 1/14/19, the Company is assumed to operate in the ordinary course while transitioning from a 505 to 425 store footprint

## Key Assumptions in Wind Down Recoveries

- **Operating Receipts**
  - Cash receipts are assumed to be generated through the following channels during the wind-down period:
    - Sales of merchandise in the normal course in the weeks leading up to the GOBs
    - Continued service revenues (direct-to-consumer repair services, B2B repair, warranty commissions)
    - Continued non-operating receipts (pass-through and non-pass-through) such as Citi credit card accrued interest sharing, insurance proceeds, dividends from foreign subsidiaries and litigation recoveries
    - Asset sales including both encumbered and unencumbered collateral
  - Same-store sales
    - Analysis assumes negative 15% same-store sales for all stores until the final GOB sales begins on 1/21/19
    - Stores are assumed to maintain a 29% gross margin throughout the projection period, excluding GOBs, which are assumed to run at a net negative margin resulting in an ~90% Net Orderly Liquidation Value
    - All sales shown net of taxes, including sales taxes, pass-through, and royalties
  - The wind-down recoveries assumes 4 waves of GOBs
    - Wave 1: 142 Stores beginning 10/28/18 ending 1/6/19
    - Wave 2: 40 Stores beginning 11/18/18 ending 1/26/19
    - Wave 3: 80 Stores starting on 1/3/2019
    - Wave 4: 425 Stores starting on 1/21/2019
  - Other Inflows
    - Minimal PA sales during GOB ($200k per week)
    - Negative 15% YoY declines in Other Revenues, including Service Revenues
- **Operating Disbursements**
  - COGS Disbursements
    - Merchandise vendors assumed to be primarily on cash-in-advance terms with 4-day average shipping time in the period leading up to the wind-down with some merch AP and non-merch AP based post-filing actuals;
      - Outstanding merchandise AP is paid down out during the case
    - Following the transition to the wind-down mode, no additional merchandise disbursements are made (last week of disbursements assumed to be the week ending 1/6/19) and merchant teams are immediately rationalized other than a small number of key employees to oversee vendor relations as the remaining on order inventory is shipped to the stores

## Key Assumptions in Wind Down Recoveries (cont'd)

- **Operating Disbursements (Continued)**
  - SG&A Disbursements
    - Assumes all dark store leases are rejected immediately (Company rejected 234 leases on 10/16/18) and GOB leases are rejected at the end of the GOB sales period; as the last set of GOBs is projected to run from the week ending 1/26/19 to the week ending 4/13/19, lease payments would be made for March and rejected in April
    - Immediate RIF of non-core; non-key personnel beginning 1/15/19 – 60 days of WARN following RIF announcement
    - Uses the Company's detailed Payroll, Benefits, Non-Merch and Tax projection to project cost
      - Assumes logistics costs are right-sized to reflect lower score count
    - GOB store payroll and other expenses are removed at the end of the GOB sales
      - GOBs expected to last 11 weeks in line with historical actuals
    - Capex assumes historical levels of maintenance with reductions in line with store closures
- **Other Disbursements**
  - Assumes $10mm of utility deposits paid, and are subsequently forfeit during the wind-down
  - Assumes no additional spend on critical vendor payments during the post-petition period
  - Accrued professional fees estimated based on current carve out reserve amount
    - After case begins to wind down, professional fees drop to an eventual monthly run rate of ~$5mm
    - Professional fees (full projected pipeline to 1/15/19 + general carve-out + success fees) accrued in the carveout reserve until the wind-down begins; fees then paid for by the liquidation of the first lien collateral after the ABL, non-insider FILO and non-insider Citi L/C have been fully amortized
  - Assumes total severance of $41mm through December 2019 (exclusive of WARN notice costs)
- **Junior DIP**
  - Starting balance of $175mm Junior DIP, which is pro forma to reflect $75mm balance as of 1/5/19 plus $100mm draw on 1/10/19
    - Junior DIP facility assumed to have a lien junior only to the First Lien DIP facility on prepetition unencumbered collateral other than specified collateral; on specified collateral, the Junior DIP liens are pari passu with the First Lien DIP facility after the first $240mm of proceeds have gone to fund the earlier of a) the wind-down reserve or b) the wind-down of business operations
      - Interest Expense of L+1,000

## Key Assumptions in Wind Down Recoveries (cont'd)

- **Unencumbered Asset Values**
  - Credit Card Tort Claim: Assumes $35mm
  - Unencumbered Receivables: Assumes $63mm, estimated using 25% recovery on $251mm book value
  - Sears Auto Centers (SAC): Assumed to be immediately liquidated simultaneously with the stores, with proceeds reflected in GOB recoveries – no going concern value
  - Includes actual sale of SRAC MTNs for net proceeds of approximately $81mm, which is included in the wind-down reserve
  - Monark: No value assumed
  - Net Operating Losses: No value assumed
  - Initial estimates of the following assets used per consultation with Lazard
    - Sears Home Improvement: $45mm
    - Sears Parts Direct: $60mm
    - Sears Service Contracts: $80mm
    - TSA modeled in place for all going concern assets such that any and all costs incurred by wind-down entity are assumed to be passed through directly to the purchaser

- **Unencumbered Real Estate Values**
  - Recoveries assumes $561mm net of transaction costs
  - Values for unencumbered real estate updated to incorporate JLL appraisals received on 1/11/19
  - Excludes values for indications of interest on unencumbered real estate received to date, which totals in excess of $350mm

