# Exhibit 62

1    UNITED STATES BANKRUPTCY COURT

     SOUTHERN DISTRICT OF NEW YORK

2    ------------------------------------x

3    In re:

4    SEARS HOLDINGS CORPORATION, et al.,

                     Debtor.

5

6                    Chapter 11

                     Case No. 18-23538 (RDD)

7

8    ------------------------------------x

             ***HIGHLY CONFIDENTIAL***

9

10

11        30(b)(6) DEPOSITION OF LAZARD FRERES

             BY ITS CORPORATE REPRESENTATIVE

12                   BRANDON AEBERSOLD

13             NEW YORK, NEW YORK

           Thursday, January 31, 2019

14

15

16

17

18

19

20

21   Reported by:

22   MARK RICHMAN, CSR, RPR, CM

23   JOB NO:  154924

24

25

**JX 096-1**

## Page 2

```
1
2
3              New York, New York
4              Thursday, January 31, 2019
5
6         30(b)(6) DEPOSITION of Lazard Freres by
7     its Corporate Representative BRANDON AEBERSOLD,
8     held at the offices of Akin Gump Strauss Hauer
9     & Feld LLP, One Bryant Park, New York, New
10    York, before MARK RICHMAN, a Certified
11    Shorthand Reporter, Registered Professional
12    Reporter and Notary Public of the State of New
13    York
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
1     APPEARANCES:
2
3     AKIN GUMP STRAUSS HAUER & FELD
4     Attorneys for Unsecured Creditors
5         One Bryant Park
6         Bank of America Tower
7         New York, New York 10036
8     BY:    JOSEPH SORKIN, ESQ.
9         PHILIP DUBLIN, ESQ.
10        JOHN KANE, ESQ.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1     A P P E A R A N C E S (Continued):
2
3     WEIL, GOTSHAL & MANGES
4     Attorneys for Debtors
5     and Debtors-in-Posession: Sears Holdings
6     Corporation, et al.
7     200 Crescent Court
8     Dallas, Texas 75201
9     BY:    JAKE RUTHERFORD, ESQ.
10    BY:    JARED FRIEDMANN, ESQ.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
1     A P P E A R A N C E S (Continued):
2     SKADDEN, ARPS, SLATE, MEAGHER & FLOM
3     Attorneys for the ABL Lenders
4         4 Times Square
5         New York, New York 10036
6     BY:    PAUL LEAKE, ESQ.
7
8
9
10    PAUL, WEISS, RIFKIND, WHARTON & GARRISON
11    Attorneys for the Restructuring Committee
12        1285 Avenue of the Americas
13        New York, New York 10019
14    BY:    JONATHAN HURWITZ, ESQ.
15
16
17
18
19
20
21
22
23
24
25
```

JX 096-2

## Page 6

1  A P P E A R A N C E S (Continued):
2
3  CLEARY GOTTLIEB STEEN & HAMILTON
4  Attorneys for ESL Investments Inc.
5  and the Witness
6       One Liberty Plaza
7       New York, New York 10006
8  BY:   ANDREW WEAVER, ESQ.
9       JACK WHITELEY, ESQ.
10
11
12
13
14
15  PRESENT:
16  MATTHEW DIAZ, FTI
17  THOMAS HEDUS, HOULIHAN LOKEY
18
19
20
21
22
23
24
25

## Page 7

1  AEBERSOLD - HIGHLY CONFIDENTIAL
2       BRANDON AEBERSOLD, called as a
3  witness, having been first duly sworn
4  by the Notary Public (Mark Richman),
5  was examined and testified as
6  follows:
7  EXAMINATION BY MR. SORKIN:
8  Q.   Good morning, Mr. Aebersold. My
9  name is Joseph Sorkin at Akin Gump and
10  we represent the Creditors' Committee
11  here in Sears. I know you've been
12  deposed before so I'm not going to go
13  through all the ground rules. I would
14  just ask that if there is a question
15  that I ask that you don't understand,
16  that you let me know and I will try and
17  ask it again or rephrase it. Is that
18  okay?
19  A.   Sure.
20  Q.   If you need a break at any point
21  just let me know and as long as there's
22  not a question pending, happy to
23  accommodate you.
24       Mr. Aebersold, why don't we start
25  with, I'm going to hand you what was

## Page 8

1       AEBERSOLD - HIGHLY CONFIDENTIAL
2  previously marked as UCC Exhibit 40.
3       (Exhibit 40, previously marked
4  and shown to witness.)
5  Q.   If you could take just a minute
6  to review that document.
7  A.   Okay.
8  Q.   Have you had a chance to review
9  that?
10  A.   Yes, I have.
11  Q.   And, Mr. Aebersold, do you
12  understand that you are here providing
13  testimony both in your individual
14  capacity, in other words based on the
15  information you know and understand, as
16  well as a corporate representative on
17  certain topics?
18  A.   I do.
19  Q.   And what I've handed you as UCC's
20  exhibit 40 identifies 3 larger
21  categories in items 1, 2 and 3 on the
22  email that you were designated as
23  the corporate representative under
24  federal Rule 30(B)(6). Do you see that?
25  A.   Yes.

## Page 9

1  AEBERSOLD - HIGHLY CONFIDENTIAL
2  Q.   And are you prepared to provide
3  testimony on those three areas today?
4  A.   I am.
5  Q.   Can you tell me, other than
6  meeting with counsel, what you did to
7  prepare to be in a position to testify
8  about the three topics where your name
9  is listed on exhibit 40?
10  A.   Other than talking with counsel?
11  Q.   Other than talking with counsel.
12  A.   I reviewed a couple of
13  presentations.
14  Q.   Did your review of those
15  presentations refresh your recollection
16  about any facts in this case?
17  A.   More so with respect to timing.
18  Q.   With respect to timing, what was
19  the timing that you understand those
20  presentations were made during or
21  prepared during?
22  A.   Sure. When we met with the
23  restructuring committee when the auction
24  actually occurred.
25  Q.   So this would have been during

JX 096-3

Page 10

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2  the January 14th through 17th time
3  period?
4      A.   That would be included.  I would
5  also include the week prior.
6      Q.   What were the presentations
7  about?
8      A.   Which presentations?
9      Q.   That you reviewed that refreshed
10 your recollection about the timing
11 associated with the auction?
12     A.   They were presentations made to
13 the restructuring committee.
14     Q.   Were those presentations that you
15 or Lazard had prepared?
16     A.   Parts of them.
17     Q.   Who else had been involved in
18 preparing those presentations?
19     A.   M-III, Weil Gotshal, debtors'
20 management.
21     Q.   Do you recall generally the
22 subject matter of those presentations?
23     A.   Not specifically.
24     Q.   Other than reviewing documents
25 and meeting with counsel, did you speak

Page 11

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2  to anyone outside the presence of
3  counsel in order to prepare yourself to
4  provide testimony today?
5      A.   No.
6      Q.   Did you review any deposition
7  transcripts of anyone who's already been
8  deposed in the Sears matter?
9      A.   I did not.
10     Q.   Did you review any auction
11 transcripts in preparation for today?
12     A.   I did not.
13     Q.   Have you reviewed any auction
14 transcripts at all in this case?
15         MR. FRIEDMANN:  Object to form.
16     A.   I don't believe so.
17     Q.   Prior to Lazard's engagement in
18 the Sears matter, and I understand that
19 Lazard was engaged prepetition on a
20 couple of assignments, but prior to
21 those assignments or the engagement that
22 led to the filing, did you personally
23 have any interaction with Mr. Lampert?
24         MR. WEAVER:  Objection to form.
25     A.   Are you talking about the prior

Page 12

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2  engagement or -- I missed the part about
3  before that led to filing.
4      Q.   Sure, why don't we just take this
5  in stages?
6      A.   Sure.
7      Q.   Can you tell me the first time
8  that Lazard was engaged by Sears in any
9  capacity?
10     A.   I can't recall specific, but the
11 general time frame was around early
12 February of 2018.
13     Q.   Were you involved in that
14 engagement?
15     A.   Yes, I was.
16     Q.   What was the purpose of that
17 engagement as far as you understood?
18     A.   The purpose was to advise and
19 help implement an out of court exchange
20 offer.
21     Q.   And who contacted Lazard, to the
22 extent you know, with respect to that
23 engagement?
24     A.   I can't recall.
25     Q.   Prior to -- were you involved

Page 13

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2  personally in the roughly February '18
3  time frame engagement with Sears?
4      A.   Yes, I was.
5      Q.   Prior to that engagement, had you
6  personally had any involvement with Mr.
7  Lampert or ESL?
8      A.   No.
9      Q.   Prior to that engagement, do you
10 know whether Lazard had previously had
11 any engagement with Mr. Lampert or ESL?
12         MR. FRIEDMANN:  Object to form.
13         MR. WEAVER:  Objection to form.
14     A.   I don't believe so, but I can't
15 be sure.
16     Q.   Understood.  I was just asking to
17 the best of your knowledge.
18     A.   Understood.
19     Q.   After the early February '18 time
20 period engagement between Lazard and
21 Sears, or of Lazard by Sears, can you
22 tell me when the next engagement was
23 between Lazard and Sears?
24     A.   I wouldn't be able to recall with
25 specifics, but that prior engagement

JX 096-4

## Page 14

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2  terminated under the terms of that
3  engagement letter some time in early to
4  mid-spring, and then we were reengaged
5  some time in early October. I
6  apologize, I can't recall the specifics.
7    Q.  Understood.  And the early
8  October engagement was the engagement
9  that led to the bankruptcy filing and is
10 the engagement you're working under now,
11 correct?
12   A.  I wouldn't say our engagement led
13 to the --
14   Q.  Fair enough.  Understood.
15   A.  -- filing of a bankruptcy.  But
16 subsequent to our engagement, a
17 bankruptcy did occur.
18   Q.  Understood.  And that is the
19 engagement you're currently operating
20 under, correct?
21   A.  Generally speaking, yes, as
22 amended.
23   Q.  We will go through, I understand
24 the engagement was amended I believe in
25 December of 2018 as approved by the

## Page 15

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2  court.  We will talk about that in a
3  little bit.
4    What I want to start talking about
5  is just understanding, let's focus on
6  the auction.  So when I say the auction
7  here, do you understand that I'm talking
8  about the auction of substantially all
9  of Sears's assets that occurred between
10 January 14th and I believe ultimately
11 closed in the early morning hours of
12 January 17th?
13   A.  Yes.
14   Q.  Were you present at Weil, the
15 offices of Weil Gotshal, Sears's
16 counsel, during that auction?
17   A.  Yes.  I did go home to sleep
18 previously for a couple of times, but
19 generally I was there.
20   Q.  Generally during that time
21 period?
22   A.  Yes.
23   Q.  Maybe not during the entire time
24 period, but you participated and were
25 present during the auction?

## Page 16

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2    A.  For most of it.
3    Q.  What was your role during the
4  auction process as far as you understood
5  it in terms of advising Sears?
6    A.  I participated in negotiations,
7  had conversations with certain bidders,
8  was answering questions and advising the
9  restructuring committee, and speaking
10 with the other present parties,
11 generally.
12   Q.  In terms of negotiations, who was
13 it that was negotiating on behalf of the
14 debtors with ESL and their advisors?
15   A.  I would say it was a combination
16 between Lazard, M-III, Weil Gotshal, at
17 times debtors' management, as well as
18 the advisors to the restructuring
19 subcommittee.
20   Q.  Was there any particular part of
21 the negotiations that you or Lazard
22 primarily had responsibility for?
23     MR. FRIEDMANN:  Object to form.
24   A.  That's hard to answer, to say
25 that we had specific responsibility.  We

## Page 17

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2  were never specifically tasked with a
3  specific component of the overall
4  transaction.  So I can't really answer.
5    Q.  Understanding that there maybe
6  wasn't a specific task, did it turn out
7  that primary responsibility for any
8  particular aspect of the negotiations
9  fell to you or Lazard?  For example,
10 negotiating the terms of the APA or
11 negotiating the economic terms with ESL
12 or negotiating additional consideration
13 for encumbered assets?  Like is there
14 any category that you recall ended up
15 sort of falling to you or Lazard in
16 terms of primary responsibilities?
17     MR. FRIEDMANN:  Object to form.
18   A.  No, I can't think of an instance
19 where it wasn't a group effort among the
20 advisors.
21   Q.  Got it.  Let me kind of take then
22 a step back from the auction and start
23 with, you recall that the definitive bid
24 deadline that was established under the
25 global bid procedures order was December

**JX 096-5**

Page 18

1      AEBERSOLD - HIGHLY CONFIDENTIAL
2    28th, correct?
3    A.   Correct.
4    Q.   And on December 28th, ESL
5    submitted a bid to the debtors, correct?
6    A.   Correct.
7    Q.   So that you're not guessing, let
8    me go ahead and provide you a copy of
9    what I understand to be the bid letter.
10   I believe it was previously marked as
11   exhibit 2.
12        (Exhibit 2, previously marked and
13        shown to witness.)
14   Q.   Mr. Aebersold, if you could just
15   take a moment to look at UCC Exhibit 2
16   and tell me if you understand this
17   document to be the bid that the company
18   received from ESL -- oh, excuse me, I
19   gave you -- yes, that's right.  That the
20   company received from ESL on December
21   28th in connection with the definitive
22   bid deadline?
23   A.   Yes, this appears to be the bid
24   letter that we received.
25   Q.   And if you look at -- let me step

Page 19

1      AEBERSOLD - HIGHLY CONFIDENTIAL
2    back for just a minute.  I realize I've
3    used a couple of terms somewhat
4    interchangeably and I just want to make
5    sure you and I understand each other.
6    If I refer to the company, the debtors,
7    or Sears, I'm intending to refer to the
8    debtors and the affiliated debtors in
9    this case, Sears Holdings.
10        Do you understand that and can we
11   have the agreement that if I'm referring
12   to debtors, the company, or Sears,
13   that's who I'm referring to?
14   A.   Yes.
15   Q.   If we are talking about a
16   go-forward Sears, I will likely refer to
17   that as Newco.  Do you understand that?
18   A.   Yes.
19   Q.   And if at any point you don't
20   understand which entity I'm referring
21   to, just let me know and I will clarify.
22   Okay?
23   A.   Sure.
24   Q.   If you can look at page 2 of
25   exhibit 2 you'll see under item number 2

Page 20

1      AEBERSOLD - HIGHLY CONFIDENTIAL
2    there's a list of Consideration:  Other
3    Value.  Do you see that?
4    A.   Yes.
5    Q.   Was your understanding that the
6    items identified in 2 a through f were
7    the value or the consideration that was
8    being provided by ESL in connection with
9    the bid received on December 28th?
10   A.   I would say it is what ESL listed
11   as their consideration.
12   Q.   Did at any time, did you or
13   anyone, any advisor of the debtors that
14   you're aware of allocate the
15   consideration, the value of the
16   consideration provided in exhibit 2 to
17   specific assets that ESL was seeking to
18   acquire?
19   A.   Your question is did who
20   allocate?
21   Q.   Did you or anyone at the debtors
22   that you know of ever attempt to
23   allocate value or assign value to the
24   particular sort of buckets of
25   consideration identified in exhibit 2?

Page 21

1      AEBERSOLD - HIGHLY CONFIDENTIAL
2        MR. FRIEDMANN:  Object to form.
3    A.   I can't recall.
4    Q.   At any time with respect to
5    whether it was any of the bids that led
6    up to the bid that has been accepted by
7    the debtors subject to Court approval,
8    are you aware of any effort to allocate
9    value specifically to assets that are
10   being acquired by ESL?
11        MR. WEAVER:  Objection to form.
12   A.   I can't recall.
13   Q.   Have you seen a document -- and
14   when I say allocate value, does that
15   make sense to you?
16   A.   Generally, sure.
17   Q.   So that what I'm asking is, to
18   the extent ESL is providing a particular
19   form of consideration, for example,
20   credit bidding a particular loan
21   facility that the value assigned to that
22   loan facility is specifically assigned
23   to particular assets being acquired in
24   connection with the sale, does that make
25   sense?

6

JX 096-6

| Page 22 |
|---|

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2    A.    Your definition makes sense.
3    Q.    At any point have you seen a
4 document that sets forth the specific
5 consideration being provided by ESL in
6 connection with the proposed sale and
7 the assets being acquired or proposed to
8 be acquired by ESL?
9        MR. WEAVER:  Objection to form.
10    A.    Under your definition of
11 allocation, I don't believe that I have.
12    Q.    Under any definition of
13 allocation, have you seen a document
14 that attempts to assign value or line up
15 consideration with the assets?
16        MR. FRIEDMANN:  Object to form.
17    A.    I can't recall a document that
18 lined up form of consideration with
19 assets.
20    Q.    Going back to exhibit 2, do you
21 remember what your reaction was to the
22 bid included in exhibit 2?
23    A.    I can't recall specifically, I'm
24 sorry.
25    Q.    Do you remember ultimately

| Page 23 |
|---|

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2 whether you provided any advice to the
3 restructuring committee or the
4 restructuring subcommittee with respect
5 to whether or not to qualify the bid
6 contained in exhibit 2 under the terms
7 of the global bid procedures order?
8        MR. FRIEDMANN:  I just want to
9 instruct the witness that in
10 answering this question, to the
11 extent that any advice you provided
12 to the restructuring committee
13 regarding qualifying the bid was
14 informed by discussions you had with
15 Weil Gotshal or any of the other
16 lawyers representing the debtors, to
17 not include that in your answer.
18    If there is advice you provided
19 that was not formed in connection
20 with discussions you had with Weil
21 Gotshal, then you can provide that
22 answer.
23        THE WITNESS:  Thank you.
24    A.    With that as a backdrop, I would
25 characterize it as answering questions

| Page 24 |
|---|

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2 and providing analysis with respect to
3 the bid.
4    Q.    Let me ask you a different
5 question then to avoid the issues
6 associated with any privilege.
7    When you received the bid
8 contained in UCC Exhibit 2, what did you
9 look at in order to analyze whether the
10 bid -- to analyze the terms of the bid?
11    A.    Can you be more specific?
12    Q.    Sure.  How did you go about
13 assessing your view of the ESL bid
14 contained in exhibit 2?
15    A.    I can't recall specifically in
16 terms of what the immediate steps were.
17 But certainly summarized the bid and
18 tried to determine aggregate
19 consideration and implication on the
20 estate.
21    Q.    And when you say aggregate
22 consideration, what did you do -- excuse
23 me.  What did you look at to determine
24 your understanding of the aggregate
25 consideration being provided in the bid

| Page 25 |
|---|

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2 in exhibit 2?
3    A.    Aggregate consideration is a
4 challenge just to say exactly what that
5 is because there's consideration that's
6 on the spectrum in terms of how firm
7 that consideration is as well as some
8 softer issues.
9    If we just stick with what the
10 more firm forms of consideration are,
11 it's totalling the value to the estate
12 of the bid.
13    There are obviously other factors
14 and consideration.
15    Q.    Understood.  And one of the
16 things you mentioned was the implication
17 on the estate.  Can you describe for me
18 in a little more detail what you meant
19 by the implication on the estate?
20    A.    Generally speaking, I can't
21 recall what were the implications and
22 what did we analyze.  But I can give an
23 example.
24    Q.    Sure.
25    A.    An example of which was what

JX 096-7

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2  would be the resulting claims to the estate
3  be under the bid, i.e., if they're
4  assuming certain liabilities, what's the
5  implication on the estate of that
6  assumption, i.e., the estate would have
7  less liabilities.
8      Q.   And when claims to the estate,
9  meaning claims that would retain with
10 the estate that weren't being assumed by
11 Newco in a proposed transaction; is that
12 correct?
13     A.   In both directions, but that
14 would be one example.
15     Q.   And claims, were you particularly
16 focused on any particular type of claim,
17 for example, were you focused on making
18 sure the estate was administratively
19 solvent?
20     A.   Administrative solvency was a
21 consideration.  I'll leave it at that.
22     Q.   In addition to administrative
23 solvency, what other considerations do
24 you recall when you were evaluating or
25 assessing the bid in exhibit 2?

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2      A.   I can't recall specifically.
3      Q.   Why was administrative solvency a
4  consideration?
5          MR. FRIEDMANN:  I will also
6  instruct the witness on this one.
7      A.   That's why I hesitated.
8          MR. FRIEDMANN:  Just again, just
9  be careful because obviously to the
10 extent that you have a view towards
11 the importance of administrative
12 solvency that's separate from advice
13 provided by counsel, that's fine to
14 share.  But to the extent your view
15 is informed in light of advice of
16 counsel, I instruct you not to answer
17 the question.
18     A.   My view of the importance of
19 administrative solvency is very much
20 informed by the advice of counsel.
21     Q.   What was your role as one of the
22 debtors' advisors with respect to
23 determinations of administrative
24 solvency, if any?
25     A.   Conducting arithmetic.

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2      Q.   Can you describe for me what that
3  entailed?
4      A.   Sure.  M-III and the debtors
5  provided a list of administrative
6  liabilities, and we subtracted those
7  being assumed or cash that we had to pay
8  for those liabilities.
9      Q.   So Lazard didn't provide any
10 judgment with respect to the
11 calculations it made in connection with
12 administrative solvency determinations?
13     A.   Did we provide judgment about our
14 calculation?
15     Q.   Did you, in addition to doing the
16 calculations, did you add any kind of
17 additional judgment with respect to the
18 information contained in that analysis?
19         MR. FRIEDMANN:  Object to form.
20     A.   I don't recall making judgment
21 with respect to arithmetic.
22     Q.   And what I'm asking more
23 specifically is, in determining, as you
24 indicated earlier, administrative
25 solvency involves assessing claims that

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2  would remain at the company and maybe
3  also value or other claims that could be
4  brought into the company, for example,
5  you understand the 503(b)(9) claims
6  might be a certain category of claims in
7  the administrative solvency analysis,
8  correct?
9      A.   Yes.
10     Q.   With respect to 503(b)(9) claims,
11 did you simply take information totalled
12 up from the company or M-III that said
13 here are the total 503(b)(9) claims we
14 estimate and you plugged it into a
15 calculation, or were you also involved
16 in determining which 503(b)(9) claims
17 should be included in that analysis?
18     A.   We relied on M-III and the
19 company to determine, in your example,
20 503(b)(9) claims.
21     Q.   Are there other types of claims
22 where you didn't rely on the company or
23 M-III and instead made some assessment
24 of what claims should be included?
25     A.   I can't recall.  But again all I

Page 30

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2  have in front of me is a bid letter from
3  December 28th. I can't recall.
4    Q.    Going back to administrative
5  solvency. Is it your testimony that the
6  only understanding you have of why
7  administrative solvency is a
8  consideration is based on discussions
9  you've had with counsel in this case?
10    A.    I think your question previously
11  is what is your view of the importance
12  of administrative solvency. I believe
13  my answer was that is very much informed
14  with the view of counsel. And to
15  disintermediate my view of
16  administrative solvency apart from that,
17  I can't do.
18    Q.    Let's separate it from this case.
19  Do you have an understanding of why
20  conceptually or in any case
21  administrative solvency or the goal of
22  achieving administrative solvency could
23  be an important goal?
24      MR. WEAVER:  Objection to form.
25    A.    Sure.

Page 31

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2    Q.    What is that understanding?
3    A.    That to remain in Chapter 11,
4  debtors need to pay their debts as they
5  become due.
6    Q.    And what happens if that is not
7  the case, if the debtors -- a debtor
8  generally, not these debtors, are not
9  able to pay debts as they come due?
10    A.    It depends on the facts and
11  circumstances.
12    Q.    But is it your testimony that why
13  administrative solvency was important
14  here, or at least your understanding of
15  that, cannot be, in your mind, separated
16  from the information you'd received or
17  heard from counsel?
18    A.    That's correct.
19      MR. WEAVER:  Objection to form.
20    Q.    Let me hand you what we're going
21  to mark as committee exhibit 22.
22      (Exhibit 22, Bates stamp
23  SEARS_UCC00413809 was marked for
24  identification.)
25      MR. WEAVER:  Joe, I'm sorry, can

Page 32

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2  we have an understanding that any
3  objection by one is an objection by
4  all?
5      MR. SORKIN:  Yes.
6    Q.    Feel free to take a minute to
7  skim or read through exhibit 2 just to
8  orient yourself. I will ask you some
9  specific questions about specific
10  passages that I'll direct you to. But
11  understand that I'm going to ask you a
12  general question to begin.
13    A.    Okay.
14    Q.    Okay. Mr. Aebersold, do you
15  recall being involved in discussions
16  with the restructuring committee of the
17  board subsequent to the December 28th
18  indicative bid provided by ESL regarding
19  whether or not the bid should be
20  accepted as a qualified bid?
21    A.    Generally, I recall being engaged
22  with the restructuring committee during
23  this time.
24    Q.    And was your role in connection
25  with those discussions different than

Page 33

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2  the role that you played with respect to
3  evaluating bids from the time of
4  December 28th with the indicative bid,
5  or the definitive bid, excuse me, that
6  was provided by ESL through the close of
7  the auction when the current bid was
8  accepted by the debtors?
9    A.    I'm sorry, I don't understand the
10  question.
11    Q.    Sure. What I'm trying to
12  understand is, from December 28th until
13  January 17th, as an advisor, we talked
14  about how in your role you provided
15  advice generally. And I understand that
16  you indicated there wasn't a particular
17  aspect of the negotiations that you
18  handled. You provided advice as did
19  others.
20      My question is, from December 28th
21  until January 17th was your role
22  generally the same as an advisor?
23      MR. FRIEDMANN:  Object to form.
24    A.    Sorry. I just got to break this
25  down.

JX 096-9

Page 34

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2    Q.    Sure.
3    A.    Because before you were asking me
4    about my role during the auction I think
5    was your question.
6    Q.    Understood.  And now I'm trying
7    to understand a little bit broader.  Was
8    your role generally the same with
9    respect to providing advice to -- and
10   let me be more specific -- to the
11   restructuring committee in connection
12   with bids received by ESL -- from ESL,
13   excuse me?
14   A.    I'm not trying to be coy here.
15   Q.    Sure.
16   A.    But let me try this.  Generally
17   speaking, yes, we were providing advice
18   and answering questions for the
19   restructuring committee during that
20   period of time that you mentioned.
21   Q.    Okay.  During the period of time
22   that I mentioned, December 28th until
23   January 17th, did you ever provide a
24   specific recommendation about whether or
25   not to accept a bid provided by ESL to

Page 35

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2    the restructuring committee?
3    A.    I can't recall.  Your question is
4    do I recall giving a specific
5    recommendation to the committee during
6    that time period?
7    Q.    Correct.  And what I'm wondering
8    is, at some -- did you provide a
9    specific thumbs up or thumbs down to the
10   bid that was being considered by the
11   restructuring subcommittee at any
12   particular time?
13       MR. FRIEDMANN:  Object to form.
14   A.    During that entire period of
15   time?
16   Q.    Correct.
17       MR. FRIEDMANN:  Object to form.
18   A.    I don't think that I phrase -- if
19   I did, it wouldn't be phrased the way
20   that you did, that I said.
21   Q.    I'm just trying to understand
22   your role.  Was it your role -- you've
23   talked about answering questions being
24   posed to you by the restructuring
25   committee during the time December 28th

Page 36

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2    through January 17th when the
3    restructuring committee was assessing
4    various bids and proposals received by
5    ESL, correct?
6    A.    Yes.
7    Q.    Were you ever asked by the
8    restructuring subcommittee or the
9    restructuring committee -- strike that.
10       Did you provide advice both to the
11   restructuring committee and the
12   restructuring subcommittee?
13       MR. FRIEDMANN:  Object to form.
14   A.    I provided advice to the
15   restructuring committee which subsumes
16   the restructuring subcommittee.
17   Q.    But when you were providing that
18   advice, you were meeting with the
19   restructuring committee, the entire
20   committee, the four members as opposed
21   to the restructuring subcommittee, the
22   two members, correct?
23   A.    Correct.
24   Q.    When you were meeting with the
25   restructuring committee, were you ever

Page 37

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2    asked or did you ever provide to them a
3    specific recommendation either to accept
4    or reject a bid that was on the table at
5    any given time in that period December
6    28th to January 17th from ESL?
7    A.    I can't recall the question being
8    asked should we accept or reject this
9    offer.  I certainly had input into
10   certain components into what I assume
11   that they relied on to use their
12   business judgment to come to that
13   determination.  But it was never put to
14   me should we accept or reject this
15   offer.
16   Q.    Okay.  And that's what I'm
17   wondering.  Did the restructuring
18   committee at any time from December 28th
19   to January 17th ask you specifically,
20   Mr. Aebersold, should we accept or
21   reject this offer?
22   A.    They asked for my recommendation
23   on components of it.  I don't think it
24   was ever phrased exactly like that to
25   me.

JX 096-10

Page 38

AEBERSOLD - HIGHLY CONFIDENTIAL

1      AEBERSOLD - HIGHLY CONFIDENTIAL
2      Q.   Okay.  And did they ever ask you,
3  in any way, whether it was phrased
4  exactly that way or not, what is your,
5  recommendation, Mr. Aebersold, about
6  whether we should accept or reject a
7  particular bid that was on the table
8  from ESL?
9          MR. FRIEDMANN:  Object to form.
10     You're still in the same time frame,
11     you included the word ever in your
12     question.
13     Q.   I will agree that what we are
14  talking about in this line of
15  questioning until it changes is still
16  the same time period, December 28th
17  until January 17th because, Mr.
18  Aebersold, you understand that until
19  December 28th there was not a definitive
20  bid from ESL, correct?
21     A.   Correct.
22     Q.   So what I'm talking about is from
23  the time there was a definitive bid from
24  ESL until January 17th at 3 a.m. when
25  the auction closed and the company

Page 39

1      AEBERSOLD - HIGHLY CONFIDENTIAL
2  accepted the bid and has now in the
3  notice of sale and in connection with
4  the sale hearing that we're working
5  towards next week, the proposal that's
6  on the table in connection with that
7  sale, my question is during that time
8  period did you ever provide advice, in
9  words or in substance, to the
10  restructuring committee that they should
11  accept the ESL bid, an ESL bid?
12     A.   Generally speaking, and again the
13  way that you phrased it, is it accept or
14  reject, we're not doing thumbs up or
15  thumbs down.  In that entire period
16  through January 17th, we did recommend
17  the ESL bid to be the successful bid at
18  the auction, based on input from other
19  advisors as well.
20     Q.   Setting aside any input from any
21  other advisors, I'm asking you, as an
22  advisor and given the information you
23  have, at any point did you believe that
24  the ESL bid should be the successful bid
25  at the auction?

Page 40

1      AEBERSOLD - HIGHLY CONFIDENTIAL
2          MR. FRIEDMANN:  Object to form.
3     A.   Sorry.  And your question is
4  asking me to remove input from other
5  advisors?
6     Q.   Yes.
7     A.   That's impossible to do because
8  that decision is pretty complex and that
9  determination would require input from
10  the other advisors.
11     Q.   Okay.  So you can't tell me or
12  the court next week, on January 14th
13  through 17th, during that time period,
14  whether there was a point in time where
15  you personally would have recommended to
16  the restructuring committee that they
17  accept the bid from ESL?
18          MR. FRIEDMANN:  Object to form,
19     mischaracterizes prior testimony.
20     A.   That's right.
21     Q.   Then I'll ask it again.  Was
22  there a point in time, from January 14th
23  through January 17th, where you
24  personally would have recommended to the
25  restructuring committee that they accept

Page 41

1      AEBERSOLD - HIGHLY CONFIDENTIAL
2  a bid from ESL?
3          MR. FRIEDMANN:  Object to form.
4     A.   Yes, based on input from the
5  other advisors, yes.
6     Q.   And did that happen?  Was there a
7  time where you personally recommended to
8  the restructuring committee, from
9  January 14th through January 17th, that
10  they accept the bid from ESL?
11     A.   Yes, in the wee hours of January
12  16th, I believe, approximately, based on
13  additional input from the other advisors
14  and importantly the debtors' management,
15  we recommended the ESL bid as the
16  highest or otherwise best bid during the
17  auction.
18     Q.   And did you agree with that
19  recommendation?
20          MR. FRIEDMANN:  Object to form.
21     A.   I'm sorry, I'm getting -- I'm not
22  trying to be coy here.  You asked me if
23  we recommended it at any point.  And I
24  answered that.  Now you're asking me if
25  I personally?

JX 096-11

Page 42

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2    Q.   When you said we, who did you
3    mean?
4    A.   I meant Lazard.
5    Q.   Okay.  Understood.  So when you
6    said we, you meant Lazard?
7    A.   Correct.
8    Q.   Okay.  That clarifies it for me,
9    thank you.  Prior to the wee hours of
10   January 16th, had Lazard recommended at
11   any point, from December 28th until
12   January 16th, that the restructuring
13   committee accept any bid from ESL?
14   A.   We were close until you said any
15   bid.  I don't recall making a
16   recommendation before, whether it was
17   January 15th or 16th or 17th, making a
18   recommendation to move forward with that
19   being a successful bid.
20   Q.   So I understand it sounds like
21   there's -- you're having some trouble
22   understandably with specificity in this
23   time period and what bid was on the
24   table.  So why don't I just ask you
25   generally, can you describe for me the

Page 43

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2    process you went through to evaluate the
3    bids and the proposals that were made
4    from December 28th until the one that
5    was accepted in the wee hours of January
6    16?
7         MR. FRIEDMANN:  Object to form.
8    A.   Let me isolate a couple of issues
9    that we helped with.
10   Q.   Sure.
11   A.   There's a lot of factors that go
12   into what's the highest or otherwise
13   best bid.
14   Q.   Sure.  I'm trying to understand
15   what was your role and what you
16   considered in the process so if you can
17   help me understand that that would be
18   helpful.
19   A.   Sure.  Covers a broad range of
20   topics and issues.  I think two that
21   were important to the restructuring
22   committee throughout that period of time
23   was, one, whether or not the bid would
24   allow the company to remain
25   administratively solvent through the

Page 44

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2    pendency of its Chapter 11 case.  And
3    number two, the ability to close the
4    transaction both with respect to ESL and
5    the debtors.
6         Again, two of a list of issues.
7    Q.   Okay.  With respect to the second
8    one, ability to close both for ESL and
9    debtors, can you describe for me in more
10   detail what you mean?
11   A.   In general, an APA has closing
12   conditions, and the question was would
13   we be able to meet those closing
14   conditions in order to close.
15   Q.   And are those conditions economic
16   conditions, timing conditions, any
17   number of conditions that you were
18   considering?
19        MR. FRIEDMANN:  Object to form.
20   A.   Sure.
21   Q.   Meaning it was a range?
22   A.   Sure.
23   Q.   It wasn't any particular thing?
24   A.   It was not one particular
25   condition.