- **Encumbered Asset Values**
  - Sparrow real estate excludes from analysis
  - Dove real estate assumed to be sold at 70% of dark value and incur a 6% broker fee
  - IPGL GL real estate assumed to be sold at 70% of dark value and incur a 6% broker fee
  - IPGL IP collateral assumed to be sold for $50mm, which represents ~15% of the low-end estimate of distressed fair market value of $345mm as stated in the Ocean Tomo appraisal document dated 1/12/18

- **Kenmore and Diehard**
  - Excluded from the analysis
  - Excludes asserted KCD Royalty administrative claim of $112mm

- Excludes any recoveries for avoidance actions and any potentially asserted claims against ESL
- Excludes any potential going concern value under one or more plans of reorganization including potential reorganization plans involving Sears Home Services, Innovel, and other business units, as well as attendant tax attributes distributed to creditors

**Certain assumptions in this document may be subject to material change, including:**

- **Go-forward financial performance of the store base**
- **Go-forward financial performance of the non-store businesses**
- **Feasibility and timing of SG&A reductions**

- **Assets**
  - Certain island stores and the Guam stores may be sold as going concern stores which would change recoveries on those assets
  - Carry costs and timing of real estate liquidations
    - The analysis does not include real estate related expenses past the end of GOB periods for potential additional time and carrying costs that may be required to sell real estate assets
  - This document excludes all avoidance action recoveries and any recoveries for litigation related to prepetition transactions
  - Assumes no proceeds from collateral charges are paid to the estate from the Sparrow collateral

- **Claims**
  - 503(b)(9) and GUC claims as of the petition date are estimated by SHC; subject to change based on further inventory receipt reconciliation
  - The initial estimate of the size of the general unsecured claim pool may change materially
  - WARN, severance, and PTOs costs associated with RIFs occurring past 11/15/18 are based on average salary and benefits of employees, and will change as employees subject to future RIFs are finalized

- **PBGC Claim**
  - This analysis does not reflect any view or estimate regarding a) the size of the PBGC claim, b) the priority of the PBGC claim, or c) any proceeds associated with the liquidation or transfer of securities held by the PBGC
    - The PBGC is likely to have a significant unsecured claim, which is excluded from this analysis
    - The Company is still performing diligence on the plan termination claim

## Creditor Recovery Matrix
### Wind-down / Orderly Liquidation (Debt and Other Starting Balances As of 1/5/2019)

**Creditor Recovery Matrix**

($ in millions)

| Creditors | Gross Claim[1] as of 1/5/19 | 1st Lien Collateral | Jr. DIP Collateral (Previously Unencumbered) | Sparrow R.E. | Dove R.E. | IP/GL Collateral | Wind-down Reserve | Carve-Out | $ Recovery | % Recovery |
|---|---|---|---|---|---|---|---|---|---|---|
| Admin and Other Priority Claims | $1,405 | ($551) | ($500) | – | ($19) | ($7) | ($240) | ($89) | $1,405 | 100% |
| DIP ABL [2] | 894 | (894) | – | – | – | – | – | – | 894 | 100% |
| Junior DIP [3] | 175 | – | (175) | – | – | – | – | – | 175 | 100% |
| FILO (1.5) | 125 | (125) | – | – | – | – | – | – | 125 | 100% |
| Citi LC Facility (1.75) | 271 | (271) | – | – | – | – | – | – | 271 | 100% |
| Adequate Protection - 507(b) [4a] | 331 | (136) [4b] | – | – | – | – | – | – | 136 | 41% |
| 2nd Lien Line of Credit Loans | 570 | – | – | – | – | – | – | – | – | – |
| ESL 2nd Lien Term Loan (PIK) | 320 | – | – | – | – | – | – | – | – | – |
| 2nd Lien Notes (PIK) | 175 | – | – | – | – | – | – | – | – | – |
| 2nd Lien Notes (2.5; Cash) | 89 | – | – | – | – | – | – | – | – | – |
| Dove Loans | 831 | – | – | – | (429) | – | – | – | 429 | 52% |
| Sparrow Loans [5] | NA | – | – | – | – | – | – | – | NA | NA |
| GL / IP Loan | 231 | – | – | – | – | (159) | – | – | 159 | 69% |
| **Total Secured Debt / Claims** | **$5,417** | **($1,976)** | **($675)** | **–** | **($448)** | **($166)** | **($240)** | **($89)** | **$3,594** | **66%** |
| Unsecured and Deficiency Claims [6] | 5,864 | – | – | – | – | – | – | – | – | – |
| **Total Unsecured Debt / Claims** | **$5,864** | **–** | **–** | **–** | **–** | **–** | **–** | **–** | **–** | **–** |

Notes:
(1) Gross claim does not mean such claim is allowed, unless allowed pursuant to a bankruptcy court order or otherwise
(2) Pro forma balance as of 1/5/19. Company has requested $100mm Jr. DIP draw for week ending 1/12/19 which would reduce the pro forma ABL balance to $894mm.
(3) Pro forma balance as of 1/5/19. Company has requested $100mm Jr. DIP draw for week ending 1/12/19 which will increase the Jr. DIP balance to $175mm.
(4a) Includes $331mm of claims under section 507(b) of the Bankruptcy Code for diminution in the value of second-lien collateral are shown based on advice from Weil. The ultimate value of these claims could vary materially given a number of factors including the use going concern or liquidation values, inclusion or exclusion of certain administrative costs such as professional fees that benefit from the Carve-Out and charges and the ultimate validity of the second-lien liens and claims. In addition, the validity and amount of such diminution claims is expected to be a disputed among the parties, including the debtors.
(4b) Recovery takes into account disputed nature of claim
(5) Sparrow entities are non-debtors and excluded from analysis.
(6) Draft estimate of gross liability per Deloitte of $3.4bn, plus ~$1bn of PA Liability, plus deficiency claims of ~$1.8bn.