Page 45

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2    Q.   Okay.  Mr. Aebersold, why don't
3    we go back to exhibit 22.  If you can
4    look on the first page I'll see these
5    are minutes from a restructuring
6    committee meeting on December 30th, the
7    meeting was held at 3:30 p.m., and if
8    you look in the paragraph below
9    materials presented you'll see that you
10   are noted as being in attendance.  Do
11   you see that?
12   A.   Yes.
13   Q.   Do you have any reason to believe
14   you weren't there?
15   A.   No.
16   Q.   Do you remember --
17   A.   Telephonically, I was there
18   telephonically.
19   Q.   Do you remember specifically the
20   meeting from December 30th?
21   A.   Generally, I remember the call.
22   Q.   Having reviewed exhibit 22
23   earlier, was there anything that you
24   noted that seemed incorrect or
25   inconsistent with your recollection of

JX 096-12

| Page 46 |
|---|

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2  the call from December 30?
3     MR. FRIEDMANN:  Object to form.
4     A.   I can't recall the call
5  specifically so it's hard to say
6  something that would have been contrary
7  to my lack of specificity.  But
8  generally, nothing jumped out.
9     Q.   If you can look at the second
10 page at the top, the first sentence
11 after the initial redaction, there is a
12 reference to the December 28th ESL bid
13 rendering the estate administratively
14 insolvent by approximately $350 million.
15 Do you see that?
16    A.   No, sorry, which paragraph?
17    Q.   The first, the carryover
18 paragraph.
19    A.   With the redactions?
20    Q.   Correct.  There are redactions in
21 the paragraph.
22    A.   I'm sorry, I thought it was the
23 paragraph below.  My apologies.
24    Q.   No problem.
25    A.   I see it.

| Page 47 |
|---|

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2     Q.   Do you recall generally that the
3  calculations indicated that the bid
4  received on December 28th from ESL would
5  render the estate administratively
6  insolvent by approximately $350 million?
7     MR. FRIEDMANN:  Object to form.
8     A.   Can you repeat the question.
9     Q.   Do you have a general
10 recollection -- or strike that.
11    Is the $350 million number here
12 that's noted on exhibit 22 consistent
13 with your recollection of the amount the
14 estate would have been rendered
15 administratively insolvent in connection
16 with the December 28th ESL bid?
17    MR. WEAVER:  Object to form.
18    MR. FRIEDMANN:  Object to form.
19    A.   I can't recall specifically, but
20 I have no reason to think that this
21 isn't approximately what the calculation
22 said at the time.
23    Q.   Okay.  And then if you go down
24 three paragraphs to the paragraph that
25 starts "The advisors discussed..." do

| Page 48 |
|---|

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2  you see that?
3     A.   Yes.
4     Q.   Can you take a minute just to
5  read that paragraph.
6     A.   Okay.
7     Q.   Do you have any reason to
8  disagree with the summary that is
9  reflected in the paragraph you just read
10 that starts "The advisors discussed..."?
11    MR. FRIEDMANN:  Object to form.
12    A.   I don't have exhibit A in front
13 of me, so, no, I don't have a reason to
14 disagree with that.
15    Q.   Okay.  And what is exhibit A?
16    A.   I don't know, just references an
17 exhibit A that I don't have in front of
18 me.
19    Q.   And would it be helpful -- if you
20 flip the page you'll see exhibit A says
21 global sale process bid qualification
22 overview.  Do you see that?
23    A.   Yes.
24    Q.   Do you know what that is?
25    A.   I can't recall.

| Page 49 |
|---|

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2     Q.   Would it help you to see exhibit
3  A, exhibit B, exhibit C, exhibit D and
4  exhibit E to understand and recall what
5  happened during the December 30th
6  minutes -- or meeting, excuse me?
7     A.   It would help me understand the
8  specifics of potentially what could have
9  been discussed.  But in terms of this
10 paragraph, I think your question was --
11 could you repeat it, but I think you
12 needed to see exhibit A to understand --
13 to answer it.
14    Q.   Look, I agree myself, I haven't
15 seen exhibit A.
16    MR. SORKIN:  Mr. Friedmann, I'd
17 request that we get the exhibits that
18 were attached to all of the minutes.
19 I don't believe we have received any
20 of the exhibits in connection with
21 the production.
22    MR. FRIEDMANN:  I believe all of
23 the documents that were the exhibits
24 were produced.  I'll refer to this
25 one in particular and give the Bates

JX 096-13

## Page 50

AEBERSOLD - HIGHLY CONFIDENTIAL

1  number.  We're not trying to hide it
2  from you.  The way they were
3  maintained in the ordinary course
4  it's almost like they said enclosed
5  and the documents are separate.  But
6  all of the presentations, that's my
7  understanding, were in fact produced
8  so you should in fact have it.
9      MR. SORKIN:  Thank you for that
10  confirmation.
11      MR. FRIEDMANN:  I'm happy to
12  match that up for you.
13      MR. SORKIN:  We can do that at a
14  break or later in the day.
15  Appreciate that.
16      MR. FRIEDMANN:  That's fine.
17  Q.   Okay.  After exhibit A, if you
18  can look at number 5, states "It" it
19  being the ESL bid, "provides minimal
20  consideration for unencumbered assets
21  such as the Sparrow equity."  Do you see
22  that?
23  A.   I do.
24  Q.   What consideration, if any, do

## Page 51

AEBERSOLD - HIGHLY CONFIDENTIAL

1  you recall being provided in the
2  December 28th ESL bid?
3  A.   I can't recall.
4  Q.   Let me ask that again.  What
5  consideration, if any, do you recall
6  being provided in the December 28th ESL
7  bid specifically for unencumbered
8  assets?
9  A.   I can't recall seeing an
10  allocation.
11  Q.   Do you recall if there was any
12  consideration being provided for
13  unencumbered assets in the December 28th
14  bid?
15      MR. FRIEDMANN:  Object to form.
16  A.   Again, I can't recall seeing an
17  allocation.
18  Q.   Do you know what unencumbered
19  assets were included as potential assets
20  in the ESL December 28th bid?
21  A.   Not specifically because I know
22  that moved throughout the process and
23  through the negotiations.
24  Q.   So let's move, fast forward to

## Page 52

AEBERSOLD - HIGHLY CONFIDENTIAL

1  now, the ESL bid that's being considered
2  by the court.  Do you know what
3  consideration specifically is being
4  provided for unencumbered assets?
5      MR. WEAVER:  Objection to form.
6  A.   Again, I don't recall an
7  allocation.
8  Q.   If there was an allocation, would
9  that help you understand what specific
10  consideration is being provided for
11  unencumbered assets?
12      MR. FRIEDMANN:  Object to form.
13  A.   Well, I think if there were an
14  allocation they provided, I would at
15  least know their view of their
16  allocation with respect to the bid.
17  Q.   Have you seen an allocation by
18  the debtors that indicates the debtors'
19  view of the allocation of value in the
20  current bid before the court?
21  A.   I think this goes to the
22  questions earlier.  The way that we've
23  talked about allocation and lining up
24  lines, I don't recall seeing one.

## Page 53

AEBERSOLD - HIGHLY CONFIDENTIAL

1  Q.   Do you have any understanding at
2  all, whether it's through an allocation
3  or otherwise, about the value that the
4  debtors are receiving in connection with
5  the current ESL bid that is before the
6  court in exchange for the unencumbered
7  assets that the debtors are proposing to
8  sell to ESL?
9      MR. FRIEDMANN:  Object to form.
10  A.   I haven't seen a specific
11  allocation.  It's probably a better
12  question for ESL.
13  Q.   The debtors haven't done that
14  analysis as far as you know?
15  A.   The debtors have not allocated
16  ESL's value in their bid, of which I'm
17  aware.
18  Q.   Have the debtors allocated any
19  value for the unencumbered assets that
20  are included in the proposed sale to ESL
21  that is before the court?
22      MR. FRIEDMANN:  Object to form,
23      asked and answered.
24  A.   I would just repeat my prior

JX 096-14

Page 54

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2  answer.
3      Q.   Are you aware of any valuation
4  that the debtors have done with respect
5  to the unencumbered assets that are
6  included in the proposed sale to ESL
7  that is before the court?
8      A.   Could we talk about valuation?
9  What do you mean by that term?
10     Q.   Are you aware of any assignment
11 of value under any definition that the
12 debtors have assigned to the
13 unencumbered assets that are being
14 provided in connection with the proposed
15 sale to ESL that's before the court?
16     A.   That was very particular in terms
17 of an assignment of value.  The reason I
18 asked you to define value, is my
19 question would be would you consider an
20 appraisal of real estate a valuation?
21     Q.   I don't have a specific
22 definition.  I'm asking you based on
23 your understanding of value, are you
24 aware of any value that has been
25 assigned to the unencumbered assets

Page 55

1      AEBERSOLD - HIGHLY CONFIDENTIAL
2  being proposed in connection with the
3  bid to ESL?
4      A.   I can't speak for -- I'm not
5  aware of Lazard preparing a valuation.
6      Q.   Are you aware of any entity?  You
7  indicated appraisals, so I assume you're
8  aware of appraisals of real estate
9  values; is that correct?
10     A.   I'm generally aware that there
11 are appraisals of real estate value.
12     Q.   Were you involved in the process
13 of preparing those appraisals?
14     A.   No.
15     Q.   Other than the appraisals, are
16 you aware of any other process to
17 determine or assign value under any
18 methodology to any of the unencumbered
19 assets that are being proposed in the
20 sale to ESL?
21     A.   When you keep saying, you say the
22 word assign or assignment, can you be
23 more clear with what you're trying to
24 ask there?
25     Q.   Sure.  There are unencumbered

Page 56

1      AEBERSOLD - HIGHLY CONFIDENTIAL
2  assets that are included in the proposed
3  sale to ESL, correct?
4      A.   There are.
5      Q.   Do you have any understanding of
6  what the value of those unencumbered
7  assets are?
8      A.   The reason I was hung up on the
9  word assignment is again I think that
10 ties back into how you described
11 allocation.
12     Q.   Right.
13     A.   I'm trying to go a different
14 direction which is you asked me also if
15 there had been any work done in terms of
16 the value of these assets.
17     Q.   Sure.  I'm asking you a different
18 question now to address your concerns.
19 Mr. Aebersold, do you have any
20 understanding of what the value of those
21 unencumbered assets are?
22     A.   There are certain assets,
23 components of which are unencumbered,
24 and to ask me if I have any sense of
25 value, sure, we've been marketing

Page 57

1      AEBERSOLD - HIGHLY CONFIDENTIAL
2  certain of those assets for several
3  months.  But no, we have not done a
4  valuation and we have not assigned value
5  to specific assets.
6      Q.   Are you aware of any valuation or
7  assignment of value to specific assets,
8  other than the appraisals that we
9  referenced, that the debtors have done?
10         MR. FRIEDMANN:  Object to form.
11     A.   I'll just try to isolate certain
12 words within that.  I'm not aware of a
13 valuation of a specific asset, other
14 than appraisals.
15     Q.   You mentioned certain of the
16 assets you had been marketing for
17 several months.  When did you begin
18 marketing assets for Sears?
19     A.   We began marketing in
20 mid-October.
21     Q.   What assets did you begin
22 marketing?
23     A.   Well, I will begin by saying we
24 would entertain interest on any of the
25 companies' assets.  I think to specify

JX 096-15

Page 58

AEBERSOLD - HIGHLY CONFIDENTIAL

1    certain of those assets in which there
2    were either a level of interest or we
3    made outbound calls, I think the most
4    important of those assets which have
5    components of which are unencumbered,
6    are the assets under the Sears Home
7    Services umbrella.
8    Q.    Any other assets that you can
9    recall that were unencumbered that were
10   included that you either received
11   inbound interest in or expressed sort
12   of, tried to gauge outbound interest in
13   with respect to unencumbered assets?
14   A.    Sure.  And again you have to be
15   careful with the term unencumbered
16   assets.  Maybe it's easier for us if we
17   just say --
18   Q.    Any assets.  I'm fine with that.
19   Any assets that you marketed.
20   A.    Okay.  Again, we had information
21   available with respect to all of the
22   company's assets, certain of which had
23   confidential information memorandums,
24   some of which we had inbound requests

Page 59

AEBERSOLD - HIGHLY CONFIDENTIAL

1    on, some of which we put outbound
2    requests to see if we could attract
3    interest.
4    But everything was marketed to the
5    extent that you're open to have
6    discussions and allow people to do
7    diligence to form a bid on an asset.
8    Q.    Which assets of Sears had you
9    prepared a confidential information
10   memorandum for?
11   A.    We had updated confidential
12   information memorandums with respect to
13   Sears Home Services generally, Parts
14   Direct as a subsidiary entity.  We had
15   information available, it's hard to call
16   it a CIM, but certainly an overview of
17   Innovel.  And again, you have to
18   remember Sears Home Services is an
19   umbrella with five subsidiary
20   businesses.
21   I know that the two underlying
22   subsidiary businesses had their own
23   CIMs.
24   Whether or not SHIP had its own

Page 60

AEBERSOLD - HIGHLY CONFIDENTIAL

1    information memorandum or the franchise
2    business, but I know that those
3    businesses were included in the Sears
4    Home Services overarching CIM.
5    Q.    Which subsidiary businesses do
6    you include in the Sears Home Services
7    overarching umbrella of businesses?
8    A.    It includes the warranty
9    business, the repair business, Parts
10   Direct, SHIP, which is Sears Home
11   Improvement Products, goes by the
12   acronym SHIP, and there's a small
13   franchise business embedded in that
14   business.
15   Q.    When did you prepare the
16   confidential information memorandum for
17   Sears Home Services?
18   A.    At around the time of filing.
19   Q.    When was it finished?
20   A.    I can't recall specifically.
21   Q.    Was it November?
22   A.    I can't recall specifically, but
23   sometime in late October, early
24   November.

Page 61

AEBERSOLD - HIGHLY CONFIDENTIAL

1    Q.    Okay.  We will come back to the
2    marketing in a little bit.  I want to
3    turn back to exhibit 22.  If we go back
4    to page 2, the minimal consideration
5    that we had been looking at for
6    unencumbered assets.  Do you see that
7    line again?
8    A.    Sorry.  Could you direct me to it
9    again.
10   Q.    Sure.  It's in the third full
11   paragraph down, there are five items
12   identified specifically.  And the fifth
13   one is "It provides," it being ESL bid,
14   from December 28th "provides minimal
15   consideration for unencumbered assets
16   such as the Sparrow equity."  Do you see
17   that?
18   A.    Yes.
19   Q.    If I wanted to understand, or if
20   you wanted to refresh your recollection
21   about what that minimal consideration
22   was, where would you look?
23   A.    I don't know.
24   Q.    Would it be contained in the

JX 096-16

Page 62

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2    December 28th definitive bid letter
3    that's marked as exhibit 2?
4    A.   Again, they didn't, not that I
5    recall, ever allocate value.
6    Q.   You mentioned earlier one of the
7    things that you evaluated was
8    conditionality and the ability to close
9    ultimately.
10       Do you recall specifically with
11   respect to the December 28th definitive
12   bid, whether you had any concerns about
13   conditionality associated with that bid?
14   A.   For clarification, you're talking
15   about the December 28th bid?
16   Q.   I am now talking about December
17   28th bid, yes.
18   A.   And your question was do I
19   recall?
20   Q.   Do you recall any concerns you
21   had about conditionality with respect to
22   the December 28th bid?
23   A.   I do.
24   Q.   What do you recall?
25   A.   Can't recall all the specifics.

Page 63

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2    I generally recall having the view that
3    the company wouldn't have enough cash to
4    close the transaction.
5    Q.   And the company not having enough
6    cash to close the transaction, is that,
7    or can you describe for me how that
8    relates to administrative solvency or
9    insolvency?  Are those the same things
10   or are they related to each other but
11   different?
12       MR. FRIEDMANN:  Object to form.
13   A.   Related but different.
14   Q.   Okay.  Can you explain how
15   they're related but different?
16   A.   Well obviously, cash to close a
17   transaction, you're closing the
18   transaction with respect to all
19   administrative claims or using that
20   cash, which would otherwise go to
21   administrative solvency, and so that's
22   how they're related.  But they are
23   distinct and they're separate in that
24   one, you need to close a transaction,
25   i.e., have cash to be able to do that as

Page 64

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2    a first step, and then as a second step
3    to remain administratively solvent.
4    Q.   Okay.  So -- I'm sorry, I didn't
5    mean to cut you off.
6    A.   No, that's okay.
7    Q.   So cash to close, if I understand
8    that, that's enough cash to continue to
9    fund operations to get to a close date;
10   is that correct?
11   A.   No.
12   Q.   No?  Can you tell me then what
13   I'm -- maybe I'm misunderstanding.  If
14   you could tell me cash to close a
15   transaction?
16   A.   Certain conditions precedent
17   under the APA require cash to meet those
18   obligations.  And so having that cash to
19   meet those obligations is generally what
20   I mean when I say cash to close the
21   transaction.
22   Q.   So it's cash to fulfill the
23   conditions that would be contained in
24   the contract, the closing contract, or
25   the contract of sale, excuse me?

Page 65

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2    A.   So articulately said, thank you.
3    Q.   And administratively solvency is
4    looking at sort of a broader set of
5    considerations with respect to the
6    ability to pay the administrative claims
7    or obligations of the entire debtors'
8    estate over some amount of time,
9    correct?
10   A.   That's generally right, yes.
11   Q.   If you can move in exhibit 22 to
12   the third paragraph on the last page and
13   the first sentence states, "Mr.
14   Aebersold presented the key terms of the
15   bids for Sears Home Services."
16       Do you see that?
17   A.   Yes.
18   Q.   Do you remember which bids had
19   been received for Sears Home Services?
20   A.   On December 30th we had bids.  I
21   can't be certain of which we'd received
22   by this point in time.
23   Q.   The next sentence states "He" --
24   that would be you from the sentence
25   before, "stressed the importance of

JX 096-17

Page 66

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2 rescheduling the auction for February
3 2019 to extend the sales process for
4 Sears Home Services, Kenmore, DieHard
5 and Parts Direct if a bid from ESL was
6 not ultimately qualified."
7     Do you see that?
8     A.   I do.
9     Q.   Why was it important to
10 reschedule the auction for February 2019
11 to extend the sales process for those
12 particular business lines?
13     A.   Let's take it in its component
14 pieces.
15     Q.   Sure.
16     A.   So Kenmore and DieHard, again,
17 that IP is not within the debtors'
18 estate and we were in conversations with
19 the PBGC in terms of reaching a deal
20 with them just to get resolution with
21 their outstanding claims.  Those assets
22 have not been marketed.  Information had
23 been made available in the data room,
24 but that would have been a separate
25 process that we had not conducted at

Page 67

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2 that point in time.
3     And so, from our perspective, if a
4 deal with the PBGC required a marketing
5 process, we certainly wouldn't be able
6 to run that full process and close it in
7 January.
8     With respect to Parts Direct and
9 Sears Home Services, we thought it would
10 be valuable with respect to those
11 processes to have a stalking horse in
12 place at the time of the auction.  And
13 so the view here was if we gave people
14 more time and were able to actually take
15 a marked up asset purchase agreement and
16 finalize it and get a deposit, that that
17 could be helpful to a later auction.
18     Q.   Is there a reason that having
19 more time with respect to Sears Home
20 Services and Parts Direct would be
21 different than having more time with
22 respect to other assets of the company
23 in terms of generating interest and
24 having an opportunity to sell certain
25 assets?

Page 68

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2     A.   Which assets?
3     Q.   I guess I'm just wondering
4 generally, there were a specific list of
5 Sears Home Services and Parts Direct and
6 you identified that for those business
7 lines, for those assets of the debtors
8 it would be beneficial to have more
9 time.
10     I'm trying to understand whether
11 there are other assets where more time
12 wouldn't have been helpful and it made
13 sense just to go ahead and sell them?
14     A.   Are you asking theoretically
15 could there have been other assets that
16 it may have been helpful to proceed on a
17 more expedited basis?
18     Q.   I'm asking that it indicates you
19 identified four particular assets of the
20 company.  Are there other assets that
21 would have been different where it would
22 have made more sense to tell them more
23 quickly?
24     A.   I didn't write the minutes or
25 review them.

Page 69

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2     Q.   Sure.
3     A.   I'm just relying on what this
4 says.
5     Q.   Okay.
6     A.   I would assume I named those four
7 in particular.  But whether or not this
8 list is exhaustive or there's others
9 that cut the other direction, I can't be
10 sure.
11     Q.   What about Innovel, would Innovel
12 have been the same?
13     A.   That more time would have helped
14 with the marketing of Innovel?
15     Q.   Yes.
16     A.   I'm not sure more time would have
17 been helpful to the marketing of
18 Innovel.
19     Q.   Why is that?
20     A.   Because Innovel, after a number
21 of conversations with bidders and our
22 own analysis, is not a fully functioning
23 standalone business.  So I'm not exactly
24 sure how more time would have helped us
25 to drive value for a business that

## Page 70

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2 generates negative EBITDA and 75 percent
3 of its revenue is generated from the
4 Sears retail platform that wouldn't
5 exist in the event of a winddown.
6    Q.   What about real estate, would
7 more time have been helpful in marketing
8 the company's real estate assets?
9    A.   I can't answer that. I was not
10 intimately involved with the real estate
11 process.
12    Q.   Did you have any involvement at
13 all in the real estate process,
14 marketing process?
15    A.   Not in the marketing process,
16 other than people contacting me with
17 respect to real estate, not knowing that
18 JLL was actually running that process,
19 answering questions about the overall
20 process and forwarding that to the real
21 estate advisors. Not much more than
22 that.
23    Q.   So if you received inbound
24 inquiries with respect to real estate,
25 you forwarded those on to JLL?

## Page 71

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2    A.   They were forwarded to JLL,
3 individuals at M-III and the companies
4 who were handling real estate. Certain
5 of that inbound interest we logged. If
6 there was another component of the
7 business that they would have been
8 interested in, we would sometimes have a
9 call with them to give the overview of
10 the process, again trying to facilitate
11 that process, although we weren't
12 leading it or directly involved.
13    Q.   You don't have a view as to
14 whether or not more time would have been
15 helpful in marketing the debtors' real
16 estate assets?
17    A.   I can't answer that.
18    Q.   Mr. Aebersold, I wanted to go to
19 sort of the early morning hours of
20 January 16th. If you can recall?
21    A.   Is that Tuesday?
22    Q.   So I believe what I'm talking
23 about, the auction started on Monday,
24 you recall that, January 14th?
25    A.   14th, okay.

## Page 72

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2    Q.   So Tuesday, January 15th, and
3 then if you go to --
4    A.   Wednesday morning.
5    Q.   -- midnight, 1 a.m.
6    A.   Past midnight, that's why I said
7 Tuesday, understood.
8    Q.   So it's Tuesday during the day in
9 terms of when you wake up and before you
10 go to bed, but technically it's
11 Wednesday morning.
12    A.   I got it.
13    Q.   Or when one would normally wake
14 up or go to bed, that might all be
15 different for all of us currently.
16    A.   Fair.
17    Q.   So I'm now talking about late
18 Tuesday night January 15th, early
19 Wednesday morning January 16th.
20    Can you describe for me the
21 meeting, to the extent you were present,
22 at which the restructuring committee
23 decided to accept the ESL bid?
24    A.   I can.
25    Q.   Can you tell me about what time

## Page 73

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2 that was, if you recall?
3    A.   I was in an absolute time warp.
4 I couldn't be at all specific. I think
5 it was just before midnight. You could
6 probably help me with when that
7 occurred, but it seems it was late on
8 Tuesday, whether or not it was Wednesday
9 morning, I can't recall.
10    Q.   Do you recall who was in the room
11 during that meeting?
12    A.   There were a lot of people in the
13 room and on the telephone. But
14 generally speaking, it was
15 representatives of M-III, Weil Gotshal,
16 Lazard, the debtors' management, members
17 of the restructuring committee and
18 advisors to the restructuring
19 subcommittee.
20    Q.   Were you in the room for that
21 meeting?
22    A.   I was.
23    Q.   Do you remember how long the
24 meeting lasted?
25    A.   I can't recall specifically. An

JX 096-19



Page 74

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2 hour?  I'm not sure.
3      MR. FRIEDMANN:  Do you want to
4 not give him the minutes of the
5 meeting to answer all these questions
6 rather than testing his memory on all
7 of this?
8      MR. SORKIN:  No.
9   Q.   What I'm trying to understand is
10 were you in the room for the entirety of
11 the meeting or was it a fluid meeting,
12 there were people in and out?  I'm
13 trying to understand what it looked
14 like?
15   A.   I know exactly where you're going
16 with this and this one is an easy one to
17 answer.  I was there for the absolute
18 entirety of that restructuring committee
19 meeting.
20   Q.   And in terms of the sort of
21 questions presented and advice given, at
22 that meeting was there a time where you
23 recall, and I know we talked about this
24 earlier so I just want to line it up to
25 this meeting, was there a time during

Page 75

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2 the meeting we're talking about, sort of
3 early morning hours of January 16th,
4 where you recommended, based on input
5 from all of the advisors that we talked
6 about earlier, that the restructuring
7 committee accept the ESL bid?
8   A.   Yes, the answer that I provided
9 previously that you're alluding to was
10 at the end of that particular meeting.
11   Q.   Let me go ahead and hand you
12 what's been previously marked as exhibit
13 49.
14   A.   Is this the answer key to my
15 memory test?
16      MR. FRIEDMANN:  Yes.  Why we took
17 the memory test first, Joseph will
18 let us know at some later date.  By
19 the way, here are your Bates numbers.
20      MR. SORKIN:  Thank you.
21      (Exhibit 49, previously marked
22 and shown to witness.)
23   Q.   Mr. Aebersold, I've handed you
24 what was previously marked as exhibit
25 49.  Exhibit 49 are the minutes of the

Page 76

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2 restructuring committee meeting from
3 January 16th, these indicate 1 a.m.,
4 again consistent with what you recall
5 generally about the meeting.
6      If you could take just a minute to
7 review the minutes and I will then have
8 a couple of questions for you.
9   A.   Okay.
10   Q.   Okay.  Before we look at a couple
11 of items specifically in exhibit 49, I'm
12 actually just curious, why was it when I
13 asked the question about whether you
14 were in the meeting you indicated I know
15 where you're going with this?
16   A.   Sure.  Because I, at the
17 conclusion of the meeting, stepped into
18 the hallway and left everyone else in
19 the meeting to try one more effort
20 against ESL to derive more value from
21 their bid.  And we staged it tactically
22 so it looked like the meeting was still
23 ongoing but that we were struggling
24 getting approval, so I went back as a
25 tactical effort to improve the bid one

Page 77

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2 last time.
3   Q.   And --
4   A.   So it worked in that it came to
5 you that I was not actually part of the
6 meeting as it was ongoing.  But I'm
7 pleased that that worked.
8   Q.   So when you came out of the
9 meeting, to your understanding the
10 meeting had already concluded and a
11 decision had been made, and I'll note in
12 the -- in exhibit 49 towards the end it
13 says, in the second to last paragraph,
14 "Subject to giving Mr. Aebersold the
15 authority to try to negotiate for
16 further improvements."  Is that what you
17 were doing when you left the meeting?
18   A.   That's correct.
19   Q.   Let me ask you, if you look at,
20 on page 2 of exhibit 49, the first
21 sentence, "Mr. Aebersold stated that
22 there was $87 million of pro forma of
23 additional value required, creating a
24 risk that there would not be enough cash
25 to close the transaction or to become

Page 78

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2  administratively solvent."
3     Is that what we were talking about
4  earlier with respect to cash to close,
5  meaning cash in order to meet the
6  conditions in the APA, and separately,
7  administrative solvency which we
8  discussed earlier?  Are those two
9  concepts the same two concepts we talked
10 about earlier?
11    MR. FRIEDMANN:  Object to form.
12    A.   Same two concepts.  Not speaking
13 to the actual amount of this number
14 here, but I believe as it's used here
15 this goes more to administrative
16 solvency, a component of which is the
17 cash consideration necessary to close.
18    Q.   Okay.  Understood.  And the
19 number here indicates $87 million pro
20 forma, correct?
21    A.   Pro forma for?
22    Q.   "Of additional value required" in
23 the same sentence?
24    A.   It's an odd usage of the words
25 pro forma but yes, here it states the

Page 79

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2  number is 87 million.
3     Q.   And do you remember whether that
4  87 million, as I think you indicated,
5  really went more towards administrative
6  solvency?
7     A.   I can't recall specifically.
8     Q.   In terms of at this meeting, do
9  you recall whether you presented or
10 someone from Lazard presented to the
11 restructuring committee information
12 showing what the potential or the
13 anticipated administrative solvency
14 might be?
15    A.   At this meeting?
16    Q.   Yes.
17    A.   Yes, we spoke to those issues,
18 among others, during this meeting.
19    Q.   And during this meeting, was it
20 Lazard's responsibility for determining
21 what that number was, or was it somebody
22 else, M-III or the company, with respect
23 to administrative solvency?
24    A.   So responsibility probably not
25 the right term, because again, as we

Page 80

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2  talked about before, most of the inputs
3  to administrative solvency or cash to
4  close are numbers that are coming from
5  the company or its financial advisor in
6  this case, M-III.  And so those
7  components were consolidated and
8  summarized in work that we took the
9  lead, I wouldn't say responsibility, we
10 took the lead on.  And again, at that
11 point it's mostly arithmetic.
12    Q.   If you look down to the paragraph
13 at the bottom of the second page of
14 exhibit 49 that carries over to the
15 third page that starts "Mr. Aebersold
16 stated that the ESL final bid was
17 materially better."  Do you see that?
18    A.   I do.
19    Q.   The second sentence states "While
20 the gap was not closed completely and he
21 could not say with confidence that there
22 would be sufficient liquidity to close
23 the transaction and to be
24 administratively solvent, ESL had added
25 a total of $153 million in value."  Do

Page 81

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2  you see that?
3     A.   I do.
4     Q.   Is that consistent with your
5  recollection of what you told the
6  restructuring committee during this
7  meeting?
8     A.   Can't recall specifically, but
9  generally, yes.
10    Q.   Do you remember what the $153
11 million in value was that ESL had added
12 at this time?
13    A.   I can't recall specifically.  I
14 know there was some give and takes.
15    I know that one component of that
16 number was the assumption of the full
17 amount of the Junior DIP.  They were
18 also leaving some cash behind with the
19 company, and I believe assuming some
20 other liabilities.
21    Q.   Do you know if this hundred --
22 and if it helps I'll refer you back to
23 the last paragraph on the first page of
24 exhibit 49 that's a carryover to the
25 second page, it identifies a number of

JX 096-21

Page 82

AEBERSOLD - HIGHLY CONFIDENTIAL

1 items that were contained in ESL's final
2 proposal. Do you see that?
3 A. I do.
4 Q. If you want to take a minute and
5 look and see if these numbers help you.
6 Do you know if the $153 million in value
7 includes or excludes SHIP?
8 A. I don't know for certain.
9 However, I believe that number excludes
10 -- sorry, includes SHIP because it's a
11 net number obviously. Sorry. Let me
12 back up a second.
13 Q. Sure.
14 A. When you say include or exclude,
15 you mean the number or the package of
16 consideration?
17 Q. I was talking about the number.
18 So let's do this a little differently.
19 If we go back to page 1 on exhibit 49
20 and identify the items that were
21 included in ESL's final proposal, the
22 first one indicates that all $350
23 million of the Junior DIP would be
24 assumed by Newco. Do you see that?

Page 83

AEBERSOLD - HIGHLY CONFIDENTIAL

1 A. Sorry, which page is that?
2 Q. Sure, it's the first page,
3 carryover to the second page.
4 A. Yes, I do. Sorry.
5 Q. Is there a value that you're
6 aware of that was assigned to all $350
7 million of the Junior DIP being assumed?
8 A. Was there a value placed on $350
9 million?
10 Q. Sure, here's what I'm trying to
11 do. I'm trying to determine that $153
12 million that we talked about on page 3
13 of exhibit 49, what makes up that 153
14 million.
15 So if we look at ESL's final bid,
16 they're going to assume all $350
17 million. It's my understanding that
18 they were already assuming $230 million
19 and that the change was that they would
20 also assume 120. Is that your
21 understanding too?
22 A. Yes. And you're going to hate me
23 for doing this, let me help you out. I
24 don't have a calculator with me. But in

Page 84

AEBERSOLD - HIGHLY CONFIDENTIAL

1 terms of -- and again I think you
2 probably have a presentation that would
3 answer this question for us -- the 153
4 is likely, and is going to be a ball
5 park figure, the sum of the $120 million
6 of additional Junior DIP financing, plus
7 19, plus 4 for the transfer taxes and
8 mechanic's liens respectively, plus 17,
9 plus 13, minus 39. I see Tom from
10 Houlihan with his calculator and he can
11 give me a nod if that's the math.
12 Q. So I understand all of the
13 numbers that you used based on exhibit
14 49 in the last paragraph, the 120, the
15 19, the 4, the 17, the 13. I don't
16 understand the 39. Can you tell me what
17 the 39 is?
18 A. Sorry. Did I say add 39 at the
19 end of that?
20 Q. You said subtract 39?
21 A. Subtract 39. Okay. So here's,
22 again working from memory in this set of
23 minutes, I think the 39 would be
24 calculated as follows: The purchase

Page 85

AEBERSOLD - HIGHLY CONFIDENTIAL

1 price for SHIP was $60 million. The
2 buyer failed to lock down its debt
3 financing or equity financing, and that
4 transaction was based on feedback from
5 the buyer not going to be able to close
6 in time.
7 From the $60 million purchase
8 price, we had assumed that we were going
9 to be paying down secured lenders $15
10 million of those proceeds, which meant
11 the benefit to the estate had been $45
12 million.
13 However, as part of that
14 transaction there was a $6 million
15 deposit in an escrow account. And so we
16 were netting that 6 from the 45. And
17 again working from memory, I think the
18 number that was what it meant for them
19 to take the asset or the proceeds, would
20 have been $39 million.
21 Q. Okay, understood, thank you.
22 That helps.
23 When I add the 120, the 19, the 4,
24 the 17, the 13 and then subtract the 39,

JX 096-22

Page 86

AEBERSOLD - HIGHLY CONFIDENTIAL
1    AEBERSOLD - HIGHLY CONFIDENTIAL
2  I get $134 million.  And I'm looking to
3  the financial advisors to confirm that
4  my idiot math is right.
5      MR. DIAZ:  You need to subtract
6  out the cash too.
7      MR. FRIEDMANN:  May I make a
8  suggestion?  That if we use -- we
9  have documents that go through all of
10  this math and that were put together
11  at the time and immediately
12  thereafter.  So rather than
13  everybody, lawyers trying to do math
14  which is always a fun exercise.
15      MR. SORKIN:  Dangerous exercise,
16  yes.
17      MR. FRIEDMANN:  If we pull out
18  the document we may be able to get a
19  more accurate representation of what
20  exactly these numbers represent and
21  what they all mean.
22  Q.   With respect to the 153, other
23  than the information we've gone through
24  in order to get to any additional
25  specificity, would you need to look at

Page 87

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2  additional documents?
3  A.   Yes.
4  Q.   Why don't we look at the third to
5  last paragraph on exhibit 49.
6  A.   Okay.
7  Q.   It states "The committee sought
8  confirmation that the recommendation of
9  Weil, M-III, Lazard and management was
10  to pursue the ESL final bid."  Do you
11  see that?
12  A.   Yes.
13  Q.   And the next sentence states that
14  "Mr. Meghji stated that while
15  administrative solvency could not be
16  assured, he agreed."  Do you see that?
17  A.   I do.
18  Q.   And Mr. Meghji is at M-III,
19  correct?
20  A.   Correct.
21  Q.   The next sentence states "Mr.
22  Riecker stated that he believed the
23  company's liquidity could be managed and
24  he agreed on behalf of management."  Do
25  you see that?

Page 88

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2  A.   I do.
3  Q.   And Mr. Riecker is the CFO and
4  part of the office of the CEO of the
5  company, correct?
6  A.   Correct.
7  Q.   I don't see any information that
8  Lazard weighed in or provided a
9  recommendation --
10      MR. FRIEDMANN:  Object to form.
11  Q.   -- that is reflected in exhibit
12  49?
13      MR. FRIEDMANN:  Same objection.
14  A.   Yes, I don't see it in this
15  particular paragraph.  But as I read it
16  as you showed it to me, I believe I did
17  in the carryover paragraph on the prior
18  page.
19  Q.   So when you say that, are you
20  reading "Mr. Aebersold stated that the
21  ESL final bid was materially better,"
22  that paragraph?
23      MR. FRIEDMANN:  Take your time.
24  A.   Sorry.  That paragraph in
25  conjunction with the paragraph that is

Page 89

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2  one, two, three, four above it.
3  Q.   Okay.  So your recollection is
4  that the information contained in the
5  two paragraphs you just identified is
6  consistent with your recommendation to
7  the restructuring committee to pursue
8  the ESL final bid?
9  A.   Generally speaking, I think the
10  recommendation had a number of
11  components, two of which, which I'm
12  heavily relying on other people for that
13  input, on the basis of what was provided
14  to me and the restructuring committee at
15  that time, on that basis, again, input
16  from Weil, advisors, subcommittee
17  advisors, we did recommend moving
18  forward with the transaction.
19  Q.   Okay.  And when you say two of
20  which you are relying on for other
21  people, are you indicating relying on
22  information from other advisors like
23  Weil and the restructuring subcommittee
24  and M-III?
25      MR. FRIEDMANN:  Object to form.

JX 096-23

Page 90

AEBERSOLD - HIGHLY CONFIDENTIAL

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2    Q.   Or were you talking about
3    information that came from other
4    advisors?
5    A.   Sorry, if you could go back to
6    the top of your question, you said to?
7    Q.   I'm sorry, in your answer, just
8    to be clear.
9    A.   Yes.
10    Q.   You said "Generally speaking, I
11    think the recommendation had a number of
12    components, two of which, which I'm
13    heavily relying on other people for that
14    input." What were those two? I just
15    wanted to make sure I understood.
16    A.   I was probably speaking with too
17    much specificity in saying two of which.
18    There are a number of which I need input
19    from others. The two I was referencing
20    in particular there are the notion of
21    administrative solvency or solvency and
22    being able to meet the conditions to
23    close importantly with respect to
24    company cash to meet those obligations.
25        MR. SORKIN:  Understood.  We've

Page 91

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2    been going about an hour and a half
3    or maybe more, why don't we take a
4    break.
5    A.   Do we need one? I'm just time
6    sensitive and so I'm happy to grind
7    through.  I do have a hard stop this
8    afternoon at 5.
9        MR. SORKIN:  Personally, yes, I
10    need a quick break.  But, yes.
11        (A recess was had.)
12    Q.   Mr. Aebersold, we talked a little
13    earlier about the insolvency analysis
14    and you indicated that a lot of what
15    Lazard had done was sort of math in
16    determining the insolvency analysis.
17    I'm going to hand you what was
18    previously marked as exhibit 14.
19        (Exhibit 14, previously marked
20    and shown to witness.)
21    Q.   And see if you can take a minute
22    to look at that email and attachment
23    that's contained in exhibit 14 and let
24    me know once you've had a chance to
25    review it.

Page 92

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2    A.   Okay.
3    Q.   Okay.  What I want to look at,
4    you'll see that exhibit 14 is an email
5    that went out to a large group of
6    advisors and restructuring committee
7    members and I believe including yourself
8    as part of the Project Blue RX at
9    Lazard.com; is that correct?
10    A.   That should have been.
11    Q.   And this is an email that went
12    out on Wednesday, January 16 at 10:24
13    p.m. So just to orient you this is the
14    day later that evening, after the bid,
15    ESL bid has been accepted but before the
16    auction is closed and finalized because
17    there were additional -- excuse me --
18    because the bid was subject to
19    additional documentation.  Do you recall
20    that?
21    A.   Yes, I do.
22    Q.   If you look at the attachment,
23    these are discussion materials titled
24    Project Blue. Can you tell me what your
25    role or Lazard's role was in preparing

Page 93

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2    the discussion materials?
3    A.   Sure. Lazard's role was to
4    aggregate the information and I believe
5    we put the presentation together.
6    Q.   Let's look specifically at slide
7    1. And this is Additional Value
8    Required is the title of the slide, do
9    you see that?
10    A.   Yes, I do.
11    Q.   And is it correct to describe
12    this slide as representing the amount or
13    the value needed to determine or to
14    assess administrative solvency?
15    A.   Yes, I think it's fair to say
16    this was a calculation based on input
17    from the company and M-III to estimate
18    issues with respect to administrative
19    solvency.
20    Q.   And what I want to do, we talked
21    earlier about 503(b)(9) claims, I want
22    to go through each of the claims and
23    understand whether, other than
24    aggregating the information and doing
25    math, Lazard had any additional input.

24

**JX 096-24**

Page 94

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2    So let's start on the left side,
3    administrative and other priority claims
4    uses of value.  Do you see that side of
5    the slide?
6    A.   I do.
7    Q.   And under the admin claims or
8    administrative claims, we talked about
9    the 503(b)(9) claims already, correct?
10    A.   Sure.
11    Q.   The accounts payable, can you
12    describe for me what involvement, if
13    any, Lazard had in determining whether
14    $196 million was the appropriate amount
15    for the accounts payable?
16    A.   Generally speaking, and I can't
17    remember particular to this particular
18    build up, relatively limited in terms of
19    deriving that number other than probably
20    reviewing some schedules that had been
21    produced along the way or maybe even the
22    day of this.  But we certainly didn't
23    generate the numbers.
24    Q.   In terms of reviewing schedules,
25    do you remember specific schedules that

Page 95

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2    Lazard reviewed, whether it was with
3    respect to specifically exhibit 14 or
4    generally this type of analysis?
5        MR. FRIEDMANN:  Object to form.
6    A.   I can't remember specifically.  I
7    do know that a number of these line
8    items were part of a model that would
9    have an Excel schedule or someone would
10    give output and send it to us or we'd
11    receive the number with backup.  I can't
12    remember specifically though.
13    Q.   Do you recall who it was that
14    determined the build up to the $196
15    million in accounts payable?
16    A.   Apologies, your question was who
17    in particular?
18    Q.   Right.  What I'm asking is
19    whether that was kind of an M-III, an
20    M-III and the company, just the company
21    or somebody other than Lazard?
22    A.   I can't be sure but it was
23    generally M-III and the company.
24    Q.   With respect to the property
25    taxes, if we go down to that, did Lazard

Page 96

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2    have any involvement in determining the
3    $135 million included for the property
4    taxes?
5    A.   I can't recall specifically.
6    Again, we may have reviewed a schedule
7    or had input into it, but we certainly
8    didn't lead deriving that number.
9    Q.   Remainco winddown costs, did
10    Lazard have any input into determining
11    that number?
12    A.   I believe this is a number, it's
13    an estimate from the M-III analysis.
14    This one I can recall over time seeing
15    build up schedules to this number.  But
16    again, I wouldn't say it's our number,
17    but I can remember reviewing input into
18    that number.
19    Q.   When you say reviewing input, did
20    you review and provide some judgment as
21    to what the number should be or whether
22    the number was correct?
23        MR. FRIEDMANN:  Object to form.
24    A.   I wouldn't classify it as
25    judgment as to whether or not it's

Page 97

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2    correct.  I think that we probably
3    reviewed schedules as this number was
4    being created and likely commented on
5    them along the way.
6    Q.   Did you come up with the
7    schedules?
8    A.   We did not develop the schedules
9    that would have supported this.
10    Q.   Do you remember what makes up the
11    Remainco winddown costs?
12    A.   I can't recall specifically.
13    Q.   Do you remember generally what
14    those categories are, that make up the
15    Remainco winddown costs?
16    A.   In a very general sense, it would
17    be the cost to get to a plan of
18    reorganization with whatever corpus of
19    assets are remaining in the estate,
20    excluding professional fees.  But again,
21    I can't remember specifically what the
22    breakdown is.
23    Q.   With respect to the 503(b)(9)
24    claims, the accounts payable and the
25    other items listed under the admin

JX 096-25

Page 98

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2  claims, you'll see the next column over
3  says Less: ESL Value. Do you see that?
4      A.   I do.
5      Q.   Can you tell me what involvement
6  you had, if any, in negotiating the
7  value that ESL would provide in
8  connection with each of those claims?
9      A.   Yes. Lazard certainly had a role
10  in the negotiation of the economic terms
11  of the transaction. And to the extent
12  that these have an economic impact on
13  the deal, which these do, we likely
14  would have been involved.
15      Q.   Do you remember or can you
16  describe for me how it was that the ESL
17  value of $139 million was arrived at in
18  connection with the 503(b)(9) claims?
19      A.   Not specifically. It was a
20  heavily negotiated number when we
21  continued to ask them to take more or
22  assume more, and they continually pushed
23  back to assume less, and the number we
24  settled on was 139.
25      Q.   Was the 139 based on their

Page 99

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2  assessment of the actual administrative
3  claims, or was it simply a result of the
4  negotiation and what they were willing
5  to do at the end of the day?
6      MR. WEAVER:  Objection.
7      MR. FRIEDMANN:  Object to form.
8      A.   I can't recall specifically but
9  it was the outcome of negotiation. And
10  I can't speak as to what they thought
11  the number was.
12      Q.   Do you remember ever seeing or
13  being provided with an assessment from
14  ESL of what the 503(b)(9) claims would
15  be?
16      A.   I can't recall.
17      Q.   What about with respect to
18  accounts payable, is the negotiation
19  around that number any different from
20  the 503(b)(9) number?
21      A.   Generally speaking, I don't
22  believe so. I do know one component of
23  the negotiation around the accounts
24  payable is there was a certain amount of
25  disputed accounts payable.

Page 100

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2      So as I sit here today
3  recollecting the 166 number, I can
4  recall getting more 503(b)(9) claims
5  assumed. There was a tension between
6  getting those assumed and accounts
7  payable assumed because if they're
8  disputed accounts payable you
9  potentially wouldn't have to pay 100
10  cent dollars with respect to all of
11  those. And so generally your framework
12  that we discussed -- sorry, our
13  framework that was a negotiated number
14  is the same. I can remember a slight
15  distinction between the two.
16      Q.   Do you have an understanding
17  based on the negotiation of the
18  mechanism for how 503(b)(9) claims that
19  are being assumed, the $139 million by
20  Newco, will be paid?
21      A.   The mechanism?
22      Q.   Correct.
23      A.   I do not.
24      Q.   What I'm asking more specifically
25  is, do you know whether the expectation

Page 101

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2  is that debtors will pay those 503(b)(9)
3  claims and then the estate will be
4  reimbursed by Newco, or whether Newco is
5  going to pay those claims directly, and
6  if so when? When I say the mechanics,
7  that's what I'm trying to understand,
8  how those actually get paid and who does
9  it and when?
10      A.   I don't know the exact mechanics.
11  Again, I was just involved in the
12  economic agreement.
13      Q.   Do you know if there is an
14  agreement between ESL and the debtors as
15  to how those mechanics will -- as to
16  those mechanics with respect to the
17  payment of 503(b)(9) claims?
18      A.   I can't recall.
19      Q.   Do you know if the APA addresses
20  the mechanics of how the 503(b)(9)
21  claims will be paid and when by Newco?
22      A.   Again, not specifically.
23      Q.   And if I ask you the same
24  questions about mechanics with respect
25  to accounts payable, do you have any

JX 096-26

AEBERSOLD - HIGHLY CONFIDENTIAL

1  different understanding about the
2  mechanics with respect to accounts
3  payable?
4     A.   Not specifically.
5     Q.   Do you know if a 503(b)(9) claim
6  or accounts payable claim is not paid
7  postclose, whether the debtors will
8  still be liable for that obligation?
9     A.   Not specifically.  That's
10  probably a better question for counsel.
11     Q.   Can you tell me what your
12  involvement is with respect to
13  negotiating the specific provisions in
14  the APA?
15     A.   When you say the specific
16  provisions, are you talking about the
17  actual language in the document?
18     Q.   Correct.
19     A.   Our role is conceptual in nature.
20  We are not wordsmithing and sitting in
21  on drafting sessions and reviewing every
22  line of the purchase agreement.
23     Q.   Okay.  So your understanding is
24  the economic terms of the deal with ESL

AEBERSOLD - HIGHLY CONFIDENTIAL

1  are that ESL will assume up to $139
2  million in 503(b)(9) claims but as to
3  exactly how that happens and how the
4  provisions are provided for in the APA,
5  that's drafting that is done separate
6  from you; is that correct?
7     A.   The economic deal was for them to
8  assume $139 million of 503(b)(9) claims.
9     Q.   If we go to the other category a
10  little bit lower down on the page, I
11  want to skip to cure costs.  Do you see
12  that?
13     A.   Yes.
14     Q.   And there is $200 million in
15  estimated cure costs and it appears less
16  ESL value of $200 million.  Is it
17  correct that your understanding of the
18  economic terms of the sale to ESL
19  include ESL assuming up to $200 million
20  your costs?
21     A.   Sorry to be so specific.
22     Q.   Sure.
23     A.   I just have this document in
24  front of me.  I can't recall if the cure

AEBERSOLD - HIGHLY CONFIDENTIAL

1  cost is an up to cap or they just agreed
2  to assume the cure costs.  I can't weigh
3  in on that.  I know the economic at
4  least general agreement was for them to
5  assume the cure costs for assets in
6  which they're taking.
7     Q.   So your understanding of the
8  agreement was for ESL to assume the cure
9  costs, and whether or not there was a
10  cap is not something you recall?
11     A.   No, that's not to say I don't
12  recall.  Just when you said it, is that
13  the agreement, I don't know if that
14  actually is what it said and I can't
15  recall the specifics about negotiating
16  that specific point.  I just generally
17  remember cure cost being assumed.  But
18  the specifics around it as to a cap, I
19  don't recall specifically.
20     Q.   Do you have any recollection of
21  why $200 million is included here for
22  cure costs?
23     A.   I don't specifically.
24     Q.   Was that an estimate based on the

AEBERSOLD - HIGHLY CONFIDENTIAL

1  cure costs that was provided by ESL?
2     A.   I'm sorry, I can't recall.
3  Again, that's an estimate coming from
4  the company and M-III.  Whether or not
5  ESL had any input or a view, I don't
6  know.
7     Q.   Do you know which contracts ESL
8  intends to assume?
9     A.   Not specifically, but a
10  substantial portion of them.
11     Q.   Are you involved in the
12  negotiation or determination of which
13  contracts ESL intends to assume?
14     A.   I am not.
15     Q.   Are you aware that currently
16  there is a proposal to push off the
17  hearing on resolution or objection to
18  cure costs until some time after the
19  hearing on the sale?
20        MR. WEAVER:  Objection to form.
21     A.   Can you repeat the question?
22     Q.   Sure.  If the sale closes -- well
23  strike that.
24        What is your understanding of an

AEBERSOLD - HIGHLY CONFIDENTIAL

1  
2 expected closing date for the sale
3 transaction assuming it's approved by
4 the court?
5     A.    February 8th, if that is a
6 Friday.
7     Q.    Yes, February 8th is a Friday.
8 In the event that cure costs are not
9 paid in advance of close, and let's for
10 this discussion assume that's February
11 8th, who would be responsible for paying
12 cure costs post-close?  Is that the
13 debtors or ESL?
14         MR. FRIEDMANN:  Object to form.
15     A.    Again, I think this comes down to
16 the mechanics of the document which I'm
17 not that specifically familiar with.
18     Q.    Have you seen any liquidity
19 analysis for the debtors from close
20 through any period of time in February
21 -- excuse me -- in 2019?
22         MR. FRIEDMANN:  Object to form.
23     A.    Sorry, I can't recall
24 specifically.  I know that there have
25 been longer dated forecasts, but I can't

AEBERSOLD - HIGHLY CONFIDENTIAL

1  
2 recall the time at which I saw those or
3 any specifics.
4     Q.    Have you prepared, or has Lazard
5 prepared, a liquidity forecast for the
6 debtors from close until any date in the
7 future?
8     A.    I do not believe Lazard has done
9 so.
10     Q.    Do you know if any of the
11 debtors' advisors have done so?
12     A.    I'm not sure.
13     Q.    Do you know if --
14     A.    Specifically, I know that I've
15 seen forecasts that go out further that
16 estimate costs and expenses going
17 forward which informs some of these
18 numbers.  But I just can't recall
19 specifically.
20     Q.    Have you seen a liquidity
21 forecast that has been prepared by the
22 company with respect to the company's
23 liquidity from close for any date in the
24 future?
25     A.    Let me be more -- have you answer

AEBERSOLD - HIGHLY CONFIDENTIAL

1  
2 a question.  When you say forecast,
3 there certainly have been estimates that
4 we've seen of costs and expenses.  I
5 think that would likely under the term
6 forecast probably meet that.
7     Q.    And those costs and expenses, who
8 prepared those?
9     A.    M-III and the company.
10     Q.    And are those different than the
11 weekly 13-week cash flow forecasts that
12 are prepared by M-III and the company?
13     A.    It's hard to say.  I'm sorry, I'm
14 not trying to be difficult here.  But to
15 say it different, typically these are
16 embedded in pretty extensive models that
17 are all integrated.  And to get an
18 output or to run a scenario from that
19 model, I don't know how you say that
20 that's somehow different.
21     Q.    When you say you recall having
22 seen forecasts or estimates, are you
23 thinking about a specific document?
24     A.    I'm thinking of output from the
25 model likely.

AEBERSOLD - HIGHLY CONFIDENTIAL

1  
2     Q.    And when you saw it, did you see
3 it on a computer screen, did you see it
4 on a document?
5     A.    I don't recall specifically.
6     Q.    But it's not anything that you or
7 Lazard was asked to do?
8     A.    I don't believe Lazard has been
9 asked to do so.
10     Q.    If you go back to exhibit 14,
11 slide 1, and we go to the right side
12 now, Additional Value Required.  Do you
13 see that?
14     A.    I do.
15     Q.    And there if you look at the red
16 box, that carries over the remaining
17 claims, the $356 million of remaining
18 claims from the left side of the page.
19 Do you see that?
20     A.    I do.
21     Q.    And then there's some deducts for
22 cash or other sources of funds that
23 would be available to pay that $356
24 million.  Do you see that?
25     A.    I do.

AEBERSOLD - HIGHLY CONFIDENTIAL

Q.   For the first two, company cash available at close and company cash available post-close, did you or Lazard have any involvement in determining what makes up those amounts?

A.   Sorry to be more precise.  In the segregation of the 79 total between the two lines?

Q.   In any aspect of it or input into the math that Lazard did?

A.   I can't recall specifically. Again, I've got a large team working with me.  They likely had input.  I can't recall specifically.  Or I don't know specifically.

Q.   Is it part of Lazard's engagement to help the company manage liquidity?

A.   I think we participate in helping the company manage liquidity, but I wouldn't say that's a primary function.

Q.   As between Lazard and M-III, would you agree that M-III, M-III's engagement is more focused on helping the company manage liquidity than as

AEBERSOLD - HIGHLY CONFIDENTIAL

compared to Lazard?

A.   I think that's fair.

Q.   If you look down -- strike that.

If you look in the sort of gold box it says Pro Forma Additional Value Required and indicates $62 million.  Do you see that?

A.   I do.

Q.   Do you recall at the time of the auction that the advisors' understanding of the additional value required to address administrative solvency was approximately $62 million?

A.   When you say at the auction can you be more specific?

Q.   Sure.  This is dated January 16th.  So I'm trying to understand, this is $62 million.  I understand that the rest of exhibit 14 talks about ways to mitigate in some ways that $62 million.

What I'm trying to understand is, over the course of the auction, was there a different number that the advisors and the restructuring committee

AEBERSOLD - HIGHLY CONFIDENTIAL

were considering when they were evaluating kind of what do we have to address in terms of value to get to administrative solvency?

A.   First, the number moved with the auction.  This number changed as the bid changed.  But again, I think what this represents simply is a calculation of input numbers to administrative solvency from the debtors' management in M-III. At the time of the closing of the auction and when this was distributed, what this represents here, I'm reading it 62 million, I think that's what was conveyed to the restructuring committee.

Q.   Did Lazard provide any advice? Did you or Lazard provide any advice directly to the restructuring committee with respect to the company's ability to address that $62 million potential shortfall with respect to administrative solvency?

A.   Can't comment on whether we gave advice generally in terms of the

AEBERSOLD - HIGHLY CONFIDENTIAL

likelihood.  We certainly weren't the primary party speaking to whether or not that was achievable.

Q.   Do you remember providing any advice as to whether or not that was achievable to address the $62 million identified on exhibit 14?

A.   Only that the identified opportunities that we had reviewed, and they were reasonable.

Q.   What did you do to determine that the identified opportunities were reasonable?

A.   We reviewed schedules from the company and M-III, which derived the opportunity list that they talked with the restructuring committee about and asked questions.  We were familiar with the schedules.

Q.   In terms of opportunities, if you can turn to slide 3, slide 3 in exhibit 14 is entitled Incremental Sources of Value & Risks.  Do you see that?

A.   I do.

JX 096-29

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2    Q.   Are those opportunities to
3    address the -- to potentially address
4    the $62 million?
5    A.   They are certain of the
6    enumerated opportunities that were
7    identified at that time.
8    Q.   At the time of the auction do you
9    recall, and take a minute to look at
10   slide 3 -- at the time of the auction do
11   you remember any opportunities that were
12   identified or provided to the
13   restructuring committee other than
14   what's included on slide 3?
15   A.   Not specifically, but there was a
16   conversation, of which we were only
17   tangentially involved, of identifying
18   opportunities and risks.  And I can't
19   recall specifically if these lists were
20   exhaustive.  But it was a -- there was a
21   fairly lengthy discussion on this topic
22   and there were certain -- certainly
23   management had other ideas how to
24   improve upon this.  And in fairness,
25   people also identified risks associated

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2    with it, I think represented by the TBD.
3    I can't speak to whether this was
4    exhaustive at that point in time.  This
5    is what the page reflects.
6    Q.   So what I'm asking specifically
7    is other than the list that's identified
8    on slide 3, and let's talk about first
9    potential incremental sources, do you
10   remember any incremental sources that
11   were discussed with the restructuring
12   committee at the time of the auction?
13   A.   I can't recall specifically.
14   Q.   With respect to risks to
15   proceeds, other than the three that are
16   identified, one of which being other
17   TBD, do you remember any specific
18   additional risks that were discussed
19   with the restructuring committee at the
20   time of the auction?
21   A.   I can't recall the specifics.  I
22   do know that other risks were noted.
23   Q.   Just specifically what they were,
24   you don't recall?
25   A.   I can't recall the specifics.

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2    Q.   Since the time of the auction,
3    what has Lazard's role been in trying to
4    achieve or act on the opportunities
5    identified as potential incremental
6    sources, whether on this list or
7    otherwise?
8    A.   As most of them are operational
9    in nature, not significantly.
10   Q.   Who as to your understanding, who
11   is it that is primarily responsible for
12   trying to act on the opportunities
13   identified in potential -- as potential
14   incremental sources of funding?
15   A.   I think it's a collective effort
16   amongst all the advisors.  But I would
17   think in terms of the laboring oar is
18   shared between M-III and management of
19   the debtors.
20   Q.   Is there any one you can think of
21   Lazard being involved in directly?
22   A.   Of the items listed here on page
23   3, I wouldn't say that Lazard has the
24   laboring oar on any of them.  Not to say
25   we have no involvement.  But again, it's

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2    not -- we're not leading those efforts.
3    Q.   Are there any, other than those
4    listed on slide 3, that Lazard has the
5    laboring oar in terms of potential
6    incremental sources to address the
7    potential administrative solvency
8    shortfall of the debtors?
9    A.   In terms of implementation?  I'm
10   not sure.
11   Q.   You don't know one way or the
12   other, or you don't think Lazard is?
13   A.   In terms of implementing, I don't
14   -- I can't think of any.
15   Q.   With respect to managing
16   potential risks by which the
17   administrative solvency shortfall could
18   grow, can you think of any involvement
19   that Lazard has in terms of primary
20   responsibility for managing those
21   potential risks?
22   A.   Yes, I don't think it would be
23   fair to say -- I can't think of anywhere
24   we are managing the implementation.
25   Q.   At the time of the auction,

Page 118

AEBERSOLD - HIGHLY CONFIDENTIAL

1   
2  whether it was the exact administrative
3  solvency analysis and description of it
4  -- strike that.
5     At the time of the auction, so
6  we're talking January 14-January 17, who
7  was it, as between the advisors, who was
8  primarily responsible for presenting to
9  the restructuring committee the
10  potential additional value that would be
11  required to address an administrative
12  shortfall -- administrative solvency
13  shortfall?
14     A.  I think generally speaking,
15  Lazard would have presented the slide
16  that we are walking through now.
17  However, due to the fact a lot of the
18  numbers are input from management, M-III
19  and also input from Weil, it was
20  certainly a collective effort.  But I
21  probably believe Lazard, including me,
22  would have likely introduced the page
23  and initiated the conversation.
24     Q.  At the auction did you express a
25  view to the restructuring committee

Page 119

AEBERSOLD - HIGHLY CONFIDENTIAL

1  about whether the potential
2  administrative solvency shortfall was a
3  risk that was achievable, in other
4  words, it could be managed?
5     MR. WEAVER:  Objection to form.
6     A.  I'll look back to the minutes.
7  Could I do that?
8     Q.  Sure.
9     A.  I guess this is exhibit 49.  I
10  think this generally reflects my
11  statement that I made to the
12  restructuring committee.
13     Q.  And which statement are you
14  referring to in exhibit 49?
15     A.  On the second page, the fifth
16  full paragraph, in conjunction with the
17  paragraph at the bottom of the page that
18  has the carryover.
19     Q.  So you think what is reflected in
20  those two paragraphs of exhibit 49
21  accurately reflects the information you
22  provided to the restructuring committee
23  with respect to administrative solvency?
24     A.  Yes, although the 87 million

Page 120

AEBERSOLD - HIGHLY CONFIDENTIAL

1   
2  doesn't ring a bell with me sitting here
3  today.  I'm not sure that that's the
4  number that I represented to the
5  committee.
6     Q.  Do you remember specifically what
7  the number was?
8     A.  If I'm not mistaken, the number
9  that we discussed on the call or meeting
10  that evening is reflected in exhibit 14,
11  which is the $62 million number.
12     Q.  Can I ask you going back to slide
13  49 -- exhibit 49, the fourth paragraph,
14  the fourth full paragraph on page 2, the
15  last sentence states, "Mr. Aebersold
16  expressed disappointment however with
17  the ESL final bid."
18     Do you see that?
19     A.  In the fifth paragraph?
20     Q.  The fifth paragraph on the page,
21  the fourth full paragraph?
22     A.  I think that's the fifth full
23  paragraph.
24     Q.  I believe it might be the
25  redactions, I grouped those.  So yes the

Page 121

AEBERSOLD - HIGHLY CONFIDENTIAL

1   
2  fifth full paragraph, last sentence
3  states, "Mr. Aebersold expressed
4  disappointment however with the ESL
5  final bid."
6     Do you see that?
7     A.  I do.
8     Q.  Do you remember what the
9  disappointment was that you expressed?
10     A.  Not specifically.  But I'm a
11  competitive person and I always want to
12  do better.
13     Q.  Was it with the -- do you
14  remember generally, was it with the cash
15  that was being provided to the debtors
16  that you were disappointed?  Was it with
17  respect to what liabilities were being
18  assumed?  Do you remember generally what
19  the disappointment was?
20     MR. WEAVER:  Object to the form.
21     A.  I think generally speaking, I was
22  disappointed that on behalf of the
23  debtors I couldn't do better.  And that
24  is not unique to this case.
25     Q.  If we look again at exhibit 14,

Page 122

AEBERSOLD - HIGHLY CONFIDENTIAL

1  slide 1, there is a line that refers to
2  KCD royalties, there's a memo.
3  A.    That's on page 1.
4  Q.    Yes.  There's $112 million number
5  associated with KCD royalties, do you
6  see that?
7  A.    I do.
8  Q.    What is your understanding, if
9  any, with respect to the $112 million
10 number reflected next to KCD royalties?
11 A.    Sorry, can you repeat the
12 question?  I was reading.
13 Q.    Sure.  Do you understand what the
14 KCD royalties category is?
15 A.    Generally speaking, yes.
16 Q.    Can you describe for me what that
17 is?
18 A.    It's the KCD IP is an entity that
19 holds the KCD IP.  And the company makes
20 payments, the debtors make payments to
21 that entity on behalf of the usage of
22 the KCD IP.
23 Q.    And do you know what the $112
24 million is?

Page 123

AEBERSOLD - HIGHLY CONFIDENTIAL

1  A.    Reading footnote 3, it says
2  "Assumes" 120 -- sorry -- "$112 million
3  of post-petition royalties owed to KCD
4  based on preliminary and ongoing
5  analysis conducted by M-III; figures
6  subject to change."
7  Q.    Did you have any involvement in
8  determining the $112 million?
9  A.    In determining the number?
10 Q.    Yes, and understanding what went
11 into or made up the $112 million?
12 A.    I think I asked for the number
13 but I certainly didn't come up with the
14 number.
15 Q.    And do you have any understanding
16 separate from discussions with counsel
17 about whether or not that $112 million
18 will need to be paid by the debtors'
19 estate?
20       MR. FRIEDMANN:  Object to form.
21 A.    Not separate from counsel.
22 Q.    And do you have any understanding
23 about how the APA treats the KCD royalty
24 payments, if at all, in terms of

Page 124

AEBERSOLD - HIGHLY CONFIDENTIAL

1  obligations either by Newco or by the
2  debtors?
3  A.    Do I have?
4  Q.    Do you have any understanding
5  about whether or not the APA addresses
6  the $112 million associated with the KCD
7  royalties as reflected on slide 1 of
8  exhibit 14?
9  A.    I can't recall a specific
10 reference to these royalty payments.
11 Q.    Are you aware of any analysis --
12 strike that.
13       What is the outside date by which
14 a sale to ESL must close?
15       MR. FRIEDMANN:  Object to form.
16 A.    I can't be certain.  I believe it
17 is January 18th.
18 Q.    Did you mean February?
19 A.    Sorry, February 16th or 18th,
20 around that general time frame.
21 Q.    The exact date would be addressed
22 by the APA; is that correct?
23 A.    That's correct.
24 Q.    Whatever that date might be, are

Page 125

AEBERSOLD - HIGHLY CONFIDENTIAL

1  you aware of any analysis that anyone at
2  the debtors has performed about the
3  impact in terms of the additional cost
4  to the estates if there is a delay in
5  closing beyond February 8th until the
6  last date of close, or the last
7  potential date of close under the APA?
8  A.    I didn't recall specifically when
9  you asked that question, but having
10 reviewed exhibit 14 when you handed it
11 to me, I did recall seeing a schedule in
12 the back of that actually reflected
13 both the February 8th date and the
14 February 16th date.  And it would appear
15 that this touches on that impact.
16 Q.    What --
17 A.    Again, I would need more time to
18 review it.
19 Q.    What involvement, if any, did
20 Lazard have in preparing, other than
21 just simply compiling, the information
22 in slide 7?
23 A.    This one is a schedule.  Again,
24 I'm trying to be helpful and recall.  I

JX 096-32

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2 believe this is a schedule from M-III
3 that we just had reformatted.
4     Q.   And if you look at the schedule,
5 it's titled incremental sources of value
6 and risks ABL detail.  Do you see that?
7     A.   Yes, I do.
8     Q.   Underneath it states "The
9 following provides further detail into
10 the ABL projections and potential
11 avenues to reduce the balance at close
12 identified by M-III."  Do you see that?
13     A.   Yes.
14     Q.   Having read that, do you
15 understand that this chart on slide 7 of
16 exhibit 14 actually reflects what might
17 happen with respect to achieving
18 opportunities in the event of a delay to
19 closing, as opposed to an analysis of
20 the cost to the company of a delay to
21 closing?
22     A.   I'm sorry, you're going to have
23 to help me with that one.  Can you
24 repeat the question.
25     Q.   Sure.  If I look at slide 7, is

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2 there anywhere on slide 7 that I can
3 look to and understand the cost to the
4 debtors of a delay beyond February 8th,
5 a delay in closing beyond February 8th?
6     A.   Well that's a complicated
7 question.  I do not see a line that says
8 cost to the debtors.  I don't see that
9 on the page.
10     Q.   Based on the information that is
11 in slide 7 of exhibit 14, can you
12 sitting here determine the cost to the
13 debtors of a delay in closing?
14     A.   I cannot.
15     Q.   Are you aware of any analysis
16 that you've seen that would provide the
17 information of a cost to the debtors to
18 a delay in closing beyond February 8th?
19     A.   Well similarly when I was asked
20 that question before and I reflected
21 this, this is an input into that cost
22 and an indication --
23     Q.   Have you seen an analysis that
24 aggregates the inputs into that cost so
25 that I could look to it and know if it

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2 closes on February 11th it will cost the
3 debtors' estate an additional call it $6
4 million, if it closes on February 12th
5 it will cost the debtors's estate an
6 additional $12 million, anything that
7 actually aggregates the costs that I
8 would be able to look to and the judge
9 would be able to look to to understand
10 what the cost to the estate is of a
11 delay in closing beyond February 8th?
12     A.   Can't recall specifically.
13     Q.   If that exists, is that something
14 that Lazard is responsible for
15 preparing?
16     A.   In terms of preparation, we would
17 not be the one deriving the inputs.  Is
18 that helpful?
19     Q.   That is helpful.
20     A.   Okay.
21     Q.   Are you aware of any analysis
22 performed by any of the debtors or any
23 of their professionals with respect to
24 how any additional costs that would
25 result from a delay in closing would be

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2 funded?
3     A.   I can't recall any.
4     Q.   Is that something that Lazard is
5 responsible for or has primary
6 responsibility for?
7     A.   That is not something for which
8 we have primary responsibility.
9     Q.   In the event that there is a
10 delay in closing, what assets would the
11 debtor have access to fund the costs
12 associated with such a delay?
13         MR. FRIEDMANN:  Object to form.
14     A.   I'm not certain.  I'd need to see
15 a schedule of those assets, the cash
16 flows.  Again, I don't have a schedule
17 in front of me outlining those.
18     Q.   Do you have a or have you seen a
19 current sources and uses that shows what
20 funds will come into the debtors at
21 close in terms of forms of
22 consideration, of whatever forms those
23 might be, and how that consideration
24 will be used to pay for the assets that
25 will leave the debtors' estate?

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2    A.   I had you halfway through.  I'm
3    sorry.  Can you repeat that.
4    Q.   Do you know what a sources and
5    uses chart is?
6    A.   I do.
7    Q.   What is a sources and uses chart?
8    A.   It's actually a more difficult
9    question than just what is a sources and
10   uses.  But typically it's comparing the
11   sources of value to uses of value in a
12   transaction and the two sides should be
13   equal.
14   Q.   Have you seen a sources and uses
15   chart that describes at close in a sale
16   to ESL the sources that will come into
17   the debtors' estates and the associated
18   uses that will equal each other?
19   A.   We've seen sources and uses.  But
20   as this presentation that is exhibit 14
21   would indicate, there's a shortfall in
22   terms of them balancing.
23   Q.   Have you seen any schedule that
24   shows, in the event there's a shortfall,
25   what assets the debtor will have to fund

AEBERSOLD - HIGHLY CONFIDENTIAL

1    that shortfall?
2
3    A.   I'm sorry.  The question is
4    complicated because you're saying
5    there's a shortfall that you can't make
6    payments and then asking --
7    Q.   Let me make it a little simpler
8    because I'm combining a couple of things
9    I recognize.  So let me ask the first
10   thing much more simply.
11        Have you seen a sources and uses
12   chart that shows, assuming a February
13   8th close, what sources come in and what
14   those sources will be used for?
15   A.   I have seen a sources and uses
16   with respect to this transaction.
17   Q.   Did you prepare that?
18   A.   I personally did not prepare it.
19   Q.   Who did?
20   A.   Well again, it's a complicated
21   transaction.  It's a group effort
22   amongst the company and all of its
23   advisors.
24   Q.   And who had primary
25   responsibility?

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2    A.   For which aspect?
3    Q.   For any aspect.
4        MR. FRIEDMANN:  Object to form.
5    A.   It depends on what the input is.
6    I mean there's multiple inputs
7    obviously.  And so, there's a number of
8    variables.  So it would depend on which
9    variable in terms of which party would
10   be providing it.
11   Q.   Do you know how much cash will
12   come into the debtors at close assuming
13   a February 8th close date?
14   A.   Not precisely.
15   Q.   Do you understand roughly, order
16   of magnitude what it might be?
17   A.   Well, it depends on a few
18   variables in terms of how the closing
19   looks.  I mean I can give a range.  It
20   would be pretty wide.
21   Q.   Okay, what's the range?
22   A.   885 million upwards to a
23   significantly higher amount.
24   Q.   And what are the variables?
25   A.   Well, I'm sorry, I don't want to

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2    get overcomplicated because the
3    mechanics in the APA are complicated.  I
4    specifically don't know.
5    Q.   Let me ask it a little
6    differently maybe to avoid a
7    complication.  Do you know how much cash
8    will come into the company at close and
9    that will remain at the company a week
10   after close?
11        MR. WEAVER:  Object to form.
12   A.   I do not know.
13   Q.   Do you have any understanding of
14   the amount of cash that will come in at
15   close and that will remain at the
16   company for any period beyond the close?
17        MR. WEAVER:  Objection to form.
18   A.   I do not specifically.
19   Q.   And are some of the variables
20   things like depending on whether or not
21   certain of the debt that is held by
22   parties other than ESL is bought out by
23   ESL prior to close; is that one of the
24   variables you're thinking of?
25   A.   Yes.  To give a specific answer,

34

JX 096-34

Page 134

AEBERSOLD - HIGHLY CONFIDENTIAL
1  I believe how the APA works is it's
2  either going to be, debt will be credit
3  bid or cash consideration will be paid
4  to do so.  So you're right, that's --
5  Q.    That's one of the considerations?
6  A.    Yes.
7  Q.    In addition to considerations
8  with respect to the credit bid
9  component, are there other variables
10 that you were thinking of?
11 A.    That's the one I was thinking of.
12 I can't sitting here today think of the
13 other variables.
14 Q.    Are you aware that in early
15 January an advisor to the debtors, I
16 believe it was M-III, estimated that the
17 daily cash burn of the company was about
18 six and a half million dollars a day?
19 A.    I can't recall that specifically.
20        MR. SORKIN:  Let me take a very
21 short break to clarify something.  We
22 can go off the record.
23        (A recess was had.)
24        (Exhibit 18, previously marked

Page 135

AEBERSOLD - HIGHLY CONFIDENTIAL
1  and shown to witness.)
2  Q.    Mr. Aebersold, I'm going to hand
3  you what was previously marked as
4  exhibit 18.  If you could take a minute
5  to look at that document and let me know
6  once you've had a chance to review it.
7        Mr. Aebersold, have you seen
8  exhibit 18 before?
9  A.    Yes, I have.
10 Q.    Do you know what it is?
11 A.    Yes, generally it's the -- a
12 document that M-III puts together to
13 track certain conditions precedent to
14 closing.
15 Q.    When you say certain conditions
16 precedent to closing, are you referring
17 specifically to page 3 of exhibit 18?
18 A.    I was speaking more generally,
19 but that does -- it is entitled
20 Conditions to Close Summary, so fair
21 point.
22 Q.    Does slide 2 reflect conditions
23 to closing?
24 A.    It doesn't reflect conditions to

Page 136

AEBERSOLD - HIGHLY CONFIDENTIAL
1  closing, it reflects factors on the
2  ability to close.
3  Q.    What input, if any, does Lazard
4  have into preparing -- or did Lazard
5  have into preparing exhibit 18?
6  A.    We did not prepare exhibit 18.
7  However, this is a document that -- this
8  template is produced multiple times a
9  week for the restructuring committee.
10 And we had commented on the template
11 which is updated for the benefit of the
12 restructuring committee.
13 Q.    With respect to slide 2, which is
14 titled Admin Solvency Tracker, do you
15 see that?
16 A.    Yes.
17 Q.    What responsibility does Lazard
18 have, if any, in tracking the items
19 identified in the admin solvency tracker
20 on slide 2?
21 A.    We're not materially involved in
22 tracking these numbers.
23 Q.    With respect to slide 4 which
24 identifies the number of Opportunity and

Page 137

AEBERSOLD - HIGHLY CONFIDENTIAL
1  Actions as of 1/25/19, does Lazard have
2  any primary responsibility for managing
3  the opportunities and actions identified
4  on slide 4?
5  A.    Give me a second, let me read
6  through these.  Sorry, can you repeat
7  the question?
8  Q.    Sure.  I'm just wondering if any
9  of these opportunities that are
10 identified on slide 4 fall into sort of
11 Lazard's realm of responsibility in
12 terms of managing?
13 A.    We're not directly involved in
14 implementing and are not listed as a
15 responsible party on the document.
16 Q.    Are you involved in negotiating
17 with any third party with respect to
18 managing liquidity issues at the
19 company?  So, for example, the last item
20 at the bottom of the page on slide 4 is
21 First Data Proceeds.  My understanding
22 is that's a deposit that's currently
23 held by the credit card processor.
24        So that would be an example of an

JX 096-35

| Page 138 |
|---|

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2  opportunity to negotiate with a third
3  party to manage an opportunity here.
4      If you want to take a minute to
5  look at these.  Is Lazard responsible
6  for negotiating with any third parties
7  in connection with the information on
8  slide 4?
9      MR. FRIEDMANN:  Object to form.
10     A.   Lazard is currently not
11  responsible for the direct negotiation
12  of the items listed here.
13     Q.   If you look at other assets on
14  slide 4, just below the middle of the
15  page under the potential actions it
16  states "$245 million of other balance
17  sheet assets," and then in the comments
18  it states, "Other assets on the balance
19  sheet not identified in the APA."  Do
20  you see that?
21     A.   I see that.
22     Q.   Do you know what the $245 million
23  of assets is?
24     A.   I do not.
25     Q.   Are you aware of $245 million of

| Page 139 |
|---|

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2  assets on the balance sheet that the
3  debtors might be able to use to address
4  any administrative solvency shortfall?
5      A.   I am not.
6      Q.   Do you know whether the $245
7  million of other assets on the balance
8  sheet, to the extent it exists, is
9  intended to -- excuse me -- will be
10  acquired by Newco postclose?
11     MR. FRIEDMANN:  Object to form.
12     A.   I do not know.
13     Q.   You mentioned earlier that one of
14  the things you were considering were
15  costs that the debtor would need to
16  address in order to achieve a closing.
17     Are there currently any costs that
18  you can identify that you're aware of
19  that lead you to the belief that the
20  debtors might not be able to close on
21  the sale to ESL?
22     A.   Can you repeat that?
23     Q.   Sure.  Are you aware -- we talked
24  earlier about cash to close the
25  transaction.  Do you recall that?

| Page 140 |
|---|

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2      A.   Yes.
3      Q.   Are you aware of any -- strike
4  that.
5      Is it your understanding that, if
6  there is a close on February 8th, the
7  debtors will have sufficient cash to
8  close the transaction?
9      A.   Is it my understanding?
10     Q.   Yes.  Do you have an
11  understanding that, if there is a close
12  on February 8th, the debtors will have
13  sufficient cash to close the
14  transaction?
15     A.   I don't know.  I would say there
16  remains uncertainty.  But according to
17  the debtors' management and individuals
18  at M-III who are closer to the numbers,
19  they still express confidence that the
20  company will be able to achieve it.
21     Q.   But M-III and members of debtors'
22  management are closer to those numbers
23  than you are?
24     A.   Yes, in terms of the liquidity
25  profile or forecasting the DIP and

| Page 141 |
|---|

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2  inventory, yes.
3      Q.   Are you aware of how much the
4  debtors will owe at close in terms of
5  payroll obligations?
6      A.   I am not.
7      Q.   Do you know whether the APA
8  requires ESL or Newco to take on the
9  payroll obligations that the debtors
10  have at close?
11     A.   Not specifically.
12     Q.   If I were to tell you that,
13  according to Mr. Meghji, there will be
14  approximately $30 to $40 million in
15  payroll obligations that the debtors
16  will have to pay at close, would that
17  surprise you?
18     MR. FRIEDMANN:  Object to form.
19     A.   Sorry.  Are you representing that
20  his testimony was that the debtors would
21  be liable for 30 some-odd million
22  dollars of payroll?
23     Q.   $30 to $40 million in payroll.
24     A.   Well I guess that's his
25  testimony.

Page 142

AEBERSOLD - HIGHLY CONFIDENTIAL

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2    Q.   Are you aware of negotiations
3  between the debtors and ESL as to how
4  they will address the payroll
5  obligations that currently sit with the
6  debtors and are not being assumed by
7  Newco of roughly $30 to $40 million at
8  closing?
9    A.   I'm not.
10    Q.   Before today, had you heard about
11  any potential unresolved issue with
12  respect to how the debtors would pay the
13  $30 to $40 million of payroll
14  obligations at closing?
15    A.   Not specifically.
16    Q.   Do you know under the APA whether
17  Newco will assume any employee benefits
18  obligations that the debtors have with
19  respect to obligations that arise
20  preclosing?
21    A.   Sorry for having to do this.
22  Could you repeat the first part of that
23  question?
24    Q.   Sure.  You understand that one of
25  the things debtors do, or these debtors

Page 143

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2  do is pay benefits to employees,
3  correct, things like healthcare?
4    A.   Yes.
5    Q.   Other stuff like that.  You're
6  aware that some of the debtors' plans
7  are self-insured plans, correct?
8    A.   Yes.
9    Q.   And you're aware that under those
10  self-insured plans, costs may be
11  incurred with respect to employees
12  incurring costs that the debtors are
13  obligated to pay and those obligations
14  arise preclose, but that those costs
15  might not become known until postclose;
16  does that make sense?
17    MR. FRIEDMANN:  Object to form.
18    A.   It makes sense.
19    Q.   Are you aware of any estimate as
20  to what those obligations might be?
21    A.   I'm not the right person to speak
22  to that.
23    Q.   Do you know if those obligations
24  are accounted for anywhere in the admin
25  solvency tracker in slide 18 -- or

Page 144

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2  excuse me, exhibit 18?
3    A.   I am not generally.  If you'd
4  like me to read the entire document
5  here, I will, but.
6    Q.   You don't need to.  If you're not
7  responsible for maintaining this and
8  it's better to talk to M-III or someone
9  else, then that's fine.
10    A.   That's correct.
11    Q.   Okay.  With respect to the
12  deposit, or excuse me, strike that.
13    With respect to the $6 million
14  deposit in connection with the SHIP sale
15  that did not happen, do you have an
16  understanding of who owns that $6
17  million?
18    A.   My understanding is that it's in
19  escrow.
20    Q.   Do you know whether the debtors
21  have a legal entitlement to that $6
22  million?
23    MR. WEAVER:  Objection to form.
24    MR. FRIEDMANN:  Object to form.
25    A.   I think with the lead-in "legal

Page 145

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2  entitlement" may be a cue to me that
3  that's probably privileged and my view
4  on that would be informed by the view of
5  counsel.
6    Q.   So I'm actually not asking that.
7  Do you have an understanding -- I'll ask
8  it differently then.  Do you have an
9  understanding of whether there is a
10  dispute with respect to who owns that $6
11  million?
12    A.   I don't know that there's a
13  dispute as to who owns it.  I think
14  there is a dispute in terms of the
15  release of that from the escrow.
16    Q.   Is it your understanding that the
17  potential purchaser of SHIP is disputing
18  whether the $6 million should be
19  released to debtors?
20    A.   I understand that they are trying
21  to not have it released.
22    Q.   But your understanding currently
23  is that that $6 million is in escrow,
24  not in the debtors' accounts?
25    A.   That's correct.

JX 096-37

| Page 146 | Page 147 |
|---|---|

AEBERSOLD - HIGHLY CONFIDENTIAL

1  Q.   Is it your understanding that
2  under the proposed asset purchase
3  agreement, ESL will ultimately assume
4  the warranty and protection agreement
5  liabilities from the debtors?
6  A.   I think you're blending two
7  concepts there.
8  Q.   Is it your understanding that
9  under the APA, ESL will assume the
10  protection agreement liabilities from
11  the debtors upon close?
12  A.   Yes, that is my understanding.
13  Q.   Do you know if there are any
14  conditions that need to be met prior to
15  ESL's assumption of those liabilities?
16  MR. FRIEDMANN:  Object to form.
17  A.   Not specifically.
18  Q.   Do you know whether those --
19  whether or not those liabilities will
20  only be assumed after there is a
21  transfer of the KCD notes which requires
22  consent from the applicable Bermuda
23  regulatory authority?
24  MR. WEAVER:  Objection to form.

AEBERSOLD - HIGHLY CONFIDENTIAL

1  A.   Bear with me.  Let me think it
2  through.
3  Q.   Sure.
4  A.   Okay.  To me that's a mechanical
5  point of what entity they're using to
6  assume those liabilities, and those
7  liabilities currently reside at Sears
8  Re.  And so I guess they are bringing
9  you back on balance sheet.  But again,
10  that's a mechanical point that I wasn't
11  involved in.
12  Q.   But your understanding is, in
13  terms of generally the terms, that upon
14  close, ESL will assume the liabilities
15  with respect to the protection
16  agreements?
17  A.   Generally speaking, yes.
18  Q.   And do you know if there is any
19  -- strike that.
20  Do you know if ESL or Newco will
21  reimburse the debtors for any payments
22  that are made in connection with
23  servicing those protection agreement
24  liabilities postclose?

| Page 148 | Page 149 |
|---|---|

AEBERSOLD - HIGHLY CONFIDENTIAL

1  A.   Not specifically.
2  Q.   Again, is that a mechanic's issue
3  in terms of how they are paid, whether
4  it's a reimbursement or an out of pocket
5  for Newco?
6  A.   I think so.
7  Q.   Are you aware of a provision in
8  the asset purchase agreement that allows
9  ESL or Newco to pay the liabilities its
10  assuming, including 503(b)(9) claims and
11  accounts payable, at some point in the
12  future, the shorter of, or excuse me,
13  the outside date of 120 days or a plan
14  of confirmation?
15  A.   Not specifically.  But could you
16  go back and read which claims you listed
17  there?
18  Q.   I listed 503(b)(9) claims and
19  accounts payable, among others.  I'm not
20  sure if it's exclusively those.
21  A.   I can't comment on the specifics.
22  I remember a conversation in
23  negotiations about, around that point,
24  but I'm not familiar with the specifics

AEBERSOLD - HIGHLY CONFIDENTIAL

1  sitting here today.
2  Q.   And to the extent any obligation
3  arises between close and whatever date
4  in the contract that is, whether it's 10
5  days, confirmation, or some other date,
6  do you have an understanding about who
7  is responsible for paying those
8  obligations, the debtors versus ESL?
9  A.   For the assumed liabilities that
10  you're mentioning.
11  Q.   Correct.
12  A.   My understanding is that ESL
13  would be paying those.
14  Q.   But as to how that happens, that
15  would be in the mechanics' world?
16  A.   I believe so.
17  Q.   Did Lazard review ESL's business
18  plan with respect to Newco?
19  A.   Could you put some definition
20  around review?
21  Q.   Sure.  Strike that.  Let me ask
22  it differently.  Have you seen a
23  business plan from ESL for Newco?
24  A.   I've seen a summary business

JX 096-38

Page 150

```
1        AEBERSOLD - HIGHLY CONFIDENTIAL
2    plan.
3    Q.    When did you first see that?
4    A.    And this is with respect to ESL's
5    business plan?
6    Q.    Correct.
7    A.    If memory serves me correctly, it
8    was in early January before the auction.
9    Q.    Did Lazard do anything to analyze
10   the business plan?
11   A.    Analyze is tricky.  I can tell
12   you that we had been to sessions where
13   management presented its business plan
14   and had been a part of discussions
15   around the development of that business
16   plan, which I understand to be the basis
17   on which ESL created its business plan.
18       So did we independently analyze
19   and diligence it as if we were a buyer?
20   Not that extensive level of diligence,
21   no.
22   Q.    What, if anything, did Lazard do
23   with respect to reviewing or evaluating
24   ESL's proposed business plan?
25   A.    Other than attend a meeting and
```

Page 151

```
1        AEBERSOLD - HIGHLY CONFIDENTIAL
2    ask general questions?
3    Q.    Correct.
4    A.    Not with respect to analyzing the
5    business plan.
6    Q.    Did Lazard provide any advice to
7    the restructuring committee or the
8    restructuring subcommittee with respect
9    to ESL's business plan?
10   A.    I don't recall doing so, other
11   than there were questions about the
12   liquidity for Newco, as you refer to it.
13   Q.    And when you say the liquidity
14   for Newco, can you tell me what you
15   mean?
16   A.    Again, it was just -- I can
17   remember distinctly getting the question
18   and it related to the availability on
19   their new financing and the implications
20   of the summary business plan that we had
21   received, I think we were asked a
22   question in conjunction with management,
23   M-III how Newco's liquidity would look
24   rolling forward, and I think I responded
25   with a question, the question to the
```

Page 152

```
1        AEBERSOLD - HIGHLY CONFIDENTIAL
2    availability under their new ABL
3    facility.
4    Q.    That you provided a response to
5    --
6    A.    A question.
7    Q.    -- a question with respect to how
8    much availability there would be under
9    the new ABL facility?
10   A.    Yes.
11   Q.    At a particular time in the
12   future, or at close?
13   A.    I think it was at close, if I
14   remember correctly.
15   Q.    Do you remember who asked that
16   question?
17   A.    I don't specifically.  I think it
18   was -- it was a member of the
19   restructuring committee.
20   Q.    Do you remember whether that was
21   during the auction?
22   A.    I think it was -- I can't recall
23   specifically.  I apologize.
24   Q.    Do you remember providing any
25   other information, whether it was an
```

Page 153

```
1        AEBERSOLD - HIGHLY CONFIDENTIAL
2    answer or a recommendation -- an answer
3    to a question or a recommendation
4    generally to the restructuring committee
5    or the restructuring subcommittee with
6    respect to ESL's go-forward plan or
7    liquidity?
8        MR. FRIEDMANN:  Object to form.
9    A.    I can't remember specifically
10   because I remember it being a discussion
11   topic.  So whether or not I -- where I
12   contributed, I can't recall
13   specifically.
14   Q.    Did you provide any advice to the
15   restructuring committee or the
16   restructuring subcommittee with respect
17   to the viability of ESL's go-forward
18   business plan?
19       MR. FRIEDMANN:  Objection to
20   form.
21   A.    I don't recall doing so.
22   Q.    Do you recall on January 16th
23   there being an issue with respect to one
24   of the provisions in the proposed APA
25   dealing with any shortfall in connection
```

JX 096-39

## Page 154

AEBERSOLD - HIGHLY CONFIDENTIAL

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2  with the amount outstanding on either
3  the ABL DIP or the Junior DIP?
4    A.   When you say shortfall, can you
5  be specific --
6    Q.   Which way?
7    A.   -- in terms of which way the
8  shortfall?
9    Q.   Sure.  Do you recall there being
10  an issue with respect to a provision
11  that required -- strike that -- that
12  indicated in the event the debtors did
13  not have $1.2 billion drawn on the ABL
14  DIP and the Junior DIP, that any
15  shortfall would accrue to the benefit of
16  ESL?
17    A.   Yes, the net benefit ultimately
18  would accrue to the benefit of ESL, yes.
19    Q.   Tell me what you remember about
20  discussions around that issue on January
21  16th?
22    MR. FRIEDMANN:  Other than
23  discussions you had with counsel
24  obviously.
25    A.   Sorry for the delay.  I'm trying

## Page 155

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2  to put myself exactly in the meeting
3  when this was discussed.
4    On the business level, I remember
5  making the argument that the net benefit
6  of overperformance, i.e., having less
7  debt on the company, should accrue to
8  the benefit of the company.  And I can
9  remember making that argument and
10  requesting that that be the case.
11    Q.   And in addition to making that
12  argument, did you also believe that is
13  what would have been reasonable in
14  connection with the terms of the asset
15  purchase agreement?
16    MR. WEAVER:  Objection to form.
17    A.   Yes, I wouldn't characterize one
18  individual term as reasonable in the
19  entire context of a deal because I think
20  you have to view the entire context of a
21  deal.  But I would have liked to have
22  prevailed on that particular point in
23  negotiations.
24    Q.   And can you explain for me in a
25  little more detail what that provision,

## Page 156

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2  in terms of your understanding, again
3  I'm not asking you to repeat what's in
4  the APA, I'm just asking you to explain
5  what the back and forth was with respect
6  to that particular provision?
7    A.   I can't remember the specifics.
8  I remember requesting it at the beating
9  the budget and having less debt on the
10  company at the time of the close of the
11  transaction, that that should inure to
12  the benefit of the estate.
13    Q.   And --
14    A.   And --
15    Q.   Sorry, go ahead.
16    A.   We never won the point.
17    Q.   And what was the argument on the
18  other side?  Why was it their view that
19  that should inure to the benefit of ESL?
20    MR. WEAVER:  Objection to form.
21    Q.   As far as they told you?
22    A.   I can't recall the specifics.  I
23  can remember the arguments going into
24  theoretically why that was the case and
25  also administrative challenge to trueing

## Page 157

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2  it up.
3    I personally was dismissive of it
4  because I wanted to win the point.  And
5  we ultimately didn't prevail.
6    Q.   Was it also your understanding
7  that in addition to any shortfall, when
8  I say shortfall I mean any lesser amount
9  drawn on the DIP facilities prior to
10  close by the debtors, in addition to a
11  dollar-dollar for credit with respect to
12  the amount that ESL would have to pay,
13  that there would also be a
14  dollar-for-dollar reduction in the
15  assumption of liabilities that ESL would
16  assume?
17    A.   Based on your question, it sounds
18  as if you're double counting beating the
19  budget.
20    Q.   I am.
21    A.   That's not my understanding of
22  how the provision works.
23    Q.   What was your understanding of
24  how the provision works?
25    A.   My understanding is that the

Page 158

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2    purchase price is actually the same. So
3    we're delivering a certain amount of
4    inventory and receivables, and there's a
5    certain amount of capital coming into
6    the estate on account of that.
7        However, to the extent that the
8    amount outstanding on the ABL DIP
9    facility is less than 8250 at that point
10   in time, that which you referred to as
11   shortfall, I think of it as overage
12   because we exceeded it, that amount is
13   an offset to other liabilities that ESL
14   is assuming.
15       It's not the way that it happens,
16   but if it helps visualize it, a certain
17   amount of -- the purchase price is the
18   purchase price. Mechanically whether it
19   comes to us or them to pay the ABL, I'm
20   not sure, but that amount comes in.
21   It's an offset to liabilities is how the
22   provision works.
23   Q.   So that's your understanding of
24   how the provision was negotiated and
25   your understanding of what the debtors

Page 159

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2    agreed to?
3    A.   That was my understanding of how
4    I thought it worked at that point in
5    time.
6    Q.   And if the APA as drafted
7    actually double counts, in your view
8    that is simply an error?
9    A.   I wouldn't say it's an error, but
10   it certainly is inconsistent with my
11   understanding of how it was supposed to
12   work.
13       MR. SORKIN:  Why don't we take a
14   short break.  We can go off the
15   record.
16       (Luncheon recess at 1:09 p.m.)
17
18
19
20
21
22
23
24
25

Page 160

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2    A F T E R N O O N   S E S S I O N
3        (1:49 p.m.)
4    BRANDON AEBERSOLD, resumed,
5    having been previously duly sworn,
6    was examined and testified further,
7    as follows:
8    CONTINUED EXAMINATION
9    BY MR. SORKIN:
10   Q.   Mr. Aebersold, if you could look
11   again at exhibit 18, I think it's the
12   first document on the stack.  If you
13   could flip to slide 2.  On slide 2, at
14   the bottom half of the chart there's a
15   group of assets identified as Additional
16   Value Identified.  Do you see that?
17   A.   I do.
18   Q.   Other than those assets
19   identified in Additional Value
20   Identified, are you aware of any assets
21   that the company would have that it
22   could either sell or use to address any
23   liquidity shortfall postclosing?
24       MR. FRIEDMANN:  Object to form.
25   A.   I'm not sure and I'm probably not

Page 161

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2    the right person to ask about that.
3    Q.   Who would be the right person?
4    A.   Either company's management or
5    M-III.
6    Q.   And you can set that aside now.
7        Do you believe that the debtors
8    and ESL will be prepared to close on
9    February 8th?
10       MR. WEAVER:  Objection to form.
11   A.   Sorry, do I believe?
12   Q.   That the debtors and ESL will be
13   in a position to close on February --
14   strike that.
15       Do you believe that the debtors
16   and ESL will be prepared to close on
17   February 8th?
18       MR. FRIEDMANN:  Object to form.
19   A.   I have no reason to believe
20   that's not the case.
21   Q.   Are you aware of any issue,
22   whether with respect to the debtors, ESL
23   or some third party, that will prevent a
24   closing from happening on February 8th?
25       MR. WEAVER:  Objection to form.

JX 096-41

Page 162

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2    A.   I don't believe so.
3    Q.   There is no particular issue that
4    the debtors' advisors are trying to
5    resolve that causes you any significant
6    concern that it won't be resolved in
7    advance of February 8th?
8    A.   Not of which I'm aware.
9    Q.   If you could for a moment -- well
10   let me ask it without the APA and if we
11   need to look at the APA we can do that.
12       Are you aware that there is a
13   provision in the APA that provides for a
14   marketing period for ESL's lenders?
15   A.   I am.
16   Q.   Do you know what the current
17   status is of that marketing period?  In
18   other words, will that period be
19   completed prior to February 8th?
20   A.   My understanding is that it is
21   scheduled to be completed before
22   February 8th.
23   Q.   In the event that it is not
24   completed before February 8th, are you
25   aware of that that is a closing

Page 163

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2    condition and would provide ESL the
3    opportunity to walk away and not close?
4        MR. WEAVER:  Objection to form.
5    A.   Well, I don't think they have the
6    ability to walk away from the
7    transaction.  I believe it would
8    potentially delay closing.  I do
9    understand that it's a closing
10   condition.
11   Q.   But your understanding is, as far
12   as you're aware, it's on target to be
13   complete by February 8th?
14   A.   That's what I've been told.
15   Q.   Are you also aware that one of
16   the closing conditions in the APA is
17   that sellers, so the debtors, will have
18   caused KCD IP, the entity that holds the
19   KCD intellectual property rights, to
20   grant a license, or that in some other
21   way a license will be granted, to Newco
22   with respect to KCD?
23   A.   Yes, I'm aware.
24   Q.   Are you involved in any way in
25   actually effectuating the license from

Page 164

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2    being transferred or provided?
3    A.   No.
4    Q.   Do you know how the debtors
5    intend to cause the nondebtor KCD to
6    transfer the license, or provide a
7    license, excuse me?
8        MR. FRIEDMANN:  I want to caution
9    the witness in responding to this
10   question not to reveal any knowledge
11   you have about how debtors may intend
12   to accomplish this that is informed
13   by discussions with counsel.  You can
14   otherwise, if it's an understanding
15   you have outside of that, you can
16   answer.
17   A.   I do have an understanding but
18   it's based almost exclusively from input
19   from counsel.
20   Q.   Okay.  Do you know whether there
21   are ongoing negotiations with the PBGC
22   with respect to that issue?
23       MR. FRIEDMANN:  Same instruction
24   in terms of what you know about
25   negotiations with PBGC and if they

Page 165

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2    are informed by counsel versus what
3    you happen to know outside of talking
4    to counsel.
5    Q.   Let me ask it differently.  Are
6    you personally involved in any
7    negotiations with the PBGC or its
8    representatives with respect to the
9    transfer or provision of a license to
10   Newco?
11   A.   Today I am sitting in this room.
12   I have been engaged with the PBGC in
13   terms of conversations dating back
14   prepetition and continue to be in
15   dialogue with them.  But a negotiation
16   is a worthwhile endeavor.
17   Q.   At this point there is no
18   resolution to any negotiations with the
19   PBGC with respect to any issues
20   associated with the intellectual
21   property rights held by KCD, correct, in
22   connection with the APA?
23   A.   Well, take that apart.  You said
24   there's no resolution.  I believe, at
25   least from the advice of counsel, I

JX 096-42

Page 166

AEBERSOLD - HIGHLY CONFIDENTIAL

1  believe the APA is actionable on its own
2  right. Whether or not there could be
3  supplemental negotiations, I'm not aware
4  of any settlement that has occurred with
5  respect to the issue the PBGC may have.
6     Q.   Has ESL, as far as you are aware
7  at this point, indicated that they are
8  prepared to waive any of the closing
9  conditions?
10    A.   Have they indicated if they are
11 prepared to waive them?
12    Q.   Correct.
13    A.   Not that I'm aware, but we're
14 also not at the closing table.
15    Q.   Have the debtors asked, as far as
16 you're aware, ESL to waive any of the
17 closing conditions at this point?
18    A.   Not that I'm aware.
19    Q.   Do you know whether or not the
20 provision of, and again separate from
21 any information you have from counsel,
22 do you know whether or not the provision
23 of a license from KCD to Newco requires
24 the consent of the PBGC?

---

Page 166

    AEBERSOLD - HIGHLY CONFIDENTIAL
1  believe the APA is actionable on its own
2  right. Whether or not there could be
3  supplemental negotiations, I'm not aware
4  of any settlement that has occurred with
5  respect to the issue the PBGC may have.
6     Q.   Has ESL, as far as you are aware
7  at this point, indicated that they are
8  prepared to waive any of the closing
9  conditions?
10    A.   Have they indicated if they are
11 prepared to waive them?
12    Q.   Correct.
13    A.   Not that I'm aware, but we're
14 also not at the closing table.
15    Q.   Have the debtors asked, as far as
16 you're aware, ESL to waive any of the
17 closing conditions at this point?
18    A.   Not that I'm aware.
19    Q.   Do you know whether or not the
20 provision of, and again separate from
21 any information you have from counsel,
22 do you know whether or not the provision
23 of a license from KCD to Newco requires
24 the consent of the PBGC?

---

Page 167

    AEBERSOLD - HIGHLY CONFIDENTIAL
1     A.   That is going to be exclusively
2  based on input from counsel.
3     Q.   Mr. Aebersold, were you involved
4  in any way in the negotiations with
5  respect to ESL's ability to credit bid
6  its debt?
7     A.   I was not.
8     Q.   That was something that was
9  handled by the restructuring
10 subcommittee's advisors?
11    A.   Correct.
12    Q.   Are you familiar with a provision
13 in the APA that allows ESL the ability,
14 over a period of 60 days postclose, to
15 designate leases for assignment to third
16 parties?
17    A.   Generally, yes.
18    Q.   Can you tell me about what your
19 understanding was of the agreement with
20 respect to that provision? Again, I'm
21 not asking you about the specific
22 provisions in the APA. I just want to
23 understand the kind of negotiations you
24 were involved in, to the extent you

---

Page 168

    AEBERSOLD - HIGHLY CONFIDENTIAL
1  were, with respect to that lease
2  designation provision?
3        MR. FRIEDMANN:  Object to form.
4     A.   Generally, that they'd have some
5  period of time to determine which leases
6  they wanted to designate to a third
7  party, and they were given a 60-day
8  window to do so, or some period of time.
9  I think you said it was 60 days.
10    Q.   What was your understanding of
11 the reason for that additional time
12 postclose to determine whether or not to
13 designate leases?
14    A.   I think from their perspective --
15 well that's conjecture. I don't know.
16 They never specified.
17    Q.   I'm asking not what you're -- I
18 don't want to know what you're
19 speculating. I want to know what you
20 were told, if anything, as to why that
21 provision was being negotiated?
22    A.   I wasn't told anything
23 specifically.
24    Q.   Okay. What did the -- did the

---

Page 169

    AEBERSOLD - HIGHLY CONFIDENTIAL
1  debtors push back on that provision at
2  all?
3     A.   I can't recall specifically.
4     Q.   Do you know in terms of the
5  negotiations what your understanding --
6  strike that.
7        What was your understanding of who
8  would benefit from any upside of an
9  assignment of the lease postclose,
10 whether it would be debtors or ESL?
11       MR. FRIEDMANN:  Object to form.
12    A.   Generally, my understanding would
13 be that the benefit would accrue to ESL.
14    Q.   And was there any negotiation
15 you're aware of that the debtors
16 insisted on obtaining part of that
17 upside or that potential upside?
18    A.   I can't remember specifically. I
19 can recall that any sharing of upside,
20 every point was fairly heavily
21 negotiated.
22    Q.   Do you remember any discussion or
23 negotiation around the number of days
24 postclose that the designation period

JX 096-43

## Page 170

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2 would last?
3    A.   Not specifically.  I do remember
4 a discussion between counsel on the
5 point, but I wasn't directly involved in
6 that point.
7    Q.   Do you remember whether, from the
8 debtors' perspective, they tried to
9 negotiate a shorter time period than 60
10 days?
11    A.   I can't remember specifically,
12 but I would assume that would be the
13 position the company would take.
14       (Exhibit 23, Court Filing was
15    marked for identification.)
16    Q.   Mr. Aebersold, I've handed you
17 what's been marked as exhibit 23.  I'll
18 represent to you that it's a filing, a
19 court filing.  And what I want to direct
20 you to is the attachment that includes
21 the Lazard engagement letter, it's
22 exhibit 1.  It is page 28 of 58 if you
23 look at the top marking from the court
24 docket.
25    A.   Okay.

## Page 171

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2    Q.   If you could take just a minute
3 to review the engagement letter and tell
4 me whether you recognize it?
5    A.   I do.
6    Q.   Is this Lazard's engagement
7 letter that was entered into just prior
8 to or in early October of 2018?
9    A.   Yes.
10    Q.   If you look at the description of
11 services, if you could just scan those
12 and I'm going to ask you about 1 (k).
13    A.   Okay.
14    Q.   Can you explain to me why in 1
15 (k) there is a condition to that
16 particular task that says "Subject to
17 Lazard's agreement so to act," whereas
18 the rest are simply describing acts that
19 Lazard is prepared to engage in?
20    A.   I can.  I think at the outset
21 it's important to note that it's a
22 reciprocal provision.  But the reason
23 that the subject to Lazard's agreement
24 so to act was based on this fee
25 structure as outlined in section 2, it

## Page 172

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2 was unknown what sales efforts would
3 need to be undertaken, and to minimize
4 the risk that under section 2 we are
5 agreeing to fees in which ultimately we
6 would be running a number of M&A sales
7 processes in addition to all the other
8 items listed in section 1, that section
9 2, in the event we were running a number
10 of sales processes, section 2 wouldn't
11 have compensated us for those
12 activities.
13    Q.   Okay.  You mentioned it's a
14 reciprocal provision.  What does that
15 mean?
16    A.   Well, the company also needs us,
17 would need to ask us to do so.  So we
18 weren't -- we weren't bound to run any
19 and all sale processes.  But at the same
20 time, they weren't bound to use Lazard
21 for any and all sale processes.
22    Q.   And the letter in exhibit --
23 excuse me -- the engagement letter in
24 exhibit 23 between Lazard and Sears is
25 dated as of October 11, 2018, correct?

## Page 173

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2    A.   You're asking me if the date is
3 as of?
4    Q.   Yes.
5    A.   Yes.
6    Q.   As of October 11th, what was your
7 understanding of the sales processes
8 that Lazard would be engaged in, if any?
9    A.   We weren't certain.
10    Q.   Do you know if the company, based
11 on the information provided to you, was
12 planning to engage in any sales process
13 as of October 11, 2018?
14    A.   Not definitively in which -- and
15 what I mean by that is Lazard had not
16 been asked to run a sales process by the
17 restructuring committee as of October
18 11.
19    Q.   Based on the information provided
20 you, do you know if any advisor had been
21 asked to run a sales process by the
22 restructuring committee as of October
23 11, 2018?
24    A.   Well the restructuring committee
25 didn't exist before around that date,

JX 096-44

Page 174

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2  and so presumably not. That being said,
3  as of October 11th there actually were
4  ongoing sales processes.
5    Q.   What were the ongoing sales
6  processes as of October 11, 2018?
7    A.   If I'm not mistaken, the company
8  was endeavoring to sell Sears Home
9  Services as well as Parts Direct as a
10  component of that.
11    I do not believe there was a
12  process for the franchise business 1 to
13  5 that I mentioned previously. I
14  actually don't believe that there was.
15    And I can't comment on the status
16  of where those were at this point in
17  time, but there was M&A activity as of
18  this date.
19    Q.   The M&A activity you're referring
20  to, who was primarily responsible for
21  running that activity when you first got
22  involved in October of 2018?
23    A.   With respect to the warranty and
24  repair business as components of Sears
25  Home Services, that was being conducted

Page 175

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2  by the company. They had an informal
3  process with three potential bidders in
4  that process. And then with respect to
5  Parts Direct, another investment bank
6  was running that process. I believe
7  that process had started either the late
8  spring or early summer of that year. So
9  it was toward the tail end of that
10  process.
11    And I'm not exactly sure with
12  respect to SHIP. I believe that was
13  also a process being run by an
14  investment bank.
15    Q.   With respect to the Parts Direct
16  process, was that Centerview that was
17  running that?
18    A.   Yes, it was.
19    Q.   With respect to SHIP, was that
20  also Centerview or was that someone
21  else?
22    A.   I can't be certain but I believe
23  that it was.
24    Q.   At what point were you first
25  asked by the company to oversee any

Page 176

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2  sales process?
3    A.   I can't remember exactly.
4    Q.   Was it in October?
5    A.   I'm distinguishing between a
6  formal request and what we were engaged
7  in. You can imagine in reviewing
8  strategic alternatives for the company,
9  are we're evaluating sales alternatives,
10  restructurings, recapitalizations, an
11  early winddown. We are evaluating a
12  lot.
13    We certainly were looking into a
14  sale of the entire company and a sale of
15  its component parts. Whether or not the
16  company was mandated to do so as of
17  whatever date, I can't be specific.
18    Q.   And my question is not formally.
19  Even informally, when were you first
20  asked to oversee any sort of sales
21  process by the company?
22    MR. FRIEDMANN: Object to form.
23    A.   I think our involvement was
24  implied that we would assist fairly
25  early on. I can't remember when the

Page 177

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2  formal request came from the
3  restructuring committee.
4    Q.   When did you first start having
5  discussions with the company about your
6  agreement to provide the services
7  included in 1 (k) in your engagement
8  letter that is exhibit 23?
9    A.   I can't remember exactly. I will
10  say in terms of background, there was a
11  lot of overlap between what would be an
12  M&A process for assets, and the
13  processes to raise capital, i.e., the
14  DIP financing process.
15    And so, from the very beginning,
16  we were populating data rooms, updating
17  information memorandums, for a financing
18  process which, if you were to draw a
19  Venn diagram between raising junior
20  capital for this company and running a
21  marketing process, there's a tremendous
22  amount of overlap.
23    So the exact moment where there
24  was a quest not just to fully understand
25  it so we could evaluate sales

Page 178

AEBERSOLD - HIGHLY CONFIDENTIAL
1
2  alternatives as a potential option for
3  the company as well as raising DIP
4  financing on the back of a number of
5  these assets, to when it was a formal
6  request of will you run this process for
7  us, I can't be certain.
8  Q.   Was it before December?
9  A.   Certainly before December.
10      (Exhibit 24, set of minutes of
11  the restructuring committee from
12  January 6, 2019 was marked for
13  identification.)
14  Q.   Mr. Aebersold, the court reporter
15  has just handed you what's been marked
16  as UCC Exhibit 24.  Exhibit 24 is a set
17  of minutes of the restructuring
18  committee from January 6, 2019.  If you
19  could take just a minute to review as
20  much as you want.  I'm going to ask you
21  a specific question from this but feel
22  free to take a minute to review the
23  document.
24  A.   Could you tell me what day of the
25  week January 6th was?

Page 179

1      AEBERSOLD - HIGHLY CONFIDENTIAL
2  Q.   I can tell you in just a minute.
3  It's a Sunday.
4  A.   It's a Sunday?
5  Q.   It's a Sunday.
6  A.   Okay.  That's helpful.  Thanks.
7  Q.   Okay.  To the extent it helps, I
8  believe that in terms of the timeline of
9  the case, December 28th with the
10  deadline for definitive bids, I think
11  January 4th was the deadline to
12  designate qualified bidders, if I
13  remember that correctly.  And as you
14  asked, January 6 was a Sunday.  So if
15  that's helpful to give some context.
16  A.   Is it okay if I look at a
17  calendar quickly just in terms of days?
18  Q.   Sure.
19  A.   Okay.  Thanks.
20  Q.   The minutes here were from
21  January 6th at 12:30 p.m. and what I
22  want to ask about is the last paragraph
23  on the first page of exhibit 24.
24  A.   Okay.
25  Q.   That paragraph states that "The

Page 180

1      AEBERSOLD - HIGHLY CONFIDENTIAL
2  committee and its advisors discussed the
3  concept of a backstop by ESL to allocate
4  the risk that the unencumbered assets do
5  not generate for the company the amount
6  projected."
7      Can you tell me what you recall
8  about the concept of a backstop by ESL
9  to address potential shortfalls with
10  respect to administrative solvency?
11  A.   Sure.  I think the notion was
12  that, based on our calculations, the bid
13  as of January 6th, and where the ESL bid
14  stood at that time, when analyzed,
15  showed that the shortfall, similar to
16  the calculation that we showed in that
17  prior presentation which I think value
18  required may have been the line, I think
19  at this point in time what this is
20  referring to is that was the shortfall
21  at that period of time.
22      However, under the ESL bid as of
23  January 6th, the bid included less
24  assets.
25      So from our perspective, although

Page 181

1      AEBERSOLD - HIGHLY CONFIDENTIAL
2  the shortfall was greater, there were
3  more assets to try to meet those
4  obligations.
5      The idea of a backstop was to say
6  if for some reason those assets weren't
7  sufficient to cover that amount, the
8  request was that ESL be required to make
9  up that shortfall.
10  Q.   As of January 6, I believe the
11  operative bid was the bid that had been
12  submitted by the December 28th bid
13  deadline.  And as you indicate, that bid
14  did not seek to acquire as many assets
15  as the bid currently in front of the
16  court, correct?
17      MR. FRIEDMANN:  Object to form.
18  A.   That sounds right.  Whether or
19  not the only bid at that point in time
20  was the December 28th and if there had
21  been updates and discussions I'm not
22  sure of, but what you're saying is
23  generally the case.
24  Q.   Okay.  What was ESL's response to
25  the idea of a backstop?

| Page 182 | Page 183 |
|---|---|

AEBERSOLD - HIGHLY CONFIDENTIAL

**Page 182**

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2    MR. WEAVER: Objection to form.
3    MR. SORKIN: Actually, like that.
4    Q.   Do you know whether or not the
5  debtors proposed to ESL that they
6  backstop any risk of a shortfall with
7  respect to administrative solvency at
8  any point?
9    A.   I believe we did.
10    Q.   Do you know what ESL's response
11  was?
12    MR. WEAVER: Objection to the
13  form.
14    A.   Not specifically.
15    Q.   Do you know generally?
16    A.   They did not agree to do so,
17  generally speaking.
18    Q.   Do you know whether, in
19  connection with the auction, the debtors
20  made a request of ESL to backstop any of
21  the potential administrative shortfall,
22  administrative claimed shortfall?
23    A.   Yes. And I pause because to
24  delineate between the weekend before the
25  auction and the actual auction is

**Page 183**

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2  challenging for me.
3    Q.   Understood.
4    A.   Because we were at Weil's offices
5  the entire time. I recall that request
6  during that period of time. Whether or
7  not it was after the formal start of the
8  auction, I think that it was but I can't
9  be certain.
10    Q.   And other than the fact that the
11  proposed APA in front of the court does
12  not contain any backstop, do you know
13  what ESL's response was to that request?
14    MR. WEAVER: Objection to the
15  form.
16    A.   As I recall, we did not prevail
17  on that point.
18    Q.   Other than ESL ultimately not
19  agreeing to that, do you remember
20  anything about the discussions back and
21  forth with respect to that concept,
22  again, at or around the time of the
23  auction?
24    A.   Not specifically. I can remember
25  conversations and discussions about the

| Page 184 | Page 185 |
|---|---|

**Page 184**

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2  point. But it was part of broader
3  negotiations and I can't remember the
4  particulars.
5    Q.   In exhibit 24 the next sentence
6  from where we were reading states "Mr.
7  Meghji stated that the value of $335
8  million ascribed to the unencumbered
9  assets is not unreasonable."
10    Do you know at this time which
11  unencumbered assets those were?
12    A.   Not specifically. I do recall
13  that those assets included some real
14  estate somewhat referred to as
15  unencumbered accounts receivable and a
16  few other items, but I can't recall
17  specifically.
18    Q.   And do you know whether those
19  items ultimately were included in the
20  ESL bid that is currently before the
21  court?
22    A.   I can't be sure in terms of there
23  were a number of items in there. There
24  are some items that have been left with
25  the estate, the degree to which I can't

**Page 185**

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2  comment on.
3    Q.   But you don't know sitting here
4  today which items have been left with
5  the estate?
6    A.   I know the two that I mentioned
7  in the previous answer, those are not
8  being left with the estate.
9    Q.   The real estate and the accounts
10  receivable?
11    A.   The bulk of. There are some that
12  are being left behind. But the bulk are
13  being taken as part of the bid.
14    Q.   The next sentence states that
15  "The committee discussed that
16  successfully monetizing the unencumbered
17  assets would likely require some time
18  and numerous separate transactions."
19    Do you recall any specific
20  discussion?
21    A.   Not the specifics. I do remember
22  in the two items I mentioned before in
23  terms of these parcels of real estate
24  and accounts receivable, that that would
25  likely be sold or dealt with piecemeal

JX 096-47

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2  and that could require an uncertain
3  amount of time to monetize it.
4      Q.   Do you remember whether there was
5  any particular amount of time discussed?
6      A.   Not specifically, but it was
7  different based on the type of
8  underlying asset.
9      Q.   With respect to the real estate,
10  do you remember any specific amount of
11  time being discussed?
12      A.   I can remember a view that that
13  would be a long-term process for certain
14  of those assets and could be in excess
15  of a year.
16      Q.   With respect to the accounts
17  receivable, do you remember any specific
18  discussion of the amount of time?
19      A.   Not with respect to the amount of
20  time.
21      Q.   With respect to the real estate,
22  were there -- sitting here now, do you
23  remember the value that was ascribed of
24  that $335 million to unencumbered real
25  estate?

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2      A.   Just to be clear, the 335, was
3  the shortfall if I'm not mistaken.
4  Breaking down his sentence, Mr. Meghji
5  stated that the value of 335 million
6  ascribed to the unencumbered assets is
7  not unreasonable.
8      The reason that that was the
9  question before him is the shortfall was
10  335 and there's this pool of assets,
11  could you cover the 335 with this
12  particular pool of assets.  And I think
13  his response, and again this is a bit of
14  conjecture, I believe what he's
15  responding to is to be able to deliver
16  $335 million from those unencumbered
17  assets is not unreasonable.
18      Q.   Okay.  And I think you sort of
19  anticipated my next question which was,
20  are you aware of any report or
21  indication that assigns that $335
22  million of value to the unencumbered
23  assets?  But I now understand what
24  you're saying is you believe that 335
25  million is really the shortfall, it's

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2  not a particular value of the
3  unencumbered assets; is that correct?
4      A.   Yes.  I mean this is based on my
5  recollection of what was a fairly
6  lengthy discussion at the time.  That's
7  the case.
8      And ultimately the value of those
9  assets, the restructuring committee and
10  the advisors, collectively, didn't view
11  that as a reasonable risk.  We were --
12  there was too much uncertainty whether
13  or not we could use those assets to
14  cover that amount.
15      And specifically and the reason I
16  mentioned it before on the accounts
17  receivable, is that the value of those
18  accounts receivable in the debtors'
19  hands after a transaction, there was a
20  tremendous amount of skepticism about
21  that value.  Collecting on a vendor
22  credit when you're no longer a customer,
23  could be challenging.
24      Q.   So is it the case that to the
25  extent there are accounts receivable

AEBERSOLD - HIGHLY CONFIDENTIAL

1
2  that remain with the debtors, realizing
3  values on that is much more difficult
4  postclose than it is preclose?  No, I
5  said it the other way around.  Strike
6  that.
7      A.   Either way, I'm going to
8  disagree.  I don't think it has as much
9  to do with trying to do it preclose
10  versus postclose as collecting on the
11  receivable when you're no longer a
12  counterparty.
13      For example, a vendor credit,
14  going to collect on a vendor credit,
15  while you're in bankruptcy not so easy
16  to do, and postclosing not so easy to
17  do, particularly when you're not the
18  ongoing business.
19      MR. SORKIN:  Why don't we take a
20  short break.  I think I have very
21  little left.
22      (A recess was had.)
23      MR. SORKIN:  Thank you, Mr.
24  Aebersold.  I don't have any further
25  questions.

JX 096-48

Page 190

1    AEBERSOLD - HIGHLY CONFIDENTIAL
2       THE WITNESS:  Thank you.
3       MR. FRIEDMANN:  Thank you.
4       (Time noted:2:39 p.m.)
5    _____
6       BRANDON AEBERSOLD
7
8    _____
9    Subscribed and sworn to
10   before me this _____
11   day of _____, 2018.
12
13   _____
14       Notary Public
15
16
17
18
19
20
21
22
23
24
25

Page 191

1
2
3
4          E X H I B I T S
5    NUMBER     DESCRIPTION         PAGE
6    EXHIBIT 22  Bates stamp          31
7              SEARS_UCC00413809
8    EXHIBIT 23  Court Filing        170
9    EXHIBIT 24  Set of minutes of the   178
10             restructuring committee
11             from January 6, 2019
12
13
14       PREVIOUSLY MARKED EXHIBITS
15   EXHIBIT 40  (Exhibit 40, previously    8
16             marked and shown to
17             witness.)
18   EXHIBIT 2   (Exhibit 2, previously    18
19             marked and shown to
20             witness.)
21   EXHIBIT 49  (Exhibit 49, previously   75
22             marked and shown to
23             witness.)
24   EXHIBIT 14  (Exhibit 14, previously   91
25             marked and shown to

Page 192

1
2             witness.)
3    EXHIBIT 18  (Exhibit 18, previously   134
4             marked and shown to
5             witness.)
6          I N D E X
7
8
9    WITNESS EXAMINATION BY     PAGE
10
     AEBERSOLD   SORKIN      7
11
12
13       REQUESTS
14       Page     Line
15
         NONE
16
17
18
19
20
21
22
23
24
25

Page 193

1
2       CERTIFICATION
3    STATE OF NEW YORK   )
         : ss.
4    COUNTY OF NEW YORK  )
5       I, MARK RICHMAN, Certified Shorthand
6    Reporter, Registered Professional Reporter
7    and Notary Public for and within the State
8    of New York, do hereby certify:
9       That the witness whose testimony is
10   herein set forth, was duly sworn by me;
11   and that the within transcript is a true
12   record of the testimony given by said
13   witness.
14       I further certify that I am not
15   related to any of the parties to this
16   action by blood or marriage, and that I am
17   in no way interested in the outcome of
18   this matter.
19       IN WITNESS WHEREOF, I have hereunto
20   set my hand this 31st day of January,
21   2019.
22
23   _____
24   MARK RICHMAN, CSR, RPR, CM
25       *   *   *

Page 194

1        ERRATA SHEET
2   Case Name:
3   Deposition Date:
4   Deponent:
5   Pg.  No. Now Reads      Should Read  Reason
6   ___ ___ _____    _____  _____
7   ___ ___ _____    _____  _____
8   ___ ___ _____    _____  _____
9   ___ ___ _____    _____  _____
10  ___ ___ _____    _____  _____
11  ___ ___ _____    _____  _____
12  ___ ___ _____    _____  _____
13  ___ ___ _____    _____  _____
14  ___ ___ _____    _____  _____
15  ___ ___ _____    _____  _____
16  ___ ___ _____    _____  _____
17  ___ ___ _____    _____  _____
18  ___ ___ _____    _____  _____
19  ___ ___ _____    _____  _____
20

                    _____
21              Signature of Deponent
22  SUBSCRIBED AND SWORN BEFORE ME
23  THIS ____ DAY OF _____, 2019.
24  _____
25  (Notary Public)  MY COMMISSION EXPIRES:_____

TSG Reporting - Worldwide        877-702-9580

JX 096-50

**A**

**$1.2 (1)**
154:13
**$112 (8)**
122:5,10,24 123:3,9
123:12,18 124:7
**$12 (1)**
128:6
**$120 (1)**
84:6
**$134 (1)**
86:2
**$135 (1)**
96:3
**$139 (4)**
98:17 100:19 103:2,9
**$15 (1)**
85:10
**$153 (4)**
80:25 81:10 82:7
83:12
**$196 (2)**
94:14 95:14
**$200 (4)**
103:15,17,20 104:22
**$230 (1)**
83:19
**$245 (4)**
138:16,22,25 139:6
**$30 (4)**
141:14,23 142:7,13
**$335 (4)**
184:7 186:24 187:16
187:21
**$350 (7)**
46:14 47:6,11 82:23
83:7,9,17
**$356 (2)**
109:17,23
**$39 (1)**
85:21
**$40 (4)**
141:14,23 142:7,13
**$45 (1)**
85:12
**$6 (8)**
85:15 128:3 144:13
144:16,21 145:10
145:18,23
**$60 (2)**
85:2,8
**$62 (8)**
111:7,14,19,21
112:21 113:7 114:4
120:11
**$87 (2)**

77:22 78:19
**a.m (3)**
38:24 72:5 76:3
**ability (9)**
44:3,8 62:8 65:6
112:20 136:3 163:6
167:6,14
**ABL (9)**
5:3 126:6,10 152:2,9
154:3,13 158:8,19
**able (15)**
13:24 31:9 44:13
63:25 67:5,14 85:6
86:18 90:22 128:8,9
139:3,20 140:20
187:15
**absolute (2)**
73:3 74:17
**accept (14)**
34:25 37:3,8,14,20
38:6 39:11,13 40:17
40:25 41:10 42:13
72:23 75:7
**accepted (6)**
21:6 32:20 33:8 39:2
43:5 92:15
**access (1)**
129:11
**accommodate (1)**
7:23
**accomplish (1)**
164:12
**account (2)**
85:16 158:6
**accounted (1)**
143:24
**accounts (22)**
94:11,15 95:15 97:24
99:18,23,25 100:6,8
101:25 102:3,7
145:24 148:12,20
184:15 185:9,24
186:16 188:16,18
188:25
**accrue (4)**
154:15,18 155:7
169:14
**accurate (1)**
86:19
**accurately (1)**
119:22
**achievable (3)**
113:4,7 119:4
**achieve (3)**
116:4 139:16 140:20
**achieving (2)**

30:22 126:17
**acquire (2)**
20:18 181:14
**acquired (5)**
21:10,23 22:7,8
139:10
**acronym (1)**
60:13
**act (4)**
116:4,12 171:17,24
**action (1)**
193:16
**actionable (1)**
166:2
**actions (3)**
137:2,4 138:15
**activities (1)**
172:12
**activity (3)**
174:17,19,21
**acts (1)**
171:18
**actual (4)**
78:13 99:2 102:18
182:25
**add (3)**
28:16 84:19 85:24
**added (2)**
80:24 81:11
**addition (7)**
26:22 28:15 134:8
155:11 157:7,10
172:7
**additional (24)**
17:12 28:17 41:13
77:23 78:22 84:7
86:24 87:2 92:17,19
93:7,25 109:12
111:6,12 115:18
118:10 125:4 128:3
128:6,24 160:15,19
168:12
**address (14)**
56:18 111:13 112:4
112:21 113:7 114:3
114:3 117:6 118:11
139:3,16 142:4
160:22 180:9
**addressed (1)**
124:22
**addresses (2)**
101:19 124:6
**admin (5)**
94:7 97:25 136:15,20
143:24
**administrative (51)**

26:20,22 27:3,11,19
27:23 28:5,12,24
29:7 30:4,7,12,16
30:21,22 31:13 63:8
63:19,21 65:6 78:7
78:15 79:5,13,23
80:3 87:15 90:21
93:14,18 94:3,8
99:2 111:13 112:5
112:10,22 117:7,17
118:2,11,12 119:3
119:24 139:4
156:25 180:10
182:7,21,22
**administratively (9)**
26:18 43:25 46:13
47:5,15 64:3 65:3
78:2 80:24
**advance (2)**
106:9 162:7
**advice (22)**
23:2,11,18 27:12,15
27:20 33:15,18 34:9
34:17 36:10,14,18
39:8 74:21 112:17
112:18,25 113:6
151:6 153:14
165:25
**advise (1)**
12:18
**advising (2)**
16:5,8
**advisor (7)**
20:13 33:13,22 39:22
80:5 134:16 173:20
**advisors (31)**
16:14,18 17:20 27:22
39:19,21 40:5,10
41:5,13 47:25 48:10
70:21 73:18 75:5
86:3 89:16,17,22
90:4 92:6 107:11
111:11,25 116:16
118:7 131:23 162:4
167:11 180:2
188:10
**Aebersold (217)**
1:12 2:7 7:1,2,8,24
8:1,11 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1,14
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1,14 33:1
34:1 35:1 36:1 37:1

37:20 38:1,5,18
39:1 40:1 41:1 42:1
43:1 44:1 45:1,2
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1,19
57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1
65:1,14 66:1 67:1
68:1 69:1 70:1 71:1
71:18 72:1 73:1
74:1 75:1,23 76:1
77:1,14,21 78:1
79:1 80:1,15 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1,20
89:1 90:1 91:1,12
92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
120:15 121:1,3
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1,3,8
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1,4,10 161:1
162:1 163:1 164:1
165:1 166:1 167:1,4
168:1 169:1 170:1
170:16 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
178:14 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
189:24 190:1,6
192:10
**affiliated (1)**
19:8
**afternoon (1)**

91:8
**aggregate (5)**
24:18,21,24 25:3 93:4
**aggregates (2)**
127:24 128:7
**aggregating (1)**
93:24
**agree (5)**
38:13 41:18 49:14
110:23 182:16
**agreed (4)**
87:16,24 104:2 159:2
**agreeing (2)**
172:5 183:19
**agreement (18)**
19:11 67:15 101:12
101:14 102:23
104:5,9,14 146:4,5
146:11 147:24
148:9 155:15
167:20 171:17,23
177:6
**agreements (1)**
147:17
**ahead (4)**
18:8 68:13 75:11
156:15
**Akin (3)**
2:8 3:3 7:9
**al (2)**
1:4 4:6
**allocate (7)**
20:14,20,23 21:8,14
62:5 180:3
**allocated (2)**
53:16,19
**allocation (14)**
22:11,13 51:11,18
52:8,9,15,17,18,20
52:24 53:3,12 56:11
**allow (2)**
43:24 59:7
**allows (2)**
148:9 167:14
**alluding (1)**
75:9
**alternatives (3)**
176:8,9 178:2
**amended (2)**
14:22,24
**America (1)**
3:6
**Americas (1)**
5:12
**amount (28)**
47:13 65:8 78:13

81:17 93:12 94:14
99:24 132:23
133:14 154:2 157:8
157:12 158:3,5,8,12
158:17,20 177:22
180:5 181:7 186:3,5
186:10,18,19
188:14,20
**amounts (1)**
110:6
**analysis (19)**
24:2 28:18 29:7,17
53:15 69:22 91:13
91:16 95:4 96:13
106:19 118:3 123:6
124:12 125:2
126:19 127:15,23
128:21
**analyze (6)**
24:9,10 25:22 150:9
150:11,18
**analyzed (1)**
180:14
**analyzing (1)**
151:4
**ANDREW (1)**
6:8
**answer (22)**
16:24 17:4 23:17,22
27:16 30:13 49:13
54:2 70:9 71:17
74:5,17 75:8,14
84:4 90:7 107:25
133:25 153:2,2
164:16 185:7
**answered (2)**
41:24 53:24
**answering (6)**
16:8 23:10,25 34:18
35:23 70:19
**anticipated (2)**
79:13 187:19
**APA (29)**
17:10 44:11 64:17
78:6 101:19 102:15
103:5 123:24 124:6
124:23 125:8 133:3
134:2 138:19 141:7
142:16 146:10
153:24 156:4 159:6
162:10,11,13
163:16 165:22
166:2 167:14,23
183:11
**apart (2)**
30:16 165:23

**apologies (2)**
46:23 95:16
**apologize (2)**
14:6 152:23
**appear (1)**
125:15
**APPEARANCES (1)**
3:1
**appears (2)**
18:23 103:16
**applicable (1)**
146:23
**appraisal (1)**
54:20
**appraisals (7)**
55:7,8,11,13,15 57:8
57:14
**Appreciate (1)**
50:16
**appropriate (1)**
94:14
**approval (2)**
21:7 76:24
**approved (2)**
14:25 106:3
**approximately (6)**
41:12 46:14 47:6,21
111:14 141:14
**areas (1)**
9:3
**argument (4)**
155:5,9,12 156:17
**arguments (1)**
156:23
**arises (1)**
149:4
**arithmetic (3)**
27:25 28:21 80:11
**ARPS (1)**
5:2
**arrived (1)**
98:17
**articulately (1)**
65:2
**ascribed (3)**
184:8 186:23 187:6
**aside (2)**
39:20 161:6
**asked (23)**
36:7 37:2,8,22 41:22
53:24 54:18 56:14
76:13 109:7,9
113:19 123:13
125:10 127:19
151:21 152:15
166:16 173:16,21

175:25 176:20
179:14
**asking (21)**
13:16 21:17 28:22
34:3 39:21 40:4
41:24 54:22 56:17
68:14,18 95:18
100:24 115:6 131:6
145:6 156:3,4
167:22 168:18
173:2
**aspect (5)**
17:8 33:17 110:10
132:2,3
**assess (1)**
93:14
**assessing (4)**
24:13 26:25 28:25
36:3
**assessment (3)**
29:23 99:2,13
**asset (8)**
57:13 59:8 67:15
85:20 146:3 148:9
155:14 186:8
**assets (91)**
15:9 17:13 20:17 21:9
21:23 22:7,15,19
50:21 51:9,14,20,20
52:5,12 53:8,20
54:5,13,25 55:19
56:2,7,16,21,22
57:2,5,7,16,18,21
57:25 58:2,5,7,9,14
58:17,19,20,23 59:9
61:7,16 66:21 67:22
67:25 68:2,7,11,15
68:19,20 70:8 71:16
97:19 104:6 129:10
129:15,24 130:25
138:13,17,18,23
139:2,7 160:15,18
160:20 177:12
178:5 180:4,24
181:3,6,14 184:9,11
184:13 185:17
186:14 187:6,10,12
187:17,23 188:3,9
188:13
**assign (4)**
20:23 22:14 55:17,22
**assigned (6)**
21:21,22 54:12,25
57:4 83:7
**assignment (7)**
54:10,17 55:22 56:9

57:7 167:16 169:10
**assignments (2)**
11:20,21
**assigns (1)**
187:21
**assist (1)**
176:24
**associated (9)**
10:11 24:6 62:13
114:25 122:6 124:7
129:12 130:17
165:20
**assume (22)**
37:10 55:7 69:6 83:17
83:21 98:22,23
103:2,9 104:3,6,9
105:9,14 106:10
142:17 146:4,10
147:7,15 157:16
170:12
**assumed (14)**
26:10 28:7 82:25 83:8
85:9 100:5,6,7,19
104:18 121:18
142:6 146:21
149:10
**Assumes (1)**
123:3
**assuming (9)**
26:4 81:19 83:19
103:20 106:3
131:12 132:12
148:11 158:14
**assumption (4)**
26:6 81:16 146:16
157:15
**assured (1)**
87:16
**attached (1)**
49:18
**attachment (3)**
91:22 92:22 170:20
**attempt (1)**
20:22
**attempts (1)**
22:14
**attend (1)**
150:25
**attendance (1)**
45:10
**Attorneys (5)**
3:4 4:4 5:3,11 6:4
**attract (1)**
59:3
**auction (43)**
9:23 10:11 11:10,13

9:23 10:11 11:10,13
15:6,6,8,16,25 16:4
17:22 33:7 34:4
38:25 39:18,25
41:17 66:2,10 67:12
67:17 71:23 92:16
111:11,15,23 112:7
112:13 114:8,10
115:12,20 116:2
117:25 118:5,24
150:8 152:21
182:19,25,25 183:8
183:23
**authority (2)**
77:15 146:24
**availability (3)**
151:18 152:2,8
**available (6)**
58:22 59:16 66:23
109:23 110:3,4
**Avenue (1)**
5:12
**avenues (1)**
126:11
**avoid (2)**
24:5 133:6
**aware (45)**
20:14 21:8 53:18 54:3
54:10,24 55:5,6,8
55:10,16 57:6,12
83:7 105:16 124:12
125:2 127:15
128:21 134:15
138:25 139:18,23
140:3 141:3 142:2
143:6,9,19 148:8
160:20 161:21
162:8,12,25 163:12
163:15,23 166:4,7
166:14,17,19
169:16 187:20

**B**

**B (2)**
49:3 191:4
**back (26)**
17:22 19:2 22:20 30:4
45:3 56:10 61:2,4,4
76:24 81:22 82:13
82:20 90:5 98:23
109:10 119:7
120:12 125:13
147:10 148:17
156:5 165:13 169:2
178:4 183:20
**backdrop (1)**

23:24
**background (1)**
177:10
**backstop (7)**
180:3,8 181:5,25
182:6,20 183:12
**backup (1)**
95:11
**balance (6)**
126:11 138:16,18
139:2,7 147:10
**balancing (1)**
130:22
**ball (1)**
84:5
**bank (3)**
3:6 175:5,14
**bankruptcy (5)**
1:1 14:9,15,17 189:15
**based (24)**
8:14 30:8 39:18 41:4
41:12 54:22 75:4
84:14 85:5 93:16
98:25 100:17
104:25 123:5
127:10 157:17
164:18 167:3
171:24 173:10,19
180:12 186:7 188:4
**basis (4)**
68:17 89:13,15
150:16
**Bates (4)**
31:22 49:25 75:19
191:6
**Bear (1)**
147:2
**beating (2)**
156:8 157:18
**bed (2)**
72:10,14
**began (1)**
57:19
**beginning (1)**
177:15
**behalf (4)**
16:13 87:24 121:22
122:22
**belief (1)**
139:19
**believe (49)**
11:16 13:14 14:24
15:10 18:10 22:11
30:12 39:23 41:12
45:13 49:19,22
71:22 78:14 81:19

82:10 88:16 92:7
93:4 96:12 99:22
107:8 109:8 118:21
120:24 124:17
126:2 134:2,17
149:17 155:12
161:7,11,15,19
162:2 163:7 165:24
166:2 174:11,14
175:6,12,22 179:8
181:10 182:9
187:14,24
**believed (1)**
87:22
**bell (1)**
120:2
**beneficial (1)**
68:8
**benefit (11)**
85:12 136:12 154:15
154:17,18 155:5,8
156:12,19 169:9,14
**benefits (2)**
142:17 143:2
**Bermuda (1)**
146:23
**best (3)**
13:17 41:16 43:13
**better (7)**
53:12 80:17 88:21
102:11 121:12,23
144:8
**beyond (6)**
125:6 127:4,5,18
128:11 133:16
**bid (108)**
17:23,25 18:5,9,17,22
18:23 20:9 21:6
22:22 23:5,7,13
24:3,7,10,10,13,17
24:25 25:12 26:3,25
30:2 32:18,19,20
33:4,5,7 34:25
35:10 37:4 38:7,20
38:23 39:2,11,11,17
39:17,24,24 40:17
41:2,10,15,16 42:13
42:15,19,23 43:13
43:23 46:12 47:3,16
48:21 50:20 51:3,8
51:15,21 52:2,17,21
53:6,17 55:3 59:8
61:14 62:2,12,13,15
62:17,22 66:5 72:23
75:7 76:21,25 80:16
83:16 87:10 88:21

89:8 92:14,15,18
112:7 120:17 121:5
134:4,9 167:6
180:12,13,22,23
181:11,11,12,13,15
181:19 184:20
185:13
**bidders (4)**
16:7 69:21 175:3
179:12
**bidding (1)**
21:20
**bids (9)**
21:5 33:3 34:12 36:4
43:3 65:15,18,20
179:10
**billion (1)**
154:13
**bit (5)**
15:3 34:7 61:3 103:11
187:13
**blending (1)**
146:7
**blood (1)**
193:16
**Blue (2)**
92:8,24
**board (1)**
32:17
**bottom (4)**
80:13 119:18 137:21
160:14
**bought (1)**
133:22
**bound (2)**
172:18,20
**box (2)**
109:16 111:6
**BRANDON (5)**
1:12 2:7 7:2 160:4
190:6
**break (8)**
7:20 33:24 50:15 91:4
91:10 134:22
159:14 189:20
**breakdown (1)**
97:22
**Breaking (1)**
187:4
**bringing (1)**
147:9
**broad (1)**
43:19
**broader (3)**
34:7 65:4 184:2
**brought (1)**

29:4
**Bryant (2)**
2:9 3:5
**buckets (1)**
20:24
**budget (2)**
156:9 157:19
**build (3)**
94:18 95:14 96:15
**bulk (2)**
185:11,12
**burn (1)**
134:18
**business (28)**
37:12 60:3,10,10,14
60:15 66:12 68:6
69:23,25 71:7
149:18,24,25 150:5
150:10,13,15,17,24
151:5,9,20 153:18
155:4 174:12,24
189:18
**businesses (5)**
59:21,23 60:4,6,8
**buyer (3)**
85:3,6 150:19

**C**

**C (4)**
4:1 5:1 6:1 49:3
**calculated (1)**
84:25
**calculation (6)**
28:14 29:15 47:21
93:16 112:9 180:16
**calculations (4)**
28:11,16 47:3 180:12
**calculator (2)**
83:25 84:11
**calendar (1)**
179:17
**call (7)**
45:21 46:2,4 59:16
71:9 120:9 128:3
**called (1)**
7:2
**calls (1)**
58:4
**cap (3)**
104:2,11,19
**capacity (2)**
8:14 12:9
**capital (3)**
158:5 177:13,20
**card (1)**
137:24

Page 4

**careful (2)**
27:9 58:16
**carries (2)**
80:14 109:16
**carryover (5)**
46:17 81:24 83:4
88:17 119:19
**case (19)**
1:6 9:16 11:14 19:9
30:9,18,20 31:7
44:2 80:6 121:24
155:10 156:24
161:20 179:9
181:23 188:7,24
194:2
**cash (35)**
28:7 63:3,6,16,20,25
64:7,8,14,17,18,20
64:22 77:24 78:4,5
78:17 80:3 81:18
86:6 90:24 108:11
109:22 110:2,3
121:14 129:15
132:11 133:7,14
134:4,18 139:24
140:7,13
**categories (2)**
8:21 97:14
**category (4)**
17:14 29:6 103:10
122:15
**cause (1)**
164:5
**caused (1)**
163:18
**causes (1)**
162:5
**caution (1)**
164:8
**cent (1)**
100:10
**Centerview (2)**
175:16,20
**CEO (1)**
88:4
**certain (32)**
8:17 16:7 26:4 29:6
37:10 56:22 57:2,11
57:15 58:2,23 64:16
65:21 67:24 71:4
82:9 99:24 114:5,22
124:17 129:14
133:21 135:14,16
158:3,5,16 173:9
175:22 178:7 183:9
186:13

**certainly (15)**
24:17 37:9 59:17 67:5
94:22 96:7 98:9
108:3 113:2 114:22
118:20 123:14
159:10 176:13
178:9
**CERTIFICATION ...**
193:2
**Certified (2)**
2:10 193:5
**certify (2)**
193:8,14
**CFO (1)**
88:3
**challenge (2)**
25:4 156:25
**challenging (2)**
183:2 188:23
**chance (3)**
8:8 91:24 135:7
**change (2)**
83:20 123:7
**changed (2)**
112:7,8
**changes (1)**
38:15
**Chapter (3)**
1:6 31:3 44:2
**characterize (2)**
23:25 155:17
**chart (6)**
126:15 130:5,7,15
131:12 160:14
**CIM (2)**
59:17 60:5
**CIMs (1)**
59:24
**circumstances (1)**
31:11
**claim (3)**
26:16 102:6,7
**claimed (1)**
182:22
**claims (42)**
26:2,8,9,15 28:25
29:3,5,6,10,13,16
29:20,21,24 63:19
65:6 66:21 93:21,22
94:3,7,8,9 97:24
98:2,8,18 99:3,14
100:4,18 101:3,5,17
101:21 103:3,9
109:17,18 148:11
148:17,19
**clarification (1)**

62:14
**clarifies (1)**
42:8
**clarify (2)**
19:21 134:22
**classify (1)**
96:24
**clear (3)**
55:23 90:8 187:2
**CLEARY (1)**
6:3
**close (63)**
33:6 42:14 44:3,8,14
62:8 63:4,6,16,24
64:7,9,14,20 67:6
77:25 78:4,17 80:4
80:22 85:6 90:23
106:9,19 107:6,23
110:3 124:15 125:7
125:8 126:11
129:21 130:15
131:13 132:12,13
133:8,10,15,16,23
135:21 136:3
139:20,24 140:6,8
140:11,13 141:4,10
141:16 146:12
147:15 149:4
152:12,13 156:10
157:10 161:8,13,16
163:3
**closed (4)**
15:11 38:25 80:20
92:16
**closer (2)**
140:18,22
**closes (3)**
105:23 128:2,4
**closing (31)**
44:11,13 63:17 64:24
106:2 112:12 125:6
126:19,21 127:5,13
127:18 128:11,25
129:10 132:18
135:15,17,24 136:2
139:16 142:8,14
161:24 162:25
163:8,9,16 166:9,15
166:18
**CM (2)**
1:22 193:24
**collect (1)**
189:14
**collecting (2)**
188:21 189:10
**collective (2)**

116:15 118:20
**collectively (1)**
188:10
**column (1)**
98:2
**combination (1)**
16:15
**combining (1)**
131:8
**come (11)**
31:9 37:12 61:2 97:6
123:14 129:20
130:16 131:13
132:12 133:8,14
**comes (3)**
106:15 158:19,20
**coming (3)**
80:4 105:4 158:5
**comment (4)**
112:24 148:22 174:15
185:2
**commented (2)**
97:4 136:11
**comments (1)**
138:17
**COMMISSION (1)**
194:25
**committee (69)**
5:11 7:10 9:23 10:13
16:9 23:3,12 31:21
32:16,22 34:11,19
35:2,5,25 36:3,9,11
36:15,19,20,25
37:18 39:10 40:16
40:25 41:8 42:13
43:22 45:6 72:22
73:17 74:18 75:7
76:2 79:11 81:6
87:7 89:7,14 92:6
111:25 112:16,19
113:18 114:13
115:12,19 118:9,25
119:13,23 120:5
136:10,13 151:7
152:19 153:4,15
173:17,22,24 177:3
178:11,18 180:2
185:15 188:9
191:10
**companies (2)**
57:25 71:3
**company (61)**
18:17,20 19:6,12 29:2
29:4,12,19,22 38:25
43:24 63:3,5 67:22
68:20 79:22 80:5

81:19 88:5 90:24
93:17 95:20,20,23
105:5 107:22 108:9
108:12 110:2,3,18
110:20,25 113:16
122:20 126:20
131:22 133:8,9,16
134:18 137:20
140:20 155:7,8
156:10 160:21
170:13 172:16
173:10 174:7 175:2
175:25 176:8,14,16
176:21 177:5,20
178:3 180:5
**company's (6)**
58:23 70:8 87:23
107:22 112:20
161:4
**compared (1)**
111:2
**comparing (1)**
130:10
**compensated (1)**
172:11
**competitive (1)**
121:11
**compiling (1)**
125:22
**complete (1)**
163:13
**completed (3)**
162:19,21,24
**completely (1)**
80:20
**complex (1)**
40:8
**complicated (4)**
127:6 131:4,20 133:3
**complication (1)**
133:7
**component (9)**
17:3 66:13 71:6 78:16
81:15 99:22 134:10
174:10 176:15
**components (8)**
37:10,23 56:23 58:6
80:7 89:11 90:12
174:24
**computer (1)**
109:3
**concept (3)**
180:3,8 183:21
**concepts (4)**
78:9,9,12 146:8
**conceptual (1)**

JX 096-54

102:20
**conceptually (1)**
30:20
**concern (1)**
162:6
**concerns (3)**
56:18 62:12,20
**concluded (1)**
77:10
**conclusion (1)**
76:17
**condition (4)**
44:25 163:2,10
171:15
**conditionality (3)**
62:8,13,21
**conditions (19)**
44:12,14,15,16,16,17
64:16,23 78:6 90:22
135:14,16,21,23,25
146:15 163:16
166:10,18
**conducted (3)**
66:25 123:6 174:25
**Conducting (1)**
27:25
**confidence (2)**
80:21 140:19
**confidential (189)**
1:8 7:1 8:1 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1
58:24 59:1,10,12
60:1,17 61:1 62:1
63:1 64:1 65:1 66:1
67:1 68:1 69:1 70:1
71:1 72:1 73:1 74:1
75:1 76:1 77:1 78:1
79:1 80:1 81:1 82:1
83:1 84:1 85:1 86:1
87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1

108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1
**confirm (1)**
86:3
**confirmation (4)**
50:11 87:8 148:15
149:6
**conjecture (2)**
168:16 187:14
**conjunction (3)**
88:25 119:17 151:22
**connection (24)**
18:21 20:8 21:24 22:6
23:19 28:11 32:24
34:11 39:3,6 47:15
49:20 53:5 54:14
55:2 98:8,18 138:7
144:14 147:23
153:25 155:14
165:22 182:19
**consent (2)**
146:23 166:25
**consider (1)**
54:19
**consideration (36)**
17:12 20:2,7,11,15,16
20:25 21:19 22:5,15
22:18 24:19,22,25
25:3,5,7,10,14
26:21 27:4 30:8

50:21,25 51:6,13
52:4,11 61:5,16,22
78:17 82:17 129:22
129:23 134:4
**considerations (4)**
26:23 65:5 134:6,8
**considered (3)**
35:10 43:16 52:2
**considering (3)**
44:18 112:2 139:14
**consistent (4)**
47:12 76:4 81:4 89:6
**consolidated (1)**
80:7
**contacted (1)**
12:21
**contacting (1)**
70:16
**contain (1)**
183:12
**contained (9)**
23:6 24:8,14 28:18
61:25 64:23 82:2
89:4 91:23
**context (3)**
155:19,20 179:15
**continually (1)**
98:22
**continue (2)**
64:8 165:14
**continued (5)**
4:1 5:1 6:1 98:21
160:8
**contract (2)**
64:24,24,25 149:5
**contracts (2)**
105:8,14
**contrary (1)**
46:6
**contributed (1)**
153:12
**conversation (3)**
114:16 118:23 148:23
**conversations (5)**
16:7 66:18 69:21
165:13 183:25
**conveyed (1)**
112:16
**copy (1)**
18:8
**corporate (4)**
1:11 2:7 8:16,23
**Corporation (2)**
1:4 4:6
**corpus (1)**
97:18

**correct (52)**
14:11,20 18:2,3,5,6
26:12 29:8 31:18
35:7,16 36:5,22,23
38:20,21 42:7 46:20
55:9 56:3 64:10
65:9 77:18 78:20
87:19,20 88:5,6
92:9 93:11 94:9
96:22 97:2 100:22
102:19 103:7,18
124:23,24 143:3,7
144:10 145:25
149:12 150:6 151:3
165:21 166:13
167:12 172:25
181:16 188:3
**correctly (3)**
150:7 152:14 179:13
**cost (14)**
97:17 104:2,18 125:4
126:20 127:3,8,12
127:17,21,24 128:2
128:5,10
**costs (25)**
96:9 97:11,15 103:12
103:16,21 104:3,6
104:10,23 105:2,19
106:8,12 107:16
108:4,7 128:7,24
129:11 139:15,17
143:10,12,14
**counsel (25)**
9:6,10,11 10:25 11:3
15:16 27:13,16,20
30:9,14 31:17
102:11 123:17,22
145:5 154:23
164:13,19 165:2,4
165:25 166:22
167:3 170:4
**counterparty (1)**
189:12
**counting (1)**
157:18
**counts (1)**
159:7
**COUNTY (1)**
193:4
**couple (8)**
9:12 11:20 15:18 19:3
43:8 76:8,10 131:8
**course (2)**
50:4 111:23
**court (21)**
1:1 4:7 12:19 15:2

21:7 40:12 52:3,21
53:7,22 54:7,15
106:4 170:14,19,23
178:14 181:16
183:11 184:21
191:8
**cover (3)**
181:7 187:11 188:14
**Covers (1)**
43:19
**coy (2)**
34:14 41:22
**created (2)**
97:4 150:17
**creating (1)**
77:23
**credit (9)**
21:20 134:3,9 137:24
157:11 167:6
188:22 189:13,14
**Creditors (2)**
3:4 7:10
**Crescent (1)**
4:7
**CSR (2)**
1:22 193:24
**cue (1)**
145:2
**cure (12)**
103:12,16,25 104:3,6
104:9,18,23 105:2
105:19 106:8,12
**curious (1)**
76:12
**current (5)**
33:7 52:21 53:6
129:19 162:16
**currently (11)**
14:19 72:15 105:16
137:23 138:10
139:17 142:5
145:22 147:8
181:15 184:20
**customer (1)**
188:22
**cut (2)**
64:5 69:9

| D | | |
| --- | --- | --- |

**D (2)**
49:3 192:6
**daily (1)**
134:18
**Dallas (1)**
4:8
**Dangerous (1)**

86:15
**data (3)**
66:23 137:22 177:16
**date (21)**
64:9 75:18 106:2
107:6,23 124:14,22
124:25 125:7,8,14
125:15 132:13
148:14 149:4,6
173:2,25 174:18
176:17 194:3
**dated (3)**
106:25 111:17 172:25
**dating (1)**
165:13
**day (10)**
50:15 72:8 92:14
94:22 99:5 134:19
178:24 190:11
193:20 194:23
**days (7)**
148:14 149:6 167:15
168:10 169:24
170:10 179:17
**deadline (5)**
17:24 18:22 179:10
179:11 181:13
**deal (7)**
66:19 67:4 98:13
102:25 103:8
155:19,21
**dealing (1)**
153:25
**dealt (1)**
185:25
**debt (6)**
85:3 133:21 134:3
155:7 156:9 167:7
**debtor (5)**
1:4 31:7 129:11
130:25 139:15
**debtors (109)**
4:4 10:19 16:14,17
18:5 19:6,8,8,12
20:13,21 21:7 23:16
27:22 28:4 31:4,7,8
33:8 41:14 44:5,9
52:19,19 53:5,8,14
53:16,19 54:4,12
57:9 65:7 66:17
68:7 71:15 73:16
101:2,14 102:8
106:13,19 107:6,11
112:11 116:19
117:8 121:15,23
122:21 123:19

124:3 125:3 127:4,8
127:13,17 128:3,22
129:20,25 130:17
132:12 134:16
139:3,20 140:7,12
140:17,21 141:4,9
141:15,20 142:3,6
142:12,18,25,25
143:6,12 144:20
145:19,24 146:6,12
147:22 149:9
154:12 157:10
158:25 161:7,12,15
161:22 162:4
163:17 164:4,11
166:16 169:2,11,16
170:8 182:5,19
188:18 189:2
**debtors's (1)**
128:5
**Debtors-in-Posessio...**
4:5
**debts (2)**
31:4,9
**December (41)**
14:25 17:25 18:4,20
20:9 30:3 32:17
33:4,12,20 34:22
35:25 37:5,18 38:16
38:19 42:11 43:4
45:6,20 46:2,12
47:4,16 49:5 51:3,7
51:14,21 61:15 62:2
62:11,15,16,22
65:20 178:8,9 179:9
181:12,20
**decided (1)**
72:23
**decision (2)**
40:8 77:11
**deducts (1)**
109:21
**define (1)**
54:18
**definition (6)**
22:2,10,12 54:11,22
149:20
**definitive (8)**
17:23 18:21 33:5
38:19,23 62:2,11
179:10
**definitively (1)**
173:14
**degree (1)**
184:25
**delay (13)**

125:5 126:18,20
127:4,5,13,18
128:11,25 129:10
129:12 154:25
163:8
**delineate (1)**
182:24
**deliver (1)**
187:15
**delivering (1)**
158:3
**depend (1)**
132:8
**depending (1)**
133:20
**depends (3)**
31:10 132:5,17
**Deponent (2)**
194:4,21
**deposed (2)**
7:12 11:8
**deposit (5)**
67:16 85:16 137:23
144:12,14
**deposition (4)**
1:11 2:6 11:6 194:3
**derive (1)**
76:20
**derived (1)**
113:16
**deriving (3)**
94:19 96:8 128:17
**describe (10)**
25:17 28:2 42:25 44:9
63:7 72:20 93:11
94:12 98:16 122:17
**described (1)**
56:10
**describes (1)**
130:15
**describing (1)**
171:18
**description (3)**
118:3 171:10 191:5
**designate (4)**
167:16 168:7,14
179:12
**designated (1)**
8:22
**designation (2)**
168:3 169:25
**detail (5)**
25:18 44:10 126:6,9
155:25
**determination (3)**
37:13 40:9 105:13

**determinations (2)**
27:23 28:12
**determine (10)**
24:18,23 29:19 55:17
83:12 93:13 113:12
127:12 168:6,13
**determined (1)**
95:14
**determining (10)**
28:23 29:16 79:20
91:16 94:13 96:2,10
110:5 123:9,10
**develop (1)**
97:8
**development (1)**
150:15
**diagram (1)**
177:19
**dialogue (1)**
165:15
**DIAZ (2)**
6:16 86:5
**DieHard (2)**
66:4,16
**different (17)**
24:4 32:25 56:13,17
63:11,13,15 67:21
68:21 72:15 99:19
102:2 108:10,15,20
111:24 186:7
**differently (5)**
82:19 133:6 145:8
149:23 165:5
**difficult (3)**
108:14 130:8 189:3
**diligence (3)**
59:8 150:19,20
**DIP (13)**
81:17 82:24 83:8 84:7
140:25 154:3,3,14
154:14 157:9 158:8
177:14 178:3
**direct (13)**
32:10 59:15 60:11
61:9 66:5 67:8,20
68:5 138:11 170:19
174:9 175:5,15
**direction (2)**
56:14 69:9
**directions (1)**
26:13
**directly (6)**
71:12 101:5 112:19
116:21 137:14
170:5
**disagree (3)**

48:8,14 189:8
**disappointed (2)**
121:16,22
**disappointment (4)**
120:16 121:4,9,19
**discussed (13)**
47:25 48:10 49:9 78:8
100:12 115:11,18
120:9 155:3 180:2
185:15 186:5,11
**discussion (10)**
92:23 93:2 106:10
114:21 153:10
169:23 170:4
185:20 186:18
188:6
**discussions (15)**
23:14,20 30:8 32:15
32:25 59:7 123:17
150:14 154:20,23
164:13 177:5
181:21 183:20,25
**disintermediate (1)**
30:15
**dismissive (1)**
157:3
**dispute (3)**
145:10,13,14
**disputed (2)**
99:25 100:8
**disputing (1)**
145:17
**distinct (1)**
63:23
**distinction (1)**
100:15
**distinctly (1)**
151:17
**distinguishing (1)**
176:5
**distributed (1)**
112:13
**DISTRICT (1)**
1:1
**docket (1)**
170:24
**document (19)**
8:6 18:17 21:13 22:4
22:13,17 86:18
102:18 103:24
106:16 108:23
109:4 135:6,13
136:8 137:16 144:4
160:12 178:23
**documentation (1)**
92:19

92:19
**documents (5)**
10:24 49:23 50:6 86:9
87:2
**doing (7)**
28:15 39:14 77:17
83:24 93:24 151:10
153:21
**dollar-dollar (1)**
157:11
**dollar-for-dollar (1)**
157:14
**dollars (3)**
100:10 134:19 141:22
**double (2)**
157:18 159:7
**drafted (1)**
159:6
**drafting (2)**
102:22 103:6
**draw (1)**
177:18
**drawn (2)**
154:13 157:9
**drive (1)**
69:25
**DUBLIN (1)**
3:9
**due (3)**
31:5,9 118:17
**duly (3)**
7:3 160:5 193:10

**E**

**E (11)**
4:1,1 5:1,1 6:1,1 49:4
160:2,2 191:4 192:6
**earlier (13)**
28:24 45:23 52:23
62:6 74:24 75:6
78:4,8,10 91:13
93:21 139:13,24
**early (16)**
12:11 13:19 14:3,5,7
15:11 60:24 71:19
72:18 75:3 134:15
150:8 171:8 175:8
176:11,25
**easier (1)**
58:17
**easy (3)**
74:16 189:15,16
**EBITDA (1)**
70:2
**economic (9)**
17:11 44:15 98:10,12

101:12 102:25
103:8,19 104:4
**effectuating (1)**
163:25
**effort (7)**
17:19 21:8 76:19,25
116:15 118:20
131:21
**efforts (2)**
117:2 172:2
**either (10)**
37:3 58:3,11 124:2
134:3 154:2 160:22
161:4 175:7 189:7
**email (4)**
8:22 91:22 92:4,11
**embedded (2)**
60:14 108:16
**employee (1)**
142:17
**employees (2)**
143:2,11
**enclosed (1)**
50:5
**encumbered (1)**
17:13
**endeavor (1)**
165:16
**endeavoring (1)**
174:8
**ended (1)**
17:14
**engage (2)**
171:19 173:12
**engaged (6)**
11:19 12:8 32:21
165:12 173:8 176:6
**engagement (28)**
11:17,21 12:2,14,17
12:23 13:3,5,9,11
13:20,22,25 14:3,8
14:8,10,12,16,19,24
110:17,24 170:21
171:3,6 172:23
177:7
**entailed (1)**
28:3
**entered (1)**
171:7
**entertain (1)**
57:24
**entire (10)**
15:23 35:14 36:19
39:15 65:7 144:4
155:19,20 176:14
183:5

**entirety (2)**
74:10,18
**entitled (2)**
113:23 135:20
**entitlement (2)**
144:21 145:2
**entity (7)**
19:20 55:6 59:15
122:19,22 147:6
163:18
**enumerated (1)**
114:6
**equal (2)**
130:13,18
**equity (3)**
50:22 61:17 85:4
**ERRATA (1)**
194:1
**error (2)**
159:8,9
**escrow (4)**
85:16 144:19 145:15
145:23
**ESL (125)**
6:4 13:7,11 16:14
17:11 18:4,18,20
20:8,10,17 21:10,18
22:5,8 24:13 32:18
33:6 34:12,12,25
36:5 37:6 38:8,20
38:24 39:11,11,17
39:24 40:17 41:2,10
41:15 42:13 44:4,8
46:12 47:4,16 50:20
51:3,7,21 52:2 53:6
53:9,13,21 54:6,15
55:3,20 56:3 61:14
66:5 72:23 75:7
76:20 80:16,24
81:11 87:10 88:21
89:8 92:15 98:3,7
98:16 99:14 101:14
102:25 103:2,17,19
103:20 104:9 105:2
105:6,8,14 106:13
120:17 121:4
124:15 130:16
133:22,23 139:21
141:8 142:3 146:4
146:10 147:15,21
148:10 149:9,13,24
150:17 154:16,18
156:19 157:12,15
158:13 161:8,12,16
161:22 163:2 166:7
166:17 167:14

169:11,14 180:3,8
180:13,22 181:8
182:5,20 183:18
184:20
**ESL's (16)**
53:17 82:2,22 83:16
146:16 149:18
150:4,24 151:9
153:6,17 162:14
167:6 181:24
182:10 183:13
**ESQ (9)**
3:8,9,10 4:9,10 5:6,14
6:8,9
**established (1)**
17:24
**estate (46)**
24:20 25:11,17,19
26:2,5,6,8,10,18
46:13 47:5,14 54:20
55:8,11 65:8 66:18
70:6,8,10,13,17,21
70:24 71:4,16 85:12
97:19 101:3 123:20
128:3,5,10 129:25
156:12 158:6
184:14,25 185:5,8,9
185:23 186:9,21,25
**estates (2)**
125:5 130:17
**estimate (7)**
29:14 93:17 96:13
104:25 105:4
107:16 143:19
**estimated (2)**
103:16 134:17
**estimates (2)**
108:3,22
**et (2)**
1:4 4:6
**evaluate (2)**
43:2 177:25
**evaluated (1)**
62:7
**evaluating (6)**
26:24 33:3 112:3
150:23 176:9,11
**evening (2)**
92:14 120:10
**event (8)**
70:5 106:8 126:18
129:9 130:24
154:12 162:23
172:9
**everybody (1)**
86:13

**exact (4)**
101:10 118:2 124:22
177:23
**exactly (11)**
25:4 37:24 38:4 69:23
74:15 86:20 103:4
155:2 175:11 176:3
177:9
**EXAMINATION (3)**
7:7 160:8 192:9
**examined (2)**
7:5 160:6
**example (11)**
17:9 21:19 25:23,25
26:14,17 29:4,19
137:20,25 189:13
**exceeded (1)**
158:12
**Excel (1)**
95:9
**excess (1)**
186:14
**exchange (2)**
12:19 53:7
**exclude (1)**
82:15
**excludes (2)**
82:8,10
**excluding (1)**
97:20
**exclusively (3)**
148:21 164:18 167:2
**excuse (14)**
18:18 24:22 33:5
34:13 49:6 64:25
92:17 106:21 139:9
144:2,12 148:13
164:7 172:23
**exercise (2)**
86:14,15
**exhaustive (3)**
69:8 114:20 115:4
**exhibit (104)**
8:2,3,20 9:9 18:11,12
18:15 19:25 20:16
20:25 22:20,22 23:6
24:8,14 25:2 26:25
31:21,22 32:7 45:3
45:22 47:12 48:12
48:15,17,20 49:2,3
49:3,3,4,12,15
50:18 61:4 62:3
65:11 75:12,21,24
75:25 76:11 77:12
77:20 80:14 81:24
82:20 83:14 84:14

87:5 88:11 91:18,19
91:23 92:4 95:3
109:10 111:20
113:8,22 119:10,15
119:21 120:10,13
121:25 124:9
125:11 126:16
127:11 130:20
134:25 135:5,9,18
136:6,7 144:2
160:11 170:14,17
170:22 172:22,24
177:8 178:10,16,16
179:23 184:5 191:6
191:8,9,15,15,18,18
191:21,21,24,24
192:3,3
**exhibits (4)**
49:17,20,23 191:14
**exist (2)**
70:5 173:25
**exists (2)**
128:13 139:8
**expectation (1)**
100:25
**expected (1)**
106:2
**expedited (1)**
68:17
**expenses (3)**
107:16 108:4,7
**EXPIRES (1)**
194:25
**explain (4)**
63:14 155:24 156:4
171:14
**express (2)**
118:24 140:19
**expressed (4)**
58:12 120:16 121:3,9
**extend (2)**
66:3,11
**extensive (2)**
108:16 150:20
**extent (14)**
12:22 21:18 23:11
27:10,14 59:6 72:21
98:11 139:8 149:3
158:7 167:25 179:7
188:25

---

**F**

**f (2)**
20:6 160:2
**facilitate (1)**
71:10

**facilities (1)**
157:9
**facility (5)**
21:21,22 152:3,9
158:9
**fact (4)**
50:8,9 118:17 183:10
**factors (3)**
25:13 43:11 136:2
**facts (2)**
9:16 31:10
**failed (1)**
85:3
**fair (6)**
14:14 72:16 93:15
111:3 117:23
135:21
**fairly (4)**
114:21 169:21 176:24
188:5
**fairness (1)**
114:24
**fall (1)**
137:11
**falling (1)**
17:15
**familiar (4)**
106:17 113:19 148:25
167:13
**far (7)**
12:17 16:4 53:15
156:21 163:11
166:7,16
**fast (1)**
51:25
**February (33)**
12:12 13:2,19 66:2,10
106:5,7,10,20
124:19,20 125:6,14
125:15 127:4,5,18
128:2,4,11 131:12
132:13 140:6,12
161:9,13,17,24
162:7,19,22,24
163:13
**federal (1)**
8:24
**fee (1)**
171:24
**feedback (1)**
85:5
**feel (2)**
32:6 178:21
**fees (2)**
97:20 172:5
**Feld (2)**

2:9 3:3
**fell (1)**
17:9
**fifth (6)**
61:13 119:16 120:19
120:20,22 121:2
**figure (1)**
84:6
**figures (1)**
123:6
**filing (9)**
11:22 12:3 14:9,15
60:19 170:14,18,19
191:8
**final (9)**
80:16 82:2,22 83:16
87:10 88:21 89:8
120:17 121:5
**finalize (1)**
67:16
**finalized (1)**
92:16
**financial (2)**
80:5 86:3
**financing (7)**
84:7 85:4,4 151:19
177:14,17 178:4
**fine (4)**
27:13 50:17 58:19
144:9
**finished (1)**
60:20
**firm (2)**
25:6,10
**first (25)**
7:3 12:7 45:4 46:10
46:17 64:2 65:13
75:17 77:20 81:23
82:23 83:3 110:2
112:6 115:8 131:9
137:22 142:22
150:3 160:12
174:21 175:24
176:19 177:4
179:23
**five (2)**
59:20 61:12
**flip (2)**
48:20 160:13
**FLOM (1)**
5:2
**flow (1)**
108:11
**flows (1)**
129:16
**fluid (1)**

74:11
**focus (1)**
15:5
**focused (3)**
26:16,17 110:24
**following (1)**
126:9
**follows (3)**
7:6 84:25 160:7
**footnote (1)**
123:2
**forecast (4)**
107:5,21 108:2,6
**forecasting (1)**
140:25
**forecasts (4)**
106:25 107:15 108:11
108:22
**form (80)**
11:15,24 13:12,13
16:23 17:17 21:2,11
21:19 22:9,16,18
28:19 30:24 31:19
33:23 35:13,17
36:13 38:9 40:2,18
41:3,20 43:7 44:19
46:3 47:7,17,18
48:11 51:16 52:6,13
53:10,23 57:10 59:8
63:12 78:11 88:10
89:25 95:5 96:23
99:7 105:21 106:14
106:22 119:6
121:20 123:21
124:16 129:13
132:4 133:11,17
138:9 139:11
141:18 143:17
144:23,24 146:17
146:25 153:8,20
155:16 156:20
160:24 161:10,18
161:25 163:4 168:4
169:12 176:22
181:17 182:2,13
183:15
**forma (5)**
77:22 78:20,21,25
111:6
**formal (4)**
176:6 177:2 178:5
183:7
**formally (1)**
176:18
**formed (1)**
23:19

**forms (3)**
25:10 129:21,22
**forth (4)**
22:4 156:5 183:21
193:10
**forward (5)**
42:18 51:25 89:18
107:17 151:24
**forwarded (2)**
70:25 71:2
**forwarding (1)**
70:20
**four (4)**
36:20 68:19 69:6 89:2
**fourth (3)**
120:13,14,21
**frame (4)**
12:11 13:3 38:10
124:21
**framework (2)**
100:11,13
**franchise (3)**
60:2,14 174:12
**free (2)**
32:6 178:22
**Freres (2)**
1:11 2:6
**Friday (2)**
106:6,7
**Friedmann (72)**
4:10 11:15 13:12
16:23 17:17 21:2
22:16 23:8 27:5,8
28:19 33:23 35:13
35:17 36:13 38:9
40:2,18 41:3,20
43:7 44:19 46:3
47:7,18 48:11 49:16
49:22 50:12,17
51:16 52:13 53:10
53:23 57:10 63:12
74:3 75:16 78:11
86:7,17 88:10,13,23
89:25 95:5 96:23
99:7 106:14,22
123:21 124:16
129:13 132:4 138:9
139:11 141:18
143:17 144:24
146:17 153:8,19
154:22 160:24
161:18 164:8,23
168:4 169:12
176:22 181:17
190:3
**front (7)**

30:2 48:12,17
103:25 129:17
181:15 183:11
**FTI (1)**
6:16
**fulfill (1)**
64:22
**full (8)**
61:11 67:6 81:16
119:17 120:14,21
120:22 121:2
**fully (2)**
69:22 177:24
**fun (1)**
86:14
**function (1)**
110:21
**functioning (1)**
69:22
**fund (3)**
64:9 129:11 130:25
**funded (1)**
129:2
**funding (1)**
116:14
**funds (2)**
109:22 129:20
**further (6)**
77:16 107:15 126:9
160:6 189:24
193:14
**future (4)**
107:7,24 148:13
152:12

—————— **G** ——————

**gap (1)**
80:20
**GARRISON (1)**
5:10
**gauge (1)**
58:13
**general (8)**
12:11 32:12 44:11
47:9 97:16 104:5
124:21 151:2
**generally (55)**
10:21 14:21 15:19,20
16:11 21:16 25:20
31:8 32:21 33:15,22
34:8,16 39:12 42:25
45:21 46:8 47:2
55:10 59:14 63:2
64:19 65:10 68:4
73:14 76:5 81:9
89:9 90:10 94:16

95:4,23 97:13 99:21
100:11 104:17
112:25 118:14
119:11 121:14,18
121:21 122:16
135:12,19 144:3
147:14,18 153:4
167:18 168:5
169:13 181:23
182:15,17
**generate (2)**
94:23 180:5
**generated (1)**
70:3
**generates (1)**
70:2
**generating (1)**
67:23
**getting (5)**
41:21 76:24 100:4,6
151:17
**give (11)**
25:22 49:25 71:9 74:4
81:14 84:12 95:10
132:19 133:25
137:6 179:15
**given (5)**
37:5 39:22 74:21
168:8 193:12
**giving (2)**
35:4 77:14
**global (3)**
17:25 23:7 48:21
**go (30)**
7:12 14:23 15:17 18:8
24:12 43:11 45:3
47:23 56:13 61:4
63:20 68:13 71:18
72:3,10,14 75:11
82:20 86:9 90:5
93:22 95:25 103:10
107:15 109:10,11
134:23 148:17
156:15 159:14
**go-forward (1)**
19:16 153:6,17
**goal (2)**
30:21,23
**goes (3)**
52:22 60:12 78:15
**going (27)**
7:12,25 22:20 30:4
31:20 32:11 74:15
76:15 83:17,23 84:5
85:6,9 91:2,17
101:5 107:16

120:12 126:22
134:3 135:3 156:23
167:2 171:12
178:20 189:7,14
**gold (1)**
111:5
**Good (1)**
7:8
**Gotshal (7)**
4:3 10:19 15:15 16:16
23:15,21 73:15
**GOTTLIEB (1)**
6:3
**grant (1)**
163:20
**granted (1)**
163:21
**greater (1)**
181:2
**grind (1)**
91:6
**ground (1)**
7:13
**group (4)**
17:19 92:5 131:21
160:15
**grouped (1)**
120:25
**grow (1)**
117:18
**guess (4)**
68:3 119:10 141:24
147:9
**guessing (1)**
18:7
**Gump (3)**
2:8 3:3 7:9

—————— **H** ——————

**H (1)**
191:4
**half (3)**
91:2 134:19 160:14
**halfway (1)**
130:2
**hallway (1)**
76:18
**HAMILTON (1)**
6:3
**hand (6)**
7:25 31:20 75:11
91:17 135:3 193:20
**handed (5)**
8:19 75:23 125:11
170:16 178:15
**handled (2)**

33:18 167:10
**handling (1)**
71:4
**hands (1)**
188:19
**happen (4)**
41:6 126:17 144:15
165:3
**happened (1)**
49:5
**happening (1)**
161:24
**happens (4)**
31:6 103:4 149:15
158:15
**happy (3)**
7:22 50:12 91:6
**hard (5)**
16:24 46:5 59:16 91:7
108:13
**hate (1)**
83:23
**Hauer (2)**
2:8 3:3
**healthcare (1)**
143:3
**heard (2)**
31:17 142:10
**hearing (3)**
39:4 105:18,20
**heavily (4)**
89:12 90:13 98:20
169:21
**HEDUS (1)**
6:17
**held (5)**
2:8 45:7 133:21
137:24 165:21
**help (10)**
12:19 43:17 49:2,7
52:10 73:6 82:6
83:24 110:18
126:23
**helped (3)**
43:9 69:13,24
**helpful (13)**
43:18 48:19 67:17
68:12,16 69:17 70:7
71:15 125:25
128:18,19 179:6,15
**helping (2)**
110:19,24
**helps (4)**
81:22 85:23 158:16
179:7
**hereunto (1)**

193:19
**hesitated (1)**
27:7
**hide (1)**
50:2
**higher (1)**
132:23
**highest (2)**
41:16 43:12
**HIGHLY (185)**
1:8 7:1 8:1 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1
67:1 68:1 69:1 70:1
71:1 72:1 73:1 74:1
75:1 76:1 77:1 78:1
79:1 80:1 81:1 82:1
83:1 84:1 85:1 86:1
87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1

168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1
**Holdings (3)**
1:4 4:5 19:9
**holds (2)**
122:20 163:18
**home (16)**
15:17 58:7 59:14,19
60:5,7,11,18 65:15
65:19 66:4 67:9,19
68:5 174:8,25
**horse (1)**
67:11
**Houlihan (2)**
6:17 84:11
**hour (2)**
74:2 91:2
**hours (6)**
15:11 41:11 42:9 43:5
71:19 75:3
**hundred (1)**
81:21
**hung (1)**
56:8
**HURWITZ (1)**
5:14

**I**

**i.e (5)**
26:3,6 63:25 155:6
177:13
**idea (2)**
181:5,25
**ideas (1)**
114:23
**identification (3)**
31:24 170:15 178:13
**identified (25)**
20:6,25 61:13 68:6,19
89:5 113:8,9,13
114:7,12,25 115:7
115:16 116:5,13
126:12 136:20
137:4,11 138:19
160:15,16,19,20
**identifies (3)**
8:20 81:25 136:25
**identify (2)**
82:21 139:18
**identifying (1)**

114:17
**idiot (1)**
86:4
**imagine (1)**
176:7
**immediate (1)**
24:16
**immediately (1)**
86:11
**impact (3)**
98:12 125:4,16
**implement (1)**
12:19
**implementation (2)**
117:9,24
**implementing (2)**
117:13 137:15
**implication (4)**
24:19 25:16,19 26:5
**implications (2)**
25:21 151:19
**implied (1)**
176:24
**importance (4)**
27:11,18 30:11 65:25
**important (6)**
30:23 31:13 43:21
58:5 66:9 171:21
**importantly (2)**
41:14 90:23
**impossible (1)**
40:7
**improve (2)**
76:25 114:24
**Improvement (1)**
60:12
**improvements (1)**
77:16
**inbound (4)**
58:12,25 70:23 71:5
**include (5)**
10:5 23:17 60:7 82:15
103:20
**included (19)**
10:4 22:22 29:17,24
38:11 51:20 53:21
54:6 56:2 58:11
60:4 82:22 96:3
104:22 114:14
177:7 180:23
184:13,19
**includes (4)**
60:9 82:8,11 170:20
**including (3)**
92:7 118:21 148:11
**inconsistent (2)**

45:25 159:10
**incorrect (1)**
45:24
**incremental (7)**
113:23 115:9,10
116:5,14 117:6
126:5
**incurred (1)**
143:11
**incurring (1)**
143:12
**independently (1)**
150:18
**indicate (3)**
76:3 130:21 181:13
**indicated (10)**
28:24 33:16 47:3 55:7
76:14 79:4 91:14
154:12 166:8,11
**indicates (5)**
52:19 68:18 78:19
82:23 111:7
**indicating (1)**
89:21
**indication (2)**
127:22 187:21
**indicative (2)**
32:18 33:4
**individual (2)**
8:13 155:18
**individuals (2)**
71:3 140:17
**informal (1)**
175:2
**informally (1)**
176:19
**information (31)**
8:15 28:18 29:11
31:16 39:22 58:21
58:24 59:10,13,16
60:2,17 66:22 79:11
86:23 88:7 89:4,22
90:3 93:4,24 119:22
125:22 127:10,17
138:7 152:25
166:22 173:11,19
177:17
**informed (7)**
23:14 27:15,20 30:13
145:4 164:12 165:2
**informs (1)**
107:17
**initial (1)**
46:11
**initiated (1)**
118:23

**Innovel (6)**
59:18 69:11,11,14,18
69:20
**input (29)**
37:9 39:18,20 40:4,9
41:4,13 75:4 89:13
89:15 90:14,18
93:16,25 96:7,10,17
96:19 105:6 110:10
110:14 112:10
118:18,19 127:21
132:5 136:4 164:18
167:3
**inputs (4)**
80:2 127:24 128:17
132:6
**inquiries (1)**
70:24
**insisted (1)**
169:17
**insolvency (3)**
63:9 91:13,16
**insolvent (3)**
46:14 47:6,15
**instance (1)**
17:18
**instruct (3)**
23:9 27:6,16
**instruction (1)**
164:23
**integrated (1)**
108:17
**intellectual (2)**
163:19 165:20
**intend (2)**
164:5,11
**intended (1)**
139:9
**intending (1)**
19:7
**intends (2)**
105:9,14
**interaction (1)**
11:23
**interchangeably (1)**
19:4
**interest (7)**
57:24 58:3,12,13 59:4
67:23 71:5
**interested (2)**
71:8 193:17
**intimately (1)**
70:10
**introduced (1)**
118:22
**inure (2)**

156:11,19
**inventory (2)**
141:2 158:4
**investment (2)**
175:5,14
**Investments (1)**
6:4
**involved (23)**
10:17 12:13,25 29:15
32:15 55:12 70:10
71:12 98:14 101:11
105:12 114:17
116:21 136:22
137:14,17 147:12
163:24 165:6 167:4
167:25 170:5
174:22
**involvement (12)**
13:6 70:12 94:12 96:2
98:5 102:13 110:5
116:25 117:18
123:8 125:20
176:23
**involves (1)**
28:25
**IP (5)**
66:17 122:19,20,23
163:18
**isolate (2)**
43:8 57:11
**issue (9)**
142:11 148:3 153:23
154:10,20 161:21
162:3 164:22 166:6
**issues (9)**
24:5 25:8 43:8,20
44:6 79:17 93:18
137:19 165:19
**item (2)**
19:25 137:20
**items (18)**
8:21 20:6 61:12 76:11
82:2,21 95:8 97:25
116:22 136:19
138:12 172:8
184:16,19,23,24
185:4,22

**J**

**JACK (1)**
6:9
**JAKE (1)**
4:9
**January (51)**
1:13 2:4 10:2 15:10
15:12 33:13,21

34:23 36:2 37:6,19
38:17,24 39:16
40:12,22,23 41:9,9
41:11 42:10,12,17
43:5 67:7 71:20,24
72:2,18,19 75:3
76:3 92:12 111:17
118:6 124:18
134:16 150:8
153:22 154:20
178:12,18,25
179:11,14,21
180:13,23 181:10
191:11 193:20
**JARED (1)**
4:10
**JLL (3)**
70:18,25 71:2
**JOB (1)**
1:23
**Joe (1)**
31:25
**JOHN (1)**
3:10
**JONATHAN (1)**
5:14
**Joseph (3)**
3:8 7:9 75:17
**judge (1)**
128:8
**judgment (7)**
28:10,13,17,20 37:12
96:20,25
**jumped (1)**
46:8
**junior (7)**
81:17 82:24 83:8 84:7
154:3,14 177:19

**K**

**k (3)**
171:12,15 177:7
**KANE (1)**
3:10
**KCD (17)**
122:3,6,11,15,19,20
122:23 123:4,24
124:7 146:22
163:18,19,22 164:5
165:21 166:24
**keep (1)**
55:21
**Kenmore (2)**
66:4,16
**key (2)**
65:14 75:14

**kind (5)**
17:21 28:16 95:19
112:3 167:24
**know (91)**
7:11,16,21 8:15 12:22
13:10 19:21 20:22
48:16,24 51:19,22
52:3,16 53:15 59:22
60:3 61:24 74:15,23
75:18 76:14 81:14
81:15,21 82:7,9
91:24 95:7 99:22
100:25 101:10,13
101:19 102:6 104:4
104:14 105:7,8
106:24 107:10,13
107:14 108:19
110:16 115:22
117:11 122:24
127:25 130:4
132:11 133:4,7,12
135:6,11 138:22
139:6,12 140:15
141:7 142:16
143:23 144:20
145:12 146:14,19
147:19,21 162:16
164:4,20,24 165:3
166:20,23 168:16
168:19,20 169:5
173:10,20 182:4,10
182:15,18 183:12
184:10,18 185:3,6
**knowing (1)**
70:17
**knowledge (2)**
13:17 164:10
**known (1)**
143:15

**L**

**laboring (1)**
116:17,24 117:5
**lack (1)**
46:7
**Lampert (3)**
11:23 13:7,11
**language (1)**
102:18
**large (2)**
92:5 110:13
**larger (1)**
8:20
**lasted (1)**
73:24
**late (4)**

60:24 72:17 73:7
175:7
**lawyers (2)**
23:16 86:13
**Lazard (67)**
1:11 2:6 10:15 11:19
12:8,21 13:10,20,21
13:23 16:16,21 17:9
17:15 28:9 42:4,6
42:10 55:5 73:16
79:10 87:9 88:8
91:15 93:25 94:13
95:2,21,25 96:10
98:9 107:4,8 109:7
109:8 110:4,11,22
111:2 112:17,18
116:21,23 117:4,12
117:19 118:15,21
125:21 128:14
129:4 136:4,5,18
137:2 138:5,10
149:18 150:9,22
151:6 170:21
171:19 172:20,24
173:8,15
**Lazard's (10)**
11:17 79:20 92:25
93:3 110:17 116:3
137:12 171:6,17,23
**Lazard.com (1)**
92:9
**lead (4)**
80:9,10 96:8 139:19
**lead-in (1)**
144:25
**leading (2)**
71:12 117:2
**LEAKE (1)**
5:6
**lease (2)**
168:2 169:10
**leases (3)**
167:16 168:6,14
**leave (2)**
26:21 129:25
**leaving (1)**
81:18
**led (5)**
11:22 12:3 14:9,12
21:5
**left (9)**
76:18 77:17 94:2
109:18 184:24
185:4,8,12 189:21
**legal (2)**
144:21,25

**lenders (3)**
5:3 85:10 162:14
**lengthy (2)**
114:21 188:6
**lesser (1)**
157:8
**let's (9)**
15:5 30:18 51:25
66:13 82:19 93:6
94:2 106:9 115:8
**letter (11)**
14:3 18:9,24 30:2
62:2 170:21 171:3,7
172:22,23 177:8
**level (3)**
58:3 150:20 155:4
**liabilities (19)**
26:4,7 28:6,8 81:20
121:17 146:6,11,16
146:20 147:7,8,15
147:25 148:10
149:10 157:15
158:13,21
**liable (2)**
102:9 141:21
**Liberty (1)**
6:6
**license (7)**
163:20,21,25 164:6,7
165:9 166:24
**liens (1)**
84:9
**light (1)**
27:15
**liked (1)**
155:21
**likelihood (1)**
113:2
**limited (1)**
94:18
**line (10)**
22:14 38:14 61:8
74:24 95:7 102:23
122:2 127:7 180:18
192:14
**lined (1)**
22:18
**lines (4)**
52:25 66:12 68:7
110:9
**lining (1)**
52:24
**liquidity (16)**
80:22 87:23 106:18
107:5,20,23 110:18
110:20,25 137:19

**list (8)**
20:2 28:5 44:6 68:4
69:8 113:17 115:7
116:6
**listed (10)**
9:9 20:10 97:25
116:22 117:4
137:15 138:12
148:17,19 172:8
**lists (1)**
114:19
**little (11)**
15:3 25:18 34:7 61:3
82:19 91:12 103:11
131:7 133:5 155:25
189:21
**LLP (1)**
2:9
**loan (2)**
21:20,22
**lock (1)**
85:3
**logged (1)**
71:5
**LOKEY (1)**
6:17
**long (2)**
7:21 73:23
**long-term (1)**
186:13
**longer (3)**
106:25 188:22 189:11
**look (43)**
18:15,25 19:24 24:9
24:23 45:4,8 46:9
49:14 50:19 61:23
76:10 77:19 80:12
82:6 83:16 86:25
87:4 91:22 92:3,22
93:6 109:15 111:4,5
114:9 119:7 121:25
126:4,25 127:3,25
128:8,9 135:6 138:5
138:13 151:23
160:10 162:11
170:23 171:10
179:16
**looked (2)**
74:13 76:22
**looking (4)**
61:6 65:4 86:2 176:13
**looks (1)**
132:19

lot (6)
43:11 73:12 91:14
118:17 176:12
177:11
lower (1)
103:11
Luncheon (1)
159:16

**M**

M-III (37)
10:19 16:16 28:4
29:12,18,23 71:3
73:15 79:22 80:6
87:9,18 89:24 93:17
95:19,20,23 96:13
105:5 108:9,12
110:22,23 112:11
113:16 116:18
118:18 123:6 126:2
126:12 134:17
135:13 140:18,21
144:8 151:23 161:5
M-III's (1)
110:23
M&A (4)
172:6 174:17,19
177:12
magnitude (1)
132:16
maintained (1)
50:4
maintaining (1)
144:7
making (7)
26:17 28:20 42:15,17
155:5,9,11
manage (4)
110:18,20,25 138:3
managed (2)
87:23 119:5
management (15)
10:20 16:17 41:14
73:16 87:9,24
112:11 114:23
116:18 118:18
140:17,22 150:13
151:22 161:4
managing (6)
117:15,20,24 137:3
137:13,19
mandated (1)
176:16
MANGES (1)
4:3
mark (6)

1:22 2:10 7:4 31:21
193:5,24
marked (24)
8:2,3 18:10,12 31:23
62:3 67:15 75:12,21
75:24 91:18,19
134:25 135:4
170:15,17 178:12
178:15 191:14,16
191:19,22,25 192:4
marketed (3)
58:20 59:5 66:22
marketing (16)
56:25 57:16,18,19,22
61:3 67:4 69:14,17
70:7,14,15 71:15
162:14,17 177:21
marking (1)
170:23
marriage (1)
193:16
match (1)
50:13
materially (3)
80:17 88:21 136:22
materials (3)
45:9 92:23 93:2
math (7)
84:12 86:4,10,13
91:15 93:25 110:11
matter (4)
10:22 11:8,18 193:18
MATTHEW (1)
6:16
MEAGHER (1)
5:2
mean (15)
42:3 44:10 54:9 64:5
64:20 82:16 86:21
124:19 132:6,19
151:15 157:8
172:15 173:15
188:4
meaning (3)
26:9 44:21 78:5
meant (5)
25:18 42:4,6 85:11,19
mechanic's (2)
84:9 148:3
mechanical (2)
147:5,11
Mechanically (1)
158:18
mechanics (10)
101:6,10,15,16,20,24
102:3 106:16 133:3

149:16
mechanism (2)
100:18,21
meet (8)
44:13 64:17,19 78:5
90:22,24 108:6
181:3
meeting (38)
9:6 10:25 36:18,24
45:6,7,20 49:6
72:21 73:11,21,24
74:5,11,11,19,22,25
75:2,10 76:2,5,14
76:17,19,22 77:6,9
77:10,17 79:8,15,18
79:19 81:7 120:9
150:25 155:2
Meghji (5)
87:14,18 141:13
184:7 187:4
member (1)
152:18
members (5)
36:20,22 73:16 92:7
140:21
memo (1)
122:3
memorandum (3)
59:11 60:2,17
memorandums (3)
58:24 59:13 177:17
memory (6)
74:6 75:15,17 84:23
85:18 150:7
mentioned (11)
25:16 34:20,22 57:15
62:6 139:13 172:13
174:13 185:6,22
188:16
mentioning (1)
149:11
met (2)
9:22 146:15
methodology (1)
55:18
mid-October (1)
57:20
mid-spring (1)
14:4
middle (1)
138:14
midnight (3)
72:5,6 73:5
million (81)
46:14 47:6,11 77:22
78:19 79:2,4 80:25

81:11 82:7,24 83:8
83:10,13,15,18,19
84:6 85:2,8,11,13
85:15,21 86:2 94:14
95:15 96:3 98:17
100:19 103:3,9,15
103:17,20 104:22
109:17,24 111:7,14
111:19,21 112:15
112:21 113:7 114:4
119:25 120:11
122:5,10,25 123:3,9
123:12,18 124:7
128:4,6 132:22
134:19 138:16,22
138:25 139:7
141:14,21,23 142:7
142:13 144:13,17
144:22 145:11,18
145:23 184:8
186:24 187:5,16,22
187:25
mind (1)
31:15
minimal (4)
50:20 61:5,15,22
minimize (1)
172:3
minus (1)
84:10
minute (14)
8:5 19:2 32:6 48:4
76:6 82:5 91:21
114:9 135:5 138:4
171:2 178:19,22
179:2
minutes (13)
45:5 49:6,18 68:24
74:4 75:25 76:7
84:24 119:7 178:10
178:17 179:20
191:9
mischaracterizes (1)
40:19
missed (1)
12:2
mistaken (3)
120:8 174:7 187:3
misunderstanding (1)
64:13
mitigate (1)
111:21
model (3)
95:8 108:19,25
models (1)
108:16

moment (3)
18:15 162:9 177:23
Monday (1)
71:23
monetize (1)
186:3
monetizing (1)
185:16
months (2)
57:3,17
morning (8)
7:8 15:11 71:19 72:4
72:11,19 73:9 75:3
move (3)
42:18 51:25 65:11
moved (2)
51:23 112:6
moving (1)
89:17
multiple (2)
132:6 136:9

**N**

N (7)
4:1 5:1 6:1 160:2,2,2
192:6
name (3)
7:9 9:8 194:2
named (1)
69:6
nature (2)
102:20 116:9
necessary (1)
78:17
need (17)
7:20 31:4 63:24 86:5
86:25 90:18 91:5,10
123:19 125:18
129:14 139:15
144:6 146:15
162:11 172:3,17
needed (2)
49:12 93:13
needs (1)
172:16
negative (1)
70:2
negotiate (3)
77:15 138:2 170:9
negotiated (5)
98:20 100:13 158:24
168:22 169:22
negotiating (9)
16:13 17:10,11,12
98:6 102:14 104:16
137:17 138:6

JX 096-62

**negotiation (11)**
98:10 99:4,9,18,23
100:17 105:13
138:11 165:15
169:15,24
**negotiations (18)**
16:6,12,21 17:8 33:17
51:24 142:2 148:24
155:23 164:21,25
165:7,18 166:4
167:5,24 169:6
184:3
**net (3)**
82:12 154:17 155:5
**netting (1)**
85:17
**never (4)**
17:2 37:13 156:16
168:17
**new (22)**
1:1,13,13 2:3,3,9,9,12
3:7,7 5:5,5,13,13
6:7,7 151:19 152:2
152:9 193:3,4,8
**Newco (22)**
19:17 26:11 82:25
100:20 101:4,4,21
124:2 139:10 141:8
142:7,17 147:21
148:6,10 149:19,24
151:12,14 163:21
165:10 166:24
**Newco's (1)**
151:23
**night (1)**
72:18
**nod (1)**
84:12
**nondebtor (1)**
164:5
**normally (1)**
72:13
**Notary (5)**
2:12 7:4 190:14 193:7
194:25
**note (2)**
77:11 171:21
**noted (4)**
45:10,24 47:12
115:22
**noted:2:39 (1)**
190:4
**notes (1)**
146:22
**notice (1)**
39:3

**notion (2)**
90:20 180:11
**November (2)**
60:22,25
**number (60)**
19:25 44:3,17 47:11
50:2,19 69:20 78:13
78:19 79:2,21 81:16
81:25 82:10,12,16
82:18 85:19 89:10
90:11,18 94:19 95:7
95:11 96:8,11,12,15
96:16,18,21,22 97:3
98:20,23 99:11,19
99:20 100:3,13
111:24 112:6,7
120:4,7,8,11 122:5
122:11 123:10,13
123:15 132:7
136:25 169:24
172:6,9 178:4
184:23 191:5
**numbers (12)**
75:19 80:4 82:6 84:14
86:20 94:23 107:18
112:10 118:18
136:23 140:18,22
**numerous (1)**
185:18

---

**O**

**O (3)**
160:2,2,2
**oar (3)**
116:17,24 117:5
**Object (56)**
11:15 13:12 16:23
17:17 21:2 22:16
28:19 33:23 35:13
35:17 36:13 38:9
40:2,18 41:3,20
43:7 44:19 46:3
47:7,17,18 48:11
51:16 52:13 53:10
53:23 57:10 63:12
78:11 88:10 89:25
95:5 96:23 99:7
106:14,22 121:20
123:21 124:16
129:13 132:4
133:11 138:9
139:11 141:18
143:17 144:24
146:17 153:8
160:24 161:18
168:4 169:12

176:22 181:17
**objection (26)**
11:24 13:13 21:11
22:9 30:24 31:19
32:3,3 52:6 88:13
99:6 105:18,21
119:6 133:17
144:23 146:25
153:19 155:16
156:20 161:10,25
163:4 182:2,12
183:14
**obligated (1)**
143:13
**obligation (2)**
102:9 149:3
**obligations (17)**
64:18,19 65:7 90:24
124:2 141:5,9,15
142:5,14,18,19
143:13,20,23 149:9
181:4
**obtaining (1)**
169:17
**obviously (6)**
25:13 27:9 63:16
82:12 132:7 154:24
**occur (1)**
14:17
**occurred (4)**
9:24 15:9 73:7 166:5
**October (13)**
14:5,8 60:24 171:8
172:25 173:6,13,17
173:22 174:3,6,22
176:4
**odd (1)**
78:24
**offer (4)**
12:20 37:9,15,21
**office (1)**
88:4
**offices (3)**
2:8 15:15 183:4
**offset (2)**
158:13,21
**oh (1)**
18:18
**okay (51)**
7:18 8:7 19:22 32:13
32:14 34:21 37:16
38:2 40:11 42:5,8
44:7 45:2 47:23
48:6,15 50:18 58:21
61:2 63:14 64:4,6
69:5 71:25 76:9,10

78:18 84:22 85:22
87:6 89:3,19 92:2,3
102:24 128:20
132:21 144:11
147:5 164:20
168:25 170:25
171:13 172:13
179:6,7,16,19,24
181:24 187:18
**once (2)**
91:24 135:7
**ongoing (7)**
76:23 77:6 123:5
164:21 174:4,5
189:18
**open (1)**
59:6
**operating (1)**
14:19
**operational (1)**
116:8
**operations (1)**
64:9
**operative (1)**
181:11
**opportunities (12)**
113:10,13,21 114:2,6
114:11,18 116:4,12
126:18 137:4,10
**opportunity (6)**
67:24 113:17 136:25
138:2,3 163:3
**opposed (2)**
36:20 126:19
**option (1)**
178:2
**order (9)**
11:3 17:25 23:7 24:9
44:14 78:5 86:24
132:15 139:16
**ordinary (1)**
50:4
**orient (2)**
32:8 92:13
**outbound (3)**
58:4,13 59:2
**outcome (2)**
99:9 193:17
**outlined (1)**
171:25
**outlining (1)**
129:17
**output (3)**
95:10 108:18,24
**outset (1)**
171:20

**outside (5)**
11:2 124:14 148:14
164:15 165:3
**outstanding (3)**
66:21 154:2 158:8
**overage (1)**
158:11
**overall (2)**
17:3 70:19
**overarching (2)**
60:5,8
**overcomplicated (1)**
133:2
**overlap (2)**
177:11,22
**overperformance (1)**
155:6
**oversee (2)**
175:25 176:20
**overview (3)**
48:22 59:17 71:9
**owe (1)**
141:4
**owed (1)**
123:4
**owns (3)**
144:16 145:10,13

---

**P**

**P (6)**
4:1,1 5:1,1 6:1,1
**p.m (6)**
45:7 92:13 159:16
160:3 179:21 190:4
**package (1)**
82:16
**page (36)**
19:24 45:4 46:10
48:20 61:5 65:12
77:20 80:13,15
81:23,25 82:20 83:2
83:3,4,13 88:18
103:11 109:18
115:5 116:22
118:22 119:16,18
120:14,20 122:4
127:9 135:18
137:21 138:15
170:22 179:23
191:5 192:9,14
**paid (8)**
100:20 101:8,21
102:7 106:9 123:19
134:4 148:4
**paragraph (32)**
45:8 46:16,18,21,23

47:24 48:5,9 49:10
61:12 65:12 77:13
80:12 81:23 84:15
87:5 88:15,17,22,24
88:25 119:17,18
120:13,14,19,20,21
120:23 121:2
179:22,25
**paragraphs (3)**
47:24 89:5 119:21
**parcels (1)**
185:23
**park (3)**
2:9 3:5 84:6
**part (13)**
12:2 16:20 77:5 85:14
88:4 92:8 95:8
110:17 142:22
150:14 169:17
184:2 185:13
**participate (1)**
110:19
**participated (2)**
15:24 16:6
**particular (31)**
16:20 17:8 20:24
21:18,20,23 26:16
33:16 35:12 38:7
44:23,24 49:25
54:16 66:12 68:19
69:7 75:10 88:15
90:20 94:17,17
95:17 152:11
155:22 156:6 162:3
171:16 186:5
187:12 188:2
**particularly (2)**
26:15 189:17
**particulars (1)**
184:4
**parties (5)**
16:10 133:22 138:6
167:17 193:15
**parts (11)**
10:16 59:14 60:10
66:5 67:8,20 68:5
174:9 175:5,15
176:15
**party (7)**
113:3 132:9 137:16
137:18 138:3
161:23 168:8
**passages (1)**
32:10
**PAUL (2)**
5:6,10

**pause (1)**
182:23
**pay (16)**
28:7 31:4,9 65:6
100:9 101:2,5
109:23 129:24
141:16 142:12
143:2,13 148:10
157:12 158:19
**payable (14)**
94:11,15 95:15 97:24
99:18,24,25 100:7,8
101:25 102:4,7
148:12,20
**paying (4)**
85:10 106:11 149:8
149:14
**payment (1)**
101:17
**payments (6)**
122:21,21 123:25
124:11 131:6
147:22
**payroll (7)**
141:5,9,15,22,23
142:4,13
**PBGC (9)**
66:19 67:4 164:21,25
165:7,12,19 166:6
166:25
**pendency (1)**
44:2
**pending (1)**
7:22
**people (9)**
59:7 67:13 70:16
73:12 74:12 89:12
89:21 90:13 114:25
**percent (1)**
70:2
**performed (2)**
125:3 128:22
**period (27)**
10:3 13:20 15:21,24
34:20,21 35:6,14
37:5 38:16 39:8,15
40:13 42:23 43:22
106:20 133:16
162:14,17,18
167:15 168:6,9
169:25 170:9
180:21 183:6
**person (4)**
121:11 143:21 161:2
161:3
**personally (11)**

11:22 13:2,6 40:15,24
41:7,25 91:9 131:18
157:3 165:6
**perspective (4)**
67:3 168:15 170:8
180:25
**Pg (1)**
194:5
**PHILIP (1)**
3:9
**phrase (1)**
35:18
**phrased (4)**
35:19 37:24 38:3
39:13
**piecemeal (1)**
185:25
**pieces (1)**
66:14
**place (1)**
67:12
**placed (1)**
83:9
**plan (16)**
97:17 148:14 149:19
149:24 150:2,5,10
150:13,16,17,24
151:5,9,20 153:6,18
**planning (1)**
173:12
**plans (3)**
143:6,7,10
**platform (1)**
70:4
**played (1)**
33:2
**Plaza (1)**
6:6
**pleased (1)**
77:7
**plugged (1)**
29:14
**plus (4)**
84:7,8,9,10
**pocket (1)**
148:5
**point (36)**
7:20 19:19 22:3 39:23
40:14,22 41:23
42:11 65:22 67:2
80:11 104:17 115:4
135:22 147:6,11
148:12,24 155:22
156:16 157:4 158:9
159:4 165:17 166:8
166:18 169:21

170:5,6 174:16
175:24 180:19
181:19 182:8
183:17 184:2
**pool (2)**
187:10,12
**populating (1)**
177:16
**portion (1)**
105:11
**posed (1)**
35:24
**position (3)**
9:7 161:13 170:13
**post-close (2)**
106:12 110:4
**post-petition (1)**
123:4
**postclose (10)**
102:8 139:10 143:15
147:25 167:15
168:13 169:10,25
189:4,10
**postclosing (2)**
160:23 189:16
**potential (23)**
51:20 79:12 112:21
115:9 116:5,13,13
117:5,7,16,21
118:10 119:2 125:8
126:10 138:15
142:11 145:17
169:18 175:3 178:2
180:9 182:21
**potentially (4)**
49:8 100:9 114:3
163:8
**precedent (3)**
64:16 135:14,17
**precise (1)**
110:7
**precisely (1)**
132:14
**preclose (3)**
143:14 189:4,9
**preclosing (1)**
142:20
**preliminary (1)**
123:5
**preparation (2)**
11:11 128:16
**prepare (6)**
9:7 11:3 60:16 131:17
131:18 136:7
**prepared (14)**
9:2,21 10:15 59:10

107:4,5,21 108:8,12
161:8,16 166:9,12
171:19
**preparing (8)**
10:18 55:5,13 92:25
125:21 128:15
136:5,6
**prepetition (2)**
11:19 165:14
**presence (1)**
11:2
**present (5)**
6:15 15:14,25 16:10
72:21
**presentation (4)**
84:3 93:5 130:20
180:17
**presentations (10)**
9:13,15,20 10:6,8,12
10:14,18,22 50:7
**presented (7)**
45:9 65:14 74:21 79:9
79:10 118:15
150:13
**presenting (1)**
118:8
**presumably (1)**
174:2
**pretty (3)**
40:8 108:16 132:20
**prevail (2)**
157:5 183:16
**prevailed (1)**
155:22
**prevent (1)**
161:23
**previous (1)**
185:7
**previously (23)**
8:2,3 13:10 15:18
18:10,12 30:10 75:9
75:12,21,24 91:18
91:19 134:25 135:4
160:5 174:13
191:14,15,18,21,24
192:3
**price (5)**
85:2,9 158:2,17,18
**primarily (4)**
16:22 116:11 118:8
174:20
**primary (9)**
17:7,16 110:21 113:3
117:19 129:5,8
131:24 137:3
**prior (18)**

10:5 11:17,20,25
12:25 13:5,9,25
40:19 42:9 53:25
88:17 133:23
146:15 157:9
162:19 171:7
180:17
**priority (1)**
94:3
**privilege (1)**
24:6
**privileged (1)**
145:3
**pro (5)**
77:22 78:19,21,25
111:6
**probably (12)**
53:12 73:6 79:24 84:3
90:16 94:19 97:2
102:11 108:6
118:21 145:3
160:25
**problem (1)**
46:24
**procedures (2)**
17:25 23:7
**proceed (1)**
68:16
**proceeds (4)**
85:11,20 115:15
137:22
**process (39)**
16:4 43:2,16 48:21
51:23 55:12,16 66:3
66:11,25 67:5,6
70:11,13,14,15,18
70:20 71:10,11
173:12,16,21
174:12 175:3,4,6,7
175:10,13,16 176:2
176:21 177:12,14
177:18,21 178:6
186:13
**processes (9)**
67:11 172:7,10,19,21
173:7 174:4,6
177:13
**processor (1)**
137:24
**produced (4)**
49:24 50:8 94:21
136:9
**production (1)**
49:21
**Products (1)**
60:12

**professional (3)**
2:11 97:20 193:6
**professionals (1)**
128:23
**profile (1)**
140:25
**Project (2)**
92:8,24
**projected (1)**
180:6
**projections (1)**
126:10
**property (4)**
95:24 96:3 163:19
165:21
**proposal (4)**
39:5 82:3,22 105:17
**proposals (2)**
36:4 43:3
**proposed (14)**
22:6,7 26:11 53:21
54:6,14 55:2,19
56:2 146:3 150:24
153:24 182:5
183:11
**proposing (1)**
53:8
**protection (4)**
146:5,11 147:16,24
**provide (21)**
9:2 11:4 18:8 23:21
28:9,13 34:23 35:8
36:10 37:2 39:8
96:20 98:7 112:17
112:18 127:16
151:6 153:14 163:2
164:6 177:6
**provided (35)**
20:8,16 22:5 23:2,11
23:18 24:25 27:13
28:5 32:18 33:6,14
33:18 34:25 36:14
51:2,7,13 52:5,11
52:15 54:14 75:8
88:8 89:13 99:13
103:5 105:2 114:12
119:23 121:15
152:4 164:2 173:11
173:19
**provides (5)**
50:20 61:14,15 126:9
162:13
**providing (9)**
8:12 21:18 24:2 34:9
34:17 36:17 113:5
132:10 152:24

**provision (19)**
148:8 154:10 155:25
156:6 157:22,24
158:22,24 162:13
165:9 166:21,23
167:13,21 168:3,22
169:2 171:22
172:14
**provisions (5)**
102:14,17 103:5
153:24 167:23
**Public (5)**
2:12 7:4 190:14 193:7
194:25
**pull (1)**
86:17
**purchase (10)**
67:15 84:25 85:8
102:23 146:3 148:9
155:15 158:2,17,18
**purchaser (1)**
145:17
**purpose (2)**
12:16,18
**pursue (2)**
87:10 89:7
**push (2)**
105:17 169:2
**pushed (1)**
98:22
**put (6)**
37:13 59:2 86:10 93:5
149:20 155:2
**puts (1)**
135:13

---

**Q**

**qualification (1)**
48:21
**qualified (3)**
32:20 66:6 179:12
**qualify (1)**
23:5
**qualifying (1)**
23:13
**quest (1)**
177:24
**question (53)**
7:14,22 20:19 23:10
24:5 27:17 30:10
32:12 33:10,20 34:5
35:3 37:7 38:12
39:7 40:3 44:12
47:8 49:10 53:13
54:19 56:18 62:18
76:13 84:4 90:6

95:16 102:11
105:22 108:2
122:13 125:10
126:24 127:7,20
130:9 131:3 137:8
142:23 151:17,22
151:25,25 152:6,7
152:16 153:3
157:17 164:10
176:18 178:21
187:9,19
**questioning (1)**
38:15
**questions (15)**
16:8 23:25 32:9 34:18
35:23 52:23 70:19
74:5,21 76:8 101:24
113:19 151:2,11
189:25
**quick (1)**
91:10
**quickly (2)**
68:23 179:17

---

**R**

**R (4)**
4:1 5:1 6:1 160:2
**raise (1)**
177:13
**raising (2)**
177:19 178:3
**range (4)**
43:19 44:21 132:19
132:21
**RDD (1)**
1:6
**reaching (1)**
66:19
**reaction (1)**
22:21
**read (9)**
32:7 48:5,9 88:15
126:14 137:6 144:4
148:17 194:5
**reading (5)**
88:20 112:14 122:13
123:2 184:6
**Reads (1)**
194:5
**real (18)**
54:20 55:8,11 70:6,8
70:10,13,17,20,24
71:4,15 184:13
185:9,23 186:9,21
186:24
**realize (1)**

19:2
**realizing (1)**
189:2
**really (3)**
17:4 79:5 187:25
**realm (1)**
137:12
**reason (14)**
45:13 47:20 48:7,13
54:17 56:8 67:18
161:19 168:12
171:22 181:6 187:8
188:15 194:5
**reasonable (5)**
113:11,14 155:13,18
188:11
**recall (111)**
10:21 12:10,24 13:24
14:6 17:14,23 21:3
21:12 22:17,23
24:15 25:21 26:24
27:2 28:20 29:25
30:3 32:15,21 35:3
35:4 37:7 42:15
46:4 47:2,19 48:25
49:4 51:2,4,6,10,12
51:17 52:7,25 58:10
60:21,23 62:5,10,19
62:20,24,25 63:2
71:20,24 73:2,9,10
73:25 74:23 76:4
79:7,9 81:8,13
92:19 95:13 96:5,14
97:12 99:8,16 100:4
101:18 103:25
104:11,13,16,20
105:3 106:23 107:2
107:18 108:21
109:5 110:12,15
111:10 114:9,19
115:13,21,24,25
124:10 125:9,12,25
128:12 129:3
134:20 139:25
151:10 152:22
153:12,21,22 154:9
156:22 169:4,20
180:7 183:5,16
184:12,16 185:19
**recapitalizations (1)**
176:10
**receivable (8)**
184:15 185:10,24
186:17 188:17,18
188:25 189:11
**receivables (1)**

158:4
**receive (1)**
95:11
**received (15)**
18:18,20,24 20:9 24:7
31:16 34:12 36:4
47:4 49:19 58:11
65:19,21 70:23
151:21
**receiving (1)**
53:5
**recess (4)**
91:11 134:24 159:16
189:22
**reciprocal (2)**
171:22 172:14
**recognize (2)**
131:9 171:4
**recollecting (1)**
100:3
**recollection (10)**
9:15 10:10 45:25
47:10,13 61:21 81:5
89:3 104:21 188:5
**recommend (2)**
39:16 89:17
**recommendation (15)**
34:24 35:5 37:3,22
38:5 41:19 42:16,18
87:8 88:9 89:6,10
90:11 153:2,3
**recommended (7)**
40:15,24 41:7,15,23
42:10 75:4
**record (3)**
134:23 159:15 193:12
**red (1)**
109:15
**redaction (1)**
46:11
**redactions (3)**
46:19,20 120:25
**reduce (1)**
126:11
**reduction (1)**
157:14
**reengaged (1)**
14:4
**refer (6)**
19:6,7,16 49:24 81:22
151:12
**reference (2)**
46:12 124:11
**referenced (1)**
57:9
**references (1)**

48:16
**referencing (1)**
90:19
**referred (2)**
158:10 184:14
**referring (7)**
19:11,13,20 119:15
135:17 174:19
180:20
**refers (1)**
122:2
**reflect (2)**
135:23,25
**reflected (8)**
48:9 88:11 119:20
120:10 122:11
124:8 125:13
127:20
**reflects (5)**
115:5 119:11,22
126:16 136:2
**reformatted (1)**
126:3
**refresh (2)**
9:15 61:21
**refreshed (1)**
10:9
**regarding (2)**
23:13 32:18
**Registered (2)**
2:11 193:6
**regulatory (1)**
146:24
**reimburse (1)**
147:22
**reimbursed (1)**
101:4
**reimbursement (1)**
148:5
**reject (6)**
37:4,8,14,21 38:6
39:14
**related (6)**
63:10,13,15,22
151:18 193:15
**relates (1)**
63:8
**relatively (1)**
94:18
**release (1)**
145:15
**released (2)**
145:19,21
**relied (2)**
29:18 37:11
**rely (1)**

29:22
**relying (5)**
69:3 89:12,20,21
90:13
**remain (7)**
29:2 31:3 43:24 64:3
133:9,15 189:2
**Remainco (3)**
96:9 97:11,15
**remaining (3)**
97:19 109:16,17
**remains (1)**
140:16
**remember (62)**
22:21,25 45:16,19,21
59:19 65:18 73:23
79:3 81:10 94:17,25
95:6,12 96:17 97:10
97:13,21 98:15
99:12 100:14
104:18 113:5
114:11 115:10,17
120:6 121:8,14,18
148:23 151:17
152:14,15,20,24
153:9,10 154:19
155:4,9 156:7,8,23
169:19,23 170:3,7
170:11 176:3,25
177:9 179:13
183:19,24 184:3
185:21 186:4,10,12
186:17,23
**remove (1)**
40:4
**render (1)**
47:5
**rendered (1)**
47:14
**rendering (1)**
46:13
**reorganization (1)**
97:18
**repair (2)**
60:10 174:24
**repeat (11)**
47:8 49:11 53:25
105:22 122:12
126:24 130:3 137:7
139:22 142:22
156:3
**rephrase (1)**
7:17
**report (1)**
187:20
**Reported (1)**

1:21
**reporter (5)**
2:11,12 178:14 193:6
193:6
**represent (3)**
7:10 86:20 170:18
**representation (1)**
86:19
**representative (4)**
1:11 2:7 8:16,23
**representatives (2)**
73:15 165:8
**represented (2)**
115:2 120:4
**representing (3)**
23:16 93:12 141:19
**represents (2)**
112:9,14
**request (8)**
49:17 176:6 177:2
178:6 181:8 182:20
183:5,13
**requesting (2)**
155:10 156:8
**requests (3)**
58:25 59:3 192:13
**require (4)**
40:9 64:17 185:17
186:2
**required (11)**
67:4 77:23 78:22 93:8
109:12 111:7,12
118:11 154:11
180:18 181:8
**requires (3)**
141:8 146:22 166:24
**reschedule (1)**
66:10
**rescheduling (1)**
66:2
**reside (1)**
147:8
**resolution (4)**
66:20 105:18 165:18
165:24
**resolve (1)**
162:5
**resolved (1)**
162:6
**respect (99)**
9:17,18 12:22 21:4
23:4 24:2 27:22
28:10,17,21 29:10
33:2 34:9 44:4,7
52:17 54:4 58:14,22
59:13 62:11,21

63:18 65:5 67:8,10
67:19,22 70:17,24
78:4 79:22 86:22
90:23 93:18 95:3,24
97:23 99:17 100:10
101:16,24 102:3,13
107:22 112:20,22
115:14 117:15
119:24 121:17
122:10 126:17
128:23 131:16
134:9 136:14,24
137:18 142:12,19
143:11 144:11,13
145:10 147:16
149:19 150:4,23
151:4,8 152:7 153:6
153:16,23 154:10
156:5 157:11
161:22 163:22
164:22 165:8,19
166:6 167:6,21
168:2 174:23 175:4
175:12,15,19
180:10 182:7
183:21 186:9,16,19
186:21
**respectively (1)**
84:9
**responded (1)**
151:24
**responding (2)**
164:9 187:15
**response (5)**
152:4 181:24 182:10
183:13 187:13
**responsibilities (1)**
17:16
**responsibility (13)**
16:22,25 17:7 79:20
79:24 80:9 117:20
129:6,8 131:25
136:18 137:3,12
**responsible (11)**
106:11 116:11 118:8
128:14 129:5
137:16 138:5,11
144:7 149:8 174:20
**rest (2)**
111:20 171:18
**restructuring (74)**
5:11 9:23 10:13 16:9
16:18 23:3,4,12
32:16,22 34:11,19
35:2,11,24 36:3,8,9
36:11,12,15,16,19

36:21,25 37:17
39:10 40:16,25 41:8
42:12 43:21 45:5
72:22 73:17,18
74:18 75:6 76:2
79:11 81:6 89:7,14
89:23 92:6 111:25
112:16,19 113:18
114:13 115:11,19
118:9,25 119:13,23
136:10,13 151:7,8
152:19 153:4,5,15
153:16 167:10
173:17,22,24 177:3
178:11,17 188:9
191:10
**restructurings (1)**
176:10
**result (2)**
99:3 128:25
**resulting (1)**
26:2
**resumed (1)**
160:4
**retail (1)**
70:4
**retain (1)**
26:9
**reveal (1)**
164:10
**revenue (1)**
70:3
**review (16)**
8:6,8 9:14 11:6,10
68:25 76:7 91:25
96:20 125:19 135:7
149:18,21 171:3
178:19,22
**reviewed (10)**
9:12 10:9 11:13 45:22
95:2 96:6 97:3
113:10,15 125:11
**reviewing (8)**
10:24 94:20,24 96:17
96:19 102:22
150:23 176:7
**Richman (5)**
1:22 2:10 7:4 193:5
193:24
**Riecker (2)**
87:22 88:3
**RIFKIND (1)**
5:10
**right (14)**
18:19 40:20 56:12
65:10 79:25 86:4

95:18 109:11 134:5
143:21 161:2,3
166:3 181:18
**rights (2)**
163:19 165:21
**ring (1)**
120:2
**risk (6)**
77:24 119:4 172:4
180:4 182:6 188:11
**risks (9)**
113:24 114:18,25
115:14,18,22
117:16,21 126:6
**role (17)**
16:3 27:21 32:24 33:2
33:14,21 34:4,8
35:22,22 43:15
92:25,25 93:3 98:9
102:20 116:3
**rolling (1)**
151:24
**room (6)**
66:23 73:10,13,20
74:10 165:11
**rooms (1)**
177:16
**roughly (3)**
13:2 132:15 142:7
**royalties (6)**
122:3,6,11,15 123:4
124:8
**royalty (2)**
123:24 124:11
**RPR (2)**
1:22 193:24
**Rule (1)**
8:24
**rules (1)**
7:13
**run (7)**
67:6 108:18 172:18
173:16,21 175:13
178:6
**running (7)**
70:18 172:6,9 174:21
175:6,17 177:20
**RUTHERFORD (1)**
4:9
**RX (1)**
92:8

---
**S**

**S (7)**
4:1 5:1 6:1 160:2,2,2
191:4

**sale (24)**
21:24 22:6 39:3,4,7
48:21 53:21 54:6,15
55:20 56:3 64:25
103:19 105:20,23
106:2 124:15
130:15 139:21
144:14 172:19,21
176:14,14
**sales (15)**
66:3,11 172:2,6,10
173:7,12,16,21
174:4,5 176:2,9,20
177:25
**saw (2)**
107:2 109:2
**saying (6)**
55:21 57:23 90:17
131:4 181:22
187:24
**says (8)**
48:20 69:4 77:13 98:3
111:6 123:2 127:7
171:16
**scan (1)**
171:11
**scenario (1)**
108:18
**schedule (9)**
95:9 96:6 125:12,24
126:2,4 129:15,16
130:23
**scheduled (1)**
162:21
**schedules (9)**
94:20,24,25 96:15
97:3,7,8 113:15,20
**screen (1)**
109:3
**Sears (35)**
1:4 4:5 7:11 11:8,18
12:8 13:3,21,21,23
16:5 19:7,9,12,16
57:18 58:7 59:9,14
59:19 60:4,7,11,18
65:15,19 66:4 67:9
67:19 68:5 70:4
147:8 172:24 174:8
174:24
**Sears's (2)**
15:9,15
**SEARS_UCC00413...**
31:23 191:7
**second (11)**
44:7 46:9 64:2 77:13
80:13,19 81:25

82:13 83:4 119:16
137:6
**section (5)**
171:25 172:4,8,8,10
**secured (1)**
85:10
**see (58)**
8:24 19:25 20:3 45:4
45:9,11 46:5,15,25
48:2,20,22 49:2,12
50:22 59:3 61:7,17
65:16 66:7 80:17
81:2 82:3,6,25
84:10 87:11,16,25
88:7,14 91:21 92:4
93:9 94:4 98:2,3
103:12 109:2,3,13
109:19,24 111:8
113:24 120:18
121:6 122:7 126:6
126:12 127:7,8
129:14 136:16
138:20,21 150:3
160:16
**seeing (6)**
51:10,17 52:25 96:14
99:12 125:12
**seek (1)**
181:14
**seeking (1)**
20:17
**seen (22)**
21:13 22:3,13 49:15
52:18 53:11 106:18
107:15,20 108:4,22
127:16,23 129:18
130:14,19,23
131:11,15 135:8
149:23,25
**segregation (1)**
110:8
**self-insured (2)**
143:7,10
**sell (5)**
53:9 67:24 68:13
160:22 174:8
**sellers (1)**
163:17
**send (1)**
95:10
**sense (9)**
21:15,25 22:2 56:24
68:13,22 97:16
143:16,18
**sensitive (1)**
91:6

**sentence (14)**
46:10 65:13,23,24
77:21 78:23 80:19
87:13,21 120:15
121:2 184:5 185:14
187:4
**separate (10)**
27:12 30:18 50:6
63:23 66:24 103:6
123:17,22 166:21
185:18
**separated (1)**
31:15
**separately (1)**
78:6
**serves (1)**
150:7
**services (16)**
58:8 59:14,19 60:5,7
60:18 65:15,19 66:4
67:9,20 68:5 171:11
174:9,25 177:6
**servicing (1)**
147:24
**sessions (2)**
102:22 150:12
**set (8)**
65:4 84:23 161:6
178:10,16 191:9
193:10,20
**sets (1)**
22:4
**Setting (1)**
39:20
**settled (1)**
98:24
**settlement (1)**
166:5
**share (1)**
27:14
**shared (1)**
116:18
**sharing (1)**
169:20
**sheet (6)**
138:17,19 139:2,8
147:10 194:1
**SHIP (10)**
59:25 60:11,13 82:8
82:11 85:2 144:14
145:17 175:12,19
**short (3)**
134:22 159:14 189:20
**shorter (2)**
148:13 170:9
**shortfall (29)**

Pg 69 of 73

Page 18

112:22 117:8,17
118:12,13 119:3
130:21,24 131:2,5
139:4 153:25 154:4
154:8,15 157:7,8
158:11 160:23
180:15,20 181:2,9
182:6,21,22 187:3,9
187:25
**shortfalls (1)**
180:9
**Shorthand (2)**
2:11 193:5
**showed (3)**
88:16 180:15,16
**showing (1)**
79:12
**shown (10)**
8:4 18:13 75:22 91:20
135:2 191:16,19,22
191:25 192:4
**shows (3)**
129:19 130:24 131:12
**side (5)**
94:2,4 109:11,18
156:18
**sides (1)**
130:12
**Signature (1)**
194:21
**significant (1)**
162:5
**significantly (2)**
116:9 132:23
**similar (1)**
180:15
**similarly (1)**
127:19
**simpler (1)**
131:7
**simply (7)**
29:11 99:3 112:9
125:22 131:10
159:8 171:18
**sit (2)**
100:2 142:5
**sitting (8)**
102:21 120:2 127:12
134:13 149:2
165:11 185:3
186:22
**six (1)**
134:19
**SKADDEN (1)**
5:2
**skepticism (1)**

188:20
**skim (1)**
32:7
**skip (1)**
103:12
**SLATE (1)**
5:2
**sleep (1)**
15:17
**slide (32)**
93:6,8,12 94:5 109:11
113:22,22 114:10
114:14 115:8 117:4
118:15 120:12
122:2 124:8 125:23
126:15,25 127:2,11
135:23 136:14,21
136:24 137:5,11,21
138:8,14 143:25
160:13,13
**slight (1)**
100:14
**small (1)**
60:13
**softer (1)**
25:8
**sold (1)**
185:25
**solvency (46)**
26:20,23 27:3,12,19
27:24 28:12,25 29:7
30:5,7,12,16,21,22
31:13 63:8,21 65:3
78:7,16 79:6,13,23
80:3 87:15 90:21,21
93:14,19 111:13
112:5,10,23 117:7
117:17 118:3,12
119:3,24 136:15,20
139:4 143:25
180:10 182:7
**solvent (5)**
26:19 43:25 64:3 78:2
80:24
**some-odd (1)**
141:21
**somebody (2)**
79:21 95:21
**somewhat (2)**
19:3 184:14
**Sorkin (19)**
3:8 7:7,9 32:5 49:16
50:10,14 74:8 75:20
86:15 90:25 91:9
134:21 159:13
160:9 182:3 189:19

189:23 192:10
**sorry (37)**
22:24 31:25 33:9,24
40:3 41:21 46:16,22
61:9 64:4 82:11,12
83:2,5 84:19 88:24
90:5,7 100:12
103:22 105:3
106:23 108:13
110:7 122:12 123:3
124:20 126:22
130:3 131:3 132:25
137:7 141:19
142:21 154:25
156:15 161:11
**sort (12)**
17:15 20:24 58:12
65:4 71:19 74:20
75:2 91:15 111:5
137:11 176:20
187:18
**sought (1)**
87:7
**sounds (3)**
42:20 157:17 181:18
**sources (20)**
109:22 113:23 115:9
115:10 116:6,14
117:6 126:5 129:19
130:4,7,9,11,14,16
130:19 131:11,13
131:14,15
**SOUTHERN (1)**
1:1
**Sparrow (2)**
50:22 61:17
**speak (5)**
10:25 55:4 99:10
115:3 143:21
**speaking (19)**
14:21 16:9 25:20
34:17 39:12 73:14
78:12 89:9 90:10,16
94:16 99:21 113:3
118:14 121:21
122:16 135:19
147:18 182:17
**specific (39)**
12:10 16:25 17:3,6
20:17 22:4 24:11
32:9,9 34:10,24
35:4,9 37:3 52:10
53:11 54:21 57:5,7
57:13 68:4 73:4
94:25 102:14,16
103:22 104:17

108:23 111:16
115:17 124:10
133:25 154:5
167:22 176:17
178:21 185:19
186:10,17
**specifically (81)**
10:23 17:2 21:9,22
22:23 24:15 27:2
28:23 37:19 45:19
46:5 47:19 51:8,22
52:4 60:21,23 61:13
62:10 73:25 76:11
79:7 81:8,13 93:6
95:3,6,12 96:5
97:12,21 98:19 99:8
100:24 101:22
102:5,10 104:20,24
105:10 106:17,24
107:14,19 109:5
110:12,15,16
114:15,19 115:6,13
115:23 120:6
121:10 125:9
128:12 133:4,18
134:20 135:18
141:11 142:15
146:18 148:2,16
152:17,23 153:9,13
168:24 169:4,19
170:3,11 182:14
183:24 184:12,17
186:6 188:15
**specificity (4)**
42:22 46:7 86:25
90:17
**specifics (14)**
13:25 14:6 49:8 62:25
104:16,19 107:3
115:21,25 148:22
148:25 156:7,22
185:21
**specified (1)**
168:17
**specify (1)**
57:25
**spectrum (1)**
25:6
**speculating (1)**
168:20
**spoke (1)**
79:17
**spring (1)**
175:8
**Square (1)**
5:4

**ss (1)**
193:3
**stack (1)**
160:12
**staged (1)**
76:21
**stages (1)**
12:5
**stalking (1)**
67:11
**stamp (2)**
31:22 191:6
**standalone (1)**
69:23
**start (6)**
7:24 15:4 17:22 94:2
177:4 183:7
**started (2)**
71:23 175:7
**starts (3)**
47:25 48:10 80:15
**State (3)**
2:12 193:3,7
**stated (7)**
77:21 80:16 87:14,22
88:20 184:7 187:5
**statement (2)**
119:12,14
**states (17)**
1:1 50:19 65:13,23
78:25 80:19 87:7,13
87:21 120:15 121:3
126:8 138:16,18
179:25 184:6
185:14
**status (2)**
162:17 174:15
**STEEN (1)**
6:3
**step (4)**
17:22 18:25 64:2,2
**stepped (1)**
76:17
**steps (1)**
24:16
**stick (1)**
25:9
**stood (1)**
180:14
**stop (1)**
91:7
**strategic (1)**
176:8
**Strauss (2)**
2:8 3:3
**stressed (1)**

65:25
**strike (14)**
36:9 47:10 105:24
    111:4 118:4 124:13
    140:3 144:12
    147:20 149:22
    154:11 161:14
    169:7 189:5
**structure (1)**
171:25
**struggling (1)**
76:23
**stuff (1)**
143:5
**subcommittee (13)**
16:19 23:4 35:11 36:8
    36:12,16,21 73:19
    89:16,23 151:8
    153:5,16
**subcommittee's (1)**
167:11
**subject (7)**
10:22 21:7 77:14
    92:18 123:7 171:16
    171:23
**submitted (2)**
18:5 181:12
**Subscribed (2)**
190:9 194:22
**subsequent (2)**
14:16 32:17
**subsidiary (4)**
59:15,20,23 60:6
**substance (1)**
39:9
**substantial (1)**
105:11
**substantially (1)**
15:8
**subsumes (1)**
36:15
**subtract (4)**
84:21,22 85:25 86:5
**subtracted (1)**
28:6
**successful (3)**
39:17,24 42:19
**successfully (1)**
185:16
**sufficient (4)**
80:22 140:7,13 181:7
**suggestion (1)**
86:8
**sum (1)**
84:6
**summarized (2)**

24:17 80:8
**summary (4)**
48:8 135:21 149:25
    151:20
**summer (1)**
175:8
**Sunday (4)**
179:3,4,5,14
**supplemental (1)**
166:4
**supported (1)**
97:9
**supposed (1)**
159:11
**sure (63)**
7:19 9:22 12:4,6
    13:15 19:5,23 21:16
    24:12 25:24 26:18
    28:4 30:25 33:11
    34:2,15 43:10,14,19
    44:20,22 55:25
    56:17,25 58:15
    61:11 66:15 69:2,10
    69:16,24 74:2 76:16
    82:14 83:3,11 90:15
    93:3 94:10 95:22
    103:23 105:23
    107:12 111:17
    117:10 119:9 120:3
    122:14 126:25
    137:9 139:23
    142:24 147:4
    148:21 149:22
    154:9 158:20
    160:25 175:11
    179:18 180:11
    181:22 184:22
**surprise (1)**
141:17
**sworn (5)**
7:3 160:5 190:9
    193:10 194:22

———————
**T**
**T (2)**
160:2 191:4
**table (5)**
37:4 38:7 39:6 42:24
    166:15
**tactical (1)**
76:25
**tactically (1)**
76:21
**tail (1)**
175:9
**take (28)**

8:5 12:4 17:21 18:15
    29:11 32:6 48:4
    66:13 67:14 76:6
    82:5 85:20 88:23
    91:3,21 98:21 114:9
    134:21 135:5 138:4
    141:8 159:13
    165:23 170:13
    171:2 178:19,22
    189:19
**taken (1)**
185:13
**takes (1)**
81:14
**talk (4)**
15:2 54:8 115:8 144:8
**talked (13)**
33:13 35:23 52:24
    74:23 75:5 78:9
    80:2 83:13 91:12
    93:20 94:8 113:17
    139:23
**talking (19)**
9:10,11 11:25 15:4,7
    19:15 38:14,22
    62:14,16 71:22
    72:17 75:2 78:3
    82:18 90:2 102:17
    118:6 165:3
**talks (1)**
111:20
**tangentially (1)**
114:17
**target (1)**
163:12
**task (2)**
17:6 171:16
**tasked (1)**
17:2
**taxes (3)**
84:8 95:25 96:4
**TBD (2)**
115:2,17
**team (1)**
110:13
**technically (1)**
72:10
**telephone (1)**
73:13
**telephonically (2)**
45:17,18
**tell (22)**
9:5 12:7 13:22 18:16
    40:11 64:12,14
    68:22 72:25 84:17
    92:24 98:5 102:12

141:12 150:11
151:14 154:19
167:19 171:3
178:24 179:2 180:7
**template (2)**
136:9,11
**tension (1)**
100:5
**term (5)**
54:9 58:16 79:25
    108:5 155:18
**terminated (1)**
14:2
**terms (59)**
14:2 16:5,12 17:10,11
    17:16 19:3 23:6
    24:10,16 25:6 49:9
    54:16 56:15 65:14
    66:19 67:23 72:9
    74:20 79:8 84:2
    94:18,24 98:10
    102:25 103:19
    112:4,25 113:21
    116:17 117:5,9,13
    117:19 123:25
    125:4 128:16
    129:21 130:22
    132:9,18 137:13
    140:24 141:4
    145:14 147:14,14
    148:4 154:7 155:14
    156:2 164:24
    165:13 169:5
    177:10 179:8,17
    184:22 185:23
**test (2)**
75:15,17
**testified (2)**
7:5 160:6
**testify (1)**
9:7
**testimony (10)**
8:13 9:3 11:4 30:5
    31:12 40:19 141:20
    141:25 193:9,12
**testing (1)**
74:6
**Texas (1)**
4:8
**thank (9)**
23:23 42:9 50:10 65:2
    75:20 85:22 189:23
    190:2,3
**Thanks (2)**
179:6,19
**theoretically (2)**

68:14 156:24
**they'd (1)**
168:5
**thing (2)**
44:23 131:10
**things (8)**
25:16 62:7 63:9 131:8
    133:20 139:14
    142:25 143:3
**think (72)**
17:18 30:10 34:4
    35:18 37:23 43:20
    47:20 49:10,11
    52:14,22 56:9 57:25
    58:4 73:4 79:4 84:2
    84:24 85:18 88:9 89:9
    90:11 93:15 97:2
    106:15 108:5
    110:19 111:3 112:8
    112:15 115:2
    116:15,17,20
    117:12,14,18,22,23
    118:14 119:11,20
    120:22 121:21
    123:13 134:13
    144:25 145:13
    146:7 147:2 148:7
    151:21,24 152:13
    152:17,22 155:19
    158:11 160:11
    163:5 168:10,15
    171:20 176:23
    179:10 180:11,17
    180:18 183:8
    187:12,18 189:8,20
**thinking (5)**
108:23,24 133:24
    134:11,12
**third (10)**
61:11 65:12 80:15
    87:4 137:18 138:2,6
    161:23 167:16
    168:7
**THOMAS (1)**
6:17
**thought (4)**
46:22 67:9 99:10
    159:4
**three (6)**
9:3,8 47:24 89:2
    115:15 175:3
**thumbs (4)**
35:9,9 39:14,15
**Thursday (2)**
1:13 2:4
**ties (1)**

188:21
**values (2)**
55:9 189:3
**variable (1)**
132:9
**variables (7)**
132:8,18,24 133:19
133:24 134:10,14
**various (1)**
36:4
**vendor (3)**
188:21 189:13,14
**Venn (1)**
177:19
**versus (3)**
149:9 165:2 189:10
**viability (1)**
153:17
**view (21)**
24:13 27:10,14,18
30:11,14,15 52:16
52:20 63:2 67:13
71:13 105:6 118:25
145:3,4 155:20
156:18 159:7
186:12 188:10
**visualize (1)**
158:16

_____
**W**
_____
**waive (3)**
166:9,12,17
**wake (2)**
72:9,13
**walk (2)**
163:3,6
**walking (1)**
118:16
**want (21)**
15:4 19:4 23:8 61:3
74:3,24 82:5 92:3
93:20,21 103:12
121:11 132:25
138:4 164:8 167:23
168:19,20 170:19
178:20 179:22
**wanted (6)**
61:20,21 71:18 90:15
157:4 168:7
**warp (1)**
73:3
**warranty (3)**
60:9 146:5 174:23
**wasn't (7)**
17:6,19 33:16 44:23
147:11 168:23

170:5
**way (19)**
35:19 38:3,4 39:13
50:3 52:23 75:19
94:21 97:5 117:11
154:6,7 158:15
163:21,24 167:5
189:5,7 193:17
**ways (2)**
111:20,21
**we're (12)**
31:20 39:4,14 50:2
75:2 117:2 118:6
136:22 137:14
158:3 166:14 176:9
**we've (6)**
52:23 56:25 86:23
90:25 108:4 130:19
**WEAVER (26)**
6:8 11:24 13:13 21:11
22:9 30:24 31:19,25
47:17 52:6 99:6
105:21 119:6
121:20 133:11,17
144:23 146:25
155:16 156:20
161:10,25 163:4
182:2,12 183:14
**Wednesday (5)**
72:4,11,19 73:8 92:12
**wee (3)**
41:11 42:9 43:5
**week (6)**
10:5 39:5 40:12 133:9
136:10 178:25
**weekend (1)**
182:24
**weekly (1)**
108:11
**weigh (1)**
104:3
**weighed (1)**
88:8
**Weil (12)**
4:3 10:19 15:14,15
16:16 23:15,20
73:15 87:9 89:16,23
118:19
**Weil's (1)**
183:4
**WEISS (1)**
5:10
**went (6)**
43:2 76:24 79:5 92:5
92:11 123:11
**weren't (9)**

26:10 45:14 71:11
113:2 172:18,18,20
173:9 181:6
**WHARTON (1)**
5:10
**WHEREOF (1)**
193:19
**WHITELEY (1)**
6:9
**wide (1)**
132:20
**willing (1)**
99:4
**win (1)**
157:4
**winddown (5)**
70:5 96:9 97:11,15
176:11
**window (1)**
168:9
**witness (21)**
6:5 7:3 8:4 18:13 23:9
23:23 27:6 75:22
91:20 135:2 164:9
190:2 191:17,20,23
192:2,5,9 193:9,13
193:19
**won (1)**
156:16
**wondering (4)**
35:7 37:17 68:3 137:9
**word (3)**
38:11 55:22 56:9
**words (6)**
8:14 39:9 57:12 78:24
119:5 162:18
**wordsmithing (1)**
102:21
**work (3)**
56:15 80:8 159:12
**worked (3)**
77:4,7 159:4
**working (5)**
14:10 39:4 84:23
85:18 110:13
**works (4)**
134:2 157:22,24
158:22
**world (1)**
149:16
**worthwhile (1)**
165:16
**wouldn't (16)**
13:24 14:12 35:19
63:3 67:5 68:12
70:4 80:9 96:16,24

100:9 110:21
116:23 155:17
159:9 172:10
**write (1)**
68:24

_____
**X**
_____
**x (4)**
1:2,8 191:4 192:6

_____
**Y**
_____
**year (2)**
175:8 186:15
**York (19)**
1:1,13,13 2:3,3,9,10
2:13 3:7,7 5:5,5,13
5:13 6:7,7 193:3,4,8

_____
**Z**
_____

_____
**0**
_____

_____
**1**
_____
**1 (15)**
8:21 72:5 76:3 82:20
93:7 109:11 122:2,4
124:8 170:22
171:12,14 172:8
174:12 177:7
**1/25/19 (1)**
137:2
**1:09 (1)**
159:16
**1:49 (1)**
160:3
**10 (1)**
149:5
**10:24 (1)**
92:12
**100 (1)**
100:9
**10006 (1)**
6:7
**10019 (1)**
5:13
**10036 (2)**
3:7 5:5
**11 (8)**
1:6 31:3 44:2 172:25
173:13,18,23 174:6
**11th (3)**
128:2 173:6 174:3
**12:30 (1)**
179:21
**120 (5)**
83:21 84:15 85:24

123:3 148:14
**1285 (1)**
5:12
**12th (1)**
128:4
**13 (3)**
84:10,16 85:25
**13-week (1)**
108:11
**134 (1)**
192:3
**139 (2)**
98:24,25
**14 (18)**
91:18,19,23 92:4 95:3
109:10 111:20
113:8,23 120:10
121:25 124:9
125:11 126:16
127:11 130:20
191:24,24
**14-January (1)**
118:6
**14th (7)**
10:2 15:10 40:12,22
41:9 71:24,25
**153 (3)**
83:14 84:4 86:22
**154924 (1)**
1:23
**15th (3)**
42:17 72:2,18
**16 (2)**
43:6 92:12
**166 (1)**
100:3
**16th (13)**
41:12 42:10,12,17
71:20 72:19 75:3
76:3 111:18 124:20
125:15 153:22
154:21
**17 (4)**
84:9,16 85:25 118:6
**170 (1)**
191:8
**178 (1)**
191:9
**17th (15)**
10:2 15:12 33:13,21
34:23 36:2 37:6,19
38:17,24 39:16
40:13,23 41:9 42:17
**18 (14)**
13:2,19 134:25 135:5
135:9,18 136:6,7

143:25 144:2
160:11 191:18
192:3,3
**18-23538 (1)**
1:6
**18th (2)**
124:18,20
**19 (3)**
84:8,16 85:24

——————— 2 ———————
**2 (33)**
8:21 18:11,12,15
19:24,25,25 20:6,16
20:25 22:20,22 23:6
24:8,14 25:2 26:25
32:7 61:5 62:3
77:20 120:14
135:23 136:14,21
160:13,13 171:25
172:4,9,10 191:18
191:18
**200 (1)**
4:7
**2018 (9)**
12:12 14:25 171:8
172:25 173:13,23
174:6,22 190:11
**2019 (10)**
1:13 2:4 66:3,10
106:21 178:12,18
191:11 193:21
194:23
**22 (8)**
31:21,22 45:3,22
47:12 61:4 65:11
191:6
**23 (5)**
170:14,17 172:24
177:8 191:8
**24 (6)**
178:10,16,16 179:23
184:5 191:9
**28 (1)**
170:22
**28th (33)**
18:2,4,21 20:9 30:3
32:17 33:4,12,20
34:22 35:25 37:6,18
38:16,19 42:11 43:4
46:12 47:4,16 51:3
51:7,14,21 61:15
62:2,11,15,17,22
179:9 181:12,20

——————— 3 ———————

**3 (13)**
8:20,21 38:24 83:13
113:22,22 114:10
114:14 115:8
116:23 117:4 123:2
135:18
**3:30 (1)**
45:7
**30 (2)**
46:2 141:21
**30(b)(6) (3)**
1:11 2:6 8:24
**30th (4)**
45:6,20 49:5 65:20
**31 (3)**
1:13 2:4 191:6
**31st (1)**
193:20
**335 (5)**
187:2,5,10,11,24
**39 (8)**
84:10,17,18,19,21,22
84:24 85:25

——————— 4 ———————
**4 (10)**
5:4 84:8,16 85:24
136:24 137:5,11,21
138:8,14
**40 (6)**
8:2,3,20 9:9 191:15
191:15
**45 (1)**
85:17
**49 (21)**
75:13,21,25,25 76:11
77:12,20 80:14
81:24 82:20 83:14
84:15 87:5 88:12
119:10,15,21
120:13,13 191:21
191:21
**4th (1)**
179:11

——————— 5 ———————
**5 (3)**
50:19 91:8 174:13
**503(b)(9) (21)**
29:5,10,13,16,20
93:21 94:9 97:23
98:18 99:14,20
100:4,18 101:2,17
101:20 102:6 103:3
103:9 148:11,19
**58 (1)**

170:22

——————— 6 ———————
**6 (6)**
85:17 178:12,18
179:14 181:10
191:11
**60 (3)**
167:15 168:10 170:9
**60-day (1)**
168:8
**62 (1)**
112:15
**6th (4)**
178:25 179:21 180:13
180:23

——————— 7 ———————
**7 (6)**
125:23 126:15,25
127:2,11 192:10
**75 (2)**
70:2 191:21
**75201 (1)**
4:8
**79 (1)**
110:8

——————— 8 ———————
**8 (1)**
191:15
**8250 (1)**
158:9
**87 (3)**
79:2,4 119:25
**885 (1)**
132:22
**8th (21)**
106:5,7,11 125:6,14
127:4,5,18 128:11
131:13 132:13
140:6,12 161:9,17
161:24 162:7,19,22
162:24 163:13

——————— 9 ———————
**91 (1)**
191:24

JX 096-72